UNITED STATES DISTRICT COURT
SOUTHERIN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re BP plc Securities Litigation | No. 4:10-md-02185 <br><br> Honorable Keith P. Ellison |

**NEW YORK AND OHIO'S SUR-REPLY IN FURTHER SUPPORT OF THEIR MOTION TO CONSOLIDATE RELATED ACTIONS, FOR APPOINTMENT AS CO-LEAD PLAINTIFF, AND FOR APPROVAL OF CHOICE OF CO-LEAD COUNSEL, AND IN RESPONSE TO THE NEW ARGUMENTS RAISED IN THE LUDLOW PLAINTIFFS' REPLY MEMORANDUM**

**I.      INTRODUCTION**

New York and Ohio submit this response to the extraneous declarations filed in connection with the Ludlow Plaintiffs' reply brief (Dkt. #49) ("Ludlow Reply Brief"). More specifically, the Ludlow Reply Brief includes, and heavily relies upon, two additional expert declarations as well as a joint declaration from its members (the "Ludlow Declaration"). *Each of these declarations offers new arguments or information not addressed in the moving or opposition briefs*.[1] In particular, the Silver and Nettesheim declarations unfairly criticize the longer alleged class period – notice of which was properly made to the putative class *three weeks* before the Lead Plaintiff motion[2] – by claiming such a class period is inconsistent with events surrounding the Deepwater Horizon oil spill. The theory of the longer class period is not so narrow. Rather, New York and Ohio submit that BP plc's ("BP" or the "Company") reckless disregard for health, safety and the environment, and its false and misleading disclosure about those issues, is and has been systemic throughout BP's operations for five years. Both the oil spill and BP's lack of preparedness to respond to it, are the manifestations of this behavior.

Importantly, the Ludlow Plaintiffs' proposed class period of March 4, 2009 through April 20, 2010 is fundamentally flawed because, for example, it abruptly concludes when the Deepwater Horizon exploded. The Ludlow Plaintiffs' framing of the class period is highly questionable because it will allow Defendants to argue that BP's ADRs did not decline in a statistically

---

[1] The Silver Declaration purports to rely on academic studies by Professor James Cox of Duke University to support his contentions. However, submitted herewith is a Declaration from Professor Cox explaining why Professor Silver's conclusions about his data are incorrect.

[2] The Ludlow Plaintiffs improperly imply that New York and Ohio have attempted to manipulate the class period by filing the *Oklahoma Police* complaint the day before the lead plaintiff deadline in order to claim larger losses. Ludlow Reply at 7-8. This is flatly wrong. The *McClurg* action was filed *three weeks* before the *Oklahoma Police* action and counsel for New York and Ohio had nothing to do with the *McClurg* filing. *McClurg* only noticed ADR investors and the *Oklahoma Police* action was filed to notice ordinary share purchasers for the same period. Moreover, on July 9, 2010, David Humphries filed an ERISA action against BP alleging the same five year class period. *See Humphries v. BP Corp N.A., Inc.*, No. 10-cv-04300 (S.D. Tex.). Once again, counsel for New York and Ohio had nothing to do with the filing of the *Humphries* ERISA action. Thus, the Ludlow Plaintiffs' claims of manipulation by counsel are spurious.

1

significant manner in response to the April 20, 2010 explosion by falling $0.39 per share (just 0.65%) in reaction. In fact, the bulk of the stock drop that precipitated this litigation occurred only after investors learned that BP had lied about its commitment to safety and was wholly unprepared to respond to the spill, causing the amount of oil spilled to be far greater than what the BP defendants represented. In other words, by ignoring the tail of the class period and BP's anemic response to the spill, the Ludlow Plaintiffs fail to include the market's reaction and corresponding stock drops, and impede investors' ability to recover losses for even the Ludlow Plaintiffs' more narrowly defined theory of the case. A graph of BP's ADR decline during this period is annexed as Chart 1 to the Declaration of Adam Werner ("Werner Decl."), which is filed herewith.

Indeed, for the sake of the lead plaintiff determination, it is *completely irrelevant* when the Class Period begins. In fact, utilizing any of the class period beginning dates previously asserted – *i.e.,* March 4, 2009 (*Ludlow* and *Johnson Investment Council*); April 16, 2009 (*Yeun*); February 27, 2008 (*Greenfield*); or June 30, 2005 (*McClurg* and *Oklahoma Police*) – New York and Ohio have vastly larger ADR losses than the Ludlow Plaintiffs when the Class Period <u>concludes</u> on June 1, 2010. Using the June 1, 2010 end date, the movants' losses in ADRs in the various alleged class periods are as follows:

**BP, PLC**
**Losses in Sponsored ADR (055622104)**

| Class Period | New York and Ohio | | Ludlow Plaintiffs | |
|---|---|---|---|---|
| | FIFO (Loss)/Profit | LIFO (Loss)/Profit | FIFO (Loss)/Profit | LIFO (Loss)/Profit |
| 04/16/09 - 06/01/10 | ($2,969,317) | ($2,407,300) | ($163,202) | ($163,202) |
| 03/04/09 - 06/01/10 | ($3,699,994) | ($1,872,806) | ($163,202) | ($163,202) |
| 02/27/08 - 06/01/10 | ($8,956,502) | ($3,655,203) | ($163,202) | ($163,202) |
| 06/30/05 - 06/01/10 | ($21,901,635) | ($20,642,328) | ($163,202) | ($163,202) |

*See* Werner Decl. ¶¶18-19. Thus, pursuant to the PSLRA, regardless of when the class period begins, using the proper ending date of June 1, 2010, as opposed to the date advanced by the Ludlow Plaintiffs alone, it is clear that New York and Ohio have the greatest interest in the relief sought by the class and should be appointed as Lead Plaintiff.

## II. ARGUMENT

### A. New York and Ohio Have the Largest Financial Interest In the Legally Defensible Class Periods

#### 1. It is More Than Plausible that the Class Period Should Conclude No Earlier Than June 1, 2010

The Ludlow Plaintiffs argue that the Ludlow Period is the *only* plausible class period and that New York and Ohio are trying to manipulate it to artificially increase their own losses. Ludlow Reply at 6.[3] This argument is unsupportable.

The Ludlow Plaintiffs devote considerable energy in arguing that March 4, 2009 is the appropriate *start* date for the class period. The Ludlow Plaintiffs, however, have completely failed to support why the class period must *end* on April 20, 2010. Instead, they have merely submitted a declaration opining that: (i) the average length of a class period in a securities class action is between 12 and 16 months, and (ii) that a 59-month class period is "relatively uncommon." *See* Decl. of Prof. Charles M. Silver at 7. Yet, neither of these *general* conclusions has any bearing on the *specific* facts alleged in *this* litigation. *See* Decl. of Prof. James D. Cox at ¶¶8, 15. Professor

---

[3] The Ludlow Plaintiffs cite to *In re Centerline Holding Co. Sec. Litig.*, No. 08 Civ. 505 (SAS), 2008 U.S. Dist. LEXIS 36406 (S.D.N.Y. May 5, 2008) for the proposition that a court should only use a class period that is "plausible" in determining which lead plaintiff movant has the largest financial interest. Ludlow Reply at 4. No court within this Circuit has *ever* adopted a so-called "plausibility" standard. In contrast, one court, *Plumbers & Pipefitters Local 562 Pension Fund v. MGIC Inv. Corp.*, 256 F.R.D. 620, 625 (E.D. Wis. 2009), rejected the plausibility standard and adopted a "not obviously frivolous" standard. *Id.* Aside from *Centerline*, the Ludlow Plaintiffs have failed to cite any other court in the 15 year history of the PSLRA that has adopted a "plausibility" standard. However, whichever standard is used, it has been met by New York and Ohio with respect to the asserted five-year class period.

3

Cox (whose data serves the basis on which Professor Silver forms most of his conclusions) makes clear that:

- o  The average length of securities class action class periods is irrelevant to whether the length of a specific class action's class period is appropriate – indeed, "three of the four largest securities class action settlements in U.S. history involved cases with class periods averaging over 42 months in length." Cox Decl. at ¶¶9-10.

- o  Concerns over dilution of claims in longer class periods are adequately addressed by plans of allocation, which "can (and should) take into account the relative strengths of the claims of purchasers who bought their shares at different points in the class period. Thus, the class members with the strongest claims will generally recover much more per share than class members with weaker claims." *Id.* at ¶¶9-13.

- o  Where plaintiffs purchase the same type of security and allege the same legal claims, creating two classes or sub-classes is unnecessary and inefficient. *Id.* at ¶¶16-17.

Similarly, Ms. Nettesheim has "provide[d] a timeline of key news and information pertaining to BP's operations in the Gulf of Mexico and the Deepwater Horizon explosion[.]" Supp. Decl. of Jane Nettesheim at 1.[4] However, Ms. Nettesheim ignores *every* disclosure made by or about BP between May 1, 2010 and June 1, 2010 in her analysis. *Id.*, Ex. 2 at 2. This glaring omission is especially noticeable since *every* securities class action complaint – except for *Ludlow* – ends its class period in either May or June 2010. *See Greenfield* (May 12, 2010); *Yeun* (May 21, 2010); *Johnson Investment Council* (June 1, 2010); *McClurg* (same); *Oklahoma Police* (same). As set forth above, under any of these end dates, New York and Ohio have considerably larger losses in BP ADRs than the Ludlow Plaintiffs.

Indeed, it is irresponsible for the Ludlow Plaintiffs to suggest that the class period should end on April 20, 2010. Defendants made far too many false and misleading statements following the April 20, 2010 explosion to warrant such an end date. *See e.g.*, *Oklahoma Police* Compl. ¶¶69-82. For example, in the days and weeks following the explosion, the *Oklahoma Police* Complaint

---

[4] Ms. Nettesheim's original declaration was filed as an exhibit in support of the Ludlow Plaintiff's opposition brief (Dkt. #41) and simply calculated the parties' losses during the Ludlow Period and nothing more.

4

alleges that BP intentionally understated the oil flow rate in an attempt to diminish the perceived impact of the spill. *See id.* ¶¶70-71.

Moreover, several additional disclosures were made following the April 20, 2010 explosion that revealed the full extent of BP's lack of commitment to health, safety and the environment. For instance, on April 29, 2010, when a BP representative suggested the oil spill would range from 1,000 to 5,000 barrels per day, BP's ADRs fell $4.78 per share – or 8.2% – in response to this news. *See* Werner Decl. ¶13. Then, on May 10, 2010, BP disclosed the failure of its first containment effort. *Oklahoma Police* Compl. ¶76. On May 16, 2010, BP announced a new strategy of containing the flow of oil by inserting a tube into the well to siphon off a large portion of the leaking oil. *Id.* However, on May 19, 2010, BP disclosed that this effort had also failed and the Company's ADRs tumbled even lower. *Id.* On May 26, 2010, BP began its so-called "top kill" efforts. *Id.* ¶80. Yet, just three days later, BP revealed that the "top kill" procedure had failed.

Finally, on June 1, 2010, which was the next trading day following the failure of the "top kill" procedure, U.S. Attorney General Eric Holder announced that the U.S. Department of Justice opened formal criminal and civil probes into BP in response to the oil spill and the Company's false assurances that it was prepared to respond in the event of such a disaster.[5] With these disclosures, the Company's stock price plummeted by $6.43 per share (or 15%) on extremely heavy volume (130 million shares). *Id*. ¶82; *see also* Werner Decl. ¶14.[6] Excluding such a profound stock drop, of more than $23.50 per share, or 40%, from the time of the spill through the failed clean up

---

[5] Indeed, facts are still being released regarding BP's fraudulent conduct. For example, on November 9, 2010, former BP CEO Tony Hayward admitted in an interview that BP was unprepared for the Deepwater Horizon spill, thus fortifying the allegations that the statements made between April and June, 2010 regarding BP's ability to handle the spill were false and misleading (yet this period is not included in the Ludlow Plaintiffs' proposed class period).

[6] Even the *Ludlow* complaint relies on several of these post-April 20, 2010 disclosures to demonstrate BP's wrongful conduct. *See, e.g., Ludlow* Compl. ¶¶6 (noting disclosures on May 3, 2010), 12 (discussing announcements in "mid-May"), 17 (arguing that "[s]ince April 20, BP has lost 20% of its market capitalization as its shares have plummeted"), 172-176 (citing disclosures on April 30, 2010 and May 8-10, 2010), 183 (citing news story from April 29, 2010).

5

responses, is antithetical to the class' interest and calls into question the Ludlow Plaintiffs' adequacy to represent the class.

Similarly, concluding the class period on April 20, 2010 could create significant loss causation problems for the class. More specifically, in order to allege loss causation, a plaintiff must allege that the curative disclosure caused a "statistically significant" decline in the company's stock price. *In re Remec Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1266 (S.D. Cal. 2010) (citing *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342-347 (2005)). If the class period concludes on April 20, 2010, Defendants will contend that the class cannot demonstrate loss causation because the $0.39 drop on April 21, the first trading day after disclosure of the Deepwater Horizon explosion, was not statistically significant.[7] Thus, April 20, 2010 is not an appropriate date on which to end the class period.

Accordingly, the most plausible ending date will be no earlier than June 1, 2010. The significance of when to end the class period is clearly not lost on the Ludlow Plaintiffs. They themselves noted in their opposition, *see* Ludlow Opposition at 18 n5, that one of the Ohio funds, Ohio Public Employees Retirement System, purchased large amounts of ADRs in May 2010, while BP was still misleading investors as to the size and scope of the spill. By conceding that June 1 is an appropriate ending date, the Ludlow Plaintiffs would have to concede that New York and Ohio have the largest financial interest in the relief sought by the class. Thus, the Ludlow Plaintiffs are taking positions to advance their own interests and that of their counsel in seeking a leadership position for a carve out of the class period that is not logical, and by doing so places the Ludlow Plaintiffs' interests ahead of the interests of the class as a whole. *See Munoz v. Orr*, 200 F.3d 291 (5th Cir. 2000) (recognizing that "[i]t is well established that a class representative cannot have interests adverse to the class") (citation omitted).

---

[7] This is not to say Defendants' argument is correct. Rather, it is only pointing out an additional risk that the class would be exposed to if the Ludlow Plaintiffs are appointed as Lead Plaintiffs.

### 2. A Class Period Longer than that Advanced by the Ludlow Plaintiffs is Not Only Plausible, but Preferable

The Ludlow Plaintiffs describe the theory of the case as one in which BP misled investors about the safety and risk management procedures of its deep-sea drilling operations in the Gulf and, particularly, the Macondo well. However, the theory underpinning a longer, five-year class period is based on BP's misleading of investors about the safety and integrity of its operations worldwide, up to and including BP's failed attempts to contain the Gulf oil spill. The Ludlow Plaintiffs' faulty assumption that a longer class period is implausible is belied by the facts currently available (even before discovery has commenced).

Beginning in 2005, Defendants made numerous statements claiming that safety was BP's "top priority" and assuring investors that the Company was conducting its operations in a manner that would avoid unjustified risk of catastrophic failures. By way of example, BP vowed that it was committed to safety and integrity of operations in its Code of Conduct that was issued in 2005 and has been posted continuously on its website ever since. Its assurances include the following:

- o At BP our aspirations are – no accidents, no harm to people and no damage to the environment. We are committed to the protection of the natural environment, to the safety of the communities in which we operate, and to the health, safety and security of our people. Everyone who works for BP, everywhere, has a responsibility for getting HSSE [Health, Safety, Security and the Environment] right.
- o BP is committed to providing all BP employees – and those of other companies working on our premises – with a safe and secure work environment where no one is subject to unnecessary risk.
- o We recognize that safe operations depend not only on technically sound plant and equipment, but also on competent people and an active HSSE culture. No activity is so important that it cannot be done safely.

In reality, from June 30, 2005 through June 1, 2010, BP's conduct showed a reckless disregard for safety. The Deepwater Horizon's explosion was a manifestation of this reckless disregard for HSSE principles; however, any number of other examples exists of such reckless

7

indifference for maintaining safe operations. As set forth below, those examples span the length of the longest class period alleged and systemically plagued BP's operations.

- o From 2000 to 2010, the Coast Guard issued six enforcement warnings and handed down one civil penalty and a notice of violation to the Deepwater Horizon. (Associated Press, *Deepwater Horizon Rig Had History of Spills, Fires Before Big Gulf of Mexico Oil Spill,* April 30, 2010).

- o In 2004, BP ordered Transocean to replace one of the two sets of blind shear rams on the Deepwater Horizon's blowout preventer with a test ram, in order to save money during drill operations, leaving no backup. (New York Times, *Regulators Failed to Address Risks in Oil Rig Fail-Safe Device*, June 20, 2010).

- o At the start of the class period, June 30, 2005, following the explosion at the BP Texas City Refinery, which killed 15 and injured 180, the EPA was conducting a criminal investigation of BP and OSHA placed BP in their "Enhanced Enforcement Program for Employers Who are Indifferent to Their Obligations." (U.S. Chemical Safety and Hazard Investigation Board, Investigation Report: Refinery Explosion and Fire at 238 (March 2007)). On information and belief, OSHA kept BP in the program through 2010 because of continuing violations and fatal incidents at Texas City and other worksites.

- o BP failed to meet the conditions of a 2007 criminal plea agreement for violations of the Clean Water Act following a 210,000 gallon oil spill on a BP-operated pipeline in Alaska in 2006, for which the company was fined $24 million and put on probation. In 2010, BP's Alaska probation officer petitioned to have the company's probation revoked in connection with a slew of leaks and explosions on BP's pipelines in northern Alaska in the summer and fall of 2009. (Decl. in Support of Petition for Summons for Offender Under Probation at 1-3, *United States v. BP Exploration (Alaska), Inc*., 07-cr-00125 (D. Alaska, Nov. 17, 2010)).

- o On April 25, 2006, OSHA fined BP Products North America, Inc. more than $2.4 million for unsafe operations at its Ohio refinery, citing 32 instances of willful violations and five serious violations relating to the safety of its operations.

- o On August 31, 2006, an Alaska Legislator wrote a largely unnoticed letter to BP CEO Lord John Browne regarding the BP Prudhoe Bay spill, claiming that BP managers were dishonest and misleading in testimony and calling for "a significant change in attitude, actions, accountability and direction." (Letter from John Harris to Lord Browne re: North Slope, August 31, 2006).

- o On August 15, 2008, internal BP emails, non-public at the time, raised concerns about serious safety lapses aboard the BP drilling rig Atlantis involving well design procedures. BP manager Barry Duff wrote that a lack of properly reviewed and approved designs could result in "catastrophic operating errors" and "currently there are hundreds if not thousands of Subsea documents that have never been finalized," which Duff referred to as "fundamentally wrong." Kenneth Abbott, a BP employee, continued to raise the same concerns from November 2008 through January 2009, but was fired by BP in February 2009. In April 2010, Stanley Sporkin, BP's Ombudsman,

confirmed that the allegations had been substantiated. Pls.' Am. Compl. and Req. for Injunctive Relief at 9-17, *United States v. BP P.L.C.*, 09-cv-01193 (S.D. Tex. Sept. 10, 2010)

o On June 22, 2009, other non-public BP internal emails raised concerns about the use of metal casings on the Deepwater Horizon, saying that a "worst-case scenario" could arise as a result. (The New York Times, Documents Show Early Worries About Safety of Rig, May 29, 2010). A September 2009 internal audit of the Deepwater Horizon by BP revealed an "excessive" number of overdue maintenance items ("over 390 items amounting to 3,545 man-hours") and that several key parts of the rig's blow-out preventer had not been serviced or replaced per requirements set by the American Petroleum Institute and the device's manufacturer. (BP Audit of Deepwater Horizon, September 2009, quoted in BP Deepwater Horizon Accident Investigation Report, September 8, 2010, at Appendix Y).

o In numerous non-public letters between 2005 to 2009, which were first released in September 2010, British regulatory officials notified BP of serious safety concerns with their rig operations in the North Sea. In letters relating to their Magnus platform, officials said they had found confusion among workers regarding who would order a well shut-off in the event of a blow-out. In another letter, officials wrote that BP failed to provide adequate safety training to North Sea staff and to conduct adequate oil spill response exercises. In another letter, regulators described "evidence of a culture among your contractors . . . of working outside of procedures, permit or permit conditions. In another letter, the HSE criticized BP procedures for investigating safety incidents and from learning from past incidents and investigations. (Reuters, *BP North Sea Rig Lacked Procedures on Blow-outs*, September 15, 2010).

o In October 2009, OSHA revealed that it had issued 271 notifications to BP for failing to correct hazards at the Texas City refinery over the four-year period following the explosion in March 2005. In addition, OSHA identified 439 "willful and egregious" violations of industry-accepted safety controls at the refinery." (The New York Times, *BP Faced Record Fine for '05 Refinery Explosion*, October 30, 2009).

o In May 2010 it was revealed that between June 2007 and February 2010, BP received 862 citations for OSHA violations at its refineries in Texas City and Toledo, Ohio, of which 760 were classified as "egregious willful" and 69 were classified as "willful." These willful violations accounted for over 97 percent of all willful violations found by OSHA in U.S. refineries during the same period – as BP's competitors' combined citations were 22. (Center for Public Integrity, *OSHA Says BP Has "Systemic Safety Problem"*, May 16, 2010).

These examples are in no way exhaustive, yet in combination with the Ludlow Plaintiffs' failure to include BP's inadequate response to the oil spill in their class period, the events set forth above demonstrate why a five year class period is certainly "plausible." They demonstrate the plausibility of a stock fraud action stemming from BP's systemic disregard for HSSE throughout its

9

operations and for the entirety of the five year class period. Accordingly, a five year class period easily satisfies any plausibility test.

### B. The Ludlow Declaration is Misleading and Fails to Establish Cohesiveness

The Ludlow Plaintiffs also improperly include the Ludlow Declaration in an attempt to illustrate the group's cohesiveness. Ludlow Reply at 8-9. However, the Ludlow Declaration is a red-herring because it was entered into *after* the Ludlow Plaintiffs had already moved for appointment as Lead Plaintiff. More specifically, the Ludlow Declaration was executed between November 2 and 5, 2010, while the lead plaintiff deadline in this action was July 22, 2010 – *i.e.*, three months *prior* to the signing of the Ludlow Declaration.

The Ludlow Declaration is also misleading because it fails to explain how the group was formed or whether it had any pre-litigation relationship. This is not surprising in light of the fact that their counsel had them sign forms stating that "counsel may exercise its discretion in determining whether to move on my behalf for appointment as lead plaintiff." Dkt. 22, Ex. 3. In contrast, New York and Ohio discussed their joint prosecution of this action prior to agreeing to work together and submitted the declaration with their initial lead plaintiff motion. See Dkt. #23, Ex. C.

### III. CONCLUSION

For all of the above reasons, New York and Ohio respectfully request that the Court appoint them as Lead Plaintiff and approve their selection of Co-Lead Counsel.

DATED: November 19, 2010  Respectfully submitted,

**YETTER COLEMAN LLP**

/s/ R. Paul Yetter
R. Paul Yetter (Bar No. 22154200)
Autry W. Ross (Bar No. 17283950)
909 Fannin, Suite 3600
Houston, TX 77010
Tel: (713) 632-8000
Fax: (713) 632-8002

*Counsel for New York and Ohio and Proposed Liaison Counsel for the Class*

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Steven J. Toll (admitted *pro hac vice*)
Daniel S. Sommers (admitted *pro hac vice*)
Julie G. Reiser (admitted *pro hac vice*)
Matthew K. Handley (admitted *pro hac vice*)
Joshua M. Kolsky (admitted *pro hac vice*)
1100 New York Avenue N.W.
West Tower, Suite 500
Washington, D.C. 20005-3964
Tel: (202) 408-4600
Fax: (202) 408-4699

**BERMAN DEVALERIO**
Jeffrey C. Block (admitted *pro hac vice*)
Jason M. Leviton (admitted *pro hac vice*)
One Liberty Square
Boston, MA 02109
Tel: (617) 542-8300
Fax: (617) 542-1194
-   *and* -
Joseph J. Tabacco, Jr.
Matthew D. Pearson (admitted *pro hac vice*)
One California Street, Suite 900
San Francisco, CA 94111
Tel: (415) 433-3200
Fax: (415) 433-6382


*Counsel for New York and Ohio and*
*Proposed Co-Lead Counsel for the Class*