prevent or control those conditions immediately. Never assume that someone else will report a risk or concern.

- Seek advice and help if: – You are ever unclear about your HSSE obligations. – You have a concern about a potential or actual breach of HSSE law or a BP HSSE requirement.

**Never**

- Undertake work when your performance is impaired by alcohol or other drugs, legal or illegal, prescribed or otherwise.

- Possess, use or transfer illegal drugs or other substances on company premises.

- Use threats, intimidation or other violence at work, or bring weapons – including those carried for sporting purposes – onto company premises

Wherever we operate, we will strive to minimize any damage to the environment arising from our activities.

407. The statements referenced above were false and misleading because among other reasons, (1) BP was unprepared for a catastrophic disaster in the Gulf; (2) BP lacked sufficient internal controls and risk management to insure environmental stewardship; and (3) its drilling processes were done safely to avoid environmental disasters.

## J. 2009 SUSTAINABILITY REVIEW

408. On April 15, 2010, BP issued its online 2009 Sustainability Review. BP stated, in relevant part:

- **Our Values**

BP is progressive, responsible, innovative and performance driven.

- **Responsible**

We are committed to the safety and development of our people and the communities and societies in which we operate. We aim for no accidents, no harm to people and no damage to the environment.

- **Performance Driven**

We deliver on our promises through continuous improvement and safe, reliable operations.

These values guide us in the conduct of our business. In all our business we expect our people to meet high ethical standards and to act in accordance with our code of conduct.

- **Group Chief Executive's Review**

*Question*: What progress has BP made on safety during 2009?

*Answer*: **Safety is fundamental to our success as a company and 2009 was important because of the progress we made in implementing our operating management system (OMS).** The OMS contains rigorous and tested processes for reducing risks and driving continuous improvement. I see it as the foundation for a safe, responsible and high-performing BP. Having been initially introduced at eight sites in 2008, the OMS rollout extended to 70 sites by the end of 2009, including all our operated refineries and petrochemicals plants. This means implementation is 80% complete. I'm proud that our injury rates have come down around 75% in the past decade.

- **How We Operate**

*Risk Management*

Group risks – the significant risks that could affect the achievement of our objectives – have responses designed to deal with them in the most appropriate way. These include our operating management system for delivery of safe, responsible and reliable operating activity, and group standards, which set out processes for other major areas such as investment decisions or fraud and misconduct reporting.

The group chief executive's (GCE) senior team – known as the executive team – is supported by sub-committees to be responsible for and monitor specific group risks. These include the group operations risk committee, the group financial risk committee and the group people committee. The GCE also conducts regular performance reviews with the business segments and key functions to monitor performance and the management of risk and to intervene if necessary.

*People Management*

People management is based on performance objectives through which individuals are accountable for delivering specific elements of the group plan within agreed boundaries.

Clear lines of communication exist for the provision of relevant information to help ensure all people are clear on what is expected of them and are up to do their job. Employees can raise concerns with line managers, human resources, legal or compliance teams or through OpenTalk, and independent confidential helpline.

- **Diverse and affordable energy**

*Working at the fronteirs*
BP works at the geographical and technological frontiers of the energy industry. We have decades of experience of using cutting-edge skills and technology to undertake complex oil and gas projects in many of the world's most technically challenging and hostile environments, such as the Arctic and **ultra deepwater**. Recent innovations include new technologies to increase recovery from mature oil fields and advanced seismic techniques that create highly detailed images of reservoir formations miles below the surface. One of our recent finds, the Tiber field in the **Gulf of Mexico**, was made by drilling a well 31,000 feet into the earth in water 4,000 feet deep.

*Deepwater exploration*

BP has substantial deepwater assets around the world, including the **Gulf of Mexico**, Angola and Brazil (pending closure).

- **Safe And Responsible Energy**

*Safety, People and Performance*
Safety, people and performance are BP's top priorities.

**Our commitment to safe and reliable operations starts with the group chief executive and leadership: a commitment that filters down through the organization and is regularly communicated to all staff.**

All fatalities, other major incidents and many that had the potential to become major incidents are discussed by the group operations risk committee, chaired by the group chief executive. We undertake incident investigations with the aim of learning as much as possible and taking action to prevent recurrence.

We constantly seek to improve our personal, process and transportation safety performance through the use of established processes, ongoing capability development and knowledge sharing with other organizations.

*Personal Safety and Health*

Creating a safe and healthy working environment is essential for our success.

- **Operating Skills and Knowledge**

Our safety and operations learning framework enhances the capability of our staff at all levels to deliver safe, reliable, responsible and efficient operations. Our Operations Academy helps senior operations leaders learn to manage operations in a way that eliminates defects and drives continuous improvement, not only taking actions themselves, but empowering front-line employees to be agents of change. Executive Operations sessions support the executive team and senior business leaders in the development of operations capability specific to their role.

**"I am extremely proud of BP's 2009 safety performance – it reflects a sustained effort across all our operations over many years." – Tony Hayward**

- **Managing Our Impact**

We aim to minimize our environmental impact by taking a systematic and disciplined approach to operations, using sophisticated risk assessment techniques that directly inform our business plans.

- **Our People**

People are fundamental to our progress in BP. Our performance and our safety record depend on our employees' skill and commitment. We therefore organize, manage and reward employees in ways designed to achieve the best possible performance, today and for the long term.

- **Compliance and Ethics**

BP's reputation, and therefore its future, depends on every BP employee, everywhere, every day, taking personal responsibility for ethical and compliant business conduct. It is a fundamental BP commitment to comply with all applicable legal requirements and adhere to high ethical standards.

409. The above referenced statements were materially false and misleading when made because Defendants failed to disclose the following facts of which they were aware or were

reckless in not being aware of: (1) BP had failed to implement adequate safety procedures; (2) BP conducted its operations in the Gulf without any legitimate oil spill response plan; (3) BP understated its exposure from drilling operations in the Gulf; (4) BP lacked adequate internal and safety controls; (5) BP's Gulf Operations had failed to implement BP's OMS in any robust manner and the individuals responsible for its implementation had been terminated or moved outside of Gulf Operations; and (6) BP's highest officers had knowledge that its Gulf Operations had caused oil spills in 2008 and two of its rigs (the Deepwater Horizon and the Atlantis) had reported operational safety problems, which would have been reported to GORC and, as such, put Defendants on notice of the inadequacy of their safety processes in the Gulf of Mexico.

## K. 2009 SUSTAINABILITY REPORT

410. On April 15, 2010, BP issued its 2009 Sustainability Report. BP stated, in relevant part:

- **A Systematic Approach**

> **BP constantly seeks to improve its safety performance through the procedures, processes and training programmes that we implement in pursuit of our goal of no accidents, no harm to people and no damage to the environment.**
>
> Our commitment to safe, reliable and responsible operations starts with the group chief executive Tony Hayward and his leadership team: a commitment that filters down through the organization and is regularly communicated to all staff.
>
> Safety performance is a regular focus of the group chief executive's formal communications such as BP's quarterly results and in less formal communications such as his regular townhalls with BP staff. BP's leadership has continued to reinforce the importance of safety when undertaking regular site visits to BP facilities around the world and from all parts of the business.
>
> **"I am extremely proud of BP's 2009 safety performance – it reflects a sustained effort across all our operations over many years." – Tony Hayward**

*Promoting Safe Operations*

We are carrying forward our efforts on process safety, which is an integral part of our operating management system (OMS) and ingrained within our capability programmes. As participants in a second round of operations leadership sessions at MIT this year, the group chief executive and his executive team were instrumental in establishing the concept of continuous improvement to help drive systematic safety and reliability in our operations. Continuous improvement is a means of empowering our operations managers and supervisors, who are closest to our operational problems, to develop the necessary solutions.

*Taking Our Safety Pulse*

**We believe our focus on changing BP's safety culture over the last few years is yielding results**. To measure how effectively we have embedded our safety message in the organization, we assess employee views on various dimensions of safety within the 'Pulse plus" survey.

Responses suggest continued progress in integrating safety into our business, with 98% of those surveyed saying they know how to do their job safely. Positive responses have also been received to questions regarding confidence in line management making safety a priority (82% compared with 80% in 2008), being open to suggestions for improving safety performance (87%, from 81% in 2008) and being receptive to honest information about safety (98% versus 97% in 2008). In a new question on whether employees have seen evidence that BP is making progress in improving the safety and reliability of its operations, 76% gave a positive response.

- **Striving for Safe Operations**

BP continues to implement its operating management system (OMS), a cornerstone of achieving safe, reliable and responsible operations at every BP operation.

Taking a systematic approach is integral to improving safety and operating performance in BP operated sites. Our operating management system covers all areas from process safety, to personal health, to environmental performance.

*A Unifying Way of Operating*

We have successfully introduced OMS at every refinery worldwide in advance of the internal expectations. Hugh Parsons, Vice President with responsibility for management processes in refining states that "the OMS framework has given us a common path, applicable across different sites and assets worldwide. It has provided a unifying way of operating. This is true not only for refining but across

the whole of BP, where we have a much clearer definition of what 'good operations' looks and feels like, regardless of the business context."

- **Safety Performance**

**BP has well-developed systems, processes and metrics for reporting safety performance in support of internal performance management and to enable learning and public reporting**.

*Our Approach to Safety Reporting*

Reported health and safety data is collected for all operations where BP has health and safety management control. Data is not externally reported from units where BP does not have operational control, such as part-owned entities and joint ventures operated by others, including TNK-BP. If an incident occurs, it is recorded locally by employees, contractors and management using our **internal web-based data management system**.

**All fatalities, other major incidents and many that had the potential to become major incidents are discussed by the group operations risk committee**, chaired by the **group chief executive**. We undertake incident investigations with the aim of learning as much as possible and taking action to prevent recurrence.

Detailed data is collected on all work-related incidents resulting in fatalities involving employees, contractors or third parties. Incidents which cause injury or illness to members of the workforce (employees and contractors) are recorded and their severity categorized using definitions and guidance provided by the US Occupational Health and Safety Administration (OSHA).

- **Safety and Operations Audits**

BP's safety and operations audits assess compliance with standards and the effectiveness of operational risk management.

**The audits provide a rigorous check on safety and operations programmes.** We categorize audit findings against pre-defined criteria agreed between the audit team and the audited entity's leadership and, for identified issues, set remedial corrective actions, including completion due dates. For the audit report findings, the group audit team tracks actions, verifying that they have been completed and using subject matter experts where necessary. Progress is reported quarterly, at which time issues, such as overdue action closures, are highlighted to executive management in the executive-level group operations risk committee. To date, more than 10,000 actions have been generated, of which more than 70% have been verified as closed.

We've developed the audit process and protocols to enable auditing against the requirements in our operating management system (OMS). We've also developed and delivered a training programme to prepare auditors for auditing against OMS and its associated practices and are completing the modification of all relevant information management systems.

Our safety and operations audit team, which is independent from the businesses they review, has, as planned, identified key sites and audited their performance. In the three-year period to the end of 2009, the team completed a full cycle of audits, covering 94 BP operations. This work, which in 2009 included pilot audits for analysis against the requirements of the OMS, has provided a rigorous process for assessing our businesses against BP's relevant standards and requirements.

- **Process Safety**

**BP is fully committed to becoming a recognized industry leader in process safety management and continues to work to achieve this.**

Process safety involves applying good design principles, engineering and operating and maintenance practices to manage our operations safely.

*Process Safety Reporting*
To track our progress in process safety management, we measure lagging indicators which record events that have already occurred, **such as oil spills**, and leading indicators that focus on the strength of our controls to prevent undesired incidents, such as **inspections and tests of safety-critical equipment**.

- **Oil Spills**

**BP recognizes the risk posed to the environment from spills and takes a range of measures to prevent any loss of hydrocarbons**.

*Our approach*

Our strategy to address spills has three components:

**Prevention: we seek to assure the integrity of vessels and pipelines used to transport oil and other hydrocarbons.**

**Preparation: we seek to ensure an infrastructure is in place to deal effectively with spills and their impacts. Our operating facilities have the capacity and resources to respond to spill incidents and we participate in industry and**

> **international forums to coordinate contingency planning and emergency response.**
>
> Performance: we record incidents, learn lessons and aim to reduce the number of losses from primary containment.
>
> **Incidents are recorded locally by our staff and contractors using our web-based incident tracking system. BP's executive management is notified quarterly about numbers and volumes of spills and spills of more than 100 barrels.**

411. The above referenced statements were materially false and misleading when made because Defendants failed to disclose the following facts of which they were aware or were reckless in not being aware of: (1) BP had failed to implement adequate safety procedures; (2) BP conducted its operations in the Gulf without any legitimate oil spill response plan; (3) BP understated its exposure from drilling operations in the Gulf; (4) BP lacked adequate internal and safety controls; (5) BP's Gulf Operations had failed to implement BP's OMS in any robust manner and the individuals responsible for its implementation had been terminated or moved outside of Gulf Operations; and (6) BP's highest officers had knowledge that its Gulf Operations had caused oil spills in 2008 and two of its rigs (the Deepwater Horizon and the Atlantis) had reported operational safety problems, which would have been reported to GORC and, as such, put Defendants on notice of the inadequacy of their safety processes in the Gulf of Mexico.

412. Moreover, Defendant Hayward chaired GORC and Defendant Inglis was a member. As detailed above, the BP Gulf Rig Atlantis caused an oil spill in 2008 and raised concerns of safety critical equipment on the Atlantis that according to BP's statements would have been received and reviewed by Hayward and Inglis. Additionally, as detailed above safety critical equipment on the Horizon was tested and inspected prior to the spill and the results of these tests and inspections according to BP's own statements, would have been communicated to GORC.

413. Despite having knowledge of safety process problems in the Gulf of Mexico, including knowledge of oil spills, safety-critical equipment failures on two Gulf Rigs, and safety process concerns in the Gulf during the Subclass Period, BP issued false and misleading statements related to the safety process strength of BP's Gulf Operations. Defendants, including but not limited to Hayward and Inglis, had knowledge of BP's Gulf of Mexico safety and operational problems, yet touted the huge growth potential of the Gulf of Mexico, concealing the massive safety problems that existed in the Gulf of Mexico, which were known to BP.

## VII.

## LOSS CAUSATION

414. During the Subclass Period, as detailed herein, the Defendants engaged in a scheme to deceive the market and in a course of conduct that artificially inflated the value of BP securities, including ADRs, and operated as a fraud or deceit on members of the Subclass by misrepresenting the Company's risk management and safety processes.

415. As a result of the Individual Defendants' fraudulent conduct as alleged herein, the price of BP securities, including ADRs, was artificially inflated throughout the Subclass Period. When Lead Plaintiffs and other members of the Subclass purchased their securities, the true value of such securities was substantially lower than the prices actually paid. When the truth about BP's safety operations and risk management was revealed to the market, the price of BP securities declined in response, as the artificial inflation caused by BP's material omissions and false and misleading statements were removed from the price of BP's securities, thereby causing substantial damage to Plaintiffs and other members of the Subclass.

416. Defendants' false and misleading statements set forth above were widely disseminated to the securities markets, investment analysts, and to the investing public. Those statements caused and maintained the artificial inflation of the price of BP's securities, which consequently traded at prices in excess of their true value. As a result of the Deepwater Horizon spill, which revealed the truth about BP's disregard of risk management and safety practices, BP's shares have lost a substantial percentage of their value. For example, on April 20, 2010, the price of one BP ADR was approximately $59. Within a week, the share had dropped to approximately $50. The price continued to plunge in response to the further materialization of the true state of Defendants' Gulf of Mexico safety operations and risk management.



417. It was entirely foreseeable that concealing the true state of BP's safety and risk management procedures in the Gulf of Mexico would artificially inflate the price of BP securities. It was similarly foreseeable that the ultimate revelation of the true condition of BP's safety and risk management procedures operation in the Gulf of Mexico would cause the price of BP securities to drop significantly as the inflation caused by their misstatements was corrected. Accordingly, the conduct of the Defendants, as alleged herein, proximately caused foreseeable damages to Plaintiffs and members of the Subclass.

418. Plaintiffs purchased their shares of BP in reliance on BP's statements that they had implemented appropriate risk management and safety mechanisms to reduce the risk that catastrophic and expensive disasters such as the Deepwater Horizon would occur, and if they did occur, that BP's exposure would be reduced because of such measures. It is now apparent, however, that such mechanisms were not implemented. Therefore, Defendants' wrongful conduct directly and proximately caused the economic loss suffered by Plaintiffs.

419. As explained herein, these false statements directly or proximately caused, or were a substantial contributing cause of, the damages and economic loss suffered by Lead Plaintiffs and other members of the Subclass, and maintained the artificial inflation in the prices of BP securities throughout the Subclass Period and until the truth was revealed to the market.

## VIII.

## SCIENTER ALLEGATIONS

420. Appropriate safety and risk management procedures are at the core of BP's drilling operations, particularly in the Gulf. Accordingly, the implementation of appropriate safety and risk management processes was a matter driven from the top of the organization. BP's CEO and

Board of Directors were involved in both the day-to-day and strategic decisions relating to BP's procedures and protocols. Nevertheless, as detailed herein, Defendants took affirmative steps which inhibited the ability of BP to implement appropriate safety processes, including but not limited to, mandating budget cuts at the expense of safety processes, disregarding warnings from BP employees and risk managers, and terminating or removing key Gulf Operators charged with implementing safety processes in the Gulf.

421. Moreover, BP's corporate structure mandated that BP's officers and directors were on notice of and has access to all material facts relating to the safety processes of BP's Gulf operations. Accordingly, Defendants knew or recklessly disregarded facts concerning the inadequate safety and risk management practices in BP's Gulf operations. For example, BP's senior management openly boasted of their personal commitment to such practices, and executive officer and Board oversight of safety processes were described as a fundamental part of BP's corporate restructuring, particularly after Hayward became CEO and BP implemented the Baker Report's guidance on executive and Board oversight of corporate safety processes.

422. However, Defendants knowingly or recklessly disregarded these facts concerning the safety of their Gulf of Mexico drilling operations. Additionally, confidential witnesses and other investigations provide facts, described above, which further contribute to a strong inference of scienter.

## A. <u>BASED ON THEIR CORPORATE ROLE AND MEMBERSHIP TO KEY BOARD COMMITTEES, INDIVIDUAL DEFENDANTS HAD KNOWLEDGE OF BP'S CONCEALED GULF OF MEXICO SAFETY PROBLEMS</u>

### 1. <u>SAFETY, ETHICS, AND ENVIRONMENT ASSURANCE COMMITTEE</u>

423. BP's Board has five committees, including an Audit Committee, Remuneration Committee, Chairman's Committee, Nomination Committee, and a Safety, Ethics, and Environment Assurance Committee ("SEEAC") committee. SEEAC was formerly known as the Ethics and Environment Assurance Committee, but in 2005, following the Texas City disaster, added "Safety" as a focus. As stated above, Defendant Castell is the current Committee chairman.

424. SEEAC is composed of independent non-executive **directors** and is charged with the oversight of health, safety, and environmental (HSE) matters.

425. According to BP's Board Governance principles, SEEAC is charged with:

- Monitoring and obtaining assurance that the Group Chief Executive's ("GCE's") internal control system for operations is designed and implemented effectively in support of his observance of the relevant Executive Limitations;
- Monitoring and obtaining assurance that the management or mitigation of significant BP risks of a non-financial nature is appropriately addressed by the GCE;
- Receiving and reviewing regular reports from the GCE or his delegate, the Group Internal Auditor and the Group Compliance and Ethics Officer regarding the GCE's adherence to the relevant Executive Limitations and his management in responding to risk;

- Reviewing material to be placed before shareholders which addresses environmental, safety and ethical performance and make recommendations to the Board about their adoption and publication;
- Reviewing reports on the Group's compliance with its Code of Conduct and on the employee concerns programme (OpenTalk) as it relates to non-financial issues; and
- Recommending to the Board any changes or further delineation of the Executive Limitations in relation to non-financial matters

426. Defendants Castell, Anderson, Burgmans, Carroll and Davis are all directors of BP and members of BP's Safety, Ethics and Environment Assurance Committee. These directors are responsible for making both day-to-day and strategic decisions regarding safety for BP and for monitoring that those safety mechanisms were implemented**.** As a result, these Defendants had knowledge of and access to, or recklessly disregarded, BP's safety problems in the Gulf of Mexico, which were concealed from Plaintiffs.

**2. GROUP OPERATIONS RISK COMMITTEE**

427. In 2007, BP created a GORC, which consisted of BP executives. During the Subclass Period, GORC was chaired by BP's then-CEO and Board member Hayward. Defendant Inglis was also a GORC member. GORC was expressly charged with reviewing and analyzing safety incidents in BP's operations and regularly reporting SEEAC. GORC was charged with providing process safety oversight by **conducting regular reviews of incidents**, **detailed examinations of safety-related activities**, and **identifying areas for additional focus**.

428. GORC consisted of BP executives and was at all relevant times chaired by BP's then-CEO and Board member Hayward, and it included Defendant Inglis. GORC was expressly

charged with analyzing safety incidents in BP's operations. According to BP, GORC would have regularly been provided analyses and data, including compliance violations, fines and penalties, and government reportable incidents. Thus, members of GORC had access to facts concerning the true nature of the safety and risk of BP's Gulf of Mexico operations.

429. The flow chart below (from BP's 2009 Annual Report) shows how all the pieces fit together to support BP's goal of "no accidents, no harm to people, and no damage to the environment."




### 3. <u>BP'S INTERNAL REPORTING STRUCTURES MANDATED THAT GULF SAFETY PROBLEMS REACHED THE EXECUTIVE AND BOARD LEVEL</u>

430. According to BP's **2009 Form 20-F Annual Report**, BP's safety and operations agenda was given the highest priority by executive management and the Board to ensure the Company operated safely, reliably and responsibly. BP purportedly implemented, among other

means of reporting, safety and operations auditing and metrics to monitor process safety performance and regular **progress updates to SEEAC**. BP further claimed that it possessed well-developed systems, processes and metrics for reporting safety performance in support of internal performance management and to enable learning and public reporting.

431. Additionally, all fatalities, other major incidents and incidents that had the potential to become major incidents were discussed by the GORC, chaired by the GCE for the purpose of undertaking incident investigations with the aim of learning as much as possible and taking action to prevent recurrence.

432. Further, health and safety data was collected and should an incident occur, it would be recorded locally by employees, contractors and management using our **internal web-based data management system**. Any reported incidents, including the problems on the Gulf Rigs Atlantis and Deepwater Horizon, would have been reviewed or recklessly disregarded by GORC and communicated to SEEAC. As such all Defendants would have access to, and knowingly or recklessly disregarded, information related to the endemic safety problems BP faced in the Gulf of Mexico during the Subclass Period.

433. According to BP's 2009 Sustainability Report, to track its progress in process safety management, it recorded events **such as oil spills** (those in excess of 100 barrels, e.g Atlantis). Also leading indicators that focused on the strength of BP's controls to prevent undesired incidents, such as **inspections and tests of safety-critical equipment**, would have been measured and elevated to executive management through BP's web-based incident tracking system. As such, BP's executive management knowingly or recklessly disregarded the Gulf of Mexico safety incidents that were occurring during the Subclass Period. Deposition testimony of

a senior BP safety employee, whose name and exact title are withheld pursuant to the confidentiality agreements entered in both this action and MDL 2179, testified that an internal database was utilized and was accessible for all recorded safety incidents.

434. As confirmed by a BP safety analyst in deposition testimony from the MDL 2179, high potential incidents like those described above, including incidents during the Subclass Period, would have been reviewed at the Board level. The deponent's name and exact title are withheld from this Complaint due to Confidentiality Agreements in both this action and the MDL 2179 action. This witness confirmed that he had prepared reports regarding safety incidents that were delivered to the Board or to a Board representative.

435. Additionally, according to a senior member of the BP internal audit team, whose name and exact title are withheld pursuant to the confidentiality agreements entered in both this action and MDL 2179, the Gulf of Mexico Operations were audited by a safety and operational risk audit team, which would have reported to the BP, plc audit committee of which Defendant Davis, Jr. was a member. The audit committee in turn had reporting responsibilities to the full Board. Given the myriad safety and operational risk complaints on both the Atlantis and Deepwater Horizon, including but not limited to the complaints raised by Ken Abbott set forth above, the true state of the operational safety and risk of the Gulf of Mexico Operations was known or recklessly disregarded by Defendants.

## B. DEFENDANTS KNOWINGLY OR RECKLESSLY DISREGARDED FACTS THAT BELIED THEIR STATEMENTS CONCERNING THE SAFETY OF THEIR GULF OPERATIONS

436. During the Subclass Period, Defendants had both the motive and opportunity to commit fraud. For example, under the executive compensation policies adopted by the Board,

70% of Defendant Hayward's performance bonus in 2009 would be based on the achievement of financial metrics and no bonus based process safety.

437. They also had actual knowledge of the misleading nature of the statements they made or acted in reckless disregard of the true information known to them at the time. In so doing, Defendants participated in a scheme to defraud and committed acts, practices and participated in a course of business conduct that operated as a fraud or deceit on purchasers of BP securities (as set forth herein) during the Subclass Period.

438. At the time of making (and/or adopting) the above referenced misrepresentations and omissions regarding BP's internal safety operations, Defendants were aware of facts and knowingly or recklessly disregarded facts that belied these statements and the omission of which facts made those statements misleading. In addition to the facts set forth above which show the falsity of Defendants' statements (and thus also show scienter in making those statements), the facts below support a strong inference of scienter.

439. As Defendants had knowledge that the Gulf of Mexico was a key driver for BP and the documents (many of which were signed or attested to by top officers and directors), testimony, and confidential statements cited above show, BP had publically stated that new exploration in the Gulf of Mexico was critical to BP's growth and success and that it could achieve those results in a safe manner.

440. However, Defendants also knew that BP had systemic problems relating to its safety and risk management practices in the Gulf. Evidence of this knowledge is shown as follows:

- Internal communications by project managers to senior staff in BP that, in the Gulf of Mexico, project managers and engineers were submitting out-dated information

that violated BP's Code of Conduct and created a serious risk of a catastrophic disaster. This includes the April 15, 2008 Duff e-mail.

- An internal BP presentation in May 2009 citing a shortage of experienced offshore workers and stating that more training was required to "maintain safe, reliable and efficient operations."

- In the months leading up the Deepwater Horizon, BP not only knew about problems on the oil rig, it was BP senior managers who gave direct orders that put profit and speed before safety. Those orders are one of the principal causes of the Deepwater Horizon disaster. These facts were concealed and not disclosed to BP shareholders.

- Defendants Hayward's and Inglis' involvement in GORC meant that the Gulf Rig Atlantis problems were communicated to them. Additionally, as detailed above, safety critical equipment on the Deepwater Horizon was tested and inspected prior to the spill, and the results of these tests and inspections, according to BP's own statements, would have been communicated to GORC.

- GORC members, including Defendants Hayward and Inglis would have received safety process information via the internal web-based data management system and as such would have or should have had knowledge regarding the Gulf problems, including but not limited to the Atlantis and Deepwater Horizon rigs detailed above.

- BP's Ombudsman and an independent firm hired by BP 2009 confirmed that BP failed to complete essential engineering documents and was thereby violating its own policies on the Gulf Rig Atlantis.

- BP terminated or displaced the highest ranking employees responsible for Gulf of Mexico Operations in the fourth quarter of 2009 and first quarter of 2010, for among other reasons, concerns these individuals raised related to process safety.

- A December 2008 internal BP strategy document BP strategy document warned Defendants that BP still did not adequately plan for serious safety risks for **its operations in the Gulf**. The document warned that senior management's failure to address this shortcoming could result in "multiple injuries/fatalities," "major environmental damage," "catastrophic loss of the facility," and "damage to corporate reputation."

- Delayed maintenance on the Deepwater Horizon sister rig because of a tight cost budget which led to a minor oil spill in the Gulf.

- Some of the same equipment BP had been found to have negligently allowed to deteriorate at Prudhoe Bay for emergency shutdown, including safety shutoff valves and gas and fire detectors were found to be lacking and could have helped prevent the fire and explosion on the Deepwater Horizon.

- BP could have drilled the hole with a "liner" which would have reduced the blowout risk, but this was rejected because it was slower and up to $10 million more expensive.

- An internal BP document (Forward Plan Review) recommending against the long string option because of the risks: "Long string of casing was the primary option" but a "Liner/Tieback . . . is now the recommended option."

- Advance testing by engineers from Halliburton and BP determining the unreliability of cementing with a long string production casing. The cementing experts recommended a shift to a Liner, but that recommendation was resisted by BP.

- Internal BP emails from late March 2010 acknowledged the risks of the Long String design but chose it as the primary option because it "saves a lot of time . . . at least 3 days," "saves a good deal of time/money," and is the "[b]est economic case."

- BP's Senior Management's selection of six centralizers versus the original designed 21 to save 10 hours. Six centralizers were selected despite advance testing by Halliburton which concluded that 21 centralizers was the recommended number to ensure a secure cement job; using 10 would result in a "moderate" gas flow problem and using only six would result in a "severe" gas flow problem.

- Advance knowledge of three failed negative pressure tests at Macondo and BP's admission that these pressure test results were clear warning signs of a "very large abnormality" in the well.

- BP's knowledge that the manufacturer of Deepwater Horizon's blowout preventer's had a history of blowout preventer failures. Nevertheless, BP used that manufacturer's blowout preventer on the Deepwater Horizon.

- Previous disputes with the manufacturer of the blowout preventer that failed on the Deepwater Horizon concerning blowout preventers.

- A 2004 study by federal regulators showed that blowout preventers may not function in deepwater drilling environments because of increased force. BP knew that better blowout preventers were needed for the Deepwater Horizon but consciously chose not to install them.

- An MMS study noted that blowouts during cementing work were continuing with alarming regularity, particularly in the Gulf of Mexico. Cementing was a factor in 18 of 39 well blowouts in the Gulf of Mexico between 1992 and 2006.

- Halliburton, BP's Deepwater Horizon joint venturer, was responsible for cementing a well off the coast of Australia that blew in August 2009, leaking oil for ten weeks before it was plugged. An MMS official has testified that a poor cement job likely caused the blowout.

- April 6, 2009, letter from MMS to BP indicating risks of drilling at the Macondo well.

- BP drilling at a depth in excess of the MMS permitted depth despite knowledge the threat of blowouts increases as drilling depths increase, especially in an area with such troublesome geology as the Northern Gulf of Mexico and advance warnings of the same by the MMS.

- BP's determination, against API guidance and Halliburton recommendation not to do a "bottoms up circulation" to save time and money.

- Failure to pay for a $128,000 bond long.

- BP's mandate for 7% reductions in costs for all of its drilling operations in the Gulf of Mexico.

- Under Hayward's stewardship, BP slashed $4 billion in expenses in2009 and spent 0.0033 percent of BP revenues on research and development regarding safer offshore drilling technologies.

- An internal BP audit confirmed safety process problems and outstanding safety items on the Deepwater Horizon but instead of improving safety on the oil rig, made efforts to further cut costs.

- A September 2009 BP audit team finding that the Deepwater Horizon suffered from excessive overdue maintenance totaling 390 jobs and 3,545 man hours. Thirty-one of which included findings that were related to well control system maintenance, and six related to BOP maintenance. All findings were outstanding as of December 2009.

- Executive compensation policies where 70% of performance bonuses are based on the achievement of financial metrics, and only 15% on safety (and not process safety).

- Congressional testimony by executives of four major oil companies testified that they did not agree with BP's methods of operations. "We would not have drilled the well the way they did" stated Exxon Mobil Chairman Rex Tillerson.

- Anadarko's chief executive, Jim Hackett, stated "The mounting evidence clearly demonstrates that this tragedy was preventable and the direct result of BP's reckless decisions and actions." Hacket added that he was "shocked" to find that BP "operated unsafely and failed to monitor and react to several critical warning signs during the drilling of the Macondo well.

- Congressional testimony by Harry Thierens, BP's vice president for drilling and completions, wherein he stated he could not recall what BP had done to improve safety after the Texas City explosion.

- BP Chief Operating Officer Doug Suttles's admission that BP did not actually have a response plan with "proven equipment and technology" in place that could contain the Deepwater Horizon Spill.

- Defendant Hayward's admission that "BP's contingency plans were inadequate," and that the company had been "making it up day to day."

- Defendant McKay's testimonial admission to the House Subcommittee on Oversight and Investigations, Committee on Energy and Commerce, that BP did not have the capability and technology to respond to the Deepwater Horizon oil spill.

- Congressional findings that BP senior officials who were responsible for the Macondo well were oblivious to the problems at the Macondo well.

- Findings of the NAE that BP "lack[ed] . . . a suitable approach for anticipating and managing the inherent risks, uncertainties and dangers associated with deepwater drilling operations" and "fail[ed] to learn from previous near misses."

441. As a result of their positions with BP, Defendants either knew or were reckless in failing to know each of the above facts.

## C. CONFIDENTIAL WITNESSES AND GOVERNMENTAL INVESTIGATIONS PROVIDE AN ADDITIONAL INFERENCE OF SCIENTER

442. As set forth above, confidential witnesses have confirmed that BP's senior management knew of systemic safety process problems prior to the Deepwater Horizon. These witnesses confirm that safety process problems and solutions were submitted to BP's Board of Directors and were not implemented at its offshore operations. Moreover, CW2 confirms that BP's restructuring threatened the operational safety of BP's Gulf of Mexico operations and that this concern was known or should have been known by among other, Defendant Inglis.

443. In addition, lawsuits and/or investigations are now proceeding by the Department of Justice and States' Attorney Generals against BP and Defendants, which are further evidence of scienter.

# IX.

# PRESUMPTION OF RELIANCE

444. Plaintiffs, representing the Subclass, relied on BP's statements and would not have purchased BP securities had they known of BP's actual safety and risk management practices. Plaintiffs are also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are predicated in part upon material omissions of fact that Defendants had a duty to disclose.

445. Additionally, Plaintiffs are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, at all relevant times, the market for BP securities, including ADRs, was open, efficient and well developed. For example, with respect to BP ADRs:

- BP ADRs met the requirements for listing, and were listed and actively traded, on the NYSE, a highly efficient market.

- As a regulated issuer of securities in the United States, BP filed Annual Reports on Form 20-F with the SEC. These reports were publicly available and could be and were reviewed by the investing public.

- BP ADRs were followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports were publicly available and entered into the public marketplace.

- BP regularly issued press releases that were carried by national newswires. Each of these releases was publicly available and entered the public marketplace.

446. As a result, the market for BP securities promptly digested current information with respect to BP from all publicly-available sources and reflected such information in BP's stock price. The price of BP securities moved in direct response to information regarding the company that was put out in the public marketplace. For example, the share price of BP ADRs dropped significantly after the explosion on the Deepwater Horizon and the resulting discovery of BP's safety and risk management practices. Under these circumstances, all purchasers of BP securities during the Subclass Period, including Plaintiffs, relied on the market price of BP securities and suffered similar injury through their purchase of such securities at artificially inflated prices and a presumption of reliance applies.

## X.

## INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

447. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. The statements alleged to be false and misleading concerned statements of existing or historical fact or conditions. Additionally, to the extent that any of the statements alleged to be false and

misleading may be deemed to be forward looking statements, the Defendants are nevertheless liable for those statements because they were not identified as forward looking statements or, even if so identified, the statements were material. They were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Additionally, at the time each of those statements was made, the Defendants had actual knowledge that the particular forward-looking statement was false or the forward looking statement was authorized and/or approved by an officer or director of BP who knew that the statement was false when made. In addition, to the extent that any of the statements set forth above were accurate when made, they became inaccurate or misleading because of subsequent events, and the Defendants failed to update those statements that later became inaccurate and/or did not disclose information that undermined the validity of those statements.

## XI.

## CLAIMS FOR RELIEF

### COUNT I.

### VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER

**(Against the BP Defendants McKay, Hayward, Svanberg and Inglis)**

448. Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter.

449. During the Subclass Period, each of the Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Subclass Period, did deceive the investing public, including Plaintiffs and other Subclass members, as alleged herein and caused

Plaintiffs and other members of the Subclass to purchase BP securities at distorted prices that they would not have paid had they known of the improper conduct alleged herein. In furtherance of this improper scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

450. Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of BP securities, including Plaintiffs and other members of the Subclass, by making false and misleading statements and omitting material facts regarding BP's risk management and safety practices generally and specifically as to the Gulf of Mexico. This was done in an effort to artificially inflate BP's securities' value in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued as primary participants in the wrongful and illegal conduct and scheme charged herein. These false statements and omissions are set forth above.

451. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to make affirmative misrepresentations and conceal adverse material information about BP's safety record and earnings, as specified herein.

452. Defendants employed devices, schemes and artifices to defraud and a course of conduct and scheme as alleged herein to improperly manipulate and profit and thereby engaged in transactions, practices and a course of business which operated as a fraud and deceit upon Plaintiffs and members of the Subclass.

453. As set forth above, Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of inflating the market price of BP securities, including ADRs.

454. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of BP securities were distorted during the Subclass Period such that they did not reflect the true financial health and risk management and safety practices of BP as alleged herein. In ignorance of these facts, the market prices of the shares were distorted, and relying directly or indirectly on the false and misleading statements made by the Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Subclass Period, Plaintiffs and the other members of the Subclass acquired the shares or interests in BP during the Subclass Period at distorted prices and were damaged thereby when the value of their shares fell after the truth became known, representing the causal connection between Defendants' fraud and Plaintiffs' damages.

455. At the time of said misrepresentations and omissions, Plaintiffs and other members of the Subclass were ignorant of their falsity, and believed them to be true. Had Plaintiffs and other members of the Subclass and the marketplace known of the truth concerning BP's operations, which were not disclosed by Defendants, Plaintiffs and other members of the Subclass would not have purchased or otherwise acquired their shares or, if they had acquired such shares

or other interests during the Subclass Period, they would not have done so at the distorted prices which they paid.

456. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

**COUNT II.**

**VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT**

**(Against the Individual Defendants)**

457. Plaintiffs hereby incorporate by reference all of the allegations set forth above as though fully set forth hereafter.

458. It is appropriate to treat the Individual Defendants and BP as a group for pleading purposes and to presume that the materially false, misleading, and incomplete information conveyed in the BP public filings, press releases and other publications are the collective actions of the Individual Defendants and BP.

459. The Individual Defendants acted as controlling persons of BP within the meaning of Section 20(a) of the Exchange Act for the reasons alleged herein. By virtue of their operational and management control of BP's respective businesses and systematic involvement in the fraudulent scheme alleged herein, the Individual Defendants named herein each had the power to influence and control and did influence and control, directly or indirectly, the decision-making and actions of BP, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. Each of the Individual Defendants named herein had the ability to prevent the issuance of the statements alleged to be false and misleading or cause such statements to be corrected.

460. Each of the Individual Defendants named herein had direct and supervisory involvement in the operations of BP and, therefore, did have the power to control or influence the implementation of BP's risk management and safety procedures for its oil exploration and production operations, including those that relate to the Deepwater Horizon disaster that give rise to the securities violations as alleged herein, and exercised the same.

461. Each of the Individual Defendants named herein, by virtue of their high-level positions and participation in and/or awareness of BP's operations, had the power to influence and control and did influence and control, directly or indirectly, the decision-making of BP, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of BP's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. BP controlled the Individual Defendants and all of its employees.

462. As set forth above, Defendants BP, McKay, Hayward, Svanberg and Inglis violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, each of the Individual Defendants is liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Subclass suffered damages in connection with their purchases of BP securities during the Subclass Period at inflated prices and the losses suffered when the value of their shares fell after the truth became known, representing the causal connection between Defendants' fraud and the damages suffered by Plaintiffs and the Subclass.

## XII.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Subclass, pray for judgment as follows:

1. Declaring this action to be a proper action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Subclass defined herein;

2. Awarding Plaintiffs and all members of the Subclass damages against the Defendants, jointly and severally, in an amount to be proven at trial;

3. Awarding Plaintiffs and members of the Subclass pre-judgment interest, as well as reasonable attorneys' fees and other costs;

4. Awarding such other relief as this Court may deem just and proper.

/ / /

/ / /

/ / /

## XIII.

## JURY TRIAL DEMAND

Plaintiffs, pursuant to Federal Rule of Civil Procedure 38, demand a trial by jury of all issues which are subject to adjudication by a trier of fact.

Dated: February 11, 2011

By *s/ Joseph W. Cotchett*

**COTCHETT, PITRE & McCARTHY**
Joseph W. Cotchett
Mark C. Molumphy
Jordanna G. Thigpen
Imtiaz A. Siddiqui
Matthew K. Edling
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
Fax: (650) 697-0577

*Co-Lead Counsel for Lead Plaintiffs and the Proposed Subclass*

By *s/ Richard W. Mithoff*

**MITHOFF LAW FIRM**
Richard W. Mithoff
Texas Bar Number: 14228500
William J. Stradley
Texas Bar Number: 19353000
One Allen Center
500 Dallas Street
Houston, TX 77002
Telephone: 713-654-1122
Fax: 713-739-8085

*Attorney-In-Charge and Co-Lead Counsel for Lead Plaintiffs and the Proposed Subclass*

# EXHIBIT A

# HISTORY OF SAFETY LAPSES

**February 1985**: BP pays £15,000 for safety violations after a gas blowout in the North Sea.[1]

**March 1989**: Exxon Valdez spill. BP was responsible for containing the spill but they did not have adequate/proper equipment and was unable to respond. Exxon took over the clean-up operations. Browne was head of BP E&P at the time and later became BP's CEO.[2]

**March 1998**: BP fined £750,000 after the Grangemouth Explosions that killed three workers. Reports of a chemical leak were ignored while a BP employee maintained it was safe to continue work.[3]

**October 1990**: BP fined $2.3 Million for dumping pollutants from its Pennsylvania refinery into the Delaware River for 6 years.[4]

**July 1991**: BP fined $135,000 for violations that lead to a Washington state refinery exploding and killing 1 worker and injuring 6 others.[5]

**April 1994**: BP Chemicals fined £200,000 for a fire that started at the

---

[1] The Guardian (London). "BP Fined 15,000 pounds on safety charge after North Sea fire." February 6, 1985.

[2] CBS News. "BP Played Central Role in Exxon Valdez Disaster Two Decades after Alaska Spill, Observers Find Eerie Similarities in Oil Company's Slow Containment Response." May 25, 2010.

[3] The Herald (Glasgow). "BP is fined pounds 750,000 after fatal blast at refinery." March 22, 1988.

[4] Associated Press. "BP Oil assessed $2.3 million fine for polluting river. (Delaware River)." The Oil Daily. Energy Intelligence Group. October 24, 1990.

[5] Lange, Larry. "Refiner cited for violations in fatal blast; British Petroleum fined record $135,000 for safety 'shortcuts.'" Seattle Post-Intelligencer. July 16, 1991.

Grangemouth plant. One worker was killed in the fire and 3 were seriously burned.[6]

**March 1999**: BP paid $1.75 Million to the EPA for illegally discharging pollutants into the air and not alerting emergency response authorities of their actions at an Ohio refinery.[7]

**May 1999**: BP Exploration fined £20,000 for violating health and safety regulations that lead to an explosion on a North Sea gas platform.[8]

**February 2000**: BP Exploration pays $22 Million in fines and civil penalties for dumping hazardous materials at a North Slope oil field and failing to notify authorities.[9]

**April 2000**: BP Amoco paid $32 Million to settle claims that BP underpaid royalties on oil leases on Federal and Indian land.[10]

**June 2000**: BP fined $1.43 Million when a steam line ruptured at Grangemouth and threatened local residents. Three days later Grangemouth had a flammable gas leak that led to a 9 ton vapor explosion.[11]

BP fined £15,000 for dumping pollutants into the River Tweed with home heating oil, and spent another £200,000 for clean-

[6] The Herald (Glasgow). "BP Chemicals fined £200,000 over death fire." April 22, 1994.

[7] US Environmental Protection Agency press release. "BP Oil must monitor flaring of gases at Toledo refinery." March 15, 1999.

[8] The Herald (Glasgow). "Maximum fine for oil firm over gas explosion." May 11, 1999.

[9] Speiss, Ben. "BP settles for $15.5 million; company also faces probation in dumping of toxic waste." Anchorage Daily News. February 2, 2000.

[10] Sniffen, Michael J. "BP Amoco to Resolve Royalties Case." Associated Press. April 11, 2000.

[11] "Grangemouth incidents scar BP." The Oil Daily. January 23, 2002.

up.[12]

**January 2001**: Eight refineries at BP Amoco violated the Clean Air Act which resulted in BP Amoco paying $600 million to resolve and another $10 million in civil penalties.[13]

**March 2001**: Three workers killed during explosions at BP Amoco Polymers Plant, located in Augusta, Georgia.[14]

**September 2001**: BP fined $141,000 by OSHA that related to the explosion and fire at a North Carolina facility. Three employees were killed during this accident.

**October 2001**: BP fined £200,000 for exposing their platform workers to gas leaks for 4 years on an Amoco gas platform.[15]

**December 2001**: BP fined £60,000 when a gas station in Luton, England leaked 40,000 liters of gas.[16]

**July 2002**: BP settled a suit for $46 million that alleged its Arco Subsidiary failed to improve leaking underground fuel storage tanks at 59 gas stations for over 10 years.[17]

**2003 - 2004**: BP paid $303.5 million in fines, penalties and restitution to settle charges against them that they manipulated the propane

[12] The Scotsman. "BP fined 15,000 pounds over river pollution." June 14, 2000.

[13] US Environmental Protection Agency press release. "EPA finalizes agreement with petroleum refinery." January 19, 2001.

[14] Edwards, Johnny. "Three die in fatal explosion at Augusta, Ga. BP Amoco Polymers Plant." Augusta Chronicle. March 14, 2001.

[15] The Scotsman. "BP fined more than GBP 200,000." October 13, 2001.

[16] "One fuel spill BP need worry about no longer." Luton Today. May 14, 2010.

[17] Carrell, Severin. "BP pays $46m settlement after breaching US anti-pollution laws." The Independent. July 7, 2002.

market, drove up prices for consumers while generating a $20 million profit.[18]

**<u>July 2004</u>**: BP fined £25,000 for leaking 6.5 tonnes of diesel fuel into the North Sea while its supply ship was trying to refuel a drilling platform.[19]

**<u>November 2004</u>**: BP fined £200,000 for a gas leak from its Forties Alpha North Sea platform in 2002.[20]

**<u>March 2005</u>**: An explosion and fire at BP's Texas City Refinery killed 15 workers and injured over 170 people.[21] Monitoring alarm systems failed to alert the plant that highly combustible chemicals and vapors were overfilling the unit which caused the explosion.[22] This accident was the worst industrial accident in the U.S. in the past 15 years.[23] The Chemical Safety Board said that BP's lack of safety procedures and safety culture attributed to this major accident.[24] Investigators also determined that budget cuts within BP and production

---

[18] U.S. Commodity Futures Trading Commission. Press Release. "U.S. Commodity Futures Trading Commission Charges BP Products of North America, Inc. with Cornering the Propane Market and Manipulating the Price of Propane." June 28, 2006; BP Statement on Settlements. "BP America Announces Resolution of Texas City, Alaska, Propane Trading Law Enforcement Investigations." October 25, 2007.

[19] Innes, John. "Diesel spill in sea costs BP £25,000." Scotsman. December 6, 2005.

[20] Barry, Maggie. "Gas Leak: BP Fined." Daily Mirror. November 17, 2004.

[21] U.S. Occupational Health and Safety Administration. Press Release. "OSHA Fines BP $2.4 Million for Safety and Health Violations." April 25, 2006.

[22] Porretto, John and Dan Caterinicchia. "Probe of BP plant blast cites oversight." Associated Press.

[23] Porretto, John and Dan Caterinicchia. "Probe of BP plant blast cites oversight." Associated Press. Olsen, Lise. "BP refinery deaths top industry in U.S." Houston Chronicle. May 16, 2005.

[24] "Poor BP safety standards at root of refinery blast." Birmingham (UK) Post. March 20, 2007.

pressures on managers affected process safeties. As a result, BP was fined $50 million for violating the Risk Management Plan regulations under the Clean Air Act. In addition, BP paid $21 million to OSHA for workplace safety violations and another $1.5 billion in damages and repairs.

**July 2005**: Hurricane Dennis damaged and destabilized the Thunder Horse Deep Sea Platform in the Gulf of Mexico.[25] BP found a ballast piping was installed incorrectly which caused the Platform to dip into the Gulf.[26] BP also found additional problems in 2006 with their subsea equipment and compressions systems.[27]

**August 2005**: BP's Board commissioned the Baker Panel after the CSB warned that BP had serious safety management lapses. CSB urged the BP Board to look into their safety oversight, safe management of refineries, and their corporate safety culture.

**March 2006**: BP's Prudhoe Bay facility leaked 267,000 gallons of crude oil, from a corroded pipeline, into Alaska's North Slope, which was deemed "the largest spill of crude on the North Slope."[28] Similarly in August 2006, BP had to shut down Prudhoe Bay due to a second corroded pipeline which caused another small leak.[29] BP admitted that they disregarded the necessary steps and actions to avoid the spill and eventually paid $20 million in fines and restitution.[30] BP also paid $1.7 million in fines to

---

[25] Andrew, Kelly. "Delays at Thunder Horse add to BP's woes." The Oil Daily. September 19, 2006.

[26] Greising, David. "Troubles run deep on Gulf oil platform." Chicago Tribune. May 28, 2007.

[27] "New Thunder Horse Woes." International Petroleum Finance. June 1, 2006.

[28] "Alaska hit by 'massive' oil spill." BBC. March 11, 2006.

[29] BP. Press Release. "BP to shutdown Prudhoe Bay Oil Field." August 7, 2006.

[30] BP Statement on Settlements. "BP America Announces Resolution of Texas City, Alaska, Propane Trading Law Enforcement Investigations." October 25, 2007.

Alaska for oil spill containment violations in 2009.[31] As of 2010, U.S. authorities are still trying to collect millions of dollars from BP for water and air pollution violations and neglecting their promised deadlines to prevent future spills.[32]

**<u>April 2006</u>**: BP fined $2.4 million for workplace safety violations at its Ohio refinery. These violations were similar to those that contributed to the Texas City disaster.[33]

**<u>August 2006</u>**: A pipeline technician, Stuart Sneed, working on the Prudhoe Bay, found a crack in a transit line pipeline and issued orders for all nearby welders to stop working, for fear of igniting a fire. BP retaliated and fired Sneed two weeks later. Arbitrators were brought in to investigation and confirmed Sneed's story.

**<u>September 2006</u>**: BP fined $900,000 by the EPA for discharging volatile organic compounds from its gas stations.[34]

**<u>September 2006</u>**: Report commissioned from the Vinson & Elkins law firm found that BP's environment was not conducive for employees to report problems to upper management.[35] For example, a BP worker filed a complaint that the corrosion inspection staff was

---

[31] Alaska Department of Law and Alaska Department of Environmental Conservation. Press Release. "State Reaches Settlement with BP Exploration (Alaska) Inc." September 22, 2009.

[32] Loy, Wesley. "Federal regulators, BP work on settlement for '06 spills." Anchorage Daily News. May 23, 2010.

[33] U.S. Occupational Health and Safety Administration. Press Release. "OSHA Fines BP $2.4 Million for Safety and Health Violations." April 25, 2006.

[34] US Environmental Protection Agency. "BP, Shell Pay $1.5 Million in Penalties for Auto Gas Violations Threatening Public Health." October 5, 2006.

[35] Davidson, Paul. "Congressmen slam BP executives at Alaskan oil leak hearing." USA Today. September 7, 2006.

cut by 25% and he was threatened with firing.[36]

**December 2006**: Supply boat hits the North Sea platform's support legs and was evacuated. Structural integrity of platform may have been compromised.[37]

**January 2007**: Baker Report was issued and the panel found that BP had not provided effective process safety leadership and had not established process safety as a core value across BP's refineries.

**March 2007**: CSB issued their final report regarding the investigation into the Texas City disaster. The report stated that the BP, "Board of Directors did not provide effective oversight of BP's safety culture and major accident prevention programs."

Booze Allen reported that BP's strategy of focusing on financial performance over operational safety created a culture where all projects and activities must fit into a budget, whether it was safe or not.

**June 2007**: BP fined $869,000 by state of Michigan for ignoring and failing to clean up leaking gas station tanks even though BP was aware of these leaking tanks for years.[38]

**July 2007**: BP settled with California utilities and paid $18 million for overcharging customers for electricity during California's energy crisis in 2000 and 2001.[39]

---

[36] Mauer, Richard. "BP was warned of intimidation." Anchorage Daily News. October 3, 2007.

[37] "Alert on oil platform after collision." (Aberdeen) Press and Journal. December 14, 2006.

[38] Lam, Tina. "BP is fined for leaking underground tanks." Detroit Free Press. June 2, 2007.

[39] "U.S. FERC approves $18 mln BP-California settlement." Reuters. July 6, 2007.

**August 2007**: BP settled a class action lawsuit that alleged BP underpaid landowners for the right to drill oil on their land for $35 million.[40]

**October 2007**: BP pleads guilty and agreed to pay a $20 million fine related with the Alaska oil spills. BP also had to pay a $12 million criminal fine and serve 3 years of probation.

BP also announced 2 plea agreements and a deferred prosecution agreement with U.S. DOJ related to the Texas City disaster.

**May 2008**: The Deepwater Horizon rig flooded with sea water due to removed piping and caused $1 million in damages. Investigators concluded that the piping was removed without permit or authority from management.

**June 2008**: Atlantis rig spilled 193 barrels of oil into the Gulf of Mexico due to a ruptured steel tubing. Investigators concluded that BP managers postponed repairs due to cost savings and budget.[41]

**August 2008**: The Deepwater Horizon lost power for two minutes and almost drifted into the sea.

Ken Abbott, BP's production manager, e-mailed colleagues and warned that hundreds of documents of "as built" documents for the Atlantis rig were never finalized. He warned that having the wrong documents could lead to catastrophic failures. Abbott was terminated after his concerns were raised.

**September 2008**: An eight-inch high pressure gas line in Alaska separated. There were no injuries but investigators found that the incident

---

[40]Laura Dichter et. al v. BP America Production Company. Case No. D-0101-CV-200001620, State of New Mexico, First Judicial District. Notice of Settlement. August 15, 2007.

[41] Guy Chazan, Benoit Faucon, and Ben Casselman. "AS CEO Hayward Remade BP, Safety, Cost Drives Clashed." Wall Street Journal. June 29, 2010.

could have been potentially catastrophic. According to Alaska's Petroleum Systems Integrity Office, the separation resulted from "procedures that either were not in place or had not been fully implemented at BP in their management system."

BP evacuated 212 workers from rig when a blowout caused the Azeri-Chirag-Guneshli field to be shut down for weeks. BP concluded that the blowout was caused by a faulty cement job.

**February 2009**: BP fined $180 million by the EPA for violating the Clean Air Act in connection with the Texas City disaster.[42]

**March 2009**: U.S. Federal Court in Houston approved BP's guilty plea and $50 million criminal fine for a criminal workplace safety charge in connection with the Texas City Refinery disaster. BP America Chairman and President, Bob Malone, admitted that had BP's safety and risk management were more disciplined and comprehensive, the Texas City disaster could have been avoided altogether.[43]

**January 2010**: U.S. House of Representatives members Bart Stupak and Henry Waxman wrote to BP's president of Alaskan operations, and warned that the Company's efforts to cut costs could imperil safety at BP facilities: "Committee staff have received reports that proposed budget cuts by BP may threaten the company's ability to maintain safe operations." Attached to the Congressmen's letter was a request for documents. The letter and the document requests were discussed with the Board.

U.K. Health and Safety inspectors visited the Magnus rig off the coast of Scotland and found that confusion existed about

---

[42] US Environmental Protection Agency. "BP Products to pay nearly $180 million to settle Clean Air violations at Texas City Refinery." February 19, 2009.

[43] BP America, Inc Press Release. "BP America announces resolution of Texas City, Alaska, propane trading, law enforcement investigations." October 25, 2007; British Petroleum. U.S. Securities and Exchange Commission filing 20-F, 2009.

who would order a well shut-off in event of a blowout.[44]

EPA attorneys sent an email to BP General Counsel, Jack Lynch, stating that: "[i]t appears that BP, regardless of its code of conduct and statements to the government, will do whatever is necessary to cover up the improper actions of its senior managers. This promotes intimidation, retaliation, blackballing and unethical behavior in the management ranks, and a culture of fear and lack of ethics in the employee ranks. Nothing has been done in TWO YEARS. This is a current graphic example of why EPA does not trust BP."[45]

**April 2010**: Deepwater Horizon disaster.

---

[44] Tom Bergin & Daniel Fineren, BP North Sea rig lacked procedures on blow-outs (Reuters Sep. 15, 2010).

[45] Abrahm Lustgarten, Furious growth, cost cuts led to BP accidents past and present (ProPublica, October 26, 2010).

# EXHIBIT B

bp

MINERALS MANAGEMENT SERVICE
RECEIVED
FEB 23 2009
FIELD OPERATIONS
Plans Section, GOM OCS Region, New Orleans, LA

# Initial Exploration Plan

## Mississippi Canyon Block 252

## OCS-G 32306

# Public Information

CONTROL No. N-9349
REVIEWER: Michelle Griffitt
PHONE: (504) 736-2975

BP Exploration & Production Inc.
February 2009




AMENDMENT

2/2/09

# TABLE OF CONTENTS

**Section**


**1.0 Plan Contents**
- 1.1 Plan Information Form
- 1.2 Location Information
- 1.3 Safety and Pollution Prevention Features
- 1.4 Storage Tanks and Production Vessels
- 1.5 Pollution Prevention Measures
- 1.6 Attachments to Section 1.0

**2.0 General Information**
- 2.1 Applications and Permits
- 2.2 Drilling Fluids
- 2.3 New or Unusual Technology
- 2.4 Bonding Information
- 2.5 Oil Spill Financial Responsibility (OSFR)
- 2.6 Deepwater Well Control
- 2.7 Blowout Scenario

**3.0 Geological, Geophysical, and $H_2S$ Information**
- 3.1 Geological and Geophysical Information
- 3.2 $H_2S$ Information
- 3.3 Attachments to Section 3.0

**4.0 Biological, Physical, and Socioeconomic Information**
- 4.1 Chemosynthetic Information
- 4.2 Topographic Features Information
- 4.3 Live Bottoms (Pinnacle Trend)
- 4.4 Live Bottoms (Low Relief)
- 4.5 Potentially Sensitive Biological Features
- 4.6 Remotely Operated Vehicle (ROV) Monitoring Survey Plan
- 4.7 Archaeological Report

**5.0 Waste and Discharge Information**
- 5.1 Projected Generated Wastes
- 5.2 Projected Ocean Discharge

**6.0 Air Emissions Information**
- 6.1 Emissions Worksheets and Screening Questions
- 6.2 Contact Information
- 6.3 Modeling Report

**7.0 Oil Spills Information**
- 7.1 Oil Spill Response Planning
- 7.2 Modeling Report

**8.0 Environmental Monitoring Information**
- 8.1 Monitoring Systems
- 8.2 Flower Garden Banks National Marine Sanctuary

**9.0 Lease Stipulation Information**
- 9.1 Lease Stipulations for MC 252

**10.0 Environmental Mitigation Measures Information**
- 10.1 Description of Mitigation Measures
- 10.2 Incidental Takes

## TABLE OF CONTENTS

**11.0 Support Vessels and Aircraft Information**
- 11.1 General
- 11.2 Diesel Oil Supply Vessels
- 11.3 Diesel Fluids Transportation
- 11.4 Solid and Liquid Wastes Transportation
- 11.5 Vicinity Map
- 11.6 Attachments to Section 10.0

**12.0 Onshore Support Facilities Information**
- 12.1 General Information
- 12.2 Support Base construction or Expansion
- 12.3 Waste Disposal

**13.0 Coastal Zone Management Act (CZMA) Information**
- 13.1 Consistency Certification
- 13.2 Other Information
- 13.3 Attachments to Section 12.0

**14.0 Environmental Impact Analysis (EIA)**
- 14.1 Impact Producing Factors
- 14.2 Analysis
- 14.3 Impacts on Proposed Activities
- 14.4 Environmental Hazards
- 14.5 Alternatives
- 14.6 Mitigation Measures
- 14.7 Consultation
- 14.8 Preparers
- 14.9 References

**15.0 Administrative Information**
- 15.1 Exempted Information Description (Public Information Copies Only)
- 15.2 Bibliography

**1.0 Plan Contents**

Under this Exploration Plan, BP Exploration & Production Inc. proposes to drill and temporarily abandon two (2) exploratory wells in the Macondo project area.

**1.1. Plan Information Form**

Included in Section 1.0 is Form MMS-137 "OCS Plan Information Form" which provides details concerning the activities proposed in this plan. The dates shown are tentative.

**1.2 Location Information**

A well location plat prepared in accordance with Notice to Lessees (NTL) 2008-G04 is included in Section 1.0.

**1.3 Safety and Pollution Prevention Features**

The proposed wells will be drilled with Transocean's *Marianas* rig. Rig specifications will be made a part of the appropriate Applications for Permit to Drill.

Please note that if the aforementioned semi-submersible drilling rig is not available and another rig is contracted, any differences regarding air emissions, drilling equipment, pollution control and safety equipment will be addressed at that time.

Safety features on the MODU will include well control, pollution prevention, welding procedure, and blowout prevention equipment as described in Title 30 CFR Part 250, Subparts C, D, E, G and O and as further clarified by MMS Notices to Lessees and current policy making invoked by the MMS. The *Marianas* is ISO 14001 certified.

The MMS is required to conduct onsite inspections of offshore facilities to confirm operators are complying with lease stipulations, operating regulations, approved plans, and other conditions, as well as to assure safety and pollution prevention requirements are being met. The National Potential Incident of Noncompliance (PINC) List serves as the baseline for these inspections. The MMS also inspects the stockpiles of equipment listed in the operator's approved Regional Oil Spill Response Plan that would be used for the containment and cleanup of hydrocarbon spills.

Appropriate life rafts, life jackets, rig buoys, etc. will be maintained on the facility at all times as mandated by the U.S. Coast Guard regulations contained in Title 33 CFR.

Supervisory and certain designated personnel on-board the facility will be familiar with the effluent limitations and guidelines for overboard discharges into the receiving waters, as outlined in the NPDES General Permit GMG290000.

**1.4 Storage Tanks and Production Vessels** – Information regarding the storage tanks that will be used to conduct the drilling operations proposed in this plan that will store oil, as defined at 30 CFR 254.6 is provided in the table below. Only those tanks with a capacity of 25 barrels or more are included.

| Type of Storage Tank | Type of Facility | Tank Capacity (bbls) | Number of Tanks | Total Capacity (bbls) | Fluid Gravity (API) |
|---|---|---|---|---|---|
| Fuel Oil | Semi-Submersible | 4794 | 4 | 19176 | 27.489 |
| Waste Oil | Semi-Submersible | 31 | 1 | 31 | 34.971 |
| Fuel Oil | Semi-Submersible | 123 | 2 | 246 | 27.489 |
| Fuel Oil | Semi-Submersible | 137 | 1 | 137 | 27.489 |

| Type of Storage Tank | Type of Facility | Tank Capacity (bbls) | Number of Tanks | Total Capacity (bbls) | Fluid Gravity (API) |
|---|---|---|---|---|---|
| Fuel Oil | Semi-Submersible | 115 | 1 | 115 | 27.489 |
| Fuel Oil | Semi-Submersible | 32 | 1 | 32 | 27.489 |
| Hydraulic | Semi-Submersible | 29 | 3 | 87 | 31.144 |
| Lube Oil | Semi-Submersible | 134 | 1 | 134 | 34.971 |
| Heli-Fuel | Semi-Submersible | 50 | 1 | 50 | 37.961 |

1.5 **Pollution Prevention Measures** – A discussion of measures to prevent the discharge of oils and greases from drilling rigs during rainfall and routine operations is not required for the operations proposed in this plan.

1.6 **Additional Measures** – A discussion of additional safety, pollution prevention, or early spill detection measures beyond those required by 30 CFR 250 is not required in this plan.

1.7 **Attachments to Section 1.0**

- OCS Plan Information Form (Form MMS 137)
- Well Location Maps

U.S. Department of the Interior OMB Control Number: 1010-0049
Minerals Management Service OMB Approval Expires: August 31, 2006

# OCS PLAN INFORMATION FORM

## General Information

| | | | | |
|---|---|---|---|---|
| Type of OCS Plan | X | Exploration Plan (EP) | | Development Operations Coordination Document (DOCD) |
| Company Name: BP Exploration & Production, Inc. | | | MMS Operation Number: 02481 | |
| Address: 200 Westlake Park Blvd | | | Contact Person: Scherie Douglas | |
| Houston, TX 77079 | | | Phone Number: 281-366-6843 | |
| | | | E-Mail Address: scherie.douglas@bp.com | |

| | | | |
|---|---|---|---|
| Lease(s):OCS-G 32306 | Area: MC | Block(s): 252 | Project Name (If Applicable): Maeondo |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Objective(s): | X | Oil | | Gas | | Sulphur | | Salt | Onshore Base: Fourchon, LA | Distance to Closes Land (Miles): 48 |

## Description of Proposed Activities (Mark all that apply)

| | | | |
|---|---|---|---|
| X | Exploration drilling | | Development drilling |
| | Well completion | | Installation of production platform |
| | Well test flaring (for more than 48 hours) | | Installation of production facilities |
| | Installation of caisson or platform as well protection structure | | Installation of satellite structure |
| | Installation of subsea wellheads and/or manifolds | | Commence production |
| | Installation of lease term pipelines | | Other (Specify and describe) |

| | | | | |
|---|---|---|---|---|
| Have you submitted or do you plan to submit a Conservation Information Document to accompany this plan? | | Yes | X | No |
| Do you propose to use new or unusual technology to conduct your activities? | | Yes | X | No |
| Do you propose any facility that will serve as a host facility for deepwater subsea development? | | Yes | X | No |
| Do you propose any activities that may disturb an MMS-designated high-probability archaeological area? | | Yes | X | No |
| Have all of the surface locations of your proposed activities been previously reviewed and approved by MMS? | | Yes | X | No |

## Tentative Schedule of Proposed Activities

| *Proposed Activity* | *Start Date* | *End Date* | *No. of Days* |
|---|---|---|---|
| Drill and temporarily abandon well location "A" | 04/15/2009 | 07/24/2009 | 100 |
| Drill and temporarily abandon well location "B" | 04/15/2010 | 07/24/2010 | 100 |
| | | | |
| | | | |

## Description of Drilling Rig / Description of Production Platform

| | Description of Drilling Rig | | | | Description of Production Platform | | |
|---|---|---|---|---|---|---|---|
| | Jackup | | Drillship | | Caisson | | Tension Leg Platform |
| | Gorilla Jackup | | Platform rig | | Well protector | | Compliant tower |
| X | Semi-submersible | | Submersible | | Fixed Platform | | Guyed tower |
| | DP Semi-submersible | | Other (Attach description) | | Subsea manifold | | Floating production system |
| Drilling Rig Name (if known): Transocean's *Marianas* | | | | | Spar | | Other (Attach Description) |

## Description of Lease Term Pipelines

| From (Facility/Area/Block) | To (Facility/Area/Block) | Diameter (Feet) | Length (Feet) |
|---|---|---|---|
| NA | | | |

OCS PLAN INFORMATION FORM (CONTINUED)

## *Include one copy of this page for each proposed well/structure*

| *Proposed Well/Structure Location* | | | | |
|---|---|---|---|---|
| *Well or Structure Name/Number (If renaming well or structure, reference previous name):* Well Location "A" | | | *Subsea Completion* | |
| Anchor Radius (if applicable) in feet: 4600 | | | Yes | X No |
| | **Surface Location** | | **Bottom-Hole Location (For Wells)** | |
| **Lease No.** | OCS-G 32306 | | | |
| **Area Name** | MC | | | |
| **Block No.** | 252 | | | |
| **Blockline Departures** | N/S Departure 6943 F _N_ L | | N/S Departure F _N_ L | |
| **(in feet)** | E/W Departure 1036 F _E_ L | | E/W Departure F _E_ L | |
| **Lamber X-Y coordinates** | X: 1202803.88 | | X: | |
| | Y: 10431617.00 | | Y: | |
| **Latitude / Longitude** | Latitude 28°44'17.277"N | | Latitude | |
| | Longitude 88°21'57.340"W | | Longitude | |
| | TVD (Feet): | MD (Feet): | Water Depth (Feet): 4992 | |

**Anchor Locations for Drilling Rig or Construction Barge (If anchor radius supplied above, not necessary)**

| Anchor Name or No. | Area | Block | X Coordinate | Y Coordinate | Length of Anchor Chain on Seafloor |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**Paperwork Reduction Act of 1995 Statement:** The Paperwork Reduction Act of 1995 (44 U.S.C. Chapter 35) requires us to inform you that MMS collects this information as part of an applicant's Exploration Plan or Development Operations Coordination Document submitted for MMS approval. We use the information to facilitate our review and data entry for OCS plans. We will protect proprietary data according to the Freedom of Information Act and 30 CFR 250.196. An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid Office of Management and Budget Control Number. The use of this form is voluntary. The public reporting burden for this form is included in the burden for preparing Exploration Plans and Development Operations Coordination Documents. We estimate that burden to average 580 hours per response, including the time for reviewing instructions, gathering and maintaining data, and completing and reviewing the form. Direct comments regarding the burden estimate or any other aspect of this form to the Information Collection Clearance Officer, Mail Stop 4230, Minerals Management Service, 1849 C Street, N.W., Washington, DC 20240.

OCS PLAN INFORMATION FORM (CONTINUED)

***Include one copy of this page for each proposed well/structure***

| | | | | | |
|---|---|---|---|---|---|
| ***Proposed Well/Structure Location*** | | | | | |
| ***Well or Structure Name/Number (If renaming well or structure, reference previous name):*** Well Location "B" | | | ***Subsea Completion*** | | |
| Anchor Radius (if applicable) in feet: 4600 | | | | Yes | X No |
| | **Surface Location** | | **Bottom-Hole Location (For Wells)** | | |
| **Lease No.** | OCS-G 32306 | | | | |
| **Area Name** | MC | | | | |
| **Block No.** | 252 | | | | |
| **Blockline Departures (in feet)** | N/S Departure 7066' F_N_L | | N/S Departure F_N_L | | |
| | E/W Departure 1326' F_E_L | | E/W Departure F_E_L | | |
| **Lamber X-Y coordinates** | X: 1202514.00 | | X: | | |
| | Y: 10434194.00 | | Y: | | |
| **Latitude / Longitude** | Latitude 28°44'16.027"N | | Latitude | | |
| | Longitude 88°22'00.581"W | | Longitude | | |
| | TVD (Feet): | MD (Feet): | Water Depth (Feet): 4992 | | |

**Anchor Locations for Drilling Rig or Construction Barge (If anchor radius supplied above, not necessary)**

| Anchor Name or No. | Area | Block | X Coordinate | Y Coordinate | Length of Anchor Chain on Seafloor |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**Paperwork Reduction Act of 1995 Statement:** The Paperwork Reduction Act of 1995 (44 U.S.C. Chapter 35) requires us to inform you that MMS collects this information as part of an applicant's Exploration Plan or Development Operations Coordination Document submitted for MMS approval. We use the information to facilitate our review and data entry for OCS plans. We will protect proprietary data according to the Freedom of Information Act and 30 CFR 250.196. An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid Office of Management and Budget Control Number. The use of this form is voluntary. The public reporting burden for this form is included in the burden for preparing Exploration Plans and Development Operations Coordination Documents. We estimate that burden to average 580 hours per response, including the time for reviewing instructions, gathering and maintaining data, and completing and reviewing the form. Direct comments regarding the burden estimate or any other aspect of this form to the Information Collection Clearance Officer, Mail Stop 4230, Minerals Management Service, 1849 C Street, N.W., Washington, DC 20240.

Y = 10,438,560.00ft

X = 1,188,000.00ft

Proposed Surface Hole locations:

| | Block Ties FEL x FNL | UTM Zone 16 North NAD27 - US Survey Feet Northing (Y) | Easting (X) | NAD27 Lat/Long Latitude | Longitude | NAD83 Lat/Long Latitude | Longitude | Water Depth |
|---|---|---|---|---|---|---|---|---|
| "A" | 1036.12' X 6943.00' | 10431617.00ft | 1202803.88ft | 28°44'17.277"N | 88°21'57.340"W | 28°44'18.128"N | 88°21'57.362"W | -4992ft |
| "B" | 1326.00' X 7066.00' | 10431494.00ft | 1202514.00ft | 28°44'16.027"N | 88°22'00.581"W | 28°44'16.877"N | 88°22'00.603"W | -4992ft |




Y = 10,422,720.00ft

X = 1,203,840.00ft

Notes:
1) All coordinate data in UTM Zone 16 North, NAD27, US survey feet unless otherwise noted;
2) All geodetic conversions transformed utilizing NADCON version 2.0 or better equivalent software;
3) Locations NOT in a Military Warning Area

"Public Information"

bp

BP EXPLORATION AND PRODUCTION

EP Locations OCS-G32306 MC 252 "A" and "B"

Mississippi Canyon Area (OPD# NH16-10) Block 252 Offshore Federal - Louisiana

Plat prepared by. Brian D. Autio, RPLS BP IT&S GoM SPU

Scale 1" = 2000 ft

Date: 11February 2009

# SECTION 2.0
# General Information
# (250.213 and 250.243)

**2.1 Applications and Permits** – The table below provides information on the filing or approval status of the individual and/or site-specific Federal, State and local application approvals or permits that must be obtained to conduct the proposed activities.

| Application/Permit | Issuing Agency | Status |
|---|---|---|
| Application for Permit to Drill | MMS – New Orleans District | To be submitted |
| Emergency Evacuation Plan | USCG | To be submitted |

**2.2 Drilling Fluids** - A table providing information on the types (including chemical constituents) and amounts of the drilling fluids that are planned to drill the proposed wells is included below:

| Type of Drilling Fluid | Estimated Volume of Drilling Fluid to be Used per Well |
|---|---|
| Water-based (seawater, freshwater, barite) | 20,000 bbls |
| Synthetic-based (internal olefin, ester) | 10,000 bbls |

**2.3 New or Unusual Technology**

BP Exploration & Production Inc. does not propose to utilize new techniques or unusual technologies for these operations; however, the best available and safest technologies (BAST) as referenced in Title 30 CFR 250 will be incorporated as standard operational procedures.

**2.4 Bonding Information**

The bond requirements for the activities and facilities proposed in this Exploration Plan are satisfied by a $3,000,000 area-wide bond furnished and maintained according Title 30 CFR Part 256, Subpart I, and NTL No. 2000-G16 *"Guidelines for General Lease Surety Bonds"*, dated September 7, 2000.

**2.5 Oil Spill Financial Responsibility (OSFR)**

BP Exploration & Production Inc., MMS company number 02481, has demonstrated oil spill financial responsibility for the facilities proposed in this Exploration Plan according to Title 30 CFR Part 253, and National NTL No. 2008-N05, "*Guidelines for Oil Spill Financial Responsibility for Covered Facilities*".

**2.6 Deepwater Well Control**

BP Exploration & Production Inc., MMS company number 02481, has the financial capability to drill a relief well and conduct other emergency well control operations.

**2.7 Blowout Scenario**

A scenario for a potential blowout of the well from which BP would expect to have the highest volume of liquid hydrocarbons is not required for the operations proposed in this EP.

# SECTION 3.0
# Geological, Geophysical, and $H_2S$ Information
# (250.214, 250.215, 250.244 and 240.245)

## 3.1 Geological and Geophysical Information

The following subsections describe the various geological and geophysical data that has been included with this plan. Maps and cross-sections can be found at the end of this descriptive section or as attachments to the overall Plan.

**3.1.1 Geological description** – Proprietary Information

**3.1.2 Structure contour maps** - Current structure contour maps at a scale of 1 inch = 2,000 feet (depth-based, expressed in feet subsea) drawn on the top of each prospective hydrocarbon sand, showing the entire lease block and the location of each proposed well and the locations of geological cross-sections.

**3.1.3 Interpreted two-dimensional (2-D) and/or three dimensional (3D) seismic lines** –3D seismic data for shallow hazards identification as per the guidelines outlined in NTL 2008-G05.

**3.1.4 Geological structure cross-sections** – Interpreted geological structure cross-sections showing the location and depth of each proposed well and showing at least one key horizon and the objective sands.

**3.1.5 Shallow hazards report** - The proposed surface location of this well was selected based on the results of: a regional shallow hazards survey and study of MC208, MC252 and MC296 and portions of surrounding blocks conducted by KC Offshore in 1998 for Texaco Exploration and Production Inc. (Texaco) using HR2D seismic data integrated with 3D exploration seismic data; AND a shallow hazards report for MC252 and MC296 and vicinity produced by Fugro GeoServices, Inc. (Fugro) in 2003 for Dominion Exploration and Production Inc. (Dominion) based on exploration 3D seismic data – the seafloor mapping area for this report covered all of MC252 and MC296, whereas the subsurface mapping area only covered the southern half of MC252 and the northern half of MC296. Copies of the 1998 KC Offshore report have already been submitted to the MMS in support of the Texaco EP documentation for five proposed wells (A through E) with surface locations in MC252 (Plan Control N 6521, approved 16 July, 1999) and copies of the 2003 Fugro report were submitted in support of the Dominion EP documentation for four proposed wells (A through D) with surface locations in MC252 and MC296 (Plan Control N 7743, approved 29 May, 2003).

A site-specific Shallow Hazards and Archaeological Assessment for the proposed wellsite and mooring pattern was commissioned by BP and produced by C&C Technologies (C&C) in 2009 based on AUV data acquired during January 2009 over a larger area.

**3.1.6 Shallow hazards assessment** – A shallow hazard analysis prepared, in accordance with NTL No. 2008-G05, for all proposed surface locations evaluating seafloor and subsurface geologic and manmade features and conditions.

**3.1.7 High resolution seismic lines** – An annotated copy of the high-resolution survey line closest to each of the proposed well locations.

**3.1.8 Stratigraphic column** – Generalized biostratigraphic/lithostratigraphic column from the seafloor to the total depth of the proposed wells.

**3.1.9 Time vs. depth tables** – A table providing seismic time versus depth for the proposed well locations.

**SECTION 3.0**
**Geological, Geophysical, and $H_2S$ Information**
**(250.214, 250.215, 250.244 and 240.245)**

## 3.2 $H_2S$ Information

**3.2.1 Concentration** – It is not expected that $H_2S$ will be encountered during the operations proposed in this plan.

**3.2.2 Classification** – Pursuant to Title 30 CFR 250.490(c), BP requests a determination that Mississippi Canyon Block 252 is located in an area where the absence of $H_2S$ has been confirmed.

**3.2.3 $H_2S$ Contingency Plan** – An $H_2S$ Contingency Plan prepared according to 30 CFR 250.4990(f) will not be required for the operations proposed in this plan.

**3.2.4 Modeling Report** – $H_2S$ at concentrations greater than 500 parts per million (ppm) are not expected in the operations proposed in this plan; therefore a modeling report is not required.

## 3.3 Attachments to Section 3.0

- Shallow hazard assessment

bp

# Bathymetry Map

Proposed Mississippi Canyon Block 252 "B" Location




Water depths in feet
Contour Interval = 50 feet

Water depths in feet
Contour Interval = 10 feet




Bathymetry data derived from exploration 3D seismic water bottom time picks, converted to feet using an average water column velocity of 4922 ft/sec derived from offset well time-depth pairs and then adjusted to C&C 2009 AUV depth at proposed wellsite

Images produced in Fledermaus
Vertical exaggeration = x0.1

Plate 6

## CONCLUSIONS

This Shallow Hazards Assessment for location "A" in Mississippi Canyon Block 252 (OCS-G-32306) supplements the Exploration Plan (EP) to be submitted to the Minerals Management Service (MMS). This narrative defines the proposed location and documents the anticipated tophole drilling conditions within a radius of 1,500 ft of the primary location

Conditions at the proposed drilling location have been evaluated on the basis of: a regional shallow hazards survey and study conducted by KC Offshore in 1998 for Texaco Exploration and Production Inc. using HR2D seismic data integrated with 3D exploration seismic data; a shallow hazards report for MC252 and MC296 produced by Fugro GeoServices, Inc. (Fugro) in 2003 for Dominion Exploration and Production Inc. based on exploration 3D seismic; mapping performed internally in 2008 and 2009 by BP America Inc. for MC252 and vicinity using a merged data volume (mosaic) re-processed by TGS in 2004 and covering a large portion of the Mississippi Canyon Lease Area; results of a site-specific Shallow Hazards and Archaeological Assessment for the proposed wellsite and mooring pattern commissioned by BP and produced by C&C Technologies (C&C) in 2009 based on AUV data acquired during January 2009 over a larger area; and well information for the nearby MC252#1 and MC296#1 wells.

Results of the data review indicate

- The seafloor at the proposed "A" location is in a water depth of 4,992 ft and dips to the southeast at ~3.0°. The only seafloor feature identified on the exploration 3D seismic data within the vicinity is a low-relief escarpment approximately 1,000 ft to the south of the "A" location, which is the seafloor expression of a deeply-buried scarp associated with mass-wasting.
- There is no evidence for the existence of high-density chemosynthetic communities within 1,500 ft of the proposed well location.
- There is no evidence for shipwreck debris or sites of archaeological significance at or within 1,500 ft of the proposed well location.
- The proposed wellbore will not intersect any faults between the seafloor and the depth limit of this investigation at Horizon 6 or 5,328 ft bml.
- The risk of encountering **shallow gas** is ranked as: ***Moderate*** for two sand-prone sequences within the middle and lower portions of Unit 6; ***Low*** for the central portion of Unit 4 and a sandy sequence at the base of Unit 4, the upper portion of Unit 5 and an interval within the top of Unit 6; and ***Negligible*** for all other units or portions of units between the Seafloor and Horizon 60.

## CONCLUSIONS

This Shallow Hazards Assessment for location "B" in Mississippi Canyon Block 252 (OCS-G-32306) supplements the Exploration Plan (EP) to be submitted to the Minerals Management Service (MMS). This narrative defines the proposed location and documents the anticipated tophole drilling conditions within a radius of 1,500 ft of the primary location

Conditions at the proposed drilling location have been evaluated on the basis of: a regional shallow hazards survey and study conducted by KC Offshore in 1998 for Texaco Exploration and Production Inc. using HR2D seismic data integrated with 3D exploration seismic data; a shallow hazards report for MC252 and MC296 produced by Fugro GeoServices, Inc. (Fugro) in 2003 for Dominion Exploration and Production Inc. based on exploration 3D seismic; mapping performed internally in 2008 and 2009 by BP America Inc. for MC252 and vicinity using a merged data volume (mosaic) re-processed by TGS in 2004 and covering a large portion of the Mississippi Canyon Lease Area; results of a site-specific Shallow Hazards and Archaeological Assessment for the proposed wellsite and mooring pattern commissioned by BP and produced by C&C Technologies (C&C) in 2009 based on AUV data acquired during January 2009 over a larger area; and well information for the nearby MC252#1 and MC296#1 wells.

Results of the data review indicate

- The seafloor at the proposed "B" location is in a water depth of 4,992 ft and dips to the southeast at ~3.0°. The only seafloor feature identified on the exploration 3D seismic data within the vicinity is a low-relief escarpment approximately 950 ft to the south of the "B" location, which is the seafloor expression of a deeply-buried scarp associated with mass-wasting.
- There is no evidence for the existence of high-density chemosynthetic communities within 1,500 ft of the proposed well location.
- There is no evidence for shipwreck debris or sites of archaeological significance at or within 1,500 ft of the proposed well location.
- The proposed wellbore will not intersect any faults between the seafloor and the depth limit of this investigation at Horizon 6 or 5,292 ft bml.
- The risk of encountering **shallow gas** is ranked as: ***Moderate*** for two sand-prone sequences within the middle and lower portions of Unit 6; ***Low*** for the central portion of Unit 4 and a sandy sequence at the base of Unit 4, the upper portion of Unit 5 and an interval within the top of Unit 6; and ***Negligible*** for all other units or portions of units between the Seafloor and Horizon 60.

# SECTION 4.0
# Biological, Physical, and Socioeconomic Information
# (250.216 and 250.247)

## 4.1 Chemosynthetic Information

Since the proposed seafloor disturbing activities are in water depths greater than 400 meters, maps, analysis, and a statement prepared using the guidance in Attachment B of NTL No. 2000-G20, "Deepwater Chemosynthetic Communities" are provided as attachments to Section 3.0.

Seafloor conditions capable of supporting high-density chemosynthetic communities are not expected within the mooring pattern or within 1,500 ft. of any proposed SEPLA anchor locations.

## 4.2 Topographic Features Information

MMS and NOAA Fisheries have entered into a programmatic consultation agreement for Essential Fish Habitat, which requires that no bottom disturbing activities may occur within 500 feet of the no-activity zone of a topographic feature. If such bottom disturbing activities are proposed, the MMS is required to consult with NOAA Fisheries.

**4.2.1 Topographic features map** – No bottom-disturbing activities (including rig placement, and rig or construction barge use of anchors, chains, cables, and wire ropes) proposed in this plan are within 305 meters (1000 feet) of the "No Activity Zone" of an identified topographic feature. Therefore the map described in Attachment 2, Section A, Item No. 1 of NTL No. 2004-G05, *"Biologically Sensitive Areas of the Gulf of Mexico,"* dated April 1, 2004 is not required.

**4.2.2 Topographic features statement (shunting)** – This exploration plan does not proposed to drill more than two wells from the same surface location located outside the 1-mile Zone but within the Protective Zone of an identified topographic feature. Therefore the statement described in Attachment 2, Section A, Item No. 2 of NTL No. 2004-G05 *"Biologically Sensitive Areas of the Gulf of Mexico,"* dated April 1, 2004 is not required.

## 4.3 Live Bottoms (Pinnacle Trend)

MMS and NOAA Fisheries have entered into a programmatic consultation agreement for Essential Fish Habitat that relates to bottom-disturbing activities occurring within 100 feet of any Pinnacle Trend feature with vertical relief greater than or equal to 8 feet. Any such proposed activities would require MMS to consult with the NOAA Fisheries pursuant to the agreement.

Mississippi Canyon Block 252 is not located in the vicinity of a Pinnacle Trend area.

## 4.4 Live Bottoms (Low Relief)

The Live Bottom (low relief) stipulation is not attached to the lease for Mississippi Canyon Block 252. Therefore the map described in Attachment 6, Section A of NTL No. 2004-G05 *"Biologically Sensitive Areas of the Gulf of Mexico,"* dated April 1, 2004 is not required.

## 4.5 Potentially Sensitive Biological Features

No bottom disturbing activities (including rig placement and rig or construction barge use of anchors, chains, cables, and wire ropes) within 30 meters (100 feet) of potentially sensitive biological features are proposed in this plan. Therefore the map described in Attachment 8, Section A of NTL No. 2004-G05 *"Biologically Sensitive Areas of the Gulf of Mexico,"* dated April 1, 2004 is not required.

## 4.6 Remotely Operated Vehicle (ROV) Monitoring Survey Plan

Pursuant to NTL No. 2008-G06 *"Remotely Operated Vehicle Surveys in Deepwater,"* operators may be required to conduct remotely operated vehicle (ROV) surveys during pre-spud and post-drilling operations for the purpose of biological and physical observations.

MC 252 is located in Grid 16. Therefore, according to the MMS website Grid EA and ROV Status Report, the ROV surveys will not be required for the proposed operations.

### 4.7 Threatened or endangered species, critical habitat, and marine mammal information

Twenty-nine species of marine mammals occur in the GOM. There are 28 species of cetaceans (7 mysticete and 21 odontocete species) and 1 sirenian species, the manatee.

Five baleen whales, one toothed whale, and one sirenian occur in the GOM and are listed as endangered under the Endangered Species Act (ESA):

- The Northern Right Whale
- The Blue Whale
- The Fin Whale
- The Sei Whale
- The Humpback Whale
- The Sperm Whale
- The West Indian Manatee

The sperm whale is common in oceanic waters of the northern GOM and appears to be a resident species, while the baleen whales are considered rare or extralimital in the Gulf. The West Indian manatee typically inhabits only coastal marine, brackish, and freshwater areas.

Five sea turtles inhabit the waters of GOM and are listed as endangered: the Leatherback, Green, Hawksbill, Kemp's Ridley, and Loggerhead turtle. These five species are all highly migratory, and no individual members of any of the species are likely to be year-round residents of the proposed area of interest.

There are no critical habitats designated within the Gulf of Mexico for the threatened and endangered species listed above.

Additional information can be found in Section 14.0 of this Plan.

### 4.7 Archaeological Report

Pursuant to NTL No. 2005-G07 *"Archaeological Resource Surveys and Reports"*, and further clarified in NTL NO. 2006-G07 *"Revisions to the List of OCS Lease Blocks Requiring Archaeological Resource Surveys and Reports"*, lessees proposing bottom-disturbing activities in areas that have been identified as "High Probability Shipwreck blocks or Prehistoric areas must submit an archaeological report or a reference to such a report if it has already been provided to the Regional Supervisor.

Mississippi Canyon Block 252 is located in a block designated as a High Probability Shipwreck or Prehistoric Area. An Archaeological Assessment is included with the plan.

## SECTION 5.0
## Waste and Discharge Information
## (250.217 and 250.248)

The Minerals Management Service (MMS), U.S. Coast Guard (USCG) and the U.S. Environmental Protection Agency regulate the overboard discharge and/or disposal of operational waste associated with oil and gas exploration and production activities.

### 5.1 Projected Generated Wastes

The term disposed wastes describes those wastes generated by the proposed activities that are disposed of by means other than by releasing them into the waters of the Gulf of Mexico at the site where they are generated. These wastes can be disposed of by offsite release, injections, encapsulation, or placement at either onshore or offshore permitted locations for the purpose of returning them back to the environment

A table providing information on the projected solid and liquid wastes likely to be generated by the proposed activities is included below:

| Type of Waste | Composition | Projected Amount |
|---|---|---|
| Spent drilling fluids | Water-based drilling muds | 20,000 bbls/well |
| Cuttings containing synthetic-based mud | Cuttings coated with synthetic based drilling muds | 4000 bbls/well |
| Trash | Trash and Debris | 18,000 cu. ft. |
| Drill cuttings associated with water-based fluids | Cuttings coated with water based drilling muds | 1800 bbls |
| Sanitary wastes (Omnipure unit) | Sanitary wastes from living quarters | 10,000 bbls |

### 5.2 Projected Ocean Discharge

The term discharges describes those wastes generated by the proposed activities that will be disposed of by releasing them into the waters of the Gulf of Mexico at the site where they are generated, usually after receiving some form of treatment before they are released, and in compliance with applicable NPDES permits or State requirements.

BP has requested coverage under the EPA Region VI NPDES General Permit GMG290110 for discharges associated with exploration activities in Mississippi Canyon Block 252, and will take applicable steps to ensure all offshore discharges associated with the proposed operations will be conducted in accordance with the permit.

A table describing and liquid wastes to be discharged overboard is included below:

| Type of Waste | Total Amount to be Discharged | Discharge Rate | Discharge Method |
|---|---|---|---|
| Water-based Drilling Fluid | 20,000 bbls | 1800 bbls/hr | Riserless drilling, discharged at the mudline |
| Drill cuttings associated with water-based fluids | 1,800 bbls | 400 bbls/hr | Riserless drilling discharged at the mudline |
| Drill cuttings associated with | 4000 bbl | 100 bbl/hr | Discharge overboard through |

## SECTION 5.0
## Waste and Discharge Information
## (250.217 and 250.248)

| Type of Waste | Total Amount to be Discharged | Discharge Rate | Discharge Method |
|---|---|---|---|
| synthetic based fluids | | | shunt line to 40' below waterline. |
| Sanitary wastes (Omnipure unit) | 10,000 bbls | 3600 gallons/day | Block Chlorinate and Discharge overboard |
| Domestic wastes | 30 gal/person/day | Not applicable | Block Remove floating solids, discharge overboard |
| Deck drainage | Dependant upon rainfall and deck washdown | Not applicable | Block Remove oil and grease, discharge overboard |

# SECTION 6.0
# Air Emissions Information
# (250.218 and 250.249)

Offshore air emissions related to the proposed activities result mainly from the drilling rig operations, helicopters and service vessels. These emissions occur mainly from combustion or burning of fuels and natural gas and from venting or evaporation of hydrocarbons. The combustion of fuels occurs primarily on diesel-powered generators, pumps or motors and from lighter fuel motors.

Primary air pollutants associated with OCS activities are nitrogen oxides, carbon monoxide, sulphur oxides, volatile organic compound and suspended particulate.

**6.1** **Emissions worksheets and screening questions** – Plan emissions were calculated using the methodology, emission factors, and worksheets in Form MMS-138 for Exploration Plans and are attached to this section of the Exploration Plan.

Screening questions and emissions summary are described in the tables below. The Plan Emissions and the Complex Total Emissions are the same.

| Yes | No | Air Quality Screening Questions |
|---|---|---|
| | X | Is any calculated Complex Total (CT) Emission amount (in tons) associated with your proposed exploration activities more than 90% of the amounts calculated using the following formulas: CT = 2400D2/3 for CO, and CT = 33.3D for the other air pollutants (where D = distance to shore in miles)? |
| | X | Do your emission calculations include any emission reduction measures or modified emission factors? |
| | X | Are your proposed exploration activities located east of 87.5° W longitude? |
| | X | Do you expect to encounter H2S at concentrations greater than 20 parts per million (ppm)? |
| | X | Do you propose to flare or vent natural gas for more than 48 continuous hours from any proposed well? |
| | X | Do you propose to burn produced hydrocarbon liquids? |

| Air Quality Emissions Summary | | | | | |
|---|---|---|---|---|---|
| Year | Emitted Substance | | | | |
| | PM | SOx | NOx | VOC | CO |
| 2009 | 38.60 | 177.05 | 1326.70 | 39.80 | 289.46 |
| 2010 | 38.60 | 177.05 | 1326.70 | 39.80 | 289.46 |
| Allowable | 1598.40 | 1598.40 | 1598.40 | 1598.40 | 44906.21 |

**6.2** **Contact Information** – Information for a contact who calculated the projected Plan Emissions and exemption amounts and can answer questions regarding the same is listed below:

Megan Parks
BP Exploration & Production Inc.
281.366.8296
Megan.parks@bp.com

**6.3** **Modeling Report** – An Offshore Coastal Dispersion (OCD) Modeling Report for the proposed operations is not required for the operations proposed in this EP.

## 6.4 Attachments to section 6.0

- Form MMS-138 worksheets

OMB Control No. 1010-0049
OMB Approval Expires: August 31, 2006

## EXPLORATION PLAN (EP)
## AIR QUALITY SCREENING CHECKLIST

| | |
|---|---|
| **COMPANY** | BP Exploration & Production Inc. |
| **AREA** | Mississippi Canyon |
| **BLOCK** | 252 |
| **LEASE** | OCS-G32306 |
| **PLATFORM** | |
| **WELL** | A & B |
| | |
| **COMPANY CONTACT** | Megan Parks |
| **TELEPHONE NO.** | 281-366-8296 |
| **REMARKS** | Drill and temporarily abandon 2 exploratory wells. |

# EMISSIONS CALCULATIONS 1ST YEAR

| COMPANY | AREA | BLOCK | LEASE | PLATFORM | WELL | | CONTACT | PHONE | REMARKS |
|---|---|---|---|---|---|---|---|---|---|
| BP Exploration & Production Ir | Mississippi Canyon | 252 | OCS-G32306 | | A & B | | Megan Parks | 281-366-8206 | |

| OPERATIONS | EQUIPMENT | RATING | MAX. FUEL | ACT. FUEL | RUN TIME | | MAXIMUM POUNDS PER HOUR | | | | | ESTIMATED TONS | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Diesel Engines | HP | GAL/HR | GAL/D | | | | | | | | | | | | |
| | Nat. Gas Engines | HP | SCF/HR | SCF/D | | | | | | | | | | | | |
| | Burners | MMBTU/HR | SCF/HR | SCF/D | HR/D | DAYS | PM | SOx | NOx | VOC | CO | PM | SOx | NOx | VOC | CO |
| DRILLING | PRIME MOVER>600hp diesel | 3600 | 173.88 | 11129.00 | 24 | 100 | 2.54 | 11.64 | 87.22 | 2.62 | 19.03 | 8.12 | 37.25 | 279.14 | 8.37 | 60.90 |
| Marianas MODU | PRIME MOVER>600hp diesel | 3600 | 173.88 | 4173.12 | 24 | 100 | 2.54 | 11.64 | 87.22 | 2.62 | 19.03 | 3.04 | 13.97 | 104.67 | 3.14 | 22.84 |
| | PRIME MOVER>600hp diesel | 3600 | 173.88 | 4173.12 | 24 | 100 | 2.54 | 11.64 | 87.22 | 2.62 | 19.03 | 3.04 | 13.97 | 104.67 | 3.14 | 22.84 |
| | PRIME MOVER>600hp diesel | 3600 | 173.88 | 4173.12 | 24 | 100 | 2.54 | 11.64 | 87.22 | 2.62 | 19.03 | 3.04 | 13.97 | 104.67 | 3.14 | 22.84 |
| | PRIME MOVER>600hp diesel | 3600 | 173.88 | 4173.12 | 24 | 100 | 2.54 | 11.64 | 87.22 | 2.62 | 19.03 | 3.04 | 13.97 | 104.67 | 3.14 | 22.84 |
| | PRIME MOVER>600hp diesel | 3600 | 173.88 | 4173.12 | 24 | 100 | 2.54 | 11.64 | 87.22 | 2.62 | 19.03 | 3.04 | 13.97 | 104.67 | 3.14 | 22.84 |
| | PRIME MOVER>600hp diesel | 1950 | 94.185 | 2260.44 | 24 | 100 | 1.37 | 8.31 | 47.25 | 1.42 | 10.31 | 1.65 | 7.57 | 56.70 | 1.70 | 12.37 |
| Tugs to move MODU | VESSELS>600hp diesel(support) | 16500 | 796.95 | 19126.80 | 24 | 8 | 11.63 | 53.35 | 399.76 | 11.99 | 87.22 | 1.12 | 5.12 | 38.38 | 1.15 | 8.37 |
| | VESSELS>600hp diesel(support) | 13500 | 652.05 | 15649.20 | 24 | 8 | 9.52 | 43.65 | 327.09 | 9.61 | 71.37 | 0.91 | 4.19 | 31.40 | 0.94 | 6.85 |
| | VESSELS>600hp diesel(support) | 13500 | 652.05 | 15649.20 | 24 | 8 | 9.52 | 43.65 | 327.09 | 9.61 | 71.37 | 0.91 | 4.19 | 31.40 | 0.94 | 6.85 |
| | VESSELS>600hp diesel(support) | 15000 | 724.5 | 17388.00 | 24 | 8 | 10.57 | 48.50 | 363.44 | 10.90 | 79.30 | 1.01 | 4.66 | 34.89 | 1.05 | 7.61 |
| | VESSELS>600hp diesel(support) | 15000 | 724.5 | 17388.00 | 24 | 8 | 10.57 | 48.50 | 363.44 | 10.90 | 79.30 | 1.01 | 4.66 | 34.89 | 1.05 | 7.61 |
| Anchor handling | VESSELS>600hp diesel(support) | 15000 | 724.5 | 17388.00 | 24 | 30 | 10.57 | 48.50 | 363.44 | 10.90 | 79.30 | 3.81 | 17.46 | 130.84 | 3.93 | 26.55 |
| Anchor handling | VESSELS>600hp diesel(support) | 15000 | 724.5 | 17388.00 | 24 | 12 | 10.57 | 48.50 | 363.44 | 10.90 | 79.30 | 1.52 | 6.96 | 52.33 | 1.57 | 11.42 |
| Support vessels for rig | VESSELS>600hp diesel(crew) | 6600 | 318.78 | 7650.72 | 6 | 100 | 4.85 | 21.34 | 159.91 | 4.80 | 34.89 | 1.68 | 8.54 | 63.96 | 1.92 | 13.96 |
| | VESSELS>600hp diesel(support) | 3400 | 164.22 | 3941.28 | 6 | 100 | 2.40 | 10.99 | 82.38 | 2.47 | 17.97 | 0.72 | 3.30 | 24.71 | 0.74 | 5.39 |
| | VESSELS>600hp diesel(support) | 3400 | 164.22 | 3941.28 | 6 | 100 | 2.40 | 10.99 | 82.38 | 2.47 | 17.97 | 0.72 | 3.30 | 24.71 | 0.74 | 5.39 |
| | MISC. | BPD | SCF/HR | COUNT | | | | | | | | | | | | |
| | TANK- | 0 | | | 0 | 0 | | | | 0.00 | | | | | 0.00 | |
| DRILLING | OIL BURN | 0 | | | 0 | 0 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| WELL TEST | GAS FLARE | | 0 | | 0 | 0 | | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 | 0.00 | 0.00 | 0.00 |
| 2009 | YEAR TOTAL | | | | | | 99.00 | 454.14 | 3402.97 | 102.09 | 742.47 | 38.60 | 177.05 | 1328.70 | 39.80 | 289.48 |
| EXEMPTION CALCULATION | DISTANCE FROM LAND IN MILES | | | | | | | | | | | 1598.40 | 1596.40 | 1598.40 | 1596.40 | 44906.21 |
| | 48.0 | | | | | | | | | | | | | | | |

# EMISSIONS CALCULATIONS 1ST YEAR

| COMPANY | AREA | BLOCK | LEASE | PLATFORM | WELL | | | CONTACT | | | PHONE | REMARKS | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BP Exploration & Production In | Mississippi Canyon | 252 | OCS-G32306 | | A & B | | | | Megan Parks | | 281-366-8296 | | | | | |
| OPERATIONS | EQUIPMENT | RATING | MAX. FUEL | ACT. FUEL | RUN TIME | | MAXIMUM POUNDS PER HOUR | | | | | ESTIMATED TONS | | | | |
| | Diesel Engines | HP | GAL/HR | GAL/D | | | | | | | | | | | | |
| | Nat. Gas Engines | HP | SCF/HR | SCF/D | | | | | | | | | | | | |
| | Burners | MMBTU/HR | SCF/HR | SCF/D | HR/D | DAYS | PM | SOx | NOx | VOC | CO | PM | SOx | NOx | VOC | CO |
| DRILLING | PRIME MOVER>600hp diesel | 3600 | 173.88 | 11129.00 | 24 | 100 | 2.54 | 11.64 | 87.22 | 2.62 | 19.03 | 8.12 | 37.25 | 279.14 | 8.37 | 60.90 |
| Marianas MODU | PRIME MOVER>600hp diesel | 3600 | 173.88 | 4173.12 | 24 | 100 | 2.54 | 11.64 | 67 22 | 2.62 | 19.03 | 3.04 | 13.97 | 104.67 | 3.14 | 22.84 |
| | PRIME MOVER>600hp diesel | 3600 | 173.88 | 4173.12 | 24 | 100 | 2.54 | 11.64 | 67.22 | 2.62 | 19.03 | 3.04 | 13.97 | 104.67 | 3.14 | 22.84 |
| | PRIME MOVER>600hp diesel | 3600 | 173.88 | 4173.12 | 24 | 100 | 2.54 | 11.64 | 67.22 | 2.62 | 19.03 | 3.04 | 13.97 | 104.67 | 3.14 | 22.84 |
| | PRIME MOVER>600hp diesel | 3600 | 173.88 | 4173.12 | 24 | 100 | 2.54 | 11.64 | 67.22 | 2.62 | 19.03 | 3.04 | 13.97 | 104.67 | 3.14 | 22.84 |
| | PRIME MOVER>600hp diesel | 3600 | 173.88 | 4173.12 | 24 | 100 | 2.54 | 11.64 | 67.22 | 2.62 | 19.03 | 3.04 | 13.97 | 104.67 | 3.14 | 22.84 |
| | PRIME MOVER>600hp diesel | 1950 | 94.185 | 2260.44 | 24 | 100 | 1.37 | 6.31 | 47.25 | 1.42 | 10.31 | 1.65 | 7.57 | 56.70 | 1.70 | 12.37 |
| Tugs to move MODU | VESSELS>600hp diesel(support) | 16500 | 796.95 | 19126.80 | 24 | 8 | 11.63 | 53.35 | 399.76 | 11.99 | 87.22 | 1.12 | 5.12 | 36.36 | 1.15 | 8.37 |
| | VESSELS>600hp diesel(support) | 13500 | 652.05 | 15649.20 | 24 | 8 | 9.52 | 43.65 | 327.09 | 9.81 | 71.37 | 0.91 | 4.19 | 31.40 | 0.94 | 6.85 |
| | VESSELS>600hp diesel(support) | 13500 | 652.05 | 15649.20 | 24 | 8 | 9.52 | 43.65 | 327.09 | 9.81 | 71.37 | 0.91 | 4.19 | 31.40 | 0.94 | 6.65 |
| | VESSELS>600hp diesel(support) | 15000 | 724.5 | 17388.00 | 24 | 8 | 10.57 | 46.50 | 363.44 | 10.90 | 79.30 | 1.01 | 4.86 | 34.89 | 1.05 | 7.61 |
| | VESSELS>600hp diesel(support) | 15000 | 724.5 | 17388.00 | 24 | 8 | 10.57 | 46.50 | 363 44 | 10.90 | 79.30 | 1.01 | 4.66 | 34.89 | 1.05 | 7.61 |
| Anchor handling | VESSELS>600hp diesel(support) | 15000 | 724.5 | 17388.00 | 24 | 30 | 10.57 | 48.50 | 363.44 | 10.90 | 79.30 | 3.81 | 17.46 | 130.84 | 3.93 | 28.55 |
| Anchor handling | VESSELS>600hp diesel(support) | 15000 | 724.5 | 17388.00 | 24 | 12 | 10.57 | 48.50 | 363.44 | 10.90 | 79.30 | 1.52 | 6.98 | 52.33 | 1.57 | 11.42 |
| Support vessels for rig | VESSELS>600hp diesel(crew) | 6600 | 318.78 | 7650.72 | 6 | 100 | 4 85 | 21.34 | 159.91 | 4.80 | 34.89 | 1.86 | 8.54 | 63.96 | 1.92 | 13.96 |
| | VESSELS>600hp diesel(support) | 3400 | 184.22 | 3941.28 | 6 | 100 | 2.40 | 10.99 | 82.38 | 2.47 | 17.97 | 0.72 | 3.30 | 24.71 | 0.74 | 5.39 |
| | VESSELS>600hp diesel(support) | 3400 | 184.22 | 3941.28 | 6 | 100 | 2.40 | 10.99 | 82.38 | 2.47 | 17.97 | 0.72 | 3.30 | 24.71 | 0.74 | 5.39 |
| | MISC. | BPD | SCF/HR | COUNT | | | | | | | | | | | | |
| | TANK- | 0 | | | 0 | 0 | | | | 0.00 | | | | | 0.00 | |
| DRILLING | OIL BURN | 0 | | | 0 | 0 | 0 00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| WELL TEST | GAS FLARE | | 0 | | 0 | 0 | | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 | 0.00 | 0.00 | 0.00 |
| 2009 | YEAR TOTAL | | | | | | 99.00 | 454.14 | 3402.97 | 102.09 | 742.47 | 38.60 | 177.05 | 1328.70 | 39.80 | 289.46 |
| EXEMPTION CALCULATION | DISTANCE FROM LAND IN MILES | | | | | | | | | | | 1598.40 | 1598.40 | 1598.40 | 1598.40 | 44908.21 |
| | 48.0 | | | | | | | | | | | | | | | |

Form MMS-138 (August 2003)
Page 3 of 8

SUMMARY

| COMPANY | AREA | BLOCK | LEASE | PLATFORM | WELL |
|---|---|---|---|---|---|
| BP Exploration | Mississippi Canyon | 252 | OCS-G32306 | | A & B |

| Year | Emitted Substance | | | | |
|---|---|---|---|---|---|
| | PM | SOx | NOx | VOC | CO |
| 2009 | 38.60 | 177.05 | 1326.70 | 39.80 | 289.46 |
| 2010 | 38.60 | 177.05 | 1326.70 | 39.80 | 289.46 |
| Allowable | 1598.40 | 1598.40 | 1598.40 | 1598.40 | 44906.21 |

# SECTION 7.0
# Oil Spills Information
# (250.219 and 250.250)

## 7.1 Oil Spill Response Planning

The proposed activities are in the Central Planning Area of the GOM. Therefore a site-specific Oil Spill Response Plan (OSRP) is not required for this plan.

**7.1.1 Regional OSRP Information** – All proposed activities and facilities in this Exploration Plan will be covered by the Oil Spill Response Plan filed by BP America Inc. (MMS company number 21591) and includes BP Exploration & Production Inc. (MMS company number 02481) in accordance with 30 CFR 254 and approved on November 14, 2008.

**7.1.2 Spill Response Sites** – Information on the location of the primary spill response equipment and the location of planned staging area(s) that would be used in the unlikely event of an oil spill resulting from the activities proposed in this plan is provided in the table below.

| Primary Response Equipment Location | Preplanned Staging Location(s) |
|---|---|
| Belle Chasse, LA | Port Fourchon, LA |
| New Iberia, LA | Morgan City, LA |

**7.1.3 OSRO Information** – BP utilizes the National Response Corporation (NRC) and the Marine Spill Response Corporation (MSRC) as the primary providers for oil spill removal equipment. The MSRC STARS network provides for the closest available personnel, as well as an MSRC supervisor to operate the equipment.

**7.1. Worst-Case Scenario Determination** – A comparison of the appropriate worst-case scenario from BP's approved regional OSRP with the worst-case scenario from the proposed activities in this Exploration Plan is provided in the table below. The proposed activities are within ten miles seaward of the coastline therefore the "near-shore" worst-case scenario is provided as well as the "exploration" worst-case scenario.

| Category | Regional OSRP (Exploration) | EP |
|---|---|---|
| Type of Activity | Exploration Drilling | Exploration Drilling |
| Facility Location | MC 727 | MC 252 |
| Facility Designation | MODU | MODU |
| Distance to Nearest Shoreline | 50 | 49 miles |
| Volume Uncontrolled Blowout (per day) | 300,000 | 162,000 |
| Type of Oil(s) | Crude Oil | Crude Oil |
| API Gravity | 28° | 33° *(estimated)* |

Since BP Exploration & Production Inc. has the capability to respond to the appropriate worst-case spill scenario included in its regional OSRP approved on November 14, 2008, and since the worst-case scenario determined for our Exploration Plan does not replace the appropriate worst-case scenario in our regional OSRP, I hereby certify that BP Exploration & Production Inc. has the capability to respond, to the maximum extent practicable, to a worst-case discharge, or a substantial threat of such a discharge, resulting from the activities proposed in our Exploration Plan.

**7.1.5 Oil spill response discussion** – a discussion of response to an oil spill resulting from the activities proposed in this plan is not required for this Exploration Plan.

### 7.2 Modeling report

A model of a potential oil or hazardous substance spill is not required for the activities proposed in this plan.

# SECTION 8.0
# Environmental Monitoring Information
# (250.221 and 250.252)

## 8.1 Monitoring Systems

**8.1.1** Operational personnel have been instructed to check for pollution frequently during their tour of duty and, in the event pollution is spotted, to identify and shut-off the source and make immediate notifications as per instructions provided in Section 2 and 3 of BP's approved OSRP, Volume II.

**8.1.2** In accordance with the provisions of Title 30 CFR Part 250.417(e) and NTL 2009-G02 *"Deepwater Ocean Current Monitoring on Floating Facilities"* dated January 27, 2009, the MODU will be equipped with an Acoustic Doppler Current Profile (ADCP) current monitoring system onboard to ensure continuous monitoring and gathering of ocean current data on a real-time basis from the ocean surface and seafloor.

## 8.2 Incidental Takes

BP does not anticipate that any protected species might be incidentally taken during operations proposed in this plan. All activities will be conducted in adherence to NTL 2007-G03 "Marine Trash and Debris Awareness Training and Elimination", NTL 2007-G04 "Vessel Strike Avoidance and Injured/Dead Protected Species Reporting" and NTL 2007-G-02 "Implementation of Seismic Survey Mitigation and Protected Species Observer Program". Monitoring activities are conducted by all personnel on vessels, rigs and platforms to prevent accidental loss of materials overboard and to report sightings of injured/dead protected species. Vessel personnel conduct continual watch while underway to prevent takes through avoidance and to immediately report any observations of injured or dead mammals/turtles, regardless of cause.

Visual and/or passive acoustic monitoring of the area surrounding the sound source will be done by trained marine mammal observers as part of borehole seismic surveys. Visual observers will conduct the NTL prescribed monitoring program during day light hours. Passive acoustic monitoring will be used to monitor and clear the exclusion zone if a night time operation is scheduled.

## 8.3 Flower Garden Banks National Marine Sanctuary

The proposed activities are not located within the Protective Zones of the Flower Garden Banks or Stetson Bank.

# SECTION 9.0
## Lease Stipulation Information
## (250.222 and 250.253)

Oil and gas exploration activities on the OCS are subject to stipulations developed before the lease sale and would be attached to the lease instrument, as necessary, in the form of mitigating measures. The MMS is responsible for ensuring full compliance with stipulations.

9.1 **Stipulation 3 – Military Area (ETWA-1F)**

The military warning area stipulation has been applied to blocks in military warning areas to mitigate potential multiple-use conflicts. The stipulation reduces potential impacts, primarily those associated with safety, by curtailing OCS operations and support activities in areas where military operations are being conducted. One of the requirements of this stipulation is that the operator notify the military prior to conducting oil and gas activities; and if required, enter into an agreement to provide for positive control of boats, ships, and aircraft operating into the warnings areas.

Mississippi Canyon 252 is located within the designated Eglin Water Test Area EWTA-1F. Therefore, in accordance with the requirements of the referenced stipulation, BP will contact the Air Force Development Test Center, Eglin AFB in order to coordinate and control the electromagnetic emissions, boats, ships and aircraft in the area during the proposed operations

# SECTION 10.0
# Environmental Mitigation Measures Information
# (250.223 and 250.254)

**10.1** A description of the measures that would be taken to avoid, minimize, and mitigate impacts to the marine and coastal environments and habitats, biota, and threatened and endangered species is not required for this plan.

**10.2** Incidental Takes - BP does not anticipate that any protected species might be incidentally taken during operations proposed in this plan. All activities will be conducted in adherence to NTL 2007-G03 "Marine Trash and Debris Awareness Training and Elimination", NTL 2007-G04 "Vessel Strike Avoidance and Injured/Dead Protected Species Reporting" and NTL 2007-G-02 "Implementation of Seismic Survey Mitigation and Protected Species Observer Program". Mitigation to prevent takes varies based on the activity underway and it can include 1) worker training on waste management and trash and debris containment procedures to avoid accidental loss overboard and it's potential impact on protected species; 2) vessel procedures to slow down or stop when a protected species is observed; 3) protected species observer program with associated ramp up, shut down and shot pause procedures during seismic operations (VSP).

# SECTION 11.0
## Support Vessels and Aircraft Information
## (250.224 and 250.257)

### 11.1 General

The table below provides information regarding the vessels and aircraft that will be used to support the activities proposed in this plan.

| Type | Maximum Fuel Tank Storage Capacity | Maximum No. in Area at Any time | Trip Frequency or Duration |
|---|---|---|---|
| Aircraft-Helicopter | 300 gallons | 1 | 1 trip daily |
| Crew boat | 36,000 gallons | 1 | 1 trip daily |
| Work boat | 152,000 gallons | 2 | 1 trip daily |

### 11.2 Diesel Oil Supply Vessels

Additional information on the vessels used to supply diesel oil is not required for the activities proposed in this plan.

### 11.3 Drilling Fluids Transportation

The proposed activities are not located in an area where the State of Florida is an affected state. Therefore, information on the projected drilling fluids transported from the onshore support facilities to the drilling unit is not required.

### 11. 4 Solid and Liquid Wastes Transportation

Information regarding the transport of any of the solid and liquid wastes from the site of the proposed activities to other offshore structures or to temporary or permanent onshore facilities for storage disposal is not required for the operations proposed in this plan.

### 11.5 Vicinity Map

A map showing the location of the proposed activities relative to the shoreline, the distance of the proposed activities from the shoreline, and the primary route(s) of the support vessels and aircraft that will be used when traveling between the onshore support facilities and drilling unit is provided as an attachment to this section.

### 11.6 Attachments to Section 10.0

- Vicinity Map







Projection: UTM Zone 16 North
Datum: NAD27
Distance Units: US Survey Feet

# "VICINITY CHART"

Sheet 1 of 2

| | | |
|---|---|---|
| bp | BP EXPLORATION AND PRODUCTION<br>EP Locations OCS-G32306 MC 252 'A' and 'B'<br>Mississippi Canyon Area (OPD# NH16-10) Block 252 Offshore Federal - Louisiana<br>Plat prepared by: Brian D. Autio, RPLS IT&S BP GoM SPU | Scale 1" = 50 miles<br>Date: 11February 2009 |

# SECTION 12.0
# Onshore Support Facilities Information
# (250.225 and 250.258)

The onshore support base for the proposed operations will be in Fourchon, Louisiana. Mississippi Canyon Block 252 is located approximately 190 miles from the nearest Louisiana shoreline and approximately 242 miles from the onshore support base located in Fourchon, Louisiana.

## 12.1 General

The following table provides information of the onshore facility that will be used to provide supply and service support for the activities proposed in this plan.

| Name | Location | Existing/New/Modified |
|---|---|---|
| C-Port | Fourchon, LA | Existing |

The C-Port Fourchon, Louisiana facility provides a vehicle parking lot, office space, radio communication equipment, outside and warehouse storage space, crane, forklifts, water and fueling facilities, and boat dock space. The base is owned by Chouest and is leased by BP Exploration & Production Inc. The base is in operation 24 hours each day.

A small amount of vessel and helicopter traffic may originate from bases other those described above in order to address changes in weather, market, and operational conditions. It is expected that this vessel traffic will originate from bases and locations that are in the near vicinity of the base previously described.

## 12.2 Support Base Construction or Expansion

The proposed operations are temporary in nature and do not mandate any immediate measures for additional land acquisition or expansion of the existing onshore base facilities.

## 12.3 Waste Disposal

The table below provides information on the onshore facilities that will be used to store and dispose of any solid and liquid wastes generated by the proposed activities.

| Name/Location of Facility | Type of Waste | Amount | Max Rate | Disposal Method |
|---|---|---|---|---|
| BHI / Fourchon | Spent synthetic-based drilling fluids | 15,000 bbls/ well | 50 bbls/day | Return to supplier for reclamation |
| Aaron Oil Co. or Omega Waste Management3 | Waste Oil / Used oil filters | 365 bbl/yr | 1.0 bbl/day | Packed in MPT tanks or USCG drums and transport to shorebase for disposal |
| Omega | Trash and debris | 18,000 ft3 | 100 $ft^3$/day | Compacted into canvas bags and transported to shorebase for disposal |
| Vendor or Omega Waste Management | Chemical product wastes | 360 bbls | 2 bbl/day | Transport in approved containers to shorebase for disposal |

# SECTION 13.0
# Coastal Zone Management Act (CZMA) Information
# (250.226 and 250.260)

Under the direction of the Coastal Zone Management Act (CZMA), the states of Alabama, Florida, Louisiana, Mississippi and Texas developed Coastal Zone Management Programs (CZMP) to allow for the supervision of significant land and water use activities that take place within or that could significantly impact their respective coastal zones.

## 13.1 Consistency Certification

A Coastal Zone Management Act consistency certification according to 15 CFR 930.76(c) and (d) for Louisiana is attached to this section.

## 13.2 Other Information

Issues identified in the Louisiana CZMP include the following: general coastal use guidelines, levees, linear facilities (pipelines); dredges soil deposition; shoreline modifications, surface alterations, hydrologic and sediment transport modifications; waste disposal; uses that result in the alteration of waters draining into coastal waters; oil, gas or other mineral activities; and air and water quality.

**BP has considered all of Louisiana's and Mississippi's enforceable policies and certifies the consistency for the proposed operations.**

**13.2.1** The following Louisiana guidelines are applicable to the proposed operations:

| TOPIC | GUIDELINE NO. | CROSS REFERENCE |
|---|---|---|
| Air Quality | 1.2 | Section 6.0 |
| Water Quality | 1.2 | Section 5.0 |
| Permitting Authority | 1.6 | Sections 4.0 thru 14.0 |
| Adverse Effects | 1.7 | Section 14.0 |
| Multiple Use | 1.9 | Section 1.0 and 2.0 |
| Waste Storage, Treatment and Disposal Facilities | 8.1 | Section 5.0 and 12.0 |
| Hazardous Waste Storage, Treatment and Disposal | 8.2 | Section 5.0 and 12.0 |
| Approved Disposal Sites | 8.8 | Section 5.0 and 12.0 |
| Radioactive Waste | 8.9 | Section 5.0 and 12.0 |
| Siting of Exploration, Production Activities | 10.3 | Sections 2.0 and 14.0 |
| Access to Site | 10.5 | Section 2.0 and 12.0 |
| Best Practical Techniques for Drilling/Production Sites | 10.6 | Sections 2.0 and 5.0 |
| Drilling and Production Equipment Guidelines for Preventing Adverse Environmental Effects | 10.10 | Section 1.0 |
| Effective Environmental Protection and Emergency or Contingency Plans | 10.11 | Sections 1.0, 7.0 and 14.0 |

**13.2.2** The following Mississippi guidelines are applicable to the proposed operations:

## SECTION 13.0
## Coastal Zone Management Act (CZMA) Information
## (250.226 and 250.260)

| TOPIC | GUIDELINE NO. | CROSS REFERENCE |
|---|---|---|
| To provide for reasonable industrial expansion in the coastal area and to insure the efficient utilization of waterfront industrial sites so that suitable site are conserved for water dependent industry | Goal 1 | Section 2.0 and 12.0 |
| To favor the preservation of the coastal wetlands and ecosystems, except where a specific alternation of specific coastal wetlands would serve a higher public interest in compliance with the public purposes of the public trust in which the coastal wetlands are held. | Goal 2 | Sections 2.0 and 14.0 |
| To protect, propagate, and conserve the state's seafood and aquatic life in connection with the revitalization of the seafloor industry of the state of Mississippi. | Goal 3 | Sections 2.0 and 14.0 |
| To conserve the air and waters of the state, and to protect, maintain, and improve the quality thereof for public use, for the prorogation of wildlife, fish, and aquatic life, and for domestic, agricultural, industrial, recreational, and other legitimate beneficial uses. | Goal 4 | Sections 5.0 through 14.0 |
| To put to benefit use to the fullest extent of which they are capable the water resources of the state, and to prevent the waste, unreasonable use, or unreasonable method of use of water. | Goal 5 | Section 5.0 and 14.0 |
| To preserve the state's historical and archaeological resources, to prevent their destruction, and to enhance these resources whenever possible. | Goal 6 | Section 4.0 and 14.0 |
| To encourage the preservation of natural scenic qualities in the coastal area. | Goal 7 | Section 14.0 |
| To assist local governments in the provision of public facilities services in a manner consistent with the coastal program. | Goal 8 | Section 2.0 |

### 13.3 Attachments to Section 12.0

- Certificate of Coastal Zone Consistency for the State of Louisiana
- Certificate of Coastal Zone Consistency for the State of Mississippi

# COASTAL ZONE MANAGEMENT

# CONSISTENCY CERTIFICATION

**Initial Exploration Plan**
*Type of OCS Plan*

**Mississippi Canyon Block 252**
*Area and Block*

**OCS-G 32306**
*Lease Number*

The proposed activities described in detail in this OCS Plan comply with Louisiana's approved Coastal Management Program(s) and will be conducted in a manner consistent with such Program(s).

**BP Exploration and Production, Inc.**
*Lessee or Operator*

Scherie Douglas
*Certifying Official*

**February 20, 2009**
*Date*

# COASTAL ZONE MANAGEMENT

# CONSISTENCY CERTIFICATION

**Initial Exploration Plan**
*Type of OCS Plan*

**Mississippi Canyon Block 252**
*Area and Block*

**OCS-G 32306**
*Lease Number*

The proposed activities described in detail in this OCS Plan comply with Mississippi's approved Coastal Management Program(s) and will be conducted in a manner consistent with such Program(s).

**BP Exploration and Production, Inc.**
*Lessee or Operator*

Scherie Douglas
*Certifying Official*

**February 20, 2009**
*Date*

# SECTION 14.0
# Environmental Impact Analysis (EIA)
# (250.227 and 250.261)

## 14.1 Impact Producing Factors (IPS's)

| Environmental Resources | Impact Producing Factors (IPFs) Categories and examples Refer to a recent GOM OCS Lease Sale EIS for a more complete list of IPFs | | | | | |
|---|---|---|---|---|---|---|
| | Emissions (air, noise, light, etc.) | Effluents (muds, cuttings, other discharges to the water column or seafloor) | Physical disturbances to the seafloor (rig or anchor emplacements, etc.) | Wastes sent to shore for treatment or disposal | Accidents (e.g., oil spills, chemical spills, H2S releases) | Marine Trash and Debris |
| | | | | | | |
| **Site-specific at Offshore Location** | | | | | | |
| Designated topographic features | | (1) | (1) | | (1) | |
| Pinnacle Trend area live bottoms | | (2) | (2) | | (2) | |
| Eastern Gulf live bottoms | | (3) | (3) | | (3) | |
| Chemosynthetic communities | | | (4) | | | |
| Water quality | | X | | | x | |
| Fisheries | x | | | | x | |
| Marine mammals | (8) x | | | | (8) x | x |
| Sea turtles | (8) x | | | | (8) x | x |
| Air quality | (9) x | | | | | |
| Shipwreck sites (known or potential) | | | (7) x | | | |
| Prehistoric archaeological sites | | | (7) x | | | |
| | | | | | | |
| **Vicinity of Offshore Location** | | | | | | |
| Essential fish habitat | X | | | | (6) x | |
| Marine and pelagic birds | X | | | | X | x |
| Public health and safety | | | | | (5) | |
| | | | | | | |
| **Coastal and Onshore** | | | | | | |
| Beaches | | | | | (6) x | x |
| Wetlands | | | | | (6) x | |
| Shorebirds and coastal nesting birds | | | | | (6) x | |
| Coastal wildlife refuges | | | | | (6) x | |
| Wilderness areas | | | | | (6) x | |
| | | | | | | |
| **Other Resources You Identify** | | | | | | |
| | | | | | | |
| | | | | | | |

*Footnotes for Environmental Impact Analysis Matrix*

1. *Activities that may affect a marine sanctuary or topographic feature. Specifically, if the well or platform site or any anchors will be on the seafloor within the:*
   a. *4-mile zone of the Flower Garden Banks, or the 3-mile zone of Stetson Bank;*
   b. *1000-m, 1-mile or 3-mile zone of any topographic feature (submarine bank) protected by the Topographic Features Stipulation attached to an OCS lease;*
   c. *Essential Fish Habitat (EFH) criteria of 500 ft from any no-activity zone; or*
   d. *Proximity of any submarine bank (500 ft buffer zone) with relief greater than 2 meters that is not protected by the Topographic Features Stipulation attached to an OCS lease.*

2. *Activities with any bottom disturbance within an OCS lease block protected through the Live Bottom Activities (Pinnacle Trend) Stipulation attached to an OCS lease.*

3. *Activities within any Eastern Gulf OCS block where seafloor habitats are protected by the Live Bottom (Low Relief) Stipulation attached to an OCS lease.*
4. *Activities on blocks designated by the MMS as being in water depths 400 meters or greater.*
5. *Exploration or production activities where $H_2S$ concentrations greater than 500 ppm might be encountered.*
6. *All activities that could result in an accidental spill of produced liquid hydrocarbons or diesel fuel that you determine would impact these environmental resources. If the proposed action is located a sufficient distance from a resource that no impact would occur, the EIA can note that in a sentence or two.*
7. *All activities that involve seafloor disturbances, including anchor emplacements, in any OCS block designated by the MMS as having high-probability for the occurrence of shipwrecks or prehistoric sites, including such blocks that will be affected that are adjacent to the lease block in which your planned activity will occur. If the proposed activities are located e sufficient distance from a shipwreck or prehistoric site that no impact would occur, the EIA can note that in a sentence or two.*
8. *All activities that you determine might have an adverse effect on endangered or threatened marina mammals or sea turtles or their critical habitats.*
9. *Production activities that involve transportation of produced fluids to shore using shuttle tankers or barges*

## 14.2 Analysis

### 14.2.1 Site Specific at Offshore Location

**14.2.1.1 Designated Topographic Features –** There are no IPF's (including effluents, physical disturbances to the seafloor, and accidents) from the proposed activities that could cause impacts to topographic features. The site-specific offshore location of the proposed activities (Mississippi Canyon Block 252) is outside the 3-mile zone of any identified topographic feature.

**14.2.1.2 Pinnacle Trend Area Live Bottoms -** There are no IPF's (including effluents, physical disturbances to the seafloor, and accidents) from the proposed activities that could cause impacts to pinnacle trend area live bottoms. The site-specific offshore location of the proposed activities (Mississippi Canyon Block 252) is not in a pinnacle trend live bottom stipulated block.

**14.2.1.3 Eastern Gulf Live Bottoms –** The eastern gulf live bottoms are not in the vicinity of the operations proposed in this plan.

**14.2.1.4 Chemosynthetic communities -** The proposed activities would occur in deep water (water depths >400 meters). Therefore, IPF's (e.g. physical disturbances to the seafloor, effluents) from the proposed activities have the potential to cause impacts to chemosynthetic communities. However, the proposed activities would be conducted in accordance with current regulations. Accordingly, BP has provided MMS with the required maps, analyses and statement(s) prepared using the guidance in Attachment B of NTL No. 2000-G20 *"Deepwater Chemosynthetic Communities"*. As shown in the shallow hazards report accompanying this plan, and the seafloor amplitude map included in Section 3.0 of this plan, no indications of the presence of chemosynthetic communities are recognized on the 3-D seismic data at and around the proposed locations. The risk of chemosynthetic communities at or close to this location is therefore believed to be negligible.

**14.2.1.5 Water Quality** – Effluents and accidents from the proposed activities in Mississippi Canyon Block 252 could potentially cause impacts to water quality. However, since all discharges will be made in accordance with a general National Pollutant Discharge Elimination System (NPDES) permit issued by the U.S. Environmental Protection Agency, operational discharges are not expected to cause significance adverse impacts to water quality. It is unlikely that an accidental oil spill release would occur from the proposed activities. In the event of such an accidental release, the water quality would be temporarily affected by the dissolved components and small droplets. Currents and microbial degradation would remove the oil from the water column or dilute the constituents to background levels.

**14.2.1.6 Fisheries** - An accidental oil spill that might occur as a result of the proposed operation in Mississippi Canyon Block 252 has the potential to cause some detrimental effects to fisheries. However, it is unlikely that an accidental surface or subsurface oil spill would occur from the proposed activities. If such a spill were to occur in open waters of the OCS proximate to mobile adult finfish or shellfish, the effects would likely be sub-lethal and the extent of damage would be reduced to the capability of adult fish and shellfish to avoid a spill, to metabolize hydrocarbons, and to excrete both metabolites and parent compounds. No adverse activities to fisheries are anticipated as a result of the proposed activities.

**14.2.1.7 Marine Mammals** – Marine mammals may be adversely impacted by several IPF's, including vessel traffic, noise, accidental oil spills, and loss of trash and debris, all of which could occur due to the proposed action. Chronic and sporadic sub-lethal effects could occur that may stress and/or weaken individuals of a local group or population and make them more susceptible to infection from natural or anthropogenic sources. Few lethal effects are expected from oil spills, chance collisions with service vessels and ingestion of plastic material. Oil spills of any size are estimated to be aperdiodic events that may contact cetaceans. Disturbance (e.g., noise) may stress animals, weaken their immune systems, and make them more vulnerable to parasites and diseases that normally would not be fatal.

The net result of any disturbance would depend on the size and percentage of the population affected, ecological importance of the disturbed area, environmental and biological parameters that influence an animal's sensitivity to disturbance and stress, and the accommodation time in response to prolonged disturbance (Geraci and St. Aubin, et al., 2001). Sperm whales are one of 11 whale species that are hit commonly by ships (Laist et al., 2001). Collisions between OCS vessels and cetaceans within the project area are expected to be unusual events. No adverse impacts to endangered or threatened marine mammals are anticipated as a result of the proposed activities in Mississippi Canyon Block 252.

**14.2.1.8 Sea Turtles** - IPF's that could impact sea turtles include vessel traffic, noise, trash and debris, and accidental oil spills. Small numbers of turtles could be killed or injured by chance collision with service vessels or by eating indigestible trash, particularly plastic items, accidentally lost from drill rigs, production facilities and service vessels. Drilling rigs and project vessels produce noise that could disrupt normal behavior patterns and create some stress potentially making sea turtles more susceptible to disease. Oil spills and oil spill response activities are potential threats that could have lethal effects on turtles. Contact with oil, consumption of oil particles, and oil-contaminated prey could seriously affect individual sea turtles. Oil-spill-response planning and the habitat protection requirements of the Oil Pollution Act of 1990 should mitigate the threats.

Most OCS related impacts on sea turtles are expected to be sub-lethal. Chronic sub-lethal effects (e.g., stress) resulting in persistent physiological or behavioral changes and/or avoidance of effected areas could cause declines in survival or productivity, resulting in gradual population declines

No adverse impacts to endangered or threatened sea turtles are anticipated as a result of the proposed activities in Mississippi Canyon Block 252.

**14.2.1.9 Air Quality** – The proposed activities are located approximately 190 miles offshore. There would be a limited degree of air quality degradation in the immediate vicinity of the proposed activities. Air quality analysis (included in Section 6.0 of this plan) is below the MMS exemption level.

**14.2.1.10 Shipwreck Sites (known or potential)** – Mississippi Canyon Block 252 is on the MMS list of blocks determined to have a high probability of historic shipwrecks. A review of the Shallow Hazards Study included with this plan in accordance with NTL 2005-G07 and NTL 98-20 indicates there are no known or potential shipwreck sites located within the survey area. Therefore, no impacts on such sites are expected as a result of the proposed operations.

However, should BP discover man-made debris that appears to indicate the presence of a shipwreck (e.g. a sonar image or visual confirmation of an iron, steel or wooden hull, wooden timbers, anchors, concentrations of man-made objects such as bottles or ceramics, piles of ballast rock) within or adjacent to our lease area, BP will immediately halt operations, take steps to ensure that the site is not disturbed in any way and contact the Regional Supervisor, Leasing and Environment, within 48 hours of its discovery. BP will cease all operations within 1000 feet (305 meters) of the site until the Regional Director instructs our office on what steps to take to assess the site's potential historic significance and what steps to protect it.

**14.2.1.11 Prehistoric Archaeological Sites** – The lease is on the MMS list if blocks determined to have a high probability of prehistoric archaeological resources. A review of the Shallow Hazards Study included with this plan in accordance with NTL 2005-G07 and NTL 2006-G07 indicates there are no known or potential archaeological sites located within the survey area. Shallow Hazard survey performed in the area indicates no known or potential archaeological sites at the proposed locations. Therefore, no impacts on such sites are expected as a result of the proposed operations.

### 14.2.2 Vicinity of Offshore Location

**14.2.2.1 Essential Fish Habitat** - An accidental oil spill that might occur as a result of the proposed action has the potential to cause some detrimental effects on essential fish habitat. However, it is unlikely that an accidental surface or subsurface oil spill would occur from the proposed activities. If such a spill were to occur in open waters of the OCS proximate to mobile adult finfish or shellfish, the effects would likely be sub-lethal and the extent of damage would be reduced to the capability of adult fish and shellfish to avoid a spill, to metabolize hydrocarbons, and to excrete both metabolites and parent compounds. No adverse impacts to essential fish habitat are anticipated as a result of the proposed activities in Mississippi Canyon Block 252.

In the event of an unanticipated blowout resulting in an oil spill, it is unlikely to have an impact based on the industry wide standards for using proven equipment and technology for such responses, implementation of BP's Regional Oil Spill Response Plan which

address available equipment and personnel, techniques for containment and recovery and removal of the oil spill.

**14.2.2.1 Marine and Pelagic Birds** - An accidental oil spill that might occur as a result of the proposed action has the potential to impact marine and pelagic birds – birds could become oiled. However, it is unlikely that an accidental oil spill would occur from the proposed activities. No adverse impacts to marine and pelagic birds are anticipated as a result of the proposed activities in Mississippi Canyon Block 252.

Marine and pelagic birds could become entangled and snared in discarded trash and debris, or ingest small plastic debris that can cause permanent injuries and death. Operators are prohibited from deliberately discharging debris as mandated by MARPOL – Annex V and the Marine Plastic Pollution Research and Control Act, and regulations imposed by various agencies including the U. S. Coast Guard and the Environmental Protection Agency.

BP will operate in accordance with the regulations and also avoid accidental loss of solid waste items by maintaining waste management plans, manifesting trash sent to shore and using special precautions such as covering outside trash bins to prevent accidental loss of solid waste. Special caution will be exercised when handling and disposing of small items and packaging materials, particularly those made of non-biodegradable, environmentally persistent materials such as plastic or glass.

Informational placards will be posted on vessels and facilities that have sleeping or food preparation capabilities. All offshore personnel, including contractors and other support services-related personnel (e.g. helicopter pilots, vessel captains and boat crews) will be indoctrinated on waste procedures and will view the marine trash and debris training video annually. Debris, if any, from these proposed activities in Mississippi Canyon Block 252 will seldom interact with marine and pelagic birds. Therefore the effects will be negligible.

**14.2.2.3 Public Health and Safety** – There are no anticipated IPF's (including any accidental $H_2S$ releases) from the proposed activities that could impact public health and safety. BP has requested MMS classify the proposed objective area as "$H_2S$ absent" and "$H_2S$ Unknown".

### 14.2.3 Coastal and Onshore

**14.2.3.1 Beaches** - An accidental oil spill from the proposed activities could cause impacts to beaches. However, due to the distance to shore (48 miles) and the response capabilities that would be implemented, no significant adverse impacts are expected. Both the historical spill data and the combined trajectory/risk calculations referenced in the publication OCS EIS/EA MMS 2002-052 indicate there is little risk of contact or impact to the coastline and associated environmental resources. The activities proposed in the plan will be covered by our regional OSRP (refer to information submitted in Section 7.0 of this plan).

Trash on the beach is recognized as a major threat to the enjoyment and use of beaches. Only a limited amount of marine debris, if any, should result from the proposed activities. Operators are prohibited from deliberately discharging debris as mandated by MARPOL – Annex V and the Marine Plastic Pollution Research and Control Act, and regulations imposed by various agencies including the U. S. Coast Guard and the Environmental Protection Agency.

BP will operate in accordance with the regulations and also avoid accidental loss of solid waste items by maintaining waste management plans, manifesting trash sent to shore and using special precautions such as covering outside trash bins to prevent accidental loss of solid waste. Special caution will be exercised when handling and disposing of small items and packaging materials, particularly those made of non-biodegradable, environmentally persistent materials such as plastic or glass.

Informational placards will be posted on vessels and facilities that have sleeping or food preparation capabilities. All offshore personnel, including contractors and other support services-related personnel (e.g. helicopter pilots, vessel captains and boat crews) will be indoctrinated on waste procedures and will view the marine trash and debris training video annually.

**14.2.3.2 Wetlands** - An accidental oil spill from the proposed activities could cause impacts to wetlands. However, due to the distance to shore (48 miles) and the response capabilities that would be implemented, no significant adverse impacts are expected. Both the historical spill data and the combined trajectory/risk calculations referenced in the publication OCS EIS/EA MMS 2002-052 indicate there is little risk of contact or impact to the coastline and associated environmental resources. The activities proposed in the plan will be covered by our regional OSRP (refer to information submitted in Section 7.0 of this plan).

**14.2.3.3 Shore Birds and Coastal Nesting Birds** - An accidental oil spill from the proposed activities could cause impacts to shore birds and coastal nesting birds. However, due to the distance to shore (48 miles) and the response capabilities that would be implemented, no significant adverse impacts are expected. Both the historical spill data and the combined trajectory/risk calculations referenced in the publication OCS EIS/EA MMS 2002-052 indicate there is little risk of contact or impact to the coastline and associated environmental resources. The activities proposed in the plan will be covered by our regional OSRP (refer to information submitted in Section 7.0 of this plan).

Coastal and marine birds could become entangled and snared in discarded trash and debris, or ingest small plastic debris that can cause permanent injuries and death. Operators are prohibited from deliberately discharging debris as mandated by MARPOL – Annex V and the Marine Plastic Pollution Research and Control Act, and regulations imposed by various agencies including the U. S. Coast Guard and the Environmental Protection Agency.

BP will operate in accordance with the regulations and also avoid accidental loss of solid waste items by maintaining waste management plans, manifesting trash sent to shore and using special precautions such as covering outside trash bins to prevent accidental loss of solid waste. Special caution will be exercised when handling and disposing of small items and packaging materials, particularly those made of non-biodegradable, environmentally persistent materials such as plastic or glass.

Informational placards will be posted on vessels and facilities that have sleeping or food preparation capabilities. All offshore personnel, including contractors and other support services-related personnel (e.g. helicopter pilots, vessel captains and boat crews) will be indoctrinated on waste procedures and will view the marine trash and debris training video annually.

**14.2.3.4 Coastal Wildlife Refuges** - An accidental oil spill from the proposed activities could cause impacts to coastal wildlife refuges. However, due to the distance to shore (48 miles) and the response capabilities that would be implemented, no significant adverse impacts are expected. Both the historical spill data and the combined trajectory/risk calculations referenced in the publication OCS EIS/EA MMS 2002-052 indicate there is little risk of contact or impact to the coastline and associated environmental resources. The activities proposed in the plan will be covered by our regional OSRP (refer to information submitted in Section 7.0 of this plan).

**14.2.3.5 Wilderness Areas** - An accidental oil spill from the proposed activities could cause impacts to coastal wilderness areas. However, due to the distance from shore (48 miles) and the response capabilities that would be implemented, no significant adverse impacts are expected. Both the historical spill data and the combined trajectory/risk calculations referenced in the publication OCS EIS/EA MMS 2002-052 indicate there is little risk of contact or impact to the coastline and associated environmental resources. The activities proposed in the plan will be covered by our regional OSRP (refer to information submitted in Section 7.0 of this plan).

**14.2.3.6 Other Environmental Resources Identified** – BP has not identified any other environmental resources other than those addressed above.

**14.3 Impacts on Proposed Activities** – The site-specific environmental conditions have been taken into account for the proposed activities and no impacts are expected as a result of these conditions.

A shallow hazards survey and shallow hazards assessment of any seafloor and subsurface geological or manmade features and conditions that may adversely affect operations has been submitted in accordance with NTL 2008-G05. Based on the above report and analysis, BP has concluded there are no surface or subsurface geological or manmade features or conditions that may adversely affect the proposed activities.

**14.4 Environmental Hazards** – The proposed activities could be adversely impacted by strong environmental phenomena such as a hurricane. In the event a hurricane seems likely, the following procedures from BP's Severe Weather Contingency Plan would be followed.

**14.4.1 Safety Precautions**

**14.4.1.1 During Hurricane Season,** the following safety precautions should be exercised:

- Maintain an adequate supply of mud on board to return to work per rig capabilities.
- Maintain enough fuel on board to allow rig to operate for 3-4 days after restart.
- Maintain a near capacity supply of drilling water on board
- Secure all loose equipment that will not be used or moved in normal operations. Check rig's supply of cable, cable clamps, rope and other material which might be needed to secure any equipment or material during a hurricane. An order shall be placed for any material needed. Have tie-down cables, chains, turnbuckles, etc., prepared for tying down all equipment in the event of a hurricane shut down
- Lay down all excess drill pipe and drill collars standing in derrick
- At all times, have the following equipment on the rig:
    - Halliburton RTTS full bore storm packer, complete with Sub-Surface Control (SSC II or SSC III) Valve. RTTS is to be of proper size to fit inside the last casing string, as required
    - Baker Model "G" Full Flow Float Sub.

– Gray inside BOP (to be kept for back-up)

Make sure above equipment is always in good working condition and subbed for running in the drill string, as required.

- Familiarize all personnel with hurricane securing procedures. Hold safety meetings with all crews to review hurricane evacuation plan and keep personnel aware of their role in carrying out the procedure
- Make frequent checks of aids-to-navigation and communication equipment. Report any defect immediately for repair
- Report the "Time Required To Secure Rig" on the Drilling Report. This estimate will include time to plug and suspend well for the current hole section. A detailed list of required operations and associated times to complete the same should be documented and kept current on the rig
- Review the POB Roster to ensure that it is current
- Monitor Weather Service reports twice daily. Monitor more often as necessary
- Prepare an inventory of all rental equipment on board that shows vendors, serial numbers and dates of arrival and departure
- Maintain an estimate of variable loads on board and record this estimate on the IADC Daily report
- Ensure all hatches, vents, etc. are in good working order
- Ensure system which operates emergency generator is in good working order
- Ensure marine transportation is able to accommodate a full rig crew in one trip if necessary
- Maintain a minimum of 500 sacks of cement on board or enough to properly plug the open hole where applicable

### 14.4.2 Phase I

A hurricane or severe tropical disturbance develops which could impact BP's Offshore GoM operations, or which forms and enters the Gulf of Mexico. Upon announcement of this Phase, the Well Site Leader on each rig will:

- Continue present operation, recognizing that deteriorating weather conditions may dictate changes in operations. Incorporate a ported drill pipe float into the BHA on the next trip out of hole. When drilling at a depth where high pressures are expected or at a depth where salt may be encountered, drilling operations may be suspended, the mud conditioned and the bit pulled up into the casing until the hurricane danger has passed or orders to commence Phase II are received. Do not commence any potentially hazardous operations. Discuss operations with the Operations Superintendent or delegate and obtain approval to change operations if necessary

- Set up a 24-hour weather watch. Post a weather map and see that the storm's position is plotted and kept current at all times. Report any important changes in weather to the Operations Superintendent.
- Develop Initial Action Plan

- Keep POB Roster current. The roster shall include name, company, and title of each person on board

- Make a thorough inspection of all equipment. All movable objects which are not in use or expected to be used within 72 hours will be firmly secured or removed from the rig. Any objects which are placed in service will again be secured after use

- Lay down extra drill pipe, drill collars or tubing standing in the derrick. If drilling in open hole, do this on next trip out
- Make preparations to lay down drill pipe that is in open hole
- Make preparations to set either a storm packer or mechanical plug. Check storm packer and connections. Super glue all O-rings in the SSC Valve
- Start and run emergency air compressor; make sure it will build 100 psi pressure and ensure the batteries have adequate power to start emergency generator, depending on system installed.
- Check auxiliary power for aid to navigation lights and fog horn and battery status.
- Check all communication facilities and be certain they are operable. Make necessary repairs immediately
- Ensure storm calculations and evacuation lists are prepared
- Determine what equipment and/or liquids will have to be off-loaded to reduce variable load to storm survival limits
- Maintain flexible marine transportation schedule wherein necessary boats can be in the field with minimum notice to assist with possible evacuation
- After preparations for Phase I have been completed, the Well Site Leader shall report same to the Operations Superintendent.

### 14.4.3 Phase II

A hurricane or high winds, equal to 45 knots (52 mph) ahead of the storm are within twenty-four (24) to seventy-two (72) hours of a location. During Phase II, all rig operations will be secured, and all non-essential personnel will be evacuated. Under most anticipated conditions, action should be taken that would permit support vessels to leave location twenty-four (24) hours ahead of the hurricane or high winds, and personnel on the jack-up rig to start leaving twenty-four (24) ahead of the hurricane or predicted high winds and seas (winds over 40 mph and seas greater than 10 ft).

Upon announcement of this Phase, the Well Site Leader on each rig will:

- Condition mud and get hole in condition for securing well. If open hole conditions allow, POOH and incorporate a ported drill pipe float into the BHA if not previously done during Phase I. Have drilling crews start out of the hole laying down drill pipe. Pipe will be pulled up into the casing, with the remainder laid down, where conditions permit. Do not strip pipe on pipe rack. Take out? Set a storm packer or mechanical plug in the casing. If unable to secure well with a storm packer, set a cement plug

  NOTE: If workover, recompletion, or well-testing operations are in progress, the procedures to secure the well will depend on the exact operation being undertaken. Have plan outlined at all times and consult with Completion/Drilling Team Leader for final approval.

- Make up the Halliburton RTTS Full Bore Packer and SSC II or SSC III Storm Valve in the drill string (Appendix B, RTTS Storm packer Instructions) and run in hole. Install and set packer so that the bit will be near the casing shoe, but not in the open hole.

The packer is to be positioned a sufficient distance below the mudline to allow the well to be abandoned if the packer cannot be pulled

- Check and tighten snub lines on blowout preventer if applicable.

- Communicate preparedness priorities to all personnel

- Stop all non-essential traffic to the work site and prepare to evacuate all non-essential personnel. Determine evacuation point and arrangements

- Skid rig package

- Make a personal inspection of all equipment to be sure that everything is ready for a hurricane and have key contract personnel do the same
  - Finalize all variable deck load calculations. Ensure variable load is distributed evenly on all legs
  - Secure drill pipe and drill collars on rack
  - Secure hoses and tension top drive
  - Secure all other related equipment
  - Dump/pump out shale shaker sand traps and pits. Leave valves open and secure water-tight plate over return line.
  - Dump liquids as required. Discuss with Operations Superintendent prior to dumping any mud!!
  - Secure crane booms in boom rests. Close all doors on cranes
  - Secure all water-tight doors and vents. Close all doors on leg units. Install boards around control room. Close and secure all fan vent covers
  - Secure all equipment below deck. Secure all oil drums
  - Remove lights and electric motors where necessary and store below deck
  - Close air valves off at tanks. Check auxiliary air compressor for fuel
  - Secure all manhole covers
  - If possible, remove and store all radio and dish antennas
  - Pump out bilges and sumps
  - Store and secure all oxygen and acetylene bottles
  - Remove and secure life rafts
  - Ensure primary engine diesel day tank and emergency engine day tank are full
  - Securely close jacking motor covers or cover exposed motors with visqueen and duct tape per Contractor Guidelines.
  - Fill drill water tanks as near full as possible and close equalizing valves
  - Blank flanges on cement unit exhaust
  - Raise water well tower
  - Stow away all take on hoses and tie up ropes in the lower hull area.
  - Place all breakable accommodation/office items on floor (TVs, monitors, computers)

- Have workboats and crew boats in field to evacuate personnel. Inform them of rig readiness condition

- Evacuate all non-essential personnel by available air or sea transportation. Each facility will develop a list of personnel to be evacuated. Keep POB Roster current. Record all times of departure

- Record the following on the IADC report:

- Estimate of variable load
  - Any adjustments made in variable load (i.e., pump off water, barite, etc.)
  - Total amount of casing, drill pipe, drill collars and HWDP left on deck
  - Describe any pipe left in the derrick or in wellbore,
  - Document the status of the rig and equipment on the IADC Report prior to final evacuation. Example: Navigation lights, rig tracking system, battery status etc.

- Contact the Operations Superintendent and the Logistics Group once the rig is secure and all non-essential personnel have been evacuated.

- The Well Site Leader on each facility is given full authority to do whatever he thinks is necessary to protect people, wells and equipment in the event communications with shore is no longer possible

**14.4.4 Phase III**

A hurricane or high winds, equal to 45 knots (52 mph) ahead of a storm are within twenty-four (24) hours of the location. When Phase III becomes effective, evacuation of all remaining personnel on the facility will commence.

Upon announcement of this phase, the Well Site Leader on each rig will:

- Ensure well is properly suspended and a document stating how the wellbore has been secured.

- Make final check that all equipment and supplies are secured

- Shut down all engines except emergency generator

- Turn on aid-to-navigation and fog horn and confirm battery power adequate. Document any issues and explain what the condition of the rig and equipment is prior to final evacuation.

- Consult with contract Tool pusher and record preparations that have been made to ready the rig for the storm on the IADC report. The IADC reports, along with a current list of all rental equipment on board and critical irreplaceable paperwork, will be carried by the Rig Tool pusher upon evacuation of the rig
-
- The Well Site Leader and contract Tool pusher will maintain a list of all personnel evacuated and the telephone numbers where they can be contacted after the hurricane

- Commence evacuation of remaining personnel to shore by available air or sea transportation

- Contact the Operations Superintendent and the Logistics Support Group when rig is secured just prior to final evacuation and again when all personnel have reached shore

- The Operations Superintendent is responsible for keeping Management current on all critical operations

**14.4.5 Phase IV**

A Hurricane or Tropical Storm has made landfall or is sufficiently away from a location and no longer poses a threat to that location to allow personnel to begin the return to the work process.

During this Phase, the following procedures will apply:

- Contact contractors to return to rig
- Contact contract boats and start them to shore base
- Upon arrival at rig, inspect for damage and start up engines
- Test all lines for integrity (service, high pressure mud)
- Lower water well tower
- Install bell nipple and BOP fluid lines
- Test choke and kill lines as required by well program
- Open choke line below blind rams and check for pressure
- Test Bops as required by well program
- Pick-up drill pipe with centralizers and RIH. Ratchet into the storm valve, pick up 10,000 lbs on the packer to open the ball valve and check for drill pipe pressure. Close annular preventer, release packer. Retrieving procedure is described in Appendix B. Check for pressure through choke line. Open annular preventer
- Pull out of hole. Lay down packer and stage in hole

**14.5 Alternatives** – No alternatives to the proposed activities were considered to reduce environmental impacts.

**14.6 Mitigation Measures** – No mitigation measures other than those required by regulation and BP policy will be employed to avoid, diminish or eliminate potential impacts on environmental resources.

**14.7 Consultation** – No agencies or persons were consulted regarding potential impacts associated with the proposed activities.

**14.8 Preparers** – The EIA was prepared by the following:

Scherie D. Douglas
Sr. Regulatory Specialist
BP Exploration & Production, Inc.

**14.9 References:** - Although not always cited, the following were utilized in preparing the EIA:

- Regional Geohazard Assessment Study, GEMs
- OCS EIS/EA MMS 2002-052, 2002
- MMS EIS – Lease Sale 187

- NPDES Permit GMG290110
- Air Quality Review
- BP Regional Oil Spill Response Plan
- Title 30 CFR Part 250 Subpart B
- MMS NTL 2006-N06 *"Flaring and Venting Regulations"*
- MMS NTL 2004-G05 *"Biologically Sensitive Areas of the Gulf of Mexico"*
- MMS NTL 2007-G04 *"Vessel Strike Avoidance and Injured/Dead Protective Species"*
- MMS NTL 2007-G03 *"Marine Trash & Debris Awareness and Elimination"*
- MMS NTL 2005-G07 *"Archaeological Resource Surveys and Reports"*
- MMS NTL 2006-G07 *"Revisions to the List of OCS Lease Blocks Requiring Archaeological Resource Surveys and Reports"*
- MMS NTL 2000-G20 *"Chemosynthetic Communities"*

# SECTION 15.0
# Administrative Information
# (250.228 and 250.262)

## 15.1 Exempted Information Description (public information copies only)

- Geological Information in section 3.0
- Bottomhole location information in section 1.0

## 15.2 Bibliography

Any previously submitted EP, DPP, DOCD, study report, survey report or any other material referenced in this plan is listed below:


- Regional Geohazard Assessment Study (N-6521 and N-7743)