# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

In re BP plc Securities Litigation

No. 4:10-md-02185

Honorable Keith P. Ellison

**LEAD PLAINTIFFS NEW YORK AND OHIO'S
CONSOLIDATED CLASS ACTION COMPLAINT
FOR ALL PURCHASERS OF BP SECURITIES
FROM JANUARY 16, 2007 THROUGH MAY 28, 2010**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................2

II.   JURISDICTION AND VENUE ........................................................................11

III.  THE PARTIES .................................................................................................11

     A.    Plaintiffs ...............................................................................................11

     B.    Defendants ...........................................................................................12

     C.    Non-Party ............................................................................................17

IV.  BACKGROUND ..............................................................................................17

     A.    BP's Relevant Operations ...................................................................17

     B.    BP's Process Safety Controls Were Deficient Prior to the Class Period ..............18

V.   DEFENDANTS' SCIENTER CONCERNING BP'S RISKS IN
OFFSHORE DRILLING AND BP'S FAILURE TO IMPLEMENT
PROPER PROCESS SAFETY CONTROLS AND PROCEDURES ............................27

     A.    Defendants Knew, or Recklessly Disregarded, That BP's Process
Safety Procedures Did Not Adequately Address the Known Risks in
Deepwater Drilling, Risks that Materialized at the Macondo Well ......................27

     B     Additional Scienter Allegations:  Defendants' Disregard of Safety and
Operational Concerns With BP's Other Operations..............................................42

     C.    BP Retaliated Against Individuals Who Raised Concerns About
the Safety and Integrity of its Operations.............................................................47

VI.  THE MATERIALIZATION OF THE UNDISCLOSED RISKS – DEEPWATER
HORIZON OIL SPILL AND ITS AFTERMATH.............................................................53

     A.    BP's Systematic Failures Caused the Explosion on and the Sinking of the
Deepwater Horizon Rig ........................................................................................53

     B.    BP Was Wholly Unprepared to Contain the Oil Spill .........................................72

VII. DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS
AND OMISSIONS OF MATERIAL FACT DURING THE CLASS PERIOD..............86

VIII. LOSS CAUSATION ......................................................................................161

-i-

# TABLE OF CONTENTS
(continued)

**Page**

IX.     APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE
        MARKET DOCTRINE ................................................................................................168

X.      CLASS ACTION ALLEGATIONS .............................................................................169

XI.     NO SAFE HARBOR .....................................................................................................170

XII.    PRAYER FOR RELIEF .................................................................................................177

XII.    DEMAND FOR JURY TRIAL .....................................................................................178

Lead Plaintiffs, Thomas P. DiNapoli, Comptroller of the State of New York, as Administrative Head of the New York State and Local Retirement Systems and sole Trustee of the New York State Common Retirement Fund, and the Ohio Public Employees Retirement System, the State Teachers Retirement System of Ohio, the School Employees Retirement System of Ohio and the Ohio Police & Fire Pension Fund together with their statutory litigation counsel, the Ohio Attorney General Mike  DeWine (collectively "New York and Ohio" or "Plaintiffs") bring this action under the federal securities laws and the laws of the State of New York and the United Kingdom ("UK") against BP plc ("BP" or the "Company") and certain of its officers, directors and affiliates. This is a class action on behalf of a Class as follows:

(1) With respect to Plaintiffs' claims under the Securities Exchange Act of 1934 (the "Exchange Act"), (a) all persons and entities who purchased or otherwise acquired BP American Depositary Shares ("ADSs") between January 16, 2007 and May 28, 2010, inclusive (the "Class Period"), and (b) all U.S. persons and entities who purchased or otherwise acquired BP ordinary shares in domestic transactions, executed on a foreign exchange, during the Class Period;

(2) With respect to Plaintiffs' claims under New York common law, all U.S. persons and entities who purchased or otherwise acquired BP ordinary shares during the Class Period; and

(3) With respect to Plaintiffs' claims under UK law, all persons and entities who purchased or otherwise acquired BP ordinary shares during the Class Period.[1]

---

[1] The allegations in this Complaint are based on personal knowledge as to Plaintiffs' own acts and on information and belief as to all other matters, based on an investigation conducted by Plaintiffs' Co-Lead Counsel, including, among other things: (i) review and analysis of BP's public filings with the U.S. Securities and Exchange Commission ("SEC") and other regulatory agencies; (ii) review and analysis of other publicly available information concerning BP, including governmental records, documents obtained through other civil actions against BP, independent reports, and other testimony, documents, and reports obtained in connection with hearings held by the U.S. House of Representatives, the U.S. Senate, the Joint Investigation of the U.S. Coast Guard and Bureau of Ocean Energy Management, Regulation and Enforcement, (iii) the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling ("Presidential Commission"); and (iv) interviews with former BP employees and other witnesses.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations after a reasonable opportunity to engage in discovery.

I.   <u>INTRODUCTION</u>

1.        On April 20, 2010, the deep sea oil rig, *Deepwater Horizon* – which Transocean owned and BP leased, operated, and controlled – exploded in the Gulf of Mexico. The crew was preparing to place the Macondo well – which they referred to as the "***well from hell***"[2] – into "temporary abandonment," whereby a drilling rig finishes a well and then seals it with cement, allowing another production rig to return, quickly drill through the cement, and begin pumping oil or gas for production.

2.        The temporary abandonment was 45 days late and $58 million over-budget. A series of last minute modifications – hallmarks of BP's operations – had rattled the crew, with one supervisor reporting that "***we're flying by the seat of our pants***."

3.        At approximately 9:00 p.m. on April 20, 2010, drilling mud laced with oil and gas rocketed up through the well, knocking birds from the sky and covering the deck of the rig in a thick layer of hydrocarbon-filled drilling mud.  Shortly thereafter, gas and oil flowing from the well ignited, causing an explosion aboard the *Deepwater Horizon* that claimed the lives of 11 crew members and injured many others, including some who jumped from the rig to save their lives.

4.        The *Deepwater Horizon* burned for almost two days before sinking on the morning of April 22, 2010.    As the *Deepwater Horizon* sank, it further damaged the pipe that had connected the rig to the wellbore.

5.        Eighty-seven days passed before BP stopped the flow of oil from the Macondo well on July 15, 2010.  Approximately *5 million barrels* of oil (more than 206 million gallons)[3] – or about 60,000 barrels a day – spilled into the waters of the Gulf of Mexico causing

---

[2]  Unless otherwise indicated, emphasis has been added throughout.
[3]  A barrel of oil is equivalent to 42 gallons.

the largest oil spill in the history of the petroleum industry.  As noted in a recent article appearing in *Fortune* magazine, the oil spill in the Gulf of Mexico "surpass[ed] the Exxon *Valdez* disaster by at least 1,800 percent, in terms of the number of barrels of oil spilled into the sea.

6.     As the truth regarding the lack of safety and integrity of BP's operations emerged, as well as information regarding:  (i) the true size of the oil spill; (ii) BP's inability to control the spill; and (iii) the mounting costs BP would pay as a result of the environmental disaster – BP's ADSs and ordinary common shares plunged in value.  From the date of the *Deepwater Horizon* explosion through May 28, 2010, BP's securities fell in value by 48% and wiped out over ***$91billion*** in market capitalization.

7.     No fewer than nine governmental investigations reviewed (and are currently reviewing) the incident, including a commission appointed by the President of the United States to study the catastrophe:  the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling (the "Presidential Commission").  The Presidential Commission, after interviewing hundreds of witnesses, reviewing hundreds of thousands of pages of documents and consulting with industry experts, issued the "Presidential Commission Report" in January 2011.  The first conclusion of the Presidential Commission Report was simple yet powerful:  "***[t]he explosive loss of the Macondo well could have been prevented***."  Indeed, the Presidential Commission specifically found that:  "***the blowout was not the product of a series of aberrational decisions made by rogue industry or government officials that could not have been anticipated or expected to occur again.  Rather, the root causes are systemic***" to BP.

8.     Moreover, the Presidential Commission detailed numerous safety tests and procedures that the *Deepwater Horizon* crew failed to perform or outright ignored.  The

Presidential Commission Report concluded that "*[t]he immediate causes of the Macondo well blowout can be traced to a series of identifiable mistakes made by BP, Halliburton, and Transocean that reveal such systematic failures in risk management that place in doubt the safety culture of the entire industry*."

9.       In November 2010, the National Academy of Engineering, which is conducting a separate investigation into the Deepwater Horizon incident, issued an "Interim Report" detailing BP's operational failures that led to the Deepwater Horizon catastrophe.  The report stated:  "*The various failures mentioned in this report indicate the lack of a suitable approach for anticipating and managing the inherent risks, uncertainties, and dangers associated with deepwater drilling operations and a failure to learn from previous near misses. . . . Of particular concern is an apparent lack of a systems approach that would integrate the multiplicity of factors potentially affecting the safety of the well, monitor the overall margins of safety, and assess the various decisions from perspectives of well integrity and safety.*

10.       BP is no stranger to catastrophic industrial incidents, including incidents related to its off-shore drilling operations.  For example:

(a)       In May and June 2000, a BP refinery, the Grangemouth Complex, located in Scotland, suffered three potentially life threatening incidents.  The U.K. Health and Safety Executive (the "UK HSE") investigated and found "a number of weaknesses in the safety management systems . . . ."  In particular, the UK HSE found that "BP failed to achieve the operational control and maintenance of process systems required by law."

(b)       In 2003, the U.S. Department of the Interior's Minerals Management Service ("MMS") – which is responsible for monitoring and regulating offshore drilling activities in the U.S. – criticized BP's safety practices in the Gulf of Mexico after two back-to-

4

back blowouts on gas rigs in 2002. MMS noted that inadequate safety process planning and inadequate personnel training had enabled an erroneous chain of decision-making in the field and caused these blowouts. The otherwise preventable incidents stemming from BP's offshore drilling mishaps in the Gulf of Mexico were prescient of incidents to come in the *Deepwater Horizon* explosion.

(c)     Shortly thereafter, in November 2003, a gas line ruptured on BP's *Forties Alpha* platform in the North Sea, flooding the platform with hazardous methane gas and almost causing an explosion. In response, UK regulators cited BP for numerous violations of statutory safety rules. A former BP employee on the platform later told the Presidential Commission that "BP focused heavily on personnel safety and not on maintaining its facilities" – *i.e.,* process safety.

(d)     In 2005, a blast at BP's Texas City, Texas refinery killed 15 workers and injured more than 170. The U.S. Chemical Safety Board's ("CSB") report regarding the Texas City incident found that "***the overall safety culture and process safety management . . . . program had serious deficiencies***."

(e)     In March 2006, BP shut down one of its Prudhoe Bay transit pipelines in Alaska after discovering a 212,000 gallon oil leak in a section of corroded pipe, which was later found to have resulted from poor maintenance and almost non-existent inspections. BP subsequently shut down additional sections of corroded pipeline for repairs once additional problems were discovered during subsequent inspections in early 2007.

11.     In 2005, at the CSB's urging, BP established its own independent panel to review and improve its safety procedures. Former U.S. Secretary of State James Baker, III chaired what is referred to herein as the "Baker Panel." After completing its investigation, the

Baker Panel issued a report on January 16, 2007 (the "Baker Report"), finding, in the words of the Presidential Commission, that "***BP management had not distinguished between occupational safety – concern over slips, sprains, and other workplace accidents – and process safety:  hazard analysis, design for safety, material verification, equipment maintenance, and process-changing reporting***.  And the [Baker P]anel further concluded that BP was not investing leadership and other resources in managing the highest risks."  More specifically, the Baker Panel held that:  "***from the top of the company, starting with the Board and going down . . . BP has not provided effective process safety leadership and has not adequately established process safety as a core value***."  Indeed, even Defendant Browne admitted that BP had failed to adequately address process safety issues prior to the Texas City disaster and that it was those failures that led to the explosion.  For example, Defendant Browne stated, in part, that:

> We had emphasised that individuals had to be safe as they went about their daily work – "personal safety."  That led to dramatic improvements.  ***But we had not emphasised that processes and equipment had to be safe under all circumstances and operated in a safe way at all times – "process safety."***

12.     The Baker Panel singled out organizational problems as the root cause of BP's continued failure to learn from, and respond to, major incidents, finding "a lack of operating discipline, toleration of serious deviations from safe operating practices, and apparent complacency toward serious process-safety risks."

13.     In May 2007, the chairman of the Chemical Safety Board, Carolyn Merritt, testified before Congress about "striking similarities" between the Alaska and Texas incidents, stating that "Virtually all of the seven root causes identified for the Prudhoe Bay incidents have strong echoes in Texas City," and noting "flawed communication of lessons learned, excessive decentralization of safety functions and high management turnover. BP focused on personal safety statistics but allowed catastrophic process safety risks to grow."

6

14.        On January 16, 2007, the Baker Panel released its Report which contained 10 recommendations "*to help bring about, sustainable improvements in process safety performance.*"

15.        The Class Period for this securities fraud action begins that same day when BP professed its commitment to becoming an industry leader in process safety.  BP CEO Defendant Browne responded to the Baker Report recommendations with the following statements, among others:  "*BP gets it.  And I get it too*."  He continued: "*BP's workforce is ready, willing and able to participate in a sustained Group-wide effort to move BP towards excellence in process safety*.  *BP's safety lapses have been chronic.*"

16.        Lord Browne's acknowledgement of BP's troubled past – and his pledge to investors that BP would be a different company going forward – was the beginning of a purported sea change in BP's operations. Throughout the Class Period, Defendants would consistently return to this pledge and the recommendations of the Baker Report, assuring investors that BP had learned its lesson and that its operations were now safe and reliable. BP went so far as to say that it strived to be an industry leader in process safety and managing risk.

17.        In a conference call with stock market analysts in February 2007, Browne reaffirmed his and BP's commitment to implementing the Baker Report recommendations: "above all else we need to concentrate on two things – safety and performance.  *Safety is fundamental to everything that we will do. We will embrace with equal commitment each of the three dimensions of safety -- personal safety, <u>process safety</u> and the environment.* Our aspiration is to be an industry leader in each."

18.        When Anthony B. "Tony" Hayward ("Hayward") succeeded Browne as CEO in May 2007, one of his first commitments was to "*focus on safety like a laser*."  Hayward,

the other Individual Defendants (defined below), and BP itself, repeatedly reaffirmed, in its public filings with United States Securities and Exchange Commission ("SEC") which were disseminated to investors in the United States through the mails and other means of interstate commerce, BP's commitment to process safety and, in particular, the virtues of such efforts in one of its greatest profit centers, the Gulf of Mexico.

19.     As has since been revealed, the truth greatly diverged from Browne's and Hayward's affirmations.  A January 24, 2011 *Fortune* magazine article entitled "BP: An Accident Waiting to Happen," revealed a previously unreleased internal BP strategy document dated December 2008 that specifically warned BP executives of serious process safety "gaps" in the Gulf of Mexico:

> ***It's become apparent that process-safety major hazards and risks are not fully understood by engineering or line operating personnel.  Insufficient awareness is leading to missed signals that precede incidents and response after incidents, both of which increases the potential for and severity of process-safety related incidents***.

The document concluded that BP employees needed "major hazard awareness" training.

20.     The *Fortune* article quoted Nancy Leveson ("Leveson"), an industrial safety expert at the Massachusetts Institute of Technology ("MIT") who served on a panel that investigated BP's safety practices after its Texas City refinery explosion and, subsequently, taught safety classes to BP executives in a course entitled BP "Operations Academy."  More recently, Leveson served as an advisor to the Presidential Commission.  In the article, Leveson was quoted for criticizing BP's approach to safety, explaining that BP "just did safety wrong." She determined that BP was "producing a lot of standards but many were not very good and many were irrelevant."  She was so troubled by BP's approach to safety that, in January 2010, she warned colleagues that BP is "***an accident waiting to happen***."

8

21.      The *Fortune* article discussed the Operations Academy that Hayward both implemented and attended.  The program focused on process safety and taught universal lessons: "***Critical procedures should be formalized*** and carried out with rigor; it's essential to maintain multiple safeguards against an accident; ***it is dangerous to change operating plans on the fly***; anomalies need to be clearly resolved; ***small incidents are warning signs that conditions are ripe for a disaster***."

22.      Notably, the deficiencies above existed not only with refineries and pipelines, but also with offshore drilling operations.  Despite delivering these warnings from the prior disasters to BP executives about the need for clear operational protocols and safety measures, the Presidential Commission Report concluded that BP had no adequate process safety procedures in place with regard to well testing in deep sea drilling.  It similarly lacked established protocols for securing a well before placing it into temporary abandonment.  The Company also failed to properly outfit rigs with properly designed and tested equipment to meet the extreme risks posed by deepwater drilling operations.

23.      Rig personnel had excessive discretion in making critical decisions, including, but not limited to:  how to case and cement the well; how to test the well for integrity; and what to do when warning signs develop.  The Presidential Commission Report found, much like the Baker Report three and a half years earlier, that BP's "***approach to managing safety has been on individual worker occupational safety but not on process safety.  These incidents and subsequent analyses indicate that the company does not have consistent and reliable risk-management processes – and thus has been unable to meet its professed commitment to safety***."

24.     Throughout the Class Period, Defendants misled Plaintiffs and the Class by conveying BP's commitment to and implementation of process safety reform throughout the Company and that, in the event of an emergency well blowout, BP was prepared to contain and adequately address an oil spill in the Gulf of Mexico.  Thus, investors were deceived as to BP's true risk profile in deep sea drilling when they purchased BP ADSs and ordinary shares at prices artificially inflated by BP's material misrepresentations and omissions of material fact during the Class Period.

25.     When Defendant Hayward took over as CEO in 2007, even though he stated that he would focus on safety like a laser, the Company failed to conduct the process safety overhaul it represented to investors it would implement.  In short, BP was not an industry leader in safety processes for its drilling operations.  Moreover, BP's Oil Spill Response Plan (defined below) was highly misleading and riddled with material misstatements about its ability to respond to a major oil spill; the reality was BP was in a "trial by fire" situation in trying to contain the oil spewing into the Gulf of Mexico.

26.     After the explosion, the truth about BP and its lack of commitment to and implementation of safety processes to avoid preventable incidents began to emerge.  Investors learned that:  BP was not the safe and secure company it portrayed itself to be; BP had not implemented the process safety overhaul it represented it would in response to the Baker Report; BP knew or recklessly disregarded that the amount of the spill was vastly greater than BP had publicly admitted; BP knew or recklessly disregarded that its statements regarding the size of the oil spill were false and materially misleading when made; BP could not contain the oil spill; BP could not stop the flow of oil from the well until 87 days after the explosion; the cost to BP as a result of the spill would be well over $20 billion (BP has now raised the estimated cost to $40

10

billion); and BP would have to temporarily suspend its stock dividend to pay for the spill related clean up costs.  As a result, when the truth was revealed, BP's stock price plunged in value, causing Plaintiffs and the Class to lose as much as 40% of their investments.

## II.   JURISDICTION AND VENUE

27.     The claims herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. 240.10b-5, promulgated thereunder; New York common law fraud; the Financial Services and Markets Act 2000 (UK); and under English common law.

28.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and 28 U.S.C. §§ 1331, 1332, and 1367.

29.     Venue is proper in this District pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b), as BP's U.S. operations are headquartered in this District.  Also, by Order dated August 10, 2010, the Judicial Panel on Multidistrict Litigation transferred several related actions to this jurisdiction for coordination and pretrial proceedings.

30.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications and the facilities of a national securities exchange and market.

## III.   THE PARTIES

### A.     Plaintiffs

31.     Plaintiff, Thomas P. DiNapoli, Comptroller of the State of New York, as Administrative Head of the New York State and Local Retirement Systems and sole Trustee of the New York State Common Retirement Fund, as set forth in the certification previously filed in

this litigation, and incorporated by reference herein, purchased BP ADSs and ordinary shares at artificially inflated prices during the Class Period and has been damaged thereby.

32.        Plaintiff, the Ohio Public Employees Retirement System, the State Teachers Retirement System of Ohio, the School Employees Retirement System of Ohio and the Ohio Police & Fire Pension Fund, along with  their statutory litigation counsel, the Ohio Attorney General Mike DeWine, as set forth in the certification previously filed in this litigation, and incorporated by reference herein, purchased BP ADSs and ordinary shares at artificially inflated prices during the Class Period and has been damaged thereby.

**B.        Defendants**

33.        Defendant BP plc is a UK corporation with its principal executive offices located in London, England.  A sampling of BP's contacts with the United States are as follows: (a) BP is the largest oil and gas producer in the U.S.; (b) BP has 40 percent of its assets and workers in North America; (c) BP's ADSs are listed on the New York Stock Exchange and BP is the largest non-U.S. company listed on the NYSE; (d) BP's ordinary shares are listed on the NYSE in connection with its ADS program; (e) roughly 40% of BP's ordinary common shares are owned by individuals and institutions within the U.S.; and (f) BP files annual reports and other documents with the SEC.

34.        Defendant BP America, Inc. ("BP America"), a wholly-owned subsidiary of BP, is a Delaware corporation with its principal place of business in Houston, Texas.  BP America produces oil and natural gas products in the United States.

35.        Defendant BP Exploration & Production, Inc. ("BP Exploration"), a wholly-owned subsidiary of BP, is a Delaware corporation with its principal place of business in Houston, Texas.  BP Exploration provided materially false and misleading filings to the MMS during the Class Period.

12

36.     Defendant Anthony B. "Tony" Hayward ("Hayward") served as the Company's Chief Executive Officer ("CEO") from May 2007 until October 2010 and served as an executive director of the Company from 2003 to November 2010.  Hayward, who holds a PhD in Geology, began working at BP in 1982 as a rig geologist offshore of Aberdeen, Scotland and later as a field geologist in various locations throughout the world.  From 2002 to 2007, he served as the CEO of BP's Exploration and Production business segment, which oversees exploration and drilling in the Gulf of Mexico, among other places.  Hayward was a member of BP's executive management, which is responsible for the day-to-day running of BP.  During the Class Period, Hayward signed certain BP Annual Reports that are alleged herein to have been knowingly or recklessly false and misleading when made and made other knowingly or recklessly false and misleading statements as well.

37.     Defendant Lord Edmund John Philip Browne, Baron Browne of Madingley ("Browne") served as the Company's CEO from 1995 until April 2007.  Browne joined BP as an apprentice in 1966 and held various positions, including Managing Director and CEO of BP Exploration.  Browne was a member of BP's executive management, which is responsible for the day-to-day running of BP.  During the Class Period, Browne signed BP's 2006 Annual Report that is alleged herein to have been knowingly or recklessly false and misleading when made and made other knowingly or recklessly false and misleading statements as well.

38.     Defendant Andrew G. "Andy" Inglis ("Inglis") served as the Company's Chief Executive, Exploration and Production and as an executive director of the Company from February 2007 until October 2010.  Inglis joined BP as a Mechanical Engineer in 1980 and worked in various locations throughout the world, including the Gulf of Mexico, Alaska, and the North Sea.  In 1996, Inglis became Chief of Staff for Exploration and Production and from 1997

13

to 1999, he was responsible for leading BP's activities in the deepwater Gulf of Mexico. Beginning in July 2004, Inglis was Executive Vice President and Deputy Chief Executive of Exploration and Production. Inglis was a member of BP's executive management, which is responsible for the day-to-day running of BP.  Inglis is a Chartered Mechanical Engineer and is a Fellow of the Royal Academy of Engineering and of the Institute of Mechanical Engineers. During the Class Period, Inglis made knowingly or recklessly false and misleading statements as alleged herein.

39.        Defendant H. Lamar McKay ("McKay") has served as Chairman and President of BP America since January 2009.  McKay began his career in 1980 at Amoco Production Company.  Since 1998, he has worked for BP in various capacities, including as the Head of Strategy and Planning for Worldwide Exploration and Production, the Business Unit Leader for the Central North Sea in Aberdeen, Scotland, and the Chief of Staff for worldwide Exploration and Production.  In May 2007, McKay became the Senior Group Vice President of BP and Executive Vice President of BP America, in which capacity he led BP's negotiations on the settlements for both the Texas City refinery disaster and Alaska pipeline oil spills.  McKay is a member of BP's executive management, which is responsible for the day-to-day running of BP. He holds a degree in Petroleum Engineering and is based in Houston, Texas.  During the Class Period, McKay made knowingly or recklessly false and misleading statements as alleged herein.

40.        Defendant Bryon E. Grote ("Grote") has served as the Company's Chief Financial Officer ("CFO") since 2002 and as a director of the Company since 2000.  He previously worked as an Executive Vice President of BP Exploration and Production.  Grote is a member of BP's executive management, which is responsible for the day-to-day running of BP. During the Class Period, Grote signed BP's Annual Reports that are alleged herein to have been

14

knowingly or recklessly false and misleading when made and made other knowingly or recklessly false and misleading statements as well.

41.      Defendant Douglas Suttles ("Suttles") served as BP's Chief Operating Officer for Exploration and Production from January 2009 until at least January 2011.  Suttles has worked in the oil industry since 1983 and has worked in several different engineering and leadership roles at BP, including Vice President for Northern North Sea Operations and President of BP's Trinidadian oil business.  In January 2007, he was named President of BP Exploration (Alaska) Inc.  Suttles holds a degree in Mechanical Engineering.  During the Class Period, Suttles made knowingly or recklessly false and misleading statements as alleged herein.  On January 12, 2011, Suttles, who is only 50 years old, announced that he would be retiring from BP.

42.      Defendant Iain Conn ("Conn") is the Chief Executive for BP Refining and Marketing.  He began working for BP in 1986.  Conn is a member of BP's executive management, which is responsible for the day-to-day running of BP.  During the Class Period, Conn made knowingly or recklessly false and misleading statements as alleged herein.

43.      Defendant David Rainey ("Rainey") is BP's Vice President of Exploration for the Gulf of Mexico.  Rainey was a member of BP's executive management, which is responsible for the day-to-day running of BP.  During the Class Period, Rainey made knowingly or recklessly false and misleading statements as alleged herein.

44.      Defendant Robert "Bob" Dudley ("Dudley") has served as BP's Group Chief Executive since October 2010 and as an executive director since April 2009.  Dudley has worked in the oil industry since 1979 and for BP since 1999, where he has served in numerous roles.  He is a member of BP's executive management, which is responsible for the day-to-day running of

15

BP.  Dudley holds a degree in Chemical Engineering.  During the Class Period, Dudley made knowingly or recklessly false and misleading statements as alleged herein.

45.      Defendant Robert "Bob" Malone ("Malone") served as Chairman and President of BP America from July 2006 until February 2009, and as an Executive Vice President of BP until March 2009.  Malone served on BP's executive management team, which is responsible for the day-to-day running of BP.  Malone holds a degree in Petroleum Engineering and has worked for BP for 34 years.  During the Class Period, Malone made knowingly or recklessly false and misleading statements as alleged herein.

46.      Defendants Hayward, Browne, Inglis, McKay, Grote, Suttles, Conn, Rainey, Dudley and Malone are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of BP's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made regarding BP's operations were then materially false and misleading when made.  Each Individual Defendant herein made materially false and misleading statements, or omitted to disclose material facts, to investors in the U.S. and disseminated such material misstatements

16

through the use and means of interstate commerce within the U.S. and caused U.S. investors to purchase BP securities at artificially inflated prices.

### C.   Non-Party

47.      JPMorgan Chase Bank, N.A. ("JPMorgan Chase") is the issuer of BP ADSs and performs the roles of the transfer agent, registrar, record keeper, and dividend paying agent. JPMorgan Chase actively manages the BP ADS account by issuing physical certificates, account statements, and dividend checks to ADS investors and maintains records pertaining to ADS investors.  JPMorgan Chase also coordinates the proxy voting process and arranges for custody of the BP ordinary shares underlying the BP ADSs.

## IV.  BACKGROUND

### A.   BP's Relevant Operations

48.      BP is a global oil and gas company and is the third-largest energy company in the world.  BP is active in every area of the oil and gas industry, including drilling exploration and production, refining, distribution and marketing, petrochemicals, power generation and trading.  With operations in over 80 countries, BP produces around 3.8 million barrels of oil equivalent per day.  Its largest division is BP America, which is the biggest producer of oil and gas in the U.S.

49.      During the Class Period, BP's quarterly profits were in the billions of dollars, exceeding $10 billion per quarter in 2008.  Since the first quarter of 2007, BP consistently paid quarterly dividends between 5 and 10 pence (between and 8 and 16 cents) per ordinary common share.

50.      BP's Exploration and Production segment includes oil and natural gas exploration, field development and production, and marketing and trading of natural gas.  It has exploration and production activities in Angola, Azerbaijan, Canada, Egypt, Libya, the Russian

Federation, Trinidad and Tobago, Norway, the United Kingdom, and the United States, as well as in the Asia Pacific, Latin America, North Africa, and the Middle East.

51.        Throughout the Class Period, BP touted its Exploration and Production business and, more specifically, its operations in the deepwater Gulf of Mexico, a region BP hailed as a "profit centre" and a "high margin" production area.  Defendant Malone described the Gulf of Mexico as "an important source of domestic energy, and offshore deepwater developments" and told investors that oil from that region accounted for one-sixth of all oil produced in the U.S.

**B.**        **BP's Process Safety Controls Were Deficient Prior to the Class Period**

52.        Prior to the beginning of the Class Period, BP was no stranger to the risks involved in the petroleum industry and deepwater drilling and, in fact, was at the center of a number of catastrophic incidents that took a toll on lives and the environment.

*BP's Flawed Process Safety Controls Cause Grangemouth Incidents*

53.        Between May 29 and June 10, 2000, BP's Grangemouth storage and refining complex in Scotland experienced three major incidents.  These included a power failure leading to the emergency shutdown of the oil refinery; the rupture of a key steam pipe; and a fire in the refinery's catalytic cracker unit, which produces gasoline. The UK HSE investigated the incidents and issued a report in 2003 finding in all three incidents "weaknesses in [BP's] safety management systems on-site over a period of time."  BP carried out an internal investigation, which concurred in many of the UK HSE's findings.  BP later pled guilty to criminal charges stemming from the incidents and paid over £1 million in fines.

***Safety Lapses in BP's Deepwater Drilling Operations***

54.        In 2002, the *Ocean King*, a drill rig under BP's operational control in the Gulf of Mexico, experienced two separate blowout incidents within a three-month span, raising questions about BP's process safety and well design procedures and practices.

55.        The first incident occurred in August 2002, when the *Ocean King* suffered a gas blowout while drilling a well in the Gulf of Mexico's Grand Isle block near Louisiana. The crew's efforts to contain the well failed, and they soon evacuated the rig because of the high level of airborne gas. The flow of gas and other material exploded, causing a fire on the rig and $2 million in damage.

56.        During its investigation, MMS discovered that BP had inexplicably installed a non-compliant blowout diverter system, which contributed to the explosion and fire, rather than the one specifically designed and approved for the rig.  MMS also found that the fire's effects were intensified because BP personnel had stored pressurized containers of flammable gas too close to the diverter output.  Worse still, the investigation revealed that BP engineers, because of a nearby well drilling project, knew that there was a shallow gas pocket at 2,700 feet beneath the sea floor surface, the precise depth which the rig had reached when the well blew out.  The incident was both caused by and revealed a host of systemic safety issues involving BP's failures to build and execute wells as designed, ensure the proper design of the drill rig, and keep accurate up-to-date designs of their equipment.

57.        Just three months later, in November 2002, after the *Ocean King* had undergone major repairs and returned to the Grand Isle block, a second incident occurred, similar to the first. After cementing the steel casing in another newly drilled well hole, mud and gas began to flow onto the rig, indicating a failed cementing job. After an unsuccessful effort to contain the well, the crew evacuated.  The MMS issued a harsh critique of the second incident,

19

noting the flawed attempt to bring the well into control, and serious deficiencies in BP's safety protocols and knowledge of equipment.

58.     The two incidents in 2002 resulted in MMS issuing a special Safety Alert to all drilling companies in the Gulf of Mexico regarding the serious risk of a blowout in the event of a failed cementing job.  The Safety Alert specifically mentioned MMS's findings about BP during the Ocean King incident, cautioning others in the industry about "erroneous chain of decisions, inadequate training of personnel or knowledge of the diverter system, and inadequate planning."

59.     In May 2003, BP suffered a near blowout not far from the Macondo well.  In that incident, the *Transocean Enterprise*, on contract with BP, drifted off its drill site just as a well was being completed, breaking the riser pipe linking the rig to the ocean floor.  The breaking of the riser was strikingly similar to what occurred on the *Deepwater Horizon* after it exploded.  Fortunately for BP, the backup "deadman" switch on the rig's blowout preventer ("BOP") worked:  the BOP's rams closed, preventing the flow of oil or gas into the Gulf of Mexico from the damaged riser.  A subsequent inspection, however, showed that pieces of broken riser pipe were leaning up against the BOP, close to its control lines, and that the BOP itself was partially damaged – demonstrating that the "fail safe" BOP device, regardless of its immediate effectiveness, was subsequently vulnerable to damage or incapacitation by falling riser pipe – an outcome which in fact occurred during the Deepwater Horizon incident.

60.     In August 2004, BP experienced a blowout in the Nile delta, off the coast of Egypt, when the *GSF Adriatic IV*, a gas drilling rig operated by Global Santa Fe (which, in 2007, merged with Transocean) exploded while completing a well for a joint consortium, which included BP. The fire raged for over a week before the well was brought under control. Analysts

20

later said that Egypt's natural gas production was reduced by 10-15 percent because of the incident.  As with the *Deepwater Horizon* incident, the blowout occurred after a final cementing job failed.

61.        In 2005, an independent five year audit of the BOP on the *Deepwater Horizon* itself revealed problems with gauges and leaks, suggesting that the device was not being properly maintained. The audit, however, was incomplete: because the *Deepwater Horizon*'s BOP was in use at the time of the audit and many of its components were never properly tested. For example, one key test – to determine whether the unit's blind shear rams could in fact cut through actual drilling pipe – was never performed.

62.        Then, in September 2009, a BP audit of the *Deepwater Horizon* found serious concerns that could "***lead to loss of life, serious injury or environmental damage as a result of inadequate use and/or failure of equipment***."  For example, the audit found excessive overdue maintenance – including 390 separate jobs that would take more than 3,500 man hours to remedy.  Thirty-one of these jobs were related to well control system issues, six related to BOP maintenance concerns, and the remaining problems dealt with concerns related to the electronic alarm systems, ballast systems used to stabilize the vessel, and other problems.

***Pipeline Cracks in the Thunder Horse PDQ***

63.        In July 2005, BP's massive and newly-deployed production rig in the Gulf of Mexico, *Thunder Horse PDQ*, was evacuated for a passing hurricane and almost capsized after a key internal valve, which had been installed backwards, allowed ballast water to accumulate in one section of the rig, causing a dangerous tilt. When the rig was later put in dry-dock for repairs, cracks were discovered in the underwater pipelines beneath the rig.  A senior engineering consultant who worked on the Thunder Horse project later told *The New York Times* that the

pipeline cracks: "could have been catastrophic."  He continued by noting that: "You would have lost a lot of oil a mile down before you would have even known. It could have been a helluva spill – much like the Deepwater Horizon."  The *Thunderhorse* repairs took three years to complete.

***Safety Lapses that Caused the Texas City Refinery Explosion***

64.     On March 23, 2005, an explosion occurred at BP's Texas City refinery. Fifteen people were killed and approximately 170 were injured.  The U.S. Environmental Protection Agency's ("EPA") criminal investigative division launched a criminal investigation, as did the U.S. Occupational Safety and Health Association ("OSHA"), EPA civil inspectors, the CSB, and the Texas Environmental Quality Commission ("TCEQ").

65.     In April 2005, OSHA placed BP under its Enhanced Enforcement Program for employers who are "indifferent to their obligations under the OSH Act."  EPA civil inspectors entered into a settlement with BP, laying out a timeline and plan to bring the refinery's operations into compliance with EPA regulations.  TCEQ reached a similar agreement with BP in mid 2006.

66.     In mid-2005, the CSB recommended that BP appoint an independent commission to investigate the Company's internal safety culture and uncover the causes of the incident as well as to investigate other general concerns with BP's safety environment.  In response, in October 2005, BP announced the formation of the "U.S. Refineries Independent Safety Review Panel," chaired by former Secretary of State James Baker.  The Baker Panel began conducting investigations in October 2005 and issued its final report on January 16, 2007.

67.     In March 2007, CSB completed its investigation of the Texas City incident. The report flagged weaknesses in BP's safety culture.  It criticized BP's management for its lack

of "focus on controlling major hazard risk, finding that managers provided "ineffective leadership and oversight."  CSB's report also identified the Company's failures to heed warning signs and internal concerns raised by its own staff, writing that BP's managers "provided ineffective leadership and oversight" and "did not implement adequate safety oversight, provide needed human and economic resources, or consistently model adherence to safety rules and procedures."  The CSB found a direct correlation between the blast and BP's cuts in safety and staffing budgets, concluding:  BP "did not effectively evaluate the safety implications of major organizational, personnel, and policy changes."  Finally, the CSB report criticized BP for failing to learn from its earlier, similar mistakes.

*Widespread Corrosion Causes Leaks in BP's Alaskan Pipeline Operations*

68.     In early 2006, an oil spill of 210,000 to 260,000 gallons occurred on BP's Prudhoe Bay pipelines on Alaska's North Slope, facing the Arctic Sea.  The pipeline had been leaking for weeks and was first discovered on March 2, 2006.  Joint federal and state investigations, encompassing both criminal and civil matters, began in March 2006. The investigations ultimately addressed not only the March 2006 leak, but also addressed weaknesses in other parts of the pipeline, and a subsequent leak that occurred on another part of the pipeline in August 2006.

69.     An EPA criminal investigation concluded that widespread corrosion in the pipelines had led to the March and August leaks (and other points of corrosion uncovered in the investigation) and that BP could have prevented the leaks by maintaining and inspecting its pipelines.  It further concluded that the duration of the spill revealed BP's criminal neglect of the pipeline.

70.        In 2007, BP pled guilty to a criminal charge in connection with the March

2006 spill, admitting that BP's "criminal negligence" caused the corrosion – and thus the spill

itself.  BP was sentenced to three years of probation and fined 22 million dollars.

71.        The 2006 spill was BP's second criminal plea in the U.S. in a decade:  in the

late 1990s BP was indicted because its engineers were injecting dangerous materials into a well

casing to dispose of the materials.  In response, BP pled guilty in 2000, was put on five years of

probation, and entered into a compliance agreement with the EPA's debarment division.

72.        In March 2007, the Company received warnings about the deficiencies in its

corporate governance from the consulting firm Booz Allen Hamilton ("Booz Allen").  In the

wake of the 2006 spill on its Prudhoe Bay pipeline, BP retained Booz Allen to "identify potential

organizational, process, and governance issues" that related or contributed to the incident.  The

Booz Allen report found that BP's executive management and Board of Directors had created a

culture focused on cost-cutting and ensuring that budget targets were met, while ignoring safety

issues and critical maintenance.  Among other findings, Booz Allen found major shortcomings in

the Company's internal communications culture noting, in particular, that "critical risk data" and

concerns about major risks were not properly communicated within BP:  More specifically, the

report noted that "[r]isk-related vertical and horizontal communications do not elevate critical

risk data to senior leadership."  Booz Allen effectively put Defendants on notice that they could

not rely on the Company's internal reporting mechanisms to receive "critical risk data" and thus

understand the risk of catastrophic operating failure.

73.        In May 2007, the chairman of the Chemical Safety Board, Carolyn Merritt,

testified before Congress about similarities between the Booz Allen report on Alaska and the

CSB's report on Texas, noting that "[v]irtually all of the seven root causes identified for the

24

Prudhoe Bay incidents have strong echoes in Texas City," and identified "common findings" that included "flawed communication of lessons learned, excessive decentralization of safety functions and high management turnover.   BP focused on personal safety statistics but allowed catastrophic process safety risks to grow."

### BP Purports to Leave Its Troubled Past Behind

74.        With all of its past problems staring BP in the face, the Company in early 2007 finally appeared to address its previous safety shortcomings.  The Baker Panel strongly suggested that BP immediately implement the following ten recommendations:

> RECOMMENDATION # 1 – PROCESS SAFETY LEADERSHIP – The Board of Directors of BP p.l.c, BP's executive management (including its Group Chief Executive), and other members of *BP's corporate management must provide effective leadership on and establish appropriate goals for process safety*. Those individuals must demonstrate their commitment to process safety by articulating a clear message on the importance of process safety and matching that message both with the policies they adopt and the actions they take.

> RECOMMENDATION #2 – INTEGRATED AND COMPREHENSIVE PROCESS SAFETY MANAGEMENT SYSTEM – BP should establish and implement an integrated and comprehensive process safety management system that systematically and continuously identifies, reduces, and manages process safety risks at its U.S. refineries.

> RECOMMENDATION #3 – PROCESS SAFETY KNOWLEDGE AND EXPERTISE – BP should develop and implement a system to ensure that its executive management, its refining line management above the refinery level, and all U.S. refining personnel, including managers, supervisors, workers, and contractors, possess an appropriate level of process safety knowledge and expertise.

> RECOMMENDATION #4 – PROCESS SAFETY CULTURE – BP should involve the relevant stakeholders to develop a positive, trusting, and open process safety culture within each U.S. refinery.

> RECOMMENDATION #5 – CLEARLY DEFINED EXPECTATIONS AND ACCOUNTABILITY FOR PROCESS SAFETY – BP should clearly define expectations and strengthen accountability for process safety performance at all levels in executive management and in the refining managerial and supervisory reporting line.

RECOMMENDATION #6 – SUPPORT FOR LINE MANAGEMENT – BP should provide more effective and better coordinated process safety support for the U.S. refining line organization.

RECOMMENDATION #7 – LEADING AND LAGGING PERFORMANCE INDICATORS FOR PROCESS SAFETY – BP should develop, implement, maintain, and periodically update an integrated set of leading and lagging performance indicators for more effectively monitoring the process safety performance of the U.S. refineries by BP's refining line management, executive management (including the Group Chief Executive), and Board of Directors. In addition, BP should work with the U.S. Chemical Safety and Hazard Investigation Board and with industry, labor organizations, other governmental agencies, and other organizations to develop a consensus set of leading and lagging indicators for process safety performance for use in the refining and chemical processing industries.

RECOMMENDATION #8 – PROCESS SAFETY AUDITING – BP should establish and implement an effective system to audit process safety performance at its U.S. refineries.

RECOMMENDATION #9 – BOARD MONITORING – BP's Board should monitor the implementation of the recommendations of the Panel . . . and the ongoing process safety performance of BP's U.S. refineries. The Board should, for a period of at least five calendar years, engage an independent monitor to report annually to the Board on BP's progress in implementing the Panel's recommendations . . . . The Board should also report publicly on the progress of such implementation and on BP's ongoing process safety performance.

RECOMMENDATION #10 – INDUSTRY LEADER – BP should use the lessons learned from the Texas City tragedy and from the Panel's report to transform the company into a recognized industry leader in process safety management. The Panel believes that these recommendations . . . can help bring about sustainable improvements in process safety performance at all BP U.S. refineries.

75.      Following the release of the Baker Panel recommendations, BP consistently stated that it would implement the mandates across all lines of its business.  In a January 16, 2007 press conference responding to the findings of the Baker Report, Defendant Browne announced:

If I had to say one thing which I hope you will all hear today it is this 'BP gets it.' And I get it too. This happened on my watch and, as Chief Executive, I have a responsibility to learn from what has occurred. *I recognise the need for improvement and that my successor, Tony Hayward, and I need to take a lead in*

*putting that right by championing process safety as a foundation of BP's operations*.

***

The list of what we have done since the accident *shows how seriously we take process safety*.

76.         Yet the truth, as described herein, is not only that BP did not "get it," but that Defendants knew of or recklessly disregarded their continued failure to implement the process safety programs and procedures necessary to avoid the recurrence of similarly preventable deep sea drilling incidents.  The occurrence of the worst industrial incident in history, along with the Presidential Commission's finding that BP has not met "it's professed commitment to safety" belied BP's public representations concerning its professed commitment to ensuring the safety of its deep sea drilling operations.

## V.   DEFENDANTS' SCIENTER CONCERNING BP'S RISKS IN OFFSHORE DRILLING AND BP'S FAILURE TO IMPLEMENT PROPER PROCESS SAFETY CONTROLS AND PROCEDURES

### A.   Defendants Knew, or Recklessly Disregarded, That BP's Process Safety Procedures Did Not Adequately Address the Known Risks in Deepwater Drilling, Risks that Materialized at the Macondo Well

77.         Throughout the Class Period, Defendants were aware, or recklessly disregarded, that their statements to their investors regarding BP's commitment to safety were not true and that their statements touting the importance of deepwater drilling in the Gulf of Mexico omitted material information regarding BP's highly risky and unsafe practices in its deep sea operations.

78.         The Presidential Commission found that there was no "comprehensive and systematic risk-analysis, peer-review, or management of change process" for any of the following key decisions, amongst others:

- Failing to wait for the correct amount of centralizers;

27

- Failing to wait for the foam stability test results and/or redesigning slurry;
- Failing to run a cement evaluation log;
- Failing to use the correct spacer to avoid disposal issues;
- Failing to displace the mud from the riser before setting the surface cement plug;
- Failing to properly place the cement plug at the appropriate level and instead placing it 3,000 feet before the mud line;
- Failing to install additional physical barriers during the temporary abandonment procedure;
- Failing to perform further well integrity diagnostics in light of the troubling and unexplained negative pressure test failures; and
- Failing to use the correct mud pits and conducting other simultaneous operations during mud displacement.

The Presidential Commission then concluded that:  "***The evidence now available does not show that the BP team members (or other companies' personnel) responsible for these decisions conducted any sort of formal analysis to assess the relative riskiness of available alternatives***."

***Faulty Cementing Jobs and Other Stability Issues Were Known as the Most Frequent Causes of Well Control Problems***

79.    As early as 2003, BP knew or recklessly disregarded risks associated with oil spills in offshore drilling related to the failure of cementing at various stages of well development, from the cementing around well casings and annuluses to the cementing of plugs, or shoes, to block pressure during the process of "temporary well abandonment.".

80.    BP was aware – though it failed to disclose its awareness to the investing public – that as early as 2003, MMS had determined that failed cement jobs were associated with 33 blowout or well kick incidents in the Gulf of Mexico between 1973 and 2004, some of which involved "well loss" and "rig and platform destruction by fire."  Indeed, an October 22, 2003 MMS alert noted that "*[a]nnular flow related to cementing surface casing has been identified as one of the most frequent causes of loss of control incidents in the Gulf of Mexico*."

28

81.     BP had experienced cementing failures and knew of similar failures on other companies' rigs prior to and during the Class Period.  Additionally, BP experienced, but did not disclose, its own problems with a faulty cement job on one of its deepwater wells in the Caspian Sea, off the coast of Azerbaijan, in September 2008.

82.     More specifically, on or around September 17, 2008, BP experienced a gas leak at one of its central production platforms in the Azeri-Chirag-Guneshi ("ACG") field in the Caspian Sea – which is the largest of BP's deepwater drilling operations in Azerbaijan.  Shortly thereafter, another rig in the field, called *B-17*, suffered a blowout, causing gas, water, and mud to shoot onto the rig floor, raising the possibility of an explosion.  The rig that suffered a blowout was evacuated and its well was sealed, either by annular rams or because the well simply "bridged" (collapsed on itself or otherwise stopped flowing on its own).  As a result, BP shut down most of the entire field's operations, cutting daily production by over 600,000 barrels per day.  In later communications, BP told U.S. officials that they suspected that numerous wells had a "bad cement job."

83.     BP made no announcement or disclosure of this incident at the time it occurred.  In fact, BP's Form 20-F for 2008 merely mentioned a "subsurface gas release" on September 17, 2008 and notably omitted references to the blowout on Well B-17, the fact that gas alarms went off on the field's central production platform, and the possibility that cementing jobs on other wells were faulty as well.  As noted by *The Wall Street Journal* on December 17, 2010:  "BP had been 'exceptionally circumspect in disseminating information' about the [ACG gas] leak, both to the public and [to] its partner."  Moreover, according to the same article, several of BP's partners "were upset with BP for allegedly withholding information from them about the incident."

29

***Defendants Knew or Recklessly Disregarded That BOPs Were Known to Fail, Yet Did Not Adjust Their Process Safety Procedures Accordingly***

84.     As early as 2000, and on a continuous basis throughout the Class Period, Defendants were aware of or recklessly disregarded the substantial and known risks associated with relying on a single blind shear ram in a BOP to prevent an uncontrolled oil or gas release. Indeed, Defendants were well aware that blind shear rams were highly untrustworthy and failed nearly 50% of the time.

85.     A BOP is a large, five-story device typically set on the ocean floor at the so-called "mud line," beneath the riser connecting the rig to the sea floor and on top of the cement surface casing that seals around the "annulus," which runs down further into the earth toward the "pay sands" in which oil and gas are found.

86.     More specifically, Defendants knew, or recklessly disregarded, that, in the event the BOP needed to be activated, the following should occur:

- Closure of the "variable rams," which would seal the area around the drill pipe in the well (or, with "annular rams" or "blind rams," if no pipe lay in the well), thereby sealing oil and gas in the annulus below the BOP; and then attempting to pump drilling mud into the annulus to outweigh and balance the pressure of rising oil and gas; or

- In a worse scenario, and if the method described above did not work, activate the BOP's "blind shear rams," which are intended to cut through drill pipe in the well and then seal the oil down in the annulus below the BOP; or

- In an emergency setting, set the BOP to activate all of its rams – variable, annular, and blind shear – and disconnect from the riser, preventing further gas or oil from rising to the rig above.

87.     As set forth below, as early as 2000, and on a continuous basis throughout the Class Period, Defendants knew that various components of BOPs in use (both on their own rigs and Transocean-owned rigs) had high probabilities of failure, especially in deepwater and

ultra-deepwater settings, where drill piping is thicker and more difficult to cut and where hydrostatic pressures affect hydraulic systems which control the BOP rams.

88.      In July 2001, the analyst group SINTEF, the largest independent research organization in Scandinavia, provided the MMS with a report recommending that all deepwater and ultra-deepwater drilling rigs in operation in the Gulf of Mexico be equipped with not one, but *two* separate blind shear rams, because of the significant risk that one might fail.  The SINTEF report, while not publicly released, was shared with BP and other industry operators.

89.      In both December 2002 and September 2004, MMS provided to BP and other industry operators several reports written by West Engineering Services revealing serious deficiencies with blind shear rams.  In particular, the reports mentioned:

- The incapacity of shears to cut through many newer types of drill pipe, which tend to be thicker than older pipes;

- The certainty with which the shears that close on the thick joints that connect the sections of pipe together (rather than simply closing on the pipe itself) fail; and

- The significantly lower capabilities of shears to cut pipe at extreme depths, for instance, in excess of 5,000 feet, because of the effect of hydrostatic pressure on BOPs' hydraulic systems.

90.      The studies noted above, although not known to the general public, were shared with and made available to industry members, including senior BP managers and directors involved in drilling operations, and were discussed at industry conferences that occurred during the Class Period, including, but not limited to, conferences held by the Society of Petroleum Engineers ("SPE") and the International Association of Drilling Contractors ("IADC") in New Orleans, February 2-4, 2010 and in Amsterdam in 2009.  Senior BP drilling managers routinely attended SPE and IADC conferences, including those noted above.

91.       In April 2000, an independent expert report by EQE International, a risk and insurance consulting group, conducted an extensive analysis of the BOP to be installed on the *Deepwater Horizon*. The report, which was not publicly disclosed until June 20, 2010, identified a serious flaw in the BOP's design – despite extensive back-up systems, or so-called "redundancies," in the BOP's layout – there was a particular component in the unit's hydraulic system, a single "shuttle valve," which had no backup.  In response, EQE noted the potential for a "single point failure" of the shuttle valve and explained that if the shuttle valve failed, the remaining redundancies built into the BOP would be rendered irrelevant.

92.       Significantly, throughout the Class Period, BP actually utilized the services of West Engineering, the company that carried out the research for MMS on BOP reliability, to carry out specific studies for the Company on risk issues relating to BOP testing.  In both 2008 and early 2010, BP specifically requested, as a member of the joint industry group focused on deepwater drilling issues, that West Engineering carry out research projects on BOP reliability and testing, and integrate past studies analyzing BOPs and their device failures.

93.       A July 2009 report also put BP on notice that BOPs were unreliable.  BP's partner, Transocean, commissioned the report, which analyzed past BOP performance (including in the Gulf of Mexico) as part of a risk assessment for deepwater drilling in the Beaufort Sea, north of Alaska.  The report, written by the consultant group Det Norske Veritas, which was subsequently contracted by the U.S. government to perform an extensive investigation into the *Deepwater Horizon*'s BOP in the wake of the April 2010 blowout and explosion, found that, in practice, blind shear rams on offshore BOPs had a failure rate of 45 percent.  The existence of this report was first disclosed to the investing public on June 20, 2010.

94.       BP exacerbated the risk of BOP failure by permitting rigs operating in the Gulf of Mexico to be equipped with just one single blind shear ram.  Notably, in late 2004, well before the start of the Class Period, BP contracted with Transocean to replace one of the rams on the *Deepwater Horizon*'s BOP with a test ram in order to speed up testing procedures.  Yet, the installation of this test ram lowered the unit's reliability even further.  Indeed, an agreement between BP and Transocean executed in October 2004 noted BP's awareness that the removal of the second ram would "reduce the built-in redundancy" of the BOP and raise the rig's "risk profile."  The existence of this agreement was not made public until June 20, 2010.

95.       Thus, despite all the knowledge and information about difficulties with cementing and BOPs, Defendants either knew, or recklessly disregarded, that BP failed to establish uniform process safety features for rig operators to follow during off shore drilling to address cementing issues and for the Company to follow with regard to BOPs.

**BP Received No Less Than One Hundred Safety Warnings for its Safety Protocol Lapses in its North Sea Deepwater Drilling Operations**

96.       Defendants knew of the significant risks in its deepwater drilling operations during the Class Period that were pervasive across BP's deepwater operations.  Yet, Defendants knew, or recklessly disregarded, that BP's process safety protocols failed to properly and sufficiently address these known risks.

97.       Unknown to the investing public, the UK HSE levied extensive citations and fines on BP, sending no fewer than 100 letters or notices to BP between 2006 and 2010, and citing the Company for safety or environmental violations related to exploration or production rigs, pipeline or storage systems, or other facilities.  Many of the communications related to offshore deepwater rigs operated by BP in the North Sea around Scotland, including the *Schiehallion*, *Unity*, *Bruce*, *Hutton*, *Magnus*, *Clair*, and *Miller* vessels.  Some of these rigs and

33

the ships that serviced them were decades old, and the safety issues, in many cases, concerned a failure to properly maintain and inspect equipment.

98.     According to UK HSE records, the *Schiehallion*, an aging floating production storage and offloading ("FPSO") ship in the far North Sea, experienced a 2005 engine room fire and a 2006 "mooring chain failure," resulting in special UK HSE inspections and meetings with BP officials, and notifications concerning various violations of safety and environmental violations during the Class Period.

99.     In correspondence in 2006, UK HSE strongly urged BP to dry-dock the *Schiehallion* for repairs. BP refused, arguing that they would instead prioritize efforts to improve the ship's condition through a focus on maintenance. UK HSE, in a letter to BP on February 2, 2007, strongly criticized BP's decision, noting several areas of maintenance backlog and numerous cases in which past UK HSE notices were not addressed, and listing various continuing operations which were not in compliance with "relevant statutory provisions" ("RSPs"):

> Finally, it is HSE's view that ***the overall magnitude of the various categories of maintenance backlog [on the Schiehallion] is such that BP does not have sufficient control of the situation***. . . . [T]he situation means that there are concerns for BP's continued ability to comply with the fundamental duties under Sections 2 and 3 of the HASWA [Health and Safety at Work Act]. At the meeting of 29th January, we discussed with BP the issues associated with drydocking, shutting down production and prioritizing integrity management (i.e., the latter being BP's current approach) as a means of addressing the overall maintenance backlog. ***We listened to BP's opinions on the issues associated with the various options, but remain unconvinced that BP's proposed course of actions to remain on station, with an increased focus on integrity, is compatible with achieving compliance with the RSPs given the historic susceptibility of the FPSO Schiehallion to events or conditions that exacerbate ongoing maintenance backlogs*** (e.g., 2005 Compressor Fire, 2006 Mooring Chain Failure).

100.     The February 2, 2007 UK HSE letter continued, laying out concerns that were prescient of the Deepwater Horizon incident:

[UK HSE maintains] the view that **major accidents result when a series of failings with several critical risk control systems materialize concurrently. . . . The number and relatedness of backlogs on the Schiehallion is such that it appears as though there is a significant risk of such a series of failings arising.**

101.     The February 2, 2007 UK HSE letter concluded with criticism of BP's larger problem with its lax safety culture and inability to avoid a major incident that echoed the MMS's findings about BP in 2002:  "BP's decisions on the *Schiehallion* have not in any way been informed by a systematic assessment [by independent safety inspectors] of the adequacy of the management system to achieve compliance with those RSPs . . . that are intended to avoid the failings that might align to cause major accidents."

102.     According to a 2009 UK HSE letter, BP again suffered a "significant Hydrocarbon Release" (*i.e.*, an oil spill or gas release) on the *Schiehallion* rig on August 4, 2008. The UK HSE said the release was attributable to a "failure to comply" with BP's own process safety procedures.

103.     Several other UK HSE letters were sent to BP between 2007 and 2010 as well.  These letters outlined safety and maintenance problems on other rigs that could create a serious risk of hydrocarbon release:

- A March 5, 2009 UK HSE letter discussed inspections of BP's *Harding* rig, criticizing BP's failure to inspect several "high risk" systems for corrosion, as requested in previous notices.  The inspector wrote:  "This lack of progress is unsatisfactory.   It is important that the condition of these systems is ascertained in a timely manner, in order to reduce the risk of loss of containment incidents" (*i.e.*, spills); and

- Additional letters to BP Exploration Operating Company Ltd. on March 25, 2008, March 5, 2009, and July 7, 2009 relating to the *Bruce*, *Magnus*, *Unity*, and *ETAP* platforms criticize BP for failing to conduct maintenance programs compatible with the intended lifespan of its rigs – suggesting, in other words, that BP was running its own equipment into ruin.

*Defendants Knew, or Recklessly Disregarded, That They Misrepresented the Adequacy and Sufficiency of BP's Operational Management System to Implement Effective Process Safety Controls*

104.     In 2006, BP began to implement its Operating Management System ("OMS"), touting it as a "single framework" of standards across BP's operations, which would result in "continuous improvement" of safety practices.  In April 2008, Defendant Hayward said that OMS was aimed at "ensuring that our operations *across the world look and feel the same everywhere – and perform to the same high standard*."

105.     On the contrary, as revealed in testimony throughout the latter half of 2010 and the Presidential Commission Report, BP's OMS did *not* provide a "single" or "common" framework for BP's safety operations throughout the world.  Instead, it allowed BP to use differing safety practices country-by-country and to meet only the minimal requirements set by local regulations.

106.     With respect to offshore operations, applicable rules for drilling protocols are more rigorous in certain jurisdictions, such as Norway, Canada, and the United Kingdom, than in the Gulf of Mexico. For instance, rules exist in other jurisdictions to the effect that "two barriers" must always be maintained on top of hydrocarbons during well completion, that wells in temporary abandonment never be left "underbalanced," and that BOPs always be equipped with two blind shear rams and emergency acoustical switches**.**  BP followed such higher standards for wells drilled in the jurisdictions that required heightened safety measures.  In contrast, in the U.S. BP took advantage of a lower level of regulation in the Gulf of Mexico.

107.     In this way, BP's OMS operates in stark contrast to Shell's safety program. Shell's "Safety Case" methodology dictates that Shell personnel not merely follow regulations but specifically make out a satisfactory "case" for the safety of a particular operation and the

mitigation of risk; Shell's Safety Case also requires the company to perform the same mandatory drilling practices around the world, whether demanded by regulations or not.  Unlike Shell's program, BP's OMS failed to set consistent safety standards across BP's operations although Defendants represented to investors that BP adopted consistent practices throughout its world-wide operations.

108.     BP's decision to adopt lower safety standards in its Gulf of Mexico operations was not inconsequential.  The Presidential Commission found that it was precisely because BP was operating under the lower standards required in the Gulf of Mexico that the Deepwater Horizon explosion occurred.  Had BP, at the Macondo well, been operating under the higher standards demanded under UK, Canadian, or Norwegian rules, the Gulf disaster would not have occurred.  Significantly, the Presidential Commission described BP's OMS and safety protocols as far inferior to the safety protocols and systems that Shell and Exxon Mobil have adopted in their offshore drilling operations.

109.     Additionally, BP publicly represented to investors that, pursuant to the OMS, "We [BP] document and rigorously follow procedures for safe and effective operating." However, the Presidential Commission Report also found that OMS failed to provide workers with procedures for making decisions during operations: "*the company does not have consistent and reliable risk-management processes – and thus has been unable to meet its professed commitment to safety. BP's safety lapses have been chronic*."

110.     In a presentation on July 2, 2010 at the Aspen Ideas Festival, two senior Shell engineers, Joe Leimkuhler and John Hollowell, articulated a number of specific other areas in which Shell's safety systems for drilling deepwater wells were substantially superior to BP's.

Shell engineers made similar presentations during a Presidential Commission hearing on November 9, 2010.

111.     On June 15, 2010, in Congressional Testimony before the House Energy and Environment Subcommittee in Washington, the executives of Exxon Mobil, Chevron, and Shell articulated why their companies' safety programs were significantly superior to that of BP, and each categorically stated that the Deepwater Horizon incident would not have occurred had they been acting as the well site operator, for reasons of practices and design.  For example:

- "We would not have drilled the well the way they did," said Rex W. Tillerson, chief executive of Exxon Mobil.

- "It certainly appears that not all the standards that we would recommend or that we would employ were in place," said John S. Watson, chairman of Chevron.

- "It's not a well that we would have drilled with that mechanical setup," said Marvin E. Odum, President of Shell.

112.     During the Class Period, BP's procedures for deepwater drilling – its "Drilling Wells Operating Policy" – contained fewer absolute or imperative rules and guidelines than the similar guidelines issued by Shell, Exxon Mobil, and Chevron, *i.e.*, industry standard. Moreover, even where BP protocols contained "absolute" rules, managers were charged with the discretion to deviate from them, exceptions that other companies, such as Shell, do not allow. For instance, BP's decision on the *Deepwater Horizon* on the night of April 20, 2010, to displace drilling mud from part of the rig's riser and the well's annulus, thus leaving the well "underbalanced," and with only one barrier (which soon failed), is a drilling rule "exception" that other companies' procedures and best practices forbid.

113.     Beyond the aforementioned issues, safety personnel and drilling engineers within BP found BP's OMS manual was confusing, poorly drafted, and incomplete, and hardly

the safety panacea that BP publicly suggested it was.  Thus, as discussed herein, Defendants

knew, or recklessly disregarded, that they materially misrepresented the Company's OMS to

investors.

***BP Knowingly or Recklessly Disregarded That its 2007-2009 Budget Reductions and Staff
Reorganizations Were Negatively Affecting Its Operational Process Safety Programs***

114.     Contrary to public statements and assurances to shareholders, BP's cost-

cutting affected protocols and processes for ensuring worker and process safety and preventing

environmental incidents.

115.     In October 2007, Defendant Hayward announced plans to reorganize BP to

accomplish "increased efficiencies."  Defendant Grote, BP's CFO, told analysts in an October

2007 conference call that the changes were "designed to simplify the organization and improve

productivity and accountability, bringing up operating units to enable them to focus on safe,

reliable, and profitable operations."  However, Defendants failed to disclose that the so-called

"reorganization" – which resulted in numerous layoffs and cuts to safety budgets – would

materially affect the Company's ability to drill safely in the Gulf of Mexico.

116.     Cutbacks and layoffs hit their height in 2009.  For example, according to

Confidential Witness No. 1 ("CW1"), the manager of report writing in the Office of Compliance

and Ethics ("OCE") at BP America during 2008 and 2009, stated that in July 2009, BP merged

its U.S.-based Group Compliance and Ethics ("GRCE") Office in Houston, which oversaw BP

operations in the Americas, with its Global Compliance and Ethics ("GLCE") Office in London.

According to CW1, the merger resulted in "huge staff reductions" with GRCE suffering a 33

percent cut and GLCE cut by 44 percent. (As a result of the merger, CW1 was offered a

severance package and resigned.)  Even with these glaring and substantial cuts, Defendants

continued to falsely profess throughout the Class Period that the Company's focus on process safety would not be hampered.

117.     The cuts and reshuffling in BP's Compliance and Ethics staff was reflected also in cuts in Health, Safety, Security, and Environment ("HSSE") staff.  Cuts in HSSE budgeting and staff led to resignations and terminations of HSSE managers who complained or raised issues about the cuts.  Among those terminated was Curtis Jackson, a senior HSSE manager for Gulf of Mexico operations, responsible for HSSE issues related to deepwater drilling, in January 2010. Additionally, Phil Dziubinski ("Dziubinski"), BP Exploration Alaska's ("BPXA") senior officer for HSSE, who raised safety concerns stemming from extensive overtime in Alaska, was terminated in late 2009, ostensibly as part of HSSE downsizing.

118.     The effects of BP de-prioritizing safety in 2009 and re-shuffling and merging staff had direct repercussions on BP's drilling operations. In late 2009, just before the *Deepwater Horizon* was dispatched to drill the Macondo well, BP's senior Vice President for Drilling Operations for the Gulf of Mexico, Kevin Lacy ("Lacy"), resigned from the Company because of disagreements with BP over its lack of commitment to process safety.

119.     Lacy, an experienced drilling engineer who had implemented a rigorous drilling safety program while at Chevron, had been recruited to join BP in 2007 to improve and standardize its drilling policies and protocols.  He reached a mutual agreement with BP to resign in December 2009 because he believed that the Company was not adequately committed to improving its safety protocols in offshore drilling operations to the level of its industry peers and that the Company's reorganization was negatively affecting the overall safety of BP drilling operations.  Before leaving, Lacy communicated his concerns to executives with the Company,

including to Barbara Yilmaz, BP's Vice President for Global Drilling and Completions, and to Defendant Inglis, the head of BP's Exploration and Production unit.

120.     Lacy's departure from the Gulf of Mexico drilling unit in December 2009 coincided with other additional and extensive reshuffling of personnel in the BP Gulf of Mexico drilling unit.  Several experienced senior engineers were transferred out of the Gulf of Mexico in or around December 2009, such that by the time of the Deepwater Horizon incident, four out of five of BP's senior drilling officials for the Gulf of Mexico had only been in their posts for a few months.  Indeed, BP's Wells Manager for the Gulf of Mexico, David Rich ("Rich"), was promoted only weeks before the incident and was primarily experienced in well completion operations, not exploratory drilling like that being undertaken by the *Deepwater Horizon* on the Macondo well.  Additionally, neither Rich nor his immediate subordinate, David Sims ("Sims"), the Drilling and Completions Operations Manager for the Gulf of Mexico, had experience with well control operations.  Concerns about staffing turnovers were raised as a process safety issue in the Baker Report three and a half years earlier.  The staffing turnovers in the Gulf of Mexico directly impacted drilling operations on the *Deepwater Horizon*'s operations at the Macondo well.  Indeed, as *The Wall Street Journal* reported on January 29, 2011, John Guide, who directed *Deepwater Horizon*'s operations from Houston, told Sims, just days before the Deepwater Horizon incident, that it was "chaos" on the rig and that "[t]he operation is not going to succeed if we continue in this manner."  Sims merely told Guide to tell the rig workers "to hang in there . . . until the [Macondo] well is over."  At that point, Sims left BP's Houston office to attend a dance practice.

**B.  Additional Scienter Allegations:  Defendants' Disregard of Safety and Operational Concerns With BP's Other Operations**

121.       During the Class Period Defendants knew, or recklessly disregarded, that the recommendations of the Baker Panel were not being adequately instituted throughout the Company, especially in terms of improving its process safety practices.  In particular, as set forth below, between 2008 and 2010, the Environmental Protection Agency warned BP's General Counsel, among other senior BP executives, that EPA investigators found BP to be operating unsafely.

*Concerns about the Integrity of Safety Processes in Alaska*

122.       On April 11-12, 2009, Marc Kovac ("Kovac"), a BP mechanic, welder and union representative, sent two emails to BP's Ombudsman's office – which was headed by the Honorable Stanley Sporkin (a retired federal judge) – copying numerous BPXA offices raising serious concerns about the integrity of pipelines in Alaska, overstretched staff and contractors, and general problems with inspections of oil wells in the western part of BP's Prudhoe Bay facilities. The first email noted that "it's getting back to a very dangerous situation, too much overtime and too much responsibility and area to cover for each man. Anything can happen when [well] pads are not monitored. Anything can happen when workers work over 12 hours a day, every day.  Things are not getting better."  In a second email dated April 12, 2009, Kovac listed a host of specific examples of overstretched staff, concluding that the situation "sets us up for another major mishap. Who will they blame this time? This situation is not acceptable."

123.       Then, in June and August 2009, BP employees and representative members of the United Steelworkers met with BP management in Alaska about various safety and pipeline integrity issues and complaints about BP's culture making it difficult for employees to raise safety issues.  Minutes released from the United Steelworkers revealed that union representatives

raised detailed concerns to BP management about understaffing and excessive overtime (being required to work 16-18 hour shifts) and noted that these issues caused an "increased . . . risk for accidents."

124.     This concern was underscored in October 2009 by Dziubinski.  Dziubinski noted that a shift greater than 16 hours impeded workers' ability to make sound decisions, describing the impaired decision-making ability as akin to "intoxication."  He noted these conditions were persistent in BP's operations before and throughout the Class Period.  Further, he believed that the failure to abate such work conditions would require BP to affirmatively acknowledge to HSE Committees, the Board, the Ombudsman and Congress that this situation put "production ahead of safety."  In late 2009, Dziubinski was asked to resign from his post in what he believes was retaliation for voicing his concerns.

125.     In the June and August 2009 meetings, union representatives also raised concerns about delayed replacement or repair of equipment and old, corroded pipelines, including gas leak detectors. (Faulty gas leak detection devices were among the problems that led to the ignition of flammable gases during the blowout and subsequent explosion on the *Deepwater Horizon*.)  "*We have several lines ready to leak*," the representatives are noted as stating. The minutes show union representatives urging BP not to simply "patch" pipelines: "These lines should be replaced."

126.     These were precisely the types of safety issues BP informed investors it would address after the Baker Report was released and the types of safety issues that BP represented to investors were – purportedly – already being addressed and remedied throughout the Class Period.

*Afraid-a-spill E-mail Raises Complaints about Alyeska's Operations*

127.　　In late 2009, another private employee "concern" was sent to the BP

Ombudsman from an anonymous employee of BP-operated Aleyska, the BP-led consortium that

operates the Trans-Alaska Pipeline in Alaska.  The email was signed "Afraid-a-spill."  The email

raised a litany of complaints about Alyeska's operations, including serious safety and pipeline

integrity concerns.

128.　　Unidentified executives, the email stated, "told employees not to speak up or go

against" the Alyeska CEO, Kevin Hostetler ("Hostetler").  The email stated that as a result of

Hostetler's behavior, the work environment at Alyeska had degraded over several years to the point

where: "*People are afraid to speak up on safety or integrity issues for fear of retaliation*."

According to a subsequent investigation into the allegations by BP-retained lawyers with the law

firm Morgan Lewis & Bockius, the subject of the email was communicated to BP senior

leadership in early 2010, and Judge Sporkin, the Ombudsman discussed it with BP leadership,

which led to the firm being hired to carry out a further investigation.  The results of the

investigation still are not public.

129.　　Concerns about the risks of spills in BP's Alaska operations, and the

inadequacy of BP's pipeline integrity and inspection programs, were not only being voiced

internally or to the BP Ombudsman. BP also received enforcement letters sent to BP companies

by the U.S. Department of Transportation's "Pipeline and Hazardous Materials Safety

Administration" ("PHMSA").  PHMSA letters communicate regulatory violations, enforcement

actions, orders to comply, and warnings relating to pipelines.  In 2008 through 2010, BP related

companies operating in the United States received 40 separate enforcement letters from PHMSA,

a far higher number than those sent in the same period to peer companies Exxon Mobil, Conoco

Philips, Chevron, or Shell.  (During the same period, Shell received only six PHMSA letters.)
One PHMSA letter was sent to BP on April 20, 2010, the very day the Deepwater Horizon blast
occurred.  In that letter, PHMSA communicated that it had found serious shortcomings with BP's
pipeline inspection and anti-corrosion systems in Alaska, increasing the likelihood of a major
spill.

130.     These were precisely the types of safety issues BP informed investors it
would address after release of the Baker Report and the types of safety issues that BP represented
to investors were – purportedly – already being addressed and remedied throughout the Class
Period.

### Aftermath of BP's 2007 Criminal Plea

131.     As described in ¶ 70, in 2007, BP pled guilty to a violation of the U.S.
Federal Water Pollution Control Act in connection with the Alaska pipeline oil spill, admitting
that its "criminal negligence" had caused the corrosion and thus the spill.  BP was sentenced to
three years of probation, and fined $22 million.  In late 2008 BP attempted to obtain an early
release from probation in Alaska, arguing to its federal probation officer, Mary Frances Barnes
("Barnes"), that the Company had made "significant progress" in relevant areas of maintenance
and inspection.  Unbeknownst to investors, however, Barnes, found continuing safety issues and
incidents with BP operations and denied BP's request.  In September 2010, due to continuing
complaints that she received about safety and pipeline integrity issues in 2008 through 2010,
Barnes requested that the court revoke BP's probation and that additional fines and penalties be
levied against the Company.

132.     Also unknown to investors during the Class Period, BP was potentially
facing serious disciplinary action by the EPA's Suspension and Debarment Division ("SDD"), in
connection with past and ongoing misconduct in Alaska, Texas, and other states.  The SDD has

the authority to prevent BP from being a party to any U.S. government or state contract or grant funded with federal funds, which would materially affect BP's revenues.

133.     Beginning in early 2008 and through early 2010, Jeanne Pascal ("Pascal"), the EPA SDD Debarment Counsel for Region 10 (West Coast and Alaska) who handled EPA debarment oversight activities on the BP Group in the greater United States, communicated repeatedly by telephone and email with senior BP officials, including senior BP executive and Defendant Doug Suttles, BP General Counsel Jack Lynch ("Lynch"), and BP's counsel at Vinson & Elkins, Carol Dinkins, among other persons.  The BP Ombudsman, Judge Sporkin, also raised Pascal's concerns with the President of BP America, Defendant McKay.  In her communications, Pascal noted that her office was in receipt of information from BP employees and from EPA inspectors in Alaska and Texas demonstrating that BP was *in a state of continuing non-compliance* with numerous applicable laws and civil settlement agreements; that BP was continuing to run many of its operations unsafely; and that BP was continuing to retaliate against workers and contractors who raised safety and environmental issues.  Thus, on several occasions during the Class Period, Pascal stated that, because of the Company's continuing misconduct, the EPA was entitled to file a debarment complaint, to strip BP and its subsidiaries of the right to bid for U.S. government contracts and to bid for U.S. government oil and gas concessions.

134.     BP was also informed of significant problems with its process safety with respect to refineries.  For example, in May 2010, it was revealed that between June 2007 and February 2010, BP received a total of 862 citations for OSHA violations relating to its refineries in Texas City and Toledo, Ohio, of which 760 were classified as "egregious willful" and 69 were classified as "willful."  The willful violations accounted for over 97 percent of all willful

46

violations found by OSHA in all U.S. refineries during the same period – BP's main competitors' combined citations were 22.  Center for Public Integrity, *OSHA Says BP Has "Systemic Safety Problem,"* May 16, 2010.

135.      These were precisely the types of safety issues BP informed investors it was addressing after release of the Baker Report.

### C.   BP Retaliated Against Individuals Who Raised Concerns About the Safety and Integrity of its Operations

*Whistleblower Retaliation in the Gulf of Mexico*

136.      Throughout the Class Period, and contrary to BP's representations to its shareholders, BP engaged in continuous and systemic retaliation against employees who reported concerns about the safety and integrity of BP's operations.  These whistleblowers provide further support of Defendants' knowledge or reckless disregard of the falsity and misleading nature of their Class Period statements.

137.      In August 2008, Kenneth Abbott ("Abbott"), a BP engineer working on design and blueprint management issues relating to the operations of BP's *Atlantis* rig (a major BP rig involved in drilling deepwater exploration and production wells in the Gulf of Mexico), began to raise concerns with BP managers about the Company's practices and policies for managing and updating designs and blueprints for its infrastructure and equipment on the *Atlantis*. One particular concern was that designs for critical units on the rig were not updated to reflect changes made during repairs, maintenance, or other modifications.

138.      On or around August 15, 2008, BP manager Barry Duff ("Duff"), who worked with Abbott, wrote to BP managers and corroborated Abbott's concerns, stating that a lack of properly-reviewed and approved designs could result in "***catastrophic operating errors***"

and that "***currently there are hundreds if not thousands of Subsea documents that have never been finalized***," a situation which Duff referred to as "***fundamentally wrong***."

139.      Abbott continued to raise the above concerns from November 2008 through January 2009 when he was fired in retaliation for his whistle-blowing.  Shortly after his termination, Abbott raised his concerns with the Company's Ombudsman.  On June 17, 2010, Abbott was invited to testify before Congress to describe the circumstances that led him to initially report his concerns to senior BP management.  During his testimony, Abbott stated, in part, that:

> ***From my experience working in the industry for over 30 years, I have never seen these kinds of problems with other companies***.  Of course, everyone and every company will make mistakes occasionally.  ***I have never seen another company with the kind of widespread disregard for proper engineering and safety procedures that I saw at BP and that we hear from the news reports about BP Horizon, or BP Texas City, or the BP's Alaska pipeline spills.  BP's own investigation of itself,*** by former Secretary of State James Baker***, reported that BP has a culture which simply does not follow safety regulations.  From what I saw, that culture has not changed***."

140.      Among the documents sent to the BP Ombudsman, and forwarded to senior BP managers during the Ombudsman's investigation into Abbott's allegations in 2009 and early 2010, was a declaration by a safety engineer in Houston, Texas, Mike Sawyer, who independently reviewed Abbott's allegations, internal BP emails, and applicable regulations.

141.      The Sawyer affidavit affirmed that a "large portion of [the *Atlantis'*] subsea safety critical drawings, documents, specifications, and certificates were not in final, 'as-built' status," and warned:  "***The lack of 'as-built' design documents is a violation of Federal requirements under the Department of Interior MMS Safety and Environmental Management Systems as specified in 30 CFR Part 250 [including] 30 CFR 250.903 and 905***."  The Sawyer affidavit specifically warned that:

- "Time is of the essence in avoiding an Outer Continental Shelf (OCS) environmental disaster, Atlantis production should be shut in until resolution of its design short comings is complete and a thorough inspection confirms that critical breaches have been satisfactorily resolved. . . . *It is inconceivable that BP could justify the risk of commissioning Atlantis production without completed design documentation reflecting the latest approved design version* . . . .

- "The absence of a complete set of final, up-to-date, 'as-built' engineering documents, including appropriate engineering approval, introduces substantial risk of large scale *damage to the deepwater Gulf of Mexico (GOM) environment and harm to workers*, primarily because analyses and inspections based on *unverified design documents can not accurately assess risk or suitability for service*. . . .

- "The wide spread pattern of unapproved design, testing, and inspection documentation on the Atlantis subsea project creates a risk of a catastrophic incident threatening the GOM deepwater environment and the *safety* of platform workers. *The extent of documentation discrepancies creates a substantial risk that a catastrophic event could occur at any time*.

142.     In April 2010, BP's Ombudsman wrote to Abbott and affirmed that his allegations had been substantiated.  More specifically, Abbot received a letter from BP's Deputy Ombudsman, Billie Garde ("Garde"), on April 13, 2010, stating: "Your concerns about the [Atlantis] project not following the terms of its own Project Execution Plan were substantiated. . . . [BP] did not do a comprehensive documentation audit regarding the documentation issues on Atlantis. . . . *The concerns that you expressed about the status of the drawings upgrade project were . . . of concern to others who raised the concern before you worked there, while you were there, and after you left*."

143.     In addition, the Presidential Commission Report found that a contributory factor to the Deepwater Horizon explosion and the problems in attempting to trigger the BOP related to BP's practice of not updating designs and plans from their original schematics – much like the problems complained about with regard to the *Atlantis*.

49

144.     On the issue of retaliation, the Presidential Commission Report also noted that a survey conducted in March 2010 indicated that crew members working on the *Deepwater Horizon* feared retaliation.  The survey, which included workers on the *Deepwater Horizon* and three other rigs, was conducted between March 12 and March 16, 2010 – *i.e.,* approximately one month prior to the Deepwater Horizon explosion.  According to the Presidential Commission, the survey found that:  "Some 46 percent of crew members surveyed felt that some of the workforce feared reprisals for reporting unsafe situations, and 15 percent felt that there were not always enough people available to carry out work safely."

**Whistleblower Retaliation in Alaska**

145.     The BP Ombudsman conducted a robust investigation of Acuren, the company responsible for pipeline inspection and monitoring of BP's pipelines in Alaska, where BP contractor Marty Anderson ("Anderson") had worked until 2008 and who had began to raise serious criticisms with his supervisors and BP intermediaries about BP's pipeline corrosion and inspection system in Alaska and Acuren's staffing for that program.  According to 2009 communications between the BP Ombudsman's office and Lynch, in 2007 Anderson began to cite "a significant quality control breakdown" in Acuren's and BP's testing procedures, "inadequate record keeping," and "unqualified inspectors in the field performing inspections." BP's Ombudsman's office stated that "[t]he concerns were serious, and although people try to downplay the significance of the issues, they reveal a complete breakdown."  According to the BP Ombudsman's office, the audit confirmed Anderson's claims.

146.     The matters concerning Anderson and pipeline inspections were serious enough for the BP Ombudsman's office to raise them with BP and BP North America officials, including Rick Cape, BP's Vice President for Compliance and Ethics, *specifically recommending*

*to him that Anderson's concerns be reported to the BP Board of Directors and to Lynch.*  In addition, the Ombudsman himself, Judge Sporkin, communicated Anderson's concerns in 2008 with then-President of BP North America Bob Malone.  Garde wrote to Lynch about it in September 2009, and Anderson himself met with Lynch on August 3, 2009.  BP did not adequately address the continuing concerns that had been raised.  An internal email dated July 15, 2010, from Christine Anastos, a BP Ombudsman Inspector, to other Ombudsman staff, stated that "many of the issues identified by Marty [Anderson] years ago appear to be persisting" [*i.e.*, into mid 2010] and "it is clear that, over time, root causes have not been identified and/or addressed . . . ."

147.     A 2008 BP Ombudsman "Workforce Briefing" containing an assessment of Acuren's "Work Environment" reported that a survey of Acuren employees by the Ombudsman's office found significant problems with workers' perceptions of potential retaliation for reporting safety or environmental concerns.  A "key insight" in the presentation stated that "[a]ctions and events in the past 18 months [*i.e.*, during the period BP vowed to improve safety practices in Alaska in the wake of the 2006 spills] have had a decidedly chilling impact on worker attitudes."  The section noted: "[p]roduction is viewed by very many workers as the primary focus," (*i.e.*, as opposed to safety).  The presentation also noted that the "actual or perceived presence of HIRD [Harassment, Intimidation, Retaliation, Discrimination] is high in the Acuren organization. . . ."  In fact, one in three employees believed "recent resignations" were due to HIRD, and 38 percent of employees – and 80 percent of the employees who worked on natural gas lines – indicated as the reason for not reporting safety concerns: "nothing seems to happen to reported items."

148.    The Ombudsman also noted that about one in ten Acuren employees said in the last 18 months that they had been asked to perform a job that was not in compliance with regulations or safety practices.  (The number was even higher for workers who monitor BP natural gas pipelines:  almost half of Acuren's workers indicated that they had been asked to perform "non-compliant work".)

149.    The 2008 presentation also included selected quotes from employees, including the following:

- "I've raised issues, now I'm labeled a troublemaker."

- "You get treated better when your supervisor doesn't hear from you."

- "[A] co-worker falsified production numbers and I brought it to my supervisor's attention with the result that I was ostracized, moved to a different shift, moved to the ghetto and told I should produce more in line with the guy who falsified the records."

- "Supervisors talk safety but when concerns are brought up they are viewed as irritating and just given lip service."

- "I have stopped jobs for safety reasons and they just hand it to the next guy till they find someone who will do it" [*i.e.*, the job that was stopped].

- "I was pressured to change my evaluation of some pipe which I deemed to be defective."

- "BP doesn't listen, they put too much emphasis on rules to look good but have no common sense when it comes to safety."

- "BP's support of safety comes off as lip service and seems to only be in place to lower their insurance rates. While superficially, BP delivers lip service about safety, their continually increasing demands accompanied by consistently decreasing resources create a 'results oriented' atmosphere where the ends justify the means."

- "BP creates the adverse and dysfunctional world we work in here. Many problems that occur are because they drive people too hard to perform with limited resources. . . ."

150.     Furthermore, BP Ombudsman records from 2010 include numerous other examples of serious issues raised by Acuren employees.  For instance, according to an article published by ProPublica on June 7, 2010, on December 9, 2009 a "Concerned Individual" at Acuren raised process safety concerns about other personnel "pencil whipping" test results (manipulating devices to change readings) and "falsified inspections."  This individual's name is Stuart Sneed ("Sneed").  Sneed worked on BP's Alaska pipeline and stated that:  "They [BP] say it's your duty to come forward . . . but then when you do come forward, they screw you.  They'll destroy your life. . . .  No one up there [in Alaska] is going to say anything if there is something they see is unsafe.  They are not going to say a word."

## VI.   THE MATERIALIZATION OF THE UNDISCLOSED RISKS – DEEPWATER HORIZON OIL SPILL AND ITS AFTERMATH

### A.     BP's Systematic Failures Caused the Explosion on and the Sinking of the Deepwater Horizon Rig

***BP Acquires the Rights to the Macondo Well and Began Its Preparation to Drill Despite Having an Inadequate and Error-Filled Oil Spill Response Plan***

151.     The tragedy of the Macondo well explosion was avertable, but BP's overarching culture of indefensible risk-taking prevailed.  At every turn, BP's conduct evidenced a systematic departure from recognized industry safety practices.  Thus, the Presidential Commission found that "***the cumulative risk that resulted from these decisions and actions was both unreasonably large and avoidable[.]***"

152.     In March 2008, BP paid approximately $34 million to acquire the exclusive drilling rights from the MMS for the Mississippi Canyon Block 252, a nine-square-mile plot in the Gulf of Mexico that encompasses the Macondo well.  Although the Mississippi Canyon area has many productive oil fields, BP knew little about the specific geology of Block 252 and, in fact, the Macondo was the Company's first well on the new lease.  BP planned to drill the well to

20,200 feet in order to learn the geology of the area and to determine whether the oil and gas reservoir would warrant installing production equipment.  The Macondo well was located 47.6 miles off the coast of Louisiana.  It was believed that the well could hold as much as fifty (50) million barrels (or 2.1 billion gallons) of producible oil.

153.     Throughout the Class Period, MMS required BP to prepare and file oil spill response plans demonstrating the Company's specific strategy and ability to respond to an oil spill if one occurred while drilling in the Gulf of Mexico.  MMS regulations required that an oil spill response plan include, *inter alia*:  (i) an emergency response action plan; (ii) disclosure of the equipment available to combat an oil spill; (iii) any oil spill response contractual agreements with third-parties; (iv) calculations of the worst-case discharge scenarios; (v) a plan for dispersant use in case of a spill; (vi) an in-situ oil burning plan; and (vii) information regarding oil spill response training and drills.  *See* 30 C.F.R. § 254.21.

154.     The first of these requirements, the "emergency response action plan," is the "core" of the overall operational response plan and required BP to disclose, among other things: (i) information regarding the Company's oil spill response team; (ii) the types and characteristics of oil at the facility; (iii) procedures for early detection of a spill; and (iv) procedures to be followed in the event of an oil spill.  *See* 30 C.F.R. § 254.23.

155.     BP publicly filed its oil spill response plan for the Gulf of Mexico – entitled "Regional Oil Spill Response Plan – Gulf of Mexico" – with the MMS on December 1, 2000 and last revised the plan on June 30, 2009 ("BP's Regional OSRP for the GOM").  A regional oil spill response plan is designed to cover multiple facilities or leases of a lessee that have: (i) similar modeled spill trajectories and worst case discharge scenarios, (ii) the potential to affect the same ecological or socioeconomic resources, and (iii) are located in close enough proximity

to be served by the same response equipment and personnel.  BP's Regional OSRP for the GOM covers a massive area, including all of the United States' interests in the Gulf of Mexico.  This area encompasses the coastal waters of Texas, Louisiana, Alabama, Mississippi, and Florida.  BP has approximately 600 leases and operates roughly 70 oil wells in the Gulf of Mexico.  BP's Regional OSRP for the GOM applied to all of these wells.

156.     According to BP's Regional OSRP for the GOM, the "***TOTAL WORST CASE DISCHARGE" scenarios in the Gulf of Mexico ranged from a release of 28,033 barrels of oil per day to 250,000 barrels of oil per day***.  More specifically, BP's Regional OSRP for the GOM stated:  (i) an oil spill occurring less than ten miles from the shoreline could create a worst case discharge of 28,033 barrels of oil per day; (ii) an oil spill that occurred greater than ten miles from the shoreline could create a worst case discharge of 177,400 barrels of oil per day; and (iii) an oil spill caused by a mobile drilling rig that is drilling an exploratory well could create a worst case discharge of 250,000 barrels of oil per day.  BP's Regional OSRP for the GOM explicitly states that the Company and its subcontractors ***could recover approximately 491,721 barrels of oil per day*** (or more than 20.6 million gallons) in the event of an oil spill in the Gulf of Mexico.  Moreover, the Company claimed and provided certified statements to the MMS that BP and its subcontractors "*maintain the necessary spill containment and recovery equipment to respond effectively to spills.*"

157.     On March 10, 2009, the MMS deemed the Company's initial exploration plan for Mississippi Canyon Block 252 ("BP's EP") "submitted."  BP's EP includes the area encompassing the Macondo well.[4]

---

[4]  BP's Regional OSRP for the GOM and EP are collectively referred to herein as "BP's Oil Spill Response Plan."

158.     According to BP's EP, the worst case scenario of an oil spill occurring in Mississippi Canyon Block 252 would be the release of approximately *162,000 barrels of oil per day*.

159.     In BP's EP, the Company claimed it would have no difficulty responding to a worst case scenario while drilling the Macondo well:

> ***Since BP … has the capability to respond to the appropriate worst-case scenario included in its regional OSRP …, and since the worst-case scenario determined for our [EP] does not replace the appropriate worst-case scenario in our regional OSRP, I hereby certify that BP … has the capability to respond, to the maximum extent practicable, to a worst-case discharge, or a substantial threat of such a discharge, resulting from the activities proposed in our [EP].***

***

> ***[D]ue to the distance to shore (48 miles) and the response capabilities that would be implemented, no significant adverse impacts are expected.***

160.     Because the worst case scenario discharge figures in BP's EP – which BP calculated – fell below the threshold established in BP's Regional OSRP for the GOM, the Company was not required to submit a site-specific drilling plan for the Macondo well itself.

161.     In October 2009, the semi-submersible Transocean rig *Marianas* began drilling the Macondo well.  However, operations were halted at approximately 4,000 feet below the sea floor due to damage caused to the rig by Hurricane Ida.

162.     The replacement rig, the *Deepwater Horizon*, arrived at the Macondo well on January 31, 2010.  Although the rig was in place on that date, several steps needed to occur prior to beginning any drilling operation, including connecting the rig's BOP to the wellhead.  BP completed these steps by February 10, 2010 and the *Deepwater Horizon* began drilling shortly thereafter.

163.     Once the rig was connected to the BOP via the riser, BP inserted the drill bit and drilling pipe through the riser and BOP in order to reach the wellbore in the ocean floor.  As drilling progressesed, so-called "drilling mud" was pumped down through the drilling pipe and emerged through holes in the drill bit.

164.     Drilling mud is not mud in the traditional sense; it is a blend of synthetic fluids, polymers and weighting agents costing approximately $100.00 per barrel.  Drilling mud accounts for as much as 10% of the total cost in drilling a deepwater well.  Drilling mud is a critical part of the drilling process.  For example, as it is circulated down the drilling pipe and back up the wellbore to the rig, drilling mud clears the wellbore of broken rock and other debris (referred to as "cuttings"), cools the drill bit and maintains stable pressure within the well, which is critical to the mechanical stability and integrity of the wellbore.

165.     When drilling a deepwater well like the Macondo – which lies approximately 5,000 feet (or about 1 mile) below the ocean's surface and extends another 13,000 feet below the ocean floor – controlling pressure is a paramount concern.  The inward or "pore" pressure (*i.e.*, the pressure exerted by the fluid in the surrounding rock formation on the wellbore) must be balanced with the outward or "fracture" pressure (*i.e.*, the pressure exerted by the drilling fluids in the wellbore on the surrounding rock formation).  Following proper safety procedures is critical because uncontrolled well pressure can cause an explosion.

166.     On April 9, 2010, the weight of the drilling mud being pumped into the Macondo well was too high and fractured the surrounding formation; drilling mud began flowing into the cracks in the formation.  In an attempt to plug the fractures and stop the outflow of drilling fluid, BP circulated 172 barrels of thick, viscous fluid, referred to as a "lost circulation pill," into the wellbore.  The lost circulation pill succeeded in staunching the outflow of drilling

mud, but the episode underscored the sensitivity of the Macondo well.  As noted by the Presidential Commission:  "*BP's on-shore engineering team realized the situation had become delicate*.  They had to maintain the weight of the mud in the wellbore at approximately 14.0 pounds per gallon (ppg) in order to balance the pressure exerted by the hydrocarbons in the pay zone."  Thus, BP's engineers were on notice that they must be even more vigilant in monitoring and controlling the competing pressures within the wellbore.

### Casing and Cementing the Well

167.    Once the initial drilling of the well was complete, BP then needed to insert casing to seal off the walls of the wellbore to provide structural integrity.  BP considered two casing methods:  a long-string casing and a liner/tie-back casing.  The long-string casing involves hanging a single continuous wall of steel from the wellhead on the ocean floor down to the bottom of the well over thirteen thousand feet below.  The liner/tie-back method entails hanging shorter segments of casing to one another in order to form a stronger and less flexible piece of metal.  A critical distinction between the two methods is that the long-string casing method provides two barriers to flow up the annular space (once cementing is complete) whereas the liner/tie-back casing provides four barriers to annular flow.  This means that the liner/tie-back method provides twice the safety precautions as compared with the long-string casing method.  In addition, BP knew that obtaining a reliable primary cement job with the long-string casing would be much more difficult.

168.    In fact, between April 14 and 15, 2010, the BP engineering team in Houston, Texas modeled the likely success of the cementing process using the two casing methods and determined that *the long- string method would fail in effectively cementing the Macondo well*.

169.     In light of this determination, the engineering team elected to proceed with the liner/tie-back method, but, according to the Presidential Commission, others at BP opposed the decision.  In the end, despite the conclusion that the long-string method could not be cemented reliably, BP's view prevailed and the crew proceeded with the long-string casing method.

170.     The next step in the drilling process was to thread the long-string casing through the center of the wellbore down to the bottom of the well.  Centering the casing is of vital importance to obtaining a secure cement job.  As the cement mixture flows out of the casing, it ascends through the annular space surrounding the casing.  If the space around the casing is uneven (*i.e.*, there is more space on one side than on the other), the cement begins to fill in the annular space in an uneven manner, leaving channels of drilling mud in the cement.  These channels are pathways through which highly pressurized hydrocarbons can flow.

171.     To ensure that the long-string casing will be centered, guides called "centralizers" are placed around the casing at regular intervals.  For the Macondo well, BP decided that it would use only six centralizers because that was the amount currently available on the rig.  It does not appear that the Company's reasoning was based on any scientific or engineering calculations.  However, before BP could actually place the centralizers in the well, it needed Halliburton – who BP contracted for this cementing job – to verify that six centralizers would be sufficient.

172.     On or about April 15, 2010, Halliburton engineer Jesse Gagliano ("Gagliano") performed computer simulations to assess the likelihood of a satisfactory cement job using six centralizers.  Gagliano's calculations demonstrated a high likelihood of channeling resulting in a cement failure if the Company used only six centralizers.  Computer simulations

showed that twenty-one centralizers were necessary – *i.e.,* almost four times as many as BP intended to use.

173.     After reviewing the modeling data himself, BP Drilling Team engineer Gregory Walz ("Walz") agreed with Gagliano's conclusions.  On April 16, 2010, Walz wrote to other BP engineers and stated, in part, that the operation needs "to honor the … modeling to be consistent with our previous decisions to go with the long string."  Walz proceeded to make arrangements to obtain the additional centralizers.

174.     However, BP Well Team Leader John Guide ("Guide"), who was also based in BP's Houston office, opposed using the additional centralizers because the installation would delay the team by approximately ten hours and would therefore cost BP money.   Although BP ordered additional centralizers, when they arrived on the *Deepwater Horizon* it was determined that the centralizers were the wrong type.  Despite the serious threat of channeling identified in the modeling data, however, Guide's view prevailed and only six centralizers were used to center the more than thirteen thousand foot long-string casing in the wellbore.

175.     BP's culture of unreasonable, indefensible risk taking is echoed in an email by Brett Cocales (a drilling operations engineer in BP's Houston office), dated April 16, 2010, in which he stated:

> Even if the hole is perfectly straight, a straight piece of pipe even in tension will not seek the perfect center of the hole unless it has something to centralize it. **But, who cares, it's done, end of story, will probably be fine** and we'll get a good cement job.

176.     On April 17, 2010, after learning that BP would proceed with only six centralizers, Gagliano re-ran the computer simulations and modeling using seven centralizers and the conclusion was the same: the well would have "**a SEVERE gas flow problem**."   BP, however, continued to ignore its own expert's opinion.

177.     On April 18, 2010, BP began lowering the long-string casing into the wellbore.  To enable the drilling mud located in the wellbore to flow smoothly and distribute evenly as the long-string casing is lowered, two trap doors within the long-string casing, referred to as the "float collar," are propped open with a tube called an "auto fill tube."

178.     On April 19, 2010, after the long-string casing reached the bottom of the wellbore, BP needed to dislodge the auto fill tube, converting the float collar from a two-way valve to a one-way valve.  Successfully converting the float collar insures that the pumped cement will only flow downward through the casing, a critical step in the cementing process.

179.     Two events should have indicated to BP that the conversion of the float collar was not proceeding properly.  First, the tube should be dislodged once the flow through the tube reaches six barrels of mud per minute (6 bpm), equivalent to six hundred pounds of pressure per square inch (600 psi).  Yet, as the crew pumped drilling mud down the casing, pressure began to climb beyond the 600 psi threshold which should have converted the float collar, but still the crew was unable to establish flow.  The pressure continued to rise, peaking at 3,142 psi (more than five times more pressure than should have been needed to convert the float collar) before suddenly dropping precipitously.  It appears that BP assumed that this meant the float collars had converted.  This is a scientifically indefensible position, however, because, as noted by the Presidential Commission: "[t]he auto fill tube was designed to convert in response to *flow-induced* pressure.  Without the required rate of flow, an increase in *static* pressure, no matter how great, will not dislodge the tube."

180.     Second, after the tube is dislodged and the float collar is converted to a one way passage, the amount of pressure needed to circulate drilling mud from the rig, down the drilling pipe and up the annular space to the rig again should have been 570 psi.  Yet, as BP

began the process of converting the float collars, the results differed considerably. After the spike and sudden drop in pressure, the circulation pressure was only 340 psi.

181.    BP personnel on the rig erroneously ignored the mounting evidence that something was amiss, and proceeded to the next step in the well abandonment plan – mud circulation.

182.    Correct mud circulation requires a complete circulation of drilling mud in the wellbore, referred to as "bottoms up" circulation. The process, which requires about 12 hours, allows workers on the rig to test the mud for gas influxes, safely remove any gas pockets, and evacuate any debris or other foreign matter that could contaminate the cement. Given the heightened challenges of cementing a long-string (as opposed to a liner/tie-back) casing, this step was critical. In addition, "bottoms up" circulation would allow the BP crew to test the mud at the bottom of the well for hydrocarbons, the presence of which would indicate a leak in the cement job at the bottom of the well.

183.    In order to complete a "bottoms up" circulation, BP needed to circulate 2,760 barrels of drilling mud. Instead, as noted by the Presidential Commission, BP circulated only 350 barrels of mud – eight times less than the amount required to properly complete the "bottoms up" circulation of the well.

184.    In cementing the Macondo well, BP used nitrogen foam, a cement with which it had little experience in the Gulf of Mexico. In February 2010, Gagliano conducted tests regarding the stability of the nitrogen foam cement. The tests showed that the mixture was unstable and therefore represented an additional risk of well failure. According to the Presidential Commission Report, these test results were communicated to BP personnel in

62

Houston on March 8, 2010, however, the warnings were ignored and BP pumped nitrogen foam cement into the Macondo well.

185.     BP's internal guidelines dictated that the top of the annular cement should be 1,000 feet above the uppermost hydrocarbon zone.  For the Macondo well, BP injected just enough cement to extend the annular cement barrier half the distance, or only 500 feet above the uppermost hydrocarbon zone.  According to the Presidential Commission Report, this deviation reduced the safety margin for this procedure by 50% and meant that a total of sixty barrels of cement would be used to cement the well, which BP's own engineers recognized left absolutely no margin for error.  Also according to the Presidential Commission Report, BP was also keenly aware that it was pumping the cement at an unsafe rate (four barrels per minute rather than six barrels per minute), further impeding the efficiency with which cement would be displaced from the annular space, and reducing its safety margin even further.

186.     At 12:40 a.m. on April 20, 2010, the crew finished pumping the primary cement job.  A team of outside technicians was on hand to conduct the battery of tests needed including, but not limited to, the "cement log," which was designed to evaluate and test the sufficiency of the cement job.  The cement log is an acoustical test used to identify areas (if any) where the cement failed to channel up through the annular space in a uniform fashion.  If cement channeling is uneven, pockets form, creating the possibility that hydrocarbons will enter the wellbore where they can ascend (and expand) rapidly.

187.     The acoustical test was especially critical given BP's prior erroneous decisions regarding the construction of the Macondo well, which included, *inter alia*:  (i) using the difficult-to-cement long-string casing method; (ii) foregoing the "bottoms up" mud circulation; (iii) failing to use twenty one centralizers as the Company's expert recommended;

(iv) ignoring scientifically accepted data pertaining to the float collar conversion; (v) electing to use nitrogen foam cement deemed unstable in prior testing; (vi) pumping the cement at reckless rates; and (vii) halving the safety margin by setting the cement 500 (rather than 1,000) feet above the hydrocarbon bearing "pay zone."  BP decided to forego the acoustical test and sent the team of technicians home by helicopter at 11:15 a.m. that morning.  Forgoing the acoustical test saved the Company approximately ten hours and $100,000.  This decision was contrary to industry practice and the recommended safe practices of the American Petroleum Institute.

### BP Begins the Temporary Abandonment Process

188.    The *Deepwater Horizon* rig is a drilling rig as opposed to a production rig. Once drilling operations are complete, the well is placed in "temporary abandonment" until the arrival of the production rig, which will connect to the well and begin pumping oil and gas from the site.  Placing the well into temporary abandonment means that that the drilling rig will be removing its own BOP and riser from the wellhead.  There are several key features in the temporary abandonment process to insure that the well is secure before the BOP and riser are removed.  For one, a cement plug, which acts like a cap, is placed in the well.  Typically this cap is placed at or near the mudline.  The area in the well *beneath* the cap is filled in with heavy drilling mud, which applies additional downward pressure on the hydrocarbon bearing zone.  If the cement plug is placed at a greater depth, this necessarily means that there will be less heavy drilling mud in the well underneath the cement plug.  Finally, the crew will install a "lockdown sleeve" at the wellhead.  Throughout this process, the well is monitored and a series of tests are performed to insure that the well is secure – *i.e.*, that no hydrocarbons are leaking into the well. According to the Presidential Commission, neither the BP Well Site leaders, nor any of the rig's crew, had seen the temporary abandonment plan for the Macondo well prior to 10:43 a.m. on the

day abandonment procedure began.  Indeed, the temporary abandonment plan had undergone

numerous changes leading up to April 20, 2010, but, according to the Presidential Commission:

"It does not appear that the changes to the temporary abandonment procedures went through any

sort of formal review at all."

189.       Prior to abandonment, the well must be tested to insure that there are no

leaks.  In part, this involves conducting a "negative-pressure test" to assess whether

hydrocarbons are flowing into the well.  To conduct this test, BP needed to simulate the pressure

conditions that would exist in the well once it was placed into temporary abandonment.  As part

of the negative pressure test, the crew removed 3,300 feet of mud from the wellbore.

190.       To remove the drilling mud from the wellbore (and later the riser), BP

pumped "spacer" through the drilling pipe followed by seawater.  Spacer is a synthetic blend that

acts as a barrier between the drilling mud and seawater.  Although the use of spacer is a common

and accepted practice, BP's spacer concoction was mixed on board the rig from leftover

chemicals that would enable BP to save money and skirt environmental regulations.  As

explained by the Presidential Commission:

> While drilling crews routinely use water-based spacer fluids to separate oil-based
> drilling mud from seawater, *the spacer BP chose to use during the negative
> pressure test was unusual*.  BP had directed . . . mud engineers on the rig to *create
> a spacer out of two different lost-circulation materials left over on the rig – the
> heavy, viscous drilling fluids used to patch fractures in the formation . . . .*
>
> *BP wanted to use these materials as spacer in order to avoid having to dispose of
> them onshore as hazardous waste pursuant to the Resource and Conservation
> Recovery Act*, exploiting an exception that allows companies to dump water-based
> "drilling fluids" overboard if they have been circulated down through a well.  *At
> BP's direction, the [mud engineers] combined the materials to create an
> unusually large volume of spacer that had never previously been used by anyone
> on the rig or by BP as a spacer, nor been thoroughly tested for that purpose.*

65

191.     Testimony before the Presidential Commission indicates that this concocted, untested spacer may have clogged the BOP's kill line, interfering with the results of later testing designed to assess the integrity of the well.

192.     After removing drilling mud from the wellbore, BP began a negative-pressure test to determine whether the well was sealed such that gas or liquid could not permeate into the well.  This negative pressure test is the ***only*** test that assesses the integrity of the cement job at the bottom of the well.  BP had no established procedure or protocol for conducting a negative pressure test.

193.     To conduct the negative-pressure test, the crew "bled off" pressure from the drilling pipe until it was 0 psi.  The pipe was then sealed and monitored.  For a successful negative pressure test, the pressure within the drilling pipe must remain at 0 psi for a certain period of time.  The BP crew went through this process ***three*** times – bleeding down the pressure and then sealing the pipe – and all ***three*** times the pressure within the drill pipe jumped, reaching 1400 psi on the third attempt.  Thus, the pressure test failed three times, in identical fashion.

194.     The negative-pressure test performed exactly as intended.  It gave the clear, unequivocal warning that the integrity of the well was compromised.  As noted by the Presidential Commission:  "[B]ased on available information, *the 1400 psi reading on the drill pipe could only have been caused by a leak* into the well."  In May 2010, BP admitted in Congressional testimony that these pressure test results clearly signaled a "very large abnormality" in the well.  Yet, notwithstanding the unequivocal results of the negative pressure test and without communicating the results to safety experts in Houston, BP ignored the warnings and instead applied the same test to the "kill line," one of the pipes used to circulate fluids into and out of the well.

66

195.     After conducting the negative-pressure test a *fourth* time (this time on the kill line), BP achieved what it considered to be a successful test result, and continued with the temporary abandonment process.  During this last test, the crew was able to maintain 0 psi on the kill line, but the pressure on the drill pipe continued at 1400 psi.  The Presidential Commission Report found that "BP used a spacer that had not been used by anyone at BP or on the rig before, that was not fully tested, and that may have clogged the kill line," leading to the so-called successful test result.

196.     As part of the negative-pressure testing of the well, the crew had already removed 3,300 feet of drilling mud below the sea floor from the well and replaced it with seawater.  This decision was driven by BP's choice to place the "cement plug" at a depth of 3,000 feet.  The cement plug is a three hundred foot cap, which is placed in the well as an additional safety measure to secure the well while it is in temporary abandonment.  Placing the cement plug 3,300 feet below the ocean floor is not in accordance with accepted industry practice for performing this function.  Indeed, placing the cement plug three *thousand* feet below the mud line was inconsistent with MMS regulations and required special dispensation.

197.     The associated risks were amplified by BP's decision:  (i) to leave 3,300 feet of the well below the ocean floor filled with only seawater, rather than heavy drilling mud and (ii) to postpone placement of the cement plug in the well.  As a result, once BP opened the annular preventers on the BOP to facilitate the removal of mud from the riser, the only remaining barriers between the rig and the highly pressurized hydrocarbons in the well were the drilling mud remaining in the bottom section of the well and, beneath that, the cement job at the very bottom of the well.

67

198.     At this stage, there was nothing to prevent leaked hydrocarbons (if present in the wellbore) from traveling up the riser to the rig.  An influx of hydrocarbons is called a "kick" and is exceedingly dangerous due to the highly pressurized conditions.  One gallon of gas at the bottom of the well is capable of expanding to 1,000 gallons by the time it reaches the rig on the ocean's surface.  As the gas expands, it accelerates the kick.  It is therefore imperative that the well be monitored closely for any evidence of a mounting kick.

199.     At 8:02 p.m. on April 20, 2010, BP began to remove the drilling mud from the riser.  As operations proceeded, the drilling mud was returning to the rig, but BP failed to monitor the rate of return.  The returned mud should have been placed in a subset of the rig's mud pits, referred to as the "active mud pits," to facilitate monitoring.  Instead, the returned mud was being dispersed over a number of pits and mud from other operations was being routed to the active mud pits.  As a result, there was no way to know whether more mud was returning to the rig than was being pumped into the well, a fact that would have been evidence that a kick was in progress.

200.     At 9:01 p.m. on April 20, 2010, pressure measurements in the well signaled the impending crisis.  Pressure in the well should have remained constant or decreased because the pumping pressure remained constant.  However, the pressure in the drilling pipe slowly began to *increase*, signaling an influx of hydrocarbons into the well.

201.     The crew did not respond to the pressure reading until approximately 9:30 p.m., when driller Dewey Revette ordered a crew member to bleed pressure from the drilling pipe.  Despite the strong evidence of a kick, BP and its crew took no steps to assess the cause of the pressure reading or to seal the well.  In addition, no employee in BP's Houston office was monitoring the pressure in the Macondo well.  As Fred Bartlit ("Bartlit"), a Presidential

Commission investigator, made clear during a Commission presentation on November 9, 2010, drill pressure data was "available" in BP's office in Houston, but BP did not in fact monitor it the night of the Deepwater Horizon blowout: "There was nobody in that B.P. Macondo well office that night," Bartlit said. "Everybody had gone home."

202.     Sometime after 9:40 p.m. on April 20, 2010, drilling mud began spewing onto the rig floor and, a few minutes later, the crew began its initial attempt to activate the BOP.

**Explosion on the Deepwater Horizon Rig**

203.     The crew initially attempted to activate the rig's BOP annular preventer, a doughnut-shaped rubber and steel seal that fits around the drill pipe and seals the hydrocarbons from flooding the rig itself.  However, the annular preventer failed to stop the flow of oil, most likely because the device had been ruptured four weeks earlier when the drilling pipe was moved through the annular preventer while the preventer was in the closed position, sending a plume of drilling fluid filled with chunks of rubber to the surface.

204.     Well data indicates that at 9:38 p.m., the first hydrocarbons passed through the BOP.

205.     At 9:46 p.m. the crew attempted to activate the variable bore ram, which (like the annular preventer) should have sealed off the area around the drilling pipe.  This effort also failed to stop the flow of hydrocarbons.

206.     At 9:49 p.m., the hydrocarbon-filled drilling mud that was continuing to spew onto the deck of the rig ignited, causing the first explosion aboard the *Deepwater Horizon*. One eye witness referred to "a cascade of liquid" pouring out twenty stories above the main deck of the rig.  Another described hearing an explosion that sounded like a "blown tire, times

100." Barrels filled with explosive materials were catching fire and launching into the sky like missiles.

207.	After the explosion, workers on the bridge did not immediately act to deploy the Emergency Disconnect System ("EDS").  Andrea Fleytas ("Fleytas"), a Dynamic Positioning Operator for the *Deepwater Horizon* who was in the bridge at the time of the explosion, told *The New York Times* that it did not occur to her to use the EDS and, in fact, she had never been taught how to use it.  With respect to the EDS system, Fleytas stated, "I don't know of any procedures."

208.	Sometime after the explosion, BP's Subsea Supervisor Christopher Pleasant made his way to the bridge and attempted to activate the EDS, which should have activated the BOP's blind shear ram.  The blind sheer ram – the last line of defense – is designed to seal a wellbore by cutting through the drilling pipe and pinching it closed, as the rams close off the well.  However, the blind shear ram failed to respond.

209.	Despite the failure of the EDS, the BOP's "deadman switch" (an automatic response mechanism) should have triggered the blind sheer ram.  The deadman switch also failed to activate the blind shear ram.  Later inspections revealed that the device had a myriad of problems due to lack of inspection and poor maintenance, including low battery charges in the critical components responsible for deploying the blind shear ram and defective relays that supply the power to close the blind shear ram.

210.	At this point, the only option left to the crew to activate the BOP would have been an acoustical control signal that would trigger deployment of the blind sheer ram via an encoded pulse of sound transmitted by an underwater transducer.  However, BP decided not to install the acoustic switch.  While an acoustic switch is not required in the United States, it is

70

mandated in many places throughout the world.  In those foreign locations, BP uses rigs that do include such a safety device.

211.     Witnesses on a supply ship stood horrified as they watched the fire growing on the rig and crew members leaping from the main deck and jumping 100 feet into the sea. With no way to bring the explosion under control, crew members abandoned ship, struggling to fight their way to safety.  The *Deepwater Horizon* burned for thirty-six hours before finally tipping and sinking.  The impact to human lives was stark – 11 crew members were killed and 17 more were injured.

**BP Continues to Attempt to Activate the BOP Following the Crews Abandonment of the Deepwater Horizon**

212.     Beginning at 1:15 a.m. on April 21, 2010, BP and other personnel began attempts to activate the BOP with remotely operated vehicles ("ROVs").  Over the ensuing days, BP attempted to activate the blind shear ram on several occasions.  All efforts failed.

213.     First, the ROVs applied hydraulic pressure to a panel controlling the blind shear ram, a method of activating the ram, referred to as "hot stab."  It would take BP ten days to learn that the method would necessarily fail because the targeted panel was actually attached to a useless test ram.

214.     The ROVs also cut electrical wires in an attempt to simulate the deadman switch and attempted to activate the ram by triggering the autoshear (an automated disconnect that is triggered if the rig drifts too far from the well, threatening to break the riser).  Still the ram did not deploy.

215.     At 10:22 a.m. on April 22, 2010, the *Deepwater Horizon* sank, wrenching and further damaging the riser.

216.     On May 5, 2010, after learning that the attempts to activate the blind shear ram through the "hot stab" method were actually targeting a useless test ram, BP ceased its attempts to activate the BOP.

### B.     BP Was Wholly Unprepared to Contain the Oil Spill

*BP Was Knowingly or Recklessly Unprepared to Manage and Respond to a Spill in the Gulf of Mexico*

217.     In the wake of the Deepwater Horizon catastrophe, it has become evident that BP's Oil Spill Response Plan was materially false and misleading when filed.  Indeed, the Presidential Commission has described BP's Oil Spill Response Plan as outright "*embarrassing*."  Indeed, Defendant Suttles admitted on May 10, 2010 that BP failed to have an oil spill response plan with "*proven equipment and technology*" in place that could contain the oil spill.  Similarly, in a November 9, 2010 interview with the BBC, Hayward ultimately confirmed that the Company had failed to draw up sufficient emergency response plans, admitting that "*we were making it up day to day*."

218.     For example, since BP claimed that it was prepared to recover approximately 500,000 barrels of spilled oil per day, and the worst case scenario for the Macondo well was the release of only 162,000 barrels of oil per day, the Company should have had no problems containing the oil spill.  However, as noted by the Presidential Commission:  "*Despite [BP's claims that it "could recover nearly 500,000 barrels of oil per day"], the oil-spill removal organizations were quickly outmatched.*"

219.     Furthermore, while BP's Regional OSRP for the GOM claimed that an oil spill occurring under the three different scenarios – *i.e.,* less than ten miles from the shoreline, more than ten miles from the shoreline, and from a mobile drilling rig that is drilling an exploratory well – could cause differences in the amount of oil spilled, BP consistently stated

that the "shoreline impact" under each scenario would be identical.  This led the Presidential Commission to find that BP's Regional OSRP for the GOM "*evidenced [a] serious [lack] of attention to detail*."

220.     The Presidential Commission also noted several other errors in BP's Oil Spill Response Plan.  For instance, the Presidential Commission found that BP's Regional OSRP for the GOM was false when issued because "half of the 'Resource Identification' appendix (five pages) … was copied from material on [The National Oceanic and Atmospheric Administration ("NOAA")] websites, without any discernable effort to determine the applicability of that information to the Gulf of Mexico.  *As a result, the BP Oil Response Plan described biological resources nonexistent in the Gulf – including sea lions, sea otters, and walruses*."

221.     Likewise, BP's Regional OSRP for the GOM named Dr. Peter L. Lutz ("Lutz") from the University of Miami's School of Marine Sciences as a wildlife expert.  Lutz was a pioneer in whole-organism integrative physiology, but the Presidential Commission found that he "*had died several years before BP submitted its plan*."  Not only had Lutz been deceased since 2005, but he left the University of Miami almost twenty years prior to chair the marine biology department at a different university.

222.     Similarly, BP's Regional OSRP for the GOM included incorrect contact information for the Marine Spill Response Corporation ("MSRC").  According to the Presidential Commission, the MSRC was "BP's main oil-spill removal organization in the Gulf," but, inexplicably, "*a link in [BP's Regional OSRP] that purported to go to the Marine Spill Response Corporation website actually led to a Japanese entertainment site*."  Likewise, the names and phone numbers of several Texas A&M University marine specialists were wrong and

the listing of certain mammal stranding network offices in Louisiana and Florida were outdated and, in certain cases, had been closed.

223.     On June 8, 2010, journalist Tim Dickinson from *Rolling Stone* magazine published an article decrying BP's Oil Spill Response Plan.  The article's powerful message was clear:  "***The effect of leaving BP in charge of capping the well***, says a scientist involved in the government side of the [clean up] effort, ***has been 'like a drunk driver getting into a car wreck and then helping the police with the accident investigation***" or, in other words, allowing a fox to guard the hen house and hoping that it does not get hungry.  The article also stated, in part, that:

> 'This response plan is not worth the paper it is written on,' said Rick Steiner, a retired professor of marine science at the University of Alaska, who helped lead the scientific response to the Valdez disaster.  'Incredibly, this voluminous document never once discusses how to stop a deepwater blowout.'

224.     Likewise, these gross deficiencies, errors and misrepresentations, among others, caused the Associated Press to publish an article on June 10, 2010 entitled "BP Spill Response Plans Severely Flawed" which detailed the "***glaring errors and omissions in BP's oil spill response plans***."  The article states, in relevant part, as follows:

> BP PLC's 582-page regional spill plan for the Gulf, and its 52-page, [EP] … ***vastly understate the dangers posed by an uncontrolled leak and vastly overstate the company's preparedness to deal with one***, according to an Associated Press analysis.
>
> ***
>
> In the spill scenarios detailed in the documents, fish, marine mammals and birds escape serious harm; beaches remain pristine; water quality is only a temporary problem. And those are the projections for a leak about 10 times worse than what has been calculated for the ongoing disaster.
>
> ***

*The plans contain wildly false assumptions about oil spills. BP's proposed method to calculate spill volume judging by the darkness of the oil sheen is way off. The internationally accepted formula would produce estimates 100 times higher.*

***

In early May, at least 80 Louisiana state prisoners were trained to clean birds by listening to a presentation and watching a video. It was a work force never envisioned in the plans, which contain no detailed references to how birds would be cleansed of oil.

***

There are other examples of how BP's plans have fallen short:

**Beaches where oil washed up within weeks of a spill were supposed to be safe from contamination because BP promised it could marshal more than enough boats to scoop up all the oil before any deepwater spill could reach shore a claim that in retrospect seems absurd**.

"The vessels in question maintain the necessary spill containment and recovery equipment to respond effectively," one of the documents says.

**BP asserts that the combined response could skim, suck up or otherwise remove 20 million gallons of oil each day from the water. But that is about how much has leaked in the past six weeks and the slick now covers about 3,300 square miles**, according to Hans Graber, director of the University of Miami's satellite sensing facility. *Only a small fraction of the spill has been successfully skimmed. Plus, an undetermined portion has sunk to the bottom of the Gulf or is suspended somewhere in between.*

*The plan uses computer modeling to project a 21 percent chance of oil reaching the Louisiana coast within a month of a spill. In reality, an oily sheen reached the Mississippi River delta just nine days after the April 20 explosion.* Heavy globs soon followed. *Other locales where oil washed up within weeks of the explosion were characterized in BP's regional plan as safely out of the way of any oil danger.*

BP's site plan regarding birds, sea turtles or endangered marine mammals ("no adverse impacts") also have proved far too optimistic.

While the exact toll on the Gulf's wildlife may never be known, the effects clearly have been devastating.

More than 400 oiled birds have been treated, while dozens have been found dead and covered in crude, mainly in Louisiana but also in Mississippi, Alabama and

Florida. More than 200 lifeless turtles, several dolphins and countless fish also have washed ashore.

*The response plans anticipate nothing on this scale. There weren't supposed to be any coastline problems because the site was far offshore.*

"Due to the distance to shore (48 miles) and the response capabilities that would be implemented, no significant adverse impacts are expected," the site plan says.

*** 

*Perhaps the starkest example of BP's planning failures:   The company has insisted that the size of the leak doesn't matter because it has been reacting to a worst-case scenario all along.*

*Yet each step of the way, as the estimated size of the daily leak has grown from 42,000 gallons to 210,000 gallons to perhaps 1.8 million gallons, BP has been forced to scramble to create potential solutions on the fly, to add more boats, more boom, more skimmers, more workers. And containment domes, top kills, top hats.*

*While a disaster as devastating as a major oil spill will create unforeseen problems, BP's plans do not anticipate even the most obvious issues, and use mountains of words to dismiss problems that have proven overwhelming.*

### The Failed Use of Unprecedented Amounts of Dispersants

225.      As set forth below, BP's extensive and potentially problematic use of dispersants further demonstrated its lack of preparedness to respond to the spill.

226.      On April 22, 2010, BP began spraying massive amounts of dispersants – namely "Corexit" – on the oil that had reached the surface of the Gulf of Mexico.  Dispersants such as Corexit are not intended to remove oil from the water; rather, energy from wind and waves naturally disperses oil and dispersants may accelerate the process by allowing the oil to mix with water more easily, dispersing the oil vertically and horizontally in the water column.

227.      However, dispersants pose several serious health and environmental threats. For example, dispersants – including Corexit – decrease the amount of oil on the surface of the water, but *increase* the amount of oil in the water column.  Corexit therefore enables the oil to

76

spread over a wider area, significantly increasing the exposure of marine life to toxic chemicals and oil.  In addition, chemically dispersed oil can be toxic not just in the short term, but also over the long term.  Accordingly, the decision to engage in wide-spread use of dispersants must be carefully considered, particularly given the fact that studies have found that dispersants may not increase biodegradation rates and *might even inhibit biodegradation*.

228.     Furthermore, Corexit is a chemical dispersant that contains 2-butoxy ethanol. According to the New Jersey Department of Health, 2-butoxy ethanol "may be a carcinogen in humans. There may be no safe level of exposure to a carcinogen, so all contact should be reduced to the lowest possible level."  BP's OSRP for the GOM makes no mention of this serious side effect.

229.     Between April 22, 2010 through April 26, 2010, BP and its subcontractors applied 14,654 gallons of Corexit to the surface of the Gulf of Mexico.  Then, from April 27, 2010 to May 3, 2010, BP and its subcontractors applied another 141,358 gallons of Corexit to the surface of the Gulf of Mexico.  The following week, they applied an additional 168,988 gallons of Corexit to the surface of the Gulf.  The Presidential Commission found that BP's extreme use of Corexit was "*novel*" and had never been used in these "*unprecedented volumes*."  The Presidential Commission stated that while oil spill "responders had often deployed dispersants to respond to spills" it had "***never***" been done "in such volumes; during the Exxon Valdez spill, responders sprayed about *5,500 gallons [of dispersants], and that use was controversial*."

230.     As the volume of dispersants sprayed on the surface grew dramatically, BP then raised the idea of applying dispersants directly at the well.  Once again, however, the Presidential Commission found that oil spill responders "*had never before applied dispersants in the deep sea*" and "*responders were concerned about the absence of information of the effects of*

77

*dispersants in the deepwater environment.  No federal agency had studied subsea dispersant use and private studies had been extremely limited.*"

231.    Because no federal agency had ever allowed the subsea release of dispersants in a deepwater environment, on May 10, 2010, the U.S. Coast Guard and EPA prohibited its use "until initial testing demonstrates the effectiveness of subsurface dispersant application."  Then, during a May 24, 2010 press conference, EPA Administrator Lisa Jackson announced that the government was instructing BP to "take immediate steps to significantly scale back the overall use of dispersants" and expressed EPA's belief that BP "can reduce the amount of dispersant applied by as much as half, and I think probably 75 percent, maybe more."  Based on the unknown and highly risky side effects of dispersants, on May 26, 2010, the U.S. Coast Guard and EPA issued a joint letter and directive stating, in part, as follows:

> Reduction in Use of Dispersants.  BP shall implement measures to limit the total amount of surface and subsurface dispersant applied each day to the minimum amount possible.  *BP shall establish an overall goal of reducing dispersant application by 75%* from the maximum daily amount used as follows:
>
> a.  Surface Application.    *BP shall eliminate the surface application of dispersants*.  In rare cases when there may have to be an exemption, BP must make a request in writing to the [Federal On Scene Coordinator ("FOSC")] providing justification which will include the volume, weather conditions, mechanical or means for removal that were considered and the reason they were not used, and other relevant information to justify the use of surface application.  The FOSC must approve the request and volume of dispersant prior to initiating surface application.
>
> b.  Subsurface Application. *BP shall be limited to a maximum subsurface application of dispersant of not more than 15,000 gallons in a single calendar day*.  Application of dispersant in amounts greater than specified in this Addendum 3 shall be in such amounts, on such day(s) and for such application (surface or subsurface) only as specifically approved in writing by the FOSC.

232.    "*Despite this directive*," the Presidential Commission noted that "*surface use of dispersants continued*."  While the Company did seek exemptions from the directive, "*EPA*

*expressed frustration that BP sought regular exemptions, and it repeatedly asked for more robust explanations of why BP could not use mechanical recovery methods, such as skimming and burning, instead of dispersants*."  On July 14, 2010, EPA ultimately prohibited the use of dispersants altogether.

**The Failed Use of A Cofferdam**

233.    Knowing that dispersants would be unable to significantly lessen the environmental catastrophe, BP began to theorize other ways that it might be able to contain and/or recover the spewing oil.  The Company's new idea – which was noticeably absent from BP's Oil Response Plan – was to place a large containment dome (or "cofferdam") over the larger of the two leaks, with a pipe at the top channeling oil and gas to a ship on the surface of the Gulf of Mexico, the *Discoverer Enterprise*.  BP had several cofferdams already, but those had been designed, and had only been utilized, in shallow water scenarios and had never been tested in a similar deepwater environment.  Thus, BP was forced to quickly attempt to modify one of its existing cofferdams for these new and unintended purposes.  The modification of the preexisting cofferdam was complete on or about May 4, 2010.  BP began its attempt to place the 98-ton dome to the sea floor late in the evening on May 6, 2010.

234.    It was essentially guaranteed that the *ad hoc* modifications that were hurriedly made to the cofferdam would be unsuccessful.  In his book on the Deepwater Horizon incident published in late 2010, *Disaster on the Horizon*, former drilling engineer Bob Cavnar ("Cavnar") described the initial containment dome effort as the "*silliest contraption*" that BP built in the aftermath of the incident, and that the steps to construct and lower it down to the leaking BOP "never made much sense . . . they were more for show – to look like they were doing something while they were trying to come up with a real plan."  Cavnar stated in an

79

interview that the cofferdam was "destined to fail" due to the "scientific certainty" that gas hydrates would immediately form in the device and clog it, and describes in his book the results of its deployment as "almost instantaneous: failure."

235.     Likewise, the Presidential Commission noted:

BP's Suttles publicly cautioned that previous successful uses had been in much shallower water.  BP recognized that chief among potential problems was the risk that methane gas escaping from the well would come into contact with cold sea water and form slushy hydrates, essentially clogging the cofferdam with hydrocarbon ice.  *Notwithstanding the uncertainty, BP, in a presentation to the leadership of the Department of Interior, described the probability of the containment dome's success as "Medium/High."   Others in the oil and gas industry were not so optimistic:  many experts believed the cofferdam effort was very likely to fail because of the hydrates.*

236.     Not surprisingly, the effort did fail.  Hydrates accumulated during the installation of the dome, yet BP only had a plan to deal with hydrates once the cofferdam was in place.  Thus, when crews started to maneuver the cofferdam into position on May 7, 2010, hydrates formed before they could even place the dome over the leak, immediately clogging the opening through which oil was to be funneled.  This error in planning almost led to another catastrophe.  As noted by the Presidential Commission:

Because hydrocarbons are lighter than water, the containment dome became buoyant as it filled with oil and gas while BP tried to lower it.  BP engineers told [the Company's Vice President overseeing the project Richard] Lynch that they had "lost the cofferdam" as the dome, full of flammable material, floated up toward the ships on the ocean surface.  Averting a potential disaster, the engineers were able to regain control of the dome and move it to safety on the sea floor.  *In the wake of the cofferdam's failure, one high-level government official recalled Andy Inglis, BP's Chief Executive Officer of Exploration and Production, saying with disgust, "If we had tried to make a hydrate collection contraption, we couldn't have done a better job.*"

237.     In the days after the failure of the cofferdam, BP temporarily utilized a device known as a "riser insertion tube" to collect some of the oil.  However, BP abandoned the

effort after only a few days because of the relatively minor amount of oil the device actually managed to collect.

***The "Top Kill" and "Junk Shot" Efforts Fail***

238.     Following the failure of the Company's cofferdam experiment, BP tried to stop the flowing oil by embarking on so-called "top kill" and "junk shot" efforts.  Both methods are industry techniques that have been historically applied to stop the flow of oil from a blown-out well with mixed results.  BP, like the rest of the oil industry, was well aware of the Ixtoc I Oil Spill in 1979 in which a rig exploded, caught fire, sank, killed workers and released millions of gallons of oil into the Gulf of Mexico.  In the Ixtoc spill, the same two techniques were attempted and it took approximately 290 days to bring that well under control.  BP's Oil Spill Response Plan made no mention of having to rely on either of these methods let alone provide any qualification as to how effective each method might be in a similar circumstance.  Further, the Presidential Commission noted that neither technique "*had []ever been used in deepwater*."  In the end, both efforts failed to control the proliferation of oil from the Macondo well.

239.     A top kill – also known as a momentum or dynamic kill – involves pumping heavy mud into the top of the well through the BOP's choke and kill lines, at rates and pressures high enough to force escaping oil back down the well and into the reservoir.  A junk shot complements a top kill and involves pumping material (including pieces of tire rubber and golf balls) into the bottom of a BOP through the choke and kill lines.  That material is supposed to get caught on obstructions within the BOP and impede the flow of oil and gas.  By slowing or stopping the flow of oil, a successful junk shot makes it easier to execute a top kill.

240.     BP's top kill and junk shot plan began on the afternoon of May 26, 2010.  As with the cofferdam experiment, BP gave mixed messages about the potential likelihood of

success to both the government and the public.  In this regard, the Presidential Commission concluded, in relevant part, as follows:

> As with the cofferdam, BP struggled with public communications surrounding the top kill.  *At the time, both industry and government officials were highly uncertain about the operation's probability of success.  One MMS employee estimated that probability as less than 50 percent, while a BP contractor said that he only gave the top kill a "tiny" chance to succeed.  But BP's Hayward told reporters, "We rate the probability of success between 60 and 70 percent."*  After the top kill failed, that prediction may have lessened public confidence in BP's management of the effort to contain the well.

241.     During three separate attempts over the next three days, BP pumped mud at rates exceeding 100,000 barrels per day and fired numerous shots of "junk" into the BOP.  After the third unsuccessful attempt, BP acknowledged that the plan was a failure.  BP's explanation of the failed attempts focused on the well's 16-inch casing, the outermost barrier between the well and the surrounding rock for more than 1,000 vertical feet.  That casing was fabricated with three sets of weak points, or "rupture disks."  During the well's production phase, the hot oil coursing through the production casing, which is inside the 16-inch casing, would lead to a buildup of pressure in the well.  If the pressure buildup was too high, it could cause the collapse of one of the two casings.  The disks were designed to rupture and relieve this potential buildup of pressure before a casing collapsed.  According to BP, pressures created by the initial blowout could have caused the rupture of disks to collapse inward, compromising the well's integrity.

242.     The Presidential Commission, however, disagreed with BP's explanation and found, in part, that the "[c]ollapse of the rupture disks *was only one of BP's possible explanations for the unsuccessful top kill.  But the company presented it to the government as the most likely scenario*."  Indeed, the U.S. Government noted that it "*did not fully accept BP's analysis of what happened*" and, in contrast, believed that "*the top kill likely failed because the rate at which oil was flowing from the well was many times greater than the then-current 5,000*

*barrels-per day estimate.*  Because BP did not pump mud into the well at a rate high enough to counter the actual flow, oil and gas from the well pushed mud back up the BOP and out of the riser."

### The "Top Hat" Failed to Collect the "Vast Majority" of the Spewing Oil

243.      In the aftermath of the failed top kill and junk shot plan, BP began shifting its main focus to collecting the oil rather than killing the well itself.  On May 29, 2010, BP announced that it would attempt to cut off the portion of the riser still attached to the top of the BOP and install a collection device – or "top hat," which would then be connected via a new riser to the *Discoverer Enterprise* vessel.  As before, BP's Oil Spill Response Plan failed to mention the top hat technique as a potential remedy in the event of an oil spill.  BP began installing the top hat on June 1, 2010 and had it in place by 11:30 p.m. on June 3, 2010.  By June 8, 2010 – forty-nine days after the explosion occurred – the *Discoverer Enterprise* was collecting about 15,000 barrels of oil per day – or approximately 25% of the oil being released.

244.      BP also developed a system to bring oil and gas to the surface through the choke line on the BOP.  More specifically, BP outfitted a vessel called the *Q4000* with collection equipment, including an oil and gas burner imported from France. This vessel and resource was also never mentioned in BP's Oil Spill Response Plan.

245.      While BP was able to slowly start collecting some of the oil, the Company was, in the words of the Presidential Commission, once again "overly optimistic about the percentage of the oil it could remove or collect."  Indeed, the Presidential Commission found, in part, as follows:

> *On June 1, Suttles said that he expected the top hat, when connected to the Discoverer Enterprise, to be able to collect the "vast majority" of the oil.  Within days, it became apparent that the top hat and Discoverer Enterprise were inadequate.  On June 6, Hayward told the BBC that, with the Q4000 in place,*

83

*"we would very much hope to be containing the vast majority of the oil." But when the Q4000 came online in mid-June, the two vessels' joint capacity of 25,000 barrels per day was still insufficient.*

246.       In the wake of the failure to contain most of the oil using the top hat, the U.S. Coast Guard continued questioning BP's response to the spill. As noted, in part, by the Presidential Commission:

> BP's Lynch said that the speed at which the company brought capacity online was limited solely by the availability of dynamically positioned production vessels.[5] One senior Coast Guard official challenged BP's definition of availability: he suggested that BP did not consider options such as procuring ships on charter with other companies until the government pushed it to do so. Obtaining another production vessel might have enabled BP to collect oil through the BOP's kill line at a rate comparable to that of the *Q4000*.

## The Well Is Finally Capped

247.       Following the limited success of the top hat procedure, BP began presenting its final well-control plans to government experts. According to the Presidential Commission Report:

> The [U.S. government] science advisors would question BP's assumptions, forcing it to evaluate worst-case scenarios and explain how it was mitigating risk. *The government saw its pushback as essential because BP would not, on its own, consider the full range of possibilities. **According to one senior government official, before the increased supervision, BP "hoped for the best, planned for the best, expected the best**."* [Paul] Tooms, BP's Vice President of Engineering, believed that the government science advisors unnecessarily slowed the containment effort, arguing that scientists consider risk differently than engineers and that BP had expertise in managing risk. *BP, however, was not in the best position to tout that expertise: its well had just blown out.*

248.       By late June, BP was working towards deploying a "capping stack," yet another *post hoc* measure nowhere reflected in BP's OSRP for the GOM. The capping stack was essentially a smaller version of a BOP, designed to sit atop the BOP and stop the flow of oil and gas.

---

[5] Dynamically positioned vessels have computer-controlled systems that maintain the vessel's exact position and direction, despite external factors such as wind, waves, and current.

249.       On July 9, 2010, Coast Guard Admiral Thad Allen ("Admiral Allen")
authorized BP to install the capping stack, but not to close it.  Sealing the capping stack would
increase the pressure in the well.  There was a concern that if one or more of the rupture disks
had in fact ruptured, the increased pressure could force hydrocarbons into the surrounding
formation, leading to uncontrolled eruptions from the ocean floor at other locations.

250.       The installation of the capping stack was completed on July 12, 2010.  The
next day, experts conducted a "well integrity test" to determine if the well had been
compromised and to see whether oil could flow into the rock formation.  According to the
Presidential Commission:  "[t]he test was to last from 6 to 48 hours, and BP had to monitor
pressure, sonar, acoustic, and visual data continuously, as recommended by the [U.S.
government's] Well Integrity Team."

251.       On July 15, 2010, after a 24-hour delay to repair a leak, BP shut the capping
stack and began the well integrity test.  For the first time in 87 days – and after approximately
five million barrels of oil had already seeped into the Gulf of Mexico – the well had finally
stopped spewing oil.  Unfortunately, however, by that time, the vast environmental damage had
already occurred and, as noted by *The New York Times* on August 6, 2010, "BP's containment
efforts had captured only approximately 16 percent of the spill."

252.       Meanwhile, on July 19, 2010, BP publicly raised the possibility of actually
killing the well through a procedure called a "static kill."  Like the top kill, the static kill
involved pumping heavy drilling mud into the well in an effort to push oil and gas back into the
reservoir.  However, because the oil and gas were already static, the pumping rates required for
the static kill to succeed were far lower than the top kill.  The U.S. government approved the
static kill procedure on August 2, 2010.  By 11:00 p.m. on August 3, 2010, the static kill

appeared to have worked.  On August 8, 2010, Admiral Allen reported that the cement had been pressure-tested and was holding.

253.     In mid-September 2010, the first relief well – which BP had begun to drill in early May – finally intercepted the Macondo well, allowing BP to pump in cement and permanently seal the reservoir.  Thus, on September 19, 2010 – 152 days after the blowout – the U.S. government finally announced that "*the Macondo well is effectively dead*."  In total, 206 million gallons of crude oil spilled into the Gulf of Mexico, thousands of square miles of fishing grounds were closed through 2010 and billions of dollars of tourist revenue in the area were lost.

## VII.   **DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT DURING THE CLASS PERIOD**

254.     Before the start of the Class Period, BP experienced a series of high-profile safety lapses that resulted in the loss of life, damage to the environment, harm to BP's reputation, and significant costs to BP in the form of criminal pleas and fines, civil settlements, and remediation expenses.  In particular, the 2005 Texas City refinery explosion and the 2006 Alaska oil spills were extremely damaging to the Company and left investors concerned about the ability of BP to operate safely and without catastrophic failures.  Responding to these concerns, beginning in January 2007, BP sought to assure its investors that BP was a Company committed to safety as its "number one priority."  BP supposedly reaffirmed this commitment to safety for three and a half years, at nearly every opportunity during the Class Period.  In fact, in May 2009, Defendant Hayward lamented that he had "got so bored with saying 'safety, people, and performance' but I have determined that I'm not going to say anything else."  This public commitment to right BP's past wrongs was touted as a sea change in BP's operations.

255.     Also throughout the Class Period, BP consistently touted its operations in the deepwater Gulf of Mexico, a region that had become one of the most important areas of

86

production for the Company and which BP hailed as a "profit centre" and a "high margin" production area.  In fact, however, BP's deepwater drilling operations created undisclosed risks of a catastrophic system failure that ultimately was realized when the *Deepwater Horizon* exploded and oil began to spew from the Macondo well.  Moreover, the explosion revealed that BP never committed to developing effective safety protocols and systems through OMS or within its deepwater drilling operations that would guide its employees through best practices to avoid an otherwise preventable spill or to contain a spill, should one occur.

The January 16, 2007 Statements

256.    The Class Period begins on January 16, 2007, with BP holding a press conference to discuss the public release of the Baker Report.  At that press conference, Defendant Browne assured investors of BP's commitment to improving its process safety in accordance with the Baker Panel's recommendations.  For example, Defendant Browne stated, in part, as follows:

> If I had to say one thing which I hope you will all hear today it is this **"BP gets it."**
>
> **And I get it too**. This happened on my watch and, as Chief Executive, I have a responsibility to learn from what has occurred. I recognise the need for improvement and that my successor, **Tony Hayward, and I need to take a lead in putting that right by championing process safety as a foundation of BP's operations.**
>
> ***
>
> Finally, in its executive summary, the Panel says it believes that **BP's workforce is ready, willing and able to participate in a sustained Group-wide effort to move BP towards excellence in process safe**ty. I wholeheartedly agree. **And I would like to make clear that the tone is indeed being set at the top.**

257.    The foregoing statements, which caused BP securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by

Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)     Browne falsely represented that BP would be placing process safety at the foundation of BP's operations and that BP was "ready, willing, and able" to improve process safety when, in fact, BP was instead expanding its deepwater drilling operations without implementing adequate process safety procedures for well testing in deep sea drilling and creating protocols for identifying when warning signs arise and responding to warning signs when they arise so as to avert a disaster (¶¶ 78-83, 95, 109, 192); and

(b)     Browne falsely represented that BP was "championing process safety as a foundation of BP's operations" and that it was moving towards "excellence in process safety" yet BP's OMS system failed to require uniform process safety policies and procedures that would have eliminated or reduced the risk of deepwater drilling and prevented the blowout at the Macondo well (¶¶ 104-113).

**The February 6, 2007 Statements**

258.     On February 6, 2007, BP held a conference call with analysts and investors (in which Defendants Browne, Grote, Hayward, Dudley, and Inglis participated), during which it falsely reaffirmed its commitment to process safety and reported that improvements had already begun.

259.     Defendant Hayward falsely explained that safety would take precedence even over the pace of oil production, stating, *inter alia*, as follows:

> I would now like to give you new guidance for our expected future production rates. Relative to our projections of February last year, our production forecast has been impacted by five things.  Firstly, ***we further increased our focus on safety and operational efficiency and will in some cases deliberately slow the pace of our activity in order to improve its safety and efficiency.***

88

260.     The foregoing statements, which caused BP securities to trade at artificially inflated prices, were each materially false and misleading when made or omitted material information, and were known by Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)     Hayward falsely represented that BP was committed to process safety when, in fact, BP was expanding its deepwater drilling operations without implementing adequate process safety procedures for well testing in deep sea drilling and creating protocols for identifying warning signs and responding to warning signs when they arise so as to avert a disaster (¶¶ 78-83, 95, 109, 192); and

(b)     Hayward falsely represented that BP would "in some cases deliberately slow the pace of [its] activity in order to improve its safety," when, in fact, BP failed to implement the operational protocols necessary to insure that safety was not compromised for expediency (¶¶ 78, 109, 192).

**The February 23, 2007 Statements**

261.     On February 23, 2007, BP released its 2006 Annual Review that reported continuing progress in improving its process safety.  In particular, BP stated, in part, as follows:

> What does the world expect of an energy company today?  *We believe it is to provide energy to customers now and in the future in a safe, sustainable and environmentally responsible way.  BP strengthened its commitments to these principles in 2006.*  We have acted decisively to address what matters most today and tomorrow: investment in better operations and execution; *a clear focus on the three dimensions of safety – personal safety, process safety and the environment*; and more secure and diverse choices for energy consumers in the future; all accompanied by a sustained capability to deliver performance – and deliver it the right way.

> ***

> *Safety has always been one of our core priorities*. When the safety of people and of BP operations is at stake, actions matter far more than words. *We continued to*

89

*make significant investment and took numerous actions to improve the three dimensions of safety* – personal safety, *process safety* and the environment – and the monitoring of all our operations in 2006.

262.     The 2006 Annual Review contained the "Group chief executive's review," signed by Defendant Browne.  Browne falsely stated, in part, that:  "*[w]e have been urgently addressing operational issues and matters related to our safety performance*," "[s]afety has always been one of our core priorities," and that "*BP aspires to be an industry leader* in the three dimensions of safety – personal safety, *process safety* and the environment."  Browne also vowed that BP was implementing the Baker Panel's recommendations and that the Company's current "aim . . . is to develop a timely and intelligent plan of action in order to transform BP into an industry leader in process safety management."

263.     The foregoing statements, which caused BP securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)     Defendants falsely represented that BP was committed to process safety when, in fact, BP was expanding its deepwater drilling operations without implementing adequate process safety procedures for well testing in deep sea drilling; and, without creating protocols to identify warning signs and responses to warning signs when they develop so as to avert a disaster, thereby increasing BP's exposure to risk (¶¶ 78-83, 95, 109, 192); and

(b)     Defendants falsely represented that BP was committed to environmental safety when, in fact, BP failed to implement adequate operational protocols and safety measures to prevent its operations from causing significant harm to the environment.  For example, BP's

Oil Spill Response Plan for the GOM contained numerous material errors, gross deficiencies and was completely inadequate to stop or contain a deepwater oil spill  (¶¶ 217-224).

**The March 6, 2007 Statements**

264.        On March 6, 2007, BP filed its 2006 Annual Report with the SEC on Form 20-F, which was signed by Defendants Browne and Grote.  In the report, BP touted the deepwater Gulf of Mexico as one of its new "profit centres" and a primary economic driver, while minimizing the expected environmental liabilities from those operations:

> We believe that BP has a strong portfolio of assets in each of its main segments . . . . ***Profit centres are, or are expected to become, areas that provide significant production and income for the segment.  Our new profit centres are in*** Asia Pacific (Australia, Vietnam, Indonesia and China), Azerbaijan, North Africa (Algeria), Angola, Trinidad & Tobago and ***the deepwater Gulf of Mexico***; and in Russia/Kazakhstan (including our operations in TNK-BP, Sakhalin and LukArco), ***where we believe we have competitive advantage*** and which we believe provide the foundation for volume growth and improved margins in the future.
>
>                ***
>
> Deepwater Gulf of Mexico is one of our new profit centres and our largest area of growth in the US.  In 2006, our deepwater Gulf of Mexico crude oil production was 195mb/d and gas production was 323mmcf/d.
>
>                ***
>
> A risk of increased ***environmental costs and impacts*** is inherent in particular operations and products of the group and there can be no assurance that material liabilities and costs will not be incurred in the future. ***In general, the group does not expect that it will be affected differently from other companies with comparable assets engaged in similar businesses***.

265.        The foregoing statements, which caused BP securities to trade at artificially inflated prices, were each materially false and misleading when made or contained material omissions, and were known by Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)      Defendants falsely represented that BP's deepwater Gulf of Mexico operations gave the Company a "competitive advantage" when, in fact, such operations increased risk for BP relative to its competitors who operated at lower depths, with more robust safety programs (¶¶ 107-112);

(b)      Defendants misrepresented that BP would not "be affected differently from other companies with comparable assets engaged in similar businesses" as BP failed to disclose the multiple safety failures and near-failures that BP had experienced in its deepwater drilling operations thereby materially misrepresenting the risks to BP as compared to its competitors (¶¶ 53-63, 81-83, 98-103);

(c)      Defendants misrepresented the risks and liabilities to which BP was exposed in that they failed to disclose that BP was unprepared to contain an oil leak occurring at a great depth and that, in the event of such leak, oil could flow for several months before being contained, thereby materially impacting BP's profitability (¶¶ 217-246); and

(d)      Defendants falsely represented that BP's environmental remediation costs would not differ significantly from those of its competitors when, in fact, BP's (i) focus on high-risk deepwater operations, (ii) failure to adopt adequate operational protocols and safety measures and (iii) failure to implement industry best practices increased its potential liabilities beyond those of its competitors (¶¶ 78, 94-95, 104-113, 192).

**The April 2007 Statements**

266.      In its Sustainability Report for 2006 (dated April 2007), BP stated that as part of its OMS, "We [BP] ***document and rigorously follow procedures*** for safe and effective operating." The foregoing statement, which caused BP securities to trade at artificially inflated prices, was materially false and misleading when made, and was known by Defendants to be

false at that time, or was made with reckless disregard for the truth.  Contrary to its public statements, BP did not have adequate documented procedures for its operations, and in particular did not have adequate written procedures for controlling a well during drilling.  For example, BP failed to document how to perform a negative pressure test or interpret the results of that test, despite the fact that this was a critical test for assessing the integrity of the well and the *only* test that could assess the adequacy of the cement job at the bottom of a well (¶¶ 78, 192).

**The April 24, 2007 Statements**

267.　　On April 24, 2007, BP held a conference call with analysts and investors (in which Defendant Grote participated), and Defendant Grote emphasized BP's continued focus on safe operations, including Exploration and Production operations in the deepwater Gulf of Mexico.  For example, Defendant Grote stated, in part, as follows:

> 2007 will represent a year of consolidation.  We are stabilizing our operations and beginning to build momentum as Texas City continues its recommissioning and we focus on delivering major E&P projects like Atlantis and Thunder Horse.  Our strategy is unchanged and ***our current focus remains on safe and reliable operations*** and the delivery of improved performance.

268.　　The foregoing statements, which caused BP securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)　　Grote falsely represented BP's focus was on safe and reliable operations when, in fact, BP was expanding its deepwater drilling operations without implementing adequate process safety procedures for well testing in deep sea drilling and creating protocols to identify warning signs and responding to warning signs when they develop so as to avert a disaster thereby increasing BP's exposure to risk (¶¶ 78-83, 95, 109, 192);

93

(b)      Grote misrepresented the true risks to BP associated with deepwater drilling as he failed to disclose the multiple safety failures and near-failures that BP had experienced in its deepwater drilling operations thereby rendering his statements materially false and misleading  (¶¶ 53-63, 81-83, 98-103).

**The May 16, 2007 Statements**

269.      On May 16, 2007, Defendant Malone testified before the U.S. House of Representatives Committee on Energy and Commerce, Subcommittee on Oversight and Investigations.  During his testimony, Malone falsely claimed that:  "*[t]oday, I want to assure you that we get it*. We have learned the lessons of the past."  Malone also submitted certain written statements to the Committee.  In those written statements, Malone falsely stated, in part, as follows:

> **BP America is committed to safety**, and the expectation of our management is that **budget guidelines should never result in a compromise in safety performance**.  That is and has long been our philosophy . . . .
>
> ***
>
> I continue to meet with employees to reinforce my expectations of them:  **that they must ensure that our operations are safe, that they understand they have both a right and responsibility to shut down any process they feel is unsafe or operationally unsound, and that they are encouraged to raise concerns on any issue**.
>
> ***
>
> **BP does not tolerate retaliation against workers who raise safety concerns**.

270.      The foregoing statements, which caused BP securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)     Malone  portrayed BP's operations as safe when, in fact, BP was expanding its deepwater drilling operations without implementing adequate operational protocols and safety measures to reduce the risk of catastrophic failure, thereby increasing the Company's exposure to risk (¶¶ 78-95, 109, 192);

(b)     Malone misrepresented BP's risk profile and the risks associated with deepwater drilling in that he failed to disclose the multiple safety failures and near-failures that BP had experienced in its deepwater drilling operations thereby rendering his statements materially false and misleading (¶¶ 53-63, 81-83, 98-103); and

(c)     Malone falsely represented that BP did not retaliate against workers who raised safety concerns when, in fact, BP knew that numerous, substantiated complaints of retaliation had been submitted to the Company through numerous avenues, including the Company's Office of the Ombudsman headed by Judge Sporkin (¶¶ 136-150).

**The September 25, 2007 Statements**

271.     On September 25, 2007, Defendant Inglis spoke at the Sanford Bernstein 4th Annual Strategic Decisions Conference.  Through his remarks, Inglis misrepresented the uniformity of BP's safety and the Company's ability to manage risks in deepwater drilling operations.  In particular, Inglis stated:

> ***One aspect of our focus on safe and reliable operations*** that I mentioned earlier ***is our new standardised Operating Management System (OMS).*** This will provide a blueprint for safety and all aspects of operations throughout BP, ***making sure operations are undertaken to a consistently high standard worldwide***.
>
> ***                            *****
>
> ***By taking and managing risks in frontier regions we have established an unrivalled asset base in some of the world's most prolific basins***.  Management of those assets has given us a resource base of nearly 60 billion barrels, with a significant proportion in conventional resources.  ***We are developing strong***

*growth in deepwater* and tight gas through a spread of major projects around the world.

272.     The foregoing statements, which caused BP securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)     Inglis falsely represented BP's focus on safe and reliable operations when, in fact, BP was expanding its deepwater drilling operations without implementing adequate process safety procedures for well testing in deep sea drilling and creating protocols to identify warning signs and responding to warning signs when they develop so as to avert a disaster thereby increasing BP's exposure to risk (¶¶ 78-95, 109, 192);

(b)     Inglis falsely represented that BP's OMS would provide a "consistently high standard worldwide" when, in fact, BP had no intention of implementing consistent practices throughout the Company.  Rather, BP was – and would continue to – implement differing safety practices country-by-country in order to save time and money  (¶¶ 105-107);

(c)     While highlighting the strong growth in deepwater operations, Inglis misrepresented the true risks associated with such drilling in that he failed to disclose the multiple safety failures and near-failures that BP had experienced in its deepwater drilling operations thereby rendering his statements materially false and misleading (¶¶ 53-63, 81-83, 98-103); and

(d)      Inglis misrepresented that BP was "managing risks" in its deepwater operations when, as the Presidential Commission Report found, BP lacked "consistent and reliable risk-management processes – and thus has been unable to meet its professed

commitment to safety" thereby increasing BP's risk profile and rendering his statements materially false and misleading.

**The October 25, 2007 Statements**

273.    On October 25, 2007, BP issued a press release announcing the resolution of various law enforcement investigations, including those relating to the Texas City refinery explosion and the Prudhoe Bay oil spill.  The press release quoted Defendant Malone stating, in part, that:  "[i]n the months and years since these violations occurred, *we have made real progress in the areas of process safety performance and risk management*."  The press release also claimed that:  "BP America is in the midst of a comprehensive effort to improve its safety culture and *to strengthen and standardize process safety and risk management programs* at all BP-operated facilities."

274.    The foregoing statements, which caused BP securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)    Malone misrepresented that  "real progress" was  made in the areas of "process safety performance and risk management" and that BP was "standariz[ing] process safety and risk management at all BP-operated facilities" when, in fact, BP was expanding its deepwater drilling operations without implementing adequate operational protocols and safety measures necessary to reduce the risk of catastrophic failure, thereby increasing the Company's exposure to risk (¶¶ 78-95, 109, 192) and, as the Presidential Commission Report found, BP lacked "consistent and reliable risk-management processes";

(b)      Malone misrepresented the true risks associated with deepwater drilling in that he failed to disclose the multiple safety failures and near-failures that BP had experienced in its deepwater drilling operations rendering his statements materially false and misleading (¶¶ 53-63, 81-83, 98-103); and

(c)      Defendants misrepresented BP's efforts to "improve its safety culture and to standardize safety and risk management programs" since BP did not, in fact, standardize its process safety programs with regard to deepwater drilling and Malone failed to disclose that BP implemented  safety budget cuts and staff reductions which impacted the Company's ability to safely drill in the Gulf of Mexico rendering his statements materially misleading (¶¶ 78, 109, 114-120, 192).

**The November 8, 2007 Statements**

275.      On November 8, 2007, Defendant Hayward spoke at the Houston Forum about BP's supposed commitment to process safety and about the Company's ability to successfully operate at the industry's "frontiers," which included the Gulf of Mexico.  During his presentation, Defendant Hayward stated, in part, as follows:

> We continue to implement the roadmap provided to ourselves and the industry by the excellent work of the Baker Panel.  ***BP remains absolutely committed to taking these lessons and becoming a world leader in process safety.***

276.      The foregoing statements, which caused BP securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)      Hayward misrepresented BP's absolute commitment to process safety when, in fact, BP was not so committed and was instead expanding its deepwater drilling

operations without implementing adequate operational protocols and safety measures necessary to reduce the risk of catastrophic failure, thereby increasing the Company's exposure to risk (¶¶ 78-95, 109, 192);

(b)      Hayward misrepresented the true risks associated with deepwater drilling in that he failed to disclose the multiple safety failures and near-failures that BP had experienced in its deepwater drilling operations rendering his statements materially false and misleading (¶¶ 53-63, 81-83, 98-103);

(c)      Hayward misrepresented that BP maintained sufficiently advanced safety practices for use in frontier regions such as deepwater (¶¶ 78-95, 109, 192); and

(d)      Hayward misled investors with regard to BP's OMS, BP's safety program, as OMS permitted BP to meet only minimal local requirements rather than industry best practices, and was unsuited to deepwater drilling (¶¶ 105-107).

**The February 22, 2008 Statements**

277.      On February 22, 2008, BP released its 2007 Annual Review, which emphasized that the Company remained committed to process safety.  Indeed, the strength of the safety message and level of priority given to it was reflected by the report's cover page, which read:

Our key priorities
Safety
People
Performance

278.      The 2007 Annual Review also contained statements related to safety and risk management:

*In safety, we are significantly lowering the risk profile of our operations*. We are working hard to ensure that we have the right people with the right skills in the right places. And we are addressing performance by reducing organizational

99

complexity, *improving operational consistency* and changing individual behaviours. On the front lines of our business, we are moving this agenda forward.

***

Process safety

> Throughout 2007, *BP continued to progress the process safety enhancement programme* initiated in response to the March 2005 incident at the Texas City refinery. *We have made progress across the group on all the recommendations*:
>
> • Leadership – *We have consistently communicated that safe and reliable operations are our highest priority*. Our safety and operations audit group was strengthened and completed 28 audits in 2007.
>
> • *Management systems – Implementation of our operating management system began at an initial group of sites, which included all five US refineries.*
>
> • Knowledge and expertise – We established an executive-level training programme, ran process safety workshops and launched an operations academy for site-based staff *to enhance process safety capability*. Specialists have been deployed at our US refineries to accelerate priority improvement programmes.
>
> • Culture – To reinforce the need for a stronger safety culture, we undertook in-house assessments of BP's safety culture, supported by communication from leadership.
>
> • Indicators – Progress has been made in developing leading and lagging indicators, building on metrics already reported to executive management. We are working with the industry to develop indicators and this already includes progress to agree a metric covering loss of primary containment.

279.    The 2007 Annual Review contained the "Group chief executive's review," signed by Defendant Hayward.  In his Executive Review, Defendant Hayward assured investors that, under his leadership, safety was BP's top priority.  For example, Defendant Hayward stated, in part, as follows: "[w]hen I took over as group chief executive, the immediate task was to restore the integrity and the efficiency of BP's operations.  *I set out three priorities: safety,*

100

*people and performance*." Defendant Hayward further explained that BP's new OMS brings "*greater consistency to [BP's] operations*" regardless of where those operations were occurring.

280.    The foregoing statements in the 2007 Annual Review, which caused BP securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)    Defendants falsely portrayed BP's operations as having a lower "risk profile" when, in fact, BP was expanding its deepwater drilling operations without implementing adequate operational protocols and safety measures necessary to reduce the risk of catastrophic failure, thereby increasing the Company's exposure to risk (¶¶ 78-95, 109, 192);

(b)    Defendants misrepresented the true risks associated with deepwater drilling in that they failed to disclose the multiple safety failures and near-failures that BP had experienced in its deepwater drilling operations rendering their statements materially false and misleading (¶¶ 53-63, 81-83, 98-103);

(c)    Defendants falsely represented that BP's OMS was "improving operational consistency" when, in fact, BP set differing safety practices country-by-country in order to save time and money (¶¶ 105-107); and

(d)    Defendants misrepresented BP's professed commitment to safety as they failed to disclose that BP was implementing safety budget cuts and staff reductions that impacted the Company's ability to safely drill in the Gulf of Mexico (¶¶ 114-120).

**The February 27, 2008 Statements**

281.    On February 27, 2008, BP conducted its 2008 Strategy Presentation during a conference call with investors and analysts (in which Defendants Hayward, Inglis, Dudley,

Conn, and Grote participated).  There, certain of the Defendants asserted that safety was BP's top priority and claimed that the Company was able to deliver strong performance while maintaining safe operations.  More specifically, these Defendants stated, in part, as follows:

> [Hayward:] ***2007 saw further improvement in our overall safety performance***.  Over the last eight years, our safety performance, measured by Recordable Injury Frequency Rate, the standard measure of safety in our industry, has improved three-fold.  As you can see on this chart, our performance is amongst the best in our industry.
>
> Notwithstanding this track record, ***our intense focus on process safety continues***.  We are making good progress in addressing the recommendations of the Baker Panel and ***have begun to implement a new Operating Management System across all of BP's operations***.  Integrity-related incidents have fallen significantly over the last three years, and oil spills of more than one barrel continue a strong downward trend.
>
> ***Safe and reliable operations remain our number one priority.***
>
> ***
>
> [Inglis:]  O***ur top priority continues to be the safety and reliability of our operations***.  In 2007, we saw both an improvement in personal safety and increased reliability.
>
> ***
>
> ***[I]n the Gulf of Mexico, our priorities are clear – grow revenues near term through the safe startup and ramp-up of Atlantis and Thunder Horse***; grow our resource position through successful exploration and access, and advance key deepwater technologies to exploit that resource base.
>
> We're on track in executing that strategy.  We've established a highly competitive position through our extensive lease-holding and track record in exploration.  Our exploration success over the last seven years has created a deepwater resource position of 1.2 billion barrels.  We added to that with the Isabela discovery last year and renewed our lease holding position with the award of 171 leases in the 2007 sales.
>
> ***
>
> [Hayward:]  ***We are taking action to close the competitive gap through a focused effort on three priorities of safety, people and performance. We are determined to operate safely and reliably, to develop the capability of our people and to***

102

*drive performance through restoring operational momentum. At the same time we are rigorously reducing complexity and cost. In Exploration and Production, we continue to see the benefits of our strategy*. Our resource base, even as it stands today, underpins the potential to sustain production of at least four million barrels a day out to 2020. We will do better than this as we continue to pursue new access and deliver further exploration success.

282.     The foregoing statements, which caused BP securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)     Defendants falsely portrayed that BP's "intense focus on process safety continues" and that "[o]ur top priority continues to be the safety and reliability of our operations" when, in fact, BP was expanding its deepwater drilling operations without implementing adequate operational protocols and safety measures necessary to reduce the risk of catastrophic failure, thereby increasing the Company's exposure to risk (¶¶ 78-95, 109, 192);

(b)     Defendants misrepresented the true risks associated with deepwater drilling as they failed to disclose the multiple safety failures and near-failures that BP had experienced in its deepwater drilling operations and BP's failure to adequately address those risks through its failure to implement proper and adequate safety procedures (¶¶ 53-63, 81-83, 98-103);

(c)     Defendants misrepresented BP's OMS as BP was using differing safety practices country-by-country in order to save time and money (¶¶ 105-107); and

(d)     Defendants misrepresented BP's professed commitment to safety in that they failed to disclose that BP was implementing safety budget cuts and staff reductions that impacted the Company's ability to safely drill in the Gulf of Mexico rendering their statements materially false and misleading (¶¶ 114-120).

**The March 4, 2008 Statements**

283.　　On March 4, 2008, BP filed its 2007 Annual Report with the SEC on Form 20-F, which was signed by Defendants Hayward and Grote.  In the report, BP highlighted its deepwater Gulf of Mexico drilling operations and assured investors that the Company was operating safely.  More specifically, the Form 20-F stated, in part, as follows:

> We believe that BP has a strong portfolio of assets . . . .  ***Profit centres are, or are expected to become, areas that provide significant production and income for the segment***.  ***Our current areas of major development include the deepwater Gulf of Mexico***, Azerbaijan, Algeria, Angola, Egypt and Asia Pacific ***where we believe we have competitive advantage*** and that we believe provide the foundation for volume growth and improved margins in the future.
>
> ***
>
> We have completed 50 major accident risk assessments (MARs). The assessments identify high-level risks that, if they occur, would have a major effect on people or the environment.  ***Many of these risks, such as a loss of containment from our operations, are common across the industry. Mitigation plans to manage and respond to identified risks form part of the MAR analysis***.
>
> ***
>
> As described by BP's group chief executive, the ***OMS "is the foundation for a safe, effective, and high-performing BP***.  It has two purposes: to further reduce HSE risks in our operations and to continuously improve the quality of those operations''.  The system's 'elements of operating' describe eight dimensions of how people, processes, plant and performance operate within BP.  ***A continuous improvement process drives and sustains improvement of these elements at a local level***.
>
> ***
>
> A risk of increased environmental costs and impacts is inherent in particular operations and products of the group and there can be no assurance that material liabilities and costs will not be incurred in the future.  ***In general, the group does not expect that it will be affected differently from other companies with comparable assets engaged in similar businesses***.
>
> ***

Although the cost of any future remediation could be significant and may be material to the result of operations in the period in which it is recognized, *we do not expect that such costs will have a material effect on the group's financial position or liquidity.  We believe our provisions are sufficient for known requirements; we do not believe that our costs will differ significantly from those of other companies engaged in similar industries*, or that our competitive position will be adversely affected as a result.

***

*In the US, former US district court judge Stanley Sporkin acts as an ombudsperson whom employees and contractors can contact confidentially to report any suspected breach of compliance, ethics or the code of conduct, including safety concerns.  We take steps to identify and correct areas of non-compliance and take disciplinary action where appropriate*.

284.    The foregoing statements in the 2008 Annual Review, which caused BP securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)    Defendants misrepresented the true risks associated with deepwater drilling in that they failed to disclose the multiple safety failures and near-failures that BP had experienced in its deepwater drilling operations rendering their statements materially false and misleading ( ¶¶ 78-95, 109, 192);

(b)    Defendants falsely represented that BP's deepwater Gulf of Mexico operations gave the Company a "competitive advantage" when, in fact, such operations created increased risk for the Company relative to its competitors who typically operated at lower depths and had more robust safety programs (¶¶ 107-112);

(c)    Defendants falsely represented that BP had completed mitigation plans to manage and respond to high-level risks when, in fact, BP was completely unprepared to deal with an oil spill in the Gulf of Mexico (¶¶ 217-246);

105

(d)      Defendants misrepresented the OMS as BP was using differing safety practices country-by-country in order to save time and money  (¶¶ 105-107);

(e)      Defendants falsely represented that BP's remediation costs would not differ significantly from those of its competitors when, in fact, BP's (i) focus on high-risk deepwater operations , (ii) failure to adopt adequate operational protocols and safety measures and (iii) failure to implement industry best practices increased its potential liabilities beyond those of its competitors (¶¶ 78, 94-95, 104-113, 192);

(f)      BP falsely represented that the Company "take[s] steps to identify and correct areas of non-compliance" and that "employees and contractors can contact [the Company's Ombudsman] confidentially" when, in fact, the Company engaged in a systematic pattern of retaliation against workers who reported safety violations  (¶¶ 136-150);

(g)      BP falsely represented that, with regard to "remediation," its "*provisions are sufficient for known requirements*" as BP's remediation plan for the Gulf of Mexico was grossly deficient and completely incapable of remediation in the event of an oil spill (¶¶ 217-246); and

(h)      BP misrepresented that its "risk of increased environmental costs and impacts" would not be "affected differently from other companies with comparable assets engaged in similar businesses" as BP's safety processes lagged behind its competitors, thereby exposing BP to much greater risks of increased environmental costs and impacts than its competitors (¶¶ 107-112).

**The April 17, 2008 Statements**

285.      On April 17, 2008, Defendant Hayward and BP Chairman Peter Sutherland delivered speeches at the Company's 2008 Annual General Meeting.  BP posted transcripts of

the speeches on its publicly-accessible website.  In his speech, Hayward again asserted that

safety was of the utmost importance at BP and distinguished BP from other oil companies based

on its deepwater operations.  In particular, Hayward stated, in part, as follows:

> When I took over as chief executive last May, I said that we would focus on three basic priorities: safety, people, and performance.  Everyone at BP understands those priorities. And while I am in this role they will remain the priorities.
>
> ***Safety is our number one priority and in 2007 our overall safety record continued to improve***.  Over the last eight years ***our safety performance according to the standard industry measure has improved threefold and is now among the best in our industry.***
>
> ***Our intense focus on process safety continues***. ***We are making good progress in addressing the recommendations of the Baker Panel and have begun to implement a new Operating Management System across all of BP's operations. This is aimed at ensuring that our operations across the world look and feel the same everywhere - and perform to the same high standard***.
>
> ***
>
> International oil companies have always operated on the frontiers of the industry. ***And that is where BP is happiest, doing the tough stuff that others cannot or choose not to do***.  From our roots in those Edwardian days when the company was formed, prospecting for oil among the dunes of Persia - it is the same frontier spirit that is evident today as we develop the deepwaters of Angola, the Gulf of Mexico and Egypt[.] . . .
>
> Today, we continue to push technological frontiers, exploiting tight gas, increasing reserves through enhanced oil recovery techniques, developing advanced seismic imaging techniques and pioneering research into the next generation of biofuels - which will based on more efficient molecules and will not be derived from food crops. . . .
>
> So - the frontier is where our role is.  ***It is by pushing the energy frontier, by moving into new markets and new geographies and by applying our know-how and new technology, that BP has for almost one hundred years generated its returns.***

286.     The foregoing statements, which caused BP securities to trade at artificially

inflated prices, were each materially false and misleading when made, and were known by

Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)     Defendants misrepresented the true risks associated with deepwater drilling in that they failed to disclose the multiple safety failures and near-failures that BP had experienced in its deepwater drilling operations rendering their statements materially false and misleading (¶¶ 53-63, 81-83, 98-103);

(b)     Defendants misrepresented that BP's OMS  was  "aimed at ensuring that our operations across the world look and feel the same everywhere – and perform to the same high standard," as, in fact, BP was using differing safety practices country-by-country in order to save time and money (¶¶ 105-107);

(c)     Defendants  misrepresented BP's professed commitment to safety in that they failed to disclose that BP was implementing safety budget cuts and staff reductions which impacted the Company's ability to safely drill in the Gulf of Mexico rendering their statements materially false and misleading (¶¶ 114-120); and

(d)     Defendants falsely represented that BP's safety performance was "among the best in our industry" when, in fact, BP's (i) focus on high-risk deepwater operations, (ii) failure to adopt adequate operational protocols and safety measures and (iii) failure to implement industry best practices increased its potential liabilities beyond those of its competitors (¶¶ 78, 94-95, 104-113, 192).

**The May 20, 2008 Statements**

287.     On May 20, 2008, BP issued its 2007 Sustainability Review, which contained a "Group chief executive's introduction," signed by Defendant Hayward.  There,

Hayward claimed that "[w]e are also now introducing our new operating management system (OMS), designed to bring greater consistency to our operations."

288.    The foregoing statement, which caused BP securities to trade at artificially inflated prices, was materially false and misleading when made, and was known by Defendants to be false at that time, or was made with reckless disregard for the truth because it failed to disclose that BP was using differing safety practices country-by-country in order to save time and money (¶¶ 105-107).

**The December 17, 2008 Statements**

289.    On December 17, 2008,  Defendant Hayward gave a speech at the HRH Prince Of Wales's 3rd Annual Accounting for Sustainability Forum.  BP posted a transcript of the speech on its publicly-accessible website.  Hayward claimed that BP was continuing to improve its process safety practices.  More specifically, Defendant Hayward stated, in part, as follows:

> BP had a number of high-profile safety lapses in recent years, notably at our Texas City refinery, where there was tragic and unacceptable loss of life.
>
> These lapses exposed shortcomings - but they also gave us a huge opportunity to learn and improve the way we operate.  We opened ourselves up to scrutiny - and *we listened more to our front-line operations people* - who, of course, really know what is going on on the ground.   *And we have continuously reported progress against a response plan and against an independent external report*.
>
> One of the many consequences for us has been to develop and to *embed a new Operating Management System right across BP - and we operate in 100 countries - so that is no mean feat.*
>
> The critical aspect of this system is that it actually translates words into action*. It starts out as a set of requirements which are the platform for safe, reliable, responsible operating activities.  And then we continuously improve what we do, every day, every month, every year - in pursuit of sustainable operating excellence.* Importantly, it is developed, implemented and sustained locally in our operating businesses - and makes our leaders locally fully-accountable for what they do.

290.     The foregoing statements created the false impression of consistent progress in safety processes, a potent OMS, and thus, safe, reliable and responsible deep sea drilling operations, which caused BP securities to trade at artificially inflated prices, were each materially false and misleading when made or included material omissions, and were known by Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)     An internal BP strategy document issued in December 2008 warned BP executives of "major" process-safety concerns in the Gulf of Mexico that permitted the accumulation of risks prior to and in response to incidents and therefore, increased the likelihood and severity of "process-safety related incidents."  (¶ 19);

(b)     Hayward misrepresented that BP did not tolerate any retaliation against workers who raised safety concerns when, in fact, BP engaged in a pattern of systematic retaliation against workers who reported safety violations (¶¶ 136-150);

(c)     Hayward misrepresented BP's OMS as using differing safety practices country-by-country in order to save time and money   (¶¶  105-107); and

(d)     Hayward misrepresented BP's professed commitment to safety in that he failed to disclose that BP was implementing safety budget cuts and staff reductions which impacted BP's ability to safely drill in the Gulf of Mexico rendering his statements materially false and misleading (¶¶ 114-120).

**The February 2009 Statements**

291.     In a February 2009 presentation before the Microsoft Global Energy Forum, BP stated that as part of its OMS, "We [BP] ***document and rigorously follow procedures*** for safe and effective operating."   The foregoing statement, which caused BP securities to trade at

artificially inflated prices, was materially false and misleading when made, and was known by Defendants to be false at that time, or was made with reckless disregard for the truth.  Contrary to its public statements, BP did not have adequate documented procedures for its operations, and in particular did not have written procedures for controlling a well during drilling.  For example, BP failed to document how to perform a negative pressure test or interpret the results of that test, despite the fact that this was the *only* test that could assess the integrity of the cement job at the bottom of a well.

**The February 10, 2009 Statements**

292.    On February 10, 2009, Defendant Hayward delivered a speech at the Cambridge Energy Research Association  ("CERA") Executive Conference in Houston, Texas. BP posted a transcript of the speech on its publicly-accessible website.  In the speech, Hayward discussed the need to "support the development of hydrocarbon resources here in the US and around the world."  In addition, Defendant Hayward falsely stated that the U.S. should allow drilling on the outer continental shelf because ***"[w]e have the know-how and technology to tap these resources safely and with minimal impact to the environment."***

293.    The foregoing statements, which caused BP securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by Defendants to be false at that time, or were made with reckless disregard for the truth for the following reasons, among others:

(a)    An internal BP strategy document issued in December 2008 warned BP executives of "major" process-safety concerns in the Gulf of Mexico that permitted the accumulation of risks prior to and in response to incidents and therefore increased the likelihood and severity of "process-safety related incidents"  (¶ 19);

(b)     Hayward falsely represented that BP was able to develop hydrocarbon resources safely when, in fact, BP lacked adequate operational protocols and safety measures necessary, thereby increasing the risk of catastrophic failure (¶¶ 78-95, 109, 192); and

(c)     Hayward falsely represented that BP could develop hydrocarbon resources "with minimal impact to the environment" when, in fact, BP was completely unprepared to deal with an oil spill in the Gulf of Mexico (¶¶ 217-246).

**The February 24, 2009 Statements**

294.    On February 24, 2009, BP issued its 2008 Annual Review and repeatedly assured investors of its supposed continuing commitment to safety. For example, the 2008 Annual Review falsely stated, in part, as follows:

> Our forward agenda focus on safety, people and performance is paying off. ***BP is in the leading group for safety performance in the industry***[.]
>
> ***
>
> ***Safety, both personal and process, remains our highest priority***. 2008 was one of our best ever years for personal safety, with our performance expected to remain among the best in the industry. During the year we began migrating to ***the new BP OMS, which has an increased focus on process safety and continuous improvement***. The majority of our operations in North America Gas, ***the Gulf of Mexico***, Colombia and the Endicott field in Alaska all completed the migration to the OMS in 2008.
>
> ***
>
> ***Safety is our top priority***. While improved systems and processes are vital, another factor is even more important when it comes to safe and reliable operations – people. ***We continue to work to establish a strong safety culture, developing deep knowledge within every employee and sharing learning.***
>
> ***
>
> ***Our priorities remain the same – safety, people and performance***, focusing on the delivery of safe, reliable and efficient operations while maintaining flexibility so we can respond to oil price volatility.

295.     The 2008 Annual Review also contained the "Group chief executive's review," which was signed by Defendant Hayward.  Hayward asserted that safety was BP's "number one priority" and discussed the "safe and reliable" Gulf of Mexico operations.  More specifically, Hayward stated, in part, that:

> In a year that will be remembered for extremely volatile oil prices and exceptional stock market turbulence, BP delivered an excellent set of results.  We made good progress on achieving safe and reliable operations, and delivered strong operational momentum that reduced the performance gap with our competitors.

***

> Q: At the start of the year what priorities did you set out for BP?

> Safety, people and performance, and these remain our priorities.  ***Our number one priority was to do everything possible to achieve safe, compliant and reliable operations***.  Good policies and processes are essential but, ultimately, safety is about how people think and act.  That's critical at the front line but it is also true for the entire group. Safety must inform every decision and every action. ***The BP operating management system (OMS) turns the principle of safe and reliable operations into reality by governing how every BP project, site, operation and facility is managed***.

***

> Q: How did Exploration and Production perform?

> It was an excellent year, with major projects such as Thunder Horse in the Gulf of Mexico and Deepwater Gunashli in Azerbaijan coming onstream.  That, together with ***safe and reliable performance from our existing operations***, contributed to underlying production growth – in contrast to the falling output of our major competitors – and more than compensated for the effects of Hurricanes Ike and Gustav and other operational issues.

296.     The foregoing statements, which caused BP securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

113

(a)      Defendants misrepresented and misled investors by stating that the Gulf of Mexico operations had implemented the OMS when, in fact, an internal BP strategy document issued in December 2008 warned BP executives, there were "major" process-safety concerns in the Gulf of Mexico that permitted the accumulation of risks prior to and in response to incidents and therefore increased the likelihood and severity of "process-safety related incidents" thereby misleading investors that operations in the Gulf of Mexico were operating within uniform Companywide process safety procedures (¶ 19):

(b)      Defendants falsely portrayed process safety as BP's highest priority when, in fact, BP was expanding its deepwater drilling operations without implementing adequate operational protocols and safety measures necessary to reduce the risk of catastrophic failure, thereby increasing the Company's exposure to risk rendering their statements materially false and misleading (¶¶ 78-95, 109, 192);

(c)      Defendants misrepresented the true risks associated with deepwater drilling in that they failed to disclose the multiple safety failures and near-failures that BP had experienced in its deepwater drilling operations rendering their statements materially false and misleading  (¶¶ 53-63, 81-83, 98-103);

(d)      Defendants misrepresented the OMS as BP was using differing safety practices country-by-country in order to save time and money  (¶¶ 105-107);

(e)      Defendants misrepresented BP's professed commitment to safety as they failed to disclose that BP was implementing safety budget cuts and staff reductions  which negatively impacted its process safety practices rendering their statements materially false and misleading (¶¶ 114-120);

(f)      Defendants falsely represented that BP was in the "leading group for safety performance in the industry" when, in fact, BP's (i) focus on high-risk deepwater operations, (ii) failure to adopt adequate operational protocols and safety measures and (iii) failure to implement industry best practices increased its potential liabilities beyond those of its competitors (¶¶ 78, 94-95, 104-113, 192); and

(g)      Defendants misrepresented that BP had a "strong safety culture" that encouraged "sharing [of] learning," when in fact BP engaged in a pattern of systematic retaliation against workers who reported safety violations (¶¶ 136-150).

**The February 25, 2009 Statements**

297.      On February 25, 2009, Defendant McKay testified before the U.S. House of Representatives' Committee on Natural Resources.  In his written statements submitted to the Committee, he falsely assured the Committee of the safety of drilling in the deepwater Gulf of Mexico.  More specifically, McKay wrote, in part, that:

> *The track record of BP and the industry generally in the Western and Central Gulf of Mexico (GOM) demonstrates that when areas are opened, they can be leased, explored and developed to the highest environmental and operational standards in the world*.

298.      During the hearing, McKay further falsely testified, in part, that:

Mr. HASTINGS.  Could you elaborate a little bit on the technological advances that have occurred in the industry that has made your work more environmentally friendly?

Mr. MCKAY.  Yes.  I think building on from where my colleague from Exxon was, seismic technology has moved massively forward in the last 30 years.  We can image and see things, and therefore target things that weren't even possible as little as 10 years ago. The footprint that we must impact, in terms of number of wells drilled, leads that are developed down into prospects, and some are culled, as they are not potential, that has increased our ability to drill in the right place drastically.

The other thing I would say, in drilling technology we can now do extended-reach drilling.  You heard an example of up to six miles. There are examples, we are trying to go out eight miles. *We can also design the wells based on the seismic interpretations to be safer, more robust and designed better for the situations that they are going into*.  *The third area is around monitoring and control.  The systems, the pressure sensors, temperature sensors, flow sensors are miles better than they were in the past.*

*We can see things and understand things in real time now downhole in the well and at the surface, and control things much better than we could in the past.* The last area, I would say, which is a big, big benefit, is the usage of subsea completions where we can drill wells, produce those wells purely from subsea installations, tie those back to central processing facilities 15, 20, 30 miles away and therefore the visual impact is very low.

*And so when you combine all those systems, you have a safer, more environmentally sensitive methodology of development today than we had 30 years ago, or actually even 10 years ago*.

299.    The foregoing statements, which caused BP securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)    An internal BP strategy document issued in December 2008 warned BP executives of "major" process-safety concerns in the Gulf of Mexico that permitted the accumulation of risks prior to and in response to incidents and therefore, increased the likelihood and severity of "process-safety related incidents."  (¶ 19);

(b)    McKay misrepresented the true risks associated with deepwater drilling in that he failed to disclose the multiple safety failures and near-failures that BP had experienced in its deepwater drilling operations rendering his statements materially false and misleading (¶¶ 53-63, 81-83, 98-103);

(c)    McKay misrepresented BP's professed commitment to process safety and overall risk profile in that he failed to disclose that BP did not have the operational protocols and

safety measures necessary to monitor and exercise control over its deepwater drilling operations, rendering his statements materially false and misleading . (¶¶ 78-95, 109, 192);

   (d) McKay misrepresented OMS as BP was, in fact, using differing safety practices country-by-country in order to save time and money (¶¶ 105-107);

   (e) McKay falsely represented that BP was monitoring pressure sensors in "real time."  On the contrary, as Presidential Commission investigator made clear during a presentation on November 9, 2010, although drill pressure data was "available" in BP's office in Houston, BP did not in fact monitor it, including on April 20, 2010, the night of the Deepwater Horizon blowout: "There was nobody in that B.P. Macondo well office that night . . . Everybody had gone home.";

   (f) McKay misrepresented BP's professed commitment to safety  in that he failed to disclose that BP was implementing safety budget cuts and staff reductions which impacted BP's ability to drill safely in the Gulf of Mexico rendering his statements materially false and misleading (¶¶ 114-120); and

   (g) McKay misrepresented that BP was prepared to and had the ability to contain an oil leak occurring in a deepwater environment rendering his statements materially false and misleading  (¶¶ 217-246).

**The March 3, 2009 Statements**

   300. On March 3, 2009, BP held its 2009 Strategy Presentation (in which Defendants Conn, Inglis and Hayward participated).  BP released a transcript of the presentation, which falsely stated, in part, that:

> [Hayward:] ***2008 was another year of progress on our number one priority of safe and reliable operations***.

Fatalities were the lowest since the BP Amoco merger in 1999, with five deaths in 2008, compared with seven in 2007.  This was still five too many, and we are relentless in pursuit of no fatalities.

***

***We remain focused on process safety and asset reliability.  We have begun the implementation of our Operating Management System, which covers everything from employee competencies to risk assessment, and we're already seeing the benefits***.

***

[Inglis:]  ***There is one important caveat: safe and reliable operations come first whatever cost efficiency measures we undertake***, ***and we continue to advance the safety and reliability of our operations through implementing OMS***.

301.     The foregoing statements, which caused BP securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)     Defendants falsely portrayed BP's focus on "process safety and asset reliability" when, in fact, BP was expanding its deepwater drilling operations without implementing adequate operational protocols and safety measures necessary to reduce the risk of catastrophic failure, thereby increasing the Company's exposure to risk (¶¶ 78-95, 109, 192);

(b)     An internal BP strategy document issued in December 2008 warned BP executives of "major" process-safety concerns in the Gulf of Mexico that permitted the accumulation of risks prior to and in response to incidents and therefore, increased the likelihood and severity of "process-safety related incidents."  (¶ 19);

(c)     Defendants misrepresented the true risks associated with deepwater drilling in that they failed to disclose the multiple safety failures and near-failures that BP had

118

experienced in its deepwater drilling operations rendering their statements materially false and misleading  (¶¶ 53-63, 81-83, 98-103);

(d)     Defendants misrepresented the OMS as BP was, in fact, using differing safety practices country-by-country in order to save time and money  (¶¶ 105-107);

(e)     Defendants misrepresented BP's professed commitment to safety in that they failed to disclose that BP was implementing safety budget cuts and staff reductions which impacted BP's ability to drill safely in the Gulf of Mexico rendering their statements materially false and misleading (¶¶ 114-120); and

(f)     Defendants falsely represented that BP did not sacrifice safety in order to cut costs when, in fact, BP routinely did so by, for example, not utilizing more reliable blowout preventers because of their added cost (¶ 94).

**The March 4, 2009 Statements**

302.     On March 4, 2009, BP filed its 2008 Annual Report with the SEC on Form 20-F, which was signed by Defendants Hayward and Grote.  In the report, BP made numerous false statements about its supposed safe practices and the quality of its deepwater Gulf of Mexico operations.  For example, the Form 20-F stated, in part, as follows:

> ***During 2008, we continued to pursue our three strategic priorities of 'Safety', 'People' and 'Performance'***, which underpin BP's 'forward agenda'.
>
> Through this, we have taken steps to restore revenues, reduce complexity and manage costs and have made significant progress towards closing the competitive performance gap to our peer group. Looking forward, our strategy is to create value for shareholders by investing to deliver growth in Exploration and Production, together with high-quality earnings and returns throughout our operations.  ***Our first priority will always be to ensure the safety and integrity of our operations***.

***

119

We are dependent on our people and technology to deliver on our strategy. We intend to invest in ensuring that we have people with the right capability and experience to meet all of our objectives and the technology to support the delivery of competitive business performance and new business development. ***BP is committed to delivering its strategy by operating safely, reliably, in compliance with the law*** and within the discipline of a clear financial framework.

***

Deepwater Gulf of Mexico is our largest area of growth in the US. In 2008, our deepwater Gulf of Mexico liquids production was 244mb/d and gas production was 40mboe/d.

***

***Throughout 2008, senior leadership across the group continued to hold safety as their highest priority***.

***

We continue to implement our new operating management system ***(OMS), a framework for operations across BP that is integral to improving safety and operating performance in every site.***

When fully implemented, OMS will be the single framework within which we will operate, consolidating BP's requirements relating to process safety, environmental performance, legal compliance in operations, and personal, marine and driving safety. . . . The OMS establishes a set of requirements, and provides sites with a systematic way to improve operating performance on a continuous basis. ***BP businesses implementing OMS must work to integrate group requirements within their local system*** to meet legal obligations, address local stakeholder needs, reduce risk and improve efficiency and reliability. ***A number of mandatory operating and engineering technical requirements have been defined within the OMS, to address process safety and related risks***.

All operated businesses plan to transition to OMS by the end of 2010. ***Eight sites completed the transition to OMS in 2008***; two petrochemicals plants, Cooper River and Decatur, two refineries, Lingen and Gelsenkirchen and four Exploration and Production sites, North America Gas, ***the Gulf of Mexico***, Colombia and the Endicott field in Alaska. . . . For the sites already involved, implementing OMS has involved detailed planning, including gap assessments supported by external facilitators. A core aspect of OMS implementation is that ***each site produces its own 'local OMS', which takes account of relevant risks at the site and details the site's approach to managing those risks***. As part of its transition to OMS, a site issues its local OMS handbook, and this summarizes its approach to risk

120

management.   Each site also develops a plan to close gaps that is reviewed annually.

\*\*\*

BP operates in more than 90 countries worldwide.  In each of these areas, BP has, or is developing, processes designed to ensure compliance with applicable regulations. In addition, each employee is required to comply with BP health, safety and environmental policies as embedded in the BP code of conduct.  Our partners, suppliers and contractors are also encouraged to adopt them.

\*\*\*

In the US, former US district court judge Stanley Sporkin acts as an ombudsperson. ***Employees and contractors can contact him confidentially to report any suspected breach of compliance, ethics or the code of conduct, including safety concerns***.

***We take steps to identify and correct areas of non-compliance and take disciplinary action where appropriate.***

303.	The foregoing statements, which caused BP securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)	An internal BP strategy document issued in December 2008 warned BP executives of "major" process-safety concerns in the Gulf of Mexico that permitted the accumulation of risks prior to and in response to incidents and therefore increased the likelihood and severity of "process-safety related incidents."  (¶ 19);

(b)	Defendants falsely portrayed BP's "first priority" as "the safety and integrity of our operations" when, in fact BP was expanding its deepwater drilling operations without implementing adequate operational protocols and safety measures necessary to reduce the risk of catastrophic failure, thereby increasing the Company's exposure to risk (¶¶ 78-95, 109, 192);

121

(c)     Defendants misrepresented the true risks associated with deepwater drilling in that they failed to disclose the multiple safety failures and near-failures that BP had experienced in its deepwater drilling operations thereby rendering their statements materially false and misleading (¶¶ 53-63, 81-83, 98-103);

(d)     Defendants misrepresented BP's professed commitment to safety as they failed to disclose that BP was implementing safety budget cuts and staff reductions which impacted BP's ability to drill safely in the Gulf of Mexico rendering their statements materially false and misleading (¶¶ 114-120);

(e)     Defendants falsely represented that OMS required BP businesses to "integrate group requirements within their local system" when, in fact, OMS allowed BP business to use differing safety practices country-by-country in order to save time and money (¶¶ 105-107); and

(f)     Defendants misrepresented that the Gulf of Mexico site had completed the transition to OMS and had produced a "local OMS" but failed to disclose that BP's Gulf of Mexico operations lacked adequate operational protocols and safety measures necessary to reduce the risk of catastrophic failure (¶¶ 78-95, 109, 192).

**The March 10, 2009 Statements**

304.     On March 10, 2009, BP's EP, which discusses BP's purported safety protocol for the Mississippi Canyon Block 252, was "deemed submitted" by the MMS.  The document was initially received by the MMS on February 23, 2009 and was available to the public and BP's investors no later than March 10, 2009.  The document falsely stated, in part, that:

> ***I hereby certify that BP Exploration & Production Inc. has the capability to respond, to the maximum extent practicable, to a worst-case discharge***, or a

substantial threat of such discharge, resulting from the activities proposed in our Exploration Plan.

*\*\*\**

An accidental oil spill that might occur as a result of the proposed operation in Mississippi Canyon Block 252 has the potential to cause some detrimental effects to fisheries. However, it is unlikely that an accidental surface or subsurface oil spill would occur from the proposed activities. *If such a spill were to occur in open waters of the OCS proximate to mobile adult finfish or shellfish, the effects would likely be sublethal* and the extent of damage would be reduced to the capability of adult fish and shellfish to avoid a spill, to metabolize hydrocarbons, and to excrete both metabolites and parent compounds. No adverse activities to fisheries are anticipated as a result of the proposed activities.

*\*\*\**

*In the event of an unanticipated blowout resulting in an oil spill, it is unlikely to have an impact based on the industry wide standards for using proven equipment and technology for such responses, implementation of BP's Regional Oil Spill Response Plan which address available equipment and personnel, techniques for containment and recovery and removal of the oil spill.*

305.     In addition, the EP stated that:

An accidental oil spill from the proposed activities could cause impacts to beaches. However, *due to the distance to shore (48 miles) and the response capabilities that would be implemented, no significant adverse impacts are expected*. Both the historical spill data and the combined trajectory/risk calculations referenced in the publication OCS EIA/EA MMS 2002-052 indicate *there is little risk of contact or impact to the coastline and associated environmental resources*.

306.     The EP also contained identical statements to the statement in the immediately preceding paragraph, except that they pertained to wetlands, coastal wildlife, refuges, and wilderness areas.

307.     The foregoing statements, which caused BP securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

123

(a)      As explained by a group of eight U.S. Senators in a May 17, 2010 letter to Attorney General Holder, there was no "proven equipment and technology" to respond to the spill.  The Senators wrote that "[m]uch of the response and implementation of spill control technologies appears to be taking place on an ad hoc basis."  Indeed, BP acknowledged on May 10, 2010 that: "*[a]ll of the techniques being attempted or evaluated to contain the flow of oil on the seabed involve significant uncertainties because they have not been tested in these conditions before*."

(b)      BP falsely represented that the EP was based on an analysis of the Mississippi Canyon Block 252 site when, in fact, the EP was boilerplate language copied from one or more exploration plans that MMS had previously approved for other distinct drilling sites (¶¶ 220-222);

(c)      BP misrepresented that BP was prepared to stop a blowout at Mississippi Canyon Block 252 or contain the resulting oil spill when, in fact, BP was wholly unprepared (¶¶ 217-246); and

(d)      BP misrepresented that an oil spill would not adversely impact beaches, wetlands, and other environmentally sensitive areas (¶¶ 224).

**The March 25, 2009 Statements**

308.      On March 25, 2009, Defendant McKay delivered a speech at the Howard Weil Energy Conference in New Orleans, Louisiana, in which he discussed the nearby deepwater Gulf of Mexico operations.  BP posted a transcript of the speech on its publicly-accessible website.  In the speech, McKay falsely claimed that BP was using the "best technology" in the Gulf of Mexico and gave assurances that BP was not cutting costs when it came to safety:

By the way, let me add that ***managing costs down does not mean BP will be skimping when it comes to ensuring our operations remain safe***, reliable and compliant in the years ahead.

***Safety will continue to have first call on the company's resources***.

309.     The foregoing statements, which caused BP securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)     McKay falsely portrayed the state of technology as safe when, in fact, BP was expanding its deepwater drilling operations without implementing adequate operational protocols and safety measures necessary to reduce the risk of catastrophic failure, thereby increasing the Company's exposure to risk (¶¶ 78-95, 109, 192);

(b)     McKay misrepresented the true risks associated with deepwater drilling in that he failed to disclose the multiple safety failures and near-failures that BP had experienced in its deepwater drilling operations (¶¶ 53-63, 81-83, 98-103);

(c)     McKay misrepresented the OMS as BP was, in fact, using differing safety practices country-by-country in order to save time and money (¶¶ 105-107);

(d)     McKay misrepresented BP's commitment to safety in that he failed to disclose that BP was implementing safety budget cuts and staff reductions, which negatively impacted its process safety practices rendering his statements materially false and misleading (¶¶ 114-120);

(e)     McKay misrepresented that BP's deepwater Gulf of Mexico operations did not create increased risk for the Company relative to its competitors, who typically operated at lower depths and had more robust safety programs (¶¶ 107-112); and

(f)      McKay misrepresented that BP always put safety ahead of production when, in fact, BP routinely failed to do so by, for example, not utilizing more reliable blowout preventers because of their added cost (¶ 95).

**The April 16, 2009 Statements**

310.      On April 16, 2009, Defendant Hayward spoke at the 2009 Annual General Meeting, in which he falsely stated, in part, that:  ***"[o]ur number one priority of safe and reliable operations*** has been vital to the underpinning of our restored competitive performance." BP posted a transcript of the speech on its publicly-accessible website.

311.      The foregoing statement, which caused BP securities to trade at artificially inflated prices, was materially false and misleading when made, and known by Hayward to be false at that time, or was made with reckless disregard for the truth, for the following reasons, among others:

(a)      Hayward falsely portrayed BP's focus as on "safe, reliable operations" when in fact, BP was expanding its deepwater drilling operations without implementing adequate operational protocols and safety measures necessary to reduce the risk of catastrophic failure, thereby increasing the Company's exposure to risk (¶¶ 78-95, 109, 192);

(b)      An internal BP strategy document issued in December 2008 warned BP executives of "major" process-safety concerns in the Gulf of Mexico that permitted the accumulation of risks prior to and in response to incidents and therefore increased the likelihood and severity of "process-safety related incidents."  (¶ 19);

(c)      Hayward misrepresented the true risks associated with deepwater drilling in that they failed to disclose the multiple safety failures and near-failures that BP had

experienced in its deepwater drilling operations rendering his statements materially false and

misleading (¶¶ 53-63, 81-83, 98-103);

        (d)     Hayward misrepresented the OMS as BP was, in fact, using differing

safety practices country-by-country in order to save time and money (¶¶ 105-107); and

        (e)     Hayward misrepresented BP's commitment to safety in that he failed to

disclose that BP was implementing safety budget cuts and staff reductions that impacted BP's

ability to safely drill in the Gulf of Mexico rendering his statements materially false and

misleading. (¶¶ 114-120)

**The May 8, 2009 Statements**

312.        On May 8, 2009, David Eyton (Eyton"), BP's Group Head of Research and

Technology, gave a speech at Cambridge University in England.  BP posted a transcript of the

speech on its publicly-accessible website.  Eyton discussed BP's ability to operate "at frontiers"

such as the Gulf of Mexico and to effectively manage the associated risks.  In addition, Eyton

falsely stated, in part, that:

> [W]e always have and we continue to operate at frontiers . . . .
>
> The first of these - operating at frontiers - is really about risk taking. It is about operating without analogues. It is about being an applier of technology in the field and about not being afraid to go first. ***It is about having a deep understanding of the natural environment and the hazards it contains.***  It demands that we learn from 'doing' and ***share that know-how across the company.***  It requires substantial in-house resources - both expertise and money - to handle the scale and complexity of the risk. And, it is worth emphasizing that throughout this period and despite the extremes of geography in which we operate, ***technology has continuously improved the safety and environmental footprint of our industry.***

313.        The foregoing statements, which caused BP securities to trade at artificially

inflated prices, were each materially false and misleading when made, and were known by

Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)     Eyton falsely portrayed BP as having a "deep understanding" of the natural environment in which it operated when, in fact, BP lacked the operational protocols necessary to acquire sufficient knowledge to safely and reliable conduct its operations.  For example, BP's lack of operational protocols resulted in oil spill response plans that contained numerous errors, gross deficiencies and which were wholly inadequate to respond to a deepwater oil spill (¶¶ 219-224);

(b)     Eyton misrepresented the true risks associated with deepwater drilling in that they failed to disclose the multiple safety failures and near-failures that BP had experienced in its deepwater drilling operations (¶¶ 53-63, 81-83, 98-103);

(c)     Eyton misrepresented BP's commitment to the environment and ability to respond to an offshore oil spill in that they failed to disclose that BP was unprepared to contain an oil leak occurring at a great depth and that, in the event of such leak, oil could flow for several months before being contained (¶¶ 217-246); and

(d)     Eyton misrepresented BP's commitment to safety in that they failed to disclose that BP was implementing safety budget cuts and staff reductions, which impacted BP's ability to safely drill in the Gulf of Mexico (¶¶ 114-120).

**The June 30, 2009 Statements**

314.     On June 30, 2009, BP publicly filed its revised oil spill response plan for the Gulf of Mexico – entitled "Regional Oil Spill Response Plan – Gulf of Mexico" or "BP's Regional OSRP for the GOM".  According to BP's Regional OSRP for the GOM, the "***TOTAL WORST CASE DISCHARGE" scenarios in the Gulf of Mexico ranged from a release of 28,033 barrels of oil per day to 250,000 barrels of oil per day***".  More specifically, BP's Regional

128

OSRP for the GOM stated:  (i) an oil spill occurring less than ten miles from the shoreline could create a worst case discharge of 28,033 barrels of oil per day; (ii) an oil spill that occurred greater than ten miles from the shoreline could create a worst case discharge of 177,400 barrels of oil per day; and (iii) an oil spill caused by a mobile drilling rig that is drilling an exploratory well could create a worst case discharge of 250,000 barrels of oil per day.  BP's Regional OSRP for the GOM explicitly states that the Company and its subcontractors *could recover approximately 491,721 barrels of oil per day* (or more than 20.6 million gallons) in the event of an oil spill in the Gulf of Mexico.  The Company further claimed and provided certified statements to the MMS that BP and its subcontractors "*maintain the necessary spill containment and recovery equipment to respond effectively to spills*."

315.    The foregoing statement, which caused BP securities to trade at artificially inflated prices, that BP and its subcontractors "maintain the necessary spill containment and recovery equipment to respond effectively to spills" was materially false and misleading when made, and was known by Defendants to be false at that time, or was made with reckless disregard for the truth, for the following reasons, among others:

(a)    BP's Oil Spill Response Plan contained numerous errors, gross deficiencies and were wholly inadequate to respond to a deepwater oil spill (¶¶ 219-224); and

(b)    Defendant Hayward confirmed that the Company had failed to draw up sufficient emergency response plans, admitting that during the spill "*we were making it up day to day*" (¶ 217).  In addition, Defendant Suttles admitted that BP failed to have an oil spill response plan with "proven equipment and technology" in place that could contain the oil spill.

**The November 19, 2009 Statements**

316.     On November 19, 2009, Defendant Rainey testified in front of and submitted written statements to the United States Senate Committee on Energy and Natural Resources. Rainey's testimony included the following false and misleading statements:

> *Releases from oil and gas operations are rare, and the application of technology has enabled a dramatic reduction of releases from our industry over the last 30 years*.  To be clear, any release from our operations is unacceptable, and we will continue to invest in research and technology to drive us to our ultimate goal of zero discharge.

> Contrary to popular perception, ours is a high-tech industry.  To demonstrate this point, I would like to highlight three *technologies which enable the safe and reliable production of offshore oil and gas*.  These are seismic imaging, drilling, and production systems.

> \*\*\*

> In summary, I would like to return to the Gulf of Mexico, where technology has been a key driver of our success.  In September, we announced a Tiber discovery, where we set a new drilling depth record for the industry at 35,055 feet.  There are many challenges to overcome to bring Tiber to production, but they are exciting challenges and we look forward to addressing them.  As we do so, *we will be ever mindful and respectful of the communities and the environments in which we operate.*

317.     Rainey elaborated further on these remarks in his prepared statement, which included the following false and misleading statements:

> Examples of the technologies which have helped to reduce accidental releases include:

> • *Down hole flow control valves that shut down the well automatically if damage to the surface equipment is detected*;

> • *Blowout preventer technology which includes redundant systems and controls*;

> • *New and improved well control techniques which maintain constant control of the fluids in the wellbore*;

> • *Sensors which continually monitor the subsurface and seabed conditions for sudden changes in well pressures*; and

- *BP's fiber optic network in the US Gulf of Mexico which allows us to monitor well pressures in real time, both at the facility and in our offices in Houston.*

While our intent is to prevent all accidental discharges, we conduct regular emergency drills with local, state, and federal agencies. *All of our production facilities have contingency plans that identify the procedures, response equipment, and key personnel needed for responding to incidents.*

Offshore Technologies Enabling Environmental Stewardship

Three key technologies which enable the safe and reliable production of offshore oil and gas resources:

- Seismic imaging;
- Offshore drilling; and
- Offshore production systems.

Seismic imaging allows us to predict the presence of hydrocarbon reservoirs below the sea bed. Drilling allows us to test for the presence of hydrocarbons in the reservoirs. When hydrocarbons are present, the well bore connects the reservoir to the surface, where *production systems enable us to produce the hydrocarbons, and deliver them safely to the refinery.*

Our industry has a remarkable track record of moving forward the limits of each of these technologies. In BP, we have been at the forefront of both the development of the technologies, and their application.

***

Advances in drilling technologies and production systems have been significant. They include extended reach drilling, drilling in deeper waters, and to greater depths. *These advances enable more production while reducing environmental impacts* and allowing for efficient use of existing facilities and infrastructure.

318.    The foregoing statements, which caused BP securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

131

(a)     Rainey falsely represented that "releases from oil and gas operations are rare" when in fact, BP had experienced numerous releases in recent years that were undisclosed to investors (¶¶ 52-73, 81-83, 96-103);

(b)     An internal BP strategy document issued in December 2008 warned BP executives of "major" process-safety concerns in the Gulf of Mexico that permitted the accumulation of risks prior to and in response to incidents and therefore increased the likelihood and severity of "process-safety related incidents"  (¶ 19);

(c)     Rainey misrepresented BP's true risk profile associated with deepwater drilling in that he failed to disclose the multiple safety failures and near-failures that BP had experienced in its deepwater drilling operations, as well as BP's audit of the *Deepwater Horizon* which found equipment failures serious enough to lead to personal injury and environmental damage, rendering his statements materially false and misleading (¶¶ 53-63, 81-83, 98-103);

(d)     Rainey misrepresented that while BOP's had the technology to include redundant systems and controls, BP had purposefully removed such redundant systems in its drilling operations in the Gulf of Mexico rendering his statements materially false and misleading (¶ 94);

(e)     Rainey falsely represented that BP was able to conduct its operations safely when, in fact, BP did not have adequate operational protocols and safety measures necessary to reduce the risk of catastrophic failure.  Due to the lack of adequate protocol, the nature of BP's operations differed vastly from the representations made to the public.  For example: as noted in ¶¶ 94, 106, the BOPs used in BP's operations did *not* have adequate safety redundancies, such as a second blind shear ram or an acoustical control switch; in the event of a blowout, the well would *not* automatically shut-in. Furthermore, well pressures were *not* being

monitored "*both at the facility and in our offices in Houston*" in real time:  On the contrary, as Presidential Commission investigator made clear during a presentation on November 9, 2010, although drill pressure data was "available" in BP's office in Houston, BP did not in fact monitor it, including on April 20, 2010, the night of the Deepwater Horizon blowout: "There was nobody in that B.P. Macondo well office that night  . . . .  Everybody had gone home" (¶ 201);

(f)     Rainey misrepresented BP's commitment to the environment and ability to respond to an oil spill as it did not have an adequate contingency plan for dealing with incidents such as a well blowout and subsequent deepwater oil leak thereby misrepresenting BP's risk profile, rendering his statements materially false and misleading (¶¶ 217-246); and

(g)     Rainey falsely represented that BP was committed to "Environmental Stewardship" and reducing environmental impacts when, in fact, BP was completely unprepared to prevent a deep water well blowout and stop the worst oil leak in history (¶¶ 217-249).

**The February 26, 2010 Statements**

319.     On February 26, 2010, BP released its 2009 Annual Review in which it touted its deepwater Gulf of Mexico operations and reaffirmed its alleged commitment to safety. In particular, BP stated:

> ***In Exploration and Production our strategy is to invest to grow production safely, reliably and efficiently*** by strengthening our portfolio of leadership positions in the world's most prolific hydrocarbon basins, enabled by the development and application of technology and strong relationships based on mutual advantage.
>
> ***
>
> ***Safety, both personal and process, remains our highest priority***.

133

The 2009 Annual Review also contained a "Chairman's letter," that assured investors about BP's risk management practices. For example, the Chairman's letter falsely stated, in part, that:

> Risk remains a key issue for every business, but at BP it is fundamental to what we do. We operate at the frontiers of the energy industry, in an environment where attitude to risk is key. The countries we work in, the technical and physical challenges we take on and the investments we make – these all demand a sharp focus on how we manage risk. We must never shrink from taking on difficult challenges, but ***the board will strive to set high expectations of how risk is managed and remain vigilant on oversight***.

320.    The 2009 Annual Review also contained a "Group chief executive's review," signed by Defendant Hayward. In addition to emphasizing BP's supposed commitment to safety, Hayward also boasted of the Company's deepwater Gulf of Mexico operations and its ability to manage risk while operating at the frontiers of the industry. More specifically, Hayward's letter falsely claimed, in part, that:

> ***Our priorities have remained absolutely consistent – safety, people and performance – and you can see the results of this focus with improvements on all three fronts***. This year we have increased emphasis on operational efficiency, with a particular focus on compliance and continuous improvement. ***Achieving safe, reliable and compliant operations is our number one priority*** and the foundation stone for good business.
>
> ***
>
> BP has always operated at the frontiers of the energy industry and our core strengths are more relevant and valuable than ever. BP's experience, skills, capability, technology and access to markets enable resource holders to maximize returns over the long term. ***We continue to show our ability to take on and manage risk***, ***doing the difficult things that others either can't do or choose not to do***.

321.    The foregoing statements, which caused BP securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by

Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)     Defendants falsely portrayed improvements in safe, reliable and compliant operations and claimed that BP was able to "take on and manage risk," when, as the Presidential Commission Report found, BP lacked "consistent and reliable risk-management processes – and thus has been unable to meet its professed commitment to safety";

(b)     Defendants falsely portrayed BP's operations as safe when, in fact, BP was expanding its deepwater drilling operations without implementing adequate operational protocols and safety measures necessary to reduce the risk of catastrophic failure, thereby increasing the Company's exposure to risk (¶¶ 78-95, 109, 192);

(c)     Defendants misrepresented BP's true risks associated with deepwater drilling in that they failed to disclose the multiple safety failures and near-failures that BP had experienced in its deepwater drilling operations as well as BP's audit of the *Deepwater Horizon,* which found equipment failures serious enough to lead to personal injury and environmental damage, rendering their statements materially false and misleading (¶¶ 53-63, 81-83, 98-103);

(d)     Defendants misrepresented the OMS as BP was, in fact, using differing safety practices country-by-country in order to save time and money  (¶¶ 105-107);

(e)     Defendants misrepresented BP's commitment to safety in that they failed to disclose that BP had implemented safety budget cuts and staff reductions  that negatively impacted safety, including a 33% reduction in the Group Compliance and Ethics department budget and a 44% reduction in the Global Compliance and Ethics department budget (¶¶ 114-120); and

135

(f)     Defendants misrepresented BP's risk profile in comparison to its competitors as BP's deepwater Gulf of Mexico operations created increased risk for the Company relative to its competitors, who typically operated at lower depths and had more robust safety programs (¶¶ 107-112).

**The March 2, 2010 Statements**

322.     On March 2, 2010, BP conducted its 2010 Strategy Presentation (in which Defendants Conn, Inglis, and Hayward participated).  During the presentation, certain of the Defendants falsely assured investors that safety was BP's number one priority and remained so even as the Company improved efficiency.  In addition, these Defendants falsely stated, in part, that:

> [Hayward:] ***Our focus on safe and reliable operations is now strongly embedded in our business***; we are continuing to build the core capabilities of our people; and we have started to see the benefits of improved performance flowing through to the bottom line. . . .  ***Safety remains our number one priority*** and we can see clear progress.
>
> ***
>
> In summary, ***we are strengthening the safety culture throughout our business***, and building a track record that we intend to become industry leading.
>
> ***
>
> We will vigorously drive cost and capital efficiency whilst at the same time maintaining our ***first priority of safe and reliable operations***.
>
> ***
>
> Our goal over the next few years is to realise the latent potential of our asset base by improving the efficiency and effectiveness of everything we do, whilst at the same time maintaining our ***priority of safe, reliable operations***.
>
> ***

[Inglis:]  Let's now look at the ways in which we strengthened our portfolio in 2009.  We added to our exploration inventory; deepening in the Gulf of Mexico, Egypt and Indonesia.

\*\*\*

Our strategy is clear.  *We invest to grow production safely, reliably and efficiently.*

\*\*\*

There is one important caveat: *safe and reliable operations always come first, whatever cost efficiency measures we undertake*.

\*\*\*

[Conn:] *Safe and reliable operations remain the no. 1 priority*.  In 2009 we had one of the best years in terms of safety performance, with *many of our personal and process safety measures comparing favorably with industry peers* and no workforce fatalities.

323.    The foregoing statements, which caused BP securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)    Defendants falsely portrayed the priority of safe, reliable operations when in fact, BP was expanding its deepwater drilling operations without implementing adequate operational protocols and safety measures necessary to reduce the risk of catastrophic failure, thereby increasing the Company's exposure to risk (¶¶ 78-95, 109, 192).

(b)    Defendants misrepresented the true risks associated with deepwater drilling in that they failed to disclose the multiple safety failures and near-failures that BP had experienced in its deepwater drilling operations as well as BP's audit of the *Deepwater Horizon,* which found equipment failures serious enough to lead to personal injury and environmental damage,  rendering their statements materially false and misleading (¶¶ 53-63, 81-83, 98-103);

137

(c)      An internal BP strategy document issued in December 2008 warned BP executives of "major" process-safety concerns in the Gulf of Mexico that permitted the accumulation of risks prior to and in response to incidents and therefore, increased the likelihood and severity of "process-safety related incidents."  (¶ 19);

(d)      Defendants falsely represented that BP was strengthening its safety culture, when in fact BP engaged in a systematic pattern of retaliation against workers who reported safety violations (¶¶ 136-150);

(e)      Defendants misrepresented BP's commitment to safety in that they failed to disclose that BP had implemented safety budget cuts and staff reductions  that negatively impacted safety, including a 33% reduction in the Group Compliance and Ethics department budget and a 44% reduction in the Global Compliance and Ethics department budget (¶¶ 114-120);

(f)      Defendants falsely represented that BP did not sacrifice safety when, in fact, BP routinely did so by, for example, not using more reliable blowout preventers because of their added cost (¶ 94); and

(g)      Defendants falsely represented that BP's safety performance compared favorably with that of its competitors when, in fact,  BP's (i) focus on high-risk deepwater operations, (ii) failure to adopt adequate operational protocols and safety measures and (iii) failure to implement industry best practices increased its potential liabilities beyond those of its competitors (¶¶ 78, 94-95, 104-113, 193).

**The March 5, 2010 Statements**

324.      On March 5, 2010, BP filed its 2009 Annual Report with the SEC on Form 20-F, which was signed by Defendants Hayward and Grote.  In the report, BP continued to tout

its position as the largest producer in deepwater Gulf of Mexico operations while delivering

safety in its operations.  In addition, the Form 20-F falsely stated, in part, that:

> ***The priorities that drove our success in 2009 – safety, people and performance – remain the foundation of our agenda*** as we build on our momentum and work to further enhance our competitive position. . . .  To meet growing world demand, BP is committed to exploring, developing and producing more fossil fuel resources; manufacturing, processing and delivering better and more advanced products; and enabling the transition to a lower-carbon future.  ***We aim to do this while operating safely, reliably and in compliance with the law****. . . .*

> Our intention is to generate and sustain business momentum and growth through a rigorous process of continuous improvement and an ***ongoing focus on safety, people and performance****. . . .*

> Safe, reliable and compliant operations remain the group's first priority. A key enabler for this is the ***BP operating management system (OMS), which provides a common framework for all BP operations, designed to achieve consistency and continuous improvement in safety and efficiency****.*

> \*\*\*

> ***In Exploration and Production, safety, both personal and process, remains our highest priority****. . .*

> ***BP's operating management system (OMS) provides us with a systematic framework for safe, reliable and efficient operations****.*  Throughout 2009, OMS helped us to deliver continuous improvement in the way we manage our people, processes, plant and performance.

> From onshore production facilities to offshore platforms, a total of 47 exploration and production sites had completed their transition to OMS by the end of 2009. The remaining seven sites are on track to transition to OMS in 2010.

> \*\*\*

> ***Our priorities [for Exploration and Production] remain the same — safety, people and performance, focusing on the delivery of safe, reliable and efficient operations****.*

> In 2010, we aim to use the momentum generated in 2009 to continue to improve operational, cost and capital efficiency, while ensuring we maintain our ***priorities of safe, reliable and efficient operations****.*

> \*\*\*

139

Deepwater Gulf of Mexico is our largest area of growth in the US. In addition, we are the largest producer and acreage holder in the region.

\*\*\*

***Safety, people and performance are BP's top priorities.  We constantly seek to improve our safety performance through the procedures, processes and training programmes that we implement in pursuit of our goal of 'no accidents, no harm to people and no damage to the environment'.***

\*\*\*

***In 2009, BP's safety record continued to improve*** . . . .

This performance follows several years of intense focus on training and procedures across BP. ***BP's operating management system (OMS), which provides a single operating framework for all BP operations***, is a key part of continuing to drive a rigorous approach to safe operations.  2009 marked an important year in the continuing implementation of OMS.

\*\*\*

Taking a systematic approach is integral to improving safety and operating performance in every BP site. Our OMS covers all areas from process safety, to personal health, to environmental performance.  ***By applying consistent principles and processes across the BP group's operations, the system provides for an integrated and consistent way of working***. These principles and processes are designed to simplify the organization, improve productivity, enable consistent execution and focus BP on performance

\*\*\*

***We continue to strengthen our processes for managing compliance with environmental regulations*** in each of the countries in which we operate.  In addition, each employee is required to comply with the health, safety and environmental requirements of the BP code of conduct.  We expect our partners, suppliers and contractors to comply with legal requirements and operate consistently with the principles of our code of conduct.

\*\*\*

In the US, former US district court judge Stanley Sporkin acts as an ombudsperson. ***Employees and contractors can contact him confidentially to report any suspected breach of compliance, ethics or the code of conduct, including safety concerns***.

140

*We take steps to identify and correct areas of non-compliance* and take disciplinary action where appropriate.

***

Following the tragic incident at the Texas City refinery in 2005 the [Safety, Ethics, and Environment Assurance] committee has observed a number of key developments, including: the establishment of a safety & operations (S&O) function with the highest calibre of staff; ***development of a group-wide operating management system (OMS) which is being progressively adopted by all operating sites***; ***the establishment of training programmes in conjunction with MIT that are teaching project management and operational excellence***; ***the dissemination of standard engineering practices throughout the group***; and the formation of a highly experienced S&O audit team formed to assess the safety and efficiency of operations and recommend improvements. ***Throughout this time the group chief executive has made safety the number one priority.***

325.     The foregoing statements, which caused BP securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)     Defendants falsely portrayed BP's commitment to process and personal safety and that OMS provided BP with a framework for safe, consistent and reliable operations, when, in fact, BP was expanding its deepwater drilling operations without implementing adequate operational protocols and safety measures to reduce the risk of catastrophic failure thereby increasing the Company's exposure to risk (¶¶ 78-95, 109, 192);

(c)     Defendants misrepresented BP's true risks associated with deepwater drilling in that they failed to disclose the multiple safety failures and near-failures that BP had experienced in its deepwater drilling operations as well as BP's audit of the *Deepwater Horizon,* which found equipment failures serious enough to lead to personal injury and environmental

141

damage, thereby rendering their statements materially false and misleading (¶¶ 53-63, 81-83, 98-103);

(d)     An internal BP strategy document issued in December 2008 warned BP executives of "major" process-safety concerns in the Gulf of Mexico that permitted the accumulation of risks prior to and in response to incidents and therefore increased the likelihood and severity of "process-safety related incidents"  (¶ 19);

(e)     Defendants falsely represented that OMS applied "consistent principles and processes across the BP group's operations" when, in fact, OMS allowed BP to use differing safety practices country-by-country in order to save time and money (¶¶ 105-107);

(f)     Defendants misrepresented BP's commitment to safety as they failed to disclose that BP had implemented safety budget cuts and staff reductions that negatively impacted safety, including a 33% reduction in the Group Compliance and Ethics department budget and a 44% reduction in the Global Compliance and Ethics department budget (¶¶ 114-120);

(g)     Defendants misrepresented BP's risk profile and its risks from its deepwater Gulf of Mexico operations relative to its competitors, who typically operated at lower depths and had more robust safety programs (¶¶ 107-112); and

(h)     Defendants falsely represented that BP was committed to complying with environmental regulations.  In fact, BP's contingency plans to deal with an oil spill in the Gulf of Mexico (including the environmental impacts of such a spill) contained numerous errors and gross deficiencies, leading to the *ad hoc* implementation of untested measures, such as the unprecedented use of chemical dispersants contrary to direct orders from the EPA  (¶¶ 217-246).

**The March 9, 2010 Statements**

326.        On March 9, 2010, Defendant Inglis gave a speech at CERA Week in Houston, Texas.  BP posted a transcript of the speech on its publicly-accessible website.  In the speech, Inglis boasted of BP's ability to operate in deepwater but failed to mention the heightened risks associated with doing so.  For example, Inglis falsely stated, in part, as follows:

> Deepwater has meant pushing our boundaries in several ways besides the sheer depth of water and wells. ***We've developed the capability to create advanced floating production facilities, complex riser systems and subsea equipment with the ability to integrate the elements to cope with extreme temperatures, pressures, and oceanographic conditions. And that has enabled BP to become the leading deepwater IOC***.

327.        The foregoing statements, which caused BP securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)        Inglis misrepresented BP's risk profile concerning deepwater drilling in that he failed to disclose that — whatever BP's technical abilities may have been in theory — the Company did not have adequate operational protocols and safety measures in place to enable it to operate in a safe, reliable manner, particularly in a deepwater environment (¶¶ 78-95, 109, 192);

(b)        An internal BP strategy document issued in December 2008 warned BP executives of "major" process-safety concerns in the Gulf of Mexico that permitted the accumulation of risks prior to and in response to incidents and therefore, increased the likelihood and severity of "process-safety related incidents"  (¶ 19);

(c)        Inglis misrepresented BP's true risk profile associated with deepwater drilling in that he failed to disclose the multiple safety failures and near-failures that BP had

143

experienced in its deepwater drilling operations as well as BP's audit of the *Deepwater Horizon,* which found equipment failures serious enough to lead to personal injury and environmental damage, rendering his statements materially false and misleading (¶¶ 53-63, 81-83, 98-103);

        (d)    Inglis misrepresented the risks of BP's deepwater Gulf of Mexico operations relative to its competitors, who typically operated at lower depths and had more robust safety programs rendering his statements materially false and misleading  (¶¶ 107-112); and

        (e)    Inglis misrepresented BP's ability to respond to a deepwater oil spill as BP was unprepared to contain an oil leak occurring at a great depth and that, in the event of such leak, oil could flow for several months before being contained (¶¶ 217-246).

**The March 22, 2010 Statements**

        328.    On March 22, 2010, Defendant Inglis delivered a speech at the Howard Weil Energy Conference in New Orleans, Louisiana, in which he discussed the nearby deepwater Gulf of Mexico operations.  BP posted a transcript of the speech on its publicly-accessible website. During the presentation, Inglis falsely stated, in part, as follows:

> This record shows the result of learning from experience – identifying and building our core strengths which lie in deepwater, gas – in particular unconventional gas, and getting the most out of the world's giant oil fields.  Let me say a little about each.
>
> Firstly, Deepwater.  Among the majors, ***we are now the leading deepwater producer and a lot of our deepwater experience has, of course, been gained in the Gulf of Mexico***.
>
> This is where we have pioneered the advanced seismic imaging techniques that have enabled us to see below the salt and go ever deeper into the tertiary layer.
>
>                         ***
>
> And this is the latest chapter in an ongoing story of learning how to find and produce oil at unprecedented depths, temperatures and pressures, with advanced

floating production facilities, complex riser systems and leading edge subsea equipment.

\*\*\*

We are currently planning to make final investment decisions for 24 new major projects in the next two years. Each project has been high-graded through our project selection and progression process. **They are concentrated in the Gulf of Mexico**, the North Sea, Azerbaijan and Angola – **high margin production areas that improve the portfolio and enable profitable growth.**

\*\*\*

**Safety and operational integrity underpins everything we do, and we are now in the final phase of rolling out our operating management system that provides a single, consistent framework for our operations**, **covering all areas from personal and process safety to environmental performance**.  And I am pleased to say that in 2009 we saw continuing improvement in all aspects.

329.     The foregoing statements, which caused BP securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)     Inglis falsely portrayed BP's operations as safe and as having a lower execution risk when, in fact, BP was expanding its deepwater drilling operations without implementing adequate operational protocols and safety measures to reduce the risk of catastrophic failure, thereby increasing the Company's exposure to risk (¶¶ 78-95, 109, 192);

(b)     Inglis misrepresented BP's risks in claiming that deepwater drilling operations in the Gulf of Mexico would "improve the portfolio and enable profitable growth," as he failed to disclose the multiple safety failures and near-failures that BP had experienced in its deepwater drilling operations (¶¶ 81-83, 98-103);

(c)     Inglis misrepresented  BP's deepwater Gulf of Mexico operations increased risk for the Company relative to its competitors, who typically operated at lower

145

depths and had more robust safety programs rendering his statements materially false and misleading (¶¶ 53-63, 81-83, 98-103);

(d)     Inglis misrepresented BP's ability to contain an oil spill and liability exposure as a result in that he failed to disclose that BP was unprepared to contain an oil leak occurring at a great depth and that, in the event of such leak, oil could flow for several months before being contained (¶¶ 217-246); and

(e)     Inglis falsely represented that OMS provided a "single, consistent framework" for operations when, in fact, BP was using differing safety practices country-by-country in order to save time and money  (¶¶ 105-107).

**The March 23, 2010 Statements**

330.     On March 23, 2010, Defendant Hayward delivered a speech at the Peterson Institute for International Economics in Washington, D.C. in which he discussed BP's changes to its safety program following the Texas City, Texas refinery explosion.  BP posted a transcript of the speech on its publicly-accessible website.  During the presentation, Hayward falsely stated, in part, that:

> Five years ago on this day, fifteen people died and many more were injured, when an explosion tore through our Texas City refinery**.**
>
> *That tragic accident has changed in a profound and fundamental way our approach to safety and operations integrity - providing a safe working environment is a paramount responsibility, and our first and foremost priority.*

331.     The foregoing statements, which caused BP securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

146

(a)      Hayward falsely portrayed BP's operations as safe when, in fact, BP was expanding its deepwater drilling operations without implementing adequate operational protocols and safety measures necessary to reduce the risk of catastrophic failure, thereby increasing the Company's exposure to risk (¶¶ 78-95, 109, 192);

(b)      Hayward misrepresented the OMS in that BP was, in fact, using differing safety practices country-by-country in order to save time and money  (¶¶105-107

(c)      Hayward falsely represented that BP's "paramount responsibility" and its "first and foremost priority" was providing a safe work environment when, in fact, BP's lack of operational and safety protocols routinely resulted in decisions that sacrificed safety in order to save time and money (¶¶ 94, 174); and

(d)      Hayward misrepresented BP's commitment to safety in that he failed to disclose that BP had implemented safety budget cuts and staff reductions  that negatively impacted safety, including a 33% reduction in the Group Compliance and Ethics department budget and a 44% reduction in the Global Compliance and Ethics department budget  (¶¶ 114-120).

**The April 15, 2010 Statements**

332.      On April 15, 2010, Defendant Hayward gave a speech at the 2009 Annual General Meeting.  BP posted a transcript of the speech on its publicly-accessible website.  In the speech, Hayward reported on the state of BP's safety program and touted the Gulf of Mexico as a "high margin production area."  In addition, Hayward falsely stated, in part, that:

> Our priorities – which lie at the heart of all our operations – remain safety, people and performance. This is what we call our 'Forward Agenda'.  ***Our focus on safe and reliable operations is now strongly embedded in all our businesses***; we are continuing to build on the core capabilities of our people; and ***we have started to see the benefits of improved operational performance flowing through to the bottom line.***

Let me address each of these in turn.

> ***Safety remains our number one priority and I'm pleased to report we can see clear progress.*** There has been a significant reduction in the frequency of recordable injuries and the number of major incidents related to integrity failures has also fallen. ***At the same time we're reducing containment losses in our operations.***

333.     The foregoing statements, which caused BP securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)     An internal BP strategy document issued in December 2008 warned BP executives of "major" process-safety concerns in the Gulf of Mexico that permitted the accumulation of risks prior to and in response to incidents and therefore increased the likelihood and severity of "process-safety related incidents"  (¶ 19);

(b)     Hayward falsely portrayed BP's operations as "safe and reliable" resulting in "improved operational performance flowing through to the bottom line," when, in fact, BP was expanding its deepwater drilling operations without implementing adequate operational protocols and safety measures necessary to reduce the risk of catastrophic failure, thereby increasing the Company's exposure to risk and unprecedented financial loss (¶¶ 78-95, 109, 192);

(c)     Hayward falsely represented that BP's "first priority" was safety when, in fact, BP's lack of operational and safety protocols routinely resulted in decisions that sacrificed safety in order to save time and money (¶¶ 94, 174);

(d)     Hayward misrepresented BP's true risks associated with deepwater drilling in that he failed to disclose the multiple safety failures and near-failures that BP had

experienced in its deepwater drilling operations as well as BP's audit of the *Deepwater Horizon,* which found equipment failures serious enough to lead to personal injury and environmental damage, thereby rendering his statements materially false and misleading  (¶¶ 53-63, 81-83, 98-103);

(e)      Hayward misrepresented the OMS in that BP was, in fact, using differing safety practices country-by-country in order to save time and money (¶¶ 105-107);

(f)      Hayward misrepresented BP's commitment to safety in that he failed to disclose that BP had implemented safety budget cuts and staff reductions  that negatively impacted safety, including a 33% reduction in the Group Compliance and Ethics department budget and a 44% reduction in the Global Compliance and Ethics department budget  (¶¶ 114-120); and

(g)      In stating that BP was "reducing its containment losses," Hayward misrepresented BP's ability to respond to an oil spill in that he failed to disclose that BP's Oil Spill Response Plan contained numerous errors, gross deficiencies and were wholly inadequate to respond to a deepwater oil spill (¶¶ 217-224).

334.      On the same day, BP issued its 2009 Sustainability Review, which reiterated that "[s]afety, people, and performance are BP's top priorities."  It stated further, in part:

Systematic approach to safe and  environmentally responsible operations

BP's operating management system *(OMS) provides a single framework for all BP operations to follow*, covering all areas from process safety, to personal health, to environmental performance.

Providing an integrated and consistent way of working, the *OMS helps ensure that a rigorous approach to safe operations continues to be taken*. Its principles and processes are designed to simplify the organization, improve productivity, enable consistent execution and focus BP on performance.

335.    The foregoing statements, which caused BP securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)    An internal BP strategy document issued in December 2008 warned BP executives of "major" process-safety concerns in the Gulf of Mexico that permitted the accumulation of risks prior to and in response to incidents and therefore, increased the likelihood and severity of "process-safety related incidents"  (¶ 19);

(b)    Defendants falsely represented that safety was one of BP's "top priorities" when, in fact, BP's lack of operational and safety protocols routinely resulted in decisions that sacrificed safety in order to save time and money  (¶¶ 94, 174);

(c)    Defendants falsely represented that OMS "provides a single framework for all BP operations to follow" when, in fact, OMS allowed BP to use differing safety practices country-by-country in order to save time and money  (¶¶ 105-107).

***As The Truth Begins to Emerge BP Continues To Deceive Investors***

**April 20, 2010**

336.    On the evening of April 20, 2010, after the markets closed, the Macondo well suffered a significant – yet preventable – blowout, leading to a fatal explosion aboard the *Deepwater Horizon* killing 11 crew members and injuring many others.  After attempts to stop the blowout failed, the surviving crew members abandoned ship, as the rig became engulfed in flames.  Oil and gas spewed from the Macondo well onto the rig and into the Gulf of Mexico.

**The April 21, 2010 Statements**

337.     On April 21, 2010, BP issued two press releases about the *Deepwater Horizon* explosion.  In the first press release, BP confirmed a statement by Transocean reporting a fire aboard the rig.  In the second press release, BP offered its full support to Transocean and said it "stood ready to assist" in responding to the tragedy.  However, neither press release acknowledged that oil was currently leaking from the Macondo well into the Gulf of Mexico.

338.     The foregoing statements, which enabled BP securities to continue to trade at artificially inflated prices, were materially false and misleading when made, and were known by Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)     Defendants failed to acknowledge that oil was leaking from the Macondo well site even though Defendants knew within hours that oil was leaking.  As Defendant McKay testified to before the Subcommittee on Environmental and Public Works on May 11, 2010, the "first spill response portions of [the Gulf of Mexico spill plan] were called in two hours after the explosion;"

(b)     Defendants falsely represented that BP was "ready to assist" in responding to the incident when, in fact, BP's Oil Spill Response Plan contained numerous errors, gross deficiencies and were wholly inadequate for responding to a deepwater well blowout and oil spill (¶¶ 217-224); and

(c)     Defendants failed to disclose that BP was completely unprepared to stop the leak or contain the oil spill (¶¶ 217-246).

**April 22, 2010**

339.     At approximately 10:22 a.m. on April 22, 2010, the *Deepwater Horizon* rig

sank, further damaging the riser that had connected the rig to the wellhead on the ocean floor.

**April 24 - 26, 2010**

340.     On Saturday, April 24, 2010, while the unsuccessful attempts to activate the

BOP continued, ROVs discovered additional leaks in the broken riser.  Although officials had

initially estimated that it would take the ROVs 24 to 36 hours to deploy the BOP, by Monday,

April 26, 2010, oil continued to spew into the Gulf of Mexico.  This news caused BP ADSs to

fall $1.97 per ADS, closing at $57.91 per ADS or more than 3%; BP's ordinary shares suffered

similarly, dropping 31.8p, or 5%, to close at 610p per share on April 27, 2010.

**The April 28 - 29, 2010 Statements**

341.     On April 28, 2010, after the markets closed, Coast Guard leader Rear

Admiral Landry announced during a joint press conference with BP that NOAA had increased its

estimate of the oil flow rate from 1,000 to 5,000 barrels per day.

342.     During the joint press conference, Defendant Suttles again reiterated that

BP's best estimate was that ***1,000 barrels of oil per day were flowing from the Macondo well***.

In addition, Suttles stated, in part, as follows:

> Late this afternoon, while monitoring the blowout preventer area, which we have
> done continuously since the event began, we discovered a new point of leak.  This
> leak is just beyond the top of the blowout preventer in the pipe work called the
> riser.  Given the location, ***we do not believe this changes the amount currently***
> ***estimated to be released***.

343.     The following day, April 29, 2010, Department of Homeland Security Janet

Napolitano announced that "***today I will be designating that this is a spill of national***

***significance***."

344.    On the same day, April 29, 2010, Defendant Suttles conducted several media interviews to discuss the oil flow rate from the Macondo well.  For example, during an interview with The Early Show, Suttles stated, in part, as follows:  "*I think that somewhere between one and five thousand barrels a day is probably the best estimate we have today*."  Suttles made a nearly identical false statement later in the day during an interview with The Today Show.

345.    On the news that spill estimates had increased to 5,000 barrels per day and Secretary Napolitano's designation of the spill as one of "national significance," BP ADSs fell from $57.34 per ADS on April 28, 2010 to close at $52.56 per ADS on April 29, 2010, a decline of $4.78 per ADS or more than 8%; BP's ordinary shares fell 40.8p or almost 7% to close at 584.2p on that same day.

346.    Although the price of BP securities fell in response to this news, the price of BP's securities were still artificially inflated due to the false and misleading statements made by Defendant Suttles on April 28 and 29, 2010.  Each of these statements was materially false and misleading when made, and were known by Defendants to be false at that time, or were made with reckless disregard for the truth because they falsely represented that the amount spilling from the Macondo well was between 1,000 and 5,000 barrels of oil per day.   In contrast, Defendants failed to disclose that the Company's "*best estimate*" of the amount of oil flowing from the well was more likely between 5,758 barrels per day and a high of 14,266 barrels per day – well above the amount claimed by Suttles.  These figures were provided to BP's senior management in two internal BP document dated April 26, 2010 and April 27, 2010 – *i.e., before* Suttles made his public misrepresentations.   In a hearing before the U.S House of Representatives on May 26, 2010, Representative Edward Markey was outraged about Suttles' misrepresentations and stated, in part, as follows:

Yesterday, BP provided me with an internal document dated April 27, 2010, and cited as BP Confidential that shows a low estimate, a best guess, and a high estimate of the amount of oil that was leaking. According to this BP document, the company's low estimate of the leak on April 27 [2010] was 1,063 barrels per day. *Its best guess was 5,758 barrels per day. Its high estimate was 14,266 barrels per day.*

\*\*\*

BP has also turned over another document dated April 26 [, 2010] which includes a 5,000 barrel per day figure as well. *So when BP was citing the 1,000-barrel per day figure to the American people on April 28th, their own internal documents from the day before show that their best guess was a leak of 5,768 barrels per day and their high estimate was more than 14,000 barrels* that were spilling into the Gulf every day.

347.    Likewise, in a May 27, 2010 news conference, President Obama remarked that BP had failed to be fully forthcoming in describing the rate of the oil leak:

*I think it is a legitimate concern to question whether BP's interests in being fully forthcoming about the extent of the damage is aligned with the public interest.*  I mean, their interests may be to minimize the damage, and to the extent that they have better information than anybody else, to not be fully forthcoming.  So my attitude is *we have to verify whatever it is they say about the damage*.

This is an area, by the way, where I do think our efforts fell short.  And I'm not contradicting my prior point that people were working as hard as they could and doing the best that they could on this front.  But I do believe that *when the initial estimates came that there were -- it was 5,000 barrels spilling into the ocean per day*, that was based on satellite imagery and satellite data that would give a rough calculation.  *At that point, BP already had a camera down there, but wasn't fully forthcoming in terms of what did those pictures look like*.

348.    Also, in his book on the Deepwater Horizon incident, former drilling engineer Bob Cavnar explained that "*[n]o one in the industry ever believed the flow were less than 20,000 barrels a day*."  In an interview, Cavnar said that the characteristics of the Macondo well, in particular the fact that it was drilled into "High Pressure High Temperature" pay sands and the specific fact that the well's pressure had blown out the *Deepwater Horizon*'s riser,

154

dictated a higher flow rate.  "If pressure directly from the pay sands blows out a major deepwater rig, by definition it's going to result in a very significant flow of oil," he said.

349.    It is not surprising that Defendants continuously misrepresented the known amounts of oil that were being released from the well.  As noted in a *Rolling Stone* article dated June 8, 2010:  "***For BP, the motive [to downplay the amount of oil seeping into the Gulf] is financial.  Under the Clean Water Act, the company could owe fines of as much as $4,300 for every barrel [of oil] spilled, in addition to royalties for the oil it is squandering***."

**May 3, 2010**

350.    On May 3, 2010, after initially blaming Transocean and others for the Macondo well blowout and spill, BP admitted that it was fully responsible for the disaster in the Gulf of Mexico.  More specifically, Defendant Hayward told NPR's Steve Inskeep that:  "***It is indeed BP's responsibility to deal with this, and we are dealing with it . . . .  We will absolutely be paying for the cleanup operation.  There is no doubt about that.  It's our responsibility – we accept it fully***."  On this news, the Company's ADSs fell from $52.15 per ADS on Friday, April 30, 2010 to close at $50.19 per ADS on Monday, May 3, 2010, a decline of $1.96 per ADS or almost 4%; BP's ordinary shares fell from 575.5p per share to close at 552.84p per share on Tuesday, May 4, 2010.[6]

**The May 5, 2010 Statements**

351.    On May 5, 2010, Defendant Suttles participated in a press conference in Robert, Louisiana during which he discussed the Company's use of the cofferdam.  For example, Suttles stated, in part, as follows:

> Over the weekend, then, we'll be attaching that dome to the drillship Enterprise with a riser pipework assembly, which will allow the oil to flow up to the surface and be processed.  So if all goes to plan, we should begin to start that operation,

---

[6]  The London Stock Exchange was closed on Monday, May 3, 2010 for Early May Bank Holiday.

the beginning of trying to process the fluids on the surface and stop the spilling to the sea, on Monday.

352.     The foregoing statement, which caused BP securities to trade at artificially inflated prices, was materially false and misleading when made, and was known by Defendants to be false at that time, or was made with reckless disregard for the truth because it failed to disclose that the use of the cofferdam was highly likely to fail and, indeed, had never been used in a deepwater environment.

353.     Also on May 5, 2010, Defendant Hayward conducted an interview with journalists from the Houston Chronicle, at BP's offices in Houston.  In reference to the oil flow rate at the Macondo well, Hayward stated, "A guesstimate is a guesstimate.  And the guesstimate remains 5,000 barrels a day."

354.     The foregoing statement, which caused BP securities to trade at artificially inflated prices, was materially false and misleading when made, and was known by Defendants to be false at that time, or was made with reckless disregard for the truth because it falsely represented that the amount spilling from the Macondo well was approximately 5,000 barrels of oil per day.  In contrast, Defendants failed to disclose that the Company's "best estimate" of the amount of oil flowing from the well was actually between 5,758 barrels per day and 14,266 barrels per day – significantly larger than the amount claimed by Hayward.

**The May 6, 2010 Statements**

355.     On May 6, 2010, Defendant Dudley delivered a speech at the Chief Executives' Club in Boston, Massachusetts.  BP posted a transcript of the speech on its publicly-accessible website.  In the speech, Dudley discussed the *Deepwater Horizon* rig and its safety mechanisms.  More specifically, Dudley falsely stated, in part, that:

At the time of the explosion, the Deepwater Horizon drilling rig had been working for BP for almost nine years. . . . *The rig had handled some of the industry's greatest technical challenges, and her safety record had been excellent and had recently won awards*.

***

A Blowout Preventer is used on every oil and gas well drilled in the world today – onshore and offshore.

*These mechanisms are regularly inspected and tested*.  If they don't pass the test, drilling operations are made safe and the system is replaced or repaired and retested.

*BOPs are designed to be fail-safe*.  This Blowout Preventer was not. It failed to close, or to close completely.

356.        The May 6, 2010 statements by Dudley, which caused BP securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)        Dudley falsely represented that the *Deepwater Horizon*'s safety record had been excellent when, in fact, there were problems dating back to the 2005 audit of the *Deepwater Horizon*'s BOP and as revealed by the 2009 audit (¶¶ 61-62).  Indeed, ROV operator Tyrone Benton ("Benton") testified before the Joint Investigation team on July 23, 2010 and said that he had discovered a leak in the *Deepwater Horizon*'s BOP sometime between "February 24 and March 13[, 2010]."  After discovering the leak, Benton informed representatives of both BP and Transocean of the serious problem.  As reported by *The Guardian* on June 21, 2010:  "Benton says that he spotted a leak on the rig's Blowout Preventer . . . He told the BBC's Panorama programme that both *BP and Transocean, who owned the rig, were informed of the leak, and the faulty part – a control pod – was switched off rather than being repaired*";

157

(b)     Dudley failed to disclose that BP had modified the *Deepwater Horizon*'s BOP to remove a second blind sheer ram, further reducing the chance that the BOP could work effectively  (¶ 95);

(c)     Dudley misrepresented that BOP's are regularly inspected and tested, falsely implying and or misleading investors that the BOP on the *Deepwater Horizon* was inspected and passed its testing when, in fact, the BOP on the *Deepwater Horizon* was found to have  a hydraulic leak and BP deactivated the control pod, rather than repair the leak ;

(d)     Dudley misled investors that the BOP on the Deepwater Horizon was inspected and tested and passed those tests when, in fact, four weeks before the explosion, chunks of the BOP's rubberized annular preventer had surfaced after a pressure-related incident indicating that there were operational problems with the BOP (¶ 203); and

(e)     Dudley failed to disclose that on March 10, 2010, BP sought and obtained a postponement of MMS's inspection of the BOP.

***Post Class Period Statements and Events***

**The Saturday May 29 – June 1, 2010 Statements**

357.     On Saturday, May 29, 2010, while trading markets were closed, BP revealed that the "top kill" procedure it had begun a few days earlier had failed.  The failure of "top kill" indicated that BP would be unable to stop the oil spill and would have to rely on efforts to try to contain the spill while it completed the relief wells.  The failed attempt to kill the well by using the "top kill" and "junk shot" efforts shocked investors.  As noted by ABC News on Saturday, May 29, 2010:  "We begin tonight with ***breaking news*** from the Gulf*.  After so much talk that Top Kill was the best bet to plug the oil spill in the Gulf, BP announced just a short time ago that the effort has failed. . . . That live picture so many Americans have been keeping track of*

*[i.e., the oil spewing from the Macondo well], us included, confirms that the oil is still gushing into the Gulf.  This is another crushing blow when it comes on what is now day 40 of this crisis*."  Similarly, on that same day, the Agence France Presse reported, in part, that:  "*The announcement [that the top kill and junk short plans failed] is a stunning setback for efforts to halt what has become the worst oil spill in US history* . . ."  Moreover, *The Business Insider* made clear that the failure of the top kill would lead to BP's securities being "*slaughtered in London trading on Monday*."

358.    On that same day, *The New York Times* published an article entitled "Documents Show Early Worries About Safety of Rig."  The article provided *new* evidence that:

> Internal documents from BP show that there were serious problems and safety concerns with the Deepwater Horizon rig *far earlier than those the company described to Congress last week.*
>
> ***
>
> The documents show that in March, after several weeks of problems on the rig, BP was struggling with a loss of "well control."  *And as far back as 11 months ago, it was concerned about the well casing and the blowout preventer.*

359.    On Tuesday, June 1, 2010, minutes before the close of the U.S. market, U.S. Attorney General Eric Holder announced that the U.S. Department of Justice had opened formal criminal and civil probes into BP in response to the oil spill and its false assurances that it could stop the flow of oil.  On the disclosure of the failed top kill procedure and *The New York Times* article, the Company's ADSs fell from $42.95 per ADS on Friday, May 28, 2010 to close at $36.52 per ADS on June 1, 2010, a decline of $6.43 per ADS or approximately 15%; BP's ordinary shares also fell from 494.8p to 430p those same days, a decline of 64.8p or more than 13%.

159

**June 2, 2010**

360.    On June 2, 2010, Defendant Hayward admitted that it is "an entirely fair criticism"  to blame BP for the disorganized and poor cleanup effort because ***"[w]hat's undoubtedly true is that we did not have the tools you'd  want in your tool kit."*** to stop the leak from the Macondo well in the Gulf of Mexico in the aftermath of the explosion.

**June 9, 2010**

361.    On June 9, 2010, fears that the Company would suspend dividends caused a further decline in BP securities.  On this news, the Company's ADSs fell from $34.68 per ADS on June 8, 2010 to close at $29.20 per ADS on June 9, 2010, a decline of $5.48 per ADS or almost 16%.  BP's ordinary shares also fell from 408.9p per ordinary share to 391.9p  per ordinary share that same day, a decline of 17p or 4%.

362.    Speculation regarding the possibility that BP would suspend dividend payments continued on June 9, 2010.  An Associated Press Article published on the afternoon of June 9, 2010 entitled "Dividend Worries Weigh on BP Shares" explained, "Cutting the dividend would have a big impact in Britain, as BP accounts for around 12-13 percent of payments from companies in the blue-chip FTSE 100 index . . . ."  On this news, and after the markets re-opened, BP ordinary shares fell an additional 7% from 391.9p per share on June 9, 2010 to 365.5p per share on June 10, 2010.

**June 14, 2010**

363.    Then, on June 14, 2010, BP's Board of Directors met to discuss suspending the Company's dividend payments in light of the Company's agreement to setup a $20 billion claim fund for damages caused by Deepwater Horizon catastrophe.  On that date, *The New York Times* reported, in part, as follows:

To make sure that all claims are paid, the Obama administration has stepped up the pressure on the company, demanding that it set aside money to pay for future liabilities before paying dividends to shareholders, which now amount to about $10.5 billion annually. Senate Democrats are asking BP to set up a $20 billion cleanup fund. BP, which has spent about $1.5 billion on the cleanup so far, has said it expects to be able to pay all spill costs from its regular operating funds. ***But in response to the federal government's requests, BP's board met Monday to consider its options.*** A spokesman said the company did not expect to announce decisions about its dividend until after its chairman and its chief executive spoke with Mr. Obama on Wednesday at a meeting the president had called. ***A person with direct knowledge of the discussions said the board was considering three options: suspending payment of the dividend for two quarters, paying the dividend in bonus shares rather than cash, or placing an amount equal to the dividend payment in escrow while continuing to pay for the cleanup separately.***

364.     On this news, the Company's ADSs and ordinary common shares fell 10% and 8%, respectively.  Indeed, according to another news source:  "Shares in BP plunged again Monday [June 14, 2010] as the company's board discussed US demands that it suspend dividend payments until it pays for the cleanup of the Gulf oil spill."

## VIII.  LOSS CAUSATION

365.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.  Throughout the Class Period, the market prices of BP securities (both ADSs and ordinary shares) were artificially inflated as a direct result of Defendants' materially false and misleading statements and omissions.  For example, prior to the Deepwater Horizon incident, securities analysts touted BP's renewed dedication to safety and BP's operations in  the Gulf of Mexico as one of the main focuses for BP's future results:

- A February 28, 2008 analyst report from JP Morgan stated that "Safety and operations: although BP has already made significant progress in this area through the

implementation of the Baker panel recommendation and their 'sixpoint plan', safety and operations remains one of BP's main priorities."

- An October 9, 2009 analyst report from Bank of America stated that "[w]e believe that the focus of results will centre around . . . the ongoing exploration effort in the Gulf of Mexico (GoM) . . ."

- A February 1, 2010 analyst report from Dolmen Stockbrokers stated "we also foresee better production figures as a consequence of early restoration of operations at the company's US refineries and the ramping up of production in the Gulf of Mexico."

- A March 3, 2010 analyst report from Bank of America stated that "the development of recent deepwater discoveries in the GoM (eg, Tiber field) along with further growth from TNKBP is set to be the key drivers."

- A March 3, 2010 analyst report from JP Morgan described BP's Gulf of Mexico projects as "high margin."

- A March 12, 2010 analyst report from Bank of America stated that "[w]hilst BP has limited experience in Brazil, we would argue that their knowledge of the GoM – particularly in the Lower Tertiary area - is second to none and are clearly taking a positive view here."

366.     When the truth became known, the prices of BP securities declined precipitously as the artificial inflation was removed from the prices of these securities, causing substantial damage to Plaintiffs and members of the Class.  The charts below show the fluctuation of the price of BP securities up to, during, and following the Class Period.

BP ADS Reaction Throughout the Class Period



BP Ordinary Share Reaction Throughout the Class Period



367.    During the Class Period, BP's ADSs traded as high as $79.70 per ADS. Similarly, BP's ordinary shares traded as high as 655.40 pence per ordinary share during the Class Period.

368.    On April 20, 2010, prior to the explosion on the *Deepwater Horizon*, BP's ADSs and ordinary shares were trading at $60.48 and 655.40 pence, respectively, as Defendants continued to deceive investors regarding its true risk profile and its utter lack of process safety controls.  That night, after the markets closed, the explosion aboard the *Deepwater Horizon* occurred.

369.    Due to Defendants' ongoing misrepresentations and omissions regarding the explosion and resulting oil spill, the truth regarding Defendants' failure to implement process safety controls began to emerge on April 26, 2010, when officials announced that attempts to stop the spill had failed and oil was flowing into the Gulf of Mexico.  This news caused BP ADSs to fall from $59.88 per ADS on Friday, April 23, 2010 to close at $57.91 per ADS on Monday, April 26, 2010, a decline of $1.97 per ADS; BP's ordinary shares suffered similarly, dropping from 641.8p on April 26, 2010 to close at 610p per share on April 27, 2010, a decline of 31.8p per share.

370.    On April 29, 2010, NOAA increased its estimate regarding the amount of oil that was spewing into the Gulf of Mexico from 1,000 to 5,000 barrels per day and the U.S. government declared the Macondo disaster a spill of national significance.  This news caused BP ADSs to fall from $57.34 per ADS on April 28, 2010 to close at $52.56 per ADS on April 29, 2010, a decline of $4.78 per ADS or more than 8%; BP's ordinary shares fell 40.8p or almost 7% to close at 584.2p on that same day.

371.       On May 3, 2010, BP admitted full responsibility for the disaster in the Gulf of Mexico.  On this news, the Company's ADSs fell from $52.15 per ADS on Friday, April 30, 2010 to close at $50.19 per ADS on Monday, May 3, 2010, a decline of $1.96 per ADS; BP's ordinary shares fell from 575.5p per share to close at 552.84p per share on Tuesday, May 4, 2010.[7]

372.       On May 10, 2010, Defendant Hayward admitted that the volume of oil spilling into the Gulf of Mexico was far greater than BP's initial statements indicated.  Additionally, BP revealed that oil spill costs to date had reached $350 million.  In reaction to this news, BP's ADSs fell from $49.06 per ADS on Friday, May 7, 2010 to close at $48.75 on Monday, May 10, 2010, a decline of $0.31 per ADS; BP's ordinary shares fell from 561.29p to 549.2p per share that same day.

373.       On May 24, 2010, BP announced that the costs for remediating the oil spill to date had more than doubled, from $350 million to $760 million.  In addition, the Company announced that it was capturing less oil than it expected.  Finally, pressure on BP continued to grow because the U.S. government threatened to take over the oil spill response effort because of BP's lack of progress.  On this news, the Company's ADSs fell from $43.86 per ADS on Friday, May 21, 2010 to close at $41.86 per ADS on Monday, May 24, 2010, a decline of $2.00 per ADS; BP's ordinary shares fell from 517.75p to close at 493p that same day.

374.       On Saturday, May 29, 2010, while trading markets were closed, BP revealed that the "top kill" procedure it had begun a few days earlier had failed.  This was highly material to investors.  For example, ABC News reported the "***breaking news***" and stated, on Saturday, May 29, 2010, as follows: "We begin tonight with ***breaking news*** from the Gulf.  ***After so much talk that Top Kill was the best bet to plug the oil spill in the Gulf, BP announced just a short***

---

[7]  As noted above, the London Stock Exchange was closed on Monday, May 3, 2010 for Early May Bank Holiday.

*time ago that the effort has failed. . . . That live picture so many Americans have been keeping track of [i.e., the oil spewing from the Macondo well], us included, confirms that the oil is still gushing into the Gulf.  This is another crushing blow when it comes on what is now day 40 of this crisis*."  Similarly, on that same day, the Agence France Presse reported, in part, that:  "*The announcement [that the top kill and junk short plans failed] is a stunning setback for efforts to halt what has become the worst oil spill in US history* . . ."  Finally, *The Business Insider* made clear that the failure of the top kill would lead to BP's securities being "*slaughtered in London trading on Monday*."

375.    On that same day, *The New York Times* published an article entitled "Documents Show Early Worries About Safety of Rig."  The article provided new evidence regarding serious safety concerns with the *Deepwater Horizon* rig far earlier than those previously described by BP.  The next day, Sunday, May 30, 2010, Dudley conducted an interview and admitted that BP's original oil flow estimates were vastly understated.  On these disclosures, the Company's ADSs fell from $42.95 per ADS on Friday, May 28, 2010 to close at $36.52 per ADS on Tuesday, June 1, 2010, a decline of $6.43 per ADS or approximately 15%; BP's ordinary shares also fell from 494.8p to 430p those same days, a decline of 64.8p or more than 13%.[8]

376.    On June 9, 2010, fears that the Company would suspend dividends caused a further decline in BP securities.  An Associated Press Article dated June 9, 2010 entitled "Dividend Worries Weigh on BP Shares" explained, "Shares in BP PLC fell further on Wednesday [June 9, 2010] amid fears the British oil company will bow to U.S. political pressure to cut dividends to help pay for the Gulf of Mexico oil spill disaster."  On this news, the

---

[8] As noted above, the U.S. and UK financial markets were closed on Monday, May 31, 2010 for the Memorial Day holiday and Spring Bank holiday, respectively.

Company's ADSs fell from $34.68 per ADS on June 8, 2010 to close at $29.20 per ADS on June 9, 2010, a decline of $5.48 per ADS or almost 16%.  BP's ordinary shares also fell from 408.9p per ordinary share to 391.9p  per ordinary share that same day, a decline of 17p or 4%.

377.       Speculation regarding the possibility that BP would suspend dividend payments continued on June 9, 2010.  Indeed, the Associated Press article published on the afternoon of June 9, 2010 (after the close of the London Stock Exchange) explained that "Cutting the dividend would have a big impact in Britain, as BP accounts for around 12-13 percent of payments from companies in the blue-chip FTSE 100 index . . . ."  On this news, and after the markets re-opened, BP ordinary shares fell an additional 7% from 391.9p per share on June 9, 2010 to 365.5p per share on June 10, 2010.

378.       On June 14, 2010, BP's Board of Directors officially met to discuss suspending the Company's dividend payments in light of the Company's agreement to setup a $20 billion claim fund for damages caused by Deepwater Horizon catastrophe.  According to one news source:  "Shares in BP plunged again Monday [June 14, 2010] as the company's board discussed US demands that it suspend dividend payments until it pays for the cleanup of the Gulf oil spill."  On this news, the Company's ADSs fell from $33.97 per ADS on Friday, June 11, 2010 to close at $30.67 per ADS on Monday, June 14, 2010, a decline of $3.30 per ADS or almost 10%; BP's ordinary shares fell from 391.9p per share to close at 362p per share that same day, a decline of nearly 30p per share or almost 8%.

379.       In all, as a consequence of the revelation of truth concerning BP securities during the Class Period, the Company's securities fell in value by 48% and wiped out over *$90 billion* in market capitalization.

380.     Defendants materially misstated the risks of the Company's operations, particular with respect to deepwater drilling in the Gulf of Mexico.  The adverse consequences of the materialization of this risk as disclosed by Defendants were entirely foreseeable to Defendants at all relevant times.  Defendants' conduct, as alleged herein, proximately caused foreseeable losses and damages to Plaintiffs and members of the Class.

## IX.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE MARKET DOCTRINE

381.     Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     The Company's ADSs and ordinary shares traded in efficient markets;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's ADSs and ordinary shares; and

(e)     Plaintiffs and other members of the Class purchased BP ADSs and/or ordinary shares between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

382.     At all relevant times, the markets for BP ADSs and ordinary shares were efficient for the following reasons, among others: (a) BP filed periodic public reports with the SEC; and (b) BP regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as

communications with the financial press, securities analysts and other similar reporting services. Plaintiffs and the Class relied on the price of BP ADSs and ordinary shares, which reflected all the information in the market, including the misstatements by Defendants.

## X.    CLASS ACTION ALLEGATIONS

383.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a Class as follows:

> (1) With respect to Plaintiffs' claims under the Securities Exchange Act of 1934 (the "Exchange Act"), (a) all persons and entities who purchased or otherwise acquired BP American Depositary Shares ("ADSs") between January 16, 2007 and May 28, 2010, inclusive (the "Class Period"), and (b) all U.S. persons and entities who purchased or otherwise acquired BP ordinary shares in domestic transactions, executed on a foreign exchange, during the Class Period;

> (2) With respect to Plaintiffs' claims under New York common law, all U.S. persons and entities who purchased or otherwise acquired BP ordinary shares during the Class Period; and

> (3) With respect to Plaintiffs' claims under UK law, all persons and entities who purchased or otherwise acquired BP ordinary shares during the Class Period.

Excluded from the Class are Defendants, directors, and officers of BP and their families and affiliates.

384.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

385.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

> (a)    Whether the Securities Exchange Act was violated by Defendants;

> (b)    Whether New York law was violated by Defendants;

> (c)    Whether UK law was violated by Defendants;

169

(d)     Whether Defendants omitted and/or misrepresented material facts;

(e)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(f)     Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(g)     Whether the prices of BP ADSs and ordinary shares were thereby artificially inflated; and

(h)     The extent of damage sustained by Class members and the appropriate measure of damages.

386.     Plaintiffs' claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

387.     Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation.  Plaintiffs have no interests that conflict with those of the Class.

388.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XI.   <u>NO SAFE HARBOR</u>

389.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The specific statements pleaded herein were not identified as forward-looking statements when made.

390.     To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

391.     Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are also liable for any false or misleading forward-looking statements pleaded because, at the time each statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of BP who knew that the statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

392.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

393.     During the Class Period, Defendants both directly and indirectly used the means and instrumentalities of interstate commerce in the U.S. to carry carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase BP ADSs and/or ordinary shares

171

at artificially inflated prices in the U.S.  In furtherance of this unlawful scheme, plan and course

of conduct, these defendants, and each of them, took the actions set forth herein.

394.        Defendants both directly and indirectly used the means and instrumentalities

of interstate commerce in the U.S.: (i) employed devices, schemes, and artifices to defraud; (ii)

made untrue statements of material fact and/or omitted to state material facts necessary to make

the statements not misleading; and (iii) engaged in acts, practices, and a course of business which

operated as a fraud and deceit upon the purchasers of the Company's ADSs and ordinary shares

in an effort to artificially inflate and maintain the market prices for BP ADSs and ordinary shares

in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  As a result of all Defendants'

conduct, investors in the U.S. purchased BP ordinary shares in the U.S. and purchased BP ADSs

at artificially inflated prices and were damaged thereby when the price of those ADSs and

ordinary shares declined as alleged herein.

## SECOND CLAIM
### Violation of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

395.        Plaintiffs repeat and reallege each and every allegation contained above as if

fully set forth herein.

396.        The Individual Defendants acted as controlling persons of BP within the

meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level

positions, and their ownership and contractual rights, participation in and/or awareness of the

Company's operations and/or intimate knowledge of the false financial statements filed by the

Company with the SEC and disseminated to the investing public, the Individual Defendants had

the power to influence and control and did influence and control, directly or indirectly, the

decision-making of the Company, including the content and dissemination of the various

172

statements which Plaintiffs contend are false and misleading and/or omitted material information.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

397.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

398.     As set forth above, BP, BP America, and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's ADSs and ordinary shares during the Class Period.

### THIRD CLAIM
### Common Law Fraudulent Misrepresentation and Deceit
### (Against BP)

399.     Plaintiffs repeat and reallege each and every allegation in the foregoing paragraphs as if fully set for herein.

400.     This Count is asserted against BP based on common law principles of fraud and conspiracy to commit fraud.

401.     As alleged herein, each Defendant made material misrepresentations and omitted to disclose material facts about BP's capability to safely drill in the Gulf of Mexico and

its ability to adequately contain and respond to an oil spill if one occurred while drilling in the Gulf of Mexico.

402.      Defendants also conspired with each other for the purpose of misleading Plaintiffs and the Class regarding BP's commitment to safety and its ability to contain and respond to an oil spill if one occurred while drilling in the Gulf of Mexico, and each committed overt acts, including the making of false and misleading statements, in furtherance of such conspiracy.

403.      The aforesaid misrepresentations and omissions by Defendants were made intentionally, or at a minimum with severe recklessness, to induce reliance thereon by Plaintiffs and the Class when making their investment decisions.

404.      The aforesaid misrepresentations and omissions by Defendants constitute fraud and deceit under New York and English common law.

405.      Plaintiffs, including the funds they managed, reasonably relied on Defendants' misrepresentations when deciding to purchase BP securities and when otherwise making investment decisions with regard to those securities during the Class Period, and did not know of any of the misrepresentations and omissions at the time the investment decisions were made.  Plaintiffs' and the Class members' reliance was justified since they were unaware of the true facts; if the true facts had been known to Plaintiffs and the other members of the Class, they would not have acted as they did in holding and purchasing BP securities.

406.      As a direct and proximate cause of the fraud and deceit by Defendants, Plaintiffs and the Class suffered damages in connection with their investments in BP securities during the Class Period.

407.    The fraud and deceit committed by Defendants was intentional and/or involved conscious acts that willfully and wantonly disregarded the rights of others, including Plaintiffs and the Class.  As a result, BP is liable to Plaintiffs and the Class for putative damages.

## FOURTH CLAIM
### Violation of the Financial Services and Markets Act of the United Kingdom
### (Against BP)

408.    Plaintiffs repeat and reallege each and every allegation in the foregoing paragraphs as if fully set for herein.

409.    This Count is brought pursuant to Section 90A of the Financial Services and Markets Act of 2000 ("FSMA 2000"), as amended by the Companies Act of 2006, against BP, seeking damages in relation to Plaintiffs' and the Class's purchases of BP securities during the Class Period.

410.    Defendants made misrepresentations in reports and statements published in response to provisions implementing Articles 4, 5 and 6 of Directive 2004/109/EC of the Transparency Obligations Directive of December 31, 2004 and in its preliminary statements pertaining thereto.

411.    These reports and statements were created by Defendants in discharging managerial responsibilities on behalf of the Company.

412.    The misrepresentations and omissions by Defendants were made intentionally, or at a minimum with severe recklessness, to induce reliance thereon by Plaintiffs and the Class when making their investment decisions.

413.    Plaintiffs and the Class reasonably relied on Defendants' misrepresentations when deciding to purchase BP securities and when otherwise making investment decisions with regard to those securities, and did not know of any of the misrepresentations and omissions at the

time the investment decisions were made.  Plaintiffs' and the Class members' reliance was justified since they were unaware of the true facts; if the true facts had been known to Plaintiffs and the other members of the Class, they would not have acted as they did in holding and purchasing BP securities.

414.     By reason of the foregoing, BP is liable to Plaintiffs for compensation as provided by Section 90A of the FSMA 2000, as amended.

**FIFTH CLAIM**
**Negligent Misrepresentation and Misstatement**
**(Against BP)**

415.     Plaintiffs repeat and reallege each and every allegation in the foregoing paragraphs as if fully set for herein.

416.     This Count is asserted against BP based on U.K. common law principles of negligent misrepresentation and misstatement.

417.     In making the material misrepresentations and omissions described herein, Defendants were careless and negligent in imparting the misrepresentations and omissions, had no reasonable grounds for believing the aforesaid representations to be true, or should have known them not to be true.  Plaintiffs and the Class were expected to rely on the aforesaid misrepresentations and omissions and Defendants expressed the misrepresentations directly to Plaintiffs and the Class with the knowledge that the misrepresentations and omissions would be relied and acted upon by Plaintiffs and the Class.  Defendants negligently breached their duty owed to Plaintiffs and the Class and induced them to purchase BP securities during the Class Period and/or to maintain their investment in the Company's securities during the Class Period.

418.     In detrimental reliance upon the aforesaid material negligent misrepresentations and omissions, Plaintiffs and the Class purchased BP securities and/or

maintained their BP investments during the Class Period.  But for the misrepresentations and

omissions made by Defendants, Plaintiffs and the Class would not have purchased and/or

continued holding BP securities during the Class Period.  Defendants, in the course of their

business, profession, or employment, and/or in transactions with Plaintiffs and the Class,

supplied materially false and misleading information and guidance to Plaintiffs and the Class in

connection with their transactions in BP securities during the Class Period.  Plaintiffs and the

Class justifiably relied upon the information.  Defendants failed to exercise reasonable care or

competence in obtaining or communicating said information to Plaintiffs and the Class.

419.      Because of the negligent misrepresentations and omissions made by

Defendants during the Class Period, Plaintiffs and the Class are entitled to rescission of their

initial investments in BP securities and restitution of their initial investment in BP securities, plus

damages as they are determined at trial.

## XII.    <u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

    a.    Determining that this action is a proper class action pursuant to Rule 23(a) and

          (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined

          herein, and a certification of Plaintiffs as class representatives pursuant to

          Rule 23 of the Federal Rules of Civil Procedure;

    b.    Awarding compensatory and punitive damages in favor of Plaintiffs and the

          other Class members against all Defendants, jointly and severally, for all

          damages sustained as a result of Defendants' wrongdoing, in an amount

          proven at trial, including pre-judgment and post-judgment interest thereon;

    c.   Awarding Plaintiffs and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

    d.   Awarding Plaintiffs and the other Class members such other relief as this Court may deem just and proper.

## XIII.  DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury in this action of all issues so triable.

DATED:  February 14, 2011        Respectfully submitted,

**YETTER COLEMAN LLP**

/s/ R. Paul Yetter
R. Paul Yetter (Bar No. 22154200)
Autry W. Ross (Bar No. 17283950)
909 Fannin, Suite 3600
Houston, TX  77010
Tel: (713) 632-8000
Fax: (713) 632-8002

***Counsel for New York and Ohio and
Liaison Counsel for the Class***

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Steven J. Toll (admitted *pro hac vice*)
Daniel S. Sommers (admitted *pro hac vice*)
Julie G. Reiser (admitted *pro hac vice*)
Matthew K. Handley (admitted *pro hac vice*)
Joshua M. Kolsky (admitted *pro hac vice*)
1100 New York Avenue N.W.
West Tower, Suite 500
Washington, D.C.  20005-3964
Tel: (202) 408-4600
Fax: (202) 408-4699

**BERMAN DEVALERIO**
Jeffrey C. Block (admitted *pro hac vice*)
Jason M. Leviton (admitted *pro hac vice*)
Whitney E. Street (admitted *pro hac vice*)
One Liberty Square
Boston, MA  02109
Tel: (617) 542-8300
Fax: (617) 542-1194

***Co-Lead Counsel for New York and Ohio and for the Class***