# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF TEXAS

## HOUSTON DIVISION

| | |
|---|---|
| In re: BP p.l.c. SECURITIES LITIGATION | **Civil Action No. 4:10-md-2185** |
| In re:  BP ERISA LITIGATION | **Civil Action No. 4:10-cv-4214** |
| | **JURY** |
| | **Honorable Keith P. Ellison** |

## <u>CONSOLIDATED COMPLAINT</u>

## <u>REDACTED PURSUANT TO PROTECTIVE ORDER</u>

#27955-v5

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

## TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................. 1

II.  JURISDICTION AND VENUE .......................................................... 6

III.  PARTIES ............................................................................................. 6

    A.  The Plaintiffs ............................................................................ 6

    B.  The Defendants ......................................................................... 8

        (i)  BP Corporation North America Inc. .......................... 8

        (ii)  The Members of the BP North America Board of Directors ................... 9

        (iii)  Designated Officers ..................................................... 12

        (iv)  The Appointing Officers ............................................. 15

        (v)  The BP Corporation North America Inc. Savings Plan Committee and its Members ................... 15

        (vi)  Plan Administrators ...................................................... 20

        (vii)  Doe Defendants ........................................................... 20

        (viii)  Corporate Defendants ................................................. 20

IV.  THE PLANS ....................................................................................... 23

    A.  Description of the Plans ........................................................... 23

    B.  Plan Contributions ................................................................... 23

    C.  Investment Options .................................................................. 25

    D.  Plan Fiduciaries ....................................................................... 25

        (i)  BP North America ....................................................... 26

        (ii)  BP North America Board of Directors ...................... 28

        (iii)  Designated Officer ..................................................... 29

        (iv)  Appointing Officers .................................................... 30

        (v)  Savings Plan Committee ............................................. 31

        (vi)  Plan Administrator ...................................................... 33

        (vii)  Investment Manager ................................................... 34

i

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

### TABLE OF CONTENTS (cont.)

**Page**

| | | |
|---|---|---|
| V. | CLASS ACTION ALLEGATIONS | 35 |
| VI. | FACTUAL ALLEGATIONS | 37 |
| | A. Introduction | 37 |
| | B. BP's Safety Record Prior to the *Deepwater Horizon* Explosion | 41 |
| | (i) Ocean King (2002) | 42 |
| | (ii) Transocean Discoverer Enterprise (2003) | 44 |
| | (iii) Forties Alpha (2003) | 44 |
| | (iv) GSF Adriatric IV (2004) | 45 |
| | (v) Texas City (2005) | 45 |
| | (vi) Baker Report | 49 |
| | (vii) Thunder Horse PDQ (2005) | 54 |
| | (viii) Prudhoe Bay Alaskan Pipeline Operation (2006) | 55 |
| | (ix) Ohio Refinery (2006) | 56 |
| | (x) Atlantis Platform (2008) | 57 |
| | C. Defendants' Inaccurate Public Statements Leading Up To The *Deepwater Horizon* Disaster | 58 |
| | D. The Events Leading to Disaster on *Deepwater Horizon* Were the Materialization of the Risks that Resulted from BP's Deficient Safety and Risk Management Culture | 75 |
| | E. The Events Immediately Leading Up To The Disaster | 77 |
| | F. Aftermath of the Blowout and Efforts to Plug the Well | 95 |
| VII. | MISMANAGEMENT OF THE PLANS' ASSETS | 107 |
| VIII. | CLAIMS FOR RELIEF UNDER ERISA | 109 |
| IX. | REMEDIES | 111 |
| X. | PRAYER FOR RELIEF | 120 |
| XI. | JURY TRIAL DEMAND | 121 |

#27955-v5

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

## I.    INTRODUCTION

1.      Plaintiffs **David M. Humphries, Jerry McGuire, Edward Mineman, Charis Moule, Frankie Ramirez**, **Maureen S. Riely**, **Thomas P. Soesman**, **Arshadullah Syed** and **Ralph Whitley**, on behalf of the BP Employee Savings Plan ("ESP"), the BP Capital Accumulation Plan ("CAP"), the BP Partnership Savings Plan ("PSP"), and the BP DirectSave Plan ("DSP") (collectively, the "Plans" or the "BP 401(k) Plans"), on behalf of themselves, and only to the extent deemed necessary by the Court, on behalf of a class of similarly situated participants and beneficiaries of the Plans (the "Participants"), allege the following for their Consolidated Complaint (the "Complaint").

2.      Plaintiffs bring this action derivatively pursuant to §§ 502(a)(2) and (3) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1132(a)(2) and (3).

3.      Plaintiffs also bring this action as a class action in the event that class action procedures are deemed necessary by the Court, pursuant to Fed. R. Civ. P. 23(a) and Fed. R. Civ. P. 23(b)(1) and/or (b)(3), on behalf of Plaintiffs and the following class of persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of any of the Plans, whose accounts held units of the BP Stock Fund (the BP Stock Fund is a unitized fund comprised of BP p.l.c. American Depositary Shares ("ADSs") and cash to facilitate daily transactions) that were held in the BP Master Trust, at any time from January 16, 2007 through June 24, 2010, inclusive (the "Class Period") and were damaged thereby. Excluded from the Class are Defendants and members of the Defendants' immediate families, any entity in which a Defendant has a controlling interest, and their heirs, successors-in-interest, or assigns (in their capacities as heirs, successors-in-interest, and assigns).

4.      Defendants breached their duties to Plaintiffs, the Plans and the Class in violation of ERISA sections 404(a) and 405 by continuing to offer, hold, and acquire additional units of the BP Stock Fund at a time when the price of BP ADSs was artificially inflated, BP was issuing inaccurate and misleading statements regarding BP's business practices, and BP was concealing its reckless management of its operations ("BP" refers to BP p.l.c. and all of its subsidiaries, collectively). Defendants' failure to prudently and loyally manage the assets of the Plans, failure

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

to provide complete and accurate information to the Participants, and failure to monitor other Plan fiduciaries and to provide them with complete and accurate information, caused the Plans and the Participants to lose hundreds of millions of dollars.

5.     Beginning in January 2007, in response to multiple catastrophic accidents that hampered its business and resulted in the loss of life and billions of dollars in liabilities to BP between 2002 and 2007, BP publicly made unequivocal and repeated representations that it would place safety over profits, had adequate procedures in place to deal with major oil spills in the Gulf of Mexico, and had established appropriate processes to ensure safety.

6.     The BP U.S. Refineries Independent Safety Review Panel issued a report of its findings and conclusions in January 2007 following its lengthy investigation of a major accident at BP's Texas City refinery (the "Baker Report").  The Baker Report detailed a substantive critique of significant problems with BP's safety culture.  In response to the Baker Report, BP launched a public campaign of statements, beginning January 16, 2007, that promised and assured the public that BP's operations were in the process of swift and continuous safety improvements from the top down, with safety always the "highest priority."   BP announced in press releases, public filings, and investor presentations that it had taken material steps to address the recommendations of the Baker Report.

7.     In his analyst conference call on February 6, 2007, Defendant Hayward, the Chief Executive Officer of BP pl.c. at the time and an Investment Fiduciary of the Plans, gave assurances that "[w]e have further increased our focus on safety and operational efficiency and will in some cases deliberately slow the pace of our activity in order to improve its safety and efficiency."  Given these assurances and Defendant Hayward's commitment to "focus on safety like a laser," BP was expected to carefully assess the problems with its Gulf of Mexico oil drilling operations.  But BP did the opposite.  BP charged ahead, and the *Deepwater Horizon's* team was pushed to work harder and faster to finish the job.  Critical decisions were made on the fly.  Like BP's earlier disasters, dangerous work proceeded at a fast pace without proper safety

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

protocols, and pressure by BP management to seal the Macondo well and move on to the next well took precedence over carefully planned, safe, and reliable processes.

8.      In stark contrast to Defendant Hayward's November 8, 2007 statements at a Houston Forum, that BP was committed to implementing the Baker Panel's roadmap and making BP a "world leader in process safety," BP was woefully unprepared to safely conduct operations at the Macondo well in the Gulf of Mexico.  As a result, when the well's integrity failed, BP was unable to deal with the disaster.  Due in large part to BP's distorted priorities of putting profits before safety, critical safety-sensitive decisions that should have been planned in advance, such as cementing, the choice of casing, and the number of spacers, were made on an *ad hoc* basis.

9.      Unbeknownst to the Participants, Defendants were aware or should have been aware of the multiple and systemic safety problems and serious mismanagement that continued at BP and ultimately led to the demise of the *Deepwater Horizon*.

10.     After the explosion of the *Deepwater Horizon*, Defendant Hayward shocked the world by publicly conceding that BP did not have a proper recovery plan in place to contain and clean up the spill, and that BP did not have the appropriate processes and procedures in place to prevent and/or clean up the *Deepwater Horizon* disaster.  Hayward acknowledged that BP "did not have the tools you would want in your tool kit" to contain the spill.

11.     Despite regulations requiring BP to have a spill response plan to deal with this very contingency, BP's plan had been cut and pasted from a pre-existing plan created for a very different situation in Alaska.  Recycling the Alaska plan no doubt allowed for a cheap and expeditious solution to the requirement to have some sort of plan, but BP's "plan" ultimately proved worthless when the spill occurred.  BP's conduct represented a calculated decision by its leaders — many of whom also served as fiduciaries to the Plans — to place profits over safety and to conceal material information about its reckless management and deceptive practices.

12.     Similar to the devastating situations involving fiduciaries of other large 401(k) plans that imprudently offered employer stock to its employees such as Enron and WorldCom,

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

this case represents extraordinary circumstances where the senior executives of one of the largest companies in the world who were charged with the highest duty known to law participated in, were aware of, or should have been aware of BP's failure to disclose its serious management problems and its misleading and inaccurate statements about its business activities in the Gulf of Mexico and the resulting inflated value of the BP Stock Fund.

13.    In January 2007, the BP Stock Fund comprised approximately $3.1 billion of the approximate $9.5 billion in total assets held by the combined Plans, or almost one third of the Plans' total assets at the start of the relevant period.  Therefore, the retirement benefits of the Participants were dependent to a substantial degree on the performance of BP ADSs and the need for prudent fiduciary decisions by Defendants concerning this enormous, ongoing investment. By the end of the Class Period, these amounts had fallen to approximately $1.25 billion of $7 billion in combined Plan holdings, due in significant part to the dramatic decline in the value of BP ADSs resulting from losses following the April 20, 2010 explosion of the *Deepwater Horizon*, and the resulting failure to have an appropriate mitigation plan in place that led to one of the largest environmental catastrophes in history.

14.    Given the admitted crucial importance of safety to BP's business and the myriad of problems it experienced in the years leading up to the *Deepwater Horizon* disaster, prudent fiduciaries in similar circumstances would have considered themselves bound to liquidate the BP Stock Fund and to remove, limit, or restrict the BP Stock Fund from the menu of investments offered by the Plans.  Defendants did none of the above.  This case is not about requiring fiduciaries to make unreasonable predictions based on speculation, but rather it is about requiring fiduciaries to make an objective analysis based on the actual state of company affairs, and a fiduciary's responsibility to understand that a disaster would (and did) bring about great losses to the Plans.  As detailed below, a disaster of the proportion of *Deepwater Horizon* and the resulting losses suffered by the Plans were both predictable and likely as was known or should have been known by the Defendants given their respective positions within BP, Defendants' knowledge of BP's reckless corporate culture, and BP's repeated failure to comply with its

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

promises to improve safety.  Therefore, Defendants knew of or should have known that BP ADSs were an imprudent investment for the Plans.  Because of Defendants' failure to protect the Participants' retirement savings from being imprudently invested in an excessively risky BP Stock Fund, Plaintiffs, the Plans and the Class have lost hundreds of millions of dollars in retirement benefits, for which Defendants are liable.

15.     In Count I, Plaintiffs allege that certain Defendants, each having responsibilities regarding the management and investment of the Plans' assets in the BP Stock Fund, breached their fiduciary duties to the Plans and the Participants by failing to prudently and loyally manage the Plans' investment in the BP Stock Fund by: (i) continuing to offer the BP Stock Fund as a Plan investment option when it was imprudent to do so; (ii) maintaining the Plans' pre-existing heavy investment in the BP Stock Fund when it was no longer a prudent investment for the Plans; and (iii) investing the Plans' assets in BP ADSs.

16.     Defendants' actions and/or inactions run directly counter to the express purpose of ERISA pension plans, which are designed to help provide funds for participants' retirement.  *See* ERISA § 2 ("CONGRESSIONAL FINDINGS AND DECLARATION OF POLICY").

17.     Plaintiffs' Count II alleges that certain Defendants failed to communicate to the Participants and the investment manager of the Plans complete and accurate information regarding the Plans' investment in BP ADSs sufficient enough to advise the Participants of the true risks of investing their retirement savings in the BP Stock Fund.

18.     Plaintiffs' Count III alleges that certain Defendants breached their fiduciary duties by failing adequately to monitor other persons to whom responsibility for management/administration of Plans' assets was delegated, including State Street Bank and Trust ("State Street"), despite the fact that such Defendants knew or should have known that such other fiduciaries were allowing the Plans to continue offering the BP Stock Fund as an investment option and investing the Plans' assets in The BP Stock Fund.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

## II.    JURISDICTION AND VENUE

19.    Plaintiffs' claims arise under and pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

20.    This Court has personal jurisdiction, both general and specific, over Defendants because ERISA provides for nationwide service of process, ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), and because all Defendants either reside in the United States or are subject to service of process in the United States, this Court has personal jurisdiction over them.

21.    Venue is appropriate in the Southern District of Texas pursuant to 28 U.S.C. § 1407 and the Transfer Order of the Judicial Panel on Multi-District Litigation entered October 13, 2010.  Venue is also proper in the Southern District of Illinois pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because during the relevant time period, the Plans were administered in that District, some or all of the Defendants resided or maintained their primary place of business in that District and some or all of the fiduciary breaches for which relief is sought occurred in that District.  By filing this Complaint in this District, Plaintiffs do not waive their right to have the action transferred to the Southern District of Illinois.

## III.    PARTIES

### A.    The Plaintiffs

22.    Plaintiff **David M. Humphries** is a resident of Texas.  He is a participant in the ESP within the meaning of ERISA §§ 3(7) and 502(a), 29 U.S.C. §§ 1002(7) and 1123(a).  During the Class Period, the ESP purchased or maintained units of the BP Stock Fund for Plaintiff Humphries' individual account.

23.    Plaintiff **Jerry McGuire** is a resident of Illinois.  He is a participant in the ESP within the meaning of ERISA §§ 3(7) and 502(a), 29 U.S.C. §§ 1002(7) and 1123(a).  During the Class Period, the ESP purchased or maintained units of the BP Stock Fund for Plaintiff McGuire's individual account.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

24.     Plaintiff **Edward Mineman** is a resident of Texas.  He is a participant in the ESP within the meaning of ERISA §§ 3(7) and 502(a), 29 U.S.C. §§ 1002(7) and 1123(a).  During the Class Period, the ESP purchased or maintained units of the BP Stock Fund for Plaintiff Mineman's individual account.

25.     Plaintiff **Charis Moule** is a resident of Florida.  She is a participant in the ESP within the meaning of ERISA §§ 3(7) and 502(a), 29 U.S.C. §§ 1002(7) and 1123(a).  During the Class Period, the ESP purchased or maintained units of the BP Stock Fund for Plaintiff Moule's individual account.

26.     Plaintiff **Frankie Ramirez** is a resident of California.  He is a participant in the CAP within the meaning of ERISA §§ 3(7) and 502(a), 29 U.S.C. §§ 1002(7) and 1123(a).  During the Class Period, the CAP purchased or maintained units of the BP Stock Fund for Plaintiff Ramirez's individual account.

27.     Plaintiff **Maureen S. Riely** is a resident of Maryland.  She is a participant in the ESP within the meaning of ERISA §§ 3(7) and 502(a), 29 U.S.C. §§ 1002(7) and 1123(a).  During the Class Period, the ESP purchased or maintained units of the BP Stock Fund for Plaintiff Riely's individual account.

28.     Plaintiff **Thomas P. Soesman** is a resident of Florida.  He is a participant in the ESP within the meaning of ERISA §§ 3(7) and 502(a), 29 U.S.C. §§ 1002(7) and 1123(a).  During the Class Period, the ESP purchased or maintained units of the BP Stock Fund for Plaintiff Soesman's individual account.

29.     Plaintiff **Arshadullah Syed** is a resident of Illinois.  He is a participant in the ESP within the meaning of ERISA §§ 3(7) and 502(a), 29 U.S.C. §§ 1002(7) and 1123(a). During the Class Period, the ESP purchased or maintained units of the BP Stock Fund for Plaintiff Syed's individual account.

30.     Plaintiff **Ralph Whitley** is a resident of Florida.  He is a participant in the ESP within the meaning of ERISA §§ 3(7) and 502(a), 29 U.S.C. §§ 1002(7) and 1123(a).  During the

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

Class Period, the ESP purchased or maintained units of the BP Stock Fund for Plaintiff Whitley's individual account.

### B.    The Defendants

31.    As more fully described below, the Defendants are: **BP Corporation North America Inc., BP p.l.c., BP America Inc., BP North America Inc.'s Board of Directors, The Savings Plan Investment Oversight Committee, Lord John Browne, Corey Correnti, Marvin L. Damsma, Richard J. Dorazil, James Dupree, Patrick Gower, Anthony Hayward, Jeanne M. Johns, Robert A. Malone, Lamar McKay, Patricia H. Miller, Stephanie C. Moore, Stephen J. Riney, Brian D. Smith, Neil Shaw, Thomas L. Taylor,** and **Gregory T. Williamson**.

32.    The "Individual Defendants" are:  Lord John Browne, Corey Correnti, Marvin L. Damsma, Richard J. Dorazil, James Dupree, Patrick Gower, Anthony Hayward, Jeanne M. Johns, Robert A. Malone, Lamar McKay, Patricia H. Miller, Stephanie C. Moore, Stephen J. Riney, Brian D. Smith, Neil Shaw, Thomas L. Taylor, and Gregory T. Williamson.

33.    At all relevant times, under the governing plan documents, the fiduciaries of the Plans that had the discretion, control, and/or authority over the BP Stock Fund and/or the duty to appoint and/or monitor the fiduciaries that had discretion, control, and/or authority over the BP Stock Fund, included BP North America Inc., the members of the BP North America Inc. Board of Directors, the Designated Officer(s), the Appointing Officer, the Plan Administrator, and the BP Corporation North America Inc. Savings Plan Investment Oversight Committee ("SPIOC" or "Savings Plan Committee").

### (i)      BP Corporation North America Inc.

34.    Defendant **BP Corporation North America Inc.** ("BP North America") is an Indiana corporation with its principal place of business in Warrenville, Illinois.  BP North America is a wholly-owned subsidiary of BP America Inc. ("BP America") and an indirect wholly-owned subsidiary of BP p.l.c.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

35.     At all relevant times, BP North America was the Plan Sponsor of each Plan, and it had the discretion, authority, and/or control to add, delete, and/or freeze the BP Stock Fund and to liquidate the BP Stock Fund if it determined the BP Stock Fund was no longer a prudent investment.

### (ii)     The Members of the BP North America Board of Directors

36.     Defendant **Robert A. Malone** ("Malone") was a BP North America Inc. Board member ("BP North America Board Member") during the Class Period (specifically from June 15, 2006 through February 1, 2009), a member of the Savings Plan Committee from June 30, 2006 through February 1, 2009, a "Designated Officer" under the terms of the Plans from July 1, 2006 to February 1, 2009, and an "Appointing Officer" and an "Appointing Officer Acting as Applicable Administrative Fiduciary" under the terms of the Plans during the Class Period. During the Class Period, Malone was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control respecting management of the Plans, and/or exercised authority or control respecting management or disposition of the Plans' assets, and/or because he had discretionary authority or discretionary responsibility in the administration of the Plans.

37.     During the Class Period, Defendant Malone was the President of BP North America (specifically from 2007 through 2009).  He is a long-time BP executive with experience in operations and health, safety, security, and the environment.  From 2004 through 2006, Malone also served as chief executive officer of BP Shipping Limited, where he was responsible for the operation of the petroleum industry's largest oil and natural gas fleet.  In June 2006, Malone was appointed Chairman of the Board and President of BP America and he held these positions until 2009.  In his capacity as Chairman of the Board and President of BP America, Malone reported to the Group Chief Executive, Defendant Browne.  According to BP's January 2007 report to the BP Refineries Independent Safety Panel, Malone was particularly focused on safety, compliance, and regulatory affairs, and had the benefit of direct reports for the safety and operations function and the compliance and ethics function.  In addition, Malone had the ultimate

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

veto power on safety, operations, and compliance matters for BP in the United States.  Less than two months after his appointment, Malone acknowledged to a Congressional committee that repeated safety problems had generated questions about BP's credentials and accusations that the company had profited at the expense of employee safety.

38.    Defendant **Lamar McKay** ("McKay") was a BP North America Board Member during the Class Period (specifically from April 13, 2009 through at least the end of the Class Period), a "Designated Officer" under the terms of the Plans from December 18, 2007 to at least the end of the Class Period, an "Appointing Officer" under the terms of the Plans during the relevant period, a member and Chairman of the Savings Plan Committee from May 15, 2008 to at least the end of the Class Period, and an "Appointing Officer Acting as Applicable Named Fiduciary" under the terms of the Plans during the Class Period.  During the Class Period, McKay was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control respecting management of the Plans, and/or exercised authority or control respecting management or disposition of the Plans' assets, and/or because he had discretionary authority or discretionary responsibility in the administration of the Plans.

39.    McKay has served as the Chairman and President of BP America during the Class Period, and has served as President of BP North America from 2009 through the present. McKay is the chief representative of BP in the United States.  McKay also is a member of the BP p.l.c. executive management team and has led BP's special projects team from early 2008. According to McKay's testimony before Congress on May 11, 2010, he is BP's lead representative in the United States and is responsible for broad oversight and connectivity across all of BP's U.S.-based operations.

40.    Defendant **Stephen J. Riney** ("Riney") was a BP North America Board Member from March 1, 2005 to February 12, 2007, a member of the Savings Plan Committee from February 1, 2005 to March 14, 2007.  During the Class Period, Riney was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

respecting management of the Plans, and/or exercised authority or control respecting management or disposition of the Plans' assets, and/or because he had discretionary authority or discretionary responsibility in the administration of the Plans.

41.    Riney also served as Vice President of Finance for BP America and currently serves as Global Head of Mergers and Acquisitions for BP p.l.c.

42.    Defendant **Brian D. Smith** ("Smith") was a BP North America Board Member from June 15, 2009 to at least the close of the Class Period, and a member of the Savings Plan Committee from July 1, 2009 through at least the end of the Class Period.  During the Class Period, Smith was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control respecting management of the Plans, and/or exercised authority or control respecting management or disposition of the Plans' assets, and/or because he had discretionary authority or discretionary responsibility in the administration of the Plans.

43.    Smith also served as Vice President and Chief Financial Officer of BP America and BP North America during the relevant period.  He currently serves as Vice President of Structured Finance for BP p.l.c.'s Western Hemisphere division.

44.    Defendant **Thomas L. Taylor** ("Taylor") was a BP North America Board Member from February 12, 2007 to July 1, 2009.  In addition, he was a member of the Savings Plan Committee from March 14, 2007 to September 1, 2009.  During the Class Period, Taylor was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control respecting management of the Plans, and/or exercised authority or control respecting management or disposition of the Plans' assets, and/or because he had discretionary authority or discretionary responsibility in the administration of the Plans.

45.    Taylor also served as Vice President and Chief Financial Officer of BP North America as well as Global Vice President, Business Financial Services and CFO for the Americas for BP p.l.c. from 2007 through 2009.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

46.     Defendants Malone, McKay, Riney, Smith and Taylor will be referred to herein as the "BP North America Board Defendants."

### (iii)     Designated Officers

47.     Defendant **Lord John Browne** ("Browne") was a "Designated Officer" under the terms of the Plans during the Class Period (specifically from December 31, 1998 to May 1, 2007).  As a Designated Officer, he was also an Investment Named Fiduciary during the Class Period.  During the Class Period, Browne was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control respecting management of the Plans, and/or exercised authority or control respecting management or disposition of the Plans' assets, and/or because he had discretionary authority or discretionary responsibility in the administration of the Plans.

48.     Browne joined BP in 1969 and held a variety of exploration and production posts in Alaska, New York, California, Canada, and England.  In 1986, Browne became Executive Vice President and Chief Financial Officer of Standard Oil of Ohio, and in 1987 became Chief Executive Officer of Standard Oil Production Company.  In 1989, he became Managing Director and Chief Executive Officer of BP Exploration based in London, England.  In September, 1991, he became Managing Director of BP p.l.c.'s Board of Directors.  Browne served as the Group Chief Executive of BP p.l.c. from 1995 until 2007.

49.     Defendant **Richard J. Dorazil** ("Dorazil") was a "Designated Officer" under the terms of the Plans during the Class Period (specifically from December 18, 2007 to at least the end of the Class Period), a member of the Savings Plan Committee from January 7, 2007 through at least the end of the Class Period, and a a Plan Administrator and an Administrative Named Fiduciary, Applicable Administrative Named Fiduciary, and Applicable Named Fiduciary during the Class Period.  As a Designated Officer, he was also an Investment Named Fiduciary during the Class Period.  He signed BP p.l.c.'s Forms 11-K Annual Report (hereinafter Form 11-K) filed with the U.S. Securities and Exchange Commission in his capacity as Plan Administrator

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

during the relevant period.  During the Class Period, Dorazil was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control respecting management of the Plans, and/or exercised authority or control respecting management or disposition of the Plans' assets, and/or because he had discretionary authority or discretionary responsibility in the administration of the Plans.

50.     While Defendant Dorazil was acting as a fiduciary with respect to the Plans he was also acting as an agent and employee of one or more of the Corporate Defendants (Defendants BP p.l.c., BP America, and BP North America are collectively referred to herein as the "Corporate Defendants").  In particular, during the Class Period, Defendant Dorazil was an employee of BP North America with the title of Vice President, HR Total Rewards, Western Hemisphere, and his employment at BP North America included human resources work and implementation of BP North America's employee benefit programs, including the Plans.  The breaches of fiduciary duty committed by Defendant Dorazil described in this Complaint were committed while Defendant Dorazil was acting in the scope of his employment by BP North America.

51.     Defendant **Anthony Hayward** ("Hayward") was a Designated Officer during the relevant period.  As a Designated Officer, he was also an Investment Named Fiduciary during the Class Period.  During the relevant period, Hayward was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control respecting management of the Plans, and/or exercised authority or control respecting management or disposition of the Plans' assets, and/or because he had discretionary authority or discretionary responsibility in the administration of the Plans.

52.     Defendant Hayward began his career at BP in 1982.  By the time the Class Period began, Defendant Hayward had risen to Group Chief Executive of BP p.l.c.

53.     At the beginning of his career, Defendant Hayward worked as a rig geologist and held a series of technical and commercial positions in BP Exploration.  He came to the attention

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

of then CEO Defendant Browne at a leadership conference in Phoenix, Arizona in 1990. Defendant Browne named him his Executive Assistant at that time.  In 1999, he became Group Vice President of BP Amoco Exploration and Production.  In 2000, he was named Group Treasurer of BP p.l.c.  In that capacity he was responsible for global treasury operations, corporate finance, and mergers and acquisitions.  In 2002, he became Chief Executive Officer of Exploration and Production, finally becoming Group Chief Executive of BP p.l.c. in May 2007.

54.     Defendant Hayward has appeared in this District and elsewhere in the United States to make statements regarding BP's commitment to safety.  For example, Hayward appeared at a town hall meeting in Houston, Texas in the aftermath of the Texas City Refinery Explosion in 2006.  He gave a presentation at the Houston Forum on November 8, 2007, assuring that BP would implement improvements to safety.  In addition, Defendant Hayward serves as a member of the MIT Energy Advisory Board, and in connection with that position, he gave a speech at MIT in 2009.  He also spoke at the Stanford Business School that same year. Defendant Hayward is currently involved as a partner in AEA Investors, a private equity firm based in New York.  Hayward appeared in television commercials that aired throughout the U.S. apologizing for the Gulf Spill tragedy.  Hayward also made this apology in full-page ads appearing in major daily U.S. newspapers, including The New York Times, The Wall Street Journal, USA Today, and The Washington Post.

55.     Defendant Malone (from July 1, 2006 to February 1, 2009) and Defendant McKay (from April 13, 2009 to at least the end of the Class Period) were Designated Officers.  As Designated Officer, Malone and McKay were also Investment Named Fiduciaries during the Class Period.

56.     Hereafter Defendants Browne, Hayward, Dorazil, Malone and McKay shall be referred to as the "Designated Officer Defendants."

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

### (iv)    The Appointing Officers

57.    Defendants Malone and McKay were Appointing Officers during the Class Period. Defendants Malone and McKay shall hereafter be referred to as the "Appointing Officer Defendants."

### (v)    The BP Corporation North America Inc. Savings Plan Committee and its Members

58.    Defendant **Savings Plan Committee** is a Named Fiduciary ("Named Fiduciary" means a named fiduciary within the meaning of ERISA, including without limitation, sections 402, 403, or 405 of ERISA) of the Plans, as discussed below.

59.    Defendant **Corey T. Correnti** ("Correnti") was a member of the Savings Plan Committee from July 1, 2009 through at least the end of the Class Period.  During the Class Period, Correnti was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control respecting management of the Plans, and/or exercised authority or control respecting management or disposition of the Plans' assets, and/or because he had discretionary authority or discretionary responsibility in the administration of the Plans.

60.    Correnti began working for BP p.l.c. in London in 1998.  Prior to the start of the Class Period, he transferred to BP North America.  Correnti has held several positions in BP North America, including Chief Operating Officer, Products Supply and Trading.  During the Class Period, Correnti served as President of BP North America's East and Gulf Coast fuels value chain.  Correnti currently holds the position of Vice President and Strategic Performance Unit Leader of BP Products North America.

61.    Defendant **Marvin L. Damsma** ("Damsma") was a member of the Savings Plan Committee from about September 20, 2004 to April 1, 2008, and the Director, Trust Investments, The Americas from at least the beginning of the Class Period to June 10, 2008.  As Director, Trust Investments, The Americas, Defendant Damsma was also an Investment Named Fiduciary. Pursuant to the Bylaws of SPIOC, the Director, Trust Investments, The Americas has the

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

authority to act, in the case of an emergency, on behalf of the Savings Plan Committee to the extent he reasonably believes it is necessary to avoid a fiduciary breach under ERISA or to avoid a large loss by an ERISA plan or trust.  SPIOC Bylaws, Sec. 5.12.  During the Class Period, Damsma was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control respecting management of the Plans, and/or exercised authority or control respecting management or disposition of the Plans' assets, and/or because he had discretionary authority or discretionary responsibility in the administration of the Plans.

62.    While Defendant Damsma was acting as a fiduciary with respect to the Plans he was also acting as an agent and employee of one or more of the Corporate Defendants.  In particular, during the Class Period, Defendant Damsma was an employee of BP America with the title of Director of Trust Investments.  His employment included implementation of BP's employee benefit programs, including the Plans.  The breaches of fiduciary duty committed by Defendant Damsma described in this Complaint were committed while Defendant Damsma was acting in the scope of his employment by BP America.

63.    Defendant **James Dupree** ("Dupree") was a member of the SPIOC from February 1, 2010 until at least the end of the Class Period.  During the Class Period, Dupree was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control respecting management of the Plans, and/or exercised authority or control respecting management or disposition of the Plans' assets, and/or because he had discretionary authority or discretionary responsibility in the administration of the Plans.

64.    Defendant Dupree has served as Senior Vice President and Strategic Performance Unit Leader of BP's Gulf of Mexico division from November 2009 through at least the end of the Class Period.  Dupree also served as Board Member of BP America.  *Forbes* reported on May 15, 2010, that Defendant Dupree testified to the House Energy and Commerce Committee that the Macondo well failed to pass the pressure test on the day of the explosion, and a follow-

#27955-v5

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

up test proved unsatisfactory as well.  Carl Gutierrez, "What's the Story BP?," *Forbes*, May 15, 2010.

65.    Defendant **Patrick Gower** ("Gower") was a member of the Savings Plan Committee from September 20, 2004 though May 15, 2008.  During the Class Period, Gower was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control respecting management of the Plans, and/or exercised authority or control respecting management or disposition of the Plans' assets, and/or because he had discretionary authority or discretionary responsibility in the administration of the Plans.

66.    During the Class Period, Defendant Gower also served as Vice President of Refining, U.S. Region, BP North America and his duties in that capacity included accountability for managing performances of refineries in the region.  In 2007, an internal BP investigation recommended that Gower, along with three other BP executives be fired for management shortcomings in creating a "culture of risk taking" at BP leading up to the 2005 explosion that killed 15 people at BP's Texas City refinery.

67.    Defendant **Jeanne M. Johns** ("Johns") was a member of the Savings Plan Committee from about September 20, 2004 to May 15, 2008.  Johns also served as President of BP's Asia Olefin and Derivatives division during the relevant period.  During the Class Period, Johns was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control respecting management of the Plans, and/or exercised authority or control respecting management or disposition of the Plans' assets, and/or because he had discretionary authority or discretionary responsibility in the administration of the Plans.

68.    Defendant **Patricia H. Miller** ("Miller") was a member of the SPIOC from May 22, 2006 to January 7, 2008.  During the Class Period, Miller was the Plans' Administrator, Administrative Named Fiduciary, Applicable Administrative Named Fiduciary, and the Applicable Named Fiduciary (from May 22, 2006 to December 18, 2007).  During the Class Period, Miller was a fiduciary within the meaning of ERISA because she exercised discretionary

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

authority or discretionary control respecting management of the Plans, and/or exercised authority or control respecting management or disposition of the Plans' assets, and/or because she had discretionary authority or discretionary responsibility in the administration of the Plans.

69.     While Defendant Miller was acting as a fiduciary with respect to the Plans, she was also acting as an agent and employee of one or more of the Corporate Defendants.  In particular, during the relevant period, Defendant Miller was an employee of BP North America with the title of Vice President of Human Resources for the Western Hemisphere, and her employment at BP North America included human resources work and implementation of BP North America's employee benefit programs, including the Plans.  The breaches of fiduciary duty committed by Defendant Miller described in this Complaint were committed while Defendant Miller was acting in the scope of her employment by BP North America.

70.     Defendant **Stephanie C. Moore (formerly Atkins)** ("Moore") was a member of the SPIOC from February 9, 2006 through at least the end of the Class Period.  During the Class Period, Moore was a fiduciary within the meaning of ERISA because she exercised discretionary authority or discretionary control respecting management of the Plans, and/or exercised authority or control respecting management or disposition of the Plans' assets, and/or because she had discretionary authority or discretionary responsibility in the administration of the Plans.

71.     During the Class Period, Moore also served as Vice President of Human Resources for BP's Exploration and Production Technology division.  Moore worked in BP's Houston location.  In 2005, Moore was part of a team assembled to perform an internal accountability audit into executive responsibility following the Texas City refinery explosion.

72.     Defendant **Neil Shaw** ("Shaw") was a member of the SPIOC from May 15, 2008 through February 1, 2010.  During the Class Period, Shaw was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control respecting management of the Plans, and/or exercised authority or control respecting management or

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

disposition of the Plans' assets, and/or because he had discretionary authority or discretionary responsibility in the administration of the Plans.

73.     Shaw also served as BP's Senior Vice President and Strategic Performance Unit Leader in charge of BP p.l.c.'s Gulf of Mexico division from 2007 to 2009.  Shaw also served as Chief Operating Officer of Developments in the Executive Office of BP's Global Exploration and Production unit through at least the end of the Class Period.

74.     Defendant **Gregory T. Williamson** ("Williamson") was a member of the SPIOC from April 1, 2008, through at least the end of the Class Period.  Williamson also served as Director of Trust Investments, The Americas from June 10, 2008 through the present. Williamson's duties in this capacity included supervising and managing U.S. defined benefits plans and 401(k) plans.  As the Director of Trust Investments, The Americas, Williamson was also an Investment Named Fiduciary.  During the Class Period, Williamson was a fiduciary within the meaning of ERISA because he exercised discretionary authority or discretionary control respecting management of the Plans, and/or exercised authority or control respecting management or disposition of the Plans' assets, and/or because he had discretionary authority or discretionary responsibility in the administration of the Plans.

75.     While Defendant Williamson was acting as a fiduciary with respect to the Plans he was also acting as an agent and employee of one or more of the Corporate Defendants.  In particular, during the relevant period Defendant Williamson was an employee of BP America with the title of Director of Trusts Investments (from June 10, 2008 to the present).  His employment at BP America included human resources work and, as noted above, implementation of BP's employee pension programs, including the Plans.  The breaches of fiduciary duty committed by Defendant Williamson described in this Complaint were committed while Defendant Williamson was acting in the scope of his employment by BP America.

76.     As discussed above, the following Defendants were both members of the BP North America Board and members of the Savings Plan Committee during the Class Period:  Malone,

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

McKay, Riney, Smith, and Taylor.  In addition, Defendant Dorazil, a Designated Officer during the Class Period, was also a member of the Savings Plan Committee.

77.     Defendants the Savings Plan Committee, Correnti, Damsma, Dorazil, Dupree, Gower, Johns, Malone, McKay, Miller, Moore, Riney, Shaw, Smith, Taylor, and Williamson are referred to hereinafter collectively as the "SPIOC Defendants."

### (vi)     Plan Administrators

78.     As discussed above, Defendant Dorazil served as the Plan Administrator, Administrative Named Fiduciary and the Applicable Administrative Named Fiduciary during the relevant period (from December 18, 2007 through at least the end of the Class Period).  In addition, Defendant Miller served as the "Plan Administrator Administrative Named Fiduciary" and the "Applicable Administrative Named Fiduciary" during the Class Period (specifically from May 22, 2006 to December 18, 2007).

79.     Defendants Dorazil and Miller shall hereinafter be referred to collectively as the "Plan Administrator Defendants."

### (vii)     Doe Defendants

80.     Defendant **Plan Fiduciary DOES 1-20** are fiduciaries of the Plans whose exact identities will be ascertained through discovery.  They may include, but be not limited to, members of the SPIOC, if appointed under the terms of the Plans; additional members of the SPIOC during the relevant time frame; individual members of the BP North America Board; and other fiduciaries as they are named.

### (viii)     Corporate Defendants

81.     Defendant **BP p.l.c.** is a public limited liability company incorporated in England and Wales.  BP p.l.c.'s principal executive offices are located at 1 St. James Square, London SW1Y 4PD, England.  BP p.l.c. is one of the world's largest energy companies, with extensive contacts in the U.S.  Through its own operations, and its subsidiaries and affiliates, it is the largest producer of oil and gas offshore in the Gulf of Mexico.  BP p.l.c.'s operations and assets

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

in the Gulf of Mexico are the most significant part of its operations and assets in the world.  BP p.l.c., through its own operations, its subsidiaries and affiliates, operates tens of thousands of miles of pipelines in the U.S., has several refineries in the U.S., and is the second-largest gasoline marketer in the U.S.  Forty-five percent of the entity's oil reserves are in the U.S. (compared to only 9% in the U.K.), and the U.S. accounts for 54% of total refining, 40% of fixed assets, and 31% of petrochemical production.  BP p.l.c., its subsidiaries and affiliates have approximately 29,000 employees in the U.S., one-third of its total worldwide employees and twice as many employees as in the U.K.  BP p.l.c. grew to its current size through mergers with old-line American oil companies like Amoco and ARCO, which were spun off of Standard Oil generations ago.  During the relevant period, BP p.l.c. was a fiduciary within the meaning of ERISA because BP p.l.c., acting through its officers and directors, exercised discretionary authority and control with respect to the appointment of the Plans' fiduciaries, management and administration of the Plans and the Plans' assets.

82.     Defendant **BP America Inc.** ("BP America") is a wholly-owned subsidiary of BP p.l.c.  BP America is a Delaware corporation with its principal place of business in Warrenville, Illinois.  BP America is BP p.l.c.'s single largest subsidiary.  BP America is designated as the claims administrator for the Plans.  During the Class Period, BP America was a fiduciary within the meaning of ERISA because BP America, acting through its officers and directors, exercised discretionary authority and control with respect to the appointment of the Plans' fiduciaries, management and administration of the Plans and the Plans' assets.

83.     The Corporate Defendants are liable under the doctrine of *respondeat superior* for the breaches of fiduciary duty committed by their employees because each Corporate Defendant knowingly and actively participated in the breaches of fiduciary duty committed by these employees.

84.     The Corporate Defendants knew that the BP Stock Fund was offered in the Plans because BP North America is the named sponsor of the Plans; BP America is designated as the

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

Claims Administrator for the Plans and BP p.l.c. filed Forms 11-K with the SEC stating that "Certain Master Trust investments include American Depositary Shares of BP p.l.c. ('BP ADSs')."

85.     The Corporate Defendants also were aware, based upon significant prior warnings as detailed herein, that BP was taking too many risks and cutting corners regarding safety in pursuit of growth and profits, and that, as a result, a disaster of the proportion of *Deepwater Horizon* was likely to happen and could cause material losses to the Plans, and that this risk of catastrophic loss rendered the BP Stock Fund an imprudent retirement investment for the Plans' participants.

86.     Thus, the Corporate Defendants knew or should have known that the BP Stock Fund was offered by the Plans for the Participants' accounts and that the BP Stock Fund was an imprudent investment for retirement.   But the Corporate Defendants, upon information and belief, never provided adequate warnings or instructions to their employees or assisted various Individual Defendants with the proper execution of their fiduciary duties under ERISA.

87.     Instead, the Corporate Defendants ignored their duty to monitor their employees' fiduciary performance and to communicate information to the Individual Defendants as needed for the proper performance of their fiduciary duties, and continued to allow the Individual Defendants (especially Defendants Dorazil, Williamson, Miller, and Damsma) to meet on company property, during business hours, and use company resources to administer the Plans and to continue to allow the Plans to hold and acquire BP ADSs.

88.     By virtue of their *de facto* control over their employees/agents, the Corporate Defendants also had effective control over the disposition of the Plans' assets.   The Corporate Defendants also had incentive to, and did, appoint fiduciaries who were likely to, and did, maintain the status quo of Plans' investment in the BP Stock Fund because the Corporate Defendants reaped the benefits of the company stock being offered and held as a plan investment

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

option, including tax benefits, keeping significant amounts of stock in friendly hands, and helping with the Corporate Defendants' cash flows.

## IV.    THE PLANS

### A.    Description of the Plans

89.    The relevant portions of the Plans are substantially similar except for the employees covered by each Plan and the contribution and matching provisions of each Plan, as set forth below.  *See* Form 11-K, dated June 16, 2010.  The Plans comingled their assets in the BP Master Trust for Employee Savings Plans ("BP Master Trust") and have a common group of fiduciaries and administrators.

90.    At all times relevant to this Complaint, each Plan was an "Employee Benefit Plan" within the meaning of ERISA §§ 3(3) and 3(2)(A), 29 U.S.C. §§ 1002(3) and 1002(2)(A).

91.    Each Plan was a "Defined Contribution" and "Individual Account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that each Plan provided for individual accounts for each Participant and for benefits based solely upon the amount contributed to the Participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other Participants which could be allocated to such Participant's accounts.

92.    The purpose of each Plan was "to encourage eligible employees to regularly save part of their earnings and to assist them in accumulating additional financial security for their retirement."  Form 11-K.

### B.    Plan Contributions

93.    According to the Form 11-K, The Participants in the Plans could make contributions to each Plan as described below.  For the ESP:

> [P]articipating employees may contribute up to 80% (100% prior to May 1, 2009) of their qualified pay on a pre-tax, after tax and/or Roth 401(k) basis, subject to Internal Revenue Service ("IRS") limits.  Participants who attain age 50 before the end of the applicable plan year are eligible to make additional elective deferrals (catch-up contributions), subject to the IRS limits.  A specified portion of the employee contribution, up to a maximum of 7% of compensation, as

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

defined, is matched by the Company.  Participants are permitted to rollover amounts into ESP representing distributions from other qualified plans.

*See also* ESP, Article III.

For the CAP, the Form 11-K states:

> Under CAP, participants may contribute up to 27% of their base pay, subject to IRS limits.  Participants who attain age 50 before the end of the applicable plan year are eligible to make additional elective deferrals (catch-up contributions), subject to the IRS limits.  The Company makes matching contributions to the participant's account at 160% of the participant's pretax contribution, up to a maximum Company contribution of 8% of the participants base salary.  Participants are permitted to rollover amounts into CAP representing distributions from other qualified plans.

*See also* CAP, Sec. 4.

For the PSP, the Form 11-K states:

> Under PSP, participating employees may contribute up to 80% (100% prior to May 1, 2009) of their qualified pay on a pre-tax, after tax and/or Roth 401(k) basis, subject to IRS limits.  Participants who attain age 50 before the end of the applicable plan year are eligible to make additional elective deferrals (catch-up contributions) subject to IRS limits.  A specified portion of the employee contribution, up to a maximum of 3% of compensation, as defined, is matched by the Company.  Participants are permitted to rollover amounts into PSP representing distributions from other qualified plans.

*See also* PSP Article III.

For the DSP, the Form 11-K states:

> Under DSP, participating employees may contribute up to 80% (100% prior to May 1, 2009) of their qualified pay on a pre-tax, after tax and/or Roth 401(k) basis, subject to IRS limits.  Participants who attain age 50 before the end of the applicable year are eligible to make additional elective deferrals (catch-up contributions) subject to IRS limits.  Except for eligible employees of Air BP, the Company makes matching contributions to the participant's account equal to $0.50 for each $1.00 of employee contributions up to 4% of compensation.  Participants are permitted to rollover amounts into DSP representing distributions from other qualified plans.

*See also* DSP Article III.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

### C.   Investment Options

94.   Contributions were invested in one or more of the investment options selected by Defendants and presented to the Participants in the Investment Options Guide.  BP, INVESTMENT OPTIONS GUIDE (Apr. 2007); BP, INVESTMENT OPTIONS GUIDE (Aug. 2008).  At all relevant times, as described below, each of the Defendants maintained the discretion, authority, and/or control to add, delete, limit, or freeze any investment options offered by the Plans, including the BP Stock Fund.  During the relevant period, approximately one third of each Plan was invested in the BP Stock Fund.

95.   At all relevant times, the Investment Options Guides dated April 2007 and August 2008 for the Plans constituted part of a prospectus covering the securities offered by the Plans.  The Plan Prospectus for each Plan incorporates by reference the documents filed by BP p.l.c. with the SEC, including the BP Annual Report on Form 20-F, the BP Reports on Form 6-K, and any filing made with the SEC under Section 13(a), 13(c), 14, or 15(d) of the Securities and Exchange Act of 1934.  BP, INVESTMENT OPTIONS GUIDE (Aug. 2008) at 74.  The Plan Prospectus also includes a summary of the Plans, the most recent Quarterly Investment Performance Statement and documents incorporated by reference and future supplements to all of the above documents.  The SPD encouraged the Participants to read the Investment Options Guide, which in turn, provides the Participants with directions to obtain the relevant public filings.  *See, e.g.,* July 2009 ESP Summary Plan Description at 27.

### D.   Plan Fiduciaries

96.   Under the terms of the Plans, "Fiduciary" is defined as: (a) any individual or entity which a Designated Officer identifies to be an Administrative Named Fiduciary with respect to such individual's or entity's authority to control and manage the operation and administration of the Plans; (b) any individual or entity which an Administrative Named Fiduciary, acting on behalf of the Plans, designated to be a Fiduciary; or (c) any other individual or entity who performs a fiduciary function under the Plan as defined in section 3(21) of ERISA.  ESP, Sec. 1.52; PSP, Sec. 1.48; DSP, Sec. 1.48.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

97.    At all relevant times, under the governing plan documents, the fiduciaries of the Plans that had the discretion, control, and/or authority over the BP Stock Fund, or the duty to appoint and/or monitor the fiduciaries that had discretion, control, and/or authority over the BP Stock Fund, included BP North America, the members BP North America Board, the Designated Officer(s), the Appointing Officer(s), the Plan Administrator, the SPIOC and its members, and State Street.

### (i)    BP North America

98.    At all relevant times, BP North America was the Plan Sponsor of each Plan.  ESP, Sec. 1.72; PSP, Sec. 1.66; DSP, Sec. 1.66.

99.    At all relevant times, the Investment Options Guide provided that BP North America had the discretion, authority, and/or control to add, delete, and/or freeze the BP Stock Fund and to liquidate the BP Stock Fund if it determined the BP Stock Fund was no longer a prudent investment.  BP, INVESTMENT OPTIONS GUIDE (Aug. 2008) at 35; BP, INVESTMENT OPTIONS GUIDE (Apr. 2007) at 41.  Specifically, the 2007 and 2008 Investment Options Guides, which constitute part of a prospectus for the Plans, recognizes that BP retains the authority and discretion to liquidate all of the BP ADSs in the BP Stock Fund:  "*Under limited circumstances and in accordance with ERISA, the investment manager may attempt to liquidate all the BP ADSs in the BP Stock Fund should the investment manager **or BP** determine such an investment is no longer prudent.*"  (italics in original; bold added).

100.    On or about April 5, 2000, BP North America entered into an Investment Management Agreement with State Street (the "Management Agreement") with respect to the investment of various investment accounts of the Plans, including the BP Stock Fund.

101.    BP North America represented and warranted that under the terms of the Plans and Trust Agreement it was authorized to enter into the Management Agreement and appoint State Street as the investment manager.  Management Agreement, Secs. 1(c) and 20(iii).  The

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

Management Agreement is executed by State Street and BP Amoco Corporation (currently known as BP North America).

102.   The Management Agreement provides that BP North America could terminate the Management Agreement or the BP Stock Fund Investment Account at any time on written notice to State Street.  Management Agreement, Sec. 11.

103.   The Management Agreement provides: "Pursuant to resolutions, the Board of Directors of the Company and BP America, Inc. [sic] ('BP America') designated the Company's Investment Committee as the 'named fiduciary' under the Employee Retirement Income Security Act of 1974 ('ERISA') for purposes of selecting investment managers under the Company's and BP America's employee benefit plans.  Pursuant to this delegation of authority, the Investment Committee has selected the Investment Manager and, subject to the terms and conditions of this Agreement, hereby delegated fiduciary authority to the Investment Manager."   Management Agreement, ¶ 1 of the Recitals.

104.   The Management Agreement provides that BP North America "shall be responsible for the overall diversification of the Trust Fund and the Investment Manager's obligation to specifically diversify the Investment Accounts shall be subject to the Investment Strategy Guidelines attached hereto as Exhibit 'C' and hereby made part hereof."   Management Agreement, Sec. 2(b) (emphasis in original).

105.   Under the Management Agreement, unless otherwise directed in writing by BP North America, State Street had "full discretionary authority to" manage the investment of the assets in each Investment Account . . . ***provided, however***, that for each Investment Account (i) any and all transactions that the Investment Manager enters into shall be undertaken by the Investment  Manager in accordance with the Investment Strategy Guidelines applicable to such Investment Account and (ii) the Investment Manager shall not enter into any transaction applicable to such Investment Account other than those specifically authorized by the Investment Strategy Guidelines."   Management Agreement, Sec. 3(a). (Emphasis added.)

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

106.   Under the Management Agreement, BP North America had the overriding ability to "cause cash or any Securities and other Property to be added to or withdrawn from any Investment Account in its *discretion*, and shall give or cause written notice of such additions or withdrawals to be given to the Investment Manager."   Management Agreement, Sec. 7. (Emphasis added).  The "Securities or other Property" include the BP Stock Fund.

107.   The Investment Strategy Guidelines provide that the BP Stock Fund could be comprised of BP ADSs and cash equivalents, and that it could use short term lines of credit where appropriate.  In addition, upon prior approval of BP North America, the BP Stock Fund could invest in other public and private debt and equities securities, including debt and equity derivatives such as options and future contracts.  Management Agreement, Exh. C-1 (E).

108.   The Investment Strategy Guidelines further provide that the Investment Strategy Guidelines could be revised only by "mutual agreement" of BP North America and the Investment Manager and that BP North America could "unilaterally amend, revise or alter these Guidelines at any time for any reason by giving reasonable notice to the Investment Manager." Management Agreement, Exh. C-1 (F).

109.   Under the Management Agreement, State Street is required to provide to BP North America reports concerning the performance of the BP Stock Fund as well as a compliance statement representing that State Street had managed the BP Stock Fund in accordance with the Investment Strategy Guidelines.  Management Agreement, Exh. C-1 (G) and (H).

### (ii)    BP North America Board of Directors

110.   The Plans state that "[w]henever [BP North America] has the authority to take action under this Plan, [BP North America's] Board of Directors and each Designated Officer have the authority to act on behalf of [BP North America]. . . ."   ESP, Sec. 14.5; PSP, Sec. 14.5; DSP, Sec. 14.5; CAP, Sec. 10.4.

111.   BP North America, through the authority vested in its Board of Directors, enabled the Appointing Officer to have the authority, control and/or discretion to act, to the extent

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

provided in the Plans, on behalf of the Plans, and enabled the Administrator to have the authority, control, or discretion to act, to the extent provided in the Plans, on behalf of the Plans. ESP, Sec. 14.1(a); PSP, Sec. 14.1(a); DSP, Sec. 14.1(a); CAP, Sec. 10.1.

112.   At all relevant times, the BP North America Board was responsible for monitoring the SPIOC.  Once annually, or more or less frequently as requested by the BP North America Board, the SPIOC submitted a written report to the BP North America Board reflecting SPIOC's actions for the subsequent to the last BP North America Board report.  SPIOC Bylaws, Sec. 5.4.

113.   **Redacted Pursuant to Protective Order**

### (iii)     Designated Officer

114.   "Designated Officer" means the Appointing Officer, the Vice President, and any other officer of the BP North America and/or BP p.l.c., the Group Chief Executive of BP p.l.c. and any other officer of BP p.l.c., to whom (but only to the extent specifically provided) authority to act on behalf of BP North America has been granted by the Board of Directors. ESP, Sec. 1.39; PSP, Sec. 1.35; DSP, Sec. 1.35; CAP, Sec. 1.16.

115.   At all relevant times, the Designated Officer, acting on behalf of the BP North America and/or BP p.l.c., had all the powers necessary or incidental to carrying out the duties and rights assigned by the Plans to the Designated Officer acting on behalf of BP North America and/or BP p.l.c. or as may be granted to him from time to time, by the BP North America Board. By way of illustration and not limitation, these powers included: (a) with respect to the Appointing Officer, the power to identify any person or entity as a Named Fiduciary, and allocate to each such Named Fiduciary or its duties and responsibilities; (b) the power to establish policies and make such delegations or designations as may be necessary or incidental to

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

the Designated Officer's authority and control over the Plans acting on behalf of BP North America and/or BP p.l.c.; (c) the power to retain, monitor, and terminate such service providers and advisors as are considered appropriate to perform employer activities with respect to the Plans and to delegate any of his duties, as appropriate to such service providers and advisors; and (d) the power to take any other actions he deems necessary, incidental, or desirable to the performance of his duties as Designated Officer action on behalf of BP North America and/or BP p.l.c., including the power to delegate that power to any person.  ESP, Sec. 14.1(b); PSP, Sec. 14.1(b); DSP, Sec. 14.1(b); CAP, Sec. 10.1(b).

116.  Upon information and belief, the Designated Officers are "Investment Named Fiduciaries" and "Administrative Named Fiduciaries."

117.  Under the Plans' terms, the "Investment Named Fiduciary" means a Named Fiduciary with respect to, among other things, "the exercise of discretionary authority or discretionary control respecting management of the Plans or the exercise of any authority or control respecting management or disposition of any assets of the Plans, within the meaning of Section 3(21)(A)(i) of ERISA."  ESP, Sec. 1.62; PSP, Sec. 1.57; DSP, Sec. 1.57; CAP, Sec. 1.28.

118.  Under the Plans' terms, "Administrative Named Fiduciary" means a Named Fiduciary with respect to, among other things, "the discretionary authority or discretionary control respecting management of the Plans or the exercise of any authority or control respecting management or disposition of any assets of the Plans, within the meaning of Section 3(21)(A)(i) of ERISA.  ESP, Sec. 1.5; PSP, Sec. 1.5; DSP, Sec. 1.5; CAP, Sec. 1.2.

### (iv)    Appointing Officers

119.  At all relevant times, the President of BP North America served as the Appointing Officer.  ESP, Sec. 1.13; PSP, Sec. 1.13 DSP, Sec. 1.13; CAP, Sec. 1.7.

120.  At all relevant times, the Appointing Officer, acting as an Applicable Administrative Named Fiduciary, had all the authority or discretion of an Administrative Named Fiduciary, including but not limited to, the authority or discretion to (a) select the person serving

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

as Administrator, voting members of the Investment Committee or the Savings Plan Committee, and any Named Fiduciary with respect to the Plans, and (b) remove the person serving as Administrator, voting members of the Investment Committee or Savings Plan Committee, and any Named Fiduciary with respect to the Plans.  ESP, Sec. 14.1(c); PSP, Sec. 14.1(c); DSP, Sec. 14.1(c); CAP, Sec. 10.1(c); SPIOC Bylaws Section 1.3(a).

### (v)      Savings Plan Committee

121.   For each Plan, the Investment Committee means the SPIOC, the members of which are designated by the Appointing Officer for the Plans.  ESP, Sec. 1.60; PSP, Sec. 1.55; DSP, Sec. 1.55; CAP, Sec. 1.27.

122.   At all relevant times, the SPIOC was designated as an "Investment Named Fiduciary" as defined under Section 402(a)(2) of ERISA with the discretion, control, and authority under the Plans to appoint, monitor, and remove trustees; select, direct, monitor and terminate external investment managers; develop investment strategies and policies; and direct the trustee as to the investment and reinvestment of the trust.  ESP, Sec. 1.62; PSP, Sec. 1.57; DSP, Sec. 1.57; CAP, Sec. 1.28; SPIOC Bylaws, Sec. 1.2.

123.   At all relevant times, the SPIOC and the Designated Officer of the Plans had the discretion, control, and/or authority to add, delete, limit, and/or freeze an investment option, including the BP Stock Fund:

> Investment Options.  The Plan's Investment Options are indicated in Appendix 1.58.  In addition, a Designated Officer may, from time to time, as directed by the Investment Committee:
>
> > (a)      limit or freeze investment in, or transfers from, an Investment Option;
> >
> > (b)      add funding vehicles thereunder;
> >
> > (c)      liquidate, consolidate, or otherwise reorganize an existing Investment Option; or
> >
> > (d)      add new Investment Options to, or delete Investment Options from Appendix 1.58.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

ESP, Sec. 6.3; *see also* PSP, Sec. 6.3; DSP, Sec. 6.3.

124.   The Savings Plan Committee had discretion, authority, and/or control over the administration of the Plans and the selection of various investment funds as investment options under the Plans, including the BP Stock Fund.  In addition, on information and belief, the SPIOC was an "Applicable Investment Named Fiduciary," an "Applicable Named Fiduciary," and an "Investment Named Fiduciary" under the terms of the Plans during the Class Period.

125.   The **Savings Plan Committee Members** were fiduciaries of the Plans as a result of their membership on the Savings Plan Committee and a fiduciary and "administrator" of the Plans during the relevant time period.  The Savings Plan Committee is an investment committee that oversees investment options in the Plans.   Under the terms of the Plans, the Savings Plan Committee Members' fiduciary responsibilities included, without limitation:  (a) the authority to establish and select various investment funds as investment options under the Plans, including the BP Stock Fund which invested in BP ADSs; (b) the responsibility for establishing and carrying out a funding policy consistent with the Plans' objectives; and (c) the responsibility for performing the fiduciary functions allocated to the Savings Plan Committee under the Plans, insofar as the Savings Plan Committee Members served as members of and comprised the Savings Plan Committee unless BP North America specified otherwise.   SPIOC Bylaws, Sec. 1.2(a).  As a result of such express authority, and by virtue of any actions exercised and functions undertaken in furtherance of such authority during all relevant time frames, the Savings Plan Committee Members were fiduciaries of the Plans within the meaning of ERISA § 3(21)(a).

126.   **Redacted Pursuant to Protective Order**

127.   **Redacted Pursuant to Protective Order**

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

**Redacted Pursuant to Protective Order**

128.   In a December 2008 mailing to the Participants entitled "Benefitting you" and regarding Annual Enrollment 2009, Defendant Dorazil, the Appointing Officer, Plan Administrator, and member of the SPIOC assured Participants that "Any investment may go up or down.  We all know that.  The BP Savings Plan Investment Committee (SPIOC) monitors the investments options in our 401(k) plan.  The SPIOC can't control gains and losses, but it can evaluate the quality of our investment choices."

### (vi)     Plan Administrator

129.   At all relevant times, the "Administrator" was the "Plan Administrator" and had the discretion, authority, and/or control to restrict investment options in each Plan.  At all times during the relevant period, the Plan Administrator was the V.P. of Human Resources and/or the Vice President, Total Rewards, Western Hemisphere.  ESP, Secs. 1.6 and 1.94; PSP, Secs. 1.6 and 1.86; DSP, Sec. 1.6 and 1.86; CAP, Secs. 1.3 and 1.40; April 2007 Investment Options Guide, at 2; August 2008 Investment Options Guide, at 2; SPIOC Bylaws, Sec. 1.2(a).

130.   Under the Plans, the Administrator reserved "the right to take any and all action he determined to be appropriate to minimize plan disruptions, and to protect the interest of all Plan Participants . . . for any other reason."  Such actions included establishing rules that operate to limit or restrict Participant rights under the Plan to effectuate transactions.  The Plan Administrator could implement such actions without prior notice to Plan Participants.  ESP, Sec. 6.5; PSP, Sec. 6.5; DSP, Sec. 6.5; CAP, Sec. 6.2(d).

131.   Under the Plans, the Administrator had the power to establish rules applicable to Investment Elections (an election by which a participant directs the investment of his or her

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

contributions or amounts allocated to his account) and to limit the investment options that may be elected by the Participant.  ESP, Sec. 1.61; PSP, Sec. 1.56; DSP, Sec. 1.56; CAP, Sec. 6.2(b).

132.   Under the Plans, the "Administrative Named Fiduciary" is a Named Fiduciary with respect to:  "(a) the authority to control and manage the operation and administration of the Plan or the Trust, within the meaning of Section 402(a)(1) of ERISA; (b) the discretionary authority or discretionary responsibility in the administration of the Plan or the trust within the meaning of Section 3(21)(A)(ii) of ERISA; or (c) the exercise of discretionary authority or discretionary control respecting management of the Plan or the trust or the exercise of any authority or control respecting management or disposition of any assets of the Plan or the Trust, within the meaning of Section 3(21)(A)(i) of ERISA."  ESP, Sec. 1.5; PSP, Sec. 1.5; DSP, Sec. 1.56; CAP, Sec. 1.2.

133.   The Plan Administrator acting as an Applicable Administrative Named Fiduciary has: (a) all the authority or discretion of an Administrative Named Fiduciary, including but not limited to, the authority or discretion to (b) construe and apply the provisions of the Plans, (c) appoint and compensate such specialists (including attorneys, actuaries, consultants, and accountants) to aid in the administration of the Plans, (d) settle or compromise any litigation against the Plans or a fiduciary with respect to which the Plans have a claim filed against them or an indemnity obligation to a third party, (e) delegate Authority or Discretion to a fiduciary, and (f) take any other actions necessary incidental, or desirable to the performance of the Authority or Discretion of the Administrator.  ESP, Sec. 14.1(d); PSP, Sec. 14.1(d); DSP, Sec. 14.1(d); CAP, Sec. 10.1; SPIOC Bylaws, Sec. 1.2 (a).

### (vii)    Investment Manager

134.   On or about April 6, 2000, BP North America and State Street entered into the Management Agreement whereby BP North America delegated certain of its fiduciary responsibilities to State Street with respect to certain investment accounts in the Plans, including the BP Stock Fund.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

135.   As described above, although BP North America delegated discretion to manage the BP Stock Fund to State Street, BP North America maintained the ultimate discretion, control, and/or authority over the BP Stock Fund by, among other things, mandating that State Street follow the Investment Strategy Guidelines that could be unilaterally amended by BP North America without notice and/or revised based on a mutual agreement between BP North America and State Street.   Management Agreement, Exh. C-1(F).   In addition, BP North America maintained the power to terminate the Management Agreement at any time.   Management Agreement, Sec. 11.

## V.    CLASS ACTION ALLEGATIONS

136.   Plaintiffs bring this action as a class action in the event that class action procedures are deemed necessary by the Court, pursuant to Fed. R. Civ. P. 23(a) and Fed. R. Civ. P. 23(b)(1) and/or (b)(3), on behalf of Plaintiffs and the following Class of persons similarly situated:

> All persons who were participants in or beneficiaries of any of the Plans, whose accounts held units of the BP Stock Fund that were held in the BP Master Trust at any time from January 16, 2007 and June 24, 2010, inclusive (the "Class Period") and were damaged thereby.   Excluded from the Class are Defendants and members of Defendants' immediate families, any entity in which a Defendant has a controlling interest, and their heirs, successors-in-interest, or assigns (in their capacities as heirs, successors-in-interest, and assigns).

137. The members of the Class are so numerous that joinder of all members is impracticable.   While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are, at minimum, tens of thousands of members of the Class.   For example, as of December 31, 2009, the ESP had 40,937 participants of whom, upon information and belief, several thousand are members of the Class.

138.   Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class.   Among the questions of law and fact common to the Class are:

     (a)     whether Defendants were fiduciaries;

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

(b)     whether Defendants breached their fiduciary duties to the Plans by failing

to conduct an appropriate investigation into the prudence of the BP Stock

Fund;

(c)     whether Defendants breached their fiduciary duties by (i) continuing to

offer the BP Stock Fund as an investment option for the Plans and the

Participants, (ii) investing Plan assets in the BP Stock Fund, and/or (iii)

investing Fund assets in BP ADSs;

(d)     whether Defendants' communications to the Plans and the Participants

provided complete and accurate information concerning the risks of

investing Plan assets in the BP Stock Fund;

(e)     whether Defendants negligently or intentionally provided inaccurate

and/or misleading information, or failed to disclose material information,

to the Plans and the Participants concerning BP;

(f)     whether Defendants in supervisory roles failed in their monitoring of the

SPIOC Defendants;

(g)     whether the Plans suffered losses as a result of Defendants' breaches; and

(h)     whether the Plans and/or the Participants are entitled to damages or other

relief.

139.   Plaintiffs' claims are typical of the claims of the other members of the Class

because Plaintiffs and all members of the Class sustained damages arising out of Defendants'

wrongful conduct in violation of ERISA as complained herein.

140.   Plaintiffs will fairly and adequately represent and protect the interests of the Class.

Plaintiffs' interests are coincident with and not antagonistic to the interests of the other Class

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

members. Plaintiffs have retained able counsel with extensive experience in class action, complex, and ERISA litigation.

141. Class action status is also warranted under Rule 23(b)(1) because prosecution of separate actions by members of the Class would, as a practical matter, be dispositive of the interests of the other members who are not parties to the adjudications or would substantially impair or impede their ability to protect their interests.

142. Class action status is also warranted under the other subsections of 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

143. Defendants' actions and inactions apply generally to all Participants such that final relief is appropriate respecting the Class as a whole.

144. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for individual Class members to seek redress for the wrongful conduct alleged. Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## VI.    FACTUAL ALLEGATIONS

### A.    Introduction

145. The *Deepwater Horizon* accident was a disaster of epic proportion that took the lives of 11 people and brought environmental catastrophe to the northern Gulf of Mexico and

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

U.S. Gulf Coast.  BP received unprecedented high-profile daily negative news coverage for months following the April 20, 2010 explosion.  BP's stock price suffered material and deep drops as a result of the disaster.  Yet, given the dysfunctional state of BP's safety and risk management procedures, the disaster and its consequences were or should have been no surprise to BP and the fiduciaries of the Plans.  Given the admitted crucial importance of safety to BP's business and the myriad of problems BP experienced in the years leading up to the *Deepwater Horizon* disaster, reasonable fiduciaries would have considered themselves bound to divest BP ADSs from the Plans.  This case is not about making unreasonable predictions based on speculation but rather objective analysis considering the state of company affairs and a fiduciary's responsibility to understand that a disaster like *Deepwater Horizon* would (and did) bring about great losses to the Plans.  As detailed below, a disaster of the proportion of *Deepwater Horizon* and the resulting losses suffered by the Plans were a predictable future for BP.  Therefore, Defendants knew or should have known that BP ADSs were an imprudent investment for the Plans.  Defendants failed to protect the Participants' retirement savings from being imprudently invested in the BP Stock Fund, and as a result, the Plans suffered losses, for which Defendants are liable.

146.  Drilling offshore for oil located thousands of feet below the ocean floor is an inherently difficult and complicated process.  Meticulous attention to safety is a prerequisite to the success of this process.  Failure to pay this requisite attention to safety gives rise to not only a risk, but to a near certainty of disaster, one which most likely includes loss of human life and environmental destruction.

147.  As detailed in the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling's Report to the President entitled "DEEP WATER:  The Gulf Oil Spill and the Future of Offshore Drilling" (the "Presidential Report"), released on January 11, 2011, "[o]il forms deep beneath the Earth's surface when organic materials deposited in ancient sediments slowly transform in response to intense heat and pressure.  Over the course of millions of years, these materials 'cook' into liquid and gaseous hydrocarbons."  In some instances, these materials

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

can rise to the surface on their own through porous mineral layers.  In other instances they are blocked by an impermeable layer and collect in porous rock below that.  According to the Presidential Report, "the business of drilling for oil consists of finding and tapping these 'pay zones' of porous hydrocarbon-filled rock."  The weight of those rocks can create "tremendous pressure on the hydrocarbons," and the "deeper the well, the higher the pressure—and the higher the pressure, the greater the challenge in safely removing the hydrocarbons."

148.  According to the Presidential Report, "[t]he principal challenge in deepwater drilling is to drill a path to the hydro-carbon filled pay zone in a manner that simultaneously controls these enormous pressures and avoids fracturing the geologic formation in which the reservoir is found."

It is a delicate balance. The drillers must balance the reservoir pressure (pore pressure) pushing hydrocarbons into the well with counter-pressure from inside the wellbore. If too much counter-pressure is used, the formation can be fractured. But if too little counter-pressure is used, the result can be an uncontrolled intrusion of hydrocarbons into the well, and a discharge from the well itself as the oil and gas rush up and out of the well. An uncontrolled discharge is known as a blowout.

149.  As a result, drilling a well is a complex process.  According to the Presidential Report, those drilling "use drill pipe, casing, mud, and cement in a series of carefully calibrated steps to control pressure while drilling thousands of feet below the seafloor to reach the pay zone."

Drilling mud, which is used to lubricate and cool the drill bit during drilling, plays a critical role in controlling the hydrocarbon pressure in a well. The weight of the column of mud in a well exerts pressure that counterbalances the pressure in the hydrocarbon formation. If the mud weight is too low, fluids such as oil and gas can enter the well, causing what is known as a "kick." But if the mud weight is too high, it can fracture the surrounding rock, potentially leading to "lost returns"—leakage of the mud into the formation. The rig crew therefore monitors and adjusts the weight (density) of the drilling mud as the well is being drilled— one of many sensitive, technical tasks requiring special equipment and the interpretation of data from difficult drilling environments.

Casing strings, which are a series of steel tubes installed to line the well as the drilling progresses, also help to control pressures. First, they protect more fragile

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

sections of the well structure outside the casing from the pressure of the mud inside. Second, they prevent high-pressure fluids (like hydrocarbons) outside the casing from entering the wellbore and flowing up the well. To secure the casing, crews pump in cement to seal the space between the casing and the wellbore. If a completed well can yield economically valuable oil and gas, the crews can initiate production by punching holes through the casing and surrounding cement to allow hydrocarbons to flow into the well.

Designed and used properly, drilling mud, cement, and casing work together to enable the crew to control wellbore pressure. If they fail, the crew can, in an emergency, close powerful blowout-preventer valves that should seal off the well at the wellhead.

150.   Safety is plainly crucial to this process, a fact BP has conceded in its public statements.  According to the Presidential Report, BP had, prior to the Gulf oil spill, "proclaimed the importance of safety for its vast worldwide operations."  As noted in the Presidential Report, BP repeatedly admitted in its Sustainability Review 2009 that safety was crucial for the company's success.  For example, the BP Sustainability Review included statements such as (1) "[s]afety is fundamental to our success as a company" and (2) "[o]ur goal of 'no accidents, no harm to people and no damage to the environment' is fundamental to BP's activities."

151.   Not only did BP admit that safety was essential to its success, but BP repeatedly publicly stated that its business operated with proper safety and risk management procedures, as detailed below.  Despite the fact that BP recognized that safety was of paramount importance to it business and operations, BP's commitment to safety was sorely lacking.  According to the Presidential Report:

> Yet despite the improvement in injury and spill rates during that decade, BP has caused a number of disastrous or potentially disastrous workplace incidents that suggests its approach to managing safety has been on individual worker occupational safety but not on process safety.  These incidents and subsequent analyses indicate that the company does not have consistent and reliable risk-management processes—and thus has been unable to meet its professed commitment to safety.  BP's safety lapses have been chronic.

152.   These chronic safety lapses were ultimately responsible for the *Deepwater Horizon* disaster.  The Deepwater Horizon Study Group, a group of experts and professionals in the field of offshore drilling, issued a report on March 1, 2011 entitled "Final Report on the Investigation

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

of the Macondo Well Blowout" (the "DHSG Report").   The DHSG Report documents BP's long-standing and multiple failures to operate safely:

> This disaster was preventable if existing progressive guidelines and practices [had] been followed—the Best Available and Safest Technology. BP's organizations and operating teams did not possess a functional Safety Culture. Their system was not propelled toward the goal of maximum safety in all of its manifestations but was rather geared toward a trip-and-fall compliance mentality rather than being focused on the Big-Picture. It has been observed that BP's system "forgot to be afraid." The system was not reflective of one having well-informed, reporting, or just cultures. The system showed little evidence of being a high-reliability organization possessing a rapid learning culture that had the willingness and competence to draw the right conclusions from the system's safety signals. The Macondo well disaster was an organizational accident whose roots were deeply embedded in gross imbalances between the system's provisions for production and those for protection.

> The multiple failures (to contain, control, mitigate, plan, and clean-up) that unfolded and ultimately drove this disaster appear to be deeply rooted in a multi-decade history of organizational malfunctions and shortsightedness. There were multiple opportunities to properly assess the likelihoods and consequences of organizational decisions (i.e., Risk Assessment and Management) that were ostensibly driven by BP management's desire to "close the competitive gap" and improve bottom-line performance. Consequently, although there were multiple chances to do the right things in the right ways at the right times, management's perspective failed to recognize and accept its own fallibilities despite a record of recent accidents in the U.S. and a series of promises to change BP's safety culture.

**B.     BP's Safety Record Prior to the *Deepwater Horizon* Explosion**

153.   As mentioned above, BP was responsible for many accidents and disasters in the years leading up to *Deepwater Horizon* tragedy.   These incidents show BP's reckless pattern of compromising safety in order to save time and money.   Many of the earlier incidents were caused by problems similar to those that befell the *Deepwater Horizon*, including equipment failures, failure to properly cement the well, poor team communication, and the inability to properly identify and confront problems and crises.   They involved loss of control of wells and explosions.   These incidents all presented lessons to BP that, if properly learned, would have prevented the cascade of events that lead to disaster on the *Deepwater Horizon*.   The fact that

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

those events did occur on the *Deepwater Horizon* evidence a complete inability and/or reckless disregard of BP to learn from its mistakes.

### (i)   Ocean King (2002)

154.   In 2002, the Ocean King, a drilling rig under the operational control of BP suffered two catastrophic blowouts within a roughly three month period.  According to reports from the U.S. Department of the Interior Minerals Management Service ("MMS" subsequently renamed Bureau of Ocean Energy Management, Regulation and Enforcement), the Ocean King was exploring at a depth of about 3,600 feet in the Gulf of Mexico off the Grand Isle portion of the Louisiana coast, not far from the Macondo well in Mississippi Canyon.

155.   On August 8, 2002, during routine drilling, the Ocean King experienced an uncontrolled burst of high-pressure natural gas that shot up the drilling pipe, setting off the onboard alarm.  The crew was unable to regain control of the well and was forced to evacuate. Shortly thereafter, the gas reached the well deck and ignited.  The fire raged for over seven hours and was fed by highly flammable acetylene bottles located on the rig itself.

156.   An investigation by the MMS discovered that the diverter — the safety equipment that is meant to divert gases, water, mud, and other materials away from the facilities and personnel — failed.  In fact, according to an MMS Report, the diverter installed on the Ocean King was not only different from the approved diverter design, the installation itself "failed to meet MMS regulations and policies."  Making matters worse, the crew aboard the Ocean King negligently stored highly flammable materials near the diverter output, which increased exponentially the danger of a blowout.

157.   Nearly three months later, on November 14, 2002, the Ocean King, having returned to service after a series of repairs from the earlier blowout, suffered a second potentially disastrous incident.  The crew was cementing the well when a micro-annulus formed, indicating a failed cement job.  The micro-annulus, a small gap between the casing or liner and the cement, allowed gas to enter behind the surface casing, past the conductor casing shoe, and into the

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

annulus.  In response, the crew shifted the diverter into "test" mode, thereby shutting in the well.  As pressure built, the crew repeatedly attempted to bleed the line to no avail.  Eventually gas was detected on the rig floor, and, once again, the Ocean King was evacuated.  Attempts were made to open the diverter remotely, but the crew soon realized that when left in "test" mode, the diverter could not be operated remotely.

158.  Although BP had revamped the diverter system on the Ocean King following the August 8, 2002 explosion, the upgrades proved to be meaningless given that the crew was not familiar with the system.  The MMS reported that BP "supervisors were unaware that use of the 'test' mode disabled the ability to control the diverter from the remote location."

159.  Following the second incident, the MMS issued a safety alert warning of the danger of a blowout associated with cementing a well.  Specifically, the MMS warned that "[a]nnular flow related to cementing surface casing has been identified as one of the most frequent causes of loss of control incidents in the Gulf of Mexico."  In addition, MMS issued the following recommendations to oil well operators, recommendations that, if heeded, would have served BP in preventing the disaster on the *Deepwater Horizon*:

> The MMS recommends to the operators and drilling contractors the following:
>
> 1.  For each well, the operators and contractors should conduct a review of the contingency procedures to be followed in the event of annular flow after cementing.  Before using the diverter to hold back pressure after cementing, detailed planning is recommended, including identification of maximum pressure to be held, method of monitoring and measuring pressure, and how that pressure will be diverted if necessary.
>
> 2.  The operators and contractors should ensure the contingency procedures are clearly disseminated to all rig supervisors and any personnel who could be involved in emergency decision making.
>
> 3.  The operators and drilling contractors should ensure all supervisory personnel are fully trained in diverter operations specific to each rig, including pressure limits and control mechanisms, under all circumstances.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

4.  The operators should review cementing practices and procedures for shallow casing strings and adopt best cementing practices that provide the most protection from annular flow after cementing.

### (ii)    Transocean Discoverer Enterprise (2003)

160.   According to a June 20, 2010 *New York Times* article titled "Regulators Failed to Address Risks in Oil Rig Fail-Safe Device," the Transocean Discoverer Enterprise, operated by BP, was drilling a deepwater well in the Mississippi Canyon on May 21, 2003, when the rig experienced a heave, followed by a jarring action, at about 4:00 a.m.   The crew dispatched a remotely operated underwater vehicle ("ROV"), and soon discovered that the jolt they had felt was the riser snapping apart in at least two places.   It was at this time that BP experienced firsthand the benefits of redundant blind shear rams.   The first set of blind shear rams closed automatically through the "dead man" sequence, effectively sealing off the well.   However, the crew realized that a section of the broken riser had come to rest against the blowout preventer ("BOP"), causing it damage and coming uncomfortably close to the control lines, an event eerily similar to what happened to the riser in *Deepwater Horizon*.   Upon seeing the damage to the BOP, the crew used the ROV to activate the second set of shear rams, proving the necessity of this extra layer of safety.

### (iii)    Forties Alpha (2003)

161.   According to a June 28, 2010 *Weekly Standard* article titled "Beyond Pathetic," on November 23, 2003, at BP's Forties Alpha platform located in the North Sea, the crew experienced a near-catastrophic incident when a corroded gas line ruptured, engulfing the platform in a cloud of highly flammable gas.   Fortunately, heavy wind allowed the gas to abate without igniting, and a potential disaster was averted.   However, such fortune would not have been necessary had BP properly monitored and maintained the gas line to prevent corrosion.   In fact, during the time leading up to the gas leak, BP had decreased the maintenance budget, leaving the Forties Alpha platform engineers with less than 80 percent of the money they considered necessary to ensure the rig's safety.

44

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

162.   The *Weekly Standard* article reported that Oberon Houston, an engineer and manager on the Forties Alpha platform, wrote of BP's attitude towards safety:

> I had been dissatisfied with the way senior BP management focused so heavily on the easy part of safety, holding the hand rails, spending hours discussing the merits of reverse parking and the dangers of not having a lid on a coffee cup—but were less enthusiastic about the hard stuff, investing in and maintaining their complex facilities.

163.   Ultimately, BP admitted to breaking health and safety regulations by failing to protect against corrosion on the ruptured gas line

### (iv)      GSF Adriatic IV (2004)

164.   BP experienced yet another catastrophic blowout, this time on the GSK Adriatic IV, a gas drilling rig operating off the coast of Egypt, operated by BP as part of a joint venture with Italy's ENI and Egypt's General Petroleum Corporation.   On August 10, 2004, the GSF Adriatic IV was severely damaged after a blowout caused an explosion which eventually engulfed the entire rig in flames.   The fire raged for over a week before the rig finally plunged into the Mediterranean Sea.

### (v)      Texas City Refinery (2005)

165.   On March 23, 2005, BP's Texas City Refinery suffered one of the worst industrial disasters in U.S. history.   The refinery explosion left 15 people dead, injured an additional 180 people, and resulted in financial losses exceeding $1.5 billion.   This watershed event made it abundantly clear to BP that serious deficiencies were embedded in the company's safety culture. Moreover, as detailed below, the causes of the refinery tragedy bear striking similarities to the causes of the *Deepwater Horizon* disaster.

166.   An investigation by the U.S. Chemical Safety and Hazard Investigation Board ("CSB") found that the incident occurred during the startup of an isomerization ("ISOM") unit. This was a specialized and safety-sensitive process that, like operation of the *Deepwater Horizon* required meticulous adherence to safety protocols.   During the ISOM startup, a refinery tower was overfilled, causing pressure relief devices to open.   A geyser of flammable liquid was

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

released and then evaporated as it fell to the ground, forming a cloud of flammable vapor.  The vapor cloud ignited, causing a catastrophic explosion that not only led to the aforementioned casualties, but also damaged homes as far away as three-quarters of a mile from the refinery.

167.   According to the CSB report, the refinery tower had been filled for over three hours without any liquids being removed.  This led to flooding of the tower and the resulting high pressure, which activated the relief valves that discharged flammable liquid to the blowdown system.   The CSB found significant underlying safety breaches that ultimately resulted in the overfilling of the tower:

- The tower level indicator showed that the tower level was declining when it was actually overfilling. The redundant high level alarm did not activate, and the tower was not equipped with any other level indications or automatic safety devices.

- The control board display did not provide adequate information on the imbalance of flows in and out of the tower to alert the operators to the dangerously high level.

- A lack of supervisory oversight and technically trained personnel during the startup, an especially hazardous period, was an omission contrary to BP safety guidelines. An extra board operator was not assigned to assist, despite a staffing assessment that recommended an additional board operator for all ISOM startups.

- Supervisors and operators poorly communicated critical information regarding the startup during the shift turnover; BP did not have a shift turnover communication requirement for its operations staff.

- ISOM operators were likely fatigued from working 12-hour shifts for 29 or more consecutive days.

- The operator training program was inadequate. The central training department staff had been reduced from 28 to eight, and simulators were unavailable for operators to practice handling abnormal situations, including infrequent and high hazard operations such as startups and unit upsets.

- Outdated and ineffective procedures did not address recurring operational problem during startup, leading operators to believe

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

that procedures could be altered or did not need to be followed
during the startup process.

168.   The CSB also found that equipment failures and other structural oversights by BP contributed to the disaster.  In fact, in the years prior to the incident, eight serious releases of flammable material from the blowdown stack had occurred, and most ISOM startups experienced high liquid levels in the splitter tower.  BP never investigated these events.  The CSB Report stated that "[d]eficiencies in BP's mechanical integrity program resulted in the 'run to failure' of process equipment at Texas City."  In fact, "cost-cutting and failure to invest in the 1990s by Amoco and then BP left the Texas City refinery vulnerable to a catastrophe.  BP targeted budget cuts of 25 percent in 1999 and another 25 percent in 2005, even though much of the refinery's infrastructure and process equipment were in disrepair.  Also, operator training and staffing were downsized."

169.   Before the process unit was started on March 23, 2005, there were reported malfunctions of the tower level indicator, level sight glass, and a pressure control valve.  However, the unit was started anyway.

170.   Following the deadly explosion, the CSB found that the size of the blowdown drum was insufficient to contain the liquid sent to it by the pressure relief valves.  Ultimately, the blowdown drum overfilled and then shot out the flammable liquid that subsequently fell to the ground and ignited.  Significantly, a relief valve system safety study had not been completed.

171.   The CSB also reported that BP never replaced the blowdown drums and atmospheric stacks, even though a series of incidents warned that this equipment was unsafe.  In 1992, OSHA cited a similar blowdown drum and stack as unsafe, but the citation was withdrawn as part of a settlement agreement.  In 1997, a major modification replaced the then-existing blowdown drum and stack with similar equipment, but Amoco did not connect it to a flare system that would safely receive and combust waste gases from emergency relief valve discharge or process vent.  In 2002, BP engineers proposed connecting the blowdown system to a flare, but a less expensive option was chosen.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

172.   The vast majority of incidents that had occurred at BP-owned or operated facilities were directly attributable to BP's deeply embedded culture of putting cost-cutting before safety. Texas City was no different.  The CSB found that cost-cutting, failure to invest, and production pressures from BP impaired process safety performance at Texas City.  In addition, the BP Board of Directors did not provide effective oversight of BP's safety culture and major accident prevention programs.  The Board did not have a member responsible for assessing and verifying the performance of BP's major accident hazard prevention programs.

173.   Furthermore, similar to the Forties Alpha platform, BP relied on a low personal injury rate at Texas City as a safety indicator, which failed to provide a true picture of the process safety performance and the soundness of the safety culture.  According to the CSB Report, "[o]ne underlying cause was that BP used inadequate methods to measure safety conditions at Texas City.  For instance, a very low personal injury rate at Texas City gave BP a misleading indicator of process safety performance.  In addition, while most attention was focused on the injury rate, the overall safety culture and process safety management program had serious deficiencies."

174.   The CSB also found that BP had a "check the box" mentality, meaning personnel completed paperwork and simply checked off on safety policy and procedural requirements even when those requirements had not been met.  The CSB further found:

> BP Texas City lacked a reporting and learning culture. Personnel were not encouraged to report safety problems and some feared retaliation for doing so. The lessons from incidents and near-misses, therefore, were generally not captured or acted upon. Important relevant safety lessons from a British government investigation of incidents at BP's Grangemouth, Scotland, refinery were also not incorporated at Texas City.

175.   Safety campaigns, goals, and rewards focused on improving personal safety metrics and worker behaviors rather than process safety and safety management systems. While compliance with many safety policies and procedures was deficient at all levels of the refinery, Texas City managers did not lead by example regarding safety.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

### (vi) Baker Report

176. In the wake of the Texas City explosion, on August 17, 2005, the CSB recommended that BP establish an independent panel of experts to examine BP's corporate safety management systems, safety culture, and oversight of the North American refineries. In making its recommendation, the CSB noted that the Texas City refinery had experienced two other fatal safety incidents in 2004, a major process-related hydrogen fire in July 2005, and another serious incident in August 2005. Based on these incidents and the results of the first few months of its preliminary investigation, the CSB cited serious concerns about:

- the effectiveness of the safety management system at the BP Texas City refinery,

- the effectiveness of BP North America's corporate safety oversight of its refining facilities, and

- a corporate safety culture that appeared to have tolerated serious and longstanding deviations from good safety practice.

177. In response to the CSB's recommendation, BP issued a press release, where Defendant Browne said, "The Texas City explosion was the worst tragedy in the recent history of BP, and we will do everything possible to ensure nothing like it happens again. Today's recommendation from the CSB is a welcome development and we take it seriously."

178. BP commissioned the BP U.S. Refineries Independent Safety Review Panel, chaired by former Secretary of State James Baker, III (the "Baker Panel"), which issued its findings in the Baker Report in January 2007. The Baker Panel focused its findings into three categories: (a) corporate safety culture; (b) process safety management systems; and (c) performance evaluation, corrective action, and corporate oversight.

179. With regard to BP's safety culture, the Baker Panel found, "BP has not provided effective process safety leadership and has not adequately established process safety as a core value across all its five U.S. refineries." The Baker Panel also echoed Oberon Houston's experiences on the Forties Alpha platform, explaining that "BP mistakenly interpreted improving

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

personal injury rates as an indication of acceptable process safety performance at its U.S. refineries." In other words, two years after the Forties Alpha incident, BP was still focused on preventing slip-and-fall type accidents while practically ignoring the potential for catastrophic disasters.

180. The Baker Panel went on to explain the deficiencies in BP's process safety management protocol. The Baker Report explained that, "[w]hile all of BP's U.S. refineries have active programs to analyze process hazards, the system as a whole does not ensure adequate identification and rigorous analysis of those hazards. The Panel's examination also indicates that the extent and recurring nature of this deficiency is not isolated, but systemic." The Baker Panel also found that "BP has not effectively implemented its corporate-level aspirational guidelines and expectations relating to process risk."

181. Finally, the Baker Panel found that one of BP's biggest shortfalls was its inability to learn from its experiences. Particularly, the Baker Report states that "significant deficiencies existed in BP's site and corporate systems for measuring process safety performance, investigating incidents and near misses, auditing system performance, addressing previously identified process safety-related action items, and ensuring sufficient management and board oversight. Many of the process safety deficiencies are not new but were identifiable to BP based upon lessons from previous process safety incidents, including process incidents that occurred at BP's facility in Grangemouth, Scotland in 2000."

182. The CSB also found that BP's problems were systemic and were not isolated to this particular incident at this particular location. In fact, the CSB found that the "Texas City disaster was caused by organizational and safety deficiencies at all levels of the BP Corporation. Warning signs of a possible disaster were present for several years, but company officials did not intervene effectively to prevent it. The extent of the serious safety culture deficiencies was further revealed when the refinery experienced two additional serious incidents just a few

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

months after the March 2005 disaster.  In one, a pipe failure caused a reported $30 million in damage; the other resulted in a $2 million property loss."

183.   The Baker Panel issued the following recommendations:

**RECOMMENDATION # 1 – PROCESS SAFETY LEADERSHIP**

The Board of Directors of BP p.l.c., BP's executive management (including its Group Chief Executive), and other members of BP's corporate management must provide effective leadership on and establish appropriate goals for process safety. Those individuals must demonstrate their commitment to process safety by articulating a clear message on the importance of process safety and matching that message both with the policies they adopt and the actions they take.

**RECOMMENDATION #2 – INTEGRATED AND COMPREHENSIVE PROCESS SAFETY MANAGEMENT SYSTEM**

BP should establish and implement an integrated and comprehensive process safety management system that systematically and continuously identifies, reduces, and manages process safety risks at its U.S. refineries.

**RECOMMENDATION #3 – PROCESS SAFETY KNOWLEDGE AND EXPERTISE**

BP should develop and implement a system to ensure that its executive management, its refining line management above the refinery level, and all U.S. refining personnel, including managers, supervisors, workers, and contractors, possess an appropriate level of process safety knowledge and expertise.

**RECOMMENDATION #4 – PROCESS SAFETY CULTURE**

BP should involve the relevant stakeholders to develop a positive, trusting, and open process safety culture within each U.S. refinery.

**RECOMMENDATION #5 – CLEARLY DEFINED EXPECTATIONS AND ACCOUNTABILITY FOR PROCESS SAFETY**

BP should clearly define expectations and strengthen accountability for process safety performance at all levels in executive management and in the refining, managerial and supervisory reporting line.

**RECOMMENDATION #6 – SUPPORT FOR LINE MANAGEMENT**

BP should provide more effective and better coordinated process safety support for the U.S. refining line organization.

#27955-v5

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

**RECOMMENDATION #7 – LEADING AND LAGGING PERFORMANCE INDICATORS FOR PROCESS SAFETY**

BP should develop, implement, maintain, and periodically update an integrated set of leading and lagging performance indicators for more effectively monitoring the process safety performance of the U.S. refineries by BP's refining line management, executive management (including the Group Chief Executive), and Board of Directors. In addition, BP should work with the U.S. Chemical Safety and Hazard Investigation Board and with industry, labor organizations, other governmental agencies, and other organizations to develop a consensus set of leading and lagging indicators for process safety performance for use in the refining and chemical processing industries.

**RECOMMENDATION #8 – PROCESS SAFETY AUDITING**

BP should establish and implement an effective system to audit process safety performance at its U.S. refineries.

**RECOMMENDATION #9 – BOARD MONITORING**

BP's Board should monitor the implementation of the recommendations of the Panel (including the related commentary) and the ongoing process safety performance of BP's U.S. refineries. The Board should, for a period of at least five calendar years, engage an independent monitor to report annually to the Board on BP's progress in implementing the Panel's recommendations (including the related commentary). The Board should also report publicly on the progress of such implementation and on BP's ongoing process safety performance.

**RECOMMENDATION #10 – INDUSTRY LEADER**

BP should use the lessons learned from the Texas City tragedy and from the Panel's report to transform the company into a recognized industry leader in process safety management.

184.   After this incident OSHA uncovered 301 egregious, willful violations for which BP paid a $21 million fine.   The fine was, at the time, the largest ever issued by OSHA in its 35-year history.   But even prior to OSHA's issuing the citations and fine, the refinery experienced two additional serious incidents.

185.   On October 30, 2009, BP was fined $87 million for "outstanding life threatening safety problems" in connection with the March 23, 2005 accident at the BP Texas City Refinery. Hilda Solis, the Secretary of the Department of Labor, stated that there still existed 439 "willful and egregious safety violations" that could result in another catastrophic accident.  Jordan Barab,

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

an assistant secretary at OSHA stated, "Just the fact that there are still so many outstanding problems, life-threatening problems, at this plant, indicates that they still have a systemic safety problem." Even though BP claimed that it would clean up its safety record, it did not do so. On the contrary, such systemic safety problems resulted in the *Deepwater Horizon* disaster.

186. The DHSG Report, which detailed the similarities between the Texas City disaster and the *Deepwater Horizon* tragedy, as follows:

- Multiple system operator malfunctions during a critical period in operations,

- Not following required or accepted operations guidelines (i.e., "casual compliance"),

- Neglected maintenance,

- Instrumentation that either did not work properly or whose data interpretation gave false positives,

- Inappropriate assessment and management of operations risks,

- Multiple operations conducted at critical times with unanticipated interactions,

- Inadequate communications between members of the operations groups,

- Unawareness of risks,

- Diversion of attention at critical times,

- A culture with incentives that provided for increases in productivity without commensurate increases in protection,

- Inappropriate cost and corner cutting,

- Lack of appropriate selection and training of personnel, and

- Improper management of change.

187. The DHSG Report also highlighted the fact that "in both cases — the BP Texas City and the BP Macondo well disasters — meetings were held with operations personnel at the same time and place the initial failures were developing. These meetings were intended to congratulate the operating crews and organizations for their excellent records for worker safety.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

Both of these disasters have served — as many others have served — to clearly show there are important differences between worker safety and system safety.  One does not assure the other."

188.   The Baker Panel's recommendations made crystal clear what BP had to do to fix its deficient safety and risk management culture.  These recommendations focused on actions that needed to be taken by, first and foremost, BP's senior management.  In other words, the Baker Panel raised numerous red flags concerning senior management's role in BP's safety processes.  BP's senior management, despite their public statements to the contrary, ignored these red flags and failed to implement the Baker Panel's recommendations.  The result was yet another series of debacles, as shown by the cascade of events leading to the April 20, 2010 explosion on the *Deepwater Horizon* and the oil spill that followed.

### (vii)     Thunder Horse PDQ (2005)

189.   According to a July 12, 2010 *New York Times* article titled "In BP's Record, a History of Boldness and Costly Blunders," in July 2005, like many times before, BP averted crisis by sheer luck.  In the wake of Hurricane Dennis, on July 11, 2005, a passing ship spotted the $1 billion Thunder Horse platform, which was intended to produce about 20 percent of the Gulf's oil output, severely listing to one side, as if it were about to sink.  Investigation into this near disaster revealed that a valve installed backward had caused the vessel to flood during the hurricane, jeopardizing the project before any oil had even been pumped.  Other problems, discovered later, included a welding job so shoddy that it left underwater pipelines brittle and full of cracks.

190.   Gordon A. Aaker, Jr., a senior engineering consultant on the project, later stated that "[i]t could have been catastrophic.  You would have lost a lot of oil a mile down before you would have even known. It could have been a helluva spill — much like the Deepwater Horizon."

191.   The problems at Thunder Horse were not an anomaly, but a warning that BP was taking too many risks and cutting corners in pursuit of growth and profits.  This problem was

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

brought to BP's attention a number of times by experts, analysts, competitors and former employees.  Despite a catalog of crises and near misses in recent years, BP has been chronically unable or unwilling to learn from its mistakes, as an examination of its record shows.

### (viii)    Prudhoe Bay Alaskan Pipeline Operation (2006)

192.   On March 2, 2006, less than one year after the Texas City disaster, BP discovered a leak in a pipeline in the Western Operating Area of the Prudhoe Bay in Alaska (the largest oil field in the U.S.) which caused a spill of more than 200,000 gallons of oil.  According to an Alaska Department of Environmental Conservation joint incident investigation report dated April 14, 2006, the leak occurred as a result of internal corrosion.   The report identified BP Exploration Alaska, Inc. as the responsible party.

193.   On May 16, 2007, Carolyn W. Merritt, Chairman and Chief Executive Officer of the CSB, testified before the U.S. House of Representatives Committee on Energy and Commerce regarding the incidents at Texas City and Prudhoe Bay.  Merritt stated that there were "striking similarities in the reported causes of the 2006 events involving BP's Prudhoe Bay pipelines and the 2005 explosion at the BP Texas City Refinery.  Most if not all of the seven root causes . . . identified for the Prudhoe Bay incidents have strong echoes in Texas City."

194.   At the committee's request, Merritt reviewed a report prepared by Booz Allen Hamilton, under contract to BP, on the 2006 pipeline events in Prudhoe Bay, and compared the findings with her own.   Merritt testified to BP's imprudent cost-cutting at the expense of operational integrity:

> The Booz Allen report states that "Alaska was under severe budget pressure from BP."  The budgeting process was "largely driven by top-down targets" rather than an analysis of risks, and the "top-down targets were considered sacrosanct and were rarely exceeded."   The cost pressures, we are told, resulted in staff reductions throughout BP Alaska and specifically in the corrosion control program, and in the deferral of integrity projects. The report states that "from 2002 to 2004, a series of reorganization projects focused on streamlining business operations and cutting costs."

*       *       *

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

In the CSB's report, we found that cost cutting, production pressures, and a failure to invest left the BP Texas City refinery vulnerable to a catastrophe. Shortly after acquiring Amoco in 1999, the BP Group Chief Executive ordered an across-the-board 25% cut in fixed spending. Such policies were particularly imprudent in light of the age and condition of some of BP's newly acquired assets, including the Texas City Refinery. A 2002 internal BP report, cited in our investigation, noted that "the prevailing culture at the Texas City refinery was to accept cost reductions without challenge and not to raise concerns when operational integrity was compromised."

195.   On October 25, 2007, BP Exploration Alaska Inc., pled guilty to a criminal violation of the Clean Water Act and was sentenced to three years' probation and fined $22 million.  A Congressional committee later determined that BP p.l.c. had ignored opportunities to prevent the spill and that "draconian" cost-saving measures had led to shortcuts in its operations. Indeed, following an investigation by the U.S. House of Representatives Energy and Commerce subcommittee, Bart Stupak, chairman of the subcommittee, stated that his "review of the mountain of circumstantial evidence can only lead me to the conclusion that severe pressure for cost cutting did have an impact on maintenance of pipelines."  Representative Stupak found that the cost-cutting, reflected in emails and other documents obtained by the subcommittee, occurred from 1999 through 2005, at a time when BP was earning more than $106 billion in profits.

196.   The Prudhoe Bay incident and the Texas City disaster led to the resignation of John Browne, BP's former CEO.  BP promised again that it would change and improve its safety.

### (ix)     Ohio Refinery (2006)

197.   In April 2006, BP was fined $2.4 million by OSHA for unsafe operations at BP's Oregon, Ohio refinery.  Investigators had found 32 "willful" violations that were remarkably similar to safety issues identified after the fatal explosion in Texas City, such as buildings too close to the processing units and ignoring deficiencies in gas monitors.  According to OSHA, a willful violation is "committed with intentional disregard for, or a plain indifference, to employee safety and health."

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

198.   According to U.S. Secretary of Labor Hilda Solis, "OSHA has found that BP often ignored or severely delayed fixing known hazards in its refineries . . . .   There is no excuse for taking chances with people's lives.  BP must fix the hazards now."

199.   Indeed, BP failed to fix the hazards.   BP's continual disregard for safety is illustrated by the fact that BP is among the top violators named on OSHA's website.  BP owns the dubious distinction of having its own web page on OSHA's website, detailing BP's numerous safety violations and resulting fines.

(x)        **Atlantis Platform (2008)**

200.   According to a June 28, 2010 *Wall Street Journal* article, titled "As CEO Hayward Remade BP, Safety, Cost Drives Clashed," a piece of steel tubing ruptured on BP's Atlantis oil platform in the Gulf of Mexico on June 5, 2008, causing 192 barrels of oil to spill from the rig. The tubing was attached to a defective pipeline pump that BP had put off repairing in what an internal report later described as "the context of a tight cost budget."

201.   BP investigators found that the deferred repair was a "critical factor" in the incident, but "leadership did not clearly question" the safety impact of delaying the repair.   The budget for Atlantis was "underestimated," resulting in "conflicting discretions/demands."

202.   While BP investigators were questioning Atlantis's lean operation and its seemingly poor effect on safety, top executives were praising it.  According to the June 28, 2010 *Wall Street Journal* article, in early April 2008, Defendant Shaw, former head of BP's Gulf of Mexico operations and SPIOC member, met with the top managers with the aim, according to an internal BP communication, to instill a "much stronger performance culture" in the organization, based on strictly managing costs and the notion that "every dollar counts."   A former BP employee told the Wall Street Journal that the Gulf of Mexico under Defendant Shaw was focused on meeting performance targets, which determined bonuses for top managers and low-level workers alike.  Plan fiduciaries like Defendant Shaw, would set the stage for what was about to become the most devastating oil spill in history.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

### C.   Defendants' Inaccurate Public Statements Leading Up To The *Deepwater Horizon* Disaster

203.   The incidents detailed above raised red flags to BP and Defendants that the company's safety and risk management culture was utterly deficient and that BP was at extreme risk for another catastrophe if this culture was not fixed.  In the wake of these incidents, BP and other Defendants made statements promising that safety was being improved at the company. These statements show that Defendants: (1) recognized these red flags, (2) understood that it was vital for the company to fix its deficient safety and risk management culture, and (3) understood the consequences that would result if that culture were allowed to continue.  By making these statements, BP and other Defendants took ownership of the safety problems facing the company and were fully aware that the failure to fix BP's deficient safety and risk management culture was incredibly likely to lead to a disaster of the magnitude of *Deepwater Horizon*.

204.   Despite these statements, Defendants were aware that BP's culture remained the same as before, emphasizing cost cutting to the detriment of safety.   As a result of BP's inaccurate assurances: BP ADSs were trading at artificially inflated prices throughout the Class Period.

205.   On January 16, 2007 (the first day of the Class Period), BP held a press conference to address the public release of the Baker Report.   At that press conference, Defendant Browne assured investors — in the wake of Texas City, Prudhoe Bay and several other catastrophic disasters — of BP's commitment to follow the Baker Panel's recommendations to improve its process safety.   Browne assured that after countless incidents which caused harm to people and the environment that "BP gets it.  And I get it too."   Defendant Browne continued:

> This happened on my watch and, as Chief Executive, I have a responsibility to learn from what has occurred. I recognise the need for improvement and that my successor, Tony Hayward, and I need to take a lead in putting that right by championing process safety as a foundation of BP's operations.

*     *     *

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

> Finally, in its executive summary, the Panel says it believes that BP's workforce is ready, willing and able to participate in a sustained Group-wide effort to move BP towards excellence in process safety. I wholeheartedly agree. And I would like to make clear that the tone is indeed being set at the top.

206.  This statement was inaccurate in that any sustained group-wide effort that was moving BP towards excellence in process safety was inadequate.  As made clear by the events on the *Deepwater* Horizon leading up to the April 20, 2010 explosion, BP's safety and risk management culture remained woefully deficient.

207.  On February 6, 2007, BP held an earnings call with analysts and investors (in which Defendants Browne and Hayward participated).  During the call, BP continued to tout its commitment to safety and went so far as to say that it had already began experiencing improvement.  Specifically, Defendant Hayward claimed that safety would take priority over production rates, explaining:

> I would now like to give you new guidance for our expected future production rates. Relative to our projections of February last year, our production forecast has been impacted by five things. Firstly, we further increased our focus on safety and operational efficiency and will in some cases deliberately slow the pace of our activity in order to improve its safety and efficiency.

208.  This statement was inaccurate as the company did not adequately increase its focus on safety.  As made clear by the events on the *Deepwater Horizon* leading up to the April 20, 2010 explosion, BP did not "slow the pace" of its activity to improve safety.  To the contrary, BP placed time and money far ahead of safety on the *Deepwater Horizon*.

209.  On February 23, 2007, BP released its 2006 Annual Review that reported continuing progress in improving its process safety.  In the Annual Review, BP stated, up front and in a comparatively large font:

> What does the world expect of an energy company today? We believe it is to provide energy to customers now and in the future in a safe, sustainable and environmentally responsible way. BP strengthened its commitments to these principles in 2006. We have acted decisively to address what matters most today and tomorrow: investment in better operations and execution; a clear focus on the three dimensions of safety – personal safety, process safety and the environment;

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

and more secure and diverse choices for energy consumers in the future; all accompanied by a sustained capability to deliver performance – and deliver it the right way.

210.   Later in the Annual Review, in his message to shareholders, Defendant Browne explained that although BP "fell short of our expectations in certain areas, notably with two oil spills in Alaska," BP is:

> headed in the right strategic direction and we should not allow recent setbacks to obscure that. We have been urgently addressing operational issues and matters related to our safety performance. And I believe that, from the lessons we have learned, the fresh investment and priorities we are putting in place and the determined reaffirmation of our core values, BP will emerge a stronger company.

211.   However, BP continued to mislead the public, including the Participants, by touting its personal safety record, without revealing that its safety processes were inadequate to prevent major disasters from happening again. The 2006 Annual Review stated that "BP aspires to be an industry leader in the three dimensions of safety – personal safety, process safety and the environment. We have had a strong track record in the day-to-day personal safety of our people."

212.   Defendant Browne also vowed that BP was implementing the Baker Panel's recommendations. Defendant Browne explained that the company's "aim now is to develop a timely and intelligent plan of action in order to transform BP into an industry leader in process safety management."

213.   On March 6, 2007, BP filed its 2006 Annual Report with the SEC on Form 20-F, which was signed by Defendant Browne. In the Annual Report, BP touted the Gulf of Mexico as one of its new "profit centres" and a primary economic driver, while minimizing the expected environmental liabilities from those operations.

214.   On April 24, 2007, BP held an earnings conference call with analysts and investors and Byron Grote, Chief Financial Officer of Defendant BP p.l.c. ("Grote") assured the public of BP's continued focus on safe operations, including exploration and production operations in the Gulf of Mexico. Specifically, Grote stated that BP's "strategy is unchanged and our current

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

focus remains on safe and reliable operations and the delivery of improved performance." Again, this statement was inaccurate given that BP still suffered from inadequate safety and risk management procedures, as made clear by the events on the *Deepwater Horizon* leading up to the April 20, 2010 explosion.

215.  On May 16, 2007, Defendant Malone testified before the U.S. House of Representatives Committee on Energy and Commerce, Subcommittee on Oversight and Investigations.  Echoing Defendant Browne's comments following the release of the Baker Report, Malone misleadingly claimed that "[t]oday, I want to assure you that we get it.  We have learned the lessons of the past."  In Defendant Malone's written statement to the Committee, he explained:

> BP America is committed to safety, and the expectation of our management is that budget guidelines should never result in a compromise in safety performance. That is and has long been our philosophy . . . .

> \*      \*      \*

> I continue to meet with employees to reinforce my expectations of them: that they must ensure that our operations are safe, that they understand they have both a right and responsibility to shut down any process they feel is unsafe or operationally unsound, and that they are encouraged to raise concerns on any issue.

> \*      \*      \*

> BP does not tolerate retaliation against workers who raise safety concerns.

216.  These statements were inaccurate as made clear by the events on the *Deepwater Horizon* leading up to the April 20, 2010 explosion.  BP continuously compromised its safety performance for budgetary reasons and was therefore not properly committed to safety.

217.  On October 25, 2007, BP filed with the SEC a Form 6-K and a press release announcing the resolution of various law enforcement investigations, including those relating to the Texas City Refinery explosion and the Prudhoe Bay oil spill.  The press release quoted Defendant Malone stating, in part, that: "[i]n the months and years since these violations occurred, we have made real progress in the areas of process safety performance and risk

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

management."  The press release further assured the public that "BP America is in the midst of a comprehensive effort to improve its safety culture and to strengthen and standardize process safety and risk management programs at all BP-operated facilities."  This statement was inaccurate because, as detailed below, the same deficiencies in BP's safety and risk management culture that had caused the Texas City Refinery explosion and the Prudhoe Bay oil spill would lead to the disaster on the *Deepwater Horizon*.

218.   On February 22, 2008, BP issued its 2007 Annual Review, which contained further assurances that the company remained committed to process safety.  In fact, the cover page states in large font:

> Our key priorities
>
> Safety
>
> People
>
> Performance

219.   The 2007 Annual Review contained a message from Defendant Hayward, where he once again emphasized BP's commitment to safety:

> Running safe and reliable operations is our greatest responsibility. At the start of 2007, the panel, chaired by former US Secretary of State James A Baker, III, reported on the safety culture across our US refineries, following the tragic accident at Texas City in 2005.  We agreed to implement all its recommendations and accepted the challenge to transform BP into a world leader in process safety.  All parts of the group are actively working to implement the panel's recommendations relevant to their business.

220.   Regarding process safety, the 2007 Annual Review stated:

> Throughout 2007, BP continued to progress the process safety enhancement programme initiated in response to the March 2005 incident at the Texas City refinery.

> We have made progress across the group on all the recommendations:

> • Leadership. We have consistently communicated that safe and reliable operations are our highest priority. Our safety and operations audit group was strengthened and completed 28 audits in 2007.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

• Management systems. Implementation of our operating management system began at an initial group of sites, which included all five US refineries.

• Knowledge and expertise. We established an executive-level training programme, ran process safety workshops and launched an operations academy for site-based staff to enhance process safety capability. Specialists have been deployed at our US refineries to accelerate priority improvement programmes.

• Culture. To reinforce the need for a stronger safety culture, we undertook in-house assessments of BP's safety culture, supported by communication from leadership.

• Indicators. Progress has been made in developing leading and lagging indicators, building on metrics already reported to executive management. We are working with the industry to develop indicators and this already includes progress to agree upon [sic] a metric covering loss of primary containment.

Across the US refining system, we have worked to address factors that contributed to the Texas City refinery incident, including where facilities are sited, atmospheric relief systems, operating procedures and operator training, as well as control of work systems and process safety culture and leadership. The refineries have also engaged with employees on how to improve process safety.

221. On February 27, 2008, BP conducted its 2008 Strategy Presentation during a conference call with investors and analysts (in which Defendant Hayward participated along with Robert Dudley).   There, certain Defendants asserted that safety was BP's top priority and claimed that the company was able to deliver strong performance while maintaining safe operations.  More specifically, these Defendants stated, in part, as follows:

[Hayward:] 2007 saw further improvement in our overall safety performance. Over the last eight years, our safety performance, measured by Recordable Injury Frequency Rate, the standard measure of safety in our industry, has improved three-fold. As you can see on this chart, our performance is amongst the best in our industry.

Notwithstanding this track record, our intense focus on process safety continues. We are making good progress in addressing the recommendations of the Baker Panel and have begun to implement a new Operating Management System across all of BP's operations. Integrity-related incidents have fallen significantly over the last three years, and oil spills of more than one barrel continue a strong downward trend.

Safe and reliable operations remain our number one priority.

* * *

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

[Andrew G. Inglis, former Chief Executive of Exploration & Production of Defendant BP p.l.c.:] Our top priority continues to be the safety and reliability of our operations. In 2007, we saw both an improvement in personal safety and increased reliability.

*　　*　　*

[I]n the Gulf of Mexico, our priorities are clear – grow revenues near term through the safe startup and ramp-up of Atlantis and Thunder Horse; grow our resource position through successful exploration and access, and advance key deepwater technologies to exploit that resource base.

*　　*　　*

[Hayward:] We are taking action to close the competitive gap through a focused effort on three priorities of safety, people and performance. We are determined to operate safely and reliably, to develop the capability of our people and to drive performance through restoring operational momentum. At the same time we are rigorously reducing complexity and cost. In Exploration and Production, we continue to see the benefits of our strategy. Our resource base, even as it stands today, underpins the potential to sustain production of at least four million barrels a day out to 2020. We will do better than this as we continue to pursue new access and deliver further exploration success.

222.   Given the events leading up to the April 20, 2010 explosion on the *Deepwater Horizon*, Defendant Hayward's comment that the company was "making good progress in addressing the recommendations of the Baker Panel" was inaccurate.   Moreover, Defendant Inglis' comment that the company's "top priority continue[d] to be the safety and reliability of our operations" bore little relation to the truth.

223.   On March 4, 2008, BP filed its 2007 Annual Report with the SEC on Form 20-F, which was signed by Defendant Hayward.   In the report, BP again listed deepwater Gulf of Mexico drilling operations among its "profit centres" and assured investors that the company was operating safely.   Specifically, the Form 20-F stated, in part, as follows:

We believe that BP has a strong portfolio of assets . . . . Profit centres are, or are expected to become, areas that provide significant production and income for the segment. Our current areas of major development include the deepwater Gulf of Mexico, Azerbaijan, Algeria, Angola, Egypt and Asia Pacific where we believe we have competitive advantage and that we believe provide the foundation for volume growth and improved margins in the future.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

\*     \*     \*

Throughout 2007, BP continued to progress the process safety enhancement programme initiated in response to the March 2005 incident at the Texas City refinery.  We worked to implement the recommendations of the BP US Refineries Independent Safety Review Panel (the panel), which issued its report on the incident in January 2007 . . . .  We have made material progress throughout the group across all of the panel's 10 recommendations.

\*     \*     \*

A risk of increased environmental costs and impacts is inherent in particular operations and products of the group and there can be no assurance that material liabilities and costs will not be incurred in the future. In general, the group does not expect that it will be affected differently from other companies with comparable assets engaged in similar businesses.

\*     \*     \*

Although the cost of any future remediation could be significant and may be material to the result of operations in the period in which it is recognized, we do not expect that such costs will have a material effect on the group's financial position or liquidity. We believe our provisions are sufficient for known requirements; we do not believe that our costs will differ significantly from those of other companies engaged in similar industries, or that our competitive position will be adversely affected as a result.

224.   The statements above were inaccurate as BP had not "made material progress throughout the group across all of the [Baker] panel's 10 recommendations" as made clear by the events leading up to the April 20, 2010 explosion.

225.   On April 17, 2008, Defendant Hayward and then Chairman of BP p.l.c. Peter Sutherland delivered speeches at the company's 2008 Annual General Meeting, transcripts of which were posted on its website.  Hayward again touted BP's commitment to safety, stating:

When I took over as chief executive last May, I said that we would focus on three basic priorities: safety, people, and performance. Everyone at BP understands those priorities. And while I am in this role they will remain the priorities.

Safety is our number one priority and in 2007 our overall safety record continued to improve. Over the last eight years our safety performance according to the standard industry measure has improved threefold and is now among the best in our industry.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

Our intense focus on process safety continues. We are making good progress in addressing the recommendations of the Baker Panel and have begun to implement a new Operating Management System across all of BP's operations. This is aimed at ensuring that our operations across the world look and feel the same everywhere – and perform to the same high standard.

226.   As made clear by the events on the *Deepwater Horizon* leading up to the explosion, safety was not BP's "number one priority" and the company was not "making good progress in addressing the recommendations of the Baker Panel . . . ."

227.   On December 17, 2008, Defendant Hayward gave a speech at the HRH Prince Of Wales's 3rd Annual Accounting for Sustainability Forum, a transcript of which was posted on its website.   Hayward claimed that BP was continuing to improve its process safety practices. Specifically, Defendant Hayward stated:

BP had a number of high-profile safety lapses in recent years, notably at our Texas City refinery, where there was tragic and unacceptable loss of life.

These lapses exposed shortcomings – but they also gave us a huge opportunity to learn and improve the way we operate. We opened ourselves up to scrutiny – and we listened more to our front-line operations people – who, of course, really know what is going on on the ground. And we have continuously reported progress against a response plan and against an independent external report.

One of the many consequences for us has been to develop and to embed a new Operating Management System right across BP – and we operate in 100 countries – so that is no mean feat.

The critical aspect of this system is that it actually translates words into action. It starts out as a set of requirements which are the platform for safe, reliable, responsible operating activities. And then we continuously improve what we do, every day, every month, every year – in pursuit of sustainable operating excellence.  Importantly, it is developed, implemented and sustained locally in our operating businesses – and makes our leaders locally fully-accountable for what they do.

228.   As made clear by the events on the *Deepwater Horizon* leading up to the April 20, 2010 explosion, the statements above were inaccurate as BP never made progress in response to the Baker Report and the company failed to adequately improve or fix its deficient safety and risk management culture.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

229.   On February 10, 2009, Defendant Hayward delivered a speech at the Cambridge Energy Research Association Executive Conference in Houston, Texas, a transcript of which was posted on its website.  In his speech, Hayward discussed the need to "support the development of hydrocarbon resources here in the US and around the world."  In addition, Defendant Hayward stated that the U.S. should allow drilling on the outer continental shelf because "[w]e have the know-how and technology to tap these resources safely and with minimal impact to the environment."

230.   On February 24, 2009, BP issued its 2008 Annual Review where it again assured investors of its continuing commitment to safety.   Defendant Hayward's "Group Chief Executive's Review" stated:

> In a year that will be remembered for extremely volatile oil prices and exceptional stock market turbulence, BP delivered an excellent set of results. We made good progress on achieving safe and reliable operations, and delivered strong operational momentum that reduced the performance gap with our competitors.
>
> *      *      *
>
> Safety, people and performance, and these remain our priorities. Our number one priority was to do everything possible to achieve safe, compliant and reliable operations.
>
> Good policies and processes are essential but, ultimately, safety is about how people think and act. That's critical at the front line but it is also true for the entire group. Safety must inform every decision and every action. The BP operating management system (OMS) turns the principle of safe and reliable operations into reality by governing how every BP project, site, operation and facility is managed.

231.   The Annual Review also stated:

> Safety, both personal and process, remains our highest priority. 2008 was one of our best ever years for personal safety, with our performance expected to remain among the best in the industry. During the year we began migrating to the new BP OMS, which has an increased focus on process safety and continuous improvement. The majority of our operations in North America Gas, the Gulf of Mexico, Colombia and the Endicott field in Alaska all completed the migration to the OMS in 2008.
>
> *      *      *

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

Safety is our top priority. While improved systems and processes are vital, another factor is even more important when it comes to safe and reliable operations – people. We continue to work to establish a strong safety culture, developing deep knowledge within every employee and sharing learning.

232.   As made clear by the events on the *Deepwater Horizon* leading up to the April 20, 2010 explosion, Defendants were not adequately working to establish a strong safety culture at BP.  The culture at BP did not promote an atmosphere where "[s]afety must inform every decision and every action."

233.   On February 25, 2009, Defendant McKay testified before the U.S. House of Representatives' Committee on Natural Resources.  In his written statements submitted to the Committee, he falsely assured the Committee of the safety of drilling in the deepwater Gulf of Mexico. Specifically, McKay wrote:

> The track record of BP and the industry generally in the Western and Central Gulf of Mexico (GOM) demonstrates that when areas are opened, they can be leased, explored and developed to the highest environmental and operational standards in the world.

234.   During the hearing, McKay also testified that because of advances in technology, BP "can see things and understand things in real time now downhole in the well and at the surface, and control things much better than we could in the past.  The last area, I would say, which is a big, big benefit, is the usage of subsea completions where we can drill wells, produce those wells purely from subsea installations, tie those back to central processing facilities 15, 20, 30 miles away and therefore the visual impact is very low.  And so when you combine all those systems, you have a safer, more environmentally sensitive methodology of development today than we had 30 years ago, or actually even 10 years ago."

235.   On March 4, 2009, BP filed its 2008 Annual Report with the SEC on Form 20-F, which was signed by Defendant Hayward.  In the report, BP continued to mislead investors as to its supposed safe practices and the quality of its deepwater Gulf of Mexico operations.  For example, the 2008 Annual Report stated:

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

During 2008, we continued to pursue our three strategic priorities of 'Safety', 'People' and 'Performance', which underpin BP's 'forward agenda'.

Through this, we have taken steps to restore revenues, reduce complexity and manage costs and have made significant progress towards closing the competitive performance gap to our peer group. Looking forward, our strategy is to create value for shareholders by investing to deliver growth in Exploration and Production, together with high-quality earnings and returns throughout our operations. Our first priority will always be to ensure the safety and integrity of our operations.

*     *     *

We remain fully committed to becoming a recognized industry leader in process safety management and are working to achieve this. We have taken a range of steps, including acting on the recommendations from both the panel and those within the first annual report of the independent expert.

Our actions can be summarized in three principal areas:

• We have made progress in reducing process safety risk at our US refineries. For example, we have completed and learned from safety and operations audits, relocated workers to lower-risk accommodation and implemented fatigue reduction programmes.

• Executive management has taken a range of actions to demonstrate their leadership and commitment to safety. The group chief executive has consistently emphasized that safety, people, and performance are our top priority, a belief made clear in his 2007 announcement of a forward agenda for simplification and cultural change in BP. Safety performance has been scrutinized by the Group Operations Risk Committee (the GORC), chaired by the group chief executive and tasked with assuring the group chief executive that group operational risks are identified and managed appropriately. We continued to build our team of safety and operations auditors. A team of 45 auditors is now in place, with 36 audits completed in 2008.

• Many of the process-safety related improvements recommended by the panel are being implemented across the group through the OMS. The group essentials within the OMS (which cover diverse aspects of operating activity including legal compliance, process and environmental safety and basic operating practices) in some cases go beyond the panel's process safety recommendations, a point noted by the independent expert in his first report.

236.   BP's priorities did not ensure the safety and integrity of its operations.  Rather, BP continued to emphasize short cuts to save time and money at the expense of safety.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

237.   On March 10, 2009, BP's Initial Exploration Plan, which discusses BP's purported safety protocol for the Mississippi Canyon Block 252, was "deemed submitted" by the MMS. The document was initially received by the MMS on February 23, 2009 and was available to the public and BP's investors no later than March 10, 2009. The document inaccurately stated, in part, that:

> I hereby certify that BP Exploration & Production Inc. has the capability to respond, to the maximum extent practicable, to a worst-case discharge, or a substantial threat of such discharge, resulting from the activities proposed in our Exploration Plan.

> \*        \*        \*

> An accidental oil spill that might occur as a result of the proposed operation in Mississippi Canyon Block 252 has the potential to cause some detrimental effects to fisheries. However, it is unlikely that an accidental surface or subsurface oil spill would occur from the proposed activities. If such a spill were to occur in open waters of the OCS proximate to mobile adult finfish or shellfish, the effects would likely be sublethal and the extent of damage would be reduced to the capability of adult fish and shellfish to avoid a spill, to metabolize hydrocarbons, and to excrete both metabolites and parent compounds. No adverse activities to fisheries are anticipated as a result of the proposed activities.

> \*        \*        \*

> In the event of an unanticipated blowout resulting in an oil spill, it is unlikely to have an impact based on the industry wide standards for using proven equipment and technology for such responses, implementation of BP's Regional Oil Spill Response Plan which address available equipment and personnel, techniques for containment and recovery and removal of the oil spill.

238.   These statements were inaccurate as BP did not have the capability to properly respond to a "worst-case discharge."  In reality, BP was unable to face the task of stopping the deluge of oil spilling into the Gulf of Mexico after the April 20, 2010 explosion on the *Deepwater Horizon*.

239.   On March 25, 2009, Defendant McKay delivered a speech at the Howard Weil Energy Conference, titled "A Healthy America Needs a Healthy Energy Industry."  In his remarks, Defendant McKay stated:

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

By the way, let me add that managing costs down does not mean BP will be skimping when it comes to ensuring our operations remain safe, reliance and compliant in the years to come.

Safety will continue to have first call on the company's resources.

240.   On June 30, 2009, BP publicly filed its revised oil spill response plan for the Gulf of Mexico – entitled "Regional Oil Spill Response Plan – Gulf of Mexico."  According to the Response Plan,

Site Safety Planning is an essential element of emergency preparedness and response. BP is dedicated to ensuring the safety of company personnel and the public. In the event of an oil spill, or other emergency, BP will manage a coordinated response to minimize impacts to the environment while keeping safety issues in the forefront. The Site Safety Plan . . . is a general plan intended to address initial safety criteria during the early stages of the response effort.

241.   The statement above was inaccurate as BP was unprepared and unable to properly respond to a disaster of the magnitude that occurred on the *Deepwater Horizon*.

242.   Regional Oil Spill Response Plan for the Gulf of Mexico also explicitly states that BP and its subcontractors could recover approximately 491,721 barrels of oil per day in the event of an oil spill in the Gulf of Mexico.  BP further claimed and provided certified statements to the MMS that BP and its subcontractors "maintain the necessary spill containment and recovery equipment to respond effectively to spills."

243.   On February 26, 2010, BP released its 2009 Annual Review in which it again emphasized its deepwater Gulf of Mexico operations and reaffirmed its alleged commitment to safety.  The Annual Review went on to reinforce that "[s]afety, both personal and process, remains our highest priority."

244.   The Annual Review contained a "Chairman's letter," in which Carl-Henric Svanberg stated that the executive team, under the leadership of Hayward, is focused "on safety, operational performance and culture[, which] has produced great results across the group."

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

245.   Svanberg also commented on the enormous risk BP faces in its daily operations, and standards the Board sets in overseeing the mitigation of that risk.   Specifically, Svanberg stated:

> Risk remains a key issue for every business, but at BP it is fundamental to what we do. We operate at the frontiers of the energy industry, in an environment where attitude to risk is key. The countries we work in, the technical and physical challenges we take on and the investments we make – these all demand a sharp focus on how we manage risk. We must never shrink from taking on difficult challenges, but the board will strive to set high expectations of how risk is managed and remain vigilant on oversight.

246.   The 2009 Annual Review also contained a "Group chief executive's review," signed by Defendant Hayward.   In addition to emphasizing BP's supposed commitment to safety, Hayward echoed Svanberg's statement towards risk, touting the company's deepwater Gulf of Mexico operations and its ability to manage risk while operating at the frontiers of the industry.   Specifically, Hayward's letter claimed that:

> Our priorities have remained absolutely consistent – safety, people and performance – and you can see the results of this focus with improvements on all three fronts. This year we have increased emphasis on operational efficiency, with a particular focus on compliance and continuous improvement. Achieving safe, reliable and compliant operations is our number one priority and the foundation stone for good business.
>
> *          *          *
>
> BP has always operated at the frontiers of the energy industry and our core strengths are more relevant and valuable than ever. BP's experience, skills, capability, technology and access to markets enable resource holders to maximize returns over the long term. We continue to show our ability to take on and manage risk, doing the difficult things that others either can't do or choose not to do.

247.   The 2009 Annual Review admits the importance of safety, but contained inaccurate statements about the company's commitment to safety, as made clear by the events leading to the April 20, 2010 explosion on the *Deepwater Horizon.*

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

248.  On March 5, 2010, BP filed its 2009 Annual Report with the SEC on Form 20-F, which was signed by Defendant Hayward.  In the report, BP continued to tout its ability to deliver safety in its operations.  In addition, the Form 20-F stated:

> Safe, reliable and compliant operations remain the group's first priority. A key enabler for this is the BP operating management system (OMS), which provides a common framework for all BP operations, designed to achieve consistency and continuous improvement in safety and efficiency. OMS includes mandatory practices, such as integrity management and incident investigation, which are designed to address particular risks. In addition, it enables each site to focus on the most important risks in its own operations and sets out procedures on how to manage them in accordance with the group-wide framework.

> \*     \*     \*

> Good progress has been made on underpinning improved safety performance in 2009. Throughout the year, we continued to focus on training and enhancing procedures across the organization. Significantly, 2009 was an important year in the development of OMS. By the end of 2009, around 80% of our operating sites were using the system, including all our operated refineries and petrochemicals plants.

> \*     \*     \*

> The priorities that drove our success in 2009 – safety, people and performance – remain the foundation of our agenda as we build on our momentum and work to further enhance our competitive position. . . . To meet growing world demand, BP is committed to exploring, developing and producing more fossil fuel resources; manufacturing, processing and delivering better and more advanced products; and enabling the transition to a lower-carbon future. We aim to do this while operating safely, reliably and in compliance with the law. . . .

> \*     \*     \*

> In 2009, BP's safety record continued to improve . . .

> This performance follows several years of intense focus on training and procedures across BP. BP's operating management system (OMS), which provides a single operating framework for all BP operations, is a key part of continuing to drive a rigorous approach to safe operations. 2009 marked an important year in the continuing implementation of OMS.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

249.   The statements in this Form 20-F, less than two months before the explosion on the *Deepwater Horizon*, contain the same inaccuracies about the BP's commitment to and level of safety.

250.   On March 22, 2010, Inglis delivered a speech at the Howard Weil Energy Conference in New Orleans, Louisiana, a transcript of which was posted to BP's website. During the presentation, Inglis stated:

> Safety and operational integrity underpins everything we do, and we are now in the final phase of rolling out our operating management system that provides a single, consistent framework for our operations, covering all areas from personal and process safety to environmental performance. And I am pleased to say that in 2009 we saw continuing improvement in all aspects.

251.   As made clear by the events on the *Deepwater Horizon* leading up to the April 20, 2010 explosion, "[s]afety and operational integrity" did not "underpin[] everything [BP did]." Rather, safety took a back seat to cost-cutting and time-saving measures.

252.   On March 23, 2010, Defendant Hayward delivered a speech at the Peterson Institute for International Economics in Washington, D.C., a transcript of which was posted to BP's website.  During the presentation, Hayward stated:

> That tragic [Texas City refinery] accident has changed in a profound and fundamental way our approach to safety and operations integrity – providing a safe working environment is a paramount responsibility, and our first and foremost priority.

253.   As made clear by the subsequent events, the Texas City accident did not change "in a profound and fundamental way [BP's] approach to safety . . .."  Rather, as detailed above, there were striking similarities between the Texas City and *Deepwater Horizon* disasters.

254.   On April 15, 2010, BP issued its 2009 Sustainability Review, in which it continued to reiterate that "[s]afety, people, and performance are BP's top priorities."  The Review stated:

> BP's operating management system (OMS) provides a single framework for all BP operations to follow, covering all areas from process safety, to personal health, to environmental performance.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

Providing an integrated and consistent way of working, the OMS helps ensure
that a rigorous approach to safe operations continues to be taken. Its principles
and processes are designed to simplify the organization, improve productivity,
enable consistent execution and focus BP on performance.

255. This statement, made while the cascade of events towards disaster on the
*Deepwater Horizon* had already begun, was inaccurate in that safety was not a top priority at BP
and that there was no "rigorous approach to safe operations" at BP.

**D.     The Events Leading to Disaster on *Deepwater Horizon* Were the
        Materialization of the Risks that Resulted from BP's Deficient Safety and
        Risk Management Culture**

256. The events leading to the April 20, 2010 explosion on the Deepwater Horizon
demonstrate that the safety and risk management culture touted by Defendants during the
relevant period did not exist.   While any one of the events that contributed to the disaster
discussed below is evidence of that deficient safety and risk management culture, the cascade of
events that occurred leaves no doubt whatsoever that BP's public statements made during the
relevant period did not reflect reality.   Defendants continuously stated that safety would never be
compromised to save money.   Yet, as the following recitation of facts make clear, and as the
Presidential Report concludes, corners were continuously cut on the *Deepwater Horizon* to save
time and money.   Defendants continuously touted their compliance with and implementation of
the Baker Report.   As the DHSG Report notes, there are striking similarities between the Texas
City Refinery disaster and the *Deepwater Horizon* disaster.   In reality, Defendants' statements
made during the relevant period bore little resemblance to the true nature of BP's safety and risk
management culture.   Rather than a company striving to conduct its business in the safest manner
possible, BP as a company was stagnant in addressing its previous failures.

257. The *Deepwater Horizon* rig was described by the Presidential Report as the
"[p]ride of the Transocean fleet of offshore drilling rigs."   The rig cost $560 million to build.
Unlike many rigs, the *Deepwater Horizon* was not anchored into place while it drilled a well.
Rather, it used a satellite-guided dynamic positioning system to control thrusters powerful
enough to keep the 33,000-ton rig centered over a well even in high seas.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

258.   The Macondo well is located in the Mississippi Canyon-section of the outer continental shelf in the Gulf of Mexico close to the states of Louisiana, Mississippi, Alabama, and Florida.  At the Macondo well, *Deepwater Horizon* was positioned above water that was 4,992 feet deep.  Two and a half miles beneath the floor of the Gulf was a large reservoir of oil and gas that was trapped in a porous rock formation at temperatures in excess of 200 degrees.

259.   BP began drilling the Macondo well with the Marianas rig, but it was damaged by Hurricane Ida in November 2009 after it had drilled to a depth of 9,090 feet.  BP replaced the Marianas with the *Deepwater Horizon*, which arrived at the well on January 31, 2010.  When the *Deepwater Horizon* arrived, it began to prepare to lower its blowout preventer onto the wellhead.

260.   According to the Presidential Report, a blowout preventer is "a stack of enormous valves that rig crews use both as a drilling tool and as an emergency safety device."  Everything used in the well passes through the blowout preventer.  The *Deepwater Horizon's* blowout preventer had numerous ways to seal the well.  At the top of the blowout preventer were "annular preventers" that encircled the drill pipe or casing.  When these preventers are squeezed shut, they seal the annular space around the drill pipe, which seals the well.  The blowout preventer also contained five sets of metal rams.  According to the Presidential Report, the "'blind shear ram' was designed to cut through drill pipe inside the blowout preventer to seal off the well in emergency situations.  It could be activated manually by drillers on the rig, by an ROV, or by an automated emergency 'deadman system.'  A casing shear ram was designed to cut through casing; and three sets of pipe rams were in place to close off the space around the drill pipe."

261.   **Redacted Pursuant to Protective Order**

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

Redacted Pursuant to Protective Order

262.   Redacted Pursuant to Protective Order

### E.     The Events Immediately Leading Up To The Disaster

263.   On April 9, 2010, the *Deepwater Horizon* had penetrated the pay zone.  According to the Presidential Report, when the well reached 18,193 feet below sea level, the pressure exerted by the drilling mud exceeded "the strength of the formation."  This caused mud to flow through cracks of the formation instead of returning to the rig.  As a result, drilling stopped and the crew of the *Deepwater Horizon* sealed the fractures by pumping a special fluid down the drill.  While the fractures were successfully sealed, the engineers determined that if the well were drilled deeper the pressure would become too high, which, in turn, would pose a risk of further fracturing of the rock surrounding the well.  As a result, BP stopped drilling the well at 18,360 feet instead of the planned 20,200 feet.

264.   Once the drilling stopped, the well had to be prepared for production.  This included lowering the production casing into its proper and final position and then cementing it into place.  BP had the option to choose between two types of casing.  According to the Presidential Report, one option was a "long string casing," which was "a single continuous wall

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

of steel between the wellhead on the seafloor, and the oil and gas zone at the bottom of the well."
The second option was a "liner," which was "a shorter string of casing hung lower in the well
and anchored to the next higher string."  According to the Presidential Report, "[a] liner would
result in a more complex—and theoretically more leak-prone—system over the life of the well.
But it would be easier to cement into place at Macondo."  According to the DHSG Report, the
advantage of the liner over the long string is that the liner provides four barriers to annular flow
(the flow of hydrocarbons up through the annulus) as opposed to the only two barriers provided
by the long string.

265.   On June 19, 2010, in an article entitled "BP Relied on Cheaper Wells," the *Wall
Street Journal* reported that its analysis showed how BP regularly employed "risky" long string
design well designs that skimped on industry-standard safety measures rather than the safer and
more costly liner tieback design used by BP's peers.  The article stated, in part:

> The design was used on the well that exploded in the Gulf of Mexico on April 20,
> killing 11 workers and causing America's worst offshore oil spill. The only other
> major well design, which is more expensive, includes more safeguards against a
> natural-gas blowout of the kind that destroyed the *Deepwater Horizon*.
>
> A Journal analysis of records provided by the U.S. Minerals Management Service
> shows that BP used the less costly design—called "long string"—on 35% of its
> deepwater wells since July 2003, the earliest date the well-design data were
> available. Anadarko Petroleum Corp., a minority partner of BP's in the destroyed
> well, used it on 42% of its deepwater Gulf wells, though it says it doesn't do so in
> wells of the type drilled by BP.
>
> Both companies used the design much more often, on average, than other major
> Gulf drillers. Out of 218 deepwater wells in the Gulf drilled since July 2003, 26%
> used the long-string design. It derives its name from its use of a single, long
> "string" of pipe from the sea floor to the bottom of the well.
>
> Other big drillers use long-string design less frequently than BP, according to the
> Journal's data analysis.
>
> *            *            *
>
> A long-string design is cheaper because a single pipe runs the length of the well
> and can be installed in one step. But it also can create a dangerous pathway for
> natural gas to rise unchecked outside the pipe.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

\*   \*   \*

The other method, known as "liner tieback," is more complex and costlier. First, a section of pipe called a liner is placed at the bottom of the well and cemented into place, creating an extra barrier to prevent natural gas from rising to the surface. Typically, another pipe is connected to the liner to create a pipe to the surface.

\*   \*   \*

A letter to BP's CEO, Mr. Hayward, by two Democratic Congressmen ahead of his testimony to their committee on Thursday, said the choice of the long-string design for the Horizon well was one of five decisions BP made that posed a trade-off between cost and well safety.

266.   At the Macondo well, after the casing was lowered, Halliburton would be responsible for cementing the casing into place.  According to the Presidential Report, BP's design team had originally planned to use the long string casing.  On April 14 and 15, BP's engineers and a Halliburton engineer used "sophisticated computer programs to model the likely outcome of the cementing process."  Early results of this testing "suggested the long string could not be cemented reliably.  Although the BP design team then switched to a liner, that shift met resistance within BP:

> The engineers were encouraged to engage an in-house BP cementing expert to review Halliburton's recommendations. That BP expert determined that certain inputs should be corrected.  Calculations with the new inputs showed that a long string could be cemented properly. The BP engineers accordingly decided that installing a long string was "*again* the primary option." (Emphasis in original.)

267.   According to the DHSG Report, BP's decision to use the long-string production casing was determined by four factors: "1) zonal isolation, 2) annular pressure build-up, 3) mechanical barriers and integrity, and 4) total lifetime cost."

> The liner and tie-back option would take about 3 days more time and cost about $7 to $10 million more than the single long string.  While the tieback well design could provide an additional barrier to hydrocarbon intrusion into the well, BP felt both designs "provided a sound basis for design."

268.   BP chose the option that cost less time and money rather than the option that would provide extra protection against a kickback of oil or gas into the well.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

269.   In order to properly install long-string production casing, centralizers needed to be installed at predetermined points along the casing string.  According to the Presidential Report, "[c]entralizers are critical components in ensuring a good cement job."

> When a casing string hangs in the center of the wellbore, cement pumped down the casing will flow evenly back up the annulus, displacing any mud and debris that were previously in that space and leaving a clean column of cement. If the casing is not centered, the cement will flow preferentially up the path of least resistance—the larger spaces in the annulus—and slowly or not at all in the narrower annular space. That can leave behind channels of drilling mud that can severely compromise a primary cement job by creating paths and gaps through which pressurized hydrocarbons can flow.

270.   According to the DHSG Report, BP originally planned to use 21 centralizers. However, the rig was only supplied with only 6 centralizers.  According to the Presidential Report, Halliburton engineer Jesse Gagliano had studied whether 6 centralizers would be sufficient.  He concluded that the production casing would need more than 6 centralizers to avoid channeling.  According to the DHSG Report, Halliburton reported to BP that a well with 7 centralizers was likely to have "'severe' gas flow problems."

271.   As a result, BP ordered 15 additional "slip-on" centralizers because there were no more regular centralizers in stock.  According to the Presidential Report, the BP team and Wells Team Leader John Guide did not trust the slip-on centralizers because "the pieces can slide out of position or, worse, catch on other equipment as the casing is lowered."  When Guide was informed on April 16 of the decision to use the slip-on centralizers, he initially deferred, but then challenged the decision.  According to the Presidential Report, Guide had initially been assured that the additional centralizers would be custom-designed on-piece units that would limit the potential for centralizer "hang up".  However, when the centralizers arrived, BP engineer Brian Morel reported that the centralizers were of the conventional "slip-on" variety.  Morel emailed BP drilling engineer Brett Cocales to question the need for additional centralizers.  Morel responded that the team would probably be fine without the additional centralizers.  Guide expressed the view that the additional centralizers would take 10 hours to install and 45 pieces of

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

equipment that could "come off" during installation.  In the end, BP proceeded by installing only the original 6 centralizers instead of using the additional 15 slip-on centralizers or ordering additional preferred centralizers.   BP thereby flatly ignored the risks documented in the Halliburton study.

272.   The Presidential Report concluded that although it cannot be "unequivocally establish[ed] whether the failure to use 15 additional centralizers was a direct cause of the blowout. . . . the process by which BP arrived at the decision to use only six centralizers . . . illuminates the flaws in BP's management and design procedures, as well as poor communication between BP and Halliburton."  According to the Presidential Report, it did not appear that BP had tried to determine before April 15 whether more centralizers would be needed.  Moreover, it did not appear that BP "base[d] its decision on a full examination of all potential risks involved."   Rather, concludes the Presidential Report, the decision "appears to have been driven by an aversion to one particular risk: that slip-on centralizers would hang up on other equipment."

273.   **Redacted Pursuant to Protective Order**

274.   The centralizers were vital to the proper installation of the long string casing, the proper installation of which itself vital to properly temporarily abandoning the well.  Despite this, BP used only 6 centralizers with the "hope" that gravity would complete the job.

275.   **Redacted Pursuant to Protective Order**

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

Redacted Pursuant to Protective Order

276.   Redacted Pursuant to Protective Order

Redacted Pursuant to Protective Order

277.   The long string production casing was installed into its final position on April 19,

2010.  According to the Presidential Report, the next task was to prepare the float-valve system

for cementing.

> During the cementing process, fluids pumped into the well should flow in a one-
> way path: down the center of the last casing string, out the bottom, and up the
> annulus (between the exterior of the steel casing and the surrounding rock
> formations).  To ensure unidirectional flow, the crew needed to push the auto-fill
> tube downward, so it would no longer prop open the float valves. With the tube
> out of the way, the flapper valves would spring shut and convert from two-way
> valves into one-way valves that would allow mud and cement to flow down the
> casing into the shoe track, but prevent any fluid from reversing direction and
> coming back up the casing. Once the float valves had converted, Halliburton
> could pump cement down through the casing and up around the annulus; the
> valves would keep cement from flowing back up the casing once the crew stopped
> pumping.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

278.   BP encountered difficulties when it attempted to prepare the float-valve system for cementing.  This process consisted of pumping mud through the casing.  The DHSG Report stated that:

> [A]ccording to BP either the float collar or reamer shoe was plugged. The establishment of circulation and float collar conversion should have taken one attempt at approximately 400 to 700 psi.  Instead, the circulation/conversion took nine attempts with gradually increasing pressure until a final pressure of 3,142 psi was developed.  The high pressures required for the float collar conversion raised concerns about blockage in the reamer shoe at the bottom, breakdown of the weak formations at the bottom of the well, and that the float collar might not have converted. It is unclear as to whether the 3,142 psi of pressure actually converted the float collar or if it just cleared a plugged shoe.  There were additional concerns with the low circulating pressures following the conversion. It was decided the standpipe gauge pressures were "inaccurate."

279.   BP's delinquent safety culture failed again.  According to the Presidential Report, "BP's team appears not to have seriously examined *why* it had to apply over four times the 750 psi design pressure to convert the float valves."   Moreover, while BP focused on the high pressure reading and the fact that circulation had been established, it appears that BP never considered the issue of whether sufficient mud flow rate had been achieved to convert the float valves.  As BP was so concerned about causing cracks in the formation surrounding the well and suffering lost returns, "BP's engineers had specified a very low circulating pump rate—lower than the flow rate necessary to convert the float valves.  BP does not appear to have accounted for this fact."

280.   According to the Presidential Report, "[c]ementing an oil well is an inherently uncertain process" and "things can go wrong even under optimal conditions."  Despite this, BP compromised Halliburton's cementing design in four different ways.  BP did so as a result of its engineers' concern that the cementing procedure might place too much pressure on the geologic formation around the well and could trigger a lost-returns event similar to the one that occurred on April 9, 2010 as detailed above.  In other words, BP compromised the safety of the cementing design as a result of worries that oil would seep through cracks of the well into surrounding earth, thereby making that oil unrecoverable for production and sale.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

281.   The first compromise, according to the Presidential Report, was that BP decided not to do a complete "bottoms-up" circulation before it cemented the well.  A bottoms-up circulation removes hydrocarbons and debris in the bottom of the well.  According to the DHSG Report:

> Due to BP engineer concerns for *wash out* in the weak formation at the bottom of the hole accompanied by disturbance of the lost circulation material that had been placed in this part of the well, only about half of the well-casing volume was circulated out.  The incomplete bottoms-up circulation did not meet Halliburton's *best practices*.  This incomplete circulation would have left any hydrocarbons that remained in the well lingering in the upper part of the well. (Emphasis in original.)

282.   According to the Presidential Report, the second compromise was that BP decided to pump cement down the well at a "relatively low rate of 4 barrels or less per minute."

> Higher flow rates tend to increase the efficiency with which cement displaces mud from the annular space. But the increased pump pressure required to move the cement quickly would mean more pressure on the formation (ECD) and an increased risk of lost returns. BP decided to reduce the risk of lost returns in exchange for a less-than-optimal rate of cement flow.

283.   The third compromise was that BP limited the volume of cement that Halliburton would pump down the well.

> Pumping more cement is a standard industry practice to insure against uncertain cementing conditions: more cement means less risk of contamination and less risk that the cement job will be compromised by slight errors in placement.  But more cement at Macondo would mean a higher cement column in the annulus, which in turn would exert more pressure on the fragile formation below. Accordingly, BP determined that the annular cement column should extend only 500 feet above the uppermost hydrocarbon-bearing zone (and 800 feet above the main hydrocarbon zones), and that this would be sufficient to fulfill MMS regulations of "500 feet above the uppermost hydrocarbon-bearing zone."  However, it did not satisfy BP's own internal guidelines, which specify that the top of the annular cement should be 1,000 feet above the uppermost hydrocarbon zone.  As designed, BP would have Halliburton pump a total of approximately 60 barrels of cement down the well—a volume that its own engineers recognized would provide little margin for error.

284.   According to the Presidential Report, the fourth compromise was that BP "in close consultation with Halliburton" chose to use "nitrogen foam cement."  This was a cement formula

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

that was injected with "tiny bubbles of nitrogen gas" in order to "lighten the resulting slurry from approximately 16.7 ppg to 14.5 ppg — thereby reducing the pressure the cement would exert on the fragile formation."  The Presidential Report added that "Halliburton is an industry leader in foam cementing, but BP appears to have had little experience with foam technology for cementing production casing in the Gulf of Mexico."

285.   The cement job was completed not long after midnight on April 20, 2010. Immediately following the completion of this job, BP and Halliburton performed a check to test whether the float valves were closed and holding.  To do this, they opened a valve at the cementing unit to see whether any fluid flowed from the well.  According to the Presidential Report, models had predicted 5 barrels of flow back.  In fact, 5.5 barrels of liquid flowed back, which they considered "within the acceptable margin of error."  They concluded from this that the float valves were holding, and BP and Halliburton declared the cement job a success.

286.   That morning the BP team met with contractors on the rig and, according to the Presidential Report, concluded that "the cement job went well enough to send home a team of technicians from Schlumberger who had been standing by on the rig . . . to perform a suite of cement evaluation tests on the primary cement job, including cement bond logs."  The BP team made this decision by relying on a decision tree that Guide and BP engineers had previously prepared.  The primary criterion BP used to determine whether to perform the cement evaluation test was whether there were losses while cementing the casing string.  Since there were no losses, "BP sent the Schlumberger team home and moved on to prepare the well for temporary abandonment."

287.   The Presidential Report concluded that the BP team erred by focusing on full returns as the only criterion for deciding whether to run a cement evaluation log.  The fact that there were full returns provided little if any information about: "(1) the precise location where the cement ended up; (2) whether channeling had occurred; (3) whether the cement had been contaminated; or (4) whether the foam cement had remained stable."  The Presidential Report

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

stated that BP should have run a cement evaluation log "or sought other equivalent indication of cement quality in light of the many issues surrounding and leading up to the cement job.  BP's report agrees."

288.  The Presidential Report further elaborated that, with regard to the cementing decisions and procedures at the Macondo well, "BP's fundamental mistake was its failure—notwithstanding the inherent uncertainty of cementing and the many specific risk factors surrounding the cement job at Macondo — to exercise special caution (and, accordingly, to direct its contractors to be especially vigilant) before relying on the primary cement as a barrier to hydrocarbon flow."  This makes clear, once again, that the deficient safety culture at BP created an environment that did not at all encourage its workers to be careful in situations that demanded the utmost care.

289.  According to the Presidential Report, "temporary abandonment" is the process by which BP would secure the well and allow *Deepwater Horizon* to remove its riser (the piping that connects the drilling rig with the blowout preventer at the wellhead on the seafloor) and blowout preventer from the wellhead so it could make way for a new rig that would install hydrocarbon-collection and production equipment.  At 10:43 a.m., BP engineer Morel emailed an "Ops Note" containing the temporary abandonment procedures for the well to the rest of the Macondo team.  According to the Presidential Report, "[i]t was the first time the BP Well Site Leaders on the rig had seen the procedures they would use that day."

290.  The sequence of the temporary abandonment procedures were summarized by the Presidential Report:

      (a)      Perform a positive-pressure test to test the integrity of the production casing;

      (b)      Run the drill pipe into the well to 8,367 feet (3,300 feet below the mud line);

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

(c)     Displace the 3,300 feet of mud in the well with seawater, lifting the mud above the blowout preventer and into the riser;

(d)     Perform a negative-pressure test to assess the integrity of the well and bottom-hole cement job to ensure *outside* fluids (such as hydrocarbons) are not leaking *into* the well;

(e)     Displace the mud in the riser with seawater;

(f)     Set the surface cement plug at 8,367 feet; and

(g)     Set the lockdown sleeve.

291.   According to the Presidential Report, BP had made numerous changes to the temporary abandonment procedures in the two weeks leading up to April 20:

For example, in its April 12 drilling plan, BP had planned (1) to set the lockdown sleeve before setting the surface cement plug and (2) to set the surface cement plug in seawater only 6,000 feet below sea level (as opposed to 8,367 feet). The April 12 plan did not include a negative-pressure test.  On April 14, Morel sent an e-mail entitled "Forward Ops" setting forth a different procedure, which included a negative-pressure test but would require setting the surface cement plug in mud before displacement of the riser with seawater.   On April 16, BP sent an Application for Permit to Modify to MMS describing a temporary abandonment procedure that was different from the procedure in either the April 12 drilling plan, the April 14 e-mail, or the April 20 "Ops Note."  There is no evidence that these changes went through *any* sort of formal risk assessment or management of change process.

292.   To conduct the positive-pressure test, fluids were pumped into the well to generate pressure and then checked to see if it would hold.  The *Deepwater Horizon* crew pressured the well up to 250 psi for five minutes, and then raised the pressure to 2,500 psi for 30 minutes. According to the Presidential Report, the pressure inside the well remained steady during both tests, which showed that "there were no leaks in the production casing through which fluids could pass from inside the well to the outside."  However, according to the DHSG Report, this test was performed too early and risked compromising the cement job:

This test was performed about 10.5 hours after the cement placement was completed—well before the 48 hours that the Halliburton lab tests indicated necessary for the foamed portion of the cement to develop sufficient strength. This early testing has raised concerns for disturbance of the uncured cement next

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

to the casing resulting in a *micro-annulus* where fluids could flow even after the cement had hardened.

293.   After the positive-pressure test, the crew began to prepare for the negative-pressure test.  This consisted of lowering the drill pipe down to approximately 8,367 feet below sea level and then pumping a spacer (a liquid that separates the heavy drilling mud from the seawater) and seawater down the drill pipe to push 3,300 feet of mud from below the mud line to above the blowout preventer.  According to the Presidential Report, the spacer fluid BP used here was "unusual."

> BP had directed M-I SWACO mud engineers on the rig to create a spacer out of two different lost-circulation materials left over on the rig—the heavy, viscous drilling fluids used to patch fractures in the formation when the crew experiences lost returns.  M-I SWACO had previously mixed two different unused batches, or "pills," of lost-circulation materials in case there were further lost returns.  BP wanted to use these materials as spacer in order to avoid having to dispose of them onshore as hazardous waste pursuant to the Resource and Conservation Recovery Act, exploiting an exception that allows companies to dump waterbased "drilling fluids" overboard if they have been circulated down through a well.  At BP's direction, M-I SWACO combined the materials to create an unusually large volume of spacer *that had never previously been used by anyone on the rig or by BP as a spacer, nor been thoroughly tested for that purpose.*  (Emphasis added.)

294.   BP's actions here were a continuation in its parade of mistakes that each built on the previous mistake on its way to disaster at the end of the day.  According to the Presidential Report, there were three mistakes that took place at this juncture:

> (a)   BP should not have replaced 3,300 feet of mud below the mud line with seawater.  Drilling mud is much heavier than seawater, and the mud's removal "placed more stress on the cement job at the bottom of the well than necessary."  BP did this because it preferred to set cement plugs in seawater rather than mud to avoid mud contamination.  However, "[t]he risks BP created by its decision to displace 3,300 feet of mud with seawater outweighed its concerns about cement setting better in seawater than mud. . . . BP also could have set one or more non-cement bridge plugs (which work equally well in mud or seawater).  No evidence has yet been produced that the BP team ever formally evaluated these options or the relative risks created by removing 3,300 feet of mud.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

(a)     It was not necessary for BP to set the cement plug 3,300 feet below the mudline.  BP did this so it could set the lockdown sleeve last in the temporary abandonment sequence and therefore minimize chances of damage to the sleeve.  "BP's desire to set the lockdown sleeve last did not justify the risks its decision created."  Moreover, there were other proven means BP could have used to protect the lockdown sleeve if it were set earlier in the process.  The individual in charge of lockdown sleeves for BP in the Gulf of Mexico, Merrick Kelley, told the National Commission that he recommended setting the plug at 1,300 feet below the mud line.  The Presidential Report concluded that this "would have significantly increased the margin of safety for the well.

(a)     According to the Presidential Report, "[t]he most troubling aspect of BP's temporary abandonment procedure was BP's decision to displace mud from the riser before setting the surface cement plug or other barrier in the production casing."  This decision "unnecessarily and substantially increased the risk of a blowout."  When BP displaced that mud, the blowout preventer was left open with the cement at the bottom of the well in the annulus and shoe track as the only physical barrier that could prevent flow up the production casing from the pay zone to the rig.  BP could have set the surface cement plug or a mechanical plug before displacing the riser.  It could also have replaced mud in the wellbore with heavier mud to "overbalance the well."  The Presidential Report states that "[i]t is not apparent why BP chose not to do any of these things.

295.   To conduct the negative-pressure test, pressure from inside the well is removed to see if fluids (such as hydrocarbons) leak through the bottomhole cement job.  According to the Presidential Report, this simulates the effect of removing the mud in the wellbore and the riser during temporary abandonment.  If the long-string casing and the cement job were designed and installed properly, hydrocarbons will be prevented from intruding into the well.  According to the Presidential Report, a negative-pressure test proceeds as follows:

First, the crew sets up the well to simulate the expected hydrostatic pressure exerted by the column of fluids on the bottom of the well in its abandoned state.  Second, the crew bleeds off any pent-up pressure that remains in the well, taking it down to 0 psi. Third, the crew and Well Site Leaders watch to make sure that nothing flows up from and out of the well and that no pressure builds back up inside of the well. If there is no flow or pressure buildup, that means that the casing and primary cement have sealed the well off from external fluid pressure and flow. A negative-pressure test is successful if there is no flow out of the well for a sustained period and if there is no pressure build-up inside the well when it is closed at the surface.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

296.   The crew began the negative-pressure test and opened the drill pipe to bleed off any pressure that had built up in the well during the mud-displacement process.  They were unsuccessful in bleeding the pressure down to zero and could not get the pressure below 266 psi. They then closed the drill pipe and pressure jumped to 1,262 psi.  In addition, the mud level inside the riser had dropped which probably meant that it was leaking down past the annular preventer, out of the riser and into the well.  Transocean Offshore Installation Manager Jimmy Harrell ordered the annular preventer closed more tightly to try to stop the leak.

297.   The crew once again opened the drill pipe and attempted to bleed the pressure down to zero.  This time they were successful.  However, when they shut the drill pipe, the pressure went up to 773 psi.  They made yet another attempt, and although again successful in bleeding the pressure down to zero, when they closed the pipe the pressure shot up to 1,400 psi. According to the Presidential Report, the Transocean crew and BP Well Site Leaders discussed the results.  Jason Anderson, one of those well site leaders, concluding that the 1,400 psi reading was caused by a phenomenon called the "bladder effect," which meant that heavy mud in the riser was exerting pressure on the annular preventer, which in turn transmitted pressure to the drill pipe.

298.   According to the Presidential Report, BP Well Site Leader Don Vidrine insisted on running a second negative-pressure test, but to perform that second test on the kill line rather than the drill pipe.  The kill line is one of three 3-inch diameter pipes that run from the rig to the blowout preventer to allow the crew to circulate fluids into and out of the well at the sea floor. The pressure on the kill line should have been identical to the pressure on the drill pipe because both flow paths went to the same place.  During this test, the crew opened the kill line and was successful in bleeding down the pressure to zero.  A small amount of fluid flowed, then stopped, and there was no more flow for the 30 minutes that it was left open.  This test, therefore, satisfied the criteria for a successful negative-pressure test.   According to the Presidential Report, however, the pressure on the drill pipe remained at 1,400 psi throughout.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

The Well Site Leaders and crew never appear to have reconciled the two different pressure readings.   The "bladder effect" may have been proposed as an explanation for the anomaly—but based on available information, the 1,400 psi reading on the drill pipe could only have been caused by a leak into the well. Nevertheless, at 8 p.m., BP Well Site Leaders, in consultation with the crew, made a key error and mistakenly concluded the second negative test procedure had confirmed the well's integrity.   They declared the test a success and moved on to the next step in temporary abandonment.

299.   The Presidential Report concluded that "[t]he failure to properly conduct and interpret the negative-pressure test was a major contributing factor to the blowout."   The negative-pressure test produced data that "were not ambiguous."   The results repeatedly showed "that formation fluids, in this case hydrocarbons, were flowing into the well."

300.   BP's deficient safety culture was responsible for this failure.   Rather than undertaking this crucial test with the utmost care, the BP team acted as if the goal was to have a test that produced results that allowed them to proceed to the next step, rather than to produce results that were accurate.   According to the Presidential Report:

> Given the risk factors surrounding the primary cement job and other prior unusual events (such as difficulty converting the float valves), the BP Well Site Leaders and, to the extent they were aware of the issues, the Transocean crew should have been particularly sensitive to anomalous pressure readings and ready to accept that the primary cement job could have failed.   ***It appears instead they started from the assumption that the well could not be flowing, and kept running tests and coming up with various explanations until they had convinced themselves their assumption was correct.***   (Emphasis added.)

301.   The Presidential Report identified five potential factors that "may have contributed to the failure to properly conduct and interpret the negative-pressure test":

> (b)   First, there was no standard procedure for running or interpreting the test in either MMS regulations or written industry protocols. Indeed, the regulations and standards did not require BP to run a negative-pressure test at all.

> (c)   Second, BP and Transocean had no internal procedures for running or interpreting negative-pressure tests, and had not formally trained their personnel in how to do so.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

(d)   Third, the BP Macondo team did not provide the Well Site Leaders or rig crew with specific procedures for performing the negative-pressure test at Macondo.

(e)   Fourth, BP did not have in place (or did not enforce) any policy that would have required personnel to call back to shore for a second opinion about confusing data.

(f)   Finally, due to poor communication, it does not appear that the men performing and interpreting the test had a full appreciation of the context in which they were performing it.   Such an appreciation might have increased their willingness to believe the well was flowing.   Context aside, however, individuals conducting and interpreting the negative-pressure test should always do so with an expectation that the well might lack integrity.

302.   The crew then proceeded to open the annular preventer and begin displacing mud and spacer from the riser.  During this time, the crew has to monitor the well for kicks, which are any unplanned influxes of gas or fluids, among other anomalies.  According to the Presidential Report, there are a number of ways to monitor the well for kicks.  The first is to measure the volume of mud in the active pits.  The volume of mud sent from the active pits to the well should equal the volume of mud returning to the pits.  An increase in volume is a "powerful indicator" that something else is flowing into the well.  The second is to confirm that the volume of rate of flow of fluids coming from the well equals the volume and rate of fluids being pumped into the well.  If the flow out is greater than the flow in, it is a "strong indicator" that a kick may be under way.  In addition, the crew can perform visual "flow checks" through cameras and other stations to observe whether fluids are flowing from the well when the pumps are shut off, at which time flow from the well should stop.  Finally, the drill-pipe pressure can be monitored.  While there are numerous reasons that drill-pipe pressure can change, any change in pressure while the pump rate remains constant could indicate a kick.

303.   According to the Presidential Report, the annular preventer was opened at 8:02 p.m.  The process of displacing mud and spacer from the riser went smoothly for nearly an hour.  According to the Presidential Report, the pressure was slowly, but steadily, decreasing over time

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

as lighter seawater displaced the heavy drilling mud in the riser.  However, at approximately 9:01 p.m., the drill pipe pressure began to slowly increase, despite the fact that the pump rate remained constant.  By 9:08 p.m., the pressure had increased from 1,250 psi to 1,350 psi.  The Presidential Report stated that while the magnitude of the increase in pressure may have appeared subtle on the monitoring display, the change from decreasing pressure to increasing pressure was not.

> Had someone noticed it, he would have had to explain to himself how the drill-pipe pressure could be increasing while the pump rate was not. One possible reason might have been that hydrocarbons were flowing into the well and pushing heavy drilling mud up past the drill pipe.

304.  At 9:08 p.m. the pumps were shut down to perform a "sheen test" as the fluid that would next be returning from the riser was the spacer that had been pumped in during the negative-pressure test.  BP wanted to dump this fluid overboard, but first had to test to make sure all of the oil-based mud had been removed from the riser.  According to the Presidential Report, during this time, mudlogger Joseph Keith performed a visual flow check to make sure the well was not flowing while the pumps were off.  According to Keith, there was no flow.

305.  The sheen test was successful and the pumps were turned back on after 6 minutes, at 9:14 p.m.  During these 6 minutes, however, the pressure in the drill pipe continued to increase.  According to the Presidential Report:

> What nobody appears to have noticed during those six minutes (perhaps as a result of all of the activity) was that drill-pipe pressure was increasing again. With the pumps off, the drill-pipe pressure . . . should have stayed constant or gone down. Instead, it went up by approximately 250 psi.  This increase in pressure was clear in the Sperry Sun data, and likely would have been clearer on the Hitec display. Had someone noticed it, he would have recognized this as a significant anomaly that warranted further investigation before turning the pumps back on. But by 9:14 p.m., the crew turned the pumps back on, obscuring the signal. Drill-pipe pressure increased, but so did the pump rate.

306.  According to the Presidential Report, four minutes after the pumps went back on, a pressure-relief valve on one of the pumps blew.  A number of crewmembers went to the pump room to fix the valve.  Then, shortly before 9:30 p.m., driller Dewey Revette noticed "an odd and

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

unexpected pressure difference between the drill pipe and the kill line." The crew then shut off the pumps to investigate. The drill-pipe pressure initially decreased, but then increased by 550 psi over a 5.5 minute period. The pressure on the kill line remained "significantly lower."

307. Ravette then had a floorhand bleed off the drill pipe pressure to eliminate the difference. The drill-pipe pressure initially dropped, but then immediately began climbing again. According to the Presidential Report:

> Young and Anderson left the rig floor. Despite the mounting evidence of a kick, however, neither Revette nor Anderson performed a visual flow check or shut in the well.

> At 9:39 p.m., drill-pipe pressure shifted direction and started decreasing. In retrospect, this was a very bad sign. It likely meant that lighter-weight hydrocarbons were now pushing heavy drilling mud out of the way up the casing past the drill pipe.

308. According to the Presidential Report, "drilling mud began spewing from the rotary onto the rig floor" sometime between 9:40 and 9:43 p.m. It was at this point that some members of the crew finally realized a kick had occurred. Immediate action was taken including routing the flow coming from the riser through the diverter system and sending it into the mud-gas separator. The crew also closed one of the annular preventers on the blowout preventer to shut the well in.

> Their efforts were futile. By the time the rig crew acted, gas was already above the BOP, rocketing up the riser, and expanding rapidly. At the Commission's November 8, 2010, hearing, a representative from Transocean likened it to "a 550-ton freight train hitting the rig floor," followed by what he described as "a jet engine's worth of gas coming out of the rotary." The flow from the well quickly overwhelmed the mud-gas separator system. Ignition and explosion were all but inevitable. The first explosion occurred at approximately 9:49 p.m. On the drilling floor, the Macondo disaster claimed its first victims.

309. When the mud had begun spewing from the rig floor, the crew should have diverted the flow overboard (rather than into the mud-gas separator) or activated the blind shear ram. While, according to the Presidential Report, this may have not prevented the explosion, it could have given the crew more time or limited the explosion's impact. One of the possible

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

explanations the Presidential Report proffers for why the crew failed to take either or both of these actions is that "the rig crew had not been trained adequately how to respond to such an emergency situation."

310.  The blowout preventer failed to contain the well both before and after the explosions.  According to the Presidential Report, after the first explosion, the crew attempted to engage the emergency disconnect system, which should have closed the blind shear ram, severed the drill pipe, sealed the well, and disconnected *Deepwater Horizon* from the blowout preventer. *Deepwater Horizon* never disconnected.  It is possible that the explosion had already damaged the cables to the blowout preventer, which would have prevented the disconnect sequence from starting.  Finally, the blowout preventer's automatic mode function, also known as the "deadman" system, should have triggered the blind shear ram after the power, communication, and hydraulics connections between the rig and the blowout preventer were cut.

311.  Following the explosions, *Deepwater Horizon* burned for nearly two days before it sank to the bottom of the Gulf of Mexico.  When the rig sank, the marine riser connecting the blowout preventer and the well to the rig separated from the rig and fell to the bottom of the Gulf.

### F.    Aftermath of the Blowout and Efforts to Plug the Well

312.  On April 21, 2010, BP issued two press releases concerning the *Deepwater Horizon* explosion.  In one press release, BP confirmed a statement by Transocean reporting a fire aboard the rig.  In the other press release, Defendant Hayward stated, "[w]e are also very focused on providing every possible assistance in the effort to deal with the consequences of the incident."  Conspicuously absent from both press releases was the fact that oil was currently leaking from the Macondo well into the Gulf of Mexico.

313.  On April 23, 2010, BP filed with the SEC a Form 6-K and press release dated April 22, 2010 discussing the initiation of its response to the Gulf of Mexico oil spill.  In the release, Defendant Hayward misleadingly assured the public of BP's ability to limit the flow of oil.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

Specifically, Hayward stated, "There should be no doubt of our resolve to limit the escape of oil and protect the marine and coastal environments from its effects."

314.   On April 23, 2010, the U.S. Coast Guard announced that it appeared that oil was not flowing from the sunken drilling rig and damaged well.  However, on April 24, 2010, an ROV confirmed that oil was indeed leaking from the well.  Coast Guard Rear Admiral Mary Landry stated, "[w]e thought what we were dealing with as of yesterday was a surface residual [oil] from the mobile offshore drilling unit.  In addition to that is oil emanating from the well.  It is a big change from yesterday . . . .  This is a very serious spill, absolutely."  Coast Guard and BP officials estimated as much as 1,000 barrels of oil was leaking into the Gulf each day.

315.   In fact, massive amounts of oil, far eclipsing the 1,000 barrels per day estimate, were leaking from the broken riser into the Gulf of Mexico.  According the Presidential Report, "BP had no available, tested technique to stop a deepwater blowout other than the lengthy process of drilling a relief well."  Moreover:

> If BP's response capacity was underwhelming, some aspects of its response plan were embarrassing. In the plan, BP had named Peter Lutz as a wildlife expert on whom it would rely; he had died several years before BP submitted its plan. BP listed seals and walruses as two species of concern in case of an oil spill in the Gulf; these species never see Gulf waters.  And a link in the plan that purported to go to the Marine Spill Response Corporation website actually led to a Japanese entertainment site.

316.   On April 28, 2010, Admiral Landry announced that due to the discovery of an additional leak from the well, the National Oceanic and Atmospheric Administration ("NOAA") increased its estimate to 5,000 barrels of oil spilling into the Gulf each day.  On the following day, Doug Suttles, Chief Operating Officer of BP Exploration & Production, expressed disagreement with NOAA's estimated flow rate, stating, "I think that somewhere between one and five thousand barrels a day is probably the best estimate we have today."  However, an internal BP document later surfaced which shows that on April 27, 2010 BP had arrived at an estimate of 5,758 barrels per day, ranging up to a high of 14,266 barrels per day.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

317.   On the news of the increased estimates of oil spilling into the Gulf, the price of BP ADSs declined 8.34% or $4.78 from $57.34 to a close of $52.56 on April 29, 2010.

318.   Up until the flow of oil was stopped in July 2010, BP continually downplayed the amount of oil leaking into the Gulf.   On April 30, 2010, John Curry, a spokesman for BP working from the Gulf Coast central command operations, said that 5,000 barrels a day was a "guestimate . . .There's a range of uncertainty, and it's very difficult to accurately gauge how much there is."

319.   From April 27 through May 1, 2010, several independent scientists used various methodologies to calculate the amount of oil leaking from the well.   These estimates, which appeared in the national press as early as April 29, 2010 ranged from 5,000-26,500 barrels per day.   However, on May 5, 2010, Defendant Hayward told the Houston Chronicle, "A guesstimate is a guesstimate.   And the guesstimate remains 5,000 barrels a day."

320.   BP made efforts to trigger the blowout preventer through May 5, all of which failed.   According to the Presidential Report, these efforts "were plagued by engineering and organizational problems."   Shockingly, during these attempts, BP and Transocean relied on diagrams of the blowout preventer for nearly 10 days that showed the wrong plumbing, causing the engineers that were attempting to trigger one of the blowout preventer's rams through a hydraulic panel to misdirect their efforts.   According to the Presidential Report, BP Vice President Harry Thierens, who led blowout preventer operations for BP, stated that he was "quite frankly astonished that this could have happened."

321. On May 13, 2010, David Kotok, chairman and chief investment officer at Cumberland Advisors, reported that experts alleged that "BP is purposefully covering up or excluding information and keeping professionals from participating in a coordinated national effort to deal with this catastrophe."   On May 14, 2010, Defendant Hayward continued to minimize the significance of the spill, saying "[t]he Gulf of Mexico is a very big ocean.   The

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

amount of volume of oil and dispersant we are putting into it is tiny in relation to the total water volume."

322.   As government and independent party spill estimates rose, BP remained steadfast in downplaying the severity of the oil flowing into the Gulf.  For example, on May 30, 2010, Robert Dudley stated that the original estimates by the government and BP officials of 5,000 barrels a day were based on satellite pictures and that the then current estimate of 12,000 to 19,000 barrels was "issued without an actual flow measurement."

323.   Not only was the news of the amount of oil leaking from the well getting worse, but stories began to appear about BP's deficient safety culture and habit of trading safety for time and money.  According to one of the survivors of the *Deepwater Horizon*, BP had known about potential problems on the *Deepwater Horizon* for months prior to the accident.  On May 16, 2010, the survivor informed *60 Minutes* that BP had initially estimated work to take 21 days.  However, as the time for setting up the well extended to six weeks, BP's management became agitated and ordered workers to speed up the schedule.  An earlier problem with the well had cost BP an extra $25 million.  BP's management pressured the workers on the oil rig to make up that loss.  The *Deepwater Horizon* survivor told *60 Minutes* that BP was continuously pressuring them to work quickly.  When the timeline for drilling the Macondo well became delayed, coupled with the loss of $25 million in the earlier incident, BP managers ordered the drillers to work even faster.

324.   On May 29, 2010, the *New York Times* reported in an article entitled "Documents Show Early Worries About Safety of Rig," that BP recognized ongoing safety concerns about the *Deepwater Horizon* months before the explosion.  That article explained, in part, that: "Internal documents from BP show that there were serious problems and safety concerns with the *Deepwater Horizon* far earlier than those the company described to Congress last week."  The article further stated that: "The documents show that in March, after several weeks of problems

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

on the rig, BP was struggling with a loss of 'well control.'  And as far back as 11 months ago, it was concerned about the well casing and the blowout preventer."

325.   The price of BP ADSs was $60.48 at the close of trading on April 20, 2010, just hours before the blowout on *Deepwater Horizon*.  Over the next month, the price of BP ADSs declined to $42.95 on Friday May 28, 2010.  On the trading day following the May 29, 2010 *New York Times* article mentioned immediately above, the price of BP ADSs fell approximately 13%, closing at $36.52 on June 1, 2010.

326.   The precipitous decline in the price of BP ADSs since the first day of the *Deepwater Horizon* explosion caused analysts to question whether BP could survive as a going concern.  In commenting on whether Hayward would resign or whether BP p.l.c. would issue a dividend, one analyst stated "'[t]he situation is now beyond both of these points and the key question is can BP survive?'"  *See* Benn Harrington, *"BP Survival Worries Drag FTSE 100 Down,"* telegraph.co.uk (June 1, 2010).

327.   Also on June 1, 2010, UBS raised its estimates of the total spill costs from $12 billion up to a revised figure of $40 billion.

328.   On June 2, 2010, rating agency DBRS "placed the 'AA (high)' Issuer Rating of BP plc Under Review with Negative Implications as the company's series of operations to stop the oil spill, started on April 20, 2010, from its operated Macondo well in the Gulf of Mexico have been unsuccessful."

329.   On June 2, 2010, Credit Suisse Group AG estimated that BP's combined cleanup, restoration, and litigation costs stemming from the *Deepwater Horizon* disaster could exceed $37 billion, while research firm Tudor Pickering Holt estimated the total at $35 billion to $40 billion.  A *Smart Money* article quoted Macquarie Research analyst Jason Gammel as saying "[t]here's no reason to be moving into [BP] stock today" given the lack of firm figures related to BP's cleanup liability.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

330.   On June 3, 2010, Fitch announced that it had "downgraded BP's Longterm Issuer Default Rating (IDR) and senior unsecured rating to 'AA' from 'AA+' . . . and placed the ratings on Rating Watch Negative (RWN)." Also, Fitch announced that, "The ratings on BP Capital Markets plc's senior unsecured issues, which are fully and unconditionally guaranteed by BP, have been downgraded to 'AA' from 'AA+' and placed on RWN."

331.   Also on June 3, 2010, Moody's announced that it "downgraded the senior unsecured ratings of BP plc and its guaranteed subsidiaries by one notch to Aa2 from Aa1, and the long-term issuer ratings of BP Corporation North America, Inc. and BP Finance plc to Aa3 from Aa2" and that it placed these long-term debt ratings on review for further possible downgrade.

332.   On June 4, 2010, S&P announced that it had downgraded BP's long-term rating to "AA-" from "AA," that it was placing its long- and short-term corporate credit ratings for BP on CreditWatch negative, and that further downgrades were possible.

333.   In a June 4, 2010 press release, BP stated that the "longer-term costs of environmental remediation, claims and litigation are not predictable at this stage, but they will be sizeable and are likely to spread over many years."

334.   Some analysts estimated that legal costs in connection with the spill would exceed $60 billion, and others estimated that clean up costs would range between $15 and $40 billion. However a jury verdict against BP and/or BP p.l.c. could take BP's liabilities for the spill into hundreds of billions of dollars.  Analysts on Wall Street refer to this as the "Texaco Scenario," referring to the 1987 verdict against Texaco which forced it to file for protection under Chapter 11 of the Bankruptcy Code because it could not afford to pay a jury award.  *See* Andrew Ross Sorkin, "Imagining the Worst for BP's Future," *N.Y. Times* (June 7, 2010) at B1.

335.   On June 9, 2010 as a result of fears that BP would suspend dividends, the price of BP ADSs declined 15.80% or $5.48 from $34.68 to a close of $29.20.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

336.   On June 10, 2010, Bloomberg News reported that "BP plc bonds and credit-default swaps are trading as if the energy company has lost its investment-grade rating as costs mount from the worst oil spill in U.S. history."

337.   Also on June 10, 2010, an article entitled "Is BP About to Fail?," available via *Seeking Alpha*, observed that "[c]redit spreads are forecasting increasing near-term solvency risks in shares of BP" and that "[t]he term structure in CDS has severely inverted implying a very high risk of near-term default."

338.   More information continued to be disclosed showing that Defendants knew or should have known of the high probability that a catastrophe of this magnitude could occur.  On June 14, 2010, the U.S. Congressional Subcommittee on Oversight and Investigations sent a letter to Defendant Hayward detailing serious questions about the decisions made by BP in the days and hours before the explosion on the *Deepwater Horizon*:

> On April 15, **five days before the explosion, BP's drilling engineer called Macondo a "nightmare well."**  In spite of the well's difficulties, BP appears to have made multiple decisions for economic reasons that increased the danger of a catastrophic well failure.  In several instances, these decisions appear to violate industry guidelines and were made despite warnings from BP's own personnel and its contractors.  In effect, it appears that BP repeatedly chose risky procedures in order to reduce costs and save time and made minimal efforts to contain the added risk.
>
> At the time of the blowout, the Macondo well was significantly behind schedule. This appears to have created pressure to take shortcuts to speed finishing the well. In particular, the Committee is focusing on five crucial decisions made by BP: (1) the decision to use a well design with few barriers to gas flow; (2) the failure to use a sufficient number of "centralizers" to prevent channeling during the cement process; (3) the failure to run a cement bond log to evaluate the effectiveness of the cement job; (4) the failure to circulate potentially gas-bearing drilling muds out of the well; and (5) the failure to secure the wellhead with a lockdown sleeve before allowing pressure on the seal from below. The common feature of these five decisions is that they posed a trade-off between cost and well safety. (Emphasis added.)

339.   That same day, *Investment Week*, citing an analysis by the Daily Telegraph of data compiled by Citywatch, reported that major UK institutions, including Scottish Widows (BP's

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

ninth-largest shareholder), Threadneedle, and AXA, all cut their BP holdings since the *Deepwater Horizon* disaster began.

340.  On June 15, 2010, Fitch announced that it had "downgraded BP plc's Long-term Issuer Default Rating (IDR) and senior unsecured rating to 'BBB' from 'AA' . . . and downgraded the Short-term IDR to 'F3' from 'F1+'. The Rating Watch on all ratings has been changed to Evolving (RWE) from Negative (RWN)."

341.  On June 16, 2010, BP agreed to set aside a $20 billion escrow fund over the next three and one-half years to cover its liabilities arising from the *Deepwater Horizon* spill.  BP also represented that it would sell oil and gas fields and cut investments in drilling if necessary to ensure BP had enough money to pay such costs.

342.  In setting up the fund, the company acknowledged that $20 billion did not represent a cap on BP's liabilities and further noted that any fines or penalties associated with the spill would be paid separately and in addition to the fund amount.

343.  On the same day, BP cancelled its previously declared quarterly dividend for the first quarter of 2010, as well as dividends for the second and third quarters of 2010.

344.  The *New York Times* reported that analysts had begun to estimate that potential criminal fines could increase BP's legal costs to $63 billion.

345.  In addition, Hayward publicly stated that "BP is a 'responsible party' under the Oil Pollution Act. This means that federal law requires BP, as one of the working interest owners of Mississippi Canyon 252, to pay to clean up the spill and to compensate for the economic and environmental impacts of the spill. "Let me be clear: BP has accepted this responsibility and will fulfill this obligation."  *See "*Prepared Testimony of Tony Hayward to United States House of Representatives, Committee on Energy and Commerce, Subcommittee on Oversight and Investigations," June 17, 2010.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

346.   BP accepted responsibility to pay all "legitimate" claims by damaged individuals and businesses.  As of June 17, 2010, BP announced that it had made $245 million available to a Louisiana barrier islands project, Mississippi, Alabama and Florida; would pay $360 million to the state of Louisiana; had committed $500 million to studying the impact of the *Deepwater Horizon* incident; and had paid over $90 million on the more than 56,000 claims that had been submitted as a result of the disaster.

347.   In his June 17, 2010 testimony to Congress, Defendant Hayward acknowledged that the *Deepwater Horizon* catastrophe should never have occurred:  "The explosion and fire aboard the *Deepwater Horizon* and the resulting oil spill in the Gulf of Mexico never should have happened – and I am deeply sorry that they did.  None of us yet knows why it happened."

348.   That same day, BP common stock was downgraded to "Hold" from "Buy" by Seymour Price equity analyst Alan Sinclair; to "Underweight" from "Equalweight" by Barclays Capital equity analyst Lucy Haskins; and to "Neutral" from "Buy" by Bank of America – Merrill Lynch.

349.   S&P also announced that it "lowered its long- and short term corporate credit ratings on . . . BP plc to 'A/A-1' from 'AA-/A-1+'. The ratings remain on CreditWatch. . . ."

350.   On June 18, 2010, Moody's cut its ratings on $25 billion of rated BP debt securities. Moody's slashed by three notches its rating on BP's senior unsecured debt from "Aa2" to "A2," lowered the unsecured issuer rating of BP Corporation North America by four notches to "Baa1" from "Aa3," and dropped the senior unsecured issuer rating of BP Finance plc by three notches to "A3" from "Aa3."

351.   BP faces potentially huge civil and criminal exposure from governmental entities. As reported on June 18, 2010 in a Wall Street Journal article entitled "BP Case Will Be One of Largest Ever for DOJ," a team of 40 criminal prosecutors in the Department of Justice's Environmental and Natural Resources Division is investigating the *Deepwater Horizon* disaster.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

352.   On June 18, 2010, the Associated Press quoted Lawrence Goldstein, a director of the Energy Policy Research Foundation, as saying, "If the government has a single minded focus to be punitive, it could take this company down."

353.   On June 21, 2010, Bloomberg News called BP "the worst oil investment this year on Wall Street" and reported that BP "would face an extra $500 million a year in interest costs to raise $10 billion in the bond market."

354.   On June 28, 2010, BP ADSs plunged to an intraday low of $26.75, before rebounding slightly to close at $27.05, representing a loss of almost 55% since April 19, 2010.

355.   Also on June 28, 2010, Bloomberg reported that, because of recent downgrades on its debt, Credit Suisse Group AG had demanded that BP post collateral to borrow over $10 million. The same day, Bloomberg reported that BP had to pledge $840 million of shares in Russian oil producer OAO Rosneft to secure a $2 billion loan for use in battling the Gulf oil spill.

356.   On July 27, 2010, BP announced its plans to sell $30 billion in assts to cover costs related to the spill.

357.   The same day, BP announced a second quarter loss of $17.1 billion as a direct result of the Gulf of Mexico oil spill, a record loss for the company.  In the day's press release, BP announce that CEO Tony Hayward would be replaced with Robert Dudley, a BP executive director. Outgoing CEO Hayward stated, "The Gulf of Mexico explosion was a terrible tragedy for which – as the man in charge of BP when it happened – I will always feel a deep responsibility, regardless of where blame is ultimately found to lie."  Although Hayward resigned as CEO, he did not leave the company and is now running BP's operations in Russia, which were previously run by Robert Dudley.

358.   Late on August 3, 2010, a "static kill" procedure was successful in stopping the flow from the well.  According to the Presidential Report, the federal government released a 5-page report on August 4, 2010 titled *BP Deepwater Horizon Oil Budget: What Happened to the*

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

*Oil?*, which provided the federal government's first public estimate of the total volume of oil leaked into the Gulf of Mexico, an estimate of 4.9 million barrels.  This was based on the estimates of the daily rate of oil flow, which ranged from 62,200 barrels per day on April 22 to 52,700 barrels per day on July 14.

359.  BP's numerous missteps leading up to the Macondo well blowout plainly resulted from deficiencies in BP's safety culture.  BP placed a premium on time and money over safety.  Both the Presidential Report and the DHSG Report made clear that this misplacement of priorities had disastrous effects.

360.  The Presidential Report concluded that three things could have contained the hydrocarbon pressures that led to the well blowout: "the cement at the bottom of the well, the mud in the well and in the riser, and the blowout preventer."  Moreover, "mistakes and failures to appreciate risk compromised each of those potential barriers, steadily depriving the crew of safeguards until the blowout was inevitable and, at the very end, uncontrollable."

361.  BP, however, seemed more focused on saving time than prudently ensuring safety and managing risk.  The following chart appears in the Presidential Report:

**FIGURE 4.10: Examples of Decisions That Increased Risk At Macondo While Potentially Saving Time**

| Decision | Was There A Less Risky Alternative Available? | Less Time Than Alternative? | Decision-maker |
|---|---|---|---|
| Not Waiting for More Centralizers of Preferred Design | Yes | Saved Time | BP on Shore |
| Not Waiting for Foam Stability Test Results and/or Redesigning Slurry | Yes | Saved Time | Halliburton (and Perhaps BP) on Shore |

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

| Decision | Was There A Less Risky Alternative Available? | Less Time Than Alternative? | Decision-maker |
|---|---|---|---|
| Not Running Cement Evaluation Log | Yes | Saved Time | BP on Shore |
| Using Spacer Made from Combined Lost Circulation Materials to Avoid Disposal Issues | Yes | Saved Time | BP on Shore |
| Displacing Mud from Riser Before Setting Surface Cement Plug | Yes | Unclear | BP on Shore |
| Setting Surface Cement Plug 3,000 Feet Below Mud Line in Seawater | Yes | Unclear | BP on Shore (Approved by MMS) |
| Not Installing Additional Physical Barriers During Temporary Abandonment Procedure | Yes | Saved Time | BP on Shore |
| Not Performing Further Well Integrity Diagnostics in Light of Troubling and Unexplained Negative Pressure Test Results | Yes | Saved Time | BP (and Perhaps Transocean) an Rig |
| Bypassing Pits and Conducting Other Simultaneous Operations During Displacement | Yes | Saved Time | Transocean (and Perhaps BP) on Rig |

362.   **Redacted Pursuant to Protective Order**

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

**Redacted Pursuant to Protective Order**

363.   As detailed throughout, the *Deepwater Horizon* catastrophe did not occur because of a single misstep or one person's mistakes.   Rather, the disaster happened due to a chain of errors that were unquestionably a result of a culture at BP that failed to prioritize safety and risk management when conducting such difficult and dangerous operations.   BP was well aware of these problems.   Recognizing the importance of improving safety and risk management, BP publicly touted its improvement following previous mishaps.   In reality, however, BP failed miserably to learn from the mistakes that had led to previous disasters.   As the DHSG Report concluded, "[t]he Macondo well disaster was an organizational accident whose roots were deeply embedded in gross imbalances between the system's provisions for production and those for protection."

364.   On March 29, 2011, it was reported that BP was hit with a negative note by broker Collins Stewart, who advised clients to sell on account of concerns over BP's troubled deal with Russia's Roseneft.

365.   That same day, it was also reported that US investigators were considering corporate manslaughter charges against BP following the *Deepwater Horizon* incident.   These serious charges could extend to BP's management and further increase the company's existing liabilities.

## VII.   MISMANAGEMENT OF THE PLANS' ASSETS

366.   Throughout the Class Period, the Individual Defendants, all high-level executives or BP personnel that had knowledge or should have had knowledge of the misleading and inaccurate statements about BP's safety programs and processes and the extraordinary deficiencies in BP's operations, had the discretion, control, and/or authority under the terms of

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

the Plans to divest the Plans from investment in units of the BP Stock Fund; stop future contributions from being invested in the BP Stock Fund; appoint, monitor, and remove trustees; select, direct, monitor and terminate external investment managers of the BP Stock Fund; develop investment strategies and policies for the BP Stock Fund; and/or direct the trustee as to the investment and reinvestment of the Plans' assets.

367.   Pursuant to ERISA § 404(a), 29 U.S.C. § 1104(a), at all times relevant to this Complaint, Defendants owed the highest duty known to law to discharge their responsibilities with respect to the Plans with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and of like aims, and to diversify investments in the Plans so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so.

368.   Defendants breached their fiduciary duties by, among other things, failing to divest the Plans of units of the BP Stock Fund; discontinue further contributions of BP ADSs to the Plans; remove or take other similar action as to BP ADSs as an investment option for the Plans; properly monitor State Street as the independent fiduciary regarding the appropriateness of an investment in BP ADSs; and resign as fiduciaries of the Plans if as a result of their employment by BP, they could not loyally serve the Plans and the Participants.   In fact, Defendants continued to invest and to allow investment of the Plans' assets in units of the BP Stock Fund even though they knew or should have known of the misleading and/or inaccurate statements made to the investing public about BP's safety protocols in place for its gas and oil operations.   Once the true corporate culture of BP became known as a result of the *Deepwater Horizon* explosion, the price of the inflated BP ADSs substantially decreased in value, causing hundreds of millions of dollars of losses to the Plans.

369. Further, Defendants breached their fiduciary duties by direct and indirect communications with the Participants, made in their fiduciary capacity, which contained statements concerning BP ADSs that these Defendants knew or should have known were untrue

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

and inaccurate.   These communications included Plan-wide and Class-wide affirmative and materially misleading statements as to BP's safety protocols, which were purportedly in place for its gas and oil operations as discussed herein, that were contained in the documents that, upon information and belief, were incorporated into plan documents disseminated to the Participants.

370.   Defendants withheld material, non-public facts from the Participants and provided inaccurate and incomplete information to them regarding the company's safety protocols in its drilling operations and the soundness of BP ADSs as an investment vehicle.  As a consequence, the Participants did not exercise independent control over their investments in the BP Stock Fund.

371.   **Redacted Pursuant to Protective Order**

## VIII.   CLAIMS FOR RELIEF UNDER ERISA

372.   At all relevant times, Defendants were and acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

373.   ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

374.   ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

375. ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. (Emphasis added)

376. These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and have been described by some courts as the "highest known to the law." They entail, among other things:

    (a)    The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan;

    (b)    A duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor, and;

    (c)    A duty to disclose and inform, which encompasses: (i) a negative duty not to misinform; (ii) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (iii) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

377.   ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

> . . . in addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

378.   Plaintiffs therefore bring this action under the authority of ERISA § 502(a) for Plan-wide relief under ERISA §§ 409(a) and 405(a) to recover losses sustained by the Plans arising out of the breaches of fiduciary duties by Defendants for violations under ERISA § 404(a)(1) and  405(a).

## IX.    REMEDIES

379.   Plaintiffs, on behalf of the Plans, seek alternative types of relief under ERISA.

380.   First, with respect to calculation of the losses to the Plans, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Plans would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the BP Stock Fund would have instead been made in the most profitable alternative investment available.  In this way, the remedy restores the Plans' lost value and puts the Participants in the position they would have been in if the Plans had been properly administered by their fiduciaries. Accordingly, Plaintiffs, on behalf of the Plans, seek lost profits as a result of Defendants' breaches.  In particular, Plaintiffs, on behalf of the Plans, seek the profit that had been lost by investing in the BP Stock Fund instead of investing in other prudent funds within the Plans that were available at the time and which have outperformed the returns on the BP Stock Fund.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

381.   Second, Plaintiffs, on behalf of the Plans, seek to recover the losses incurred by investing their retirement funds in units of the BP Stock Fund when BP ADSs were a risky and imprudent investment.

382.   Third, Plaintiffs, on behalf of the Plans, seek a constructive trust imposed over all amounts by which the Plans' fiduciaries benefited as a result of their breaches.   In particular, Plaintiffs seek to impose a constructive trust on the amounts received by Defendants for selling their BP shares, including amounts that certain Defendants received when they sold BP shares at the same time that those Defendants were causing the Plans to use the Plans' assets to acquire and hold units of the BP Stock Fund.

383.   Plaintiffs, the Plans, and the Class are therefore entitled to relief from Defendants in the form of: (i) a monetary payment to the Plans to make good to the Plans the losses to the Plans resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (ii) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(2) and (3), 29 U.S.C. §§ 1109(a) and 1132(a)(2); (iii) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (iv) taxable costs and interests on these amounts, as provided by law; and (v) such other legal or equitable relief as may be just and proper.

384.   Under ERISA, each Defendant is jointly and severally liable for the losses suffered by the Plans in this case.

## COUNT I

### Failure to Prudently and Loyally Manage the Plans' Assets
**(Breaches of Fiduciary Duties in Violation of ERISA § 404 and § 405)**
**(Against All Defendants)**

385.   Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

386.   At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because they exercised discretionary authority or control over the administration and/or management of the Plans or disposition of the Plans' assets.

387.   Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent.   Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested. Defendants were responsible for ensuring that all investment options offered to Participants, including BP ADSs, were invested prudently and that such investments were consistent with the purpose of the Plan.   Defendants are liable for losses incurred as a result of the BP ADSs being imprudent for retirement savings accounts.

388.   A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries.   ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).   Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

389.   Defendants breached their duties to prudently and loyally manage the Plans' assets. During the relevant period, these Defendants knew or should have known, based upon a proper investigation of the BP Stock Fund, that BP ADSs were not a suitable and appropriate investment for the Plans as described herein.   Investment in BP ADSs during the relevant period clearly did not serve the Plans' purpose of helping the Participants save for retirement, and in fact caused significant losses and/or a depreciation in the Participants' retirement savings.   As a

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiffs and the Participants, lost a significant portion of their retirement benefits.

390.   Defendants either failed to conduct a proper investigation of the BP Stock Fund in violation of their duty of prudence and thus failed to uncover the problems discussed herein, or, alternatively, Defendants conducted such an investigation but, in violation of their duty of loyalty, nevertheless continued to allow the Plans to hold and offer the BP Stock Fund as an investment option.

391.   During the relevant period, Defendants failed to take any meaningful steps to protect the Participants from the inevitable losses that they knew, or should have known based upon a proper investigation, would ensue as BP's material problems, described herein, became public.

392.   Defendants also breached their co-fiduciary obligations by, among their other failures: knowingly participating in, or knowingly undertaking to conceal, the other Defendants' failure to disclose crucial information regarding the company's operations and artificial inflation of the price of BP ADSs.  Defendants had knowledge of such breaches by other fiduciaries of the Plans, yet made no effort to remedy the same.

393.   Pursuant to ERISA §§ 409, 502(a)(2), and 502(a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3),  Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

### Failure to Provide Participants With Complete and Adequate Information
### (Against All Defendants)

394.   Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

395.   During the relevant period, Defendants, in violation of their duty of loyalty, failed to adequately inform the Participants about the true risk and return characteristics of BP common stock and BP ADSs as required by ERISA's duty of loyalty.

396.   During the relevant period, Defendants issued to Participants Summary Plan Descriptions and other uniform, written fiduciary communications, some of which incorporated BP's SEC filings by reference.  These fiduciary communications failed to disclose, among other things, important information about BP's operations and prospects, which information Defendants knew, or should have known based upon a proper investigation and which are described throughout this Complaint.

397.   Had Defendants not constantly reinforced to the Participants the safety, stability and prudence of investment in BP common stock and BP ADSs during the relevant period, the Participants could have divested their holdings of units of the BP Stock Fund sooner or at least minimized such holdings earlier, thereby mitigating their and the Plans' losses.

398.   Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable plan participant that results in harm to the participant, the participant is presumed as a matter of law to have relied upon such misrepresentations and omissions to his or her detriment.  Here, Defendants' above-described statements, acts and omissions constituted misrepresentations and omissions which were fundamentally inaccurate about the prudence of investing in BP ADSs and were material to any reasonable person's decision about whether or not to invest or maintain any part of their retirement savings in the BP Stock Fund during the relevant period. Plaintiffs and the Participants are therefore presumed to have relied to their detriment on the misleading statements, acts, and omissions of Defendants.

399.   Plaintiffs further contend that the Plans suffered losses, and Plaintiffs and the Participants suffered losses, by the above-described conduct of Defendants named during the Class Period because Defendants' conduct fundamentally misled Plaintiffs and the Participants

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

about the prudence of making and maintaining their retirement investments in the BP Stock Fund, and that, in making and maintaining such investments, Plaintiffs and the Participants relied to their detriment upon the materially inaccurate and misleading statements, acts and omissions of Defendants.

400.   Had Defendants discharged their fiduciary duties to prudently disclose material information, the loss suffered by the Plans would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plans, and indirectly Plaintiffs and the Participants, lost a significant portion of their retirement savings.

401.   Defendants are also liable as co-fiduciaries because they knowingly participated in and knowingly undertook to conceal the failure of the other fiduciaries to provide complete and accurate information regarding BP ADSs, despite knowledge of their breaches.  Further, they enabled such conduct as a result of their own failure to satisfy their fiduciary duties and as a result of having knowledge of the other fiduciaries' failures to satisfy their duty to provide only complete and accurate information to Participants, yet not making any effort to remedy the breaches.

402.  Pursuant to ERISA §§ 409, 502(a)(2), and 502(a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

**COUNT III**

**Failure to Adequately Monitor Other Fiduciaries and
Provide Them with Accurate Information
(Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405)
(Against the BP North America Board Defendants,
the Designated Officer Defendants, the Appointing Officer Defendants,
and the SPIOC Defendants)**

403.  Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

404.  At all relevant times, as alleged above, the BP North America Board Defendants, the Designated Officer Defendants, the Appointing Officer Defendants, and the SPIOC Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

405.   At all relevant times, as alleged above, the scope of the fiduciary responsibility of the BP North America Board Defendants, the Designated Officer Defendants, the Appointing Officer Defendants, and the SPIOC Defendants included the responsibility to appoint, evaluate, and monitor other fiduciaries, including the members of the Savings Plan Committee.

406.  The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries.  In this case, that means that the monitoring fiduciaries, the BP North America Board Defendants, the Designated Officer Defendants, the Appointing Officer Defendants, and the SPIOC Defendants had the duty to:

(a)    Ensure that the monitored fiduciaries possessed the needed credentials and experience, or used qualified advisors and service providers to fulfill their duties, and were knowledgeable about the operations of the Plans, the goals of the Plan and the behavior of the Participants;

(b)    Ensure that the monitored fiduciaries were provided with adequate financial resources to do their job;

(c)    Ensure that the monitored fiduciaries had adequate information to do their job of overseeing the Plans' investments;

(d)    Ensure that the monitored fiduciaries had ready access to outside, impartial advisors when needed;

(e)    Ensure that the monitored fiduciaries maintained adequate records of the information on which they base their decisions and analysis with respect to the Plans' investment options; and

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

(f)    Ensure that the monitored fiduciaries reported regularly to the BP North
America Board Defendants, the Designated Officer Defendants, the
Appointing Officer Defendants, the SPIOC Defendants,  The BP North
America Board Defendants, the Designated Officer Defendants, the
Appointing Officer Defendants, and the SPIOC Defendants must then
review, understand, and approve the conduct of the hands-on fiduciaries.

407.   Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries
are performing their fiduciary obligations, including those with respect to the investment of a
plan's assets, and must take prompt and effective action to protect a plan and its participants
when they are not. In addition, a monitoring fiduciary must provide the monitored fiduciaries
with complete and accurate information in their possession that they know or reasonably should
know that the monitored fiduciaries must have in order to prudently manage a plan and a plan's
assets.

408.   The BP North America Board Defendants, the Designated Officer Defendants, the
Appointing Officer Defendants, and the SPIOC Defendants breached their fiduciary monitoring
duties by, among other things, (a) failing to ensure that the monitored fiduciaries conducted a
proper investigation as to whether to offer the BP Stock Fund; (b) failed to ensure that the
monitoring fiduciaries had access to knowledge about the company's problems alleged above,
which made company stock an imprudent retirement investment, and (c) failing to ensure that the
monitored fiduciaries completely appreciated the huge risk of investment of the retirement
savings of rank and file employees in BP ADSs, an investment that was imprudent for retirement
savings accounts.  The BP North America Board Defendants, the Designated Officer Defendants,
the Appointing Officer Defendants, and the SPIOC Defendants knew or should have known that
the fiduciaries they were responsible for monitoring were: (i) imprudently allowing the Plan to
continue offering the BP Stock Fund as an investment alternative for the Plans, and (ii)
continuing to invest the assets of the Plan in BP ADSs when it no longer was prudent to do so.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

Despite this knowledge, the BP North America Board Defendants, the Designated Officer Defendants, the Appointing Officer Defendants, and the SPIOC Defendants failed to take action to protect the Plans, and concomitantly the Participants, from the consequences of these fiduciaries' failures.

409.   In addition, the BP North America Board Defendants, the Designated Officer Defendants, the Appointing Officer Defendants, and the SPIOC Defendants in connection with their monitoring and oversight duties, were required to disclose to the monitored fiduciaries accurate information about the condition of BP that they knew or should have known that the monitored fiduciaries needed to make sufficiently informed decisions. By remaining silent and continuing to conceal such information from the other fiduciaries, the BP North America Board Defendants, the Designated Officer Defendants, the Appointing Officer Defendants, and the SPIOC Defendants breached their monitoring duties under the Plans and ERISA.

410.   The BP North America Board Defendants, the Designated Officer Defendants, the Appointing Officer Defendants, and the SPIOC Defendants are liable as co-fiduciaries because they were the Plans' fiduciaries and they knowingly participated in each other's fiduciary breaches as well as those by the monitored fiduciaries, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

411.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly the Plaintiffs and the Participants lost a significant portion of their retirement benefits.

412.   Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

## X.     PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of the Plans and the Participants, pray for relief as follows:

A.     That judgment be entered for the Plaintiffs and the Participants on behalf of the Plans, determining that Defendants, and each of them jointly and severally, breached their fiduciary duties owed to the Plans and the Participants;

B.     That Defendants, and each of them jointly and severally, restore to the Plans and the Participants the losses sustained by the Plans and the Participants due to the breaches of fiduciary duties under Count I through Count III in an amount to be proven at trial;

C.     Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plans as the result of breaches of fiduciary duty;

D.     An Order enjoining Defendants, and each of them, from any further violations of the ERISA fiduciary obligations;

E.     Actual damages in the amount of any losses the Plans suffered, to be allocated among the Participants' individual accounts in proportion to the accounts' losses;

F.     An Order that Defendants allocate the Plans' recoveries to the accounts of all Participants who had their accounts invested in the BP Stock Fund in proportion to the accounts' losses attributable to the precipitous decline in the share price of BP ADSs.

G.     That an appropriate class of Participants be certified and designated by the Court to receive the amounts restored to the Plans by Defendants;

H.     That the Court award reasonable attorney fees, costs and expenses to Class counsel under 29 U.S.C. § 1132(g) and/or in accordance with the laws and rules governing class actions and common funds, under Fed. R. Civ. P. 23; and

I.     For such further legal, equitable and remedial relief that this Court deems just and proper to protect the legitimate rights of Plaintiff, the Plans and the Participants.

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

# XI.    JURY TRIAL DEMAND

Plaintiffs, pursuant to Fed. R. Civ. P. 38, demand a trial by jury of all issues which are

subject to adjudication by a trier of fact.

Dated:  May 27, 2011


*/s/ Thomas R. Ajamie*                                          */s/ W. Mark Lanier*

_____            _____

Thomas Robert Ajamie                                      W. Mark Lanier
Texas Bar No. 00952400                                    Texas Bar No. 11934600
Dona Szak                                                          THE LANIER LAW FIRM
Texas Bar No. 19597500                                    6810 FM 1960 West
John W. Clay                                                      Houston, Texas 77069
Texas Bar No. 00796366                                    Tel: (713) 659-5200
AJAMIE LLP                                                       Fax: (713) 659-2204
711 Louisiana, Suite 2150
Houston, TX 77002                                            Evan M. Janush *(pro hac vice)*
Tel: (713) 860-1600                                           THE LANIER LAW FIRM
Fax: (713) 860-1699                                          126 East 56th Street, 6th Floor
                                                                          New York, New York, 10022
                                                                          Tel: (212) 860-1600
                                                                          Fax: (713) 860-7699


*Attorneys for Plaintiff David M. Humphries*        *Attorneys for Plaintiffs Charis Moule, Jerry*
*and Interim Co-Liaison Counsel*                          *McGuire and Maureen S. Riely and Interim*
                                                                          *Co-Liaison Counsel*

Ronald S. Kravitz                                              Sanford P. Dumain *(pro hac vice)*
Texas Bar No. 00795147                                    Lori G. Feldman *(pro hac vice)*
Kim Zeldin *(pro hac vice)*                                Arvind B. Khurana *(pro hac vice)*
LINER GRODE STEIN, YANKELEVITZ            MILBERG LLP
SUNSHINE REGENSTREIF & TAYLOR LLP   One Pennsylvania Plaza
199 Fremont Street, 20th Floor                          New York, New York 10119
San Francisco, CA 94105                                    Tel: (212) 594-5300
Tel: (415) 489-7700                                           Fax:  (212)868-1229
Fax: (415) 278-7701


*Attorneys for Plaintiff David M. Humphries and*   *Attorneys for Plaintiffs Charis Moule, Jerry*
*Interim Co-Lead Counsel*                                   *McGuire and Maureen S. Riely and Interim*
                                                                          *Co-Lead Counsel*

#27955-v5

PORTIONS OF THIS DOCUMENT CONTAIN
CONFIDENTIAL INFORMATION
REDACTED PURSUANT TO PROTECTIVE ORDER

Stephen J. Fearon, Jr. *(pro hac vice)*
Joseph Goljan *(pro hac vice)*
Olga Anna Posmyk *(pro hac vice)*
SQUITIERI & FEARON LLP
32 East 57th Street, 12th Floor
New York, New York 10022
Tel: (212) 421-6492

*Attorneys for Plaintiffs Ralph Whitley and
Frankie Ramirez and Interim Counsel --
Executive Committee*

Gregory M. Egleston *(pro hac vice)*
EGLESTON LAW FIRM
440 Park Avenue South, 5th Floor
New York, NY 10016
Tel: (212) 683-3400

*Attorneys for Plaintiff Ralph Whitley*

Edwin J. Mills
Michael J. Klein
STULL STULL & BRODY
6 East 45th Street
New York, NY 10017
Tel: (212) 687-7230

*Attorneys for Plaintiff Edward Mineman*

Robert I. Harwood *(pro hac vice)*
Jeffrey M. Norton *(pro hac vice)*
Tanya Korkhov *(pro hac vice)*
HARWOOD FEFFER LLP
488 Madison Avenue, Suite 801
New York, NY 10022
Tel: (212) 935-7400

*Attorneys for Plaintiffs Charis Moule, Jerry
McGuire and Maureen S. Riely and Interim
Counsel -- Executive Committee*

Thomas J. McKenna *(pro hac vice)*
GAINEY AND MCKENNA
295 Madison Avenue, 4th Floor
New York, NY 10017
Tel: (212) 983-1300

*Attorneys for Plaintiff Thomas P. Soesman*

Robert A. Izard *(pro hac vice)*
IZARD NOBEL LLP
29 South Main Street Suite 215
West Hartford, CT 06107
Tel: (860) 493-6292
Fax: (860) 493-6290

*Attorneys for Plaintiff Arshadullah Syed*