CAUSE NO. 09 CV 1352

| | | |
|---|---|---|
| NANCY GOLDSTEIN, derivatively on behalf of BP p.l.c., | § § § | IN THE DISTRICT COURT OF |
| Plaintiff, | § § § | |
| vs. | § § | GALVESTON COUNTY, TEXAS |
| IAIN C. CONN, BYRON E. GROTE, ANTHONY B. HAYWARD, ANDREW G. INGLIS, ANTONY BURGMANS, CYNTHIA B. CARROLL, WILLIAM M. CASTELL, GEORGE DAVID, ERROLL B. DAVIS, JR., DOUGLAS J. FLINT, DEANNE S. JULIUS, TOM MCKILLOP, IAN M.G. PROSSER, PETER D. SUTHERLAND, DAVID C. ALLEN, JOHN H. BRYAN, CHARLES F. KNIGHT, JOHN A. MANZONI, HENRY MICHAEL P. MILES, ROBIN B. NICHOLSON, MICHAEL H. WILSON, BRIAN E. FRANK, ROBERT A. MALONE, LAMAR MCKAY, and WALTER E. MASSEY, | § § § § § § § § § § § § § § § § § § § | |
| Defendants. | § § § | |
| -and- | § § § | |
| BP p.l.c., BP AMERICA INC., and BP PRODUCTS NORTH AMERICA, INC., | § § § | 122nd JUDICIAL DISTRICT |
| Nominal Defendants. | § | |

**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND PLEA TO THE JURISDICTION AND REPLY IN FURTHER SUPPORT OF PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS**

Plaintiff, Nancy Goldstein ("Plaintiff"), through her counsel, respectfully files this Memorandum in Opposition to Defendants' Motion To Dismiss and Plea to the Jurisdiction and Reply in Further Support of her Motion to Compel Production of Documents, and in support thereof states as follows:

## INTRODUCTION

For many years, BP, p.l.c. and its two wholly-owned operating subsidiaries, BP America, Inc. ("BP America") and BP Products North America, Inc. ("BP Products") (collectively "BP") have indisputably caused significant human and environmental damage to Galveston and Texas stemming from the unsafe and unlawful operation of the Texas City Refinery. Indeed, BP's misconduct at the Texas City Refinery was, in part, the subject of a shareholder derivative lawsuit filed in Alaska and later settled there. *In re BP p.l.c. Deriv. Litig.*, No. 3AN-06-11929CI (Alaska Super. Ct. May 18, 2007) ("*BP Alaska*") (Ex. A hereto). This Texas-based misconduct caused both the federal and Texas governments to prosecute BP in Texas resulting, just so far, in huge fines.

In the face of the unprecedented catastrophe at Texas City, Defendants claim that English law applies to the question of Plaintiff's standing under the "internal affairs" choice-of-law doctrine. Defendants claim that Plaintiff lacks standing to sue under English law. In making this argument, however, Defendants ask this Court to blind itself to the *BP Alaska* case where, applying the internal affairs doctrine, the court nonetheless applied Alaska law to affirm the plaintiffs' standing, ruling that Alaska had a much more significant relationship to the case, including the Defendants' corporate liability for oil spills flowing from BP's Alaskan pipelines.

2

As set forth below, contrary to Defendants' argument that English law applies here and that, under English law, Plaintiff has no standing to assert her claims, under the egregious circumstances of this case and in accord with the *BP Alaska* decision, Texas has a more significant relationship to BP's past and continuing willful violations of federal and state environmental and employee safety laws at its Texas City Refinery than does England. Moreover, even if English law applies, on its face, the section of the U.K. Companies Act that Defendants rely upon only applies to "proceedings in England and Wales or Northern Ireland" – not proceedings before this Court in Texas. Moreover, to the extent English common law applies, the illegality of BP's conduct would allow such a derivative action to proceed.

Defendants also argue that the Court should defer to the determination of BP's Special Committee that this action should not continue. However, as set forth herein and in Plaintiff's previously-filed Memorandum in Support of her Motion to Compel (hereinafter "Compel Memo"), the Special Committee process that led to this determination was severely flawed. In all events, under Texas Law any ruling on the merits of the Special Committee's work cannot be decided until the Court compels Defendants to produce documents that will help Plaintiff assess the Special Committee's Independence and Good Faith.

For these reasons and for those set forth in the Compel Memo, the Court should determine that Plaintiff has standing to sue under applicable Texas law or, in the alternative, under English law. Further, the Court should deny Defendants' motion to dismiss based upon the recommendation of the Special Committee or, in the alternative,

grant Plaintiff's Motion to Compel so that she can explore the independence and good faith of the Special Committee on a full evidentiary record in accord with Texas law.

## FACTUAL AND PROCEDURAL BACKGROUND

### BP's Substantial Texas Operations and Contacts

Defendants cannot reasonably dispute that the underlying misconduct in this case substantially impacts Texas. The Texas City Refinery is BP's largest in the United States, employing approximately 1,800 people and refining roughly 460,000 barrels of crude-oil each day. ¶ 18.[1] BP is the largest non-United States company listed on the New York Stock Exchange, and according to BP's website it is "the largest investor in U.S. energy development." *Id.* 91% of BP ADR holders, like Plaintiff, are located in the U.S. with only 1.3% located in the U.K. *See* www.adr.com/DRDetailsDRDetails/Ownership?cusip=055622104 (last visited on May 26, 2011).

Nominal Defendant BP, p.l.c., has significant Texas operations through its wholly owned subsidiaries which are also nominal Defendants in this action. BP America has its principal place of business in Houston. ¶ 19. BP America and BP Products operate the Texas City Refinery. ¶ 20. The members of BP America and BP Product's boards of directors have, at all times, consisted entirely of officers and/or employees of BP p.l.c. and/or BP America and/or BP Products. *Id.*

---

[1] Citations to "¶" refer to corresponding paragraphs in Plaintiff's First Amended Petition (the "Petition"), January 6, 2010, Cause No. 09 CV 1352. The Petition is attached as Ex. D to Plaintiff's Compel Memo.

**BP's Texas City Refinery**

In August 2001, units of BP and it predecessor at the Texas City Refinery, Amoco Oil Company, entered into a consent decree to resolve federal Clean Air Act ("CAA" or the "Act") claims the United States Department of Justice ("DOJ") and several states asserted against them in connection with operations at the Texas City Refinery (the "Consent Decree").  ¶¶ 4, 60.  From 2005[2] to the present, BP committed multiple additional violations of the CAA and other laws at its Texas City refinery, including major violations of emissions standards for extremely hazardous materials such as benzene, refrigerants, and asbestos.  ¶¶ 6, 64-71.  As a result of these violations, BP agreed with DOJ in 2009:  to spend in excess of $161 million on pollution controls, to enhance maintenance and monitoring, and improve internal management practices; to spend $6 million on a project geared toward reducing air pollution in Texas City; and to pay a $12 million fine.  ¶ 75.

In September 2005, after the catastrophic explosion at the Texas City refinery, BP entered into a settlement agreement (the "Settlement Agreement") with the Occupational Safety and Health Administration ("OSHA").  Pursuant to the Settlement Agreement, BP agreed, among other things:  to pay a penalty of $21,361,500 to OSHA, the highest penalty ever issued by OSHA at that point; a comprehensive evaluation of the Texas City refinery's Process Safety Management ("PSM") program by an independent auditor; to implement all feasible recommendations of the auditor; and to undertake other abatement

---

[2] On March 23, 2005, a catastrophic explosion occurred at the Texas City refinery. Fifteen people were killed and at least another 170 were injured.  In connection with that explosion, on October 25, 2007, BP pled guilty to a felony criminal violation of the CAA and agreed to pay a $50 million fine.  The explosion is not at issue in the present litigation.  ¶¶ 5, 12.

actions such as conducting audits and determining the adequacy of pressure relief for individual pieces of equipment. ¶ 12.

Nonetheless, on October 30, 2009, OSHA announced it was issuing $87,430,000 in proposed penalties to BP, both the largest fine in the agency's history and the highest since the September 2005 penalty agreed to by BP in the Settlement Agreement. The penalty was comprised of two components: $56,700,000 for violation of two provisions of the Settlement Agreement as a result of 270 separate failures to abate violations of the PSM standard; and $30,730,000 for 439 willful new violations of the PSM standard where BP showed either an intentional disregard for the requirements of the Occupational Safety and Health Act or plain indifference to employee safety and health. ¶ 13.

But there was even more. On May 22, 2009, the State of Texas filed a 108-page enforcement action seeking civil penalties and injunctive relief against BP in the District Court of Travis County, Texas (the "State of Texas Action"), alleging, among other things, that between March 2005 and September 2008, BP violated various Texas state environmental statutes related to 53 separate unlawful pollutant emissions at the Texas City Refinery. On June 29, 2009, Texas's Attorney General announced that BP had agreed to a temporary injunction pursuant to which BP "agreed to refrain from unlawfully emitting pollutants into the air" at the Texas City Refinery. ¶ 10. The State of Texas Action was filed in the District Court of Travis County, Texas, 201st Judicial District and seeks civil penalties and injunctive relief related to numerous "Excessive Emissions Events" and "Emissions Events" that occurred at the Texas City Refinery between March 2005 and September 2008. ¶ 76.

On December 17, 2009, a federal jury in the action *Garner v. BP Amoco Chem.*

*Co.*, Civ. A. No. G-07-221 (S.D. Tex.), ordered BP America to pay more than $100 million to ten workers who allegedly were injured by a gas leak at BP's Texas City Refinery. ¶¶ 16, 85. Agreeing with the plaintiffs' contentions, the jury determined that there "[w]as an escape, spill, release, or leak of a toxic substance at the BP facility, on the occasion in question, due to the negligence of BP, its agents, employees, or servants" and that such negligence was "a proximate cause of the injuries . . . that [the jury] found that any plaintiff suffered," and awarded a total of $325,338.56 in compensatory damages. ¶ 86. The jury also determined that "Plaintiff [had] proven that BP acted with gross negligence, with malice or willfulness or with callous and reckless indifference to the safety or rights of others," and awarded punitive damages totaling $100 million. ¶ 87.

### This Action

Plaintiff alleges in the Petition that the Individual Defendants, *i.e.*, the specified current and former directors of the nominal Defendants in this action, "intentionally or recklessly disregarded their fiduciary obligations by failing to ensure BP's compliance with environmental protection statutes and regulations, as well as the requirements of the Occupational Safety and Health Act related to the operation of the Texas City Refinery despite several, repeated, obvious warnings that BP was not in compliance with federal and Texas state environmental laws and regulations as well as federal safety standards." ¶ 2.

After providing written demands to BP's board of directors (Compel Memo Ex. A & B), on July 31, 2009, Plaintiff's Original Petition (the "Original Petition") was filed in this Court. Compel Memo Ex. C. After a subsequent supplemental written demand was provided to BP's board, on January 6, 2010, Plaintiff filed the Petition. Compel

Memo Ex. D. During this time, Defendants informed Plaintiff that a special committee of the BP's board of directors (the "Special Committee") had been formed allegedly to evaluate the claims asserted in the written demands, the Original Petition, and the Petition. Pursuant to Tex. Bus. Corp. Act art. 5.14F and a stipulation among the parties, the action was stayed until such time as the Special Committee completed its investigation and made its recommendation.

The Special Committee hired U.S. attorneys to advise it. Compel Memo Ex. L, BP Goldstein 544. The great majority of documents the Special Committee's attorneys purportedly reviewed were generated in Texas. Compel Memo Ex. E, at Appendix 5, Appendix 12. The majority of witnesses the Special Committee supposedly interviewed work in the U.S. or Texas. Compel Memo Ex. E, at Appendix 2, Appendix 11.

On June 28, 2010, counsel for the Special Committee informed Plaintiff that the Special Committee's investigation had concluded, and on July 9, 2010, the Special Committee provided to Plaintiff's counsel its "PowerPoint," titled "*Goldstein* Special Committee: Summary of Investigation," in which, the Special Committee concluded that the continuation of this action "is not in the best interests of BP p.l.c. or the two BP p.l.c. affiliates named as nominal defendants in the litigation." Compel Memo Ex. E. As set forth in Plaintiff's Compel Memo, unlike other special committee investigations of U.S. companies, BP's Special Committee did not write a formal comprehensive report of its work and findings. *Compare* Compel Memo Ex. BB. In all events, the power point slides the Special Committee produced document that the board of *BP plc was ultimately responsible for the supervision of safety and environmental issues at the Texas City refinery* and regularly received reports from Texas concerning those issues, especially

8

the members of the so-called Safety, Ethics, and Environmental Assurance Committee. *See e.g. id.* "*Goldstein* Special Committee: Summary of Investigation June 2010," at 10-19; 24, 33, 35; Appendices 6, 8, 9.

On September 21, 2010, Defendants filed their Motion to Dismiss Plaintiff's First Amended Petition. Compel Memo Ex. F. Pursuant to Tex. Bus. Org. Code § 21.556, a plaintiff is entitled to discovery if, like here, a company moves to dismiss a derivative action on the basis of a special committee's decision. Under Section 21.556, defendants are required to produce to such a plaintiff documents regarding: (1) whether the special committee is independent and disinterested; (2) the good faith of the special committee's inquiry; and (3) the reasonableness of the procedures followed by the special committee. *Id.* In accord with Section 21.556, Plaintiff served her First Request for Production of Documents to All Defendants (the "Document Requests"). Compel Mem. Ex. H. After receiving what Plaintiff considered an inadequate response to the Document Requests and an inadequate production of documents, on February 16, 2011, Plaintiff filed her Motion to Compel Production of Documents. On March 14, 2011, Defendants filed their Opposition to Plaintiff's Motion to Compel. On March 18, 2011, Defendants filed their Plea to the Jurisdiction.

## ARGUMENT

## I. PLAINTIFF HAS STANDING TO ASSERT HER DERIVATIVE CLAIMS

### A. Plaintiff's Standing To Sue Must Be Assessed Under Texas Law

Defendants do not assert that Plaintiff lacks standing to assert derivative claims against BP plc and the Individual Defendants under Texas law. Instead, Defendants claim that the Court must dismiss the Petition under English law, which they claim

applies here under the so-called "internal affairs doctrine" because BP plc is a British corporation. As explained below, Defendants' interpretation of the internal affairs doctrine is fundamentally flawed because they ignore the fact that the law of the company's state of incorporation does not automatically apply to every case in every situation. Under circumstances precisely similar to this case, in fact, the court in the *Alaska BP* case squarely rejected BP's efforts to avoid liability by referencing English law. *In re BP p.l.c. Deriv. Litig.*, No. 3AN-06-11929CI (Alaska Super. Ct. May 18, 2007).

The internal affairs doctrine is a common law choice of law principle published in the Restatement (Second) of Conflicts. Under the heading "Directors' or Officers' Liability," the Restatement (Second) of Conflicts defines the "internal affairs doctrine" as providing that:

> [t]he local law of the state of incorporation will be applied to determine the existence and extent of a director's or officer's liability to the corporation, its creditors and shareholders, *except where*, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the parties and the transaction, in which event the local law of the other state will be applied.

Restatement (Second) of Conflicts § 309 (emphasis added). Defendants claim that this Court must apply English law to the question of Plaintiff's standing to sue solely because BP Plc, just one of the three corporate Defendants named in the Petition, is organized under English law. This argument fails for the fundamental reason that it ignores the "significant relationship" aspect of the internal affairs doctrine.

Defendants do not, and cannot, deny that Texas has a more significant relationship than England to the claims here. As set forth in the Petition, Defendants' alleged misconduct has wreaked havoc on the Galveston community causing death and

substantial injury to workers here.  BP has also poisoned Galveston's ground and air with cancer-causing toxic chemicals.  BP faces enormous financial liability from this conduct in actions brought by both the federal government and the Attorney General of Texas.

Defendants cannot refute the fact that under almost identical circumstances, the *BP Alaska* court turned aside BP's efforts to dismiss a shareholder derivative suit based upon the application of English law.  Like this case, *BP Alaska* was a derivative action based upon alleged breaches of fiduciary duties by BP plc's board members and officers (and those of its U.S. subsidiaries) in causing harm in the U.S. including:  (1) leaks and a temporary shutdown of an oil pipeline at BP's partially-owned and solely operated oil field in Prudhoe Bay, Alaska; (2) *the 2005 fatal explosion at BP's Texas City oil refinery;* and (3) commodities trading activities by BP traders that were found to violate company policy and state and federal law.  *Id.* at 1.[3]  The plaintiffs alleged that "breaches of fiduciary duty of care and candor by Defendants caused BP and three of its U.S. subsidiaries to violate:  (1) environmental protection regulations and laws; (2) worker and workplace safety regulations and laws; and (3) fair and honest trade practices regulations and laws."  *Id.* at 1-2.  Specifically, plaintiffs maintained, among other things, that the defendants "permitted, or even encouraged, improper and illegal activities targeted at cutting costs, boosting revenues, and inflating the results reported from the Company's operations" through "1)  . . . a reduction (or elimination) of expenditures on plant and equipment maintenance for both refineries and pipelines; [and] 2) . . . a decrease of mandatory inspections."  *Id.* at 2.

---

[3] Indeed, BP's Special Committee thought that the *BP Alaska* case was so similar to this one that it listed the "Alaska settlement bar" included in the settlement of that action in a list of factors the Special Committee claimed to be "Other Facts Weighing Against ["Plaintiff's"] claims.  Compel Memo Ex. E at 20.

As in this case, the defendants argued that English law should apply. The Alaska court roundly rejected that claim relying upon the internal affairs doctrine. *Id*. at 10. Pursuant to Section 309 of the Restatement (Second) of Conflicts, the court examined the principles in Section Six of the Restatement to determine whether Alaska had a more significant relationship to the transaction and the parties that would require the application of that state's law.

The choice of law principles enunciated in Section 6(2) of the Restatement (Second) of Conflicts include:

> (a) the needs of the interstate and international systems,
>
> (b) the relevant policies of the forum, [and]
>
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue[.]

Regarding subsection (a), the court determined that "[i]nterstate and international systems must rely on corporations to be good corporate citizens. Laws which hold corporations liable for their wrongdoing facilitate the harmonious flow of commerce[.]" *Id*. at 10. Concerning subsection (b), the court found that "*[t]he policies of Alaska favor holding Defendants accountable for their alleged acts and omissions which have an impact within the state*." *Id*. (Emphasis added). With respect to subsection (c), the court concluded that "[w]hile England does have an interest in policing the internal affairs of its corporations, *Alaska's interest here is dominant, as it is the* situs *of the consequences of Defendants' alleged wrongdoing.*" *Id.* 10-11 (Emphasis added). The court also noted the uncertainty of the status of English law as well as the defendants' argument that English law applies, and found that regardless of the resolution of the question of what law applies in the

12

United Kingdom, "Alaska has a significant interest in the management of BP when those decisions detrimentally impact the nature and quality of operations in Alaska." *Id.* 11.[4] The court concluded, based on these factors, that public policy considerations required the application of Alaska law to determine the defendants' liability. *Id.*[5]

In the face of a court decision that went directly against them in every aspect, Defendants are relegated to arguing that somehow the scope of the Texas internal affairs doctrine differs from the Restatement (Second) of Conflicts. No such authority, however, exists. Defendants fail to cite any Texas precedent rejecting the Restatement (Second) of Conflicts formulation of the internal affairs doctrine.

Defendants nonetheless claim to find support in the generalized language contained in two Texas statutes. *See* Tex. Bus. Orgs. Code §§ 1.102, 21.562(a).[6] Neither of these statutes shows any intent by the Texas Legislature to break with the common law and sound public policy. *Cornish v. Cornish*, 56 Tex. 564, 564 (1882). In

---

[4] As set forth herein, to the extent it applies, Plaintiff asserts that English law is not uncertain but, in fact, favors a finding of standing.

[5] In an identical case contemporaneously brought by another shareholder plaintiff in New York, the federal court found that English law would apply because "*the defendants have minimal contacts with New York.*" *In re BP p.l.c. Deriv. Litig.*, 507 F. Supp. 2d 302, 308-09 (S.D.N.Y. 2007). The shareholder plaintiff in that case filed an appeal with the Second Circuit but apparently settled the case with defendants and dismissed the appeal.

[6] Tex. Bus. Orgs. Code § 21.562(a) ("[i]n a derivative proceeding brought in the right of a foreign corporation, the matters covered by this subchapter are governed by the laws of the jurisdiction of incorporation of the foreign corporation, except for Sections 21.555, 21.560, and 21.561, which are procedural provisions and do not relate to the internal affairs of the foreign corporation"); Tex. Bus. Orgs. Code § 1.102 ("If the formation of an entity occurs when a certificate of formation or similar instrument filed with a foreign governmental authority takes effect, the law of the state or other jurisdiction in which that foreign governmental authority is located governs the formation and internal affairs of the entity").

13

fact, at least two federal courts have used the Restatement (Second) of Conflicts approach despite the existence of state laws like Tex. Bus. Orgs. Code § 1.102. *See Nagy v. Riblet Products Corp.*, 79 F.3d 572, 576 (7th Cir. 1996) (Easterbrook, C.J.) ("[t]his statute does not in terms forbid the development of a common law doctrine that affects the internal affairs of foreign corporations, but it establishes that the [forum law] presumptively conforms to the norm in looking to the law of the state of incorporation for internal-affairs issues"); *see also Mukamal v. Bakes*, 378 F. App'x 890, 896-97 (11th Cir. 2010), *cert. denied,* 131 S. Ct. 1785 (2011) (despite an apparent mandatory statute, the court applied the company's state of incorporation law only because plaintiff failed to demonstrate that the forum state did not have a more significant relationship).

### B.    Texas Law Does Not Bar Double Derivative Actions

BP cannot sustain its claim that Plaintiff lacks standing to assert double derivative claims against BP America, Inc. ("BP America") or BP Products North America, Inc. ("BP Products") under English law, because as demonstrated above, Texas law applies to those claims.  Further, assuming Texas law does apply, which it does, BP cannot rely on Tex. Bus. Orgs. § 21.552(a) for the proposition that the Texas Legislature outlawed double derivative actions for both foreign corporations *and* Texas corporations. Defendants fail to cite a single decision of any Texas court either so interpreting Section 21.552(a) or opining that pre-code Texas common law barred double derivative actions. Double derivative actions are well-known and recognized including under the laws of Maryland and Delaware where BP America and BP Products, respectively, are incorporated. *See Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993) ("[i]n a double derivative suit . . . a stockholder of a parent corporation seeks recovery for a cause of

14

action belonging to a subsidiary corporation"); *Bennett v. Damascus Cmty. Bank*, 2006 MDBT 6 (Md. Cir. Ct. 2006) (Maryland generally follows Delaware law including the *Rales* decision). The radical change in common law that BP advocates would have to be explicit. Section 21.552(a), however, says only that "[a] shareholder may not institute or maintain a derivative proceeding unless: (1) the shareholder: (A) was a shareholder of the corporation at the time of the act or omission complained of . . ." *Id.* Section 21.552(a) is plainly a codification of the so-called contemporaneous ownership rule designed to prevent a plaintiff from "buying into" a shareholder derivative case by purchasing shares to challenge pre-ownership corporate wrongdoing. *See* 2 Model Bus. Corp. Act Ann. § 7.41 at 7-295-98 (4th ed. 2009) (Texas is among the states to have codified the "'contemporaneous ownership rule'"). A contrary reading would bar any shareholder derivative lawsuit that seeks redress for wrongdoing perpetrated by directors of a wholly owned subsidiary – a sea change in the law nowhere indicated in the Texas Business Organizations Code or common law.

## C.   Plaintiff Has Standing Even If English Law Applies

Like Texas, the law of England requires courts to act as gatekeepers to decide whether a derivative claim can continue.[7] Under English law such determination is made under the Companies Act of 2006, if applicable, or the common law rule derived from *Foss v. Harbottle*, 67 Eng. Rep. 189 (Ch. 1843). Here, the Companies Act provision at

---

[7] Unlike Texas, under English law, there is no requirement that before commencing a derivative action the plaintiff make a demand on the board of directors of the company to institute such a suit, nor is there a requirement that a court give deference to a decision of a special committee of the board of directors of the company not to institute such a suit. *See* Declaration of Paul Chaisty QC ("Chaisty Declaration" or "Chaisty Decl."), attached hereto as Ex. B, ¶ 34. Exhibits to the Chaisty Declaration are separately filed herewith.

issue is applicable on its face only to "proceedings" in England, Wales and Northern Ireland, thus not applicable to the proceedings here in Texas. As demonstrated below, because BP's illegal conduct was *ultra vires* and, therefore, falls within an exception to the common-law rule of *Foss v. Harbottle*, Plaintiff has standing under English law to assert her claim.[8]

### 1. The Companies Act's "Permission" Provisions Only Apply to Actions Brought in England, Wales and Northern Ireland – Not Texas

Defendants argue that English law applies to this case and that under the English statute "the Companies Act," plaintiff lacks standing to assert the derivative claim here. Defendants base this argument on Section 261(1) of that law, which, according to Defendants, requires that "a shareholder seeking to sue derivatively on behalf of a corporation organized under the laws of England and Wales first must obtain permission to continue the action from the English High Court." Defs Motion to Dismiss at 13. Conveniently, Defendants fail to disclose to the Court that the very first words of the chapter that contains Section 261(1) state, very clearly, that "This Chapter applies to *proceedings* in England and Wales or Northern Ireland." The Companies Act § 260(1) (emphasis added); *see* Chaisty Decl. ¶ 16, setting out provisions of Sections 260-263. Since it is obvious that these proceedings are not "in England and Wales or Northern Ireland" -- but in Texas -- the Companies Act's "permission" requirements are not applicable here.[9] *See* Chaisty Decl. ¶ 18 ("Quite simply, the Section appears to have no

---

[8] As under Texas law, there is nothing in either the Companies Act or English common law that indicates that English law precludes double derivative claims. *See* Chaisty Decl. ¶¶ 25-29.

[9] Defendants also cite *Vaughn v. LJ Int'l, Inc.*, 94 Cal. Rptr. 3d 166 (Cal. Ct. App. 2009), a California case decided under the law of the British Virgin Islands, which they say has

16

application to proceedings commenced outside England and Wales or Northern Ireland.").

> ### 2. Even if the Companies Act's "Permission" Provisions Could Apply Here, the Provisions Are Procedural, Not Substantive, and Therefore Should Not Be Applied

Defendants admit that under Texas law, "'In a derivative proceeding brought in the right of a foreign corporation . . . *the substantive law* of the jurisdiction where the foreign corporation is incorporated applies.'" Defs Motion to Dismiss at 11 (quoting *Connolly v. Gasmire*, 257 S.W.3d 831, 839 (Tex. App.—Dallas 2008, no pet.) (emphasis added). Thus, even if English law applies, under Texas law, only the substantive law of England would apply.

As indicated in the Chaisty Declaration, under English law, the requirement that permission be sought by a particular court in a particular way is procedural, not substantive, and, therefore, should not be followed by this Court.[10] *See* Chaisty Decl. ¶¶ 19-24 citing, among others, *Base Metal v. Shamurin,* [2004] EWCA Civ. 1316 ("[W]hether the shareholder has satisfied any procedural rules for bringing a derivative

---

"a nearly identical requirement," Defs. Motion to Dismiss at 15, and is "similar to the U.K Companies Act." *Id.* However, a review of the BVI Companies Act shows that while there are requirements to bring a derivative case under BVI law, those requirements are significantly different from those in the U.K. Companies Act (see Ex. C hereto). But more importantly, unlike the U.K. Companies Act (which specifically limits its application to proceedings in England, Wales, and Northern Ireland), the section of the BVI Companies Act that contains those requirements does not limit its scope to proceedings in the BVI, or anywhere. *Compare id. with* Companies Act ¶ 260(1).

[10] According to the Supreme Court, "The test [of whether a rule is procedural or substantive] is not whether the rule affects a litigant's substantive rights; most procedural rules do." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 130 S. Ct 1431, 1442 (2010). Instead, the test is whether the rule "governs only 'the manner and the means' by which the litigants' rights are 'enforced'." *Id.* (citation omitted). Since the Companies Act "permission" section governs only the manner and means by which litigants in England enforce their rights, the rule is properly classified as procedural.

17

claim . . . are matters of procedural law for the lex fori rather than the law of the place of incorporation"); *Waddington Ltd. v. Chan Chun Hoo Thomas,* [2009] 2 BCLC 82 ("The question whether the leave of the Court is required is a procedural question governed by the lex fori.").

The court's analysis in *Messinger v. United Canso Oil & Gas, Ltd.*, 486 F. Supp. 788 (D. Conn. 1980), is consistent with Mr. Chaisty's conclusion and the cases cited in his declaration. In *Messinger,* the court declined to dismiss the derivative claims of a shareholder of a Canadian company. In so doing, the court rejected the defendants' argument that the plaintiff's failure to comply with a provision of the Canadian Business Corporations Act requiring that "no derivative action may be commenced without leave of the court," *id.* at 797, required dismissal of the action. According to the court, "[T]he particular device by which plaintiffs obtain leave to file suit is surely a procedural mechanism that this court is not obligated to employ." *Id.* (footnote omitted.)

Here, if the Court determines that despite its geographical limitations, the Companies Act does apply,[11] which it does not, this Court can easily apply the substantive factors of the Act (as opposed to the strictly procedural requirement that permission be sought by a particular English court) which appear in Section 263, to determine whether permission should be given to allow Plaintiff's claim to proceed to a determination on the merits. *See* Chaisty Decl. ¶ 24 ("In any event, the Texas Court is readily capable of itself considering the factors, if considered necessary or appropriate, in Section 263.").

---

[11] Even if the Court determined that the Companies Act does apply, it would only apply, at most, to conduct that occurred after October 1, 2007. *See* Chaisty Decl. ¶¶ 13-14.

Under Section 263, there are, predominantly, three factors at issue here:

-- Whether a director of the company, consistent with his or her duty to promote the success of the company (as set out in Section 172 of the Companies Act)[12] would continue the claim;

-- Whether the acts at issue had been, could be, or would likely be ratified by the company; and

--Whether the company has decided not to pursue the claim.

All three of these factors weigh in favor of the continuation of this action.[13]

### a.      "Success of the Company" Factors

Under the first consideration of Section 263 listed above, the question is: would a director agree the claim should continue if he or she were acting consistent with the factors in Section 172? There can be no doubt that the answer is yes. Subsection one of Section 172 of the Companies Act provides these factors:

(1)      A director of a company must act in the way he considers, in good faith, would be most likely to promote the success of the company for the benefit of its members as a whole, and in doing so have regard (amongst other matters) to –

(a)      the likely consequences of any decision in the long term,

---

[12]Section 172 is attached hereto as Ex. D.

[13] The other two factors are whether the Plaintiff is acting in good faith and whether the plaintiff could pursue a direct, rather than derivative, claim based on the same allegations. *See* Section 263(3)(a) and (f). Defendants make no argument that Plaintiff is not acting in good faith, and it is clear that the claims Plaintiff asserts here are derivative and could not be asserted directly by her. Therefore, these two factors also weigh in favor of a continuation of this action.

(b)    the interests of the company's employees,

(c)    the need to foster the company's business relationships with suppliers, customers and others,

(d)    the impact of the company's operations on the community and the environment,

(e)    the desirability of the company maintaining a reputation for high standards of business conduct, and

(f)    the need to act fairly as between members of the company.

As alleged in the Amended Petition, BP, at its Texas City facility, has consistently ignored the safety of its employees and the environment of Texas. It is clear that allowing the continuation of this action may, in fact, lead to positive consequences for BP in the long term, improving the lives and safety of its employees, as well as the lives of those who live in the area surrounding the Texas City facility. If this action is successful, BP may be forced to improve the safety of its employees, the impact of the company on the community and the environment, and, ultimately, as a result, the company's reputation may also improve. These factors, which stress the interests of employees, the community, and the environment, weigh in favor of continuation of this action.

### b.    The Acts at Issue Have Not Been, and Would Likely Not Be, Ratified by the Company

As discussed below, the illegal acts at issue are *ultra vires*; they cannot be ratified by the company. (*See infra* at Section I.C.3.) However, even if ratification were possible, which it is not, the numerous instances of willful violation of Texas and federal

environmental and safety regulations that BP has committed at its Texas City facility have not been ratified. Moreover, it is hard to imagine that such willful violations "would be likely to be[] ratified by the company." Section 263(3)(d). This factor weighs in favor of continuation of this action.

               **c.**     **While the Company Has Decided Not To Pursue the Claim, the Process that Led to that Decision Was Deeply Flawed**

While the Company did decide not to pursue the claims as alleged in the Amended Petition, as demonstrated below (*see infra* at Section II), the Special Committee process that led to that decision was deeply flawed. This factor also weighs in favor of continuation of this action.

               **3.**     **Plaintiff Has Standing Under the *Ultra Vires*/Illegality Exception to *Foss v. Harbottle***

Under the English common-law rule of *Foss v. Harbottle*, derivative actions are not maintainable unless they fall within certain exceptions to that rule. *See* Chaisty Decl. ¶ 12. One such exception is if the acts at issue are *ultra vires* or illegal. In the strict sense of the term, *ultra vires* means an act that "cannot be ratified by a simple majority of shareholders voting in a general meeting." Chaisty Aff. ¶ 10. While Defendants' expert, Martin Moore,[14] cites a few cases that stand for the proposition that illegal acts, such as those committed here, are not technically *ultra vires*, Mr. Moore ignores the fact that the leading British law textbooks agree that illegal acts cannot be ratified and are included

---

[14] Mr. Moore is BP's resident expert on English derivative law, having submitted declarations in *In re BP p.l.c. Deriv. Litig.*, 507 F. Supp. 2d 302 (S.D.N.Y. 2007) ("*BP NY*"), and in *In re BP p.l.c. Deriv. Litig.*, No. 3AN-06-11929CI (Alaska Super. Ct. May 18, 2007), cases sharing some of the same facts as the instant matter that were both settled while appeals were pending. Moreover, according to Mr. Moore's declaration, aside from advising BP "on an number of different legal matters" "over the years," one of the Defendants is godfather to his youngest daughter. *See* Moore Decl. ¶ 4.

within the exception. *See* Chaisty Decl. ¶ 10, citing *Gore-Browne on Companies* ¶ [3]-[5] ("The rule does not extend to a case where the act complained of is illegal"); *Palmer's Company Law* ¶ 8.3424 (shareholders cannot ratify actions prohibited "by the general law"); 7 *Halsbury's Laws of England* ¶ 500 (derivative action may be maintained "where the company is conducting its business in an illegal way"; citation omitted).

Mr. Chaisty disputes Mr. Moore's narrow view of the *ultra vires*/illegality exception:

> In my view, Mr Moore adopts an unduly restrictive analysis as to the application of the ultra vires/illegality exception. The simple question is whether, assuming that the allegations are made out, the directors have abused their powers as directors and whether a minority shareholder would fall within the *Foss v. Harbottle* exemption so as to be allowed to proceed in order to obtain a remedy to prevent injustice? In my view, the present circumstances ought to form an exception within the Common law rule. There appears to be a case of abuse worthy of being pursued and the minority shareholder is attempting to pursue a remedy to correct that abuse. *These allegations appear to fall within, at the very least, the relevant category of general law which the leading textbooks appear to agree can be pursued,* or at least make out a prima facie case to that effect.

Chaisty Decl. ¶ 12 (emphasis added); *see Messinger*, 486 F. Supp. at 795 (*Foss v. Harbottle ultra vires* exception includes illegality "consist[ing] of an act contrary to statute, to the corporate by-laws, or to the directors' fiduciary obligations").[15]

Here, to the extent the Court determines that English common law applies, the claims in the Amended Petition (including multiple and continuing willful violations of federal and state environmental and employee safety statutes) fall into the *ultra*

---

[15] Defendants rely upon *City of Harper Woods Employees' Ret. Sys. v. Olver,* 589 F.3d 1292 (D.C. Cir. 2009), for its argument that the facts here fall outside the *ultra vire*/illegality exception. In his Declaration, at ¶ 35, Mr. Chaisty explains why that case was incorrectly decided under English law and "would appear to be of very doubtful value" under the circumstances here.

*vires*/illegality exception to *Foss v. Harbottle*, and, therefore, these claims should be permitted to proceed to a determination of the merits.[16]

## II.   UNDER   TEXAS   LAW,   THE   SPECIAL   COMMITTEE'S DETERMINATION SHOULD NOT BE GIVEN DEFERENCE BY THIS COURT[17]

Under Texas law, dismissal of this action based on the Special Committee's determination is proper only if the Special Committee was "independent and disinterested," *see* Tex. Org. Code § 21.554, acted in good faith and conducted a reasonable inquiry, *see id.* § 21.558. As demonstrated below the Special Committee was not independent and its inquiry was not conducted in good faith or reasonably.

### A.   The Special Committee Lacked Independence Because BP Was Inextricably and Impermissibly Involved in the Process

It is a matter of common sense that the hallmark of any special committee is its independence and ability to operate free from the influence of the defendants the Company tasks it to investigate. *See Lewis v. Fuqua*, 502 A.2d 962, 966 (Del. Ch. 1985) (the "first matter to be considered" is whether the SLC is independent).

---

[16] Defendants' expert, Mr. Moore, confirms (¶ 114) that the application of English law by this Court after the Petition is sustained would not be complicated:

> In the event that permission to continue a derivative claim is given and such a claim proceeds to trial, the Court would have at its disposal all the remedies for breach of fiduciary duty which would be available had the claim been brought by BP Plc itself. Such remedies would include injunctive and/or declaratory relief as well as equitable compensation, damages and/or an account of profits.

[17] While the record clearly demonstrates that the Court should not defer to the Special Committee's flawed determination, Section 21.556(b) also provides that "[t]he scope of discovery may be expanded if the court determines after notice and hearing that a good faith review of the allegations for purposes of Section 21.558 has not been made by an independent and disinterested person or group in accordance with that section." Aside from denying the motion to dismiss based on the Special Committee's lack of independence and its failure to act in good faith or reasonably, under Section 21.556(b), the Court has discretion to expand the scope of discovery.

**B.    The Special Committee Did Not Act in Good Faith or Reasonably**

**III.    PLAINTIFF'S MOTION TO COMPEL RELATED TO DOCUMENT REQUESTS NUMBERED 11, 10, 12, AND 14 SHOULD BE GRANTED**

While Plaintiff believes the record is sufficient for this Court to determine that Defendants' Motion to Dismiss should be denied and full merits discovery commenced, in the alternative, Plaintiff's motion to compel, which seeks the production of documents responsive to Document Requests numbered 11, 10, 12, and 14, should be granted. Request number 11 asks for documents reviewed by the Special Committee; Request number 10 asks for documents concerning what should or should not have been sought or reviewed by the Special Committee; Request number 12 asks for notes from the interviews conducted by the Special Committee; and Request number 14 seeks outlines or questionnaires prepared by the Special Committee or its advisers related to their investigation. Defendants argue either that the documents are not within the limitations of Section 21.556(a) or that such documents are protected by the attorney work product doctrine. They are wrong as to both arguments.

Contrary to Defendants' argument that the documents Plaintiff seeks here constitute impermissible merits discovery, Plaintiff seeks witness interview materials, which courts have found to be a critical component in the assessment of a special committee's good faith and the reasonability of its investigation. In *Weiser v. Grace*, 683 N.Y.S.2d 781, 785 (N.Y. Sup. Ct. 1998), for example, the New York trial court explained:

> [T]he court finds that the production of the notes, summaries and outlines regarding the committee's interviews of witnesses is necessary and will

> facilitate determination of the reasonableness and good faith of the SLC's
> investigation. Contrary to the SLC's contentions, plaintiffs' requests do
> not constitute all-encompassing merits discovery. In order for plaintiffs to
> reasonably challenge the thoroughness of the SLC's factual investigation,
> they must be able to examine the questions posed and the subjects
> explored in the witness interviews. Similarly, it is impossible for the court
> to assess whether the SLC pursued its charge with diligence and zeal, if
> the court is unable to review the development of the factual record that
> underlies the [SLC Report].

*Id.* The court in *Peller v. Southern Co.*, 707 F. Supp. 525 (N.D. Ga. 1988), had similar

concerns:

> The conduct of the interviews is a most important factor in determining
> whether the [SLC] pursued its charge with diligence and zeal, or whether
> it played softball with critical players.

*Id.* at 529; *see also Strougo ex rel. Brazil Fund v. Padegs*, 1 F. Supp. 2d 276, 282

(S.D.N.Y. 1998) (granting motion to compel production of, among other things, notes of

witness interviews).

Moreover, to the extent the documents Plaintiff seeks were protected by the work

product doctrine, such protection was waived by the fact that the Special Committee

relied upon the witness interviews in its report, which Defendants now cite as a basis for

dismissal of this case.

In *Zitin v. Turley*, No. CIV 89-2061-PHX-CAM, 1991 U.S. Dist. LEXIS 10084

(D. Az. Jun. 20, 1991), plaintiffs moved to compel production of similar interview notes

and documents in a derivative action alleging, among other things, breach of fiduciary

duty. *Id.* at *1. The court was skeptical concerning defendants' privilege and work

product claims:

> It appears to the Court that the Committee and counsel specifically set up
> the investigation so that all of the communications and underlying
> information on which the report was based would be either privileged or
> work product. This strategy is especially apparent in the interviews of

> witness which were conducted by attorneys and only recorded by the
> attorneys. Thus, the underlying information became "mental impressions"
> which are not even discoverable under the "Substantially equivalent"
> exception to work product immunity. *The Court finds this practice to be
> an indication of the lack of good faith of the Committee and Counsel in
> investigating the allegations.*

*Id.* at \*13 (emphasis added).

In addition to finding this practice to be an indication of the Special Committee's

"lack of good faith," *id.*, the *Zitin* court held that any privilege or work product immunity

had been waived:

> Any privilege or work product immunity which existed was waived for
> documents that were communicated to the committee and formed the basis
> of its decision that pursuing the claims is not in the best interest of the
> corporation. It would be unequitable for the corporation to establish a
> committee to issue a report which determines the advisability of the suit,
> fail to provide to the plaintiffs/shareholders most of the underlying
> information as privileged and work product and yet rely on the Report as
> the basis for ending the case in a motion for Summary judgment.

*Id.* at \*19.

Here, as in *Zitin*, the Special Committee interviews were set up by attorneys and

conducted by attorneys. There is no indication that any member of the Special

Committee even attended an interview, let alone conducted one. This practice further

indicates the Special Committee's lack of good faith. *See Zitin,* at \*13. Moreover, to the

extent there was any work product protection for these interview-related documents, such

protection was waived because of the Special Committee's reliance on them to prepare its

report suggesting the dismissal of this action. While the Special Committee repeatedly

cites its witness interviews for the basis of its conclusions, Defendants have failed to

disclose anything about the scope or subject matter of these interviews or their

thoroughness.

26

## CONCLUSION

For all of the following reasons, Plaintiff respectfully requests that the Court deny

Defendants' Motion to Dismiss and Plea to the Jurisdiction and grant Plaintiff's Motion

to Compel.

Dated: May 27, 2011

Respectfully submitted,

*Jeff Chambers (by by permission)*

Jeffrey W. Chambers
Texas State Bar No. 04075000
Don Jackson
Texas State Bar No. 10476000
Shashi Patel
Texas State Bar No. 24002731
WARE, JACKSON, LEE & CHAMBERS, L.L.P.
America Tower, 42nd Floor
2929 Allen Parkway
Houston, Texas 77019
(713) 659-6400 (telephone)
(713) 659-6262 (fax)

ATTORNEYS FOR PLAINTIFF

OF COUNSEL FOR PLAINTIFF:

WOLF POPPER LLP
845 Third Avenue
New York, NY 10022
(212) 759-4600 (telephone)
(212) 486-2093 (fax)

RIGRODSKY & LONG, P.A.
919 North Market Street, Suite 980
Wilmington, DE 19801
(302) 295-5310 (telephone)
(302) 654-7530 (fax)

## CERTIFICATE OF SERVICE

I do hereby certify that on this 27th day of May, 2011, a true and correct copy of the foregoing instrument was served on the following counsel of record, in accordance with the Texas Rules of Civil Procedure.

David T. Harvin
Vinson & Elkins LLP
2500 First City Tower
1001 Fannin
Houston, TX 77002-6760

Richard C. Pepperman II
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004-2498

Shashi Patel