# EXHIBIT B

violations accounted for over 97% of *all* similar OSHA citations in U.S. refineries during the same period. *Id*. OSHA determined that BP had a "[s]ystemic [s]afety [p]roblem." *Id*.

In October 2007, BP began a company-wide reorganization, ostensibly to accomplish "increased efficiencies." ¶115. The reorganization resulted in numerous layoffs and cuts to safety budgets, cuts which hit their height in 2009. ¶¶115-17. In late 2009, BP's Senior Vice President for Drilling Operations in the Gulf, Kevin Lacy, reached a mutual agreement with BP to separate because BP was not committed to improving its safety protocols in offshore drilling operations to the level of its industry peers and because the Company's reorganization was negatively affecting the overall safety of BP's drilling operations. ¶¶118-19. Lacy's concerns were communicated to Defendant Inglis.

**Deleted:** resigned

**Deleted:** his concerns directly

BP's unsafe practices were so severe and pervasive that the EPA threatened to take away BP's right to bid for U.S. government contracts and oil and gas concessions. ¶133. During the Class Period, the EPA criticized BP's continuing non-compliance with numerous laws and settlement agreements, its failure to run operations safely, and its practice of retaliating against workers who raised safety and environmental concerns. *Id*.

### D. BP's Disregard for Safety Processes Causes the *DWH* Disaster

In the prophetic words of industrial safety expert, Nancy Leveson, who investigated BP's safety practices and taught safety classes to BP executives during the Class Period, the Company's approach to safety left BP "an accident waiting to happen." ¶20. BP's lack of commitment to and implementation of safety processes to avoid preventable incidents emerged after April 20, 2010, when the *DWH* oil rig exploded in the Gulf. ¶¶1, 26. The explosion was the manifestation of the risk created by BP's failure to implement its promised safety improvements and its departure from recognized industry safety practices – a risk that the Presidential Commission concluded was "unreasonably large and avoidable[.]" ¶151.

Since the spill, at least nine governmental investigations have reviewed (or are currently reviewing) the incident. ¶7. These investigations reveal a company virtually indistinguishable from its pre-Baker Panel self in terms of its safety regime. Just as the Baker Panel determined in

safety protocols for offshore drilling operations as far inferior to those of Shell and Exxon Mobil. ¶108.

Second, BP's published cautionary language (a boilerplate statement that "failure to manage those risks could result in injury or loss of life, environmental damage, or loss of production and could result in regulatory action, legal liability and damage to our reputation") in no way qualifies as "meaningful" so as to obviate liability. First, the warning itself misleads in that it hypothetically discusses a "failure to manage risks" although Defendants were aware of *ongoing* and systemic failures in risk management throughout BP's operations. This was the precise situation in *Lormand*. 565 F.3d at 234; *see also id*. at 247 ("warnings about the risks associated with the no-deposit programs were glossed over as a future risk of *limited* magnitude that would be averted rather than certain dangers that had already begun to materialize"). Second, boilerplate cautionary language never allows defendants to escape liability. *See Tetra*, 2009 U.S. Dist. LEXIS 126687, at *37-40 ("'Meaningful cautionary language' cannot be boilerplate and must include substantive, company-specific warnings based on realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors." [*sic*.]) (quoting *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 372 (5th Cir. 2004))); *see also Slayton v. Am. Express Co*., 604 F.3d 758, 772 (2d Cir. 2010) ("Cautionary language must be extensive and specific. A vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation.").[25]

---

[25] None of the cases cited by Defendants is to the contrary. In each of *Kapps v. Torch Offshore, Inc.* 379 F.3d 207 (5th Cir. 2004) (gas prices listed daily in several widely circulated papers, such as the Wall Street Journal, defeated plaintiffs' claims that defendant, a gas and oil provider, had misrepresented the price trends of gas in its initial public offering prospectus); *Hillson Partners Ltd. P'ship v. Adage, Inc*., 42 F.3d 204 (4th Cir. 1994) (disclosure of defendants' subsidiary's poor financial performance disclosed in the previous two years' annual report defeated plaintiff's claim that defendant had failed to disclose the information on later filed first and second quarter reports and mid-year press releases the following year); *Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co*., 432 F. Supp. 2d 571 (E.D. Va. 2006) (public disclosure of insurance company steering agreements in generally available analyst reports defeated plaintiffs claim that HRH failed to disclose that they relied heavily on non-standard commissions in reporting its revenue and earnings using illicit steering agreements) the specific information plaintiffs alleged defendants' misrepresented or omitted was widely known and/or available to the general public. Conversely, here, although BP touted its commitment to safety throughout the Class Period, the Company had disregarded necessary safety protocols and instead was cited countless times by the U.S. EPA, OSHA,

performance according to the standard industry measure has improved threefold and is now among the best in our industry" is true. *See* Br. at 30. This is flatly wrong. The statement was false or misleading when made because BP's safety performance was ***not*** "among the best in our industry."[28] The Presidential Commission described BP's OMS and safety protocols generally as far inferior to those that Shell and Exxon Mobil relied on in their offshore drilling operations; moreover, Defendants were aware of a December 2008 audit report that revealed significant safety gaps in BP's operations that increased the risk of major process safety disasters. BP also intentionally hired drilling manager Kevin Lacy from Chevron to improve and standardize BP's drilling protocols and Lacy reached a mutual agreement with BP to separate ***because*** BP was not committed to improving its drilling protocols. *See* ¶¶108, 118.[29] On a similar note, Defendant McKay falsely testified that: "The track record of BP and the industry generally in the Western and Central Gulf of Mexico (GOM) demonstrates that when areas are opened they can be leased, explored and developed to the highest environmental and operational standards in the world." ¶297. BP used safety standards far below those used in other areas of the world and below those used by its competitors in the Gulf. *See* ¶¶108.

---

after Worldcom acquired MCI, the court found that "vague statements of corporate optimism" including statements such as "I'm proud of how former MCI and WorldCom employees have worked together…" and "Our Internet business continues to enjoy great success" were not actionable. 191 F. Supp. 2d. at 785-86. However, here, Defendants statements are not vague corporate optimism, but instead consciously omit that "BP's track record" of the "highest operational standards" and its "competitive advantage" were achieved by ignoring standard industry safety practices and numerous internal warnings and notifications, including concerns raised in a key December 2008 internal strategy document and countless employee complaints raised internally and via the BP ombudsman, which alerted BP to the "major" concerns and safety lapses that plagued the Company's Gulf operations. *See Taubenfeld v. Hotels.com*, 385 F. Supp. 2d 587 (N.D. Tex. 2004) (finding statements by the company's CEO that he "expected the company to continue to be extremely profitable," to be nonactionable corporate optimism, unlike BP which touted its "improved safety and environmental footprint" albeit at the expense of process-safety.)

[28] Defendants may claim that they were not speaking about process safety in making these statements, but process safety is an integral part of safety performance.

[29] Defendants string cite several cases purportedly supporting the notion that vague corporate optimism about the future are not actionable. However, as explained herein, BP's statements during the Class Period are not examples of corporate optimism about BP's future, but instead are specific statements about "BP's track record," ¶297, and its "highly competitive advantage," ¶281, which were achieved by disregarding safety concerns and not at "the highest environmental and operations standards in the world." Further, BP's statements do not use words like "best" or "expect" or "optimistic" or "believe." Instead, BP's statements include verbs such as "ensure," ¶285, "require," ¶289, "rigorously follow," ¶266, "established," ¶281. As result, Defendants' citations are clearly inapposite. *See* Br. at 20 n.15.

stated by the Presidential Commission, Defendants did not meet their "professed commitment to safety." ¶23. While Defendants nitpick many of the individual scienter allegations in the Complaint, they do not address the allegations collectively and have not offered a competing non-culpable inference. The Complaint pleads a litany of facts that support the strong inference that Defendants either knew, or recklessly disregarded, that their commitment to improving BP's process safety was lacking and that the purported progress made was non-existent. As discussed in greater detail below, allegations that support a strong inference of scienter include, *inter alia*:

- Defendants Hayward, Conn, and Inglis reviewed copious information relating to safety deficiencies through their membership on the Group Operations Risk Committee ("GORC"), which managed process safety performance and analyzed major safety and high potential incidents.

- During the Class Period, the Company received nearly 1,000 citations or letters from governmental agencies resulting from safety and environmental violations throughout BP's operations, many of which were labeled as "egregious and willful." ¶134.

- A 2009 audit of the *DWH*'s BOP revealed that "inadequate use and/or failure of equipment" was serious enough to lead to "loss of life, serious injury or environmental damage." Nearly identical findings were made after a prior 2005 audit. ¶62.

- Defendants knew that blind shear rams on BOPs failed approximately 50% of the time and yet BP removed one ram from the *DWH*'s BOP, acknowledging that doing so would raise the rig's "risk profile." ¶¶85-95.

- MMS warned BP that failed cement jobs were "one of the most frequent causes" of blowouts in the Gulf, ¶80, and in 2008, BP experienced a blowout in Azerbaijan which resulted from a "bad cement job" and caused BP to stop the daily production of over 600,000 barrels, ¶¶82-83.

- A December 2008 internal BP strategy document warned that personnel in the Gulf do not fully understand "process-safety major hazards and risks." ¶19.

- The EPA criticized BP's continuing non-compliance with numerous laws and settlement agreements, its failure to run operations safely, and its practice of retaliating against workers who raised safety and environmental concerns and threatened BP with debarment proceedings. ¶133.

- BP's Senior Vice President of Drilling Operations in the Gulf reached a mutual agreement with BP to separate due to his concerns that BP's commitment to improving process safety in offshore drilling was lacking and that the Company's reorganization

**Deleted:** resigned
**Deleted:** safety
**Deleted:** and
**Deleted:** specifically
**Deleted:** informed Defendant Inglis

29

was affecting the safety of BP's offshore drilling operations. <ins>Lacy's concerns were raised with Defendant Inglis in December 2009.</ins> ¶119.

- Defendants Hayward, Inglis, and Suttles were each forced to leave BP within months of the end of the Class Period. ¶¶36, 38, 41.

These allegations give rise to a strong inference that each of the Defendants knew, or acted in reckless disregard of the truth, as to the vast and serious deficiencies in BP's safety regime and that their public statements to the contrary were materially false or misleading. *See BP Prudhoe Bay*, 2007 U.S. Dist. LEXIS 83007 at *10-13 (rejecting defendants argument that they were unaware of pipeline condition problems where plaintiffs alleged that defendants reduced pipeline monitoring staff, red flags were raised about condition of pipeline, employees told BP about potential for catastrophe, and competitors demonstrated a higher standard of care).

To the extent that certain of these allegations are not specific to any particular defendant, they are broadly applicable to all Defendants because they relate to BP's core operations. *See Dana Corp.*, 2011 WL 2020717, at *4-5 (applying allegations, including those specific to only one defendant, to conclude as to *both* defendants that "it is difficult to grasp the thought that [the defendants] really had no idea that [the company] was on the road to bankruptcy"); *Garden City Emps.' Ret. Sys. v. Psychiatric Solutions, Inc.*, No. 09-882, 2011 U.S. Dist. LEXIS 35661, at *158-59 (M.D. Tenn. Mar. 31, 2011) ("As a matter of law, high-level executives can be presumed to be aware of matters central to their business's operation[.]") (internal quotation mark omitted).[34] Defendants should not be allowed to now profess ignorance of BP's safety performance after claiming time and time again during the Class Period that safety was BP's "top priority."

---

[34] *See also In re PeopleSoft, Inc. Sec. Litig.*, No. 99-00472, 2000 WL 1737936, *3 (N.D. Cal. May 25, 2000); *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000).

charge of the abandonment process for the *DWH* had no experience with well control operations. ¶¶115, 120. The danger arising from such inexperienced leadership was made all the worse because the *DWH* crew feared retaliation for reporting unsafe working conditions. ¶144.

Moreover, BP specifically hired Kevin Lacy to improve BP's offshore drilling protocols in the Gulf – *i.e.*, to make BP's drilling operations there safer. When Lacy reached a mutual agreement with BP to separate because BP was not taking safety seriously, it can be inferred that BP's senior management – Hayward, Inglis[40], Conn, Suttles, McKay, Rainey and Malone – knew of the separation agreement and the reasons why.

These facts all relate to critical shortcomings in BP's offshore drilling operations that GORC monitored on a monthly basis. Moreover, because offshore drilling was one of BP's self-described "profit centres," ¶51, these safety deficits would also have been known or recklessly disregarded by Defendants McKay (President of BP America, ¶39), Suttles (Chief Operating Officer for Exploration and Production, ¶41), Rainey (Vice President of Exploration for the Gulf, ¶43), and Malone (President of BP America, ¶45). *See In re OCA, Inc. Sec. & Deriv. Litig.*, No. 05-2165, 2006 WL 3747560 at *18 (E.D. La. Dec. 14, 2006) (scienter is inferred with regards to critical information on company's key assets); *Garden City*, 2011 U.S. Dist. LEXIS 35661, at *158-59 ("As a matter of law, high-level executives can be presumed to be aware of matters central to their business's operation[.]").[41]

        **c.    Defendants concede that Plaintiffs have set forth specific scienter allegations with respect to Defendants Suttles, McKay, Malone, and Inglis**

Defendants concede that the Complaint sets forth specific scienter allegations regarding Defendants Suttles, McKay, Malone, and Inglis but challenge the sufficiency of those allegations. Br. at 43-46. Despite Defendants' attempt to fashion a new and even-more-heightened pleading standard – which could only be satisfied with proof of a smoking-gun – it is

---

[40] The Complaint expressly alleges that Inglis received communications regarding Lacy's concerns that BP was not adequately committed to process safety. ¶119.

[41] *See also, e.g., In re NetSolve, Inc. Sec. Litig.*, 185 F. Supp. 2d 684, 697; *DVI, Inc*, 2010 U.S. Dist. LEXIS 92768, at *21; *Arthocare*, 726 F. Supp. 2d at 718; *Plotkin*, 407 F.3d at 700; *Enron Corp.* 2003 WL 21418157, at *3, 15-16.

35

downplay the significance of the issues, they reveal a complete breakdown." *Id.*[46] In 2008, Sporkin communicated this information directly to Defendant Malone, who was then President of BP North America. ¶146. These specific allegations, taken in light of all facts set forth in the Complaint, support the inference that Defendant Malone knew, or was reckless in not knowing, that BP's operations suffered from a significant quality control and management failures. Notably, Plaintiffs do not merely allege some fact purportedly communicated by an unnamed subordinate to Defendant Malone. Rather, the communication is alleged to have come from Judge Sporkin, who intentionally brought the safety concerns to the attention of the President of BP North America in connection with his role as Ombudsman. *Id.*

*Inglis*. The Complaint alleges that BP's Senior Vice President for Drilling Operations in the Gulf, Kevin Lacy, informed Defendant Inglis in or about December 2009 that BP's commitment to improving process safety in offshore drilling was lacking and that the Company's reorganization was affecting the safety of BP's offshore drilling operations. ¶119. The Complaint further alleges that in December 2008, BP executives including Defendant Inglis as a member of the GORC, were apprised of process safety gaps in the Gulf that could result in a severe incident. ¶19. Indeed, Defendant Inglis met as a part of GORC to analyze every major safety incident and high potential incident as well as all citations that *governmental* agencies issued to BP. Reiser Decl., Ex. I at 42, 66, 74. These allegations meet *Tellabs* and *Lormand*'s standard of demonstrating that Defendant Inglis knew of or recklessly disregarded pervasive metrics of process safety hazards while at the same time publicly touting BP's "continuing improvement in all aspects" of safety and integrity in the Gulf. ¶328; *Lormand*, 565 F.3d at 254.

In short, Plaintiffs have adequately alleged "specific facts" supporting the strong inference that Defendants Hayward, Conn, Inglis, Suttles, McKay, and Malone acted with scienter. In support of their argument to the contrary, Defendants rely almost exclusively on *Southland*

> **Deleted:** specifically

---

[46] The seriousness of the issues raised to Defendant Malone was confirmed by the Presidential Commission, which concluded that BP was operating during this period without "reliable risk management processes" and that the "OMS failed to provide workers with procedures for making decisions during operations." ¶109.

*Securities Corp. v. INspire Insurance Solutions, Inc.,* 365 F.3d 353 (5th Cir. 2004) and *Indiana Electrical Workers' Pension Trust Fund IBEW, et al. v. Shaw Group Inc.,* 537 F.3d 527 (5th Cir. 2008). However, those cases are readily distinguishable. The allegations in *Shaw* are as follows: "[The defendant] is alleged to have been 'informed, in great detail, by a former . . . project controls manager, of all the problems associated with the use of [the product]'."[47] Similarly, in *Southland,* the plaintiffs alleged that "[Company] insiders . . . were repeatedly told by [the company's] programmers and developers that [the product] would never work as defendants had represented it to work."[48] In both cases, the plaintiffs failed to identify: (1) the source that provided the information to the defendant; (2) any information on which the court could assess the probability that the source knew the information that was provided to the defendant; (3) any detail whatsoever about the subject of the communication; and (4) any sense of the context or reason for the communications. Here, in contrast, the Complaint sets forth detailed allegations regarding the identity of the speaker, facts supporting the probability that the source knew the information that was communicated, a description of the substance of the communication, and the context in which the communication was made. *See, e.g.*, ¶119 (communications received by Defendant Inglis in 2009 related to Lacy's concerns that BP lacked a commitment to process safety). These detailed allegations clearly satisfy the pleading standards for a violation of Section 10(b).

> **Deleted:** Lacy telling
> **Deleted:** December
> **Deleted:** that he was resigning because of
> **Deleted:** 's
> **Deleted:** of

### d. Defendants ignore additional scienter allegations with regard to Defendants Browne, Dudley, Rainey, and Grote

On November 19, 2009, Defendant Rainey testified before the United States Senate Committee on Energy and Natural Resources, during which he made false and misleading statements, including: touting the use of blowout preventers that incorporated "redundant systems and controls." ¶317. Rainey was BP's Vice President of Exploration for the Gulf of Mexico, ¶43, and therefore necessarily knew that these statements were false because BP had admitted that removing the second ram on the *DWH*'s BOP would "reduce the built-in

---

[47] Br. at 43 (citing *Shaw,* 537 F.3d at 539).
[48] Br. at 43 (citing *Southland*, 365 F.3d at 376).

39

| | | DEFENDANTS' STATEMENTS AND WHY THEY WERE KNOWINGLY FALSE AND MISLEADING | |
|---|---|---|---|
| **Materially False and Misleading Statement or Omission** | **Date: Speaker; Location** | **Explanation of Why The Statement Was Knowingly False and Misleading** | **Defendants' Argument** |
| new standardized Operating Management System (OMS). This will provide a blueprint for safety and all aspect of operations throughout BP, making sure operations are undertaken to a consistently high standard worldwide." ¶271<br><br>"We are developing strong growth in deepwater and tight gas through a spread of major projects around the world." ¶271 | Inglis; Speech at Sanford Bernstein Conference | notices, and audit-change due date requests on a monthly basis. As a member of GORC, Inglis was aware or recklessly disregarded the following information:<br><br>BP was expanding its deepwater drilling operations without implementing adequate process safety procedures for well testing. ¶257. For example, BP learned from MMS that failed cement jobs were "one of the most frequent causes of loss of [well] control." ¶80. Further, BP understood that blind shear rams on BOPs had a failure rate of 45 percent and, as a result, a second blind shear ram would lower the BOP's risk profile, yet BP had one of the blind shear rams removed on the *Deepwater Horizon* because it was cheaper to test. ¶¶93-94. Thus, BP failed to develop processes for properly performing cement jobs as well as minimizing risk in the event that a blowout occurred. ¶¶78, 95.<br><br>BP's refinery business, received 862 non-public OSHA citations that were deemed almost entirely "egregious and willful" violations. ¶134.<br><br>BP had no intention of implementing consistent practices throughout the Company. Rather, BP was – and would continue to – implement differing safety practices country-by-country in order to save time and money. ¶¶272, 105-07. BP's reorganization ultimately led BP's Vice President for Drilling Operations in the Gulf of Mexico, Kevin Lacy, to reach a mutual agreement with BP to separate from the Company. ¶¶118-120.<br><br>The Presidential Commission Report concluded that BP lacked "consistent and reliable risk-management processes – and thus has been unable to meet its professed commitment to safety." ¶¶272, 78 | Deleted: resign |
| "In the months and years since the[] [Texas City refinery explosion and Prudhoe Bay oil spill] violations occurred, we have made real progress in the areas of process safety performance and risk management." ¶273<br><br>"BP America is in the midst of a comprehensive effort to | October 25, 2007 Defendant Malone; Press Release | As President of BP America, Malone was aware or recklessly disregarded facts concerning BP's safety deficits, including:<br><br>Beginning in 2007, BP contractor Marty Anderson notified individuals within BP, including Ombudsman Stanley Sporkin, of "a significant quality control breakdown" in BP's testing procedures, "inadequate record keeping," and "unqualified inspectors in the field performing inspections." ¶145. After reviewing the allegations raised by Mr. Anderson, the Ombudsman's office concluded: "[t]he concerns were serious, and although people try to downplay the significance of the issues, they reveal a complete breakdown." *Id.* In 2008, Sporkin communicated this information directly to Malone. ¶146.<br>BP was expanding its deepwater drilling operations without implementing adequate | Generalized statement |

7

| Materially False and Misleading Statement or Omission | Date: Speaker; Location | Explanation of Why The Statement Was <u>Knowingly</u> False and Misleading | Defendants' Argument |
|---|---|---|---|
| | | DEFENDANTS' STATEMENTS AND WHY THEY WERE KNOWINGLY FALSE AND MISLEADING | |
| | | would lower the BOP's risk profile, yet BP had one of the blind shear rams removed on the *Deepwater Horizon* because it was cheaper to test. ¶¶93-94. Thus, BP failed to develop processes for properly performing cement jobs as well as minimizing risk in the event that a blowout occurred. ¶¶78, 95.<br><br>BP failed to disclose the multiple safety failures and near-failures that it had experienced in its deepwater drilling operations. ¶276<br><br>BP was not "committed to taking these lessons" as BP received a total of 862 citations for OSHA violations between June 2007 and February 2010 of which 760 were classified as "egregious willful" and 69 were classified as "willful." The willful violations accounted for over 97 percent of all willful violations found by OSHA in all U.S. refineries during the same period. ¶134. | |
| "In safety, we are significantly lowering the risk profile of our operations." ¶278<br><br>"We established an executive-level training programme, ran process safety workshops and launched an operations academy for site-based staff to enhance process safety capability." ¶278 | February 22, 2008: BP 2007 Annual Review | Defendants had direct access to information regarding BP's safety failures as top ranking executives and/or as members of GORC which reviewed process safety metrics, workforce fatalities, loss of well control incidents, process safety incidents, high potential incidents, major incidents, and compliance notices on a monthly basis. As a result, BP knew or recklessly disregarded the these facts:<br><br>BP had no intention of implementing consistent practices throughout the Company. Rather, BP was – and would continue to – implement differing safety practices country-by-country in order to save time and money. ¶¶ 272, 105-07. BP's reorganization ultimately led BP's Vice President for Drilling Operations in the Gulf of Mexico, Kevin Lacy, to <u>reach a mutual agreement with BP to separate</u> from the Company. ¶¶118-120.<br><br>BP was expanding its deepwater drilling operations without implementing adequate process safety procedures for well testing. ¶257. For example, BP learned from MMS that failed cement jobs were "one of the most frequent causes of loss of [well] control." ¶80. Further, BP understood that blind shear rams on BOPs had a failure rate of 45 percent and, as a result, a second blind shear ram would lower the BOP's risk profile, yet BP had one of the blind shear rams removed on the *Deepwater Horizon* because it was cheaper to test. ¶¶93-94. Thus, BP failed to develop processes for properly performing cement jobs as well as minimizing risk in the event that a blowout occurred. ¶¶78, 95.<br><br>BP received a total of 862 citations for OSHA violations between June 2007 and February | Statement of historical fact<br><br>Generalized statement |

**Deleted:** resign

9

1001293.1 1

## DEFENDANTS' STATEMENTS AND WHY THEY WERE KNOWINGLY FALSE AND MISLEADING

| Materially False and Misleading Statement or Omission | Date: Speaker; Location | Explanation of Why The Statement Was **Knowingly** False and Misleading | Defendants' Argument |
|---|---|---|---|
| in addressing the recommendations of the Baker Panel and have begun to implement a new Operating Management System across all of BP's operations… We are determined to operate safely and reliably …" ¶281 | | as a result, a second blind shear ram would lower the BOP's risk profile, yet BP had one of the blind shear rams removed on the *Deepwater Horizon* because it was cheaper to test. ¶¶93-94. Thus, BP failed to develop processes for properly performing cement jobs as well as minimizing risk in the event that a blowout occurred. ¶¶78, 95.<br><br>Defendants misrepresented BP's OMS because BP had no intention of implementing consistent practices throughout the Company. Rather, BP was – and would continue to – implement differing safety practices country-by-country in order to save time and money. ¶¶272, 105-07. BP's reorganization ultimately led BP's Vice President for Drilling Operations in the Gulf of Mexico, Kevin Lacy, to reach a mutual agreement with BP to separate from the Company. ¶¶118-120.<br><br>BP received a total of 862 citations for OSHA violations between June 2007 and February 2010 of which 760 were classified as "egregious willful" and 69 were classified as "willful." The willful violations accounted for over 97 percent of all willful violations found by OSHA in all U.S. refineries during the same period. ¶134. | |
| "We have completed 50 major accident risk assessments (MARs). The assessments identify high-level risk that, if they occur, would have a major effect on people or the environment. Many of these risks, such as a loss of containment from our operations, are common across the industry… Mitigation plans to manage and respond to identified risks form part of the MAR analysis." ¶283<br><br>"The OMS 'is the foundation for a safe, effective, and high-performing BP…'A continuous improvement | March 4, 2008: Defendants Hayward and Grote; 2007 Annual Report Form 20-F | Hayward had direct access to information regarding BP's safety failures as Chairman of BP's GORC which reviewed process safety metrics, workforce fatalities, loss of well control incidents, process safety incidents, high potential incidents, major incidents, and compliance notices on a monthly basis. Similarly, as BP's CFO, Grote also had access to this information. As a result, Hayward and Grote knew or recklessly disregarded these facts:<br><br>As early as 2003, MMS warned BP that failed cement jobs were "one of the most frequent causes" of blowouts in the Gulf of Mexico. ¶80.<br><br>Defendants failed to disclose the multiple safety failures and near-failures that BP experienced. ¶284<br><br>When BP spoke about "mitigation plans" it had a duty to disclose, but failed to reveal that BP's "mitigation plans" did not prepare them to deal with an oil spill in the Gulf of Mexico. ¶284, 217-46.<br><br>BP described OMS as a "foundation for safe and effective" performance, yet failed to disclose that BP's OMS was using different safety practices country-by-country rendering | Statement of historical fact<br><br>Failure to plead the reason the statement is false<br><br>Generalized statement |

**Deleted:** resign

11

1001293.1 1

| | | DEFENDANTS' STATEMENTS AND WHY THEY WERE KNOWINGLY FALSE AND MISLEADING | |
|---|---|---|---|
| **Materially False and Misleading Statement or Omission** | **Date: Speaker; Location** | **Explanation of Why The Statement Was Knowingly False and Misleading** | **Defendants' Argument** |
| process drives and sustains improvement of these elements at a local level." ¶283<br><br>"In general, the group does not expect that it will be affected differently from other companies with comparable assets engaged in similar businesses." ¶283 | | deep sea drilling in the Gulf of Mexico far riskier than in other regions. In fact, BP had no intention of implementing consistent practices throughout the Company. ¶¶272, 105-07.<br><br>BP knew that operations in the Gulf presented increased risk for BP relative to its competitors who operated with more robust safety programs. Kevin Lacy, BP's Vice President for Drilling Operations for the Gulf of Mexico from 2007 through December 2009, was recruited from Chevron precisely to improve BP's safety protocols to the level of its industry peers. ¶¶118-19.<br><br>The Presidential Commission found that BP's OMS and safety protocols were far inferior to those adopted by Shell and Exxon Mobil and concluded that BP "has been unable to meet its professed commitment to safety. BP's safety lapses have been chronic." ¶109. | |
| "In 2007 our overall safety record continued to improve. Over the last eight years our safety performance according to the standard industry measure has improved threefold and is now among the best in our industry." ¶285.<br><br>"Everyone at BP understands those priorities. And while I am in this role they will remain priorities" and "focus on process safety continues... OMS... is aimed at ensuring that our operations across the world look and feel the same everywhere - and perform to the same high standard." ¶285 | April 17, 2008 Defendant Hayward; Speech at BP's 2008 General Meeting | Hayward had direct access to information regarding BP's safety failures as Chairman of BP's GORC which reviewed process safety metrics, workforce fatalities, loss of well control incidents, process safety incidents, high potential incidents, major incidents, and compliance notices, on a monthly basis. As a result, Hayward knew or recklessly disregarded these facts:<br><br>Defendants misrepresented BP's professed commitment to safety in that they failed to disclose that BP was implementing safety budget cuts and staff reductions which impacted the Company's ability to safely drill in the Gulf of Mexico. Defendants falsely represented that BP's safety performance was "among the best in our industry" when, in fact, BP's (i) focus on high-risk deepwater operations without proper safety protocols and the failure to implement industry best practices increased its potential liabilities beyond those of its competitors. ¶ 286.<br><br>Defendants misrepresented that BP's OMS was "aimed at ensuring that our operations across the world look and feel the same everywhere – and perform to the same high standard" but BP had no intention of implementing consistent practices throughout the Company. Rather, BP was – and would continue to – implement differing safety practices country-by-country in order to save time and money. ¶¶272, 105-07. BP's reorganization ultimately led its Vice President for Drilling Operations in the Gulf of Mexico, Kevin Lacy, to reach a mutual agreement with BP to separate from the Company. ¶¶118-120.<br><br>BP received a total of 862 citations for OSHA violations between June 2007 and February | Generalized statement<br><br>Deleted: resign |

12

1001293.1 1

| | | **DEFENDANTS' STATEMENTS AND WHY THEY WERE KNOWINGLY FALSE AND MISLEADING** | |
|---|---|---|---|
| **Materially False and Misleading Statement or Omission** | **Date: Speaker; Location** | **Explanation of Why The Statement Was <u>Knowingly</u> False and Misleading** | **Defendants' Argument** |
| | | 2010 of which 760 were classified as "egregious willful" and 69 were classified as "willful." The willful violations accounted for over 97 percent of all willful violations found by OSHA in all U.S. refineries during the same period. ¶134.<br><br>The Presidential Commission revealed that BP's OMS and safety protocols were far inferior to the safety protocols and systems that Shell and Exxon Mobil have adopted, ¶108, and therefore BP "has been unable to meet its professed commitment to safety. BP's safety lapses have been chronic." ¶109. | |
| "[W]e are also now introducing our new operating management system (OMS) designed to bring greater consistency to our operations." ¶287 | May 20, 2008: Defendant Hayward; BP 2007 Sustainability Report | BP had no intention of implementing consistent practices throughout the Company. Rather, BP was – and would continue to – implement differing safety practices country-by-country in order to save time and money. ¶¶272, 105-07. BP's reorganization ultimately led its Vice President for Drilling Operations in the Gulf of Mexico, Kevin Lacy, to <u>reach a mutual agreement with BP to separate</u> from the Company. ¶¶118-120.<br><br>The Presidential Commission found that BP's OMS and safety protocols were far inferior to those adopted by Shell and Exxon Mobil and concluded that BP "has been unable to meet its professed commitment to safety. BP's safety lapses have been chronic." ¶109.<br><br>Between 2006 and 2010, BP received no fewer than 100 non-public citations from the UK government for safety or environmental violations in its offshore drilling operations including an admonition that the magnitude of BP's lapses "might align to cause major accidents." ¶¶ 97, 101. | Generalized statement<br><br>Deleted: resign |
| "[T]he critical aspect of this [operating management] system is that it actually translates words into action. It starts out as a set of requirements which are the platform for safe, reliable, responsible operating activities. And then we continuously improve what we do, every day, every month, every year – in pursuit of sustainable operating | December 17, 2008: Defendant Hayward; Speech at HRH Prince of Wales's Annual Accounting Forum | Hayward had direct access to information regarding BP's safety failures as the Chairman of BP's GORC which reviewed process safety metrics, workforce fatalities, loss of well control incidents, process safety incidents, high potential incidents, major incidents and compliance notices on a monthly basis. As Chairman of GORC, Hayward was aware or recklessly disregarded these facts:<br><br>Since as early as October 2003, BP was aware that failed cement jobs were the most likely cause of loss of well control. ¶80. Yet, BP failed to establish adequate safety processes to mitigate this risk. ¶80. BP experienced, but did not disclose, its own problems with a faulty cement job on one of its deepwater wells in the Caspian Sea, off the coast of Azerbaijan, in September 2008. ¶81. More specifically, on September 17, 2008, BP experienced a gas leak at one of its central production platforms in the Azeri-Chirag-Guneshi ("ACG") field in the Caspian Sea – which is the largest of BP's deepwater | Plaintiffs fail to plead why statement is false |

13

1001293.1 1

| | | **DEFENDANTS' STATEMENTS AND WHY THEY WERE KNOWINGLY FALSE AND MISLEADING** | |
|---|---|---|---|
| **Materially False and Misleading Statement or Omission** | **Date: Speaker; Location** | **Explanation of Why The Statement Was Knowingly False and Misleading** | **Defendants' Argument** |
| | | occur at any time." ¶141.  Further, the Ombudsman's office concluded that Abbott's concerns were substantiated and revealed "[t]he concerns that you expressed about the status of the drawings upgrade project were . . . of concern to others who raised the concern before you worked there, while you were there, and after you left." ¶142.<br><br>The Presidential Commission revealed that BP's OMS and safety protocols were far inferior to those adopted by Shell and Exxon Mobil and concluded, as a result, that BP "has been unable to meet its professed commitment to safety.  BP's safety lapses have been chronic." ¶109.  Thus, BP's track record did not indicate that it could explore and develop wells to the "highest environmental and operational standards in the world." | |
| "There is one important caveat: safe and reliable operations come first whatever cost efficiency measures we undertake, and we continue to advance the safety and reliability of our operations through implementing OMS." ¶300.<br><br>"We remain focused on process safety and asset reliability.  We have begun implementation of our Operating Management System, which covers everything from employee competencies to risk assessment, and we're already seen the benefits." ¶299 | March 3, 2009: Defendant Hayward; BP 2009 Strategy Presentation | Hayward had direct access to information regarding BP's safety failures as the Chairman of BP's GORC which reviewed process safety metrics, workforce fatalities, loss of well control incidents, process safety incidents, high potential incidents, major incidents, compliance notices, and audit-change due date requests on a monthly basis.  As Chairman of GORC, Hayward was aware or recklessly disregarded the following information:<br><br>Defendants misrepresented BP's professed commitment to safety in that they failed to disclose that BP was implementing safety budget cuts and staff reductions which impacted the Company's ability to safely drill in the Gulf of Mexico.  Defendants falsely represented that BP's safety performance was "among the best in our industry" when, in fact, BP's focus on high-risk deepwater operations while ignoring the need to adopt adequate operational protocols and safety measures and BP's failure to implement industry best practices increased its potential liabilities beyond those of its competitors. ¶286.<br><br>Defendants misrepresented that BP's OMS was "aimed at ensuring that our operations across the world look and feel the same everywhere – and perform to the same high standard" but BP had no intention of implementing consistent practices throughout the Company.  Rather, BP was – and would continue to – implement differing safety practices country-by-country. ¶¶272, 105-07.  BP's reorganization ultimately led its Vice President for Drilling Operations in the Gulf of Mexico, Kevin Lacy, to reach a mutual agreement with BP to separate from the Company. ¶¶118-120.<br><br>BP received a total of 862 citations for OSHA violations between June 2007 and February 2010 of which 760 were classified as "egregious willful" and 69 were classified as | Generalized statement<br><br>*Deleted: resign* |

20

1001293.1 1

| | | DEFENDANTS' STATEMENTS AND WHY THEY WERE KNOWINGLY FALSE AND MISLEADING | |
|---|---|---|---|
| **Materially False and Misleading Statement or Omission** | **Date: Speaker; Location** | **Explanation of Why The Statement Was <u>Knowingly</u> False and Misleading** | **Defendants' Argument** |
| Examples of technologies which have helped reduce accidental releases include: … Blowout preventer technology which includes redundant systems and controls; New and improved well control techniques which maintain constant control of the fluids in the wellbore…" ¶317. | | November 9, 2010, although drill pressure data was "available" in BP's office in Houston, BP did not in fact monitor it, including on April 20, 2010, the night of the *Deepwater Horizon* blowout: "There was nobody in that B.P. Macondo well office that night. … Everybody had gone home" ¶318<br><br>By November 19, 2009, BP had undertaken "huge staff reductions," particularly in HSSE, ultimately, Kevin Lacy, a Sr. VP for Drilling Operations in the Gulf reached a mutual agreement with BP to separate because he felt BP was not adequately committed to improving safety and, in particular, that its reorganization was negatively affecting the safety of BP's drilling operations. ¶119.<br><br>As reported by the Guardian on June 21, 2010: Tyrone Benton stated that he spotted a leak on the rig's BOP at least a month before the blowout. He told the BBC's Panorama programme that both "BP and Transocean, who owned the rig, were informed of the leak, and the faulty part- a control pad – was switched off rather than being repaired." ¶356.<br><br>BP failed to disclose the multiple safety failures and near-failures that BP had experienced in its deepwater drilling operations as well as BP's audit of the *Deepwater Horizon*, which found equipment failures serious enough to lead to personal injury and environmental damage. ¶¶53-63, 81-83, 98-103.<br><br>A 2009 audit of the *Deepwater Horizon's* BOP revealed that "inadequate use and/or failure of equipment" was serious enough to lead to "loss of life, serious injury or environmental damage." A prior audit in 2005 identified similar safety concerns. ¶62. | **Deleted:** resigned |
| "BP's fiber optic network in the US Gulf of Mexico which allows us to monitor well pressures in real time, both at the facility and in our offices in Houston. . . All of our production facilities have contingency plans that identify the procedures, response equipment, and key personnel needed for responding to | November 19, 2009: Defendant Rainey; Testimony before U.S. Senate Committee on Energy and Natural Resources | As Vice President of Exploration for the Gulf of Mexico, Rainey was aware of safety deficits, including:<br><br>A 2009 audit of the *Deepwater Horizon's* BOP revealed that "inadequate use and/or failure of equipment" was serious enough to lead to "loss of life, serious injury or environmental damage." A prior audit in 2005 identified similar safety concerns. ¶62.<br><br>The December 2008 strategy document warned Rainey that personnel in the Gulf of Mexico do not fully understand "process-safety major hazards and risks." ¶19.<br><br>BP had purposefully removed redundant systems in its drilling operations in the Gulf of | Generalized statement |

28

1001293.1 1

| Materially False and Misleading Statement or Omission | Date: Speaker; Location | Explanation of Why The Statement Was <u>Knowingly</u> False and Misleading | Defendants' Argument |
|---|---|---|---|
| **DEFENDANTS' STATEMENTS AND WHY THEY WERE KNOWINGLY FALSE AND MISLEADING** ||||
| incidents." ¶317 | | Mexico. BP did not have adequate operational protocols and safety measures necessary to reduce the risk of catastrophic failure. For example: as noted in ¶¶94, 106, the BOPs used in BP's operations did not have adequate safety redundancies, such as a second blind shear ram or an acoustical control switch; in the event of a blowout, the well would not automatically shut-in.<br><br>Furthermore, well pressures were not being monitored "both at the facility and in our offices in Houston" in real time: On the contrary, as Presidential Commission investigator made clear during a presentation on November 9, 2010, although drill pressure data was "available" in BP's office in Houston, BP did not in fact monitor it, including on April 20, 2010, the night of the *Deepwater Horizon* blowout: "There was nobody in that B.P. Macondo well office that night . . . . Everybody had gone home" ¶318<br><br>By November 19, 2009, BP had undertaken "huge staff reductions," particularly in HSSE, ultimately, Kevin Lacy, a Senior Vice President for Drilling Operations in the Gulf reached a mutual agreement with BP to separate because of disagreements related to process safety. ¶116-18. Notably, Lacy had developed Chevron's safety program and felt BP was not adequately committed to improving safety and, in particular, that its reorganization was negatively affecting the safety of BP's drilling operations. ¶119. | [Deleted: resigned] |
| "In Exploration and Production our strategy is to invest to grow production safely, reliably and efficiently by strengthening our portfolio of leadership positions in the world's most prolific hydrocarbon basins…" ¶319.<br><br>"[T]he board will strive to set high expectations of how risk is managed and remain vigilant on oversight." ¶319. | February 26, 2010: BP 2009 Annual Review | Defendants, through BP's GORC, knew or recklessly disregarded facts relating to BP's safety deficiencies. The GORC reviewed process safety metrics, workforce fatalities, loss of well control incidents, process safety incidents, high potential incidents, major incidents, compliance notices, and audit-change due date requests on a monthly basis. As a result, Defendants were aware or recklessly disregarded the following information:<br><br>Defendants falsely portrayed improvements in safe, reliable and compliant operations when, as the Presidential Commission Report found, BP lacked "significant and reliable risk management processes. ¶321<br><br>BP was expanding its deepwater drilling operations without implementing adequate process safety procedures for well testing. ¶257. For example, BP learned from MMS that failed cement jobs were "one of the most frequent causes of loss of [well] control." ¶80. Further, BP understood that blind shear rams on BOPs had a failure rate of 45 percent and, as a result, a second blind shear ram would lower the BOP's risk profile, yet BP had one of the blind shear rams removed on the *Deepwater Horizon* because it was cheaper to test. | Forward Looking Statements<br><br>Generalized Statements |

29

1001293.1 1

| | | DEFENDANTS' STATEMENTS AND WHY THEY WERE KNOWINGLY FALSE AND MISLEADING | |
|---|---|---|---|
| **Materially False and Misleading Statement or Omission** | **Date: Speaker; Location** | **Explanation of Why The Statement Was Knowingly False and Misleading** | **Defendants' Argument** |
| | | concern before you worked there, while you were there, and after you left." ¶142. | |
| "[S]afety and operational integrity underpins everything we do... covering all areas from personal and process safety to environmental performance" ¶328. | March 22, 2010: Defendant Inglis; Speech at Howard Weil Energy Conference, New Orleans, LA. | Inglis had direct access to information regarding BP's safety failures as a member of BP's GORC which reviewed process safety metrics, workforce fatalities, loss of well control incidents, process safety incidents, high potential incidents, major incidents, compliance notices, and audit-change due date requests on a monthly basis. As a member of GORC, Inglis was aware or recklessly disregarded the following information:<br><br>Inglis learned in or about December 2009 that BP's Senior Vice President for Drilling Operations in the Gulf of Mexico, Kevin Lacy, believed that BP's commitment to improving process safety in offshore drilling was lacking and that the Company's reorganization was affecting the safety of BP's offshore drilling operations. ¶119.<br><br>A 2009 audit of the *Deepwater Horizon's* BOP revealed that "inadequate use and/or failure of equipment" was serious enough to lead to "loss of life, serious injury or environmental damage." A prior audit in 2005 identified similar safety concerns. ¶62.<br><br>Between 2006 and 2010, BP received no fewer than 100 non-public citations from the UK government for safety or environmental violations in its offshore drilling operations including an admonition that the magnitude of BP's lapses "might align to cause major accidents." ¶¶ 97, 101.<br><br>In 2008 through 2010, BP received 40 separate non-public letters from a U.S. governmental agency, the last one arriving the same day as the *Deepwater Horizon* explosion. ¶129.<br><br>The Presidential Commission revealed that BP's OMS and safety protocols were far inferior to those adopted by Shell and Exxon Mobil and concluded that BP "has been unable to meet its professed commitment to safety. BP's safety lapses have been chronic." ¶109.<br><br>An internal December 2008 strategy document warned BP executives of "major" process-safety concerns in Gulf of Mexico that increase "the potential for and severity of process-safety related incidents" and calling for "major hazard awareness training" for BP employees. ¶19. | Generalized statement |

**Deleted:** specifically informed Inglis in or about December 2009

| | | DEFENDANTS' STATEMENTS AND WHY THEY WERE KNOWINGLY FALSE AND MISLEADING | |
|---|---|---|---|
| **Materially False and Misleading Statement or Omission** | **Date: Speaker; Location** | **Explanation of Why The Statement Was Knowingly False and Misleading** | **Defendants' Argument** |
| responsibility, and our first and foremost priority." ¶330 | International Economics, Washington, DC | process safety procedures for well testing. ¶257.  For example, BP learned from MMS that failed cement jobs were "one of the most frequent causes of loss of [well] control." ¶80.  Further, BP understood that blind shear rams on BOPs had a failure rate of 45 percent and, as a result, a second blind shear ram would lower the BOP's risk profile, yet BP had one of the blind shear rams removed on the *Deepwater Horizon* because it was cheaper to test. ¶¶93-94.  Thus, BP failed to develop processes for properly performing cement jobs as well as minimizing risk in the event that a blowout occurred.  ¶¶78, 95, 331.<br><br>BP received a total of 862 citations for OSHA violations between June 2007 and February 2010 of which 760 were classified as "egregious willful" and 69 were classified as "willful."  The willful violations accounted for over 97 percent of all willful violations found by OSHA in all U.S. refineries during the same period.  ¶134.<br><br>BP's refinery business, received 862 non-public OSHA citations that were deemed almost entirely "egregious and willful" violations. ¶134.<br><br>The Presidential Commission criticized BP's OMS and safety protocols as being far inferior to those adopted by Shell and Exxon Mobil and concluded that BP "has been unable to meet its professed commitment to safety.  BP's safety lapses have been chronic." ¶109.<br><br>Nancy Leveson, an industrial safety expert and professor at the Massachusetts Institute of Technology taught safety classes to BP executives and criticized BP's approach because BP "just did safety wrong … producing a lot of standards but many were not very good and many were irrelevant." ¶20.<br><br>BP had no intention of implementing consistent practices throughout the Company.  Rather, BP was – and would continue to – implement differing safety practices country-by-country. ¶¶272, 105-07.  BP's reorganization ultimately led VP for Drilling Operations in the Gulf of Mexico, Kevin Lacy, to reach a mutual agreement with BP to separate from the Company. ¶¶118-120.<br><br>Defendant misrepresented that BP's paramount responsibility was providing a safe work environment when, in fact, BP's lack of operational and safety protocols resulted in decisions that sacrificed safety in order to save time and money. ¶331, 94, 174. | **Deleted:** resign |

37

**DEFENDANTS' STATEMENTS AND WHY THEY WERE KNOWINGLY FALSE AND MISLEADING**

| Materially False and Misleading Statement or Omission | Date: Speaker; Location | Explanation of Why The Statement Was <u>Knowingly</u> False and Misleading | Defendants' Argument |
|---|---|---|---|
| all areas from process safety, to personal health, to environmental performance… OMS helps ensure that a rigorous approach to safe operations continues to be taken." ¶334 | Review | a result, Defendants were aware or recklessly disregarded the following information:<br><br>An internal December 2008 strategy document warned BP executives of "major" process-safety concerns in Gulf of Mexico that increase "the potential for and severity of process-safety related incidents" and calling for "major hazard awareness training" for BP employees. ¶19.<br><br>BP falsely represented the "single framework" for all BP operations to follow when, in fact, BP had no intention of implementing consistent practices throughout the Company. Rather, BP was – and would continue to – implement differing safety practices country-by-country in order to save time and money. ¶¶272, 105-07. BP's reorganization ultimately led Vice President for Drilling Operations in the Gulf of Mexico, Kevin Lacy, to <u>reach a mutual agreement with BP to separate</u> from the Company. ¶¶118-120, 335. [Deleted: resign]<br><br>A 2009 audit of the *Deepwater Horizon's* BOP revealed that "inadequate use and/or failure of equipment" was serious enough to lead to "loss of life, serious injury or environmental damage." A prior audit in 2005 identified similar safety concerns. ¶62.<br><br>Between 2006 and 2010, BP received no fewer than 100 non-public citations from the UK government for safety or environmental violations in its offshore drilling operations including an admonition that the magnitude of BP's lapses "might align to cause major accidents." ¶¶ 97, 101.<br><br>In 2008 through 2010, BP received 40 separate non-public letters from a U.S. governmental agency, the last one arriving the same day as the *Deepwater Horizon* explosion. ¶129.<br><br>BP's refinery business, received 862 non-public OSHA citations that were deemed almost entirely "egregious and willful" violations. ¶134. | |
| BP's best estimate was that 1,000 barrels of oil per day were flowing from the Macondo well. ¶342<br><br>"I think that somewhere | April 28, 2010: Defendant Suttles; Press Conference, | As Chief Operating Officer for Exploration and Production, Suttles was aware of safety deficits, including:<br><br>Suttles failed to disclose that the Company's "best estimate" of the amount of oil flowing from the well was more likely between 5,758 barrels per day and a high of 14,266 barrels per day – well above the 1,000 barrel per day amount claimed by Suttles. These figures | Immaterial because statement made after the spill occurred. |

39

1001293.1 1