**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re BP plc Securities Litigation | No. 4:10-md-02185 |
| | Honorable Keith P. Ellison |

## NOTICE OF RECENT AUTHORITY

Co-Lead Plaintiffs New York and Ohio[1] hereby notify the Court of a recent decision denying motions to dismiss in a securities class action by the United States District Court for the District of Massachusetts in *Hill v. State Street Corp.*, No. 09-12146, 2011 U.S. Dist. LEXIS 85128 (D. Mass. Aug. 3, 2011), attached hereto as Exhibit A. The decision further supports New York and Ohio's arguments in opposition to Defendants' motions to dismiss the complaint.

In *Hill*, the plaintiffs alleged that State Street had deceived its investors in two ways: first, by impermissibly charging its clients a different exchange rate than the one the bank actually used to execute foreign exchange trades and, second, by misleading the market regarding its exposure to billions of dollars of losses from certain mortgage-backed securities ("MBS") contained in its investment portfolio and in four commercial paper conduits. *Id.* at *5-6, *50.

### *Foreign Exchange Fraud*

The *Hill* court held that the plaintiffs had adequately alleged that State Street's foreign exchange practices constituted fraud by high-ranking State Street officials, in part, because of the

---

[1] New York and Ohio refer to Thomas P. DiNapoli, Comptroller of the State of New York, as Administrative Head of the New York State and Local Retirement Systems and sole Trustee of the New York State Common Retirement Fund, and the Ohio Public Employees Retirement System, the State Teachers Retirement System of Ohio, the School Employees Retirement System of Ohio and the Ohio Police & Fire Pension Fund, as represented by Ohio's Attorney General Michael DeWine.

inference of scienter derived from the company's "lax internal controls and non-existent risk management practices." *Id*. at *42. Similarly here, BP's poor risk management practices, of which Defendants were aware – particularly in the wake of the Texas City Refinery explosion, the massive oil spill in Alaska, and myriad of other process safety related incidents – demonstrate that Defendants' statements were at least recklessly made when they failed to discuss known process safety failures in their operations, even after being made aware that such failures would lead to a loss of well control. ¶¶ 19, 77-150.

The *Hill* court also held that the "materiality of the misstatements . . . must be considered in light of their impact on State Street's reputation" and stated that "if clients were to lose trust in State Street, the financial impact on the company could be significantly greater than the total amount of the markup." *Hill*, 2011 U.S. Dist. LEXIS 85128, at *49-50. Here, BP's numerous statements regarding safety were designed to boost the Company's reputation after a series of high-profile, costly, and even deadly disasters. Additional safety failures would have had an impact on BP significantly greater than the costs of fines and remediation. Indeed, even towards the end of the Class Period, Defendant Suttles knowingly misrepresented the amount of oil flowing from the well, in an ultimately futile effort to protect BP's reputation and bottom line. ¶¶ 342, 344.

Finally, the *Hill* court held that a "strong inference of scienter" existed where State Street's CEO retired shortly after the California attorney general announced it had brought claims against the company and where the defendants had offered no "competing narrative" to explain the CEO's retirement. *Id*. at *43. Here too, Defendants Anthony Hayward, Andy Inglis, and Doug Suttles were each forced to leave shortly after the end of the class period because of the serious wrongdoing each of them had been accused of committing. Complaint, ¶¶ 36, 38, 41. Defendants offer no "competing narrative" to explain these removals. Thus, as in *Hill*, the removal of these individuals shortly after the end of the class period is additional indicia of scienter.

### *False Descriptions of Asset Quality*

Responding to marketplace concerns about the safety of State Street's MBS, the company repeatedly assured investors that the assets in its portfolio and conduits were of "high quality." *Id*. at *20, *50-51. Those representations were false, however, as State Street was forced to disclose that it had suffered large losses in its portfolio and conduits. *Id*. at *22-23. When the losses were publicly revealed, State Street's stock declined significantly. *Id*. at *23.

In its motion to dismiss the *Hill* complaint, State Street raised arguments similar to those Defendants raise here. In particular, State Street argued that its description of assets as being of "high quality" were honestly held and reasonably based opinions and were not false because they referred only to the credit quality of the assets. *Id*. at *52, *70. The court rejected those arguments, holding that (1) "given the context in which Defendants used the phrase 'high quality,' it is entirely plausible that the public would reasonably understand the statement to be a factual declaration"; (2) although the use of "high quality" was admittedly "ambiguous," the phrase "could well have been interpreted by investors to refer to more than the likelihood of default" and did not necessarily have the limited meaning claimed by the defendants; and (3) even if the false statements were "couched in conclusory terms like 'high value' and 'fair,'" those statements were still "actionable because 'conclusory terms in a commercial context are reasonably understood to rest on a factual basis that justified them as accurate, the absence of which renders them misleading.'" *Id*. at *54, *74, *71 n.14 (quoting *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1093 (1991)). The court also explained that the question of falsity was a fact issue not to be resolved on the motion to dismiss: "[u]ltimately, the issue of whether State Street's 'high quality' statements were false and misleading is a factual question." *Id*. at *75.

Similarly, here, Defendants' repeated statements claiming a strong commitment to process safety and improvements therein were materially false and misleading because they could reasonably be understood by investors to mean that BP had consistent and reliable risk-management practices and that it had adopted safety protocols for its most risky operations –

both of which were untrue. As in *Hill*, where "[i]t was predictable that a person would understand 'high quality' assets at that point in time to mean that the assets would not trigger massive losses for the company," *id*. at *67, here Defendants' professed commitments to process safety reforms following the Baker Panel report were reasonably understood to mean that BP had actually undertaken adequate measures to prevent additional catastrophic process safety failures.

Moreover, the *Hill* court held that State Street's numerous disclosures and cautionary language were insufficient to protect it from liability because the announcement of State Street's losses on the MBS caused "a massive sell-off of State Street's stock[.]" *Id*. at *62-63. According to the court, "given that such a drastic drop (60%) occurred immediately after the January 16 announcement and that investors felt blind-sided by State Street's . . . news, it is clear that some of the State Street disclosures simply failed to provide sufficient warning or detail, while others actually obscured as much as they revealed." *Id*. at *64. Likewise, the *Deepwater Horizon* disaster and the revelations of BP's poor process safety management that followed caused BP's stock price to plunge. The market reaction reveals that the lack of safety processes in BP's deepwater drilling operations were not adequately disclosed and, thus, could not have been considered as part of BP's risk profile.

If the *Hill* decision had been available to New York and Ohio at the time they drafted their Opposition to Defendants' Motion to Dismiss the Claims of BP ADS Purchasers in the New York and Ohio Plaintiffs' Consolidated Class Action Complaint, references to the decision would have been included on at least pages 17, 18, 21, and 46.

DATED: August 23, 2011 Respectfully submitted,


**YETTER COLEMAN LLP**

/s/ R. Paul Yetter
R. Paul Yetter (Bar No. 22154200)
Autry W. Ross (Bar No. 17283950)
909 Fannin, Suite 3600
Houston, TX 77010
Tel: (713) 632-8000
Fax: (713) 632-8002

***Counsel for New York and Ohio and
Liaison Counsel for the Class***

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Steven J. Toll (admitted *pro hac vice*)
Daniel S. Sommers (admitted *pro hac vice*)
Julie G. Reiser (admitted *pro hac vice*)
Joshua M. Kolsky (admitted *pro hac vice*)
1100 New York Avenue N.W.
West Tower, Suite 500
Washington, D.C. 20005-3964
Tel: (202) 408-4600
Fax: (202) 408-4699

**BERMAN DEVALERIO**
Jeffrey C. Block (admitted *pro hac vice*)
Jason M. Leviton (admitted *pro hac vice*)
Whitney E. Street (admitted *pro hac vice*)
One Liberty Square
Boston, MA 02109
Tel: (617) 542-8300
Fax: (617) 542-1194

***Counsel for New York and Ohio and
Co-Lead Counsel for the Class***

## CERTIFICATE OF SERVICE

I hereby certify that on August 23, 2011, the foregoing was electronically served on counsel of record in this matter who are registered with the Court's ECF filing system through ECF notification.

_____/s/ R. Paul Yetter_____
R. Paul Yetter (Bar No. 22154200)