**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re BP p.l.c. Securities Litigation | No.  4:10-MD-02185 |
| Robert R. Glenn, | No.  4:11-cv-02941 |
| Plaintiff, | |
| | Honorable Keith P. Ellison |
| v. | |
| | JURY TRIAL DEMANDED |
| BP p.l.c., | |
| | **ORAL ARGUMENT REQUESTED** |
| Defendant. | |

**PLAINTIFF ROBERT R. GLENN'S MEMORANDUM IN OPPOSITION TO**
**DEFENDANT BP'S MOTION TO DISMISS THE CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

I.   THE LAW APPLICABLE TO BP'S MOTION TO DISMISS .................................... - 3 -

    A.   The Federal Law of the Ninth Circuit Governs .................................................. - 3 -

    B.   Plaintiff's Claims Arise Under New York Law ................................................... - 3 -

II.  PLAINTIFF'S COMPLAINT STATES A VALID CLAIM FOR DIVIDENDS
    OWED .......................................................................................................................... - 4 -

    A.   Legal Standard .................................................................................................... - 5 -

    B.   Directors' Declaration of Dividends is Irrevocable Under English Law ............ - 6 -

    C.   BP's Motion to Dismiss Presents a Factual Dispute ........................................... - 8 -

    D.   BP's Directors Declared the Dividend Under Article 131(B), Not Article
        132 ..................................................................................................................... - 10 -

    E.   Under BP's Articles, All Dividends are Irrevocable After the Record Date ..... - 14 -

III. THE UNITED STATES IS THE PROPER FORUM FOR THIS CASE ..................... - 16 -

    A.   Legal Standard .................................................................................................. - 16 -

    B.   Adequate Forum ................................................................................................ - 17 -

    C.   Private and Public Interest Factors Weigh Against Dismissal .......................... - 17 -

        1.   Private Factors Weigh Against Transfer ................................................. - 19 -

        2.   Public Factors Weigh Against Transfer .................................................. - 22 -

IV.  THE DISTRICT COURT OF OREGON HAS PERSONAL JURISDICTION
    OVER BP .................................................................................................................. - 25 -

    A.   Legal Standard .................................................................................................. - 25 -

    B.   BP's Business Activities and the Continuing Presence in Oregon of BP's
        General Agent Establish General Jurisdiction .................................................. - 26 -

    C.   Plaintiff's Complaint Satisfies the Pleading Requirements for Jurisdiction ..... - 30 -

# TABLE OF AUTHORITIES

## CASES

*Acorn v. Household Intern., Inc.*,
211 F.Supp.2d 1160 (N.D. Cal. 2002) ........................................................................... - 30 -

*Adelson v. Hananel*,
510 F.3d 43 (1st Cir. 2007) ............................................................................................ - 19 -

*Ashcroft v. Iqbal*,
129 S.Ct. 1937 (2009) ........................................................................................ - 6 -, - 32 -

*Ballard v. Savage*,
65 F.3d 1495 (9th Cir. 1995) ......................................................................................... - 25 -

*Batchelder v. Kawamoto*,
147 F.3d 915 (9th Cir. 1998) ........................................................................................... - 4 -

*Bauman v. DaimlerChrysler Corp.*,
644 F.3d 909 (9th Cir. 2011) ........................................................... - 26 -, - 27 -, - 28 -

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................................................ - 5 -

*Bodner v. Banque Paribas*,
114 F.Supp.2d 117 (E.D.N.Y. 2000) ............................................................................ - 17 -

*Boschetto v. Hansing*,
539 F.3d 1011 (9th Cir. 2008) ....................................................................................... - 25 -

*Boston Telecomm. Group, Inc. v. Wood*,
588 F.3d 1201 (9th Cir. 2009) .................................................................................. passim

*Carijano v. Occidental Petroleum Corp.*,
643 F.3d 1216 (9th Cir. 2011) ........................................................................... - 16 -, - 17 -

*Chan v. Society Expeditions, Inc.*,
39 F.3d 1398 (9th Cir. 1994) ......................................................................................... - 28 -

*Cheng v. Boeing Co.*,
708 F.2d 1406 (9th Cir. 1983) ....................................................................................... - 24 -

*Conley v. Gibson*,
355 U.S. 41 (1957) .......................................................................................................... - 5 -

*Cook v. Brewer*,
637 F.3d 1002 (9th Cir. 2011) ......................................................................................... - 6 -

*DiRienzo v. Philip Services Corp.*,
294 F.3d 21 (2d Cir. 2002) ................................................................................. - 20 -, - 24 -

*Doe v. Unocal Corp.*,
248 F.3d 915 (9th Cir. 2001) ............................................................................. - 25 -, - 28 -

*Dole Food Co. v. Watts*,
303 F.3d 1104 (9th Cir. 2002) ............................................................- 16 -

*Fiore v. Walden*,
--- F.3d ---, 2011 WL 4014311 (9th Cir. 2011) ................................- 32 -

*Gray & Co. v. Firstenberg Mach. Co.*,
913 F.2d 7580 (9th Cir. 1990) ...........................................................- 26 -

*Guidi v. Inter-Continental Hotels Corp.*,
224 F.3d 142 (2d Cir. 2000)...............................................................- 19 -

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
466 U.S. 408 (1984)............................................................................- 26 -

*Hydrick v. Hunter*,
466 F.3d 676 (9th Cir. 2006) ...............................................................- 5 -

*In re Assicurazioni Generali S.p.A. Holocaust Ins. Litig.*,
228 F.Supp.2d 348 (S.D.N.Y. 2002)...................................................- 19 -

*In re Ford Motor Co.*,
591 F.3d 406, (5th Cir. 2009) ...............................................................- 3 -

*In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*,
2011 WL 1232352 (S.D. Tex. 2011) ....................................................- 3 -

*In re Lernout & Hauspie Sec. Litig.*,
208 F.Supp.2d 74, 93 (D. Mass. 2002) ...............................................- 22 -

*In re Phenylpropanolamine (PPA) Prod. Liab. Litig.*,
344 F.Supp.2d 686 (W.D. Wash. 2003)...............................................- 30 -

*In re Topps Co., Inc. Shareholder Litig.*,
19 Misc.3d 1103(A), 859 N.Y.S.2d 907 (N.Y. Sup. 2007) ....................- 4 -

*In re Tyson*,
433 B.R. 68 (S.D.N.Y. 2010)...............................................................- 23 -

*Industrial Equity Ltd. v. Blackburn*,
(1977) 137 CLR 567 ...................................- 7 -, - 9 -, - 10 -, - 11 -

*Inland Revenue Commissioners v. Laird Group plc*: [2003] 1 W.L.R. 2476 ............................- 7 -

*International Shoe Co. v. Washington*,
326 U.S. 310 (1945)............................................................................- 26 -

*Itoba Ltd. v. LEP Group PLC*,
930 F.Supp. 36 (D. Conn. 1996) .........................................................- 20 -

*Koster v. (Am.) Lumbermens Mut. Cas. Co.*,
330 U.S. 518 (1947)............................................. - 17 -, - 18 -, - 22 -

*Kramer Motors, Inc., v. British Leyland, Ltd.*,
628 F.2d 1175 (9th Cir. 1980) ...........................................................- 30 -

*Lagunas Nitrate Co. Ltd. v. Shroeder*,

[1901] 85 L.T. 22 ........................................................................................................- 9 -

*Lueck v. Sundstrand Corp.*,
236 F.3d 1137 (9th Cir. 2001) ...............................................- 17 -, - 19 -, - 20 -, - 21 -

*Narayan v. EGL, Inc.*,
616 F.3d 895 (9th Cir. 2010) ...................................................................................- 4 -

*Norlin Corp. v. Rooney, Pace Inc.*,
744 F.2d 255 (2d Cir. 1984)....................................................................................- 4 -

*Peach v. Shopshire*,
2006 WL 456772 (W.D. Wash. 2006) ....................................................................- 23 -

*Piper Aircraft Co. v. Reyno*,
454 U.S. 235 (1981) ....................................................................... - 17 -, - 22 -

*Potel v. Inland Revenue Commissioner*,
[1971] 2 A11 ER 504..............................................................................................- 9 -

*Raptor Inc. v. Elanex Pharm. Corp.*,
2000 WL 1617998 (D. Or. 2000)..........................................................................- 24 -

*Ravelo Monegro v. Rosa*,
211 F.3d 509 (9th Cir. 2000) ...................................................................- 17 -, - 18 -

*Reid-Walen v. Hansen*,
933 F.2d 1390 (8th Cir. 1991) ..............................................................................- 19 -

*Revenue & Customs Comm'rs v. Holland*
[2011] Bus.L.R. 111..............................................................................................- 14 -

*Scheuer v. Rhodes*,
416 U.S. 232 (1974)................................................................................................- 5 -

*Schwarzenegger v. Fred Martin Motor Co.*,
374 F.3d 797 (9th Cir. 2004) ...............................................................................- 26 -

*Seal Source, Inc. v. Calderon*,
2009 WL 2762047 (D. Or. 2009)..........................................................................- 31 -

*Sher v. Johnson*,
911 F.2d 1357 (9th Cir. 1990) ..............................................................................- 27 -

*Skaff v. Meridien N. Am. Beverly Hills, LLC*,
506 F.3d 832 (9th Cir. 2007) ................................................................................- 31 -

*Staats v. Biograph Co.*,
236 F. 454 (2d Cir. 1916).........................................................................................- 8 -

*Tempur-Pedic Intern., Inc. v. Go Satellite Inc.*,
758 F.Supp.2d 366 (N.D. Tex. 2010) ...........................................................- 20 -, - 21 -

*Tuazon v. R.J. Reynolds Tobacco Co.*,
433 F.3d 1163 (9th Cir. 2006) .................................................... - 22 -, - 24 -, - 30 -

*U.S. v. Bonds*,

iv

608 F.3d 495 (9th Cir. 2010) ....................................................................................... - 29 -

*Wells Fargo & Co. v. Wells Fargo Exp. Co.*,
556 F.2d 406 (9th Cir. 1977) ...................................................................................... - 26 -

*Williams v. Green Bay & Western R.R.*,
326 U.S. 549 (1946)................................................................................... - 18 -, - 23 -

## STATUTES/RULES

28 U.S.C. § 1391 ....................................................................................................... - 31 -

28 U.S.C. § 1404 ....................................................................................................... - 18 -

28 U.S.C. § 1407 ............................................................................................... - 3 -, - 18 -

28 U.S.C. § 1441 ....................................................................................................... - 18 -

28 U.S.C. § 1453 ....................................................................................................... - 18 -

Or. Rev. Stat. § 81.120(1)............................................................................................ -3-

Or. Rev. Stat. § 60.721 .............................................................................................. -33-

SEC Rule 10b-17(b)(1)(vii) ....................................................................................... -14-

## OTHER AUTHORITIES

1 Gore-Browne on Companies (45th ed. 2011) ............................................................ -7-

Gower & Davies, PRINCIPLES OF MODERN COMPANY LAW, 62 (8th ed. 2008)...... - 6 -, - 7 -, - 11 -

Eilis Ferran, Company Law & Corporate Finance (1999)......................................... -15-

NYSE Listed Company Manual ......................................................................... -14-,- 15 -

PALMERS COMPANY LAW (2010) ................................................................... - 6 -, - 7 -

Plaintiff Robert R. Glenn ("Plaintiff") respectfully submits this memorandum in opposition to the Motion to Dismiss the Class Action Complaint filed by defendant BP p.l.c. ("BP").  This memorandum is supported by the Class Action Complaint [Dkt. #1] (the "Complaint"), the Declaration of David Mabb Q.C., filed herewith (the "Mabb Decl."); and the Declaration of Jacob S. Gill, filed herewith (the "Gill Decl.").

## UNOPPOSED REQUEST FOR LEAVE TO FILE EXTENDED BRIEF

Plaintiff requests leave to file this extended memorandum, which exceeds the page limits set forth in Court Procedure 6(A).  The undersigned counsel for Plaintiff have conferred by telephone with counsel for defendant BP, and counsel for defendant BP have indicated that they do not oppose Plaintiff's request to file this extended memorandum.

## BACKGROUND

This case asserts a claim for a debt for unpaid dividends.  BP lists its American Depositary Shares ("ADSs") on the New York Stock Exchange ("NYSE").[1]  On April 27, 2010, BP announced that its board of directors had declared a quarterly dividend for the first quarter of 2010 of $0.84 per BP ADS payable on June 21, 2010, to its ADS shareholders of record as of May 7, 2010, thereby creating a binding and irrevocable obligation on the part of BP.

---

[1] BP's ordinary shares are traded on the London Stock Exchange.  Each BP ADS represents the right to receive six ordinary shares and is evidenced by an American Depository Receipt ("ADR").  *See* Gill Decl., Ex. F at 2.  This memorandum will use the term ADS to refer to both ADSs and ADRs.  The SEC explains the distinction between the terms ADS and ADR as follows:

> Sometimes the terms [ADR] and [ADS] are used interchangeably.  An ADR is actually the negotiable physical certificate that evidences ADSs (in much the same way a stock certificate evidences shares of stock), and an ADS is the security that represents an ownership interest in deposited securities (in much the same way a share of stock represents an ownership interest in the corporation).  ADRs are the instruments actually traded in the market.

SEC, "International Investing" (available at http://www.sec.gov/investor/pubs/ininvest.htm).

Complaint, ¶¶ 24, 26.  Just before the payment date, and well after the record date, BP announced that its board of directors had "cancelled" the previously declared first quarter dividend.  BP did not pay the dividend on June 21, 2010, as it was legally obligated to do. Complaint, ¶¶ 38, 45.  Applicable law and BP's organizational documents did not authorize or permit BP's directors to cancel or not pay when due the properly declared first quarter dividend. Complaint, ¶¶ 46-47.

 Plaintiff was a BP ADS shareholder as of the record date, and he did not receive the dividend payment to which he was entitled.  So on April 7, 2011, Plaintiff, a United States citizen and Oregon resident, filed a lawsuit in his local federal district court in Eugene, Oregon, seeking to recover the unpaid first quarter dividend for himself and for all other BP ADS shareholders as of the record date.  Complaint ¶ 1.  Consistent with his status as a creditor of BP with respect to the unpaid dividend, Plaintiff asserted claims for assumpsit, money had and received, unjust enrichment, and breach of contract.  Complaint ¶¶ 49-74.  He served the complaint on BP through its designated agent in the United States, BP America, Inc., a Delaware corporation registered and authorized to conduct business in the state of Oregon ("BP America"). *See* Gill Decl., Ex. AA.  (BP stipulated to service preserving objections to jurisdiction.)

 BP successfully sought the transfer of this case to MDL 2185, and now BP seeks dismissal of Plaintiffs claims on three grounds.  First, BP asserts a motion to dismiss under Rule 12(b)(6), but BP's motion is based on a disputed issue of fact as to whether BP's directors declared a dividend, not on any failure by Plaintiff to state a claim upon which this court may grant relief.  Second, BP asks the court to dismiss the claims under the doctrine of forum non conveniens, but BP fails to satisfy its heavy burden of proof.  Its argument that these claims are the same as the derivative claims previously dismissed from MDL 2185 is contrary to law and

ignores the fact that this is a claim brought by a United States citizen and Oregon resident to recover a debt arising under New York law relating to securities trading on an American exchange. Finally, BP contends that it is not subject to jurisdiction in the District of Oregon. However, BP maintains a continuous presence in Oregon through its designated general agent, BP America, thereby subjecting itself to the general jurisdiction of the state and federal courts located in the state.

## ARGUMENT

### I.     The Law Applicable to BP's Motion to Dismiss

#### A.     The Federal Law of the Ninth Circuit Governs

The Fifth Circuit has explained that a transfer under 28 U.S.C. § 1407 "accomplishes but a change of courtrooms." *In re Ford Motor Co.*, 591 F.3d 406, 413 n.5 (5th Cir. 2009) (citations and quotations omitted). Accordingly, where a case is transferred for the purpose of MDL pretrial proceedings, the transferee court must apply the law of the transferor court. *Id.*; *see also In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 2011 WL 1232352 at n.5 (S.D. Tex. 2011). Thus, the federal law that applies to this case is the law of the Ninth Circuit.

#### B.     Plaintiff's Claims Arise Under New York Law

BP ADS shares are issued pursuant to an Amended and Restated Deposit Agreement[2] (as amended, the "Deposit Agreement") between BP, its ADS shareholders, and JPMorgan Chase Bank, N.A., the depositary ("JPMorgan Chase"). *See* Gill Decl., Ex. F at p. 2. The Deposit Agreement includes a New York choice-of-law provision. Section 7.6 provides: "This Deposit Agreement and the Receipts shall be interpreted and all rights hereunder and thereunder and provisions hereof and thereof shall be governed by the laws of the State of New York." *See* Gill

Decl., Ex. F at p. 27.  Such contractual choice-of-law provisions are routinely enforced.  *See*

*Batchelder v. Kawamoto*, 147 F.3d 915, 918 (9th Cir. 1998).[3]  Thus, plaintiff's claims arise under

New York law.

New York courts do not automatically apply the "internal affairs" choice-of-law rule.

*See Norlin Corp. v. Rooney, Pace Inc.*, 744 F.2d 255, 263 (2d Cir. 1984) (citation omitted).

Nonetheless, Plaintiff stipulates for purposes of BP's motion to dismiss that certain aspects of

this case relating to the authority of the BP directors under BP's articles of association will be

governed by English law.  *See In re Topps Co., Inc. Shareholder Litig.*, 19 Misc.3d 1103(A), 859

N.Y.S.2d 907 (N.Y. Sup. 2007) (internal affairs doctrine did not override contractual choice-of-

law provision).

## II.      Plaintiff's Complaint States a Valid Claim for Dividends Owed

BP's motion to dismiss is based on a disputed issue of fact as to whether BP's directors

declared a dividend, not any failure by Plaintiff to state a claim upon which this court may grant

relief.  Indeed, BP necessarily acknowledges that if BP's directors declared a dividend, then

Plaintiff states a cognizable claim for dividends owed.  *See* BP Memo[4] at 16.  Plaintiff alleges

that BP's directors declared the 2010 first quarter dividend and that under BP's articles and

applicable law, BP's directors had the authority to declare and pay the dividend.  Complaint at ¶¶

---------------------------------(Cont.)

[2] The Amended and Restated Deposit Agreement, dated as of August 1, 2007 (*see* Gill Decl., Ex. F), was amended by an Amendment No. 1 to Deposit Agreement dated as of March 8, 2010 (*see* Gill Decl., Ex. G).

[3] "To determine the applicable substantive law, a federal court sitting in diversity applies the choice-of-law rules of the forum."  *Narayan v. EGL, Inc.*, 616 F.3d 895, 898 (9th Cir. 2010) (citation omitted).  Oregon law gives effect to contractual choice-of-law provisions.  *See* Or. Rev. Stat. § 81.120(1) ("[T]he contractual rights and duties of the parties are governed by the law or laws that the parties have chosen."); *see also Union Pacific R. Co. v. Mower*, 219 F.3d 1069, 1075 n.5 (9th Cir. 2000) (citation omitted).

[4] "BP Memo" refers to Defendant BP's Memorandum in Support of its Motion to Dismiss [Dkt. #17].

24, 26.  Plaintiff alleges that the dividend was payable on June 21, 2010, to all BP ADS

shareholders of record as of May 7, 2010, and that Plaintiff was a BP ADS shareholder of record

as of that date.  ¶¶ 24, 30.  Plaintiff alleges that the declaration of the dividend and record date

created a binding obligation to pay the dividend on June 21, 2010, and that under BP's articles

and applicable law, BP's directors did not have the power to cancel the properly declared first

quarter dividend.  Complaint at ¶¶ 26, 46.  Finally, Plaintiff alleges that BP did not pay the

dividend on June 21, 2010.  Complaint at ¶ 45.  In short, Plaintiff's claim states a valid claim for

relief, and BP's motion should be denied.

     A.    <u>Legal Standard</u>

    "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the

claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of

what the … claim is and the grounds upon which it rests.'"  *Bell Atlantic Corp. v. Twombly*, 550

U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  Thus, the court's task

in resolving a motion to dismiss under Rule 12(b)(6) "is necessarily a limited one."  *Hydrick v.

Hunter*, 466 F.3d 676, 686 (9th Cir. 2006) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236

(1974)).  "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is

entitled to offer evidence to support the claims."  *Id*.  "Indeed it may appear on the face of the

pleadings that a recovery is very remote and unlikely but that is not the test."  *Scheuer*, 416 U.S.

at 236; *see also Twombly*, 550 U.S. at 555 (explaining that "a well-pleaded complaint may

proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a

recovery is very remote and unlikely.' ") (quoting *Scheuer*, 416 U.S. at 236).  Rather, a

complaint will be sustained as long as it contains "sufficient factual matter, accepted as true, to

state a claim to relief that is plausible on its face."  *Cook v. Brewer*, 637 F.3d 1002, 1004 (9th

Cir. 2011) (quoting *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009)).  Plaintiff's complaint states

a valid claim for relief, and BP's motion must therefore be denied.

     B.    <u>Directors' Declaration of Dividends is Irrevocable Under English Law</u>

     English company law leaves much of the regulation of the internal affairs of a company

to the company itself through rules laid down in its articles of association.[5]  *See* Gower &

Davies, Principles of Modern Company Law, 62 (8th ed. 2008).  The importance of a

company's articles is evident in the structure of the Companies Act 2006: Section 18 of the Act

requires each company to "have articles of association prescribing regulations for the company,"

and Section 20 of the Act provides that a company, unless it has expressly opted out, will be

governed by the default rules set forth in model articles promulgated by the Secretary of State.

Mabb Decl. ¶¶ 17-29; *see also* Palmers Company Law § 2.1101 (2010); Principles of

Modern Company Law at 63-64.  BP has expressly opted out of the model articles.  *See* BP

Articles, Art. 1 ("The Regulations in Table A of the Companies (Table A-F) Regulations 1985,

the model articles for public companies in the Companies (Model Articles) Regulations 2008 and

any similar regulations in Statutes relating to companies do not apply to the Company.").

     "The internal procedure which a company has to follow when declaring a dividend is left

to the articles of association."  Principles of Modern Company Law at 285; *see also* Palmers

Company Law at § 9.710 ("The Companies Act 2006 itself does not provide who shall declare

dividend and, in particular, does not require the dividend to be declared by the general

---

[5] A company's articles of association constitute a contract between the company and each
member, and ordinary principles of contract law generally apply.  Gower & Davies,
PRINCIPLES OF MODERN COMPANY LAW, 66-67 (8th ed. 2008).  However, because of the
public, statutory nature of the contract, "those who deal with the company have a legitimate
expectation that the registered articles represent an accurate statement of the company's internal
regulations."  *Id.* at 67.  Therefore, a company's articles should not be interpreted in a manner
that results in a meaning substantially different from that which someone reading the registered
articles would understand them to have.  *Id.*; *see also* Mabb Decl. ¶¶ 30-31.

meeting."); Mabb Decl. ¶ 33.  Although the default rule under the model articles allows a company to declare a dividend only after a recommendation by the board and approval by shareholders, "[i]t is possible to lay down in the articles that a dividend shall be declared by the directors."  PALMERS COMPANY LAW at § 9.710; *see also* PRINCIPLES OF MODERN COMPANY LAW at 286 ("There is no apparent reason why the articles should not give the dividend decision entirely to the directors."); Mabb Decl. ¶¶ 68, 71-73.  BP's articles authorize the directors to declare dividends.  Article 131(B) provides: "The Directors may also from time to time declare and pay dividends on shares of any class of such amounts and on such dates and in respect of such periods as they think fit."  Jackson Decl.,[6] Ex. A at p. 37; *see also* Mabb Decl. ¶¶ 58-68.

"Once declared, subject to the articles, a dividend becomes a debt due by the company which cannot be withdrawn by the company and for which the shareholders may sue."  GORE-BROWNE ON COMPANIES at 25[17]; *see also* PALMERS COMPANY LAW at § 9.715 ("Once a dividend has been declared, it is ultra vires to resolve that payment should be postponed."); Mabb Decl. ¶¶ 69-70.  As explained in *Inland Revenue Commissioners v. Laird Group plc*:

> The shareholders own the company, but they entrust the management of its undertaking to the directors.  To enable the directors to carry out their functions, shareholders give them a discretion to decide how much of the company's funds should be retained to pay creditors and carry on the business and how much can safely be returned to shareholders by way of dividend.  ***By declaring a dividend, the directors effectively release funds due to the shareholders from their power to retain them in the business.***

[2003] 1 W.L.R. 2476 at ¶ 41 (emphasis added); *see also Industrial Equity Ltd. v. Blackburn*, (1977) 137 CLR 567, 571-72.  In this respect English law is consistent with the general American rule under state law:

> [I]f a board of directors should declare a cash dividend and make a public announcement of the fact, the courts have held that thereafter the board has no

---

[6] "Jackson Decl." refers to the Declaration of David J. Jackson [Dkt. #17-12].

right to reconsider and rescind its action.  The reason seems to be that the
declaration of the dividend sets apart from the profits of the corporation a sum
which is to be paid to the stockholders in proportion to their shares, and that it
creates a debt due from the corporation to each shareholder, resulting in the
relation of debtor and creditor.  A dividend divides the property which belongs to
the corporation into that which the corporation retains and that which the
corporation agrees to pay to the stockholders, and which it is thereby bound to
pay.

*Staats v. Biograph Co.*, 236 F. 454, 458 (2d Cir. 1916).

Accordingly, consistent with the allegations set forth in the Complaint, if BP's Board of

Directors declared the dividend pursuant to its authority under Article 131(B), then the dividend

was a debt owing to each BP ADS shareholder that could not be cancelled or modified by any

subsequent action by BP's Board of Directors.  *See* Mabb Decl. ¶ 70.

      C.     <u>BP's Motion to Dismiss Presents a Factual Dispute</u>

BP's motion to dismiss under Rule 12(b)(6) is premised on its contention that its articles

do not give its directors the authority to declare dividends.  In its discussion of the provisions of

BP's articles that relate to the declaration and payment of dividends, BP scrupulously avoids any

mention of the express authority to declare dividends granted to BP's directors under Article

131(B).  Instead, BP asserts that "Article 131(a) of BP's Articles of Association provides that BP

shareholders can approve final dividends, while Article 132 authorizes BP's directors to pay

interim dividends 'as they think fit.'"  BP Memo at 14.  BP then relies on this gross

mischaracterization of its articles to conclude that no dividend could be owing because no

dividend could be declared by BP's directors.  *See* BP Memo at 14.

BP's "interim dividend" argument is a straw man, set up and dispatched by BP while the

real issue stands untouched.  The cases and other authorities cited by BP stand for the

unremarkable proposition that a company's directors, acting without the authority to declare

dividends pursuant to the provisions of the model articles, may reverse a decision to pay interim

dividends.  While that may be an accurate statement of the law, it simply has no relevance to the dispute set forth in the Complaint, *i.e.*, whether BP's Board of Directors could cancel a properly declared dividend.

Indeed, none of the cases upon which BP relies (and to which the cited treatises refer) involved company articles like BP's that authorized the declaration of dividends by directors. For example, in *Lagunas Nitrate Co. Ltd. v. Shroeder*, a case addressing actions under model articles with respect to dividends, the court emphasized the board's lack of authority to declare dividends.  [1901] 85 L.T. 22, 23 ("That is not an absolute declaration of dividend; indeed, the article only empowers the directors to pay on account of the next forthcoming dividend such interim dividend as in their judgment the position of the company may justify."); *see also* Mabb Decl. ¶ 53.  And in *Potel v. Inland Revenue Commissioners*, another model articles case, the court explained the significant distinction between the authority to declare and the authority to pay and highlighted the directors' lack of authority:

> There is a difference between declaring a dividend and paying a dividend.  The declaration of a dividend … creates a debt enforceable immediately or in the future, according to whether the dividend is or is not expressed to be payable at a future date.  The payment of the dividend is a different operation.  It is an actual distribution of part of the assets of the company.  The two processes, declaration and payment, are quite separate.  Article 125 in the present case did not in terms authorize the directors to declare a dividend, that is to say, to create the relationship of debtor and creditors between the company and its members.  It only authorized the act of payment.

[1971] 2 All ER 504, 513; *see also* Mabb Decl. ¶ 55(v).

More relevant to this dispute is the decision of the High Court of Australia in *Industrial Equity Ltd. v. Blackburn*, (1977) 137 CLR 567.  *Industrial Equity* involved a challenge to the directors' decision to make a special distribution of cash and shares.  *Id.* at 571.  The articles gave the directors both the power to declare dividends and the power to pay interim dividends, and the directors and the company sought to justify the special distribution as the payment of an

- 9 -

interim dividend.  *Id*. at 571-72.  However, the court rejected that position because the company's articles gave the directors the power to pay non-cash dividends only "when declaring a dividend."  *Id*. at 571-72 ("This interpretation of [the articles] destroys the appellants' submission that the special distribution can be justified as the payment of an interim dividend."); *see also* Mabb Decl. ¶ 69(vi).

       D.      <u>BP's Directors Declared the Dividend Under Article 131(B), Not Article 132</u>

As noted above, BP's articles authorize the directors to declare dividends.  They gained that authority in 2003, when BP's shareholders approved new articles that, among other things, gave BP's directors the right to declare and pay ordinary dividends.  *See* Mabb Decl. ¶¶ 66-67; Gill Decl. Ex. R at p. 8.  The directors' authority with respect to the declaration of dividends is set out in Article 131, which states:

**Powers and rights in respect of dividends**

**131**  (A)  The Company may by ordinary resolution declare dividends but no such dividend shall exceed the amount recommended by the Directors.

    ***(B)  The Directors may also from time to time declare and pay dividends on shares of any class of such amounts and on such dates and in respect of such periods as they think fit.***

    (C)  Dividends may be declared and paid in any currency or currencies that the Directors shall determine, provided that:

    (i)  the Directors shall announce a sterling equivalent for any dividend declared in another currency and the date of the intended announcement of such sterling equivalent shall be notified by the Directors when the dividend is declared;

    (ii)  the sterling equivalent for any dividend declared in another currency shall be determined in accordance with Article 133(C); and

    (iii)  holders of Ordinary Shares shall be entitled to be paid dividends in sterling.

    (D)  When declaring a dividend, the Company or the Directors may identify either generally or in relation to any particular group or groups of shareholders the funds from which it is proposed that the dividend will be paid.

Jackson Decl., Ex. A at p. 37 (emphasis added).[7]

A company's directors must act in accordance with the company's articles, and they may only exercise the powers granted by the articles for the purposes for which they are conferred. *See* Companies Act 2006, § 171; PRINCIPLES OF MODERN COMPANY LAW at 498; Mabb Decl. ¶¶ 33-34.  Thus, the actions of BP's directors with respect to the dividend must be examined within the context of the articles as a whole.[8]  *See Industrial Equity*, 137 CLR at 571-73; Mabb Decl.¶¶ 91, 98-99.  Viewed in that light, it is clear that BP's directors declared the 2010 first quarter dividend pursuant to their authority under Article 131(B).

Article 131(C) applies only with respect to dividends declared pursuant to Article 131(A) or Article 131(B).  *See* Mabb Decl. ¶¶ 68, 99(iii).  BP's directors unquestionably were acting pursuant to the requirements set forth in Article 131(C) with respect to the 2010 first quarter dividend:

- BP's directors declared the dividend in U.S. dollars.  *See* Gill Decl., Ex. A at p. 2 ("The quarterly dividend, to be paid on 21 June 2010, is 14 cents per share ($0.84 per

---

[7] The article upon which BP relies, Article 132, states:

**Payment of fixed dividends**

**132**     If and so far as in the opinion of the Directors the profits of the Company justify such payments, the Directors may declare and pay the fixed dividends on any class of shares carrying a fixed dividend expressed to be payable on fixed dates on the half-yearly or other dates prescribed for the payment thereof and may also from time to time pay interim dividends on shares of any class of such amounts and on such dates and in respect of such periods as they think fit.

Jackson Decl., Ex. A at p. 37.

[8] A company's articles of association constitute a contract between the company and each member, and ordinary principles of contract law generally apply.  *See* PRINCIPLES OF MODERN COMPANY LAW at 66-67; Mabb Decl. ¶ 30.  However, because of the public, statutory nature of the contract, "those who deal with the company have a legitimate expectation that the registered articles represent an accurate statement of the company's internal regulations." *Id.* at 67.  Therefore, a company's articles should not be interpreted in a manner that results in a

ADS), the same as a year ago.").  The authority to declare dividends in U.S. dollars arises under Article 131(C), and no similar provision of BP's articles applies with respect to any announcement of interim dividends.  *See* Mabb Decl. ¶ 99(iii).

- With the dividend, BP's directors noted the date of the intended announcement of the sterling equivalent as required by Article 131(C)(i).  *See* Gill Decl., Ex. A at p. 2 ("The corresponding amount in sterling will be announced on 8 June 2010.").

- On June 8, 2010, BP's directors announced the sterling equivalent for the declared dividend as required by Article 131(C)(i).  *See* Gill Decl., Ex. D at p. 2 ("[T]he amount of sterling dividend payable in cash on 21 June 2010 will be: 9.5568 pence per share.").

- BP's directors determined the sterling equivalent in accordance with Article 133(C)[9] as required by Article 131(C)(ii).  *See* Gill Decl., Ex. D at p. 2("Sterling dividends payable in cash will be converted from US dollars at an average of the market exchange rate over the four dealing days from 2 June 2010 to 7 June 2010 (£1 = US$1.46492).").

BP's directors also offered a scrip dividend alternative with respect to the 2010 first quarter dividend.  *See* Gill Decl., Ex. A at p. 2 ("A scrip dividend alternative is available, allowing shareholders to elect to receive their dividend in the form of new ordinary shares and ADS holders in the form of new ADSs.").  BP's directors offered the scrip dividend pursuant to Article 142 and the authorizing resolution approved by the shareholders at the annual general

_____ (Cont.)

meaning substantially different from that which someone reading the registered articles would understand them to have.  *See* id.; *see also* Mabb Decl. ¶ 31.

[9] *See* Jackson Decl., Ex. A at p. 38.

meeting held on April 15, 2010.[10]  *See* Mabb Decl. ¶ 99(ii).  The shareholder resolution

authorized BP's directors "to offer the holders of ordinary shares of the company … the right to

elect (in whole or part), to receive new ordinary shares (credited as fully paid) instead of cash, in

respect of ***any dividend as may be declared by the directors*** from time to time …."  Gill Decl.,

Ex. Y at p. 5 (emphasis added); *see also* Mabb Decl. ¶ 99(ii).  The language of the resolution

limiting the scrip dividend program to dividends declared by the directors is consistent with the

provisions of Article 142.[11]

Finally, when BP's directors purported to cancel the dividend on June 16, 2010, they left

no doubt that they were purporting to cancel a *declared* dividend:

> Notwithstanding BP's strong financial and asset position, the current
> circumstances require the Board to be prudent and it has therefore decided to
> cancel ***the previously declared first quarter dividend*** scheduled for payment on
> 21st June and that no interim dividends will be declared in respect of the second
> and third quarters of 2010.

Gill Decl., Ex. E at p. 2 (emphasis added).  Clearly, BP's directors understood that they had

acted pursuant to their authority to declare dividends under Article 131(B), an understanding that

is consistent with BP's other statements and communications with shareholders.[12]  BP's after-

the-fact efforts to re-characterize its directors' actions are ineffective.  *See* Mabb Decl. ¶¶ 95-96.

---

[10] Article 142(D) provides: "The Directors may not allot Scrip Shares unless so authorised by ordinary resolution. Such a resolution may give authority in relation to particular dividends or may extend to all dividends declared or paid in the period specified in the resolution…." Jackson Decl., Ex. A at p. 41.

[11] For example, Article 142(F) provides that participants in BP's dividend reinvestment plan automatically enrolled in scrip dividend program with respect to each dividend payable during the time any such program may be in effect "***whether such dividend is declared before, at or after such time***", and Article 142(C)  provides that the scrip dividend is determined by reference to the cash amount of the dividend the shareholder "would have received by way of dividend in the currency ***in which such dividend was declared***."  Jackson Decl., Ex. A at p. 41 (emphasis added).

[12] For example, BP's shareholder "welcome letter" describes the dividend process as follows:

Indeed, BP's position – that its directors only pay interim dividends – is incompatible with the BP directors' obligations with respect to dividends.  As noted above, under BP's articles, either the shareholders or the directors may declare dividends.  BP readily acknowledges that its directors do not refer the matter of dividends to the company's shareholders.  *See* BP Memo at 14, n. 9.  Indeed, a review of notices for BP's annual general meetings during the period 2003 through 2011 shows that since gaining the power to declare dividends, BP's directors have <u>never</u> referred the matter of dividends to the shareholders.  Gill Decl. Exs. R-Z. Such a practice would be inconsistent with English law concerning the payment of interim dividends.  *See Revenue & Customs Comm'rs v. Holland* [2011] Bus.L.R. 111, 148 ("[F]or a company to pay an endless stream of interim dividends, with no final dividend ever recommended by the directors and approved by the company in general meeting, could not be a proper exercise of the powers conferred by the [company's articles].") (L. Walker, dissenting).[13]

    E.    <u>Under BP's Articles, All Dividends are Irrevocable After the Record Date</u>

BP's singular focus on Article 132 also ignores the effect of Article 143, an exchange-oriented provision that fixes BP's obligations with respect to dividends as of the record date

---

(Cont.)

BP announces financial results four times a year, and the BP directors decide the level of each dividend based on those results. If a dividend is declared, BP pays the dividend approximately six weeks after the announcement.  A dividend is paid for each share, so the amount you receive depends on the number of shares you own.

BP declares dividends in US dollars and at the same time states an equivalent sterling dividend….

Gill Decl., Ex. O at p. 7 (emphasis added).

[13] BP's position – that its directors may cancel dividends at will at any time prior to payment – would also be inconsistent with SEC and NYSE dividend notice requirements, which require, with respect to any dividend announced, disclosure describing "Details of any condition which must be satisfied … to enable payment of distribution."  SEC Rule 10b-17(b)(1)(vii); *see also* NYSE Listed Company Manual § 204.12 ("If there is a condition which must be satisfied … to enable payment of the dividend, give details.").

- 14 -

announced by the directors.  Under the default rules applicable to the model articles, "it is the

person who is the registered holder of the share on the date of the declaration of a final dividend

or payment of an interim dividend who is entitled to the dividend."  COMPANY LAW AND

CORPORATE FINANCE at 421.  "However, articles commonly authorize the board to select a date

(the record date) for the payment of dividends.  Shareholders on the register on the selected date

receive the dividend …." *Id.*

Article 143 is such a provision, providing that "[n]otwithstanding any other provision of

these Articles … the Directors may by resolution specify any date ("record date") as the date …

on which persons registered as the holders of shares or other securities ***shall be entitled to receipt***

***of any dividend*** …."  Jackson Decl., Ex. A at p. 42 (emphasis added).  A specified record date

fixing the shareholders' entitlement to dividends is necessary to the proper functioning of the

securities markets.  Thus, NYSE rules require listed companies to announce a record date for any

dividend declared.  *See* NYSE Listed Company Manual § 204.12.  And where the payment of a

dividend is subject to fulfillment of some condition (such as further corporate action), the record

date should be "after the date on which it will definitely be determined whether or not the

distribution will be made."  *Id.* at § 703.02(B).

Consistent with those requirements, BP's directors exercised their authority under Article

143 and specified a record date of May 7, 2010, for the declared first quarter dividend.  *See* Gill

Decl., Ex. A at p. 4 ("The dividend is payable on 21 June 2010 to shareholders and ADS holders

on the register on 7 May 2010.").  As a result, whether they were acting under Article 132 or

Article 131(B), BP's directors could not cancel the 2010 first quarter dividend after the record

date.[14]

---

[14] BP explains the significance of the record date in its shareholder welcome letter:

**III.**     <u>**The United States is the Proper Forum for this Case**</u>

      BP makes a general contention that this case should be treated identically to the derivative action recently dismissed in this MDL.  But this is not a derivative case.  It is a case by a United States citizen and Oregon resident to recover a debt owed to him by BP arising under New York law.  Accordingly, BP fails to meet its burden to establish that litigating such claims in the United State would be sufficiently "oppressive" and "vexatious" to warrant dismissal of Plaintiff's claims.

      A.     <u>Legal Standard</u>

      "The doctrine of *forum non conveniens* is a drastic exercise of the court's 'inherent power' because, unlike a mere transfer of venue, it results in the dismissal of a plaintiff's case." *Carijano v. Occidental Petroleum Corp.*, 643 F.3d 1216, 1224 (9th Cir. 2011).  Accordingly, courts "have treated *forum non conveniens* as 'an exceptional tool to be employed sparingly,' and not a 'doctrine that compels plaintiffs to choose the optimal forum for their claim.'"  *Id*. at 1224 (quoting *Dole Food Co. v. Watts*, 303 F.3d 1104, 1118 (9th Cir. 2002)).  "A party seeking dismissal of an action on forum non conveniens grounds must show two things: (1) the existence of an adequate alternative forum, and (2) that the balance of private and public interest factors favors dismissal."  *Boston Telecomm. Group, Inc. v. Wood*, 588 F.3d 1201, 1206 (9th Cir. 2009) (citation and internal quotations omitted).   The burden of proof rests with the defendant, who must make "a clear showing of facts which establish such oppression and vexation of a

---

      (Cont.)

      If you buy shares before the ex-dividend date you are entitled to receive the dividend recently announced.  If you buy on or after that date, in the ex-dividend period, that dividend is payable to the previous owner.

      The dividend is paid to shareholders based on the number of shares held on the share register at the record date. The record date is currently two days after the ex-dividend date.

Gill Decl., Ex. O at p. 8.

defendant as to be out of proportion to plaintiff's convenience." *Boston Telecomm.*, 588 F.3d at

1212 (citing *Ravelo Monegro v. Rosa*, 211 F.3d 509, 514 (9th Cir. 2000)); *see also Piper Aircraft*

*Co. v. Reyno*, 454 U.S. 235, 241 (1981).

> B.    Adequate Forum

To demonstrate that England is an adequate alternative forum, BP must show that it is

"amenable to process" in England and that "the subject matter of the lawsuit is cognizable [there]

so as to provide plaintiff appropriate redress." *Bodner v. Banque Paribas*, 114 F.Supp.2d 117,

132 (E.D.N.Y. 2000); *see also Piper Aircraft*, 454 U.S. at 254 n.22.  BP represents that it is

amenable to process in England and that the claims asserted by Plaintiff would be cognizable in

the English courts.  In reliance on those representations, Plaintiff agrees that England satisfies the

requirements for an adequate alternative forum.

> C.    Private and Public Interest Factors Weigh Against Dismissal

"When a domestic plaintiff initiates litigation in its home forum, it is presumptively

convenient." *Carijano*, 643 F.3d at 1224 (citing *Piper Aircraft*, 454 U.S. at 257).  Even where a

plaintiff is suing in a state other than his state of residence, "where the plaintiff is a United States

citizen, the defendant must satisfy a heavy burden of proof … [and] the plaintiff's choice of

forum should rarely be disturbed." *Boston Telecomm.*, 588 F.3d at 1207.  Thus, "[i]n weighing

the relevant private and public interest factors, 'ordinarily, a plaintiff's choice of forum will not

be disturbed unless the "private interest" and the "public interest" factors strongly favor trial in a

foreign country'" *Id*. at 1206 (quoting *Lueck v. Sundstrand Corp.*, 236 F.3d 1137, 1145 (9th Cir.

2001)).

BP, citing *Koster v. (Am.) Lumbermens Mut. Cas. Co.*, 330 U.S. 518 (1947), contends

that "little deference is due in this case because Plaintiff seeks to represent a putative class of all

holders of BP ADSs as of May 7, 2010, most of whom have no connection to Plaintiff's chosen

forum." BP Memo at 16. But BP's reliance on *Koster* is misplaced. *Koster* was a derivative action, and the Court's decision in that case was based on "the special problems of forum non conveniens which inhere in derivative actions." *Koster*, 330 U.S. at 521. Indeed, the *Koster* court expressly distinguished the derivative case before it from *Williams v. Green Bay & Western R.R.*, 326 U.S. 549 (1946), a case decided just a year earlier in which the Court had reversed a dismissal on forum non conveniens grounds of a class action to recover payments due on corporate debentures. *See Koster*, 330 U.S. at 521 (explaining that *Williams* "was not a derivative action brought in the right of a nominal defendant corporation").[15]

Moreover, the members of the putative class in this case, *i.e.*, all BP ADS shareholders as of the record date for payment of the dividend, have an indisputably strong connection to the federal district court forum chosen by Plaintiff. Because the BP ADS shares are traded on the NYSE (while BP's ordinary shares are listed on the London stock Exchange), most, if not all, of the "thousands of potential holders of BP ADSs as of the relevant date" (BP Memo at 17) are likely to be United States citizens or residents. BP's motion to dismiss seeks to deny the entire class access to a United States forum, but BP's underlying "class representative" argument attacks the convenience of Oregon relative to the other states in which the class members may reside. The convenience of Oregon relative to any other forum within the United States is irrelevant to this dispute. Powerful procedural mechanisms (*e.g.*, removal pursuant to 28 U.S.C. §§ 1441 and 1453 and transfer pursuant to 28 U.S.C. §§ 1404(a) and 1407) exist to allow a defendant to seek its preferred forum amongst the various state and federal courts in the United States. *See Ravelo*, 211 F.3d at 512. Therefore, in a case like this involving an alternative forum

---

[15] The Court explained that the facts in *Williams* "were quite different" because *Williams* was "a class suit brought to recover amounts alleged to be due to plaintiffs on debentures." *Koster*, 330 U.S. at 528.

outside the United States, the relevant "home forum" for the plaintiff is the United States rather than the plaintiff's particular state of residence.  *See Boston Telecomm.*, 588 F.3d at 1207 ("[W]here the plaintiff is a United States citizen, the defendant must satisfy a heavy burden of proof.").[16]  And a representative plaintiff's choice of forum is not diminished merely because of the class-action nature of the suit.  *See In re Assicurazioni Generali S.p.A. Holocaust Ins. Litig.*, 228 F.Supp.2d 348, 351-53 (S.D.N.Y. 2002).

Plaintiff, a U.S. citizen and an Oregon resident, seeks to recover a specific debt owed to him personally arising out of his ownership of BP ADS shares registered and issued under American law and traded on a national American exchange.  He also seeks relief on behalf of all other BP ADS shareholders whose rights, like Plaintiff's, arise out of their ownership of BP ADS shares and who were entitled to and did not receive payment of the 2010 first quarter dividend. Accordingly, Plaintiff's choice of forum is entitled to substantial deference and should not be disturbed.

            1.    <u>Private Factors Weigh Against Transfer</u>

The private interest factors informing the forum non conveniens analysis include: "(1) the residence of the parties and the witnesses; (2) the forum's convenience to the litigants; (3) access to physical evidence and other sources of proof; (4) whether unwilling witnesses can be compelled to testify; (5) the cost of bringing witnesses to trial; (6) the enforceability of the judgment; and (7) all other practical problems that make trial of a case easy, expeditious and

---

[16] *See also Guidi v. Inter-Continental Hotels Corp.*, 224 F.3d 142, 147 (2d Cir. 2000) ("In this case, Plaintiffs argue-and we agree-that their 'home forum' as American citizens is a United States court …") (citation omitted); *Reid-Walen v. Hansen*, 933 F.2d 1390, 1394 (8th Cir. 1991) ("the 'home forum' for the plaintiff is any federal district in the United States, not the particular district where the plaintiff lives."); *Adelson v. Hananel*, 510 F.3d 43, 53 (1st Cir. 2007) (recognizing the "strong presumption favoring the American forum selected by American plaintiffs"); *Tempur-Pedic Intern., Inc. v. Go Satellite Inc.*, 758 F.Supp.2d 366, 380 n.8 (N.D. Tex. 2010).

inexpensive." *Boston Telecomm.*, 588 F.3d at 1206-07 (quoting *Lueck*, 236 F.3d at 1145).

BP contends that the case should be dismissed because BP's corporate records are located in London.  *See* BP Memo at 17.  Because BP does not contend that transporting the documents (or copies of them) would be "oppressive" or "vexatious", this factor should be accorded less weight in light of the substantial advancements in communications and transportation.  *DiRienzo v. Philip Services Corp.*, 294 F.3d 21 (2d Cir. 2002) (citing *Itoba Ltd. v. LEP Group PLC*, 930 F.Supp. 36, 44 (D. Conn. 1996)).  Moreover, BP's own corporate records are under BP's control, but there are other relevant documents under neither party's control that are located in the United States, including, for example, the register of BP ADS shareholders maintained by JPMorgan Chase under the terms of the Deposit Agreement.  *See* Gill Decl. Ex. F at p. 17 ("The Depositary or its agent shall keep at facilities in the United States, a Receipt register for the registration of Receipts and transfers of receipts.").  Accordingly, because the relevant documents are either located in the United States or under the parties' control, this factor weighs against transfer.  *See Lueck*, 236 F.3d at 1147 (where parties controlled all documents located in the United States but could not compel production of documents located in New Zealand, factor favored dismissal); *see also Tempur-Pedic Intern., Inc. v. Go Satellite Inc.*, 758 F.Supp.2d 366, 380 (N.D. Tex. 2010) ("Defendants have access to their own records … whether this case is litigated in Texas or in British Columbia, and the court can compel parties to the suit to produce discovery.") (footnote omitted).

BP makes the conclusory assertion that "any unwilling witnesses in this case are much more likely to be subject to compulsory process in England than in Oregon …."  BP Memo at 18.  BP does not, however, identify any potential unwilling witnesses.  The only potential witnesses identified by BP are "BP's directors" (who are subject to BP's control), and BP does not identify

which of its directors should be considered or provide any information concerning the materiality or importance of their testimony.[17]  A party seeking "the extraordinary measure of dismissal on forum non conveniens grounds" must provide "information sufficient to assist the court in assessing the 'materiality and importance' of each witness."  *Boston Telecomm.*, 588 F.3d at 1210 (quoting *Lueck*, 236 F.3d at 1146).  Without such information the court cannot undertake the proper inquiry, and this factor therefore weighs against transfer.  *Id*. at 1210; *see also Tempur-Pedic*, 758 F.Supp.2d at 380 (N.D. Tex. 2010) (factor weighed against dismissal because defendants "[did] not identify the third-party witnesses or potential evidence that could become more difficult to access if the litigation is conducted in this court").

BP also makes the conclusory assertion that "the cost of attendance at trial for willing witnesses will be far less in England."  BP Memo at 18.  But again BP does not identify the witnesses whose attendance should be considered, and BP does not explain why the costs of attendance would "be far less in England" for such witnesses.  Without such information the court cannot undertake the proper inquiry, and, therefore, this factor also weighs against transfer.  *See Boston Telecomm.*, 588 F.3d at 1210; *Lueck*, 236 F.3d at 1146.

Finally, the court must consider the efficiency of the class action mechanism available in the United States.  *See id.* at 1207 (private interest factors include "all other practical problems that make trial of a case easy, expeditious and inexpensive"); FRCP 23(b)(3) (class certified where "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy").  Requiring each of the thousands of BP ADS shareholder as of the record date to pursue their claims separately in the English courts would create an unnecessary expense and

---

[17] Of BP's thirteen current directors, five are American, one is Swedish, one is Dutch, one is South African, four are British, and one is a dual American/British citizen.  *See* Gill Decl., Ex. H at pp. 6-18.

burden on the parties and the English courts.  *See*, *e.g.*, *In re Lernout & Hauspie Sec. Litig.*, 208

F.Supp.2d 74, 93 (D. Mass. 2002) ("the confusion and expense associated with forcing each

class member in the United States to individually sue defendants in Belgium would be

tremendous and strongly weigh against dismissal").

All of the physical evidence and witnesses identified by BP are under BP's control.  The

physical evidence located in the United States is not under the control of either party.  BP

identifies no unwilling witnesses and provides no information to support its assertion that the

costs of attendance for any witness "would be far less in England" than in the United States.

Accordingly, the private interest factors weigh against transfer.

2.    Public Factors Weigh Against Transfer

The public interest factors informing the forum non conveniens analysis include: "(1) the

local interest in the lawsuit, (2) the court's familiarity with the governing law, (3) the burden on

local courts and juries, (4) congestion in the court, and (5) the costs of resolving a dispute

unrelated to a particular forum."  *Boston Telecomm.*, 588 F.3d at 1211.

BP argues that "Plaintiff's claims challenging the decision of BP's Board of Directors to

rescind the June 2010 quarterly dividend are governed by English law," and contends that "[t]his

court thus has discretion under the forum non conveniens doctrine to dismiss this action rather

than apply foreign law."  BP Memo at 18-19.  BP's assertion is contrary to established law.

"There is no rule of law … which requires dismissal of a suitor from the forum on a mere

showing that the trial will involve issues which relate to the internal affairs of a foreign

corporation."  *Koster*, 330 U.S. at 527; *see also Piper Aircraft*, 454 U.S. at 249 (explaining that

"inquiry into the internal affairs of a foreign corporation … is one, but only one, factor which

may show convenience.") (quoting *Koster*, 330 U.S. at 527); *Tuazon v. R.J. Reynolds Tobacco

Co.*, 433 F.3d 1163, 1182 (9th Cir. 2006) (affirming denial of motion to dismiss notwithstanding

application of Phillipine law).

The Supreme Court's decision in *Williams* controls this issue.  The case involved a class action suit brought in the named plaintiffs' home state (New York) against a foreign (Wisconsin) company to recover amounts alleged to be due under debentures issued by the company. *Williams*, 326 U.S. at 551.  The case hinged on the question of whether the directors had discretion to determine whether or not certain sums should be paid on the debentures at issue. *Id*. at 552.  The district court dismissed the case on forum non conveniens grounds "because the subject matter was concerned with the internal affairs of a foreign corporation," and the Second Circuit affirmed.  *Id*. at 551-52.  The Supreme Court reversed, holding that "it was improper to dismiss the case on the grounds of forum non conveniens."  *Id*. at 553.  The Court explained:

> A corporation chartered by one State commonly does business in the farthest reaches of the nation.  Its business engagements-the issuance of securities, mortgaging of assets, contractual undertakings-frequently raise questions concerning the construction of its charter, by-laws and the like, or the scope of authority of its officers or directors, or the responsibility of one group in the corporate family to another group.  All such questions involve in a sense the internal affairs of a corporation-whether in a suit on a contract the corporation interposes the defense of ultra vires, or a bondholder sues on his bond or a stockholder asserts rights under his stock certificate.  But a federal court which undertakes to decide such a question does not trespass on a forbidden domain …  The fact that the corporation law of another State is involved does not set the case apart for special treatment.  The problem of ascertaining the state law may often be difficult.  But that is not a sufficient ground for a federal court to decline to exercise its jurisdiction to decide a case properly before it.

*Id*. (internal citations omitted).  The Court's reasoning applies with equal force to this case. "Federal courts apply foreign law routinely, and adequate procedures have been developed for that purpose."  *Peach v. Shopshire*, 2006 WL 456772 at *10 (W.D. Wash. 2006) (citing FRCP 44.1); *see also In re Tyson*, 433 B.R. 68, 78-95 (S.D.N.Y. 2010) (determining and applying English company law).

Moreover, as explained above, the relationship between BP and its ADS shareholders is

subject to the Deposit Agreement and its New York choice of law provision.  As a result, an English court addressing plaintiff's claims would be required to apply New York state law, a fact that weighs against dismissal.  *See Cheng v. Boeing Co.*, 708 F.2d 1406 (9th Cir. 1983) (recognizing that "the necessity of applying American law may add weight to the factors favoring retention of jurisdiction") (citation omitted).

Finally, BP contends that the first public interest factor, "the local interest in the lawsuit", weighs in favor of dismissal, arguing that "Plaintiff's claims have no connection to Oregon other than that Plaintiff allegedly resides there."  BP Memo at 19.  "With this public interest factor," the Ninth Circuit has explained, a court "ask[s] only if there is an identifiable local interest in the controversy, not whether another forum also has an interest."  *Boston Telecomm.*, 588 F.3d at 1212 (quoting *Tuazon*, 433 F.3d at 1182).  Thus, this court does not need to decide that Oregon or the United States "is the principal locus" of the case or that Oregon or the United States "has more of an interest than any other jurisdiction" in order to conclude that Oregon or the United States has a meaningful interest in this litigation.  *Id.*  Oregon clearly has an interest in this lawsuit.  *See Raptor Inc. v. Elanex Pharm. Corp.*, 2000 WL 1617998 at *2 (D. Or. 2000) ("Oregon certainly has an interest in resolving the action filed by its resident … to recover damages caused by the breach of contract"); *see also DiRienzo*, 294 F.3d at 31 (recognizing the United States' interest in actions involving securities transactions conducted "in the United States, by Americans, in American dollars, on American stock exchanges").  For the court to find otherwise would constitute an abuse of discretion.  *Boston Telecomm.*, 588 F.3d at 1212 ("The district court abused its discretion in holding that no "identifiable local interest [exists] in this lawsuit.").

This is not a derivative case.  It is a case by a United States citizen and Oregon resident to

recover a debt owed to him by BP.  The burden is BP's to "make a clear showing of facts which establish such oppression and vexation ... as to be out of proportion to plaintiff's convenience." *Boston Telecomm.*, 588 F.3d at 1212.  BP has failed to make that showing, and its motion must therefore be denied.

## IV.   The District Court of Oregon Has Personal Jurisdiction Over BP.

BP argues that Plaintiff has failed to allege a *prima facie* case of personal jurisdiction over BP and that this court may not exercise general or specific jurisdiction over BP.  BP is wrong.  Plaintiff's Complaint meets the pleading requirements for jurisdiction, and BP's continuous presence in Oregon through its agent, BP America Inc., and BP's other business activities, clearly establish that the District of Oregon has personal jurisdiction over BP.

### A.   Legal Standard

A motion to dismiss for lack of personal jurisdiction is governed by Rule 12(b)(2) of the Federal Rules of Civil Procedure.  "In opposition to a defendant's motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that jurisdiction is proper." *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008) (citation omitted.  In evaluating the defendant's motion, "[t]he court may consider evidence presented in affidavits to assist it in its determination and may order discovery on the jurisdictional issues." *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001) (citation omitted.  If the court decides the motion based on the pleadings and affidavits submitted by the parties without conducting an evidentiary hearing, "the plaintiff need make only a *prima facie* showing of jurisdictional facts to withstand the motion to dismiss." *Id* (quoting *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995)).  The court accepts uncontroverted allegations contained within the complaint as true, and resolves conflicts between statements contained within the parties' affidavits in the plaintiff's favor.  *See id.*

- 25 -

B.    <u>BP's Business Activities and the Continuing Presence in Oregon of BP's General Agent Establish General Jurisdiction</u>

"Where, as here, there is no applicable federal statute governing personal jurisdiction, the district court applies the laws of the state in which the district court sits." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004) (citing Fed. R. Civ. P. 4 (k)(1)(A. Oregon Rule of Civil Procedure 4 extends personal jurisdiction to the extent permitted by federal due process. *Gray & Co. v. Firstenberg Mach. Co.*, 913 F.2d 758, 760 (9th Cir. 1990); *see also* Or. R. Civ. P. 4.  Federal due process jurisprudence requires that, to be subject to the personal jurisdiction of a federal court, a nonresident defendant must have at least "'minimum contacts'" with the court's forum state such that "the exercise of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'" *Schwarzenegger*, 374 F.3d at 801 (*quoting International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

"Presence is a well-established basis for general jurisdiction: an individual who is physically present in a state is subject to the jurisdiction of its courts on any matter." *Bauman v. DaimlerChrysler Corp.*, 644 F.3d 909, 920 (9th Cir. 2011).  Thus, "[f]or general jurisdiction to exist over a nonresident defendant … the defendant must engage in continuous and systematic general business contacts … that approximate physical presence in the forum state." *Schwarzenegger*, 374 F.3d at 801 (*quoting Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984)).

Under principles of agency, BP is deemed to have maintained an actual continuous physical presence in the state of Oregon and is therefore subject to the general jurisdiction of the state and federal courts located in Oregon.  *See Wells Fargo & Co. v. Wells Fargo Exp. Co.*, 556 F.2d 406, 423 (9th Cir. 1977) (parent company may be subject to personal jurisdiction for the acts of subsidiary "if a common law agency is found to exist") (citations omitted); *Sher v.*

*Johnson*, 911 F.2d 1357, 1362 (9th Cir. 1990) ("For purposes of personal jurisdiction, the actions

of an agent are attributable to the principal."). Since at least 2004, BP has continuously held out

BP America as its general agent in the United States.[18]  BP America is the United States holding

company for all BP subsidiary companies operating in the United States.  *See* Gill Decl., Ex. I at

p. 1, and Ex. H at pp. 49-80.  Since at least 2000, BP America has been authorized to transact

business in Oregon and has continuously maintained a registered office and registered agent in

Oregon.  *See* Gill Decl., Exs. L-N; *see also* Or. Rev. Stat. § 60.721 ("Each foreign corporation

authorized to transact business in this state must continuously maintain in this state: (1) A

registered office … and (2) A registered agent ….").  BP America is the United States arm of

BP.  BP America maintains a permanent presence in Oregon, and BP has expressly designated

BP America as its general agent in the United States.  Accordingly, BP should expect to be

called to answer in the Oregon courts when it fails to meet its contractual obligations to Oregon

residents.

      BP America's Oregon contacts would be imputed to BP even without BP's express

declaration of agency.  The Ninth Circuit recognizes an "agency" test for determining whether

there are "necessary contacts to support the exercise of personal jurisdiction over a foreign parent

company by virtue of its relationship to a subsidiary that has continual operations in the forum."

*Bauman*, 644 F.3d at 920.  The test's two-prong inquiry is satisfied where (i) the subsidiary is

---

[18] *See*, *e.g.*, BP 2003 Annual Report (Gill Decl., Ex. K at p. 3) ("Our agent in the USA is: BP
America Inc."); BP 2004 Annual Report (Gill Decl., Ex. K at p. 2) ("Our agent in the USA is: BP
America Inc."); BP 2005 Annual Report (Gill Decl., Ex. K at p. 6) ("Our agent in the USA is: BP
America Inc."); BP 2006 Annual Report (Gill Decl., Ex. K at p. 8) ("Our agent in the US is BP
America Inc."); BP 2007 Annual Report (Gill Decl., Ex. K at p. 15) ("Our agent in the US is BP
America Inc."); BP 2008 Annual Report (Gill Decl., Ex. K at p. 18) ("Our agent in the US is BP
America Inc."); BP 2009 Annual Report (Gill Decl., Ex. K at p. 20) ("Our agent in the US is BP
America Inc."); BP 2010 Annual Report (Gill Decl., Ex. K at p. 22) ("Our agent in the US is BP
America Inc.").

sufficiently important that "the actions of the subsidiary can be understood as a manifestation of the parent's presence," *id*. at 921, and (ii) the parent has "the right of control" with respect to the subsidiary, *id*. at 922-23.

The "sufficient importance" inquiry is satisfied where the subsidiary functions as "the incorporated department of its parent," performing functions that the parent "would otherwise have to perform." *Unocal*, F.3d at 928.  In other words, in this case, is BP America sufficiently important to BP that, if BP America went out of business, BP would continue BP America's business activities in the United States either by performing those activities itself, or alternatively performing them through a new representative?  *See Bauman*, 644 F.3d at 920 (asking same). The answer to that question is "Yes".

As explained above, BP America **is** BP in the United States.  A huge business in its own right, BP America is the largest oil and gas producer and one of the largest gasoline retailers in the United States.  Complaint ¶ 14.  It accounts for more than forty percent of BP's fixed assets and more than thirty percent of BP's employees.  Complaint ¶ 14.  These percentages far exceed those found by the Ninth Circuit in *Bauman* to be "critical" to the foreign principal's business operations.  *See Bauman*, 644 F.3d at 922 (American distributor of Mercedes-Benz vehicles was "sufficiently important" where the United States market accounted for 19% of all sales of Mercedes-Benz vehicles worldwide); *Chan v. Society Expeditions, Inc.*, 39 F.3d 1398, 1406 (9th Cir. 1994) (remanding with instructions to consider, among other factors, what percentage of the parent's business came from the subsidiary).  In other words, BP "simply could not afford to be without" its United States operations.  *Bauman*, 644 F.3d at 922.

The second prong of the "agency" test considers whether the parent has "the right of control" with respect to the subsidiary.  *Id*. at 922-23.  The Ninth Circuit has emphasized that the

issue of control must be considered "as part of a test that primarily considers whether the

services are of 'sufficient importance.'" *Id*. at 923.  The amount of control need not rise to the

level of "exercis[ing] control over the operations of the subsidiary on a day-to-day basis in order

to meet the agency test." *Id*. at 923.  Indeed, the parent need not exercise any actual control over

the subsidiary; an agency relationship arises where the parent and the subsidiary merely manifest

their assent to the parent's right to control the subsidiary.  *Id*. at 923 (citing *U.S. v. Bonds*, 608

F.3d 495, 506 (9th Cir. 2010)).

There is no question of BP's right of control with respect to BP America.  BP owns BP

America.[19]  As explained above, BP has expressly designated BP America as its general agent in

the United States.  That agency relationship was evident in a written statement submitted by

Lamar McKay, chairman and president of BP America, to the Senate Committee on Energy and

Natural Resources:

> As Chairman and President of BP America, I am part of an executive team that
> reports directly to our Global CEO, Tony Hayward.  I am BP's lead representative
> in the US and am responsible for broad oversight and connectivity across all of
> our US-based businesses.

Gill Decl., Ex. J at p. 5.  BP's right to control BP America is also evident from BP's exercise of

actual control over BP America in response to the disasters faced by BP America during the past

decade.  For example, BP asserted control over the operations and management of BP America

following the disastrous 2005 Texas City refinery fire:

---

[19] Before 2007 BP directly owned a 100% interest in BP America.  In 2007, BP interposed BP
Holdings North America Limited ("BPHNA"), a company whose sole function is to hold BP's
ownership interest in BP America.  *See* Gill Decl., Ex. Q at pp. 1,13 and Ex. H at p. 49.  BP is
the sole shareholder of BPHNA.  *See* Gill Decl., Ex. P at pp. 4-5and Ex. H at p. 49.  The
directors of BPHNA are directors and senior executives of BP.  *See* Gill Decl., Ex. Q at p. 12.
They are not compensated for their services as directors.  *See* Gill Decl., Ex. Q at p. 12.  BPHNA
has no employees.  *See* Gill Decl., Ex. Q at p. 12.

Throughout 2006, BP continued to respond to the 23 March 2005 incident at its Texas City refinery.  BP addressed a number of the factors that contributed to the incident … BP also implemented a number of actions relating to safety and operations, not only at US refineries but also at other facilities worldwide.  These actions include a decision to increase spending to an average of $1.7 billion a year over the next four years to improve the integrity and reliability of US refining assets, the formation of a safety and operations function to focus on operations and process safety across the group, the appointment of a new chairman and president of BP America Inc. and the creation of an advisory board to assist BP America Inc.'s management in monitoring and assessing BP's US operations ….

Gill Decl., Ex. L at p. 10 (BP 2006 Annual Report).  The level of control actually exercised by

BP over the internal affairs of BP America leaves no doubt regarding BP America's agent status.

*See*, *e.g.*, *Acorn v. Household Intern., Inc.*, 211 F.Supp.2d 1160, 1166 (N.D. Cal. 2002) (parent's

control over subsidiary's internal affairs indicative of agency) (citing *Kramer Motors, Inc., v.*

*British Leyland, Ltd.*, 628 F.2d 1175 (9th Cir. 1980)); *In re Phenylpropanolamine (PPA) Prod.*

*Liab. Litig.*, 344 F.Supp.2d 686, 694-95 (W.D. Wash. 2003).[20]

C.    Plaintiff's Complaint Satisfies the Pleading Requirements for Jurisdiction

Contrary to BP's reliance on Oregon state law in its motion to dismiss, the Federal Rules

of Civil Procedure and federal case law dictate the pleading requirements in this case.  Plaintiff

filed this case in the District of Oregon and met the requirements for federal court jurisdiction:

the aggregate claims of the putative class members exceed $5 million, and Plaintiff is a resident

---

[20] A finding of general and specific jurisdiction is also warranted by BP's decision to issue its ADS shares pursuant to the Deposit Agreement and to register and list its shares on the NYSE, actions taken specifically to access the capital markets of Oregon and the rest of the United States.  A court may exercise "specific jurisdiction where the suit arises out of or is related to the defendant's contacts with the forum and the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1169 (9th Cir. 2006) (internal quotation and citation omitted); *see also Ruston Gas Turbines, Inc.*, 9 F.3d at 418-19 ("A state exercises 'specific jurisdiction' over a non-resident defendant when the lawsuit arises from or relates to the defendant's contact with the forum state.").

of a different state than BP.  *See* 28 U.S.C. § 1332(d)(2); Complaint ¶ 10.  Therefore, federal

pleading standards apply, and BP's citations to Oregon state law are inapposite.

Rule 8(a)(1) states that a claim for relief must contain "a short and plain statement of the

grounds for the court's jurisdiction."  Fed. R. Civ. P. 8(a)(1).  This Rule was enacted to eliminate

"the archaic system of fact pleading found in the state codes of pleading applied by the federal

courts under the 1872 Conformity Act.  Today, the only function left to be performed by the

pleadings alone is that of notice."  *Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832,

839 (9th Cir. 2007) (citation and quotation marks omitted).  Courts are to construe pleadings

liberally "so as to do justice," and Rule 8(a)(1) requires only that the complaint "gives the

defendant sufficient notice of the court's jurisdiction."  *Id.*; *see also Seal Source, Inc. v.

Calderon*, 2009 WL 2762047, at *1 (D. Or. 2009) (same).

Plaintiff's Complaint satisfies the requirements of Rule 8(a)(1).  In the section entitled

"Jurisdiction and Venue", the Complaint sets forth the basis for the court's original jurisdiction

over the subject matter of this action: "[T]he aggregate claims of the putative Class members

exceed $5 million, exclusive of interest and costs, and [P]laintiff is a resident of a different state

than BP."  Complaint ¶ 10.  It explains that "[v]enue is proper in this district pursuant to 28

U.S.C. § 1391 because BP is subject to personal jurisdiction here and a substantial part of the

events giving rise to the claims occurred in this district."  Complaint ¶ 12.  The Complaint also

sets forth a "short and plain statement" describing the basis for the court's personal jurisdiction

over BP.  It alleges that "BP operates through … its designated agent … BP America, Inc., a

Delaware corporation registered and authorized to conduct business in the state of Oregon,"

Complaint ¶ 14, and explains that "[t]his Court has personal jurisdiction over BP pursuant to

Rule 4(k)(1)(a) of the Federal Rules of Civil Procedure because BP is subject to the jurisdiction of the courts of general jurisdiction in this district," Complaint ¶ 11.

The sufficiency of Plaintiff's Complaint with respect to pleading personal jurisdiction is underscored by the Ninth Circuit's recent decision in *Fiore v. Walden*, --- F.3d ---, 2011 WL 4014311 (9th Cir. 2011). In that case, two airline passengers, who were temporarily in the Atlanta airport changing planes and were carrying a large amount of money, had their funds seized by federal law enforcement officers. *Id*. at *1. The passengers, whose funds were legal gambling proceeds, not evidence of drug transactions, sued the officers in the District of Nevada, where the passengers were traveling at the time of the seizure and where they lived at least part-time. *Id*. Considering the officers' challenge to personal jurisdiction in Nevada, the Ninth Circuit explained:

> We will draw reasonable inferences from the complaint in favor of the plaintiff where personal jurisdiction is at stake, and will assume credibility. This approach is in line with the pleading standard set forth by the Supreme Court in *Ashcroft v. Iqbal,* --- U.S. ---, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). *See id.* at 1949 ("A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

*Id*. at *5. The Ninth Circuit concluded that the plaintiffs had established that the District of Nevada had personal jurisdiction over the officers because the officers had purposefully directed their activities at residents of the chosen forum. *Id*. at *6. The court's conclusion rested on reasonable inferences drawn from "key facts in the complaint," including the plaintiffs' statements of residency, the allegation that they maintained residences in Las Vegas to which they were returning, and the allegation that their funds were legitimate proceeds of their gambling trade. *Id*.

Because Plaintiff's Complaint contains three "short and plain statement[s] of the grounds for the court's jurisdiction" and sufficient facts to allow reasonably drawn inferences "in favor of

the plaintiff where personal jurisdiction is at stake," Plaintiff respectfully submits that the Complaint sets forth a *prima facie* case for personal jurisdiction over BP.  .

## CONCLUSION

BP's motion under Rule 12(b)(6) is not directed to the allegations in the Complaint. Instead it attacks on the merits,  wrongly asserting that BP's directors could not have declared a dividend.  BP fails to satisfy its heavy burden with respect to its motion to dismiss on forum non conveniens grounds.  This is an action brought by an American citizen and Oregon resident to recover a debt arising under New York law relating to securities trading on an American exchange, and the fact that issues of English law may come into play does not allow the court to deny Plaintiff his choice of forum.  Finally, BP maintains a continuous presence in Oregon through its designated general agent, BP America, thereby subjecting itself to the general jurisdiction of the state and federal courts located in the state.  Accordingly, and for the reasons set forth in this memorandum, the complaint, and the supporting declarations, BP's motion to dismiss should be denied.

DATED this 26th day of October, 2011.

OF COUNSEL

Mark W. Collmer
Texas State Bar No. 04626420
Collmer Law Group
1221 Lamar, Suite 1302
Houston, TX 77010
Telephone:     (713) 337-4040
Facsimile:     (713) 337-4044
Email:          mark@collmerlawcom

Respectfully submitted,

STOLL STOLL BERNE LOKTING &
SHLACHTER P.C.


By:  /s/ Jacob S. Gill
**Steve D. Larson** (pro hac vice)
Email: slarson@stollberne.com
**Keith A. Ketterling** (pro hac vice)
Email:  kketterling@stollberne.com
**Jennifer S. Wagner** (pro hac vice pending)
Email:  jwagner@stollberne.com
**Jacob S. Gill** (pro hac vice)
Email:  jgill@stollberne.com
209 S.W. Oak Street, Fifth Floor
Portland, Oregon 97204
Telephone:     (503) 227-1600
Facsimile:     (503) 227-6840

*Attorney-in-Charge for Plaintiff*

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Plaintiff Robert R. Glenn's

Memorandum in Opposition to Defendant BP's Motion to Dismiss the Class Action Complaint.

has been served through the Court's electronic filing and notification system on October 26,

2011.

                                       /s/ Jacob Gill
                                       Jacob Gill