**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re BP p.l.c. Securities Litigation | No. 4:10-MD-02185 |
| Robert R. Glenn, | No. 4:11-cv-02941 |
| Plaintiff, | |
| v. | Honorable Keith P. Ellison |
| | JURY TRIAL DEMANDED |
| BP p.l.c., | **ORAL ARGUMENT REQUESTED** |
| Defendant. | |

**PLAINTIFF'S APPENDIX OF CITED AUTHORITIES REFERENCED IN
PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

| AUTHORITIES | TAB |
|---|---|
| Gower & Davies, PRINCIPLES OF MODERN COMPANY LAW (8th ed. 2008) | 1 |
| PALMERS COMPANY LAW at § 2.1101 | 2 |
| PALMERS COMPANY LAW at § 9.710 | 3 |
| PALMERS COMPANY LAW at § 9.715 | 4 |
| *Inland Revenue Commissioners v. Laird Group plc* [2003] 1 W.L.R. 2476 | 5 |
| *Industrial Equity Ltd. v. Blackburn* (1977) 137 CLR 567, 571-72 | 6 |
| *Revenue & Customs Comm'rs v. Holland* [2011] Bus.L.R. | 7 |

{SSBLS Main Documents\8127\001\00323226-1 }

Page 1 - PLAINTIFF'S APPENDIX OF CITED AUTHORITIES

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

| **AUTHORITIES** | **TAB** |
|---|---|
| NYSE Listed Company Manual § 204.12 | 8 |
| NYSE Listed Company Manual § 703.02 | 9 |

DATED this 26th day of October, 2011.

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.

By:  /s/ Jacob S. Gill
 **Steve D. Larson**, OSB No. 863540
 Email: slarson@stollberne.com
 **Keith A. Ketterling**, OSB No. 913368
 Email: kketterling@stollberne.com
 **Jennifer S. Wagner**, OSB No. 024470
 Email: jwagner@stollberne.com
 **Jacob S. Gill**, OSB No. 033238
 Email: jgill@stollberne.com
209 S.W. Oak Street, Fifth Floor
Portland, Oregon 97204
Telephone: (503) 227-1600
Facsimile: (503) 227-6840

Attorney for Plaintiff

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

# TAB 1

# GOWER AND DAVIES'

# PRINCIPLES OF

# MODERN COMPANY LAW

## EIGHTH EDITION

### By

## PAUL L. DAVIES, Q.C. (hon), F.B.A.

*Cassel Professor of*
*Commercial Law*
*London School of Economics*
*and Political Science*
*Honorary Bencher of Gray's Inn*

with contributions from

## SARAH WORTHINGTON

*Barrister*
*Professor of Law at the*
*London School of Economics and*
*Political Science*

and

## EVA MICHELER

*Senior Lecturer in Law*
*London School of Economics and*
*Political Science*
*Ao Universitätsprofessor*
*Wirtschaftsuniversität Wien*

**SWEET & MAXWELL**           **THOMSON REUTERS**

First Edition .................................................................................................1954
Second Edition.............................................................................................. 1957
    *Second impression* ..............................................................................1959
    *Third impression*.................................................................................. 1961
    *Fourth impression*................................................................................ 1963
    *Fifth impression* ..................................................................................1965
    *Sixth impression*................................................................................... 1967
    *Seventh impression*............................................................................... 1968
Third Edition................................................................................................ 1969
Fourth Edition.............................................................................................. 1979
    *First Supplement* .................................................................................1980
    *Second Supplement*............................................................................... 1988
Fifth Edition................................................................................................. 1992
    *Second impression*................................................................................ 1994
Sixth Edition................................................................................................ 1997
Seventh Edition............................................................................................ 2003
    *Second impression*................................................................................ 2005
    *Third impression*.................................................................................. 2007
Eighth Edition.............................................................................................. 2008

Published in 2008 by Thomson Reuters (Legal) Limited
(Registered in England & Wales, Company No 1679046. Registered Office
and address for service: 100 Avenue Road, London, NW3 3PF)
trading as Sweet & Maxwell
*www.sweetandmaxwell.co.uk*

Reprinted in the UK by CPI William Clowes
Beccles NR34 7TL

No natural forests were destroyed to make this product, only farmed
timber was used and replanted.

British Cataloguing in Publication Data

A CIP catalogue record for this book
is available from the British Library

ISBN: 9780421949003

All rights reserved. Crown copyright material is reproduced with the
permission of the Controller of HMSO and the Queen's Printer for
Scotland.

No part of this publication may be reproduced or transmitted, in any form
or by any means, or stored in any retrieval system of any nature, without
prior written permission, except for permitted fair dealing under the
Copyright, Designs and Patents Act 1988, or in accordance with the terms
of a licence issued by the Copyright Licensing Agency in respect of
photocopying and/or reprographic reproduction. Application for
permission for other use of copyright material including permission to
reproduce extracts in other published works shall be made to the
publishers. Full acknowledgment of author, publisher and source must be
given.

©
Thomson Reuters (Legal) Limited
2008

above, in recent years the Law Commissions (English and Scottish) have also played an important part in company law reform. In the long term, however, the CLR was unconvinced that periodic, ad hoc, comprehensive reviews of the type it had undertaken were the best way forward, because they depend so heavily upon governmental commitment to devote the necessary resources to the exercise. It recommended instead that a standing Company Law and Reporting Commission should have the remit of keeping company law under review and reporting annually to the Secretary of State its views on where, if anywhere, reform was needed. In addition, the Secretary of State would be obliged to consult the Commission on proposed secondary legislation.[44] In this way, it was hoped, company law reform would become a continuing and expert process, so that less weight would need to be placed on ad hoc, across-the-board reviews. However, the Government rejected the proposal for a standing Commission.[45]

## THE COMPANY'S CONSTITUTION

### The significance of the constitution

3–10     A remarkable feature of British company law is the extent to which it leaves regulation of the internal affairs of a company to the company itself through rules laid down in its constitution and, in particular, in its articles of association. In fact, the principle is that the articles may deal with any matter which is not, or to the extent that it is not, regulated through any of the sources mentioned above. This is not stated explicitly in the Act, but is rather an assumption upon which the Act is drafted, too obvious to be worth stating. However, the crucial point is not just the formal relationship between the articles and the other sources of company law, especially the Act, but the extent to which substantive matters, central to the company's operation, are left to be regulated by the articles. Examples of important matters which are regulated mainly by the articles are the division of powers between the shareholders and the board of directors, and the composition, structure and operation of the board of directors.[46] Many jurisdictions regulate these matters through their companies legislation, rather than the company's constitution, and this is true of systems as otherwise different as those of Germany and the United States.[47]

---

[44]  Final Report I, para.5.22.
[45]  Modernising, I, pp.48–49.
[46]  For listed companies, the Combined Code has now begun to trespass upon the autonomy of the company. See below, Ch.14.
[47]  See for Germany the *Aktiengesetz*, Pt Four, subdivisions One and Two, and for the United States, the Model Business Corporation Act, Ch.8.

In the American case, however, the legislation often uses default rules, which can be changed by appropriate provisions in the company's constitution, so that, where this is the case, the shareholders can ultimately adopt the set of rules they want, as is the case in Britain. For example, paragraph 8.01 of the Model Business Corporation Act gives a broad management power to the board of a US company, but allows the shareholders, in the constitution or by shareholder agreement, to cut down that provision if they wish and allocate decisions to themselves; whereas the directors of a British company have management powers only to the extent that they are given to the board by the articles (as, normally, they are).[48] The ultimate division of powers between board and shareholders, in similar types of company, may thus be equivalent in the two countries. Nevertheless, since the shareholders control the constitution (see below) the British approach can be said to represent the view that the shareholders constitute the ultimate source of managerial authority within the company and that the directors obtain their powers by a process of delegation from the shareholders, albeit a delegation of a formal type which, so long as it lasts, may make the directors the central decision-making body on behalf of the company.[49] By contrast, the German and, even, the American approach can be said to be based on the principle that the allocation of powers to the organs of the company is the result of a legislative act, even if, within limits, the shareholders may alter the initial legislative allocation.

The importance of the articles of association in the British scheme is perhaps reflected in the provisions in the Act authorising the Secretary of State to promulgate model articles of association for companies of different types[50] and, in particular, in the default status conferred upon the statutory models.[51] This power is of long standing and under it have been issued from time to time lettered "tables" of model articles, that for companies limited by shares being invariably "Table A". Many companies exist whose articles are based on the Table A of 1985 or the earlier one of 1948 or, conceivably, even earlier versions. The current statutory instrument creating the models[52] has abandoned the device of denoting the models by lettered tables, but the Act and the statutory instrument in fact demonstrate that an even greater importance is now placed on the models. Following the CLR,[53] the present Act gives the power to produce sepa-

---

[48] See the (draft) model articles for public companies, art.2: "Subject to the articles, the directors are responsible for the management of the company's business, for which purpose they may exercise all the powers of the company." The model article for private companies limited by shares is in similar terms.

[49] See below, Ch.14.

[50] s.19.

[51] s.20.

[52] The (draft) Companies (Model Articles) Regulations available on the BERR web-site.

[53] Final Report II, Ch.17.

rate model articles for private and public companies limited by shares (as well as for companies not limited by shares) and this power has been exercised. The model for private companies limited by shares is in Schedule 1 to the draft Regulations and that for public companies in Schedule 3. Given the range of companies falling under the companies legislation, it is surprising that a single model set of articles for companies limited by shares was thought for so long to be adequate.[54]

**3–11**    When a limited company is formed,[55] it will be treated as having adopted the relevant model articles, except to the extent that it chooses to have different articles, either in whole or in part.[56] That choice may be expressed by adopting articles which, in one or more respects, are inconsistent with the model, but the model will still apply to govern matters which are not dealt with in the articles specified by the company, i.e. the model performs a gap-filling role in such a case. If the company wishes to avoid this impact of the model, it must include in its articles an article which specifically excludes the whole of the model. This is sometimes done, but it was in fact common for companies to register articles which, by contrast, explicitly adopted Table A but stated that Table A should operate in relation to the company subject to a list of specific amendments. This meant that the full articles of the company could be established only through the laborious process of taking Table A and applying the specified changes to it, hardly a transparent process. This approach no longer seems permissible, in view of the requirement that the articles "must be contained in a single document".[57] Thus, it appears that the company must deliver to the registrar a complete set of its articles contained within a single document—not a significant burden in these days of electronic word processing. However, saying anything about the articles is not obligatory. Those registering the company could say nothing, in which case the model will apply in full.[58] At the other extreme, they could exclude the model entirely and adopt a set of articles which contains very different provisions.

The version of the model which is implied into the company's articles (unless excluded) is that which is extant when the company is formed. The subsequent promulgation of a revised version of the model will not affect companies already registered but only those registered in the future.[59] Hence the fact, noted above, that there are many companies in existence for whom the relevant model is Table A of 1948. For the practitioner, therefore, the replacement of one model

---

[54] Probably the facility of company formation agents in developing their own standard model articles for different classes of company met much of the need in practice.

[55] Whether limited by shares or not; s.8(2) of CA 1985 created a default only in the case of companies limited by shares.

[56] s.20(1).

[57] s.18(3)(a).

[58] s.20(1)(a)—unless there is no model prescribed, in which case it must register articles of association: s.18(2).

[59] s.20(2).

d by shares
power has
y shares is
companies
r the com-
articles for
idequate.⁵⁴
as having
nt that it
irt.⁵⁶ That
e or more
l will still
ie articles
ng role in
he model,
:ludes the
s in fact
contrast,
iperate in
ints. This
hed only
lying the
ipproach
that the
appears
iet of its
t burden
ng any-
:ing the
ipply in
rely and
is.
npany's
ipany is
of the
y those
iere are
:able A
: model

.rd model

e case of

rticles of

by another is not a reason to forget one's learning about the former model.

The aim of the models might be thought to be to reduce the costs faced by those forming companies. Under the British structure the company cannot work effectively without fairly elaborate articles and the models aim to supply that need for those who do not wish, or cannot afford, to work out their own internal regulations.

### What constitutes the constitution?

Unlike its predecessors the 2006 Act defines the company's con-    3–12
stitution.⁶⁰ The term includes the articles of association but is not
limited to them. Also included are "any resolutions or agreements to
which Chapter 3 [of Part 3] applies".⁶¹ Chapter 3 applies to special
resolutions of the shareholders (whether passed as such or by virtue
of unanimous agreement among the members);⁶² any resolution or
agreement of a class of members binding all the members of the class
(for example, a resolution varying class rights);⁶³ any unanimous
resolution or agreement adopted by the members of a class provided
that it would not otherwise be binding on them unless passed by a
particular majority or in a particular manner; and any other resolu-
tion or agreement to which the chapter applies by virtue of any
enactment.⁶⁴ In practice, the most important category is special
resolutions of the shareholders. Thus, it is important to ascertain
whether a particular provision of the Act applies only to the com-
pany's articles or to its constitution more generally. Given its much
reduced legal status, it is not surprising that the memorandum of
association does not feature as part of the company's constitution.⁶⁵

### The legal status of the constitution

The common law tends to classify the rule-books of associations,
whether they are clubs, trade unions, friendly societies or other, as
contractual in nature. The articles of association are no exception to
this principle, though in this case the classification is done by the Act.
Section 33 of the Act provides that "the provisions of the company's
constitution bind the company and its members to the same extent as
if there were covenants on the part of *the company and* of each
member to observe it." The wording of this section can be traced
back with variations to the original Act of 1844 which adopted the



---

⁶⁰ The provisions of the Companies Act 2006 relating to its constitution are scheduled to come into force on October 1, 2009.
⁶¹ s.17.
⁶² See para.15–25.
⁶³ See Ch.19. This could be an ordinary resolution of the class, if it binds all the members of the class.
⁶⁴ s.29.
⁶⁵ For the residual function of the memorandum see para.4–14.

existing method of forming an unincorporated joint stock company by deed of settlement (which did, of course, constitute a contract between the members who sealed it) and merely superimposed incorporation on registration. The 1856 Act substituted the memorandum and articles for the deed of settlement. Unhappily, full account was not taken of the vital new factor (namely that the incorporated company was a separate legal entity) and the words (in the previous versions of the provision) "as if . . . signed and sealed by each member"[66] did not have added to them "and by the company". Thus, the Acts appeared to say that the articles bound only the members, a very odd result since the observance of the "rule-book" is one of the cornerstones of the member's protection against the company (whether it is the directors or a majority shareholder who currently controls the company). This oddity had survived into the modern Acts and would have survived into the 2006 Act, had not the Opposition spokesman in the Commons picked up and pressed the amendment Lord Wedderburn had advanced in the Lords to make the whole matter clear through the simple step of inserting the words italicised above into the provision.[67]

The Company Law Review wondered whether it was any longer appropriate to regard the articles of association as a contract, but in the end decided that the issue did not call for immediate resolution,[68] and the Act in fact retains the contractual approach. What is clear, however, is that the articles constitute a rather particular form of contract, and the peculiarities of that contract need to be noted here.

*(i) The parties to the contract*

**3–14**  In the light of what has just been said, it is now clear that the articles constitute a contract between the company and each member. Further, the contract is enforceable among the members *inter se*. The principal occasions on which this question is likely to be important arise when articles confer on members a right of pre-emption or first

---

[66] The treatment of the articles as a deed has also been removed from the current section, thus removing the consequence that a debt owed by the member to the company was a "specialty" debt, with its special limitation period, rather than an ordinary one. Contrast s.14(2) of CA 1985 and s.33(2) of CA 2006 and *cf. Compania de Electridad de Buenos Aires, Re* [1980] Ch. 146 at 187.

[67] H C Debs, Standing Committee D, Third Sitting, 20 June 2006, cols.87–89—the so-called "Wedderburn-Djanogly" amendment. The Bill as introduced had adopted the old formula despite the fact that the CLR had said that the former provision (s.14 of the CA 1985) was "obscurely drafted . . . [and] clearly cannot just be re-enacted and no one supports that approach" and that "we propose therefore that the replacement for section 14 should make it clear that the constitution confers mutual rights, obligations and powers between the company and its members . . ." (Completing, paras 5.64 and 5.65) Practitioners had long treated the articles as binding as between member and company, although on the basis of only a first instance authority: *Hickman v Kent or Romney Marsh Sheepbreeders Association* [1915] 1 Ch. 881.

[68] Completing, paras 5.68–5.69.

refusal when another member wishes to sell his shares[69] or, more rarely, impose a duty on the remaining members or the directors to buy the shares of a retiring member.[70] A direct action between the shareholders concerned is here possible; and for the law to insist on action through the company would merely be to promote multiplicity of actions and involve the company in unnecessary litigation. Thus, the contract created by section 33 is a multi-party contract, not that this feature in itself distinguishes it from many other types of contract found in the commercial world.

### (ii) The contract as a public document

Although the articles of association have a contractual status, they are clearly more than a private bargain among the company and its members. The company's articles become a public document at the moment of formation, either because the relevant model articles, themselves a public document, will apply or because the company supplies to the registrar for public registration its own articles which amend or even fully replace the statutory model.[71] Publicity of the company's constitution has always been a requirement of British company law and is now in any event a requirement of Community company law.[72] Thus, those who deal with the company have a legitimate expectation that the registered articles represent an accurate statement of the company's internal regulations. From this situation the courts have concluded that standard contract law should be applied to the articles only with certain qualifications. The courts are reluctant to apply to the statutory contract those doctrines of contract law which might result in the articles subsequently being held to have a content substantially different from that which someone reading the registered documents would have understood them to have. Thus, the Court of Appeal has held that articles cannot later be rectified to give effect to what the incorporators actually intended but failed to embody in the registered document, since the reader of the registered documents could have no way of guessing that any error had been made in transposing the incorporators' agreement into the document.[73] Equally, that Court has refused to imply terms into the statutory contract from extrinsic evidence of surrounding circumstances, since that evidence would probably not be known to third parties who would thus have no basis for

**3–15**

---

[69] *Borland's Trustee v Steel* [1901] 1 Ch. 279 (member seeking declaration that rights of pre-emption in articles were valid); *cf. Lyle & Scott v Scott's Trustees* [1959] A.C. 763, HL and see para.27–7.

[70] *Rayfield v Hands* [1960] Ch. 1, where Vaisey J. was prepared to make an order in effect for specific performance.

[71] ss. 9(5)(b) and 14.

[72] Directive 68/151/EEC, [1968] O.J. 41, Art.2(1)(b).

[73] *Scott v Frank F. Scott (London) Ltd* [1940] Ch. 794, CA.

CHAPTER 12

# DIVIDENDS AND DISTRIBUTIONS

THE BASIC RULES ................................ 12–1

DEFINITION OF A DISTRIBUTION ...... 12–4

RELEVANT ACCOUNTS ........................ 12–5
  Interim and initial accounts ................... 12–6

CONSEQUENCES OF UNLAWFUL
DISTRIBUTIONS .................................... 12–8

CONCLUSION ....................................... 12–10

## THE BASIC RULES

**12–1**  The rules on legal capital discussed in the previous chapter have their main impact as a control on the amount a company may pay by way of dividend or other form of distribution to its shareholders. That is to say, these rules set a maximum limit on what may be so distributed. Whether the company chooses to make the maximum distribution permitted by the distribution rules is, in most circumstances, a matter for it. Where a company has substantial distributable profits, it will often not pay them all out to the shareholders but will keep some for re-investment. The legal rules have their bite where the company does in fact hold enough cash to make a dividend but the rules to be discussed in this chapter prevent a distribution at the level the company would desire. The internal procedure which a company has to follow when declaring a dividend is left to the articles of association, but the model articles for both private and public companies limited by shares require both a recommendation from the board and shareholder approval, but with the shareholders not permitted to approve a level of dividend above that recommended by the directors.[1] If the articles, unusually, say absolutely nothing about the mechanism for determining dividends, then on normal principles that decision would rest with the share-

---

[1] Draft model articles for private companies, art.30(2); for public companies, art.69(2).

holders alone. There is no apparent reason why the articles should not give the dividend decision entirely to the directors, though it is rare to do so, and it is thought that that would require very clear words in the articles, i.e. the court would be unlikely to deduce this result from a general grant of management powers to the board.

The inter-relationship between the legal capital rules and the rules on distributions appears most clearly in the rule applicable to public companies and set out in section 831 of the Act.[2] It applies a balance-sheet test for the legality of a distribution. A company must not make a distribution if its net assets (assets minus liabilities) are (or would be after the distribution) less than its called up share capital and undistributable reserves.[3] Its undistributable reserves include its share premium account.[4] Thus, to take a simple example, a company which has issued as fully paid up 200 £1 shares at an issue price of £1.50 will have a share capital of £200 and a value of £100 in its share premium account. Consequently, for such a company it will not be enough to permit a distribution of, say, 10p per share that it has positive net assets of £20, so that it can pay the dividend and still have assets in balance with its liabilities. Instead, it must have positive net assets of £320 before it pays the dividend. The legal capital rules thus lead to greater conservatism in the payment of dividends than would a "bare" net assets test for the legality of dividend payment (which test is obviously not the only potential alternative to the current test). One can also see from this example the significance of the share premium account being classified as an undistributable reserve in domestic law.[5] If, as before 1948, the share premium account were a distributable reserve, the company would need to have positive net assets of only £220 before it made the dividend payment. And had the company chosen to set the par value at 10p (but still issued the shares at the same price, generating a premium of £1.40 per share), it would have needed positive net assets of only £40 before it made the dividend payment.

However, the undistributable reserves include not only the share premium account. Also added is the "capital redemption reserve" which we shall consider in the following chapter.[6] That is created when a company re-purchases or redeems its shares, and it simply replaces the reduction in the share capital account which the re-purchase or redemption brings about. In other words, the capital redemption reserve operates so as to hold legal capital constant in this situation but it does not increase it. Further, there is added any

---

[2] The rule is derived from Art.15(1)(a) of the Second Directive (77/91/EEC).
[3] s.831(1),(2).
[4] s.831(4)(a). On the share premium account see para.11–8.
[5] s.610 and para.11–8.
[6] Below, para.13–3.

### Acting in accordance with the constitution

**16–20**  As we saw in Chapter 3,[65] in contrast to many other company law jurisdictions, the main source of the directors' powers is likely to be the company's articles, and the articles, therefore, are likely also to be a source of constraints on the directors' powers. The articles may confer unlimited powers on the directors, but they are likely in fact to set some parameters within which the powers are to be exercised, even if the limits are generous, as they typically will be. So, it is perhaps not surprising that section 171 contains the obligation "to act in accordance with the company's constitution". However, it should be noted that the term "constitution" goes beyond the articles. It includes resolutions and agreements which are required to be notified to the Registrar and annexed to the articles, notably any special resolution of the company.[66] It also embraces any resolution or decision taken in accordance with the constitution and any decision by the members of the company or a class of members which is treated as equivalent to a decision of the company.[67] Thus, the duty includes an obligation to obey decisions properly taken by the shareholders in general meeting, for example, giving instructions to the directors without formally altering the articles.[68]

This duty was recognised in the early years of modern company law and is reflected in a number of nineteenth-century decisions, usually involving the purported exercise by directors of powers which were ultra vires the company[69] or payments of dividends or directors' remuneration contrary to the provisions in the company's articles.[70] The directors break this duty if they act in fact in breach of the requirements of the company's constitution; it is not necessary that they should be shown to be subjectively aware of the unconstitutional nature of their actions.[71] In other words, directors are under a duty to acquaint themselves with the terms of the company's articles and to abide by them. Moreover, this is one of the situations where the trust

---

[65] See above, para.3–10.

[66] ss.17 and 29–30.

[67] s.257.

[68] As we saw at para.14–4 under the draft model articles the shareholders by special resolution may give directors instructions as to how they should conduct the management of the company, even in areas where the articles confer managerial powers upon the directors.

[69] *Lands Allotment Company, Re* [1894] 1 Ch. 616, CA. On ultra vires see above at paras 7–2ff.

[70] *Oxford Benefit Building and Investment Society, Re* (1886) 35 Ch. D. 502 (an early example of a company's accounts recognising profits which had not been earned); *Leeds Estate Building and Investment Company v Shepherd* (1887) 36 Ch. D. 787. It might be said that the requirement upon the directors to repay the dividends was based on the illegality of their payment as a matter of statute or common law, but the directors were also required to repay their remuneration, the payment of which was objectionable only because it was done in breach of the company's articles. (The articles entitled the directors to remuneration only if dividends of a certain size were paid, a rule which, perhaps naturally, encouraged the directors not to be too careful about observing the restrictions on their dividend payment powers.)

[71] See the cases cited in fn.70.

# TAB 2



UK PALMER 2.1101                                                                                                   Page 1
**(Publication page references are not available for this document.)**

Palmers Company Law from Sweet and Maxwell
Part 2 - Formation of Companies
C. - The Articles of Association
The Articles of Association
Introduction
Copyright (C) Sweet & Maxwell, Ltd.
This material was last updated August 31, 2007

2.1101 - Introduction

2.1101

 The articles of association are the second, and by far the most significant, of the company's constitutional documents. A company, whether private or public, limited or unlimited, and whether limited by shares or by guarantee must have articles of association prescribing regulations for the company (s.18(1)). These articles may be "bespoke", in the sense that they are drafted specifically so as to meet the requirements of those forming the company, or, as will be seen below,(FN1) on registration those forming the company may choose to adopt some, or all, of the model articles as prescribed by regulation by the Secretary of State. If articles are registered by those forming the company they must be contained in a single document and must be divided into consecutively numbered paragraphs (s.18(3)).

 (FN1) See PCL para. 2.1102.

END OF DOCUMENT

# TAB 3



Palmers Company Law from Sweet and Maxwell
Part 9 - Accounts, Audit and Dividends
B. - Dividends and Profit
Dividends
Declaration of dividend
Who declares dividend
Copyright (C) Sweet & Maxwell, Ltd.
This material was last updated April 16, 2010

9.710 - Who declares dividend

9.710

The Companies Act 2006 itself does not provide who shall declare dividend and, in particular, does not require the dividend to be declared by the general meeting. It is possible to lay down in the articles that a dividend shall be declared by the directors, and if the company adopts its own articles, excluding the application of Table A, and these articles do not contain provisions relating to the declaration of dividend or clearly exclude the inference that dividend is to be declared in the usual manner, the directors, under their general powers,(FN1) will be entitled to declare a dividend without sanction of the general meeting.

This, however, is not the usual practice. Articles commonly contain provisions on the declaration of a dividend, and it is usual to leave it to the general meeting to sanction or declare the final dividend.

(FN1) See PCL Pts 8.23-8.32.

END OF DOCUMENT

© 2011 Thomson Reuters.

# TAB 4



Palmers Company Law from Sweet and Maxwell
Part 9 - Accounts, Audit and Dividends
B. - Dividends and Profit
Dividends
Declaration of dividend
Shareholder's claim for declared dividend
Copyright (C) Sweet & Maxwell, Ltd.
This material was last updated February 13, 2009

9.715 - Shareholder's claim for declared dividend

9.715

Where a dividend is declared and becomes payable, it is a debt and each shareholder is entitled to sue the company for his proportion.(FN1) Until the dividend is declared and payable, the shareholder has no right to sue. (FN2) Once a dividend has been declared, it is ultra vires to resolve that payment should be postponed.(FN3) Articles commonly exclude any claim for interest on an unpaid dividend.(FN4) If such articles apply interest, it is due (at the judicial rate), not from the commencement of proceedings, but from the date of any decree (interim or final).(FN5)

If there are arrears of declared dividend in the winding up, the sums due are, by virtue of section 74(2)(f) of the Insolvency Act 1986, not deemed to be a debt of the company. This means that a member who competes with a creditor is deferred to the latter until the latter is satisfied. In the final adjustment between the contributories, the sum due on account of a declared dividend may under the same section be taken into account. These rules likewise apply to arrears due to past members, whether these members can still be placed on the B list of contributories or not.(FN6)

(FN1) Severn and Wye and Severn Bridge Railway, Re [1896] 1 Ch. 559.

(FN2) Bond v Barrow Haematite Steel Co [1902] 1 Ch. 353.

(FN3) Doherty v Jaymarke Developments (Prospecthill) Ltd 2001 S.L.T. (Sh. Ct.) 6 affirmed 2001 S.L.T. 75 (Sh. Ct.) (except in relation to the date from which interest should run).

(FN4) Such provisions will be found in art.107 of Table A (1985) and art.122 of Table A (1948) and apply to both interim and final dividends: Doherty v Jaymarke Developments (Prospecthill) Ltd 2001 S.L.T. 75 (Sh. Ct.). Similar provisions are to be found in The Companies (Model Articles) Regulations 2008 (SI 2008/3229), art.74 in Sch.3 for public companies; and art.32 in Sch.1 for private companies limited by shares.

(FN5) Doherty v Jaymarke Developments (Prospecthill) Ltd 2001 G.W.D. 4.149 (Sh. Ct.) (overturning on this point Doherty v Jaymarke Developments (Prospecthill) Ltd 2000 G.W.D. 26.971).

(FN6) Consolidated Goldfields of New Zealand Ltd, Re [1953] Ch. 689.

END OF DOCUMENT

# TAB 5

Westlaw.

[2003] 1 W.L.R. 2476                                                          Page 1
[2003] UKHL 54 [2003] 1 W.L.R. 2476 [2003] 4 All E.R. 669 [2003] S.T.C. 1349 75 T.C. 399 [2003] B.T.C. 385
[2003] S.T.I. 1821 (2003) 100(43) L.S.G. 32 Times, October 23, 2003 Official Transcript [2003] UKHL 54 [2003] 1
W.L.R. 2476 [2003] 4 All E.R. 669 [2003] S.T.C. 1349 75 T.C. 399 [2003] B.T.C. 385 [2003] S.T.I. 1821 (2003)
100(43) L.S.G. 32 Times, October 23, 2003 Official Transcript
(Cite as: [2003] 1 W.L.R. 2476)

[2003] UKHL 54

**\*2476 Inland Revenue Commissioners v Laird Group plc**

House of Lords

Lord Nicholls of Birkenhead, Lord Hoffmann,
Lord Millett, Lord Rodger of Earlsferry, and Lord
Walker of Gestingthorpe

2003 July 23; Oct 16

Revenue—Corporation tax—Advance corpora-
tion tax—Taxpayer company acquiring entire share
capital of another company—Both companies dec-
laring dividends—Franked investment income set off
by taxpayer company against advance corporation
tax—Whether payment of dividend "transaction in
securities"— Income and Corporation Taxes Act
1988 (c 1), ss. 703(2), 709(2)

In June 1990 the taxpayer company acquired
the entire share capital of S Ltd. On 5 December 1990
the taxpayer declared a dividend on its own shares. On
17 December 1990 S Ltd paid an interim dividend to
the taxpayer. That dividend was received by the tax-
payer as franked investment income so that £1m of
advance corporation tax paid by S Ltd could be set off
against the advance corporation tax payable by the
taxpayer on its own dividend. The Board of Inland
Revenue issued a notice under section 703 of
the Income and Corporation Taxes Act 1988 to
counteract the tax advantage obtained by the taxpayer
on the ground that the payment of the dividends by the
taxpayer and S Ltd were transactions in or relating to
securities which were not carried out for bona fide
commercial reasons or in the course of making or
managing investments and had as one of their main
objects the obtaining of a tax advantage. The special
commissioners dismissed the taxpayer's appeal but a
tribunal constituted under section 706 of
the Act allowed the appeal. Lightman J dismissed the
appeal of the Inland Revenue Commissioners but the
Court of Appeal allowed their appeal.

On the taxpayer's appeal—

*Held* , allowing the appeal, that the liquidation
of a company was not in itself "a transaction in se-
curities" within the meaning of section
703(2) so that the distribution of the undistri-
buted profits of the company in liquidation was not a
transaction relating to securities, because neither the
shares themselves nor the rights attached to them were
affected by a payment which merely gave effect to the
shareholders' right to receive what was already theirs
in the proportion which was due to them; that the
position was not materially different if part of the
undistributed profits was paid to the shareholders by
way of dividend while the company was a going
concern; that, whether the company was in liquidation
or continuing to carry on business as a going concern,
the distribution of undistributed profits to shareholders
entitled thereto merely gave effect to the rights at-
tached to the shares; that, since the release of funds
from the liquidator's discretion to retain them for the
purpose of the winding up of the company was not a
transaction in securities, neither was the release of
funds from the directors' discretion to retain them for
the purposes of the undertaking; and that, accordingly,
the dividends paid and received by the taxpayer were
not transactions to which section
703 applied so as to counteract the tax advan-
tage (post, pa-
ras 1 , 2 , 27 —
38 , 42 , 44 —
46 ).

Inland Revenue Comrs v Parker [1966] AC 141,
HL(E) ; Greenberg v Inland Revenue
Comrs [1972] AC 109, HL(E) and Inland
Revenue Comrs v Joiner [1975] 1 WLR 1701, HL(E)
considered .

Decision of the Court of Appeal [2002]
EWCA Civ 576 ; [2002] STC
722 reversed. *2477

**The following cases are referred to in the opinion
of Lord Millett:**

[2003] 1 W.L.R. 2476                                                                        Page 2

[2003] UKHL 54 [2003] 1 W.L.R. 2476 [2003] 4 All E.R. 669 [2003] S.T.C. 1349 75 T.C. 399 [2003] B.T.C. 385
[2003] S.T.I. 1821 (2003) 100(43) L.S.G. 32 Times, October 23, 2003 Official Transcript [2003] UKHL 54 [2003] 1
W.L.R. 2476 [2003] 4 All E.R. 669 [2003] S.T.C. 1349 75 T.C. 399 [2003] B.T.C. 385 [2003] S.T.I. 1821 (2003)
100(43) L.S.G. 32 Times, October 23, 2003 Official Transcript
**(Cite as: [2003] 1 W.L.R. 2476)**

- Borland's Trustee v Steel Bros & Co Ltd [1901] 1 Ch 279
- Greenberg v Inland Revenue Comrs [1972] AC 109; [1971] 3 WLR 386; [1971] 3 All ER 136, HL(E)
- Inland Revenue Comrs v Crossman [1937] AC 26          ;          [1936] 1 All ER 762, HL(E)
- Inland Revenue Comrs v Joiner [1975] 1 WLR 1701; [1975] 3 All ER 1050, HL(E)
- Inland Revenue Comrs v Parker [1966] AC 141; [1966] 2 WLR 486; [1966] 1 All ER 399, HL(E)
- Sheppard v Inland Revenue Comrs (No 2) (1993) 65 TC 724
- Short v Treasury Comrs [1948] 1 KB 116, CA

argument:

**The following additional case was referred to in**
- Farrell v Alexander [1977] AC 59; [1976] 3 WLR 145; [1976] 2 All ER 721, HL(E)

**APPEAL**       from the Court of Appeal

   The taxpayer, Laird Group plc, appealed from a
decision of the Court of Appeal (Sir Andrew Morritt
V-C, Mummery and Longmore LJJ) on 30 April 2002
allowing an appeal by the Inland Revenue Commis-
sioners from a decision of Lightman J who, on 28
February 2001, dismissed the commissioners' appeal
from a decision on 20 January 2000 of a tribunal
constituted under       section 706 of the Income and
Corporation Taxes Act 1988       (Mr Stephen Oliver
QC, Mr A J Ring and Mr Roger White) allowing the

- Andrew Thornhill QC      and      James Henderson       for the taxpayer.
- Michael Furness QC      and      David Ewart      for the commissioners.

LORD NICHOLLS OF BIRKENHEAD

Their Lordships took time for consideration.

   16 October.       **LORD NICHOLLS OF
BIRKENHEAD**

1 My Lords, I have had the advantage of reading in
draft the speech of my noble and learned friend, Lord
Millett. For the reasons he gives, with which I agree, I
would allow this appeal and make the order he pro-
poses.

LORD HOFFMANN

2 My Lords, I have had the advantage of reading in
draft the speech of my noble and learned friend, Lord
Millett. For the reasons he has given, I too would
allow this appeal.

LORD MILLETT

taxpayer's appeal from a decision of the special
commissioners (Mr T H K Everett and Mr P W de
Voil) on 8 February 1999 upholding a notice of as-
sessment issued to the taxpayer on 17 January 1994.
The Court of Appeal granted the taxpayer permission
to appeal.

The facts are stated in the opinion of Lord Millett.

**Representation**

3      My Lords, the question for decision in this
appeal is whether the payment of a dividend in respect
of shares is "a transaction in securities" or "a transac-
tion … relating to securities" within the meaning
of      section 703 of the Income and Corporation
Taxes Act 1988      . The tribunal established un-
der      section 706      of the 1988 Act and
Lightman J held that it is not. The special commis-
sioners and the Court of Appeal held that it
is.      *2478

**The facts**

4 The facts are remarkably simple for a case con-
cerned with tax avoidance. In June 1990 the taxpayer
The Laird Group plc ("Laird") acquired the entire
share capital of Stanton Rubber and Plastics Ltd
("Stanton"). Six months later Laird declared and paid
a dividend of £3,848,000 to its shareholders ("the
Laird dividend"). Shortly afterwards Stanton paid an
interim dividend of £3m to Laird ("the Stanton divi-
dend").

© 2011 Thomson Reuters.

[2003] 1 W.L.R. 2476                                                                                    Page 3
[2003] UKHL 54 [2003] 1 W.L.R. 2476 [2003] 4 All E.R. 669 [2003] S.T.C. 1349 75 T.C. 399 [2003] B.T.C. 385
[2003] S.T.I. 1821 (2003) 100(43) L.S.G. 32 Times, October 23, 2003 Official Transcript [2003] UKHL 54 [2003] 1
W.L.R. 2476 [2003] 4 All E.R. 669 [2003] S.T.C. 1349 75 T.C. 399 [2003] B.T.C. 385 [2003] S.T.I. 1821 (2003)
100(43) L.S.G. 32 Times, October 23, 2003 Official Transcript
**(Cite as: [2003] 1 W.L.R. 2476)**

### The tax consequences

5 Companies pay mainstream corporation tax on their profits. In turn their shareholders are generally liable to income tax under Schedule F on dividends and other distributions which they receive in respect of their shares. At all material times the United Kingdom operated a partial imputation system under which shareholders could use part of the corporation tax for which the company was liable to offset their own liability to income tax on dividends and other distributions which they received from the company. In order to ensure that the credit taken by the shareholders represented tax which the company had actually paid, a company resident in the United Kingdom and paying a dividend to its shareholders was required to pay advance corporation tax in respect of the dividend. The company could set off the amount of advance corporation tax which it paid against its liability to mainstream corporation tax on its profits in the current year or past years. It could also carry any unused balance of advance corporation tax forward and set it off against its liability to mainstream corporation tax in future years.

6 This system penalised companies such as Laird which paid substantial dividends to their shareholders but which earned most of their profits overseas through subsidiaries resident and taxable abroad. They had to pay advance corporation tax in respect of the dividends but were liable to relatively little mainstream corporation tax on their overseas profits because these would already have borne tax abroad. This gave rise to unusable advance corporation tax which fell to be written off against profits.

7 Stanton had accumulated substantial profits on which mainstream corporation tax had been paid. On its acquisition by Laird, Laird and Stanton became members of the same group of companies. Stanton could have elected to pay dividends to Laird under a group election. Had it done so, it would not have been required to account to the Revenue for advance corporation tax in respect of the Stanton dividend. Laird, on the other hand, would have had to pay advance corporation tax on the Laird dividend, but would have insufficient mainstream corporation tax against which the payment could be set off.

8        Stanton therefore did not make a group election. Instead it paid advance corporation tax of £1m on the Stanton dividend and set this sum off against mainstream corporation tax on its profits for the current and past years. Payment of the Stanton dividend thus gave rise to a reduction or repayment of £1m of Stanton's mainstream corporation tax. Laird, for its part, received the Stanton dividend as franked investment income, that is to say a dividend on which advance corporation tax had been paid, and this could be set against Laird's liability to pay advance corporation tax on the Laird dividend. As a result Laird paid £1m        less        by        way        of vance     **\*2479**     corporation tax in respect of the Laird dividend than it would have done if it had not received the Stanton dividend.

### The proceedings

9        In 1993 the Board of Inland Revenue issued a notice under        section 703(3)        of the 1988 Act to counteract the tax advantage which Laird had obtained by arranging to receive payment of the Stanton dividend.        Section 703        enables the Board to take action to counteract a tax advantage which has been obtained in prescribed circumstances in consequence of a transaction in securities or of the combined effect of two or more such transactions. The taxpayer can repel the Board's attack by showing that the transaction or transactions in question were carried out for bona fide commercial reasons or in the ordinary course of making or managing investments and that none of them had as their main object or one of their main objects the obtaining of a tax advantage.

10        The Board alleged that the payments of the Stanton and Laird dividends were transactions in securities which were not carried out for bona fide commercial reasons or in the course of making or managing investments and had as one of their main objects the obtaining of a tax advantage within the meaning of        section 703(1)        of the 1988 Act. Following service of the section 703 notice Laird was assessed to advance corporation tax in a sum of £1m.

11 The special commissioners dismissed Laird's appeal against the section 703 notice and upheld the assessment. They held that each of the dividends was a transaction in securities. Laird asked for the case to be

© 2011 Thomson Reuters

[2003] 1 W.L.R. 2476                                                                                                                          Page 4

[2003] UKHL 54 [2003] 1 W.L.R. 2476 [2003] 4 All E.R. 669 [2003] S.T.C. 1349 75 T.C. 399 [2003] B.T.C. 385
[2003] S.T.I. 1821 (2003) 100(43) L.S.G. 32 Times, October 23, 2003 Official Transcript [2003] UKHL 54 [2003] 1
W.L.R. 2476 [2003] 4 All E.R. 669 [2003] S.T.C. 1349 75 T.C. 399 [2003] B.T.C. 385 [2003] S.T.I. 1821 (2003)
100(43) L.S.G. 32 Times, October 23, 2003 Official Transcript

**(Cite as: [2003] 1 W.L.R. 2476)**

reheard by the tribunal, which held that the declaration and payment of a dividend do not constitute transactions in securities within the meaning of section 703 of the 1988 Act and discharged the assessment. The Revenue appealed by way of case stated to the High Court, where Lightman J upheld the tribunal's decision and dismissed the Revenue's appeal. The Court of Appeal allowed the Revenue's further appeal and reinstated the assessment. Laird now appeals to your Lordships' House.

**The legislation**

12      The narrow issue arising on the appeal is whether the Stanton dividend (which was the dividend which gave rise to the tax advantage which Laird obtained) was "a transaction in securities" within the meaning of section 703 of the 1988 Act. This section forms part of a group of sections (    sections 703 to 710    ) which were first enacted by    section 28 of the Finance Act 1960    . These provisions have been amended from time to time in a number of respects which, with one exception, are not material, and were consolidated by the    Income and Corporation Taxes Act 1970    and again by the 1988 Act. The critical definition of "transaction in securities" which is now to be found in    section 709(2)    of the 1988 Act, however, has not changed over the years. For ease of exposition, I shall refer to the predecessor sections by reference to their counterparts in the 1988 Act.

13      It is not necessary to set out the lengthy and complicated statutory provisions at length. They can be found in the reports of the decisions below. Shortly stated, they enable the Revenue to counteract a tax advantage where (i) there is a transaction in securities (or two or more such transactions); (ii) the transaction or transactions have occurred in one or    *2480    more of the five sets of circumstances mentioned in    section 704    ; and (iii) in consequence of the transaction or the combined effect of two or more such transactions the taxpayer has obtained or is in a position to obtain a tax advantage.

14      These are three separate and independent requirements. The Revenue do not suggest that it is sufficient that the taxpayer has obtained a tax advantage in one of the circumstances described in section 704; he must also be shown to have obtained the tax advantage in question in consequence of one or more transactions in securities. This appears plainly from the structure of the section, from the fact that it is a defence for the taxpayer to show that the transaction or transactions were entered into for bona fide commercial reasons even if the circumstances described in section 704 are present, and from the way in which the courts have stated the issues: see, for ple,    Inland Revenue Comrs v Joiner [1975] 1 WLR 1701    , 1705    e    , per Lord Wilberforce.

15      It is common ground that conditions (ii) and (iii) above are satisfied. The circumstances described in    paragraph A of section 704    occurred because "in connection with the distribution of profits of a company" (Stanton) "the person in question" (Laird) received an abnormal amount by way of dividend and the amount so received was taken into account for the purpose of the application of franked investment income in calculating Laird's liability to pay advanced corporation tax.

16 It is also common ground (i) that the Stanton dividend was of an abnormal amount; (ii) that Laird gained a tax advantage in consequence of the receipt of the Stanton dividend in that the receipt reduced or discharged its liability to pay advance corporation tax; and (iii) that the payment of the Stanton dividend had as one of its main objects the obtaining of a tax advantage. The remaining requirement, on which issue is joined, is whether the payment of the Stanton dividend constituted a transaction in securities. Laird concedes that the acquisition of the share capital of Stanton was such a transaction. But the tribunal found that it was carried out for bona fide commercial reasons and did not have as its main object, or one of its main objects, the obtaining of a tax advantage; and this finding has not been challenged by the Revenue.

17      The expression "transaction in securities" is defined in    section 709(2)    of the 1988 Act as follows:

"(2)... 'transaction in securities' includes transactions, of whatever description, relating to securities, and in particular—(i)the purchase, sale or exchange of securities;(ii)the issuing or securing the issue of, or applying or subscribing for, new securities;(iii)the altering, or securing the alteration of, the rights at-

© 2011 Thomson Reuters.

[2003] UKHL 54 [2003] 1 W.L.R. 2476 [2003] 4 All E.R. 669 [2003] S.T.C. 1349 75 T.C. 399 [2003] B.T.C. 385 [2003] S.T.I. 1821 (2003) 100(43) L.S.G. 32 Times, October 23, 2003 Official Transcript [2003] UKHL 54 [2003] 1 W.L.R. 2476 [2003] 4 All E.R. 669 [2003] S.T.C. 1349 75 T.C. 399 [2003] B.T.C. 385 [2003] S.T.I. 1821 (2003) 100(43) L.S.G. 32 Times, October 23, 2003 Official Transcript

**(Cite as: [2003] 1 W.L.R. 2476)**

tached to securities ..."          The question is whether the payment of a dividend is "a transaction relating to" the shares in respect of which it is paid.

18       I need set out only one further provision which has a bearing on the present issue, viz,        section 703(2)        of the 1988 Act. This was first introduced by the          Finance Act 1962        and is in the following terms:

"(2)          For the purposes of this Chapter a tax advantage obtained or obtainable by a person shall be deemed to be obtained or obtainable by him in consequence of a transaction in securities or of the combined effect of two or more such transactions, if it is obtained          or          obtainable in          *2481          consequence of the combined effect of the transaction or transactions and the liquidation of a company"          This assumes that, whatever else "a transaction in securities" may mean, it does not include the liquidation of a company, for if it did the subsection would be pointless: see          Inland Revenue Comrs v Parker [1975] 1 WLR 1701          , 1708          h          , per          Viscount          Dilhorne          and          p 1712          b          —          f          , per Lord Diplock. Section 703(2) is directed at the perceived lacuna which would otherwise arise where the tax advantage was obtained, not in consequence of two or more transactions in securities, but in consequence of a transaction in securities and a liquidation and would not have been obtained but for the liquidation.

**The authorities**

19       The relevant statutory provisions have been considered by your Lordships' House on three occasions: in          Inland Revenue Comrs v Parker [1966] AC 141          ;          Greenberg v Inland Revenue Comrs [1972] AC 109          ; and          Joiner          . In none of them did the present question fall for decision.

20       In          Parker          a company capitalised a sum standing to the credit of its profit and loss account and applied it in issuing redeemable debentures to its members in proportion to the amounts paid up on their shares. The company subsequently redeemed the debentures at par. The difficulty arose

because the debentures were issued in 1953, long before the enactment of the          Finance Act 1960          , while notice of redemption was not given until 1961. The Finance Act 1960 was not retrospective. The question was whether the redemption and cancellation of the debentures by themselves constituted transactions in securities. The House unanimously held that they did.

21       In          Greenberg          a company created a new class of preferred shares which it issued credited as fully paid to its two shareholders. They sold the shares to a purchaser on terms that the price was to be paid by instalments. Under arrangements made between the parties the company paid dividends on the shares which were paid into the purchaser's bank account. Corresponding sums were then paid out of the bank account to the shareholders in payment of the purchase price for the shares. By this means the shareholders converted dividends, which would have been taxable in their hands, into instalments of the purchase price for their shares, which were not. The problem was again one of timing. The arrangements were made before the enactment of the Finance Act 1960, but the payments were made after it. The Revenue did not contend that the declaration and payment of a dividend by itself was a transaction in securities. Its contentions were more modest. It did not focus its attention on the dividends. It claimed that the payment of the instalments of the purchase price, or the completion of the sale by such payment, was such a transaction. All members of the Committee accepted the Revenue's contention that the contract of sale, which was clearly a transaction in securities, was not carried out until the instalments of the purchase price were paid. Four members of the Committee (Lord Reid, Lord Morris of Borth-y-Gest, Lord Guest and Lord Simon of Glaisdale) also agreed that the payments of the instalments of the purchase price were themselves transactions in          *2482          securities in consequence of which a tax advantage had been obtained. Lord Simon thought that the payments of the dividends were the transactions in securities in consequence of which the tax advantage was obtained. Lord Reid agreed with him but did not rest his conclusion on this ground. Lord Guest was equivocal on this point; while Lord Wilberforce expressly reserved his position.

22       In          Inland Revenue Comrs v Joiner [1975] 1 WLR 1701          the taxpayers entered into

© 2011 Thomson Reuters.

[2003] 1 W.L.R. 2476                                                    Page 6
[2003] UKHL 54 [2003] 1 W.L.R. 2476 [2003] 4 All E.R. 669 [2003] S.T.C. 1349 75 T.C. 399 [2003] B.T.C. 385
[2003] S.T.I. 1821 (2003) 100(43) L.S.G. 32 Times, October 23, 2003 Official Transcript [2003] UKHL 54 [2003] 1
W.L.R. 2476 [2003] 4 All E.R. 669 [2003] S.T.C. 1349 75 T.C. 399 [2003] B.T.C. 385 [2003] S.T.I. 1821 (2003)
100(43) L.S.G. 32 Times, October 23, 2003 Official Transcript
**(Cite as: [2003] 1 W.L.R. 2476)**

a shareholders' agreement which varied the rights attached to their shares in important respects before putting the company into liquidation. The variations were all necessary steps in order to achieve the taxpayers' objective, which was to receive the undistributed profits of the company as surplus assets in the liquidation (and therefore free of surtax) while keeping the business itself in existence. The Court of Appeal held that the liquidation by itself was a transaction in securities. Before your Lordships' House, however, the Revenue did not contend that a straightforward liquidation without any variation of the rights attached to the shares was a transaction in securities, and the House did not hold that it did. All members of the Committee rested their decision on the ground given by Goulding J at first instance, that the variation of rights constituted a transaction in securities and that accordingly the tax advantage was obtained in consequence of the combined effect of a transaction in securities and the liquidation of a company.

23      Both      Parker      [1966]     AC 141     and      Greenberg [1972] AC 109      contain dicta on the question whether the payment of a dividend is a transaction in securities. Opinion was divided in      Greenberg      on the question whether      Parker      compelled the conclusion that a dividend is a transaction in securities. Lord Simon thought that it did, at p 151      g      , while Lord Wilberforce went out of his way to say that it did not, see p 146      e      .      Greenberg      itself has often been assumed to be authority for the proposition that it is: see, for example      Sheppard v Inland Revenue Comrs (No 2) (1993) 65 TC 724      , 744      h      . I respectfully prefer Lord Wilberforce's conclusion. As I have already observed, the point did not arise for decision in any of the cases. Moreover, the dicta in      Parker      and      Greenberg      must be treated with caution, for both cases were decided on the Finance Act 1960 as it stood before the introduction of what has become section 703(2).

24      But the three cases in your Lordships' House contain many valuable and authoritative insights which help to tease out the statutory definition of "transaction in securities" in section 709(2). Lord Reid's speech in      Greenberg      makes it clear that the expression may include a unilateral

transaction, such as the redemption or cancellation of a debenture or payment of a dividend. In      Parker      , at pp 164–165, Lord Hodson said of the words "transactions, of whatever description, relating to securities" that "there could hardly be a wider net connecting transactions and securities".

25      In      Joiner      [1975]  1  WLR 1701      , 1705–1706, Lord Wilberforce summarised the effect of the earlier decisions in two propositions. First:

"Upon      the      enactment      of      the original      section 28 of the Finance Act 1960      it was possible to contend, and it was contended, that this section (and its associated sections) was directed against a particular type of tax avoidance known generally under such descriptions as dividend stripping, asset stripping and bond washing and that the sections and particular expressions used in them, amongst others 'transactions in securities' should be interpreted in the light of this supposed purpose. But this line of argument became unmaintainable after the decisions of this House in      *2483 Inland Revenue Comrs v Parker [1966] AC 141      and      Greenberg v Inland Revenue Comrs [1972] AC 109      "      Despite this the taxpayer was at some pains to resurrect the argument before us. With all due respect, that horse has been dead for nearly 30 years.

26      Secondly:

"we must continue to give to 'transactions in securities' and 'transactions … relating to securities' the widest meaning: we can neither confine these expressions to the instances given in [section 409(2)], nor can we deduce from that enumeration any limitation upon their scope."

**"Transactions in securities"**

27      My Lords, with all respect to those who have argued otherwise in the past, I do not think that there is any room for doubt that, as a matter of ordinary language, the creation, issue, sale, purchase, exchange, redemption and extinguishment of shares or debentures are all "transactions in securities". In each

© 2011 Thomson Reuters.

[2003] 1 W.L.R. 2476                                                                                                    Page 7
[2003] UKHL 54 [2003] 1 W.L.R. 2476 [2003] 4 All E.R. 669 [2003] S.T.C. 1349 75 T.C. 399 [2003] B.T.C. 385
[2003] S.T.I. 1821 (2003) 100(43) L.S.G. 32 Times, October 23, 2003 Official Transcript [2003] UKHL 54 [2003] 1
W.L.R. 2476 [2003] 4 All E.R. 669 [2003] S.T.C. 1349 75 T.C. 399 [2003] B.T.C. 385 [2003] S.T.I. 1821 (2003)
100(43) L.S.G. 32 Times, October 23, 2003 Official Transcript
(Cite as: [2003] 1 W.L.R. 2476)

case the securities themselves are the subject matter of the transaction. But there is also no doubt that the connection between the transaction and the securities may be looser than this. The transaction need not be a "transaction *in* securities"; it may be a "transaction ... *relating to* securities". One example of such a transaction appears in section 709(2)(iii) : "the altering, or securing the alteration of, the rights attached to securities". It is not possible to use this example to deduce the nature of the necessary relationship between the transaction and the securities; but some relationship there must be.

### "Transaction ... relating to securities"

28 I think that there are two indications of the kind of relationship that Parliament had in mind. One is the width of the word "securities". The other is in section 703(2), which shows that Parliament did not regard the liquidation of a company in itself as a transaction relating to its shares.

29 The word "securities" includes not only stocks and shares of every description, including preference shares, but also debentures and unsecured loan notes. It would not be a normal use of language to describe the payment of a fixed dividend in respect of preference shares as a transaction relating to securities; and I would at least pause before attaching such a description to the payment of interest on a debt merely because it was secured by a debenture or unsecured loan note. Neither the debt nor the rights attached to it, which include the right to receive interest payable in respect of it, is affected by the payment in any way. The debt merely provides the measure of the amount to be received by way of interest. The same applies to fixed dividends payable in respect of preference shares.

30 Before the introduction of section 703(2), therefore, the question whether the payment of a dividend on ordinary shares was a transaction relating to securities was a question of some nicety which was never finally resolved. But that section and the assumption which it makes that the liquidation of a company is not such a transaction cast further light on the kind of relationship between the transaction and the security which Parliament had in mind.*2484

31      It can hardly be said that the liquidation of a company does not affect its shares or the rights of the shareholders at all. Any transfer of shares made after the commencement of the winding up is void unless made to or with the sanction of the tor: section 88 of the Insolvency Act 1986 . The company's property is realised and applied in satisfaction of the companies' liabilities and subject thereto is distributable among the shareholders according to their rights and interests in the company: section 107 . After the creditors have been paid in full and the amounts credited as paid up on the share capital have been repaid, the balance in the liquidator's hands represents the undistributed profits of the company. If there is nothing due in respect of any preference shares, these belong to the ordinary shareholders and are distributable to them in proportion to the amounts credited as paid up on their shares. The company is then dissolved.

32 It is not difficult to see why the effect of the liquidation in making the shares non-transferable should not be regarded as a transaction relating to the shares. It is because it is only the right to transfer legal title to the shares which is affected; shareholders remain free to deal with the beneficial interest in their shares. The purpose of making the legal title to the shares non-transferable is merely to freeze the company's register of members at the date of the winding up so that the liquidator can safely deal with the shareholders whose names appear on the register at that date. Taxation is normally concerned with beneficial interests.

33 It is also tolerably clear why the dissolution of the company at the end of the process is not regarded as a transaction in securities. The shares themselves are not extinguished by payment of the amounts due to the shareholders (which may and often does take place by instalments), though since they merely represent a proportionate share of the company they necessarily cease to exist when the company itself does. But the shareholders remain contributories, and if for example further assets are discovered they may petition to have the company restored to the register so that they may share in the proceeds.

34 Accordingly the critical questions are: (i) why is the payment of the undistributed profits of the company to the shareholders in the course of a liquidation not a transaction relating to their shares? and (ii) what

© 2011 Thomson Reuters.

[2003] 1 W.L.R. 2476                                                                    Page 8
[2003] UKHL 54 [2003] 1 W.L.R. 2476 [2003] 4 All E.R. 669 [2003] S.T.C. 1349 75 T.C. 399 [2003] B.T.C. 385
[2003] S.T.I. 1821 (2003) 100(43) L.S.G. 32 Times, October 23, 2003 Official Transcript [2003] UKHL 54 [2003] 1
W.L.R. 2476 [2003] 4 All E.R. 669 [2003] S.T.C. 1349 75 T.C. 399 [2003] B.T.C. 385 [2003] S.T.I. 1821 (2003)
100(43) L.S.G. 32 Times, October 23, 2003 Official Transcript
**(Cite as: [2003] 1 W.L.R. 2476)**

if any is the difference between the payment of the undistributed profits to the shareholders in the course of a liquidation and their distribution to shareholders by way of dividend while the company is a going concern? In both cases the payment to each shareholder is made in respect of his shares.

35      The juridical nature of a share is not easy to describe. It is not a share in the company's undertaking, for the company owns its property beneficially and not in trust for its members: "shareholders are not, in the eye of the law, part owners of the undertaking": see          Short v Treasury Comrs [1948] 1 KB 116          , 122. It is classified as a chose in action, but this merely tells us that it is a species of intangible personal property. It is customary to describe it as "a bundle of rights and liabilities", and this is probably the nearest that one can get to its character, provided that it is appreciated that it is more than a bundle of contractual rights. The most widely quoted definition of a share is that of Farwell J in          Borland's Trustee v Steel Bros & Co Ltd [1901] 1 Ch 279          , 288 which was approved by your Lordships' House in          Inland Revenue Comrs v Crossman [1937] AC 26          . It was usefully          *2485          and in my respectful opinion accurately summarised by Lord Russell of Killowen in his speech (dissenting on the facts) in that case, at p 66:

"It is the interest of a person in the company, that interest being composed of rights and obligations which are defined by the          Companies Act          and by the memorandum and articles of association of the company."          These rights, however, are not purely personal rights. They confer proprietary rights in the company though not in its property. The company is at one and the same time a juridical person with rights and duties of its own, and a res owned by its shareholders: see          Gower's Principles of Modern Company Law          , 6th ed (1997), p 301.

36      The rights of the shareholders in a company are set out in its articles of association. In the case of ordinary shareholders they are normally those described by Lord Wilberforce in          Inland Revenue Comrs v Joiner [1975] 1 WLR 1701          , 1706–1707: "rights to received dividends, if declared, rights to vote, rights in a liquidation to receive a share

of surplus assets after discharge of liabilities"

37 Once realised the assets of a company in liquidation are a distributable fund in the hands of the liquidator, who no longer needs funds with which to carry on its undertaking. After the creditors have been paid and the amounts credited as paid up on the shares have been repaid, the balance is distributable to the ordinary shareholders because it belongs to them, subject only to the liquidator's discretion to retain sufficient funds in his hands to enable him to complete the winding up. The distribution of the undistributed profits of a company in liquidation to its shareholders is not a transaction relating to securities because neither the shares themselves nor the rights attached to them are affected by a payment which merely gives effect to the shareholders' rights; they receive only what is already theirs. Distributions are made to shareholders in respect of the shares, but the shares of the individual shareholder are nothing more than the measure of the proportion of the total which is due to him.

38      In my opinion the position is not materially different if part of the undistributed profits is paid to the shareholders by way of dividend while the company is a going concern. The Court of Appeal seized on the fact that until a dividend, if final, is declared or, if interim, is paid, the shareholders have no right to it:          [2002] STC 722          . Accordingly, the Court of Appeal concluded, the declaration and payment do not merely give effect to pre-existing rights.

39 This proposition merits further examination. If correct, it has the advantage of distinguishing the payment of ordinary dividends from the payment of interest on a debenture or loan note, and the disadvantage of leaving the payment of a preference dividend to depend upon the particular wording of the articles of association in question.

40 The right to receive a dividend does not arise until the conditions laid down in the company's articles of association are satisfied. Any requirement that a dividend must be declared by the directors before the shareholders are entitled to receive it must be found in the company's articles of association: there is nothing in the Companies Acts save an obligation not to pay dividends out of capital. Constraints on the shareholders' rights to receive dividends contained in the articles are self-imposed.*2486

© 2011 Thomson Reuters.

[2003] 1 W.L.R. 2476                                                                                                    Page 9
[2003] UKHL 54 [2003] 1 W.L.R. 2476 [2003] 4 All E.R. 669 [2003] S.T.C. 1349 75 T.C. 399 [2003] B.T.C. 385
[2003] S.T.I. 1821 (2003) 100(43) L.S.G. 32 Times, October 23, 2003 Official Transcript [2003] UKHL 54 [2003] 1
W.L.R. 2476 [2003] 4 All E.R. 669 [2003] S.T.C. 1349 75 T.C. 399 [2003] B.T.C. 385 [2003] S.T.I. 1821 (2003)
100(43) L.S.G. 32 Times, October 23, 2003 Official Transcript
(Cite as: [2003] 1 W.L.R. 2476)

41 In the early days articles of association commonly left the declaration of dividends to the company in general meeting, that is to say to the shareholders themselves. Gradually, however, it became the general practice to require the dividend to be declared by the directors. The change was a response to the increasing separation of ownership and management. The shareholders own the company, but they entrust the management of its undertaking to the directors. To enable the directors to carry out their functions, shareholders give them a discretion to decide how much of the company's funds should be retained to pay creditors and carry on the business and how much can safely be returned to shareholders by way of dividend. By declaring a dividend, the directors effectively release funds due to the shareholders from their power to retain them in the business.

42 Whether the company is in liquidation or continuing to carry on business as a going concern, therefore, the distribution of the undistributed profits of a company to the shareholders entitled thereto merely gives effect to the rights attached to the shares. The funds are released, in the one case from the liquidator's discretion to retain them for the purpose of the winding up, and in the other from the directors' discretion to retain them for the purposes of the undertaking. Given that the former is not "a transaction relating to securities", neither in my opinion is the latter. The relationship between the payment and the shares in respect of which it is paid is the same in both cases.

43 I have reached this conclusion without reference to Hansard; but I am comforted by the fact that it is supported by the explanation given to Parliament by the Attorney General, Sir Reginald Manningham-Buller QC (later Viscount Dilhorne), when introducing what was to become section 28 of the Finance Act 1960. This makes it unnecessary to consider whether it would have been proper to resort to Hansard had the meaning of the expression "transaction ... relating to securities" been incapable of resolution without doing so.

**Conclusion**

44 I would allow the appeal with costs here and below, set aside the decision of the Court of Appeal and the Board's notice under section 703, and discharge the assessment.

LORD RODGER OF EARLSFERRY

45 My Lords, I have had the advantage of reading in draft the speech of my noble and learned friend, Lord Millett. For the reasons he gives in his speech I would allow this appeal.

LORD WALKER OF GESTINGTHORPE

46 My Lords, I have had the advantage of reading in draft the speech of my noble and learned friend, Lord Millett. For the reasons he gives in his speech I would allow this appeal.Appeal allowed with costs in Court of Appeal and House of Lords.

---

| 1. Income and Corporation Taxes Act 1988, s. 703(2) | | : | | see | post, |
| para | 18 | . | S 709(2) | | ; see |
| post, para | | 17 | | . | |

END OF DOCUMENT

© 2011 Thomson Reuters.

# TAB 6

Westlaw.

137 CLR 567                                                                Page 1
1977 WL 166295 (HCA), 137 CLR 567, 17 ALR 575, 3 ACLR 89, 52 ALJR 89, [1977] CLC 40-370
(Cite as: 137 CLR 567)

52 ALJR 89; 17 ALR 575; 3 ACLR 89; [1977] CLC
29,635 (¶40-370); 1977 WL 166295; 52 ALJ 514; 52
ALJ 284

Keywords

Synopsis

Opinions

Stephen J.

Mason J.

Jacobs J.

Murphy J.

Aickin J.

Industrial Equity Ltd. v Blackburn

Industrial Equity Limited and Others Defendants,
Appellants;
and
Blackburn and Others Plaintiffs, Respondents.
On appeal from the Supreme Court of New South
Wales.

22 August 1977; 15 November 1977. Sydney

Stephen , Mason , Jacobs , Murphy and Aickin JJ.

Companies - Dividends - Payable only out of profits -
Holding company - Declaration and payment of div-
idend - Amount of dividend more than profits of
holding company - Profits of group exceeding amount
of dividend - Articles of association - Power to resolve
to pay dividend wholly or in part by distribution of
specific assets - Resolution to distribute assets to some
shareholders and to pay cash to others - Whether au-
thorized by article - Companies Act, 1961 (N.S.W.), s.
376 (1).

Section 376 (1) of the Companies Act, 1961
(N.S.W.) provides that no dividend shall be
payable to the shareholders of any company ex-
cept out of profits.

Held, that profits available for distribution by a
company which is a holding company by way of
dividend are the profits of the holding company
and not the group profits disclosed by the con-
solidated accounts of the holding company and its
subsidiaries.

Per curiam. Although a company may declare a
dividend which is not to be paid or payable to
shareholders until a future date, profits in an
amount necessary to sustain the dividend must
exist in the company at the time the dividend is
declared.

The articles of association of a company empo-
wered the directors to resolve when declaring a
dividend that it be paid wholly or in part by the
distribution of specific assets.

Held, by Stephen, Mason, Murphy and Aickin JJ.,
that the articles did not authorize the directors to
resolve that some shareholders should receive a
dividend in cash and others in specific assets.

Decision of the Supreme Court of New South
Wales (Court of Appeal): Industrial Equity Ltd. v.
Blackburn (1977), 2 A.C.L.R. 421; 40 A.C.L.C.
370, affirmed.

APPEAL from the Supreme Court of New South
Wales.

On 30th October 1975 the board of directors of
Industrial Equity Ltd. ("the Company") declared a
"special distribution" *568 payable partly in cash
and partly by the distribution of fully paid up
shares in Minerva Centre Ltd. The resolution was
subject to a condition that the dividends payable
to members holding less than 400 shares and to
the principal shareholder would be paid wholly in
cash. At the date of the declaration, the amount
required to pay the "special distribution" was

© 2011 Thomson Reuters.

137 CLR 567
1977 WL 166295 (HCA), 137 CLR 567, 17 ALR 575, 3 ACLR 89, 52 ALJR 89, [1977] CLC 40-370
(Cite as: 137 CLR 567)

more than the Company's profits for the year in question, but was less than the amount of the consolidated profit of the group of companies of which the Company was the holding company. Three shareholders applied to the Supreme Court of New South Wales for declarations that the resolution was invalid on the ground (a) that it involved the payment of a dividend otherwise than out of profits, contrary to s. 376 (1) of the Companies Act, 1961 (N.S.W.) and the corresponding provision of the company's articles of association; and (b) that it was not authorized by the articles in that it discriminated against certain shareholders by providing for payment in cash to shareholders with less than 400 shares and to the principal shareholder. The defendants to the action were the Company, its directors and Minerva Centre Ltd. Needham J. made a declaration that the "special distribution" declared by the Company on 30th October 1975 and paid to its shareholders on or about 14th November 1975 was not authorized by its articles of association(1). An appeal by the defendants to the Court of Appeal Division of the Supreme Court (Reynolds, Hutley and Glass JJ.A.) was dismissed(2). They appealed from the judgment of the Court of Appeal Division to the High Court.

A. J. Rogers Q.C., B. A. Beaumont and B. M. James, for the appellants,referred to Consolidated Agencies Ltd. v. Bertram Ltd.(3); In re Jowitt(4); In re Aramayo Francke Mines Ltd.(5).

A. M. Gleeson Q.C. and R. B. S. Macfarlan, for the respondents,referred to Hill v. Permanent Trustee Co. of New South Wales(6); Davis Investments Pty. Ltd. v. Commissioner of Stamp Duties (N.S.W.)(7); Australasian Oil Exploration Ltd. v. Lachberg(8); Potel v. Inland Revenue Commissioners(9); Hoole v. Great Western Railway Co.(10); Wood v. Odessa Waterworks Co.(11);*569 Bond v. Barrow Haematite Steel Co.(12); In re Spanish Prospecting Co. Ltd. (13); Dimbula Valley (Ceylon) Tea Co. Ltd. v. Laurie(14); Payne v. Parker (15).

Cur. adv. vult.

The following written judgments were delivered:-

Nov. 15

Stephen J.

I have had the opportunity of reading the reasons for judgment prepared by my brother Mason. I agree with them and with his dismissal of this appeal.

Mason J.

On the application of the respondents who are shareholders in the appellant Industrial Equity Ltd. ("the Company") the Supreme Court of New South Wales in its Equity Division (Needham J.)(16) made a declaration that "the special distribution" declared by the Company and paid to its shareholders on or about 14th November 1975 was not authorized by its articles of association. An appeal from this decision to the New South Wales Court of Appeal failed(17). Undeterred by their lack of success the appellants appealed to this Court.

In the notice dated 7th October 1975 of the annual general meeting of the Company to be held on 30th October 1975 the only reference to dividends was contained in the following item of business:

> "2. To approve the payment of dividends for the year ended 30th June, 1975."

In the annual report of the Company dated 3rd October 1975, a copy of which was circulated to shareholders with the notice of meetings and copies of the accounts, the respondent Brierley, who was the chairman of the Company, advised that the annual dividend was being maintained at the rate of 15 per cent per annum with interim and final payments of 7&frac12; per cent each, the interim dividend having been paid earlier in the year. The report continued:

> "In addition the Board proposes a special distribution of 1 ordinary share in Minerva Centre Ltd (a subsidiary of the group) for every 4 shares held in Industrial Equity Ltd. In the case of shares held by the parent company or in parcels of less than 400 there will be a cash payment instead at the rate of 35% (17 1/2 cents per Industrial Equity share). The purpose of this distribution is to provide an immediate bonus to shareholders and to enable them to participate directly in

137 CLR 567                                                                                                      Page 3
1977 WL 166295 (HCA), 137 CLR 567, 17 ALR 575, 3 ACLR 89, 52 ALJR 89, [1977] CLC 40-370
(Cite as: 137 CLR 567)

the *570 future development of Minerva
Centre Ltd which intends to develop as an
active property investor."

At a meeting of the Board of Directors of the Com-
pany on 39th October 1975 it was resolved

"that a Dividend payable partly in cash and
partly by the distribution of specific assets,
namely, fully paid up shares of $1 each in the
capital of Minerva Centre Limited, be and is
hereby declared at the rate of 3&frac34;c and
one quarter share in the capital of Minerva
Centre Limited for each share in the com-
pany registered in the name of each Member
at 5 p.m. on the 24th October, 1975 subject to
and upon the conditions following:

1. That such dividend be payable on 14th
November, 1975.

2. That any entitlement to a fraction of a cent
or a fraction of a share in Minerva Centre
Limited shall be disregarded.

3. That to settle difficulties which may arise
in regard to the distribution of shares in Mi-
nerva Centre Limited, the value of such
shares is fixed at 70c per share.

4. That cash payments upon the footing of the
value so fixed be made to Members holding
less than 400 shares in the Company.

5. That a cash payment upon the footing of
the value so fixed be made on shares benefi-
cially owned by the Citizens & Graziers Life
Assurance Company Limited."

Later on the same day the annual general meeting
approved "The declaration of dividends on the basis
adopted by a resolution of the Board of Directors".

At that time the capital of the Company was divided
into shares of 50c each. Citizens & Graziers Life As-
surance Co. Ltd. ("the Assurance Company") benefi-
cially owned more than one-half of the issued capital
of the Company. It was agreed that the amount re-
quired to meet the special distribution, valuing the
shares in Minerva Centre Ltd. at 70c per share, was

$647,500. The amount required to meet the cash div-
idend of 15 per cent for the year was $261,567. Yet the
profit and loss account of the Company for the year
ended 30th June 1975 disclosed a net profit for the
year of $207,492 only, with unappropriated profits
from previous years standing at $106,058, yielding
total unappropriated profits from which dividends
might be declared or paid of $313,550. In the profit
and loss account the interim dividend of 7 1/2 per cent
and the proposed final dividend of 7 1/2 per cent, each
being part of the annual cash dividend of 15 per cent
for the year, were debited against the amount of
$313,550, leaving a balance of $51,983 unappro-
priated profits at 30th June 1975 available to meet the
special distribution. The profit and loss *571 account
made no provision in respect of the proposed special
distribution and it is this circumstance which has
founded the suggestion that the special distribution
was an interim dividend for the year ending 30th June
1976. Clause 3 (i) of the Ninth Schedule to the Com-
panies Act, 1961 (N.S.W.), as amended, requires that
the accounts disclose in respect of the financial year
"the amount of dividends paid during the financial
year and the amount of dividends proposed to be
paid", excluding amounts shown in the accounts of the
previous year as amounts proposed to be paid. For
reasons which I shall express later, the suggestion that
the special distribution was an interim dividend must
be rejected.

In fact the net profit of $207,492 for the year ended
30th June 1975 had been calculated after taking into
account an operating loss of $802,508 and an ex-
traordinary item of profit amounting to $1,010,000
arising from a revaluation of investments in subsidiary
companies.

The attack upon the validity of the special distribution
was made on two grounds:

(a) That it involved the payment of a dividend
otherwise than out of profits, contrary to art. 129
and s. 376 (1) of the Companies Act, 1961
(N.S.W.), as amended; and

(b) That it was not authorized by the articles of
association in that it discriminated against other
shareholders by providing for payment in cash to
the majority beneficial shareholder, there being
no authority for the making of that payment in the
circumstances.

© 2011 Thomson Reuters.

The articles of association vest in the directors, not in the Company in general meeting, the power to declare a dividend. Article 128 provides:

"128. The directors may declare a dividend to be paid to the members according to their rights and interests in the profits and may fix the time for payment."

It is followed by arts. 129 and 130 which are in these terms:

"129. No dividend shall be payable except out of the profits of the Company and no dividend shall carry interest as against the Company.

130. The declaration of the directors as to the amount of the net profits of the Company shall be conclusive."

The directors are also given a power to pay interim dividends by art. 131 which provides:

"131. The directors may from time to time pay to the members such interim dividends as in their judgment the position of the Company justifies and may fix the time for payment."*572

It will be noticed that this is expressed as a power to pay and not as a power to declare interim dividends. There is a well recognized distinction between a power to declare a final dividend and a power to pay an interim dividend. One consequence of the distinction is that although the declaration of a final dividend gives rise to a debt payable by the company to the shareholder immediately or from the date stipulated for payment, a resolution for the payment of an interim dividend does not create such a debt in favour of the shareholder (Potel v. Inland Revenue Commissioners(18)).

Article 134 provides:

"134. The directors when declaring a dividend may resolve that such dividend be paid wholly or in part by the distribution of specific assets and in particular of paid-up shares

debentures or debenture stock of the Company or paid-up shares debentures or debenture stock of any other company or in any one or more of such ways."

As this power is expressed to be given to the directors "when declaring a dividend" it must be taken to refer to the directors' power to "declare a dividend" under art. 128, not to their power to "pay ... interim dividends" under art. 131. This interpretation of art. 134 destroys the appellants' submission that the special distribution can be justified as the payment of an interim dividend. But it should not be thought that this is the only flaw in that submission. There are others. Article 137, to which I shall shortly refer, from which the appellants sought to draw authority for fixing the value for distribution of specific assets and for determining that a cash payment should be made to Minerva Centre Ltd. upon the footing of a value so fixed, does not apply to the payment of an interim dividend. Its area of application is designated by its opening words, "For the purpose of giving effect to any resolution under the three last preceding articles ..." They do not include art. 131.

Indeed, the facts which I have already recited show the submission to be misconceived. The resolution passed by the directors on 30th October was expressed to be for one dividend, payable as to part in cash at the rate of 3&frac34; cents per share and as to the balance by the special distribution. The directors did not seek to draw any distinction between the two elements in the resolution and it is acknowledged that the cash dividend of 7&frac12; per cent was declared for the year ended 30th June 1975 and included in the profit and loss account for the year. Nor did the general meeting draw any distinction between the two when it *573 approved by resolution on the same day. The notice convening the annual general meeting, as I have said, gave notice only in the second item of the intention to approve the payment of dividends for that year and the proposal for the special distribution as outlined in the chairman's report for the year gives no indication that it was intended to be an interim dividend for the succeeding year. And the chairman at the annual general meeting stated that the special distribution was open for discussion under the second item in the notice convening the meeting.

For all these reasons at least the special distribution cannot be sustained as the payment of an interim

© 2011 Thomson Reuters.

137 CLR 567                                                                                        Page 5
1977 WL 166295 (HCA), 137 CLR 567, 17 ALR 575, 3 ACLR 89, 52 ALJR 89, [1977] CLC 40-370
(Cite as: 137 CLR 567)

dividend under art. 131.

Article 134 enables the Company to distribute specific assets in entire or partial satisfaction of a dividend, subject to an appropriate resolution by the directors. There is in my view no warrant for giving it a further significance by reading it as though it authorized the directors to resolve that some shareholders should receive the dividends in cash and others in specific assets. The language of the article contains nothing to indicate that it was directed to such a situation. And we should not assume, in the absence of some indication of intention, that the articles authorize the directors to discriminate as between shareholders in paying or satisfying a dividend. The article has to be read with art. 137. So far my comments have been directed to art. 134 according to its tenor without the added operation given to it by the later provision.

Article 134 is followed by arts. 135 and 136. The first of the two articles gives power to capitalize profits and distribute them as shares or debentures. The second empowers the Company to pay up any unissued shares to be issued to members out of a capital redemption fund arising from redemption of redeemable preference shares. These two articles, together with art. 134, constitute "the last three preceding articles" referred to in art. 137 which goes on to provide:

"137. For the purpose of giving effect to any resolution under the three last preceding articles the directors may settle any difficulty which may arise in regard to the distribution as they think expedient and in particular may issue fractional certificates and may fix the value for distribution of any specific assets and may determine that cash payments shall be made to any members upon the footing of the value so fixed or that fractions of less value than one dollar may be disregarded in order to adjust the rights of all parties and may vest any such cash or specific assets in trustees upon such trusts for the persons entitled to the dividend or *574 capitalised funds as may seem expedient to the directors. Where requisite a proper contract or particulars thereof shall be filed in accordance with the provisions of the Companies Act and the directors may appoint any person to sign such contract on behalf of the persons entitled to the dividend or capitalised fund

and such appointment shall be effective."

It is an essential condition of the power conferred by this article that there should exist a difficulty in regard to the distribution. The provisions give some indications of the kinds of difficulty which are contemplated, as, for example, where on the proposed distribution a shareholder would be entitled to a fraction of a share or a debenture and where shareholders are to receive both specific assets and cash. Here the appellants' difficulty is that there was according to the terms of the special distribution no difficulty which called for the directors to settle it by resolving that the major beneficial shareholder should receive cash. All that appears is that the directors discriminated between that shareholder and other shareholders, at least those holding 400 or more shares in the Company, without assigning any reason for so doing, let alone a reason relating to difficulties inherent in or arising in connexion with the proposed distribution.

The interpretation which I have placed on arts. 134 and 137 is fatal to the special distribution considered either as a dividend for the year ended 30th June 1975 or as an interim dividend for the succeeding year.

Although this conclusion disposes of the appeal, I now turn to the question which arose in relation to art. 129 and s. 376 (1) because it was fully argued. Section 376 (1) of the Companies Act, which is similar to art. 129, provides: "No dividend shall be payable to the shareholders of any company except out of profits or pursuant to section sixty." The reference to s. 60, which relates to payments from the share premium account, may be disregarded. The consequences of a violation of the prohibition contained in sub-s. (1) of s. 376 are set out in sub-ss. (2) and (3). They provide:

"(2) Every director or manager of a company who wilfully pays or permits to be paid any dividend out of what he knows is not profits except pursuant to section sixty-

(a) shall without prejudice to any other liability be guilty of an offence against this Act; and

(b) shall also be liable to the creditors of the company for the amount of the debts due by the company to them respectively to the extent by

© 2011 Thomson Reuters.

137 CLR 567                                                                                                      Page 6
1977 WL 166295 (HCA), 137 CLR 567, 17 ALR 575, 3 ACLR 89, 52 ALJR 89, [1977] CLC 40-370
(Cite as: 137 CLR 567)

> which the dividends so paid have exceeded the profits and such amount may *575 be recovered by the creditors or the liquidator suing on behalf of the creditors.

Penalty: One thousand dollars.

> (3) If the whole amount is recovered from one director or from the manager he may recover contribution against any other person liable who has directed or consented to such payment."

The appellants' case in this Court is that the consolidated accounts for the year ended 30th June 1975 of the group of companies of which the Company was the holding or parent company show that there were available sufficient group profits from which the dividend could be paid. According to these accounts the net profit of the group for the year after making provision for taxation and after making allowance for the proportion of profit due to outside interests and for profits earned prior to acquisition was $1,120,938, an amount well in excess of the dividends declared on 30th October 1975. Moreover, the consolidated accounts showed the existence of unappropriated group profits at the end of the financial year at $5,599,066 after making allowance for the payment of a 15 per cent dividend.

The question then is whether in ascertaining the amount of profits available for distribution by a holding company by way of dividend it is correct to look at the profit of the holding company itself or to the group profit as disclosed by the consolidated accounts. The appellants say that profits in the subsidiaries lie within the disposition of the holding company which may, by virtue of its capacity to control a general meeting of each of its subsidiaries, ensure the distribution of profits to it by declaration and payment of dividends. Consequently, the subsidiaries' profits are effectively the profits of the holding company for the purpose of computing what it may distribute by way of dividend-that is how the argument runs. The appellants also seek to enlist support from s. 162 of the Companies Act on the footing that it requires the preparation and circulation of group accounts, thereby indicating, so it is suggested, that it is to the group profits that one should look for relevant purposes.

But in the end the argument brings us back to the provisions of art. 129 and to s. 376 (1). No doubt s. 376 (1), like art. 129, operates to deny to a company power to make the prohibited payment as it is a statutory expression of a rule, often enshrined as here in the articles, which relates to the powers of a company. The issue is then whether the reference to profits in the article, and for that matter in the sub-section, is a reference to the profits of the holding company that is proposing to declare and pay a dividend or to the profits of the group of which it is a *576 parent. Article 129, unlike s. 376 (1), speaks of "the profits of the Company". However, the appellants do not concede that this excludes the profits of the group, claiming that for relevant purposes the profits of the group are the profits of "the Company".

Although s. 376 (1) does not explicitly identify the source of the profits to which it refers, it should also be understood as referring to the profits of the company which declares and pays the dividend. The sub-section is not a recent innovation. It has a history in Australian company law dating back to s. 48 of the Companies Act 1896 (Vict.), long before consolidated or group accounts became a gleam in the draftsman's eye. It has no statutory counterpart in the United Kingdom, though it is but a reflection of the principle enunciated in the English courts much earlier-see, e.g., Burnes v. Pennell (19); In re National Funds Assurance Co.(20). The principle, which was certainly designed to protect creditors and, I think, shareholders, more particularly where there is more than one class of shareholder in a company, inhibits the payment by way of dividends out of a company's capital. It is founded on the proposition recognized in Trevor v. Whitworth(21) that a reduction of capital can only be effected in accordance with the statutory procedure and that there can be no return of capital except in accordance with that procedure-In re Exchange Banking Co. (Flitcroft's Case)(22). The rule is frequently expressed, as here, in the form of a prohibition against dividends being payable except out of profits.

In this case there is no reason for me to explore all the complexities which have emerged in relation to the application of the rule-whether it refers to the amount of nominal capital which has been paid up (a view on which some of the earlier cases seem to turn) or to assets in which the paid-up capital has been invested (a view on which the later cases appear to proceed), whether the obscure distinction taken between fixed

137 CLR 567                                                                                                          Page 7
1977 WL 166295 (HCA), 137 CLR 567, 17 ALR 575, 3 ACLR 89, 52 ALJR 89, [1977] CLC 40-370
(Cite as: 137 CLR 567)

and circulating capital which lies at the heart of some of the statements (Lee v. Neuchatel Asphalte Co.(23); Verner v. General and Commercial Investment Trust(24); In re National Bank of Wales Ltd.(25): affd. sub. nom. Dovey v. Cory(26); Ammonia Soda Co. Ltd. v. Chamberlain(27)) is correctly taken, and as to what precisely is meant by the word "profits" in this context (see, for example, the discussion in*577 Palmer's Company Law, 22nd ed. (1976), pp. 794 et seq.). It is sufficient to say that in all the cases it has been assumed the principle refers exclusively to the profits of the company declaring and paying the dividend, though, so far as I am aware, in none of the decided cases did it appear that there were profits in subsidiary companies to which the article of association might have been applied. There are, I think, a number of reasons which sustain the accuracy of this assumption.

In the first place, it is a natural consequence of the recognition of the separate personality of each company, a recognition which derives from Salomon v. Salomon & Co. Ltd.(28), and which has been confirmed by Lee v. Lee's Air Farming Ltd.(29). It has been said that the rigours of the doctrine enunciated by Salomon v. Salomon & Co. Ltd. have been alleviated by the modern requirements as to consolidated or group accounts introduced in the United Kingdom by the Companies Act, 1948 and in New South Wales by the Companies Act, 1961 (N.S.W.)-see Gower, Modern Company Law, 3rd ed. (1969), pp. 198-199. But the purpose of these requirements is to ensure that the members of, and for that matter persons dealing with, a holding company are provided with accurate information as to the profit or loss and the state of affairs of that company and its subsidiary companies within the group, information which would not be forthcoming if all the shareholders received was limited to the accounts of the holding company disclosing as assets the shares which it holds in its subsidiaries. It is for this purpose that the Companies Act treats the business group as one entity and requires that its financial results be incorporated in consolidated accounts to be circulated to shareholders and laid before a general meeting (s. 162 (4), s. 164 (1)) and requires that the accounts and other documents shall accompany the annual return which shall be lodged with the Corporate Affairs Commission (s. 158; Eighth Schedule, Pt II).

However, it can scarcely be contended that the provi-

sions of the Act operate to deny the separate legal personality of each company in a group. Thus, in the absence of contract creating some additional right, the creditors of company A, a subsidiary company within a group, can look only to that company for payment of their debts. They cannot look to company B, the holding company, for payment (see Walker v. Wimborne(30)).

The Companies Act does not, in the case of holding companies, substitute the requirement for group accounts for the old *578 requirement of accounts of the holding company itself. Group accounts are an additional requirement; the holding company is still obliged to lay before its shareholders in general meeting its profit and loss account and balance sheets (s. 162 (1) and (3)), containing the information prescribed by the statute and accompanied by the prescribed documents. Indeed, s. 162 in sub-s. (1) and sub-s. (4) draws a distinction between the "profit or loss of the company" and "the profit or loss of the company and its subsidiaries", thereby indicating, to my mind, that s. 376 (1) refers to the profits of the company, not those of the group. The predecessors of s. 376 (1), expressed in like terms, were in force well before the provisions as to group accounts were introduced. There are, of course, even stronger grounds for taking a similar view of art. 129 expressed, as it is, according to a time-honoured formula which originated long before group accounts or groups of companies became part of the company scene.

Underlying the rule that dividends are payable out of profits is the notion that the profits in question have already accrued in the company and that upon the declaration of a dividend by the directors or the company in general meeting there immediately springs into existence, fully armed so to speak, a debt owing by the company to each shareholder (In re Severn and Wye and Severn Bridge Railway Co.(31); Bond v. Barrow Haematite Steel Co.(32); Potel v. Inland Revenue Commissioners(33)). However, it is accepted that a company may declare a dividend which is to be paid or payable to shareholders at some future date. This has evidently inspired the thought that the requirement as to the existence of profits is satisfied if they exist at the time stipulated for payment. It is incorrect. Both the article and the section are to be understood as stipulating that the profits in an amount necessary to sustain the dividend are in existence in the company itself at the time of the declara-

© 2011 Thomson Reuters.

137 CLR 567
1977 WL 166295 (HCA), 137 CLR 567, 17 ALR 575, 3 ACLR 89, 52 ALJR 89, [1977] CLC 40-370
(Cite as: 137 CLR 567)

tion of the dividend. The prohibition is not against dividends being "paid" otherwise than out of profits, but against their being "payable" otherwise than out of profits. The prohibition is certainly directed to the declaration of a dividend-though it is possible that it is also directed to payment-because it is the declaration that creates the right in the shareholder and it is the declaration that reflects the consideration by the directors or shareholders of the accounts and profit situation of the company. The rule has been expressed in the United States in these terms: "... corporations can only declare dividends from *579 earnings, which must be present when the dividend is declared. They cannot be declared in anticipation of earnings." (In re Given's Estate(34)). It has been stated in somewhat less inflexible terms in American Jurisprudence, vol. 19, 2d, s. 826:

> "The theory of a dividend is that it shall be payable only from ... earnings which are or will be ready for actual distribution at a definite date provided for in the resolution declaring the dividend. Generally, the earnings or profits from which dividends are properly payable must be present when the dividend is declared; it cannot ordinarily be declared in anticipation of earnings or on a mere hope or expectation of profits."

It would be productive of confusion and uncertainty if companies were to declare dividends against the possibility that profits not in existence at the time of declaration would or might be earned or received by the time the dividend was paid. In this instance the dividend declared by the Company was for the year ended 30th June 1975. It was therefore a dividend payable out of the accumulated profits of the Company at the end of that year. Any additional receipts by way of dividend or otherwise by the Company from its subsidiaries after the end of the financial year stood to be considered as an element in the Company's profit situation in the succeeding year.

What I have already said disposes of the appellants' contention that the respondents should not succeed because they failed to discharge the onus of demonstrating that profits may have been received by the Company in the form of distributions by subsidiaries before the date of declaration or the date of payment of the dividend. The dividend was in my opinion declared for the year ended 30th June 1975, that is, out of

the profits of the Company as they stood at that date. It has been shown that they were inadequate. Even if profits were earned after that date they were not the source of the dividend which was declared. And in any event the evidence is sufficient to justify the inference that the dividend was declared by the directors and approved by the shareholders on 30th October 1975 exclusively by reference to the materials to which I have referred and that neither the directors nor the shareholders had the advantage of more recent or up-to-date accounts reflecting the profit situation of the Company at a later date, say 30th September 1975.*580

It is common ground that the special distribution, which in my opinion was ultra vires for the reasons already given, is severable from the cash dividend of 15 per cent.

In the event I would dismiss the appeal.

Jacobs J.

I am of opinion that the whole of the special distribution made in mid-November 1975 was invalid and I would dismiss the appeal.

The special distribution needed to be made out of profits earned up to a date which was either the date of the declaration of the special distribution as a dividend or the date of the making of that distribution. I do not find it necessary to decide which of these dates is the relevant one in application of s. 376 (1) of the Companies Act or art. 129 of the company's articles of association and I would prefer not to express a concluded opinion on this question.

I am satisfied that the relevant profits earned must be profits in the company itself, that undistributed profits from subsidiaries cannot as such be taken into account. I do not wish to add anything to the reasons which Mason J. has given for this conclusion.

Next, I would make it clear that the appellants expressly disclaimed any reliance upon the accumulation of profits in subsidiary companies as evidence that the shares in those subsidiaries had additional value, so that, if a revaluation of assets had taken place, there would have been disclosed capital profits with the result that such capital profits could be taken into

© 2011 Thomson Reuters.

137 CLR 567                                                                                          Page 9
1977 WL 166295 (HCA), 137 CLR 567, 17 ALR 575, 3 ACLR 89, 52 ALJR 89, [1977] CLC 40-370
(Cite as: 137 CLR 567)

account even without a revaluation. It was accepted before this court that the reasoning of Buckey J. in Dimbula Valley (Ceylon) Tea Co. Ltd. v. Laurie(35) correctly stated the law.

The question then is–did the respondents who bore the onus of proof establish that there were no profits sufficient to cover the amount of the special distribution? The appellants have submitted that they did not, in that the respondents relied on accounts of the company up to 30th June 1975 and did not establish that profits had not accumulated between that date and the dates of declaration and payment (or distribution) of the dividend. It was submitted that the dividend could be regarded as an interim dividend and might have been made out of profits made or disclosed after 30th June 1975. I am satisfied that the distribution could not be regarded as an interim dividend in respect of the financial year ended 30th June 1976. I agree with the reasons expressed by Mason J. for this conclusion and do not *581 wish to add anything in this respect. Further, I am not satisfied that it would make any difference even if it were. No dividend can be paid except out of profits and the impugned dividend and distribution was in fact paid and made. The application of this requirement is not governed either by accounting periods or the accounting system.

The question is whether there were profits at the relevant time which I shall take to be the time of the payment and the making of the distribution. (If there were not profits at that date then certainly there were not profits at the date, a little earlier, when the dividend was declared and I am therefore content to examine the position at the date of payment and distribution.)

It must be borne in mind that, although the respondents bore the onus, the whole of the information upon the subject matter lay within the knowledge of the appellant company. That being so the burden of proof could be satisfied by such evidence as could support the inference that the special distribution was not a dividend in respect of profits acquired or disclosed subsequently to 30th June 1975. The appellant company could easily have cleared up the misapprehension if the drawing of such an inference was in fact a misapprehension of the true position but it did not do so. The fact that the profits had not been earned or disclosed up to 30th June 1975 carried the respondents some distance towards establishing that they had not

been earned up to the time of the special distribution in mid-November. To this must be added the circumstances of the calling and holding of the annual general meeting. The notice of meeting relevantly gave as an item of business only the approval of the payment of dividends for the year ended 30th June 1975. The annual report dated 3rd October 1975 gave no hint that the special distribution which was described therein was to be made out of profits which had been earned or disclosed since the end of the last accounting period. In these circumstances the inference that they had not been earned or disclosed since the end of that period was certainly open. The failure to make any attempt to rebut it gave it greatly added strength. The course of the hearing before Needham J. when adjournment was granted to enable a revaluation of assets to be made is practically conclusive that there had not been an earlier revaluation. I am therefore of the opinion that the respondents established their case that the special distribution was contrary to s. 376 (1) of the Companies Act and art. 129 of the appellant company's articles of association.

Having come to this conclusion it is not necessary for me to express an opinion on the question whether the company had *582 power to make a discriminatory distribution of cash in respect of the shares beneficially owned by one company only and of shares in Minerva Centre Ltd. in respect of shares held by all other shareholders. I bear in mind that the good faith of the directors and the members in general meeting was not challenged. The question turns upon the construction of arts. 134 and 137 of the articles of association. I am not satisfied that in no circumstances could directors under such articles distribute shares to some shareholder or shareholders and cash to another or others, exercising their powers under art. 137 for that purpose. That being so, I prefer to express no concluded opinion on the question.

Murphy J.

The appeal should be dismissed for the reasons given by Mason J.

Aickin J.

I have had the advantage of reading the reasons for judgment prepared by my brother Mason and am in agreement with them.

I would therefore dismiss the appeal.

Appeal dismissed with costs.

Solicitors for the appellants, Jackson, Heyes & Wilson.

Solicitors for the respondents, Dawson Waldron.

R.A.S.

FN(1) (1976) 2 A.C.L.R. 8; 40 A.C.L.C. 267.

FN(2) (1977) 2 A.C.L.R. 421; 40 A.C.L.C. 370.

FN(3) [1965] A.C. 470.

FN(4) [1922] 2 Ch. 442.

FN(5) [1921] 1 Ch. 675.

FN(6) [1930] A.C. 720.

FN(7) (1958) 100 C.L.R. 392. at p. 406.

FN(8) (1958) 101 C.L.R. 119.

FN(9) [1971] 2 All E.R. 504; (1970) 46 T.C. 658.

FN(10) (1867) L.R. 3 Ch. App. 262.

FN(11) (1899) 42 Ch. D. 636.

FN(12) [1902] 1 Ch. 353.

FN(13) [1911] 1 Ch. 92.

FN(14) [1961] 1 Ch. 353.

FN(15) [1976] 1 N.S.W.L.R. 191.

FN(16) (1976) 2 A.C.L.R. 8; 40 A.C.L.C. 267.

FN(17) (1977) 2 A.C.L.R. 421; 40 A.C.L.C. 370.

FN(18) [1971] 2 All E.R. 504, at pp. 511-512; (1970)
46 T.C. 658, at p. 667.

FN(19) (1849) 2 H.L.C. 497 [9 E.R. 1181].

FN(20) (1878) 10 Ch. D. 118.

FN(21) (1887) 12 App. Cas. 409.

FN(22) (1882) 21 Ch. D. 519, at p. 533.

FN(23) (1889) 41 Ch. D. 1.

FN(24) [1894] 2 Ch. 239, at pp. 266-267.

FN(25) [1899] 2 Ch. 629, at pp. 670-671.

FN(26) [1901] A.C. 477.

FN(27) [1918] 1 Ch. 266, at pp. 286-287; cf. at p. 299.

FN(28) [1897] A.C. 22.

FN(29) [1961] A.C. 12.

FN(30) (1976) 137 C.L.R. 1, at p. 6.

FN(31) [1896] 1 Ch. 559.

FN(32) [1902] 1 Ch. 353, at p. 362.

FN(33) [1971] 2 All E.R. 504; (1970) 46 T.C. 658.

FN(34) (1936) 185 A. 778, at p. 780.

FN(35) [1961] 1 Ch. 353.

(c) Thomson Legal and Regulatory Limited ABN 64
058 914 668

END OF DOCUMENT

# TAB 7


Westlaw.

[2011] Bus. L.R. 111                                                                                                              Page 1
[2010] UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C.
1 [2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript [2010]
UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C. 1
[2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript
(Cite as: [2011] Bus. L.R. 111)

[2010] UKSC 51

**\*111 Revenue and Customs Commissioners v
Holland and another**

Supreme Court

Lord Hope of Craighead, Lord Walker of Ges-
tingthorpe, Lord Collins of Mapesbury, Lord Clarke
of Stone-cum-Ebony, and Lord Saville of Newdigate

2010 July 21, 22; Nov 24

Company—Director—Breach of duty—De facto
director—Companies upon insolvency disclosing
substantial deficiency as to tax liability—Defendant
human director of corporate director of insolvent
companies—Whether defendant to be treated as de
facto director of insolvent companies—Whether liable
for misuse of company's assets—Insolvency Act 1986
(c 45) (as amended by Enterprise Act 2002 (c 40), s 2,
Sch 17, para 18 ), s 212(1)(a)

The defendants operated as their trading company PS
Ltd, of which they were the sole directors, each
holding half the issued share capital. PS Ltd itself held
all the issued share capital of P(DS) Ltd and P(SS)
Ltd, companies which had been incorporated to act as
sole corporate director and company secretary re-
spectively of each of 42 composite companies. The
defendants were the sole directors of P(DS) Ltd and
P(SS) Ltd. The issued share capital in the composite
companies comprised one voting A share, which was
held by PST Ltd, a company of which the defendants
were the sole directors, each holding half the issued
share capital. The composite companies paid regular
dividends to their shareholders, which were calculated
by a software programme on PS Ltd's computer on the
basis of figures entered into the computer by the first
defendant. The computer programme then generated a
document purporting to be a minute of a directors'
meeting of the relevant composite company. Acting
on professional advice, the defendants had specifically
structured the composite companies with the aim of
ensuring that none of them became liable for higher
rate corporation tax ("HRCT"). Initially the revenue
accepted that the composite companies were exempt

from HRCT but in April 2002 they changed their
position. In August 2004 the defendants received
advice from leading counsel that the composite com-
panies were liable to pay HRCT. Between April 2002
and August 2004 and thereafter until the companies
went into liquidation in October 2004 dividends con-
tinued to be paid on the assumption that the composite
companies would only be liable for small companies
corporation tax. Consequently, there was a substantial
deficiency in the liquidation of each of the composite
companies in respect of the HRCT liability. The rev-
enue issued proceedings under section 212 of the
Insolvency Act 1986 , as amended 1 , contending that
the defendants had been de facto directors of the
composite companies and that, by causing them to pay
dividends without making provision for liabilities,
they were guilty of misfeasance and breach of their
directorial duties and that, in those circumstances, the
dividends were unlawful distributions which, subject
to relief, the defendants were liable to repay. The
judge found that the first defendant (though not the
second) had been a de facto director of the composite
companies and, as such, was liable, as from a date
shortly after the receipt of leading counsel's advice, for
the continued unlawful payment of dividends without
making provision for HRCT. On the first defendant's
appeal, the Court of Appeal held that, although there
might be circumstances in which the human director
of a corporate director could so act as to cause himself
to be regarded \*112 as a de facto director of the sub-
ject company, something more would be required than
the mere performance by him of his duties as a de jure
director of the corporate director and it allowed the
appeal on the ground that, on the facts, the first de-
fendant was not a de facto director of the composite
companies.

On the revenue's appeal—

*Held* , dismissing the appeal (Lord Walker of Ges-
tingthorpe and Lord Clarke of Stone-cum-Ebony JJSC
dissenting), that the question whether the first defen-
dant was acting as de facto director of the composite
companies, so as to impose on him fiduciary duties in
relation to those companies, must be approached on
the basis that the corporate director of the composite
companies and the first defendant were in law separate

[2011] Bus. L.R. 111                                                                                          Page 2
[2010] UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C.
1 [2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript [2010]
UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C. 1
[2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript
(Cite as: [2011] Bus. L.R. 111)

persons, each with their own separate legal personal-
ity; that the mere fact of acting as a director of a cor-
porate director of a company was not enough to make
an individual a de facto director of that company; that,
so long as the first defendant's acts were entirely
within the ambit of the discharge of his duties and
responsibilities as a director of the corporate director,
it was to that capacity that his acts had to be attributed;
and that since, on the facts, the first defendant had
done no more than discharge his duties as the director
of the corporate director of the composite companies,
he had not acted as de facto director of the composite
companies so as to make him responsible for the mi-
suse of their assets (post, paras 25, 39–43, 52, 53, 93,
94–96, 97–100).

approved .

Salomon v A Salomon & Co Ltd [1897] AC 22, HL(E)
applied .

Lo-Line Electric Motors Ltd, In re [1988] Ch 477 and
In re Kaytech International plc [1999] 2 BCLC 351,
CA considered .

Decision of the Court of Appeal [2009] EWCA Civ
625 ; [2010] Bus LR 259 ; [2009] STC 1639 ; [2009] 2
BCLC 309 affirmed .

The following cases are referred to in the judgments:

In re Hydrodam (Corby) Ltd [1994] 2 BCLC 180
*   Bairstow v Queens Moat Houses plc [2001] EWCA Civ 712; [2001] 2 BCLC 531, CA
*   Belmont Finance Corpn v Williams Furniture Ltd (No 2) [1980] 1 All ER 393, CA
*   Bulawayo Market and Offices Co Ltd, In re [1907] 2 Ch 458
*   Canadian Land Reclaiming and Colonising Co (Coventry and Dixon's case) (1880) 14 Ch D 660, CA
*   Chameleon Mining NL v Murchison Metals Ltd [2010] FCA 1129
*   Channel Collieries Trust Ltd v Dover, St Margaret's & Martin Mill Light Railway Co [1914] 2 Ch 506, CA
*   City Equitable Fire Insurance Co Ltd, In re [1925] Ch 407, CA
*   County Life Assurance Co, In re (1870) LR 5 Ch App 288
*   County Marine Insurance Co, In re (Rance's case) (1870) LR 6 Ch App 104
*   Daido Asia Japan Co Ltd v Rothen [2002] BCC 589
*   Dovey v Cory [1901] AC 477, HL(E)
*   Eurostem Maritime Ltd, In re [1987] PCC 190
*   Exchange Banking Co, In re (Flitcroft's case) (1882) 21 Ch D 519, CA
*   Fayers Legal Services Ltd v Day (unreported) 11 April 2001 , Patten J
*   Foss v Harbottle (1843) 2 Hare 461
*   Freeman & Lockyer v Buckhurst Park Properties (Mangal) Ltd [1964] 2 QB 480; [1964] 2 WLR 618; [1964] 1
    All ER 630, CA
*   Gebo Investments (Labuan) Ltd v Signatory Investments Pty Ltd [2005] NSWSC 544
*   Gibson v Barton (1875) LR 10 QB 329, DC
*   Hydrodam (Corby) Ltd, In re [1994] 2 BCLC 180
*   John Morley Building Co v Barras [1891] 2 Ch 386
*   Kaytech International plc, In re [1999] 2 BCLC 351, CA
*   Kingston Cotton Mill Co (No 2), In re [1896] 1 Ch 331
*   Lands Allotment Co, In re [1894] 1 Ch 616, CA
*113
*   Lo-Line Electric Motors Ltd, In re [1988] Ch 477; [1988] 3 WLR 26; [1988] 2 All ER 692; [1988] BCLC 698
*   Loquitur Ltd, In re [2003] EWHC 999 (Ch); [2003] STC 1394; [2003] 2 BCLC 442
*   Mahony v East Holyford Mining Co (1875) LR 7 HL 869, HL(I)

© 2011 Thomson Reuters.

[2011] Bus. L.R. 111                                                                                      Page 3

[2010] UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C. 1 [2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript [2010] UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C. 1 [2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript
(Cite as: [2011] Bus. L.R. 111)

- Mangles v Grand Collier Dock Co (1840) 10 Simons 519
- Mea Corpn Ltd, In re [2006] EWHC 1846 (Ch); [2007] 1 BCLC 618
- Moorgate Metals Ltd, In re [1995] 1 BCLC 503
- Morris v Kanssen [1946] AC 459; [1946] 1 All ER 586, HL(E)
- Murray v Bush (1873) LR 6 HL 37, HL(E)
- New Par Consols Ltd, In re [1898] 1 QB 573, DC
- Osler Institute Inc v Forde (2003) 333 F 3d 832
- Parmalat Securities Litigation, In re (2010) 684 F Supp 2d 453
- Primlake Ltd v Matthews Associates [2006] EWHC 1227 (Ch); [2007] 1 BCLC 666
- R v Lawson [1905] 1 KB 541, CCR
- Rama Corpn Ltd v Proved Tin and General Investments Ltd [1952] 2 QB 147; [1952] 1 All ER 554
- Richborough Furniture Ltd, In re [1996] 1 BCLC 507
- Royal British Bank v Turquand (1856) 6 E & B 327
- Salomon v A Salomon & Co Ltd [1897] AC 22, HL(E)
- Scavuzzo v The Queen [2006] 2 CTC 2429
- Secretary of State for Trade and Industry v Deverell [2001] Ch 340; [2000] 2 WLR 907; [2000] 2 All ER 365; [2000] 2 BCLC 1057, CA
- Secretary of State for Trade and Industry v Hall [2006] EWHC 1995 (Ch); [2009] BCC 190
- Secretary of State for Trade and Industry v Hollier [2006] EWHC 1804 (Ch); [2007] Bus LR 352; [2007] BCC 11
- Secretary of State for Trade and Industry v Tjolle [1998] 1 BCLC 333
- Selangor United Rubber Estates Ltd v Cradock (No 3) [1968] 1 WLR 1555; [1968] 2 All ER 1073; [1968] 2 Lloyd's Rep 289
- Standard Chartered Bank v Pakistan National Shipping Corpn (Nos 2 and 4) [2002] UKHL 43; [2003] 1 AC 959; [2002] 3 WLR 1547; [2003] 1 All ER 173; [2003] 2 All ER (Comm) 451; [2003] 1 Lloyd's Rep 227; [2003] 1 BCLC 32, HL(E)
- Ultraframe (UK) Ltd v Fielding (No 2) [2005] EWHC 1638 (Ch); [2006] FSR 293
- West Mercia Safetywear Ltd v Dodd [1988] BCLC 250, CA
- Western Counties Steam Bakeries and Milling Co, In re [1897] 1 Ch 617, CA
- Wheeliker v Canada (1999) 172 DLR (4th) 708

                                                          ment:
The following additional cases were cited in argu-

- Australian Securities Commission v AS Nominees Ltd (1995) 133 ALR 1
- Bartlett v Barclays Bank Trust Co Ltd (Nos 1 and 2) [1980] Ch 515; [1980] 2 WLR 430; [1980] 1 All ER 139; [1980] 2 All ER 92
- Bath v Standard Land Co [1911] 1 Ch 618, CA
- Bristol and West Building Society v Mothew [1998] Ch 1; [1997] 2 WLR 436; [1996] 4 All ER 698, CA
- Dubai Aluminium Co Ltd v Salaam [2002] UKHL 48; [2003] 2 AC 366; [2002] 3 WLR 1913; [2003] 1 All ER 97; [2003] 1 Lloyd's Rep 65, HL(E)
- Fletcher v Green (1864) 33 Beav 426
- HR v JAPT [1997] Pens LR 99
- Kensington International Ltd v Republic of Congo [2005] EWHC 2684 (Comm); [2006] 2 BCLC 296
- Knott v Cottee (1852) 16 Beav 77
- Royal Brunei Airlines Sdn Bhd v Tan [1995] 2 AC 378; [1995] 3 WLR 64; [1995] 3 All ER 97, PC

© 2011 Thomson Reuters.

[2010] UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C.
1 [2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript [2010]
UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C. 1
[2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript
**(Cite as: [2011] Bus. L.R. 111)**

• Sunlight Incandescent Gas Lamp Co Ltd, In re [1900] 2 Ch 728

**\*114**

• Target Holdings Ltd v Redferns [1996] AC 421; [1995] 3 WLR 352; [1995] 3 All ER 785, HL(E)

• Williams v Natural Life Health Foods Ltd [1998] 1 WLR 830; [1998] 2 All ER 577; [1998] 1 BCLC 428, HL(E)

• Wilson v Lord Bury (1880) 5 QBD 518, CA

**APPEAL** from the Court of Appeal

The Revenue and Customs Commissioners appealed,
with permission of the Supreme Court (Lord Walker
of Gestingthorpe, Lord Mance, Lord Collins of Ma-
pesbury JJSC) granted on 5 November 2009, against a
decision of the Court of Appeal (Ward, Rimer, Elias
LJJ) on 2 July 2009 allowing an appeal by the first
defendant, Michael Holland, against a decision of Mr
Mark Cawson QC, sitting as a deputy High Court
judge, on 24 June 2008 [2008] EWHC 2200 (Ch);
[2009] Bus LR 1 that he was a de facto director of 42
companies (whose various names were distinguished
only by numbers: Paycheck Services 3 Ltd to Pay-
check Services 12 Ltd, Paycheck Services 14 Ltd to
Paycheck Services 44 Ltd and PC (45) Ltd), which
had entered into administration on 19 October 2004
and then into liquidation, and that, pursuant to section
212 of the Insolvency Act 1986 , he should contribute
to their assets.

The facts are stated in the judgment of Lord Hope of
Craighead DPSC.

*Michael Green QC* and *Adam Sher* (instructed by
*Solicitor, Revenue and Customs* ) for the revenue.

*Peter Knox QC, Aidan Casey* and *Helen Pugh* (in-
structed by *Neil Myerson LLP, Altrincham* ) for the
first defendant.

The second defendant did not appear and was not
represented.

The court took time for consideration.

24 November 2010. LORD HOPE OF CRAIGHEAD
DPSC

1 This is an appeal by HM Revenue and Customs
("HMRC") against a decision of the Court of Appeal
(Ward, Rimer and Elias LJJ) dated 2 July 2009: [2010]
Bus LR 259 . The court allowed an appeal by Mr

Michael Holland ("Mr Holland") against an order
dated 4 July 2008 by Mr Mark Cawson QC, sitting as a
deputy High Court judge of the Chancery Division,
following a judgment which he issued on 24 June
2008: [2008] EWHC 2200 (Ch); [2009] Bus LR 1 .
The trial over which the deputy judge presided arose
out of 42 originating applications issued by HMRC on
27 July 2006 against Mr Holland and his wife Linda.
The applications were made under section 212 of the
Insolvency Act 1986 . It was alleged that Mr and Mrs
Holland were de facto directors of 42 insolvent com-
panies of which HMRC is the only creditor, and that
they had been guilty of misfeasance and breach of
duty in causing the payment of dividends to the
companies' shareholders between 24 April 2002 and
19 October 2004 when the companies had insufficient
distributable reserves to pay their creditors. Orders
were sought requiring them to contribute sums to the
assets of the insolvent companies by way of com-
pensation in respect of their misfeasance and breach of
duty of amounts totalling in excess of £3.5m.

2 The background to the litigation was the setting up
by Mr and Mrs Holland in 1999 of a complicated
structure of companies, \*115 including the 42 com-
panies of which they were alleged to be de facto di-
rectors. Their business was the administering of the
business and tax affairs of contractors working in
various sectors, but mainly that of information tech-
nology. Each contractor was taken on as an employee
of one of the 42 companies and allotted a non-voting
share. This enabled him to be rewarded on a weekly or
monthly basis by way of both salary and dividends.
The contractors' services were provided to clients
through an agency which paid the parent company.
The intention was to provide the same tax advantages
to the non-voting shareholders/employees as they
would have enjoyed had they each set up and run their
own individual service companies, while relieving
them of the administrative burden of doing so. It was
of the essence of this scheme that each of the 42
companies would be liable to pay corporation tax at
the small companies' rate under section 13 of the In-
come and Corporation Taxes Act 1988 . So long as
they were not regarded as "associated" for the pur-

© 2011 Thomson Reuters.

[2011] Bus. L.R. 111                                                                                         Page 5
[2010] UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C.
1 [2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript [2010]
UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C. 1
[2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript
(Cite as: [2011] Bus. L.R. 111)

poses of section 416 of the 1988 Act, they could achieve this aim provided that each company kept its profits below the £300,000 threshold, which it did. As it turned out, however, the scheme was doomed to fail. By the operation of section 417(3) of the 1988 Act Mr Holland, as the settlor of the one share in each company which had voting rights, fell to be treated as being in control of them. The result was that the 42 companies were treated as associated for tax purposes. Because their collective turnover exceeded the £300,000 threshold, each company was liable for higher rate corporation tax ("HRCT"). Dividends had been paid after making provision only for corporation tax at the lower rate. So there was a substantial deficiency in the liquidation of each company in respect of its HRCT liability.

3 The deputy judge dismissed the claims against Mrs Holland, and there has been no appeal against that decision. He took a different view of the position of Mr Holland. He found that he was a de facto director of each of the 42 companies and so was answerable to HMRC's claims under section 212 . He divided the allegations against Mr Holland into three different periods. First, in respect of the period from 24 April 2002 to 18 August 2004, the deputy judge held that Mr Holland was at no stage liable or, if he was, that he ought to have been relieved from liability pursuant to section 727 of the Companies Act 1985 . Second, he held that Mr Holland was entitled to a short period of grace from 19 to 22 August 2004 as, although he was liable for the payment of dividends during this period, the circumstances were such that he was entitled to be relieved under section 727 from that liability. In respect of the remaining period from 23 August to 19 October 2004, he held that Mr Holland had been guilty of misfeasance and breach of duty in relation to each company in causing the payment to its shareholders of the unlawful dividends, and that it would not be a proper exercise of the power under section 727 to relieve him of that liability: [2009] Bus LR 1 , paras 236–237. He ordered an assessment of the amount that Mr Holland was liable to contribute to the companies' assets, but he limited this amount to the HRCT that the companies had failed to provide for to meet the claims of HMRC in respect of their trading during that period.

4 The Court of Appeal allowed Mr Holland's appeal against the orders which the deputy judge made against him, dismissed the originating applications

and dismissed a cross appeal by HMRC as the points that it *116 sought to raise were no longer in issue. Had it been necessary to decide them it would, by a majority (Rimer LJ dissenting), have dismissed HMRC's appeal against the deputy judge's decisions to allow Mr Holland a period of grace from 19 to 22 August 2004 and as to the amount that he was liable to contribute to the assets of the companies, its contention being that he should have been ordered to repay the full amount of the unlawful dividends. In the appeal by HMRC to this court all of these points are in issue, although if Mr Holland succeeds on the question whether he was a de facto director the other issues will become academic.

**The corporate structure**

5 From about June 1997 to February 1999 Mr and Mrs Holland ran a company called Paycheck Services Ltd ("Paycheck"), whose function, in return for a fee, was to administer the business and tax affairs of contractors who did not want to go to the trouble of setting up and running their own companies. Each contractor who joined the scheme became an employee of Paycheck and was allotted a non-voting share in the company. This entitled him to dividends as well as a salary. Paycheck's income was derived from charging the contractor's clients for his services. Most contractors did not pay higher rate income tax, and the bulk of their income from Paycheck was by way of a dividend. It soon became apparent, however, that the income of Paycheck was likely to exceed the limit for the small companies' rate of corporation tax of £300,000, which was between 19% and 21% during the relevant period. So Mr and Mrs Holland, with the help of a number of professional advisers, set about devising a new structure which would enable them to expand their business while avoiding corporation tax at the higher rate, which during the relevant period was between 30% and 33%.

6 The new structure was established in February 1999. It operated until 13 October 2004, when all the companies went into administration and later into liquidation. Under this structure Mr and Mrs Holland each held 50% of the issued shares in, and were directors of, a new company called Paycheck Services Ltd ("Paycheck Services"). Paycheck Services held 100% of the issued shares in, and Mr and Mrs Holland were appointed as directors of two further new companies called Paycheck (Directors Services) Ltd ("Paycheck

© 2011 Thomson Reuters.

[2011] Bus. L.R. 111                                                                                            Page 6
[2010] UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C.
1 [2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript [2010]
UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C. 1
[2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript
(Cite as: [2011] Bus. L.R. 111)

Directors") and Paycheck (Secretarial Services) Ltd ("Paycheck Secretarial"). Paycheck Directors and Paycheck Secretarial were incorporated to act respectively as the sole director and secretary of 42 trading companies ("the composite companies"), each of which had similar names distinguished only by a number. Their names were Paycheck Services 3 Ltd, Paycheck Services 4 Ltd, and so on.

7 Each of the composite companies had a single voting "A" share and 50 non-voting shares, each of a separate class (B1, B2, C1, C2, etc). The A share was held by yet another new company called Paycheck Services Trustee Ltd ("Paycheck Trustee"), of which Mr and Mrs Holland were each directors and in which they each held 50% of the issued share capital. The A share was held by Paycheck Trustee pursuant to a trust deed of which Mr Holland was the settlor, which provided that each A share was be held for the benefit of the members of the composite companies. The non-voting shares were, in the case of each composite company, held by about 50 shareholders/employees, each of whom held one each of the separate classes of shares in the company.*117

8 Article 8(b)(i) of the articles of association of the composite companies provided:

"each class of non-voting shares shall carry the right to the receipt of such dividends payable on each such class of shares, in such amounts, at such frequency, at such times as, on the recommendation of the directors, the holder of the 'A' share shall, in general meeting, resolve in accordance with the following: (aa) subject to the provisions of the Act and to the following provisions of this article, the company may, by ordinary resolution passed at a general meeting upon the recommendation of the directors, declare a dividend for any class of the non-voting shares ... (ee) when paying interim dividends, the directors may make payments of interim dividends to one or more classes of non-voting shares to the exclusion of one or more other classes of non-voting shares on the same basis that final dividends may be paid by the company to each class of non-voting shares in accordance with the foregoing; (ff) regulations 102 and 103 of Table A shall be read and construed accordingly with the foregoing provisions of this article."

9 As had been the case under the previous structure, the services of the shareholders/employees were con-

tracted out, typically through employment agencies. Under the new structure this was done by the composite companies which, out of the income they received, made the following payments: (i) a fee to Paycheck Services for its administrative services; (ii) a salary to each shareholder/employee, typically limited to the national minimum wage and the associated PAYE tax and national insurance contributions; and (iii) after making provision for the payment of corporation tax at the small companies' rate, a dividend to each shareholder/employee.

10 The dividends were paid on a regular basis. The shareholders/employees put in timesheets for the work that they had done. The relevant figures were entered into Paycheck Services' computer, and the accountancy software thereon then calculated the dividend payable after making provision for the items listed in the previous paragraph. The computer programme then generated a document purporting to be a minute of a directors' meeting of the relevant composite company. It recorded as present "M Holland Paycheck (Director Services) Ltd, LM Holland Paycheck (Secretarial Services) Ltd" and that it had been resolved that a dividend of a specified amount be distributed to the specified shareholder/employee. The computer generated on the minute a copy of Mr Holland's signature, beneath which appeared the words "for and on behalf of Paycheck (Director Services) Ltd". This was the only authority for payment by the composite company of the relevant dividend.

### The corporation tax problem

11 As already noted, it was crucial to the commercial viability of the scheme that the composite companies should have annual taxable profits of no more than £300,000, so as to get the benefit of the small companies' rate of corporation tax. There was, however, a flaw in the structure which, as Rimer LJ said in para 16, was not spotted when the structure was established. Section 13(3) of the 1988 Act limited the benefit of the small companies' rate by providing that where a company had two or more *118 associated companies during an accounting period they would have to share a single £300,000 limit. Mr Holland was the settlor of the trust under which Paycheck Trustee held the A shares in each of the composite companies. The effect of section 417(3) of the 1988 Act was that Mr Holland was regarded as in control of all the composite companies, so they were "associated"

© 2011 Thomson Reuters.

[2011] Bus. L.R. 111                                                                                                      Page 7
[2010] UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C. 1 [2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript [2010] UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C. 1 [2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript
(Cite as: [2011] Bus. L.R. 111)

within the meaning of section 13 of that Act. Their collective profits all had to be aggregated, and they had to be treated for the purposes of the small companies' rate of corporation tax as a single company.

12 It had been thought by Mr and Mrs Holland and their advisers that an escape from this consequence was provided by Extra Statutory Concession C9 ("ESC C9"). Its effect was believed to be that the composite companies would not be regarded as "associated". It was not appreciated when the new structure was established that the fact that Mr Holland was the common settlor of the A shares in each company meant that he fell to be regarded as being in control of each of the companies, with the result that ESC C9 did not apply. But, as Rimer LJ observed in the Court of Appeal, [2010] Bus LR 259 , para 18, the advice that Mr and Mrs Holland received that the companies would not be regarded as "associated" was not unqualified.

13 The risk of HMRC attacking the scheme was recognised in written advice given by tax counsel on 22 January 1999. The deputy judge commented that the advice contained a number of apparent contradictions: see [2008] EWHC 2200 (Ch) at [44]. Mr Holland's solicitor advised in February 1999 that the two trading companies then in existence should restrict their profits to £150,000 each. In March 2001 the composite companies' accountants received an informal telephone enquiry about the arrangements from an official at the Wrexham 1 tax office. This was followed by a letter in relation to three of the composite companies in which a detailed profit and loss account, with notes to indicate whether the companies were grouped or associated, was requested. The accountants and the solicitor repeated their advice to Mr Holland about restricting profits of each of the two companies to £150,000.

14 Subsequent contacts with HMRC are described in detailed findings made by the deputy judge: see paras 55 and following. He found that the accountants, and through them Mr Holland, were led to believe in March 2001 that HMRC would treat the matter as covered by ESC C9 and that it was content, in the light of an explanation common to all the composite companies, that there was no association between them: see para 66. But he added that it would have been open to HMRC at any time to take the point on the effect of section 417(3) of the 1988 Act and of Mr Holland's

position as the settlor of the A shares that was not, in fact, taken until over three years later: see para 67. On 24 April 2002 Mr Williams of HMRC wrote to say that in his view the companies were associated. Throughout the rest of 2002 and most of 2003 there was what Rimer LJ called "sporadic and inconclusive" correspondence between HMRC and the composite companies' advisers: see [2010] Bus LR 259 , para 25. Mr Williams was dissatisfied with the arrangements but he failed to identify its crucial flaw. It was not at this stage suggested to Mr Holland by his advisers that he should cease trading or consider not continuing to cause the composite companies to pay dividends without making provision for HRCT. *119

15 On 4 December 2003 HMRC opened a formal inquiry into the claims for the small companies' rate made for all the composite companies for the year ended 31 July 2002. On 8 December 2003 it issued closure notices for the years ended 31 July 2000 and 2002 and assessments in relation to the year ended 31 July 2001 on the basis that the composite companies were liable to HRCT. At a meeting of professional advisers on 24 February 2004 the corporation tax deficit, if HMRC were to succeed, was estimated at £2m. Nevertheless it was decided that the composite companies should continue to trade and continue to pay dividends without making any reservation for HRCT.

16 There was a meeting with HMRC on 21 June 2004 at which officials raised the issue of the composite companies' solvency. On 25 June 2004 Mr Russell (who had taken over HMRC's file from Mr Williams) wrote expressing the view that the structure was an avoidance scheme and identifying the common settlor point under section 417(3) of the 1988 Act. This was the first time that HMRC had taken this point. Mr Holland's solicitor sought advice from counsel whose advice had been taken when the scheme was set up. Neither of them identified the importance of the common settlor point raised by HMRC, but on 6 August 2004 another tax counsel advised on the telephone that it "blows our scheme out of the water". In written advice he recommended that the composite companies should cease trading or that the structure should be substantially revised as soon as practicable. He also proposed an alternative structure that would avoid the "association" problem and suggested that it might be possible to persuade HMRC not to pursue a claim for periods up to 31 July 2004 if it was adopted.

© 2011 Thomson Reuters.

[2011] Bus. L.R. 111                                                                          Page 8
[2010] UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C.
1 [2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript [2010]
UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C. 1
[2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript
**(Cite as: [2011] Bus. L.R. 111)**

It was decided to take a second opinion from leading counsel, and a conference with Mr John Tallon QC in London was arranged for 18 August 2004. He advised that, although HMRC had dealt with the issue badly and that leave for judicial review might well be granted, the composite companies would ultimately lose if such an application were made. He agreed that the new corporate structure that had been suggested was basically sound and that a letter should be sent requesting a meeting with HMRC in the hope that it might be possible to achieve a favourable settlement.

17 A discussion took place between Mr Holland and his advisers on the train back from London to Colwyn Bay after the conference. In the light of Mr Tallon's advice Mr Holland's solicitor advised him that he and Mrs Holland might be unlawfully trading and that trading should not continue if there was no reasonable prospect of avoiding insolvent liquidation. But Mr Holland was not, for reasons that the deputy judge regarded as understandable, in any mood to engage properly in this discussion: see [2008] EWHC 2200 (Ch) at [160]. His solicitor did not repeat the advice that he gave on the train, nor was there any evidence that Mr Holland sought, or was given, advice as to the propriety of continuing to pay dividends.

18 The letter which Mr Tallon had settled was sent to HMRC, and a meeting took place on 4 October 2004 with a view to attempting a settlement. HMRC were told for the first time of the intention to transfer the business to a new structure. Mr Holland's advisers proposed to HMRC that they should accept that ESC C9 did apply to the existing companies to the end of October on the basis that they would cease to trade, then pay all *120 outstanding corporation tax at the small companies' rate and then be dissolved. It was suggested that the pot available to HMRC would be less if the composite companies were forced to cease trading and go into insolvency. HMRC rejected this proposal. By a letter dated 5 October 2004, which was received on 13 October 2004 and forwarded at once to Mr Holland, Mr Russell made it clear that HRCT was still being sought from 2002. Mr Holland was advised that there was now no prospect of a deal with HMRC and that no further dividends should be declared. No dividends were declared after 13 October 2004. On 19 October 2004 administrators were appointed to the composite companies and the various service contracts were transferred to the new companies. The composite companies were left with a total deficiency of about £3.5m in respect of unpaid corporation tax.

**The issues**

19 The first issue, which lies at the heart of this appeal, is whether Mr Holland was a de facto director of the composite companies. If he was, a number of further issues arise concerning the nature and scope of the remedy. As set out in the agreed statement of facts and issues, they are as follows:

"(2)Whether Mr Holland's liability for payment of unlawful dividends is strict or whether it is necessary to show that he was negligent (in breach of his common law duty of care). (3) Whether the correct remedy for any breach of Mr Holland's duties as a director not to cause the companies to make unlawful payments of dividends is damages or equitable compensation for the net loss sustained by the company as a result of the breach, or restitution or restoration of the amount of the unlawful dividends without an inquiry into the loss sustained. (4) The scope of the discretion under section 212 of the Insolvency Act 1986 . In particular: (a) whether the discretion is wide enough to allow the court to reduce the award to nil or some other sum (as Mr Holland contends) ... or (b) whether it is more circumscribed as HMRC contends ... so that the judge did not have power to limit Mr Holland's liability to the amount of HRCT that fell due during the relevant period (approximately £144,000). (5) Whether, in the light of the judge's findings as to whether Mr Holland acted reasonably from 18 August 2004 onwards, there was jurisdiction under section 727 of the Companies Act 1985 to allow Mr Holland a 'few days grace' between 18 and 23 August 2004. (6) Whether the judge should have relieved Mr Holland of liability under section 727 in respect of the period from 23 August 2004 onwards."

**The first issue: was Mr Holland a de facto director?(a)**

**Background**

20 An examination of this issue must start with some of the basic elements of company law. A company is, of course, an artificial entity, a creature of statute. So it can act only through human beings. Inevitably it is human beings who must take the decisions, and give effect to them by actions, if the company is to do

© 2011 Thomson Reuters.

[2011] Bus. L.R. 111                                                                              Page 9
[2010] UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C.
1 [2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 (2008) S.T.I. 3074 Times, November 30, 2010 Official Transcript [2010]
UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C. 1
[2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript
(Cite as: [2011] Bus. L.R. 111)

anything at all: see *Palmer's Company Law* , looseleaf ed, vol 2, para 8.101; *Gower & Davies, Principles of Modern \*121 Company Law* , 8th ed, (2008), para 7–1. A company is formed by one or more persons subscribing their names to a memorandum of association and complying with the requirements of the Act as to registration: Companies Act 1985, section 1 ; see now Companies Act 2006, section 7 . Among the requirements for registration is a statement of the company's proposed officers, including the required particulars of the person or persons who are to be the first director or directors of the company: Companies Act 1985, section 10(2) ; see now Companies Act 2006, section 12(1) . The expression "director" is not defined in the Companies Acts. All section 741(1) of the 1985 Act says is: "In this Act, 'director' includes any person occupying the position of director, by whatever name called": see now the 2006 Act, section 250 . In In re Lo-Line Electric Motors Ltd [1988] Ch 477 , 489 Sir Nicolas Browne-Wilkinson V-C, noting that this definition was inclusive and not exhaustive, said that its meaning had to be derived from the words of the Act as whole.

21 The definition extends, of course, to persons who are validly appointed as directors. Persons who are not directors de jure may nevertheless be treated as directors de facto. Sir Nicolas Browne-Wilkinson said that in his judgment it was not possible to treat a de facto director as a "director" for all the purposes of the Companies Act 1985 . But it is not in dispute that de facto directors are within section 212 of the Insolvency Act 1986 . That section, as amended by section 248 of and paragraph 18 of Schedule 17 to the Enterprise Act 2002 , provides so far as relevant:

"(1)This section applies if in the course of the winding up of a company it appears that a person who—(a) is or has been an officer of the company, (b) has acted as liquidator or administrative receiver of the company, or (c) not being a person falling within paragraph (a) or (b), is or has been concerned, or has taken part, in the promotion, formation or management of the company, has misapplied or retained, or become accountable for, any money or other property of the company, or been guilty of any misfeasance or breach of any fiduciary or other duty in relation to the company.""(3)The court may, on the application of the official receiver or the liquidator, or of any creditor or contributory examine into the conduct of the person falling within subsection (1) and compel him—(a) to

repay, restore or account for the money or property or any part of it, with interest at such rate as the court thinks just, or (b) to contribute such sum to the company's asset by way of compensation in respect of the misfeasance or breach of fiduciary or other duty as the court thinks just."Section 251 of the Insolvency Act 1986 , as amended, provides that "officer", in relation to a body corporate, includes a director, manager or secretary. Mr Knox QC for Mr Holland accepted that, as section 212 of the 1986 Act was concerned with the conduct of directors and their liability for actions or decisions in relation to the company, de facto directors must be assumed to be covered by this expression and treated as directors. As he put in his written case, this is to ensure that the persons with real directorial control but who, for whatever reason, lack a formal appointment are held responsible in law for their conduct of the affairs of the company. \*122

22 There is a third type of director, known as a "shadow director".Section 741(2) of the Companies Act 1985 (see now sections 251(1) and (2) of the Companies Act 2006 ) provided:

"In relation to a company, 'shadow director' means a person in accordance with whose directions or instructions the directors of the company are accustomed to act. However, a person is not deemed a shadow director by reason only that the directors act on advice given by him in a professional capacity." But, as Rimer LJ observed in [2010] Bus LR 259 , para 57, it has not been asserted in this case that Mr Holland was a shadow director of the composite companies. Section 214 of the Insolvency Act 1986 , which provides a remedy in relation to a person who is or has been a director of a company for wrongful trading, is extended to shadow directors expressly by subsection (7) . But HMRC do not rely on that section. Section 212 , under which a summary remedy is sought in this case, applies to a person who is or has been an "officer" of the company. It does not apply to shadow directors because, unlike section 214 , the statute does not provide for this.

23 There is another feature of company law that must be taken into account in the examination of the question whether Mr Holland was a de facto director of the composite companies. As has already been noted, Paycheck Directors and Paycheck Secretarial were incorporated to act respectively as the sole director and secretary of 42 trading companies. The 19th

[2011] Bus. L.R. 111            Page 10

[2010] UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C. 1 [2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript [2010] UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C. 1 [2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript

**(Cite as: [2011] Bus. L.R. 111)**

century company law statutes made no provision for corporate directors. The question whether a company could act as the director of another company does not appear to have been raised in any reported case until In re Bulawayo Market and Offices Co Ltd [1907] 2 Ch 458 . Objection was taken by a minority of the shareholders to the appointment of a limited company as the company's sole manager. Warrington J dismissed the application without calling on the respondents. He said, at p 463, that there was nothing in the Companies Act 1862 (25 & 26 Vict c 89) which made it incumbent on a company to have directors who were individual persons and responsible as individuals to the shareholders.

24 The Companies Act 1929 was the first statute to recognise in terms that a company could be a director: see sections 144, 145 ; see also sections 176, 178 and 201 of the Companies Act 1948 . Section 282(3) of the Companies Act 1985 , which was the Act in force in February 1999 when the new corporate structure was established, provided that every private company shall have at least one director. Section 283(4)(b) provided that no company shall have as sole director of the company "a corporation the sole director of which is secretary to the company". Section 305(1) provided that a company which stated the name of any of its directors on any business letter had to state the name of every director who was an individual "and the corporate name of every corporate director". Section 155(1) of the Companies Act 2006 now provides that a company must have at least one director who is a natural person. But no such requirement was in force during the events that gave rise to the claim in this case. The position then was that the Companies Act 1985 allowed a company to have a corporation as its sole director, so long as its sole director was not the secretary to the company. *123

25 The new corporate structure was created on the assumption that it was open to the composite companies to have, as their sole de jure director, Paycheck Directors of which Mr and Mrs Holland were the directors. Mr Holland and his advisers cannot be criticised for doing so, as this was expressly permitted by the statute. Drawing on the reasoning in Salomon v A Salomon & Co Ltd [1897] AC 22 , Mr Knox submitted that the separate legal personality of Paycheck Directors from that of its directors had to be respected. I do not think that he needed the authority of Salomon's case for that proposition. Salomon's case was con-

cerned with the different question whether, as Lord Macnaghten put it at p 51, a body corporate could lose its individuality by issuing the bulk of its capital to one person. The deputy judge acknowledged that it was not alleged by HMRC that Paycheck Directors was a pure shell or a façade. Nor was it asserted that Mr Holland acted outside his authority as a director of Paycheck Directors in directing the affairs of the composite companies: see [2009] Bus LR 1 , para 172; see also Rimer LJ, [2010] Bus LR 259 , para 47. The question whether Mr Holland was acting as de facto director of the composite companies so as to impose on him fiduciary duties in relation to those companies when the purported directors' meetings were held on his direction at which the relevant dividends were declared must be approached on the basis that Paycheck Directors and Mr Holland were in law separate persons, each with their own separate legal personality. (b)

## De facto directors: the authorities

26 The expression "de facto director" has been in use for a long time, as Robert Walker LJ observed in In re Kaytech International plc [1999] 2 BCLC 351 , 420. It was used by Sir George Jessel MR in In re Canadian Land Reclaiming and Colonising Co (Coventry and Dixon's case) (1880) 14 Ch D 660 , where the question was whether two individuals who had been appointed and acted as directors while they were ineligible were directors or other officers liable to a summons for misfeasance. The test which he applied, at pp 664–665, was whether a man who had assumed a position could be allowed to deny in court that he was really entitled to occupy it. But it is not easy to identify a simple and reliable test for determining whether a person in Mr Holland's position was acting as de facto director of a company whose sole director was a company of which he was a director de jure. There are a number of first instance cases which offer some assistance. But I do not think that they provide a clear and simple solution to the problem, as the facts which can give rise to it are so variable.

27 In In re Lo-Line Electric Motors Ltd [1988] Ch 477 it was accepted that Mr Browning, against whom the disqualification proceedings were brought and who had not actually been appointed a director, de facto ran one of the companies which he allowed to trade after his retirement as a director de jure knowing it to be insolvent. Sir Nicolas Browne-Wilkinson V-C held

© 2011 Thomson Reuters.

[2011] Bus. L.R. 111                                                                                          Page 11
[2010] UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C.
1 [2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript [2010]
UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C. 1
[2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript
(Cite as: [2011] Bus. L.R. 111)

that the court had to have regard to his conduct as director whether validly appointed or invalidly appointed or merely de facto acting as a director. He said, at p 490:

"the plain intention of Parliament in section 300 was to have regard to the conduct of a person acting as a director, whether validly appointed, invalidly appointed, or just assuming to act as director without any appointment at all."*124 But he did not need to explore what was needed to determine whether an individual could properly be held to be acting de facto as a director of a company in a case such as this, where a corporate director was interposed between him and the subject company and his actions could be attributed entirely to the position which he occupied de jure as a director of the corporate director.

28 That question was however in issue in In re Hydrodam (Corby) Ltd [1994] 2 BCLC 180 . That was a company which had only two directors, which were two Channel Islands companies. It went into compulsory liquidation, and its liquidator brought claims for wrongful trading under section 214 of the Insolvency Act 1986 against 14 defendants who included two of the directors of Eagle Trust plc of which Hydrodam was, by several removes, an indirect subsidiary. It was alleged that they were responsible for the wrongful trading of Hydrodam from the date when they were appointed to be directors of Eagle Trust. But, as Millett J observed at p 183, the Channel Islands companies were Hydrodam's titular directors and there was nothing pleaded in the points of claim to suggest that there were, in addition to the titular directors, any other persons who claimed to be directors of the company at all. The case was argued on the basis that sufficient facts had been pleaded to justify the inference that Eagle Trust acted as a shadow director of the company, and that as directors of the shadow director its directors were collectively responsible for Eagle Trust's conduct in relation to the company as its de facto or shadow directors.

29 Millett J held that the liquidator had failed to plead or adduce any evidence to support the allegation that the directors of Eagle Trust were at any material time directors of Hydrodam, and the proceedings were struck out. There are significant differences between that case and this. It is not alleged here that Mr Holland was a shadow director and section 212 of the Insolvency Act 1986 , unlike section 214 , does not

extend to shadow directors. But it is of interest because of what Millett J said in the course of his judgment about what is needed to establish that a person is a de facto director. At pp 182–183 he said:

"I would interpose at this point by observing that in my judgment an allegation that a defendant acted as de facto or shadow director, without distinguishing between the two, is embarrassing. It suggests-and counsel's submissions to me support the inference-that the liquidator takes the view that de facto or shadow directors are very similar, that their roles overlap, and that it may not be possible to determine in any given case whether a particular person was a de facto or a shadow director. I do not accept that at all. The terms do not overlap. They are alternatives, and in most and perhaps all cases are mutually exclusive. A de facto director is a person who assumes to act as a director. He is held out as a director by the company, and claims and purports to be a director, although never actually or validly appointed as such. To establish that a person was a de facto director of a company it is necessary to plead and prove that he undertook functions in relation to the company which could properly be discharged only by a director. It is not sufficient to show that he was concerned in the management of the company's affairs or undertook tasks in relation to its business which can properly be performed by a manager below board level. A de facto *125 director, I repeat, is one who claims to act and purports to act as director, although not validly appointed as such. A shadow director, by contrast, does not claim or purport to act as director. On the contrary, he claims not to be a director. He lurks in the shadows, sheltering behind others who, he claims, are the only directors of the company to the exclusion of himself. He is not held out as a director by the company." Here too, as in In re Lo-Line Electric Motors Ltd , the test which is being suggested is whether the individual assumed office as a director. But Millett J added these words [1994] 2 BCLC 180 , 184:

"The liquidator submitted that where a body corporate is a director of a company, whether it be a de jure, de facto or shadow director, its own directors must ipso facto be shadow directors of the company. In my judgment that simply does not follow. Attendance at board meetings and voting, with others, may in certain limited circumstances expose a director to personal liability to the company of which he is a director or its creditors. But it does not, without more, constitute him

[2011] Bus. L.R. 111                                                                 Page 12
[2010] UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C.
1 [2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript [2010]
UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C. 1
[2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript
(Cite as: [2011] Bus. L.R. 111)

a director of any company of which his company is a
director." The words "without more" are important.
They indicate that the mere fact of acting as a director
of a corporate director will not be enough for that
individual to become a de facto director of the subject
company.

30 In In re Richborough Furniture Ltd [1996] 1 BCLC
507 the question was raised whether one of the three
respondents, who was not a director of the company
de jure, was nevertheless a director of the company de
facto and as such liable under section 6 of the Com-
pany Directors Disqualification Act 1986 to be dis-
qualified. Asking himself what is a de facto director,
Timothy Lloyd QC (sitting as a deputy High Court
judge) said, at p 524:

"It seems to me that for someone to be made liable to
disqualification under section 6 as a de facto director,
the court would have to have clear evidence that he
had been either the sole person directing the affairs of
the company (or acting with others all equally lacking
in a valid appointment, as in Morris v Kanssen [1946]
AC 459 ) or, if there were others who were true di-
rectors, that he was acting on an equal footing with the
others in directing the affairs of the company. It also
seems to me that, if it is unclear whether the acts of the
person in question are referable to an assumed direc-
torship, or to some other capacity such as shareholder
or, as here, consultant, the person in question must be
entitled to the benefit of the doubt." He held that the
individual in question, who was a business consultant
providing computer and other management services to
the company, was not a de facto director despite
having undertaken negotiations with creditors and
performed some of the functions of a finance director.

31 In Secretary of State for Trade and Industry v
Tjolle [1998] 1 BCLC 333 Jacob J was referred to
what was said in In re Hydrodam (Corby) Ltd [1994] 2
BCLC 180 , including a passage at p 182 where Millett
J pointed to the purpose of any test as being to impose
liability for wrongful trading on those persons who
were in a position to prevent damage to creditors by
taking steps to protect their interests; and to *126 In re
Richborough Furniture Ltd [1996] 1 BCLC 507 . He
said [1998] 1 BCLC 333 , 343–344:

"For myself I think it may be difficult to postulate any
one decisive test. I think what is involved is very much
a question of degree. The court takes into account all

the relevant factors. Those factors include at least
whether or not there was a holding out by the company
of the individual as a director, whether the individual
used the title, whether the individual had proper in-
formation (eg management accounts) on which to base
decisions, and whether the individual had to make
major decisions and so on. Taking all these factors
into account, one asks 'was this individual part of the
corporate governing structure', answering it as a kind
of jury question. In deciding this, one bears very much
in mind why one is asking the question. That is why I
think the passage I quoted from Millett J is important.
There would be no justification for the law making a
person liable to misfeasance or disqualification pro-
ceedings unless they were truly in a position to exer-
cise the powers and discharge the functions of a di-
rector. Otherwise they would be made liable for events
over which they had no real control, either in fact or
law." In that case the individual in question was given
the courtesy title of deputy managing director but did
not form part of the real corporate governance of the
company. There was no function that she performed
that could only be properly discharged by a director.

32 In In re Kaytech International plc [1999] 2 BCLC
351 , 423–424 Robert Walker LJ said that he saw
much force in what Jacob J said in the Tjolle case
when he declined to formulate a single test. Referring
to the passage which I have just quoted, he added this
observation:

"I do not understand Jacob J, in the first part of that
passage, to be enumerating tests which must all be
satisfied if de facto directorship is to be established.
He is simply drawing attention to some (but not all) of
the relevant factors, recognising that the crucial issue
is whether the individual in question has assumed the
status and functions of a company director so as to
make himself responsible under the 1986 Act as if he
were a de jure director." Here again the word "as-
sumed" is used. But, as Lewison J said in In re Mea
Corpn Ltd [2007] 1 BCLC 618 , para 83, in consi-
dering whether a person "assumes to act as a director"
what is important is not what he calls himself but what
he did: see also Secretary of State for Trade and In-
dustry v Hollier [2007] Bus LR 352 , para 66.

33 The question whether a director of a corporate
director could, through his control of the corporate
director, be held to be a de facto director of the subject
company which was in issue in In re Hydrodam

© 2011 Thomson Reuters.

[2011] Bus. L.R. 111                                                                 Page 13
[2010] UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C.
1 [2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript [2010]
UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C. 1
[2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript
(Cite as: [2011] Bus. L.R. 111)

(Corby) Ltd [1994] 2 BCLC 180 was raised again in Secretary of State for Trade and Industry v Hall [2009] BCC 190 . The first respondent to those proceedings for disqualification, Mr Hall, did not respond, did not appear and was not represented. The question which the court had to consider was whether the second respondent, Mr Nuttall, was a de facto director of the subject company by reason of the fact that he owned and controlled and was the sole director of its corporate director. The case against him failed because he had not, either individually or through his control of the *127 corporate director, taken any step which indicated that either he or his company had assumed the status and functions of a director of the subject company. It was accepted by the Secretary of State that Mr Nuttall did not fit the description of a de facto director which emerged from Millett J's judgment in In re Hydrodam . This was because that description required positive action by an individual which showed that he was acting as if he was a director. It was contended that it was sufficient that he was in a position to exercise the powers and discharge the functions of a director of the subject company, even if he did not actually do anything. But Evans-Lombe J said that he could not accept that argument: see para 30.

34 Among the reasons which Evans-Lombe J gave for coming to that conclusion in that paragraph were the following:

"(ii)In the Hydrodam case ... Millett J finds that the director of a corporate director is not, without more, constituted a director, whether shadow or de facto, of a subject company. However I do not read his judgment as saying that this can never happen. I can well accept that an individual through his control of a corporate director can constitute himself a de facto director of a subject company. It seems to me that whether or not he does so will depend on what that individual procures the corporate director to do. In theory I am not bound by the judgment of Millett J in the Hydrodam case. Even putting on one side the authority of that judge in this and other fields of the law, I would need convincing reasons for not following it. I can find none. (iii) It seems to me that in order to be constituted a de facto director of a subject company, a director of a corporate de jure director must cause the corporate director to take actions with relation to the subject company as would have constituted it a de facto director of that company were it not already a director de

jure. (iv) In addition the degree of control which the director of the corporate director exercises over that company will be of relevance. In the present case Mr Nuttall's control was absolute but the situation may be substantially different where the corporate director is controlled by a board with a number of members with different responsibilities. Equally the shareholder control of the corporate director may be relevant."

35 The deputy judge was impressed by para (iii) in this list of reasons. He said that applying that test to Mr Holland's case would clearly lead to the conclusion that he was a de facto director of the composite companies in that he, in so far as he is properly to be regarded as having acted on behalf of Paycheck Directors, clearly caused it to act in such a way as would have caused the latter to be treated as a de facto director were it not already a de jure director: see [2009] Bus LR 1 , para 176. This left for consideration Mr Knox's argument that to make that finding would involve piercing the corporate veil which, on the authority of Salomon v A Salomon & Co Ltd [1897] AC 22 , was contrary to principle. He was not persuaded that arguments as to separate corporate personality were of assistance or relevant to the issue. He said that as a matter of fact Mr Holland did, by what he actually did, direct the affairs of the composite companies and that it was beside the point whether he purported to do so on his own account or as agent for Paycheck Directors: see para 177. As the corporate veil point was the only point taken on behalf of Mr Holland, he found that it necessarily followed that he was a de facto director of the composite companies. *128

36 In the Court of Appeal Rimer LJ (with whom Ward and Elias LJJ agreed on this aspect of the case) reached the opposite conclusion. He accepted that the critical issue was, as Robert Walker LJ put it in In re Kaytech International plc [1999] 2 BCLC 351 , 423, whether the individual assumed the status and function of a company director so as to make himself responsible as if he were a de jure director and that it mattered not what the individual called himself but what he did: see [2010] Bus LR 259 , para 65. He concluded, I think rightly, that the only authorities that lent any assistance on the question posed by this case were In re Hydrodam (Corby) Ltd [1994] 2 BCLC 180 and Secretary of State for Trade and Industry v Hall [2009] BCC 190 . Recalling that the essence of Millett J's reasoning in In re Hydrodam was that membership of the board of a corporate director will not, without

© 2011 Thomson Reuters.

[2011] Bus. L.R. 111                                                                                                          Page 14
[2010] UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C.
1 [2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript [2010]
UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C. 1
[2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript
(Cite as: [2011] Bus. L.R. 111)

more, make such member a shadow or de facto di-
rector of any company, he said that he did not find
anything in that judgment to suggest that the "requisite
more" would be satisfied merely by the active partic-
ipation of the board member in the making of board
decisions by the corporate director in relation to the
actions of the subject company: see [2010] Bus LR
259 , para 66. As for the test suggested by
Evans-Lombe J in para 30(iii) of his judgment in the
Hall case which had impressed the judge, he said that
it appeared to him to be somewhat artificial and that it
was wrong in principle. He saw no reason why a di-
rector of a corporate director who is doing no more
than discharging his duties as such should thereby
become a de facto director of the subject company: see
para 70.

37 In para 74 Rimer LJ added these comments:

"I emphasise that nothing that I have said is intended
to suggest that there can never be circumstances in
which a director of a corporate director can or will so
act as to cause himself to be regarded as a de facto
director of the subject company. But something more
will be required than the mere performance by him of
his duties as a de jure director of the corporate direc-
tor. On the facts accepted by the judge, there was
nothing more in the present case."(c)

**Mr Holland's case**

38 The remedy that is provided by section 212 of the
Insolvency Act 1986 may be sought only against
persons to whom that section applies, as described in
section 212(1) . The description that applies to this
case is that set out in para (a) of the subsection: "is or
has been an officer of the company." The word "of-
ficer" includes a director, but it is accepted that the
section does not apply to shadow directors because the
statute does not provide for this. It follows that HMRC
must plead and prove against Mr Holland that he was a
de facto director of the composite companies.

39 How is this to be done? It is plain from the author-
ities that the circumstances vary widely from case to
case. Jacob J declined to formulate a single decisive
test in Secretary of State for Trade and Industry v
Tjolle [1998] 1 BCLC 333 , as he saw the question
very much as one of fact and degree. He was com-
mended by Robert Walker LJ in In re Kaytech Inter-

national plc [1999] 2 BCLC 351 , 423 for not doing so,
and I respectfully agree that there is much force in
Jacob J's observation. All one can say, as a generality,
is that all the relevant factors must be taken into ac-
count. But it is possible to obtain some guidance by
looking at the purpose *129 of the section. As Millett J
said in In re Hydrodam (Corby) Ltd [1994] 2 BCLC
180 , 182, the liability is imposed on those who were
in a position to prevent damage to creditors by taking
proper steps to protect their interests. As he put it,
those who assume to act as directors and who thereby
exercise the powers and discharge the functions of a
director, whether validly appointed or not, must accept
the responsibilities of the office. So one must look at
what the person actually did to see whether he as-
sumed those responsibilities in relation to the subject
company.

40 The problem that is presented by this case, how-
ever, is that Mr Holland was doing no more than dis-
charging his duties as the director of the corporate
director of the composite companies. Everything that
he did was done under that umbrella. Mr Green QC for
HMRC was unable to point to anything that he did
which could not be said to have been done by him in
his capacity as a director of the corporate director.
When asked what it was that lay outside his perfor-
mance of that role, he said that it was simply the
quality of his acts. He did everything. He was the
decision maker, and he was the person who gave ef-
fect to those decisions. In In re Hydrodam , at p 184,
Millett J rejected the proposition that, where a body
corporate is a director of a company, whether it be de
jure, de facto or shadow director, its own directors
must ipso facto be shadow directors of the subject
company. He said that attendance at board meetings
and voting with others did not, without more, consti-
tute him a director of any company of which his
company is a director. That would not be a fair de-
scription of what Mr Holland did in this case. But in a
later paragraph, on p 184, Millett J said:

"It is possible (although it is not so alleged) that the
directors of Eagle Trust as a collective body gave
directions to the directors of the company and that the
directors of the company were accustomed to act in
accordance with such directions. But if they did give
such directions as directors of Eagle Trust, acting as
the board of Eagle Trust, they did so as agents for
Eagle Trust (or more accurately as the appropriate
organ of Eagle Trust) and the result is to constitute

© 2011 Thomson Reuters.

[2010] UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C. 1 [2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript [2010] UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C. 1 [2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript
(Cite as: [2011] Bus. L.R. 111)

Eagle Trust, but not themselves, shadow directors of the company." This passage indicates that the "without more" requirement that Millett J had in mind would not be satisfied by evidence that the individual director of the body corporate was actually giving instructions in that capacity to the subject company and the subject company was accustomed to act in accordance with those directions. That would not be enough to prove that the individual director assumed a role in the management of the subject company which imposed responsibility on him for misuse of the subject company's assets.

41 The facts of this case do not precisely match those in In re Hydrodam . But I think, with respect, that Rimer LJ put his finger on the way the question in this case should be answered. In para 67 of his judgment [2010] Bus LR 259 he referred to the "principle" that emerges from Millett J's judgment. In para 70 he said that the proposition that Evans-Lombe J set out in para 30(iii) of his judgment in Secretary of State for Trade and Industry v Hall [2009] BCC 190 was "wrong in principle". He rejected the argument that the mere fact that an individual has been acting as a director of the corporate director can, or may, result in his also becoming a director *130 of the subject company. He expressed the principle that he had in mind in these words, at para 68:

"The relevant act in relation to the affairs of the subject company is an act directed by the corporate director, not one directed by the latter company's individual board members. That may be regarded as a distinction of some technicality. But so long as we have a system of company law which recognises the difference between a company and its directors, it is a distinction that must be recognised and respected."

42 This was, I think, the point that Mr Knox was seeking to make when he referred to the speeches in Salomon v A Salomon & Co Ltd [1897] AC 22 . As Lord Davey said at p 54, the intention of the legislature must be collected from the language of its enactments. One can properly say, as Lord Macnaghten did about the company and its subscribers at p 51, that a company is at law a different person from its directors and that it is the intention of the enactment that this distinction should be recognised. I do not think that one can overcome this distinction by pointing, as Mr Green seeks to do, simply to the quality of the acts done by the director and asking whether he was the guiding spirit of the subject company or had a real influence over its affairs. As a test, that would create far too much uncertainty. Those who act as directors of a corporate director are entitled to know what it is that they can and cannot do when they are procuring acts by the corporate director. That is as true of a case such as this, where the affairs of the corporate director are effectively in the hands of one individual, as it is where there is a board comprised of several directors who always act collectively. As Lord Collins of Mapesbury JSC says (see paras 53 and 95, below), the question is one of law and it is a question of principle. I think that the guiding principle can be expressed in this way, unless and until Parliament provides otherwise. So long as the relevant acts are done by the individual entirely within the ambit of the discharge of his duties and responsibilities as a director of the corporate director, it is to that capacity that his acts must be attributed.

43 It is, of course, right to bear in mind the interests of the creditors. Their protection lies in the remedies that are available for breach of the fiduciary duty that rests on the shoulder of every director. But the essential point, which Millett J was at pains to stress in In re Hydrodam [1994] 2 BCLC 180 , is that for a creditor of the subject company to obtain those remedies the individual must be shown to have been a director, not just of the corporate director but of the subject company too. I agree with Rimer LJ that, on the facts accepted by the deputy judge, it has not been shown that Mr Holland was acting as de facto director of the composite companies so as to make him responsible for the misuse of their assets. I also agree with the reasons that Lord Collins JSC gives for reaching this conclusion.

The other issues

44 On the view that I take on the first issue, the points raised about the extent of the liability do not require to be decided. But I would offer these brief comments on some of them, as these points were fully and carefully argued by counsel on both sides. *131

45 First, there is the question whether the liability for the payment of unlawful dividends is strict or depends on a degree of fault being established. There are two lines of authority on this issue. On the one hand there are cases in which it has been said without qualification that directors are under a duty not to cause an

[2011] Bus. L.R. 111                                                                          Page 16
[2010] UKSC 51 [2010] 1 W.L.R. 2793 [2011]Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C.
1 [2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript [2010]
UKSC 51 [2010] 1 W.L.R. 2793 [2011]Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C. 1
[2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript
**(Cite as: [2011] Bus. L.R. 111)**

unlawful and ultra vires payment of a dividend: see In re Exchange Banking Co (Flitcroft's case) (1882) 21 Ch D 519 ; In re Lands Allotment Co [1894] 1 Ch 616 , 638; Selangor United Rubber Estates Ltd v Cradock (No 3) [1968] 1 WLR 1555 , 1575; Belmont Finance Corpn v Williams Furniture Ltd (No 2) [1980] 1 All ER 393 , 404 and In re Loquitur Ltd [2003] 2 BCLC 442 , 471–472. On the other there is a line of authority to the effect that a director is only liable if he makes a misapplication of a company's assets if he knew or ought reasonably to have known that it was a misapplication: see In re County Marine Insurance Co (Rance's case) (1870) LR 6 Ch App 104 , 118; In re Kingston Cotton Mill Co (No 2) [1896] 1 Ch 331 , 345–348; Dovey v Cory [1901] AC 477 , 489–490 and In re City Equitable Fire Insurance Co Ltd [1925] Ch 407 , 426, per Romer J.

46 The trend of modern authority supports the view that a director who causes a misapplication of a company's assets is in principle strictly liable to make good the misapplication, subject to his right to claim relief under section 727 of the Companies Act 1985 . The authorities that favour the contrary view really come to an end with Dovey v Cory [1901] AC 477 , as the later judgment of Romer J in In re City Equitable Fire Insurance Co Ltd [1925] Ch 407 can be read, at least in relation to dividends, as supporting strict liability. Furthermore, the whole point of introducing the right to claim relief under section 727 was to enable the court to mitigate the potentially harsh effect of being held strictly liable. That relief was introduced by section 32 of the Companies Act 1907 , so it was not available when most of the cases in this line of authority were being decided.

47 It is not necessary to express a definite view on this issue in this case. As counsel for HMRC pointed out in their written case, there has been no challenge to the finding by the deputy judge that as from 18 August 2004 all the dividends were unlawful, and it is accepted that the relief available by way of a defence under section 727 of the 1985 Act would have been available if Mr Holland could show that he acted reasonably. So the issue is academic here, and there is no doubt for this reason that it was not thought to be necessary to develop the point fully in oral argument. But the better view seems to me that in cases such as this, where it is accepted that the payment of dividends was unlawful, a director who causes their payment is strictly liable, subject of course to his right to claim

relief under the statute.

48 Then there is the question whether the correct remedy for any breach of the duties of a director not to make unlawful payments of dividends is damages or equitable compensation for the net loss sustained by the company, or restitution or restoration of the amount of the unlawful dividends without any inquiry into the loss sustained. The deputy judge held that the established remedy was to require the director to reinstate the amount of the payment without any inquiry as to the loss suffered by the company as a result of the breach of duty: see [2009] Bus LR 1 , para 218. But he declined to make an order in these terms. What he did, having refused relief under section 727 for this period as he held that Mr Holland had not acted reasonably in paying the dividend without taking all *132 appropriate advice and properly informing himself, was to order him to pay the amount of HRCT that the companies had not provided for in the period of trading from 23 August 2004. He said that he was doing this in the exercise of his discretion under section 212 of the Insolvency Act 1986 : see para 274.

49 I agree with the Court of Appeal that the obligation is to restore the moneys wrongfully paid out. This, as the deputy judge accepted, is the established remedy. Where dividends have been paid unlawfully, the directors' obligation is to account to the company for the full amount of those dividends: see Bairstow v Queens Moat Houses plc [2001] 2 BCLC 531 , para 54, per Robert Walker LJ. But there is a discretion under section 212 that it is open to the judge to exercise. This is indicated by the use of the word "may" in subsection (3) . Rimer LJ said that the judge's order should have reflected the wrong that had actually been committed and the fact that he had refused relief under section 727 of the 1985 Act in respect of it. Elias LJ, at [2010] Bus LR 259 , paras 133–134, and Ward LJ, at para 143, disagreed. In their view it was open to the deputy judge to limit the amount that Mr Holland should pay to what HMRC had lost from his unlawful conduct. Had it been necessary to reach a view on this point, I would have agreed with the majority. HMRC is the only creditor. There is no evidence that anyone would have been disadvantaged by limiting the liability in this way. It would have been a different matter if the deputy judge had misdirected himself as to the extent of the obligation. That plainly is not so. As he made clear in para 274 of his judgment ( [2009] Bus LR 1 ), he proceeded on the basis that, while restora-

© 2011 Thomson Reuters.

[2011] Bus. L.R. 111                                                                                                            Page 17
[2010] UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C.
1 [2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript [2010]
UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C. 1
[2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript
(Cite as: [2011] Bus. L.R. 111)

tion is the established remedy, he had a discretion under section 212 of the 1986 Act to limit the award to what was required to make up the deficiency of a particular creditor where the claim was made by a party other than the liquidator. In my opinion it was open to him to exercise his discretion in this way, and I do not think that he can be faulted for doing so in this case.

50 Lastly, there are the questions about relief under section 727 of the Companies Act 1985 . There are two points. First, there is the decision by the deputy judge that Mr Holland was entitled to a few days grace after the events of 18 August 2004 to enable him to take stock. Rimer LJ thought the deputy judge was in error in giving Mr Holland this grace period: see [2010] Bus LR 259 , para 88. He said that Mr Holland had not conducted himself so as to deserve it and that there was no factual basis for the decision. Here too Elias LJ, at para 128, and Ward LJ, at para 138, disagreed. Elias LJ said that there was evidence justifying the deputy judge's analysis. I respectfully agree with the majority on this point too. It seems to me that the judge provided a sufficient explanation for his decision in [2009] Bus LR 1 , paras 269 and 270, and that his was a decision with which an appellate court could not properly interfere.

51 The second question is whether, as Mr Knox submitted, the judge should have gone further and relieved Mr Holland from the obligation to pay anything at all. He suggested that account should have been taken of the fact that, as he put it, the course taken by Mr Holland was the least bad of all the alternatives. I do not see how, on the facts found by the deputy judge, this argument can be supported. He found that Mr Holland acted unreasonably because he did not take appropriate advice or inform himself as to the merits of what he was doing. But there is a more fundamental *133 point. Mr Knox submitted that the discretion under section 212 was wide enough to allow the court to reduce the award to nil even if it declined relief under section 727 of the 1985 Act. I agree with Rimer LJ that the discretion under section 212(3) , which is essentially procedural in nature, is a discretion as to amount only once liability has been established. It is not so wide as to allow the judge, having determined that the section applies, to decline to make any order at all: see paras 108–110. The discretion which he is given by section 212(3) is as to the order that would be appropriate once liability has been established, not to

grant relief against liability. It is a discretion as to how much the director should be ordered to pay, so as to do what is just in all the circumstances: see In re Loquitur Ltd [2003] 2 BCLC 442 , para 245, per Etherton J. The deputy judge was right to reject this argument.

## Conclusion

52 As I agree with the Court of Appeal that it has not been shown that when he was directing payment by the composite companies of the unlawful dividends Mr Holland was acting as their de facto director, I would dismiss the appeal.

LORD COLLINS OF MAPESBURY JSC

### Introduction

53 I agree with Lord Hope of Craighead DPSC that the appeal should be dismissed, and write to set out my own approach on the main issue. In my judgment what divides this court is not simply a matter of appreciation of the facts, namely whether what Mr Holland did in fact was sufficient to make him a de facto director of the composite companies, but a question of law and a question of principle. The question is whether fiduciary duties can be imposed, in relation to a company whose sole director is a corporate director, on a director of that corporate director when all of his relevant acts were done as a director of the corporate director and can be attributed in law solely to the activities of the corporate director.

54 My reasons will require some elaboration, particularly because they involve examination of older case law which was not cited in argument, but can be summarised in this way. Mr Holland is sought to be made liable for breach of fiduciary duty as a de facto director of the composite companies. For almost 150 years de facto directors in English law were persons who had been appointed as directors, but whose appointment was defective, or had come to an end, but who acted or continued to act as directors. There was a striking judicial innovation in In re Lo-Line Electric Motors Ltd [1988] Ch 477 and In re Hydrodam (Corby) Ltd [1994] 2 BCLC 180 (endorsed by the Court of Appeal in In re Kaytech International plc [1999] 2 BCLC 351 ) by which (at the risk of over-simplification) persons who were held to be part of the corporate governance of a company, even

© 2011 Thomson Reuters.

[2011] Bus. L.R. 111                                                                                                    Page 18
[2010] UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C.
1 [2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript [2010]
UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C. 1
[2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript
(Cite as: [2011] Bus. L.R. 111)

though not directors, could be treated as directors for the purposes of statutory provisions relating to such matters as wrongful trading by, and disqualification of, directors. To extend that line of authority so as to impose fiduciary duties on Mr Holland in relation to the composite companies, when all of his acts can be attributed in law solely to the activities of Paycheck Directors would be an unjustifiable *134 judicial extension of the concept of de facto director, and best left to the legislature, given that it was as recently as 2006 that it intervened to require that at least one director of a company be a natural person: Companies Act 2006, section 155(1) .

55 The issue is whether Mr Holland can be made liable, pursuant to the Insolvency Act 1986, section 212 (as amended), to account for the funds paid out by the insolvent composite companies on the basis that they have been misapplied by him, or he is accountable for them, or has been guilty of misfeasance or breach of any fiduciary or other duty in relation to the funds. It is common ground that (a) a de facto director is covered by section 212 ; (b) "shadow" directors (ie "a person in accordance with whose directions or instructions the directors of the company are accustomed to act": Companies Act 1985, section 741(2) ; Companies Act 2006, section 251(1) ) are not within section 212 ; and (c) section 212 is a procedural provision which does not create any substantive obligations, and consequently for a person to be made liable under section 212 , that person must be guilty of breach of an independent duty: In re Canadian Land Reclaiming and Colonising Co (Coventry and Dixon's case) (1880) 14 Ch D 660 ; In re City Equitable Fire Insurance Co Ltd [1925] Ch 407 .

56 In this case the basis of the relevant independent duty is significant. The only basis on which liability is sought to be placed on Mr Holland is that as a de facto director of the composite companies he was in breach of his fiduciary duty not to misapply their funds by paying unlawful dividends. Directors are accountable for breach of fiduciary duty to a company for unlawful distributions paid in contravention of what is now the Companies Act 2006, section 830 : see eg Bairstow v Queens Moat Houses plc [2001] 2 BCLC 531 . In In re Exchange Banking Co (Flitcroft's case) (1882) 21 Ch D 519 the liquidator of an insolvent banking company issued a summons against five former directors who had been concerned in paying dividends at a time when they knew the company had no distributable profits. The Court of Appeal held the directors jointly and severally liable for each of the dividends. The principle was put by Sir George Jessel MR, at p 534: "It follows then that if directors who are quasi trustees for the company improperly pay away the assets to the shareholders, they are liable to replace them." It is not suggested that (in the absence of dishonesty) persons who facilitate the payment of unlawful dividends are responsible for knowing assistance in a breach of trust.

57 In my judgment the decision of the House of Lords in Standard Chartered Bank v Pakistan National Shipping Corpn (Nos 2 and 4) [2003] 1 AC 959 is of no assistance in the solution of the problem raised on this appeal. The basis of that decision is that a director who makes fraudulent representations is liable in deceit irrespective of whether he makes the representations on behalf of a company. The decision of the Court of Appeal, which was reversed by the House of Lords and which had held that he was not liable because he had been acting on behalf of the company, was plainly wrong (although I used more diplomatic language in Daido Asia Japan Co Ltd v Rothen [2002] BCC 589 ). But in the present case there can be no suggestion that Mr Holland is not responsible because the corporate director is responsible. He will be responsible if what he did was unlawful. The question, to which it is now necessary to turn, is whether he was himself in breach of duty. *135

**The development of the law relating to de facto directors**

**Validity of acts of de facto directors**

58 Most of the early cases are about the validity of the acts of de facto directors, but they are relevant to the question of principle, namely what makes a person a de facto director. The first mention in the case law of de facto directors appears to have been in Mangles v Grand Collier Dock Co (1840) 10 Simons 519 , a case involving the formation of a dock company by private Act of Parliament. Sir Lancelot Shadwell V-C said, at p 535, that the Act assumed that persons by whom a call was made had to be directors de facto, and that all that Parliament meant was that, if the call were made by persons appearing to be directors, it should not be necessary to prove their appointment. The first full discussion of the de facto director was in the famous case of Foss v Harbottle (1843) 2 Hare 461 , which

© 2011 Thomson Reuters.

[2010] UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C. 1 [2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript [2010] UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C. 1 [2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript

**(Cite as: [2011] Bus. L.R. 111)**

was of course concerned with the right of shareholders in a company incorporated by Act of Parliament to sue for wrongs alleged to have been done to the company, a matter which has no relevance to the present appeal. The shareholders claimed that the extinction of the board of directors by the bankruptcy and consequent disqualification of three of them, and the want of any clerk or officer, effectually prevented the due convening of a general meeting of shareholders competent to secure the remaining property of the company, and provide for its due application. That argument was rejected on the basis that the continued existence of a board of directors de facto must be intended; and that the possibility of convening a general meeting of shareholders capable of controlling the acts of the existing board was not excluded by the allegations of the bill; that in such circumstances there was nothing to prevent the company from obtaining redress in its corporate character in respect of the matters complained of. Sir James Wigram V-C held, at p 496, that shareholders could serve a notice requiring an extraordinary general meeting at the place where "the board of directors de facto, whether qualified or not, carry on the business of the company at a given place". He said, at p 498:

"Whatever the bill may say of the *illegal* constitution of the board of directors, because the individual directors are not duly qualified, it does not anywhere suggest that there has not been during the whole period, and that there was not when the bill was filed, a board of directors acting in and carrying on the affairs of the corporation, and whose acting must have been acquiesced in by the body of proprietors; at least, ever since the illegal constitution of the board of directors became known, and the acts in question were discovered. But if there has been or is a board de facto, their acts may be valid, although the persons so acting may not have been duly qualified."

59 The concept of de facto directors is used in that case to validate acts which might otherwise have been invalid, and most of the early cases are not only about persons who purported to be directors but whose appointment was defective, but they are also mainly concerned with whether the acts of those persons were legally valid or effective. Several of the cases are also applications of the principle in the Companies Acts or in articles of association that, notwithstanding that it might be afterwards discovered that there was some defect or error in the appointment of the directors, any

acts *136 of those directors were to be valid: see from the Companies Clauses Consolidation Act 1845 (8 & 9 Vict c 16), section 99 , and the Joint Stock Companies Act 1856 (19 & 20 Vict c 47), Schedule, Table B, regulation 60 , through to the Companies Act 2006, section 161 , and the Companies (Tables A to F) Regulations 1985 (SI 1985/805), Schedule 1, Table A, regulation 92 .

60 The question in In re County Life Assurance Co (1870) LR 5 Ch App 288 was whether a claim under a policy could be admitted in the liquidation of an insurance company. The directors who were named in the articles, and signed the memorandum of association, refused to act and passed a resolution that the company should not carry on business or allot shares. Notwithstanding this resolution, Mr Preston, the promoter of the company, and one of the shareholders carried on business and allotted shares and appointed directors. A stranger effected a policy at the company's office which was signed by three of the de facto directors, and sealed with what purported to be the seal of the company. It was held to be binding because, per Sir GM Giffard LJ, at p 293:

"The company is bound by what takes place in the usual course of business with a third party where that third party deals bona fide with persons who may be termed de facto directors, and who might, so far as he could tell, have been directors de jure."

61 In Murray v Bush (1873) LR 6 HL 37, the first of three decisions of the House of Lords dealing with de facto directors, the question concerned the validity of a share transfer and whether the purported transferee was a contributory. Its articles of association required (inter alia) that the directors at a board meeting had to certify their approval of the proposed transferee. Bush was a shareholder and a director. The articles also required directors to have a share qualification. The transfer was approved at a board meeting, but it was claimed that three of the directors were not duly appointed because they had not executed a deed binding themselves to obey the regulations of the company. Section 30 of the Joint Stock Companies Act 1844 (7 & 8 Vict c 110) provided that notwithstanding that it might be afterwards discovered that there was some defect or error in the appointment of the directors, any acts of those directors were to be valid. The House of Lords was equally divided on the outcome of the appeal (which was from a decision of Lord Hatherley

© 2011 Thomson Reuters.

[2011] Bus. L.R. 111                                                                                                    Page 20
[2010] UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C.
1 [2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript [2010]
UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C. 1
[2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript
(Cite as: [2011] Bus. L.R. 111)

LC, who also sat on the appeal) and therefore the appeal was dismissed. Lord Cairns and Lord Hatherley decided that the transfer was to be treated as valid because of section 30 and because the company itself had approved the transfer. Lord Hatherley (at pp 76–77) referred to directors to whom section 30 applied as directors de facto. This case concerned persons who acted in all respects as if they were directors.

62 In the second decision of the House of Lords, Mahony v East Holyford Mining Co Ltd (1875) LR 7 HL 869 , it was held that bankers who held funds of a company could lawfully honour the cheques of the directors without being bound to inquire whether the persons pretending to sign as directors had been duly appointed in conformity with the provisions of the memorandum and articles of association. The persons purporting to act as directors had not been appointed, as required by the articles, by the subscribers to the memorandum. Lord Cairns LC, Lord Hatherley and *137 Lord Penzance considered that the case was covered by the normal validating provision in the articles that acts done by the board or by a committee of directors should, notwithstanding that it be afterwards discovered that there was some defect in the appointment be as valid as if every such person had been duly appointed, and was qualified to be a director.

63 Lord Cairns said, at p 888, that the House of Lords:

"should now hold that there having been de facto directors of the company, who were suffered and permitted by the majority of those who signed the articles of association to occupy the position of and act as directors, and the bankers having, in the full belief that these persons were directors, as they were represented to be, honoured the cheques drawn by them, the payment of these cheques is an answer to the action of the liquidator of the company ..."

64 Lord Penzance said, at pp 900–901:

"In the present case, from the time when the East Holyford Mining Co came into existence, that is after the registration of the memorandum and articles of association, three persons usurped the position of directors (I say 'usurped', because they do not seem to have been regularly appointed) and another person usurped the office of secretary. This they did in the face of the subscribers to and shareholders in the company, as well as of persons dealing with the company; and both before the company was legally formed, and after it was formed, they publicly advertised themselves in the prospectus as directors and secretary respectively. They occupied the offices designated in the prospectus, and they opened an account with the bank therein named. During the six months following they assumed, to the exclusion of all others, the executive functions of the company; no subscribers, nor shareholders, nor strangers dealt with any one else, and no one questioned their authority. Therefore, during the whole of the time that this company was acting as a company, these individuals were ostensibly directors and secretary respectively, and they were the de facto directors and secretary ... It seems to me, therefore, my Lords, that we have here the case of three individuals being de facto directors, and one being de facto secretary."

65 Slade J, in Rama Corpn Ltd v Proved Tin and General Investments Ltd [1952] 2 QB 147 , considered that the point in the Mahony case was whether the bank was entitled to treat the persons who were described in the mandate as directors. They were directors de facto, and whether they were directors de jure depended on whether the provisions in the articles relating to the appointment of directors had been complied with. This was a matter of internal management into which the bank was not bound to inquire: Royal British Bank v Turquand (1856) 6 E & B 327 . In Freeman & Lockyer v Buckhurst Park Properties (Mangal) Ltd [1964] 2 QB 480 , 507, Diplock LJ said that the basis of the decision in the Mahony case was that the conduct of those who were entitled to appoint the directors was relied on as a representation that they had been appointed.

66 The issue in John Morley Building Co v Barras [1891] 2 Ch 386 was whether an action was properly brought by de facto directors on behalf of the company to restrain the defendants from holding themselves out as *138 directors. The persons who had brought the action were persons who had been appointed directors by a document which had been signed by only seven of the subscribers instead of all of them. It claimed that because they were de facto directors under the articles at the first ordinary meeting after the registration of the company they retired from office after that as "vacating" directors, they continued in office until the ordinary meeting in the next year. It was held that the

© 2011 Thomson Reuters.

[2011] Bus. L.R. 111                                                                                                                Page 21
[2010] UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C.
1 [2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript [2010]
UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C. 1
[2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript
(Cite as: [2011] Bus. L.R. 111)

provision did not apply to persons who were only de facto directors. It applied only to those directors who had been validly appointed in pursuance of the articles. De facto directors did not derive any authority from that clause as against directors duly appointed. The defendants were validly appointed and the action was not properly brought.

67 In Channel Collieries Trust Ltd v Dover, St Margaret's and Martin Mill Light Railway Co [1914] 2 Ch 506 the sole remaining director purported to fill vacancies on the board, even though there was no quorum. It was held that "their acts as de facto directors" were validated by section 99 of the Companies Clauses Consolidation Act 1845 . Swinfen Eady LJ approved, at pp 514–515, the way in which it was put in the then current edition of *Buckley on the Companies Acts* , 9th ed (1909), p 169 in relation to the equivalent provision in the Companies (Consolidation) Act 1908, section 74 : "Endangering accuracy for the sake of brevity, it may be said that the effect of this section is that, as between the company and persons having no notice to the contrary, directors etc de facto are as good as directors etc de jure."

68 The third decision of the House of Lords on de facto directors, Morris v Kanssen [1946] AC 459 , was concerned with the validation provision in section 143 of the Companies Act 1929 . It was held that the appointment of X as a director at a board meeting attended by A and B, and the allotment of shares to X, were not validated by the section in a case where A and B had falsely claimed that B had been duly appointed a director, and where A had ceased to be a director in accordance with the company's articles because no general meeting had been held in the relevant year. Lord Simonds said, at p 475, that there was no authority for the proposition that a director or de facto director could invoke the rule so as to validate a transaction which was in fact irregular and unauthorised. The decision raises difficulties which are not relevant on this appeal: see *Gower & Davies, Principles of Modern Company Law* , 8th ed (2008), para 7–15, and the Companies Act 2006, section 161 .

69 All of the cases discussed thus far concerned persons who actually acted as directors, and all are about the authority of de facto directors or the validity of their acts. There was an invalid appointment in all of them, except Foss v Harbottle 2 Hare 461 (where there had been a valid appointment, but the directors had

ceased to hold office), and in Morris v Kanssen [1946] AC 459 , where two de facto directors were involved, one of whom had ceased to hold office and the other had been invalidly appointed.

### The liability of de facto directors

70 The only cases touching on the liability of de facto directors before the modern developments in the law are Gibson v Barton (1875) LR 10 QB 329 , In re Canadian Land Reclaiming and Colonising Co (Coventry and Dixon's case) (1880) 14 Ch D 660 , In re New Par Consols Ltd [1898] 1 QB 573 , and R v Lawson [1905] 1 KB 541 . *139

71 Like the cases on the validity of directors' acts, both In re Canadian Land Reclaiming and Colonising Co (Coventry and Dixon's case) and In re New Par Consols Ltd were about individuals who had been appointed directors: in the former case, the appointment of the two directors was defective, and in the latter case the defendant had ceased to be a director through an act of bankruptcy. Neither Gibson v Barton nor R v Lawson directly involved de facto directors. In each of those cases the question was whether a person who had acted as a manager of a company could be treated as a manager for the purposes, in the former case, of a predecessor of the Insolvency Act 1986, section 212 and in the latter case, of the Larceny Act 1861 (24 & 25 Vict c 96), even though he had not been appointed as such. Gibson v Barton deals obiter with the position of directors.

72 Gibson v Barton LR 10 QB 329 is the first case in which the liability of a de facto director is considered (but again in the context of a director whose appointment is invalid), and the first case in which the analogy of executor de son tort is employed. The issue was whether a penalty under the Companies Act 1862 (25 & 26 Vict c 89) for failure to file an annual return could be imposed under a section which imposed the penalty on the company and on "every director and manager of the company who shall knowingly and wilfully authorise or permit such default". The appellant was held to have been rightly convicted because he had been permitted by the board to manage the company generally, just as if he had been legally appointed to act as manager. Blackburn J also dealt with the position of directors, but he also was plainly thinking of a director whose appointment was defective, or, as he put it, "illegally elected". He said, at pp

© 2011 Thomson Reuters.

[2011] Bus. L.R. 111                                                                                    Page 22
[2010] UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C.
1 [2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript [2010]
UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C. 1
[2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript
(Cite as: [2011] Bus. L.R. 111)
338–339:

"There are many instances in which a person who de facto exercises an office cannot defend himself by saying, when he is called upon to bear liability in consequence of his wrong, 'I am not rightfully in the office, there is another man who may turn me out'. An executor de son tort is an instance in which a man incurs all the liabilities of an executor as to third persons, and he is not permitted to say, 'I am not executor; there is another man who may take out probate'. The answer is, 'Your liability as to a third person rests upon your being executor de son tort; you have usurped the office and must bear the liabilities' ... So, if a director were to set up in answer to a penalty under section 27, that he was not a director, that he was illegally elected, the answer would be, 'You have acted as director, and were a director in your own wrong'. I think there was evidence to justify the Lord Mayor in drawing the conclusion that the appellant was de facto manager. No doubt the appellant is called secretary, but was he a person to whom the whole management had been delegated, probably improperly delegated, by the board of directors, and who had taken upon himself to act as sole manager? He himself says in the minutes, 'The secretary', that is himself, 'reported that, in order to comply with the requirement of the Joint Stock Companies Acts he had called a general meeting of the shareholders', etc ... That is evidence upon which the Lord Mayor might find that he had taken on himself the management of the company; he has of his own authority done an act which was to be done only by the directors. So, again, in the letter he tells the directors he will call a meeting. I do not say he had power to call a *140 meeting. I think he had not, but I think that is evidence that he had assumed to act for the directors, and had taken the management of the company on himself. The Lord Mayor rightly drew the inference that the appellant was, by his own wrong, manager of the company."

73 An executor de son tort is a person who has not been lawfully appointed executor or administrator who by reason of his intrusion upon the affairs of the deceased is treated for some purposes as having assumed the executorship: *Williams, Mortimer & Sunnucks, Executors, Administrators and Probate* , 19th ed (2008), para 8–16.

74 The analogy with an executor de son tort was taken up in In re Canadian Land Reclaiming and Colonising

Co (Coventry and Dixon's case) 14 Ch D 660 , which is the authority for the proposition that de facto directors are directors for the purposes of what is now the Insolvency Act 1986, section 212 , but it too (like all of the older cases) is a case about persons who were appointed as, and acted as, directors, but whose appointment was defective. Coventry and Dixon were appointed, and for some time acted, as directors of a company in which the qualification for a director was the holding of a hundred shares. Neither of them was the holder of any shares. In the course of the winding up the liquidator applied under section 165 of the Companies Act 1862 (a predecessor of section 212 of the Insolvency Act 1986 ) to charge them for misfeasance in acting as directors without qualification.

75 In the Court of Appeal it was held, reversing the judgment of Sir George Jessel MR, that section 165 created no right and merely provided a summary mode of calling directors to account for acts of impropriety, and that to make a person liable under it he must be shown to have been guilty of some misconduct by which the company had suffered loss. But there was no disagreement on the concept of de facto directors.

76 Sir George Jessel MR, in a passage which was not affected by the reversal of his decision, said, at pp 664–665:

"No doubt they were not properly elected, and were, therefore, not de jure directors of the company; but that they were de facto directors of the company is equally beyond all question. The point I have to consider is whether the person who acts as de facto director is a director within the meaning of this section, or whether he can afterwards be allowed to deny that he was a director within the meaning of this section. I think he cannot. We are familiar in the law with a great number of cases in which a man who assumes a position cannot be allowed to deny in a court of justice that he really was entitled to occupy that position. The most familiar instance is that of executor de son tort. In like manner, it seems to me, in an application under this section, the de facto director is a director for the purposes of this section."

77 James LJ said, at p 670:

"It was admitted by the appellants that these persons, as de facto directors, would be liable for any act of

© 2011 Thomson Reuters.

[2011] Bus. L.R. 111                                                                                    Page 23
[2010] UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C.
1 [2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript [2010]
UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C. 1
[2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript
(Cite as: [2011] Bus. L.R. 111)

commission or any omission on their part in the same manner and to the same extent as if they had been de jure as well as de facto directors. They were, so to say, directors de son tort, and liable in that character, but not otherwise, and you must shew something that they did which resulted in loss to the company, and for *141 which, if they had been duly appointed directors of the company, the company would have been entitled to a remedy against them."

78 Bramwell LJ said, at p 673: "If he has done anything wrong as a de facto director, no doubt he can be got at under the clause."

79 In In re Western Counties Steam Bakeries and Milling Co [1897] 1 Ch 617 , 630, AL Smith LJ said in a phrase which is the only one in the older cases to foreshadow the modern development of the law: "When examined, Coventry and Dixon's case is only the case of Gibson v Barton over again. I agree that doing the work of a director may make a person a de facto director ..."

80 In In re New Par Consols Ltd [1898] 1 QB 573 Mr Gregory was a director of the company, and continued to act as such until it was wound up on 14 August 1897. He was adjudicated bankrupt in October 1896, having committed an act of bankruptcy on 3 August 1896. The articles provided that the office of director be vacated if he became a bankrupt. The bankruptcy dated back to the act of bankruptcy in August 1896 and he took the point that he was not bound to submit a statement of affairs because he had ceased to be a director of the company more than one year before the winding up. It is hardly surprising that the argument was rejected. Lord Russell of Killowen CJ said, at p 576, that the object of the legislation (the Companies (Winding-up) Act 1890 (53 & 54 Vict c 63), section 7 ) was to get at the persons who had the information which the court required, and accordingly:

"even if he had properly and legally ceased to be a director, but was de facto acting as a director within the prescribed period of a year, he was a director within the meaning of the section, and subject to the obligation to prepare and sign the accounts which are required by that section."

81 Gibson v Barton was applied in R v Lawson [1905] 1 KB 541 . The Larceny Act 1861, section 84 , made it a misdemeanour for "any director, manager, or public officer of any body corporate or public company" to publish false statements with intent to deceive or defraud. It was held that it applied to a person who, without having been appointed an officer of the company, had in fact acted throughout as the manager of the affairs of the company.

### The modern law

82 It seems that there is not a single case prior to the 1980s in which the term de facto director was applied to anyone other than one who had been appointed a director, but whose appointment was defective, or one who had been, but had ceased to be, a director. Consequently the extension of statutory provisions relating to disqualification of directors and wrongful trading by directors to persons who had not been appointed as directors but who took part in management was a judicial innovation, first fully articulated in In re Lo-Line Electric Motors Ltd [1988] Ch 477 by Sir Nicolas Browne-Wilkinson V-C.

83 Prior to that decision, in In re Eurostem Maritime Ltd [1987] PCC 190 , there was a disqualification application under the Companies Act 1985, section 300 (now the Company Directors Disqualification Act 1986, section 6 ). The application related to the respondent's association with *142 seven companies. He was a director of four of them. Mervyn Davies J held that the respondent was actively concerned in the administration of all seven companies and that section 300 applied to de facto directors.

84 The relevant facts in In re Lo-Line Electric Motors Ltd [1988] Ch 477 were that the respondent had been a director of company A; he resigned as a director but continued as production manager; after the sole remaining director had absconded to the United States, the respondent took over the running of the company, but was not appointed as a director; the respondent also acted as a director of company B, although he was never appointed as such. Sir Nicolas Browne-Wilkinson V-C held that for the purposes of a disqualification order under the 1985 Act, in considering whether a person was unfit to be a director, only his conduct "as director" was relevant, and that, as a matter of construction, "director" in section 300 included a person de facto acting as a director, though not appointed as such. It is apparent from the report of the argument that the respondent did not dispute that

[2011] Bus. L.R. 111                                                                                                                Page 24
[2010] UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C.
1 [2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript [2010]
UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C. 1
[2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript
(Cite as: [2011] Bus. L.R. 111)

he had run the companies. The only argument relevant
to the present case is that, relying on Morris v Kanssen
[1946] AC 459 , it was suggested that a de facto di-
rector was a director whose purported appointment
was invalid, and not a person who had never been
appointed. Sir Nicolas Browne-Wilkinson V-C re-
jected this argument [1988] Ch 477 , 490:

"[Counsel for the respondent] sought to draw a dis-
tinction between two types of de facto director, viz (a)
a person who has been appointed director, but inva-
lidly and (b) a person who has never been appointed
director at all. He submitted that if, contrary to his
primary submission, section 300 of the 1985 Act
permitted regard to be paid to the conduct of a director
who was invalidly appointed, the section did not ex-
tend to the conduct of a person who had never been
appointed a director at all. He relied on Morris v
Kanssen [1946] AC 459, 471, in which the House of
Lords drew exactly that distinction in holding that the
statutory predecessor of section 285 of the 1985 Act
(validation of acts of directors) did not validate the
acts of a person who had never been appointed a di-
rector at all. I do not accept this submission. For the
reasons I have given the plain intention of Parliament
in section 300 was to have regard to the conduct of a
person acting as a director, whether validly appointed,
invalidly appointed, or just assuming to act as director
without any appointment at all. In this context, there is
no logic in drawing the distinction put forward by
[counsel]. Morris v Kanssen was dealing with quite a
different section which validated the acts of a director
'notwithstanding any defect that may afterwards be
discovered in his appointment or qualification'. In that
case, both the words of the section and the common
sense of the matter pointed to the section being con-
cerned only with the acts of a person who had been
invalidly appointed a director."

85 The most discussed modern authority is In re Hy-
drodam (Corby) Ltd [1994] 2 BCLC 180 . Hydrodam
had two corporate directors, which were companies
incorporated in the Channel Islands. It was a subsid-
iary of Eagle Trust plc. The liquidator commenced
proceedings against Eagle Trust plc (the ultimate
parent company of Hydrodam through two other sub-
sidiaries) and all of Eagle Trust's directors, alleging
that they were liable as de facto or shadow directors of
Hydrodam under *143 section 214 of the Insolvency
Act 1986 for wrongful trading. The decision con-
cerned an application by two of the directors to strike

out the proceedings. It was alleged that as directors of
Eagle Trust they were, with the other directors, col-
lectively responsible for the conduct of Eagle Trust in
relation to Hydrodam. The proceedings were struck
out because the liquidator had neither pleaded nor
adduced evidence to support any allegation that either
of the respondents was a director of Hydrodam.

86 Millett J accepted that the liability for wrongful
trading imposed by section 214 extended to de facto
directors as well as to de jure and shadow directors. He
said, at p 183:

"A de facto director is a person who assumes to act as
a director. He is held out as a director by the company,
and claims and purports to be a director, although
never actually or validly appointed as such. To estab-
lish that a person was a de facto director of a company
it is necessary to plead and prove that he undertook
functions in relation to the company which could
properly be discharged only by a director. It is not
sufficient to show that he was concerned in the man-
agement of the company's affairs or undertook tasks in
relation to its business which can properly be per-
formed by a manager below board level. A de facto
director, I repeat, is one who claims to act and purports
to act as a director, although not validly appointed as
such."

87 Millett J, in a much debated passage, dealt with the
question whether the directors of a corporate director
of a company must ipso facto be what he described as
shadow directors (by which he probably also meant to
include de facto directors) of the company. His answer
was, at p 184:

"Attendance of board meetings and voting, with oth-
ers, may in certain limited circumstances expose a
director to personal liability to the company of which
he is a director or its creditors. But it does not, without
more, constitute him a director of any company of
which his company is a director."

88 On the facts Millett J held that the liquidator had
neither pleaded nor adduced evidence that either of the
directors was a director of Hydrodam. As regards one
of them, Dr Hardwick, he had never acted as a direc-
tor, and as regards the other, Mr Thomas, it was not
alleged that he acted in any way in relation to the
company's affairs.

© 2011 Thomson Reuters.

[2011] Bus. L.R. 111                                                     Page 25
[2010] UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C.
1 [2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript [2010]
UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C. 1
[2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript
**(Cite as: [2011] Bus. L.R. 111)**

89 Since the decision in In re Hydrodam there have been many decisions on de facto directors, most of which have been in disqualification cases at first instance. Many of the cases have involved a textual analysis of Millett J's judgment (which was, according to the report, a reserved judgment delivered on the day following the oral hearing). The most notable developments have been in In re Richborough Furniture Ltd [1996] 1 BCLC 507 (Timothy Lloyd QC), and Secretary of State for Trade and Industry v Tjolle [1998] 1 BCLC 333 (Jacob J), and in the decision of the Court of Appeal in In re Kaytech International plc [1999] 2 BCLC 351 , which contains a valuable analysis by Robert Walker LJ.

90 The decisions have treated In re Hydrodam as a starting point. But although in In re Hydrodam Millett J used expressions such as "held out as a director" and "claims and purports to be a director", it has been held that although these were relevant factors, they were not necessary factors, and he *144 could not have meant that the label "director" had to have been attached to the person or that he be held out as a director: see In re Moorgate Metals Ltd [1995] 1 BCLC 503 (Warner J); In re Richborough Furniture Ltd [1996] 1 BCLC 507 (Timothy Lloyd QC) and cf Secretary of State for Trade and Industry v Tjolle [1998] 1 BCLC 333 , 343.

91 Once the concept of de facto director was divorced from the unlawful holding of office, there were two consequences. The first consequence was that the distinction between de facto directors and shadow directors was eroded. A shadow director is "a person in accordance with whose directions or instructions the directors of the company are accustomed to act": see Companies Act 1985, section 741(2) ; Companies Act 2006, section 251(1) . In In re Hydrodam [1994] 2 BCLC 180 , 183, Millett J said that de facto and shadow directorship "do not overlap. They are alternatives, and in most and perhaps all cases are mutually exclusive". But the distinction was impossible to maintain with the extension of the concept of de facto directorship and the consideration of such matters as the taking of major decisions by the individual, which might be through instructions to the de jure directors, and the evaluation of his real influence in the affairs of the company: see In re Kaytech International plc [1999] 2 BCLC 351 , 424, per Robert Walker LJ. The second consequence is that the courts were confronted

with the very difficult problem of identifying what functions were in essence the sole responsibility of a director or board of directors. A number of tests have been suggested of which the following are the most relevant. First, whether the person was the sole person directing the affairs of the company (or acting with others equally lacking in a valid appointment), or if there were others who were true directors, whether he was acting on an equal footing with the others in directing its affairs: In re Richborough Furniture Ltd [1996] 1 BCLC 507 . Second, whether there was a holding out by the company of the individual as a director, and whether the individual used the title: Secretary of State for Trade and Industry v Tjolle [1998] 1 BCLC 333 . Third, taking all the circumstances into account, whether the individual was part of "the corporate governing structure": see Secretary of State for Trade and Industry v Tjolle , at pp 343–344, approved in In re Kaytech International plc [1999] 2 BCLC 351 , 423, where Robert Walker LJ also approved the way in which Jacob J in the Tjolle case had declined to formulate a single test. He also said, at p 424 that the concepts of shadow director and de facto director had in common "that an individual who was not a de jure director is alleged to have exercised real influence (otherwise than as a professional adviser) in the corporate governance of a company". See also especially In re Mea Corp Ltd [2007] 1 BCLC 618 (Lewison J); Ultraframe (UK) Ltd v Fielding (No 2) [2006] FSR 293 (Lewison J); Secretary of State for Trade and Industry v Hollier [2007] Bus LR 352 (Etherton J). In fact it is just as difficult to define "corporate governance" as it is to identify those activities which are essentially the sole responsibility of a director or board of directors, although perhaps the most quoted definition is that of the Cadbury Report: "Corporate governance is the system by which companies are directed and controlled" (Report of the Committee on the Financial Aspects of Corporate Governance, 1992, para 2.5).

92 Other common law jurisdictions have had to deal with similar problems, and they have also imposed liabilities not only on irregularly *145 appointed directors or persons who, without being appointed as directors, have been held out as directors, but also on persons who perform the functions of directors with any appointment, irregular or otherwise, and without any holding out: for Australia see the Corporations Act 2001, section 9 , and eg Gebo Investments (Labuan) Ltd v Signatory Investments Pty Ltd [2005]

© 2011 Thomson Reuters.

[2011] Bus. L.R. 111                                                                                         Page 26
[2010] UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C.
1 [2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript [2010]
UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C. 1
[2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript
(Cite as: [2011] Bus. L.R. 111)

NSWSC 544 ; Chameleon Mining NL v Murchison
Metals Ltd [2010] FCA 1129 ; for Canada, contrast
Wheeliker v Canada (1999) 172 DLR (4th) 708 , 716,
para 19 (remedies available against persons "who act
as directors or who are held out by the company as
directors although they lack the required qualification
or authority") with Scavuzzo v The Queen [2006] 2
CTC 2429 , para 32 ("a person must have some sem-
blance of qualification as director and must hold
himself ... out as a director"); in the United States de
facto director still connotes a person who, without
being a director, claims to be one (eg Osler Institute
Inc v Forde (2003) 333 F 3d 832 ), but the courts
impose fiduciary duties on other persons who, without
being directors, are "control persons" (eg In re Par-
malat Securities Litigation (2010) 684 F Supp 2d 453 ,
475–476).

93 It does not follow that "de facto director" must be
given the same meaning in all of the different contexts
in which a "director" may be liable. It seems to me that
in the present context of the fiduciary duty of a di-
rector not to dispose wrongfully of the company's
assets, the crucial question is whether the person as-
sumed the duties of a director. Both Sir Nicolas
Browne-Wilkinson V-C in In re Lo-Line Electric
Motors Ltd [1988] Ch 477 , 490, and Millett J in In re
Hydrodam [1994] 2 BCLC 180 , 183, referred to the
assumption of office as a mark of a de facto director.
In Fayers Legal Services Ltd v Day (unreported) 11
April 2001 , a case relating to breach of fiduciary duty,
Patten J, rejecting a claim that the defendant was a de
facto director of the company and had been in breach
of fiduciary duty, said that in order to make him liable
for misfeasance as a de facto director the person must
be part of the corporate governing structure, and the
claimants had to prove that he assumed a role in the
company sufficient to impose on him a fiduciary duty
to the company and to make him responsible for the
misuse of its assets. It seems to me that that is the
correct formulation in a case of the present kind. See
also Primlake Ltd v Matthews Associates [2007] 1
BCLC 666 , para 284.

**Conclusion**

94 It follows that I do not consider that the answer to
the question on this appeal lies in considering what
Millett J meant by the words "without more," and then
attempting to catalogue what Mr Holland did. If the
question is, as I believe, whether Mr Holland was part

of the corporate governing structure of the composite
companies and whether he assumed a role in those
companies which imposed on him the fiduciary duties
of a director, then I would answer that he was not.

95 This is not simply a question of fact, since it raises
the question of principle of the effects of acts done by
a director of a corporate director in that capacity. The
sole director of the composite companies was Pay-
check Directors. From the time of the decision in In re
Bulawayo Market and Offices Co Ltd [1907] 2 Ch 458
that a company could have a sole corporate director
and its statutory recognition from the Companies Act
1929, sections 144 and 145 , until the requirement in
the *146 Companies Act 2006, section 155(1) , that a
company have at least one director who is a natural
person, the corporate structure of the type in this case
was perfectly lawful.

96 There is no material to suggest that Mr Holland was
doing anything other than discharging his duties as the
director of the corporate director of the composite
companies. It does not follow from the fact that he was
taking all the relevant decisions that he was part of the
corporate governance of the composite companies or
that he assumed fiduciary duties in respect of them. If
he was a de facto director of the composite companies
simply because he was the guiding mind behind their
sole corporate director, then that would be so in the
case of every company with a sole corporate director.
The development of the law of de facto directors from
In re Lo-Line [1988] Ch 477 and In re Hydrodam
[1994] 2 BCLC 180 onwards was a significant judicial
innovation given that for some 150 years de facto
directors meant individuals who had actually been
appointed, or purportedly appointed, as directors. As
has been seen, in two of the three older cases which
dealt with the liability of de facto directors, an analogy
was drawn with executors de son tort: Gibson v Barton
(1875) LR 10 QB 329 and In re Canadian Land Rec-
laiming and Colonising Co (Coventry and Dixon's
case) (1880) 14 Ch D 660 . That suggests strongly that
the basis of liability was the assumption of responsi-
bility. The legislature has already intervened in the
2006 Act to ensure that there is a natural person to
whom responsibility is attributed. The purpose of what
became Companies Act 2006, section 155(1) , was to
ensure that every company would have at least one
individual who could, if necessary, be held to account
for the company's actions: see Department of Trade
and Industry, *Company Law Reform* (Cm 6456)

© 2011 Thomson Reuters.

[2011] Bus. L.R. 111                                                                                    Page 27
[2010] UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C.
1 [2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript [2010]
UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C. 1
[2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript
(Cite as: [2011] Bus. L.R. 111)

(2005), para 3.3. For the court to hold that every significant decision of individual directors of a corporate director is to be regarded as being taken as if they were directors of the company of which it is the corporate director goes considerably beyond the law as it has been developed at first instance and by the Court of Appeal in the modern de facto director cases, and beyond what I would regard as the function of the court. I would not wish to question the modern judicial development of the de facto director concept, and I well understand the policy reasons why in such a case as this a person in the position of Mr Holland should be liable, although those reasons may not be as powerful as they were prior to the enactment of the Companies Act 2006, section 155(1) . The legislature could have intervened to require that all directors be natural persons, as under the Corporations Act 2001, section 201B (Australia), the Canada Business Corporations Act 1985, section 105(1)(c) , the New York Business Corporation Law, section 701 , and the Delaware General Corporate Law, section 141(b) . But it did not, and in my judgment the proposed extension which is inherent in HMRC's case is a matter for the legislature and not for this court.

LORD SAVILLE OF NEWDIGATE

97 To my mind the Revenue's case necessarily involves substantial inroads into the long established principle that although a company is an artificial entity and can only act through natural persons, it is to be treated as a legal personality separate and distinct from its directors and members.

98 It is the case that Mr Holland was the guiding mind behind the sole corporate director of the composite companies. He was the natural person *147 who decided that the composite companies should pay the dividends in question. But he did so in the course of directing the corporate director, not by acting or purporting to act as a director of the composite companies. In my judgment, it does not follow from the fact that Mr Holland caused the corporate director to make decisions in relation to the composite companies that he was accordingly a de facto director of the composite companies. To suggest that he was is to ignore or bypass the separate legal personality of the corporate director and instead to treat Mr Holland as though he, rather than the corporate director, was the legal personality running the composite companies.

99 As Lord Collins of Mapesbury JSC has pointed out in para 96 of his judgment, if this were the law, then in the case of every company with a sole corporate director, the natural person or persons who caused the corporate director to make decisions relating to the company would necessarily be de facto directors of that company. Such a state of affairs would lie awkwardly with the fact that in 2006 Parliament enacted that a company must have at least one director who is a natural person; hardly necessary if the natural person or persons who were the guiding minds behind the corporate director's decisions relating to the company were ipso facto to be treated as de facto directors of the company.

100 I accordingly agree that for the reasons given by Lord Hope of Craighead DPSC and Lord Collins of Mapesbury JSC, this appeal should be dismissed.

LORD WALKER OF GESTINGTHORPE JSC

101 I am unable to agree with the reasoning and conclusions of the majority on the first issue in this appeal. The court's decision will, I fear, make it easier for risk-averse individuals to use artificial corporate structures in order to insulate themselves against responsibility to an insolvent company's unsecured creditors.

102 I gratefully adopt Lord Hope of Craighead DPSC's summary of the relevant facts. I would add only that the specimen of the standard form computer-generated document purporting to be a minute of a meeting of the board of directors of the composite company does not specify whether the dividend to be paid is an interim dividend or a final dividend.

103 This last point is potentially of some importance because article 8(b)(i) of the articles of each of the composite companies, part of which is set out in para 8 of Lord Hope DPSC's judgment, makes the payment of dividends a matter for the decision of the company in general meeting acting on the recommendation of the directors. Article 8(b)(i)(ee) and (ff) provide as follows:

"(ee)when paying interim dividends, the directors may make payments of interim dividends to one or more classes of non-voting shares to the exclusion of one or more other classes of non-voting shares on the same

[2011] Bus. L.R. 111                                                                                              Page 28
[2010] UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C.
1 [2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript [2010]
UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C. 1
[2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript
(Cite as: [2011] Bus. L.R. 111)

basis that final dividends may be paid by the company to each class of non-voting shares in accordance with the foregoing; (ff) regulations 102 and 103 of Table A shall be read and construed accordingly with the foregoing provisions of this article."

104 Rather surprisingly, the question whether the dividends purportedly paid by the composite companies were interim or final *148 dividends seems not to have been considered in the courts below. Nor was it raised in argument in this court. It may have been assumed that every single dividend paid by any of the composite companies was an interim dividend payment of which was a decision for the corporate director alone. But for a company to pay an endless stream of interim dividends, with no final dividend ever recommended by the directors and approved by the company in general meeting, could not be a proper exercise of the powers conferred by the article. That conclusion is reinforced by the opening words of article 8(b)(i) ("such dividends payable on each such class of shares in such amounts, at such frequency, at such times as, on the recommendation of the directors, the holder of the A share shall, in general meeting, resolve ...").

105 The holder of the A share in each of the composite companies was of course Paycheck Services Trustee Ltd, the directors and shareholders of which were Mr and Mrs Holland. Paycheck Services Trustee Ltd held each A share on the trusts of a settlement made by Mr Holland. The beneficiaries were the other shareholders in the composite company in questions. Clause 3.1 of the form of settlement expressly provided for how the voting control conferred by the A share was to be exercised:

"In the exercise by the trustees of their duties hereunder and of the voting rights attached to the 'A' share the trustees shall act at all times in the best interests of the [relevant composite company] and the members and the company's employees."

**The authorities**

106 In the courts below counsel for Mr Holland relied heavily on the decision of Millett J in In re Hydrodam (Corby) Ltd [1994] 2 BCLC 180 . That company ("Hydrodam") had two corporate directors, both incorporated in the Channel Islands. Millett J com-

mented, at p 183:

"That fact alone may be sufficient to justify an inference that they were accustomed to act in accordance with the directions of others; in which case there were shadow directors of the company. But there is nothing pleaded in the points of claim to suggest that there were, in addition to the titular directors, any other persons who claimed to be directors of the company at all." Millett J went on to explain in detail why the pleaded case was so deficient. Hydrodam's liquidator had made claims for wrongful trading against numerous respondents including two individuals who were (with six or seven co-directors) directors of Eagle Trust plc ("Eagle") of which Hydrodam was (at two removes) an indirect subsidiary. The pleaded case against the two individuals was that they were "collectively responsible" for decisions taken by Eagle in relation to Hydrodam. In that case, the judge said, it was Eagle, not two members of its fairly large board, who should be regarded as a shadow director, at p 184:

"But if all they have done is to act in their capacity as directors of the ultimate holding company, in passing resolutions at board meetings, then in my judgment the holding company is the shadow director of the subsidiary, and they are not."*149 To put the point another way, in the statutory definition of "shadow director", the context in which "person" is used does not permit the singular to include the plural.

107 In striking out the defective pleading as against the two directors of Eagle, Millett J, was, if I may respectfully say so, obviously right. But he also made some general observations which have been much quoted and discussed, and not accepted without some qualification, in later cases. The key passage, at pp 182–183 is set out in para 29 of Lord Hope DPSC's judgment and I need not repeat it.

108 Later authority, at first instance and in the Court of Appeal, has qualified some of Millett J's propositions and developed others. It is unnecessary to embark on a lengthy discussion of all the first instance authorities. There are three main points of qualification. First, Millett J said that a de facto director "assumes" to act as such, is "held out" as such, and "claims and purports" to be a director. That is true of some of the early cases in which an apparently de jure director had been disqualified by failing to obtain the requisite share qualification, or by bankruptcy: see for

© 2011 Thomson Reuters.

[2011] Bus. L.R. 111                                                                                      Page 29
[2010] UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C.
1 [2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript [2010]
UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C. 1
[2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript
(Cite as: [2011] Bus. L.R. 111)

instance the cases mentioned by Sir Nicolas Browne-Wilkinson V-C in In re Lo-Line Electric Motors Ltd [1988] Ch 477 , 489–490. But it is not required in every case. The Vice-Chancellor's view was, at p 490:

"the plain intention of Parliament in section 300 [of the Companies Act 1985 , the predecessor of the Company Directors Disqualification Act 1986 ] was to have regard to the conduct of a person acting as a director, whether validly appointed, invalidly appointed, or just assuming to act as director without any appointment at all." Here the context shows that "assuming" was used in a neutral sense, simply drawing attention to what the individual in question actually did. To the same effect are the observations of Etherton J in Secretary of State for Trade and Industry v Hollier [2007] Bus LR 352 , para 66 (but compare para 81(4)). This analysis is supported by the observations of Lewison J in In re Mea Corpn Ltd [2007] 1 BCLC 618 , paras 83 and 84, citing Jacob J in Secretary of State for Trade and Industry v Tjolle [1998] 1 BCLC 333 , 343–344. Lewison J said, "In considering whether a person 'assumes to act as a director' what is important is not what he calls himself, but what he did".

109 Secondly (though not directly relevant in this appeal), it is not necessary that a shadow director should be someone who "lurks in the shadows". He may do so, especially if he has a bad commercial reputation (or has actually been disqualified from acting as a director). But he may be the chief executive of a group of companies who openly gives directions to the board of a subsidiary company on which he does not sit. This point has been made by the Court of Appeal in In re Kaytech International plc [1999] 2 BCLC 351 , 424 (Robert Walker LJ) and in Secretary of State for Trade and Industry v Deverell [2001] Ch 340 , para 36 (Morritt LJ). Indeed, Millett J could be said to have recognised it himself in the example that he gave in a later paragraph in In re Hydrodam [1994] 2 BCLC 180 , 184 f .

110 Thirdly (following on from the first two points) it is not the case that the concepts of de facto director and shadow director are fundamentally different, and always, or nearly always, to be regarded as mutually exclusive categories. This point has been made in In re Kaytech [1999] 2 BCLC 351 , *150 424. It was left open in the Deverell case [2001] Ch 340 , para 36, but

in the In re Mea [2007] 1 BCLC 618 , para 89 Lewison J has taken the Deverell case as leading to the same conclusion:

"Now that Morritt LJ has explained that the role of a shadow director does not necessarily extend over the whole range of the company's activities, it seems to me that there is no conceptual difficulty in concluding that a person can be both a shadow director and a de facto director simultaneously … In each case, it is necessary to examine the facts, bearing in mind that, as Morritt LJ explained ([2001] Ch 340, 354), the purpose of the legislation is to 'identify those, other than professional advisers, with real influence in the corporate affairs of the company'."

111 Subject to these qualifications (which are in my opinion correct and necessary) In re Hydrodam still provides valuable guidance especially in emphasising, at p 183, that "to establish that a person was a de facto director of a company it is necessary to plead and prove that he undertook functions in relation to the company which could properly be discharged only by a director". This essential feature has been further explained and developed in In re Kaytech [1999] 2 BCLC 351 , 423–424 (citing the Tjolle case [1998] 1 BCLC 333 ), in the Hollier case [2007] Bus LR 352 , paras 66–81, and in In re Mea [2007] 1 BCLC 618 , paras 82–83.

### "Something more"

112 In In re Hydrodam [1994] 2 BCLC 180 , 184, Millett J added some further observations to the passage already referred to:

"Attendance of board meetings and voting, with others, may in certain limited circumstances expose a director to personal liability to the company of which he is a director or its creditors. But it does not, without more, constitute him a director of any company of which his company is a director." The theme that "something more" is required has been repeated in later cases, including the judgment of Rimer LJ in this case [2010] Bus LR 259 , para 66. Rimer LJ did not take from In re Hydrodam (and I entirely agree)

"that the requisite more would be satisfied merely by the active participation of the board member in the making of board decisions by the corporate director in

© 2011 Thomson Reuters.

[2011] Bus. L.R. 111                                                                    Page 30
[2010] UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C.
1 [2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript [2010]
UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C. 1
[2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript
**(Cite as: [2011] Bus. L.R. 111)**

relation to the actions of the subject company."

113 In a section of his judgment headed "Mr Holland's case" (there is no parallel section considering the revenue's case) Lord Hope DPSC observes at para 41, "the facts of this case do not precisely match those of In re Hydrodam ". That is, with respect, a considerable understatement. In In re Hydrodam , as already noted, each of the individuals in question was one of about eight persons who made up the board of directors of Eagle, of which Hydrodam was a sub-sub-subsidiary. The pleaded case was that the Eagle directors were "collectively responsible". Being a de facto director is a matter of what the individual himself does on his own initiative, not simply as part of a process of collective decision making.

114 Mr Holland was (with his professional advisers, who took their instructions from Mr Holland, and whose function was simply to give advice) the founder and guiding spirit of the whole Paycheck empire. With *151 the concurrence of his wife (whose responsibilities were no more than secretarial) he was the only active director of both Paycheck Directors and Paycheck Secretarial; he was the original holder of all the A shares which carried voting control of the composite companies, and he was the only active director of the corporate trustee which held the A shares under settlements which he had created. He took the decision (after receiving the advice of leading counsel at the consultation on 18 August 2004) that composite companies should continue trading, and should continue to pay dividends without reserving for higher rate corporation tax.

115 If those facts did not amount to the "something more" referred to in the authorities, it is hard to imagine circumstances that would do so. The repeated assertion that everything that Mr Holland did was done in his capacity as a director of Paycheck Directors, and was within his authority as a director of that company, is no doubt not "pure sham" but it is, in my view, the most arid formalism. In my view Mr Holland was acting both as a de jure director of Paycheck Directors and as a de facto director of the composite companies. A de facto director is not formally invested with office, but if what he actually does amounts to taking all important decisions affecting the relevant company, and seeing that they are carried out, he is acting as a director of that company. It makes no difference that he is also acting as the only active de

jure director of a corporate director of the company.

116 I reach that conclusion without reference to the point, raised earlier in this judgment, about the status of the payments as interim dividends. The court heard no argument on the point, and it would not be right to place any reliance on it. But Mr Holland's apparent disregard for the provisions of articles tailor-made for his own purposes makes his reliance on formalities even less convincing.

**The Standard Chartered case**

117 Mr Green, for HMRC, relied strongly on the decision of the House of Lords in Standard Chartered Bank v Pakistan National Shipping Corpn (Nos 2 and 4) [2003] 1 AC 959 . In that case Mr Mehra had made fraudulent misrepresentations on behalf of a company called Oakprime, of which he was a director. The Court of Appeal accepted the argument that he was not personally liable for deceit because he had been acting solely on behalf of Oakprime. The House of Lords trenchantly exposed the fallacy of this reasoning. The most important passages are paras 20–23 in the opinion of Lord Hoffmann and paras 35–41 in the opinion of Lord Rodger of Earlsferry.

118 These passages in their entirety call for careful study, but I will limit quotation to para 41 of Lord Rodger's opinion:

"The Court of Appeal sought support for their view that Mr Mehra should not be held personally liable in the speech of Lord Steyn in Williams v Natural Life Health Foods Ltd [1998] 1 WLR 830 , 834–835. In truth it provides no such support. The issue in that case related to the personal liability of a director for a misleading projection, prepared in large part by him and issued by the company, as to the profits which the plaintiffs might earn by opening a health food shop under a franchise. Lord Steyn, with whom the other members of the House concurred, said *152 ( [1998] 1 WLR 830 , 835 b-c ): 'But in order to establish personal liability under the principle of Hedley Byrne & Co Ltd v Heller & Partners Ltd [1964] AC 465 , which requires the existence of a special relationship between plaintiff and tortfeasor, it is not sufficient that there should have been a special relationship with the principal. There must have been an assumption of responsibility such as to create a special relationship

© 2011 Thomson Reuters.

[2010] UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C. 1 [2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript [2010] UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C. 1 [2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript
**(Cite as: [2011] Bus. L.R. 111)**

with the director or employee himself.' Since the plaintiffs had failed to show a special relationship with the director himself, the House held that he was not liable. Lord Steyn was dealing with the tort of negligence where a claimant must establish that the defendant owed him a duty of care. There is no such requirement in the case of deceit. Liability for deceit is so self-evident that we do not consider it as resulting from a breach of duty (Tony Weir, *Tort Law* (2002), p 30). Mr Mehra set out by his fraudulent acts to make Standard Chartered pay under the letter of credit. He succeeded. He is accordingly personally liable for the loss which he thereby caused them."

119 Mr Knox, for Mr Holland, summarily dismissed this case as irrelevant on the ground that it was a claim in deceit. So it was, and there has never been any pleading or finding of dishonesty against Mr Holland. Nevertheless there is to my mind a significant parallel between liability for deceit (which is in Lord Rodger's words "so self-evident that we do not consider it as resulting from a breach of duty") and the unqualified statutory prohibition in section 263 of the Companies Act 1985 on payment of a dividend otherwise than out of available profits. Contravention of this prohibition is a statutory wrong giving rise to strict liability, and anyone who is in a position to contravene it is likely to be in a fiduciary position: see further below. Mr Holland was the human cause of (and apart from his wife's secretarial assistance, the only human being who took any part in) the payment of unlawful dividends. They were, as Rimer LJ said, at [2010] Bus LR 259 , para 112, payments which should never have been made. Mr Holland is liable for the payments because he deliberately made them. His liability has nothing to do with limited liability of shareholders, or with Salomon v A Salomon & Co Ltd [1897] AC 22 .

120 I have carefully considered the judgment of Lord Collins of Mapesbury JSC. It contains a very full analysis of the early cases and the development of the law relating to de facto directors. It notes that In re Lo-Line Electric Motors Ltd [1988] Ch 477 was a striking judicial innovation. But its innovation has been followed and developed in many decisions at first instance and in the Court of Appeal.

121 I agree with Lord Collins JSC that section 212 is procedural in nature, and that for liability to arise under the section, a breach of some identifiable duty must be established. I also agree that assumption of

responsibility is the appropriate test, so long as that expression is understood as focusing on what the individual in question did, rather than what he was called: see the authorities mentioned in para 108 above. In this case the assumption of responsibility equates with the fiduciary duty that a company director owes to his company not to make an unauthorised distribution of capital. But in the circumstances of this case I think that there would be some element of putting the cart before the horse in looking for a fiduciary duty before looking at what Mr Holland did, because it is what he did that **\*153** demonstrates that he was undertaking responsibility and exposing himself to a claim for breach of fiduciary duty.

122 Lord Collins JSC makes a modest reference to his own monumental first instance judgment in Primlake Ltd v Matthews Associates [2007] 1 BCLC 666 . It would be inappropriate, in a dissenting judgment, to go far into that decision, which was not cited to the court. But it is to my mind a striking example, comparable on its facts to this case, of an individual held to be a de facto director, and to be liable for breach of fiduciary duty, because of what he did: see the summary at para 311 of the judgment.

123 Lord Saville of Newdigate's brief judgment overlooks the important difference between a multiplicity of human directors participating in the collective governance of a single corporate director (as is common and as was the case, indirectly, in In re Hydrodam [1994] 2 BCLC 180 ), and a single individual director who is the guiding mind of a single corporate director, as Mr Holland was in this case.

**Other issues**

124 On the other issues I agree with Rimer LJ in the Court of Appeal. The discretion conferred by section 212(3) of the Insolvency Act 1986 is not a wide discretion. It does not replicate or extend the court's power to grant relief under section 727 of the Companies Act 1985 . What it does is to enable the court to adjust the remedy to the circumstances of the particular case (some examples are given by Dillon LJ in West Mercia Safetywear Ltd v Dodd [1988] BCLC 250 ).

125 For these reasons I would for my part have allowed the appeal and restored the order of the deputy

[2011] Bus. L.R. 111                                                                                                    Page 32
[2010] UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C.
1 [2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript [2010]
UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C. 1
[2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript
(Cite as: [2011] Bus. L.R. 111)

judge but without the restriction on Mr Holland's liability imposed by para 2 of the judge's order.

## LORD CLARKE OF STONE-CUM-EBONY JSC

126 I agree with Lord Walker of Gestingthorpe JSC that this appeal should be allowed for the reasons he gives. I state the principal considerations which have led me to that conclusion because others take a different view.

127 I entirely agree with Lord Walker JSC's analysis of and qualifications to the decision and reasoning of Millett J in In re Hydrodam (Corby) Ltd [1994] 2 BCLC 180 . In particular, I agree that, as Lewison J said in In re Mea Corpn Ltd [2007] 1 BCLC 618 , para 89 (in the passage quoted by Lord Walker JSC), there is no conceptual difficulty in holding that a person can be both a shadow director and a de facto director simultaneously and that the real purpose of each is to identify those, other than professional advisers, with real influence in the corporate affairs of the company.

128 As I read the judgments in the present case, it is accepted in them all that, in order to establish that a person was a de facto director, it is necessary to plead and prove that he undertook functions in relation to a company which could properly be carried out only by a director and that he must have done "something more" than merely participate in decisions by the corporate director in relation to the actions of the subject company. This requirement was not satisfied in In re Hydrodam because each of the individuals alleged to be de facto directors was, as Lord Walker JSC describes it, one of about eight people who made up the board of Eagle, of *154 which Hydrodam was a sub-sub-subsidiary. The allegation was that the directors of Eagle were collectively responsible. I agree with Lord Walker JSC that being a de facto director depends upon what the individual does on his own initiative.

129 The question in each case is whether the individual did something more than participate in a collective decision. In this case the question is whether Mr Holland did an act which was a directorial act of each composite company. I agree with Lord Walker JSC that it does not follow from the fact that he did the act in his capacity as a director of Paycheck Directors, which was the corporate director of each composite

company, that he did not also do it as a de facto director of each composite company. There is no reason in principle why it cannot be held as a matter of fact that Mr Holland decided to pay the dividends both as a de jure director of Paycheck Directors and as a de facto director of each composite company.

130 Section 263(1) of the Companies Act 1985 provides: "A company shall not make a distribution except out of profits available for the purpose." As Lord Hope of Craighead DPSC observes at para 47, it was held by the deputy judge that, as from 18 August 2004, all the dividends were unlawful and it is accepted that the relief available under section 727 of that Act would have been available to Mr Holland if he could show that he acted reasonably. It is thus accepted that, if Mr Holland was a de facto director of the composite companies, his position is the same as that of the de jure director of those companies, namely Paycheck Directors. The de jure director would be liable, subject to section 727 , because it procured the payment of unlawful dividends and, if Mr Holland was a de facto director, he would be liable on the same basis.

131 It is in this regard that I agree with Lord Walker that assistance is to be found in the reasoning of the House of Lords in Standard Chartered Bank v Pakistan National Shipping Corpn (Nos 2 and 4) [2003] 1 AC 959 . If Mr Holland was a de facto director of the composite companies, he is liable because, as a matter of fact, he procured the unlawful payment of the dividends to the shareholders and because he cannot show that he acted reasonably so as to enable him to seek relief under section 727 . In the Standard Chartered Bank case Mr Mehra was liable "not because he was a director but because he committed a fraud": see per Lord Hoffmann at para 22. In the extract from para 41 of the speech of Lord Rodger quoted by Lord Walker JSC (at para 118 above) he said: "Mr Mehra set out by his fraudulent acts to make Standard Chartered pay under the letter of credit. He succeeded. He is accordingly personally liable for the loss that he thereby caused them." As I see it, the position is essentially the same here. If Mr Holland is a de facto director of the composite companies, it is because he personally procured the payment of the unlawful dividends and is liable to restore them just as the de jure director is.

132 Mr Michael Green submitted that if agency and therefore capacity are irrelevant to the question whether an individual has committed a tort, as was

© 2011 Thomson Reuters.

[2011] Bus. L.R. 111                                                                                               Page 33
[2010] UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C.
1 [2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript [2010]
UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C. 1
[2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript
(Cite as: [2011] Bus. L.R. 111)

held in the Standard Chartered Bank case, then so capacity should be irrelevant to the question whether an individual is a de facto director. I would accept that submission. In both cases the answer to the question depends upon what the individual did, not upon the capacity in which he did it. *155

133 Lord Collins of Mapesbury JSC has expressed the view that what divides the court is not simply a matter of the facts, namely whether what Mr Holland did was in fact sufficient to make him a de facto director of the composite companies, but a question of law and a question of principle. He formulates the question at para 53 as being whether fiduciary duties can be imposed, in relation to a company whose sole director is a corporate director, on a director of that corporate director when all of his relevant acts were done as a director of the corporate director and can be attributed in law solely to the activities of the corporate director. That appears to me to be a similar principle to that stated by Lord Hope DPSC at para 42 that, so long as the relevant acts are done by the individual entirely within the ambit of the discharge of a person's duties and responsibilities as a director of a corporate director, it is to that capacity that his acts must be attributed.

134 As I understand it, those propositions are advanced as propositions of law. However, no authority is cited for them and, for my part, I would not accept them. I recognise of course that, as Lord Collins JSC points out at para 95, until section 155(1) of the Companies Act 2006 was enacted, it was perfectly lawful for a company to have a corporate director as a sole director. I also recognise that Mr Holland was a director of Paycheck Directors. However, as I see it, it does not follow as a matter of law that he cannot be a de facto director of the composite companies. Whether he was or not is a question of fact.

135 Lord Collins JSC says at para 93 that in the present context the crucial question is whether Mr Holland assumed the duties of a director. He then approves the test stated by Patten J in the unreported case of Fayers Legal Services Ltd v Day 11 April 2001 , where the question was whether the defendant was a de facto director of a company and liable for misfeasance or breach of fiduciary duty. The test stated by Patten J was whether the defendant was part of the corporate governing structure; the claimant had to prove that he assumed a role in the company sufficient to impose upon him a fiduciary duty to the company and make him responsible for the misuse of its assets.

136 I do not think that either Patten J or Lord Collins JSC can have intended that the question whether a person is a de facto director always depends upon whether he owed a fiduciary duty. In most cases, it is logical and, to my mind, correct in principle to ask the single question whether he is a de facto director. If he is, it follows that he owes fiduciary duties. If he is not, it equally follows that he does not. It may have been appropriate to ask a rolled up question in the Fayers Legal Services case because the issue there was whether what the alleged director had amounted to acting in a directorial manner on the facts. It was held by Patten J, at para 73, that his acts were essentially managerial and not directorial. It may well have been relevant to the issue in that case to ask whether the acts performed by him were of a kind which might be expected to give rise to a fiduciary duty and thus to be the acts of a de facto director.

137 The two questions posed by Lord Collins JSC in para 94 are whether the alleged de facto director assumed the duties of a director and whether he was part of the governing structure. I agree that those are relevant questions to ask but I also agree with Lord Walker JSC that they are questions of fact. So too are other questions identified in the authorities. Examples include those given by Lord Collins JSC in para 91 including the *156 following: whether the individual was taking the major decisions, which might be through instructions to the de jure directors, and what was real influence in the affairs of the company (see In re Kaytech International plc [1999] 2 BCLC 351 , per Robert Walker LJ at p 424); whether he was the sole person directing the affairs of the company or whether there were others who were the true directors and whether he was acting on an equal footing with the others (see In re Richborough Furniture Ltd [1996] 1 BCLC 507 ); and whether he exercised real influence, otherwise than as a professional adviser, in the corporate governance of the company: see In re Kaytech at p 424. As Lord Collins JSC has observed at para 91 in a quotation from the Cadbury Report, corporate governance is the system by which businesses are directed and controlled.

138 In my opinion all those questions are questions of fact. For my part, I do not see how they can be questions of law when the question is whether someone who is not a de jure director is a de facto director. That

© 2011 Thomson Reuters.

[2011] Bus. L.R. 111                                                                                      Page 34
[2010] UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C.
1 [2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript [2010]
UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C. 1
[2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript
(Cite as: [2011] Bus. L.R. 111)

question depends ultimately on the answer to the question what Mr Holland did.

139 The question is thus one of fact. What did Mr Holland do? There can be no doubt that the decision to pay dividends was a directorial act and not a mere managerial act. It seems to me that, if (as the deputy judge has held), Mr Holland in fact deliberately procured the payment of the dividends by the directors of Paycheck Directors and had the de facto power to do so, he was a de facto director. As such, he owed a fiduciary duty to the company and the procuring of the payment of the dividends was a breach of fiduciary duty and, on the deputy judge's findings of fact, an unlawful act. He is accordingly liable to restore the dividends.

140 I agree with Lord Walker JSC that such a liability has nothing to do with the limited liability of shareholders or with Salomon v A Salomon & Co Ltd [1897] AC 22 . The conclusion that Mr Holland was a de facto director does not involve the piercing of the corporate veil but simply the application of the principles identified in the modern cases to the facts of this case.

141 On the detailed facts, again I agree with Lord Walker JSC. As he explains, and is not in dispute, all the decisions were made by Mr Holland. Each decision by Mr Holland to procure Paycheck Directors to pay the dividends without reserving for the relevant composite company's liability to tax was a decision to commit an unlawful act. Each decision was, as I see it, a decision to carry out the underlying decision previously made by Mr Holland, who was then wearing a number of hats, that none of the composite companies would reserve for higher rate tax. When each decision to pay a particular dividend was made, he was thus acting, both as a de jure director of Paycheck Directors and as a de facto director of the particular composite company. Moreover, he was not acting merely as a director of Paycheck Directors, but pursuant to a decision he had already made wearing all his hats.

142 In these circumstances, it is in my opinion artificial and wrong to hold that he was doing no more than merely discharging his duties as a de jure director of Paycheck Directors, as Rimer LJ suggested at [2010] Bus LR 259 , paras 70–72 and 74. There is no reason in principle why a person may not act in more than one capacity. The question is again one of fact. On the

deputy judge's findings of fact, Mr Holland was not merely discharging his duties as a director of the corporate director. He was in fact acting as a *157 director of the composite companies by deciding (after taking leading counsel's advice) that the composite companies should both continue trading and continue paying dividends without reserving for higher rate corporation tax and by procuring the directors of Paycheck Directors as a director of the composite companies to pay the unlawful dividends. The specific decision in each case was no more than an implementation of the scheme which he had devised (as described by Lord Walker JSC) by entering the particular figures in the computer programme and authorising payments to the particular shareholders/employees.

143 If Mr Holland had not been a director of Paycheck Directors but had simply directed other directors of Paycheck Directors to make those payments as a director of the relevant composite company, there could, as I see it, be no doubt that Mr Holland was acting as a de facto director of the composite companies, simply on the basis of what he actually did. Suppose, for example, his wife was the sole director of Paycheck Directors and he had instructed her to pay the dividends and she had done so without giving independent thought to the matter, he would surely have been doing so as inter alia a de facto director of the composite companies. The fact that he was a director of Paycheck Services to my mind would make no difference.

144 On the facts the answers to the various questions posed above are clear. He was part of the governing structure because he in fact made every decision as to the payment of dividends. He thus assumed the duties of a director because paying dividends is what directors do. He was taking the major decisions through instructions to the de jure director of the composite companies. His real influence on the affairs of the companies was total. Indeed, he was the sole person directing the affairs of the company. There were no others who were taking decisions other than in accordance with his directions. In short, he exercised real influence, otherwise than as a professional adviser, in the corporate governance of the company. In so concluding I use the expression corporate governance in the sense used in the Cadbury Report as being the system by which the composite companies businesses were directed and controlled. They were di-

© 2011 Thomson Reuters.

[2011] Bus. L.R. 111                                                                    Page 35
[2010] UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C.
1 [2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript [2010]
UKSC 51 [2010] 1 W.L.R. 2793 [2011] Bus. L.R. 111 [2011] 1 All E.R. 430 [2011] S.T.C. 269 [2011] B.C.C. 1
[2011] 1 B.C.L.C. 141 [2011] B.P.I.R. 96 [2010] S.T.I. 3074 Times, November 30, 2010 Official Transcript
**(Cite as: [2011] Bus. L.R. 111)**
rected and controlled by Mr Holland.

145 In all the circumstances I would hold that Mr
Holland was a de facto director of the composite
companies on the ground that he in fact made direc-
torial decisions with regard to them.

146 As to the other issues, like Lord Walker JSC, I
agree with the views of Rimer LJ in the Court of
Appeal. For the reasons I have given I would allow the
appeal and make the order proposed by Lord Walker
JSC.

*Appeal dismissed with costs* . Jill Sutherland, Barris-
ter **\*158**

---

1. Insolvency Act 1986, s 212 , as amended: see post,
para 21.

END OF DOCUMENT

© 2011 Thomson Reuters.

# TAB 8



NYSE Listed Co. Manual s 204.12, 1998 WL 34299927 (N.Y.S.E. List. Co. Man.)

*1 Last Modified: 08/21/2006

New York Stock Exchange, Inc.

New York Stock Exchange Listed Company Manual
Section 2 Disclosure and Reporting Material Information
Copyright (c) New York Stock Exchange, Inc. All Rights Reserved.

204.12 DIVIDENDS AND STOCK DISTRIBUTIONS

Prompt notice will be given to the Exchange as to any dividend action or action relating to a stock distribution in respect of a listed stock (including the omission or postponement of a dividend action at the customary time as well as the declaration of a dividend). Such notice is in addition to immediate publicity and should be given at least ten days in advance of the record date. The dividend notice should be given to the Exchange preferably by FAX (212) 656-5893; or, if by telephone, promptly confirmed by FAX, telegram or letter. Notice should be given as soon as possible after declaration and in any event, no later than simultaneously with the announcement to the news media. The notice should include:

Cash dividend--
   • Declaration Date.
   • Record date or dates of closing and reopening transfer books (should dates be used for any other purpose, please so describe).
   • Per share amount of any tax to be withheld with respect to the dividend, description of tax and per share amount of the dividend payable after deduction of tax.
   • Payment date.
   • If there is a condition which must be satisfied, or governmental approval which must be secured, to enable payment of the dividend, give details. (See Para. 703.02 (B), "Conditionally Authorized Distributions".)

Stock Dividend, Split or Distribution--

   • Ratio of stock dividend or stock split.
   • Record date for holders entitled to receive the distribution.
   • If there is a condition which must be satisfied, or governmental approval which must be secured, to enable the stock distribution to be made, give details. (See Para. 703.02 (B) "Conditionally Authorized Distributions".)
   • Date for mailing of certificates if the stock distribution is to be effected by mailing certificates for additional shares. (It is essential that distribution be made as promptly as possible in order to reduce to the minimum the period during which due-bills are used. (See Para. 703.02 (B), "Trading with Due-Bills"), for details.)
   • Method of settling fractional share interests, if any. If to be settled in cash, indicate the basis for determining cash value of fractional share interests. If to be settled by purchase or sale of fractional share interests, indicate mail and expiration dates of order forms. The name of the disbursing agent handling the settlement of fractions should be given. (See Para. 703.02 (B), "Fractional Share Interests: Methods of Settlement", for details.)
   • Brokers' cut off date--Period to be allowed after record or effective date on which brokers and other nominees may advise the company or its disbursing agent as to their full and fractional share requirements. A broker or nominee cannot determine, until after the record date, just what his full share and fractional share requirements

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 4:10-md-02185   Document 285   Filed in TXSD on 10/26/11   Page 80 of 93

NYSE Listed Co. Manual s 204.12, 1998 WL 34299927 (N.Y.S.E. List. Co.                    Page 2
Man.)

will be. Because of this problem, it is desirable to allow a period of one week after the record date during which brokers and nominees may advise the disbursing agent of their requirements. A minimum of three business days could be prearranged with the Exchange if a tighter schedule is necessary. As an alternative procedure applicable when the time between record date and payment date is too short to allow a one week period for advice of share requirements, it is the regular practice for the company to instruct the paying agent to issue fractional share payments to brokers and other nominees as required by them against full share certificates surrendered by them for a period of not less than a week after the payment date.

**\*2** The company's notice to the Exchange should indicate which of the above methods will be followed in respect of brokers' and nominees' requirements and the date by which they must notify the disbursing agent of their full and fractional share requirements. The Exchange will publicize this information in its Weekly Bulletin or in special circulars so that those concerned will be informed as to the procedure to be followed. (See Para. 703.02 (B), "Full Share and Fractional Needs of Nominees", for details.)

Should any of the above information not be available at the time notice of the calling of the Board of Directors' meeting is given for the purpose of dividend action, the information shall be supplied to the Exchange as soon as it becomes available.
   • Proposed effective date of charter amendment (if applicable).
   • Date of Board action calling meeting of shareholders to approve charter, amendment or increase in authorized shares (if applicable). Such notice should also disclose: the date of the shareholders' meeting; the record date for determining holders entitled to vote at the meeting and matters to be acted upon at the meeting.

Declaration of a dividend necessitates that the Exchange give advance notice to its member organizations as to the record date and other details pertaining to the dividend so they may have shares held by them, but registered in the names of others, transferred to the proper names for orderly receipt of the dividend. Also, the Exchange must arrange for and give advance notice of the changes in dealings in the stock to an "ex-dividend" basis, which is generally two business days prior to the record date. (See Para. 703.02 (B), "'Regular Way' Trading with a deferred 'Ex' Date," for details.)

Because of the confusion in dealings and other difficulties that would ensue if a dividend were declared without proper notice being received, it is the practice of the Exchange, as a safeguard, to make inquiry of a company when notice of a dividend is not received at the time such notice might be expected according to the company's past record. Notice to the Exchange that the dividend meeting has been postponed, dividend has been omitted, etc. will eliminate the necessity for such inquiry.

The Exchange has no requirement as to the time interval between the record and payment dates. However, in the interest of shareholders, it is desirable that such interval be as short as possible. Accepted practice is to designate the payment date as the day on which dividend checks may be presented for payment at the company's paying agency in New York City. Mailing of the dividend checks should be accomplished so as to make them available in New York City for payment on that day.

NYSE Listed Co. Manual s 204.12, 1998 WL 34299927 (N.Y.S.E. List. Co. Man.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

# TAB 9



NYSE Listed Co. Manual s 703.02, 1998 WL 34299985 (N.Y.S.E. List. Co.                    Page 1
Man.)

NYSE Listed Co. Manual s 703.02, 1998 WL 34299985 (N.Y.S.E. List. Co. Man.)

New York Stock Exchange, Inc.

New York Stock Exchange Listed Company Manual
Section 7 Listing Applications
703.00 Subsequent Listing Applications and Debt Securities Applications

*1 Last Modified: 07/01/1998

Copyright (c) New York Stock Exchange, Inc. All Rights Reserved.

703.02 (PART 1) STOCK SPLIT/STOCK RIGHTS/STOCK DIVIDEND LISTING PROCESS

(A) Introduction
Stock Splits–
There are many factors which a company must consider in evaluating the merits of splitting its stock. Studies by the Exchange indicate that a properly timed stock split can contribute to an increase in and broadening of the shareholder base and can also be an important means of improving market liquidity. Generally speaking, a properly timed stock split, when effected under appropriate circumstances, serves as an excellent means of generating greater investor interest. Postsplit price is also an important consideration, especially when a company is competing in the financial marketplace for investor attention with other high quality securities.

Exchange statistics indicate a preferential price range within which a significant percentage of Exchange round-lot volume is generated. This preference tends to be strongly reinforced when demand for a particular security is supported by a strong corporate image, widely recognized product lines, a strong financial picture and a good dividend history.

Furthermore, a stock split can present an opportunity for long-term holders to consider the possibility of selling a portion of their position. This could have the effect of creating additional round-lot holders and thereby act as an aid in obtaining additional liquidity, thus assisting in broadening the floating supply of the stock.

A stock split also acts as a means of converting odd-lot holders into round-lot holders. It is the round-lot holder that plays a very important role in a stock's marketability and liquidity on the Exchange.

Today, liquidity is probably the most important element in the investment decision, other than the financial condition or suitability of the security under consideration. Optimum liquidity is measured by the relative ease and promptness with which a security may be traded with a minimum price change from the previous transaction. Accordingly, a further objective of a stock split is to lower the market price sufficiently in order to broaden marketability.

Consideration of a stock split is therefore justified when a company's shares are selling at a relatively high price, and when such action is accompanied by healthy operating results and a strong financial condition. When these factors are further supported by anticipated growth as evidenced by a steady increase in earnings, dividends, book value and revenue, a strong foundation is in place for a stock split decision.

While not having any fixed formula for determination of the appropriate ratio for a stock split, the Exchange is of the view that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

NYSE Listed Co. Manual s 703.02, 1998 WL 34299985 (N.Y.S.E. List. Co. Man.)

Page 2

a stock split in a ratio of less than two shares for one (i.e., one additional share for each share outstanding), is not likely to achieve, to a satisfactory degree, the constructive purposes of a stock split.

*2 Experience has shown that frequently, when a stock split in a lesser proportion has been effected, the company has felt it necessary to follow it up with a further small stock split within a relatively short period in order to obtain the desired result. Adjustments of that nature, following each other too closely, may have effects upon the market not consistent with the best interests of the company, of its shareholders, or those of the general investing public.

As it appears to the Exchange, a stock split should be effected on a basis designed to produce, in one step, and to the full extent deemed beneficial, the adjustments of price and distribution indicated by current and anticipated conditions. If those conditions do not indicate clearly that a stock split of at least two-for-one proportion is warranted, it is questionable whether they warrant any stock split at all.

Furthermore, recurring stock splits in a ratio less than two-for-one may give rise to the question of whether such stock splits are not, in effect, periodic stock dividends to which the accounting requirement and other phases of the Exchange's stock dividend policy apply.

The Exchange also takes the position that a stock split is not in the public interest in the case of a company which, because of the nature of its business, its capitalization, or other factors, has a record of widely fluctuating earnings with alternating years of substantial profits and heavy losses.

Preliminary Discussion Suggested–
Any company contemplating a stock split should discuss the matter with the company's Exchange representative before taking definitive action.

A preliminary discussion would be mutually helpful not only in clarifying matters of policy, but in arranging a schedule which will ensure the necessary coordination of the different actions to be taken by both the company and the Exchange. Such discussion will not result in premature disclosure of the company's plans.

Stock Dividends–
Many listed companies find it preferable at times to pay dividends in stock rather than cash, particularly in those cases in which a substantial part of earnings is retained by the company for use in its business. In order to guard against possible misconception by the shareowners of the effect of stock dividends on their equity in the company, and of their relation to current earnings, the Exchange has adopted certain standards of disclosure and accounting treatment.

Distinction between a Stock Dividend, a Partial Stock Split, and a Stock Split in Exchange Policy:

*Stock Dividend*– A distribution of less than 25 % of the outstanding shares (as calculated prior to the distribution).

*Partial Stock Split*– A distribution of 25 % or more but less than 100 % of the outstanding shares (as calculated prior to the distribution).

*Stock Split*– A distribution of 100% or more of the outstanding shares (as calculated prior to the distribution).

Accounting Treatment–
*3 In accordance with generally accepted accounting principles, the following accounting treatment is required for the various distributions:

*Stock Dividend*– Capitalize retained earnings for the fair market value of the additional shares to be issued. Fair market value

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

NYSE Listed Co. Manual s 703.02, 1998 WL 34299985 (N.Y.S.E. List. Co.
Man.)

Page 3

should closely approximate the current share market price adjusted to give effect to the distribution.

*Partial Stock Split*–Requires capitalization of paid-in capital (surplus) for the par or stated value of the shares issued only where there is to be no change in the par or stated value. In those circumstances where the distributions of small stock splits assume the character of stock dividends through repetition of issuance under circumstances not consistent with the intent and purpose of stock splits, the Exchange may require that such distributions be accounted for as stock dividends, i.e., capitalization of retained earnings.

*Stock Split*–Requires transfer from paid-in capital (surplus) for the par or stated value of the shares issued unless there is to be a change in the par or stated value.

Avoidance of the Word "Dividend"–
A stock split is frequently effected by means of a distribution to shareholders upon the same authority, and in the same manner as a stock dividend. However, in order to preserve the distinction between a stock split and a stock dividend, the use of the word "dividend" should be avoided in any reference to a stock split when such a distribution does not result in the capitalization of retained earnings of the fair market value of the shares distributed. Such usage may otherwise tend to obscure the real nature of the distribution. Where legal considerations require the use of the word "dividend", the distribution should be described, for example, as a "stock split effected in the form of a stock dividend."

Notice to Shareholders with Stock Dividend Distribution–
A notice should be sent to shareholders with the distribution advising them of the amount capitalized in the aggregate and per share, the relation of such aggregate amount to current earnings and retained earnings, the account or accounts to which such aggregate has been charged and credited, the reason for issuance of the stock dividend, and that sale of the dividend shares would reduce their proportionate equity in the company.

(B) Procedures to Follow When a Stock Dividend or Stock Split is Declared

Notice to the Exchange–
It is essential that, when news of a proposed stock distribution is released shortly before the opening or during market hours (9:30 A. M. to 5 P.M., New York time), the company should follow the Exchange's timely disclosure/telephone alert procedures. (See Paras. 202.05 and 202.06(B).)

In addition to the press release, the Exchange requires certain information in a separate confirmation letter to the Exchange. See Para 204.16.

•Brokers' cut-off date–Period to be allowed after record or effective date in which brokers and other nominees may advise the company or its disbursing agent as to their full and fractional share requirements. A broker or nominee cannot determine, until after the record date, just what his full share and fractional share requirements will be. Because of this problem, it is desirable to allow a period of one week after the record date during which brokers and nominees may advise the disbursing agent of their requirements. A minimum of three business days could be prearranged with the Exchange if a tighter schedule is necessary. As an alternative procedure applicable when the time between record date and payment date is too short to allow a one week period for advice of share requirements, it is the regular practice for the company to instruct the paying agent to issue fractional share payments to brokers and other nominees as required by them against full share certificates surrendered by them for a period of not less than a week after the payment date.

*4 The company's notice to the Exchange should indicate which of the above methods will be followed in respect of brokers' and nominees' requirements and the date by which they must notify the disbursing agent of their full and fractional share requirements. The Exchange will publicize this information in its Weekly Bulletin or special circulars so that those concerned will be informed as to the procedure to be followed.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

NYSE Listed Co. Manual s 703.02, 1998 WL 34299985 (N.Y.S.E. List. Co.                                    Page 4
Man.)

Should any of the above information not be available at the time notice of the calling of the Board of Directors' meeting is given for the purpose of dividend action, the information shall be supplied to the Exchange as soon as it becomes available.

"When Issued" Trading in Distributed Shares–
In the case of a stock distribution which is substantial, both in percentage and in number of shares, the Exchange considers it desirable from the standpoint of public interest to afford shareholders who will receive the distribution the facilities of the Exchange market for their shares at the earliest possible moment.

This is accomplished by trading the "new" shares on a "when issued" basis while continuing the "regular way" market at the predistribution price. These two markets exist concurrently through the mail date. The regular way trading process is more fully explained below. In "when issued" trading, contracts for the purchase and sale of shares are made in the same manner as are regular way contracts for presently issued shares, except that when issued contracts are settled by delivery and payment of the shares on a date chosen by the Exchange, normally after the company's mail or payment date. Ordinarily, the date fixed for settlement of when issued contracts is the fourth business day after mailing of the split shares. When issued trading itself terminates on the mail date. Because of the delayed settlement of contracts, companies should avoid setting a record date for any purpose until seven business days after the mail date and may not set a record date during such seven day period for a cash dividend.

Normally, the Exchange will initiate when issued trading when the percentage of additional stock distributed is 25 % or more of the outstanding. There is no fixed date for the commencement of when issued trading, but the Exchange will usually wait until such time as all corporate and official action requisite to the issuance of shares has been taken. The Exchange will also wait until the company's listing application for the distribution has been authorized. Therefore, the company is urged to file the listing application early, preferably before the record date.

703.02 (PART 2) STOCK SPLIT/STOCK RIGHTS/STOCK DIVIDEND LISTING PROCESS

"Regular Way" Trading with a Deferred "Ex" Date–
Normally, a distribution of less than 25 % is traded "ex" (without the distribution) on and after the second business day prior to the record date. This procedure is based on the Exchange's three-day delivery rule, pursuant to which contracts made on the Exchange for the purchase and sale of securities are settled by delivery on the third business day after the contract is made, unless other terms of settlement are specified at the time the contract is made.

*5 In calculating the ex-dividend date, days on which the Exchange or the banks, transfer agencies and depositories for securities in New York State are closed are not counted as business days. Following is a tabulation showing the relation between record dates and the normal ex-dividend dates, according to the days of the week:

| Record Date | Normal Ex-Dividend Date |
| --- | --- |
| Monday | preceding Thursday |
| Tuesday | preceding Friday |
| Wednesday | preceding |
| Thursday | preceding Tuesday |
| Friday | preceding Wednesday |
| Saturday | preceding Wednesday |
| Sunday | preceding Wednesday |

When either the record date or normal ex-dividend date, or when any intervening weekday (except Saturday), is a holiday on which the Exchange or the banks, agencies and depositories for securities in New York State are closed, the ex-dividend date will be one business day earlier than shown in the above tabulation, as the occurrence of such holiday defers, by one business day, deliveries in settlement of contracts made on the Exchange in the regular way.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

NYSE Listed Co. Manual s 703.02, 1998 WL 34299985 (N.Y.S.E. List. Co.
Man.)

Holidays thus affecting the ex-dividend dates are:
- New Year's Day (Jan. 1)
- Presidents' Day (third Mon. in Feb.)
- Martin Luther King's Day (third Mon. in Jan.)
- Good Friday (variable date between Mar. 20 and April 23, both inclusive)
- Memorial Day (last Mon. in May)
- Independence Day (July 4)
- Labor Day (1st Mon. in Sept.)
- Columbus Day (second Mon. in Oct.) [FNa1]
- Veterans Day (Nov. 11) [FNa1]
- Thanksgiving Day (fourth Thurs. in Nov.)
- Christmas Day (Dec. 25)

In the event that any of the above holidays falls on Sunday, it is regularly observed on the following Monday.

When the distribution is 25 % or more, the Exchange will defer trading the security "ex" until one day after the mail date for the distribution. This deferral is in the public interest because the normal "ex" basis of trading would result in the adjustment of the market price by the amount of distribution. For example, in a two-for-one stock split, a normal "ex" would reduce the market price of a $50 stock by $25. Consequently, shareholders would be deprived of the market value of their holdings represented by the distribution between the "ex" date and their receipt of the distributed shares. By deferring the "ex" date, shareholders who sell during this period are able to realize the value of the distribution to which they are entitled as record holders, as well as the value of the shares they already hold and avoid the freezing of a substantial part of the market value of the stock.

Conditionally Authorized Distribution–

*Setting Record Date*
*6 Circumstances may cause a Board of Directors to authorize a stock distribution which, at the time of authorization, is subject to future fulfillment of some requirement or condition, such as some action by shareholders, or approval by a public authority. Such a situation always involves the possibility that the prerequisite requirement or condition will not be fulfilled and that the distribution will not be made on schedule–a possibility usually given recognition by expression of the condition precedent in the authorizing resolutions. (Theoretically, the same situation could occur in relation to a cash dividend but, as a practical matter, such an occurrence is very unlikely. If it should occur, the resulting problem would have to be treated by special methods designed to fit the circumstances.)

Because of that possibility, certain factors must be taken into account in the fixing of the record date for the distribution so as to keep to the minimum the difficulties and confusion which will result if the condition precedent is not met and the distribution is not made on schedule.

If, at the time of the Board's conditional authorization, there is a specific date upon which it will definitely become known whether or not the distribution will be made (as is generally the case when the prerequisite requirement or condition is an action by shareholders) a specific record date for the distribution may, if so desired, be fixed at the time the Board authorizes the distribution.

The record date so fixed should, if at all possible, be a date which is at least six business days after the date on which it will definitely be determined whether or not the distribution will be made. That six-business-day interval will be of considerable significance in the event that the distribution is not made on schedule in that brokerage firms will be spared the futile labor and expense of obtaining due-bills assigning the distribution shares from selling customers in contracts made on and after the second business day prior to the record dates; of charging such customers' accounts with state transfer taxes, if any, in respect of due-bills; and the greater labor and expense of revising those entries, redetermining the account balances, and sending corrected

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

NYSE Listed Co. Manual s 703.02, 1998 WL 34299985 (N.Y.S.E. List. Co. Man.)

Page 6

confirmations of sales to customers.

Ordinarily, it should be feasible to allow the full six-business-day interval. However, if this is not feasible, the maximum interval possible under the circumstances should be allowed, and in no event should the record date occur earlier than the business day after the date on which it will definitely be determined whether or not the distribution will be made.

It may be that, at the time of the Board's conditional authorization, there is no specific date on which it will definitely become known whether or not the distribution will be made (as is frequently the case when approval by a public authority is involved).

In such a case the Exchange must ask that the schedule be arranged so that the record date will not occur until at least nine calendar days after it is definitely determined that the distribution will be made.

*7 This may be done, of course, by deferring the fixing of the record date until the prerequisite requirement or condition has been fulfilled, and then fixing a record date as to which the Exchange shall receive nine calendar days' advance notice. Or, if some difficulty in reconvening the Board a second time for the fixing of a record date is anticipated, it may be feasible for the Board, when authorizing the distribution, instead of fixing a specific day of the month as the record date, to fix "the ninth day after" fulfillment of the prerequisite requirement or condition as the record date. In the latter case, the Exchange should receive immediate notice of the fulfillment of the prerequisite requirement or condition.

The nine-day interval is the barest minimum which will permit the Exchange to give effective advance publicity to the definitive record date and to issue a ruling as to the basis of dealings.

*Deferred "Ex" date and Use of Due Bills*
When the issuance of a stock dividend, or stock distribution, or subscription right is subject to fulfillment of some requirement or condition (such as further corporate action, or action or approval by some public authority) which will not be fulfilled before the normal "ex" date, "ex" dealings are deferred and due-bills are used until a specific date subsequent to the date on which the prerequisite requirement or condition is to be fulfilled or until further notice if the date of such fulfillment is indeterminate.

The date fixed for "ex" dealings in such a case is usually the first or second business day after the Exchange receives notice that the prerequisite requirement or condition has been fulfilled, depending on the hour at which such notice is received. The date fixed for redemption of due-bills is usually the first or second business day after the mailing of the stock dividend or three business days after the mailing of the distribution shares or the subscription rights.

The deferral of the "ex" date and use of due-bills in situations involving conditional distributions is necessary to avoid the risk that a loss may occur should the prerequisite requirement or condition not be met. If the change to the "ex" basis of dealings were permitted to occur on the normal "ex" date (the second business day prior to the record date) and it should happen that the prerequisite requirement or condition were not fulfilled, so that the stock dividend, stock distribution or subscription right could not be issued, sellers in the "ex" market would have suffered a loss that could not be recovered.

*Avoiding the Use of Due-Bills*
It is recognized that it is not always possible to avoid circumstances which result in the issuance of a stock dividend or stock distribution, or subscription rights being subject to future fulfillment of some requirement or condition. However, even though such circumstances cannot be avoided, it will usually be possible to avoid deviation from the normal procedure for "ex" dealings and the consequent use of due-bills if the company will cooperate by adoption of certain simple procedures.

*8 For example, in the case of a stock dividend or distribution, when the date for fulfillment of the requirement or condition prerequisite to issuance is known with reasonable certainty, it should generally be feasible, at the time the dividend is declared, or the distribution authorized, to fix a specific record date which is at least six business days subsequent to the prearranged date on which the Exchange will receive notice of such fulfillment. With the prerequisite requirement or condition fulfilled, and issuance assured, a six-business-day period will allow the Exchange just enough time to issue the customary advance notice that

NYSE Listed Co. Manual s 703.02, 1998 WL 34299985 (N.Y.S.E. List. Co. Man.)

Page 7

dealings in the stock will be "ex" on the normal date; or, if the prerequisite requirement or condition is not fulfilled, or if its fulfillment is delayed, it will allow enough time to take such other steps as may be necessary.

In a case where it is not known, with reasonable certainty, when the prerequisite requirement or condition will be fulfilled, or if there is doubt that it will be fulfilled at all, the situation can be met by deferring the fixing of the record date until the requirement or condition has been fulfilled, and then fixing a record date as to which the Exchange shall receive at least nine calendar days' advance notice. If some difficulty on reconvening the Board for the purpose of fixing the record date is anticipated, or may be feasible, when the dividend is declared, for the Board to fix the record date as "the ninth day after" fulfillment of the prerequisite requirement or condition instead of designating a specific date. In the latter case, the Exchange should receive immediate notice of such fulfillment so that it will have nine days in which to give effective advance notice of the record date, as finally determined, through the medium of its Weekly Bulletin or special circulars, in addition to the advance notice it must give as to "ex" dealings.

In the case of subscription rights, it is usually necessary to make their issuance subject to effectiveness of registration of the securities being offered under the Securities Act of 1933. Usually, too, if the offering is underwritten it is not practicable, from the viewpoint of the underwriters, either to defer the fixing of a record date until that condition has been fulfilled or to fix a record date which will be six business days after the condition has been fulfilled. However, where the offering is not underwritten, it should generally be possible to follow the latter course; i.e., to fix a record date which shall be six business days after registration under the Securities Act of 1933 becomes effective, or any other requirement or condition prerequisite to issuance of the rights is fulfilled, or expected to be fulfilled.

Trading with Due-Bills–
While, under certain circumstances, the deferment of "ex" dealings and use of due-bills is essential from the standpoint of public interest, there are certain undesirable features attaching to that procedure which make advisable holding their use to a minimum. Because of these undesirable features, "ex" dealings are deferred and use of due-bills resorted to only in cases where such deferment cannot be avoided, and in those cases the procedure is employed for the shortest possible period.

\*9 While the purchaser of stock during the period between the normal "ex" date and the deferred "ex" date is paying full value, including the value of the distribution, he does not become a record holder entitled to receive the distribution directly from the company. Therefore, the seller, who is the holder on the record date and the prospective recipient of the distributed shares, is required to assign the right to these shares to the purchaser.

Such assignment is made through an instrument known as a "due-bill." The seller delivers the due-bill to the purchaser, along with the certificates for the shares covered by the contract, in settlement of the contract. The due-bill is redeemed by the seller's delivery of the distribution to the holder of the due-bill, on a date fixed by an Exchange ruling. Due-bills are issued in standard form prepared by the Exchange and are supplied to member firms in the required quantity. The manner of their execution and guaranty is prescribed by Exchange rules.

Company's Agreement to Recognize Due-Bills–

Ordinarily, due-bills are redeemed on the date specified in the Exchange ruling by direct dealing of the broker representing the seller with the broker representing the holder of the due-bill. However, in order to make such due-bills enforceable and deliverable in settlement of contracts, the Exchange must obtain the company's agreement to recognize them as valid assignments by the record holders and, upon their presentation to the issuing agent prior to the distribution, to cause the dividend or distribution shares to be issued to the assignees just as though such assignees were holders of record on the record date.

This agreement will be requested of the company by the Exchange when required. It should give rise to no problems, as due-bills are seldom presented to the company or its agents for this purpose, and then usually through misunderstanding. (See Exchange form letter in Para. 904.05.)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

NYSE Listed Co. Manual s 703.02, 1998 WL 34299985 (N.Y.S.E. List. Co.         Page 8
Man.)

[FNa1]. While the Exchange will be open on these days, the banks, agencies and depositories for securities in New York State are regularly closed and, therefore, they are not counted as business days.

703.02 (PART 3) STOCK SPLIT/STOCK RIGHTS/STOCK DIVIDEND LISTING PROCESS
Company Due-Bills for Convertible Securities–
A company having convertible securities outstanding may have them presented for conversion into the stock which is being split after the record date for the distribution and before the payment has been made. The Exchange recommends in such instances that the converting security holder receive on conversion the number of shares to which he was entitled prior to the distribution, plus a "company due-bill" which will entitle the registered owner, or his assigns, to receive the additional shares on or after the distribution date upon surrender of the due-bill to the company's agent. Since such a due-bill would be transferable, it would be acceptable in settlement of contracts made on this Exchange and the converting security holder would be able to sell his entire holdings without waiting for the distribution date. The advantage of using such a procedure is that the holder of stock with a company due-bill attached would be able to use the same market facilities and mechanics if he wished to sell as would a holder of record on the stock split record date who can use the standard form of due-bill.

*10 This special form of due-bill, which would be executed by the company or its agent, is usually in the form of a certification that a designated number of shares are being held by the distribution agent and will be delivered to a named individual or assigns upon surrender of the due-bill on or after the distribution date. Many companies specify in the due-bill that the additional shares will be mailed to the person named therein if the due-bill has not been presented within thirty days after the distribution date. This provision avoids the problem of holding the shares for an indefinite period if the due-bill is not presented promptly. The form on which the certification is printed should contain a border and underlying tint in color to give the appearance of an instrument of value. It should be submitted in draft form for approval by the Exchange in order to ensure its acceptability for delivery in settlement of an Exchange contract. Specimens may be secured from the Exchange upon request.

Record Date During or Shortly after a Stock Distribution–
When stock is traded with due-bills attached, as is the case in a stock split effected by distribution of additional shares, the additional shares are seldom transferred into the name of the buyer until the distribution is made and the due-bills are redeemed. Therefore, should a cash dividend be payable to holders of record on any date between the record date for the stock distribution and a date seven business days after the additional shares are mailed, such dividend would be paid to the seller as the holder of record on the company's books. Since the buyer would be entitled to the dividend, the Exchange would have to protect the buyer's interests by ruling that an additional due-bill for the cash dividend be secured from each person who had sold stock during the period. This would result in mechanical problems and, in many instances, difficulty in persuading the seller that the cash dividend properly belongs to the buyer. Accordingly, in order to allow such buyers time to receive the additional shares in settlement of contracts and have them transferred into their names, no record date for a cash dividend is acceptable which falls between the record date for a stock dividend or a stock split and a date seven business days after the date the additional stock is mailed.

The same record date may be used for a cash dividend and a stock distribution. To avoid misunderstandings, care should be taken that both the declaration and the public announcement express clearly the basis on which the cash dividend will be paid. In case of an identical record date for a stock split and a cash dividend, the cash dividend should be declared in terms of the "old" stock rather than the split stock in order to make it clear that a purchaser of the split shares on a "when-issued" basis will not be entitled to receive the cash dividend.

A shareholders' meeting and other record dates during the above period should be avoided. For example, if a voting record were taken for a shareholders meeting between the record and distribution dates for a stock split, a broker who purchased and surrendered his stock for transfer to his name after the record date for the split (in order to establish his voting rights) would not be permitted to vote the shares to be received as a result of the distribution.

Full Share and Fractional Share Needs of Nominees–
*11 In connection with stock dividends, or other stock distributions made to holders of record, brokers and other nominees must make exact allocation of the dividend or distribution to the accounts of customers or other accounts for which they act as no-

Case 4:10-md-02185 Document 285 Filed in TXSD on 10/26/11 Page 90 of 93

NYSE Listed Co. Manual s 703.02, 1998 WL 34299985 (N.Y.S.E. List. Co.                    Page 9
Man.)

minees. In order to make such allocation, they may require full shares, and cash for settlement of fractional share interests, or may be required to buy or sell fractional share interests, on a basis different than that indicated by their record holdings. For example, in the case of a 2 1/2% stock dividend, a nominee holding of record 1,000 shares would receive 25 full shares in payment of the dividend on the basis of his record holdings. However those holdings might represent 10 accounts, and the beneficial owners thereof might each be entitled to 2 1/2 dividend shares. In such a case, the nominee would require 20 full shares, and cash for 5 shares (if fractions are to be settled in cash). If an agency were being set up to buy or sell fractional share interests, the nominee in this case might be required to buy or sell 1/2 share for each of the ten accounts–a total of five shares.

The broker or nominee cannot determine, until after the record date, just what his full share and fractional share requirements will be. As a means of meeting this situation, it is the regular practice to allow a period of one week after the record date, during which brokers and nominees may advise the dividend disbursing agent of their requirements, and then to issue to them, in accordance with their advices, the appropriate amounts of full shares and cash, or the appropriate number of forms for instructing the agent to buy or sell fractions when the dividend is paid. Shorter periods ranging to a minimum of three business days may be pre-arranged with the company's Exchange representative where a tighter schedule is necessary.

As an alternative, when the time between record date and payment date is too short to allow the above period for that purpose, it is the regular practice for the company to instruct the dividend paying agent to issue fractional share payments to brokers and other nominees as required by them against full share dividend certificates surrendered by them, for a period of not less than a week after the payment date.

The company's notice to the Exchange of the dividend action should indicate which of the above methods will be followed in respect to broker's and nominees' requirements and the date by which they must notify the disbursing agent of their full and fractional share requirements. The Exchange will publicize this information in its Weekly Bulletin or special circulars so that those concerned will be informed as to the procedure to be followed.

Fractional Share Interests: Methods of Settlement–
The Exchange has no rule or policy requiring the use of any particular method for the settlement of fractional share interests resulting from stock dividends or other transactions.

**\*12** It is expected, of course, that whatever method is employed will treat all holders of such interests equitably; that it will afford adequate opportunity for the exercise of the rights and realization of the value attaching to such interests; and that such method will not only be feasible and simple, but will require no more than ordinary business prudence and diligence for the exercise of such rights and realization of such value.

The several methods which have been employed in the settlement of fractional share interests by companies listed on the Exchange are described below.

*Settlement in Cash*
In recent years, most listed companies have elected to settle fractional share interests by immediate cash payment therefor.

In some such cases, the number of full shares represented by fractional share interests were issued to an agent who (as agent for holders entitled to said interests) sold such shares and distributed the proceeds of sale to said holders. In other cases, no shares were issued in respect to fractional share interests. Instead, the Board authorized direct cash payment of such interests, usually at an amount related to market value on a date pertinent to the dividend (or other transaction) resulting in the fractional share interests.

*Agency for Purchase or Sale of Fractional Share Interests*
Another method gives the holders of fractional share interests the right, for a specified period, to purchase the additional fractions required to make up full shares, or to sell the fractions to which they are entitled. This is accomplished by the establishment of an agency which, during a specified period, buys or sells such fractions for the account and risk of the holders

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

NYSE Listed Co. Manual s 703.02, 1998 WL 34299985 (N.Y.S.E. List. Co.                                    Page 10
Man.)

thereof, pursuant to their instructions. At the end of the period, the full shares represented by any fractional interests as to which no instructions have been received are sold and the proceeds remitted to the holders entitled thereto.

The agency employed for this purpose has usually been a bank or trust company. All charges, such as transfer taxes, commissions and other service charges, usually are borne by the company. Purchasing holders pay only the proportionate market value of the fraction purchased, and selling holders receive the full proportionate market value of the fraction sold.

Instructions for the purchase or sale of fractions are communicated to the agent on a form provided by the company or the agent at, or before, the time the full shares are distributed (or become available for exchange, if the transaction of issuance is one requiring an exchange of certificates). Such form should include, or be accompanied by, detailed instructions to holders of fractional interests as to the procedure to be followed. Such instructions should state, prominently, that if the holder fails to give the agent instructions within the specified period, his fractional interest will be sold.

Transactions are made by the agent within a specified period after receipt of instructions, and holders are billed directly by the agent for the cost of fractions purchased, or have remitted to them the proceeds from fractions sold. Usually, the right is reserved to the agent to offset buying and selling orders received during a specified period at prices current on the Exchange during that period. Thus, the agent's actual purchases or sales of the security are limited to the excess of purchase or sale orders received during that period.

*13 The purchase for the account of any one holder is limited to the fraction necessary to complete a full share. Similarly, the sale for the account of any one holder is limited to the fraction to which he is entitled.

The period for which the agency is retained has varied in different cases, but, obviously, if the arrangement is to be of fullest service to shareholders and the company, sufficient time must be allowed for communication in both directions, plus a reasonable period for decision by holders as to whether to buy or to sell. In that connection, thirty days would appear to be the minimum serviceable period.

(C) Change in Par Value
The question of a change in par value of a stock in connection with a stock split is left entirely to the discretion of the company because of the possible involvement of original issue taxes and other corporate factors.

Where a change in par value is involved and a supply of certificates bearing the old par value is on hand, the question will arise whether to discard the existing supply or overprint the certificates with the new par value and continue their use. One of the considerations involved is that of cost, and in that connection it should be kept in mind that additional agency fees will be involved if overprinted certificates are used and there are subsequent requests by shareholders for an exchange for the new form of certificate. Many companies have found that use of the new form of certificate for both the distribution and subsequent transfers is less costly in the long run even though it means destroying the existing supply of old certificates. The Exchange prefers to avoid the use of overstamped certificates so as to keep the number of certificate forms in public hands to a minimum. But it will accept either method.

Where overprinted certificates are used, it is urged that they be used to the extent possible to effect distribution of the split shares so that the use of new certificates upon subsequent transfer may commence at the earliest possible date. However, if the space limitations in the old certificate form make their use inconvenient because of mechanical preparation of certificates to be distributed, the distribution may be made entirely with new certificates and the overprinted certificates used for subsequent transfers.

The Exchange recommends mailing the additional shares for all splits.

(D) Distribution Effected by Charter Amendment
Charter Amendment and Mailing of Additional Shares–

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 4:10-md-02185   Document 285   Filed in TXSD on 10/26/11   Page 92 of 93

NYSE Listed Co. Manual s 703.02, 1998 WL 34299985 (N.Y.S.E. List. Co.                    Page 11
Man.)

Under this method, each outstanding certificate continues to evidence, after the split up, the same number of shares as it did prior to the split up. Certificates evidencing the additional shares resulting from the split up must be mailed to holders of record as of the close of business on the effective date of the amendment.

When a company must amend its charter to effect a stock distribution, the date on which the charter amendment becomes effective is necessarily the record date for the purpose of distribution of the additional shares.

*14 Since this method necessitates mailing of additional share certificates, dealings on the Exchange are conducted on the same basis as in the case of a large stock dividend or stock distribution. "When issued" dealings in the new shares are usually initiated as soon as practicable; "ex" dealings are deferred until one day after the mail date for the distribution and deliveries made after the record date are accompanied by due-bills. (See (B) above in this section for additional details.)

It is essential to Exchange procedure that the charter amendment be filed as early as possible in the morning of the day on which it is to become effective if not filed before then so that the Exchange can issue at noon on the day of effectiveness, its customary notice that dealings will be ex-distribution the following day. However, even though the amendment is filed early in the day, the record should be taken as of the close of business on the day of effectiveness, just as for any record taken for the purpose of distribution to shareholders. The amendment should contain a provision deferring its effectiveness until the close of business on the day of effectiveness, or such other provision as may be necessary to establish clearly that the record is to be taken at that time. This is necessary to avoid the confusion and misunderstanding among transferors and transferees that would result if the record were taken prior to the close of business.

The date fixed for effectiveness of the amendment should be not less than ten days after the date of shareholders' approval except under unusual circumstances and except as prearranged with the Exchange. If such ten day interval is not feasible, the maximum interval possible under the circumstances should be allowed. In no event shall the date fixed in advance for effectiveness of the amendment be earlier than the business day following the date of shareholder action. The Exchange must receive prompt notice of the intended effective date.

Charter Amendment and Exchange of Certificates–
Under this infrequently used method, used only in cases where the split up involves a change in par value, each outstanding certificate comes to evidence the new number of shares after the split up. However, for trading and delivery purposes, the outstanding certificates must be submitted in exchange for new certificates representing the post-split shares.

Since the outstanding certificates must be exchanged for new post-split share certificates, "when issued" dealings are usually initiated upon effectiveness of the charter amendment when dealings in the old stock are simultaneously discontinued. As a result, there is no need for "ex" dealings or for the use of due-bills. When issued trading normally continues until one day after advice is received that a significant number of the old share certificates has been exchanged. (See (B) above in this section for additional detail.)

*15 The charter amendment should not be made effective until a supply of new certificates is available for purposes of the exchange. The new certificates to be issued in the exchange should be sufficiently distinctive in appearance from the old certificates to make identification of the shares represented by each type of certificate readily possible.

(E) Filing a Listing Application
The general instructions for preparation and filing of a listing application are described in Para. 703.01. The listing application format is presented in Para. 903.02.

Timing–
As with other listing applications, the application should be filed at least two weeks before the company wishes the Exchange to take action. Because of the desire to commence "when issued" trading in situations where there is a distribution of 25 % or

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

NYSE Listed Co. Manual s 703.02, 1998 WL 34299985 (N.Y.S.E. List. Co.
Man.)

more, the listing application should be filed before the record date even though some of the information requested in the ap-
plication will not be available until after the record date.

(F) Supporting Documents

The following documents must be filed in support of the listing application:
- Timetable listing declaration date, record date, mail date, date of shareholders' meeting (if applicable), effective date of
  charter amendment (if applicable) and broker's cut-off date (if applicable). Such information may be referenced in a cover
  letter which accompanies the application.
- Opinion of counsel.
- Specimen certificates (if requested).
- Notice of availability of eligible securities for trading (if requested).
- Due-bill letter (if requested). (See Para. 904.03.)
- Current form of Listing Fee Agreement (if not previously filed). (See Para. 902.01.)
- Current form of Listing Agreement (if not previously filed). (See Para 901.00)

NYSE Listed Co. Manual s 703.02, 1998 WL 34299985 (N.Y.S.E. List. Co. Man.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.