Notice of BP Annual General Meeting 2010
Notes on resolutions

## Resolution 12
### Dr B E Grote

**Proposal for re-election**

Dr Grote has served on the board for nearly 10 years. His performance has been evaluated by the group chief executive and considered by the chairman's committee, as a result of which the board recommends Dr Grote's re-election as an executive director.



Byron Grote was appointed to the board of BP as an executive director in 2000 and became chief financial officer in 2002, following two years as chief executive of BP chemicals. He has accountability for BP's integrated supply and trading activities.

He joined The Standard Oil Company of Ohio in 1979. Following a variety of roles, he became group treasurer and chief executive officer of BP finance in 1992. In 1994, he took up the position of regional chief executive in Latin America returning to London in 1995 to become deputy chief executive officer of BP exploration.

He became group chief of staff in 1997 and, following the merger of BP and Amoco, in 1999 he was appointed executive vice president, exploration and production.

He is a non-executive director of Unilever NV and Unilever PLC.

Dr Grote was born in 1948.

## Resolution 13
### Dr A B Hayward

**Proposal for re-election**

Dr Hayward has served on the board for more than seven years. His performance has been evaluated and considered by the chairman's committee, as a result of which the board recommends his re-election as an executive director.



Tony Hayward was appointed to the board of BP in 2003 and became group chief executive in 2007. From 2002 until 2007, he was chief executive officer of BP's exploration and production business segment.

He joined BP in 1982 and, following a series of technical and commercial roles in BP exploration, in 1992 he moved to Colombia as exploration manager. In 1995, he became president of the BP group in Venezuela.

In 1997, Dr Hayward returned to London and in 1999, following the merger of BP and Amoco, he became a group vice president and a member of the upstream executive committee. He was appointed group treasurer in 2000 and became an executive vice president in 2002, becoming chief executive officer for exploration and production later that year.

Dr Hayward was born in 1957.

## Resolution 14
### Mr A G Inglis

**Proposal for re-election**

Mr Inglis has served on the board for more than three years. His performance has been evaluated by the group chief executive and considered by the chairman's committee, as a result of which the board recommends his re-election as an executive director.



Andy Inglis was appointed to the board of BP in 2007, becoming chief executive of BP's exploration and production business segment.

Mr Inglis joined BP in 1980. Following a variety of roles he was appointed chief of staff, exploration and production in 1996. From 1997 until 1999, he was responsible for leading BP's activities in the deepwater Gulf of Mexico.

In 1999, following the merger of BP and Amoco, he was appointed vice president, US western gas business unit. In 2004, he became executive vice president and deputy chief executive of exploration and production with responsibility for BP's growth areas.

He is a non-executive director of BAE Systems plc. Mr Inglis was born in 1959.

J. Gill Declaration Exhibit Y Page 10 of 36

Notice of BP Annual General Meeting 2010
Notes on resolutions

## Resolution 15
### Dr D S Julius



**Proposal for re-election**

Dr Julius has served on the board for more than nine years. She brings broad economic and financial experience to the board and continues to chair the remuneration committee. Having satisfied itself of Dr Julius's independence, the board recommends her re-election as a non-executive director.

DeAnne Julius was appointed a non-executive director of BP in 2001. She is chairman of the remuneration committee and a member of the chairman's and the nomination committees.

Dr Julius began her career in 1975 working for the World Bank. In 1986, she became director of the International Economics Programme at the Royal Institute of International Affairs, and in 1989 she was appointed chief economist at the Royal Dutch Shell Group becoming chief economist at British Airways PLC in 1993.

Between 1997 and 2001, Dr Julius was an independent member of the Bank of England's Monetary Policy Committee. Since 2001, she has held a variety of non-executive appointments and, in 2003, she was appointed chairman of the Royal Institute of International Affairs. She is a non-executive director of Roche Holdings SA and Jones Lang LaSalle, Inc.

Dr Julius was born in 1949 and was awarded a CBE in 2002.

## Resolution 16
### Mr C-H Svanberg



**Proposal for election**

Mr Svanberg joined the board in September 2009. He has had a significant career in several important industries latterly as chief executive officer of Ericsson. He has significant global experience. He was independent on his appointment and the board recommends his election as a director.

Mr Svanberg was appointed a non-executive director of BP on 1 September 2009 and, in succession to Mr Sutherland, became chairman of BP on 1 January 2010. He is chairman of the chairman's and the nomination committees, and attends meetings of the remuneration committee.

Mr Svanberg spent his early career at Asea Brown Boveri and the Securitas Group, before moving to the Assa Abloy Group as president and chief executive officer.

From 2003 until 31 December 2009, when he left to join BP, he was president and chief executive officer of Ericsson, also serving as the chairman of Sony Ericsson Mobile Communications AB.

Mr Svanberg continues to be a non-executive director of Ericsson, and is also on the boards of the Confederation of Swedish Enterprise, Melker Schörling AB and the University of Uppsala.

He is a member of the Steering Committee of the Global Alliance for Information and Communication Technologies and Development and of the external advisory board of the Earth Institute at Columbia University.

Mr Svanberg is the recipient of the King of Sweden's medal for his contribution to Swedish industry.

Mr Svanberg was born in 1952.

9

## Notes to resolution 17
### Reappointment of auditors

The appointment of Ernst & Young LLP as auditors of the company terminates at the conclusion of the annual general meeting. They have indicated their willingness to stand for re-election as auditors of the company until the conclusion of the annual general meeting in 2011. The directors recommend their reappointment and seek authority to fix their remuneration.

## Notes to resolution 18
### Articles of Association

It is proposed to adopt new articles of association (the 'New Articles'). These are intended to replace the company's current articles of association (the 'Current Articles'). From 1 October 2009, the Companies Act 2006 (the 'Act') abolished the need to have object provisions in a company's memorandum of association, and provided that the provisions of a company's memorandum are treated as forming part of the company's articles of association. The current object provisions will therefore be repealed on the adoption of the New Articles. In addition the New Articles will take account of the implementation of the final provisions of the Act, any changes to the Act as a result of the implementation of the Companies (Shareholders' Rights) Regulations 2009 and to enable the company to implement the Scrip Dividend Programme. Due to the extent of the changes, the company is proposing the adoption of the New Articles rather than amendments to the Current Articles.

The principal changes being proposed in the New Articles are summarized in Appendix 1. Other changes, which are of a minor technical or clarifying nature, have not been noted. A clean copy of the New Articles and a copy marked up to show changes from the Current Articles are available for inspection as noted on page 32 and at *www.bp.com/agmdownloads*.

## Notes to resolution 19
### Share buyback

Authority is sought to purchase up to 10% of the ordinary issued share capital of the company during the period stated below, continuing the authority granted by the shareholders at previous annual general meetings.

Resolution 19 specifies the maximum number of shares that may be purchased and the minimum and maximum prices at which they may be bought. The directors will exercise this authority only when to do so would be in the best interests of shareholders generally. The authority will expire at the conclusion of the annual general meeting in 2011 or 15 July 2011, whichever is the earlier. Shares that are purchased by the company must either be cancelled or held in treasury. Treasury shares are shares in the company that are owned by the company itself. Once shares are held in treasury, the directors may dispose of them in accordance with the relevant legislation by:
- selling the shares (or any of them) for cash;
- transferring the shares (or any of them) for the purposes of or pursuant to an employees' share scheme; or
- cancelling the shares (or any of them).

It is the company's current intention that, of the shares repurchased under this authority, sufficient shares will be held in treasury to meet the requirements as they arise of the company's share incentive arrangements, with the remainder being cancelled.

No repurchases of shares were made from the date of the last annual general meeting to 31 December 2009.

For information, as at 18 February 2010, there were options outstanding over 285,364,691 million ordinary shares, representing 1.51% of the company's ordinary issued share capital (excluding treasury shares). If the authority given by resolution 19 were to be fully used, these would then represent 1.68% of the company's ordinary issued share capital (excluding treasury shares). The company has no warrants in issue in relation to its shares.

## Notes to resolutions 20 and 21
### Directors' authority to allot shares

The purpose of resolution 20 is to give the directors authority to allot shares up to a specified amount, and resolution 21 enables directors to allot such shares in particular circumstances without having to offer such shares to existing shareholders.

Influenced by events in the financial markets over the past few years, the Association of British Insurers (ABI) changed its guidelines to increase the amount of the authorities that directors may seek in relation to the allotment of shares and disapplication of pre-emption rights. The company is now intending to take advantage of this flexibility, which has been widely adopted by other quoted companies.

In relation to resolution 20, the directors are seeking authority to allot shares, in accordance with revised institutional investor guidelines, of up to a maximum of $3,143 million. This is equal to 66.6% of the company's issued share capital (excluding treasury shares) as at 18 February 2010. If the New Articles are adopted under resolution 18, then the relevant authority contained in the New Articles under Section 551 of the new Act will be activated by resolution 20 and so will apply. If the New Articles are not adopted, the existing authority contained in the Current Articles under Section 80 of the Companies Act 1985 will be continued by the resolution to ensure that this authority would still be available to the directors.

In relation to resolution 21 the directors are also seeking authority to allot shares for cash and to dispose of treasury shares, other than by way of a rights issue, up to a maximum of $236 million, without having to offer such shares to existing shareholders. This is equal to 5% of the company's issued share capital (excluding treasury shares) as at 18 February 2010.

In accordance with the guidelines issued by the Pre-Emption Group of the ABI, the directors confirm their intention that no more than 7.5% of the issued share capital will be issued for cash on a non-pre-emptive basis during any rolling three-year period. The directors have no present intention of exercising the authorities beyond their use in connection with the disposal of treasury shares in accordance with the relevant legislation.

As in the case of resolution 20, if the New Articles are adopted then the relevant authority in the New Articles under Section 561 of the new Act will be activated by resolution 21 and so will apply. Similarly, if the new Articles are not adopted, the existing authority contained in the Current Articles under Section 89 of the Companies Act 1985 will be continued by the resolution.

As at 26 February 2010, the company held 1,867,679,692 treasury shares, which represents 9.89% of the company's issued ordinary share capital (excluding treasury shares).

The authorities will expire on the date of the annual general meeting in 2011 or 15 July 2011, whichever is the earlier.

## Notes to resolution 22
### Notice of general meetings

Due to changes in the law made by the implementation of the Companies (Shareholders' Rights) Regulations 2009, listed companies must call general meetings (other than an annual general meeting) on at least 21 clear days' notice unless the company:
- has obtained shareholder approval for the holding of general meetings on 14 clear days' notice by passing an appropriate resolution at its most recent annual general meeting; and
- offers the facility for shareholders to vote by electronic means accessible to all shareholders.

To enable the company to continue to utilize the shorter notice period of 14 days for calling such general meetings, shareholders are being asked to approve this resolution. The shorter notice period would not be used as a matter of routine for such meetings, but only where the flexibility is merited by the business of the meeting and is thought to be to the advantage of shareholders as a whole. If granted, this authority will be effective until the company's next annual general meeting. This is the same authority as was sought and granted at the 2009 AGM.

## Notes to resolution 23
### Renewal of the Executive Directors' Incentive Plan

The board is seeking the approval of shareholders for a renewal of the Executive Directors' Incentive Plan (the 'plan'), which comprises the framework for long-term incentives for executive directors of the company. The plan was first approved by shareholders in April 2000 and renewed in April 2005, in each case for a five-year period. In 2005, it was explained to shareholders that, if the remuneration committee considered that the plan should be renewed, then shareholder approval would be sought at the annual general meeting in 2010.

Further information is contained in Appendix 2.

## Notes to resolution 24
### Scrip Dividend Programme

For some time, the company has given shareholders the choice of taking dividends in cash or shares/American Repositary Receipts ('ADRs'). During recent years, eligible shareholders have been able to participate in the BP Dividend Re-investment Programme ('DRIP') and ADR holders in the direct access plan, giving them the opportunity to use their cash dividend to buy additional ordinary shares or ADRs in the company through special dealing arrangements. The company is now proposing to introduce the Scrip Dividend Programme as it is believed that for those shareholders who choose to take their dividend in shares or ADRs rather than cash, the Scrip Dividend Programme is an attractive alternative.

If approved (and assuming the adoption of the New Articles of Association), the Programme will allow participants to receive ordinary shares or ADRs for every cash dividend entitlement where the scrip is offered, unless and until they notify the company otherwise. The directors will retain the discretion to decide whether to offer a scrip dividend alternative in respect of each future dividend. However, it is the directors' current intention to offer the scrip alternative for each dividend paid. UK shareholders who elect to take new shares in the company under the Programme will increase their holdings without incurring stamp duty. ADR holders will be subject to stamp duty relief tax and issuance fees.

The requirements of the Scrip Dividend Programme mean that there will be certain changes to the current dividend timetable. BP is a company that operates and accounts for its performance in US dollars, has its ordinary shares denominated in US dollars and its dividend is US dollar based. It has been the company's custom to announce the sterling equivalent of the dividend at the time that the US dollar dividend is announced. On implementation of the Scrip Dividend Programme, the US dollar dividend will be announced as usual. However, the announcement of the equivalent GBP dividend will not take place until after the date when shareholders need to decide whether to elect to receive their dividend in shares rather than cash. This change in the timetable results from the company not being able to determine the amount of cash required for dividend payments until after scrip elections have been made. However, the company intends to publish on its website an illustrative GBP equivalent after it announces its US dollar dividend. To enable shareholders sufficient time to decide whether to elect for the scrip, cash dividends will be paid approximately two weeks later than currently.

It is proposed that, subject to shareholder approval, the Programme would commence at the earliest with the first quarter 2010 interim dividend, which is expected to be announced on 27 April 2010.

On the approval of this resolution and the adoption of the New Articles, the DRIP will be withdrawn. As permitted under the New Articles, existing participants in the DRIP will be treated as having elected to participate in the Programme without having to make a Scrip Dividend election. Any shareholder who participates in the DRIP and is included in this arrangement will be entitled to withdraw from the Programme by contacting our Registrars, Equiniti. Any cash balances remaining for DRIP participants on its termination will be carried forward (without interest) to be included in the calculation of the next dividend entitlement.

Due to the introduction of the Scrip Dividend Programme, plans in other jurisdictions conferring dividend reinvestment elements may be withdrawn. Where that is the case shareholders will receive formal notice of this.

Details of how the Scrip Dividend Programme will operate for ordinary shareholders can be found at Appendix 3. Separate details of how the Programme will operate for ADR holders will be sent to ADR holders with this notice of meeting. The full Terms and Conditions of the Programme are available on our website at *www.bp.com/scrip* or from our Registrars, Equiniti.

In line with investor protection guidelines, the authority contained in this resolution is sought for five years and shall therefore expire prior to the conclusion of the annual general meeting to be held in 2015. Unless there is a change in circumstances, the company expects to seek an extension of this authority prior to its expiry.

## Notes to resolution 25
### Shareholder resolution

Resolution 25 has been requisitioned by a group of shareholders. The company's response to that resolution is in Appendix 4.

## Appendices

### Appendix 1

### Explanatory notes of principal changes to the company's articles of association

Substantive changes being proposed in the New Articles are intended to bring them into line with changes in the law, to affect the implementation of the Scrip Dividend Programme and to, separately, give greater flexibility to the methods of payment of cash dividends. These changes are not intended to affect the manner in which the company operates.

#### 1. The company's objects

The provisions regulating the operations of the company are currently set out in the company's memorandum and articles of association. Historically a company's objects were stated in its memorandum. They were important as the means of giving the company capacity to operate in the specific fields set by its shareholders. Over time the objects came to be expressed in such wide terms as to provide no real limit on what the company could do. The Companies Act 2006 ('Act') recognizes this and has abolished the need to have object provisions and states that unless a company's articles provide otherwise, a company's objects are unrestricted.

For this reason the company is proposing to remove its objects clause together with all other provisions of its memorandum that, by virtue of the Act, are treated as forming part of the company's articles of association as of 1 October 2009. As the effect of the changes will be to remove the statement currently in the company's memorandum regarding limited liability, the New Articles will contain an express statement regarding the limited liability of shareholders.

#### 2. Articles that duplicate statutory provisions

Provisions in the Current Articles that replicate provisions contained in the Act are where necessary removed or amended to bring them into line with the Act.

#### 3. Change of name

Under the Companies Act 1985, a company could only change its name by special resolution. Under the Act a company will be able to change its name by other means provided for by its articles. To take advantage of this provision, the New Articles enable the directors to pass a resolution to change the company's name.

#### 4. Authorized share capital and unissued shares

The Act abolishes the requirement for a company to have an authorized share capital and the New Articles reflect this. The old requirement used to operate as a control on the dilution of shareholdings but this function has over the years been superseded by controls over allotments, which are in the company's articles and are renewed at each annual general meeting (see resolutions 20 and 21). Directors will still be limited as to the number of shares they can at any time allot because allotment authority continues to be required under the Act, save in respect of employee share schemes. Consequential amendments to reflect this have been made in the New Articles.

#### 5. Redenomination of shares

The New Articles include a provision that enables the company, on the approval of shareholders by ordinary resolution, to redenominate its nominal share capital from one currency to another.

#### 6. Redeemable shares

Under the Companies Act 1985, if a company wished to issue redeemable shares, it had to include in its articles the terms and manner of redemption. The Act enables directors to determine such matters instead, provided they are so authorized by the articles. The New Articles contain such an authorization. The company has no plans to issue redeemable shares but if it did so the directors would need shareholders' authority to issue new shares in the usual way.

#### 7. Authority to purchase own shares, consolidate and subdivide shares, and reduce share capital

Under the Companies Act 1985, a company required specific enabling provisions in its articles to purchase its own shares, to consolidate or subdivide its shares and to reduce its share capital or other undistributable reserves as well as shareholder authority to undertake the relevant action. The Current Articles include these enabling provisions. Under the Act a company will only require shareholder authority to do any of these things, and it will no longer be necessary for articles to contain enabling provisions. Accordingly the relevant enabling provisions have been removed in the New Articles.

#### 8. Provision for employees on cessation of business

The Act provides that the powers of the directors of a company to make provision for a person employed or formerly employed by the company or any of its subsidiaries in connection with the cessation or transfer to any person of the whole or part of the undertaking of the company or that subsidiary, may only be exercised by the directors if they are so authorized by the company's articles or by the company in general meeting. The New Articles provide that the directors may exercise this power.

#### 9. Use of company seals

Under the Companies Act 1985, a company required authority in its articles to have an official seal for use abroad. Under the Act, such authority will no longer be required. Accordingly, the relevant authorization has been removed in the New Articles.

The New Articles also provide an alternative option for execution of documents (other than share certificates). Under the New Articles, when the seal is affixed to a document it may be signed by one authorized person in the presence of a witness, whereas previously the requirement was for signature by either a director and the secretary or two directors or such other person or persons as the directors may approve.

Notice of BP Annual General Meeting 2010
Appendices

### 10. Suspension of registration of share transfers

The Current Articles permit the directors to suspend the registration of transfers. Under the Act share transfers must be registered as soon as practicable. The power in the Current Articles to suspend the registration of transfers is inconsistent with this requirement. Accordingly, this power has been removed in the New Articles.

### 11. Voting by corporate representatives

The Shareholders' Rights Regulations have amended the Act in order to enable multiple representatives appointed by the same corporate member to vote in different ways on a show of hands and a poll. The New Articles remove provisions in the Current Articles dealing with voting by corporate representatives on the basis that these are now dealt with in the Act.

### 12. Adjournments for lack of quorum

Under the Act as amended by the Shareholders' Rights Regulations, general meetings adjourned for lack of quorum must be held at least 10 clear days after the original meeting. The Current Articles have been changed to reflect this requirement.

### 13. Postponement of meetings

The New Articles include provisions to allow the directors to postpone a general meeting if they consider that it would be impractical or unreasonable to hold such meeting on the intended date, time and/or place.

### 14. Scrip Dividend Programme

The New Articles include provisions that would enable the company to introduce a Scrip Dividend Programme, where this has been approved by shareholders by ordinary resolution.

These include provisions to allow existing participants in the BP DRIP to be treated as having elected to participate in the Programme without having to make a Scrip Dividend election and to enable any cash balances remaining for DRIP participants to be carried forward (without interest) to be included in the calculation of the next dividend entitlement. In addition, the provisions enable the directors to capitalize the appropriate nominal amounts of new shares of the company allotted under the Programme out of the sums standing to the credit of any reserve account of the company including the share premium account.

### 15. Payment mechanisms for dividends

The New Articles include provisions that give the company more flexibility as to the method by which they can pay dividends. Although it is not the current intention to change the current method of payment by cheque, future circumstances may make this desirable, or even necessary, such as any changes in banking practice that eliminate cheque payments.



New Articles
bp.com/agmdownloads

14

## Appendix 2
### Explanatory notes relating to the renewal of the Executive Directors' Incentive Plan

The board is seeking the approval of shareholders for a renewal of the Executive Directors' Incentive Plan (the 'plan'), which forms the framework for long-term incentives for executive directors of BP p.l.c. ('BP' or the 'company'). The plan was first approved by shareholders in April 2000 and renewed in April 2005, in each case for a five-year period. In 2005, it was explained that, if the remuneration committee (the 'committee') considered that the plan should be renewed, then shareholder approval would be sought at the 2010 AGM.

During 2009, the committee conducted a comprehensive review of all elements of remuneration policy for executive directors, including the operation of the plan, in the light of BP's specific needs, and developments in best practice for directors' remuneration. The committee also consulted a number of major shareholders, in line with the board's policy of being proactive in obtaining an understanding of shareholder preferences.

The committee concluded that the plan continued to provide a sound framework for establishing long-term incentive arrangements for executive directors and should be renewed for another five years. As described below, some changes to policy in operating the framework are appropriate, the most important being the introduction of a deferred matching share element ('the deferred matching element') to operate alongside the performance share element.

The remuneration packages for executive directors will comprise a balance of the following elements:
- salary;
- annual bonus, a proportion of which will be deferred into shares under the deferred matching element. Vesting of this element will be dependent on the committee's assessment of safety and environmental sustainability over a three-year deferral period;
- a long-term incentive award under the performance share element of the plan. Vesting of this element will be dependent on the company's financial and operational performance relative to the oil majors over a three-year performance period; and
- appropriate final salary pension arrangements.

The committee believes that the combination of vesting conditions on the deferred matching and performance share elements is consistent with its policy of taking a holistic approach towards measurement of long-term performance.

Set out below are the main features of the plan, together with an explanation of the objectives that the committee is seeking to meet by renewing the plan. Key proposed changes in executive director remuneration policy as a whole are set out in the directors' remuneration report on pages 81 to 92 of *BP Annual Report and Accounts 2009*. The directors' remuneration report also contains details of the arrangements that have been implemented under the plan over the past few years.

Each year, the quantum and balance of the long-term incentives to be provided under the plan are reviewed by the committee, together with all the elements of the executive directors' remuneration, to ensure a comprehensive approach and to test overall market competitiveness.

In considering the proposal to renew the plan, shareholders should note the following key changes to the framework of the plan and to the committee's policy for operating it:
- the framework of the plan will be amended by creating a deferred matching element, which will implement the committee's policy of deferring a portion of annual bonus into shares. Further information on this element is set out below;
- the current structure for granting performance share awards will remain largely unchanged, save that the maximum grant level will be reduced from 2011 (as described below) to reflect the introduction of the deferred matching element;
- all categories of award, and shares vesting under awards, will be subject to clawback in the event they were assessed on the basis of materially misstated financial or other data;
- the treatment of participants who leave employment before the vesting of awards will be updated to take account of developments in market practice, including to provide for the prorating of awards that are preserved on leaving; and
- the cash element (which has not to date been used) will be removed from the plan.

### Key objectives of the plan
The committee believes the plan forms a very important part of a balanced combination of remuneration elements for executive directors.

The key objectives of the plan are to ensure that the remuneration packages for the executive directors support the company's goal of maximizing sustainable long-term shareholder value, and to provide a just system of fixed and variable pay for participants, taking into account the success of BP and the competitive global marketplace in which BP operates.

The plan is designed to achieve these objectives by:
- giving the committee a range of tools, within an overall framework approved by shareholders, with which to construct remuneration packages that are tailored to the company's business objectives each year and are calibrated to achieve the desired linkage between performance and pay;
- permitting the committee to assess performance against the goal of maximizing long-term shareholder value on both qualitative and quantitative grounds, thus allowing exercise of judgement in an informed and reasonable manner by the committee in relation to the vesting of shares; and
- making the terms and operation of the plan as clear and uncomplicated as possible for participants and shareholders.

### Plan summary
The plan will have three elements for the committee to use to construct executive directors' long-term incentive pay. These will comprise: (i) the performance share element; (ii) the deferred matching element; and (iii) the share option element. Each element is described below. The long-term cash-based incentive element will no longer be available. In determining which of the elements to use, and in setting performance conditions each year, the committee will consider a range of internal and external factors affecting BP, and best practice in relation to executive remuneration.

The committee believes that a significant long-term shareholding in the company by executive directors reinforces the alignment of their interests with those of shareholders. Currently this comprises a target of shares equivalent to 5 times salary within a reasonable time of appointment as an executive director.

The plan is operated by the remuneration committee composed of non-executive directors. Its members are not eligible to participate in the plan and are considered by the board to be independent. The committee is accountable for its operation of the plan through the directors' remuneration report, which is subject to shareholder vote at the annual general meeting each year.

### The deferred matching element

This element permits the committee to satisfy one-third of the annual bonus for 2010 and subsequent financial years in the form of a conditional share award ('deferred shares') that will vest after three years subject to an assessment of safety and environmental sustainability over that period.

The committee believes that this safety and environmental hurdle is appropriate for several reasons. First, high standards in this area are an important priority of BP's business strategy. Second, maintaining safety and environmental standards over the long term is a good qualitative determinant of the sustainability of the business. Third, this non-financial hurdle will complement the financial and operational performance conditions applicable to performance share awards.

The number of deferred shares will be set by dividing the pre-tax amount of the annual bonus otherwise payable to the executive director by the share price averaged over the three business days following the announcement of results for the previous financial year. To the extent that deferred shares vest, these will be matched by the company on a one-for-on basis. Thus, at the time of granting a specified number of deferred shares, the committee will grant a matching award over the same number of shares ('matching shares').

Vesting of the deferred shares (and therefore the one-for-one matching shares) will depend on an assessment of safety and environmental sustainability over the three-year deferral period. If, over the three years, there is a material deterioration in safety and environment metrics, or major incidents revealing underlying weaknesses in safety and environmental management, then the committee may conclude that awards should vest in part, or not at all, and may differentiate between participants if it thinks fit. In reaching its determination, the committee will obtain advice from the safety, ethics and environment assurance committee which regularly monitors these matters and reports to shareholders in the Annual Report and Accounts and Sustainability Report.

Executive directors may voluntarily defer a further one-third of their annual bonus into shares, which will be capable of vesting, and will qualify for matching, on the same basis as compulsory deferrals.

The committee considers that the deferred matching element, including the facility to make further voluntary deferrals on the same terms, is an appropriate means for executive directors to build up a significant long-term shareholding in the company.

Although the committee considers that the safety and environmental hurdle will remain appropriate, the committee may in future impose a different hurdle, which it considers to be no less demanding, on awards under this element.

Where shares vest under this element, participants will receive additional shares representing the value of dividends that would have been paid on those shares during the performance period and reinvested.

Shares that vest under this element will only be released if the company's minimum shareholding target (explained above) has been met.

If a participant ceases employment before the vesting date, their entitlement to deferred shares will be preserved unless they are dismissed for misconduct (in which case awards will lapse). A leaver's matching shares will generally lapse on cessation of employment, although they will be preserved where cessation is due to death or ill-health, or where the committee exercises discretion to preserve a leaver's matching shares. Where awards are preserved, vesting is subject to the assessment of safety and environmental performance over the three-year period. The number of matching shares that vest at the end of the period will be prorated based on service within the performance period.

### The performance share element

This element permits the committee to award conditional shares ('performance shares') to executive directors, which vest based on performance.

The maximum number of performance shares that may be awarded to an executive director in any one year will be determined at the discretion of the committee and will not exceed a value of 5.5 times salary in the case of the group chief executive, 4.75 times salary in the case of the chief executive of Exploration and Production, and 4 times salary in the case of the other executive directors. These salary multiples are a reduction from previous maximum levels of 7.5 times salary in the case of the group chief executive and 5.5 times salary for the other executive directors, in order to reflect the introduction of the deferred matching element.

16

Performance shares will only vest to the extent that a performance condition is met; this is described below. In addition, the committee will have an overriding discretion, in exceptional circumstances (relating either to the company or a particular participant), to reduce the number of shares that vest (or to provide that no shares vest).

Where performance shares vest, participants will receive additional shares representing the value of dividends that would have been paid on these shares during the performance period and reinvested.

The conditions attaching to performance shares will be determined by the committee at the time of grant of an award and will relate to the company's performance (either absolutely, or relative to competitors) over a period of not less than three years from grant.

The shares that vest following the end of the three-year performance period will normally be subject to a compulsory retention period determined by the committee. This will not usually be less than three years. Sufficient shares may be sold to discharge tax liabilities in relation to the release of shares. Shares will only be released at the end of the retention period if the company's minimum shareholding guidelines (explained above) have been met. This gives executive directors a six-year incentive structure in relation to the performance share element.

The first awards of performance shares under the renewed plan will be made in February 2011. For those awards, and awards in future years, the committee may continue with the performance condition imposed in 2010, or may impose a different condition, which it considers to be no less demanding.

For performance shares awarded under the plan in February 2010, the three-year performance condition relates to BP's performance against the other oil majors (ExxonMobil, Shell, Total, ChevronTexaco and ConocoPhillips) over a three-year period.

Vesting of performance shares under these awards will be based, as to one-third, on total shareholder return ('TSR') versus the comparator group and, as to two-thirds, on a balanced scorecard of underlying performance versus the same competitors. For the first one-third, TSR is calculated by reference to the share price performance of each company over the period, assuming dividends to be reinvested in each company's shares. All share prices will be averaged over the three months before the beginning and end of the performance period, and will be measured in US dollars. For the second two-thirds, the underlying performance will be assessed on three measures reflecting key priorities in BP's strategy – in Exploration and Production, hydrocarbon production growth; in Refining and Marketing, improvement in earnings per barrel; and group increase in underlying net income. Both production growth and refining earnings improvement are key strategic objectives for the group. Group increase in underlying net income acts as a holistic measure of success reflecting revenues, costs and complexity as well as safe and reliable operations.

All the above measures will be compared with those of the five other oil majors to determine the overall vesting result. The methodology used will rank each of the five other oil majors on each of the measures. BP's performance will then be compared on an interpolated basis relative to the performance of the other five. For performance between second and third or first and second, the result will be interpolated based on BP's performance relative to the company ranked directly above and below it. Performance shares will vest at 100%, 70% and 35% for performance equivalent to first, second and third rank respectively and none for fourth or fifth place. The three underlying measures will be averaged to form the balanced scorecard component.

The committee is mindful of the possibility that a simple ranking system may in some circumstances give rise to distorted results in view of the broad similarity of the oil majors' underlying businesses, the small size of the comparator group and inherent imperfections in measurement. To counter this, the committee will have the ability to exercise discretion in a reasonable and informed manner to adjust (upwards or downwards) the vesting level derived from the ranking if it considers that the ranking does not appropriately reflect BP's underlying business performance relative to the comparator group.

The committee will explain any adjustment in the next directors' remuneration report following the vesting, in line with its commitment to transparency.

In exceptional recruitment circumstances, the committee may award performance shares that are subject to a requirement of continued service over a specified period, rather than a corporate performance condition.

Generally, if a participant ceases employment before the end of the performance period, their entitlement to performance shares awarded will lapse. However, awards will vest (based on achievement of the performance condition) at the end of the performance period where cessation was due to death or ill-health. The committee may also, at its discretion, preserve awards held by participants who cease employment during the performance period. In those cases, the number of shares that vest at the end of the performance period will be prorated based on service within the performance period. For performance share awards granted in February 2010 and previous years, different leaver provisions applied in that awards held by those leaving due to retirement and redundancy would vest at the end of the performance period (based on achievement of the performance condition and provided that, on cessation, the award had been held for at least 12 months), and would not be subject to time prorating as described above.