Thad T. Dameris (*pro hac vice*)
HOGAN LOVELLS US LLP
700 Louisiana Street, Suite 4300
Houston, Texas 77002
Tel: 713-632-1400
Fax: 713-583-6297
Email: thad.dameris@hoganlovells.com

Norman J. Blears (State Bar. No. 95600)
HOGAN LOVELLS US LLP
525 University Avenue, 4th Floor
Palo Alto, California 94301
Tel: 650-463-4000
Email: norman.blears@hoganlovells.com
Counsel for Defendants AIRBUS S.A.S.;
AIRBUS AMERICAS, INC.; AND AIRBUS
AMERICAS SALES, INC.

Counsel for the remaining Defendants are listed
on the signature page

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE AIRCRASH OVER THE MID-ATLANTIC ON JUNE 1, 2009 | **CASE NO. 3:10-MD-2144 CRB**<br>**[ALL CASES]**<br><br>**MANUFACTURING DEFENDANTS' JOINT MOTION TO DISMISS ON THE GROUNDS OF *FORUM NON CONVENIENS***<br><br>Hearing Date: September 24, 2010<br>Time: 10:30 a.m.<br>Before: Hon. Charles R. Breyer<br>Place: Courtroom 8, 19th Floor |

CASE NO. 3:10-MD-2144 CRB        MANUFACTURING DEFENDANTS' JOINT
MOTION TO DISMISS

\\DC - 027627/000047 - 3103158 v1

# TABLE OF CONTENTS

**PAGE**

Table of Authorities ...................................................................................................i

INTRODUCTION AND SUMMARY OF ARGUMENT ..............................................1

BACKGROUND ........................................................................................................6

    A.    The Air France Flight 447 Accident and the French Investigations.......................6

    B.    Plaintiffs' Lawsuits in the United States...............................................................8

LEGAL ANALYSIS AND MEMORANDUM OF LAW ............................................17

I.    THE COURT SHOULD DISMISS PLAINTIFFS' CLAIMS FOR REFILING IN FRANCE BASED ON *FORUM NON CONVENIENS* .......................................17

    A.    France Is An Available And Adequate Forum For the Adjudication of Plaintiffs' Claims ...............................................................................................19

    B.    The Private And Public Interest Factors Weigh In Favor Of Dismissal...............20

        1.    The foreign plaintiffs' choice of forum warrants only limited deference; the two United States plaintiffs receive more deference..........................................................................................................21

        2.    Consideration of the private interest factors strongly favors litigation in France. ..................................................................................23

            a.    French courts offer superior access to key evidence. ...................23

            b.    Cost of obtaining attendance of willing witnesses is greater in the United States than in France. ...................................30

            c.    Examination of the wreckage, which is in France, favors a French forum.............................................................................31

            d.    The inability to implead potentially liable third parties in the United States, and the capability to try all claims in a consolidated proceeding in France, favors dismissal to France.............................................................................................33

---

CASE NO. 3:10-MD-2144 CRB                MANUFACTURING DEFENDANTS' JOINT MOTION TO DISMISS

**PAGE**

3. The public interest factors also weigh in favor of dismissal to France...................................................................................................34

a. Compared to the United States, France has a much stronger interest in these cases........................................................35

b. Trying dozens of cases relating to the Accident in the United States presents enormous administrative burdens.............39

c. Complex choice-of-law issues, and the need to apply French law, favor dismissal.. ...........................................................41

CONCLUSION..........................................................................................................42

1

**TABLE OF AUTHORITIES**

2

**Cases**                                                                                        **Page**

3

4   *Cheng v. Boeing Co.*, 708 F.2d 1406 (9th Cir. 1983) ...................................................3, 18, 21, 37

5   *Clerides v. Boeing Co.*, 534 F.3d 623 (7th Cir. 2008) ...........................................18, 36, 37

6
    *Da Rocha v. Bell Helicopter Textron, Inc.*, 451 F. Supp. 2d 1318 (S.D. Fla. 2006) ..............29, 38
7
    *Esheva v. Siberia Airlines*, 499 F. Supp. 2d 493 (S.D.N.Y. 2007) ........................................18, 36
8
    *Gambra v. Int'l Lease Fin. Corp.*, 377 F. Supp. 2d 810
9        (C.D. Cal. 2005) ...........................................................................19, 28, 33, 35, 38, 39, 42
10
    *Gschwind v. Cessna Aircraft Co.*, 161 F.3d 602 (10th Cir. 1998)........................................19, 20
11
    *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947) ...............................................19, 23, 29, 35, 39, 40
12
    *Gund v. Pilatus Aircraft, Ltd.*, No. 07-4902, 2010 WL 887376
13       (N.D. Cal. Mar. 11, 2010).........................................................................................41

14  *Ilusorio v. Ilusorio-Bildner*, 103 F. Supp. 2d 672 (S.D.N.Y. 2000) ........................................40

15
    *In re Air Crash at Agana, Guam*, MDL No. 1238, No. 98-ml-7211
16       (C.D. Cal. Jan. 25, 1999) .........................................................................................34

17  *In re Air Crash Near Athens, Greece on August 14, 2007*, 479 F. Supp. 2d 792
18       (N.D. Ill. 2007) ................................................................................................18, 22

19  *In re Air Crash Near Nantucket Island, Mass., on Oct. 31, 1999*, 340 F. Supp. 2d 240
20       (E.D.N.Y. 2004).......................................................................................................34

21  *In re Air Crash Near Peixoto De Azeveda, Brazil, on Sept. 29, 2006*,
         574 F. Supp. 2d 272 (E.D.N.Y. 2008), *aff'd Lleras v. Excelaire Servs. Inc.*,
22       No. 08-3823-cv, 2009 WL 4282112 (2d Cir. Dec. 2, 2009).......................................18

23  *In re Air Crash Over the Taiwan Straits*, 331 F. Supp. 2d 1176
24       (C.D. Cal. 2004).......................................................................3, 18, 28, 30, 38, 41

25  *In re Factor VIII or IX Concentrate Blood Prods. Liab. Litig.*, 408 F. Supp. 2d 569
26       (N.D. Ill. 2006) ......................................................................................................39

27

28

|  | **PAGE** |
|---|---|

*In re Vioxx Prods. Liab. Litig.*, MDL No. 1657, 2009 WL 1636244
(E.D. La. Feb. 10, 2009) .................................................................... 39

*Lauritzen v. Larsen*, 345 U.S. 571 (1953) ........................................... 41

*Leetsch v. Freedman*, 260 F.3d 1100 (9th Cir. 2001) .......................... 28

*Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998) .......................... 40

*Lockman Found. v. Evangelical Alliance Mission*, 930 F.2d 764 (9th Cir. 1991) ........................ 21

*Loya v. Starwood Hotels & Resorts Worldwide, Inc.*, 583 F.3d 656 (9th Cir. 2009) ..............18, 21

*Lueck v. Sundstrand Corp.*, 236 F.3d 1137 (9th Cir. 2001).........................................*passim*

*Magnin v. Teledyne Cont'l Motors*, 91 F.3d 1424 (11th Cir. 1996)....19, 20, 24, 27, 29, 31, 32, 42

*MGN Pension Tr. v. Morgan Stanley Trust Co.*, 947 F.Supp. 611
(E.D.N.Y. 1996).................................................................................. 36

*Miskow v. Boeing Co.*, 664 F.2d 205 (9th Cir. 1981) ......................... 18

*Nai-Chao v. Boeing*, 555 F.Supp. 9 (N.D. Cal. 1982) ....................22, 32

*Nolan v. Boeing Co.*, 919 F.2d 1058 (5th Cir. 1990)......................... 22, 37-38

*Pain v. United Tech.*, 637 F.2d 775 (D.C. Cir. 1980) .......................22, 26

*Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981)...............................*passim*

*Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren*, 361 F.3d 11
(1st Cir. 2004) .................................................................................. 40

*Satz v. McDonnell Douglas Corp.*, 244 F.3d 1279 (11th Cir. 2001) (per curiam) ..............3, 22, 33

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422 (2007)................................26

*Tazoe v. Aereas*, No. 07-21941, 2009 WL 3232908 (S.D. Fla. Aug. 24, 2009)....................22, 38

*Torreblanca de Aguilar v. Boeing Co.*, 806 F.Supp. 139 (E.D. Tex. 1992) ..................................28

*United Mine Workers v. Gibbs*, 383 U.S. 715 (1966)................................................................34

CASE NO. 3:10-MD-2144 CRB

iv

MANUFACTURING DEFENDANTS' JOINT
MOTION TO DISMISS

**PAGE**

*Van Schijndel v. Boeing Co.*, 434 F. Supp. 2d 766 (C.D. Cal. 2006),
    *aff'd mem.*, 263 Fed.Appx. 555 (9th Cir. 2008)......................................3, 18, 25, 26, 28, 34, 39

*Vivendi S.A. v. T-Mobile U.S.A., Inc.*, No. , 2008 WL 2345283
    (W.D. Wash. June 5, 2008), *aff'd* 586 F.3d 689 (9th Cir. 2009)................................21, 30, 40

*Vorbiev v. McDonnell Douglas Helicopters, Inc.*, No. 08-05539,
    2009 WL 1765675 (N.D. Cal. June 18, 2009)........................................................................38

**Statutes**

Death on the High Seas Act, 46 U.S.C. §§ 761-767 *et seq*.........................................................41

**International Treaties**

Annex 13 to Convention on Int'l Civil Aviation, Aircraft Accident and Incident
    Investigation (9th ed. July 2001) ...........................................................................................6

Convention for the Unification of Certain Rules for International Carriage by Air
    (May 28, 1999) (entered into force on Nov. 4, 2003), *reprinted in* S. Treaty Doc.
    No. 106-45, 1999 WL 33292734 ..................................................................................9, 10, 34

**Additional Material**

Air France, *Press Release N° 5*, Flight Air France 447 Rio de Janeiro –
    Paris-Charles de Gaulle ...........................................................................................................6

Air France, *Press Release N° 7*, Flight Air France 447 Rio de Janeiro –
    Paris-Charles de Gaulle ...........................................................................................................6

BBC, *Lost Jet Data 'May Not Be Found,'* BBC News, June 3, 2009 ...........................................35

Bureau d'Enquêtes et d'Analyses, Interim Report On the Accident on 1st June 2009 of
    the Airbus A330-203 Registered F-GZCP Operated by Air France Flight 447 Rio
    de Janeiro – Paris (July 2, 2009)........................................................................................6, 7

Bureau d'Enquêtes et d'Analyses, Second Interim Report On the Accident on 1st June
    2009 of the Airbus A330-203 Registered F-GZCP Operated by Air France Flight
    447 Rio de Janeiro – Paris (Dec. 17, 2009) ....................................................................6, 7, 8

Emma Vandore, *Air France Crash Victims' Families Want New Search*, AP,
    May 31, 2010 ......................................................................................................................7, 35

CASE NO. 3:10-MD-2144 CRB

MANUFACTURING DEFENDANTS' JOINT
MOTION TO DISMISS

v

\\\DC - 027627/000047 - 3103158 v1

1                                                                    **PAGE**

2   Heather Smith, *Air France Crash Spurs Debate Over Lawsuit Locations*, Bloomberg,

3       June 15, 2009. ...................................................................................................8

4   Interview with Steven Marks, *Airbus Failed*, veja.com ............................................22

5   Judicial Conference, Judicial Business of the United States Courts, Table C-6 (2009),

6       http://www.uscourts.gov/Statistics.aspx ..................................................40

7   Nicola Clark, *France to Renew Search for Plane's Data Recorders*, New York Times,

8       Oct. 26, 2009...................................................................................................7

9   Stewarts Law, Air France Flight 447, Frequently Asked Questions .............................10

10  Sudip Kar-Gupta, *Search for Air France Crash Black Box Suspended*, Reuters, May

        25, 2010. ...........................................................................................................7

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

\\\DC - 027627/000047 - 3103158 v1

Defendants Airbus S.A.S.; Airbus Americas, Inc.; Airbus Americas Sales, Inc.; Honeywell International Inc.; Rockwell Collins, Inc.; Thales Avionics, S.A. (including where incorrectly sued as Thales Group); Thales U.S.A., Inc.; Thales Avionics, Inc.; Motorola, Inc.; Intel Corp.; Hamilton Sundstrand Corporation; Goodrich Corporation; Rosemount Aerospace Inc.; General Electric Company; GE Aviation Systems, LLC; E.I. du Pont de Nemours and Company; and Tyco Electronics Corporation (sued herein as Raychem Corp.) (collectively, the "Manufacturing Defendants")[1] jointly move this Court for an order dismissing plaintiffs' claims under the *forum non conveniens* doctrine for refiling in France.

### INTRODUCTION AND SUMMARY OF ARGUMENT

These consolidated actions arise out of the worst aviation accident in French history—the crash of Air France Flight 447 ("the Accident")—the factual underpinnings of which are firmly rooted in France. Notably, the Accident occurred during a flight operated by France's flagship carrier, Société Air France ("Air France"), from Brazil to France and involved an Airbus A330-203 aircraft registered F-GZCP (the "Aircraft"), which was designed, built, and certified in France by Airbus S.A.S. ("Airbus"). The Aircraft was maintained, and the French flight crew trained, by Air France in France. One of the components on the Aircraft alleged by plaintiffs to have failed, the pitot probes, was also designed and built in France by a French company, Thales Avionics, S.A. The largest proportion of the 228 passengers and crewmembers that died were French citizens or residents; only two passengers were United States citizens.

France has also led the investigations, both administrative and criminal, into the Accident. For the past year, France's Air Accident Investigation Bureau, Bureau d'Enquêtes et d'Analyses

---

[1]   Defendants only move in those cases in which they have been properly served and entered an appearance.

MANUFACTURING DEFENDANTS' JOINT
MOTION TO DISMISS

(the "BEA"), has conducted the technical investigation into the Accident—one of the most expensive and painstaking accident investigations in aviation history. In excess of 30 million dollars has already been spent to recover the wreckage and, in particular, the Digital Flight Data and Cockpit Voice Recorders ("DFDR" and "CVR"), which remain missing and are unlikely to be found.[2] At the same time, two French magistrates are conducting a criminal investigation into the Accident. With the assistance of the air transport division of a French national law enforcement agency, Gendarmerie du Transport Aérien (the "GTA"), and judicially appointed experts on aviation matters, four of whom are already at work, the magistrates will decide whether to bring criminal charges in connection with the Accident.

Despite the Accident's overwhelming connections to France, scores of foreign nationals, but only two U.S. citizens, have filed wrongful death actions in the United States. Yet this Court need not—indeed should not—be constrained by plaintiffs' forum selection. Rather, it has discretion under the *forum non conveniens* doctrine to dismiss plaintiffs' claims for resolution in a more convenient and appropriate forum—the courts of France. This discretion is exemplified nowhere more clearly than in *Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981). In that case, the Supreme Court agreed that a United States citizen's product liability and negligence claims against American aircraft and propeller manufacturers relating to the deaths of several Scottish citizens in a Scottish airplane accident should be dismissed for refiling in Scotland. The Court reasoned that the plaintiff's claims could be tried more easily in Scotland, where evidence relating

---

[2]     The DFDR records hundreds of flight parameters, including the Aircraft's altitude, speed, acceleration or deceleration, engine speed, cabin pressure, and movements of the rudder, flaps, and other flight control surfaces. The CVR records communications within, to, and from the cockpit. Together, the DFDR and CVR are frequently referred to as the aircraft's "black box." If found, the DFDR and CVR would provide important information concerning the cause of the Accident.

\\DC - 027627/000047 - 3103158 v1

to the decedents' damages was located and where the parties would have easier access to a wider body of liability evidence and witnesses. The Court also agreed that Scotland, which is where the accident was investigated, had a greater interest in the plaintiff's claims and the accident than did the United States, which was only where defendants designed and manufactured the aircraft and propeller. Importantly, the Court expressly rejected the argument that the claims should not be dismissed because the United States had an overriding interest in policing the conduct of domestic manufacturers. *Id.* at 260-61 ("The incremental deterrence that would be gained if this trial were held in an American court is likely to be insignificant.").

Notwithstanding *Piper Aircraft*, foreign plaintiffs have consistently come to the United States for the purpose of filing product liability claims related to foreign aviation accidents, all the while challenging almost every facet of the Supreme Court's reasoning. Yet federal courts have hewed closely to *Piper Aircraft* and dismissed almost all such claims on *forum non conveniens* grounds. *E.g.*, *Lueck v. Sundstrand Corp.*, 236 F.3d 1137 (9th Cir. 2001); *Cheng v. Boeing Co.*, 708 F.2d 1406 (9th Cir. 1983). This includes cases that involve the claims of a small number of plaintiffs who are United States citizens. *E.g.*, *Cheng*, 708 F.2d at 1408; *Satz v. McDonnell Douglas Corp.*, 244 F.3d 1279, 1281 n.1 (11th Cir. 2001) (per curiam); *In re Air Crash Over the Taiwan Straits*, 331 F. Supp. 2d 1176, 1179 n.5 (C.D. Cal. 2004). And, as *Piper Aircraft* itself confirms, it includes cases in which defendants designed and manufactured allegedly defective products in the United States. *E.g.*, *Piper Aircraft*, 454 U.S. at 261; *Van Schijndel v. Boeing Co.*, 434 F. Supp. 2d 766, 777 (C.D. Cal. 2006) (collecting cases dismissing foreign aviation accident claims filed against Boeing), *aff'd mem.*, 263 Fed.Appx. 555 (9th Cir. 2008). In fact, in the past 5 years alone, federal courts have dismissed on *forum non conveniens* grounds 15 of 18 reported

---

foreign aviation accident cases that have been brought primarily by foreign plaintiffs. *Forum Non Conveniens* Chart, Exhibit 1 to the Declaration of David J. Weiner ("Weiner Decl.").

The instant cases present an even stronger basis for *forum non conveniens* dismissal than *Piper Aircraft* or any of the foreign aviation accident cases that followed in its wake. First, the Aircraft was manufactured in France, not the United States, as was true in *Piper Aircraft* and the subsequent cases. Second, unlike every other recent commercial aviation accident, the missing DFDR and CVR leave an enormous void in the Court's and the parties' ability to reconstruct the Accident and determine how it occurred and who is at fault. While the BEA and criminal investigators have attempted to fill this void—they have devoted an entire year since the Accident to their investigations, including collecting documents, interviewing witnesses, and assembling thousands of pieces of the wreckage—it is evident that access to the widest body of liability evidence will be more important in these cases than those cases in which the DFDR and CVR were available.

Significantly, all of the evidence collected by the BEA and French criminal investigators is in France, where it will be available to the parties upon dismissal of their claims in the United States and refiling in France. As set forth in the declaration of Jean-Paul Béraudo ("Béraudo Decl."), a retired Justice of the French Supreme Court, the parties would have several mechanisms for obtaining access to this key evidence in French judicial proceedings. For example, French civil courts can issue orders to compel the disclosure of documents and evidence collected by the BEA and can appoint their own experts to review and analyze the wreckage. French civil courts can also order BEA investigators to testify and can order criminal investigators to share the evidence they have collected, including expert reports in the criminal file. Alternatively, plaintiffs can intervene in the French criminal investigation as civil parties

CASE NO. 3:10-MD-2144 CRB

MANUFACTURING DEFENDANTS' JOINT MOTION TO DISMISS

4

1    and have access to all of the evidence and testimony compiled by the criminal investigators as

2    well as the BEA's investigation file.  French civil courts will also have easy access to the

3    Manufacturing Defendants' evidence—much of which is already in France where several

4    Manufacturing Defendants are located—because they have all agreed as part of this motion to

5    make their witnesses and documents available in French civil proceedings.

6

7         In contrast, French law mandate is clear that the evidence and testimony collected by the

8    BEA and criminal investigators—the most thorough and complete collection of information

9    pertaining to the Accident—will not be accessible to any of the parties if these cases are tried in

10   the United States.  Béraudo Decl. ¶¶ 18, 23.  Thus, regardless of time and cost, no amount of

11   discovery in the United States will ever succeed in replicating the evidence available in French

12   proceedings needed to determine liability.  Additionally, because a substantial proportion of the

13   plaintiffs are citizens of France or other European Union states, damages evidence will be more

14   readily accessible, and at less cost, to French courts through procedures available under French

15   and European Union laws and regulations than it will be to the parties if plaintiffs' claims are

16   tried in the United States.  Finally, while Air France incorrectly argues that it is not subject to all

17   but two of the plaintiffs' claims and certain contribution and indemnity claims in the United

18   States, there is no dispute that all claims, cross-claims, and third-party claims can be tried

19   together on a consolidated basis in France.  This will ensure that there are no duplicative trials

20   and that verdicts are consistent.

21

22        These facts demonstrate that plaintiffs' claims can be tried far more efficiently and at less

23   cost in France than in the United States.  While it is likely that plaintiffs here will attempt to

24   reargue *Piper Aircraft*, they cannot overcome its time-tested reasoning, now firmly entrenched in

25   the Federal Reporters, to say nothing of the powerful connection between their claims and France.

26

27

28

CASE NO. 3:10-MD-2144 CRB                                    MANUFACTURING DEFENDANTS' JOINT
                                                            MOTION TO DISMISS
                                        5

For these reasons, and as set forth in greater detail below, the *forum non conveniens* doctrine's well-defined and familiar principles compel dismissal of plaintiffs' claims for refiling in France.

## BACKGROUND

### A.   The Air France Flight 447 Accident and the French Investigations

Air France Flight 447 was a scheduled passenger flight from Rio de Janeiro, Brazil to Paris, France, which crashed into the Atlantic Ocean on June 1, 2009. The Accident resulted in the deaths of all 216 passengers and 12 crewmembers, a plurality of whom—72—were French citizens or residents.[3] The French Navy, French Air Force, and the Brazilian Navy conducted search and recovery efforts in the vicinity of the Accident. Bureau d'Enquêtes et d'Analyses, Interim Report On the Accident on 1st June 2009 of the Airbus A330-203 Registered F-GZCP Operated by Air France Flight 447 Rio de Janeiro – Paris at 37, 47-48 (July 2, 2009) ("BEA First Interim Report"), Exhibit 4 to Weiner Decl. Beginning on June 6, 2009, portions of the Aircraft's wreckage were recovered and turned over to the BEA for transport to France. *Id.* at 38, 45.

Because the Accident involved a French-built and French-registered aircraft operated by a French airline, France's BEA was assigned the lead role in the official investigation of the circumstances surrounding, and probable causes of, the Accident. *See* Annex 13 to Convention on Int'l Civil Aviation, Aircraft Accident and Incident Investigation at 5.3 (9th ed. July 2001). This investigation began early on June 1, 2009, shortly after the Aircraft was reported missing. BEA First Interim Report at 11. The more than 1,000 pieces of wreckage recovered to date have been returned to France and assembled by the BEA in a hangar in Toulouse, France. Bureau

---

[3]   According to information provided by Air France to investigators and the press, the deceased were citizens of 33 countries, including 72 French citizens, 59 Brazilian citizens and 26 German citizens. Air France, *Press Release Nº 5 and 7*, Flight Air France 447 Rio de Janeiro – Paris-Charles de Gaulle, Exhibits 2 & 3 to Weiner Decl. Only 2 passengers on Flight 447 were United States citizens. *Id.*

d'Enquêtes et d'Analyses, *Second Interim Report On the Accident on 1st June 2009 of the Airbus A330-203 Registered F-GZCP Operated by Air France Flight 447 Rio de Janeiro – Paris at 12* (Dec. 17, 2009) ("BEA Second Interim Report"), Exhibit 5 to Weiner Decl.  Following the original recovery efforts in June 2009, the French Navy and BEA undertook two further attempts to find additional wreckage.  These searches cost almost 30 million dollars.  Emma Vandore, *Air France Crash Victims' Families Want New Search*, AP, May 31, 2010; Nicola Clark, *France to Renew Search for Plane's Data Recorders*, New York Times, Oct. 26, 2009, Exhibits 6 and 7 to Weiner Decl.  However, after an ambitious search effort that was unprecedented in aviation history in its cost, complexity, and scope, substantial portions of the wreckage, including the DFDR and CVR, remain missing and may never be recovered.  Sudip Kar-Gupta, *Search for Air France Crash Black Box Suspended*, Reuters, May 25, 2010, Exhibit 8 to Weiner Decl.

As of June 15, 2010, the BEA has issued two interim reports concerning its investigation, although it has not yet reached any findings of probable cause.  *See* Ex. 4 & 5, Weiner Decl. According to the Reports, meteorological data shows that a powerful storm, typical of the region in June, with the potential for "notable" turbulence was in Air France 447's flight path on the night of the Accident.  BEA Second Interim Report at 69.  The Reports further state that the storm entailed "strong condensation towards AF447's flight level probably associated with convection phenomena" and that three other flights on a similar path shortly before and after Air France 447—including another Air France Airbus A330, an Iberia Airbus A340, and a Lufthansa Boeing 747—diverted to avoid the storm.  *See* BEA First Interim Report at 67-68; BEA Second Interim Report at 69.  The Reports suggest that by not diverting—as did all other similarly situated aircraft—and flying directly into high altitude convective storm clouds, the Air France 447 flight crew placed the Aircraft into dangerous conditions that could have affected the efficacy of

\\\DC - 027627/000047 - 3103158 v1

1    sensors mounted on the Aircraft's outer-body. These sensors, along with other components,

2    collect air pressure information that is used by certain Aircraft systems. Along with other

3    information, airspeed is then derived and used by the Aircraft's electronic systems. *See id.* at 69-

4    70. The Reports note that Air France 447's electronic systems transmitted twenty-four automatic

5    maintenance messages indicating "inconsistency in measured speeds." *Id.* at 69. Based on these

6    preliminary findings, it is believed that the Air France flight crew did not employ appropriate

7    piloting procedures for responding to the flight conditions in which they placed the Aircraft,

8    which may have resulted in a loss of control of the Aircraft.

9    In addition to the BEA's investigation to establish the Accident's probable causes, on June

10   5, 2009, a French public prosecutor opened a criminal investigation into the Accident.

11   Declaration of Karl K. Hennessee ("Hennessee Decl.") ¶ 17. Conducted by two investigating

12   magistrates, and with the assistance of the GTA, judicial experts, and the Centre d'Essais

13   Aéronautique de Toulouse ("CEAT"), a French governmental entity comprised of aviation experts,

14   the criminal investigators have already interviewed numerous witnesses and collected relevant

15   documents. *Id.* Media reports confirm that family members of at least one of the Flight 447

16   passengers have intervened in the criminal proceedings. Heather Smith, *Air France Crash Spurs*

17   *Debate Over Lawsuit Locations*, Bloomberg, June 15, 2009, Exhibit 9 to Weiner Decl. No

18   charges have been brought against any person or entity to date. Hennessee Decl. ¶ 17. None of

19   the Manufacturing Defendants are parties to the criminal investigation. *Id.*

20   **B.      Plaintiffs' Lawsuits in the United States**

21   As of June 15, 2010, 72 plaintiffs had commenced 36 lawsuits on behalf of 56 decedents

22   who died in the Accident. Only two of the 72 plaintiffs are United States citizens and they are

23   suing on behalf of the only two United States citizens who died in the Accident. *Harris, et al. v.*

28   | CASE NO. 3:10-MD-2144 CRB | MANUFACTURING DEFENDANTS' JOINT |
     |---|---|
     |   | MOTION TO DISMISS |

8

*Societe Air France, et al.*, No. 09-cv-3155 (S.D. Tex.). The remaining cases were all filed by foreign citizens from France (10 plaintiffs); Ireland (4 plaintiffs); the United Kingdom (1 plaintiff); Germany (1 plaintiff); the Philippines (1 plaintiff); Russia (5 plaintiffs); Lebanon (1 plaintiff); Slovakia (1 plaintiff); Venezuela (1 plaintiff); Hungary (2 plaintiffs); and Brazil (1 plaintiff). The nationalities of the remaining plaintiffs are not set forth in their complaints.[4] The cases were filed in the Southern Districts of Texas and Florida, the Northern District of California, and the Circuit Court of Cook County, Illinois (removed to the Northern District of Illinois). Pursuant to an order of the Judicial Panel on Multidistrict Litigation the cases were consolidated and transferred to this Court for centralized pretrial proceedings. [Docket Entry ("D.E.") 1]

Plaintiffs' complaints assert two general sets of allegations. First, all plaintiffs allege that the Aircraft, maintained and operated by Air France, and a number of its components, including the pitot probes, were defectively designed or manufactured. Second, in addition to product liability claims, the two U.S. plaintiffs—the *Harris* plaintiffs—also allege that the Accident resulted from Air France's negligence. While Air France is absent from the foreign plaintiffs' complaints, this does not necessarily reflect a view that it is not at fault—rather, the Montreal Convention bars the foreign plaintiffs from suing Air France in the United States although it allows all plaintiffs to sue it in France. Convention for the Unification of Certain Rules for International Carriage by Air, art. 33 (May 28, 1999) (entered into force on Nov. 4, 2003), *reprinted in* S. Treaty Doc. No. 106-45, 1999 WL 33292734 ("Montreal Convention"). In fact, none of the foreign plaintiffs has stated that they intend to forego filing claims against Air France and they still have a year left before they would need to do so. *Id.* art. 35 (two year statute of

---

[4] It is believed, but not confirmed, that many of the plaintiffs whose nationalities are not set forth in their complaints are Brazilian.

limitations for Convention claims). Moreover, given that Air France is presumptively liable under the Montreal Convention for damages up to 100,000 Special Drawing Rights,[5] and liable for all compensable damages in excess of this amount unless it proves that it was entirely free of any negligence in causing the Accident, such stipulations are unlikely. *Id.* art. 17, 21.[6]

Plaintiffs' complaints name a total of 20 defendants. But even at this stage of proceedings it is evident that many of these defendants were not involved in the design or manufacture of the Aircraft or any of its component parts. The named defendants are as follows:

1. Air France is France's flag carrier. Air France maintains its principal place of business and worldwide headquarters in Tremblay-en-France, France. Air France made decisions regarding the purchase, configuration, operation, and maintenance of the Accident Aircraft, including decisions about whether to upgrade or change components, and the training of the Accident flight crew in France. It is believed that the majority of Air France personnel reside in France. The citizenship and residency of the Flight 447 flight crew was French. Ex. 3, Weiner Decl. All Air France witnesses and documents are believed to be in France. Hennessee Dec. ¶ 20.

2. Airbus S.A.S. is a *société par action simplifiée* that is organized under the laws of France. Hennessee Decl. ¶ 3. Owned by the European Aeronautic Defence and Space Company ("EADS"), Airbus maintains its principal place of business and worldwide headquarters in Toulouse-Blagnac, France where the majority of its employees are located and where all final

---

[5]     The Special Drawing Right is an international reserve asset that is valued based on a basket of currencies. At present rates, 100,000 Special Drawing Rights is roughly equivalent to $150,000.

[6]     Recognizing the benefits provided by the Montreal Convention, marketing material prepared by one of the law firms for plaintiffs in these cases emphasizes that "families of all deceased passengers are GUARANTEED to receive some compensation under the Montreal Convention." Stewarts Law, Air France Flight 447, Frequently Asked Questions at 2, Exhibit 10 to Weiner Decl.

---

CASE NO. 3:10-MD-2144 CRB

10

MANUFACTURING DEFENDANTS' JOINT MOTION TO DISMISS

1    decisions concerning the design, assembly, certification, and marketing of Airbus aircraft are

2    made. *Id.* ¶¶ 3, 6.

3    Airbus designed and manufactured the Aircraft in France and delivered it to Air France in

4    France in April 2005 pursuant to French and European laws and regulations.[7]  *Id.* ¶¶ 12-14.

5    Airbus also performed all testing on the Aircraft and prepared the technical, operating, and

6    training manuals and other documents relating to the Aircraft in France.  *Id.* ¶ 12.  All decisions

7    about Aircraft performance and whether and how to change manuals or issue warnings were

8    made in France.  *Id.*  The Aircraft was certified for flight in France by the Direction Générale de

9    l'Aviation Civile ("DGAC"), France's counterpart to the Federal Aviation Administration

10   ("FAA").  *Id.* ¶ 13.  Airbus provided marketing and customer support services relating to the

11   Aircraft to Air France in France.  *Id.* ¶¶ 12, 18.  All Airbus witnesses and documents relevant to

12   the Accident and the allegations in the complaints are located principally in France and, to a

13   lesser extent, in Germany, the United Kingdom, and Spain.  *Id.* ¶ 18.  Notably, Airbus does not

14   have any witnesses or documents in the United States.  *Id.* ¶¶ 18-19.

15   3. <u>Airbus Americas, Inc.</u>, is a subsidiary of Airbus that owns companies responsible for

16   coordinating marketing and customer support to Airbus customers located in North and South

17   America.  *Id.* ¶ 8.  Based in Herndon, Virginia, where it maintains its principal place of business

18   and headquarters, Airbus Americas was not involved in the design, manufacture, or certification

19   of the Aircraft.  *Id.*  Airbus Americas did not provide any marketing or customer support services

20   to Air France and did not participate in the training of the flight crew operating Air France

---

[7]    Certain Airbus-affiliated companies in Germany, the United Kingdom, and Spain assisted
in the design and assembly of various A330 components, but they performed this work pursuant
to specifications and oversight provided by Airbus personnel in France.  Hennessee Decl. ¶ 12.

CASE NO. 3:10-MD-2144 CRB                                    MANUFACTURING DEFENDANTS' JOINT
                                                                        MOTION TO DISMISS
                                          11

Flight 447. *Id.* Airbus Americas does not have any witnesses or documents relevant to the Accident or any of the allegations in the complaints. *Id.*

4. Airbus Americas Sales, Inc., is a subsidiary of Airbus Americas that is also based in Herndon, Virginia. *Id.* ¶ 9. Airbus Americas Sales' sole responsibility is to market and provide customer support for Airbus aircraft to customers in North and South America. *Id.* Airbus Americas Sales does not play a role in the design, manufacture, or certification of any Airbus aircraft and did not provide any marketing, customer support, or training to any Air France flight crews. *Id.* Like Airbus Americas, Airbus Americas Sales does not have any witnesses or documents relevant to the Accident or any of the allegations in the complaints. *Id.*

5. Thales Avionics, S.A., is a *société anonyme* that is organized under the laws of France with its principal place of business in Neuilly-sur-Seine, France. Declaration of Bernard Caruso ¶ 4 ("Caruso Decl."). Thales Avionics, S.A. manufactured pitot probes and certain flight control computers that are alleged to have been on the Aircraft in France. *Id.* ¶ 6. The pitot probes and certain flight control computers were sold to Airbus for installation on new Air France aircraft and were delivered to Airbus in France. *Id.* Product support for pitot probes and certain flight control computers is provided by Thales Avionics, S.A. to Air France in France. *Id.* Replacements and spare parts for the pitot probes are sold by Thales Avionics, S.A. to Air France for delivery to Air France in France. *Id.* Thales Avionics, S.A. witnesses and documents are in France. *Id.* ¶ 7. Thales Avionics, S.A. is the only one of the five "Thales" defendants named in the complaints that designed, tested, manufactured, or sold pitot probes and any other flight control computers to Airbus for installation on Airbus A330-203 aircraft. *Id.* ¶ 6.

6. Thales S.A., a *société anonyme* organized under the laws of France with its principal place of business in Neuilly-sur-Seine, France, is a holding company that owns 100% of Thales

Avionics, S.A. *Id.* ¶ 9. However, Thales S.A. is a separate company and did not design, test, manufacture, or sell any of the parts alleged by plaintiffs to be defective. *Id.* ¶¶ 6, 11.

7. Thales USA, Inc. and Thales Avionics, Inc. Thales USA, Inc., is a Delaware corporation. Declaration of Howard M. Diamond ¶ 3 ("Diamond Decl."). Among the companies owned by Thales USA, Inc. is Thales Holdings Corp. *Id.* Thales Holdings Corp., a Delaware corporation, is the 100% owner of Thales Avionics, Inc., which is also a Delaware corporation. *Id; see also* Declaration of Richard Flocco ¶ 3 ("Flocco Decl."). Neither Thales USA, Inc. nor Thales Avionics, Inc. designed, tested, manufactured, or sold pitot probes or flight control computers to Airbus for installation on new A300-203 aircraft purchased by and delivered to Air France or to Air France as replacements or spare parts for A300-203 aircraft. Diamond Decl. ¶¶ 5-6; Flocco Decl. ¶¶ 5-6. And neither Thales USA, Inc. nor Thales Avionics, Inc. has any witnesses or documents relevant to the any of the allegations in any of the complaints. Diamond Decl. ¶¶ 7-8; Flocco Decl. ¶¶ 7-8. Neither Thales USA, Inc. nor Thales Avionics, Inc. are subsidiaries of Thales Avionics, S.A. Diamond Decl. ¶ 4; Flocco Decl. ¶ 4; Caruso Decl. ¶ 8.

8. Thales Group is not a legal entity and has no employees; thus, it does not have any documents or witnesses relating to the design, testing, manufacture, and sale of those parts alleged by plaintiffs to be defective. Caruso Decl. ¶ 12.

9. Rosemount Aerospace Inc. ("Rosemount"), a wholly-owned subsidiary of Goodrich Corporation, is an aerospace manufacturing company with its principal place of business in Burnsville, Minnesota. Declaration of Quinn Moynihan ¶ 4. Rosemount designs and manufactures in-flight ice detection sensors and angle of attack sensors for commercial and military aircraft, including certain Airbus aircraft. *Id.* ¶ 5. Rosemount employees with

\\\DC - 027627/000047 - 3103158 v1

knowledge of, and documents relating to, Rosemount in-flight ice detection sensors and angle of attack sensors for use on certain Airbus aircraft are located in Burnsville, Minnesota. *Id.* ¶ 6.

10. <u>Goodrich Corporation</u> ("Goodrich"), the parent corporation of Rosemount, is a global supplier of systems and services to the aerospace and defense markets headquartered in Charlotte, North Carolina. *Id.* ¶ 7. Goodrich itself does not design, manufacture or sell in-flight ice detection sensors and angle of attack sensors for use on Airbus aircraft. *Id.* ¶ 8. Documents or witnesses relevant to in-flight ice detection sensors or angle of attack sensors for use on Airbus aircraft would be located at Goodrich's Rosemount subsidiary in Burnsville, Minnesota. *Id.* ¶ 9.

11. <u>Honeywell International Inc.</u> ("Honeywell") is a Delaware corporation with its principal place of business in Morristown, New Jersey. Declaration of Sidney P. Gipson ¶ 2. Honeywell designs and manufactures the air data inertial reference units ("ADIRU") for certain Airbus aircraft. *Id.* Honeywell's witnesses and documents relating to the ADIRU are in France, Arizona, and Minnesota. *Id.* ¶¶ 2-3. Honeywell also has customer support employees who work on-site in France at Air France and Airbus. *Id.* ¶ 2.

12. <u>Rockwell Collins, Inc.</u> is informed and believes that the Airbus A330-203 operated by Air France and involved in the crash on June 1, 2009, was equipped with a Rockwell Collins WXR-700X weather radar system ("Radar System") designed, manufactured and sold by Rockwell Collins. Declaration of Roger Southgate ("Southgate Decl.") ¶ 3. Rockwell Collins' principal place of business is in Cedar Rapids, Iowa. *Id.* ¶ 4. Rockwell Collins also maintains a facility in Melbourne, Florida. *Id.* Much of the initial engineering and design efforts as well as the manufacture of the Radar System occurred in Cedar Rapids. *Id.* Witnesses and documents relevant to the Radar System installed on the Accident Aircraft are located both in Cedar Rapids and Melbourne. *Id.* In connection with the certification, sale and support of the Radar System,

---

CASE NO. 3:10-MD-2144 CRB

14

MANUFACTURING DEFENDANTS' JOINT MOTION TO DISMISS

1    Rockwell Collins maintains a facility in Toulouse, France and an office in Paris. *Id.* ¶ 5.

2    Witnesses and documents relevant to the Radar System installed on the Accident Aircraft are

3    located in both locations. *Id.* Rockwell Collins' Paris office personnel have worked with Air

4    France personnel both in providing specifications and technical information regarding the Radar

5    System as well as in negotiating sales and subsequent support agreements. *Id.* ¶ 8.

6

7    13. <u>Motorola, Inc.</u> ("Motorola") is a Delaware corporation with its principal place of

8    business in Schaumburg, Illinois. Declaration of Bradley Dunderman ¶ 2. Motorola designed

9    and manufactured microprocessors until 2004, when it divested its semiconductor products

10   business unit. *Id.* ¶¶ 3, 4. As a result of the divestiture, Motorola neither maintains documents

11   related to nor employs personnel with knowledge of the design, manufacture, or sale of

12   microprocessors. *Id.* ¶ 7. Freescale Semiconductor, Inc., to which Motorola's semiconductor

13   products business unit was divested, is an Austin, Texas, based Delaware corporation with

14   operations in 20 countries. Freescale Semiconductor, Freescale Worldwide,

15   http://www.freescale.com/webapp/sps/site/homepage.jsp?nodeId=067147 (last visited June 15,

16   2010).

17

18   14. <u>Intel Corp.</u> is a Delaware Corporation with its principal place of business in Santa

19   Clara, California. Declaration of Wesley H. Worden ¶ 4. The foreign plaintiffs (but not the U.S.

20   claimants) contend that Intel microprocessors and microcontrollers were on the Aircraft and were

21   defective because they "allowed erroneous data and spurious signals," "prevented" ADIRU's and

22   flight computers "from functioning properly," and "commanded" and "authorized" "dangerous

23   and unauthorized flight control movements." *Id.* ¶ 6. These allegations reflect a fundamental

24   misunderstanding of what microprocessors and microcontrollers do. *Id.* ¶ 7. Those components

25   faithfully execute the commands they receive. *Id.* They do not "direct," "allow" or "command."

26

27

28

*Id.* Intel has learned that certain of its standard, "commercial grade" microprocessors and microcontrollers may have been procured from third parties and installed in the Aircraft. *Id.* ¶¶ 8-11. These components were designed in Arizona and Oregon, manufactured in Israel, tested in Asia, and assembled elsewhere in Asia. *Id.* ¶ 12-15.

15. <u>Hamilton Sundstrand Corporation</u> ("Hamilton") is a Delaware corporation with its principal place of business in Windsor Locks, Connecticut. Plaintiffs allege that Hamilton is liable for design and manufacturing defects in the Aircraft's side stick controls; however, this component was designed and manufactured in France by the French corporation Ratier-Figeac, a subsidiary of Hamilton. Aff. of Stuart C. Browning ¶ 3. To the extent that Ratier-Figeac side stick controls were on the Aircraft, they would have been designed and manufactured in France where all witnesses with knowledge of and documents relating to them would be located. *Id.*

16. <u>General Electric Company</u> ("General Electric") is a New York corporation with its principal place of business in Fairfield, Connecticut. Declaration of Dwight C. Wilson ("Wilson Decl.") ¶ 2. General Electric designs and manufactures engines for certain Airbus aircraft. *Id* ¶ 3. Final assembly and testing of the engines that are the subject of plaintiffs' complaints took place in France. *Id.* ¶ 4. General Electric sold and delivered these engines to Airbus in France. *Id.* The witnesses and documents relevant to the allegations in plaintiffs' complaints against General Electric are located predominantly in Ohio, North Carolina, and France. *Id.* ¶ 5.

17. <u>GE Aviation Systems, LLC</u> ("GE Aviation Systems") is a Delaware limited liability company with its principal place of business in Cincinnati, Ohio. Wilson Decl. ¶ 6. Contrary to the allegations in plaintiffs' complaints, GE Aviation Systems did not design, manufacture, assemble, market, or sell the engines on the Aircraft. *Id.* ¶ 8. Accordingly, there are no relevant GE Aviation Systems witnesses or documents.

---

CASE NO. 3:10-MD-2144 CRB

MANUFACTURING DEFENDANTS' JOINT MOTION TO DISMISS

16

\\\DC - 027627/000047 - 3103158 v1

18. <u>E.I. du Pont de Nemours & Company</u> ("Dupont") is a Delaware corporation with its principal place of business in Wilmington, Delaware. Declaration of Edward C. McKenzie ¶ 2. Plaintiffs variably allege that DuPont manufactured "wiring" or "wiring insulation" or "Kapton® wiring insulation" allegedly installed on the Aircraft. DuPont does not manufacture wiring for aircraft. *Id.* ¶ 3. While DuPont designs and manufactures a polyimide insulating film product marketed under the Kapton® brand name, which may be used as insulation for aircraft wiring, there is no evidence that DuPont's product was used on the Accident Aircraft. *Id.* ¶ 4. If any DuPont Kapton® film was on the Aircraft, however, it would have been designed and manufactured in Circleville, Ohio, further processed in Luxembourg, and marketed and sold to French wire manufacturers. *Id.* ¶¶ 5-7. Dupont's relevant witnesses and documents relating to Kapton® are located in Luxembourg, Germany, France and Ohio. *Id.* ¶¶ 9-11.

19. <u>Tyco Electronics Corporation</u> (sued herein as Raychem Corp.) ("Tyco") is a Pennsylvania corporation with its principal place of business in Berwyn, Pennsylvania. Declaration of Russ Piraino ¶ 4. Plaintiffs' allegations against Tyco concern aerospace wiring. While Tyco designs and manufactures aerospace wiring at facilities in Menlo Park, California, the United Kingdom, and China, Tyco does not have any relevant evidence in these or any other jurisdictions because it does not supply any products to Airbus. *Id.* ¶¶ 4, 5.[8]

## LEGAL ANALYSIS AND MEMORANDUM OF LAW

### I.    THE COURT SHOULD DISMISS PLAINTIFFS' CLAIMS FOR REFILING IN FRANCE BASED ON *FORUM NON CONVENIENS*

Federal courts in recent years have dismissed on *forum non conveniens* grounds virtually all claims brought in the United States by foreign plaintiffs in connection with foreign aviation

---

[8]    Judd Wire, Inc. is named as a defendant in several cases but it has not been served and has already been voluntarily dismissed by a number of plaintiffs in cases relating to the Accident.

\\\DC - 027627/000047 - 3103158 v1

accidents, even in cases that involve a small number of United States citizens. *See Piper Aircraft*, 454 U.S. 235; *Lueck*, 236 F.3d at 1137; *Cheng*, 708 F.2d at 1406; *Miskow v. Boeing Co.*, 664 F.2d 205 (9th Cir. 1981); *Clerides v. Boeing Co.*, 534 F.3d 623 (7th Cir. 2008); *Esheva v. Siberia Airlines*, 499 F. Supp. 2d 493 (S.D.N.Y. 2007); *Van Schijndel*, 434 F. Supp. 2d at 766, *aff'd mem.*, 263 Fed.Appx. 555 (9th Cir. 2008). These dismissals include, notably, cases that were consolidated for pretrial purposes by the MDL Panel and then dismissed under the *forum non conveniens* doctrine. *See In re Air Crash Near Peixoto De Azeveda, Brazil, on Sept. 29, 2006*, 574 F. Supp. 2d 272 (E.D.N.Y. 2008), *aff'd Lleras v. Excelaire Servs. Inc.*, No. 08-3823-cv, 2009 WL 4282112 (2d Cir. Dec. 2, 2009); *In re Air Crash Near Athens, Greece*, 479 F. Supp. 2d 792 (N.D. Ill. 2007), *aff'd Clerides*, 534 F.3d 623; *In re Air Crash Over the Taiwan Straits*, 331 F. Supp. 2d at 1199. These dismissals reflect certain basic truths—notably, that it is highly burdensome and costly, and therefore "oppressive[] and vexatio[us] . . . out of all proportion to plaintiff's convenience," for parties to defend themselves in the United States when key liability and damages evidence is not accessible because it is located in a foreign forum, and that the forum with direct connections to a foreign aviation accident has a far more pronounced interest in resulting litigation. *Piper Aircraft*, 454 U.S. at 241 (internal quotation marks omitted).

The decision to dismiss based on *forum non conveniens* rests on a two part test. *Loya v. Starwood Hotels & Resorts Worldwide, Inc.*, 583 F.3d 656, 664 (9th Cir. 2009). First, the Court must determine if an alternative and adequate foreign forum exists. *Lueck*, 236 F.3d at 1142. Second, if such a forum exists, the Court must weigh factors pertaining to private interests—these focus on the burdens of the proceedings on the parties—and public interests—these focus on the burdens of the proceedings on the forum. *Id.* Application of these *forum non conveniens*

---

CASE NO. 3:10-MD-2144 CRB

18

MANUFACTURING DEFENDANTS' JOINT
MOTION TO DISMISS

principles to plaintiffs' claims confirms that dismissal is warranted and that their claims should be dismissed for refiling in France.

### A. France Is An Available And Adequate Forum For The Adjudication Of Plaintiffs' Claims

The threshold inquiry in *forum non conveniens* analysis is whether an alternative foreign forum is "available" and "adequate." *Id.* at 1143. Not surprisingly, several courts have already held that France is available and adequate with respect to wrongful death claims arising out of aviation accidents. *Gschwind v. Cessna Aircraft Co.*, 161 F.3d 602, 606-07 (10th Cir. 1998); *Magnin v. Teledyne Cont'l Motors*, 91 F.3d 1424, 1429 (11th Cir. 1996); *Gambra v. Int'l Lease Fin. Corp.*, 377 F. Supp. 2d 810 (C.D. Cal. 2005). The declaration of Justice Béraudo, describing French jurisdiction, procedure, and substantive law, also verifies the availability and adequacy of French courts for the resolution of plaintiffs' claims.

First, it is clear that France is an available forum. The standard for determining a forum's availability is simply whether "the defendant is 'amenable to process' in the other jurisdiction." *Piper Aircraft*, 454 U.S. at 265 n.22 (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 506-07 (1947)). This threshold requirement is met here because the Manufacturing Defendants agree to consent, and are in any event subject, to French civil jurisdiction with respect to the Accident. Béraudo Decl. ¶¶ 26-28; *see also Lueck*, 236 F.3d at 1143 (finding New Zealand to be available where defendants agreed to jurisdiction there). France also is available for plaintiffs' and third-party claims against Air France because Air France is organized under French laws and maintains its principal place of business in France. Béraudo Decl. ¶ 29.

Second, France satisfies the "adequacy" requirement. *See Piper Aircraft*, 454 U.S. at 252 n.18 ("Rules roughly equivalent to American strict liability are effective in France. . . .");

---

CASE NO. 3:10-MD-2144 CRB

19

MANUFACTURING DEFENDANTS' JOINT MOTION TO DISMISS

*Gschwind*, 161 F.3d at 607 ("French law recognizes product liability and wrongful death actions."); *Magnin*, 91 F.3d at 1429 ("French law applies a very broad statutory basis for tort liability"). A forum may be deemed inadequate only under the rare circumstances where it "does not permit litigation of the subject matter of the dispute" or where the remedies afforded for plaintiffs' claimed injuries are "clearly unsatisfactory." *Piper Aircraft*, 454 U.S. at 255 n.22. French courts, as Justice Béraudo explains, easily meet this standard. They provide remedies for negligence and products liability claims based on decedents' wrongful deaths. Béraudo Decl. ¶¶ 12, 31-34. French law allows for compensation to direct and indirect victims, as well as the beneficiaries of those who were injured. *Id.* ¶¶ 35-36. Moral and economic damages are available and can encompass loss of earnings and enjoyment and psychological suffering caused by the death of a loved one. *Id.*

French civil courts also employ procedural mechanisms that will ensure that trials are fair, open, and expeditious. *Id.* ¶¶ 9-14. Notably, plaintiffs can bring their claims in a trial-level court and can appeal an adverse decision to an intermediate appellate and supreme court. *Id.* ¶¶ 7, 10. French civil courts also have broad powers to compel the production of evidence and testimony from parties and non-parties, appoint experts, and direct the parties to address matters that they have not adequately explained. *Id.* ¶¶ 15-21, 25. Finally, French civil courts can order the consolidation of proceedings so that all parties and claims in a related matter are tried together. *Id.* ¶ 30. In sum, French civil courts are an adequate forum for trial of plaintiffs' claims.

**B.    The Private And Public Interest Factors Weigh In Favor Of Dismissal**

Because France satisfies the threshold availability and adequacy inquiry, the Court must next balance the private and public interest factors. *See Lueck*, 236 F.3d at 1142. Based on the French courts' superior access to key sources of proof, as well as France's greater interest in the

CASE NO. 3:10-MD-2144 CRB

MANUFACTURING DEFENDANTS' JOINT
MOTION TO DISMISS

20

\\\DC - 027627/000047 - 3103158 v1

Accident and these cases, the private and public interest factors firmly establish that trials in this forum will be "oppressive[] and vexatio[us]" to Manufacturing Defendants and that dismissal is warranted. *Piper Aircraft*, 454 U.S. at 241 (internal quotation marks omitted).

1. **The foreign plaintiffs' choice of forum warrants only limited deference; the two United States plaintiffs receive more deference.**

At the outset, the Court's balancing of private and public interest factors must take into account the appropriate level of deference to be accorded to plaintiffs' choice of forum. *Id.* at 255-56. The general rule is that plaintiffs who sue in their home forum are entitled to some deference because they are presumed to have selected the forum because it is convenient, *see id.*; however, "the deference due is 'far from absolute,'" *Loya*, 583 F.3d at 665 (quoting *Lockman Found. v. Evangelical Alliance Mission*, 930 F.2d 764, 767 (9th Cir. 1991)). Indeed, the Ninth Circuit has stressed that "[t]he presence of American plaintiffs . . . is not in and of itself sufficient to bar a district court from dismissing a case on the ground of *forum non conveniens*," *Cheng*, 708 F.2d at 1411, and *forum non conveniens* dismissals of claims brought by United States citizens are not uncommon, *see Loya*, 583 F.3d at 660 (dismissing wrongful death claim brought on behalf of United States citizen who died while scuba diving in Mexico); *supra* at 18. The analog to this general rule is that foreign plaintiffs who choose to initiate litigation in United States courts are entitled to "less deference." *Piper Aircraft*, 454 U.S. at 256; *see also Vivendi SA v. T-Mobile USA, Inc.*, 586 F.3d 689, 693 (9th Cir. 2009) (foreign plaintiff's choice of United States forum afforded "little deference").

Plaintiffs in these cases are 70 foreign, and 2 United States, citizens. Because the foreign citizens elected to sue in a forum that is far from their homes and most of the relevant evidence and with little more than a passing interest in their claims, it is doubtful that convenience

CASE NO. 3:10-MD-2144 CRB

MANUFACTURING DEFENDANTS' JOINT MOTION TO DISMISS

21

motivated their choice of forum.[9]  While the decision of the two United States plaintiffs to sue in the United States is entitled to more deference, this deference does not outweigh the multiple factors that strongly point in favor of *forum non conveniens* dismissal.  In fact, under virtually identical circumstances, federal courts have dismissed claims brought by U.S. citizens relating to foreign aviation accidents.  *See Piper Aircraft*, 454 U.S. at 239 (affirming dismissal of case that involved one U.S. plaintiff); *Pain v. United Tech.*, 637 F.2d 775 (D.C. Cir. 1980) (affirming dismissal of aviation accident case involving one U.S. plaintiff and one U.S. decedent); *Satz*, 244 F.3d at 1281 n.1 (affirming dismissal of aviation accident case involving two U.S. plaintiffs); *Nolan v. Boeing Co.*, 919 F.2d 1058, 1060 (5th Cir. 1990) (affirming dismissal of aviation accident case involving two U.S. plaintiffs); *Tazoe v. Aereas*, No. 07-21941, 2009 WL 3232908 (S.D. Fla. Aug. 24, 2009) (dismissing 1 U.S. plaintiff, 1 U.S. decedent, and 77 foreign plaintiffs to Brazil); *In re Air Crash Near Athens, Greece on August 14, 2007*, 479 F. Supp. 2d 792, 804 (N.D. Ill. 2007) (granting dismissal and noting that while "one of the decedents was an American citizen, the vast majority of decedents were not"); *Nai-Chao v. Boeing*, 555 F. Supp. 9, 21 (N.D. Cal. 1982) (dismissing aviation accident case involving multiple U.S. plaintiffs and noting, "federal courts have not felt constrained to retain jurisdiction over predominantly foreign cases involving American plaintiffs where an examination of the *Gilbert* factors demonstrated that the action is more appropriately brought in a foreign forum").  So too here, taking the appropriate

---

[9]  Counsel for a large number of the plaintiffs confirmed the logic of affording less deference to the foreign plaintiffs' decision to sue in the United States when he admitted in an interview relating to these cases that he always files lawsuits in the United States, not because it is a convenient forum, but because of the prospect of taking advantage of the generosity of American juries.  Interview with Steven Marks, *Airbus Failed*, veja.com, Exhibit 11 to Weiner Decl.

CASE NO. 3:10-MD-2144 CRB            MANUFACTURING DEFENDANTS' JOINT MOTION TO DISMISS

22

level of deference into account, dismissal is warranted with respect to all plaintiffs, including the two U.S. citizens, because their claims are more appropriately resolved in France.

### 2. Consideration of the private interest factors strongly favors litigation in France.

The relevant private interest factors for the Court to consider include: "'the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing witnesses; possibility for view of the premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive.'" *Piper Aircraft*, 454 U.S. at 241 n.6 (quoting *Gulf Oil*, 330 U.S. at 508). The Court's analysis must be tailored to the circumstances and some factors might not be relevant. *Id.* at 249. Nevertheless, analysis of the pertinent factors highlights that trials in the United States would be so costly in terms of time, money, and resources, and would involve so many obstacles to obtaining access to witnesses and evidence, that dismissal of plaintiffs' claims for refiling in France is warranted.

### a. French courts offer superior access to key evidence.

France is a more convenient forum because the largest proportion of the most important and material evidence is located there and can be accessed more easily and at less cost than if trials are held in the United States. *See Lueck*, 236 F.3d at 1146 (evaluation of access to evidence should focus on "materiality and importance" and overall "accessibility and convenience to the forum"). In fact, in ordering *forum non conveniens* dismissal of foreign aviation accident cases, federal courts have consistently emphasized the importance of trying cases in the forum that provides the greatest access to the most important sources of proof. *See id.* (affirming dismissal to New Zealand in view of "numerous witnesses and evidence which are located in New Zealand,

---

\\DC - 027627/000047 - 3103158 v1

including the aircraft wreckage, the flight crew, crash investigators, Plaintiffs, Plaintiffs' doctors and employers, airline and aircraft records, investigation records, and records regarding the qualifications of the flight crew and their employment."); *Magnin*, 91 F.3d at 1424 (affirming dismissal to France where most of the evidence, including "the crash investigators . . . the owner of the aircraft, those who maintained it, and the damages witnesses" were located in France). With respect to plaintiffs' claims, the greatest access to the most important evidence is in France.

*Liability Evidence*. More so than in any of the numerous foreign aviation accident cases that have been dismissed based on the *forum non conveniens* doctrine, ease of access to liability evidence is a paramount factor that weighs in favor of dismissal of plaintiffs' claims. As noted previously, an intensive and costly search by French investigators failed to locate the Aircraft's DFDR and CVR and it is unlikely that these important pieces of evidence will ever be recovered. In the DFDR's and CVR's absence, the BEA and investigating magistrates—working with technical assistance from the GTA, CEAT, and additional technical experts who already have been appointed by the investigating magistrates—have undertaken an investigation unprecedented in cost and technical complexity to determine the Accident's cause. Hennessee Decl. ¶¶ 15-17. The BEA has already investigated, among other things, the meteorological data at the time of the Accident, Air France maintenance records, the flight crew's preparation and background, the Aircraft's certification, the actions of aircraft that diverted around the same storms and turbulence that Air France Flight 447 passed through, and communications between aircraft with air traffic controllers in Brazil and Senegal. Ex. 4 & 5, Weiner Decl. In the process of its investigation, the BEA has taken testimony from relevant witnesses, collected documents, and assembled the wreckage that has been recovered to date. At the same time, and working in parallel to the BEA,

CASE NO. 3:10-MD-2144 CRB

MANUFACTURING DEFENDANTS' JOINT MOTION TO DISMISS

24

the criminal investigators have been collecting evidence and taking testimony to determine if criminal charges are warranted.

Significantly, the parties can access this comprehensive body of BEA and criminal investigation evidence in France, but not in the United States. As Justice Béraudo explains, French civil courts can order the BEA to disclose evidence in its possession and can order BEA investigators to testify about their findings, *even while the BEA investigation is still underway.* Béraudo Decl. ¶ 17. French civil courts also can order the disclosure of the criminal investigation file, including any expert reports. *Id.* ¶ 25. Yet because of various French laws, the parties will not have access to any of the BEA's or criminal investigators' evidence or testimony if these cases remain in the United States. *Id.* ¶¶ 18, 23. The parties instead will have to conduct yet another costly investigation into the Accident. *See Van Schijndel*, 434 F. Supp. 2d at 780 (noting inefficiency of trying aviation accident case in the United States that is subject of foreign investigation). Worse, the parties will have to conduct this investigation thousands of miles away from the key parties, witnesses, and sources of proof. But no matter how much time and resources the parties devote to discovery, they will never be able to replicate the evidence available to them in French proceedings, because here they will not have access to the evidence and testimony from the BEA and French criminal investigators.[10]

The documents, wreckage, and testimony amassed over the past year in the two French investigations are not the only liability evidence in France. French courts would also have easier access to evidence and witnesses from the three companies that have been at the center of the

---

[10]     Plaintiffs also have the option to intervene as civil parties in the French criminal proceedings. Béraudo Decl. ¶ 38. Through this procedure they can obtain evidence and testimony collected by the criminal and BEA investigators. *Id.* ¶ 24. Plaintiffs also will be entitled to seek damages in the French criminal proceedings. *Id.* ¶ 38.

CASE NO. 3:10-MD-2144 CRB

MANUFACTURING DEFENDANTS' JOINT MOTION TO DISMISS

25

BEA's investigation—Air France, Airbus, and Thales.[11] All three are based in France where their witnesses and documents are all located. At the very least, this evidence includes the following:

- Air France's documents and witnesses relating to its operation and maintenance of the Aircraft;

- Air France's documents and witnesses relating to the training and supervision of flight crews, including the French flight crew that was operating the Aircraft at the time of the Accident;

- Air France's documents and witnesses pertaining to the decision whether to change or replace the pitot probes on the Aircraft;

- Airbus's documents and witnesses pertaining to the design, manufacture, assembly, maintenance, instructions, and post-delivery support services for the Aircraft;

- Airbus's documents and witnesses pertaining to flight manuals, which were prepared, delivered, and updated in France;

- Thales's documents and witnesses pertaining to the design and manufacture of the relevant component parts for the Aircraft, including pitot probes;

- testimony from pilots and crew from the Air France flight that navigated around the mid-Atlantic storms shortly before the Accident; and

- documents and witnesses pertaining to the meteorological study undertaken by Météo France, which is cited in the First BEA Report.

Hennessee Decl. ¶ 20. Evidence pertaining to at least five other allegedly defective components is also located in France. *See supra* at 11-17. This evidence is far more accessible in France.

---

[11]    Because *forum non conveniens* analysis must take into account "what evidence will bear on the plaintiff's claim or on defenses to the claim," access to Air France evidence is relevant with respect to all the cases, even though it is only named as a defendant in *Harris*. *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 432 (2007). It is thus well-established that plaintiffs cannot unilaterally circumscribe the Court's consideration of access to Air France witnesses and documents, which is central to certain Manufacturing Defendants' defenses, just by limiting their allegations to product liability claims. *See Lueck*, 236 F.3d at 1146 (evidence concerning carrier's conduct was relevant in *forum non conveniens* analysis even though plaintiffs only brought product liability claims where defendants planned to argue that carrier was liable); *Pain*, 637 F.2d at 788 (same); *Van Schijndel*, 434 F. Supp. 2d at 776-77 (same).

CASE NO. 3:10-MD-2144 CRB                          MANUFACTURING DEFENDANTS' JOINT
                                                                            MOTION TO DISMISS

26

It will also be simpler and less costly for French courts than U.S. courts to obtain testimony and other evidence from non-party witnesses in France and the European Union, including the pilots on the aircraft of French, German, and Spanish airlines that diverted from the path taken by Air France Flight 447. Hennessee Decl. ¶ 21. French courts have wide-ranging powers to order the production of evidence and testimony from non-parties in France. Béraudo Decl. ¶¶ 15-19. Additionally, relying on European Union regulations, French courts can easily and efficiently obtain testimony from non-party witnesses elsewhere in the European Union. *Id.* ¶ 20. In contrast, Manufacturing Defendants will not be able to obtain live testimony from these and any other French non-party witnesses if trials proceed in the United States; instead, they will have to rely on letters rogatory which are costly, time consuming, and inefficient. *See Magnin*, 91 F.3d at 1430 (noting unavailability of French non-party witnesses as factor favoring dismissal).

Finally, while plaintiffs named several United States defendants, evidence from these defendants will be equally accessible to French courts. Indeed, many of these defendants— Airbus Americas, Airbus Americas Sales, Thales USA, Thales Avionics, Motorola, Hamilton, GE Aviation Systems, and Goodrich—have no relevant evidence because they did not play any role in the design or manufacture of the Aircraft or any of its component parts. The remaining U.S. defendants are likely to have far less evidence relevant to plaintiffs' claims than the defendants based in France for the simple reason that the design, manufacture, certification, assembly, and operation of an aircraft is far more complex and resource intensive than that of individual component parts. In any event, combining the availability of the French investigatory material with the defendants' willingness to make witnesses and documents available in French proceedings—in fact, several Manufacturing Defendants are already cooperating with the French

---

CASE NO. 3:10-MD-2144 CRB

MANUFACTURING DEFENDANTS' JOINT MOTION TO DISMISS

27

investigators—demonstrates that access to liability evidence will be far better in France than in the United States.[12]

Where, as here, some evidence is in the United States, but more evidence is located in a foreign forum and is likely to be inaccessible for proceedings in the United States, dismissal is preferable because it will make trials more convenient and less costly. *Lueck*, 236 F.3d at 1147 ("It is clear that evidence important to this dispute exists in both the United States and New Zealand. However, because the district court cannot compel production of much of the New Zealand evidence, whereas the parties control, and therefore can bring, all the United States evidence to New Zealand, the private interest factors weigh in favor of dismissal."); *Gambra*, 377 F. Supp. 2d at 820 ("Given that a large volume of relevant evidence is either located in France now or can be made available there by agreement, while much of the evidence located in France would be difficult, if not impossible, to obtain in California, the Court finds that this factor favors dismissal."); *In re Air Crash Over the Taiwan Straits*, 331 F. Supp. 2d at 1199 (dismissal to Taiwan because "a majority of the liability evidence regarding the accident aircraft is located in Taiwan").[13] Thus, dismissal to France is warranted if for no other reason than because it will offer better, more complete, and less costly access to liability evidence.

---

[12] The disparity in the location of witnesses and documents also suggests that translation costs will be lower in France than the United States. *See Leetsch v. Freedman*, 260 F.3d 1100, 1103 (9th Cir. 2001) ("The German court would be more competent than a United States court to hear the claim because of its familiarity with the German language. . . .").

[13] It is notable that almost *none* of the liability evidence is located in any of the individual states in which plaintiffs filed their claims. *See supra* at 10-17. As other courts, confronted with similar facts, have observed, "'[t]he fact that some evidence concerning the aircraft's design and manufacture may be located elsewhere in the United States does not make the Eastern District of Texas a convenient forum.'" *Van Schijndel*, 434 F. Supp. 2d at 778 (quoting *Torreblanca v. Aguilar v. Boeing Co.*, 806 F.Supp. 139, 144 (E.D. Tex. 1992)).

CASE NO. 3:10-MD-2144 CRB

MANUFACTURING DEFENDANTS' JOINT MOTION TO DISMISS

28

*Damages Evidence.* French courts also offer better access to damages evidence, including to non-party witnesses who are not subject to jurisdiction in the United States. French citizens made up the largest proportion of passengers and crewmembers on Flight 447. Ex. 2 & 3, Weiner Decl. A large number of plaintiffs, and the decedents on whose behalf they are suing, are also French citizens or residents. It is believed that most witnesses relevant to determining these plaintiffs' damages, including plaintiffs' and decedents' family members, friends, employers, and healthcare providers, are in France. Hennessee Decl. ¶ 20. None of these witnesses would be subject to compulsory process by this or any other U.S. court, *see Magnin*, 91 F.3d at 1430, while their testimony can be easily obtained in French proceedings. Béraudo Decl. ¶ 15. This Court's inability to obtain compulsory process over French witnesses so that Manufacturing Defendants are "forced to try their cases on deposition . . . create[s] a condition not satisfactory to court, jury or most litigants." *Gulf Oil*, 330 U.S. at 411. Moreover, documents pertaining to these plaintiffs' damages claims—including, but not limited to, documents, records, and correspondence concerning decedents' employment, finances, relationships, and health—are also in France and subject to orders of production by French courts. Béraudo Decl. ¶ 15.

There will also be superior access to damages evidence pertaining to the claims of the European Union plaintiffs in France than the United States. Using European Union regulations, French courts can readily obtain access to witnesses and documents relating to these claims, which are all located in the European Union. *See supra* at 27. Courts in the United States, in contrast, would have to rely on the Hague Convention or letters rogatory which are "notoriously inefficient" and "costly." *Da Rocha v. Bell Helicopter Textron, Inc.*, 451 F. Supp. 2d 1318, 1325 (S.D. Fla. 2006). As one court explained, Hague Convention procedures are more complex and time consuming compared to procedures for the production of evidence in the European Union:

\\\DC - 027627/000047 - 3103158 v1

The court recognizes that letters rogatory could be used to compel witnesses, located in countries that are signatories to the Hague Convention to testify; it seems, however, incredibly burdensome to engage in that lengthy process when Plaintiffs could bring their claim in a country where more witnesses reside and where the parties could take advantage of European Commission Regulation 1206/2001 the purpose of which is to simplify and accelerate the taking of evidence. In the court's experience, the letters rogatory process is anything but simple and accelerated.

*Vivendi S.A. v. T-Mobile U.S.A., Inc.*, No. , 2008 WL 2345283, at *13 (W.D. Wash. June 5, 2008),

*aff'd* 586 F.3d 689, 696 (9th Cir. 2009) (finding that "[t]his determination, based on the district court's experience, falls within its 'sound discretion'").

Thus, as with the liability evidence, French courts will have access to almost all the same damages evidence that is available in the United States while simultaneously offering access to numerous additional witnesses and documents that are only available in the United States, if at all, through costly and time-consuming letters rogatory. *See In re Air Crash Over the Taiwan Straits*, 331 F. Supp. 2d at 1196 ("Even if there were significant liability evidence both in the United States and Taiwan, therefore, a Taiwan forum would offer greater ease of access to sources of proof overall.").

        **b.**    **Cost of obtaining attendance of willing witnesses is greater in the United States than in France.**

Dismissal of plaintiffs' claims to France is also warranted because it will be far less costly to obtain the attendance of willing witnesses in France than in the United States. The largest proportion of key liability witnesses are in France—employees from Air France, Airbus, and Thales—as are the largest proportion of damages witnesses—the French plaintiffs and the family members, friends, employers, and healthcare providers for the French decedents. Hennessee Decl. ¶ 20. Witnesses for several other Manufacturing Defendants are also in France. *See supra* at 11-17. Likewise, many of the remaining plaintiffs and witnesses relevant to their damages claims are

---

CASE NO. 3:10-MD-2144 CRB

30

MANUFACTURING DEFENDANTS' JOINT MOTION TO DISMISS

in European Union countries, from where it will be far less costly for them to attend and participate in proceedings in France than in the United States. Compared to proceeding in France, the cost to transport these French and European witnesses to proceedings throughout the United States will be formidable and underscores that this forum is *non conveniens*.

The locations of the remaining witnesses also support the convenience of a French forum. An unknown number of plaintiffs reside in South America and elsewhere and will have to travel whether proceedings are in the United States or France. There is no reason to believe that the costs associated with proceedings in France would be substantially higher for these plaintiffs than would be the case if proceedings are here. *See Lueck* 236 F.3d at 1147 n.4 ("There is also relevant evidence in Canada; but because that evidence must be transported regardless of the ultimate forum, it does not affect the outcome of this case."). And while two plaintiffs and several Manufacturing Defendants are located in the United States, because the largest proportion of witnesses—especially, but not exclusively, witnesses from Air France, Airbus, and Thales— are in France, the overall costs of transporting witnesses are likely to be much lower if these cases proceed in France. Accordingly, witness transportation costs are likely to decrease, on balance, if these cases are tried in France, further supporting dismissal. *See Magnin*, 91 F.3d at 1430 (dismissal warranted in view of the "cost of attendance of any French witnesses who agree to come to this country to testify.").

        **c.**    **Examination of the wreckage, which is in France, favors a French forum.**

As noted above, the investigators' failure to recover the DFDR and CVR makes the ability to examine the wreckage that has been recovered a critical factor that favors dismissal to France. *See Piper Aircraft*, 454 U.S. at 242 ("Trial would be aided . . . by easy access to the wreckage.");

\\\DC - 027627/000047 - 3103158 v1

*Lueck*, 236 F.3d at 1146 (same). Examination of the wreckage may provide the only clues regarding the condition of the Aircraft at the time of the Accident and, ultimately determine the Accident's cause. For example, preliminary analyses of the wreckage suggest damage due to vertical compressions and deformations from the bottom upward caused by heavy loads. BEA Second Interim Report at 15, 20. Based on this information the BEA believes that the Aircraft struck the water "pitch-up, with a slight bank and at a high vertical speed." *Id.* at 70. From more detailed studies of the wreckage, which is the only physical evidence in the case, the parties may glean additional information about the Accident's cause or causes.

But the wreckage, which has been assembled by BEA investigators in France and remains in France, will not be available to the parties if the cases remain in the United States. Béraudo Decl. ¶ 23. Given the relative absence of other liability evidence available to the parties and their experts, the wreckage's unavailability is a particularly significant handicap to Manufacturing Defendants. French courts, in contrast, can direct the BEA to produce its technical analyses to the parties and can appoint experts to study and analyze the wreckage. *Id.* ¶¶ 17-19. Moreover, because the expert's work is conducted in an adversarial fashion, the parties and their experts and consultants will be able to question the judicial experts and direct them to analyze and study specific attributes of the wreckage. *Id.* ¶ 19. This will enable the parties and the French court to develop a far better understanding about the Accident's causes than would be possible in the United States. *Id.* The availability of the wreckage only in France is yet another factor weighing in favor of dismissal to France. *See Magnin*, 91 F.3d at 1430 (dismissal to France warranted where "[t]he aircraft wreckage, including the allegedly defective engine, is located in France.").

---

CASE NO. 3:10-MD-2144 CRB

MANUFACTURING DEFENDANTS' JOINT MOTION TO DISMISS

32

\\\DC - 027627/000047 - 3103158 v1

**d. The inability to implead potentially liable third parties in the United States, and the capability to try all claims in a consolidated proceeding in France, favors dismissal to France.**

The final private interest factor is the possible inability to implead potentially liable third parties, including Air France, in the United States. It is well recognized that the inability to implead such parties is a factor that favors *forum non conveniens* dismissal of product liability claims that arise out of foreign aviation accident cases. *Piper*, 454 U.S. at 259 ("problems posed by the inability to implead potential third-party defendants clearly supported holding the trial in Scotland"); *Gambra*, 377 F. Supp. 2d at 823-24 (same). These cases underscore that "the trier of fact cannot be expected to evaluate fairly the relative liability of parties not present at the trial," *Nai-Chao*, 555 F. Supp. at 19, and that it is prejudicial for parties to have to mount an "empty chair" defense in which they attempt to implicate an absent defendant, *Satz*, 244 F.3d at 1284 n.4.

At this stage of proceedings Air France has been identified as potentially liable to plaintiffs and Airbus, Thales, and Intel have already filed cross- and third-party claims against it. However, Air France has moved to dismiss the third-party claims for lack of subject matter jurisdiction. [D.E. 13] Should Air France obtain a dismissal, its absence would seriously prejudice Airbus, Thales, and Intel, who all intend to argue as their principal defense that Air France bears responsibility for the Accident. *See Piper Aircraft*, 454 U.S. at 259; *Lueck*, 236 F.3d at 1146. As *Piper Aircraft* and *Lueck* recognize, presenting this defense would be next to impossible without the ability to present live testimony from Air France witnesses. At the very least, Air France's dismissal would lead to duplicative proceedings in the United States and

\\\DC - 027627/000047 - 3103158 v1

France, create a risk of inconsistent verdicts, and run counter to the widely recognized rule favoring consolidation of claims. *United Mine Workers v. Gibbs*, 383 U.S. 715, 724 (1966).[14]

Finally, even if the Court denies Air France's motion to dismiss, as it should, France is still a far superior forum for trials relating to the Accident because French courts can hear all claims by all parties, including the claims of all plaintiffs and defendants against Air France. Béraudo Decl. ¶ 30. Specifically, under Article 33 of the Montreal Convention, plaintiffs in these cases, both foreign and domestic, can sue Air France in France. But if these cases remain in the United States, the foreign plaintiffs may still opt to bring lawsuits in France against Air France; in turn, Air France could bring its own contribution and indemnity claims against Airbus, Thales, Intel, and others in France. *Id.* ¶ 29. Under these circumstances, courts on both sides of the Atlantic would be adjudicating the same claims with respect to the same parties. Thus, the best way to prevent duplicative and potentially inconsistent proceedings of this sort is to dismiss these cases to France where a civil court can try all claims relating to the Accident. *See Van Schijndel*, 434 F. Supp. 2d at 780 (finding that this factor favors dismissal where foreign airline might have Warsaw Convention defense to aircraft manufacturer's indemnity claims in the United States but foreign court can try all claims in consolidated proceedings).

### 3. The public interest factors also weigh in favor of dismissal to France.

The public interest factors reflect the fundamental sovereign interests in "having localized controversies decided at home," in minimizing "administrative difficulties" such as court

---

[14] To be clear, Airbus, Thales, and Intel vigorously dispute Air France's interpretation of the Montreal Convention. In fact, the only courts to have directly addressed this issue have concluded that the Convention is limited to claims by passengers against carriers and therefore it is not applicable to third-party contribution and indemnity claims asserted by manufacturers. *In re Air Crash Near Nantucket Island, Mass., on Oct. 31, 1999*, 340 F. Supp. 2d 240 (E.D.N.Y. 2004); *In re Air Crash at Agana, Guam*, MDL No. 1238, No. 98-ml-7211 (C.D. Cal. Jan. 25, 1999), Exhibit 12 to Weiner Decl.

| | |
|---|---|
| CASE NO. 3:10-MD-2144 CRB | MANUFACTURING DEFENDANTS' JOINT MOTION TO DISMISS |

34

congestion and imposing jury duty on citizens in a "community which has no relation to the litigation," and in unnecessarily burdening courts with "problems in conflict of laws." *Gulf Oil*, 330 U.S. at 508-09. Like the private interest factors, the public interest factors in these cases weigh in favor of dismissal to France.

### a. Compared to the United States, France has a much stronger interest in these cases.

France's stronger, more far-reaching interest in these cases is a key factor that weighs heavily in favor of dismissal. *See Lueck*, 236 F.3d at 1147; *Gambra*, 377 F. Supp. 2d at 825. The Accident occurred on a flight to Paris, France that was operated by a French-trained flight crew on France's flagship commercial airline on an aircraft that was designed and built in France by a French company and that was certified for flight by French regulatory agencies. Air France Flight 447 carried more citizens of France than of any other country. *See* Exhibits 2-3, Weiner Decl. Following the Accident, several associations of victims' families were created in France. Béraudo Decl. ¶ 38. French media has devoted considerable attention to the Accident, *id.*, and French President Nicolas Sarkozy has spoken about the Accident and attended a memorial service for the victims. BBC, *Lost Jet Data 'May Not Be Found,'* BBC News, June 3, 2009, Exhibit 13 to Weiner Decl. The first anniversary of the Accident was marked prominently in France and featured ceremonies at Notre Dame and Floral Park in Paris and the dedication of a monument to the victims at Paris's most famous cemetery, Pére Lachaise. Ex. 6 to Weiner Decl. France's Transport Minister also wrote the victims' families "promising to do everything possible to find answers." *Id.*

France's interest in the Accident goes further still. The Accident has been the subject of the largest and most expensive technical investigation in French aviation history; in fact, even

---

CASE NO. 3:10-MD-2144 CRB

MANUFACTURING DEFENDANTS' JOINT MOTION TO DISMISS

outside of France there is no precedent for the magnitude and complexity of the French-led and funded effort to recover the DFDR, CVR, and wreckage from the depths of the Atlantic Ocean. France's decision to launch a criminal investigation—including the French criminal investigators' decision to appoint experts—also strongly supports the French interest in the Accident. *See Clerides*, 534 F.3d at 630 ("Greece and Cyprus have demonstrated interest in the case through their respective criminal investigations into the crash and through Greece's official investigation of the crash."); *Esheva*, 499 F. Supp. 2d at 500 (noting Russia's strong interest in Russian aviation accident involving Russian airline based on Russian technical and criminal investigations); *MGN Pension Trustees v. Morgan Stanley Trust Co.*, 947 F.Supp. 611, 621 (E.D.N.Y. 1996) (dismissing fraud cases to England and according "exceptional weight" to fact that matter had "engaged the attention of the Serious Fraud Office, the Department of Trade and Commerce and the House of Commons in the United Kingdom").

All of these facts reflect France's sovereign interests in plaintiffs' claims and the Accident. As the Ninth Circuit observed under similar circumstances in *Lueck*:

> [T]he interest in New Zealand regarding this suit is extremely high. The crash involved a New Zealand airline carrying New Zealand passengers. The accident and its aftermath, including the accident investigation, the post-investigation activity, and the various legal proceedings including an ongoing criminal probe, have all received significant attention by the local media. Because the local interest in this lawsuit is comparatively low, the citizens of Arizona should not be forced to bear the burden of this dispute.

236 F.3d at 1174. The same logic applies to plaintiffs' claims and supports dismissal to France.

Whereas France has well-established interests in the Accident and plaintiffs' claims, the interests of the United States are remote. Air France Flight 447 did not fly from, to, through, or anywhere near the United States—much less California, Florida, Illinois, or Texas—and only 2 out of 228 people on the flight were United States citizens. The Accident is not the subject of any

---

CASE NO. 3:10-MD-2144 CRB

MANUFACTURING DEFENDANTS' JOINT MOTION TO DISMISS

36

official investigations in this country and it has not commanded anything close to the attention of the authorities and public here that it has in France.

Moreover, plaintiffs' inclusion in their complaints of several U.S. defendants is insufficient to overcome France's primary and significant interest in these cases. Many of the U.S. defendants were not even involved in the design or manufacture of the Aircraft or any of its components. *See supra* at 11-17. To the extent that plaintiffs attempt to artificially anchor their cases in the United States by naming as defendants companies that are related only tangentially, if at all, to the Accident, their effort should fail. A contrary outcome would accomplish little more than to make "American courts, which are already extremely attractive to foreign plaintiffs, . . . even more attractive" and cause the "flow of litigation into the United States [to] increase and further congest already crowded courts." *Piper Aircraft*, 454 U.S. at 252. If foreign plaintiffs suing in connection with foreign torts that involve foreign-built products can evade the *forum non conveniens* doctrine simply by naming a handful of U.S. component part suppliers, then, contrary to *Piper Aircraft*, litigation in the United States will become the norm for claims such as these.

Regardless, federal courts—including the Supreme Court and the Ninth Circuit—have consistently held that any generalized interest in deterring the allegedly tortious conduct of domestic manufacturers is "simply not sufficient to justify the enormous commitment of judicial time and resources that would inevitably be required" to try cases such as these. *Piper Aircraft*, 454 U.S. at 261; *see also Lueck*, 236 F.3d at 1147 (same). On this basis, dismissal is routinely ordered in cases filed in the United States in connection with foreign aviation accidents *even though they involve aircraft that were designed and built entirely in the United States*. *Piper Aircraft*, 454 U.S. at 261 (aircraft manufactured in Pennsylvania); *Cheng*, 708 F.2d at 20-21 (aircraft manufactured in Washington); *Clerides*, 534 F.3d at 626 (same); *Nolan*, 919 F.2d at

\\\DC - 027627/000047 - 3103158 v1

1061 (same); *Vorbiev v. McDonnell Douglas Helicopters, Inc.*, No. 08-05539, 2009 WL 1765675 (N.D. Cal. June 18, 2009) (helicopter manufactured in Arizona). Here, the connection to the United States is even more tenuous, because it is only certain component parts that were allegedly manufactured in the United States, whereas, the Aircraft was designed, manufactured, maintained, and certified in France. *See Lueck*, 236 F.3d at 1147 (Arizona's interest in deterring manufacture of allegedly defective radio altimeter deemed "slight compared to the time and resources the district court in Arizona would expend if it were to retain jurisdiction"); *Gambra*, 377 F. Supp. 2d at 825 (France has greater interest in cases even though aircraft and various components were manufactured in the United States).

Finally, to the extent that the interests of the specific fora in which plaintiffs originally filed their lawsuits are considered, "rather than the United States, . . . the imbalance is even greater." *In re Air Crash Over the Taiwan Straits*, 331 F. Supp. 2d at 1206. Florida has almost no identifiable connections to the Accident—it is, however, the residence of several plaintiffs' lawyers who habitually use the local courts for the filing of foreign aviation accident claims that are routinely dismissed on *forum non conveniens* grounds. *See King v. Cessna Aircraft Co.*, 562 F.3d 1374 (11th Cir. 2009) (affirming dismissal of European plaintiffs' claims relating to Italian accident); *Tazoe*, No. 07-21941, 2009 WL 3232908 (dismissing claims of 1 U.S. and 76 Brazilian plaintiffs relating to Brazilian accident); *Da Rocha*, 451 F. Supp. 2d at 1327 (dismissing claims of Brazilian plaintiffs in connection with Brazilian accident). California and Illinois have only minimal connections to these cases by virtue of the fact that two defendants alleged to be subcomponent manufacturers are based in these states; however, almost none of the relevant conduct occurred in either one of these jurisdictions. *See supra* at 11-17. These minimal connections are far outweighed by France's interests in these cases and on their own "do[] not

\\\DC - 027627/000047 - 3103158 v1

mean that a motion to dismiss on *forum non conveniens* grounds should be denied." *Van Schijndel*, 434 F. Supp. 2d at 783; *see also Gambra*, 377 F. Supp. 2d at 825 (finding that California had only "minimal interest" in actions where "[a] substantial portion of defendants' evidence [wa]s located outside of California").

In sum, "there is 'a local interest in having localized controversies decided at home,'" *Piper*, 454 U.S. at 260 (quoting *Gulf Oil*, 330 U.S. at 509), and it is clear, given the myriad connections between these cases and France, that France has a far stronger interest in having these cases decided in France than the United States does in having them decided here.

> **b.      Trying dozens of cases relating to the Accident in the United States presents enormous administrative burdens.**

Federal courts deciding *forum non conveniens* motions are instructed to consider the administrative difficulties that are created when "litigation is piled up in congested centers rather than handled at its origin." *Gulf Oil Corp*, 330 U.S. at 508-509. Where a foreign plaintiff's case is part of an MDL, courts look to the docket congestion of the MDL court, as well as the transferor court. *In re Vioxx Prods. Liab. Litig.*, MDL No. 1657, 2009 WL 1636244, at *10 (E.D. La. Feb. 10, 2009); *In re Factor VIII or IX Concentrate Blood Prods. Liab. Litig.*, 408 F. Supp. 2d 569, 588 (N.D. Ill. 2006). When federal courts are visited with foreign controversies, it is appropriate to apply the doctrine of *forum non conveniens* upon "foreseeing the hardship on local citizens which results when an imported controversy is tried locally." *Id.* at 26.

The administrative burdens associated with trying plaintiffs' claims in the United States favor dismissal to France. There currently are 36 pending lawsuits relating to the Accident involving 72 separate plaintiffs and 56 decedents. While these cases have been consolidated for joint pretrial proceedings, a fact that serves to underscore the cases' procedural complexity, they

---

CASE NO. 3:10-MD-2144 CRB

MANUFACTURING DEFENDANTS' JOINT MOTION TO DISMISS

39

eventually will have to be remanded to the transferor courts for separate trials. *Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998) (MDL courts lack authority to try transferred cases). Because plaintiffs' claims have fundamentally foreign postures, discovery is likely to entail primarily foreign depositions and is likely to be particularly time-consuming and costly. Experience in similar cases suggests that the parties will almost certainly have to rely on letters rogatory, which can be "burdensome, costly, and time-consuming." *Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren*, 361 F.3d 11, 21 (1st Cir. 2004); *see also Ilusorio v. Ilusorio-Bildner*, 103 F. Supp. 2d 672, 677 (S.D.N.Y. 2000) (noting that "use of letters rogatory to obtain foreign witness' testimony would be a time-consuming and prohibitively expensive means of obtaining discovery"). Given the amount of international discovery that must be undertaken if these cases are tried in the United States, it is very likely that these cases will impose unique demands on the parties and the Court.

Aside from the complexities associated with completing international discovery and conducting numerous liability trials in the United States, the transferor courts will also have to conduct dozens of separate jury trials on damages. Given that the transferor courts are among the most congested in the federal judiciary, it would likely take several years to schedule and complete trials of such a large number of cases. *See* Judicial Conference, Judicial Business of the United States Courts, Table C-6 (2009), http://www.uscourts.gov/Statistics.aspx (last visited June 15, 2010). Further, the prospective costs of empanelling juries for those trials—to the citizens of the relevant judicial districts, the various courts and, ultimately, to the taxpayers who would foot the bill—underscore the extent to which "[t]he burden on local courts and juries unconnected to the case and the costs of resolving . . . dispute[s] unrelated to the forum . . . favor[s] dismissal." *Vivendi*, 586 F.3d at 696; *see also Gulf Oil*, 330 U.S. at 508-09 ("Jury duty is a burden that ought

not to be imposed upon the people of a community which has no relation to the litigation."). Thus, while these cases will create administrative burdens wherever they are tried, those burdens should be assigned to the forum with the most interest in the Accident—France.

**c.     Complex choice-of-law issues, and the need to apply French law, favor dismissal.**

The complex choice-of-law issues in these cases, and the fact that French law is likely to apply, is the final public interest factor and it too weighs in favor of dismissal. Because plaintiffs' claims arise under the Death on the High Seas Act, 46 U.S.C. §§ 761-767 ("DOHSA"), and because DOHSA does not require venue in the United States, this Court need not make a final choice-of-law determination as part of the *forum non conveniens* analysis. *See Lueck*, 236 F.3d at 1148. Nevertheless, the admiralty choice-of-law test applicable in DOHSA cases would likely result in the application of French law. *See Gund v. Pilatus Aircraft, Ltd.*, No. 07-4902, 2010 WL 887376, at *6 (N.D. Cal. Mar. 11, 2010) (applying admiralty choice-of-law test to claims arising under DOHSA). Under *Lauritzen v. Larsen*, 345 U.S. 571 (1953), the Court would have to weigh multiple factors focusing on the foreign and United States interests.[15] While it is likely that the foreign interests predominate, to the extent that any *Lauritzen* factors point toward the United States, "the fact that the law of the flag points toward [France] would likely be dispositive." *In re Air Crash Over the Taiwan Straits*, 331 F. Supp. 2d 1209. Because French law is likely to apply, the choice-of-law factor weighs in favor of dismissal. *See Lueck*, 236 F.3d at 1148 n.6 ("because New Zealand law is likely to apply in this suit, the choice of law determination weighs in favor of

---

[15]     The *Lauritzen* factors include: (1) the place of the wrongful act; (2) the law of the flag; (3) the allegiance or domicile of the injured seaman; (4) the allegiance of the defendant shipowner; (5) the place where the contract of employment was made; (6) the inaccessibility of the foreign forum; and (7) the law of the forum and the shipowner's base of operations. *Id.*

---

CASE NO. 3:10-MD-2144 CRB                                     MANUFACTURING DEFENDANTS' JOINT
                                                             MOTION TO DISMISS
41

dismissal"); *Magnin*, 91 F.3d at 1430 ("Far better that the case be tried in France by one or more jurists as familiar with French law as we are unfamiliar with it."); *Gambra*, 377 F. Supp. 2d at 827 ("possibility" that DOHSA could apply and "possibility" that either French or Egyptian law could apply weighed in favor of dismissal to French forum).

## CONCLUSION

The circumstances surrounding the Accident are fundamentally French in nature and origin. What is more, these cases present an even more compelling basis for dismissal than the many decisions by other federal courts granting such dismissals in claims arising out of foreign accidents. Therefore plaintiffs' claims should be dismissed under the *forum non conveniens* doctrine for refiling in the courts of France, a forum that offers superior access to evidence and has a greater sovereign interest in the Accident and plaintiffs' claims than the United States.[16]

Dated: June 15, 2010.

Respectfully submitted,

**HOGAN LOVELLS US LLP**

By: */s/Thad T. Dameris*

Thad T. Dameris*
Hogan Lovells US LLP
700 Louisiana Street, Suite 4300
Houston, Texas 77002
Tel.: 713-632-1400

---

[16] The Manufacturing Defendants all consent to the following conditions of dismissal: (1) submit to the jurisdiction of a French civil court in connection with actions refiled there by plaintiffs, provided that plaintiffs do not do anything to challenge or undermine the jurisdiction of the French civil courts; (2) toll any statute of limitations that might apply to such refiled actions for 120 days after dismissal by this Court; (3) make available in such refiled actions any evidence and witnesses under their possession, custody, or control upon appropriate request by the French civil courts; and (4) pay any final, non-appealable judgment awarded against them by a French civil court in refiled actions.

CASE NO. 3:10-MD-2144 CRB                    MANUFACTURING DEFENDANTS' JOINT
                                             MOTION TO DISMISS

42

Fax: 713-583-6297
Email: thad.dameris@hoganlovells.com

Norman J. Blears (State Bar. No. 95600)
Hogan Lovells US LLP
525 University Avenue, 4th Floor
Palo Alto, California 94301
Tel.: 650-463-4000
Email: norman.blears@hoganlovells.com

**Counsel for AIRBUS S.A.S.; AIRBUS
AMERICAS, INC.; AIRBUS AMERICAS
SALES, INC.**
*\* Admitted pro hac vice*

Lisa J. Savitt
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004
Phone: (202) 624-2500
Fax: (202) 628-5116
Email: lsavitt@crowell.com
**Counsel for E.I. du Pont de Nemours & Co.**

Sheila A. Sundvall
PAUL HASTINGS JANOFSKY & WALKER LLP
191 North Wacker Drive, 30th Floor
Chicago, IL 60606
Phone: (312) 499-6000
Fax: (312) 499-6100
Email: sheilasundvall@paulhastings.com
**Counsel for GE Aviation Systems, LLC and General Electric Co.**

Alan H. Collier
FITZPATRICK & HUNT,
TUCKER, COLLIER, PAGANO, AUBERT LLP
633 W. 5th St., 60th Floor
Los Angeles, CA 90071
Tel: (213) 873-2100
Fax: (213) 873-2125
Email: alan.collier@fitzhunt.com
**Counsel for Hamilton Sundstrand Corp.**

William V. O'Connor
MORRISON & FOERSTER LLP

---

CASE NO. 3:10-MD-2144 CRB

43

MANUFACTURING DEFENDANTS' JOINT
MOTION TO DISMISS

\\\DC - 027627/000047 - 3103158 v1

1   12531 High Bluff Drive Suite 100
    San Diego, CA 92130
2   Phone: (858) 720-5100
3   Fax: (858) 720-5125
    Email: woconnor@mofo.com
4   **Counsel for Honeywell International Inc.**

5   John D. Dillow
    PERKINS COIE LLP
6   1201 Third Avenue, Suite 4800
7   Seattle, WA 98101-3099
    Phone: (206) 359-8000
8   Fax: (206) 359-9000
    Email: jdillow@perkinscoie.com
9   **Counsel for Intel Corp.**

10
    Jonathan M. Stern
11  SCHNADER HARRISON SEGAL & LEWIS LLP
    750 Ninth Street, N.W., Suite 550
12  Washington, DC 20001
13  Phone: (202) 419-4202
    Fax: (202) 419-4252
14  Email: jstern@schnader.com
    **Counsel for Motorola, Inc.**
15

16  Patrick E. Bradley
    REED SMITH LLP
17  136 Main Street, Suite 250
    Princeton Forrestal Village
18  Princeton, NJ 08540
19  Tel: (609) 987-0050
    Fax: (609) 951-0824
20  Email: pbradley@reedsmith.com
    **Counsel for Rockwell Collins, Inc.**
21

22  Raymond G. Mullady, Jr.
    BLANK ROME LLP
23  Watergate 600 New Hampshire Ave., NW
    Washington, DC 20037
24  Tel: (202) 772-5828
    Fax: (202) 572-8414
25  Email: mullady@blankrome.com

26  Laurie Alberts Salita
27  BLANK ROME LLP

28  CASE NO. 3:10-MD-2144 CRB                    MANUFACTURING DEFENDANTS' JOINT
                                    44          MOTION TO DISMISS

1  One Logan Square
2  130 N. 18th Street
   Philadelphia, PA 19103-6998
3  Phone: (215) 569-5500
   Fax: (215) 832-5445
4  Email: salita@blankrome.com
   **Counsel for Rosemount Aerospace Inc.**
5

6  Eugene Massamillo
   KAPLAN, MASSAMILLO & ANDREWS LLC
7  70 E. 55th Street, 25th Floor
   New York, New York 11022
8  Tel: (212) 922-0450
   Fax: (212) 922-530
9  Email: emassamillo@kmalawfirm.com

10
   Richard A. Walker
11 Todd M. Saranecki
   KAPLAN, MASSAMILLO & ANDREWS LLC
12 200 W. Madison Street, 16th Floor
   Chicago, Illinois 60606
13 Telephone: (312) 345-3000
   Facsimile: (312) 345-3119
14 Email: rwalker@kmalawfirm.com
15 **Counsel for Thales Avionics, S.A. (including where incorrectly sued as Thales Group);**
   **Thales U.S.A., Inc.; Thales Avionics, Inc.**
16

17 James Hunt
   FITZPATRICK & HUNT,
18 TUCKER, COLLIER, PAGANO, AUBERT LLP
   633 W. 5th St., 60th Floor
19 Los Angeles, CA 90071
   Tel: (213) 873-2100
20 Fax: (213) 873-2125
   Email: james.hunt@fitzhunt.com
21 **Counsel for Tyco Electronics Corporation (sued herein as Raychem Corp.)**
22

23

24

25

26

27

28 CASE NO. 3:10-MD-2144 CRB                    MANUFACTURING DEFENDANTS' JOINT
                                                MOTION TO DISMISS
                          45

\\\DC - 027627/000047 - 3103158 v1

1

## <u>CERTIFICATE OF SERVICE</u>

2

   I HEREBY CERTIFY that on this 15th day of June 2010, I electronically filed the

3

foregoing document with the Clerk of Court using CM/ECF.  I also certify the foregoing

4

document is being served this day on all counsel of record or pro se parties identified in the

5

6

manner specified, either via transmission of Notices of Electronic Filing via CM/ECF or in some

7

other authorized manner for those counsel or parties who are not authorized to receive

8

electronically Notices of Electronic Filing.

9

10
                                              _____ /s/ Thad Dameris _____

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

CASE NO. 3:10-MD-2144 CRB

MANUFACTURING DEFENDANTS' JOINT
MOTION TO DISMISS

46

\\\DC - 027627/000047 - 3103158 v1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE AIR CRASH OVER THE MID-ATLANTIC ON JUNE 1, 2009 | MDL Docket No. 10-2144 CRB [ALL CASES] |

**[PROPOSED] ORDER**

This matter came before the Court upon Manufacturing Defendants' Joint Motion to Dismiss Based on *Forum Non Conveniens*. It is hereby ordered that Motion is GRANTED and is made subject to Manufacturing Defendants' agreement to the following conditions:

1. to submit to the jurisdiction of a French civil court in connection with actions refiled in France by plaintiffs, provided that plaintiffs do not do anything to challenge or undermine the jurisdiction of the French civil courts;

2. to toll any statute of limitations that might apply to such refiled actions for 120 days after dismissal by this Court;

3. to make available in such refiled actions any evidence and witnesses under their possession, custody, or control upon appropriate request by the French civil courts; and

4. to pay any final, non-appealable judgment awarded against them by a French civil court in refiled actions.

DATED: _____, 2010

_____

Hon. Charles R. Breyer
U.S. District Judge

MANUFACTURING DEFENDANTS' JOINT
MOTION TO DISMISS

\\\DC - 027627/000047 - 3103158 v1