UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE CHARLES R. BREYER, JUDGE

```
------------------------------)
                              )
IN RE:                        )
AIR CRASH OVER THE            )      No. MDL 10-2144 (CRB)
MID-ATLANTIC ON JUNE 1, 2009  )
                              )      San Francisco, California
                              )      Friday, September 24 2010
------------------------------)         (64 pages)
```

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

| | |
|---|---|
| For Plaintiffs: (Liaison counsel) | Bowles & Verna, LLP California Plaza 2121 North California Boulevard Suite 875 Walnut Creek, California 94596 |
| | BY:  MICHAEL P. VERNA |
| For Plaintiffs: | PodhurstOrseck City National Bank Building 25 West Flagler Street Suite 800 Miami, Florida 33130 |
| | BY:  STEVEN C. MARKS STEPHEN F. ROSENTHAL |
| For Plaintiffs: (Harris) | Mithoff Law Firm 500 Dallas Street Suite 3450 Houston, Texas 77007 |
| | BY:  RICHARD W. MITHOFF |
| For Plaintiffs: (Harris) | Beck, Redden & Secrest One Houston Center 1221 McKinney Street Suite 4500 Houston, Texas 77010 |
| | BY:  RUSSEL S. POST |

```
 1   APPEARANCES (cont.):

 2

 3   For Defendant:          Hogan, Lovells US, LLP
     (Airbus; liaison)       Bank of America Center
 4                           700 Louisiana
                             Suite 4300
 5                           Houston, Texas 77002
                        BY:  THAD T. DAMERIS
 6                           BRUCE OAKLEY

 7   For Defendant:          Holland & Knight
     (Air France)            31 West 52nd Street
 8                           New York, New York 10019
                        BY:  ALAN D. REITZFELD
 9                           CHARLES L. COLEMAN III
                             CHRISTOPHER G. KELLY
10                           JUDITH R. NEMSICK

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1    Friday, January 23, 2009

2                                                      (9:28 a.m.)

3            (In open court)

4            DEPUTY CLERK:  Calling MDL 10-2144, In re: Air Crash

5    Over mid-Atlantic on June 1st, 2009.

6            Counsel, come forward and state your appearances.

7            MR. MITHOFF:  Richard Mithoff and Russell Post for the

8    Harris plaintiffs, your Honor.

9            MR. VERNA:  Michael Verna from Bowles & Verna, liaison

10   counsel for plaintiffs, appearing for plaintiffs.

11           MR. MARKS:  Steven C. Marks with PodhurstOrseck for

12   Plaintiffs.

13           MR. ROSENTHAL:  Stephen Rosenthal, also for

14   PodhurstOrseck Plaintiffs, with Mr. Marks.

15           MR. DAMERIS:  Thad Dameris and Bruce Oakley on behalf

16   of Airbus S.A.S. and defense liaison counsel.

17           MR. KELLY:  Christopher Kelly for Air France with my

18   colleagues Alan Reitzfeld and Judy Nemsick, from Holland &

19   Knight.  Thank you.

20           THE COURT:  Well, as to the Air France's motion to

21   dismiss the domestic claims, that is the -- there are two,

22   right?

23           MR. VERNA:  That is correct, your Honor.

24           THE COURT:  On jurisdictional grounds, that motion's

25   denied.  The -- it's the Court's view, and I'll write on this
```

1    subject, it's the Court's view that jurisdiction is proper as

2    submitted.

3        Of course, what is the major motion here is the forum

4    non conveniens motion.  And I think I'd like to hear some

5    further discussion of that.  It comes up in the context, does

6    it not, that all the defendants are amenable to service in

7    France?  Is that right?  I mean, is that an issue at all?

8        Stand by the microphone.

9        MR. DAMERIS:  Thad Dameris on behalf of the

10    manufacturing defendants.

11        It's not an issue, your Honor, for two reasons:  One,

12    under the rules of French civil procedure, they are amenable to

13    sue.  But two, we have all stipulated to make ourselves

14    available and atone to the jurisdiction of French courts.

15        THE COURT:  So the motion is made in that context,

16    that is, that there is another forum that would accept

17    jurisdiction and that the parties have agreed that they are

18    amenable to service in that jurisdiction.  And I guess,

19    further, that no argument would be made that somehow a

20    comparable forum non conveniens motion can be made in that

21    jurisdiction?  Is that right as well?  If it were to go to

22    France, it wouldn't --

23        MR. DAMERIS:  It would stay in France, your Honor.

24        THE COURT:  It would stay in France and nobody would

25    raise an issue that somehow because we have American

1    manufacturers or we have -- whatever the argument is -- that

2    somehow it ought to be transferred to some other jurisdiction,

3    whether it should come back to the United States, whether it

4    should go to Brazil, whether it should go to X, Y or Z, those

5    arguments wouldn't be made.

6          MR. DAMERIS:  They would not be made by the

7    manufacturers.

8          THE COURT:  I think I need to know more.  Because it

9    just seems to me that one of the factors that one looks at in a

10   forum non conveniens motion is that there is an adequate forum

11   in some other case, which forum could and would -- the answer

12   really is would adjudicate the claims.  Otherwise, there's this

13   enormous bouncing back and forth and suddenly it goes to France

14   then it goes to Brazil, then it goes to Uruguay, then it goes

15   to the Canary Islands -- I mean, I don't know, it can go

16   anywhere.  And I think I need to know and I think I'm going to

17   get a commitment before -- if I were to rule and grant the

18   forum non conveniens motion, that it would be heard in its

19   entirety, the case would be heard in its entirety.

20         Now, I have to work that out in my own mind, what

21   ought to be said -- in France.  That is to say, that no motion

22   could be made in France that would somehow deprive the French

23   court of jurisdiction in entering the final judgment.  What

24   about that?

25         MR. REITZFELD:  Alan Reitzfeld for Air France.  Air

1   France commits to jurisdiction in France.  So the answer to

2   your Honor's question is yes, we commit to it.

3        THE COURT:  And when you say you commit to

4   jurisdiction in France, are you saying to me that Air France is

5   agreeing that the litigation can be determined on the merits in

6   France?  Jurisdiction -- I'm just -- I'm sort of talking out

7   loud, so -- and thinking out loud.  So I don't know how much

8   you can actually say.  I mean, obviously if there is some

9   impediment, statute of limitations, where there couldn't be --

10  or some other type of impediment that wouldn't result in a

11  final judgment in a sense of an adjudication on the merits,

12  that might very well result in some other final judgment,

13  that's -- that I understand.

14        What I'm concerned about is a type of forum non

15  conveniens argument being made in France that somehow would

16  require the plaintiffs to go to some other jurisdiction to

17  attempt to adjudicate their claims.  That's of some concern to

18  me.  I don't know quite how to say it and I don't know to what

19  extent you can bind -- or you are willing -- I think you can

20  bind Air France to a lot of things.  The question is, how far

21  would you be willing to stipulate to something of that nature?

22        MR. REITZFELD:  I think that the answer is yes, if the

23  Court is asking us as is a condition precedent to an FNC

24  dismissal that we would not make an FNC motion in France.  This

25  may be more detailed than the Court is asking for, but the

```
1   jurisdiction -- I think that all three experts from the
2   manufacturing defendants, Air France and the plaintiffs, all
3   agree that the jurisdiction would be in Bobigny --
4   B-o-b-i-g-n-y -- France, and there may be some jurisdictional
5   issues on the crew cases where under French law they may have
6   to go to a special court.  But in terms of the Court's general
7   question, yes, we will concede as a condition precedent to FNC
8   not to forum on a case out of France.
9        MR. DAMERIS:  On behalf of the manufacturing
10  defendants, we make the same commitment in the stipulation of
11  the last footnote in our motion, and they bring -- that we
12  won't assert statute of limitations that had already expired in
13  this court.  That the plaintiffs have a reasonable time to
14  reappear.  That we won't contest the Court's jurisdiction.
15       But there's actually some jurisprudence on this point.
16  It's the Flash Air case, and Justice Béraudo in his
17  declarations first, and supplemental, addressed it, because in
18  that case the Central District of California dismissed the
19  case.  And it was the plaintiffs that tried to interfere with
20  the jurisdiction of the French court and argued that the French
21  courts couldn't take the cases, and therefore they should come
22  back to the U.S.  And it went all the way up to the French
23  Supreme Court, and the French Supreme Court ruled that, No,
24  France could hear these cases upon dismissal on forum non
25  conveniens.
```

1          So you have the stipulations of all of the defendants

2     that we will appear, we'll assent to jurisdiction.  We will not

3     move for forum non conveniens.  We will not assert limitations.

4     But you also have the backstop of the French Supreme Court

5     decision which is specifically addressed in Justice Béraudo's

6     declaration.

7          THE COURT:  Yes.

8          MR. VERNA:  Michael Verna for the plaintiffs.

9          Two points:  If the implication here is that -- or if

10    the implication here is that by dismissing this case in favor

11    of France, all actions will be consolidated in France, we will

12    not have litigation in multiple forums, the answer is that will

13    not happen.  A number of the plaintiffs -- in fact, a vast

14    majority of the plaintiffs in this case -- only 12 out of the

15    66 cases here that involve French citizens.  The remainders are

16    primarily Brazilian and other places of the world.  They

17    cannot, under the Montreal Convention, sue Air France directly

18    in the United States.  They can and would file an interruption

19    claim in the Brazilian courts in order to toll the statute of

20    limitations of the two years of the Montreal.  If this case

21    proceeded here, in this court, where Air France is a party in

22    the Harris case, where Air France has been cross-complained in

23    by the defendants, Air France's liability would be adjudicated

24    here, and then that determination could then be applied to

25    either resolve the case via settlement or could be applied in

1    the Brazilian jurisdiction.

2            But I don't want the implication to be that simply

3    because the defendants are willing to commit themselves to

4    submit to French jurisdiction, that that consolidates all

5    proceedings.

6            THE COURT:  With what you're saying, would that be

7    also true of the case if it were in France?  That is to say,

8    would Air France's liability be adjudicated such a way in

9    France that it would have an impact -- I don't know if impact's

10   the right word -- but on the interruption proceedings in

11   Brazil?

12           In other words, what difference does it make, if

13   somebody's going to file a claim in Brazil -- and I understand

14   why they would -- you're telling me that the adjudication of

15   Air France's liability here will be determinative, I guess?  Or

16   have an impact?  Or --

17           MR. VERNA:  Have an impact.

18           THE COURT:  My question to you is:  I understand

19   that -- is that any different from what would happen in France

20   if in fact the case were in France and a Brazilian survivor --

21   a next-of-kin, rather; sorry -- next of kin would file a

22   proceeding in Brazil?  Is there any difference between the two?

23           MR. VERNA:  Probably not the main difference.

24   However, is, why have cases going in three jurisdictions when

25   we can have cases only going in two jurisdictions?

1    THE COURT:  But the argument would be that it would

2    still be two jurisdictions.  I see.  I think the argument is if

3    the case went to France, you would have the Brazilian

4    interruption and you would have the French determination.  If

5    it proceeds in the United States, you'd have the Brazilian

6    interruption and the United States determination, if it did

7    proceed here.

8    MR. VERNA:  And the issue I wanted to --

9    THE COURT:  And maybe it's more complicated with

10   respect to that.

11   MR. VERNA:  I think it's a bit more complicated,

12   largely because the Harris plaintiffs are in this case.  You

13   just ruled that the Court has jurisdiction over them.  And if

14   the Harris plaintiffs have sued Air France directly --

15   THE COURT:  But that would be a question, though.

16   Better watch that, because if I did actually transfer the case

17   to France under forum non conveniens, I may very well transfer

18   the Harris plaintiffs to France, something you don't want me to

19   do.  But that would take care of that particular little

20   problem.

21   MR. VERNA:  It would.  I would suggested to the Court

22   that 10 months ago in the Boston Telecommunications case, the

23   Ninth Circuit ruled otherwise and reversed Judge White who did

24   that.  So it seems --

25   THE COURT:  You're saying -- well, that's interesting.

1    I have to take a look at that.  I hadn't thought about it that

2    way.  Maybe I haven't fully considered the implications of it.

3    You're saying as a matter of law in the Ninth Circuit I can't

4    do that.

5            MR. VERNA:  I'm saying in the Boston

6    Telecommunications case, which involved and American plaintiff,

7    the appellate court found abuse of discretion by Judge White in

8    dismissing that in favor of, I believe, Slovakia, and that was

9    only December of '09.

10           THE COURT:  That's interesting.  Depending on where I

11   go, I have to seriously look at that case.

12           MR. VERNA:  I could get the cite for you.

13           THE COURT:  No, no.  I can it.  I mean, I can't.  They

14   can (referring to law clerks).

15           (General laughter)

16           THE COURT:  When you state a cite, just look to your

17   right, please.

18           MR. VERNA:  It's F.3d something.

19           THE COURT:  Well, I could say that.

20           MR. VERNA:  The point of this, your Honor, is that if

21   in fact the Harris case were to stay in this courtroom --

22           THE COURT:  Well, that's a different issue.

23           MR. VERNA:  I realize that's an issue before you, but

24   if, in fact, that case stays here -- and frankly, it's hard to

25   imagine that the American plaintiffs would be sent to France

1    when the Montreal Convention specifically provides that they

2    can sue in their home forum where they're residents.

3         THE COURT:  That's a function, though, of the strength

4    of the forum non conveniens motion.  I mean, you know -- and

5    how the Montreal Convention, Warsaw Convention, it all

6    interrelates to it, a question that I have to sort of work my

7    way through.

8         But you know, one of the things I think is a very high

9    priority in my own mind is to try to avoid duplicative

10   proceedings, one; and two, inconsistent results.  That's also

11   extraordinarily important.  Because you don't want to have a

12   situation where you have a single air crash and, you know,

13   next-of-kin "A" gets, you know, gets the benefit of a favorable

14   ruling, next-of-kin "B" gets an unfavorable ruling, same set of

15   facts.  You know.  Same set of facts.  That would be very

16   disquieting.  And so I am thinking about trying to figure out a

17   single forum.  Now you say, well, we have one.

18        MR. VERNA:  That's exactly my point.

19        THE COURT:  And here I am.  I understand that, but

20   then I have to factor in the different factors.  But we'll get

21   to that argument.  We'll get to that argument.  And unless

22   there's some other reason not to get to that argument --

23        MR. VERNA:  I would suggest to the Court that all the

24   parties, the culpable parties, American or French, Airbus and

25   Thales, are before the Court now.  Nobody's contesting the

1    Court's jurisdiction over the French defendants, and certainly

2    the Court has jurisdiction over the multitude of U.S.

3    defendants.  So by granting the FNC motion and sending the case

4    over to France, we're not creating some new party that can

5    exist.  Because indeed Air France is already a party in this

6    case.  Even though it cannot be sued directly by the foreign

7    plaintiffs, it has been brought into the case on an indemnity

8    cross complaint by Airbus and Thales and Intel.  It's a

9    defendant in the Harris case.  Its liability will be

10   adjudicated in this courtroom.  This is where everybody is.

11   And frankly, where I would think the law requires everybody to

12   stay, especially as to Harris, and as to Air France on the

13   indemnity cross complaint.

14          If we're looking at not duplicating proceedings, then,

15   with all due respect, I think this is the place not to

16   duplicate proceedings, because if the case goes over to France,

17   it's not consolidating things.

18          And on the balancing test, in terms of the evidence,

19   the factors --

20          THE COURT:  It's not consolidating things if in fact

21   the Harris plaintiffs remain here.  But if they don't -- isn't

22   that right?

23          MR. VERNA:  Well, certainly if you send two Americans

24   along with all the foreigners to France --

25          THE COURT:  I understand that you believe I shouldn't

1    do it.  But if I did it -- if I did it -- then I wouldn't be

2    duplicating proceedings, would I?  Other than this --

3         MR. VERNA:  But that's not improving the situation.

4    It's a standoff.  Either we're going to have cases in Brazil

5    and interruption proceedings and a case pending here, we're

6    going to have cases in Brazil and interruption proceedings and

7    a case proceeding in France -- it's not improving the situation

8    by sending it over to France.  And indeed, the burden of proof

9    is on the defense.

10        THE COURT:  It only improves the situation -- it would

11   only improve the situation if in fact I did send over

12   everything save and except for the Harris plaintiffs.  If I

13   kept the Harris plaintiffs here and I had the Harris plaintiffs

14   here and whatever they're litigating, and the rest of it went

15   over to France, and you still have the Brazilian -- then you

16   have the Brazilian, you have the French and then you have the

17   United States.  So --

18        MR. VERNA:  That's my point.  I think two is better

19   than three.

20        THE COURT:  But that hinges on whether or not the

21   Harris people go, if I decide the other stuff goes.

22        Okay.  Well, I think I see the map.  The question

23   is -- I mean, unless somebody -- everybody's sort of standing.

24   I get a sense somebody's got to say something.  But I'd really

25   like to get -- unless I got that wrong, I don't want to hear

1   anything more about that piece of it.

2          MR. DAMERIS:  I do think you have that part wrong,

3   your Honor.

4          THE COURT:  Okay.  Tell me what I have wrong.  Then

5   I'll hear from everybody.  We have time.

6          MR. DAMERIS:  On the multiplicity of suits, and where

7   they're going to be determined, this court can't decide

8   plaintiff rights vis-a-vis Air France because of convention.

9   Period.  Full stop.  The only claims that can be decided

10  against Air France are the Harris plaintiffs' claim, and then

11  the cross claims of Airbus, Intel and Thales if the Court

12  denies Air France's motion.  Put that aside for a moment.

13         So if these cases go to France, it would be beyond

14  dispute, and Mr. Verna would have to concede that French courts

15  would have jurisdiction of every claimant's claim against Air

16  France and every cross party or third party claim arising there

17  out of.

18         So we know the French would have them all.

19         If you say, I would exercise this prerogative to

20  ignore this Court's order and I'm going to Brazil, the

21  consequence is the Brazilian court would have jurisdiction of

22  plaintiffs' claim against Air France.  As soon as they sue Air

23  France down there, guess what happens?  They sue Airbus,

24  Thales, Motorola, Intel, Dupont.  So now we have a mirror image

25  of this lawsuit down there where the plaintiffs' primary

1    defendant is Air France, and Air France cross claims against

2    the defendants, the manufacturers.  And in this court you have

3    the plaintiffs' primary claim against the manufacturing

4    defendants, and the manufacturing defendants cross-claiming

5    against Air France.  So they're mirror images of each other.

6          But by keeping the case here -- talking about foreign

7    defendants, now, who can come back to Harris.  By keeping the

8    case here, what you actually do is create the dynamic that you

9    absolutely have parallel proceedings and then you have the

10   possibilities of race to judgment, inconsistent results, and

11   what happens there if they find Air France responsible because

12   that's the target defendant?  They have a whole different

13   liability standard.  And then to come here to the United States

14   and have a trial and they find a manufacturing defendant liable

15   because there may or may not be a slot on that verdict form for

16   Air France, because none of the passengers, none of the crew

17   members, are entitled to sue Air France in the United States.

18         So that's why I disagree.  What we do here isn't going

19   to resolve the claims against Air France.  And it's actually

20   going to act as a catalyst for additional claims in different

21   jurisdictions.  But if we send them all to France, that court,

22   the experts and the plaintiffs even concedes, that court can

23   hear every one of these claims for passengers.

24         THE COURT:  So what about the Harris situation?

25         MR. DAMERIS:  The deal with the Harrises, your Honor,

1    is that they are absolutely provided the fifth forum, and I'll

2    yield to Air France on this, but what happened when -- and it's

3    very -- the 11th Circuit's opinion in West Caribbean, they went

4    through and they looked at the negotiating histories of the

5    Montreal Convention and the U.S. government's position, and it

6    got down to the point where the U.S. government said, We want

7    to have the fifth jurisdiction, the principal residence of the

8    passenger, but we also want to make sure that everybody

9    understands that that fifth jurisdiction is still subject to

10   forum non conveniens.

11          And so that's what happened in West Caribbean.  There

12   were Americans on board the aircraft, and the Court first said,

13   You're entitled to file your suit here.  We have subject matter

14   jurisdiction over your claim.

15          Now, I'm willing to do the traditional *Piper vs. Reyno*

16   forum non conveniens analysis, and I'm going to decide whether

17   it's an adequate alternative forum, balance private/public

18   interest factors, and make a determination pertaining to rights

19   of standing and deference.  And in that case, the Southern

20   District of Florida dismissed the U.S. plaintiffs, and in that

21   case the Eleventh Circuit affirmed it.

22          And I'll tell you, there are other cases that are --

23   of -- that have, the same thing has happened.  That's the

24   position of the Fifth Circuit In Re:  Air Disaster --

25          THE COURT:  What about the position of the Ninth

```
1    Circuit?
2              MR. DAMERIS:  Under the Warsaw Convention, the Ninth
3    Circuit took a different position in the *Hosaka* case.  They
4    did, your Honor.
5              THE COURT:  The argument is -- that was early on with
6    respect to the Montreal Convention -- that it hadn't been
7    really fleshed out, and that the court didn't really seriously
8    consider the issues.
9              MR. DAMERIS:  Your Honor, I'm a manufacturer's lawyer,
10   so I'll give you my spin on it.
11             THE COURT:  In fairness to your -- no, we'll get to
12   that in a minute.  But I want to hear what counsel have to say.
13             MR. MITHOFF:  Richard Mithoff.
14             First of all, as your Honor has already alluded,
15   there's an open issue in the Ninth Circuit as to whether or not
16   forum non conveniens doctrine even applies to the Montreal
17   Convention.  The Ninth Circuit previously held it did not apply
18   on the Warsaw Convention.  Even if the doctrine were to apply,
19   we think it is entirely inconsistent with the fifth
20   jurisdiction.  The fifth jurisdiction, which was proposed and
21   proffered by the United States at the Montreal Convention, was
22   specifically intended for a situation in which citizens were
23   attempting to sue in their home forum in a case where
24   everything else happened outside the United States.  The
25   accident occurred outside the United States.  The carrier,
```

principal place of business, is outside the United States.
Tickets are purchased outside the United States.  The very
situation which would ordinarily lend itself to a forum non
conveniens motion.  But in that situation, the United States
argued for -- France opposed -- the United States argued for
and won the right for the fifth jurisdiction choice of forum.

            To allow the fifth jurisdiction, but at the same time
to allow a forum non conveniens motion on the fifth
jurisdiction -- we're not talking about any of the other
choices of forum -- is totally inconsistent.  The exception
would be swallowing the rule.  The West Caribbean case that is
referenced as we read it did not include U.S. plaintiffs, and
in fact, the basis for filing it in the United States was that
contracting carriers were Florida companies.  It was not a
fifth jurisdiction type claim.  We are aware of no case, no
case, in which any United States court has ever dismissed a
U.S. plaintiff for forum non conveniens where the case was
filed under the fifth jurisdiction.  No case.  And we are not
aware of any basis in logic or in law that would allow forum
non conveniens doctrine to be applied, at least to the fifth
jurisdiction.  It simply would not be a logical result, given
the whole purpose and intent of the fifth jurisdiction.

            THE COURT:  Why wouldn't it be -- your last statement,
why wouldn't it be?  I mean, why shouldn't one -- you may be
talking about policy, but I sort of lost -- why wouldn't a

1    forum non conveniens motion make some sense, as much sense, in

2    that case, in that scenario, as it does in any other scenario?

3        MR. MITHOFF:  Because the fifth jurisdiction forum

4    will exist only in a situation in which the only contact, if

5    you will, is that the U.S. plaintiff resides here as the home

6    forum.  And everything else takes place overseas.  The accident

7    occurred overseas --

8        THE COURT:  So you're saying they put it in, really,

9    notwithstanding all the forum non conveniens factors, it was

10   put in because they said, hey, you know, by the way, we're

11   going to treat you differently.  We're going to treat you

12   differently if you're a citizen of the United States, or "X" --

13       MR. MITHOFF:  Precisely.

14       THE COURT:  And you always have the right to bring

15   your case to court and have it adjudicated in court.  That's a

16   special case.

17       MR. MITHOFF:  Precisely.  And that is made clear from

18   the minutes of the Montreal Convention.

19       THE COURT:  I think I understand that.  Fine.  Okay.

20   Sir?

21       MR. MARKS:  Steve Mark with PodhurstOrseck.  We

22   represent 41 of the families and their Brazilian families.

23       You raised a concern, a legitimate concern, about

24   whether or not there's going to be a duplication of litigation,

25   inconsistent results.  And at the very first hearing you

```
1  raised, which we think is the most important issue, and your

2  Honor's concern that these cases not get distracted.  That the

3  people focus on the cases.  And that we move them forward to a

4  prompt and reasonable conclusion.  In fact, your words were to

5  try and resolve it as much as possible.  No one wants to be

6  here; it's not in anyone's interest to have long, protracted

7  litigation.

8          Now, taking what your Honor said, under no

9  circumstances -- and I can assure you and I'll stipulate to it,

10 just like the defendants have -- these 41 Brazilian families

11 will not go to France.  Your Honor can make a ruling that

12 accepts their stipulation, but your order would never compel us

13 that we must file there.  We can file where we choose, where

14 there's jurisdiction.  They will never -- because a French

15 court one will take forever.

16          Two, will never be able to prove much of the evidence

17 because we're going to be stuck behind a criminal proceeding.

18 You have the two most important powerful companies in France,

19 the largest employer and the nation's largest carrier, and

20 these Brazilian families who have chosen a U.S. forum, which is

21 their right, and it is presumptively a correct forum, it's

22 their choice, where they have jurisdiction over nine of the 12

23 defendants are U.S. -- right down the street, some of them --

24 it's a strange argument to suggest that somehow it's

25 inconvenient for these U.S. defendants to defend in the courts
```

1    where they live, are used to and so on.

2              And --

3              THE COURT:  Can I ask this question?  Because I'm not

4    conversant with interruption proceedings.  Every proceeding's

5    an interruption anyway...

6              (General laughter)

7              THE COURT:  Including this one.  So -- but my -- are

8    you saying to me, you know, if this case proceeds, your clients

9    would not institute proceedings in Brazil?  Is that -- did I

10   hear correctly?

11             MR. MARKS:  No, you did not.

12             THE COURT:  Is that what you're saying to me?

13             MR. MARKS:  No, they would have a choice.  We could

14   file what's called an interruption, which is merely a

15   document -- I've done it in Brazil on many occasions.  It's a

16   single-page document which merely advises the world, we don't

17   serve it, it's put in the court record, that we intend to

18   preserve our rights to sue and may do so at a later time.

19   That's an option for some of the Brazilian families.

20             The other option would be for them, for some, if they

21   chose, to file in Brazil against Air France, where there's

22   jurisdiction, and the manufacturing defendants.

23             Now, my clients are interested in finding out the

24   truth and what actually happened, which they'll never be able

25   to do in Brazil.  They're here because the U.S. defendants are

1  here, the evidence is here, it's all in English, and they can

2  establish and prove what happened.

3        THE COURT:  I understand that.  I understand that

4  argument.  But I'm not sure you really answered my question.

5  So let me just tell you what my understanding is.

6        MR. MARKS:  Sure.

7        THE COURT:  If what you are saying to me is that of

8  course we would advise the Brazilian courts of the status of

9  this litigation or something -- I don't know quite what it

10  means, so -- I think you're saying to me:  We would advise the

11  Brazilian courts that we may have a claim against Air France or

12  we may have a claim against X or Y, and somehow that would

13  preserve our right at some point to pursue the claim, then that

14  of course is somewhat troubling to me in that I see the very

15  thing that I wanted to try to avoid, which is the duplication

16  of litigation, the possibility of inconsistent verdicts, the

17  requirement that the defense -- defendants, some, all of

18  them -- have to defend in multiple jurisdictions, based upon

19  essentially a single set of facts, a single occurrence, a

20  single incident.

21        So I guess what I'm saying to you is, Look, I turned

22  to them and said, Are you willing to agree that the

23  jurisdiction would be in France and that you wouldn't raise a

24  forum non conveniens motion and that you would adjudicate under

25  French law, assume all those claims, would you be willing to

1    agree to that so there would be some determination?  And they

2    said, Oh, yeah, that's not a problem.  Yeah, absolutely.

3            And I wonder whether I can say to you the same thing.

4    I wonder whether I can say to you, Look, if I keep it here -- I

5    don't want any proceedings in Brazil.  I -- you know, it's

6    going to be here in San Francisco.  By the way, I'll make a

7    number of commitments in terms of timing.  I have no problem,

8    none at all, giving everybody an early trial date, giving

9    everybody individual attention, moving cases along.  I can

10   guarantee it, as long as I'm the judge in the case, that it

11   would be expeditiously adjudicated.  And I could tell you what

12   I mean by that.  So it's not that -- the proverbial pig in the

13   poke.  I could tell you dates and so forth and so on.

14           But I'm curious -- and maybe this is, you know, maybe

15   this isn't part of the process, but who knows what is, you

16   know -- maybe I can condition it remaining here on something

17   like that, on a -- an agreement that the case would not be

18   adjudicated in Brazil.

19           MR. MARKS:  That's a fair position.  And we accept

20   your proposal.  And what would -- what we would tell you is, so

21   you understand the full backdrop of Brazil, unlike the United

22   States, they don't have consolidated proceedings.  Unlike the

23   United States, we're going to have a jurisdictional battle with

24   multiple U.S. defendants.  Unlike the suits, these cases you're

25   talking about inconsistent results and multiple defendants.  In

```
1    Brazil, Brazilians living in Minas Gerais, Belo Horizante will
2    bring their case in their jurisdiction.  We will have 50
3    different jurisdictions where the people will be bringing 50
4    different cases.  They cannot be consolidated.  And that
5    necessarily opens it up for inconsistent verdicts and results
6    in Brazil.  So Brazil, which would be the only other choice
7    these Brazilians would exercise if your Honor doesn't keep it,
8    would be the worst forum, per your fears.  We would have 50
9    different judges determining liability and damages and have a
10   battle.
11           And if history is any indication, TAM 1 and TAM 2,
12   which are Brazilian accidents involving Brazilians on the
13   ground where there was lot of the legitimate justification as
14   opposed to smoke, which is here, where witnesses were there,
15   controllers were implicated -- I mean, there was a real,
16   legitimate basis -- those cases are still pending.  And in '96,
17   when that accident happened, we're looking at Brazilian
18   citizens, 14 years, have another maybe 10 years.  So Brazil is
19   a very bad option for the families.
20           So when your Honor says, I'm interested in fairness,
21   getting a result, and you're going to give us certainty, we
22   trust this Court; our families trust your Honor to be able to
23   provide fairness and justice.  And we will do that.  And we
24   will so stipulate to this Court's jurisdiction.
25           THE COURT:  I think I understand that argument.  Okay.
```

1      Yes, sir?

2      MR. REITZFELD:  Alan Reitzfeld, again for Air France.

3 I'd like to respond, with the Court's indulgence, to

4 Mr. Mithoff's points, please.

5      First of all, it's important to note that the delegate

6 from the United States to the Montreal Convention explicitly

7 rejected the argument made by Mr. Mithoff that the fifth

8 jurisdiction precludes FNC dismissal.  Let me quote.  The U.S.

9 delegate stated that -- U.S. delegates stated that the fifth

10 jurisdiction was not intended, and here's the quote, "to limit

11 the ability of courts in their discretion from applying the law

12 of the court seized of the case to dismiss cases that more

13 properly belonged in one of the other jurisdictions."

14      And I'm referring to Page 180 from the minutes, which

15 I believe is document 16115.

16      So right off the bat, we have the legislative history

17 showing that the fifth jurisdiction was not a magic key that

18 locks the door from non conveniens dismissal.

19      Let me talk just a bit about the *Hosaka* case, which is

20 the Ninth Circuit case decided under the Warsaw Convention.

21 First of all, as I mentioned, *Hosaka* was decided under the

22 Warsaw Convention, not the Montreal Convention, and I quote

23 again from Footnote 17305, Fd.3d at 1001:

24      "We offer no opinion as to whether the text and

25 drafting history of the Montreal Convention demonstrate whether

1   forum non conveniens would be available in an action brought

2   under that as yet ratified treaty."

3           Every reported decision that either side has cited on

4   the Montreal Convention has held that it does not preclude

5   forum non conveniens dismissal.  That the language in 33.4,

6   talking about applying the procedural rules of the law, the

7   Court seized of the case allows forum non conveniens.

8           We also, and I quote -- well, I refer the Court to the

9   *Newvac* case that Mr. Dameris was talking about, the Eleventh

10  Circuit, the District Court decision in that case; and also the

11  *Kahn v. Delta*, the recent Eastern District case.  They all said

12  the same thing.

13          Now, one thing -- I have a long outline; I'll skip

14  ahead, because sometimes our tax dollars at work are very

15  effective.  And in the West Caribbean case, the District Court

16  asked the United States under 28 USC 517 to file a formal

17  statement of interest.  And the Court received what it asked

18  for.  And the U.S. Department of Justice filed a statement of

19  interest, which made the following points, and I'm referring

20  now to document Number 116:

21          "First, we respectfully note that the reasonable views

22  of the executive branch concerning the meaning of an

23  international treaty are entitled to deference."

24          Now, I want to say again this is the official

25  statement of interest.  It's not the government as party taking

1    a position.  It's the official statement of interest.

2           Next, another quote:  "The United States believes that

3    forum non conveniens doctrine remains available as a procedural

4    tool for federal courts to use in their discretion in

5    litigation governed by the Montreal Convention."

6           And the Court again refers to the fact that the

7    questions of procedure are to the way the Court seize of the

8    case.

9           And the statement goes on and on and sets forth some

10   points from the legislative history.  And it talks about the

11   fact that *Hosaka* was discussing the Warsaw Convention, which is

12   a 1929 treaty, before Gulf Oil in the 1940's really accepted

13   the forum non conveniens doctrine.  And yet the Montreal

14   Convention back in 1999 occurred when forum non conveniens was

15   a very popular procedural tool.  And there's a lot of

16   discussion about it in the minutes.

17          So the *Hosaka* case has really no value here.  This is

18   a brand-new treaty.  It's a more modernized treaty, and it

19   makes it clear from the U.S. statement of interest, and also

20   from other statements of the delegates, for example -- and I

21   don't want to take too much of the court's time -- the delegate

22   from Switzerland interpreted the law of the Court seized of the

23   case, to mean that, and I quote, "whenever a case is brought

24   before a court which applied this principal, forum non

25   conveniens, the Court would have to examine the case and come

1    to a conclusion as to whether it regarded itself competent for

2    that case or not."

3          And likewise, the chairperson -- at one point, the

4    U.S. delegate had suggested we put in expressly forum non

5    conveniens into the convention saying it's okay to apply forum

6    non conveniens.  But there was also a concern that countries

7    that don't accept forum non conveniens might feel that it was

8    being thrust upon them.  So the decision was made just to leave

9    it be.

10          And I want to quote the chairman in summing up the

11    U.S. delegate's suggestion:  "Nothing in this argument is

12    intended to limit the ability of the courts seize of the case

13    to dismiss cases which could more properly belong to another of

14    the jurisdictions stated in the convention.  And would in fact

15    preserve the right of those states which had the forum non

16    conveniens principal, and in no way derogate from those who did

17    not have it.  It would leave the door open to the latter to

18    think in the future as to whether it may well be appropriate to

19    change their own law if they so wished."

20          So we have every reported decision discussing the

21    Montreal Convention saying that forum non conveniens is fine

22    under 334.  We have an official position of the U.S. Department

23    of Justice saying the same.

24          We think this is a red herring.  We think that the

25    fifth jurisdiction is not the magic key to lock the door forum

     1     non, and it's clear both from the text of the convention and

     2     the legislative history that forum non conveniens remains a

     3     procedural tool that's allowed in this court.

     4                 Thank you, your Honor.

     5                 MR. DAMERIS:  Thad Dameris on behalf of manufacturing

     6     defendants.

     7                 First, to respond quickly, your Honor, to the point:

     8     You put the hypothetical stipulation to Mr. Marks, and a couple

     9     of points in response to that.

    10                 Although he represents several Brazilian families in

    11     this litigation, there are in excess of 151 passengers or crew

    12     members that have not yet filed cases.  And we wouldn't have

    13     their stipulations.  That's the first point.

    14                 The second point is that the stipulation would have to

    15     be that they are waiving all rights against Air France in all

    16     jurisdictions, not just Brazil, because see, there are four

    17     other jurisdictions, and if he says I'm not going to Brazil, he

    18     might end up in some other forum.  France, for example, after

    19     these proceedings have been concluded.  He might file an

    20     interruption action there.  And so if he's going to enter into

    21     a stipulation on behalf of his clients, it's going to have to

    22     be that in return for choosing the U.S. jurisdiction, he's

    23     basically releasing Air France of all liability, because the

    24     only liability that he can assert against Air France is in a

    25     conventional jurisdiction, which is either France or, for some

1    limited number of plaintiffs, Brazil.  So that's the point

2    there.

3            Your Honor, the other reason why I don't think the

4    stipulation of the plaintiff works -- and let me say, in

5    defendant's stipulation, it's a tool that's been well

6    recognized and approved by the U.S. Supreme Court.  See, it's

7    an easy way of getting beyond jurisdictional arguments, and you

8    don't have a battle of experts in one -- the plaintiff's saying

9    the courts can't exercise jurisdiction, and the defendant's

10   saying they can, and so if the defendants just stipulate, in a

11   forum, that you're beyond that point.

12           But the problem with a stipulation is what we're here

13   to do today, and what the Ninth Circuit in the *Van Schijndel*

14   opinion has taught us, what we have to do is we have to balance

15   the convenience of litigation in this court versus the

16   alternative forum, and we can't go pick a bunch of different

17   other forums, because there's not a record made on that.  If

18   the Court were to dismiss today for Brazil on the record before

19   it, I submit -- sadly, as a proponent of dismissal -- that that

20   would be error.  And that's the *Van Schijndel* decision out of

21   the Ninth Circuit.

22           So what we need to do is look at the path before us.

23   And it's a very simple one.  We first decide whether France is

24   an adequate and alternative forum.  We know it is because there

25   are several circuits that have already found it is in aviation

1    disaster cases.

2            We also know it is because the plaintiffs don't

3    seriously contest it.  In fact, they do concede it's an

4    adequate forum in their papers.  And when we know that it's an

5    adequate and alternative forum, both from the declaration of

6    their expert, who concedes that it would have jurisdiction of

7    all these claims, but also the declarations of Justice Béraudo,

8    of the French Supreme Court --

9            THE COURT:  I'm trying to figure out why it's an

10   inconvenient forum for your clients.

11           MR. DAMERIS:  The U.S.?

12           THE COURT:  Yeah.

13           MR. DAMERIS:  That's the point I'm coming to next,

14   your Honor.  The issue here is, it's on -- and that's one of

15   the -- we will call the private interest factors.  And the

16   private interest factors go to ease of access to sources of

17   proof; and the availability of compulsory process for

18   attendance of unwilling witnesses.

19           And so what I have done is I have prepared a little

20   chart -- I'll ask my colleague, Mr. Oakley, to hand it up.

21   I've prepared a chart that we can use to try and focus on what

22   pieces of evidence, that the evidence here -- if you'll allow

23   me, your Honor, hand that up -- we had originally proposed to

24   do this by PowerPoint, but I think the old-fashioned way is

25   better.

1    Bruce, if you have some copies, you might make them

2    available for the clerks.

3    So what we need to focus on is what is the material

4    evidence, and what is the record on this motion before this

5    Court.

6    Now, I'll remind the Court that -- and this is a very

7    unique accident, because in my entire professional career, this

8    is the only accident I'm aware of where we don't have digital

9    flight data recorder information and we don't have cockpit

10   voice recorder information, which typically tells the story.

11   And which typically can get rid of some of the very speculative

12   theories that could be brought against U.S. defendants.  For

13   example, they've sued the engine manufacturers.  We actually do

14   have some engine data that was wirelessly reported on the day

15   of the accident that the BEA cites in their report, and they

16   say they find no malfunction of the engines.  Yet these

17   plaintiffs have still named General Electric.

18   So with that in mind, we're missing a large and

19   important tool:  The black boxes.  Let's focus on what the

20   evidence is the record establishes, this material, and where

21   it's located, and what tools do we have to compel it here,

22   because if they can't bring that material evidence here, we're

23   establishing that this is an inconvenient forum and it can be

24   burdensome on these defendants and their defense.

25   And so I start off with the BEA Annex 13 investigative

1    material.  The BEA is the equivalent of the NTSB.  Under the

2    Chicago convention of 1944, Annex 13, it defines which parties

3    or which states lead investigations.  France leads this

4    investigation for five reasons:

5           One is that it occurred over water, so there's no

6    state where the occurrence happened; two, it's because it's the

7    state of registry of the aircraft; three is it's also the state

8    of the operator, Air France; four is it is the state of

9    manufacturer, Airbus; and five is, it is the state of

10   certification.

11          DGAC, the French equivalent of the FAA -- now known as

12   EASA -- E-A-S-A -- is the authority that's certified this

13   aircraft and its component parts.  And it's a very regulated

14   industry, and nothing gets on the aircraft or comes off the

15   aircraft without approval from the regulator.  Because you have

16   to have a type of certificate, and they are done on what you

17   call joint airworthiness standards.  So that the French and the

18   Americans will get together and discuss standards.  And then

19   the French build the aircraft to the joint standards, they can

20   operate in U.S. airspace.

21          And the same thing's true for Boeing aircraft.  If the

22   Boeing aircraft are built to the joint standards, then the U.S.

23   FAA certifies the aircraft, but the Europeans allow it in their

24   airspace.

25          So, the BEA leads this investigation.  They are in

1    exclusive custody and control of the wreckage.  It's in a

2    hanger in Toulouse.  They are in control of the aircraft

3    messages -- and I'll get to the story of air -- if the Court's

4    interested -- in a moment.

5          They're in control of the witness interviews of the

6    pilots.  There were three flights, two before and one after

7    Flight 447, that diverted around this storm.  Those pilots have

8    been interviewed as to what the weather was like.  One of those

9    aircraft, an Air France A330, using the identical weather

10   radar, and what could be seen before the Flight 447 accident

11   could be seen on that Rockwell Collins radar.  All those

12   witness statements are confidentially held by the BEA in France

13   right now.  Those witnesses reside in France, or Germany.

14         The DGAC, the EASA, all their investigative materials,

15   all their certification materials, all the correspondence back

16   and forth between operators, airlines, manufacturers, and

17   component part manufacturers, different parts, improvements,

18   in-service history -- all of that stuff is in residence in

19   France.

20         I mentioned the wreckage, I mentioned the pilots,

21   certification records.  The records about these pitot probes,

22   which received a lot of attention in the BEA official reports.

23   All of that is in France, your Honor.  The Air France

24   maintenance records on these aircraft; the Air France training

25   records for this flight crew; what they were taught about how

1    to handle unreliable air speed indications; what they were

2    taught about the proper operation of a Rockwell Collins radar

3    and how to adjust the gain and the tilt so as to be able to see

4    further into deep storms -- all of that information is in

5    France, your Honor.

6         And that information is critical.  If you look at the

7    *Lueck* opinion out of the Ninth Circuit, they talk about

8    maintenance records.  They talk about pilot training records.

9    The Ninth Circuit talks about, specifically, certification.

10   All that kind of information -- statements from pilots -- all

11   that information the Ninth Circuit found to be material and

12   should be available --

13        THE COURT:  If you were to remain here and you need

14   that information, would you proceed under the Hague Convention?

15        MR. DAMERIS:  I can't, your Honor, and Justice Béraudo

16   speaks to that.  And we also -- at Annex 13.  Two parts of

17   Annex 13 apply.  The first part is 5.12, and it specifically

18   said that the information that forms the basis of the BEA's

19   investigation may not be released unless a French court makes a

20   finding that it can be released and would not have a negative

21   impact on future investigations.  So, a French court has to do

22   the release.

23        The second thing is in Béraudo's declaration -- and I

24   can give you the cite if you want; it's in our brief, so it

25   would be easy to find.  In Béraudo's declaration, he says that

1    a letter of request under the Hague would not be sufficient to

2    release the professional secrecy and the Annex 13 secrecy

3    confidentiality requirements.  And that it has never, ever

4    happened in French history.  And he had familiarity with these

5    issues, having sat on the French Supreme Court and having ruled

6    on some of these issues.

7         So, I go on to some of the really critical evidence,

8    and these are pieces of the evidence that will allow the

9    parties to try to, A, to defend themselves; and to try and

10   create the picture of what happened on this dark and stormy

11   night.

12        Current and former Air France employees that provided

13   flight training to these pilots.  The Air France flight crew

14   that have perished that aren't here, but their training and

15   performance records.  French National Weather Service witnesses

16   and documents the BEA's been relying upon to determine the

17   intensity of these terms.  The ACARS messages.  That's very

18   interesting.  The plaintiff said that the ACARS messages were

19   in fact the black box in this case, and that only the people at

20   ARINC in Annapolis, Maryland could answer the questions.

21        And I made another chart here if I can pass it up.

22   Thank you.

23        Your Honor, if you look at -- I pulled these directly

24   out of -- these quotes out of the plaintiff's briefs.  They say

25   the manufacturing defendants completely ignore the fact that

1    the ACARS messages can only be fully understood with the help

2    of the developer of the ACARS, ARINC, which is based in

3    Annapolis, Maryland.  Because of the developer --

4              THE COURT:  I understand this.  Now, ACARS is in

5    Maryland, but their principal business is in Switzerland or --

6              MR. DAMERIS:  No, exactly the opposite.  ACARS is one

7    of two commercial competitors.  Other one's called SITA,

8    S-I-T-A.  SITA provided the service to Air France.  ARINC had

9    nothing to do with it.  We've got a declaration attached to our

10   reply where the vice-president or global director of ARINC

11   services says:  We did not receive, we did not transmit, any

12   ACARS messages to Air France 447 on the first of June, 2009.

13   And therefore we have no information about their content, their

14   prioritization, synchronization or anything else.  All of that

15   is in the hands of SITA headquarters in Geneva, the operational

16   office that received the sat-com messages in France,

17   transmitted to Air France's ground facility in France.

18             THE COURT:  Can I go back?

19             MR. DAMERIS:  Yes, sir.

20             THE COURT:  As to your argument that certain things,

21   in the Justice's opinion, either, one, have never been

22   released; or would require a court order from France to release

23   them, that's with -- isn't that true as well if the litigation

24   were to proceed in France?  Is that not true?

25             MR. DAMERIS:  It's not.  He specifically addresses why

1    it's not true.

2         THE COURT:  Why isn't it?

3         MR. DAMERIS:  Because there's a procedure in the

4    French system where the French judges are in control of the

5    information to take information either from a BEA investigation

6    or a criminal investigation -- there are two criminal

7    investigations ongoing in France right now -- for use in civil

8    proceedings in France.

9         THE COURT:  Okay.  Okay.  I got that.  Thank you.

10        MR. DAMERIS:  So your Honor, I'll move on from the

11   ARINC -- I think you get my point on the ARINC.

12        So we come back to -- I can go through each of these

13   private interest factors, but they are the availability of

14   compulsory process for the attendance of unwilling witnesses --

15   we just talked about all these different bits of evidence and

16   witnesses that would have custody of them --

17        THE COURT:  What about the argument, you know, things

18   are -- not to be critical of France, but proceedings can be

19   virtually interminable in courts outside the United States, and

20   here, at least, notwithstanding the inconvenience and perhaps

21   some other difficulties with respect to -- that you've

22   highlighted, there would be an adjudication in a more rapid

23   manner?  And that in fairness, there ought to be an

24   adjudication in, you know, like one's lifetime; that it

25   shouldn't -- that these claims shouldn't be subject to 25 years

1    or 30 years of litigation, which is -- and that's their

2    argument, that that's what would happen in France.  What about

3    that argument?

4        MR. DAMERIS:  I agree with the principal.  I disagree

5    with the argument.  It has no factual basis.  Justice Béraudo

6    deals with it specifically.  They gave five examples from their

7    law expert, Mr. Cachard, a 37-year-old gentleman, two years of

8    legal experience, no experience in an aviation case, and

9    concedes that he's never been involved in a proceeding to

10   gather evidence under the Hague Convention.

11       Now, Mr. Cachard says -- and there are five examples

12   where it took a long time to get cases resolved.  Four of them

13   are easy to dismiss; they're criminal cases.  They're not the

14   civil cases.  And he concedes this in his deposition.  So -- he

15   says it in his declaration, he concedes it in his deposition.

16   And Justice Béraudo in his supplemental declaration drives the

17   point home and gives it the factual representation and the

18   reference to the court records that will help understand it.

19       The fifth case is a case called Flash Air.  It's a

20   case, an Air France flight, going to Egypt.  The cases got

21   filed in the Central District of California.  The judge in the

22   Central District of California dismissed them for forum non

23   conveniens for refiling in France.  The plaintiffs went to

24   France and contested the jurisdiction.  Rather than refile the

25   case and prosecute their claims, they argued to the French

1    court:  You can't assert jurisdiction over us, so that they

2    could then come back to the United States and say, It really

3    wasn't an available forum.  That case -- the plaintiffs

4    instituted the argument.  They lost it.  The plaintiffs

5    appealed it.  All of the delay associated with that case was

6    because of the plaintiffs and their appeals.  The defendants

7    stood up and said, We're here, we've stipulated, we're ready.

8    In fact, the Court gave them a trial date 14 months out.  So,

9    your Honor, the declaration of Justice Béraudo makes clear that

10   these cases don't go too long.

11        Two instructive points in addition to that, on our

12   side of the aisle.  The Courts of appeal make it clear that

13   delay has to be intolerable delay.  And the fact that it would

14   take four years to resolve something in France as opposed to

15   three years in the United States is not the delay that has any

16   consideration in forum non conveniens, and there's a lot of

17   circuit court law on that.

18        The second point, your Honor -- I know this court is

19   familiar with the proceedings that happened in the Alaska

20   Airlines case.  I've been involved in other cases, including

21   the unfortunate accident of American Airlines on the 12th of

22   November 2001 outside of New York at Bell Harbor.  That case

23   was -- those cases were filed in early January.  Accident,

24   November 20, '01; cases filed early January, 2002.  It was 2008

25   till we got the last cases resolved.  So your Honor, you know,

1    there's a delay in systems all over when you get into these

2    very large cases.  You've got to deal with the damages for the

3    passengers on a passenger-by-passenger basis.  It takes time to

4    gather the information and get settled.

5           And what happens in these cases, because the airline

6    has stipulated liability under the Convention, when the cases

7    get into the right forum where the airline can be sued, in

8    France, they settle very quickly.  Because the jurisdiction

9    issues are beside.  You know exactly where you are.  And the

10   parties sit down and the cases get resolved and people move on

11   with their lives.

12          What happens when you try and separate a product claim

13   from an airline claim is you get into these intolerable delays

14   that result in forum non conveniens until the cases can get

15   back together.  And they can only be put back together in

16   France.  And a few cases in Brazil.  But these Brazilian

17   plaintiffs can elect France or they can elect Brazil, but they

18   cannot elect the U.S. to resolve their cases against the

19   airline.

20          THE COURT:  Thank you.

21          MR. DAMERIS:  The last point I would make, if you look

22   at the remainder of the private interest factors, access to the

23   wreckage is one the Supreme Court specifically mentions, and of

24   course that's in France, and you can't order that wreckage

25   here.

1          And the other practical problem is translations.

2    Whether this case is tried here or in France, there are going

3    to have to be translations.  French documents into English,

4    English documents into French, Brazilian or Portuguese into

5    English.  It's neutral, I would tell the Court.

6          The other thing is -- are congestion of the Court.

7    That's one of the public interest factors.  I would submit that

8    this court can have consolidated centralized pretrial

9    proceedings here, but you can only try the merits of the cases

10   that were original actions here.  Everything else, all of

11   Mr. Marks' cases, have to go back to the Southern District of

12   Florida.  It may be that that judge decides that you have

13   experience with the cases and they come back on 1404.  But

14   that's the decision of your brother down there.

15         So these cases, if they're here, they're not

16   centralized in one court for resolution.  Just for pretrial.

17   If they go to France, they're centralized in one court for

18   complete resolution.

19         THE COURT:  All right.  All right.

20         MR. DAMERIS:  The other thing is --

21         THE COURT:  In response to that, the history has been

22   that essentially the cases have been resolved in the initial

23   court.  I mean, in the court -- not the initial court, in the

24   transferee court.

25         MR. DAMERIS:  There has been that experience, your

1    Honor, I agree.

2              THE COURT:  But I think technically you're quite

3    right.  So -- I mean, I understand that argument.

4              MR. DAMERIS:  I'll move to the end of the public

5    interest factors, your Honor, which are the interest -- and

6    this is an important one -- the interest in deciding localized

7    controversies at home.  Put aside the Harrises for a second;

8    I'll come back to them.  Absent the Harrises, this can't be

9    described as a localized controversy.  This is a case that

10   involves a French airline on a French air-built -- or a

11   French-built air frame, with the largest number of persons that

12   were on board that died were French nationals.  Aircraft's

13   certified by the French authorities, and the investigation is

14   led by the French aviation authorities, by the BEA.

15             Two separate criminal investigations are ongoing.  And

16   the circuit courts around the country have held no better

17   indicia of localized interest in a matter than if they've

18   instituted their own criminal investigations.  This is a matter

19   of deep interest to the French.  And -- imagine how we would

20   feel if we had a U.S. accident of American Airlines of a Boeing

21   aircraft with Americans on board and the French decided that

22   they were going to decide whether that Boeing aircraft was

23   properly certified, whether American Airlines properly trained

24   their pilots.  It really is a local issue for the French.

25             THE COURT:  I understand that.

1        MR. DAMERIS:  Other administrative difficulties.  This

2   court has to rely on the Hague Convention with the countries

3   that have signed it.  I'll mention to the Court:  Brazil hasn't

4   signed the Hague Convention.  So you have to go through a whole

5   different procedure with Brazil.

6        In France, the Hague Convention will apply vis-a-vis

7   the United States, and it's completely circumvented by the

8   defendants collective submission that will make our witnesses

9   and will make our documents available upon request to the

10  French court.  So the French Court doesn't have to use Hague

11  for the U.S. -- you do have to use Hague.

12       THE COURT:  Okay.  Okay.

13       MR. DAMERIS:  The other point is EC regulation

14  1206/2001.  There's a reform of the French procedure, or the

15  European procedure, within the European community.  The judges

16  there can skip the central authority for justice, pick up the

17  phone, call another judge, and they can move quickly and gather

18  information in Germany, Spain or elsewhere.

19       Conflicts of law.  This case will require the Court to

20  forego its DOHSA, Lauritzen factors, laws of the flag of the

21  ship, France -- you can go through the factors.  I've looked at

22  them, your Honor.  We don't have to judge it today.  It's not

23  an issue the Court tells me I can decide before, it's going to

24  be French law as to the majority of the defendants on

25  liability.  It's going to be French law on the 72 persons that

1    died that were French nationals.  It may be Brazilian law or

2    some other law as relates to other passengers, but what's not

3    what it's going to be, is going to be a U.S. law.

4          And so we're going to have very complicated questions

5    of choice of law on an issue-by-issue basis and on a

6    defendant-by-defendant and plaintiff-by-plaintiff basis.

7          Truth in fact, your Honor, these cases have absolutely

8    no relationship with Miami, where they were originally filed;

9    with Chicago in the state courts of Cook County, where they

10   were removed, and then, you know, MDL'ed up to here.  And

11   where -- San Francisco, for that matter.  You know, in our

12   briefs, we go through and make the points plaintiffs have

13   mischaracterized where the relevant evidence resides.  There's

14   not any relevant evidence in Miami.

15         THE COURT:  I think the question isn't -- from an MDL

16   point of view, I think the question is the United States, as

17   distinct from San Francisco or Miami or Chicago.  I think

18   that's the question.

19         MR. DAMERIS:  I don't think the Ninth Circuit has been

20   clear on that point, your Honor.  If you read their -- a couple

21   of decisions including *Lueck* and *Van Schijndel*, and in those

22   cases, your Honor, the Court looked at state by state and not

23   United States versus other forums.

24         THE COURT:  I'll look at that.

25         MR. DAMERIS:  One thing I'll close with here, and this

1    is a quote out of the United States Supreme Court's -- a quote

2    out of the *Piper* decision.  And the plaintiffs have made a big

3    point that they need this forum to police these defendants, and

4    that these American defendants, many of which they can't even

5    prove had parts on the airplane -- and all that's addressed in

6    our brief.  But in *Piper*, it's written that, "Respondent argues

7    that American citizens have an interest in ensuring that

8    American manufacturers are deterred from producing defective

9    products, and that additional deterrence might be obtained if

10   Piper and Hartzell were tried in the United States, where they

11   could be sued on the basis of both negligence and strict

12   liability."

13          The Court wrote, "However, the incremental deterrence

14   that might be gained if this trial were held in an American

15   court is likely to be insignificant."

16          So these whole arguments raised about bilateral

17   treaties?  Rejected.  Lack of access to contingent fees?

18   Rejected.  Lack of access to federal-style discovery?

19   Rejected.  Deterrence?  Rejected.

20          And we attached to our brief a chart of all the cases,

21   and -- the cases since 1981 forward, since the day of Piper,

22   we've tracked foreign aviation cases.  And what's really

23   striking is we're talking about balancing interest, and we show

24   how decidedly they tip in favor of France on this case with a

25   French air frame manufacturer.  Look at the number of cases

```
 1    that have dismissed Boeing, McDonnell Douglas, Sigorsky

 2    Helicopter, Bell Helicopter, Pratt & Whitney -- all these icons

 3    of American business that have been involved in foreign

 4    aviation accidents -- and the courts have said there simply is

 5    not enough convenience to these foreign plaintiffs' selection

 6    to sue here.  And you should go back to either the place of the

 7    accident -- that's one place they send them.  We can't send it

 8    to the Atlantic.  To the place of destination, which is the

 9    destination for dismissal, and what we're moving for here,

10    which also happens to be the place of manufacture and the place

11    of the official investigation, etc.  And sometimes they send it

12    to the place of the plaintiffs --

13                THE COURT:  I understand.  Thank you very much.

14                MR. DAMERIS:  Thank you, your Honor.

15                THE COURT:  Response?

16                MR. MARKS:  Thank you, your Honor.  Mr. Marks with

17    PodhurstOrseck.

18                First of all, I'll solve the Lexicon in 1404 problem:

19    If your Honor keeps the cases, we'll refile in San Francisco

20    and dismiss the transfer case.

21                Number two, it is curious because we have an argument

22    made by Mr. Dameris for Air France when they are only the

23    airframe manufacturer, their liability really isn't at issue.

24    What is at issue is the weather, radar system on the aircraft,

25    and the component parts, which make up the navigational system.
```

```
1    All those lawyers, those U.S. lawyers sitting behind us,
2    represent U.S. companies.  Where all the evidence is here, all
3    the witnesses are here, former witnesses are here.  And this is
4    a red herring, this list, and I'll go through it quickly.
5         First, Mr. Dameris concedes that these documents that
6    are being held in a criminal proceeding and with the BEA are
7    confidential.  They remain confidential, and there's not ever
8    been in the history of French jurisprudence a French court
9    which has compelled the production of those materials.  So the
10   fact that they're in France, if your Honor and some people file
11   there, there is no showing that it's ever been released.  And
12   it would be purely speculative to suggest that it would be
13   released.
14        Moreover, we have the two most important French
15   entities in this courtroom.  If they wanted to get these
16   documents, there would be procedural vehicles that they could
17   have.  They're parties to the investigation.  And to the extent
18   they wanted to do something to get that material, which they
19   haven't done, then they would presumably do it.
20        The next item is these pilots.  These pilots who flew
21   the other flights -- there's not even any dispute about it;
22   that's not even an issue in the case.  We agree that they did
23   divert it, they saw it.  We have transcripts.  We know it's in
24   the BEA report, what occurred.  It's not even a factual
25   dispute.  But as we've done in virtually every case -- Concord,
```

1    TAM, Goal -- we've cooperated with defense counsel.  I've known

2    these gentlemen for many, many years.  The witnesses, they

3    voluntarily appeared.  We deposed them.  We did that in SDA

4    King.  A lot of witnesses in Europe voluntarily appeared, we

5    videotaped and produced them.

6         The rest of these items fall into a broad category of

7    documents which are within their control:  Crew records,

8    certification records.  As a matter of law, the certification

9    records are produced and made by Airbus.

10         And these U.S. companies, Garmin and other companies,

11   or the weather radar system data, the certification is here.

12   Their products are certified by the FAA in the United States

13   for all these U.S. manufactured components, whatever

14   certification records are in their possession.  Because when

15   they submit them, all the data by the manufacturers on

16   performance, on the engine performance, on the type of the

17   computer information that's gathered and how the autopilot

18   system works, all that has to be in their possession because

19   they do the testing.  They submit that document to FAA.  FAA

20   stamps it approved or not.

21         And whatever correspondence exists between those

22   parties is here in the United States, and it's subject to one

23   button on a computer that's scanned and will be produced here.

24   And they're all in English because all certification documents

25   are in English.

1         So the next -- and the crew records, are with Air

2    France, who presumably has those records because they're their

3    crew.

4         So all the records that can list -- they can make a

5    chart that's 20 pages long, but none of the documents that they

6    contend they need, have ever been produced before, or aren't in

7    their possession.  So that is a complete red herring.

8         Let's talk about how intolerable France is.  It is so

9    intolerable that the Brazilians would rather wait 15 to 18

10   years in Brazil than to exercise their -- the possibility of

11   going to France.  I'll tell you why, apart from the political

12   reality of Air France and Airbus having whatever impact it has.

13        If you look at the Internet -- and it happened -- we

14   will supplement the record, this apparently occurred a couple

15   of days or a day ago; it was just reported -- a newspaper

16   article appeared.  Maybe it will straighten out; we don't know

17   for sure:  "Title 11 Work to Rule Strike in Bottle-Necked

18   Judiciary."  These articles discuss the fact that the judiciary

19   in France is bottle-necked.  And there's currently a strike in

20   France by court personnel.  So apart from all of the problems

21   with proof, apart from the problems with delay, apart from the

22   problems with prejudice, these actions are not going to end up

23   in France.

24        Let's talk about history, because Mr. Dameris

25   mentioned what has happened in the past anecdotally and what is

1   the most efficient way to handle these cases.  Concord.  I

2   represent all the victims of the Concord.  We filed suit in the

3   Southern District before Honorable Judge Paul Huck.  Got those

4   cases.  It was clear early on in that litigation he was going

5   to keep those cases.  The second that became clear, we settled

6   within a year, every single passenger case.  And -- because

7   there was no forum non conveniens dismissal, and because the

8   parties knew -- and some of them are in this courtroom;

9   Mr. Dameris was not there -- we settled every one of those

10  cases.  Eighty-eight German families.

11         Next case.  King.  King was heard before Judge Moreno.

12  I represented all 69 passengers.  That case was denied three

13  times forum non conveniens.  Even Judge Moreno and the Eleventh

14  Circuit affirmed the right of an American to be in an American

15  court.  And that action, three weeks before trial, because that

16  case involved a wreck that occurred at Linate Airport between

17  two planes on the ground, where the controls were at issue,

18  where the airport personnel were at issue because there was --

19         THE COURT:  I want to go back to one point.  So

20  you're -- which is a point you made the last, about five

21  minutes ago, the availability of evidence.  And your argument

22  really is:  Look, as to all these things, which certainly they

23  are, a lot of them, not all of them, are in France -- you say,

24  either, one, nobody can get them; or two, Air France and Airbus

25  can get them.  Okay.  You say that you know they have -- they

1    either have them, because they're there --

2            MR. MARKS:  Right.

3            THE COURT:  -- or they probably could seek them.  I --

4    and I understand that.  So you say, look, they shouldn't

5    complain about that.  If anything, we should complain, and

6    we're not going to complain.

7            And that's my question:  If it turns out that the case

8    remains here and the -- and that evidence is inaccessible to

9    you for a variety of reasons -- don't have process, Hague

10   convention doesn't work, da-da-da-da-da -- you know, it's a

11   custom and practice in France, this or that or whatever's going

12   on, one never knows -- I mean, I certainly will never know --

13   you're telling me, Hey, we're not going to complain, we're not

14   going to seek delays, we're not going to seek sanctions.  You

15   know, we're not going to ask that adverse inferences be drawn.

16   We're not going to do any of those things.  Is that what you're

17   saying to me?  I'm saying it rather broadly because, you know,

18   I don't want to hear something later on that I just sort of

19   didn't cover.

20           MR. MARKS:  On behalf of every client that is before

21   your court which my firm represents, which is the vast

22   majority -- Mr. Verna and Mr. Mithoff can stand up if they

23   disagree with this -- we will not complain -- you're right,

24   we're the ones who suffer.

25           Further, we're still concerned about going there and

1    never getting our day in court.  We will so stipulate that

2    under no circumstances will we ask for an inference, a jury

3    instruction, argue to a witness on a cross-examination, or

4    anything, but -- we have burden of proof, so if anyone had a

5    right to complain, your Honor is absolutely correct.

6              THE COURT:  Thank you for that.  That sentence answers

7    that question, as far as my mind is concerned.

8              I think counsel is right, though, that with respect to

9    those people who aren't in front of me, that is, those

10   Brazilian next of kin who are not here, there's no way you can

11   bind them.  There's no way anybody from that side of the

12   table -- or either table -- can bind them.  And I guess there's

13   nothing to say on that subject.  It exists.  They'll do what

14   they do.  And yes, indeed, it could result in inconsistent

15   results.  And that's the way life is in the big city.

16             MR. MARKS:  That's always a risk.  You have a

17   Ukrainian, has a right to file in the Ukraine.  Nothing can be

18   done about it.

19             THE COURT:  I understand.

20             MR. MARKS:  I'll tell you, as a practical matter, I

21   was going to get that --

22             THE COURT:  Tell me as a practical matter.  I'm much

23   more interested in that.

24             MR. MARKS:  I know, because we know -- underwriters

25   for Air France and I had a lot of discussions over the last

1    many months.  I know that virtually -- there's a large group of

2    claimants that are very close to resolving in Europe.  There's

3    another large group of plaintiffs in Brazil, including in ours,

4    which --

5              THE COURT:  You say that through the process itself,

6    the likelihood is there'll be an adjudication one way or the

7    other.

8              MR. MARKS:  As a matter of practice.

9              THE COURT:  I don't think I want to get into that.  I

10   mean, I don't know that -- I'm just trying to -- I'm just

11   making sure I have a picture of it.

12             MR. MARKS:  In *SilkAir*, which was tried involving a --

13   Japanese, I tried that case in LA County state court a few

14   years back.  It's the last major air disaster ever going to go

15   to a jury trial.  We tried it for two months in LA.  We had in

16   that case, you know, very similar products claims about the

17   tail rudder system.  We tried that case on behalf of a group of

18   33, or 156 federal plaintiffs.  We took depositions by

19   agreement all over the world.

20             THE COURT:  One other question.  Let me ask you this,

21   and I should know the answer to this:  If I do not grant the

22   forum non conveniens motion, is that appealable?

23             MR. MARKS:  No, your Honor.

24             THE COURT:  Is that correct?

25             MR. DAMERIS:  Your Honor, it's only appealable if you

1    certify, or by mandamus.

2              THE COURT:  I see.

3              MR. MARKS:  That's why there's opinions only on the

4    granting in the most part because when they're denied -- and I

5    can go through a litany --

6              THE COURT:  No, that's fine.

7              MR. MARKS:  When they're denied, the cases get

8    resolved.

9              THE COURT:  Well, the question is, is it resolved

10   fairly or not fairly?  I understand that.  I'm just interested

11   in the mechanics.  For the moment, I'm interested in the

12   mechanics on that issue in purposes of delay.  I mean, you

13   know, I'm very, very concerned.  I'm very, very concerned about

14   delay.  Taking the Air Alaska -- the one case I've had

15   experience with, which was the Alaskan -- Air Alaska crash, in

16   which I became the successor judge, the only way that case

17   resolved, in my judgment, was setting trial dates and moving

18   the case along.

19             Now, you can say that's true about a lot of cases.

20   And it is true about a lot of cases.  And I don't think air

21   crash cases are so different from other cases except that there

22   is a necessity in an air crash case for reasons other than the

23   air -- than the facts of the cases for a rapid adjudication.

24   Because lives are left open in terms of next of kin, that the

25   only thing that brings about some type of closure to claimants

1    is a resolution of the case.  And so that's -- while that can

2    be said about a lot of cases, it can be said -- it's even

3    more -- it's even more important in air crash cases.  The

4    suddenness of the death, the circumstances of the death, the

5    uncertainty as to where to go, as to how the case is going to

6    be adjudicated, the uncertainty of claims -- they are all

7    important to bring about a resolution.

8            I will also say to the defendants that there was

9    enormous cooperation from the Air Alaska defendants in bringing

10   about a resolution.  So I'm not at all by anything I say

11   suggesting that the defendants have an interest in not

12   resolving the case in a humane, expeditious fashion.  But I

13   think that we all understand what goes on in an air crash case.

14   At least I have that understanding.  So that's an issue that I

15   think -- part of these are private factors, public factors --

16   but it's a factor that I have to think about pretty carefully.

17           MR. MARKS:  Thank you, your Honor.  I can tell you on

18   behalf of the families that that is a concern in all their

19   decision-making.  And you have, as you point out, spouses that

20   were working, paying for private schools, mortgage payments,

21   and those real-life things do occur.

22           Now, one last point.  I know you don't want me to go

23   through all these.

24           THE COURT:  No, I don't.

25           MR. MARKS:  But I do want to say one thing:  Make no

1    mistake by the -- we're "forum shopping".  They're forum

2    shopping.  The victims, we believe, can get a better shot.

3              THE COURT:  Yeah.

4              MR. MARKS:  What I will say to you is refer your Honor

5    to a case in New York called *Esheva*, cited by the defendants.

6    I would ask that you go to the Court file, read a stipulation

7    that is in the record in that case between me and Mr. Dameris

8    involving Russian plaintiffs and a New York U.S. proceeding

9    where Airbus --

10             THE COURT:  Is it part of the record in front of me?

11             MR. MARKS:  No, unfortunately.  I think it's referred

12   to, but it's public record.  You just push on the -- it's like

13   a case anywhere else.

14             THE COURT:  Why don't you discuss it and you can add

15   to the record that stipulation if you think it's relevant and

16   you can respond to it.

17             MR. MARKS:  Mark the only thing I was going to say

18   about it was that in that case, Airbus agreed that even though

19   it was a crash, it remains --

20             THE COURT:  I'm a little concerned about something

21   being put in front of me.  If there's a stipulation in a

22   different case --

23             MR. DAMERIS:  Two points on that, your Honor:  I

24   really don't have a problem, first of all.  That case was in

25   front of Judge Denise Cotes in the Southern District of

```
1    New York.  There was a stipulation between Airbus, leasing a

2    3002 -- not the manufacturer -- U.S. entity, and Mr. Marks'

3    clients, as a single accident entity --

4              THE COURT:  I can make this short.  Absent an

5    agreement, I'm not going to consider it.  There you go.

6              MR. DAMERIS:  Thank you, your Honor.

7              THE COURT:  Okay.  Yes?

8              MR. ROSENTHAL:  Steve Rosenthal on behalf of the

9    PodhurstOrseck plaintiffs.  Let me add one point, at the risk

10   of taking this a little too long.

11             THE COURT:  You get one point.

12             MR. ROSENTHAL:  One point.  You emphasized the

13   importance of an expeditious resolution of the case.  And

14   earlier in this proceeding you said that you know that you have

15   the power to guarantee that this case will move along.  One

16   point that hasn't been highlighted in this, and I'll bring it

17   front and center, which is in France there is no guarantee,

18   there is no crystal ball that we can look at that would say

19   there would not be a stay entered.

20             THE COURT:  I can't guarantee that either.  The Ninth

21   Circuit could very well come in and -- could come in and they

22   could say -- they could say, Not so fast.

23             MR. ROSENTHAL:  The difference --

24             THE COURT:  They have done that.  They've been known

25   to do that.  But I think it's unlikely that that would occur in
```

```
1    the Ninth Circuit.

2            MR. ROSENTHAL:  I'm talking about a different kind of

3    stay, though.  Because there's a criminal proceeding pending in

4    France.

5            THE COURT:  I see.

6            MR. ROSENTHAL:  As a matter of French law, which is

7    why I wanted to alert the Court to it.  There's a dispute among

8    the experts here.

9            But the bottom line is in the past, French judges, the

10   law, used to be a stay was mandatory for a civil proceeding.

11   In 2007, the law was changed.  Two points arise from that.  One

12   of them is that French judges are used to having a civil action

13   stayed.  And secondly, they have complete and utter discretion

14   of whether or not to issue a stay in favor of the termination

15   of a criminal proceeding.

16           THE COURT:  Cuts the other way, doesn't it?  Now it's

17   discretionary.  Before it was mandatory.  Mandatory results in

18   a stay.  Here a judge can decide not to stay.

19           But I understand.  I understand what you're saying.

20   Okay?

21           MR. ROSENTHAL:  My point is simply there is no crystal

22   ball.

23           THE COURT:  Nope.  I don't have one either.

24           Okay.  Anything further?

25           MR. DAMERIS:  Last point, your Honor.  The issue of
```

1 | stay is in our brief at Page 11, so you can -- I'll let you all

2 | deal with that separately.

3 | The issue about separating the cases and expediting

4 | matters, and Mr. Marks' argument with, just keep

5 | them together --

6 | THE COURT: I don't know about that. I'm not going to

7 | decide upon that basis. I think that's the wrong thing to do.

8 | I mean, that just sort of takes all the law, throws it out and

9 | says, By the way, you can come to whatever result you want to

10 | in an effort to try to resolve the case. That's in the law...

11 | I won't do it on that basis. I don't know whether it

12 | would settle. The only thing is, if it's here, it would move

13 | at a particular speed. I have that sense. Because, of course,

14 | I have had the 13 years I've had, I know what happens in cases

15 | in front of me, you know. In front of other judge -- some of

16 | them move faster; some of them don't. So I have that sense.

17 | But I'm not saying that I think, Well, oh, by the way,

18 | let's have this case here because it will all settle here.

19 | I don't know. I don't know. I mean, I'm a trial

20 | judge. I hate to say it, but I love trials. And you know, you

21 | guys are great. You know. You're really good lawyers. So I

22 | don't think I would be -- at somebody else's expense,

23 | regrettably -- but I don't think I would be bored, or have

24 | to -- or think that I'd have to do the legal work here. No,

25 | no, no. I understand that.

1          MR. DAMERIS:  So, I won't belabor that point.

2          In rebuttal, I'd encourage as you review the briefs,

3    that there is no evidence in here that the transcripts of these

4    other pilots have been transcribed or released by the BEA.

5    That's made up of whole cloth.  We don't have those

6    transcripts.  That's information that's held closely by the

7    BEA, your Honor.

8          The argument with the documents and the control of

9    Airbus and then he slips in and says the FAA's got them, these

10   Airbus aircraft, your Honor, are certified in France by the

11   DGAC, now EASA.  Those documents are there.  Sure Airbus has

12   its submissions.  It doesn't have any of the analysis or the

13   testing.

14         THE COURT:  But let me ask this question:  Let's say

15   there are a series of documents in France that would be helpful

16   to the defense, that would help establish -- they certified it

17   was this, it was that, da-da-da-da -- whatever they say.  You

18   could get them, couldn't you?

19         MR. DAMERIS:  Not necessarily.

20         THE COURT:  Unless it was part of a criminal

21   investigation that otherwise it wouldn't be released.  But for

22   the most part, aren't these documents documents that you -- if

23   they were helpful to the defense -- would be able to -- you'd

24   be able to produce them?

25         MR. DAMERIS:  The documents in our custody and

```
1    control.  But there's a large volume that's in the BEA, your
2    Honor, and it's in the DGAC, now EASA.  And those are the
3    documents that we've alluded to in our briefs and declarations,
4    we can't pry loose with an order of this court.  The only way
5    we can get those is through French proceedings.  And we know
6    this, your Honor.  If we go to a French court and we say, We'd
7    like these documents because we'd like to take them to
8    San Francisco and use them in proceedings down there, we know
9    what the answer is.
10              THE COURT:  You're saying if you ask.
11              Now, let me turn to Air France -- or Airbus, I mean.
12              MR. DAMERIS:  I am Airbus, your Honor.
13              THE COURT:  Pardon me.  Yes.  Okay.  Fine.  And you're
14   saying the -- the country of your origin in terms of --
15              MR. DAMERIS:  My corporate entity.
16              THE COURT:  Seeking delivery of these documents that
17   would help a national company, you wouldn't be able to get
18   them?
19              MR. DAMERIS:  Absolutely.  And it's in our
20   declaration.
21              THE COURT:  Okay.  I'll take a look at that.
22              MR. DAMERIS:  Thank you, your Honor.
23              THE COURT:  Thank you very much.  We're in recess.
24              Obviously, I'm taking it under submission.
25              MR. KELLY:  May I ask another question?  There was
```

1   another motion on which involved Air France's motion to dismiss

2   the third-party complaints.

3          THE COURT:  I'll address that in my order.

4          MR. KELLY:  Thank you, your Honor.

5          THE COURT:  Thank you.

6          That, by the way, that would be mooted, wouldn't it,

7   by -- if I transferred the case?

8          MR. KELLY:  Yes, it would, your Honor.

9          THE COURT:  Okay.  I don't want to indicate anything,

10  but...

11         MR. KELLY:  Very good.

12         (Adjourned)

13                           oOo

14

15

16              CERTIFICATE OF REPORTER

17

18         I, Connie Kuhl, Official Reporter for the United
    States Court, Northern District of California, hereby certify
    that the foregoing proceedings were reported by me, a certified
19  shorthand reporter, and were thereafter transcribed under my
    direction into written form.

20

21  _____

22              Connie Kuhl, RMR, CRR
              Monday, September 27, 2010

23

24

25

Connie Kuhl, Realtime Official Reporter
USDC - CAND 415-431-2020