# Exhibit 3

Supplemental Declaration of Martin Moore QC

**I, Martin Luke Moore QC of Erskine Chambers, 33 Chancery Lane, London WC2A 1EN, state pursuant to 28 U.S.C. §1746**

## A: Introduction

1. I make this declaration further to my First Declaration dated 14th September 2011. I make it on the same basis as set out in paragraph 7 of that declaration – namely that I owe my duties to this Court and not to the party appointing me.

2. The purpose of this declaration is to expand upon the discussion in my first declaration, and to address certain matters raised by the Plaintiff, in light of the Declaration of David Mabb QC dated 26 October 2011 and the Plaintiff's Memorandum in Opposition to BP's Motion to Dismiss.

3. In doing so I have focussed on the significant issues and my lack of comment on other, more peripheral, points should not be taken as any endorsement by me.

4. Exhibit 1 to this Declaration is a collection of the cases and materials referred to herein, which have not already been exhibited to my First Declaration or that of Mr Mabb.

## B: Mr Mabb's approach

5. I note at the outset that there is substantial agreement between me and Mr Mabb. In particular, he accepts that Article 132 of BP's Articles of Association gives BP's directors the power to declare an interim dividend, and that such a dividend is cancellable. (Paras 64 and 77)

6. He also appears to accept that BP's directors announced the dividend as an interim dividend, and that they cancelled it on that basis. (Para 97)

7. Most of the rest of his Declaration is directed (generally in speculative or tentative terms), to identifying possible routes to the conclusion that – notwithstanding those matters – BP's directors might have had power, and might have exercised the power, to create a binding obligation on BP to pay. He suggests that:

(a)     Despite being unable to identify any material to suggest this, and accepting that their contemporaneous and subsequent behaviour suggests otherwise, "it is not possible to dismiss the alternative" that the directors may have intended to pass the resolution under Article 131(B) rather than Article 132. (Para 106)

(b)     On his construction of Article 131(B), a resolution of the directors would create a binding obligation. (Para 107)

(c)     The use of the word "interim" might be taken to mean "periodic" rather than that the dividend is cancellable. (Para 98(iv))

8.   Mr Mabb indicates that he is asked to "reserve" the question of whether identification of a record date could create a binding obligation where none previously existed. (Para 80)

**C: Summary of my response**

9.   In summary, I express the following views in this Declaration:

(a)     Mr Mabb's approach seems to me to come from the wrong direction. The questions as a matter of English law should be (i) what did the directors purport to do? and (ii) did they have power to do it? The answers seem to me to be:

(i)     They purported to declare, and cancel, an interim dividend.

(ii)    It is not in dispute that they had the power to do so under Article 132.

(b)     It is well-settled as a matter of English law that an interim dividend is cancellable and that when a resolution refers to an "interim dividend" that is what it is to be taken as meaning.

(c)     In any event, I do not consider that a resolution of the directors under Article 131(B) would create a binding obligation on BP. The power to

create such an obligation is vested in a higher authority, namely the shareholders in general meeting.

(d)     I do not consider that the Record Date provisions in Article 143 have any bearing on the matter.

(e)     It would be possible for ADS Holders to pursue these claims *en masse* in the English Courts, through a Group Litigation Order.

**D: The Approach to the Resolution for an Interim Dividend**

10.   Mr Mabb correctly observes that the relevant resolution and announcements do not refer to a specific Article as the basis for the directors' decision. In my experience that is not unusual. Directors are commercial men who make decisions which are then recorded. Unlike lawyers, they do not cite the jurisdictional roots of their decisions.

11.   Mr Mabb's approach is to suggest that the Court must determine, as a matter of fact, which article the directors intended to proceed under. In my opinion, such an approach is flawed as a matter of English company law. Like most decision-makers, businessmen will not ordinarily make their decisions while poring over the constitutional documents delineating their powers. Rather, they will simply resolve to take some specified action.

12.   When they make such a resolution, the question must simply be, do they have a legitimate basis for doing so? If so, their decision is valid; if not, then it is not. It is not a requirement that they should have *intended* to act pursuant to a particular power. Often they will not even have considered the precise terms of the power, and would have no intention of the kind Mr Mabb considers a court should seek. Their inability to answer the jurisprudential question about which power they intended to proceed under does not render the act invalid. The question is an objective one - whether what they in fact did was within the scope of their powers.

13.   In this case, what BP's directors in fact did was announce "A First Quarter Interim Dividend", which they announced as such (and using the word 'interim' in the heading).  (Minutes, Meeting of the Board of Directors of BP plc, April 15,

3

2010; *see also* BP plc Group Results First Quarter 2010, April 27, 2010; Press Release, *First Interim Dividend for 2010: Payment of Dividends in Sterling*, BP plc, June 8, 2010; Press Release, BP Establishes $20 Billion Claims Fund for Deepwater Horizon Oil Spill and Outlines Dividend Decisions, BP plc, June 16, 2010.) As I explained in my First Declaration, the announcement of an interim dividend is well understood as a matter of English law and commercial discourse to give rise to no obligation to pay until the time of payment (as distinct from a final dividend).

14. Mr Mabb accepts that BP's directors had the power under Article 132 to take such a course of action. In my opinion, as a matter of English law, that is the end of the inquiry.

**E: No apparent basis for an alternative view**

15. The matters Mr Mabb's relies on for not ruling out an exercise of an Article 131(B) power are not in truth matters of evidence. On examination there are only three matters he puts forward for consideration. Firstly, a possible meaning of the word "interim" (para 98(iv)), secondly an extrapolation from the scrip dividend article (para 99 (ii)) and thirdly an extrapolation of the ability to pay dividends in any currency (para 99(ii))[1].

16. First, Mr Mabb suggests (at para 98(iv)) that the directors might not have intended to proceed under Article 132 because the word "interim" might be used "to refer to a short periodic, i.e. quarterly, dividend" or "simply to a dividend decided on by the directors".

17. With respect, I do not consider that to be a realistic interpretation:

   (a) First, the very word "interim" captures the fundamentally conditional nature of such a dividend.

   (b) Second, as is explained in my First Declaration, the classic statements in the leading cases (<u>Lagunas Nitrate Company Limited v Schroeder</u>

---

[1] His comments in Para 99(i) that the word interim had not been used in five previous quarters seems to me, if anything, to be a point against a theory that the directors might not have intended in April 2010 to exercise their Article 132 power to announce an interim dividend.

and Schmidt (1901) 85 LT 22 and IRC v Potel [1971] 2 All ER 504), make it crystal clear that as a matter of English law, an interim divided is one where "it is open to the board at any time before payment to review its decision and resolve not to pay the dividend".

(c)     Third, it is the word "quarter" in the announcement which, if anything, transmitted the meaning periodic. It is unnecessarily repetitious to accord that meaning to "interim" as well.

18.  It is universally understood by commercial lawyers and commercial parties in England that what is meant by "interim dividend" is as stated in paragraph 17(b) above. That meaning is a universally accepted principle of English company law, supported by more than a century of authorities, including all of the textbooks and the accounting and tax guidance, set out at paragraphs 21 and 22 of my First Declaration.

19.  Mr. Mabb's second and third points pre-suppose that he is right on his conclusion as to the legal effect of the exercise of an Article 131(B) power, which I do not consider he is.  Furthermore, even if he were right, it is necessary also to conclude that a court would construe the word "declare" in exactly the same way wherever it appeared in an Article. This is not necessarily so; as the cases of Lagunas Nitrate Syndicate referred to by both myself and Mr. Mabb and Dalmia v. Cssr of Income Tax [1964] All I.R. 1866 referred to in paragraph 26(b) below show, the word "declare" is often used to refer to an announcement of a non-binding interim dividend. The Articles relating to scrip dividends and currency of payment are self-evidently not concerned with entitlement but rather with administrative matters. They do not assist at all in ascertaining the legal consequence of the word "declare" and, if they cannot do that, they certainly cannot assist in ascertaining what BP's directors were doing in this case.

20.  Finally, on this question of interpretation, there is one matter on which I profoundly disagree with Mr. Mabb. At one point Mr Mabb (para 90) says that in his opinion statements made after the date of the resolution (26 April 2010) are irrelevant to its interpretation. I do not agree. The resolution is not a contract, and thus the exercise in this case is not one in contractual interpretation. The question is simply, what did the directors do? It seems to me that the subsequent documents (and the manner in which the decision was announced

to stockholders) are highly relevant, if there is any dispute on this issue –
although, as I say, I do not see any real doubt about the matter[2].

21.  For those reasons, in my opinion, an English court would not overturn the
settled understanding of the meaning of the term "interim dividend". Indeed Mr
Mabb offers no positive reason for doing so. Such a decision would undoubtedly
be a very significant and surprising development in English company law.

**F: The Meaning of Article 131(B)**

22.  Mr Mabb concludes (at para 68) that the use of the phrase "declare and pay" in
Article 131(B) is a "composite expression" indicating that a declaration of a
dividend under that Article would create a debt immediately, notwithstanding
that:

    (a)   The dividend is expressed to be interim.

    (b)   The dividend is "declared" by the directors and not by the shareholders.

23.  As I explained above, I disagree both with Mr Mabb's premise (in that there is no
basis to think the dividend was resolved upon with reference to Article 131(B))
and with his discounting of the word "interim". But in any event I disagree with
his conclusion on the meaning of Article 131(B).

24.  In this respect, Mr Mabb's analysis poses a novel point of English law. At its
core, he contends that the words "declare and pay" have a special meaning,
with the effect that any "declaration" creates an immediate binding obligation to
pay at a later date.

25.  I do not agree with that analysis. It is common ground that (as set out in para 14
of my First Declaration) in the standard form articles dealing with the declaration
of a final dividend by the shareholders in general meeting, a "declaration" has
that effect. However, it seems to me that there are two important distinguishing
features:

---

[2]  Indeed, the subsequent statements are all consistent with an interim dividend having been announced.

(a)     In that case, the declaration is by the shareholders in general meeting (which body is the ultimate authority of the company), not by directors acting alone.

(b)     The standard article uses only the term "declare", not "declare and pay". So the declaration is the only step to be taken under the article.

26.  It seems to me that the reason why a binding obligation is created under the standard articles for a final dividend is because the decision is by the shareholders in general meeting, not because of the use of a talismanic word, "declare". That view finds support in the case law:

(a)     In Bond v. Barrow Haematite Steel Company [1902] 1 Ch 353, at 362 where Farwell J specifically attributed this power to "the corporate body" (i.e. the members):

"The necessity for the declaration of a dividend as a condition precedent to an action to recover is stated in general terms in Lindley on Companies 5th edp.437, and, where the reserve fund article applies, it is obvious that such a declaration is essential, for the shareholder has no right to any payment until the corporate body has determined that the money can properly be paid away."[3]

(b)     In an Indian case, Dalmia v Commissioner of Income Tax [1964] All Indian Reports 1866 where Article 74 of the company's articles provided, unusually, for the directors to "declare an interim dividend". Dealing with the submission that the use of the word "declare" meant that a binding obligation arose, the Court said as follows: (emphasis added)

"This rule applies only in case of a dividend declared by the company in general meeting..."

"Therefore a declaration by a company in general meeting gives rise to an enforceable obligation, but a resolution of the Board of Directors

---

[3] The textbook to which Farwell J referred made it clear that to be recoverable a dividend must be both declared and payable – it is clear from the context that he regarded the process of becoming payable as separate, and not necessarily following from, declaration: (emphasis added)

"The plaintiff must prove that the dividend sought to be recovered has been declared, and has become payable, and that he has legal title to dividend payable in respect of the shares by virtue of which he claims it"

> *resolving to pay interim dividend or <u>even resolving to declare interim dividend</u> pursuant to the authority conferred upon them given by the articles of association <u>gives rise to no enforceable obligation against the company</u>, because the resolution is always capable of being rescinded. Therefore departure [from the standard articles] makes no real difference in the true character of the right arising in favour of the members of the company on execution of the power."*

27. While the question is unresolved as a matter of English law, I think it likely that an English court would follow this approach. It seems to me that the true difference is primarily in the nature of the body taking the decision, and the decision itself.   The shareholders in general meeting are the ultimate deliberative body of the company, consisting of those who own the company. That is reflected in their power, *inter alia*, to remove the directors at any time.[4] The proper distinction reflects their respective status:

    (a)   A shareholders' resolution to declare a dividend is a decision of the ultimate authority in the company. It is not appropriate that the directors should have a discretion to countermand their decision at a later date by deciding not to pay the dividend. Shareholders' decision to declare is final and binding.

    (b)   By contrast, if the shareholders have not decided the question, the directors in exercising a delegated power are entitled to reconsider their <u>own</u> resolution at any time, just as they could with any other decision.

28. The distinction between the bodies that declare the dividend is also reflected by the different words of Article 131(B), in particular the use of the words "declare and pay":

    (a)   Where under the standard articles shareholders "declare" a dividend, it is necessary, mechanically, for directors to arrange for its payment. But it is not thought necessary to make express provision for that. The legally relevant point is simply that the dividend is declared by the shareholders and the only word used is "declare".

    (b)   By contrast, Article 131(B) in relation to directors uses the words "declare and pay". That identifies two distinct steps on the part of the directors. It

---

[4] Enshrined in statute by s.168 CA 2006.

seems to me that, based on the general principle above that directors can revisit their own decisions and resolutions, the correct interpretation is that the use of those words envisages that the dividend can be cancelled between the decision to declare, and the decision to pay.

(c) The difficulty with Mr Mabb's approach is that it denudes the words "and pay" of any meaning, forcing the entire emphasis on the word "declare". It also assumes that in adopting the Article the company intended that, in my experience uniquely for English listed companies, over 100 years of settled practice should be overturned.

29. Thus, in my opinion, the only provision of BP's Articles that addresses a "final" dividend in the ordinary sense – that is to say one that, once declared, gives rise to a legal obligation to pay and cannot be revoked – is Article 131(A), which requires a shareholder decision in general meeting.

30. In support of his position Mr Mabb cites an Australian case, Industrial Equity. In that case, unusually, the directors were given the power to declare final dividends. Mr Mabb cites a comment of Mason J that such a declaration would give rise to debt. However I note that:

(a) Just like the Dalmia case pointing in the opposite direction, Industrial Equity would not be binding on an English court. The Court would have to choose which line of authority to follow, or consider whether one or other could be distinguished. However, I note that in Dalmia (unlike Industrial Equity) the relevant point does form part of the ratio of the decision.

(b) In Industrial Equity, the relevant article provided that "The directors may declare a dividend to be paid to the members" (my emphasis). That is a key distinction. Once declared, the dividend was "to be paid" – there was no provision that the directors "may ...pay" as there is in Article 131(B).

(c) Most importantly, in Industrial Equity, the shareholders in general meeting did not retain any power to declare a dividend. So the decision of the directors was the decision of the ultimate authority of the

9

company on that issue. By contrast, BP is like the company in <u>Dalmia</u> – the principal authority rests with the shareholders – see Article 131(A).

31. Those seem to me to be good grounds for distinguishing the <u>Industrial Equity</u> case and following the reasoning in <u>Dalmia</u>.

32. Mr Mabb also refers (at para 69(iv)) to the occasional use of Articles which provide for a dividend to become payable automatically. It seems to me that that is a further case where the shareholders' authority is wholly displaced. Given that it involves no declaration of any kind, I do not consider that it sheds further light on the issue.

33. Mr Mabb further cites (at para 69(v)) a comment of Brightman J in <u>IRC v Potel</u> to the effect that articles can authorise directors to "create the relationship of debtor and creditor". I agree that it is constitutionally possible (as in <u>Industrial Equity</u>) for the articles to make directors the authoritative body of the company in relation to the declaration of final dividends. But it does not follow that in all circumstances the declaration of a dividend by directors would create a debtor-creditor relationship and in my view, does not do so where (as here) the Articles expressly give that power to the shareholders in general meeting. Beyond that, the general comment of Brightman J (which is not part of the ratio of the case) is of little help when analysing a specific set of articles.

**G: Record Date**

34. At para 80 of his Declaration, Mr Mabb refers to a possible argument that the specification of a record date for payment of the interim dividend might render it irrevocable. He says that he was not asked to consider that question, but simply to reserve it.

35. I am not sure why that is, as the Plaintiff appears to rely heavily on this argument in their Memorandum in Opposition (at Section II (E)). Since it is alleged that the focus on the relevant power, Article 132, "ignores the effect of Article 143", I address the point here, briefly.

36. It seems to me that the analysis in this section of the Memorandum in Opposition is simply wrong as a matter of construction of BP's Articles. As Mr

Mabb correctly states, the Articles are to be interpreted as a business document.[5]  It is apparent from the Articles as a whole that the purpose of Article 143 is mechanical. It is simply to deal with two issues:

(a)  Identifying which of two or more successive holders of the same shares is entitled to a particular dividend.

(b)  Permitting BP to identify, for administrative convenience, to whom the dividend will be paid in advance of the planned payment date.

37.  In other words, Article 143 is dealing with <u>who</u> gets paid and <u>when</u> the dividend is paid – not <u>whether</u> it is payable as a matter of law.

38.  I do not think that an English Court construing the Articles would conclude that Article 143 alters by the back door the established position in relation to an interim dividend – namely that it is cancellable by the Board until paid.

**H: Class Actions in England and Wales**

39.  At pages 21-22 of the Memorandum in Opposition, Plaintiff appears to suggest that if this matter were litigated in the Courts of England and Wales, it would require:

*"thousands of BP ADS shareholders ... to pursue their claims separately in the English courts".*

40.  That statement does not accurately reflect English law and procedure. The claims at issue could be brought by way of class action in the English Courts.

41.  English Courts recognise a form of opt-out class action under the rubric of "Representation Orders" made under CPR 19.6. Under CPR 19.6 the Court may order that one named claimant or defendant prosecute or defend an action on behalf of a class of individuals.

---

[5] BWE International Ltd v Jones [2004] 1 BCLC 406.

11

42. This form of action is relatively limited. In this case, however, the relevant criteria would seem to be met on the facts as I understand them.

    (a)    The parties must have the "same interest". The interest must arise (i) as a common interest, for example an interest arising under a common document; (ii) a common grievance and (iii) a remedy beneficial to all, but not damages.

    (b)    In this case, certain common documents are at issue – for example, BP's articles of association and the resolution to declare an interim dividend.

    (c)    The parties cannot claim damages. But here, the claim is in debt. Likewise the prohibition on damages claims may be waived where the total quantum of damages due to all parties can be assessed[6] and where there is no basis for thinking that the issues are likely to be different in respect of different members of the class.[7] That is likely to be the case here – the Plaintiff claims that all the members of the class have lost the same thing.

43. If this matter were litigated in England, I think it very likely that the Court would consider a Representation Order to be the appropriate way of dealing with the claims of holders of both ordinary shares and ADSs.

44. Furthermore, if a single shareholder brought an action in the UK and obtained judgment, every other shareholder (and thus ADS holder) might be entitled to invoke that judgment on the basis of an issue estoppel.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on    15th    November 2011

Martin Luke Moore QC

---

[6] EMI Records Limited v Riley [1981] 1 WLR 923
[7] Independiente Ltd v Music Trading On-Line (HK) Ltd [2003] EWHC 470