# Exhibit 4

Ex. 1 to Supplemental Declaration of Martin Moore QC

# Index to Exhibit One of the Supplemental
# Declaration of Martin Moore QC

| **Document** | **Tab** |
|---|---|
| *Dalmia* v. *Commissioner of Income-Tax*, 1964 AIR 1866 (India S. Ct.) | 1 |
| NATHANIEL LINDLEY, A TREATISE ON THE LAW OF COMPANIES (5th ed. 1889) | 2 |
| U.K. Companies Act 2006 § 168 | 3 |
| *E.M.I Records Ltd.* v. *Riley*, [1981] 1 WLR 923 | 4 |
| *Independiente Ltd* v. *Music Trading ON-Line (HK) LTD*, [2003] EWHC 470 (Ch) | 5 |

---

## EXHIBIT 1

---

This is the Exhibit 1 referred to in my Declaration dated this  15th  day of
November 2011

Signed:  *Martin Moore*

MARTIN LUKE MOORE QC

# Tab 1

PETITIONER:
J. DALMIA

          Vs.

RESPONDENT:
COMMISSIONER OF INCOME-TAX, NEW DELHI

DATE OF JUDGMENT:
01/04/1964

BENCH:
SHAH, J.C.
BENCH:
SHAH, J.C.
SUBBARAO, K.
SIKRI, S.M.

CITATION:
 1964 AIR 1866              1964 SCR  (7) 579
 CITATOR INFO :
 F        1965 SC1263  (18,20)
 R        1965 SC1862  (14,27)
 R        1970 SC 281  (5)
 R        1971 SC 846  (10)



ACT:
Company  Law-Resolution  of  Board  of  Directors-interim
dividend-If creates a debt enforceable against the company-
Income  Tax-Payable on the dividend in the year in which  it
was actually paid, credited, or distributed or deemed to  be
paid-"Paid"-Meaning of-Indian Companies Act,  1913  (7  of
-1913),  s. 17(2), Art. 95 Sch.  I-Income-tax Act, 1922  (11
of 1922), s. 16 (2).


HEADNOTE:
The appellant held shares in a company the Board of
Directors  of  which by a resolution dated August  30,  1950
declared  interim  dividends.  The  appellant  received   a
dividend  -warrant  dated December 28, 1950 for a  certain
amount  being the interim dividend in respect of  its  share
holdings in the company.  The appellant's year of accounting
had  ended  on September 30, 1950.  The revenue  authorities
brought  to tax the amount so received with other income  of
the appellant in the assessment year 1952-53 after rejecting
the  objection of the appellant that it represented  income
for the assessment year 1951-52.  In a reference made  under
s. 66(1) of the Indian Income-tax Act, 1922, the High  Court
agreed  with the Revenue authority that the dividend was  in
view  of  Art. 95 of the First Schedule to Indian  Companies
Act,  1913,  liable to be included in the  assessment  year
1952-53.
Held:  A declaration of dividend by a company in  a  general
meeting gives rise to a debt.
In re Severn and Wile and Severn Bridge Railway Co. (1896) 1
Ch. 559, referred to.
But  a mere resolution of the Directors resolving to  pay  a
certain  amount as interim dividend does not create  a  debt
enforceable against the company for it is always open to the
Directors  to rescind the resolution before payment of  the
dividend.
The Lagunas Nitrate Company (Ltd.) v. J. Henry Schroeder and

Company, 17 Times Law Reports 625, referred to.
Commissioner of Income-tax, Bombay v. Laxmidas Mutraj
Khatau, 16 I.T.R. 248, distinguished.
(ii) The test applied by Chagla C. J. (in C.I.T., Bombay v.
Laxmidas Mulraj Khatau, 16 I.T.R. 248) that because the
,dividend becomes due to the assessee who has the right to
deal with or dispose of the same in any manner he likes, it
is taxable in the year in which it is declared ˙cannot be
regarded as correct.
(iii) Dividend may be said to be paid within the meaning of
s. 16(2) of the Indian Income-tax Act, 1922 when the company
discharges its liability and makes the amount thereof
unconditionally available to the member entitled thereto.
Purshottamdas Thakurdas v. C.I.T., Bombay, 34 I.T.R, 204,
referred to.
I P(1)) 1 S.C.I- 17 (a)
580
(iv) The declaration of interim dividend capable of being
rescinded by the directors does not operate as a payment
under s. 16(2) of the Income-tax Act before the company has
parted with the amount of dividend or discharged its
obligation by some other act.


JUDGMENT:
CIVIL APPELLATE JURISDICTION: Civil Appeal No. 505 of 1963.
Appeal from the judgment and order dated March 6, 1961 of
the Punjab High Court (Circuit Bench) at Delhi in I.T.R. No.
16 of 1959.
S. K. Kapur and B. P. Maheshwari, for the appellant.
C. K. Daphtary, Attorney-General, K. N. Rajagopal Sastri
and R. N. Sachthey, for the respondent.
April 1, 1964. The judgment of the Court was delivered by.
SHAH, J.-The appellant which is a Hindu undivided family was
the registered holder of 1,500 shares of M/s Govan Bros.
(Rampur) Ltd. in the year of account October 1, 1950 to
September 30, 1951. Pursuant to a resolution passed by the
board of directors of M/s Govan Bros. (Rampur) Ltd.-
hereinafter called 'Govan Bros.'-at a meeting held on August
30, 1950, the appellant received a dividend warrant dated
December 28, 1950 for Rs. 4,12,500/being interim dividend in
respect of its shareholding in Govan Bros. This amount was
brought to tax with the other income of the appellant in the
assessment year 1952-53 by the Revenue authorities. after
rejecting the objection of the appellant that it represented
income for the assessment year 1951-52.
At the instance of the appellant the Appellate Tribunal drew
up a statement of the case and referred the question set out
hereinbelow to the High Court of Punjab under s. 66(1) of
the Indian Income-tax Act:
            "Whether on a true interpretation of Article
            95 of the First Schedule to the Indian
            Companies Act, 1913, the dividend of Rs.
            4,12,500/- was liable to be included in the
            assessment year 1952-53."
The High Court recorded an answer to the question in the
affirmative. Against the order of the High Court, this
appeal is preferred by the appellant with certificate
granted by the High Court.
Even though the question was framed a;-, if article 95 of
the First Schedule to the Indian Companies Act, 1913, ap-
plies to Govan Bros, it is common ground that the company
581
was registered under the Companies Act of the former Rampur

State, and it had adopted special Articles of Association in
supersession of Table A of the Companies Act.  The  relevant
articles of Govan Bros. dealing with declaration or  payment
of final and interim dividends were articles 73 and 74.   The
High Court therefore proceeded to deal with the question  on
the  footing that it was, by the question  referred,  called
upon to interpret article 74 of the Articles of  Association
of  Govan Bros.  It is common ground between  the  appellant
and the Revenue that the provisions of the Companies Act  of
the  former  Rampur State were in terms identical  with  the
provisions of the Indian Companies Act, 1913.
The appellant contend that the directors of Govan Bros.  had
in  exercise of authority expressly conferred upon  them  by
article  74 declared dividend in their meeting dated  August
30, 1950 and on such declaration the dividend became a  debt
due to the appellant and under the Indian Income-tax Act  it
became  taxable in the year of assessment 1951-52,  for  the
previous  year of the appellant had ended on September  30,
1951.   The  Commissioner of  Income-tax says  that  the
directors  of  Govan Bros. had paid by warrant  issued  on
December 28, 1950 pursuant to a resolution dated August  30,
1950,  interim  dividend  and it was only on payment the
dividend became taxable under s. 16(2) of the Indian Income-
tax Act.  It is said by the Commissioner that dividend final
or  interim  is  taxable not in the year  in  which  it  is
declared but only in the year in which it is paid, credited
or  distributed,  or  deemed  to  be  paid,  credited  or
distributed, and that in any event a resolution by the Board
of  Directors  to pay interim dividend does  not  create  an
enforceable  obligation,  for  it  is  always  open  to  the
directors to rescind the resolution for payment of  dividend
even if it is one in form declaring dividend.
The  Indian  Companies Act, 1913 contains no  provision  for
declaration of dividend either interim or final: it does not
say  as to who shall declare the dividend, nor does  it  say
that  dividend may be declared in a general meeting  of  the
company.   But s. 17(2) provides that the company may  adopt
all  or any of the regulations contained in Table A  in  the
First  Schedule  to the Companies Act as its  articles  of
association,  and  shall in any event be deemed to  contain
regulations  identical with or to the same  effect,  amongst
others, as regulation 95 and regulation 97 contained in that
Table.   Regulation 95 of Table A provides that the  company
in  general meeting may declare dividends, but no  dividends
shall  exeed  the amount recommended by the  directors,  and
regulation  97  states that no  dividends shall  be  paid
otherwise  than  out  of profits of the year or any  other
undistributed  profits.   Regulation  96, which is  not  an
obligatory article, provides that the
582
directors  may  from time to time pay to the  members  such
interim dividends as appear to the directors to be justified
by  the  profits of the company.  Govan Bros. had in  their
Articles  of Association made the following provision  with
regard to dividends:

> "Art. 73.  The Company in general meeting  may
> declare  a dividend to be paid to the  members
> according to their rights and interests in the
> profits.
> Art. 74.  When in their opinion the profits of
> the company permit, the directors may  declare
> an interim dividend.
> Art. 77.  No dividend shall be payable, except
> out  of  the net  profits  arising  from  the
> business  of  the  company,  and  no    larger

                     dividends    shall    be    declared    than    is
                     recommended by the directors."
By Art. 80 it was provided that unless otherwise directed by
the company in general meeting any dividends may be paid  by
cheque  or warrant sent through the post to  the  registered
address  of  the member entitled to the same.   In Art.  74
relating to payment of interim dividend. there was a  slight
departure  from  the regulation under Table A of  the  First
Schedule to the Companies Act.  Whereas under regulation  96
Table  A the directors are authorised to pay to the  members
interim dividends, by Art. 74 of the Articles of Association
of  Govan Bros. the directors are  authorised  to  declare
interim dividend.  It may be noticed that under s. 17, adop-
tion  of an article in form identical with, or to  the  same
effect as regulation 96 of Table A, is not made obligatory.
The  material part of s. 16(2) of the Income-tax Act  as  it
stood before it was deleted by s. 7 of the Finance Act, 1959
with effect from April 1, 1960, read as follows:
                     "For  the purposes of inclusion in the  total
                     income  of an assessee any dividend  shall  be
                     deemed  to be income of the previous year  in
                     which  it is paid, credited or distributed  or
                     deemed  to  have  been  paid,  credited  or
                     distributed to him
The clause in terms made dividend the income of the year  in
which it was paid, credited or distributed or was deemed  to
have  been  paid, credited or distributed.  In the  present
case  dividend  was paid to the appellant  on  December  28,
1950.   It is not the case of the appellant that the  amount
was  either credited in the books of account of Govan  Bros.
to  the appellant or was distributed or deemed to have  been
paid,  credited or distributed to the appellant  before  the
close  of the appellant's year of account ending  September
30,  1950.   But  Mr.  Kapur contends that under  the  law
governing companies
583
on declaration, dividend interim or final becomes due,  and
it must be regarded for the purpose of the Income-tax Act as
paid to the member on the date on which it is declared.
There  is  no  doubt that a declaration  of  dividend  by  a
company in general meeting gives rise to a debt.  "When  a
company  declares  a dividend on its shares, a  debt  imme-
diately  becomes payable to each shareholder in  respect  of
his dividend for which he can sue at law, and the Statute of
limitation immediately begins to run": In re Severn and  Wye
and Severn Bridge Railway Company(1).  But this rule applies
only in case of dividend declared by the company in  general
meeting.   A final dividend in general may be sanctioned  at
an  annual  meeting when the accounts are presented to  the
members.   But  power  to pay interim dividend is  usually
vested,  by the articles of association, in the  directors.
For  paying interim dividend a resolution of the company  is
not  required:  if  the  directors  are  authorised by  the
articles  of  association they may pay such amount as  they
think proper, having regard to their estimate of the profits
made  by the company. Interim dividend is therefore  paid
pursuant  to  the resolution of the directors  on  some  day
between  the ordinary general meetings of the  company.   On
payment,  undoubtedly interim dividend becomes the  property
of the shareholder.  But a mere resolution of the  directors
resolving  to pay a certain amount as interim dividend  does
not create a debt enforceable against the company, for it is
always  open  to  the directors to  rescind  the  resolution
before  payment  of the dividend.  In The  Lagunas  Nitrate
Company (Limited) v. J. Henry Schroeder and Company (2)  the

directors of a company passed a resolution declaring interim
dividend payable on a future date, and requested the
company's bankers to set apart, out of the money of the
company in their hand, into a special account entitled
"interim Dividend Account", a sum sufficient to cover the
dividend, pending the company's instructions. But before
the date fixed for payment, the directors resolved that
pending certain litigation to which the company was a party,
payment of dividend be postponed. it was held by the Court
that the directors had the right even after resolving to pay
interim dividend to rescind the resolution and no
enforceable right arose in favour of the members of the
company by the declaration of interim dividend.
In Halsbury's Laws of England, III Edn., Vol. 6 p. 402,
Art. 778, it has been stated:
"A directors' declaration of an interim dividend may
be rescinded before payment has been made."
(1) (1896) 1 Ch. 559.
(1)17 Times Law Reports 625.
584
Therefore a declaration by a company in general meeting
gives rise to an enforceable obligation, but a resolution of
the Board of Directors resolving to pay interim dividend or
even resolving to declare interim dividend pursuant to the
authority conferred upon them by the articles of association
gives rise to no enforceable obligation against the company,
because the resolution is always capable of being rescinded.
Therefore departure in the text of Art. 74 of the Articles
of Association of Govan Bros. from the statutory version
under Table A of the power in respect of interim dividend
which may be entrusted to the directors, makes no real
difference in the true character of the right arising in
favour of the members of the company on execution of the
power. The directors by the Articles of Association are
entrusted with the administration of the affairs of a
company; it is open to them if so authorised to declare
interim dividend. They may, but are not bound to, pay
interim dividend, even if the finances of the company
justify such payment, even if the directors have resolved to
pay interim dividend, they may before payment rescind the
resolution.
Counsel for the appellant does not rely upon any evidence of
actual payment or upon any credit given to the appellant in
the books of account of the company nor upon any
distribution. Even the resolution of the directors of
August 30, 1950 is not on the record, and there is no
evidence that it was resolved to pay the dividend on any
date before it was actually paid, and the company had taken
any step to implement the resolution within the year of
account corresponding to the assessment year 1951-52. There
is no statutory provision which gives rise to a fiction that
on declaration of interim dividend, it should be deemed to
be paid, credited or distributed.
In support of the plea that interim dividend was taxable in
the year of assessment 1951-52, the appellant relies upon
two facts only-the power vested in the directors to declare
interim dividend, and the passing of a resolution by the
directors relating to interim dividend on August 30, 1950
followed by the drawing of dividend warrants dated December
28, 1950. But for reasons already stated a resolution of
the board of directors declaring interim dividend, until it
is implemented by some step taken by the company, creates no
enforceable right in the shareholders. The judgment of the
Bombay High Court in Commissioner of Income-tax, Bombay v.
Laxmidas Mulraj Khatau(1) on which counsel for the appellant

relies, does not assist him either.  In that case the
company declared a dividend out of its profits, and made  it
payable a few days later.  The dividend was paid on the
(1)  16 I.T.R. 248.

585

date on which it was made payable by the resolution of  the
company.  The Income-tax Officer treated the amount received
by the member as dividend income for the assessment year in
which it was actually received.  The High Court of Bombay in
a reference under s. 66 observed that a;-, soon as the divi-
dend was declared it became the income of the assessee which
income the assessee could deal with or dispose of in any
manner he liked.  Chagla C. J., speaking for the Court enun-
ciated the law as follows:

> "It is impossible to give a literal
> construction to the expression "paid" used in
> this sub-section (sub-s. (2) of s. 16).  If a
> literal construction were to be given, then it
> would amount to this that "until the dividend
> warrant was actually cashed and the dividend
> amount was actually realised it cannot be
> stated that the dividend was paid to the
> share-
> holder.    *    *    *         *    *
> I think the proper construction to give to
> that word is when the dividend is declared
> then a liability arises on the part of the
> company to make that payment to the
> shareholder and with regard to the shareholder
> when the income represented by that dividend
> accrues or arises to him.
> The mere fact that the actual payment of the
> income is deferred is immaterial and
> irrelevant."

But whether dividend-interim or fixed is income taxable in a
particular year of assessment must be determined in the
light of s. 16(2) of the Indian Income-tax Act.  The
Legislature had not made dividend income taxable in the year
in which it becomes due: by express words of the statute, it
is taxable only in the year in which it is paid, credited or
distributed or is deemed to be paid, credited or
distributed.  The Legislature has made distinct provisions
relating to the year in which different heads of income
become taxable.  Salary becomes taxable by s. 7 when it is
allowed to the employee or becomes due to him, whether it is
actually paid to him or not.  Interest on securities under
s. 8 is taxable when it is received by the assessee.  Under
s. 9 tax on property becomes payable not on any actual
receipt of income from the property but on a purely national
computation in the year of account of a bona fide annual
value of the property, subject to the adjustments provided
in that section.  Profits and gains of business, profession
or vocation carried on by an assessee are computed in
accordance with the method of accounting regularly employed
by the assessee, unless the Income-tax Officer being of the
opinion that profits or gains cannot properly be deduced
therefrom, directs otherwise.  Other sources of income-and
dividends are included in this residuary class-become
taxable in the year in which they

586

are received or accrue or arise or are deemed to be
received, accrued or arise, according to the nature of the
particular income.  The year in which a particular class of
income be comes taxable must therefore be determined, in
the light of its true character, and subject to the special

provision, if any, applicable thereto.  The Legislature has
enacted an express provision making dividend income  taxable
in the year in which it is paid, credited or distributed  or
is to be deemed, so paid, credited or distributed.  The test
applied  by Chagla C. J., that because the dividend  becomes
due  to  the assessee who has the right  to  deal  with  or
dispose of the same in any manner he likes, it is taxable in
the  year  in which it is declared, cannot  be  regarded  as
correct.  The expression "paid" in s. 16(2) it is true does
not  contemplate  actual  receipt  of  the  dividend  by  the
member.  In general, dividend may be said to be paid  within
the  meaning  of s. 16(2), when the  company  discharges  its
liability  and makes the amount of dividend  unconditionally
available to the member entitled thereto.  Chagla C. J., has
himself in Purshotamdas Thakurdas v. Commissioner of Income-
tax,  Bombay  City' (2)  expressed  a  different  view.   The
learned  Chief  Justice in delivering  the  judgment  of  the
court  referred  to Laxmidas Mulraj Khatau's  case  (3)  and
observed  that  the principle of that case applied  only  to
those  cases  where in facts the dividend was  paid  to  the
shareholder  and not to cases where a  contingent  liability
was undertaken and no payment was made.  He observed:
                    "* * * one thing is clear from  the  language
          used  by the Legislature that  it did not intend
          to  equate  "paid" with  "declared"  in  every
          case.  /  Therefore,  it  is  open  to  us  to
          consider,  notwithstanding the Khatau  Mills'
          case,  whether on the facts of this  case,  it
          could  be  said that dividend has  been  paid,
          which  although it may have been declared  may
          never  be  payable and in fact  has  not  been
          paid."
If  the mere declaration of dividend in general  meeting  of
the  company  is not to be regarded as  payment  within  the
meaning  of  s.  16(2),  much less can it be said  that  a
resolution  declaring interim dividend-which is  capable  of
being rescinded by directors-operates as payment before  the
company  has actually parted with the amount of dividend  or
discharged obligation by some other act.  The High Court was
therefore  right in recording an affirmative answer  to  the
question propounded for the consideration of the Court.
The appeal fails and is dismissed with costs.
Appeal dismissed.
(1)  34 I.T.R. 204.
587



# Tab 2

# A TREATISE

ON THE

# LAW OF COMPANIES,

CONSIDERED AS A BRANCH OF

## THE LAW OF PARTNERSHIP.



### FIFTH EDITION.

BY

THE RIGHT HONOURABLE

## SIR NATHANIEL LINDLEY, Knt., LL.D. Ed.,

ONE OF THE LORDS JUSTICES OF HER MAJESTY'S COURT OF APPEAL.

ASSISTED BY

### WALTER B. LINDLEY, M.A.,

OF LINCOLN'S INN, ESQ., BARRISTER-AT-LAW.

AND

### WILLIAM C. GULL, M.A.,

OF LINCOLN'S INN, ESQ., BARRISTER-AT-LAW,
VINERIAN SCHOLAR IN THE UNIVERSITY OF OXFORD, 1888.

LONDON :

## SWEET AND MAXWELL, Limited,

3, CHANCERY LANE, AND 8, BELL YARD,
Law Booksellers and Publishers.
MEREDITH, RAY, & LITTLER, MANCHESTER ;
HODGES, FIGGIS, & CO., AND E. PONSONBY, DUBLIN ;
THACKER, SPINK, & CO., CALCUTTA ;
C. F. MAXWELL, MELBOURNE & SYDNEY.
1889.

ACTIONS FOR DIVIDENDS.

Dividends which are actually declared and payable by an incorporated company, are recoverable by action brought by the person having the legal title to receive them, against the company.  The plaintiff must prove that the dividend sought to be recovered has been declared, and has become payable, and that he has the legal title to the dividend payable in respect of the shares by virtue of which he claims it.  The circumstance that he is not a registered shareholder will not prejudice him if he has been wrongfully removed by the company from the register (e).  A married woman may sue for dividends on shares standing in her own name (f).

The non-payment of calls is, in most companies, an answer to an action for dividends; and even where it is not so, calls and dividends may be set off against each other (ff).

Except where an action would lie by one partner against another for money in the hands of the latter payable to the former, an action for a dividend due to a member of an unincorporated company would not lie before the passing of the Judicature acts (g). <span>Dividends of unincorporated companies.</span>

Having made these general observations on the payment of dividends, it is proposed to notice shortly the legislative enactments bearing upon the same subject. <span>Dividends of particular companies.</span>

No shareholder in a company governed by the Letters Patent act, is entitled to any share of the profits of the company unless he is registered as a shareholder (h). <span>7 Wm. 4 & 1 Vict. c. 73.</span>

The Companies' clauses consolidation act declares, that a company governed by it shall not be bound to see to the execution of any trust, and that the receipt of the person, or of any one of the persons in whose name a share may be registered, shall be a discharge to the company for all monies paid in respect of such share, notwithstanding any trusts to <span>8 & 9 Vict. c. 16.</span>

where a married woman sued alone for dividends and recovered, the non-joinder of her husband not having been pleaded in abatement.

(e) *Dalton* v. *Midland Rail. Co.*, 12 C. B. 458, and 13 ib. 474.

(f) 45 & 46 Vict. c. 75, §§ 1, 6-9,

and *ante*, p. 41 *et seq.*

(ff) *Ante*, p. 434, note (o), *infra*, p. 438.

(g) See *Lyon* v. *Haynes*, 5 Man. & Gr. 504.  See Partn. 560 *et seq.*

(h) 7 Wm. 4 & 1 Vict. c. 73, § 20.

# Tab 3

*Companies Act 2006 (c. 46)*   77
*Part 10 — A company's directors*
*Chapter 1 — Appointment and removal of directors*

      (b)   be accompanied by a consent, by that person, to act in that capacity.

(3)  Where—

      (a)   a company gives notice of a change of a director's service address as stated in the company's register of directors, and

      (b)   the notice is not accompanied by notice of any resulting change in the particulars contained in the company's register of directors' residential addresses,

the notice must be accompanied by a statement that no such change is required.

(4)  If default is made in complying with this section, an offence is committed by—

      (a)   the company, and

      (b)   every officer of the company who is in default.

For this purpose a shadow director is treated as an officer of the company.

(5)  A person guilty of an offence under this section is liable on summary conviction to a fine not exceeding level 5 on the standard scale and, for continued contravention, a daily default fine not exceeding one-tenth of level 5 on the standard scale.

*Removal*

## 168   Resolution to remove director

(1)  A company may by ordinary resolution at a meeting remove a director before the expiration of his period of office, notwithstanding anything in any agreement between it and him.

(2)  Special notice is required of a resolution to remove a director under this section or to appoint somebody instead of a director so removed at the meeting at which he is removed.

(3)  A vacancy created by the removal of a director under this section, if not filled at the meeting at which he is removed, may be filled as a casual vacancy.

(4)  A person appointed director in place of a person removed under this section is treated, for the purpose of determining the time at which he or any other director is to retire, as if he had become director on the day on which the person in whose place he is appointed was last appointed a director.

(5)  This section is not to be taken—

      (a)   as depriving a person removed under it of compensation or damages payable to him in respect of the termination of his appointment as director or of any appointment terminating with that as director, or

      (b)   as derogating from any power to remove a director that may exist apart from this section.

## 169   Director's right to protest against removal

(1)  On receipt of notice of an intended resolution to remove a director under section 168, the company must forthwith send a copy of the notice to the director concerned.

(2)  The director (whether or not a member of the company) is entitled to be heard on the resolution at the meeting.

# Tab 4

The Weekly Law Reports, June 26, 1981

923

1 W.L.R.

A

[CHANCERY DIVISION]

\* E.M.I. RECORDS LTD. *v.* RILEY AND OTHERS

[1978 E. No. 1778]

B  1981  March 13                                                    Dillon J.

*Practice—Parties—Representative action—Infringement of copy-*
*right—Member suing in personal capacity and on behalf of*
*class—Admissions by defendant—Whether member entitled to*
*injunction and to inquiry as to damages in representative*
*capacity*

C
    The plaintiffs were members of B.P.I. whose members
were all involved in the business of producing, manufacturing
and distributing sound recordings. The defendant was a
market trader. In 1978, the plaintiffs commenced an action
against the defendant who they believed to be involved in
the manufacture and sale of " pirate records " made directly
or indirectly from sound recordings in which B.P.I. members
owned the copyright. Their claim, made on behalf of them-
D  selves and on behalf of all B.P.I. members· was for an injunc-
tion to prevent further infringements of their copyright and
an inquiry as to damages. The defendant admitted the sale
of pirate records.
    On the plaintiffs' application for judgment on admissions,
for an order restraining the defendants from infringing their
copyright and an inquiry as to the damage suffered as a result
of previous infringements: —
E      *Held,* (1) that, since the defendant had admitted the sale
of pirate records, the plaintiffs were entitled on their own
behalf and on behalf of all B.P.I. members, to an injunction
restraining the defendant from ordering, selling or parting
with any pirate records (post, p. 925E–H).
    (2) That, since nearly all recordings in this country were
produced by members of B.P.I. and the defendant had
F  admitted that most of her pirate records had been recordings
of discs, records and tapes produced, made and distributed
by members of B.P.I., the plaintiffs, suing in a representative
capacity in which they could claim an injunction, could also
recover damages suffered as a result of any infringement of
the members' copyright and, therefore, avoid the unnecessary
complications of establishing what damage had been suffered
individually by members if the court required each member to
G  commence proceedings on his own behalf (post, p. 926E, G–H).
    *Prudential Assurance Co. Ltd.* v. *Newman Industries*
*Ltd.* [1980] 2 W.L.R. 339 distinguished.

The following cases are referred to in the judgment:

*Prudential Assurance Co. Ltd.* v. *Newman Industries Ltd.* [1980] 2
    W.L.R. 339; [1979] 3 All E.R. 507.

H
No additional cases were cited in argument.

MOTION

On October 19, 1979, the plaintiffs, E.M.I. Records Ltd. (" E.M.I."),
members of the British Phonographic Industry Ltd. (" B.P.I."), acting
on their own behalf and representing all other members of B.P.I., issued
a writ claiming infringement of their copyright, inter alios, by the

924

**E.M.I. Records Ltd. v. Riley (Ch.D.)**                    [1981]

defendant, Grace Riley, a market trader, who had been selling pirate  A
records copied from recordings in which the B.P.I. members owned
copyright.  On November 19, 1979, in her defence, the defendant
admitted the infringements.  Having regard to those admissions, E.M.I.
issued a motion for judgment in their action on March 13, 1981, claiming
an order, inter alia, that the defendant be restrained from making or
selling any record made directly or indirectly from a sound recording
the copyright in which was owned by any member of B.P.I. and an  B
inquiry as to the damages sustained by members of B.P.I. by reason
of the defendants' infringements of their copyright.

   *P. R. K. Prescott* for the plaintiffs.
The defendant appeared in person.
                                                                        C

   DILLON J.   This is a motion for judgment on admissions.  The action
is brought by E.M.I. Records Ltd., suing on behalf of themselves and
on behalf of and as representing all other members of the British Phono-
graphic Industry Ltd., against a Mrs. Riley, as first defendant.  There
were a number of other defendants originally named in the proceedings,
and the proceedings remain on foot against one of them, Mr. Patrick  D
Buckley, but no claim against him is before me today.
   The action was started in 1978, and the statement of claim was
served on June 8, 1979.  The admissions by the defendant, Mrs. Riley,
which are relied on are contained in two documents.  One is called
" Reply to plaintiff's statement of claim " and it is signed by the
defendant and dated November 19, 1979.  This was, I think, intended
to represent the defendant's defence to the action, but it was not  E
accepted as satisfactory in form, and accordingly a little later she served
a document which is substantially to the same effect, headed "Defence
of Grace Riley first defendant," which is signed and dated November
22, 1979.
   The action concerns the sale of pirate cassettes.  The statement of
claim sets out in paragraph 1 certain definitions.  The definition of  F
" pirate record " is a " record made directly or indirectly from a sound
recording without the licence of the United Kingdom copyright owner
or exclusive licensee, being a member of the class," and the " class " is
all members of the British Phonographic Industry Ltd. (" B.P.I.") a
company limited by guarantee.  The statement of claim then sets out in
paragraphs 2 and 3 that the plaintiffs are a legitimate record company
and members of the B.P.I. and they sue on behalf of and representing  G
and for the benefit of the class, and that nearly all records in this
country are produced, made or distributed by members of the class,
and in her defence the defendant agrees both those paragraphs.  Para-
graph 4 of the statement of claim sets out that the members of the class
are continually and frequently producing, making or distributing records
embodying new sound recordings.  The member of the class respon-  H
sible for each sound recording owns the copyright therein or is the
exclusive licensee thereunder.  The defendant in her defence expressly
does not deny the existence of copyright.
   Paragraph 8 of the statement of claim (I shall have to come back
to paragraph 7 of the statement of claim) asserts that the defendants
and each of them had been concerned in a business in this country of
making pirate records and/or authorising them to be made and/or selling

925

1 W.L.R.          E.M.I. Records Ltd. v. Riley (Ch.D.)          Dillon J.

A   and/or distributing for trade purposes records which to their knowledge were pirate and the said business, the paragraph asserts, occurred on a massive scale and over a considerable period, and particulars are served separately with the statement of claim.

  As to that the defendant Mrs. Riley denies ever making a pirate record in her life, but she says that she did order them to be made and she did authorise her daughter to sell them for her. She denies that the

B   business occurred on a massive scale over a considerable period, but she does say that the business was conducted for some 25 weeks on 25 Saturdays in Portobello Market, 12 days in Carnaby Street, and 32 days in Oxford Street, and she says that the total number of the tapes sold was approximately 2,980, and that the probable quantity affecting members of the class was 2,900 tapes on the assumption that

C   her sales affected members of the class. She claims that her sales were too small to affect the large record companies, but I take this to mean that she is accepting that 2,900 out of the 2,980 tapes she admits selling were pirated versions of recordings made by members of the class.

  Paragraph 7 of the statement of claim asserts that the members of the class have consented to all pecuniary remedies granted in respect

D   of actions for inter alia infringement of copyright in sound recordings and selling counterfeit records and all sums paid in settlement of such actions being actions conducted by the solicitors to the B.P.I. being paid to the B.P.I. in order to defray the expenses of detecting and suppressing the pirate and counterfeit record and like trades, and it asserts further that the action is being conducted by the solicitors to the B.P.I. The

E   defendant in her defence says that she has no comment on that, by which I take her to mean that she does not dispute it. She has also said that she does not want this action complicated and extended by massive inquiries.

  It seems to me that on the admissions in the defendant's defence and in the reply to the statement of claim, which is to the same effect and on the further admissions in a sworn statement by the

F   defendant which is dated November 17, 1978, which she has put before me, the plaintiffs are entitled to an injunction against the defendant. They are entitled to relief in respect of goods seized under an *Anton Piller* order, and they are entitled to the costs of the action, but the entitlement is not entirely in the form of the draft minutes of order, because the draft minutes of order set forth a form of injunction which

G   would restrain the defendant, for instance, from making or assisting in the making of pirate records, and she has expressly denied that she has ever made such a record or assisted in the making of such a record. I think that the plaintiffs are entitled to an injunction restraining her from ordering or selling or exposing offers for sale or inviting offers to acquire or parting with any pirate record, that is to say, any record made directly

H   or indirectly from a sound recording without the licence of the United Kingdom copyright owner or exclusive licensee being a number of the class.

  I think the plaintiffs are also entitled to an order that their solicitors may deliver to the plaintiffs or to their order all pirate records, including the packaging thereof, which are currently in the custody of the solicitors as a result of the *Anton Piller* order which was executed at the inception of the proceedings, but there should be an order that the

926

Dillon J.          E.M.I. Records Ltd. v. Riley (Ch.D.)          [1981]

solicitors release to the defendant all genuine cassettes which are in **A**
their possession as a result of the *Anton Piller* order.

The minutes of order then ask for an inquiry as to what damages
the members of the class have sustained by reason of the defendant's
infringements of copyright and conversion of infringing copies, the
costs of the inquiry to be reserved and that the plaintiffs do recover
judgment for such sums as are found due together with interest thereon
without prejudice to the plaintiffs' obligations to hold or apply the said **B**
sums in such manner if any as may be required of them at law or in
equity.

Mr. Prescott for the plaintiffs has taken me to the judgment of
Vinelott J. in *Prudential Assurance Co. Ltd.* v. *Newman Industries
Ltd.* [1980] 2 W.L.R. 339, where the judge expressed the view that it
was not appropriate to award damages to a plaintiff in a representative **C**
capacity. A plaintiff in a representative capacity might be entitled to
relief by way of declaration or injunction, but not to relief by way of
damages. Mr. Prescott has submitted that that case is distinguishable
on its facts from the present case, and he has referred me to orders made
by Foster J. and Whitford J. who on motions for judgment in default
of defence directed inquiries as to damages suffered by the plaintiffs **D**
or any other member of the B.P.I.

I think that the fundamental factor is the special position in this
particular trade of the B.P.I. This is not a case of a small number of
manufacturers getting together as a self-constituted association where
there would be a serious likelihood that other pirate cassettes which the
defendant may have sold would have nothing to do with the members **E**
of the association, because she herself has admitted that nearly all records
in this country, and " record " includes discs or tapes or similar con-
trivances for reproducing sound, are produced, made or distributed by
the members of the B.P.I. The matter of substance that underlies this is
that if the plaintiffs can only recover damages in respect of tapes in
which they individually own the copyright they will have considerable
difficulty in establishing which pirate E.M.I. tapes were sold by the **F**
defendant among the 2,980 tapes which she admits having sold or among
whatever higher number it is found she had sold, but given the admission
that nearly all records including tapes are produced, made or distributed
by members of the B.P.I., on an inquiry as to damages suffered by all
members of the B.P.I. the task will be much simpler since it will be
clear and seems to be admitted that nearly all the tapes which the
defendant had sold were tapes the copyright in which belongs to members **G**
of the B.P.I.

In the circumstances of the B.P.I. and the pleaded allegations,
including paragraph 7 of the statement of claim, and I have already
referred to the defence to these, it seems to me that it is appropriate
that damages should be recoverable by the plaintiffs in the representa-
tive capacity in which they are entitled to sue for an injunction, and **H**
it would be a wholly unnecessary complication of our procedure if the
court were to insist that for the purposes of the inquiry as to damages
all members of the B.P.I. must be joined as co-plaintiffs, or alternatively,
all members except for E.M.I. Records Ltd. must issue separate writs
and apply for them to be consolidated with the claim for damages of
E.M.I. Records Ltd.

Therefore, in my judgment, it is appropriate that the inquiry as

The Weekly Law Reports, June 26, 1981

927

1 W.L.R.                    E.M.I. Records Ltd. v. Riley (Ch.D.)                    Dillon J.

A    to damages should be in the form set out in the draft minutes of order,
but it must be clear that there is to be no duplication of damage in so
far as there are claims outstanding as against other defendants.   That
is a matter which Mr. Prescott mentioned at an early stage in his sub-
missions, but did not in fact elaborate as the argument proceeded.

Finally, the plaintiffs must be entitled as against the defendant to
their costs of the action to date, including the costs of obtaining and
B    executing the *Anton Piller* order, such costs to be taxed if not agreed;
but the costs of the inquiry and all future further costs after today's
date are reserved.

*Injunction granted.*
*Order for inquiry as to damages.*
*Plaintiffs' costs to date to be taxed*
C                                    *if not agreed.*
*All further costs reserved.*

Solicitors:  *A. E. Hamlin & Co.*

[Reported by Miss Eileen O'Grady, Barrister-at-Law]

D

---

[COURT OF APPEAL]

E            * FAITH PANTON PROPERTY PLAN LTD. *v.*
HODGETTS AND ANOTHER

[1979 F. No. 519]

1980  Dec. 15, 16, 17, 18;                    Waller and Brandon L.JJ.
1981  Jan. 21                                  and Sir David Cairns
F
*Injunction—Interlocutory—Jurisdiction to grant—Interlocutory*
*order for payment of taxed costs — Order unenforceable*
*pending taxation—Intention to defeat enforcement of order*
*by disposal of assets—Injunction restraining disposal of assets*
*before trial—Supreme Court of Judicature (Consolidation)*
*Act 1925 (15 & 16 Geo. 5, c. 49), s. 45 (1)*

G            The plaintiffs, in a claim restraining the defendants from
doing certain acts calculated to harm their business, inclu-
ding passing off their goods or business as the goods or
business of the plaintiffs, moved for interlocutory relief and,
in those proceedings, the defendants gave undertakings to the
court until trial.  On motions to commit the first defendant
for breaches of the undertakings, Foster J. ordered him to
pay the costs of the motions to be taxed on the basis of a
H            full indemnity.  Those costs, assessed at £12,000, had not
yet been taxed and due to the delay before taxation could
take place, it was unlikely that they would be taxed for
another four or five months.  The plaintiffs, anxious about the
enforcement of the order for costs as the first defendant had
stated that he intended to sell his business assets and make
himself bankrupt, applied for an injunction restraining the
defendants from assigning, selling or otherwise dealing with
moulds and any rights they might have in the copyright and
letters patent relating to a design of bathroom and sanitary

# Tab 5

Case No: HC 02C02413, Neutral Citation Number :  [2003] EWHC 470 (Ch)

IN THE HIGH COURT OF JUSTICE
IN THE CHANCERY DIVISION

Royal Courts of Justice
Strand, London, WC2A 2LL

Thursday 13th March, 2003

B e f o r e:

THE VICE–CHANCELLOR

— — — — — — —

INDEPENDIENTE LTD AND OTHERS

Claimants

— v —

MUSIC TRADING ON–LINE (HK) LTD AND OTHERS

Defendants

— — — — — — — — —

Mr. Henry Carr QC and Mr. Mark Vanhegan (instructed by Wiggin & Co) for the Claimants
Mr. Jeffery Onions QC and Mr. Philip Roberts (instructed by Messrs Nicholson Graham &
Jones) for the First to Third and Fifth Defendants

Hearing date : 4th March 2003

J U D G M E N T

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of
this Judgment and that copies of this version as handed down may be treated as authentic.

## Introduction

1.   The claimants are the owners or the exclusive licensees of the UK copyright in various sound recordings.   The fifth defendant ("Mr Robinson") is a substantial shareholder in the second defendant ("BVI"), the beneficial owner of the shares in the third defendant ("UPI") and a director of the first defendant ("HK") and of UPI.   The first defendant ("HK") is a wholly owned subsidiary of BVI.   (Proceedings against the fourth defendant have been discontinued.)

2.   Since early 2000 the defendants or one of them have operated a website at www.cd-wow.com in the trading name CD–WOW at which they advertise for sale a large number of CDs containing sound recordings of well known popular artists. Orders placed on that website are supplied by HK with CDs from Hong Kong.   Such CDs are genuine in that they were made and released on the market outside the European Economic Area with the knowledge and approval of the owners of the UK copyright or their exclusive licensees.

3.   On 23rd August 2002 the claim form in these proceedings was issued by the claimants seeking an injunction, damages or an account of profits and delivery up of infringing copies.   The claim is made in relation to CDs embodying sound recordings in which they own or are the exclusive licensees of the UK copyright which had been released on the market outside EEA and subsequently supplied by HK to buyers in the UK.   The infringements relied on are the importation of such CDs into the United Kingdom and their subsequent possession in the course of business and issue to the public as provided in ss.18, 22 and 23 Copyright, Designs and Patents Act 1988 ("CDPA").   The claim form states that the claimants are

> "suing on behalf of themselves and for and as representing all other members of the British Phonographic Industry Ltd ["BPI"] and Phonographic Performance Ltd ["PPL"]".

In the particulars of claim served the same day it is alleged that the claimants are members of BPI and/or PPL and sue on behalf of all other members whose names are set out in Schedule 1 thereto.   It is claimed that nearly all sound recordings produced in the UK are produced, manufactured or distributed by such members each of whom is a qualifying person for the purposes of s.154 CDPA.

4.   In response to an objection made by solicitors for the defendants, by a letter dated 4th October 2002 the claimants' solicitors indicated that the representative claim would be limited to those members of BPI and PPL as are "owners and/or exclusive licensees of UK sound recordings".   The defendants were not satisfied with this assurance and on 23rd December 2002 issued the first of the applications now before me seeking an order in accordance with CPR Rule 19.6(2) preventing the claimants from acting in the representative capacity claimed on the grounds that (1) the claimants have not demonstrated that they are authorised by the persons they claim to

represent to bring the action as presently constituted and (2) they do not have the same interest as those persons.

5.      Following further correspondence between the parties' respective solicitors the second application now before me was issued by the claimants on 5th February 2003.  By that application the claimants seek, amongst other things, to add as the sixth and seventh claimants Sony Music Entertainment (UK) Ltd and Sony Music Entertainment Inc, and to amend the particulars of claim.  If permission to amend as sought is granted then the title to the claim will still aver that the first six claimants "sue on behalf of themselves and for and as representing all other members of [BPI and PPL]".  Paragraphs 3 to 7 will be in the following terms:

> 3.      The <u>First to Sixth</u> Claimants are ~~and have at all material times been~~ members of the British Phonographic Industry Limited ("the BPI") and/or Phonographic Performance Limited ("PPL").  The BPI is a company limited by guarantee established (amongst other things) to represent the interests and to protect the rights of its members and, in particular, the sound recording copyrights owned by or exclusively licensed to its members together with the rights in performances owned by such members.  PPL is a company limited by guarantee.  Its objects include (among other things) the power to authorise the BPI to take action in the interest of any member or members of PPL with a view to protecting the interests or rights of any member or members of PPL with particular regard to infringement of copyright in sound recordings.  <u>The members of the BPI have given it a mandate to authorize third parties to act on their behalf to prosecute proceedings in the High Court. The BPI has authorized the First to Sixth Claimants on behalf of its members and on behalf of the members of the PPL to commence and prosecute these proceedings.</u>

> 3A.     The Seventh Claimant is incorporated under the laws of the State of Delaware and is (along with the Sixth Claimant) a company within the Sony Group of companies.

> 4.      The First to Sixth Claimants each sue on their own behalf and for and on behalf of and as representing all other members of the BPI and PPL that own or are the exclusive licensees of United Kingdom sound recording copyrights. ("the Relevant Members").

> 5.      The <u>Relevant Members</u> ~~members of the BPI and PPL~~ are continually and frequently producing, manufacturing and/or distributing records embodying new sound recordings, and nearly all reproductions of sound recordings (namely compact

discs, vinyl records and cassette tapes) that are produced, made or distributed within the United Kingdom are produced, manufactured and/or distributed by the <u>Relevant Members</u> ~~members of the BPI and/or PPL~~.

6.    The <u>Relevant Member</u> ~~member of the BPI and/or PPL~~ responsible for the making of each sound recording owns the United Kingdom sound recording copyright therein or is the exclusive licensee thereof. Lists of the current members of the:

BPI that are Relevant Members are set out in Schedule 1 annexed hereto; and

PPL that are Relevant Members but not also members of the BPI are set out in Schedule 1A annexed hereto.

7.    Each of the <u>Relevant Members</u> ~~members of the BPI and PPL~~ is and has at all material times been a qualifying person within the meaning of section 154 of the 1988 Act.

6.    CPR Rule 19.6, so far as relevant, provides that

(1) Where more than one person has the same interest in a claim -

(a) the claim may be begun; or

(b) the court may order that the claim be  continued,

by or against one or more of the persons who have the same interest as representatives of any other persons who have that interest.

(2) The court may direct that a person may not act as a representative.

(3) Any party may apply to the court for an order under paragraph (2).

(4) Unless the court otherwise directs any judgment or order given in a claim in which a party is acting as a representative under this rule -

(a) is binding on all persons represented in the claim; but

(b) may only be enforced by or against a person who is not a party to the claim with the permission of the court.

7.    The issues for my determination are (1) whether the claim comes within the provisions of CPR Rule 19.6(1), and if so (2) whether I should make a direction under Rule 19.6(2) that the claimants may not act as representatives.  The extent to which I should grant permission to amend the particulars of claim or make the further directions sought depend on my answers to those questions.

## The Facts

8.    BPI was incorporated in 1972.  The objects for which it was established include:

[(a)...]

(b) to promote and protect the welfare and interest of the British record industry and in this respect to take such action on behalf of its members or individual members of the Association as may be considered necessary;

[(c) to (j)]

(k) to make representations and to institute and to prosecute and defend proceedings before the Copyright Tribunal and any other Court or Tribunal; and

(l) to do all such other things as are incidental or conducive to the attainment of the above objects or any of them."

9.    An aspiring member is required to sign an application form.  It summarises the objects of BPI and  contains an acknowledgement that if the application is accepted the applicant agrees to abide by the rules and regulations of BPI as contained in its memorandum and articles of association or otherwise decided on by the Council of Management of BPI.  The Articles of Association, adopted on 22nd September 1999, contain the usual provisions for regulating the conduct of a company's business through a board of directors.  It was submitted by counsel for the claimants that the operation of the objects clause of the memorandum of association and the application form signed by all members conferred on BPI, without more, the authority to institute proceedings in the name or on behalf of a member.  I do not agree.  The memorandum confers on BPI the corporate ability to sue on behalf of others.  The member acknowledges that that is so.  Such acknowledgement does not, without more, authorise BPI to institute any particular action in the name or on behalf of a member.

10.    PPL adopted a new memorandum of association in June 1996.  By clause 4 it is empowered to enforce on behalf of its members or third parties, being producers of sound recordings, the performing rights and dubbing rights arising under the Copyright Acts 1911, 1956 and CDPA and for that purpose to take assignments and other assurances of performers' rights from its members and others.  On 14th

November 2001 PPL adopted new articles of association.  Art.1 defined "Dubbing Right", "Performing Right" and "Sound Recordings" by reference to the relevant provisions of CDPA and Copyright Acts 1911 and 1956.   Art.7 provides that every member grants to PPL

"acting by itself or through duly authorised agents for and during the period of his membership...

[(i) authority to collect fees and to sue for infringement of Performing or Dubbing Rights.]

(ii) the power and authority, to the extent the directors deem necessary, to protect generally the Member's interests in the Sound Recordings.

[(iii) and (iv)]

(v) the power and authority to authorise any person, body, organisation acting on behalf of copyright owners or performers (or any of them) as and on such terms as the Directors may deem necessary or expedient to institute or prosecute proceedings before any court, tribunal or other body and to take any other action or steps on behalf of the Company and/or any member or members and/or in the interests (directly or indirectly) of any Member or Members or performers designed or intended or undertaken to prevent or discourage the piracy or counterfeiting of, or the infringement of the copyright in, Sound Recordings provided always that neither the Company nor any other person, body or organisation so authorised by the Company shall be under any obligation to take any such action on behalf of any individual Member or Members or performer."

11.    The nature of the business carried on by the various defendants is described in the first witness statement of Mr Robinson and the defences of those defendants. CD-WOW is an internet business involving the sourcing and sale of, primarily, current UK Top 75 chart CDs together with new releases and old favourites.  They are made available for sale to the public on the website at www.cd-wow.com and elsewhere.   That domain name was originally registered in the name of UPI, transferred to HK on 30th November 2000 and to BVI on 22nd June 2001.  A person placing an order on the website contracts with HK.  CDs so ordered are posted in HK addressed to the customer. Replacements are supplied in the same manner but faulty or unwanted CDs are returned to an address in the UK until sufficient quantities have accumulated to make their return to Hong Kong economic.   The conditions of sale prescribe that property in the goods passes on delivery.

12.    The operation of the website came to the attention of BPI shortly after the business commenced.    Their then solicitors, Hamlins, wrote to UPI on 5th April 2000 expressing concern at the allegedly illegal parallel importation of CDs from South East Asia by UPI.  They sought suitable undertakings.  That round of correspondence

came to an end on 23rd May 2000.  On 27th November 2000 Hamlins wrote again to the solicitors for UPI asking for further information.  That exchange came to an end with a letter dated 24th January 2001 from the solicitors for UPI to Hamlins.

13.   On 11th March 2002 an agreement between PPL and BPI was executed.  Clause 2 provided, so far as relevant, that

> "PPL will mandate the BPI through its Anti-Piracy Unit ("the APU") to act on behalf of all PPL members....
>
> ....
>
> PPL will use its reasonable endeavours to procure that individual members execute such additional deeds or documents as may reasonably be required to confirm or support BPI's authority to act for the purposes of any court or other proceedings."

14.   On 29th May 2002 Wiggin & Co wrote a letter before action to HK, the solicitors previously acting for UPI, and the directors of HK.  They stated that they had been instructed by BPI "and for this purpose we are also instructed on behalf of the members of BPI".  That and other allegations were challenged by the solicitors for HK, UPI and the directors personally in subsequent correspondence.  On 21st August 2002 the chairman and chief executive of PPL wrote to the Director-General of BPI referring to proposed proceedings against HK, BVI, UPI and Mr Robinson.  He wrote:

> "In accordance with our agreement with you dated 11th March 2002 I write to confirm that the BPI is mandated to act on behalf of PPL in the Proceedings to the extent permitted by the Memorandum and Articles of PPL."

15.   As I have already indicated the claim form with particulars of claim was issued by the five claimants on 23rd August 2002.  They claimed the representative capacity, qualified by the letter of 4th October 2002, to which I have referred.  The defences of the various defendants were served in October or November 2002 and claim, amongst other things, that the claimants are not entitled to sue in the representative capacity claimed.  This led to a letter dated 3rd February 2003 from the Director-General of BPI to each of the claimants stating that:

> "I am writing to you formally to confirm our previous discussions concerning the above proceedings and to confirm your authority to bring these proceedings as claimant for and on behalf of the relevant members of BPI and PPL, namely those who own or are exclusive licensees of United Kingdom sound recording copyright.
>
> The claim is brought by you for your own benefit and for and on behalf of all relevant members of BPI and PPL.  I confirm that the claimants in the action remain ultimately responsible for costs in the proceedings but that the BPI will instruct

> solicitors to act on your behalf and will pay the costs incurred
> by those solicitors.  The claim includes a claim for damages
> and/or an account of profits.  You have agreed that any such
> monies recovered shall be accounted by you to BPI."

The writer then explained the basis for the representative nature of the proceedings by
reference to the Memorandum and Articles of both BPI and PPL, the agreement of
11th March 2002 and the letter of 21st August 2002 which I have already quoted.
The writer concluded:

> "Please therefore accept this letter as formal confirmation of
> your authority to bring these representative proceedings for and
> on behalf of the members of BPI and PPL who are owners of
> United Kingdom sound recording copyrights and/or exclusive
> licensees thereof."

16.   Counsel for the defendants now accept that a representative claimant may sue in a
representative capacity without the authority of those he claims to represent provided
only that the claim satisfies the conditions prescribed by CPR Rule 19.6.(1).
Accordingly the relevance of the issue of authority has been reduced if not
extinguished altogether.  Nevertheless and notwithstanding the submissions of
counsel for the claimants to the contrary I do not accept that the individual claimants
had actual authority from the members of either PPL or BPI to commence these
proceedings on their behalf.  In the case of the members of PPL both the agreement of
11th March 2002 and the letter of 21st August 2002 purported to do no more than
mandate BPI.  PPL did not purport to mandate the claimants and had no authority
from its members to confer the benefit of their pecuniary remedies on BPI.  Nor, for
the reasons I have given in paragraph 9 above, did BPI have the authority of its
members to sue on their behalf or to authorise the individual claimants to do so either.

### The issues in the action

17.   The applicability of CPR Rule 19.6 depends, in part, on the nature of the issues raised
by the particulars of claim.  I will describe them by reference to the proposed
amended particulars of claim.  I have already quoted paragraphs 3 to 7 dealing with
the representative nature of the claim.  Paragraph 8 alleges that the individual
claimants are the owners of the copyright in eight specific sound recordings therein
specified.  Paragraph 9 alleges that each of those eight sound recordings has been
issued to the public bearing labels or other marks sufficient to attract the
presumptions as to the subsistence and ownership of the copyright prescribed by
s.105 CDPA.  Thus the subsistence and ownership of the copyright will not be in
issue unless the defendants seek to displace the presumption.

18.   Paragraphs 10 to 24 contain the relevant allegations concerning the defendants, the
existence and mode of operation of the CD-WOW site and the terms and manner on
and in which CDs are supplied to those who order them.  It is only necessary
specifically to mention paragraph 15 in which it is alleged that

> "The CD-WOW site advertises for sale a large number of CDs
> containing sound recordings by well-known popular artists,
> the United Kingdom sound recording copyright in all or most
> of which is owned by or exclusively licensed to Relevant
> Members of BPI."

In that context there is no specific allegation of issue to the public with the labels or
other marks referred to in s.105 CDPA. If an implication to that effect is not enough
then the allegation could be simply introduced by amendment.

19.     Paragraphs 25 to 50 contain allegations relevant to the alleged infringements and the
        role played therein by the respective defendants. In each case the allegations of
        infringement are made expressly in relation to "sound recordings the United Kingdom
        sound recording copyright in each of which is owned by or exclusively licensed to
        one or more of the Relevant Members" (See paragraphs 25.1 and 37). It is true that
        the particulars relied on, set out in schedules 3 and 4, deal only with one or more of
        the eight specific sound recordings, but those are stated to be the best particulars
        available until after disclosure and the provision of further information. The point is
        clearly made in paragraph 50 in which it is stated that

> "The Claimants do not at present know of all the acts of
> primary and secondary infringements of the Claimants and the
> other Relevant Members United Kingdom sound recording
> copyrights committed by the Defendants and each of them, but
> will at the trial of this Claim seek to rely upon and seek relief
> in respect of each and every such act."

The remaining paragraphs contain the usual allegations to justify the grant of
injunctions and the award of damages, including additional damages under s.97(2)
CDPA.

20.     It is clear, therefore, that the claimants sue and seek relief in respect of the
        infringement of the United Kingdom copyright in sound recordings owned by or
        exclusively licensed to any individual claimant or any Relevant Member, as defined
        in paragraph 4.


### Right to represent


21.     The right of a claimant to represent another person in the sense of suing on his behalf
        arises if, in the terms of CPR Rule 19.6, both have "the same interest in [the] claim".
        The requirement that both should have "the same interest" is the same as that
        previously contained in RSC Ord 15 r.12. It is common ground that the general
        principles applicable under the old rule are also applicable under the new. In that
        connection it is helpful to refer to two authorities.

22.     The first is **Duke of Bedford v Ellis** [1901] AC 1. Ellis and five others sued on behalf of themselves and all other growers of fruit, flowers, vegetables, roots or herbs within the meaning of the Covent Garden Act 1828 to enforce rights conferred on them by that Act against the Duke of Bedford as the owner of the market in which they were exercisable. The Duke of Bedford applied to strike out the writ. He was successful before Romer J. The Court of Appeal discharged that order on the undertaking of the plaintiffs to join the Attorney—General as a defendant. The Duke of Bedford appealed to the House of Lords. His appeal was dismissed. Lord Macnaghten referred to the argument to the effect that the rule only applied to claims to some beneficial right of property and said (p.8):

> "But it seems to me that there is no reason whatever for so restricting the rule, which was only meant to apply the practice of the Court of Chancery to all divisions of the High Court. The old rule in the Court of Chancery was very simple and perfectly well understood. Under the old practice the Court required the presence of all parties interested in the matter in suit, in order that a final end might be made of the controversy. But when the parties were so numerous that you could never "come at justice", to use an expression in one of the older cases, if everybody interested was made a party, the rule was not allowed to stand in the way. It was originally a rule of convenience: for the sake of convenience it was relaxed. Given a common interest and a common grievance, a representative suit was in order if the relief sought was in its nature beneficial to all whom the plaintiff proposed to represent. To limit the rule to persons having a beneficial proprietary interest would be opposed to precedent, and not, I think, in accordance with common sense."

23.     In **John v Rees** [1970] 1 Ch.345, 370 Megarry J, having quoted the same passage, commented that the rule is to be treated as being not a rigid matter of principle but a flexible tool of convenience in the administration of justice. The provisions of the civil procedure rules, particularly CPR Rule 1.2, emphasise the need to interpret the phrase "the same interest" and to apply the provisions of CPR Rule 19.6 both flexibly and in conformity with the overriding objective. Accordingly there are three questions: do the individual claimants on the one hand and the Relevant Members as defined on the other have (1) a common interest, (2) a common grievance and (3) is the relief sought by the claimants in its nature beneficial to the Relevant Members? Counsel for the defendants submits that the answer to each of those questions is in the negative.

24.     With regard to the question of common interest counsel for the defendants points out that neither PPL nor BPI has asked any of their members if they wish to complain about the operation of the CD—WOW website nor is there any evidence to suggest that they do. He suggests that the only interest or grievance is that of PPL and BPI but points out that neither of them could have any cause of action in the absence of an assignment of copyright in their favour. He submits that the amended paragraphs 3 to 7 of the particulars of claim do not cure the problem of interest because the

Relevant Members are competitors in the global market place for sound recordings and the class of Relevant Member fluctuates from day to day.

25.   With regard to the second question counsel for the defendants contends that there is no evidence that any of the Relevant Members are in fact aggrieved by the activities of the defendants. The alleged infringements arise from the parallel importation of genuine CDs not counterfeit goods. He accepts that it may be inferred that all Relevant Members would wish to suppress counterfeit goods (**EMI v Riley** [1981] 1 WLR 923) but submits that no such inference can be drawn in the case of parallel importation.

26.   With regard to the benefits to be derived by the Relevant Members from the relief sought counsel for the defendants contends that the injunctions go beyond what the court will grant, as demonstrated by Scott J in **Columbia Picture Industries v Robinson** [1986] FSR 367. He relies on the letter dated 4th October 2002 from BPI to the individual claimants pointing out that any sums recovered in the action are to be accounted for to BPI as showing that they will derive no benefit from the claim to damages either.

27.   I do not accept these submissions. The common interest arises from the fact that the claim as pleaded is made in respect of the UK copyright in a sound recording to which any Relevant Member is entitled as owner or exclusive licensee. The common grievance arises from the facts pleaded regarding the operation of the CD—WOW site. There is at least a threat to supply a CD embodying a sound recording to which a Relevant Member is so entitled in response to an order placed on the website. The question whether that method of supply constitutes an infringement of the UK copyright in the sound recording is common to all Relevant Members because the same method is used for all supplies. Unless and to the extent that the defendants seek to put in issue the subsistence or ownership of the UK copyright contrary to the presumptions for which s.105 CDPA provides or the consent of a Relevant Member to the acts complained of the issues of fact and law will be identical however many sound recordings or Relevant Members are involved. It would be absurd and contrary to the propositions expressed by Megarry J in **John v Rees** and CPR Rule 1 if there had to be a separate claim in respect of each Relevant Member at least until it is seen if the issues in relation to that Relevant Member are substantially different from those relating to the generality of the Relevant Members.

28.   The relevant relief is injunctive or pecuniary. As far as pecuniary relief is concerned it is in its nature equally beneficial to Relevant Members as to the individual claimants. What they do with any money recovered in the action is a matter for them, not the defendants. The letter of 4th October 2002 from BPI to the claimants is not of itself binding on the claimants, let alone any Relevant Members. If the Relevant Members are content that the money should go to BPI that is a matter for them. Their wishes in that regard do not prevent the pecuniary relief being in its nature equally beneficial to all.

29.   In **Columbia Picture Industries v Robinson** [1986] FSR 367, 430 Scott J pointed out that the injunction sought by the plaintiffs was of very great breadth because it

aimed to restrain the defendants from knowingly infringing copyright in any film for the time being belonging to the plaintiffs or of which they were exclusive licensees. He considered that it would be wrong in principle to grant an injunction the scope of which the defendants could not know and could not discover. That proposition, which is not challenged, was stated in relation to films of which the copyright was regulated by the Copyright Act 1956. But, as counsel for the claimants points out, there was no provision in the Copyright Act 1956 for presumptions as to the subsistence of copyright and its ownership to arise from labels or marks fixed to films. In a case to which s.105 CDPA applies the use of the requisite labels or marks gives rise to a presumption of ownership readily apparent to the defendants. In any event, as counsel for the claimants pointed out, Scott J did grant injunctions in relation to copyrights to which it had been established in the action that existing members were entitled. Given the presumptions prescribed in s.105 CDPA I see no reason why it should be assumed now that Relevant Members cannot benefit from the injunctive relief sought by the claimants.

30.  For these reasons I conclude that the claimants and the Relevant Members, as defined in the particulars of claim, all have the same interest in the claim. My conclusion is supported by the views of Sir Denys Buckley expressed, obiter, in **CBS v Amstrad** [1988] 1 Ch.61. In that case Amstrad sold recording machines with which a sound recording on one tape might be duplicated onto another, blank, tape. The plaintiff, CBS, was the owner or exclusive licensee of a substantial number of sound recording copyrights. It sued for injunctions to restrain the sale of such machines without taking such precautions as might be necessary to protect the copyrights of which it or any member of the BPI was the owner or exclusive licensee. The basis of the claim was the unlawful incitement of the public to commit offences under s.21(3) Copyright Act 1956. The majority of the Court of Appeal concluded that such unlawful activity could not give rise to a civil claim and struck it out.

31.  Sir Denys Buckley took the contrary view. Consequently he, unlike the other two members of the court, had to consider whether CBS could sue in respect of copyrights owned or licensed to members of BPI. He referred to the speech of Lord Macnaghten in **Duke of Bedford v Ellis** and continued:

> "Similarly, in the instant case the plaintiffs, and all the persons whom they purport to represent, have statutory rights under the Copyright Act 1956, which the action is designed to protect from infringement resulting from the conduct of the defendants which is complained of. They share, in my judgment, a common interest and a common grievance, such as Lord Macnaghten had in mind. The relief which is primarily claimed is injunctive in form which would benefit the plaintiffs and all whom they purport to represent in the same way, that is to say, by protecting them from the risk of infringements incited by the defendants."

In relation to the claim for damages he added (p.86):

> "In the instant action, the claims of the plaintiffs and those of the persons whom they purport to represent, all have a common

> basis: damages are not the sole relief claimed and can, in my
> opinion, be regarded as a quite subsidiary form of relief,
> capable of being pursued by any individual claimant..."

32.     It follows that in my judgment the claim is capable of being brought in a
representative capacity because the claimants and the Relevant Members have the
same interest in the claim.   In their written argument counsel for the defendants
emphasised that there was no evidence that either the claimants or PPL or BPI had the
authority of the Relevant Members to bring these proceedings on their behalf.   This
is true as a matter of fact but it is irrelevant as a matter of law.  **Markt & Co Ltd v
Knight Steamship Co.Ltd** [1910] 2 KB 1021, 1039 and **John v Rees** [ibid] at p.
371.   It appears to me that in cases falling within CPR Rule 19.6 the rule itself
provides the authority of the person who is represented.

### Should a direction be made under CPR Rule 19.6(2)?

33.     Counsel for the defendants submits that if CPR Rule 19.6(1) does apply I should,
nevertheless, make a direction under Rule 19.6(2) that the claimants may not act as
representatives of the Relevant Members or any of them.   Whether or not such a
direction should be made is within the discretion of the court to be exercised in
accordance with the overriding objective.

34.     The defendants rely on a letter from the solicitors for the claimants dated 20th
November 2002 in which they indicate that they expect documents produced on
disclosure to reveal the extent of the defendants' allegedly infringing activities.   By a
request for further information served on 5th February 2003 the claimants seek details
of the CDs purchased by the defendants for resale through the CD–WOW site
including titles, quantities and whether or not such CDs had been put into circulation
in EEA by or with the consent of the owner or exclusive licensee of the UK
copyright.   In these circumstances the defendants claim that the fair trial of the issues
between them and the individual claimants will be made longer and more expensive if
the court permits the claimants to sue in the representative capacity they claim.

35.     The defendants also maintain that even if the Relevant Members and the individual
claimants have a common grievance because each of their copyrights will have been
infringed by the same course of the defendant's dealing it should not be assumed that
all Relevant Members wish to sue.   It is not, the defendants submit, self–evident that
the owner of the UK copyright in a sound recording who has consented to that sound
recording being put on the market outside EEA wishes to protect his position in the
market in EEA by preventing parallel imports.

36.     The defendants rely on the decision of Hirst J in **Haarhaus v Law Debenture Trust
Corpn** [1988] BCLC 640.   In that case the plaintiffs brought an action on behalf of
themselves and all other holders of promissory notes issued by a Nigerian Bank to
restrain the defendant, the trustee of the noteholders trust deed, from publishing
details as to the votes cast at a meeting of noteholders.   Hirst J referred to the obvious
conclusion that the figures themselves indicated such a difference of opinion as

would preclude a common grievance and relief beneficial to all noteholders.   In his .
discretion he ordered that the action might not be continued in a representative
capacity.   The defendants also draw attention to the course Laddie J took in
**Russell–Cooke Trust Co. v Elliott** (26th March 2001 unreported).   In that case the
judge was concerned with the administration of certain investment schemes set up by
a solicitor into whose practice the Law Society had intervened.   Laddie J directed
that a circular be sent to all investors to determine their views.   It is suggested that I
should do likewise in this case so that it may be determined whether or not Relevant
Members do wish proceedings to be taken on their behalf to restrain parallel imports.

37.    In my view it would not be right to make the direction sought under CPR Rule
19.6(2) or any lesser order requiring any questionnaire to be sent to Relevant
Members.   For the reasons I have already given I accept the submission of the
defendants that these proceedings have not been specifically authorised by the
Relevant Members.   But I am not prepared to infer from that that the Relevant
Members do not know of them.   Nor in the absence of any evidence to that effect am
I prepared to infer that any Relevant Member is content that the parallel importation
of sound recordings in respect of which he is the owner or exclusive licensee of the
UK copyright should continue.   If he did then such parallel importation would cease
to give rise to infringements of that copyright.

38.    It is true that the representative element of the claim is likely to make the proceedings
longer and more expensive than would be the case if they were confined to the claims
of the individual claimants.   But that is not the only comparison to be made.   The
other is to compare the aggregate time and cost involved if there were separate claims
brought by these claimants and each and every Relevant Member.   Plainly the saving
of time and expense by permitting the representative element of the claim to be
pursued in conjunction with the individual claims of the claimants is considerable.   If
the claim succeeds then the defendants can hardly complain.   If it fails they will get
their costs of the claim as a whole or of the representative part of it as the case may
be.

39.    As I have already pointed out the terms on which the proceedings are brought, as
between PPL, BPI, the individual claimants or their solicitors on the one hand and the
Relevant Members on the other are issues between them, not between them and the
defendants.   A Relevant Member will not be liable for any costs unless he has
specifically authorised the proceedings brought on his behalf.   Nor, as against him,
will BPI be entitled to retain any damages or profits recovered from the defendants on
his behalf unless he agrees.

### Conclusion

40.    For all these reasons I consider that the claim is properly brought by the individual
claimants on behalf of the Relevant Members as defined in the particulars of claim as
proposed to be amended as well as on their own behalf.   Similarly I see no reason to
make any order under CPR Rule 19.6(2).   In those circumstances I dismiss the
application of the defendants issued on 23rd December 2002.   I will hear argument
on any consequential issues as to costs and on the application of the claimants issued

on 5th February 2003 for directions if and to the extent that it has not been resolved by agreement.