# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: BP p.l.c. | § | MDL NO.: 10-md-2185 |
| SECURITIES LITIGATION | § | |
| | § | Civil Action No. 4:10-md-2185 |
| | § | |
| | § | HON. KEITH P. ELLISON |
| | § | |
| | § | |

## MEMORANDUM AND ORDER

On April 20, 2010, the Deepwater Horizon rig operated by BP plc exploded in the Gulf of Mexico, causing loss of life and the largest oil spill in this nation's history. In the months that followed, lawsuits raising a variety of claims, including securities fraud claims, were filed across the country. A group later identified as the Ludlow Plaintiffs filed an action in the Western District of Louisiana on May 21, 2010. (Doc. No. 22, Ex. 1.)[1] The Comptroller of the State of New York and the Attorney General of Ohio—representatives of a group later identified as the New York and Ohio Plaintiffs—filed suit in the Southern District of New York. (Transfer Order, Doc. No. 1.) Different plaintiff groups, including the Ludlow Plaintiffs, moved to centralize litigation in their respective districts. On August 10, 2010, the Judicial Panel on Multidistrict Litigation transferred all cases involving shareholder derivative claims, securities claims, and ERISA actions to the Southern District of Texas. (*Id.*) Claims involving personal injury, wrongful death, and property damage were centralized in a separate docket in the Eastern District of Louisiana. The Ludlow Plaintiffs' claims were included in the group transferred to the Southern District of Texas.

---

[1] All docket references are to Multi-District Litigation No. 10-md-2185.

On December 28, 2010, this Court consolidated all of the securities class actions pending in the Court,[2] appointed the New York and Ohio Plaintiffs as lead plaintiffs, and appointed the Ludlow Plaintiffs as lead plaintiffs of a subclass.[3]   (Order, Doc. No. 79.)   In its decision, this Court expressed its expectation that "the lead plaintiffs would work together as needed to prevent inefficiencies" and its hope that the two lead plaintiffs would file a joint complaint, if possible. (*Id.*)  That did not happen.   Instead, the two lead plaintiffs filed two separate and extremely lengthy consolidated amended complaints.

On February 11, 2011, the Ludlow Plaintiffs filed a consolidated class action complaint ("the Complaint") alleging securities fraud violations against two corporate defendants, BP plc and BP America, Inc., and against nine individual defendants (collectively, "Defendants"). (Complaint ("Compl."), Doc. No. 112.)   The New York and Ohio Plaintiffs filed a separate complaint (Doc. No. 113) on February 14, 2011.  On May 6, 2011, Defendants filed a motion to dismiss the claims of the Ludlow Plaintiffs.[4]   (Doc No. 151.)   The Ludlow Plaintiffs filed a response to the motion on June 6, 2011.  (Doc. No. 187.)   Defendants filed a reply in support of their motion on June 21, 2011.  (Doc. No. 219.)   After briefing concluded, the Court heard oral argument on the motion to dismiss on November 4, 2011.

Pending before the Court is Defendants' Motion to Dismiss the Claims of the BP ADS Purchasers in the Ludlow Plaintiffs' Consolidated Class Action Complaint (Doc. No. 151).

---

[2] The seven securities class actions consolidated into the instant case include: *Ludlow v. BP PLC*, Case No. 10-cv-3043, *Johnson Inv. Counsel Inc. v. BP PLC*, Case No. 10-cv-3044, *Yuen v. BP PLC*, Case No. 10-cv-3049, *Greenfield v. BP PLC*, Case No, 10-cv-3448, *McClurg v. BP PLC*, Case No. 10-cv-3449, *Oklahoma Police Pension & Ret. Sys. V. BP PLC*, Case No. 10-cv-3452, and *Safe v. British Petroleum*, Case No. 10-cv-4675.  (Doc. No. 79.)

[3] The Court created a subclass in part because the competing lead plaintiffs advanced different theories of the case. Whereas the Ludlow Plaintiffs' claims center on BP's statements about the safety of its drilling operations in the Gulf of Mexico in the thirteen months leading up to the Deepwater Horizon explosion, the New York and Ohio Plaintiffs argue more generally that BP made fraudulent statements over a three and a half year period about its safety precautions both in the Gulf of Mexico and elsewhere.  (Doc. No. 79 at 10, 18–19.)

[4] Defendants also filed two motions to dismiss the New York and Ohio Plaintiffs class, one against the claims of purchasers of BP ordinary shares (Doc. No. 153) and one against the purchasers of ADSs (Doc. No. 149.)  Given the separate briefing in this case and the diversity of allegations, defendants, and legal issues, the Court will issue a separate ruling on the New York and Ohio Plaintiffs' claims.

Having considered the parties' pleadings, arguments and the applicable law, the Court finds that Defendants' motion should be **GRANTED**.

I.      **THE PARTIES**

Lead Plaintiffs are Robert Ludlow, Peter D. Lichtman, Leslie J. Nakagiri, and Paul Huyck (collectively, the "Ludlow Plaintiffs" or "Plaintiffs"). (Compl. ¶ 16.) The Ludlow Plaintiffs, all residents of California and purchasers of BP American Depository Shares ("ADSs"), bring this consolidated class action on behalf of themselves and on behalf of the proposed plaintiff class: all others similarly situated who purchased American Depository Receipts ("ADRs") in BP, plc between March 4, 2009 and April 20, 2010 (the "Subclass Period").[5] (Compl., at 2.)

The Ludlow Plaintiffs have sued defendants BP plc and BP America, Inc. (collectively "BP" or "the Company"), and nine of BP's present and former officers and directors. BP plc is a U.K. company with its principal place of business in the United Kingdom. BP America, Inc., a subsidiary of BP plc, is a Delaware corporation that conducts substantial business in Texas. At all times relevant to this litigation, BP leased and operated the Deepwater Horizon, an oil rig responsible for drilling the Macondo well in the Gulf of Mexico.[6] (Compl. ¶ 22.) BP's shares trade on the New York Stock Exchange ("NYSE").

The nine individual defendants were directors and officers of BP prior to and during the Deepwater Horizon spill. They are Anthony B. Hayward, BP's Chief Executive Officer ("CEO") since 2007 and a member of the Board of Directors during the relevant period

---

[5] This suit has not yet been certified as a class action.
[6] Deepwater Horizon was a Mobile Offshore Drilling Unit, or MODU, which is a free floating rig positioned through satellite GPS technology and thrusters. The first rig to drill at the Macondo well was the Marianas, an anchored rig. The Deepwater Horizon rig arrived in January 2010, after the Marianas sustained damage from Hurricane Ida in November 2009. (Compl. ¶ 73.) BP did not own the Deepwater Horizon. Instead, pursuant to a 1998 drilling contract, BP paid Transocean approximately $500,000 per day to lease the Deepwater Horizon. (*Id.* ¶ 208.)

("Hayward"); Andy G. Inglis, executive director and Chief Executive of Exploration and Production from 2007 to July 2010 ("Inglis"); Carl-Henric Svanberg, a Swedish citizen and Chairman of the Board of Directors since January 2010 ("Svanberg"); H. Lamar McKay, Chairman and President of BP America, Inc. since 2009 ("McKay"); William Castell, a member of BP's Board of Directors since 2006 and Chairman of BP's Safety, Ethics and Environment Assurance Committee ("Castell"); Paul Anderson, a member of BP's Board of Directors since February 1, 2010 ("Anderson"); Antony Burgmans, a member of BP's Board of Directors since 2004 ("Burgmans"); Cynthia Carroll, a member of BP's Board of Directors since 2007 ("Carroll"); Erroll B. Davis, Jr., a member of BP's Board of Directors from 1998 to April 15, 2010 ("Davis") (collectively, the "Individual Defendants").  (Compl. ¶¶ 24–34.)  In addition, Hayward, Inglis, Castell, Anderson, Burgmans, Carroll, and Davis all served on BP's Safety Ethics & Environment Assurance Committee.  Castell served as Chairman of the SEEAC and Hayward held the position of "executive liaison."  (Compl. ¶¶ 24, 30.)  Hayward and Inglis also served on BP's Group Operations Risk Committee.  (Compl. ¶¶ 24, 26.)

## II.     SUMMARY OF THE COMPLAINT

In a Rule 12(b)(6) motion to dismiss, the court must accept as true a plaintiff's well-pleaded factual allegations.  FED. R. CIV. P. 12(b)(6).  The court does not, however, "accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions."  *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 550 (5th Cir. 2007) (citation omitted) (internal quotation marks omitted).  Accordingly, the Court will set forth the relevant facts as alleged by Plaintiffs.

The Ludlow Plaintiffs assert violations of section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act") and Rule 10b–5 of the Securities and Exchange Commission

("SEC") against BP and Individual Defendants Hayward, Inglis, McKay, and Svanberg. (Compl. ¶¶ 448–56.)  Plaintiffs also assert violations of section 20(a) of the Exchange Act against all of the Individual Defendants.  (Compl. ¶¶ 457–62.)  Plaintiffs seek certification as a class action pursuant to Rule 23, damages against the Defendants, jointly and severally, pre-judgment interest, costs, and attorneys' fees.

Following BP's release of its 2008 Annual Report, which marks the start of the Subclass Period, the price of BP ADSs grew steadily.  Plaintiffs claim the growth was buoyed by BP's repeated misrepresentations and omissions calculated to conceal the true state of BP's safety programs and the Company's risk exposure and keep the value of BP ADSs artificially inflated throughout the Subclass Period.  (Compl. ¶¶ 15, 415.)  On April 20, 2010, BP ADSs closed at $59.49 a share.  On April 20, 2010, the Deepwater Horizon rig, which BP operated, exploded. By June 25, 2010, BP's share price had fallen to $27.02 a share, reflecting a 55.3% drop in the two months following the explosion.  (Compl. ¶ 15.)  Plaintiffs claim that they purchased their shares in reliance on BP's representations that it had implemented appropriate safety mechanisms to reduce the risk of catastrophic incidents in the Company's deepwater drilling operations.  (Compl. ¶ 418.)  Plaintiffs suffered the loss of a substantial portion of their investment when the true state of BP's operations was revealed, tragically, through the Deepwater Horizon catastrophe and subsequent oil spill.  (*Id.*)

## III.   PLAINTIFFS' FACTUAL ALLEGATIONS AND CLAIMS

BP is a British oil company engaged in "every area of the oil and gas industry," including deepwater exploration and drilling.  (Compl. ¶ 52.)  Following a 1998 merger, BP became the third largest oil company in the world.  (*Id.* ¶ 56.)  In fiscal year 2009, BP's business generated $264 billion in revenues and over $16 billion in profit, making BP the single largest producer of

oil and gas in the United States.  (*Id.* ¶ 52.)  BP's continued success has been tied to the Company's aggressive development of deepwater wells in the Gulf of Mexico.  (*Id.* ¶ 53.) Through a series of mergers in the late 1990s, BP "embarked on an aggressive campaign of exploring, developing and increasing (through the acquisition of regional leases) its Gulf assets." (*Id.* ¶ 58.)

Despite its financial success, BP is also a company plagued by years of safety incidents. This timeline of safety failures reaches back years before the Subclass Period and includes incidents such as: (i) a gas line rupture on BP's Forties Alpha rig in the North Sea in 2003 (*Id.* ¶¶ 106–07), (ii) a 2005 explosion at BP's Texas City refinery, which resulted in the death of fifteen people (*Id.* ¶¶ 108-09), and (iii) a 2006 oil spill at a BP pipeline in Prudhoe Bay, Alaska (*Id.* ¶¶ 128, 135).  In addition to the leaks, spills, and explosions, regulatory reports—such as the Baker Report and a report by the U.S. Chemical Safety and Hazard Investigation Board ("CSB")— identified problems rooted in BP's safety processes.  (*Id.* ¶¶ 3, 155–57.)  Plaintiffs also point to reprimands—regulatory, civil, and criminal—that BP has received as a consequence for prior safety failures.  For example, BP's guilty pleas include (1) felony violations of the Clean Air Act and a corresponding $50 million criminal fine arising out of the Texas City explosion; (2) a violation of the Clean Water Act and a corresponding $20 million fine arising from the Prudhoe Bay spill; and (3) a three year period of corporate probation.  (*Id.* ¶ 145.)

In view of this record, BP launched a campaign, marked by the arrival of new CEO Tony Hayward, to resurrect BP's image with respect to safety.  Shortly after taking over as head of the Company, Hayward promised to "ensure [that] BP becomes an industry leader in process safety management and performance," to "[champion] process safety as a foundation of BP's operations," and "to focus like a laser on safe and reliable operations."  (*Id.* ¶¶ 4, 152–53.)

According to Plaintiffs, Hayward's public statements were calculated to change public—specifically, the investing public's—opinion on the safety of BP's operations.  But even as BP promoted its risk management and process safety reform efforts, it simultaneously glossed over the trouble brewing in its Gulf operations.

In March 2009, BP filed an Initial Exploration Plan ("IEP") for "Mississippi Canyon Block 252," a nine square mile plot of land in the Gulf of Mexico that BP leased for more than $34 million.  (*Id.* ¶ 192.)  The Macondo well, located approximately forty-eight miles from the nearest shoreline, was BP's first well on the site.  (*Id.* ¶ 193.)  The Macondo well site was notorious for high temperatures, high pressure, highly gaseous hydrocarbon reservoirs and brittle rock formations.  (*Id.* ¶ 194.)  Even the letter BP received from the U.S. Minerals Management Service ("MMS") approving drilling warned: "Exercise caution while drilling."  (*Id.* ¶ 195.)  BP received a permit to drill up to a total depth of 19,650 feet at the Macondo well site and the Company began drilling operations  in October 2009.  (*Id.* ¶ 200.)  After the Marianas rig was evacuated later that year following a hurricane, BP brought in the Deepwater Horizon rig, which it leased from Transocean, to continue drilling.  (*Id.* ¶¶ 203, 208.)

As drilling progressed, BP departed from its original well design on multiple occasions.  For example, BP ultimately used a "long string" casing design at the Macondo well instead of a "liner/tieback" design, which would have added four barriers against blowouts.[7]  The method BP selected provided only two.  (*Id.* ¶ 213.)  Internal BP emails reveal that the long string method was chosen because it saved time and money.  (*Id.* ¶ 214.)  In addition, BP installed only six

---

[7] Casing strings are used to stabilize the wellbore as a well is drilled deeper.  Casings are steel tubes installed to line the well.  The first string of casings is the widest, and as the well gets deeper the strings become progressively narrower because they must fit through the existing hole.  The strings are intended to prevent hydrocarbons from leaking into the wellbore and causing a "kick" or blowout.  They also serve to reinforce the rock walls outside the well against the pressure exerted against the walls during drilling.  (Compl. ¶ 83.)  A "long string" casing creates a continuous wall of steel from the wellhead to the bottom of the well.  A "liner" is a much shorter casing that is hung lower in the well and then anchored to the next higher string.  A liner is theoretically easier to cement into place, but has its own downsides, for example, it is more leak-prone.  (*Id.* ¶ 85–86.)

centralizer subs instead of the sixteen called for in the original well design.[8]  The shortcut was approved after BP employees learned they would have to wait for their supplier to order more centralizers to supply the number called for in the plan, causing delay.  (*Id.* ¶¶ 220–21.)  Even though a Halliburton engineer analyzed the situation and determined that using only six centralizers would cause a "severe" gas flow problem in the well, a BP employee overrode the initial decision to wait for the delivery of more centralizers, stating "who cares, it's done, end of story, will probably be fine."  (*Id.* ¶ 228.)  BP also made multiple modifications to the cementing work—such as limiting the circulation of drilling mud through the wellbore, pumping cement down the well at a slow rate, and limiting the total volume of cement pumped into the well—that departed drastically from the original cementing design, standard industry practices, and BP's own internal guidelines.  (*Id.* ¶¶ 229–34.)  Despite these modifications, BP decided not to conduct cement log evaluations after the cementing was completed, even though such tests would have gauged the success of the cement job.[9]  (*Id.* ¶ 226.)

Tests performed just before the explosion alerted BP to problems with the slurry, the type of cement used in a deepwater cement job.  Because pressure and temperature at the bottom of a deepwater well can alter the strength and curing rate of slurry, slurry is typically tested at the start of a pumping job, to ensure the cement will behave as required when it reaches the bottom of the well.  (*Id.* ¶ 90.)  Halliburton performed the slurry tests for BP, and the first test was conducted in February 2010, just after the Deepwater Horizon began work on the well.  (*Id.* ¶ 237.)  The test results revealed that the slurry was unstable.  (*Id.*)  A second test was conducted later in February; the slurry failed that test as well.  (*Id.* ¶ 238.)  A final test was conducted on

---

[8] Centralizers ensure the stability of a well by helping to keep the casing pipes centered in the well bore.  "Sub" centralizers screw into place between sections of casing.  (Compl. ¶ 87.)

[9] A post-blowout investigation found that, while Halliburton supplied BP with the original cement plan, the compromises to the plan were made at BP's insistence, despite the fact that BP had little experience with foam technology for cementing production casing in the Gulf of Mexico.  (Compl. ¶ 236.)

April 18, 2010.  Though the test takes forty-eight hours to complete, BP completed cementing on the well without awaiting the final test results.[10]  (*Id.*)

BP bypassed or curtailed other tests as well.  For example, before BP could put the well into temporary abandonment, it had to perform a positive pressure test and a negative pressure test.[11]  (*Id.* ¶ 245.)  BP successfully performed the positive test to evaluate the ability of the casing to hold under pressure.  BP also performed a negative pressure test, designed to check both the integrity of the casing and the integrity of the cement job at the bottom of the well to ensure the pressure is properly balanced.  (*Id.* ¶¶ 246–47.)  The test involves use of a "spacer," a liquid mixture which separates drilling fluids from seawater.  (*Id.*)  Instead of using the typical liquid mixture, BP used "leftover unused lost circulation materials or pills," which allowed the Company to bypass hazardous waste disposal procedures.  (*Id.* ¶ 248.)  BP conducted three negative pressure tests on the well, and the results failed each time, signaling a leak—or at least a "very large abnormality"—in the well.  (*Id.* ¶¶ 253–54.)  Despite the readings, BP continued with the temporary abandonment process.

BP made three additional, critical errors during the temporary abandonment process.  First, BP set the cement plug on top of the casing, nearly 3,300 feet down into the well.  (*Id.* ¶ 258.)  Second, BP displaced the 3,300 feet of mud above the plug with sea water, thereby greatly reducing the amount of pressure on the well from the top.  Third, BP began displacement before the cement plug had actually been set, leaving an opening for the well contents to rise up toward the rig.  (*Id.* ¶ 260.)

---

[10] BP received the final results—which were also failing—six days *after* the blowout occurred.  (Compl. ¶ 238.)

[11] Temporary abandonment is the process by which a drilling rig, like the Deepwater Horizon, is replaced with a smaller rig more suited for production and extraction.  (Compl. ¶ 95.)  In order to make room for a new rig, the existing rig must remove its riser (the piping that connects the rig to the blowout preventer) and blowout preventer from the well head.  (*Id.*)

Displacement began shortly after 8:00 p.m. on April 20, 2010.  Just after 9:00 p.m., pressure in the drill pipe began rapidly and inexplicably rising.  (*Id.* ¶ 270.)  BP employees failed to notice or investigate the pressure change.  (*Id.*)  Shortly after 9:30 p.m., mud began spewing onto the rig floor and the crew finally noticed the "kick."[12]  The rig crew was unable to activate the blowout preventer ("BOP") in time, and the explosion occurred six minutes after mud first spewed onto the rig floor.  (*Id.* ¶ 272.)  After the first explosion, the crew tried to engage the Emergency Disconnect System ("EDS") to sever the drill pipe and disconnect the rig, but they were unsuccessful.  (*Id.* ¶ 274.)  Even the automatic "deadman" system on the BOP failed to activate properly.  (*Id.*)  Subsequent investigation by the Presidential Commission—the group tasked with investigating the spill—revealed that poor maintenance and the modifications BP had authorized reduced the effectiveness of the BOP.  (*Id.* ¶¶ 274–75.)

Despite the string of ill-advised decisions and the warning signs leading up to the Deepwater Horizon disaster, BP disseminated positive public representations throughout the Subclass Period concerning its process safety programs, its risk management infrastructure, its spill response capabilities, and the Company's prioritization of safety in the Gulf.  According to Plaintiffs, these representations lulled investors into a false sense of confidence with respect to BP's control over and commitment to the safety of its operations.  The Deepwater Horizon explosion shattered the façade BP had so carefully crafted, revealing instead a slipshod safety program beset by financial, management, and personnel problems.  After Deepwater Horizon, it became clear that BP's safety efforts trailed far behind the Company's representations, as measured by both internal BP markers and external regulatory standards and industry peer comparisons.

---

[12] A kick is an unplanned influx of gas, fluid, or other anomaly that indicates that hydrocarbons are rising up the wellbore.  If the kick rises above the blowout preventer, an explosion is "all but inevitable."  (Compl. ¶¶ 267–71.)

According to the Ludlow Plaintiffs, BP's rocky safety record—highlighted most tragically in the Texas City explosion and the Prudhoe Bay spill—added value to the subsequent corporate professions of a renewed safety commitment. Against this sober backdrop of failures, promises of new safety initiatives, like BP's Operating Management System, provided greater reassurance to the market and acquired added significance for shareholders. BP's representation that it was strengthening the safety of its operations made the ultimate revelation—played out tragically in the Deepwater Horizon explosion—all the more shocking as the market learned that "the story spun by BP to outside investors was far different from the reality of its internal operations." (*Id.* ¶ 9.) Unbeknownst to the market and the public, the Deepwater Horizon catastrophe was a predictable outcome of BP's continued disregard for process safety. (*Id.* ¶¶ 8, 391.)

## A. Alleged Misrepresentations and Omissions

The Ludlow Plaintiffs claim that they paid inflated prices for BP ADSs based on Defendants' materially false and misleading misrepresentations and omissions, made on or after March 4, 2009. Plaintiffs allege thirty-five specific misstatements and omissions, all centered on BP's process safety efforts.[13] Each alleged misrepresentation or omission is identified by the number given in Plaintiffs' Appendix A (Doc. No. 187, App. A) and the corresponding paragraph identifying the statement in the Complaint.

The alleged misrepresentations began on March 4, 2009—the start of the Subclass Period—when BP issued its 2008 Annual Report, Form 20-F. That Annual Report included a section titled "Safety," which addressed safety and risk management. The section included such statements as:

---

[13] Plaintiffs pared down the specific misrepresentations they allege between the filing of the Complaint and the filing of their response to the motion to dismiss. Plaintiffs' Appendix A, filed as an attachment to their response, purports to contain all of the alleged misstatements. (Doc. No. 187, App. A.)

- "Throughout 2008, senior leadership across the group continued to hold safety as their highest priority."  (App. Stmt No. 12; Compl. ¶ 353.)[14]

- "We remain fully committed to becoming a recognized industry leader in process safety management."  (App. Stmt No. 14; Compl. ¶ 353.)

BP formed two internal committees—the Safety, Ethics and Environment Assurance Committee ("SEEAC")[15] and the Group Operations Committee ("GORC")—and charged them with oversight and coordination of its safety programs.[16]  As described in BP's 2008 Form 20-F, SEEAC responsibilities included "[r]eviewing material to be placed before shareholders which addresses environmental, safety and ethical performance and mak[ing] recommendations to the Board about their adoption and publication."  (Compl. ¶ 425.)  The GORC was "tasked with assuring the group chief executive [Hayward] that group operational risks [we]re identified and managed appropriately" and was "expressly charged with analyzing safety incidents in BP's operations."  (*Id.* ¶¶ 357, 428.)  In outlining the role of these safety committees, the 2008 20-F stated:

- "Safety performance has been scrutinized by the . . . GORC, chaired by the group chief executive (Hayward) and tasked with assuring . . . Hayward that group operational risks are identified and managed appropriately.  We continued to build our team of safety and operations auditors.  A team of 45 auditors is now in place, with 36 audits completed in 2008."  (App. Stmt. No. 15; Compl. ¶ 353.)

According to Plaintiffs, September 2009 audits of the Deepwater Horizon revealed that, contrary to this statement, safety goals were not commonly known or properly communicated to employees.  (Compl. ¶¶ 310–11.)

---

[14] Unless otherwise noted, the Court has removed all emphasis added by Plaintiffs in their Complaint.

[15] The SEEAC members were Sir William Castell (Chairman of SEEAC), Paul Anderson (Board Member), Cynthia Carroll (Board Member), Antony Burgmans (Board Member), Erroll B. Davis, Jr. (Board Member), Tony Hayward (Special Liason to SEEAC), and Andy Inglis (who reported to the SEEAC on Exploration and Production).  All seven of these individuals are Individual Defendants.

[16] The GORC members were Tony Hayward (Group Chief Executive and Chairman of the GORC), Andy Inglis (Chief Executive of Exploration and Production), John Baxter (Group Head of Engineering), Iain Conn (Chief Executive of Refining and Marketing), Mark Bly (Group Head of Safety & Operations), Vivienne Cox (Chief Executive of Alternative Energy), and Steve Westwell (Executive VP, Strategy & Integration).  Of the GORC members, only Hayward and Inglis are named Individual Defendants.

BP also developed and began to implement a company-wide safety program—the Operating Management System ("OMS")—that was to be methodically phased in across BP sites worldwide.  The 2008 20-F made the following representation about the OMS program:

-   "Eight sites completed transition to OMS in 2008; two petrochemical plants . . . two refineries . . . and four exploration and production sites, North America Gas, the Gulf of Mexico, Colombia and the Endicott field in Alaska."  (App. Stmt. No. 13; Compl. ¶ 353.)

According to Plaintiffs, these statements were materially false and misleading because BP failed to disclose that it had not in fact implemented safety measures in its Gulf of Mexico operations.  (Compl. ¶ 354.)  Plaintiffs also claim that BP conducted operations in the Gulf without any legitimate oil spill response plan and understated the risks of the Gulf operations while overstating its ability to extract oil.  (*Id.*)  Further, the 2008 Annual Report failed to disclose that BP disregarded warnings about its operations, lacked robust management processes that left it exposed to accidents, and lacked adequate internal safety and risk management controls.  (*Id.* ¶¶ 352, 354.)

BP followed its 2008 Annual Report with additional statements specifically addressing the Company's work in the Gulf of Mexico.  For example, on March 10, 2009, BP filed its IEP, under which BP proposed to drill two offshore wells in the Mississippi Canyon Block 252 plot.  (Compl., Ex. B.)  The IEP is marked "received by" the MMS on February 23, 2009.  (*Id.*)  In Section 14, titled "Environmental Impact Analysis," the IEP concludes: "[I]t is unlikely that an accidental surface or subsurface oil spill would occur from the proposed activity."  (App. Stmt. No. 16; Compl. ¶ 356.)  In addition, Section 7, titled "Oil Spills Information" states that BP "has the capability to respond to the appropriate worst case spill scenario" presented in BP's regional Oil Spill Response Plan ("Regional OSRP") and includes the following certification: "I hereby certify that BP Exploration & Production Inc. has the capability to respond, to the maximum

extent practicable, to a worst-case discharge, or a substantial threat of such a discharge, resulting from the activities proposed" in the IEP.  (Compl., Ex. B, at 71.)  BP's Regional OSRP estimated the volume of an uncontrolled blowout in the Gulf at 300,000 barrels of oil per day.  (*Id.*)  The IEP estimated the volume of an uncontrolled blowout at the Macondo site at 162,000 barrels of oil per day.  (*Id.*)  Plaintiffs contend this document was false and misleading because it failed accurately to detail the true risks and dangers associated with operation of the Deepwater Horizon.  Plaintiffs allege that both BP's estimate of 162,000 gallons as the "worst-case discharge scenario" and the Company's assurances that it was ready to respond to such an amount were false.  (*Id.* ¶ 356.)  Plaintiffs also suggest that BP did not provide all the assurances required by federal regulations.  (*Id.* ¶¶ 357–61.)  In support of these allegations, Plaintiffs point to testimony given by BP officers during the Senate investigations following the Deepwater Horizon explosion, acknowledging failures in BP's response preparedness efforts.  (*Id.* ¶¶ 362– 64.)

At the annual Howard Weil Energy Conference on March 25, 2009, Defendant McKay, the Chairman and President of BP America, discussed BP's work in the Gulf of Mexico.  In connection with the discussion, McKay stated, "By the way, let me add that managing costs down does not mean BP will be skimping when it comes to ensuring our operations remain safe, reliable and compliant in years ahead."  (App. Stmt. No. 10; Compl. ¶ 365.)  McKay also remarked, "Safety will continue to have first call on the company resources."  (App. Stmt. No. 11; Compl. ¶ 365.)  Plaintiffs allege that McKay's statements were false and misleading because McKay was aware of serious safety problems throughout BP's Gulf of Mexico operations. Specifically, McKay, as CEO of BP America, knew of systemic safety problems at BP and knew that BP managers had issued directives to put profit before safety.  (Compl. at ¶ 366.)  McKay

14

also allegedly knew that BP skimped on operational safety and that its safety program was recklessly underfunded.  (*Id.* ¶ 367.)

While testifying before the Senate and Energy and Natural Resources Committee on November 19, 2009, David Rainey ("Rainey"), Vice President for Gulf of Mexico Exploration for BP America, stated that: "While our intent is to prevent all accidental discharges, we conduct regular emergency drills with local, state, and federal agencies.  All of our production facilities have contingency plans that identify the procedures, response equipment, and key personnel needed for responding to incidents."  (App. Stmt. No. 17; Compl. ¶ 370.)  Rainey's testimony also provided specific information regarding oil operations in the Gulf.  According to Plaintiffs, Rainey's statements were misleading because he omitted facts about BP's inadequate safety protocols and failures to implement adequate safety provisions.  (Compl. ¶ 372.)

BP's 2009 Annual Review, issued on February 26, 2010, contained further representations addressing BP's progress on the safety front.  Several BP board members issued written statements as part of the Annual Review.  For example, Svanberg, in his capacity as Chairman of the Board, wrote a letter that accompanied the Annual Review stating, among other things, the following:

- "Risk remains a key issue for every business, but at BP it is fundamental to what we do.  We operate at the frontiers of the energy industry, in an environment where attitude to risk is key.  The countries we work in, the technical and physical challenges we take on and the investments we make – these all demand a sharp focus on how we manage risk.  We must never shrink from taking on difficult challenges, but the [B]oard will strive to set expectations of how risk is managed and remain vigilant on oversight."  (App. Stmt. No. 9; Compl. ¶ 374.)

Plaintiffs claim this statement was false because BP's Board was "trying to manage risk in the least costly way possible" instead of setting proper risk management expectations and procedures.  (Compl. ¶ 374.)  The Board allegedly "intentionally chose not to implement safety

and risk management protocols, including those recommended to senior management," thereby rendering false the Annual Review's portrait of the Board's oversight of safety.  (*Id.*)  Also included in the Annual Review were statements by Hayward, who wrote:

-   "Despite . . . difficult conditions, a revitalized BP kept up its momentum and delivered strong operating and financial results while continuing to focus on safe and reliable operations."  (App. Stmt. No. 1; Compl. ¶ 376.)

-   "These successes make us the largest producer and leading resource holder in the deepwater Gulf of Mexico."  (App. Stmt. No. 2; Compl. ¶ 2.)

-   "We continue to show our ability to take on and manage risk, doing the difficult things that others either can't do or choose not to do.  This is why we are able to form such strong relationships with governments and national oil companies and why we continue to have a critical role to play in supplying the world with its future energy needs."  (App. Stmt. No. 3; Compl. ¶ 377.)

Hayward also answered questions in the "Group Chief Executive's Review," which was disseminated to BP shareholders along with the Annual Review.  In discussing BP's priorities, Hayward noted, "Achieving safe, reliable and compliant operations is our number one priority and the foundation stone for good business."  (App. Stmt. No. 4; Compl. ¶ 378.)  According to Plaintiffs, all of Hayward's statements were false and misleading because Hayward was aware of the risks associated with drilling in the Gulf yet falsely reassured investors that risks were being handled appropriately.  (Compl. ¶ 377.)  Hayward also allegedly omitted the fact that BP's safety protocols were "woefully inadequate" and that BP had failed to implement all recommended safety measures.  (*Id.* ¶ 379.)

Inglis, BP's Chief Executive of Exploration and Production, similarly underscored that "[s]afety, both personal and process, remains our highest priority," in a statement included in the Annual Review.  (App. Stmt. No. 7; Compl. ¶ 380.)  Plaintiffs claim Inglis's statement was misleading because, as Chief Executive, he was aware of safety problems in BP's Gulf

operations and knew that BP was unprepared to confront safety issues in connection with its drilling in the region.  (Compl. ¶ 382.)

In a Strategy Presentation given in London on March 2, 2010, BP highlighted the Gulf of Mexico as the Company's greatest prospect for future growth.  The statement "safe and reliable operations remains #1" appeared in the presentation.  (App. Stmt. No. 20; Compl. ¶ 390.) Plaintiffs acknowledge that the Gulf of Mexico was an important economic driver for BP, but argue that BP was not committed to safety as it represented.  (Compl. ¶ 391.)  According to Plaintiffs, an incident like the Deepwater Horizon disaster was "virtually inevitable" given BP's history of safety failures and continued lack of commitment to safety.  (*Id.*)  In further support of their allegations, Plaintiffs point to information provided by confidential witnesses attesting to BP's failure to implement safety processes and to the "Abbott whistleblower action," in which BP allegedly covered up one employee's prediction of an eminent catastrophic safety failure. (*Id.*)

On March 5, 2010, BP filed its 2009 Annual Report, Form 20-F, with the SEC.  This document also reiterated that safety was BP's priority.  It included the following statements:

- "The priorities that drove our success for 2009—safety, people and performance—remain the foundation of our agenda."  (App. Stmt. No. 21; Compl. ¶ 394.)

- "In Exploration and Production, safety, both personal and process, remains our highest priority."  (App. Stmt. No. 22; Compl. ¶ 394.)

- "Our priorities remain the same, safety people and performance, focusing on the delivery of safe, reliable and efficient operations.  In 2010, we aim to use the momentum generated in 2009 to continue to improve operational, cost and capital efficiency, while ensuring we maintain our priorities of safe, reliable and efficient operations."  (App. Stmt. No. 23; Compl. ¶ 394.)

According to Plaintiffs, these statements were false and misleading because BP failed to disclose that the OMS was only partially implemented in the Gulf and that the Company had actually

terminated some of the employees responsible for implementation.  The OMS was initially rolled out in 2008, but, according to Plaintiffs, was not implemented as promised by the time of the Deepwater Horizon disaster.  Plaintiffs rely on information provided by a "confidential former BP senior employee with Gulf of Mexico responsibilities" to support their allegations.  (Compl. ¶ 395.)

The 2009 Annual Review, Form 20-F, contained additional representations specifically related to BP's progress in implementing OMS, including:

- "Safe, reliable and compliant operations remain the group's first priority.  A key enabler for this is the BP operating management system (OMS), which provides a common framework for all BP operations, designed to achieve consistency and continuous improvement in safety and efficiency.  Alongside mandatory practices to address particular risks, OMS enables each site to focus on the most important risks in its own operations and sets out procedures on how to manage them in accordance with the group-wide framework."  (App. Stmt. No. 18; Compl. ¶ 383.)

- "The reduction in the number of oil spills in 2009 follows several years of focus across BP on procedures such as 'integrity management' and 'control of work,' which are elements of BP's OMS."  (App. Stmt. No. 19; Compl. ¶ 385.)

According to Plaintiffs, these statements were false because the implementation of OMS lagged far behind target in the Gulf, OMS remained in pilot stage only, and BP had terminated many of the employees responsible for implementation at the time of these statements.  (Compl. ¶ 402.)

BP disseminated its Code of Conduct along with its public filings.  (*Id.* ¶ 406.)  The Code of Conduct stated, "no activity is so important that it cannot be done safely," and listed rules for BP employees such as, "stop any work that becomes unsafe," "make sure you know what to do if an emergency occurs at your place of work," and "only undertake work for which you are trained, competent, medically fit and sufficiently rested and alert to carry out."  (App. Stmt. No. 24, Compl. ¶ 406.)  According to Plaintiffs, these statements were false and misleading because

BP was unprepared for a safety disaster in the Gulf, and BP lacked proper internal controls and risk management procedures. (Compl.¶ 407.)

On March 22, 2010, Defendant Inglis spoke at the Howard Weil Conference and stated that: "Safety and operational integrity underpins everything we do, and we are now in the final phase of rolling out our operating management system that provides a single, consistent framework for our operations, covering all areas from personal and process safety to environmental performance." (App. Stmt. No. 8; Compl. ¶ 401.) Plaintiffs allege that Inglis's statement was false because BP was not in the final stage of rolling out OMS in the Gulf. In reality, the program was stuck in its infancy stages. (Compl. ¶¶ 334, 402.)

On April 15, 2010, BP published its 2009 Sustainability Review online. The Sustainability Review included a section titled "Safe and Responsible Energy." (*Id.* ¶ 408.) This section contained the following statement: "Our commitment to safe and reliable operations starts with the group chief executive and leadership: a commitment that filters down through the organization and is regularly communicated to all staff." (App. Stmt. No. 25; Compl. ¶ 408.) Other statements in the Sustainability Review referenced OMS specifically, stating: "Safety is fundamental to our success as a company and 2009 was important because of the progress we made in implementing our operating management system ("OMS"). "I see [OMS] as the foundation for safe, responsible and high-performing BP." "Having been initially introduced at 8 sites in 2008, the OMS rollout extended to 70 sites by the end of 2009 . . . [t]his means implementation is 80% complete." (App. Stmt. No. 5; Compl. ¶ 408.) Plaintiffs attribute this statement to Defendant Hayward and allege that it was misleading because it overstated the status of OMS implementation.

On the same day, BP issued its 2009 Sustainability Report.  In his introduction to the Sustainability Report, Hayward wrote that, "I am extremely proud of BP's 2009 safety performance—it reflects a sustained effort across all our operations over many years."  (App. Stmt. No. 6; Compl. ¶¶ 408, 410.)  Plaintiffs allege that the Sustainability Report contained a slew of misrepresentations related to BP's safety efforts, including the following:

- "BP constantly seeks to improve its safety performance through the procedures, processes and training programmes that we implement in pursuit of our goal of no accidents, no harm to people and no damage to the environment."  (App. Stmt. No. 26; Compl. ¶ 410.)

- "We believe our focus on changing BP's safety culture over the last few years is yielding results."  (App. Stmt. No. 27; Compl. ¶ 410.)

- "BP has well-developed systems, processes and metrics for reporting safety performance in support of internal performance management and to enable learning and public reporting."  (App. Stmt. No. 28; Compl. ¶ 410.)

- "BP is fully committed to becoming a recognized industry leader in process safety management and continues to work to achieve this."  (App. Stmt. No. 31; Compl. ¶ 410.)

- "[W]e seek to ensure an infrastructure is in place to deal effectively with spills and their impacts.  Our operating facilities have the capacity and resources to respond to spill incidents and we participate in industry and international forums to coordinate planning and emergency response."  (App. Stmt. No. 32; Compl. ¶ 410.)

- "Incidents are recorded locally by our staff and contractors using our web-based incident tracking system.  BP's executive management is notified quarterly about numbers and volumes of spills and spills of more than 100 barrels."  (App. Stmt. No. 33; Compl. ¶ 410.)

- "BP recognizes the risk posed to the environment from spills and takes a range of measures to prevent any loss of hydrocarbons."  (App. Stmt. No. 34; Compl. ¶ 410.)

- "To track our progress in process safety management, we measure lagging indicators which record events that have already occurred, such as oil spills, and leading indicators that focus on the strength of our controls to prevent undesired incidents, such as inspections and test of safety-critical equipment."  (App. Stmt. No. 35; Compl. ¶ 410.)

According to Plaintiffs, the statements in both the Sustainability Review and the Sustainability Report were false and misleading for the following six reasons: (1) BP had failed to implement adequate safety procedures; (2) BP did not have a legitimate Regional OSRP for the Gulf; (3) BP understated its risk exposure from drilling operations in the Gulf; (4) BP lacked adequate internal safety controls; (5) the OMS was not fully implemented in BP's Gulf operations and employees responsible for implementation had been terminated; and (6) BP's officers knew that the Company's Gulf operations had caused spills in 2008 and two of BP's rigs in the Gulf, including the Deepwater Horizon, had reported recent operational safety problems. (Compl. ¶¶ 409, 411.)

In addition, BP allegedly audited certain facilities selectively and omitted audit results that uncovered facts contrary to the statements BP publicly repeated to investors.  (Doc. No. 187, App. A.)  BP's selective presentation of audit findings rendered false additional statements in the 2010 Sustainability Report, such as the following:

- "BP's safety and operations audits assess compliance with standards and the effectiveness of operational risk management.  The audits provide a rigorous check on safety and operations programmes.  Progress is reported quarterly, at which time issues, such as overdue action closures, are highlighted to executive management in the executive-level GORC."  (App. Stmt. No. 30; Compl. ¶ 410.)

- "If an incident occurs, it is recorded locally by employees, contractors and management using our internal web-based data management system.  All fatalities, other major incidents and many that had the potential to become major incidents are discussed by the GORC, chaired by [Defendant Hayward]."  (App. Stmt. No. 29; Compl. ¶ 410.)

Plaintiffs claim that the statements outlined above were widely disseminated to the securities markets, investment analysts, and to the investing public.  Plaintiffs allegedly relied on BP's statements that the Company had implemented appropriate risk management and safety mechanisms to reduce the risk of catastrophic disasters.  By the time the true state of BP's safety

protocols was revealed through exactly the type of disaster BP represented it was working to prevent—the Deepwater Horizon explosion—Plaintiffs had already lost a substantial percentage of their investment.

### B.  Alleged Involvement of the Individual Defendants

According to Plaintiffs, the Individual Defendants were aware of the falsity of the statements outlined above due to their corporate positions, specifically, their membership on either the SEEAC or the GORC committees.  Because Defendants Castell, Anderson, Burgmans, Carroll and Davis served on the SEEAC, which was tasked with making day-to-day and strategic decisions regarding BP's safety programs, Plaintiffs contend these Individual Defendants were aware of the specific safety problems in the Gulf region.  (Compl. ¶¶ 423–26.)  Plaintiffs make similar scienter arguments with respect to Defendants Hayward and Inglis and their membership on the GORC.

In addition to their corporate roles and committee memberships, the Individual Defendants were allegedly aware of the true state of safety in the Gulf region because BP's internal reporting structures shuttled safety problems up to the Board of Directors.[17] Additionally, the testimony of three confidential witnesses suggests that BP relied on an internal database to track all safety incidents, that reports were prepared from the database and delivered to the Board, and that Gulf operations were audited by BP's internal audit committee and audit results were reported to the Board.[18]

---

[17] In expounding on this allegation during oral argument, Plaintiffs' attorney made specific reference to the "Orange Book," both during oral argument and in the power point presentation presented to the Court.  (Transcript, Doc. No. 304, at 77, lns. 16–23.)  Because Plaintiffs make no reference to the Orange Book in the Complaint, the Court does not consider it here.  *See Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 289 (5th Cir. 2006) (when considering a motion to dismiss under Rule 12(b)(6), a district court may "review only the well-pleaded facts in the complaint" and "new allegation[s] may not be considered").

[18] Due to confidentiality agreements entered in both this action and MDL 2179, Plaintiffs have withheld the names and titles of the three confidential witnesses.

Finally, the Complaint sets forth a list of factual allegations which it presents as evidence of what all of the Individual Defendants knew of BP's safety problems in the Gulf. The allegations include the following:[19]

- Internal communications, including an April 15, 2008 email, by project managers to senior staff in BP advised that project managers and engineers in the Gulf were submitting outdated information in violation of BP's Code of Conduct.

- Communications, including safety incidents recorded via an internal web-based data management system, related to safety failures on the Atlantis and Deepwater Horizon rigs were made available to GORC members.

- BP's Ombudsman and an independent firm hired by BP in 2009 confirmed that BP failed to complete certain engineering documents that left it in violation of its own policies on the Atlantis rig.

- BP terminated the highest ranking employees responsible for Gulf operations in the fourth quarter of 2009 and the first quarter of 2010 after these individuals raised process safety concerns.

- A December 2008 internal strategy document warned that BP did not adequately plan for serious safety risks in its Gulf operations.

- Maintenance was delayed on the Deepwater Horizon rig because of a tight cost budget.

- An internal BP document recommended against use of the long string option on the Deepwater Horizon rig, and testing by BP and Halliburton engineers confirmed the unreliability of cementing with a long string casing.

- Internal BP emails from late March 2010 acknowledged the risk of the long string design but justified selection of the method because it saved time.

- Senior management approved installation of six centralizers at the Macondo well even though BP's original design called for a minimum of sixteen centralizers. Installation was authorized to minimize delay. (Compl. ¶¶ 220–27.) When a Halliburton engineer wanted to perform further testing to determine whether the six centralizers would sufficiently stabilize the cement job, a BP employee told him "who cares, it's done, end of story, will probably be fine." (*Id.* ¶ 228.)

- BP drilled at a depth in excess of its MMS permit. After the Deepwater Horizon explosion, a BP crewman admitted that this depth had been misrepresented to

---

[19] In support of their scietner allegations, Plaintiffs list thirty-eight facts that they allege "Defendants" were aware of. (Compl. ¶ 440). The Court provides only a sampling here.

MMS, and that BP has in fact been drilling in excess of 22,000 feet, in violation of its permit.  (*Id.* ¶ 200.)

- BP had advance knowledge of failed negative pressure tests of the slurry used at the Macondo well site.  BP completed the cementing job before receiving the final test results, which arrived six days after the blowout.  (*Id.* ¶¶ 237–38.)

- BP knew that the manufacturer of the Deepwater Horizon's BOP had a history of BOP failures.

- Studies by governmental agencies revealed frequent failures by BOPs in the Gulf of Mexico and in deepwater drilling environments.

- An April 6, 2009, letter from MMS to BP indicated the high risk associated with drilling at the Macondo well.

- An internal BP audit confirmed outstanding safety items on the Deepwater Horizon, and a September 2009 audit found that the Deepwater Horizon suffered from excessive overdue maintenance totaling 390 jobs and 3,454 man hours.  Six of the overdue jobs related to BOP maintenance.

- BP mandated 7% cost reductions for all of its drilling operations in the Gulf.

(Compl. ¶ 436.)  Plaintiffs also allege that BP's executive compensation structure—which tied 70% of the executive performance bonus to financial metrics as opposed to safety metrics—provided the Individual Defendants with the motive to commit fraud.  (*Id.*)

## IV.    LEGAL STANDARDS

### A.  Rule 12(b)(6)

To survive a motion to dismiss, a complaint must contain sufficient factual allegations, accepted as true, to state a claim for relief that is plausible on its face.  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  It follows that, where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but has not shown—that the plaintiff is entitled to relief.  *Id.* at 1950; *see also* FED. R. CIV. P. 8(a)(2).  Well-

pleaded factual allegations must be taken as true, but the court does not "accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Cent. Laborers' Pension Fund v. Integrated Elec. Servs., Inc.*, 497 F.3d 546, 550 (5th Cir. 2007).

In considering a Rule 12(b)(6) motion to dismiss, a court must limit itself to the contents of the pleadings, with two exceptions. First, the Fifth Circuit allows the courts to consider certain documents attached to the motion to dismiss. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000). The Fifth Circuit restricts such consideration to documents that are referenced in the complaint and are central to the plaintiffs' claim. *Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003). Second, in securities cases, courts may take judicial notice of the contents of public disclosure documents that the law requires be filed with governmental agencies, such as the SEC, and that are actually filed with the agency. *Lovelace v. Software Spectrum. Inc.*, 78 F.3d 1015, 1018 n.1 (5th Cir. 1996). However, these documents may be considered only for the purpose of determining what statements they contain, not for proving the truth of their contents. *Id.*

As is required for Rule 12(b)(6) analysis, the court must draw all reasonable inferences in favor of the plaintiff. However, for scienter only, in keeping with the requirements of the Private Securities Litigation Reform Act ("PSLRA"), the court must take into account plausible inferences opposing as well as supporting a strong inference of scienter. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). Accordingly, for purposes of a Rule 12(b)(6) motion to dismiss, a strong inference of scienter is one at least as compelling as any opposing inference of non-fraudulent intent. *Id.*

### B. Section 10(b)

Under Section 10(b) of the Securities Exchange Act of 1934,

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).  SEC Rule 10b–5, promulgated pursuant to section 10(b), implements section 10(b) by forbidding, among other things, the making of any "untrue statement of a material fact" or the omission of any material fact "necessary in order to make the statements made . . . not misleading."  17 C.F.R. § 240.10b–5.  The Supreme Court has implied from the text of section 10(b) that it affords a right of action to purchasers or sellers of securities injured by its violation.  *Tellabs*, 551 U.S. at 318.  To state a private claim under section 10(b), a plaintiff must allege the following: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.  *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008); *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 641 (5th Cir. 2005).

### 1.  Material Misrepresentations and Omissions

Because Plaintiffs assert securities fraud claims, they must satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA.  *See Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009); s*ee also Tellabs*, 551 U.S. at 322 (noting that the PSLRA's twin goals are to curb frivolous, lawyer-driven litigation, while preserving investors' abilities to recover on meritorious claims).  Rule 9(b) requires that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  FED. R. CIV. P. 9(b); *see also Rosenzweig v. Azurix*, 332 F.3d 854, 866 (5th Cir. 2003) (noting that the PSLRA's

particularity requirement incorporates, at a minimum, the pleading standard for fraud under Rule 9(b)).  The PSLRA enhances the requirements of Rule 9(b) in two ways.  First, plaintiffs must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u–4(b)(1).  Second, for each act or omission alleged to be false or misleading, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Id.* at § 78u–4(b)(2).

In order to meet these additional requirements of the PSLRA, a plaintiff must, therefore: (1) specify each statement alleged to have been misleading; (2) identify the speaker; (3) state when and where the statement was made; (4) plead with particularity the contents of the false representation; (5) plead with particularity what the person making the misrepresentation obtained thereby; and (6) explain the reason or reasons why the statement is misleading, *i.e.*, why the statement is fraudulent.  *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002).  These allegations constitute the "who, what, when, where, and how" required under Rule 9(b) and the PSLRA.  *Id.*  What constitutes particularity will necessarily differ with the facts of each case.  *Guidry v. Bank of LaPlace*, 954 F.2d 278, 288 (5th Cir. 1992).  A dismissal for failure to plead fraud with particularity as required by Rule 9(b) is a dismissal on the pleadings for failure to state a claim.  *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 361 (5th Cir. 2004).

General allegations, which lump all defendants together and fail to segregate the alleged wrongdoing of one from those of another, do not meet the requirements of Rule 9(b).  The court will reject the "group pleading" approach and instead look to the state of mind of the individual corporate official or officials "who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like)

rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment." *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 533 (5th Cir. 2008).

To be actionable, a misrepresentation of a fact, or an omission of a fact, must be material. The Supreme Court recently reaffirmed that there is no bright-line rule for determining whether information withheld from a company's filings is materials as a matter of law. *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1318–23 (2011). Unwilling to allow materiality to be reduced to a test of "statistical significance," the Court held instead that assessing materiality involves a "fact-specific inquiry . . . that requires consideration of the source, content, and context" of the allegedly omitted information. *Id.* at 1321. The misrepresentation of a fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in making an investment decision. *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988). For an omission to be material, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available. *Id.* at 232; *see also Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1445 (5th Cir. 1993) (explaining that the appropriate inquiry is whether the statement or omitted fact is significant, "such that it alters the total mix of information available about the proposed investment"). Materiality is not judged in the abstract, but in light of the surrounding circumstances. *Rubinstein v. Collins*, 20 F.3d 160, 168 (5th Cir. 1994).

With regard to misstatements, the PSLRA establishes a "safe harbor" protecting a forward-looking statement from liability where such a statement is made by a natural person, unless plaintiffs prove that it was made with actual knowledge that the statement was false and misleading. 15 U.S.C. § 78u–5(c)(1)(A). A statement is forward looking if it is:

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C); [or]

(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer[.]

15 U.S.C. § 78u–5(i)(1)(A).

The safe harbor provision protects individuals and corporations from liability for forward-looking statements that prove false if the statement is "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" or where the forward-looking statement is immaterial. *Id.* at § 78u–5(c)(1)(A)(i)–(ii). Where the forward-looking statement is not accompanied by cautionary language, a plaintiff must demonstrate that the defendant made the statement with "actual knowledge" as to its falsity. *Id.* at § 78u–5(c)(1)(B).

Vague, optimistic statements are not actionable. Allegations that amount to little more than corporate "cheerleading" are puffery, projections of future performance not worded as guarantees, and are not actionable under federal securities law because no reasonable investor would consider such statements material and because investors and analysts are too sophisticated to rely on vague expressions of optimism rather than specific facts. *Krim*, 989 F.2d at 1446. Additionally, "it is well-established that generalized positive statements about a company's progress are not a basis for liability." *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 419 (5th Cir. 2001). Statements that are predictive in nature are actionable only if they were false when made.

29

*Shushany v. Allwaste, Inc.*, 992 F.2d 517, 524 (5th Cir. 1993).

### 2.  Scienter

Section 10(b) and Rule 10b–5 do not protect investors against negligence or corporate mismanagement.  *Shaw Group*, 537 F.3d at 535.   Under the PSLRA, it is not enough to particularize false statements or fraudulent omissions made by a defendant; rather, for "each act or omission alleged" to be false or misleading, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u–4(b)(2).  To establish a section 10(b) claim, a private plaintiff must prove that the defendant acted with scienter.  *Tellabs*, 551 U.S. at 319.

*Tellabs* outlined a three step approach to reviewing scienter allegations in a motion to dismiss a federal securities fraud case pursuant to the PSLRA.  *Id.* at 323.   First, the allegations must, as in federal pleadings generally, be taken as true.  *Id.*   Second, courts may consider documents incorporated in the complaint by reference and matters subject to judicial notice.  *Id.* The facts must be evaluated collectively, not in isolation, to determine whether a strong inference of scienter has been pleaded.  *Id.* at 324; *see also Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 260 (5th Cir. 2005) ("While [the Fifth Circuit] will view a complaint *in toto* when considering whether a complaint has adequately pled scienter . . . each allegation of fraud must individually meet the particularity requirements of the PSLRA.") (citation omitted).  Third, a court must take into account plausible inferences opposing as well as supporting a strong inference of scienter. *Tellabs*, 551 U.S. at 324.  The inference of scienter must ultimately be "cogent and compelling," not merely "reasonable" or "permissible."  *Id.*; *see also Shaw Group*, 537 F.3d at 533–34 (adopting *Tellabs*' three step approach).

In the context of federal securities fraud, scienter is "defined as 'an intent to deceive,

manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it.'" *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009) (quoting *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 643 (5th Cir.2005)); *see also Plotkin v. IP Axess Inc.*, 407 F.3d 690, 697 (5th Cir. 2005) ("[A] securities fraud plaintiff must prove that the defendant either consciously misbehaved . . . or was so severely reckless that it demonstrates that the defendant must have been aware of the danger of misleading the investing public."). Severe recklessness is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Rosenzweig*, 332 F.3d at 866.

For a complaint to adequately plead scienter, "Congress require[s] plaintiffs to plead with particularity facts that would give rise to a 'strong'— *i.e.,* a powerful or cogent—inference." *Tellabs,* 551 U.S. at 323.   The inference need not be "irrefutable, i.e., of the 'smoking gun' genre, or even the most plausible of competing inferences." *Id.* (citation omitted) (internal quotation omitted).   Nonetheless, the "inference of scienter must be more than merely 'reasonable'or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Id.* In addition, "[t]he strength of an inference cannot be decided in vacuum. . . . To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 323–24.  "[O]missions and ambiguities count against inferring scienter, for plaintiffs must 'state with particularity facts

giving rise to a strong inference that the defendants acted with the required state of mind.'"  *Id.* at 326 (quoting 15 U.S.C. § 78u–4(b)(2)).

Although circumstantial evidence can support a strong inference of scienter, allegations of motive and opportunity standing alone will not suffice.  *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 430 (5th Cir. 2002).  Appropriate motive and opportunity allegations may, however, "meaningfully enhance the strength of the inference of scienter."  *Southland*, 365 F.3d at 368 (quoting *Nathenson*, 267 F.3d at 412).  Corporate officers are not liable for acts solely because they are officers, even where their day-to-day involvement in the corporation is pleaded.  *Id.* However, corporate statements can be connected to a particular officer if plaintiffs allege the officer signed the document in which the statement appears or they adequately allege the officer's involvement in creating the document.  *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006).

The Fifth Circuit has rejected the group pleading approach to scienter.  *Shaw Group*, 537 F.3d at 534.  Instead, a court must look to the state of mind of the individual corporate official or officials making or issuing the statement "rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment." *Southland*, 365 F.3d at 366.  As the Fifth Circuit explained, "[c]onsistent with our rejection of the 'group pleading' doctrine, we do not construe allegations contained in the Complaint against the 'defendants' as a group as properly imputable to any particular individual defendant unless the connection between the individual defendant and the allegedly fraudulent statement is specifically pleaded."  *Southland,* 365 F.3d at 365.  Therefore, when pleading fraud claims against individuals under section 10(b) and Rule 10b–5, plaintiffs must distinguish among defendants and allege the role of each.  *Id.*

### 3.  Section 20(a) claims

Under section 20(a) of the Exchange Act, "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . ."  15 U.S.C. § 78t(a).  Section 20(a) is a secondary liability provision, and plaintiffs must therefore establish a primary violation under section 10(b) before liability arises under section 20(a).  *ABC Arbitrage*, 291 F.3d at 348 n. 57 (noting that "control person" liability is "derivative, i.e., such liability is predicated on the existence of an independent violation of the securities laws").  Accordingly, if a plaintiff fails to state a claim for a primary securities fraud violation under section 10(b) or Rule 10b-5, they necessarily fail to state a claim for control person liability under section 20(a).  *Blackwell*, 440 F.3d at 288.

### C.  Personal Jurisdiction

Plaintiffs bear the burden of demonstrating facts sufficient to support personal jurisdiction over any nonresident defendants.  *United Galvanizing, Inc. v. Imperial Zinc Corp.*, No. H-08-0551, 2008 WL 4746334, at *3 (S.D. Tex. Oct. 27, 2008).  Constitutional due process requires a plaintiff to show that (i) the defendants purposefully availed themselves of the benefits and protections of Texas law, thereby establishing minimum contacts with the forum, and that (ii) exercising personal jurisdiction does "not offend traditional notions of fair play and substantial justice."  *Comman-Aire Corp. v. Ontario Mech. Sales & Service Inc.*, 963 F.2d 90, 84 (5th Cir. 1992).  "There are two types of minimum contacts: those that give rise to specific personal jurisdiction and those that give rise to general personal jurisdiction.  *Lewis v. Fresne*, 252 F.3d 352, 358 (5th Cir. 2001).  Specific jurisdiction exists where "a nonresident defendant

has purposefully directed its activities at the forum state and the litigation results from alleged injuries" stemming from those activities.  *Cent. Freight Lines, Inc. v. APA Transp. Corp.*, 332 F.3d 376, 381 (5th Cir. 2003) (internal citations omitted).  General jurisdiction can be exercised when a defendant's contacts with the forum state are substantial, continuous, and systematic, even if unrelated to the litigation.  *Id.*  The "continuous and systematic contacts test is a difficult one to meet, requiring extensive contacts between a defendant and a forum."  *Johnston v. Multidata Systems Intern. Corp.*, 523 F.3d 602, 609 (5th Cir. 2008).  Although the party seeking to invoke the power of the court bears the burden of proving that jurisdiction exists, a *prima facie* showing suffices, and the plaintiff need not establish jurisdiction by a preponderance of the evidence.  *Luv N. Care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 469 (5th Cir. 2006) (citation omitted).

## V.    ANALYSIS

### A.  Plaintiffs' Section 10(b) Claims

In order to adequately plead a misleading statement or omission under the PSLRA, a plaintiff must: (1) specify each statement alleged to have been misleading; (2) identify the speaker; (3) state when and where the statement was made; (4) plead with particularity the contents of the false representation; (5) plead with particularity what the person making the misrepresentation obtained thereby; and (6) explain the reasons why the statement is misleading, *i.e.*, why the statement is fraudulent.  *ABC Arbitrage*, 291 F.3d at 350.

### 1.  Summary Chart of Plaintiffs' Allegations

The Complaint excerpts allegedly false and misleading statements from eleven different sources.  At oral argument, Plaintiffs' counsel categorized all of the statements into what Plaintiffs characterize as five general misrepresentations, namely: (1) that OMS was fully

34

implemented in the Gulf of Mexico; (2) that OMS applied across all BP operations; (3) that BP had the capability to manage risk; (4) that BP had the capacity and resources to respond to spill incidents; and (5) that safety was the highest priority at BP. The following chart lists in chronological order each source alleged by Plaintiffs to contain false and misleading statements, identifies the numbered paragraph of the Complaint in which the allegations are made, identifies any Individual Defendant to whom the statement is attributed, identifies the "misrepresentation number" corresponding to Plaintiffs' Appendix A, and identifies by "X" which of the five categories of misrepresentations the allegation purportedly supports.

| Document | Complaint ¶ | Speaker | Misrep # | OMS implemented in Gulf | Application of OMS across operations | Risk management capabilities | Capacity to respond to spills | Safety as highest priority |
|---|---|---|---|---|---|---|---|---|
| March 4, 2009 2008 Annual Report (20-F) | 353-54 | BP | 12, 13, 14, 15 | X | | X | | X |
| March 10, 2009 Initial Exploration Plan | 355-63 | BP | 16 | | | | X | |
| March 15, 2009 Howard Weil Conference | 365-67 | McKay | 10, 11 | | | | X | X |
| Nov. 19, 2009 Senate Committee Testimony | 368-72 | Rainey | 17 | | | | X | |
| Feb. 26, 2010 2009 Annual Review | 374-86 | BP, Hayward, Svanberg, Inglis | 1, 2, 3, 4, 7, 9, 18, 19 | X | | X | | X |
| March 2, 2010 Strategy Presentation | 387-93 | BP | 20 | | | | | X |
| March 5, 2010 2009 Annual Report (20-F) | 394-400 | BP | 21, 22, 23 | | | | | X |
| March 22, 2010 Howard Weil Conference | 401-05 | Inglis | 8 | | X | | | |
| Code of Conduct | 406-07 | BP | 24 | | | | | X |
| April 15, 2010 Sustainability Review | 408-09 | BP, Hayward | 5, 25 | X | | | | X |
| April 15, 2010 Sustainability Report | 410-11 | BP, Hayward | 6, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35 | | | X | X | X |

### 2.   Alleged Misrepresentations and Omissions

The Court will address each of the thirty-five alleged misrepresentations as they fall into the five categories.   Because Defendants contest only materiality and scienter, the Court will concentrate its analysis on these elements, addressing first whether Plaintiffs have pleaded with particularity the alleged misrepresentations and omissions.

### a.   Misrepresentations as to the implementation status of BP's Operating Management System (OMS)

BP's OMS program was billed as a "framework for operations across BP that is integral to improving safety and operating performance in every site."   (Compl. ¶ 353.)   The OMS "establishe[d] a set of requirements" and provided BP businesses with a "systematic way to improve operating performance."   (*Id.*)   OMS requirements included "[a] number of mandatory operating and engineering technical requirements . . . to address process safety and related risks." (*Id.*)   The process of implementing OMS at each site involved "detailed planning, including gap assessments," development of a "local OMS handbook" and a "plan to close gaps that is reviewed annually."   (*Id.*)   On multiple occasions, BP represented that OMS was implemented in the Company's Gulf operations in 2008.   *See* App. Stmt. No. 13, Compl. ¶ 353 ("Eight sites completed transition to OMS in 2008; two petrochemical plants . . . two refineries . . . and four exploration and production sites, North America Gas, the Gulf of Mexico, Colombia and the Endicott field in Alaska.")[20]; App. Stmt. No. 5, Compl. ¶ 408 ("Safety is fundamental to our success as a company and 2009 was important because of the progress we made in implementing our operating management system ("OMS").   "I see [OMS] as the foundation for safe, responsible and high-performing BP."   "Having been initially introduced at 8 sites in 2008, the

---

[20] Plaintiffs have copied into their Complaint an entire three-page section from BP's 2008 Annual Report, Form 20-F.   (Compl. ¶ 353.)   However, their discussion (as well as Plaintiff's Appendix A) highlights the specific portions identified here.

OMS rollout extended to 70 sites by the end of 2009 . . . [t]his means implementation is 80% complete.").

According to Defendants, BP's allegations concerning OMS are too vague to meet the PSLRA's particularity requirements because Plaintiffs identify only broad statements and numerous, lengthy excerpts from BP's public filings as allegedly misleading. (Doc. No. 152, at 10.) Defendants argue that statements concerning "progress" in implementing OMS are too generalized to be actionable. (*Id.*, at 19.) Defendants also argue that all statements concerning OMS are immaterial.

### i.  Particularity

#### *(a) 2008 Annual Report, Form 20-F Statement (App. Stmt. No. 13)*

Plaintiffs allege that the statement in BP's 2008 Annual Review representing that eight sites, including the Gulf of Mexico, had "completed transition to OMS in 2008" was false because BP had not in fact implemented OMS in the Gulf in 2008. According to Plaintiffs, OMS was in fact still in its infancy stages in 2009 and 2010. (Compl. ¶ 334.) During oral argument, Defendants conceded that this statement was indeed false.[21]

Even without this concession, Plaintiffs have adequately supported their allegation of falsity. Plaintiffs point to decisions made by Defendant Inglis, Executive Director and the Chief Executive of Exploration and Production during the Subclass Period, to implement global cost cutting measures that reorganized drilling operations in the Gulf. (*Id.* ¶ 335.) As a consequence of these measures, key individuals responsible for implementation of OMS in the Gulf were terminated or transferred. (*Id.*)  Plaintiffs also rely on information obtained from several

---

[21] During oral argument on November 4, 2011, counsel for Defendants stated that: "The statement here that the Gulf of Mexico completed the transition to OMS in 2008, that is a statement of a specific fact, unlike the others. This is the one statement, Your Honor, that the plaintiffs have alleged that I will admit to the Court is not accurate. The Gulf of Mexico completed the transition to OMS at the end of 2009, not at the end of 2008." (Transcript, Doc.No. 304, at 58, lns. 15–21.)

confidential witnesses.  According to Confidential Witness 2 ("CW2"), BP's OMS program lagged far behind the safety programs of BP's industry peers.  (*Id.* ¶ 334.)  In connection with Inglis's restructuring, CW2 explained that key employees tasked with implementing OMS were replaced with individuals lacking knowledge and experience.  (*Id.* ¶ 336–41.)  Specifically, Ian Little, BP's "Gulf of Mexico wells manager," was replaced by David Sims.  Harry Thierens was replaced by David Rich in 2009.  Kevin Lacy, BP's Vice President for Drilling and Completions, was terminated in December 2009, and replaced by Patrick O'Bryan.  According to Confidential Witness 1 ("CW1") and CW2, these replacements lacked experience and expertise.  (*Id.* ¶ 341.)  In addition, CW1 and CW2 confirmed that BP had not "implemented a robust operations management system" in the Gulf in 2009 and 2010, and BP failed to implement any OMS protocol on the Deepwater Horizon.  (*Id.* ¶¶ 341, 285.)  In 2009 and 2010, OMS was "still in its infancy stages" in the Gulf region.  (*Id.* ¶¶ 334, 344.)  Finally, Confidential Witness 3 ("CW3") confirmed that BP did not actually implement the "Best Practices" protocol it had approved nor did it supply its upstream operations, which included offshore exploration operations, with any process safety or risk management policies.  (*Id.* ¶ 344.)  The Court now must address whether these facts adequately demonstrate the alleged falsity of the statement at issue.

Plaintiffs first contend that BP's cost-cutting measures necessarily interfered with its implementation of OMS in the Gulf.  Plaintiffs point to cost-cutting measures that Inglis initiated in "the fourth quarter of 2009 and in January 2010."  (*Id.* ¶ 335.)  Yet, the 2008 Annual Report statement relates to implementation of OMS *in 2008*, by Plaintiffs' timeline at least a year before any of the alleged cost-cutting measures occurred.  While BP's allocation of resources to the OMS programs could theoretically affect the implementation status and effectiveness of such a program, Plaintiffs here attempt to draw a connection between temporally disparate events.

38

Cost-cutting measures in late 2009 and early 2010 cannot prove that BP had not previously implemented OMS in the Gulf in 2008.

In addition to the cost-cutting decisions, Plaintiffs rely on information provided by confidential witnesses. Defendants argue that the allegations attributed to confidential witnesses are entitled to no weight. (Doc. No. 152, at 43.) Plaintiffs can only rely on information obtained from unnamed confidential witnesses if the witnesses "are identified through general descriptions in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source as described would possess the information pleaded to support the allegations of false or misleading statements." *ABC Arbitrage*, 291 F.3d at 353. Defendants contend that here Plaintiffs fail to specify the title, responsibilities, or dates of employment of the confidential witnesses that Plaintiffs seek to rely on.

According to Plaintiffs, CW1 is an "expert witness on oil rig operational safety and a former consultant to the BP Board of Directors." (Compl. ¶ 285.) CW2 is "a former BP senior manager and an expert in the offshore oil and gas drilling and completions." (*Id.* ¶ 334.) CW3 is an "expert[] in oil company operations safety and former consultant[] to BP's Board of Directors." (*Id.* ¶ 344.) Although Plaintiffs do not provide the dates when the confidential witnesses worked for BP, all three witnesses are alleged to have done so, either as BP employees or as consultants. Two of the confidential witnesses allegedly had direct reporting lines to BP's Board of Directors; the third worked as a BP senior manager. All three worked in the area of rig safety or rig operations. In addition, at least two of the witnesses allegedly possess information dating back to 2005, placing them at BP during the relevant time period. (*Id.* ¶ 344.) All three of the confidential witnesses purport to have obtained information from or related to specific BP employees, demonstrating that they worked in at least some degree of proximity with named

individuals who were involved in BP's Gulf operations. (*Id.* ¶¶ 336–41); *see also ABC Arbitrage*, 291 F.3d at 357 (finding that "allegations concerning a conversation between a 'high ranking [company] official' who was 'a top executive of [the company]'" and one of the company's executive vice presidents were "pleaded with sufficient particularity to meet the standards"). In addition, both CW2 and CW3 profess knowledge of internal BP documents, such as a specific "Best Practices" document. (Compl. ¶ 344.) CW3 also stated that BP slashed budgets by 25%, which also suggests access to internal BP information. (*Id.*)

While "[i]t would be better were the informants named in the complaint, because it would be easier to determine" whether they in fact knew what they are alleged to know, "the absence of proper names does not invalidate" the information the Complaint claims they provide. *See Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 712 (7th Cir. 2008) ("*Tellabs II*"). Here, where all three confidential witnesses are alleged to have worked for BP in some capacity during the relevant Subclass Period, interacted with named BP employees involved in Gulf operations, and been privy to internal corporate documents, the witnesses are "described in the complaint with sufficient particularity to support the probability" that they possess the information Plaintiffs allege. *ABC Arbitrage*, 291 F.3d at 354. Accepting the facts gleaned from confidential witnesses as true, Plaintiffs have pleaded with sufficient particularity the alleged misrepresentation in BP's 2008 Annual Review.

### *(b) 2009 Sustainability Review Statement (App. Stmt. No. 5)*

Accepting the facts discussed above as true also demonstrates the falsity of the statements about OMS implementation in BP's 2009 Sustainability Review (App. Stmt. No. 5; Compl. ¶ 408.) This statement, too, references the "eight sites" where OMS was implemented in 2008. If Plaintiffs can prove what they allege—that OMS was not actually implemented in the Gulf in

2008—it follows that these numbers, which BP was still citing in 2009 without modification, cannot be correct.  Additionally, the faulty data call into question BP's additional claim that the implementation of OMS was "80% complete" by the end of 2009, because, according to Plaintiffs, OMS was still only in infancy stages in the Gulf of Mexico in 2010.  (Compl. ¶ 334.)

According to CW1, BP failed to implement an appropriate OMS protocol at the Deepwater Horizon, which would have ensured that "the individual decision makers at the rig level understood how cost-savings and corner-cutting . . . affect[ed] the process safety."  (*Id.* ¶ 285.)  CW3 also confirmed that budgets were slashed by 25%, thereby diminishing the resources needed to implement OMS.  (*Id.* ¶ 344.)  Accepting these facts as true, Plaintiffs have pointed to information significantly undermining BP's representation that the Gulf of Mexico region had "completed the transition to OMS in 2008."  Plaintiffs have alleged with particularity statements in BP's 2009 Sustainability Review related to BP's implementation of OMS in its Gulf operations.

## ii.       Materiality

Even if Plaintiffs have adequately pleaded the falsity of these statements, Defendants assert that the misrepresentations were immaterial.  According to Defendants, statements related to progress in implementing OMS are too generalized to form the basis of a securities fraud claim.  (Doc. No. 152, at 19.)  Defendants argue that "progress" is not testable and "generalized positive statements about a company's progress are not a basis for liability."  *Nathenson*, 267 F.3d at 419.

A statement or omission is material "if there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest.  *R&W Technical Servs. Ltd. v. Commodity Futures Trading Comm'n*, 205 F.3d 165, 169 (5th Cir.

2000), *cert denied*, 531 U.S. 817 (2000).  The Supreme Court has repeatedly declined to adopt a bright-line rule for determining materiality.  *See Basic*, 485 U.S. at 236; *Matrixx Initiatives*, 131 S. Ct. at 1312.  Instead, the question is whether "a reasonable investor" would have viewed the nondisclosed information "as having significantly altered the 'total mix' of information made available."  131 S. Ct. at 1312 (citation omitted).  Had the OMS merely been an internal safety initiative, Defendants might have argued convincingly regarding its irrelevance, but BP's decision to highlight the OMS program in its public reports renders it a representation that investors may rightly rely on.  *See, e.g., Lormand*, 565 F.3d at 248–49 (finding that "[o]nce the defendants engaged in public discussions concerning the benefits of . . . the no-deposit programs, they had a duty to disclose a 'mix of information' that is not misleading.").  Further, the content of the statements regarding OMS implementation are grounded in fact.  The reference to "eight sites," followed by a specific list including an explicit reference to the Gulf of Mexico, is an objective statement.  Because statements regarding OMS are "an assertion of a relationship between data and a conclusion," namely, that OMS was implemented in specific locations and, therefore, that BP was on track in implementing its safety process initiative, it is "one that a finder of fact could test against record evidence."  *City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 674 (6th Cir. 2005).

Defendants contend that statements related to "progress" on any front are too vague to be material to investors.  (Doc. No. 152, at 19.)  But Plaintiffs have done much more than assert that a vague, false impression was created here.[22]  While BP could have spoken in general terms

---

[22] Defendants also contend that all or virtually all of the purported misrepresentations and omissions constitute mere corporate mismanagement.  Under the Supreme Court's holding in *Santa Fe*, Defendants submit, such statements are not actionable under section 10(b).  *See Santa Fe Industries, Inc. v. Green*, 430 U.S. 462 (1977).  Some of the statements Plaintiffs identify, especially those discussed below relating to BP's cost-cutting strategy, could perhaps be categorized as "mere corporate mismanagement."  *See, e.g., In re Craftmatic*, 890 F.2d 628, 640 (3d Cir. 1989) (finding that failures to disclose that costs were out of control and that company lacked effective controls were not actionable).  However, the Court has already determined, below, that many of these misrepresentations are not

about its progress in the safety arena, it did not do so.  Instead, the Company presented specific information about OMS, including the number of sites in which the program was implemented and statistical percentages demonstrating that the Company was on track with implementation. (Compl. ¶¶ 353, 408.)   BP juxtaposed this hard data about the OMS program with the Company's expectations for continued success in its Gulf drilling operations, thereby elevating the significance of OMS.  "A reasonable juror could . . . conclude that the statement, without some qualification or accompanying disclosure of the numerous pieces of evidence that tended to cut the other way, was a misrepresentation." *Bridgestone*, 399 F.3d at 672.  Because BP chose to speak about OMS, it had a duty to speak accurately.  *Rubinstein v. Collins*, 20 F.3d at 170 (noting that, "under Rule 10b–5, a duty to speak the full truth arises when a defendant undertakes a duty to say anything.") (citation omitted) (internal quotation marks omitted).

Defendants also argue that statements about OMS were immaterial to investors because the market was well aware of the risks associated with deepwater drilling.  (Doc. No. 152, at 28–29.)   Defendants miss the point here.  Plaintiffs do not merely allege that the market was unaware of the risks; instead, Plaintiffs contend that BP's representations about its risk management programs—of which OMS was the centerpiece—lulled the market into false confidence in BP's ability to *manage* those risks.  It may be the case that at the summary

actionable for failure to plead with the particularity required under Rule 9(b) and the PSLRA.  The remaining allegations cannot be so easily written off as mere corporate mismanagement.  The Court is not persuaded by Defendants' insistence on analogizing this case to *Union Carbide*.  *See In re Union Carbide Class Action Sec. Litig.*, 648 F.Supp. 1322, 1326 (S.D.N.Y. 1986) (holding that facts reflected corporate mismanagement and not securities fraud where plaintiffs failed to allege any actual statements made misleading and instead "chose[] to assert vaguely that a false and misleading impression was created").  Although Defendants repeatedly stress the commonalities between this case and *Union Carbide*, there are key differences between the two that save some of Plaintiffs' allegations here.  Whereas in *Union Carbide* the alleged data did not undermine any specific affirmative misstatements, here Plaintiffs have pinned alleged facts and data to BP's public statements concerning the OMS program, as the PSLRA requires them to do.   In *Union Carbide*, there were no alleged affirmative misrepresentations, only an alleged omission.  Plaintiffs here go much further in their allegations, arguing that BP effectively launched an ongoing public relations campaign to resuscitate its safety image before investors. Statements made as part of that campaign were not related solely to the breakdown revealed in the Deepwater Horizon catastrophe; instead, several of the misrepresentations Plaintiffs allege call into question the very makeup and viability of BP's process safety program.

43

judgment or trial stages of this dispute, BP will identify evidence that persuades the finder of fact that BP had indeed completed implementation of OMS in the Gulf of Mexico.  Or perhaps BP will introduce some other evidence showing that its statements about OMS were not in fact misleading.  However, at this stage in the suit, construing the Complaint in the light most favorable to the Plaintiffs, a reasonable juror could find that BP's representations that it had implemented OMS in the Gulf in 2008 when it had not actually done so constitute material misrepresentations.  The statements contained in the 2008 Annual Report and 2009 Sustainability Review are therefore actionable.[23]

### iii.    Safe Harbor

Defendants argue that, even if the misrepresentations contained in BP's 2008 Annual Report are materially false and misleading, they are nonetheless not actionable because they are forward-looking statements protected by the PSLRA's safe harbor provision.[24]  A forward-looking statement is a statement containing financial projections, a statement of the plans and objectives of management for future operations, or a statement of future economic performance. *In re TETRA Technologies, Inc. Sec. Litig.*, No. 4:08-cv-0965, 2009 WL 6325540, at *12 (S.D. Tex. July 9, 2009); 15 U.S.C. § 78u-5(i)(1).  The PSLRA creates a safe harbor for forward looking statements if: (1) the statement is "accompanied by meaningful cautionary statements"; (2) the statement is immaterial; or (3) in the absence of cautionary language, the plaintiff fails to demonstrate that the statement was made with knowledge of falsity.  15 U.S.C. § 78u-5(c)(1)(A). A district court must consider each statement individually and address how "each . . . statement

---

[23] By Plaintiffs' numbering system, the actionable statements are contained in Misrepresentations 5 (Compl. ¶ 408) and 13 (Compl. ¶ 353).

[24] Defendants identify seven statements among the thirty-five alleged misrepresentations that they claim are forward-looking statements protected by the PSLRA's safe harbor provision.  (Doc. No. 152, App. C.)  Aside from the statements in the 2008 Annual Report, all other statements Defendants identify are not actionable for failure to plead falsity, as discussed below.  See Section V.A.2.(c)-(e).  Therefore, the Court does not perform the safe harbor analysis with respect to the rest of the misrepresentations.

(or portions of those statements) is specifically and meaningfully protected by the safe harbor." *Lormand*, 565 F.3d at 245.

Defendants argue that BP's 2008 Annual Report contains forward-looking statements and provides "meaningful cautionary statements," thereby making the statements Plaintiffs identify not actionable. (Doc. No. 152, at 33.) BP's 2008 Annual Report does indeed advise that it contains forward-looking statements. Under a heading captioned "Forward-looking statements," the 2008 Annual Report alerts readers that the document "contains certain forward-looking statements" and explains that such statements are generally "identified with the use of words such as 'will', 'expects', 'is expected to', 'aims', 'should', 'may', 'objective', 'is likely to', 'intends', 'believes', 'plans', 'we see' or similar expressions." (Doc. No. 150-12, Ex. H, at 10.) The advisory then warns the reader to be alert for forward-looking statements in the "Performance review *(pages 6-56)*" section of the Annual Report. (*Id.*) Within the "Performance Review" section, the Annual Report states that forward-looking statements may appear in connection with a lengthy list of items, including "strategy, management aims and objectives," "planned expansion, investment or other projects," and "the plans of the group, the cost of and provision for future remediation programmes," and the "continuing priority of safe, compliant and reliable operations." (*Id.*)

The statements Plaintiffs identify regarding the implementation of OMS are located within the "Performance Review" section. (*Id.*, at 37–38.) However, the specific statement at issue here—Statement 13—is not forward-looking. The section of the 2008 Annual Report captioned "Management systems" begins by stating, "All operated businesses plan to transition to OMS by the end of 2010." (*Id.*, at 37.) That statement uses one of the verbs BP highlights as denoting a forward-looking statement and is clearly a prediction. However, the specific portion

45

of the section Plaintiffs challenge, which immediately follows the prediction, states that: "Eight sites *completed* the transition . . ." and then lists the Gulf of Mexico as one of the eight sites. (*Id.*)[25]  The section continues: "For the sites *already involved*, implementing OMS *has involved* detailed planning, including gap assessments."  (*Id.*)  The section concludes: "The transition to OMS . . . *has been handled* in a formal and systemic way."  (*Id.*)  Thus, the portions of the Annual Report that Plaintiffs challenge are statements that BP presented as statements of fact, goals already achieved, or actions already taken.  While tense is not determinative on whether a statement is forward-looking, it is a relevant consideration.  *See Tellabs II*, 513 F.3d at 705.  Even where a statement contains a mixed tense, it "is not entitled to safe harbor with respect to the part of the statement that refers to the present" or to past facts.  *Id.*  Here, the challenged statements are presented as a representation of BP's past achievements in implementation of OMS and are not forward-looking.  Therefore, the statements in the 2008 Annual Report are not shielded under the PSLRA's safe harbor provisions.[26]

### b.  *Misrepresentations regarding OMS's application across all BP operations*

Plaintiffs further expand their allegations stemming from BP's operation of its OMS program to argue that even if OMS had been implemented as promised, OMS would not have applied to the majority of BP's rigs in the Gulf, including the Deepwater Horizon.  Essentially, the OMS was not a "framework" at all, but merely a façade for an ineffectual safety program. Plaintiffs allege three specific misrepresentations in connection with this argument: two

---

[25] All emphasis here is the Court's own.

[26] Plaintiffs allege that four different statements within BP's 2008 Annual Report are false and misleading.  The discussion here applies only to App. Stmt. No. 13.  Statements 12, 14, and 15, also contained in the 2008 Annual Report, are not actionable for different reasons, as set out in the Court's analysis below.  *See infra* Section V.A.2.e.  The safe harbor discussion here is thus confined to Statement 13.

statements found in BP's 2009 Annual Review and one statement made by Defendant Inglis during an industry speech.  (App. Stmt. Nos. 18–19, 8; Compl. ¶¶ 383, 385, 401.)

### i.  Particularity

*(a)  2009 Annual Review Statements (App. Stmt. Nos. 18–19)*

Plaintiffs point to two specific statements in BP's 2009 Annual Review and allege that the statements falsely represented that BP's OMS program would apply to all of BP's operations. The first statement at issue is the following:

- "Safe, reliable and compliant operations remain the group's first priority.  A key enabler for this is the BP operating management system (OMS), which provides a common framework for all BP operations, designed to achieve consistency and continuous improvement in safety and efficiency.  Alongside mandatory practices to address particular risks, OMS enables each site to focus on the most important risks in its own operations and sets out procedures on how to manage them in accordance with the group-wide framework."  (App. Stmt. No. 18; Compl. ¶ 383.)

Plaintiffs aver that the statement misrepresents the reach of the OMS because it led investors to believe that if OMS was implemented in a given site, *e.g.*, in BP's Gulf operations, then it applied to all operations at that site.[27]  (Compl. ¶ 384.)  In support of the falsity of this statement about the breadth of the OMS program and its application in the Gulf, Plaintiffs cite facts that undermine BP's presentation of the OMS program.  For example, Plaintiffs point to statements from a confidential witness that BP's upstream operations—including offshore exploration rigs in the Gulf—never received any information related to OMS.  (Compl. ¶¶ 334, 344.)  In addition, confidential witnesses confirm that BP did not implement its operational "Best Practices" in its upstream, *i.e.*, offshore, operations.  (*Id.* ¶ 344.)  A former BP senior employee with Gulf Operations responsibilities stated that BP had only begun to implement OMS in the

---

[27] Plaintiffs' counsel further elaborated on this misrepresentation during oral argument, explaining that "BP implemented OMS at only one of seven of the owned or leased drilling rigs in the Gulf of Mexico.  So the non-owned rigs, which constituted six of the seven rigs [in the Gulf], OMS, by its own terms, didn't even apply.  It didn't even apply to [the Deepwater] Horizon."  (Doc. No. 304, at 47, lns. 8–12.)

Gulf in a pilot stage and employees in key positions in Gulf operations had no knowledge of OMS requirements.  (*Id.* ¶ 402.)  In addition, a 2009 audit of the Deepwater Horizon rig revealed that "safety goals were not commonly known and not widely communicated."  (*Id.* ¶ 310–11.)  Following cost-cutting measures in 2009 and 2010, BP relied on individuals without adequate experience and expertise to implement BP's OMS system in the Gulf, leaving the program disorganized and implementation unfinished.  (*Id.* ¶ 335.)

Plaintiffs "need not allege 'all' facts that may be 'related' to their claims," since "[s]uch a requirement is impossible at the pleading stage because, in nearly every securities fraud case, only the defendants know 'all' the facts related to the alleged fraud."  *In re NetSolve, Inc. Sec. Litig.*, 185 F. Supp. 2d 684, 696 n. 10 (W.D. Tex. 2001).  Here, Plaintiffs have alleged facts sufficient to call into question the intended breadth of OMS in BP's Gulf operations.  The alleged facts suggest that BP's Gulf rigs, including the Deepwater Horizon, were missing key components of the OMS system or never received any information related to OMS at all.  The facts call into question BP's assertion in the 2009 Annual Review that each site in the Gulf had mandatory practices and procedures in place to govern process safety concerns.

Plaintiffs also challenge another statement in the 2009 Annual Review:

-   "The reduction in the number of oil spills in 2009 follows several years of focus across BP on procedures such as 'integrity management' and 'control of work,' which are elements of BP's OMS."  (App. Stmt. No. 19; Compl. ¶ 385.)

In addition to the facts outlined above related to the implementation of OMS, Plaintiffs claim this statement was false and misleading because BP failed to mention that the 2009 "Total Recordable Incident Rate," which measured incidents for every 200,000 man hours worked, was .97 for the Gulf, well over the Company's target rate of .62.  (Compl. ¶ 291.)  Plaintiffs also claim that delays in maintenance work on the Deepwater Horizon and BP's failure to assign a

larger portion of its revenue to offshore drilling safety measures undermine the truth of this statement. (*Id.* ¶¶ 307, 311.)

The alleged facts do not support the falsity of this second statement. The challenged statement makes no reference to the scope of OMS. Instead, the statement is one of fact. It is a claim that the number of spill incidents decreased in 2009. Nothing Plaintiffs allege challenges that underlying factual assertion. Plaintiffs do not assert that BP did not in fact reduce the number of oil spills. The "Target Recordable Incident Rate," the only metric Plaintiffs identify, is more akin to a measure of personnel safety than a measure of oil spills. Allegations that safety procedures were not widely known or that BP did not allocate enough of its revenue to safety technologies does not undermine BP's assertion that there was an identifiable reduction in the number of oil spills. Because Plaintiffs fail to identify any facts calling into question the specific statement they challenge, Plaintiffs have failed to plead with particularity the falsity of Statement No. 19.

### (b) Howard Weil Conference Statement (App. Stmt. No. 8)

Plaintiffs also contend that Defendant Inglis falsely represented the reach of OMS during a speech at the Howard Weil Conference on March 22, 2010. *See* App. Stmt. No. 8, Compl. ¶ 401 ("Safety and operational integrity underpins everything we do, and we are now in the final phase of rolling out our operating management system that provides a single, consistent framework for our operations, covering all areas from personal and process safety to environmental performance."). Plaintiffs argue that Inglis's statement was false because, in addition to the facts set out above, BP personnel in charge of implementing OMS were terminated or transferred. (Compl. ¶ 335.) Confidential witnesses confirmed that BP's OMS program lagged behind that of its peers and that BP had still not implemented a robust risk

management program by 2010.  (*Id.* ¶ 341.)  CW1 also confirmed that BP failed to implement an appropriate OMS protocol, leaving decision makers at the rig level uncertain of appropriate safety practices.  (*Id.* ¶ 285.)   For the same reasons addressed with respect to Statement 18 above, the Court finds that Plaintiffs have alleged facts sufficient to call into question the implementation of OMS in BP's Gulf operations.  The alleged facts suggest that BP's Gulf rigs were missing key components of the OMS system or never received any information related to OMS at all.  The facts thus call into question Inglis's statement that the OMS provided a "single, consistent framework" for "all areas" of BP's operations.

### i.  Materiality

What Plaintiffs allege here is an omission: BP failed to clarify the intended scope of its OMS program while simultaneously presenting the program to the public as an expansive program.  Because the allegations here involve an omission, the issue is whether Defendants owed Plaintiffs a duty to disclose information about the true extent of OMS.  As the Supreme Court explained in *Matrixx*, whether a defendant owes a duty to disclose turns on whether the omission renders his statement false or misleading, not whether the omitted information was material.  *Matrixx*, 131 S. Ct. at 1321–22 (citing 17 CFR § 240.10b-5(b)).  "The question thus is not whether a [defendant's] silence can give rise to liability, but whether liability may flow from his decision to speak . . . concerning material details . . ., without revealing certain additional facts necessary to make his statement not misleading."  *Bridgestone*, 399 F.3d at 670 (quoting *Rubin v. Schottenstein, Zox & Dunn*, 143 F.3d 263, 267 (6th Cir. 1998)).

BP was not obligated to talk about the scope of OMS at all, yet talk about OMS it did. Plaintiffs highlight the disconnect between what a reasonable investor would assume upon reading BP's broad-brush portrait of the intended goals of the OMS program and the reality,

which was that OMS applied only to rigs BP owned outright, not to rigs it operated.[28]  BP's

document titled "Gulf of Mexico SPU Drilling and Completions OMS Implementation Terms of

Reference" states that:

> BP sites world-wide are required to use OMS as the framework for their Local
> Operating Management System (LOMS).  OMS applies to all operations and
> premises, controlled or owned by BP, and sites operated or controlled on BP's
> behalf.  These include offshore production facilities, drilling rigs, vessels, process
> plants, and refineries.

(Doc. No. 187, Ex. 34).  BP's 2008 Form 20-F Annual Report further states that "[a]ll operated

businesses plan to transition to OMS by the end of 2010."  (Compl. ¶ 353.)  Yet, if Plaintiffs'

allegations are true, these "operated businesses" would not have included BP-operated rigs

unless the rigs were also one-hundred percent BP-owned.  A disconcerting revelation indeed to

an investor who, expecting words to convey their dictionary meaning, might be under the

impression that the "common framework" would apply to "all BP operations" and "each site."

    The two statements about the breadth of OMS's application to BP's operations are

actionable because they were made while Defendants were in possession of specific information

undermining the truth of those statements.  Continually referring to OMS with descriptors such

as "framework," "overall," and "company-wide" becomes misleading when the safety program

was not intended to apply to the majority of BP's Gulf operations.  *See In re K-tel Intern., Inc.*

*Sec. Litig.*, 300 F.3d 881, 896, 898 (8th Cir. 2002) ("[T]he requirement is not to dump all known

information with every public announcement, but the law requires 'an actor to provide complete

and non-misleading information with respect to the subjections *on which he undertakes to*

*speak*.'") (citation omitted).

---

[28] During oral argument, Plaintiffs' counsel presented the Court with a powerpoint slide presentation which included a slide (No. 26) diagramming the seven wells BP operates in the Gulf region.  As the slide demonstrates pictorially, the OMS program would have applied only to the Thunderhouse PDQ rig, which BP owned.  It would not have applied to the Transocean Marianas, the GSF Development Driller II or III, the Bob Palmer Jackup Rig, the Discover Enterprise, or, notably, to the Deepwater Horizon, all of whom BP operated but did not own.

Here, given the manner in which OMS was repeatedly described, portrayed as a comprehensive, company-wide program, a reasonable investor would likely find it material to know that OMS's application to "all" BP operations would exclude, in the Gulf region alone, six of the seven rigs BP worked on.  BP apparently attributes different meaning to descriptors such as "all," "company-wide," "common," "framework," "each," "single," and "consistent" than the average investor might assume.  If Plaintiffs' allegations are true, OMS, billed as the "common" and "group-wide framework" for "all BP operations" "covering all areas" and "enabl[ing] each site" to implement "mandatory practices," was not intended to cover any BP operations where BP was not the outright owner of the rig.[29]

Defendants claim these are "general, vague statements" and, as such, would not be material to investors.  To the contrary, it is the very vagueness of the statements that makes them misleading.  The fact that "all operations" and "each site" really only include, in the Gulf of Mexico for example, one of BP's seven rigs is a significant omission.  The fact that the "common framework" and "group-wide framework" does not implicate any safety protocols at all for over 80% of BP's operations in a specific region is a significant omission.  To suggest that such sweeping terms are merely puffery or that investors would find it unimportant to know that BP did not intend for its star safety initiative to have any effect on the majority of its Gulf operations is hard to believe.  In a company so plagued by a history of safety failures and so dependent on the success of its public commitment to, as Defendant Hayward put it, "turn the corner on safety," BP cannot credibly argue that the extent and reach of its key safety initiative was immaterial to investors.

---

[29] As defense counsel conceded during oral argument, the OMS system did not apply to the Deepwater Horizon rig, even though "BP owned 50 percent of the well and there were two other companies that owned the remaining 50 percent, or BP owned 60 percent.  There were three owners of this well.  I mean, BP was clearly the responsible party--"  (Doc. No. 304, at 67, lns. 25–25; at 68, lns. 1-3.)

Knowing that BP had not implemented the OMS in the Gulf of Mexico and did not intend to implement the OMS in the majority of its Gulf operations would have changed the "total mix" of information available to investors.  Investors might have questioned BP's commitment to safety in the Gulf region and perhaps reevaluated the risk associated with a Company that had no intention of implementing its principal safety program in the very area BP touted as its principal growth region.   Plaintiffs have thus adequately alleged actionable misrepresentations with respect to statements discussing the extent of BP's OMS program.[30]

### c.  Misrepresentations as to the adequacy of BP's risk management capabilities

According to Plaintiffs, BP's third general misrepresentation was its claim that the Company had the risk management infrastructure in place to effectively manage risk in its operations, especially in its Gulf of Mexico deepwater drilling operations.   The alleged misrepresentations are found in BP's 2008 Annual Report, 2009 Sustainability Report, and 2009 Annual Review.  (App. Stmt. Nos. 15, 29–30, 1–3, 9; Compl. ¶¶ 353, 410–11, 376–77, 374.) According to Plaintiffs, the seven challenged statements falsely suggested that BP's risk management system in the Gulf allowed the company to effectively manage risk.  The reality, according to Plaintiffs, was that Defendants were fully aware of shortcomings in the risk management system and those deficiencies directly impacted the future success of BP's Gulf operations. (Doc. No. 187, at 18.)  Defendants contend that the identified statements are simply general statements about risks already known to the market and are therefore not actionable.  In addition, Defendants urge that the statements are neither misleading nor material.

---

[30] The actionable misrepresentations are Misrepresentations 8 and 18.  Misrepresentation 19 is not actionable.

### i. Particularity

*(a) 2008 Annual Report, Form 20-F Statement (App. Stmt. No. 15)*

Plaintiffs challenge the following statement from the 2008 Annual Report:

- "Safety performance has been scrutinized by the . . . GORC, chaired by the group chief executive (Hayward) and tasked with assuring . . . Hayward that group operational risks are identified and managed appropriately. We continued to build our team of safety and operations auditors. A team of 45 auditors is now in place, with 36 audits completed in 2008." (App. Stmt. No. 15; Compl. ¶ 353.)

Plaintiffs allege that the statement is false because an internal report found that delayed maintenance on the Atlantis, another of BP's Gulf rigs, caused a smaller oil spill before the Deepwater Horizon explosion. (Compl. ¶ 169.) In addition, an audit conducted in September 2009 revealed a backlog of required maintenance jobs before the Deepwater Horizon could be considered up to date with safety goals. (*Id.* ¶ 311.) Plaintiffs also point to incomplete engineering documents on the Atlantis rig, allegedly discovered by Kenneth Abbott, the "projects control lead" for the Atlantis. (*Id.* ¶¶ 172–75.)

The facts Plaintiffs advance in support of falsity are unrelated to the actual statements Plaintiffs challenge. The only objectively verifiable claims contained in the challenged statement relate to the GORC and the assertion that BP had a team of 45 auditors in place "with 36 audits completed in 2008. (*Id.* ¶ 353.) The GORC was an internal BP committee tasked with monitoring implementation of OMS and charged with discussing "[a]ll major incidents and many high-potential incidents" in order to help the Company learn from each incident. (*Id.*) Plaintiffs apparently contest that "safety performance ha[d] been scrutinized" by the GORC and that "group operational risks [we]re identified and managed appropriately." However, the facts Plaintiffs cite as evidence of the falsity of this representation do not undercut the truth of the statement. A backlog of maintenance jobs and missing documents on one of BP's rigs does not

demonstrate that members of the GORC were not, in fact, scrutinizing safety incidents.  Further, none of the facts that Plaintiffs allege disprove BP's claim that the Company conducted thirty-six audits in 2008, a statement easily tested against record evidence.

In addition, Plaintiffs allege temporally disparate facts that do nothing to advance their allegations.  Here, neither an audit conducted in late 2009 nor Abbott's findings "[i]n this same time period," can support the falsity of statements that refer to 2008.  (*Id.* ¶ 172.)  Plaintiffs' contention that Abbott supervised an audit in September 2009 would seem to support rather than undermine BP's representation that risks were "identified" and "scrutinized."  Abbott allegedly found backlogs in maintenance jobs on rigs in the Gulf.  But his actions in identifying gaps in BP's safety protocols indicate that BP was "scrutinizing" and "identifying" safety performance, just as the statement suggests.  (*Id.* ¶ 353.)  The facts suggest nothing as to whether risks were managed appropriately or inappropriately.  As a result, Plaintiffs have not pleaded the falsity of the statement contained in the 2008 Annual Report.[31]

> (b) 2009 Sustainability Report Statements (App. Stmt. Nos. 29, 30)

Plaintiffs allege that the following two statements in the 2009 Sustainability Report, which they attribute to BP as a corporate defendant, were false:

- "If an incident occurs, it is recorded locally by employees, contractors and management using our internal web-based data management system.  All fatalities, other major incidents and many that had the potential to become major incidents are discussed by the GORC, chaired by [Defendant Hayward]."  (App. Stmt. No. 29; Compl. ¶ 411.)

- "BP's safety and operations audits assess compliance with standards and the effectiveness of operational risk management.  The audits provide a rigorous check on safety and operations programmes.  Progress is reported quarterly, at which time issues, such as overdue action closures, are highlighted to executive management in the executive-level GORC."  (App. Stmt. No. 30; Compl. ¶ 410.)

---

[31] Misrepresentation No. 15 (Compl. ¶ 353) is, therefore, not actionable.

Plaintiffs claim the first statement is false due to material omissions regarding BP's lack of safety and risk management policies and lack of training among BP personnel. Specifically, Plaintiffs contend that the statement leaves out critical facts, such as that BP failed to implement adequate safety procedures, lacked internal controls, and had failed to implement OMS in the Gulf. (Compl. ¶ 411.) But Plaintiffs allege only vague facts in support of the falsity of this statement. The implementation—or lack thereof—of OMS in the Gulf has no bearing on whether audits were in fact carried out as the Sustainability Report represents. Likewise, allegations of general failures to implement safety procedures and controls lack the particularity required under the PSLRA. *See Westfall v. Miller*, 77 F.3d 868, 870 (5th Cir. 1996) (explaining that a court need not "strain to find inferences favorable to the plaintiffs"); *Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 178 (5th Cir. 1997), *cert. denied,* 522 U.S. 966 (1997) ("A complaint can be long-winded, even prolix, without pleading with particularity. Indeed, such a garrulous style is not an uncommon mask for an absence of detail."). Plaintiffs do not allege any particular facts undermining BP's assertion that the Company relied on an "internal web-based data management system" to track safety incidents. Nor do Plaintiffs cite any evidence that the GORC was not fulfilling its committee duties and discussing safety incidents. Plaintiffs have thus failed to plead falsity with respect to Statement 29.

The second statement identified in the 2009 Sustainability Report makes specific representations regarding BP's safety and compliance audits. (Compl. ¶ 410.) The audits allegedly provided a "rigorous check" on safety compliance and risk management, and audit reports were prepared quarterly. (*Id.*) Plaintiffs have failed to adequately allege the falsity of this statement. Plaintiffs claim in their opposition motion that BP "selectively audited certain facilities" and "omitt[ed] audit results [that] consistently uncovered facts that were contrary to

BP statements" on risk management.  (Doc. No. 187, App. A.)  Had Plaintiffs alleged and supported such facts in their Complaint, Plaintiffs might have alleged actionable misrepresentations with respect to this statement.  Selective audit procedures calculated to emphasize favorable results and omit unfavorable findings could very well be material to investors.  However, because Plaintiffs failed to assert any facts undermining BP's audit process in their Complaint, the Court cannot consider such allegations now.  Plaintiffs have thus failed to plead the falsity of the two statements in BP's 2009 Sustainability Report.[32]

*(c) 2009 Annual Review Statements (App. Stmt. Nos. 1–3, 9)*

Plaintiffs challenge three statements in BP's 2009 Annual Review.  *See* App. Stmt. No. 1, Compl. ¶ 376 ("Despite . . . difficult conditions, a revitalized BP kept up its momentum and delivered strong operating and financial results while continuing to focus on safe and reliable operations."); App. Stmt. No. 2, Compl. ¶ 376 ("These successes make us the largest producer and leading resource holder in the deepwater Gulf of Mexico."); App. Stmt. No. 3, Compl. ¶ 377 ("We continue to show our ability to take on and manage risk, doing the difficult things that others either can't do or choose not to do.  This is why we are able to form such strong relationships with governments and national oil companies and why we continue to have a critical role to play in supplying the world with its future energy needs.").  Plaintiffs also challenge a portion of the statement of the Chairman of the Board, attributed to Defendant Svanberg, which was included in the Annual Review.  *See* App. Stmt. No. 9, Compl. ¶ 374 ("Risk remains a key issue for every business, but at BP it is fundamental to what we do.  We operate at the frontiers of the energy industry, in an environment where attitude to risk is key.  The countries we work in, the technical and physical challenges we take on and the investments we make – these all demand a sharp focus on how we manage risk.  We must never shrink from

---

[32] Misrepresentations No. 29 (Compl. ¶ 411) and 30 (*Id.* ¶ 410) are not actionable.

taking on difficult challenges, but the [B]oard will strive to set expectations of how risk is managed and remain vigilant on oversight.").

According to Plaintiffs, Svanberg's statement is false because BP's Board of Directors did not in fact "set expectations of how risk is managed" nor did they "remain vigilant on oversight." (Doc. No. 187, App. A.) To demonstrate the misleading nature of this statement, Plaintiffs point to evidence from a variety of sources, including CW1, a rig audit, specific decisions made by the Board, and post-spill findings by the Presidential Commission. Plaintiffs argue that a September 2009 audit revealed 390 maintenance jobs backlogged on the Deepwater Horizon. (Compl. ¶ 310.) The jobs were still outstanding months later, in December 2009. (*Id.*) According to CW1, BP failed to implement OMS as directed, thereby failing to ensure that individual employees on the rig understood safety protocols. (*Id.* ¶ 285.) CW3 confirmed that BP failed to implement the "Best Practices" it had approved for its operations in 2005. (*Id.* ¶¶ 344–45.) Plaintiffs also point to select findings of the Presidential Commission which included, among other things, findings that: (1) "BP's management process did not adequately identify or address risks created by late changes to [the Macondo well] design and procedures"; (2) there "appears to have been no formal system" for ensuring the safety of alternate procedures selected for the Macondo well; (3) "[n]one of BP's [] decisions . . . appear to have been subject to comprehensive and systematic risk-management"; and (4) "evidence now available does not show that the BP team members . . . responsible for these decisions conducted any sort of formal analysis to assess the relative riskiness of available alternatives." (*Id.* ¶¶ 314–16.)

Setting aside Statement No. 2 (Compl. ¶ 376), which is merely a statement about BP's competitiveness in the industry and far too vague an assertion to be actionable, the remaining three statements all address BP's risk management capabilities. Statements about the

adequacy of risk management operations and capabilities may be false and misleading where the speaker knows, or should know, that such operations are inadequate to manage the risks a company faces. *See*, *e.g.*, *In re Fannie Mae Sec. Litig.*, Nos. 08 Civ. 7831, 09 MD 2013, 2010 WL 3825713, at *14–15 (S.D.N.Y. Sept. 30, 2010) (finding material misstatements sufficient to survive a motion to dismiss where Fannie Mae's statements that its risk management operation was "appropriate" were made despite defendants' knowledge that the risk management system was inadequate for the new subprime assets the company was purchasing). Here, however, Plaintiffs are unable to identify material information left out of the statements they claim are misleading because the statements are simply too vague to be false or material.

The Annual Review statements represented that BP could "keep up momentum" while simultaneously focusing on safe operations, "take on and manage risk," and, with the Board of Directors at the helm, "set expectations of how risk is managed." (*Id.* ¶¶ 374, 376–77.) These portions of the Annual Review are statements "of the vague and optimistic type that cannot support a securities fraud action. . . . and contain no concrete factual or material misrepresentation." *Southland*, 365 F.3d at 372; *see also ECA v. JP Morgan Chase Co.*, 553 F.3d 187, 205–06 (2d Cir. 2009) (characterizing as "puffery" statements that issuer's risk management program was "highly disciplined" and finding that such statements would not be relied upon by a reasonable investor because they "did not, and could not, amount to a guarantee that [the issuer's] choices would prevent failures in its risk management practices"). Because Plaintiffs have not pleaded with particularity the false and misleading nature of BP's statements related to the Company's risk management capabilities, the challenged statements are not actionable.[33]

---

[33] The nonactionable statements are those contained in Misrepresentations 1 (Compl. ¶ 376), 2 (*Id.*), 3 (*Id.* ¶ 377) and 9 (*Id.* ¶ 374).

### d.   Misrepresentations regarding BP's capacity to respond to spills

According to Plaintiffs, the fourth category of misrepresentations includes statements related to BP's capacity to respond to spill incidents.   These statements are contained in BP's IEP, Rainey's testimony before a Senate committee, BP's 2009 Sustainability Report, and miscellaneous speeches given by Defendant McKay.   Plaintiffs' allegations relating to BP's inability to respond to spills and those relating to its failure to implement OMS are intertwined to the extent that Plaintiffs rely on the failed implementation of OMS to demonstrate the falsity of BP's representations regarding its ability to respond to spills.

### i. Particularity

#### (a)   The Initial Exploration Plan (IEP) (App. Stmt. No. 16)

According to Plaintiffs, BP's misrepresentations about its response plans are found in the IEP for the Mississippi Canyon Block 252.  (Compl. ¶ 192.)  BP submitted the IEP to the MMS in compliance with federal regulations requiring BP to demonstrate it had planned and prepared to conduct drilling in a safe manner.  (*Id.* ¶¶ 198, 357–60.)  The IEP for the site was published on March 10, 2009.

Plaintiffs have alleged several misrepresentations in the IEP relating to BP's capacity to respond to spills.  First, in connection with the IEP, BP sought a permit to drill to a total depth of 19,650 feet at the Macondo site.  After the Deepwater Horizon spill, a BP crewman admitted that this depth had been misrepresented to MMS, and that BP has in fact been drilling in excess of 22,000 feet, in violation of its permit.  (*Id.* ¶ 200.)[34]  Second, the IEP stated that "it is unlikely that an accidental surface or subsurface spill would occur from the proposed activity" at the site.  (App. Stmt. No. 16; Compl. ¶ 356.)  Plaintiffs allege this statement was false not only because BP failed to implement the OMS program on the Deepwater Horizon, which would have

---

[34] The BP crewman is not named or otherwise identified in the Complaint.

included a spill response plan, but also because, as the Presidential Commission concluded, there was "nothing to suggest that BP's engineering team conducted a formal, disciplined analysis of the combined impact of these risk factors on the prospects of a successful cement job." (*Id.* ¶ 281.) In addition, both BP Chief Operating Officer Doug Suttles ("Suttles") and Defendant McKay made damaging post-spill admissions, acknowledging that BP did not actually have a proven response plan and that BP's "contingency plans were inadequate" and "ma[de] up day to day." (*Id.* ¶ 362.) Third, Plaintiffs allege that BP falsely assured the MMS that it was prepared to respond to a worst-case discharge scenario of 162,000 gallons of oil per day. (*Id.* ¶ 356.) When the Deepwater Horizon spill occurred, it was readily apparent that BP was incapable of containing a spill amount only a fraction of the amount represented in the IEP. (*Id.*)

Plaintiffs also allege that the IEP omitted information required by law. Plaintiffs point to federal regulations requiring the IEP to include "oil and hazardous substance spills information," "a scenario for the potential blowout," and an oil spill response plan comparing the appropriate worst-case discharge scenario to that in the IEP. (*Id.* ¶¶ 358–62.) According to Plaintiffs, BP had no internal safety and risk management processes that satisfied these regulations. Following the spill, Suttles acknowledged that BP did not have a response plan with "proven equipment and technology." (*Id.* ¶ 362.) In addition, Defendant Hayward subsequently admitted, "'What is undoubtedly true is that we did not have the tools you would want in your tool kit,' and it was 'an entirely fair criticism' to say the company had not been fully prepared for a deep-water oil leak." (*Id.* ¶ 286.)

Plaintiffs have sufficiently pleaded facts to demonstrate that BP misrepresented the size of the spill it was prepared to respond to in the Gulf and misrepresented the Company's general

spill response capabilities.[35]  BP claimed it was prepared to respond to a spill of up to 162,000 barrels of oil per day, but when the Deepwater Horizon spill occurred, BP proved utterly unable to respond adequately.  In addition, federal regulations set minimum requirements for BP's contingency plans, and Plaintiffs have adequately alleged, relying on both the IEP and post-spill admissions made by Suttles and Hayward, that BP in fact lacked adequate contingency plans.  Further, the alleged facts suggest that BP's IEP was not in compliance with federal regulations and BP in fact violated MMS regulations both in its IEP and in drilling deeper at the Macondo site than was allowed.  These facts are sufficient to call into question BP's representation that an accidental spill was "unlikely," and Statement 16 is, therefore, actionable.  (Compl. ¶ 356.)

*(b)  Rainey's Senate Testimony (App. Stmt. No. 17)*

Plaintiffs also identify as false and misleading testimony that Rainey, BP's Vice President for Gulf of Mexico Exploration for BP America, provided to the U.S. Senate and Energy and Natural Resources Committee in November 2009.  On that occasion, Rainey stated:

-  "While our intent is to prevent all accidental discharges, we conduct regular emergency drills with local, state, and federal agencies.  All of our production facilities have contingency plans that identify the procedures, response equipment, and key personnel needed for responding to incidents."  (App. Stmt. No. 17; Compl. ¶ 370.)

Plaintiffs contend Rainey's testimony was false and misleading because BP had not in fact implemented OMS in the Gulf and, therefore, the Deepwater Horizon rig did not have a contingency plan in place.  (Compl. ¶ 334.)  Plaintiffs also re-urge the information obtained from CW1 and CW2 confirming that, even as late as 2009 and 2010, BP's OMS program remained in its infancy stages.  (*Id.*)  The 2009 audit of the Deepwater Horizon further confirmed that rig

---

[35] Defendants do not challenge the alleged falsity of the statements contained in the IEP.  Instead, because this is a fraud on the market case, Defendants argued that Plaintiffs had not adequately pleaded reliance on the alleged misrepresentations and omissions because Plaintiffs did not allege that the IEP was "publicly disseminated" during the Class Period.  (Doc. No. 152, at 30.)  Although they subsequently withdrew their reliance argument, Defendants still maintain that Plaintiffs have not adequately alleged scienter.  (Doc. No. 219, at 13.)

crew members were not knowledgeable about well operation practices.  (*Id.* ¶ 343.)  BP's cost-cutting measures also removed key individuals with knowledge of safety procedures and OMS from their posts in the Gulf.  (*Id.* ¶ 335.)  Finally, as part of the post-spill investigation, the Presidential Commission concluded that there was "nothing to suggest that BP's engineering team conducted a formal, disciplined analysis of . . . risk factors."  (*Id.* ¶ 281.)  According to BP's own internal reporting, decisions regarding the Macondo well "appear to have been made by the BP Macondo well team in an ad hoc fashion."  (*Id.* ¶ 296.)  The alleged facts undermine Rainey's assertion that "all [BP] production facilities" had contingency plans and the "key personnel" needed to adequately respond to spill incidents, and Plaintiffs have pleaded with particularity the false and misleading nature of Rainey's statement.

*(c) 2009 Sustainability Report (App. Stmt. Nos. 32–35)*

Plaintiffs also allege that the following statements, found in BP's 2009 Sustainability Report, falsely represented BP's spill response preparedness:

- "[W]e seek to ensure an infrastructure is in place to deal effectively with spills and their impacts.  Our operating facilities have the capacity and resources to respond to spill incidents and we participate in industry and international forums to coordinate planning and emergency response."  (App. Stmt. No. 32; Compl. ¶ 410.)

- "Incidents are recorded locally by our staff and contractors using our web-based incident tracking system.  BP's executive management is notified quarterly about numbers and volumes of spills and spills of more than 100 barrels."  (App. Stmt. No. 33; Compl. ¶ 410.)

- "BP recognizes the risk posed to the environment from spills and takes a range of measures to prevent any loss of hydrocarbons."  (App. Stmt. No.  34; Compl. ¶ 410.)

- "To track our progress in process safety management, we measure lagging indicators which record events that have already occurred, such as oil spills, and leading indicators that focus on the strength of our controls to prevent undesired incidents, such as inspections and test of safety-critical equipment."  (App. Stmt. No. 35; Compl. ¶ 410.)

Plaintiffs allege the same facts discussed above to demonstrate the falsity of these statements. These facts only support allegations of falsity with respect to the first statement identified in the Sustainability Report.  (App. Stmt. No. 32; Compl. ¶ 410.)  As discussed above, Plaintiffs have called into question whether the Deepwater Horizon was covered under BP's OMS program and they have also pointed to specific deficiencies on the rig that undermine the assertion that BP's operating facilities all had the resources "to deal effectively with spills."  For the reasons discussed above, Plaintiffs have alleged facts sufficient to plead with particularity the falsity of this statement.

The remaining three statements are not actionable.  First, the statement that BP "recognizes the risk" is too vague a statement to be demonstrably false or misleading.  (App. Stmt. No. 34; Compl. ¶ 34.)  The remaining two statements suffer from the opposite deficiency: the facts Plaintiffs' allege are not tailored to the very detailed assertions contained in the statements.  Plaintiffs have done nothing to suggest that BP staff did not in fact use a "web-based incident tracking system" and report spill incidents to BP's executive management.  (App. Stmt. No. 33; Compl. ¶ 410.)  Plaintiffs' prior assertions about BP's creation of the GORC and the SEEAC to address safety incidents actually suggests the opposite.  (Compl. ¶ 411.)  Similarly, Plaintiffs have raised no facts to undermine the claim that BP relied on "lagging" and "leading" indicators to track progress.  (App. Stmt. No. 35; Compl. ¶ 410.)

*(d) Howard Weil Conference Statement (App. Stmt. No. 10)*

During the Howard Weil Conference in March 2010, McKay stated that "managing costs down does not mean BP will be skimping when it comes to ensuring our operations remain safe, reliable and compliant in the years ahead."  (App. Stmt. No. 10; Compl. ¶ 365.)  Plaintiffs claim this statement was false because BP was aware, through internal presentations, that it was facing

a shortage of offshore workers, that additional personnel training was needed, that "Best Practices" had not been implemented, that cost-cutting measures meant the appropriate employees were not stationed in the Gulf, and that OMS had not been implemented.  (*Id.* ¶¶ 440, 345, 335.)  Plaintiffs have not adequately alleged the falsity of this statement, primarily because the statement is made in general, vague terms, without any specific promise as to how BP intended to "manage costs down."  The statement refers to managing cost in the abstract, not in relation to the Deepwater Horizon rig or even BP's Gulf operations.  In addition, McKay's statement specifically refers to "the years ahead" and makes no representation about the state of BP's current operations at the time the statement was made.  Plaintiffs have not pleaded the statement by McKay with sufficient particularity as required under the PSLRA and Rule 9(b) and, as a result, the alleged misrepresentation is not actionable.

### ii.  Materiality

Defendants claim that the statements related to BP's spill response capabilities could not have been misleading to investors because such statements were revealed to be inadequate days after the Deepwater Horizon explosion, when investors were already aware of the catastrophe.  Given this timeline, Defendants claim that any inaccuracies or omissions became material only in hindsight and therefore could not have been material to investors at the time the statements were made.  (Doc. No. 152, at 24–25.)

The Court is not persuaded that the statements about BP's ability to respond to a spill in the Gulf were immaterial.  Prior to the Deepwater Horizon disaster, BP filed a very detailed document—the IEP—outlining its ability to prevent and respond to accidents in the Gulf.  The document contained specific spill estimates for the Macondo well site and assurances that the Company was prepared to respond to a spill of up to 162,000 barrels of oil per day at the site.

(Compl. ¶ 356.)   Knowledge that BP's response capability was vastly overstated and that the Company in fact did not implement process safety reforms in the Gulf or on the Deepwater Horizon would have indeed altered the "total mix of information" available to investors and, possibly, undercut their confidence in their investment.   "The omission of a known risk, its probability of materialization, and its anticipated magnitude, are usually material to any disclosure."  *Lormand*, 565 F.3d at 248.   The statements Plaintiffs highlight falsely assured investors that BP would have everything under control if a spill occurred in the Gulf.   The Deepwater Horizon incident revealed the depth of that deception.   The Court cannot say here, on the basis of the Complaint and Defendants' arguments, that the misrepresentations related to BP's spill response capabilities are immaterial as a matter of law.

### e. *Misrepresentation of safety as BP's highest priority (App. Stmt. Nos. 4, 6–7, 11–12, 14, 20–28, 31)*

The remaining statements Plaintiffs have highlighted as misrepresentations all fall under BP's general misrepresentation that BP would make safety its highest priority.   Sixteen of the thirty-five alleged misrepresentations Plaintiffs identify are examples of this misrepresentation. They include statements found in BP's 2008 Annual Report, the "Group Chief Executive's Review" portion of the 2009 Annual Review, BP's 2009 Annual Report, BP's publicly available Code of Conduct, the Company's 2009 Sustainability Review and Sustainability Report, one of BP's "Strategy Presentations" in London, and statements made by Defendant McKay at the Howard Weil Energy Conference.  *See* App. Stmt No. 12, Compl. ¶ 353 ("Throughout 2008, senior leadership across the group continued to hold safety as their highest priority."); App. Stmt No. 14, Compl. ¶ 353 ("We remain fully committed to becoming a recognized industry leader in process safety management."); App. Stmt. No. 4, Compl. ¶ 378 ("Achieving safe, reliable and compliant operations is our number one priority and the foundation stone for good business.");

App. Stmt. No. 11, Compl. ¶ 365 (McKay: "Safety will continue to have first call on the company resources."); App. Stmt. No. 7, Compl. ¶ 380 (Inglis: "Safety, both personal and process, remains our highest priority."); App. Stmt. No. 20, Compl. ¶ 390 ("[S]afe and reliable operations remains #1"); App. Stmt. No. 21, Compl. ¶ 394 ("The priorities that drove our success for 2009—safety, people and performance—remain the foundation of our agenda."); App. Stmt. No. 22, Compl. ¶ 394 ("In Exploration and Production, safety, both personal and process, remains our highest priority."); App. Stmt. No. 23, Compl. ¶ 394 ("Our priorities remain the same, safety people and performance, focusing on the delivery of safe, reliable and efficient operations.  In 2010, we aim to use the momentum generated in 2009 to continue to improve operational, cost and capital efficiency, while ensuring we maintain our priorities of safe, reliable and efficient operations."); App. Stmt. No. 24, Compl. ¶ 406 (Code of Conduct: "no activity is so important that it cannot be done safely," "stop any work that becomes unsafe," "make sure you know what to do if an emergency occurs at your place of work," "only undertake work for which you are trained, competent, medically fit and sufficiently rested and alert to carry out."); App. Stmt. No. 25, Compl. ¶ 408 ("Our commitment to safe and reliable operations starts with the group chief executive and leadership: a commitment that filters down through the organization and is regularly communicated to all staff."); App. Stmt. No. 6, Compl. ¶¶ 408, 410 (Hayward: "I am extremely proud of BP's 2009 safety performance—it reflects a sustained effort across all our operations over many years."); App. Stmt. No. 26, Compl. ¶ 410 ("BP constantly seeks to improve its safety performance through the procedures, processes and training programmes that we implement in pursuit of our goal of no accidents, no harm to people and no damage to the environment."); App. Stmt. No. 27, Compl. ¶ 410 ("We believe our focus on changing BP's safety culture over the last few years is yielding results."); App. Stmt. No. 28, Compl. ¶ 410

("BP has well-developed systems, processes and metrics for reporting safety performance in support of internal performance management and to enable learning and public reporting."); App. Stmt. No. 31, Compl. ¶ 410 ("BP is fully committed to becoming a recognized industry leader in process safety management and continues to work to achieve this.").

### i.      Particularity

The statements Plaintiffs identify all express some variation of BP's promise to make safety a priority.  Plaintiffs allege that such statements were false for a variety of reasons. Plaintiffs claim that global cost-cutting restructuring measures led BP to transfer or terminate individual employees critical to the successful implementation of OMS.  (Compl. ¶ 335.)  BP failed to implement best practices, such as hiring personnel experienced in safety and risk management.  (*Id.* ¶ 345.)  Plaintiffs also claim that their allegations specifically related to OMS—such as the failure to implement OMS and OMS's lag behind comparable programs among BP's industry peers—further demonstrate the falsity of BP's claims that it was prioritizing safety.  BP also failed to create a "global safety division" until January 2011, even though the idea was first presented to the Board of Directors as early as 2001.  (*Id.* ¶ 346.) Plaintiffs also challenge BP's allocation of its revenue, arguing that the fact that BP spent only .0033 percent of its 2009 revenue on "research and development for safer offshore drilling technologies" belies any suggestion that the Company was truly putting safety first.  (*Id.* ¶ 307.) Plaintiffs further allege that BP's tight cost budget delayed maintenance on the Atlantis rig.  (*Id.* ¶ 169.)

Plaintiffs also point to specific problems on several of BP's rigs in the Gulf.  For example, tubing in the Atlantis rig ruptured in 2008, causing a small oil spill.  Following the spill, BP employee Kenneth Abbott developed a database detailing the completion and approval

status of required engineering documents on the Atlantis. (*Id.* ¶¶ 172–74.) Abbott's database revealed that a majority of the documents had never received approval at any phase of development. (*Id.*) With respect to the Deepwater Horizon rig, Plaintiffs point to post-spill findings by the Presidential Commission noting that "BP's management process did not adequately identify or address risks" at the Macondo well and that the Deepwater Horizon crew "had not been trained adequately in how to respond to an emergency situation." (*Id.* ¶¶ 272, 314–16.) Plaintiffs also allege that both the Atlantis and Deepwater Horizon rigs violated MMS drilling regulations: the Atlantis apparently lacked MMS-required engineering documents and the Deepwater Horizon drilled deeper than allowed under its MMS permit. (*Id.* ¶¶ 180, 440.) An internal BP presentation from May 2009 revealed a shortage of experienced offshore workers on both rigs. (*Id.* ¶ 440.) And a September 2009 audit concluded that safety goals were not commonly known or communicated on the rigs. (*Id.* ¶ 311.)

Defendants counter that all statements about "safety in general," BP's commitment to improving process safety, and statements about BP's progress in implementing process safety measures are neither misleading nor material. (Doc. No. 152, at 15–18.) Defendants contend that such statements are not actionable because they lack "a standard against which a reasonable investor could expect them to be pegged." *Bridgestone*, 399 F.3d at 671. Defendants characterize the statements related to BP's progress on process safety measures as "generalized positive statements" and argue, correctly, that such statements cannot serve as a basis for liability. (Doc. No. 150, at 16.)

General statements about corporate "progress" are "too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem to be important to a securities investment decision." *Bridgestone*, 399 F.3d at 671; *see also*

*Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 870 (5th Cir. 2003) ("'[M]aking steady progress' is precisely the sort of generalized positive characterization that is not actionable under the securities laws.").   The statements listed above are all in this vein, as they are generalized statements about BP's "commitment to safety," placement of "safety as the number one priority," and its leadership in "process safety management."  (Compl. ¶¶ 269, 273, 275.)  Even the very specific facts Plaintiffs allege to show the falsity of the statements cannot confirm or deny whether "progress" was being made or whether safety was truly being "prioritized" as "# 1" or the "highest priority."   Because Plaintiffs have failed to plead any misrepresentations related to BP's prioritization of safety with the particularity required under Rule 9(b) and the PSLRA, the identified statements are not actionable.[36]

### ii.    Materiality

All of the statements Plaintiffs identify are simply different iterations of BP's general message about prioritizing safety.   Not only have Plaintiffs failed to plead the identified statements with the particularity required under the PSLRA, but such statements are immaterial to investors.  A "company's expressions of confidence in its management or business are not actionable."  *Rosenzweig*, 332 F.3d at 869; *see, e.g.*, *In re MCI Worldcom, Inc. Sec. Litig.*, 191 F. Supp. 2d 778, 785 (S.D. Miss. 2002) (holding immaterial statements that "[t]he fundamentals of our business remain strong" and "[w]e are leading the charge into this new era"); *see also Raab v. Gen. Physics Corp.*, 4 F.3d 286, 290 (4th Cir. 1993) (holding that "[a]nalysts and arbitragers rely on facts in determining the value of a security, not mere expressions of optimism from a company spokesman.").   "Progress" on making safety a "priority" is too illusory a metric, and a generalized commitment to prioritize safety is simply too vague a message to be proven material.

---

[36] The nonactionable statements in this category include Misrepresentation Nos. 4 (Compl. ¶ 378), 6 (*Id.* ¶ 408), 7 (*Id.* ¶ 380), 11 (*Id.* ¶ 365), 12, 14 (*Id.* ¶ 353), 20 (*Id.* ¶ 390), 21–23 (*Id.* ¶ 394), 24 (*Id.* ¶ 406), 25 (*Id.* ¶ 408), 26–28 (*Id.* ¶ 410), 31 (*Id.* ¶ 410).

Because the sixteen statements Plaintiffs identify are neither pleaded with particularity nor material, these statements are not actionable.

### 3.  Scienter

To adequately plead scienter and survive Defendants' motion to dismiss, the Complaint must state with particularity enough facts to raise an inference of scienter on the part of at least one Individual Defendant with regard to at least one allegedly fraudulent statement, and that inference must be such that a reasonable person would conclude that it is at least as compelling as any opposing inference.  *See Tellabs*, 155 U.S. at 326; *Shaw Group*, 537 F.3d at 533–34. "The critical issue in a motion to dismiss based on insufficient allegations of scienter is whether the allegations of fraud contained in a plaintiffs' complaint are sufficiently connected to each of the defendants such that a strong inference of scienter on their part is appropriate."  *In re Franklin Bank*, 782 F. Supp. 2d 364, 387 (S.D. Tex. 2011).  Thus, the Court must consider whether Plaintiffs have satisfied the heightened pleading requirements for proving scienter as to each Individual Defendant against whom Plaintiffs allege section 10(b) violations.

### a.  *Scienter as to Individual Defendants*

Defendants take issue with what they characterize as Plaintiffs' repeated "group pleading," *i.e.,* the Complaint references "Defendants," "BP's officers and directors," "senior management," or "BP" as an undifferentiated unit rather than specifically alleging actions or omissions attributable to each named defendant.  (Doc. No. 152, at 35.)  Because the Fifth Circuit has rejected the group pleading approach, Plaintiffs are required to "distinguish among defendants and allege the role of each with respect to 'each act or omission' in the alleged fraud."  *In re TETRA Techs.*, 2009 WL 6325540, at *3; *see also Shaw Group*, 537 F.3d at 533 (rejecting the group pleading approach to scienter in the Fifth Circuit).  The Court must therefore

disregard all group pleaded allegations in the Complaint and undertake scienter analysis only where Plaintiffs have specifically tethered an alleged misrepresentation or omission to one or more of the Individual Defendants.  *See Southland*, 365 F.3d at 365 (explaining that plaintiffs "must allege facts sufficient to raise a strong inference of scienter with respect to each individual defendants").

As a threshold matter, the Court dismisses Plaintiffs' claims against Individual Defendants McKay and Svanberg.[37]  Of the thirty-five alleged misrepresentations, Plaintiffs attribute two statements to McKay and one statement to Svanberg.[38]  Because the Court has already decided above that none of the statements attributable to McKay and Svanberg are actionable, Plaintiffs cannot demonstrate scienter as to either McKay or Svanberg.  *See supra* Sections V.2.c.i.(c), V.2.d.i.(d), V.2.e.; *see also Blackwell*, 440 F.3d at 287 (explaining that a complaint must specifically tie the individual defendants to the statements or omissions, or it will fail under the PSLRA's heightened pleading standard).

### i.  Hayward

Plaintiffs attribute six misrepresentations to Hayward, four found in BP's 2009 Annual Review and two from the 2009 Sustainability Review and Sustainability Report.  (App. Stmt. Nos. 1–6.)  As discussed above, only one of the statements attributable to Hayward—the statement in the 2009 Sustainability Review claiming that OMS was introduced in the Gulf in 2008—is pleaded with the required particularity.  *See* App. Stmt. No. 5, Compl. ¶ 408 ("Having been initially introduced at 8 sites in 2008, the OMS rollout extended to 70 sites by the end of 2009 . . . [t]his means implementation is 80% complete.").

---

[37] Plaintiffs name nine Individual Defendants.  They allege section 10(b) violations only with respect to four of them: Hayward, Inglis, McKay, and Svanberg.

[38] The Court does not reach the issue of personal jurisdiction because the Court dismisses Plaintiffs' claims against Defendant Svanberg for failure to adequately allege scienter.  (Doc. No. 152, at 49.)

Defendants argue that Plaintiffs have failed to adequately plead scienter with respect to Hayward and instead rest their allegations on Hayward's corporate position and job title. Plaintiffs assert that Hayward was CEO, Chairman of the GORC, and executive liaison to the SEEAC and, therefore, had specific duties as a Board member. (*Id.* ¶¶ 24, 427–28.) Because the GORC was "charged with providing process safety oversight by conducting regular reviews of incidents" and "detailed examinations of safety-related activities," Plaintiffs contend that Hayward would have "regularly been provided" analyses and data, including information on compliance violations, fines and penalties, and reportable incidents. (*Id.* ¶ 428.)

Plaintiffs also list thirty-eight additional facts that "Defendants" allegedly knew or recklessly disregarded. (*Id.* ¶ 440.) Only two of these ostensible facts allege something that Hayward himself either did or said.[39] First, as a GORC member, Hayward was allegedly aware of the problems on the Atlantis rig and the failing test results of critical pieces of safety equipment on the Deepwater Horizon. (*Id.* ¶ 440.) Second, subsequent to the spill, Hayward admitted that "BP's contingency plans were inadequate," and that the company had been "making it up day to day." (*Id.*) Finally, Plaintiffs point out that 70% of Hayward's performance bonus was based on the achievement of financial metrics and only 15% was based on safety (and not process safety specifically). (*Id.* ¶¶ 165, 436.) Plaintiffs cite the disparity as further evidence of scienter. (*Id.*)

"Incentive compensation" cannot serve as the predicate for an allegation of fraud. *Abrams*, 292 F.3d at 434 ("It does not follow that because executives have components of their compensation keyed to performance, one can infer fraudulent intent."). At bottom, all of Plaintiffs' other scienter allegations rest entirely on Hayward's membership on the GORC.

---

[39] The remainder of the list refers to facts allegedly communicated to "BP's Senior Management," "BP," "senior staff" or no named individual at all. (Compl. ¶ 440.)

Broad, conclusory allegations of scienter against Hayward, based solely on his position as CEO and a member of the GORC, are insufficient to meet the heightened pleading standard of Rule 9(b) and the PSLRA. *See Shaw Group*, 537 F.3d at 535 (explaining that pleadings of scienter may not rest on the inference that a defendant must have been aware of a fraudulent statement based on his position in the company). Plaintiffs suggest that membership in the GORC is entitled to more weight in the scienter analysis than a mere corporate title or position in the company. But Plaintiffs fail to allege facts sufficient to distinguish membership in the GORC from general membership in the Company as an officer or director.

The allegations regarding Hayward's access to "analyses and data" and other reports pursuant to his GORC membership are inadequate. Plaintiffs provide very little detail about the source of the reports and data Hayward supposedly received. For example, Plaintiffs allege that BP had an "internal web-based data management system" that compiled any reported safety incidents, including problems on the rigs in the Gulf, and Plaintiffs claim that Hayward had access to the system as a member of the GORC. (*Id.* ¶ 432.) An unnamed senior BP safety employee also confirmed that an internal database was utilized and accessible for all recorded safety incidents.[40] (*Id.* ¶ 433.) An unnamed BP safety analyst testified that he had prepared reports regarding safety incidents that were delivered to the Board or a Board representative. (*Id.* ¶ 434.) A senior member of the BP internal audit team testified that Gulf operations were audited by an audit risk team, which reported to the full Board of Directors. (*Id.* ¶ 435.) "[U]nsupported general claim[s] about the existence of confidential corporate reports that reveal information contrary to reported accounts is insufficient to survive a motion to dismiss." *Abrams*, 292 F.3d at 432. Here, all the allegations lack corroborating details about the content of

---

[40] Plaintiffs state that they withhold the names and titles of the employees in compliance with the confidentiality agreements in place in this action as well as in MDL 2179.

the reports, their authors, and their specific recipients. *Id.* at 431–32 (finding that allegations that "senior level executives" received "unidentified daily, weekly and monthly financial reports" was insufficient to establish scienter); *see also Goldstein v. MCI WorldCom*, 340 F.3d 238, 253 (5th Cir. 2003) (noting that the allegations "that the individual defendants (the CEO and CFO) received daily, weekly, and monthly financial reports that appraised them of the company's true financial status" were insufficient and overly general); *ABC Arbitrage*, 291 F.3d at 358 (allegations concerning "regular reports" from specified subsidiary to parent and to parent's CEO and named member of executive committee insufficient because "any such 'regular reports' are insufficiently identified as to who prepared them and how frequently they were prepared"); *Southland*, 365 F.3d at 370 ("An unsupported general claim of the existence of company reports reflecting contrary information is insufficient to survive a motion to dismiss.").

Plaintiffs "need[] to specify the internal reports, who prepared them and when, how firm the numbers were or which company officers reviewed them." *ABC Arbitrage*, 291 F.3d at 356. Plaintiffs fail to do so here. Plaintiffs provide no details regarding the contents of the reports Hayward received, whether Hayward was the determined recipient (or whether such reports were sent en masse to GORC members), or the frequency with which such reports were prepared and distributed. The additional allegations that Hayward had access to an internal web-based data management system suffers from the same deficiency. Plaintiffs have not alleged facts sufficient to demonstrate that Hayward has access to information contradicting his representations about OMS and BP's success in implementing OMS.[41] As a member of the GORC, Hayward may indeed have been privy to information related to BP's process safety measures; however,

---

[41] During oral argument, Plaintiffs cited various statements made by Defendant Hayward during a deposition taken in connection with the MDL 2179 docket. While the Court recognizes the significant weight these statements could lend to Plaintiffs' scienter allegations, the Court cannot consider additional evidence outside the Complaint at this time.

Plaintiffs have failed to identify any such information.  As a result, they cannot provide a "cogent and compelling" inference of scienter with respect to Hayward.  The Court therefore dismisses Plaintiffs' claims against Hayward.

### ii. Inglis

Inglis was an Executive Director and the Chief Executive of Exploration and Production from 2007 to October 31, 2010.  (Compl. ¶ 26.)  Plaintiffs attribute two of the thirty-five alleged misrepresentations to Inglis.  (App. Stmt. Nos. 7–8; Compl. ¶¶ 380, 401.)  Following the Court's analysis above, only the statement Inglis made as part of a speech at the Howard Weil Conference in March 2010 is alleged with particularity.

Plaintiffs allege the same facts in support of scienter as they do with respect to Defendant Hayward.  Because Inglis was a member of the GORC and attended meetings of the SEEAC, Plaintiffs contend that Inglis, like Hayward, had access to "reports, "analyses and data," and the "internal web-based data management system."  (*Id.* ¶¶ 427–428, 433.)  Plaintiffs also suggest, in the long list of additional facts known to "Defendants," that Inglis, too, was aware of problems with the Gulf Rig Atlantis and failed test results of Deepwater Horizon's safety equipment.  (*Id.* ¶ 440.)  Defendants argue that all of the scienter allegations are based solely on Inglis's position within the Company.  Defendants also argue that Plaintiffs do not rely on the content of any of the documents Inglis allegedly received in formulating their allegations against him and thus the scienter allegations fail to connect Inglis to the false statements.

Plaintiffs have alleged no specific scienter allegations with respect to Inglis, and their allegations fail for the same reasons discussed above with respect to Hayward.  Plaintiffs cannot rely on Inglis's position on the GORC, interaction with the SEEAC, and reports and other internal documents with no specified contents or authors.  Plaintiffs have thus failed to plead

scienter with respect to Inglis under the heightened pleading standards of Rule 9(b) and the PSLRA.  The Court therefore dismisses Plaintiffs' claims against Inglis.

### b.   Scienter as to Corporate Defendants

Turning to the potential section 10(b) liability of BP itself, the Court can treat as having been made by BP all the actionable misrepresentations contained in SEC filings, press releases, and other reports issued in BP's name because all of the Individual Defendants were executive officers of the Company whose actions were intended to benefit the Company.  *See Southland*, 365 F.3d at 366.  In addition, all misrepresentations attributable to individual defendants are also treated as having been made by BP, as "all of them appear from the face of the Complaint to have been made pursuant to their positions of authority within the company."  *Id.*  Because Plaintiffs have failed to adequately allege scienter with respect to all of the Individual Defendants, the Court is left to determine whether Plaintiffs have adequately alleged scienter for the remaining corporate statements not attributed to any Individual Defendant.

Plaintiffs have alleged three actionable unattributed statements that appear in BP's 2008 Annual Report (App. Stmt. No. 13; Compl. ¶ 353), BP's 2009 Annual Review (App. Stmt. No. 18; Compl. ¶ 383), and BP's 2009 Sustainability Report (App. Stmt. No. 32; Compl. ¶ 410).  In addition, Plaintiffs allege two remaining actionable misrepresentations that they attribute to non-defendants: these include a statement in the IEP (App. Stmt. No. 16; Compl. ¶ 356) and testimony attributed to Rainey (App. Stmt. No. 15; Compl. ¶ 370).

In order to adequately plead scienter as to a corporate defendant, Plaintiffs must link the statement to a corporate officer who can be seen as acting on behalf of the corporation in making the statement.  *Southland*, 365 F.3d at 366 ("A defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the

requisite level of scienter, i.e., knows that the statement is false, or is at least deliberately reckless as to its falsity, at the time he or she makes the statement.").  General common law principles support the logic in circumscribing corporate scienter.  Because "an essentially subjective state of mind" is an element of a cause of action for fraud, "the required state of mind must actually exist in the individual making (or being a cause of the making of) the misrepresentation," and may not simply be imputed to the corporation on general principles of agency.  *Id.*; *see also Tellabs II*, 513 F.3d at 707 ("The problem with inferring a collective intent to deceive behind the act of a corporation is that the hierarchical and differentiated corporate structure makes it quite plausible that a fraud, though ordinarily not a deliberate act, could be the result of a series of acts none of which was done with scienter and imputable to the company by the doctrine of respondeat superior.").

The Seventh Circuit recently outlined the only way around this dead-end for unattributed corporate statements, hypothesizing that "it is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted the fraud."  *Tellabs II*, 513 F.3d at 710.  By way of example, the *Tellabs II* court cited a hypothetical announcement by General Motors that it had sold one million SUVs in a given year when it had in fact sold zero.  *Id.*  Subsequent courts to have considered application of this potential roundabout have underscored that it is narrow indeed.  *See*, *e.g.*, *In re Dell Sec. Litig.*, 591 F. Supp. 2d 877, 899 (W.D. Tex. 2008) (noting that "the situation envisioned by the [Tellabs] court was one where the false or misleading announcement was so dramatic [it] would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false.") (internal citations omitted).

78

In examining corporate scienter with respect to the statements contained in the IEP the "critical question, therefore, is how likely is it that the allegedly false statements . . . were the result of merely careless mistakes at the management level based on false information fed it from below, rather than of an intent to deceive or a reckless indifference to whether the statements were misleading." 513 F.3d at 709. On the one hand, the errors contained in the IEP are glaring and egregious. The IEP estimated the worst case scenario of a spill occurring in the Mississippi Canyon Block 252 specifically at 162,000 barrels per day. (Compl. ¶ 356.) The difference between what BP was actually able to recover and what it claimed it could recover is so great that the projected numbers in the IEP appeared to have been invented out of thin air, and the IEP's assertion that "it [wa]s unlikely that an accidental surface or subsurface spill would occur from the proposed activity" at the Macondo well site appears misleading. (*Id.*) Plaintiffs have also alleged that the IEP contained even more explicit falsities: BP requested a permit to drill to a depth of 19,650 feet at the Macondo site yet drilled "in excess of 22,000 feet, in violation of its permit." (*Id.* ¶ 200.) The false estimates and outright misrepresentations of BP's capabilities and intentions at the Macondo site weigh in favor of a finding of reckless indifference with respect to the Corporate Defendants, as such blatant errors seem to reflect BP's utter disregard for the potential magnitude of the damage an uncontainable spill could cause—and did cause—in the Gulf of Mexico.

On the other hand, the IEP clearly has an author. The cover page of the IEP lists "BP Exploration & Production Inc." at the bottom of the page; all subsequent pages in the document have BP Exploration & Production Inc. listed in the footer. (Doc. No. 112, Ex. B.) Thus, on every page, the document represents that BP Exploration & Production Inc. was the entity responsible for authorship. Plaintiffs could have sued this corporate entity, but they have not.

While it is possible that the allegedly false statements in the IEP were based on "a reckless indifference as to whether the statements were misleading," as required for a finding of corporate scienter, Plaintiffs have not brought their claim against the responsible party.  As a result, the misleading statements in the IEP are insufficient to support a finding of scienter with respect to the named Corporate Defendants.  *See Janus Capital Group v. First Derivative Traders*, 131 S. Ct. 2296, 2302 (2011) ("For purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether or how to communicate it.").   The same rationale applies to Rainey's statement.   (App. Stmt. No. 17; Compl. 370).  Plaintiffs attribute the statement to Rainey, but they have not named Rainey as a defendant.  Plaintiffs have thus failed to adequately plead corporate scienter with respect to both statements.

The remaining three unattributed statements contain misrepresentations as to the implementation status of OMS in the Gulf and the application of OMS across BP's facilities. (App. Stmt. Nos. 13, 18, 32; Compl. ¶¶ 353, 383, 410.)   Once again, the question before this Court is whether the statements are more likely a reflection of mistakes at the management level based on false information or evidence of "an intent to deceive or a reckless indifference as to whether the statements were misleading."  *Tellabs II*, 513 F.3d at 709.  The three statements occurred over the course of a year and a half; indeed, more than a year separates the first two statements.   While Plaintiffs have alleged facts supporting their argument that BP falsely represented the implementation status of OMS in the Gulf and failed to disclose the narrow reach of the program with respect to BP's operations, it is more likely that these three statements—all of which are highlighted as the lone falsity in lengthy public filings—are evidence of careless mistakes at the management level.  Where individual misrepresentations are connected to no

80

individual corporate officer, corporate scienter is severely circumscribed.  The three statements here—made without an alleged corporate officer as a speaker, buried within BP's public filings, and separated by more than a year—do not give rise to the required strong inference of corporate scienter.  Plaintiffs have thus failed to allege scienter with respect to the Corporate Defendants with respect to the unattributed misrepresentations and statements prepared by non-defendant individuals and entities.

### B.  Section 20(a) claims

Because the Court has found that Plaintiffs have failed to allege section 10(b) violations with respect to the Corporate Defendants and with respect to Defendants Hayward, Inglis, McKay and Svanberg, the remaining Individual Defendants—Castell, Anderson, Burgmans, Carroll, and Davis, Jr.—cannot be secondarily liable under section 20(a).[42]

---

[42] Because the Court dismisses Plaintiffs' claims against Individual Defendants Burgmans, Castell, and Carroll, the Court does not reach the issue of whether it may exercise personal jurisdiction over these foreign Defendants.

## VI.     CONCLUSION

It is ordered that Defendants' Motion to Dismiss the Claims of BP ADS Purchasers in the Ludlow Plaintiffs' Consolidated Class Action Complaint (Doc. No. 151) is **GRANTED**.  The Court is acutely aware that federal legislation and authoritative precedents have created for plaintiffs in all securities actions formidable challenges to successful pleading.  Today's decision is a reflection of that.  By no means, however, does the Court mean to signal that no pleadings Plaintiffs could proffer would be successful.  An amended complaint may well be able to adduce additional information responsive to this Court's concerns.  Should Plaintiffs wish to amend their Complaint, they are instructed to file an amended complaint in conformity with the rulings expressed in this Order within twenty days.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the 13th day of February, 2012.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE