**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: BP p.l.c. | § | MDL NO.: 10-md-2185 |
| SECURITIES LITIGATION | § | |
| | § | Civil Action No. 4:10-md-2185 |
| | § | |
| | § | HON. KEITH P. ELLISON |
| | § | |

**<u>MEMORANDUM AND ORDER</u>**

On April 20, 2010, the Macondo well blew out, costing the lives of eleven rig workers, and setting off a chain of events that eventually sank the Deepwater Horizon rig operated by Defendant BP plc. The blowout spilled over four million barrels of oil into the Gulf of Mexico. In the months that followed, lawsuits raising a variety of claims, including securities fraud claims, were filed across the country. The Comptroller of the State of New York and the Attorney General of Ohio—representatives of a group of plaintiffs later identified as the New York and Ohio Plaintiffs—filed suit in the Southern District of New York. (Transfer Order, Doc No. 1.)[1] A group later identified as the Ludlow Plaintiffs filed an action in the Western District of Louisiana. (*Id.*) By Order dated August 10, 2010, the Judicial Panel on Multidistrict Litigation transferred all cases involving shareholder derivative claims, securities claims, and ERISA actions to the Southern District of Texas. (*Id.*) Claims involving personal injury, wrongful death, and property damage were centralized in a separate docket in the Eastern District of Louisiana. The claims of both the New York and Ohio Plaintiffs and the Ludlow Plaintiffs were included in the group transferred to the Southern District of Texas.

---

[1] All docket references are to Multi-District Litigation No. 10-md-2185.

On December 28, 2010, this Court consolidated all of the securities class actions pending in the Court,[2] appointed the New York and Ohio Plaintiffs as lead plaintiffs, and appointed the Ludlow Plaintiffs as lead plaintiffs of a subclass.[3] (Order, Doc. No. 79.) In its decision, this Court expressed its expectation that "the lead plaintiffs work together as needed to prevent inefficiencies" and its hope that the two lead plaintiffs would file a joint complaint, if possible. (*Id.*) That did not happen. Instead, the two lead plaintiffs filed two separate and extremely lengthy consolidated amended complaints.

On February 14, 2011, the New York and Ohio Plaintiffs filed a Consolidated Class Action Complaint (hereinafter "Complaint") against three corporate defendants, BP plc, BP America, Inc., and BP Exploration & Production, Inc., and against ten individual defendants (collectively "Defendants"). (Complaint ("Compl."), Doc. No. 113.) The Ludlow Plaintiffs filed a separate complaint on February 11, 2011. (Doc. No. 112.) On March 4, 2011, this Court set a briefing schedule for Defendants' motions to dismiss after deciding that, by necessity, briefing in this case had to be directed separately to each complaint. (Doc. No. 120.)

On May 6, 2011, Defendants filed two separate motions to dismiss the New York and Ohio Plaintiffs, distinguishing between the claims of the purchasers of BP ordinary shares ("Ordinary Share Purchasers") (Doc. No. 153) and the remaining claims of the purchasers of BP American Depositary Shares ("ADSs") ("ADS Purchasers") (Doc. No. 149).[4] The Ordinary

---

[2] The seven securities class actions consolidated into the instant case include: *Ludlow v. BP PLC*, Case No. 10-cv-3043, *Johnson Inv. Counsel Inc. v. BP PLC*, Case No. 10-cv-3044, *Yuen v. BP PLC*, Case No. 10-cv-3049, *Greenfield v. BP PLC*, Case No, 10-cv-3448, *McClurg v. BP PLC*, Case No. 10-cv-3449, *Oklahoma Police Pension & Ret. Sys. V. BP PLC*, Case No. 10-cv-3452, and *Safe v. British Petroleum*, Case No. 10-cv-4675.

[3] The Court created a subclass in part because the competing lead plaintiffs advanced different theories of the case. Whereas the Ludlow Plaintiffs' claims center on BP's statements about the safety of its drilling operations in the Gulf of Mexico in the thirteen months leading up to the Deepwater Horizon explosion, the New York and Ohio Plaintiffs argue more generally that BP made fraudulent statements over a much longer period, between 2007 and 2010, about safety precautions both in the Gulf of Mexico and elsewhere. (Doc. No. 79 at 10, 18–19.)

[4] Defendants also filed a motion to dismiss the Ludlow Plaintiffs' claims (Doc. No. 151). Given the separate briefing in this case and the diversity of allegations, defendants, and legal issues, the Court will issue a separate

Share Purchasers and ADS Purchasers then filed separate responses to the motions to dismiss. (Doc. Nos. 175 & 186.)  Defendants filed replies in support of their respective motions to dismiss on June 21, 2011.  (Doc. Nos. 216 & 220.)  After briefing concluded, the Court heard oral argument on the motions to dismiss on November 4, 2011.

Pending before the Court are Defendants' Motion to Dismiss the Claims of BP ADS Purchasers in the New York and Ohio Plaintiffs' Consolidated Class Action Complaint (Doc. No. 149) and Defendants' Motion to Dismiss the Claims of Purchasers of BP Ordinary Shares (Doc. No. 153).  Having considered the parties' pleadings, arguments and the applicable law, the Court finds that Defendants' Motion to Dismiss the Claims of BP ADS Purchasers (Doc. No. 149) must be **GRANTED IN PART** and **DENIED IN PART**.  Defendants' Motion to Dismiss the Claims of BP Ordinary Share Purchasers (Doc. No. 153) must be **GRANTED** in its entirety.

## I.   DEFENDANTS' MOTION TO DISMISS THE CLAIMS OF BP ADS PURCHASERS IS GRANTED IN PART AND DENIED IN PART

What follows is a description of the parties, a summary of the allegations in the Complaint, the standards applicable to the motion, and the Court's conclusions with respect to the adequacy of the allegations of false and misleading statements, materiality, and scienter.

### A.  The Parties

Lead Plaintiffs are Thomas P. DiNapoli, Comptroller of the State of New York, as Administrative Head of the New York State and Local Retirement Systems and sole Trustee of New York State Common Retirement Fund, and four Ohio systems.  They are the Ohio Public Employees Retirement System, the State Teachers Retirement System of Ohio, the School Employees Retirement System of Ohio, and the Ohio Police & Fire Pension Fund, along with their statutory litigation counsel, Ohio Attorney General Mike DeWine (collectively, the

---

ruling on the Ludlow Plaintiffs' claims.

"NY/OH Plaintiffs" or "Plaintiffs").   (Compl. ¶¶ 31–32.)   The NY/OH Plaintiffs bring their consolidated class action on behalf of the following proposed plaintiff class: (1) all persons and entities who purchased or acquired BP ADSs (the "ADS Purchasers") between January 16, 2007, and May 28, 2010 (the "Class Period"), and (2) all persons and entities who purchased or acquired BP ordinary shares in domestic transactions executed on foreign exchanges (the "Ordinary Share Purchasers") during the Class Period.[5]  (Compl., at 1.)

Defendants include BP plc, BP America, Inc., and BP Exploration & Production, Inc. (collectively "BP" or "the Company") and ten of BP's present and former officers and directors. BP plc is a U.K. corporation with its principal executive offices located in London, England. BP's ADSs trade on the New York Stock Exchange ("NYSE"), and BP is the largest non-U.S. company listed on the NYSE.  (Compl. ¶ 33.)  BP's ordinary shares are also listed on the NYSE in connection with BP's ADS program.  BP America, Inc. and BP Exploration & Production, Inc. ("BP E&P"), both wholly-owned subsidiaries of BP, are Delaware corporations with their principal places of business in Houston, Texas.  (*Id.* ¶¶ 34–35.)

The ten individual defendants were directors and officers of BP prior to and during the Deepwater Horizon spill.  They are Anthony B. "Tony" Hayward, executive director of BP since 2003 and BP's Chief Executive Officer ("CEO") from May 2007 to October 2010 ("Hayward"); Lord Edmund John Philip Browne, BP's CEO from 1995 to April 2007 ("Browne"); Andrew G. "Andy" Inglis, Chief Executive of Exploration and Production and an executive director of BP from 2007 to October 2010 ("Inglis"); Bryon E. Grote, a member of BP's executive management, serving as a director since 2000 and the Company's Chief Financial Officer ("CFO") since 2002 ("Grote"); Douglas Suttles, BP's Chief Operating Officer for Exploration and Production from January 2009 to at least January 2011 ("Suttles"); Iain Conn, Chief

---

[5] This suit has not yet been certified as a class action.

Executive for BP Refining and Marketing ("Conn"); David Rainey, BP's Vice President of Exploration for the Gulf of Mexico ("Rainey"); Robert "Bob" Dudley, an executive director of BP since April 2009 and Group Chief Executive since October 2010 ("Dudley"); Robert "Bob" Malone, Chairman and President of BP America from July 2006 to February 2009 ("Malone"); and H. Lamar McKay, the Chairman and President of BP America, since January 2009 ("McKay") (collectively, the "Individual Defendants").  (*Id.* ¶¶ 36–45.)

### B.  Factual Allegations and Claims

In a Rule 12(b)(6) motion to dismiss, the court must accept as true a plaintiff's well-pleaded factual allegations.  FED. R. CIV. P. 12(b)(6).  The court does not, however, "accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions."  *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 550 (5th Cir. 2007) (citation omitted) (internal quotation marks omitted).  Accordingly, the Court will set forth the relevant facts as alleged by Plaintiffs.

The NY/OH Plaintiffs, both the ADS Purchasers and Ordinary Share Purchasers, assert violations of section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 of the Securities and Exchange Commission ("SEC") against all Defendants.[6]  They also assert violations of section 20(a) of the Exchange Act against the Individual Defendants.  In addition, the Ordinary Share Purchasers assert both New York common law and English law claims against BP.  Plaintiffs seek certification as a class action pursuant to Rule 23, compensatory and punitive damages against Defendants, jointly and severally, pre-judgment interest, costs, and attorneys' fees.

---

[6] For simplicity's sake, the Court will refer to Plaintiffs' claims arising under section 10(b) and Rule 10b–5 as "section 10(b)" claims.

Plaintiffs seek damages stemming from their stock losses following the explosion of BP's Deepwater Horizon rig in the Gulf of Mexico on April 20, 2010.  BP was unable to stop the resulting oil spill for eighty-seven days following the explosion, costing the Company somewhere between $20 and $40 billion dollars.  (Compl. ¶ 26.)  From the date of the Deepwater Horizon explosion through May 28, 2010, the last day of the Class Period, BP's securities fell in value by 48%, wiping out over $91 billion in market capitalization, and causing Plaintiffs to lose as much as 40% of their investments.  (*Id.* ¶¶ 6, 26.)

### 1.  *BP and Its Safety Record*

BP is the third-largest energy company in the world.  BP operates in over eighty countries and is engaged in every facet of the oil and gas industry, including drilling, exploration and production, refining, distribution and marketing, petrochemicals, and power generation and trading.  (Compl. ¶ 48.)  BP's profits exceeded $10 billion per quarter in 2008, and the Company's quarterly profits remained in the billions throughout the Class Period.  (*Id.* ¶ 49.)  Despite these record profits, BP has struggled to overcome a corporate image tarnished by an unfortunate record of safety failures and catastrophic incidents that have adversely affected both the individuals and the environments that have come into contact with BP's operations worldwide.

Plaintiffs trace BP's troubled safety record back to 2000, when, following "life threatening incidents" at a BP refinery in Scotland, an investigation by the U.K.'s Health and Safety Executive ("U.K. HSE") revealed a number of deficiencies in BP's operational control and maintenance of process systems.  (*Id.* ¶ 10.)  From that time forward, similar safety failures occurred with some regularity, touching both BP's land and offshore operations.  In 2002, one of the rigs operated by BP in the Gulf of Mexico—the Ocean King—experienced two separate

blowout incidents.  (*Id.* ¶¶ 54–57.)  The incidents prompted the U.S. Department of the Interior Minerals Management Services ("MMS") to issue a Safety Alert to all companies drilling in the Gulf.  (*Id.* ¶ 58.)  The Safety Alert warned of the serious risk of a blowout associated with failed cementing jobs.  (*Id.*)  Despite the warnings, blowouts continued to occur in BP's operations. The Transocean Enterprise, a rig BP contracted in the Gulf, suffered a blowout in 2003.  (*Id.* ¶ 59.)  Another blowout occurred in 2004 on a rig BP operated as part of a joint consortium in the Nile delta.  (*Id.* ¶ 60.)

These safety failures occurred regularly, in fact yearly, up until 2005, when an explosion at BP's Texas City refinery prompted the U.S. Chemical Safety Board ("CSB") to order an investigation.  (*Id.* ¶ 11.)  At the CSB's prompting, BP also established its own independent panel—the "Baker Panel," headed by former Secretary of State James Baker—to review and improve the Company's safety procedures.  (*Id.*)  Even while the panel was conducting its investigation, safety-related incidents continued to occur in BP's operations.  In early 2006, an oil spill occurred off the coast of Alaska after a leak in a corroded pipeline in BP's Prudhoe Bay operations went unnoticed for weeks.  (*Id.* ¶ 68.)  BP pleaded guilty to criminal negligence in connection with the Prudhoe Bay spill and paid a fine of twenty-two million dollars.  (*Id.* ¶ 70.)

### 2.  *The Baker Report*

The Baker Panel released its final report—the "Baker Report"—in January 2007.  (*Id.* ¶ 74.)  The report cited organizational problems as the root cause of BP's failure to respond to major incidents and concluded, among other things, that "BP management had not distinguished between occupational safety . . . and process safety" and "ha[d] not adequately established process safety as a core value."  (*Id.*)  The Baker Report also included the following ten recommendations that it urged BP to implement expeditiously:

RECOMMENDATION # 1 – PROCESS SAFETY LEADERSHIP – The Board of Directors of BP p.l.c., BP's executive management (including its Group Chief Executive), and other members of BP's corporate management must provide effective leadership on and establish appropriate goals for process safety. Those individuals must demonstrate their commitment to process safety by articulating a clear message on the importance of process safety and matching that message both with the policies they adopt and the actions they take.

RECOMMENDATION # 2 – INTEGRATED AND COMPREHENSIVE PROCESS SAFETY MANAGEMENT SYSTEM – BP should establish and implement an integrated and comprehensive process safety management system that systematically and continuously identifies, reduces, and manages process safety risks at its U.S. refineries.

RECOMMENDATION # 3 – PROCESS SAFETY KNOWLEDGE AND EXPERTISE – BP should develop and implement a system to ensure that its executive management, its refining line management above the refinery level, and all U.S. refining personnel, including managers, supervisors, workers, and contractors, possess an appropriate level of process safety knowledge and expertise.

RECOMMENDATION # 4 – PROCESS SAFETY CULTURE – BP should involve the relevant stakeholders to develop a positive, trusting, and open process safety culture within each U.S. refinery.

RECOMMENDATION # 5 – CLEARLY DEFINED EXPECTATIONS AND ACCOUNTABILITY FOR PROCESS SAFETY – BP should clearly define expectations and strengthen accountability for process safety performance at all levels in executive management and in the refining managerial and supervisory reporting line.

RECOMMENDATION # 6 – SUPPORT FOR LINE MANAGEMENT – BP should provide more effective and better coordinated process safety support for the U.S. refining line organization.

RECOMMENDATION # 7 – LEADING AND LAGGING PERFORMANCE INDICATORS FOR PROCESS SAFETY – BP should develop, implement, maintain, and periodically update an integrated set of leading and lagging performance indicators for more effectively monitoring the process safety performance of the U.S. refineries by BP's refining line management, executive management (including the Group Chief Executive), and the Board of Directors.

RECOMMENDATION # 8 – PROCESS SAFETY AUDITING – BP should establish and implement an effective system to audit process safety performance at its U.S. refineries.

RECOMMENDATION # 9 – BOARD MONITORING – BP's Board should monitor the implementation of the recommendations of the Panel . . . and the ongoing process safety performance of BP's U.S. refineries.  The Board should, for a period of at least five calendar years, engage an independent monitor to report annually to the Board on BP's progress in implementing the Panel's recommendations . . . . The Board should also report publicly on the progress of such implementation and on BP's ongoing process safety performance.

RECOMMENDATION # 10 – INDUSTRY LEADER – BP should use the lessons learned from the Texas City tragedy and from the Panel's report to transform the company into a recognized industry leader in process safety management.  The Panel believes that these recommendations . . . can help bring about sustainable improvements in process safety performance at all BP U.S. refineries.

(Compl. ¶ 74.)

Two other reports echoed the findings of the Baker Panel and made BP aware of deficiencies in its corporate governance structure that directly contributed to the Company's safety failures.   First, following the Prudhoe Bay spill, BP retained an independent consulting firm, Booz Allen Hamilton ("Booz Allen"), to identify organizational, process, and governance issues that contributed to the spill.  (*Id.* ¶ 72.)  The Booz Allen report found that (1) BP's management culture was consumed with cost-cutting and meeting financial targets at the expense of safety and maintenance issues, and that (2) BP's internal communication culture failed to elevate critical risk data to senior leadership, thereby stymieing corrective action on the safety front.  (*Id.*)  Second, the CSB's report on the Texas City explosion, released in March 2007, identified similar weaknesses.  The report criticized BP management, finding that management provided "ineffective leadership and oversight," failed to "focus on controlling major hazard risk," "did not effectively evaluate the safety implications of major organizational, personnel, and policy changes," and "did not implement adequate safety oversight, provide[] needed human and economic resources, or . . . model adherence to safety rules and procedures."  (*Id.* ¶ 67.)

Such findings, especially those in the Baker Report, prompted BP to make a concerted effort to address its previous safety shortcomings and rebuild its corporate image.  Following the release of the Baker Report, BP repeatedly promised investors that it would be a different company going forward.  (*Id.* ¶ 16.)  BP took advantage of every opportunity to reiterate the Company's renewed commitment to process safety reforms across its operations.  (*Id.* ¶ 18.)  These assurances included representations that BP was prepared to contain and adequately address any oil spill that might occur in the Gulf of Mexico.  (*Id.* ¶ 24.)

### 3.  BP's Gulf of Mexico Operations

BP America, BP's largest division, is the largest producer of oil and gas in the United States.  (*Id.* ¶ 48.)  BP's Exploration and Production business segment undertakes activities around the world, including deepwater operations in the Gulf of Mexico.  (*Id.* ¶ 51.)  BP promoted its Gulf operations throughout the Class Period.  (*Id.*)  As President of BP America, Defendant Malone explained that the Gulf of Mexico accounted for one-sixth of all oil produced in the United States and repeatedly touted the Gulf region as a key "profit centre" and "high margin" production area for BP.  (*Id.*)  According to Plaintiffs, the alleged misrepresentations acquired added significance for investors when viewed against the backdrop of BP's profitable forecast for its Gulf operations.

### 4.  False and Misleading Statements Made Prior to the Deepwater Horizon Disaster

Plaintiffs select January 16, 2007, the "same day when BP [first] professed its commitment to becoming an industry leader in process safety," as the start of the Class Period.  (*Id.* ¶ 15.)  The Complaint describes the allegedly false and misleading statements that BP disseminated to investors through public filings and through verbal and written statements made by the Individual Defendants throughout the Class Period.  These include statements made

during a press conference in January 2007 following the release of the Baker Report (Compl. ¶¶ 256–57); statements made during calls with investors and analysts, including general conference calls (*Id.* ¶¶ 258–60, 267) and a strategy presentation call in early 2008 (*Id.* ¶ 281); statements published in BP's Annual Review in 2006, 2007, 2008, and 2009 (*Id.* ¶¶ 261, 277, 294, 319); BP's Form 20-F Annual Report filings with the SEC for years 2006 through 2009 (*Id.* ¶¶ 264, 283, 302, 324); statements contained in BP's 2006 Sustainability Report (*Id.* ¶ 266) and 2007 and 2009 Sustainability Review publications (*Id.* ¶¶ 287, 334); testimony given by BP executive officers before both House (*Id.* ¶¶ 269, 297) and Senate Committees (*Id.* ¶ 316); statements made by BP representatives and executive officers as participants at industry conferences, including the Sanford Bernstein 4th Annual Strategic Decisions Conference (*Id.* ¶ 271), the Houston Forum (*Id.* ¶ 275), the HRH Prince of Wales 3rd Annual Accounting for Sustainability Forum (*Id.* ¶ 289), Microsoft's Global Energy Forum (*Id.* ¶ 291), the Cambridge Energy Research Association Executive Conference (*Id.* ¶¶ 292, 326), the Howard Weil Energy Conference (*Id.* ¶¶ 308, 328), and an event hosted by the Peterson Institute for International Economics, in Washington, D.C. (*Id.* ¶ 330); statements made in BP press releases, both prior to and after the Deepwater Horizon explosion (*Id.* ¶¶ 273, 337–52); and statements made by BP executives during interviews and speeches (*Id.* ¶¶ 312, 353–56).

Plaintiffs present the alleged misrepresentations chronologically in their Complaint. For ease of reference, the Court has assigned numbers to the alleged misrepresentations and, in some cases, combines multiple statements made on the same date or by the same speaker. These numbers do not correspond to the numbered paragraphs in the Complaint; however, the corresponding paragraphs in the Complaint are referenced as well. The specific misrepresentations are described as follows:

On January 16, 2007, BP held a press conference to discuss the release of the Baker Report.  At the press conference, Browne assured investors of BP's commitment to improving its process safety programs, stating:

- "If I had to say one thing which I hope you will all hear today it is this 'BP gets it.'  And I get it too."

- "I recognize the need for improvement and that my successor, Tony Hayward, and I need to take a lead in putting that right by championing process safety as a foundation of BP's operations."

- "Finally, in its executive summary, the Panel says it believes that BP's workforce is ready, willing and able to participate in a sustained Group-wide effort to move BP towards excellence in process safety.  I wholeheartedly agree.  And I would like to make clear that the tone is indeed being set at the top."

(Misrep. No. 1; Compl. ¶ 256.)  According to Plaintiffs, Browne's promises were false from the beginning, as BP continued to expand its deepwater operations without implementing adequate safety procedures for well testing during deepwater drilling.  (Compl. ¶ 257(a).)  Shortly after Browne's announcements at the press conference, BP held a conference call with analysts and investors.  Browne, Grote, Hayward, Dudley, and Inglis participated in the call, which took place on February 6, 2007.  Hayward made the following statement during the call:

- "I would now like to give you new guidance for our expected future production rates.  Relative to our projections of February last year, our production forecast has been impacted by five things.  Firstly, we further increased our focus on safety and operational efficiency and will in some cases deliberately slow the pace of our activity in order to improve its safety and efficiency."

(Misrep. No. 2; Compl. ¶¶ 258–60.)  Plaintiffs contend that Hayward's projections were false because BP continued to expand its deepwater drilling operations without implementing safety protocols.  Further, claim Plaintiffs, BP always placed expediency over safety, rendering false Hayward's promises to "deliberately slow the pace" of operations.  (Compl. ¶ 260(b).)

On February 23, 2007, BP released its 2006 Annual Review, which contained the following statements:

- "What does the world expect of an energy company today?  We believe it is to provide energy to customers now and in the future in a safe, sustainable and environmentally responsible way.  BP strengthened its commitments to these principles in 2006."

- "Safety has always been one of our core priorities.  When the safety of people and of BP operations is at stake, actions matter far more than words.  We continued to make significant investment and took numerous actions to improve the three dimensions of safety – personal safety, process safety, and the environment – and the monitoring of all our operations in 2006."

(Misrep. No. 3; Compl. ¶ 261.)   The document also contained the following statements by Browne, as part of the "Group chief executive's review":

- "We have been urgently addressing operational issues and matters related to our safety performance."

- "Safety has always been one of our core priorities."

- "BP aspires to be an industry leader in the three dimensions of safety – personal safety, process safety and the environment."

(Misrep. No. 4; Compl. ¶ 262.)  Browne also represented that BP's current aim was "to develop a timely and intelligent plan of action in order to transform BP into an industry leader in process safety management."  (*Id.*)  Plaintiffs point to BP's continued expansion of its deepwater drilling operations without implementing environmental safety protocols as evidence of the falsity of these statements.  (Compl. ¶ 263(a)–(b).)

BP filed its 2006 Annual Report, Form 20-F, with the SEC on March 6, 2007.  Defendants Browne and Grote signed the report, which highlighted the Gulf of Mexico as one of BP's new "profit centres."  (*Id.* ¶ 264.)  The Report contained relevant statements such as the following:

- "Profit centres are, or are expected to become, areas that provide significant production and income for the segment. Our new profit centres are in . . . the deepwater Gulf of Mexico . . . where we believe we have competitive advantage and which we believe provide[s] the foundation for volume growth and improved margins in the future."

- "Deepwater Gulf of Mexico is one of our new profit centres and our largest area of growth in the US. In 2006, our deepwater Gulf of Mexico crude oil production was 195mb/d and gas production was 323mmcf/d."

- "A risk of increased environmental costs and impacts is inherent in particular operations and products of the group and there can be no assurance that material liabilities and costs will not be incurred in the future. In general, the group does not expect that it will be affected differently from other companies with comparable assets engaged in similar businesses."

(Misrep. No. 5; Compl. ¶ 264.) Plaintiffs claim that BP's comparison to its industry peers was misleading in that BP's focus on high-risk deepwater operations, coupled with its failure to implement industry best practices, actually increased BP's risk profile beyond that of its industry peers. (Compl. ¶ 265(d).)

In its 2006 Sustainability Report, released in April 2007, BP first referenced its Operational Management System ("OMS"), the program that would serve as the foundation for the changes to BP's process safety procedures. The Sustainability Report represented that, as part of OMS, BP "document[s] and rigorously follow[s] procedures for safe and effective operating." (Misrep. No. 6; Compl. ¶ 266.) Plaintiffs contend this statement was false because BP did not have adequate documented procedures for its operations, particularly for its drilling operations. (Compl. ¶ 266.)

On April 24, 2007, BP held a conference call with analysts and investors. During the call, Defendant Grote, BP's CFO at the time, stated the following:

- "2007 will represent a year of consolidation. We are stabilizing our operations and beginning to build momentum as Texas City continues its recommissioning and we focus on delivering major E&P projects like Atlantis and Thunder Horse.

14

Our strategy is unchanged and our current focus remains on safe and reliable operations and the delivery of improved performance."

(Misrep. No. 7; Compl. ¶ 267.)  Plaintiffs claim that Grote's statement misled investors because BP continued expanding its deepwater drilling without implementing safety procedures and failed to disclose multiple safety failures and near-failures in its deepwater operations.  (Compl. ¶ 268(a)–(b).)

On May 16, 2007, Malone testified before the U.S. House of Representatives Committee on Energy and Commerce, Subcommittee on Oversight and Investigations.  In both verbal and written testimony, Malone stated:

- "Today, I want to assure you that we get it.  We have learned the lessons of the past."

- "BP America is committed to safety, and the expectation of our management is that budget guidelines should never result in a compromise in safety performance. That is and has long been our philosophy . . . ."

- "I continue to meet with employees to reinforce my expectations of them: that they must ensure that our operations are safe, that they understand that they have both a right and responsibility to shut down any process they feel is unsafe or operationally unsound, and that they are encouraged to raise concerns on any issue."

- "BP does not tolerate retaliation against workers who raise safety concerns."

(Misrep. No. 8; Compl. ¶ 269.)   In addition to Plaintiffs' contention that BP expanded its deepwater drilling operations without implementing safety procedures, Plaintiffs also allege that Malone falsely represented that BP did not retaliate against workers who raised safety concerns. (Compl. ¶ 270(c).)   According to Plaintiffs, BP was aware that substantiated complaints of retaliation had been submitted to the Company through numerous avenues, including the Ombudsman's office.  (*Id.*)

On September 25, 2007, Inglis gave a speech at the Sanford Bernstein 4th Annual Strategic Decisions Conference.  His remarks included the following statements:

- "One aspect of our focus on safe and reliable operations that I mentioned earlier is our new standardized Operating Management System (OMS).  This will provide a blueprint for safety and all aspects of operations throughout BP, making sure operations are undertaken to a consistently high standard worldwide."

- "By taking and managing risks in frontier regions we have established an unrivaled asset base in some of the world's most prolific basins.  Management of those assets has given us a resource base of nearly 60 billion barrels, with a significant portion in conventional resources.  We are developing strong growth in deepwater and tight gas through a spread of major projects around the world."

(Misrep. No. 9; Compl. ¶ 271.)  Plaintiffs again cite BP's expansion of deepwater drilling, lack of safety protocols, and string of near-failures as evidence of the falsity of Inglis's statements. Plaintiffs also allege that BP's OMS program in fact did not provide a "consistently high standard worldwide" because BP continued to vary its safety practices and standards depending on the particular country in which it operated.  (Compl. ¶ 272.)

On October 25, 2007, BP announced in a press release the resolution of various investigations, including those into the Texas City explosion and the Prudhoe Bay spill.  The press release included the following statements by Malone:

- "In the months and years since these violations occurred, we have made real progress in the areas of process safety performance and risk management."

- "BP America is in the midst of a comprehensive effort to improve its safety culture and to strengthen and standardize process safety and risk management programs at all BP-operated facilities."

(Misrep. No. 10; Compl. ¶ 273.)  Malone's representations were allegedly false because, in addition to the reasons outlined above, BP did not standardize its process safety programs. Instead, BP implemented budget cuts and staff reductions aimed specifically at its safety programs.  (Compl. ¶ 274.)

A few weeks later, Hayward, too, spoke of BP's commitment to process safety. On November 8, 2007, at the Houston Forum, Hayward made the following representation:

- "We continue to implement the roadmap provided to ourselves and the industry by the excellent work of the Baker Panel. BP remains absolutely committed to taking these lessons and becoming a world leader in process safety."

(Misrep. No. 11; Compl. ¶ 275.) As with their allegations regarding Inglis's statements, Plaintiffs claim that Hayward misled investors with regard to BP's OMS program because the OMS program permitted BP to meet the minimum local requirements in each country where it operated, as opposed to industry best practices. (Compl. ¶ 276(d).)

BP published its 2007 Annual Review on February 22, 2008. The Annual Review contained many statements specifically related to BP's process safety efforts. These included:

- "Throughout 2007, BP continued to progress the process safety enhancement programme initiated in response to the March 2005 incident at the Texas City refinery. We have made progress across the group on all the recommendations."

- "Leadership – We have consistently communicated that safe and reliable operations are our highest priority. Our safety and operations audit group was strengthened and completed 28 audits in 2007."

- "Management systems – Implementation of our operating management systems began at an initial group of sites, which included all five US refineries."

- "Knowledge and expertise – We established an executive level training programme, ran process safety workshops and launched an operations academy for site-based staff to enhance process safety capability. Specialists have been deployed at our US refineries to accelerate priority improvement programmes."

- "Culture – To reinforce the need for a stronger safety culture, we undertook in-house assessments of BP's safety culture, supported by communication from leadership."

- "Indicators – Progress has been made in developing leading and lagging indicators, building on metrics already reported to executive management. We are working with the industry to develop indicators and this includes progress to agree a [sic] metric covering loss of primary containment."

(Misrep. No. 12; Compl. ¶ 278.)   The 2007 Annual Review also contained a section titled, "Group chief executive's review."   In this section, Hayward elaborated on BP's prioritization of safety, stating that, "When I took over as group chief executive, the immediate task was to restore the integrity and efficiency of BP's operations.   I set out three priorities: safety, people and performance."   (Misrep. No. 13; Compl. ¶ 279.)   Plaintiffs cite the same facts—including cost cutting measures by BP, expansion of deepwater drilling operations, and an accumulation of undisclosed safety failures—as evidence of the falsity of the statements in the 2007 Annual Review.   (Compl. ¶ 280.)

BP conducted its 2008 Strategy Presentation during a conference call with investors and analysts on February 27, 2008.   Individual Defendants Hayward, Inglis, Dudley, Conn, and Grote participated in the call.   Several of the Individual Defendants underscored BP's commitment to safety as a top priority.   For example, Hayward explained that:

- "2007 saw further improvement in [BP's] overall safety performance.   Over the last eight years, our safety performance, measured by Recordable Injury Frequency Rate, the standard measure of safety in our industry, has improved three-fold.   As you can see on this chart, our performance is amongst the best in our industry."

- "[O]ur intense focus on process safety continues.   We are making good progress in addressing the recommendations of the Baker Panel and have begun to implement a new Operating Management System across all of BP's operations. Integrity-related incidents have fallen significantly over the last three years, and oil spills of more than one barrel continue a strong downward trend."

- "Safe and reliable operations remain our number one priority."

- "We are taking action to close the competitive gap through a focused effort on three priorities of safety, people and performance.   We are determined to operate safely and reliably, to develop the capability of our people and to drive performance through restoring operational momentum.   At the same time we are rigorously reducing complexity and cost.   In Exploration and Production, we continue to see the benefits of our strategy."

Defendant Inglis made similar statements during the conference call:

18

- "Our top priority continues to be the safety and reliability of our operations.  In 2007, we saw both an improvement in personal safety and increased reliability."

- "[I]n the Gulf of Mexico, our priorities are clear – grow revenues near term through the safe startup and ramp-up of Atlantis and Thunder Horse. . . . We're on track in executing that strategy.  We've established a highly competitive position through our extensive lease-holding and track record in exploration."

(Misrep. No. 14; Compl. ¶ 282.)  Plaintiffs allege that all of these representations were false, citing BP's expansion of deepwater drilling without appropriate safety protocols, its cost-cutting and staff reduction initiatives, variation in BP's OMS program by country, and a string of allegedly undisclosed safety mishaps.  (Compl. ¶ 282.)

BP followed the February conference call with the filing of its 2007 Annual Report, Form 20-F, on March 4, 2008.  The Annual Report touted BP's "strong portfolio of assets" and referred to the Gulf of Mexico as one of BP's "current areas of major development" where BP believed it had a "competitive advantage."  (*Id.* ¶ 283.)  The Annual Report also discussed BP's risk assessment efforts, including OMS, as follows:

- "We have completed 50 major accident risk assessments (MARs).  The assessments identify high-level risks that, if they occur, would have a major effect on people or the environment.  Many of these risks, such as a loss of containment from our operations, are common across the industry.  Mitigation plans to manage and respond to identified risks form part of the MAR analysis."

- "[T]he OMS 'is the foundation for a safe, effective, and high-performing BP.'"

- "A continuous improvement process drives and sustains improvement of these elements at a local level."

- "A risk of increased environmental costs and impacts is inherent in particular operations and products of the group and there can be no assurance that material liabilities and costs will not be incurred in the future.  In general, the group does not expect that it will be affected differently from other companies with comparable assets engaged in similar businesses."

(Misrep. No. 15; Compl. ¶ 283.)  Although BP referenced mitigation plans, Plaintiffs allege that BP failed to reveal that BP's plans left the Company ill-equipped to deal with an oil spill in the

Gulf of Mexico. Plaintiffs claim that BP falsely represented both that it had completed mitigation plans and that the plans would have provided adequate oil spill response protocols. (Compl. ¶ 284.) In addition, while BP described OMS as the foundation for BP's safety efforts, OMS actually allowed BP to use different safety practices and standards in different countries. (*Id.* ¶ 272(b).)

On April 17, 2008, BP held the Company's 2008 Annual General Meeting. BP subsequently posted transcripts of speeches given by Hayward and BP Chairman Peter Sutherland at the meeting. Hayward's remarks included the following:

- "Safety is our number one priority and in 2007 our overall safety record continued to improve. Over the last eight years our safety performance according to the standard industry measure has improved threefold and is now among the best in our industry."

- "Our intense focus on process safety continues. We are making good progress in addressing the recommendations of the Baker Panel and have begun to implement a new Operating Management System across all of BP's operations. This is aimed at ensuring that our operations across the world look and feel the same everywhere – and perform to the same high standard."

(Misrep. No. 16; Compl. ¶ 285.) In addition to the reasons demonstrating falsity already discussed above, Plaintiffs contend that BP misrepresented its professed commitment to safety in that it failed to disclose that BP was implementing safety budget cuts and staff reductions which impacted the Company's ability to drill safely in the Gulf. (Compl. ¶ 286.)

On May 28, 2008, BP issued its 2007 Sustainability Review, which included a "Group chief executive's introduction" section signed by Hayward. The section contained the statement, "We are also now introducing our new operating management system (OMS), designed to bring greater consistency to our operations." (Misrep. No. 17; Compl. ¶ 287.) This statement was allegedly misleading because BP had no intention of implementing consistent practices throughout the Company. (Compl. ¶ 272.) In addition, BP continued to receive citations from

U.K. authorities.  The Company received at least one-hundred non-public citations over a four year span, belying its supposed commitment to consistent and safe operations.  (*Id.* ¶ 97.)

Hayward also gave a speech at the HRH Prince of Wales's 3rd Annual Accounting for Sustainability Forum on December 17, 2008.  BP subsequently posted a transcript of Hayward's speech on its website.  During the speech, Hayward spoke of BP's continued effort to improve its process safety practices following the Texas City refinery explosion, and stated that:

-   "One of the many consequences for [BP] has been to develop and embed a new Operating Management System right across BP – and we operate in 100 countries – so that is no mean feat."

-   "The critical aspect of this system is that it actually translates words into action. It starts out as a set of requirements which are the platform for safe, reliable, responsible operating activities.  And then we continuously improve what we do, every day, every month, every year – in pursuit of sustainable operating excellence."

(Misrep. No. 18; Compl. ¶ 289.)   In addition to the inconsistent practices and numerous regulatory citations from both U.S. and U.K. agencies, an internal December 2008 strategy document warned BP executives of major process safety concerns in the Gulf of Mexico. (Compl. ¶ 19.)   The warnings contained in the internal document severely undermined Hayward's portrait of BP's safety efforts.

During a presentation at the Microsoft Global Energy Forum in February 2009, BP stated that, as part of the OMS program, "We [BP] document and rigorously follow procedures for safe and effective operating."  (Misrep. No. 19, Compl. ¶ 291.)  Shortly thereafter, in a speech at the Cambridge Energy Research Association ("CERA") Executive Conference on February 10, 2009, Hayward again touted BP's safety procedures.  Hayward opined that, because "[BP] ha[s] the know-how and technology to tap these resources safely and with minimal impact to the environment," the U.S. should allow drilling on the outer continental shelf and "support the

hydrocarbon resources here in the US."  (Misrep. No. 20; Compl. ¶ 292.)  Plaintiffs assert that

these statements were false because BP was unprepared to deal with the Deepwater Horizon oil

spill in the Gulf of Mexico.  (Compl. ¶ 293.)

BP's 2008 Annual Review, issued on February 24, 2009, provided additional assurances

to investors of the Company's commitment to safety.  The Annual Review stated, in part:

-   "Our forward agenda focus on safety, people and performance is paying off.  BP
    is in the leading group for safety performance in the industry."

-   "Safety, both personal and process, remains our highest priority.  2008 was one of
    our best years ever for personal safety, with our performance expected to remain
    among the best in the industry.  During the year we began migrating to the new
    BP OMS, which has an increased focus on process safety and continuous
    improvement.  The majority of our operations in North America Gas, the Gulf of
    Mexico, Colombia and the Endicott field in Alaska all completed the migration to
    the OMS in 2008."

-   "Safety is our top priority . . . We continue to work to establish a strong safety
    culture, developing deep knowledge within every employee and sharing
    learning."

(Misrep. No. 21; Compl. ¶ 294.)   The document also included a "Group chief executive's

review" section signed by Hayward.  In a Q&A section discussing Hayward's priorities for BP,

Hayward explained that:

-   "Our number one priority was to do everything possible to achieve safe,
    compliant and reliable operations. . . . Safety must inform every decision and
    every action.  The BP operating management system (OMS) turns the principle of
    safe and reliable operations into reality by governing how every BP project, site,
    operation and facility is managed."

(Misrep. No. 22; Compl. ¶ 295.)  These statements were allegedly false and misleading for the

reasons already set forth above.  (Compl. ¶ 296.)

On February 25, 2009, McKay testified before the U.S. House of Representatives

Committee on Natural Resources.  In the written testimony he submitted, McKay represented

that "[t]he track record of BP and the industry generally in the Western and Central Gulf of

Mexico (GOM) demonstrates that when areas are opened, they can be leased, explored and developed to the highest environmental and operational standards in the world."  (Misrep. No. 23; Compl. ¶ 297.)  McKay's representations allegedly were false because, as president of BP America, McKay was aware of the safety deficits discussed above, including multiple safety failures that BP had experienced, but not reported, in its deepwater drilling operations.  (*Id.*)  He also allegedly was aware of the internal strategy document warning of major process safety concerns in the Gulf.  (*Id.*)

In March 2009, BP held its 2009 Strategy Presentation for investors.   Defendants Hayward, Inglis, and Conn participated.   BP released a transcript of the presentation, which contained the following statements:

- From Hayward: "2008 was another year of progress on our number one priority of safe and reliable operations."

- "We remain focused on process safety and asset reliability.  We have begun the implementation of [OMS], which covers everything from employee competencies to risk assessment, and we're already seeing the benefits."

- From Inglis: "There is one important caveat: safe and reliable operations come first whatever cost efficiency measures we undertake, and we continue to advance the safety and reliability of our operations through implementing OMS."

(Misrep. No. 24; Compl. ¶ 300.)  These statements were allegedly false and misleading because BP was in fact implementing budget cuts and staff reductions in key areas impacting the Company's ability to keep its professed commitment to safety.  (Compl. ¶ 301(e).)

Following its Strategy Presentation, BP filed its 2008 Annual Report, Form 20-F, with the SEC.   Hayward and Grote signed the form.   Plaintiffs identify numerous statements in the 2008 Annual Report as false and misleading, including:

- "During 2008, we continued to pursue our three strategic priorities of 'Safety', 'People' and 'Performance', which underpin BP's 'forward agenda'."

- "Our first priority will always be to ensure the safety and integrity of our operations."

- "Throughout 2008, senior leadership across the group continued to hold safety as their highest priority."

- "All operated businesses plan to transition to OMS by the end of 2010. Eight sites completed the transition to OMS in 2008; . . . four Exploration and Production sites, North America Gas, the Gulf of Mexico, Colombia and the Endicott field in Alaska. . . . A core aspect of OMS implementation is that each site produces its own 'local OMS', which takes account of relevant risks at the site and details the site's approach to managing those risks."

(Misrep. No. 25; Compl. ¶ 302.)  These statements were allegedly false and misleading because Defendants misrepresented that the Gulf of Mexico site had completed the transition to OMS and had produced a "local OMS" but failed to disclose that BP's Gulf operations lacked adequate operational protocols and safety procedures necessary to reduce the risk of catastrophic failure. (Compl. ¶ 303.)

On March 10, 2009, BP's initial exploration plan ("IEP") for the Mississippi Canyon Block 252—the site of the Macondo well—was marked "submitted" by the MMS.  Plaintiffs allege that the IEP was initially received by the MMS on February 23, 2009 and was available to the public no later than March 10, 2009.  (*Id.* ¶ 304.)  Plaintiffs claim that the IEP falsely certified "that BP Exploration & Production Inc. has the capability to respond, to the maximum extent practicable, to a worst-case discharge, or a substantial threat of such discharge, resulting from the activities proposed in our Exploration Plan," that is, the development of the Macondo well site.  (Misrep. No. 26; Compl. ¶ 304.)  The IEP also made specific representations about BP's ability to respond to a blowout, stating that:

- "In the event of an unanticipated blowout resulting in an oil spill, it is unlikely to have an impact based on the industry wide standards for using proven equipment and techonology for such responses, implementation of BP's Regional Oil Spill Response Plan which address [sic] available equipment and personnel, techniques for containment and recovery and removal of the oil spill."

24

(*Id.*)  According to Plaintiffs, these representations in BP's IEP were revealed to be false when BP proved unable to respond to the blowout on the Deepwater Horizon.  Following the spill, a group of U.S. Senators wrote a letter to Attorney General Eric Holder, stating that BP's response and implementation of spill control efforts "appear[ed] to be taking place on an ad hoc basis." (Compl. ¶ 307(a).)  BP later acknowledged that the techniques it relied on in its containment efforts "involve[d] significant uncertainties because they ha[d] not been tested in these conditions before."  (*Id.*)

On March 25, 2009, McKay gave a speech at the Howard Weil Energy Conference in New Orleans, in which he discussed BP's Gulf operations.  In the speech, McKay explained "that managing costs down does not mean BP will be skimping when it comes to ensuring our operations remain safe, reliable and compliant in the years ahead."  He further assured the audience that "[s]afety will continue to have first call on the company's resources."  (Misrep. No. 27; Compl. ¶ 308.)  Shortly thereafter, in April 2009, Hayward spoke at BP's 2009 Annual General Meeting and stated that "[BP's] number one priority of safe and reliable operations has been vital to the underpinning of our restored competitive performance."  (Misrep. No. 28; Compl. ¶ 310.)  In May 2009, BP's Group Head of Research and Technology, David Eyton, gave a speech at Cambridge University in England.  During his speech, Eyton discussed BP's ability to operate at the "frontiers," including the Gulf region, and claimed that "[t]echnology has continuously improved the safety and environmental footprint of our industry."  (Misrep. No. 29; Compl. ¶ 312.)  These statements were allegedly false and misleading for the same reasons set forth above, including BP's failure to implement safety protocols in the Gulf, its cost-cutting measures undermining the safety of its operations, and undisclosed prior safety failures.  (Compl. ¶ 311.)

On June 30, 2009, BP filed its revised Oil Spill Response Plan for the Gulf of Mexico ("Regional OSRP").  Like BP's IEP, the Regional OSRP provided estimates of the amount of oil BP could recover during a spill.  Specifically, the Regional OSRP stated that "[t]he company [BP] and its subcontractors could recover approximately 491,721 barrels of oil per day (or more than 20.6 million gallons) in the event of an oil spill in the Gulf of Mexico."  (Misrep. No. 30; Compl. ¶ 314.)  This estimate was allegedly false and misleading given that BP was unable to contain the spill from the Deepwater Horizon, which spilled only about 60,000 barrels of oil per day.  (Compl. ¶¶ 315, 5.)

On November 19, 2009, Rainey testified before the U.S. Senate Committee on Energy and Natural Resources, providing both oral and written testimony.  Rainey's testimony included the following representation: "Releases from oil and gas operations are rare, and the application of technology has enabled a dramatic reduction of releases from our industry over the last 30 years."  Rainey then elaborated on these technologies, providing the following examples of "technologies which have helped to reduce accidental releases": down hole flow control valves that shut down the well automatically if damage to the surface equipment is detected; blowout preventer technology including redundant systems and controls; new and improved well control techniques; sensors to monitor subsurface and seabed conditions for pressure changes; and BP's fiber optic network in the Gulf "which allows [BP] to monitor well pressures in real time, both at the facility and in [BP's] offices in Houston."  (Misrep. No. 31; Compl. ¶ 317.)  Rainey's statements were allegedly false and misleading because BP had purposefully removed redundant systems in its drilling operations in the Gulf of Mexico, alterations that included removal of one of the blind shear rams on the Deepwater Horizon's blowout preventer.  (Compl. ¶¶ 94, 318.)

26

BP released its 2009 Annual Review on February 26, 2010.  The document included statements praising the success of BP's Gulf operations and its commitment to safety, such as:

- "In Exploration and Production our strategy is to invest to grow production safely, reliably and efficiently by strengthening our portfolio of leadership positions in the world's most prolific hydrocarbon basins, enabled by the development and application of technology and strong relationships based on mutual advantage."

- "Safety, both personal and process, remains our highest priority."

(Misrep. No. 32; Compl. ¶ 319.)  The "Chairman's letter" section of the Annual Review further espoused BP's commitment to safety, proclaiming that "the board will strive to set high expectations of how risk is managed and remain vigilant on oversight."  (*Id.*)  Finally, Hayward's statements in the Annual Review, included as part of the "Group chief executive's review," contained additional alleged misrepresentations, including:

- "Our priorities remained absolutely consistent – safety, people and performance – and you can see the results of this focus with improvements on all three fronts."

- "We continue to show our ability to take on and manage risk, doing the difficult things that others either can't do or choose not to do."

(Misrep. No. 33; Compl. ¶ 320.)  The foregoing statements were allegedly false and misleading for the same reasons set forth above.  (Compl. ¶ 321.)

On March 2, 2010, BP conducted its 2010 Strategy Presentation.  Hayward, Inglis, and Conn participated in the event.  During the presentation, Defendants again assured investors that safety was BP's top priority.  Such assurances included the following statements:

- By Hayward: "Our focus on safe and reliable operations is now strongly embedded in our business; we are continuing to build the core capabilities of our people;  .  .  .  Safety remains our number one priority and we can see clear progress."

- By Hayward: "In summary, we are strengthening the safety culture throughout our business, and building a track record that we intend to become industry leading."

- By Hayward: "We will vigorously drive cost and capital efficiency whilst at the same time maintaining our first priority of safe and reliable operations."

- By Inglis: "Our strategy is clear.  We invest to grow production safely, reliably and efficiently."

- By Inglis: "There is one important caveat: safe and reliable operations always come first, whatever cost efficiency measures we undertake."

- By Conn: "Safe and reliable operations remain the no. 1 priority.  In 2009 we had one of the best years in terms of safety performance, with many of our personal and process safety measures comparing favorably with industry peers and no workforce fatalities."

(Misrep. No. 34; Compl. ¶ 322.)  These statements allegedly falsely represented that BP's safety performance compared favorably with that of its competitors when, in fact, BP's focus on and expansion of high-risk deepwater operations and its failure to adopt industry best practices for safety increased the Company's potential liabilities beyond those of its competitors.  (Compl. ¶ 323.)

On March 5, 2010, BP filed its 2009 Annual Report, Form 20-F, with the SEC.  Hayward and Grote signed the report.  The report allegedly contained numerous false statements.  For example, the report addressed BP's reliance on OMS as a "systematic framework for safe, reliable and efficient operations" and a "common framework for all BP operations."  (Misrep. No. 35; Compl. ¶ 324.)  Additionally, the report repeatedly emphasized safety as BP's priority and claimed that BP had "continued to strengthen [its] processes for managing compliance" with a variety of regulations.  (*Id.*)  It also referenced the Ombudsman's office and noted that "employees and contractors c[ould] contact him confidentially to report any suspected breach . . . including safety concerns."  (*Id.*)  Finally, the Annual Report made specific reference to the Texas City incident and BP's subsequent progress on the safety front, stating that:

- "Following the tragic incident at the Texas City refinery in 2005 the [Safety, Ethics, and Environment Assurance] committee has observed a number of key

> developments, including: the establishment of a safety & operations (S&O) function with the highest caliber of staff; development of a group-wide operating management system (OMS) which is being progressively adopted by all operating sites; the establishment of training programmes in conjunction with MIT that are teaching project management and operational excellence; the dissemination of standard engineering practices throughout the group . . . . Throughout this time the group chief executive has made safety the number one priority."

(Misrep. No. 35; Compl. ¶ 324.)  The foregoing statements in the Annual Review were allegedly false and misleading for all of the reasons discussed above.  (Compl. ¶ 325.)

In March 2010, Defendants Hayward and Inglis gave several speeches that included additional misrepresentations.  On March 9, 2010, Inglis spoke at the CERA Week conference in Houston, Texas.  A transcript of Inglis's speech, posted on BP's website, included the following representation:

> - "[BP has] developed the capability to create advanced floating production facilities, complex riser systems, and subsea equipment with the ability to integrate the elements to cope with extreme temperatures, pressures, and oceanographic conditions.  And that has enabled BP to become the leading deepwater IOC."

(Misrep. No. 36; Compl. ¶ 326.)  At the Howard Weil Energy Conference in New Orleans, held on March 22, 2010, Inglis again praised BP's competitiveness in the Gulf region, claiming that "we are now the leading deepwater producer and a lot of our deepwater experience has, of course, been gained in the Gulf of Mexico."  (Misrep. No. 37; Compl. ¶ 328.)  Inglis's statements were allegedly false and misleading when made because, in addition to the reasons discussed above, BP's Senior Vice President for Drilling Operations in the Gulf of Mexico, Kevin Lacy ("Lacy"), had informed Inglis directly of his concerns that BP lacked a commitment to improving process safety in the Gulf region and that the Company's reorganization was placing BP's offshore operations at risk.  (Compl. ¶ 119.)  Lacy allegedly spoke to Inglis in December 2009.  (*Id.*)

Hayward, too, delivered a speech in March 2010, in which he discussed BP's changes to its safety program following the Texas City refinery explosion.  During the speech, which was held at the Peterson Institute for International Economics in Washington, D.C., Hayward claimed that the "tragic accident has changed in a profound and fundamental way our approach to safety and operations integrity – providing a safe working environment is a paramount responsibility, and our first and foremost priority."  (Misrep. No. 38; Compl. ¶ 330.)  Plaintiffs allege that this statement was misleading for all the reasons set forth above.  (Compl. ¶ 331.)

On April 15, 2010, BP held its 2009 Annual General Meeting and also released its 2009 Sustainability Review.  Hayward gave a speech during the General Meeting, stating:

- "Our focus on safe and reliable operations is now strongly embedded in all our businesses; . . . we have started to see the benefits of improved operational performance flowing through to the bottom line."

- "Safety remains our number one priority and I'm pleased to report we can see clear progress."

(Misrep. No. 39; Compl. ¶ 332.)   The 2009 Sustainability Review, too, reiterated BP's commitment to safety by specifically referencing OMS:

- "BP's operating management system (OMS) provides a single framework for all BP operations to follow, covering all areas from process safety, to personal health, to environmental performance."

- "Providing an integrated and consistent way of working, the OMS helps ensure that a rigorous approach to safe operations continues to be taken."

(Misrep. No. 40; Compl. ¶ 334.)  These statements were allegedly false because BP was on notice that there were major process safety concerns in the Gulf of Mexico, that its "framework" did not require consistent practices worldwide, and that a 2009 audit of the Deepwater Horizon's blowout preventer revealed overdue maintenance jobs serious enough to lead to "loss of life, serious injury or environmental damage."  (Compl. ¶¶ 62, 333–34.)

The Complaint alleges that all of the statements described above were false representations and empty promises.  The reality—as revealed in the Deepwater Horizon catastrophe—was that BP had deceived investors as to BP's true risk profile in deep sea drilling because "the Company failed to conduct the process safety overhaul it represented to investors it would implement."  (*Id.* ¶¶ 24–25.)  According to Plaintiffs, not only was the Deepwater Horizon disaster a predictable consequence of BP's failure to implement safety reforms, but BP possessed actual knowledge of serious equipment failures, maintenance delays, and authorized changes that reduced the safety redundancies on the Deepwater Horizon to such an extent that the Company was on notice that just such a disaster was likely to occur.  (*Id.* ¶ 62.)  While the Deepwater Horizon disaster shocked investors, Plaintiffs claim that it should have come as no surprise to BP.

### 5.   *The Deepwater Horizon Explosion*

The Macondo well site sits almost fifty miles off the coast of Louisiana and is believed to hold as much as 2.1 billion gallons of producible oil.  (Compl. ¶ 152.)  The well is part of the Mississippi Canyon Block 252, a nine square-mile plot in the Gulf of Mexico.  BP paid $34 million for the exclusive drilling rights on the plot, and the Macondo well was to be BP's first well there.  (*Id.*)  Before a company can undertake deepwater drilling operations in the Gulf of Mexico, the MMS requires the company to file an oil spill response plan ("OSRP").  By law, an OSRP must contain very specific details of a Company's strategy for responding to a potential spill.[7]  For example, MMS regulations require that an OSRP include: (1) an emergency response action plan; (2) disclosure of the equipment available to combat an oil spill; (3) any oil spill response contractual agreements with third-parties; (4) calculations of worst-case discharge

---

[7] The required contents of an OSRP are set out in the Federal Register.  *See* 30 C.F.R. § 254.23.

scenarios; (5) a plan for dispersant use in case of a spill, (6) an in-situ oil burning plan, and (7) information regarding oil spill response training and drills.  (*Id.*)

BP publicly filed its first Regional OSRP for the Gulf of Mexico on December 1, 2000. The most recent revision, titled "BP's Regional OSRP for the GOM," was filed on June 30, 2009.  (*Id.* ¶ 155.)  BP's Regional OSRP estimated the "total worst case discharge" scenario for the Gulf of Mexico at a range of between 28,033 barrels of oil per day to up to 250,000 barrels per day.[8]  (*Id.* ¶ 156.)  The Regional OSRP also stated that BP and its subcontractors had the capacity to recover approximately 491,721 barrels of oil per day, well over the projected total worst case discharge scenario for the Gulf of Mexico.  (*Id.*)

In addition to this Regional OSRP, BP also filed an IEP for the Mississippi Canyon Block 252 on March 10, 2009.  (*Id.* ¶ 157.)  BP's IEP provided an additional estimate of the worst case spill scenario specific to Block 252.  The IEP estimated that worst case scenario at approximately 162,000 barrels of oil per day.  The IEP reiterated that "BP . . . ha[d] the capability to respond to the appropriate worst-case scenario included in its regional OSRP" of 250,000 barrels per day. (*Id.* ¶ 159.)  Therefore, since the scenario at Block 252 produced a lower estimate of 162,000 barrels per day, BP's IEP "certified" that BP had the ability to respond to the worst case discharge at Block 252, where the Macondo well was located.  (*Id.*)

BP first began drilling the Macondo well with the Marianas rig, which it leased from Transocean.  (*Id.* ¶ 161.)  Following a hurricane, BP replaced the Marianas with the Deepwater Horizon, a rig also on lease from Transocean.  (*Id.* ¶ 162.)  The Deepwater Horizon came with a

---

[8] The wide variations in the estimated spill amounts correlate to the spill's distance from shore.  The amount of the spill increases progressively the further out a spill occurs.  As BP's Regional OSRP explained, an oil spill occurring less than ten miles from shore could create a worst case discharge of 28,033 barrels per day.  A spill greater than ten miles could increase the possible discharge to 177,400 barrels per day.  Finally, a spill caused by a mobile drilling rig—such as the Deepwater Horizon— drilling an exploratory well could generate a spill of up to 250,000 barrels per day.  (Compl. ¶ 156.)

troubled safety history of its own.  As early as 2005, an independent audit of the blowout preventer ("BOP") on the Deepwater Horizon suggested maintenance problems.  (*Id.* ¶ 61.)  In September 2009, a BP audit of the Deepwater Horizon revealed serious concerns that could "lead to loss of life, serious injury or environmental damage as a result of inadequate use and/or failure of equipment."  (*Id.* ¶ 62.)  Specific problems identified included overdue maintenance jobs related to well control issues, BOP maintenance, alarm systems, and stabilization systems on the rig. (*Id.*)

A BOP is a five-story device set on the ocean floor at the mud line, that is, beneath the riser connecting a rig to the sea floor but on top of the cement surface casing that seals the rig in place.  (*Id.* ¶ 85.)  If closed properly, a BOP can prevent an uncontrolled oil or gas release from a well.  (*Id.* ¶ 84.)  To activate a BOP, rams must be closed to seal the area around the drill pipe in the well, thereby locking any unwanted oil and gas into the well.  (*Id.* ¶ 86.)  "Blind" or "annular" rams are used if no pipe has been laid in the well.  (*Id.*)  If the rams cannot be closed, operators must activate a BOP's blind shear rams, which are intended to cut through any drill pipe in the well and then seal in the oil below the BOP.  (*Id.*)  In a worst case scenario, an operator may activate all rams, both annular and blind shear, which will completely disconnect the BOP from the riser and prevent oil and gas from rising up to the rig above.  (*Id.*)  As early as 2001, analysts recommended that companies operating deepwater rigs in the Gulf of Mexico equip their BOPs with two blind shear rams instead of one, as blind shear rams carry a significant risk of failure.  (*Id.* ¶ 88.)  Over the next several years, BP conducted several other tests on the reliability of BOPs, including the BOP on the Deepwater Horizon.  (*Id.* ¶¶ 89–93.)[9]

---

[9] The Complaint insinuates, but does not explicitly allege, that BP was in possession of two specific reports from independent expert groups casting doubt on the safety of the Deepwater Horizon's BOP.  First, in April 2000, EQE International conducted an analysis of the BOP to be installed on the Deepwater Horizon.  That analysis revealed that there was a particular component on the BOP—the "shuttle valve"—that had no backup.  Thus, if the shuttle

On April 20, 2010, after several disruptions in the drilling process, BP prepared to place the Macondo well into "temporary abandonment," a process by which a drilling rig—such as the Deepwater Horizon—removes its own BOP and riser from the well so that a production rig can take its place and begin production.  (*Id.* ¶ 188.)  Part of the temporary abandonment process involves placing a cement plug, a three-hundred-foot cap, over the well and filling the area below the plug with heavy drilling mud to keep downward pressure on the hydrocarbon zone in the well.  (*Id.*)  Prior to abandonment, a negative-pressure test is performed to assess whether any leaks allow hydrocarbons to flow into the well.  (*Id.* ¶ 189.)  According to Plaintiffs, BP had no established procedure or protocol for conducting the negative pressure test, and pressure tests the BP crew did perform failed three times, indicating that a leak—or at least a "very large abnormality"—existed in the well.  (*Id.* ¶¶ 193–94.)  After finally receiving a successful test result on the fourth attempt, the BP crew removed 3,300 feet of drilling mud from the well and replaced it with sea water.  At this point in the process, the only barriers left between the rig and the hydrocarbons in the well were the remaining drilling mud at the bottom of the well and the cement plug, which BP had placed further down in the well than MMS regulations allowed.  (*Id.* ¶¶ 196–97.)

At 9:01 p.m. on the evening of April 20, 2010—after the markets had closed for the day—pressure measurements in the Macondo well increased dramatically, signaling a crisis.  (*Id.* ¶ 200.)  Although the pressure data were immediately available in BP's Houston office, a subsequent investigation found that there was "nobody in that B.P. Macondo well office that

---

valve failed, it would render all remaining redundancies built into the BOP useless.  While Plaintiffs tie this report to the Deepwater Horizon, they do not allege explicitly that BP possessed the report, only that it "was not publicly disclosed until June 20, 2010."  (Compl. ¶ 91.)  Second, Det Norske Veritas, an independent consulting group, analyzed past BOP performance generally and produced a report, commissioned by Transocean and released in July 2009.  The report found that blind shear rams in BOPs have a failure rate of 45%.  While Plaintiffs allege that the "existence of this report was first disclosed to the investing public on June 20, 2010," they do not allege that BP possessed it before that date.  (*Id.* ¶ 93.)

night" and "everybody had gone home."  (*Id.* ¶ 201.)  In addition, the BP crew on the rig did not

respond until 9:30 p.m., a half hour after the first problematic pressure readings occurred.  (*Id.*)

At 9:38 p.m. the first hydrocarbons passed through the BOP and spewed up onto the floor of the

rig.  (*Id.* ¶ 202–06.)  The crew attempted to activate the BOP's annular preventer, but it had

ruptured four weeks earlier and had not been repaired.  (*Id.*)  At 9:49 p.m., the deck of the rig

ignited, causing a cascade of liquid to shoot twenty stories above the main deck of the rig.  (*Id.*)

After the explosion, workers should have deployed the rig's Emergency Disconnect System

("EDS"), but rig workers later explained that they had not been trained in how to do so.  (*Id.* ¶

207.)  A BP employee eventually attempted to activate the EDS, which in turn should have

activated the blind shear ram, but the ram failed to respond.  (*Id.* ¶ 208.)  The BOP's deadman

switch, an automatic response mechanism, also failed to trigger the blind shear ram because its

battery had not been charged properly following maintenance and inspection delays.  (*Id.* ¶ 209.)

With no escape plan, crew members leaped off the rig, 100 feet down, into the ocean.  Eleven

crew members died and seventeen were injured.  The Deepwater Horizon continued to burn for

thirty-six hours before finally sinking into the Gulf on the morning of April 22, 2010.  (*Id.* ¶

211.)  Even after the rig sank, oil continued to gush from the open well into the Gulf.

### 6.  *False and Misleading Statements Following the Deepwater Horizon Disaster*

Plaintiffs claim that BP continued to issue false and misleading statements following the

Deepwater Horizon explosion by misrepresenting both the estimated amount of the spill and

BP's ability to respond to it.  BP issued its first two press releases about the incident on April 21,

2010.  The first confirmed a previous statement issued by Transocean reporting a fire aboard the

Deepwater Horizon.  The second offered BP's support to Transocean, stating that BP "stood

ready to assist" in responding to the fire.  (Misrep. No. 41; Compl. ¶ 337.)  Plaintiffs allege these

press releases were intended to keep BP securities trading at inflated prices because BP failed to acknowledge that oil was already leaking from the Macondo well.  (Compl. ¶ 338.)  In addition, Plaintiffs assert that the multiple errors in BP's Regional OSRP undermined any representation that BP stood "ready to assist."  (*Id.*)

By April 26, 2010, additional leaks were discovered in the riser and it was clear that oil continued to spill into the Gulf.  This news caused BP ADSs to fall $1.97 per ADS, or more than 3%.  (*Id.* ¶ 340.)  On April 28, 2010, BP held a joint press conference with the U.S. Coast Guard.  Speaking at the press conference, Defendant Suttles calculated BP's "best estimate" for the spill at 1,000 barrels of oil per day.   (Misrep. No. 42; Compl. ¶ 342.)   Suttles also added the following:

- "Late this afternoon, while monitoring the blowout preventer area, which we have done continuously since the event began, we discovered a new point of leak.  This leak is just beyond the top of the blowout preventer in the pipe work called the riser.  Given the location, we do not believe this changes the amount currently estimated to be released."

(*Id.*)   Suttles's estimates were allegedly false and misleading because he was actually in possession of much higher spill estimates.  (Compl. ¶ 346.)  The next day, April 29, 2010, Suttles conducted additional media interviews and discussed the rate of the oil spill.  On The Early Show, for example, Suttles stated: "I think that somewhere between one and five thousand barrels a day is probably the best estimate we have today."  (Misrep. No. 43; Compl. ¶ 344.)

During the U.S. House of Representatives' post-spill investigation, Representative Markey revealed various internal BP documents that the Company possessed during the spill.  These included: (1) a BP internal document dated April 27, 2010, marked "Confidential," showing BP's low estimate of the spill at 1,063 barrels per day, its "best guess" at 5,758 barrels per day, and its high estimate at 14,266 barrels per day and (2) a BP internal document dated

April 26, 2010, reflecting a 5,000 barrel per day spill estimate.  (*Id.* ¶ 346.)  These internal estimates, available to BP at least a day before Suttles provided estimates to the public, reveal the falsity of Suttles's announcements.  Suttles cited the 1,000 barrel figure despite knowing that BP's "best estimate" was actually greater than 5,000 barrels per day.  (*Id.*)  Plaintiffs contend that Suttles intentionally lowballed the estimates to keep the price of BP securities up.  (*Id.* ¶ 346.)

On April 29, 2010, Janet Napolitano, U.S. Secretary of Homeland Security, designated the spill a "spill of national significance."  (*Id.* ¶ 343.)  Following this announcement, BP securities fell from $57.34 per ADS on April 28 to $52.56 per ADS on April 29, a decline of almost $5 per share.  (*Id.* ¶ 345.)  Plaintiffs contend that even these amounts were artificially inflated as a result of Suttles's inaccurate spill estimates.  (*Id.* ¶ 346.)  BP's ADSs fell almost another 4%, dropping to $50.19 per ADS over the weekend of April 30, 2010.  (*Id.* ¶ 350.)  On May 5, 2010, Suttles again appeared before the public during a press conference in Robert, Louisiana.  The subject of the press conference was BP's planned use of a cofferdam to stop the spill.  As Suttles explained:

- "Over the weekend, then, we'll be attaching that dome to the drillship Enterprise with a riser pipework assembly, which will allow the oil to flow up to the surface and be processed.  So if all goes to plan, we should begin to start that operation, the beginning of trying to process the fluids on the surface and stop the spilling to the sea, on Monday."

(Misrep. No. 44; Compl. ¶ 351.)  Suttles's statement was allegedly misleading because BP knew that the cofferdam was highly likely to fail and had never been used in a deepwater environment.  (Compl. ¶ 352.)

Also on May 5, 2010, Hayward conducted an interview with journalists from the Houston Chronicle.  In the interview, Hayward stated that: "A guesstimate is a guesstimate.  And the

guesstimate remains 5,000 barrels a day."  (Misrep. No. 45; Compl. ¶ 353.)  Plaintiffs allege that

Hayward, like Inglis, was in possession of internal BP documents disclosing that the best

estimate was actually 5,758 barrels per day and as high as 14,266 barrels per day.  As with

Suttles's statements, Plaintiffs assert that Hayward's "guesstimate" misrepresented the spill rate

in order to keep BP securities prices from falling further.  (*Id.* ¶ 354.)

On May 6, 2010, Dudley spoke at the Chief Executives' Club in Boston, Massachusetts.

BP posted a transcript of Dudley's speech on its website.  During his speech, Dudley specifically

discussed the Deepwater Horizon and BOPs, stating:

- "At the time of the explosion, the Deepwater Horizon drilling rig had been
  working for BP for almost nine years. . . . The rig had handled some of the
  industry's greatest technical challenges, and her safety record had been excellent
  and had recently won awards."

- "A Blowout Preventer is used on every oil and gas well drilled in the world today
  – onshore and offshore."

- "These mechanisms are regularly inspected and tested.  If they don't pass the test,
  drilling operations are made safe and the system is replaced or repaired and
  retested."

- "BOPs are designed to be fail-safe.  This Blowout Preventer was not.  It failed to
  close, or to close completely."

(Misrep. No. 46; Compl. ¶ 355.)  These statements were allegedly false and misleading because

(1) the Deepwater Horizon's BOP was not regularly inspected, given the large backlog of

maintenance jobs revealed by the internal audit in 2009; (2) BP had actually modified the

Deepwater Horizon's BOP by removing the second blind shear ram, further reducing the safety

redundancies on the rig; (3) four weeks before the explosion, chunks of the BOP's annular

preventer had broken off, indicating operational problems with the BOP; and (4) on March 10,

2010, a little over a month before the explosion, BP sought and obtained a postponement of the

MMS's inspection of the BOP.  (*Id.* ¶ 356.)

On June 1, 2010, Attorney General Holder announced that the U.S. Department of Justice ("DOJ") had opened formal criminal and civil investigations into BP following the spill. Following a New York Times article titled, "Documents Show Early Worries About Safety of Rig," published on May 28, 2010, BP's ADSs fell from $42.95 per share to $36.52 per share by June 1, 2010, a decline of approximately 15%.  (*Id.* ¶ 359.)  On June 9, 2010, fears that BP would suspend dividends caused further decline in the value of BP's securities.  (*Id.* ¶¶ 361–63.) On June 14, 2010, BP's Board of Directors met to discuss suspending dividend payments.  On receipt of this news, BP ADSs plunged almost 10%.  (*Id.* ¶ 378.)  In total, BP's securities fell in value by almost 48% from the date of the Deepwater Horizon explosion through June 2010.  (*Id.* ¶ 379.)

### C.  Legal Standard

#### 1.  *Rule 12(b)(6)*

To survive a motion to dismiss, a complaint must contain sufficient factual allegations, accepted as true, to state a claim for relief that is plausible on its face.  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  It follows that, where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but has not shown—that the plaintiff is entitled to relief.  *Id.* at 1950; *see also* FED. R. CIV. P. 8(a)(2).  Well-pleaded factual allegations must be taken as true, but the court does not "accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions."  *Cent. Laborers' Pension Fund v. Integrated Elec. Servs., Inc.*, 497 F.3d 546, 550 (5th Cir. 2007).

In considering a Rule 12(b)(6) motion to dismiss, a court must limit itself to the contents of the pleadings, with two exceptions.  First, the Fifth Circuit allows the courts to consider certain documents attached to the motion to dismiss.  *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000).  The Fifth Circuit restricts such consideration to documents that are referenced in the complaint and are central to the plaintiffs' claim.  *Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003).  Second, in securities cases, courts may take judicial notice of the contents of public disclosure documents that the law requires be filed with governmental agencies, such as the SEC, and that are actually filed with the agency.  *Lovelace v. Software Spectrum. Inc.*, 78 F.3d 1015, 1018 n.1 (5th Cir. 1996).  However, these documents may be considered only for the purpose of determining what statements they contain, not for proving the truth of their contents.  *Id.*

As is required for Rule 12(b)(6) analysis, the court must draw all reasonable inferences in favor of the plaintiff.  However, for scienter only, in keeping with the requirements of the Private Securities Litigation Reform Act ("PSLRA"), the court must take into account plausible inferences opposing as well as supporting a strong inference of scienter.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).  Accordingly, for purposes of a Rule 12(b)(6) motion to dismiss, a strong inference of scienter is one at least as compelling as any opposing inference of non-fraudulent intent.  *Id.*

### 2.  Section 10(b)

Under section 10(b) of the Securities Exchange Act of 1934,

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may

40

prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).  SEC Rule 10b–5, promulgated pursuant to section 10(b), implements section 10(b) by forbidding, among other things, the making of any "untrue statement of a material fact" or the omission of any material fact "necessary in order to make the statements made . . . not misleading."  17 C.F.R. § 240.10b–5.  The Supreme Court has implied from the text of section 10(b) that it affords a right of action to purchasers or sellers of securities injured by its violation. *Tellabs*, 551 U.S. at 318.  To state a private claim under section 10(b), a plaintiff must allege the following: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008); *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 641 (5th Cir. 2005).

### a.   Material Misrepresentations and Omissions

Because Plaintiffs assert securities fraud claims, they must satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA.  *See Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009); s*ee also Tellabs*, 551 U.S. at 322 (noting that the PSLRA's twin goals are to curb frivolous, lawyer-driven litigation, while preserving investors' abilities to recover on meritorious claims).  Rule 9(b) requires that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  FED. R. CIV. P. 9(b); *see also Rosenzweig v. Azurix*, 332 F.3d 854, 866 (5th Cir. 2003) (noting that the PSLRA's particularity requirement incorporates, at a minimum, the pleading standard for fraud under Rule 9(b)).  The PSLRA enhances the requirements of Rule 9(b) in two ways.  First, plaintiffs must "specify each statement alleged to have been misleading, [and] the reason or reasons why the

statement is misleading."  15 U.S.C. § 78u–4(b)(1).  Second, for each act or omission alleged to be false or misleading, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Id.* at § 78u–4(b)(2).

In order to meet these additional requirements of the PSLRA, a plaintiff must, therefore: (1) specify each statement alleged to have been misleading; (2) identify the speaker; (3) state when and where the statement was made; (4) plead with particularity the contents of the false representation; (5) plead with particularity what the person making the misrepresentation obtained thereby; and (6) explain the reason or reasons why the statement is misleading, *i.e.*, why the statement is fraudulent.  *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002).  These allegations constitute the "who, what, when, where, and how" required under Rule 9(b) and the PSLRA.  *Id.*  What constitutes particularity will necessarily differ with the facts of each case.  *Guidry v. Bank of LaPlace*, 954 F.2d 278, 288 (5th Cir. 1992).  A dismissal for failure to plead fraud with particularity as required by Rule 9(b) is a dismissal on the pleadings for failure to state a claim.  *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 361 (5th Cir. 2004).

General allegations, which lump all defendants together and fail to segregate the alleged wrongdoing of one from those of another, do not meet the requirements of Rule 9(b).  The court will reject the "group pleading" approach and instead look to the state of mind of the individual corporate official or officials "who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment."  *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 533 (5th Cir. 2008).

42

To be actionable, a misrepresentation of a fact, or an omission of a fact, must be material. The Supreme Court recently reaffirmed that there is no bright-line rule for determining whether information withheld from a company's filings is materials as a matter of law. *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1318–23 (2011). Unwilling to allow materiality to be reduced to a test of "statistical significance," the Court held instead that assessing materiality involves a "fact-specific inquiry . . . that requires consideration of the source, content, and context" of the allegedly omitted information. *Id.* at 1321. The misrepresentation of a fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in making an investment decision. *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988). For an omission to be material, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available. *Id.* at 232; *see also Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1445 (5th Cir. 1993) (explaining that the appropriate inquiry is whether the statement or omitted fact is significant, "such that it alters the total mix of information available about the proposed investment"). Materiality is not judged in the abstract, but in light of the surrounding circumstances. *Rubinstein v. Collins*, 20 F.3d 160, 168 (5th Cir. 1994).

With regard to misstatements, the PSLRA establishes a "safe harbor" protecting a forward-looking statement from liability where such a statement is made by a natural person, unless plaintiffs prove that it was made with actual knowledge that the statement was false and misleading. 15 U.S.C. § 78u–5(c)(1)(A). A statement is forward looking if it is:

> (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;
> (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;
> (C) a statement of future economic performance, including any such statement

contained in a discussion and analysis of financial condition by the management
or in the results of operations included pursuant to the rules and regulations of the
Commission;

(D) any statement of the assumptions underlying or relating to any statement
described in subparagraph (A), (B), or (C); [or]

(E) any report issued by an outside reviewer retained by an issuer, to the extent
that the report assesses a forward-looking statement made by the issuer[.]

15 U.S.C. § 78u–5(i)(1)(A).

The safe harbor provision protects individuals and corporations from liability for forward-looking statements that prove false if the statement is "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" or where the forward-looking statement is immaterial. *Id.* at § 78u–5(c)(1)(A)(i)–(ii). Where the forward-looking statement is not accompanied by cautionary language, a plaintiff must demonstrate that the defendant made the statement with "actual knowledge" as to its falsity. *Id.* at § 78u–5(c)(1)(B).

Vague, optimistic statements are not actionable. Allegations that amount to little more than corporate "cheerleading" are puffery, projections of future performance not worded as guarantees, and are not actionable under federal securities law because no reasonable investor would consider such statements material and because investors and analysts are too sophisticated to rely on vague expressions of optimism rather than specific facts. *Krim*, 989 F.2d at 1446. Additionally, "it is well-established that generalized positive statements about a company's progress are not a basis for liability." *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 419 (5th Cir. 2001). Statements that are predictive in nature are actionable only if they were false when made. *Shushany v. Allwaste, Inc.*, 992 F.2d 517, 524 (5th Cir. 1993).

### b.  Scienter

Section 10(b) and Rule 10b–5 do not protect investors against negligence or corporate

mismanagement.  *Shaw Group*, 537 F.3d at 535.   Under the PSLRA, it is not enough to particularize false statements or fraudulent omissions made by a defendant; rather, for "each act or omission alleged" to be false or misleading, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u–4(b)(2).  To establish a section 10(b) claim, a private plaintiff must prove that the defendant acted with scienter.  *Tellabs*, 551 U.S. at 319.

*Tellabs* outlined a three step approach to reviewing scienter allegations in a motion to dismiss a federal securities fraud case pursuant to the PSLRA.  *Id.* at 323.   First, the allegations must, as in federal pleadings generally, be taken as true.  *Id.*   Second, courts may consider documents incorporated in the complaint by reference and matters subject to judicial notice.  *Id.*  The facts must be evaluated collectively, not in isolation, to determine whether a strong inference of scienter has been pleaded.  *Id.* at 324; *see also Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 260 (5th Cir. 2005) ("While [the Fifth Circuit] will view a complaint *in toto* when considering whether a complaint has adequately pled scienter . . . each allegation of fraud must individually meet the particularity requirements of the PSLRA.") (citation omitted).  Third, a court must take into account plausible inferences opposing as well as supporting a strong inference of scienter. *Tellabs*, 551 U.S. at 324.  The inference of scienter must ultimately be "cogent and compelling," not merely "reasonable" or "permissible."  *Id.*; *see also Shaw Group*, 537 F.3d at 533–34 (adopting *Tellabs*' three step approach).

In the context of federal securities fraud, scienter is "defined as 'an intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it.'" *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th

45

Cir. 2009) (quoting *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 643 (5th Cir.2005)); *see also Plotkin v. IP Axess Inc.*, 407 F.3d 690, 697 (5th Cir. 2005) ("[A] securities fraud plaintiff must prove that the defendant either consciously misbehaved . . . or was so severely reckless that it demonstrates that the defendant must have been aware of the danger of misleading the investing public."). Severe recklessness is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Rosenzweig*, 332 F.3d at 866.

For a complaint to adequately plead scienter, "Congress require[s] plaintiffs to plead with particularity facts that would give rise to a 'strong— *i.e.,* a powerful or cogent—inference." *Tellabs,* 551 U.S. at 323.  The inference need not be "irrefutable, i.e., of the 'smoking gun' genre, or even the most plausible of competing inferences."  *Id.* (citation omitted) (internal quotation omitted).   Nonetheless, the "inference of scienter must be more than merely 'reasonable'or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Id.*  In addition, "[t]he strength of an inference cannot be decided in vacuum. . . . To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 323–24.  "[O]missions and ambiguities count against inferring scienter, for plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendants acted with the required state of mind.'" *Id.* at 326 (quoting 15 U.S.C. § 78u–4(b)(2)).

Although circumstantial evidence can support a strong inference of scienter, allegations

of motive and opportunity standing alone will not suffice. *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 430 (5th Cir. 2002). Appropriate motive and opportunity allegations may, however, "meaningfully enhance the strength of the inference of scienter." *Southland*, 365 F.3d at 368 (quoting *Nathenson*, 267 F.3d at 412). Corporate officers are not liable for acts solely because they are officers, even where their day-to-day involvement in the corporation is pleaded. *Id.* However, corporate statements can be connected to a particular officer if plaintiffs allege the officer signed the document in which the statement appears or they adequately allege the officer's involvement in creating the document. *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006).

The Fifth Circuit has rejected the group pleading approach to scienter. *Shaw Group*, 537 F.3d at 534. Instead, a court must look to the state of mind of the individual corporate official or officials making or issuing the statement "rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment." *Southland*, 365 F.3d at 366. As the Fifth Circuit explained, "[c]onsistent with our rejection of the 'group pleading' doctrine, we do not construe allegations contained in the Complaint against the 'defendants' as a group as properly imputable to any particular individual defendant unless the connection between the individual defendant and the allegedly fraudulent statement is specifically pleaded." *Southland,* 365 F.3d at 365. Therefore, when pleading fraud claims against individuals under section 10(b) and Rule 10b–5, plaintiffs must distinguish among defendants and allege the role of each. *Id.*

### 3. Section 20(a) claims

Under section 20(a) of the Exchange Act, "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation

thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . ."  15 U.S.C. § 78t(a).  Section 20(a) is a secondary liability provision, and plaintiffs must therefore establish a primary violation under section 10(b) before liability arises under section 20(a).  *ABC Arbitrage*, 291 F.3d at 348 n. 57 (noting that "control person" liability is "derivative, i.e., such liability is predicated on the existence of an independent violation of the securities laws").  Accordingly, if a plaintiff fails to state a claim for a primary securities fraud violation under section 10(b) or Rule 10b-5, they necessarily fail to state a claim for control person liability under section 20(a). *Fin. Acquisition Partners*, 440 F.3d at 288.

### D.  Analysis

#### 1.  Plaintiffs Have Alleged False and Misleading Statements

In order to adequately plead a misleading statement or omission under the PSLRA, a plaintiff must (1) specify each statement alleged to have been misleading; (2) identify the speaker; (3) state when and where the statement was made; (4) plead with particularity the contents of the false representation; (5) plead with particularity what the person making the misrepresentation obtained thereby; and (6) explain the reasons why the statement is misleading, *i.e.*, why the statement is fraudulent.  *ABC Arbitrage*, 291 F.3d at 350.  By the Court's calculation, and combining alleged misstatements made in the same document or by the same speaker on the same date, Plaintiffs allege that BP, or its officers or directors, made forty-six misrepresentations over the course of a three and a half year period.  Notwithstanding the volume and breadth of the allegations, Plaintiffs cite almost identical facts—indeed, the same paragraph appears in the Complaint, almost verbatim, over twenty times—as evidence of the falsity of each statement.  Specifically, Plaintiffs allege that the majority of the statements were false for some

48

combination of the following five reasons: (1) BP was not committed to process safety because the Company continued to expand its deepwater operations without implementing adequate process safety procedures (Compl. ¶¶ 256(a), 260(a), 263(a), 268(a), 270(a), 272(a), 274(a), 276(a), 280(a), 282(a), 296(b), 301(a), 303(b), 309(a), 311(a), 321(b), 323(a), 325(a), 329(a), 331(a), 333(b)); (2) BP misrepresented its risk profile by failing to disclose the "multiple safety failures and near-failures" that BP experienced in its deepwater drilling operations (Compl. ¶¶ 265(c), 268(b), 270(b), 272(c), 274(b), 276(b), 280(b), 282(b), 284(a), 286(a), 296(c), 299(b), 301(c), 303(c), 309(b), 311(c), 312(b), 318(c), 321(c), 325(c), 333(d)); (3) BP represented that it did not retaliate against workers who raised safety concerns with the Company when, in fact, BP was aware that numerous, substantiated complaints of retaliation had been submitted to the Company (Compl. ¶¶ 270(c), 284(f), 290(b), 323(d)); (4) BP implemented budget cuts and staff reductions which undermined the Company's ability to drill safely in the Gulf of Mexico (Compl. ¶¶ 274(c), 280(d), 282(d), 286(c), 290(d), 296(e), 299(f), 301(e), 303(d), 309(d), 311(e), 313(d), 321(e), 323(e), 325(f), 331(d), 333(f)); (5) BP's safety program, of which OMS was a key component, failed to require uniform process safety policies, instead allowing BP to implement practices that varied country by country (Compl. ¶¶ 257(b), 272(b), 276(d), 280(c), 282(c), 286(b), 288, 290(c), 296(d), 299(d), 301(d), 303(e), 309(c), 311(d), 321(d), 325(e), 329(e), 331(b), 333(e), 335(c)).

Plaintiffs support these allegations of falsity with citations to the alleged facts. Because Plaintiffs rely on the same descriptions and facts to demonstrate the falsity of nearly all of the identified misrepresentations, the Court will address the substance of Plaintiffs' proffered support only once. The Court will address separately the few instances where Plaintiffs offer

additional, unique factual support for their allegations.[10]   The following chart lists in chronological order each source alleged by Plaintiffs to contain false and misleading statements, identifies the numbered paragraph of the Complaint in which the allegations are made, identifies any Individual Defendants to whom the statement is attributed, identifies the "Misrepresentation Number" the Court has assigned to each group of statements, and identifies by "X" the category of factual support Plaintiffs rely on to demonstrate the falsity of the statement.

| Source | Compl. ¶ | Speaker | Misrep # | Expanding deepwater drilling without safety procedures | Failure to disclose prior safety incidents | Systemic retaliation against workers | Budget cuts and layoffs | Variation among safety practices by country | Other |
|---|---|---|---|---|---|---|---|---|---|
| Jan. 16, 2007 Press Conference | 256-57 | Browne | 1 | X | | | | X | |
| Feb. 6, 2007 Conference call with investors | 258-60 | BP, Browne, Grote, Hayward, Dudley, Inglis | 2 | X | | | | | X |
| Feb. 23, 2007 2006 Annual Review | 261-63 | BP, Browne | 3, 4 | X | | | | | X |
| Mar. 6, 2007 2006 Annual Report, Form 20-F | 264-65 | BP, Browne, Grote | 5 | X | X | | | | |
| April 2007 Sustainability Report (2006) | 266 | BP | 6 | | | | | | X |
| April 24, 2007 Conference call with investors | 267-68 | Grote | 7 | X | X | | | | |
| May 16, 2007 Testimony, U.S. House of Representatives | 269-70 | Malone | 8 | X | X | X | | | |
| Sept. 25, 2007 Sanford Berstein 4th Annual Strategic Decisions Conference | 271-72 | Inglis | 9 | X | X | | | X | |

[10] In their response to Defendants' motion to dismiss, Plaintiffs attached an appendix, Appendix A, which offers a summary of their allegations and an explanation of why the statements were false and misleading.   In the explanation section, Plaintiffs attempt to rely on some additional factual support—such as the various Defendants' membership on BP's Group Operations Risk Committee—not included in their Complaint.  The Court does not consider allegations not included in Plaintiffs' Complaint in its analysis here.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Oct. 25, 2007<br>BP Press Release | 273-74 | Malone | 10 | X | X | | X | | |
| Nov. 8, 2007<br>Houston Forum | 275-76 | Hayward | 11 | X | X | | | X | |
| Feb. 22, 2008<br>2007 Annual<br>Review | 277-80 | BP,<br>Hayward | 12, 13 | X | X | | X | X | |
| Feb. 27, 2008<br>2008 Strategy<br>Presentation<br>conference call<br>with investors | 281-82 | BP,<br>Hayward,<br>Inglis,<br>Dudley,<br>Conn,<br>Grote | 14 | X | X | | X | X | |
| Mar. 4, 2008<br>2007 Annual<br>Report, Form 20-F | 283-84 | BP,<br>Hayward,<br>Grote | 15 | X | | X | | | X |
| April 17, 2008<br>2008 Annual<br>General Meeting | 285-86 | Hayward,<br>Sutherland | 16 | X | X | | X | X | |
| May 20, 2008<br>Sustainability<br>Review (2007) | 287-88 | BP,<br>Hayward | 17 | | | | | X | |
| Dec. 17, 2008<br>HRH Prince of<br>Wales 3rd Annual<br>Accounting for<br>Sustainability<br>Forum | 289-90 | Hayward | 18 | | X | | X | X | X |
| Feb. 2009<br>Microsoft Global<br>Energy Forum | 291 | BP | 19 | | | | | | X |
| Feb. 10, 2009<br>Cambridge Energy<br>Research Assoc.<br>(CERA) Executive<br>Conference,<br>Houston, TX | 292-93 | Hayward | 20 | | | | | | X |
| Feb. 24, 2009<br>2008 Annual<br>Review | 294-96 | BP,<br>Hayward | 21, 22 | X | X | | X | X | |
| Feb. 25, 2009<br>Testimony before<br>U.S. House of<br>Representatives | 297-99 | McKay | 23 | | X | | X | X | X |
| Mar. 3, 2009<br>2009 Strategy<br>Presentation | 300-01 | BP, Conn,<br>Inglis,<br>Hayward | 24 | X | X | | X | X | X |
| Mar. 4, 2009<br>2008 Annual<br>Report, Form 20-F | 302-03 | BP, Grote,<br>Hayward | 25 | X | X | | X | X | X |
| Mar. 10, 2009<br>Exploration Plan<br>for Macondo well | 304-07 | BP | 26 | | | | | | X |
| Mar. 25, 2009<br>Howard Weil<br>Conference, New<br>Orleans, LA | 308-09 | McKay | 27 | X | X | | X | X | X |
| April 16, 2009<br>2009 Annual<br>General Meeting | 310-11 | Hayward | 28 | X | X | | X | X | X |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| May 8, 2009 Cambridge University speech | 312-13 | Eyton | 29 | | X | | X | | X |
| June 30, 2009 Revised Regional OSRP for GOM | 314-15 | BP | 30 | | | | | | X |
| Nov. 19, 2009 Testimony before U.S. Senate Committee | 316-18 | Rainey | 31 | | | | | | X |
| Feb. 26, 2010 2009 Annual Review | 319-21 | BP, Hayward | 32, 33 | X | X | | X | X | |
| Mar. 2, 2010 2010 Strategy Presentation | 322-23 | BP, Conn, Inglis, Hayward | 34 | X | X | X | X | | X |
| Mar. 5, 2010 2009 Annual Report, Form 20-F | 324-25 | BP, Grote, Hayward | 35 | X | X | | X | X | X |
| Mar. 9, 2010 CERA Week, Houston, TX speech | 326-27 | Inglis | 36 | | X | | | | X |
| Mar. 22, 2010 Howard Weil Energy Conference, New Orleans, LA | 328-29 | Inglis | 37 | X | X | | | X | X |
| Mar. 23, 2010 Peterson Institute for Int'l Economics, Wash. D.C. | 330-31 | Hayward | 38 | X | | | X | X | |
| April 15, 2010 2009 Annual General Meeting | 332-33 | Hayward | 39 | X | X | | X | X | X |
| April 15, 2010 Sustainability Review (2009) | 334-35 | BP | 40 | | | | | X | X |
| April 21, 2010 Press Release | 337-38 | BP | 41 | | | | | | X |
| April 28, 2010 Press Conference | 342 | Suttles | 42 | | | | | | X |
| April 29, 2010 Press Conference | 344 | Suttles | 43 | | | | | | X |
| May 5, 2010 Press Conference | 351-52 | Suttles | 44 | | | | | | X |
| May 5, 2010 Interview | 353-54 | Hayward | 45 | | | | | | X |
| May 6, 2010 Chief Executive Club speech, Boston, MA | 355-56 | Dudley | 46 | | | | | | X |

The Court addresses below whether the facts identified are sufficient to plead with particularity the falsity or misleading nature of each alleged misrepresentation or omission.

### a. BP expanded deepwater drilling operations without implementing adequate process safety procedures

As described above, the Complaint alleges that Defendants, including BP and Individual Defendants Browne, Grote, Hayward, Inglis, Dudley, Malone, and Conn, made false statements about BP's commitment to process safety. *See*, *e.g.*, Compl. ¶ 256 (Browne: "BP's workforce is ready, willing and able to participate in a sustained Group-wide effort to move BP towards excellence in process safety. . . . And I would like to make clear that the tone is indeed being set at the top."); Compl. ¶ 261 ("We have acted decisively to address what matters most today and tomorrow: . . . a clear focus on the three dimensions of safety – personal safety, process safety and the environment.");  Compl. ¶ 273 (Malone: "BP America is in the midst of a comprehensive effort to improve its safety culture and to strengthen and standardize process safety and risk management programs at all BP-operated facilities."); Compl. ¶ 281 ("2007 saw further improvement in our overall safety performance. . . . Safe and reliable operations remain our number one priority."); Compl. ¶ 291 ("We document and rigorously follow procedures for safe and effective operating."); Compl. ¶ 294 ("Safety, both personal and process, remains our highest priority. . . . During the year [2008] we began migrating to the new BP OMS, which has an increased focus on process safety . . . ."); Compl. ¶ 295 (Hayward: "Our number one priority was to do everything possible to achieve safe, compliant and reliable operations."); Compl. ¶ 300 (Hayward: "2008 was another year of progress on our number one priority of safe and reliable operations.") (Inglis: "There is one important caveat: safe and reliable operations come first whatever cost efficiency measures we undertake . . . ."); Compl. ¶ 302 ("Throughout 2008, senior leadership across the group continued to hold safety as their highest priority."); Compl. ¶ 310 (Hayward: "Our number one priority of safe and reliable operations has been vital to the underpinning of our restored competitive performance."); Compl. ¶ 320 (Hayward: "Our

priorities have remained absolutely consistent – safety, people and performance – and you can see the results of this focus with improvements on all three fronts. . . . Achieving safe, reliable and compliant operations is our number one priority."); Compl. ¶ 322 ("Safety remains our number one priority and we can see clear progress.") ("In 2009 we had one of the best years in terms of safety performance, with many of our . . . process safety measures comparing favorably with industry peers . . . ."); Compl. ¶ 324 ("We constantly seek to improve our safety performance through the procedures, processes and training programmes that we implement in pursuit of our goal of 'no accidents, no harm to people and no damage to the environment.'"); Compl. ¶ 332 ("Safety remains our number one priority and I'm pleased to report we can see clear progress.").

According to Plaintiffs, these statements were false when made because BP represented that it would place process safety at the foundation of the Company's operations "when, in fact, BP was instead expanding its deepwater drilling operations without implementing adequate process safety procedures." (Compl. ¶¶ 256(a), 260(a), 263(a), 268(a), 270(a), 272(a), 274(a), 276(a), 280(a), 282(a), 296(b), 301(a), 303(b), 309(a), 311(a), 321(b), 323(a), 325(a), 329(a), 331(a), 333(b).) The Complaint alleges that BP was aware of the specific dangers associated with cement jobs in deepwater drilling environments and yet took no action to implement procedures to reduce the risk of accidents occurring on BP-operated rigs like the Deepwater Horizon. Plaintiffs contend BP was aware of the dangers of cement jobs because, as early as 2003, the MMS released a report calculating that failed cement jobs accounted for thirty-three blowout or well "kick" incidents between 1973 and 2004. (Compl. ¶ 80.) Specifically, the MMS report alerted BP to the fact that "annular flow related to cementing surface casing has been identified as one of the most frequent causes of loss of control incidents in the Gulf of

Mexico."  (*Id.*)  In fact, BP had experienced the dangers of faulty cementing jobs at one of its own wells, even prior to the Deepwater Horizon incident.  In September 2008, one of the rigs in BP's operations in Azerbaijan suffered a blowout, causing gas, water, and mud to shoot onto the rig floor, although no explosion occurred.  (*Id.* ¶ 82.)  Following the incident in Azerbaijan, BP reported to U.S. officials that they suspected that numerous wells had "bad cement job[s]," but BP did not disclose the Azerbaijan incident on its Form 20-F for 2008 or any other public document available to investors.  (*Id.* ¶ 83.)

The Complaint also alleges that BP disregarded known risks related to its use of BOPs.  BP was aware that blind sheer rams had a high failure rate.  (*Id.* ¶ 84.)  The MMS distributed a report to BP and its industry peers recommending that companies install two blind shear rams in deepwater drilling rigs instead of just one.  (*Id.* ¶ 88.)  Nonetheless, BP permitted the BOP on the Deepwater Horizon to be equipped with just one blind shear ram.  (*Id.* ¶ 94.)  In fact, BP executed an agreement with Transocean when it contracted to operate the Deepwater Horizon to allow the rig to operate with only one blind shear ram.  Transocean agreed to remove one of the two blind shear rams (which allowed BP to speed up testing procedures), but only after BP signed the agreement acknowledging that the removal of the ram would "reduce the built-in redundancy" of the BOP and raise the rig's "risk profile."  (*Id.* ¶ 94.)

Additional studies revealing common deficiencies in blind shear rams were distributed to BP managers and directors at industry conferences during the Class Period, including conferences held in 2009 and in February 2010.  (*Id.* ¶ 90.)  Plaintiffs also allege that BP knew of actual deficiencies on the specific BOP installed on the Deepwater Horizon.  Reports from two different consulting groups—EQE International and Det Norske Veritas—revealed serious flaws in the design and the shuttle valve of the BOP on the Deepwater Horizon.  (*Id.* ¶¶ 91–93.)

Plaintiffs also point to the findings of the Presidential Commission—the Commission tasked with investigating the cause of the Deepwater Horizon explosion—as evidence that Defendants knew, or were reckless in not knowing, that BP had not implemented adequate process safety measures.  For example, the Presidential Commission found that BP had no "comprehensive and systematic risk-analysis, peer-review, or management of change process" for any of the following decisions made on the Deepwater Horizon: failing to wait for the correct amount of centralizers, failing to run appropriate tests on the slurry, failing to run a cement evaluation log, failing to displace mud from the riser before setting the cement plug, failing to properly place the cement plug at the appropriate level, failing to install additional physical barriers during the temporary abandonment procedure, and failing to perform additional integrity diagnostics.  (*Id.* ¶ 78.)  The Commission concluded that the evidence did not show that "BP team members . . . responsible for these decisions conducted any sort of formal analysis to assess the relative riskiness of available alternatives."  (*Id.*)

Defendants counter that all statements about "safety in general," BP's commitment to improving process safety, and statements about BP's progress in implementing process safety measures are neither misleading nor material.  (Doc. No. 150, at 15–16, App. A.)  Defendants contend that such statements are not actionable because they lack "a standard against which a reasonable investor could expect them to be pegged."  *City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 671 (6th Cir. 2004).  Defendants characterize all statements related to BP's progress on process safety measures "generalized positive statements" and argue, correctly, that such statements cannot serve as a basis for liability.  (Doc. No. 150, at 16); *see also Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 870 (5th Cir. 2003) ("'[M]aking steady progress'

is precisely the sort of generalized positive characterization that is not actionable under the securities laws.").

General statements about corporate "progress" are "too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision." *Bridgestone*, 399 F.3d at 671.  The statements listed above are all in this vein, as they are generalized statements about BP's "commitment to safety," prioritization of "process safety performance," headway in making "real progress" in the process safety arena, and desire to become a "world leader in process safety."  (Compl. ¶¶ 269, 273, 275.)  Even the very specific facts Plaintiffs allege to show the falsity of the statements cannot confirm or deny whether "progress" was being made; general "progress" is simply too illusory a metric from the start.  Such statements, therefore, are not actionable.[11]

But Plaintiffs also allege statements of a different vein.  Many of Plaintiffs' allegations in this category are statements that refer to progress in process safety as measured against the metrics set forth in the Baker Report's recommendations.  These statements make specific reference to BP's progress following the Texas City explosion and the Baker Panel's findings.  *See*, *e.g.*, Compl. ¶ 273 (Malone: "In the months and years since these violations occurred [at Texas City refinery], we have made real progress in the areas of process safety performance and risk management."); Compl. ¶ 275 (Hayward: "We continue to implement the roadmap provided to ourselves and the industry by the . . . Baker Panel.  BP remains absolutely committed to taking these lessons and becoming a world leader in process safety."); Compl. ¶¶ 281, 285 ("[O]ur intense focus on process safety continues.  We are making good progress in addressing the recommendations of the Baker Panel and have begun to implement a new [OMS] across all of

---

[11] By the Court's numbering system, nonactionable statements in this category are included in Misrepresentations 1–4 (Compl. ¶¶ 256–62), 7–9 (*Id.* ¶¶ 267–71), 19 (*Id.* ¶ 291), 21–25 (*Id.* ¶¶ 294–302), 28 (*Id.* ¶¶ 310–11), 32–33 (*Id.* ¶¶ 319-20), 34 (*Id.* ¶ 322), and 39 (*Id.* ¶ 332).

BP's operations."); Compl. ¶ 289 ("BP had a number of high-profile safety lapses in recent years, notably at our Texas City refinery, where there was a tragic and unacceptable loss of life. . . . We opened ourselves up to scrutiny . . . [a]nd we have continuously reported progress against a response plan and against an independent external report."); Compl. ¶ 278 ("Throughout 2007, BP continued to progress the process safety enhancement programme initiated in response to the March 2005 incident at the Texas City refinery.  We have made progress across the group on all the recommendations: Leadership – We have consistently communicated that safe and reliable operations are our highest priority.  Knowledge and expertise – We established an executive-level training programme, ran process safety workshops and launched an operations academy for site-based staff to enhance process safety capability."); Compl. ¶ 324 ("Following the tragic incident at the Texas City refinery in 2005 the [Safety, Ethics, and Environment Assurance] committee has observed a number of key developments, including: . . . development of a group-wide operating management system (OMS) which is being progressively adopted by all operating sites; the establishment of training programmes in conjunction with MIT that are teaching project management and operational excellence; the dissemination of standard engineering practices throughout the group; and the formation of a highly experienced S&O audit team formed to assess the safety and efficiency of operations and recommend improvements.  Throughout this time the group chief executive has made safety the number one priority."); Compl. ¶ 330 ("That tragic accident [Texas City] has changed in a profound and fundamental way our approach to safety and operations integrity – providing a safe working environment is a paramount responsibility, and our first and foremost priority.").

The Baker Panel recommendations did not leave BP with a "squishy" mandate.  To the contrary, the Panel's number one recommendation, titled, "Process Safety Leadership," required

BP's corporate management to "demonstrate their commitment to process safety by articulating a clear message on the importance of process safety *and matching that message both with the policies they adopt and the actions they take*." (Compl. ¶ 74) (emphasis added). BP clearly embraced the first portion of the Baker Report's mandate. In an effort to "articulate a clear message" with respect to process safety, Hayward, Inglis, and other BP executives reeled off the "safety is our number one priority" catchphrase at every turn. But Plaintiffs' allegations raise a triable issue as to whether BP followed through on the latter portion of the Baker Panel's recommendation, which required BP to match the message with policies and actions.

The Baker Panel's recommendation on process safety was a response to a string of prior safety failures in BP's operations. The incidents included blowouts in the Gulf in 2002 and 2003 and in the Nile delta in 2004. (Compl. ¶¶ 54–59.) These were followed by the explosion at the Texas City refinery in 2005 and the spill in Prudhoe Bay in 2006. (*Id.* ¶¶ 11, 68.) All of these incidents served as evidence for the Baker Panel's conclusion that BP had not adequately established process safety as a core value. (*Id.* ¶ 74.) Following the release of the Baker Report and the clear roadmap for improvement contained therein, BP launched what effectively amounted to a public relations campaign to resuscitate the Company's image with respect to process safety. The statements that Plaintiffs highlight as false and misleading were part of that campaign. BP's statements inundated the market with the image that BP was making significant progress on process safety. That image was frequent, repeated, and unequivocal. Plaintiffs suggest it was also necessary to BP's continued financial success following the findings of the CSB and the Baker Report. (*Id.* ¶ 67.)

According to Plaintiffs, there were stark differences between the image BP projected and the reality of BP's operations. Just three years after BP began touting its process safety efforts,

the Deepwater Horizon disaster occurred.  This was a disaster so similar to prior disasters—the culmination of corner-cutting, overlooked and disregarded warnings, a lack of oversight, a failure to train employees properly, and long overdue maintenance—that it raises a genuine question as to whether BP was truly making the progress it claimed.  The Baker Report recommendation required BP to "match its message" on process safety with policies and actions. BP itself embraced the recommendation as a metric and frequently cited the Company's progress against that metric.  For example, BP's Annual Reports described specific "key developments" (Compl. ¶ 324), BP claimed to have established training programs and process safety workshops (*Id.* ¶ 278), and BP executives made frequent reference to implementing the Baker Report's "roadmap" (*Id.* ¶ 275.)   A repeated utterance, even on a promise of progress, can become misleading where repetition becomes a statement of current and ongoing compliance.  *See, e.g., Reese v. BP Exploration*, 643 F.3d 681, 691 (9th Cir. 2011) (noting that even a promise or forward-looking statement can become an inaccurate assertion as to a matter of past or existing fact if repeated filing creates an "impression of a state of affairs that differs in a material way from one that actually exists") (citation omitted) (internal quotation marks omitted).

Plaintiffs have alleged sufficient facts to call into question whether BP and its corporate officers and directors were in fact implementing the process safety reforms as they represented. BP had a starting point for its mandate: improve process safety beyond where it was at the time of the Texas City explosion through implementation of the policies, procedures, and recommendations detailed in the Baker Report.  The Deepwater Horizon explosion, subsequent investigation, and other facts Plaintiffs allege pointing to similarities between the Deepwater Horizon accident and BP's history of safety failures support Plaintiffs' contention that BP seriously overstated the "progress" it had made in implementing the Baker Panel's

recommendations.  Where Plaintiffs have tethered their allegations to BP's statements involving progress in process safety efforts as measured against the Baker Report recommendations, they have alleged section 10(b) violations with the particularity required under the PSLRA and Rule 9(b).[12]

### b.  BP misrepresented its risk profile because it failed to disclose prior safety failures

The Complaint alleges that BP misrepresented its risk exposure to investors by repeatedly and falsely downplaying its exposure to risk.  *See*, *e.g.*, Compl. ¶ 267 (Grote: "Our strategy is unchanged and our current focus remains on safe and reliable operations and the delivery of improved performance."); Compl. ¶ 269 (Malone: "BP America is committed to safety, and the expectation of our management is that budget guidelines should never result in a compromise in safety performance."); Compl. ¶ 271 (Inglis: "By taking and managing risks in frontier regions we have established an unrivalled asset base in some of the world's most prolific basins. . . . We are developing strong growth in deepwater and tight gas through a spread of major projects around the world."); Compl. ¶ 273 (Malone: "BP America is in the midst of a comprehensive effort to improve its safety culture and to strengthen and standardize process safety and risk management programs at all BP-operated facilities."); Compl. ¶ 281 ("[I]n the Gulf of Mexico, our priorities are clear – grow revenues near term through the safe startup and ramp-up of Atlantis and Thunder Horse; grow our resources position through successful exploration and access, and advance key deepwater technologies to exploit that resource base."); Compl. ¶ 297 (McKay: "The track record of BP and the industry generally in the Western and Central Gulf of Mexico (GOM) demonstrates that when areas are opened, they can be leased, explored and developed to the highest environmental and operational standards in the world."); Compl. ¶ 312

---

[12]  The actionable misrepresentations are, following this Court's numbering system, statements included in Misrepresentations 10-14 (Compl. ¶¶ 273-282), 16 (¶ 285-86), 18 (¶ 289-90), 35 (¶ 324-25), and 38 (¶ 330-31).

(Eyton: "[I]t is worth emphasizing that throughout this period and despite the extremes of geography in which we operate, technology has continuously improved the safety and environmental footprint of our industry."); Compl. ¶ 332 (Hayward: "There has been a significant reduction in the frequency of recordable injuries and the number of major incidents related to integrity failures has also fallen.  At the same time we're reducing containment losses in our operations.").

Only a few of the statements Plaintiffs allege as false and misleading reference BP's risk exposure in explicit terms.  *See*, *e.g.*, Compl. ¶ 264 ("A risk of increased environmental costs and impacts is inherent in particular operations and products of the group and there can be no assurance that material liabilities and costs will not be incurred in the future.  In general, the group does not expect that it will be affected differently from other companies with comparable assets engaged in similar business."); Compl. ¶ 278 ("In safety, we are significantly lowering the risk profile of our operations."); Compl. ¶ 319 ("Risk remains a key issue for every business, but at BP it is fundamental to what we do. . . .  We must never shrink from taking on difficult challenges, but the board will strive to set high expectations of how risk is managed and remain vigilant on oversight."); Compl. ¶ 320 (Hayward: "We continue to show our ability to take on and manage risk, doing the difficult things that others either can't do or choose not to do.")

According to Plaintiffs, the misrepresentations contained in such statements were twofold.  Broadly speaking, BP misrepresented the general risks associated with deepwater drilling in that it failed to disclose "multiple safety failures and near-failures" that BP experienced in its deepwater operations.  More specifically, BP misrepresented its exposure to risk by failing to disclose that it was unprepared to contain an oil leak in its Gulf operations.

Plaintiffs claim that BP failed to disclose prior safety failures, thereby rendering false any representation that the Company was in control of its risk exposure.  (Compl. ¶¶ 265(c), 268(b), 270(b), 272(c), 274(b), 276(b), 280(b), 282(b), 284(a), 286(a), 296(c), 299(b), 301(c), 303(c), 309(b), 311(c), 312(b), 318(c), 321(c), 325(c), 333(d).)  In support of these allegations, Plaintiffs point to the string of safety incidents preceding the Deepwater Horizon explosion, beginning in 2000 with incidents at BP's Grangemouth refinery in Scotland and continuing through the Texas City explosion.  (Compl. ¶¶ 53–63.)  Plaintiffs also point to correspondence BP received from the U.K. HSE regarding several of BP's rigs operating in U.K. jurisdictions that were overdue on maintenance and repair requirements.  (Compl. ¶¶ 98–103.)  Nowhere in the Complaint do Plaintiffs allege that any of the safety incidents between the years 2000 and 2007 remained undisclosed.  In fact, Plaintiffs allege that BP failed to disclose only one incident, a September 2008 gas leak in BP's Azerbaijan deepwater drilling operations in the Caspian Sea.  (Compl. ¶¶ 81–83.)  "Shortly thereafter" there was a blowout at another rig in the same field; Plaintiffs do not state whether that rig was part of BP's operations.  (*Id.*)  However, Plaintiffs allege that BP made no announcement or disclosure of the incident until BP filed its Annual Report, Form 20-F, for 2008.  Plaintiffs suggest that the disclosure in the 2008 Annual Report downplayed the incident, referring to it as a "subsurface gas release" and omitting references to the blowout on the nearby rig.  (*Id.*)

Defendants argue that the allegedly undisclosed risks were actually "well-publicized safety lapses" already known to the market.  (Doc. No. 150, at 27.)  According to Defendants, the incidents in the Nile delta and the Caspian Sea, in addition to the other incidents that occurred in BP's U.S. operations, were well-publicized and even prompted the MMS to investigate BP twice and issue Safety Alerts to all drilling companies in the Gulf.  (*Id.*)  Because

such risks were widely known to the market, Defendants argue any representations related to BP's risk management efforts were not misleading or could not have been material.  (*Id.*)

Statements about the adequacy of risk management operations and capabilities may be false and misleading where the speaker knows, or should know, that such operations are inadequate to manage the risks a company faces.  *See*, *e.g.*, *In re Fannie Mae Sec. Litig.*, Nos. 08 Civ. 7831, 09 MD 2013, 2010 WL 3825713, at *14–15 (S.D.N.Y. Sept. 30, 2010) (finding material misstatements sufficient to survive a motion to dismiss where Fannie Mae's statements that its risk management operation was "appropriate" were made despite defendants' knowledge that their risk management system was inadequate for the new subprime assets they were purchasing); *see also In re Wash. Mutual, Inc. Sec., Derivative & ERISA Litig.*, 694 F. Supp. 2d 1192, 1208–09 (W.D. Wash. 2009) (finding that plaintiffs had sufficiently pleaded the falsity of thirteen statements representing that the defendant company maintained "appropriate policies, standards and limits designed to maintain risk exposures" where the company "had in fact weakened its risk management practices in order to increase loan volume").  However, Plaintiffs do not adequately allege falsity with respect to the statements at issue here.  Instead of pointing to specific flaws in BP's risk management system, Plaintiffs merely stress BP's awareness of the riskiness of its operations.   Plaintiffs' argument, in simplest form, is that it was false or misleading for BP to claim that it could "take on and manage risk" or that it was "lowering its risk profile" when safety-related accidents had previously occurred in some of BP's operations worldwide.  But demonstrating BP's knowledge of risk does not demonstrate that its statements were false or misleading; Plaintiffs' argument mistakenly equates risk with falsity.

In *Evolution Capital Advisors*, the SEC argued that defendants committed securities fraud in connection with their investments in a loan program administered by the Small Business

Administration ("SBA").  *S.E.C. v. Evolution Capital Advisors*, LLC, No. H-11-2945, 2011 WL 6754070, at *1 (S.D. Tex. Dec. 22, 2011).  Investors were allegedly defrauded after defendants misrepresented the nature and risk profile of their involvement in the program by leading investors to believe the company would invest in the more secure option available under the program, SBA loans, when it instead invested in the riskier option, SBA "IO strips."  *Id.* at *1–2. The court found that "[t]he heart of the case is the difference between the risks of investing in an SBA loan and investing in an SBA IO strip," that is, whether or not defendants made "misrepresentations concerning *the nature of the investments that would be made*."  *Id.* at *13. (emphasis added).

Here, Plaintiffs have not alleged any misrepresentations concerning "the nature of the investments" that were made.  *Id.* at *13.  In fact, many of the statements Plaintiffs claim are misleading are actually acknowledgments of BP's risk exposure.  *See*, *e.g.*, Compl. ¶ 264 ("A risk of increased environmental costs and impacts is inherent in particular operations and products of the group and there can be no assurance that material liabilities and costs will not be incurred in the future.  In general, the group does not expect that it will be affected differently from other companies with comparable assets engaged in similar business."); Compl. ¶ 319 ("Risk remains a key issue for every business, but at BP it is fundamental to what we do. . . . We must never shrink from taking on difficult challenges, but the board will strive to set high expectations of how risk is managed and remain vigilant on oversight.").  The likelihood of kicks or blowouts in deepwater drilling operations is exactly the type of risk inherent in an investment in the oil industry.  While the risk associated with the oil industry, and deepwater drilling operations in particular, is obviously a subject matter important—even material—to investors, it is not one that investors are generally unaware of.

Plaintiffs must do more than point to the volatile nature of deepwater drilling operations in order to plead securities fraud with the particularity required under the PSLRA and Rule 9(b). Simply citing prior examples of safety failures does not render false or misleading generalized statements about BP's risk profile or the riskiness of its operations. Even a company operating in a risky industry can manage risk, and Plaintiffs have pointed to no facts undermining BP's assertions that it intended to do so. Plaintiffs' reliance on the existence of such risk as proof of falsity is insufficient to demonstrate the falsity of the statements at issue here.[13]

Plaintiffs fare better in their allegations that BP misrepresented its specific ability to respond to an oil spill in the Gulf, thereby misleading investors as to its risk exposure in its Gulf operations. Plaintiffs point to specific misrepresentations in BP's Regional OSRP for the GOM, which estimated the total worst case discharge scenarios in the Gulf at between 28,033 barrels and 250,000 barrels of oil per day. (Compl. ¶ 314.) In addition, BP's Regional OSRP for the GOM explicitly states that BP and its subcontractors "could recover approximately 491,721 barrels of oil per day (or more than 20.6 million gallons) in the event of an oil spill in the Gulf." (*Id.*) The Regional OSRP also stated that BP possessed "the necessary spill containment and recovery equipment to respond effectively to spills." (*Id.*) Plaintiffs also rely on BP's IEP for the Macondo well site and allege that the statement contained therein—that "BP Exploration & Production Inc. has the capability to respond, to the maximum extent practicable, to a worst-case discharge," which BP estimated at 162,000 barrels of oil per day—was false. (*Id.* ¶¶ 158, 304.) In addition, a few months prior to the Deepwater Horizon disaster, Defendant Rainey testified before a Senate Committee and similarly represented that "[a]ll of [BP's] production facilities have contingency plans that identify the procedures, response equipment, and key personnel

---

[13] By the Court's numbering system, the nonactionable statements in this category are included in Misrepresentations 5 (Compl. ¶ 264), 7–9 (*Id.* ¶ 267–71), 10 (*Id.* ¶ 273), 12 (*Id.* ¶ 278), 14 (*Id.* ¶ 281), 23 (*Id.* ¶ 297), 29 (*Id.* ¶312), 32–33 (*Id.* ¶¶ 319–20), and 39 (*Id.* ¶ 332).

needed for responding to incidents." (*Id.* ¶ 317.) Rainey referred specifically to the capabilities of BP America's Houston offices, stating that "BP's fiber optic network in the US Gulf of Mexico . . . allows us to monitor well pressures in real time, both at the facility and in our offices in Houston." (*Id.*)

Plaintiffs assert that all these representations were false because BP proved utterly unable to respond to the spill following the Deepwater Horizon disaster. Through the IEP and the Regional OSRP, BP represented that it was prepared to respond to a spill release of somewhere between 162,000 and 250,000 barrels of oil per day. (*Id.* ¶¶ 158, 156.) Plaintiffs allege that the worst case discharge scenarios in BP's public representations were significantly higher than the actual amount of the spill, yet BP's "oil-spill removal organizations were quickly outmatched" following the Deepwater Horizon explosion. (*Id.* ¶ 218.) Plaintiffs estimate that 60,000 barrels of oil per day spilled from the Macondo well following the Deepwater Horizon blowout. (*Id.* ¶ 5.) Yet, even forty-nine days after the spill, BP was recovering oil at a rate of only 15,000 barrels per day. (*Id.* ¶ 243.)

Plaintiffs also claim that much of BP's Regional OSRP was inaccurate: irrelevant material was copied from other websites, the Regional OSRP "described biological resources nonexistent in the Gulf," and the Regional OSRP named as the Company's "wildlife expert" a man deceased several years before BP filed its Regional OSRP. (*Id.* ¶¶ 220–22.) In further support of the falsity of these statements, Plaintiffs point to post-spill statements by Suttles and Hayward admitting that BP did not have an oil spill response plan with "proven equipment and technology" and that the Company was instead "making it up day to day." (*Id.* ¶¶ 217, 315.) Finally, with respect to Rainey's representations that BP America's Houston offices allowed for close monitoring of the Deepwater Horizon rig, Plaintiffs assert that, on the night of the

explosion, there was "nobody in that B.P. Macondo well office," and BP was therefore, in addition to the many other reasons, unprepared to respond to spills in the Gulf. (*Id.* ¶ 201.)

Plaintiffs have sufficiently pleaded facts to demonstrate that BP misrepresented the size of the spill it was prepared to respond to in the Gulf and misrepresented the Company's general spill response capabilities. BP stated it was prepared to respond to a spill more than four times as large as the maximum daily spill amount that resulted from the Deepwater Horizon incident. Plaintiffs have highlighted the wide disparity between the amount of the actual spill and BP's representation as to its preparedness, other falsities in both the Regional OSRP and the IEP, and the failures of BP America's Houston office to respond appropriately to emergency warnings from the Deepwater Horizon. Thus, they have sufficiently pleaded actionable misrepresentations related to BP's ability to respond to an oil spill in the Gulf of Mexico.

Defendants do not challenge the alleged falsity of the statements contained in the Regional OSRP and the IEP. Instead, because this is a fraud on the market case, Defendants contend that Plaintiffs have not adequately pleaded reliance on the alleged misrepresentations contained in the Regional OSRP and the IEP because they do not allege that the documents were "publicaly disseminated" during the Class Period.[14] (Doc. No. 150, at 28.) The fraud on the market theory allows "a presumption that potentially significant publicly disseminated information is reflected in the price of stock traded on an efficient market" unless rebutted by a factual showing that the information at issue did not affect the market price. *Nathenson*, 267 F.3d at 415. Here, Plaintiffs allege that the IEP was received by the MMS on February 23, 2009, and was "available to the public" no later than March 10, 2009. (Compl. ¶ 304.) They allege that the Regional OSRP was "publicly filed" on June 30, 2009. (*Id.* ¶ 314.) The Court agrees

---

[14] In subsequent briefing, Defendants withdrew their challenge to Plaintiffs' pleading of reliance on the IEP. However, Defendants still contend that allegations related to the IEP fail on scienter grounds. (Doc. No. 220, at 14 n. 11.)

with Plaintiffs that, for purposes of pleading reliance in a fraud on the market case, there is no material difference between pleading that the IEP was "available to the public" or "publicly filed" and alleging that a document was "publicly disseminated." *See Basic Inc. v. Levinson*, 485 U.S. 224, 246 n. 24 (1988) ("[W]e need only believe that market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices."). Plaintiffs have adequately alleged reliance on the IEP and the Regional OSRP and have therefore pleaded with particularity misrepresentations stemming from BP's representations that it was prepared to respond to a spill in the Gulf of Mexico.[15]

### c. BP claimed it did not retaliate against workers for reporting safety concerns while engaging in a systematic pattern of retaliation

Plaintiffs allege that BP's representations that the Company was strengthening its safety culture were false and misleading. *See* Compl. ¶ 269 (Malone: "I continue to meet with employees to reinforce my expectations of them: that they must ensure that our operations are safe, that they understand they have both a right and responsibility to shut down any process they feel is unsafe or operationally unsound, and that they are encouraged to raise concerns on any issue.") (Malone: "BP does not tolerate retaliation against workers who raise safety concerns."); Compl. ¶¶ 283, 302 ("In the US, former US district court judge Stanley Sporkin acts as an ombudsperson. Employees and contractors can contact him confidentially to report any suspected breach of compliance, ethics or the code of conduct, including safety concerns."); Compl. ¶ 289 (Hayward: "We opened ourselves up to scrutiny – and we listened more to our front-line operations people – who, of course, really know what is going on on the ground."); Compl. ¶ 322 ("In summary, we are strengthening our safety culture throughout our business, and building a track record that we intend to become industry leading.").

---

[15] By the Court's numbering system, the alleged misrepresentations that survive in this category are numbered 26 (Compl. ¶ 304), 30 (*Id.* ¶ 314), and 31 (*Id.* ¶ 316).

According to Plaintiffs, these statements were false and misleading because BP was systematically retaliating against workers who reported safety violations.  As evidence of BP's retaliation, Plaintiffs point to BP employee Kenneth Abbott ("Abbott").  Abbott worked as an engineer on BP's Atlantis rig, another deepwater drilling rig in the Gulf of Mexico.  (Compl. ¶ 137.)  Abbott became concerned that designs for critical units on the rig were not updated to reflect changes made during repairs and maintenance.  (*Id.*)  Abbott reported his concerns in August 2008.  A few weeks later, another employee who worked with Abbott, BP manager Barry Duff ("Duff"), wrote a letter to other BP managers corroborating Abbott's concerns.  (*Id.* ¶ 138.)[16]  Abbott continued to voice safety concerns until January 2009, when BP fired him for his whistle-blowing activity.  (*Id.* ¶ 139.)  After his termination, Abbott raised his concerns with BP's Ombudsman.  Part of the Ombudsman's investigation revealed an affidavit from safety engineer Mike Sawyer, who independently reviewed Abbott's reports and corroborated Abbott's concerns.[17]  (*Id.* ¶¶ 140–41.)  In April 2010, a week before the Deepwater Horizon explosion, BP's Deputy Ombudsman, Billie Garde ("Garde"), sent Abbott a letter affirming that the Ombudsman's office had substantiated Abbott's concerns.[18]

Plaintiffs also point to further evidence of retaliation against employees that came to light following the Deepwater Horizon disaster.  The Presidential Commission Report noted that a survey conducted in March 2010 indicated that 46% of BP crew members—including crew

---

[16] According to Plaintiffs, Duff's letter referred to "hundreds of thousands of Subsea documents that have never been finalized," which Duff warned was "fundamentally wrong" and could result in "catastrophic operating errors." (Compl. ¶ 138.)

[17] Sawyer's affidavit called it "inconceivable" for BP to justify production on the Atlantis rig without completed design documentation and warned of the "substantial risk of large scale damage to the deepwater Gulf of Mexico (GOM) environment and harm to workers" stemming from "unverified design documents" that impeded BP's ability to accurately assess risk.  The affidavit concluded that "[t]he extent of documentation discrepancies creates a substantial risk that a catastrophic event could occur at any time."  (Compl. ¶ 141.)

[18] Garde's letter stated: "Your concerns about the [Atlantis] project not following the terms of its own Project Execution Plan were substantiated. . . . [BP] did not do a comprehensive documentation audit regarding the documentation issues on Atlantis. . . . The concerns that you expressed about the status of the drawings upgrade project were . . . of concern to others who raised the concern before you worked there, while you were there, and after you left."  (Compl. ¶ 142.)

members on the Deepwater Horizon—feared retaliation for reporting unsafe situations.  (*Id.* ¶ 144.)  Another 15% felt there were not enough employees to carry out work safely.  (*Id.*)  BP's Ombudsman also conducted an extensive investigation into Acuren, BP's contractor for pipeline inspection and monitoring in BP's Alaskan operations.  (*Id.* ¶¶ 145–50.)  One of the contractor's employees, Marty Anderson ("Anderson"), raised safety concerns with his supervisors and with BP intermediaries.   (*Id.*)    In 2009, BP's Ombudsman eventually investigated Anderson's complaints, substantiated his concerns, and concluded that "[the] concerns were serious, and although people try to downplay the significance of the issues, they reveal a complete breakdown."  (*Id.*)  BP's Ombudsman's office reported the concerns to BP and BP North America officials and recommended that Anderson's concerns be reported directly to BP's Board of Directors.  (*Id.*)  BP's Ombudsman, Judge Sporkin, communicated the concerns directly to Defendant Malone, as President of BP North America.[19]  (*Id.*)

The alleged facts cannot serve as evidence that statements about "strengthening BP's safety culture" were false or misleading.  Generalized statements about corporate culture are too vague to be actionable.  *See, e.g.*, *In re Fleming Co. Inc. Sec. & Derivative Litig.*, MSL-1530, 2004 WL 5278716, at *26 (E.D. Tex. June 16, 2004) (finding that a statement that the company instituted a "culture of thrift" was simply "too general to constitute a material misstatement as required under Rule 10b-5").  However, the alleged facts sufficiently, even forcefully, establish that BP was knowingly retaliating against workers who reported safety concerns, even while issuing statements explicitly denying any retaliation.  Further, the alleged facts call into question specific statements made by Malone—who, according to Plaintiffs, had direct contact with the

---

[19] Defendants urge the Court to take judicial notice of a subsequent MMS report finding Abbott's claim to be without merit.  (Doc. No. 150, at 23 n. 17.)  The Court declines to do so at this time.  Plaintiffs have made specific allegations in their Complaint with respect to Abbott's experience that the Court is bound to accept as true for purposes of a motion to dismiss.  Defendants' factual disputes are more appropriately left for subsequent proceedings.

Ombudsman and was aware of such concerns—and Hayward claiming that BP "listened to operations people" and encouraged employees to raise safety concerns. (Compl. ¶¶ 269, 289.) Plaintiffs' facts support their contention that BP retaliated against workers—both its own and those of its contractors—who reported safety concerns. Because Plaintiffs have alleged facts directly contradicting BP's representations that it did not retaliate against workers for reporting safety concerns, they have adequately pleaded the falsity of the statements they identify regarding BP's retaliation.[20]

### d. BP failed to disclose budget cuts and layoffs which impacted the safety of drilling operations in the Gulf

Plaintiffs claim that BP misrepresented its efforts and intentions to improve safety performance in its operations because the Company actually implemented safety budget cuts and staff reductions which impacted BP's ability to safely drill in the Gulf of Mexico. According to Plaintiffs, evidence of safety and budget cuts demonstrate the false and misleading nature of statements about BP's intended progress in the area of process safety. *See, e.g.*, Compl. ¶ 273 ("BP America is in the midst of a comprehensive effort to improve its safety culture and to strengthen and standardize process safety and risk management programs at all BP-operated facilities."); Compl. ¶ 285 ("Safety is our number one priority and in 2007 our overall safety record continued to improve."); Compl. ¶ 295 (Hayward: "Safety, people and performance, these remain our priorities. Our number one priority was to do everything possible to achieve safe, compliant and reliable operations."); Compl. ¶ 302 ("Our first priority will always be to ensure

---

[20] By the Court's numbering system, statements contained in Misrepresentations 8 (Compl. ¶ 269) and 18 (*Id.* ¶ 289) are actionable and those contained in Misrepresentations 15 (*Id.* ¶ 283), 25 (*Id.* ¶ 302), and 34 (*Id.* ¶ 322) are not. In addition, Plaintiffs claim that Misrepresentations 6 and 19, both containing BP's statement that "We document and rigorously follow procedures for safe and effective operating," was false and misleading because BP in fact failed to provide adequate documented procedures for its operations. (*Id.* ¶¶ 266, 291). Plaintiffs point out that Defendants never specifically challenged this statement in their briefing and argue that it is, therefore, actionable. (Doc. No. 186, at 13). The Court finds that Plaintiffs' allegations here concerning BP's retaliation against employees for reporting safety concerns specifically related to documentation of procedures is sufficient to plead the falsity of this statement, making it, too, actionable.

the safety and integrity of our operations."); Compl. ¶ 324 ("The priorities that drove our success in 2009 – safety, people and performance – remain the foundation of our agenda as we build our momentum and work to further enhance our competitive position.").

Plaintiffs also claim that BP's representations that it would prioritize safety over cost-cutting efforts were false and misleading. *See*, *e.g.*, Compl. ¶ 281 (Hayward: "We are taking action to close the competitive gap through a focused effort on three priorities of safety, people and performance. We are determined to operate safely and reliably, to develop the capability of our people and to drive performance through restoring operational momentum. At the same time we are rigorously reducing complexity and cost. In Exploration and Production, we continue to see the benefits of our strategy."); Compl. ¶ 300 (Inglis: "There is one important caveat: safe and reliable operations come first whatever cost efficiency measures we undertake, and we continue to advance the safety and reliability of our operations through implementing OMS."); Compl. ¶ 308 ("By the way, let me add that managing costs down does not mean BP will be skimping when it comes to ensuring our operations remain safe, reliable and compliant in the years ahead."); Compl. ¶ 322 ("There is one important caveat: safe and reliable operations always come first, whatever cost efficiency measures we undertake.").

Plaintiffs contend that budget cuts and staff reductions in BP's operations made it impossible for BP truly to be prioritizing safety in the manner it represented to investors. In support of this allegation, Plaintiffs point to Hayward's October 2007 announcement of BP's planned reorganization. (Compl. ¶ 115.) The reorganization was intended to increase efficiency, simplify the organization, improve productivity, and "bring[] up operating units to enable them to focus on safe, reliable, and profitable operations." (*Id.*) Plaintiffs also point to an alleged merger whereby BP combined its compliance offices in its Houston and London locations. (*Id.* ¶

116.)  According to a confidential witness (who was laid off during the merger), the merger caused "huge staff reductions."  (*Id.*)  Plaintiffs also highlight the experience of BP's former senior Vice President for Drilling Operations in the Gulf, Kevin Lacy ("Lacy").  (*Id.* ¶ 118.) Lacy allegedly had disagreements with BP over "its lack of commitment to process safety," which eventually led to his departure from the Company in late 2009.[21]  (*Id.* ¶ 119.)  BP also reshuffled other personnel in the Gulf, which Plaintiffs claim led to a dearth of experience in regional operations and contributed to the Deepwater Horizon explosion.  (*Id.* ¶ 120.)  For example, David Rich ("Rich"), the employee who held the position of Wells Manager for the Gulf of Mexico, was promoted to the spot only a few weeks before the incident.  (*Id.*)  Plaintiffs allege that neither Rich nor his immediate subordinate had sufficient experience in well control operations.  (*Id.*)

The first collection of statements above suffers from the same shortcoming as the statements related to general "progress" in the area of process safety: all are too vague to be actionable.  With respect to the second set of statements—those where BP represented that safe operations would take precedence over cost cutting measures—Plaintiffs fail to adequately allege falsity.  Plaintiffs' allegations regarding the effect of layoffs and budget cuts on BP's safety programs are merely conclusory.  Even where Plaintiffs cite facts, the connections they draw between the alleged facts and BP's safety programs are too attenuated to support the falsity of the misrepresentations Plaintiffs identify.  For example, Plaintiffs point to Hayward's announcement of reorganization in late 2007, but they do not allege facts that demonstrate *how* the reorganization might have affected the safety of BP's drilling operations.  (*Id.* ¶ 115.)  They

---

[21] The parties dispute the proper characterization of Lacy's departure.  Both parties rely on evidence from the MDL 2179 docket to support their positions.  (Doc. No. 226, at 2–3.)  This Court will not consider evidence outside the Complaint in deciding the motion to dismiss and it need not do so here, as the viability of Plaintiffs' allegations does not turn on the circumstances of Lacy's departure.

merely equate "reorganization" with "numerous layoffs and cuts to safety budgets," and allege no facts suggesting that the reorganization directly affected BP's safety budget.  (*Id.*)  Plaintiffs state that layoffs "hit their height in 2009" when BP merged its Houston and London offices.  (*Id.* ¶ 116.)  Instead of attributing the layoffs to predictable fallout from the merger, an equally plausible explanation, Plaintiffs ask the Court to assume that such layoffs directly hampered BP's safety program.  (*Id.*)  The alleged facts, even if taken as true, do not support such unfounded assumptions.  *See, e.g., Southland*, 365 F.3d at 361 (noting that a court need not strain to find inferences favorable to the plaintiffs).  Finally, the departure or reassignment of a handful of individual employees does not demonstrate anything about BP's safety program.  Lacy's departure from BP—however the parties wish to characterize it—is attributed (by Plaintiffs, at least) to "disagreements with BP over its lack of commitment to process safety."  (*Id.* ¶ 118.)  As discussed above, BP's general commitment to process safety is not actionable in the abstract.  And facts related to Lacy specifically—whose departure is not alleged to be tied to staffing cuts—does not demonstrate the falsity of BP's statements about prioritizing safety while simultaneously cutting costs.

Further, many of the statements Plaintiffs cite as misrepresentations actually demonstrate that BP was forthcoming with its plans to enact cost-cutting measures.  For example, Hayward was very clear that BP's cost-cutting measures were a part of BP's overarching corporate strategy.  *See, e.g.*, Compl. ¶ 281 (Hayward: "We are taking action to close the competitive gap through a focused effort on three priorities of safety, people and performance.  We are determined to operate safely and reliably, to develop the capability of our people and to drive performance through restoring operational momentum.  At the same time we are rigorously reducing complexity and cost.  In Exploration and Production, we continue to see the benefits of

our strategy.").  As Hayward's statement suggests, when BP's strategy of balancing cost-cutting and safe operations worked, it had the potential to benefit investors.  There is nothing fundamentally at odds with BP attempting to both prioritize safety and curb expenses, and Plaintiffs have alleged no facts to suggest that the two goals were necessarily mutually exclusive here.  Plaintiffs must allege more than that BP merged offices, promoted employees, and transferred employees between divisions to allege the falsity of BP's statements regarding balancing cost-cutting measures with its safety program.  Plaintiffs have not pleaded the statements identified here with sufficient particularity required under the PSLRA and Rule 9(b), and the alleged misrepresentations related to BP's cost-cutting measures are not actionable.[22]

### e.  BP misrepresented that OMS would bring uniformity to BP's worldwide operations

Plaintiffs allege that BP falsely represented that it was "championing process safety" and implementing "consistently high standards worldwide" in connection with its OMS.  *See*, *e.g.*, Compl. ¶ 271 (Inglis: "One aspect of our focus on safe and reliable operations that I mentioned earlier is our new standardised Operating Management System (OMS).  This will provide a blueprint for safety and all aspects of operations throughout BP, making sure operations are undertaken to a consistently high standard worldwide."); Compl. ¶ 278 (discussing progress in process safety: "Management systems – Implementation of our operating management system began at an initial group of sites [in 2007], which included all five US refineries."); Compl. ¶ 279 (Hayward: "[BP's OMS brings] greater consistency to [BP's] operations."); Compl. ¶¶ 281, 285 (Hayward: "We are making good progress in addressing the recommendations of the Baker Panel and have begun to implement a new Operating Management System across all of BP's

---

[22] By the Court's numbering system, this makes statements found in Misrepresentation Nos. 10 (Compl. ¶ 273), 14 (*Id.* ¶ 281), 16 (*Id.* ¶ 285), 22 (*Id.* ¶ 295), 24 (*Id.* ¶ 300), 25 (*Id.* ¶ 302), 27 (*Id.* ¶ 308), 34 (*Id.* ¶ 322), and 35 (*Id.* ¶ 324) not actionable.

operations."); Compl. ¶ 283 ("[OMS] is the foundation for a safe, effective, and high-performing BP.  It has two purposes: to further reduce HSE risks in our operations and to continuously improve the quality of those operations."); Compl. ¶ 287 (Hayward: "[W]e are also now introducing our new operating management system (OMS), designed to bring greater consistency to our operations."); Compl. ¶ 289 (Hayward: "One of the many consequences for us has been to develop and to embed a new Operating Management System right across BP – and we operate in 100 countries – so that is no mean feat."); Compl. ¶ 294 ("During [2008] we began migrating to the new BP OMS, which has an increased focus on process safety and continuous improvement. The majority of our operations in North America Gas, the Gulf of Mexico, Colombia and the Endicott field in Alaska all completed the migration to the OMS in 2008."); Compl. ¶ 295 (Hayward: "The BP operating management system (OMS) turns the principle of safe and reliable operations into reality by governing how every BP project, site, operation and facility is managed."); Compl. ¶ 300 (Hayward: "We have begun implementation of our Operating Management System, which covers everything from employee competencies to risk assessment, and we're already seeing the benefits."), (Inglis: "[W]e continue to advance the safety and reliability of our operations through implementing OMS."); Compl. ¶ 324 ("BP's operating management system (OMS) provides us with a systematic framework for safe, reliable and efficient operations."), ("BP's operating management system (OMS), which provides a single operating framework for all BP operations, is a key part of continuing to drive a rigorous approach to safe operations.  2009 marked an important year in continuing to implement OMS."); Compl. ¶ 328 ("Safety and operational integrity underpins everything we do, and we are now in the final phase of rolling out our operating management system that provides a single, consistent framework for our operations . . . .") Compl. ¶ 334 ("Providing an integrated and

consistent way of working, the OMS helps ensure that a rigorous approach to safe operations continues to be taken.").

The most complete description of BP's OMS program appeared in BP's 2008 Annual Report, Form 20-F.  The passage describes OMS as follows:

> When fully implemented, OMS will be the single framework within which [BP] will operate, consolidating BP's requirements relating to process safety, environmental performance, legal compliance in operations, and personal, marine and driving safety. . . . The OMS establishes a set of requirements, and provides sites with a systemic way to improve operating performance on a continuous basis.  BP businesses implementing OMS must work to integrate group requirements within their local system to meet legal obligations, address local stakeholder needs, reduce risk and improve efficiency and reliability.  A number of mandatory operating and engineering technical requirements have been defined within the OMS, to address process safety and related risks.

(Compl. ¶ 302.)  Plaintiffs contend that all of the above statements relating to OMS were false and misleading because BP continued to rely on different safety standards in different countries despite having knowledge that uniform practices would have prevented disasters like the Deepwater Horizon blowout.  Specifically, Plaintiffs allege that BP only met higher standards where individual countries required the Company to do so.  (*Id.* ¶ 106.)  For example, Plaintiffs point out that Norway, Canada, and the United Kingdom impose more rigorous restrictions on drilling than does the United States in the Gulf of Mexico.[23]  (*Id.*)  BP followed higher standards for wells drilled in those jurisdictions but "took advantage of a lower level of regulation in the Gulf of Mexico."  (*Id.* ¶ 106.)  According to Plaintiffs, had BP operated under the higher standards imposed in Norway, Canada, or the United Kingdom, the Deepwater Horizon disaster would not have occurred.  (*Id.* ¶ 108.)

Plaintiffs also seek to demonstrate the falsity of BP's statements on its OMS program by

---

[23] Specifically, other jurisdictions require "two barriers" to be maintained on top of hydrocarbons during well completion, that wells in temporary abandonment never be left "underbalanced," and that two blind shear rams be installed on all BOPs.  (Compl. ¶ 106.)

comparing BP's standards to those of its industry peers.  For example, Shell's "Safety Case" methodology requires employees to "make out a satisfactory 'case' for the safety of a particular operation," rather than "merely follow regulations," which is all that BP required.  (*Id.* ¶ 107.) Plaintiffs also point to testimony provided by executives from Shell, Chevron, and Exxon Mobil to the House Environment Subcommittee following the Deepwater Horizon disaster.  (*Id.* ¶ 111.) The collective gist of the testimony was that other companies would not have drilled the Macondo well as BP did.  (*Id.*)  Plaintiffs also contend that BP's "Drilling Wells Operating Policy" contained "fewer absolute or imperative rules" than the guidelines of other companies and allowed managers more discretion in deviating from such rules.  (*Id.* ¶ 112.)  Finally, unnamed "safety personnel and drilling engineers within BP" deemed BP's OMS manual "confusing, poorly drafted, and incomplete."  (*Id.* ¶ 113.)

Defendants argue that BP's statements about OMS providing a "consistently high standard worldwide" are too broad and generalized to be actionable.  They are correct. Describing OMS as a "consistent" and "systematic" program makes no tangible promise to investors.  Such statements do not represent, or even imply, that the same standard will be applied worldwide.  Plaintiffs would apparently have consistency defined to mean use of identical safety standards in each of the eighty or more countries where BP operates.  But Plaintiffs do not allege facts to support the imposition of such a metric.

Plaintiffs argue that BP described OMS as a foundation for safe and effective performance but failed to disclose that BP's OMS actually allowed the Company to implement different safety standards in different regions, so long as the standards met the minimum regulations required in each region.  (Compl. ¶ 272.)  Because the U.S. government's regulations were more lax than those of other countries, this enabled BP to set laxer safety standards for its

operations in the Gulf.  Plaintiffs do not allege that BP's operations violated U.S. law or regulations in the Gulf; yet, Plaintiffs would have this Court find that BP's decision to comply with U.S. regulations rather than self-impose stricter regulations supports the falsity of general statements about BP's OMS program.  This Court declines to do so.  Even assuming Plaintiffs correctly argue that the Deepwater Horizon disaster would not have occurred had BP been operating under Canadian, Norwegian, or British standards, they have not pointed to any statement by BP representing that OMS required it to select the most rigorous drilling regulation from around the world and follow it worldwide.[24]  Plaintiffs may prefer the strictures of drilling regulations promulgated in other countries, but the leniency of U.S. drilling regulations does not reflect any falsity on BP's part as to statements regarding its OMS program.

The Court turns now to Plaintiffs' allegations that BP's failure to follow the standards of peer companies made its statements about OMS false.  Plaintiffs set their own definition for industry standard, claiming that BP's procedures for deepwater drilling "contained fewer absolute or imperative rules . . . than the similar guidelines issued by Shell, Exxon Mobil, and Chevron, *i.e.*, industry standard."  (*Id.* ¶ 112.)  Simply comparing BP's OMS system to the safety programs of BP's industry peers does not explain why BP's statements about its own program are false or misleading.  Plaintiffs, like all investors, are free to choose between companies when making investment decisions.  None of the misrepresentations about OMS can be false simply because BP's OMS was not identical to safety programs among its industry peers when BP never made any such comparison to other programs.[25]

---

[24] In fact, in some of the statements that Plaintiffs identify BP actually disclosed that the OMS program contemplated local variations based on local law.  *See*, *e.g.*, Compl. ¶ 302 ("BP businesses implementing OMS must work to integrate group requirements within their local system to meet legal obligations, address local stakeholder needs, reduce risk and improve efficiency and reliability.").

[25] The only statement in which BP compared its record to any industry standard is found in Misrepresentation 14, BP's 2008 Strategy Presentation, in which Hayward stated that: "Over the last eight years, our safety performance, measured by Recordable Injury Frequency Rate, the standard measure of safety in our industry, has improved three-

In sum, Plaintiffs fail to focus their factual allegations to the actual statements at hand. The misrepresentations Plaintiffs allege relate specifically to BP's OMS program and BP's representation of the program as one designed to bring "consistency across all operations." Yet, Plaintiffs allege no defect in BP's OMS program. Nor do they allege that OMS was not properly implemented or that OMS did not apply to all of BP's operations.[26] Instead, Plaintiffs apparently challenge the substance of the OMS program, contending that its requirements were not rigorous enough. Plaintiffs do not allege that BP did not do what it represented; instead Plaintiffs allege that what BP represented it would do was not good enough, as judged against the laws and regulations of other countries and the practices of BP's competitors. Plaintiffs have thus failed to plead with particularity that BP's statements related to its OMS program were false or misleading.[27]

### f. BP provided false estimates of the spill amount following the Deepwater Horizon explosion

Plaintiffs allege that BP knowingly provided false estimates of the spill amount in the days and weeks immediately following the Deepwater Horizon disaster. On April 21, 2010, less than twenty-four hours after the Deepwater Horizon explosion occurred, BP issued two separate press releases. One confirmed that there was a fire aboard the rig; the other offered BP's support to Transocean and stated that BP "stood ready to assist." (Compl. ¶ 337.) Plaintiffs claim that

---

[26] fold. As you can see on this chart, our performance is amongst the best in our industry." (Compl. ¶ 281.) Plaintiffs have not challenged that BP's record as measured by the "Recordable Injury Frequency Rate" was false, nor do Plaintiffs allege any connection between this particular metric and any statement BP made about OMS.

[26] Some of the statements Plaintiffs identify do address the implementation of OMS. *See*, *e.g.*, Compl. ¶ 278 ("Implementation of our operating management system began at an initial group of sites, which included all five US refineries."); Compl. ¶¶ 281, 285 (Hayward: "We are making good progress in addressing the recommendations of the Baker Panel and have begun to implement a new Operating Management System across all of BP's operations."). Yet Plaintiffs do not explain why statements about BP's implementation of OMS were false or misleading. Plaintiffs allege the same set of facts—related to differing standards country by country and the failure of OMS to measure up to BP's industry peers' programs—with respect to each statement about OMS instead of tailoring their allegations to the specific misrepresentations they identify.

[27] The non actionable statements are contained in portions of Misrepresentations 9 (Compl. ¶ 271), 12 (*Id.* ¶ 278), 13–18 (*Id.* ¶¶ 279–89), 21–22 (*Id.* ¶¶ 294–95), 24 (*Id.* ¶ 300), 35 (*Id.* ¶ 324), 37 (*Id.* ¶ 328), and 40 (*Id.* ¶ 334).

these press releases were false and misleading because in neither release did BP state that oil was already leaking from the well.  (*Id.*)  Plaintiffs allege that BP was already aware of the leak at the time it issued the press releases because, as McKay later testified, the "first spill response portions of [the Gulf of Mexico spill plan] were called in two hours after the explosion."  (*Id.* ¶ 338(a).)  Plaintiffs also allege that BP falsely represented that it was "ready to assist," given the errors in BP's Regional OSRP, as discussed above.  (*Id.* ¶ 338(b)-(c).)

Plaintiffs have not adequately alleged the falsity of these statements.  An examination of BP's first press release reveals that it simply reprinted a statement originally issued by Transocean reporting a fire on the Deepwater Horizon rig.  (Doc. No. 150-25, Ex. U.)  The only line of the press release written by BP stated that "BP confirms that Transocean Ltd. issued the following statement today," followed by a reprinting of Transocean's statement setoff in quotation marks with the notation "SOURCE: Transocean Ltd." at the end.  (*Id.*)  Because BP's press release did not purport to provide any additional information generated by BP, Plaintiffs have failed to adequately allege the falsity of the statement.

Plaintiffs also fail to demonstrate the falsity of the second press release, dated April 21, 2010.  In the statement, BP stated that "it stood ready to assist in any way."  (Doc. No. 150-26, Ex. V.)  The release also included a quote from Hayward stating that, "We are also very focused on providing every possible assistance in the effort to deal with the consequences of the incident," and offered condolences to the rig personnel and families involved.  (*Id.*)  The general statement that BP "stood ready to assist" is too vague to be material.  *See In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 385–86 (S.D. Tex. 2011) (categorizing a statement such as "we can shepherd this institution through this cycle" as non-actionable puffery).  In addition, a statement must be false or misleading at the time it was made.  Plaintiffs point to the errors in

BP's Regional OSRP, that were subsequently revealed as BP actually took action to assist. But Plaintiffs do not allege that BP knew of the errors at the time it offered assistance to Transocean.

The additional statements Plaintiffs contend are false all contained numerical estimates of the spill in the days following the explosion. On April 28, 2010, Suttles stated that BP's best estimate was 1,000 barrels of oil flowing from the well. (Compl. ¶ 342.) Suttles also made reference to a "new point of leak" in the blowout preventer area but stated that, "[g]iven the location, we do not believe this changes the amount currently estimated to be released." (*Id.*) On April 29, Suttles conducted an interview on The Early Show and provided the following estimate: "I think that somewhere between one and five thousand barrels a day is probably the best estimate we have today." (*Id.* ¶ 344.) On May 5, 2010, the Houston Chronicle interviewed Hayward, who stated that "the guesstimate remains 5,000 barrels a day." (*Id.* ¶ 353.) Plaintiffs contend that these spill estimates were false and misleading because BP was in possession of two internal documents giving different estimates than those BP provided to the public.

The first of the two documents is an internal BP document entitled, "Estimation of the Oil Released from Deepwater Horizon Incident." The document is dated April 26, 2010, marked "1200 hrs," and gives an estimate of "roughly 5000" barrels per day. (Doc. No. 150-27, Ex. W.) The second document is an internal BP document marked "BP Confidential" dated May 17, 2010, with that date crossed out and "4/27/20" written in. (Doc. No. 150-28, Ex. X.) The document provided three estimates of the spill amount: a low estimate of 1,063 barrels per day, a "Best Guess" estimate of 5,758 barrels per day, and a high estimate of 14,266 barrels per day. (*Id.*) These two documents sufficiently demonstrate the alleged falsity of the estimates provided by both Suttles and Hayward. The April 26 document gave an estimate of "roughly 5,000 barrels," yet on April 28 Suttles pegged BP's best estimate at only 1,000 barrels. Subsequent

statements by Suttles and Hayward put the estimate at "somewhere between 1,000 and 5,000" or at a "guesstimate" of 5,000, while the second document from April 27 clearly shows that BP's best estimate was actually over 5,000 and as high as 14,000 barrels per day. The documents support Plaintiffs' contention that BP was lowballing the estimate numbers in an attempt to keep stock prices from falling. Whether the facts will actually establish that BP intentionally gave the public lower estimates is an issue for trial. *See, e.g., Joffee v. Lehman Bros., Inc.*, No. 04 Civ. 3507, 2005 WL 1492101, at *6 (S.D.N.Y. June 23, 2005) (holding that factual disputes are inappropriate for disposition on a motion to dismiss). Plaintiffs have alleged facts sufficient to call into question the truth of these three estimates.

Plaintiffs also allege that Suttles's statements regarding BP's use of the cofferdam were misleading. *See*, *e.g.*, Compl. ¶ 351 ("Over the weekend, then, we'll be attaching that dome to the drillship Enterprise with a riser pipework assembly, which will allow the oil to flow up to the surface and be processed. So if all goes to plan, we should begin to start that operation, the beginning of trying to process the fluids on the surface and stop the spilling to the sea, on Monday."). Plaintiffs contend this statement was false because, according to Plaintiffs, the use of the cofferdam was "highly likely to fail" and had never been used in a deepwater environment. (*Id.* ¶ 352.) Plaintiffs identify no factual support for their argument and give no explanation or source to explain why it was likely to fail. Because Plaintiffs have not adequately alleged the falsity of this statement, it is not actionable.

Finally, Plaintiffs allege that Dudley's statement that the Deepwater Horizon rig "had handled some of the industry's greatest technical challenges, and her safety record had been excellent and had recently won awards," was false and misleading. (*Id.* ¶ 355.) Plaintiffs contend that Dudley's portrait of the rig's safety record was inaccurate because it failed to take

into account that the rig had suffered problems as far back as 2005.  (*Id.* ¶ 356.)  Additionally, even if the Deepwater Horizon was at one point a safe rig, Dudley's statement omitted the facts that BP had removed one of the two blind shear rams on the rig after leasing it from Transocean, the BOP on the Deepwater Horizon failed multiple tests in the week leading up to the explosion, that there were other indicators of operational problems, and that BP postponed the MMS's planned inspection of the BOP on March 10, 2010.  (*Id.* ¶ 356(b)-(e).)  Plaintiffs have alleged sufficient facts to call into question whether Dudley's statements about the Deepwater Horizon rig misrepresented the rig's safety record or omitted key concerns about the rig of which BP was aware in the months leading up to the explosion.

With respect to the post-spill statements, Plaintiffs have alleged a sufficient basis to contend that the post-spill statements were false and misleading only with respect to Suttles's statements that provided numerical estimates of spill amounts and Dudley's representations as to the Deepwater Horizon rig's safety record.[28]

### g.   Other allegations

Plaintiffs also allege that statements that mentioned deepwater drilling in the Gulf of Mexico, BP's leadership in deepwater drilling, the competitive advantage afforded BP by such operations, and deepwater drilling's effect on the environment were misleading because of the risks associated with such operations.  *See* Compl. ¶ 264 ("Profit centres are, or are expected to become, areas that provide significant production and income for the segment.  Our new profit centres are in . . . the deepwater Gulf of Mexico . . . where we believe we have competitive advantage."); Compl. ¶ 271 ("We are developing strong growth in deepwater and tight gas though a spread of major projects around the world."); Compl. ¶ 292 ("[W]e have the know-how

---

[28] Following the Court's numbering system, the actionable statements are contained in Misrepresentations 42 (Compl. ¶ 342), 43 (*Id.* ¶ 344), 45 (*Id.* ¶353), and 46 (*Id.* ¶ 355).  Statements contained in Misrepresentations 41 (*Id.* ¶337) and 44 (*Id.* ¶ 351) are not actionable.

and technology to tap these resources safely and with minimal impact to the environment."); Compl. ¶ 297 (McKay: "The track record of BP and the industry generally in the Western and Central Gulf of Mexico (GOM) demonstrates that when areas are opened, they can be leased, explored and developed to the highest environmental and operational standards in the world."); Compl. ¶ 312 (Eyton: "And, it is worth emphasizing that throughout this period and despite the extremes of geography in which we operate, technology has continuously improved the safety and environmental footprint of our industry."); Compl. ¶ 326 ("We've developed the capability to create advanced floating production facilities, complex riser systems and subsea equipment with the ability to integrate the elements to cope with extreme temperatures, pressures, and oceanographic conditions.  And that has enabled BP to become the leading deepwater IOC."); Compl. ¶ 328 ("Among the majors, we are now the leading deepwater producer and a lot of our deepwater experience has, of course, been gained in the Gulf of Mexico.").

Defendants argue that Plaintiffs have failed to allege the falsity of these statements and that the statements are "not specific enough to perpetrate a fraud on the market."  *Rosenzweig*, 332 F.3d at 870 (citation omitted) (internal quotation marks omitted).  The Court agrees. Statements about BP's leadership in the deepwater drilling industry are too vague to be actionable.  *See*, *e.g.*, *Taubenfeld v. Hotels.com*, 385 F. Supp. 2d 587, 592 (N.D. Tex. 2004) (finding immaterial as a matter of law statements "worded as vague optimism, not phrased in terms of guarantees" because such statements are too vague for investors to rely on).  Because Plaintiffs have not pleaded with particularity the misrepresentations related to deepwater drilling generally and BP's position in the industry, these statements are not actionable.[29]

---

[29] Using the Court's numbering system, the nonactionable statements are included in Misrepresentation Nos. 5 (Compl. ¶ 264), 9 (*Id.* ¶ 271), 20 (*Id.* ¶ 292), 22 (*Id.* ¶ 295), 23 (*Id.* ¶ 297), 29 (*Id.* ¶ 312), 31 (*Id.* ¶ 316), and 36 (*Id.* ¶326).

### 2.  *The Adequately Alleged Misrepresentations are Material*

Plaintiffs have pleaded with particularity misrepresentations involving BP's progress in implementing the Baker Report's recommendations, its ability to respond to a spill in the Gulf of Mexico, reported retaliation against employees who raise safety concern, and post-spill estimates of the spill amounts.  Defendants argue that statements about safety and BP's progress in implementing process safety changes are not material.  (Doc. No. 150, at 15.)  They further claim that any failure to include details about problems specific to the Deepwater Horizon rig appear material only in hindsight.  (*Id.*, at 21.)  Because materiality is judged at the time of the alleged misrepresentation, Defendants argue that such information could not have been material before the Deepwater Horizon incident.  *See, e.g., Shaw Group*, 537 F.3d at 541 (considering whether concealed problems with customer were material to announcement before problems became public).

A misrepresentation or omission is material if there is a substantial likelihood that a reasonable investor would consider the information to have significantly altered the total mix of information about investing in the company.  *ABC Arbitrage*, 291 F.3d at 361.  "[G]eneralized, positive statements about the company's competitive strengths, experienced management, and future prospects" are immaterial.  *Rosenzweig*, 332 F.3d at 869. In addition, "[v]ague, loose optimistic allegations that amount to little more than corporate cheerleading are 'puffery,'" projections of future performance not worded as guarantees, and are not actionable . . . because no reasonable investor would consider such vague statements material and because investors and analysts are too sophisticated to rely on vague expressions of optimism rather than specific facts."  *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 888 (S.D. Tex. 2001).

Defendants contend that statements about BP's progress in implementing the Baker Panel's recommendations are not material. The Baker Panel report was unquestionably important; BP in fact held a press conference to announce the final report and to publicly declare its commitment to reforming the Company's process safety efforts. The report was critical in that it flagged inadequacies in BP's corporate management structure and urged BP to expeditiously implement reforms critical to preventing future disasters. (Compl. ¶ 74.) The report, by its own terms, required BP to provide the public with regular reports on the Company's progress in implementing the recommendations. (*Id.*) This continuous reporting requirement underscores that the Baker Report did in fact serve as a metric by which investors could keep tabs on BP's compliance efforts and progress. BP, too, made the recommendations material by providing consistent updates on the Company's progress.

Defendants also claim that statements in the IEP and the Regional OSRP about BP's ability to respond to a spill, as well as post-spill estimates, could not have been misleading to investors because such statements were either made, or revealed to be inadequate, days after the Deepwater Horizon explosion, when investors were already aware of the catastrophe. The Court is not persuaded that the spill estimates were immaterial. Since 2007, BP had claimed that it was implementing specific process safety reforms, including both policies and practices, to prevent accidents like those at Texas City and Prudhoe Bay from reoccurring. BP also filed very detailed documents—the IEP and the Regional OSRP—outlining its ability to prevent and respond to accidents in the Gulf. Both documents contained specific spill estimates for the region and assurances that the Company was prepared to respond to a spill of up to 491,721 barrels of oil per day in the Gulf. (Compl. ¶ 314.) Thus, when Suttles announced that the spill rate after the Deepwater Horizon explosion was only 1,000 barrels per day, and even when Hayward

subsequently took the "guesstimate" up to 5,000 barrels per day, investors—based on all of BP's prior representations about beefed up process safety efforts and comprehensive spill response plans—could have indeed believed that BP was equipped to contain a spill in the amounts BP represented.  Knowledge that process safety reforms were not being applied to the Deepwater Horizon rig, that the Regional OSRP vastly overstated BP's ability to respond to a spill, and that Suttles's estimates greatly understated the spill amount, would have indeed altered the "total mix of information" available to investors and, possibly, undercut their confidence in their investment.  Post-spill estimates of the spill amount are material because "[t]he omission of a known risk, its probability of materialization, and its anticipated magnitude, are usually material to any disclosure."  *Lormand*, 565 F.3d at 248; *see also Basic*, 485 U.S. at 232.  Pre- and post-spill statements providing false assurances to the market that BP had everything under control could have, as Plaintiffs allege, kept prices artificially inflated until it became clear to investors—through government, regulatory, and third-party reports—that BP was in reality "making it up day to day."  (Compl. ¶ 217.)  BP's implementation of promised safety reforms and representation as to its ability to respond to spills in the Gulf of Mexico—one of the Company's professed profit centers—goes to the heart of BP's corporate value and financial stability and is information material to investors.

Materiality "is not measured by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers."  *Lormand*, 565 F.3d at 248; *see also Isquith ex rel. Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 203 (5th Cir. 1988) (noting that "emphasis and gloss can, in the right circumstances create liability" under Rule 10b–5).  The Court declines to dismiss the Complaint on the basis that Plaintiffs are relying on statements in BP's public filings and statements that are not material.  "Because materiality is a mixed

question of law and fact, it is usually left for the jury." *United States v. Peterson*, 101 F.3d 375, 380 (5th Cir. 1996).   Although on a motion to dismiss "a court can determine statements to be immaterial as a matter of law," the Court cannot say here, on the basis of Plaintiffs' Complaint and Defendants' arguments, that each of the misrepresentations that Plaintiffs have sufficiently alleged to be false and misleading are immaterial as a matter of law.  *ABC Arbitrage*, 291 F.3d at 359.

### 3.   The Adequately Alleged Misrepresentations are Not Protected Under the PSLRA's Safe Harbor Provisions

The PSLRA provides a safe harbor for "any forward-looking statement, whether written or oral, if and to the extent that the forward-looking statement is identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u–5(c)(1)(A)(i).  If a forward-looking statement is identified as forward-looking and accompanied by meaningful cautionary statements, the statement is not actionable and the defendant's state of mind is irrelevant.  *In re Enron Corp. Sec., Derivative & ERISA Litigation*, 235 F. Supp. 2d 549, 575 (S.D. Tex. 2002) (citing *Harris v. Ivax Corp.*, 182 F.3d 799, 803 (11th Cir.1999)).   "If the representation or omission is fraudulent, independent of the existence of a forward-looking statement, the representation or omission is not shielded simply because a forward-looking statement exists."  *In re Blockbuster Inc. Sec. Litig.*, 2004 WL 884308, at *7 (N.D. Tex. April 26, 2004).

Defendants contend that eight of the alleged misrepresentations are forward-looking statements protected by the PSLRA's safe harbor provision.[30]  (Doc. No. 150, App. C.)  The

---

[30] The misrepresentations Defendants categorize as forward-looking statements are Misrepresentation Nos. 3 (Compl. ¶ 261), 5 (*Id.* ¶ 264), 14 (*Id.* ¶ 281), 15 (*Id.* ¶ 283), 25 (*Id.* ¶ 302), 32 (*Id.* ¶ 319), 34 (*Id.* ¶ 322), and 35 (*Id.* ¶ 324).

Court has already determined that six of the eight statements Defendants identify as forward-looking are not actionable.  *See supra* Section I.D.1.  In addition, while the two remaining statements Defendants list—those contained in the 2008 Strategy Presentation and BP's 2009 Annual Report, Form 20-F—are part of the documents containing actionable misrepresentations, the portions Defendants contend are forward-looking are not the actionable portions of the documents.  *See supra* Section I.D.1.i.  Thus, because the statements Defendants identify as forward-looking do not contain actionable misrepresentations, the Court need not consider whether the statements are protected under the PSLRA's safe harbor provision.

### 4.  *Plaintiffs Have Adequately Pleaded Scienter Against Some of the Individual Defendants*

To adequately plead scienter and survive Defendants' motion to dismiss, the Complaint must state with particularity enough facts to raise an inference of scienter on the part of at least one Individual Defendant with regard to at least one allegedly fraudulent statement, and that inference must be such that a reasonable person would conclude that it is at least as compelling as any opposing inference. *See Tellabs*, 155 U.S. at 326; *Shaw Group*, 537 F.3d at 533–34.  "The critical issue in a motion to dismiss based on insufficient allegations of scienter is whether the allegations of fraud contained in a plaintiff's complaint are sufficiently connected to each of the defendants such that a strong inference of scienter on their part is appropriate."  *In re Franklin Bank*, 782 F. Supp. 2d at 387.  Thus, the Court must consider whether Plaintiffs have satisfied the heightened pleading requirements for proving scienter for each allegedly fraudulent misrepresentation as to each Individual Defendant.

Defendants take issue with Plaintiffs' repeated "group pleading," *i.e.*, that the Complaint references "Defendants," "BP," "BP managers," or "BP leadership," rather than specifically alleging actions or omissions attributable to each named defendant.  (Doc. No. 150, at 37–38.)

Because the Fifth Circuit has rejected the group pleading approach, Plaintiffs must "distinguish among defendants and allege the role of each with respect to 'each act or omission' in the alleged fraud." *In re TETRA Techs.*, No. 4:08-cv-0965, 2009 WL 6325540, at *3 (S.D. Tex. 2008); *see also Shaw Group*, 537 F.3d at 533 (rejecting the group pleading approach to scienter in the Fifth Circuit). While Plaintiffs frequently present only what "BP" allegedly knew in their factual allegations, Plaintiffs do tether the majority of the alleged misrepresentations and omissions they identify to one or more of the Individual Defendants and name the specific speaker or responsible party. Therefore, although the Court must disregard group pleaded allegations in the Complaint, Plaintiffs have distinguished among the roles of each Individual Defendant to a sufficient degree to require this Court to undertake scienter analysis with respect to each Individual Defendant.

Plaintiffs name ten Individual Defendants. Defendants argue that Plaintiffs have not made individualized scienter allegations as to six of them: Browne, Conn, Dudley, Grote, Hayward, and Rainey. With respect to the other four defendants—Inglis, McKay, Suttles, and Malone—Defendants contend that the scienter allegations are inadequate. The Court addresses scienter with respect to each Individual Defendant separately below.[31]

### a. McKay

McKay has served as Chairman and President of BP American since January 2009. (Compl. ¶ 39.) In 2007, McKay worked as the Senior Group Vice President of BP and Executive Vice President of BP America. (*Id.*) According to Plaintiffs, these positions made McKay responsible for BP's negotiations on the settlements in both the Texas City and Prudhoe

---

[31] In their response to the motion to dismiss, Plaintiffs make additional scienter allegations. Specifically, Plaintiffs allege that Hayward, Conn, and Inglis "reviewed copious information relating to safety deficiencies through their membership on the Group Operations Committee ("GORC")." (Doc. No. 186, at 29.) Because Plaintiffs did not include any mention of the GORC in their Complaint, the Court does not consider this information in its scienter analysis.

Bay incidents.  (*Id.*)  Plaintiffs also allege that McKay communicated with the BP Ombudsman, Judge Sporkin, regarding the concerns an EPA attorney, Jeanne Pascal, expressed about BP's operations.  (Compl. ¶ 133.)  Defendants concede that Plaintiffs did assert individualized allegations of scienter against McKay, but claim that such allegations are inadequate.  (Doc. No. 150, at 43.)

McKay is alleged to have made two of the forty-six misrepresentations identified in the Complaint, one in his testimony before the U.S. House of Representatives in February 2009, and another at the Howard Weil Conference in New Orleans in March 2009.  (Misrep. Nos. 23 & 27; Compl. ¶¶ 297–99, 308–09.)  Because the Court has already determined above that the two alleged misrepresentations attributable to McKay are not actionable, Plaintiffs cannot demonstrate scienter as to Defendant McKay.  *See Blackwell*, 440 F.3d at 287 (explaining that a complaint must specifically tie individual defendants to the statements or omissions, or it will fail under the PSLRA's heightened pleading standard.).  The Court therefore dismisses Plaintiffs' claims against McKay.

### b.   Conn

Defendant Conn is BP's Chief Executive for BP Refining and Marketing, and he also serves as a member of BP's executive management.  (Compl. ¶ 42.)  Conn is alleged to have participated in three separate strategy presentations made to investors, one in February 2008 (Misrep. No. 14; Compl. ¶ 281), one in March 2009 (Misrep. No. 24; Compl. ¶ 300–01), and one in March 2010 (Misrep. No. 34; Compl. ¶ 322–23).  The Court has determined above that two of these presentations contained no actionable misrepresentations.  The only remaining actionable misrepresentation is contained in the February 2008 Strategy Presentation conference call with investors, in which Conn is alleged to have participated.   (Misrep. No. 14; Compl. ¶ 281.)

Plaintiffs identify some specific statements made by Defendants Hayward and Inglis during the call, but they tie no specific statement to Conn. (*Id.*)  The only actionable misrepresentation is contained in the portion of the call transcript attributed to Hayward; the remaining unattributed section contains no actionable misrepresentation. (*Id.*)  Because Plaintiffs' allegation that Conn participated in the call is insufficient to connect him to any actionable misrepresentation, the Court dismisses Plaintiffs' claims against Conn.

### c.  Grote

Defendant Grote is BP's CFO.  He has held the position since 2002 and, in addition, has served as one of BP's directors since 2000.  (Compl. ¶ 40.)  Plaintiffs link Defendant Grote to seven of the alleged misrepresentations.  Only one statement is attributed to Grote individually. With respect to all of the others, Grote is alleged to have participated on conference calls with investors (Misrep. Nos. 2, 14; Compl. ¶¶ 258, 281) or signed BP's public filings in his capacity as CFO (Misrep. Nos. 5, 15, 25, 35; Compl. ¶¶ 264, 283, 302, 324).  The one misrepresentation attributed to Grote individually was also part of a conference call that took place in April 2007. (Misrep. No. 7, Compl. ¶ 267.)  Following this Court's analysis above, only two of the alleged misrepresentations involving Defendant Grote are actionable, Misrepresentations 14 and 35.  *See supra* Section I.D.1.a.

Misrepresentation 14 is contained in a strategy presentation made during a conference call in which Grote, along with Hayward, Inglis, Dudley, and Conn, allegedly participated. Plaintiffs identify some specific statements made by Defendants Hayward and Inglis during the call, but they tie no specific statement to Grote.  (Compl. ¶ 281.)  The only actionable misrepresentation is contained in the portion of the call transcript attributed to Hayward; the

remaining unattributed section contains no actionable misrepresentation.[32]   (*Id.*)   Plaintiffs'
allegation that Grote generally participated in the call is insufficient to connect him to this
misrepresentation.

Misrepresentation 35 refers to statements in BP's 2009 Annual Report, Form 20-F, which
BP filed with the SEC on March 5, 2010.  (*Id.* ¶ 324.)  Corporate officers such as Grote cannot
be liable for allegedly fraudulent statements solely because of their positions at BP.  *See*
*Southland*, 365 F.3d at 364–65.  Corporate statements can, however, be tied to directors and
officers if plaintiffs allege that the officer or director signed the document containing the
statements or allege their involvement in creating the documents.  *Blackwell*, 440 F.3d at 287;
*see also Southland*, 365 F.3d at 365 (explaining that a corporate officer can be connected to an
unattributed corporate document by pleading a signature on the document or "particular factual
allegations explaining the individual's involvement in the formulation of either the entire
document, or that specific portion of the document, containing the statement").  Plaintiffs have
alleged that Grote signed the Annual Report.[33]   (Compl. ¶ 324.)  Because the Complaint pleads
that Grote signed the Annual Report, the allegedly fraudulent statements in the Form 20-F can be
attributed to him.  However, connecting the statement to Grote does not answer the question of
whether Plaintiffs have adequately pleaded scienter on the part of Grote with respect to the 2009
Annual Report.

---

[32] Plaintiffs also identify an additional statement made by Grote in an October 2007 conference call.  According to
Plaintiffs, Grote told analysts that plans to reorganize the company were "designed to simplify the organization and
improve productivity and accountability, bringing up operating units to enable them to focus on safe, reliable, and
profitable operations."  (Compl. ¶ 115.)  However, Plaintiffs do not identify this statement in the section of their
Complaint devoted to misrepresentations and omissions and, therefore, the Court does not consider it.

[33] Plaintiffs did not attach a copy of BP's 2009 Annual Report to their Complaint, but the Court takes judicial notice
of the contents of this publicly filed document.  *See* BP's 2009 Form 20-F, Exhibit 13 (Certificates Certification),
*available  at:  http://www.sec.gov/Archives/edgar/data/313807/000095012310021364/u08439exv13.htm*; *see  also*
*Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1018 & n. 1 (5th Cir. 1996) (explaining that, in securities cases,
courts may take judicial notice of the contents of public disclosure documents that the law requires to be filed with
the SEC.  While Defendants did attach the 2009 Form 20-F as an exhibit to their motion to dismiss, they did not
include the certification page relevant for the Court's scienter analysis.  (Doc. No. 150, Ex. G).

In alleging that Grote signed BP's Annual Report, Plaintiffs are referring to the certification furnished pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), which requires senior executives of public companies to certify the accuracy of quarterly and annual financial reports. *See* 15 U.S.C. § 7241(a). But a SOX certification, standing alone, is not indicative of scienter. The Fifth Circuit has made clear that "a Sarbanes-Oxley certification is only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements." *Shaw Group*, 537 F.3d at 545 (quoting *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006)). "There must be, in other words, facts establishing that the officer who signed the certification had a reason to know, or should have suspected, due to the presence of . . . 'red flags,' that the financial statements contained material misstatements or omissions." *Id.* (internal quotation marks omitted). Although the Complaint nominally pleads that "Defendants" and "BP" were aware of BP's failure to make progress on process safety following issuance of the Baker Report, not one of the statements listed in the Complaint to demonstrate this knowledge is attributed to Grote specifically. Instead, the Complaint merely states that Grote, as a member of BP's executive management, was "responsible for the day-to-day running of BP." (Compl. ¶ 40.) The Complaint pleads no facts to support this allegation. *See In re Franklin Bank*, 782 F. Supp. 2d at 376 ("Conclusory allegations that a defendant 'should have known' about internal corporate problems based merely on his position or status within the corporation will not suffice to establish scienter."). Accordingly, Plaintiffs' allegation that Grote committed securities fraud with respect to the 2009 Annual Report fails to adequately plead scienter under the heightened pleading requirements of Rule 9(b) and the PSLRA. The Court therefore dismisses Plaintiffs' claims against Grote.

#### d.  Browne

Browne served as BP's CEO from 1995 until April 2007, when he was succeeded by Hayward.  (Compl. ¶¶ 18, 37.)  Browne worked for BP for less than four months of Plaintiffs' three and a half year Class Period.  Plaintiffs attribute five misrepresentations to Browne. (Misrepresentation Nos. 1–5, Compl. ¶¶ 256–65.)  Because the Court has found that all five of the misrepresentations are not actionable, Plaintiffs cannot adequately plead scienter with respect to Browne.  *See supra* Section I.D.1.a.  Accordingly, the Court dismisses Plaintiffs' claims against Browne.

#### e.  Rainey

Rainey is BP's Vice President of Exploration for the Gulf of Mexico.  Plaintiffs allege that Rainey made one of the forty-six misrepresentations identified in the Complaint. Specifically, Plaintiffs point to testimony Rainey gave before the U.S. Senate Committee on Energy and Natural Resources on November 19, 2009.  (Compl. ¶ 316.)  The Court determined above that the actionable portion of Rainey's testimony relates to Rainey's representation that BP's production facilities had the necessary contingency plans in place to respond to incidents. *See supra* Section. I.D.1.b.  By identifying specific portions of Rainey's testimony, Plaintiffs have adequately attributed an actionable misrepresentation to him.  However, the Court must still determine whether Plaintiffs have adequately pleaded scienter on the part of Rainey with respect to the alleged misrepresentation.

In this Court's determination, Plaintiffs have failed to do so.  The Complaint alleges that Rainey misrepresented BP's true risk profile by failing to disclose prior safety failures and problems revealed in BP's audit of the Deepwater Horizon, misrepresented the BOP's system of safety controls while failing to disclose that BP had removed redundant systems, and falsely

represented that BP could conduct safe operations when BP did not have adequate controls in place. (Compl. ¶¶ 318(c)-(e).) Yet the Complaint pleads no facts to support Rainey's knowledge of any of these facts.[34]

Instead, the Complaint merely states that Rainey, as a member of BP's executive management, was "responsible for the day-to-day running of BP." (*Id.* ¶ 40.) No facts are given in support of this conclusion. Because "[c]onclusory allegations that a defendant 'should have known' about internal corporate problems" based solely on his position within the company are insufficient to establish scienter, Plaintiffs' have not adequately pleaded scienter with respect to Rainey under the heightened pleading requirements of Rule 9(b) and the PSLRA. *See In re Franklin Bank*, 782 F. Supp. 2d at 376. The Court therefore dismisses Plaintiffs' claims against Rainey.

### f.   Inglis

Inglis was BP's Chief Executive of Exploration and Production and an executive director from February 2007 until October 2010. (Compl. ¶ 38.) Plaintiffs attribute six alleged misrepresentations to Inglis. (Misrep. Nos. 9, 14, 24, 34, 36 & 37; Compl. ¶¶ 271, 281, 300, 322, 326–329.) Following the Court's analysis above, only one of the misrepresentations Plaintiffs attribute to Inglis is actionable. (Misrep. No. 14; Compl. ¶ 281.)

The actionable statement, Misrepresentation 14, is contained in a strategy presentation made during a conference call in which Inglis, along with Hayward, Grote, Dudley, and Conn,

---

[34] At oral argument, Plaintiffs referenced, for the first time, additional allegations of scienter with respect to the post-spill statements. Specifically, Plaintiffs asserted that Rainey acted as Suttles' "right-hand man" in BP's spill response efforts. Rainey apparently worked as "BP Deputy Incident Commander from the Unified Area Command." (Transcript, Doc. No. 305, at 64, lns. 23-25). Plaintiffs claimed that, since the filing of the Complaint, they have obtained "absolutely clear evidence, deposition testimony from Mr. Suttles and Mr. Rainey, that Mr. Rainey was delegated by Mr. Suttles to prepare these spread flow worksheets every day and prepared multiple ones every day. He spoke twice on the phone with Suttles and others every day." (*Id.*, at 73, lns. 5-9). Plaintiffs alleged no post-spill misrepresentations attributed to Defendant Rainey in the Complaint and the Court will not consider any of the additional information provided for the first time during oral argument.

allegedly participated.  (Compl. ¶ 281.)  Plaintiffs identify as misrepresentations one specific statement made by Inglis and two made by Hayward during the call.  (*Id.*)  However, the only actionable misrepresentation is contained in the portion of the call transcript attributed to Hayward; the remaining unattributed section contains no actionable misrepresentation.  (*Id.*)  Because Plaintiffs have identified no actionable misrepresentations attributable to Defendant Inglis, Plaintiffs cannot adequately plead scienter with respect to Inglis.  The Court therefore dismisses Plaintiffs' claims with respect to Inglis.[35]

### g.  Hayward

Hayward was BP's CEO from May 2007 until October 2010.  (Compl. ¶ 36.)  Before assuming the position of CEO, Hayward was CEO of BP's Exploration and Production business segment, which "oversees exploration and drilling in the Gulf of Mexico, among other places." (*Id.*)  He also served as an executive director from 2003 until November 2010.  (*Id.*)  Plaintiffs portray Hayward as the driving force behind BP's campaign to "turn the corner on safety," and they attribute more of the alleged misrepresentations to Hayward—nineteen out of the total forty-six—than to any other Individual Defendant.  The Court has determined that nine of the nineteen statements attributable to Hayward are actionable.  *See supra* Section I.D.1.  The actionable misrepresentations include: statements made by Hayward at the Houston Forum in 2007 (Misrep. No. 11; Compl. ¶ 275); portions of BP's 2007 Annual Review, which Hayward signed (Misrep. No. 12; Compl. ¶ 278); statements attributed to Hayward from a 2008 Strategy Presentation conference call with investors (Misrep. No. 14; Compl. ¶ 281) and the 2009 General Meeting (Misrep. No. 28; Compl. ¶ 310); a speech Hayward gave during BP's 2008 Annual

---

[35] Defendants argue that Plaintiffs' one specific scienter allegation with respect to Inglis—that former BP employee Kevin Lacy communicated concerns about safety protocols in BP's drilling practices to Inglis—is insufficient to allege scienter.  Because there are no actionable misrepresentations or omissions attributed to Defendant Inglis, the Court need not determine the adequacy of the scienter allegation.

General Meeting (Misrep. No. 16; Compl. ¶ 285); a speech Hayward gave at the HRH Prince of

Wales 3rd Annual Accounting for Sustainability Forum in December 2008 (Misrep. No. 18;

Compl. ¶ 289); statements in BP's 2009 Annual Report (Misrep. No. 35; Compl. ¶ 324); a

speech at the Peterson Institute for International Economics in Washington, D.C. in March 2010

(Misrep. No. 38; Compl. ¶ 330); and post-spill estimates of the spill rate Hayward gave during

interviews following the Deepwater Horizon incident (Misrep. No. 45; Compl. ¶ 353).  Aside

from the one post-spill statement, all of the actionable misrepresentations Plaintiffs attribute to

Hayward involve Hayward's representations that BP was making progress in addressing the

recommendations of the Baker Panel Report and improving its process safety systems following

the Texas City incident.

Defendants claim Plaintiffs have failed to adequately plead scienter with respect to

Hayward.  They have not.  Plaintiffs adequately allege scienter with respect to Hayward by

pointing to Hayward's own admissions as to what his job as CEO entailed, including verbal

commitments revealing that he took responsibility for BP's process safety efforts and was the

key individual tracking that progress.  From the very beginning, when he succeeded Browne as

CEO in May 2007, Hayward committed to "focus on safety like a laser."  (Compl. ¶ 18.)  As

outgoing CEO, Browne, too, stated that Hayward intended to "take a lead . . . by championing

process safety."  (*Id.* ¶ 75.)  As CEO, Hayward implemented an "Operations Academy," a safety

course for BP executives.  (*Id.* ¶ 20–21.)  Hayward attended the Operations Academy and took

coursework specifically focused on process safety.  (*Id.*)  Hayward claimed he was following the

implementation of BP's OMS program and repeatedly mentioned the Company's goals for the

program.  (*Id.* ¶¶ 104, 279.)  Hayward also had a hand in BP's reorganization efforts; in fact, he

was the first to announce BP's plans to undergo reorganization.  (*Id.* ¶ 115.)  Throughout his

time as CEO, Hayward continued to tout BP's safety improvements, even stating in 2009 that he was "so bored with saying 'safety, people, and performance,' but I have determined that I'm not going to say anything else."  (*Id.* ¶ 254.)  Although not all of the statements are actionable, Plaintiffs point to at least eighteen separate occasions on which Hayward spoke of BP's progress in process safety or its progress as measured since the Texas City accident in 2005.  Hayward's own actions as the spokesperson and champion for BP's reform efforts weigh strongly in favor of the inference that Hayward paid special attention to BP's process safety efforts or, at the least, was reckless in not doing so while continuing to publicly tout improvements.  *See, e.g.*, *In re NetSolve, Inc. Sec. Litig.*, 185 F. Supp. 2d 648, 697 (W.D. Tex. 2001) (finding allegations of scienter adequate where undisclosed problems should have been obvious to the company's high ranking executives); *see also Abrams*, 291 F.3d at 351–54 (explaining that a securities fraud complaint may survive where plaintiffs have "alleged facts demonstrating that defendants failed to review or check information that they had a duty to monitor"); *see also In re Washington Mut., Inc. Sec., Derivative & ERISA Litig.*, 694 F. Supp. 2d 1192, 1209–1210 (W.D. Wash. 2009) (finding a strong inference of scienter pleaded as to statement about risk management where defendant was responsible for overseeing risk management).  The competing inference—that Hayward professed to be focused on process safety but remained unaware of actual process safety concerns in BP's operations on the ground—is far less compelling.

In addition, Hayward acknowledged his failures following the spill.  In November 2010, Hayward confirmed that BP was "making it up day to day" following the Deepwater Horizon spill and had failed to draw up sufficient emergency plans.  (Compl. ¶ 217.)  Hayward also stated during an NPR interview about the spill that, "It is indeed BP's responsibility to deal with this, and we are dealing with it. . . . There is no doubt about that.  It's our responsibility – we accept it

fully." (*Id.* ¶ 350.)  In June 2010, Hayward admitted that it was "an entirely fair criticism" to blame BP for the poor cleanup effort because "[w]hat's undoubtedly true is that we did not have the tools you'd want in your tool kit."  (*Id.* ¶ 360.)  Further, with respect to the post-spill estimates, Hayward later acknowledged, about a month after he provided public estimates, that the volume of oil spilling into the Gulf was far greater than BP's initial statements indicated.  (*Id.* ¶ 372.)

Hayward's admissions of the breakdowns in BP's process safety plans further support the inference that he was aware of inadequacies.  *See*, *e.g.*, *In re Toyota Motor Corp. Sec. Litig.*, No. CV 10-922 DSF, 2011 WL 2675395, at *4 (C.D. Cal. July 7, 2011) (finding that "the defects at issue were simply too significant for it to be plausible that top . . . management was not aware of the possible ramifications of the problem by the time the statements at issue were made."); *see also Plotkin v. IP Axess Inc.*, 407 F.3d 690, 700 (5th Cir. 2005) (explaining that "an egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of recklessness."); *see also In re Enron Corp.*, 2003 WL 2148157 at *3, *15–16 (holding that red flags, along with the defendants' positions within the company, were sufficient to demonstrate scienter).  The "number, size, timing, nature, frequency, and context" of the misrepresentations are all factors that may "shift the balance of the inferences to be drawn from such allegations . . . significantly in favor of scienter."  *In re Fleming Co. Inc. Sec. & Derivative Litig.*, No. MD1530, 2004 WL 5278716, at *11 (E.D. Tex. June 16, 2004).  Mere weeks after assuming the position of CEO, Hayward began promoting BP's efforts to improve its process safety program.  The success of the efforts, in turn, were to determine the success of Hayward's tenure as CEO.  Over the course of the Class Period, Hayward made numerous and frequent statements about BP's progress in the safety arena—so many statements that even Hayward

admitted he got "bored with saying 'safety, people, and performance.'" (Compl. ¶ 254.)  These statements, coupled with Hayward's own representation of his job description and the responsibility he assumed to spearhead BP's safety reform efforts, make him more than a run of the mill corporate officer.[36]  Hayward defined his position as CEO to include a special and targeted focus on process safety.  Taking him at his own word, the Court finds that Plaintiffs have sufficiently pleaded scienter with respect to Hayward.[37]

### h.  Malone

Malone was Chairman and President of BP America from July 2006 until February 2009, and Executive Vice President of BP until March 2009.  (Comp. ¶ 45.)  Plaintiffs tie Malone to two of the forty-six alleged misrepresentations.   One of the alleged misrepresentations by Malone occurred during his testimony before the U.S. House of Representatives in May 2007.  (Misrep. No. 8; Compl. ¶ 269.)  The second is found in a transcript of a BP press release issued in October 2007.   (Misrep No. 10; Compl. ¶ 273–74.)   The first statement allegedly falsely represented that BP did not take retaliatory action against employees who reported safety concerns; the second statement concerned BP's progress in safety following the Texas City and Prudhoe Bay incidents.   The Court has already determined that both of these misrepresentations are actionable.   However, the Court must still determine whether Plaintiffs have adequately alleged scienter with respect to these actionable misrepresentations.

---

[36] In their briefing, Plaintiffs argue that the timing of Hayward's resignation, in October 2010, provides an additional indicia of scienter.  While true that a forced departure is "another factor supporting a strong inference of scienter," the Court does not find that Plaintiffs have alleged a forced resignation with respect to Hayward.  *Kaltman v. Key Energy Servs.*, 447 F. Supp. 2d 648, 664 (W.D. Tex. 2006).  The Complaint merely states that Hayward held the position of CEO from May 2007 until October 2010.  (Compl. ¶ 36.)  Plaintiffs have pleaded no facts to support their suggestion that Hayward's resignation was forced.  Therefore, the Court does not consider this allegation as providing further support for Plaintiffs' scienter argument.

[37] For the same reasons discussed below with respect to Defendant Suttles, the Court finds that there is also scienter with respect to Hayward's post-spill statement providing lower estimates to the public than those BP actually possessed.  *See infra* Section I.D.4.j.

During his testimony before Congress, Malone claimed that BP did not retaliate against workers.  (Compl. ¶ 269.)   In support of scienter, Plaintiffs allege that Malone had direct knowledge of concerns over BP's retaliation against employees through communications Malone had with BP's Ombudsman, Judge Sporkin.  (*Id.* ¶ 146.)   The fact that Malone allegedly possessed direct knowledge of retaliation would be evidence of scienter with respect to Malone's representations to the contrary *if* Plaintiffs had alleged that Malone possessed such knowledge when he made the statement.  *See In re Entrust Sec. Litig.*, No. 2:00CV119, 2002 WL 31968321, at *5 (E.D. Tex. Sept. 30, 2002) (finding no scienter where "plaintiffs have pleaded no specific facts that indicate at the time the alleged [misrepresentations] were made, the defendants had actual knowledge of contradictory facts").  Malone testified before Congress in May 2007.  (*Id.* ¶ 269.)  Malone is not alleged to have received information from the Ombudsman contradicting his representation until 2008.  (*Id.* ¶ 146.)  Because "[a] plaintiff cannot charge a defendant with intentionally misleading investors about facts the defendant may have become aware of *after* making an allegedly misleading statement," the knowledge Malone allegedly gained in 2008 cannot support Plaintiffs' allegation of scienter as to his 2007 statement.  *In re Franklin Bank*, 782 F. Supp. 2d at 376; *see also Plotkin v. IP Axess Inc.*, 407 F.3d 690, 698 (5th Cir. 2005).

Misrepresentation 10 relates to BP's progress in the area of process safety following the Texas City and Prudhoe Bay incidents.  (Compl. ¶ 273.)  Plaintiffs only allegation of scienter relates to Malone's knowledge of retaliation and does not demonstrate that Malone was aware of any of BP's failures to implement adequate safety protocols in the Gulf.  Because Plaintiffs have merely alleged that Malone "served on BP's executive management team" and, as a result, was "responsible for the day-to-day running of BP," their scienter allegations are insufficient to meet

the heightened pleading standard required under Rule 9(b) and the PSLRA.  The Court therefore dismisses Plaintiffs' claims with respect to Malone.

### i.  Dudley

Dudley is BP's Group Chief Executive but has only held the position since October 2010.  (Compl. ¶ 44.)  He has also served as an executive director since April 2009.  (*Id.*)  Plaintiffs attribute three of the alleged misrepresentations to Dudley.  With respect to the first two misreprsentations, Plaintiffs allege that Dudley participated in two conference calls with investors, one in February 2007 and the other in February 2008.  (Misrep. Nos. 2 & 14; Compl. ¶¶ 258, 281.)  The Court has already determined, above, that statements that were made during the February 2007 call are not actionable.  *See supra* Section I.D.1.a.  With respect to the conference call in February 2008, Plaintiffs attribute no specific statements to Dudley; instead, they simply allege that he "participated" in the call.  (Compl. ¶ 281.)  However, Plaintiffs fail to explain how Dudley could have participated in this particular call when he did not join BP's executive management team until April 2009, over a year after the call took place, and did not assume his current position of Group Chief Executive until October 2010, over two and a half years after the call took place and almost five months after the Class Period ended.  (*Id.* ¶ 44.)  Plaintiffs thus fail to adequately attribute this second misrepresentation to Dudley.

The remaining actionable misrepresentation relates to a speech Dudley gave at the Chief Executives' Club in Boston, Massachusetts following the Deepwater Horizon spill.  (Misrep. No. 46; Compl. ¶ 355.)  During the speech, Dudley allegedly portrayed the Deepwater Horizon's safety record in a false light and claimed that the rig underwent regular inspection and testing.  (*Id.*)  As discussed above, Plaintiffs alleged sufficient facts to call into question the truth of this statement; they fail, however, to adequately allege scienter.

Plaintiffs claim that Dudley failed to disclose "problems dating back to the 2005 audit of the Deepwater Horizon's BOP," removal of the second blind shear ram on the BOP, and intentional delays and postponement of routine inspections of the Deepwater Horizon's BOP. (Compl. ¶¶ 356(a)-(e).)  The Complaint nominally pleads these facts, but does not explain how this knowledge is attributable to Dudley.  Instead, the Complaint merely states that Dudley was a "member of BP's executive management" and, therefore, was "responsible for the day-to-day running of BP." (*Id.* ¶ 44.)  Yet Plaintiffs do not allege that Dudley joined BP's executive management until April 2009, years after the BOP audit (in 2005) and the removal of the second blind shear ram (in 2004). (*Id.* ¶¶ 61, 94.)  Plaintiffs' broad, conclusory allegations as to Dudley, based solely on his position within BP, are insufficient to meet the heightened pleading standard enumerated under Rule 9(b) and the PSLRA. *See*, *e.g.*, *Shaw Group*, 537 F.3d at 535 (explaining that pleadings of scienter may not rest on the inference that a defendant must have been aware of a fraudulent statement based on his position in the company).  The Court therefore dismisses Plaintiffs' claims with respect to Dudley.

### j.  Suttles

Suttles was BP's Chief Operating Officer for Exploration and Production from January 2009 until at least January 2011" (Compl. ¶ 41.)  Plaintiffs have adequately alleged actionable misrepresentations attributable to Suttles with respect to two post-spill statements presenting spill estimates lower than the estimates BP actually possessed. (Misrep. Nos. 42–43; Compl. ¶¶ 342–344.)  Plaintiffs allege scienter with respect to Suttles by claiming that he was in possession of the two internal BP documents providing different, and higher, spill estimates than those that Suttles gave to the public. (*Id.* ¶ 346.)  Suttles was "the top BP official co-managing the 45,000-person spill response with the Coast Guard." (Doc. No. 220, at 23.)  Defendants contend that,

based on Suttles' position as head of BP's spill response team, it is conceivable that he was unaware of particular estimates at any particular time.  (*Id.*)  Plaintiffs argue the opposite: that it is inconceivable that Suttles, who led BP's media response effort after the oil spill, would not have known of "BP's very *own estimates* of the flow rate."  (Doc. No. 186, at 36.)  Plaintiffs' argument is more persuasive here.  *See*, *e.g.*, *see also Abrams*, 291 F.3d at 351–54 (explaining that a securities fraud complaint may survive where plaintiffs have alleged facts demonstrating that defendants failed to review or check information that they had a duty to monitor); *see also In re Washington. Mut., Inc.*, 694 F. Supp. 2d at 1209–1210 (finding a strong inference of scienter pleaded as to statement about risk management where defendant was responsible for overseeing risk management).

Review of the complete transcript of Suttles' interview on The Early Show, the interview alleged to contain one of the misrepresentations, suggests that Suttles indeed was aware of the internal BP documents when he gave the public an estimate of only 1,000 barrels.  The relevant portion of the interview from April 29, 2010, reads as follows:

> MAGGIE RODRIGUEZ: Thank you sir.  This morning, we're learning that the leak from the well is five times worse than originally estimated.  Yet, we just heard you say in our report that you don't believe this will change the amount that's estimated to be released in to the ocean.  I'm not an expert.  But how is it possible that four thousand additional gallons leaking a day does not change the equation?

> DOUG SUTTLES: Well, Maggie. Let me—let—first, as you probably say, just like everybody, you know, our—our real focus and what we want to occur is to stop this leak as quick as we can. . . . But I should probably explain that on the— the difference between one and five thousand barrels a day and—and what we tried to explain is that, what we're seeing through the remote-operated vehicle cameras on the floor hasn't actually changed. . . . We think that the range has increased of what the estimate has been.  So, I think that somewhere between one and five thousand barrels a day is probably the best estimate we have today.

> MAGGIE RODRIGUEZ: It's a big difference though between one and five, isn't it?

> DOUG SUTTLES: Well it clearly is.  Clearly there's—there's a difference between one and five.  But in terms of our response, it actually doesn't change.  Our spill plan actually recognized these amounts and actually what we're going to do out—out in the field, out on the surface of the sea actually doesn't change based on that number.

(Doc. No. 150-30, Ex. Z.)  Suttles's interview suggests that he was indeed aware of BP's estimate amounts, even though in his opinion they did not affect BP's response efforts.  Additionally, Suttles's responses—all professing a clear knowledge of the estimates and the rationale behind the estimates—belie Defendant's suggestion that, as head of BP's spill response team, Suttles would be unaware of BP's own estimates.

The inference of scienter "need not be irrefutable, i.e., of the 'smoking-gun' genre." *Tellabs*, 155 U.S. at 324.  In determining whether the inference of scienter is cogent and compelling, the Court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff.  *Id.*  BP's internal document dated April 27, 2010, provided three different estimates for the spill rate: a low of 1,063 barrels per day, a best estimate of 5,758 barrels per day, and a high estimate of 14,266 barrels per day.  (Doc. No. 150-28, Ex. X.)  Even BP's very first internal estimate, available on April 26, 2010, gave an estimate of "roughly 5000" barrels per day.  (Doc. No. 150-27, Ex. W.)  Despite these two documents, Suttles gave an estimate of 1,000 barrels on April 28, 2010.  (Compl. ¶ 342.)  On April 29, two days after the BP document containing the low, best, and high estimates was created, Suttles provided the public with a "best estimate" of "somewhere between one and five thousand barrels a day."  (*Id.* ¶ 344.)

Defendants argue that Suttles "acknowledged that the flow rate . . . could be 5,000 barrels a day" and claimed that the difference between a best estimate of 5,000 barrels per day and 5,758 barrels per day is "not material enough."  (Transcript, Doc. No. 305, at 50, lns. 11–12, 25.)  The

Court disagrees, and, further, finds that Plaintiffs have adequately alleged scienter with respect to Suttles. BP's share prices began to drop the day after the Deepwater Horizon explosion. On April 26, share prices fell more than 3%. (Compl. ¶ 340.) On April 27, they fell 5%. (*Id.*) On April 29, share prices fell almost 7%. (*Id.* ¶ 345.) By April 30, shares had fallen another 4%. (*Id.* ¶ 350.) Suttles appeared before the press on April 27, April 28, April 29, May 3, and additional days thereafter.

Considering the circumstances *in toto*, the Court finds that the stronger inference is that Suttles, the representative at the head of BP's spill response team tasked with interfacing with the press, was acutely aware of BP's spill estimates and the market's reaction to the increasing uncertainty shrouding the potential for a successful recovery. There is no equally strong competing inference to explain why Suttles repeatedly gave a lower "best estimate" than the estimates BP itself prepared. Plaintiffs have alleged that Suttles was head of BP's oil spill response team and that BP had prepared its own internal estimates that provided a spill range with a worst-case ceiling of more than double what Suttles announced to the public. Here—where every passing second affected (and increased) the total damage to the Gulf—Plaintiffs have alleged facts sufficient to establish that Suttles intended to deceive investors, or was at the very least reckless, in revealing a much lower spill estimate than BP actually possessed at the time of Suttles's public statements.[38]

---

[38] The Court is cognizant of the fact that Plaintiffs have included other allegations of scienter with respect to Defendant Suttles as well, such as Suttles' early retirement, his communications with EPA Debarment Counsel Jeanne Pascal, and post-spill findings by the Presidential Commission. (Compl. ¶¶ 41, 133, 217, 245.) Because the Court finds that the facts discussed above sufficiently support Plaintiffs' scienter allegations with respect to Suttles, the Court does not address any additional support the other facts may provide.

### 4.  *Plaintiffs Have Adequately Pleaded Scienter Against the Corporate Defendants*

Turning to the potential section 10(b) liability of BP itself, the Court can treat as having been made by BP all the actionable misrepresentations contained in SEC filings, press releases, and other reports issued in BP's name because all of the Individual Defendants were executive officers of the Company whose actions were intended to benefit the Company.  *See Southland*, 365 F.3d at 366.  In addition, all misrepresentations attributable to Individual Defendants are also treated as having been made by BP, as "all of them appear from the face of the Complaint to have been made pursuant to their positions of authority within the company."  *Id.*  Thus, the actionable misrepresentations discussed above that are attributable to Hayward and Suttles are sufficient to give rise to an inference of scienter with respect to BP.

However, the Court must still determine whether Plaintiffs have adequately alleged scienter for the remaining corporate statements not attributed to any Individual Defendant.  The unattributed statements appear in BP's 2006 Sustainability Report (Compl. ¶ 266), BP's 2009 Sustainability Review (Compl. ¶ 334), portions of BP's four Annual Reviews published between 2006 and 2009 that are not signed by or connected to any Individual Defendant (Compl. ¶¶ 261, 277–278, 294, 319), and the two press releases issued by BP on April 21, 2010 (Compl. ¶ 337). The Court has already determined that the statement in the 2006 Sustainability Report is the only actionable misrepresentation attributed to BP alone.

In addition, three of the remaining actionable misrepresentations are attributed to non-defendants; these include the IEP, Regional OSRP, and a presentation given at the Microsoft Global Energy Forum in 2009.  (Compl. ¶¶ 291, 304–06, 314.)  The IEP for the Macondo well identifies a "contact person" named Scherie Douglas of BP Exploration & Production, Inc. (Doc. No. 150, Ex. DD.)   The Regional OSRP lists Dan R. Replogle, "GoM EMS Mgmt

110

Representative," as the "Authority," Earnest Bush, "Environmental Coordinator," as the "Custodian," and Kristy McNease, "GoM HSSE Document Mgmt Administrator," as the "Document Administrator." (*Id.*, Ex. T.)  The February 2009 presentation to the Microsoft Global Energy Forum was made by Danny Williams, "BP Business Information Manager." (*Id.*, Ex. DD.)

In order to adequately plead scienter as to a corporate defendant, Plaintiffs must link the statement to a corporate officer who can be seen as acting on behalf of the corporation in making the statement.  *Southland*, 365 F.3d at 366 ("A defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter, i.e., knows that the statement is false, or is at least deliberately reckless as to its falsity, at the time he or she makes the statement.").  General common law principles support the logic in circumscribing corporate scienter.  Because "an essentially subjective state of mind" is an element of a cause of action for fraud, "the required state of mind must actually exist in the individual making (or being a cause of the making of) the misrepresentation," and may not simply be imputed to the corporation on general principles of agency.  *Id.*; *see also Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 707 (7th Cir. 2008) ("*Tellabs II*") ("The problem with inferring a collective intent to deceive behind the act of a corporation is that the hierarchical and differentiated corporate structure makes it quite plausible that a fraud, though ordinarily not a deliberate act, could be the result of a series of acts none of which was done with scienter and imputable to the company by the doctrine of respondeat superior.").

The Seventh Circuit recently outlined the only way around this dead-end for unattributed corporate statements, hypothesizing that "it is possible to draw a strong inference of corporate

scienter without being able to name the individuals who concocted the fraud." *Tellabs II*, 513 F.3d at 710.  By way of example, the *Tellabs II* court cited a hypothetical announcement by General Motors that it had sold one million SUVs in a given year when it had in fact sold zero. *Id.*  Subsequent courts to have considered application of this potential roundabout have underscored that it is narrow indeed.  *See*, *e.g.*, *In re Dell Sec. Litig.*, 591 F. Supp. 2d 877, 899 (W.D. Tex. 2008) (noting that "the situation envisioned by the [Tellabs] court was one where the false or misleading announcement was so dramatic [it] would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false.") (citation omitted) (internal quotation marks omitted).

The only two statements that could possibly surmount *Tellab II*'s standard are those contained in the IEP and the Regional OSRP.  In examining corporate scienter with respect to these statements, the "critical question, therefore, is how likely is it that the allegedly false statements . . . were the result of merely careless mistakes at the management level based on false information fed it from below, rather than of an intent to deceive or a reckless indifference to whether the statements were misleading."  513 F.3d at 709.  In this Court's opinion, it is a close call indeed.  On the one hand, the errors contained in the IEP and the Regional OSRP are glaring and egregious.  The Regional OSRP estimated the worst case discharge scenario for a spill in the Gulf at between 28,033 barrels of oil per day up to 250,000 barrels per day.  (Compl. ¶ 156.)  The IEP estimated the worst case scenario of a spill occurring in the Mississippi Canyon Block 252 specifically at 162,000 barrels per day.  (*Id.* ¶ 158.)  The Regional OSRP explicitly stated that BP and its contractors could recover approximately 491,721 barrels of oil per day, or more than 20.6 million gallons.  (*Id.* ¶ 156.)

112

The difference between what BP was actually able to recover and what it claimed it could recover is so great that the projected numbers in the IEP and the Regional OSRP appeared to have been invented out of thin air.  Over the course of the spill, over four million barrels of oil, or more than 206 million gallons, spilled into the Gulf at a rate of about 60,000 barrels per day.  (*Id.* ¶ 5.)  By June 18, 2010, forty-nine days after the explosion, BP's recovery operation was collecting only 15,000 barrels of oil per day.  (*Id.* ¶ 243.)  Despite BP's claims that it could recover nearly 500,000 barrels of oil per day, its "oil-spill removal organizations were quickly outmatched," even though the actual spill amount was almost a third less than what BP predicted as a worst case scenario for the Mississippi Canyon Block and eight times less than what BP said it could recover in the Gulf.  (*Id.* ¶ 218.)  In *Tellabs II*, the Seventh Circuit contemplated a ratio of one million to zero as an example of a falsity so egregious as to give rise to scienter even for an unattributed corporate statement.   513 F.3d at 710.  Here, BP claimed it could recover 491,721 barrels of oil per day when it could recover only 15,000.  Taking into consideration the added gravity of the fact that the numbers here refer to barrels of oil being spilled into an ocean as opposed to SUV production (the hypothetical in *Tellabs II*), the erroneous estimates climb very close to—if not exceed—the extraordinary nature of the facts envisioned by the Seventh Circuit.

Further, additional errors in the Regional OSRP exacerbate the misrepresentation.  The Presidential Commission found that the Regional OSRP "evidenced [a] serious [lack] of attention to detail."   (Compl. ¶ 219.)  For example, "half of the 'Resource Identification' appendix (five pages) . . . was copied from material on NOAA [National Oceanic and Atmospheric Administration] websites, without any discernable effort to determine the applicability of that information to the Gulf of Mexico."  (Compl. ¶ 220; Doc. No. 150, Ex. R.)

The Regional OSRP also designated as a wildlife expert a professor who had died several years before BP prepared its plan. (Compl. ¶ 221.) Perhaps most absurdly, the Regional OSRP laid out concerns for "biological resources nonexistent in the Gulf—including sea lions, sea otters, and walruses." The farcicality of such glaring errors in sections of the Regional OSRP, sections which the Presidential Commission determined had been cut and paste from nearly identical plans prepared for other oil companies, sufficiently support an allegation of reckless indifference. (Doc. No. 150, Ex. R, at 84.) The invented estimates and inapplicable paragraphs weigh in favor of an adequate pleading of reckless indifference as such blatant errors seem to reflect BP's utter disregard for the potential magnitude of the damage an uncontainable spill could cause—and did cause—in the Gulf of Mexico.

On the other hand, both the IEP and the Regional OSRP name specific individuals ostensibly charged with creation, or at least management and distribution, of the two documents. The Regional OSRP lists the titles of three non-defendant individuals. These three individuals— a "Gulf of Mexico EMS Management Representative," an "Environmental Coordinator," and a "Gulf of Mexico HSSE Document Management Administrator"—likely occupied fairly low positions on BP's corporate totem pole. This could support a conclusion that the glaring errors were merely careless mistakes. At the very least, it raises a question as to whether the individuals with direct control over the misrepresentations in the IEP and the Regional OSRP occupied positions that would allow this Court to impute scienter to BP. Corporate documents that have no stated author or statements within documents not attributed to any individual may only be charged to a corporate officer, thereby imputing scienter as to the corporation itself, where there are specific factual allegations linking the individual to the statement. *Southland*, 365 F.3d at 365. However, even *Southland* allows unattributed corporate documents to be

attributed to a corporation where the statements were "made by its authorized officers to further the interests of the corporation." *Id.* It is unclear whether these individuals would have qualified as "authorized officers" for purposes of corporate scienter analysis.

Nonetheless, application of corporate scienter is appropriate here. The errors in the IEP and the Regional OSRP are so egregious as to rise to the level of extraordinary and dramatic falsity contemplated by the Seventh Circuit in *Tellabs II*. These statements, presented to the MMS and the public as realistic projections for BP's ability to contain a spill in the Gulf, were so far from the truth as to support a finding of reckless indifference. Plaintiffs have therefore adequately alleged corporate scienter with respect to the misrepresentations contained in the IEP and the Regional OSRP. Plaintiffs have not adequately alleged corporate scienter with respect to the remaining two unattributed misrepresentations—those contained in the 2006 Sustainability Report and the Microsoft Global Energy Forum presentation—which do not rise to the level of falsity contemplated under *Tellabs II*.[39]

### 5. The Complaint Adequately Pleads a § 20(a) Claim

Section 20(a) of the Exchange Act makes those who control others who violate section 10(b) jointly and severally liable "unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). Thus, to prove a violation of section 20(a), a plaintiff must first prove an underlying securities fraud violation and prove that the controlling person had actual power over the controlled person and induced or participated in the alleged violation. *Dennis v. General Imaging, Inc.*, 918 F.2d 496, 509 (5th Cir. 1990). The Individual Defendants move to dismiss Plaintiffs' section 20(a) claim, arguing that Plaintiffs have failed to plead a primary violation

---

[39] By the Court's numbering system, these are statements contained in Misrepresentations 6 (Compl. ¶ 266) and 19 (Compl. ¶ 291).

under section 10(b).  Section 20(a) claims are subject only to the pleading requirements of Rule 8, not the heightened requirements of Rule 9(b); therefore, to adequately state a claim under section 20(a), Plaintiffs need only provide the defendant fair notice of the claim and the basis of the allegations.  *Abbott v. Equity Group, Inc.*, 2 F.3d 613, 620 (5th Cir. 1993).  Plaintiffs have adequately pleaded a violation of section 10(b) only with respect to Individual Defendants Hayward and Suttles.  *See supra* Section I.D.4.vii, x.

Under the control person doctrine, even corporate officers who did not personally make a representation or play a significant role in the preparation of a misrepresentation may still be liable under section 20(a).  *See In re Enron*, 235 F. Supp. 2d at 594–96.  However, a plaintiff must plead facts indicating that defendants not directly involved in the making of actionable misrepresentations nonetheless "had the requisite power to directly or indirectly control or influence corporate policy."  *G.A. Thompson & Co.*, 636 F.2d 945, 958 (5th Cir. 1981).  Such a showing can be made by pointing to day-to-day control of a company's operations, knowledge of the underlying primary violation by the controlled person, or facts showing the defendant had the requisite power to influence corporate policies.  *Id.*  Here Plaintiffs have alleged that all of the Individual Defendants participated in the day-to-day operations of the Company, but they have pointed to no specific knowledge or facts demonstrating such control.  As a result, Plaintiffs have not pleaded the requisite factual basis for their claim that McKay, Grote, Conn, Browne, Rainey, Inglis, Malone, and Dudley controlled Hayward, Suttles or BP, or that they otherwise participated in an alleged violation.

The Court therefore **GRANTS** the motion to dismiss with respect to Individual Defendants McKay, Conn, Grote, Browne, Inglis, Dudley, Malone, and Rainey and **DENIES** the motions of Hayward and Suttles (Doc. No. 149).

## II.   DEFENDANTS' MOTION TO DISMISS THE CLAIMS OF BP ORDINARY SHARE PURCHASERS IS GRANTED

### A.  The Allegations

The factual allegations, including the misrepresentations alleged in the Complaint, have been described in detail above.  Plaintiffs' proposed class includes both ADS Purchasers and Ordinary Share Purchasers.  The Ordinary Share Purchasers advance New York common law and English common law claims, in addition to their section 10(b) claims.  The ADS Purchasers bought BP ADSs on the NYSE.  The Ordinary Share Purchasers, a group comprised of U.S. investors, bought ordinary shares on the London Stock Exchange ("LSE").  Defendants contend that the difference in the location of the purchase requires this Court, before moving into the substance of the Ordinary Share Purchasers' section 10(b) claims, to consider preliminarily whether the Ordinary Share Purchasers can bring Exchange Act claims at all in light of the Supreme Court's recent decision in *Morrison v. National Australia Bank Ltd.*, 130 S.Ct. 2869 (2010).

In addition to their argument that *Morrison* requires dismissal of the Ordinary Share Purchasers' Exchange Act claims, Defendants contend that non-Exchange Act claims asserted under New York common law and English law should also be dismissed.  Defendants argue that the Securities Litigation Uniform Standards Act precludes both Plaintiffs' New York common law and English law claims.  Defendants further contend that the Court should decline supplemental jurisdiction over Plaintiffs' English law claims or, in the alternative, dismiss on forum non conveniens grounds.

### B.  Legal Standard

#### 1.  *Review of State Common Law Claims*

##### i.  SLUSA

The Securities Litigation Uniform Standards Act of 1998 ("SLUSA") provides that "no covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging": (a) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or (b) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.  15 U.S.C. § 78 bb(f)(1).  The term "covered class action" refers to "any single lawsuit" or "any group of lawsuits" meeting certain statutory definitions.  15 U.S.C. § 78bb(f)(5)(B)(i)(III).  The term "covered securities" includes securities "listed, or authorized for listing, on the New York Stock Exchange."  15 U.S.C. § 77r(b)(1)(A).

##### ii.  CAFA

Under the Class Action Fairness Act ("CAFA"), a court has diversity jurisdiction over class action claims arising under foreign law where (1) the class exceeds one hundred members, (2) the amount in controversy exceeds $5 million, and (3) there is minimal diversity.  28 U.S.C. § 1332(d)(2).  CAFA does not apply to claims solely involving "covered securities."  *Id.* at § 1332(d)(9).  "Covered securities include securities "listed, or authorized for listing, on the New York Stock Exchange."  15 U.S.C. § 77r(b)(1)(A).

#### 2.  *Supplemental Jurisdiction*

Supplemental jurisdiction under 28 U.S.C. § 1367 may provide an alternative basis for jurisdiction over foreign law claims.  "[I]n any civil action of which the district courts have

original jurisdiction," the statute provides a district court with supplemental jurisdiction "over all other claims that are so related to claims in the action within such original jursidction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).  The statute also permits district courts to decline to exercise supplemental jurisdiction where: (1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction. 28 U.S.C. § 1367(c)(1)-(3).

### C.  Analysis

Defendants make three arguments in support of their motion to dismiss the claims brought by the Ordinary Share Purchasers.   First, Defendants claim the Supreme Court's decision in *Morrison v. Nat'l Australia Bank* requires dismissal of Exchange Act claims brought by holders of ordinary shares purchased on a foreign exchange.  Second, Defendants contend that SLUSA precludes Plaintiffs' New York common law and English law claims.  Third, Defendants urge this Court to decline supplemental jurisdiction over Plaintiffs' English common law claims or, in the alternative, dismiss the English law claims on forum non conveniens grounds.

### 1.  *The Supreme Court's Decision in* Morrison *Requires Dismissal of the § 10(b) Claims*

By its plain language, section 10(b) of the Exchange Act prohibits securities fraud only where it occurs "in connection with the purchase or sale of a security listed on an American stock exchange or any security not so registered."   15 U.S.C. § 78j.  In *Morrison*, the Supreme Court interpreted this language and determined that section 10(b) does not provide a cause of action for "f-cubed" claims, that is, claims where foreign plaintiffs sue foreign defendants for

misconduct in connection with securities traded on foreign exchanges.   *Morrison v. Nat'l Australia Bank Ltd.*, 130 S.Ct. 2869, 2888 (2010).   Promoting the "primacy of the domestic exchange," the *Morrison* Court curtailed section 10(b)'s extraterritorial reach, limiting it to "domestic transactions."   *Id.* at 2884.   Subsequent courts interpreting the decision have characterized the Supreme Court's decision as one that "roundly (and derisively) buried the venerable 'conduct or effect' test" previously devised by the Second Circuit and used by courts nationwide to determine whether section 10(b) protections apply extraterritorially.  *Id.* at 2879 (explaining that the Second Circuit had previously "established that application of § 10(b) could be premised upon either some effect on American securities markets or investors . . . or significant conduct in the United States").

Plaintiffs contend that *Morrison* does not prevent the Ordinary Share Purchasers from maintaining their claims.   They are incorrect.   The Ordinary Share Purchasers' section 10(b) claims fall squarely into the category of claims that *Morrison* seeks to curtail.   BP ordinary shares trade only on the LSE.  (Doc. No. 175, at 2.)  The shares are registered on the NYSE, but, as Plaintiffs concede, the shares never traded on a U.S. exchange and were listed on the NYSE solely to comply with SEC requirements governing BP's ADS program.  (*Id.*)  Because the ordinary shares traded only on the LSE, Plaintiffs cannot point to the "domestic transaction," which must include a "domestic purchase or sale," required for section 10(b) liability following *Morrison*.

Plaintiffs advance two arguments in an attempt to point to a "domestic transaction." Plaintiffs' first argument hinges on the residency of the investors and the locus of the purchase decision.  Plaintiffs highlight that many of the investors in the NY/OH Plaintiff class, including those who purchased BP ordinary shares, are U.S. residents.  (*Id.*, at 5.)  In addition to the

residency of the purchasers linking the shares to the United States, Plaintiffs claim that several "pivotal aspects of the purchases"—including the initial purchase decision—were made in the United States.  (*Id.* at 6.)  Plaintiffs' second argument grasps at a technicality that Plaintiffs believe works in their favor: the LSE rules allow trades to occur directly through third-party, U.S.-based market makers.  (*Id.*, at 8.)  Plaintiffs believe this raises an issue as to whether such a trade occurs "physically" in the United States or in England.  Plaintiffs' arguments have already been rejected by other courts, and there is no justification for a different outcome here.

Plaintiffs first attempt to distinguish this case based on the citizenship of the investors involved.  But even Justice Stevens, who disagreed with the *Morrison* majority's complete trouncing of the Second Circuit's conduct and effects test, acknowledged that the addition of a U.S. investor to the *Morrison* scenario would be insufficient to create liability under section 10(b).[40]  In applying *Morrison*, a majority of district courts have found the citizenship of the investors involved or mere "listing" on the NYSE insufficient reasons to extend section 10(b) liability.  *See*, *e.g.*, *Cornwell v. Credit Suisse Group*, 729 F. Supp. 2d 620, 623–24 (S.D.N.Y. 2010) (holding that section 10(b) does not extend to foreign securities traded on foreign exchanges even if purchased or sold by U.S. investors and even if the foreign issuer had ADRs listed on U.S. exchanges); *In re Alstom SA Sec. Litig.*, 741 F. Supp. 2d 469, 472–73 (S.D.N.Y. 2010) (holding that *Morrison* precludes securities claims brought by U.S. investors who purchase securities on a foreign exchange, even where those securities are also "listed on" a U.S. exchange); *In re Infineon Techs. AG Sec. Litig.*, No. C 04-04156 JW, 2011 WL 7121006, at 3 (N.D. Cal. Mar. 17, 2011) (finding that "f-squared" claims are precluded by *Morrison* because

---

[40] "Imagine, for example, an American investor who buys shares in a company listed only on an overseas exchange. That company has a major American subsidiary with executives based in New York City; and it was in New York City that the executives masterminded and implemented a massive deception which artificially inflated the stock price—and which will, upon its disclosure, cause the price to plummet. . . . [This] investor would, under the Court's new test, be barred from seeking relief under § 10(b)." *Morrison*, 130 S.Ct. at 2894 (Stevens, concurring).

the location of the exchange where the purchase is made, not factors like the location or citizenship of the purchaser, is the only relevant consideration).[41]

Plaintiffs' second, more novel argument hinges on the trading rules governing the LSE. Plaintiffs explain that "ordinary shares can be purchased directly from a third-party market maker over an electronic communications network that could result in matching U.S. purchasers and sellers, or internally within a broker-dealer from its own inventory."  (Doc. No. 175, at 8.) Thus, Plaintiffs dispute that that the physical locus of the trade is necessarily London, even if ordinary shares only trade on the LSE.  As Defendants correctly point out, courts have refused to adopt as technical a reading as Plaintiffs would require for their section 10(b) claim to survive *Morrison.  See*, *e.g.*, *Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.*, 753 F. Supp. 2d 166, 177–78 (S.D.N.Y. 2010) (deeming shares to be purchased on a foreign exchange even where the initial purchase orders were placed by brokers in Chicago and reasoning that, for *Morrison* purposes, a purchase does not *per force* occur where the order has been placed); *Stackhouse v. Toyota Motor Co.*, 2010 WL 3377409, at *1 (C.D. Cal. July 16, 2010) ("'[D]omestic transactions' or 'purchase[s] or sale[s] … in the United States' means purchases and sales of securities explicitly solicited by the issuer within the U.S. rather than transactions in foreign-traded securities where the ultimate purchaser or seller has physically remained in the U.S."); *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 530 (S.D.N.Y. 2011) (finding that "foreign-cubed" transactions cannot survive *Morrison* where ordinary shares are listed but not traded on a domestic exchange as a result of a foreign issuer's ADR program because such a technical argument runs "contrary to the spirit of *Morrison*"); *Cascade Fund, LLP v. Absolute Capital Mgmt. Holdings Ltd.*, No. 08-cv-01381, 2011 WL

---

[41] In connection with the motion to consolidate, even the Ludlow Plaintiffs argued that BP ordinary shares are not covered by U.S. securities laws post-*Morrison*.

1211511, at *6 (D. Col. Mar. 31, 2011) (finding unpersuasive "the proposition that a domestic investor's purchase of foreign stocks on foreign exchanges are nevertheless 'domestic transactions' subject to § 10(b) if the issuer solicited the investments in the United States," "particularly where *Morrison* makes no mention whatsoever of the significance of the place of solicitation.").  The most recent decision on this issue is directly on point, holding that claims asserted by U.S. investors who purchased UBS stock on a foreign exchange were barred, even though the orders were placed from the United States.  *In re UBS Sec. Litig.*, No. 07-cv-11225(RJS), 2011 WL 4059356, at *5 (S.D.N.Y. Sept. 13, 2011) (rejecting "Plaintiffs' hyper-technical parsing of the opinion and find[ing], consistent with the overwhelming majority of other courts to have addressed the issue, that foreign-cubed claims asserted against issuers whose securities are crosslisted on an American exchange are outside the scope of § 10(b).").

As one court recently explained, "the conduct and effect analysis as applied to § 10(b) extraterritoriality disputes is now dead letter.  Plaintiffs' cosmetic touch-ups will not give the corpse new life."  *Cornwell v. Credit Suisse Group*, 729 F. Supp. 2d 620, 622 (S.D.N.Y. 2010).  Following *Morrison* out to its logical conclusion requires us to adopt the reasoning of the other district courts to have considered this issue.[42]  Plaintiffs would exclude from operation of the *Morrison* standard securities traded on exchanges abroad if the purchase or sale involves a U.S. investor or if some aspect of the foreign transactions occurs in the United States.  But the

---

[42] During oral argument, Plaintiffs urged the Court to find that all subsequent decisions interpreting *Morrison* were simply wrong.  The Court cannot discount the jurisprudence of the Second Circuit—a circuit with extensive securities experience—so easily.  However, the Court is cognizant of the potential for legislative action on the horizon.  Enacted last year, the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank) directed the SEC to conduct a study and issue recommendations to Congress as to whether private rights of action under section 10(b) should be extended to "conduct within the United States that constitutes a significant step in the furtherance of the violation, even if the securities transaction occurs outside the United States and involves only foreign investors."  Dodd-Frank § 929Y.  The period for comments has already closed, and the SEC is due to submit its report to Congress in early 2012.  Although there is the possibility of legislative action directly addressing this subject, a number of contingencies prevent the Court from delaying this case to await such a possibility.  Not only is the speed of any such action impossible to predict, but the Court is not aware that such action—even if it were to benefit similarly situated plaintiffs—would be retroactive.

*Morrison* standard, "promulgated to govern the application of § 10(b) in transnational securities purchases and sales[,] does not leave open any of the back doors, loopholes or wiggle room to accommodate the distinctions Plaintiffs urge to overcome the decisive force of that ruling on their § 10(b) claims here." *Cornwell*, 729 F. Supp. 2d at 622–23.

The arguments Plaintiffs advance here "simply amount to a restoration of the core element of the effect test." *Id.* at 624.  Similarly, carving out an exception for the purchase of securities on the LSE because some acts that ultimately result in the execution of a transaction abroad take place in the United States would be to reinstate the conduct test.  *Id.*  Post *Morrison*, the only relevant inquiry is *where the transaction occurred*, *i.e.*, whether it was a "domestic transaction."  130 S.Ct. at 2884.  Regardless of their U.S. residency and the LSE trading rules, the Ordinary Share Purchasers bought BP ordinary shares on the LSE, the only exchange where BP ordinary shares trade.  Because Plaintiffs cannot point to a domestic transaction involving BP ordinary shares, the Court must dismiss the section 10(b) claims brought by the BP Ordinary Shareholders in the NY/OH Plaintiff class.

### 2.  SLUSA Precludes Plaintiffs' New York Common Law Claims

In addition to their section 10(b) claims, Plaintiffs assert common law fraud claims under New York law.  (Compl. ¶ 399–406.)  BP argues that SLUSA bars these claims.  SLUSA precludes a securities action if: (1) the action is a "covered class action"; (2) the claims are based on state law; (3) the action involves one or more "covered securities"; and (4) the claims allege a misrepresentation or omission of a material fact "in connection with the purchase or sale" of a security.  15 U.S.C. § 78bb(f)(1).  The parties do not dispute that Plaintiffs' New York common law claims involve a "covered class action" and state law claims.  However, the parties do disagree as to whether the action involves "covered securities" and whether the alleged

misrepresentations and omissions were made "in connection with" the purchase or sale of securities.

### i.   BP ordinary shares qualify as "covered securities"

Defendants argue that BP ordinary shares fall within the definition of "covered securities" under SLUSA and that Plaintiffs' New York law claims are, therefore, precluded. Plaintiffs dispute this, arguing that Defendants are attempting to "have it both ways" by arguing that BP ordinary shares are not a "domestic transaction" under *Morrison* while simultaneously arguing that the same shares are "covered securities" for SLUSA purposes.  (Doc. No. 175, at 10.)  Plaintiffs contend that the definition of "covered securities" under SLUSA requires shares to be registered or listed *and traded* on a U.S. exchange since mere listing is insufficient for section 10(b) liability post-*Morrison*.   (*Id.*)   In sum, Plaintiffs argue that the "trading requirement" of *Morrison* must be applied in the SLUSA context.  (*Id.*)

The definition of "covered securities" under SLUSA is straightforward; it includes securities "listed, or authorized for listing, on the New York Stock Exchange."  15 U.S.C. § 77r(b)(1)(A).  In the Complaint, Plaintiffs state explicitly that BP ordinary shares are listed on the NYSE.  (Compl. ¶ 33.)  Indeed, Plaintiffs rely on this fact to counter Defendants' argument for dismissal under *Morrison*.  (Doc. No. 175, at 4.)  Despite this clear definition, Plaintiffs urge the Court to look to the subsection heading of the statute, which refers to the "Exclusive Federal regulation of nationally traded securities."  15 U.S.C. § 77r(b)(1).  Plaintiffs claim the inclusion of "trading" in the heading implies a trading requirement for qualification as a "covered security," even though the definition portion of the statute, which follows, makes no reference to trading.  (Doc. No. 175, at 10.)  Plaintiffs' reliance on the heading of the SLUSA subsection is misplaced.  *See, e.g.*, *Penn. Dep't of Corr. V. Yeskey*, 524 U.S. 206, 212 (1998) ("[T]he title of a

statute . . . cannot limit the plain meaning of the text" and is "of use only when [it] shed[s] light on some ambiguous word or phrase."); *see also United States v. Hoang*, 636 F.3d 677, 681 (5th Cir. 2011) (finding reference to a subtitle "unnecessary and inappropriate" where there was no ambiguity in the subsection).

In addition, other courts to have considered the issue have refused to read a trading requirement into the definition of "covered securities" where the plain language of the statue is clear.  *See*, *e.g.*, *In re Toyota Motor Corp.*, 2011 WL 2675395 at *6 (refusing to exercise jurisdiction over plaintiffs' Japanese law claims where Toyota's common shares were listed on the NYSE and therefore were "covered securities" ); *In re Metro Sec. Litig.*, 532 F. Supp. 2d 1260, 1298–99 (E.D. Wash. 2007) ("The plain language of SLUSA illustrates that a security need not actually be traded on a national scale in order to be considered a covered security."). Plaintiffs' New York common law claims meet the third element of the SLUSA preclusion test as the ordinary shares at issue are clearly "covered securities" for purposes of SLUSA.

### ii.  The  "in connection with" requirement is satisfied

Plaintiffs further argue that SLUSA does not preclude their New York common law claims because such claims are not made "in connection with" the purchase or sale of covered securities.  In support of this argument, Plaintiffs contend that their non-Exchange Act claims are "separate and distinct" from violations in connection with the ADSs (Doc. No. 175, at 11.) Because the Court has decided, above, that the BP ordinary shares are covered securities for purposes of SLUSA, the allegations Plaintiffs advance in their Complaint (all of which are pleaded identically on behalf of both the ADS Purchasers and the Ordinary Share Purchasers) are clearly in connection with the purchase of BP ordinary shares.  Therefore, the Court need not decide whether conduct "in connection with" the BP ADSs alone, which both parties concede are

covered securities, creates a link between the ADSs and the ordinary shares sufficient to preclude the latter under SLUSA.  Because the BP ordinary shares themselves are "covered securities," Plaintiffs' New York common law claims, founded on allegations of misrepresentations and omissions advanced in connection with the ordinary shares, are precluded under SLUSA.

### 3.  Plaintiffs' English Law Claims Must Also Be Dismissed

Plaintiffs have raised several claims under English law, including claims for alleged violations of the Financial Services and Markets Act of 2006, common law fraud, and negligent misrepresentation and misstatement.  *See* Compl. ¶¶ 404–19 (Claims Three, Four, and Five). Defendants argue that Plaintiffs' English law claims must be dismissed for lack of jurisdiction or on forum non conveniens grounds.

### i.  The Court does not have original jurisdiction over the English law claims

Plaintiffs assert that this Court has original jurisdiction over their English law claims pursuant to CAFA.  Under CAFA, a court has diversity jurisdiction over class action claims arising under foreign law where (1) the class exceeds one hundred members, (2) the amount in controversy exceeds $5 million, and (3) there is minimal diversity.  28 U.S.C. § 1332(d)(2). CAFA does not apply to claims involving solely "covered securities."  *Id.* at § (d)(9).  CAFA looks to the same definition as SLUSA for the meaning of the phrase "covered securities"; "covered securities" thus include securities "listed, or authorized for listing, on the New York Stock Exchange."  15 U.S.C. § 77r(b)(1)(A).

Because CAFA and SLUSA look to the same definition of "covered securities," the Court's analysis with respect to CAFA tracks its SLUSA analysis above.  Plaintiffs have conceded that the BP ordinary shares at issue are listed on the NYSE.  Yet, once again, Plaintiffs contend that BP ordinary shares are not "covered securities" for purposes of CAFA because they

are only "listed" on the NYSE, not traded.  Courts have refused to read a trading requirement

into the definition of "covered securities."  *See*, *e.g.*, *In re Toyota Motor Corp.*, 2001 WL

2675395 at *6 (refusing to exercise jurisdiction over plaintiffs' Japanese law claims where

Toyota's common shares were listed on the NYSE and therefore were covered securities under

CAFA).  Just as they were "covered securities" for purposes of SLUSA, BP ordinary shares are

"covered securities" under CAFA.  Therefore, this Court lacks original jurisdiction over

Plaintiffs' English law claims.

> ### ii.  The Court may not exercise supplemental jurisdiction where it lacks jurisdiction over Plaintiffs' securities fraud claims

Plaintiffs also urge the Court to exercise supplemental jurisdiction over their English law

claims.  A district court may exercise supplemental jurisdiction where foreign law claims form

part of the same case or controversy and arise from a common nucleus of operative facts.  *See* 28

U.S.C. § 1367(c).  A court may decline to exercise supplemental jurisdiction over a claim if: (1)

the claim raises novel issues of state law; (2) the claim substantially predominates over claims as

to which the district court has original jurisdiction; (3) the district court has dismissed all claims

as to which it has original jurisdiction; or (4) exceptional circumstances or other compelling

reasons exist for declining jurisdiction.  *Id.*  Because this Court does not have jurisdiction over

the Ordinary Share Purchasers' section 10(b) claims, the Court cannot exercise supplemental

jurisdiction over Plaintiffs' English law claims.

## III.    CONCLUSION

It is ordered that Defendants' Motion to Dismiss the ADS Purchasers in the NY/OH

Plaintiff class (Doc. No. 149) is **PARTIALLY GRANTED** to the extent that the Court

dismisses claims against Individual Defendants H. Lamar McKay, Iain Conn, Bryon Grote, Lord

Edmund John Philip Browne, David Rainey, Andrew G. Inglis, Robert Dudley, and Robert Malone.  The motion is also **PARTIALLY DENIED**: the Court finds that Plaintiffs have adequately pleaded section 10(b) violations by Defendants BP plc, BP America, BP Exploration & Production, Anthony Hayward and Douglas Suttles, and adequately pleaded control person liability pursuant to section 20(a) with respect to defendants Hayward and Suttles.  It is further ordered that Defendants' Motion to Dismiss the Ordinary Share Purchasers (Doc. No. 153) is **GRANTED**.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the 13th day of February, 2012.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE