**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE: BP p.l.c.** | § | **MDL No. 10-md-2185** |
| **SECURITIES LITIGATION** | § | |
| | § | **Civil Action No. 4:10-cv-4214** |
| **IN RE: BP p.l.c.** | § | |
| **ERISA LITIGATION** | § | **HON. KEITH P. ELLISON** |
| | § | |
| | § | |

**MEMORANDUM AND ORDER**

This is a putative class action arising out of the Deepwater Horizon catastrophe and brought pursuant to the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(2)-(3). Pending before the Court is Defendants' Motion to Dismiss the Consolidated Complaint (Doc. No. 88).[1] Having considered the parties' pleadings, arguments, and the applicable law, the Court finds that Defendants' motion must be **GRANTED**.

## I.     BACKGROUND

### A. Plaintiffs and the ERISA Plans

BP is one of the world's largest energy companies. Through its own operations, and those of its subsidiaries, BP is the largest producer of offshore oil and gas in the Gulf of Mexico. (Complaint ("Compl."), Doc. No. 57 ¶ 81). Forty-five percent of BP's oil reserves are in the United States, where BP employs approximately 29,000 workers. (*Id.*) Plaintiffs are nine individual participants and beneficiaries[2] ("Plaintiffs" or "Plan Participants") of four BP employee investment and savings plans regulated by ERISA: the BP Employee Savings Plan ("ESP"), the BP Capital Accumulation Plan ("CAP"), the BP Partnership Savings Plan ("PSP"),

---

[1] All references are to Case No. 10-cv-4214.
[2] The individual plaintiffs are David M. Humphries, Jerry McGuire, Edward Mineman, Charis Moule, Frankie Ramirez, Maureen S. Riley, Thomas P. Soesman, Arshadullah Syed, and Ralph Whitley. (Compl. ¶ 1.)

and the BP DirectSave Plan ("DSP") (collectively "the Plans").[3]   (Compl. ¶ 1.)   Plaintiffs propose to represent a class comprised of "all persons who were participants in or beneficiaries of any of the Plans, whose accounts held units of BP Stock Fund . . . that were held in the BP Master Trust, at any time from January 16, 2007 through June 24, 2010, inclusive (the "Class Period") and were damaged thereby."[4]   (Id. ¶ 3.)

The four BP Plans—the ESP, CAP, PSP, and DSP—are "defined contribution" or "individual account" plans within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).   (Id. ¶ 91.)   The purpose of the Plans, as explained in BP's Form 11-K, is "to encourage eligible employees to regularly save part of their earnings and to assist them in accumulating financial security for their retirement."   (Id. ¶ 92.)   The relevant portions of the Plans are substantially similar, except for the employees covered by each Plan and the contribution and matching provisions of the Plans.   Plan participants can contribute to the Plans "on a pre-tax, after tax and/or Roth 401(k) basis," and BP made matching cash contributions, up to a certain amount, depending on the particular plan provisions.   (Id. ¶ 93.)

Under the terms of the Plans, each participant controls his or her individual account and makes investment decisions based on a menu of available investment options.   (Id. ¶ 94.)   The "Investment Options Guide" presents the investment options available to Plan Participants.   (BP Investment Options Guide, Defs.' Exh. H, Doc. No. 92-2.)   Participants can choose from a wide range of investment options, one of which is the BP Stock Fund.   (Compl. ¶ 3; ESP, Appendix 1.58 ("Core Investment Options"), Defs.' Exh. A, Doc. No. 88-4.)   With the exception of a small

---

[3] The Complaint alleges that the individual plaintiffs were participants in either the ESP or the CAP.   Because no individual plaintiff is alleged to have participated in the PSP or DSP, Defendants reserve the right to challenge Plaintiffs' proposed class if and when it becomes appropriate to do so.

[4] This action has not been certified as a class action.   Plaintiffs wish to bring a class action "only to the extent deemed necessary by the Court."   (Compl. ¶ 1)   Plaintiffs anticipate that there are, "at a minimum, tens of thousands of members of the Class."   (Id. ¶ 137.)   As of December 31, 2009, the ESP alone had 40,937 participants.   (Id.)

cash component included for liquidity purposes, the BP Stock Fund is invested entirely in BP American Depositary Shares ("ADSs").  (*Id.* ¶ 3.)   The Investment Options Guide advises participants that, "[u]nder limited circumstances and in accordance with ERISA, the investment manager may attempt to liquidate all the BP ADSs in the BP Stock Fund should the manager or BP determine such an investment is no longer prudent."  (Investment Options Guide, at 35.) Approximately one-third of each Plan was invested in the BP Stock Fund.  (Compl. ¶ 94.)

During the relevant period, the Plans comingled their assets in the BP Master Trust for Employee Savings Plans ("BP Master Trust").  (*Id.* ¶ 89).   The Plans also shared common fiduciaries and administrators, including: the BP North America Board of Directors, the Savings Plan Investment Oversight Committee, Designated Officers, Appointing Officers, Plan Administrators, and a third-party investment manager.  (Compl. ¶¶ 89, 110-134.)

BP North America ("BPNAI"), a wholly-owned subsidiary of BP America, Inc., is the Plan Sponsor of each of the Plans.  (Compl. ¶ 98; ESP § 1.72.)  BPNAI's Board of Directors also plays a role in administration of the plans, as the terms of the Plans provide that "[w]henever [BPNAI] has the authority to take action under this Plan, [BPNAI's] Board of Directors and each Designated Officer have the authority to act on behalf of [BPNAI]."  (*Id.* ¶ 110.)  The Savings Plan Investment Oversight Committee ("SPIOC") is an investment committee in charge of overseeing the investment options available under the Plans.  (*Id.* ¶ 125.)  BPNAI created the SPIOC "as a committee of the Board of Directors."  (*Id.* ¶ 113.)  Under the terms of the Plans, SPIOC responsibilities included the authority to establish and select the various investment funds offered as investment options under the Plans, the responsibility for establishing and carrying out a funding policy for the Plans, and the performing of other fiduciary functions allocated to the SPIOC.  (*Id.*)

State Street, an independent third-party investment manager, also served as a key fiduciary of the Plans.  On April 5, 2000, BPNAI entered into an Investment Management Agreement with State Street, thereby appointing State Street as investment manager for the Plans.[5]  (*Id.* ¶ 100.)   The Investment Management Agreement granted State Street "full discretionary authority" to manage the assets in each of the Plans as follows:

> Authority of the Investment Manager: Unless otherwise directed in writing by the Company, the Investment Manager shall have full discretionary authority to manage the investment of the assets in each Investment Account, including the authority to purchase, sell, cover open positions, and generally to deal in securities, financial and commodity futures contracts, options and other property comprising or relating to each Investment Account . . . provided, however, that for each Investment Account (i) any and all transactions that the Investment Managers enters into shall be undertaken by the Investment Manager in accordance with the Investment Strategy Guidelines applicable to such Investment Account and (ii) the Investment Manager shall not enter into any transaction applicable to such Investment Account other than those specifically authorized by the Investment Strategy Guidelines.

(Investment Manager Agreement ("IMA"), Defs.' Exh. J, Doc. No. 93-2.)   The Investment Management Agreement delegated "fiduciary authority" to State Street, as the Investment Manager.   (IMA, at 1.)   The Investment Management Agreement left BPNAI with the "responsib[ility] for the overall diversification of the Trust Fund" and made State Street's obligation to diversify investment accounts subject to the "Investment Strategy Guidelines." (IMA § 2(b).)   These Investment Strategy Guidelines provided that the BP Stock Fund could be comprised of BP ADSs and cash equivalents, and that it could use short term lines of credit where appropriate.  (*Id.* ¶ 107; IMA, Exh. C-1.)  Upon obtaining prior approval from BPNAI, the BP Stock Fund could also invest in other public and private debt and equity securities, including debt and equity derivatives such as options and futures contracts.   (IMA, Exh. C-1.)   The

---

[5] The Investment Management Agreement was executed by State Street and BP Amoco Corporation, now known as BP North America.  (Compl. ¶ 101; Investment Manager Agreement, Doc. No. 93-2, at 1.)  The document provided to the Court is titled "Investment Manager Agreement."  (Defs.' Exh. J, Doc. No. 93-2.)  Here, the Court refers to the agreement as the "Investment Management Agreement," in keeping with the references made in the Complaint.

Investment Management Agreement also gave BPNAI the authority to terminate the agreement or any investment account at any time upon written notice to State Street.  (IMA, Mgmt Agrt § 11; Compl. ¶ 102.)  Under the Investment Management Agreement, State Street was to provide annual reports on the performance of the BP Stock Fund to BP North America.  (Compl. ¶ 109.)  Additionally, the SPIOC was required to submit written reports, at least once per year, detailing any actions the SPIOC took in its monitoring of the fund.  (*Id.* ¶ 112.)

### B. Defendants

Defendants are various corporate entities and individuals associated with the Plans.  The corporate defendants are BP Corporation North America Inc., BP p.l.c., and BP America Inc (collectively, "the Corporate Defendants").  (*Id.* ¶ 34.)  BPNAI is a wholly-owned subsidiary of BP America Inc. ("BP America") and an indirect wholly-owned subsidiary of BP p.l.c.  (*Id.* ¶ 34.)  BPNAI was the "Plan Sponsor" of each of the Plans.  (*Id.* ¶¶ 35, 98.)  BP p.l.c. is a public limited liability company incorporated in England and Wales.  (*Id.* ¶ 81.)  BP p.l.c. allegedly acted as a fiduciary "within the meaning of ERISA because BP p.l.c., acting through its officers and directors, exercised discretionary authority and control with respect to the appointment of the Plans' fiduciaries, management and administration of the Plans and the Plans' assets."  (*Id.* ¶ 81.)  During the relevant period, BP p.l.c. filed Form 11-K with the SEC stating that "Certain Master Trust investments include American Depositary Shares of BP p.l.c. ('BP ADSs')."  (*Id.* ¶ 84.)  A Delaware corporation with its principal place of business in Illinois, BP America is BP's largest subsidiary.  (*Id.* ¶ 82.)  BP America was the "Claims Administrator" for the Plans during the relevant period.  (*Id.*)

Plaintiffs have also named seventeen individual defendants who Plaintiffs allege acted as fiduciaries of the Plans during the Class Period.  The seventeen individual defendants are: Lord

John Browne, Anthony Hayward, Robert A. Malone, Lamar McKay, Richard J. Dorazil, Stephen J. Riney, Brian D. Smith, Thomas L. Taylor, Corey Correnti, Marvin L. Damsma, James Dupree, Patrick Gower, Jeanne M. Johns, Patricia H. Miller, Stephanie C. Moore, Neil Shaw, and Gregory T. Williamson (collectively, the "Individual Defendants").  (*Id.* ¶ 31.)  Lord John Browne ("Browne") served as Group Chief Executive of BP from 1995 until 2007.  (*Id.* ¶ 48.)  Anthony Hayward ("Hayward") became Chief Executive Officer of Exploration and Production in 2002 and Group Chief Executive of BP p.l.c. in May 2007.  (*Id.* ¶ 53.)  During the Class Period, Robert Malone ("Malone") was President of BPNAI and served as a BPNAI board member.  (*Id.* ¶ 47.)  Lamar McKay ("McKay") served as Chairman and President of BP America, and he has served as the President of BPNAI following Malone's departure in 2009.  (*Id.* ¶ 39.)  McKay also has served as a BPNAI board member since April 13, 2009.  Defendant Richard J. Dorazil ("Dorazil") served in a human resources capacity at BPNAI.  Specifically, during the Class Period, Dorazil held the title of Vice President, HR Total Rewards, Western Hemisphere for BPNAI.  (*Id.* ¶ 50.)  Stephen J. Riney ("Riney") served as Vice President of Finance for BP America, and he currently serves as Global Head of Mergers and Acquisitions for BP p.l.c.  (*Id.* ¶ 41.)  Brian D. Smith ("Smith") held the position of Vice President and Chief Financial Officer of BP America and BPNAI during the relevant period.  (*Id.* ¶ 43.)  Thomas L. Taylor ("Taylor") served as Vice President and Chief Financial Officer ("CFO") of BPNAI and Global Vice President, Business Financial Services and CFO for the Americas for BP p.l.c. from 2007 through 2009.  (*Id.* ¶ 45.)  Defendants Correnti, Damsma, Dupree, Gower, Johns, Miller, Moore, Shaw, and Williamson are designated as defendants for their service on the SPIOC.  Their specific positions and roles within BP are discussed in greater detail below.

Many of these Individual Defendants served on BPNAI's Board of Directors or on the

SPIOC, both of which are also named defendants in this action.[6]  (*Id.* ¶ 31.)  The seventeen individuals are named defendants to the extent they served in fiduciary roles for the Plans.  Plaintiffs organize the Individual Defendants into the following fiduciary groups: BPNAI Board Defendants, Designated Officer Defendants, Appointing Officer Defendants, members of the SPIOC, Plan Administrator Defendants, and unnamed "Plan Fiduciary DOES."[7]  The specific Individual Defendants included in these groups are detailed below:[8]

### i.      The BPNAI Board Defendants

Plaintiffs contend BPNAI vested in the Board of Directors the authority, control, and discretion to act on behalf of the Plans.  (Compl. ¶ 111.)  Further, the BPNAI Board was responsible for monitoring the SPIOC.  (*Id.* ¶ 112.)  Defendants Malone, McKay, Riney, Smith, and Taylor are included in the group of alleged fiduciaries referred to collectively as the "BPNAI Board Defendants."  (*Id.* ¶¶ 36–46.)

### ii.     Designated Officer Defendants:

Under the Plans, a "Designated Officer" refers to the Appointing Officer, the Vice President, and any other officer of BPNAI or BP, the Group Chief Executive of BP, or any other BP officer to whom BPNAI's Board of Directors grants the authority to act.  (*Id.* ¶ 114.)  Plaintiffs contend that Designated Officers, acting on behalf of BPNAI, were fiduciaries to the extent they had "all the powers necessary or incidental to carrying out the duties and rights

---

[6] Riney was a member of BPNAI's Board from March 2005 until February 12, 2007.  (Compl. ¶ 40.)  He also served as a member of the SPIOC from February 1, 2005 until March 14, 2007.  (*Id.*)  Smith was a BPNAI board member and a member of the SPIOC from June 15, 2009 and July 1, 2009, respectively, until at least the end of the Class Period.  (*Id.* ¶ 42.)  Taylor was a BPNAI board member and a member of the SPIOC.  (*Id.* ¶ 44.)

[7] Some of the Individual Defendants overlap as members of multiple fiduciary groups.  For example, in addition to his service on the SPIOC, Malone was allegedly a "Designated Officer," an "Appointing Officer," and an "Appointing Officer Acting as Applicable Administrative Fiduciary" under the terms of the Plans.  (Compl. ¶ 36.)  Similarly, McKay allegedly served as a "Designated Officer," an "Appointing Officer," and an "Appointing Officer Acting as Applicable Named Fiduciary."  (*Id.* ¶ 39.)

[8] This organization of Defendants into groups based on fiduciary roles is based solely on Plaintiffs' allegations in the Complaint.  The Court does not decide for purposes of this motion to dismiss whether the Defendants actually qualify as fiduciaries of the Plans.

assigned by the Plans." (*Id.* ¶ 115.)  Plaintiffs contend that, under the terms of the Plans, individuals appointed as "Investment Named Fiduciaries" and "Administrative Named Fiduciaries" would be considered Designated Officers.  (*Id.* ¶ 116.)  Defendants Browne, Dorazil, Hayward, Malone, and McKay all allegedly served as "Designated Officers" under the terms of the Plans during the relevant period and are referred to, collectively, as the "Designated Officer Defendants."[9] (*Id.* ¶¶ 47–56.)

### iii. Appointing Officer Defendants

The President of BPNAI serves as the "Appointing Officer" under the Plans.  (*Id.* ¶ 119.) Under the terms of the Plans, an "Administrative Named Fiduciary" refers to a named fiduciary with "the discretionary authority or discretionary control respecting management of the Plans or the exercise of any authority or control respecting management or disposition of any assets of the Plans." (*Id.* ¶ 118.)  Plaintiffs contend that Appointing Officers, acting as Administrative Named Fiduciaries, were Plan fiduciaries insofar as they would have had the authority and discretion to select voting members of the SPIOC and to select and remove persons named "Administrators" of the Plans.  (*Id.* ¶ 120.)  Given that Malone and McKay both served as President of BPNAI for successive periods during the Class Period, Malone and McKay are referred to collectively as the "Appointing Officer Defendants."  (*Id.* ¶ 57.)

### iv. SPIOC Defendants

Nine former members of the SPIOC are named as individual defendants in this action. Corey T. Correnti ("Correnti") worked first for BP and, later, for BPNAI.  During the Class Period, Correnti served as President of BP North America's East and Gulf Coast fuels value

---

[9] As Designated Officers, Browne, Malone, and McKay were also "Investment Named Fiduciaries" during the Class Period.  (Compl. ¶¶ 47, 55.)  Under the Plans' terms, "Investment Named Fiduciary" signifies a Named Fiduciary with respect to, among other things, "the exercise of discretionary authority or discretionary control respecting management of the Plans or the exercise of any authority or control respecting management or disposition of any assets of the Plans, within the meaning of Section 3(21)(A)(i) of ERISA."  (*Id.* ¶ 117.)

chain.  (*Id.* ¶ 60.)  Correnti was a member of the SPIOC from June 1, 2009 through at least the end of the Class Period.  (*Id.* ¶ 59.)  Marvin L. Damsma ("Damsma") worked as Director of Trust Investments for BP America during the Class Period.  (*Id.* ¶ 62.)  Damsma also served as an SPIOC member from September 2004 until April 1, 2008.  (*Id.* ¶ 61.)  James Dupree ("Dupree") worked as Senior Vice President and Strategic Performance Unit Leader of BP's Gulf of Mexico division beginning in November 2009.  (*Id.* ¶ 64.)  Dupree was also an SPIOC member, beginning on February 1, 2010, and continuing through the end of the Class Period. (*Id.* ¶ 63.)  Patrick Gower ("Gower") served as Vice President of Refining, U.S. Region for BP North America.  (*Id.* ¶ 66.)  Gower was also a member of the SPIOC from September 20, 2004 through May 15, 2008.  (*Id.* ¶ 65.)  Jeanne M. Johns ("Johns") was an SPIOC member and also served as President of BP's Asia Olefin and Derivatives division during the Class Period.  (*Id.* ¶ 67.)  Patricia H. Miller ("Miller") served as Vice President of Human Resources for BP North America and also as an SPIOC member.  (*Id.* ¶¶ 68–69.)  Stephanie C. Moore ("Moore") was an SPIOC member and Vice President of Human Resources for BP's Exploration and Production Technology division.  (*Id.* ¶¶ 70–71.)  Neil Shaw ("Shaw") worked as BP's senior Vice President and Strategic Performance Leader in charge of BP's Gulf of Mexico division from 2007 until 2009.  (*Id.* ¶ 73.)  He, too, was a member of the SPIOC during the relevant period.  (*Id.* ¶ 72.) Gregory T. Williamson ("Williamson") worked as Director of Trust Investments for BP America from June 10, 2008 to the present and also served as an SPIOC member during the Class Period. (*Id.* ¶¶ 74–75.)

Plaintiffs allege that these individuals were Plan fiduciaries to the extent that, as SPIOC members, they were allocated the discretion, authority, and control over the administration of the Plans and the selection of investment options for the Plans.  (*Id.* ¶ 124.)   Defendants Correnti,

Damsma, Dupree, Gower, Johns, Miller, Moore, Shaw, and Williamson are collectively referred to as the "SPIOC Defendants."

### v.      Plan Administrator Defendants

During the relevant period, the Vice President of Human Resources or the Vice President, Total Rewards, Western Hemisphere served as the "Administrator" or "Plan Administrator" of the Plans.  (*Id.* ¶ 129.)  Under the terms of the Plans, the Administrator was vested with "the right to take any and all action he determined to be appropriate to minimize plan disruptions, and to protect the interest of all Plan Participants . . . for any other reason."  (*Id.* ¶ 130.)  Further, the Administrator had the power to establish rules to govern investment elections and to otherwise limit the investment options available to Plan participants.  (*Id.* ¶ 131.)  During the relevant period, Defendant Miller held the position of "Plan Administrator Administrative Named Fiduciary" and "Applicable Administrative Named Fiduciary" from 2006 through December 2007.  (*Id.* ¶ 78.)  Defendant Dorazil took over the position from Miller in December 2007 and served as the relevant Administrator through the end of the Class Period.  (*Id.*)  Defendants Miller and Dorazil are referred to collectively as the "Plan Administrator Defendants."  (*Id.* ¶¶ 79, 133.)

### vi.      Plan Fiduciary DOES 1-20

Plaintiffs also name "Plan Fiduciary DOES 1-20" as Defendants with the expectation that the identities of additional Plan fiduciaries will be ascertained through discovery.  (*Id.* ¶ 80.)  Plaintiffs expect this group to include additional members of the SPIOC and additional individual members of BPNAI's Board of Directors.  (*Id.*)

### C.  The Current Action

This case is predicated on the same factual allegations—alleged process safety failures, systemic safety deficiencies, and the explosion of the BP-operated Deepwater Horizon rig—as the securities actions also pending before this Court.  (*In re BP Sec. Litig.*, Multi-District Litigation No. 10-md-2185.)   The Complaint exhaustively chronicles BP's "safety record" leading up to the Deepwater Horizon accident to set the stage for Plaintiffs' expectations and Defendants' responsibilities as fiduciaries of the Plans.  BP's increased focus on safety was part of the Company's decision to confront its troubling history of "chronic safety lapses" dating back to at least 2002 and ranging from catastrophic blowouts on other BP rigs around the world, the explosion and loss of life at the Texas City refinery in 2005, and the oil spill in Prudhoe Bay, Alaska in 2006.  (Compl. ¶¶ 5, 152–76.)  Following the issuance of the Baker Report in 2007, which provided a series of ten recommendations intended to reform BP's safety performance, BP representatives made repeated public promises to reform the company's safety programs.  (*Id.* ¶¶ 203–55.)

According to Plaintiffs, these public commitments to improvement in the safety arena demonstrated that Defendants were aware of the "red flags" the Company faced, cognizant of the need for reform of the Company's safety culture, and on notice of the potential consequences of a failure to implement required reforms.  (*Id.* ¶ 203.)  Plaintiffs contend the public promises about BP's progress in improving its safety programs were false and constituted "misleading and inaccurate statements about BP's safety programs and processes and the extraordinary deficiencies in BP's operations."  (*Id.* ¶ 366.)  The image of progress presented to the public masked the true risk BP faced as a result of its deficient safety and risk management culture.  (*Id.* ¶ 256.)  Plaintiffs allege that the continued lack of reform in BP's safety and risk management

culture "represented a calculated decision by its leaders – many of whom served as fiduciaries to the Plans – to place profits over safety and to conceal material information about its reckless management and deceptive practices." (*Id.* ¶ 11.)  The Deepwater Horizon explosion and spill was, under Plaintiffs' theory, the culmination of these failed reform efforts.  These failures to implement adequate safety measures in BP's operations made the Deepwater Horizon disaster— the the subsequent losses in value of the Plans—predictable. (*Id.* ¶14.)  Thus, it was Defendants' failure to disclose BP's "serious management problems and inaccurate statements about its business activities in the Gulf of Mexico" that artificially inflated the value of the BP Stock Fund. (*Id.* ¶ 12.)

In January 2007, the BP Stock Fund comprised approximately $3.1 billion of the $9.5 billion in total assets held by the combined Plans, or almost one-third of the Plans' total assets at the start of the Class Period. (*Id.* ¶ 13.)  On April 20, 2010, BP ADSs closed at $60.48.  Following the Deepwater Horizon explosion and subsequent uncontained oil spill, BP ADS prices dropped, closing at $36.52 on June 1, 2010, a little over a month later. (*Id.* ¶ 325.)  On June 3, 2010, Fitch, a rating agency, downgraded BP's "Longterm Issuer Default Rating" and senior unsecured rating from "AA+" to "AA." (*Id.* ¶ 330.)  The following day, Standard & Poors downgraded BP's long-term rating from "AA" to "AA-" and placed BP's long and short-term credit ratings on a negative watch. (*Id.* ¶ 332.)  On June 9, 2010, as a result of fears that BP would suspend dividends, the price of BP ADSs declined further, closing at $29.20. (*Id.* ¶ 335.)  On June 16, 2010, BP announced that it was in fact cancelling its previously declared quarterly dividend for the first quarter of 2010, as well as dividends for the second and third quarters of 2010. (*Id.* ¶ 343.)  On June 18, 2010, Moody's lowered its rating on BP's unsecured debt from "Aa2" to "A2" and lowered its issuer rating of BPNAI. (*Id.* ¶ 350.)  On June 28, 2010, four days

after the end of the Class Period, BP ADS prices reached an intraday low of $26.75, closing at $27.05, representing a loss of almost 55% following the Deepwater Horizon explosion. (*Id.* ¶ 354.)

Due to the Plans' investment in the BP Stock Fund, the Plans suffered substantial losses after the Deepwater Horizon disaster occurred and the true state of BP's safety operations was revealed. (*Id.*) Following the drop in BP ADS prices, the total combined value of the Plans' assets fell to $7 billion, with the value of the BP Stock Fund dropping to $1.25 billion of that total at the end of the Class Period.[10] (*Id.*)

Plaintiffs bring this action on the ground that Defendants knew, or should have known, that the Plans' heavy investment in the BP Stock Fund was imprudent given the inadequate safety and risk management procedures in BP's operations. The escalating risk in BP's operations increased the likelihood that a disaster like the Deepwater Horizon disaster would occur, would cause material losses to the Plans, and would expose the BP Stock Fund to sharp losses. (*Id.* ¶ 85.) Plaintiffs claim that, "[g]iven the admitted crucial importance of safety to BP's business and the myriad of problems it experienced in the years leading up to the Deepwater Horizon disaster, prudent fiduciaries in similar circumstances would have considered themselves bound to liquidate the BP Stock Fund and to remove, limit, or restrict the BP Stock Fund from the menu of investments offered by the Plans." (*Id.* ¶ 14.) Specifically, Plaintiffs claim that Defendants breached their fiduciary duties by continuing to offer BP stock as an investment option to Plan participants even though Defendants knew, or should have known, that BP stock was not a suitable and appropriate investment (Count I). (Compl. ¶¶ 386–93.)

---

[10] Following this decline, BP's stock price rebounded significantly. By the time Plaintiffs filed their Complaint, BP stock had regained almost 70% of its pre-Deepwater Horizon value. (Doc. No. 88-1, at 21.) *See In re Administaff Sec. Litig.*, Civ. No. 03-2082, 2006 WL 846378, at *1 n.1 (S.D. Tex. Mar. 30, 2006) (noting that a district court may take judicial notice of stock prices and consider materials filed with the SEC in ruling on a motion to dismiss).

Plaintiffs also allege that Defendants breached their fiduciary duties by failing to provide Plan Participants with complete and adequate information about the "safety, stability, and prudence of investment" in BP stock (Count II).  (*Id.* ¶¶ 395–402.)  Finally, Plaintiffs claim that certain Defendants breached their fiduciary duties by failing to adequately monitor other fiduciaries (Count III).  (*Id.* ¶¶ 404–12.)

After deciding that the ERISA actions stemming from the Deepwater Horizon disaster involved questions of fact similar to those at issue in the securities actions previously centralized in the Southern District of Texas, the Judicial Panel on Multi-District Litigation transferred ERISA actions filed in Illinois and New York to the Southern District of Texas.[11]  (Order, Doc. No. 6.)  This Court appointed interim class counsel on February 11, 2011.  (Order, Doc. No. 44.)  Plaintiffs filed a Consolidated Complaint (Doc. No. 57) on May 27, 2011.  Defendants moved to dismiss the Complaint on July 26, 2011 (Doc. No. 88).[12]  Plaintiffs filed a response in opposition on September 23, 2011 (Doc. No. 102), and Defendants filed their reply in further support of the motion to dismiss on November 7, 2011 (Doc. No. 109).  The Court heard oral argument on the motion to dismiss on January 20, 2012.

## II.   LEGAL STANDARD

### A.  12(b)(6)

In deciding whether to dismiss a case for failure to state a claim under Rule 12(b)(6), "the district court must take the factual allegations of the complaint as true and resolve any ambiguities or doubts regarding the sufficiency of the claim in favor of the plaintiff."

---

[11] The original actions centralized included *Charis Moule v. BP Corp. North America, Inc.*, C.A. No. 1:10-3990 and *Syed Arshadullah v. BP, PLC*, C.A. No. 1:10-4026, originally filed in the Northern District of Illinois, and *Ralph Whitley v. BP, PLC*, C.A. No. 1:10-4935, originally filed in the Southern District of New York.

[12] The motion to dismiss was originally filed on behalf of all the Corporate Defendants and fifteen of the seventeen Individual Defendants.  The remaining two Individual Defendants (Damsma and Miller) filed a joinder on September 19, 2011.  (Doc. No. 94.)

14

*Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Mere "formulaic recitation of the elements of a cause of action will not do."  *Id.*  Even taking into account the liberal pleading standard set forth by Rule 12(b)(6), the Court may not assume that a plaintiff can prove facts he has not alleged.  *Campbell v. Wells Fargo Bank, N.A.,* 781 F.2d 440, 443 (5th Cir. 1986).  Moreover, dismissal is appropriate where the complaint "lacks an allegation regarding a required element necessary to obtain relief."  *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995) (citation omitted).

ERISA does not impose heightened pleading requirements.  *In re Dynegy, Inc. ERISA Litig.*, 309 F. Supp. 2d 861, 867 (S.D. Tex. 2004).  Thus proceeding under Rule 8, a plaintiff is only required to provide "a short and plain statement of the claim" to put the defendant on notice of the subject and basis of the claim.  FED. R. CIV. P. 8(a).  "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint."  *Twombly*, 550 U.S. at 546.

In evaluating a 12(b)(6) motion, the court "must limit [its consideration] to the contents of the pleadings, including attachments thereto."  *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000) (citing FED. R. CIV. P. 12(b)(6)).  Documents not attached to the pleadings, but to the motion to dismiss, may be considered "part of the pleadings if they are referred to in the plaintiff's complaint and are central to [the] claim . . . [because i]n so attaching, the defendant merely assists the plaintiff in establishing the basis of the suit, and the court in making the elementary determination of whether a claim has been stated."  *Id.* at 498–99 (citing

*Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)).

## B. ERISA

Congress enacted ERISA as a statutory scheme "to protect employees' rights to benefits while also encouraging employers to develop employee benefits programs." *Martinez v. Schlumberger, Ltd.,* 338 F.3d 407, 411 (5th Cir. 2003).   ERISA requires every employee benefit plan to be established and maintained pursuant to a written instrument that provides "for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan." 29 U.S.C. § 1102(a)(1).   "[F]iduciary status is not an all or nothing proposition."   *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 284 F. Supp. 2d 511, 544 (S.D. Tex. 2003) (quoting *Beddall v. State Street Bank and Trust Co.*, 137 F.3d 12, 18 (1st Cir. 1998)).   A person or entity becomes an ERISA fiduciary either by being named as a fiduciary in the written instruments governing the employee benefit plan, or by exercising discretionary authority or control over the management, administration, or assets of a plan.   29 U.S.C. §§ 1102(a), 1002(21)(A).   The issue of fiduciary status is a mixed question of law and fact and "is to be determined by looking at the *actual* authority or power demonstrated, as well as the formal title and duties of the party at issue."   *Landry v. Air Line Pilots Ass'n Int'l AFL-CIO*, 901 F.2d 404, 418 (5th Cir. 1990) (emphasis in original).

ERISA provides specific rules governing fiduciary duties and the information that fiduciaries must provide to plan participants and government agencies.  *Martinez*, 338 F.3d at 411.  ERISA fiduciaries assume several affirmative duties, including: (1) the duty to act solely in the interest of plan participants and beneficiaries, (2) the duty to exercise care, skill, prudence, and diligence, (3) the duty to diversify investments of the plan to minimize risk of loss unless it is imprudent to do so under the circumstances, and (4) the duty to act in accordance with the

16

documents and instruments governing the plan unless to do so would violate ERISA.  29 U.S.C.

§ 1104(a)(1); *see also Laborers Nat'l Pension Fund v. N. Trust Quantitative Advisors, Inc.,* 173

F.3d 313, 317 (5th Cir. 1999).

An ERISA plan participant or beneficiary may bring a civil action against an ERISA

fiduciary to recover benefits or for injunctive or equitable relief for an alleged breach of

fiduciary duties.  29 U.S.C. § 1132.  Section 405(a) of ERISA also creates liability for "co-

fiduciaries" who (1) participate or conceal the breach of another fiduciary, (2) enable other

fiduciaries, through their own inaction, to commit a breach, or (3) have knowledge of a breach

and fail to make "reasonable efforts under the circumstances to remedy the breach."  *Id.* §

1105(a).  ERISA does not permit a civil action for legal damages against a non-fiduciary charged

with knowing participation in a fiduciary breach.  *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262

(1993).  As an alternative to fiduciary liability, a non-fiduciary may be liable as a "party in

interest," but only for "appropriate equitable relief," including injunctions and equitable

restitution, in civil actions brought by plan participants under 29 U.S.C. § 1132(a)(3).

To establish a breach of fiduciary duty, an ERISA plaintiff must prove a breach of a

fiduciary duty and a prima facie case of loss to the plan.  "Once the plaintiff has satisfied these

burdens, the burden of persuasion shifts to the fiduciary to prove that the loss was not caused by .

. . the breach of duty."  *McDonald v. Provident Indem. Life Ins. Co.,* 60 F.3d 234, 237 (5th

Cir.1995) (internal citation and quotation omitted).  ERISA provides an affirmative defense to a

breach of fiduciary duty claim for plans that establish individual accounts and allow participants

to exercise control over the assets in their accounts.  *Langbecker v. Elec. Data Sys. Corp.*, 476

F.3d 299, 311 (5th Cir. 2007).  Specifically, "no person who is otherwise a fiduciary shall be

liable . . . for any loss, or by reason of any breach, which results from such participant's or

17

beneficiary's exercise of control."  29 U.S.C. § 1104(c)(1)(A)(ii).  ERISA also provides a "safe harbor" provision for eligible individual account plans ("EIAPs").  EIAPs are designed to hold employer securities and, as such, are excepted from ERISA's general prohibitions against acquiring employer stock above a certain percentage.  *Id.* § 1107(a)(2).  In addition, fiduciaries of EIAPs do not have a duty to diversify and do not act imprudently by not diversifying the assets of an EIAP.  *Id.* § 1104(a)(2).

## III.   ANALYSIS

Plaintiffs claim that Defendants breached their fiduciary duties by, among other things, failing to (1) divest the Plans of units of the BP Stock Fund, (2) discontinue further contributions of BP ADSs to the Plans, (3) remove BP ADSs as an investment option for the Plans, (4) properly monitor State Street as the independent fiduciary, and (5) resign as fiduciaries of the Plans when, as a result of their employment with BP, Defendants could no longer continue to loyally serve the Plans and the Plan Participants.  (*Id.* ¶ 368.)  Plaintiffs allege additional breaches of fiduciary duty related to Defendants' direct and indirect communications with Plan Participants and argue that said communications left the Plan Participants with inaccurate and incomplete information regarding the soundness of BP ADSs as an investment vehicle.  (*Id.* ¶¶ 369–70.)

Defendants contend that Plaintiffs' allegations related to breach of the fiduciary duties of prudence and loyalty (Count I) must be dismissed for failure to overcome the presumption of prudence that protects fiduciaries of EIAPs.  (Doc. No. 88, at 1.)  Defendants also argue that the alleged breaches of an ERISA duty to inform (Count II) fail because they are (a) unrelated to any specific disclosure obligation imposed by the statute, (b) not connected to any fiduciary role held by Defendants, (c) not pleaded with particularity as required under Rule 9(b), and (d) fail to

adequately allege reliance. (*Id.*) Defendants argue that Plaintiffs' derivative claims of co-fiduciary liability (Count III) also must fail for lack of an underlying claim. (*Id.*, at 2.) As an alternative to their arguments on the merits, Defendants suggest that all claims against the Corporate Defendants, Director Defendants, and Designated Officer Defendants should be dismissed because these individuals and entities do not qualify as fiduciaries under ERISA with respect to the matters alleged in the Complaint. (*Id.*) Because the Court finds that Plaintiffs have failed to state a claim for breach of fiduciary duty generally, as discussed below, it is not necessary for this Court to determine whether Plaintiffs have stated a proper claim against the named Defendants.

### A. Count I: Defendants Allegedly Failed to Prudently and Loyally Manage the Plans' Assets

Under controlling Fifth Circuit law, company stock is a presumptively prudent investment for benefit plans. To overcome this presumption—first developed by the Third Circuit in *Moench v. Robertson*—a plaintiff must "establish[] that the fiduciary abused its discretion by investing in employer securities." 62 F.3d 553, 571 (3d Cir. 1995); *see also Edgar v. Avaya, Inc.*, 503 F.3d 340, 347 (3d Cir. 2007) (extending the *Moench* presumption to EIAPs). The Fifth Circuit, which adopted the *Moench* presumption in *Kirschbaum v. Reliant Energy*, has explained that the abuse of discretion standard is met only where a plaintiff alleges "persuasive and analytically rigorous facts demonstrating that reasonable fiduciaries would have considered themselves bound to divest." *Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 256 (5th Cir. 2008). In other words, a plaintiff must show that the fiduciary "could not have believed reasonably that continued adherence to the [plan's] direction was in keeping with the settlor's expectations of how a prudent fiduciary would operate." *Moench*, 62 F.3d at 571. Defendants contend that the *Moench* presumption bars Plaintiffs' breach of duty claim here. Plaintiffs argue

19

that their claim should not be dismissed based on the *Moench* presumption because: (1) the presumption only applies when the fiduciary is required by the terms of the plan to invest in company stock; (2) the presumption does not apply on a motion to dismiss; and (3) assuming the presumption does apply, Plaintiffs have pleaded sufficient facts to overcome it.   The Court addresses each of these arguments in turn.

### i.   The presumption of prudence is applicable to the Plans here

An "eligible individual account plan" ("EIAP") is an individual account plan that is "(i) a profit-sharing, stock bonus, thrift, or savings plan [or] (ii) an employee stock ownership plan" and which "explicitly provides for acquisition and holding of qualifying employer securities." 29 U.S.C. §§ 1107(d)(3)(A)-(B).   EIAPs serve a dual statutory purpose in that they serve to encourage employee stock ownership, in addition to acting as "vehicle[s] for retirement savings." *In re Dell, Inc. ERISA Litig.*, 563 F. Supp. 2d 681, 691 (W.D. Tex. 2008) (internal quotation omitted).   Under ERISA, EIAPs enjoy "the favored status Congress has granted to employee stock investments in their own companies."   *Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299, 308 (5th Cir. 2007).   The presumption of prudence is a reflection of this favored status, providing that "an EIAP fiduciary who invests Plan assets in the employer's security is entitled to a presumption that this investment decision was prudent, which Plaintiff may rebut by establishing that the fiduciary abused its discretion by investing in employer securities."   *Dell*, 563 F. Supp. 2d at 691.

Here, the Plans are "defined contribution" and "individual account" plans within the meaning of ERISA § 3(34) and have the express purpose of "encourage[ing] eligible employees to regularly save part of their earnings and . . . assist[ing] them in accumulating additional financial security for their retirement."   (Compl. ¶¶ 91–92.)   By their own terms, the Plans are

"intended to constitute . . . qualified profit sharing plan[s]."[13]  (ESP, at 3.)  The Plans at issue here included BP common stock as one of the investment options available to Plan Participants. Specifically, the BP Stock Fund, a fund comprised almost entirely of BP ADSs, was listed as one of the "core investment options" offered by the Plans.  (Compl. ¶ 94; *see also* ESP, Appendix 1.58.)  During the relevant period, the BP Stock Fund comprised one-third of the Plans' assets. (*Id.* ¶ 94.)  Although the BP Stock Fund was offered as an investment option and the Plans qualify as EIAPs, Plaintiffs argue that Defendants' decision to make the BP Stock Fund available is not entitled to a presumption of prudence because the terms of the Plans do not absolutely *require* investment in the BP Stock Fund.

Since adopting the presumption of prudence, the Fifth Circuit has made clear that "[t]he *Moench* presumption logically applies to any allegations of fiduciary duty breach for failure to divest an EIAP or ESOP of company stock."  *Kirschbaum*, 526 F.3d at 254.  "This protection is not limited by whether the plan requires, encourages, or permits investment so long as the investment is an EIAP or ESOP."  *Dell*, 563 F. Supp. 2d at 691.  "[T]he rule adopted by *Moench* and extended to EIAPs by *Avaya* does not require an express plan mandate or preference for such investments."  *Id.* at 692.  Simply put, application of the *Moench* presumption in this Circuit does not hinge on the extent to which the Plans mandate investment in employer stock—or whether such investment is mandated at all—so long as the plan in question is an EIAP.  *See, e.g.*, *Dell*, 563 F. Supp. 2d at 692 (applying the *Moench* presumption even where the Dell Plan "d[id] not even suggest, much less require, that the Plan invest in Dell stock"); *see also Fisher v. JP Morgan Chase & Co.*, 703 F. Supp. 2d 374, 383 (S.D.N.Y. 2010) (finding that the presumption "applies to any allegations of fiduciary duty breach for failure to divest an EIAP or ESOP of

---

[13] All Plan citations are to the 2008 restatement of the ESP, Defendants' Exhibit A (Doc. No. 88-3).  Earlier plan documents are referenced only to the extent their terms differ.

company stock"); *Citigroup ERISA Litig.*, No. 07 Civ. 9790, 2009 WL 2762708, at *16 (S.D.N.Y. Aug. 31, 2009) (noting that the *Moench* presumption would apply "even if defendants did have discretion to eliminate Citigroup stock as an investment option").

Application of the presumption is appropriate here because the Plans are EIAPs within the meaning of 29 U.S.C. § 1107(d)(3)(A) and (B) and, further, the Plans encourage investment in the BP Stock Fund.  Plaintiffs' portrayal of the Plans as merely "permitting" such an investment unfairly minimizes the importance of the BP Stock Fund as a core investment option under the terms of the Plans.  The Plans specifically single out and define the "Company Stock Fund" as the BP Stock Fund Investment Option.  (ESP § 1.32)  No other investment option is similarly defined in the text of the Plans.  Further, the Plans' investment appendix—Appendix 1.58—is embedded in the text of the Plans.  (ESP, Appendix 1.58).  Appendix 1.58 identifies the BP Stock Fund as a "core investment option" available to Plan Participants.  (*Id.*)  Moreover, numerous other Plan provisions specifically reference the Company Stock Fund and, therefore, would be rendered meaningless if the BP Stock Fund were unavailable as an investment option. These provisions include: (a) ESP § 6.5, which provides that "purchases and sales in the Company Stock Fund will be restricted for Participants subject to applicable statutory, stock exchange or Company trading restrictions"; (b) ESP §§ 9.7(f) and 10.3(b), the Plans' withdrawal provisions, which provide that the BP Stock Fund is the only option from which a withdrawal or payment may be made in kind, rather than in cash; (c) ESP § 18.14, the Plans' "Notice and Information Requirements" description, which refers to the disclosure of Company-related information in connection with the Plans' purchase, distribution, or transfer of Company Stock. In sum, the Plan documents presuppose the existence of the Company Stock Fund and underscore the importance of the BP Stock Fund as a key investment option available to Plan

Participants.[14]   Taking into account these factors, application of the *Moench* presumption is appropriate here.

### ii. The presumption of prudence is properly applied at the motion to dismiss stage

Plaintiffs argue that the presumption of prudence, even if applicable to the Plans, should not be applied at the motion to dismiss stage because "it is an evidentiary standard suited for evaluation after the development of a full factual record."  (Doc. No. 102, at 2.)  Since filing their opposition to Plaintiff's motion to dismiss, Plaintiffs have alerted the Court to further authority which they contend supports their argument that application of the *Moench* presumption is inappropriate at this stage.  (ERISA Plaintiffs' Notice of Recent Authority, Doc. No. 111.)  In *Pfeil v. State Street Bank and Trust Co.*, the Sixth Circuit recently held that the presumption of reasonableness "is not an additional pleading requirement and thus does not apply at the motion to dismiss stage."  No. 10-2302, 2012 WL 555481, at *5 (6th Cir. Feb. 22, 2012).  Notably, the court based its decision on the language it had previously used in initially adopting the *Moench* presumption in the circuit.  *Id.*  In that prior decision, the Sixth Circuit had explained that a plaintiff could rebut the presumption "by *showing* that a prudent fiduciary acting under similar circumstances would have made a different investment decision."  *Id.* (quoting *Kuper v. Iovenko*, 66 F.3d 1447, 1459 (6th Cir. 1995)) (emphasis in original).  Finding that use of the word "showing" implied consideration of summary judgment as opposed to a motion to

---

[14] Plaintiffs assert that the SPIOC could have eliminated the BP Stock Fund as an investment option as a matter of fiduciary discretion.  (Doc. No. 102, at 17.)  Defendants argue the contrary, explaining that, because the BP Stock Fund is embedded in the Plans as Appendix 1.58, the choice to eliminate the Fund could be made only by plan amendment, which constitutes a "quintessential non-fiduciary" act carried out in settlor capacity.  *See Kirshbaum*, 526 F.3d at 251 ("Excluded from fiduciary responsibilities . . . are the decisions of a plan sponsor to modify, amend or terminate the plan; such decisions are those of a trust settlor, not a fiduciary.").  Such an action could, therefore, not be taken by the SPIOC, but rather would have to have been made by a Designated Officer acting as a settlor on behalf of BPNAI's Board of Directors.  ESP §§ 6.3, 16.1(a)-(c), 16.4 ("Decisions regarding the design of the Plan (including any decision to amend or terminate, or to not amend or terminate the Plan) will be made in a settlor capacity and will not be governed by the fiduciary responsibilities of ERISA.")  A finding on this factual issue is not required to determine that application of the *Moench* presumption is appropriate here.

dismiss, the Sixth Circuit in *Pfeil* cast the presumption as an evidentiary presumption. *Id.*

By drawing this Court's attention to *Pfeil*, Plaintiffs correctly highlight the circuit split on the issue of whether the *Moench* presumption applies at the motion to dismiss stage. The Second, Third, and Ninth Circuits have applied the presumption when considering motions to dismiss; the Sixth Circuit has not. *See, e.g.*, *In re Citigroup ERISA Litig.*, 662 F.3d 128, 139 (2d Cir. 2011) (rejecting plaintiffs' argument that the *Moench* presumption should not apply at the pleading stage and explaining that "[t]he 'presumption' is not an evidentiary presumption; it is a standard of review applied to a decision made by an ERISA fiduciary. Where plaintiffs do not allege facts sufficient to establish that a plan fiduciary has abused his discretion, there is no reason not to grant a motion to dismiss"); *Edgar v. Avaya*, 503 F.3d 340, 349 (3d Cir. 2007) (remaining "unconvinced" by plaintiff's argument that application of the *Moench* presumption at the motion to dismiss stage was "somehow inconsistent with the liberal pleading standards set forth in Rule 8"); *Griffin v. Flagstar Bancorp, Inc.*, No. 2:10-cv-10610, 2011 WL 1261196, at *36 (E.D. Mich. Mar. 31, 2011) (noting that "although the term 'presumption' often describes evidentiary standards, in this context the presumption merely indicates the standard required for plaintiffs to state claims in 'stock drop' cases."); *Wright v. Medtronic, Inc.*, No. 09-CV-0443, 2010 WL 1027808, at *7 n.9 (D. Minn. Mar. 17, 2010) ("[I]t is somewhat misleading to say, in the context of a Rule 12(b)(6) motion, that the Court is applying a 'presumption' or that a plaintiff must plead sufficient facts to 'overcome' it. A plaintiff who has failed to plead facts that, if proven, would establish that an EIAP should not have invested in any employer stock has failed to state a claim, not failed to overcome a presumption.").

Plaintiffs also are correct in pointing out that the Fifth Circuit has not expressly addressed whether the presumption applies at the motion to dismiss stage. However, since *Kirschbaum*

was decided, every reported district court decision in this Circuit addressing fiduciary challenges to employer stock investments has dismissed the complaints under Rule 12(b)(6) on the basis of the presumption.  *See, e.g.*, *Fulmer v. Klein*, No. 3:09-CV-2354-N, 2011 WL 1108661, at *6 (N.D. Tex. Mar. 16, 2011); *Halaris v. Viacom, Inc.*, No. 3:06-CV-1646, 2008 WL 3855044, at *4 (N.D. Tex. Aug. 19, 2008); *Dell*, 563 F. Supp. 2d at 692–93; *In re Radioshack Corp. ERISA Litig.*, 547 F. Supp. 2d 606, 614–16 (N.D. Tex. 2008).  Even in the most recent decision on this issue—a decision issued after the Sixth Circuit's *Pfeil* decision—a judge in the Northern District of Texas remained unpersuaded by the Sixth Circuit's logic.  *See Fulmer v. Klein*, No, 3:09-CV-2354-N, slip. op., at 14–15 n.13 (N.D. Tex. Mar. 15, 2012) ("*Fulmer II*") ("The Court agrees with the Second and Third Circuits that the presumption is applicable when considering a motion to dismiss.").

   This Court must side with all the other district courts in this circuit and apply the *Moench* presumption at the motion to dismiss stage.  The Fifth Circuit did not select language in *Kirschbaum*—such as the "showing" required under the Sixth Circuit's application of the presumption—to suggest that the *Moench* presumption is confined to the summary judgment stage.  Instead, the Fifth Circuit explained that the courts are to look for "persuasive and analytically rigorous facts" to overcome the presumption.  *Kirschbaum*, 526 F.3d at 256.  If a plaintiff does not plead such persuasive and analytically rigorous facts, *i.e.*, the essential elements of his or her legal claim, there is no reason for a district court to allow the claim to proceed to discovery where, even if the allegations pleaded were proven true, plaintiffs would be unable to establish that Defendants abused their discretion.  *See Gerren v. McGraw-Hill Cos., Inc.*, 660 F.3d 605, 610 (2d Cir. 2011) (dismissing action where, "even [assuming] that plaintiffs' allegations are proved, plaintiffs are unable to establish that

defendants knew or should have known that McGraw-Hill was in a dire situation"). Finding the reasoning of the Second, Third, and Ninth Circuits more persuasive, the presumption of prudence is appropriately applied here at the 12(b)(6) stage, as the standard of review through which this Court must analyze decisions made by alleged ERISA fiduciaries.

### iii.  Plaintiffs have failed to overcome the presumption of prudence

Finding that the presumption of prudence applies to the Plans at the motion to dismiss stage, the Court must turn to Plaintiffs' third argument against dismissal, that is, Plaintiffs' contention that they have pleaded sufficient facts to overcome the presumption. In *Kirschbaum*, the Fifth Circuit implied that the *Moench* presumption is not to be applied with equal strength in all cases. Instead, where a company savings plan mandates investment in company stock "a greater degree of deference, and hence a lesser degree of judicial scrutiny, [is] appropriate to such mandatory plans." *Kirschbaum*, 526 F.3d 243, 254–55. Plaintiffs argue that the converse must be true in the case at hand. As the Fifth Circuit explained, *Moench* "clearly implies that a plan participant [bears] an even heavier burden of showing a fiduciary duty breach where the plan utterly compelled investment in company stock." 526 F.3d at 255. Here, where the BP Stock Fund was only one among a multitude of choices, where participants were free to invest in BP stock or not invest in BP stock at all, and where BP made matching contributions in cash as opposed to company stock, Plaintiffs argue that they must confront only an intermediate presumption. *See, e.g.*, *In re Schering-Plough ERISA Litig.*, 08-CV-1432 (DMC), 2010 WL 2667414 (D.N.J. June 29, 2010) (finding an intermediate abuse of discretion standard appropriate where defendants were not not absolutely required to invest in employer securities but were "more than simply permitted to make such investments"); *see also Dann v. Lincoln Nat'l Corp.*, 2010 U.S. Dist. LEXIS 39045, at *24 (E.D. Pa. Apr. 20, 2010) (adopting an intermediate abuse

of discretion standard where "[r]ead as a whole, it is clear that the Plans contemplate and expect that the [Company] Stock Fund is available as an investment option").

Even assuming the *Moench* presumption presents an intermediate burden for Plaintiffs does not help them to overcome it.  Plaintiffs allege that, beginning as early as 2007, Defendants issued a series of false statements in press releases, quarterly reports, and presentations to investors that overstated BP's efforts to reform its process safety controls in its worldwide operations and, more specifically, in its offshore operations in the Gulf of Mexico.  (Compl. ¶¶ 203–55.)  These statements touted BP's promises to prioritize safety above all other corporate initiatives and included reassurances that BP was making progress in implementing key safety reforms urged by the Baker Panel in early 2007.  (*Id.*)  Plaintiffs allege that the falsity of these statements was tragically revealed on April 20, 2010, when the Deepwater Horizon rig exploded in the Gulf of Mexico and BP proved unable to contain the largest oil spill in U.S. history.  (*Id.* ¶ 256.)  Following the catastrophic accident, BP's stock prices fell.  (*Id.* ¶ 325.)  Over the course of several weeks following the blowout, various rating agencies downgraded BP's ratings.  (*Id.* ¶¶ 328–32, 340.)  Approximately two months after the accident, BP announced it would set aside a $20 billion escrow fund to cover its liabilities arising out of the Deepwater Horizon accident.  (*Id.* ¶ 341.)  On the same day, BP cancelled its previously declared quarterly dividend for the first quarter of 2010.  (*Id.* ¶ 343.)  In the two months following the accident, BP's stock price fell from $60.48 to less than $27, diminishing the value of the BP Stock Fund by approximately $1.85 billion.  (*Id.* ¶¶ 13, 325, 353.)

According to Plaintiffs, the Deepwater Horizon accident was a predictable consequence of BP's failure to implement much-needed safety reforms.  The state of BP's safety programs and the predictability of the Deepwater Horizon accident—facts and considerations allegedly

available to the fiduciaries of the Plans—in turn required Defendants to make a series of assumptions and take a series of preemptive actions to protect the Plans.  (Compl. ¶ 145.)  Under Plaintiffs' theory of the case, Defendants knew or should have known that BP was not in fact implementing the safety reforms espoused by company representatives, that the failure to make particular safety reforms would result in a catastrophic offshore accident, that BP would be unable to contain an offshore spill in the Gulf, that the uncontained spill would result in a significant price drop in the price of BP ADSs, and that Defendants therefore should have divested the Plans of all BP stock, thereby overriding all individual employees' decisions to direct their contributions to the BP Stock Fund, either by limiting, freezing, or liquidating the BP Stock Fund or by deleting the BP Stock Fund as an Investment Option altogether.  (*Id.* ¶ 368.) Plaintiffs' allegations fail to overcome the presumption of prudence because the Complaint (1) fails to allege how the fiduciaries knew of the alleged shortcomings in BP's safety operations and (2) fails to allege sufficient facts to suggest that BP's underlying operations were indeed in dire straits following the Deepwater Horizon explosion so as to call into question the continued financial viability of the Company.

### a. *The Complaint fails to point to material, non-public facts known to Defendants*

"[P]laintiffs may state a claim only where a fiduciary's knowledge of nonpublic information did or should have made the fiduciary aware that investment in company stock was not only a risky investment, but a *bad* one—that 'it was imprudent for the Plan to hold even one share of [company] stock' because the price was artificially inflated."  *Halaris v. Viacom*, No. 3:06-CV-1646-N, 2008 WL 3855044, at *2 (N.D. Tex. Aug. 19, 2008) (quoting *Kirschbaum*, 526 F.3d at 249).  Plaintiffs claim that flaws in BP's safety programs should have set off a domino-like series of actions on the part of fiduciaries of the Plans, culminating in divestment of

the BP Stock Fund.  Missing is the very first step required to set off the chain reaction: Plaintiffs fail to allege how Defendants were aware of non-public information that would have prompted them to take fiduciary action with respect to the Plans.

Plaintiffs repeatedly emphasize that "the safety and risk management culture touted by Defendants during the relevant period did not exist" and that "BP's public statements during the relevant period did not reflect reality."  (Compl. § 256.)  The Complaint cites various internal communications as evidence of known problems at the Deepwater Horizon site.  For example, a March 10, 2011, email from BP drilling engineer Brett Cocales to Adam Salmi warned of "[m]ajor problems on the well" related to the cement plugs.  (*Id.* ¶ 262.)  Unidentified individuals at Halliburton allegedly reported to unidentified individuals at BP that a greater number of centralizers should have been used on the rig.  (*Id.* ¶ 270.)  Debate over proper use of centralizers at the Macondo well involved BP Wells Team Leader John Guide, BP engineer Brian Morel, and BP drilling engineer Brett Cocales.  (*Id.* ¶ 271.)  Five days before the blowout, these individuals, and others, were copied on a series of emails discussing the risks associated with the centralizers.  (*Id.* ¶¶ 273–76.)  Other members of "the BP team" met with contractors on the rig and made critical—and, Plaintiffs allege, erroneous—decisions in the days and hours before the blowout.  (*Id.* ¶¶ 285–88.)  Notably absent from these communications is any mention of any of the named Defendants.  Thus, while Plaintiffs' allegations point to what BP employees at the well site may have known leading up to the blowout, none of the internal communications suggest that *Plan fiduciaries* were aware of this non-public information.  Similarly, the Complaint's lengthy recounting of a series of alleged misrepresentations—borrowed almost verbatim from the complaints filed in the securities actions pending before this Court—fail to point to non-public information known to fiduciaries.

Plaintiffs' reliance on post-accident reports, investigations, and news articles is also telling.  Plaintiffs point to reports from the Deepwater Horizon Study Group and the Presidential Commission detailing the slew of technical errors made on the Deepwater Horizon leading up to the blowout.  (Compl. ¶¶ 152, 263–66.)  BP's own internal investigation, summarized in the Bly Report, also noted that "several choices [on the Deepwater Horizon] appear rushed, not adequately tested and confirmed."  (*Id.* ¶ 362.)  Plaintiffs also point to a slew of news articles criticizing both BP's operations and its management of the oil spill and containment efforts.  (*Id.* ¶¶ 265, 323–26, 334, 337, 353.)  While the news articles were certainly negative—invoking doomsday with titles such as "Imagining the Worst for BP's Future" and "Is BP About to Fail?"—they do not demonstrate how the Plan fiduciaries should have known of safety concerns prior to the Deepwater Horizon incident.  In fact, Plaintiffs' reliance on contemporaneous news reports does more to cast their claims in a speculative light than it does to ground the claims in the type of "persuasive and analytically rigorous facts" needed to overcome the *Moench* presumption.

In order to overcome the presumption of prudence, "Plaintiffs must allege facts making it plausible that Defendants should have, by virtue of their nonpublic knowledge, considered themselves bound to divest."  *Halaris*, 2008 WL 3855044, at *2 n.6.  Such a claim is implausible here, as Plaintiffs have not alleged how Defendants, as the alleged fiduciaries, would have had access to the non-public information Plaintiffs claim was critical to investors or have been on notice of the likelihood of a catastrophic accident in BP's operations.[15]  While the Complaint

---

[15] Plaintiffs point to the alleged involvement of named Defendants in only one instance.  Specifically, Plaintiffs allege that an SPIOC meeting occurred on June 4, 2010, and that one of the SPIOC members and a defendant in this action (Williamson) "reminded the SPIOC members that the SPIOC is responsible as a named fiduciary for selecting, monitoring, terminating investment managers along with determining the prudence of continuing to offer BP Stock Fund as an investment option."  (Compl. ¶ 371.)  Without further context or content, this allegation alone is insufficient to support Plaintiffs' attempt to overcome the *Moench* presumption.

alleges extensive breakdowns in BP's safety operations on the Deepwater Horizon, it fails to allege that Defendants had access to "nonpublic information that should have put them on notice that [BP] was about to . . . suffer such calamities that they should have considered themselves bound to divest." *Id.* at *2.

### b. The Complaint fails to allege facts sufficient to call into question the ongoing viability of BP

To demonstrate a breach of fiduciary duty, Plaintiffs must allege "dire circumstances," not merely an expected decline in the value of company securities. *Edgar*, 503 F.3d at 348–49. Here, the Complaint fails to allege the underlying facts that would support Plaintiffs' claim for breach of the fiduciary duty. The Deepwater Horizon catastrophe was not the manifestation of a novel risk unknown to investors. Nor were the consequences for investors—the drop in BP's stock price—of a magnitude sufficient to call into question the continued viability of the Company.

Even assuming *arguendo* that Defendants were aware of risks to BP's offshore drilling operations, Plaintiffs' allegations do not suggest that the risk was one Plan Participants would have been unaware of. The Complaint highlights the risks associated with offshore drilling in great detail, including the risks of using a particular number of centralizers and the risks associated with the cementing process. (Compl. ¶¶ 270, 280–585, 287.) The Complaint also points to internal communications between members of BP's well team suggesting that development at the Macondo well was particularly likely to cause major problems. (*Id.* ¶¶ 261–62.) Though Plaintiffs explain the nuances and intrinsic risks of offshore drilling with finesse, they fail to explain why the risks associated with BP's principal operations was anything out of the ordinary that would have required the alleged fiduciaries to divest the Plans of the BP Stock

Fund.[16]

The Complaint also presents an extensive chronicle of BP's prior safety accidents.  (*Id.* ¶¶ 153–202.)  Yet, Plaintiffs' lengthy recounting of instances of BP's marred safety record and detailed accounting of each and every safety accident from 2002 onward actually undermines their claim that the Deepwater Horizon accident was anything out of the ordinary.   While dramatic and tragic in the number of lives lost and the severe and ongoing environmental repercussions, Plaintiffs do little to distinguish the Deepwater Horizon incident from prior accidents or explain why Defendants should have assumed BP stock would not recover in value, just as it had after every other industrial accident from 2002 forward.   "Essentially, Plaintiffs' allegations support only the claim that the stock dropped due to the (unfortunate) materialization of publically known risk."  *Halaris*, 2008 WL 3855044, at *2.  "One cannot say that whenever plan fiduciaries are aware of circumstances that may impair the value of company stock, they have a fiduciary duty to depart from ESOP or EIAP plan provisions."  *Kirschbaum*, 526 F.3d at 256.  In underscoring the riskiness of BP's operations, Plaintiffs have failed to point to the type of "dire circumstances" required to state a claim for a breach of fiduciary duty here.  Instead, Plaintiffs point to an unfortunate accident that stemmed from exactly the type of risk BP, through the very nature of its business, always faces.

Turning to Plaintiffs' allegations regarding the stock drop, the Court must keep in mind

---

[16] In addition, Plan Participants were advised of the risks associated with investment in the BP Stock Fund.  The Investment Options Guide warned participants:

> You should be aware that there is a risk to holding substantial portions of your assets in securities of any one company (e.g., the BP Stock Fund), as individual securities tend to have wider price swings up and down, in short periods of time, than investments in funds holding multiple securities.  (Investment Options Guide, at 6.)

The Investment Options Guide further warned participants:

> There is no assurance that the [BP Stock] Fund will achieve its objective.  Also, the past performance of this option cannot necessarily be used to gauge future performance.  It is possible to lose money by investing in this option.  (Investment Options Guide, at 35.)

that "[m]ere stock fluctuations, even those that trend downward significantly, are insufficient to establish the requisite imprudence to rebut the *Moench* presumption." *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1099 (9th Cir. 2004) (dismissing complaint under Rule 12(b)(6)); *Kirschbaum*, 526 F.3d at 255–56. The facts of the stock drop here further contradict Plaintiffs' grim portrait of the state of BP's operations following the Deepwater Horizon accident. According to the Complaint, BP's stock price closed at $60.48 on April 20, 2010, hours before the blowout occurred. (Compl. ¶ 325.) Following the Deepwater Horizon explosion and over the course of the next month, BP ADSs fell approximately 13%, closing at $36.52 on June 1, 2010. (*Id.*) By June 9, 2010, following various rating agencies' downgrading of BP, the price of BP ADSs declined further, closing at $29.20. (*Id.* ¶ 335.) Four days after the last day of the Class Period, BP ADSs closed at $27.05, representing a decline of almost 55% since April 19, 2010. (*Id.* ¶ 354.)

The percentage decline is far less than declines other courts routinely deem insufficient to rebut the *Moench* presumption. *See, e.g.*, *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 551 (S.D.N.Y. 2011) (93% drop); *In re Bank of Am. Corp. Secs.*, 756 F. Supp. 2d 330, 354 (S.D.N.Y. 2010) (83% drop); *Wright*, 360 F.3d at 1096 (9th Cir. 2004) (75% drop); *Kuper v. Iovenko*, 66 F.3d 1447, 1451 (6th Cir. 1995) (80% drop). In addition, the duration of the decline was short-lived. In the thirteen months following the end of the Class Period, BP's stock price increased from the June 2010 closing low up to $46.77, an increase of more than 62%. (Doc. No. 88-1, at 21.) By the time Plaintiffs filed this Complaint, BP's stock had regained almost 70% of its pre-Deepwater Horizon value. (Defs.' Exh. R.)

Examining the fluctuations in BP's stock price suggests that Plaintiffs' losses were only temporary. Further, in 2010, the year of the explosion, BP's operating revenues actually

increased by 24%, exceeding $297 billion.  (Doc. No. 88-1, at 19.)  BP's performance remained strong in the first quarter of 2011, and the Company generated revenues of approximately $85 billion.  (*Id.*, at 20.)  Further, BP's steady revenue stream and expansive worldwide operations belie Plaintiffs' contention that the Deepwater Horizon explosion and subsequent spill were a threat to viability of the company going forward.  *See, e.g.*, *In re Citigroup ERISA Litig.*, No. 07 Civ. 9790, 2009 WL 2762708, at *19 (S.D.N.Y. Aug. 31, 2009) (dismissing duty of prudence claim for failure to overcome *Moench* presumption where losses due to collapse of subprime mortgage market "were not cataclysmic" give the size of the company, its market capitalization, its revenues, and numbers of customers and employees).  Considering all of these facts, it is clear that Plaintiffs allegations are insufficient to demonstrate that the alleged fiduciaries should have considered the long-term viability of BP's operations at risk.

While hindsight is not the starting point for a determination as to whether Plaintiffs' allegations are sufficient, it necessarily informs the discussion in this case, as the subsequent recovery in BP's stock price likely would have subjected the alleged fiduciaries to liability had they in fact decided to take the action Plaintiffs now urge was appropriate.  Plaintiffs have selected the end date of their proposed Class Period to coincide with the low point of BP's stock prices.  While Plaintiffs' choice is logical, the Court simply cannot discount the rapid recovery of BP's stock price following the end of the Class Period.  Doing so would unfairly diminish the competing concern that Defendants would have faced had they indeed decided to take fiduciary action following the Deepwater Horizon accident.   Had Defendants divested rapidly they undoubtedly would have found themselves defending against a breach of fiduciary duty claim for divesting the BP Stock Fund prematurely, based on a two-month decline in stock price, thereby depriving plan participants of the subsequent—and rapid—recovery in BP stock.  "A fiduciary

cannot be placed in the untenable position of having to predict the future of the company stock's performance.  In such a case, he could be sued for not selling if he adhered to the plan, but also for deviating from the plan if the stock rebounded."  *Kirschbaum*, 526 F.3d at 256; *see also In re Coca Cola Enterprises Inc. ERISA Litig.*, 1:06-CV-0953, 2007 WL 1810211, at *10 (N.D. Ga. June 20, 2007) (noting that a fiduciary who scraps plan requirements is "just as apt to be sued" as if he had enforced them).

Although the *Moench* presumption does not require Plaintiffs to demonstrate BP was on the verge of collapse, it provides fiduciaries of EIAPs with "a substantial shield."  *Kirshbaum*, 526 F.3d at 256.  Following *Kirschbaum*, every reported decision in the Fifth Circuit addressing ERISA fiduciary challenges to employer stock investments has dismissed those claims for failure to allege "persuasive and analytically rigorous facts" sufficient to rebut the *Moench* presumption. *See, e.g.*, *Dell*, 563 F. Supp. 2d at 694 (dismissing claim under Rule 12(b)(6) where "Dell stock may not have been the best investment" but "there is no indication Dell's survival was ever threatened nor that Dell's stock was in danger of becoming worthless"); *RadioShack Corp.*, 547 F. Supp. 2d at 614–16 (dismissing claim pursuant to *Moench*); *Citigroup*, 2009 WL 2762708, at *19 (dismissing duty of prudence claim for failure to overcome *Moench* presumption because losses due to collapse of subprime mortgage market "were not cataclysmic" given the size of the company).  Plaintiffs have not distinguished their claims from those found insufficient to overcome the *Moench* presumption.

As the Complaint acknowledges, BP is the largest oil and gas producer in the Gulf of Mexico, operates tens of thousands of miles of pipelines in the United States alone, and employees almost 30,000 people in this country.  (Compl. ¶ 81.)  Plaintiffs' allegations simply do not support their contention that BP's ongoing viability was at stake following the Deepwater

Horizon incident.  *Cf. In re Schering-Plough ERISA Litig.*, 08-CV-1432 (DMC), 2010 WL 2667414 (D.N.J. June 29, 2010) (finding that fiduciaries should have known that downplaying adverse drug trial results artificially inflated stock prices where 60-70% of the company's profits were "largely dependent upon the continuing profitability" of the particular drug).  Because Plaintiffs have failed to allege the type of "persuasive and analytically rigorous facts" required to overcome the *Moench* presumption, the Court must grant Defendants' motion to dismiss with respect to Count I.

### B. Count II: Defendants Allegedly Failed to Provide Plan Participants with Complete and Adequate Information About BP's Safety Programs

Plaintiffs also allege that Defendants breached their fiduciary duties under ERISA by making misrepresentations about the status of BP's safety reforms.  Specifically, Plaintiffs allege that

> Defendants issued to Participants Summary Plan Descriptions and other uniform, written fiduciary communications, some of which incorporated BP's SEC filings by reference.  These fiduciary communications failed to disclose, among other things, important information about BP's operations and prospects, which information Defendants knew or should have known based upon a proper investigation.  (Compl. ¶ 396.)

Defendants assert that Plaintiffs have failed to adequately state a claim for failure to provide plan participants with complete and adequate information.  Defendants contend that (1) they had no fiduciary duty under ERISA to disclose information concerning BP's business affairs to plan participants, (2) that fiduciary disclosure duties would not extend to the alleged non-disclosures at issue, (3) that the alleged misrepresentations were not made by Defendants in an ERISA fiduciary capacity, and (4) that Plaintiffs have failed to plead detrimental reliance.  Additionally, Defendants claim that Rule 9(b) pleading standards apply to fiduciary breach claims that sound in fraud and that Plaintiffs have failed to meet this heightened pleading

standard.

ERISA maps out a "comprehensive set of 'reporting and disclosure' requirements." *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83 (1995) (citing 29 U.S.C. §§ 1021–031).[17]  In addition, if an ERISA fiduciary communicates information to plan participants, the fiduciary must be truthful.  *Edgar*, 503 F.3d at 350 ("It is well-established that an ERISA fiduciary 'may not materially mislead those to whom section 1104(a)'s duties of loyalty and prudence are owed.'") (quoting *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 440 (3d Cir. 1996)) *see also Worldcom, Inc. ERISA Litig.*, 263 F. Supp. 2d 745, 767 (S.D.N.Y. 2003) ("ERISA fiduciaries cannot transmit false information to plan participants when a prudent fiduciary would understand that the information was false.").  In addition, an affirmative duty to disclose can arise when special circumstances threaten a potentially extreme impact on the plan as a whole. *In re Dynegy, Inc. ERISA Litig.*, 309 F. Supp. 2d 861, 888 (S.D. Tex. 2004).

In Count II of the Complaint, Plaintiffs bring an ERISA claim for alleged misrepresentations and omissions that Defendants made concerning the continued safety of BP's drilling operations.  The alleged false statements and omissions Plaintiffs have selected in the Complaint are identical to the misrepresentations alleged in the securities litigation pending before this court.  But to recover for these statements under ERISA, as opposed to the securities laws, Plaintiffs' claim cannot rest on their allegations of false statements.  Plaintiffs must also

---

[17] Plaintiffs do not allege any violation of these ERISA requirements.  Instead, they argue Defendants breached ERISA's general duty of loyalty through their failure to disclose "investment risks of employer stock."  (Doc. No. 102, at 24.)  As the Fifth Circuit has recognized, "the express language of ERISA 'provides little indication as to whether there is ever a fiduciary duty to disclose information to participants and beneficiaries.'"  *Kujanek v. Houston Poly Bag I, Ltd.*, 658 F.3d 483, 488 (5th Cir. 2011) (quoting *Martinez v. Schlumberger, Ltd.*, 338 F.3d 407, 412 (5th Cir. 2003)).  Looking to the law of trusts, the Circuit has noted that an ERISA fiduciary has a duty to disclose "material facts affecting the interest of the beneficiary which the fiduciary knows the beneficiary does not know but needs to know for his protection."  *Id.*  However, the Fifth Circuit has confined application of this principle to cases in which a fiduciary withholds material information *related to the plan*. *See, e.g.*, *Kujanek*, 658 F.3d at 488 (finding violation of fiduciary duty where employer withheld plan documents and rollover form); *see also Citigroup*, 662 F.3d 128, at 143 ("We decline to broaden the application . . . to create a duty to provide participants with nonpublic information pertaining to specific investment options.").

demonstrate that the statements were made *in a fiduciary capacity*. *See Kirschbaum*, 526 F.3d at 256. Plaintiffs have not done so here.

In determining whether Defendants face ERISA liability for their actions, "[t]he relevant questions is not whether an employer's action adversely affected a beneficiary's interest, but whether the employer was acting as a fiduciary when it took that action." *Id.* at 256–57. The misrepresentations alleged here were made in BP's SEC filings and public statements. Generally speaking, SEC filings and general statements to the market are *not* fiduciary communications. *See Pegram v. Herdich*, 530 U.S. 211, 225–26 (2000); *see also Fulmer v. Klein*, 2011 WL 1108661, at *4 ("Individuals act in their corporate capacity while making statements in SEC filings."). However, SEC filings can become fiduciary communications if fiduciaries sufficiently incorporate the filings into plan documents. 2011 WL 1108661, at *4; *see also Kirschbaum*, 526 F.3d at 257.

In *Kirschbaum*, plaintiffs argued that misrepresentations in the defendant's Form 10-Q and 10-K filings became fiduciary statements when defendants incorporated them into the prospectus and the company's Form S-8 Registration Statement. The Fifth Circuit determined that defendants were not acting as fiduciaries with respect to the statements because incorporating the SEC filings into the prospectus was "discharging . . . corporate duties under the securities laws." *Id.* Similarly, in *Fulmer*, plaintiffs alleged that defendants made misrepresentations in the company's SEC filings and incorporated those misrepresentations into the Summary Plan Description of the company's EIAP. *Fulmer*, 2011 WL 1108661, at *4. Specifically, defendants stated that the summary plan description "constitutes part of a prospectus covering [registered] securities." *Id.* Finding that the statement "facially does not incorporate SEC filings by reference into the [summary plan description] or direct [the] reader to

38

SEC filings for further information," the court concluded that plaintiffs had not shown that the alleged misrepresentations were incorporated into plan documents nor made in defendants' fiduciary capacity. *Id.*

In order to adequately allege that misrepresentations made in SEC filings are incorporated into plan documents, a plaintiff must point to plan documents that "encouraged them to review or rely on allegedly misleading SEC filings." *Id.* For example, in *Dynergy*, plaintiffs succeeded on their breach of fiduciary duty claim where defendants had distributed a plan prospectus stating that "each participant is encouraged to carefully review" the SEC filings, which misrepresented the company's financial condition. *In re Dynergy, Inc. ERISA Litig.*, 309 F. Supp. 2d 861, 869, 880 (S.D. Tex. 2004). In fact, this advice followed immediately after the Prospectus's discussion of the "Dynergy Stock Fund," that is, the company stock fund at issue in the litigation. *Id.* at 879. Further, the statement encouraged participants to review the SEC filings expressly "for additional information relevant to investments in the Dynergy Stock Fund." *Id.* Under these facts, the court concluded that "defendants, in the exercise of their fiduciary duties as plan administrators, represented the company's SEC filings as reliable sources of information regarding investment in company stock to plan participants." *Id.*; *see also Worldcom, Inc. ERISA Litig.*, 263 F. Supp. 2d 745, 766 (S.D.N.Y. 2003) (finding plaintiffs had stated a claim for fiduciary liability where they distributed copies of the SEC filings to plan participants).

Plaintiffs' argument for incorporation is much more attenuated than the facts demonstrating incorporation of SEC filings in *Dynergy*. Here, Plaintiffs contend that Summary Plan Descriptions ("SPDs") of the Plans were distributed to Participants. Those SPDs advised Participants to refer to the Investment Options Guide ("IOG") for further information about the

plans.  The IOG, in turn, informs participants that the plan *prospectus* incorporates various SEC documents; it does not purport to incorporate those documents into the IOG.  (Defs.' Exh. H, Doc. No. 92-6, at 74).  Plaintiffs thus argue that because Defendants, while acting in their fiduciary capacity, distributed SPDs to the Participants, they are liable for statements made in their corporate capacity that were incorporated by (multiple stages of) reference into the SPDs. This argument is unpersuasive.

Plaintiffs' multi-layered incorporation argument is too attenuated to adequately allege that Defendants acted in a fiduciary capacity when making statements in SEC filings.  Indeed, under Plaintiffs' theory of incorporation, Defendants would be held responsible for making statements four-steps removed from any action taken as fiduciaries.  Even assuming *arguendo* that the SEC filings indeed contained misrepresentations, Defendants were not acting as fiduciaries merely because those filings were incorporated into the prospectus, which was referenced in the IOG, which was cross-referenced in the SPD.  Plaintiffs have only demonstrated that the SEC filings were incorporated into the prospectus; as a matter of law, a prospectus is not a fiduciary document.  *See Kirshbaum*, 526 F.3d at 257 (citing 15 U.S.C. § 77e; 17 C.F.R. §§ 230.428(a)(1), (b)(1); 17 C.F.R. § 239.16(b)).  Defendants acted as fiduciaries in distributing the SPDs to plan participants.  Beyond that step, the Court is unable to extend fiduciary status through subsequent layers of action in which Defendants acted, if at all, only in a corporate capacity.[18]

Further, even the Plan documents that do make reference to BP's SEC filings do not demonstrate that Defendants *affirmatively encouraged* Plan Participants to consult the SEC filings with respect to their investments in the BP Stock Fund.  For example, the IOG includes

---

[18] Additionally, the Complaint fails to allege that most of the Individual Defendants played any role, either as signatory or speaker, in the creation of the SEC filings or other public statements allegedly containing misrepresentations.

40

several references to BP's SEC filings.  First, in a section titled "Documents filed with the Securities and Exchange Commission," the IOG lists the SEC filings incorporated into the prospectus and includes a paragraph titled "How to review SEC filings," which directs readers to the appropriate website and mail address to request copies of SEC filings.  (Investment Options Guide, at 74.)  The IOG also includes a page titled "Additional information about securities" that lists where BP ADSs are traded and provides appropriate contact information for the reader wishing to obtain copies of BP's SEC filings.  (*Id.* at 75.)  The SPD similarly directs participants: "Read the entire *Investment Options Guide*, the most recent Quarterly Investment Performance Statement and any *Updates* for a more complete description of all the investment options described in this summary and for information about selecting your investment options." (Summary Plan Description, Defs.' Exh. G, Doc. No. 92-1, at 26.)

While these select passages of the IOG and SPD do reference BPs SEC filings and advise Participants on how to obtain complete copies, they do not "affirmatively encourage" Participants to consult the SEC filings with respect to investment in the BP Stock Fund.  The SPD encourages Participants to read "the entire Investment Option Guide," an 80 page document, two pages of which inform the reader how to request copies of BP's SEC filings. This is a far cry from the *Dynergy* level of encouragement, where the SPD urged plan participants to "carefully review" specific SEC filings *in relation to* their investment in the company stock fund.  Because Plaintiffs have failed to adequately allege that the SEC filings containing the alleged misrepresentations were incorporated into the Plan documents, the Court cannot find that the alleged misrepresentations were made by Defendants' acting in a fiduciary capacity.  Further, with respect to any alleged misrepresentations contained in other sources, such as public statements or press releases, the Complaint does not allege any facts from which

the trier of fact could infer that the Defendants encouraged plan participants to review or rely on such information.  Nor do Plaintiffs allege any facts to demonstrate that the press releases or other public statements by Defendants were promulgated in connection with the management or administration of the Plans.  Because Plaintiffs have failed to adequately allege that Defendants made misrepresentations while acting in a fiduciary capacity, the Court grants Defendants' motion to dismiss with respect to Count II.[19]

### C. Count III: Defendants Allegedly Failed to Adequately Monitor Co-Fiduciaries

In Count III, Plaintiffs allege that the BPNAI Board Defendants, the Designated Officer Defendants, the Appointing Officer Defendants, and the SPIOC Defendants failed to properly monitor other fiduciaries.  (Compl. ¶¶ 403–12.)  To prevail on these derivative claims, Plaintiffs must adequately state a claim for an underlying breach of fiduciary duty.  Because Plaintiffs have not done so here, their derivative claim also must fail.  The Court therefore grants Defendants' motion to dismiss Count III.

### IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss the Consolidated Complaint (Doc. No. 88) is **GRANTED** in its entirety.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the 30th day of March, 2012.



KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

---

[19] In confining dismissal of Count II to Plaintiffs' failure to demonstrate that the alleged misrepresentations were incorporated into the relevant Plan documents or otherwise made in a fiduciary capacity, the Court in no way suggests that Plaintiffs would be able to overcome the additional arguments Defendants have raised in support of dismissal.