# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

In re BP plc Securities Litigation

No. 4:10-md-02185

Honorable Keith P. Ellison

**FILED UNDER SEAL**

## SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
## FOR ALL PURCHASERS OF BP ADS SECURITIES

**Page**

I.    PREFACE ................................................................................ 2

II.    INTRODUCTION ................................................................... 2

III.    JURISDICTION AND VENUE ............................................. 12

IV.    THE PARTIES ...................................................................... 13

     A.    Plaintiffs ..................................................................... 13

     B.    Defendants .................................................................. 14

V.    NON-PARTIES ..................................................................... 17

VI.    CONFIDENTIAL WITNESSES ........................................... 19

VII.    BACKGROUND .................................................................. 20

     A.    BP's Relevant Operations ......................................... 20

     B.    BP's Process Safety Controls Were Deficient Prior to the Class and Subclass Periods ..................................... 21

VIII.    DEFENDANTS' SCIENTER CONCERNING BP'S FALSE OR MISLEADING STATEMENTS REGARDING RISKS IN OFFSHORE DRILLING AND BP'S FAILURE TO IMPLEMENT PROPER PROCESS SAFETY CONTROLS AND PROCEDURES ..................................................................... 44

     A.    When They Spoke Defendants Knew, or Recklessly Disregarded, That BP's Process Safety Procedures Did Not Adequately Address the Known Risks in Deepwater Drilling, Risks that Materialized at the Macondo Well ....... 44

     B.    BP's Scienter for Corporate Statements ................... 52

     C.    Additional Scienter Allegations: Defendants' Disregard of Safety and Operational Concerns ....................... 59

     D.    Additional Scienter Allegations: BP Retaliated Against Individuals Who Raised Concerns About the Safety and Integrity of its Operations ..................... 67

IX.    THE MATERIALIZATION OF THE UNDISCLOSED RISKS – DEEPWATER HORIZON OIL SPILL AND ITS AFTERMATH ........................................................... 73

     A.    BP's Systematic Failures Caused the Explosion on and the Sinking of the Deepwater Horizon Rig ................. 73

     B.    BP Was Wholly Unprepared to Contain the Oil Spill .... 92

X.    DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMITTED MATERIAL FACTS DURING THE CLASS AND SUBCLASS PERIODS ............................................................... 106

XI.    LOSS CAUSATION ........................................................... 152

XII.   APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD-ON-THE MARKET DOCTRINE ................................................................................. 158

XIII.  CLASS ACTION ALLEGATIONS ............................................................... 159

XIV.   NO SAFE HARBOR .................................................................................... 160

XV.    PRAYER FOR RELIEF ............................................................................... 163

XVI.   DEMAND FOR JURY TRIAL ..................................................................... 164

In accordance with the Court's Memoranda and Orders dated February 13, 2012 and February 23, 2012, Thomas P. DiNapoli, Comptroller of the State of New York, as Administrative Head of the New York State and Local Retirement Systems and sole Trustee of the New York State Common Retirement Fund, and the Ohio Public Employees Retirement System and its statutory litigation counsel, the Ohio Attorney General Mike DeWine (collectively "New York and Ohio"), along with Sub-Class Lead Plaintiffs Robert H. Ludlow, Peter D. Lichtman, Leslie J. Nakagiri and Paul Huyck (along with New York and Ohio, "Lead Plaintiffs"), bring this action under the federal securities laws against BP plc ("BP" or the "Company") and certain of its officers, directors and affiliates. This is a class action on behalf of all persons and entities who purchased or otherwise acquired BP American Depositary Shares ("ADSs") between May 9, 2007 and May 28, 2010 inclusive (the "Class Period") as well as a Subclass of investors who purchased BP ADSs between March 4, 2009 and April 20, 2010 inclusive (the "Subclass Period").[1]

Lead Plaintiffs undertake this amendment to conform the Complaint to the Court's February 13, 2012 Memoranda and Orders and its February 23, 2012 Order. In so doing, Lead Plaintiffs do not waive and hereby preserve all previously asserted claims regarding all securities and defendants included in the Consolidated Class Action Complaint ("First Amended Complaint") in this action as if fully set forth herein.

---

[1] The allegations in this Complaint are based on personal knowledge as to Plaintiffs' own acts and on information and belief as to all other matters, based on an investigation conducted by Plaintiffs' Co-Lead Counsel, including, among other things: (i) review and analysis of BP's public filings with the U.S. Securities and Exchange Commission ("SEC") and other regulatory agencies; (ii) review and analysis of other publicly available information concerning BP, including governmental records, documents obtained through other civil actions against BP, independent reports, and other testimony, documents, and reports obtained in connection with hearings held by the U.S. House of Representatives, the U.S. Senate, the Joint Investigation of the U.S. Coast Guard and Bureau of Ocean Energy Management, Regulation and Enforcement, (iii) the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling ("Presidential Commission"); (iv) interviews with former BP employees and other witnesses; and (v) testimony and documents produced in *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010,* MDL 2179 (E.D. La.). Plaintiffs believe that substantial additional evidentiary support will exist for the allegations after a reasonable opportunity to engage in discovery.

This consolidated action seeks to hold BP plc, BP America, Inc., BP Exploration and Production, Inc., Anthony B. Hayward, Andrew G. Inglis, and Douglas J. Suttles accountable for materially false or misleading statements and omissions made, in violation of the federal securities laws, in the following areas: (1) BP's improvements in process safety as measured against the Baker Panel recommendations; (2) BP's Operating Management System's ("OMS") application to BP operations that were not fully-owned by BP; (3) BP having completed the transition to OMS in the Gulf of Mexico in 2008; (4) BP's ability to respond to and contain a significant oil spill in the Gulf of Mexico; and (5) the spill-rate after the *Deepwater Horizon* explosion.

## I.  PREFACE

1.      Plaintiffs have identified by boldface and italics within the Misrepresentations Section of this Second Consolidated Amended Class Action Complaint (Section X) the key provisions of the misrepresentations that the Court has previously held actionable (or sufficient as to particularity, falsity and materiality), or that Plaintiffs reasonably believe to be the same as or substantially similar to such statements. *See also* Appendix A attached hereto.

## II.  INTRODUCTION

2.      On April 20, 2010, the deep sea oil rig, *Deepwater Horizon* – which Transocean owned and BP leased, operated, and controlled – exploded in the Gulf of Mexico. The crew was preparing to place the Macondo well – which they referred to as the "***well from hell***"[2] – into "temporary abandonment," whereby a drilling rig finishes a well and then seals it with cement, allowing another production rig to return, quickly drill through the cement, and begin pumping oil or gas for production.

---

[2] Unless otherwise indicated, emphasis has been added throughout.

3. The temporary abandonment was 45 days late and $58 million over-budget. A series of last minute modifications – hallmarks of BP's operations – had rattled the crew, with one supervisor reporting that "***we're flying by the seat of our pants***."

4. At approximately 9:00 p.m. on April 20, 2010, drilling mud laced with oil and gas rocketed up through the well, knocking birds from the sky and covering the deck of the rig in a thick layer of hydrocarbon-filled drilling mud. Shortly thereafter, gas and oil flowing from the well ignited, causing an explosion aboard the *Deepwater Horizon* that claimed the lives of 11 crew members and injured many others, including some who jumped from the rig to save their lives.

5. The *Deepwater Horizon* burned for almost two days before sinking on the morning of April 22, 2010. As the *Deepwater Horizon* sank, it further damaged the pipe that had connected the rig to the wellbore.

6. Eighty-seven days passed before BP stopped the flow of oil from the Macondo well on July 15, 2010. Approximately *5 million barrels* of oil (more than 206 million gallons) – or about 60,000 barrels a day – spilled into the waters of the Gulf of Mexico causing the largest oil spill in the history of the petroleum industry. As noted in an article appearing in *Fortune* magazine, the oil spill in the Gulf of Mexico "surpass[ed] the Exxon *Valdez* disaster by at least 1,800 percent, in terms of the number of barrels of oil spilled into the sea.

7. Put simply, representations made by BP to outside investors were far different from the reality of its internal operations. By touting the growth potential of its Gulf of Mexico operations and highlighting compliance with recommendations for improvement in process safety, BP convinced investors, including Lead Plaintiffs, that BP would be able to generate

tremendous growth with carefully managed and minimal risk. However, BP made misrepresentations to, and misled, the investing public.

8. As the truth regarding the lack of safety and integrity of BP's operations emerged, as well as information regarding: (i) the true size of the oil spill; (ii) BP's inability to control the spill; and (iii) the mounting costs BP would pay as a result of the environmental disaster – BP's ADSs plunged in value. From the date of the *Deepwater Horizon* explosion through May 28, 2010, BP's securities fell in value by 48% and wiped out over ***$91 billion*** in market capitalization.

9. No fewer than nine governmental investigations reviewed the incident, including a commission appointed by the President of the United States to study the catastrophe: the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling (the "Presidential Commission"). The Presidential Commission, after interviewing hundreds of witnesses, reviewing hundreds of thousands of pages of documents and consulting with industry experts, issued the "Presidential Commission Report" in January 2011. The first conclusion of the Presidential Commission Report was simple yet powerful: "***[t]he explosive loss of the Macondo well could have been prevented***." Indeed, the Presidential Commission specifically found that: "***the blowout was not the product of a series of aberrational decisions made by rogue industry or government officials that could not have been anticipated or expected to occur again. Rather, the root causes are systemic***" to BP.

10. Moreover, the Presidential Commission detailed numerous safety tests and procedures that the *Deepwater Horizon* crew failed to perform or outright ignored. For instance, the Presidential Commission concluded, "there was nothing to suggest that BP's engineering team conducted a formal, disciplined analysis of the combined impact of [] risk factors on the

prospects of a successful cement job." The Presidential Commission Report concluded that

"*[t]he immediate causes of the Macondo well blowout can be traced to a series of identifiable mistakes made by BP, Halliburton, and Transocean that reveal such systematic failures in risk management that place in doubt the safety culture of the entire industry*."

11.     In November 2010, the National Academy of Engineering, which is conducting a separate investigation into the *Deepwater Horizon* incident, issued an "Interim Report" detailing BP's operational failures that led to the *Deepwater Horizon* catastrophe. The report stated: "*The various failures mentioned in this report indicate the lack of a suitable approach for anticipating and managing the inherent risks, uncertainties, and dangers associated with deepwater drilling operations and a failure to learn from previous near misses. . . . Of particular concern is an apparent lack of a systems approach that would integrate the multiplicity of factors potentially affecting the safety of the well, monitor the overall margins of safety, and assess the various decisions from perspectives of well integrity and safety.*

12.     BP is no stranger to catastrophic industrial incidents, including incidents related to its off-shore drilling operations. For example:

(a)     In May and June 2000, a BP refinery, the Grangemouth Complex, located in Scotland, suffered three potentially life threatening incidents. The U.K. Health and Safety Executive (the "UK HSE") investigated and found "a number of weaknesses in the safety management systems . . . ." In particular, the UK HSE found that "BP failed to achieve the operational control and maintenance of process systems required by law."

(b)     In 2003, the U.S. Department of the Interior's Minerals Management Service ("MMS") – which is responsible for monitoring and regulating offshore drilling activities in the U.S. – criticized BP's safety practices in the Gulf of Mexico after two back-to-

back blowouts on gas rigs in 2002. MMS noted that inadequate safety process planning and inadequate personnel training had enabled an erroneous chain of decision-making in the field and caused these blowouts. The otherwise preventable incidents stemming from BP's offshore drilling mishaps in the Gulf of Mexico were prescient of incidents to come in the *Deepwater Horizon* explosion.

(c)          Shortly thereafter, in November 2003, a gas line ruptured on BP's *Forties Alpha* platform in the North Sea, flooding the platform with hazardous methane gas and almost causing an explosion. In response, UK regulators cited BP for numerous violations of statutory safety rules. A former BP employee on the platform later told the Presidential Commission that "BP focused heavily on personnel safety and not on maintaining its facilities" – *i.e.,* process safety.

(d)          In 2005, a blast at BP's Texas City, Texas refinery killed 15 workers and injured more than 170. The U.S. Chemical Safety Board's ("CSB") report regarding the Texas City incident found that "***the overall safety culture and process safety management . . . program had serious deficiencies***."

(e)          In March 2006, BP shut down one of its Prudhoe Bay transit pipelines in Alaska after discovering a 212,000 gallon oil leak in a section of corroded pipe, which was later found to have resulted from poor maintenance and almost non-existent inspections. BP subsequently shut down additional sections of corroded pipeline for repairs once additional problems were discovered during subsequent inspections in early 2007.

13.      In 2005, at the CSB's urging, BP established its own independent panel to review and improve its safety procedures. Former U.S. Secretary of State James Baker, III chaired what is referred to herein as the "Baker Panel." After completing its investigation, the

Baker Panel issued a report on January 16, 2007 (the "Baker Report"), finding, in the words of the Presidential Commission, that "***BP management had not distinguished between occupational safety – concern over slips, sprains, and other workplace accidents – and process safety: hazard analysis, design for safety, material verification, equipment maintenance, and process-changing reporting***. And the [Baker P]anel further concluded that BP was not investing leadership and other resources in managing the highest risks." More specifically, the Baker Panel found that: "***from the top of the company, starting with the Board and going down . . . BP has not provided effective process safety leadership and has not adequately established process safety as a core value***." Indeed, even then-BP CEO Lord John Browne admitted that BP had failed to adequately address process safety issues prior to the Texas City disaster and that it was those failures that led to the explosion. For example, Lord Browne stated, in part, that:

> We had emphasised that individuals had to be safe as they went about their daily work – "personal safety." That led to dramatic improvements. ***But we had not emphasised that processes and equipment had to be safe under all circumstances and operated in a safe way at all times – "process safety."***

14.     The Baker Panel singled out organizational problems as the root cause of BP's continued failure to learn from, and respond to, major incidents, finding "a lack of operating discipline, toleration of serious deviations from safe operating practices, and apparent complacency toward serious process-safety risks."

15.     In May 2007, the chairman of the Chemical Safety Board, Carolyn Merritt, testified before Congress about "striking similarities" between the Alaska and Texas incidents, stating that "[v]irtually all of the seven root causes identified for the Prudhoe Bay incidents have strong echoes in Texas City," and noting "flawed communication of lessons learned, excessive decentralization of safety functions and high management turnover. BP focused on personal safety statistics but allowed catastrophic process safety risks to grow."

16. On January 16, 2007, the Baker Panel released its Report which contained 10 recommendations "*to help bring about, sustainable improvements in process safety performance.*"

17. BP professed its commitment to becoming an industry leader in process safety. Lord Browne responded to the Baker Report recommendations with the following statements, among others: "*BP gets it. And I get it too*." He continued: "*BP's workforce is ready, willing and able to participate in a sustained Group-wide effort to move BP towards excellence in process safety. BP's safety lapses have been chronic.*"

18. Lord Browne's acknowledgement of BP's troubled past – and his pledge to investors that BP would be a different company going forward – was the beginning of a purported sea change in BP's operations. Throughout the Class and Subclass Periods, Defendants would consistently return to this pledge and the recommendations of the Baker Report, assuring investors that BP had learned its lesson and that its operations were now safe and reliable. BP went so far as to say that it strived to be an industry leader in process safety and managing risk.

19. For example, in conference calls with analysts, Browne reaffirmed his and BP's commitment to implementing the Baker Report recommendations: "above all else we need to concentrate on two things – safety and performance. *Safety is fundamental to everything that we will do. We will embrace with equal commitment each of the three dimensions of safety -- personal safety, <u>process safety</u> and the environment.* Our aspiration is to be an industry leader in each."

20. When Defendant Anthony B. "Tony" Hayward ("Hayward") succeeded Browne as CEO in May 2007, one of his first commitments was to "*focus on safety like a laser*."

Hayward, other BP representatives, and BP itself, repeatedly reaffirmed, in its public filings with United States Securities and Exchange Commission ("SEC") which were disseminated to investors in the United States through the mails and other means of interstate commerce, BP's commitment to process safety and, in particular, the virtues of such efforts in one of its greatest profit centers, the Gulf of Mexico.

21.     As has since been revealed, the truth greatly diverged from Lord Browne's and Hayward's affirmations.  A January 24, 2011 *Fortune* magazine article entitled "BP: An Accident Waiting to Happen," revealed a previously unreleased internal BP strategy document dated December 2008 that specifically warned BP executives of serious process safety "gaps" in the Gulf of Mexico:

> ***It's become apparent that process-safety major hazards and risks are not fully understood by engineering or line operating personnel.  Insufficient awareness is leading to missed signals that precede incidents and response after incidents, both of which increases the potential for and severity of process-safety related incidents***.

The document concluded that BP employees needed "major hazard awareness" training.

22.     The *Fortune* article quoted Nancy Leveson ("Leveson"), an industrial safety expert at the Massachusetts Institute of Technology ("MIT") who served on a panel that investigated BP's safety practices after its Texas City refinery explosion and, subsequently, taught safety classes to BP executives in a course entitled BP "Operations Academy."  More recently, Leveson served as an advisor to the Presidential Commission.  In the article, Leveson was quoted for criticizing BP's approach to safety, explaining that BP "just did safety wrong." She determined that BP was "producing a lot of standards but many were not very good and many were irrelevant."  She was so troubled by BP's approach to safety that, in January 2010, she warned colleagues that BP is "***an accident waiting to happen***."

23.     The *Fortune* article discussed the BP Operations Academy that Hayward both implemented and attended.  The program focused on process safety and taught universal lessons: "***Critical procedures should be formalized*** and carried out with rigor; it's essential to maintain multiple safeguards against an accident; ***it is dangerous to change operating plans on the fly***; anomalies need to be clearly resolved; ***small incidents are warning signs that conditions are ripe for a disaster***."

24.     Notably, the deficiencies above existed not only with refineries and pipelines, but also with offshore drilling operations.  Despite supposedly learning from the prior disasters about the need for clear operational protocols and safety measures, the Presidential Commission Report concluded that BP had no adequate process safety procedures in place with regard to well testing in deep sea drilling.  It similarly lacked established protocols for securing a well before placing it into temporary abandonment.  The Company also failed to properly outfit rigs with properly designed and tested equipment to meet the extreme risks posed by deepwater drilling operations.

25.     Rig personnel had excessive discretion in making critical decisions, including, but not limited to:  how to case and cement the well; how to test the well for integrity; and what to do when warning signs develop.  The Presidential Commission Report found, much like the Baker Report three and a half years earlier, that BP's "***approach to managing safety has been on individual worker occupational safety but not on process safety.  These incidents and subsequent analyses indicate that the company does not have consistent and reliable risk-management processes – and thus has been unable to meet its professed commitment to safety***."

26.     Throughout the Class and Subclass Periods, Defendants made misrepresentations to, and misled, Lead Plaintiffs and the Classes by conveying BP's commitment to and implementation of process safety reform throughout the Company and that, in the event of an emergency well blowout, BP was prepared to contain and adequately address an oil spill in the Gulf of Mexico. Thus, investors were deceived as to BP's true risk profile in deep sea drilling when they purchased BP ADSs at prices artificially inflated by BP's material misrepresentations and omissions of material fact during the Class and Subclass Periods.

27.     When Defendant Hayward took over as CEO in 2007, he stated that he would focus on safety like a laser, when in reality the Company failed to conduct the process safety overhaul it represented to investors it would implement. In short, BP was not an industry leader in safety processes for its drilling operations. Moreover, BP's Oil Spill Response Plan (defined below) was highly misleading and riddled with material misstatements about its ability to respond to a major oil spill; the reality was BP was in a "trial by fire" situation in trying to contain the oil spewing into the Gulf of Mexico.

28.     After the explosion, the truth about BP and its lack of commitment to and implementation of safety processes to avoid preventable incidents began to emerge. Investors learned that:

- BP was not the safe and secure company it portrayed itself to be;

- BP was not making the progress it claimed in overhauling process safety as it claimed it would in response to the Baker Report;

- BP had not completed the transition of all its operations to its process safety protocol, OMS, in the Gulf of Mexico during the Class and Subclass Periods although it represented to investors that it had done so by 2008;

- Despite its public statements regarding the scope of OMS, BP knew that OMS was never designed to be operational on third-party rigs, such as the *Deepwater Horizon*; and,

11

- BP knew or recklessly disregarded that its statements regarding the size of the oil spill were materially false and misleading when made.

29.     BP could not contain the oil spill or stop the flow of oil from the well until 87 days after the explosion; the total cost to BP as a result of the spill will be well over $20 billion (BP has now raised the estimated cost to $40 billion); and BP had to temporarily suspend its stock dividend to pay for the spill related clean up costs.

30.     As a result, when the truth was revealed, BP's stock price plunged in value, causing Lead Plaintiffs and the Classes to suffer enormous losses.

## III.     **JURISDICTION AND VENUE**

31.     The claims herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. 240.10b-5, promulgated thereunder.

32.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa; and 28 U.S.C. §§1331, 1332, and 1367.

33.     Venue is proper in this District pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act, and 28 U.S.C. §1391(b), as BP's U.S. operations are headquartered in this District.  Also, by Order dated August 10, 2010, the Judicial Panel on Multidistrict Litigation transferred several related actions to this jurisdiction for coordination and pretrial proceedings.

34.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications and the facilities of a national securities exchange and market.

## IV.    THE PARTIES

### A.    Plaintiffs

35.    Plaintiff, Thomas P. DiNapoli, Comptroller of the State of New York, as Administrative Head of the New York State and Local Retirement Systems and sole Trustee of the New York State Common Retirement Fund ("New York"), as set forth in the certification previously filed in this litigation, and incorporated by reference herein, purchased BP ADSs at artificially inflated prices during the Class Period and has been damaged thereby.

36.    Plaintiff, the Ohio Public Employees Retirement System, along with its statutory litigation counsel, the Ohio Attorney General Mike DeWine ("Ohio"), as set forth in the certification previously filed in this litigation, and incorporated by reference herein, purchased BP ADSs at artificially inflated prices during the Class Period and has been damaged thereby.

37.    Plaintiff Robert H. Ludlow, Jr. is a citizen of California. Ludlow purchased BP ADSs on January 4, 2010 at artificially inflated prices during the Subclass Period and has been damaged thereby.

38.    Plaintiff Peter D. Lichtman is a citizen of California. Lichtman purchased BP ADSs on July 1, 2009, July 20, 2009, October 1, 2009, December 29, 2009, and January 19, 2010 at artificially inflated prices during the Subclass Period and has been damaged thereby.

39.    Plaintiff Leslie J. Nakagiri is a citizen of California. Nakagiri purchased BP ADSs on April 12, 2010 at artificially inflated prices during the Subclass Period and has been damaged thereby.

40.    Plaintiff Paul Huyck is a citizen of California. Huyck purchased BP ADSs on April 7, 2010 at artificially inflated prices during the Subclass Period and has been damaged thereby.

### B. Defendants

41.     Defendant BP plc is a UK corporation with its principal executive offices located in London, England.  A sampling of BP's contacts with the United States are as follows: (a) BP is the largest oil and gas producer in the U.S.; (b) BP has 40 percent of its assets and workers in North America; (c) BP's ADSs are listed on the New York Stock Exchange and BP is the largest non-U.S. company listed on the NYSE; (d) BP's ordinary shares are listed on the NYSE in connection with its ADS program; (e) roughly 40% of BP's ordinary common shares are owned by individuals and institutions within the U.S.; and (f) BP files annual reports and other documents with the SEC.

42.     Defendant BP America, Inc. ("BP America"), a wholly-owned subsidiary of BP, is a Delaware corporation with its principal place of business in Houston, Texas.  BP America produces oil and natural gas products in the United States.

43.     Defendant BP Exploration & Production, Inc. ("BP Exploration"), a wholly-owned subsidiary of BP, is a Delaware corporation with its principal place of business in Houston, Texas.  BP Exploration provided materially false and misleading filings to the MMS during the Class and Subclass Periods.

44.     Defendant Anthony B. "Tony" Hayward ("Hayward") served as the Company's Chief Executive Officer ("CEO") from May 2007 until October 2010 and served as an executive director of the Company from 2003 to November 2010.  Hayward, who holds a PhD in Geology, began working at BP in 1982 as a rig geologist offshore of Aberdeen, Scotland and later as a field geologist in various locations throughout the world.  From 2002 to 2007, he served as the CEO of BP's Exploration and Production business segment, which oversees exploration and drilling in the Gulf of Mexico, among other places.  Hayward was a member of BP's executive management.  Starting in 2006, Hayward headed the Group Operations Risk

14

Committee ("GORC"), an executive committee that reviewed the Company's safety protocols, including OMS and responded to safety incidents in BP's operations. Hayward also was the executive liaison to the Safety and Ethics & Environment Assurance Committee ("SEEAC"), which is the board of directors' committee responsible for ensuring that BP's safety protocols are implemented and followed, including the implementation of the Baker Panel's recommendations. GORC prepared regular safety reports for SEEAC, including quarterly reports called the Health Safety Environment & Operations Integrity Report, otherwise known as the "Orange Book." During the Class and Subclass Periods, Hayward signed certain BP Annual Reports that are alleged herein to have been knowingly or recklessly false and misleading when made and made other knowingly or recklessly false and misleading statements as well. On July 27, 2010, BP announced that Hayward would be leaving the Company, effective October 1, 2010.

45.     Defendant Douglas J. Suttles ("Suttles") served as BP's Chief Operating Officer for Exploration and Production from January 2009 until at least January 2011. Suttles has worked in the oil industry since 1983 and has worked in several different engineering and leadership roles at BP, including Vice President for Northern North Sea Operations and President of BP's Trinidadian oil business. In January 2007, he was named President of BP Exploration (Alaska) Inc. Suttles holds a degree in Mechanical Engineering. During the Class and Subclass Periods, Suttles made knowingly or recklessly false and misleading statements as alleged herein. On January 12, 2011, Suttles, who is only 50 years old, announced his retirement from BP.

46.     Defendant Andrew G. "Andy" Inglis ("Inglis") served as the Company's CEO of BP Exploration and Production, Inc. ("Exploration and Production" or "E&P") and as an executive director of the Company from February 2007 until October 2010. Inglis joined BP as a Mechanical Engineer in 1980 and worked in various locations throughout the world, including

the Gulf of Mexico, Alaska, and the North Sea. In 1996, Inglis became Chief of Staff for Exploration and Production and, from 1997 to 1999, he was responsible for leading BP's activities in the deepwater Gulf of Mexico. Beginning in July 2004, Inglis was Executive Vice President and Deputy Chief Executive Officer of Exploration and Production. Inglis was a member of BP's executive management. As CEO of E&P, Inglis attended SEEAC meetings to report on topics specific to BP Exploration and Production. Inglis also served as a GORC member, provided special reports on Exploration and Production to the Chairman of GORC (Defendant Hayward), and received quarterly Orange Book reports that monitored the progress of OMS implementation across BP. Inglis is a Chartered Mechanical Engineer and is a Fellow of the Royal Academy of Engineering and of the Institute of Mechanical Engineers. Inglis considered himself at the apex of responsibility during the Class and Subclass Periods (with the possible exception of Defendant Hayward) for BP's exploration and production activities worldwide:

> Q. Do you feel any responsibility, sir, at all for what happened on April 20th of 2010?
> A. As the CEO of the exploration and production company, I am responsible for the safe and reliable operations across all of the E&P operations globally.
> * * *
> Q. And that, of course, would include Gulf of Mexico, correct?
> A. Again, as I said, I was responsible for the – the safety and reliability of – of our operations globally. So that would include the Gulf of Mexico operations.
> * * *
> Q. All right. And in terms of safety for drilling and exploration operations in the Gulf of Mexico and worldwide insofar as safety is concerned, other than perhaps Dr. Hayward, you would have been the highest in line of authority; is that true?
> A. In terms of the – the responsibility for their safe and reliable operations, yes.

Inglis Dep. at 75:24-76:5, 79:18-24, 80:13-22. Inglis made knowingly or recklessly false

or misleading statements regarding BP's process safety system, as alleged herein. On

September 29, 2010 BP announced that Inglis would be stepping down from his role as

head of the "Upstream business," would step down as a main board director on October

31, 2010, and would leave the Company at the end of that year.

47.     Defendants Hayward, Suttles, and Inglis are collectively referred to hereinafter

as the "Individual Defendants." The Individual Defendants, because of their positions with the

Company, possessed the power and authority to control the contents of BP's reports to the SEC,

press releases and presentations to securities analysts, money and portfolio managers and

institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of

the Company's reports and press releases alleged herein to be misleading prior to, or shortly

after, their issuance and had the ability and opportunity to prevent their issuance or cause them to

be corrected. Because of their positions and access to material non-public information, each of

the Individual Defendants knew that the adverse facts specified herein had not been disclosed to,

and were being concealed from, the public, and that the positive representations which were

being made regarding BP's operations were then materially false or misleading when made.

Each Individual Defendant herein made materially false or misleading statements, or omitted to

disclose material facts, to investors in the U.S. and disseminated such material misstatements

through the use and means of interstate commerce within the U.S. and caused U.S. investors to

purchase BP securities at artificially inflated prices.

## V.    **NON-PARTIES**

48.     Lord Edmund John Philip Browne, Baron Browne of Madingley ("Browne")

served as the Company's CEO from 1995 until April 2007. Browne joined BP as an apprentice

17

in 1966 and held various positions, including Managing Director and CEO of BP Exploration. Browne was a member of BP's executive management.

49.     H. Lamar McKay ("McKay") has served as Chairman and President of BP America since January 2009. McKay began his career in 1980 at Amoco Production Company. Since 1998, he has worked for BP in various capacities, including as the Head of Strategy and Planning for Worldwide Exploration and Production, the Business Unit Leader for the Central North Sea in Aberdeen, Scotland, and the Chief of Staff for worldwide Exploration and Production. In May 2007, McKay became the Senior Group Vice President of BP and Executive Vice President of BP America, in which capacity he led BP's negotiations on the settlements for both the Texas City refinery disaster and Alaska pipeline oil spills. McKay is a member of BP's executive management. He holds a degree in Petroleum Engineering and is based in Houston, Texas.

50.     Bryon E. Grote ("Grote") has served as the Company's Chief Financial Officer ("CFO") since 2002 and as a director of the Company since 2000. He previously worked as an Executive Vice President of BP Exploration and Production. Grote is a member of BP's executive management.

51.     William Castell ("Castell") joined BP's Board of Directors in 2006 as the chairman of SEEAC. At each SEEAC meeting Castell and other SEEAC members were provided a report from GORC, usually presented in person by Hayward, and each quarter SEEAC received the Orange Book. Additionally, SEEAC was provided regular reports on the implementation of Baker Panel recommendations and reports on the development and implementation of OMS.

52.     Robert "Bob" Malone ("Malone") served as Chairman and President of BP America from July 2006 until February 2009, and as an Executive Vice President of BP until March 2009. Malone served on BP's executive management team. Malone holds a degree in Petroleum Engineering and has worked for BP for 34 years.

53.     David Rainey ("Rainey") is BP's Vice President of Exploration for the Gulf of Mexico. Rainey was the person within BP Exploration and Production who had "ultimate accountability" for implementing OMS in the Gulf of Mexico and he participated in the Gulf of Mexico gap assessment in 2009 that identified significant risks to BP in the Gulf of Mexico. Rainey was also a member of BP's executive management.

## VI.     CONFIDENTIAL WITNESSES

54.     Confidential Witness #1 ("CW1") is a confidential witness on process safety and risk assessment and management. Through 2005, CW1 consulted directly with the BP Board of Directors and executive management. Specifically, CW1 acted as a safety systems and risk assessment consultant for, among other things, deepwater platforms and offshore drilling, including but not limited to the Gulf of Mexico. Subsequent to the consultation, through the present, CW1 has been apprised of information related to BP's process safety and risk assessment and management in the Gulf of Mexico operations.

55.     Confidential Witness #2 ("CW2") is a former BP senior manager and an expert in the offshore oil and gas drilling and completions. CW2 possessed information related directly to BP's Gulf of Mexico deepwater exploration, including but not limited to process safety implementation. Prior to separating from BP in 2009, CW2 reported directly to senior BP executives and indirectly to Defendant Inglis.

56.     Confidential Witness #3 ("CW3") is an oil industry operational safety expert and former consultant to the BP Board of Directors. CW3 presented information and analyses

directly to non-party Lord Browne and former CEO Tony Hayward on issues, including but not limited to implementation of process safety and risk management practices.

## VII.   BACKGROUND

### A.   BP's Relevant Operations

57.     BP is a global oil and gas company and is the third-largest energy company in the world.  BP is active in every area of the oil and gas industry, including drilling exploration and production, refining, distribution and marketing, petrochemicals, power generation and trading.  With operations in over 80 countries, BP produces around 3.8 million barrels of oil equivalent per day.  Its largest division is BP America, which is the biggest producer of oil and gas in the U.S.

58.     BP's Exploration and Production segment includes oil and natural gas exploration, field development and production, and marketing and trading of natural gas.  It has exploration and production activities in Angola, Azerbaijan, Canada, Egypt, Libya, the Russian Federation, Trinidad and Tobago, Norway, the United Kingdom, and the United States (including the Gulf of Mexico), as well as in the Asia Pacific, Latin America, North Africa, and the Middle East.

59.     Throughout the Class and Subclass Periods, BP touted its Exploration and Production business and, more specifically, its operations in the deepwater Gulf of Mexico, a region BP hailed as a "profit centre" and a "high margin" production area.  BP described the Gulf of Mexico as "an important source of domestic energy, and offshore deepwater developments" and told investors that oil from that region accounted for one-sixth of all oil produced in the U.S.

60.     Specifically, in the 2008 Annual Report filed on Form 20-F on March 4, 2009, BP highlighted the safety and success of its operations in the Gulf of Mexico, emphasizing the fact

that it was one of the largest deepwater operators in the world. At the same time, BP failed to disclose that it had not implemented safety measures for its Gulf of Mexico operations, and BP also failed to disclose that it had disregarded safety warnings about its operations and that it lacked robust risk management processes that left the Company dangerously exposed to a catastrophic accident.

**B.** **BP's Process Safety Controls Were Deficient Prior to the Class and Subclass Periods**

61.       Prior to the beginning of the Class and Subclass Periods, BP was no stranger to the risks involved in the petroleum industry and deepwater drilling and, in fact, was at the center of a number of catastrophic incidents that took a toll on lives and the environment.

*BP's Flawed Process Safety Controls Cause Grangemouth Incidents*

62.       Between May 29 and June 10, 2000, BP's Grangemouth storage and refining complex in Scotland experienced three major incidents. These included a power failure leading to the emergency shutdown of the oil refinery; the rupture of a key steam pipe; and a fire in the refinery's catalytic cracker unit, which produces gasoline. The UK HSE investigated the incidents and issued a report in 2003 finding in all three incidents "weaknesses in [BP's] safety management systems on-site over a period of time." BP carried out an internal investigation, which concurred in many of the UK HSE's findings. BP later pled guilty to criminal charges stemming from the incidents and paid over £1 million in fines.

///

***Safety Lapses in BP's Deepwater Drilling Operations***

63.     In 2002, the *Ocean King*, a drilling rig under BP's operational control in the Gulf of Mexico, experienced two separate blowout incidents within a three-month span, raising questions about BP's process safety and well design procedures and practices.

64.     The first incident occurred in August 2002, when the *Ocean King* suffered a gas blowout while drilling a well in the Gulf of Mexico's Grand Isle block near Louisiana. The crew's efforts to contain the well failed, and they soon evacuated the rig because of the high level of airborne gas. The flow of gas and other material exploded, causing a fire on the rig and $2 million in damage.

65.     During its investigation, MMS discovered that BP had inexplicably installed a non-compliant blowout diverter system, which contributed to the explosion and fire, rather than the one specifically designed and approved for the rig. MMS also found that the fire's effects were intensified because BP personnel had stored pressurized containers of flammable gas too close to the diverter output. Worse still, the investigation revealed that BP engineers, because of a nearby well drilling project, knew that there was a shallow gas pocket at 2,700 feet beneath the sea floor surface, the precise depth which the rig had reached when the well blew out. The incident was both caused by and revealed a host of systemic safety issues involving BP's failures to build and execute wells as designed, ensure the proper design of the drill rig, and keep accurate up-to-date designs of their equipment.

66.     Just three months later, in November 2002, after the *Ocean King* had undergone major repairs and returned to the Grand Isle block, a second incident occurred, similar to the first. After cementing the steel casing in another newly drilled well hole, mud and gas began to flow onto the rig, indicating a failed cementing job. After an unsuccessful effort to contain the well, the crew evacuated. The MMS issued a harsh critique of the second incident,

noting the flawed attempt to bring the well under control, and serious deficiencies in BP's safety protocols and knowledge of equipment.

67.      The two incidents in 2002 resulted in MMS issuing a special "Safety Alert" to all drilling companies in the Gulf of Mexico regarding the serious risk of a blowout in the event of a failed cementing job.  The Safety Alert specifically mentioned MMS's findings about BP during the *Ocean King* incident, cautioning others in the industry about "erroneous chain of decisions, inadequate training of personnel or knowledge of the diverter system, and inadequate planning."

68.      In May 2003, BP suffered a near blowout not far from the Macondo well.  In that incident, the Transocean *Discoverer Enterprise*, on contract with BP, drifted off its drill site just as a well was being completed, breaking the riser pipe linking the rig to the ocean floor.  The breaking of the riser was strikingly similar to what occurred on the *Deepwater Horizon* after it exploded.  Fortunately for BP, the backup "deadman" switch on the rig's blowout preventer ("BOP") worked:  the BOP's rams closed, preventing the flow of oil or gas into the Gulf of Mexico from the damaged riser.  A subsequent inspection, however, showed that pieces of broken riser pipe were leaning up against the BOP, close to its control lines, and that the BOP itself was partially damaged – demonstrating that the "fail safe" BOP device, regardless of its immediate effectiveness, was subsequently vulnerable to damage or incapacitation by a falling riser pipe – an outcome which in fact occurred during the *Deepwater Horizon* incident.

69.      In August 2004, BP experienced a blowout in the Nile delta, off the coast of Egypt, when the *GSF Adriatic IV*, a gas drilling rig leased from Global Santa Fe (which, in 2007, merged with Transocean) exploded while completing a well for a joint consortium, which included BP.  The fire raged for over a week before the well was brought under control.

Analysts later said that Egypt's natural gas production was reduced by 10-15 percent because of the incident. As with the *Deepwater Horizon* incident, the blowout occurred after a final cementing job failed.

### Pipeline Cracks in the Thunder Horse PDQ

70.　　　In July 2005, BP's massive and newly-deployed production and drilling rig in the Gulf of Mexico, *Thunder Horse PDQ*, was evacuated for a passing hurricane and almost capsized after a key internal valve, which had been installed backwards, allowed ballast water to accumulate in one section of the rig, causing a dangerous tilt. When the rig was later put in dry-dock for repairs, cracks were discovered in the underwater pipelines beneath the rig. A senior engineering consultant who worked on the *Thunder Horse* project later told *The New York Times* that the pipeline cracks: "could have been catastrophic." He continued by noting that: "You would have lost a lot of oil a mile down before you would have even known. It could have been a helluva spill – much like the *Deepwater Horizon*." The *Thunder Horse* repairs took three years to complete.

### Safety Lapses that Caused the Texas City Refinery Explosion

71.　　　On March 23, 2005, an explosion occurred at BP's Texas City refinery. Fifteen people were killed and approximately 170 were injured. The U.S. Environmental Protection Agency's ("EPA") criminal investigative division launched a criminal investigation, as did the U.S. Occupational Safety and Health Administration ("OSHA"), EPA civil inspectors, the CSB, and the Texas Environmental Quality Commission ("TCEQ").

72.　　　In April 2005, OSHA placed BP under its Enhanced Enforcement Program for employers who are "indifferent to their obligations under the OSH Act." EPA civil inspectors entered into a settlement with BP, laying out a timeline and plan to bring the refinery's

operations into compliance with EPA regulations. TCEQ reached a similar agreement with BP in mid 2006.

73.     In mid-2005, the CSB recommended that BP appoint an independent commission to investigate the Company's internal safety culture and uncover the causes of the incident as well as to investigate other general concerns with BP's safety environment. In response, in October 2005, BP announced the formation of the "U.S. Refineries Independent Safety Review Panel," chaired by former Secretary of State James Baker. The Baker Panel began conducting investigations in October 2005 and issued its final report on January 16, 2007.

74.     In March 2007, CSB completed its investigation of the Texas City incident and issued its report on March 22, 2007. The report flagged weaknesses in BP's safety culture. It criticized BP's management for its lack of "focus on controlling major hazard risk," finding that managers provided "ineffective corporate leadership and oversight." CSB's report also identified the Company's failures to heed warning signs and internal concerns raised by its own staff, writing that BP's managers "provided ineffective leadership and oversight" and "did not implement adequate safety oversight, provide needed human and economic resources, or consistently model adherence to safety rules and procedures." The CSB found a direct correlation between the blast and BP's cuts in safety and staffing budgets, concluding: BP "did not effectively evaluate the safety implications of major organizational, personnel, and policy changes." Finally, the CSB report criticized BP for failing to learn from its earlier, similar mistakes.

***Widespread Corrosion Causes Leaks in BP's Alaskan Pipeline Operations***

75.     In early 2006, an oil spill of 210,000 to 260,000 gallons occurred on BP's Prudhoe Bay pipelines on Alaska's North Slope, facing the Arctic Sea. The pipeline had been

leaking for weeks and was first discovered on March 2, 2006. Joint federal and state investigations, encompassing both criminal and civil matters, began in March 2006. The investigations ultimately addressed not only the March 2006 leak, but also addressed weaknesses in other parts of the pipeline, and a subsequent leak that occurred on another part of the pipeline in August 2006.

76.　　An EPA criminal investigation concluded that widespread corrosion in the pipelines had led to the March and August leaks (and other points of corrosion uncovered in the investigation) and that BP could have prevented the leaks by maintaining and inspecting its pipelines. It further concluded that the duration of the spill revealed BP's criminal neglect of the pipeline.

77.　　In 2007, BP pled guilty to a criminal charge in connection with the March 2006 spill, admitting that BP's "criminal negligence" caused the corrosion – and thus the spill itself. BP was sentenced to three years of probation and fined 22 million dollars.

78.　　The 2006 spill was BP's second criminal plea in the U.S. in a decade: in the late 1990s BP was indicted because its engineers were injecting dangerous materials into a well casing to dispose of the materials. In response, BP pled guilty in 2000, was put on five years of probation, and entered into a compliance agreement with the EPA's debarment division.

79.　　In March 2007, the Company received warnings about the deficiencies in its corporate governance from the consulting firm Booz Allen Hamilton ("Booz Allen"). In the wake of the 2006 spill on its Prudhoe Bay pipeline, BP retained Booz Allen to "identify potential organizational, process, and governance issues" that related or contributed to the incident. The Booz Allen report found that BP's executive management and Board of Directors had created a culture focused on cost-cutting and ensuring that budget targets were met, while ignoring safety

26

issues and critical maintenance. Among other findings, Booz Allen found major shortcomings in the Company's internal communications culture noting, in particular, that "critical risk data" and concerns about major risks were not properly communicated within BP. More specifically, the report noted that "[r]isk-related vertical and horizontal communications do not elevate critical risk data to senior leadership." Booz Allen effectively put Defendants on notice that they could not rely on the Company's internal reporting mechanisms to receive "critical risk data" and thus understand the risk of catastrophic operating failure.

80.    In May 2007, the chairman of the Chemical Safety Board, Carolyn Merritt, testified before Congress about similarities between the Booz Allen report on Alaska and the CSB's report on Texas City, noting that "[v]irtually all of the seven root causes identified for the Prudhoe Bay incidents have strong echoes in Texas City," and identified "common findings" that included "flawed communication of lessons learned, excessive decentralization of safety functions and high management turnover. BP focused on personal safety statistics but allowed catastrophic process safety risks to grow."

### BP Nominally Adopts the Baker Panel Recommendations

81.    With all of its past problems staring BP in the face, the Company in early 2007 finally appeared to address its previous safety shortcomings. The Baker Panel strongly suggested that BP immediately implement the following ten recommendations:

RECOMMENDATION #1 – PROCESS SAFETY LEADERSHIP – The Board of Directors of BP p.l.c, BP's executive management (including its Group Chief Executive), and other members of BP's corporate management must provide effective leadership on and establish appropriate goals for process safety. Those individuals must demonstrate their commitment to process safety by articulating a clear message on the importance of process safety and matching that message both with the policies they adopt and the actions they take.

RECOMMENDATION #2 – INTEGRATED AND COMPREHENSIVE PROCESS SAFETY MANAGEMENT SYSTEM – BP should establish and

implement an integrated and comprehensive process safety management system that systematically and continuously identifies, reduces, and manages process safety risks at its U.S. refineries.

RECOMMENDATION #3 – PROCESS SAFETY KNOWLEDGE AND EXPERTISE – BP should develop and implement a system to ensure that its executive management, its refining line management above the refinery level, and all U.S. refining personnel, including managers, supervisors, workers, and contractors, possess an appropriate level of process safety knowledge and expertise.

RECOMMENDATION #4 – PROCESS SAFETY CULTURE – BP should involve the relevant stakeholders to develop a positive, trusting, and open process safety culture within each U.S. refinery.

RECOMMENDATION #5 – CLEARLY DEFINED EXPECTATIONS AND ACCOUNTABILITY FOR PROCESS SAFETY – BP should clearly define expectations and strengthen accountability for process safety performance at all levels in executive management and in the refining managerial and supervisory reporting line.

RECOMMENDATION #6 – SUPPORT FOR LINE MANAGEMENT – BP should provide more effective and better coordinated process safety support for the U.S. refining line organization.

RECOMMENDATION #7 – LEADING AND LAGGING PERFORMANCE INDICATORS FOR PROCESS SAFETY – BP should develop, implement, maintain, and periodically update an integrated set of leading and lagging performance indicators for more effectively monitoring the process safety performance of the U.S. refineries by BP's refining line management, executive management (including the Group Chief Executive), and Board of Directors. In addition, BP should work with the U.S. Chemical Safety and Hazard Investigation Board and with industry, labor organizations, other governmental agencies, and other organizations to develop a consensus set of leading and lagging indicators for process safety performance for use in the refining and chemical processing industries.

RECOMMENDATION #8 – PROCESS SAFETY AUDITING – BP should establish and implement an effective system to audit process safety performance at its U.S. refineries.

RECOMMENDATION #9 – BOARD MONITORING – BP's Board should monitor the implementation of the recommendations of the Panel . . . and the ongoing process safety performance of BP's U.S. refineries. The Board should, for a period of at least five calendar years, engage an independent monitor to report annually to the Board on BP's progress in implementing the Panel's

recommendations . . . . The Board should also report publicly on the progress of such implementation and on BP's ongoing process safety performance.

RECOMMENDATION #10 – INDUSTRY LEADER – BP should use the lessons learned from the Texas City tragedy and from the Panel's report to transform the company into a recognized industry leader in process safety management. The Panel believes that these recommendations . . . can help bring about sustainable improvements in process safety performance at all BP U.S. refineries.

82.     Following the release of the Baker Panel recommendations, BP consistently stated that it would implement the mandates across all lines of its business.  In a January 16, 2007 press conference responding to the findings of the Baker Report, Browne announced:

If I had to say one thing which I hope you will all hear today it is this 'BP gets it.' And I get it too. This happened on my watch and, as Chief Executive, I have a responsibility to learn from what has occurred. ***I recognise the need for improvement and that my successor, Tony Hayward, and I need to take a lead in putting that right by championing process safety as a foundation of BP's operations***.

* * *

The list of what we have done since the accident ***shows how seriously we take process safety***.

83.     Yet the truth, as described herein, is not only that BP did not "get it," but that Defendants knew of or recklessly disregarded their continued failure to implement the process safety programs and procedures either as promised or necessary to avoid the recurrence of similarly preventable deep sea drilling incidents.  The occurrence of the worst industrial incident in history, along with the Presidential Commission's finding that BP has not met "it's professed commitment to safety" belied BP's public representations concerning its professed commitment to ensuring the safety of its deep sea drilling operations.

///

*BP Creates the Group Operations Risk Committee and the Safety, Ethics and Environment Assurance Committee to Implement and Monitor Process Safety Systems*

84.     As part of the Company's professed commitment to process safety, BP told investors OMS was designed to address the Baker Panel's recommendation to establish and implement an integrated and comprehensive system that would systematically identify, reduce and manage process safety risks. In connection with this public mandate, BP set up a committee called GORC – Group Operations Risk Committee – that would be tasked with oversight and implementation of OMS, among other responsibilities. GORC met monthly and included sectional CEOs, with Defendant Hayward as Committee Chair. GORC's role was to educate Defendant Hayward, the CEO, and to insure that operational risks were identified and properly managed. ███████████████████████████████████████████

███████████████████████████████████████

85.     Defendants Hayward and Inglis both testified that they were knowledgeable about the scope and implementation of OMS through their participation in GORC. Defendant Inglis testified:

> A.     The group operations – Group Operations Risk Committee was set up by – by Tony Hayward to monitor our safety and integrity performance. It was there to act as a vehicle for continuing to improve our performance. That was through OMS. So part of it was to actually look at how OMS was being implemented. It connected into the OMS audit function, so that reported in to GORC.

Inglis Dep. at 279:21-280:4.

86.     Similarly, as the CEO of BP and Chairman of GORC, Hayward was responsible for overseeing OMS development and implementation, which gave him detailed knowledge in these areas:

> Q.     And you are very familiar with process safety because of your position as Chair of the Group Operating Risk Committee, aren't you?

30

A.    I am.

*  *  *

Q.    And one of the responsibilities you had . . . as Chair of [GORC] . . . tell me whether I read this correctly, quote, "Oversight of development and implementation of BP's Operating Management System . . ."

A.    That's correct.

Hayward Dep. at 149:10-13; 163:14-21.

87.    Defendants Hayward, Inglis, and other members of GORC received regular status updates concerning the scope and implementation of OMS via the "Orange Book." As described by Defendant Inglis, the purpose of the Orange Book was to provide members of GORC with key performance indicators concerning implementation of OMS:

Q.    What was the purpose of the Orange Book?

A.    The Orange Book actually started in the upstream [synonymous with "Exploration & Production"]. It was sort of under my leadership, and then it got introduced as something that would apply across the whole of the – of the group, but, in essence, it was to provide a – a performance monitoring in – performance monitoring information around safety and operational integrity. So it had in it key performance indicators, indicators of progress on various initiatives, whether they be the six-point plan, the implementation of OMS. So it was a – a compendium of all the information that you could use to assess progress on our safety and operation integrity agenda.

Inglis Dep. at 286:24-287:15.

88.    Inglis testified that he monitored the implementation of OMS through the Orange Book: "There was then a very rigorous process for [OMS'] implementation, as I've described to you. I monitored the implementation of that through the – the Orange Book and the three stages of [g]ap assessment, prioritization, and MOC [Management of Change]." Inglis Dep. at 379:11-16.

89.    Defendant Hayward further admitted that the Orange Book provided a clear indication of what areas of BP's operations had or had not implemented OMS:

Q.     And what other areas would not have had OMS fully implemented until the end of 2010, other than the Gulf of Mexico?

A.     I can't remember the list, but, you know, we have a list that's in many of these reports, that – that document – if you refer to the thing called the Orange Book, it's very clear which areas are complete, which areas are in – in transition.

Hayward Dep. at 791:7-11.

### *SEEAC Closely Monitored BP's Safety Performance Including OMS Implementation*

90.     BP's Safety, Ethics and Environment Assurance Committee was a board-level committee.  SEEAC was created to ensure that company publications concerning environmental, safety, and ethical matters were accurate.  It purportedly carried out that purpose by obtaining reports from Defendant Hayward, a Special Liaison to SEEAC, who regularly reported to SEEAC concerning issues within the purview of GORC, including the status of OMS implementation.  SEEAC also independently monitored progress in BP's process safety efforts. Defendant Inglis also reported to SEEAC, from time to time, concerning matters relating to his Exploration and Production unit.  SEEAC met regularly (more than quarterly) – eight times in 2008, seven times in 2009, and nine times in 2010 – and was continuously updated with respect to BP's implementation of OMS.  Indeed, Hayward attended each of these meetings up until the time of the blowout.

91.     William Castell, the chairman of SEEAC, testified that "the duties and obligations [of SEEAC] are set out in [BP's] Annual Report."  BP's 2008 Annual Report, published on March 4, 2009, defined SEEAC responsibilities as including:  "[r]eviewing material to be placed before shareholders that addresses environmental, safety and ethical performance and make [*sic*] recommendations to the Board about their adoption and publication."  It defined "the main tasks and requirements for SEEAC" to include "monitoring and obtaining assurance that the management or mitigation of material non-financial risks [was] appropriately addressed

32

by the group chief executive."  Castell testified that non-financial risks include safety-related risks.

92.     The 2008 Annual Report also discussed the types of information received by SEEAC:  "[SEEAC] receives information on agenda items from both internal and external sources, including internal audit, the safety and operations function, the group compliance and ethics function, and Ernst & Young.  Like other board committees, SEEAC can access independent advice and counsel if it requires, on an unrestricted basis."

93.     Moreover, Castell testified that SEEAC members received the Orange Book on a quarterly basis, and that it contained detailed data concerning BP's safety performance:

Q.     Now, the Reports you get, that's the Orange Book; is that right?
A.     We receive an Orange Book on a quarterly basis, sir.

Q.     Yes.  And tell us what that is.  What is the Orange Book?
A.     The Orange Book is a compilation of Operations and Risk data which is – which is received by the Group Operations Risk Committee, which is the mechanisms of formal reporting to the GORC Committee as to the level of safety achieved, the lead and lag factors, the major incidents reported.  These are all consolidated.  So on a quarterly basis, there is a consolidated document that refers to the last quarter's performance.

* * *

Q.     Is it metrics?
A.     It's metrics, and it's – well, it goes beyond metrics, sir.  There are Reports that highlight where there have been major incidents.  There are verbal Reports from Upstream and Downstream, and there are Reports on Audit, so not always metrics.  There are also, you know, comments on audits, audit closeouts, et cetera.

* * *

Q.     I'm trying to understand at what level the seriousness of an incident would come to your Committee, the SEEAC Committee.  How – how bad does it have to be before your Committee finds out about it?
                                        * * *
A.     I think you've seen from the data, sir, that we have the data that comes to us.  When you say, "How bad does it have to be," the – the data in the

33

> Orange Book goes down to lost days of work. So if they lost days at
> work, we can see it.

Castell Dep. at 377:23-378:12, 378:15-22, 380:22-381:1, 381:4-8.

94. ████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

***BP Launches OMS to Purportedly Implement the Baker Panel's Recommendations, but
Exempts OMS's Application from Rigs that BP Did Not Fully-Own***

95.      In 2007, BP introduced OMS at 12 representative pilot sites and by early 2008
BP purportedly sought to implement OMS company-wide. OMS was supposedly the
cornerstone of BP's efforts at improving its process safety protocols and preventing major
accidents in the wake of the Texas City disaster. According to Ellis Armstrong, CFO of BP
Exploration and Fed. R. Civ. P. 30(b)(6) witness in the MDL 2179 action, BP's executive
management made the determination to extend the Baker Panel process safety recommendations
across the entire panoply of the BP Group, including Exploration and Production in the Gulf of

34

Mexico, rather than limiting implementation to its refineries. Armstrong Dep. at 57:1-13. Defendant Hayward repeatedly and publicly referred to OMS as the means by which BP would improve its process safety performance.

96.  BP's 2006 Sustainability Report, made publicly available on May 9, 2007, represented that "OMS is a comprehensive system that covers *all aspects* of our operations . . . ." The Report further represented that "[t]he new OMS will apply to *all operations*" and BP stated in its 2007 Annual Review that "OMS is the foundation for a safe, effective, and high-performing BP."

97.  On September 25, 2007, Defendant Inglis spoke at the Sanford Bernstein 4th Annual Strategic Decisions Conference and misleadingly stated: "One aspect of our focus on safe and reliable operations that I mentioned earlier is our new standardised Operating Management System (OMS). This will provide a blueprint for safety and *all aspects of operations* throughout BP."

98.  On May 20, 2008, BP released its 2007 Sustainability Report. In the "Group chief executive's introduction" to that report, Defendant Hayward noted that BP was "still learning lessons from" Texas City and had "agreed to implement all [the Baker Panel's] recommendations and we are now working to do so." Describing BP's efforts in that regard, Hayward stated, "[w]e are also now introducing our new operating management system (OMS), designed to bring greater consistency to our operations. My executive team continues to monitor closely our safety performance." In that regard, the 2007 Sustainability Report further noted that the Hayward-led GORC met 14 times in 2007.

99.  On February 24, 2009, BP released its 2008 Annual Review. In the section titled, the "Group Chief Executive's Review," Defendant Hayward noted that "[t]he BP

operating management system (OMS) turns the principle of safe and reliable operations into reality by governing how *every BP project, site, operation, and facility is managed.*" Similarly, on March 4, 2009, BP released its 2008 Annual Report filed on Form 20-F, which was signed by Defendant Hayward. According to the 2008 20-F, OMS was a "*framework for operations across BP* that is integral to improving safety and operating performance in *every site.*"

100. Contrary to Defendants' representations, however, and as admitted by BP at the hearing on its motions to dismiss, OMS did not apply to BP's operations on rigs unless the rig was fully-owned by BP. This included six out of seven wells in the Gulf of Mexico during early 2010, among them the Transocean-owned *Deepwater Horizon*. *See* MTD Hr'g Tr. (Dkt. No. 304) at 66:6-68:20.

101. Indeed, BP never intended for OMS to apply to the entirety of BP's operations and OMS was specifically not applicable to drilling rigs that BP did not fully-own. Massive portions of BP's riskiest and potentially most profitable exploration and production projects were largely exempt from OMS because the well sites were physically drilled by contracted drilling rigs. Indeed, BP used contracted rigs to drill the majority of wells in the deepwater Gulf of Mexico. Armstrong Dep. at 247:18-248:4. This practice and the intent to exclude contracted drilling rigs from OMS coverage meant that OMS did not apply to the vast majority of BP's deepwater drilling operations in the Gulf of Mexico, including the Transocean-owned *Deepwater Horizon*.

102. The deposition testimony of several key BP personnel in the MDL 2179 action confirms this reality. John Mogford ("Mogford"), BP's former Global Head of Safety & Operations and a GORC member testified that "OMS was designed for BP owned and operated institutions, so the focus was on BP production facilities where BP had people . . . according to

the guidance for where it was to be applied, on – OMS was not designed to be implemented on contractor sites or vessels." Mogford Dep. at 150:13-19. According to Mogford, this key limitation of the OMS was known to GORC, including Defendants Hayward and Inglis, because the "OMS document, it was approved, and the scope was approved . . . at the GORC." *Id.* at 461:18-19. Mogford testified that GORC held "a discussion that the scope was that [OMS] applied to BP owned and operated and controlled sites." *Id.* at 461:23-25.

103.    Likewise, in his deposition in MDL 2179, Defendant Hayward testified that BP's OMS and safety systems did not apply to third-party contractors in the Gulf of Mexico, including the *Deepwater Horizon*:

> Q.    And, again, the effective well control system, is that something that is both part [Transocean]'s and part BP's?
>
> A.    Yes, ***very largely Transocean, because it is a Transocean Drilling Team that implement the well control procedures. There's no one from BP involved in implementing well control procedures***. So what we have to do is determine that the well control procedures that Transocean has and that are documented as their well control procedures are appropriate, and, of course, that they're . . . followed.
>
> Q.    Okay. But if there are well control procedures and process procedures in place in the gulf of Mexico, BP procedures, those are applicable as well as the [Transocean] procedures?
>
> A.    Well, I don't want to be pedantic, ***but BP doesn't have well control procedures to manage a well that is beginning to flow, because we're not actually drilling any of the wells that our contractors are***. So what we want to verify is that those procedures are in place, and they're deemed to be appropriate, and people have been trained such that they know them, and when a situation occurs, that they implement and follow them to control the well.

Hayward Dep. at 668:7-669:5.

104.    John Baxter, Group Head of Engineering for BP and member of GORC, testified that OMS did not apply to the *Deepwater Horizon,* and that as a result numerous safety and risk management procedures instituted in direct response to the Baker Panel recommendations were not applicable to the majority of BP's drilling fleet in the Gulf of Mexico, including the

37

*Deepwater Horizon*. Baxter Dep. at 175:14-15. For example, BP did not apply its Integrity Management, Major Accident Risk ("MAR") analysis, Safety & Operations Audits, or Control of Work to the majority of its drilling rig fleet, including the *Deepwater Horizon*, because OMS was limited to rigs that were fully owned by BP. *Id.* at 175:11-12; 186:24-187:8; 191:20-192:23; 210:3-10. This was confirmed by Pat O'Bryan, Vice President of Drilling & Completions, who testified that "[t]he only drilling rig that we had in our fleet [in the Gulf of Mexico] that would fall under the BP OMS is the BP-owned rig the PDQ on Thunderhorse." O'Bryan Dep. at 413:6-9.

105. Several BP employees familiar with BP's drilling and completions in the Gulf of Mexico revealed that upstream operations – *i.e.* drilling rigs, including the *Deepwater Horizon* – did not receive information on OMS. For instance, John Guide, Wells Team Leader for the *Deepwater Horizon*, testified that he had no formalized training on OMS until January 2011. Guide Dep. at 433:5-8. Ronnie Sepulvado, Well Site Leader on the *Deepwater Horizon* since 2003, stated that he didn't know what the Gulf of Mexico local OMS was, that he had only "heard" of process safety, and he was completely unfamiliar with 13 policies that were ostensibly part of the Gulf of Mexico Local OMS. Sepulvado Dep. at 357:16-20, 391:6-394:10. Additionally, Cheryl Grounds, Chief Engineer of Process and Process Safety, stated that "[m]y understanding is it was frequently stated in the company is [*sic*] that drilling managed their own work. And we had a lot of work to do in process safety elsewhere, so that was prioritized. So I focused on producing assets and major capital projects[.]" Grounds Dep. at 88:18-24. These statements confirm that the scope of OMS was never intended to apply to some of BP's most critical projects involving drilling rigs that were not fully-owned by BP.

***Defendant Hayward Knew That a Deepwater Blowout Was the Highest Risk Facing BP Operations in the Gulf of Mexico and Knew That Drilling in the Gulf of Mexico Itself Was Highly Risky***

106. Defendant Hayward stated that BP's cornerstone process safety program (OMS) in the Gulf of Mexico, would apply "across all of BP's operations," that BP had "completed the transition to OMS in" the Gulf of Mexico and that OMS "turns the principle of safe and reliable operations into reality by governing how every BP project, site, operation and facility is managed." These and other similar statements were, at a minimum, severely reckless, considering his knowledge that a deepwater blowout was the highest risk facing BP in the Gulf of Mexico. Not only did Defendant Hayward know that his misrepresentations concerning OMS implementation were false, but he also knew that those misrepresentations concerned the highest risk that BP faced in the Gulf of Mexico, and one of the highest risks facing the company. As Hayward testified in his deposition in the MDL 2179 Action:

> Q. Well, what you did know, though, was that DEEPWATER blowout was the highest risk across the entire corporation and that it was the highest risk for your Exploration and Production Unit, wasn't it?
> A. It was certainly one of the highest risks for the corporation. It was the highest risk in the Gulf of Mexico and one of the highest risks for the Ex – for the Exploration and Production Unit.

Hayward Dep. at 196:10-18.

***Contrary To Defendants' Assertions, the Gulf of Mexico Had Not Completed The Transition to OMS At The Time Of The Deepwater Horizon Disaster***

107. BP's 2008 and 2009 Annual Reports on Form 20-F included Defendants' representations that OMS was in place at BP's exploration and production projects in the Gulf of Mexico. BP stated unequivocally that, "[e]ight sites completed the transition to OMS in 2008," including "the Gulf of Mexico." In reality, however, as BP conceded at oral argument, this statement was false when made. MTD Hr'g Tr. (Dkt. 304) at 58: 15-21 ("The statement here that the Gulf of Mexico completed the transition to OMS in 2008, that that is a statement of

specific fact . . . that the plaintiffs have alleged and that I will admit to the Court is not accurate").

108.    During the Class and Subclass Periods, BP and Defendants presented specific information about OMS, including the number of sites in which the program was supposedly implemented, specific sites where it was supposedly already implemented, and statistical percentages demonstrating that the Company was supposedly on track with implementation. BP presented this hard data on OMS implementation – and the benefits that OMS had allegedly already begun to achieve – alongside the Company's expectations for continued success in its Gulf of Mexico operations. However, the transition to OMS in the Gulf of Mexico was not complete in 2008 and was not even complete at the time of the *Deepwater Horizon* disaster.

109.    As Defendant Hayward testified at his deposition in the MDL 2179 action, he knew that OMS was not fully implemented in the Gulf of Mexico as of April 2010:

> Q.    Go back to an old familiar subject, the OMS. Did you know in April of 2010, that the OMS had not been fully implemented in the Gulf of Mexico?
> A.    I – yeah. I believe I was aware that it had not been fully implemented. It was in the process of being implemented as it was in other parts of BP.
>
> Q.    But specifically with respect to the Gulf of Mexico, that's your answer?
> A.    Yes.
>
> Q.    Okay. When did you come to learn that?
> A.    I would have been aware of it prior to the – you know, in the course of doing my – my job.
>
> Q.    Okay.
> A.    Because we had a – as I've explained a number of times through this deposition, the Group Operations Risk Committee was looking at the progress of implementation.
>
> Q.    So you were getting reports as to where it was implemented, where it was not yet implemented?
> A.    And where it – where it was entrained, so to speak.

Hayward Dep. at 662:25-663:20.

110.     Hayward further testified that BP did not even begin to implement OMS in the Gulf of Mexico until the Fall of 2009 and that he did not expect implementation to be complete until the end of 2010:

> Q.     [Y]ou said that you were on target to implement OMS in the Gulf of Mexico in 2009?
> A.     I – my recollection is that we began the process of cutover to OMS in the Fall of 2009.
>                            * * *
> Q.     And your recollection also is that you would have completed that implementation in the Gulf of Mexico by the end of 2010?
> A.     That's correct.

Hayward Dep. at 789:11-14, 789:17-20.

111.     BP's failure to complete implementation of OMS in the Gulf of Mexico had enormous repercussions.  Hayward testified that the *Deepwater Horizon* tragedy potentially could have been avoided if OMS had been fully implemented in the Gulf and/or applicable to the *Deepwater Horizon*.

> Q.     If OMS had been implemented in the Gulf of Mexico before April 20, 2010, is there not the potential for having avoided this terrible catastrophe?
>                            * * *
> A.     There is possible potential –
>                            * * *
> A.     Undoubtedly.

Hayward Dep. at 793:25-794:8.

112.   Likewise, SEEAC Chairman Castell fully understood that implementation of OMS had not been completed in the Gulf of Mexico by 2008.  Castell testified, "I believe OMS started its integration in the Gulf in 2009.  I would be personally surprised – and I don't know, but I'd be surprised if it had been fully integrated with all the legacy systems [as of April 20, 2010]."  Castell Dep. at 71:11-14.

113. Moreover, ████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████

114. In addition, the people charged with implementing OMS in the Gulf of Mexico were transferred or terminated in Q4 2009 and Q1 2010. Moreover, according to CW2, BP's OMS lagged far behind its peers (*e.g.* Chevron and Exxon) in 2009, and by 2010, the program was still in its pilot phase and yet to be fully implemented in the Gulf of Mexico.

115. According to CW1, there was a company failure to implement an OMS protocol that would have ensured that the individual decision makers at the rig level understood how cost-savings and corner-cutting could affect the process safety of the *Deepwater Horizon.*

116. In the fourth quarter of 2009 and in January 2010, BP, as part of a global cost-cutting restructuring, reorganized the drilling operations unit for the Gulf of Mexico. According to CW2, the global reorganization was attributable to decisions made by Defendants Inglis and Suttles. A consequence of the restructuring was the termination or forced transfer for those chiefly responsible for BP's Gulf of Mexico Operations, including but not limited to safety processes and the implementation of BP's OMS in the Gulf of Mexico.

117. Further as described below, the individuals brought in to implement BP's OMS and manage BP's Gulf of Mexico Operations lacked the knowledge, experience and expertise of those they were replacing. In fact, in September 2009 a non-public BP rig audit of the *Deepwater Horizon* found that safety goals were not commonly known or properly communicated to employees and not all relevant rig personnel were knowledgeable about drilling and well operations practices.

42

118.    According to CW2, the restructuring of BP's Gulf of Mexico operations was undertaken despite concerns raised by CW2 and other senior BP employees to top-level management with direct reporting responsibilities to BP's board of directors. These concerns related to BP's ability to operate safely in the Gulf.

119.    Ian Little was the Gulf of Mexico wells manager for BP. Little was replaced by David Sims who, according to CW2, lacked Little's knowledge and expertise. Despite this, Sims was required to make decisions regarding not only management of the well, but also required to manage the response to the *Deepwater Horiozon's* explosion.

120.    Prior to becoming Vice President of Drilling and Completions, London in December 2009, Harry Thierens served from 2006-2009 as the well director for the Gulf of Mexico. He managed the engineering and operations group in the Gulf of Mexico. Thierens was replaced by David Rich, who according to CW2 lacked the expertise of Thierens.

121.    Kevin Lacy was the vice president of Drilling and Completions for BP until December 15, 2009 when he left the Company. Lacy, who worked in exploration and production for thirty years, was replaced by Patrick O'Bryan.

122.    According to CW1 and CW2, O'Bryan lacked Lacy's experience and expertise. According to CW2, by 2009 and 2010, BP still had not implemented a robust operations management system to ensure offshore processes could be managed effectively for both exploration and risk. Given the difficulties of Gulf of Mexico exploration, this invited disaster.

///

**VIII. DEFENDANTS' SCIENTER CONCERNING BP'S FALSE OR MISLEADING STATEMENTS REGARDING RISKS IN OFFSHORE DRILLING AND BP'S FAILURE TO IMPLEMENT PROPER PROCESS SAFETY CONTROLS AND PROCEDURES**

**A. When They Spoke Defendants Knew, or Recklessly Disregarded, That BP's Process Safety Procedures Did Not Adequately Address the Known Risks in Deepwater Drilling, Risks that Materialized at the Macondo Well**

123. Throughout the Class and Subclass Periods, Defendants were aware, or recklessly disregarded, that their statements to investors regarding BP's commitment to safety were not true and that their statements touting the importance of deepwater drilling in the Gulf of Mexico omitted material information regarding BP's highly risky and unsafe practices in its deep sea operations.

124. The Presidential Commission found that there was no "comprehensive and systematic risk-analysis, peer-review, or management of change process" for any of the following key decisions, amongst others:

- Failing to wait for the correct amount of centralizers;
- Failing to wait for the foam stability test results and/or redesigning slurry;
- Failing to run a cement evaluation log;
- Failing to use the correct spacer to avoid disposal issues;
- Failing to recognize the dangers inherent in displacing the mud from the riser before the surface cement plug had been set;
- Failing to properly place the cement plug at the appropriate level and instead placing it 3,000 feet before the mud line;
- Failing to install additional physical barriers during the temporary abandonment procedure;
- Failing to perform further well integrity diagnostics in light of the troubling and unexplained negative pressure test failures; and
- Failing to monitor the mud pits and conducting other simultaneous operations during mud displacement.

125. The Presidential Commission then concluded that: "*The evidence now available does not show that the BP team members (or other companies' personnel) responsible*

*for these decisions conducted any sort of formal analysis to assess the relative riskiness of available alternatives*."

**Faulty Cementing Jobs and Other Stability Issues Were Known as the Most Frequent Causes of Well Control Problems**

126.     As early as 2003, BP knew or recklessly disregarded risks associated with oil spills in offshore drilling related to the failure of cementing at various stages of well development, from the cementing around well casings and annuluses to the cementing of plugs, or shoes, to block pressure during the process of "temporary well abandonment."

127.     BP was aware – though it failed to disclose its awareness to the investing public – that as early as 2003, MMS had determined that failed cement jobs were associated with 33 blowout or well kick incidents in the Gulf of Mexico since 1973, some of which involved "well loss" and "rig and platform destruction by fire." Indeed, an October 22, 2003 MMS alert noted that "*[a]nnular flow related to cementing surface casing has been identified as one of the most frequent causes of loss of control incidents in the Gulf of Mexico*."

128.     BP had experienced cementing failures and knew of similar failures on other companies' rigs prior to and during the Class and Subclass Periods. Additionally, BP experienced, but did not disclose, its own problems with a faulty cement job on one of its deepwater wells in the Caspian Sea, off the coast of Azerbaijan, in September 2008.

129.     More specifically, on or around September 17, 2008, BP experienced a gas leak at one of its central production platforms in the Azeri-Chirag-Guneshi ("ACG") field in the Caspian Sea – which is the largest of BP's deepwater drilling operations in Azerbaijan. Shortly thereafter, another rig in the field, called *B-17*, suffered a blowout, causing gas, water, and mud to shoot onto the rig floor, raising the possibility of an explosion. *B-17* was evacuated and its well was sealed, either by annular rams or because the well simply "bridged" (collapsed on itself

45

or otherwise stopped flowing on its own). As a result, BP shut down most of the entire field's operations, cutting daily production by over 600,000 barrels per day. In later communications, BP told U.S. officials that they suspected that numerous wells had a "bad cement job."

130.    BP made no announcement or disclosure of this incident at the time it occurred. In fact, BP's Form 20-F for 2008 merely mentioned a "subsurface gas release" on September 17, 2008 and notably omitted references to the blowout on *B-17*, the fact that gas alarms went off on the field's central production platform, and the possibility that cementing jobs on other wells were faulty as well. As noted by *The Wall Street Journal* on December 17, 2010: "BP had been 'exceptionally circumspect in disseminating information' about the [ACG gas] leak, both to the public and [to] its partner." Moreover, according to the same article, several of BP's partners "were upset with BP for allegedly withholding information from them about the incident."

***Defendants Knew or Recklessly Disregarded That BOPs Were Known to Fail, Yet Did Not Adjust Their Process Safety Procedures Accordingly***

131.    As early as 2000, and on a continuous basis throughout the Class and Subclass Periods, Defendants were aware of or recklessly disregarded the substantial and known risks associated with relying on a single blind shear ram in a BOP to prevent an uncontrolled oil or gas release. Indeed, Defendants were well aware that blind shear rams were highly untrustworthy and failed nearly 50% of the time.

132.    A BOP is a large, five-story device typically set on the ocean floor at the so-called "mud line," beneath the riser connecting the rig to the sea floor and on top of the cement surface casing that seals around the "annulus," which runs down further into the earth toward the "pay sands" in which oil and gas are found.

133.     More specifically, Defendants knew, or recklessly disregarded, that, in the event the BOP needed to be activated, the following should occur:

- Closure of the "variable rams," which would seal the area around the drill pipe in the well (or, with "annular rams" or "blind rams," if no pipe lay in the well), thereby sealing oil and gas in the annulus below the BOP; and then attempting to pump drilling mud into the annulus to outweigh and balance the pressure of rising oil and gas; or:

- In a worse scenario, and if the method described above did not work, activate the BOP's "blind shear rams," which are intended to cut through drill pipe in the well and then seal the oil down in the annulus below the BOP; or

- In an emergency setting, set the BOP to activate all of its rams – variable, annular, and blind shear – and disconnect from the riser, preventing further gas or oil from rising to the rig above.

134.     As set forth below, as early as 2000, and on a continuous basis throughout the Class and Subclass Periods, Defendants knew, or were reckless in not knowing, that various components of BOPs in use (both on their own rigs and Transocean-owned rigs) had high probabilities of failure, especially in deepwater and ultra-deepwater settings, where drill piping is thicker and more difficult to cut and where hydrostatic pressures affect hydraulic systems which control the BOP rams.

135.     In July 2001, the analyst group SINTEF, the largest independent research organization in Scandinavia, provided the MMS with a report recommending that all deepwater and ultra-deepwater drilling rigs in operation in the Gulf of Mexico be equipped with not one, but *two* separate blind shear rams, because of the significant risk that one might fail.  The SINTEF report, while not publicly released, was shared with BP and other industry operators.

136.     In both December 2002 and September 2004, MMS provided to BP and other industry operators several reports written by West Engineering Services revealing serious deficiencies with blind shear rams.  In particular, the reports mentioned:

47

- The incapacity of shears to cut through many newer types of drill pipe, which tend to be thicker than older pipes;

- The certainty with which the shears that close on the thick joints that connect the sections of pipe together (rather than simply closing on the pipe itself) fail; and

- The significantly lower capabilities of shears to cut pipe at extreme depths, for instance, in excess of 5,000 feet, because of the effect of hydrostatic pressure on BOPs' hydraulic systems.

137.    The studies noted above, although not known to the general public, were shared with and made available to industry members, including senior BP managers and directors involved in drilling operations, and were discussed at industry conferences that occurred during the Class and Subclass Periods, including, but not limited to, conferences held by the Society of Petroleum Engineers ("SPE") and the International Association of Drilling Contractors ("IADC") in New Orleans, February 2-4, 2010 and in Amsterdam in 2009.  Senior BP drilling managers routinely attended SPE and IADC conferences, including those noted above.

138.    In April 2000, an independent expert report by EQE International, a risk and insurance consulting group, conducted an extensive analysis of the BOP to be installed on the *Deepwater Horizon*.  The report, which was not publicly disclosed until June 20, 2010, identified a serious flaw in the BOP's design – despite extensive back-up systems, or so-called "redundancies," in the BOP's layout – there was a particular component in the unit's hydraulic system, a single "shuttle valve," which had no backup.  In response, EQE noted the potential for a "single point failure" of the shuttle valve and explained that if the shuttle valve failed, the remaining redundancies built into the BOP would be rendered irrelevant.

139.    Significantly, throughout the Class and Subclass Periods, BP actually utilized the services of West Engineering, the company that carried out the research for MMS on BOP

reliability, to carry out specific studies for the Company on risk issues relating to BOP testing. In both 2008 and early 2010, BP specifically requested, as a member of the joint industry group focused on deepwater drilling issues, that West Engineering carry out research projects on BOP reliability and testing, and integrate past studies analyzing BOPs and their device failures.

140.    A July 2009 report also put BP on notice that BOPs were unreliable.  BP's partner, Transocean, commissioned the report, which analyzed past BOP performance (including in the Gulf of Mexico) as part of a risk assessment for deepwater drilling in the Beaufort Sea, north of Alaska.  The report, written by the consultant group Det Norske Veritas, which was subsequently contracted by the U.S. government to perform an extensive investigation into the *Deepwater Horizon*'s BOP in the wake of the April 2010 blowout and explosion, found that, in practice, blind shear rams on offshore BOPs had a failure rate of 45 percent.

141.    Defendant Hayward acknowledged in his deposition that he was aware that problems had been identified with BOPs and that those problems were generally known throughout the industry.  Hayward Dep. at 774:9-780:20.  Nevertheless, the existence of this report and its findings were not disclosed to the investing public until June 20, 2010.

142.    BP exacerbated the risk of BOP failure by permitting rigs operating in the Gulf of Mexico to be equipped with just one single blind shear ram.  In addition, BP contracted with Transocean in 2004 to replace one of the variable bore rams on the *Deepwater Horizon*'s BOP with a test ram in order to speed up subsea testing procedures.  Yet, the installation of this test ram lowered the unit's reliability even further.  Indeed, an agreement between BP and Transocean executed in October 2004, Transocean noted BP's awareness that the removal of the variable bore ram would "reduce the built-in redundancy" of the BOP and raise the rig's "risk profile."  The existence of this agreement was not made public until June 20, 2010.

143.     Thus, despite all the knowledge and information about difficulties with cementing and BOPs, Defendants either knew, or recklessly disregarded, that BP failed to establish uniform process safety features for rig operators to follow during off shore drilling to address cementing issues and for the Company to follow with regard to BOPs.

### BP Received No Less Than One Hundred Safety Warnings for its Safety Protocol Lapses in its North Sea Deepwater Drilling Operations

144.     Defendants knew of the significant risks in its deepwater drilling operations during the Class and Subclass Periods that were pervasive across BP's deepwater operations. Yet, Defendants knew, or recklessly disregarded, that BP's process safety protocols failed to properly and sufficiently address these known risks.

145.     Unknown to the investing public, the UK HSE levied extensive citations and fines on BP, sending no fewer than 100 letters or notices to BP between 2006 and 2010, and citing the Company for safety or environmental violations related to exploration or production rigs, pipeline or storage systems, or other facilities. Many of the communications related to offshore deepwater rigs operated by BP in the North Sea around Scotland, including the *Schiehallion*, *Unity*, *Bruce*, *Hutton*, *Magnus*, *Clair*, and *Miller* vessels. Some of these rigs and the ships that serviced them were decades old, and the safety issues, in many cases, concerned a failure to properly maintain and inspect equipment.

146.     According to UK HSE records, the *Schiehallion*, an aging floating production storage and offloading ("FPSO") ship in the far North Sea, experienced a 2005 engine room fire and a 2006 "mooring chain failure," resulting in special UK HSE inspections and meetings with BP officials, and notifications concerning various violations of safety and environmental violations during the Class and Subclass Periods.

147.    In correspondence in 2006, UK HSE strongly urged BP to dry-dock the

*Schiehallion* for repairs. BP refused, arguing that they would instead prioritize efforts to improve

the ship's condition through a focus on maintenance.  UK HSE, in a letter to BP on February 2,

2007, strongly criticized BP's decision, noting several areas of maintenance backlog and

numerous cases in which past UK HSE notices were not addressed, and listing various

continuing operations which were not in compliance with "relevant statutory provisions"

("RSPs"):

> Finally, it is HSE's view that ***the overall magnitude of the various categories of maintenance backlog [on the Schiehallion] is such that BP does not have sufficient control of the situation***.  .  .  . [T]he situation means that there are concerns for BP's continued ability to comply with the fundamental duties under Sections 2 and 3 of the HASWA [Health and Safety at Work Act]. At the meeting of 29th January, we discussed with BP the issues associated with drydocking, shutting down production and prioritizing integrity management (i.e., the latter being BP's current approach) as a means of addressing the overall maintenance backlog.  ***We listened to BP's opinions on the issues associated with the various options, but remain unconvinced that BP's proposed course of actions to remain on station, with an increased focus on integrity, is compatible with achieving compliance with the RSPs given the historic susceptibility of the FPSO Schiehallion to events or conditions that exacerbate ongoing maintenance backlogs*** (e.g., 2005 Compressor Fire, 2006 Mooring Chain Failure).

148.    The February 2, 2007 UK HSE letter continued, laying out concerns that were

prescient of the *Deepwater Horizon* incident:

> [UK HSE maintains] the view that ***major accidents result when a series of failings with several critical risk control systems materialize concurrently. . . . The number and relatedness of backlogs on the Schiehallion is such that it appears as though there is a significant risk of such a series of failings arising.***

149.    The February 2, 2007 UK HSE letter concluded with criticism of BP's larger

problem with its lax safety culture and inability to avoid a major incident that echoed the MMS's

findings about BP in 2002:  "BP's decisions on the *Schiehallion* have not in any way been

informed by a systematic assessment [by independent safety inspectors] of the adequacy of the

management system to achieve compliance with those RSPs . . . that are intended to avoid the failings that might align to cause major accidents."

150.    According to a 2009 UK HSE letter, BP again suffered a "significant

Hydrocarbon Release" (*i.e.*, an oil spill or gas release) on the *Schiehallion* rig on August 4, 2008.

The UK HSE said the release was attributable to a "failure to comply" with BP's own process

safety procedures.

151.    Several other UK HSE letters were sent to BP between 2007 and 2010 as well.

These letters outlined safety and maintenance problems on other rigs that could create a serious

risk of hydrocarbon release:

- A March 5, 2009 UK HSE letter discussed inspections of BP's *Harding* rig, criticizing BP's failure to inspect several "high risk" systems for corrosion, as requested in previous notices. The inspector wrote: "This lack of progress is unsatisfactory. It is important that the condition of these systems is ascertained in a timely manner, in order to reduce the risk of loss of containment incidents" (*i.e.*, spills); and

- Additional letters to BP on March 25, 2008, March 5, 2009, and July 7, 2009 relating to the *Bruce*, *Magnus*, *Unity*, and *ETAP* platforms criticize BP for failing to conduct maintenance programs compatible with the intended lifespan of its rigs – suggesting, in other words, that BP was running its own equipment into ruin.

**B. BP's Scienter for Corporate Statements**

*BP's Internal Reporting Structures Mandated that the CEO and Board Review Process Safety and Risk*

152.



153.     The Safety & Operations segment ("S&O") was a key component of OMS that BP utilized to achieve monitoring of process safety performance. Before and during the Class and Subclass Period, BP utilized the S&O function for a variety of reporting mechanisms, progress updates and metrics which allowed for the Executive and Board to monitor process safety performance. ███████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████

154.     The Orange Book was a reporting format conceived of by Defendants Inglis and Hayward, to relay key safety information to GORC. Ellis Armstrong, CFO of BP Exploration and Production, was involved in the process of creating the Orange Book. Armstrong Dep. at 85:21-22. Armstrong testified that the purpose of the Orange Book was to cull safety metrics across BP and regional business units, including E&P in the Gulf of Mexico that "had the same level of standing in the firm as financial information." This information was reported on a quarterly basis to GORC and SEEAC in connection with the committees' safety monitoring roles. Armstrong Dep. at 86:4-11.

155.     █████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████

54

*SEEAC Approved BP's Publications Regarding Safety*

156.     As noted above, SEEAC responsibilities included: "[r]eviewing material to be placed before shareholders which addresses environmental, safety and ethical performance and make recommendations to the Board about their adoption and publication."

157.

158.

159.

55

160.

161.     Also, BP's "Sustainability Reporting 2009 Safety" ("Sustainability Report")

was published on April 15, 2010.



162.    Just weeks before the publication of the Sustainability Report, SEEAC met

again, and the top item on its agenda was commendation of the final draft form of the report.

***Defendants Consciously Limited The Scope of Safety & Operations Audits So As Not To Apply To The Majority Of BP's Deepwater Drilling Fleet***

163.    Contrary to BP's representations that OMS was a systematic management

framework that provided superior monitoring of safety, Defendants Hayward and Inglis made the

decision to exclude some of the most lucrative – and the riskiest – of all BP operations from

S&O audits.

57

164.     These S&O audits were especially critical because they tested rig and rig personnel's compliance with safety standards and risk management practices, including requirements set forth under OMS.

165.     ████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████ Defendants Hayward and Inglis made a conscious decision to exclude these risky BP operations, which were responsible for drilling the vast majority of BP's deepwater wells in the Gulf of Mexico, from the scope of the S&O audit function. Had such operations not been purposefully excluded, GORC and SEEAC (which received all S&O audits) would have received detailed information concerning the myriad process safety failures on the *Deepwater Horizon* (such as those identified throughout the Presidential Commission's Report).

166.     ████████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████ The decision to exclude Gulf of Mexico from BP's S&O Audits belied BP's repeated public statements regarding a systematic framework for improved process safety.

58

## C. Additional Scienter Allegations: Defendants' Disregard of Safety and Operational Concerns

167. ████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████

168. ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████

169. ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████

///

59

*Defendants Knew of, or Recklessly Disregarded, Significant Process Safety Problems with Third-Party Rigs and, in Particular, Rigs Leased From Transocean*

170. During the Class and Subclass Periods, Defendants knew of, or recklessly disregarded, significant process safety problems with rigs operated or owned by third parties. These individuals knew of especially acute problems for Transocean-operated rigs.

171. ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████

172. On July 21, 2007, BP experienced a high-potential incident in the Gulf of Mexico. The incident involved Transocean rig operators dragging the BOP along the sea floor which almost severed underground pipelines. ████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████

173. ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████

174. ████████████████████████████████████████████████████

██████████████████████████████████████████ As a result of these

incidents, a joint safety improvement plan was to have been implemented to address rig-safety

culture and joint standardization.

175. Defendant Inglis himself expressed concerns that OMS standards were not being

applied to contractor operated drilling rigs. In an email to the Upstream Senior Leadership Team

dated July 13, 2009, Defendant Inglis stated:

> One of the emerging findings from our analysis of incidents is that conformance
> with Control of Work (CoW) practices, on many of our contractor operated
> drilling rigs, falls short of BP expectations. I have asked Barbara [Yilmaz] to
> clarify the expectations we have of our contractors in the matter of CoW and the
> bridging requirements between contractor practice and BP's CoW Standard.

176. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████

177. █████████████████████████████████████████████████████

████████████████████████████████████

*Concerns about the Integrity of Safety Processes in Alaska*

178. On April 11-12, 2009, Marc Kovac ("Kovac"), a BP mechanic, welder and union

representative, sent two emails to BP's Ombudsman's office – which was headed by the

Honorable Stanley Sporkin (a retired federal judge) – copying numerous BP Exploration Alaska

61

BPXA offices raising serious concerns about the integrity of pipelines in Alaska, overstretched staff and contractors, and general problems with inspections of oil wells in the western part of BP's Prudhoe Bay facilities. The first email noted that "it's getting back to a very dangerous situation, too much overtime and too much responsibility and area to cover for each man. Anything can happen when [well] pads are not monitored. Anything can happen when workers work over 12 hours a day, every day. Things are not getting better." In a second email dated April 12, 2009, Kovac listed a host of specific examples of overstretched staff, concluding that the situation "sets us up for another major mishap. Who will they blame this time? This situation is not acceptable."

179. Then, in June and August 2009, BP employees and representative members of the United Steelworkers met with BP management in Alaska about various safety and pipeline integrity issues and complaints about BP's culture making it difficult for employees to raise safety issues. Minutes released from the United Steelworkers revealed that union representatives raised detailed concerns to BP management about understaffing and excessive overtime (being required to work 16-18 hour shifts) and noted that these issues caused an "increased . . . risk for accidents."

180. This concern was underscored in October 2009 by Phil Dziubinski ("Dziubinski"), BPXA senior officer for HSSE. Dziubinski noted that a shift greater than 16 hours impeded workers' ability to make sound decisions, describing the impaired decision-making ability as akin to "intoxication." He noted these conditions were persistent in BP's operations before and throughout the Class Period. Further, he believed that the failure to abate such work conditions would require BP to affirmatively acknowledge to HSE Committees, the Board, the Ombudsman

and Congress that this situation put "production ahead of safety." In late 2009, Dziubinski was asked to resign from his post in what he believes was retaliation for voicing his concerns.

181. In the June and August 2009 meetings, union representatives also raised concerns about delayed replacement or repair of equipment and old, corroded pipelines, including gas leak detectors. (Faulty gas leak detection devices were among the problems that led to the ignition of flammable gases during the blowout and subsequent explosion on the *Deepwater Horizon*.) "*We have several lines ready to leak,*" the representatives are noted as stating. The minutes show union representatives urging BP not to simply "patch" pipelines: "These lines should be replaced."

182. These were precisely the types of safety issues BP informed investors it would address after the Baker Report was released and the types of safety issues that BP represented to investors were – purportedly – already being addressed and remedied throughout the Class and Subclass Periods.

**Afraid-a-spill E-mail Raises Complaints about Alyeska's Operations**

183. In late 2009, another private employee "concern" was sent to the BP Ombudsman from an anonymous employee of BP-operated Aleyska, the BP-led consortium that operates the Trans-Alaska Pipeline in Alaska. The email was signed "Afraid-a-spill." The email raised a litany of complaints about Alyeska's operations, including serious safety and pipeline integrity concerns.

184. Unidentified executives, the email stated, "told employees not to speak up or go against" the Alyeska CEO, Kevin Hostetler ("Hostetler"). The email stated that as a result of Hostetler's behavior, the work environment at Alyeska had degraded over several years to the point where: "*People are afraid to speak up on safety or integrity issues for fear of retaliation.*"

According to a subsequent investigation into the allegations by BP-retained lawyers with the law firm Morgan Lewis & Bockius, the subject of the email was communicated to BP senior leadership in early 2010, and Judge Sporkin, the Ombudsman, discussed it with BP leadership, which led to the firm being hired to carry out a further investigation. The results of the investigation still are not public.

185. Concerns about the risks of spills in BP's Alaska operations, and the inadequacy of BP's pipeline integrity and inspection programs, were not only being voiced internally or to the BP Ombudsman. BP also received enforcement letters sent to BP companies by the U.S. Department of Transportation's "Pipeline and Hazardous Materials Safety Administration" ("PHMSA"). PHMSA letters communicate regulatory violations, enforcement actions, orders to comply, and warnings relating to pipelines. In 2008 through 2010, BP related companies operating in the United States received 40 separate enforcement letters from PHMSA, a far higher number than those sent in the same period to peer companies Exxon Mobil, Conoco Philips, Chevron, or Shell. (During the same period, Shell received only six PHMSA letters.) One PHMSA letter was sent to BP on April 20, 2010, the very day the *Deepwater Horizon* blast occurred. In that letter, PHMSA communicated that it had found serious shortcomings with BP's pipeline inspection and anti-corrosion systems in Alaska, increasing the likelihood of a major spill.

186. These were precisely the types of safety issues BP informed investors it would address after release of the Baker Report and the types of safety issues that BP represented to investors were – purportedly – already being addressed and remedied throughout the Class and Subclass Periods.

///

***Aftermath of BP's 2007 Criminal Plea***

187.    During the Class and Subclass Periods, Defendants Hayward and Inglis knew, or recklessly disregarded, that the recommendations of the Baker Panel were not being adequately instituted throughout the Company, especially in terms of improving its process safety practices. In particular, as set forth below, between 2008 and 2010, the Environmental Protection Agency warned BP's General Counsel, among other senior BP executives, that EPA investigators found BP to be operating unsafely.

188.    As described above, BP pled guilty to a violation of the U.S. Federal Water Pollution Control Act in connection with the Alaska pipeline oil spill, admitting that its "criminal negligence" had caused the corrosion and thus the spill.  BP was sentenced to three years of probation, and fined $22 million.  In late 2008 BP attempted to obtain an early release from probation in Alaska, arguing to its federal probation officer, Mary Frances Barnes ("Barnes"), that the Company had made "significant progress" in relevant areas of maintenance and inspection.  Unbeknownst to investors, however, Barnes, found continuing safety issues and incidents with BP operations and denied BP's request.  In September 2010, due to continuing complaints that she received about safety and pipeline integrity issues in 2008 through 2010, Barnes requested that the court revoke BP's probation and that additional fines and penalties be levied against the Company.

189.    Also unknown to investors during the Class and Subclass Periods, BP was potentially facing serious disciplinary action by the EPA's Suspension and Debarment Division ("SDD"), in connection with past and ongoing misconduct in Alaska, Texas, and other states. The SDD has the authority to prevent BP from being a party to any U.S. government or state contract or grant funded with federal funds, which would materially affect BP's revenues.

190.    Beginning in early 2008 and through early 2010, Jeanne Pascal ("Pascal"), the

EPA SDD Debarment Counsel for Region 10 (West Coast and Alaska) who handled EPA

debarment oversight activities on the BP Group in the greater United States, communicated

repeatedly by telephone and email with senior BP officials, including senior BP executive and

Defendant Doug Suttles, BP General Counsel Jack Lynch ("Lynch"), and BP's counsel at

Vinson & Elkins, Carol Dinkins, among other persons.  The BP Ombudsman, Judge Sporkin,

also raised Pascal's concerns with the President of BP America, McKay.  In her

communications, Pascal noted that her office was in receipt of information from BP employees

and from EPA inspectors in Alaska and Texas demonstrating that BP was ***in a state of

continuing non-compliance*** with numerous applicable laws and civil settlement agreements; that

BP was continuing to run many of its operations unsafely; and that BP was continuing to retaliate

against workers and contractors who raised safety and environmental issues.  Thus, on several

occasions during the Class and Subclass Periods, Pascal stated that, because of the Company's

continuing misconduct, the EPA was entitled to file a debarment complaint, to strip BP and its

subsidiaries of the right to bid for U.S. government contracts and to bid for U.S. government oil

and gas concessions.

191.    BP was also informed of significant problems with its process safety with respect

to refineries.  For example, in May 2010, it was revealed that between June 2007 and February

2010, BP received a total of 862 citations for OSHA violations relating to its refineries in Texas

City and Toledo, Ohio, of which 760 were classified as "egregious willful" and 69 were

classified as "willful."  The willful violations accounted for over 97 percent of all willful

violations found by OSHA in all U.S. refineries during the same period – BP's main

competitors' combined citations were 22.  Center for Public Integrity, *OSHA Says BP Has "Systemic Safety Problem,"* May 16, 2010.

192.    These were precisely the types of safety issues BP informed investors it was addressing after release of the Baker Report.

### D. Additional Scienter Allegations:  BP Retaliated Against Individuals Who Raised Concerns About the Safety and Integrity of its Operations

*Whistleblower Retaliation in the Gulf of Mexico*

193.    Throughout the Class and Subclass Periods, and contrary to BP's representations to its shareholders, BP engaged in continuous and systemic retaliation against employees who reported concerns about the safety and integrity of BP's operations.  These whistleblowers provide further support of Defendants' knowledge or reckless disregard of the falsity and misleading nature of their Class and Subclass Period statements.

194.    In August 2008, Kenneth Abbott ("Abbott"), a BP engineer working on design and blueprint management issues relating to the operations of BP's *Atlantis* rig (a major BP rig involved in drilling deepwater exploration and production wells in the Gulf of Mexico), began to raise concerns with BP managers about the Company's practices and policies for managing and updating designs and blueprints for its infrastructure and equipment on the *Atlantis*.  One particular concern was that designs for critical units on the rig were not updated to reflect changes made during repairs, maintenance, or other modifications.

195.    On or around August 15, 2008, BP manager Barry Duff ("Duff"), who worked with Abbott, wrote to BP managers and corroborated Abbott's concerns, stating that a lack of properly-reviewed and approved designs could result in "***catastrophic operating errors***" and that "***currently there are hundreds if not thousands of Subsea documents that have never been finalized***," a situation which Duff referred to as "***fundamentally wrong***."

196. Abbott continued to raise the above concerns from November 2008 through January 2009 when he was fired in retaliation for his whistle-blowing. Shortly after his termination, Abbott raised his concerns with the Company's Ombudsman. On June 17, 2010, Abbott was invited to testify before Congress to describe the circumstances that led him to initially report his concerns to senior BP management. During his testimony, Abbott stated, in part, that:

> *From my experience working in the industry for over 30 years, I have never seen these kinds of problems with other companies*. Of course, everyone and every company will make mistakes occasionally. *I have never seen another company with the kind of widespread disregard for proper engineering and safety procedures that I saw at BP and that we hear from the news reports about BP Horizon, or BP Texas City, or the BP's Alaska pipeline spills. BP's own investigation of itself,* by former Secretary of State James Baker*, reported that BP has a culture which simply does not follow safety regulations. From what I saw, that culture has not changed*.

197. Among the documents sent to the BP Ombudsman, and forwarded to senior BP managers during the Ombudsman's investigation into Abbott's allegations in 2009 and early 2010, was a declaration by a safety engineer in Houston, Texas, Mike Sawyer, who independently reviewed Abbott's allegations, internal BP emails, and applicable regulations.

198. The Sawyer affidavit affirmed that a "large portion of [the *Atlantis'*] subsea safety critical drawings, documents, specifications, and certificates were not in final, 'as-built' status," and warned: "*The lack of 'as-built' design documents is a violation of Federal requirements under the Department of Interior MMS Safety and Environmental Management Systems as specified in 30 CFR Part 250 [including] 30 CFR 250.903 and 905*." The Sawyer affidavit specifically warned that:

- Time is of the essence in avoiding an Outer Continental Shelf (OCS) environmental disaster, Atlantis production should be shut in until resolution of its design short comings is complete and a thorough inspection confirms that critical breaches have been satisfactorily resolved. . . . *It is inconceivable*

*that BP could justify the risk of commissioning Atlantis production without completed design documentation reflecting the latest approved design version* . . . .

- The absence of a complete set of final, up-to-date, 'as-built' engineering documents, including appropriate engineering approval, introduces substantial risk of large scale *damage to the deepwater Gulf of Mexico (GOM) environment and harm to workers*, primarily because analyses and inspections based on *unverified design documents can not accurately assess risk or suitability for service*. . . .

- "The wide spread pattern of unapproved design, testing, and inspection documentation on the Atlantis subsea project creates a risk of a catastrophic incident threatening the GOM deepwater environment and the *safety* of platform workers. *The extent of documentation discrepancies creates a substantial risk that a catastrophic event could occur at any time*.

199.    In April 2010, BP's Ombudsman wrote to Abbott and affirmed that his allegations had been substantiated.  More specifically, Abbot received a letter from BP's Deputy Ombudsman, Billie Garde ("Garde"), on April 13, 2010, stating:  "Your concerns about the [Atlantis] project not following the terms of its own Project Execution Plan were substantiated. . . . [BP] did not do a comprehensive documentation audit regarding the documentation issues on Atlantis. . . . *The concerns that you expressed about the status of the drawings upgrade project were . . . of concern to others who raised the concern before you worked there, while you were there, and after you left*."

200.    In addition, the Presidential Commission Report found that a contributory factor to the *Deepwater Horizon* explosion and the problems in attempting to trigger the BOP related to BP's practice of not updating designs and plans from their original schematics – much like the problems complained about with regard to the *Atlantis*.

201.    On the issue of retaliation, the Presidential Commission Report also noted that a survey conducted in March 2010 indicated that crew members working on the *Deepwater Horizon* feared retaliation.  The survey, which included workers on the *Deepwater Horizon* and

three other rigs, was conducted between March 12 and March 16, 2010 – *i.e.,* approximately one month prior to the *Deepwater Horizon* explosion. According to the Presidential Commission, the survey found that: "Some 46 percent of crew members surveyed felt that some of the workforce feared reprisals for reporting unsafe situations, and 15 percent felt that there were not always enough people available to carry out work safely."

***Whistleblower Retaliation in Alaska***

202.    The BP Ombudsman conducted a robust investigation of Acuren, the company responsible for pipeline inspection and monitoring of BP's pipelines in Alaska, where BP contractor Marty Anderson ("Anderson") had worked until 2008 and who had began to raise serious criticisms with his supervisors and BP intermediaries about BP's pipeline corrosion and inspection system in Alaska and Acuren's staffing for that program. According to 2009 communications between the BP Ombudsman's office and Lynch, in 2007 Anderson began to cite "a significant quality control breakdown" in Acuren's and BP's testing procedures, "inadequate record keeping," and "unqualified inspectors in the field performing inspections." BP's Ombudsman's office stated that "[t]he concerns were serious, and although people try to downplay the significance of the issues, they reveal a complete breakdown." According to the BP Ombudsman's office, the audit confirmed Anderson's claims.

203.    The matters concerning Anderson and pipeline inspections were serious enough for the BP Ombudsman's office to raise them with BP and BP North America officials, including Rick Cape, BP's Vice President for Compliance and Ethics, *specifically recommending to him that Anderson's concerns be reported to the BP Board of Directors and to Lynch.* In addition, the Ombudsman himself, Judge Sporkin, communicated Anderson's concerns in 2008 with then-President of BP North America Bob Malone. Garde wrote to Lynch about it in September 2009,

and Anderson himself met with Lynch on August 3, 2009.  BP did not adequately address the continuing concerns that had been raised.  An internal email dated July 15, 2010, from Christine Anastos, a BP Ombudsman Inspector, to other Ombudsman staff, stated that "many of the issues identified by Marty [Anderson] years ago appear to be persisting" [*i.e.*, into mid 2010] and "it is clear that, over time, root causes have not been identified and/or addressed . . . ."

204.   A 2008 BP Ombudsman "Workforce Briefing" containing an assessment of Acuren's "Work Environment" reported that a survey of Acuren employees by the Ombudsman's office found significant problems with workers' perceptions of potential retaliation for reporting safety or environmental concerns.  A "key insight" in the presentation stated that "[a]ctions and events in the past 18 months [*i.e.*, during the period BP vowed to improve safety practices in Alaska in the wake of the 2006 spills] have had a decidedly chilling impact on worker attitudes."  The section noted:  "[p]roduction is viewed by very many workers as the primary focus," (*i.e.*, as opposed to safety).  The presentation also noted that the "actual or perceived presence of HIRD [Harassment, Intimidation, Retaliation, Discrimination] is high in the Acuren organization. . . ."  In fact, one in three employees believed "recent resignations" were due to HIRD, and 38 percent of employees – and 80 percent of the employees who worked on natural gas lines – indicated as the reason for not reporting safety concerns:  "nothing seems to happen to reported items."

205.   The Ombudsman also noted that about one in ten Acuren employees said in the last 18 months that they had been asked to perform a job that was not in compliance with regulations or safety practices.  (The number was even higher for workers who monitor BP natural gas pipelines:  almost half of Acuren's workers indicated that they had been asked to perform "non-compliant work".)

206.    The 2008 presentation also included selected quotes from employees, including the following:

- "I've raised issues, now I'm labeled a troublemaker."

- "You get treated better when your supervisor doesn't hear from you."

- "[A] co-worker falsified production numbers and I brought it to my supervisor's attention with the result that I was ostracized, moved to a different shift, moved to the ghetto and told I should produce more in line with the guy who falsified the records."

- "Supervisors talk safety but when concerns are brought up they are viewed as irritating and just given lip service."

- "I have stopped jobs for safety reasons and they just hand it to the next guy till they find someone who will do it" [*i.e.*, the job that was stopped].

- "I was pressured to change my evaluation of some pipe which I deemed to be defective."

- "BP doesn't listen, they put too much emphasis on rules to look good but have no common sense when it comes to safety."

- "BP's support of safety comes off as lip service and seems to only be in place to lower their insurance rates. While superficially, BP delivers lip service about safety, their continually increasing demands accompanied by consistently decreasing resources create a 'results oriented' atmosphere where the ends justify the means."

- "BP creates the adverse and dysfunctional world we work in here. Many problems that occur are because they drive people too hard to perform with limited resources. . . ."

207.    Furthermore, BP Ombudsman records from 2010 include numerous other examples of serious issues raised by Acuren employees.  For instance, according to an article published by ProPublica on June 7, 2010, on December 9, 2009 a "Concerned Individual" at Acuren raised process safety concerns about other personnel "pencil whipping" test results (manipulating devices to change readings) and "falsified inspections."  This individual's name is

Stuart Sneed ("Sneed"). Sneed worked on BP's Alaska pipeline and stated that: "They [BP] say it's your duty to come forward . . . but then when you do come forward, they screw you. They'll destroy your life. . . . No one up there [in Alaska] is going to say anything if there is something they see is unsafe. They are not going to say a word."

## IX. THE MATERIALIZATION OF THE UNDISCLOSED RISKS – DEEPWATER HORIZON OIL SPILL AND ITS AFTERMATH

### A. BP's Systematic Failures Caused the Explosion on and the Sinking of the *Deepwater Horizon* Rig

***BP Acquires the Rights to the Macondo Well and Began Its Preparation to Drill Despite Having an Inadequate and Error-Filled Oil Spill Response Plan***

208. The tragedy of the Macondo well explosion was avertable, but BP's overarching culture of indefensible risk-taking prevailed. At every turn, BP's conduct evidenced a systematic departure from recognized industry safety practices. Thus, the Presidential Commission found that "*the cumulative risk that resulted from these decisions and actions was both unreasonably large and avoidable[.]*"

209. In March 2008, BP paid approximately $34 million to acquire the exclusive drilling rights from the MMS for the Mississippi Canyon Block 252, a nine-square-mile plot in the Gulf of Mexico that encompasses the Macondo well. Although the Mississippi Canyon area has many productive oil fields, BP knew little about the specific geology of Block 252 and, in fact, the Macondo was the Company's first well on the new lease. BP planned to drill the well to 20,200 feet in order to learn the geology of the area and to determine whether the oil and gas reservoir would warrant installing production equipment. The Macondo well was located 47.6 miles off the coast of Louisiana. It was believed that the well could hold as much as fifty (50) million barrels (or 2.1 billion gallons) of producible oil.

73

210.    Throughout the Class and Subclass Periods, MMS required BP to prepare and file oil spill response plans demonstrating the Company's specific strategy and ability to respond to an oil spill if one occurred while drilling in the Gulf of Mexico.  MMS regulations required that an oil spill response plan include, *inter alia*:  (i) an emergency response action plan; (ii) disclosure of the equipment available to combat an oil spill; (iii) any oil spill response contractual agreements with third-parties; (iv) calculations of the worst-case discharge scenarios; (v) a plan for dispersant use in case of a spill; (vi) an in-situ oil burning plan; and (vii) information regarding oil spill response training and drills.  *See* 30 C.F.R. § 254.21.

211.    The first of these requirements, the "emergency response action plan," is the "core" of the overall operational response plan and required BP to disclose, among other things: (i) information regarding the Company's oil spill response team; (ii) the types and characteristics of oil at the facility; (iii) procedures for early detection of a spill; and (iv) procedures to be followed in the event of an oil spill.  *See* 30 C.F.R. § 254.23.

212.    BP publicly filed its oil spill response plan for the Gulf of Mexico – entitled "Regional Oil Spill Response Plan – Gulf of Mexico" – with the MMS on December 1, 2000 and last revised the plan on June 30, 2009 ("BP's Regional OSRP for the GOM").  A regional oil spill response plan is designed to cover multiple facilities or leases of a lessee that have: (i) similar modeled spill trajectories and worst case discharge scenarios, (ii) the potential to affect the same ecological or socioeconomic resources, and (iii) are located in close enough proximity to be served by the same response equipment and personnel.  BP's Regional OSRP for the GOM covers a massive area, including all of the United States' interests in the Gulf of Mexico.  This area encompasses the coastal waters of Texas, Louisiana, Alabama, Mississippi, and Florida.  BP

has approximately 600 leases and operates roughly 70 oil wells in the Gulf of Mexico. BP's Regional OSRP for the GOM applied to all of these wells.

213. According to BP's Regional OSRP for the GOM, the "***TOTAL WORST CASE DISCHARGE" scenarios in the Gulf of Mexico ranged from a release of 28,033 barrels of oil per day to 250,000 barrels of oil per day***. More specifically, BP's Regional OSRP for the GOM stated: (i) an oil spill occurring less than ten miles from the shoreline could create a worst case discharge of 28,033 barrels of oil per day; (ii) an oil spill that occurred greater than ten miles from the shoreline could create a worst case discharge of 177,400 barrels of oil per day; and (iii) an oil spill caused by a mobile drilling rig that is drilling an exploratory well could create a worst case discharge of 250,000 barrels of oil per day. BP's Regional OSRP for the GOM explicitly states that the Company and its subcontractors ***could recover approximately 491,721 barrels of oil per day*** (or more than 20.6 million gallons) in the event of an oil spill in the Gulf of Mexico. Moreover, the Company claimed and provided certified statements to the MMS that BP and its subcontractors "*maintain the necessary spill containment and recovery equipment to respond effectively to spills.*"

214. On March 10, 2009, the MMS deemed the Company's initial exploration plan for Mississippi Canyon Block 252 ("BP's EP") "submitted." BP's EP included the area encompassing the Macondo well.[3] In connection with the EP, BP sought a permit from the MMS to drill to a total depth of 19,650 feet at the Macondo Well. Following the sinking of the *Deepwater Horizon*, a BP crewman admitted that this depth had been misrepresented to the MMS, and that BP had in fact drilled in excess of 22,000 feet, in violation of its permit.

---

[3] BP's Regional OSRP for the GOM and EP are collectively referred to herein as "BP's Oil Spill Response Plan."

215.     According to BP's EP, the worst case scenario of an oil spill occurring in

Mississippi Canyon Block 252 would be the release of approximately *162,000 barrels of oil per

day*.

216.     In BP's EP, the Company claimed it would have no difficulty responding to a

worst case scenario while drilling the Macondo well:

> **Since BP … has the capability to respond to the appropriate worst-case
> scenario included in its regional OSRP …, and since the worst-case scenario
> determined for our [EP] does not replace the appropriate worst-case scenario in
> our regional OSRP, I hereby certify that BP … has the capability to respond, to
> the maximum extent practicable, to a worst-case discharge, or a substantial
> threat of such a discharge, resulting from the activities proposed in our [EP]**.

* * *

> **[D]ue to the distance to shore (48 miles) and the response capabilities that
> would be implemented, no significant adverse impacts are expected.**

217.     Because the worst case scenario discharge figures in BP's EP – which BP

calculated – fell below the threshold established in BP's Regional OSRP for the GOM, the

Company was not required to submit a site-specific drilling plan for the Macondo well itself.

218.     In October 2009, the semi-submersible Transocean rig *Marianas* began drilling the

Macondo well.  However, operations were halted at approximately 4,000 feet below the sea floor

due to damage caused to the rig by Hurricane Ida.

219.     The replacement rig, the *Deepwater Horizon*, arrived at the Macondo well on

January 31, 2010.  Although the rig was in place on that date, several steps needed to occur prior

to beginning any drilling operation, including connecting the rig's BOP to the wellhead.  BP

completed these steps by February 10, 2010 and the *Deepwater Horizon* began drilling shortly

thereafter.

220.    Once the rig was connected to the BOP via the riser, BP inserted the drill bit and drilling pipe through the riser and BOP in order to reach the wellbore in the ocean floor.  As drilling progressed, so-called "drilling mud" was pumped down through the drilling pipe and emerged through holes in the drill bit.

221.    Drilling mud is not mud in the traditional sense; it is a blend of synthetic fluids, polymers and weighting agents costing approximately $100.00 per barrel.  Drilling mud accounts for as much as 10% of the total cost in drilling a deepwater well.  Drilling mud is a critical part of the drilling process.  For example, as it is circulated down the drilling pipe and back up the wellbore to the rig, drilling mud clears the wellbore of broken rock and other debris (referred to as "cuttings"), cools the drill bit and maintains stable pressure within the well, which is critical to the mechanical stability and integrity of the wellbore.

222.    When drilling a deepwater well like the Macondo – which lies approximately 5,000 feet (or about 1 mile) below the ocean's surface and extends another 13,000 feet below the ocean floor – controlling pressure is a paramount concern.  The inward or "pore" pressure (*i.e.*, the pressure exerted by the fluid in the surrounding rock formation on the wellbore) must be balanced with the outward or "fracture" pressure (*i.e.*, the pressure exerted by the drilling fluids in the wellbore on the surrounding rock formation).  Following proper safety procedures is critical because uncontrolled well pressure can cause an explosion.

223.    On April 9, 2010, the weight of the drilling mud being pumped into the Macondo well was too high and fractured the surrounding formation; drilling mud began flowing into the cracks in the formation.  In an attempt to plug the fractures and stop the outflow of drilling fluid, BP circulated 172 barrels of thick, viscous fluid, referred to as a "lost circulation pill," into the wellbore.  The lost circulation pill succeeded in staunching the outflow of drilling mud, but the

episode underscored the sensitivity of the Macondo well. As noted by the Presidential Commission: "*BP's on-shore engineering team realized the situation had become delicate. They had to maintain the weight of the mud in the wellbore at approximately 14.0 pounds per gallon (ppg) in order to balance the pressure exerted by the hydrocarbons in the pay zone.*" Thus, BP's engineers were on notice that they must be even more vigilant in monitoring and controlling the competing pressures within the wellbore.

### Casing and Cementing the Well

224.   Once the initial drilling of the well was complete, BP then needed to insert casing to seal off the walls of the wellbore to provide structural integrity. BP considered two casing methods: a long-string casing and a liner/tie-back casing. The long-string casing involves hanging a single continuous wall of steel from the wellhead on the ocean floor down to the bottom of the well over thirteen thousand feet below. The liner/tie-back method entails hanging shorter segments of casing to one another in order to form a stronger and less flexible piece of metal. A critical distinction between the two methods is that the long-string casing method provides two barriers to flow up the annular space (once cementing is complete) whereas the liner/tie-back casing provides four barriers to annular flow. This means that the liner/tie-back method provides twice the safety precautions as compared with the long-string casing method. In addition, BP knew that obtaining a reliable primary cement job with the long-string casing would be much more difficult.

225.   In fact, between April 14 and 15, 2010, the BP engineering team in Houston, Texas modeled the likely success of the cementing process using the two casing methods and determined that **the long- string method would fail in effectively cementing the Macondo well**.

226.    In light of this determination, the engineering team elected to proceed with the liner/tie-back method, but, according to the Presidential Commission, others at BP opposed the decision.  In the end, despite the conclusion that the long-string method could not be cemented reliably, BP's view prevailed and the crew proceeded with the long-string casing method.

227.    The next step in the drilling process was to thread the long-string casing through the center of the wellbore down to the bottom of the well.  Centering the casing is of vital importance to obtaining a secure cement job.  As the cement mixture flows out of the casing, it ascends through the annular space surrounding the casing.  If the space around the casing is uneven (*i.e.*, there is more space on one side than on the other), the cement begins to fill in the annular space in an uneven manner, leaving channels of drilling mud in the cement.  These channels are pathways through which highly pressurized hydrocarbons can flow.

228.    To ensure that the long-string casing will be centered, guides called "centralizers" are placed around the casing at regular intervals.  For the Macondo well, BP decided that it would use only six centralizers because that was the amount currently available on the rig.  It does not appear that the Company's reasoning was based on any scientific or engineering calculations.  However, before BP could actually place the centralizers in the well, it needed Halliburton – who BP contracted for this cementing job – to verify that six centralizers would be sufficient.

229.    On or about April 15, 2010, Halliburton engineer Jesse Gagliano ("Gagliano") performed computer simulations to assess the likelihood of a satisfactory cement job using six centralizers.  Gagliano's calculations demonstrated a high likelihood of channeling resulting in a cement failure if the Company used only six centralizers.  Computer simulations showed that twenty-one centralizers were necessary – *i.e.,* almost four times as many as BP intended to use.

230.    After reviewing the modeling data himself, BP Drilling Team engineer Gregory Walz ("Walz") agreed with Gagliano's conclusions.  On April 16, 2010, Walz wrote to other BP engineers and stated, in part, that the operation needs "to honor the … modeling to be consistent with our previous decisions to go with the long string."  Walz proceeded to make arrangements to obtain the additional centralizers.

231.    However, BP Well Team Leader John Guide ("Guide"), who was also based in BP's Houston office, opposed using the additional centralizers because the installation would delay the team by approximately ten hours and would therefore cost BP money.  Although BP ordered additional centralizers, when they arrived on the *Deepwater Horizon* it was determined that the centralizers were the wrong type.  Despite the serious threat of channeling identified in the modeling data, however, Guide's view prevailed and only six centralizers were used to center the more than thirteen thousand foot long-string casing in the wellbore.

232.    BP's culture of unreasonable, indefensible risk taking is echoed in an email by Brett Cocales (a drilling operations engineer in BP's Houston office), dated April 16, 2010, in which he stated:

> Even if the hole is perfectly straight, a straight piece of pipe even in tension will not seek the perfect center of the hole unless it has something to centralize it. ***But, who cares, it's done, end of story, will probably be fine*** and we'll get a good cement job.

233.    On April 17, 2010, after learning that BP would proceed with only six centralizers, Gagliano re-ran the computer simulations and modeling using seven centralizers and the conclusion was the same: the well would have "***a SEVERE gas flow problem***."  BP, however, continued to ignore its own expert's opinion.

234.    On April 18, 2010, BP began lowering the long-string casing into the wellbore.  To enable the drilling mud located in the wellbore to flow smoothly and distribute evenly as the

long-string casing is lowered, two trap doors within the long-string casing, referred to as the "float collar," are propped open with a tube called an "auto fill tube."

235.   On April 19, 2010, after the long-string casing reached the bottom of the wellbore, BP needed to dislodge the auto fill tube, converting the float collar from a two-way valve to a one-way valve.  Successfully converting the float collar insures that the pumped cement will only flow downward through the casing, a critical step in the cementing process.

236.   Two events should have indicated to BP that the conversion of the float collar was not proceeding properly.  First, the tube should be dislodged once the flow through the tube reaches six barrels of mud per minute (6 bpm), equivalent to six hundred pounds of pressure per square inch (600 psi).  Yet, as the crew pumped drilling mud down the casing, pressure began to climb beyond the 600 psi threshold which should have converted the float collar, but still the crew was unable to establish flow.  The pressure continued to rise, peaking at 3,142 psi (more than five times more pressure than should have been needed to convert the float collar) before suddenly dropping precipitously.  It appears that BP assumed that this meant the float collars had converted.  This is a scientifically indefensible position, however, because, as noted by the Presidential Commission: "[t]he auto fill tube was designed to convert in response to *flow-induced* pressure.  Without the required rate of flow, an increase in *static* pressure, no matter how great, will not dislodge the tube."

237.   Second, after the tube is dislodged and the float collar is converted to a one way passage, the amount of pressure needed to circulate drilling mud from the rig, down the drilling pipe and up the annular space to the rig again should have been 570 psi.  Yet, as BP began the process of converting the float collars, the results differed considerably.  After the spike and sudden drop in pressure, the circulation pressure was only 340 psi.

238.   BP personnel on the rig erroneously ignored the mounting evidence that something was amiss, and proceeded to the next step in the well abandonment plan – mud circulation.

239.   Correct mud circulation requires a complete circulation of drilling mud in the wellbore, referred to as "bottoms up" circulation.  The process, which requires about 12 hours, allows workers on the rig to test the mud for gas influxes, safely remove any gas pockets, and evacuate any debris or other foreign matter that could contaminate the cement.  Given the heightened challenges of cementing a long-string (as opposed to a liner/tie-back) casing, this step was critical.  In addition, "bottoms up" circulation would allow the BP crew to test the mud at the bottom of the well for hydrocarbons, the presence of which would indicate a leak in the cement job at the bottom of the well.

240.   In order to complete a "bottoms up" circulation, BP needed to circulate 2,760 barrels of drilling mud.  Instead, as noted by the Presidential Commission, BP circulated only 350 barrels of mud – eight times less than the amount required to properly complete the "bottoms up" circulation of the well.

241.   In cementing the Macondo well, BP used nitrogen foam, a cement with which it had little experience in the Gulf of Mexico.  In February 2010, Gagliano conducted tests regarding the stability of the nitrogen foam cement.  The tests showed that the mixture was unstable and therefore represented an additional risk of well failure.  According to the Presidential Commission Report, these test results were communicated to BP personnel in Houston on March 8, 2010, however, the warnings were ignored and BP pumped nitrogen foam cement into the Macondo well.

242.   BP's internal guidelines dictated that the top of the annular cement should be 1,000 feet above the uppermost hydrocarbon zone.  For the Macondo well, BP injected just enough

cement to extend the annular cement barrier half the distance, or only 500 feet above the uppermost hydrocarbon zone. According to the Presidential Commission Report, this deviation reduced the safety margin for this procedure by 50% and meant that a total of sixty barrels of cement would be used to cement the well, which BP's own engineers recognized left absolutely no margin for error. Also according to the Presidential Commission Report, BP was also keenly aware that it was pumping the cement at an unsafe rate (four barrels per minute rather than six barrels per minute), further impeding the efficiency with which cement would be displaced from the annular space, and reducing its safety margin even further.

243. At 12:40 a.m. on April 20, 2010, the crew finished pumping the primary cement job. A team of outside technicians was on hand to conduct the battery of tests needed including, but not limited to, the "cement log," which was designed to evaluate and test the sufficiency of the cement job. The cement log is an acoustical test used to identify areas (if any) where the cement failed to channel up through the annular space in a uniform fashion. If cement channeling is uneven, pockets form, creating the possibility that hydrocarbons will enter the wellbore where they can ascend (and expand) rapidly.

244. The acoustical test was especially critical given BP's prior erroneous decisions regarding the construction of the Macondo well, which included, *inter alia*: (i) using the difficult-to-cement long-string casing method; (ii) foregoing the "bottoms up" mud circulation; (iii) failing to use twenty one centralizers as the Company's expert recommended; (iv) ignoring scientifically accepted data pertaining to the float collar conversion; (v) electing to use nitrogen foam cement deemed unstable in prior testing; (vi) pumping the cement at reckless rates; and (vii) halving the safety margin by setting the cement 500 (rather than 1,000) feet above the hydrocarbon bearing "pay zone." BP decided to forego the acoustical test and sent the team of

technicians home by helicopter at 11:15 a.m. that morning. Forgoing the acoustical test saved the Company approximately ten hours and $100,000. This decision was contrary to industry practice and the recommended safe practices of the American Petroleum Institute.

### BP Begins the Temporary Abandonment Process

245.    The *Deepwater Horizon* rig is a drilling rig as opposed to a production rig. Once drilling operations are complete, the well is placed in "temporary abandonment" until the arrival of the production rig, which will connect to the well and begin pumping oil and gas from the site. Placing the well into temporary abandonment means that that the drilling rig will be removing its own BOP and riser from the wellhead. There are several key features in the temporary abandonment process to insure that the well is secure before the BOP and riser are removed. For one, a cement plug, which acts like a cap, is placed in the well. Typically this cap is placed at or near the mudline. The area in the well *beneath* the cap is filled in with heavy drilling mud, which applies additional downward pressure on the hydrocarbon bearing zone. If the cement plug is placed at a greater depth, this necessarily means that there will be less heavy drilling mud in the well underneath the cement plug. Finally, the crew will install a "lockdown sleeve" at the wellhead. Throughout this process, the well is monitored and a series of tests are performed to insure that the well is secure – *i.e.*, that no hydrocarbons are leaking into the well. According to the Presidential Commission, neither the BP Well Site leaders, nor any of the rig's crew, had seen the temporary abandonment plan for the Macondo well prior to 10:43 a.m. on the day abandonment procedure began. Indeed, the temporary abandonment plan had undergone numerous changes leading up to April 20, 2010, but, according to the Presidential Commission: "It does not appear that the changes to the temporary abandonment procedures went through any sort of formal review at all."

246.   Prior to abandonment, the well must be tested to insure that there are no leaks.  In part, this involves conducting a "negative-pressure test" to assess whether hydrocarbons are flowing into the well.  To conduct this test, BP needed to simulate the pressure conditions that would exist in the well once it was placed into temporary abandonment.  As part of the negative pressure test, the crew removed 3,300 feet of mud from the wellbore.

247.   To remove the drilling mud from the wellbore (and later the riser), BP pumped "spacer" through the drilling pipe followed by seawater.  Spacer is a synthetic blend that acts as a barrier between the drilling mud and seawater.  Although the use of spacer is a common and accepted practice, BP's spacer concoction was mixed on board the rig from leftover chemicals that would enable BP to save money and skirt environmental regulations.  As explained by the Presidential Commission:

> While drilling crews routinely use water-based spacer fluids to separate oil-based drilling mud from seawater, *the spacer BP chose to use during the negative pressure test was unusual*.  BP had directed . . . mud engineers on the rig to *create a spacer out of two different lost-circulation materials left over on the rig – the heavy, viscous drilling fluids used to patch fractures in the formation* . . . .
>
> *BP wanted to use these materials as spacer in order to avoid having to dispose of them onshore as hazardous waste pursuant to the Resource and Conservation Recovery Act*, exploiting an exception that allows companies to dump water-based "drilling fluids" overboard if they have been circulated down through a well.  *At BP's direction, the [mud engineers] combined the materials to create an unusually large volume of spacer that had never previously been used by anyone on the rig or by BP as a spacer, nor been thoroughly tested for that purpose.*

248.   Testimony before the Presidential Commission indicates that this concocted, untested spacer may have clogged the BOP's kill line, interfering with the results of later testing designed to assess the integrity of the well.

249.   After removing drilling mud from the wellbore, BP began a negative-pressure test to determine whether the well was sealed such that gas or liquid could not permeate into the well.

This negative pressure test is the ***only*** test that assesses the integrity of the cement job at the bottom of the well. BP had no established procedure or protocol for conducting a negative pressure test.

250. To conduct the negative-pressure test, the crew "bled off" pressure from the drilling pipe until it was 0 psi. The pipe was then sealed and monitored. For a successful negative pressure test, the pressure within the drilling pipe must remain at 0 psi for a certain period of time. The BP crew went through this process ***three*** times – bleeding down the pressure and then sealing the pipe – and all ***three*** times the pressure within the drill pipe jumped, reaching 1400 psi on the third attempt. Thus, the pressure test failed three times, in identical fashion.

251. The negative-pressure test performed exactly as intended. It gave the clear, unequivocal warning that the integrity of the well was compromised. As noted by the Presidential Commission: "[B]ased on available information, *the 1400 psi reading on the drill pipe could only have been caused by a leak* into the well." In May 2010, BP admitted in Congressional testimony that these pressure test results clearly signaled a "very large abnormality" in the well. Yet, notwithstanding the unequivocal results of the negative pressure test and without communicating the results to safety experts in Houston, BP ignored the warnings and instead applied the same test to the "kill line," one of the pipes used to circulate fluids into and out of the well.

252. After conducting the negative-pressure test a *fourth* time (this time on the kill line), BP achieved what it considered to be a successful test result, and continued with the temporary abandonment process. During this last test, the crew was able to maintain 0 psi on the kill line, but the pressure on the drill pipe continued at 1400 psi. The Presidential Commission Report found that "BP used a spacer that had not been used by anyone at BP or on the rig before, that

was not fully tested, and that may have clogged the kill line," leading to the so-called successful test result.

253.    As part of the negative-pressure testing of the well, the crew had already removed 3,300 feet of drilling mud below the sea floor from the well and replaced it with seawater.  This decision was driven by BP's choice to place the "cement plug" at a depth of 3,000 feet.  The cement plug is a three hundred foot cap, which is placed in the well as an additional safety measure to secure the well while it is in temporary abandonment.  Placing the cement plug 3,300 feet below the ocean floor is not in accordance with accepted industry practice for performing this function.  Indeed, placing the cement plug three *thousand* feet below the mud line was inconsistent with MMS regulations and required special dispensation.

254.    The associated risks were amplified by BP's decision:  (i) to leave 3,300 feet of the well below the ocean floor filled with only seawater, rather than heavy drilling mud and (ii) to postpone placement of the cement plug in the well.  As a result, once BP opened the annular preventers on the BOP to facilitate the removal of mud from the riser, the only remaining barriers between the rig and the highly pressurized hydrocarbons in the well were the drilling mud remaining in the bottom section of the well and, beneath that, the cement job at the very bottom of the well.

255.    At this stage, there was nothing to prevent leaked hydrocarbons (if present in the wellbore) from traveling up the riser to the rig.  An influx of hydrocarbons is called a "kick" and is exceedingly dangerous due to the highly pressurized conditions.  One gallon of gas at the bottom of the well is capable of expanding to 1,000 gallons by the time it reaches the rig on the ocean's surface.  As the gas expands, it accelerates the kick.  It is therefore imperative that the well be monitored closely for any evidence of a mounting kick.

256.     At 8:02 p.m. on April 20, 2010, BP began to remove the drilling mud from the riser. As operations proceeded, the drilling mud was returning to the rig, but BP failed to monitor the rate of return. The returned mud should have been placed in a subset of the rig's mud pits, referred to as the "active mud pits," to facilitate monitoring. Instead, the returned mud was being dispersed over a number of pits and mud from other operations was being routed to the active mud pits. As a result, there was no way to know whether more mud was returning to the rig than was being pumped into the well, a fact that would have been evidence that a kick was in progress.

257.     At 9:01 p.m. on April 20, 2010, pressure measurements in the well signaled the impending crisis. Pressure in the well should have remained constant or decreased because the pumping pressure remained constant. However, the pressure in the drilling pipe slowly began to *increase*, signaling an influx of hydrocarbons into the well.

258.     The crew did not respond to the pressure reading until approximately 9:30 p.m., when driller Dewey Revette ordered a crew member to bleed pressure from the drilling pipe. Despite the strong evidence of a kick, BP and its crew took no steps to assess the cause of the pressure reading or to seal the well. In addition, no employee in BP's Houston office was monitoring the pressure in the Macondo well. As Fred Bartlit ("Bartlit"), a Presidential Commission investigator, made clear during a Commission presentation on November 9, 2010, drill pressure data was "available" in BP's office in Houston, but BP did not in fact monitor it the night of the *Deepwater Horizon* blowout: "There was nobody in that B.P. Macondo well office that night," Bartlit said. "Everybody had gone home."

259.     Sometime after 9:40 p.m. on April 20, 2010, drilling mud began spewing onto the rig floor and, a few minutes later, the crew began its initial attempt to activate the BOP.

***Explosion on the Deepwater Horizon***

260. The crew initially attempted to activate the rig's BOP annular preventer, a doughnut-shaped rubber and steel seal that fits around the drill pipe and seals the hydrocarbons from flooding the rig itself. However, the annular preventer failed to stop the flow of oil, most likely because the device had been ruptured four weeks earlier when the drilling pipe was moved through the annular preventer while the preventer was in the closed position, sending a plume of drilling fluid filled with chunks of rubber to the surface.

261. Well data indicates that at 9:38 p.m., the first hydrocarbons passed through the BOP.

262. At 9:46 p.m. the crew attempted to activate the variable bore ram, which (like the annular preventer) should have sealed off the area around the drilling pipe. This effort also failed to stop the flow of hydrocarbons.

263. At 9:49 p.m., the hydrocarbon-filled drilling mud that was continuing to spew onto the deck of the rig ignited, causing the first explosion aboard the *Deepwater Horizon*. One eyewitness referred to "a cascade of liquid" pouring out twenty stories above the main deck of the rig. Another described hearing an explosion that sounded like a "blown tire, times 100." Barrels filled with explosive materials were catching fire and launching into the sky like missiles.

264. After the explosion, workers on the bridge did not immediately act to deploy the Emergency Disconnect System ("EDS"). Andrea Fleytas ("Fleytas"), a Dynamic Positioning Operator for the *Deepwater Horizon* who was in the bridge at the time of the explosion, told *The New York Times* that it did not occur to her to use the EDS and, in fact, she had never been

taught how to use it. With respect to the EDS system, Fleytas stated, "I don't know of any procedures."

265. Sometime after the explosion, BP's Subsea Supervisor Christopher Pleasant made his way to the bridge and attempted to activate the EDS, which should have activated the BOP's blind shear ram. The blind sheer ram – the last line of defense – is designed to seal a wellbore by cutting through the drilling pipe and pinching it closed, as the rams close off the well. However, the blind shear ram failed to respond.

266. Despite the failure of the EDS, the BOP's "deadman switch" (an automatic response mechanism) should have triggered the blind sheer ram. The deadman switch also failed to activate the blind shear ram. Later inspections revealed that the device had a myriad of problems due to lack of inspection and poor maintenance, including low battery charges in the critical components responsible for deploying the blind shear ram and defective relays that supply the power to close the blind shear ram.

267. At this point, the only option left to the crew to activate the BOP would have been an acoustical control signal that would trigger deployment of the blind sheer ram via an encoded pulse of sound transmitted by an underwater transducer. However, BP decided not to install the acoustic switch. While an acoustic switch is not required in the United States, it is mandated in many places throughout the world. In those foreign locations, BP uses rigs that do include such a safety device.

268. Witnesses on a supply ship stood horrified as they watched the fire growing on the rig and crew members leaping from the main deck and jumping 100 feet into the sea. With no way to bring the explosion under control, crew members abandoned ship, struggling to fight their way to safety. The *Deepwater Horizon* burned for thirty-six hours before finally tipping and

sinking.  The impact to human lives was stark – 11 crew members were killed and 17 more were injured.

**BP Continues to Attempt to Activate the BOP Following the Abandonment of the *Deepwater Horizon***

269.    Beginning at 1:15 a.m. on April 21, 2010, BP and other personnel began attempts to activate the BOP with remotely operated vehicles ("ROVs").  Over the ensuing days, BP attempted to activate the blind shear ram on several occasions.  All efforts failed.

270.    First, the ROVs applied hydraulic pressure to a panel controlling the blind shear ram, a method of activating the ram, referred to as "hot stab."  It would take BP ten days to learn that the method would necessarily fail because the targeted panel was actually attached to a useless test ram.

271.    The ROVs also cut electrical wires in an attempt to simulate the deadman switch and attempted to activate the ram by triggering the autoshear (an automated disconnect that is triggered if the rig drifts too far from the well, threatening to break the riser).  Still the ram did not deploy.

272.    At 10:22 a.m. on April 22, 2010, the *Deepwater Horizon* sank, wrenching and further damaging the riser.

273.    On May 5, 2010, after learning that the attempts to activate the blind shear ram through the "hot stab" method were actually targeting a useless test ram, BP ceased its attempts to activate the BOP.

///

## B.   BP Was Wholly Unprepared to Contain the Oil Spill

*BP Was Knowingly or Recklessly Unprepared to Manage and Respond to a Spill in the Gulf of Mexico*

274.   In the wake of the *Deepwater Horizon* catastrophe, it has become evident that BP's OSRP was materially false and misleading when filed.  Indeed, the Presidential Commission has described BP's OSRP as outright "***embarrassing***."  Indeed, Defendant Suttles admitted on May 10, 2010 that BP failed to have an oil spill response plan with "***proven equipment and technology***" in place that could contain the oil spill.  Similarly, in a November 9, 2010 interview with the BBC, Hayward ultimately confirmed that the Company had failed to draw up sufficient emergency response plans, admitting that "***we were making it up day to day***."

275.   For example, since BP claimed that it was prepared to recover approximately 500,000 barrels of spilled oil per day, and the worst case scenario for the Macondo well was the release of only 162,000 barrels of oil per day, the Company should have had no problems containing the oil spill.  However, as noted by the Presidential Commission:  "*Despite [BP's claims that it 'could recover nearly 500,000 barrels of oil per day'], the oil-spill removal organizations were quickly outmatched.*"

276.   Furthermore, while BP's Regional OSRP for the Gulf of Mexico claimed that an oil spill occurring under the three different scenarios – *i.e.,* less than ten miles from the shoreline, more than ten miles from the shoreline, and from a mobile drilling rig that is drilling an exploratory well – could cause differences in the amount of oil spilled, BP consistently stated that the "shoreline impact" under each scenario would be identical.  This led the Presidential Commission to find that BP's Regional OSRP for the Gulf of Mexico "*evidenced [a] serious [lack] of attention to detail.*"

277.    The Presidential Commission also noted several other errors in BP's OSRP.  For instance, the Presidential Commission found that BP's Regional OSRP for the Gulf of Mexico was false when issued because "half of the 'Resource Identification' appendix (five pages) … was copied from material on [The National Oceanic and Atmospheric Administration ("NOAA")] websites, without any discernable effort to determine the applicability of that information to the Gulf of Mexico.  *As a result, the BP Oil Response Plan described biological resources nonexistent in the Gulf – including sea lions, sea otters, and walruses*."

278.    Likewise, BP's Regional OSRP for the Gulf of Mexico named Dr. Peter L. Lutz ("Lutz") from the University of Miami's School of Marine Sciences as a wildlife expert.  Lutz was a pioneer in whole-organism integrative physiology, but the Presidential Commission found that he had "*had died several years before BP submitted its plan*."  Not only had Lutz been deceased since 2005, but he left the University of Miami almost twenty years prior to chair the marine biology department at a different university.

279.    Similarly, BP's Regional OSRP for the Gulf of Mexico included incorrect contact information for the Marine Spill Response Corporation ("MSRC").  According to the Presidential Commission, the MSRC was "BP's main oil-spill removal organization in the Gulf," but, inexplicably, "*a link in [BP's Regional OSRP] that purported to go to the Marine Spill Response Corporation website actually led to a Japanese entertainment site*."  Likewise, the names and phone numbers of several Texas A&M University marine specialists were wrong and the listing of certain mammal stranding network offices in Louisiana and Florida were outdated and, in certain cases, had been closed.

280.    On June 8, 2010, journalist Tim Dickinson from *Rolling Stone* magazine published an article decrying BP's OSRP.  The article's powerful message was clear:  "*The effect of*

**leaving BP in charge of capping the well**, says a scientist involved in the government side of the [clean up] effort, **has been 'like a drunk driver getting into a car wreck and then helping the police with the accident investigation**" or, in other words, allowing a fox to guard the hen house and hoping that it does not get hungry.  The article also stated, in part, that:

> 'This response plan is not worth the paper it is written on,' said Rick Steiner, a retired professor of marine science at the University of Alaska, who helped lead the scientific response to the Valdez disaster.  'Incredibly, this voluminous document never once discusses how to stop a deepwater blowout.'

281.   Likewise, these gross deficiencies, errors and misrepresentations, among others, caused the Associated Press to publish an article on June 10, 2010 entitled "BP Spill Response Plans Severely Flawed" which detailed the "**glaring errors and omissions in BP's oil spill response plans**."  The article states, in relevant part, as follows:

> **BP PLC's 582-page regional spill plan for the Gulf, and its 52-page, [EP] … vastly understate the dangers posed by an uncontrolled leak and vastly overstate the company's preparedness to deal with one**, according to an Associated Press analysis.
>
> * * *
>
> In the spill scenarios detailed in the documents, fish, marine mammals and birds escape serious harm; beaches remain pristine; water quality is only a temporary problem. And those are the projections for a leak about 10 times worse than what has been calculated for the ongoing disaster.
>
> * * *
>
> *The plans contain wildly false assumptions about oil spills. BP's proposed method to calculate spill volume judging by the darkness of the oil sheen is way off. The internationally accepted formula would produce estimates 100 times higher.*
>
> * * *
>
> In early May, at least 80 Louisiana state prisoners were trained to clean birds by listening to a presentation and watching a video. It was a work force never envisioned in the plans, which contain no detailed references to how birds would be cleansed of oil.

* * *

There are other examples of how BP's plans have fallen short:

**Beaches where oil washed up within weeks of a spill were supposed to be safe from contamination because BP promised it could marshal more than enough boats to scoop up all the oil before any deepwater spill could reach shore a claim that in retrospect seems absurd**.

"The vessels in question maintain the necessary spill containment and recovery equipment to respond effectively," one of the documents says.

**BP asserts that the combined response could skim, suck up or otherwise remove 20 million gallons of oil each day from the water. But that is about how much has leaked in the past six weeks and the slick now covers about 3,300 square miles**, according to Hans Graber, director of the University of Miami's satellite sensing facility. *Only a small fraction of the spill has been successfully skimmed. Plus, an undetermined portion has sunk to the bottom of the Gulf or is suspended somewhere in between.*

*The plan uses computer modeling to project a 21 percent chance of oil reaching the Louisiana coast within a month of a spill. In reality, an oily sheen reached the Mississippi River delta just nine days after the April 20 explosion. Heavy globs soon followed. Other locales where oil washed up within weeks of the explosion were characterized in BP's regional plan as safely out of the way of any oil danger.*

BP's site plan regarding birds, sea turtles or endangered marine mammals ("no adverse impacts") also have proved far too optimistic.

While the exact toll on the Gulf's wildlife may never be known, the effects clearly have been devastating.

More than 400 oiled birds have been treated, while dozens have been found dead and covered in crude, mainly in Louisiana but also in Mississippi, Alabama and Florida. More than 200 lifeless turtles, several dolphins and countless fish also have washed ashore.

*The response plans anticipate nothing on this scale. There weren't supposed to be any coastline problems because the site was far offshore.*
"Due to the distance to shore (48 miles) and the response capabilities that would be implemented, no significant adverse impacts are expected," the site plan says.

* * *

*Perhaps the starkest example of BP's planning failures: The company has insisted that the size of the leak doesn't matter because it has been reacting to a worst-case scenario all along.*

*Yet each step of the way, as the estimated size of the daily leak has grown from 42,000 gallons to 210,000 gallons to perhaps 1.8 million gallons, BP has been forced to scramble to create potential solutions on the fly, to add more boats, more boom, more skimmers, more workers. And containment domes, top kills, top hats.*

*While a disaster as devastating as a major oil spill will create unforeseen problems, BP's plans do not anticipate even the most obvious issues, and use mountains of words to dismiss problems that have proven overwhelming.*

### The Failed Use of Unprecedented Amounts of Dispersants

282. As set forth below, BP's extensive and potentially problematic use of dispersants further demonstrated its lack of preparedness to respond to the spill.

283. On April 22, 2010, BP began spraying massive amounts of dispersants – namely "Corexit" – on the oil that had reached the surface of the Gulf of Mexico. Dispersants such as Corexit are not intended to remove oil from the water; rather, energy from wind and waves naturally disperses oil and dispersants may accelerate the process by allowing the oil to mix with water more easily, dispersing the oil vertically and horizontally in the water column.

284. However, dispersants pose several serious health and environmental threats. For example, dispersants – including Corexit – decrease the amount of oil on the surface of the water, but *increase* the amount of oil in the water column. Corexit therefore enables the oil to spread over a wider area, significantly increasing the exposure of marine life to toxic chemicals and oil. In addition, chemically dispersed oil can be toxic not just in the short term, but also over the long term. Accordingly, the decision to engage in wide-spread use of dispersants must be carefully considered, particularly given the fact that studies have found that dispersants may not increase biodegradation rates and *might even inhibit biodegradation*.

285.    Furthermore, Corexit is a chemical dispersant that contains 2-butoxy ethanol. According to the New Jersey Department of Health, 2-butoxy ethanol "may be a carcinogen in humans. There may be no safe level of exposure to a carcinogen, so all contact should be reduced to the lowest possible level."  BP's OSRP for the Gulf of Mexico makes no mention of this serious side effect.

286.    Between April 22, 2010 through April 26, 2010, BP and its subcontractors applied 14,654 gallons of Corexit to the surface of the Gulf of Mexico.  Then, from April 27, 2010 to May 3, 2010, BP and its subcontractors applied another 141,358 gallons of Corexit to the surface of the Gulf of Mexico.  The following week, they applied an additional 168,988 gallons of Corexit to the surface of the Gulf of Mexico.  The Presidential Commission found that BP's extreme use of Corexit was "*novel*" and had never been used in these "*unprecedented volumes.*" The Presidential Commission stated that while oil spill "responders had often deployed dispersants to respond to spills" it had "***never***" been done "in such volumes; during the Exxon Valdez spill, responders sprayed about *5,500 gallons [of dispersants], and that use was controversial.*"

287.    As the volume of dispersants sprayed on the surface grew dramatically, BP then raised the idea of applying dispersants directly at the well.  Once again, however, the Presidential Commission found that oil spill responders "*had never before applied dispersants in the deep sea*" and "*responders were concerned about the absence of information of the effects of dispersants in the deepwater environment.  No federal agency had studied subsea dispersant use and private studies had been extremely limited.*"

288.    Because no federal agency had ever allowed the subsea release of dispersants in a deepwater environment, on May 10, 2010, the U.S. Coast Guard and EPA prohibited its use

"until initial testing demonstrates the effectiveness of subsurface dispersant application."  Then, during a May 24, 2010 press conference, EPA Administrator Lisa Jackson announced that the government was instructing BP to "take immediate steps to significantly scale back the overall use of dispersants" and expressed EPA's belief that BP "can reduce the amount of dispersant applied by as much as half, and I think probably 75 percent, maybe more."  Based on the unknown and highly risky side effects of dispersants, on May 26, 2010, the U.S. Coast Guard and EPA issued a joint letter and directive stating, in part, as follows:

> Reduction in Use of Dispersants.  BP shall implement measures to limit the total amount of surface and subsurface dispersant applied each day to the minimum amount possible. *BP shall establish an overall goal of reducing dispersant application by 75%* from the maximum daily amount used as follows:
>
> a. Surface Application.  *BP shall eliminate the surface application of dispersants.*  In rare cases when there may have to be an exemption, BP must make a request in writing to the [Federal On Scene Coordinator ("FOSC")] providing justification which will include the volume, weather conditions, mechanical or means for removal that were considered and the reason they were not used, and other relevant information to justify the use of surface application.  The FOSC must approve the request and volume of dispersant prior to initiating surface application.
>
> b. Subsurface Application. *BP shall be limited to a maximum subsurface application of dispersant of not more than 15,000 gallons in a single calendar day.*  Application of dispersant in amounts greater than specified in this Addendum 3 shall be in such amounts, on such day(s) and for such application (surface or subsurface) only as specifically approved in writing by the FOSC.

289.  "*Despite this directive*," the Presidential Commission noted that "*surface use of dispersants continued*."  While the Company did seek exemptions from the directive, "*EPA expressed frustration that BP sought regular exemptions, and it repeatedly asked for more robust explanations of why BP could not use mechanical recovery methods, such as skimming and burning, instead of dispersants*."  On July 14, 2010, EPA ultimately prohibited the use of dispersants altogether.

### The Failed Use of A Cofferdam

290.    Knowing that dispersants would be unable to significantly lessen the environmental catastrophe, BP began to theorize other ways that it might be able to contain and/or recover the spewing oil.  The Company's new idea – which was noticeably absent from BP's OSRP – was to place a large containment dome (or "cofferdam") over the larger of the two leaks, with a pipe at the top channeling oil and gas to a ship on the surface of the Gulf of Mexico, the *Discoverer Enterprise*.  BP had several cofferdams already, but those had been designed, and had only been utilized, in shallow water scenarios and had never been tested in a similar deepwater environment.  Thus, BP was forced to quickly attempt to modify one of its existing cofferdams for these new and unintended purposes.  The modification of the preexisting cofferdam was complete on or about May 4, 2010.  BP began its attempt to place the 98-ton dome to the sea floor late in the evening on May 6, 2010.

291.    It was essentially guaranteed that the *ad hoc* modifications that were hurriedly made to the cofferdam would be unsuccessful.  In his book on the *Deepwater Horizon* incident published in late 2010, *Disaster on the Horizon*, former drilling engineer Bob Cavnar ("Cavnar") described the initial containment dome effort as the "*silliest contraption*" that BP built in the aftermath of the incident, and that the steps to construct and lower it down to the leaking BOP "never made much sense . . . they were more for show – to look like they were doing something while they were trying to come up with a real plan."  Cavnar stated in an interview that the cofferdam was "destined to fail" due to the "scientific certainty" that gas hydrates would immediately form in the device and clog it, and describes in his book the results of its deployment as "almost instantaneous failure."

292.    Likewise, the Presidential Commission noted:

BP's Suttles publicly cautioned that previous successful uses had been in much shallower water. BP recognized that chief among potential problems was the risk that methane gas escaping from the well would come into contact with cold sea water and form slushy hydrates, essentially clogging the cofferdam with hydrocarbon ice. *Notwithstanding the uncertainty, BP, in a presentation to the leadership of the Department of Interior, described the probability of the containment dome's success as "Medium/High." Others in the oil and gas industry were not so optimistic: many experts believed the cofferdam effort was very likely to fail because of the hydrates.*

293. Not surprisingly, the effort did fail. Hydrates accumulated during the installation of the dome, yet BP only had a plan to deal with hydrates once the cofferdam was in place. Thus, when crews started to maneuver the cofferdam into position on May 7, 2010, hydrates formed before they could even place the dome over the leak, immediately clogging the opening through which oil was to be funneled. This error in planning almost led to another catastrophe. As noted by the Presidential Commission:

Because hydrocarbons are lighter than water, the containment dome became buoyant as it filled with oil and gas while BP tried to lower it. BP engineers told [the Company's Vice President overseeing the project Richard] Lynch that they had "lost the cofferdam" as the dome, full of flammable material, floated up toward the ships on the ocean surface. Averting a potential disaster, the engineers were able to regain control of the dome and move it to safety on the sea floor. *In the wake of the cofferdam's failure, one high-level government official recalled Andy Inglis, BP's Chief Executive Officer of Exploration and Production, saying with disgust, "If we had tried to make a hydrate collection contraption, we couldn't have done a better job*."

294. In the days after the failure of the cofferdam, BP temporarily utilized a device known as a "riser insertion tube" to collect some of the oil. However, BP abandoned the effort after only a few days because of the relatively minor amount of oil the device actually managed to collect.

### The "Top Kill" and "Junk Shot" Efforts Fail

295. Following the failure of the Company's cofferdam experiment, BP tried to stop the flowing oil by embarking on so-called "top kill" and "junk shot" efforts. Both methods are

industry techniques that have been historically applied to stop the flow of oil from a blown-out well.

296.   BP, like the rest of the oil industry, was well aware of the Ixtoc I Oil Spill in 1979 in which a rig exploded, caught fire, sank, killed workers and released millions of gallons of oil into the Gulf of Mexico.  In the Ixtoc spill, the same two techniques were attempted and it took approximately 290 days to bring that well under control.  BP's Oil Spill Response Plan made no mention of having to rely on either of these methods let alone provide any qualification as to how effective each method might be in a similar circumstance.  Further, the Presidential Commission noted that neither technique "*had []ever been used in deepwater*."  In the end, both efforts failed to control the proliferation of oil from the Macondo well.

297.   A top kill – also known as a momentum or dynamic kill – involves pumping heavy mud into the top of the well through the BOP's choke and kill lines, at rates and pressures high enough to force escaping oil back down the well and into the reservoir.  A junk shot complements a top kill and involves pumping material (including pieces of tire rubber and golf balls) into the bottom of a BOP through the choke and kill lines.  That material is supposed to get caught on obstructions within the BOP and impede the flow of oil and gas.  By slowing or stopping the flow of oil, a successful junk shot makes it easier to execute a top kill.

298.   BP's top kill and junk shot plan began on the afternoon of May 26, 2010.  As with the cofferdam experiment, BP gave mixed messages about the potential likelihood of success to both the government and the public.  In this regard, the Presidential Commission concluded, in relevant part, as follows:

> As with the cofferdam, BP struggled with public communications surrounding the top kill.  ***At the time, both industry and government officials were highly uncertain about the operation's probability of success.***  *One MMS employee estimated that probability as less than 50 percent, **while a BP contractor said***

*that he only gave the top kill a "tiny" chance to succeed. But BP's Hayward told reporters, "We rate the probability of success between 60 and 70 percent."* After the top kill failed, that prediction may have lessened public confidence in BP's management of the effort to contain the well.

299.    During three separate attempts over the next three days, BP pumped mud at rates exceeding 100,000 barrels per day and fired numerous shots of "junk" into the BOP. After the third unsuccessful attempt, BP acknowledged that the plan was a failure. BP's explanation of the failed attempts focused on the well's 16-inch casing, the outermost barrier between the well and the surrounding rock for more than 1,000 vertical feet. That casing was fabricated with three sets of weak points, or "rupture disks." During the well's production phase, the hot oil coursing through the production casing, which is inside the 16-inch casing, would lead to a buildup of pressure in the well. If the pressure buildup was too high, it could cause the collapse of one of the two casings. The disks were designed to rupture and relieve this potential buildup of pressure before a casing collapsed. According to BP, pressures created by the initial blowout could have caused the rupture of disks to collapse inward, compromising the well's integrity.

300.    The Presidential Commission, however, disagreed with BP's explanation and found, in part, that the "[c]ollapse of the rupture disks *was only one of BP's possible explanations for the unsuccessful top kill. But the company presented it to the government as the most likely scenario.*" Indeed, the U.S. Government noted that it "*did not fully accept BP's analysis of what happened*" and, in contrast, believed that "*the top kill likely failed because the rate at which oil was flowing from the well was many times greater than the then-current 5,000 barrels-per day estimate.*" Because BP did not pump mud into the well at a rate high enough to counter the actual flow, oil and gas from the well pushed mud back up the BOP and out of the riser."

***The "Top Hat" Failed to Collect the "Vast Majority" of the Spewing Oil***

301.   In the aftermath of the failed top kill and junk shot plan, BP began shifting its main focus to collecting the oil rather than killing the well itself.  On May 29, 2010, BP announced that it would attempt to cut off the portion of the riser still attached to the top of the BOP and install a collection device – or "top hat," which would then be connected via a new riser to the *Discoverer Enterprise* vessel.  As before, BP's Oil Spill Response Plan failed to mention the top hat technique as a potential remedy in the event of an oil spill.  BP began installing the top hat on June 1, 2010 and had it in place by 11:30 p.m. on June 3, 2010.  By June 8, 2010 – forty-nine days after the explosion occurred – the *Discoverer Enterprise* was collecting about 15,000 barrels of oil per day – or approximately 25% of the oil being released.

302.   BP also developed a system to bring oil and gas to the surface through the choke line on the BOP.  More specifically, BP outfitted a vessel called the *Q4000* with collection equipment, including an oil and gas burner imported from France. This vessel and resource was also never mentioned in BP's Oil Spill Response Plan.

303.   While BP was able to slowly start collecting some of the oil, the Company was, in the words of the Presidential Commission, once again "overly optimistic about the percentage of the oil it could remove or collect."  Indeed, the Presidential Commission found, in part, as follows:

> On June 1, Suttles said that he expected the top hat, when connected to the *Discoverer Enterprise*, to be able to collect the "vast majority" of the oil.  Within days, it became apparent that the top hat and *Discoverer Enterprise* were inadequate.  On June 6, Hayward told the BBC that, with the *Q4000* in place, "we would very much hope to be containing the vast majority of the oil."  But when the *Q4000* came online in mid-June, the two vessels' joint capacity of 25,000 barrels per day was still insufficient.

304.   In the wake of the failure to contain most of the oil using the top hat, the U.S.

Coast Guard continued questioning BP's response to the spill.  As noted, in part, by the

Presidential Commission:

> BP's Lynch said that the speed at which the company brought capacity online
> was limited solely by the availability of dynamically positioned production
> vessels.[4]   One senior Coast Guard official challenged BP's definition of
> availability:  he suggested that BP did not consider options such as procuring
> ships on charter with other companies until the government pushed it to do so.
> Obtaining another production vessel might have enabled BP to collect oil
> through the BOP's kill line at a rate comparable to that of the *Q4000*.

### The Well Is Finally Capped

305.   Following the limited success of the top hat procedure, BP began presenting its

final well-control plans to government experts.  According to the Presidential Commission

Report:

> The [U.S. government] science advisors would question BP's assumptions,
> forcing it to evaluate worst-case scenarios and explain how it was mitigating risk.
> *The government saw its pushback as essential because BP would not, on its own,
> consider the full range of possibilities.* ***According to one senior government
> official, before the increased supervision, BP "hoped for the best, planned for
> the best, expected the best*****.**"  [Paul] Tooms, BP's Vice President of Engineering,
> believed that the government science advisors unnecessarily slowed the
> containment effort, arguing that scientists consider risk differently than engineers
> and that BP had expertise in managing risk.  *BP, however, was not in the best
> position to tout that expertise:  its well had just blown out*.

306.   By late June, BP was working towards deploying a "capping stack," yet another

*post hoc* measure nowhere reflected in BP's OSRP for the Gulf of Mexico.  The capping stack

was essentially a smaller version of a BOP, designed to sit atop the BOP and stop the flow of oil

and gas.

307.   On July 9, 2010, Coast Guard Admiral Thad Allen ("Admiral Allen") authorized

BP to install the capping stack, but not to close it.  Sealing the capping stack would increase the

---

[4]   Dynamically positioned vessels have computer-controlled systems that maintain the vessel's exact position and
direction, despite external factors such as wind, waves, and current.

pressure in the well. There was a concern that if one or more of the rupture disks had in fact ruptured, the increased pressure could force hydrocarbons into the surrounding formation, leading to uncontrolled eruptions from the ocean floor at other locations.

308. The installation of the capping stack was completed on July 12, 2010. The next day, experts conducted a "well integrity test" to determine if the well had been compromised and to see whether oil could flow into the rock formation. According to the Presidential Commission: "[t]he test was to last from 6 to 48 hours, and BP had to monitor pressure, sonar, acoustic, and visual data continuously, as recommended by the [U.S. government's] Well Integrity Team."

309. On July 15, 2010, after a 24-hour delay to repair a leak, BP shut the capping stack and began the well integrity test. For the first time in 87 days – and after approximately five million barrels of oil had already seeped into the Gulf of Mexico – the well had finally stopped spewing oil. Unfortunately, however, by that time, the vast environmental damage had already occurred and, as noted by *The New York Times* on August 6, 2010, "BP's containment efforts had captured only approximately 16 percent of the spill."

310. Meanwhile, on July 19, 2010, BP publicly raised the possibility of actually killing the well through a procedure called a "static kill." Like the top kill, the static kill involved pumping heavy drilling mud into the well in an effort to push oil and gas back into the reservoir. However, because the oil and gas were already static, the pumping rates required for the static kill to succeed were far lower than the top kill. The U.S. government approved the static kill procedure on August 2, 2010. By 11:00 p.m. on August 3, 2010, the static kill appeared to have worked. On August 8, 2010, Admiral Allen reported that the cement had been pressure-tested and was holding.

311. In mid-September 2010, the first relief well – which BP had begun to drill in early May – finally intercepted the Macondo well, allowing BP to pump in cement and permanently seal the reservoir. Thus, on September 19, 2010 – 152 days after the blowout – the U.S. government finally announced that "*the Macondo well is effectively dead*." In total, 206 million gallons of crude oil spilled into the Gulf of Mexico, thousands of square miles of fishing grounds were closed through 2010 and billions of dollars of tourist revenue in the area were lost.

## X.   DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMITTED MATERIAL FACTS DURING THE CLASS AND SUBCLASS PERIODS

312. Before the start of the Class Periods, BP experienced a series of high-profile safety lapses that resulted in the loss of life, damage to the environment, harm to BP's reputation, and significant costs to BP in the form of criminal pleas and fines, civil settlements, and remediation expenses. In particular, the 2005 Texas City refinery explosion and the 2006 Alaska oil spills were extremely damaging to the Company and left investors concerned about the ability of BP to operate safely and without catastrophic failures.

313. Responding to these concerns, beginning on May 9, 2007, BP sought to assure its investors that BP was a company committed to ensuring safe operations through the implementation of the Baker Panel recommendations and, in particular, its process safety system, OMS. BP reaffirmed this commitment to safety for three years, and at nearly every opportunity during the Class and Subclass Periods. In fact, in May 2009, Defendant Hayward lamented that he had "got so bored with saying 'safety, people, and performance' but [he had] determined that [he was] not going to say anything else." This public commitment to right BP's past wrongs was touted as a sea change in BP's operations.

314. Throughout the Class and Subclass Periods, BP consistently touted its operations in the deepwater Gulf of Mexico, a region that had become one of the most important areas of

production for the Company and which BP hailed as a "profit centre" and a "high margin" production area. In fact, however, BP's deepwater drilling operations created undisclosed risks of a catastrophic system failure that ultimately was realized when the *Deepwater Horizon* exploded and oil began to spew from the Macondo well. Moreover, the explosion revealed that BP never committed to developing effective safety protocols and systems through OMS on rigs that BP did not fully-own, had not completed OMS in the Gulf of Mexico as it had claimed, and did not have procedures in place that would guide its employees through best practices to avoid an otherwise preventable spill or to contain a spill, should one occur.

## A. The May 9, 2007 Statements

315. On May 9, 2007, BP issued its 2006 Sustainability Report, which stated, in part:

During 2006, we undertook specific investments and targeted programmes in response to the Texas City incident as well as building more comprehensive systems for managing process safety across the group. . . . During 2006, we built on the learning from more recent incidents and industry best practice to develop a new operating management system (OMS) to achieve further improvements and reductions in risk. Our goals remain unchanged: no accidents, no harm to people and no damage to the environment. ***The OMS is a comprehensive system that covers all aspects of our operations***, including three dimensions of safety – personal safety, process safety and the environment.

However, we recognize that we have more to do to achieve excellence in process safety, which includes preventing accidental releases of hazardous materials from industrial processes that can have catastrophic effects, such as fires, which may result in fatalities, injuries or environmental damage. This was one of the main findings of the BP US Refineries Independent Safety Review Panel under former US Secretary of State James A Baker, III, which reported in January 2007. The panel made 10 recommendations, all of which BP will implement, in areas ranging from leadership to performance indicators[.]

\* \* \*

***The new OMS will apply to all operations*** by the end of 2010 and includes safety, integrity, environmental management and health. . . . ***Each site will have its own local OMS***, based on a consistent group-wide framework. . . . The aim of the OMS is to have consistent standards of design, construction, operating procedures and maintenance that help to ensure the reliability and integrity of our plants.

\* \* \*

In 2006, this approach was approved as a group practice, part of the new OMS, defining the environmental impact management processes and requirements to which BP will operate. We intend that all new projects in BP will use the practice [of assessing "environmental requirements for new projects"] by the end of 2007. The practice was developed primarily for major projects where the potential for environmental impact is often the greatest. However, it also applies to smaller projects that may have the potential for similar levels of impact in environmentally sensitive areas. (Footnote omitted)

316. The foregoing misrepresentations, which caused BP securities to trade at artificially inflated prices, were materially false or misleading when made, and were known by Defendants, including Defendant Hayward as chairman of GORC and special liaison to SEEAC, to be false at that time, or were made with reckless disregard for the truth, for the following reason, among others: BP misled investors with regard to BP's OMS program applying to "all aspects of our operations," "all operations," and "all new projects in BP" when, in fact, OMS applied only to rigs that BP fully-owned but not to BP's operations where BP leased rigs from others, as it did with Transocean's *Deepwater Horizon* in the Gulf of Mexico (¶¶ 100-105).

**B. The July 24, 2007 Statements**

317. On July 24, 2007, BP held a conference call with analysts and investors, during which Defendant Hayward stated:

First, safety. We are ensuring that we have consistent, safe, reliable operations across BP. We are implementing the Baker Panel recommendations. We are also in the early days of establishing a new way of operating in BP – ***with the progressive rollout of a common group-wide Operating Management System***.

318. The foregoing misrepresentation, which caused BP securities to trade at artificially inflated prices, was materially false or misleading when made, and was known by Defendant Hayward to be false at that time, or was made with reckless disregard for the truth, for the following reasons, among others: Defendant Hayward misled investors with regard to BP's OMS program as providing a "common" or "group-wide" solution when, in fact, OMS applied

only to rigs that BP fully-owned but not to BP's operations where BP leased rigs from others, as it did with Transocean's *Deepwater Horizon* in the Gulf of Mexico (¶¶ 100-105).

**C. The September 25, 2007 Statements**

319.    On  September 25, 2007, Defendant Inglis spoke at the Sanford Bernstein 4th Annual Strategic Decisions Conference, during which he misrepresented the scope of BP's OMS:

> One aspect of our focus on safe and reliable operations that I mentioned earlier, is our new standardized ***Operating Management System (OMS).  This will provide a blueprint for safety and all aspects of operations throughout BP***, making sure operations are undertaken to a consistently high standard worldwide.

320.    The foregoing misrepresentation, which caused BP securities to trade at artificially inflated prices, was materially false or misleading when made, and was known by Defendant Inglis to be false at that time, or was made with reckless disregard for the truth, because Defendant Inglis stated that OMS would apply to "all aspects of operations" and failed to disclose that BP's OMS would apply only to rigs that BP fully-owned but not to BP's operations where BP leased rigs from others, as it did with Transocean's *Deepwater Horizon* in the Gulf of Mexico (¶¶ 100-105).

**D. The November 8, 2007 Statements** [Sustained per NY/Ohio Order (Misrepresentation #11)]

321.    On November 8, 2007, Defendant Hayward spoke at the Houston Forum about BP's implementation of the Baker Panel recommendations.  During his presentation, Defendant Hayward stated, in part, as follows:

> ***We continue to implement the roadmap provided to ourselves and the industry by the excellent work of the Baker Panel***.  BP remains absolutely committed to taking these lessons and becoming a world leader in process safety.

322.    The foregoing misrepresentation, which caused BP securities to trade at artificially inflated prices, was materially false or misleading when made, and was known by Defendant

Hayward to be false at that time, or was made with reckless disregard for the truth, for the following reasons, among others: Defendant Hayward misled investors about BP's implementation of the Baker Panel's recommendations because he falsely represented BP's intention to implement the policies, procedures, and recommendations detailed in the Baker Report (¶¶ 21-25, 28, 83, 124-125).

**E. The February 22, 2008 Statements** [Portions sustained per NY/Ohio Amended Order (Misrepresentation #13)]

323.     On February 22, 2008, BP released its 2007 Annual Review, which contained the "Group chief executive's review." In his Executive Review, Defendant Hayward stated that, under his leadership, safety was BP's top priority. For example, Defendant Hayward stated, in part, as follows: "[w]hen I took over as group chief executive, the immediate task was to restore the integrity and the efficiency of BP's operations. *I set out three priorities: safety, people and performance*."

324.     The foregoing misrepresentation, which caused BP securities to trade at artificially inflated prices, was materially false or misleading when made, and was known by Defendant Hayward to be false at that time, or was made with reckless disregard for the truth, for the following reason, among others: Defendant Hayward misled investors with regard to BP's efforts to "restore the integrity and the efficiency of BP's operations," which supposedly was to be achieved by implementing the Baker Panel's recommendations. Defendants' repeated statements falsely represented BP's intention to implement the policies, procedures, and recommendations detailed in the Baker Report (¶¶ 21-25, 28, 83, 124-125).

///

**F. The February 27, 2008 Statements** [Sustained per NY/Ohio Order (Misrepresentation #14); Dismissed portions deleted]

325. On February 27, 2008, BP conducted its 2008 Strategy Presentation during a conference call with investors and analysts (in which Defendant Hayward participated). There, Defendant Hayward stated, in part, as follows:

> Notwithstanding this track record *our intense focus on process safety continues.* *We are making good progress in addressing the recommendations of the Baker Panel and have begun to implement a new Operating Management System across all of BP's operations.* Integrity related incidents have fallen significantly over the last three years and oil spills of more than one barrel continue a strong downward trend.
>
> Safe and reliable operations remain our number one priority.

326. The foregoing misrepresentations, which caused BP securities to trade at artificially inflated prices, were each materially false or misleading when made, and were known by Defendant Hayward to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a) Hayward misled investors with regard to BP's implementation of the Baker Panel's recommendations because Defendants' repeated statements falsely represented BP's intention to and actual progress in implementing the policies, procedures, and recommendations detailed in the Baker Report (¶¶ 21-25, 28, 83, 124-125); and

(b) Defendant Hayward misrepresented that BP was implementing OMS "across all of BP's operations" when, in fact, OMS applied only to rigs that BP fully-owned but not to BP's operations where BP leased rigs from others, as it did with Transocean's *Deepwater Horizon* in the Gulf of Mexico (¶¶ 100-105).

///

**G. The April 17, 2008 Statements** [Sustained per NY/Ohio Order (Misrepresentation #16); Dismissed portions deleted]

327.    On April 17, 2008, Defendant Hayward and BP Chairman Peter Sutherland delivered speeches at the Company's 2008 Annual General Meeting.  BP posted transcripts of the speeches on its publicly-accessible website.  In his speech, Defendant Hayward again asserted that safety was of the utmost importance at BP and distinguished BP from other oil companies based on its deepwater operations.  In particular, Defendant Hayward stated, in part, as follows:

> When I took over as chief executive last May, I said that we would focus on three basic priorities: safety, people, and performance.  Everyone at BP understands those priorities. And while I am in this role they will remain the priorities.

> Safety is our number one priority and in 2007 our overall safety record continued to improve.  Over the last eight years our safety performance according to the standard industry measure has improved threefold and is now among the best in our industry.

> ***Our intense focus on process safety continues***.  ***We are making good progress in addressing the recommendations of the Baker Panel and have begun to implement a new Operating Management System across all of BP's operations.***  This is aimed at ensuring that our operations across the world look and feel the same everywhere - and perform to the same high standard.

328.    The foregoing misrepresentations, which caused BP securities to trade at artificially inflated prices, were each materially false or misleading when made, and were known by Defendant Hayward to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)      Defendant Hayward misled investors with regard to BP's implementation of the Baker Panel's recommendations because Defendants' repeated statements falsely represented BP's intention to and actual progress in implementing the policies, procedures, and recommendations detailed in the Baker Report (¶¶ 21-25, 28, 83, 124-125); and

(b)     Defendant Hayward misrepresented that BP was implementing OMS "across all of BP's operations" when, in fact, OMS applied only to rigs that BP fully-owned but not to BP's operations where BP leased rigs from others, as it did with Transocean's *Deepwater Horizon* in the Gulf of Mexico (¶¶ 100-105).

**H. The December 17, 2008 Statements** [Portions Sustained per NY/Ohio Order (Misrepresentation #18)]

329.    On December 17, 2008, Defendant Hayward gave a speech at the HRH Prince Of Wales's 3rd Annual Accounting for Sustainability Forum.  BP posted a transcript of the speech on its publicly-accessible website.  Hayward claimed that BP was continuing to improve its process safety practices.  More specifically, Defendant Hayward stated, in part, as follows:

> BP had a number of high-profile safety lapses in recent years, notably at our Texas City refinery, where there was tragic and unacceptable loss of life.

> These lapses exposed shortcomings - but they also gave us a huge opportunity to learn and improve the way we operate.  *We opened ourselves up to scrutiny - and we listened more to our front-line operations people - who, of course, really know what is going on on the ground.   And we have continuously reported progress against a response plan and against an independent external report*.

> One of the many consequences for us has been to develop and to embed a new Operating Management System right across BP - and we operate in 100 countries - so that is no mean feat.

330.    The foregoing misrepresentations, of consistent progress in safety processes, a potent OMS, and thus, safe, reliable and responsible deep sea drilling operations, which caused BP securities to trade at artificially inflated prices, were each materially false or misleading when made or included material omissions, and were known by Defendant Hayward to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)     An internal BP strategy document issued in December 2008 warned BP executives of "major" process-safety concerns in the Gulf of Mexico that permitted the

accumulation of risks prior to and in response to incidents and therefore, increased the likelihood and severity of "process-safety related incidents." (¶ 21); and

(b)    Defendant Hayward misled investors with regard to BP's implementation of the Baker Panel's recommendations because Defendants' repeated statements falsely represented BP's intention to and actual progress in implementing the policies, procedures, and recommendations detailed in the Baker Report (¶¶ 21-25, 28, 83, 124-125).

## I.  The February 24, 2009 Statements

331.   On February 24, 2009, BP issued its 2008 Annual Review and repeatedly assured investors of its supposed continuing commitment to safety.  For example, the 2008 Annual Review falsely stated, in part, as follows:

> Safety, both personal and process, remains our highest priority.  2008 was one of our best ever years for personal safety, with our performance expected to remain among the best in the industry.  During the year we began migrating to **the new BP OMS, which has an increased focus on process safety and continuous improvement**.  The majority of our operations in North America Gas, **the Gulf of Mexico**, Colombia and the Endicott field in Alaska **all completed the migration to the OMS in 2008**.

332.   The 2008 Annual Review also contained the "Group chief executive's review," in which Defendant Hayward asserted that safety was BP's "number one priority" and discussed the "safe and reliable" Gulf of Mexico operations.  More specifically, Hayward stated, in part, that:

> Q: At the start of the year what priorities did you set out for BP?
>
> Safety, people and performance, and these remain our priorities.  Our number one priority was to do everything possible to achieve safe, compliant and reliable operations.  Good policies and processes are essential but, ultimately, safety is about how people think and act.  That's critical at the front line but it is also true for the entire group. Safety must inform every decision and every action.  **The BP operating management system (OMS) turns the principle of safe and reliable operations into reality by governing how every BP project, site, operation and facility is managed**.

* * *

Q: How did Exploration and Production perform?

It was an excellent year, with major projects such as Thunder Horse in the Gulf of Mexico and Deepwater Gunashli in Azerbaijan coming onstream. That, together with safe and reliable performance from our existing operations, contributed to underlying production growth – in contrast to the falling output of our major competitors – and more than compensated for the effects of Hurricanes Ike and Gustav and other operational issues.

333. The foregoing misrepresentations, which caused BP securities to trade at artificially inflated prices, were each materially false or misleading when made, and were known by Defendant BP and Hayward to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a) BP misled investors by stating that the Gulf of Mexico operations had completed the transition to OMS when, in fact, *inter alia*, Defendant Hayward and other BP personnel testified in MDL 2179 that OMS had not been implemented in the Gulf of Mexico as of April 2010 (¶¶109-112), and BP conceded the falsity of the representation at the hearing on Defendants' motions to dismiss on November 4, 2011 (Transcript Doc. No. 304 at 58:15-21) (¶ 107);

(b) Hayward misrepresented that OMS governed "how every BP project, site, operation and facility is managed" when, in fact, OMS applied only to rigs that BP fully-owned but not to BP's operations where BP leased rigs from others, as it did with Transocean's *Deepwater Horizon* in the Gulf of Mexico (¶¶ 100-105); and

(c) An internal BP strategy document issued in December 2008 warned GORC members, including Defendant Hayward, that there were "major" process-safety concerns in the Gulf of Mexico that permitted the accumulation of risks prior to and in response to

115

incidents and therefore increased the likelihood and severity of "process-safety related incidents" thereby misleading investors that operations in the Gulf of Mexico were operating within uniform Company-wide process safety procedures (¶ 21).

### J. The March 4, 2009 Statements

334.   On March 4, 2009, BP filed its 2008 Annual Report with the SEC on Form 20-F, which was signed by Defendant Hayward.  In the report, BP misrepresented the scope and implementation of its OMS, BP's marquee process safety initiative, and made numerous false statements about its supposed safe practices and the quality of its deepwater Gulf of Mexico operations.  Specifically, BP misrepresented that eight sites, including the Gulf of Mexico, had "completed the transition to OMS in 2008."

335.   For example, the Form 20-F stated, in part, as follows:

We continue to implement our new operating management system *(OMS), a framework for operations across BP that is integral to improving safety and operating performance in every site.*

When fully implemented, OMS will be the single framework within which we will operate, consolidating BP's requirements relating to process safety, environmental performance, legal compliance in operations, and personal, marine and driving safety. . . .  The OMS establishes a set of requirements, and provides sites with a systematic way to improve operating performance on a continuous basis.  BP businesses implementing OMS must work to integrate group requirements within their local system to meet legal obligations, address local stakeholder needs, reduce risk and improve efficiency and reliability.  A number of mandatory operating and engineering technical requirements have been defined within the OMS, to address process safety and related risks.

All operated businesses plan to transition to OMS by the end of 2010.  *Eight sites completed the transition to OMS in 2008*; two petrochemicals plants, Cooper River and Decatur, two refineries, Lingen and Gelsenkirchen and four Exploration and Production sites, North America Gas, *the Gulf of Mexico*,  Colombia and the Endicott field in Alaska. . . .  For the sites already involved, implementing OMS has involved detailed planning, including gap assessments supported by external facilitators.  A core aspect of OMS implementation is that each site produces its own 'local OMS', which takes account of relevant risks at the site and details the site's approach to managing those risks. As part of its transition to OMS, a site

issues its local OMS handbook, and this summarizes its approach to risk management. Each site also develops a plan to close gaps that is reviewed annually. The transition to OMS, at local and group level, has been handled in a formal and systematic way, to ensure the change is managed safely and comprehensively.

Experience so far has supported our expectation that having one integrated and coherent system brings benefits of simplification and clarity, and that the process of change is supporting our renewed commitment to safe operations.

\* \* \*

- Executive management has taken a range of actions to demonstrate their leadership and commitment to safety. The group chief executive has consistently emphasized that safety, people, and performance are our top priority, a belief made clear in his 2007 announcement of a forward agenda for simplification and cultural change in BP. Safety performance has been scrutinized by the Group Operations Risk Committee (the GORC), chaired by the group chief executive and tasked with assuring the group chief executive that group operational risks are identified and managed appropriately. . . .

336.    The foregoing misrepresentations, which caused BP securities to trade at artificially inflated prices, were each materially false or misleading when made, and were known by Defendants BP and Hayward to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)    Defendant Hayward signed the certification statement for the foregoing statement and was the Chairman of GORC who was ultimately responsible and charged with oversight and implementation of OMS. (¶¶ 85-86). ██████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████ (¶¶ 159-160);

(b)    Defendant Hayward testified that he knew OMS was not implemented in the Gulf of Mexico in 2008, that he knew the Gulf of Mexico would not "beg[i]n the process of cutover to OMS" until Fall 2009, and that OMS had not even been implemented in the Gulf of

117

Mexico as of April 2010. (¶¶ 109-110). Other BP personnel, including GORC member John Baxter, testified that OMS had not even been implemented in the Gulf of Mexico as of April 2010. (¶ 104). Moreover, BP conceded the falsity of this statement at the hearing on Defendants' motions to dismiss on November 4, 2011 (Transcript Doc. No. 304 at 58:15-21) (¶ 107);

        (c)     Approximately one month prior to publication of BP's 2008 Annual Report, Defendant Hayward received a report directly from Defendant Inglis confirming that the Gulf of Mexico had not completed the transition to OMS by the conclusion of 2008 (¶ 113);

        (d)     An internal BP strategy document issued in December 2008 warned GORC members, including Defendant Hayward, that there were "major" process-safety concerns in the Gulf of Mexico that permitted the accumulation of risks prior to and in response to incidents and therefore increased the likelihood and severity of "process-safety related incidents" thereby misleading investors that operations in the Gulf of Mexico were operating within uniform company-wide process safety procedures (¶ 21);

        (e)     Defendant Hayward testified that he knew that process safety was an integral part of OMS, and that the purpose of OMS was to prevent major accidents, such as the blowout that occurred on the *Deepwater Horizon* on April 20, 2010. He also testified that he knew that the risk of a deepwater blowout was "one of the highest risks" facing BP, and the "highest risk in the Gulf of Mexico." (¶ 106). Moreover, Defendant Hayward testified that, had OMS been implemented in the Gulf of Mexico, OMS "undoubtedly" had the potential to avoid the *Deepwater Horizon* disaster (¶ 111);

        (f)     Defendant Hayward misrepresented that OMS was a "common" system that applied as a "single operating framework" to "all BP operations" and would be "adopted by

all operating sites," when, in fact, OMS applied only to rigs that BP fully-owned but not to BP's operations where BP leased rigs from others, as it did with Transocean's *Deepwater Horizon* in the Gulf of Mexico (¶¶ 100-105);

(g)     According to CW2, by 2009 and 2010, BP's OMS lagged far behind the safety programs of its industry peers, was still in its pilot phase, and had yet to be fully implemented in the Gulf of Mexico (and was not implemented on the *Deepwater Horizon*). Moreover, employees in key positions in Gulf of Mexico operations had no knowledge of OMS requirements (¶¶ 114, 116, 118-20, 122); and

(h)     Defendants failed to disclose or indicate the following:  (1) BP had inadequate safety procedures in place for its Gulf of Mexico operations; (2) BP conducted its operations in the Gulf of Mexico without any legitimate oil spill response plan; (3) BP understated the risks of its Gulf of Mexico operations while overstating its ability to extract oil from the Gulf of Mexico; and (4) BP lacked adequate internal safety and risk management controls.

**K.  The March 10, 2009 Statements** [Sustained per NY/Ohio Order (Misrepresentation #26)]; Ludlow Order as to Particularity/Falsity/Materiality (Misrepresentation # L16)]

337.     On March 10, 2009, BP's EP, which discusses BP's purported safety protocol for the Mississippi Canyon Block 252, was "deemed submitted" by the MMS.  The document was initially received by the MMS on February 23, 2009 and was available to the public and BP's investors no later than March 10, 2009.  The document falsely stated, in part, that:

> ***I hereby certify that BP Exploration & Production Inc. has the capability to respond, to the maximum extent practicable, to a worst-case discharge***, or a substantial threat of such a discharge, resulting from the activities proposed in our Exploration Plan.
>
> * * *
>
> An accidental oil spill that might occur as a result of the proposed operation in Mississippi Canyon Block 252 has the potential to cause some detrimental effects

119

to fisheries. However, it is unlikely that an accidental surface or subsurface oil spill would occur from the proposed activities. *If such a spill were to occur in open waters of the OCS proximate to mobile adult finfish or shellfish, the effects would likely be sublethal* and the extent of damage would be reduced to the capability of adult fish and shellfish to avoid a spill, to metabolize hydrocarbons, and to excrete both metabolites and parent compounds. No adverse activities to fisheries are anticipated as a result of the proposed activities.

\* \* \*

*In the event of an unanticipated blowout resulting in an oil spill, it is unlikely to have an impact based on the industry wide standards for using proven equipment and technology for such responses, implementation of BP's Regional Oil Spill Response Plan which address available equipment and personnel, techniques for containment and recovery and removal of the oil spill.*

338.    In addition, the EP stated that:

An accidental oil spill from the proposed activities could cause impacts to beaches. However, *due to the distance to shore (48 miles) and the response capabilities that would be implemented, no significant adverse impacts are expected*. Both the historical spill data and the combined trajectory/risk calculations referenced in the publication OCS EIS/EA MMS 2002-052 indicate *there is little risk of contact or impact to the coastline and associated environmental resources*.

339.    The EP also contained identical statements to the statement in the immediately preceding paragraph, except that they pertained to wetlands, coastal wildlife, refuges, and wilderness areas.

340.    Section 7.1 of the EP also falsely estimated a worst-case discharge scenario of 162,000 barrels of oil per day, an amount it falsely assured the MMS that it was prepared to respond to.

341.    Additionally, before BP could begin operations at the Macondo site, federal regulations required BP to submit its EP demonstrating that it had planned and prepared to conduct its proposed activities in a manner that was safe, conformed to applicable regulations and sound conservation practices, and would not cause undue or serious harm or damage to

human or marine health, or the coastal environment. 30 C.F.R. §§250.201, 250.202. BP did not have such a plan or a means of conducting their proposed activities.

342. Further, federal regulations required that the EP be accompanied by "oil and hazardous substance spills information" and "environmental impact analysis information." 30 C.F.R. §§250.212, 250.219, 250.227.

343. Among the information required to accompany the EP was a "blowout scenario," described as follows:

> A scenario for the potential blowout of the proposed well in your EP that you expect will have the highest volume of liquid hydrocarbons. Include the estimated flow rate, total volume, and maximum duration of the potential blowout. Also, discuss the potential for the well to bridge over, the likelihood for surface intervention to stop the blowout, the availability of a rig to drill a relief well, and rig package constraints. Estimate the time it would take to drill a relief well. 30 C.F.R. §250.213(g).

344. The oil and hazardous spills information accompanying the EP was also required to include an oil spill response plan providing the calculated volume of BP's worst-case discharge scenario (*See* 30 C.F.R. §254.26(a)), and a comparison of the appropriate worst-case discharge scenario in [its] approved regional [Oil Spill Response Plan] with the worst-case discharge scenario that could result from [its] proposed exploration activities; and a description of the worst-case discharge scenario that could result from [its] proposed exploration activities. *See* 30 C.F.R. §§254.26(b), (c), (d), and (e); 30 C.F.R. §250.219.

345. Federal regulations required BP to conduct all of its lease and unit activities according to its approved EP, or suffer civil penalties or the forfeiture or cancellation of its lease. 30 C.F.R. §250.280.

346. The misrepresentations in ¶¶ 337-340, which caused BP securities to trade at artificially inflated prices, were each materially false or misleading when made, and were known

by Defendant BP to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a) As explained by a group of eight U.S. Senators in a May 17, 2010 letter to U.S. Attorney General Eric H. Holder, Jr., there was no "proven equipment and technology" to respond to the spill. The Senators wrote that "[m]uch of the response and implementation of spill control technologies appears to be taking place on an ad hoc basis." Indeed, BP acknowledged on May 10, 2010 that: "*[a]ll of the techniques being attempted or evaluated to contain the flow of oil on the seabed involve significant uncertainties because they have not been tested in these conditions before*";

(b) BP falsely represented that the EP was based on an analysis of the Mississippi Canyon Block 252 site when, in fact, the EP was boilerplate language copied from one or more exploration plans that MMS had previously approved for other distinct drilling sites;

(c) BP misrepresented that BP was prepared to stop a blowout at Mississippi Canyon Block 252 or contain the resulting oil spill when, in fact, BP was wholly unprepared;

(d) In connection with the EP, BP sought a permit from the MMS to drill to a total depth of 19,650 feet at the Macondo Well. Following the sinking of the *Deepwater Horizon*, a BP crewman admitted that this depth had been misrepresented to the MMS, and that BP had in fact drilled in excess of 22,000 feet, in violation of its permit (¶ 214);

(e) BP misrepresented that an oil spill would not adversely impact beaches, wetlands, and other environmentally sensitive areas;

(f) Concealed from the investing public was BP's failure to have sufficient internal safety and risk management processes to satisfy the above referenced regulation. In fact, Defendant Suttles acknowledged on May 10, 2010, that BP did not actually have a response plan

with "proven equipment and technology" in place that could contain the *Deepwater Horizon*

Spill (¶ 274). Later, Defendant Hayward admitted that "BP's contingency plans were

inadequate," and that the company had been *"making it up day to day*." Defendant Hayward

further admitted that it was "an entirely fair criticism" to blame BP for the disorganized and poor

cleanup effort because *"[w]hat's undoubtedly true is that we did not have the tools you'd want*

*in your tool kit*" to stop the leak from the Macondo well in the Gulf of Mexico in the aftermath of

the explosion (¶¶ 274, 385);

      (g)    On May 12, 2010, H. Lamar McKay, Chairman, President and Chief

Operating Officer of Defendant BP America, Inc., admitted in testimony to the House

Subcommittee on Oversight and Investigations, Committee on Energy and Commerce, that BP

did not have the capability and technology to respond to the *Deepwater Horizon* oil spill:

> Mr. McKay: We are using the best technology at scale. This is the largest effort
> that has ever been put together. So we believe we are using the best technology
> and if we have any other ideas.

> Mrs. Capps: But you never had any until it happened.

> Mr. McKay: Well, we have been drilling with the Coast Guard for years.

> Mrs. Capps: Did you develop technologies for dealing with this?

> Mr. McKay: Not individual technologies for this, no.

> Mrs. Capps: I rest my case

      (h)    The Presidential Commission concluded, "there was nothing to suggest that

BP's engineering team conducted a formal, disciplined analysis of the combined impact of [] risk

factors on the prospects of a successful cement job" (¶ 10); and

(i)     Finally, in his deposition testimony, Defendant Inglis confirmed that BP never invested a dollar in developing methods to contain an oil spill.  Inglis Dep. at 162:9-162:21.

## L.  The April 16, 2009 Statements

347.   On April 16, 2009, BP issued its 2008 Sustainability Review, which contained a "Group Chief executive's review" containing remarks by Defendant Hayward.  Defendant Hayward stated, in part: "You can see a similar balanced approach in our new ***operating management system (OMS), which is to be implemented at each BP site***.  It covers everything from compliance and risk management through to governance and measuring results."

348.   The foregoing misrepresentation, which caused BP securities to trade at artificially inflated prices, was materially false and misleading when made, and was known by Defendant Hayward to be false at that time, or was made with reckless disregard for the truth, for the following reason, among others:  Defendant Hayward misrepresented that BP was implementing OMS "at each BP site" when, in fact, OMS applied only to rigs that BP fully-owned but not to BP's operations where BP leased rigs from others, as it did with Transocean's *Deepwater Horizon* in the Gulf of Mexico (¶¶ 100-105).

## M. The June 30, 2009 Statements  [Sustained per NY/Ohio Order (Misrepresentation #30)]

349.   On June 30, 2009, BP publicly filed its revised oil spill response plan for the Gulf of Mexico – entitled "Regional Oil Spill Response Plan – Gulf of Mexico" or "BP's Regional OSRP for the GOM".  According to BP's Regional OSRP for the GOM, the "***TOTAL WORST CASE DISCHARGE" scenarios in the Gulf of Mexico ranged from a release of 28,033 barrels of oil per day to 250,000 barrels of oil per day***.  More specifically, BP's Regional OSRP for the GOM stated:  (i) an oil spill occurring less than ten miles from the shoreline could create a worst case discharge of 28,033 barrels of oil per day; (ii) an oil spill that occurred greater than ten

miles from the shoreline could create a worst case discharge of 177,400 barrels of oil per day; and (iii) an oil spill caused by a mobile drilling rig that is drilling an exploratory well could create a worst case discharge of 250,000 barrels of oil per day. BP's Regional OSRP for the GOM explicitly states that the Company and its subcontractors ***could recover approximately 491,721 barrels of oil per day*** (or more than 20.6 million gallons) in the event of an oil spill in the Gulf of Mexico. The Company further claimed and provided certified statements to the MMS that BP and its subcontractors "***maintain the necessary spill containment and recovery equipment to respond effectively to spills***."

350. The foregoing misrepresentations, which caused BP securities to trade at artificially inflated prices, that BP and its subcontractors "maintain the necessary spill containment and recovery equipment to respond effectively to spills" and that nearly 500,000 barrels of oil per day could be recovered were each materially false or misleading when made, and were known by Defendant BP to be false at that time, or was made with reckless disregard for the truth, for the following reasons, among others:

> (a)     BP's Oil Spill Response Plan contained numerous errors, gross deficiencies and was wholly inadequate to respond to a deepwater oil spill (¶¶ 274-281); and

> (b)     Defendant Hayward confirmed that the Company had failed to draw up sufficient emergency response plans, admitting that during the spill "***we were making it up day to day***" (¶ 274). In addition, Defendant Suttles admitted that BP failed to have an oil spill response plan with "proven equipment and technology" in place that could contain the oil spill (¶ 274).

///

**N. The February 26, 2010 Statements** [Portions sustained as to particularity/falsity per Ludlow Order (Misrepresentation 18)]

351. On February 26, 2010, BP issued its 2009 Annual Review. In the Annual Review,

BP made misrepresentations concerning the scope of OMS. In a section entitled "Sustaining

momentum and growth," BP acknowledged that its safety protocols are material to investors by

including a separate section on safety entitled "Safety, reliability, compliance and continuous

improvement." That section states:

> Safe, reliable and compliant operations remain the group's first priority. A key enabler
> for this is the BP operating management system *(OMS), which provides a common
> framework for all BP operations*, designed to achieve consistency and continuous
> improvement in safety and efficiency. Alongside mandatory practices to address
> particular risks, *OMS enables each site to focus on the most important risks in its own
> operations and sets out procedures on how to manage them in accordance with the
> group-wide framework.*

352. The foregoing misrepresentations, which caused BP securities to trade at

artificially inflated prices, that BP's OMS "provides a common framework for *all* BP operations"

and "enables *each site* to focus on the most important risks in its own operations and sets out

procedures on how to manage them in accordance with the group-wide framework" were each

materially false or misleading when made, and/or omitted to disclose material facts necessary to

make the statements not misleading, for the following reasons, among others:

(a) Because the 2009 Annual Review was "material to be placed before shareholders

which addresses environmental, safety and ethical performance," SEEAC was required to review

the 2009 Annual Review and make recommendations to the board concerning its adoption and

publication (¶¶ 91, 156).

126

(b)     Defendant Hayward has testified that he knew OMS was not fully implemented in the Gulf of Mexico in 2008 or at the time of the *Deepwater Horizon* disaster (¶ 109-112). Other BP personnel, including GORC member John Baxter, testified that OMS was not implemented in the Gulf of Mexico as of April 2010 (¶ 104). Moreover, BP conceded the falsity of such statements on November 4, 2011 (Transcript Doc. No. 304 at 58:15-21) (¶ 107);

(c)     As of the date of this statement, OMS applied to only one drilling rig out of the seven drilling rigs in Gulf of Mexico, the BP-owned PDQ on *Thunderhorse*. (¶ 100). Moreover, Defendants Hayward and Inglis knew, or were reckless in not knowing, that contracted drilling rigs without OMS accounted for the majority of deepwater wells drilled in the Gulf of Mexico – which were the chief economic driver for BP Exploration and Production – during the Class and Subclass Periods (¶¶ 109-112);

(d)     Defendants Hayward and Inglis (and other GORC members) made the decision not to apply key elements of OMS, including Safety and Operations Audits and Major Accident Risk analysis, to Gulf of Mexico joint ventures and Gulf of Mexico exploration, including the *Deepwater Horizon.* (¶¶ 104, 164-165); *see also* Armstrong Dep. at 207:20-208:18;

(e)     According to CW2, by 2009 and 2010, BP's OMS lagged far behind the safety programs of its industry peers, was still in its pilot phase, and had yet to be fully implemented in the Gulf of Mexico (and was not implemented on the *Deepwater Horizon*). (¶¶ 114, 116, 118-

127

20, 122). Moreover, employees in key positions in Gulf of Mexico operations had no knowledge of OMS requirements (¶ 105);

(h)    Key personnel in the Gulf of Mexico (David Sims, David Rich, Patrick O'Bryan) lacked the knowledge, experience and expertise of those they were replacing (Ian Little, Harry Thierens, and Kevin Lacy) as such BP's OMS implementation in the Gulf of Mexico was disorganized and incomplete (¶ 117); and

(i)    A 2009 rig audit of the *Deepwater Horizon* revealed that not all relevant personnel on the rig were knowledgeable about drilling and well operation practices and rig crew members were not knowledgeable about well operation practices, including containing a blowout (¶ 117).

**O. The March 5, 2010 Statements** [Portions sustained per NY/Ohio Order (Misrepresentation #35); Dismissed portions deleted]

353.   On March 5, 2010, BP filed its 2009 Annual Report with the SEC on Form 20-F, which was signed by Defendant Hayward. In the report, BP continued to tout its position as the largest producer of oil in deepwater Gulf of Mexico operations while delivering safety in its operations. In addition, the Form 20-F falsely stated, in part, that:

> Safe, reliable and compliant operations remain the group's first priority. A key enabler for this is the ***BP operating management system (OMS), which provides a common framework for all BP operations, designed to achieve consistency and continuous improvement in safety and efficiency***.
>
> * * *
>
> This performance follows several years of intense focus on training and procedures across BP. ***BP's operating management system (OMS), which provides a single operating framework for all BP operations***, is a key part of continuing to drive a rigorous approach to safe operations. 2009 marked an important year in the continuing implementation of OMS.
>
> * * *

Our OMS covers all areas from process safety, to personal health, to environmental performance.

* * *

***Following the tragic incident at the Texas City refinery in 2005 the [Safety, Ethics, and Environment Assurance] committee has observed a number of key developments***, ***including***: the establishment of a safety & operations (S&O) function with the highest calibre of staff; ***development of a group-wide operating management system (OMS) which is being progressively adopted by all operating sites***; the establishment of training programmes in conjunction with MIT that are teaching project management and operational excellence; the dissemination of standard engineering practices throughout the group; and the formation of a highly experienced S&O audit team formed to assess the safety and efficiency of operations and recommend improvements. Throughout this time the group chief executive has made safety the number one priority.

354. The foregoing misrepresentations, which caused BP securities to trade at artificially inflated prices, were each materially false or misleading when made, and were known by Defendant Hayward to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a) Hayward falsely claimed that BP had undertaken a series of "key developments" since the Texas City refinery disaster and misled investors with regard to BP's implementation of the Baker Panel's recommendations because Defendants' repeated statements falsely represented BP's intent to and actual progress in improving its process safety since the Texas City disaster (¶¶ 21-25, 28, 83, 124-125); and

(b) Defendant Hayward misrepresented that OMS was a "common" system that applied as a "single operating framework" to "all BP operations" and would be "adopted by all operating sites," when, in fact, OMS applied only to rigs that BP fully-owned but not to BP's operations where BP leased rigs from others, as it did with Transocean's *Deepwater Horizon* in the Gulf of Mexico (¶¶ 100-105).

///

129

**P. The March 22, 2010 Statements** [Sustained as to particularity/falsity/materiality per Ludlow Order (Misrepresentation #8)]

355.    On March 22, 2010, Defendant Inglis delivered a speech at the Howard Weil Energy Conference in New Orleans, Louisiana, in which he discussed the nearby deepwater Gulf of Mexico operations.  BP posted a transcript of the speech on its publicly-accessible website.  During the presentation, Inglis falsely stated, in part, as follows:

> We are currently planning to make final investment decisions for 24 new major projects in the next two years.  Each project has been high-graded though our project selection and progression process.  They are concentrated in the Gulf of Mexico, the North Sea, Azerbaijan and Angola – high margin production areas that improve the portfolio and enable profitable growth.

* * *

> ***Safety and operational integrity underpins everything we do, and we are now in the final phase of rolling out our operating management system that provides a single, consistent framework for our operations, covering all areas from personal and process safety to environmental performance.***  And I am pleased to say that in 2009 we saw continuing improvement in all aspects.

356.    The foregoing misrepresentation, which caused BP securities to trade at artificially inflated prices, was materially false and misleading when made, and was known by Defendant Inglis to be false at that time, or was made with reckless disregard for the truth, for the following reasons, among others:

(a)    Defendant Inglis was a member of GORC, and as such, was charged with oversight and implementation of OMS with respect to exploration and production activities in the deepwater Gulf of Mexico (¶¶ 46, 85, 87-88).  Moreover, Defendant Inglis received the quarterly Orange Book that contained detailed reports concerning the scope of OMS and revealed that the status of its implementation across BP's various business units, including Exploration and Production in the Gulf of Mexico, was incomplete (¶¶46, 85, 87-89);

(b)     Defendant Inglis made these statements about the importance of deepwater drilling in the Gulf of Mexico as part of BP's asset portfolio during the Howard Weil Energy Conference, which bills itself as "one of the premier investor conferences in the energy industry." *See* http://howardweil.com/energy-conference.aspx. However, as of the date of Inglis' statement, OMS applied to only one drilling rig out of the seven drilling rigs in Gulf of Mexico, the BP-owned PDQ on *Thunderhorse* (¶ 100). Moreover, as Chief Executive of Exploration and Production, Inglis knew, or was reckless in not knowing, that over half of the deepwater wells drilled in the Gulf of Mexico – which were the chief economic driver for BP Exploration and Production – were drilled by contracted rigs that did not apply OMS, including the *Deepwater Horizon* (¶¶ 100-105); *see also* Armstrong Dep. at 247:7-248:21;

(c)     Defendant Inglis (and other GORC members) made the decision to not apply key elements of OMS, including Safety and Operations Audits and Major Accident Risk analysis, to Gulf of Mexico joint ventures and Gulf of Mexico exploration, including the *Deepwater Horizon* (¶¶ 104, 164-165); *see also* Armstrong Dep. at 207:20-208:18;

(d)     Defendant Inglis testified that "[o]ne of the purposes of OMS would be to prevent loss of primary containment." Inglis Dep. at 242:23-243:9. Moreover, on July 13, 2009, Defendant Inglis sent an email to the Upstream Senior Leadership Team that expressed concern over contractor operated rigs – *e.g.* the *Deepwater Horizon* – not conforming to BP's Control of Work practices (¶ 175). ■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■ (¶ 176);

(e)     BP had only begun to implement its OMS in a pilot stage in the Gulf of Mexico when BP, in part due to a re-organization led by Inglis, terminated and/or displaced the

key employees responsible for the implementation of OMS (¶¶ 114-116). According to CW2 it was not true that BP was in the final stages of rolling out OMS in the Gulf of Mexico in 2010 and employees in key positions, including Wells Team Leaders and Well Site Leaders, in Gulf of Mexico operations had no knowledge of OMS requirements (¶¶ 105, 114, 116-20, 122);

(f)    Key personnel in the Gulf of Mexico (David Sims, David Rich, Patrick O'Bryan) lacked the knowledge, experience and expertise of those they were replacing (Ian Little, Harry Thierens, and Kevin Lacy), and BP's OMS implementation in the Gulf of Mexico was disorganized and incomplete (¶¶ 116, 117, 119 -122);

(g)    According to CW1 , there was a company failure to implement an appropriate OMS protocol which would have ensured that the individual decision makers at the rig level understood how cost-savings and corner-cutting could affect the process safety of the *Deepwater Horizon* (¶ 115); and

(h)    According to CW2, by 2009 and 2010, BP's OMS lagged far behind the safety programs of its industry peers, was still in its pilot phase, and had yet to be fully implemented in the Gulf of Mexico (and was not implemented on the *Deepwater Horizon*). (¶¶ 114, 116-20, 122).

**Q.  The March 23, 2010 Statements** [Sustained per NY/Ohio Order (Misrepresentation #38)]

357.   On March 23, 2010, Defendant Hayward delivered a speech at the Peterson Institute for International Economics in Washington, D.C. in which he discussed BP's changes to its safety program following the Texas City, Texas refinery explosion.  BP posted a transcript of the speech on its publicly-accessible website.  During the presentation, Hayward falsely stated, in part, that:

> Five years ago on this day, fifteen people died and many more were injured, when an explosion tore through our Texas City refinery.

*That tragic accident has changed in a profound and fundamental way our approach to safety and operations integrity - providing a safe working environment is a paramount responsibility, and our first and foremost priority.*

358.    The foregoing misrepresentation, which caused BP securities to trade at artificially inflated prices, was materially false or misleading when made, and was known by Defendant Hayward to be false at that time, or was made with reckless disregard for the truth, for the following reason, among others:  Defendant Hayward misrepresented that BP had changed its approach to safety "in a profound and fundamental way" in response to the Texas City disaster, when, in fact, Defendants' repeated statements falsely represented BP's intention to and actual progress in implementing the policies, procedures, and recommendations detailed in the Baker Report that were to achieve process safety reforms following the Texas City disaster (¶¶ 21-25, 28, 83, 124-125).

**R and S.    The April 15, 2010 Statements** [Portions sustained as to particularity/falsity/materiality per Ludlow Order (Misrepresentations #5, #30 and #32); Dismissed portions deleted]

## R.  The 2009 Sustainability Review

359.    On April 15, 2010, BP issued its 2009 Sustainability Review, which contained a Q&A session with Defendant Hayward in a section entitled "Group Chief Executive's Review." There, Defendant Hayward reemphasized the misrepresentation contained in BP's 2008 Annual Report (which he signed), that eight sites (including the Gulf of Mexico) completed the transition to OMS in 2008:

- **Group Chief Executive's Review**

*Question*:  What progress has BP made on safety during 2009?

*Answer*:  Safety is fundamental to our success as a company and 2009 was important because of the progress we made in implementing our operating management system (OMS).  The OMS contains rigorous and tested processes for reducing risks and driving continuous improvement.  I see it as the foundation for

a safe, responsible and high-performing BP. ***Having been initially introduced at eight sites in 2008,*** the OMS rollout extended to 70 sites by the end of 2009, including all our operated refineries and petrochemicals plants. ***This means implementation is 80% complete***.

360.    The foregoing misrepresentations, which caused BP securities to trade at artificially inflated prices, were each materially false or misleading when made, and were known by Defendants BP and Hayward to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)    Defendant Hayward, as Chairman of GORC, was ultimately responsible for and charged with oversight and implementation of OMS (¶¶ 85-86);

(b)    Defendant Hayward testified that he knew OMS was not implemented in the Gulf of Mexico in 2008, that he knew the Gulf of Mexico had not "beg[u]n the process of cutover to OMS" until Fall 2009, and that OMS had not been implemented in the Gulf of Mexico as of April 2010 (¶¶ 109-110). Other BP personnel, including GORC member John Baxter, testified that OMS was not implemented in the Gulf of Mexico as of April 2010 (¶ 104);

(c)    Hayward made this statement, which reemphasized and confirmed the earlier statement made in the 2008 20-F that eight sites, including the Gulf of Mexico, had completed the transition to OMS despite knowledge that the Gulf of Mexico had not completed the transition to OMS in 2008 (¶¶ 107-110, 113);

(d)    Hayward misrepresented that OMS was a "common" system that applied as a "single operating framework" to "all BP operations" and would be "adopted by all operating sites," when, in fact, OMS applied only to rigs that BP fully-owned but not to BP's operations where BP leased rigs from others, as it did with Transocean's *Deepwater Horizon* in the Gulf of Mexico (¶¶ 100-105). Moreover, Hayward was aware or reckless in disregarding, that OMS was never meant to apply, and in fact, never did apply, to contracted third-party rigs, which

134

accounted for the majority of BP's deepwater wells drilled in the Gulf of Mexico during the Class and Subclass Periods (¶¶ 100-105);

(e)  Approximately one month prior to publication of BP's 2008 Annual Report, Defendant Hayward received a report directly from Defendant Inglis confirming that the Gulf of Mexico had not completed the transition to OMS by the conclusion of 2008 (¶ 113);

(f)  As members of GORC, Defendants Hayward and Inglis received documents that put them on notice that the Gulf of Mexico had not completed the transition to OMS (¶¶ 87-89);

(g)  An internal BP strategy document issued in December 2008 warned GORC members, including Defendant Hayward, that there were "major" process-safety concerns in the Gulf of Mexico that permitted the accumulation of risks prior to and in response to incidents and therefore increased the likelihood and severity of "process-safety related incidents" thereby misleading investors that operations in the Gulf of Mexico were operating within uniform company-wide process safety procedures (¶ 21);

(h)  Defendant Hayward testified that he knew that process safety was an integral part of OMS, and that the purpose of OMS was to prevent major accidents, such as the blowout that occurred on the *Deepwater Horizon* on April 20, 2010. He also testified that he knew that the risk of a deepwater blowout was "one of the highest risks" facing BP, and the "highest risk in the Gulf of Mexico." (¶ 106). Moreover, Defendant Hayward testified that, had OMS been implemented in the Gulf of Mexico, OMS "undoubtedly" had the potential to avoid the *Deepwater Horizon* disaster (¶ 111);

(i)  According to CW2, by 2009 and 2010, BP's OMS lagged far behind the safety programs of its industry peers, was still in its pilot phase, and had yet to be fully

implemented in the Gulf of Mexico (and was not implemented on the *Deepwater Horizon*) (¶¶ 114, 116-20, 122). Moreover, employees in key positions in Gulf of Mexico operations had no knowledge of OMS requirements (¶ 105);

(j) According to CW1 there was a company failure to implement an appropriate Operations Management Safety protocol which would have ensured that the individual decision makers at the rig level understood how cost-savings and corner-cutting could affect the process safety of the *Deepwater Horizon* (¶ 115); and

(k) Defendants failed to disclose or indicate the following: (1) BP had inadequate safety procedures in place for its Gulf of Mexico operations; (2) BP conducted its operations in the Gulf of Mexico without any legitimate oil spill response plan; (3) BP understated the risks of its Gulf of Mexico operations while overstating its ability to extract oil from the Gulf of Mexico; and (4) BP lacked adequate internal safety and risk management controls.

361. Additionally, the 2009 Sustainability Review, published April 15, 2010, which emphasized BP's systematic approach to safe and environmentally responsible operations, stated further, in part:

BP's operating management system (***OMS) provides a single framework for all BP operations to follow***, covering all areas from process safety, to personal health, to environmental performance.

Providing an integrated and consistent way of working, the OMS helps ensure that a rigorous approach to safe operations continues to be taken. Its principles and processes are designed to simplify the organization, improve productivity, ***enable consistent execution*** and focus BP on performance.

362. The foregoing misrepresentations, which caused BP securities to trade at artificially inflated prices, were each materially false or misleading when made, and were known

by Defendants BP and Hayward to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)     Because the 2009 Sustainability Review was "material to be placed before shareholders which addresses environmental, safety and ethical performance," SEEAC was required to review the 2009 Sustainability Review and make recommendations to the board concerning its adoption and publication. (¶¶ 91, 156); *see also* 2008 Form 20-F at 69;



137

(c)     Additionally, on ███████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████ (¶ 162);

(d)     Defendants BP and Hayward misled investors by stating that the Gulf of Mexico operations had completed the transition to OMS when, in fact, *inter alia*, Defendant Hayward and other BP personnel testified in MDL 2179 that OMS had not been implemented in the Gulf of Mexico as of April 2010 (¶¶ 109-112), and BP conceded the falsity of this statement at the hearing on Defendants' motions to dismiss on November 4, 2011 (Transcript Doc. No. 304 at 58, lns 15-21) (¶ 107);

(e)     Hayward misled investors with regard to BP's OMS program, because BP did not intend for OMS to apply to BP's operations that were not fully-owned by BP, as was the case with Transocean's *Deepwater Horizon* in the Gulf of Mexico (¶¶ 100-105);

(f)     An internal BP strategy document issued in December 2008 warned GORC members, including Defendant Hayward, that there were "major" process-safety concerns in the Gulf of Mexico that permitted the accumulation of risks prior to and in response to incidents and therefore increased the likelihood and severity of "process-safety related incidents" thereby misleading investors that operations in the Gulf of Mexico were operating within uniform Companywide process safety procedures (¶ 21); and

138

(h)     Defendant Hayward further misled investors regarding BP's OMS

program given ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (¶¶ 164-165). Defendant Hayward knew

that Gulf of Mexico joint ventures (such as the Macondo well) were "not in scope" of the BP

Safety & Operations audit program (¶ 165).

## S. The 2009 Sustainability Report

363.    On April 15, 2010, BP issued its 2009 Sustainability Report, which was evaluated

and recommended for publication by SEEAC prior to its publication. The Sustainability Report

contained misrepresentations related to BP's capability to respond to oil spills:

- **Oil Spills**

BP recognizes the risk posed to the environment from spills and takes a range of
measures to prevent any loss of hydrocarbons.

*Our approach*

Our strategy to address spills has three components:

Prevention: we seek to assure the integrity of vessels and pipelines used to
transport oil and other hydrocarbons.

***Preparation: we seek to ensure an infrastructure is in place to deal effectively
with spills and their impacts. Our operating facilities have the capacity and
resources to respond to spill incidents and we participate in industry and
international forums to coordinate contingency planning and emergency
response.***

Performance: we record incidents, learn lessons and aim to reduce the number of
losses from primary containment.

139

364.    Moreover, BP's 2009 Sustainability Report stressed BP's capability to operate safely, primarily through its implementation of OMS and commitment to improving process safety:

- A Systematic Approach

BP constantly seeks to improve its safety performance through the procedures, processes and training programmes that we implement in pursuit of our goal of "no accidents, no harm to people and no damage to the environment."

Our commitment to safe, reliable and responsible operations starts with the group chief executive Tony Hayward and his leadership team: a commitment that filters down through the organization and is regularly communicated to all staff.

Safety performance is a regular focus of the group chief executive's formal communications such as BP's quarterly results and in less formal communications such as his regular townhalls with BP staff.  BP's leadership has continued to reinforce the importance of safety when undertaking regular site visits to BP facilities around the world and from all parts of the business.

"I am extremely proud of BP's 2009 safety performance – it reflects a sustained effort across all our operations over many years." – Tony Hayward, Group Chief Executive

*Promoting Safe Operations*

We are carrying forward our efforts on process safety, which is an integral part of our operating management system (OMS) and ingrained within our capability programmes. As participants in a second round of operations leadership sessions at MIT this year, the group chief executive and his executive team were instrumental in establishing the concept of continuous improvement to help drive systematic safety and reliability in our operations.  Continuous improvement is a means of empowering our operations managers and supervisors, who are closest to our operational problems, to develop the necessary solutions.

* * *

- **Striving for Safe Operations**

**BP continues to implement its operating management system (OMS), a cornerstone of achieving safe, reliable and responsible operations at every BP operation**

Taking a systematic approach is integral to improving safety and operating performance in BP operated sites. Our operating management system covers all areas from process safety, to personal health, to environmental performance.

* * *

*A Unifying Way of Operatin*g

We have successfully introduced OMS at every refinery worldwide in advance of the internal expectations.  Hugh Parsons, Vice President with responsibility for management processes in refining states that "the OMS framework has given us a common path, applicable across different sites and assets worldwide. It has provided a unifying way of operating. This is true not only for refining but across the whole of BP, where we have a much clearer definition of what 'good operations' looks and feels like, regardless of the business context."

* * *

- **Process Safety**

BP is fully committed to becoming a recognized industry leader in process safety management and continues to work to achieve this.

Process safety involves applying good design principles, engineering and operating and maintenance practices to manage our operations safely.

*Process Safety Reporting*
To track our progress in process safety management, we measure lagging indicators which record events that have already occurred, such as oil spills, and leading indicators that focus on the strength of our controls to prevent undesired incidents, such as inspections and tests of safety-critical equipment.

365.   The foregoing misrepresentations, which caused BP securities to trade at artificially inflated prices, were each  materially false or misleading when made, and were known by BP to be false at that the time, or were  made with reckless disregard for the truth, for the following reasons, among others:

(a)     Because the 2009 Sustainability Report was "material to be placed before shareholders which addresses environmental, safety and ethical performance," SEEAC was

required to review the 2009 Sustainability Report and make recommendations to the board concerning its adoption and publication (¶¶ 91, 156); *see also* 2008 Form 20-F at 69;

(b)     SEEAC, including Defendant Hayward, specifically discussed and reviewed the content of the "2009 Sustainability Review" and the companion document titled "2009 Sustainability Reporting," which were published simultaneously, before they were released to the public (¶¶ 161-162). ██████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

██  ████████  ██████  ██████  ████  ██████  ████  ████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████

████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████

(c)     ████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████ (¶ 162);

    (d)    Defendants were also aware that BP safety and operations audits consistently uncovered facts that were contrary to public representations of improved process safety and operations. ████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████ (¶¶ 152-155);

    (e)    The 2009 rig audit of the *Deepwater Horizon* confirmed that not all relevant personnel on the rig were knowledgeable about drilling and well operation practices including containing a blowout, and safety goals were not commonly known or properly communicated (¶ 117);

    (f)    The Presidential Commission concluded, "there was nothing to suggest that BP's engineering team conducted a formal, disciplined analysis of the combined impact of [] risk factors on the prospects of a successful cement job" (¶ 10);

    (g)    According to CW2, by 2009 and 2010, BP's OMS lagged far behind the safety programs of its industry peers, was still in its pilot phase, and had yet to be fully implemented in the Gulf of Mexico (and was not implemented on the *Deepwater Horizon*) (¶¶ 114, 116-20, 122). Moreover, employees in key positions in Gulf of Mexico operations had no knowledge of OMS requirements (¶ 105);

(h)     BP's Gulf of Mexico operations had failed to implement BP's OMS in any robust manner and the individuals responsible for its implementation had been terminated or moved outside of Gulf of Mexico operations (¶¶ 105, 114-116);

(i)     BP's highest officers had knowledge that its Gulf of Mexico operations had caused oil spills in 2008 and two of its rigs (the *Deepwater Horizon* and the *Atlantis*) had reported operational safety problems, which would have been reported to GORC and, as such, put Defendants on notice of the inadequacy of their safety processes in the Gulf of Mexico (¶¶ 117, 152-155, 193-201);

(j)     BP conducted its operations in the Gulf of Mexico without any legitimate oil spill response plan, understated its exposure from drilling operations in the Gulf of Mexico, and lacked adequate internal and safety controls (¶¶ 274-281); and

(k)     According to BP's own internal reporting, decisions regarding the Macondo well "appear to have been made by the BP Macondo well team in an ad hoc fashion . . . This appears to have been a key causal factor to the blowout."

***As the Truth Begins to Emerge, BP Continues to Deceive Investors***

**April 20, 2010**

366.   On the evening of April 20, 2010, after the markets closed, the Macondo well suffered a significant – yet preventable – blowout, leading to a fatal explosion aboard the *Deepwater Horizon* killing 11 crew members and injuring many others.  After attempts to stop the blowout failed, the surviving crew members abandoned ship, as the rig became engulfed in flames.  Oil and gas spewed from the Macondo well onto the rig and into the Gulf of Mexico.

///

**April 21, 2010**

367.   On April 21, 2010, BP issued two press releases about the *Deepwater Horizon* explosion.  In the first press release, BP confirmed a statement by Transocean reporting a fire aboard the rig.  In the second press release, BP offered its full support to Transocean and said it "stood ready to assist" in responding to the tragedy.  However, neither press release acknowledged that oil was currently leaking from the Macondo well into the Gulf of Mexico.

**April 22, 2010**

368.   At approximately 10:22 a.m. on April 22, 2010, the *Deepwater Horizon* rig sank, further damaging the riser that had connected the rig to the wellhead on the ocean floor.

**April 24 - 26, 2010**

369.   On Saturday, April 24, 2010, while the unsuccessful attempts to activate the BOP continued, ROVs discovered additional leaks in the broken riser.  Although officials had initially estimated that it would take the ROVs 24 to 36 hours to deploy the BOP, by Monday, April 26, 2010, oil continued to spew into the Gulf of Mexico.  This news caused BP ADSs to fall $1.97 per ADS, closing at $57.91 per ADS or more than 3% on April 27, 2010.

**T  and  U.   The  April  28 - 29,  2010  Statements** [Sustained  per  NY/Ohio  Order (Misrepresentations #42 and 43)]

370.   On April 28, 2010, after the markets closed, Coast Guard leader Rear Admiral Landry announced during a joint press conference with BP that NOAA had increased its estimate of the oil flow rate from 1,000 to 5,000 barrels per day.

371.   During the joint press conference, Defendant Suttles again reiterated that BP's best estimate was that ***1,000 barrels of oil per day were flowing from the Macondo well***.  In addition, Suttles stated, in part, as follows:

> Late this afternoon, while monitoring the blowout preventer area, which we have done continuously since the event began, we discovered a new point of leak.  This

leak is just beyond the top of the blowout preventer in the pipe work called the riser. Given the location, ***we do not believe this changes the amount currently estimated to be released***.

372. The following day, April 29, 2010, Department of Homeland Security Janet Napolitano announced that "*today I will be designating that this is a spill of national significance.*"

373. On the same day, April 29, 2010, Defendant Suttles conducted several media interviews to discuss the oil flow rate from the Macondo well. For example, during an interview with The Early Show, Suttles stated, in part, as follows: "***I think that somewhere between one and five thousand barrels a day is probably the best estimate we have today.***" Suttles made a nearly identical false statement later in the day during an interview with The Today Show.

374. On the news that spill estimates had increased to 5,000 barrels per day and Secretary Napolitano's designation of the spill as one of "national significance," BP ADSs fell from $57.34 per ADS on April 28, 2010 to close at $52.56 per ADS on April 29, 2010, a decline of $4.78 per ADS or more than 8%.

375. Although the price of BP securities fell in response to this news, the price of BP's securities were still artificially inflated due to the false and misleading statements made by Defendant Suttles on April 28 and 29, 2010. Each of these misrepresentations (Statements T and U, respectively) were materially false or misleading when made, and were known by Defendant Suttles to be false at that time, or were made with reckless disregard for the truth because they falsely represented that the amount spilling from the Macondo well was between 1,000 and 5,000 barrels of oil per day. In contrast, Defendant Suttles failed to disclose that the Company's "***best estimate***" of the amount of oil flowing from the well was more likely between 5,758 barrels per day and a high of 14,266 barrels per day – well above the amount claimed by Defendant Suttles.

146

Further, Rainey's deposition testimony in MDL 2179 indicated that one internal estimate of the amount of oil flowing from the well was as high as 92,000 barrels per day. These figures were provided to BP's senior management in two internal BP documents dated April 26, 2010 and April 27, 2010 – *i.e., **before** Suttles made his public misrepresentations. In a hearing before the U.S. House of Representatives on May 26, 2010, Representative Edward Markey was outraged about Suttles's misrepresentations and stated, in part, as follows:

> Yesterday, BP provided me with an internal document dated April 27, 2010, and cited as BP Confidential that shows a low estimate, a best guess, and a high estimate of the amount of oil that was leaking. According to this BP document, the company's low estimate of the leak on April 27 [2010] was 1,063 barrels per day. *Its best guess was 5,758 barrels per day. Its high estimate was 14,266 barrels per day.*
>
> * * *
>
> BP has also turned over another document dated April 26 [2010] which includes a 5,000 barrel per day figure as well. *So when BP was citing the 1,000-barrel per day figure to the American people on April 28th, their own internal documents from the day before show that their best guess was a leak of 5,768 barrels per day and their high estimate was more than 14,000 barrels* that were spilling into the Gulf every day.

376. Likewise, in a May 27, 2010 news conference, President Obama remarked that BP had failed to be fully forthcoming in describing the rate of the oil leak:

> *I think it is a legitimate concern to question whether BP's interests in being fully forthcoming about the extent of the damage is aligned with the public interest.* I mean, their interests may be to minimize the damage, and to the extent that they have better information than anybody else, to not be fully forthcoming. So my attitude is *we have to verify whatever it is they say about the damage.*
>
> This is an area, by the way, where I do think our efforts fell short. And I'm not contradicting my prior point that people were working as hard as they could and doing the best that they could on this front. But I do believe that *when the initial estimates came that there were -- it was 5,000 barrels spilling into the ocean per day*, that was based on satellite imagery and satellite data that would give a rough calculation. *At that point, BP already had a camera down there, but wasn't fully forthcoming in terms of what did those pictures look like.*

377. In his book on the *Deepwater Horizon* incident, former drilling engineer Bob Cavnar explained that "*[n]o one in the industry ever believed the flow was less than 20,000 barrels a day*." In an interview, Cavnar said that the characteristics of the Macondo well, in particular the fact that it was drilled into "High Pressure High Temperature" pay sands and the specific fact that the well's pressure had blown out the *Deepwater Horizon*'s riser, dictated a higher flow rate. "If pressure directly from the pay sands blows out a major deepwater rig, by definition it's going to result in a very significant flow of oil," he said.

378. It is not surprising that Defendant Suttles continuously misrepresented the known amounts of oil that were being released from the well. As noted in a *Rolling Stone* article dated June 8, 2010: "*For BP, the motive [to downplay the amount of oil seeping into the Gulf] is financial: Under the Clean Water Act, the company could owe fines of as much as $4,300 for every barrel [of oil] spilled, in addition to royalties for the oil it is squandering.*"

379. Since the Complaint was first filed, a grand jury has been empanelled on this very issue of BP's intentional deception in connection with the actual spill rate, according to a July 2011 public filing by Halliburton.

**May 3, 2010**

380. On May 3, 2010, after initially blaming Transocean and others for the Macondo well blowout and spill, BP admitted that it was fully responsible for the disaster in the Gulf of Mexico. More specifically, Defendant Hayward told NPR's Steve Inskeep that: "It is indeed BP's responsibility to deal with this, and we are dealing with it . . . . We will absolutely be paying for the cleanup operation. There is no doubt about that. It's our responsibility – we accept it fully." On this news, the Company's ADSs fell from $52.15 per ADS on Friday, April

30, 2010 to close at $50.19 per ADS on Monday, May 3, 2010, a decline of $1.96 per ADS or almost 4%.

## V. The May 5, 2010 Statements [Sustained per NY/Ohio Order (Misrepresentation #45)]

381. On May 5, 2010, Defendant Hayward conducted an interview with journalists from the Houston Chronicle, at BP's offices in Houston. In reference to the oil flow rate at the Macondo well, Hayward stated, "***A guesstimate is a guesstimate. And the guesstimate remains 5,000 barrels a day***."

382. The foregoing misrepresentation, which caused BP securities to trade at artificially inflated prices, was materially false or misleading when made, and was known by Defendant Hayward to be false at that time, or was made with reckless disregard for the truth because it falsely represented that the amount spilling from the Macondo well was approximately 5,000 barrels of oil per day. In contrast, Defendants failed to disclose that the Company's "best estimate" of the amount of oil flowing from the well was actually between 5,758 barrels per day and 14,266 barrels per day – significantly larger than the amount claimed by Hayward.

## POST CLASS AND SUBCLASS PERIOD STATEMENTS AND EVENTS

### The Saturday May 29 – June 1, 2010 Statements

383. On Saturday, May 29, 2010, while trading markets were closed, BP revealed that the "top kill" procedure it had begun a few days earlier had failed. The failure of the "top kill" indicated that BP would be unable to stop the oil spill and would have to rely on efforts to try to contain the spill while it completed the relief wells. The failed attempt to kill the well by using the "top kill" and "junk shot" efforts shocked investors. As noted by ABC News on Saturday, May 29, 2010:  "We begin tonight with ***breaking news*** from the Gulf***. After so much talk that Top Kill was the best bet to plug the oil spill in the Gulf, BP announced just a short time ago***

149

*that the effort has failed. . . . That live picture so many Americans have been keeping track of [i.e., the oil spewing from the Macondo well], us included, confirms that the oil is still gushing into the Gulf.  This is another crushing blow when it comes on what is now day 40 of this crisis*."  Similarly, on that same day, the Agence France Presse reported, in part, that:  "***The announcement [that the top kill and junk short plans failed] is a stunning setback for efforts to halt what has become the worst oil spill in US history*** . . ."  Moreover, *The Business Insider* made clear that the failure of the top kill would lead to BP's securities being "***slaughtered in London trading on Monday***."

384.   On that same day, *The New York Times* published an article entitled "Documents Show Early Worries About Safety of Rig."  The article provided ***new*** evidence that:

> Internal documents from BP show that there were serious problems and safety concerns with the Deepwater Horizon rig ***far earlier than those the company described to Congress last week.***

* * *

> The documents show that in March, after several weeks of problems on the rig, BP was struggling with a loss of "well control."  ***And as far back as 11 months ago, it was concerned about the well casing and the blowout preventer.***

385.   On Tuesday, June 1, 2010, minutes before the close of the U.S. market, U.S. Attorney General Eric Holder announced that the U.S. Department of Justice had opened formal criminal and civil probes into BP in response to the oil spill and its false assurances that it could stop the flow of oil.  On the disclosure of the failed top kill procedure and *The New York Times* article, the Company's ADSs fell from $42.95 per ADS on Friday, May 28, 2010 to close at $36.52 per ADS on June 1, 2010, a decline of $6.43 per ADS or approximately 15%.

**June 2, 2010**

386.    On June 2, 2010, Defendant Hayward admitted that it was "an entirely fair criticism" to blame BP for the disorganized and poor cleanup effort because ***"[w]hat's undoubtedly true is that we did not have the tools you would want in your tool kit"*** to stop the leak from the Macondo well in the Gulf of Mexico in the aftermath of the explosion.

**June 9, 2010**

387.    On June 9, 2010, fears that the Company would suspend dividends caused a further decline in BP securities.  On this news, the Company's ADSs fell from $34.68 per ADS on June 8, 2010 to close at $29.20 per ADS on June 9, 2010, a decline of $5.48 per ADS or almost 16%.

388.    Speculation regarding the possibility that BP would suspend dividend payments continued on June 9, 2010.  An Associated Press article published on the afternoon of June 9, 2010 entitled "Dividend Worries Weigh on BP Shares" explained, "cutting the dividend would have a big impact in Britain, as BP accounts for around 12-13 percent of payments from companies in the blue-chip FTSE 100 index . . . ."

**June 14, 2010**

389.    Then, on June 14, 2010, BP's Board of Directors met to discuss suspending the Company's dividend payments in light of the Company's agreement to setup a $20 billion claim fund for damages caused by the *Deepwater Horizon* catastrophe.  On that date, *The New York Times* reported, in part, as follows:

> To make sure that all claims are paid, the Obama administration has stepped up the pressure on the company, demanding that it set aside money to pay for future liabilities before paying dividends to shareholders, which now amount to about $10.5 billion annually. Senate Democrats are asking BP to set up a $20 billion cleanup fund. BP, which has spent about $1.5 billion on the cleanup so far, has said it expects to be able to pay all spill costs from its regular operating funds. ***But in response to the federal government's requests, BP's board met Monday to consider its options.***  A spokesman said the company did not expect to

announce decisions about its dividend until after its chairman and its chief executive spoke with Mr. Obama on Wednesday at a meeting the president had called. ***A person with direct knowledge of the discussions said the board was considering three options: suspending payment of the dividend for two quarters, paying the dividend in bonus shares rather than cash, or placing an amount equal to the dividend payment in escrow while continuing to pay for the cleanup separately.***

390. On this news, the Company's ADSs fell 10% and 8%, respectively. Indeed, according to another news source: "Shares in BP plunged again Monday [June 14, 2010] as the company's board discussed US demands that it suspend dividend payments until it pays for the cleanup of the Gulf oil spill."

## XI. **LOSS CAUSATION**

391. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and Class and Subclass members. Throughout the Class and Subclass periods, the market prices of BP ADSs were artificially inflated as a direct result of Defendants' materially false and misleading statements and omissions. For example, prior to the *Deepwater Horizon* incident, securities analysts touted BP's renewed dedication to safety and BP's operations in the Gulf of Mexico as one of the main focuses for BP's future results:

- A February 28, 2008 analyst report from JP Morgan stated that "Safety and operations: although BP has already made significant progress in this area through the implementation of the Baker panel recommendation and their 'sixpoint plan', safety and operations remains one of BP's main priorities."

- An October 9, 2009 analyst report from Bank of America stated that "[w]e believe that the focus of results will centre around . . . the ongoing exploration effort in the Gulf of Mexico (GoM) . . ."

- A February 1, 2010 analyst report from Dolmen Stockbrokers stated "we also foresee better production figures as a consequence of early restoration of operations at the company's US refineries and the ramping up of production in the Gulf of Mexico."

- A March 3, 2010 analyst report from Bank of America stated that "the development of recent deepwater discoveries in the GoM (eg, Tiber field) along with further growth from TNKBP is set to be the key drivers."

- A March 3, 2010 analyst report from JP Morgan described BP's Gulf of Mexico projects as "high margin."

- A March 12, 2010 analyst report from Bank of America stated that "[w]hilst BP has limited experience in Brazil, we would argue that their knowledge of the GoM – particularly in the Lower Tertiary area - is second to none and are clearly taking a positive view here."

392. When the truth became known, the prices of BP securities declined precipitously as the artificial inflation was removed from the prices of these securities, causing substantial damage to Plaintiffs and members of the Class and Subclass. The chart below shows the fluctuation of the price of BP securities up to, during, and following the Class and subclass periods.

*///*

**BP ADS Reaction Throughout the Class Period**



393.   During the Class and Subclass periods, BP's ADSs traded as high as $79.70 per ADS.

394.   On April 20, 2010, prior to the explosion on the *Deepwater Horizon*, BP's ADSs were trading at $60.48 as Defendants continued to deceive investors regarding its true risk profile and its utter lack of process safety controls.  That night, after the markets closed, the explosion aboard the *Deepwater Horizon* occurred.

395.   Due to Defendants' ongoing misrepresentations and omissions regarding the true state of BP's safety measures and operational protocols the explosion and resulting oil spill, the truth regarding Defendants' failure to implement process safety controls emerged on April 20, 2010 and within a week the share price had dropped ten dollars and it would continue to plummet during the weeks of subsequent corrective disclosures.

396.    On April 26, 2010, officials announced that attempts to stop the spill had failed and oil was flowing into the Gulf of Mexico.  This news caused BP ADSs to fall from $59.88 per ADS on Friday, April 23, 2010 to close at $57.91 per ADS on Monday, April 26, 2010, a decline of $1.97 per ADS.

397.    On April 29, 2010, NOAA increased its estimate regarding the amount of oil that was spewing into the Gulf of Mexico from 1,000 to 5,000 barrels per day and the U.S. government declared the Macondo disaster a spill of national significance.  This news caused BP ADSs to fall from $57.34 per ADS on April 28, 2010 to close at $52.56 per ADS on April 29, 2010, a decline of $4.78 per ADS or more than 8%.

398.    On May 3, 2010, BP admitted full responsibility for the disaster in the Gulf of Mexico.  On this news, the Company's ADSs fell from $52.15 per ADS on Friday, April 30, 2010 to close at $50.19 per ADS on Monday, May 3, 2010, a decline of $1.96 per ADS.

399.    On May 10, 2010, Defendant Hayward admitted that the volume of oil spilling into the Gulf of Mexico was far greater than BP's initial statements indicated.  Additionally, BP revealed that oil spill costs to date had reached $350 million.  In reaction to this news, BP's ADSs fell from $49.06 per ADS on Friday, May 7, 2010 to close at $48.75 on Monday, May 10, 2010, a decline of $0.31 per ADS.

400.    On May 24, 2010, BP announced that the costs for remediating the oil spill to date had more than doubled, from $350 million to $760 million.  In addition, the Company announced that it was capturing less oil than it expected.  Finally, pressure on BP continued to grow because the U.S. government threatened to take over the oil spill response effort because of BP's lack of progress.  On this news, the Company's ADSs fell from $43.86 per ADS on Friday, May 21, 2010 to close at $41.86 per ADS on Monday, May 24, 2010, a decline of $2.00 per ADS.

401.    On Saturday, May 29, 2010, while trading markets were closed, BP revealed that the "top kill" procedure it had begun a few days earlier had failed.  This was highly material to investors.  For example, ABC News reported the "***breaking news***" and stated, on Saturday, May 29, 2010, as follows:  "We begin tonight with ***breaking news*** from the Gulf*.  **After so much talk that Top Kill was the best bet to plug the oil spill in the Gulf, BP announced just a short time ago that the effort has failed. . . . That live picture so many Americans have been keeping track of [i.e., the oil spewing from the Macondo well], us included, confirms that the oil is still gushing into the Gulf.  This is another crushing blow when it comes on what is now day 40 of this crisis**".*  Similarly, on that same day, the Agence France Presse reported, in part, that:  "***The announcement [that the top kill and junk short plans failed] is a stunning setback for efforts to halt what has become the worst oil spill in US history*** . . ."  Finally, *The Business Insider* made clear that the failure of the top kill would lead to BP's securities being "***slaughtered in London trading on Monday***."

402.    On that same day, *The New York Times* published an article entitled "Documents Show Early Worries About Safety of Rig."  The article provided new evidence regarding serious safety concerns with the *Deepwater Horizon* rig far earlier than those previously described by BP.  The next day, Sunday, May 30, 2010, Dudley conducted an interview and admitted that BP's original oil flow estimates were vastly understated.  On these disclosures, the Company's ADSs fell from $42.95 per ADS on Friday, May 28, 2010 to close at $36.52 per ADS on Tuesday, June 1, 2010, a decline of $6.43 per ADS or approximately 15%.[5]

403.    On June 9, 2010, fears that the Company would suspend dividends caused a further decline in BP securities.  An Associated Press article dated June 9, 2010 entitled "Dividend Worries Weigh on BP Shares" explained, "[s]hares in BP PLC fell further on Wednesday [June

---

[5] As noted above, the U.S. financial markets were closed on Monday, May 31, 2010 for the Memorial Day holiday.

9, 2010] amid fears the British oil company will bow to U.S. political pressure to cut dividends to help pay for the Gulf of Mexico oil spill disaster." On this news, the Company's ADSs fell from $34.68 per ADS on June 8, 2010 to close at $29.20 per ADS on June 9, 2010, a decline of $5.48 per ADS or almost 16%.

404. Speculation regarding the possibility that BP would suspend dividend payments continued on June 9, 2010. Indeed, the Associated Press article published on the afternoon of June 9, 2010 (after the close of the London Stock Exchange) explained that "Cutting the dividend would have a big impact in Britain, as BP accounts for around 12-13 percent of payments from companies in the blue-chip FTSE 100 index . . . ."

405. On June 14, 2010, BP's Board of Directors officially met to discuss suspending the Company's dividend payments in light of the Company's agreement to setup a $20 billion claim fund for damages caused by *Deepwater Horizon* catastrophe. According to one news source: "Shares in BP plunged again Monday [June 14, 2010] as the company's board discussed US demands that it suspend dividend payments until it pays for the cleanup of the Gulf oil spill." On this news, the Company's ADSs fell from $33.97 per ADS on Friday, June 11, 2010 to close at $30.67 per ADS on Monday, June 14, 2010, a decline of $3.30 per ADS or almost 10%.

406. In all, as a consequence of the revelation of truth concerning BP securities during the Class Period, the Company's securities fell in value by 48% and wiped out over ***$90 billion*** in market capitalization.

407. Defendants materially misstated the risks of the Company's operations, particular with respect to deepwater drilling in the Gulf of Mexico. The adverse consequences of the materialization of this risk as disclosed by Defendants were entirely foreseeable to Defendants at

all relevant times.  Defendants' conduct, as alleged herein, proximately caused foreseeable losses and damages to Plaintiffs and members of the Class and Subclass.

## XII.  APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD-ON-THE-MARKET DOCTRINE

408.  Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

      (a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period and Subclass periods;

      (b)    The omissions and misrepresentations were material;

      (c)    The Company's ADSs traded in efficient markets;

      (d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's ADSs; and

      (e)    Plaintiffs and other members of the Class and Subclass purchased BP ADSs between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

409.  At all relevant times, the markets for BP ADSs were efficient for the following reasons, among others:  (a) BP filed periodic public reports with the SEC; and (b) BP regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.  Plaintiffs and the Class and Subclass relied on the price of BP ADSs, which reflected all the information in the market, including the misstatements by Defendants.

## XIII.   CLASS ACTION ALLEGATIONS

410.   Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a Class of all persons and entities who purchased or otherwise acquired BP American Depositary Shares ("ADSs") between May 9, 2007 and May 28, 2010, inclusive as well as all persons and entities who purchased or otherwise acquired BP ADSs between March 4, 2009 and April 20, 2010.  Excluded from the Class and Subclass are Defendants, directors, and officers of BP and their families and affiliates.

411.   The members of the Class and Subclass are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

412.   There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class and Subclass which predominate over questions which may affect individual Class and Subclass members include:

(a)   Whether the Securities Exchange Act was violated by Defendants;

(b)   Whether Defendants omitted and/or misrepresented material facts;

(c)   Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)   Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)   Whether the prices of BP ADSs were thereby artificially inflated; and

(f)   The extent of damage sustained by Class members and the appropriate measure of damages.

413.   Plaintiffs' claims are typical of those of the Class and Subclass because Plaintiffs, the Class, and the Subclass sustained damages from Defendants' wrongful conduct.

414.   Plaintiffs will adequately protect the interests of the Class and Subclass and have retained counsel who are experienced in class action securities litigation.  Plaintiffs have no interests that conflict with those of the Class or Subclass.

415.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XIV.   **NO SAFE HARBOR**

416.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not identified as forward-looking statements when made.

417.   To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

418.   Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are also liable for any false or misleading forward-looking statements pleaded because, at the time each statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of BP who knew that the statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants

expressly related to or stated to be dependent on those historic or present tense statements when made.

## FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder (Against All Defendants)

419. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

420. During the Class and Subclass periods, Defendants both directly and indirectly used the means and instrumentalities of interstate commerce in the U.S. to carry out a plan, scheme and course of conduct which was intended to and, throughout the Class and Subclass Periods, did: (i) deceive the investing public, including Plaintiffs and other Class and Subclass members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class and Subclass to purchase BP ADSs at artificially inflated prices in the U.S. In furtherance of this unlawful scheme, plan and course of conduct, these defendants, and each of them, took the actions set forth herein.

421. Defendants both directly and indirectly used the means and instrumentalities of interstate commerce in the U.S.: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's ADSs in an effort to artificially inflate and maintain the market prices for BP ADSs in violation of Section 10(b) of the Exchange Act and Rule 10b-5. As a result of all Defendants' conduct, investors purchased BP ADSs at artificially inflated prices and were damaged thereby when the price of those ADSs declined as alleged herein.

161

## SECOND CLAIM
### Violation of Section 20(a) of the Exchange Act
### (Against Individual Defendants Hayward, Inglis, and Suttles)

422. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

423. The Individual Defendants acted as controlling persons of BP within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading and/or omitted material information. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

424. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

425. As set forth above, BP, BP America, BP Exploration and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are

liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class and Subclass suffered damages in connection with their purchases of the Company's ADSs and ordinary shares during the Class and Subclass Periods.

## XV. <u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

a. Determining that this action is a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Classes as defined herein, and a certification of Plaintiffs as class and subclass representatives pursuant to Rule 23 of the Federal Rules of Civil Procedure;

b. Awarding compensatory and punitive damages in favor of Plaintiffs and the other Class and Subclass members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount proven at trial, including pre-judgment and post-judgment interest thereon;

c. Awarding Plaintiffs and other members of the Class and Subclass their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

d. Awarding Plaintiffs and the other Class and Subclass members such other relief as this Court may deem just and proper.

*///*

## XVI.  DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury in this action of all issues so triable.

DATED:  April 2, 2012                    Respectfully submitted,

**YETTER COLEMAN LLP**

/s/ R. Paul Yetter
R. Paul Yetter (Federal Bar No. 3639)
Autry W. Ross (Federal Bar No. 9731)
Wynn B. McCloskey (Federal Bar No. 99)
909 Fannin, Suite 3600
Houston, TX  77010
Tel: (713) 632-8000
Fax: (713) 632-8002

***Counsel for New York and Ohio and
Liaison Counsel for the Class***

/s/ Richard W. Mithoff
**MITHOFF LAW FIRM**
Richard W. Mithoff (Federal Bar No. 2012)
William J. Stradley (Federal Bar No. 397)
Sherie P. Beckman (Federal Bar No. 11098)
Warner V. Hocker (Federal Bar No. 1133732)
One Allen Center
500 Dallas Street
Houston, TX 77002
Telephone:  713-654-1122
Fax:  713-739-8085

***Attorney-In-Charge   and   Co-Lead   Counsel   for   the
Subclass***

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Steven J. Toll (admitted *pro hac vice*)
Daniel S. Sommers (admitted *pro hac vice*)
Julie Goldsmith Reiser (admitted *pro hac vice*)
Joshua S. Devore (admitted *pro hac vice*)
Joshua M. Kolsky (admitted *pro hac vice*)
1100 New York Avenue N.W.
West Tower, Suite 500
Washington, D.C. 20005-3964
Tel: (202) 408-4600
Fax: (202) 408-4699

**BERMAN DEVALERIO**
Glen DeValerio (admitted *pro hac vice*)
Kristin J. Moody (admitted *pro hac vice*)
Steven J. Buttacavoli (admitted *pro hac vice*)
One Liberty Square
Boston, MA 02109
Tel: (617) 542-8300
Fax: (617) 542-1194

*Co-Lead Counsel for New York and Ohio and for the Class*

**COTCHETT, PITRE & McCARTHY**
Joseph W. Cotchett
Mark C. Molumphy
Imtiaz A. Siddiqui
Matthew K. Edling
Bryan M. Payne
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
Fax: (650) 697-0577

*Co-Lead Counsel for the Subclass*

**BLOCK & LEVITON LLP**
Jeffrey C. Block
Jason M. Leviton

Whitney E. Street
Mark A. Delaney
155 Federal Street
Boston, MA 02110
(617) 398-5600

***Counsel to Lead Plaintiff the Ohio Public
Employees Retirement System***

# Appendix A
## Summary of Misrepresentations

| Misrep. Letter in Consol. Compl. | Date and Speaker | Consol. Comp. ¶ | Misrep. # from Prior Orders | Held Materially False and Misleading? | Scienter Found? | Baker Report Progress | OMS Applies to All Operations | OMS Complete in GOM | Ability to Respond to Spill | Oil Spill Flow Rates |
|---|---|---|---|---|---|---|---|---|---|---|
| A | May 9, 2007 BP | 315 | New | N/A | N/A | | X | | | |
| B | July 24, 2007 Hayward | 317 | New | N/A | N/A | | X | | | |
| C | Sept. 25, 2007 Inglis | 319 | 9 (NY/OH) | No | No | | X | | | |
| D | Nov. 8, 2007 Hayward | 321 | 11 (NY/OH) | Yes | Yes | X | | | | |

| Misrep. Letter in Consol. Compl. | Date and Speaker | Consol. Comp. ¶ | Misrep. # from Prior Orders | Held Materially False and Misleading? | Scienter Found? | Baker Report Progress | OMS Applies to All Operations | OMS Complete in GOM | Ability to Respond to Spill | Oil Spill Flow Rates |
|---|---|---|---|---|---|---|---|---|---|---|
| E | Feb. 22, 2008<br><br>Hayward | 323 | 13 (NY/OH) | Yes | Yes | X | | | | |
| F | Feb. 27, 2008<br><br>Hayward | 325 | 14 (NY/OH) | Yes[1] | Yes | X | X | | | |
| G | Apr. 17, 2008<br><br>Hayward | 327 | 16 (NY/OH) | Yes[2] | Yes | X | X | | | |
| H | Dec. 17, 2008<br><br>Hayward | 329 | 18 (NY/OH) | Yes | Yes | X | | | | |

[1] This statement was held materially false and misleading for overstating progress in process safety efforts as measured against the Baker Report recommendations. The Second Consolidated Amended Class Action Complaint ("Complaint") alleges the statement is actionable for the additional reason that it misrepresented that OMS applied to all of BP's operations.

[2] This statement was held materially false and misleading for overstating progress in process safety efforts as measured against the Baker Report recommendations. The Complaint alleges that the statement is actionable for the additional reason that it misrepresented that OMS applied to all of BP's operations.

| Misrep. Letter in Consol. Compl. | Date and Speaker | Consol. Comp. ¶ | Misrep. # from Prior Orders | Held Materially False and Misleading? | Scienter Found? | Baker Report Progress | OMS Applies to All Operations | OMS Complete in GOM | Ability to Respond to Spill | Oil Spill Flow Rates |
|---|---|---|---|---|---|---|---|---|---|---|
| I | Feb. 24, 2009<br><br>BP, Hayward | 331-332 | 21 (NY/OH)<br><br>22 (NY/OH) | No | No | | X (Hayward) | X (BP) | | |
| J | Mar. 4, 2009<br><br>Hayward | 334-335 | 25 (NY/OH)<br><br>13 (L) | Yes (L)[3] | No | | X | X | | |
| K | Mar. 10, 2009<br><br>BP E&P | 337-340 | 26 (NYOH)<br><br>16 (L) | Yes | Yes | | | | X | |
| L | April 16, 2009<br><br>Hayward | 347 | New | N/A | N/A | | X | | | |
| M | June 30, 2009<br><br>BP E&P | 349 | 30 (NY/OH) | Yes | Yes | | | | X | |

---

[3] This statement was held materially false and misleading for misrepresenting that BP had completed implementation of OMS in the Gulf of Mexico. The Complaint alleges that the statement is actionable for the additional reason that it misrepresented that OMS applied to all of BP's operations.

| Misrep. Letter in Consol. Compl. | Date and Speaker | Consol. Comp. ¶ | Misrep. # from Prior Orders | Held Materially False and Misleading? | Scienter Found? | Baker Report Progress | OMS Applies to All Operations | OMS Complete in GOM | Ability to Respond to Spill | Oil Spill Flow Rates |
|---|---|---|---|---|---|---|---|---|---|---|
| N | Feb. 26, 2010<br><br>BP | 351 | 18 (L) | Yes | No | | X | | | |
| O | Mar. 5, 2010<br><br>Hayward | 353 | 35 (NY/OH) | Yes[4] | Yes | X | X | | | |
| P | Mar. 22, 2010<br><br>Inglis | 355 | 8 (L) | Yes | No | | X | | | |
| Q | Mar. 23, 2010<br><br>Hayward | 357 | 38 (NY/OH) | Yes | Yes | X | | | | |
| R | Apr. 15, 2010<br><br>Hayward, BP | 359, 361 | 40 (NY/OH)<br><br>5 (L) | Yes (L)[5] | No | | X (BP) | X (Hayward) | | |

[4] This statement was held materially false and misleading for overstating progress in process safety efforts as measured against the Baker Report recommendations. The Complaint alleges that the statement is actionable for the additional reason that it misrepresented that OMS applied to all of BP's operations.

[5] This statement was held materially false and misleading for misrepresenting that BP had completed implementation of OMS in the Gulf of Mexico. The Complaint alleges that the statement is actionable for the additional reason that it misrepresented that OMS applied to all of BP's operations.

| Misrep. Letter in Consol. Compl. | Date and Speaker | Consol. Comp. ¶ | Misrep. # from Prior Orders | Held Materially False and Misleading? | Scienter Found? | Baker Report Progress | OMS Applies to All Operations | OMS Complete in GOM | Ability to Respond to Spill | Oil Spill Flow Rates |
|---|---|---|---|---|---|---|---|---|---|---|
| S | Apr. 15, 2010<br><br>BP | 363, 364 | 32 (L)<br><br>New | Yes (L) | No | | X | | X | |
| T | Apr. 28, 2010<br><br>Suttles | 371 | 42 (NY/OH) | Yes | Yes | | | | | X |
| U | Apr. 29, 2010<br><br>Suttles | 373 | 43 (NY/OH) | Yes | Yes | | | | | X |
| V | May 5, 2010<br><br>Hayward | 381 | 45 (NY/OH) | Yes | Yes | | | | | X |