**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

In re BP p.l.c. Securities Litigation

No. 4:10-MD-02185

Honorable Keith P. Ellison

JURY TRIAL DEMANDED

**ORAL ARGUMENT REQUESTED**

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT**
**OF THEIR MOTION TO DISMISS IN PART THE**
**SECOND CONSOLIDATED AMENDED COMPLAINT**

OF COUNSEL:

Daryl A. Libow (pro hac vice)
Amanda F. Davidoff
SULLIVAN & CROMWELL LLP
1701 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
Telephone: (202) 956-7500
libowd@sullcrom.com
davidoffa@sullcrom.com

Richard C. Pepperman, II (pro hac vice)
Marc De Leeuw (pro hac vice)
Matthew A. Peller
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone: (212) 558-4000
peppermanr@sullcrom.com
deleeuwm@sullcrom.com
pellerm@sullcrom.com

Thomas W. Taylor
Texas State Bar No. 19723875
S.D. Tex. Bar No. 3906
ANDREWS KURTH LLP
600 Travis, Suite 4200
Houston, Texas  77002
Telephone:  (713) 220-4200
Facsimile:  (713) 220-4285
ttaylor@andrewskurth.com

*Attorney-in-Charge for Defendants*

Stephen C. Neal
COOLEY LLP
3175 Hanover Street
Palo Alto, California  94304
Telephone: (650) 843-5000
nealsc@cooley.com

Kathleen H. Goodhart
COOLEY LLP
101 California Street, 5th Floor
San Francisco, CA  94111
Telephone: (415) 693-2000
kgoodhart@cooley.com

*Attorneys for Andrew G. Inglis*

May 2, 2012

# TABLE OF CONTENTS

**Page**

NATURE AND STAGE OF THE PROCEEDING................................................................1

STATEMENT OF THE ISSUES......................................................................................1

SUMMARY OF THE ARGUMENT ................................................................................2

BACKGROUND ...........................................................................................................3

    A.    The Court's February 13 Decisions ...............................................................3

    B.    The SAC........................................................................................................4

    C.    The Scope of BP's OMS................................................................................6

        1.    OMS Explicitly Applies to Contractors...............................................6

        2.    Hayward and Inglis Were Told That OMS Applies to "All" Operations. ...............................................................................10

        3.    The SAC's Contrary Allegations About the Scope of OMS Lack Support. ......................................................................10

    D.    BP's Implementation of OMS in the Gulf of Mexico..............................13

        1.    OMS Was Implemented by the Gulf of Mexico SPU and Most Gulf of Mexico Entities by the End of 2008 and in All Gulf Entities by the End of 2009............................................................13

        2.    The SAC's Contrary Allegations About OMS Implementation in the Gulf of Mexico Lack Support. ...........................................15

ARGUMENT ...............................................................................................................18

I.    PLAINTIFFS FAIL ADEQUATELY TO ALLEGE THAT THE NEW STATEMENTS WERE FALSE OR MISLEADING OR MADE WITH SCIENTER.................................................................18

    A.    BP's 2006 Sustainability Report Dated May 9, 2007 ...............................18

    B.    Hayward's Statement During an Investor Conference Call on July 24, 2007 ......................................................................................21

    C.    Inglis's Speech at the Sanford Bernstein 4th Annual Strategic Decisions Conference on September 25, 2007 .......................................23

# TABLE OF CONTENTS
## (continued)

**Page**

D.   Hayward's Statement at BP's 2008 Strategy Presentation
on February 27, 2008 ...................................................................24

E.   Hayward's Speech at the 2008 Annual General Meeting
on April 17, 2008 .........................................................................25

F.   BP's 2008 Annual Review Dated February 24, 2009.............................25

G.   Hayward's Statement in BP's 2008 Annual Review
Dated February 24, 2009...............................................................28

H.   BP's 2008 Form 20-F Annual Report Dated March 4, 2009 ...................29

I.   Hayward's Statement in BP's 2008 Sustainability Review
Dated April 16, 2009.....................................................................32

J.   BP's 2009 Annual Review Dated February 26, 2010.............................32

K.   BP's 2009 Form 20-F Annual Report Dated March 5, 2010 ...................34

L.   Inglis's Speech at Howard Weil Energy Conference
on March 22, 2010 ........................................................................35

M.   Hayward's Statement in BP's 2009 Sustainability Review
Dated April 15, 2010.....................................................................37

N.   BP's 2009 Sustainability Review Dated April 15, 2010........................40

O.   BP's 2009 Sustainability Report Dated April 15, 2010 .........................42

II.   PLAINTIFFS FAIL ADEQUATELY TO ALLEGE THAT THE
STATEMENTS CONCERNING OMS CAUSED ANY LOSSES...................45

III.   PLAINTIFFS FAIL TO STATE A SECTION 20(a) CLAIM
AGAINST INGLIS.......................................................................49

CONCLUSION.......................................................................................50

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alaska Electrical Pension Fund* v. *Flowserve Corp.*,
  572 F.3d 221 (5th Cir. 2009) .................................................................................47, 48

*Catogas* v. *Cyberonics, Inc.*,
  292 F. App'x 311 (5th Cir. 2008) ..........................................................................47

*Collins* v. *Morgan Stanley Dean Witter*,
  224 F.3d 496 (5th Cir. 2000) ...................................................................................6

*Dennis* v. *General Imaging, Inc.*,
  918 F.2d 496 (5th Cir. 1990) ..........................................................................1, 3, 49

*Dura Pharmaceuticals, Inc.* v. *Broudo*,
  544 U.S. 336 (2005) ...............................................................................................46

*Flaherty & Crumrine Preferred Income Fund Inc.* v. *TXU Corp.*,
  565 F.3d 200 (5th Cir. 2009) ......................................................................22, 24, 30, 39

*In re Bristol-Myers Squibb Securities Litigation*,
  312 F. Supp. 2d 549 (S.D.N.Y. 2004).....................................................................19

*In re Enron Corporation Securities, Derivative & ERISA Litigation*,
  761 F. Supp. 2d 504 (S.D. Tex. 2011) ....................................................................19

*In re Officemax, Inc. Securities Litigation*,
  2002 U.S. Dist. LEXIS 27019 (N.D. Ohio Mar. 26, 2002) .................................20, 35

*In re Take-Two Interactive Securities Litigation*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008).....................................................................22

*In re TETRA Technologies., Inc. Securities Litigation*,
  2009 U.S. Dist. LEXIS 126687 (S.D. Tex. July 9, 2009).....................................45

*Indiana Electrical Workers' Pension Trust Fund IBEW* v. *Shaw Group, Inc.*,
  537 F.3d 527 (5th Cir. 2008) ..................................................................................22

*Katyle* v. *Penn National Gaming, Inc.*,
  637 F.3d 462 (4th Cir. 2011) ..................................................................................48

*Lentell* v. *Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005)...............................................................................47, 48

*Lormand* v. *US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) ......................................................................... passim

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Makor Issues & Rights, Ltd.* v. *Tellabs Inc.*,
   513 F.3d 702 (7th Cir. 2008) ......................................................................... passim

*Southland Securities Corp.* v. *INSpire Ins. Solutions, Inc.*,
   365 F.3d 353 (5th Cir. 2004) .......................................................................34, 41, 43

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007).........................................................................................6, 30, 39

*United States ex rel. Riley* v. *St. Luke's Episcopal Hospital*,
   355 F.3d 370 (5th Cir. 2004) ......................................................................................19

**STATUTES AND RULES**

15 U.S.C. § 78u-4 .....................................................................................................................18

15 U.S.C. § 78u-5 .....................................................................................................................20

Federal Rules of Civil Procedure Rule 9 ......................................................................................1

Federal Rules of Civil Procedure Rule 12 ....................................................................................1

Defendants submit this memorandum in support of their motion, pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss in part the Second Consolidated Amended Class Action Complaint ("SAC").

## NATURE AND STAGE OF THE PROCEEDING

This is a putative securities class action arising from the Deepwater Horizon explosion and ensuing oil spill.  The Court appointed a group identified as the New York and Ohio Plaintiffs as lead plaintiffs and a group identified as the Ludlow Plaintiffs as lead plaintiffs for a putative subclass.  These two groups thereafter filed separate complaints.  On February 13, 2012, the Court issued two decisions dismissing the lead complaint in part and the subclass complaint in its entirety with leave to re-plead.

Following the Court's decisions, plaintiffs jointly filed the SAC on behalf of purchasers of BP p.l.c. ("BP") American Depositary Shares ("ADSs") between May 9, 2007 and May 28, 2010, asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 thereunder.  This motion to dismiss is directed only at the alleged misstatements in the SAC that either were rejected by the Court as a basis for a Section 10(b) claim in its prior rulings or were not included in plaintiffs' original complaints.

## STATEMENT OF THE ISSUES

1. Can plaintiffs adequately plead Section 10(b) violations based on alleged misstatements (i) that the SAC and documents cited therein demonstrate were true, and/or (ii) if there is no strong inference that any defendant acted with scienter in making the statements?

2. Should Section 10(b) claims be dismissed for failure to allege loss causation, where the SAC alleges no corrective disclosures related to the statements and no loss from a risk they supposedly concealed?  *Lormand* v. *US Unwired, Inc.*, 565 F.3d 228, 258 (5th Cir. 2009).

3. Should Section 20(a) claims be dismissed as to an individual alleged only in conclusory terms to have exercised control over an alleged violator of Section 10(b)?  *Dennis* v. *Gen. Imaging, Inc.*, 918 F.2d 496, 509 (5th Cir. 1990).

## SUMMARY OF THE ARGUMENT

Both original complaints in this action alleged that statements about BP's Operating Management System ("OMS"), a "framework" for operations that consolidates requirements related to safety, environmental performance and regulatory compliance, were fraudulent. In its Orders on defendants' motions to dismiss, this Court held that plaintiffs failed adequately to allege that those statements were false or that the speakers acted with scienter. Relying on voluminous discovery from MDL 2179, plaintiffs now seek to re-plead those statements (and add new statements). They also seek to add back into the case a previously dismissed individual defendant, Andrew Inglis. The allegations of the SAC and documents incorporated therein demonstrate, however, that plaintiffs cannot adequately plead Section 10(b) violations based on the OMS statements. Those statements, and Andrew Inglis, thus should be dismissed, and this action should proceed based only on the 12 statements held to be actionable in this Court's previous rulings.

First, the SAC relies on snippets of out-of-context deposition testimony and excerpts of documents to allege that, supposedly contrary to public statements, OMS did not apply to leased rigs and was not implemented in the Gulf of Mexico by the time of the Deepwater Horizon explosion. But the very documents on which plaintiffs rely—and plaintiffs' own allegations— undermine plaintiffs' ability to plead a Section 10(b) violation based on those statements. The cited documents show that OMS applied to leased rigs through its provisions titled "Working with Contractors," among others, and that OMS was implemented by BP's Gulf of Mexico business unit in late 2008 and in each of the Gulf's individual business entities by the end of 2009. The documents further show that Tony Hayward and Andrew Inglis, the speakers of many of the statements, were informed repeatedly of those facts, which were consistent with their statements. Plaintiffs thus have not adequately pleaded that defendants' public statements were

false or, if so, that they were made with scienter. In addition, three alleged misstatements concerning the future application of OMS fall within the safe harbor for forward-looking statements under the Private Securities Litigation Reform Act of 1995 ("PSLRA").

Second, plaintiffs fail to allege any corrective disclosures of defendants' supposedly fraudulent statements concerning OMS that caused their losses, or any loss from risks concealed by those statements. The SAC thus does not adequately allege loss causation for those statements. *Lormand*, 565 F.3d at 258.

Third, the SAC includes no allegations that Inglis controlled any primary violator of Section 10(b) or participated in any alleged violation. The Section 20(a) claim against him thus likewise fails as a matter of law. *Dennis*, 918 F.2d at 509.

## BACKGROUND

### A.    The Court's February 13 Decisions

The Court's February 13, 2012 decisions sustained 12 alleged misstatements in the lead New York and Ohio complaint: seven statements by Tony Hayward about BP's "progress in process safety efforts as measured against Baker Report recommendations" (NY/OH Opinion (Doc. 324) at 57-61, 99-103); two statements in regulatory filings about BP's ability "to respond to a spill in the Gulf of Mexico" (*id.* at 66-69); and three "numerical estimates of spill amounts" by Douglas Suttles and Hayward after the Deepwater Horizon explosion (*id.* at 83-85, 101-02, 106-09).[1] The Court held that plaintiffs had not adequately pleaded Section 10(b) violations based on all other statements challenged by plaintiffs, including all statements related to OMS. The Court also dismissed all claims against numerous individual defendants, including Inglis.

---

[1] Using plaintiffs' lettering in SAC Appendix A, the sustained statements are D, E, H, K, M, Q, T, U and V and parts of F, G and O.

The statements related to OMS that were rejected by this Court fall into two categories. First, the Ludlow complaint challenged two statements concerning the date on which the Gulf of Mexico "completed the transition to OMS." (Doc. 112 ¶¶ 354, 409.) The Court held that plaintiffs had failed adequately to plead scienter with respect to those statements. (Ludlow Opinion (Doc. 323) at 72-76, 80-81.) Second, both complaints challenged statements that OMS was a "common framework for all BP operations." (Doc. 112 ¶¶ 383, 401; Doc. 113 ¶¶ 271, 281, 285, 295, 302-03, 324.) The New York and Ohio plaintiffs alleged that such statements were untrue because BP followed local laws in each country and had operating standards different from those of its peers. (Doc. 113 ¶¶ 106-08, 112-13, 272, 324-25.) The Court rejected those arguments, holding that the "statements do not represent, or even imply, that the same standard will be applied worldwide" or that BP's standards were "identical" to those of other companies. (NY/OH Opinion at 79.) The Ludlow plaintiffs alleged that OMS was not a common framework because it was not fully implemented in the Gulf of Mexico in late 2009 and early 2010, in part because of personnel changes. (Doc. 112 ¶¶ 384, 402.) At oral argument on defendants' motion, the Ludlow plaintiffs offered a new theory, one that appeared nowhere in their complaint or prior briefs: that the OMS statements were false and misleading because OMS supposedly did not apply to rigs that BP leased from contractors. (*See* Ludlow Opinion at 47 & n.27.) Based on the Ludlow plaintiffs' allegations about BP's alleged failure to implement OMS in the Gulf, the Court held that plaintiffs had adequately alleged the statements to be false, but had not adequately alleged scienter. (*Id.* at 47-48.)

## B.     The SAC

After issuing its February 13 decisions, the Court instructed plaintiffs to file a joint amended complaint and permitted them to attempt to re-plead "claims dismissed without

prejudice," while cautioning that any challenges to the February 13 rulings could be made only by motions under Rules 59 or 60, not by way of amendment.  (Minute Entry (Feb. 23, 2012).)

In their joint SAC, plaintiffs added 13 alleged misstatements concerning OMS:  seven statements from the original New York and Ohio complaint that the Court had rejected for failure to allege falsity (Statements C, F, G, I, J, O & R); two statements from the Ludlow complaint that the Court had rejected for failure to allege scienter (Statements N & P); and four entirely new statements (Statements A, B, L & S).[2]  In preparing the SAC, plaintiffs have had access to all documents produced by BP and all depositions taken in *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, MDL No. 2179 (E.D. La.).  The SAC thus now quotes and incorporates voluminous deposition testimony and documentary evidence in an effort to allege that these 13 statements were false and made with scienter.

In attempting to plead scienter, plaintiffs allege that Hayward and Inglis "were knowledgeable about the scope and implementation of OMS through their participation in GORC," including attendance at monthly meetings and access to "Pre-reads" prepared for GORC members.  (SAC ¶¶ 84-86, 113, 336(c), 360(e); *e.g.* Exs. A-B.[3])  The complaint also alleges that Hayward and Inglis "received regular status updates concerning the scope and implementation of OMS via the 'Orange Book.'"  (SAC ¶ 87; *e.g.* Exs. C-E.)  Plaintiffs allege that Inglis "monitored the implementation of OMS through the Orange Book," which "provided a clear indication of what areas of BP's operations had or had not implemented OMS."  (SAC

---

[2] Parts of Statements F, G and O concerning BP's progress measured against the Baker Report's recommendations were sustained in the New York and Ohio decision, but the parts concerning OMS were rejected.  (NY/OH Opinion at 77, 81 & nn.26-27.)  Part of Statement S concerning BP's ability to respond to spills was alleged to be fraudulent in the Ludlow complaint but rejected on scienter grounds; the part concerning OMS was not challenged.  (Ludlow Opinion at 80-81.)

[3] "Ex. __" refers to exhibits to the Declaration of Georgia L. Lucier, filed herewith.

¶¶ 88-89.)    Plaintiffs also quote from a December 2008 "internal BP strategy document" allegedly received by Hayward and Inglis that is the Local OMS Handbook for the Gulf of Mexico Strategic Performance Unit ("SPU").  (*Compare*, *e.g.*, *id.* ¶¶ 21, 360(g) *with* Ex. F at 38.)

## C.    The Scope of BP's OMS

### 1.    OMS Explicitly Applies to Contractors.

BP's OMS is a "framework" for operations that provides "requirements relating to process safety, environmental performance, legal compliance in operations, and personal, marine and driving safety."  (SAC ¶ 335.)  Documents incorporated into the SAC demonstrate that OMS applies across BP, to all of BP's operations—as well as to instances where BP relies on contractors such as Transocean, which owned the Deepwater Horizon rig, to carry out work.



---

[4] In deciding this motion, the Court may consider documents incorporated by reference into the SAC. *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  The Fifth Circuit permits consideration of such documents when they are (i) referenced in the complaint and (ii) central to plaintiffs' claims. *Collins* v. *Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000).  Here, plaintiffs depend entirely on documents referenced in the SAC to satisfy the PSLRA's pleading standards. As such, those documents are central to plaintiffs' claims based on OMS-related statements.







Deposition testimony referenced in the SAC confirms that OMS applied to MODUs. When asked whether "OMS applied to the Deepwater Horizon drilling operation at Macondo," Inglis testified that "OMS did apply, yes." (Ex. J at 191:4-9 (deposition quoted at SAC ¶ 46).) Inglis explained that "the approach would be that the contractor's safety management system applies and then you would look to make sure that it's bridged to the BP process and if there are areas where there needs to be a—a supplementary approach applied, you identify those." (*Id.* at 641:24-642:4.) When plaintiffs' counsel asked Inglis to assume, hypothetically, that OMS did not apply to the Deepwater Horizon, Inglis responded that the assumption did not make sense: "My belief deeply is that it had—that—that the OMS—the group level existed, the OMS— the Gulf of Mexico existed, that there was a local OMS covering the drilling and completions activity, that had been signed off, then implemented at the back end of 2009, and, therefore, it was applicable. (*Id.* at 193:12-18.) Ellis Armstrong, CFO of BP's Exploration & Production segment and a BP Rule 30(b)(6) witness (deposition quoted at SAC ¶¶ 95, 101, 154, 352(d),

356(b)-(c)), likewise testified that the "core description of OMS" requires BP to look at "the management systems of the contractor and . . . seek to match them to—you know, check those to see if they're consistent with OMS." (Ex. K at 420:6-17; *see also id.* 470:14-17.)

### 2.    Hayward and Inglis Were Told That OMS Applies to "All" Operations.

Consistent with OMS's application across BP, including to contractors, internal BP documents allegedly received by Hayward and Inglis referred to OMS as applying to "all" BP operations.



Plaintiffs allege that Hayward and Inglis "were knowledgeable about the scope and implementation of OMS" because of information they received as GORC members. (SAC ¶ 85.)

### 3.    The SAC's Contrary Allegations About the Scope of OMS Lack Support.

Plaintiffs nevertheless allege that statements by Hayward and Inglis that OMS applied "across all of BP's operations" were fraudulent (SAC ¶ 327) because "OMS did not apply to BP's operations on rigs unless the rig was fully-owned by BP" (*id.* ¶ 100). Plaintiffs assert that

- 10 -

BP's practice and intent were "to exclude contracted drilling rigs from OMS coverage," which "meant that OMS did not apply to the vast majority of BP's deepwater drilling operations in the Gulf of Mexico, including the Transocean-owned *Deepwater Horizon*." (*Id.* ¶ 101.) In so arguing, plaintiffs rely on out-of-context snippets from depositions (*id.* ¶¶ 101-05), even though the witnesses at issue explained that OMS applied to contractors by requiring BP to ensure that contractors' HSSE management systems were at least as stringent as BP's system and by requiring a "bridging document" to the extent contractors' systems fell short.

The SAC quotes deposition testimony from GORC member John Baxter that OMS did not "apply" to the Deepwater Horizon. (*Id.* ¶ 104.) In fact, Baxter testified that OMS did apply to contractors, although not *in the same way* it applied to BP-operated entities. As Baxter explained, BP had to "follow the OMS in terms of reviewing [the] contractor safety management system" to ensure that "it will deliver the same intent as OMS" by conducting a "gap assessment" and then asking "what, if anything additional, should be applied." (Ex. L at Vol. 1 175:2-9, 192:10-11.)[6] Plaintiffs also quote a statement by Pat O'Bryan, former Vice President of Drilling and Completions, that the BP-owned Thunderhorse was the only drilling rig in the Gulf of Mexico "that would fall under the BP OMS." (SAC ¶ 104.) But plaintiffs omit O'Bryan's testimony just a page earlier that "the contractor's Safety Management System, is bridged to the BP Safety Management System, which is in conformance with OMS, and we operate under the Drilling Contractors Safety Management System." (Ex. M at 412:21-25.) Likewise, plaintiffs allege that Ronnie Sepulvado, the BP well site leader on the Deepwater Horizon, was unfamiliar

---

[6] *See also id.* at 242:2-4 (OMS "requires that any contractor activity, which is not operating in the BP entity, is reviewed against OMS"); *id.* at Vol. 2 8:5-10 (OMS "does have provisions for where BP is working with contractors. And where the contractors aren't working at a BP site, then it would review the contractor safety management system. And BP requires that it's [sic] contractors have safety management systems of their own").

with OMS, implying that OMS did not apply to that rig.  (SAC ¶ 105.) ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████ ██ ████████████ And plaintiffs quote John Mogford's statement that "OMS was not designed to be implemented on contractor sites or vessels," leaving out his explanation that "the operator does have to verify appropriately the Safety Management systems of drilling contractors and provide—make sure there are effective bridges in place."  (SAC ¶ 102; Ex. O at 462:25-463:3.)[7]

Plaintiffs also rely on a July 13, 2009 email from Inglis reporting that "conformance with Control of Work (CoW) practices, on many of our contractor operated drilling rigs, falls short of BP expectations" and noting that he asked an employee to clarify "the expectations we have of our contractors in the matter of CoW and the bridging requirements between contractor practice and BP's CoW Standard."  (SAC ¶ 175; Ex. Q.)  This email supports, rather than undermines, the conclusion that OMS applies to contractors by showing that BP required contractor "conformance" with the Control of Work standard—which plaintiffs allege "is a component of OMS" (SAC ¶ 176)—and by demonstrating that "bridging requirements between contractor practice and BP's CoW standard" were mandated.

---

[7] Plaintiffs also quote (SAC ¶ 103) Hayward's testimony that Transocean's "well control procedures" applied on the Deepwater Horizon rig, and that BP's role was to "verify . . . that those procedures are in place, and they're deemed to be appropriate, and people have been trained such that they know them, and when a situation occurs, that they implement them and follow them to control the well."  (Ex. P at 668:18-669:5.)  This testimony does not even mention OMS or its application to contractors.

**D.     BP's Implementation of OMS in the Gulf of Mexico**

**1.     OMS Was Implemented by the Gulf of Mexico SPU and Most Gulf of Mexico Entities by the End of 2008 and in All Gulf Entities by the End of 2009.**

Plaintiffs allege that Hayward and Inglis monitored the implementation of OMS "through their participation in GORC" and their access to the "Orange Book."   (SAC ¶¶ 44, 46, 85-89, 356(a).)

[9] gHSEr or "Getting Health Safety and Environment Right" was a BP safety management system in place before implementation of OMS.



Consistent with these reports, BP's 2008 Annual Review dated February 24, 2009 announced that "the majority of our operations in North America Gas, the Gulf of Mexico, Colombia and the Endicott field in Alaska all completed the migration to the OMS in 2008." (Ex. R at 15 (quoted at SAC ¶ 331).)  One week later, on March 4, 2009, BP's 2008 Form 20-F made a slightly different announcement:  that the Gulf of Mexico and other "sites" had "completed the transition to OMS in 2008."  (Ex. S at 37 (quoted at SAC ¶¶ 334-35).)

---

<sup>10</sup> For this reason, defendants acknowledged at oral argument on their motions to dismiss the original complaints that the statement in BP's 2008 Form 20-F was inaccurate to the extent it could be interpreted to imply that every BP entity in the Gulf of Mexico SPU had completed the transition to OMS by the end of 2008.  Although BP conceded that plaintiffs had adequately alleged the falsity of this statement at the motion to dismiss stage, given that the Gulf of Mexico SPU, a BP "site," had completed the transition to OMS in 2008, BP intends to show at a later stage of this action that the statement was accurate.



Shortly thereafter, BP's 2009 Sustainability Review dated April 15, 2010 similarly stated that "the OMS rollout extended to 70 sites by the end of 2009," making company-wide implementation "80% complete."  (Ex. U at 3) (quoted at SAC ¶ 359).)

### 2.    The SAC's Contrary Allegations About OMS Implementation in the Gulf of Mexico Lack Support.

Plaintiffs allege that the three public statements described above (in BP's 2008 Annual Review, 2008 Form 20-F and 2009 Sustainability Report (SAC ¶¶ 331, 334-35, 359)) were fraudulent because "the transition to OMS in the Gulf of Mexico was not complete" prior to April 2010.  (SAC ¶ 108.)  For each of these statements, the Court found the allegations of falsity or scienter in the prior complaints to be inadequate.  (Ludlow Opinion at 80; NY/OH Opinion at

---

[11] BP's Rule 30(b)(6) witness in MDL 2179 likewise agreed that "the Gulf of Mexico [had] adopted the OMS in its entirety" by the end of 2009.  (Armstrong Dep. at 465:22-466:3 (deposition cited at SAC ¶¶ 95, 101, 154, 352(d), 356(a)-(c)).)

81 nn.26-27.) Plaintiffs' attempt to remedy these deficiencies rests almost entirely on deposition testimony from witnesses who did not recall when OMS was implemented in the Gulf.

For example, plaintiffs assert that John Baxter testified that "OMS had not even been implemented in the Gulf of Mexico as of April 2010." (SAC ¶ 336(b).) In fact, he testified that "I don't know" when the Gulf transitioned to OMS. (Ex. L at Vol. 1 357:15-17.) Plaintiffs also quote the testimony of William Castell, Chairman of SEEAC, that he believed OMS "started its integration in the Gulf in 2009" and that he would be "surprised" if OMS was "fully integrated with all the legacy systems" by April 2010. (SAC ¶ 112.) The SAC omits, however, Castell's testimony on the very same page that he "didn't know what the status was of OMS in the Gulf on April the 20, 2010"—as well as his earlier testimony that he could not recall what SEEAC knew in 2008 about the status of OMS implementation in the Gulf. (Ex. V at 68:14-20, 71:17-19.)[12]

Plaintiffs rely most heavily on Hayward's testimony that he believed that the Gulf of Mexico had not "fully implemented" OMS before April 20, 2010. (SAC ¶¶ 109-11.) When asked whether he knew in June 2010 that "OMS was nowhere near full implementation in the Gulf of Mexico," Hayward responded that he "certainly knew that OMS implementation was not complete in many parts of the company because we had made it very clear it was a five-year journey and we were in Year 3." (Ex. P at 160:2-14.) When asked the same question a second time, Hayward repeated that "what I knew was it was not fully implemented across the entirety of the [company's] operations." (*Id.* at 162:1-6.) And when asked a third time, Hayward reiterated that "I wasn't aware of the details of the implementation in the Gulf of Mexico at the time. . . . But I was certainly aware that the implementation of OMS was not complete across the

---

[12] In any event, Castell's testimony referred to when OMS was "integrated with all the legacy systems" in the Gulf—not when the Gulf "completed the transition" to OMS.

company. And I may—I can't recall—have been aware that it was not complete in the Gulf of Mexico. I probably was." (*Id.* at 182:16-183:7.)

From that point forward in his deposition, after repeatedly stating that he could not recall the details of the implementation as of April 20, 2010, Hayward accepted the questioner's representation that OMS had not been fully implemented in the Gulf by April 2010 and answered questions about whether he *would have been* aware of that purported fact. For example, in the excerpt quoted by plaintiffs, Hayward testified that "I would have been aware of [the status of OMS implementation] in the course of doing my—my job" because GORC "was looking at the progress of implementation." (*Id.* at 663:3-16 (quoted at SAC ¶ 109).) Hayward stated, however, that he could not "remember the list" of the BP entities where OMS was not fully implemented until the end of 2010, but "if you refer to the thing called the Orange Book, it's very clear which areas are complete, which areas are in—in transition." (SAC ¶ 89 (quoting Hayward Dep. at 791:4-11).)

Aside from this deposition testimony, plaintiffs cite information attributed to "confidential witnesses" that BP's OMS allegedly lagged behind that of its peers in 2009; that by 2010, OMS allegedly "was still in its pilot phase and yet to be fully implemented in the Gulf of Mexico"; ██████████████████████████████████████████ and that a reorganization in late 2009 and January 2010 allegedly resulted in the termination or transfer of those responsible for Gulf safety processes and OMS implementation and their replacement with less qualified individuals. (SAC ¶¶ 114-22.) Plaintiffs allege that one of the confidential witnesses, along with other unidentified "senior BP employees," raised "concerns" about the reorganization to unidentified "top-level management with direct reporting responsibilities to BP's board of directors." (*Id.* ¶ 118.) Despite their access to extensive

discovery from BP, plaintiffs do not allege that any information provided by the confidential witnesses, all of which related to late 2009 or later, was ever conveyed to Hayward or Inglis. Based on plaintiffs' own allegations, these defendants' knowledge of the status of OMS implementation was limited to what appeared in the Orange Books, the GORC Pre-reads and other documents supposedly provided to them.

## ARGUMENT

In its February 13 decisions, this Court set forth in detail the law applicable to this motion. (NY/OH Opinion at 39-48; Ludlow Opinion at 24-33.) "To state a private claim under section 10(b), a plaintiff must allege the following: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." (NY/OH Opinion at 41.) None of the new challenged statements is adequately alleged to be false or misleading or made with scienter. Nor have plaintiffs adequately alleged that the statements concerning OMS caused their losses.

## I.    PLAINTIFFS FAIL ADEQUATELY TO ALLEGE THAT THE NEW STATEMENTS WERE FALSE OR MISLEADING OR MADE WITH SCIENTER.

Under the PSLRA, a private securities complaint must plead with particularity "'the reason or reasons why the statement is misleading'" and "'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" (NY/OH Opinion at 41-42 (quoting 15 U.S.C. § 78u-4(b)(1), (2)).) Plaintiffs fail to satisfy these pleading requirements for each statement added to the SAC.

### A.    BP's 2006 Sustainability Report Dated May 9, 2007

BP's 2006 Sustainability Report stated:

***The OMS is a comprehensive system that covers all aspects of our operations***, including three dimensions of safety – personal safety, process safety and the

- 18 -

environment. . . . *The new OMS will apply to all operations* by the end of 2010 and includes safety, integrity, environmental management and health. . . . *Each site will have its own local OMS*, based on a consistent group-wide framework. . . . (SAC ¶ 315 (Statement A).)

Plaintiffs assert that this statement (not challenged in the original complaints) was false or misleading and made with scienter because "OMS applied only to rigs that BP fully-owned but not to BP's operations where BP leased rigs from others." (SAC ¶ 316.) "The court need not accept as true an allegation that is contradicted by documents on which the complaint relies." *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 555 (S.D.N.Y. 2004); *accord United States ex rel. Riley* v. *St. Luke's Episcopal Hosp.*, 355 F.3d 370, 377 (5th Cir. 2004) ("If . . . an allegation is contradicted by the contents of an exhibit attached to the pleading, then indeed the exhibit and not the allegation controls."); *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 761 F. Supp. 2d 504, 522 n.7 (S.D. Tex. 2011).

The SAC and documents it references make clear that this statement is true—that OMS is a "system" that "will apply to" and will "cover[] all aspects" of BP's operations—and that plaintiffs are incorrect that OMS did not apply to leased rigs. (SAC ¶ 315.) ███████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████ ██ ███████████████ Plaintiffs themselves allege that BP audited Transocean's Deepwater Horizon rig and expected contractors' "conformance" with BP Control of Work practices, ████████████████████ (SAC ¶¶ 117, 175-76, 356(d).) Moreover, the deposition testimony cited by plaintiffs (SAC ¶¶ 100-05) does not support their contention that this statement is false. The deponents either said nothing about OMS's application to contractor operations or recognized that OMS applied to the work of contractors

by requiring BP contractually to ensure the adequacy of the contractors' safety management systems, with BP's OMS as the guide for that determination. *See supra* Section C.3.

Nor have plaintiffs adequately alleged scienter with respect to this statement. Plaintiffs attribute the statement to "BP," not to any individual. (SAC ¶¶ 96, 315 & App. A.)  As a result, "the only way" plaintiffs can plead scienter on the part of BP for this unattributed corporate statement is by pleading errors "so egregious as to rise to the level of extraordinary and dramatic falsity contemplated by the Seventh Circuit in *Tellabs II*"—that is, facts akin to General Motors' announcing it had sold one million SUVs in a year when the true number was zero.  (NY/OH Opinion at 111-12, 115.)  The statement in BP's 2006 Sustainability Review concerning OMS does not come close to satisfying that standard.  In fact, an internal GORC report in 2007 from John Mogford, BP's Group Vice President of Safety and Operations, affirmed that OMS "will apply to *all* operations and will cover *all* aspects of HSE compliance and risk management." (Ex. A at 15 (document quoted at SAC ¶ 84) (emphasis added).)  The clear similarity between this internal report and the statement in BP's 2006 Sustainability Report issued near the same time strongly supports the non-culpable inference that "BP" believed in May 2007 that OMS applied to "all" operations.  *See In re Officemax, Inc. Sec. Litig.*, 2002 U.S. Dist. LEXIS 27019, at *51 (N.D. Ohio Mar. 26, 2002) (lack of "divergence" between internal studies and public statements undercut scienter inference).

Finally, this forward-looking statement falls within the PSLRA's safe harbor.  As this Court explained, "a statement of the plans and objectives of management for future operations" is forward-looking, and the PSLRA safe harbor applies if such a statement is "accompanied by meaningful cautionary statements" or was not made with "knowledge of falsity."  (Ludlow Opinion at 44 (quoting 15 U.S.C. § 78u-5(c)(1)(A)).)  The references to where OMS "will apply"

and what each site "will have" (SAC ¶ 315) are statements of future plans. And the description of OMS as "a comprehensive system that covers all aspects of our operations" likewise is forward-looking when read in context: The 2006 Sustainability Report makes clear that OMS is a work in progress by explaining on the same page that "we are building a stronger long-term system for managing process safety within the OMS." (Ex. W at 9.) The challenged statement also is accompanied by meaningful cautionary language warning that statements about "implementation and completion of certain safety and environmental-related measures" are forward-looking and that actual results may differ from expectations. (*Id.* at table of contents.)

**B.     Hayward's Statement During an Investor Conference Call on July 24, 2007**

During a conference call with analysts and investors on July 24, 2007, Hayward stated:

> We are also in the early days of establishing a new way of operating in BP – *with the progressive rollout of a common group-wide Operating Management System*. (SAC ¶ 317 (Statement B).)

Plaintiffs again allege that this statement (also not challenged in the original complaints) was fraudulent because "OMS applied only to rigs that BP-fully owned but not to BP's operations where BP leased rigs from others." (SAC ¶ 318 (citing *id.* ¶¶ 100-05).) As explained above, this statement is neither false nor misleading: OMS *is* a common system that applies to BP group-wide. Contrary to plaintiffs' contention, OMS also applies to leased rigs through OMS's "Working with Contractors" provisions and the OMS "applicability" provisions in Part 4 of the OMS Framework. *See supra* Sections C, I.A. Moreover, as this Court previously recognized, a "common group-wide" system need not apply identically to every part of BP's operations. (*See* NY/OH Opinion at 79 (describing OMS as "consistent" and "systematic" did not mean it used "identical safety standards" worldwide).)

Plaintiffs also do not adequately plead that Hayward made this statement with scienter. In analyzing scienter, the Court takes plaintiffs' allegations as true, reviews "documents

incorporated into the Complaint by reference and matters subject to judicial notice," and considers "plausible inferences opposing as well as supporting a strong inference of scienter." (*Id.* at 45.)   Where "it can be inferred" that an alleged misstatement was "truthful[]," "[t]his constitutes a plausible nonculpable explanation." *Flaherty & Crumrine Preferred Income Fund Inc.* v. *TXU Corp.*, 565 F.3d 200, 212 (5th Cir. 2009); *see also Ind. Elec. Workers' Pension Trust Fund IBEW* v. *Shaw Group, Inc.*, 537 F.3d 527, 538 (5th Cir. 2008) (statements "susceptible to many interpretations, including innocent ones," insufficient to meet PSLRA's heightened standards); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 263, 274 & n.15 (S.D.N.Y. 2008) (where it was unclear statements were false, "competing, nonculpable explanations" were stronger than scienter inference).

Plaintiffs' allegations raise no inference of scienter, much less the required strong inference.  The excerpt of Hayward's deposition quoted by plaintiffs refers to his knowledge of whose "well control procedures" applied on the Deepwater Horizon rig and says nothing about OMS.  (SAC ¶ 103; Ex. P at 668:18-669:5.)  Even if some inference of scienter were appropriate, that inference would be rebutted by the ███████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████

Finally, Hayward's statement also is protected by the PSLRA safe harbor for forward-looking statements.  *See supra* Section I.A.  The statement expressly states that BP is in the "early days" of a "progressive rollout" of a "common group-wide" system.  As such, the statement is forward-looking.  It also was accompanied by meaningful cautionary language

warning, among other things, that "production and timing of major project[s]" may diverge from expectations based on a number of factors.  (Ex. X at 2.)

### C.   Inglis's Speech at the Sanford Bernstein 4th Annual Strategic Decisions Conference on September 25, 2007

At the Sanford Bernstein 4th Annual Strategic Decisions Conference, Inglis stated:

> One aspect of our focus on safe and reliable operations that I mentioned earlier, is our new standardized *Operating Management System (OMS).  This will provide a blueprint for safety and all aspects of operations throughout BP*, making sure operations are undertaken to a consistently high standard worldwide.  (SAC ¶ 319 (Statement C).)

Once again, plaintiffs assert that this statement was fraudulent because Inglis "failed to disclose that BP's OMS would apply only to rigs that BP fully-owned but not to BP's operations where BP leased rigs from others."  (SAC ¶ 320.)  The Court previously held that plaintiffs failed adequately to allege that this statement was false or misleading.  (NY/OH Opinion at 81 & n.27.)  That conclusion remains correct:  OMS does apply to all aspects of BP's operations, as well as to rigs leased from contractors such as Transocean through OMS's "Working with Contractors" and applicability provisions.  *See supra* Sections I.A & I.B.  Moreover, Inglis's statement does not say that OMS will apply in an identical manner to both BP employees and BP contractors.  Instead, Inglis stated that the purpose of OMS is "making sure operations are undertaken to a consistently high standard worldwide."  (SAC ¶ 319.)  OMS achieves this goal by ensuring that contractor safety management systems are at least as protective as BP's systems and by "bridging" any gaps.  *See supra* Section C.1.

Plaintiffs' scienter allegations are especially weak.  Plaintiffs identify no information allegedly received by Inglis prior to making this comment that contradicts his statement that OMS "will provide a blueprint for safety and all aspects of operations throughout BP."  To the contrary, Inglis testified that he understood that "OMS did apply, yes," to operations on

- 23 -

Transocean's Deepwater Horizon rig and further explained the requirements for bridging contractor safety management systems to BP's standards.   (Ex. J at 191:4-9, 641:24-642:4 (deposition quoted at SAC ¶¶ 46, 85, 87-88, 346, 356(d)).)   That testimony— ███████████ ████████████████████████████████████████████████████ ████████████████████████████████   █████████   ██   ████—undermines any inference of scienter. *See Flaherty*, 565 F.3d at 212 (inference that alleged misstatement may be "truthful[]" is plausible nonculpable explanation).   The Court therefore again should conclude that plaintiffs "have alleged no specific scienter allegations with respect to Inglis."   (Ludlow Opinion at 76.)

Inglis's statement also is forward-looking and protected by the PSLRA safe harbor.   The statement asserts that OMS "*will* provide a blueprint for safety and all aspects of operations throughout BP."   (SAC ¶ 319 (emphasis added).)   It also was accompanied by meaningful cautionary language warning that the speech contained forward-looking statements that "involve risks and uncertainties" and that "actual results may differ."   (Ex. Y at 1.)

### D.   Hayward's Statement at BP's 2008 Strategy Presentation on February 27, 2008

At BP's 2008 Strategy Presentation, Hayward stated:

Notwithstanding this track record our intense focus on process safety continues. We are making good progress in addressing the recommendations of the Baker Panel and *have begun to implement a new Operating Management System across all of BP's operations*.  (SAC ¶ 325 (Statement F).)

Seeking to overcome the Court's prior conclusion that this statement was not adequately alleged to be false or misleading (NY/OH Opinion at 81 & n.27), plaintiffs contend that "Hayward misrepresented that BP was implementing OMS 'across all of BP's operations' when, in fact, OMS applied only to rigs BP fully-owned but not to BP's operations where BP leased rigs from others."  (SAC ¶ 326(b).)   As explained above, Hayward's statement was neither false

- 24 -

nor misleading:  OMS applies to all of BP's operations, and to rigs leased from contractors.  *See*

*supra* Sections C, I.B.   Nor have plaintiffs adequately alleged that Hayward made the

statement—███████████████████████████████████████████████████—

with scienter.  *See supra* Section I.B.

### E.    Hayward's Speech at the 2008 Annual General Meeting on April 17, 2008

During his speech at BP's 2008 Annual General Meeting, Hayward stated:

> Our intense focus on process safety continues.  We are making good progress in addressing the recommendations of the Baker Panel and ***have begun to implement a new Operating Management System across all of BP's operations.*** (SAC ¶ 327 (Statement G).)

Plaintiffs again contend that "Hayward misrepresented that BP was implementing OMS

'across all of BP's operations' when, in fact, OMS applied only to rigs BP fully-owned but not to

BP's operations where BP leased rigs from others."   (SAC ¶ 328(b).)   This statement by

Hayward is identical to the alleged misstatement discussed in the previous section:   the

statements were made two months apart by the same speaker, and the Court found both to be

inadequately pleaded in the New York and Ohio complaint.  (NY/OH Opinion at 81 n.27.)   The

SAC likewise does not adequately allege that Hayward's statement was false or misleading or

made with scienter for the same reasons discussed above.  *See supra* Sections I.B and I.D.

### F.    BP's 2008 Annual Review Dated February 24, 2009

BP's 2008 Annual Review contains the following statement not attributed to any

individual:

> During the year we began migrating to ***the new BP OMS, which has an increased focus on process safety and continuous improvement***.  ***<ins>The majority of our operations</ins>*** in North America Gas, ***the Gulf of Mexico***, Colombia and the Endicott field in Alaska ***all completed the migration to the OMS in 2008***.  (SAC ¶ 331 (Statement I) (underlined emphasis added).)

- 25 -

The Court previously held that the statement that "the majority of our operations in . . . the Gulf of Mexico . . . completed the migration to OMS" was not adequately alleged to be false or misleading.  (NY/OH Opinion at 81 & n.26.)  Plaintiffs now allege that the statement was fraudulent because "Hayward and other BP personnel testified in MDL 2179 that OMS had not been implemented in the Gulf of Mexico as of April 2010."  (SAC ¶ 333(a).)  As explained above, Hayward's deposition testimony reflects only that he could not recall when OMS was implemented in the Gulf of Mexico, that he at some point accepted the questioner's representation that OMS was implemented in the Gulf after April 2010, and that he emphasized that the Orange Book was the definitive authority on OMS implementation status.  *See supra* Section D.2. ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████

Plaintiffs allege that "[a]n "internal BP strategy document issued in December 2008 warned GORC members, including Defendant Hayward, that there were major process safety concerns in the Gulf of Mexico."  (SAC ¶ 333(c).)  According to plaintiffs, these concerns were inconsistent with the suggestion "that operations in the Gulf of Mexico were operating within uniform Company-wide safety procedures."  (*Id.*) ███████████████████████████

██████████████████████████████████████████████████████████████████

████████  ████████  ████████  ████  ███████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

- 26 -

██████████████████  ████  ██████████████████████
████████████████

Plaintiffs also have raised no inference of scienter for this statement in BP's 2008 Annual Review.  Plaintiffs attribute this statement to "BP," not to any individual.  (*See* SAC ¶ 331 & App. A.)  To plead scienter, plaintiffs thus must satisfy *Tellabs II*'s "egregious" falsity standard.  (NY/OH Opinion at 111-12, 115.)  They do not come close to satisfying that demanding test.  The SAC relies entirely on deposition testimony of Hayward and Castell to plead scienter.  (SAC ¶ 333(a).)  Both witnesses testified that they could not recall when OMS was implemented in the Gulf.  *See supra* Section D.2.  More importantly, neither testified that he knew *in early 2009* when the 2008 Annual Review was published that OMS had not been implemented at a majority of BP facilities in the Gulf of Mexico.  Even if this deposition testimony could raise some inference of scienter, the documents referenced in the SAC make the competing non-culpable inference (that the statement was believed to be true) much stronger:





███████████████████████████████████████████ This defeats

any inference of corporate scienter.[13]

### G.   Hayward's Statement in BP's 2008 Annual Review Dated February 24, 2009

The "Group chief executive's review" section of BP's 2008 Annual Review states:

> ***The BP operating management system (OMS) turns the principle of safe and reliable operations into reality by governing how every BP project, site, operation and facility is managed.***  (SAC ¶ 332 (Statement I).)

As with earlier statements concerning OMS, plaintiffs attempt to overcome the Court's

ruling that they had inadequately pleaded falsity (NY/OH Opinion at 81 & n.27) by alleging that

"OMS applied only to rigs that BP fully-owned but not to BP's operations where BP leased rigs

from others."  (SAC ¶ 333(b).)  In "governing how every BP project, site, operation and facility

is managed," a management system need not "govern" each in an identical manner.  ████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████ ██ ████████████

Ex. H.)   The SAC itself alleges that BP audited the Deepwater Horizon rig leased from

Transocean and that BP expected contractors' "conformance" with BP Control of Work

practices, ████████████████████████████████

  ██████████████████████████████████████████████

██████████████████████████████████████████████

<hr />

[13] Plaintiffs also assert that the statement that "the new BP OMS . . . has an increased focus on process safety and continuous improvement" was fraudulent, but they allege no facts demonstrating that this statement was false or misleading or made with scienter.  (SAC ¶¶ 332-33.)

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████

### H.    BP's 2008 Form 20-F Annual Report Dated March 4, 2009

On March 4, 2009, BP filed its 2008 Annual Report with the SEC on Form 20-F, which was signed by Hayward.  (SAC ¶ 334.)  The Form 20-F states:

> We continue to implement our new operating management system *(OMS), a framework for operations across BP that is integral to improving safety and operating performance in every site . . . .*

> All operated businesses plan to transition to OMS by the end of 2010.  *Eight sites completed the transition to OMS in 2008*; two petrochemicals plants, Cooper River and Decatur, two refineries, Lingen and Gelsenkirchen and four Exploration and Production sites, North America Gas, *the Gulf of Mexico*, Colombia and the Endicott field in Alaska. . . .  (SAC ¶ 335 (Statement J).)

Plaintiffs allege that characterizing OMS as a "framework for operations across BP" was false or misleading because "OMS applied only to rigs that BP fully-owned but not to BP's operations where BP leased rigs from others."  (SAC ¶ 336(f).)  This argument fails for the same reasons discussed above.  *See supra* Section I.G.  A "framework" need not dictate detailed rules that apply in exactly the same fashion to every aspect of a system.  (*See* NY/OH Opinion at 79 (describing OMS as "consistent" and "systematic" did not mean it used "identical safety standards" worldwide).)  ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████████████████ ██ ████████████████

These documents show that the alleged misstatement was neither false nor misleading and undercut any inference of scienter. *Flaherty*, 565 F.3d at 212 (scienter not adequately alleged for statement that may be "truthful[]").

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████ *See*

*supra* Section D.1.  The Court found that plaintiffs adequately pled that the statement in BP's 2008 Annual Report that the Gulf of Mexico "completed the transition to OMS in 2008" was false.  (Ludlow Opinion at 37.)  But plaintiffs still have not alleged a Section 10(b) violation based on that statement because, like the Ludlow plaintiffs before (*see id.* at 80), they fail adequately to allege a "cogent and compelling" inference of scienter. *Tellabs*, 551 U.S. at 324.

Plaintiffs refer to an allegation by a confidential witness that OMS in 2010 "was still in its pilot phase, and had yet to be fully implemented in the Gulf of Mexico."  (SAC ¶ 336(g).)[14] Not only is this statement inconsistent with other allegations contained in (and documents incorporated in) the SAC (*see supra* Section D), but plaintiffs also make no effort to connect this confidential witness to Hayward, who signed BP's 2008 Annual Report.  (*Id.* ¶ 336(a).) Plaintiffs also point to testimony by Hayward that he understood "the purpose of OMS" and "the risk of a deepwater blowout" (*id.* ¶ 336(e)), but fail to explain why such testimony establishes that Hayward acted with scienter in signing the 2008 Annual Report.  Plaintiffs further rely on a tortured reading of Hayward's deposition testimony concerning the implementation of OMS in the Gulf.  (SAC ¶ 336(b).)  That testimony, however, reflects that Hayward could not recall when OMS was implemented in the Gulf, that he eventually accepted the questioner's representation

---

[14] Plaintiffs also allege that "employees in key positions in Gulf of Mexico operations had no knowledge of OMS requirements."  (SAC ¶ 336(g) (citing *id.* ¶¶ 114, 116, 118-20, 122).)  Those paragraphs do not support this allegation and, in any event, do not raise an inference that Hayward acted with scienter in signing BP's 2008 Annual Report.  (*Id.* ¶¶ 114-22.)

- 30 -

that OMS was implemented in the Gulf after April 2010, and that he identified the Orange Book

as the definitive authority on OMS implementation status.  *See supra* Section D.2.

Any inference of scienter raised by plaintiffs' allegations is outweighed by the competing

non-culpable inference raised by the remainder of the SAC and the documents referenced in it.

- One week before the challenged statement was made in BP's 2008 Annual Report, BP's 2008 Annual Review was released correctly stating that a *majority* of BP's operations in the Gulf completed the migration to OMS in 2008. (*Compare* SAC ¶ 331 *with id.* ¶ 335.)  It is implausible that Hayward, in signing BP's 2008 Annual Report, intended to defraud investors by making a statement (the Gulf of Mexico "completed the transition to OMS in 2008") that varied only slightly from a statement made one week earlier.

- Plaintiffs allege that Hayward acted with scienter because he received the Gulf of Mexico OMS Handbook.  (SAC ¶ 336(d) (citing *id.* ¶ 21).) ███████████████████ ██████████████  This information, which is accurate, is sufficiently similar to the alleged misstatement in BP's 2008 Annual Report that it cannot give rise to a strong inference that Hayward intentionally issued a false statement or was highly reckless as to its accuracy.

- Plaintiffs allege that Hayward's knowledge of OMS implementation came from the Orange Book.  (SAC ¶¶ 86-89.) ██████████████████████ █████████████████████████████████████████████

- █████████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████  Again, that information is not sufficiently contrary to the alleged misstatement in BP's 2008 Annual Report to give rise to a strong inference that Hayward acted with scienter in signing that report.

When these allegations are considered together, the more plausible inference is that the statement

in BP's 2008 Annual Report about the implementation of OMS in the Gulf was not intentionally

or recklessly false.  This is exactly what this Court held in ruling that the Ludlow complaint

failed to state a claim based on that statement.  (Ludlow Opinion at 80-81.)

I.      **Hayward's Statement in BP's 2008 Sustainability Review Dated April 16, 2009**

The "Group Chief executive's review" section of BP's 2008 Sustainability Review states:

> You can see a similar balanced approach in our new *operating management system (OMS), which is to be implemented at each BP site*. It covers everything from compliance and risk management through to governance and measuring results. (SAC ¶ 347 (Statement L).)

Plaintiffs again assert that Hayward's statement that OMS was "to be implemented at each BP site" was false because the deposition testimony shows that OMS did not apply to "BP's operations where BP leased rigs from others." (SAC ¶ 348 (citing *id.* ¶¶ 100-05).) As explained above, the documents and deposition testimony referenced in the SAC reveal that OMS in fact applied to leased contractor-owned rigs, thus defeating any contention that the statement (not challenged in the original complaints) was false or misleading. *See supra* Section C. For the same reason, the SAC does not give rise to the requisite strong inference that Hayward acted with scienter in making this statement.

J.      **BP's 2009 Annual Review Dated February 26, 2010**

BP's 2009 Annual Review contains the following statement not attributed to any individual:

> Safe, reliable and compliant operations remain the group's first priority. A key enabler for this is the BP operating management system *(OMS), which provides a common framework for all BP operations*, designed to achieve consistency and continuous improvement in safety and efficiency. Alongside mandatory practices to address particular risks, *OMS enables each site to focus on the most important risks in its own operations and sets out procedures on how to manage them in accordance with the group-wide framework*. (SAC ¶ 351 (Statement N).)

As they did in the Ludlow complaint previously dismissed by the Court, plaintiffs allege that this statement was false or misleading because (i) after a reorganization in late 2009 and early 2010, key personnel in the Gulf allegedly lacked the experience of those they replaced and lacked knowledge of OMS's requirements (SAC ¶ 352(e), (h)); ████████████████

██████████████████████████████████████████████

███████████████████████████████ ██ ███████ and (iii) a confidential witness claimed that OMS in 2009 and 2010 lagged behind peer safety programs, was still in its pilot phase, and had yet to be fully implemented in the Gulf (*id.* ¶ 352(e)). The Court concluded in its Ludlow decision that these allegations were "sufficient to call into question the intended breadth of OMS in BP's Gulf operations," but failed to satisfy the *Tellabs II* egregious falsity standard for pleading corporate scienter. (Ludlow Opinion at 48, 79-81.)

In response, plaintiffs added allegations (first raised by the Ludlow plaintiffs at oral argument, *see* p. 4, *supra*) that (i) OMS allegedly did not apply to leased rigs in the Gulf (*id.* ¶ 352(c)); (ii) BP allegedly did not apply "key elements" of OMS, including Safety and Operations audits, to joint ventures or "exploration" in the Gulf (*id.* ¶ 352(d)); and (iii) Hayward allegedly knew that OMS had not been fully implemented in the Gulf by April 20, 2010 (*id.* ¶ 352(b)). Instead of correcting the deficiencies in the Ludlow complaint, these new allegations and the documents referenced therein demonstrate that OMS did apply to rigs leased from contractors, such as the Deepwater Horizon, and that OMS prescribed "risk-based periodic audits" of contractors. (*See supra* Section C; Ex. H at 18.)

Moreover, plaintiffs have failed to remedy the inadequacy of their scienter allegations. Plaintiffs do not allege that any individual made or is liable under Section 10(b) for this statement in BP's 2009 Annual Review. (*See* SAC ¶ 351 ("In the Annual Review, BP made misrepresentations . . . .") & App. A (attributing statement to "BP").) Plaintiffs' allegations about this statement—"made without an alleged corporate officer as a speaker, buried within BP's public filings" (Ludlow Opinion at 80-81)—do not come close to pleading corporate scienter under *Tellabs II*'s "egregious" falsity standard.

Plaintiffs attempt to plead scienter for this statement by alleging ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████ is insufficient to "link the

statement to a corporate officer" whose scienter may be imputed to BP.  (Ludlow Opinion at 77.)

That linkage is established only by allegations, not present here, that an individual "ma[d]e or

issue[d] the statement (or order[ed] or approve[d] it or its making or issuance, or . . . furnish[ed]

information or language for inclusion therein . . .)."  *Southland Sec. Corp.* v. *INSpire Ins.*

*Solutions, Inc.*, 365 F.3d 353, 366 (5th Cir. 2004).  The more plausible inference here is not

fraud, but rather that Hayward and Inglis were told and believed that OMS applied to rigs leased

from contractors as set forth in the "Working With Contractors" Sub-Element and GRP, as well

as the applicability provisions of the OMS Framework.  *See supra* Section C.

### K.     BP's 2009 Form 20-F Annual Report Dated March 5, 2010

On March 5, 2010, BP filed its 2009 Annual Report with the SEC on Form 20-F, which

was signed by Hayward.  (SAC ¶ 353.)  The Form 20-F states:

> Safe, reliable and compliant operations remain the group's first priority.  A key
> enabler for this is the BP operating management system *(OMS), which provides a*
> *common framework for all BP operations*, designed to achieve consistency and
> continuous improvement in safety and efficiency.  * * *
>
> This performance follows several years of intense focus on training and
> procedures across BP.  *BP's operating management system (OMS), which*
> *provides a single operating framework for all BP operations*, is a key part of
> continuing to drive a rigorous approach to safe operations.  2009 marked an
> important year in the continuing implementation of OMS.  * * *
>
> Following the tragic incident at the Texas City refinery in 2005 the [SEEAC] has
> observed a number of key developments, including . . . *development of a group-*

*wide operating management system (OMS) which is being progressively adopted by all operating sites . . . .* (SAC ¶ 353 (Statement O).)[15]

Plaintiffs allege that the OMS-related statements in this excerpt—previously dismissed for failure adequately to allege that they were false or misleading (NY/OH Opinion at 81 & n.27)—were fraudulent because OMS did not apply "to BP's operations where BP leased rigs from others." (SAC ¶ 354(b).) As explained above, the SAC and documents it references show that OMS is a "framework" that applies to contractors, including those operating rigs leased by BP. *See supra* Section I.G. And regardless of whether these statements are adequately alleged to be false or misleading, plaintiffs have not adequately pleaded scienter. Documents allegedly shown to Hayward, including the Gulf of Mexico OMS Handbook, establish that OMS applies to contractors such as Transocean. *See supra* Section I.B. In view of these internal documents supporting the challenged statements, plaintiffs have not alleged facts that give rise to a strong inference that Hayward acted with scienter in signing BP's 2009 Annual Report. *See Officemax*, 2002 U.S. Dist. LEXIS 27019, at *51 (lack of "divergence" between internal studies and public statements undercut scienter inference).

## L.      Inglis's Speech at Howard Weil Energy Conference on March 22, 2010

During a speech at the Howard Weil Energy Conference, Andrew Inglis stated:

*Safety and operational integrity underpins everything we do, and we are now in the final phase of rolling out our operating management system that provides a single, consistent framework for our operations, covering all areas from personal and process safety to environmental performance.* And I am pleased to say that in 2009 we saw continuing improvement in all aspects. (SAC ¶ 355 (Statement P).)

---

[15] Where defendants do not challenge the adequacy of plaintiffs' pleadings for a portion of a statement—here, the statement concerning progress made after the Texas City incident—plaintiffs' bolding of that portion of the statement is not included.

Plaintiffs allege, as they did in the dismissed Ludlow complaint, that this statement was false or misleading because (i) after a reorganization, key personnel in the Gulf allegedly lacked the experience of those they replaced and lacked knowledge of OMS (SAC ¶ 356(e), (f)); (ii) a confidential witness claimed that OMS in 2009 and 2010 lagged behind peer safety programs, was still in its pilot phase, and had yet to be fully implemented in the Gulf (*id.* ¶ 356(h)); and (iii) according to another confidential witness, BP failed to implement "an appropriate OMS protocol" that would have raised awareness about the impact of cost-cutting on safety at the Deepwater Horizon rig (*id.* ¶ 356(g)). In its Ludlow decision, the Court found "that Plaintiffs have alleged facts sufficient to call into question the implementation of OMS in BP's Gulf operations" (Ludlow Opinion at 50), but held that the Ludlow complaint contained "no specific scienter allegations with respect to Inglis" (*id.* at 76).

Plaintiffs responded by alleging that (i) OMS allegedly did not apply to leased drilling rigs in the Gulf (*id.* ¶ 356(b)); (ii) GORC allegedly decided not to apply "key elements" of OMS, including Safety and Operations audits, to joint ventures or "exploration" in the Gulf (*id.* ¶ 356(c)); and (iii) Inglis sent an email on July 13, 2009 expressing concern that contractors were not meeting BP's expectations for "conformance" to the Control of Work practices—a part of OMS (*id.* ¶ 356(d)). These allegations and the documents on which they rely establish that, contrary to plaintiffs' contention, OMS did apply to contractors and Inglis's characterization of OMS as a "single, consistent framework" was accurate. *See supra* Section C.

Moreover, plaintiffs have not remedied their deficient scienter allegations with respect to Inglis. (Ludlow Opinion at 76-77.) At his deposition, which is cited in the SAC (*e.g.* SAC ¶ 46), Inglis testified that "OMS did apply" to the Deepwater Horizon and to contractors generally. (Ex. J at 191:4-9.) Inglis also rejected suggestions by counsel that he assume that OMS did not

apply to the Deepwater Horizon, testified to his deep "belief" and understanding that OMS did apply, and explained how OMS in fact applied to leased rigs. (*Id.* at 193:9-18.) This testimony is consistent with documents plaintiffs themselves allege Inglis received, ███████████████

████████████████████████████████████████████████

██████████████████████████ In addition, Inglis's July 2009 email (referenced in the SAC at ¶ 356(d)) shows that he expected contractors to conform with OMS's Control of Work requirements and that when he learned that contractors were not operating within that framework, he sought to achieve "conformance" (SAC ¶ 356(d); Ex. Q). And plaintiffs still do not allege that Inglis was aware of any contrary information supposedly known to confidential witnesses.[16] (*Id.* ¶¶ 114-22.) The more plausible inference therefore is that Inglis understood and believed that OMS was "a single, consistent framework for our operations, covering all areas" of BP. (*Id.* ¶ 355.)

### M.   Hayward's Statement in BP's 2009 Sustainability Review Dated April 15, 2010

The "Group Chief Executive's Review" section of BP's 2009 Sustainability Review states:

> ***Having been initially introduced at eight sites in 2008***, the OMS rollout extended to 70 sites by the end of 2009, including all our operated refineries and petrochemicals plants. ***This means implementation is 80% complete.*** (SAC ¶ 359 (Statement R).)

According to plaintiffs, this statement was false or misleading because (i) OMS allegedly did not apply to leased rigs in the Gulf (*id.* ¶ 360(d)); (ii) a confidential witness claimed that OMS in 2009 and 2010 lagged behind peer safety programs, was still in its pilot phase, and had

---

[16] Plaintiffs have dropped the allegation in the original New York and Ohio complaint that Kevin Lacy resigned because of safety concerns about BP's Gulf operations and that he communicated those concerns to Inglis—the only allegation in either original complaint that purported to connect Inglis to any information contrary to public statements. (Doc. 113 ¶¶ 118-19.)

yet to be fully implemented in the Gulf (*id.* ¶ 360(i)); (iii) ██████████████████████
████████████████████████████████████████████████ ██ ██████████

(iv) Hayward and Inglis received the quarterly Orange Books, which "put them on notice that the Gulf of Mexico had not completed the transition to OMS" (*id.* ¶ 360(f)); (v) █████████
████████████████████████████████████████████████████████████████

████████████████ ██ ████████ (vi) a confidential witness said that BP failed to implement an "appropriate" OMS protocol (*id.* ¶ 360(j)); and (vii) defendants failed to disclose BP's safety record, BP's alleged lack of a legitimate OSRP, BP's alleged understatement of the risks of its operations and overstatement of their rewards, and BP's alleged lack of adequate internal safety/risk management protocols (*id.* ¶ 360(k)).

In addressing the Ludlow complaint, the Court found that this statement was adequately alleged to be false or misleading because "[i]f Plaintiffs can prove what they allege—that OMS was not actually implemented in the Gulf in 2008"—it could not be true that OMS had been introduced at eight sites in 2008 or that its implementation was "80% complete" as of April 2010. (Ludlow Opinion at 40-41.) The SAC and documents on which it relies show that Hayward's statement in BP's 2009 Sustainability Review concerning the implementation of OMS was accurate. ██████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████



The SAC also fails to allege facts that create a "cogent and compelling" inference that Hayward acted with scienter. *Tellabs*, 551 U.S. at 324. Rather, the fact that Hayward's statement is consistent with internal reports creates a "plausible nonculpable explanation" of his actions. *Flaherty*, 565 F.3d at 212. ███████████████████████ ██ fourth quarter 2009 Orange Book received by Hayward, which plaintiffs allege was the authoritative source of information about OMS implementation. (SAC ¶¶ 44, 87-89, 152, 154-44, 356, 365.) Plaintiffs thus cannot plead a strong inference that Hayward intentionally made a false statement or acted with a high degree of recklessness.

Plaintiffs' additional scienter allegations—that (i) Hayward allegedly knew that the risk of a deepwater blowout was one of the highest to BP (*id.* ¶ 360(h)); (ii) Hayward was responsible for OMS implementation (*id.* ¶ 360(a)); and (iii) Hayward and Baxter allegedly testified that they "knew" OMS was not implemented in the Gulf in 2008 (*id.* ¶ 360(b))—do nothing to alter this conclusion, or the Court's conclusion that plaintiffs previously failed to allege scienter for this statement (Ludlow Opinion at 75-76). Hayward's testimony makes clear that his knowledge of the status of OMS implementation came from the Orange Books (SAC ¶ 89), ███████████████

---

[17] Plaintiffs also do not adequately allege that this statement was false or misleading in light of their allegation (not present in the Ludlow complaint) that "BP introduced OMS at 12 representative pilot sites" in 2007. (SAC ¶ 95.)

███████████████████████████████████ Moreover, the alleged

misstatement contains only general information and does not even mention deepwater drilling or

the Gulf of Mexico, weighing heavily against any inference that Hayward intended to mislead

anyone about the status of OMS implementation in the Gulf.

### N.    BP's 2009 Sustainability Review Dated April 15, 2010

BP's 2009 Sustainability Review contains the following statement not attributed to any

individual:

> BP's operating management system (***OMS) provides a single framework for all
> BP operations to follow***, covering all areas from process safety, to personal
> health, to environmental performance.
>
> Providing an integrated and consistent way of working, the OMS helps ensure
> that a rigorous approach to safe operations continues to be taken.  Its principles
> and processes are designed to simplify the organization, improve productivity,
> ***enable consistent execution*** and focus BP on performance.   (SAC ¶ 361
> (Statement R).)

Plaintiffs allege that this statement was fraudulent because (i) OMS allegedly had not

been implemented in the Gulf by April 2010 (SAC ¶ 362(d)); (ii) an internal BP strategy

document (the Gulf of Mexico OMS Handbook) warned of "major" process safety concerns in

the Gulf (*id.* ¶ 362(f)); (iii) OMS did not apply to leased rigs (*id.* ¶ 362(e)); and ██████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████  ██  ████████

In addressing the New York and Ohio complaint, the Court found that this statement was

not adequately alleged to be false or misleading, noting that plaintiffs had failed to "allege that

OMS was not properly implemented or that OMS did not apply to all of BP's operations."

(NY/OH Opinion at 81.)  Plaintiffs' new allegations and the documents referenced in the SAC

reaffirm this conclusion.  It is clear that OMS applied to leased rigs through the "Working with

Contractors" Sub-Element and GRP and that BP expected contractors to comply with OMS's standards.  *See supra* Section C. ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

Plaintiffs also fail to remedy the inadequacy of their scienter allegations.  Plaintiffs do not allege that any individual made this unattributed statement in BP's 2009 Sustainability Review or is liable for it under Section 10(b).  (*See* SAC ¶ 361 & App. A (attributing statement to "BP").)  Nor do they even try to plead corporate scienter under *Tellabs II*'s "egregious" falsity standard.  As this Court previously held, such statements—"made without an alleged corporate officer as a speaker" and "buried within BP's public filings" (here, a 37-page document)—"do not give rise to the required strong inference of corporate scienter."  (Ludlow Opinion at 81.)

In an attempt to allege scienter for this unattributed statement, plaintiffs seek to connect the document in which it appeared to Hayward and Inglis, alleging that (i) "SEEAC was required to review the 2009 Sustainability Review and make recommendations to the board concerning its adoption and publication" (SAC ¶ 362(a)), ███████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████████████████  None of these allegations—██████████████████████████████████

████████████████████████████████████—constitutes particularized facts linking Hayward or Inglis to the alleged misstatement—three sentences in a 37-page document. *Southland*, 365 F.3d at 366 (scienter imputed only where individual "ma[d]e or issue[d] the

statement (or order[ed] or approve[ed] it or its making or issuance, or . . . furnish[ed] information or language for inclusion therein . . .)"). Even if the few sentences of BP's 2009 Sustainability Review at issue could be connected to Hayward or Inglis, the SAC does not create a "cogent and compelling" inference that those sentences were spoken with an intent to defraud. Accepting plaintiffs' own allegations, both Hayward and Inglis were informed that OMS applies to "all" BP operations, and to rigs leased from contractors, and also were told that OMS had been implemented in each of the Gulf of Mexico's business entities by the end of 2009. *See supra* Sections C, D.

**O.     BP's 2009 Sustainability Report Dated April 15, 2010**

BP's 2009 Sustainability Report also contains the following statements not attributed to any individual:

> ***Preparation: we seek to ensure an infrastructure is in place to deal effectively with spills and their impacts.  Our operating facilities have the capacity and resources to respond to spill incidents and we participate in industry and international forums to coordinate contingency planning and emergency response. \*\*\****
>
> ***BP continues to implement its operating management system (OMS), a cornerstone of achieving safe, reliable and responsible operations at every BP operation.*** (SAC ¶¶ 363-64 (Statement S).)

In addressing the Ludlow complaint, the Court found that BP's statement that it "seek[s] to ensure an infrastructure is in place to deal effectively with spills" was adequately alleged to be false or misleading (Ludlow Opinion at 63-64), but concluded that plaintiffs had failed to allege corporate scienter for this unattributed statement in a lengthy public filing (*id*. at 80-81).  None of plaintiffs' new allegations alter this conclusion.  Plaintiffs point to alleged deficiencies in BP's Oil Spill Response Plan, criticisms of the spill response by the Presidential Commission and in a newspaper article, and post-hoc statements by Hayward and Suttles about the spill response. (SAC ¶ 365(j) (citing *id*. ¶¶ 274-81).)  The original Ludlow complaint contained these same

allegations (Doc. 112 ¶¶ 286, 354, 360, 362, 409, 411), and they were held to be inadequate to plead scienter.

The SAC includes a single new allegation: ███████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████ █ ████████  This new allegation is insufficient to plead corporate scienter under *Tellabs II*'s "egregious" falsity standard.  The existence of █

████████████████████████████████████████████████████████████

██████████████████████████████████████  does not come close to showing that any errors in BP's 2009 Sustainability Review were "glaring and egregious."  (Ludlow Opinion at 79.)  As this Court previously observed, "[w]here individual misrepresentations are connected to no individual corporate officer, corporate scienter is severely circumscribed." (*Id.* at 80-81.)

As with several other corporate statements, plaintiffs do not allege that any individual defendant is liable under Section 10(b) for this statement.  Plaintiffs instead seek to plead scienter by connecting Hayward and Inglis to the document.  (*See* SAC ¶ 365(a)-(c).)  This effort again fails to give rise to the requisite strong inference of "an intent to deceive or a reckless indifference to whether the statements were misleading." *Makor Issues & Rights, Ltd.* v. *Tellabs Inc. ("Tellabs II")*, 513 F.3d 702, 709 (7th Cir. 2008).  ████████████████████████

████████████████████████████████████████████████████████████

██████████████████████  ████████  ██████████████  Even if Hayward or Inglis somehow could be linked to those few sentences of a lengthy report, plaintiffs fail to allege—

despite their access to copious discovery—facts showing that either was aware or should have been aware that BP was not able to respond "effectively" to an oil spill.

Plaintiffs also allege that the statements in BP's 2009 Sustainability Report about OMS[18] were false or misleading because (i) a confidential witness claimed that OMS in 2009 and 2010 lagged behind peer safety programs, was still in its pilot phase, and had yet to be fully implemented in the Gulf (SAC ¶ 365(g)); (ii) BP's Gulf operations "had failed to implement BP's OMS in any robust manner" and those responsible for its implementation had allegedly been terminated or transferred (*id.* ¶365(h)); (iii) BP allegedly lacked a legitimate OSRP, understated the risks of its operations, and lacked adequate internal safety controls (*id.* ¶ 365(j));

(iv) ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████ and (vi) the

Presidential Commission and BP's internal reporting after the Deepwater Horizon spill concluded that decisions on the rig were not based on a proper risk analysis (*id.* ¶ 365(f), (k)).

In light of documents referenced in the SAC showing that OMS applied to rigs leased from contractors and was implemented in the Gulf in 2009 (*see supra* Sections C, D), the statements challenged by plaintiffs are not adequately alleged to be false. Plaintiffs also have not adequately pleaded corporate scienter for these unattributed statements. (*See* Ludlow Opinion at 77-81.)  The statement that "BP continues to implement its operating management system (OMS), a cornerstone of achieving safe, reliable and responsible operations at every BP operation," is not a glaring and egregiously false statement analogous to the General Motors

---

[18] The Court has not previously considered this part of the 2009 Sustainability Report because neither party challenged it in the prior complaints. (*See* Ludlow Opinion at 11 n.13.)

hypothetical discussed in *Tellabs II*. (*See id.* at 78.).  And, even if the statements could be connected to Hayward or Inglis, the more plausible inference is that those individuals believed the reports they received stating that OMS *did* apply across the company, including to contractors, and that OMS was implemented in each of the Gulf of Mexico's business entities by 2009.

## II.  PLAINTIFFS FAIL ADEQUATELY TO ALLEGE THAT THE STATEMENTS CONCERNING OMS CAUSED ANY LOSSES.

A plaintiff alleging a Section 10(b) claim must plead loss causation, that is, "a facially 'plausible' causal relationship between the fraudulent statements or omissions and plaintiff's economic loss . . . followed by the leaking out of relevant or related truth about the fraud that caused a significant part of the depreciation of the stock and plaintiff's economic loss." *Lormand*, 565 F.3d at 258.  In *Lormand*, the Fifth Circuit affirmed a district court's dismissal of a complaint for failure to allege loss causation as to certain allegedly false statements because "none of the [complaint's] alleged disclosures plausibly suggests that a significant part of the stock price's decline and plaintiff's consequent economic loss was caused by a revelation of truth."  *Id.* at 260.  As this Court put it, a plaintiff "must allege that the market responded negatively to a corrective disclosure"—a disclosure that reveals that a prior statement was "wrong."  *In re TETRA Techs., Inc. Sec. Litig.*, 2009 U.S. Dist. LEXIS 126687, at *30-31 (S.D. Tex. July 9, 2009).  The SAC here fails to satisfy that pleading standard for the statements concerning OMS.

Plaintiffs identify ten "corrective disclosures" between April 26, 2010 and June 14, 2010. (SAC ¶¶ 396-405.)  According to plaintiffs, the cumulative decline in the price of BP ADSs on those ten days was $26.23 per share—more than 43% of the price of BP ADSs on April 20, 2010 and nearly all of the loss plaintiffs attribute to defendants' alleged fraud.  (*Id.* ¶¶ 8, 406.)

- 45 -

Plaintiffs fail, however, to allege a plausible "causal connection" between that decline and the revelation of the truth about OMS because none of the supposed "corrective disclosures" corrected the alleged falsity of those statements or even mentioned OMS.  (*See id*. ¶¶ 396-405.)[19] The disclosures instead discuss the significance of the Deepwater Horizon spill, the costs of remediating the spill, the suspension of BP's dividends, BP's failure to "plug" the well, specific safety concerns with the Deepwater Horizon rig, and estimates of the volume of oil flowing from the well.[20]  Absent allegations of corrective disclosures that reveal the alleged fraud, plaintiffs have not alleged that the fraud "caused a significant part of the depreciation of the stock and plaintiff[s'] economic loss." *Lormand*, 565 F.3d at 258.

Plaintiffs' loss causation allegations here are similar to those in *Lormand*.  The complaint there alleged misstatements by US Unwired about (i) the benefits of "Type II affiliation" with Sprint and (ii) Sprint's consequent requirement that US Unwired offer a "no-deposit" calling program for subprime customers.  *Id*. at 262.  Although the Fifth Circuit found that plaintiffs adequately had alleged falsity, materiality and scienter for both categories of statements, the court affirmed the dismissal of all Section 10(b) claims based on statements about Type II affiliation because the complaint "fail[ed] to allege any disclosure that relates to US Unwired's conversion to Type II affiliation or the transfer of core functions to Sprint." *Id*. at 260.  The

---

[19] Citing analyst reports that make no mention of OMS, plaintiffs allege that "the market prices of BP ADSs were artificially inflated as a direct result of Defendants' materially false and misleading statements and omissions." (SAC ¶ 391.) Allegations of purchase price inflation (if there was any) do not adequately allege loss causation. *Dura Pharms., Inc.* v. *Broudo*, 544 U.S. 336, 342 (2005).

[20] The alleged disclosures were (i) an initial announcement by "officials" that oil was spilling into the Gulf (SAC ¶ 396), (ii) a government announcement that the spill was of national significance (*id.* ¶ 397), (iii) BP's statement that it took full responsibility for the spill (*id.* ¶ 398), (iv) BP's announcements of the rising cost of remediating the spill to date (*id.* ¶¶ 399-400), (v) speculation about possible suspension of BP dividends (*id.* ¶¶ 403, 405), (vi) revised estimates from NOAA and BP regarding the amount of oil spilling from the well (*id.* ¶¶ 397, 399, 402), (vii) news that BP failed to "plug" the well (*id.* ¶ 401), and (viii) a *New York Times* article about "safety concerns with the Deepwater Horizon rig (*id.* ¶ 402).

same principle applies here.   Plaintiffs fail to allege any disclosure that relates to OMS, its implementation in the Gulf of Mexico, or its application to leased rigs.   Consequently, all Section 10(b) claims based on OMS-related statements should be dismissed.

Some courts recognize a second method of pleading loss causation, known as "materialization of the risk," whereby "a misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions." *Lentell* v. *Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005).   Fifth Circuit law does not support this approach.   In *Lormand*, the Fifth Circuit recognized that the statements about Type II affiliation "omitted known risks of severe magnitude," such as "churn, bad debt, lack of independent control," that "had already materialized" and continued to materialize, causing losses—yet the court still upheld the dismissal of all Section 10(b) claims based on those statements for failure to plead loss causation. *Lormand*, 565 F.3d at 249, 260; *see also Catogas* v. *Cyberonics, Inc.*, 292 F. App'x 311, 314 (5th Cir. 2008) (to allege loss causation, plaintiff "must allege . . . that the market reacted negatively to a corrective disclosure").

The Fifth Circuit also rejected a theory similar to "materialization of the risk" in *Alaska Electrical Pension Fund* v. *Flowserve Corp.*, 572 F.3d 221 (5th Cir. 2009).   In that case, plaintiffs argued that "[s]o long as the difference between the market's erroneous perception of the financial condition of the company and the company's true financial condition is a consequence of the fraud, . . . a loss that results from a revelation of the company's true financial condition is caused by the fraud." *Id.* at 230 (considering loss causation on appeal of class certification decision).   The Fifth Circuit disagreed, holding that "to establish loss causation th[e]

disclosed information must reflect part of the 'relevant truth'—the truth obscured by the fraudulent statements." *Id.* ("Only information known to the market can cause a loss.").[21]

In any event, the "materialization of the risk" method of pleading loss causation does not apply where "[t]he market well understood the risk" that later appeared. *Katyle* v. *Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 477 (4th Cir. 2011). The risk of a deepwater drilling accident was known to investors and routinely disclosed by BP. (*See* Exs. S, Z-BB (BP 2009 Form 20-F, Mar. 5, 2010, at 14-16; BP 2008 Form 20-F, Mar. 4, 2009, at 8-10; BP 2007 Form 20-F, Mar. 4, 2008, at 8-9; BP 2006 Form 20-F, Mar. 6, 2007, at 8-9).) Plaintiffs themselves acknowledge that "BP [was] no stranger to catastrophic industrial incidents, including incidents related to its off-shore drilling operations." (SAC ¶ 12.) The Court also made these very points in dismissing the related ERISA action: "The Deepwater Horizon catastrophe was *not the manifestation of a novel risk unknown to investors.*" (ERISA Opinion (Doc. 337) at 31 (emphasis added); *see id.* at 32 ("Plaintiffs point to an unfortunate accident that stemmed from exactly the type of risk BP, through the very nature of its business, always faces.").) Plaintiffs fail plausibly to allege that the risk of a well blowout was concealed from the market, let alone that this risk was concealed by the alleged misstatements concerning OMS. *See Lentell*, 396 F.3d at 173.

Finally, statements about when OMS was implemented in the Gulf of Mexico (SAC ¶¶ 331, 334-35, 359 (Statements I, J & R)) could not possibly have caused any losses. The documents upon which the SAC relies show that OMS was fully implemented in the Gulf by the end of 2009, months before the Deepwater Horizon explosion. *See supra* Section D. Accordingly, even if "materialization of the risk" could be sufficient for pleading loss causation,

---

[21] That test was satisfied in *Flowserve* because the alleged misstatement was earnings guidance for fiscal year 2002, which was later revised downward, causing losses. 572 F.3d at 231. The court also rejected defendants' theory that "a plaintiff must show a 'fact-for-fact'" disclosure of information that fully corrected prior misstatements." *Id.* at 229-30.

the Deepwater Horizon explosion and ensuing oil spill could not be a materialization of the risk that OMS was not fully implemented in the Gulf.[22]

Because plaintiffs have neither identified a disclosure that corrects the alleged falsity of the OMS statements nor alleged that the OMS statements concealed a risk that materialized and caused their losses, they have failed to allege loss causation with respect to the OMS statements. Plaintiffs thus cannot plead a Section 10(b) violation with respect to those statements.

## III.    PLAINTIFFS FAIL TO STATE A SECTION 20(a) CLAIM AGAINST INGLIS.

"[T]o prove a violation of section 20(a), a plaintiff must first prove an underlying securities fraud violation and prove that the controlling person had actual power over the controlled person and induced or participated in the alleged violation." (NY/OH Opinion at 115 (citing *Dennis* v. *General Imaging, Inc.*, 918 F.2d 496, 509 (5th Cir. 1990).)  Plaintiffs do not allege that Inglis induced or participated in any alleged misstatements, except for those attributed to him (which should be dismissed).    The allegations that remain—conclusory and undifferentiated assertions about Inglis's "high-level position[]," "unlimited access" to the alleged misstatements, ability to correct them, and "direct and supervisory involvement in the day-to-day operations of the Company" (SAC ¶¶ 423-24)—are insufficient to state a claim under Section 20(a).  As this Court previously held in dismissing this claim against Inglis, plaintiffs have pointed to "no specific knowledge or facts demonstrating" Inglis's control over the challenged corporate statements.  (NY/OH Opinion at 116.)

---

[22] Plaintiffs allege that "Hayward testified that, had OMS been implemented in the Gulf of Mexico, OMS 'undoubtedly' had the potential to avoid the Deepwater Horizon disaster." (SAC ¶¶ 336(e), 360(h).)  In fact, Hayward stated:  "on the basis of your assumptions, it is potentially possible that it may have been avoided.  There are many other things that potentially possibly may have prevented the accident." (Hayward Dep. at 793:19-22.)  In responding to this line of questioning, Hayward was told to assume incorrectly that OMS was not implemented in the Gulf as of April 20, 2010. *See supra* Section D.

## CONCLUSION

Plaintiffs have not adequately pleaded a Section 10(b) violation based on the new alleged misstatements challenged in the SAC.  Plaintiffs also have failed to plead a Section 20(a) claim against Andrew Inglis.  Consequently, this action should be permitted to proceed based only on the 12 statements sustained by the Court in its February 13, 2012 rulings, and all claims against Andrew Inglis should be dismissed with prejudice.

Dated: May 2, 2012

Respectfully submitted,

OF COUNSEL:

Daryl A. Libow (pro hac vice)
Amanda F. Davidoff
SULLIVAN & CROMWELL LLP
1701 Pennsylvania Avenue, N.W.
Washington, D.C.  20006-5805
Telephone:  (202) 956-7500

Richard C. Pepperman, II (pro hac vice)
Marc De Leeuw (pro hac vice)
Matthew A. Peller
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Telephone:  (212) 558-4000

Stephen C. Neal
COOLEY LLP
3175 Hanover Street
Palo Alto, California  94304
Telephone: (650) 843-5000

Kathleen H. Goodhart
COOLEY LLP
101 California Street, 5th Floor
San Francisco, CA  94111
Telephone: (415) 693-2000

*Attorneys for Andrew G. Inglis*

*/s/ Thomas W. Taylor*
Thomas W. Taylor
Texas State Bar No. 19723875
S.D. Tex. Bar No. 3906
ANDREWS KURTH LLP
600 Travis, Suite 4200
Houston, Texas  77002
Telephone:  (713) 220-4200
Facsimile:  (713) 220-4285
ttaylor@andrewskurth.com

*Attorney-in-Charge for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing Memorandum has

been served by electronic CM/ECF filing, on this 2nd day of May, 2012.

*/s/ Thomas W. Taylor*
Thomas W. Taylor