# Exhibit O

01-369.78
EAF/dlr

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: OIL SPILL by the OIL RIG "DEEPWATER HORIZON" in the GULF OF MEXICO, on APRIL 20, 2010 | ) ) ) ) ) ) ) | MDL NO. 2179<br>SECTION: J<br>JUDGE BARBIER<br>MAG. JUDGE SHUSHAN |

**CONFIDENTIAL**

***WorldwideVIEW™***

**Interactive Deposition Digital Display**

ORAL AND VIDEOTAPED DEPOSITION OF:



# John Mogford

**VOLUME 2**

JUNE 29, 2011

***COPY***




*Systems Technology for the Litigation World*

Litigation Group•Court Reporting•Video Production•Videoconferencing

**For U.S. & International Services**
**800 - 745 - 1101**

you. I have it --

MR. LEGER: And I will confirm that I heard the DOJ attorney grant that allocation.

MR. FOWKES: I -- I'm not saying that she didn't. I'm just -- my -- my point is I think that should be on the record, and that should be done before the DOJ starts its questioning, before a party starts its questioning.

MS. HOUSE: Well, thank you.

MR. FOWKES: All right.

Q. (By Ms. House) All right. Now, Mr. Baxter and you have testified that the mobile operating drilling units, sometimes called MODUs, and -- which would include the DEEPWATER HORIZON, that they were never part of OMS and didn't have to follow the Integrity Management standards or the Management of Risk Assessments; is that correct?

(Discussion off the record.)

A. What I -- what I've said is that the OMS was designed to cover BP operated and own -- owned activities. Parts of OMS certainly frame the management -- the -- the management of risk and activity, but lots of the tools in OMS do not apply to MODUs.

Q. (By Ms. House) Okay. Who decided that that

was an acceptable approach to MODU Safety?

A. I think that we decided it, when we considered the -- the reality of how we could apply the tools to -- to Operations. We could not manage maintenance on MODUs, we could not hire and fire people on MODUs, we couldn't compensate people for not delivering their tasks on MODUs, we don't maintain the records on our MODUs, nor can we on things that are carried out.

And so the scope, it was a conscious decision as to what the scope was. I don't believe -- believe there was a conscious conversation about MODUs in it, but it was a conversation of what can we apply this to and what should we apply this to.

Q. And this conversation that you're referencing, when did it occur and who was involved?

A. I think it was as we formulated our thoughts on OMS. There was a conversation with -- I don't think it was a -- a -- eventually, the GORC signed off on it, but it was a conversation between the segment representatives and myself, John Baxter, and, actually, where -- where is the scope of this.

Q. And when you say "the segment representatives," could you be more clear?

A. It'd be -- I think at the time it was Ellis Armstrong and Sue Rataj or --

Q. Who did they -- who were they the segments representatives of?

A. They were -- one from Exploration & Production, one from Refining and Marketing who talked to their organizations to ensure that it was practical. But we -- the scope was -- we -- for instance, we had long conversations in refining and marketing about the applicability to gas stations, you know, do you need a management system on a gas station.

Q. M-h'm.

A. And we -- so -- so their segments went away and came back with a considered view of what we could do. But from -- from the start, OMS was designed for BP owned and operated and controlled sites.

Q. And did you -- these -- the particular conversation that would have to do with Exploration & Production, that segment would be the one in which the MODUs related to deepwater rigs. That would --

A. Correct.

Q. -- cover that, correct?

A. Correct.

Q. And that person was again?

A. Refine -- Refining and Marketing do not have any MODUs.

Q. Right.

A. So -- so I -- I believe it was Ellis Armstrong, but I -- I may be slightly wrong. But Ellis was in -- in that role at the time.

Q. And these conversations, were they in formal meetings? Were -- how did they take place?

A. We had a OMS Steering Workgroups which were lead by John Sieg, who worked for me, and John worked with the -- with the segments, and then the segments talked to the VPs, and then we talked about it at the Fun -- as we called it, the Functional Steering Group.

Q. And you, obviously, have a clear memory of the gas station discussions. Do you have any specific memory of discussing coverage of the MODUs?

A. No, no. Just a conversation that we cannot implement this on sites that we don't operate.

Q. M-h'm. And you said that it was relayed to the GORC Committee. How was it relayed?

A. Through the OMS document, it was approved, and the scope was approved at the -- at -- at the GORC.

Q. And was there explicit discussion with the GORC that third party contractors were not going to be covered?

A. No, but there was a discussion that the scope was that it applied to BP owned and operated and controlled sites.

Q. M-h'm. And would that -- would that be documented in Minutes?

A. It would be documented, I believe, that the OMS was endorsed for roll-out. It was within the OMS document.

Q. But other than the endorsement of the OMS and what it specifically cover -- covered, you don't have any memory of discussing specifically --

A. No. Because there were --

Q. -- what wasn't covered?

A. There were -- it was -- there were three-tier conversations or detailed conversations within the segments, then the OMS Steering Group, and then through to the segment Chief Executives with their own representatives, and then at the GORC, which was final endorsement or challenge, if people didn't agree with it.

Q. Okay. Now, you understand that if BP is relying on its drilling contractors' safety processes, that BP is still accountival -- accountable for meaningful verification of the strength and quality of those processes to BP's own standards, correct?

A. That is -- I -- I don't think I've said that, and I would use slightly different words. But I think that the operator does have to verify appropriately the

Safety Management systems of drilling contractors and provide -- and make sure there are effective bridges in place.

Q. And that's a critical BP fallback, correct? That's a -- that's a part of the Process Safety system, that you have meaningful verification of those third party contractors' safety processes?

A. Yeah -- verify -- verify that they are in place, but cannot en -- ensure that they are complied with.

Q. But you have to verify they're in place, and you have to verify that they're robust, correct?

A. Correct.

Q. Could you please go back to -- I -- I believe it was marked Tab 4 by the Government yesterday. I'll show you the document again, and that was Exhibit 278.

A. Yeah.

Q. Here, I can give you one with a -- that's stapled, if you prefer.

MR. FOWKES: Thank you.

Q. (By Ms. House) And if you look at -- this was the document, just to clear up the record, this was Exhibit 278, the March 2001 document called "getting HSE right" --

MS. HOUSE: Can you pass that to him?

Q. (By Ms. House) -- "a guide for BP managers." And if you look on Page 6 of that document, you can confirm that you've signed -- that's your signature there?

A. That is my signature there.

Q. So this was document, right?

A. I'm on a lot of papers, aren't I?

Q. So -- so this was your document, correct?

MR. FOWKES: Object to the form.

A. I -- I approved it. It was issued under the Chief Executives' Authority.

Q. (By Ms. House) Okay. And if you could turn to Page 13. It's titled: "Element 4: Working with Contractors and Others." And it reads, starting at the top: "Contractors, suppliers and others are key to our Group business performance and we will assess their capabilities and competencies to perform work on our behalf. We will work together with them to ensure our HSE Expectations are aligned."

And "HSE" is what again?

A. Health, Safety, and Environment.

Q. And then there are a variety of "Expectations" that are listed below, correct?

A. Correct.

Q. And 4.1, at the end of it, it references

"...including a system for assuring their compliance."

Do you see that?

A. That's correct, m-h'm.

Q. And so BP was to make sure there was a system for assuring compliance, correct?

A. Yes, when this policy was in place, yeah.

Q. Okay. And then 4.2, references: "Hazards and risks associated with contractor and procurement activities in our businesses are identified, managed and communicated."

And that was a requirement of BP, correct?

MR. FOWKES: Objection, form.

A. It was stated in the policy, in an "Expectation," yes.

Q. (By Ms. House) And 4.4 reads: "Clear deliverables and performance standards are agreed to and systems are put in place to assure HSE and technical compliance."

And that was also a requirement, correct?

A. Correct.

Q. Could you turn to what was marked in Halliburton's questioning of you yesterday. I believe it was 6274. And ex -- exhibit -- pardon me. Sorry. Frog in my throat.

Exhibit 6274 are -- is the cover sheet from

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

SUBSCRIBED AND SWORN to by me on this 29th day of June, 2011.

______________________________

Emanuel A. Fontana, Jr., RPR
Texas CSR No. 1232
Expiration Date: 12/31/12
Worldwide Court Reporters
Firm Registration No. 223
3000 Weslayan, Suite 235
Houston, Texas 77027
(713) 572-2000