

# IN RE OFFICEMAX, INC. SECURITIES LITIGATION

## Case No. 1:00-CV-2432

### UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO, EASTERN DIVISION

*2002 U.S. Dist. LEXIS 27019*

**March 26, 2002, Decided**

**SUBSEQUENT HISTORY:** Reconsideration denied by, Motion denied by *In re OfficeMax, Inc. Sec. Litig., 2002 U.S. Dist. LEXIS 28060 (N.D. Ohio, July 26, 2002)*

**DISPOSITION:** [*1] Defendants' Motion to Dismiss GRANTED. Case DISMISSED.

**COUNSEL:** For Bernard Fidel, Plaintiff: Stephen P. Polapink, LEAD ATTORNEY, Milberg, Weiss, Bershad, Haynes & Lerach, Frederick B. Burnside, William S. Lerach, Milberg, Weiss, Bershad, Hynes & Lerach, San Diego, CA.

For Bernard Fidel, Plaintiff: Jack Landskroner, Landskroner Law Firm, Cleveland, OH.

For OfficeMax, Inc., Michael Feuer, Jeffrey L. Rutherford, Defendants: Daniel P. Mascaro, Progressive Corporation, Mayfield Village, OH.

For OfficeMax, Inc., Michael Feuer, Jeffrey L. Rutherford, Defendants: James R. Wooley, Marcia E. Marsteller, Baker & Hostetler, Cleveland, OH.

For OfficeMax, Inc., Michael Feuer, Jeffrey L. Rutherford, Defendants: Robert S. Rifkind, Cravath, Swain & Moore, Roger G. Brooks, Cravath, Swaine & Moore, New York, NY.

**JUDGES:** KATHLEEN McDONALD O'MALLEY, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** KATHLEEN McDONALD O'MALLEY

**OPINION**

*MEMORANDUM & ORDER*

Defendants OfficeMax, Inc. (OfficeMax), Michael Feuer, and Jeffrey L. Rutherford, pursuant to *Federal Rules of Civil Procedure 9(b) and 12(b)(6)*, move this Court to dismiss [*2] Plaintiffs' Second Amended Complaint alleging securities fraud. (Docket No. 52.) Plaintiffs, a class consisting of stockholders who purchased OfficeMax stock (or publicly-traded options) between March 2, 1999, and September 30, 1999, allege that the Defendants made false or misleading statements which had the effect of artificially inflating the price of that stock to the detriment of the Plaintiffs. In moving for dismissal, Defendants argue, among other things, that the Complaint fails to sufficiently allege scienter, both because it lacks particularity as to that element and because it does not allege facts creating a "strong inference" of scienter as required under the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737 (codified in various sections of *15 U.S.C. §§ 77a et seq.* and *§§ 78a et seq.*) ("PSLRA").

After considering the parties' briefs and the points raised at oral argument, [1] the Court finds Defendants'

argument with respect to scienter well taken. Because the allegations in the Complaint do not state with particularity facts giving rise to a strong inference of scienter, the Court **GRANTS** Defendants' **[*3]** motion and **DISMISSES** the case.

> 1   During oral argument on August 9, 2001, the Court denied on the record the Plaintiffs' Motion to Strike Extrinsic Exhibits and All References thereto. (Docket No. 58.) At that time the Court noted that the motion was denied because it was not the most appropriate vehicle for making determinations concerning whether these items were appropriate for the Court's consideration. Except to the limited extent noted in footnote 6 below, the Court has found it unnecessary to rely on the items to which Plaintiffs objected. (Mot. to Strike at 1, n.2.) Thus, again except as noted below, the objections underlying that motion are moot.

**I. THE COMPLAINT**

Plaintiffs claim financial harm arising from false or misleading statements by Defendants that allegedly had the effect of artificially inflating the price of OfficeMax stock during the period in which Plaintiffs purchased the stock or options--between March 2, 1999, and September 30, 1999 (the "Class Period"). Specifically, Plaintiffs **[*4]** claim that Defendants made, or induced others to make, a series of statements about anticipated profitability and earnings potential which Defendants knew were false or misleading in light of the true state of OfficeMax's operations.

OfficeMax, headquartered in Shaker Heights, Ohio, operates a chain of high volume, deep-discount office supply superstores across the United States, as well as many smaller format stores and an online office supply e-commerce site. Its business is separated into two segments: A Core Business Segment, consisting of everything but computer sales (e.g., office supplies, business machines, peripherals, and copying services), and a Computer Business Segment. Defendant Feuer is the founder and Chief Executive Officer (CEO) of the company, while Defendant Rutherford is the Chief Financial Officer (CFO). The 68-page Complaint outlines Plaintiffs allegations by, first, describing the Defendants' "scienter and scheme." Then, the Complaint sets forth a number of allegedly false or misleading statements either made by Defendants directly or made by analysts but, Plaintiffs allege, attributable to Defendants. These statements are separated into three time periods: **[*5]** March-April, May-June, and August of 1999. For each of the three time periods, a separate list of "true but concealed facts" are alleged which, Plaintiffs assert, render the statements either false or misleading. Each list of facts contains between 24 and 26 allegations each, although many "true but concealed" facts alleged in one list are also contained in the others. Finally, the Complaint alleges several violations of Generally Accepted Accounting Principles (GAAP). The allegations are described in more detail below.

A. *Conditions of OfficeMax Prior to the Class Period.*

1. *Stock price downturn.* The Complaint alleges that, in the months immediately preceding the Class Period, OfficeMax was in deep trouble. In the second quarter of fiscal year 1998, OfficeMax stock fell to between $ 7 and $ 8 per share, down from a $ 19 5/8 high of two quarters earlier. Describing OfficeMax as the office supply industry "stepchild," perennially ranking behind the industry leaders Office Depot and Staples, the Complaint notes that, despite rapidly expanding its number of warehouse stores during fiscal years 1996, 1997, and 1998, OfficeMax reported sharply declining earnings per share **[*6]** (EPS) in fiscal year 1998 (ending on January 23, 1999).

The Plaintiffs postulate both a number of causes, and a number of effects, of this downturn. Among its causes were increasing losses from its computer sales and an "extraordinarily-high executive turnover, particularly during the summer of 1999, as many executives refused to work with Feuer, who maintained ironclad control over all of OfficeMax's day-to-day operations." (Compl. P 3.) 2 The effect of the downturn was to pressure OfficeMax's top officers, Feuer and Rutherford, to improve its operating results and stock price. (Compl. P 4.) According to the Complaint, the pressure was of such magnitude that Feuer realized that "unless OfficeMax was turned around, his position as CEO was in danger." (*Id.*)

> 2   Stressing that the executive turnover problem was most acute in the summer of *1999* in a paragraph alleging its causative role in the stock price drop of *1998* creates, at least, some chronological confusion for the reader of the Complaint. The effects of the Complaint's

numerous inconsistencies is more generally discussed in Section III.B, *infra.*

[*7] 2. *Hidden condition of OfficeMax.*

The Complaint's "true but concealed facts" sections allege a multitude of troubling conditions at OfficeMax, many of which allegedly preexisted the Class Period and all of which the investing public was purportedly unaware. The Complaint alleges that the procurement system for its Core Business Segment was "badly flawed" and "defective" (Compl. PP 11(b), 11(o)). Moreover, it alleges, OfficeMax's inventory control systems for both its Core and Computer Business Segments operated inefficiently and ineffectively (Compl. P 11(g)) and lacked internal infrastructure (Compl. P 11(c)), resulting in massive excess inventory. OfficeMax policies, according to the Complaint, exacerbated the procurement and inventory problems. These policies included (1) a policy of never having sales (Compl. P 11(p)); (2) a policy of putting older inventory in back rooms so that customers would be more likely to buy new items (Compl. P 11(q)); and a policy of overstocking its stores with merchandise (Compl. P 11(u)). The Complaint also alleges that Feuer did not open or close stores responsibly. It states, "Not only did Feuer require certain new stores to open knowing that [*8] the forecasted sales for those new stores would be less than the internally required amount to open a new store ... but Feuer also refused to close existing stores that continually operated at a loss." (Compl. P 11(k)). Moreover, new store openings were not well coordinated with purchasing. For example, many stores were opened after back-to-school shopping season and remained overstocked with back-to-school merchandise. (Compl. P 11(t)). According to the Complaint, this was the state of affairs prior to the Class Period.

3. *Feuer's and Rutherford's scienter.* The Complaint alleges that Feuer and Rutherford behaved either purposely or recklessly in deceiving the investing public about OfficeMax's condition. It alleges knowledge of the "true but concealed facts" detailed throughout the Complaint, along with opportunity to conceal them and a motive to do so.

a. *Knowledge.* Feuer and Rutherford, as top OfficeMax executives, had access to a bevy of reports and records that purportedly kept them informed of OfficeMax's operating and financial conditions. The Complaint alleges that each were "hands on" managers, dealing daily with important issues facing OfficeMax's business. (Compl. [*9] P 23.) Inventory is a major concern for an office supply superstore such as OfficeMax, particularly because of its strategy to compete with Staples and Office Depot by continuing to open new stores. The Complaint alleges that, because inventory control was so important, both Feuer and Rutherford "must have had" knowledge of the inventory problems described above. In particular, each had access to reports generated by "StoreMax," such as "Top Performer" reports (used to track inventory by quantity and to assess margin and total sales dollars of products) and an "inventory control book" (a program that tracked discontinued products), as well as daily reports directly from stores. (Compl. P 26.)

The Complaint also notes that a consultant report highlighted these inventory problems. During fiscal years 1998 and 1999, Kurt Salmon & Associates ("Salmon") conducted a three stage study of OfficeMax's inventory management. The Complaint notes that "by early F99, as Salmon was about to begin the third phase of the comprehensive business study," it had reached several conclusions which are paraphrased in the Complaint. These conclusions include that "OfficeMax's procurement and inventory policies [*10] were materially deficient and inadequate for the size of its business--especially given its expansion program," and "OfficeMax's rapid expansion program was outstripping OfficeMax's already inadequate procurement and inventory policies." (Compl. P 37.) With an inadequate inventory control system and "lack of management talent," the Salmon study concluded that OfficeMax would need to curtail its expansion program to regain control over its Core Business Segment. (Compl. P 21.)

b. *Motive/Opportunity.*

The Complaint alleges that Feuer and Rutherford had the opportunity to commit fraud, because they controlled company press releases and Securities and Exchange Commission (SEC) filings, while their executive positions gave them access to insider information. As for motive, the Complaint cites the stock drop noted above--from an all time high of 19-5/8 in April 1998 to $ 7-$ 8 per share in February 1999, just before the start of the Class Period. Plaintiffs claim that this downturn caused "extreme dissatisfaction" among OfficeMax shareholders, causing Feuer to realize that, absent improved operating performance, his position as CEO

would be "in danger." (Compl. P 44.) The Complaint [*11] does not, however, describe any particular conditions that would highlight or quantify that danger, such as an imminent takeover bid or proxy war. Nor does it suggest any insider trading, bribery, or other financial self-dealing by the Defendants.

4. *Restructuring.* In January 1999, two months before the Class Period began, OfficeMax announced that it was dramatically changing its business model. From then on, it would only sell computers made by IBM and one other manufacturer (Comp. P 5). It launched an experimental program of selling IBM computers in a "store-within-a-store" format, whereby IBM personnel (or OfficeMax personnel trained by IBM) handled the computer sales and in which IBM bore the risk associated with computer inventory control. Coincident with the restructuring, OfficeMax announced that it would now report its Core Business Segment and Computer Business Segment financial results separately. It also announced that it was raising its Core Business Segment inventory items by about 1,000 items per store. Finally, it announced an approximately $ 80 million pre-tax inventory writedown to address obsolete and discontinued computer inventory. (Compl. P 45.) Plaintiffs [*12] claim that Defendants' $ 80 million writedown of inventory, in context, was understood by investors as eliminating "all" excess inventory. (Compl. P 11(a)). Plaintiffs do not point to any statement made by OfficeMax or anyone acting on its behalf, however, assuring investors that the $ 80 million writedown would have such an effect on its inventory.

Plaintiffs highlight particular aspects of OfficeMax's announcement about its new strategy, including the following excerpts from OfficeMax's January 19, 1999, press release:

> The Company stated that this will give investors better visibility to OfficeMax's financial results and the consistent positive growth for its Core Business Segment .... OfficeMax said that its Core Business Segment has been strong and gaining momentum over the past three years .... [Feuer stated,] "Our consistent sales and earnings growth in the Core Business Segment has been overshadowed on a consolidated basis by the losses sustained in our computer business. Our improving operating results will be more clearly depicted through segment reporting as we continue to develop and implement the new strategy for our computer business as well as ongoing improvements [*13] in our core supply business."

(Compl. P 46.) [3]

> 3   Although not at issue in this motion, the Court notes that the timing of the deceptive practices appears somewhat inconsistent with the Class Period selected. Plaintiffs suggest, without actually alleging, that the entire restructuring initiative, from the very beginning, was a ruse to artificially inflate OfficeMax's stock. (*See* Compl. P 44-46). If this were the case, then the deception would have begun in January 1999, when the restructuring was announced, rather than March 2, 1999, when the Class Period begins.

The Complaint also concedes, however, that OfficeMax was addressing its inventory problems in two other ways. During the Class Period, "OfficeMax was in the process of attempting to remedy the procurement and inventory management problems by reconfiguring its supply chain-store-distribution processes." Moreover, OfficeMax was "installing a new, more high powered and sophisticated computerized purchasing and inventory control system made [*14] by SAP - a huge European software maker." (Compl. P 30.) The Complaint nevertheless alleges that these changes were "taking much longer than had been anticipated." (*Id.*)

B. *Statements Made During the Class Period.*

Plaintiffs allege that, during the Class Period, Defendants made numerous statements about OfficeMax's financial and operating condition that were either false or misleading; Plaintiffs allege that the Defendants knew that OfficeMax could not perform at the optimistic level that the Defendants communicated to the investing public. The bulk of these statements were made in releases of quarterly reports, during follow-up discussions of those releases with analysts, or by analysts themselves, who, Plaintiffs claim, were just parroting what they were told by Defendants. The Complaint alleges that the fraudulent statements ceased on September 30, 1999, when OfficeMax revised its forecasts and adopted a substantially more pessimistic stance. Each time segment is discussed below.

1. *March 2, 1999 through April 1999.*

The Class Period begins on March 2, 1999, when OfficeMax reported its results for the fourth quarter of fiscal year 1998 and for the balance of that **[*15]** fiscal year. Plaintiffs highlight two excerpts from the report that they consider deceptive: first, a quote from Feuer in which he says, "Our focus on improving merchandise margins through an enhanced product assortment ... is reflected in our overall improved gross profit" and "the strength of our balance sheet ... provides us financial flexibility to take advantage of future opportunities." (Compl. P 49.) Plaintiffs then allege that, on the same day, subsequent to the release of the report, OfficeMax held a conference call for analysts and other interested parties to discuss OfficeMax's results and future prospects. The Complaint summarizes the statements allegedly made by Feuer and/or Rutherford during the conference call as follows:

> . OfficeMax had revised its business model to lessen the losses from its Computer Segment, while increasing its profits from its Core Business Segment - which were due to a large increase in the number of SKUs sold by the Core Business Segment and to an improving inventory management in its Core Business Segment - which would result in OfficeMax achieving strong EPS growth during fiscal year 1999 and fiscal year 2000.
>
> . OfficeMax's Core **[*16]** Business Segment was performing extremely well and had strong positive momentum, which would lead that Segment to achieve strong EPS growth during fiscal years 1999 and 2000.
>
> . OfficeMax's Core Business Segment was significantly improving its inventory management and control, such that OfficeMax's inventories in the Core Business Management Segment were being more effectively and efficiently utilized and managed, boosting the profits and EPS of the Core Business Segment and of OfficeMax overall.
>
> . OfficeMax's Core Business Segment profitability was boosted by the significant expansion of the number of SKUs carried by OfficeMax's Core Business Segment (about 1,000 items per store) and in the increased sales of more profitable items.
>
> . The inventories in OfficeMax's Core Business Segment were well managed and under control.
>
> . The acceleration of OfficeMax's aggressive new store expansion plan was proceeding successfully, was under control and would further boost OfficeMax's revenues and profits and EPS.
>
> . OfficeMax's new store expansion program would boost OfficeMax's revenues, profits, and EPS during the 3rd quarter and 4th quarter of fiscal year 1999.
>
> . **[*17]** As a result of the foregoing, OfficeMax was forecasting fiscal year 1999 EPS of $ .90-.93 and fiscal year 2000 EPS of $ 1.05-$ 1.10.

(Compl. P 50.) As a result of the conference call and follow up discussions with senior management, many analysts wrote reports about OfficeMax's current financial position and future prospects. Plaintiffs imply, without specifically alleging, that all the statements contained in the analysts' reports are directly attributable to Feuer and Rutherford. The analysts' reports, excerpted in some detail in the Complaint, each generally paint an optimistic view of the changes being made by OfficeMax, including quotes such as "core business is on the upswing and quite profitable" (Compl. P 51). Some contain specific comments on inventory control: "While management intends to reduce the FY end inventory tally by approximately $ 200 million, the addition of 100 new stores (stocking about $ 1.3 million in inventory each), plus two new delivery centers and a new PowerMax distribution facility should offset." (Compl P 56.) The Complaint summarizes Plaintiffs' view of the March 1999 communications to analysts and investors as follows:

> OfficeMax assured **[*18]** analysts and investors that its newly organized business model was off to a good start, with its 1st quarter F99 Core Business Segment sales running at or ahead of plan; that the Core

Business Segment's profit margins were increasing; and that OfficeMax's Core Business Segment would achieve comparable "same store" sales growth (sales in the Core Business Segment at stores open at least a year) in the mid-single digits during F99.

(Compl. P 7.) In April 1999, OfficeMax issued its fiscal year 1998 Annual Report. It included a letter from Feuer that is excerpted in detail in the Complaint. The excerpts include a summary of yearly sales and three paragraphs concerning the PowerMax system, a supply-chain distribution system launched in 1998. Although much is excerpted, two of Feuer's statements are highlighted in bold by Plaintiffs: first, "We positioned the Company for future growth and market leadership by implementing our latest superstore format - Millennium 8.0 - and launching our smaller footprint OfficeMax PDQ pilot store"; and second, "We believe the major changes we have made in 1998 and our future expansion plans will provide very meaningful returns in the years ahead. **[*19]** " (Compl. P 58.)

After describing the statements made in the March 2nd report, the conference call statements, the statements made by analysts but attributed to Feuer and Rutherford, and the Feuer letter contained in the 1998 Annual Report, the Complaint then asserts that "each of the statements made between March 2, 1999 and April 1999 were false or misleading when issued." (Compl. P 59.) It then lists twenty-four "true but concealed facts" that allegedly demonstrate the falsity of each of the statements made. As summarized earlier, these alleged facts describe problems at OfficeMax, including inventory problems, policies which exacerbated those problems, unprofitable policies with regard to opening new stores or closing existing ones, and the high level of executive turnover caused by Feuer's harsh management style. (*Id.*) The Complaint alleges that the Defendants knew that, "as a result of the foregoing adverse conditions in OfficeMax's business, OfficeMax could not, and would not" achieve anything near the optimistic forecasts made by the company. (*Id.*)

2. *May and June 1999.*

On May 11, 1999, OfficeMax reported its first quarter fiscal year 1999 results. That release **[*20]** is quoted in much detail, with approximately half of it highlighted by the Plaintiffs in bold typeface. (Compl. P 60.) In the Complaint's "summary" section, the Plaintiffs identify the particular aspects of the May and June 1999 statements that they assert are particularly relevant:

> OfficeMax reported better than forecast 1st quarter F99 results - consolidated EPS of $ .19. OfficeMax also reported its separate Core Business Segment results for the first time, showing Core Business Segment EPS of $ .25. OfficeMax attributed these better-than-expected results to the success of its revamped business model and attributed the increased earnings of its Core Business Segment to the Core Business Segment's enhanced merchandise selection, better product assurances and OfficeMax's success in managing the inventories of its Core Business and Computer Business Segments. OfficeMax also stated that its ambitious new store expansion program was proceeding ahead of plan ... and that this would mean "very positive implications" for 2nd half F99 financial results. OfficeMax also assured investors that its enhanced cash flow was the result of its improved supply chain management.

(Compl. **[*21]** P 7.) Following the release of the first quarter results, OfficeMax again held a conference call with analysts to discuss the results and future projections, during which, according to the Complaint, Feuer and Rutherford essentially repeated the points they made in the March 2, 1999 conference call, except that they allegedly increased their "forecasted" F99 EPS to $ .93-.95 and F00 EPS to $ 1.05-$ 1.15. Following a summary of that conference call, the Complaint lays out in detail a number of analysts' reports throughout May and June that, again, it implies are directly attributable to Feuer and Rutherford. These statements, again, are generally optimistic statements about OfficeMax's short term and long term prospects. They include, and the Complaint sets out in bold, statements such as, "The Company believes the acceleration of store openings will be very beneficial in the fourth quarter, when OfficeMax typically generates about 30% of OfficeMax's sales and nearly 45% of the company's earnings" (Compl. P 62) and, "We see significant upside potential in second half of year." (Compl. P 65.)

After detailing these analysts' reports (which stretch through May and the beginning of June), **[*22]** the Complaint then asserts that "each of the statements made between May 11, 1999 and June 8, 1999 were false or misleading when issued." (Compl. P 70.) It then lists the "true but concealed facts" that substantially repeat the "true but concealed facts" that were earlier listed to demonstrate the falsity of the March and April statements. Again, these "true but concealed facts" include reference to inventory problems, procurement problems, executive retention problems, as well as allegations that OfficeMax's revised business model "was not working, as its rapid expansion of the number of SKUs sold by its Core Business Segment, about a thousand items per store, was resulting in the accumulation of millions of dollars worth of merchandise, which was not selling well." (Compl. P 70(d).) It also highlights other policy changes that had not done well, particularly a new program called the "flat rate discount program" which applied only to new corporate customers, allegedly outraging existing customers who did not benefit from the program; existing customers allegedly ceased doing business with OfficeMax. (Compl. P 70(j).) As it did with the March and April statements, the Complaint here **[*23]** alleges with respect to the May and June statements that Defendants knew that, "as a result of the foregoing adverse conditions in OfficeMax's business, OfficeMax could not, and would not" achieve anything near the optimistic forecasts made by the company. (Compl. P 70.)

3. *August 1999.*

On August 10, 1999, OfficeMax reported its second quarter fiscal year 1999 results. Again, the Complaint sets out the press release, again it describes a conference call to analysts on the same day in which optimistic forecasts were made, and again it describes, in detail, analysts reports following the conference call. The Complaint summarizes these statements as follows:

> OfficeMax reported its 2nd quarter F99 results (typically the weakest quarter of OfficeMax's fiscal year), which were in line with forecasted levels: consolidated EPS of $ .02 and Core Business Segment EPS of $ .07. OfficeMax also announced that it was going to further accelerate its ambitious new store expansion program so that it would open more stores in F99 than previously indicated (115 stores instead of the previously announced 100 stores) and would open those stores earlier in F99 than previously indicated. OfficeMax **[*24]** told investors that this acceleration would have a very positive impact on OfficeMax's financial results during the 2nd half F99 and especially during the 4th quarter F99-by far the most important quarter of OfficeMax's fiscal year, a quarter in which OfficeMax achieved about 40% of its earnings for the full year. OfficeMax further represented that the positive financial impact of these accelerated new store openings and of OfficeMax's aggressive new store expansion plan would continue into F00. When OfficeMax revealed that its same store sales for its Core Business Segment had declined slightly during the 2nd quarter F99, instead of increasing to mid-single digits as previously promised, it assured investors that this was due to price declines limited to a few products (i.e. printers and fax machines). OfficeMax further stated that its Core Business Segment operations were continuing to improve due to the Core Business Segment's enhanced merchandise mix, tightly focused product assortment and the successful management of its inventories, which led to increased Core Business Segment EPS. OfficeMax stressed that the Core Business Segment's inventories were in good shape with decreased **[*25]** per-store inventories, with overall inventory increasing less than sales and with inventory turns increasing. OfficeMax forecasted 3rd quarter F99 EPS of $ .30-$ .32 and 4th quarter F99 EPS of $ .41-$ .42, which would lead to F99 EPS of $ .93-$ .95 and F00 EPS of $ 1.05-$ 1.15.

(Compl. P 9.) Again, the Complaint alleges that each of these statements "were false or misleading when issued," followed by essentially the same "true but concealed facts" recited for the earlier time periods, and alleges that, "as a result of the foregoing adverse conditions in OfficeMax's business, OfficeMax could not, and would

not," achieve anywhere near the optimistic forecasts made by the company. (Compl. P 80(z).)

4. *September 30, 1999.*

At the end of September, OfficeMax announced that it was revising its forecasts for the second half of fiscal year 1999 as well as for fiscal year 2000 and expected much less favorable results. OfficeMax also announced that it would take an $ 83 million writedown due to excessive, overvalued, or unsaleable inventory in its Core Business Segment, that it was sharply reducing the number of merchandise items carried by its Core Business Segment, and that it **[*26]** was sharply curtailing its new store expansion program to save money. The stock price fell over 32% in two days to $ 5 per share.

C. *GAAP Violations.*

Finally, the Complaint alleges two distinct GAAP violations to accompany the fraudulent statements described above. It alleges, first, that OfficeMax improperly accounted for its inventory, and second, that it improperly accounted for vendor rebates as current income.

1. *Inventory accounting.*

The Complaint alleges that the company "did not take adequate reserves for excess and overvalued inventory." (Compl. P 92.) The Complaint notes here a long list of reasons why the company had problems with inventory, some of which were included in the "true but concealed facts" portions above, others of which are alleged here for the first time (e.g., "The problem with the Computer Business Segment was the return rate." (Compl. P 91(p)).) In regard to the $ 83 million inventory writeoff, the Complaint alleges:

> Had OfficeMax appropriately reserved for excess and overvalued inventory in prior quarters, such a large charge would have been unnecessary. Moreover, had OfficeMax accrued timely and adequate reserves for excess inventory **[*27]** during the Class Period, its Core Business Segment would have reported minimal, if any, net income in the 1st quarter F99, instead of the $ 29 million it reported, and would have further reported a large loss in the 2nd quarter F99 instead of the $ 8 million it actually reported. Additionally, OfficeMax's assets and retained earnings as reported in the Company's balance sheet for the 1st and 2nd quarters F99 were materially overstated due to the Company's failure to properly value its inventory.

(Compl. P 96.) Other than the fact of the $ 83 million writedown, the Complaint does not further quantify by what degree reserves taken during the Class Period were inadequate.

2. *Vendor rebates.*

Plaintiffs also allege that Defendants improperly applied vendor rebates to current income, rather than to a reduction in the purchase price of the merchandise, in violation of GAAP principles. While Plaintiffs do not allege when this policy began, and it, in fact, appears that the policy significantly predated the Class Period, Plaintiffs nevertheless allege that it was part of the scheme to artificially inflate the price of the stock. After approximating OfficeMax's retail sales, markup **[*28]** rates, costs of goods, and percentage of rebates, Plaintiffs estimate the vendor rebates were "$ 100 million to $ 126 million per year." (Compl. P 99.) At the end of the Class Period, OfficeMax announced a "vendor rationalization" policy in which it "unbundled" vendor rebate benefits from income, thus effectively ending this practice. (*Id.*)

With respect to vendor rebates, the Complaint alleges not only a GAAP violation for inventory that may have been responsibly purchased, but also a scheme to purposely purchase more inventory than was needed. Plaintiffs allege that Defendants acquired excess inventory not by mistake but "solely to benefit from associated vendor credits for advertising and other costs, and then recognizing the credits as income prior to using the inventory and/or incurring the costs." (Compl. P 97.)

The effect of the GAAP violations, according to the Complaint, was that net income was reported as favorable in the first and second quarter of F99. While Feuer attributed these favorable quarterly results to better product assortment and other indicators of better management, according to the Complaint, those results would have shown minimal, if any, income for **[*29]** those quarters absent GAAP violations.

## II. MOTION TO DISMISS STANDARD FOR SECURITIES FRAUD COMPLAINTS

In deciding a motion to dismiss under *Rule 12(b)(6)*, the Court must take all well-pleaded allegations in the complaint as true and construe those allegations in a light most favorable to the plaintiff. *Summit Health, Ltd. v. Pinhas, 500 U.S. 322, 325, 114 L. Ed. 2d 366, 111 S. Ct. 1842 (1991)*; *Dana Corp. v. Blue Cross & Blue Shield Mut., 900 F.2d 882 (6th Cir. 1990)*; *Craighead v. E.F. Hutton & Co., 899 F.2d 485, 489 (6th Cir. 1990)*. However, the Court need not accept as true a legal conclusion couched as a factual allegation. *Papasan v. Allain, 478 U.S. 265, 286, 92 L. Ed. 2d 209, 106 S. Ct. 2932 (1986)*. A well-pleaded allegation is one that alleges specific facts and does not merely rely upon conclusory statements. In the context of a motion to dismiss a securities fraud claim, a court "may consider the full texts of the SEC filings, prospectus, analyst's reports and statements 'integral to the complaint,' even if not attached, without converting the motion into one for summary judgment under *Rule 56*." *In re Royal Appliance Securities Litigation,* 1995 U.S. App. LEXIS 24626, 1995 WL 490131, **[*30]** at *2 (6th Cir. Aug. 15, 1995). In addition, the Court may consider documents to which the plaintiffs refer in their complaint, even if the plaintiffs do not attach them as exhibits as long as these documents are central to plaintiffs' claims, *Weiner v. Klais & Co., 108 F.3d 86, 89 (6th Cir. 1997)*, as well as public records and matter of which a court may take judicial notice, *Jackson v. City of Columbus, 194 F.2d 737, 745 (6th Cir. 1999)*, without converting the motion to dismiss into a motion for summary judgment.

In 1995, Congress passed the PSLRA which heightened the pleading standard in securities litigation. The PSLRA requires a plaintiff to state with particularity all facts supporting an allegation made on information and belief, and all facts establishing scienter. *Section 78u-4(b)* states:

> **(b) Requirements for securities fraud actions**
>
> **(1) Misleading statements and omissions**
>
> In any private action arising under this chapter in which the plaintiff alleges that the defendant--
>
> (A) made an untrue statement of a material fact; or
>
> (B) omitted to state a material fact necessary in order to make the statements made, **[*31]** in the light of circumstances in which they were made, not misleading;
>
> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.
>
> **(2) Required state of mind**
>
> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

*15 U.S.C. § 78u-4(b)(1)& (2)*.

The Sixth Circuit, in *In re Comshare, Inc. Securities Litigation, 183 F.3d 542 (6th Cir. 1999)*, held that plaintiffs may meet PSLRA pleading requirements "by alleging facts that give rise to a strong inference of reckless behavior but not by alleging facts that illustrate nothing more than a defendant's motive **[*32]** and opportunity to commit fraud." *Id. at 551*. The Court in *Comshare* defined recklessness as "highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger may not be known, it must at least be so obvious that any reasonable man would have known of it." *Id. at 550* (citing *Mansbach v. Prescott, 598 F.2d 1017, 1025 (6th Cir. 1979))*. Recklessness is to be understood as a "mental state apart

from negligence and akin to conscious disregard." *Id.*

The Court in *Comshare,* in explaining the role allegations of motive and opportunity play in the assessment of scienter, stated:

> We cannot agree that under the PSLRA, plaintiffs may establish a "strong inference" of scienter merely by alleging facts demonstrating motive and opportunity where those facts do not simultaneously establish that the defendant acted recklessly or knowingly, or with the requisite state of mind. While facts regarding motive and opportunity may be "relevant to pleading circumstances from which a strong inference of fraudulent scienter may be inferred," *In re Baesa, 969 F. Supp. 238, 242*, and may, **[*33]** on occasion, rise to the level of creating a strong inference of reckless or knowing conduct, the bare pleading of motive and opportunity does not, standing alone, constitute the pleading of a strong inference of scienter.

*Id. at 551* (footnote omitted). In *Helwig v. Vencor, Inc., 251 F.3d 540 (6th Cir. 2001)* (en banc), the Sixth Circuit clarified its *Comshare* decision regarding the role that motive and opportunity play to showing recklessness:

> While it is true that motive and opportunity are not substitutes for a showing of recklessness, they can be catalysts to fraud and so serve as external markers to the required state of mind. Comshare made this distinction clear by refusing to equate motive and opportunity with scienter but yet recognizing that facts showing each may support a strong inference of recklessness. We reaffirm that plaintiffs cannot simply plead "motive and opportunity" as a mantra for recovery under the Reform Act.

*Id. at 550*. Courts must focus on the facts of the case before them and not simply look to the labels that the parties place on them. *Id. at 550-51*. "Accordingly, facts presenting **[*34]** motive and opportunity may be of enough weight to state a claim under the PSLRA, whereas pleading conclusory labels of motive and opportunity will not suffice." *Id. at 551* (citing *Comshare, 183 F.3d at 551*).

The Court in *Helwig* found this fact-specific approach best reflected the intent of Congress. *Helwig, 251 F.3d at 551* (citing *Greebel v. FTP Software, Inc., 194 F.3d 185, 196 (1st Cir. 1999)* ("whatever the characteristic patterns of the facts alleged, those facts must now present a strong inference of scienter")). Thus, in order to determine whether scienter has been pled adequately under the PSLRA, the Court must assess whether the allegations in the complaint, taken as a whole, including those relating to motive and opportunity, give rise to a strong inference of recklessness on the part of the defendants. While recognizing such a fact-specific inquiry does not lend itself to rigid formulas for determining when a plaintiff has sufficiently alleged scienter, the Court did indicate several factors that are usually relevant to this inquiry:

> (1) insider trading at a suspicious time or in an unusual amount; **[*35]**
>
> (2) divergence between internal reports and external statements on the same subject;
>
> (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information;
>
> (4) evidence of bribery by a top company official;
>
> (5) existence of ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit;
>
> (6) disregard of the most current factual information before making statements;
>
> (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;
>
> (8) the personal interest of certain directors in not informing the disinterested directors of an impending sale of stock;

and

(9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Id.* at 552 (citing *Greebel, 194 F.3d at 196*). The Court emphasized, however, that this list was not exhaustive, and was only meant to "point to fixed constellations of facts that courts have found probative of securities fraud." *Id. at 552*.

In adopting this standard, the Sixth Circuit expressly rejected the views of those [*36] courts with both broader and narrower views of the PSLRA. Thus, the Court in *Comshare,* reiterated by its decision in *Helwig,* rejected the view espoused by a number of courts, including the Second Circuit, that the PSLRA simply requires a plaintiff to either (1) allege facts constituting strong circumstantial evidence of conscious or reckless behavior, or (2) allege facts showing a defendant's motive and opportunity to commit fraud. *Comshare, 183 F.3d at 549*. And, the Court in *Comshare* rejected the view, espoused by the district court in that case, that a plaintiff must allege facts indicating a knowing misrepresentation or conscious intent to defraud before a complaint can pass muster under the PSLRA. *Id. at 551-52*.

Instead, after a careful analysis of the plain language of the PSLRA, the Court in *Comshare* concluded that, while a plaintiff may state a valid claim under the PSLRA premised on recklessness alone (as distinct from knowing misconduct), the facts alleged collectively must give rise to a "strong inference" that the defendants did, indeed, behave recklessly. *Helwig* reaffirms this approach. Thus, the Sixth Circuit employs a [*37] form of "totality of the circumstances" analysis; this Court, accordingly, declines to examine plaintiffs allegations in piecemeal fashion and, will instead, assess them collectively to determine what inferences may be drawn therefrom.

### III. ANALYSIS

To state a claim under *§ 10(b) of the Securities and Exchange Act of 1934*, and *Rule 10b-5*, a plaintiff must allege in connection with the purchase or sale of securities (1) a misrepresentation or omission, (2) of a material fact, (3) made with scienter, (4) upon which the plaintiff relied, and (5) which proximately caused the plaintiff's injury. *Comshare, 183 F.3d at 548*. Defendants move for dismissal of the Complaint, focusing on the first three elements: With regard to misrepresentations and materiality, Defendants argue (1) that many of the alleged misrepresentations were neither made by Defendants nor can be attributed to them; (2) that the Complaint does not sufficiently allege with particularity why or how the alleged misrepresentations were false; (3) that many of the alleged misrepresentations were not material; and (4) that the Defendants' forward looking statements were appropriately qualified and are, [*38] thus, not actionable. With regard to scienter, Defendants argue that the Complaint lacks particularity in its allegations, and, in any case, the facts alleged do not create a strong inference of either an intent to deceive or recklessness. Defendants also argue separately that, with respect to GAAP violations, the Complaint is deficient because those allegations are made with insufficient particularity and do not raise an inference of scienter either alone or in combination with Plaintiffs' other allegations of wrongdoing.

Because the Court finds that the Complaint does not allege facts with particularity which give rise to a strong inference of scienter, the Court dismisses the Complaint without reaching Defendants other arguments. [4]

> 4   The Court notes, however, that many of Defendants' contentions appear to have merit, either in whole or in part. Plaintiffs, for instance, focus many of their allegations of fraud on forward looking statements of optimism about the future which are not generally actionable under the PSLRA. In addition, while the Complaint charges Defendants with responsibility for all of the statements and predictions made by analysts, many of the statements to which Plaintiffs point are clearly couched as opinions of the analysts which, similarly, are not actionable. Finally, it appears that many of the statements with which Plaintiffs purport to take issue simply are not false. Because the Court resolves Defendants' motion on other grounds, the Court does not undertake here to parse Plaintiffs' allegations and determine which could, in the appropriate circumstances, otherwise support a claim under *§ 10(b)*. The Court confirms, though, that it has closely examined Plaintiffs' allegations on an individual and collective basis to determine, to the extent possible, the totality of the circumstances actually presented by Plaintiffs' Complaint.

**[\*39]** Scienter generally refers to a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193, 47 L. Ed. 2d 668, 96 S. Ct. 1375 (1976)*. While Defendants contend that the Complaint insufficiently pleads scienter, Plaintiffs argue that their Complaint gives rise to a strong inference of scienter through the combination of (1) its allegations regarding Feuer's and Rutherford's motive and opportunity to defraud, (2) its allegations showing a divergence between internal reports and statements made to the public, and (3) its allegations of GAAP violations. Each is discussed below.

    A. *Motive and Opportunity.*

The Complaint alleges that Feuer and Rutherford each had the opportunity and the motive to defraud stockholders. The Plaintiffs argue that these allegations help create a strong inference of scienter.

The Complaint first makes the unsurprising allegation that, as top executives in the company, Feuer and Rutherford enjoyed access to a wide selection of internal reports and information, as well as control over OfficeMax public releases and financial disclosures, providing them an opportunity to defraud the public. In regard **[\*40]** to motive, however, the Complaint makes only a passing reference to the "extreme dissatisfaction" of stockholders because of the substantial decline in stock price, concluding that Feuer "realized that unless the Company was turned around, his position as CEO was in danger." (Compl. P 44.) Plaintiffs argue in their brief that Feuer felt particular pressure because he had launched the major restructuring of the company. [5] They also argue that, as early as March 2, 1999, Feuer must have already known that the major restructuring announced two months earlier would not and could not work; with that knowledge, he nevertheless lied about it, or recklessly disregarded its failure, in order to save his job.

> 5   This is somewhat at odds, again, with the suggestion that the restructuring itself was part of the fraudulent scheme. *See supra* note 2. In other words, Plaintiffs suggest that the pressure on Feuer was both caused by, and a result of, the restructuring.

Plaintiffs cite this Court's opinion in *In re Telxon Corp. Securities Litigation, 133 F. Supp. 2d 1010 (N.D. Ohio 2000),* **[\*41]** for the proposition that particular pressure that an executive may face to demonstrate the wisdom of changes that he has made or to otherwise secure his executive position are relevant to a scienter inquiry. *Id. at 1028*; *see also Helwig, 251 F.3d at 552*. Plaintiffs are quite correct in arguing that these types of allegations are relevant. They are, however, more or less meaningful depending upon the circumstances in which they are made. The defendants in *Telxon* were new executives under pressure to "improve performance after several initial quarters of poor performance under their oversight." The *Telxon* executives were, moreover, "motivated by the promise of substantial additional compensation to make sure their predictions of profitable performance became a reality" and by "the need to stave off ... take over efforts and an ensuing proxy battle." *Telxon, 133 F. Supp. 2d at 1028*. Plaintiffs' Complaint does not allege facts similar, in scope or degree, to *Telxon.* Feuer was no neophyte anxious to prove his mettle, he was the founder of the company. No take over efforts, proxy battles, or particular compensation methods are **[\*42]** alleged which would give rise to some particular danger to the Defendants. *See City of Philadelphia v. Fleming Cos., 264 F.3d 1245, 1270 (10th Cir. 2001)* (finding alleged motives insufficient to raise strong inference of scienter when no allegations of personal financial benefit from misrepresentations); *Phillips v. LCI Int'l, Inc., 190 F.3d 609 (4th Cir. 1999)* (finding that "assertions that a corporate officer or director committed fraud in order to retain an executive position ... simply do not, in themselves, adequately plead scienter" (citations omitted)). Merely concluding that stockholders were extremely dissatisfied by a stock falling, even plummeting, does not lend any *particular* weight to allegations of reckless or intentional conduct. The Court notes, as well, the absence of other "fixed constellations of facts that courts have found probative," *Helwig, 251 F.3d at 552*, in this inquiry: No insider trading, at suspicious times or otherwise, is alleged, let alone bribery or other financial self-dealing. *See id.* Indeed, there is not only no apparent financial incentive for Defendants to engage in the deceptive practices **[\*43]** alleged in the Complaint, given their respective shareholdings, which Defendants retained throughout the Class Period and beyond, there appears to have been a disincentive to do so. [6]

> 6   The documents disclosing the scope of share ownership by Feuer and Rutherford, as well as the absence of trading in those shares, were attached to Defendants' motion to dismiss and were the subject of Plaintiffs' motion to strike. Because

those public filings (OfficeMax's reports on Forms 10-K) are integral to the allegations of the Complaint and because the facts Defendants attempt to glean from them are undisputed, the Court finds no prohibition against reference to them. To that limited extent, Plaintiffs' motion to strike is DENIED.

Although Plaintiffs' allegations are most certainly relevant to the Court's totality of the circumstances analysis, the Court finds, in the context of this case, that they are significantly weak allegations, and, thus, they do not substantially assist the Court in drawing the inferences of reckless [*44] or intentional conduct Plaintiffs ask the Court to draw. [7]

> 7   To the extent that Defendants imply in their motion that the absence of allegations of motive is *fatal* to a claim under the PSLRA, the Court expressly rejects that notion. Motive is but one factor, in the totality of circumstances, which the Court must consider. Its presence or absence is more or less meaningful in any given case, depending on all of the other facts and circumstances presented.

B. *Divergence between Internal Reports and External Statements.*

The Complaint alleges that Defendants made repeated optimistic statements about OfficeMax's profitability and the efficiency of its operations when it knew of massive inventory problems from the Salmon study, internal inventory and finance reports, management meetings, and through their active management roles. Citing *Helwig,* Plaintiffs note that this divergence is relevant to scienter. *See id. at 552.*

Although Plaintiffs claim that a multitude of reports and [*45] internal communications must have been inconsistent with the optimistic public statements about OfficeMax, they cite only one report in particular: the Salmon study. According to the Complaint, the Salmon study reviewed OfficeMax's inventory control systems in three stages. At the end of fiscal year 1998, before the study was complete, Salmon concluded that OfficeMax had inadequate management talent and procurement and inventory policies; thus, it would need to curtail its expansion program to regain control over its Core Business Segment. (Compl. P 21.) Plaintiffs claim that Defendants either recklessly or intentionally concealed these findings from the investing public.

Plaintiffs' argument is undercut in several respects, however. Most notable is the Complaint's concession that OfficeMax, before and during the Class Period, was reconfiguring its entire supply distribution process in order to remedy the procurement and inventory problems that had been identified. (Compl. P 30.) The Complaint also concedes that OfficeMax was addressing its inventory problems during the Class Period by "installing a new, more high powered and sophisticated computerized purchasing and inventory control [*46] system made by SAP - a huge European software maker." (*Id.*) Given the substantial changes being made in order to address the problems identified in the Salmon study, the Court does not find that the Defendants' optimistic statements--about the company in general or the inventory control systems in particular--are inconsistent with the preliminary conclusions of that as-yet-incomplete study. The fact that these changes were "taking much longer than had been anticipated," (*id.*), only points up the fact that hindsight is more accurate than forecasting. OfficeMax's optimism about its new business model and its designs for "improving" inventory control, *see* Complaint at P 50, do not conflict with a study that identified those problems before these changes took place.

Comparison with the facts of *Helwig* is instructive on this point. In that case, a health care organization publicly claimed that "it could not predict whether Medicare reform proposals would be adopted by Congress or if adopted, what effect, if any, such proposals would have on its business." *Helwig, 251 F.3d at 546*. But a month before, company executives gave employees notice that they would [*47] be laid off in sixty days because "there were tough times coming in the industry because of the likely cutbacks in Medicare" and told them they would have been laid off anyway because "the proposed Medicare regulations were going to make it difficult for [the company] to make money and stay profitable."*Id.* Thus, the company was telling its employees that it clearly understood what was coming, while telling the public that it did not. Here, the Complaint does not state facts that demonstrate such "divergence" between the Salmon study and the company's optimistic statements during the Class Period.

What is left after the Salmon study is a number of conclusory allegations about the condition of the

company along with assumptions not only that the Defendants were aware of those characterizations at the time, but also that they understood their materiality and either recklessly or intentionally concealed them. This portion of the Complaint, which constitutes the bulk of the allegations, lacks the particularity required under the PSLRA when alleging scienter. *See 15 U.S.C. § 78u-4(b)(2)*. In fact, most of the "true but concealed facts" appear to be bare conclusions **[*48]** that do not arise from either particular, or even generally identified, reports, meetings, or management responsibilities. For example, what is the basis for the allegation that "Feuer require[d] certain new stores to open knowing that the forecasted sales for those stores would be less than the internally required amount to open a new store--$ 4 million per store--[and] refused to close existing stores that continually operated at a loss"? (Compl. P 59(i).) Not only do the long and repeated lists of alleged "true but concealed facts" appear without an explanation of the facts upon which each allegation is based, but most appear to be allegations of mere bad management, rather than indications of bad faith.

Moreover, many of the "concealed facts" appear either internally inconsistent or chronologically problematic. For example, the Complaint alleges the pre-class period stock price drop (the drop that allegedly placed so much pressure on Feuer, et al.) was caused, in part, by "high executive turnover" due to "Feuer's autocratic management style and ego" and inability to work with senior management." According to the Complaint, these problems were "known throughout the industry. **[*49]** " (Compl. P 42.) But this alleged problem, if it were known throughout the industry and was already having a negative affect on the stock price when the Class Period began, can hardly be considered a "true but *concealed* fact" as the Complaint elsewhere describes it. (Compl. P 70(x), 80(y).) Similarly, the fact that OfficeMax had a policy of "not having sales" does not seem to be the sort of "concealed" insider-information that would surprise members of the public familiar with the company. (Compl. P 70(n).)

Several allegations are also chronologically inconsistent. For example, when alleging that OfficeMax's optimistic May and June 1999 statements were false or misleading, Plaintiffs describe as a "true but concealed fact" that "in August 1999, OfficeMax rolled out a new program called the 'flat rate discount program' that only applied to new, large, corporate customers."

(Compl. P 70(j).) The Complaint then alleges that this new program irritated existing customers who could not benefit from the discount, driving them to other stores. (*Id.*) It is not clear how the Court is to infer the falsity of optimistic statements made in May or June from the fact that a policy, *not* **[*50]** *even begun until two months later,* subsequently backfired. [8]

> [8] The timing of Plaintiffs major allegations is also problematic in a different respect: Plaintiffs attempt to draw a parallel with the facts of *Fidel v. Farley, 2001 U.S. Dist. LEXIS 9461, No. 1:00-CV-48-M (W.D. Ky. June 27, 2001)*. In that case, a restructuring of Fruit of the Loom was begun in 1995, while the alleged failure of that restructuring (and defendants' knowledge and concealment of that failure) occurred years later. It appears far different to allege, as the Plaintiffs do here, that as early as March 2, 1999, only two months after the restructuring had begun, Defendants were already in a position to know that the restructuring was failing and would continue to fail. Because the Complaint fails to identify any basis underlying that allegation, the Court finds it particularly difficult to draw the inferences Plaintiff suggests are apparent from this sequence of events.

These particular inconsistencies, in addition to **[*51]** the repetitive and somewhat confusing organization of the Complaint as a whole, do not assist Plaintiffs. Although inartful pleading does not, by itself, warrant dismissal of a Complaint, it can, and here does, weaken any inferences that might be drawn from it. For all these reasons, the Court finds little, if any, divergence between any identified internal reports and external statements, and thus little, if any, inference of scienter. [9]

> [9] It is not insignificant that, throughout the Class Period, OfficeMax was openly discussing efforts to improve its inventory control. Contrary to Plaintiffs' implications, these statements, when considered as a whole, can be read as public acknowledgments of continuing problems with its inventory, rather than a guarantee that all such problems had been solved.

C. *GAAP Violations.*

Violations of GAAP, by themselves, are generally not enough, without more, to create an inference of

reckless conduct. *See, e.g., Comshare, 183 F.3d at 553.* They are, however, **[*52]** part of the totality of circumstances which the Court must assess. As discussed below, the Plaintiffs allege that OfficeMax violated GAAP by failing to record appropriate reserves and by improperly accounting for vendor rebates.

1. *Improper accounting for inventory.* Noting that GAAP requires evaluation of inventory at each quarter-end, the Complaint alleges that OfficeMax failed to do so during the Class Period. It notes, moreover, that GAAP requires that "where the utility of goods is no longer as great as its cost, whether due to physical deterioration, obsolescence, changes in price levels, or other causes, the difference should be recognized as a loss of the current period." (Compl. P 90.) It alleges that, instead, OfficeMax kept its deteriorating excess inventory at its original value until it ultimately took an $ 83 million writedown in September 1999. The Complaint also alleges that the Defendants each must have known of this failure, due to their positions as top managers. It then alleges a host of "practices" or "conditions" that Plaintiffs claim caused the company to accumulate excess, obsolete, or otherwise overvalued inventory.

The Court finds little--beyond speculation--in **[*53]** these allegations. Plaintiffs merely identify a GAAP provision and apply it to the $ 83 million writedown in September by suggesting that writedowns should have occurred earlier or in stages. Plaintiffs do not, however, explain when these writedowns should have occurred nor offer any basis to assume that periodic writedowns would have had a meaningful impact on the value of OfficeMax stock.

These references to GAAP add little weight to Plaintiffs' scienter allegations. GAAP violations must be plead with particularity. *See Greebel v. FTP Software, Inc., 194 F.3d 185, 203-04 (1st Cir. 1999)* (noting that "a general allegation that the practices at issue resulted in a false report of company earnings is not a sufficiently particular claim of misrepresentation"). One of the reasons this is true is because GAAP is not "a canonical set of rules that will ensure identical accounting treatment of identical transactions," instead they "tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management." *Thor Power Tool Co. v. Commissioner of Internal Revenue, 439 U.S. 522, 544, 58 L. Ed. 2d 785, 99 S. Ct. 773 (1979)*; *Chalverus v. Pegasystems, Inc., 59 F. Supp. 2d 226 (D. Mass. 1999).*

**[*54]** Thus, one person's accounting decisions on a given matter, even if open to debate, are not necessarily improper, much less intentionally misleading. Plaintiffs must allege "specific facts that illustrate 'red flags' that should have put Defendant on notice of the revenue recognition errors" before evidence of GAAP errors may be considered meaningful. *Comshare, 183 F.3d at 553.*

In an effort to satisfy this standard, Plaintiffs cite *Helwig, 251 F.3d at 552*, for the proposition that "closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information" is relevant to scienter. (Mot. Opp'n at 23.) They then point out that the September 30, 1999 announcement of an $ 83 million writedown and revised downward forecasts occurred less than two months after OfficeMax's optimistic forecasts in August. While the Court generally agrees with Plaintiffs' proposition of law, its application here does not help create a strong inference of scienter. As discussed earlier, OfficeMax's inventory control system was being entirely restructured, and the Complaint alleges an ongoing Salmon study of those systems. In fact, **[*55]** the September 30, 1999 press release announced that the policy changes, which resulted in the writedown, themselves resulted from a comprehensive business assessment study undertaken in the Spring of 1999 and finished in September. (Mot. Dismiss, Ex. 17.) Plaintiffs, thus, are not able to negate the inference that "something has changed" which explains the difference between the forecasts in August and those in September. *See Telxon, 133 F. Supp. 2d, at 1031 n.4.*

Finally, while Plaintiffs assert that the revenue recognition methodology used by OfficeMax violated GAAP, there is no allegation that the accounting principle Plaintiffs would have had OfficeMax employ was widely accepted or employed throughout other segments of the industry. Despite the ultimate writedown, moreover, there is no allegation of a restatement of any of the periods during which this revenue recognition methodology was used.

2. *Vendor rebates.*

The Complaint also alleges that OfficeMax recognized vendor rebates as income, in violation of GAAP. It asserts, moreover, that Feuer and Rutherford not only were aware of this practice, but also exacerbated the problem by purposely buying more inventory **[*56]** during the Class Period than they needed, so that the

failure of their new business model would be hidden.

These allegations are, again, conclusory. It is not clear from the Complaint whether it alleges that the vendor rebate "scheme" began at the beginning of the Class Period or long before, thus, the Court cannot assess whether the problem was a longstanding one or a short term policy that aligns with the Class Period. *See Comshare*, 183 F.3d 553 (noting that even if GAAP violations occurred over long period of time, that fact alone is not sufficient inference of scienter). Nor does the Complaint identify any particular transactions to elucidate its claim. Its only detail is a hypothetical: "If OfficeMax bought merchandise for $ 50 with 15 points of vendor funding, OfficeMax received $ 15 back in rebate, but the company valued the inventory at $ 50." (Compl. P 99.) Although the Complaint purports to calculate the monetary difference created by the alleged improper accounting, its calculations are based on nothing more than approximations of total sales in an average year. Moreover, the allegation identifies no underlying set of facts giving rise to Plaintiffs' belief **[*57]** that vendor rebates were treated improperly. The Court also finds the additional charge--that Defendants purposely purchased excess inventory solely to reap the short-term gain of vendor rebates, to the detriment of longer term profits--somewhat mystifying. This asserts, apparently, that, in order to hide the company's problems of excess inventory, Feuer and Rutherford bought *more* excess inventory. Plaintiffs do not appear even to acknowledge the peculiarity of this assertion.

Plaintiffs contend that the "enormity" of the alleged GAAP violations mandate the inference that the Defendants knew of them or were reckless in disregarding them. (Mot. Opp'n at 22.) The Court agrees that GAAP violations resulting in substantial misstatements of a company's financial condition may, under appropriate circumstances, create such an inference. *See Hayman v. PricewaterhouseCoopers, LLP*, Case No. 1:01-CV-1078 (N.D. Ohio March 26, 2002) (finding that numerous egregious violations of relatively simple GAAP and GAAS violations, resulting in substantial restatements, contributed to strong inference of scienter). But this inference may only arise if the GAAP violations--"enormous" or otherwise--are **[*58]** plead with sufficient specificity to make the allegations meaningful. *See id.* (noting specific facts, specific transactions, and specific "red flags" alleged in regard to GAAP and GAAS violations). This the Plaintiffs have failed to do here. Indeed, the Court finds that Plaintiffs' allegations of GAAP violations do not survive under the particularity standards of the PSLRA, and may not survive even under the more lenient standard of *Federal Rule of Civil Procedure 9(b)*. Because the allegations are vague and conclusory at best, the Court finds that they add little weight to any inference of recklessness or intentional deception.

Taken as a whole, Plaintiffs' allegations of scienter lack strength. Plaintiffs fail to hypothesize any motive for Feuer, the founder of OfficeMax and its largest shareholder, to undercut his companies' long term financial health. In fact, in alleging motive, the Plaintiffs demonstrate only the lack of it--notably absent is any circumstance particular to Feuer or Rutherford which puts them in a position different than any other top executive whose company's stock has recently slumped. Moreover, although Plaintiffs **[*59]** attempt to show that OfficeMax's internal reports were inconsistent with its optimistic public statements, they identify but one report, and do not demonstrate that report's inconsistency with those public statements. They rely instead on conclusory representations of the company's health, along with bare allegations that Defendants not only "must have" reached those same conclusions but recklessly or purposely concealed them. Finally, what is left of the Complaint is two assertions of GAAP violations that are without any supporting detail; neither identifies any underlying set of facts giving rise to a belief that GAAP was, indeed, violated. On the contrary, the allegations are so conclusory that the Court does not, indeed cannot, draw any particular inference from them. Fraud or reckless behavior is, arguably, one of many reasonable inferences which may be drawn from the facts alleged here. But it is not the strongest inference created by these facts, or even one of several *strong* inferences that may be drawn. Because the Complaint does not give rise to a strong inference of scienter, as it must under the PSLRA, the Court dismisses the Complaint without reaching Defendants' other **[*60]** arguments.

**IT IS SO ORDERED.**

3/24/02

s/

**KATHLEEN McDONALD O'MALLEY**

**UNITED STATES DISTRICT JUDGE**

## *ORDER*

For the reasons set forth in the Court's memorandum and order this date, Defendants' Motion to Dismiss is hereby **GRANTED.** This case is **DISMISSED.**

**IT IS SO ORDERED.**

s/

**KATHLEEN McDONALD O'MALLEY**

**UNITED STATES DISTRICT JUDGE**