**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

In re BP plc Securities Litigation

MDL No.:10-md-2185

Civil Action No. 4:10-md-2185

Honorable Keith P. Ellison

**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS IN PART**
**THE SECOND CONSOLIDATED AMENDED COMPLAINT**

# **TABLE OF CONTENTS**

I.     STATEMENT OF THE ISSUES AND STANDARD OF REVIEW ........................................1

II.    INTRODUCTION / SUMMARY OF THE ARGUMENT ........................................1

III.   ARGUMENT ........................................4

    A.    Defendants challenge statements nearly identical to those held to have been sufficiently pled as materially false ........................................4

        1.    BP misrepresented the scope of OMS ........................................6

            a.    The Court has previously found BP's statements concerning the scope of OMS sufficiently pled as materially false and Defendants have admitted such falsity ........................................6

            b.    The SAC's OMS scope statements are substantially similar or identical to statements this Court held were sufficiently pled as materially false ........................................7

            c.    The SAC pleads additional evidence that Defendants misrepresented the scope of OMS ........................................10

        2.    BP misrepresented the implementation of OMS ........................................12

            a.    The Court has previously found Defendants' statements concerning the implementation of OMS were sufficiently pled as materially false, and Defendants have admitted such falsity ........................................12

            b.    The SAC's new OMS implementation statement is nearly identical to statements this Court held were sufficiently pled materially false ....13

            c.    The SAC pleads additional evidence that Defendants misrepresented the implementation of OMS ........................................14

        3.    BP misrepresented its ability to contain and respond to oil spills ........................................17

    B.    Defendants' OMS and spill response statements were knowingly or recklessly false ........................................17

        1.    Plaintiffs have sufficiently pled scienter on behalf of Defendants Hayward and Inglis regarding newly alleged OMS misstatements ........................................18

a.    Hayward's and Inglis's special positions at the forefront of BP's process safety reforms and OMS implementation creates a strong inference that they either knew or were reckless in not knowing the obvious limitations in OMS implementation ...................................18

b.    The SAC alleges with particularity Defendants Hayward's and Inglis's specific knowledge regarding the truth about OMS scope and implementation ...........................................................................20

2.    Plaintiffs have sufficiently pled corporate scienter with respect to the unattributed corporate statements alleged in the SAC ....................................23

C.    The SAC adequately alleged the new statements were materially false or Misleading and made with scienter ..............................................................................28

1.    BP's 2006 Sustainability Report dated May 9, 2007 (Statement A)................28

2.    Defendant Hayward speaking on a July 24, 2007 conference call (Statement B)...........................................................................................................30

3.    Defendant Inglis speaking on September 25, 2007 at the Sanford Bernstein Conference (Statement C) ...............................................................................32

4.    Defendant Hayward speaking on a February 27, 2008 conference call (Statement F) ...........................................................................................................33

5.    Defendant Hayward's speech at the 2008 General Meeting on April 17, 2008 (Statement G) ...............................................................................................33

6.    BP's 2008 Annual Review dated February 24, 2009, including the Group Chief Executive's Review (Statement I) ..........................................................34

7.    BP's 2008 Form 20-F Annual Report dated March 4, 2009 (Statement J)...........................................................................................................36

8.    Defendant Hayward's statement in BP's 2008 Sustainability Review dated April 16, 2009 (Statement L) ...............................................................37

9.    BP's 2009 Annual Review dated February 26, 2010 (Statement N) ...............38

10.    BP's 2009 Form 20-F Annual Report dated March 5, 2010 (Statement O) ...........................................................................................................39

11.    Defendant Inglis's speech at Howard Weil Energy Conference on March

22, 2010 (Statement P) ................................................................40

12.    BP's 2009 Sustainability Review issued April 15, 2010 (Statement R) ...........41

13.    BP's 2009 Sustainability Report dated April 15, 2010 (Statement S) .............43

D.    The SAC adequately pleads loss causation in connection with Defendants' misrepresentations about the scope of OMS .................................................45

E.    The SAC properly alleges a control person claim against Defendant Inglis ...............49

IV.    CONCLUSION ......................................................................................50

## <u>TABLE OF AUTHORITIES</u>

### <u>CASES</u>

*Alaska Elec. Pension Fund v. Flowserve Corp.*
  572 F.3d 221 (5th Cir. 2009) --------------------------------------------------------------------46, 48

*Aubrey v. Barlin*
  No. 10-CA-076, 2011 U.S. Dist. LEXIS 15332 (W.D. Tex. Feb. 16, 2011) -------------------------- 46

*Brody v. Zix Corp.*
  No. 04-cv-1913, 2006 U.S. Dist. LEXIS 69302 (N.D. Tex. Sept. 26, 2006)-----------------------------1

*Dennis v. General Imaging, Inc.*
  918 F.2d 496 (5th Cir. 1990) -------------------------------------------------------------------------- 49

*Dura Pharm., Inc. v. Broudo*
  544 U.S. 336 (2005) -------------------------------------------------------------------1, 4, 46, 47

*Flaherty & Crumrine Preferred Income Fund Inc. v. TXU Corp.*
  565 F.3d 200 (5th Cir. 2009) -------------------------------------------------------------------------- 31

*Gilmore v. Shearson/American Express, Inc.,*
  811 F.2d 108 (2d Cir. 1987) -------------------------------------------------------------------------- 45

*Global Healing Ctr., LP v. Powell*
  No. 10-cv-4790, 2012 U.S. Dist. LEXIS 67777 (S.D. Tex. May 15, 2012) ---------------------------- 45

*Harris Bank Naperville v. Pachaly*
  902 F. Supp. 156  (N.D. Ill. 1995)-------------------------------------------------------------------- 45

*In re Am. Int'l Grp., Inc.*
  741 F. Supp. 2d 511 (S.D.N.Y. 2010)---------------------------------------------------------------- 47

*In re BP P.L.C. Sec. Litig.,*
  No. 10-md-2185, 2012 U.S. Dist. LEXIS 17787 (S.D. Tex. Feb. 13, 2012) --------------------------1, 3

*In re Bristol-Myers Squibb Sec. Litig.*
  312 F. Supp. 2d 549 (S.D.N.Y. 2004)----------------------------------------------------------------- 28

iv

*In re Dell Inc. Sec. Litig.*
  591 F. Supp. 2d 877 (W.D. Tex. 2008) ------------------------------------------------------------------- 27

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*
  761 F. Supp. 2d 504 (S.D. Tex. 2011) -------------------------------------------------------------------- 29

*In re Lehman Brothers Securities Fraud Litigation*
  799 F. Supp. 2d 258 (S.D.N.Y. July 27, 2011) ------------------------------------------------------- 48

*In re Officemax, Inc. Securities Litigation*
  No. 00-cv-2432, 2002 U.S. Dist. LEXIS 27019 (N.D. Ohio Mar. 26, 2002)-------------------------- 23

*In re Take-Two Interactive Sec. Litig.*
  551 F. Supp. 2d 247 (S.D.N.Y. 2008) ------------------------------------------------------------------- 31

*In re Tetra Techs. Inc. Sec. Litig.*
  No. 08-cv-0965, 2009 U.S. Dist. LEXIS 126687 (S.D. Tex. July 9, 2009)--------------- 1, 45, 46, 47

*In re Triton Energy Ltd. Sec. Litig.,*
  No. 5:98-CV-256, 2001 U.S. Dist. LEXIS 5920 (E.D. Tex. Mar. 30, 2001)------------------------------ 1

*In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.,*
  694 F. Supp. 2d 1192 (W.D. Wash. 2009) -------------------------------------------------------------- 23

*In re Williams Sec. Litig.*
  558 F.3d 1130 (10th Cir. 2009) --------------------------------------------------------------------------- 46

*Indiana Electrical Workers' Pension Trust Fund Ibew v. Shaw Group, Inc.*
  537 F.3d 527 (5th Cir. 2008) ------------------------------------------------------------------------------ 31

*Lentell v. Merrill Lynch & Co., Inc.*
  396 F.3d 161 (2d Cir. 2005) ------------------------------------------------------------------------------- 46

*Lormand v. US Unwired, Inc.*
  565 F.3d 228 (5th Cir. 2009) ---------------------------------------------------------------------45, 46, 47, 49

*Makor Issues & Rights, Ltd. v. Tellabs Inc.,*
  513 F.3d  702 (7th Cir. 2008) --------------------------------------------------------------------------passim

*Martin v. John W. Stone Oil Distrib., Inc.*
    819 F.2d 547(5th Cir. 1987) ----------------------------------------------------------------------- 5

*Miller v. Nationwide Life Ins. Co.*
    No. 06-31178, 2008 U.S. App. LEXIS 16922 (5th Cir. Aug. 6, 2008)------------------------------ 5

*Novak v. Kasaks*
    216 F.3d 300 (2d Cir. 2000) ------------------------------------------------------------------- 22

*Rubinstein v. Collins*
    20 F.3d 160 (5th Cir. 1994)------------------------------------------------------------------- 47

*Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*
    365 F.3d 353 (5th Cir. 2004) --------------------------------------------------------- 23, 39, 44

*Stokes v. Gann*
    498 F.3d 483 (5th Cir. 2007) ------------------------------------------------------------------ 1

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*
    551 U.S. 308(2007) ----------------------------------------------------------------------------- 1

*U.S. ex rel. Riley v. St. Luke's Episcopal Hosp.*
    355 F.3d 370 (5th Cir. 2004) ----------------------------------------------------------------- 29

## **STATUTES**

15 U.S.C. § 78u-5(c)(1)(A) ------------------------------------------------------------------- 30

## **RULES**

17 C.F.R. §240.12b-2------------------------------------------------------------------------ 50

Fed. R. Civ. P. 15(a)(2)----------------------------------------------------------------------- 50

Federal Rule of Civil Procedure 12(g)(2)------------------------------------------------------ 45

## I.    STATEMENT OF THE ISSUES AND STANDARD OF REVIEW

1. When accepting all well-pleaded facts as true and viewing those facts in the light most favorable to Plaintiffs, does the complaint adequately allege Section 10(b) violations based on Defendants' allegedly materially false or misleading statements?  *See Stokes v. Gann*, 498 F.3d 483, 484 (5th Cir. 2007).

2. Does a complaint adequately plead scienter where it alleges that each defendant received, had access to, and/or purposefully ignored, information that made the challenged statements materially false or misleading?  *See, e.g., In re Triton Energy Ltd. Sec. Litig.*, No. 5:98-CV-256, 2001 U.S. Dist. LEXIS 5920, at *31-32 (E.D. Tex. Mar. 30, 2001); *In re Tetra Techs. Inc. Sec. Litig.,* No. 08-cv-0965, 2009 U.S. Dist. LEXIS 126687, at *16-17 (S.D. Tex. July 9, 2009); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 330 (2007).

3. Does a complaint meet the Rule 8 standard requiring a "facially plausible" causal relationship between the misrepresentations and economic loss, where it alleges that Plaintiffs purchased stock at artificially inflated prices and that the artificial inflation dissipated through the revelation of previously-concealed information?  *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 344 (2005); *Lormand v. US Unwired, Inc*., 565 F.3d 228, 258 (5th Cir. 2009).

4. Where a complaint adequately alleges a violation of Section 10(b), should a Section 20(a) claim also be sustained if the Section 20(a) defendant had:  (i) unfettered access to the false statements in question, (ii) the ability to correct the false statements, and (iii) supervisory involvement in the day-to-day operations of the company?  *See, e.g., Brody v. Zix Corp.*, No. 04-cv-1913, 2006 U.S. Dist. LEXIS 69302, at *25-27 (N.D. Tex. Sept. 26, 2006).

## II.    INTRODUCTION / SUMMARY OF THE ARGUMENT

This Court previously found statements concerning the claimed scope and implementation of BP's highly-touted process safety program "OMS" to be actionable.  *See* Ludlow Opinion (Dkt. 323) at 47-48, 49-53 (hereinafter referred to as "Dkt. 323").[1]  The Court also found scienter on the part of Defendants Hayward and BP with regard to statements about BP's progress in implementing the Baker Panel recommendations, BP's ability to respond to an oil spill, and the amount of oil spilling into the Gulf.  The statements in the Second Consolidated Amended Complaint ("SAC") challenged by Defendants are nearly identical to those that the Court already upheld as materially false or misleading in its prior opinions.  (*See* Appendix A).  These statements require no new

---

[1]  All references to Dkt. 323 refer to *In re BP P.L.C. Sec. Litig.*, No. 10-md-2185, 2012 U.S. Dist. LEXIS 17787 (S.D. Tex. Feb. 13, 2012).

analysis in order to conclude that Defendants materially misled investors by misrepresenting the scope and implementation of OMS as well as BP's ability to contain and clean up an oil spill in the Gulf of Mexico.

Moreover, Defendants' instant motion to dismiss reads more like a motion for summary judgment or a trial brief than a Rule 12(b)(6) motion.  Defendants' arguments rely on highly tendentious interpretations of the facts and rest on the improper premise that the Court should consider competing interpretations of evidence and view the inferences in *Defendants'* favor.  (*See, e.g.* Def. Br. at 10).  Defendants' approach is contrary to the law governing motions to dismiss.  To the extent that factual interpretations differ, resolution is inappropriate at the motion to dismiss stage and competing inferences must be drawn in *Plaintiffs'* favor.

Defendants' arguments in support of dismissal are also inconsistent with their prior admissions to the Court and can be rejected on that basis alone.  Defendants made two critical admissions at oral argument:  (1) OMS did not apply to BP's operations on rigs unless the rig was fully-owned by BP (¶100;[2] Dkt. 304 at 66:6-68:20); and (2) OMS was not completed in the Gulf of Mexico in 2008 (¶107; Dkt. 304 at 58:15-21).  Each of these assertions is contrary to Defendants' Class Period statements.  Defendants now seek to distance themselves from those critical admissions, even though Plaintiffs identified multiple additional sources in the SAC compelling the conclusion that BP materially misstated:  (1) its process safety improvements; (2) its commitment to implementing the Baker Panel recommendations; (3) the scope and timing of OMS implementation; and (4) BP's ability to contain and respond to an oil spill in the Gulf of Mexico.

The SAC also more than adequately alleges each Defendant's scienter with respect to the scope and completion of OMS in the Gulf of Mexico.  Plaintiffs plead specific facts concerning

---

[2]  Unless otherwise indicated, all paragraph citations ("¶__") in this Response are to paragraphs within Plaintiffs Second Consolidated Amended Class Action Complaint for all Purchasers of BP ADS Securities (the "SAC").

Defendants Hayward's and Inglis's decisions to limit the reach of OMS in BP's Gulf of Mexico operations, including the *Deepwater Horizon*.  Likewise, the SAC identifies relevant reports and information concerning the scope and implementation of OMS that Defendants Hayward and Inglis each reviewed in anticipation of meetings where they were responsible for implementing process safety measures to meet the Baker Panel recommendations.   In the face of this clear evidence demonstrating Hayward's and Inglis's design of the OMS system and absolute responsibility for its execution, Defendants' response that Hayward and Inglis were powerless figures with no knowledge—who were somehow confused by the terminology used to explain the scope and implementation of OMS—rings hollow.   In its prior opinion, this Court held:  "[t]aking him at his own word," Hayward's role required him to be ultimately responsible for BP's safety reform efforts.   NY/Ohio Opinion (Dkt. 324) at 103 (hereinafter referred to as "Dkt. 324").[3]  The same conclusion must also extend to Inglis, who admitted:   "I am responsible for the safe and reliable operations across all of the E&P operations globally."  (¶46).

Defendants' loss causation challenge is equally unpersuasive.  According to the Presidential Commission, the *Deepwater Horizon* explosion was avoidable and resulted from multiple, unreasonable process safety failures.  (¶¶9-10, 208).  Yet, investors were completely unaware of the risks BP took because Defendants' misrepresentations "lulled the market into false confidence in BP's ability to *manage* those risks."  (Dkt. 323 at 43).   In the aftermath of the explosion and notwithstanding Defendants' misrepresentations about spill rates[4] that this Court has already

---

[3]  All references to Dkt. 324 refer to *In re BP P.L.C.*, No. 10-md-2185, 2012 U.S. Dist. LEXIS 17788 (S.D. Tex. Feb. 13, 2012).

[4]  On April 24, 2012, the Department of Justice charged a BP engineer with obstruction of justice for deliberately withholding internal flow-rate models that were shared with BP's Drilling Engineering Manager for its Gulf of Mexico operations.  *See* Dep't of Justice, *Former BP Engineer Arrested for Obstruction of Justice in Connection with the Deepwater Horizon Criminal Investigation*, Apr. 24, 2012, *available at* http://www.justice.gov/opa/pr/2012/April/12-ag-524.html.

determined are actionable, the stock price fell precipitously, shedding the artificial inflation that Defendants' misrepresentations had produced.  Under Rule 8(a)(2)'s pleading standards, "a facially 'plausible' causal relationship between the fraudulent statements or omissions and plaintiff's economic loss" sufficiently alleges loss causation.  *Dura*, 544 U.S. at 346-47.

## III.   ARGUMENT

### A.   Defendants challenge statements nearly identical to those held to have been sufficiently pled as materially false.

Defendants spend the majority of their motion in a futile effort to argue issues that this Court has correctly decided and that remain the law of the case.  Defendants challenge statements in the SAC describing:  OMS scope (Statements A, B, C, F, G, L, N, P, and portions of Statements I, J, O, R and S);[5] OMS implementation (portions of Statements I, J and R); and BP's spill response capability (a portion of Statement S).  This Court previously held that Statements N and P, and portions of Statements J, R, and S were sufficiently pled as materially false, but lacked sufficient allegations of scienter.  The SAC's new misrepresentations are nearly identical to these reasserted statements, and are further supported by BP documents and sworn testimony of numerous witnesses in MDL 2179, including Defendant Hayward (*See, e.g.* ¶¶95-122).  Significantly, Defendants admitted to the Court that OMS did not apply to BP's operations on rigs unless the rig was fully-owned by BP and that OMS was not completed in the Gulf of Mexico in 2008.  (*See* MTD Hr'g Tr. (Dkt. 304) at 58:15-21, 80:13-16).  The Court should reject Defendants' attempt to re-open issues that have already been decided.

Additionally, Defendants devote much of their motion to arguing factual issues while ignoring the competing facts pled in the SAC and contained in the documents and testimony on which the SAC is based.  In deciding a motion to dismiss, the Court must take the "complaint as

---

[5] Unless otherwise indicated, Plaintiffs refer to the statement letters assigned in the SAC.

true and view the facts in the light most favorable to the Plaintiff to determine whether a plausible claim has been made." *Miller v. Nationwide Life Ins. Co.*, No. 06-31178, 2008 U.S. App. LEXIS 16922, at *8-9 (5th Cir. Aug. 6, 2008). To the extent that factual interpretations differ, "[r]esolution of [] a factual dispute is improper under a 12(b)(6) inquiry." *Id.* at *8.[6] Defendants request that the Court do precisely the opposite.

Defendants' motion largely focuses on BP's purported efforts with respect to its Health, Safety, Security, and Environmental ("HSSE") regime—a system primarily concerned with *personal safety*, with only attenuated relevance to the purportedly comprehensive *process safety* regime of OMS. BP's arguments that HSSE may have bridged to contractors' personal safety management systems miss the point. Defendants misrepresented to investors that BP was managing *process safety* through the implementation of OMS at "*every* BP project, site, operation and facility." (*See, e.g.,* Statement I.)

BP was the legal operator of the Macondo well and, as such, was the responsible party for all aspects of the well's design and subsequent development, including bearing statutory liability in the event of a blowout. (*See e.g.,* Dkt. 304 at 67:22-25 – 68:1-3 ("BP was clearly the responsible party.") (¶209)). BP's leaders maintained continuous control; managing, coordinating, and directing the activities of no fewer than five contractors who performed operations on the well. BP was uniquely situated to assess the multiple, overlapping process safety risks involved in operating the well. And it necessarily follows that BP's investors expected that BP's process safety framework would be applied to control and manage those risks. Yet, as alleged in the SAC (¶¶105,

---

[6] Even summary judgment is improper where the same facts are potentially subject to differing inferences: "[s]ummary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from these facts . . . . If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment." *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 548 (5th Cir. 1987).

223) the BP employees who were leading BP's operations on the *Deepwater Horizon*—those who were in the best position to make a process safety evaluation—testified that they had never even heard of OMS, let alone been trained on it.

       **1.**    **BP misrepresented the scope of OMS.**

          **a.**    **The Court has previously found BP's statements concerning the scope of OMS sufficiently pled as materially false and Defendants have admitted such falsity.**

The Court has already held that the falsity of Defendants' misrepresentations concerning the scope of OMS had been adequately pled:

> [t]he alleged facts suggest that BP's Gulf rigs, including the Deepwater Horizon, were missing key components of the OMS system or never received any information related to OMS at all. The facts call into question BP's assertion[s] . . . that each site in the Gulf had mandatory practices and procedures in place to govern process safety concerns.
>
>                                 \* \* \*
>
> What Plaintiffs allege here is an omission: BP failed to clarify the intended scope of its OMS program while simultaneously presenting the program to the public as an expansive program. (Dkt. 323 at 48, 50).

The Court also thoroughly examined the materiality of such statements:

> BP was not obligated to talk about the scope of OMS at all, yet talk about OMS it did . . . . [I]f Plaintiffs' allegations are true, these "operated businesses" would not have included BP-operated rigs unless the rigs were also one-hundred percent BP-owned. A disconcerting revelation indeed to an investor who, expecting words to convey their dictionary meaning, might be under the impression that the "common framework" would apply to "all BP operations" and "each site . . . ." Defendants were in possession of specific information undermining the truth of those statements. Continually referring to OMS with descriptors such as "framework," "overall," and "company-wide" becomes misleading when the safety program was not intended to apply to the majority of BP's Gulf operations.
>
>                                 \* \* \*
>
> Here, given the manner in which OMS was repeatedly described, portrayed as a comprehensive, company-wide program, a reasonable investor would likely find it material to know that OMS's application to "all" BP operations would exclude, in the Gulf region alone, six of the seven rigs BP worked on. BP apparently attributes different meaning to descriptors such as "all," "company-wide," "common,"

"framework," "each," "single," and "consistent" than the average investor might assume.

* * *

[I]t is the very vagueness of the statements that makes them misleading.  The fact that "all operations" and "each site" really only include, in the Gulf of Mexico for example, one of BP's seven rigs is a significant omission. . . .  In a company so plagued by a history of safety failures and so dependent on the success of its public commitment to, as Defendant Hayward put it, "turn the corner on safety," BP cannot credibly argue that the extent and reach of its key safety initiative was immaterial to investors.  (Dkt. 323 at 50-52) (internal citations omitted).

Indeed, if BP in fact could not "superimpose" OMS on its highest-yield, highest-risk operations in the Gulf of Mexico, then it should have disclosed this fact.  (*See* Dkt. 305 at 80:13-20).  As the Court correctly observed, it would not have been "a difficult disclosure at all" for BP to state that OMS would "apply to BP-owned wells but not to BP-operated wells."  (Dkt. 304 at 68:9-20).  Instead, BP did exactly the opposite, representing that OMS would exist at "all BP operations."  The Court's reasoning is clear, well-supported, and should not be disturbed.

Defendants have also *admitted* that they did not believe OMS could be applied to contractor operations:

I honestly think that when BP was implementing OMS for its company, no one ever thought that BP was going to be able to superimpose on third party contractors that it hires.  (Dkt. 305 at 80:13-16).

Defendants cannot escape their own admissions.

### b.    The SAC's OMS scope statements are substantially similar or identical to statements this Court held were sufficiently pled as materially false.

Statements N and P are the exact statements that this Court previously held were properly pleaded as materially false.  (Ludlow App. Stmt. Nos. 8 and 18; Ludlow Compl. ¶¶383, 401; Dkt. 323 at 47-48, 49-53):

Safe, reliable and compliant operations remain the group's first priority. A key enabler for this is the BP operating management system *(OMS), which provides a*

7

***common framework* for *all BP operations*,** designed to achieve consistency and continuous improvement in safety and efficiency. Alongside mandatory practices to address particular risks, ***OMS enables _each site_ to focus on the most important risks in its own operations and sets out procedures on how to manage them in accordance with the _group-wide framework_.*** (Statement N; ¶351 (additional emphasis added)).

\* \* \*

***Safety and operational integrity underpins everything we do, and we are now in the final phase of rolling out our operating management system that provides a _single, consistent framework for our operations_, covering _all areas_ from personal and process safety to environmental performance.*** And I am pleased to say that in 2009 we saw continuing improvement in all aspects.  (Statement P; ¶355 additional emphasis added)).

The new statements in the SAC concerning the scope of OMS are substantially

similar or identical to those reasserted statements:

. . . ***The OMS is a comprehensive system that covers _all aspects of our operations_*** . . . . ***The new OMS will apply to _all operations_*** by the end of 2010 and includes safety, integrity, environmental management and health. . . . ***_Each site will have its own local OMS_*** . . . .  (Statement A; ¶315 (additional emphasis added));

\* \* \*

. . . establishing a new way of operating in BP – ***with the progressive rollout of a _common group-wide_ Operating Management System***.  (Statement B; ¶317 (additional emphasis added));

\* \* \*

. . . our new standardized ***Operating Management System (OMS). This will provide a blueprint for safety and _all aspects of operations throughout BP_***, making sure operations are undertaken to a consistently high standard worldwide.  (Statement C; ¶319 (additional emphasis added));

\* \* \*

We . . . ***have begun to implement a new Operating Management System across _all of BP's operations_***.  (Statement F; ¶325 (additional emphasis added));

\* \* \*

. . . ***[BP has] begun to implement a new Operating Management System across _all of BP's operations._*** This is aimed at ensuring that our operations across the world look and feel the same everywhere - and perform to the same high standard.  (Statement G; ¶327 (additional emphasis added));

\* \* \*

***The BP operating management system (OMS) turns the principle of safe and reliable operations into reality by governing how _every BP project, site, operation and facility_ is managed***.  (Portion of Statement I; ¶332 (additional emphasis added));

\* \* \*

8

. . . *(OMS), a framework for operations <u>across BP</u> that is integral to improving safety and operating performance in <u>every site</u>.*  (Portion of Statement J; ¶335 (additional emphasis added));

* * *

You can see a similar balanced approach in our new *operating management system (OMS), which is to be implemented at <u>each BP site</u>*.  (Statement L; ¶347 (additional emphasis added));

* * *

Safe, reliable and compliant operations remain the group's first priority. A key enabler for this is the *BP operating management system (OMS), which provides a <u>common framework</u> for <u>all BP operations</u>, designed to achieve consistency and continuous improvement in safety and efficiency . . . BP's operating management system (OMS), which provides a <u>single operating framework for all BP operations</u>*, is a key part of continuing to drive a rigorous approach to safe operations . . . (Portion of Statement O; ¶353 (additional emphasis added));

* * *

*Following the tragic incident at the Texas City refinery in 2005 the [Safety, Ethics, and Environment Assurance] committee has observed a number of key developments*, *including*: the establishment of a safety & operations (S&O) function with the highest calibre of staff; *development of a <u>group-wide</u> operating management system (OMS) which is being progressively adopted by <u>all operating sites</u>* . . . .[7]  (Portion of Statement O; ¶353 (additional emphasis added));

* * *

BP's operating management system (*OMS) provides a <u>single framework</u> for <u>all BP operations</u> to follow* . . . .  Its principles and processes are designed to simplify the organization, improve productivity, *enable <u>consistent</u> execution* and focus BP on performance.  (Portion of Statement R; ¶361 (additional emphasis added));

* * *

*BP continues to implement its operating management system (OMS), a cornerstone of achieving safe, reliable and responsible operations at <u>every BP operation</u>*.  (Portion of Statement S; ¶364 (additional emphasis added)).

In light of the identical nature or substantial similarity of Statements A, B, C, F, G, L, and portions of Statements I, J, O, R and S to previously asserted Statements N and P, and in light of Defendants' own admission that OMS was not and could not be "superimposed" on contractor

---

[7]  The Court has already held the last portion of Statement O – emphasizing portions concerning OMS as part and parcel of the greater Baker Panel statement – materially false.  (Dkt. 324 at 58, 61, 61 n.12).  The Court further held that Hayward had the requisite scienter when making the statement.  (*Id*. at 100-03)  That statement was not addressed by the Court as a non-actionable OMS statement.  (*See id*. at 77, 81, 81 n.27)  Having been found actionable in all respects by this Court, the statement is not credibly subject to challenge.

operations, Defendants cannot now credibly argue that such statements are not likewise materially false or misleading.

> **c.    The SAC pleads additional evidence that Defendants misrepresented the scope of OMS.**

Several BP deponents in MDL 2179 have confirmed that OMS was not intended to apply, and did not apply, to contracted drilling rigs, and that OMS was limited to rigs fully owned by BP:

> John Mogford, BP's former Global Head of Safety & Operations and a GORC member, testified that "OMS was not designed to be implemented on contractor sites or vessels." (¶102).

> John Baxter, Group Head of Engineering for BP and member of GORC, testified that OMS did not apply to the *Deepwater Horizon* because OMS applied only to rigs that were fully owned by BP. This meant that BP did not apply its Integrity Management, Major Accident Risk ("MAR") analysis, Safety & Operations Audits,[8] or Control of Work to the majority of its drilling rig fleet, including the *Deepwater Horizon*. (¶104).

> Pat O'Bryan, Vice President of Drilling & Completions, testified that "[t]he only drilling rig that we had in our fleet [in the Gulf of Mexico] that would fall under the BP OMS is the BP-owned rig the PDQ on Thunderhorse." (¶104).

Setting aside the rule that allegations in a complaint must be taken as true, Defendants' assertion that Plaintiffs relied on "out-of-context snippets from depositions" about the scope of OMS is false. Defendants argue that testimony by Baxter, O'Bryan, and Mogford about the existence of "gap assessments" and "bridging documents" undermines those witnesses' testimony that OMS did not apply to contractor rigs. (Def. Br. at 11-12). Defendants are wrong. If those witnesses thought that the gap assessments or bridging documents meant that OMS applied to contractor rigs, they would have said so, but they did not. Instead, for example, Mogford, despite

---

[8]  S&O audits were a significant component of OMS because they tested rig and rig personnel's compliance with safety standards and risk management practices, including requirements set forth under OMS. (¶¶163-66). S&O Audits are entirely distinguishable from rig-audits, which largely audit maintenance and mechanical issues, as opposed to process safety issues. Defendants point out that a rig-audit was conducted at the *Deepwater Horizon*, but this has no bearing on the applicability of OMS to contracted rigs. On the other hand, the *Deepwater Horizon* – at Defendants Hayward's and Inglis' direction – *did not* have an S&O audit, which is consistent with SAC's allegations that process safety practices under OMS did not apply to contracted rigs. (*Id.*)

his knowledge of bridging documents, squarely testified that "OMS was not designed to be implemented on contractor sites or vessels." (¶102; Mogford Dep. at 150:18-19).  Likewise, despite Baxter's understanding of "gap assessments," he still gave a clear "No" answer when asked outright "Did OMS apply to the Deepwater Horizon?" (¶104; Baxter Dep. Vol. I, at 175:14-15).  In other words, even BP's own employees do not think that gap assessments or bridging documents made OMS applicable to contractor rigs.

Furthermore, the bridging reports which BP claims filled gaps between the contractors' safety systems and OMS did not actually impose standards equivalent to BP's OMS.  The "bridging report" that Defendants reference regarding BP's contractors requires use of an "HSSE" system primarily concerned with *personal*, not process, safety.  (*See, e.g.,* Def. Br. at 6-8).  ████████████ ███████████████████████████████████████████████████████████████████████████

████████ Indeed, early in the Class Period, Defendant Inglis authored a document complaining that risks were high on non-BP-owned rigs because ███████████████████████████████ █ ████████████ (¶171). On July 13, 2009, he echoed the same concern that safety standards on drilling rigs "fall[] short of BP expectations." (¶175).  This abdication of responsibility for management of catastrophic process safety risk was approved at the highest levels of BP, yet BP never disclosed to investors that it viewed contractors' process safety systems as inferior to OMS.

Finally, Defendants attack the allegations in the SAC through a semantic device, arguing that when Defendants used the term "implementation of OMS" with respect to rigs that BP did not fully-own, investors knew that what BP really meant was that the Company would ███████████ ███████████████████████████████████████████████████████████████████████████

███████████████████ (Def. Br. at 7 *et seq*).  Defendants' after-the-fact attempts to now cast OMS as a vague and ephemeral standard or suggested guideline for the evaluation and management

11

of process safety risk are belied by Defendants' own repeated, unequivocal statements that "OMS is a comprehensive system that covers all aspects of our operations," and that it "sets out procedures on how to manage [risk]," providing the "principles and process . . . [to] enable consistent execution." (*See, e.g.,* ¶¶96-97, 315, 319, 351, 355, 361). At most, Defendants create factual issues to be resolved at a later point in these proceedings and in no way defeat the strong and compelling inference of scienter demonstrated by Plaintiffs.

### 2. BP misrepresented the implementation of OMS.

#### a. The Court has previously found Defendants' statements concerning the implementation of OMS were sufficiently pled as materially false, and Defendants have admitted such falsity.

The Court held that allegations of OMS implementation misrepresentations were adequately pled as materially false, in part relying on the fact that Defendants admitted the falsity of such statements. (Dkt. 323 at 37). As the Court noted, Defendants conceded:

> The statement here that the Gulf of Mexico completed the transition to OMS in 2008, that is a statement of a specific fact . . . . This is the one statement, Your Honor, that the plaintiffs have alleged that I will admit to the Court is not accurate. (Dkt. 323 at 37 n.21 (quoting Dkt. 304 at 58:15-21)).[9]

The Court held:

> BP's decision to highlight the OMS program in its public reports renders it a representation that investors may rightly rely on. . . . Further, the content of the statements regarding OMS implementation are grounded in fact. The reference to "eight sites," followed by a specific list including an explicit reference to the Gulf of Mexico, is an objective statement.
>
> * * *
>
> [P]laintiffs have done much more than assert that a vague, false impression was created here. While BP could have spoken in general terms about its progress in the safety arena, it did not do so. Instead, the Company presented specific information about OMS, including the number of sites in which the program was implemented and statistical percentages demonstrating that the Company was on track with

---

[9]   Defendants again admitted falsity in their brief in support of their motion to dismiss: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Def. Br. at 13).

implementation. . . .  "A reasonable juror could . . . conclude that the statement, without some qualification or accompanying disclosure of the numerous pieces of evidence that tended to cut the other way, was a misrepresentation."  Because BP chose to speak about OMS, it had a duty to speak accurately.

* * *

Plaintiffs do not merely allege that the market was unaware of the risks; instead, Plaintiffs contend that BP's representations about its risk management programs—of which OMS was the centerpiece—lulled the market into false confidence in BP's ability to manage those risks . . . .  [A]t this stage in the suit, construing the Complaint in the light most favorable to the Plaintiffs, a reasonable juror could find that BP's representations that it had implemented OMS in the Gulf in 2008 when it had not actually done so constitute material misrepresentations.  (Dkt. 323 at 42-44).

The Court's holding should not be disturbed and Defendants cannot escape their own admissions regarding the same or substantially identical statements in the SAC.

> **b.      The SAC's new OMS implementation statement is nearly identical to statements this Court held were sufficiently pled materially false.**

The portions of Statements J and R concerning OMS implementation are the exact statements that this Court already held were properly pleaded as materially false.  (Ludlow App. Stmt. Nos. 13 and 5; Ludlow Compl.  ¶¶334, 408; Dkt. 323 at 37-44):

All operated businesses plan to transition to OMS by the end of 2010. ***Eight sites completed the transition to OMS in 2008***; two petrochemicals plants, Cooper River and Decatur, two refineries, Lingen and Gelsenkirchen and four Exploration and Production sites, North America Gas, ***the Gulf of Mexico***, Colombia and the Endicott field in Alaska . . . .  (Portion of Statement J; ¶335).

* * *

Safety is fundamental to our success as a company and 2009 was important because of the progress we made in implementing our operating management system (OMS). The OMS contains rigorous and tested processes for reducing risks and driving continuous improvement. I see it as the foundation for a safe, responsible and high-performing BP. ***Having been initially introduced at eight sites in 2008***, the OMS rollout extended to 70 sites by the end of 2009, including all our operated refineries and petrochemicals plants. ***This means implementation is 80% complete***.  (Portion of Statement R; ¶359).

Further, the portion of Statement I concerning the implementation of OMS is nearly identical to the sustained statements:

> Safety, both personal and process, remains our highest priority. 2008 was one of our best ever years for personal safety, with our performance expected to remain among the best in the industry. During the year we began migrating to ***the new BP OMS, which has an increased focus on process safety and continuous improvement***. The majority of our operations in North America Gas, ***the Gulf of Mexico***, Colombia and the Endicott field in Alaska ***all completed the migration to the OMS in 2008***. (Portion of Statement I; ¶331).

Even though Defendants admitted at oral argument that OMS was not implemented in the Gulf of Mexico in 2008 (Dkt. 304 at 58:15-21), they now claim that the phrase "[t]he majority of our operations" fundamentally alters the analysis concerning the falsity and materiality of this statement.  (Def. Br. at 25-26).  However, it is not even clear whether that portion of the statement applies only to representations concerning North America Gas, or to all of the listed operations. Accordingly, as this Court has held, "it is the very vagueness of the statement[] that makes [it] misleading;"  the fact that Defendants only intended to implement OMS "on one of BP's seven rigs is a significant omission."  (*See* Dkt. 323 at 52).

In light of the Court's prior rulings concerning the material falsity of the portions of Statements J and R concerning OMS implementation, which remain the law of the case, and in light of Defendants' own admission that OMS was not implemented in the Gulf of Mexico in 2008, Defendants cannot now credibly argue against the material falsity of the new challenged statement.

### c.    The SAC pleads additional evidence that Defendants misrepresented the implementation of OMS.

The SAC alleges significant evidence that OMS implementation was not complete in the Gulf of Mexico in 2008 or even at the time of the *Deepwater Horizon* disaster.  The Orange Books and the February 2009 GORC Pre-Read (identified by Plaintiffs and referenced by Defendants in

14

their instant brief at page 14) were provided to Hayward, Inglis, and GORC.  (¶¶84-89).  Those documents show ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ (¶113, ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ Furthermore, Hayward, the architect of OMS and the person responsible for overseeing its development and implementation, testified that he knew that the Gulf of Mexico would not "beg[i]n the process of cutover to OMS" until "Fall of 2009," and that such process would not be complete until "the end of 2010."  (¶110; Hayward Dep. at 789:11-14, 789:17-20).[10]

John Guide, BP's Well Team Leader for the Macondo well since 2003, testified that he received no formal training concerning OMS until 2011, nearly a year *after* the disaster:

> Q.   But there was no formal training on OMS until 2011 when you had that computer training?
> A.   Yes.  (¶105; Guide Dep. at 434:5-8).

Defendant Hayward's and Guide's testimony are further supported by other allegations in the SAC that OMS was not implemented with respect to contracted drilling operations in the deepwater Gulf of Mexico, including the *Deepwater Horizon*, by April 20, 2010.  (¶¶100-05, 107-16).

Defendants misconstrue Plaintiffs' characterization of the testimony of senior corporate officers who were members of GORC and SEEAC.  For example, the testimony of SEEAC member Castell demonstrated that, although he may not have recalled the exact status of OMS

---

[10]  Defendants now try to claim that other testimony by Hayward, given the day before, demonstrates that Hayward was confused or unsure concerning the status of OMS implementation.  (Def. Br. at 16-17).  However, in the testimony cited by Defendants, Hayward merely stated that he "certainly knew that OMS implementation was not complete in many parts of the company" and that he "probably was" aware that OMS was not complete in the Gulf of Mexico – testimony which is fully consistent with that cited by Plaintiffs and which does not suggest any confusion.  *Id.*

implementation in the Gulf of Mexico at the time of the *Deepwater Horizon* disaster, he knew enough that he would have been surprised had such implementation been complete:

> Q.   Do you know today whether or not OMS had been implemented in the Gulf of Mexico on April 20th, 2010?
>
> A.   I believe that OMS started its integration in the Gulf in 2009.  I would be personally surprised – and I don't know, but I'd be surprised if it had been fully integrated with all the legacy systems.  (Castell Dep. at 71:9-19; *see also* ¶112 (citing Castell Dep. at 71:9-14); *cf.* Def. Br. at 16 (citing Castell Dep. at 71:15-17)).

Furthermore, Hayward's own testimony leaves no doubt that he knew that the Gulf of Mexico did not even "beg[i]n the process of cutover to OMS" until "Fall of 2009," and that BP "would have completed that implementation in the Gulf of Mexico by the end of 2010."  (¶110, Hayward Dep. at 789:11-14, 17-20; *see also* ¶109).  At best, Defendants have highlighted a factual issue that should be left to the province of a jury.

The SAC contains further substantiation on this point in the form of confidential witness allegations.  In response, BP repeats the same arguments it made with respect to the Ludlow Plaintiffs' Consolidated Amended Complaint, which this Court previously rejected.  (Def. Br. at 17-18, 30, 37).  The Court found that "all three confidential witnesses are alleged to have worked for BP in some capacity during the relevant Subclass Period, interacted with named BP employees involved in Gulf Operations, and been privy to internal corporate documents . . . the witnesses are described in the complaint with sufficient particularity to support the probability that they possess the information Plaintiffs allege."  (Dkt. 323 at 40).  Moreover, the statements of the confidential witnesses are fully consistent with and buttressed by the testimony of BP's own witnesses.  Such statements are thus entitled to considerable weight.

16

### 3.   BP misrepresented its ability to contain and respond to oil spills.

The final challenge BP lodges against new or reasserted statements in the SAC relates to BP's misrepresentation of its capacity, resources and "infrastructure . . . to deal effectively with spills and their impacts." (Statement S, ¶363).  Statement S is as "glaring and egregious" as were BP's "invented estimates" of the amount of oil that BP could recover, which "appeared to have been invented out of thin air," and which this Court found to be actionable. (Dkt. 324 at 112-14).  It is hard to imagine a more "extraordinary and dramatic" misrepresentation about BP's ability to respond to an oil spill given its haplessness after the *Deepwater Horizon* explosion. (*Id*. at 115).

Defendant Hayward later acknowledged "we were making it up day to day." (¶274).  Defendant Suttles conceded that BP did not have the "proven equipment and technology" in place to respond to the spill. (*Id*.).  The Presidential Commission candidly described as "embarrassing" what BP euphemistically referred to as "infrastructure." (¶274).  A retired marine science professor criticized BP's response plan as "not worth the paper it is written on." (¶280).  These descriptions lead to the inevitable conclusion that BP's espoused ability to respond to a spill was as fabricated as the amounts of oil BP claimed it could contain.  The Court's ruling that BP's OSRP and IEP were actionable can be readily applied to Statement S.

### B.   Defendants' OMS and spill response statements were knowingly or recklessly false.

Plaintiffs allege with particularity:  (i) Defendants Hayward's and Inglis's key roles in designing, controlling and implementing OMS; (ii) the degree to which BP exempted any meaningful application of OMS's process safety regime in the Gulf of Mexico by excluding rigs that BP did not fully own; (iii) BP's failure to introduce OMS to key areas of its Drilling & Completions segment in the Gulf of Mexico (including the Macondo Wells Team) by the time of

17

the *Deepwater Horizon* disaster; (iv) Defendants Hayward's and Inglis's knowledge of same; and (v) that corporate statements published by BP were prepared and approved by BP executives who knew the statements were false or were reckless as to their truth.

> **1.     Plaintiffs have sufficiently pled scienter on behalf of Defendants Hayward and Inglis regarding newly alleged OMS misstatements.**

Plaintiffs' newly stated and detailed allegations regarding Defendants Hayward's and Inglis's scienter pertain to the scope and timing of OMS implementation (Statements B, C, F, G, I, J, L, O, P, and R).  The SAC alleges information establishing that Defendants Hayward and Inglis were central figures in OMS development and implementation, and that they were recipients of specific information contrary to their public statements regarding OMS.  Plaintiffs thus have established a compelling inference that Defendants Hayward and Inglis either knew or were reckless in not knowing that their statements regarding OMS were materially false or misleading.

> **a.     Hayward's and Inglis's special positions at the forefront of BP's process safety reforms and OMS implementation creates a strong inference that they either knew or were reckless in not knowing the obvious limitations in OMS implementation.**

This Court held that an individual's special position within a corporation as a steward of safety management, charged with particularized responsibilities for process safety, can create a strong inference of scienter as to the true state of the Company's process safety.  Specifically, the Court held that Plaintiffs adequately alleged scienter with respect to Defendant Hayward:

> Plaintiffs adequately allege scienter with respect to Hayward by pointing to Hayward's own admission as to what his job as CEO entailed, including verbal commitments revealing that he took responsibility for BP's process safety efforts and was the key individual tracking that progress. . . .  Hayward's own actions as the spokesperson and champion for BP's reform efforts weigh strongly in favor of the inference that Hayward paid special attention to BP's process safety efforts or, at the least, was reckless in not doing so while continuing to publicly tout improvements.  The competing inference—that Hayward professed to be focused on process safety but remained unaware of actual process safety concerns in BP's operations on the ground—is far less compelling.  (Dkt. 324 at 100-01 (internal citations omitted)).

That holding applies with particular force to Hayward's misrepresentations about the scope of OMS (what this Court referred to as BP's "safety process initiative" (Dkt. 323 at 42)), and the status of OMS implementation.  In its holding, the Court specifically noted that "Hayward claimed he was following the implementation of BP's OMS program and repeatedly mentioned the Company's goals for the program."  (Dkt. 324 at 100).  Indeed, Hayward himself had "set up" the GORC, which was a "vehicle for continuing to improve [BP's process safety] performance.  That was through the OMS.  So part of it was to actually look at how OMS was being implemented." (¶85).  Part of Hayward's responsibilities as Chair of the GORC included "[o]versight of development and implementation of BP's Operating Management System" (¶86), and Hayward regularly reported to the SEEAC regarding the status of OMS implementation (¶90).

The SAC alleges that Defendant Inglis held a position second only to Defendant Hayward at BP regarding accountability for OMS development and implementation.  (¶46).  It is consistent with the law and this Court's February 13, 2012 Opinion to conclude that Defendant Inglis also knew of or displayed reckless indifference in not knowing the scope of OMS at the time of his misstatements.  The SAC paints a clear picture of the inner workings of BP's process safety monitoring and implementation protocols for OMS.  Specifically, Defendant Inglis testified that he was second only to Defendant Hayward in authority and responsibility for safe and reliable operations in the Gulf of Mexico, stating that "[a]s the CEO of the exploration and production company," he was "responsible for the safe and reliable operations across all of the E&P operations globally."  (¶46).  Also, like Hayward, Inglis was knowledgeable about the scope of OMS through his participation in the GORC, ██████████████████████████████  (¶84).  And like Hayward, Inglis repeatedly discussed BP's process safety and OMS in particular.

19

As these allegations make clear, there is a strong inference that Defendants Hayward and Inglis, as the two individuals most responsible for OMS and BP's process safety regime, knew or were reckless in not knowing the most basic facts about OMS. The competing inference—that Defendants Hayward and Inglis were at the center of OMS implementation efforts, but were unaware that it did not apply to rigs that BP did not fully own or that it was not operational in the Gulf at the time of the *Deepwater Horizon* disaster—is far less compelling and simply not credible.

> **b.  The SAC alleges with particularity Defendants Hayward's and Inglis's specific knowledge regarding the truth about OMS scope and implementation.**

Beyond their critical roles at the apex of BP's process safety regime, the SAC contains particularized allegations establishing that both Defendant Hayward and Defendant Inglis had <u>specific</u> knowledge that OMS did not apply to rigs that BP did not fully-own and that Hayward knew had not been implemented in the Gulf of Mexico even at the time of the *Deepwater Horizon* disaster (let alone in 2008, as Defendants claimed). Regarding the scope of OMS, the SAC alleges:

- Defendant Hayward has testified that he knew BP would <u>not</u> have any operational well control procedures—a critical process safety safeguard—in place on a Transocean rig: "BP doesn't have well control procedures to manage a well that is beginning to flow, because we're not actually drilling any of the wells that our contractors are."[11] (¶103).  Fellow GORC member John Baxter confirmed this, testifying that BP "does not apply its safety management system to other activities where the contractor has their own safety management system . . . there is no requirement to . . . the OMS to actually apply that to the contractors' activities."  (Baxter Dep., Vol. I, 192:1-6; *see* ¶104).  Defendant Hayward's statement is remarkable as he has acknowledged that a loss of well control "was certainly one of the highest risks for the corporation.  It was the highest risk in the Gulf of Mexico and one of the highest risks for the Ex – for the Exploration and Production Unit."  (¶106).

---

[11]   In their brief, Defendants dismiss this testimony regarding BP's failure to have any well control procedures in place on the *Deepwater Horizon* because OMS is not specifically mentioned by name.  (Def. Br. at 12 n.7).  However, it is irrelevant whether Hayward used the term "OMS."  Hayward's testimony was that Transocean's well control system applied on the *Deepwater Horizon* because it was a Transocean rig.  (¶103).  According to Hayward, "BP doesn't have well control procedures to manage a well that is beginning to flow, because we're not actually drilling any of the wells that our contractors are."  *Id.*  Well control is merely one example of how BP deferred its process safety responsibilities to contractors on rigs that it did not fully-own.

20

- ███████████████████████████████████████████
  ███████████████████████████████████████████
  ███████████████████████████████████████████
  ███████████████████████████████████ (¶164).

- In an email to the Upstream Senior Leadership Team dated July 13, 2009, Defendant Inglis found that contractor conformance with Control of Work (CoW) practices fell short of BP expectations.  (¶¶175-76).  CoW is a component of OMS and this email shows that Inglis was aware that any attempt to "bridge" contractor safety management systems to OMS were ineffectual and no substitute for actual OMS implementation.

- OMS was designed and approved by the GORC (including Defendants Hayward and Inglis) "for BP owned and operated institutions" but not "to be implemented on contractor sites or vessels."  (¶102).  GORC specifically discussed that OMS applied to "BP owned and operated and controlled sites."  (*Id*.).

As to the status of OMS implementation, the SAC alleges:

- Defendant Hayward testified that BP did not even begin to implement OMS in the Gulf of Mexico until Fall 2009 and that he did not expect implementation to be complete until the end of 2010:

  > Q. Go back to an old familiar subject, the OMS. Did you know in April of 2010, that the OMS had not been fully implemented in the Gulf of Mexico?
  > A. I – yeah. I believe I was aware that it had not been fully implemented. It was in the process of being implemented as it was in other parts of BP.

  > Q. But specifically with respect to the Gulf of Mexico, that's your answer?
  > A. Yes.

  > Q. Okay. When did you come to learn that?
  > A. I would have been aware of it prior to the – you know, in the course of doing my – my job.

  > Q. Okay.
  > A. Because we had a – as I've explained a number of times through this deposition, the Group Operations Risk Committee was looking at the progress of implementation.

  > Q. So you were getting reports as to where it was implemented, where it was not yet implemented?
  > A. And where it where it was entrained, so to speak.
  >                                        * * *
  > Q. [Y]ou said that you were on target to implement OMS in the Gulf of Mexico in 2009?
  > A. I – my recollection is that we began the process of cutover to OMS in the Fall of 2009.

21

* * *

      Q. And your recollection also is that you would have completed that implementation in the Gulf of Mexico by the end of 2010?

      A. That's correct.

(¶¶109-10; Hayward Dep. at 662:25-663:20, 789:11-14, 789:17-20).

- ████████████████████████████████████████████████████████
  ████████████████████████████████████████████████████████
  ████████████ (¶113).

- Defendants Hayward and Inglis received regular status updates concerning the implementation of OMS via the Orange Book. One of the purposes of the Orange Book was to provide members of GORC with key performance indicators concerning the implementation of OMS. (¶87). Inglis specifically testified to this fact: "There was then a very rigorous process for [OMS] implementation, as I've described to you. I monitored the implementation of that through the – the Orange Book[.]" (¶88). Likewise, Defendant Hayward testified that he stayed apprised of what BP's operations had or had not implemented the OMS through the Orange Book. (¶89).

Despite overwhelming direct evidence of scienter, Defendants have introduced excerpts of documents and testimony which they claim lead to a competing inference that Defendants Hayward and Inglis were somehow ignorant of the basic facts about OMS, or were misled by terminology used in corporate documents. (Def. Br. at 10, 13-15). This inference is far less compelling than the inference of culpability presented by Plaintiffs, where Defendants designed OMS, closely monitored OMS, and clearly knew the most central aspects of OMS scope and implementation. Defendants Hayward and Inglis were each responsible for BP's process safety reform efforts and took it upon themselves to communicate regularly with the public on those efforts, as recommended by the Baker Panel. These Defendants therefore had a duty to speak fully and truthfully, including as to matters that they should have known were true. To the extent Hayward or Inglis received differing accounts of OMS scope or implementation, they would have been at least severely reckless in speaking to the public on these issues without first ensuring their information was correct. *See Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) ("[W]e have found allegations of

22

recklessness to be sufficient where plaintiffs alleged facts demonstrating that defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud."); *In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.*, 694 F. Supp. 2d 1192, 1209–10 (W.D. Wash. 2009) (finding a strong inference of scienter pleaded as to statement about risk management where defendant was responsible for overseeing risk management).[12]

### 2. Plaintiffs have sufficiently pled corporate scienter with respect to the unattributed corporate statements alleged in the SAC.

The remaining five statements challenged by Defendants are corporate statements that BP disseminated in its public filings, namely the Company's Sustainability Reports and Reviews and its Annual Reports.  As the Court held, "[c]orporate statements can . . . be tied to directors and officers if plaintiffs . . . allege their involvement in creating the documents."  (Dkt. 324 at 95 (finding that an unattributed statement in the 2009 Annual Report could be attributed to BP's Chief Financial Officer, Byron E. Grote, because he signed the document)); *see also Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 365 (5th Cir. 2004) ("[C]orporate documents that have no stated author or statements within documents not attributed to any individual may be charged to one or more corporate officers provided specific factual allegations link the individual to the statement at issue.").[13]

---

[12] *In re Officemax, Inc. Securities Litigation*, No. 00-cv-2432, 2002 U.S. Dist. LEXIS 27019 (N.D. Ohio Mar. 26, 2002), cited by Defendants, is inapposite.  There, the plaintiffs argued that scienter was shown by the defendants' receipt of an internal study which, plaintiffs' argued, differed with the defendants' public statements. *Id.* at *44-45.  The court's holding was simply that the internal study did *not* differ from the public statements and therefore did not support an inference of scienter. *Id.* at *46, 51.  *Officemax* does not support Defendants' argument, which is effectively that a defendant can rely on any shred of information that sounds consistent with their misrepresentations, even if the great bulk of information received by the defendant says otherwise.

[13] Defendants conceded in their briefing on the Motion to Dismiss the New York and Ohio Complaint that unattributed statements may be charged to corporate officers where the plaintiff alleges a specific factual link between the individual and the statement:

"[C]orporate documents that have no stated author or statements within documents not attributed to any individual may be charged to one or more corporate officers provided specific factual allegations link the individual to the statement at issue."  (Dkt. 220 at 22).

23

The SAC alleges facts demonstrating that BP's SEEAC approved the corporate statements pled in the SAC.   SEEAC was responsible for reviewing for accuracy and recommending publication of "material to be placed before shareholders that addresses environmental, safety and ethical performance." (¶¶90-91).

Each of the members of SEEAC (in particular its Chairman, William Castell), knew, or were reckless in not knowing, the true scope of OMS and the status of its implementation.   Consistent with SEEAC's mandate to ensure the accuracy of publications regarding safety, these individuals received information from various sources, "including internal audit, the safety and operations function, and the group compliance and ethics function." (¶92).  They also regularly reviewed the Orange Book, which contained information on the scope and status of OMS implementation.  (¶93).

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

(¶94).    In particular, SEEAC Chairman Castell knew the truth about OMS scope and implementation.  Castell testified that OMS had not been completed in the Gulf of Mexico by 2008, stating:  "I would be personally surprised – and I don't know, but I'd be surprised if it had been fully integrated with all the legacy systems [as of April 20, 2010]." (¶112).

As a result of SEEAC's approval of all statements to shareholders concerning safety issues and its knowledge of safety and OMS in particular, the corporate statements alleged in the SAC can each be tied to the members of SEEAC.  As alleged in the SAC, ████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████ (containing Statement S).

(¶161). ████████████████████████████████████████████████████████

██████████████████████████████████ (*Id.*). ████████████

24



(¶162). ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████ (containing Statement R).  (*Id.*) ████████████████████████ (*Id.*).

Therefore, the SAC contains specific allegations that the SEEAC members, as well as Defendants

Hayward and Inglis, reviewed and approved the 2009 Sustainability Report.  It is a reasonable

inference that SEEAC also reviewed and approved other BP documents regarding safety that were

disseminated to shareholders throughout the class periods.

With respect to the 2009 Annual Review (Statement N), Defendants Hayward and Inglis

████████████████████████████████████████

████████████ (¶352(a)).  Thus, Plaintiffs have set forth detailed factual allegations regarding

Defendants Hayward's and Inglis's "involvement in creating the" 2009 Annual Review.  (Dkt. 324

at 95).  And, as discussed above, these Defendants knew, or were reckless in not knowing, the truth

about the scope of OMS, which was misrepresented in Statement N.  *See* § B(1)(b) *supra*.

Although not necessary to prevail given the allegations discussed above, the corporate

misrepresentations challenged by Defendants also are sufficiently egregious to establish a "strong

inference" of corporate scienter under the standard set forth in *Makor Issues & Rights, Ltd. v.*

*Tellabs Inc.,* 513 F.3d 702 (7th Cir. 2008) ("*Tellabs II*").  As this Court held:

> BP claimed it could recover 491,721 barrels of oil per day when it could recover
> only 15,000. Taking into consideration the added gravity of the fact that the numbers
> here refer to barrels of oil being spilled into an ocean as opposed to SUV production
> (the hypothetical in *Tellabs II*), the erroneous estimates climb very close to—if not
> exceed—the extraordinary nature of the facts envisioned by the Seventh Circuit.

> Further, additional errors in the Regional OSRP exacerbate the misrepresentation. . . . The invented estimates and inapplicable paragraphs weigh in favor of an adequate pleading of reckless indifference as such blatant errors seem to reflect BP's utter disregard for the potential magnitude of the damage an uncontainable spill could cause—and did cause—in the Gulf of Mexico.

(Dkt. 324 at 113-14).  Similarly, the 2009 Sustainability Report falsely claimed that BP would "ensure an infrastructure is in place to deal effectively with spills and their impacts." (¶ 363).  The Report further claimed that BP's "operating facilities have the capacity and resources to respond to spill incidents" and that BP "participate[d] in industry and international forums to coordinate contingency planning and emergency response." (*Id.*)  When faced with the truth—a runaway well spewing 60,000 barrels of oil per day into the sensitive ecosystem of the Gulf of Mexico for approximately three months—Defendant Hayward admitted the falsity of these statements, conceding that "[w]hat's undoubtedly true is that we did not have the tools you'd want in your tool kit" and that the Company was "making it up day to day." (¶¶274, 386).  As with the statements set forth in BP's OSRP and IEP, its statements in its Sustainability Report regarding its emergency planning and spill response capability were blatantly erroneous and evidence a complete disregard for the seriousness of the resulting consequences, thus satisfying the corporate scienter standard correctly articulated by the Court.  (*See* Dkt. 324 at 115 (statements regarding BP's "ability to contain a spill in the Gulf, were so far from the truth as to support a finding of reckless indifference.")).

BP's statements regarding the scope of OMS similarly evidence a reckless indifference sufficient to satisfy the *Tellabs II* standard.  Contrary to the Defendants' public statements that OMS was a "comprehensive system that covers all aspect of our operations," Defendants knew that OMS would never apply to any rig operated but not owned by BP.

26

The hypothetical set forth in the *Tellabs II* decision is instructive.  There, the court reasoned that a claim by Toyota that it had manufactured one million SUVs, when in fact it had manufactured zero, would demonstrate a strong inference of corporate scienter due to the "dramatic" nature of the false statement.  513 F.3d at 710.  Here, BP's CEO touted from his inception into office that he would "focus on safety like a laser" and that BP was "addressing the recommendations of the Baker Panel" through the implementation of the Company's marquee process safety regime, OMS.  BP repeatedly assured investors that OMS was the means through which the Company was effectively managing process safety risk.  It wasn't, and it didn't.  Contrary to BP's public statements, Defendants and other members of the Board of Directors made the conscious decision to exempt approximately 85% of its highest risk and highest yield operations in the Gulf of Mexico from the application of OMS.  (¶¶163-66).  As with the *Tellabs II* hypothetical, BP's statements regarding the scope of OMS implementation were sufficiently "dramatic" that the statements "would have been approved by corporate officials sufficiently knowledgeable about the company to know that the [statements were] false."  (Dkt. 324 at 112 (quoting *In re Dell Inc. Sec. Litig.*, 591 F. Supp. 2d 877, 899 (W.D. Tex. 2008))).  Indeed, the evidence demonstrates that corporate officers, including Hayward and Inglis, were the individuals who were the most knowledgeable about OMS.  (¶¶46, 84-94, 102-04, 106, 109-13).  "Because the alternative hypotheses—either a cascade of innocent mistakes, or acts of subordinate employees, either or both resulting in a series of false statements— are far less likely than the hypothesis of scienter at the corporate level at which the statements were approved, the latter hypothesis must be considered cogent."  *Tellabs II,* 513 F.3d at 711.

27

**C.**      **The SAC adequately alleges the new statements were materially false or misleading and made with scienter.**

**1.   BP's 2006 Sustainability Report dated May 9, 2007 (Statement A).**

BP's 2006 Sustainability Report, issued May 9, 2007,[14] falsely represented that BP's OMS "covers all aspects of [BP's] operations" and would "apply to all operations" at BP with a "consistent group-wide framework."   (¶315).   The Court has already held that substantively identical statements by Defendants, representing that OMS provided a "common framework for all BP operations," a "group-wide framework," and "a single, consistent framework for [BP's] operations," were sufficiently pled as materially false and misleading and failed to disclose material information about the true scope of BP's OMS.  (*See* § III.A.1.a; *see also* Dkt. 323 at 47-48, 49-53). The Court found such statements to be actionable, concluding that "[c]ontinually referring to OMS with descriptors such as 'framework,' 'overall,' and 'company-wide' becomes misleading when the safety program was not intended to apply to the majority of BP's Gulf operations."  (Dkt. 323 at 51; *see also id*. at 52 (holding such statements material)).   As the misrepresentations in Statement A are essentially identical to those found to be actionable in the Ludlow Opinion, they should likewise be found actionable here.

Despite the foregoing, Defendants challenge the falsity of the representations in Statement A based on what they erroneously claim to be contradictory information in the SAC and documents referenced therein.[15]   According to Defendants' newly-crafted argument, OMS did apply to third-

---

[14]  Contrary to Defendants' suggestion that statements in this document were not challenged in Plaintiffs' original complaints, statements in this document were, in fact, challenged in the New York and Ohio complaint.  (*See* New York and Ohio Compl. ¶266 ("Misrep. No. 6" per the NY/Ohio Opinion)).  This document was previously identified by the April 2007 date on its face, not the May 9, 2007 date on which it was released to the public.

[15]  The cases cited by Defendants for the proposition that allegations in a complaint should not be accepted as true when they are purportedly "contradicted by documents on which the complaint relies" do not support dismissal here.  *See In re Bristol-Myers Squibb Sec. Litig*., 312 F. Supp. 2d 549, 555, 566 (S.D.N.Y. 2004) (noting plaintiffs' counsel conceded at argument that certain documents cited in complaint did not indicate "consignment sales" under legal definition of that

party contractors because of various OMS "Sub-Element[s]" and *recommended* practices that BP

contends sought some unmeasured comparability between the "*contractor's* safety management

system" and BP's OMS and because an audit of the *Deepwater Horizon* was purportedly performed

in 2009.  (Def. Br. at 19) (emphasis added).  Defendants also attempt to discredit MDL 2179

deposition testimony that clearly establishes that BP's OMS did not apply to rigs that BP did not

fully-own.  These arguments fail for the reasons described above in § A(1), including that:  the

Court has already concluded that OMS did not apply to third party rigs; Defendants have admitted

that this was the case; and the SAC contains additional allegations that OMS applied only to rigs

that were fully owned by BP.  Defendants' new line – that "OMS did apply to contractors, although

not *in the same way* it applied to BP-operated entities" (Def. Br. at 11, emphasis in original) – itself

suggests a triable issue of fact regarding how OMS supposedly applied to contractors.

Plaintiffs have sufficiently alleged BP's scienter for two reasons.  First, as discussed above,

the SAC alleges that Defendants Hayward and Inglis were involved in creating Statement A and

that each possessed the requisite scienter.  (*See* § III.B.2 (noting corporate scienter can be alleged by

linking one or more corporate officers to the statement)).  Second, BP's false statements and

material omissions regarding the scope of OMS in Statement A were sufficiently egregious under

*Tellabs II* to establish a strong inference of scienter due to the fact that OMS would never apply to

any rig that BP did not fully own, including more than 85% of BP's drilling operations in the Gulf

of Mexico.  (*See id.*).

---

term necessary to support claim); *U.S. ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 377 (5th Cir. 2004) (finding dismissal based on purportedly contradictory documents improper unless  "it appears beyond doubt that Plaintiff can prove 'no set of facts' in support of her claim," and noting that even if "exhibits called into question one or more of the examples," dismissal is improper unless exhibits call into question entire claim (citation omitted)); *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 761 F. Supp. 2d 504, 523 n.7 (S.D. Tex. 2011) (finding terms of contract did not describe defendant's "'complete' control" of other entity as plaintiffs alleged, and plaintiffs alleged no other facts supporting their claim).

29

Lastly, BP's claim in Statement A that OMS "covers all aspects of [BP's] operations" and was developed to "apply to all operations" are not, as Defendants contend, forward-looking statements protected by the PSLRA safe harbor.  Far from statements about future "plans and objectives," Plaintiffs' allegations concern BP's concealment of the reality that, at the time the statements were made, OMS did not apply to "all" aspects of BP's operations because it did not, and was *never* intended to, apply to rigs that BP did not fully own.  Moreover, even if there were a forward-looking component to Statement A, which there is not, Defendants' drumbeat of statements touting OMS as the central component of BP's commitment to process safety and implementation of the Baker Panel's recommendations nonetheless weighs in favor of finding the statements actionable.  As the Court has held, "[a] repeated utterance, even on a promise of progress, can become misleading where repetition becomes a statement of current and ongoing compliance." (Dkt. 324 at 60 (internal citation omitted)).  Thus, a forward-looking statement can become an inaccurate assertion of past or existing fact if repetition creates an "impression of a state of affairs that differs in a material way from one that actually exists."  (*Id*.).  Regardless, the PSLRA safe harbor cannot apply here, where the SAC alleges that "the statement was made with knowledge of falsity."  (Dkt. 323 at 44 (quoting 15 U.S.C. § 78u-5(c)(1)(A)).

### 2. Defendant Hayward speaking on a July 24, 2007 conference call (Statement B).

On July 24, 2007, BP held a conference call with analysts and investors, during which Defendant Hayward misrepresented that OMS applied group-wide:

> We are also in the early days of establishing a new way of operating in BP – ***with the progressive rollout of a common group-wide Operating Management System.*** (¶317).

The Court previously held substantially similar statements were sufficiently pled as materially false (*See* Dkt. 323 at 50, 53 (describing statements referring to OMS as a "framework," "overall," and "company-wide" as misleading); Statements N and P).  As described above, the SAC includes additional allegations of falsity, and direct evidence of scienter by Defendant Hayward. (¶¶100-06).  Hayward was the architect of OMS, he specifically tasked GORC with monitoring the development and implementation of OMS, and he admitted he was ultimately responsible for such development and implementation.   (*See* ¶¶85-86, 102-04, 318).   Hayward and other GORC members testified that OMS did not apply across all operations, including approximately 85% of BP's highest-risk deepwater drilling operations in the Gulf of Mexico.  (¶¶100-04, 106).  Hayward testified that BP operations on contracted rigs failed to apply critical components of OMS, including well control procedures, designed to manage the catastrophic risk of a deepwater blowout.  (¶103).[16]

Defendants have conceded that OMS did not apply to BP's operations on rigs unless the rig was fully-owned by BP (¶100; (Dkt. 304 at 66:6-68:20)), and that "when BP was implementing OMS for its company, no one ever thought that BP was going to be able to superimpose [OMS] on third party contractors that it hires."  (Dkt. 305 at 80:13-16).  BP employees and confidential witnesses confirmed that OMS did not apply group-wide to all BP operations.  (¶¶105, 318).

Lastly, the statement is not protected by the PSLRA safe harbor.  The statement describes the scope of OMS as it was being established at that time and Hayward knew at that time that OMS

---

[16]  Defendants incorrectly suggest that there can be no scienter for statements that are susceptible to multiple interpretations, including innocent ones.  (Def. Br. at 22).  If Defendants were correct, there could be no liability for any misleading statements because misleading statements, almost by definition, are susceptible to various meanings. Defendants' cases are inapposite.  The ambiguous statements in *Indiana Electrical Workers' Pension Trust Fund Ibew v. Shaw Group, Inc.*, 537 F.3d 527, 537-38 (5th Cir. 2008) were not the defendants' misrepresentations, but private conversations that the plaintiffs argued showed scienter, but which were actually innocent.  Also, the scienter analysis in *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 274 & n.15 (S.D.N.Y. 2008) says nothing about any ambiguity in the false statements, but simply holds that the scienter allegations were insufficient.  Finally, *Flaherty & Crumrine Preferred Income Fund Inc. v. TXU Corp.*, 565 F.3d 200, 212 (5th Cir. 2009) merely held that it could be inferred that the defendants did not know their statements were false.

applied only to BP's own operations:  there was no subsequent change to limit the scope of OMS beyond the restrictions applied from its inception.  Moreover, the supposed cautionary language merely stated that "production and timing of major project[s]" may differ from expectations, but did not warn investors that OMS did not and never would apply to most of BP's deepwater operations.

### 3. Defendant Inglis speaking on September 25, 2007 at the Sanford Bernstein Conference (Statement C).

On September 25, 2007, Defendant Inglis spoke at the Sanford Bernstein 4th Annual Strategic Decisions Conference, during which he misrepresented that OMS would apply to all aspects of operations throughout BP:

> One aspect of our focus on safe and reliable operations that I mentioned earlier, is our new standardized ***Operating Management System (OMS).  This will provide a blueprint for safety and all aspects of operations throughout BP***, making sure operations are undertaken to a consistently high standard worldwide.  (¶319).

The Court previously held substantially similar statements were sufficiently pled as materially false.  (*See* Dkt. 323 at 50, 53; Statements N and P).  As described above, the SAC includes additional allegations of falsity, and direct evidence of scienter by Defendant Inglis.  (¶¶100-06; *see* III.C.2, *supra*).  Moreover, BP has conceded that OMS only applied to rigs that BP fully-owned and that it never thought that it could "superimpose" OMS on contractors.

Defendant Inglis was the Chief Executive of Exploration and Production (which included the Drilling & Completions unit) and knew, or was reckless in not knowing, that approximately 85% of the deepwater drilling rigs in the Gulf of Mexico were contracted rigs that did not apply OMS as the process safety management system.  (¶¶100-01).  Defendant Inglis was also a member of GORC and was charged with oversight and implementation of OMS with respect to exploration and production activities in the Gulf of Mexico.  (¶¶46, 85, 87-88).  Defendant Inglis testified that he was "responsible for the safe and reliable operations across all of the E&P operations."  (¶46).

32

Accordingly, Inglis knew his statement was materially false when made, or made the statement with reckless disregard for the truth. Inglis's statement is not protected by the PSLRA safe harbor. At that point, Defendants had already designed OMS and its intended scope was known to them.

### 4. Defendant Hayward speaking on a February 27, 2008 conference call (Statement F).

On February 27, 2008, BP conducted its 2008 Strategy Presentation during a conference call with investors and analysts. During that call, Defendant Hayward misrepresented that OMS would apply across all of BP's operations:

> Notwithstanding this track record *our intense focus on process safety continues. We are making good progress in addressing the recommendations of the Baker Panel and have begun to implement a new Operating Management System across all of BP's operations*. (¶325).

The Court previously held substantially similar statements were sufficiently pled as materially false. (*See* Dkt. 323 at 50, 53; Statements N and P). As described above, the SAC includes additional allegations of falsity and direct evidence of scienter from members of GORC, including that of Defendant Hayward—the architect of OMS, charged with its development and implementation, including to BP's highest-risk Gulf of Mexico operations. (¶¶85-86, 100-06, 326; *See* § III.C.2, *supra*). Moreover, BP conceded that OMS only applied to rigs that BP fully-owned and that it never thought that it could "superimpose" OMS on contractors. (*See* § III.C.2, *supra*).

### 5. Defendant Hayward's speech at the 2008 General Meeting on April 17, 2008 (Statement G).

On April 17, 2008, Defendant Hayward delivered a speech at BP's 2008 Annual General Meeting. During his speech, Defendant Hayward misrepresented that OMS would apply across all of BP's operations:

> *"We are making good progress in addressing the recommendations of the Baker Panel and have begun to implement a new Operating Management System across all of BP's operations."* (¶327).

33

The Court previously held substantially similar statements were sufficiently pled as materially false. (*See* Dkt. 323 at 50, 53; Statements N and P). The SAC includes additional allegations of falsity, and direct evidence of scienter from members of GORC, including that of Defendant Hayward — the architect of OMS, charged with its development and implementation, including to BP's highest-risk Gulf of Mexico operations. (¶¶85-86, 100-06, 328; *See* § III.C.2, *supra*). Moreover, BP conceded that OMS only applied to rigs that BP fully-owned, and that it never thought that it could "superimpose" OMS on contractors. (*See* § III.C.2, *supra*).

### 6. BP's 2008 Annual Review dated February 24, 2009, including the Group Chief Executive's Review (Statement I).

BP's 2008 Annual Review dated February 24, 2009 falsely assured investors that "[t]he majority of our operations in North America Gas, ***the Gulf of Mexico***, Colombia and the Endicott field in Alaska ***all completed the migration to the OMS in 2008.***" (¶331). Despite conceding the falsity of this statement (i) at the hearing on the Motion to dismiss (*see* MTD Hr'g Tr. (Dkt. 304) at 58:15-21 ("The statement here that the Gulf of Mexico completed the transition to OMS in 2008. . . . I will admit to the Court is not accurate.")) and (ii) in the course of Defendant Hayward's deposition (*see* ¶109), Defendants now challenge the falsity of the representations in Statement I by emphasizing the word "majority." Defendants' argument is belied not only by their prior admissions, but also by the fact that OMS did not and never would apply to a "majority" of BP's operations in the Gulf because Defendants made the conscious decision to exempt in excess of 85% of BP's Gulf drilling operations from OMS. Also, the word "majority" appears to modify the phrase "our operations in North America Gas," not "the Gulf of Mexico." Defendants' argument, at best, creates an issue of fact which cannot be resolved at this stage of the proceedings.

As described above, the SAC includes direct evidence of scienter from members of GORC and SEEAC, including Defendants Hayward, Inglis and SEEAC Chairman Castell.  Defendants Hayward and Inglis knew that the Gulf of Mexico had not completed the transition to OMS by the conclusion of 2008 because ███████████████████████████████████████████████████ ███████████████████████████████████████ (¶113).  Additionally, Hayward, Inglis and all GORC members received regular reports (including Orange Books) updating them on the status of OMS implementation in the Gulf of Mexico.  (¶¶87-89, 109).  Moreover, Defendant Hayward as special liaison to SEEAC regularly reported to SEEAC, a board committee which specifically reviewed and approved "material to be placed before shareholders" addressing safety issues (¶¶90-94, 156-62), on the status of OMS implementation.  (¶90).  SEEAC Chairman Castell testified that he understood that implementation of OMS had not been completed in the Gulf of Mexico by 2008 (¶112) and Defendant Hayward testified that implementation had not been completed at the time of the *Deepwater Horizon* disaster (¶110).

The 2009 Annual Review also included the Group Chief Executive's Review, in which Defendant Hayward claimed that "[t]he BP operating management system *(OMS)* turns the principle of safe and reliable operations into reality by *governing how every BP project, site, operation and facility is managed*."  (¶332).  As discussed in detail above*, Defendants have conceded that OMS did not apply to rigs operated, but not owned, by BP, and therefore did not apply to the vast majority of BP's operations in the Gulf.  (*See* Dkt. 304 at 68:9:20; Dkt. 305 at 80:13-16).[17]  The SAC also adequately alleges that the statement was knowingly false when made, or made with reckless indifference to the truth.  As the Court previously held, "Hayward's own actions as the spokesperson and champion for BP's reform efforts weigh strongly in favor of the

---

[17] *See also* §§ III.A.1.a, III.A.1.b, *supra,* discussing in detail the allegations set forth with particularity in the SAC.

inference that Hayward paid special attention to BP's process safety efforts or, at the least, was reckless in not doing so while continuing to publicly tout improvements."  (Dkt. 324 at 101). Defendant Hayward's statement regarding the scope of OMS is essentially a more detailed version of the prior statements regarding process safety that were upheld by the Court.

### 7.   BP's 2008 Form 20-F Annual Report dated March 4, 2009 (Statement J).

On March 4, 2009, BP filed its 2008 Annual Report with the SEC on Form 20-F, which was signed by Defendant Hayward.  The Annual Report falsely claimed:  "We continue to implement our new operating management system *(OMS), a framework for operations across BP that is integral to improving safety and operating performance in every site . . . ."*  (¶335).  It further claimed that "*[e]ight sites completed the transition to OMS in 2008*" including "*the Gulf of Mexico*[.]"  (*Id.*).

The Court previously held substantially similar statements regarding the scope of OMS applying across all operations were sufficiently pled as materially false.  (*See* Dkt. 323 at 50, 53). As described above, the SAC includes additional allegations of falsity (¶¶100-04) as well as direct evidence of Defendant Hayward's scienter at the time that he signed the Annual Report.  (¶336). Further, BP conceded at the hearing on Defendants' motions to dismiss that OMS did not apply to BP's operations on rigs unless the rig was fully-owned by BP.  (¶100; Dkt. 304 at 66:6-68:20). Defendant Hayward, as Chairman of GORC, was the individual at BP ultimately responsible for implementation and oversight of OMS.  (¶¶85-86).  Hayward and fellow GORC members testified that OMS did not apply across all operations nor to the great majority of the BP Gulf of Mexico operations.  (¶¶102-04).  Hayward possessed an internal strategy document confirming that the specific operations within the Gulf of Mexico were not governed by OMS.  (¶336(d)).  The

36

inapplicability of OMS to all BP operations was confirmed by several BP employees and confidential witnesses.  (¶¶105, 336(b), (c) and (g)).

In addition, the Court has previously held this exact statement that the Gulf completed the transition to OMS in 2008 to be sufficiently pled as a material misrepresentation.  (*See* Dkt. 323 at 40, 44).  Defendant Hayward testified that he knew OMS was not implemented in the Gulf of Mexico in 2008, that he knew the Gulf of Mexico would not "beg[i]n the process of cutover to OMS" until Fall 2009, and that OMS had not been implemented in the Gulf of Mexico as of April 2010.  (¶¶109-10).  In February 2009, ███████████████████████████████████ ███████████████████████████████████████████  (¶113). Moreover, at the hearing on Defendants' motions to dismiss on November 4, 2011 BP conceded OMS was not completed in the Gulf of Mexico in 2008.  (¶107; Dkt. 304 at 58: 15-21).

### 8. Defendant Hayward's statement in BP's 2008 Sustainability Review dated April 16, 2009 (Statement L).

On April 16, 2009, BP issued its 2008 Sustainability Review, which contained statements from Defendant Hayward in the "Group Chief executive's review."  Hayward's statements misrepresented that OMS applied across all BP operations:

> "You can see a similar balanced approach in our new ***operating management system (OMS), which is to be implemented at each BP site.***"  (¶347).

The Court previously held substantially similar statements regarding the scope of OMS were sufficiently pled as materially false.  (*See* Dkt. 323 at 50, 53; Statements N and P).  As described above, the SAC includes additional allegations of falsity, and direct evidence of scienter on the part of Defendant Hayward, which existed at the time he made the statement.  Again, Hayward was the architect of OMS and was charged with its development and implementation, including to BP's highest-risk Gulf of Mexico operations.  (¶¶85-86, 100-06, 348; *See* § III.C.2, *supra*).  Defendant

Hayward was also aware of major process-safety related concerns that increased the likelihood and severity of "process safety related incidents" within BP's Gulf of Mexico operations. (¶21). Moreover, as described above, BP conceded that OMS only applied to rigs that BP fully-owned, and that it never thought that it could "superimpose" OMS on contractors. (*See* § III.C.2, *supra*).

### 9.  BP's 2009 Annual Review dated February 26, 2010 (Statement N).

BP's 2009 Annual Review, dated February 26, 2010, falsely represented that BP's OMS "***provides a common framework for all BP operations***," and that "***OMS enables each [BP] site*** to focus on the most important risks in its own operations and sets out procedures on how to manage them in accordance with ***the group-wide framework***." (¶351).  This statement was materially false and misleading and failed to disclose material information because OMS did not—and was never intended to—apply to third-party contracted rigs that made up the vast majority of BP's drilling fleet, including the Transocean-owned *Deepwater Horizon*. (¶¶100-05, 361).  As Defendants acknowledge (Def. Br. at 33), the Court has already concluded that these statements were actionable. (*See* Dkt. 323 at 48).  Moreover, Defendants have conceded that OMS did not apply to rigs that were not fully owned by BP. (*See* § III.C.1, *supra*).  The purportedly contradictory documents cited by Defendants do not undercut Plaintiffs' allegations and improperly raise factual disputes that are inappropriate at the motion to dismiss stage.

The SAC sufficiently alleges scienter with respect to this statement for two reasons.  First, as alleged in the SAC, Defendants Hayward and Inglis knew that OMS never was intended to apply to rigs that BP did not fully-own because they both, as members of GORC and self-described stewards of OMS implementation, were intricately involved in the creation of BP's OMS and the "OMS document . . . was approved, and the scope was approved . . . at the GORC." (¶102; *see also* § III.A.1.c, *supra*).  In addition, the SAC alleges that SEEAC, for which Defendant Hayward served

38

as Executive Liaison, specifically reviewed and approved "material to be placed before shareholders" addressing safety issues, and that SEAAC members knew that OMS did not apply to rigs that were not fully owned by BP.  (¶¶90-94, 156-62).  This is more than sufficient to satisfy the corporate scienter pleading standard in *Southland,* 365 F.3d at 366.  (*See also* § III.B.2, *supra*).  Second, BP's false statements and material omissions regarding the scope of OMS in Statement N are sufficiently egregious under *Tellabs II* to establish a strong inference of scienter due to the fact that OMS would never apply to any rig that BP did not fully own, *including more than 85% of BP's drilling operations in the Gulf of Mexico*.  (*See id.*)

### 10. BP's 2009 Form 20-F Annual Report dated March 5, 2010 (Statement O).

On March 5, 2010, BP filed its 2009 Annual Report with the SEC on Form 20-F, which was signed by Defendant Hayward.  The Annual Report misrepresented that OMS applied across all BP operations, noting:

> ". . . *the BP operating management system (OMS), which provides a common framework for all BP operations*"; and
>
> "*BP's operating management system (OMS), which provides a single operating framework for all BP operations.*"[18] (¶353).

The Court previously held substantially similar statements were sufficiently pled as materially false.  (*See* Dkt. 323 at 50, 53; Statements N and P).  As described above, the SAC includes additional allegations of falsity and direct evidence of scienter for Defendant Hayward, which existed at the time he signed the Annual Report.  Again, Hayward was the architect of OMS, charged with its development and implementation, including to BP's highest-risk Gulf of Mexico operations.  (¶¶85-86, 100-06, 354; *see* § III.C.2, *supra*).  Defendant Hayward was also aware of

---

[18] The final portion of Statement O, beginning with "Following the tragic incident at Texas City . . ." is not credibly subject to challenge, having been found actionable in all respects by this Court.  *See supra* at 9 n.7.

major process-safety related concerns that increased the likelihood and severity of "process safety related incidents" within BP's Gulf of Mexico operations.  (¶21; *see* § III.C.8, *supra*).  Moreover, as described above, BP conceded that OMS only applied to rigs that BP fully-owned, and that it never thought that it could "superimpose" OMS on contractors.  (*See* § III.C.2, *supra*).

Additionally, Defendant Hayward received a July 31, 2009 GORC Pre-Read, which informed him that 

(¶¶163-166).  The document also complained of a ███████████████ (¶177).

### 11.  Defendant Inglis's speech at Howard Weil Energy Conference on March 22, 2010 (Statement P).

On March 22, 2010, Defendant Inglis delivered a speech at the Howard Weil Energy Conference where he misrepresented that OMS applied across all BP operations:

> ". . . *we are now in the final phase of rolling out our operating management system that provides a single, consistent framework for our operations, covering all areas from personal and process safety to environmental performance*."  (¶355).

The Court previously held this exact statement that "OMS provided a 'single, consistent framework' for 'all areas' of BP's operations" was sufficiently pled as materially false.  (*See* Dkt. 323 at 50, 53).  The SAC includes additional allegations of falsity, and direct evidence of scienter for Defendant Inglis, which existed at the time he made the statement.  Again, Inglis was the CEO of Exploration and Production and was second in command and responsibility only to Defendant Hayward with respect to oversight, development, and implementation of OMS.  As Defendant Inglis testified, he was "responsible for the safe and reliable operations across all of the E&P operations."  (¶¶46, 85-88, 100-06, 356; *see* § III.C.3, *supra*).  Direct evidence also shows that Defendant Inglis was aware of major process-safety related concerns that increased the likelihood

40

and severity of "process safety related incidents" within BP's Gulf of Mexico operations.  (¶21; *see* § III.C.8, *supra*).

Defendant Inglis also received 

(¶¶163-166).  The document also complained of a ██████████████████ (¶177).

### 12.  BP's 2009 Sustainability Review issued April 15, 2010 (Statement R).

BP's 2009 Sustainability Review, dated April 15, 2010, contained a Q&A session  in which Defendant Hayward falsely represented that BP's OMS, "[*h*]*aving been initially introduced at eight sites in 2008,*" had been "extended to 70 sites by the end of 2009," meaning that "*implementation is 80% complete.*"  (¶359).  These statements, which reemphasized and confirmed the earlier statements made in the 2008 Annual Report that eight sights, including the Gulf of Mexico, had "*completed the transition to OMS,*" were materially false and misleading and failed to disclose material information.  OMS had not been implemented at all BP rigs in the Gulf of Mexico and was never intended to apply to third-party contracted rigs that made up the vast majority of BP's drilling fleet.  (¶¶100-05, 361).

Indeed, the Court already held that these statements were adequately alleged to be false and misleading because, if "OMS was not actually implemented in the Gulf in 2008 – it follows that these numbers, which BP was still citing in 2009 without modification, cannot be correct. Additionally, the faulty data call into question BP's additional claim that the implementation of OMS was '80% complete' by the end of 2009."  (*See* Dkt. 323 at 40-41).  In the SAC, Plaintiffs have added further allegations demonstrating the falsity of these statements, including the testimony

41

of John Baxter that OMS had not been implemented in the Gulf as of April 2010.  (*See* § III.A.2.c, *supra*).  To the extent that Defendants now challenge the falsity of the representations in Statement R based on what they erroneously claim to be contradictory information in the SAC and documents and testimony referenced therein, their arguments should be rejected as they seek to reargue the Court's prior ruling and, at best, they create an issue of fact which cannot be resolved at this stage of the proceedings.

Further, Plaintiffs have sufficiently alleged scienter with respect to Defendant Hayward. The SAC alleges that Hayward knew that OMS had not been implemented in the Gulf by April 2010 and was never was intended to apply to third party rigs because, as Chairman of GORC and a self-described steward of OMS implementation, he was intimately involved in the creation of BP's OMS and closely monitored its implementation which, in itself, creates a cogent and compelling inference that Hayward knew the truth about OMS scope and implementation.   (*See* §§ III.A.1, III.A.2, *supra*).   In addition, the SAC contains specific allegations demonstrating Hayward's scienter, including Hayward's own testimony stating OMS had not been implemented in the Gulf at the time of the *Deepwater Horizon* disaster and that BP's well control procedures did not apply to rigs that BP did not fully-own.  (*See also id*.)

In addition, the 2009 Sustainability Review, which emphasized BP's systematic approach to safe and environmentally responsible operations, stated further that OMS "***provides a single framework for all BP operations to follow***" and that the OMS "principles and processes are designed to . . .  ***enable consistent execution*** and focus BP on performance." (¶361).   These statements were materially false and misleading and failed to disclose material information because OMS did not – and was never intended to – apply to third-party contracted rigs that made up the vast majority of BP's drilling fleet.  (¶¶100-05, 361).   Indeed, the Court has already held that

42

substantively identical statements were sufficiently pled as materially false and misleading.  (*See* §
III.A.1.a; *see also* Dkt. 323 at 47-48, 49-53).

Plaintiffs have sufficiently alleged BP's scienter with respect to this statement for two
reasons.  First, the SAC alleges that factual links between Statement R and Defendant Hayward
sufficient to allege scienter.  (¶162).  As alleged in the SAC, Defendants Hayward knew that OMS
never was intended to apply to third party rigs because, as Chairman of GORC and a self-described
steward of OMS implementation, he was intricately involved in the creation of BP's OMS and the
"OMS document . . . was approved, and the scope was approved . . . at the GORC."  (¶102; *see also*
§ III.B.1, *supra* (describing additional allegations indicating that Hayward had specific knowledge
that OMS did not apply to third party operations)).  Second, BP's false statements and material
omissions regarding the scope of OMS in Statement R were sufficiently egregious under *Tellabs II*
to establish a strong inference of scienter due to the fact that OMS would never apply to any rig that
BP did not fully own, including more than 85% of BP's Gulf of Mexico operations.  (*See* § III.B.2,
*supra*).

### 13.   BP's 2009 Sustainability Report dated April 15, 2010 (Statement S).

In its 2009 Sustainability Report dated April 15, 2010, BP made two separate
misrepresentations.  First, BP falsely represented that it was able to effectively respond to an oil
spill, stating, in part, "*[o]ur operating facilities have the capacity and resources to respond to spill
incidents* . . . .."  (¶363).  Defendants acknowledge that the Court has found that this statement was
adequately alleged to be false and misleading.   (Def. Br. at 42 (citing Dkt. 323 at 63-64)).
However, Defendants wrongly assert that the SAC fails to allege scienter sufficiently in connection
with this statement, incorrectly claiming that the SAC's scienter allegations are substantially the

43

same as those found insufficient in the Ludlow Complaint.  To the contrary, the SAC alleges that: SEEAC, including Defendant Hayward, specifically discussed the contents of the 2009 Sustainability Report on February 24, 2010 (¶¶365(a)-(b)); GORC, including Defendants Hayward and Inglis, received copies of the Orange Book that revealed deficiencies in connection with BP's ability to respond to a spill (¶365(d)); and BP lacked a legitimate oil spill response plan ("OSRP") (¶365(j)).  With respect to the latter allegation, the SAC includes numerous allegations detailing the woefully inadequate nature of BP's OSRP (specifically cross-referenced in ¶365(j)) that were previously not included in the Ludlow Complaint, including, among other things, that the plan included information about potential effects on wildlife not present in the Gulf of Mexico and cited a wildlife expert who had died several years before BP submitted its plan.  (¶¶274-81).  These are substantively the same allegations of egregious misstatements found to be sufficient to establish corporate scienter in connection with BP's OSRP in the NY/Ohio Opinion under *Tellabs II*.  (*See* Dkt. 324 at 115).  For the same reason, the SAC sufficiently alleges BP's scienter with respect to the oil spill response misrepresentation in Statement S. (¶363).  Moreover, corporate scienter is also sufficiently alleged as to this statement under *Southland*, 365 F.3d at 365-66, given that the SAC links this statement to specific corporate individuals, namely SEEAC Chairman Castell and Defendants Hayward and Inglis.  (*See* § III.B.2).

The second misrepresentation alleged in Statement S is that BP falsely represented that BP's OMS was the "cornerstone of achieving safe, reliable and responsible operations ***at every BP operation***."  (¶364).  This statement is essentially identical to those discussed herein in which Defendants misrepresented the scope of BP's OMS by failing to disclose that OMS did not apply to rigs that were not fully owned by BP, and Defendants have raised substantially identical objections here as they did regarding those other statements.  Therefore, for the same reasons articulated

44

above, Plaintiffs have sufficiently alleged that this statement was false and misleading and failed to disclose material information about the scope of BP's OMS, and sufficiently alleged that the statement was made with scienter.  (*See* §§ III.A.1, III.B.2, III.C.1).

**D.      The SAC adequately pleads loss causation in connection with Defendants' misrepresentations about the scope of OMS.**

In their initial motion to dismiss briefing, Defendants did not even mention the phrase "loss causation," much less argue that Plaintiffs failed to plead it.[19]  (*See* Dkt. 150, 152).  Defendants' newfound argument that the SAC fails adequately to plead loss causation with respect to Plaintiffs' OMS claims (even though many of the statements at issue are identical to those pled in the prior complaints) misconstrues the SAC, misapplies Fifth Circuit law and lacks merit.[20]

Loss causation is sufficiently pled where plaintiffs allege, under Rule 8(a)(2) pleading standards, "a facially 'plausible' causal relationship between the fraudulent statements or omissions and plaintiff's economic loss, including allegations of a material misrepresentation or omission, followed by the leaking out of *relevant or related truth about the fraud* that caused a significant part of the depreciation of the stock and plaintiff's economic loss."  *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 258 (5th Cir. 2009) (emphasis added); *see also In re TETRA Techs. Inc. Sec. Litig.*, 2009 U.S. Dist. LEXIS 126687, at *30-31 (S.D. Tex. July 9, 2009) (*quoting Lormand*, 565 F.3d at 258).

---

[19]  For this reason, Defendants' loss causation argument is precluded by Federal Rule of Civil Procedure 12(g)(2), which prohibits a party from making a subsequent Rule 12 motion "raising a defense or objection that was available to the party but omitted from its earlier motion."  Fed. R. Civ. P. 12(g)(2); *see also Gilmore v. Shearson/American Express, Inc.*, 811 F.2d 108, 112 (2d Cir. 1987) ("Rule 12 defenses . . . if waived by defendant's failure to raise those objections in response to the original complaint, may not be resurrected merely because a plaintiff has amended the complaint"); *Harris Bank Naperville v. Pachaly*, 902 F. Supp. 156, 157 (N.D. Ill. 1995) (amended complaint does not revive right to present defenses that were available before amendment but not asserted.).  Plaintiffs do recognize that this Court has discretion to consider the loss causation issue despite Defendants' noncompliance with Rule 12(g)(2). *See Global Healing Ctr., LP v. Powell*, No. 10-cv-4790, 2012 U.S. Dist. LEXIS 67777, at *9-11 (S.D. Tex. May 15, 2012) (Ellison, J.).

[20]  Defendants do not challenge that Plaintiffs have sufficiently alleged loss causation in connection with the single new oil spill response claim in the SAC (Statement S; ¶364).

45

The Fifth Circuit permits loss causation to be alleged based on indirect disclosures of the truth. *Lormand*, 565 F.3d at 261-64.  Thus, Defendants are fundamentally incorrect in claiming that the Fifth Circuit does not recognize the concept of "materialization of the risk."  (Def. Br. at 47).[21] And, despite Defendants' best efforts to suggest otherwise, "the disclosure need not reveal that previous information was fraudulent, only that it was wrong."  *In re TETRA Techs,* 2009 U.S. Dist. LEXIS 126687, at *31.

While alleging that one or more corrective disclosures may have caused plaintiffs' losses satisfies the loss causation requirement, such an allegation is not necessary.  Rather, as the Supreme Court explained in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), loss causation is adequately pled when the "relevant truth" is disclosed—*i.e.* when the facts as to the riskiness of the company's operations become generally known and, as a result, share prices decline.  *Id.* at 344. Put differently, "to establish loss causation this disclosed information must reflect part of the 'relevant truth'—the truth obscured by the fraudulent statements."  *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009); *see also In re Williams Sec. Litig.*, 558 F.3d 1130, 1140 (10th Cir. 2009) (the disclosure must "relate back to the misrepresentation and not to some other negative information about the company").  Accordingly, Plaintiffs need not, as Defendants contend, allege corrective disclosures that "mentioned OMS" to sufficiently plead loss causation, because the Fifth Circuit permits loss causation to be alleged based on indirect

---

[21]   In *Lormand*, the Fifth Circuit explained that indirect disclosures may reveal the truth, which is, in fact, the same concept underlying "materialization of the risk."  *Id.* 563 F.3d at 261-64.  Post-*Lormand*, in *Aubrey v. Barlin*, No. 10-CA-076, 2011 U.S. Dist. LEXIS 15332, *9-10 (W.D. Tex. Feb. 16, 2011), the district court relied on the "materialization of the risk" approach, citing to the Second Circuit's decision in *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005).  The *Aubrey* court found that the plaintiff had sufficiently pled loss causation by identifying a "zone of risk" that defendants concealed and which increased a risk that ultimately came to pass.  2011 U.S. Dist. LEXIS 15332, at *10-11.

disclosures of the truth.  *Lormand*, 565 F.3d at 261-64.[22]  Moreover, because loss causation is a matter of proof at trial, it is generally inappropriate to resolve disputes over loss causation on a motion to dismiss.  *See id*. at 267 n.35 (citing cases).

The SAC's loss causation allegations are straightforward and easily meet Rule 8's notice pleading standards.  *Dura*, 544 U.S. 345-46.  The complaint alleges that starting on May 9, 2007 and continuing throughout the Class Period, the price of BP ADSs were artificially inflated by, among other things, misrepresentations concerning the steps that BP was taking to ensure safer operations in response to the Baker Panel recommendations, including OMS, BP's marquee process safety program. (¶391). This artificial inflation dissipated through the revelation of previously-concealed information about BP's lack of process safety in the riskiest of its operations as well as BP's inability to respond to a spill following the *Deepwater Horizon* explosion.  (¶¶392-406).  The SAC clearly identifies the date of each Company-specific disclosure and event and quantifies the resulting ADS price declines.  This plainly supplies "some indication" of the causal connection of Plaintiffs' loss to the misrepresentations, in compliance with *Dura*.  544 U.S. at 346-47.[23]

---

[22]  Defendants misconstrue this Court's ruling in *TETRA Techs.*, 2009 U.S. Dist. LEXIS 126687, at *30.  There, the Court held that under *Lormand*, "[t]he Fifth Circuit does not prevent a plaintiff from alleging loss causation based on the partial or indirect disclosures of the truth . . . Moreover, the disclosure need not reveal that previous information was fraudulent, only that it was wrong." *Id.* at *31.

[23]  Defendants erroneously suggest that the risk of a blowout was not concealed from the market because BP told investors that deep sea drilling is inherently dangerous.  (Def. Br. at 48 (citing ERISA Opinion (Dkt. No. 337)).  This argument fails for two reasons.  First, Defendants ignore their own role in downplaying that risk by assuring investors that BP had met the Baker Panel recommendations when it paid them only lip-service, by reporting that OMS was completed in the Gulf of Mexico when it was not, and by claiming that OMS applied to every site and operation when it did not.  (*See* Dkt. 323 at 43) ("Plaintiffs contend that BP's representations about its risk management programs-of which OMS was the centerpiece-lulled the market into false confidence in BP's ability to *manage* those risks").  To plead loss causation, Plaintiffs need only allege those concealed facts, that investors came to learn that the truth was wholly different, and that the stock price fell when the truth was revealed.  Second, Defendants' argument is a veiled attempt to argue "bespeaks caution," which certainly fails – because Defendants' affirmative misstatements about BP's process safety efforts misrepresented the degree of risk of a blowout.  *See Rubinstein v. Collins*, 20 F.3d 160, 167-68 (5th Cir. 1994) (cautionary language not necessarily sufficient to make a statement immaterial; materiality is judged in light of surrounding circumstances); *In re Am. Int'l Grp., Inc.*, 741 F. Supp. 2d 511, 531-32 (S.D.N.Y. 2010) ("[w]arnings of specific risks . . . do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risk described" (internal citations omitted)).

Defendants assert that Plaintiffs do not allege a "plausible 'causal connection'" between OMS and the revelation of the truth.  (Def. Br. at 46).  This is absurd.  Defendants' argument must fail as it would require a fact-for-fact disclosure, a requirement that the Fifth Circuit has decisively rejected.  *See Flowserve*, 572 F.3d at 230-31 (holding that a "fact-for-fact" or a "complete" disclosure is **not** required for loss causation) (emphasis added).  Defendants' myopic and misguided approach is contrary to binding precedent and would preclude loss causation in the most egregious of frauds.

*In re Lehman Brothers Securities Fraud Litigation*, 799 F. Supp. 2d 258 (S.D.N.Y. July 27, 2011), is highly instructive with respect to Plaintiffs' OMS loss causation allegations.  In *Lehman Brothers*, the court held that plaintiffs sufficiently pled loss causation where defendants concealed the extent of their exposure to certain risky asset classes, finding:

> [T]he alleged misstatements and omissions concealed the extent of Lehman's exposure to asset classes, the precarious nature of which, a jury could find, was foreseeable and, indeed, though plaintiffs perhaps need not so prove, in fact foreseen by some. *They created the impression that Lehman took greater steps to limit and manage its risk than in fact it allegedly did.  And they overstated Lehman's financial strength generally and understated the extent to which it was leveraged. According to the TAC, it was the materialization of the risks thus concealed that ultimately killed Lehman.* In consequence, plaintiffs are entitled to an opportunity to attempt to prove that some ascertainable amount of the losses they suffered was attributable to the allegedly false picture of relative security attributable to those misstatements and omissions.  *Id.* at 306-07 (footnote omitted; emphasis added).

The facts here are analogous.  Defendants' positive statements about BP's commitment to process safety, and in particular OMS, concealed the heightened likelihood of a catastrophic incident in the riskiest of BP's operations.[24]  According to the Presidential Commission, the

---

[24]  Defendants' contention that "statements about when OMS was implemented in the Gulf of Mexico … could not possibly have caused any losses," (Def. Br. at 48), is entirely without merit.  For the same reasons that the *Deepwater Horizon* disaster and resulting oil spill revealed the truth that OMS did not apply to BP's third party operations, those events further revealed that BP had not, in fact, completed the transition to its highly-touted OMS process safety system in the Gulf of Mexico, the site of BP's riskiest and most profitable operations.

*Deepwater Horizon* explosion resulted from multiple process safety failures and was preventable. (¶¶9-10).  Through their repeated misrepresentations that process safety had become a cornerstone of BP's operations, that OMS was completed in the Gulf of Mexico in 2008, and that OMS applied to *every* BP site and operation, Defendants created the false appearance that BP was operating far more safely in the Gulf of Mexico than it really was, including by claiming its touted OMS process safety program applied to its riskiest operations and those that were not fully BP-owned.  The *Deepwater Horizon* explosion and BP's subsequent inability to effectively respond to or contain the resulting spill were the materialization of the very risks that Defendants concealed from investors.[25] Plaintiffs have pled that BP's stock price fell precipitously in connection with the truth being revealed – in just the first week after the explosion, the stock dropped $10 per share or 17%, a drop which would have been even more significant but for the additional artificial inflation caused by Defendants' false and misleading misrepresentations about the magnitude of the oil spill in the Gulf and BP's inability to respond to it.  (¶395).  Thus, the SAC easily satisfies *Dura*'s pleading standard.

### E. The SAC properly alleges a control person claim against Defendant Inglis.

The SAC adequately pleads a Section 20(a) control person claim against Defendant Inglis because it alleges both a primary violation of the Exchange Act and that Inglis controlled the primary violator.  *Dennis v. General Imaging, Inc.*, 918 F.2d 496, 508-09 (5th Cir. 1990). Defendant Inglis contends that the control allegations are "undifferentiated" regarding his role over the challenged statements and therefore the Section 20(a) claim should be dismissed.  (Def. Br. at

---

[25] Defendants recognize that the Fifth Circuit found loss causation adequately pled as to certain claims of corporate misconduct in *Lormand*, yet claim that the allegations here are more akin to those found lacking a causal relationship. (Def. Br. at  47).  In fact, the allegations here are comparable to those that were upheld in *Lormand* regarding the size of the loss attributable to the alleged fraud, as well as the causal connection between information that defendants concealed from investors regarding the company's fledgling subscriber programs and the market learning the relevant truth which resulted in a significant drop in the stock price.  *Lormand*, 565 F.3d 228 at 262-64.

49).  Defendant Inglis's half-hearted challenge should be rejected, especially where, as this Court has previously recognized, such allegations are subject to a Rule 8 standard.  (Dkt. 324 at 116).  The SAC more than adequately alleges that Defendant Inglis had "the power to direct or cause the direction of" BP's policies.  (¶¶46, 87; *see also* 17 C.F.R. §240.12b-2).  Inglis led BP's activities in the Gulf of Mexico; attended SEEAC meetings; served as a GORC member; and his leadership resulted in the creation of the Orange Books that tracked the "progress" of OMS implementation and other process safety efforts.  Perhaps most importantly, Defendant Inglis identified himself as being responsible for BP's safe and reliable operations in Exploration & Production, second only to Defendant Hayward for whom identical control allegations have survived a motion to dismiss. (¶¶46, 87; s*ee also* Dkt. 324 at 103 ("Hayward defined his position as CEO to include a special and targeted focus on process safety.  Taking him at his own word, the Court finds that Plaintiffs have sufficiently pleaded scienter [and a Rule (20)(a) violation] with respect to Hayward")).

Defendant Inglis does nothing to distinguish how the allegations about him in the SAC differ from those that already survived against Defendants Suttles and Hayward.  Plaintiffs' allegations that Defendant Inglis controlled BP go well-beyond those necessary to prevail on a Rule 12(b)(6) motion to dismiss.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request the Court deny Defendants' motion.  In the alternative, Plaintiffs respectfully request leave to amend the SAC to correct any deficiencies. *See* Fed. R. Civ. P. 15(a)(2).

DATED:  May 23, 2012       Respectfully submitted,

/s/ Richard W. Mithoff          

**MITHOFF LAW FIRM**

Richard W. Mithoff (Federal Bar No. 2012)

William J. Stradley (Federal Bar No. 397)
Sherie P. Beckman (Federal Bar No. 11098)
Warner V. Hocker (Federal Bar No. 1133732)
One Allen Center
500 Dallas Street
Houston, TX 77002
Telephone:  713-654-1122
Fax:  713-739-8085

***Attorney-In-Charge and Co-Lead Counsel for the Subclass***

**YETTER COLEMAN LLP**

/s/ R. Paul Yetter
R. Paul Yetter (Federal Bar No. 3639)
Autry W. Ross (Federal Bar No. 9731)
Wynn B. McCloskey (Federal Bar No. 99)
909 Fannin, Suite 3600
Houston, TX  77010
Tel: (713) 632-8000
Fax: (713) 632-8002

***Counsel for New York and Ohio and***
***Liaison Counsel for the Class***

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Steven J. Toll (admitted *pro hac vice*)
Daniel S. Sommers (admitted *pro hac vice*)
Julie Goldsmith Reiser (admitted *pro hac vice*)
Joshua S. Devore (admitted *pro hac vice*)
Joshua M. Kolsky (admitted *pro hac vice*)
1100 New York Avenue N.W.
West Tower, Suite 500
Washington, D.C.  20005-3964
Tel: (202) 408-4600
Fax: (202) 408-4699

**BERMAN DEVALERIO**
Glen DeValerio (admitted *pro hac vice*)

51

Kristin J. Moody (admitted *pro hac vice*)
Steven J. Buttacavoli (admitted *pro hac vice*)
One Liberty Square
Boston, MA  02109
Tel: (617) 542-8300
Fax: (617) 542-1194

***Co-Lead Counsel for New York and Ohio and for the Class***

**COTCHETT, PITRE & McCARTHY, LLP**
Joseph W. Cotchett
Mark C. Molumphy
Nancy L. Fineman
Matthew K. Edling
Bryan M. Payne
840 Malcolm Road
Burlingame, CA 94010
Telephone:  (650) 697-6000
Fax:  (650) 697-0577

***Co-Lead Counsel for the Subclass***

**BLOCK & LEVITON LLP**
Jeffrey C. Block (admitted *pro hac vice*)
Jason M. Leviton (admitted *pro hac vice*)
Whitney E. Street (admitted *pro hac vice*)
Mark A. Delaney (admitted *pro hac vice*)
155 Federal Street, Suite 1303
Boston, MA 02110
(617) 398-5600

***Counsel to Lead Plaintiff the Ohio Public Employees Retirement System***

52

## Appendix A

**Comparison of New Misstatements to Those Already Held by the**
**Court to Be Sufficiently Pled as Materially False and Misleading**

| | | | | |
|---|---|---|---|---|
| **Misstatements Regarding OMS Scope – OMS Did Not Apply to Third-Party Rigs** | | | | |
| Date | Misrep. Letter in SAC | "New" OMS Misstatements | Similar or Nearly Identical OMS Misstatements Already Held to be Sufficiently Pled as Materially False and Misleading | Citation to Court's February 13, 2012 Order |
| 05/09/07[1] | A (SAC ¶315) | . . . *The OMS is a comprehensive system that covers* <u>*all aspects of our operations*</u> . . . . *The new OMS will apply to* <u>*all operations*</u> by the end of 2010 and includes safety, integrity, environmental management and health. . . . <u>*Each site*</u> *will have its own local OMS* . . . . | . . . *our operating management system that provides a* <u>*single, consistent framework for our operations*</u>*, covering* <u>*all areas*</u> *from personal and process safety to environmental performance.* (Portion of Statement P; SAC ¶355)<br><br>-AND-<br><br>. . . *(OMS), which provides a common framework for* <u>*all BP operations*</u> . . . . *OMS enables* <u>*each site*</u> *to focus on the most important risks in its own operations* . . . . (Portion of Statement N; SAC ¶351) | Ludlow Order, pp. 47-53 |
| 07/24/07 | B (SAC ¶317) | . . . establishing a new way of operating in BP – *with the progressive rollout of a* <u>*common group-wide*</u> *Operating Management System*. | . . . *(OMS), which provides a* <u>*common framework*</u> *for all BP operations* . . . . *OMS enables each site to focus on the most important risks in its own operations and sets out procedures on how to manage them in accordance with the* <u>*group-wide framework*</u>. (Portion of Statement N; SAC ¶351) | See above |

---

[1] This document was previously identified by the April 2007 date on its face, not the May 9, 2007 date on which it was released to the public.

| 09/25/07 | C (SAC ¶319) | . . . our new standardized **Operating Management System (OMS). This will provide a blueprint for safety and <u>all aspects of operations throughout BP</u>**, making sure operations are undertaken to a consistently high standard worldwide | **. . . our operating management system that provides a single, consistent framework for our operations, covering <u>all areas</u> from personal and process safety to environmental performance.** (Portion of Statement P; SAC ¶355)<br><br>-AND-<br><br>**. . . (OMS), which provides a common framework for <u>all BP operations</u>,** designed to achieve consistency and continuous improvement in safety and efficiency. (Portion of Statement N; SAC ¶351) | See above |
|---|---|---|---|---|
| 02/27/08 | F (SAC ¶325) | **We . . . have begun to implement a new Operating Management System across <u>all of BP's operations</u>.** | **. . . (OMS), which provides a common framework for <u>all BP operations</u>,** designed to achieve consistency and continuous improvement in safety and efficiency. (Portion of Statement N; SAC ¶351) | See above |
| 04/17/08 | Portion of G (SAC ¶327) | . . . **[BP has] begun to implement a new Operating Management System across <u>all of BP's operations.</u>** This is aimed at ensuring that our operations across the world look and feel the same everywhere - and perform to the same high standard. | **. . . (OMS), which provides a common framework for <u>all BP operations</u>,** designed to achieve consistency and continuous improvement in safety and efficiency. (Portion of Statement N; SAC ¶351) | See above |
| 02/24/09 | Portion of I (SAC ¶332) | **The BP operating management system (OMS) turns the principle of safe and reliable operations into reality by governing how <u>every BP project, site, operation and facility</u> is managed.** | **. . . (OMS), which provides a common framework for <u>all BP operations</u>,** designed to achieve consistency and continuous improvement in safety and efficiency. (Portion of Statement N; SAC ¶351) | See above |
| 03/04/09 | Portion of J (SAC ¶335) | **. . . (OMS), a framework for operations <u>across BP</u> that is integral to improving safety and operating performance in <u>every site</u>.** | **. . . (OMS), which provides a common framework for <u>all BP operations</u> . . . . OMS enables <u>each site</u> to focus on the most important risks in its own operations and sets out procedures on how to manage them . . . .**(Portion of Statement N; SAC ¶351) | See above |

| 04/16/09 | L (SAC¶347) | . . . our new **_operating management system (OMS), which is to be implemented at each BP site_**. | . . . **_(OMS), which provides a common framework for all BP operations . . . . OMS enables each site to focus on the most important risks in its own operations and sets out procedures on how to manage them . . . ._**(Portion of Statement N; SAC ¶351) | See above |
|---|---|---|---|---|
| 02/26/10 | N (SAC ¶ 351) | Safe, reliable and compliant operations remain the group's first priority. A key enabler for this is the BP operating management system **_(OMS), which provides a common framework for all BP operations,_** designed to achieve consistency and continuous improvement in safety and efficiency.  Alongside mandatory practices to address particular risks, **_OMS enables each site to focus on the most important risks in its own operations and sets out procedures on how to manage them in accordance with the group-wide framework_**. | _This is the same statement for which the Court already has held plaintiffs have sufficiently pleaded material falsity._<br><br>_The statement was previously set forth in the Ludlow Complaint as Statement 8 (¶383)._ | See above |

| 03/05/10 | O (SAC ¶353) | . . . the *BP operating management system (OMS), which provides a <u>common framework</u> for <u>all BP operations</u>, designed to achieve consistency and continuous improvement in safety and efficiency* . . . . *BP's operating management system (OMS), which provides a <u>single operating framework for all BP operations</u>*, is a key part of continuing to drive a rigorous approach to safe operations . . . .[2] | *Safety and operational integrity underpins everything we do, and we are now in the final phase of rolling out our operating management system that provides a <u>single, consistent framework for our operations</u>, covering <u>all areas</u> from personal and process safety to environmental performance.* And I am pleased to say that in 2009 we saw continuing improvement in all aspects.  (Portion of Statement P; SAC ¶355) <br><br> -AND- <br> Safe, reliable and compliant operations remain the group's first priority. A key enabler for this is the BP operating management system *(OMS), which provides a <u>common framework</u> for <u>all BP operations</u>,* designed to achieve consistency and continuous improvement in safety and efficiency. Alongside mandatory practices to address particular risks, *OMS enables each site to focus on the most important risks in its own operations and sets out procedures on how to manage them in accordance with the <u>group-wide framework</u>.*  (Portion of Statement N; SAC ¶351) | See above |

---

[2] The final portion of Statement O, beginning with "Following the tragic incident at Texas City . . ." is not credibly subject to challenge, having been found actionable in all respects by this Court.  *See* Plaintiffs' Resp. at 9 n.7.

| 03/22/10 | P (SAC ¶355) | ***Safety and operational integrity underpins everything we do, and we are now in the final phase of rolling out our operating management system that provides a <u>single, consistent framework for our operations</u>, covering <u>all areas</u> from personal and process safety to environmental performance.*** And I am pleased to say that in 2009 we saw continuing improvement in all aspects. (Statement P; SAC ¶355) (additional emphasis added) | *This is the same statement for which the Court already has held plaintiffs have sufficiently pleaded material falsity.* <br><br> *The statement was previously set forth in the Ludlow Complaint as Statement 18 (¶401).* | See above |
|---|---|---|---|---|
| 04/15/10 | Portion of R (SAC ¶361) | BP's operating management system (***OMS***) *provides a <u>single framework</u> for <u>all BP operations</u> to follow* . . . . Its principles and processes are designed to simplify the organization, improve productivity, ***enable <u>consistent</u> execution*** and focus BP on performance. | ***Safety and operational integrity underpins everything we do, and we are now in the final phase of rolling out our operating management system that provides a <u>single, consistent framework for our operations</u>, covering <u>all areas</u> from personal and process safety to environmental performance.*** And I am pleased to say that in 2009 we saw continuing improvement in all aspects. (Portion of Statement P; SAC ¶355) | See above |
| 04/15/10 | Portion of S (SAC ¶364) | ***BP continues to implement its operating management system (OMS), a cornerstone of achieving safe, reliable and responsible operations at <u>every BP operation</u>***. | *. . . **(OMS), which provides a common framework for <u>all BP operations</u>,** designed to achieve consistency and continuous improvement in safety and efficiency. (Portion of Statement N; SAC ¶351)* | See above |

| | | **Misstatements Regarding OMS Implementation – OMS Was Not Implemented in the Gulf at the Time of the *Deepwater Horizon* Disaster** | | |
|---|---|---|---|---|
| Date | Misrep. Letter in SAC | "New" OMS Misstatements | Similar or Nearly Identical OMS Misstatements Already Held to be Sufficiently Pled as Materially False and Misleading | Citation to Court's February 13, 2012 Order |
| 02/24/09 | Portion of I (SAC ¶331) | Safety, both personal and process, remains our highest priority.  2008 was one of our best ever years for personal safety, with our performance expected to remain among the best in the industry.  During the year we began migrating to **the new BP OMS, which has an increased focus on process safety and continuous improvement**.  The majority of our operations in North America Gas, **the Gulf of Mexico**, Colombia and the Endicott field in Alaska **all completed the migration to the OMS in 2008**. | All operated businesses plan to transition to OMS by the end of 2010. **Eight sites completed the transition to OMS in 2008**; two petrochemicals plants, Cooper River and Decatur, two refineries, Lingen and Gelsenkirchen and four Exploration and Production sites, North America Gas, **the Gulf of Mexico**, Colombia and the Endicott field in Alaska . . . . | Ludlow Order, pp. 36-44 |
| 03/04/09 | Portion of J (SAC ¶335) | All operated businesses plan to transition to OMS by the end of 2010. **Eight sites completed the transition to OMS in 2008**; two petrochemicals plants, Cooper River and Decatur, two refineries, Lingen and Gelsenkirchen and four Exploration and Production sites, North America Gas, **the Gulf of Mexico**, Colombia and the Endicott field in Alaska . . . . | *This is the same statement for which the Court already has held plaintiffs have sufficiently pleaded material falsity.* <br><br> *The statement was previously set forth in the Ludlow Complaint as Statement 13 (¶353).* | See above |
| 04/15/10 | Portion of R (SAC ¶351) | Safety is fundamental to our success as a company and 2009 was important because of the progress we made in implementing our operating management system (OMS). The OMS contains rigorous and tested processes for reducing risks and driving continuous | *This is the same statement for which the Court already has held plaintiffs have sufficiently pleaded material falsity.* <br><br> *The statement was previously set forth in the Ludlow Complaint as Statement 5 (¶408).* | See above |

| | | improvement. I see it as the foundation for a safe, responsible and high-performing BP. ***Having been initially introduced at eight sites in 2008***, the OMS rollout extended to 70 sites by the end of 2009, including all our operated refineries and petrochemicals plants. ***This means implementation is 80% complete.*** | | |
|---|---|---|---|---|
| | | **Misstatements Regarding Spill Response Capability** | | |
| Date | Misrep. Letter in SAC | "New" Spill Response Misstatement | Spill Response Misstatements Already Held to be Sufficiently Pled as Materially False and Misleading | Citation to Court's February 13, 2012 Order |
| 04/15/10 | Portion of S (SAC ¶364) | ***Preparation: we seek to ensure an infrastructure is in place to deal effectively with spills and their impacts. Our operating facilities have the capacity and resources to respond to spill incidents and we participate in industry and international forums to coordinate contingency planning and emergency response.*** | *Defendants have conceded that the Court already has found these statements were sufficiently pled as materially false and misleading. See Def. Br. at 42 ("In addressing the Ludlow complaint, the Court found that BP's statement that it "seek[s]to ensure an infrastructure is in place to deal effectively with spills" was adequately alleged to be false or misleading . . . .").* | Ludlow Order, pp. 63-66 |