# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

In re BP plc Securities Litigation

MDL No.:10-md-2185

Civil Action No. 4:10-md-2185

Honorable Keith P. Ellison

## COMPENDIUM OF UNREPORTED AUTHORITIES CITED IN PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR OPPOSITION TO DEFENDANTS' MOTION TO DISMISS IN PART THE SECOND CONSOLIDATED AMENDED COMPLAINT

1. *Aubrey v. Barlin*
   No. 10-CA-076, 2011 U.S. Dist. LEXIS 15332 (W.D. Tex. Feb. 16, 2011)

2. *Brody v. Zix Corp.*
   No. 04-cv-1913, 2006 U.S. Dist. LEXIS 69302 (N.D. Tex. Sept. 26, 2006)

3. *Global Healing Ctr., LP v. Powell*
   No. 10-cv-4790, 2012 U.S. Dist. LEXIS 67777 (S.D. Tex. May 15, 2012)

4. *In re BP P.L.C. Sec. Litig.*,
   No. 10-md-2185, 2012 U.S. Dist. LEXIS 17787 (S.D. Tex. Feb. 13, 2012)

5. *In re BP P.L.C. Sec. Litig.*,
   No. 10-md-2185, 2012 U.S. Dist. LEXIS 17788 (S.D. Tex. Feb. 13, 2012)

6. *In re Officemax, Inc. Securities Litigation*
   No. 00-cv-2432, 2002 U.S. Dist. LEXIS 27019 (N.D. Ohio Mar. 26, 2002)

7. *In re Tetra Techs. Inc. Sec. Litig.*
   No. 08-cv-0965, 2009 U.S. Dist. LEXIS 126687 (S.D. Tex. July 9, 2009)

8. *In re Triton Energy Ltd. Sec. Litig.*,
   No. 5:98-CV-256, 2001 U.S. Dist. LEXIS 5920 (E.D. Tex. Mar. 30, 2001)

9. *Miller v. Nationwide Life Ins. Co.*
   No. 06-31178, 2008 U.S. App. LEXIS 16922 (5th Cir. Aug. 6, 2008)

# EXHIBIT 1



**STEVEN B. AUBREY and BRIAN E. VODICKA, Plaintiffs, -vs- PETER E. BARLIN, GREGORY H. LAHR, SANDRA F. GUNN, MARK E. SCHIFFGENS, MITCHELL D. SAVRICK, and SAVRICK SCHUMANN JOHNSON McGARR KAMINSKI & SHIRLEY, LLP, Defendants.**

**Case No. A-10-CA-076-SS**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS, AUSTIN DIVISION**

**2011 U.S. Dist. LEXIS 15332**

**February 16, 2011, Decided**
**February 16, 2011, Filed**

**PRIOR HISTORY:** Vodicka v. Barlin, 2010 U.S. Dist. LEXIS 103700 (W.D. Tex., Sept. 29, 2010)

**COUNSEL:** [*1] For Steven B. Aubrey, Brian E. Vodicka, Plaintiffs: Elliott S. Cappuccio, LEAD ATTORNEY, Lance Hunter [Luke] Beshara, Pulman, Cappuccio, Pullen & Benson LLP, San Antonio, TX.

For Peter E. Barlin, Defendant: Dale L. Roberts, LEAD ATTORNEY, Fritz, Byrne, head & Harrison, LLP, Austin, TX; Daniel H. Byrne, LEAD ATTORNEY, Thomas G. Tucker, Fritz, Byrne, Head & Harrison, PLLC, Austin, TX.

For Gregory H. Lahr, Sandra F. Gunn, Mark E. Schiffgens, Defendants: Anthony Lee Icenogle, LEAD ATTORNEY, Icenogle & Sullivan, L.L.P., Austin, TX.

For Mitchell E. Savrick, Defendant: Michael Leonard Ray Burnett, LEAD ATTORNEY, Minton, Burton, Foster & Collins, PC, Austin, TX; Jeffrey D. Miller, Minton, Burton, Foster & Collins, P.C., Austin, TX.

For Savrick Schumann Johnson McGarr Kaminski & Shirley, LLP, Defendant: Michael Leonard Ray Burnett, LEAD ATTORNEY, Minton, Burton, Foster & Collins, PC, Austin, TX.

**JUDGES:** SAM SPARKS, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** SAM SPARKS

**OPINION**

<u>ORDER</u>

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and specifically Defendant Peter E. Barlin's Motion to Dismiss [#90], Plaintiffs' response [#97] thereto, and Barlin's reply [#102]; Defendant Sandra F. Gunn's Motion [*2] to Dismiss [#92], and Plaintiffs' response [#96] thereto; and Defendants Savrick Shumann Johnson McGarr Kaminski and Mitchell D. Savrick (the "Savrick Defendants")'s Motion to Dismiss [#95], Plaintiffs' response [#103] thereto, and the Savrick Defendants' reply [#104]. Having reviewed the motions, the relevant case law, and the file as a whole, the Court now enters the following opinion and orders.

As an initial matter, the Court notes Plaintiffs' Motion for Entry of Proposed Scheduling Order [#83] is listed as pending. In light of the Court's entry and

subsequent abatement and dismissal of the scheduling order [#87] in this case, Plaintiff's motion is DISMISSED WITHOUT PREJUDICE as moot.

For the following reasons, Barlin's Motion to Dismiss is DENIED; Gunn's Motion to Dismiss is DENIED; and the Savrick Defendants' Motion to Dismiss is DENIED.

### Background

This is not the Court's first, or even second, examination of the pleadings in this case. The Court therefore only recites the allegations necessary to resolve the motions before it.

### I. Motion to Dismiss for Failure to State a Claim -- Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires a complaint contain "a short and plain statement [*3] of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A motion under Federal Rule of Civil Procedure 12(b)(6) asks a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). In deciding a motion to dismiss under 12(b)(6), a court generally accepts as true all factual allegations contained within the complaint. *Leatherman v. Tarrant Cnty. Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 164, 113 S. Ct. 1160, 122 L. Ed. 2d 517 (1993). However, a court is not bound to accept legal conclusions couched as factual allegations. *Papasan v. Allain*, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986). Although all reasonable inferences will be resolved in favor of the plaintiff, the plaintiff must plead "specific facts, not mere conclusory allegations." *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994). The plaintiff must plead sufficient facts to state a claim for relief that is facially plausible. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference [*4] that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. Although a plaintiff's factual allegations need not establish that the defendant is probably liable, they must establish more than a "sheer possibility" that a defendant has acted unlawfully. *Id.* Determining plausibility is a "context-specific task," that must be performed in light of

a court's "judicial experience and common sense." *Id.* at 1950.

### II. Barlin's Motion to Dismiss [#90]

Barlin makes a very limited challenge, asking the Court to dismiss only one part of Plaintiffs' claim. Specifically, Barlin asks the Court to dismiss an alleged misrepresentation he made as part of the "Manor Loan" real estate investment, on the grounds Plaintiffs have not sufficiently pleaded loss causation with respect to this misrepresentation. Because the Court finds Plaintiffs have sufficiently pleaded loss causation with respect to this misrepresentation, it DENIES Barlin's motion.

### A. Barlin's Alleged Misrepresentation

According to Plaintiffs, the "Manor Loan" investment was "one part of a larger, pooled mortgage interest secured by various personal property and real property in Manor, Texas." Second Amended Complaint [*5] (2nd Am. Compl.) at ¶ 12. Plaintiffs claim they invested a total of $915,000.00 on the basis of, among other things, misrepresentations by Barlin about the identity of the principals behind the borrowing entity. *Id.* at ¶¶ 12, 48-54. Barlin allegedly told Plaintiffs two men, Vitaly Zaretsky and Jeff Turner, were the principals behind the entity to be funded by Plaintiffs' investment. *Id.* at ¶ 48. Zaretsky was allegedly portrayed as a rich man who had made "'quite a small fortune' in the Manor project." *Id.* Plaintiffs claim Turner was the former mayor of Manor. *Id.* Plaintiffs allege this was a misrepresentation because "Zaretsky and Turner were straw-men and/or not controlling principals" for the borrowing entity. *Id.* Hence, this claim has been referred to as the "Straw-Man" claim.

### B. Loss Causation Allegations

Plaintiffs claim they "would not have made the Manor Loan investment if [they] had known the true identities of the controlling principals of the borrowers, or that Zaretsky and Turner were acting as straw-men." *Id.* at ¶ 53. Plaintiffs claim supposedly-wealthy Zaretsky and former-mayor Turner were named as controlling principals of the borrowing entity to provide credibility to [*6] the investment, and to conceal the involvement of "numerous persons of dubious background." *Id.* at ¶ 49. Finally, Plaintiffs contend Barlin's misrepresentation was the proximate cause of their losses because "[t]he concealed risk--the creditworthiness of the

borrower--materialized when the borrower defaulted and Plaintiffs could not look to the collateral for repayment of the investment." *Id.* at ¶ 54.

## C. Barlin's Argument

Barlin argues Plaintiffs have failed to sufficiently plead loss causation for two reasons. First, Plaintiffs failed to allege they "relied upon the independent financial ability of the borrower's controlling principals to repay the Manor Loan in the form of a personal guaranty or other recourse." Barlin's Motion to Dismiss [#90] at 3. Second, Plaintiffs failed to allege "the 'true' principals of the borrowers adversely impacted the borrower's financial performance or contributed to the eventual default." *Id.* "Stated differently," Barlin argues, "there is no allegation that if Plaintiffs knew the 'true' principals it would have impacted their analysis of the risk of loss which they say materialized." *Id.* at 4.

## D. Plaintiffs' Response

In response, Plaintiffs argue they have [*7] sufficiently pleaded loss causation because: (1) they alleged the supposedly-wealthy Zaretsky personally guaranteed the Manor Loan; and (2) Barlin's alleged misrepresentations concealed the fact the controlling principals were not real-estate developers. Plaintiffs' Response [#97] at 3-4. If Zaretsky had, in fact, been wealthy, Plaintiffs argue they could have relied on his personal guaranty and would not have suffered losses from the failed investment. Similarly, if the controlling principals had been real estate developers (and had in fact used the investment money to improve the property), the value of the collateral real estate may have been improved enough to either prevent the borrower from defaulting at all; or to mitigate Plaintiffs' damages if the borrower did default.

As Barlin points out, the allegations supporting Plaintiffs' responsive argument were neither clear nor easy to find in the complaint. However, Plaintiffs did state in a section of their complaint related to the Manor Loan, "Creative Financial obtained a guaranty from Zaretsky." 2nd Am. Compl. at ¶ 169 n.20. Further, they noted the misrepresentation was material because a "reasonable investor would find it significant [*8] to know the true identities of persons 'behind the curtain' . . . especially when repayment of the investment depend[ed] upon ability of the borrower to profitably develop raw land serving as collateral." *Id.* ¶ 50.

It is questionable whether these allegations, standing alone, would be sufficient to support Plaintiffs' responsive arguments. However, to the extent Plaintiffs' response augments their loss causation allegations, the Court interprets the response as a motion to amend their complaint. *See Cash v. Jefferson Assocs., Inc.*, 978 F.2d 217, 218 (5th Cir. 1992) (construing a response to a motion to dismiss as a motion to amend pleading). As the Court noted in its February 11, 2011 Order [#108], there is little question the parties in this case are well aware of the issues to be litigated. The Court therefore finds there is neither surprise nor prejudice to Barlin in allowing Plaintiffs to--once again--amend their pleadings. Although the Court grows weary of Plaintiffs' apparent inability to properly plead their claims, a motion to dismiss is intended to weed out implausible or legally deficient claims before the parties incur the expense of discovery; such a motion should not be used [*9] to defeat a plausible claim on technical grounds.

The Court therefore grants Plaintiffs' motion to amend and considers their responsive allegations.

## E. Loss Causation

### 1. Legal Standard

The Private Securities Litigation Reform Act (PSLRA) makes loss causation a required element of any private securities action: "In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4).

The Fifth Circuit has held the Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007), and Federal Rule of Civil Procedure 8(a)(2), require "the plaintiff to allege, in respect to loss causation, a facially 'plausible' causal relationship between the fraudulent statements or omissions and plaintiff's economic loss." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 258 (5th Cir. 2009).

As the Second Circuit has further stated, the loss causation requirement is satisfied:

> if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged

by a disappointed [*10] investor. . . . Thus to establish loss causation, "a plaintiff must allege . . . that the subject of the fraudulent statement or omission was the cause of the actual loss suffered."

*Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005) (quoting *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001)).

## 2. Analysis

Plaintiffs have sufficiently pleaded loss causation regarding the Straw-Man claim. The "zone of risk" identified by Plaintiffs encompassed both the default of the borrowing entity, and the losses Plaintiffs incurred because of the insufficient value of the collateral. Plaintiffs allege these risks were concealed by Barlin's misrepresentations regarding Zaretsky's involvement and wealth. If Zarestky had been extremely wealthy, been a controlling principal of the borrowing entity, and personally guaranteed the investment, he might either have used his funds to prevent the borrowing entity from defaulting, or used his funds to prevent losses to Plaintiffs after default. Plaintiffs also allege Barlin's misrepresentations concealed the fact the principals were not real estate developers. Plaintiffs allege these misrepresentations concealed [*11] the actual risk of default by the borrower; and the risk of losses to Plaintiffs because the value of the collateral was insufficient to cover their investments. If the principals had been real estate developers rather than criminals, Plaintiffs allege, the risk of default might have been reduced or their losses mitigated. [1]

> 1   Based on Barlin's motion and reply, it is unclear whether Plaintiffs will be able to provide evidence to support these claims. However, such issues are properly explored in a motion for summary judgment, not a motion to dismiss.

## 3. Conclusion

The Court finds there is a facially plausible causal relationship between these misrepresentations and Plaintiffs' losses. The risks alleged by Plaintiffs were default of the borrower and insufficient value of the collateral. The misrepresentations concealed the likelihood of default and the consequences thereof. The risks that ultimately materialized were, of course, borrower default and losses to Plaintiffs due to

insufficient value of the collateral. The Court therefore finds Plaintiffs have sufficiently pleaded loss causation with respect to their Straw-Man claim. [2] Consequently, Barlin's motion to dismiss is DENIED.

> 2   The [*12] Court further notes it is unclear whether Plaintiffs intend many separate claims against Barlin relating to the Manor Loan, or a single claim comprised of many misrepresentations. In the latter case, Barlin's motion to dismiss would have to be denied, as he does not challenge the sufficiency of the other misrepresentations. However, as both parties appear to interpret each misrepresentation as a separate claim, the Court does likewise.

## III. Gunn's Motion to Dismiss [#92]

Gunn argues the Court should once again dismiss Plaintiffs' claims against her because: (1) Plaintiffs' repetition of their old allegations remain insufficient; and (2) Plaintiffs' new allegations are not sufficient to change this result. Plaintiffs, of course, disagree. The Court agrees with Plaintiffs and DENIES Gunn's motion.

## A. Plaintiffs' Allegations Against Gunn

In summary, Plaintiffs make the following factual allegations against Gunn: (1) she was the "incorporator, registered agent, active owner, director, president, and employee of Creative Financial," 2nd Am. Compl. at ¶ 8; (2) she (and Defendant Lahr) "made [*13] all decisions regarding what investments would be created, packaged, marketed, and sold by Creative Financial," *id.* at ¶ 8; (3) she hired both Barlin and the Savrick Defendants, *id.*; (4) she published documents indicating, in essence, Creative Financial's investments were conservative and safe, *id.* at ¶ 9; (5) she directed Defendants Lahr and Barlin to sell "[s]ome of the securities at issue in this lawsuit," *id.* at ¶ 10; (6) she "received outsized compensation directly from the sales as well as for purported servicing of the securities," *id.*; (7) she directed the creation, packaging, and offering of both the Temple Loan, *id.* at ¶ 11, and the Manor Loan, *id.* at ¶ 12; (8) on June 9, 2006, she sent the Savrick Defendants an email regarding the Temple Loan indicating the borrowing entity was in default to the first and second lienholders, but failed to disclose the email to Plaintiffs, *id.* at ¶ 42; (9) she was a broker for Plaintiffs, *id.* at ¶ 42 n.6; (10) she benefitted from her failure to disclose the email by receiving brokerage fees, book-keeping fees for servicing the loan, and being able

to pay money to prior investors on unrelated investments, thereby maintaining the illusion such [*14] prior investments were viable, *id.* at ¶ 44; (11) she decided which attorneys worked on which investments, *id.* at ¶ 44; and (12) on January 30, 2007, the Savrick Defendants sent her an email regarding the Manor Loan which indicated some of the collateral had been pledged to a third party, but she did not disclose this email to Plaintiffs, *id.* at ¶ 125.

## B. "Control Person" Liability

Gunn argues Plaintiffs have failed to state a claim that she is liable as a "control person" under 15 U.S.C. § 78t. That section states in part:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). Specifically, Gunn argues Plaintiffs' claims fail because "Plaintiffs simply make conclusory allegations of control." Gunn's Motion [#92] at ¶ 4.

Plaintiffs respond by citing the Fifth Circuit's opinion [*15] in *G.A. Thompson & Co., Inc. v. Partridge*, 636 F.2d 945 (5th Cir. 1981). That case indicates to establish "control person" liability a plaintiff must demonstrate a defendant's general "control" over the liable person, but not the defendant's "participation in the wrongful transaction." *Thompson*, 636 F.2d at 958. "Lack of participation and good faith constitute an affirmative defense for a controlling person." *Id.* The *Thompson* court found "control person" liability for a corporate officer who was a 24% stockholder, an officer, a director, and who was involved in the day-to-day operations of the business, because he had the "requisite power to directly or indirectly control or influence corporate policy." *Id.* Plaintiffs argue they have sufficiently pleaded Gunn was a control person under this standard. The Court agrees.

As noted above, Plaintiffs allege Gunn was

"incorporator, registered agent, active owner, director, president, and employee of Creative Financial." 2nd Am. Compl. at ¶ 8. In their response to Gunn's motion, they are even more emphatic, succinctly stating, "Gunn holds (or co-holds) every position of authority over Creative Financial that could exist." Plaintiffs' Response [*16] [#96] at ¶ 12. Taking these allegations as true, it is difficult to see how Gunn could *not* be a "control person" under 15 U.S.C. § 78t. It may be Plaintiffs will be unable to provide evidence for their claims at the summary judgment stage, but the Court finds Plaintiffs have sufficiently pleaded Gunn was a control person. And while "[c]ontrol person liability is secondary only and cannot exist in the absence of a primary violation," *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 383 (5th Cir. 2004), the Court has declined to dismiss Plaintiffs' claims against Defendants Barlin and Lahr, both of whom were allegedly controlled by Gunn. The Court therefore assumes the truth of primary violations by Barlin and Lahr for the purposes of this inquiry. Consequently, Plaintiffs have pleaded allegations sufficient to state a plausible claim for control person liability against Gunn.

## C. Primary Liability

### 1. Plaintiffs' Allegations

Plaintiffs also argue Gunn is primarily liable for her conduct. Specifically, Plaintiffs claim the following allegations are sufficient for Gunn to be directly liable under § 10(b): (1) failing to disclose the borrower on the Temple Loan was in default; [*17] (2) failing to disclose the borrower on the Manor Loan had encumbered some of the collateral for Plaintiffs' investment; and (3) false and misleading representations like those contained in Creative Financial's marketing materials. Plaintiffs' Response [#96] at ¶ 13.

### 2. Gunn's Argument

Gunn argues Plaintiffs' pleadings are deficient because Plaintiffs "make the same stock allegations as to materiality and reliance over and over again in their pleadings," and such claims are "not plausible on their face as they relate to Ms. Gunn." Gunn's Motion [#92] at ¶ 7. Further, Gunn argues Plaintiffs do not plead either Plaintiff ever met with Gunn, spoke with her, or had any basis for relying on Gunn or expecting to hear from her. *Id.* With respect to allegation (1) above, Gunn argues she sent the email to the Savrick Defendants after Plaintiffs

had already made their investments; thus, Gunn argues, Plaintiffs could not have relied on the omission, nor was the omission material. *Id.* With respect to allegation (2), Gunn argues Plaintiffs failed to sufficiently allege materiality and reliance, and reiterates her argument Plaintiffs had no expectation they would hear from her. *Id.* at ¶ 8. Finally, [*18] with respect to allegation (3), Gunn notes "Plaintiffs very pointedly fail to allege that they ever saw" the marketing materials. *Id.* at ¶ 9. Indeed, Gunn claims Plaintiffs never did see such materials; therefore, she argues, they could not have relied on them. *Id.* & n.6.

### 3. Plaintiffs' Response

In response, Plaintiffs claim Gunn had a duty to disclose because she acted as a broker and, under Texas law, brokers owe fiduciary duties to their clients. Plaintiffs' Response [#96] at ¶ 14. Moreover, with respect to allegation (1), Plaintiffs argue although they had placed money in escrow prior to June 9, 2006 (the date Gunn allegedly sent the email), they had not yet *closed* on the deal; thus, the information was material, Gunn had a duty to disclose it, and the Plaintiffs acted in reliance on Gunn's omission because reliance is presumed in omission cases. *Id.* at ¶¶ 17-21. With respect to allegation (2), Plaintiffs reiterate their duty-to-disclose and presumed-reliance arguments, and claim they have sufficiently pleaded reliance. *Id.* at ¶¶ 22-24. Finally, with respect to allegation (3), Plaintiffs argue it is irrelevant whether they saw the marketing materials because the materials simply [*19] corroborate what Gunn (and other Defendants) told them verbally. *Id.* at ¶ 26. Plaintiffs further argue they have sufficiently pleaded materiality and scienter with respect to this allegation.

### 4. Legal Standard

#### a. Prima Facie Case -- § 10(b)

For a plaintiff's § 10(b) claim to survive a motion to dismiss, the plaintiff's complaint must allege facts sufficient for the Court to find it plausible a defendant: (1) made a misrepresentation or omission; (2) of a material fact; (3) in connection with the purchase or sale of a security; (4) that such misrepresentation or omission was made with scienter by the defendant; (5) that the plaintiff justifiably relied on the misrepresentation or omission; (6) that the plaintiff suffered damages; and (7) that the defendant's misrepresentation or omission was the proximate cause of the plaintiff's loss. *Rosenzweig v.*

*Azurix Corp.*, 332 F.3d 854, 865 (5th Cir. 2003).

#### b. Particularity

The PSLRA imports the heightened pleading standard for claims of fraud under Rule 9(b); therefore, to avoid dismissal for lack of particularity, a plaintiff must: (1) specify each statement alleged to have been misleading, *i.e.*, contended to be fraudulent; (2) identify the speaker; [*20] (3) state when and where the statement was made; (4) plead with particularity the contents of the false representations; (5) plead with particularity what the person making the misrepresentation obtained thereby; and (6) explain the reason or reasons why the statement is misleading, *i.e.*, why the statement is fraudulent. *Rosenzweig*, 332 F.3d at 866.

#### c. Materiality

For an omission to be material under the PSLRA, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988) (quotation omitted).

#### d. Scienter

To establish scienter, a plaintiff must show the defendant intended to deceive, defraud, or manipulate, or that the defendant acted with severe recklessness. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 251 (5th Cir. 2009). Severe recklessness is limited to "highly unreasonable omissions or misrepresentations" that involve an "extreme departure from the standards of ordinary care." *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 408 (5th Cir. 2001).

Moreover, the PSLRA requires a plaintiff plead specific [*21] facts sufficient to give rise to a "strong inference" the defendant acted with scienter. 15 U.S.C. § 78u-4(b). In determining whether the pleaded facts give rise to a "strong" inference of scienter, a court should consider all of the facts alleged, taken collectively, and should also take into account plausible opposing inferences. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007). The inference of scienter need not be irrefutable, nor even the most compelling of all competing

inferences, but must be strong in light of other inferences. *Id.* at 324. Ultimately, a complaint will only survive if "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

### 5. Analysis

### a. Allegation One -- Temple Loan ? Failure to Disclose the Borrower was in Default

Plaintiffs claim Gunn knew about the borrowing entity's default prior to the closing of Plaintiffs' loan. While Gunn may dispute this fact, the Court is obligated to resolve factual disputes in Plaintiffs' favor at this stage. Thus, the Court assumes Gunn could have advised Plaintiffs of the borrowing entity's alleged default  [*22] prior to closing.

Plaintiffs allege Gunn was a broker, a contention the Court is obligated to accept as true. Under Texas law, a broker "is a fiduciary required to exercise fidelity in good faith toward his principal in all matters within the scope of his employment." *Janes v. CPR Corp.*, 623 S.W.2d 733, 740 (Tex. App.--Houston [1st Dist.] 1981, writ ref'd n.r.e.). "This requirement . . . imposes upon him the positive duty of communicating all information he may possess or acquire which is, or may be, material to his employer's advantage." *Id.* The Court thus concludes Gunn owed Plaintiffs a duty to disclose under Texas law.

Reliance on an omission is presumed where a plaintiff (1) alleges a claim based primarily on omissions or non-disclosure; and (2) demonstrates the defendant owes him or her a duty of disclosure. *Regents of Univ. of Cal. v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372, 384 (5th Cir. 2007). As both elements are met here, the Court presumes Plaintiffs relied on Gunn's omissions.

Although Gunn is correct Plaintiffs do not allege Gunn knew about Plaintiff's loan prior to the closing, the Court disagrees this is fatal to Plaintiff's claim. As noted above, the scienter  [*23] required for a PSLRA claim encompasses "severe recklessness," which is evidenced by highly unreasonable omissions or misrepresentations that involve an extreme departure from the standards of ordinary care. If Gunn was in charge of Creative Financial, owed fiduciary duties to Plaintiffs, and had knowledge about a substantial risk regarding one of her investments--all of which Plaintiffs allege--the Court finds the inference Gunn acted with severe recklessness

at least as compelling as any opposing inference, such as Gunn having been merely negligent or grossly negligent.

Gunn makes no particular challenge to the materiality of her alleged omission, merely objecting to Plaintiffs' "stock" allegations on the issue. The Court therefore finds she has waived her challenge to materiality. In any case, the Court finds the omitted facts material, as any reasonable investor would want to know if the entity to which they were loaning money was already defaulting on its prior obligations.

Consequently, the Court denies Gunn's motion with respect to her alleged failure to disclose the borrowing entity for the Temple Loan was in default.

### b. Allegation Two -- Manor Loan -- Failure to Disclose Encumbrances  [*24] on Collateral

Gunn's arguments--no reliance, materiality, or duty to disclose--concerning Plaintiffs' second allegation are foreclosed for the reasons stated above. The Court therefore denies Gunn's motion on this issue.

### c. Allegation Three -- Misleading Statements Illustrated by Marketing Materials

Plaintiffs argue: "The import of the brochure and flyer is that the representations contained therein almost completely corroborate all of the representations that Lahr and Barlin, acting as agents of Creative Financial, orally made to Plaintiffs." Plaintiffs' Response [#96] at ¶ 26. However, Defendants Lahr and Barlin's verbal misrepresentations to Plaintiffs, standing alone, cannot be used to impose primary liability on Gunn. To the extent Plaintiffs rely on the brochure and flyer for this purpose, it is irrelevant to their direct claim against Gunn.

However, Plaintiffs also allege: "Creative Financial instructed its agents such as Lahr and Barlin to orally make [the misrepresentation in the marketing material]. . . . After making these misrepresentations and continuing thereafter, Creative Financial, Gunn, and Lahr failed to disclose to Plaintiffs that these misrepresentations were false and/or  [*25] misleading." 2nd Am. Compl. at ¶ 168.

Construed in the light most favorable to them, Plaintiffs' claim thus seems to be: Gunn instructed Lahr and Barlin to make misrepresentations to Plaintiffs, then failed to disclose to Plaintiffs those misrepresentations

were false or misleading. Put another way, Plaintiffs claim Gunn perpetrated the misrepresentations through Lahr and Barlin.

This theory of liability appears to be explicitly provided for in the PSLRA: "It shall be unlawful for any person, directly or indirectly, to do any act or thing which it would be unlawful for such person to do under the provisions of this chapter or any rule or regulation thereunder through or by means of any other person." 15 U.S.C. § 78t(b). The Court therefore addresses the parties' arguments regarding this claim.

Plaintiffs argue reliance is presumed because this claim involves an omission. However, as noted above, reliance is only presumed when a plaintiff alleges a claim based primarily on omissions or non-disclosure. Here, the primary thrust of Plaintiffs' complaint is Gunn *directed* Lahr and Barlin to mislead Plaintiffs, not that she subsequently failed to disclose the false and misleading nature of the [*26] statements. Every claim of affirmative misrepresentation implicitly contains a claim the misrepresentation was not subsequently disclosed, but that does not bring every misrepresentation within the ambit of the presumptive reliance rule. The Court therefore declines to presume reliance on the alleged misrepresentations.

Nevertheless, Plaintiffs have alleged they did indeed rely on the misrepresentations. According to Plaintiffs, Lahr and Barlin made these misrepresentations to them. The Court cannot say Plaintiffs' reliance was not justified. The Court therefore finds Plaintiffs have sufficiently pleaded reliance.

Gunn does not challenge the materiality of the misrepresentations themselves, only the materiality of the marketing materials. Nor does she challenge Plaintiffs' allegations regarding Lahr and Barlin's scienter in making the false statements. And any challenge Gunn might make to Plaintiffs' allegations she told Lahr and Barlin to make the misrepresentations would be factual, and therefore inappropriate in the context of a motion to dismiss. Thus, the Court finds Plaintiffs' complaint alleges sufficient facts to establish a plausible case of materiality and scienter. Consequently, [*27] the Court finds Plaintiffs have sufficiently pleaded this claim.

## 6. Conclusion -- Primary Liability

The Court finds Plaintiffs have sufficiently alleged

primary violations by Gunn. The Court therefore DENIES Gunn's motion on this point.

## D. Conclusion -- Gunn's Motion to Dismiss

For the foregoing reasons, the Court DENIES Gunn's motion to dismiss. Plaintiffs may be unable to provide sufficient evidence to support all of their claims, but their allegations are sufficient to survive a motion to dismiss.

## IV. The Savrick Defendants' Motion to Dismiss [#95]

The Savrick Defendants argue Plaintiffs' claims against them should be dismissed because: (1) the Savrick Defendants owed no duty to disclose information to Plaintiff Aubrey; (2) Plaintiffs have insufficiently pleaded scienter; and (3) Plaintiffs improperly seek to impose aider and abetter liability upon the Savrick Defendants. Savrick Motion [#95] at 4. For the following reasons, the Court disagrees with the Savrick Defendants and DENIES their motion.

## A. Plaintiffs' Allegations Against the Savrick Defendants

Plaintiffs make the following factual allegations against the Savrick Defendants: (1) they "received consistent and sizeable fees to duplicate [*28] and rubber-stamp existing loan forms," 2nd Am. Compl. at ¶ 10; (2) they received the June 9, 2006 email from Gunn indicating the borrowing entity on the Temple Loan had defaulted, but failed to disclose the information to Plaintiffs, *id.* at ¶ 42; (3) they prepared the promissory note and deed of trust for the first and second lienholders on the Temple property, *id.*; (4) they represented Defendant Lahr in connection with his investment in the Temple Loan, *id.*; (5) they were attorneys for Plaintiffs, *id.* & n.6; (6) they benefitted from their nondisclosure of the email "by continuing to receive a steady stream of work and significant revenues from [Creative Financial] and its principals," *id.* at ¶ 44; (7) they sent a January 30, 2007 email to Gunn and Creative Financial regarding the Manor Loan, indicating the underlying collateral had been encumbered, but--even though they knew the collateral was to be used to secure Plaintiffs' investment--did not disclose this information to Plaintiffs, *id.* at ¶ 125 & n.13; (8) they benefitted from this non-disclosure "by continuing to receive a steady stream of work and significant revenues from [Creative Financial] and its principals," *id.* at ¶ 127; [*29] (9) they were aware of "prior fraud perpetrated by Capital

Advantage," and lawsuits against Capital Advantage's attorneys, *id.* at ¶ 128; (10) they failed with respect to the Manor Loan "to disclose that the borrower did not own and therefore could not pledge the 414-acre tract that was to serve as collateral for Plaintiffs' investment," *id.* at ¶ 131; (11) they benefitted from this failure to disclose as described above, *id.* at ¶ 133; (12) they knew the 414 acre tract was worth far less than the $50 million Lahr represented to Plaintiffs, *id.* at ¶ 134; (13) they received an email from an attorney representing a potential investor indicating a full appraisal, survey, and title work should be done if a loan was being made against the Manor property, *id.*; (14) they failed to disclose the "best 40-acre corner" of the Manor property was subject to an existing option to purchase held by a third party, and benefitted from that omission, *id.* at ¶¶ 137, 139; (15) they declined title insurance on the 414-acre Manor tract, which would have revealed the existence of the option on the 40-acre corner and the borrower's lack of title, and benefitted from the omission, *id.* at ¶¶ 143, 145; (16) they [*30] obtained title insurance in all other transactions, *id.* at ¶ 146; (17) they failed to disclose that the Manor Loan borrower owed $1.8 million in debt in connection with the purchase of the 414-acre tract, and benefitted from their omission, *id.* at ¶¶ 155, 157; and (18) they failed with respect to the Manor Loan to disclose Plaintiffs' junior lien against real property could only be obtained with the consent of the senior lienholders or that such consent would not be obtained, and they benefitted from the omission, *id.* at ¶¶ 161, 163.

**B. Duty to Disclose**

Plaintiffs do not allege any affirmative misrepresentations by the Savrick Defendants, nor do they allege the Savrick Defendants induced others to make such misrepresentations or are "control persons." Thus, Plaintiffs' claims can only succeed if the Savrick Defendants had a duty to disclose.

**1. The Parties' Arguments**

The Savrick Defendants argue they owed no such duty to Plaintiff Aubrey. Savrick Motion [#95] at 5. In support of this argument, the Savrick Defendants point to Texas state court documents of which this Court has previously taken judicial notice, see Order [#61] of April 28, 2010, in which the state court found no attorney-client [*31] relationship between Plaintiff Aubrey and the Savrick Defendants.

Plaintiffs respond by arguing: (1) a court cannot grant a motion to dismiss on the basis of res judicata; and (2) res judicata does not apply where, as here, the other court lacked subject matter jurisdiction over the claim. Plaintiffs' Response [#103] at ¶¶ 9-12.

The Savrick Defendants reply by noting a court is permitted to consider judicially-noticed matters when deciding a motion to dismiss. Savrick Reply [#104] at 2. As this Court has already taken judicial notice of the state court ruling, they argue, nothing precludes the Court from considering it here. *Id.*

**2. Analysis**

Both parties are correct about the underlying rules they cite, and the rules appear to be in tension. On the one hand, a court can consider judicially-noticed matters of public record in deciding a motion to dismiss. *Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007). On the other hand, "generally a res judicata contention cannot be brought in a motion to dismiss; it must be pleaded as an affirmative defense." *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 570 n.2 (5th Cir. 2005). Finally, a failure to timely object to the court's [*32] consideration of documents establishing res judicata waives the objection. *Id.; Norris*, 500 F.3d at 461 n.9.

Here, Plaintiffs did not object to the Court's taking judicial notice of the state court documents. However, they do object to the Court's consideration of them in the context of the Savrick Defendants' motion to dismiss. The documents are, of course, public records.

The Court need not decide how these rules interact, however, because the Court agrees with Plaintiffs' second argument: under Fifth Circuit and Texas law, res judicata does not apply where the other court lacked subject matter jurisdiction. *See Browning v. Navarro*, 887 F.2d 553, 558 (5th Cir. 1989) ("It is black-letter law that a claim is not barred by res judicata if it could not have been brought. If the court rendering judgment lacked subject-matter jurisdiction over a claim or if the procedural rules of the court made it impossible to raise a claim, then it is not precluded."); *Montgomery v. Blue Cross and Blue Shield of Tex., Inc.*, 923 S.W.2d 147, 150 (Tex. App.--Austin 1996, writ denied) ("Res judicata only applies if there is an existing final judgment *by a court of competent jurisdiction*."). Indeed, the Savrick [*33] Defendants' own state court pleading stated,

"Without subject matter jurisdiction, a court cannot render a valid judgment." Savrick Motion for Judicial Notice [#11], Ex. C at 3.

### 3. Conclusion -- Duty to Disclose

Because the Texas court granted the Savrick Defendants' motion, it found Plaintiff Aubrey lacked standing to bring his claim; without a valid plaintiff, the court lacked subject matter jurisdiction over the claim. Consequently, the Court finds Plaintiffs' claim they had an attorney-client relationship with the Savrick Defendants is not precluded by res judicata. Therefore, the Court must accept Plaintiffs' representation as true. Under Texas law, the attorney-client relationship imposed upon the Savrick Defendants a duty to disclose: "As a fiduciary, an attorney is obligated to render a full and fair disclosure of facts material to the client's representation." *Willis v. Maverick*, 760 S.W.2d 642, 645 (Tex. 1988).

### C. Scienter

The Savrick Defendants argue Plaintiffs have failed to sufficiently plead scienter. The Court disagrees. Plaintiffs' allegations, taken as a whole, give rise to a strong inference of scienter. The Court bases its conclusion in large part on the following allegations [*34] against the Savrick Defendants: (1) they failed to disclose the borrower on the Temple Loan had defaulted; (2) they failed to disclose the Manor Loan collateral had been encumbered; (3) they failed to disclose the borrower did not own the 414-acre Manor Loan tract; (4) they failed to disclose the value of the 414-acre Manor Loan tract was far below the $50 million Plaintiffs believed it was worth; (5) they failed to disclose the 40-acre corner of the Manor property was subject to an option by a third party; (6) despite uniform policy to the contrary, they failed to obtain title insurance on the 414 acre Manor Loan tract; (7) they failed to disclose the Manor Loan borrower owed $1.8 million on the purchase of the 414 acre tract; (8) they failed to disclose Plaintiffs' promised junior lien could only be obtained with the consent of the senior lienholder, whose consent was not forthcoming; and (9) they benefitted from these omissions by maintaining a steady stream of clients from Creative Financial.

This litany of allegations, if true, makes it likely the Savrick Defendants acted with at least severe recklessness in failing to disclose information to

Plaintiffs. The most plausible competing [*35] inference is negligence or gross negligence on the part of the Savrick Defendants. While this inference is plausible, the number and serious nature of the alleged omissions leads this Court to conclude the inference of scienter is at least as compelling as any competing inference. The Court therefore rejects the Savrick Defendants' argument on this point.

### D. Aider and Abetter Liability

Taking Plaintiffs' allegations as true, the Court has found the Savrick Defendants had a duty to disclose material information to Plaintiffs. Moreover, the Court has found Plaintiffs have sufficiently pleaded scienter. The Savrick Defendants' aider-and-abetter argument is therefore foreclosed. The Court finds Plaintiffs' allegations sufficient to impose primary liability on the Savrick Defendants for their omissions. The Court thus rejects the Savrick Defendants' argument.

### E. Conclusion -- Savrick Defendants' Motion to Dismiss

For the foregoing reasons, the Court DENIES the Savrick Defendants' motion to dismiss.

### Conclusion

Plaintiffs have sufficiently alleged loss causation with respect to the Straw-Man claim against Defendant Barlin. Moreover, they have sufficiently alleged "control person" and primary liability [*36] against Defendant Gunn. Finally, they have pleaded facts sufficient to establish primary liability against the Savrick Defendants.

Accordingly,

IT IS ORDERED THAT Defendant Peter E. Barlin's Motion to Dismiss [#90] is DENIED;

IT IS FURTHER ORDERED THAT Defendant Sandra F. Gunn's Motion to Dismiss [#92] is DENIED:

IT IS FURTHER ORDERED THAT the Savrick Defendants' Motion to Dismiss [#95] is DENIED.

IT IS FINALLY ORDERED THAT Plaintiffs' Motion for Entry of Proposed

2011 U.S. Dist. LEXIS 15332, *36

Scheduling Order [#83] is DISMISSED WITHOUT PREJUDICE as moot.

SIGNED this the 16th day of February 2011.

/s/ Sam Sparks

SAM SPARKS

UNITED STATES DISTRICT JUDGE

# EXHIBIT 2



**MATT BRODY, on behalf of himself and all others similarly situated, Plaintiff, vs. ZIX CORPORATION, et al., Defendants.**

**CIVIL ACTION NO. 3:04-CV-1931-K**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**2006 U.S. Dist. LEXIS 69302**

**September 26, 2006, Decided**
**September 26, 2006, Filed**

**SUBSEQUENT HISTORY:** Motion granted by, in part, Motion denied by, in part Brody v. Zix Corp., 2007 U.S. Dist. LEXIS 38230 (N.D. Tex., May 25, 2007)

**PRIOR HISTORY:** Brody v. Zix Corp., 2005 U.S. Dist. LEXIS 13871 (N.D. Tex., July 11, 2005)

**COUNSEL:** [*1] For Matt Brody, On Behalf of Himself and All Others Similarly Situated, Plaintiff: Eric J Belfi, Murray Frank & Sailer, New York, NY; Roger F Claxton, Claxton & Hill, Dallas, TX; Stuart L Berman, Schiffrin & Barroway - Radnor, Radnor, PA.

For Hershell Warner, David B Lile, Consol Plaintiffs: Roger F Claxton, Claxton & Hill, Dallas, TX.

For Maurice Silber, Consol Plaintiff: Frank E Goodrich, Baron & Budd, Dallas, TX.

For Charles Dechter, Consol Plaintiff: Roger B Greenberg, Schwartz Junell Greenberg & Oathout, Houston, TX.

For Jerome Lievre, Consol Plaintiff: Thomas E Bilek, Hoeffner & Bilek, Houston, TX.

For Zix Corporation, Ronald A Woessner, John A Ryan, Daniel S Nutkis, Steve M York, Dennis F Heathcote,

Defendants: Gerard G Pecht, Fulbright & Jaworski - Houston, Houston, TX; Karl G Dial, Fulbright & Jaworski, Dallas, TX.

For C. Eric Ray, Carlo D'Amico, Joseph Simone, Terry Shinabarker, Movants: Eric J Belfi, Murray Frank & Sailer, New York, NY; Roger F Claxton, Claxton & Hill, Dallas, TX; Eric Lechtzin, Schiffrin & Barroway - Radnor, Radnor, PA.

For Michael Prestash, Kevin Holsopple, Richard Krahn, Virginia Pepe, Roy Siegel, Movants: Thomas A Dubbs, [*2] Goodkind Labaton Rudoff & Sucharow, New York, NY; Roger F Claxton, Claxton & Hill, Dallas, TX.

For Michael Abramow, Movant: Eric J Belfi, Murray Frank & Sailer, New York, NY; Roger F Claxton, Claxton & Hill, Dallas, TX; Stuart L Berman, Schiffrin & Barroway - Radnor, Radnor, PA.

For Alfred Gentile, Movant: Andrew M Schatz, Jeffrey S Nobel, Schatz & Nobel, Hartford, CT; Andrew W Yung, Scott Yung, Dallas, TX.

**JUDGES:** ED KINKEADE, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** ED KINKEADE

2006 U.S. Dist. LEXIS 69302, *2

OPINION

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants Zix Corporation, Ronald A. Woessner, John A. Ryan, Daniel S. Nutkis, Steve M. York, and Dennis F. Heathcotes' (collectively "Defendants") Motion to Dismiss. For the following reasons, the Court **DENIES** the motion.

## I. FACTUAL BACKGROUND

Lead Plaintiff Matt Brody ("Plaintiff") in this case represents a class of individuals who purchased Zix Corporation's ("Zix") stock on or between October 30, 2003 and May 4, 2004 ("Class Period"). Zix is a provider of e-messaging protection and transaction services. The Named Defendants in this case are Zix and its executives for the Class Period: John A. Ryan ("Ryan"), [*3] CEO; Daniel S. Nutkis ("Nutkis"), Executive Vice President and Chief Strategy Officer; Steve M. York ("York"), Chief Financial Officer; Ronald A. Woessner ("Woessner"), Senior Vice President and General Counsel; and Dennis F. Heathcote ("Heathcote"), Vice President of Sales and Marketing.

In July 2003, Zix acquired substantially all of the assets and business of PocketScript, LLC ("PocketScript"), which developed electronic prescription solutions for physicians and healthcare professionals. PocketScript's electronic prescription devices gave physicians the ability to write prescriptions electronically and then transmit those prescriptions to pharmacies. This program was intended to alleviate problems with illegible physician handwriting on prescriptions and help doctors streamline the process of dealing with insurance companies and pharmacies.

Plaintiff alleges that on October 30, 2003, Defendant Ryan, with Defendants York and Nutkis present, conducted a conference call with industry analysts to discuss Zix's prospects and those of its new PocketScript product line. In that conference call, Ryan stated that Zix's goal was to equip 1,000 physicians with PocketScript devices by the [*4] end of 2003, equip 1,000 physicians per month in early 2004, and equip 2000 physicians per month "later that year." He also stated that Zix had "deployed over 500 physicians to date," meaning a PocketScript system had been installed in over 500 physicians' offices and the physicians and/or

physician assistants had received training.

Likewise, Plaintiff alleges that on February 3, 2004, Zix issued a press release and conducted another conference call with analysts to discuss its Fourth Quarter 2003 results and discuss company projections for the coming year. In that conference call, Ryan reiterated that Zix's PocketScript line had been progressing well, and gave high goals for the coming year.

Based on these high projections and other assurances from Defendants, the price of Zix stock rose dramatically during this time from roughly $ 9 per share on October 30, 2003, to over $ 17 per share on April 12, 2004. During this time, several of the Defendants acted on these high stock prices and sold large portions of their stock-Woessner sold 85.7% of his stock during this time for proceeds of $ 1,518,576.44; Nutkis sold 80.8% of his stock for proceeds of $ 1,102,302.45; and York sold 86.2% [*5] of his stock for $ 1,490,544.99.

However, Plaintiff alleges that while expectations had been high for PocketScript, Zix ran into major problems with the device's software and marketing. On May 4, 2004, Ryan revealed in a conference call to industry analysts that things were not going as well as they had hoped. Plaintiff alleges that based on this news, the price of Zix stock fell 50% over the next few days.

Plaintiff now alleges that: 1) Defendants knew about the technical problems, complaints by physicians over the usability of the product, and the widespread difficulties Zix had in actually deploying PocketScript devices; 2) Defendants made material misleading statements concerning the number of devices actually deployed; and 3) Defendants misled analysts and investors in their public statements by continuing to overstate goals and projections when in fact the PocketScript product line's actual numbers were not even close to those projections. Plaintiff claims that because of these misrepresentations, the price of Zix stock was artificially inflated, and that the class members sustained severe losses when the truth came out about the company's actual status.

## II. LEGAL STANDARD

[*6] In reviewing a Rule 12(b)(6) motion, which tests the legal sufficiency of the claims stated in the complaint, a court must look solely at the pleadings themselves. *Jackson v. Procunier*, 789 F.2d 307, 309-10 (5th Cir. 1986). In looking at whether the complaint

states a valid claim upon which relief can be granted, the court must view all facts in a light most favorable to the plaintiff and resolve any doubts in favor of the plaintiff. *Lowrey v. Texas A&M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir. 1997). The court must assume the truth of all pleaded facts and liberally construe the complaint in favor of the plaintiff. *Oliver v. Scott*, 276 F.3d 736, 740 (5th Cir. 2002). To survive a 12(b)(6) motion, a plaintiff must not make mere conclusory allegations, but must instead plead specific facts. *Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th Cir. 1992). Dismissal is appropriate where the plaintiff merely makes conclusory allegations or unwarranted deductions of fact. *U.S. ex rel. Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d 375, 379 (5th Cir. 2003). Likewise, dismissal is appropriate where the plaintiff [*7] makes no allegations regarding a required element of the asserted claim. *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995). However, in the context of securities fraud, a dismissal pursuant to Rule 12(b)(6) is difficult to obtain since such a claim revolves around fact-specific inquiries. *See Basic Inc. v. Levinson*, 485 U.S. 224, 240, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988).

Section 10(b) of the Securities Exchange Act of 1934 forbids the "use or employ, in connection with the purchase or sale of any security ... [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe. . . ." 15 U.S.C. § 78j(b). Rule 10b-5, promulgated pursuant to section 10(b), forbids the use of any "device, scheme, or artifice to defraud," and makes it unlawful for an individual to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). Plaintiffs claiming a violation of 10(b) must plead, in connection [*8] with the purchase or sale of any security: "(1) a misrepresentation or omission (2) of material fact (3) made with scienter (4) on which plaintiff relied (5) that proximately caused [the plaintiff's] injury. *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 406-07 (5th Cir. 2001); *see Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-342, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005).

Because Plaintiff asserts securities fraud under Section 10(b) and Rule 10b-5, he must also satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). Rule 9(b) requires a plaintiff alleging fraud to plead with particularity the circumstances constituting fraud, including specific allegations of the time, place, and content of the misrepresentations, the identity of the individuals who made the misrepresentations, and what the person who made those misrepresentations gained from the making of those statements. *Shushany v. Allwaste, Inc.*, 992 F.2d 517, 521 (5th Cir. 1993). In addition, the PSLRA requires complaints alleging securities fraud to "specify each statement alleged to [*9] have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1) (1998). For particularity purposes, a plaintiff must specify the who, what, when, where, and how of their alleged securities fraud. *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 349-50 (5th Cir. 2002).

## III. SUFFICIENCY OF PLAINTIFF'S PLEADING

### A. Section 10(b) Claims

Plaintiffs claiming a violation of 10(b) must plead, in connection with the purchase or sale of any security: "(1) a misrepresentation or omission (2) of material fact (3) made with scienter (4) on which plaintiff relied (5) that proximately caused [the plaintiff's] injury. *Nathenson*, 267 F.3d at 406-07.

#### 1. Material Misrepresentation

In order to show that a defendant's statement or omission was "material," the plaintiff must show that the omitted or misrepresented information would have been significant to a reasonable investor in making their investing [*10] decisions. *Basic*, 485 U.S. at 232 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S. Ct. 2126, 48 L. Ed. 2d 757 (1976)). Materiality depends on the interplay between the magnitude of the information and the probability that the event will occur. *Basic*, 485 U.S. at 238. Broad, generalized statements considered "puffery" are not actionable under Section 10(b) and Rule 10b-5. *See Plotkin v. IP Axess, Inc.*, 407 F.3d 690, 698 (5th Cir. 2005). Statements which are "mere puffery" are "vague and optimistic" containing "no concrete factual or material misrepresentation." *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 361 (5th Cir.

2004) (quoting *Lain v. Evans*, 123 F.Supp.2d 344, 348 (N.D. Tex. 2000)(Sanders, J.))

Plaintiff alleges misrepresentations and omissions were made through various statements, both oral and written, made by Defendants in press releases and/or in conference calls with analysts as follows:

(1) the healthcare industry acknowledged the effectiveness and benefits of e-prescribing;

(2) the goal for the end of 2003 was to deploy 1,000 physicians, then to [*11] deploy at least 1,000 physicians a month in early 2004 with 2,000 a month later in 2004;

(3) 500 physicians were already deployed as of October 30, 2003, and over 65,000 transactions had been processed during August and September 2003;

(4) anticipated customer commitments for the 4th Quarter 2003 was $ 2.25 million to $ 2.5 million, the low end being "virtually completed;"

(5) the participation of the 500 deployed physicians was an indication of the continued acceptance of e-prescribing;

(6) major healthcare product line (i.e., PocketScript) showed continued growth and strength as seen in Fourth Quarter 2003;

(7) by December 2003, 600 active physicians had been deployed, with an additional 400 physicians using the device occasionally;

(8) goal of 10,000 deployed physicians by end of 2004 was "achievable" because 4,000 pre-paid physicians were on order by February 3, 2004;

(9) 4,000 to 5,000 physicians made a base for the e-labs results service "Dr. Chart;"

(10) orders for the First Quarter 2004 were expected to be 11.5 million to 13 million, an increase of 4.2 million to 5.7 million over Fourth Quarter 2003, which includes a 4 million Adventist [*12] award Zix was already paid for;

(11) revenue for First Quarter 2004 was expected to be $ 2.8 million to $ 3 million, an almost 50% increase over Fourth Quarter 2003; and

(12) PocketScript's performance was better than expected after Zix completed the first full quarter of operations after acquiring PocketScript and another software product, both of which contributed to 7.3 million in new orders.

In this case, Plaintiff has sufficiently plead that Defendants allegedly made materially misleading statements and omissions. Plaintiff has effectively plead the "who, what, when, where and how" of securities fraud as to the Defendants. *See Shushany*, 992 F.2d at 521. Plaintiff has identified:

(1) the meetings at which the alleged omissions and/or materially misleading statements were made;

(2) the persons present at the meetings;

(3) who made the statements; and

(4) the allegedly misleading information and/or omissions which were provided to analysts and investors.

Such statements as Plaintiff has plead cannot be considered "mere puffery" as they are more than vague or optimistic; they contain concrete factual information Defendants [*13] could be found to have misrepresented.

Plaintiff has likewise plead why these statements were false by providing confidential witnesses who claim that:

(1) only 100 devices had been deployed by the October 2003 meeting, rather than

the 500 Ryan stated had been deployed, and only 60 practice groups had actually installed the device, with actual usage being 20-25% of those physicians;

(2) only 230 physicians had been deployed as of the First Quarter 2004, as opposed to the 600 claimed by Ryan; and

(3) physicians had complained of many technical and software problems with the devices, including the lack of "technical literacy" and support staff, inadequate formularies to allow physicians to properly prescribe medications, and lack of pharmacy contact information.

The Court concludes that Plaintiff's confidential sources have been pleaded with enough particularity to "'support the probability that a person in the position occupied by the source as described would possess the information pleaded to support the allegations of false or misleading statements made on information and belief.'" *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 259 (5th Cir. 2005) [*14] (quoting *ABC Arbitrage*, 291 F.3d at 353). Plaintiff specifies each confidential witness's job title, job description, time-frame employed at Zix, and specifically what the witness knew in relation to the PocketScript, its performance, and the Defendants.

Furthermore, Plaintiff pleaded that Defendants knew, or were reckless in not knowing, of the problems which plagued the PocketScript at the time the alleged misrepresentations were being made. Plaintiff's complaint specifically alleges, based on confidential witnesses, that Defendants had knowledge of the various problems with PocketScript, the actual deployment numbers, and the actual usage. Furthermore, there are specific allegations that Defendants had access to internal information of Zix related to PocketScript's true performance. Plaintiff contends Defendants knew of three internal tracking systems, "Big Foot," "Heat," and a sales tracking system. Based on confidential sources, each of the three systems, which tracked scheduled deployment, actual deployment, and sales of the systems, were regularly updated, and indicated that no more than 100 units had been deployed as of July 2004. Plaintiff contends that in [*15] spite of knowing all this information, Defendants continued to issue information to the public about the positive performance of PocketScript.

Plaintiff has shown that these statements made by Defendants are material in that the allegedly misrepresented information would have been important to a reasonable investor in making their investment decision. *See Basic*, 485 U.S. at 232. The Court cannot conclude these statements amounted merely to "puffery" as they could be found to contain material misrepresentations and there is nothing vague or merely optimistic about them. *See Plotkin*, 407 F.3d at 698; *Southland*, 365 F.3d at 361.

a) Safe Harbor under PSLRA

The PSLRA does provide a safe harbor for both written and oral forward-looking statements if, and to the extent that, the statement is "identified as a forward looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward looking statement. . . [and was not] made with actual knowledge by that person that the statement was false or misleading." 15 U.S.C. § 77z-2(c)(1)(A)-(B) [*16] . To avoid the safe harbor provision, the plaintiff must pleaded facts evidencing the statement was made with actual knowledge of its falsity. *Southland*, 365 F.3d at 371. As discussed in the Material Misrepresentation section, the Court concludes Plaintiff has sufficiently plead evidence that Defendants knew the statements they made were false. Therefore, Plaintiff has successfully avoided the PSLRA safe harbor provision. *See id.*

2. Scienter

In the context of securities fraud, the Fifth Circuit has defined scienter as being an "intent to deceive, manipulate, or defraud" or the type of "severe recklessness" which poses a "danger of misleading buyers or sellers. . . [and] is either known to the defendant or is so obvious that the defendant must have been aware of it." *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961-62 (5th Cir. 1981). To allege scienter based on conscious behavior, or intent, a plaintiff must plead sufficient circumstantial evidence of misbehavior. *Mortensen v. AmeriCredit Corp.*, 123 F.Supp.2d 1018, 1025 (N.D. Tex. 2000)(Fitzwater, J.). Severe recklessness encompasses "highly unreasonable omissions or [*17] misrepresentations," not simply of inexcusable or simple negligence, but of "an extreme departure from the standards of ordinary care," and which poses a risk of misleading buyers and/or sellers, which either the defendant knows or it is so obvious that the defendant

must have been aware of it. *Fener v. Belo Corp.*, 425 F.Supp.2d 788, 795 (N.D. Tex. 2006)(Fitzwater, J.)(citing *Nathenson*, 267 F.3d at 408). Allegations of motive and opportunity may strengthen the suggestion of scienter. *Nathenson*, 267 F.3d at 412. The court considers the plaintiff's evidence of scienter cumulatively. *Goldstein v. MCI WorldCom*, 340 F.3d 238, 237 (5th Cir. 2003).

In the present case, Plaintiff plead scienter as to the Defendants alleging they were severely reckless, at a minimum, based on their motive to commit fraud, evidenced by stock sales at suspicious times and in suspicious amounts, and also based on their alleged knowledge, or recklessness in not knowing, of the actual problems with PocketScript because of their access to information within Zix.

a) Stock Sales

Evidence of insider trading alone is not enough to show scienter as [*18] to a defendant, but when insider trading is done in suspicious amounts and at suspicious times, such facts evidence a strong inference of scienter. *Southland*, 365 F.3d at 368. If a plaintiff can show that several defendants made suspicious sales at suspicious times, and profited greatly thereby, such facts are probative of the defendants' intent to inflate the price of their company's stock in order to make a personal profit from their insider sales. *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 434-435 (5th Cir. 2002); *see Southland*, 365 F.3d at 368 (where the company's CEO sold 40 percent of his company stock at prices which were inflated by his own material misrepresentations as to company revenues, such facts raised a strong inference of scienter on his part).

Here, Plaintiff has plead that, during the Class Period after the alleged misrepresentations were made, Defendants Woessner, Nutkis, and York, three of the five named individual Defendants, exercised their stock options and that same day, sold over 80% of their personal stock holdings totaling more than $ 4.6 million. Plaintiff alleges that this was done at times when the price [*19] of the Zix stock was allegedly inflated due to the material misrepresentations of the Defendants:

Woessner sold 85.7% of his holdings for proceeds of $ 1,518,576.44;

Nutkis sold 80.8% of his holdings for proceeds of $ 1,102,302.45; and

York sold 86.2% of his holdings for proceeds of $ 1,490,544.99.

Plaintiff also plead that none of these Defendants had sold stock prior to the Class Period. The Court concludes such allegations as these which Plaintiff has plead give rise to a strong inference of scienter on the part of the Defendants. *See Abrams*, 292 F.3d at 435; *see also Nathenson*, 267 F.3d at 412 (allegations of motive and opportunity strengthen inference of scienter).

b) Knowledge of PocketScript's Problems

Scienter cannot be proved by inferring a corporate defendant must have known of the misstatement or omission simply because of his position in the company. *Abrams*, 292 F.3d at 432; *In re Odyssey Healthcare, Inc. Securities Litigation*, 424 F.Supp.2d 880, 890 (N.D. Tex. 2005)(Godbey, J.). However, where a plaintiff can show that defendants received and had actual knowledge to show that their statements [*20] to investors were materially misleading, such as information from computer tracking reports, such facts would give rise to a strong inference of scienter. *See In Re Odyssey Healthcare*, 424 F.Supp.2d at 889-90. Here, Plaintiff has plead, based on the testimony of confidential witnesses, that Defendants regularly received computer tracking reports from internal reporting systems which would have alerted them to the fact that their statements to analysts about physician deployment numbers were materially misleading. As the Court discussed *supra* in Material Misrepresentation, Plaintiff specifies each of the three tracking systems which were used, naming the systems and what each tracked, and what the confidential sources allege Defendants knew based on these reports. Plaintiff plead sufficient evidence that Defendants had actual knowledge to indicate their alleged misstatements and omissions could be materially misleading, thereby allowing the Court to infer scienter.

Considering all of Plaintiff's evidence cumulatively, the Court concludes Plaintiff has sufficiently plead scienter.

3. Reliance

The third element Plaintiff must plead is reliance by the investors [*21] on the statements made by Defendants. *Dura*, 544 U.S. at 342. In class action suits involving securities fraud, the Supreme Court has noted that plaintiffs may use the "fraud on the market" theory to

prove reliance. *Basic*, 485 U.S. at 241; *see Nathenson*, 267 F.3d at 413-14. The Supreme Court

> "The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements. . . ."

*Basic*, 485 U.S. at 241. When material misrepresentations have been made publicly or omissions have made the market information misleading, the stock price is not accurate and investors may be defrauded. *Rosenzweig v. Azurix Corp. (In re Azurix Corp. Secs. Litig.)*, 198 F. Supp. 2d 862, 880 (S.D. Tex. 2002). If the plaintiff can show that material misrepresentations were placed into the market or omissions made the market information misleading, the plaintiff [*22] is entitled to a presumption of reliance. *Id.* Plaintiff must present evidence that the stock price was affected by the misrepresentation or omission. *See Nathenson*, 267 F.3d at 414. In providing this evidence, Plaintiff may rely on the "fraud on the market" theory to establish reliance by the investors. *See Basic*, 485 U.S. at 241; *Id.*

The Court notes at the outset that Defendants make no argument in their motion to dismiss related to Plaintiff's failure to sufficiently establish reliance in the Complaint. However, the Court will still address this necessary element. In the Complaint, Plaintiff contends Defendants made allegedly material misrepresentations and/or omissions, as discussed in detail *supra* in the Material Misrepresentations section, in press statements and in conference calls with analysts. During the Class Period, in which these statements were made, the price of Zix stock rose from $ 9 a share at the beginning of the Period to over $ 17 a share on April 24, 2004, ten days before the end of the Period. Plaintiff presented evidence that the price of Zix stock fell 50% in the days following the May 4 press release, May 4 conference [*23] call, and May 5 press release which revealed that the performance was not as anticipated. The Court concludes Plaintiff has sufficiently shown that allegedly material misrepresentations were placed into the mix of market information as discussed *supra*; therefore, Plaintiff is

entitled to a rebuttable presumption of reliance. *See Azurix*, 198 F. Supp. 2d at 880.

### 4. Loss Causation

In order to prove loss causation, a plaintiff must show "a causal connection between the material misrepresentation and the loss." *Dura*, 544 U.S. at 342. Showing an inflated stock purchase price alone cannot in and of itself evidence loss causation; the misrepresentation which caused the inflated purchase price must have caused an economic loss, not just the potential for one. *Id.* at 345; *see also United States v. Olis*, 429 F.3d 540, 546 (5th Cir. 2005) (no loss may be attributable to a misrepresentation until the truth is later revealed and the price of the stock subsequently drops). Furthermore, the Supreme Court concluded that, pursuant to Federal Rule of Civil Procedure 8(a)(2), the plaintiff [*24] must provide the defendant with some notice of the loss and the connection plaintiff sees. *Id.* at 347.

Applying the *Dura* standard to this case, the Court concludes Plaintiff has adequately plead loss causation. Plaintiff sufficiently plead, as discussed *supra*, the misrepresentations Defendants made in relation to the PocketScript. Plaintiff plead that, during the Class Period, the purchase price of Zix stock rose from $ 9 per share to over $ 17 per share while the Defendants continued to make their alleged misrepresentations in press statements and conference calls with analysts, thereby, according to Plaintiff, causing the stock price to be become inflated. Plaintiff further plead that Defendants' disclosures on May 4, 2004, the last day of the class period, as well as on May 5, of the true performance of the PocketScript and its deployment, caused the price of Zix stock to fall dramatically, 50% over the following days. There can be no doubt that this provides Defendants with at least some notice of the loss and the connection Plaintiff sees to the Defendants' alleged misrepresentations and then subsequent revelation of the truth, at least partially, thereby complying [*25] with *Dura*. The Court concludes that Plaintiff has sufficiently plead loss causation. *See Dura*, 544 U.S. at 342-47.

### B. Section 20(a) Claim

Section 20(a) of the Securities and Exchange Act holds liable any individual who is a "controlling person" over another individual who commits securities fraud. 15 U.S.C. § 78t(a). The Court must look to whether Plaintiff has sufficiently plead facts establishing that the

Defendants were in control of Zix, the primary violator. *See Kunzweiler v. Zero.Net, Inc.*, 2002 U.S. Dist. LEXIS 12080, 3:00-CV-2553-P, 2002 WL 1461732, at * 13 (N.D. Tex. 2002)(Solis, J.). A prima facie case of Section 20(a) claims are subject to the pleading requirements of Federal Rule of Civil Procedure 8, not the heightened requirements of Rule 9(b); therefore, only a statement giving the defendant fair notice of the plaintiff's claim and the basis of the allegation is required. *Abbott v. Equity Group, Inc.*, 2 F.3d 613, 620 (5th Cir. 1993).

Plaintiff's Complaint alleges the following Section 20(a) violation:

The Defendants . . . acted as controlling persons of Zix within [*26] the meaning of Section 20(a). . . . By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the [Zix's] operations and/or intimate knowledge of the false financial statements filed by [Zix] with the SEC and disseminated to the investing public, Defendants . . . had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiff contends are false and misleading. Defendants . . . were provided with or had unlimited access to copies of [Zix's] reports, press releases, public filings and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of [Zix] and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged [*27] herein, and exercised the same.

By virtue of their positions as controlling persons, Defendants . . . are liable pursuant to Section 20(a) . . . jointly and severally with Zix for Zix's violation of Section 10(b) and Rule 10b-5. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of [Zix's] securities during Class Period.

Plaintiff alleges that all the Defendants, by virtue of their positions within Zix, had sufficient control over the information which was disseminated to the public and given to the SEC. In addition, because of their participation in Zix's operations as well as their access to certain internal information, all the Defendants knew of the falsity of the information being given and could have stopped the dissemination of false information. Plaintiff has sufficiently stated control status under Section 20(a) as to all the Defendants. Furthermore, Plaintiff's complaint regarding the Defendants' violations of Section 20(a) provides sufficient notice under Rule 8. *See id.*

## IV. CONCLUSION

The court finds that Plaintiff's complaint sufficiently [*28] alleges a Section fraud claim against Defendants with the requisite particularity. Plaintiff's complaint also sufficiently alleges a Section 20(a) claim against Defendants with the requisite notice. Therefore, the Defendants' Motion to Dismiss is **DENIED**.

SO ORDERED

Signed September 26th, 2006

ED KINKEADE

UNITED STATES DISTRICT JUDGE

# EXHIBIT 3



**GLOBAL HEALING CENTER, LP, Plaintiff, v. JOSH POWELL, INDIVIDUALLY AND D/B/A BUYOXYPOWDER.COM, D/B/A SECUREBILLINGONE, LLC, AND D/B/A WORLD HEALTH PRODUCTS, LLC, and CHRISTOPHER CERVINO, INDIVIDUALLY AND D/B/A BUYOXYPOWDER.COM, D/B/A SECUREBILLINGONE, LLC, AND D/B/A WORLD HEALTH PRODUCTS, LLC, Defendants.**

**CIVIL ACTION NO. 4:10-CV-4790**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION**

**2012 U.S. Dist. LEXIS 67777**

**May 15, 2012, Decided**
**May 15, 2012, Filed**

**PRIOR HISTORY:** Global Healing Ctr., LP v. Powell, 2012 U.S. Dist. LEXIS 15707 (S.D. Tex., Feb. 8, 2012)

**COUNSEL:** [*1] For Global Healing Center LP, Plaintiff, Counter Defendant: Stacey L. Barnes, LEAD ATTORNEY, Lewis & Barnes, Houston, TX.

For Josh Powell, Individually doing business as Buyoxypowder.com, doing business as SecureBillingOne LLC, doing business as World Health Products LLC, Defendant: Delphine M James, Attorney at Law, Houston, TX.

For Christopher Cervino, Individually doing business as Buyoxypowder.com, doing business as SecureBillingOne LLC, doing business as World Health Products LLC, Defendant: Delphine M James, LEAD ATTORNEY, Attorney at Law, Houston, TX.

For Josh Powell, Individually, Counter Claimant: Delphine M James, Attorney at Law, Houston, TX.

For Christopher Cervino, Individually, Counter Claimant: Delphine M James, LEAD ATTORNEY, Attorney at Law, Houston, TX.

**JUDGES:** THE HONORABLE KEITH P. ELLISON, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** KEITH P. ELLISON

**OPINION**

**MEMORANDUM AND ORDER**

Pending before the Court is Plaintiff's Motion to Dismiss Defendants' Counterclaim (Doc. No. 20). After considering the motion, all responses thereto, and the applicable law, the Court finds that the motion must be granted.

**I. BACKGROUND**

This is a trademark infringement suit brought by Plaintiff Global Healing Center LP ("GHC") [*2] against Defendants Josh Powell and Christopher Cervino (collectively, the "Defendants"). On November 30, 2010, GHC filed a Complaint asserting claims for false designation of origin and false descriptions in violation of the Lanham Act, dilution of trademark in violation of the

Lanham Act, counterfeiting, copyright infringement, breach of contract, unfair competition, fraud, and cyber piracy. (Compl. ¶¶ 1-2, Doc. No. 1.)

Generally, the Complaint alleges that GHC manufactures dietary supplements and natural health care products, and that it distributes these products over the internet and through authorized distributors and resellers. (*Id.* ¶ 10.) Oxy-Powder, the product at issue in this case, is one such dietary supplement manufactured and sold by GHC. At some point, GHC entered into an agreement with Defendants, which provided that Defendants would sell Oxy-Powder in accordance with certain terms agreed upon by the parties. (*Id.* ¶ 10.) GHC alleges that Defendants violated the terms of this agreement by setting up websites purporting to be official GHC websites, and selling counterfeit Oxy-Powder through those websites. (*Id.* ¶¶ 11-13.) GHC claims that Defendants' actions violate GHC's [*3] federally registered trademark, "Oxy-Powder."

On November 30, 2010, the Court issued a temporary restraining order restraining and enjoining Defendants "from selling, promoting, advertising, offering for sale, distributing, or receiving payment for Oxy-Powder." (Doc. No. 3.) On December 16, the Court issued a preliminary injunction. (Doc. No. 10.)

On December 14, 2011, Defendants filed an Answer and Counterclaim (Doc. No. 15), in which they deny the majority of Plaintiffs' allegations, assert eleven affirmative defenses, and assert a Counterclaim for trademark cancellation. In their Counterclaim, Defendants allege that GHC intentionally placed false and misleading statements in a continued use affidavit submitted to the United States Patent and Trademark Office (the "PTO"), and that GHC therefore obtained its trademark registration of Oxy-Powder through fraud. (*Id.* ¶¶ 53-61.) On January 3, 2012, GHC moved to dismiss Defendants' Counterclaim under Federal Rule of Civil Procedure 12(b)(6). (Doc. No. 16.) GHC's motion asserted that Defendants do not have a real interest in the validity of the trademark at issue and therefore lack standing to seek cancellation of the trademark. The Court [*4] disagreed, and concluded that, because Defendants face liability in this suit for alleged infringement related to GHC's Oxy-Powder trademark, a finding that that trademark was fraudulently obtained would affect their interests. (Doc. No. 19 at 5.)

One week after the Court denied Plaintiff's motion,

Plaintiff filed the instant 12(b)(6) motion, which urges that Defendants' Counterclaim fails to meet the heightened pleading standards for fraud claims required by Federal Rule of Civil Procedure 9(b), and that it must therefore be dismissed for failure to state a claim upon which relief can be granted.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a) requires that a plaintiff's pleading include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). If a plaintiff fails to satisfy Rule 8(a), a defendant may file a motion to dismiss the plaintiff's claims under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); *see also Bank of Abbeville & Trust Co. v. Commonwealth Land Title Ins. Co.*, 201 Fed. Appx. 988, 2006 WL 2870972, at *2 (5th Cir. 2006) (citing 5 Charles [*5] Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1203 (3d ed. 2004)).

"To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief--including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). That is, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting *Twombly*, 550 U.S. at 570). A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plausibility standard is not akin to a "probability requirement," but asks for more than a sheer possibility that a defendant has acted unlawfully. *Id.* A pleading need not contain detailed factual allegations, but must set forth more than "labels and conclusions, [*6] and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted).

Ultimately, the question for a court to decide is whether the complaint states a valid claim when viewed in the light most favorable to the plaintiff. *Shandong*

*Yinguang Chem. Indus. Joint Stock Co., Ltd. v. Potter*, 607 F.3d 1029, 1032 (5th Cir. 2010) (citing *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007)). The court must accept well-pleaded facts as true, but legal conclusions are not entitled to the same assumption of truth. *Iqbal*, 129 S. Ct. at 1950. The court should not "'strain to find inferences favorable to the plaintiffs'" or "accept 'conclusory allegations, unwarranted deductions, or legal conclusions.'" *R2 Investments LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (quoting *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 361 (5th Cir. 2004)).

Allegations of fraud must meet the stricter standards of Federal Rule of Civil Procedure 9(b), which provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "At a minimum, [*7] Rule 9(b) requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003) (quoting *Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1139 (5th Cir. 1992) (internal quotation marks omitted)). The Fifth Circuit has explained that "Rule 9(b) requires 'the who, what, when, where, and how' [of the alleged fraud] to be laid out." *Id.* (quoting *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 179 (5th Cir. 1997)). A claim that a fraud allegation is insufficiently particular under Rule 9(b) is properly raised by a Rule 12(b)(6) motion for dismissal for failure to state a claim. *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 186 n. 8 (5th Cir. 2009); *Carter v. Nationwide Property and Cas. Ins. Co.*, 2011 U.S. Dist. LEXIS 60480, 2011 WL 2193385, at *1 (S.D. Tex. June 6, 2011).

Rule 9(b)'s particularity requirement is "supplemental to the Supreme Court's recent interpretation of Rule 8(a) requiring enough facts [taken as true] to state a claim to relief that is plausible on its face." *Id.* at 185 (quotations [*8] and footnote omitted). Thus, Rule 9(b) "requires only simple, concise, and direct allegations of the circumstances constituting fraud, which after *Twombly* must make relief plausible, not merely conceivable, when taken as true." *Id.* at 186 (internal quotations omitted).

### III. ANALYSIS

In responding to the Motion to Dismiss, Defendants

argue that Plaintiff is in default for failure to serve a responsive pleading within fourteen days of the Court's denial of Plaintiff's prior motion to dismiss, and that the Court therefore should not consider this second motion to dismiss. Plaintiff seeks dismissal of Defendant's fraud Counterclaim for failure to state a claim upon which relief can be granted.

### A. Procedural Issue

Before considering the merits of Plaintiff's motion to dismiss, the Court must address Defendant's preliminary argument that the motion is procedurally barred as a successive motion to dismiss. Although Defendant's argument is vague, the Court understands Defendant's position to be that the instant motion fails to comply with Rules 12(g) and 12(h)(2) of the Federal Rules of Civil Procedure, which govern successive motions to dismiss. Rule 12(g) curbs such motions, stating that "a [*9] party that makes a motion under [Rule 12] must not make another motion under [Rule 12] raising a defense or objection that was available to the party but omitted from its earlier motion." Fed. R. Civ. P. 12(g). Rule 12(h)(2) exempts from Rule 12(g) the defense of failure to state a claim upon which relief can be granted, which may be raised "(A) in any pleading allowed or ordered under Rule 7(a); (B) by a motion under Rule 12(c); or (C) at trial." Fed. R. Civ. P. 12(h)(2). A motion to dismiss is not a "pleading" within the meaning of Fed. R. Civ. P. 7(a). Thus, while the defense of failure to state a claim is never waived, if it is to be raised a second time, it technically must be raised in an answer, a motion for judgment on the pleadings under Rule12(c), or at trial. In filing a successive motion to dismiss, Plaintiff has failed to comply with the technical requirements of Rule 12(h)(2).

Recognizing that the defense of failure to state a claim is never waived and therefore will require adjudication at some point, many courts have applied these rules more permissively to allow the defense to be asserted in a successive motion to dismiss. *See Tatum v. R.J. Reynolds Tobacco Co.*, 102CV00373, 2007 U.S. Dist. LEXIS 39801, 2007 WL 1612580, at *6 (M.D.N.C. May 31, 2007) [*10] (emphasizing that all issues raised in the successive motion had been fully briefed, and that consideration of those issues early in the litigation would expedite the resolution of the case); *Stoffels ex rel., SBC Concession Plan v. SBC Communications, Inc.*, 430 F. Supp. 2d 642, 648 (W.D. Tex. 2006) (allowing successive 12(b)(6) motion where there was no evidence

that the movant intended delay); *In re Westinghouse Sec. Litig.*, CIV. A. 91-354, 1998 U.S. Dist. LEXIS 3033m 1998 WL 119554, at *6 (W.D. Pa. Mar. 12, 1998) (finding "no reason to put the defendant to the time and expense of filing an answer, or both defendant and plaintiff to the time and expense of addressing an issue to be raised later in a motion for judgment on the pleadings, when that issue can easily be resolved now."); *Mylan Laboratories, Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1059 (D. Md. 1991) (noting that a complaint can always be challenged for legal sufficiency, and finding it more efficient to treat such arguments prior to extensive discovery). Ultimately, "[s]ince the basic purpose of Rule 12(h)(2) probably is to preserve the defenses, rather than to delimit the precise timing of their assertion, [*11] this [more permissive] approach seems sound and within the spirit, if not the letter, of the provision." 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1392 (3d ed. 2004).

The Court finds that the spirit of Rule 12 would be furthered by considering Plaintiff's second motion to dismiss. The issues raised in the motion have been fully briefed, and there is no indication that Plaintiff has filed the motion to delay this case. Indeed, swift resolution of Plaintiff's failure to state a claim defense ultimately will conserve resources, both of the Court and of the parties. The Court therefore proceeds to consider Plaintiff's motion to dismiss.

**B. Fraud Counterclaim**

Section 33(b)(1) of the Lanham Act provides a defense against a registered mark when a "registration . . . was obtained fraudulently." 15 U.S.C. § 1115(b)(1). "Generally, in order to prevail on a claim of fraud in the procurement of a registration, a proponent must plead and prove: '(1) a false representation regarding a material fact; (2) knowledge or belief that the representation is false ('scienter'); (3) an intention to induce the listener to act or refrain from acting in reliance on the misrepresentation; [*12] (4) reasonable reliance on the misrepresentation; (5) damage proximately resulting from such reliance.'" *King-Size, Inc. v. Frank's King Size Clothes, Inc.*, 547 F. Supp. 1138, 1166 (S.D. Tex. 1982) (quoting *Robert B. Vance & Assocs., Inc. v. Baronet Corp.*, 487 F. Supp. 790, 797 (N.D. Ga. 1979)). The Fifth Circuit has emphasized that, "[i]n order to show that an applicant defrauded the PTO the party seeking to invalidate a mark must show that the applicant intended

to mislead the PTO." *Meineke Discount Muffler v. Jaynes*, 999 F.2d 120, 126 (5th Cir. 1993). "[A]bsent the requisite intent to mislead the PTO, even a material misrepresentation would not qualify as fraud under the Lanham Act warranting cancellation." *In re Bose Corp.*, 580 F.3d 1240, 1243 (Fed. Cir. 2009) (citing *King Auto., Inc. v. Speedy Muffler King, Inc.*, 667 F.2d 1008, 1011 n. 4 (CCPA 1981)).

**1. False Representation of Material Fact**

Defendants allege that Plaintiff falsely represented a material fact to the PTO by stating, in a continued use application, that Oxy-Powder was being sold as an immune stimulant. (Doc. No. 15 ¶¶ 53-54.) In an effort to demonstrate the falsity of this representation, Defendants point to the labeling [*13] on Plaintiff's product, which Defendants allege does not advertise that it is an immune stimulant. (*Id.* ¶ 56; 60.) Aside from asserting, on information and belief, that the Oxy-Powder label "does not advertise that it is an immune stimulant," [1] Defendants offer no allegations in support of their claim that Oxy-Powder is not being sold as an immune stimulant.

> 1    Defendants cite to "Exhibit C" in their discussion of the product label, but there is no such exhibit attached to Defendants' Answer. (Doc. No. 15 ¶ 56.)

Defendants' conclusory allegation regarding the Oxy-Power label provides an insufficient factual basis on which to state a fraud claim. Even accepting as true Defendants' allegation that the Oxy-Powder label fails to indicate that the product is an "immune stimulant," this allegation does not address whether Oxy-Powder is or is not *sold in commerce* as an immune stimulant. That is, Defendants draw no connection between the product's labeling and how it is sold. Without more, the absence of "immune stimulant" on the Oxy-Powder label, even if proven, does not demonstrate a misrepresentation (much less a material misrepresentation).

Defendants appear to raise a second allegation regarding [*14] false representation. Defendants assert that Plaintiff has advertised on its website that Germanium-132, an ingredient contained in Oxy-Powder, has pharmaceutical properties that have not been evaluated by the FDA. (Doc. No. 15 ¶ 58.) Defendants attach an exhibit from an FDA evaluation in an apparent attempt to show that Germanium-132 has, in fact, been

evaluated by the FDA. (Doc. No. 15-A.) The questionable relevance of this particular exhibit notwithstanding, Defendants fail to allege that Plaintiff made any statement regarding the FDA's evaluation on Plaintiff's trademark application. Thus, the facts alleged could, at most, support a claim that Plaintiff has misleading information on its website; there is no allegation that Plaintiff misrepresented facts regarding FDA evaluation in its trademark application.

Although Defendants' failure to allege a material misrepresentation warrants dismissal of the Counterclaim, the Court briefly considers Defendants' failure to plead knowledge of falsity and intent to mislead the PTO.

**2. Knowledge of Belief that the Representation was False**

As explained by the Federal Circuit, a misrepresentation made as part of a "conscious effort to obtain for [*15] his business a registration to which he knew it was not entitled" is fraud. *In re Bose Corp.*, 580 F.3d 1240, 1246 (Fed. Cir. 2009). An applicant commits fraud only if his or her material misrepresentation is made knowingly. *Id.* at 1243. Defendants claim that GHC "intentionally filed a continuous use affidavit knowing that it was not selling the Oxy-Powder product as an immune stimulant." (Doc. No. 15 ¶ 60.) While this pleading recites the necessary element--knowledge that Oxy-Powder was not being sold as an immune stimulant--it alleges no facts in support of the contention that Plaintiff actually knew that Oxy-Powder was not being sold as an immune stimulant at the time the application was filed. Perhaps Defendants infer that Plaintiff must have known about its failure to label Oxy-Powder as an "immune stimulant," and therefore must have known that the product was not being sold as an immune stimulant. However, as discussed above, Defendants fail to allege how the absence of such a label indicates the manner in which the product was sold; because no such connection is made, even Plaintiff's knowledge about its own labeling is insufficient to show knowledge that Oxy-Powder was not being [*16] sold as an immune stimulant.

**3. Intent to Mislead the PTO**

Defendants' pleading does not include even a conclusory recitation of this element. The failure to plead this element confirms that Defendants fail to state a claim

for fraud.

**C. Affirmative Defense**

After urging that their fraud Counterclaim is adequately plead under Rule 12(b)(6), Defendants then change course and contend that their Counterclaim is actually an affirmative defense mistakenly designated as a Counterclaim. Defendants complain that Plaintiff "is attempting to circumvent [Defendants'] affirmative defense by filing multiple motions to dismiss." (Doc. No. 21 at 7.) Pursuant to Rule 8(c), a party who mistakenly designates a defense as a Counterclaim is entitled to have the Court "treat the pleading as though it were correctly designated." Fed. R. Civ. P. 8(c). However, it is apparent from the face of Defendants' Counterclaim that the designation of fraud as a Counterclaim, rather than an affirmative defense, was not a mistake. Defendants' Counterclaim requests affirmative relief and seeks damages, [2] two traits which clearly qualify it as a Counterclaim. Thus, the Court rejects Defendants' contention that the Counterclaim [*17] was mistakenly designated.

> 2  Defendants request for affirmative relief states that "Plaintiffs have secured the trademark registration of Oxy-Powder Fraudulently [sic] and plaintiff request [sic] its cancellation;" and "Plaintiff Requests [sic] attorney fees for the damages caused by the false registration." (Doc. No. 15 ¶¶ 60-61.)

**IV. CONCLUSION**

For the foregoing reasons, Plaintiff's motion to dismiss Defendants' fraud Counterclaim must be **GRANTED**. Defendants' Counterclaim is dismissed. However, in light of Defendants' argument that they intended to plead fraud as an affirmative defense, and because justice would be served by allowing this affirmative defense, Defendants are granted leave to amend their pleadings and include an affirmative defense of fraud on the PTO. Defendants' amended Answer must be submitted by May 22, 2012.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the 15th day of May, 2012.

/s/ Keith P. Ellison

2012 U.S. Dist. LEXIS 67777, *17

THE HONORABLE KEITH P. ELLISON                    UNITED STATES DISTRICT JUDGE

# EXHIBIT 4



IN RE: BP P.L.C., SECURITIES LITIGATION

MDL NO.: 10-md-2185,Civil Action No. 4:10-md-2185

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION

2012 U.S. Dist. LEXIS 17787

February 13, 2012, Decided
February 13, 2012, Filed

**SUBSEQUENT HISTORY:** Motion granted by, in part, Motion denied by, in part, Motion granted by, Claim dismissed by In re Bp P.L.C., 2012 U.S. Dist. LEXIS 17788 (S.D. Tex., Feb. 13, 2012)

**PRIOR HISTORY:** In re BP S'holder Derivative Litig., 2011 U.S. Dist. LEXIS 135406 (S.D. Tex., Nov. 23, 2011)

**DISPOSITION:**    Motion to dismiss granted.

**COUNSEL:** [*1] For Robert Ludlow, Individually and on behalf of all others similarly situated, Plaintiff: Jordanna G Thigpen, LEAD ATTORNEY, Aron K Liang, Matthew K. Edling, Cotchett Pitre McCarthy, Burlingame, CA; Richard Warren Mithoff, Jr, LEAD ATTORNEY, Mithoff Law Firm, Houston, TX; Bryan M. Payne, PRO HAC VICE, Hester H. Cheng, PRO HAC VICE, Joseph W Cotchett, Mark C Molumphy, Nancy L Fineman, Cotchett Pitre et al, Burlingame, CA; James P Roy, Domengeaux Wright et al, Lafayette, LA; Victor S Elias, Cotchett Pitre & McCarthy LLP, Burlingame, CA; W Mark Lanier, The Lanier Law Firm, Houston, TX.

For Alan R Higgs, Individually and on behalf of all other similarly situated, Plaintiff: Ana M Cabassa, Sona R Shah, Zwerling Schachter & Zwerling LLP, New York, NY; Anthony Chu, Don K Ledgard, Capretz &

Associates, Newport Beach, CA; James T Capretz, Attorney at Law, Newport Beach, CA; Robert S Schachter, Zwerling Schachter & Zwerling, New York, NY; W Mark Lanier, The Lanier Law Firm, Houston, TX; Mary K Blasy, Scott and Scott LLP.

For Johnson Investment Counsel Inc, Individually and on behalf of all others similarly situated, Plaintiff: Dianne M Nast, Roda and Nast PC, Lancaster, PA; Richard J Arsenault, [*2] Neblett Beard et al, Alexandria, LA; Stanley M Chesley, Wilbert B Markovits, Waite Schneider Bayless Chesley Co LPA, Cincinnati, OH; W Mark Lanier, The Lanier Law Firm, Houston, TX.

For Thomas Yuen, Individually and on behalf of all others similarly situated, Sunmi Ahn, individually and on behalf of all other similarly situated, Plaintiffs: Deborah R Gross, Robert P Frutkin, Law Offices of Bernard M Gross PC, Philadelphia, PA; Kirk B Hulett, Sarah P Weber, Hulett Harper Stewart LLP, San Diego, CA; W Mark Lanier, The Lanier Law Firm, Houston, TX; Mary K Blasy, Scott and Scott LLP.

For John P Miles, Plaintiff: Albert M Myers, Michael A. Swick, Kahn Swick & Foti, LLC (Madisonville), Madisonville, LA; Amy Miller, Jeremy Friedman, PRO HAC VICE, Mark Lebovitch, PRO HAC VICE, Bernstein, Litowitz, Berger & Grossmann, LLP (New York), New York, NY; Gregory Anthony Gelderman, III, Bernstein, Litowitz, Berger & Grossmann, LLP (New

Orleans), New Orleans, LA; Lewis Kahn, Kahn Swick & Foti LLC, Madisonville, LA; Paul S Balanon, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., New Orleans, LA; Thomas Robert Ajamie, Ajamie LLP, Houston, TX; W Mark Lanier, The Lanier Law Firm, Houston, TX; Mary K Blasy, [*3] Scott and Scott LLP.

For Louisiana Municipal Police Employees' Retirement System, Plaintiff: Albert M Myers, Kahn Swick & Foti, LLC (Madisonville), Madisonville, LA; Amy Miller, Jeremy Friedman, PRO HAC VICE, Mark Lebovitch, PRO HAC VICE, Bernstein, Litowitz, Berger & Grossmann, LLP (New York), New York, NY; Gregory Anthony Gelderman, III, Bernstein, Litowitz, Berger & Grossmann, LLP (New Orleans), New Orleans, LA; Jeroen van Kwawegen, Bernstein Litowitz et al, New York, NY; John Alden Meade, Bernstein Litowitz Berger & Grossmann LLP, New Orleans, LA; Lewis Kahn, Kahn Swick & Foti LLC, Madisonville, LA; Paul S Balanon, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., New Orleans, LA; W Mark Lanier, The Lanier Law Firm, Houston, TX; Mary K Blasy, Scott and Scott LLP.

For City of New Orleans Employee's Retirement System, Plaintiff: Albert M Myers, Michael A. Swick, Kahn Swick & Foti, LLC (Madisonville), Madisonville, LA; Amy Miller, Jeremy Friedman, PRO HAC VICE, Mark Lebovitch, PRO HAC VICE, Bernstein, Litowitz, Berger & Grossmann, LLP (New York), New York, NY; Gregory Anthony Gelderman, III, Bernstein, Litowitz, Berger & Grossmann, LLP (New Orleans), New Orleans, LA; Lewis Kahn, Kahn [*4] Swick & Foti LLC, Madisonville, LA; Paul S Balanon, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., New Orleans, LA; Robert B Weintraub, Wolf Haldenstein et al, New York, NY; W Mark Lanier, The Lanier Law Firm, Houston, TX; Mary K Blasy, Scott and Scott LLP.

For Frances O. Goldman, Plaintiff: Albert M Myers, Michael A. Swick, Kahn Swick & Foti, LLC (Madisonville), Madisonville, LA; Amy Miller, Jeremy Friedman, PRO HAC VICE, Mark Lebovitch, PRO HAC VICE, Bernstein, Litowitz, Berger & Grossmann, LLP (New York), New York, NY; Gregory Anthony Gelderman, III, Bernstein, Litowitz, Berger & Grossmann, LLP (New Orleans), New Orleans, LA; Lewis Kahn, Kahn Swick & Foti LLC, Madisonville, LA; Paul S Balanon, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., New Orleans, LA; W Mark Lanier, The Lanier Law Firm, Houston, TX.

For Lore Greenfield, Individually and on behalf of all other similarly situated, Clay Dietrich, Robert Freedman, Rene Rogers, Southeast Pennsylvania Transportation Authority, Plaintiffs: W Mark Lanier, The Lanier Law Firm, Houston, TX; Mary K Blasy, Scott and Scott LLP.

Eugene McClurg, Individually and on behalf of all others similarly situated, Plaintiff, Pro se.

For Victor Skomedal, [*5] Derivatively on Behalf of BP PLC, Plaintiff: Bryan L Clobes, Cafferty Faucher LLP, Philadelphia, PA; Jarrell Edward Godfrey, Jr., Jessica A. DeNisi, Godfrey Firm, PLC, New Orleans, LA; Vincent J. Esades, Heins, Mills & Olson, PLC, Minneapolis, MN; W Mark Lanier, The Lanier Law Firm, Houston, TX; Ellen Meriwether, Cafferty Faucher LLP; Mary K Blasy, Scott and Scott LLP.

For Cody A Nedved, Derivatively on Behalf of BP PLC, Plaintiff: Lionel Howard Sutton, III, Lionel Sutton, III, Attorney at Law, New Orleans, LA; W Mark Lanier, The Lanier Law Firm, Houston, TX; Mary K Blasy, Scott and Scott LLP.

For The Oklahoma Police Pension & Retirement System, Individually and on Behalf of All Others Similarly Situated, Plaintiff: Eric R Nowak, Harrell and Nowak, New Orleans, LA; W Mark Lanier, The Lanier Law Firm, Houston, TX; Mary K Blasy, Scott and Scott LLP.

For Ralph Whitley, Individually and on behalf of all others similarly situated, Plaintiff: Amber M. Nesbitt, Kenneth A. Wexler, Wexler Wallace LLP, Chicago, IL; Gregory M. Egleston, Egleston Law Firm, Brooklyn, NY; Olga Anna Posmyk, Stephen J Fearon, Jr, Squitieri & Fearon LLP, New York, NY; Scott D Egleston, PRO HAC VICE, Egleston Law Firm, [*6] New York, NY; W Mark Lanier, The Lanier Law Firm, Houston, TX; Mary K Blasy, Scott and Scott LLP.

For Charis Moule, on behalf of herself and all others similarly situated, Plaintiff: Arvind B. Khurana, PRO HAC VICE, Jennifer J. Sosa, PRO HAC VICE, Lori G Feldman, PRO HAC VICE, Sanford P. Dumain, PRO HAC VICE, Milberg LLP, New York, NY; Charles Robert Watkins, Donaldson & Guin, LLC, Chicago, IL; Evan M Janush, PRO HAC VICE, The Lanier Law Firm PLLC, New York, NY; Marvin Alan Miller, Matthew E Van Tine, Miller Law LLC, Chicago, IL; W Mark Lanier, The Lanier Law Firm, Houston, TX; William W Thomas, Behn & Wyetzner, Chtd., Chicago, IL.

For Syed Arshadullah, Ron Pierce, Individually and on behalf of all others similarly situated and on behalf of the BP Employee Savings Plan, BP Capital Accumulation Plan, BP Partnership Savings Plan and the BP DirectSave Plan, Plaintiffs: Charles Robert Watkins, Donaldson & Guin, LLC, Chicago, IL; Robert A Izard, Jr, Izard Nobel LLP, West Hartford, CT; W Mark Lanier, The Lanier Law Firm, Houston, TX; William W Thomas, Behn & Wyetzner, Chtd., Chicago, IL; Mary K Blasy, Scott and Scott LLP.

For David M Humphries, on behalf of himself and all others similarly [*7] situated, Plaintiff: Dona Szak, Ajamie LLP, Houston, TX; Kim S. Zeldin, Ronald S Kravitz, Liner Yankelevitz Sunshine & Regenstreif LLP, San Francisco, CA; Laura Elizabeth Towbin, Mitchell L. Marinello, Novack and Macey, LLP, Chicago, IL; Thomas Robert Ajamie, Ajamie LLP, Houston, TX; W Mark Lanier, The Lanier Law Firm, Houston, TX; Mary K Blasy, Scott and Scott LLP.

For Jerry T. McGuire, Plaintiff: Arvind B. Khurana, Lori G Feldman, Sanford P. Dumain, Milberg LLP, New York, NY; Evan M Janush, PRO HAC VICE, The Lanier Law Firm PLLC, New York, NY; Jeffrey M Norton, Newman Ferrara LLP, New York, NY; Marvin Alan Miller, Matthew E Van Tine, Miller Law LLC, Chicago, IL; Robert I Harwood, Tanya Korkhov, Harwood Feffer LLP, New York, NY; W Mark Lanier, The Lanier Law Firm, Houston, TX; Mary K Blasy, Scott and Scott LLP.

For Edward F. Mineman, on behalf of himself and all others similarly situated, Plaintiff: Bruce C. Howard, Robert D. Allison, Steven Paul Schneck, Robert D. Allison & Associates, Chicago, IL; Edwin J Mills, Michael J. Klein, Stull Stull, New York, NY; Patrice Lyn Bishop, Stull, Stull & Brody, Los Angeles, CA; W Mark Lanier, The Lanier Law Firm, Houston, TX; Mary K Blasy, Scott [*8] and Scott LLP.

For Maureen S. Riely, Individually on behalf of the BP Employee Savings Plan, BP Capital Accumulation Plan, BP Partnership Savings Plan, BP DirectSave Plan, and on behalf of all others similarly situated, Plaintiff: Arvind B. Khurana, Lori G Feldman, Sanford P. Dumain, Milberg LLP, New York, NY; Evan M Janush, PRO HAC VICE, The Lanier Law Firm PLLC, New York, NY; Marvin Alan Miller, Matthew E Van Tine, Miller Law LLC, Chicago, IL; W Mark Lanier, The Lanier Law Firm, Houston, TX; Mary K Blasy, Scott and Scott LLP.

For Thomas P Soesman, Individually and on behalf of all others similarly situated, Plaintiff: Charles Robert Watkins, Donaldson & Guin, LLC, Chicago, IL; Thomas J McKenna, Gainey and McKenna, New York, NY; W Mark Lanier, The Lanier Law Firm, Houston, TX; William W Thomas, Behn & Wyetzner, Chtd., Chicago, IL; Mary K Blasy, Scott and Scott LLP.

For Taylor Safe, Individually and on behalf of all others similarly situated, Plaintiff: Donald Amamgbo, Amamgbo & Associates, Culver City, CA; Reginald Von Terrell, The Terrell Law Group, Oakland, CA; W Mark Lanier, The Lanier Law Firm, Houston, TX; Mary K Blasy, Scott and Scott LLP.

Frankie Ramirez, Plaintiff, Pro se.

For [*9] Robert R Glenn, individually and on behalf of all persons similarly situated, Plaintiff: Jacob S Gill, Keith A Ketterling, Steve D Larson, Stoll Stoll et al, Portland, OR; Jennifer S Wagner, PRO HAC VICE, Austin, TX.

For BP plc, BP America Inc, Defendant: Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC; Diane Lee McGimsey, Sullivan and Cromwell LLP, Los Angeles, CA; George Denegre, Jr, John C. Anjier, Russell Keith Jarrett, Liskow & Lewis, New Orleans, LA; Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL; Lois O Rosenbaum, Stoel Rives LLP, Portland, OR; Marc De Leeuw, Paul J Ondrasik, Jr, Richard C. Pepperman, II, Sullivan & Cromwell, New York, NY; Morgan D Hodgson, Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC.

For BP America Inc, Defendant: Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC; George Denegre, Jr, John C. Anjier, Russell Keith Jarrett, Liskow & Lewis, New Orleans, LA; Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL; Marc De Leeuw, Paul J Ondrasik, Jr, Richard C. Pepperman, II, Sullivan & [*10] Cromwell, New York, NY; Morgan D Hodgson, Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC.

For Anthony Hayward, Defendant: Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX; Diane Lee McGimsey, Sullivan and Cromwell LLP, Los

Angeles, CA; George Denegre, Jr, John C. Anjier, Russell Keith Jarrett, Liskow & Lewis, New Orleans, LA; Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL; Marc De Leeuw, Paul J Ondrasik, Jr, Richard C. Pepperman, II, Sullivan & Cromwell, New York, NY; Morgan D Hodgson, Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC.

For Andy Inglis, Defendant: Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX; George Denegre, Jr, John C. Anjier, Russell Keith Jarrett, Liskow & Lewis, New Orleans, LA; Marc De Leeuw, Paul J Ondrasik, Jr, Richard C. Pepperman, II, Sullivan & Cromwell, New York, NY.

For Carl-Henric Svanberg, William Castell, Paul Anderson, Antony Burgmans, Cynthia Carroll, Defendants: Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX; George Denegre, Jr, John C. Anjier, Russell Keith Jarrett, Liskow & Lewis, New Orleans, LA; Marc De Leeuw, [*11] Paul J Ondrasik, Jr, Richard C. Pepperman, II, Sullivan & Cromwell, New York, NY; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC.

For H Lamar McKay, Byron E Grote, Defendants: Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX; George Denegre, Jr, John C. Anjier, Russell Keith Jarrett, Liskow & Lewis, New Orleans, LA; Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL; Marc De Leeuw, Paul J Ondrasik, Jr, Richard C. Pepperman, II, Sullivan & Cromwell, New York, NY; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC.

For Erroll B Davis, Jr, Lord Edmund John Philip Browne, Peter Sutherland, Defendants: Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX; George Denegre, Jr, John C. Anjier, Russell Keith Jarrett, Liskow & Lewis, New Orleans, LA; Marc De Leeuw, Richard C. Pepperman, II, Sullivan & Cromwell, New York, NY; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC.

For Iain C Conn, George David, Ian Davis, Douglas J Flint, Deanne S Julius, Defendants: Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX; Marc De Leeuw, Paul J Ondrasik, Jr, Richard C. Pepperman, II, Sullivan & Cromwell, New York, NY;

Daryl A Libow, Sullivan [*12] & Cromwell LLP, Washington, DC.

For Robert W Dudley, Ian MG Prosser, Defendants: Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX; Marc De Leeuw, Richard C. Pepperman, II, Sullivan & Cromwell, New York, NY; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC.

For BP Exploration & Production Inc, Tom McKillop, Defendants: Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX; John C. Anjier, Russell Keith Jarrett, Liskow & Lewis, New Orleans, LA; Marc De Leeuw, Richard C. Pepperman, II, Sullivan & Cromwell, New York, NY; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC; George Denegre, Jr, Liskow & Lewis.

For Transocean Deepwater Inc, Defendant: Campbell Edington Wallace, Everett R. Fineran, Kerry J. Miller, Miles Paul Clements, Paul C. Thibodeaux, Frilot L.L.C., New Orleans, LA; Carl J Hebert, Edward F. Kohnke, IV, Preis & Roy, New Orleans, LA; Edwin G Preis, Jr, Joseph E Lee, III, Preis Roy PLC, Lafayette, LA; Evans Martin McLeod, George M Gilly, Phelps Dunbar LL, New Orleans, LA; Richard J Hymel, Preis Roy, Lafayette, LA; Robert Michael Kallam, Preis & Roy, PLC (Lafayette), Lafayette, LA.

For Transocean Offshore Deepwater Drilling Inc, Defendant: Campbell [*13] Edington Wallace, Everett R. Fineran, Kerry J. Miller, Miles Paul Clements, Paul C. Thibodeaux, Frilot L.L.C., New Orleans, LA; Carl J Hebert, Edward F. Kohnke, IV, Preis & Roy, New Orleans, LA; Edwin G Preis, Jr, Joseph E Lee, III, Preis Roy PLC, Lafayette, LA; Evans Martin McLeod, George M Gilly, Phelps Dunbar LL, New Orleans, LA; John Daniel Johnson, Sutherland Asbill Brennan LLP, Houston, TX; Richard J Hymel, Preis Roy, Lafayette, LA; Robert Michael Kallam, Preis & Roy, PLC (Lafayette), Lafayette, LA.

For Halliburton Energy Services Inc, Defendant: Adelaida J Ferchmin, Alan Davis, Derek A Walker, Katharine Rachael Colletta, Chaffe McCall LLP, New Orleans, LA; Bruce W Bowman, Jr, Donald Everett Godwin, Floyd Richard Hartley, Jr, Gavin Eugene Hill, Jenny LaNell Martinez, Godwin Ronquillo PC, Dallas, TX; Daniel A Tadros, Chaffe McCall et al, New Orleans, LA; Robert Alan York, Godwin Ronquillo, PC, Houston,

TX.

For State Street Bank and Trust Co., Defendant: Wilber H Boies, LEAD ATTORNEY, McDermott Will & Emery, Chicago, IL; Aron J Frakes, McDermott Will Emery LLP, Chicago, IL; Steven G Spears, McDermott Will et al, Houston, TX.

For Richard J. Dorazil, Defendant: Kristopher S. Ritter, [*14] Kirkland & Ellis LLP (Chicago), Chicago, IL; Marc De Leeuw, Paul J Ondrasik, Jr, Richard C. Pepperman, II, Sullivan & Cromwell, New York, NY; Morgan D Hodgson, Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC; Thomas W Taylor, Andrews and Kurth, Houston, TX; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC.

For The Savings Plan Investment Oversight Committee, Defendant: Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL; Marc De Leeuw, Paul J Ondrasik, Jr, Richard C. Pepperman, II, Sullivan & Cromwell, New York, NY; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC; Thomas W Taylor, Andrews and Kurth, Houston, TX; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC.

For Stephanie C. Atkins, Defendant: Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL; Paul J Ondrasik, Jr, Sullivan & Cromwell, New York, NY.

For BP Corporation North America Inc, Neil Shaw, Thomas L Taylor, Gregory T. Williamson, BP Corporation North America, Inc.'s Board of Directors, Lamar McKay, Defendants: Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL; Morgan D Hodgson, Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC; Paul J Ondrasik, [*15] Jr, Sullivan & Cromwell, New York, NY; Thomas W Taylor, Andrews and Kurth, Houston, TX.

For BP Corporation North America Inc. Savings Plan Investment Oversight Committee, Defendant: Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL; Paul J Ondrasik, Jr, Sullivan & Cromwell, New York, NY; Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC.

For The Investment Committee, BP Corporation North America, Inc. Savings Plan Investment Oversight Committee, Defendants: Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL.

For Robert A Malone, Defendant: Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX; Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL; Morgan D Hodgson, Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC; Paul J Ondrasik, Jr, Sullivan & Cromwell, New York, NY.

For Corey Correnti, Marvin Damsma, James Dupree, Patrick Gower, Jeanne M. Johns, Patricia H. Miller, Stephen J. Riney, Brian D. Smith, Lord John Browne, Stephanie C Moore, Defendants: Morgan D Hodgson, Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC; Paul J Ondrasik, Jr, Sullivan & Cromwell, New York, NY; Thomas W Taylor, LEAD ATTORNEY, Andrews and [*16] Kurth, Houston, TX.

For Thomas P DiNapoli, Movant: Autry W Ross, R Paul Yetter, Yetter Coleman, Houston, TX; Daniel S Sommers, Matthew K Handley, PRO HAC VICE, Steven J Toll, Cohen Milstein et al, Washington, DC; Eric R Nowak, Harrell and Nowak, New Orleans, LA; Jason M Leviton, Jeffrey C Block, Glen DeValerio, Kristin J. Moody, Mark Delaney, Berman DeValerio, Boston, MA; Joseph J Tabacco, Jr, Matthew D Pearson, Berman DeValerio, San Francisco, CA; Joshua S Devore, Joshua Kolsky, Julie Reiser, Cohen Milstein Sellers & Toll PLLC, Washington, DC.

For Richard A Cordray, Ohio Attorney General, Movant: Autry W Ross, R Paul Yetter, Yetter Coleman, Houston, TX; Eric R Nowak, Harrell and Nowak, New Orleans, LA; Joseph J Tabacco, Jr, Matthew D Pearson, Berman DeValerio, San Francisco, CA; Joshua S Devore, Joshua Kolsky, Julie Reiser, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Daniel S Sommers, Matthew K Handley, Steven J Toll, Cohen Milstein et al, Washington, DC; Glen DeValerio, Jason M Leviton, Jeffrey C Block, Kristin J. Moody, Mark Delaney, Whitney Street, PRO HAC VICE, Berman DeValerio, Boston, MA.

For Sacramento County Employees Retirement System, Fresno County Employees Retirement [*17] Association, Alameda County Employees Retirement Association, Movants: Jeffrey M. Hoffman, Mitchell J. Hoffman, Serena E. Pollack, Lowe, Stein, Hoffman, Allweiss & Hauver, LLP, New Orleans, LA.

For Peter D. Lichtman, Leslie J. Nakagiri, Paul Huyck, Movants: James P Roy, Domengeaux Wright et al, Lafayette, LA.

For Ohio Police & Fire Pension Fund, School Employees Retirement System of Ohio, State Teachers Retirement System Of Ohio ("STRS"), Movants: Jason M Leviton, Jeffrey C Block, Glen DeValerio, Kristin J. Moody, Mark Delaney, Whitney Street, PRO HAC VICE, Berman DeValerio, Boston, MA; Joshua S Devore, Julie Reiser, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Matthew D Pearson, Berman DeValerio, San Francisco, CA; Steven J Toll, Cohen Milstein et al, Washington, DC.

**JUDGES:** HON. KEITH P. ELLISON, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** KEITH P. ELLISON

**OPINION**

## MEMORANDUM AND ORDER

On April 20, 2010, the Deepwater Horizon rig operated by BP plc exploded in the Gulf of Mexico, causing loss of life and the largest oil spill in this nation's history. In the months that followed, lawsuits raising a variety of claims, including securities fraud claims, were filed across the country. A group later identified as [*18] the Ludlow Plaintiffs filed an action in the Western District of Louisiana on May 21, 2010. (Doc. No. 22, Ex. 1.) [1] The Comptroller of the State of New York and the Attorney General of Ohio--representatives of a group later identified as the New York and Ohio Plaintiffs--filed suit in the Southern District of New York. (Transfer Order, Doc. No. 1.) Different plaintiff groups, including the Ludlow Plaintiffs, moved to centralize litigation in their respective districts. On August 10, 2010, the Judicial Panel on Multidistrict Litigation transferred all cases involving shareholder derivative claims, securities claims, and ERISA actions to the Southern District of Texas. (*Id.*) Claims involving personal injury, wrongful death, and property damage were centralized in a separate docket in the Eastern District of Louisiana. The Ludlow Plaintiffs' claims were included in the group transferred to the Southern District of Texas.

> 1    All docket references are to Multi-District Litigation No. 10-md-2185.

On December 28, 2010, this Court consolidated all of the securities class actions pending in the Court, [2] appointed the New York and Ohio Plaintiffs as lead

plaintiffs, and appointed the Ludlow Plaintiffs [*19] as lead plaintiffs of a subclass. [3] (Order, Doc. No. 79.) In its decision, this Court expressed its expectation that "the lead plaintiffs would work together as needed to prevent inefficiencies" and its hope that the two lead plaintiffs would file a joint complaint, if possible. (*Id.*) That did not happen. Instead, the two lead plaintiffs filed two separate and extremely lengthy consolidated amended complaints.

> 2    The seven securities class actions consolidated into the instant case include: *Ludlow v. BP PLC*, Case No. 10-cv-3043, *Johnson Inv. Counsel Inc. v. BP PLC*, Case No. 10-cv-3044, *Yuen v. BP PLC*, Case No. 10-cv-3049, *Greenfield v. BP PLC*, Case No, 10-cv-3448, *McClurg v. BP PLC*, Case No. 10-cv-3449, *Oklahoma Police Pension & Ret. Sys. V. BP PLC*, Case No. 10-cv-3452, and *Safe v. British Petroleum*, Case No. 10-cv-4675. (Doc. No. 79.)
>
> 3    The Court created a subclass in part because the competing lead plaintiffs advanced different theories of the case. Whereas the Ludlow Plaintiffs' claims center on BP's statements about the safety of its drilling operations in the Gulf of Mexico in the thirteen months leading up to the Deepwater Horizon explosion, the New York and Ohio Plaintiffs argue [*20] more generally that BP made fraudulent statements over a three and a half year period about its safety precautions both in the Gulf of Mexico and elsewhere. (Doc. No. 79 at 10, 18-19.)

On February 11, 2011, the Ludlow Plaintiffs filed a consolidated class action complaint ("the Complaint") alleging securities fraud violations against two corporate defendants, BP plc and BP America, Inc., and against nine individual defendants (collectively, "Defendants"). (Complaint ("Compl."), Doc. No. 112.) The New York and Ohio Plaintiffs filed a separate complaint (Doc. No. 113) on February 14, 2011. On May 6, 2011, Defendants filed a motion to dismiss the claims of the Ludlow Plaintiffs. [4] (Doc. No. 151.) The Ludlow Plaintiffs filed a response to the motion on June 6, 2011. (Doc. No. 187.) Defendants filed a reply in support of their motion on June 21, 2011. (Doc. No. 219.) After briefing concluded, the Court heard oral argument on the motion to dismiss on November 4, 2011.

> 4    Defendants also filed two motions to dismiss the New York and Ohio Plaintiffs class, one

against the claims of purchasers of BP ordinary shares (Doc. No. 153) and one against the purchasers of ADSs (Doc. No. 149.) Given the separate [*21] briefing in this case and the diversity of allegations, defendants, and legal issues, the Court will issue a separate ruling on the New York and Ohio Plaintiffs' claims.

Pending before the Court is Defendants' Motion to Dismiss the Claims of the BP ADS Purchasers in the Ludlow Plaintiffs' Consolidated Class Action Complaint (Doc. No. 151). Having considered the parties' pleadings, arguments and the applicable law, the Court finds that Defendants' motion should be **GRANTED.**

## I. THE PARTIES

Lead Plaintiffs are Robert Ludlow, Peter D. Lichtman, Leslie J. Nakagiri, and Paul Huyck (collectively, the "Ludlow Plaintiffs" or "Plaintiffs"). (Compl. ¶ 16.) The Ludlow Plaintiffs, all residents of California and purchasers of BP American Depositary Shares ("ADSs"), bring this consolidated class action on behalf of themselves and on behalf of the proposed plaintiff class: all others similarly situated who purchased American Depositary Receipts ("ADRs") in BP, plc between March 4, 2009 and April 20, 2010 (the "Subclass Period"). [5] (Compl., at 2.)

5   This suit has not yet been certified as a class action.

The Ludlow Plaintiffs have sued defendants BP plc and BP America, Inc. (collectively "BP" or "the [*22] Company"), and nine of BP's present and former officers and directors. BP plc is a U.K. company with its principal place of business in the United Kingdom. BP America, Inc., a subsidiary of BP plc, is a Delaware corporation that conducts substantial business in Texas. At all times relevant to this litigation, BP leased and operated the Deepwater Horizon, an oil rig responsible for drilling the Macondo well in the Gulf of Mexico. [6] (Compl. ¶ 22.) BP's shares trade on the New York Stock Exchange ("NYSE").

6   Deepwater Horizon was a Mobile Offshore Drilling Unit, or MODU, which is a free floating rig positioned through satellite GPS technology and thrusters. The first rig to drill at the Macondo well was the Marianas, an anchored rig. The Deepwater Horizon rig arrived in January 2010,

after the Marianas sustained damage from Hurricane Ida in November 2009. (Compl. ¶ 73.) BP did not own the Deepwater Horizon. Instead, pursuant to a 1998 drilling contract, BP paid Transocean approximately $500,000 per day to lease the Deepwater Horizon. (*Id.* ¶ 208.)

The nine individual defendants were directors and officers of BP prior to and during the Deepwater Horizon spill. They are Anthony B. Hayward, [*23] BP's Chief Executive Officer ("CEO") since 2007 and a member of the Board of Directors during the relevant period ("Hayward"); Andy G. Inglis, executive director and Chief Executive of Exploration and Production from 2007 to July 2010 ("Inglis"); Carl-Henric Svanberg, a Swedish citizen and Chairman of the Board of Directors since January 2010 ("Svanberg"); H. Lamar McKay, Chairman and President of BP America, Inc. since 2009 ("McKay"); William Castell, a member of BP's Board of Directors since 2006 and Chairman of BP's Safety, Ethics and Environment Assurance Committee ("Castell"); Paul Anderson, a member of BP's Board of Directors since February 1, 2010 ("Anderson"); Antony Burgmans, a member of BP's Board of Directors since 2004 ("Burgmans"); Cynthia Carroll, a member of BP's Board of Directors since 2007 ("Carroll"); Erroll B. Davis, Jr., a member of BP's Board of Directors from 1998 to April 15, 2010 ("Davis") (collectively, the "Individual Defendants"). (Compl. ¶¶ 24-34.) In addition, Hayward, Inglis, Castell, Anderson, Burgmans, Carroll, and Davis all served on BP's Safety Ethics & Environment Assurance Committee. Castell served as Chairman of the SEEAC and Hayward held the position [*24] of "executive liaison." (Compl. ¶¶ 24, 30.) Hayward and Inglis also served on BP's Group Operations Risk Committee. (Compl. ¶¶ 24, 26.)

## II. SUMMARY OF THE COMPLAINT

In a Rule 12(b)(6) motion to dismiss, the court must accept as true a plaintiff's well-pleaded factual allegations. FED. R. CIV. P. 12(b)(6). The court does not, however, "accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 550 (5th Cir. 2007) (citation omitted) (internal quotation marks omitted). Accordingly, the Court will set forth the relevant facts as alleged by Plaintiffs.

The Ludlow Plaintiffs assert violations of section

10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 of the Securities and Exchange Commission ("SEC") against BP and Individual Defendants Hayward, Inglis, McKay, and Svanberg. (Compl. ¶¶ 448-56.) Plaintiffs also assert violations of section 20(a) of the Exchange Act against all of the Individual Defendants. (Compl. ¶¶ 457-62.) Plaintiffs seek certification as a class action pursuant to Rule 23, damages against the Defendants, jointly and severally, [*25] prejudgment interest, costs, and attorneys' fees.

Following BP's release of its 2008 Annual Report, which marks the start of the Subclass Period, the price of BP ADSs grew steadily. Plaintiffs claim the growth was buoyed by BP's repeated misrepresentations and omissions calculated to conceal the true state of BP's safety programs and the Company's risk exposure and keep the value of BP ADSs artificially inflated throughout the Subclass Period. (Compl. ¶¶ 15, 415.) On April 20, 2010, BP ADSs closed at $59.49 a share. On April 20, 2010, the Deepwater Horizon rig, which BP operated, exploded. By June 25, 2010, BP's share price had fallen to $27.02 a share, reflecting a 55.3% drop in the two months following the explosion. (Compl. ¶ 15.) Plaintiffs claim that they purchased their shares in reliance on BP's representations that it had implemented appropriate safety mechanisms to reduce the risk of catastrophic incidents in the Company's deepwater drilling operations. (Compl. ¶ 418.) Plaintiffs suffered the loss of a substantial portion of their investment when the true state of BP's operations was revealed, tragically, through the Deepwater Horizon catastrophe and subsequent oil spill. (Id.)

### III.     [*26]     PLAINTIFFS' FACTUAL ALLEGATIONS AND CLAIMS

BP is a British oil company engaged in "every area of the oil and gas industry," including deepwater exploration and drilling. (Compl. ¶ 52.) Following a 1998 merger, BP became the third largest oil company in the world. (Id. ¶ 56.) In fiscal year 2009, BP's business generated $264 billion in revenues and over $16 billion in profit, making BP the single largest producer of oil and gas in the United States. (Id. ¶ 52.) BP's continued success has been tied to the Company's aggressive development of deepwater wells in the Gulf of Mexico. (Id. ¶ 53.) Through a series of mergers in the late 1990s, BP "embarked on an aggressive campaign of exploring,

developing and increasing (through the acquisition of regional leases) its Gulf assets." (Id. ¶ 58.)

Despite its financial success, BP is also a company plagued by years of safety incidents. This timeline of safety failures reaches back years before the Subclass Period and includes incidents such as: (i) a gas line rupture on BP's Forties Alpha rig in the North Sea in 2003 (Id. ¶¶ 106-07), (ii) a 2005 explosion at BP's Texas City refinery, which resulted in the death of fifteen people (Id. ¶¶ 108-09), [*27] and (iii) a 2006 oil spill at a BP pipeline in Prudhoe Bay, Alaska (Id. ¶¶ 128, 135). In addition to the leaks, spills, and explosions, regulatory reports--such as the Baker Report and a report by the U.S. Chemical Safety and Hazard Investigation Board ("CSB")--identified problems rooted in BP's safety processes. (Id. ¶¶ 3, 155-57.) Plaintiffs also point to reprimands--regulatory, civil, and criminal--that BP has received as a consequence for prior safety failures. For example, BP's guilty pleas include (1) felony violations of the Clean Air Act and a corresponding $50 million criminal fine arising out of the Texas City explosion; (2) a violation of the Clean Water Act and a corresponding $20 million fine arising from the Prudhoe Bay spill; and (3) a three year period of corporate probation. (Id. ¶ 145.)

In view of this record, BP launched a campaign, marked by the arrival of new CEO Tony Hayward, to resurrect BP's image with respect to safety. Shortly after taking over as head of the Company, Hayward promised to "ensure [that] BP becomes an industry leader in process safety management and performance," to "[champion] process safety as a foundation of BP's operations," and "to focus like [*28] a laser on safe and reliable operations." (Id. ¶¶ 4, 152-53.) According to Plaintiffs, Hayward's public statements were calculated to change public--specifically, the investing public's--opinion on the safety of BP's operations. But even as BP promoted its risk management and process safety reform efforts, it simultaneously glossed over the trouble brewing in its Gulf operations.

In March 2009, BP filed an Initial Exploration Plan ("IEP") for "Mississippi Canyon Block 252," a nine square mile plot of land in the Gulf of Mexico that BP leased for more than $34 million. (Id. ¶ 192.) The Macondo well, located approximately forty-eight miles from the nearest shoreline, was BP's first well on the site. (Id. ¶ 193.) The Macondo well site was notorious for high temperatures, high pressure, highly gaseous hydrocarbon

reservoirs and brittle rock formations. (*Id.* ¶ 194.) Even the letter BP received from the U.S. Minerals Management Service ("MMS") approving drilling warned: "Exercise caution while drilling." (*Id.* ¶ 195.) BP received a permit to drill up to a total depth of 19,650 feet at the Macondo well site and the Company began drilling operations in October 2009. (*Id.* ¶ 200.) After the Marianas [*29] rig was evacuated later that year following a hurricane, BP brought in the Deepwater Horizon rig, which it leased from Transocean, to continue drilling. (*Id.* ¶¶ 203, 208.)

As drilling progressed, BP departed from its original well design on multiple occasions. For example, BP ultimately used a "long string" casing design at the Macondo well instead of a "liner/tieback" design, which would have added four barriers against blowouts. [7] The method BP selected provided only two. (*Id.* ¶ 213.) Internal BP emails reveal that the long string method was chosen because it saved time and money. (*Id.* ¶ 214.) In addition, BP installed only six centralizer subs instead of the sixteen called for in the original well design. [8] The shortcut was approved after BP employees learned they would have to wait for their supplier to order more centralizers to supply the number called for in the plan, causing delay. (*Id.* ¶¶ 220-21.) Even though a Halliburton engineer analyzed the situation and determined that using only six centralizers would cause a "severe" gas flow problem in the well, a BP employee overrode the initial decision to wait for the delivery of more centralizers, stating "who cares, it's done, [*30] end of story, will probably be fine." (*Id.* ¶ 228.) BP also made multiple modifications to the cementing work--such as limiting the circulation of drilling mud through the wellbore, pumping cement down the well at a slow rate, and limiting the total volume of cement pumped into the well--that departed drastically from the original cementing design, standard industry practices, and BP's own internal guidelines. (*Id.* ¶¶ 229-34.) Despite these modifications, BP decided not to conduct cement log evaluations after the cementing was completed, even though such tests would have gauged the success of the cement job. [9] (*Id.* ¶ 226.)

[7]    Casing strings are used to stabilize the wellbore as a well is drilled deeper. Casings are steel tubes installed to line the well. The first string of casings is the widest, and as the well gets deeper the strings become progressively narrower because they must fit through the existing hole.

The strings are intended to prevent hydrocarbons from leaking into the wellbore and causing a "kick" or blowout. They also serve to reinforce the rock walls outside the well against the pressure exerted against the walls during drilling. (Compl. ¶ 83.) A "long string" casing creates [*31] a continuous wall of steel from the wellhead to the bottom of the well. A "liner" is a much shorter casing that is hung lower in the well and then anchored to the next higher string. A liner is theoretically easier to cement into place, but has its own downsides, for example, it is more leak-prone. (*Id.* ¶ 85-86.)

[8]    Centralizers ensure the stability of a well by helping to keep the casing pipes centered in the well bore. "Sub" centralizers screw into place between sections of casing. (Compl. ¶ 87.)

[9]    A post-blowout investigation found that, while Halliburton supplied BP with the original cement plan, the compromises to the plan were made at BP's insistence, despite the fact that BP had little experience with foam technology for cementing production casing in the Gulf of Mexico. (Compl. ¶ 236.)

Tests performed just before the explosion alerted BP to problems with the slurry, the type of cement used in a deepwater cement job. Because pressure and temperature at the bottom of a deepwater well can alter the strength and curing rate of slurry, slurry is typically tested at the start of a pumping job, to ensure the cement will behave as required when it reaches the bottom of the well. (*Id.* ¶ 90.) [*32] Halliburton performed the slurry tests for BP, and the first test was conducted in February 2010, just after the Deepwater Horizon began work on the well. (*Id.* ¶ 237.) The test results revealed that the slurry was unstable. (*Id.*) A second test was conducted later in February; the slurry failed that test as well. (*Id.* ¶ 238.) A final test was conducted on April 18, 2010. Though the test takes forty-eight hours to complete, BP completed cementing on the well without awaiting the final test results. [10] (*Id.*)

[10]   BP received the final results--which were also failing--six days *after* the blowout occurred. (Compl. ¶ 238.)

BP bypassed or curtailed other tests as well. For example, before BP could put the well into temporary abandonment, it had to perform a positive pressure test

and a negative pressure test. [11] (*Id.* ¶ 245.) BP successfully performed the positive test to evaluate the ability of the casing to hold under pressure. BP also performed a negative pressure test, designed to check both the integrity of the casing and the integrity of the cement job at the bottom of the well to ensure the pressure is properly balanced. (*Id.* ¶¶ 246-47.) The test involves use of a "spacer," a liquid mixture [*33] which separates drilling fluids from seawater. (*Id.*) Instead of using the typical liquid mixture, BP used "leftover unused lost circulation materials or pills," which allowed the Company to bypass hazardous waste disposal procedures. (*Id.* ¶ 248.) BP conducted three negative pressure tests on the well, and the results failed each time, signaling a leak--or at least a "very large abnormality"--in the well. (*Id.* ¶¶ 253-54.) Despite the readings, BP continued with the temporary abandonment process.

> [11] Temporary abandonment is the process by which a drilling rig, like the Deepwater Horizon, is replaced with a smaller rig more suited for production and extraction. (Compl. ¶ 95.) In order to make room for a new rig, the existing rig must remove its riser (the piping that connects the rig to the blowout preventer) and blowout preventer from the well head. (*Id.*)

BP made three additional, critical errors during the temporary abandonment process. First, BP set the cement plug on top of the casing, nearly 3,300 feet down into the well. (*Id.* ¶ 258.) Second, BP displaced the 3,300 feet of mud above the plug with sea water, thereby greatly reducing the amount of pressure on the well from the top. Third, [*34] BP began displacement before the cement plug had actually been set, leaving an opening for the well contents to rise up toward the rig. (*Id.* ¶ 260.)

Displacement began shortly after 8:00 p.m. on April 20, 2010. Just after 9:00 p.m., pressure in the drill pipe began rapidly and inexplicably rising. (*Id.* ¶ 270.) BP employees failed to notice or investigate the pressure change. (*Id.*) Shortly after 9:30 p.m., mud began spewing onto the rig floor and the crew finally noticed the "kick." [12] The rig crew was unable to activate the blowout preventer ("BOP") in time, and the explosion occurred six minutes after mud first spewed onto the rig floor. (*Id.* ¶ 272.) After the first explosion, the crew tried to engage the Emergency Disconnect System ("EDS") to sever the drill pipe and disconnect the rig, but they were unsuccessful. (*Id.* ¶ 274.) Even the automatic "deadman"

system on the BOP failed to activate properly. (*Id.*) Subsequent investigation by the Presidential Commission--the group tasked with investigating the spill--revealed that poor maintenance and the modifications BP had authorized reduced the effectiveness of the BOP. (*Id.* ¶¶ 274-75.)

> [12] A kick is an unplanned influx of gas, fluid, or other [*35] anomaly that indicates that hydrocarbons are rising up the wellbore. If the kick rises above the blowout preventer, an explosion is "all but inevitable." (Compl. ¶¶ 267-71.)

Despite the string of ill-advised decisions and the warning signs leading up to the Deepwater Horizon disaster, BP disseminated positive public representations throughout the Subclass Period concerning its process safety programs, its risk management infrastructure, its spill response capabilities, and the Company's prioritization of safety in the Gulf. According to Plaintiffs, these representations lulled investors into a false sense of confidence with respect to BP's control over and commitment to the safety of its operations. The Deepwater Horizon explosion shattered the façade BP had so carefully crafted, revealing instead a slipshod safety program beset by financial, management, and personnel problems. After Deepwater Horizon, it became clear that BP's safety efforts trailed far behind the Company's representations, as measured by both internal BP markers and external regulatory standards and industry peer comparisons.

According to the Ludlow Plaintiffs, BP's rocky safety record--highlighted most tragically in [*36] the Texas City explosion and the Prudhoe Bay spill--added value to the subsequent corporate professions of a renewed safety commitment. Against this sober backdrop of failures, promises of new safety initiatives, like BP's Operating Management System, provided greater reassurance to the market and acquired added significance for shareholders. BP's representation that it was strengthening the safety of its operations made the ultimate revelation--played out tragically in the Deepwater Horizon explosion--all the more shocking as the market learned that "the story spun by BP to outside investors was far different from the reality of its internal operations." (*Id.* ¶ 9.) Unbeknownst to the market and the public, the Deepwater Horizon catastrophe was a predictable outcome of BP's continued disregard for

process safety. (*Id.* ¶¶ 8, 391.)

## A. Alleged Misrepresentations and Omissions

The Ludlow Plaintiffs claim that they paid inflated prices for BP ADSs based on Defendants' materially false and misleading misrepresentations and omissions, made on or after March 4, 2009. Plaintiffs allege thirty-five specific misstatements and omissions, all centered on BP's process safety efforts. [13] Each alleged [*37] misrepresentation or omission is identified by the number given in Plaintiffs' Appendix A (Doc. No. 187, App. A) and the corresponding paragraph identifying the statement in the Complaint.

> 13   Plaintiffs pared down the specific misrepresentations they allege between the filing of the Complaint and the filing of their response to the motion to dismiss. Plaintiffs' Appendix A, filed as an attachment to their response, purports to contain all of the alleged misstatements. (Doc. No. 187, App. A.)

The alleged misrepresentations began on March 4, 2009--the start of the Subclass Period--when BP issued its 2008 Annual Report, Form 20-F. That Annual Report included a section titled "Safety," which addressed safety and risk management. The section included such statements as:

> - "Throughout 2008, senior leadership across the group continued to hold safety as their highest priority." (App. Stmt No. 12; Compl. ¶ 353.) [14]

> - "We remain fully committed to becoming a recognized industry leader in process safety management." (App. Stmt No. 14; Compl. ¶ 353.)

> 14   Unless otherwise noted, the Court has removed all emphasis added by Plaintiffs in their Complaint.

BP formed two internal committees--the Safety, Ethics [*38] and Environment Assurance Committee ("SEEAC") [15] and the Group Operations Committee ("GORC")--and charged them with oversight and coordination of its safety programs. [16] As described in

BP's 2008 Form 20-F, SEEAC responsibilities included "[r]eviewing material to be placed before shareholders which addresses environmental, safety and ethical performance and mak[ing] recommendations to the Board about their adoption and publication." (Compl. ¶ 425.) The GORC was "tasked with assuring the group chief executive [Hayward] that group operational risks [we]re identified and managed appropriately" and was "expressly charged with analyzing safety incidents in BP's operations." (*Id.* ¶¶ 357, 428.) In outlining the role of these safety committees, the 2008 20-F stated:

> - "Safety performance has been scrutinized by the . . . GORC, chaired by the group chief executive (Hayward) and tasked with assuring . . . Hayward that group operational risks are identified and managed appropriately. We continued to build our team of safety and operations auditors. A team of 45 auditors is now in place, with 36 audits completed in 2008." (App. Stmt. No. 15; Compl. ¶ 353.)

According to Plaintiffs, September 2009 [*39] audits of the Deepwater Horizon revealed that, contrary to this statement, safety goals were not commonly known or properly communicated to employees. (Compl. ¶¶ 310-11.)

> 15   The SEEAC members were Sir William Castell (Chairman of SEEAC), Paul Anderson (Board Member), Cynthia Carroll (Board Member), Antony Burgmans (Board Member), Erroll B. Davis, Jr. (Board Member), Tony Hayward (Special Liason to SEEAC), and Andy Inglis (who reported to the SEEAC on Exploration and Production). All seven of these individuals are Individual Defendants.
>
> 16   The GORC members were Tony Hayward (Group Chief Executive and Chairman of the GORC), Andy Inglis (Chief Executive of Exploration and Production), John Baxter (Group Head of Engineering), Iain Conn (Chief Executive of Refining and Marketing), Mark Bly (Group Head of Safety & Operations), Vivienne Cox (Chief Executive of Alternative Energy), and Steve Westwell (Executive VP, Strategy & Integration). Of the GORC members, only Hayward and Inglis are named Individual Defendants.

BP also developed and began to implement a company-wide safety program--the Operating Management System ("OMS")--that was to be methodically phased in across BP sites worldwide. The 2008 [*40] 20-F made the following representation about the OMS program:

> - "Eight sites completed transition to OMS in 2008; two petrochemical plants . . . two refineries . . . and four exploration and production sites, North America Gas, the Gulf of Mexico, Colombia and the Endicott field in Alaska." (App. Stmt. No. 13; Compl. ¶ 353.)

According to Plaintiffs, these statements were materially false and misleading because BP failed to disclose that it had not in fact implemented safety measures in its Gulf of Mexico operations. (Compl. ¶ 354.) Plaintiffs also claim that BP conducted operations in the Gulf without any legitimate oil spill response plan and understated the risks of the Gulf operations while overstating its ability to extract oil. (Id.) Further, the 2008 Annual Report failed to disclose that BP disregarded warnings about its operations, lacked robust management processes that left it exposed to accidents, and lacked adequate internal safety and risk management controls. (Id. ¶¶ 352, 354.)

BP followed its 2008 Annual Report with additional statements specifically addressing the Company's work in the Gulf of Mexico. For example, on March 10, 2009, BP filed its IEP, under which BP proposed [*41] to drill two offshore wells in the Mississippi Canyon Block 252 plot. (Compl., Ex. B.) The IEP is marked "received by" the MMS on February 23, 2009. (Id.) In Section 14, titled "Environmental Impact Analysis," the IEP concludes: "[I]t is unlikely that an accidental surface or subsurface oil spill would occur from the proposed activity." (App. Stmt. No. 16; Compl. ¶ 356.) In addition, Section 7, titled "Oil Spills Information" states that BP "has the capability to respond to the appropriate worst case spill scenario" presented in BP's regional Oil Spill Response Plan ("Regional OSRP") and includes the following certification: "I hereby certify that BP Exploration & Production Inc. has the capability to respond, to the maximum extent practicable, to a worst-case discharge, or a substantial threat of such a discharge, resulting from the activities proposed" in the IEP. (Compl., Ex. B, at

71.) BP's Regional OSRP estimated the volume of an uncontrolled blowout in the Gulf at 300,000 barrels of oil per day. (Id.) The IEP estimated the volume of an uncontrolled blowout at the Macondo site at 162,000 barrels of oil per day. (Id.) Plaintiffs contend this document was false and misleading because [*42] it failed accurately to detail the true risks and dangers associated with operation of the Deepwater Horizon. Plaintiffs allege that both BP's estimate of 162,000 gallons as the "worst-case discharge scenario" and the Company's assurances that it was ready to respond to such an amount were false. (Id. ¶ 356.) Plaintiffs also suggest that BP did not provide all the assurances required by federal regulations. (Id. ¶¶ 357-61.) In support of these allegations, Plaintiffs point to testimony given by BP officers during the Senate investigations following the Deepwater Horizon explosion, acknowledging failures in BP's response preparedness efforts. (Id. ¶¶ 362-64.)

At the annual Howard Weil Energy Conference on March 25, 2009, Defendant McKay, the Chairman and President of BP America, discussed BP's work in the Gulf of Mexico. In connection with the discussion, McKay stated, "By the way, let me add that managing costs down does not mean BP will be skimping when it comes to ensuring our operations remain safe, reliable and compliant in years ahead." (App. Stmt. No. 10; Compl. ¶ 365.) McKay also remarked, "Safety will continue to have first call on the company resources." (App. Stmt. No. 11; [*43] Compl. ¶ 365.) Plaintiffs allege that McKay's statements were false and misleading because McKay was aware of serious safety problems throughout BP's Gulf of Mexico operations. Specifically, McKay, as CEO of BP America, knew of systemic safety problems at BP and knew that BP managers had issued directives to put profit before safety. (Compl. at ¶ 366.) McKay also allegedly knew that BP skimped on operational safety and that its safety program was recklessly underfunded. (Id. ¶ 367.)

While testifying before the Senate and Energy and Natural Resources Committee on November 19, 2009, David Rainey ("Rainey"), Vice President for Gulf of Mexico Exploration for BP America, stated that: "While our intent is to prevent all accidental discharges, we conduct regular emergency drills with local, state, and federal agencies. All of our production facilities have contingency plans that identify the procedures, response equipment, and key personnel needed for responding to

incidents." (App. Stmt. No. 17; Compl. ¶ 370.) Rainey's testimony also provided specific information regarding oil operations in the Gulf. According to Plaintiffs, Rainey's statements were misleading because he omitted facts about [*44] BP's inadequate safety protocols and failures to implement adequate safety provisions. (Compl. ¶ 372.)

BP's 2009 Annual Review, issued on February 26, 2010, contained further representations addressing BP's progress on the safety front. Several BP board members issued written statements as part of the Annual Review. For example, Svanberg, in his capacity as Chairman of the Board, wrote a letter that accompanied the Annual Review stating, among other things, the following:

- "Risk remains a key issue for every business, but at BP it is fundamental to what we do. We operate at the frontiers of the energy industry, in an environment where attitude to risk is key. The countries we work in, the technical and physical challenges we take on and the investments we make - these all demand a sharp focus on how we manage risk. We must never shrink from taking on difficult challenges, but the [B]oard will strive to set expectations of how risk is managed and remain vigilant on oversight." (App. Stmt. No. 9; Compl. ¶ 374.)

Plaintiffs claim this statement was false because BP's Board was "trying to manage risk in the least costly way possible" instead of setting proper risk management expectations [*45] and procedures. (Compl. ¶ 374.) The Board allegedly "intentionally chose not to implement safety and risk management protocols, including those recommended to senior management," thereby rendering false the Annual Review's portrait of the Board's oversight of safety. (Id.) Also included in the Annual Review were statements by Hayward, who wrote:

- "Despite . . . difficult conditions, a revitalized BP kept up its momentum and delivered strong operating and financial results while continuing to focus on safe and reliable operations." (App. Stmt. No. 1; Compl. ¶ 376.)

- "These successes make us the largest producer and leading resource holder in the deepwater Gulf of Mexico." (App. Stmt. No. 2; Compl. ¶ 2.)

- "We continue to show our ability to take on and manage risk, doing the difficult things that others either can't do or choose not to do. This is why we are able to form such strong relationships with governments and national oil companies and why we continue to have a critical role to play in supplying the world with its future energy needs." (App. Stmt. No. 3; Compl. ¶ 377.)

Hayward also answered questions in the "Group Chief Executive's Review," which was disseminated to BP shareholders [*46] along with the Annual Review. In discussing BP's priorities, Hayward noted, "Achieving safe, reliable and compliant operations is our number one priority and the foundation stone for good business." (App. Stmt. No. 4; Compl. ¶ 378.) According to Plaintiffs, all of Hayward's statements were false and misleading because Hayward was aware of the risks associated with drilling in the Gulf yet falsely reassured investors that risks were being handled appropriately. (Compl. ¶ 377.) Hayward also allegedly omitted the fact that BP's safety protocols were "woefully inadequate" and that BP had failed to implement all recommended safety measures. (Id. ¶ 379.)

Inglis, BP's Chief Executive of Exploration and Production, similarly underscored that "[s]afety, both personal and process, remains our highest priority," in a statement included in the Annual Review. (App. Stmt. No. 7; Compl. ¶ 380.) Plaintiffs claim Inglis's statement was misleading because, as Chief Executive, he was aware of safety problems in BP's Gulf operations and knew that BP was unprepared to confront safety issues in connection with its drilling in the region. (Compl. ¶ 382.)

In a Strategy Presentation given in London on March [*47] 2, 2010, BP highlighted the Gulf of Mexico as the Company's greatest prospect for future growth. The statement "safe and reliable operations remains #1" appeared in the presentation. (App. Stmt. No. 20; Compl. ¶ 390.) Plaintiffs acknowledge that the Gulf of Mexico was an important economic driver for BP, but argue that BP was not committed to safety as it represented. (Compl. ¶ 391.) According to Plaintiffs, an incident like the Deepwater Horizon disaster was "virtually inevitable"

given BP's history of safety failures and continued lack of commitment to safety. (*Id.*) In further support of their allegations, Plaintiffs point to information provided by confidential witnesses attesting to BP's failure to implement safety processes and to the "Abbott whistleblower action," in which BP allegedly covered up one employee's prediction of an eminent catastrophic safety failure. (*Id.*)

On March 5, 2010, BP filed its 2009 Annual Report, Form 20-F, with the SEC. This document also reiterated that safety was BP's priority. It included the following statements:

> - "The priorities that drove our success for 2009--safety, people and performance--remain the foundation of our agenda." (App. Stmt. No. 21; [*48] Compl. ¶ 394.)

> - "In Exploration and Production, safety, both personal and process, remains our highest priority." (App. Stmt. No. 22; Compl. ¶ 394.)

> - "Our priorities remain the same, safety people and performance, focusing on the delivery of safe, reliable and efficient operations. In 2010, we aim to use the momentum generated in 2009 to continue to improve operational, cost and capital efficiency, while ensuring we maintain our priorities of safe, reliable and efficient operations." (App. Stmt. No. 23; Compl. ¶ 394.)

According to Plaintiffs, these statements were false and misleading because BP failed to disclose that the OMS was only partially implemented in the Gulf and that the Company had actually terminated some of the employees responsible for implementation. The OMS was initially rolled out in 2008, but, according to Plaintiffs, was not implemented as promised by the time of the Deepwater Horizon disaster. Plaintiffs rely on information provided by a "confidential former BP senior employee with Gulf of Mexico responsibilities" to support their allegations. (Compl. ¶ 395.)

The 2009 Annual Review, Form 20-F, contained additional representations specifically related to BP's progress [*49] in implementing OMS, including:

> - "Safe, reliable and compliant operations remain the group's first priority. A key enabler for this is the BP operating management system (OMS), which provides a common framework for all BP operations, designed to achieve consistency and continuous improvement in safety and efficiency. Alongside mandatory practices to address particular risks, OMS enables each site to focus on the most important risks in its own operations and sets out procedures on how to manage them in accordance with the group-wide framework." (App. Stmt. No. 18; Compl. ¶ 383.)

> - "The reduction in the number of oil spills in 2009 follows several years of focus across BP on procedures such as 'integrity management' and 'control of work,' which are elements of BP's OMS." (App. Stmt. No. 19; Compl. ¶ 385.)

According to Plaintiffs, these statements were false because the implementation of OMS lagged far behind target in the Gulf, OMS remained in pilot stage only, and BP had terminated many of the employees responsible for implementation at the time of these statements. (Compl. ¶ 402.)

BP disseminated its Code of Conduct along with its public filings. (*Id.* ¶ 406.) The Code of Conduct stated, [*50] "no activity is so important that it cannot be done safely," and listed rules for BP employees such as, "stop any work that becomes unsafe," "make sure you know what to do if an emergency occurs at your place of work," and "only undertake work for which you are trained, competent, medically fit and sufficiently rested and alert to carry out." (App. Stmt. No. 24, Compl. ¶ 406.) According to Plaintiffs, these statements were false and misleading because BP was unprepared for a safety disaster in the Gulf, and BP lacked proper internal controls and risk management procedures. (Compl. ¶ 407.)

On March 22, 2010, Defendant Inglis spoke at the Howard Weil Conference and stated that: "Safety and operational integrity underpins everything we do, and we are now in the final phase of rolling out our operating

management system that provides a single, consistent framework for our operations, covering all areas from personal and process safety to environmental performance." (App. Stmt. No. 8; Compl. ¶ 401.) Plaintiffs allege that Inglis's statement was false because BP was not in the final stage of rolling out OMS in the Gulf. In reality, the program was stuck in its infancy stages. (Compl. ¶¶ 334, [*51] 402.)

On April 15, 2010, BP published its 2009 Sustainability Review online. The Sustainability Review included a section titled "Safe and Responsible Energy." (*Id.* ¶ 408.) This section contained the following statement: "Our commitment to safe and reliable operations starts with the group chief executive and leadership: a commitment that filters down through the organization and is regularly communicated to all staff." (App. Stmt. No. 25; Compl. ¶ 408.) Other statements in the Sustainability Review referenced OMS specifically, stating: "Safety is fundamental to our success as a company and 2009 was important because of the progress we made in implementing our operating management system ("OMS"). "I see [OMS] as the foundation for safe, responsible and high-performing BP." "Having been initially introduced at 8 sites in 2008, the OMS rollout extended to 70 sites by the end of 2009 . . . [t]his means implementation is 80% complete." (App. Stmt. No. 5; Compl. ¶ 408.) Plaintiffs attribute this statement to Defendant Hayward and allege that it was misleading because it overstated the status of OMS implementation.

On the same day, BP issued its 2009 Sustainability Report. In his introduction [*52] to the Sustainability Report, Hayward wrote that, "I am extremely proud of BP's 2009 safety performance--it reflects a sustained effort across all our operations over many years." (App. Stmt. No. 6; Compl. ¶¶ 408, 410.) Plaintiffs allege that the Sustainability Report contained a slew of misrepresentations related to BP's safety efforts, including the following:

- "BP constantly seeks to improve its safety performance through the procedures, processes and training programmes that we implement in pursuit of our goal of no accidents, no harm to people and no damage to the environment." (App. Stmt. No. 26; Compl. ¶ 410.)

- "We believe our focus on changing BP's safety culture over the last few years is yielding results." (App. Stmt. No. 27; Compl. ¶ 410.)

- "BP has well-developed systems, processes and metrics for reporting safety performance in support of internal performance management and to enable learning and public reporting." (App. Stmt. No. 28; Compl. ¶ 410.)

- "BP is fully committed to becoming a recognized industry leader in process safety management and continues to work to achieve this." (App. Stmt. No. 31; Compl. ¶ 410.)

- "[W]e seek to ensure an infrastructure is in place to deal [*53] effectively with spills and their impacts. Our operating facilities have the capacity and resources to respond to spill incidents and we participate in industry and international forums to coordinate planning and emergency response." (App. Stmt. No. 32; Compl. ¶ 410.)

- "Incidents are recorded locally by our staff and contractors using our web-based incident tracking system. BP's executive management is notified quarterly about numbers and volumes of spills and spills of more than 100 barrels." (App. Stmt. No. 33; Compl. ¶ 410.)

- "BP recognizes the risk posed to the environment from spills and takes a range of measures to prevent any loss of hydrocarbons." (App. Stmt. No. 34; Compl. ¶ 410.)

- "To track our progress in process safety management, we measure lagging indicators which record events that have already occurred, such as oil spills, and leading indicators that focus on the strength of our controls to prevent undesired incidents, such as inspections and test of safety-critical equipment." (App. Stmt. No. 35; Compl. ¶ 410.)

According to Plaintiffs, the statements in both the Sustainability Review and the Sustainability Report were false and misleading for the following six reasons: [*54] (1) BP had failed to implement adequate safety procedures; (2) BP did not have a legitimate Regional OSRP for the Gulf; (3) BP understated its risk exposure from drilling operations in the Gulf; (4) BP lacked adequate internal safety controls; (5) the OMS was not fully implemented in BP's Gulf operations and employees responsible for implementation had been terminated; and (6) BP's officers knew that the Company's Gulf operations had caused spills in 2008 and two of BP's rigs in the Gulf, including the Deepwater Horizon, had reported recent operational safety problems. (Compl. ¶¶ 409, 411.)

In addition, BP allegedly audited certain facilities selectively and omitted audit results that uncovered facts contrary to the statements BP publicly repeated to investors. (Doc. No. 187, App. A.) BP's selective presentation of audit findings rendered false additional statements in the 2010 Sustainability Report, such as the following:

> - "BP's safety and operations audits assess compliance with standards and the effectiveness of operational risk management. The audits provide a rigorous check on safety and operations programmes. Progress is reported quarterly, at which time issues, such as overdue [*55] action closures, are highlighted to executive management in the executive-level GORC." (App. Stmt. No. 30; Compl. ¶ 410.)

> - "If an incident occurs, it is recorded locally by employees, contractors and management using our internal web-based data management system. All fatalities, other major incidents and many that had the potential to become major incidents are discussed by the GORC, chaired by [Defendant Hayward]." (App. Stmt. No. 29; Compl. ¶ 410.)

Plaintiffs claim that the statements outlined above were widely disseminated to the securities markets,

investment analysts, and to the investing public. Plaintiffs allegedly relied on BP's statements that the Company had implemented appropriate risk management and safety mechanisms to reduce the risk of catastrophic disasters. By the time the true state of BP's safety protocols was revealed through exactly the type of disaster BP represented it was working to prevent--the Deepwater Horizon explosion--Plaintiffs had already lost a substantial percentage of their investment.

**B. Alleged Involvement of the Individual Defendants**

According to Plaintiffs, the Individual Defendants were aware of the falsity of the statements outlined above due to [*56] their corporate positions, specifically, their membership on either the SEEAC or the GORC committees. Because Defendants Castell, Anderson, Burgmans, Carroll and Davis served on the SEEAC, which was tasked with making day-to-day and strategic decisions regarding BP's safety programs, Plaintiffs contend these Individual Defendants were aware of the specific safety problems in the Gulf region. (Compl. ¶¶ 423-26.) Plaintiffs make similar scienter arguments with respect to Defendants Hayward and Inglis and their membership on the GORC.

In addition to their corporate roles and committee memberships, the Individual Defendants were allegedly aware of the true state of safety in the Gulf region because BP's internal reporting structures shuttled safety problems up to the Board of Directors. [17] Additionally, the testimony of three confidential witnesses suggests that BP relied on an internal database to track all safety incidents, that reports were prepared from the database and delivered to the Board, and that Gulf operations were audited by BP's internal audit committee and audit results were reported to the Board. [18]

> 17   In expounding on this allegation during oral argument, Plaintiffs' attorney [*57] made specific reference to the "Orange Book," both during oral argument and in the power point presentation presented to the Court. (Transcript, Doc. No. 304, at 77, lns. 16-23.) Because Plaintiffs make no reference to the Orange Book in the Complaint, the Court does not consider it here. *See Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 289 (5th Cir. 2006) (when considering a motion to dismiss under Rule 12(b)(6), a district court may "review only the well-pleaded facts in the complaint" and "new allegation[s] may not be

considered").

18   Due to confidentiality agreements entered in both this action and MDL 2179, Plaintiffs have withheld the names and titles of the three confidential witnesses.

Finally, the Complaint sets forth a list of factual allegations which it presents as evidence of what all of the Individual Defendants knew of BP's safety problems in the Gulf. The allegations include the following: [19]

- Internal communications, including an April 15, 2008 email, by project managers to senior staff in BP advised that project managers and engineers in the Gulf were submitting outdated information in violation of BP's Code of Conduct.

- Communications, including safety incidents [*58] recorded via an internal web-based data management system, related to safety failures on the Atlantis and Deepwater Horizon rigs were made available to GORC members.

- BP's Ombudsman and an independent firm hired by BP in 2009 confirmed that BP failed to complete certain engineering documents that left it in violation of its own policies on the Atlantis rig.

- BP terminated the highest ranking employees responsible for Gulf operations in the fourth quarter of 2009 and the first quarter of 2010 after these individuals raised process safety concerns.

- A December 2008 internal strategy document warned that BP did not adequately plan for serious safety risks in its Gulf operations.

- Maintenance was delayed on the Deepwater Horizon rig because of a tight cost budget.

- An internal BP document recommended against use of the long string option on the Deepwater Horizon rig, and testing by BP and Halliburton

engineers confirmed the unreliability of cementing with a long string casing.

- Internal BP emails from late March 2010 acknowledged the risk of the long string design but justified selection of the method because it saved time.

- Senior management approved installation of six centralizers at [*59] the Macondo well even though BP's original design called for a minimum of sixteen centralizers. Installation was authorized to minimize delay. (Compl. ¶¶ 220-27.) When a Halliburton engineer wanted to perform further testing to determine whether the six centralizers would sufficiently stabilize the cement job, a BP employee told him "who cares, it's done, end of story, will probably be fine." (Id. ¶ 228.)

- BP drilled at a depth in excess of its MMS permit. After the Deepwater Horizon explosion, a BP crewman admitted that this depth had been misrepresented to MMS, and that BP has in fact been drilling in excess of 22,000 feet, in violation of its permit. (Id. ¶ 200.)

- BP had advance knowledge of failed negative pressure tests of the slurry used at the Macondo well site. BP completed the cementing job before receiving the final test results, which arrived six days after the blowout. (Id. ¶¶ 237-38.)

- BP knew that the manufacturer of the Deepwater Horizon's BOP had a history of BOP failures.

- Studies by governmental agencies revealed frequent failures by BOPs in the Gulf of Mexico and in deepwater drilling environments.

- An April 6, 2009, letter from MMS to BP indicated the high risk [*60] associated with drilling at the Macondo well.

- An internal BP audit confirmed outstanding safety items on the Deepwater Horizon, and a September 2009 audit found that the Deepwater Horizon suffered from excessive overdue maintenance totaling 390 jobs and 3,454 man hours. Six of the overdue jobs related to BOP maintenance.

- BP mandated 7% cost reductions for all of its drilling operations in the Gulf.

(Compl. ¶ 436.) Plaintiffs also allege that BP's executive compensation structure--which tied 70% of the executive performance bonus to financial metrics as opposed to safety metrics--provided the Individual Defendants with the motive to commit fraud. (*Id.*)

19    In support of their scienter allegations, Plaintiffs list thirty-eight facts that they allege "Defendants" were aware of. (Compl. ¶ 440.) The Court provides only a sampling here.

## IV. LEGAL STANDARDS

### A. Rule 12(b)(6)

To survive a motion to dismiss, a complaint must contain sufficient factual allegations, accepted as true, to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable [*61] inference that the defendant is liable for the misconduct alleged." *Id.* It follows that, where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged--but has not shown?that the plaintiff is entitled to relief. *Id.* at 1950; *see also* FED. R. CIV. P. 8(a)(2). Well-pleaded factual allegations must be taken as true, but the court does not "accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Cent. Laborers' Pension Fund v. Integrated Elec. Servs., Inc.*, 497 F.3d 546, 550 (5th Cir. 2007).

In considering a Rule 12(b)(6) motion to dismiss, a court must limit itself to the contents of the pleadings, with two exceptions. First, the Fifth Circuit allows the courts to consider certain documents attached to the motion to dismiss. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000). The Fifth Circuit restricts such consideration to documents that are referenced in the complaint and are central to the plaintiffs' claim. *Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003). Second, in securities cases, courts may take judicial notice of the contents of public [*62] disclosure documents that the law requires be filed with governmental agencies, such as the SEC, and that are actually filed with the agency. *Lovelace v. Software Spectrum. Inc.*, 78 F.3d 1015, 1018 n.1 (5th Cir. 1996). However, these documents may be considered only for the purpose of determining what statements they contain, not for proving the truth of their contents. *Id.*

As is required for Rule 12(b)(6) analysis, the court must draw all reasonable inferences in favor of the plaintiff. However, for scienter only, in keeping with the requirements of the Private Securities Litigation Reform Act ("PSLRA"), the court must take into account plausible inferences opposing as well as supporting a strong inference of scienter. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007). Accordingly, for purposes of a Rule 12(b)(6) motion to dismiss, a strong inference of scienter is one at least as compelling as any opposing inference of non-fraudulent intent. *Id.*

### B. Section 10(b)

Under Section 10(b) of the Securities Exchange Act of 1934,

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, [*63] or of any facility of any national securities exchange . . . (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). SEC Rule 10b-5, promulgated pursuant to section 10(b), implements section 10(b) by

forbidding, among other things, the making of any "untrue statement of a material fact" or the omission of any material fact "necessary in order to make the statements made . . . not misleading." 17 C.F.R. § 240.10b-5. The Supreme Court has implied from the text of section 10(b) that it affords a right of action to purchasers or sellers of securities injured by its violation. *Tellabs*, 551 U.S. at 318. To state a private claim under section 10(b), a plaintiff must allege the following: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; [*64] (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157, 128 S. Ct. 761, 169 L. Ed. 2d 627 (2008); *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 641 (5th Cir. 2005).

### 1. Material Misrepresentations and Omissions

Because Plaintiffs assert securities fraud claims, they must satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA. *See Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009); *see also Tellabs*, 551 U.S. at 322 (noting that the PSLRA's twin goals are to curb frivolous, lawyer-driven litigation, while preserving investors' abilities to recover on meritorious claims). Rule 9(b) requires that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b); *see also Rosenzweig v. Azurix*, 332 F.3d 854, 866 (5th Cir. 2003) (noting that the PSLRA's particularity requirement incorporates, at a minimum, the pleading standard for fraud under Rule 9(b)). The PSLRA enhances the requirements of Rule 9(b) in two ways. First, plaintiffs must "specify each statement alleged to have been misleading, [and] the reason [*65] or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Second, for each act or omission alleged to be false or misleading, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* at § 78u-4(b)(2).

In order to meet these additional requirements of the PSLRA, a plaintiff must, therefore: (1) specify each statement alleged to have been misleading; (2) identify the speaker; (3) state when and where the statement was made; (4) plead with particularity the contents of the false

representation; (5) plead with particularity what the person making the misrepresentation obtained thereby; and (6) explain the reason or reasons why the statement is misleading, *i.e.*, why the statement is fraudulent. *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002). These allegations constitute the "who, what, when, where, and how" required under Rule 9(b) and the PSLRA. *Id.* What constitutes particularity will necessarily differ with the facts of each case. *Guidry v. Bank of LaPlace*, 954 F.2d 278, 288 (5th Cir. 1992). A dismissal for failure to plead fraud with particularity as required [*66] by Rule 9(b) is a dismissal on the pleadings for failure to state a claim. *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 361 (5th Cir. 2004).

General allegations, which lump all defendants together and fail to segregate the alleged wrongdoing of one from those of another, do not meet the requirements of Rule 9(b). The court will reject the "group pleading" approach and instead look to the state of mind of the individual corporate official or officials "who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment." *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 533 (5th Cir. 2008).

To be actionable, a misrepresentation of a fact, or an omission of a fact, must be material. The Supreme Court recently reaffirmed that there is no bright-line rule for determining whether information withheld from a company's filings is materials as a matter of law. *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1318-23, 179 L. Ed. 2d 398 (2011). [*67] Unwilling to allow materiality to be reduced to a test of "statistical significance," the Court held instead that assessing materiality involves a "fact-specific inquiry . . . that requires consideration of the source, content, and context" of the allegedly omitted information. *Id.* at 1321. The misrepresentation of a fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in making an investment decision. *Basic Inc. v. Levinson*, 485 U.S. 224, 231, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988). For an omission to be material, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the

"total mix" of information made available. *Id.* at 232; *see also Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1445 (5th Cir. 1993) (explaining that the appropriate inquiry is whether the statement or omitted fact is significant, "such that it alters the total mix of information available about the proposed investment"). Materiality is not judged in the abstract, but in light of the surrounding circumstances. *Rubinstein v. Collins*, 20 F.3d 160, 168 (5th Cir. 1994).

With regard to misstatements, [*68] the PSLRA establishes a "safe harbor" protecting a forward-looking statement from liability where such a statement is made by a natural person, unless plaintiffs prove that it was made with actual knowledge that the statement was false and misleading. 15 U.S.C. § 78u-5(c)(1)(A). A statement is forward looking if it is:

> (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;
>
> (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;
>
> (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;
>
> (D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C); [or]
>
> (E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement [*69] made by the issuer[.]

15 U.S.C. § 78u-5(i)(1)(A).

The safe harbor provision protects individuals and corporations from liability for forward-looking statements that prove false if the statement is "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" or where the forward-looking statement is immaterial. *Id.* at § 78u-5(c)(1)(A)(i)-(ii). Where the forward-looking statement is not accompanied by cautionary language, a plaintiff must demonstrate that the defendant made the statement with "actual knowledge" as to its falsity. *Id.* at § 78u-5(c)(1)(B).

Vague, optimistic statements are not actionable. Allegations that amount to little more than corporate "cheerleading" are puffery, projections of future performance not worded as guarantees, and are not actionable under federal securities law because no reasonable investor would consider such statements material and because investors and analysts are too sophisticated to rely on vague expressions of optimism rather than specific facts. *Krim*, 989 F.2d at 1446. Additionally, "it is well-established that generalized positive statements [*70] about a company's progress are not a basis for liability." *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 419 (5th Cir. 2001). Statements that are predictive in nature are actionable only if they were false when made. *Shushany v. Allwaste, Inc.*, 992 F.2d 517, 524 (5th Cir. 1993).

### 2. Scienter

Section 10(b) and Rule 10b-5 do not protect investors against negligence or corporate mismanagement. *Shaw Group*, 537 F.3d at 535. Under the PSLRA, it is not enough to particularize false statements or fraudulent omissions made by a defendant; rather, for "each act or omission alleged" to be false or misleading, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). To establish a section 10(b) claim, a private plaintiff must prove that the defendant acted with scienter. *Tellabs*, 551 U.S. at 319.

*Tellabs* outlined a three step approach to reviewing scienter allegations in a motion to dismiss a federal securities fraud case pursuant to the PSLRA. *Id.* at 323. First, the allegations must, as in federal pleadings generally, be taken as true. *Id.* Second, courts may consider documents incorporated in the [*71] complaint by reference and matters subject to judicial notice. *Id.* The facts must be evaluated collectively, not in isolation, to determine whether a strong inference of scienter has

been pleaded. *Id.* at 324; *see also Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 260 (5th Cir. 2005) ("While [the Fifth Circuit] will view a complaint *in toto* when considering whether a complaint has adequately pled scienter . . . each allegation of fraud must individually meet the particularity requirements of the PSLRA.") (citation omitted). Third, a court must take into account plausible inferences opposing as well as supporting a strong inference of scienter. *Tellabs*, 551 U.S. at 324. The inference of scienter must ultimately be "cogent and compelling," not merely "reasonable" or "permissible." *Id.*; *see also Shaw Group*, 537 F.3d at 533-34 (adopting *Tellabs*' three step approach).

In the context of federal securities fraud, scienter is "defined as 'an intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it.'" *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009) [*72] (quoting *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 643 (5th Cir.2005)); *see also Plotkin v. IP Axess Inc.*, 407 F.3d 690, 697 (5th Cir. 2005) ("[A] securities fraud plaintiff must prove that the defendant either consciously misbehaved . . . or was so severely reckless that it demonstrates that the defendant must have been aware of the danger of misleading the investing public."). Severe recklessness is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Rosenzweig*, 332 F.3d at 866.

For a complaint to adequately plead scienter, "Congress require[s] plaintiffs to plead with particularity facts that would give rise to a 'strong'-- *i.e.*, a powerful or cogent--inference." *Tellabs*, 551 U.S. at 323. The inference need not be "irrefutable, i.e., of the 'smoking gun' genre, or even the most plausible of competing inferences." *Id.* (citation omitted) (internal quotation omitted). Nonetheless, the "inference [*73] of scienter must be more than merely 'reasonable' or 'permissible'--it must be cogent and compelling, thus strong in light of other explanations." *Id.* In addition, "[t]he strength of an inference cannot be decided in vacuum. . . . To determine whether the plaintiff has alleged facts that give rise to the

requisite 'strong inference' of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 323-24. "[O]missions and ambiguities count against inferring scienter, for plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendants acted with the required state of mind.'" *Id.* at 326 (quoting 15 U.S.C. § 78u-4(b)(2)).

Although circumstantial evidence can support a strong inference of scienter, allegations of motive and opportunity standing alone will not suffice. *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 430 (5th Cir. 2002). Appropriate motive and opportunity allegations may, however, "meaningfully enhance the strength of the inference of scienter." *Southland*, 365 F.3d at 368 (quoting *Nathenson*, 267 F.3d at 412). Corporate officers are not liable for acts solely [*74] because they are officers, even where their day-to-day involvement in the corporation is pleaded. *Id.* However, corporate statements can be connected to a particular officer if plaintiffs allege the officer signed the document in which the statement appears or they adequately allege the officer's involvement in creating the document. *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006).

The Fifth Circuit has rejected the group pleading approach to scienter. *Shaw Group*, 537 F.3d at 534. Instead, a court must look to the state of mind of the individual corporate official or officials making or issuing the statement "rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment." *Southland*, 365 F.3d at 366. As the Fifth Circuit explained, "[c]onsistent with our rejection of the 'group pleading' doctrine, we do not construe allegations contained in the Complaint against the 'defendants' as a group as properly imputable to any particular individual defendant unless the connection between the individual defendant and the allegedly fraudulent statement is specifically pleaded." *Southland*, 365 F.3d at 365. [*75] Therefore, when pleading fraud claims against individuals under section 10(b) and Rule 10b-5, plaintiffs must distinguish among defendants and allege the role of each. *Id.*

### 3. Section 20(a) claims

Under section 20(a) of the Exchange Act, "Every person who, directly or indirectly, controls any person

liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . ." 15 U.S.C. § 78t(a). Section 20(a) is a secondary liability provision, and plaintiffs must therefore establish a primary violation under section 10(b) before liability arises under section 20(a). *ABC Arbitrage*, 291 F.3d at 348 n. 57 (noting that "control person" liability is "derivative, i.e., such liability is predicated on the existence of an independent violation of the securities laws"). Accordingly, if a plaintiff fails to state a claim for a primary securities fraud violation under section 10(b) or Rule 10b-5, they necessarily fail to state a claim for control person liability under section 20(a). *Blackwell*, 440 F.3d at 288.

## C. [*76] Personal Jurisdiction

Plaintiffs bear the burden of demonstrating facts sufficient to support personal jurisdiction over any nonresident defendants. *United Galvanizing, Inc. v. Imperial Zinc Corp.*, No. H-08-0551, 2008 U.S. Dist. LEXIS 87038, 2008 WL 4746334, at *3 (S.D. Tex. Oct. 27, 2008). Constitutional due process requires a plaintiff to show that (i) the defendants purposefully availed themselves of the benefits and protections of Texas law, thereby establishing minimum contacts with the forum, and that (ii) exercising personal jurisdiction does "not offend traditional notions of fair play and substantial justice." *Comman-Aire Corp. v. Ontario Mech. Sales & Service Inc.*, 963 F.2d 90, 94 (5th Cir. 1992). "There are two types of minimum contacts: those that give rise to specific personal jurisdiction and those that give rise to general personal jurisdiction. *Lewis v. Fresne*, 252 F.3d 352, 358 (5th Cir. 2001). Specific jurisdiction exists where "a nonresident defendant has purposefully directed its activities at the forum state and the litigation results from alleged injuries" stemming from those activities. *Cent. Freight Lines, Inc. v. APA Transp. Corp.*, 322 F.3d 376, 381 (5th Cir. 2003) (internal citations omitted). [*77] General jurisdiction can be exercised when a defendant's contacts with the forum state are substantial, continuous, and systematic, even if unrelated to the litigation. *Id.* The "continuous and systematic contacts test is a difficult one to meet, requiring extensive contacts

between a defendant and a forum." *Johnston v. Multidata Systems Intern. Corp.*, 523 F.3d 602, 609 (5th Cir. 2008). Although the party seeking to invoke the power of the court bears the burden of proving that jurisdiction exists, a *prima facie* showing suffices, and the plaintiff need not establish jurisdiction by a preponderance of the evidence. *Luv N. Care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 469 (5th Cir. 2006) (citation omitted).

## V. ANALYSIS

### A. Plaintiffs' Section 10(b) Claims

In order to adequately plead a misleading statement or omission under the PSLRA, a plaintiff must: (1) specify each statement alleged to have been misleading; (2) identify the speaker; (3) state when and where the statement was made; (4) plead with particularity the contents of the false representation; (5) plead with particularity what the person making the misrepresentation obtained thereby; and (6) explain the reasons why the statement [*78] is misleading, *i.e.*, why the statement is fraudulent. *ABC Arbitrage*, 291 F.3d at 350.

### 1. Summary Chart of Plaintiffs' Allegations

The Complaint excerpts allegedly false and misleading statements from eleven different sources. At oral argument, Plaintiffs' counsel categorized all of the statements into what Plaintiffs characterize as five general misrepresentations, namely: (1) that OMS was fully implemented in the Gulf of Mexico; (2) that OMS applied across all BP operations; (3) that BP had the capability to manage risk; (4) that BP had the capacity and resources to respond to spill incidents; and (5) that safety was the highest priority at BP. The following chart lists in chronological order each source alleged by Plaintiffs to contain false and misleading statements, identifies the numbered paragraph of the Complaint in which the allegations are made, identifies any Individual Defendant to whom the statement is attributed, identifies the "misrepresentation number" corresponding to Plaintiffs' Appendix A, and identifies by "X" which of the five categories of misrepresentations the allegation purportedly supports.

| Document | Complaint ¶ | Speaker | Misrep # | OMS implemented | Application of OMS | Risk management | Capacity to respond | Safety as highest prior- |
|---|---|---|---|---|---|---|---|---|

2012 U.S. Dist. LEXIS 17787, *78

| | | | | in Gulf | across oper-ations | capabilities | to spills | ity |
|---|---|---|---|---|---|---|---|---|
| March 4, 2009 2008 Annual Report (20-F) | 353-54 | BP | 12, 13, 14, 15 | X | | X | | X |
| March 10, 2009 Initial Exploration Plan | 355-63 | BP | 16 | | | | X | |
| March 15, 2009 Howard Weil Conference | 365-67 | McKay | 10, 11 | | | | X | X |
| Nov. 19, 2009 Senate Committee Testimony | 368-72 | Rainey | 17 | | | | X | |
| Feb. 26, 2010 2009 Annual Review | 374-86 | BP, Hayward, Svanberg, Inglis | 1, 2, 3, 4, 7, 9, 18, 19 | | X | X | | X |
| March 2, 2010 Strategy Presentation | 387-93 | BP | 20 | | | | | X |
| March 5, 2010 2009 Annual Report (20-F) | 394-400 | BP | 21, 22, 23 | | | | | X |
| March 22, 2010 Howard Weil Conference | 401-05 | Inglis | 8 | | X | | | |
| Code of Conduct | 406-07 | BP | 24 | | | | | X |
| April 15, 2010 Sustainability Review | 408-09 | BP, Hayward | 5, 25 | X | | | | X |
| April 15, 2010 Sustainability Report | 410-11 | BP, Hayward | 6, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35 | | | X | X | X |

## 2. [*79] Alleged Misrepresentations and Omissions

The Court will address each of the thirty-five alleged misrepresentations as they fall into the five categories. Because Defendants contest only materiality and scienter, the Court will concentrate its analysis on these elements, addressing first whether Plaintiffs have pleaded with particularity the alleged misrepresentations and omissions.

### a. Misrepresentations as to the implementation status of BP's Operating Management System (OMS)

BP's OMS program was billed as a "framework for operations across BP that is integral to improving safety and operating performance in every site." (Compl. ¶ 353.) The OMS "establishe[d] a set of requirements" and provided BP businesses with a "systematic way to improve operating performance." (*Id.*) OMS requirements included "[a] number of mandatory operating and engineering technical requirements . . . to address process safety and related risks." (*Id.*) The process of implementing OMS at each site involved "detailed planning, including gap assessments," development of a "local OMS handbook" and a "plan to close gaps that is reviewed annually." (*Id.*) On multiple occasions, BP represented that OMS was implemented [*80] in the Company's Gulf operations in 2008. *See* App. Stmt. No. 13, Compl. ¶ 353 ("Eight sites completed transition to OMS in 2008; two petrochemical plants . . . two refineries . . . and four exploration and production sites, North America Gas, the Gulf of Mexico, Colombia and the Endicott field in Alaska.") [20]; App. Stmt. No. 5, Compl. ¶ 408 ("Safety is fundamental to our success as a company and 2009 was important because of the progress we made in implementing our operating management system ("OMS"). "I see [OMS] as the foundation for safe, responsible and high-performing BP." "Having been initially introduced at 8 sites in 2008, the OMS rollout extended to 70 sites by the end of 2009 . . . [t]his means implementation is 80% complete.").

> 20   Plaintiffs have copied into their Complaint an entire three-page section from BP's 2008 Annual Report, Form 20-F. (Compl. ¶ 353.) However, their discussion (as well as Plaintiff's Appendix A) highlights the specific portions identified here.

According to Defendants, BP's allegations concerning OMS are too vague to meet the PSLRA's particularity requirements because Plaintiffs identify only broad statements and numerous, lengthy excerpts from BP's [*81] public filings as allegedly misleading. (Doc. No. 152, at 10.) Defendants argue that statements concerning "progress" in implementing OMS are too generalized to be actionable. (*Id.*, at 19.) Defendants also argue that all statements concerning OMS are immaterial.

### i. Particularity

#### (a) 2008 Annual Report, Form 20-F Statement (App. Stmt. No. 13)

Plaintiffs allege that the statement in BP's 2008 Annual Review representing that eight sites, including the Gulf of Mexico, had "completed transition to OMS in 2008" was false because BP had not in fact implemented OMS in the Gulf in 2008. According to Plaintiffs, OMS was in fact still in its infancy stages in 2009 and 2010. (Compl. ¶ 334.) During oral argument, Defendants conceded that this statement was indeed false. [21]

> 21   During oral argument on November 4, 2011, counsel for Defendants stated that: "The statement here that the Gulf of Mexico completed the transition to OMS in 2008, that is a statement of a specific fact, unlike the others. This is the one statement, Your Honor, that the plaintiffs have alleged that I will admit to the Court is not accurate. The Gulf of Mexico completed the transition to OMS at the end of 2009, not at the end of [*82] 2008." (Transcript, Doc.No. 304, at 58, lns. 15-21.)

Even without this concession, Plaintiffs have adequately supported their allegation of falsity. Plaintiffs point to decisions made by Defendant Inglis, Executive Director and the Chief Executive of Exploration and Production during the Subclass Period, to implement global cost cutting measures that reorganized drilling operations in the Gulf. (*Id.* ¶ 335.) As a consequence of these measures, key individuals responsible for implementation of OMS in the Gulf were terminated or transferred. (*Id.*) Plaintiffs also rely on information obtained from several confidential witnesses. According to Confidential Witness 2 ("CW2"), BP's OMS program lagged far behind the safety programs of BP's industry peers. (*Id.* ¶ 334.) In connection with Inglis's restructuring, CW2 explained that key employees tasked with implementing OMS were replaced with individuals

lacking knowledge and experience. (*Id.* ¶ 336-41.) Specifically, Ian Little, BP's "Gulf of Mexico wells manager," was replaced by David Sims. Harry Thierens was replaced by David Rich in 2009. Kevin Lacy, BP's Vice President for Drilling and Completions, was terminated in December 2009, and replaced [*83] by Patrick O'Bryan. According to Confidential Witness 1 ("CW1") and CW2, these replacements lacked experience and expertise. (*Id.* ¶ 341.) In addition, CW1 and CW2 confirmed that BP had not "implemented a robust operations management system" in the Gulf in 2009 and 2010, and BP failed to implement any OMS protocol on the Deepwater Horizon. (*Id.* ¶¶ 341, 285.) In 2009 and 2010, OMS was "still in its infancy stages" in the Gulf region. (*Id.* ¶¶ 334, 344.) Finally, Confidential Witness 3 ("CW3") confirmed that BP did not actually implement the "Best Practices" protocol it had approved nor did it supply its upstream operations, which included offshore exploration operations, with any process safety or risk management policies. (*Id.* ¶ 344.) The Court now must address whether these facts adequately demonstrate the alleged falsity of the statement at issue.

Plaintiffs first contend that BP's cost-cutting measures necessarily interfered with its implementation of OMS in the Gulf. Plaintiffs point to cost-cutting measures that Inglis initiated in "the fourth quarter of 2009 and in January 2010." (*Id.* ¶ 335.) Yet, the 2008 Annual Report statement relates to implementation of OMS *in 2008*, by Plaintiffs' [*84] timeline at least a year before any of the alleged cost-cutting measures occurred. While BP's allocation of resources to the OMS programs could theoretically affect the implementation status and effectiveness of such a program, Plaintiffs here attempt to draw a connection between temporally disparate events. Cost-cutting measures in late 2009 and early 2010 cannot prove that BP had not previously implemented OMS in the Gulf in 2008.

In addition to the cost-cutting decisions, Plaintiffs rely on information provided by confidential witnesses. Defendants argue that the allegations attributed to confidential witnesses are entitled to no weight. (Doc. No. 152, at 43.) Plaintiffs can only rely on information obtained from unnamed confidential witnesses if the witnesses "are identified through general descriptions in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source as described would possess the information pleaded to support the allegations of false or misleading

statements." *ABC Arbitrage*, 291 F.3d at 353. Defendants contend that here Plaintiffs fail to specify the title, responsibilities, or dates of employment of [*85] the confidential witnesses that Plaintiffs seek to rely on.

According to Plaintiffs, CW1 is an "expert witness on oil rig operational safety and a former consultant to the BP Board of Directors." (Compl. ¶ 285.) CW2 is "a former BP senior manager and an expert in the offshore oil and gas drilling and completions." (*Id.* ¶ 334.) CW3 is an "expert[] in oil company operations safety and former consultant[] to BP's Board of Directors." (*Id.* ¶ 344.) Although Plaintiffs do not provide the dates when the confidential witnesses worked for BP, all three witnesses are alleged to have done so, either as BP employees or as consultants. Two of the confidential witnesses allegedly had direct reporting lines to BP's Board of Directors; the third worked as a BP senior manager. All three worked in the area of rig safety or rig operations. In addition, at least two of the witnesses allegedly possess information dating back to 2005, placing them at BP during the relevant time period. (*Id.* ¶ 344.) All three of the confidential witnesses purport to have obtained information from or related to specific BP employees, demonstrating that they worked in at least some degree of proximity with named individuals [*86] who were involved in BP's Gulf operations. (*Id.* ¶¶ 336-41); *see also ABC Arbitrage*, 291 F.3d at 357 (finding that "allegations concerning a conversation between a 'high ranking [company] official' who was 'a top executive of [the company]'" and one of the company's executive vice presidents were "pleaded with sufficient particularity to meet the standards"). In addition, both CW2 and CW3 profess knowledge of internal BP documents, such as a specific "Best Practices" document. (Compl. ¶ 344.) CW3 also stated that BP slashed budgets by 25%, which also suggests access to internal BP information. (*Id.*)

While "[i]t would be better were the informants named in the complaint, because it would be easier to determine" whether they in fact knew what they are alleged to know, "the absence of proper names does not invalidate" the information the Complaint claims they provide. *See Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 712 (7th Cir. 2008) ("*Tellabs II*"). Here, where all three confidential witnesses are alleged to have worked for BP in some capacity during the relevant Subclass Period, interacted with named BP employees involved in Gulf operations, and been privy to internal corporate [*87] documents, the witnesses are "described

in the complaint with sufficient particularity to support the probability" that they possess the information Plaintiffs allege. *ABC Arbitrage*, 291 F.3d at 354. Accepting the facts gleaned from confidential witnesses as true, Plaintiffs have pleaded with sufficient particularity the alleged misrepresentation in BP's 2008 Annual Review.

*(b) 2009 Sustainability Review Statement (App. Stmt. No. 5)*

Accepting the facts discussed above as true also demonstrates the falsity of the statements about OMS implementation in BP's 2009 Sustainability Review (App. Stmt. No. 5; Compl. ¶ 408.) This statement, too, references the "eight sites" where OMS was implemented in 2008. If Plaintiffs can prove what they allege--that OMS was not actually implemented in the Gulf in 2008--it follows that these numbers, which BP was still citing in 2009 without modification, cannot be correct. Additionally, the faulty data call into question BP's additional claim that the implementation of OMS was "80% complete" by the end of 2009, because, according to Plaintiffs, OMS was still only in infancy stages in the Gulf of Mexico in 2010. (Compl. ¶ 334.)

According to CW1, BP failed to [*88] implement an appropriate OMS protocol at the Deepwater Horizon, which would have ensured that "the individual decision makers at the rig level understood how cost-savings and corner-cutting . . . affect[ed] the process safety." (*Id.* ¶ 285.) CW3 also confirmed that budgets were slashed by 25%, thereby diminishing the resources needed to implement OMS. (*Id.* ¶ 344.) Accepting these facts as true, Plaintiffs have pointed to information significantly undermining BP's representation that the Gulf of Mexico region had "completed the transition to OMS in 2008." Plaintiffs have alleged with particularity statements in BP's 2009 Sustainability Review related to BP's implementation of OMS in its Gulf operations.

**ii. Materiality**

Even if Plaintiffs have adequately pleaded the falsity of these statements, Defendants assert that the misrepresentations were immaterial. According to Defendants, statements related to progress in implementing OMS are too generalized to form the basis of a securities fraud claim. (Doc. No. 152, at 19.) Defendants argue that "progress" is not testable and "generalized positive statements about a company's

progress are not a basis for liability." *Nathenson*, 267 F.3d at 419.

A [*89] statement or omission is material "if there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest. *R&W Technical Servs. Ltd. v. Commodity Futures Trading Comm'n*, 205 F.3d 165, 169 (5th Cir. 2000), *cert denied*, 531 U.S. 817, 121 S. Ct. 54, 148 L. Ed. 2d 22 (2000). The Supreme Court has repeatedly declined to adopt a bright-line rule for determining materiality. *See Basic*, 485 U.S. at 236; *Matrixx Initiatives*, 131 S. Ct. at 1312. Instead, the question is whether "a reasonable investor" would have viewed the nondisclosed information "as having significantly altered the 'total mix' of information made available." 131 S. Ct. at 1312 (citation omitted). Had the OMS merely been an internal safety initiative, Defendants might have argued convincingly regarding its irrelevance, but BP's decision to highlight the OMS program in its public reports renders it a representation that investors may rightly rely on. *See, e.g., Lormand*, 565 F.3d at 248-49 (finding that "[o]nce the defendants engaged in public discussions concerning the benefits of . . . the no-deposit programs, they had a duty to disclose a 'mix of information' that is not misleading."). Further, [*90] the content of the statements regarding OMS implementation are grounded in fact. The reference to "eight sites," followed by a specific list including an explicit reference to the Gulf of Mexico, is an objective statement. Because statements regarding OMS are "an assertion of a relationship between data and a conclusion," namely, that OMS was implemented in specific locations and, therefore, that BP was on track in implementing its safety process initiative, it is "one that a finder of fact could test against record evidence." *City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 674 (6th Cir. 2005).

Defendants contend that statements related to "progress" on any front are too vague to be material to investors. (Doc. No. 152, at 19.) But Plaintiffs have done much more than assert that a vague, false impression was created here. [22] While BP could have spoken in general terms about its progress in the safety arena, it did not do so. Instead, the Company presented specific information about OMS, including the number of sites in which the program was implemented and statistical percentages demonstrating that the Company was on track with implementation. (Compl. ¶¶ 353, [*91] 408.) BP juxtaposed this hard data about the OMS program with

the Company's expectations for continued success in its Gulf drilling operations, thereby elevating the significance of OMS. "A reasonable juror could . . . conclude that the statement, without some qualification or accompanying disclosure of the numerous pieces of evidence that tended to cut the other way, was a misrepresentation." *Bridgestone*, 399 F.3d at 672. Because BP chose to speak about OMS, it had a duty to speak accurately. *Rubinstein v. Collins*, 20 F.3d at 170 (noting that, "under Rule 10b-5, a duty to speak the full truth arises when a defendant undertakes a duty to say anything.") (citation omitted) (internal quotation marks omitted).

22   Defendants also contend that all or virtually all of the purported misrepresentations and omissions constitute mere corporate mismanagement. Under the Supreme Court's holding in *Santa Fe*, Defendants submit, such statements are not actionable under section 10(b). *See Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S. Ct. 1292, 51 L. Ed. 2d 480 (1977). Some of the statements Plaintiffs identify, especially those discussed below relating to BP's cost-cutting strategy, could perhaps be categorized as "mere corporate [*92] mismanagement." *See, e.g., In re Craftmatic*, 890 F.2d 628, 640 (3d Cir. 1989) (finding that failures to disclose that costs were out of control and that company lacked effective controls were not actionable). However, the Court has already determined, below, that many of these misrepresentations are not actionable for failure to plead with the particularity required under Rule 9(b) and the PSLRA. The remaining allegations cannot be so easily written off as mere corporate mismanagement. The Court is not persuaded by Defendants' insistence on analogizing this case to *Union Carbide. See In re Union Carbide Class Action Sec. Litig.*, 648 F.Supp. 1322, 1326 (S.D.N.Y. 1986) (holding that facts reflected corporate mismanagement and not securities fraud where plaintiffs failed to allege any actual statements made misleading and instead "chose[] to assert vaguely that a false and misleading impression was created"). Although Defendants repeatedly stress the commonalities between this case and *Union Carbide*, there are key differences between the two that save some of Plaintiffs' allegations here. Whereas in *Union Carbide* the

alleged data did not undermine any specific affirmative misstatements, [*93] here Plaintiffs have pinned alleged facts and data to BP's public statements concerning the OMS program, as the PSLRA requires them to do. In *Union Carbide*, there were no alleged affirmative misrepresentations, only an alleged omission. Plaintiffs here go much further in their allegations, arguing that BP effectively launched an ongoing public relations campaign to resuscitate BP's safety image before investors. Statements made as part of that campaign were not related solely to the breakdown revealed in the Deepwater Horizon catastrophe; instead, several of the misrepresentations Plaintiffs allege call into question the very makeup and viability of BP's process safety program.

Defendants also argue that statements about OMS were immaterial to investors because the market was well aware of the risks associated with deepwater drilling. (Doc. No. 152, at 28-29.) Defendants miss the point here. Plaintiffs do not merely allege that the market was unaware of the risks; instead, Plaintiffs contend that BP's representations about its risk management programs--of which OMS was the centerpiece--lulled the market into false confidence in BP's ability to *manage* those risks. It may be the case that [*94] at the summary judgment or trial stages of this dispute, BP will identify evidence that persuades the finder of fact that BP had indeed completed implementation of OMS in the Gulf of Mexico. Or perhaps BP will introduce some other evidence showing that its statements about OMS were not in fact misleading. However, at this stage in the suit, construing the Complaint in the light most favorable to the Plaintiffs, a reasonable juror could find that BP's representations that it had implemented OMS in the Gulf in 2008 when it had not actually done so constitute material misrepresentations. The statements contained in the 2008 Annual Report and 2009 Sustainability Review are therefore actionable. [23]

23   By Plaintiffs' numbering system, the actionable statements are contained in Misrepresentations 5 (Compl. ¶ 408) and 13 (Compl. ¶ 353).

### iii. Safe Harbor

Defendants argue that, even if the misrepresentations contained in BP's 2008 Annual Report are materially

false and misleading, they are nonetheless not actionable because they are forward-looking statements protected by the PSLRA's safe harbor provision. [24] A forward-looking statement is a statement containing financial projections, a statement [*95] of the plans and objectives of management for future operations, or a statement of future economic performance. *In re TETRA Technologies, Inc. Sec. Litig.*, No. 4:08-cv-0965, 2009 U.S. Dist. LEXIS 126687, 2009 WL 6325540, at *12 (S.D. Tex. July 9, 2009); 15 U.S.C. § 78u-5(i)(1). The PSLRA creates a safe harbor for forward looking statements if: (1) the statement is "accompanied by meaningful cautionary statements"; (2) the statement is immaterial; or (3) in the absence of cautionary language, the plaintiff fails to demonstrate that the statement was made with knowledge of falsity. 15 U.S.C. § 78u-5(c)(1)(A). A district court must consider each statement individually and address how "each. . . statement (or portions of those statements) is specifically and meaningfully protected by the safe harbor." *Lormand*, 565 F.3d at 245.

> 24   Defendants identify seven statements among the thirty-five alleged misrepresentations that they claim are forward-looking statements protected by the PSLRA's safe harbor provision. (Doc. No. 152, App. C.) Aside from the statements in the 2008 Annual Report, all other statements Defendants identify are not actionable for failure to plead falsity, as discussed below. See Section V.A.2.(c)-(e). [*96] Therefore, the Court does not perform the safe harbor analysis with respect to the rest of the misrepresentations.

Defendants argue that BP's 2008 Annual Report contains forward-looking statements and provides "meaningful cautionary statements," thereby making the statements Plaintiffs identify not actionable. (Doc. No. 152, at 33.) BP's 2008 Annual Report does indeed advise that it contains forward-looking statements. Under a heading captioned "Forward-looking statements," the 2008 Annual Report alerts readers that the document "contains certain forward-looking statements" and explains that such statements are generally "identified with the use of words such as 'will', 'expects', 'is expected to', 'aims', 'should', 'may', 'objective', 'is likely to', 'intends', 'believes', 'plans', 'we see' or similar expressions." (Doc. No. 150-12, Ex. H, at 10.) The advisory then warns the reader to be alert for forward-looking statements in the "Performance review

*(pages 6-56)*" section of the Annual Report. (*Id.*) Within the "Performance Review" section, the Annual Report states that forward-looking statements may appear in connection with a lengthy list of items, including "strategy, management [*97] aims and objectives," "planned expansion, investment or other projects," and "the plans of the group, the cost of and provision for future remediation programmes," and the "continuing priority of safe, compliant and reliable operations." (*Id.*)

The statements Plaintiffs identify regarding the implementation of OMS are located within the "Performance Review" section. (*Id.*, at 37-38.) However, the specific statement at issue here--Statement 13--is not forward-looking. The section of the 2008 Annual Report captioned "Management systems" begins by stating, "All operated businesses plan to transition to OMS by the end of 2010." (*Id.*, at 37.) That statement uses one of the verbs BP highlights as denoting a forward-looking statement and is clearly a prediction. However, the specific portion of the section Plaintiffs challenge, which immediately follows the prediction, states that: "Eight sites *completed* the transition . . ." and then lists the Gulf of Mexico as one of the eight sites. (*Id.*) [25] The section continues: "For the sites *already involved*, implementing OMS *has involved* detailed planning, including gap assessments." (*Id.*) The section concludes: "The transition to OMS . . . *has* [*98] *been handled* in a formal and systemic way." (*Id.*) Thus, the portions of the Annual Report that Plaintiffs challenge are statements that BP presented as statements of fact, goals already achieved, or actions already taken. While tense is not determinative on whether a statement is forward-looking, it is a relevant consideration. *See Tellabs II*, 513 F.3d at 705. Even where a statement contains a mixed tense, it "is not entitled to safe harbor with respect to the part of the statement that refers to the present" or to past facts. *Id.* Here, the challenged statements are presented as a representation of BP's past achievements in implementation of OMS and are not forward-looking. Therefore, the statements in the 2008 Annual Report are not shielded under the PSLRA's safe harbor provisions. [26]

> 25   All emphasis here is the Court's own.
> 26   Plaintiffs allege that four different statements within BP's 2008 Annual Report are false and misleading. The discussion here applies only to App. Stmt. No. 13. Statements 12, 14, and 15, also contained in the 2008 Annual Report, are not

actionable for different reasons, as set out in the Court's analysis below. *See infra* Section V.A.2.e. The safe harbor discussion [*99] here is thus confined to Statement 13.

### b. Misrepresentations regarding OMS's application across all BP operations

Plaintiffs further expand their allegations stemming from BP's operation of its OMS program to argue that even if OMS had been implemented as promised, OMS would not have applied to the majority of BP's rigs in the Gulf, including the Deepwater Horizon. Essentially, the OMS was not a "framework" at all, but merely a façade for an ineffectual safety program. Plaintiffs allege three specific misrepresentations in connection with this argument: two statements found in BP's 2009 Annual Review and one statement made by Defendant Inglis during an industry speech. (App. Stmt. Nos. 18-19, 8; Compl. ¶¶ 383, 385, 401.)

### i. Particularity

*(a) 2009 Annual Review Statements (App. Stmt. Nos. 18-19)*

Plaintiffs point to two specific statements in BP's 2009 Annual Review and allege that the statements falsely represented that BP's OMS program would apply to all of BP's operations. The first statement at issue is the following:

> - "Safe, reliable and compliant operations remain the group's first priority. A key enabler for this is the BP operating management system (OMS), which provides a common [*100] framework for all BP operations, designed to achieve consistency and continuous improvement in safety and efficiency. Alongside mandatory practices to address particular risks, OMS enables each site to focus on the most important risks in its own operations and sets out procedures on how to manage them in accordance with the group-wide framework." (App. Stmt. No. 18; Compl. ¶ 383.)

Plaintiffs aver that the statement misrepresents the reach of the OMS because it led investors to believe that

if OMS was implemented in a given site, *e.g.*, in BP's Gulf operations, then it applied to all operations at that site. [27] (Compl. ¶ 384.) In support of the falsity of this statement about the breadth of the OMS program and its application in the Gulf, Plaintiffs cite facts that undermine BP's presentation of the OMS program. For example, Plaintiffs point to statements from a confidential witness that BP's upstream operations--including offshore exploration rigs in the Gulf--never received any information related to OMS. (Compl. ¶¶ 334, 344.) In addition, confidential witnesses confirm that BP did not implement its operational "Best Practices" in its upstream, *i.e.*, offshore, operations. (*Id.* ¶ 344.) [*101] A former BP senior employee with Gulf Operations responsibilities stated that BP had only begun to implement OMS in the Gulf in a pilot stage and employees in key positions in Gulf operations had no knowledge of OMS requirements. (*Id.* ¶ 402.) In addition, a 2009 audit of the Deepwater Horizon rig revealed that "safety goals were not commonly known and not widely communicated." (*Id.* ¶ 310-11.) Following cost-cutting measures in 2009 and 2010, BP relied on individuals without adequate experience and expertise to implement BP's OMS system in the Gulf, leaving the program disorganized and implementation unfinished. (*Id.* ¶ 335.)

> 27  Plaintiffs' counsel further elaborated on this misrepresentation during oral argument, explaining that "BP implemented OMS at only one of seven of the owned or leased drilling rigs in the Gulf of Mexico. So the non-owned rigs, which constituted six of the seven rigs [in the Gulf], OMS, by its own terms, didn't even apply. It didn't even apply to [the Deepwater] Horizon." (Doc. No. 304, at 47, lns. 8-12.)

Plaintiffs "need not allege 'all' facts that may be 'related' to their claims," since "[s]uch a requirement is impossible at the pleading stage because, in nearly [*102] every securities fraud case, only the defendants know 'all' the facts related to the alleged fraud." *In re NetSolve, Inc. Sec. Litig.*, 185 F. Supp. 2d 684, 696 n. 10 (W.D. Tex. 2001). Here, Plaintiffs have alleged facts sufficient to call into question the intended breadth of OMS in BP's Gulf operations. The alleged facts suggest that BP's Gulf rigs, including the Deepwater Horizon, were missing key components of the OMS system or never received any information related to OMS at all. The facts call into question BP's assertion in the 2009 Annual Review that each site in the Gulf had mandatory practices

and procedures in place to govern process safety concerns.

Plaintiffs also challenge another statement in the 2009 Annual Review:

- "The reduction in the number of oil spills in 2009 follows several years of focus across BP on procedures such as 'integrity management' and 'control of work,' which are elements of BP's OMS." (App. Stmt. No. 19; Compl. ¶ 385.)

In addition to the facts outlined above related to the implementation of OMS, Plaintiffs claim this statement was false and misleading because BP failed to mention that the 2009 "Total Recordable Incident Rate," which measured incidents [*103] for every 200,000 man hours worked, was .97 for the Gulf, well over the Company's target rate of .62. (Compl. ¶ 291.) Plaintiffs also claim that delays in maintenance work on the Deepwater Horizon and BP's failure to assign a larger portion of its revenue to offshore drilling safety measures undermine the truth of this statement. (*Id.* ¶¶ 307, 311.)

The alleged facts do not support the falsity of this second statement. The challenged statement makes no reference to the scope of OMS. Instead, the statement is one of fact. It is a claim that the number of spill incidents decreased in 2009. Nothing Plaintiffs allege challenges that underlying factual assertion. Plaintiffs do not assert that BP did not in fact reduce the number of oil spills. The "Target Recordable Incident Rate," the only metric Plaintiffs identify, is more akin to a measure of personnel safety than a measure of oil spills. Allegations that safety procedures were not widely known or that BP did not allocate enough of its revenue to safety technologies does not undermine BP's assertion that there was an identifiable reduction in the number of oil spills. Because Plaintiffs fail to identify any facts calling into question [*104] the specific statement they challenge, Plaintiffs have failed to plead with particularity the falsity of Statement No. 19.

*(b) Howard Weil Conference Statement (App. Stmt. No. 8)*

Plaintiffs also contend that Defendant Inglis falsely represented the reach of OMS during a speech at the Howard Weil Conference on March 22, 2010. *See* App.

Stmt. No. 8, Compl. ¶ 401 ("Safety and operational integrity underpins everything we do, and we are now in the final phase of rolling out our operating management system that provides a single, consistent framework for our operations, covering all areas from personal and process safety to environmental performance."). Plaintiffs argue that Inglis's statement was false because, in addition to the facts set out above, BP personnel in charge of implementing OMS were terminated or transferred. (Compl. ¶ 335.) Confidential witnesses confirmed that BP's OMS program lagged behind that of its peers and that BP had still not implemented a robust risk management program by 2010. (*Id.* ¶ 341.) CW1 also confirmed that BP failed to implement an appropriate OMS protocol, leaving decision makers at the rig level uncertain of appropriate safety practices. (*Id.* ¶ 285.) For [*105] the same reasons addressed with respect to Statement 18 above, the Court finds that Plaintiffs have alleged facts sufficient to call into question the implementation of OMS in BP's Gulf operations. The alleged facts suggest that BP's Gulf rigs were missing key components of the OMS system or never received any information related to OMS at all. The facts thus call into question Inglis's statement that the OMS provided a "single, consistent framework" for "all areas" of BP's operations.

**i. Materiality**

What Plaintiffs allege here is an omission: BP failed to clarify the intended scope of its OMS program while simultaneously presenting the program to the public as an expansive program. Because the allegations here involve an omission, the issue is whether Defendants owed Plaintiffs a duty to disclose information about the true extent of OMS. As the Supreme Court explained in *Matrixx*, whether a defendant owes a duty to disclose turns on whether the omission renders his statement false or misleading, not whether the omitted information was material. *Matrixx*, 131 S. Ct. at 1321-22 (citing 17 CFR § 240.10b-5(b)). "The question thus is not whether a [defendant's] silence can give rise to liability, [*106] but whether liability may flow from his decision to speak . . . concerning material details . . ., without revealing certain additional facts necessary to make his statement not misleading." *Bridgestone*, 399 F.3d at 670 (quoting *Rubin v. Schottenstein, Zox & Dunn*, 143 F.3d 263, 267 (6th Cir. 1998)).

BP was not obligated to talk about the scope of OMS

at all, yet talk about OMS it did. Plaintiffs highlight the disconnect between what a reasonable investor would assume upon reading BP's broad-brush portrait of the intended goals of the OMS program and the reality, which was that OMS applied only to rigs BP owned outright, not to rigs it operated. [28] BP's document titled "Gulf of Mexico SPU Drilling and Completions OMS Implementation Terms of Reference" states that:

> BP sites world-wide are required to use OMS as the framework for their Local Operating Management System (LOMS). OMS applies to all operations and premises, controlled or owned by BP, and sites operated or controlled on BP's behalf. These include offshore production facilities, drilling rigs, vessels, process plants, and refineries.

(Doc. No. 187, Ex. 34). BP's 2008 Form 20-F Annual Report further states that "[a]ll operated [*107] businesses plan to transition to OMS by the end of 2010." (Compl. ¶ 353.) Yet, if Plaintiffs' allegations are true, these "operated businesses" would not have included BP-operated rigs unless the rigs were also one-hundred percent BP-owned. A disconcerting revelation indeed to an investor who, expecting words to convey their dictionary meaning, might be under the impression that the "common framework" would apply to "all BP operations" and "each site."

> 28    During oral argument, Plaintiffs' counsel presented the Court with a powerpoint slide presentation which included a slide (No. 26) diagramming the seven wells BP operates in the Gulf region. As the slide demonstrates pictorially, the OMS program would have applied only to the Thunderhourse PDQ rig, which BP owned. It would not have applied to the Transocean Marianas, the GSF Development Driller II or III, the Bob Palmer Jackup Rig, the Discover Enterprise, or, notably, to the Deepwater Horizon, all of which BP operated but did not own.

The two statements about the breadth of OMS's application to BP's operations are actionable because they were made while Defendants were in possession of specific information undermining the truth of those [*108] statements. Continually referring to OMS with descriptors such as "framework," "overall," and "company-wide" becomes misleading when the safety program was not intended to apply to the majority of BP's Gulf operations. *See In re K-tel Intern., Inc. Sec. Litig.*, 300 F.3d 881, 896, 898 (8th Cir. 2002) ("[T]he requirement is not to dump all known information with every public announcement, but the law requires 'an actor to provide complete and non-misleading information with respect to the subjections *on which he undertakes to speak.*'") (citation omitted).

Here, given the manner in which OMS was repeatedly described, portrayed as a comprehensive, company-wide program, a reasonable investor would likely find it material to know that OMS's application to "all" BP operations would exclude, in the Gulf region alone, six of the seven rigs BP worked on. BP apparently attributes different meaning to descriptors such as "all," "company-wide," "common," "framework," "each," "single," and "consistent" than the average investor might assume. If Plaintiffs' allegations are true, OMS, billed as the "common" and "group-wide framework" for "all BP operations" "covering all areas" and "enabl[ing] each [*109] site" to implement "mandatory practices," was not intended to cover any BP operations where BP was not the outright owner of the rig. [29]

> 29    As defense counsel conceded during oral argument, the OMS system did not apply to the Deepwater Horizon rig, even though "BP owned 50 percent of the well and there were two other companies that owned the remaining 50 percent, or BP owned 60 percent. There were three owners of this well. I mean, BP was clearly the responsible party--" (Doc. No. 304, at 67, lns. 25-25; at 68, lns. 1-3.)

Defendants claim these are "general, vague statements" and, as such, would not be material to investors. To the contrary, it is the very vagueness of the statements that makes them misleading. The fact that "all operations" and "each site" really only include, in the Gulf of Mexico for example, one of BP's seven rigs is a significant omission. The fact that the "common framework" and "group-wide framework" does not implicate any safety protocols at all for over 80% of BP's operations in a specific region is a significant omission. To suggest that such sweeping terms are merely puffery or that investors would find it unimportant to know that BP did not intend for its star [*110] safety initiative to have any effect on the majority of its Gulf operations is

hard to believe. In a company so plagued by a history of safety failures and so dependent on the success of its public commitment to, as Defendant Hayward put it, "turn the corner on safety," BP cannot credibly argue that the extent and reach of its key safety initiative was immaterial to investors.

Knowing that BP had not implemented the OMS in the Gulf of Mexico and did not intend to implement the OMS in the majority of its Gulf operations would have changed the "total mix" of information available to investors. Investors might have questioned BP's commitment to safety in the Gulf region and perhaps reevaluated the risk associated with a Company that had no intention of implementing its principal safety program in the very area BP touted as its principal growth region. Plaintiffs have thus adequately alleged actionable misrepresentations with respect to statements discussing the extent of BP's OMS program. [30]

     30     The actionable misrepresentations are Misrepresentations 8 and 18. Misrepresentation 19 is not actionable.

### c. Misrepresentations as to the adequacy of BP's risk management capabilities

According to [*111] Plaintiffs, BP's third general misrepresentation was its claim that the Company had the risk management infrastructure in place to effectively manage risk in its operations, especially in its Gulf of Mexico deepwater drilling operations. The alleged misrepresentations are found in BP's 2008 Annual Report, 2009 Sustainability Report, and 2009 Annual Review. (App. Stmt. Nos. 15, 29-30, 1-3, 9; Compl. ¶¶ 353, 410-11, 376-77, 374.) According to Plaintiffs, the seven challenged statements falsely suggested that BP's risk management system in the Gulf allowed the company to effectively manage risk. The reality, according to Plaintiffs, was that Defendants were fully aware of shortcomings in the risk management system and those deficiencies directly impacted the future success of BP's Gulf operations. (Doc. No. 187, at 18.) Defendants contend that the identified statements are simply general statements about risks already known to the market and are therefore not actionable. In addition, Defendants urge that the statements are neither misleading nor material.

### i. Particularity

### (a) 2008 Annual Report, Form 20-F Statement (App. Stmt. No. 15)

Plaintiffs challenge the following statement from the [*112] 2008 Annual Report:

     - "Safety performance has been scrutinized by the . . . GORC, chaired by the group chief executive (Hayward) and tasked with assuring . . . Hayward that group operational risks are identified and managed appropriately. We continued to build our team of safety and operations auditors. A team of 45 auditors is now in place, with 36 audits completed in 2008." (App. Stmt. No. 15; Compl. ¶ 353.)

Plaintiffs allege that the statement is false because an internal report found that delayed maintenance on the Atlantis, another of BP's Gulf rigs, caused a smaller oil spill before the Deepwater Horizon explosion. (Compl. ¶ 169.) In addition, an audit conducted in September 2009 revealed a backlog of required maintenance jobs before the Deepwater Horizon could be considered up to date with safety goals. (Id. ¶ 311.) Plaintiffs also point to incomplete engineering documents on the Atlantis rig, allegedly discovered by Kenneth Abbott, the "projects control lead" for the Atlantis. (Id. ¶¶ 172-75.)

The facts Plaintiffs advance in support of falsity are unrelated to the actual statements Plaintiffs challenge. The only objectively verifiable claims contained in the challenged statement [*113] relate to the GORC and the assertion that BP had a team of 45 auditors in place "with 36 audits completed in 2008. (Id. ¶ 353.) The GORC was an internal BP committee tasked with monitoring implementation of OMS and charged with discussing "[a]ll major incidents and many high-potential incidents" in order to help the Company learn from each incident. (Id.) Plaintiffs apparently contest that "safety performance ha[d] been scrutinized" by the GORC and that "group operational risks [we]re identified and managed appropriately." However, the facts Plaintiffs cite as evidence of the falsity of this representation do not undercut the truth of the statement. A backlog of maintenance jobs and missing documents on one of BP's rigs does not demonstrate that members of the GORC were not, in fact, scrutinizing safety incidents. Further, none of the facts that Plaintiffs allege disprove BP's claim

that the Company conducted thirty-six audits in 2008, a statement easily tested against record evidence.

In addition, Plaintiffs allege temporally disparate facts that do nothing to advance their allegations. Here, neither an audit conducted in late 2009 nor Abbott's findings "[i]n this same time period," [*114] can support the falsity of statements that refer to 2008. (Id. ¶ 172.) Plaintiffs' contention that Abbott supervised an audit in September 2009 would seem to support rather than undermine BP's representation that risks were "identified" and "scrutinized." Abbott allegedly found backlogs in maintenance jobs on rigs in the Gulf. But his actions in identifying gaps in BP's safety protocols indicate that BP was "scrutinizing" and "identifying" safety performance, just as the statement suggests. (Id. ¶ 353.) The facts suggest nothing as to whether risks were managed appropriately or inappropriately. As a result, Plaintiffs have not pleaded the falsity of the statement contained in the 2008 Annual Report. [31]

31   Misrepresentation No. 15 (Compl. ¶ 353) is, therefore, not actionable.

*(b) 2009 Sustainability Report Statements (App. Stmt. Nos. 29, 30)*

Plaintiffs allege that the following two statements in the 2009 Sustainability Report, which they attribute to BP as a corporate defendant, were false:

- "If an incident occurs, it is recorded locally by employees, contractors and management using our internal web-based data management system. All fatalities, other major incidents and many that had the [*115] potential to become major incidents are discussed by the GORC, chaired by [Defendant Hayward]." (App. Stmt. No. 29; Compl. ¶ 411.)

- "BP's safety and operations audits assess compliance with standards and the effectiveness of operational risk management. The audits provide a rigorous check on safety and operations programmes. Progress is reported quarterly, at which time issues, such as overdue action closures, are highlighted to executive management in the executive-level GORC." (App. Stmt. No.

30; Compl. ¶ 410.)

Plaintiffs claim the first statement is false due to material omissions regarding BP's lack of safety and risk management policies and lack of training among BP personnel. Specifically, Plaintiffs contend that the statement leaves out critical facts, such as that BP failed to implement adequate safety procedures, lacked internal controls, and had failed to implement OMS in the Gulf. (Compl. ¶ 411.) But Plaintiffs allege only vague facts in support of the falsity of this statement. The implementation--or lack thereof--of OMS in the Gulf has no bearing on whether audits were in fact carried out as the Sustainability Report represents. Likewise, allegations of general failures to [*116] implement safety procedures and controls lack the particularity required under the PSLRA. *See Westfall v. Miller*, 77 F.3d 868, 870 (5th Cir. 1996) (explaining that a court need not "strain to find inferences favorable to the plaintiffs"); *Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 178 (5th Cir. 1997), *cert. denied*, 522 U.S. 966, 118 S. Ct. 412, 139 L. Ed. 2d 315 (1997) ("A complaint can be long-winded, even prolix, without pleading with particularity. Indeed, such a garrulous style is not an uncommon mask for an absence of detail."). Plaintiffs do not allege any particular facts undermining BP's assertion that the Company relied on an "internal web-based data management system" to track safety incidents. Nor do Plaintiffs cite any evidence that the GORC was not fulfilling its committee duties and discussing safety incidents. Plaintiffs have thus failed to plead falsity with respect to Statement 29.

The second statement identified in the 2009 Sustainability Report makes specific representations regarding BP's safety and compliance audits. (Compl. ¶ 410.) The audits allegedly provided a "rigorous check" on safety compliance and risk management, and audit reports were prepared quarterly. (*Id.*) Plaintiffs have failed [*117] to adequately allege the falsity of this statement. Plaintiffs claim in their opposition motion that BP "selectively audited certain facilities" and "omitt[ed] audit results [that] consistently uncovered facts that were contrary to BP statements" on risk management. (Doc. No. 187, App. A.) Had Plaintiffs alleged and supported such facts in their Complaint, Plaintiffs might have alleged actionable misrepresentations with respect to this statement. Selective audit procedures calculated to emphasize favorable results and omit unfavorable

findings could very well be material to investors. However, because Plaintiffs failed to assert any facts undermining BP's audit process in their Complaint, the Court cannot consider such allegations now. Plaintiffs have thus failed to plead the falsity of the two statements in BP's 2009 Sustainability Report. [32]

> [32] Misrepresentations No. 29 (Compl. ¶ 411) and 30 (*Id.* ¶ 410) are not actionable.

*(c) 2009 Annual Review Statements (App. Stmt. Nos. 1-3, 9)*

Plaintiffs challenge three statements in BP's 2009 Annual Review. *See* App. Stmt. No. 1, Compl. ¶ 376 ("Despite . . . difficult conditions, a revitalized BP kept up its momentum and delivered strong operating [*118] and financial results while continuing to focus on safe and reliable operations."); App. Stmt. No. 2, Compl. ¶ 376 ("These successes make us the largest producer and leading resource holder in the deepwater Gulf of Mexico."); App. Stmt. No. 3, Compl. ¶ 377 ("We continue to show our ability to take on and manage risk, doing the difficult things that others either can't do or choose not to do. This is why we are able to form such strong relationships with governments and national oil companies and why we continue to have a critical role to play in supplying the world with its future energy needs."). Plaintiffs also challenge a portion of the statement of the Chairman of the Board, attributed to Defendant Svanberg, which was included in the Annual Review. *See* App. Stmt. No. 9, Compl. ¶ 374 ("Risk remains a key issue for every business, but at BP it is fundamental to what we do. We operate at the frontiers of the energy industry, in an environment where attitude to risk is key. The countries we work in, the technical and physical challenges we take on and the investments we make - these all demand a sharp focus on how we manage risk. We must never shrink from taking on difficult challenges, [*119] but the [B]oard will strive to set expectations of how risk is managed and remain vigilant on oversight.").

According to Plaintiffs, Svanberg's statement is false because BP's Board of Directors did not in fact "set expectations of how risk is managed" nor did they "remain vigilant on oversight." (Doc. No. 187, App. A.) To demonstrate the misleading nature of this statement, Plaintiffs point to evidence from a variety of sources, including CW1, a rig audit, specific decisions made by the Board, and post-spill findings by the Presidential

Commission. Plaintiffs argue that a September 2009 audit revealed 390 maintenance jobs backlogged on the Deepwater Horizon. (Compl. ¶ 310.) The jobs were still outstanding months later, in December 2009. (*Id.*) According to CW1, BP failed to implement OMS as directed, thereby failing to ensure that individual employees on the rig understood safety protocols. (*Id.* ¶ 285.) CW3 confirmed that BP failed to implement the "Best Practices" it had approved for its operations in 2005. (*Id.* ¶¶ 344-45.) Plaintiffs also point to select findings of the Presidential Commission which included, among other things, findings that: (1) "BP's management process did not [*120] adequately identify or address risks created by late changes to [the Macondo well] design and procedures"; (2) there "appears to have been no formal system" for ensuring the safety of alternate procedures selected for the Macondo well; (3) "[n]one of BP's [] decisions . . . appear to have been subject to comprehensive and systematic risk-management"; and (4) "evidence now available does not show that the BP team members . . . responsible for these decisions conducted any sort of formal analysis to assess the relative riskiness of available alternatives." (*Id.* ¶¶ 314-16.)

Setting aside Statement No. 2 (Compl. ¶ 376), which is merely a statement about BP's competitiveness in the industry and far too vague an assertion to be actionable, the remaining three statements all address BP's risk management capabilities. Statements about the adequacy of risk management operations and capabilities may be false and misleading where the speaker knows, or should know, that such operations are inadequate to manage the risks a company faces. *See, e.g., In re Fannie Mae Sec. Litig.*, 742 F. Supp. 2d 382, 2010 WL 3825713, at *14-15 (S.D.N.Y. 2010) (finding material misstatements sufficient [*121] to survive a motion to dismiss where Fannie Mae's statements that its risk management operation was "appropriate" were made despite defendants' knowledge that the risk management system was inadequate for the new subprime assets the company was purchasing). Here, however, Plaintiffs are unable to identify material information left out of the statements they claim are misleading because the statements are simply too vague to be false or material.

The Annual Review statements represented that BP could "keep up momentum" while simultaneously focusing on safe operations, "take on and manage risk," and, with the Board of Directors at the helm, "set expectations of how risk is managed." (*Id.* ¶¶ 374,

376-77.) These portions of the Annual Review are statements "of the vague and optimistic type that cannot support a securities fraud action. . . and contain no concrete factual or material misrepresentation." *Southland*, 365 F.3d at 372; *see also ECA v. JP Morgan Chase Co.*, 553 F.3d 187, 205-06 (2d Cir. 2009) (characterizing as "puffery" statements that issuer's risk management program was "highly disciplined" and finding that such statements would not be relied upon by a reasonable investor because [*122] they "did not, and could not, amount to a guarantee that [the issuer's] choices would prevent failures in its risk management practices"). Because Plaintiffs have not pleaded with particularity the false and misleading nature of BP's statements related to the Company's risk management capabilities, the challenged statements are not actionable. [33]

> 33   The nonactionable statements are those contained in Misrepresentations 1 (Compl. ¶ 376), 2 (*Id.*), 3 (*Id.* ¶ 377) and 9 (*Id.* ¶ 374).

### d. *Misrepresentations regarding BP's capacity to respond to spills*

According to Plaintiffs, the fourth category of misrepresentations includes statements related to BP's capacity to respond to spill incidents. These statements are contained in BP's IEP, Rainey's testimony before a Senate committee, BP's 2009 Sustainability Report, and miscellaneous speeches given by Defendant McKay. Plaintiffs' allegations relating to BP's inability to respond to spills and those relating to its failure to implement OMS are intertwined to the extent that Plaintiffs rely on the failed implementation of OMS to demonstrate the falsity of BP's representations regarding its ability to respond to spills.

### i. Particularity

*(a) The Initial* [*123] *Exploration Plan (IEP) (App. Stmt. No. 16)*

According to Plaintiffs, BP's misrepresentations about its response plans are found in the IEP for the Mississippi Canyon Block 252. (Compl. ¶ 192.) BP submitted the IEP to the MMS in compliance with federal regulations requiring BP to demonstrate it had planned and prepared to conduct drilling in a safe manner. (*Id.* ¶¶ 198, 357-60.) The IEP for the site was published on March 10, 2009.

Plaintiffs have alleged several misrepresentations in the IEP relating to BP's capacity to respond to spills. First, in connection with the IEP, BP sought a permit to drill to a total depth of 19,650 feet at the Macondo site. After the Deepwater Horizon spill, a BP crewman admitted that this depth had been misrepresented to MMS, and that BP has in fact been drilling in excess of 22,000 feet, in violation of its permit. (*Id.* ¶ 200.) [34] Second, the IEP stated that "it is unlikely that an accidental surface or subsurface spill would occur from the proposed activity" at the site. (App. Stmt. No. 16; Compl. ¶ 356.) Plaintiffs allege this statement was false not only because BP failed to implement the OMS program on the Deepwater Horizon, which would have included [*124] a spill response plan, but also because, as the Presidential Commission concluded, there was "nothing to suggest that BP's engineering team conducted a formal, disciplined analysis of the combined impact of these risk factors on the prospects of a successful cement job." (*Id.* ¶ 281.) In addition, both BP Chief Operating Officer Doug Suttles ("Suttles") and Defendant McKay made damaging post-spill admissions, acknowledging that BP did not actually have a proven response plan and that BP's "contingency plans were inadequate" and "ma[de] up day to day." (*Id.* ¶ 362.) Third, Plaintiffs allege that BP falsely assured the MMS that it was prepared to respond to a worst-case discharge scenario of 162,000 gallons of oil per day. (*Id.* ¶ 356.) When the Deepwater Horizon spill occurred, it was readily apparent that BP was incapable of containing a spill amount only a fraction of the amount represented in the IEP. (*Id.*)

> 34   The BP crewman is not named or otherwise identified in the Complaint.

Plaintiffs also allege that the IEP omitted information required by law. Plaintiffs point to federal regulations requiring the IEP to include "oil and hazardous substance spills information," "a scenario for the [*125] potential blowout," and an oil spill response plan comparing the appropriate worst-case discharge scenario to that in the IEP. (*Id.* ¶¶ 358-62.) According to Plaintiffs, BP had no internal safety and risk management processes that satisfied these regulations. Following the spill, Suttles acknowledged that BP did not have a response plan with "proven equipment and technology." (*Id.* ¶ 362.) In addition, Defendant Hayward subsequently admitted, "'What is undoubtedly true is that we did not have the tools you would want in your tool kit,' and it was 'an entirely fair criticism' to say the company had not been

fully prepared for a deep-water oil leak." (*Id.* ¶ 286.)

Plaintiffs have sufficiently pleaded facts to demonstrate that BP misrepresented the size of the spill it was prepared to respond to in the Gulf and misrepresented the Company's general spill response capabilities. [35] BP claimed it was prepared to respond to a spill of up to 162,000 barrels of oil per day, but when the Deepwater Horizon spill occurred, BP proved utterly unable to respond adequately. In addition, federal regulations set minimum requirements for BP's contingency plans, and Plaintiffs have adequately alleged, relying [*126] on both the IEP and post-spill admissions made by Suttles and Hayward, that BP in fact lacked adequate contingency plans. Further, the alleged facts suggest that BP's IEP was not in compliance with federal regulations and BP in fact violated MMS regulations both in its IEP and in drilling deeper at the Macondo site than was allowed. These facts are sufficient to call into question BP's representation that an accidental spill was "unlikely," and Statement 16 is, therefore, actionable. (Compl. ¶ 356.)

> 35 Defendants do not challenge the alleged falsity of the statements contained in the IEP. Instead, this is a fraud on the market case, Defendants argued that Plaintiffs had not adequately pleaded reliance on the alleged misrepresentations and omissions because Plaintiffs did not allege that the IEP was "publicly disseminated" during the Class Period. (Doc. No. 152, at 30.) Although they subsequently withdrew their reliance argument, Defendants still maintain that Plaintiffs have not adequately alleged scienter. (Doc. No. 219, at 13.)

*(b) Rainey's Senate Testimony (App. Stmt. No. 17)*

Plaintiffs also identify as false and misleading testimony that Rainey, BP's Vice President for Gulf [*127] of Mexico Exploration for BP America, provided to the U.S. Senate and Energy and Natural Resources Committee in November 2009. On that occasion, Rainey stated:

> - "While our intent is to prevent all accidental discharges, we conduct regular emergency drills with local, state, and federal agencies. All of our production facilities have contingency plans that identify the procedures, response

equipment, and key personnel needed for responding to incidents." (App. Stmt. No. 17; Compl. ¶ 370.)

Plaintiffs contend Rainey's testimony was false and misleading because BP had not in fact implemented OMS in the Gulf and, therefore, the Deepwater Horizon rig did not have a contingency plan in place. (Compl. ¶ 334.) Plaintiffs also re-urge the information obtained from CW1 and CW2 confirming that, even as late as 2009 and 2010, BP's OMS program remained in its infancy stages. (*Id.*) The 2009 audit of the Deepwater Horizon further confirmed that rig crew members were not knowledgeable about well operation practices. (*Id.* ¶ 343.) BP's cost-cutting measures also removed key individuals with knowledge of safety procedures and OMS from their posts in the Gulf. (*Id.* ¶ 335.) Finally, as part of the post-spill [*128] investigation, the Presidential Commission concluded that there was "nothing to suggest that BP's engineering team conducted a formal, disciplined analysis of . . . risk factors." (*Id.* ¶ 281.) According to BP's own internal reporting, decisions regarding the Macondo well "appear to have been made by the BP Macondo well team in an ad hoc fashion." (*Id.* ¶ 296.) The alleged facts undermine Rainey's assertion that "all [BP] production facilities" had contingency plans and the "key personnel" needed to adequately respond to spill incidents, and Plaintiffs have pleaded with particularity the false and misleading nature of Rainey's statement.

*(c) 2009 Sustainability Report (App. Stmt. Nos. 32-35)*

Plaintiffs also allege that the following statements, found in BP's 2009 Sustainability Report, falsely represented BP's spill response preparedness:

> - "[W]e seek to ensure an infrastructure is in place to deal effectively with spills and their impacts. Our operating facilities have the capacity and resources to respond to spill incidents and we participate in industry and international forums to coordinate planning and emergency response." (App. Stmt. No. 32; Compl. ¶ 410.)

> - "Incidents are recorded [*129] locally by our staff and contractors using our web-based incident tracking system.

BP's executive management is notified quarterly about numbers and volumes of spills and spills of more than 100 barrels." (App. Stmt. No. 33; Compl. ¶ 410.)

- "BP recognizes the risk posed to the environment from spills and takes a range of measures to prevent any loss of hydrocarbons." (App. Stmt. No. 34; Compl. ¶ 410.)

- "To track our progress in process safety management, we measure lagging indicators which record events that have already occurred, such as oil spills, and leading indicators that focus on the strength of our controls to prevent undesired incidents, such as inspections and test of safety-critical equipment." (App. Stmt. No. 35; Compl. ¶ 410.)

Plaintiffs allege the same facts discussed above to demonstrate the falsity of these statements. These facts only support allegations of falsity with respect to the first statement identified in the Sustainability Report. (App. Stmt. No. 32; Compl. ¶ 410.) As discussed above, Plaintiffs have called into question whether the Deepwater Horizon was covered under BP's OMS program and they have also pointed to specific deficiencies on the rig that undermine [*130] the assertion that BP's operating facilities all had the resources "to deal effectively with spills." For the reasons discussed above, Plaintiffs have alleged facts sufficient to plead with particularity the falsity of this statement.

The remaining three statements are not actionable. First, the statement that BP "recognizes the risk" is too vague a statement to be demonstrably false or misleading. (App. Stmt. No. 34; Compl. ¶ 34.) The remaining two statements suffer from the opposite deficiency: the facts Plaintiffs' allege are not tailored to the very detailed assertions contained in the statements. Plaintiffs have done nothing to suggest that BP staff did not in fact use a "web-based incident tracking system" and report spill incidents to BP's executive management. (App. Stmt. No. 33; Compl. ¶ 410.) Plaintiffs' prior assertions about BP's creation of the GORC and the SEEAC to address safety incidents actually suggests the opposite. (Compl. ¶ 411.) Similarly, Plaintiffs have raised no facts to undermine the claim that BP relied on "lagging" and "leading" indicators to track progress. (App. Stmt. No. 35; Compl. ¶ 410.)

*(d) Howard Weil Conference Statement (App. Stmt. No. 10)*

During the [*131] Howard Weil Conference in March 2010, McKay stated that "managing costs down does not mean BP will be skimping when it comes to ensuring our operations remain safe, reliable and compliant in the years ahead." (App. Stmt. No. 10; Compl. ¶ 365.) Plaintiffs claim this statement was false because BP was aware, through internal presentations, that it was facing a shortage of offshore workers, that additional personnel training was needed, that "Best Practices" had not been implemented, that cost-cutting measures meant the appropriate employees were not stationed in the Gulf, and that OMS had not been implemented. (*Id.* ¶¶ 440, 345, 335.) Plaintiffs have not adequately alleged the falsity of this statement, primarily because the statement is made in general, vague terms, without any specific promise as to how BP intended to "manage costs down." The statement refers to managing cost in the abstract, not in relation to the Deepwater Horizon rig or even BP's Gulf operations. In addition, McKay's statement specifically refers to "the years ahead" and makes no representation about the state of BP's current operations at the time the statement was made. Plaintiffs have not pleaded the statement [*132] by McKay with sufficient particularity as required under the PSLRA and Rule 9(b) and, as a result, the alleged misrepresentation is not actionable.

**ii. Materiality**

Defendants claim that the statements related to BP's spill response capabilities could not have been misleading to investors because such statements were revealed to be inadequate days after the Deepwater Horizon explosion, when investors were already aware of the catastrophe. Given this timeline, Defendants claim that any inaccuracies or omissions became material only in hindsight and therefore could not have been material to investors at the time the statements were made. (Doc. No. 152, at 24-25.)

The Court is not persuaded that the statements about BP's ability to respond to a spill in the Gulf were immaterial. Prior to the Deepwater Horizon disaster, BP filed a very detailed document—the IEP—outlining its ability to prevent and respond to accidents in the Gulf. The document contained specific spill estimates for the

Macondo well site and assurances that the Company was prepared to respond to a spill of up to 162,000 barrels of oil per day at the site. (Compl. ¶ 356.) Knowledge that BP's response capability was vastly overstated [*133] and that the Company in fact did not implement process safety reforms in the Gulf or on the Deepwater Horizon would have indeed altered the "total mix of information" available to investors and, possibly, undercut their confidence in their investment. "The omission of a known risk, its probability of materialization, and its anticipated magnitude, are usually material to any disclosure." *Lormand*, 565 F.3d at 248. The statements Plaintiffs highlight falsely assured investors that BP would have everything under control if a spill occurred in the Gulf. The Deepwater Horizon incident revealed the depth of that deception. The Court cannot say here, on the basis of the Complaint and Defendants' arguments, that the misrepresentations related to BP's spill response capabilities are immaterial as a matter of law.

### e. Misrepresentation of safety as BP's highest priority (App. Stmt. Nos. 4, 6-7, 11-12, 14, 20-28, 31)

The remaining statements Plaintiffs have highlighted as misrepresentations all fall under BP's general misrepresentation that BP would make safety its highest priority. Sixteen of the thirty-five alleged misrepresentations Plaintiffs identify are examples of this misrepresentation. [*134] They include statements found in BP's 2008 Annual Report, the "Group Chief Executive's Review" portion of the 2009 Annual Review, BP's 2009 Annual Report, BP's publicly available Code of Conduct, the Company's 2009 Sustainability Review and Sustainability Report, one of BP's "Strategy Presentations" in London, and statements made by Defendant McKay at the Howard Weil Energy Conference. *See* App. Stmt No. 12, Compl. ¶ 353 ("Throughout 2008, senior leadership across the group continued to hold safety as their highest priority."); App. Stmt No. 14, Compl. ¶ 353 ("We remain fully committed to becoming a recognized industry leader in process safety management."); App. Stmt. No. 4, Compl. ¶ 378 ("Achieving safe, reliable and compliant operations is our number one priority and the foundation stone for good business."); App. Stmt. No. 11, Compl. ¶ 365 (McKay: "Safety will continue to have first call on the company resources."); App. Stmt. No. 7, Compl. ¶ 380 (Inglis: "Safety, both personal and process, remains our highest priority."); App. Stmt. No. 20, Compl. ¶ 390 ("[S]afe and reliable operations remains #1"); App. Stmt. No. 21,

Compl. ¶ 394 ("The priorities that drove our success for 2009--safety, [*135] people and performance--remain the foundation of our agenda."); App. Stmt. No. 22, Compl. ¶ 394 ("In Exploration and Production, safety, both personal and process, remains our highest priority."); App. Stmt. No. 23, Compl. ¶ 394 ("Our priorities remain the same, safety people and performance, focusing on the delivery of safe, reliable and efficient operations. In 2010, we aim to use the momentum generated in 2009 to continue to improve operational, cost and capital efficiency, while ensuring we maintain our priorities of safe, reliable and efficient operations."); App. Stmt. No. 24, Compl. ¶ 406 (Code of Conduct: "no activity is so important that it cannot be done safely," "stop any work that becomes unsafe," "make sure you know what to do if an emergency occurs at your place of work," "only undertake work for which you are trained, competent, medically fit and sufficiently rested and alert to carry out."); App. Stmt. No. 25, Compl. ¶ 408 ("Our commitment to safe and reliable operations starts with the group chief executive and leadership: a commitment that filters down through the organization and is regularly communicated to all staff."); App. Stmt. No. 6, Compl. ¶¶ 408, 410 (Hayward: [*136] "I am extremely proud of BP's 2009 safety performance--it reflects a sustained effort across all our operations over many years."); App. Stmt. No. 26, Compl. ¶ 410 ("BP constantly seeks to improve its safety performance through the procedures, processes and training programmes that we implement in pursuit of our goal of no accidents, no harm to people and no damage to the environment."); App. Stmt. No. 27, Compl. ¶ 410 ("We believe our focus on changing BP's safety culture over the last few years is yielding results."); App. Stmt. No. 28, Compl. ¶ 410 ("BP has well-developed systems, processes and metrics for reporting safety performance in support of internal performance management and to enable learning and public reporting."); App. Stmt. No. 31, Compl. ¶ 410 ("BP is fully committed to becoming a recognized industry leader in process safety management and continues to work to achieve this.").

### i. Particularity

The statements Plaintiffs identify all express some variation of BP's promise to make safety a priority. Plaintiffs allege that such statements were false for a variety of reasons. Plaintiffs claim that global cost-cutting restructuring measures led BP to transfer or terminate [*137] individual employees critical to the successful

implementation of OMS. (Compl. ¶ 335.) BP failed to implement best practices, such as hiring personnel experienced in safety and risk management. (*Id.* ¶ 345.) Plaintiffs also claim that their allegations specifically related to OMS--such as the failure to implement OMS and OMS's lag behind comparable programs among BP's industry peers--further demonstrate the falsity of BP's claims that it was prioritizing safety. BP also failed to create a "global safety division" until January 2011, even though the idea was first presented to the Board of Directors as early as 2001. (*Id.* ¶ 346.) Plaintiffs also challenge BP's allocation of its revenue, arguing that the fact that BP spent only .0033 percent of its 2009 revenue on "research and development for safer offshore drilling technologies" belies any suggestion that the Company was truly putting safety first. (*Id.* ¶ 307.) Plaintiffs further allege that BP's tight cost budget delayed maintenance on the Atlantis rig. (*Id.* ¶ 169.)

Plaintiffs also point to specific problems on several of BP's rigs in the Gulf. For example, tubing in the Atlantis rig ruptured in 2008, causing a small oil spill. Following [*138] the spill, BP employee Kenneth Abbott developed a database detailing the completion and approval status of required engineering documents on the Atlantis. (*Id.* ¶¶ 172-74.) Abbott's database revealed that a majority of the documents had never received approval at any phase of development. (*Id.*) With respect to the Deepwater Horizon rig, Plaintiffs point to post-spill findings by the Presidential Commission noting that "BP's management process did not adequately identify or address risks" at the Macondo well and that the Deepwater Horizon crew "had not been trained adequately in how to respond to an emergency situation." (*Id.* ¶¶ 272, 314-16.) Plaintiffs also allege that both the Atlantis and Deepwater Horizon rigs violated MMS drilling regulations: the Atlantis apparently lacked MMS-required engineering documents and the Deepwater Horizon drilled deeper than allowed under its MMS permit. (*Id.* ¶¶ 180, 440.) An internal BP presentation from May 2009 revealed a shortage of experienced offshore workers on both rigs. (*Id.* ¶ 440.) And a September 2009 audit concluded that safety goals were not commonly known or communicated on the rigs. (*Id.* ¶ 311.)

Defendants counter that all statements about [*139] "safety in general," BP's commitment to improving process safety, and statements about BP's progress in implementing process safety measures are neither misleading nor material. (Doc. No. 152, at 15-18.) Defendants contend that such statements are not actionable because they lack "a standard against which a reasonable investor could expect them to be pegged." *Bridgestone*, 399 F.3d at 671. Defendants characterize the statements related to BP's progress on process safety measures as "generalized positive statements" and argue, correctly, that such statements cannot serve as a basis for liability. (Doc. No. 150, at 16.)

General statements about corporate "progress" are "too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem to be important to a securities investment decision." *Bridgestone*, 399 F.3d at 671; *see also Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 870 (5th Cir. 2003) ("'[M]aking steady progress' is precisely the sort of generalized positive characterization that is not actionable under the securities laws."). The statements listed above are all in this vein, as they are generalized statements about BP's "commitment to safety," [*140] placement of "safety as the number one priority," and its leadership in "process safety management." (Compl. ¶¶ 269, 273, 275.) Even the very specific facts Plaintiffs allege to show the falsity of the statements cannot confirm or deny whether "progress" was being made or whether safety was truly being "prioritized" as "# 1" or the "highest priority." Because Plaintiffs have failed to plead any misrepresentations related to BP's prioritization of safety with the particularity required under Rule 9(b) and the PSLRA, the identified statements are not actionable. [36]

36  The nonactionable statements in this category include Misrepresentation Nos. 4 (Compl. ¶ 378), 6 (*Id.* ¶ 408), 7 (*Id.* ¶ 380), 11 (*Id.* ¶ 365), 12, 14 (*Id.* ¶ 353), 20 (*Id.* ¶ 390), 21-23 (*Id.* ¶ 394), 24 (*Id.* ¶ 406), 25 (*Id.* ¶ 408), 26-28 (*Id.* ¶ 410), 31 (*Id.* ¶ 410).

## ii. Materiality

All of the statements Plaintiffs identify are simply different iterations of BP's general message about prioritizing safety. Not only have Plaintiffs failed to plead the identified statements with the particularity required under the PSLRA, but such statements are immaterial to investors. A "company's expressions of confidence in its management or business [*141] are not actionable." *Rosenzweig*, 332 F.3d at 869; *see, e.g., In re MCI Worldcom, Inc. Secs. Litig.*, 191 F. Supp. 2d 778, 785 (S.D. Miss. 2002) (holding immaterial statements that

"[t]he fundamentals of our business remain strong" and "[w]e are leading the charge into this new era"); *see also Raab v. Gen. Physics Corp.*, 4 F.3d 286, 290 (4th Cir. 1993) (holding that "[a]nalysts and arbitragers rely on facts in determining the value of a security, not mere expressions of optimism from a company spokesman."). "Progress" on making safety a "priority" is too illusory a metric, and a generalized commitment to prioritize safety is simply too vague a message to be proven material. Because the sixteen statements Plaintiffs identify are neither pleaded with particularity nor material, these statements are not actionable.

### 3. Scienter

To adequately plead scienter and survive Defendants' motion to dismiss, the Complaint must state with particularity enough facts to raise an inference of scienter on the part of at least one Individual Defendant with regard to at least one allegedly fraudulent statement, and that inference must be such that a reasonable person would conclude that it is at least as compelling [*142] as any opposing inference. *See Tellabs*, 551 U.S. at 326; *Shaw Group*, 537 F.3d at 533-34. "The critical issue in a motion to dismiss based on insufficient allegations of scienter is whether the allegations of fraud contained in a plaintiffs' complaint are sufficiently connected to each of the defendants such that a strong inference of scienter on their part is appropriate." *In re Franklin Bank*, 782 F. Supp. 2d 364, 387 (S.D. Tex. 2011). Thus, the Court must consider whether Plaintiffs have satisfied the heightened pleading requirements for proving scienter as to each Individual Defendant against whom Plaintiffs allege section 10(b) violations.

#### a. *Scienter as to Individual Defendants*

Defendants take issue with what they characterize as Plaintiffs' repeated "group pleading," *i.e.*, the Complaint references "Defendants," "BP's officers and directors," "senior management," or "BP" as an undifferentiated unit rather than specifically alleging actions or omissions attributable to each named defendant. (Doc. No. 152, at 35.) Because the Fifth Circuit has rejected the group pleading approach, Plaintiffs are required to "distinguish among defendants and allege the role of each with respect to 'each [*143] act or omission' in the alleged fraud." *In re TETRA Techs.*, 2009 U.S. Dist. LEXIS 126687, 2009 WL 6325540, at *3; *see also Shaw Group*, 537 F.3d at 533 (rejecting the group pleading approach to scienter in the Fifth Circuit). The Court must therefore disregard all

group pleaded allegations in the Complaint and undertake scienter analysis only where Plaintiffs have specifically tethered an alleged misrepresentation or omission to one or more of the Individual Defendants. *See Southland*, 365 F.3d at 365 (explaining that plaintiffs "must allege facts sufficient to raise a strong inference of scienter with respect to each individual defendants").

As a threshold matter, the Court dismisses Plaintiffs' claims against Individual Defendants McKay and Svanberg. [37] Of the thirty-five alleged misrepresentations, Plaintiffs attribute two statements to McKay and one statement to Svanberg. [38] Because the Court has already decided above that none of the statements attributable to McKay and Svanberg are actionable, Plaintiffs cannot demonstrate scienter as to either McKay or Svanberg. *See supra* Sections V.2.c.i.(c), V.2.d.i.(d), V.2.e.; *see also Blackwell*, 440 F.3d at 287 (explaining that a complaint must specifically tie the individual [*144] defendants to the statements or omissions, or it will fail under the PSLRA's heightened pleading standard).

> [37] Plaintiffs name nine Individual Defendants. They allege section 10(b) violations only with respect to four of them: Hayward, Inglis, McKay, and Svanberg.
>
> [38] The Court does not reach the issue of personal jurisdiction because the Court dismisses Plaintiffs' claims against Defendant Svanberg for failure to adequately allege scienter. (Doc. No. 152, at 49.)

#### i. Hayward

Plaintiffs attribute six misrepresentations to Hayward, four found in BP's 2009 Annual Review and two from the 2009 Sustainability Review and Sustainability Report. (App. Stmt. Nos. 1-6.) As discussed above, only one of the statements attributable to Hayward--the statement in the 2009 Sustainability Review claiming that OMS was introduced in the Gulf in 2008--is pleaded with the required particularity. *See* App. Stmt. No. 5, Compl. ¶ 408 ("Having been initially introduced at 8 sites in 2008, the OMS rollout extended to 70 sites by the end of 2009 . . . [t]his means implementation is 80% complete.").

Defendants argue that Plaintiffs have failed to adequately plead scienter with respect to Hayward and instead rest their allegations [*145] on Hayward's

corporate position and job title. Plaintiffs assert that Hayward was CEO, Chairman of the GORC, and executive liaison to the SEEAC and, therefore, had specific duties as a Board member. (*Id.* ¶¶ 24, 427-28.) Because the GORC was "charged with providing process safety oversight by conducting regular reviews of incidents" and "detailed examinations of safety-related activities," Plaintiffs contend that Hayward would have "regularly been provided" analyses and data, including information on compliance violations, fines and penalties, and reportable incidents. (*Id.* ¶ 428.)

Plaintiffs also list thirty-eight additional facts that "Defendants" allegedly knew or recklessly disregarded. (*Id.* ¶ 440.) Only two of these ostensible facts allege something that Hayward himself either did or said. [39] First, as a GORC member, Hayward was allegedly aware of the problems on the Atlantis rig and the failing test results of critical pieces of safety equipment on the Deepwater Horizon. (*Id.* ¶ 440.) Second, subsequent to the spill, Hayward admitted that "BP's contingency plans were inadequate," and that the company had been "making it up day to day." (*Id.*) Finally, Plaintiffs point out that 70% [*146] of Hayward's performance bonus was based on the achievement of financial metrics and only 15% was based on safety (and not process safety specifically). (*Id.* ¶¶ 165, 436.) Plaintiffs cite the disparity as further evidence of scienter. (*Id.*)

> [39]     The remainder of the list refers to facts allegedly communicated to "BP's Senior Management," "BP," "senior staff" or no named individual at all. (Compl. ¶ 440.)

"Incentive compensation" cannot serve as the predicate for an allegation of fraud. *Abrams*, 292 F.3d at 434 ("It does not follow that because executives have components of their compensation keyed to performance, one can infer fraudulent intent."). At bottom, all of Plaintiffs' other scienter allegations rest entirely on Hayward's membership on the GORC. Broad, conclusory allegations of scienter against Hayward, based solely on his position as CEO and a member of the GORC, are insufficient to meet the heightened pleading standard of Rule 9(b) and the PSLRA. *See Shaw Group*, 537 F.3d at 535 (explaining that pleadings of scienter may not rest on the inference that a defendant must have been aware of a fraudulent statement based on his position in the company). Plaintiffs suggest that membership [*147] in the GORC is entitled to more weight in the scienter

analysis than a mere corporate title or position in the company. But Plaintiffs fail to allege facts sufficient to distinguish membership in the GORC from general membership in the Company as an officer or director.

The allegations regarding Hayward's access to "analyses and data" and other reports pursuant to his GORC membership are inadequate. Plaintiffs provide very little detail about the source of the reports and data Hayward supposedly received. For example, Plaintiffs allege that BP had an "internal web-based data management system" that compiled any reported safety incidents, including problems on the rigs in the Gulf, and Plaintiffs claim that Hayward had access to the system as a member of the GORC. (*Id.* ¶ 432.) An unnamed senior BP safety employee also confirmed that an internal database was utilized and accessible for all recorded safety incidents. [40] (*Id.* ¶ 433.) An unnamed BP safety analyst testified that he had prepared reports regarding safety incidents that were delivered to the Board or a Board representative. (*Id.* ¶ 434.) A senior member of the BP internal audit team testified that Gulf operations were audited [*148] by an audit risk team, which reported to the full Board of Directors. (*Id.* ¶ 435.) "[U]nsupported general claim[s] about the existence of confidential corporate reports that reveal information contrary to reported accounts is insufficient to survive a motion to dismiss." *Abrams*, 292 F.3d at 432. Here, all the allegations lack corroborating details about the content of the reports, their authors, and their specific recipients. *Id.* at 431-32 (finding that allegations that "senior level executives" received "unidentified daily, weekly and monthly financial reports" was insufficient to establish scienter); *see also Goldstein v. MCI WorldCom*, 340 F.3d 238, 253 (5th Cir. 2003) (noting that the allegations "that the individual defendants (the CEO and CFO) received daily, weekly, and monthly financial reports that appraised them of the company's true financial status" were insufficient and overly general); *ABC Arbitrage*, 291 F.3d at 358 (allegations concerning "regular reports" from specified subsidiary to parent and to parent's CEO and named member of executive committee insufficient because "any such 'regular reports' are insufficiently identified as to who prepared them and how frequently [*149] they were prepared"); *Southland*, 365 F.3d at 370 ("An unsupported general claim of the existence of company reports reflecting contrary information is insufficient to survive a motion to dismiss.").

> [40]     Plaintiffs state that they withhold the names

and titles of the employees in compliance with the confidentiality agreements in place in this action as well as in MDL 2179.

Plaintiffs "need[] to specify the internal reports, who prepared them and when, how firm the numbers were or which company officers reviewed them." *ABC Arbitrage*, 291 F.3d at 356. Plaintiffs fail to do so here. Plaintiffs provide no details regarding the contents of the reports Hayward received, whether Hayward was the determined recipient (or whether such reports were sent en masse to GORC members), or the frequency with which such reports were prepared and distributed. The additional allegations that Hayward had access to an internal web-based data management system suffers from the same deficiency. Plaintiffs have not alleged facts sufficient to demonstrate that Hayward has access to information contradicting his representations about OMS and BP's success in implementing OMS. [41] As a member of the GORC, Hayward may  [*150] indeed have been privy to information related to BP's process safety measures; however, Plaintiffs have failed to identify any such information. As a result, they cannot provide a "cogent and compelling" inference of scienter with respect to Hayward. The Court therefore dismisses Plaintiffs' claims against Hayward.

> 41  During oral argument, Plaintiffs cited various statements made by Defendant Hayward during a deposition taken in connection with the MDL 2179 docket. While the Court recognizes the significant weight these statements could lend to Plaintiffs' scienter allegations, the Court cannot consider additional evidence outside the Complaint at this time.

### ii. Inglis

Inglis was an Executive Director and the Chief Executive of Exploration and Production from 2007 to October 31, 2010. (Compl. ¶ 26.) Plaintiffs attribute two of the thirty-five alleged misrepresentations to Inglis. (App. Stmt. Nos. 7-8; Compl. ¶¶ 380, 401.) Following the Court's analysis above, only the statement Inglis made as part of a speech at the Howard Weil Conference in March 2010 is alleged with particularity.

Plaintiffs allege the same facts in support of scienter as they do with respect to Defendant Hayward. Because [*151] Inglis was a member of the GORC and attended meetings of the SEEAC, Plaintiffs contend that Inglis,

like Hayward, had access to "reports, "analyses and data," and the "internal web-based data management system." (*Id.* ¶¶ 427-428, 433.) Plaintiffs also suggest, in the long list of additional facts known to "Defendants," that Inglis, too, was aware of problems with the Gulf Rig Atlantis and failed test results of Deepwater Horizon's safety equipment. (*Id.* ¶ 440.) Defendants argue that all of the scienter allegations are based solely on Inglis's position within the Company. Defendants also argue that Plaintiffs do not rely on the content of any of the documents Inglis allegedly received in formulating their allegations against him and thus the scienter allegations fail to connect Inglis to the false statements.

Plaintiffs have alleged no specific scienter allegations with respect to Inglis, and their allegations fail for the same reasons discussed above with respect to Hayward. Plaintiffs cannot rely on Inglis's position on the GORC, interaction with the SEEAC, and reports and other internal documents with no specified contents or authors. Plaintiffs have thus failed to plead scienter with [*152] respect to Inglis under the heightened pleading standards of Rule 9(b) and the PSLRA. The Court therefore dismisses Plaintiffs' claims against Inglis.

### b. Scienter as to Corporate Defendants

Turning to the potential section 10(b) liability of BP itself, the Court can treat as having been made by BP all the actionable misrepresentations contained in SEC filings, press releases, and other reports issued in BP's name because all of the Individual Defendants were executive officers of the Company whose actions were intended to benefit the Company. *See Southland*, 365 F.3d at 366. In addition, all misrepresentations attributable to individual defendants are also treated as having been made by BP, as "all of them appear from the face of the Complaint to have been made pursuant to their positions of authority within the company." *Id.* Because Plaintiffs have failed to adequately allege scienter with respect to all of the Individual Defendants, the Court is left to determine whether Plaintiffs have adequately alleged scienter for the remaining corporate statements not attributed to any Individual Defendant.

Plaintiffs have alleged three actionable unattributed statements that appear in BP's 2008 [*153] Annual Report (App. Stmt. No. 13; Compl. ¶ 353), BP's 2009 Annual Review (App. Stmt. No. 18; Compl. ¶ 383), and BP's 2009 Sustainability Report (App. Stmt. No. 32; Compl. ¶ 410). In addition, Plaintiffs allege two

remaining actionable misrepresentations that they attribute to non-defendants: these include a statement in the IEP (App. Stmt. No. 16; Compl. ¶ 356) and testimony attributed to Rainey (App. Stmt. No. 15; Compl. ¶ 370).

In order to adequately plead scienter as to a corporate defendant, Plaintiffs must link the statement to a corporate officer who can be seen as acting on behalf of the corporation in making the statement. *Southland*, 365 F.3d at 366 ("A defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter, i.e., knows that the statement is false, or is at least deliberately reckless as to its falsity, at the time he or she makes the statement."). General common law principles support the logic in circumscribing corporate scienter. Because "an essentially subjective state of mind" is an element of a cause of action for fraud, "the required state of mind must actually [*154] exist in the individual making (or being a cause of the making of) the misrepresentation," and may not simply be imputed to the corporation on general principles of agency. *Id.*; *see also Tellabs II*, 513 F.3d at 707 ("The problem with inferring a collective intent to deceive behind the act of a corporation is that the hierarchical and differentiated corporate structure makes it quite plausible that a fraud, though ordinarily not a deliberate act, could be the result of a series of acts none of which was done with scienter and imputable to the company by the doctrine of respondeat superior.").

The Seventh Circuit recently outlined the only way around this dead-end for unattributed corporate statements, hypothesizing that "it is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted the fraud." *Tellabs II*, 513 F.3d at 710. By way of example, the *Tellabs II* court cited a hypothetical announcement by General Motors that it had sold one million SUVs in a given year when it had in fact sold zero. *Id.* Subsequent courts to have considered application of this potential roundabout have underscored that it is narrow indeed. *See, e.g., In re Dell Sec. Litig.*, 591 F. Supp. 2d 877, 899 (W.D. Tex. 2008) [*155] (noting that "the situation envisioned by the [Tellabs] court was one where the false or misleading announcement was so dramatic [it] would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false.") (internal citations omitted).

In examining corporate scienter with respect to the statements contained in the IEP the "critical question, therefore, is how likely is it that the allegedly false statements . . . were the result of merely careless mistakes at the management level based on false information fed it from below, rather than of an intent to deceive or a reckless indifference to whether the statements were misleading." 513 F.3d at 709. On the one hand, the errors contained in the IEP are glaring and egregious. The IEP estimated the worst case scenario of a spill occurring in the Mississippi Canyon Block 252 specifically at 162,000 barrels per day. (Compl. ¶ 356.) The difference between what BP was actually able to recover and what it claimed it could recover is so great that the projected numbers in the IEP appeared to have been invented out of thin air, and the IEP's assertion that "it [wa]s unlikely that an [*156] accidental surface or subsurface spill would occur from the proposed activity" at the Macondo well site appears misleading. (*Id.*) Plaintiffs have also alleged that the IEP contained even more explicit falsities: BP requested a permit to drill to a depth of 19,650 feet at the Macondo site yet drilled "in excess of 22,000 feet, in violation of its permit." (*Id.* ¶ 200.) The false estimates and outright misrepresentations of BP's capabilities and intentions at the Macondo site weigh in favor of a finding of reckless indifference with respect to the Corporate Defendants, as such blatant errors seem to reflect BP's utter disregard for the potential magnitude of the damage an uncontainable spill could cause--and did cause--in the Gulf of Mexico.

On the other hand, the IEP clearly has an author. The cover page of the IEP lists "BP Exploration & Production Inc." at the bottom of the page; all subsequent pages in the document have BP Exploration & Production Inc. listed in the footer. (Doc. No. 112, Ex. B.) Thus, on every page, the document represents that BP Exploration & Production Inc. was the entity responsible for authorship. Plaintiffs could have sued this corporate entity, but they have [*157] not. While it is possible that the allegedly false statements in the IEP were based on "a reckless indifference as to whether the statements were misleading," as required for a finding of corporate scienter, Plaintiffs have not brought their claim against the responsible party. As a result, the misleading statements in the IEP are insufficient to support a finding of scienter with respect to the named Corporate Defendants. *See Janus Capital Group v. First Derivative Traders*, 131 S. Ct. 2296, 2302, 180 L. Ed. 2d 166 (2011) ("For purposes of Rule 10b-5, the maker of a statement is

the person or entity with ultimate authority over the statement, including its content and whether or how to communicate it."). The same rationale applies to Rainey's statement. (App. Stmt. No. 17; Compl. 370). Plaintiffs attribute the statement to Rainey, but they have not named Rainey as a defendant. Plaintiffs have thus failed to adequately plead corporate scienter with respect to both statements.

The remaining three unattributed statements contain misrepresentations as to the implementation status of OMS in the Gulf and the application of OMS across BP's facilities. (App. Stmt. Nos. 13, 18, 32; Compl. ¶¶ 353, 383, 410.) Once [*158] again, the question before this Court is whether the statements are more likely a reflection of mistakes at the management level based on false information or evidence of "an intent to deceive or a reckless indifference as to whether the statements were misleading." *Tellabs II*, 513 F.3d at 709. The three statements occurred over the course of a year and a half; indeed, more than a year separates the first two statements. While Plaintiffs have alleged facts supporting their argument that BP falsely represented the implementation status of OMS in the Gulf and failed to disclose the narrow reach of the program with respect to BP's operations, it is more likely that these three statements--all of which are highlighted as the lone falsity in lengthy public filings--are evidence of careless mistakes at the management level. Where individual misrepresentations are connected to no individual corporate officer, corporate scienter is severely circumscribed. The three statements here--made without an alleged corporate officer as a speaker, buried within BP's public filings, and separated by more than a year--do not give rise to the required strong inference of corporate scienter. Plaintiffs have [*159] thus failed to allege scienter with respect to the Corporate Defendants with respect to the unattributed misrepresentations and statements prepared by non-defendant individuals and entities.

**B. Section 20(a) claims**

Because the Court has found that Plaintiffs have failed to allege section 10(b) violations with respect to the Corporate Defendants and with respect to Defendants Hayward, Inglis, McKay and Svanberg, the remaining Individual Defendants--Castell, Anderson, Burgmans, Carroll, and Davis, Jr.?cannot be secondarily liable under section 20(a). [42]

> 42  Because the Court dismisses Plaintiffs' claims against Individual Defendants Burgmans, Castell, and Carroll, the Court does not reach the issue of whether it may exercise personal jurisdiction over these foreign Defendants.

**VI. CONCLUSION**

It is ordered that Defendants' Motion to Dismiss the Claims of BP ADS Purchasers in the Ludlow Plaintiffs' Consolidated Class Action Complaint (Doc. No. 151) is **GRANTED**. The Court is acutely aware that federal legislation and authoritative precedents have created for plaintiffs in all securities actions formidable challenges to successful pleading. Today's decision is a reflection of that. By no means, however, [*160] does the Court mean to signal that no pleadings Plaintiffs could proffer would be successful. An amended complaint may well be able to adduce additional information responsive to this Court's concerns. Should Plaintiffs wish to amend their Complaint, they are instructed to file an amended complaint in conformity with the rulings expressed in this Order within twenty days.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the 13th day of February, 2012.

/s/ Keith P. Ellison

KEITH P. ELLISON

UNITED STATES DISTRICT JUDGE

# EXHIBIT 5



IN RE: BP p.l.c., SECURITIES LITIGATION

MDL NO.: 10-md-2185,Civil Action No. 4:10-md-2185

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION

2012 U.S. Dist. LEXIS 17788

February 13, 2012, Decided
February 13, 2012, Filed

**SUBSEQUENT HISTORY:** Motion granted by, Complaint dismissed at In re BP p.l.c. Secs. Litig., 2012 U.S. Dist. LEXIS 44801 (S.D. Tex., Mar. 30, 2012)

**PRIOR HISTORY:** In re BP P.L.C., 2012 U.S. Dist. LEXIS 17787 (S.D. Tex., Feb. 13, 2012)

**COUNSEL:** [*1] For Robert Ludlow, Individually and on behalf of all others similarly situated, Plaintiff: Jordanna G Thigpen, LEAD ATTORNEY, Aron K Liang, Matthew K. Edling, Cotchett Pitre McCarthy, Burlingame, CA; Richard Warren Mithoff, Jr, LEAD ATTORNEY, Mithoff Law Firm, Houston, TX; Bryan M. Payne, PRO HAC VICE, Hester H. Cheng, PRO HAC VICE, Joseph W Cotchett, Mark C Molumphy, Nancy L Fineman, Cotchett Pitre et al, Burlingame, CA; James P Roy, Domengeaux Wright et al, Lafayette, LA; Victor S Elias, Cotchett Pitre & McCarthy LLP, Burlingame, CA; W Mark Lanier, The Lanier Law Firm, Houston, TX.

For Alan R Higgs, Individually and on behalf of all other similarly situated, Plaintiff: Ana M Cabassa, Sona R Shah, Zwerling Schachter & Zwerling LLP, New York, NY; Anthony Chu, Don K Ledgard, Capretz & Associates, Newport Beach, CA; James T Capretz, Attorney at Law, Newport Beach, CA; Robert S Schachter, Zwerling Schachter & Zwerling, New York, NY; W Mark Lanier, The Lanier Law Firm, Houston,

TX; Mary K Blasy, Scott and Scott LLP.

For Johnson Investment Counsel Inc, Individually and on behalf of all others similarly situated, Plaintiff: Dianne M Nast, Roda and Nast PC, Lancaster, PA; Richard J Arsenault, [*2] Neblett Beard et al, Alexandria, LA; Stanley M Chesley, Wilbert B Markovits, Waite Schneider Bayless Chesley Co LPA, Cincinnati, OH; W Mark Lanier, The Lanier Law Firm, Houston, TX.

For Thomas Yuen, Individually and on behalf of all others similarly situated, Sunmi Ahn, individually and on behalf of all other similarly situated, Plaintiffs: Deborah R Gross, Robert P Frutkin, Law Offices of Bernard M Gross PC, Philadelphia, PA; Kirk B Hulett, Sarah P Weber, Hulett Harper Stewart LLP, San Diego, CA; W Mark Lanier, The Lanier Law Firm, Houston, TX; Mary K Blasy, Scott and Scott LLP.

For John P Miles, Plaintiff: Albert M Myers, Michael A. Swick, Kahn Swick & Foti, LLC (Madisonville), Madisonville, LA; Amy Miller, Jeremy Friedman, PRO HAC VICE, Mark Lebovitch, PRO HAC VICE, Bernstein, Litowitz, Berger & Grossmann, LLP (New York), New York, NY; Gregory Anthony Gelderman, III, Bernstein, Litowitz, Berger & Grossmann, LLP (New Orleans), New Orleans, LA; Lewis Kahn, Kahn Swick & Foti LLC, Madisonville, LA; Paul S Balanon, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., New Orleans, LA; Thomas Robert Ajamie, Ajamie LLP, Houston, TX;

W Mark Lanier, The Lanier Law Firm, Houston, TX; Mary K Blasy, [*3] Scott and Scott LLP.

For Louisiana Municipal Police Employees' Retirement System, Plaintiff: Albert M Myers, Kahn Swick & Foti, LLC (Madisonville), Madisonville, LA; Amy Miller, Jeremy Friedman, PRO HAC VICE, Mark Lebovitch, PRO HAC VICE, Bernstein, Litowitz, Berger & Grossmann, LLP (New York), New York, NY; Gregory Anthony Gelderman, III, Bernstein, Litowitz, Berger & Grossmann, LLP (New Orleans), New Orleans, LA; Jeroen van Kwawegen, Bernstein Litowitz et al, New York, NY; John Alden Meade, Bernstein Litowitz Berger & Grossmann LLP, New Orleans, LA; Lewis Kahn, Kahn Swick & Foti LLC, Madisonville, LA; Paul S Balanon, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., New Orleans, LA; W Mark Lanier, The Lanier Law Firm, Houston, TX; Mary K Blasy, Scott and Scott LLP.

For City of New Orleans Employee's Retirement System, Plaintiff: Albert M Myers, Michael A. Swick, Kahn Swick & Foti, LLC (Madisonville), Madisonville, LA; Amy Miller, Jeremy Friedman, PRO HAC VICE, Mark Lebovitch, PRO HAC VICE, Bernstein, Litowitz, Berger & Grossmann, LLP (New York), New York, NY; Gregory Anthony Gelderman, III, Bernstein, Litowitz, Berger & Grossmann, LLP (New Orleans), New Orleans, LA; Lewis Kahn, Kahn [*4] Swick & Foti LLC, Madisonville, LA; Paul S Balanon, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., New Orleans, LA; Robert B Weintraub, Wolf Haldenstein et al, New York, NY; W Mark Lanier, The Lanier Law Firm, Houston, TX; Mary K Blasy, Scott and Scott LLP.

For Frances O. Goldman, Plaintiff: Albert M Myers, Michael A. Swick, Kahn Swick & Foti, LLC (Madisonville), Madisonville, LA; Amy Miller, Jeremy Friedman, PRO HAC VICE, Mark Lebovitch, PRO HAC VICE, Bernstein, Litowitz, Berger & Grossmann, LLP (New York), New York, NY; Gregory Anthony Gelderman, III, Bernstein, Litowitz, Berger & Grossmann, LLP (New Orleans), New Orleans, LA; Lewis Kahn, Kahn Swick & Foti LLC, Madisonville, LA; Paul S Balanon, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., New Orleans, LA; W Mark Lanier, The Lanier Law Firm, Houston, TX.

For Lore Greenfield, Individually and on behalf of all other similarly situated, Clay Dietrich, Robert Freedman, Rene Rogers, Southeast Pennsylvania Transportation Authority, Plaintiffs: W Mark Lanier, The Lanier Law

Firm, Houston, TX; Mary K Blasy, Scott and Scott LLP.

Eugene McClurg, Individually and on behalf of all others similarly situated, Plaintiff, Pro se.

For Victor Skomedal, [*5] Derivatively on Behalf of BP PLC, Plaintiff: Bryan L Clobes, Cafferty Faucher LLP, Philadelphia, PA; Jarrell Edward Godfrey, Jr., Jessica A. DeNisi, Godfrey Firm, PLC, New Orleans, LA; Vincent J. Esades, Heins, Mills & Olson, PLC, Minneapolis, MN; W Mark Lanier, The Lanier Law Firm, Houston, TX; Ellen Meriwether, Cafferty Faucher LLP; Mary K Blasy, Scott and Scott LLP.

For Cody A Nedved, Derivatively on Behalf of BP PLC, Plaintiff: Lionel Howard Sutton, III, Lionel Sutton, III, Attorney at Law, New Orleans, LA; W Mark Lanier, The Lanier Law Firm, Houston, TX; Mary K Blasy, Scott and Scott LLP.

For The Oklahoma Police Pension & Retirement System, Individually and on Behalf of All Others Similarly Situated, Plaintiff: Eric R Nowak, Harrell and Nowak, New Orleans, LA; W Mark Lanier, The Lanier Law Firm, Houston, TX; Mary K Blasy, Scott and Scott LLP.

For Ralph Whitley, Individually and on behalf of all others similarly situated, Plaintiff: Amber M. Nesbitt, Kenneth A. Wexler, Wexler Wallace LLP, Chicago, IL; Gregory M. Egleston, Egleston Law Firm, Brooklyn, NY; Olga Anna Posmyk, Stephen J Fearon, Jr, Squitieri & Fearon LLP, New York, NY; Scott D Egleston, PRO HAC VICE, Egleston Law Firm, [*6] New York, NY; W Mark Lanier, The Lanier Law Firm, Houston, TX; Mary K Blasy, Scott and Scott LLP.

For Charis Moule, on behalf of herself and all others similarly situated, Plaintiff: Arvind B. Khurana, PRO HAC VICE, Jennifer J. Sosa, PRO HAC VICE, Lori G Feldman, PRO HAC VICE, Sanford P. Dumain, PRO HAC VICE, Milberg LLP, New York, NY; Charles Robert Watkins, Donaldson & Guin, LLC, Chicago, IL; Evan M Janush, PRO HAC VICE, The Lanier Law Firm PLLC, New York, NY; Marvin Alan Miller, Matthew E Van Tine, Miller Law LLC, Chicago, IL; W Mark Lanier, The Lanier Law Firm, Houston, TX; William W Thomas, Behn & Wyetzner, Chtd., Chicago, IL.

For Syed Arshadullah, Ron Pierce, Individually and on behalf of all others similarly situated and on behalf of the BP Employee Savings Plan, BP Capital Accumulation

Plan, BP Partnership Savings Plan and the BP DirectSave Plan, Plaintiffs: Charles Robert Watkins, Donaldson & Guin, LLC, Chicago, IL; Robert A Izard, Jr, Izard Nobel LLP, West Hartford, CT; W Mark Lanier, The Lanier Law Firm, Houston, TX; William W Thomas, Behn & Wyetzner, Chtd., Chicago, IL; Mary K Blasy, Scott and Scott LLP.

For David M Humphries, on behalf of himself and all others similarly [*7] situated, Plaintiff: Dona Szak, Ajamie LLP, Houston, TX; Kim S. Zeldin, Ronald S Kravitz, Liner Yankelevitz Sunshine & Regenstreif LLP, San Francisco, CA; Laura Elizabeth Towbin, Mitchell L. Marinello, Novack and Macey, LLP, Chicago, IL; Thomas Robert Ajamie, Ajamie LLP, Houston, TX; W Mark Lanier, The Lanier Law Firm, Houston, TX; Mary K Blasy, Scott and Scott LLP.

For Jerry T. McGuire, Plaintiff: Arvind B. Khurana, Lori G Feldman, Sanford P. Dumain, Milberg LLP, New York, NY; Evan M Janush, PRO HAC VICE, The Lanier Law Firm PLLC, New York, NY; Jeffrey M Norton, Newman Ferrara LLP, New York, NY; Marvin Alan Miller, Matthew E Van Tine, Miller Law LLC, Chicago, IL; Robert I Harwood, Tanya Korkhov, Harwood Feffer LLP, New York, NY; W Mark Lanier, The Lanier Law Firm, Houston, TX; Mary K Blasy, Scott and Scott LLP.

For Edward F. Mineman, on behalf of himself and all others similarly situated, Plaintiff: Bruce C. Howard, Robert D. Allison, Steven Paul Schneck, Robert D. Allison & Associates, Chicago, IL; Edwin J Mills, Michael J. Klein, Stull Stull, New York, NY; Patrice Lyn Bishop, Stull, Stull & Brody, Los Angeles, CA; W Mark Lanier, The Lanier Law Firm, Houston, TX; Mary K Blasy, Scott [*8] and Scott LLP.

For Maureen S. Riely, Individually on behalf of the BP Employee Savings Plan, BP Capital Accumulation Plan, BP Partnership Savings Plan, BP DirectSave Plan, and on behalf of all others similarly situated, Plaintiff: Arvind B. Khurana, Lori G Feldman, Sanford P. Dumain, Milberg LLP, New York, NY; Evan M Janush, PRO HAC VICE, The Lanier Law Firm PLLC, New York, NY; Marvin Alan Miller, Matthew E Van Tine, Miller Law LLC, Chicago, IL; W Mark Lanier, The Lanier Law Firm, Houston, TX; Mary K Blasy, Scott and Scott LLP.

For Thomas P Soesman, Individually and on behalf of all others similarly situated, Plaintiff: Charles Robert Watkins, Donaldson & Guin, LLC, Chicago, IL; Thomas

J McKenna, Gainey and McKenna, New York, NY; W Mark Lanier, The Lanier Law Firm, Houston, TX; William W Thomas, Behn & Wyetzner, Chtd., Chicago, IL; Mary K Blasy, Scott and Scott LLP.

For Taylor Safe, Individually and on behalf of all others similarly situated, Plaintiff: Donald Amamgbo, Amamgbo & Associates, Culver City, CA; Reginald Von Terrell, The Terrell Law Group, Oakland, CA; W Mark Lanier, The Lanier Law Firm, Houston, TX; Mary K Blasy, Scott and Scott LLP.

Frankie Ramirez, Plaintiff, Pro se.

For [*9] Robert R Glenn, individually and on behalf of all persons similarly situated, Plaintiff: Jacob S Gill, Keith A Ketterling, Steve D Larson, Stoll Stoll et al, Portland, OR; Jennifer S Wagner, PRO HAC VICE, Austin, TX.

For BP plc, BP America Inc, Defendant: Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC; Diane Lee McGimsey, Sullivan and Cromwell LLP, Los Angeles, CA; George Denegre, Jr, John C. Anjier, Russell Keith Jarrett, Liskow & Lewis, New Orleans, LA; Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL; Lois O Rosenbaum, Stoel Rives LLP, Portland, OR; Marc De Leeuw, Paul J Ondrasik, Jr, Richard C. Pepperman, II, Sullivan & Cromwell, New York, NY; Morgan D Hodgson, Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC.

For BP America Inc, Defendant: Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC; George Denegre, Jr, John C. Anjier, Russell Keith Jarrett, Liskow & Lewis, New Orleans, LA; Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL; Marc De Leeuw, Paul J Ondrasik, Jr, Richard C. Pepperman, II, Sullivan & [*10] Cromwell, New York, NY; Morgan D Hodgson, Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC.

For Anthony Hayward, Defendant: Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX; Diane Lee McGimsey, Sullivan and Cromwell LLP, Los Angeles, CA; George Denegre, Jr, John C. Anjier, Russell Keith Jarrett, Liskow & Lewis, New Orleans, LA; Kristopher S. Ritter, Kirkland & Ellis LLP

(Chicago), Chicago, IL; Marc De Leeuw, Paul J Ondrasik, Jr, Richard C. Pepperman, II, Sullivan & Cromwell, New York, NY; Morgan D Hodgson, Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC.

For Andy Inglis, Defendant: Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX; George Denegre, Jr, John C. Anjier, Russell Keith Jarrett, Liskow & Lewis, New Orleans, LA; Marc De Leeuw, Paul J Ondrasik, Jr, Richard C. Pepperman, II, Sullivan & Cromwell, New York, NY.

For Carl-Henric Svanberg, William Castell, Paul Anderson, Antony Burgmans, Cynthia Carroll, Defendants: Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX; George Denegre, Jr, John C. Anjier, Russell Keith Jarrett, Liskow & Lewis, New Orleans, LA; Marc De Leeuw, [*11] Paul J Ondrasik, Jr, Richard C. Pepperman, II, Sullivan & Cromwell, New York, NY; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC.

For H Lamar McKay, Byron E Grote, Defendants: Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX; George Denegre, Jr, John C. Anjier, Russell Keith Jarrett, Liskow & Lewis, New Orleans, LA; Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL; Marc De Leeuw, Paul J Ondrasik, Jr, Richard C. Pepperman, II, Sullivan & Cromwell, New York, NY; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC.

For Erroll B Davis, Jr, Lord Edmund John Philip Browne, Peter Sutherland, Defendants: Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX; George Denegre, Jr, John C. Anjier, Russell Keith Jarrett, Liskow & Lewis, New Orleans, LA; Marc De Leeuw, Richard C. Pepperman, II, Sullivan & Cromwell, New York, NY; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC.

For Iain C Conn, George David, Ian Davis, Douglas J Flint, Deanne S Julius, Defendants: Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX; Marc De Leeuw, Paul J Ondrasik, Jr, Richard C. Pepperman, II, Sullivan & Cromwell, New York, NY; Daryl A Libow, Sullivan [*12] & Cromwell LLP, Washington, DC.

For Robert W Dudley, Ian MG Prosser, Defendants: Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX; Marc De Leeuw, Richard C. Pepperman, II, Sullivan & Cromwell, New York, NY; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC.

For BP Exploration & Production Inc, Tom McKillop, Defendants: Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX; John C. Anjier, Russell Keith Jarrett, Liskow & Lewis, New Orleans, LA; Marc De Leeuw, Richard C. Pepperman, II, Sullivan & Cromwell, New York, NY; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC; George Denegre, Jr, Liskow & Lewis.

For Transocean Deepwater Inc, Defendant: Campbell Edington Wallace, Everett R. Fineran, Kerry J. Miller, Miles Paul Clements, Paul C. Thibodeaux, Frilot L.L.C., New Orleans, LA; Carl J Hebert, Edward F. Kohnke, IV, Preis & Roy, New Orleans, LA; Edwin G Preis, Jr, Joseph E Lee, III, Preis Roy PLC, Lafayette, LA; Evans Martin McLeod, George M Gilly, Phelps Dunbar LL, New Orleans, LA; Richard J Hymel, Preis Roy, Lafayette, LA; Robert Michael Kallam, Preis & Roy, PLC (Lafayette), Lafayette, LA.

For Transocean Offshore Deepwater Drilling Inc, Defendant: Campbell [*13] Edington Wallace, Everett R. Fineran, Kerry J. Miller, Miles Paul Clements, Paul C. Thibodeaux, Frilot L.L.C., New Orleans, LA; Carl J Hebert, Edward F. Kohnke, IV, Preis & Roy, New Orleans, LA; Edwin G Preis, Jr, Joseph E Lee, III, Preis Roy PLC, Lafayette, LA; Evans Martin McLeod, George M Gilly, Phelps Dunbar LL, New Orleans, LA; John Daniel Johnson, Sutherland Asbill Brennan LLP, Houston, TX; Richard J Hymel, Preis Roy, Lafayette, LA; Robert Michael Kallam, Preis & Roy, PLC (Lafayette), Lafayette, LA.

For Halliburton Energy Services Inc, Defendant: Adelaida J Ferchmin, Alan Davis, Derek A Walker, Katharine Rachael Colletta, Chaffe McCall LLP, New Orleans, LA; Bruce W Bowman, Jr, Donald Everett Godwin, Floyd Richard Hartley, Jr, Gavin Eugene Hill, Jenny LaNell Martinez, Godwin Ronquillo PC, Dallas, TX; Daniel A Tadros, Chaffe McCall et al, New Orleans, LA; Robert Alan York, Godwin Ronquillo, PC, Houston, TX.

For State Street Bank and Trust Co., Defendant: Wilber

H Boies, LEAD ATTORNEY, McDermott Will & Emery, Chicago, IL; Aron J Frakes, McDermott Will Emery LLP, Chicago, IL; Steven G Spears, McDermott Will et al, Houston, TX.

For Richard J. Dorazil, Defendant: Kristopher S. Ritter, [*14] Kirkland & Ellis LLP (Chicago), Chicago, IL; Marc De Leeuw, Paul J Ondrasik, Jr, Richard C. Pepperman, II, Sullivan & Cromwell, New York, NY; Morgan D Hodgson, Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC; Thomas W Taylor, Andrews and Kurth, Houston, TX; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC.

For The Savings Plan Investment Oversight Committee, Defendant: Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL; Marc De Leeuw, Paul J Ondrasik, Jr, Richard C. Pepperman, II, Sullivan & Cromwell, New York, NY; Morgan D Hodgson, Steptoe & Johnson LLP, Washington, DC; Thomas W Taylor, Andrews and Kurth, Houston, TX; Daryl A Libow, Sullivan & Cromwell LLP, Washington, DC.

For Stephanie C. Atkins, Defendant: Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL; Paul J Ondrasik, Jr, Sullivan & Cromwell, New York, NY.

For BP Corporation North America Inc, Neil Shaw, Thomas L Taylor, Gregory T. Williamson, BP Corporation North America, Inc.'s Board of Directors, Lamar McKay, Defendants: Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL; Morgan D Hodgson, Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC; Paul J Ondrasik, [*15] Jr, Sullivan & Cromwell, New York, NY; Thomas W Taylor, Andrews and Kurth, Houston, TX.

For BP Corporation North America Inc. Savings Plan Investment Oversight Committee, Defendant: Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL; Paul J Ondrasik, Jr, Sullivan & Cromwell, New York, NY; Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC.

For The Investment Committee, BP Corporation North America, Inc. Savings Plan Investment Oversight Committee, Defendants: Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL.

For Robert A Malone, Defendant: Thomas W Taylor, LEAD ATTORNEY, Andrews and Kurth, Houston, TX;

Kristopher S. Ritter, Kirkland & Ellis LLP (Chicago), Chicago, IL; Morgan D Hodgson, Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC; Paul J Ondrasik, Jr, Sullivan & Cromwell, New York, NY.

For Corey Correnti, Marvin Damsma, James Dupree, Patrick Gower, Jeanne M. Johns, Patricia H. Miller, Stephen J. Riney, Brian D. Smith, Lord John Browne, Stephanie C Moore, Defendants: Morgan D Hodgson, Ryan Thomas Jenny, Steptoe & Johnson LLP, Washington, DC; Paul J Ondrasik, Jr, Sullivan & Cromwell, New York, NY; Thomas W Taylor, LEAD ATTORNEY, Andrews and [*16] Kurth, Houston, TX.

For Thomas P DiNapoli, Movant: Autry W Ross, R Paul Yetter, Yetter Coleman, Houston, TX; Daniel S Sommers, Matthew K Handley, PRO HAC VICE, Steven J Toll, Cohen Milstein et al, Washington, DC; Eric R Nowak, Harrell and Nowak, New Orleans, LA; Jason M Leviton, Jeffrey C Block, Glen DeValerio, Kristin J. Moody, Mark Delaney, Berman DeValerio, Boston, MA; Joseph J Tabacco, Jr, Matthew D Pearson, Berman DeValerio, San Francisco, CA; Joshua S Devore, Joshua Kolsky, Julie Reiser, Cohen Milstein Sellers & Toll PLLC, Washington, DC.

For Richard A Cordray, Ohio Attorney General, Movant: Autry W Ross, R Paul Yetter, Yetter Coleman, Houston, TX; Eric R Nowak, Harrell and Nowak, New Orleans, LA; Joseph J Tabacco, Jr, Matthew D Pearson, Berman DeValerio, San Francisco, CA; Joshua S Devore, Joshua Kolsky, Julie Reiser, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Daniel S Sommers, Matthew K Handley, Steven J Toll, Cohen Milstein et al, Washington, DC; Glen DeValerio, Jason M Leviton, Jeffrey C Block, Kristin J. Moody, Mark Delaney, Whitney Street, PRO HAC VICE, Berman DeValerio, Boston, MA.

For Sacramento County Employees Retirement System, Fresno County Employees Retirement [*17] Association, Alameda County Employees Retirement Association, Movants: Jeffrey M. Hoffman, Mitchell J. Hoffman, Serena E. Pollack, Lowe, Stein, Hoffman, Allweiss & Hauver, LLP, New Orleans, LA.

For Peter D. Lichtman, Leslie J. Nakagiri, Paul Huyck, Movants: James P Roy, Domengeaux Wright et al, Lafayette, LA.

For Ohio Police & Fire Pension Fund, School Employees

Retirement System of Ohio, State Teachers Retirement System Of Ohio ("STRS"), Movants: Jason M Leviton, Jeffrey C Block, Glen DeValerio, Kristin J. Moody, Mark Delaney, Whitney Street, PRO HAC VICE, Berman DeValerio, Boston, MA; Joshua S Devore, Julie Reiser, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Matthew D Pearson, Berman DeValerio, San Francisco, CA; Steven J Toll, Cohen Milstein et al, Washington, DC.

**JUDGES:** HON. KEITH P. ELLISON, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** KEITH P. ELLISON

**OPINION**

**MEMORANDUM AND ORDER**

On April 20, 2010, the Macondo well blew out, costing the lives of eleven rig workers, and setting off a chain of events that eventually sank the Deepwater Horizon rig operated by Defendant BP plc. The blowout spilled over four million barrels of oil into the Gulf of Mexico. In the months that followed, lawsuits raising a variety [*18] of claims, including securities fraud claims, were filed across the country. The Comptroller of the State of New York and the Attorney General of Ohio--representatives of a group of plaintiffs later identified as the New York and Ohio Plaintiffs--filed suit in the Southern District of New York. (Transfer Order, Doc. No. 1.) [1] A group later identified as the Ludlow Plaintiffs filed an action in the Western District of Louisiana. (*Id.*) By Order dated August 10, 2010, the Judicial Panel on Multidistrict Litigation transferred all cases involving shareholder derivative claims, securities claims, and ERISA actions to the Southern District of Texas. (*Id.*) Claims involving personal injury, wrongful death, and property damage were centralized in a separate docket in the Eastern District of Louisiana. The claims of both the New York and Ohio Plaintiffs and the Ludlow Plaintiffs were included in the group transferred to the Southern District of Texas.

> 1   All docket references are to Multi-District Litigation No. 10-md-2185.

On December 28, 2010, this Court consolidated all of the securities class actions pending in the Court, [2] appointed the New York and Ohio Plaintiffs as lead plaintiffs, and appointed [*19] the Ludlow Plaintiffs as lead plaintiffs of a subclass. [3] (Order, Doc. No. 79.) In its decision, this Court expressed its expectation that "the lead plaintiffs work together as needed to prevent inefficiencies" and its hope that the two lead plaintiffs would file a joint complaint, if possible. (*Id.*) That did not happen. Instead, the two lead plaintiffs filed two separate and extremely lengthy consolidated amended complaints.

> 2   The seven securities class actions consolidated into the instant case include: *Ludlow v. BP PLC*, Case No. 10-cv-3043, *Johnson Inv. Counsel Inc. v. BP PLC*, Case No. 10-cv-3044, *Yuen v. BP PLC*, Case No. 10-cv-3049, *Greenfield v. BP PLC*, Case No, 10-cv-3448, *McClurg v. BP PLC*, Case No. 10-cv-3449, *Oklahoma Police Pension & Ret. Sys. V. BP PLC*, Case No. 10-cv-3452, and *Safe v. British Petroleum*, Case No. 10-cv-4675.
>
> 3   The Court created a subclass in part because the competing lead plaintiffs advanced different theories of the case. Whereas the Ludlow Plaintiffs' claims center on BP's statements about the safety of its drilling operations in the Gulf of Mexico in the thirteen months leading up to the Deepwater Horizon explosion, the New York and Ohio Plaintiffs argue [*20] more generally that BP made fraudulent statements over a much longer period, between 2007 and 2010, about safety precautions both in the Gulf of Mexico and elsewhere. (Doc. No. 79 at 10, 18-19.)

On February 14, 2011, the New York and Ohio Plaintiffs filed a Consolidated Class Action Complaint (hereinafter "Complaint") against three corporate defendants, BP plc, BP America, Inc., and BP Exploration & Production, Inc., and against ten individual defendants (collectively "Defendants"). (Complaint ("Compl."), Doc. No. 113.) The Ludlow Plaintiffs filed a separate complaint on February 11, 2011. (Doc. No. 112.) On March 4, 2011, this Court set a briefing schedule for Defendants' motions to dismiss after deciding that, by necessity, briefing in this case had to be directed separately to each complaint. (Doc. No. 120.)

On May 6, 2011, Defendants filed two separate motions to dismiss the New York and Ohio Plaintiffs, distinguishing between the claims of the purchasers of BP ordinary shares ("Ordinary Share Purchasers") (Doc. No. 153) and the remaining claims of the purchasers of BP American Depositary Shares ("ADSs") ("ADS

Purchasers") (Doc. No. 149). [4] The Ordinary Share Purchasers and ADS Purchasers [*21] then filed separate responses to the motions to dismiss. (Doc. Nos. 175 & 186.) Defendants filed replies in support of their respective motions to dismiss on June 21, 2011. (Doc. Nos. 216 & 220.) After briefing concluded, the Court heard oral argument on the motions to dismiss on November 4, 2011.

> 4  Defendants also filed a motion to dismiss the Ludlow Plaintiffs' claims (Doc. No. 151). Given the separate briefing in this case and the diversity of allegations, defendants, and legal issues, the Court will issue a separate ruling on the Ludlow Plaintiffs' claims.

Pending before the Court are Defendants' Motion to Dismiss the Claims of BP ADS Purchasers in the New York and Ohio Plaintiffs' Consolidated Class Action Complaint (Doc. No. 149) and Defendants' Motion to Dismiss the Claims of Purchasers of BP Ordinary Shares (Doc. No. 153). Having considered the parties' pleadings, arguments and the applicable law, the Court finds that Defendants' Motion to Dismiss the Claims of BP ADS Purchasers (Doc. No. 149) must be **GRANTED IN PART** and **DENIED IN PART.** Defendants' Motion to Dismiss the Claims of BP Ordinary Share Purchasers (Doc. No. 153) must be **GRANTED** in its entirety.

# I. DEFENDANTS' MOTION [*22] TO DISMISS THE CLAIMS OF BP ADS PURCHASERS IS GRANTED IN PART AND DENIED IN PART

What follows is a description of the parties, a summary of the allegations in the Complaint, the standards applicable to the motion, and the Court's conclusions with respect to the adequacy of the allegations of false and misleading statements, materiality, and scienter.

## A. The Parties

Lead Plaintiffs are Thomas P. DiNapoli, Comptroller of the State of New York, as Administrative Head of the New York State and Local Retirement Systems and sole Trustee of New York State Common Retirement Fund, and four Ohio systems. They are the Ohio Public Employees Retirement System, the State Teachers Retirement System of Ohio, the School Employees Retirement System of Ohio, and the Ohio Police & Fire Pension Fund, along with their statutory litigation counsel, Ohio Attorney General Mike DeWine (collectively, the "NY/OH Plaintiffs" or "Plaintiffs"). (Compl. ¶¶ 31-32.) The NY/OH Plaintiffs bring their consolidated class action on behalf of the following proposed plaintiff class: (1) all persons and entities who purchased or acquired BP ADSs (the "ADS Purchasers") between January 16, 2007, and May 28, 2010 (the "Class Period"), [*23] and (2) all persons and entities who purchased or acquired BP ordinary shares in domestic transactions executed on foreign exchanges (the "Ordinary Share Purchasers") during the Class Period. [5] (Compl., at 1.)

> 5  This suit has not yet been certified as a class action.

Defendants include BP plc, BP America, Inc., and BP Exploration & Production, Inc. (collectively "BP" or "the Company") and ten of BP's present and former officers and directors. BP plc is a U.K. corporation with its principal executive offices located in London, England. BP's ADSs trade on the New York Stock Exchange ("NYSE"), and BP is the largest non-U.S. company listed on the NYSE. (Compl. ¶ 33.) BP's ordinary shares are also listed on the NYSE in connection with BP's ADS program. BP America, Inc. and BP Exploration & Production, Inc. ("BP E&P"), both wholly-owned subsidiaries of BP, are Delaware corporations with their principal places of business in Houston, Texas. (*Id.* ¶¶ 34-35.)

The ten individual defendants were directors and officers of BP prior to and during the Deepwater Horizon spill. They are Anthony B. "Tony" Hayward, executive director of BP since 2003 and BP's Chief Executive Officer ("CEO") from May 2007 [*24] to October 2010 ("Hayward"); Lord Edmund John Philip Browne, BP's CEO from 1995 to April 2007 ("Browne"); Andrew G. "Andy" Inglis, Chief Executive of Exploration and Production and an executive director of BP from 2007 to October 2010 ("Inglis"); Bryon E. Grote, a member of BP's executive management, serving as a director since 2000 and the Company's Chief Financial Officer ("CFO") since 2002 ("Grote"); Douglas Suttles, BP's Chief Operating Officer for Exploration and Production from January 2009 to at least January 2011 ("Suttles"); Iain Conn, Chief Executive for BP Refining and Marketing ("Conn"); David Rainey, BP's Vice President of Exploration for the Gulf of Mexico ("Rainey"); Robert "Bob" Dudley, an executive director of BP since April

2009 and Group Chief Executive since October 2010 ("Dudley"); Robert "Bob" Malone, Chairman and President of BP America from July 2006 to February 2009 ("Malone"); and H. Lamar McKay, the Chairman and President of BP America, since January 2009 ("McKay") (collectively, the "Individual Defendants"). (*Id.* ¶¶ 36-45.)

**B. Factual Allegations and Claims**

In a Rule 12(b)(6) motion to dismiss, the court must accept as true a plaintiff's well-pleaded factual [*25] allegations. FED. R. CIV. P. 12(b)(6). The court does not, however, "accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 550 (5th Cir. 2007) (citation omitted) (internal quotation marks omitted). Accordingly, the Court will set forth the relevant facts as alleged by Plaintiffs.

The NY/OH Plaintiffs, both the ADS Purchasers and Ordinary Share Purchasers, assert violations of section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 of the Securities and Exchange Commission ("SEC") against all Defendants. [6] They also assert violations of section 20(a) of the Exchange Act against the Individual Defendants. In addition, the Ordinary Share Purchasers assert both New York common law and English law claims against BP. Plaintiffs seek certification as a class action pursuant to Rule 23, compensatory and punitive damages against Defendants, jointly and severally, pre-judgment interest, costs, and attorneys' fees.

> [6]   For simplicity's sake, the Court will refer to Plaintiffs' claims arising under section 10(b) and Rule 10b-5 as "section 10(b) [*26] claims.

Plaintiffs seek damages stemming from their stock losses following the explosion of BP's Deepwater Horizon rig in the Gulf of Mexico on April 20, 2010. BP was unable to stop the resulting oil spill for eighty-seven days following the explosion, costing the Company somewhere between $20 and $40 billion dollars. (Compl. ¶ 26.) From the date of the Deepwater Horizon explosion through May 28, 2010, the last day of the Class Period, BP's securities fell in value by 48%, wiping out over $91 billion in market capitalization, and causing Plaintiffs to lose as much as 40% of their investments. (*Id.* ¶¶ 6, 26.)

*1. BP and Its Safety Record*

BP is the third-largest energy company in the world. BP operates in over eighty countries and is engaged in every facet of the oil and gas industry, including drilling, exploration and production, refining, distribution and marketing, petrochemicals, and power generation and trading. (Compl. ¶ 48.) BP's profits exceeded $10 billion per quarter in 2008, and the Company's quarterly profits remained in the billions throughout the Class Period. (*Id.* ¶ 49.) Despite these record profits, BP has struggled to overcome a corporate image tarnished by an unfortunate [*27] record of safety failures and catastrophic incidents that have adversely affected both the individuals and the environments that have come into contact with BP's operations worldwide.

Plaintiffs trace BP's troubled safety record back to 2000, when, following "life threatening incidents" at a BP refinery in Scotland, an investigation by the U.K.'s Health and Safety Executive ("U.K. HSE") revealed a number of deficiencies in BP's operational control and maintenance of process systems. (*Id.* ¶ 10.) From that time forward, similar safety failures occurred with some regularity, touching both BP's land and offshore operations. In 2002, one of the rigs operated by BP in the Gulf of Mexico--the Ocean King--experienced two separate blowout incidents. (*Id.* ¶¶ 54-57.) The incidents prompted the U.S. Department of the Interior Minerals Management Services ("MMS") to issue a Safety Alert to all companies drilling in the Gulf. (*Id.* ¶ 58.) The Safety Alert warned of the serious risk of a blowout associated with failed cementing jobs. (*Id.*) Despite the warnings, blowouts continued to occur in BP's operations. The Transocean Enterprise, a rig BP contracted in the Gulf, suffered a blowout in 2003. (*Id.* [*28] ¶ 59.) Another blowout occurred in 2004 on a rig BP operated as part of a joint consortium in the Nile delta. (*Id.* ¶ 60.)

These safety failures occurred regularly, in fact yearly, up until 2005, when an explosion at BP's Texas City refinery prompted the U.S. Chemical Safety Board ("CSB") to order an investigation. (*Id.* ¶ 11.) At the CSB's prompting, BP also established its own independent panel--the "Baker Panel," headed by former Secretary of State James Baker--to review and improve the Company's safety procedures. (*Id.*) Even while the panel was conducting its investigation, safety-related incidents continued to occur in BP's operations. In early 2006, an oil spill occurred off the coast of Alaska after a

leak in a corroded pipeline in BP's Prudhoe Bay operations went unnoticed for weeks. (*Id.* ¶ 68.) BP pleaded guilty to criminal negligence in connection with the Prudhoe Bay spill and paid a fine of twenty-two million dollars. (*Id.* ¶ 70.)

## 2. The Baker Report

The Baker Panel released its final report--the "Baker Report"--in January 2007. (*Id.* ¶ 74.) The report cited organizational problems as the root cause of BP's failure to respond to major incidents and concluded, among other things, that [*29] "BP management had not distinguished between occupational safety . . . and process safety" and "ha[d] not adequately established process safety as a core value." (*Id.*) The Baker Report also included the following ten recommendations that it urged BP to implement expeditiously:

RECOMMENDATION # 1 -- PROCESS SAFETY LEADERSHIP -- The Board of Directors of BP p.l.c., BP's executive management (including its Group Chief Executive), and other members of BP's corporate management must provide effective leadership on and establish appropriate goals for process safety. Those individuals must demonstrate their commitment to process safety by articulating a clear message on the importance of process safety and matching that message both with the policies they adopt and the actions they take.

RECOMMENDATION # 2 -- INTEGRATED AND COMPREHENSIVE PROCESS SAFETY MANAGEMENT SYSTEM -- BP should establish and implement an integrated and comprehensive process safety management system that systematically and continuously identifies, reduces, and manages process safety risks at its U.S. refineries.

RECOMMENDATION # 3 -- PROCESS SAFETY KNOWLEDGE AND EXPERTISE -- BP should develop and implement a system to ensure that [*30] its executive management, its

refining line management above the refinery level, and all U.S. refining personnel, including managers, supervisors, workers, and contractors, possess an appropriate level of process safety knowledge and expertise.

RECOMMENDATION # 4 -- PROCESS SAFETY CULTURE -- BP should involve the relevant stakeholders to develop a positive, trusting, and open process safety culture within each U.S. refinery.

RECOMMENDATION # 5 -- CLEARLY DEFINED EXPECTATIONS AND ACCOUNTABILITY FOR PROCESS SAFETY -- BP should clearly define expectations and strengthen accountability for process safety performance at all levels in executive management and in the refining managerial and supervisory reporting line.

RECOMMENDATION # 6 -- SUPPORT FOR LINE MANAGEMENT -- BP should provide more effective and better coordinated process safety support for the U.S. refining line organization.

RECOMMENDATION # 7 -- LEADING AND LAGGING PERFORMANCE INDICATORS FOR PROCESS SAFETY -- BP should develop, implement, maintain, and periodically update an integrated set of leading and lagging performance indicators for more effectively monitoring the process safety performance of the U.S. refineries by BP's refining [*31] line management, executive management (including the Group Chief Executive), and the Board of Directors.

RECOMMENDATION # 8 -- PROCESS SAFETY AUDITING -- BP should establish and implement an effective system to audit process safety performance at its U.S. refineries.

RECOMMENDATION # 9 --

BOARD MONITORING -- BP's Board should monitor the implementation of the recommendations of the Panel . . . and the ongoing process safety performance of BP's U.S. refineries. The Board should, for a period of at least five calendar years, engage an independent monitor to report annually to the Board on BP's progress in implementing the Panel's recommendations . . . . The Board should also report publicly on the progress of such implementation and on BP's ongoing process safety performance.

RECOMMENDATION # 10 -- INDUSTRY LEADER -- BP should use the lessons learned from the Texas City tragedy and from the Panel's report to transform the company into a recognized industry leader in process safety management. The Panel believes that these recommendations . . . can help bring about sustainable improvements in process safety performance at all BP U.S. refineries.

(Compl. ¶ 74.)

Two other reports echoed the findings [*32] of the Baker Panel and made BP aware of deficiencies in its corporate governance structure that directly contributed to the Company's safety failures. First, following the Prudhoe Bay spill, BP retained an independent consulting firm, Booz Allen Hamilton ("Booz Allen"), to identify organizational, process, and governance issues that contributed to the spill. (*Id.* ¶ 72.) The Booz Allen report found that (1) BP's management culture was consumed with cost-cutting and meeting financial targets at the expense of safety and maintenance issues, and that (2) BP's internal communication culture failed to elevate critical risk data to senior leadership, thereby stymieing corrective action on the safety front. (*Id.*) Second, the CSB's report on the Texas City explosion, released in March 2007, identified similar weaknesses. The report criticized BP management, finding that management provided "ineffective leadership and oversight," failed to "focus on controlling major hazard risk," "did not effectively evaluate the safety implications of major organizational, personnel, and policy changes," and "did not implement adequate safety oversight, provide[]

needed human and economic resources, or . . [*33] . model adherence to safety rules and procedures." (*Id.* ¶ 67.)

Such findings, especially those in the Baker Report, prompted BP to make a concerted effort to address its previous safety shortcomings and rebuild its corporate image. Following the release of the Baker Report, BP repeatedly promised investors that it would be a different company going forward. (*Id.* ¶ 16.) BP took advantage of every opportunity to reiterate the Company's renewed commitment to process safety reforms across its operations. (*Id.* ¶ 18.) These assurances included representations that BP was prepared to contain and adequately address any oil spill that might occur in the Gulf of Mexico. (*Id.* ¶ 24.)

### 3. BP's Gulf of Mexico Operations

BP America, BP's largest division, is the largest producer of oil and gas in the United States. (*Id.* ¶ 48.) BP's Exploration and Production business segment undertakes activities around the world, including deepwater operations in the Gulf of Mexico. (*Id.* ¶ 51.) BP promoted its Gulf operations throughout the Class Period. (*Id.*) As President of BP America, Defendant Malone explained that the Gulf of Mexico accounted for one-sixth of all oil produced in the United States and repeatedly [*34] touted the Gulf region as a key "profit centre" and "high margin" production area for BP. (*Id.*) According to Plaintiffs, the alleged misrepresentations acquired added significance for investors when viewed against the backdrop of BP's profitable forecast for its Gulf operations.

### 4. False and Misleading Statements Made Prior to the Deepwater Horizon Disaster

Plaintiffs select January 16, 2007, the "same day when BP [first] professed its commitment to becoming an industry leader in process safety," as the start of the Class Period. (*Id.* ¶ 15.) The Complaint describes the allegedly false and misleading statements that BP disseminated to investors through public filings and through verbal and written statements made by the Individual Defendants throughout the Class Period. These include statements made during a press conference in January 2007 following the release of the Baker Report (Compl. ¶¶ 256-57); statements made during calls with investors and analysts, including general conference calls (*Id.* ¶¶ 258-60, 267) and a strategy presentation call in early

2008 (*Id.* ¶ 281); statements published in BP's Annual Review in 2006, 2007, 2008, and 2009 (*Id.* ¶¶ 261, 277, 294, 319); BP's Form 20-F [*35] Annual Report filings with the SEC for years 2006 through 2009 (*Id.* ¶¶ 264, 283, 302, 324); statements contained in BP's 2006 Sustainability Report (*Id.* ¶ 266) and 2007 and 2009 Sustainability Review publications (*Id.* ¶¶ 287, 334); testimony given by BP executive officers before both House (*Id.* ¶¶ 269, 297) and Senate Committees (*Id.* ¶ 316); statements made by BP representatives and executive officers as participants at industry conferences, including the Sanford Bernstein 4th Annual Strategic Decisions Conference (*Id.* ¶ 271), the Houston Forum (*Id.* ¶ 275), the HRH Prince of Wales 3rd Annual Accounting for Sustainability Forum (*Id.* ¶ 289), Microsoft's Global Energy Forum (*Id.* ¶ 291), the Cambridge Energy Research Association Executive Conference (*Id.* ¶¶ 292, 326), the Howard Weil Energy Conference (*Id.* ¶¶ 308, 328), and an event hosted by the Peterson Institute for International Economics, in Washington, D.C. (*Id.* ¶ 330); statements made in BP press releases, both prior to and after the Deepwater Horizon explosion (*Id.* ¶¶ 273, 337-52); and statements made by BP executives during interviews and speeches (*Id.* ¶¶ 312, 353-56).

Plaintiffs present the alleged misrepresentations chronologically [*36] in their Complaint. For ease of reference, the Court has assigned numbers to the alleged misrepresentations and, in some cases, combines multiple statements made on the same date or by the same speaker. These numbers do not correspond to the numbered paragraphs in the Complaint; however, the corresponding paragraphs in the Complaint are referenced as well. The specific misrepresentations are described as follows:

On January 16, 2007, BP held a press conference to discuss the release of the Baker Report. At the press conference, Browne assured investors of BP's commitment to improving its process safety programs, stating:

- "If I had to say one thing which I hope you will all hear today it is this 'BP gets it.' And I get it too."

- "I recognize the need for improvement and that my successor, Tony Hayward, and I need to take a lead in putting that right by championing process

safety as a foundation of BP's operations."

- "Finally, in its executive summary, the Panel says it believes that BP's workforce is ready, willing and able to participate in a sustained Group-wide effort to move BP towards excellence in process safety. I wholeheartedly agree. And I would like to make clear that the [*37] tone is indeed being set at the top."

(Misrep. No. 1; Compl. ¶ 256.) According to Plaintiffs, Browne's promises were false from the beginning, as BP continued to expand its deepwater operations without implementing adequate safety procedures for well testing during deepwater drilling. (Compl. ¶ 257(a).) Shortly after Browne's announcements at the press conference, BP held a conference call with analysts and investors. Browne, Grote, Hayward, Dudley, and Inglis participated in the call, which took place on February 6, 2007. Hayward made the following statement during the call:

- "I would now like to give you new guidance for our expected future production rates. Relative to our projections of February last year, our production forecast has been impacted by five things. Firstly, we further increased our focus on safety and operational efficiency and will in some cases deliberately slow the pace of our activity in order to improve its safety and efficiency."

(Misrep. No. 2; Compl. ¶¶ 258-60.) Plaintiffs contend that Hayward's projections were false because BP continued to expand its deepwater drilling operations without implementing safety protocols. Further, claim Plaintiffs, BP always [*38] placed expediency over safety, rendering false Hayward's promises to "deliberately slow the pace" of operations. (Compl. ¶ 260(b).)

On February 23, 2007, BP released its 2006 Annual Review, which contained the following statements:

- "What does the world expect of an energy company today? We believe it is to provide energy to customers now and in the future in a safe, sustainable and environmentally responsible way. BP

strengthened its commitments to these principles in 2006."

- "Safety has always been one of our core priorities. When the safety of people and of BP operations is at stake, actions matter far more than words. We continued to make significant investment and took numerous actions to improve the three dimensions of safety -- personal safety, process safety, and the environment -- and the monitoring of all our operations in 2006."

(Misrep. No. 3; Compl. ¶ 261.) The document also contained the following statements by Browne, as part of the "Group chief executive's review":

- "We have been urgently addressing operational issues and matters related to our safety performance."

- "Safety has always been one of our core priorities."

- "BP aspires to be an industry leader in the three dimensions [*39] of safety -- personal safety, process safety and the environment."

(Misrep. No. 4; Compl. ¶ 262.) Browne also represented that BP's current aim was "to develop a timely and intelligent plan of action in order to transform BP into an industry leader in process safety management." (*Id.*) Plaintiffs point to BP's continued expansion of its deepwater drilling operations without implementing environmental safety protocols as evidence of the falsity of these statements. (Compl. ¶ 263(a)-(b).)

BP filed its 2006 Annual Report, Form 20-F, with the SEC on March 6, 2007. Defendants Browne and Grote signed the report, which highlighted the Gulf of Mexico as one of BP's new "profit centres." (*Id.* ¶ 264.) The Report contained relevant statements such as the following:

- "Profit centres are, or are expected to become, areas that provide significant production and income for the segment. Our new profit centres are in . . . the deepwater Gulf of Mexico . . . where we believe we have competitive advantage

and which we believe provide[s] the foundation for volume growth and improved margins in the future."

- "Deepwater Gulf of Mexico is one of our new profit centres and our largest area of growth in the US. [*40] In 2006, our deepwater Gulf of Mexico crude oil production was 195mb/d and gas production was 323mmcf/d."

- "A risk of increased environmental costs and impacts is inherent in particular operations and products of the group and there can be no assurance that material liabilities and costs will not be incurred in the future. In general, the group does not expect that it will be affected differently from other companies with comparable assets engaged in similar businesses."

(Misrep. No. 5; Compl. ¶ 264.) Plaintiffs claim that BP's comparison to its industry peers was misleading in that BP's focus on high-risk deepwater operations, coupled with its failure to implement industry best practices, actually increased BP's risk profile beyond that of its industry peers. (Compl. ¶ 265(d).)

In its 2006 Sustainability Report, released in April 2007, BP first referenced its Operational Management System ("OMS"), the program that would serve as the foundation for the changes to BP's process safety procedures. The Sustainability Report represented that, as part of OMS, BP "document[s] and rigorously follow[s] procedures for safe and effective operating." (Misrep. No. 6; Compl. ¶ 266.) Plaintiffs contend [*41] this statement was false because BP did not have adequate documented procedures for its operations, particularly for its drilling operations. (Compl. ¶ 266.)

On April 24, 2007, BP held a conference call with analysts and investors. During the call, Defendant Grote, BP's CFO at the time, stated the following:

- "2007 will represent a year of consolidation. We are stabilizing our operations and beginning to build momentum as Texas City continues its recommissioning and we focus on delivering major E&P projects like Atlantis and Thunder Horse. Our strategy

is unchanged and our current focus remains on safe and reliable operations and the delivery of improved performance."

(Misrep. No. 7; Compl. ¶ 267.) Plaintiffs claim that Grote's statement misled investors because BP continued expanding its deepwater drilling without implementing safety procedures and failed to disclose multiple safety failures and near-failures in its deepwater operations. (Compl. ¶ 268(a)-(b).)

On May 16, 2007, Malone testified before the U.S. House of Representatives Committee on Energy and Commerce, Subcommittee on Oversight and Investigations. In both verbal and written testimony, Malone stated:

- "Today, I want to [*42] assure you that we get it. We have learned the lessons of the past."

- "BP America is committed to safety, and the expectation of our management is that budget guidelines should never result in a compromise in safety performance. That is and has long been our philosophy . . . ."

- "I continue to meet with employees to reinforce my expectations of them: that they must ensure that our operations are safe, that they understand that they have both a right and responsibility to shut down any process they feel is unsafe or operationally unsound, and that they are encouraged to raise concerns on any issue."

- "BP does not tolerate retaliation against workers who raise safety concerns."

(Misrep. No. 8; Compl. ¶ 269.) In addition to Plaintiffs' contention that BP expanded its deepwater drilling operations without implementing safety procedures, Plaintiffs also allege that Malone falsely represented that BP did not retaliate against workers who raised safety concerns. (Compl. ¶ 270(c).) According to Plaintiffs, BP was aware that substantiated complaints of retaliation had been submitted to the Company through numerous

avenues, including the Ombudsman's office. (*Id.*)

On September 25, 2007, Inglis [*43] gave a speech at the Sanford Bernstein 4th Annual Strategic Decisions Conference. His remarks included the following statements:

- "One aspect of our focus on safe and reliable operations that I mentioned earlier is our new standardized Operating Management System (OMS). This will provide a blueprint for safety and all aspects of operations throughout BP, making sure operations are undertaken to a consistently high standard worldwide."

- "By taking and managing risks in frontier regions we have established an unrivaled asset base in some of the world's most prolific basins. Management of those assets has given us a resource base of nearly 60 billion barrels, with a significant portion in conventional resources. We are developing strong growth in deepwater and tight gas through a spread of major projects around the world."

(Misrep. No. 9; Compl. ¶ 271.) Plaintiffs again cite BP's expansion of deepwater drilling, lack of safety protocols, and string of near-failures as evidence of the falsity of Inglis's statements. Plaintiffs also allege that BP's OMS program in fact did not provide a "consistently high standard worldwide" because BP continued to vary its safety practices and standards [*44] depending on the particular country in which it operated. (Compl. ¶ 272.)

On October 25, 2007, BP announced in a press release the resolution of various investigations, including those into the Texas City explosion and the Prudhoe Bay spill. The press release included the following statements by Malone:

- "In the months and years since these violations occurred, we have made real progress in the areas of process safety performance and risk management."

- "BP America is in the midst of a comprehensive effort to improve its safety culture and to strengthen and standardize process safety and risk management

programs at all BP-operated facilities."

(Misrep. No. 10; Compl. ¶ 273.) Malone's representations were allegedly false because, in addition to the reasons outlined above, BP did not standardize its process safety programs. Instead, BP implemented budget cuts and staff reductions aimed specifically at its safety programs. (Compl. ¶ 274.)

A few weeks later, Hayward, too, spoke of BP's commitment to process safety. On November 8, 2007, at the Houston Forum, Hayward made the following representation:

> - "We continue to implement the roadmap provided to ourselves and the industry by the excellent [*45] work of the Baker Panel. BP remains absolutely committed to taking these lessons and becoming a world leader in process safety."

(Misrep. No. 11; Compl. ¶ 275.) As with their allegations regarding Inglis's statements, Plaintiffs claim that Hayward misled investors with regard to BP's OMS program because the OMS program permitted BP to meet the minimum local requirements in each country where it operated, as opposed to industry best practices. (Compl. ¶ 276(d).)

BP published its 2007 Annual Review on February 22, 2008. The Annual Review contained many statements specifically related to BP's process safety efforts. These included:

> - "Throughout 2007, BP continued to progress the process safety enhancement programme initiated in response to the March 2005 incident at the Texas City refinery. We have made progress across the group on all the recommendations."

> - "Leadership -- We have consistently communicated that safe and reliable operations are our highest priority. Our safety and operations audit group was strengthened and completed 28 audits in 2007."

> - "Management systems -- Implementation of our operating

management systems began at an initial group of sites, which included all five US [*46] refineries."

> - "Knowledge and expertise -- We established an executive level training programme, ran process safety workshops and launched an operations academy for site-based staff to enhance process safety capability. Specialists have been deployed at our US refineries to accelerate priority improvement programmes."

> - "Culture -- To reinforce the need for a stronger safety culture, we undertook in-house assessments of BP's safety culture, supported by communication from leadership."

> - "Indicators -- Progress has been made in developing leading and lagging indicators, building on metrics already reported to executive management. We are working with the industry to develop indicators and this includes progress to agree a [sic] metric covering loss of primary containment."

(Misrep. No. 12; Compl. ¶ 278.) The 2007 Annual Review also contained a section titled, "Group chief executive's review." In this section, Hayward elaborated on BP's prioritization of safety, stating that, "When I took over as group chief executive, the immediate task was to restore the integrity and efficiency of BP's operations. I set out three priorities: safety, people and performance." (Misrep. No. 13; Compl. ¶ 279.) [*47] Plaintiffs cite the same facts--including cost cutting measures by BP, expansion of deepwater drilling operations, and an accumulation of undisclosed safety failures--as evidence of the falsity of the statements in the 2007 Annual Review. (Compl. ¶ 280.)

BP conducted its 2008 Strategy Presentation during a conference call with investors and analysts on February 27, 2008. Individual Defendants Hayward, Inglis, Dudley, Conn, and Grote participated in the call. Several of the Individual Defendants underscored BP's commitment to safety as a top priority. For example, Hayward explained that:

> - "2007 saw further improvement in

[BP's] overall safety performance. Over the last eight years, our safety performance, measured by Recordable Injury Frequency Rate, the standard measure of safety in our industry, has improved three-fold. As you can see on this chart, our performance is amongst the best in our industry."

- "[O]ur intense focus on process safety continues. We are making good progress in addressing the recommendations of the Baker Panel and have begun to implement a new Operating Management System across all of BP's operations. Integrity-related incidents have fallen significantly over the [*48] last three years, and oil spills of more than one barrel continue a strong downward trend."

- "Safe and reliable operations remain our number one priority."

- "We are taking action to close the competitive gap through a focused effort on three priorities of safety, people and performance. We are determined to operate safely and reliably, to develop the capability of our people and to drive performance through restoring operational momentum. At the same time we are rigorously reducing complexity and cost. In Exploration and Production, we continue to see the benefits of our strategy."

Defendant Inglis made similar statements during the conference call:

- "Our top priority continues to be the safety and reliability of our operations. In 2007, we saw both an improvement in personal safety and increased reliability."

- "[I]n the Gulf of Mexico, our priorities are clear -- grow revenues near term through the safe startup and ramp-up of Atlantis and Thunder Horse. . . . We're on track in executing that strategy. We've established a highly competitive position through our extensive lease-holding and track record in exploration."

(Misrep. No. 14; Compl. ¶ 282.) Plaintiffs allege that all of these [*49] representations were false, citing BP's expansion of deepwater drilling without appropriate safety protocols, its cost-cutting and staff reduction initiatives, variation in BP's OMS program by country, and a string of allegedly undisclosed safety mishaps. (Compl. ¶ 282.)

BP followed the February conference call with the filing of its 2007 Annual Report, Form 20-F, on March 4, 2008. The Annual Report touted BP's "strong portfolio of assets" and referred to the Gulf of Mexico as one of BP's "current areas of major development" where BP believed it had a "competitive advantage." (*Id.* ¶ 283.) The Annual Report also discussed BP's risk assessment efforts, including OMS, as follows:

- "We have completed 50 major accident risk assessments (MARs). The assessments identify high-level risks that, if they occur, would have a major effect on people or the environment. Many of these risks, such as a loss of containment from our operations, are common across the industry. Mitigation plans to manage and respond to identified risks form part of the MAR analysis."

- "[T]he OMS 'is the foundation for a safe, effective, and high-performing BP.'"

- "A continuous improvement process drives and sustains improvement [*50] of these elements at a local level."

- "A risk of increased environmental costs and impacts is inherent in particular operations and products of the group and there can be no assurance that material liabilities and costs will not be incurred in the future. In general, the group does not expect that it will be affected differently from other companies with comparable assets engaged in similar businesses."

(Misrep. No. 15; Compl. ¶ 283.) Although BP referenced mitigation plans, Plaintiffs allege that BP failed to reveal that BP's plans left the Company ill-equipped to deal with an oil spill in the Gulf of Mexico. Plaintiffs claim that BP falsely represented both that it had completed mitigation

plans and that the plans would have provided adequate oil spill response protocols. (Compl. ¶ 284.) In addition, while BP described OMS as the foundation for BP's safety efforts, OMS actually allowed BP to use different safety practices and standards in different countries. (*Id.* ¶ 272(b).)

On April 17, 2008, BP held the Company's 2008 Annual General Meeting. BP subsequently posted transcripts of speeches given by Hayward and BP Chairman Peter Sutherland at the meeting. Hayward's remarks included [*51] the following:

- "Safety is our number one priority and in 2007 our overall safety record continued to improve. Over the last eight years our safety performance according to the standard industry measure has improved threefold and is now among the best in our industry."

- "Our intense focus on process safety continues. We are making good progress in addressing the recommendations of the Baker Panel and have begun to implement a new Operating Management System across all of BP's operations. This is aimed at ensuring that our operations across the world look and feel the same everywhere - and perform to the same high standard."

(Misrep. No. 16; Compl. ¶ 285.) In addition to the reasons demonstrating falsity already discussed above, Plaintiffs contend that BP misrepresented its professed commitment to safety in that it failed to disclose that BP was implementing safety budget cuts and staff reductions which impacted the Company's ability to drill safely in the Gulf. (Compl. ¶ 286.)

On May 28, 2008, BP issued its 2007 Sustainability Review, which included a "Group chief executive's introduction" section signed by Hayward. The section contained the statement, "We are also now introducing our [*52] new operating management system (OMS), designed to bring greater consistency to our operations." (Misrep. No. 17; Compl. ¶ 287.) This statement was allegedly misleading because BP had no intention of implementing consistent practices throughout the Company. (Compl. ¶ 272.) In addition, BP continued to receive citations from U.K. authorities. The Company

received at least one-hundred non-public citations over a four year span, belying its supposed commitment to consistent and safe operations. (*Id.* ¶ 97.)

Hayward also gave a speech at the HRH Prince of Wales's 3rd Annual Accounting for Sustainability Forum on December 17, 2008. BP subsequently posted a transcript of Hayward's speech on its website. During the speech, Hayward spoke of BP's continued effort to improve its process safety practices following the Texas City refinery explosion, and stated that:

- "One of the many consequences for [BP] has been to develop and embed a new Operating Management System right across BP -- and we operate in 100 countries -- so that is no mean feat."

- "The critical aspect of this system is that it actually translates words into action. It starts out as a set of requirements which are the platform for [*53] safe, reliable, responsible operating activities. And then we continuously improve what we do, every day, every month, every year - in pursuit of sustainable operating excellence."

(Misrep. No. 18; Compl. ¶ 289.) In addition to the inconsistent practices and numerous regulatory citations from both U.S. and U.K. agencies, an internal December 2008 strategy document warned BP executives of major process safety concerns in the Gulf of Mexico. (Compl. ¶ 19.) The warnings contained in the internal document severely undermined Hayward's portrait of BP's safety efforts.

During a presentation at the Microsoft Global Energy Forum in February 2009, BP stated that, as part of the OMS program, "We [BP] document and rigorously follow procedures for safe and effective operating." (Misrep. No. 19, Compl. ¶ 291.) Shortly thereafter, in a speech at the Cambridge Energy Research Association ("CERA") Executive Conference on February 10, 2009, Hayward again touted BP's safety procedures. Hayward opined that, because "[BP] ha[s] the know-how and technology to tap these resources safely and with minimal impact to the environment," the U.S. should allow drilling on the outer continental shelf and "support [*54] the hydrocarbon resources here in the US." (Misrep. No.

20; Compl. ¶ 292.) Plaintiffs assert that these statements were false because BP was unprepared to deal with the Deepwater Horizon oil spill in the Gulf of Mexico. (Compl. ¶ 293.)

BP's 2008 Annual Review, issued on February 24, 2009, provided additional assurances to investors of the Company's commitment to safety. The Annual Review stated, in part:

> - "Our forward agenda focus on safety, people and performance is paying off. BP is in the leading group for safety performance in the industry."

> - "Safety, both personal and process, remains our highest priority. 2008 was one of our best years ever for personal safety, with our performance expected to remain among the best in the industry. During the year we began migrating to the new BP OMS, which has an increased focus on process safety and continuous improvement. The majority of our operations in North America Gas, the Gulf of Mexico, Colombia and the Endicott field in Alaska all completed the migration to the OMS in 2008."

> - "Safety is our top priority . . . We continue to work to establish a strong safety culture, developing deep knowledge within every employee and sharing learning."

(Misrep. [*55] No. 21; Compl. ¶ 294.) The document also included a "Group chief executive's review" section signed by Hayward. In a Q&A section discussing Hayward's priorities for BP, Hayward explained that:

> - "Our number one priority was to do everything possible to achieve safe, compliant and reliable operations. . . . Safety must inform every decision and every action. The BP operating management system (OMS) turns the principle of safe and reliable operations into reality by governing how every BP project, site, operation and facility is managed."

(Misrep. No. 22; Compl. ¶ 295.) These statements were allegedly false and misleading for the reasons already set forth above. (Compl. ¶ 296.)

On February 25, 2009, McKay testified before the U.S. House of Representatives Committee on Natural Resources. In the written testimony he submitted, McKay represented that "[t]he track record of BP and the industry generally in the Western and Central Gulf of Mexico (GOM) demonstrates that when areas are opened, they can be leased, explored and developed to the highest environmental and operational standards in the world." (Misrep. No. 23; Compl. ¶ 297.) McKay's representations allegedly were false because, as president [*56] of BP America, McKay was aware of the safety deficits discussed above, including multiple safety failures that BP had experienced, but not reported, in its deepwater drilling operations. (*Id.*) He also allegedly was aware of the internal strategy document warning of major process safety concerns in the Gulf. (*Id.*)

In March 2009, BP held its 2009 Strategy Presentation for investors. Defendants Hayward, Inglis, and Conn participated. BP released a transcript of the presentation, which contained the following statements:

> - From Hayward: "2008 was another year of progress on our number one priority of safe and reliable operations."

> - "We remain focused on process safety and asset reliability. We have begun the implementation of [OMS], which covers everything from employee competencies to risk assessment, and we're already seeing the benefits."

> - From Inglis: "There is one important caveat: safe and reliable operations come first whatever cost efficiency measures we undertake, and we continue to advance the safety and reliability of our operations through implementing OMS."

(Misrep. No. 24; Compl. ¶ 300.) These statements were allegedly false and misleading because BP was in fact implementing [*57] budget cuts and staff reductions in key areas impacting the Company's ability to keep its professed commitment to safety. (Compl. ¶ 301(e).)

Following its Strategy Presentation, BP filed its 2008

Annual Report, Form 20-F, with the SEC. Hayward and Grote signed the form. Plaintiffs identify numerous statements in the 2008 Annual Report as false and misleading, including:

> - "During 2008, we continued to pursue our three strategic priorities of 'Safety', 'People' and 'Performance', which underpin BP's 'forward agenda'."

> - "Our first priority will always be to ensure the safety and integrity of our operations."

> - "Throughout 2008, senior leadership across the group continued to hold safety as their highest priority."

> - "All operated businesses plan to transition to OMS by the end of 2010. Eight sites completed the transition to OMS in 2008; . . . four Exploration and Production sites, North America Gas, the Gulf of Mexico, Colombia and the Endicott field in Alaska. . . . A core aspect of OMS implementation is that each site produces its own 'local OMS', which takes account of relevant risks at the site and details the site's approach to managing those risks."

(Misrep. No. 25; Compl. ¶ 302.) [*58] These statements were allegedly false and misleading because Defendants misrepresented that the Gulf of Mexico site had completed the transition to OMS and had produced a "local OMS" but failed to disclose that BP's Gulf operations lacked adequate operational protocols and safety procedures necessary to reduce the risk of catastrophic failure. (Compl. ¶ 303.)

On March 10, 2009, BP's initial exploration plan ("IEP") for the Mississippi Canyon Block 252--the site of the Macondo well--was marked "submitted" by the MMS. Plaintiffs allege that the IEP was initially received by the MMS on February 23, 2009 and was available to the public no later than March 10, 2009. (*Id.* ¶ 304.) Plaintiffs claim that the IEP falsely certified "that BP Exploration & Production Inc. has the capability to respond, to the maximum extent practicable, to a worst-case discharge, or a substantial threat of such discharge, resulting from the activities proposed in our

Exploration Plan," that is, the development of the Macondo well site. (Misrep. No. 26; Compl. ¶ 304.) The IEP also made specific representations about BP's ability to respond to a blowout, stating that:

> - "In the event of an unanticipated blowout resulting [*59] in an oil spill, it is unlikely to have an impact based on the industry wide standards for using proven equipment and techonology for such responses, implementation of BP's Regional Oil Spill Response Plan which address [sic] available equipment and personnel, techniques for containment and recovery and removal of the oil spill."

(*Id.*) According to Plaintiffs, these representations in BP's IEP were revealed to be false when BP proved unable to respond to the blowout on the Deepwater Horizon. Following the spill, a group of U.S. Senators wrote a letter to Attorney General Eric Holder, stating that BP's response and implementation of spill control efforts "appear[ed] to be taking place on an ad hoc basis." (Compl. ¶ 307(a).) BP later acknowledged that the techniques it relied on in its containment efforts "involve[d] significant uncertainties because they ha[d] not been tested in these conditions before." (*Id.*)

On March 25, 2009, McKay gave a speech at the Howard Weil Energy Conference in New Orleans, in which he discussed BP's Gulf operations. In the speech, McKay explained "that managing costs down does not mean BP will be skimping when it comes to ensuring our operations remain safe, [*60] reliable and compliant in the years ahead." He further assured the audience that "[s]afety will continue to have first call on the company's resources." (Misrep. No. 27; Compl. ¶ 308.) Shortly thereafter, in April 2009, Hayward spoke at BP's 2009 Annual General Meeting and stated that "[BP's] number one priority of safe and reliable operations has been vital to the underpinning of our restored competitive performance." (Misrep. No. 28; Compl. ¶ 310.) In May 2009, BP's Group Head of Research and Technology, David Eyton, gave a speech at Cambridge University in England. During his speech, Eyton discussed BP's ability to operate at the "frontiers," including the Gulf region, and claimed that "[t]echnology has continuously improved the safety and environmental footprint of our industry." (Misrep. No. 29; Compl. ¶ 312.) These statements were allegedly false and misleading for the

same reasons set forth above, including BP's failure to implement safety protocols in the Gulf, its cost-cutting measures undermining the safety of its operations, and undisclosed prior safety failures. (Compl. ¶ 311.)

On June 30, 2009, BP filed its revised Oil Spill Response Plan for the Gulf of Mexico ("Regional [*61] OSRP"). Like BP's IEP, the Regional OSRP provided estimates of the amount of oil BP could recover during a spill. Specifically, the Regional OSRP stated that "[t]he company [BP] and its subcontractors could recover approximately 491,721 barrels of oil per day (or more than 20.6 million gallons) in the event of an oil spill in the Gulf of Mexico." (Misrep. No. 30; Compl. ¶ 314.) This estimate was allegedly false and misleading given that BP was unable to contain the spill from the Deepwater Horizon, which spilled only about 60,000 barrels of oil per day. (Compl. ¶¶ 315, 5.)

On November 19, 2009, Rainey testified before the U.S. Senate Committee on Energy and Natural Resources, providing both oral and written testimony. Rainey's testimony included the following representation: "Releases from oil and gas operations are rare, and the application of technology has enabled a dramatic reduction of releases from our industry over the last 30 years." Rainey then elaborated on these technologies, providing the following examples of "technologies which have helped to reduce accidental releases": down hole flow control valves that shut down the well automatically if damage to the surface equipment [*62] is detected; blowout preventer technology including redundant systems and controls; new and improved well control techniques; sensors to monitor subsurface and seabed conditions for pressure changes; and BP's fiber optic network in the Gulf "which allows [BP] to monitor well pressures in real time, both at the facility and in [BP's] offices in Houston." (Misrep. No. 31; Compl. ¶ 317.) Rainey's statements were allegedly false and misleading because BP had purposefully removed redundant systems in its drilling operations in the Gulf of Mexico, alterations that included removal of one of the blind shear rams on the Deepwater Horizon's blowout preventer. (Compl. ¶¶ 94, 318.)

BP released its 2009 Annual Review on February 26, 2010. The document included statements praising the success of BP's Gulf operations and its commitment to safety, such as:

- "In Exploration and Production our strategy is to invest to grow production safely, reliably and efficiently by strengthening our portfolio of leadership positions in the world's most prolific hydrocarbon basins, enabled by the development and application of technology and strong relationships based on mutual advantage."

- "Safety, both personal [*63] and process, remains our highest priority."

(Misrep. No. 32; Compl. ¶ 319.) The "Chairman's letter" section of the Annual Review further espoused BP's commitment to safety, proclaiming that "the board will strive to set high expectations of how risk is managed and remain vigilant on oversight." (Id.) Finally, Hayward's statements in the Annual Review, included as part of the "Group chief executive's review," contained additional alleged misrepresentations, including:

- "Our priorities remained absolutely consistent - safety, people and performance - and you can see the results of this focus with improvements on all three fronts."

- "We continue to show our ability to take on and manage risk, doing the difficult things that others either can't do or choose not to do."

(Misrep. No. 33; Compl. ¶ 320.) The foregoing statements were allegedly false and misleading for the same reasons set forth above. (Compl. ¶ 321.)

On March 2, 2010, BP conducted its 2010 Strategy Presentation. Hayward, Inglis, and Conn participated in the event. During the presentation, Defendants again assured investors that safety was BP's top priority. Such assurances included the following statements:

- By Hayward: "Our [*64] focus on safe and reliable operations is now strongly embedded in our business; we are continuing to build the core capabilities of our people; . . . Safety remains our number one priority and we can see clear progress."

- By Hayward: "In summary, we are

strengthening the safety culture throughout our business, and building a track record that we intend to become industry leading."

- By Hayward: "We will vigorously drive cost and capital efficiency whilst at the same time maintaining our first priority of safe and reliable operations."

- By Inglis: "Our strategy is clear. We invest to grow production safely, reliably and efficiently."

- By Inglis: "There is one important caveat: safe and reliable operations always come first, whatever cost efficiency measures we undertake."

- By Conn: "Safe and reliable operations remain the no. 1 priority. In 2009 we had one of the best years in terms of safety performance, with many of our personal and process safety measures comparing favorably with industry peers and no workforce fatalities."

(Misrep. No. 34; Compl. ¶ 322.) These statements allegedly falsely represented that BP's safety performance compared favorably with that of its competitors when, [*65] in fact, BP's focus on and expansion of high-risk deepwater operations and its failure to adopt industry best practices for safety increased the Company's potential liabilities beyond those of its competitors. (Compl. ¶ 323.)

On March 5, 2010, BP filed its 2009 Annual Report, Form 20-F, with the SEC. Hayward and Grote signed the report. The report allegedly contained numerous false statements. For example, the report addressed BP's reliance on OMS as a "systematic framework for safe, reliable and efficient operations" and a "common framework for all BP operations." (Misrep. No. 35; Compl. ¶ 324.) Additionally, the report repeatedly emphasized safety as BP's priority and claimed that BP had "continued to strengthen [its] processes for managing compliance" with a variety of regulations. (*Id.*) It also referenced the Ombudsman's office and noted that "employees and contractors c[ould] contact him confidentially to report any suspected breach . . . including safety concerns." (*Id.*) Finally, the Annual

Report made specific reference to the Texas City incident and BP's subsequent progress on the safety front, stating that:

- "Following the tragic incident at the Texas City refinery in 2005 [*66] the [Safety, Ethics, and Environment Assurance] committee has observed a number of key developments, including: the establishment of a safety & operations (S&O) function with the highest caliber of staff; development of a group-wide operating management system (OMS) which is being progressively adopted by all operating sites; the establishment of training programmes in conjunction with MIT that are teaching project management and operational excellence; the dissemination of standard engineering practices throughout the group . . . . Throughout this time the group chief executive has made safety the number one priority."

(Misrep. No. 35; Compl. ¶ 324.) The foregoing statements in the Annual Review were allegedly false and misleading for all of the reasons discussed above. (Compl. ¶ 325.)

In March 2010, Defendants Hayward and Inglis gave several speeches that included additional misrepresentations. On March 9, 2010, Inglis spoke at the CERA Week conference in Houston, Texas. A transcript of Inglis's speech, posted on BP's website, included the following representation:

- "[BP has] developed the capability to create advanced floating production facilities, complex riser systems, and subsea [*67] equipment with the ability to integrate the elements to cope with extreme temperatures, pressures, and oceanographic conditions. And that has enabled BP to become the leading deepwater IOC."

(Misrep. No. 36; Compl. ¶ 326.) At the Howard Weil Energy Conference in New Orleans, held on March 22, 2010, Inglis again praised BP's competitiveness in the Gulf region, claiming that "we are now the leading

deepwater producer and a lot of our deepwater experience has, of course, been gained in the Gulf of Mexico." (Misrep. No. 37; Compl. ¶ 328.) Inglis's statements were allegedly false and misleading when made because, in addition to the reasons discussed above, BP's Senior Vice President for Drilling Operations in the Gulf of Mexico, Kevin Lacy ("Lacy"), had informed Inglis directly of his concerns that BP lacked a commitment to improving process safety in the Gulf region and that the Company's reorganization was placing BP's offshore operations at risk. (Compl. ¶ 119.) Lacy allegedly spoke to Inglis in December 2009. (*Id.*)

Hayward, too, delivered a speech in March 2010, in which he discussed BP's changes to its safety program following the Texas City refinery explosion. During the speech, which [*68] was held at the Peterson Institute for International Economics in Washington, D.C., Hayward claimed that the "tragic accident has changed in a profound and fundamental way our approach to safety and operations integrity - providing a safe working environment is a paramount responsibility, and our first and foremost priority." (Misrep. No. 38; Compl. ¶ 330.) Plaintiffs allege that this statement was misleading for all the reasons set forth above. (Compl. ¶ 331.)

On April 15, 2010, BP held its 2009 Annual General Meeting and also released its 2009 Sustainability Review. Hayward gave a speech during the General Meeting, stating:

> - "Our focus on safe and reliable operations is now strongly embedded in all our businesses; . . . we have started to see the benefits of improved operational performance flowing through to the bottom line."

> - "Safety remains our number one priority and I'm pleased to report we can see clear progress."

(Misrep. No. 39; Compl. ¶ 332.) The 2009 Sustainability Review, too, reiterated BP's commitment to safety by specifically referencing OMS:

> - "BP's operating management system (OMS) provides a single framework for all BP operations to follow, covering all areas from process [*69] safety, to personal health, to environmental performance."

> - "Providing an integrated and consistent way of working, the OMS helps ensure that a rigorous approach to safe operations continues to be taken."

(Misrep. No. 40; Compl. ¶ 334.) These statements were allegedly false because BP was on notice that there were major process safety concerns in the Gulf of Mexico, that its "framework" did not require consistent practices worldwide, and that a 2009 audit of the Deepwater Horizon's blowout preventer revealed overdue maintenance jobs serious enough to lead to "loss of life, serious injury or environmental damage." (Compl. ¶¶ 62, 333-34.)

The Complaint alleges that all of the statements described above were false representations and empty promises. The reality--as revealed in the Deepwater Horizon catastrophe--was that BP had deceived investors as to BP's true risk profile in deep sea drilling because "the Company failed to conduct the process safety overhaul it represented to investors it would implement." (*Id.* ¶¶ 24-25.) According to Plaintiffs, not only was the Deepwater Horizon disaster a predictable consequence of BP's failure to implement safety reforms, but BP possessed actual knowledge [*70] of serious equipment failures, maintenance delays, and authorized changes that reduced the safety redundancies on the Deepwater Horizon to such an extent that the Company was on notice that just such a disaster was likely to occur. (*Id.* ¶ 62.) While the Deepwater Horizon disaster shocked investors, Plaintiffs claim that it should have come as no surprise to BP.

### 5. The Deepwater Horizon Explosion

The Macondo well site sits almost fifty miles off the coast of Louisiana and is believed to hold as much as 2.1 billion gallons of producible oil. (Compl. ¶ 152.) The well is part of the Mississippi Canyon Block 252, a nine square-mile plot in the Gulf of Mexico. BP paid $34 million for the exclusive drilling rights on the plot, and the Macondo well was to be BP's first well there. (*Id.*) Before a company can undertake deepwater drilling operations in the Gulf of Mexico, the MMS requires the company to file an oil spill response plan ("OSRP"). By law, an OSRP must contain very specific details of a Company's strategy for responding to a potential spill. [7] For example, MMS regulations require that an OSRP include: (1) an emergency response action plan; (2)

disclosure of the equipment available [*71] to combat an oil spill; (3) any oil spill response contractual agreements with third-parties; (4) calculations of worst-case discharge scenarios; (5) a plan for dispersant use in case of a spill, (6) an in-situ oil burning plan, and (7) information regarding oil spill response training and drills. (*Id.*)

> 7   The required contents of an OSRP are set out in the Federal Register. *See* 30 C.F.R. § 254.23.

BP publicly filed its first Regional OSRP for the Gulf of Mexico on December 1, 2000. The most recent revision, titled "BP's Regional OSRP for the GOM," was filed on June 30, 2009. (*Id.* ¶ 155.) BP's Regional OSRP estimated the "total worst case discharge" scenario for the Gulf of Mexico at a range of between 28,033 barrels of oil per day to up to 250,000 barrels per day. [8] (*Id.* ¶ 156.) The Regional OSRP also stated that BP and its subcontractors had the capacity to recover approximately 491,721 barrels of oil per day, well over the projected total worst case discharge scenario for the Gulf of Mexico. (*Id.*)

> 8   The wide variations in the estimated spill amounts correlate to the spill's distance from shore. The amount of the spill increases progressively the further out a spill occurs. As BP's Regional [*72] OSRP explained, an oil spill occurring less than ten miles from shore could create a worst case discharge of 28,033 barrels per day. A spill greater than ten miles could increase the possible discharge to 177,400 barrels per day. Finally, a spill caused by a mobile drilling rig--such as the Deepwater Horizon-- drilling an exploratory well could generate a spill of up to 250,000 barrels per day. (Compl. ¶ 156.)

In addition to this Regional OSRP, BP also filed an IEP for the Mississippi Canyon Block 252 on March 10, 2009. (*Id.* ¶ 157.) BP's IEP provided an additional estimate of the worst case spill scenario specific to Block 252. The IEP estimated that worst case scenario at approximately 162,000 barrels of oil per day. The IEP reiterated that "BP . . . ha[d] the capability to respond to the appropriate worst-case scenario included in its regional OSRP" of 250,000 barrels per day. (*Id.* ¶ 159.) Therefore, since the scenario at Block 252 produced a lower estimate of 162,000 barrels per day, BP's IEP "certified" that BP had the ability to respond to the worst case discharge at Block 252, where the Macondo well was located. (*Id.*)

BP first began drilling the Macondo well with the Marianas rig, [*73] which it leased from Transocean. (*Id.* ¶ 161.) Following a hurricane, BP replaced the Marianas with the Deepwater Horizon, a rig also on lease from Transocean. (*Id.* ¶ 162.) The Deepwater Horizon came with a troubled safety history of its own. As early as 2005, an independent audit of the blowout preventer ("BOP") on the Deepwater Horizon suggested maintenance problems. (*Id.* ¶ 61.) In September 2009, a BP audit of the Deepwater Horizon revealed serious concerns that could "lead to loss of life, serious injury or environmental damage as a result of inadequate use and/or failure of equipment." (*Id.* ¶ 62.) Specific problems identified included overdue maintenance jobs related to well control issues, BOP maintenance, alarm systems, and stabilization systems on the rig. (*Id.*)

A BOP is a five-story device set on the ocean floor at the mud line, that is, beneath the riser connecting a rig to the sea floor but on top of the cement surface casing that seals the rig in place. (*Id.* ¶ 85.) If closed properly, a BOP can prevent an uncontrolled oil or gas release from a well. (*Id.* ¶ 84.) To activate a BOP, rams must be closed to seal the area around the drill pipe in the well, thereby locking any unwanted [*74] oil and gas into the well. (*Id.* ¶ 86.) "Blind" or "annular" rams are used if no pipe has been laid in the well. (*Id.*) If the rams cannot be closed, operators must activate a BOP's blind shear rams, which are intended to cut through any drill pipe in the well and then seal in the oil below the BOP. (*Id.*) In a worst case scenario, an operator may activate all rams, both annular and blind shear, which will completely disconnect the BOP from the riser and prevent oil and gas from rising up to the rig above. (*Id.*) As early as 2001, analysts recommended that companies operating deepwater rigs in the Gulf of Mexico equip their BOPs with two blind shear rams instead of one, as blind shear rams carry a significant risk of failure. (*Id.* ¶ 88.) Over the next several years, BP conducted several other tests on the reliability of BOPs, including the BOP on the Deepwater Horizon. (*Id.* ¶¶ 89-93.) [9]

> 9   The Complaint insinuates, but does not explicitly allege, that BP was in possession of two specific reports from independent expert groups casting doubt on the safety of the Deepwater Horizon's BOP. First, in April 2000, EQE International conducted an analysis of the BOP to

be installed on the Deepwater [*75] Horizon. That analysis revealed that there was a particular component on the BOP--the "shuttle valve"--that had no backup. Thus, if the shuttle valve failed, it would render all remaining redundancies built into the BOP useless. While Plaintiffs tie this report to the Deepwater Horizon, they do not allege explicitly that BP possessed the report, only that it "was not publicly disclosed until June 20, 2010." (Compl. ¶ 91.) Second, Det Norske Veritas, an independent consulting group, analyzed past BOP performance generally and produced a report, commissioned by Transocean and released in July 2009. The report found that blind shear rams in BOPs have a failure rate of 45%. While Plaintiffs allege that the "existence of this report was first disclosed to the investing public on June 20, 2010," they do not allege that BP possessed it before that date. (Id. ¶ 93.)

On April 20, 2010, after several disruptions in the drilling process, BP prepared to place the Macondo well into "temporary abandonment," a process by which a drilling rig--such as the Deepwater Horizon--removes its own BOP and riser from the well so that a production rig can take its place and begin production. (Id. ¶ 188.) Part of [*76] the temporary abandonment process involves placing a cement plug, a three-hundred-foot cap, over the well and filling the area below the plug with heavy drilling mud to keep downward pressure on the hydrocarbon zone in the well. (Id.) Prior to abandonment, a negative-pressure test is performed to assess whether any leaks allow hydrocarbons to flow into the well. (Id. ¶ 189.) According to Plaintiffs, BP had no established procedure or protocol for conducting the negative pressure test, and pressure tests the BP crew did perform failed three times, indicating that a leak--or at least a "very large abnormality"--existed in the well. (Id. ¶¶ 193-94.) After finally receiving a successful test result on the fourth attempt, the BP crew removed 3,300 feet of drilling mud from the well and replaced it with sea water. At this point in the process, the only barriers left between the rig and the hydrocarbons in the well were the remaining drilling mud at the bottom of the well and the cement plug, which BP had placed further down in the well than MMS regulations allowed. (Id. ¶¶ 196-97.)

At 9:01 p.m. on the evening of April 20, 2010--after the markets had closed for the day--pressure measurements in [*77] the Macondo well increased

dramatically, signaling a crisis. (Id. ¶ 200.) Although the pressure data were immediately available in BP's Houston office, a subsequent investigation found that there was "nobody in that B.P. Macondo well office that night" and "everybody had gone home." (Id. ¶ 201.) In addition, the BP crew on the rig did not respond until 9:30 p.m., a half hour after the first problematic pressure readings occurred. (Id.) At 9:38 p.m. the first hydrocarbons passed through the BOP and spewed up onto the floor of the rig. (Id. ¶ 202-06.) The crew attempted to activate the BOP's annular preventer, but it had ruptured four weeks earlier and had not been repaired. (Id.) At 9:49 p.m., the deck of the rig ignited, causing a cascade of liquid to shoot twenty stories above the main deck of the rig. (Id.) After the explosion, workers should have deployed the rig's Emergency Disconnect System ("EDS"), but rig workers later explained that they had not been trained in how to do so. (Id. ¶ 207.) A BP employee eventually attempted to activate the EDS, which in turn should have activated the blind shear ram, but the ram failed to respond. (Id. ¶ 208.) The BOP's deadman switch, an automatic [*78] response mechanism, also failed to trigger the blind shear ram because its battery had not been charged properly following maintenance and inspection delays. (Id. ¶ 209.) With no escape plan, crew members leaped off the rig, 100 feet down, into the ocean. Eleven crew members died and seventeen were injured. The Deepwater Horizon continued to burn for thirty-six hours before finally sinking into the Gulf on the morning of April 22, 2010. (Id. ¶ 211.) Even after the rig sank, oil continued to gush from the open well into the Gulf.

### 6. False and Misleading Statements Following the Deepwater Horizon Disaster

Plaintiffs claim that BP continued to issue false and misleading statements following the Deepwater Horizon explosion by misrepresenting both the estimated amount of the spill and BP's ability to respond to it. BP issued its first two press releases about the incident on April 21, 2010. The first confirmed a previous statement issued by Transocean reporting a fire aboard the Deepwater Horizon. The second offered BP's support to Transocean, stating that BP "stood ready to assist" in responding to the fire. (Misrep. No. 41; Compl. ¶ 337.) Plaintiffs allege these press releases were intended [*79] to keep BP securities trading at inflated prices because BP failed to acknowledge that oil was already leaking from the Macondo well. (Compl. ¶ 338.) In addition, Plaintiffs

assert that the multiple errors in BP's Regional OSRP undermined any representation that BP stood "ready to assist." (*Id.*)

By April 26, 2010, additional leaks were discovered in the riser and it was clear that oil continued to spill into the Gulf. This news caused BP ADSs to fall $1.97 per ADS, or more than 3%. (*Id.* ¶ 340.) On April 28, 2010, BP held a joint press conference with the U.S. Coast Guard. Speaking at the press conference, Defendant Suttles calculated BP's "best estimate" for the spill at 1,000 barrels of oil per day. (Misrep. No. 42; Compl. ¶ 342.) Suttles also added the following:

> - "Late this afternoon, while monitoring the blowout preventer area, which we have done continuously since the event began, we discovered a new point of leak. This leak is just beyond the top of the blowout preventer in the pipe work called the riser. Given the location, we do not believe this changes the amount currently estimated to be released."

(*Id.*) Suttles's estimates were allegedly false and misleading because he was [*80] actually in possession of much higher spill estimates. (Compl. ¶ 346.) The next day, April 29, 2010, Suttles conducted additional media interviews and discussed the rate of the oil spill. On The Early Show, for example, Suttles stated: "I think that somewhere between one and five thousand barrels a day is probably the best estimate we have today." (Misrep. No. 43; Compl. ¶ 344.)

During the U.S. House of Representatives' post-spill investigation, Representative Markey revealed various internal BP documents that the Company possessed during the spill. These included: (1) a BP internal document dated April 27, 2010, marked "Confidential," showing BP's low estimate of the spill at 1,063 barrels per day, its "best guess" at 5,758 barrels per day, and its high estimate at 14,266 barrels per day and (2) a BP internal document dated April 26, 2010, reflecting a 5,000 barrel per day spill estimate. (*Id.* ¶ 346.) These internal estimates, available to BP at least a day before Suttles provided estimates to the public, reveal the falsity of Suttles's announcements. Suttles cited the 1,000 barrel figure despite knowing that BP's "best estimate" was actually greater than 5,000 barrels per day. (*Id.*) [*81] Plaintiffs contend that Suttles intentionally lowballed the

estimates to keep the price of BP securities up. (*Id.* ¶ 346.)

On April 29, 2010, Janet Napolitano, U.S. Secretary of Homeland Security, designated the spill a "spill of national significance." (*Id.* ¶ 343.) Following this announcement, BP securities fell from $57.34 per ADS on April 28 to $52.56 per ADS on April 29, a decline of almost $5 per share. (*Id.* ¶ 345.) Plaintiffs contend that even these amounts were artificially inflated as a result of Suttles's inaccurate spill estimates. (*Id.* ¶ 346.) BP's ADSs fell almost another 4%, dropping to $50.19 per ADS over the weekend of April 30, 2010. (*Id.* ¶ 350.) On May 5, 2010, Suttles again appeared before the public during a press conference in Robert, Louisiana. The subject of the press conference was BP's planned use of a cofferdam to stop the spill. As Suttles explained:

> - "Over the weekend, then, we'll be attaching that dome to the drillship Enterprise with a riser pipework assembly, which will allow the oil to flow up to the surface and be processed. So if all goes to plan, we should begin to start that operation, the beginning of trying to process the fluids on the surface and [*82] stop the spilling to the sea, on Monday."

(Misrep. No. 44; Compl. ¶ 351.) Suttles's statement was allegedly misleading because BP knew that the cofferdam was highly likely to fail and had never been used in a deepwater environment. (Compl. ¶ 352.)

Also on May 5, 2010, Hayward conducted an interview with journalists from the Houston Chronicle. In the interview, Hayward stated that: "A guesstimate is a guesstimate. And the guesstimate remains 5,000 barrels a day." (Misrep. No. 45; Compl. ¶ 353.) Plaintiffs allege that Hayward, like Inglis, was in possession of internal BP documents disclosing that the best estimate was actually 5,758 barrels per day and as high as 14,266 barrels per day. As with Suttles's statements, Plaintiffs assert that Hayward's "guesstimate" misrepresented the spill rate in order to keep BP securities prices from falling further. (*Id.* ¶ 354.)

On May 6, 2010, Dudley spoke at the Chief Executives' Club in Boston, Massachusetts. BP posted a transcript of Dudley's speech on its website. During his speech, Dudley specifically discussed the Deepwater

Horizon and BOPs, stating:

> - "At the time of the explosion, the Deepwater Horizon drilling rig had been working for BP for [*83] almost nine years. . . . The rig had handled some of the industry's greatest technical challenges, and her safety record had been excellent and had recently won awards."
>
> - "A Blowout Preventer is used on every oil and gas well drilled in the world today -- onshore and offshore."
>
> - "These mechanisms are regularly inspected and tested. If they don't pass the test, drilling operations are made safe and the system is replaced or repaired and retested."
>
> - "BOPs are designed to be fail-safe. This Blowout Preventer was not. It failed to close, or to close completely."

(Misrep. No. 46; Compl. ¶ 355.) These statements were allegedly false and misleading because (1) the Deepwater Horizon's BOP was not regularly inspected, given the large backlog of maintenance jobs revealed by the internal audit in 2009; (2) BP had actually modified the Deepwater Horizon's BOP by removing the second blind shear ram, further reducing the safety redundancies on the rig; (3) four weeks before the explosion, chunks of the BOP's annular preventer had broken off, indicating operational problems with the BOP; and (4) on March 10, 2010, a little over a month before the explosion, BP sought and obtained a postponement of [*84] the MMS's inspection of the BOP. (*Id.* ¶ 356.)

On June 1, 2010, Attorney General Holder announced that the U.S. Department of Justice ("DOJ") had opened formal criminal and civil investigations into BP following the spill. Following a New York Times article titled, "Documents Show Early Worries About Safety of Rig," published on May 28, 2010, BP's ADSs fell from $42.95 per share to $36.52 per share by June 1, 2010, a decline of approximately 15%. (*Id.* ¶ 359.) On June 9, 2010, fears that BP would suspend dividends caused further decline in the value of BP's securities. (*Id.* ¶¶ 361-63.) On June 14, 2010, BP's Board of Directors met to discuss suspending dividend payments. On receipt of this news, BP ADSs plunged almost 10%. (*Id.* ¶ 378.)

In total, BP's securities fell in value by almost 48% from the date of the Deepwater Horizon explosion through June 2010. (*Id.* ¶ 379.)

## C. Legal Standard

### 1. Rule 12(b)(6)

To survive a motion to dismiss, a complaint must contain sufficient factual allegations, accepted as true, to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009). A claim has "facial plausibility when the plaintiff pleads factual content [*85] that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* It follows that, where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged--but has not shown--that the plaintiff is entitled to relief. *Id.* at 1950; *see also* FED. R. CIV. P. 8(a)(2). Well-pleaded factual allegations must be taken as true, but the court does not "accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Cent. Laborers' Pension Fund v. Integrated Elec. Servs., Inc.*, 497 F.3d 546, 550 (5th Cir. 2007).

In considering a Rule 12(b)(6) motion to dismiss, a court must limit itself to the contents of the pleadings, with two exceptions. First, the Fifth Circuit allows the courts to consider certain documents attached to the motion to dismiss. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000). The Fifth Circuit restricts such consideration to documents that are referenced in the complaint and are central to the plaintiffs' claim. *Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003). Second, in securities cases, courts may [*86] take judicial notice of the contents of public disclosure documents that the law requires be filed with governmental agencies, such as the SEC, and that are actually filed with the agency. *Lovelace v. Software Spectrum. Inc.*, 78 F.3d 1015, 1018 n.1 (5th Cir. 1996). However, these documents may be considered only for the purpose of determining what statements they contain, not for proving the truth of their contents. *Id.*

As is required for Rule 12(b)(6) analysis, the court must draw all reasonable inferences in favor of the plaintiff. However, for scienter only, in keeping with the requirements of the Private Securities Litigation Reform Act ("PSLRA"), the court must take into account

plausible inferences opposing as well as supporting a strong inference of scienter. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007). Accordingly, for purposes of a Rule 12(b)(6) motion to dismiss, a strong inference of scienter is one at least as compelling as any opposing inference of non-fraudulent intent. *Id.*

### 2. Section 10(b)

Under section 10(b) of the Securities Exchange Act of 1934,

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality [*87] of interstate commerce or of the mails, or of any facility of any national securities exchange . . . (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). SEC Rule 10b-5, promulgated pursuant to section 10(b), implements section 10(b) by forbidding, among other things, the making of any "untrue statement of a material fact" or the omission of any material fact "necessary in order to make the statements made . . . not misleading." 17 C.F.R. § 240.10b-5. The Supreme Court has implied from the text of section 10(b) that it affords a right of action to purchasers or sellers of securities injured by its violation. *Tellabs*, 551 U.S. at 318. To state a private claim under section 10(b), a plaintiff must allege the following: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission [*88] and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157, 128 S. Ct. 761, 169 L. Ed. 2d 627 (2008); *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 641 (5th Cir. 2005).

### a. Material Misrepresentations and Omissions

Because Plaintiffs assert securities fraud claims, they must satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA. *See Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009); *see also Tellabs*, 551 U.S. at 322 (noting that the PSLRA's twin goals are to curb frivolous, lawyer-driven litigation, while preserving investors' abilities to recover on meritorious claims). Rule 9(b) requires that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b); *see also Rosenzweig v. Azurix*, 332 F.3d 854, 866 (5th Cir. 2003) (noting that the PSLRA's particularity requirement incorporates, at a minimum, the pleading standard for fraud under Rule 9(b)). The PSLRA enhances the requirements of Rule 9(b) in two ways. First, plaintiffs must "specify each statement alleged [*89] to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Second, for each act or omission alleged to be false or misleading, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* at § 78u-4(b)(2).

In order to meet these additional requirements of the PSLRA, a plaintiff must, therefore: (1) specify each statement alleged to have been misleading; (2) identify the speaker; (3) state when and where the statement was made; (4) plead with particularity the contents of the false representation; (5) plead with particularity what the person making the misrepresentation obtained thereby; and (6) explain the reason or reasons why the statement is misleading, *i.e.*, why the statement is fraudulent. *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002). These allegations constitute the "who, what, when, where, and how" required under Rule 9(b) and the PSLRA. *Id.* What constitutes particularity will necessarily differ with the facts of each case. *Guidry v. Bank of LaPlace*, 954 F.2d 278, 288 (5th Cir. 1992). A dismissal for failure to [*90] plead fraud with particularity as required by Rule 9(b) is a dismissal on the pleadings for failure to state a claim. *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 361 (5th Cir. 2004).

General allegations, which lump all defendants together and fail to segregate the alleged wrongdoing of one from those of another, do not meet the requirements

of Rule 9(b). The court will reject the "group pleading" approach and instead look to the state of mind of the individual corporate official or officials "who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment." *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 533 (5th Cir. 2008).

To be actionable, a misrepresentation of a fact, or an omission of a fact, must be material. The Supreme Court recently reaffirmed that there is no bright-line rule for determining whether information withheld from a company's filings is materials as a matter of law. *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1318-23, 179 L. Ed. 2d 398 (2011). [*91] Unwilling to allow materiality to be reduced to a test of "statistical significance," the Court held instead that assessing materiality involves a "fact-specific inquiry . . . that requires consideration of the source, content, and context" of the allegedly omitted information. *Id.* at 1321. The misrepresentation of a fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in making an investment decision. *Basic Inc. v. Levinson*, 485 U.S. 224, 231, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988). For an omission to be material, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available. *Id.* at 232; *see also Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1445 (5th Cir. 1993) (explaining that the appropriate inquiry is whether the statement or omitted fact is significant, "such that it alters the total mix of information available about the proposed investment"). Materiality is not judged in the abstract, but in light of the surrounding circumstances. *Rubinstein v. Collins*, 20 F.3d 160, 168 (5th Cir. 1994).

With regard to misstatements, [*92] the PSLRA establishes a "safe harbor" protecting a forward-looking statement from liability where such a statement is made by a natural person, unless plaintiffs prove that it was made with actual knowledge that the statement was false and misleading. 15 U.S.C. § 78u-5(c)(1)(A). A statement is forward looking if it is:

(A) a statement containing a projection

of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C); [or]

(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement [*93] made by the issuer[.]

15 U.S.C. § 78u-5(i)(1)(A).

The safe harbor provision protects individuals and corporations from liability for forward-looking statements that prove false if the statement is "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" or where the forward-looking statement is immaterial. *Id.* at § 78u-5(c)(1)(A)(i)-(ii). Where the forward-looking statement is not accompanied by cautionary language, a plaintiff must demonstrate that the defendant made the statement with "actual knowledge" as to its falsity. *Id.* at § 78u-5(c)(1)(B).

Vague, optimistic statements are not actionable. Allegations that amount to little more than corporate "cheerleading" are puffery, projections of future performance not worded as guarantees, and are not actionable under federal securities law because no reasonable investor would consider such statements material and because investors and analysts are too sophisticated to rely on vague expressions of optimism rather than specific facts. *Krim*, 989 F.2d at 1446.

Additionally, "it is well-established that generalized positive [*94] statements about a company's progress are not a basis for liability." *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 419 (5th Cir. 2001). Statements that are predictive in nature are actionable only if they were false when made. *Shushany v. Allwaste, Inc.*, 992 F.2d 517, 524 (5th Cir. 1993).

### b. Scienter

Section 10(b) and Rule 10b-5 do not protect investors against negligence or corporate mismanagement. *Shaw Group*, 537 F.3d at 535. Under the PSLRA, it is not enough to particularize false statements or fraudulent omissions made by a defendant; rather, for "each act or omission alleged" to be false or misleading, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). To establish a section 10(b) claim, a private plaintiff must prove that the defendant acted with scienter. *Tellabs*, 551 U.S. at 319.

*Tellabs* outlined a three step approach to reviewing scienter allegations in a motion to dismiss a federal securities fraud case pursuant to the PSLRA. *Id.* at 323. First, the allegations must, as in federal pleadings generally, be taken as true. *Id.* Second, courts may consider documents incorporated [*95] in the complaint by reference and matters subject to judicial notice. *Id.* The facts must be evaluated collectively, not in isolation, to determine whether a strong inference of scienter has been pleaded. *Id.* at 324; *see also Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 260 (5th Cir. 2005) ("While [the Fifth Circuit] will view a complaint *in toto* when considering whether a complaint has adequately pled scienter . . . each allegation of fraud must individually meet the particularity requirements of the PSLRA.") (citation omitted). Third, a court must take into account plausible inferences opposing as well as supporting a strong inference of scienter. *Tellabs*, 551 U.S. at 324. The inference of scienter must ultimately be "cogent and compelling," not merely "reasonable" or "permissible." *Id.*; *see also Shaw Group*, 537 F.3d at 533-34 (adopting *Tellabs*' three step approach).

In the context of federal securities fraud, scienter is "defined as 'an intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have

been aware of it.'" *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009) [*96] (quoting *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 643 (5th Cir.2005)); *see also Plotkin v. IP Axess Inc.*, 407 F.3d 690, 697 (5th Cir. 2005) ("[A] securities fraud plaintiff must prove that the defendant either consciously misbehaved . . . or was so severely reckless that it demonstrates that the defendant must have been aware of the danger of misleading the investing public."). Severe recklessness is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Rosenzweig*, 332 F.3d at 866.

For a complaint to adequately plead scienter, "Congress require[s] plaintiffs to plead with particularity facts that would give rise to a 'strong'-- *i.e.,* a powerful or cogent--inference." *Tellabs,* 551 U.S. at 323. The inference need not be "irrefutable, i.e., of the 'smoking gun' genre, or even the most plausible of competing inferences." *Id.* (citation omitted) (internal quotation omitted). Nonetheless, the "inference [*97] of scienter must be more than merely 'reasonable' or 'permissible'--it must be cogent and compelling, thus strong in light of other explanations." *Id.* In addition, "[t]he strength of an inference cannot be decided in vacuum. . . . To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 323-24. "[O]missions and ambiguities count against inferring scienter, for plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendants acted with the required state of mind.'" *Id.* at 326 (quoting 15 U.S.C. § 78u-4(b)(2)).

Although circumstantial evidence can support a strong inference of scienter, allegations of motive and opportunity standing alone will not suffice. *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 430 (5th Cir. 2002). Appropriate motive and opportunity allegations may, however, "meaningfully enhance the strength of the inference of scienter." *Southland*, 365 F.3d at 368 (quoting *Nathenson*, 267 F.3d at 412). Corporate officers are not liable for acts solely [*98] because they are officers, even where their day-to-day involvement in the

corporation is pleaded. *Id.* However, corporate statements can be connected to a particular officer if plaintiffs allege the officer signed the document in which the statement appears or they adequately allege the officer's involvement in creating the document. *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006).

The Fifth Circuit has rejected the group pleading approach to scienter. *Shaw Group*, 537 F.3d at 534. Instead, a court must look to the state of mind of the individual corporate official or officials making or issuing the statement "rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment." *Southland*, 365 F.3d at 366. As the Fifth Circuit explained, "[c]onsistent with our rejection of the 'group pleading' doctrine, we do not construe allegations contained in the Complaint against the 'defendants' as a group as properly imputable to any particular individual defendant unless the connection between the individual defendant and the allegedly fraudulent statement is specifically pleaded." *Southland*, 365 F.3d at 365. [*99] Therefore, when pleading fraud claims against individuals under section 10(b) and Rule 10b-5, plaintiffs must distinguish among defendants and allege the role of each. *Id.*

### 3. Section 20(a) claims

Under section 20(a) of the Exchange Act, "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . ." 15 U.S.C. § 78t(a). Section 20(a) is a secondary liability provision, and plaintiffs must therefore establish a primary violation under section 10(b) before liability arises under section 20(a). *ABC Arbitrage*, 291 F.3d at 348 n. 57 (noting that "control person" liability is "derivative, i.e., such liability is predicated on the existence of an independent violation of the securities laws"). Accordingly, if a plaintiff fails to state a claim for a primary securities fraud violation under section 10(b) or Rule 10b-5, they necessarily fail to state a claim for control person liability under section 20(a). *Fin. Acquisition Partners*, 440 F.3d at 288.

### D.  [*100] **Analysis**

### 1. Plaintiffs Have Alleged False and Misleading Statements

In order to adequately plead a misleading statement or omission under the PSLRA, a plaintiff must (1) specify each statement alleged to have been misleading; (2) identify the speaker; (3) state when and where the statement was made; (4) plead with particularity the contents of the false representation; (5) plead with particularity what the person making the misrepresentation obtained thereby; and (6) explain the reasons why the statement is misleading, *i.e.*, why the statement is fraudulent. *ABC Arbitrage*, 291 F.3d at 350. By the Court's calculation, and combining alleged misstatements made in the same document or by the same speaker on the same date, Plaintiffs allege that BP, or its officers or directors, made forty-six misrepresentations over the course of a three and a half year period. Notwithstanding the volume and breadth of the allegations, Plaintiffs cite almost identical facts--indeed, the same paragraph appears in the Complaint, almost verbatim, over twenty times--as evidence of the falsity of each statement. Specifically, Plaintiffs allege that the majority of the statements were false for some combination of  [*101] the following five reasons: (1) BP was not committed to process safety because the Company continued to expand its deepwater operations without implementing adequate process safety procedures (Compl. ¶¶ 256(a), 260(a), 263(a), 268(a), 270(a), 272(a), 274(a), 276(a), 280(a), 282(a), 296(b), 301(a), 303(b), 309(a), 311(a), 321(b), 323(a), 325(a), 329(a), 331(a), 333(b)); (2) BP misrepresented its risk profile by failing to disclose the "multiple safety failures and near-failures" that BP experienced in its deepwater drilling operations (Compl. ¶¶ 265(c), 268(b), 270(b), 272(c), 274(b), 276(b), 280(b), 282(b), 284(a), 286(a), 296(c), 299(b), 301(c), 303(c), 309(b), 311(c), 312(b), 318(c), 321(c), 325(c), 333(d)); (3) BP represented that it did not retaliate against workers who raised safety concerns with the Company when, in fact, BP was aware that numerous, substantiated complaints of retaliation had been submitted to the Company (Compl. ¶¶ 270(c), 284(f), 290(b), 323(d)); (4) BP implemented budget cuts and staff reductions which undermined the Company's ability to drill safely in the Gulf of Mexico (Compl. ¶¶ 274(c), 280(d), 282(d), 286(c), 290(d), 296(e), 299(f), 301(e), 303(d), 309(d),  [*102] 311(e), 313(d), 321(e), 323(e), 325(f), 331(d), 333(f)); (5) BP's safety program, of which OMS was a key component, failed to require uniform process safety policies, instead allowing BP to implement

practices that varied country by country (Compl. ¶¶ 257(b), 272(b), 276(d), 280(c), 282(c), 286(b), 288, 290(c), 296(d), 299(d), 301(d), 303(e), 309(c), 311(d), 321(d), 325(e), 329(e), 331(b), 333(e), 335(c)).

Plaintiffs support these allegations of falsity with citations to the alleged facts. Because Plaintiffs rely on the same descriptions and facts to demonstrate the falsity of nearly all of the identified misrepresentations, the Court will address the substance of Plaintiffs' proffered support only once. The Court will address separately the few instances where Plaintiffs offer additional, unique factual support for their allegations. [10] The following chart lists in chronological order each source alleged by Plaintiffs to contain false and misleading statements, identifies the numbered paragraph of the Complaint in which the allegations are made, identifies any Individual Defendants to whom the statement is attributed, identifies

the "Misrepresentation Number" the Court has assigned [*103] to each group of statements, and identifies by "X" the category of factual support Plaintiffs rely on to demonstrate the falsity of the statement.

10   In their response to Defendants' motion to dismiss, Plaintiffs attached an appendix, Appendix A, which offers a summary of their allegations and an explanation of why the statements were false and misleading. In the explanation section, Plaintiffs attempt to rely on some additional factual support--such as the various Defendants' membership on BP's Group Operations Risk Committee--not included in their Complaint. The Court does not consider allegations not included in Plaintiffs' Complaint in its analysis here.

| Source | Compl. ¶ | Speaker | Misrep # | Expanding deepwater drilling without safety procedures |
|---|---|---|---|---|
| Jan. 16, 2007 | 256-57 | Browne | 1 | X |
| Press Conference | | | | |
| Feb. 6, 2007 | 258-60 | BP, Browne, Grote, Hayward, Dudley, Inglis | 2 | X |
| Conference call with investors | | | | |
| Feb. 23, 2007 | 261-63 | BP, Browne | 3, 4 | X |
| 2006 Annual Review | | | | |
| Mar. 6, 2007 | 264-65 | BP, Browne, Grote | 5 | X |
| 2006 Annual Report, Form 20-F | | | | |
| April 2007 | 266 | BP | 6 | |
| Sustainability Report (2006) | | | | |
| April 24, 2007 | 267-68 | Grote | 7 | X |
| Conference call with investors | | | | |
| May 16, 2007 | 269-70 | Malone | 8 | X |
| Testimony, U.S. House of Represent-atives | | | | |
| Sept. 25, 2007 | 271-72 | Inglis | 9 | X |
| Sanford Berstein 4th Annual Stra-tegic Decisions Conference | | | | |
| Oct. 25, 2007 | 273-74 | Malone | 10 | X |

| BP Press Release | | | | |
|---|---|---|---|---|
| Nov. 8, 2007 | 275-76 | Hayward | 11 | X |
| Houston Forum | | | | |
| Feb. 22, 2008 | 277-80 | BP, Hayward | 12, 13 | X |
| 2007 Annual Review | | | | |
| Feb. 27, 2008 | 281-82 | BP, Hayward, Inglis, Dudley, Conn, Grote | 14 | X |
| 2008 Strategy Presentation confer-ence call with investors | | | | |
| Mar. 4, 2008 | 283-84 | BP, Hayward, Grote | 15 | X |
| 2007 Annual Report, Form 20-F | | | | |
| April 17, 2008 | 285-86 | Hayward, Sutherland | 16 | X |
| 2008 Annual General Meeting | | | | |
| May 20, 2008 | 287-88 | BP, Hayward | 17 | |
| Sustainability Review (2007) | | | | |
| Dec. 17, 2008 | 289-90 | Hayward | 18 | |
| HRH Prince of Wales 3rd Annual Accounting for Sustainability Forum | | | | |
| Feb. 2009 | 291 | BP | 19 | |
| Microsoft Global Energy Forum | | | | |
| Feb. 10, 2009 | 292-93 | Hayward | 20 | |
| Cambridge Energy Research Assoc. (CERA) Executive Conference, Hou-ston, TX | | | | |
| Feb. 24, 2009 | 294-96 | BP, Hayward | 21, 22 | X |
| 2008 Annual Review | | | | |
| Feb. 25, 2009 | 297-99 | McKay | 23 | |
| Testimony before U.S. House of Representatives | | | | |
| Mar. 3, 2009 | 300-01 | BP, Conn, Inglis, Hayward | 24 | X |
| 2009 Strategy Presentation | | | | |
| Mar. 4, 2009 | 302-03 | BP, Grote, Hayward | 25 | X |
| 2008 Annual Report, Form 20-F | | | | |
| Mar. 10, 2009 | 304-07 | BP | 26 | |
| Exploration Plan for Macondo well | | | | |
| Mar. 25, 2009 | 308-09 | McKay | 27 | X |
| Howard Weil Conference, New Or-leans, LA | | | | |

2012 U.S. Dist. LEXIS 17788, *103

| April 16, 2009 | 310-11 | Hayward | 28 | X |
| 2009 Annual General Meeting | | | | |
| May 8, 2009 | 312-13 | Eyton | 29 | |
| Cambridge University speech | | | | |
| June 30, 2009 | 314-15 | BP | 30 | |
| Revised Regional OSRP for GOM | | | | |
| Nov. 19, 2009 | 316-18 | Rainey | 31 | |
| Testimony before U.S. Senate Committee | | | | |
| Feb. 26, 2010 | 319-21 | BP, Hayward | 32, 33 | X |
| 2009 Annual Review | | | | |
| Mar. 2, 2010 | 322-23 | BP, Conn, Inglis, Hayward | 34 | X |
| 2010 Strategy Presentation | | | | |
| Mar. 5, 2010 | 324-25 | BP, Grote, Hayward | 35 | X |
| 2009 Annual Report, Form 20-F | | | | |
| Mar. 9, 2010 | 326-27 | Inglis | 36 | |
| CERA Week, Houston, TX speech | | | | |
| Mar. 22, 2010 | 328-29 | Inglis | 37 | X |
| Howard Weil Energy Conference, New Orleans, LA | | | | |
| Mar. 23, 2010 | 330-31 | Hayward | 38 | X |
| Peterson Institute for Int'l Economics, Wash. D.C. | | | | |
| April 15, 2010 | 332-33 | Hayward | 39 | X |
| 2009 Annual General Meeting | | | | |
| April 15, 2010 | 334-35 | BP | 40 | |
| Sustainability Review (2009) | | | | |
| April 21, 2010 | 337-38 | BP | 41 | |
| Press Release | | | | |
| April 28, 2010 | 342 | Suttles | 42 | |
| Press Conference | | | | |
| April 29, 2010 | 344 | Suttles | 43 | |
| Press Conference | | | | |
| May 5, 2010 | 351-52 | Suttles | 44 | |
| Press Conference | | | | |
| May 5, 2010 | 353-54 | Hayward | 45 | |
| Interview | | | | |

2012 U.S. Dist. LEXIS 17788, *103

| | | | |
|---|---|---|---|
| May 6, 2010 | 355-56 | Dudley | 46 |
| Chief Executive Club speech, Boston, MA | | | |

| Source | Failure to disclose prior safety incidents | Systemic retaliation against workers | Budget cuts and layoffs | Variation among safety practices by country | Other |
|---|---|---|---|---|---|
| Jan. 16, 2007 | | | | X | |
| Press Conference | | | | | |
| Feb. 6, 2007 | | | | | X |
| Conference call with investors | | | | | |
| Feb. 23, 2007 | | | | | X |
| 2006 Annual Review | | | | | |
| Mar. 6, 2007 | X | | | | |
| 2006 Annual Report, Form 20-F | | | | | |
| April 2007 | | | | | X |
| Sustainability Report (2006) | | | | | |
| April 24, 2007 | X | | | | |
| Conference call with investors | | | | | |
| May 16, 2007 | X | X | | | |
| Testimony, U.S. House of Representatives | | | | | |
| Sept. 25, 2007 | X | | | X | |
| Sanford Berstein 4th Annual Strategic Decisions Conference | | | | | |
| Oct. 25, 2007 | X | | X | | |
| BP Press Release | | | | | |
| Nov. 8, 2007 | X | | | X | |
| Houston Forum | | | | | |
| Feb. 22, 2008 | X | | X | X | |
| 2007 Annual Review | | | | | |
| Feb. 27, 2008 | X | | X | X | |
| 2008 Strategy Presentation conference call with investors | | | | | |
| Mar. 4, 2008 | | X | | | X |

2012 U.S. Dist. LEXIS 17788, *103

| | | | | |
|---|---|---|---|---|
| 2007 Annual Report, Form 20-F | | | | |
| April 17, 2008 | X | | X | X |
| 2008 Annual General Meeting | | | | |
| May 20, 2008 | | | X | |
| Sustainability Review (2007) | | | | |
| Dec. 17, 2008 | | X | X | X | X |
| HRH Prince of Wales 3rd Annual Accounting for Sustainability Forum | | | | |
| Feb. 2009 | | | | X |
| Microsoft Global Energy Forum | | | | |
| Feb. 10, 2009 | | | | X |
| Cambridge Energy Research Assoc. (CERA) Executive Conference, Houston, TX | | | | |
| Feb. 24, 2009 | X | | X | X |
| 2008 Annual Review | | | | |
| Feb. 25, 2009 | X | | X | X | X |
| Testimony before U.S. House of Representatives | | | | |
| Mar. 3, 2009 | X | | X | X | X |
| 2009 Strategy Presentation | | | | |
| Mar. 4, 2009 | X | | X | X | X |
| 2008 Annual Report, Form 20-F | | | | |
| Mar. 10, 2009 | | | | X |
| Exploration Plan for Macondo well | | | | |
| Mar. 25, 2009 | X | | X | X | X |
| Howard Weil Conference, New Orleans, LA | | | | |
| April 16, 2009 | X | | X | X | X |
| 2009 Annual General Meeting | | | | |
| May 8, 2009 | X | | X | | X |
| Cambridge University speech | | | | |
| June 30, 2009 | | | | X |
| Revised Regional OSRP for GOM | | | | |

2012 U.S. Dist. LEXIS 17788, *103

| | | | | | |
|---|---|---|---|---|---|
| Nov. 19, 2009 | | | | | X |
| Testimony before U.S. Senate Committee | | | | | |
| Feb. 26, 2010 | X | | | X | X | |
| 2009 Annual Review | | | | | |
| Mar. 2, 2010 | X | X | | X | | X |
| 2010 Strategy Presentation | | | | | |
| Mar. 5, 2010 | X | | | X | X | X |
| 2009 Annual Report, Form 20-F | | | | | |
| Mar. 9, 2010 | X | | | | | X |
| CERA Week, Houston, TX speech | | | | | |
| Mar. 22, 2010 | X | | | | X | X |
| Howard Weil Energy Conference, New Orleans, LA | | | | | |
| Mar. 23, 2010 | | | | X | X | |
| Peterson Institute for Int'l Economics, Wash. D.C. | | | | | |
| April 15, 2010 | X | | | X | X | X |
| 2009 Annual General Meeting | | | | | |
| April 15, 2010 | | | | | X | X |
| Sustainability | | | | | |
| Review (2009) | | | | | |
| April 21, 2010 | | | | | | X |
| Press Release | | | | | |
| April 28, 2010 | | | | | | X |
| Press Conference | | | | | |
| April 29, 2010 | | | | | | X |
| Press Conference | | | | | |
| May 5, 2010 | | | | | | X |
| Press Conference | | | | | |
| May 5, 2010 | | | | | | X |
| Interview | | | | | |
| May 6, 2010 | | | | | | X |
| Chief Executive Club speech, Boston, MA | | | | | |

The [*104] Court addresses below whether the facts identified are sufficient to plead with particularity the falsity or misleading nature of each alleged misrepresentation or omission.

### a. BP expanded deepwater drilling operations without implementing adequate process safety procedures

As described above, the Complaint alleges that Defendants, including BP and Individual Defendants Browne, Grote, Hayward, Inglis, Dudley, Malone, and Conn, made false statements about BP's commitment to process safety. *See, e.g.*, Compl. ¶ 256 (Browne: "BP's workforce is ready, willing and able to participate in a sustained Group-wide effort to move BP towards excellence in process safety. . . . And I would like to make clear that the tone is indeed being set at the top."); Compl. ¶ 261 ("We have acted decisively to address what matters most today and tomorrow: . . . a clear focus on the three dimensions of safety -- personal safety, process safety and the environment."); Compl. ¶ 273 (Malone: "BP America is in the midst of a comprehensive effort to improve its safety culture and to strengthen and standardize process safety and risk management programs at all BP-operated facilities."); Compl. ¶ 281 ("2007 saw further [*105] improvement in our overall safety performance. . . . Safe and reliable operations remain our number one priority."); Compl. ¶ 291 ("We document and rigorously follow procedures for safe and effective operations."); Compl. ¶ 294 ("Safety, both personal and process, remains our highest priority. . . . During the year [2008] we began migrating to the new BP OMS, which has an increased focus on process safety . . . ."); Compl. ¶ 295 (Hayward: "Our number one priority was to do everything possible to achieve safe, compliant and reliable operations."); Compl. ¶ 300 (Hayward: "2008 was another year of progress on our number one priority of safe and reliable operations.") (Inglis: "There is one important caveat: safe and reliable operations come first whatever cost efficiency measures we undertake . . . ."); Compl. ¶ 302 ("Throughout 2008, senior leadership across the group continued to hold safety as their highest priority."); Compl. ¶ 310 (Hayward: "Our number one priority of safe and reliable operations has been vital to the underpinning of our restored competitive performance."); Compl. ¶ 320 (Hayward: "Our priorities have remained absolutely consistent -- safety, people and performance -- [*106] and you can see the results of this focus with improvements on all three fronts. . . . Achieving safe,

reliable and compliant operations is our number one priority."); Compl. ¶ 322 ("Safety remains our number one priority and we can see clear progress.") ("In 2009 we had one of the best years in terms of safety performance, with many of our . . . process safety measures comparing favorably with industry peers . . . ."); Compl. ¶ 324 ("We constantly seek to improve our safety performance through the procedures, processes and training programmes that we implement in pursuit of our goal of 'no accidents, no harm to people and no damage to the environment.'"); Compl. ¶ 332 ("Safety remains our number one priority and I'm pleased to report we can see clear progress.").

According to Plaintiffs, these statements were false when made because BP represented that it would place process safety at the foundation of the Company's operations "when, in fact, BP was instead expanding its deepwater drilling operations without implementing adequate process safety procedures." (Compl. ¶¶ 256(a), 260(a), 263(a), 268(a), 270(a), 272(a), 274(a), 276(a), 280(a), 282(a), 296(b), 301(a), 303(b), 309(a), 311(a), [*107] 321(b), 323(a), 325(a), 329(a), 331(a), 333(b).) The Complaint alleges that BP was aware of the specific dangers associated with cement jobs in deepwater drilling environments and yet took no action to implement procedures to reduce the risk of accidents occurring on BP-operated rigs like the Deepwater Horizon. Plaintiffs contend BP was aware of the dangers of cement jobs because, as early as 2003, the MMS released a report calculating that failed cement jobs accounted for thirty-three blowout or well "kick" incidents between 1973 and 2004. (Compl. ¶ 80.) Specifically, the MMS report alerted BP to the fact that "annular flow related to cementing surface casing has been identified as one of the most frequent causes of loss of control incidents in the Gulf of Mexico." (*Id.*) In fact, BP had experienced the dangers of faulty cementing jobs at one of its own wells, even prior to the Deepwater Horizon incident. In September 2008, one of the rigs in BP's operations in Azerbaijan suffered a blowout, causing gas, water, and mud to shoot onto the rig floor, although no explosion occurred. (*Id.* ¶ 82.) Following the incident in Azerbaijan, BP reported to U.S. officials that they suspected that [*108] numerous wells had "bad cement job[s]," but BP did not disclose the Azerbaijan incident on its Form 20-F for 2008 or any other public document available to investors. (*Id.* ¶ 83.)

The Complaint also alleges that BP disregarded

known risks related to its use of BOPs. BP was aware that blind sheer rams had a high failure rate. (*Id.* ¶ 84.) The MMS distributed a report to BP and its industry peers recommending that companies install two blind sheer rams in deepwater drilling rigs instead of just one. (*Id.* ¶ 88.) Nonetheless, BP permitted the BOP on the Deepwater Horizon to be equipped with just one blind shear ram. (*Id.* ¶ 94.) In fact, BP executed an agreement with Transocean when it contracted to operate the Deepwater Horizon to allow the rig to operate with only one blind shear ram. Transocean agreed to remove one of the two blind shear rams (which allowed BP to speed up testing procedures), but only after BP signed the agreement acknowledging that the removal of the ram would "reduce the built-in redundancy" of the BOP and raise the rig's "risk profile." (*Id.* ¶ 94.)

Additional studies revealing common deficiencies in blind shear rams were distributed to BP managers and directors at industry [*109] conferences during the Class Period, including conferences held in 2009 and in February 2010. (*Id.* ¶ 90.) Plaintiffs also allege that BP knew of actual deficiencies on the specific BOP installed on the Deepwater Horizon. Reports from two different consulting groups--EQE International and Det Norske Veritas--revealed serious flaws in the design and the shuttle valve of the BOP on the Deepwater Horizon. (*Id.* ¶¶ 91-93.)

Plaintiffs also point to the findings of the Presidential Commission--the Commission tasked with investigating the cause of the Deepwater Horizon explosion--as evidence that Defendants knew, or were reckless in not knowing, that BP had not implemented adequate process safety measures. For example, the Presidential Commission found that BP had no "comprehensive and systematic risk-analysis, peer-review, or management of change process" for any of the following decisions made on the Deepwater Horizon: failing to wait for the correct amount of centralizers, failing to run appropriate tests on the slurry, failing to run a cement evaluation log, failing to displace mud from the riser before setting the cement plug, failing to properly place the cement plug at the appropriate level, [*110] failing to install additional physical barriers during the temporary abandonment procedure, and failing to perform additional integrity diagnostics. (*Id.* ¶ 78.) The Commission concluded that the evidence did not show that "BP team members . . . responsible for these decisions conducted any sort of formal analysis to assess the relative riskiness of available alternatives." (*Id.*)

Defendants counter that all statements about "safety in general," BP's commitment to improving process safety, and statements about BP's progress in implementing process safety measures are neither misleading nor material. (Doc. No. 150, at 15-16, App. A.) Defendants contend that such statements are not actionable because they lack "a standard against which a reasonable investor could expect them to be pegged." *City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 671 (6th Cir. 2004). Defendants characterize all statements related to BP's progress on process safety measures "generalized positive statements" and argue, correctly, that such statements cannot serve as a basis for liability. (Doc. No. 150, at 16; *see also Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 870 (5th Cir. 2003) ("'[M]aking [*111] steady progress' is precisely the sort of generalized positive characterization that is not actionable under the securities laws.").

General statements about corporate "progress" are "too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem material to a securities investment decision." *Bridgestone*, 399 F.3d at 671. The statements listed above are all in this vein, as they are generalized statements about BP's "commitment to safety," prioritization of "process safety performance," headway in making "real progress" in the process safety arena, and desire to become a "world leader in process safety." (Compl. ¶¶ 269, 273, 275.) Even the very specific facts Plaintiffs allege to show the falsity of the statements cannot confirm or deny whether "progress" was being made; general "progress" is simply too illusory a metric from the start. Such statements, therefore, are not actionable. [11]

> [11] By the Court's numbering system, nonactionable statements in this category are included in Misrepresentations 1-4 (Compl. ¶¶ 256-62), 7-9 (*Id.* ¶¶ 267-71), 19 (*Id.* ¶ 291), 21-25 (*Id.* ¶¶ 294-302), 28 (*Id.* ¶¶ 310-11), 32-33 (*Id.* ¶¶ 319-20), 34 (*Id.* ¶ 322), [*112] and 39 (*Id.* ¶ 332).

But Plaintiffs also allege statements of a different vein. Many of Plaintiffs' allegations in this category are statements that refer to progress in process safety as measured against the metrics set forth in the Baker Report's recommendations. These statements make specific reference to BP's progress following the Texas City explosion and the Baker Panel's findings. *See, e.g.*,

Compl. ¶ 273 (Malone: "In the months and years since these violations occurred [at Texas City refinery], we have made real progress in the areas of process safety performance and risk management."); Compl. ¶ 275 (Hayward: "We continue to implement the roadmap provided to ourselves and the industry by the . . . Baker Panel. BP remains absolutely committed to taking these lessons and becoming a world leader in process safety."); Compl. ¶¶ 281, 285 ("[O]ur intense focus on process safety continues. We are making good progress in addressing the recommendations of the Baker Panel and have begun to implement a new [OMS] across all of BP's operations."); Compl. ¶ 289 ("BP had a number of high-profile safety lapses in recent years, notably at our Texas City refinery, where there was a tragic and unacceptable [*113] loss of life. . . . We opened ourselves up to scrutiny . . . [a]nd we have continuously reported progress against a response plan and against an independent external report."); Compl. ¶ 278 ("Throughout 2007, BP continued to progress the process safety enhancement programme initiated in response to the March 2005 incident at the Texas City refinery. We have made progress across the group on all the recommendations: Leadership -- We have consistently communicated that safe and reliable operations are our highest priority. Knowledge and expertise -- We established an executive-level training programme, ran process safety workshops and launched an operations academy for site-based staff to enhance process safety capability."); Compl. ¶ 324 ("Following the tragic incident at the Texas City refinery in 2005 the [Safety, Ethics, and Environment Assurance] committee has observed a number of key developments, including: . . . development of a group-wide operating management system (OMS) which is being progressively adopted by all operating sites; the establishment of training programmes in conjunction with MIT that are teaching project management and operational excellence; the dissemination [*114] of standard engineering practices throughout the group; and the formation of a highly experienced S&O audit team formed to assess the safety and efficiency of operations and recommend improvements. Throughout this time the group chief executive has made safety the number one priority."); Compl. ¶ 330 ("That tragic accident [Texas City] has changed in a profound and fundamental way our approach to safety and operations integrity -- providing a safe working environment is a paramount responsibility, and our first and foremost priority.").

The Baker Panel recommendations did not leave BP with a "squishy" mandate. To the contrary, the Panel's number one recommendation, titled, "Process Safety Leadership," required BP's corporate management to "demonstrate their commitment to process safety by articulating a clear message on the importance of process safety *and matching that message both with the policies they adopt and the actions they take.*" (Compl. ¶ 74) (emphasis added). BP clearly embraced the first portion of the Baker Report's mandate. In an effort to "articulate a clear message" with respect to process safety, Hayward, Inglis, and other BP executives reeled off the "safety is our [*115] number one priority" catchphrase at every turn. But Plaintiffs' allegations raise a triable issue as to whether BP followed through on the latter portion of the Baker Panel's recommendation, which required BP to match the message with policies and actions.

The Baker Panel's recommendation on process safety was a response to a string of prior safety failures in BP's operations. The incidents included blowouts in the Gulf in 2002 and 2003 and in the Nile delta in 2004. (Compl. ¶¶ 54-59.) These were followed by the explosion at the Texas City refinery in 2005 and the spill in Prudhoe Bay in 2006. (*Id.* ¶¶ 11, 68.) All of these incidents served as evidence for the Baker Panel's conclusion that BP had not adequately established process safety as a core value. (*Id.* ¶ 74.) Following the release of the Baker Report and the clear roadmap for improvement contained therein, BP launched what effectively amounted to a public relations campaign to resuscitate the Company's image with respect to process safety. The statements that Plaintiffs highlight as false and misleading were part of that campaign. BP's statements inundated the market with the image that BP was making significant progress on process [*116] safety. That image was frequent, repeated, and unequivocal. Plaintiffs suggest it was also necessary to BP's continued financial success following the findings of the CSB and the Baker Report. (*Id.* ¶ 67.)

According to Plaintiffs, there were stark differences between the image BP projected and the reality of BP's operations. Just three years after BP began touting its process safety efforts, the Deepwater Horizon disaster occurred. This was a disaster so similar to prior disasters--the culmination of corner-cutting, overlooked and disregarded warnings, a lack of oversight, a failure to train employees properly, and long overdue maintenance--that it raises a genuine question as to whether BP was truly making the progress it claimed.

The Baker Report recommendation required BP to "match its message" on process safety with policies and actions. BP itself embraced the recommendation as a metric and frequently cited the Company's progress against that metric. For example, BP's Annual Reports described specific "key developments" (Compl. ¶ 324), BP claimed to have established training programs and process safety workshops (*Id.* ¶ 278), and BP executives made frequent reference to implementing [*117] the Baker Report's "roadmap" (*Id.* ¶ 275.) A repeated utterance, even on a promise of progress, can become misleading where repetition becomes a statement of current and ongoing compliance. *See, e.g., Reese v. BP Exploration*, 643 F.3d 681, 691 (9th Cir. 2011) (noting that even a promise or forward-looking statement can become an inaccurate assertion as to a matter of past or existing fact if repeated filing creates an "impression of a state of affairs that differs in a material way from one that actually exists") (citation omitted) (internal quotation marks omitted).

Plaintiffs have alleged sufficient facts to call into question whether BP and its corporate officers and directors were in fact implementing the process safety reforms as they represented. BP had a starting point for its mandate: improve process safety beyond where it was at the time of the Texas City explosion through implementation of the policies, procedures, and recommendations detailed in the Baker Report. The Deepwater Horizon explosion, subsequent investigation, and other facts Plaintiffs allege pointing to similarities between the Deepwater Horizon accident and BP's history of safety failures support Plaintiffs' [*118] contention that BP seriously overstated the "progress" it had made in implementing the Baker Panel's recommendations. Where Plaintiffs have tethered their allegations to BP's statements involving progress in process safety efforts as measured against the Baker Report recommendations, they have alleged section 10(b) violations with the particularity required under the PSLRA and Rule 9(b). [12]

> 12    The actionable misrepresentations are, following this Court's numbering system, statements included in Misrepresentations 10-14 (Compl. ¶¶ 273-282), 16 (¶ 285-86), 18 (¶ 289-90), 35 (¶ 324-25), and 38 (¶ 330-31).

**b. BP misrepresented its risk profile because it failed to disclose prior safety failures**

The Complaint alleges that BP misrepresented its risk exposure to investors by repeatedly and falsely downplaying its exposure to risk. *See, e.g.*, Compl. ¶ 267 (Grote: "Our strategy is unchanged and our current focus remains on safe and reliable operations and the delivery of improved performance."); Compl. ¶ 269 (Malone: "BP America is committed to safety, and the expectation of our management is that budget guidelines should never result in a compromise in safety performance."); Compl. ¶ 271 (Inglis: [*119] "By taking and managing risks in frontier regions we have established an unrivalled asset base in some of the world's most prolific basins. . . . We are developing strong growth in deepwater and tight gas through a spread of major projects around the world."); Compl. ¶ 273 (Malone: "BP America is in the midst of a comprehensive effort to improve its safety culture and to strengthen and standardize process safety and risk management programs at all BP-operated facilities."); Compl. ¶ 281 ("[I]n the Gulf of Mexico, our priorities are clear -- grow revenues near term through the safe startup and ramp-up of Atlantis and Thunder Horse; grow our resources position through successful exploration and access, and advance key deepwater technologies to exploit that resource base."); Compl. ¶ 297 (McKay: "The track record of BP and the industry generally in the Western and Central Gulf of Mexico (GOM) demonstrates that when areas are opened, they can be leased, explored and developed to the highest environmental and operational standards in the world."); Compl. ¶ 312 (Eyton: "[I]t is worth emphasizing that throughout this period and despite the extremes of geography in which we operate, technology [*120] has continuously improved the safety and environmental footprint of our industry."); Compl. ¶ 332 (Hayward: "There has been a significant reduction in the frequency of recordable injuries and the number of major incidents related to integrity failures has also fallen. At the same time we're reducing containment losses in our operations.").

Only a few of the statements Plaintiffs allege as false and misleading reference BP's risk exposure in explicit terms. *See, e.g.*, Compl. ¶ 264 ("A risk of increased environmental costs and impacts is inherent in particular operations and products of the group and there can be no assurance that material liabilities and costs will not be incurred in the future. In general, the group does not expect that it will be affected differently from other companies with comparable assets engaged in similar business."); Compl. ¶ 278 ("In safety, we are significantly

lowering the risk profile of our operations."); Compl. ¶ 319 ("Risk remains a key issue for every business, but at BP it is fundamental to what we do. . . . We must never shrink from taking on difficult challenges, but the board will strive to set high expectations of how risk is managed and remain [*121] vigilant on oversight."); Compl. ¶ 320 (Hayward: "We continue to show our ability to take on and manage risk, doing the difficult things that others either can't do or choose not to do.")

According to Plaintiffs, the misrepresentations contained in such statements were twofold. Broadly speaking, BP misrepresented the general risks associated with deepwater drilling in that it failed to disclose "multiple safety failures and near-failures" that BP experienced in its deepwater operations. More specifically, BP misrepresented its exposure to risk by failing to disclose that it was unprepared to contain an oil leak in its Gulf operations.

Plaintiffs claim that BP failed to disclose prior safety failures, thereby rendering false any representation that the Company was in control of its risk exposure. (Compl. ¶¶ 265(c), 268(b), 270(b), 272(c), 274(b), 276(b), 280(b), 282(b), 284(a), 286(a), 296(c), 299(b), 301(c), 303(c), 309(b), 311(c), 312(b), 318(c), 321(c), 325(c), 333(d).) In support of these allegations, Plaintiffs point to the string of safety incidents preceding the Deepwater Horizon explosion, beginning in 2000 with incidents at BP's Grangemouth refinery in Scotland and continuing [*122] through the Texas City explosion. (Compl. ¶¶ 53-63.) Plaintiffs also point to correspondence BP received from the U.K. HSE regarding several of BP's rigs operating in U.K. jurisdictions that were overdue on maintenance and repair requirements. (Compl. ¶¶ 98-103.) Nowhere in the Complaint do Plaintiffs allege that any of the safety incidents between the years 2000 and 2007 remained undisclosed. In fact, Plaintiffs allege that BP failed to disclose only one incident, a September 2008 gas leak in BP's Azerbaijan deepwater drilling operations in the Caspian Sea. (Compl. ¶¶ 81-83.) "Shortly thereafter" there was a blowout at another rig in the same field; Plaintiffs do not state whether that rig was part of BP's operations. (Id.) However, Plaintiffs allege that BP made no announcement or disclosure of the incident until BP filed its Annual Report, Form 20-F, for 2008. Plaintiffs suggest that the disclosure in the 2008 Annual Report downplayed the incident, referring to it as a "subsurface gas release" and omitting references to the blowout on the nearby rig. (Id.)

Defendants argue that the allegedly undisclosed risks were actually "well-publicized safety lapses" already known to the market. [*123] (Doc. No. 150, at 27.) According to Defendants, the incidents in the Nile delta and the Caspian Sea, in addition to the other incidents that occurred in BP's U.S. operations, were well-publicized and even prompted the MMS to investigate BP twice and issue Safety Alerts to all drilling companies in the Gulf. (Id.) Because such risks were widely known to the market, Defendants argue any representations related to BP's risk management efforts were not misleading or could not have been material. (Id.)

Statements about the adequacy of risk management operations and capabilities may be false and misleading where the speaker knows, or should know, that such operations are inadequate to manage the risks a company faces. See, e.g., In re Fannie Mae Sec. Litig., 742 F. Supp. 2d 382, 2010 WL 3825713, at *14-15 (S.D.N.Y. 2010) (finding material misstatements sufficient to survive a motion to dismiss where Fannie Mae's statements that its risk management operation was "appropriate" were made despite defendants' knowledge that their risk management system was inadequate for the new subprime assets they were purchasing; see also In re Wash. Mutual, Inc. Sec., Derivative & ERISA Litig., 694 F. Supp. 2d 1192, 1208-09 (W.D. Wash. 2009) [*124] (finding that plaintiffs had sufficiently pleaded the falsity of thirteen statements representing that the defendant company maintained "appropriate policies, standards and limits designed to maintain risk exposures" where the company "had in fact weakened its risk management practices in order to increase loan volume"). However, Plaintiffs do not adequately allege falsity with respect to the statements at issue here. Instead of pointing to specific flaws in BP's risk management system, Plaintiffs merely stress BP's awareness of the riskiness of its operations. Plaintiffs' argument, in simplest form, is that it was false or misleading for BP to claim that it could "take on and manage risk" or that it was "lowering its risk profile" when safety-related accidents had previously occurred in some of BP's operations worldwide. But demonstrating BP's knowledge of risk does not demonstrate that its statements were false or misleading; Plaintiffs' argument mistakenly equates risk with falsity.

In Evolution Capital Advisors, the SEC argued that defendants committed securities fraud in connection with

their investments in a loan program administered by the Small Business Administration ("SBA"). [*125] *S.E.C. v. Evolution Capital Advisors*, LLC, No. H-11-2945, 2011 U.S. Dist. LEXIS 147670, 2011 WL 6754070, at *1 (S.D. Tex. Dec. 22, 2011). Investors were allegedly defrauded after defendants misrepresented the nature and risk profile of their involvement in the program by leading investors to believe the company would invest in the more secure option available under the program, SBA loans, when it instead invested in the riskier option, SBA "IO strips." 2011 U.S. Dist. LEXIS 147670, [WL] at *1-2. The court found that "[t]he heart of the case is the difference between the risks of investing in an SBA loan and investing in an SBA IO strip," that is, whether or not defendants made "misrepresentations concerning *the nature of the investments that would be made.*" 2011 U.S. Dist. LEXIS 147670, [WL] at *13. (emphasis added).

Here, Plaintiffs have not alleged any misrepresentations concerning "the nature of the investments" that were made. 2011 U.S. Dist. LEXIS 147670, [WL] at *13. In fact, many of the statements Plaintiffs claim are misleading are actually acknowledgments of BP's risk exposure. *See, e.g.*, Compl. ¶ 264 ("A risk of increased environmental costs and impacts is inherent in particular operations and products of the group and there can be no assurance that material liabilities and costs will not be incurred [*126] in the future. In general, the group does not expect that it will be affected differently from other companies with comparable assets engaged in similar business."); Compl. ¶ 319 ("Risk remains a key issue for every business, but at BP it is fundamental to what we do. . . . We must never shrink from taking on difficult challenges, but the board will strive to set high expectations of how risk is managed and remain vigilant on oversight."). The likelihood of kicks or blowouts in deepwater drilling operations is exactly the type of risk inherent in an investment in the oil industry. While the risk associated with the oil industry, and deepwater drilling operations in particular, is obviously a subject matter important--even material--to investors, it is not one that investors are generally unaware of.

Plaintiffs must do more than point to the volatile nature of deepwater drilling operations in order to plead securities fraud with the particularity required under the PSLRA and Rule 9(b). Simply citing prior examples of safety failures does not render false or misleading generalized statements about BP's risk profile or the riskiness of its operations. Even a company operating in a risky [*127] industry can manage risk, and Plaintiffs have pointed to no facts undermining BP's assertions that it intended to do so. Plaintiffs' reliance on the existence of such risk as proof of falsity is insufficient to demonstrate the falsity of the statements at issue here. [13]

> 13    By the Court's numbering system, the nonactionable statements in this category are included in Misrepresentations 5 (Compl. ¶ 264), 7-9 (*Id.* ¶ 267-71), 10 (*Id.* ¶ 273), 12 (*Id.* ¶ 278), 14 (*Id.* ¶ 281), 23 (*Id.* ¶ 297), 29 (*Id.* ¶ 312), 32-33 (*Id.* ¶¶ 319-20), and 39 (*Id.* ¶ 332).

Plaintiffs fare better in their allegations that BP misrepresented its specific ability to respond to an oil spill in the Gulf, thereby misleading investors as to its risk exposure in its Gulf operations. Plaintiffs point to specific misrepresentations in BP's Regional OSRP for the GOM, which estimated the total worst case discharge scenarios in the Gulf at between 28,033 barrels and 250,000 barrels of oil per day. (Compl. ¶ 314.) In addition, BP's Regional OSRP for the GOM explicitly states that BP and its subcontractors "could recover approximately 491,721 barrels of oil per day (or more than 20.6 million gallons) in the event of an oil spill in [*128] the Gulf." (*Id.*) The Regional OSRP also stated that BP possessed "the necessary spill containment and recovery equipment to respond effectively to spills." (*Id.*) Plaintiffs also rely on BP's IEP for the Macondo well site and allege that the statement contained therein--that "BP Exploration & Production Inc. has the capability to respond, to the maximum extent practicable, to a worst-case discharge," which BP estimated at 162,000 barrels of oil per day--was false. (*Id.* ¶¶ 158, 304.) In addition, a few months prior to the Deepwater Horizon disaster, Defendant Rainey testified before a Senate Committee and similarly represented that "[a]lll of [BP's] production facilities have contingency plans that identify the procedures, response equipment, and key personnel needed for responding to incidents." (*Id.* ¶ 317.) Rainey referred specifically to the capabilities of BP America's Houston offices, stating that "BP's fiber optic network in the US Gulf of Mexico . . . allows us to monitor well pressures in real time, both at the facility and in our offices in Houston." (*Id.*)

Plaintiffs assert that all these representations were false because BP proved utterly unable to respond to the spill following [*129] the Deepwater Horizon disaster.

Through the IEP and the Regional OSRP, BP represented that it was prepared to respond to a spill release of somewhere between 162,000 and 250,000 barrels of oil per day. (*Id.* ¶¶ 158, 156.) Plaintiffs allege that the worst case discharge scenarios in BP's public representations were significantly higher than the actual amount of the spill, yet BP's "oil-spill removal organizations were quickly outmatched" following the Deepwater Horizon explosion. (*Id.* ¶ 218.) Plaintiffs estimate that 60,000 barrels of oil per day spilled from the Macondo well following the Deepwater Horizon blowout. (*Id.* ¶ 5.) Yet, even forty-nine days after the spill, BP was recovering oil at a rate of only 15,000 barrels per day. (*Id.* ¶ 243.)

Plaintiffs also claim that much of BP's Regional OSRP was inaccurate: irrelevant material was copied from other websites, the Regional OSRP "described biological resources nonexistent in the Gulf," and the Regional OSRP named as the Company's "wildlife expert" a man deceased several years before BP filed its Regional OSRP. (*Id.* ¶¶ 220-22.) In further support of the falsity of these statements, Plaintiffs point to post-spill statements by Suttles [*130] and Hayward admitting that BP did not have an oil spill response plan with "proven equipment and technology" and that the Company was instead "making it up day to day." (*Id.* ¶¶ 217, 315.) Finally, with respect to Rainey's representations that BP America's Houston offices allowed for close monitoring of the Deepwater Horizon rig, Plaintiffs assert that, on the night of the explosion, there was "nobody in that B.P. Macondo well office," and BP was therefore, in addition to the many other reasons, unprepared to respond to spills in the Gulf. (*Id.* ¶ 201.)

Plaintiffs have sufficiently pleaded facts to demonstrate that BP misrepresented the size of the spill it was prepared to respond to in the Gulf and misrepresented the Company's general spill response capabilities. BP stated it was prepared to respond to a spill more than four times as large as the maximum daily spill amount that resulted from the Deepwater Horizon incident. Plaintiffs have highlighted the wide disparity between the amount of the actual spill and BP's representation as to its preparedness, other falsities in both the Regional OSRP and the IEP, and the failures of BP America's Houston office to respond appropriately to [*131] emergency warnings from the Deepwater Horizon. Thus, they have sufficiently pleaded actionable misrepresentations related to BP's ability to respond to an oil spill in the Gulf of Mexico.

Defendants do not challenge the alleged falsity of the statements contained in the Regional OSRP and the IEP. Instead, because this is a fraud on the market case, Defendants contend that Plaintiffs have not adequately pleaded reliance on the alleged misrepresentations contained in the Regional OSRP and the IEP because they do not allege that the documents were "publicaly disseminated" during the Class Period. [14] (Doc. No. 150, at 28.) The fraud on the market theory allows "a presumption that potentially significant publicly disseminated information is reflected in the price of stock traded on an efficient market" unless rebutted by a factual showing that the information at issue did not affect the market price. *Nathenson*, 267 F.3d at 415. Here, Plaintiffs allege that the IEP was received by the MMS on February 23, 2009, and was "available to the public" no later than March 10, 2009. (Compl. ¶ 304.) They allege that the Regional OSRP was "publicly filed" on June 30, 2009. (*Id.* ¶ 314.) The Court agrees [*132] with Plaintiffs that, for purposes of pleading reliance in a fraud on the market case, there is no material difference between pleading that the IEP was "available to the public" or "publicly filed" and alleging that a document was "publicly disseminated." *See Basic Inc. v. Levinson*, 485 U.S. 224, 246 n. 24, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988) ("[W]e need only believe that market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices."). Plaintiffs have adequately alleged reliance on the IEP and the Regional OSRP and have therefore pleaded with particularity misrepresentations stemming from BP's representations that it was prepared to respond to a spill in the Gulf of Mexico. [15]

> 14  In subsequent briefing, Defendants withdrew their challenge to Plaintiffs' pleading of reliance on the IEP. However, Defendants still contend that allegations related to the IEP fail on scienter grounds. (Doc. No. 220, at 14 n. 11.)
>
> 15  By the Court's numbering system, the alleged misrepresentations that survive in this category are numbered 26 (Compl. ¶ 304), 30 (*Id.* ¶ 314), and 31 (*Id.* ¶ 316).

### c. BP claimed it did not retaliate against workers for reporting safety  [*133] concerns while engaging in a systematic pattern of retaliation

Plaintiffs allege that BP's representations that the Company was strengthening its safety culture were false

and misleading. *See* Compl. ¶ 269 (Malone: "I continue to meet with employees to reinforce my expectations of them: that they must ensure that our operations are safe, that they understand they have both a right and responsibility to shut down any process they feel is unsafe or operationally unsound, and that they are encouraged to raise concerns on any issue.") (Malone: "BP does not tolerate retaliation against workers who raise safety concerns."); Compl. ¶¶ 283, 302 ("In the US, former US district court judge Stanley Sporkin acts as an ombudsperson. Employees and contractors can contact him confidentially to report any suspected breach of compliance, ethics or the code of conduct, including safety concerns."); Compl. ¶ 289 (Hayward: "We opened ourselves up to scrutiny -- and we listened more to our front-line operations people -- who, of course, really know what is going on on the ground."); Compl. ¶ 322 ("In summary, we are strengthening our safety culture throughout our business, and building a track record that [*134] we intend to become industry leading.").

According to Plaintiffs, these statements were false and misleading because BP was systematically retaliating against workers who reported safety violations. As evidence of BP's retaliation, Plaintiffs point to BP employee Kenneth Abbott ("Abbott"). Abbott worked as an engineer on BP's Atlantis rig, another deepwater drilling rig in the Gulf of Mexico. (Compl. ¶ 137.) Abbott became concerned that designs for critical units on the rig were not updated to reflect changes made during repairs and maintenance. (*Id.*) Abbott reported his concerns in August 2008. A few weeks later, another employee who worked with Abbott, BP manager Barry Duff ("Duff"), wrote a letter to other BP managers corroborating Abbott's concerns. (*Id.* ¶ 138.) [16] Abbott continued to voice safety concerns until January 2009, when BP fired him for his whistle-blowing activity. (*Id.* ¶ 139.) After his termination, Abbott raised his concerns with BP's Ombudsman. Part of the Ombudsman's investigation revealed an affidavit from safety engineer Mike Sawyer, who independently reviewed Abbott's reports and corroborated Abbott's concerns. [17] (*Id.* ¶¶ 140-41.) In April 2010, a week before [*135] the Deepwater Horizon explosion, BP's Deputy Ombudsman, Billie Garde ("Garde"), sent Abbott a letter affirming that the Ombudsman's office had substantiated Abbott's concerns. [18]

16   According to Plaintiffs, Duff's letter referred to "hundreds of thousands of Subsea documents

that have never been finalized," which Duff warned was "fundamentally wrong" and could result in "catastrophic operating errors." (Compl. ¶ 138.)

17   Sawyer's affidavit called it "inconceivable" for BP to justify production on the Atlantis rig without completed design documentation and warned of the "substantial risk of large scale damage to the deepwater Gulf of Mexico (GOM) environment and harm to workers" stemming from "unverified design documents" that impeded BP's ability to accurately assess risk. The affidavit concluded that "[t]he extent of documentation discrepancies creates a substantial risk that a catastrophic event could occur at any time." (Compl. ¶ 141.)

18   Garde's letter stated: "Your concerns about the [Atlantis] project not following the terms of its own Project Execution Plan were substantiated. . . . [BP] did not do a comprehensive documentation audit regarding the documentation issues on Atlantis. [*136] . . . The concerns that you expressed about the status of the drawings upgrade project were . . . of concern to others who raised the concern before you worked there, while you were there, and after you left." (Compl. ¶ 142.)

Plaintiffs also point to further evidence of retaliation against employees that came to light following the Deepwater Horizon disaster. The Presidential Commission Report noted that a survey conducted in March 2010 indicated that 46% of BP crew members--including crew members on the Deepwater Horizon--feared retaliation for reporting unsafe situations. (*Id.* ¶ 144.) Another 15% felt there were not enough employees to carry out work safely. (*Id.*) BP's Ombudsman also conducted an extensive investigation into Acuren, BP's contractor for pipeline inspection and monitoring in BP's Alaskan operations. (*Id.* ¶¶ 145-50.) One of the contractor's employees, Marty Anderson ("Anderson"), raised safety concerns with his supervisors and with BP intermediaries. (*Id.*) In 2009, BP's Ombudsman eventually investigated Anderson's complaints, substantiated his concerns, and concluded that "[the] concerns were serious, and although people try to downplay the significance of the issues, [*137] they reveal a complete breakdown." (*Id.*) BP's Ombudsman's office reported the concerns to BP and BP North America officials and recommended that Anderson's concerns be

reported directly to BP's Board of Directors. (*Id.*) BP's Ombudsman, Judge Sporkin, communicated the concerns directly to Defendant Malone, as President of BP North America. [19] (*Id.*)

> 19   Defendants urge the Court to take judicial notice of a subsequent MMS report finding Abbott's claim to be without merit. (Doc. No. 150, at 23 n. 17.) The Court declines to do so at this time. Plaintiffs have made specific allegations in their Complaint with respect to Abbott's experience that the Court is bound to accept as true for purposes of a motion to dismiss. Defendants' factual disputes are more appropriately left for subsequent proceedings.

The alleged facts cannot serve as evidence that statements about "strengthening BP's safety culture" were false or misleading. Generalized statements about corporate culture are too vague to be actionable. *See, e.g., In re Fleming Cos. Inc. Secs. & Derivative Litig.*, MSL-1530, 2004 U.S. Dist. LEXIS 26488, 2004 WL 5278716, at *26 (E.D. Tex. June 10, 2004) (finding that a statement that the company instituted a "culture of thrift" [*138] was simply "too general to constitute a material misstatement as required under Rule 10b-5"). However, the alleged facts sufficiently, even forcefully, establish that BP was knowingly retaliating against workers who reported safety concerns, even while issuing statements explicitly denying any retaliation. Further, the alleged facts call into question specific statements made by Malone--who, according to Plaintiffs, had direct contact with the Ombudsman and was aware of such concerns--and Hayward claiming that BP "listened to operations people" and encouraged employees to raise safety concerns. (Compl. ¶¶ 269, 289.) Plaintiffs' facts support their contention that BP retaliated against workers--both its own and those of its contractors--who reported safety concerns. Because Plaintiffs have alleged facts directly contradicting BP's representations that it did not retaliate against workers for reporting safety concerns, they have adequately pleaded the falsity of the statements they identify regarding BP's retaliation. [20]

> 20   By the Court's numbering system, statements contained in Misrepresentations 8 (Compl. ¶ 269) and 18 (*Id.* ¶ 289) are actionable and those contained in Misrepresentations [*139] 15 (*Id.* ¶ 283), 25 (*Id.* ¶ 302), and 34 (*Id.* ¶ 322) are not. In addition, Plaintiffs claim that Misrepresentations

6 and 19, both containing BP's statement that "We document and rigorously follow procedures for safe and effective operating," was false and misleading because BP in fact failed to provide adequate documented procedures for its operations. (*Id.* ¶¶ 266, 291). Plaintiffs point out that Defendants never specifically challenged this statement in their briefing and argue that it is, therefore, actionable. (Doc. No. 186, at 13.) The Court finds that Plaintiffs' allegations here concerning BP's retaliation against employees for reporting safety concerns specifically related to documentation of procedures is sufficient to plead the falsity of this statement, making it, too, actionable.

### d. BP failed to disclose budget cuts and layoffs which impacted the safety of drilling operations in the Gulf

Plaintiffs claim that BP misrepresented its efforts and intentions to improve safety performance in its operations because the Company actually implemented safety budget cuts and staff reductions which impacted BP's ability to safely drill in the Gulf of Mexico. According to Plaintiffs, evidence [*140] of safety and budget cuts demonstrate the false and misleading nature of statements about BP's intended progress in the area of process safety. *See, e.g.*, Compl. ¶ 273 ("BP America is in the midst of a comprehensive effort to improve its safety culture and to strengthen and standardize process safety and risk management programs at all BP-operated facilities."); Compl. ¶ 285 ("Safety is our number one priority and in 2007 our overall safety record continued to improve."); Compl. ¶ 295 (Hayward: "Safety, people and performance, these remain our priorities. Our number one priority was to do everything possible to achieve safe, compliant and reliable operations."); Compl. ¶ 302 ("Our first priority will always be to ensure the safety and integrity of our operations."); Compl. ¶ 324 ("The priorities that drove our success in 2009 -- safety, people and performance -- remain the foundation of our agenda as we build our momentum and work to further enhance our competitive position.").

Plaintiffs also claim that BP's representations that it would prioritize safety over cost-cutting efforts were false and misleading. *See, e.g.*, Compl. ¶ 281 (Hayward: "We are taking action to close the competitive [*141] gap through a focused effort on three priorities of safety, people and performance. We are determined to operate

safely and reliably, to develop the capability of our people and to drive performance through restoring operational momentum. At the same time we are rigorously reducing complexity and cost. In Exploration and Production, we continue to see the benefits of our strategy."); Compl. ¶ 300 (Inglis: "There is one important caveat: safe and reliable operations come first whatever cost efficiency measures we undertake, and we continue to advance the safety and reliability of our operations through implementing OMS."); Compl. ¶ 308 ("By the way, let me add that managing costs down does not mean BP will be skimping when it comes to ensuring our operations remain safe, reliable and compliant in the years ahead."); Compl. ¶ 322 ("There is one important caveat: safe and reliable operations always come first, whatever cost efficiency measures we undertake.").

Plaintiffs contend that budget cuts and staff reductions in BP's operations made it impossible for BP truly to be prioritizing safety in the manner it represented to investors. In support of this allegation, Plaintiffs point to Hayward's [*142] October 2007 announcement of BP's planned reorganization. (Compl. ¶ 115.) The reorganization was intended to increase efficiency, simplify the organization, improve productivity, and "bring[] up operating units to enable them to focus on safe, reliable, and profitable operations." (Id.) Plaintiffs also point to an alleged merger whereby BP combined its compliance offices in its Houston and London locations. (Id. ¶ 116.) According to a confidential witness (who was laid off during the merger), the merger caused "huge staff reductions." (Id.) Plaintiffs also highlight the experience of BP's former senior Vice President for Drilling Operations in the Gulf, Kevin Lacy ("Lacy"). (Id. ¶ 118.) Lacy allegedly had disagreements with BP over "its lack of commitment to process safety," which eventually led to his departure from the Company in late 2009. [21] (Id. ¶ 119.) BP also reshuffled other personnel in the Gulf, which Plaintiffs claim led to a dearth of experience in regional operations and contributed to the Deepwater Horizon explosion. (Id. ¶ 120.) For example, David Rich ("Rich"), the employee who held the position of Wells Manager for the Gulf of Mexico, was promoted to the spot only [*143] a few weeks before the incident. (Id.) Plaintiffs allege that neither Rich nor his immediate subordinate had sufficient experience in well control operations. (Id.)

21   The parties dispute the proper characterization of Lacy's departure. Both parties rely on evidence from the MDL 2179 docket to support their positions. (Doc. No. 226, at 2-3.) This Court will not consider evidence outside the Complaint in deciding the motion to dismiss and it need not do so here, as the viability of Plaintiffs' allegations does not turn on the circumstances of Lacy's departure.

The first collection of statements above suffers from the same shortcoming as the statements related to general "progress" in the area of process safety: all are too vague to be actionable. With respect to the second set of statements--those where BP represented that safe operations would take precedence over cost cutting measures--Plaintiffs fail to adequately allege falsity. Plaintiffs' allegations regarding the effect of layoffs and budget cuts on BP's safety programs are merely conclusory. Even where Plaintiffs cite facts, the connections they draw between the alleged facts and BP's safety programs are too attenuated to support [*144] the falsity of the misrepresentations Plaintiffs identify. For example, Plaintiffs point to Hayward's announcement of reorganization in late 2007, but they do not allege facts that demonstrate *how* the reorganization might have affected the safety of BP's drilling operations. (Id. ¶ 115.) They merely equate "reorganization" with "numerous layoffs and cuts to safety budgets," and allege no facts suggesting that the reorganization directly affected BP's safety budget. (Id.) Plaintiffs state that layoffs "hit their height in 2009" when BP merged its Houston and London offices. (Id. ¶ 116.) Instead of attributing the layoffs to predictable fallout from the merger, an equally plausible explanation, Plaintiffs ask the Court to assume that such layoffs directly hampered BP's safety program. (Id.) The alleged facts, even if taken as true, do not support such unfounded assumptions. *See, e.g., Southland*, 365 F.3d at 361 (noting that a court need not strain to find inferences favorable to the plaintiffs). Finally, the departure or reassignment of a handful of individual employees does not demonstrate anything about BP's safety program. Lacy's departure from BP--however the parties wish to characterize [*145] it--is attributed (by Plaintiffs, at least) to "disagreements with BP over its lack of commitment to process safety." (Id. ¶ 118.) As discussed above, BP's general commitment to process safety is not actionable in the abstract. And facts related to Lacy specifically--whose departure is not alleged to be tied to staffing cuts--does not demonstrate the falsity of BP's statements about prioritizing safety while simultaneously cutting costs.

Further, many of the statements Plaintiffs cite as misrepresentations actually demonstrate that BP was forthcoming with its plans to enact cost-cutting measures. For example, Hayward was very clear that BP's cost-cutting measures were a part of BP's overarching corporate strategy. *See, e.g.*, Compl. ¶ 281 (Hayward: "We are taking action to close the competitive gap through a focused effort on three priorities of safety, people and performance. We are determined to operate safely and reliably, to develop the capability of our people and to drive performance through restoring operational momentum. At the same time we are rigorously reducing complexity and cost. In Exploration and Production, we continue to see the benefits of our strategy."). As Hayward's [*146] statement suggests, when BP's strategy of balancing cost-cutting and safe operations worked, it had the potential to benefit investors. There is nothing fundamentally at odds with BP attempting to both prioritize safety and curb expenses, and Plaintiffs have alleged no facts to suggest that the two goals were necessarily mutually exclusive here. Plaintiffs must allege more than that BP merged offices, promoted employees, and transferred employees between divisions to allege the falsity of BP's statements regarding balancing cost-cutting measures with its safety program. Plaintiffs have not pleaded the statements identified here with sufficient particularity required under the PSLRA and Rule 9(b), and the alleged misrepresentations related to BP's cost-cutting measures are not actionable. [22]

> 22   By the Court's numbering system, this makes statements found in Misrepresentation Nos. 10 (Compl. ¶ 273), 14 (*Id.* ¶ 281), 16 (*Id.* ¶ 285), 22 (*Id.* ¶ 295), 24 (*Id.* ¶ 300), 25 (*Id.* ¶ 302), 27 (*Id.* ¶ 308), 34 (*Id.* ¶ 322), and 35 (*Id.* ¶ 324) not actionable.

### e. BP misrepresented that OMS would bring uniformity to BP's worldwide operations

Plaintiffs allege that BP falsely represented that it was "championing [*147] process safety" and implementing "consistently high standards worldwide" in connection with its OMS. *See, e.g.*, Compl. ¶ 271 (Inglis: "One aspect of our focus on safe and reliable operations that I mentioned earlier is our new standardised Operating Management System (OMS). This will provide a blueprint for safety and all aspects of operations throughout BP, making sure operations are undertaken to a consistently high standard worldwide."); Compl. ¶ 278

(discussing progress in process safety: "Management systems -- Implementation of our operating management system began at an initial group of sites [in 2007], which included all five US refineries."); Compl. ¶ 279 (Hayward: "[BP's OMS brings] greater consistency to [BP's] operations."); Compl. ¶¶ 281, 285 (Hayward: "We are making good progress in addressing the recommendations of the Baker Panel and have begun to implement a new Operating Management System across all of BP's operations."); Compl. ¶ 283 ("[OMS] is the foundation for a safe, effective, and high-performing BP. It has two purposes: to further reduce HSE risks in our operations and to continuously improve the quality of those operations."); Compl. ¶ 287 (Hayward: "[W]e are [*148] also now introducing our new operating management system (OMS), designed to bring greater consistency to our operations."); Compl. ¶ 289 (Hayward: "One of the many consequences for us has been to develop and to embed a new Operating Management System right across BP -- and we operate in 100 countries -- so that is no mean feat."); Compl. ¶ 294 ("During [2008] we began migrating to the new BP OMS, which has an increased focus on process safety and continuous improvement. The majority of our operations in North America Gas, the Gulf of Mexico, Colombia and the Endicott field in Alaska all completed the migration to the OMS in 2008."); Compl. ¶ 295 (Hayward: "The BP operating management system (OMS) turns the principle of safe and reliable operations into reality by governing how every BP project, site, operation and facility is managed."); Compl. ¶ 300 (Hayward: "We have begun implementation of our Operating Management System, which covers everything from employee competencies to risk assessment, and we're already seeing the benefits."), (Inglis: "[W]e continue to advance the safety and reliability of our operations through implementing OMS."); Compl. ¶ 324 ("BP's operating management [*149] system (OMS) provides us with a systematic framework for safe, reliable and efficient operations."), ("BP's operating management system (OMS), which provides a single operating framework for all BP operations, is a key part of continuing to drive a rigorous approach to safe operations. 2009 marked an important year in continuing to implement OMS."); Compl. ¶ 328 ("Safety and operational integrity underpins everything we do, and we are now in the final phase of rolling out our operating management system that provides a single, consistent framework for our operations . . . .") Compl. ¶ 334 ("Providing an integrated and consistent way of working, the OMS helps ensure that a rigorous approach

to safe operations continues to be taken.").

The most complete description of BP's OMS program appeared in BP's 2008 Annual Report, Form 20-F. The passage describes OMS as follows:

> When fully implemented, OMS will be the single framework within which [BP] will operate, consolidating BP's requirements relating to process safety, environmental performance, legal compliance in operations, and personal, marine and driving safety. . . . The OMS establishes a set of requirements, and provides sites with [*150] a systemic way to improve operating performance on a continuous basis. BP businesses implementing OMS must work to integrate group requirements within their local system to meet legal obligations, address local stakeholder needs, reduce risk and improve efficiency and reliability. A number of mandatory operating and engineering technical requirements have been defined within the OMS, to address process safety and related risks.

(Compl. ¶ 302.) Plaintiffs contend that all of the above statements relating to OMS were false and misleading because BP continued to rely on different safety standards in different countries despite having knowledge that uniform practices would have prevented disasters like the Deepwater Horizon blowout. Specifically, Plaintiffs allege that BP only met higher standards where individual countries required the Company to do so. (Id. ¶ 106.) For example, Plaintiffs point out that Norway, Canada, and the United Kingdom impose more rigorous restrictions on drilling than does the United States in the Gulf of Mexico. [23] (Id.) BP followed higher standards for wells drilled in those jurisdictions but "took advantage of a lower level of regulation in the Gulf of Mexico." [*151] (Id. ¶ 106.) According to Plaintiffs, had BP operated under the higher standards imposed in Norway, Canada, or the United Kingdom, the Deepwater Horizon disaster would not have occurred. (Id. ¶ 108.)

> [23] Specifically, other jurisdictions require "two barriers" to be maintained on top of hydrocarbons during well completion, that wells in temporary abandonment never be left "underbalanced," and

that two blind shear rams be installed on all BOPs. (Compl. ¶ 106.)

Plaintiffs also seek to demonstrate the falsity of BP's statements on its OMS program by comparing BP's standards to those of its industry peers. For example, Shell's "Safety Case" methodology requires employees to "make out a satisfactory 'case' for the safety of a particular operation," rather than "merely follow regulations," which is all that BP required. (Id. ¶ 107.) Plaintiffs also point to testimony provided by executives from Shell, Chevron, and Exxon Mobil to the House Environment Subcommittee following the Deepwater Horizon disaster. (Id. ¶ 111.) The collective gist of the testimony was that other companies would not have drilled the Macondo well as BP did. (Id.) Plaintiffs also contend that BP's "Drilling Wells Operating [*152] Policy" contained "fewer absolute or imperative rules" than the guidelines of other companies and allowed managers more discretion in deviating from such rules. (Id. ¶ 112.) Finally, unnamed "safety personnel and drilling engineers within BP" deemed BP's OMS manual "confusing, poorly drafted, and incomplete." (Id. ¶ 113.)

Defendants argue that BP's statements about OMS providing a "consistently high standard worldwide" are too broad and generalized to be actionable. They are correct. Describing OMS as a "consistent" and "systematic" program makes no tangible promise to investors. Such statements do not represent, or even imply, that the same standard will be applied worldwide. Plaintiffs would apparently have consistency defined to mean use of identical safety standards in each of the eighty or more countries where BP operates. But Plaintiffs do not allege facts to support the imposition of such a metric.

Plaintiffs argue that BP described OMS as a foundation for safe and effective performance but failed to disclose that BP's OMS actually allowed the Company to implement different safety standards in different regions, so long as the standards met the minimum regulations required in [*153] each region. (Compl. ¶ 272.) Because the U.S. government's regulations were more lax than those of other countries, this enabled BP to set laxer safety standards for its operations in the Gulf. Plaintiffs do not allege that BP's operations violated U.S. law or regulations in the Gulf; yet, Plaintiffs would have this Court find that BP's decision to comply with U.S. regulations rather than self-impose stricter regulations

supports the falsity of general statements about BP's OMS program. This Court declines to do so. Even assuming Plaintiffs correctly argue that the Deepwater Horizon disaster would not have occurred had BP been operating under Canadian, Norwegian, or British standards, they have not pointed to any statement by BP representing that OMS required it to select the most rigorous drilling regulation from around the world and follow it worldwide. [24] Plaintiffs may prefer the strictures of drilling regulations promulgated in other countries, but the leniency of U.S. drilling regulations does not reflect any falsity on BP's part as to statements regarding its OMS program.

> [24] In fact, in some of the statements that Plaintiffs identify BP actually disclosed that the OMS program [*154] contemplated local variations based on local law. *See, e.g.*, Compl. ¶ 302 ("BP businesses implementing OMS must work to integrate group requirements within their local system to meet legal obligations, address local stakeholder needs, reduce risk and improve efficiency and reliability.").

The Court turns now to Plaintiffs' allegations that BP's failure to follow the standards of peer companies made its statements about OMS false. Plaintiffs set their own definition for industry standard, claiming that BP's procedures for deepwater drilling "contained fewer absolute or imperative rules . . . than the similar guidelines issued by Shell, Exxon Mobil, and Chevron, *i.e.*, industry standard." (*Id.* ¶ 112.) Simply comparing BP's OMS system to the safety programs of BP's industry peers does not explain why BP's statements about its own program are false or misleading. Plaintiffs, like all investors, are free to choose between companies when making investment decisions. None of the misrepresentations about OMS can be false simply because BP's OMS was not identical to safety programs among its industry peers when BP never made any such comparison to other programs. [25]

> [25] The only statement in which [*155] BP compared its record to any industry standard is found in Misrepresentation 14, BP's 2008 Strategy Presentation, in which Hayward stated that: "Over the last eight years, our safety performance, measured by Recordable Injury Frequency Rate, the standard measure of safety in our industry, has improved three-fold. As you can see on this chart,

our performance is amongst the best in our industry." (Compl. ¶ 281.) Plaintiffs have not challenged that BP's record as measured by the "Recordable Injury Frequency Rate" was false, nor do Plaintiffs allege any connection between this particular metric and any statement BP made about OMS.

In sum, Plaintiffs fail to focus their factual allegations to the actual statements at hand. The misrepresentations Plaintiffs allege relate specifically to BP's OMS program and BP's representation of the program as one designed to bring "consistency across all operations." Yet, Plaintiffs allege no defect in BP's OMS program. Nor do they allege that OMS was not properly implemented or that OMS did not apply to all of BP's operations. [26] Instead, Plaintiffs apparently challenge the substance of the OMS program, contending that its requirements were not rigorous [*156] enough. Plaintiffs do not allege that BP did not do what it represented; instead Plaintiffs allege that what BP represented it would do was not good enough, as judged against the laws and regulations of other countries and the practices of BP's competitors. Plaintiffs have thus failed to plead with particularity that BP's statements related to its OMS program were false or misleading. [27]

> [26] Some of the statements Plaintiffs identify do address the implementation of OMS. *See, e.g.*, Compl. ¶ 278 ("Implementation of our operating management system began at an initial group of sites, which included all five US refineries."); Compl. ¶¶ 281, 285 (Hayward: "We are making good progress in addressing the recommendations of the Baker Panel and have begun to implement a new Operating Management System across all of BP's operations."). Yet Plaintiffs do not explain why statements about BP's implementation of OMS were false or misleading. Plaintiffs allege the same set of facts--related to differing standards country by country and the failure of OMS to measure up to BP's industry peers' programs--with respect to each statement about OMS instead of tailoring their allegations to the specific misrepresentations [*157] they identify.
>
> [27] The non actionable statements are contained in portions of Misrepresentations 9 (Compl. ¶ 271), 12 (*Id.* ¶ 278), 13-18 (*Id.* ¶¶ 279-89), 21-22 (*Id.* ¶¶ 294-95), 24 (*Id.* ¶ 300), 35 (*Id.* ¶ 324), 37 (*Id.* ¶ 328), and 40 (*Id.* ¶ 334).

**f. BP provided false estimates of the spill amount following the Deepwater Horizon explosion**

Plaintiffs allege that BP knowingly provided false estimates of the spill amount in the days and weeks immediately following the Deepwater Horizon disaster. On April 21, 2010, less than twenty-four hours after the Deepwater Horizon explosion occurred, BP issued two separate press releases. One confirmed that there was a fire aboard the rig; the other offered BP's support to Transocean and stated that BP "stood ready to assist." (Compl. ¶ 337.) Plaintiffs claim that these press releases were false and misleading because in neither release did BP state that oil was already leaking from the well. (*Id.*) Plaintiffs allege that BP was already aware of the leak at the time it issued the press releases because, as McKay later testified, the "first spill response portions of [the Gulf of Mexico spill plan] were called in two hours after the explosion." (*Id.* ¶ 338(a).) [*158] Plaintiffs also allege that BP falsely represented that it was "ready to assist," given the errors in BP's Regional OSRP, as discussed above. (*Id.* ¶ 338(b)-(c).)

Plaintiffs have not adequately alleged the falsity of these statements. An examination of BP's first press release reveals that it simply reprinted a statement originally issued by Transocean reporting a fire on the Deepwater Horizon rig. (Doc. No. 150-25, Ex. U.) The only line of the press release written by BP stated that "BP confirms that Transocean Ltd. issued the following statement today," followed by a reprinting of Transocean's statement setoff in quotation marks with the notation "SOURCE: Transocean Ltd." at the end. (*Id.*) Because BP's press release did not purport to provide any additional information generated by BP, Plaintiffs have failed to adequately allege the falsity of the statement.

Plaintiffs also fail to demonstrate the falsity of the second press release, dated April 21, 2010. In the statement, BP stated that "it stood ready to assist in any way." (Doc. No. 150-26, Ex. V.) The release also included a quote from Hayward stating that, "We are also very focused on providing every possible assistance in the [*159] effort to deal with the consequences of the incident," and offered condolences to the rig personnel and families involved. (*Id.*) The general statement that BP "stood ready to assist" is too vague to be material. *See In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 385-86 (S.D. Tex. 2011) (categorizing a statement such as "we can shepherd this institution through this cycle" as

non-actionable puffery). In addition, a statement must be false or misleading at the time it was made. Plaintiffs point to the errors in BP's Regional OSRP, that were subsequently revealed as BP actually took action to assist. But Plaintiffs do not allege that BP knew of the errors at the time it offered assistance to Transocean.

The additional statements Plaintiffs contend are false all contained numerical estimates of the spill in the days following the explosion. On April 28, 2010, Suttles stated that BP's best estimate was 1,000 barrels of oil flowing from the well. (Compl. ¶ 342.) Suttles also made reference to a "new point of leak" in the blowout preventer area but stated that, "[g]iven the location, we do not believe this changes the amount currently estimated to be released." (*Id.*) On April [*160] 29, Suttles conducted an interview on The Early Show and provided the following estimate: "I think that somewhere between one and five thousand barrels a day is probably the best estimate we have today." (*Id.* ¶ 344.) On May 5, 2010, the Houston Chronicle interviewed Hayward, who stated that "the guesstimate remains 5,000 barrels a day." (*Id.* ¶ 353.) Plaintiffs contend that these spill estimates were false and misleading because BP was in possession of two internal documents giving different estimates than those BP provided to the public.

The first of the two documents is an internal BP document entitled, "Estimation of the Oil Released from Deepwater Horizon Incident." The document is dated April 26, 2010, marked "1200 hrs," and gives an estimate of "roughly 5000" barrels per day. (Doc. No. 150-27, Ex. W.) The second document is an internal BP document marked "BP Confidential" dated May 17, 2010, with that date crossed out and "4/27/20" written in. (Doc. No. 150-28, Ex. X.) The document provided three estimates of the spill amount: a low estimate of 1,063 barrels per day, a "Best Guess" estimate of 5,758 barrels per day, and a high estimate of 14,266 barrels per day. (*Id.*) These two [*161] documents sufficiently demonstrate the alleged falsity of the estimates provided by both Suttles and Hayward. The April 26 document gave an estimate of "roughly 5,000 barrels," yet on April 28 Suttles pegged BP's best estimate at only 1,000 barrels. Subsequent statements by Suttles and Hayward put the estimate at "somewhere between 1,000 and 5,000" or at a "guesstimate" of 5,000, while the second document from April 27 clearly shows that BP's best estimate was actually over 5,000 and as high as 14,000 barrels per day. The documents support Plaintiffs' contention that BP was

lowballing the estimate numbers in an attempt to keep stock prices from falling. Whether the facts will actually establish that BP intentionally gave the public lower estimates is an issue for trial. *See, e.g., Joffee v. Lehman Bros., Inc.*, No. 04 Civ. 3507, 2005 U.S. Dist. LEXIS 12313, 2005 WL 1492101, at *6 (S.D.N.Y. June 23, 2005) (holding that factual disputes are inappropriate for disposition on a motion to dismiss). Plaintiffs have alleged facts sufficient to call into question the truth of these three estimates.

Plaintiffs also allege that Suttles's statements regarding BP's use of the cofferdam were misleading. *See,* Compl. ¶ 351 [*162] ("Over the weekend, then, we'll be attaching that dome to the drillship Enterprise with a riser pipework assembly, which will allow the oil to flow up to the surface and be processed. So if all goes to plan, we should begin to start that operation, the beginning of trying to process the fluids on the surface and stop the spilling to the sea, on Monday."). Plaintiffs contend this statement was false because, according to Plaintiffs, the use of the cofferdam was "highly likely to fail" and had never been used in a deepwater environment. (*Id.* ¶ 352.) Plaintiffs identify no factual support for their argument and give no explanation or source to explain why it was likely to fail. Because Plaintiffs have not adequately alleged the falsity of this statement, it is not actionable.

Finally, Plaintiffs allege that Dudley's statement that the Deepwater Horizon rig "had handled some of the industry's greatest technical challenges, and her safety record had been excellent and had recently won awards," was false and misleading. (*Id.* ¶ 355.) Plaintiffs contend that Dudley's portrait of the rig's safety record was inaccurate because it failed to take into account that the rig had suffered problems [*163] as far back as 2005. (*Id.* ¶ 356.) Additionally, even if the Deepwater Horizon was at one point a safe rig, Dudley's statement omitted the facts that BP had removed one of the two blind shear rams on the rig after leasing it from Transocean, the BOP on the Deepwater Horizon failed multiple tests in the week leading up to the explosion, that there were other indicators of operational problems, and that BP postponed the MMS's planned inspection of the BOP on March 10, 2010. (*Id.* ¶ 356(b)-(e).) Plaintiffs have alleged sufficient facts to call into question whether Dudley's statements about the Deepwater Horizon rig misrepresented the rig's safety record or omitted key concerns about the rig of which BP was aware in the months leading up to the explosion.

With respect to the post-spill statements, Plaintiffs have alleged a sufficient basis to contend that the post-spill statements were false and misleading only with respect to Suttles's statements that provided numerical estimates of spill amounts and Dudley's representations as to the Deepwater Horizon rig's safety record. [28]

> 28   Following the Court's numbering system, the actionable statements are contained in Misrepresentations 42 (Compl. [*164] ¶ 342), 43 (*Id.* ¶ 344), 45 (*Id.* ¶353), and 46 (*Id.* ¶ 355). Statements contained in Misrepresentations 41 (*Id.* ¶337) and 44 (*Id.* ¶ 351) are not actionable.

### g. Other allegations

Plaintiffs also allege that statements that mentioned deepwater drilling in the Gulf of Mexico, BP's leadership in deepwater drilling, the competitive advantage afforded BP by such operations, and deepwater drilling's effect on the environment were misleading because of the risks associated with such operations. *See* Compl. ¶ 264 ("Profit centres are, or are expected to become, areas that provide significant production and income for the segment. Our new profit centres are in . . . the deepwater Gulf of Mexico . . . where we believe we have competitive advantage."); Compl. ¶ 271 ("We are developing strong growth in deepwater and tight gas though a spread of major projects around the world."); Compl. ¶ 292 ("[W]e have the know-how and technology to tap these resources safely and with minimal impact to the environment."); Compl. ¶ 297 (McKay: "The track record of BP and the industry generally in the Western and Central Gulf of Mexico (GOM) demonstrates that when areas are opened, they can be leased, explored and developed [*165] to the highest environmental and operational standards in the world."); Compl. ¶ 312 (Eyton: "And, it is worth emphasizing that throughout this period and despite the extremes of geography in which we operate, technology has continuously improved the safety and environmental footprint of our industry."); Compl. ¶ 326 ("We've developed the capability to create advanced floating production facilities, complex riser systems and subsea equipment with the ability to integrate the elements to cope with extreme temperatures, pressures, and oceanographic conditions. And that has enabled BP to become the leading deepwater IOC."); Compl. ¶ 328 ("Among the majors, we are now the leading deepwater producer and a lot of our deepwater

experience has, of course, been gained in the Gulf of Mexico.").

Defendants argue that Plaintiffs have failed to allege the falsity of these statements and that the statements are "not specific enough to perpetrate a fraud on the market." *Rosenzweig*, 332 F.3d at 870 (citation omitted) (internal quotation marks omitted). The Court agrees. Statements about BP's leadership in the deepwater drilling industry are too vague to be actionable. *See, e.g., Taubenfeld v. Hotels.com*, 385 F. Supp. 2d 587, 592 (N.D. Tex. 2004) [*166] (finding immaterial as a matter of law statements "worded as vague optimism, not phrased in terms of guarantees" because such statements are too vague for investors to rely on). Because Plaintiffs have not pleaded with particularity the misrepresentations related to deepwater drilling generally and BP's position in the industry, these statements are not actionable. [29]

29   Using the Court's numbering system, the nonactionable statements are included in Misrepresentation Nos. 5 (Compl. ¶ 264), 9 (*Id.* ¶ 271), 20 (*Id.* ¶ 292), 22 (*Id.* ¶ 295), 23 (*Id.* ¶ 297), 29 (*Id.* ¶ 312), 31 (*Id.* ¶ 316), and 36 (*Id.* ¶326).

## 2. The Adequately Alleged Misrepresentations are Material

Plaintiffs have pleaded with particularity misrepresentations involving BP's progress in implementing the Baker Report's recommendations, its ability to respond to a spill in the Gulf of Mexico, reported retaliation against employees who raise safety concern, and post-spill estimates of the spill amounts. Defendants argue that statements about safety and BP's progress in implementing process safety changes are not material. (Doc. No. 150, at 15.) They further claim that any failure to include details about problems specific to the [*167] Deepwater Horizon rig appear material only in hindsight. (*Id.*, at 21.) Because materiality is judged at the time of the alleged misrepresentation, Defendants argue that such information could not have been material before the Deepwater Horizon incident. *See, e.g., Shaw Group*, 537 F.3d at 541 (considering whether concealed problems with customer were material to announcement before problems became public).

A misrepresentation or omission is material if there is a substantial likelihood that a reasonable investor would consider the information to have significantly altered the total mix of information about investing in the

company. *ABC Arbitrage*, 291 F.3d at 361. "[G]eneralized, positive statements about the company's competitive strengths, experienced management, and future prospects" are immaterial. *Rosenzweig*, 332 F.3d at 869. In addition, "[v]ague, loose optimistic allegations that amount to little more than corporate cheerleading are 'puffery,' projections of future performance not worded as guarantees, and are not actionable . . . because no reasonable investor would consider such vague statements material and because investors and analysts are too sophisticated to rely on vague [*168] expressions of optimism rather than specific facts." *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 888 (S.D. Tex. 2001).

Defendants contend that statements about BP's progress in implementing the Baker Panel's recommendations are not material. The Baker Panel report was unquestionably important; BP in fact held a press conference to announce the final report and to publicly declare its commitment to reforming the Company's process safety efforts. The report was critical in that it flagged inadequacies in BP's corporate management structure and urged BP to expeditiously implement reforms critical to preventing future disasters. (Compl. ¶ 74.) The report, by its own terms, required BP to provide the public with regular reports on the Company's progress in implementing the recommendations. (*Id.*) This continuous reporting requirement underscores that the Baker Report did in fact serve as a metric by which investors could keep tabs on BP's compliance efforts and progress. BP, too, made the recommendations material by providing consistent updates on the Company's progress.

Defendants also claim that statements in the IEP and the Regional OSRP about BP's ability to respond to a [*169] spill, as well as post-spill estimates, could not have been misleading to investors because such statements were either made, or revealed to be inadequate, days after the Deepwater Horizon explosion, when investors were already aware of the catastrophe. The Court is not persuaded that the spill estimates were immaterial. Since 2007, BP had claimed that it was implementing specific process safety reforms, including both policies and practices, to prevent accidents like those at Texas City and Prudhoe Bay from reoccurring. BP also filed very detailed documents--the IEP and the Regional OSRP--outlining its ability to prevent and respond to accidents in the Gulf. Both documents

contained specific spill estimates for the region and assurances that the Company was prepared to respond to a spill of up to 491,721 barrels of oil per day in the Gulf. (Compl. ¶ 314.) Thus, when Suttles announced that the spill rate after the Deepwater Horizon explosion was only 1,000 barrels per day, and even when Hayward subsequently took the "guesstimate" up to 5,000 barrels per day, investors--based on all of BP's prior representations about beefed up process safety efforts and comprehensive spill response plans--could [*170] have indeed believed that BP was equipped to contain a spill in the amounts BP represented. Knowledge that process safety reforms were not being applied to the Deepwater Horizon rig, that the Regional OSRP vastly overstated BP's ability to respond to a spill, and that Suttles's estimates greatly understated the spill amount, would have indeed altered the "total mix of information" available to investors and, possibly, undercut their confidence in their investment. Post-spill estimates of the spill amount are material because "[t]he omission of a known risk, its probability of materialization, and its anticipated magnitude, are usually material to any disclosure." *Lormand*, 565 F.3d at 248; *see also Basic*, 485 U.S. at 232. Pre- and post-spill statements providing false assurances to the market that BP had everything under control could have, as Plaintiffs allege, kept prices artificially inflated until it became clear to investors--through government, regulatory, and third-party reports--that BP was in reality "making it up day to day." (Compl. ¶ 217.) BP's implementation of promised safety reforms and representation as to its ability to respond to spills in the Gulf of Mexico--one of the [*171] Company's professed profit centers--goes to the heart of BP's corporate value and financial stability and is information material to investors.

Materiality "is not measured by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers." *Lormand*, 565 F.3d at 248; *see also Isquith ex rel. Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 203 (5th Cir. 1988) (noting that "emphasis and gloss can, in the right circumstances create liability" under Rule 10b-5). The Court declines to dismiss the Complaint on the basis that Plaintiffs are relying on statements in BP's public filings and statements that are not material. "Because materiality is a mixed question of law and fact, it is usually left for the jury." *United States v. Peterson*, 101 F.3d 375, 380 (5th Cir. 1996). Although on a motion to dismiss "a court can determine statements to be immaterial as a matter of

law," the Court cannot say here, on the basis of Plaintiffs' Complaint and Defendants' arguments, that each of the misrepresentations that Plaintiffs have sufficiently alleged to be false and misleading are immaterial as a matter of law. *ABC Arbitrage*, 291 F.3d at 359.

### 3. The Adequately [*172] Alleged Misrepresentations are Not Protected Under the PSLRA's Safe Harbor Provisions

The PSLRA provides a safe harbor for "any forward-looking statement, whether written or oral, if and to the extent that the forward-looking statement is identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i). If a forward-looking statement is identified as forward-looking and accompanied by meaningful cautionary statements, the statement is not actionable and the defendant's state of mind is irrelevant. *In re Enron Corp. Secs., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 575 (S.D. Tex. 2002) (citing *Harris v. Ivax Corp.*, 182 F.3d 799, 803 (11th Cir.1999)). "If the representation or omission is fraudulent, independent of the existence of a forward-looking statement, the representation or omission is not shielded simply because a forward-looking statement exists." *In re Blockbuster Inc. Secs. Litig.*, 2004 U.S. Dist. LEXIS 7173, 2004 WL 884308, at *7 (N.D. Tex. April 26, 2004).

Defendants contend that eight of the alleged misrepresentations [*173] are forward-looking statements protected by the PSLRA's safe harbor provision. [30] (Doc. No. 150, App. C.) The Court has already determined that six of the eight statements Defendants identify as forward-looking are not actionable. *See supra* Section I.D.1. In addition, while the two remaining statements Defendants list--those contained in the 2008 Strategy Presentation and BP's 2009 Annual Report, Form 20-F--are part of the documents containing actionable misrepresentations, the portions Defendants contend are forward-looking are not the actionable portions of the documents. *See supra* Section I.D.1.i. Thus, because the statements Defendants identify as forward-looking do not contain actionable misrepresentations, the Court need not consider whether the statements are protected under the PSLRA's safe harbor provision.

30   The misrepresentations Defendants categorize as forward-looking statements are Misrepresentation Nos. 3 (Compl. ¶ 261), 5 (*Id.* ¶ 264), 14 (*Id.* ¶ 281), 15 (*Id.* ¶ 283), 25 (*Id.* ¶ 302), 32 (*Id.* ¶ 319), 34 (*Id.* ¶ 322), and 35 (*Id.* ¶ 324).

### 4. Plaintiffs Have Adequately Pleaded Scienter Against Some of the Individual Defendants

To adequately plead scienter and survive Defendants' [*174] motion to dismiss, the Complaint must state with particularity enough facts to raise an inference of scienter on the part of at least one Individual Defendant with regard to at least one allegedly fraudulent statement, and that inference must be such that a reasonable person would conclude that it is at least as compelling as any opposing inference. *See Tellabs*, 551 U.S. at 326; *Shaw Group*, 537 F.3d at 533-34. "The critical issue in a motion to dismiss based on insufficient allegations of scienter is whether the allegations of fraud contained in a plaintiff's complaint are sufficiently connected to each of the defendants such that a strong inference of scienter on their part is appropriate." *In re Franklin Bank*, 782 F. Supp. 2d at 387. Thus, the Court must consider whether Plaintiffs have satisfied the heightened pleading requirements for proving scienter for each allegedly fraudulent misrepresentation as to each Individual Defendant.

Defendants take issue with Plaintiffs' repeated "group pleading," *i.e.*, that the Complaint references "Defendants," "BP," "BP managers," or "BP leadership," rather than specifically alleging actions or omissions attributable to each named defendant. (Doc. [*175] No. 150, at 37-38.) Because the Fifth Circuit has rejected the group pleading approach, Plaintiffs must "distinguish among defendants and allege the role of each with respect to 'each act or omission' in the alleged fraud." *In re Tetra Techs.*, No. 4:08-cv-0965, 2009 U.S. Dist. LEXIS 126687, 2009 WL 6325540, at *3 (S.D. Tex. 2009); *see also Shaw Group*, 537 F.3d at 533 (rejecting the group pleading approach to scienter in the Fifth Circuit). While Plaintiffs frequently present only what "BP" allegedly knew in their factual allegations, Plaintiffs do tether the majority of the alleged misrepresentations and omissions they identify to one or more of the Individual Defendants and name the specific speaker or responsible party. Therefore, although the Court must disregard group pleaded allegations in the Complaint, Plaintiffs have distinguished among the roles of each Individual

Defendant to a sufficient degree to require this Court to undertake scienter analysis with respect to each Individual Defendant.

Plaintiffs name ten Individual Defendants. Defendants argue that Plaintiffs have not made individualized scienter allegations as to six of them: Browne, Conn, Dudley, Grote, Hayward, and Rainey. With respect to the other [*176] four defendants--Inglis, McKay, Suttles, and Malone--Defendants contend that the scienter allegations are inadequate. The Court addresses scienter with respect to each Individual Defendant separately below. 31

31   In their response to the motion to dismiss, Plaintiffs make additional scienter allegations. Specifically, Plaintiffs allege that Hayward, Conn, and Inglis "reviewed copious information relating to safety deficiencies through their membership on the Group Operations Committee ("GORC")." (Doc. No. 186, at 29.) Because Plaintiffs did not include any mention of the GORC in their Complaint, the Court does not consider this information in its scienter analysis.

### a. McKay

McKay has served as Chairman and President of BP American since January 2009. (Compl. ¶ 39.) In 2007, McKay worked as the Senior Group Vice President of BP and Executive Vice President of BP America. (*Id.*) According to Plaintiffs, these positions made McKay responsible for BP's negotiations on the settlements in both the Texas City and Prudhoe Bay incidents. (*Id.*) Plaintiffs also allege that McKay communicated with the BP Ombudsman, Judge Sporkin, regarding the concerns an EPA attorney, Jeanne Pascal, expressed about [*177] BP's operations. (Compl. ¶ 133.) Defendants concede that Plaintiffs did assert individualized allegations of scienter against McKay, but claim that such allegations are inadequate. (Doc. No. 150, at 43.)

McKay is alleged to have made two of the forty-six misrepresentations identified in the Complaint, one in his testimony before the U.S. House of Representatives in February 2009, and another at the Howard Weil Conference in New Orleans in March 2009. (Misrep. Nos. 23 & 27; Compl. ¶¶ 297-99, 308-09.) Because the Court has already determined above that the two alleged misrepresentations attributable to McKay are not actionable, Plaintiffs cannot demonstrate scienter as to

Defendant McKay. *See Blackwell*, 440 F.3d at 287 (explaining that a complaint must specifically tie individual defendants to the statements or omissions, or it will fail under the PSLRA's heightened pleading standard.). The Court therefore dismisses Plaintiffs' claims against McKay.

### b. Conn

Defendant Conn is BP's Chief Executive for BP Refining and Marketing, and he also serves as a member of BP's executive management. (Compl. ¶ 42.) Conn is alleged to have participated in three separate strategy presentations made to investors, [*178] one in February 2008 (Misrep. No. 14; Compl. ¶ 281), one in March 2009 (Misrep. No. 24; Compl. ¶ 300-01), and one in March 2010 (Misrep. No. 34; Compl. ¶ 322-23). The Court has determined above that two of these presentations contained no actionable misrepresentations. The only remaining actionable misrepresentation is contained in the February 2008 Strategy Presentation conference call with investors, in which Conn is alleged to have participated. (Misrep. No. 14; Compl. ¶ 281.) Plaintiffs identify some specific statements made by Defendants Hayward and Inglis during the call, but they tie no specific statement to Conn. (*Id.*) The only actionable misrepresentation is contained in the portion of the call transcript attributed to Hayward; the remaining unattributed section contains no actionable misrepresentation. (*Id.*) Because Plaintiffs' allegation that Conn participated in the call is insufficient to connect him to any actionable misrepresentation, the Court dismisses Plaintiffs' claims against Conn.

### c. Grote

Defendant Grote is BP's CFO. He has held the position since 2002 and, in addition, has served as one of BP's directors since 2000. (Compl. ¶ 40.) Plaintiffs link Defendant Grote [*179] to seven of the alleged misrepresentations. Only one statement is attributed to Grote individually. With respect to all of the others, Grote is alleged to have participated on conference calls with investors (Misrep. Nos. 2, 14; Compl. ¶¶ 258, 281) or signed BP's public filings in his capacity as CFO (Misrep. Nos. 5, 15, 25, 35; Compl. ¶¶ 264, 283, 302, 324). The one misrepresentation attributed to Grote individually was also part of a conference call that took place in April 2007. (Misrep. No. 7, Compl. ¶ 267.) Following this Court's analysis above, only two of the alleged misrepresentations involving Defendant Grote are

actionable, Misrepresentations 14 and 35. *See supra* Section I.D.1.a.

Misrepresentation 14 is contained in a strategy presentation made during a conference call in which Grote, along with Hayward, Inglis, Dudley, and Conn, allegedly participated. Plaintiffs identify some specific statements made by Defendants Hayward and Inglis during the call, but they tie no specific statement to Grote. (Compl. ¶ 281.) The only actionable misrepresentation is contained in the portion of the call transcript attributed to Hayward; the remaining unattributed section contains no actionable [*180] misrepresentation. [32] (*Id.*) Plaintiffs' allegation that Grote generally participated in the call is insufficient to connect him to this misrepresentation.

> 32  Plaintiffs also identify an additional statement made by Grote in an October 2007 conference call. According to Plaintiffs, Grote told analysts that plans to reorganize the company were "designed to simplify the organization and improve productivity and accountability, bringing up operating units to enable them to focus on safe, reliable, and profitable operations." (Compl. ¶ 115.) However, Plaintiffs do not identify this statement in the section of their Complaint devoted to misrepresentations and omissions and, therefore, the Court does not consider it.

Misrepresentation 35 refers to statements in BP's 2009 Annual Report, Form 20-F, which BP filed with the SEC on March 5, 2010. (*Id.* ¶ 324.) Corporate officers such as Grote cannot be liable for allegedly fraudulent statements solely because of their positions at BP. *See Southland*, 365 F.3d at 364-65. Corporate statements can, however, be tied to directors and officers if plaintiffs allege that the officer or director signed the document containing the statements or allege their [*181] involvement in creating the documents. *Blackwell*, 440 F.3d at 287; *see also Southland*, 365 F.3d at 365 (explaining that a corporate officer can be connected to an unattributed corporate document by pleading a signature on the document or "particular factual allegations explaining the individual's involvement in the formulation of either the entire document, or that specific portion of the document, containing the statement"). Plaintiffs have alleged that Grote signed the Annual Report. [33] (Compl. ¶ 324.) Because the Complaint pleads that Grote signed the Annual Report, the allegedly

fraudulent statements in the Form 20-F can be attributed to him. However, connecting the statement to Grote does not answer the question of whether Plaintiffs have adequately pleaded scienter on the part of Grote with respect to the 2009 Annual Report.

> 33   Plaintiffs did not attach a copy of BP's 2009 Annual Report to their Complaint, but the Court takes judicial notice of the contents of this publicly filed document. *See* BP's 2009 Form 20-F, Exhibit 13 (Certificates Certification), *available                                    at:* http://www.sec.gov/Archives/edgar/data/3 13807/000059012310021364/u08439exv13.htm ; *see also Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1018 & n. 1 (5th Cir. 1996) [*182] (explaining that, in securities cases, courts may take judicial notice of the contents of public disclosure documents that the law requires to be filed with the SEC). While Defendants did attach the 2009 Form 20-F as an exhibit to their motion to dismiss, they did not include the certification page relevant for the Court's scienter analysis. (Doc. No. 150, Ex. G).

In alleging that Grote signed BP's Annual Report, Plaintiffs are referring to the certification furnished pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), which requires senior executives of public companies to certify the accuracy of quarterly and annual financial reports. *See* 15 U.S.C. § 7241(a). But a SOX certification, standing alone, is not indicative of scienter. The Fifth Circuit has made clear that "a Sarbanes-Oxley certification is only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements." *Shaw Group*, 537 F.3d at 545 (quoting *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006)). "There must be, in other words, facts establishing that the officer who signed the certification had a reason to know, or should have [*183] suspected, due to the presence of . . . 'red flags,' that the financial statements contained material misstatements or omissions." *Id.* (internal quotation marks omitted). Although the Complaint nominally pleads that "Defendants" and "BP" were aware of BP's failure to make progress on process safety following issuance of the Baker Report, not one of the statements listed in the Complaint to demonstrate this knowledge is attributed to Grote specifically. Instead, the Complaint merely states that Grote, as a member of BP's executive

management, was "responsible for the day-today running of BP." (Compl. ¶ 40.) The Complaint pleads no facts to support this allegation. *See In re Franklin Bank*, 782 F. Supp. 2d at 376 ("Conclusory allegations that a defendant 'should have known' about internal corporate problems based merely on his position or status within the corporation will not suffice to establish scienter."). Accordingly, Plaintiffs' allegation that Grote committed securities fraud with respect to the 2009 Annual Report fails to adequately plead scienter under the heightened pleading requirements of Rule 9(b) [*184] and the PSLRA. The Court therefore dismisses Plaintiffs' claims against Grote.

#### d. Browne

Browne served as BP's CEO from 1995 until April 2007, when he was succeeded by Hayward. (Compl. ¶¶ 18, 37.) Browne worked for BP for less than four months of Plaintiffs' three and a half year Class Period. Plaintiffs attribute five misrepresentations to Browne. (Misrepresentation Nos. 1-5, Compl. ¶¶ 256-65.) Because the Court has found that all five of the misrepresentations are not actionable, Plaintiffs cannot adequately plead scienter with respect to Browne. *See supra* Section I.D.1.a. Accordingly, the Court dismisses Plaintiffs' claims against Browne.

#### e. Rainey

Rainey is BP's Vice President of Exploration for the Gulf of Mexico. Plaintiffs allege that Rainey made one of the forty-six misrepresentations identified in the Complaint. Specifically, Plaintiffs point to testimony Rainey gave before the U.S. Senate Committee on Energy and Natural Resources on November 19, 2009. (Compl. ¶ 316.) The Court determined above that the actionable portion of Rainey's testimony relates to Rainey's representation that BP's production facilities had the necessary contingency plans in place to respond to incidents. [*185] *See supra* Section. I.D.1.b. By identifying specific portions of Rainey's testimony, Plaintiffs have adequately attributed an actionable misrepresentation to him. However, the Court must still determine whether Plaintiffs have adequately pleaded scienter on the part of Rainey with respect to the alleged misrepresentation.

In this Court's determination, Plaintiffs have failed to do so. The Complaint alleges that Rainey misrepresented BP's true risk profile by failing to disclose prior safety

failures and problems revealed in BP's audit of the Deepwater Horizon, misrepresented the BOP's system of safety controls while failing to disclose that BP had removed redundant systems, and falsely represented that BP could conduct safe operations when BP did not have adequate controls in place. (Compl. ¶¶ 318(c)-(e).) Yet the Complaint pleads no facts to support Rainey's knowledge of any of these facts. [34]

> [34]   At oral argument, Plaintiffs referenced, for the first time, additional allegations of scienter with respect to the post-spill statements. Specifically, Plaintiffs asserted that Rainey acted as Suttles' "right-hand man" in BP's spill response efforts. Rainey apparently worked as "BP Deputy Incident [*186] Commander from the Unified Area Command." (Transcript, Doc. No. 305, at 64, lns. 23-25). Plaintiffs claimed that, since the filing of the Complaint, they have obtained "absolutely clear evidence, deposition testimony from Mr. Suttles and Mr. Rainey, that Mr. Rainey was delegated by Mr. Suttles to prepare these spread flow worksheets every day and prepared multiple ones every day. He spoke twice on the phone with Suttles and others every day." (*Id.*, at 73, lns. 5-9). Plaintiffs alleged no post-spill misrepresentations attributed to Defendant Rainey in the Complaint and the Court will not consider any of the additional information provided for the first time during oral argument.

Instead, the Complaint merely states that Rainey, as a member of BP's executive management, was "responsible for the day-to-day running of BP." (*Id.* ¶ 40.) No facts are given in support of this conclusion. Because "[c]onclusory allegations that a defendant 'should have known' about internal corporate problems' based solely on his position within the company are insufficient to establish scienter, Plaintiffs' have not adequately pleaded scienter with respect to Rainey under the heightened pleading requirements [*187] of Rule 9(b) and the PSLRA. *See In re Franklin Bank*, 782 F. Supp. 2d at 376. The Court therefore dismisses Plaintiffs' claims against Rainey.

**f. Inglis**

Inglis was BP's Chief Executive of Exploration and Production and an executive director from February 2007 until October 2010. (Compl. ¶ 38.) Plaintiffs attribute six alleged misrepresentations to Inglis. (Misrep. Nos. 9, 14,

24, 34, 36 & 37; Compl. ¶¶ 271, 281, 300, 322, 326-329.) Following the Court's analysis above, only one of the misrepresentations Plaintiffs attribute to Inglis is actionable. (Misrep. No. 14; Compl. ¶ 281.)

The actionable statement, Misrepresentation 14, is contained in a strategy presentation made during a conference call in which Inglis, along with Hayward, Grote, Dudley, and Conn, allegedly participated. (Compl. ¶ 281.) Plaintiffs identify as misrepresentations one specific statement made by Inglis and two made by Hayward during the call. (*Id.*) However, the only actionable misrepresentation is contained in the portion of the call transcript attributed to Hayward; the remaining unactionable section contains no actionable misrepresentation. (*Id.*) Because Plaintiffs have identified no actionable misrepresentations [*188] attributable to Defendant Inglis, Plaintiffs cannot adequately plead scienter with respect to Inglis. The Court therefore dismisses Plaintiffs' claims with respect to Inglis. [35]

> [35]   Defendants argue that Plaintiffs' one specific scienter allegation with respect to Inglis--that former BP employee Kevin Lacy communicated concerns about safety protocols in BP's drilling practices to Inglis--is insufficient to allege scienter. Because there are no actionable misrepresentations or omissions attributed to Defendant Inglis, the Court need not determine the adequacy of the scienter allegation.

**g. Hayward**

Hayward was BP's CEO from May 2007 until October 2010. (Compl. ¶ 36.) Before assuming the position of CEO, Hayward was CEO of BP's Exploration and Production business segment, which "oversees exploration and drilling in the Gulf of Mexico, among other places." (*Id.*) He also served as an executive director from 2003 until November 2010. (*Id.*) Plaintiffs portray Hayward as the driving force behind BP's campaign to "turn the corner on safety," and they attribute more of the alleged misrepresentations to Hayward--nineteen out of the total forty-six--than to any other Individual Defendant. The Court has [*189] determined that nine of the nineteen statements attributable to Hayward are actionable. *See supra* Section I.D.1. The actionable misrepresentations include: statements made by Hayward at the Houston Forum in 2007 (Misrep. No. 11; Compl. ¶ 275); portions of BP's 2007 Annual Review, which Hayward signed (Misrep.

No. 12; Compl. ¶ 278); statements attributed to Hayward from a 2008 Strategy Presentation conference call with investors (Misrep. No. 14; Compl. ¶ 281) and the 2009 General Meeting (Misrep. No. 28; Compl. ¶ 310); a speech Hayward gave during BP's 2008 Annual General Meeting (Misrep. No. 16; Compl. ¶ 285); a speech Hayward gave at the HRH Prince of Wales 3rd Annual Accounting for Sustainability Forum in December 2008 (Misrep. No. 18; Compl. ¶ 289); statements in BP's 2009 Annual Report (Misrep. No. 35; Compl. ¶ 324); a speech at the Peterson Institute for International Economics in Washington, D.C. in March 2010 (Misrep. No. 38; Compl. ¶ 330); and post-spill estimates of the spill rate Hayward gave during interviews following the Deepwater Horizon incident (Misrep. No. 45; Compl. ¶ 353. Aside from the one post-spill statement, all of the actionable misrepresentations Plaintiffs [*190] attribute to Hayward involve Hayward's representations that BP was making progress in addressing the recommendations of the Baker Panel Report and improving its process safety systems following the Texas City incident.

Defendants claim Plaintiffs have failed to adequately plead scienter with respect to Hayward. They have not. Plaintiffs adequately allege scienter with respect to Hayward by pointing to Hayward's own admissions as to what his job as CEO entailed, including verbal commitments revealing that he took responsibility for BP's process safety efforts and was the key individual tracking that progress. From the very beginning, when he succeeded Browne as CEO in May 2007, Hayward committed to "focus on safety like a laser." (Compl. ¶ 18.) As outgoing CEO, Browne, too, stated that Hayward intended to "take a lead . . . by championing process safety." (*Id.* ¶ 75.) As CEO, Hayward implemented an "Operations Academy," a safety course for BP executives. (*Id.* ¶ 20-21.) Hayward attended the Operations Academy and took coursework specifically focused on process safety. (*Id.*) Hayward claimed he was following the implementation of BP's OMS program and repeatedly mentioned the Company's goals [*191] for the program. (*Id.* ¶¶ 104, 279.) Hayward also had a hand in BP's reorganization efforts; in fact, he was the first to announce BP's plans to undergo reorganization. (*Id.* ¶ 115.) Throughout his time as CEO, Hayward continued to tout BP's safety improvements, even stating in 2009 that he was "so bored with saying 'safety, people, and performance,' but I have determined that I'm not going to say anything else." (*Id.* ¶ 254.) Although not all of the statements are actionable, Plaintiffs point to at least

eighteen separate occasions on which Hayward spoke of BP's progress in process safety or its progress as measured since the Texas City accident in 2005. Hayward's own actions as the spokesperson and champion for BP's reform efforts weigh strongly in favor of the inference that Hayward paid special attention to BP's process safety efforts or, at the least, was reckless in not doing so while continuing to publicly tout improvements. *See, e.g., In re NetSolve, Inc. Sec. Litig.*, 185 F. Supp. 2d 684, 697 (W.D. Tex. 2001) (finding allegations of scienter adequate where undisclosed problems should have been obvious to the company's high ranking executives); *see also ABC Arbitrage*, 291 F.3d at 351-54 [*192] (explaining that a securities fraud complaint may survive where plaintiffs have "alleged facts demonstrating that defendants failed to review or check information that they had a duty to monitor"); *see also In re Washington Mut., Inc. Sec., Derivative & ERISA Litig.*, 694 F. Supp. 2d 1192, 1209-1210 (W.D. Wash. 2009) (finding a strong inference of scienter pleaded as to statement about risk management where defendant was responsible for overseeing risk management). The competing inference--that Hayward professed to be focused on process safety but remained unaware of actual process safety concerns in BP's operations on the ground--is far less compelling.

In addition, Hayward acknowledged his failures following the spill. In November 2010, Hayward confirmed that BP was "making it up day to day" following the Deepwater Horizon spill and had failed to draw up sufficient emergency plans. (Compl. ¶ 217.) Hayward also stated during an NPR interview about the spill that, "It is indeed BP's responsibility to deal with this, and we are dealing with it. . . . There is no doubt about that. It's our responsibility - we accept it fully." (*Id.* ¶ 350.) In June 2010, Hayward admitted that it was "an entirely [*193] fair criticism" to blame BP for the poor cleanup effort because "[w]hat's undoubtedly true is that we did not have the tools you'd want in your tool kit." (*Id.* ¶ 360.) Further, with respect to the post-spill estimates, Hayward later acknowledged, about a month after he provided public estimates, that the volume of oil spilling into the Gulf was far greater than BP's initial statements indicated. (*Id.* ¶ 372.)

Hayward's admissions of the breakdowns in BP's process safety plans further support the inference that he was aware of inadequacies. *See, e.g., In re Toyota Motor Corp. Secs. Litig.*, No. CV 10-922 DSF, 2011 U.S. Dist.

LEXIS 75732, 2011 WL 2675395, at *4 (C.D. Cal. July 7, 2011) (finding that "the defects at issue were simply too significant for it to be plausible that top . . . management was not aware of the possible ramifications of the problem by the time the statements at issue were made."); *see also Plotkin v. IP Axess Inc.*, 407 F.3d 690, 700 (5th Cir. 2005) (explaining that "an egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of recklessness."); *see also In re Enron Corp.*, 2003 WL 2148157 at *3, *15-16 (holding that red flags, along with [*194] the defendants' positions within the company, were sufficient to demonstrate scienter). The "number, size, timing, nature, frequency, and context" of the misrepresentations are all factors that may "shift the balance of the inferences to be drawn from such allegations . . . significantly in favor of scienter." *In re Fleming Co. Inc. Sec. & Derivative Litig.*, No. MD1530, 2004 U.S. Dist. LEXIS 26488, 2004 WL 5278716, at *11 (E.D. Tex. June 16, 2004). Mere weeks after assuming the position of CEO, Hayward began promoting BP's efforts to improve its process safety program. The success of the efforts, in turn, were to determine the success of Hayward's tenure as CEO. Over the course of the Class Period, Hayward made numerous and frequent statements about BP's progress in the safety arena--so many statements that even Hayward admitted he got "bored with saying 'safety, people, and performance.'" (Compl. ¶ 254.) These statements, coupled with Hayward's own representation of his job description and the responsibility he assumed to spearhead BP's safety reform efforts, make him more than a run of the mill corporate officer. [36] Hayward defined his position as CEO to include a special and targeted focus on process safety. [*195] Taking him at his own word, the Court finds that Plaintiffs have sufficiently pleaded scienter with respect to Hayward. [37]

---

36  In their briefing, Plaintiffs argue that the timing of Hayward's resignation, in October 2010, provides an additional indicia of scienter. While true that a forced departure is "another factor supporting a strong inference of scienter," the Court does not find that Plaintiffs have alleged a forced resignation with respect to Hayward. *Kaltman v. Key Energy Servs.*, 447 F. Supp. 2d 648, 664 (W.D. Tex. 2006). The Complaint merely states that Hayward held the position of CEO from May 2007 until October 2010. (Compl. ¶ 36.) Plaintiffs have pleaded no facts to support their suggestion that Hayward's resignation was forced. Therefore, the Court does not consider this allegation as providing further support for Plaintiffs' scienter argument.

37  For the same reasons discussed below with respect to Defendant Suttles, the Court finds that there is also scienter with respect to Hayward's post-spill statement providing lower estimates to the public than those BP actually possessed. *See infra* Section I.D.4.j.

### h. Malone

Malone was Chairman and President of BP America from July 2006 [*196] until February 2009, and Executive Vice President of BP until March 2009. (Comp. ¶ 45.) Plaintiffs tie Malone to two of the forty-six alleged misrepresentations. One of the alleged misrepresentations by Malone occurred during his testimony before the U.S. House of Representatives in May 2007. (Misrep. No. 8; Compl. ¶ 269.) The second is found in a transcript of a BP press release issued in October 2007. (Misrep No. 10; Compl. ¶ 273-74.) The first statement allegedly falsely represented that BP did not take retaliatory action against employees who reported safety concerns; the second statement concerned BP's progress in safety following the Texas City and Prudhoe Bay incidents. The Court has already determined that both of these misrepresentations are actionable. However, the Court must still determine whether Plaintiffs have adequately alleged scienter with respect to these actionable misrepresentations.

During his testimony before Congress, Malone claimed that BP did not retaliate against workers. (Compl. ¶ 269.) In support of scienter, Plaintiffs allege that Malone had direct knowledge of concerns over BP's retaliation against employees through communications Malone had with BP's [*197] Ombudsman, Judge Sporkin. (*Id.* ¶ 146.) The fact that Malone allegedly possessed direct knowledge of retaliation would be evidence of scienter with respect to Malone's representations to the contrary *if* Plaintiffs had alleged that Malone possessed such knowledge when he made the statement. *See In re Entrust Sec. Litig.*, No. 2:00CV119, 2002 U.S. Dist. LEXIS 26669, 2002 WL 31968321, at *5 (E.D. Tex. Sept. 30, 2002) (finding no scienter where "plaintiffs have pleaded no specific facts that indicate at the time the alleged [misrepresentations] were made, the defendants had actual knowledge of contradictory facts"). Malone testified before Congress in May 2007. (*Id.* ¶

269.) Malone is not alleged to have received information from the Ombudsman contradicting his representation until 2008. (*Id.* ¶ 146.) Because "[a] plaintiff cannot charge a defendant with intentionally misleading investors about facts the defendant may have become aware of *after* making an allegedly misleading statement," the knowledge Malone allegedly gained in 2008 cannot support Plaintiffs' allegation of scienter as to his 2007 statement. *In re Franklin Bank*, 782 F. Supp. 2d at 376; *see also Plotkin v. IP Axess Inc.*, 407 F.3d 690, 698 (5th Cir. 2005).

Misrepresentation [*198] 10 relates to BP's progress in the area of process safety following the Texas City and Prudhoe Bay incidents. (Compl. ¶ 273.) Plaintiffs only allegation of scienter relates to Malone's knowledge of retaliation and does not demonstrate that Malone was aware of any of BP's failures to implement adequate safety protocols in the Gulf. Because Plaintiffs have merely alleged that Malone "served on BP's executive management team" and, as a result, was "responsible for the day-to-day running of BP," their scienter allegations are insufficient to meet the heightened pleading standard required under Rule 9(b) and the PSLRA. The Court therefore dismisses Plaintiffs' claims with respect to Malone.

### i. Dudley

Dudley is BP's Group Chief Executive but has only held the position since October 2010. (Compl. ¶ 44.) He has also served as an executive director since April 2009. (*Id.*) Plaintiffs attribute three of the alleged misrepresentations to Dudley. With respect to the first two misreprsentations, Plaintiffs allege that Dudley participated in two conference calls with investors, one in February 2007 and the other in February 2008. (Misrep. Nos. 2 & 14; Compl. ¶¶ 258, 281.) The Court has already determined, [*199] above, that statements that were made during the February 2007 call are not actionable. *See supra* Section I.D.1.a. With respect to the conference call in February 2008, Plaintiffs attribute no specific statements to Dudley; instead, they simply allege that he "participated" in the call. (Compl. ¶ 281.) However, Plaintiffs fail to explain how Dudley could have participated in this particular call when he did not join BP's executive management team until April 2009, over a year after the call took place, and did not assume his current position of Group Chief Executive until October 2010, over two and a half years after the call took place

and almost five months after the Class Period ended. (*Id.* ¶ 44.) Plaintiffs thus fail to adequately attribute this second misrepresentation to Dudley.

The remaining actionable misrepresentation relates to a speech Dudley gave at the Chief Executives' Club in Boston, Massachusetts following the Deepwater Horizon spill. (Misrep. No. 46; Compl. ¶ 355.) During the speech, Dudley allegedly portrayed the Deepwater Horizon's safety record in a false light and claimed that the rig underwent regular inspection and testing. (*Id.*) As discussed above, Plaintiffs [*200] alleged sufficient facts to call into question the truth of this statement; they fail, however, to adequately allege scienter.

Plaintiffs claim that Dudley failed to disclose "problems dating back to the 2005 audit of the Deepwater Horizon's BOP," removal of the second blind shear ram on the BOP, and intentional delays and postponement of routine inspections of the Deepwater Horizon's BOP. (Compl. ¶¶ 356(a)-(e).) The Complaint nominally pleads these facts, but does not explain how this knowledge is attributable to Dudley. Instead, the Complaint merely states that Dudley was a "member of BP's executive management" and, therefore, was "responsible for the day-to-day running of BP." (*Id.* ¶ 44.) Yet Plaintiffs do not allege that Dudley joined BP's executive management until April 2009, years after the BOP audit (in 2005) and the removal of the second blind shear ram (in 2004). (*Id.* ¶¶ 61, 94.) Plaintiffs' broad, conclusory allegations as to Dudley, based solely on his position within BP, are insufficient to meet the heightened pleading standard enumerated under Rule 9(b) and the PSLRA. *See, e.g., Shaw Group*, 537 F.3d at 535 (explaining that pleadings of scienter may not rest on the inference [*201] that a defendant must have been aware of a fraudulent statement based on his position in the company). The Court therefore dismisses Plaintiffs' claims with respect to Dudley.

### j. Suttles

Suttles was BP's Chief Operating Officer for Exploration and Production from January 2009 until at least January 2011" (Compl. ¶ 41.) Plaintiffs have adequately alleged actionable misrepresentations attributable to Suttles with respect to two post-spill statements presenting spill estimates lower than the estimates BP actually possessed. (Misrep. Nos. 42-43; Compl. ¶¶ 342-344.) Plaintiffs allege scienter with respect to Suttles by claiming that he was in possession

of the two internal BP documents providing different, and higher, spill estimates than those that Suttles gave to the public. (*Id.* ¶ 346.) Suttles was "the top BP official co-managing the 45,000-person spill response with the Coast Guard." (Doc. No. 220, at 23.) Defendants contend that, based on Suttles' position as head of BP's spill response team, it is conceivable that he was unaware of particular estimates at any particular time. (*Id.*) Plaintiffs argue the opposite: that it is inconceivable that Suttles, who led BP's media response effort [*202] after the oil spill, would not have known of "BP's very *own estimates* of the flow rate." (Doc. No. 186, at 36.) Plaintiffs' argument is more persuasive here. *See, e.g., see also ABC Arbitrage*, 291 F.3d at 351-54 (explaining that a securities fraud complaint may survive where plaintiffs have alleged facts demonstrating that defendants failed to review or check information that they had a duty to monitor); *see also In re Washington. Mut., Inc.*, 694 F. Supp. 2d at 1209-1210 (finding a strong inference of scienter pleaded as to statement about risk management where defendant was responsible for overseeing risk management).

Review of the complete transcript of Suttles' interview on The Early Show, the interview alleged to contain one of the misrepresentations, suggests that Suttles indeed was aware of the internal BP documents when he gave the public an estimate of only 1,000 barrels. The relevant portion of the interview from April 29, 2010, reads as follows:

MAGGIE RODRIGUEZ: Thank you sir. This morning, we're learning that the leak from the well is five times worse than originally estimated. Yet, we just heard you say in our report that you don't believe this will change the amount that's estimated [*203] to be released in to the ocean. I'm not an expert. But how is it possible that four thousand additional gallons leaking a day does not change the equation?

DOUG SUTTLES: Well, Maggie. Let me--let--first, as you probably say, just like everybody, you know, our--our real focus and what we want to occur is to stop this leak as quick as we can. . . . But I should probably explain that on the--the difference between one and five thousand

barrels a day and--and what we tried to explain is that, what we're seeing through the remote-operated vehicle cameras on the floor hasn't actually changed. . . . We think that the range has increased of what the estimate has been. So, I think that somewhere between one and five thousand barrels a day is probably the best estimate we have today.

MAGGIE RODRIGUEZ: It's a big difference though between one and five, isn't it?

DOUG SUTTLES: Well it clearly is. Clearly there's--there's a difference between one and five. But in terms of our response, it actually doesn't change. Our spill plan actually recognized these amounts and actually what we're going to do out--out in the field, out on the surface of the sea actually doesn't change based on that number.

(Doc. No. 150-30, [*204] Ex. Z.) Suttles's interview suggests that he was indeed aware of BP's estimate amounts, even though in his opinion they did not affect BP's response efforts. Additionally, Suttles's responses--all professing a clear knowledge of the estimates and the rationale behind the estimates--belie Defendant's suggestion that, as head of BP's spill response team, Suttles would be unaware of BP's own estimates.

The inference of scienter "need not be irrefutable, i.e., of the 'smoking-gun' genre." *Tellabs*, 551 U.S. at 324. In determining whether the inference of scienter is cogent and compelling, the Court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. *Id.* BP's internal document dated April 27, 2010, provided three different estimates for the spill rate: a low of 1,063 barrels per day, a best estimate of 5,758 barrels per day, and a high estimate of 14,266 barrels per day. (Doc. No. 150-28, Ex. X.) Even BP's very first internal estimate, available on April 26, 2010, gave an estimate of "roughly 5000" barrels per day. (Doc. No. 150-27, Ex. W.) Despite these two documents, Suttles gave an estimate of 1,000 barrels on April [*205] 28, 2010. (Compl. ¶ 342.) On April 29, two days after the BP document containing the

low, best, and high estimates was created, Suttles provided the public with a "best estimate" of "somewhere between one and five thousand barrels a day." (*Id.* ¶ 344.)

Defendants argue that Suttles "acknowledged that the flow rate . . . could be 5,000 barrels a day" and claimed that the difference between a best estimate of 5,000 barrels per day and 5,758 barrels per day is "not material enough." (Transcript, Doc. No. 305, at 50, lns. 11-12, 25.) The Court disagrees, and, further, finds that Plaintiffs have adequately alleged scienter with respect to Suttles. BP's share prices began to drop the day after the Deepwater Horizon explosion. On April 26, share prices fell more than 3%. (Compl. ¶ 340.) On April 27, they fell 5%. (*Id.*) On April 29, share prices fell almost 7%. (*Id.* ¶ 345.) By April 30, shares had fallen another 4%. (*Id.* ¶ 350.) Suttles appeared before the press on April 27, April 28, April 29, May 3, and additional days thereafter.

Considering the circumstances *in toto*, the Court finds that the stronger inference is that Suttles, the representative at the head of BP's spill response team tasked [*206] with interfacing with the press, was acutely aware of BP's spill estimates and the market's reaction to the increasing uncertainty shrouding the potential for a successful recovery. There is no equally strong competing inference to explain why Suttles repeatedly gave a lower "best estimate" than the estimates BP itself prepared. Plaintiffs have alleged that Suttles was head of BP's oil spill response team and that BP had prepared its own internal estimates that provided a spill range with a worst-case ceiling of more than double what Suttles announced to the public. Here--where every passing second affected (and increased) the total damage to the Gulf--Plaintiffs have alleged facts sufficient to establish that Suttles intended to deceive investors, or was at the very least reckless, in revealing a much lower spill estimate than BP actually possessed at the time of Suttles's public statements. [38]

[38]   The Court is cognizant of the fact that Plaintiffs have included other allegations of scienter with respect to Defendant Suttles as well, such as Suttles' early retirement, his communications with EPA Debarment Counsel Jeanne Pascal, and post-spill findings by the Presidential Commission. (Compl. [*207] ¶¶ 41, 133, 217, 245.) Because the Court finds that the facts discussed above sufficiently support Plaintiffs' scienter allegations with respect to

Suttles, the Court does not address any additional support the other facts may provide.

### 4. Plaintiffs Have Adequately Pleaded Scienter Against the Corporate Defendants

Turning to the potential section 10(b) liability of BP itself, the Court can treat as having been made by BP all the actionable misrepresentations contained in SEC filings, press releases, and other reports issued in BP's name because all of the Individual Defendants were executive officers of the Company whose actions were intended to benefit the Company. *See Southland*, 365 F.3d at 366. In addition, all misrepresentations attributable to Individual Defendants are also treated as having been made by BP, as "all of them appear from the face of the Complaint to have been made pursuant to their positions of authority within the company." *Id.* Thus, the actionable misrepresentations discussed above that are attributable to Hayward and Suttles are sufficient to give rise to an inference of scienter with respect to BP.

However, the Court must still determine whether Plaintiffs have [*208] adequately alleged scienter for the remaining corporate statements not attributed to any Individual Defendant. The unattributed statements appear in BP's 2006 Sustainability Report (Compl. ¶ 266), BP's 2009 Sustainability Review (Compl. ¶ 334), portions of BP's four Annual Reviews published between 2006 and 2009 that are not signed by or connected to any Individual Defendant (Compl. ¶¶ 261, 277-278, 294, 319), and the two press releases issued by BP on April 21, 2010 (Compl. ¶ 337). The Court has already determined that the statement in the 2006 Sustainability Report is the only actionable misrepresentation attributed to BP alone.

In addition, three of the remaining actionable misrepresentations are attributed to non-defendants; these include the IEP, Regional OSRP, and a presentation given at the Microsoft Global Energy Forum in 2009. (Compl. ¶¶ 291, 304-06, 314.) The IEP for the Macondo well identifies a "contact person" named Scherie Douglas of BP Exploration & Production, Inc. (Doc. No. 150, Ex. DD.) The Regional OSRP lists Dan R. Replogle, "GoM EMS Mgmt Representative," as the "Authority," Earnest Bush, "Environmental Coordinator," as the "Custodian," and Kristy McNease, "GoM HSSE [*209] Document Mgmt Administrator," as the "Document Administrator." (*Id.*, Ex. T.) The February 2009 presentation to the Microsoft Global Energy Forum was made by Danny

Williams, "BP Business Information Manager." (*Id.*, Ex. DD.)

In order to adequately plead scienter as to a corporate defendant, Plaintiffs must link the statement to a corporate officer who can be seen as acting on behalf of the corporation in making the statement. *Southland*, 365 F.3d at 366 ("A defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter, i.e., knows that the statement is false, or is at least deliberately reckless as to its falsity, at the time he or she makes the statement."). General common law principles support the logic in circumscribing corporate scienter. Because "an essentially subjective state of mind" is an element of a cause of action for fraud, "the required state of mind must actually exist in the individual making (or being a cause of the making of) the misrepresentation," and may not simply be imputed to the corporation on general principles of agency. *Id.*; *see also Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 707 (7th Cir. 2008)("*Tellabs II*") [*210] ("The problem with inferring a collective intent to deceive behind the act of a corporation is that the hierarchical and differentiated corporate structure makes it quite plausible that a fraud, though ordinarily not a deliberate act, could be the result of a series of acts none of which was done with scienter and imputable to the company by the doctrine of respondeat superior.").

The Seventh Circuit recently outlined the only way around this dead-end for unattributed corporate statements, hypothesizing that "it is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted the fraud." *Tellabs II*, 513 F.3d at 710. By way of example, the *Tellabs II* court cited a hypothetical announcement by General Motors that it had sold one million SUVs in a given year when it had in fact sold zero. *Id.* Subsequent courts to have considered application of this potential roundabout have underscored that it is narrow indeed. *See, e.g., In re Dell Sec. Litig.*, 591 F. Supp. 2d 877, 899 (W.D. Tex. 2008) (noting that "the situation envisioned by the [Tellabs] court was one where the false or misleading announcement was so dramatic [it] [*211] would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false.") (citation omitted) (internal quotation marks omitted).

The only two statements that could possibly surmount *Tellab II*'s standard are those contained in the IEP and the Regional OSRP. In examining corporate scienter with respect to these statements, the "critical question, therefore, is how likely is it that the allegedly false statements . . . were the result of merely careless mistakes at the management level based on false information fed it from below, rather than of an intent to deceive or a reckless indifference to whether the statements were misleading." 513 F.3d at 709. In this Court's opinion, it is a close call indeed. On the one hand, the errors contained in the IEP and the Regional OSRP are glaring and egregious. The Regional OSRP estimated the worst case discharge scenario for a spill in the Gulf at between 28,033 barrels of oil per day up to 250,000 barrels per day. (Compl. ¶ 156.) The IEP estimated the worst case scenario of a spill occurring in the Mississippi Canyon Block 252 specifically at 162,000 barrels per day. (*Id.* ¶ 158.) The [*212] Regional OSRP explicitly stated that BP and its contractors could recover approximately 491,721 barrels of oil per day, or more than 20.6 million gallons. (*Id.* ¶ 156.)

The difference between what BP was actually able to recover and what it claimed it could recover is so great that the projected numbers in the IEP and the Regional OSRP appeared to have been invented out of thin air. Over the course of the spill, over four million barrels of oil, or more than 206 million gallons, spilled into the Gulf at a rate of about 60,000 barrels per day. (*Id.* ¶ 5.) By June 18, 2010, forty-nine days after the explosion, BP's recovery operation was collecting only 15,000 barrels of oil per day. (*Id.* ¶ 243.) Despite BP's claims that it could recover nearly 500,000 barrels of oil per day, its "oil-spill removal organizations were quickly outmatched," even though the actual spill amount was almost a third less than what BP predicted as a worst case scenario for the Mississippi Canyon Block and eight times less than what BP said it could recover in the Gulf. (*Id.* ¶ 218.) In *Tellabs II*, the Seventh Circuit contemplated a ratio of one million to zero as an example of a falsity so egregious as to give rise [*213] to scienter even for an unattributed corporate statement. 513 F.3d at 710. Here, BP claimed it could recover 491,721 barrels of oil per day when it could recover only 15,000. Taking into consideration the added gravity of the fact that the numbers here refer to barrels of oil being spilled into an ocean as opposed to SUV production (the hypothetical in *Tellabs II*), the erroneous estimates climb very close to--if not exceed--the extraordinary nature of the facts

envisioned by the Seventh Circuit.

Further, additional errors in the Regional OSRP exacerbate the misrepresentation. The Presidential Commission found that the Regional OSRP "evidenced [a] serious [lack] of attention to detail." (Compl. ¶ 219.) For example, "half of the 'Resource Identification' appendix (five pages) . . . was copied from material on NOAA [National Oceanic and Atmospheric Administration] websites, without any discernable effort to determine the applicability of that information to the Gulf of Mexico." (Compl. ¶ 220; Doc. No. 150, Ex. R.) The Regional OSRP also designated as a wildlife expert a professor who had died several years before BP prepared its plan. (Compl. ¶ 221.) Perhaps most absurdly, the Regional OSRP [*214] laid out concerns for "biological resources nonexistent in the Gulf--including sea lions, sea otters, and walruses." The farcicality of such glaring errors in sections of the Regional OSRP, sections which the Presidential Commission determined had been cut and paste from nearly identical plans prepared for other oil companies, sufficiently support an allegation of reckless indifference. (Doc. No. 150, Ex. R, at 84.) The invented estimates and inapplicable paragraphs weigh in favor of an adequate pleading of reckless indifference as such blatant errors seem to reflect BP's utter disregard for the potential magnitude of the damage an uncontainable spill could cause--and did cause--in the Gulf of Mexico.

On the other hand, both the IEP and the Regional OSRP name specific individuals ostensibly charged with creation, or at least management and distribution, of the two documents. The Regional OSRP lists the titles of three non-defendant individuals. These three individuals--a "Gulf of Mexico EMS Management Representative," an "Environmental Coordinator," and a "Gulf of Mexico HSSE Document Management Administrator"--likely occupied fairly low positions on BP's corporate totem pole. This could [*215] support a conclusion that the glaring errors were merely careless mistakes. At the very least, it raises a question as to whether the individuals with direct control over the misrepresentations in the IEP and the Regional OSRP occupied positions that would allow this Court to impute scienter to BP. Corporate documents that have no stated author or statements within documents not attributed to any individual may only be charged to a corporate officer, thereby imputing scienter as to the corporation itself, where there are specific factual allegations linking the individual to the statement. *Southland*, 365 F.3d at

365. However, even *Southland* allows unattributed corporate documents to be attributed to a corporation where the statements were "made by its authorized officers to further the interests of the corporation." *Id.* It is unclear whether these individuals would have qualified as "authorized officers" for purposes of corporate scienter analysis.

Nonetheless, application of corporate scienter is appropriate here. The errors in the IEP and the Regional OSRP are so egregious as to rise to the level of extraordinary and dramatic falsity contemplated by the Seventh Circuit in *Tellabs* [*216] *II.* These statements, presented to the MMS and the public as realistic projections for BP's ability to contain a spill in the Gulf, were so far from the truth as to support a finding of reckless indifference. Plaintiffs have therefore adequately alleged corporate scienter with respect to the misrepresentations contained in the IEP and the Regional OSRP. Plaintiffs have not adequately alleged corporate scienter with respect to the remaining two unattributed misrepresentations--those contained in the 2006 Sustainability Report and the Microsoft Global Energy Forum presentation--which do not rise to the level of falsity contemplated under *Tellabs II.* [39]

[39]   By the Court's numbering system, these are statements contained in Misrepresentations 6 (Compl. ¶ 266) and 19 (Compl. ¶ 291).

### 5. The Complaint Adequately Pleads a § 20(a) Claim

Section 20(a) of the Exchange Act makes those who control others who violate section 10(b) jointly and severally liable "unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). Thus, to prove a violation of section 20(a), a plaintiff must first prove [*217] an underlying securities fraud violation and prove that the controlling person had actual power over the controlled person and induced or participated in the alleged violation. *Dennis v. General Imaging, Inc.*, 918 F.2d 496, 509 (5th Cir. 1990). The Individual Defendants move to dismiss Plaintiffs' section 20(a) claim, arguing that Plaintiffs have failed to plead a primary violation under section 10(b). Section 20(a) claims are subject only to the pleading requirements of Rule 8, not the heightened requirements of Rule 9(b); therefore, to adequately state a claim under section 20(a), Plaintiffs need only provide the defendant fair notice of the claim and the basis of the allegations. *Abbott v. Equity*

*Group, Inc.*, 2 F.3d 613, 620 (5th Cir. 1993). Plaintiffs have adequately pleaded a violation of section 10(b) only with respect to Individual Defendants Hayward and Suttles. *See supra* Section I.D.4.vii, x.

Under the control person doctrine, even corporate officers who did not personally make a representation or play a significant role in the preparation of a misrepresentation may still be liable under section 20(a). *See In re Enron*, 235 F. Supp. 2d at 594-96. However, a plaintiff must plead [*218] facts indicating that defendants not directly involved in the making of actionable misrepresentations nonetheless "had the requisite power to directly or indirectly control or influence corporate policy." *G.A. Thompson & Co.*, 636 F.2d 945, 958 (5th Cir. 1981). Such a showing can be made by pointing to day-to-day control of a company's operations, knowledge of the underlying primary violation by the controlled person, or facts showing the defendant had the requisite power to influence corporate policies. *Id.* Here Plaintiffs have alleged that all of the Individual Defendants participated in the day-to-day operations of the Company, but they have pointed to no specific knowledge or facts demonstrating such control. As a result, Plaintiffs have not pleaded the requisite factual basis for their claim that McKay, Grote, Conn, Browne, Rainey, Inglis, Malone, and Dudley controlled Hayward, Suttles or BP, or that they otherwise participated in an alleged violation.

The Court therefore **GRANTS** the motion to dismiss with respect to Individual Defendants McKay, Conn, Grote, Browne, Inglis, Dudley, Malone, and Rainey and **DENIES** the motions of Hayward and Suttles (Doc. No. 149).

## II. DEFENDANTS' MOTION [*219] TO DISMISS THE CLAIMS OF BP ORDINARY SHARE PURCHASERS IS GRANTED

### A. The Allegations

The factual allegations, including the misrepresentations alleged in the Complaint, have been described in detail above. Plaintiffs' proposed class includes both ADS Purchasers and Ordinary Share Purchasers. The Ordinary Share Purchasers advance New York common law and English common law claims, in addition to their section 10(b) claims. The ADS Purchasers bought BP ADSs on the NYSE. The Ordinary Share Purchasers, a group comprised of U.S. investors,

bought ordinary shares on the London Stock Exchange ("LSE"). Defendants contend that the difference in the location of the purchase requires this Court, before moving into the substance of the Ordinary Share Purchasers' section 10(b) claims, to consider preliminarily whether the Ordinary Share Purchasers can bring Exchange Act claims at all in light of the Supreme Court's recent decision in *Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct. 2869, 177 L. Ed. 2d 535 (2010).

In addition to their argument that *Morrison* requires dismissal of the Ordinary Share Purchasers' Exchange Act claims, Defendants contend that non-Exchange Act claims asserted under New York common law and [*220] English law should also be dismissed. Defendants argue that the Securities Litigation Uniform Standards Act precludes both Plaintiffs' New York common law and English law claims. Defendants further contend that the Court should decline supplemental jurisdiction over Plaintiffs' English law claims or, in the alternative, dismiss on forum non conveniens grounds.

### B. Legal Standard

#### 1. Review of State Common Law Claims

#### i. SLUSA

The Securities Litigation Uniform Standards Act of 1998 ("SLUSA") provides that "no covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging": (a) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or (b) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security. 15 U.S.C. § 78bb(f)(1). The term "covered class action" refers to "any single lawsuit" or "any group of lawsuits" meeting certain statutory definitions. 15 U.S.C. § 78bb(f)(5)(B)(i)(II). The term "covered securities" includes securities "listed, [*221] or authorized for listing, on the New York Stock Exchange." 15 U.S.C. § 77r(b)(1)(A).

#### ii. CAFA

Under the Class Action Fairness Act ("CAFA"), a court has diversity jurisdiction over class action claims arising under foreign law where (1) the class exceeds one

hundred members, (2) the amount in controversy exceeds $5 million, and (3) there is minimal diversity. 28 U.S.C. § 1332(d)(2). CAFA does not apply to claims solely involving "covered securities." *Id.* at § 1332(d)(9). "Covered securities include securities "listed, or authorized for listing, on the New York Stock Exchange." 15 U.S.C. § 77r(b)(1)(A).

### 2. Supplemental Jurisdiction

Supplemental jurisdiction under 28 U.S.C. § 1367 may provide an alternative basis for jurisdiction over foreign law claims. "[I]n any civil action of which the district courts have original jurisdiction," the statute provides a district court with supplemental jurisdiction "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). The statute also permits district courts to decline to exercise [*222] supplemental jurisdiction where: (1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction. 28 U.S.C. § 1367(c)(1)-(3).

### C. Analysis

Defendants make three arguments in support of their motion to dismiss the claims brought by the Ordinary Share Purchasers. First, Defendants claim the Supreme Court's decision in *Morrison v. Nat'l Australia Bank* requires dismissal of Exchange Act claims brought by holders of ordinary shares purchased on a foreign exchange. Second, Defendants contend that SLUSA precludes Plaintiffs' New York common law and English law claims. Third, Defendants urge this Court to decline supplemental jurisdiction over Plaintiffs' English common law claims or, in the alternative, dismiss the English law claims on forum non conveniens grounds.

### 1. The Supreme Court's Decision in Morrison Requires Dismissal of the § 10(b) Claims

By its plain language, section 10(b) of the Exchange Act prohibits securities fraud only where it occurs "in connection with the purchase or sale of a security listed on an American stock exchange or any security not so

registered. [*223] " 15 U.S.C. § 78j. In *Morrison*, the Supreme Court interpreted this language and determined that section 10(b) does not provide a cause of action for "f-cubed" claims, that is, claims where foreign plaintiffs sue foreign defendants for misconduct in connection with securities traded on foreign exchanges. *Morrison v. Nat'l Australia Bank Ltd.*, 130 S.Ct. 2869, 2888, 177 L. Ed. 2d 535 (2010). Promoting the "primacy of the domestic exchange," the *Morrison* Court curtailed section 10(b)'s extraterritorial reach, limiting it to "domestic transactions." *Id.* at 2884. Subsequent courts interpreting the decision have characterized the Supreme Court's decision as one that "roundly (and derisively) buried the venerable 'conduct or effect' test" previously devised by the Second Circuit and used by courts nationwide to determine whether section 10(b) protections apply extraterritorially. *Id.* at 2879 (explaining that the Second Circuit had previously "established that application of § 10(b) could be premised upon either some effect on [*224] American securities markets or investors . . . or significant conduct in the United States").

Plaintiffs contend that *Morrison* does not prevent the Ordinary Share Purchasers from maintaining their claims. They are incorrect. The Ordinary Share Purchasers' section 10(b) claims fall squarely into the category of claims that *Morrison* seeks to curtail. BP ordinary shares trade only on the LSE. (Doc. No. 175, at 2.) The shares are registered on the NYSE, but, as Plaintiffs concede, the shares never traded on a U.S. exchange and were listed on the NYSE solely to comply with SEC requirements governing BP's ADS program. (*Id.*) Because the ordinary shares traded only on the LSE, Plaintiffs cannot point to the "domestic transaction," which must include a "domestic purchase or sale," required for section 10(b) liability following *Morrison*.

Plaintiffs advance two arguments in an attempt to point to a "domestic transaction." Plaintiffs' first argument hinges on the residency of the investors and the locus of the purchase decision. Plaintiffs highlight that many of the investors in the NY/OH Plaintiff class, including those who purchased BP ordinary shares, are U.S. residents. (*Id.*, at 5.) In addition [*225] to the residency of the purchasers linking the shares to the United States, Plaintiffs claim that several "pivotal aspects of the purchases"--including the initial purchase decision--were made in the United States. (*Id.* at 6.) Plaintiffs' second argument grasps at a technicality that Plaintiffs believe works in their favor: the LSE rules

allow trades to occur directly through third-party, U.S.-based market makers. (*Id.*, at 8.) Plaintiffs believe this raises an issue as to whether such a trade occurs "physically" in the United States or in England. Plaintiffs' arguments have already been rejected by other courts, and there is no justification for a different outcome here.

Plaintiffs first attempt to distinguish this case based on the citizenship of the investors involved. But even Justice Stevens, who disagreed with the *Morrison* majority's complete trouncing of the Second Circuit's conduct and effects test, acknowledged that the addition of a U.S. investor to the *Morrison* scenario would be insufficient to create liability under section 10(b). [40] In applying *Morrison*, a majority of district courts have found the citizenship of the investors involved or mere "listing" on the NYSE insufficient [*226] reasons to extend section 10(b) liability. *See, e.g., Cornwell v. Credit Suisse Group*, 729 F. Supp. 2d 620, 623-24 (S.D.N.Y. 2010) (holding that section 10(b) does not extend to foreign securities traded on foreign exchanges even if purchased or sold by U.S. investors and even if the foreign issuer had ADRs listed on U.S. exchanges); *In re Alstom SA Sec. Litig.*, 741 F. Supp. 2d 469, 472-73 (S.D.N.Y. 2010) (holding that *Morrison* precludes securities claims brought by U.S. investors who purchase securities on a foreign exchange, even where those securities are also "listed on" a U.S. exchange); *In re Infineon Techs. AG Sec. Litig.*, No. C 04-04156 JW, 2011 U.S. Dist. LEXIS 152965, 2011 WL 7121006, at 3 (N.D. Cal. Mar. 17, 2011) (finding that "f-squared" claims are precluded by *Morrison* because the location of the exchange where the purchase is made, not factors like the location or citizenship of the purchaser, is the only relevant consideration). [41]

40  "Imagine, for example, an American investor who buys shares in a company listed only on an overseas exchange. That company has a major American subsidiary with executives based in New York City; and it was in New York City that the executives masterminded and implemented [*227] a massive deception which artificially inflated the stock price--and which will, upon its disclosure, cause the price to plummet. . . . [This] investor would, under the Court's new test, be barred from seeking relief under § 10(b)." *Morrison*, 130 S.Ct. at 2894 (Stevens, concurring).

41  In connection with the motion to consolidate,

even the Ludlow Plaintiffs argued that BP ordinary shares are not covered by U.S. securities laws post-*Morrison.*

Plaintiffs' second, more novel argument hinges on the trading rules governing the LSE. Plaintiffs explain that "ordinary shares can be purchased directly from a third-party market maker over an electronic communications network that could result in matching U.S. purchasers and sellers, or internally within a broker-dealer from its own inventory." (Doc. No. 175, at 8.) Thus, Plaintiffs dispute that that the physical locus of the trade is necessarily London, even if ordinary shares only trade on the LSE. As Defendants correctly point out, courts have refused to adopt as technical a reading as Plaintiffs would require for their section 10(b) claim to survive *Morrison. See, e.g., Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.*, 753 F. Supp. 2d 166, 177-78 (S.D.N.Y. 2010) [*228] (deeming shares to be purchased on a foreign exchange even where the initial purchase orders were placed by brokers in Chicago and reasoning that, for *Morrison* purposes, a purchase does not *per force* occur where the order has been placed); *Stackhouse v. Toyota Motor Co.*, 2010 U.S. Dist. LEXIS 79837, 2010 WL 3377409, at *1 (C.D. Cal. July 16, 2010) ("'[D]omestic transactions' or 'purchase[s] or sale[s] ... in the United States' means purchases and sales of securities explicitly solicited by the issuer within the U.S. rather than transactions in foreign-traded securities where the ultimate purchaser or seller has physically remained in the U.S."); *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 530 (S.D.N.Y. 2011) (finding that "foreign-cubed" transactions cannot survive *Morrison* where ordinary shares are listed but not traded on a domestic exchange as a result of a foreign issuer's ADR program because such a technical argument runs "contrary to the spirit of *Morrison*"); *Cascade Fund, LLP v. Absolute Capital Mgmt. Holdings Ltd.*, No. 08-cv-01381, 2011 U.S. Dist. LEXIS 34748, 2011 WL 1211511, at *6 (D. Col. Mar. 31, 2011) (finding unpersuasive "the proposition that a domestic investor's purchase of foreign stocks on foreign exchanges [*229] are nevertheless 'domestic transactions' subject to § 10(b) if the issuer solicited the investments in the United States," "particularly where *Morrison* makes no mention whatsoever of the significance of the place of solicitation."). The most recent decision on this issue is directly on point, holding that claims asserted by U.S. investors who purchased UBS stock on a foreign exchange were barred, even though the orders were

placed from the United States. *In re UBS Sec. Litig.*, No. 07-cv-11225(RJS), 2011 U.S. Dist. LEXIS 106274, 2011 WL 4059356, at *5 (S.D.N.Y. Sept. 13, 2011) (rejecting "Plaintiffs' hyper-technical parsing of the opinion and find[ing], consistent with the overwhelming majority of other courts to have addressed the issue, that foreign-cubed claims asserted against issuers whose securities are crosslisted on an American exchange are outside the scope of § 10(b).").

As one court recently explained, "the conduct and effect analysis as applied to § 10(b) extraterritoriality disputes is now dead letter. Plaintiffs' cosmetic touch-ups will not give the corpse new life." *Cornwell v. Credit Suisse Group*, 729 F. Supp. 2d 620, 622 (S.D.N.Y. 2010). Following *Morrison* out to its logical conclusion requires us [*230] to adopt the reasoning of the other district courts to have considered this issue. [42] Plaintiffs would exclude from operation of the *Morrison* standard securities traded on exchanges abroad if the purchase or sale involves a U.S. investor or if some aspect of the foreign transactions occurs in the United States. But the *Morrison* standard, "promulgated to govern the application of § 10(b) in transnational securities purchases and sales[,] does not leave open any of the back doors, loopholes or wiggle room to accommodate the distinctions Plaintiffs urge to overcome the decisive force of that ruling on their § 10(b) claims here." *Cornwell*, 729 F. Supp. 2d at 622-23.

> [42] During oral argument, Plaintiffs urged the Court to find that all subsequent decisions interpreting *Morrison* were simply wrong. The Court cannot discount the jurisprudence of the Second Circuit--a circuit with extensive securities experience--so easily. However, the Court is cognizant of the potential for legislative action on the horizon. Enacted last year, the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank) directed the SEC to conduct a study and issue recommendations to Congress as to whether private [*231] rights of action under section 10(b) should be extended to "conduct within the United States that constitutes a significant step in the furtherance of the violation, even if the securities transaction occurs outside the United States and involves only foreign investors." Dodd-Frank § 929Y. The period for comments has already closed, and the SEC is due to submit its report to Congress in early 2012.

Although there is the possibility of legislative action directly addressing this subject, a number of contingencies prevent the Court from delaying this case to await such a possibility. Not only is the speed of any such action impossible to predict, but the Court is not aware that such action--even if it were to benefit similarly situated plaintiffs--would be retroactive.

The arguments Plaintiffs advance here "simply amount to a restoration of the core element of the effect test." *Id.* at 624. Similarly, carving out an exception for the purchase of securities on the LSE because some acts that ultimately result in the execution of a transaction abroad take place in the United States would be to reinstate the conduct test. *Id.* Post *Morrison*, the only relevant inquiry is *where the transaction* [*232] *occurred, i.e.*, whether it was a "domestic transaction." 130 S.Ct. at 2884. Regardless of their U.S. residency and the LSE trading rules, the Ordinary Share Purchasers bought BP ordinary shares on the LSE, the only exchange where BP ordinary shares trade. Because Plaintiffs cannot point to a domestic transaction involving BP ordinary shares, the Court must dismiss the section 10(b) claims brought by the BP Ordinary Shareholders in the NY/OH Plaintiff class.

## 2. SLUSA Precludes Plaintiffs' New York Common Law Claims

In addition to their section 10(b) claims, Plaintiffs assert common law fraud claims under New York law. (Compl. ¶ 399-406.) BP argues that SLUSA bars these claims. SLUSA precludes a securities action if: (1) the action is a "covered class action"; (2) the claims are based on state law; (3) the action involves one or more "covered securities"; and (4) the claims allege a misrepresentation or omission of a material fact "in connection with the purchase or sale" of a security. 15 U.S.C. § 78bb(f)(1). The parties do not dispute that Plaintiffs' New York common law claims involve a "covered class action" and state law claims. However, the parties do disagree as to whether the action [*233] involves "covered securities" and whether the alleged misrepresentations and omissions were made "in connection with" the purchase or sale of securities.

### i. BP ordinary shares qualify as "covered securities"

Defendants argue that BP ordinary shares fall within the definition of "covered securities" under SLUSA and

that Plaintiffs' New York law claims are, therefore, precluded. Plaintiffs dispute this, arguing that Defendants are attempting to "have it both ways" by arguing that BP ordinary shares are not a "domestic transaction" under *Morrison* while simultaneously arguing that the same shares are "covered securities" for SLUSA purposes. (Doc. No. 175, at 10.) Plaintiffs contend that the definition of "covered securities" under SLUSA requires shares to be registered or listed *and traded* on a U.S. exchange since mere listing is insufficient for section 10(b) liability post-*Morrison*. (*Id.*) In sum, Plaintiffs argue that the "trading requirement" of *Morrison* must be applied in the SLUSA context. (*Id.*)

The definition of "covered securities" under SLUSA is straightforward; it includes securities "listed, or authorized for listing, on the New York Stock Exchange." 15 U.S.C. § 77r(b)(1)(A). In [*234] the Complaint, Plaintiffs state explicitly that BP ordinary shares are listed on the NYSE. (Compl. ¶ 33.) Indeed, Plaintiffs rely on this fact to counter Defendants' argument for dismissal under *Morrison*. (Doc. No. 175, at 4.) Despite this clear definition, Plaintiffs urge the Court to look to the subsection heading of the statute, which refers to the "Exclusive Federal regulation of nationally traded securities." 15 U.S.C. § 77r(b)(1). Plaintiffs claim the inclusion of "trading" in the heading implies a trading requirement for qualification as a "covered security," even though the definition portion of the statute, which follows, makes no reference to trading. (Doc. No. 175, at 10.) Plaintiffs' reliance on the heading of the SLUSA subsection is misplaced. *See, e.g., Penn. Dep't of Corr. V. Yeskey*, 524 U.S. 206, 212, 118 S. Ct. 1952, 141 L. Ed. 2d 215 (1998) ("[T]he title of a statute . . . cannot limit the plain meaning of the text" and is "of use only when [it] shed[s] light on some ambiguous word or phrase."); *see also United States v. Hoang*, 636 F.3d 677, 681 (5th Cir. 2011) (finding reference to a subtitle "unnecessary and inappropriate" where there was no ambiguity in the subsection).

In addition, other courts to [*235] have considered the issue have refused to read a trading requirement into the definition of "covered securities" where the plain language of the statue is clear. *See, e.g., In re Toyota Motor Corp.*, 2011 U.S. Dist. LEXIS 75732, 2011 WL 2675395 at *6 (refusing to exercise jurisdiction over plaintiffs' Japanese law claims where Toyota's common shares were listed on the NYSE and therefore were "covered securities" ); *In re Metro. Secs. Litig.*, 532 F.

Supp. 2d 1260, 1298-99 (E.D. Wash. 2007) ("The plain language of SLUSA illustrates that a security need not actually be traded on a national scale in order to be considered a covered security."). Plaintiffs' New York common law claims meet the third element of the SLUSA preclusion test as the ordinary shares at issue are clearly "covered securities" for purposes of SLUSA.

**ii. The "in connection with" requirement is satisfied**

Plaintiffs further argue that SLUSA does not preclude their New York common law claims because such claims are not made "in connection with" the purchase or sale of covered securities. In support of this argument, Plaintiffs contend that their non-Exchange Act claims are "separate and distinct" from violations in connection with the ADSs (Doc. No. 175, [*236] at 11.) Because the Court has decided, above, that the BP ordinary shares are covered securities for purposes of SLUSA, the allegations Plaintiffs advance in their Complaint (all of which are pleaded identically on behalf of both the ADS Purchasers and the Ordinary Share Purchasers) are clearly in connection with the purchase of BP ordinary shares. Therefore, the Court need not decide whether conduct "in connection with" the BP ADSs alone, which both parties concede are covered securities, creates a link between the ADSs and the ordinary shares sufficient to preclude the latter under SLUSA. Because the BP ordinary shares themselves are "covered securities," Plaintiffs' New York common law claims, founded on allegations of misrepresentations and omissions advanced in connection with the ordinary shares, are precluded under SLUSA.

**3. *Plaintiffs' English Law Claims Must Also Be Dismissed***

Plaintiffs have raised several claims under English law, including claims for alleged violations of the Financial Services and Markets Act of 2006, common law fraud, and negligent misrepresentation and misstatement. *See* Compl. ¶¶ 404-19 (Claims Three, Four, and Five). Defendants argue that Plaintiffs' English [*237] law claims must be dismissed for lack of jurisdiction or on forum non conveniens grounds.

**i. The Court does not have original jurisdiction over the English law claims**

Plaintiffs assert that this Court has original jurisdiction over their English law claims pursuant to

CAFA. Under CAFA, a court has diversity jurisdiction over class action claims arising under foreign law where (1) the class exceeds one hundred members, (2) the amount in controversy exceeds $5 million, and (3) there is minimal diversity. 28 U.S.C. § 1332(d)(2). CAFA does not apply to claims involving solely "covered securities." *Id.* at § (d)(9). CAFA looks to the same definition as SLUSA for the meaning of the phrase "covered securities"; "covered securities" thus include securities "listed, or authorized for listing, on the New York Stock Exchange." 15 U.S.C. § 77r(b)(1)(A).

Because CAFA and SLUSA look to the same definition of "covered securities," the Court's analysis with respect to CAFA tracks its SLUSA analysis above. Plaintiffs have conceded that the BP ordinary shares at issue are listed on the NYSE. Yet, once again, Plaintiffs contend that BP ordinary shares are not "covered securities" for purposes of CAFA because [*238] they are only "listed" on the NYSE, not traded. Courts have refused to read a trading requirement into the definition of "covered securities." *See, e.g.,* In re Toyota Motor Corp., 2011 U.S. Dist. LEXIS 75732, 2001 WL 2675395 at *6 (refusing to exercise jurisdiction over plaintiffs' Japanese law claims where Toyota's common shares were listed on the NYSE and therefore were covered securities under CAFA). Just as they were "covered securities" for purposes of SLUSA, BP ordinary shares are "covered securities" under CAFA. Therefore, this Court lacks original jurisdiction over Plaintiffs' English law claims.

**ii. The Court may not exercise supplemental jurisdiction where it lacks jurisdiction over Plaintiffs' securities fraud claims**

Plaintiffs also urge the Court to exercise supplemental jurisdiction over their English law claims. A district court may exercise supplemental jurisdiction where foreign law claims form part of the same case or controversy and arise from a common nucleus of operative facts. *See* 28 U.S.C. § 1367(c). A court may decline to exercise supplemental jurisdiction over a claim if: (1) the claim raises novel issues of state law; (2) the claim substantially predominates over claims as to which the district [*239] court has original jurisdiction; (3) the district court has dismissed all claims as to which it has original jurisdiction; or (4) exceptional circumstances or other compelling reasons exist for declining jurisdiction. *Id.* Because this Court does not have jurisdiction over the Ordinary Share Purchasers' section 10(b) claims, the Court cannot exercise supplemental jurisdiction over Plaintiffs' English law claims.

**III. CONCLUSION**

It is ordered that Defendants' Motion to Dismiss the ADS Purchasers in the NY/OH Plaintiff class (Doc. No. 149) is **PARTIALLY GRANTED** to the extent that the Court dismisses claims against Individual Defendants H. Lamar McKay, Iain Conn, Bryon Grote, Lord Edmund John Philip Browne, David Rainey, Andrew G. Inglis, Robert Dudley, and Robert Malone. The motion is also **PARTIALLY DENIED**: the Court finds that Plaintiffs have adequately pleaded section 10(b) violations by Defendants BP plc, BP America, BP Exploration & Production, Anthony Hayward and Douglas Suttles, and adequately pleaded control person liability pursuant to section 20(a) with respect to defendants Hayward and Suttles. It is further ordered that Defendants' Motion to Dismiss the Ordinary Share Purchasers [*240] (Doc. No. 153) is **GRANTED.**

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the 13th day of February, 2012.

/s/ Keith P. Ellison

KEITH P. ELLISON

UNITED STATES DISTRICT JUDGE

**EXHIBIT 6**



**IN RE OFFICEMAX, INC. SECURITIES LITIGATION**

**Case No. 1:00-CV-2432**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO, EASTERN DIVISION**

**2002 U.S. Dist. LEXIS 27019**

**March 26, 2002, Decided**

**SUBSEQUENT HISTORY:** Reconsideration denied by, Motion denied by In re OfficeMax, Inc. Sec. Litig., 2002 U.S. Dist. LEXIS 28060 (N.D. Ohio, July 26, 2002)

**DISPOSITION:** [*1] Defendants' Motion to Dismiss GRANTED. Case DISMISSED.

**COUNSEL:** For Bernard Fidel, Plaintiff: Stephen P. Polapink, LEAD ATTORNEY, Milberg, Weiss, Bershad, Haynes & Lerach, Frederick B. Burnside, William S. Lerach, Milberg, Weiss, Bershad, Hynes & Lerach, San Diego, CA.

For Bernard Fidel, Plaintiff: Jack Landskroner, Landskroner Law Firm, Cleveland, OH.

For OfficeMax, Inc., Michael Feuer, Jeffrey L. Rutherford, Defendants: Daniel P. Mascaro, Progressive Corporation, Mayfield Village, OH.

For OfficeMax, Inc., Michael Feuer, Jeffrey L. Rutherford, Defendants: James R. Wooley, Marcia E. Marsteller, Baker & Hostetler, Cleveland, OH.

For OfficeMax, Inc., Michael Feuer, Jeffrey L. Rutherford, Defendants: Robert S. Rifkind, Cravath, Swain & Moore, Roger G. Brooks, Cravath, Swaine & Moore, New York, NY.

**JUDGES:** KATHLEEN McDONALD O'MALLEY,

UNITED STATES DISTRICT JUDGE.

**OPINION BY:** KATHLEEN McDONALD O'MALLEY

**OPINION**

*MEMORANDUM & ORDER*

Defendants OfficeMax, Inc. (OfficeMax), Michael Feuer, and Jeffrey L. Rutherford, pursuant to Federal Rules of Civil Procedure 9(b)and 12(b)(6), move this Court to dismiss [*2] Plaintiffs' Second Amended Complaint alleging securities fraud. (Docket No. 52.) Plaintiffs, a class consisting of stockholders who purchased OfficeMax stock (or publicly-traded options) between March 2, 1999, and September 30, 1999, allege that the Defendants made false or misleading statements which had the effect of artificially inflating the price of that stock to the detriment of the Plaintiffs. In moving for dismissal, Defendants argue, among other things, that the Complaint fails to sufficiently allege scienter, both because it lacks particularity as to that element and because it does not allege facts creating a "strong inference" of scienter as required under the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737 (codified in various sections of 15 U.S.C. §§ 77a *et seq.* and §§ 78a *et seq.*) ("PSLRA").

After considering the parties' briefs and the points raised at oral argument, [1] the Court finds Defendants'

Case 4:10-md-02185   Document 372-1   Filed in TXSD on 05/23/12   Page 147 of 215

Page 2
2002 U.S. Dist. LEXIS 27019, *2

argument with respect to scienter well taken. Because the allegations in the Complaint do not state with particularity facts giving rise to a strong inference of scienter, the Court **GRANTS** Defendants' [*3] motion and **DISMISSES** the case.

> 1   During oral argument on August 9, 2001, the Court denied on the record the Plaintiffs' Motion to Strike Extrinsic Exhibits and All References thereto. (Docket No. 58.) At that time the Court noted that the motion was denied because it was not the most appropriate vehicle for making determinations concerning whether these items were appropriate for the Court's consideration. Except to the limited extent noted in footnote 6 below, the Court has found it unnecessary to rely on the items to which Plaintiffs objected. (Mot. to Strike at 1, n.2.) Thus, again except as noted below, the objections underlying that motion are moot.

## I. THE COMPLAINT

Plaintiffs claim financial harm arising from false or misleading statements by Defendants that allegedly had the effect of artificially inflating the price of OfficeMax stock during the period in which Plaintiffs purchased the stock or options--between March 2, 1999, and September 30, 1999 (the "Class Period"). Specifically, Plaintiffs [*4] claim that Defendants made, or induced others to make, a series of statements about anticipated profitability and earnings potential which Defendants knew were false or misleading in light of the true state of OfficeMax's operations.

OfficeMax, headquartered in Shaker Heights, Ohio, operates a chain of high volume, deep-discount office supply superstores across the United States, as well as many smaller format stores and an online office supply e-commerce site. Its business is separated into two segments: A Core Business Segment, consisting of everything but computer sales (e.g., office supplies, business machines, peripherals, and copying services), and a Computer Business Segment. Defendant Feuer is the founder and Chief Executive Officer (CEO) of the company, while Defendant Rutherford is the Chief Financial Officer (CFO). The 68-page Complaint outlines Plaintiffs allegations by, first, describing the Defendants' "scienter and scheme." Then, the Complaint sets forth a number of allegedly false or misleading statements either made by Defendants directly or made by analysts but, Plaintiffs allege, attributable to Defendants. These statements are separated into three time periods: [*5] March-April, May-June, and August of 1999. For each of the three time periods, a separate list of "true but concealed facts" are alleged which, Plaintiffs assert, render the statements either false or misleading. Each list of facts contains between 24 and 26 allegations each, although many "true but concealed" facts alleged in one list are also contained in the others. Finally, the Complaint alleges several violations of Generally Accepted Accounting Principles (GAAP). The allegations are described in more detail below.

A. *Conditions of OfficeMax Prior to the Class Period.*

1. *Stock price downturn.* The Complaint alleges that, in the months immediately preceding the Class Period, OfficeMax was in deep trouble. In the second quarter of fiscal year 1998, OfficeMax stock fell to between $ 7 and $ 8 per share, down from a $ 19 5/8 high of two quarters earlier. Describing OfficeMax as the office supply industry "stepchild," perennially ranking behind the industry leaders Office Depot and Staples, the Complaint notes that, despite rapidly expanding its number of warehouse stores during fiscal years 1996, 1997, and 1998, OfficeMax reported sharply declining earnings per share [*6]  (EPS) in fiscal year 1998 (ending on January 23, 1999).

The Plaintiffs postulate both a number of causes, and a number of effects, of this downturn. Among its causes were increasing losses from its computer sales and an "extraordinarily-high executive turnover, particularly during the summer of 1999, as many executives refused to work with Feuer, who maintained ironclad control over all of OfficeMax's day-to-day operations." (Compl. P 3.) 2 The effect of the downturn was to pressure OfficeMax's top officers, Feuer and Rutherford, to improve its operating results and stock price. (Compl. P 4.) According to the Complaint, the pressure was of such magnitude that Feuer realized that "unless OfficeMax was turned around, his position as CEO was in danger." (*Id.*)

> 2   Stressing that the executive turnover problem was most acute in the summer of *1999* in a paragraph alleging its causative role in the stock price drop of *1998* creates, at least, some chronological confusion for the reader of the Complaint. The effects of the Complaint's

numerous inconsistencies is more generally discussed in Section III.B, *infra*.

[*7]  2. *Hidden condition of OfficeMax.*

The Complaint's "true but concealed facts" sections allege a multitude of troubling conditions at OfficeMax, many of which allegedly preexisted the Class Period and all of which the investing public was purportedly unaware. The Complaint alleges that the procurement system for its Core Business Segment was "badly flawed" and "defective" (Compl. PP 11(b), 11(o)). Moreover, it alleges, OfficeMax's inventory control systems for both its Core and Computer Business Segments operated inefficiently and ineffectively (Compl. P 11(g)) and lacked internal infrastructure (Compl. P 11(c)), resulting in massive excess inventory. OfficeMax policies, according to the Complaint, exacerbated the procurement and inventory problems. These policies included (1) a policy of never having sales (Compl. P 11(p)); (2) a policy of putting older inventory in back rooms so that customers would be more likely to buy new items (Compl. P 11(q)); and a policy of overstocking its stores with merchandise (Compl. P 11(u)). The Complaint also alleges that Feuer did not open or close stores responsibly. It states, "Not only did Feuer require certain new stores to open knowing that [*8] the forecasted sales for those new stores would be less than the internally required amount to open a new store ... but Feuer also refused to close existing stores that continually operated at a loss." (Compl. P 11(k)). Moreover, new store openings were not well coordinated with purchasing. For example, many stores were opened after back-to-school shopping season and remained overstocked with back-to-school merchandise. (Compl. P 11(t)). According to the Complaint, this was the state of affairs prior to the Class Period.

3. *Feuer's and Rutherford's scienter.* The Complaint alleges that Feuer and Rutherford behaved either purposely or recklessly in deceiving the investing public about OfficeMax's condition. It alleges knowledge of the "true but concealed facts" detailed throughout the Complaint, along with opportunity to conceal them and a motive to do so.

a. *Knowledge.* Feuer and Rutherford, as top OfficeMax executives, had access to a bevy of reports and records that purportedly kept them informed of OfficeMax's operating and financial conditions. The Complaint alleges that each were "hands on" managers,

dealing daily with important issues facing OfficeMax's business. (Compl. [*9] P 23.) Inventory is a major concern for an office supply superstore such as OfficeMax, particularly because of its strategy to compete with Staples and Office Depot by continuing to open new stores. The Complaint alleges that, because inventory control was so important, both Feuer and Rutherford "must have had" knowledge of the inventory problems described above. In particular, each had access to reports generated by "StoreMax," such as "Top Performer" reports (used to track inventory by quantity and to assess margin and total sales dollars of products) and an "inventory control book" (a program that tracked discontinued products), as well as daily reports directly from stores. (Compl. P 26.)

The Complaint also notes that a consultant report highlighted these inventory problems. During fiscal years 1998 and 1999, Kurt Salmon & Associates ("Salmon") conducted a three stage study of OfficeMax's inventory management. The Complaint notes that "by early F99, as Salmon was about to begin the third phase of the comprehensive business study," it had reached several conclusions which are paraphrased in the Complaint. These conclusions include that "OfficeMax's procurement and inventory policies [*10] were materially deficient and inadequate for the size of its business--especially given its expansion program," and "OfficeMax's rapid expansion program was outstripping OfficeMax's already inadequate procurement and inventory policies." (Compl. P 37.) With an inadequate inventory control system and "lack of management talent," the Salmon study concluded that OfficeMax would need to curtail its expansion program to regain control over its Core Business Segment. (Compl. P 21.)

b. *Motive/Opportunity.*

The Complaint alleges that Feuer and Rutherford had the opportunity to commit fraud, because they controlled company press releases and Securities and Exchange Commission (SEC) filings, while their executive positions gave them access to insider information. As for motive, the Complaint cites the stock drop noted above--from an all time high of 19-5/8 in April 1998 to $ 7-$ 8 per share in February 1999, just before the start of the Class Period. Plaintiffs claim that this downturn caused "extreme dissatisfaction" among OfficeMax shareholders, causing Feuer to realize that, absent improved operating performance, his position as CEO

would be "in danger." (Compl. P 44.) The Complaint [*11] does not, however, describe any particular conditions that would highlight or quantify that danger, such as an imminent takeover bid or proxy war. Nor does it suggest any insider trading, bribery, or other financial self-dealing by the Defendants.

4. *Restructuring.* In January 1999, two months before the Class Period began, OfficeMax announced that it was dramatically changing its business model. From then on, it would only sell computers made by IBM and one other manufacturer (Comp. P 5). It launched an experimental program of selling IBM computers in a "store-within-a-store" format, whereby IBM personnel (or OfficeMax personnel trained by IBM) handled the computer sales and in which IBM bore the risk associated with computer inventory control. Coincident with the restructuring, OfficeMax announced that it would now report its Core Business Segment and Computer Business Segment financial results separately. It also announced that it was raising its Core Business Segment inventory items by about 1,000 items per store. Finally, it announced an approximately $ 80 million pre-tax inventory writedown to address obsolete and discontinued computer inventory. (Compl. P 45.) Plaintiffs [*12] claim that Defendants' $ 80 million writedown of inventory, in context, was understood by investors as eliminating "all" excess inventory. (Compl. P 11(a)). Plaintiffs do not point to any statement made by OfficeMax or anyone acting on its behalf, however, assuring investors that the $ 80 million writedown would have such an effect on its inventory.

Plaintiffs highlight particular aspects of OfficeMax's announcement about its new strategy, including the following excerpts from OfficeMax's January 19, 1999, press release:

> The Company stated that this will give investors better visibility to OfficeMax's financial results and the consistent positive growth for its Core Business Segment .... OfficeMax said that its Core Business Segment has been strong and gaining momentum over the past three years .... [Feuer stated,] "Our consistent sales and earnings growth in the Core Business Segment has been overshadowed on a consolidated basis by the losses sustained in our computer business. Our improving

operating results will be more clearly depicted through segment reporting as we continue to develop and implement the new strategy for our computer business as well as ongoing improvements [*13] in our core supply business."

(Compl. P 46.) [3]

> 3 Although not at issue in this motion, the Court notes that the timing of the deceptive practices appears somewhat inconsistent with the Class Period selected. Plaintiffs suggest, without actually alleging, that the entire restructuring initiative, from the very beginning, was a ruse to artificially inflate OfficeMax's stock. (*See* Compl. P 44-46). If this were the case, then the deception would have begun in January 1999, when the restructuring was announced, rather than March 2, 1999, when the Class Period begins.

The Complaint also concedes, however, that OfficeMax was addressing its inventory problems in two other ways. During the Class Period, "OfficeMax was in the process of attempting to remedy the procurement and inventory management problems by reconfiguring its supply chain-store-distribution processes." Moreover, OfficeMax was "installing a new, more high powered and sophisticated computerized purchasing and inventory control system made [*14] by SAP - a huge European software maker." (Compl. P 30.) The Complaint nevertheless alleges that these changes were "taking much longer than had been anticipated." (*Id.*)

B. *Statements Made During the Class Period.*

Plaintiffs allege that, during the Class Period, Defendants made numerous statements about OfficeMax's financial and operating condition that were either false or misleading; Plaintiffs allege that the Defendants knew that OfficeMax could not perform at the optimistic level that the Defendants communicated to the investing public. The bulk of these statements were made in releases of quarterly reports, during follow-up discussions of those releases with analysts, or by analysts themselves, who, Plaintiffs claim, were just parroting what they were told by Defendants. The Complaint alleges that the fraudulent statements ceased on September 30, 1999, when OfficeMax revised its forecasts and adopted a substantially more pessimistic stance. Each time segment is discussed below.

1. *March 2, 1999 through April 1999.*

The Class Period begins on March 2, 1999, when OfficeMax reported its results for the fourth quarter of fiscal year 1998 and for the balance of that [*15] fiscal year. Plaintiffs highlight two excerpts from the report that they consider deceptive: first, a quote from Feuer in which he says, "Our focus on improving merchandise margins through an enhanced product assortment ... is reflected in our overall improved gross profit" and "the strength of our balance sheet ... provides us financial flexibility to take advantage of future opportunities." (Compl. P 49.) Plaintiffs then allege that, on the same day, subsequent to the release of the report, OfficeMax held a conference call for analysts and other interested parties to discuss OfficeMax's results and future prospects. The Complaint summarizes the statements allegedly made by Feuer and/or Rutherford during the conference call as follows:

. OfficeMax had revised its business model to lessen the losses from its Computer Segment, while increasing its profits from its Core Business Segment - which were due to a large increase in the number of SKUs sold by the Core Business Segment and to an improving inventory management in its Core Business Segment - which would result in OfficeMax achieving strong EPS growth during fiscal year 1999 and fiscal year 2000.

. OfficeMax's Core [*16] Business Segment was performing extremely well and had strong positive momentum, which would lead that Segment to achieve strong EPS growth during fiscal years 1999 and 2000.

. OfficeMax's Core Business Segment was significantly improving its inventory management and control, such that OfficeMax's inventories in the Core Business Management Segment were being more effectively and efficiently utilized and managed, boosting the profits and EPS of the Core Business Segment and of OfficeMax overall.

. OfficeMax's Core Business Segment

profitability was boosted by the significant expansion of the number of SKUs carried by OfficeMax's Core Business Segment (about 1,000 items per store) and in the increased sales of more profitable items.

. The inventories in OfficeMax's Core Business Segment were well managed and under control.

. The acceleration of OfficeMax's aggressive new store expansion plan was proceeding successfully, was under control and would further boost OfficeMax's revenues and profits and EPS.

. OfficeMax's new store expansion program would boost OfficeMax's revenues, profits, and EPS during the 3rd quarter and 4th quarter of fiscal year 1999.

. [*17] As a result of the foregoing, OfficeMax was forecasting fiscal year 1999 EPS of $ .90-.93 and fiscal year 2000 EPS of $ 1.05-$ 1.10.

(Compl. P 50.) As a result of the conference call and follow up discussions with senior management, many analysts wrote reports about OfficeMax's current financial position and future prospects. Plaintiffs imply, without specifically alleging, that all the statements contained in the analysts' reports are directly attributable to Feuer and Rutherford. The analysts' reports, excerpted in some detail in the Complaint, each generally paint an optimistic view of the changes being made by OfficeMax, including quotes such as "core business is on the upswing and quite profitable" (Compl. P 51). Some contain specific comments on inventory control: "While management intends to reduce the FY end inventory tally by approximately $ 200 million, the addition of 100 new stores (stocking about $ 1.3 million in inventory each), plus two new delivery centers and a new PowerMax distribution facility should offset." (Compl P 56.) The Complaint summarizes Plaintiffs' view of the March 1999 communications to analysts and investors as follows:

OfficeMax assured [*18] analysts and investors that its newly organized business model was off to a good start, with its 1st quarter F99 Core Business Segment sales running at or ahead of plan; that the Core

Business Segment's profit margins were increasing; and that OfficeMax's Core Business Segment would achieve comparable "same store" sales growth (sales in the Core Business Segment at stores open at least a year) in the mid-single digits during F99.

(Compl. P 7.) In April 1999, OfficeMax issued its fiscal year 1998 Annual Report. It included a letter from Feuer that is excerpted in detail in the Complaint. The excerpts include a summary of yearly sales and three paragraphs concerning the PowerMax system, a supply-chain distribution system launched in 1998. Although much is excerpted, two of Feuer's statements are highlighted in bold by Plaintiffs: first, "We positioned the Company for future growth and market leadership by implementing our latest superstore format - Millennium 8.0 - and launching our smaller footprint OfficeMax PDQ pilot store"; and second, "We believe the major changes we have made in 1998 and our future expansion plans will provide very meaningful returns in the years ahead. [*19] " (Compl. P 58.)

After describing the statements made in the March 2nd report, the conference call statements, the statements made by analysts but attributed to Feuer and Rutherford, and the Feuer letter contained in the 1998 Annual Report, the Complaint then asserts that "each of the statements made between March 2, 1999 and April 1999 were false or misleading when issued." (Compl. P 59.) It then lists twenty-four "true but concealed facts" that allegedly demonstrate the falsity of each of the statements made. As summarized earlier, these alleged facts describe problems at OfficeMax, including inventory problems, policies which exacerbated those problems, unprofitable policies with regard to opening new stores or closing existing ones, and the high level of executive turnover caused by Feuer's harsh management style. (Id.) The Complaint alleges that the Defendants knew that, "as a result of the foregoing adverse conditions in OfficeMax's business, OfficeMax could not, and would not" achieve anything near the optimistic forecasts made by the company. (Id.)

2. *May and June 1999.*

On May 11, 1999, OfficeMax reported its first quarter fiscal year 1999 results. That release [*20] is quoted in much detail, with approximately half of it

highlighted by the Plaintiffs in bold typeface. (Compl. P 60.) In the Complaint's "summary" section, the Plaintiffs identify the particular aspects of the May and June 1999 statements that they assert are particularly relevant:

OfficeMax reported better than forecast 1st quarter F99 results - consolidated EPS of $ .19. OfficeMax also reported its separate Core Business Segment results for the first time, showing Core Business Segment EPS of $ .25. OfficeMax attributed these better-than-expected results to the success of its revamped business model and attributed the increased earnings of its Core Business Segment to the Core Business Segment's enhanced merchandise selection, better product assurances and OfficeMax's success in managing the inventories of its Core Business and Computer Business Segments. OfficeMax also stated that its ambitious new store expansion program was proceeding ahead of plan ... and that this would mean "very positive implications" for 2nd half F99 financial results. OfficeMax also assured investors that its enhanced cash flow was the result of its improved supply chain management.

(Compl. [*21] P 7.) Following the release of the first quarter results, OfficeMax again held a conference call with analysts to discuss the results and future projections, during which, according to the Complaint, Feuer and Rutherford essentially repeated the points they made in the March 2, 1999 conference call, except that they allegedly increased their "forecasted" F99 EPS to $ .93-.95 and F00 EPS to $ 1.05-$ 1.15. Following a summary of that conference call, the Complaint lays out in detail a number of analysts' reports throughout May and June that, again, it implies are directly attributable to Feuer and Rutherford. These statements, again, are generally optimistic statements about OfficeMax's short term and long term prospects. They include, and the Complaint sets out in bold, statements such as, "The Company believes the acceleration of store openings will be very beneficial in the fourth quarter, when OfficeMax typically generates about 30% of OfficeMax's sales and nearly 45% of the company's earnings" (Compl. P 62) and, "We see significant upside potential in second half of year." (Compl. P 65.)

After detailing these analysts' reports (which stretch through May and the beginning of June), [*22] the Complaint then asserts that "each of the statements made between May 11, 1999 and June 8, 1999 were false or misleading when issued." (Compl. P 70.) It then lists the "true but concealed facts" that substantially repeat the "true but concealed facts" that were earlier listed to demonstrate the falsity of the March and April statements. Again, these "true but concealed facts" include reference to inventory problems, procurement problems, executive retention problems, as well as allegations that OfficeMax's revised business model "was not working, as its rapid expansion of the number of SKUs sold by its Core Business Segment, about a thousand items per store, was resulting in the accumulation of millions of dollars worth of merchandise, which was not selling well." (Compl. P 70(d).) It also highlights other policy changes that had not done well, particularly a new program called the "flat rate discount program" which applied only to new corporate customers, allegedly outraging existing customers who did not benefit from the program; existing customers allegedly ceased doing business with OfficeMax. (Compl. P 70(j).) As it did with the March and April statements, the Complaint here [*23] alleges with respect to the May and June statements that Defendants knew that, "as a result of the foregoing adverse conditions in OfficeMax's business, OfficeMax could not, and would not" achieve anything near the optimistic forecasts made by the company. (Compl. P 70.)

3. *August 1999.*

On August 10, 1999, OfficeMax reported its second quarter fiscal year 1999 results. Again, the Complaint sets out the press release, again it describes a conference call to analysts on the same day in which optimistic forecasts were made, and again it describes, in detail, analysts reports following the conference call. The Complaint summarizes these statements as follows:

> OfficeMax reported its 2nd quarter F99 results (typically the weakest quarter of OfficeMax's fiscal year), which were in line with forecasted levels: consolidated EPS of $ .02 and Core Business Segment EPS of $ .07. OfficeMax also announced that it was going to further accelerate its ambitious new store expansion program so that it would open more stores in F99 than

previously indicated (115 stores instead of the previously announced 100 stores) and would open those stores earlier in F99 than previously indicated. OfficeMax [*24] told investors that this acceleration would have a very positive impact on OfficeMax's financial results during the 2nd half F99 and especially during the 4th quarter F99-by far the most important quarter of OfficeMax's fiscal year, a quarter in which OfficeMax achieved about 40% of its earnings for the full year. OfficeMax further represented that the positive financial impact of these accelerated new store openings and of OfficeMax's aggressive new store expansion plan would continue into F00. When OfficeMax revealed that its same store sales for its Core Business Segment had declined slightly during the 2nd quarter F99, instead of increasing to mid-single digits as previously promised, it assured investors that this was due to price declines limited to a few products (i.e. printers and fax machines). OfficeMax further stated that its Core Business Segment operations were continuing to improve due to the Core Business Segment's enhanced merchandise mix, tightly focused product assortment and the successful management of its inventories, which led to increased Core Business Segment EPS. OfficeMax stressed that the Core Business Segment's inventories were in good shape with decreased [*25] per-store inventories, with overall inventory increasing less than sales and with inventory turns increasing. OfficeMax forecasted 3rd quarter F99 EPS of $ .30-$ .32 and 4th quarter F99 EPS of $ .41-$ .42, which would lead to F99 EPS of $ .93-$ .95 and F00 EPS of $ 1.05-$ 1.15.

(Compl. P 9.) Again, the Complaint alleges that each of these statements "were false or misleading when issued," followed by essentially the same "true but concealed facts" recited for the earlier time periods, and alleges that, "as a result of the foregoing adverse conditions in OfficeMax's business, OfficeMax could not, and would

not," achieve anywhere near the optimistic forecasts made by the company. (Compl. P 80(z).)

4. *September 30, 1999.*

At the end of September, OfficeMax announced that it was revising its forecasts for the second half of fiscal year 1999 as well as for fiscal year 2000 and expected much less favorable results. OfficeMax also announced that it would take an $ 83 million writedown due to excessive, overvalued, or unsaleable inventory in its Core Business Segment, that it was sharply reducing the number of merchandise items carried by its Core Business Segment, and that it [*26] was sharply curtailing its new store expansion program to save money. The stock price fell over 32% in two days to $ 5 per share.

C. *GAAP Violations.*

Finally, the Complaint alleges two distinct GAAP violations to accompany the fraudulent statements described above. It alleges, first, that OfficeMax improperly accounted for its inventory, and second, that it improperly accounted for vendor rebates as current income.

1. *Inventory accounting.*

The Complaint alleges that the company "did not take adequate reserves for excess and overvalued inventory." (Compl. P 92.) The Complaint notes here a long list of reasons why the company had problems with inventory, some of which were included in the "true but concealed facts" portions above, others of which are alleged here for the first time (e.g., "The problem with the Computer Business Segment was the return rate." (Compl. P 91(p)).) In regard to the $ 83 million inventory writeoff, the Complaint alleges:

> Had OfficeMax appropriately reserved for excess and overvalued inventory in prior quarters, such a large charge would have been unnecessary. Moreover, had OfficeMax accrued timely and adequate reserves for excess inventory [*27] during the Class Period, its Core Business Segment would have reported minimal, if any, net income in the 1st quarter F99, instead of the $ 29 million it reported, and would have further reported a large loss in

the 2nd quarter F99 instead of the $ 8 million it actually reported. Additionally, OfficeMax's assets and retained earnings as reported in the Company's balance sheet for the 1st and 2nd quarters F99 were materially overstated due to the Company's failure to properly value its inventory.

(Compl. P 96.) Other than the fact of the $ 83 million writedown, the Complaint does not further quantify by what degree reserves taken during the Class Period were inadequate.

2. *Vendor rebates.*

Plaintiffs also allege that Defendants improperly applied vendor rebates to current income, rather than to a reduction in the purchase price of the merchandise, in violation of GAAP principles. While Plaintiffs do not allege when this policy began, and it, in fact, appears that the policy significantly predated the Class Period, Plaintiffs nevertheless allege that it was part of the scheme to artificially inflate the price of the stock. After approximating OfficeMax's retail sales, markup [*28] rates, costs of goods, and percentage of rebates, Plaintiffs estimate the vendor rebates were "$ 100 million to $ 126 million per year." (Compl. P 99.) At the end of the Class Period, OfficeMax announced a "vendor rationalization" policy in which it "unbundled" vendor rebate benefits from income, thus effectively ending this practice. (*Id.*)

With respect to vendor rebates, the Complaint alleges not only a GAAP violation for inventory that may have been responsibly purchased, but also a scheme to purposely purchase more inventory than was needed. Plaintiffs allege that Defendants acquired excess inventory not by mistake but "solely to benefit from associated vendor credits for advertising and other costs, and then recognizing the credits as income prior to using the inventory and/or incurring the costs." (Compl. P 97.)

The effect of the GAAP violations, according to the Complaint, was that net income was reported as favorable in the first and second quarter of F99. While Feuer attributed these favorable quarterly results to better product assortment and other indicators of better management, according to the Complaint, those results would have shown minimal, if any, income for [*29] those quarters absent GAAP violations.

## II. MOTION TO DISMISS STANDARD FOR SECURITIES FRAUD COMPLAINTS

In deciding a motion to dismiss under Rule 12(b)(6), the Court must take all well-pleaded allegations in the complaint as true and construe those allegations in a light most favorable to the plaintiff. *Summit Health, Ltd. v. Pinhas,* 500 U.S. 322, 325, 114 L. Ed. 2d 366, 111 S. Ct. 1842 (1991); *Dana Corp. v. Blue Cross & Blue Shield Mut.,* 900 F.2d 882 (6th Cir. 1990); *Craighead v. E.F. Hutton & Co.,* 899 F.2d 485, 489 (6th Cir. 1990). However, the Court need not accept as true a legal conclusion couched as a factual allegation. *Papasan v. Allain,* 478 U.S. 265, 286, 92 L. Ed. 2d 209, 106 S. Ct. 2932 (1986). A well-pleaded allegation is one that alleges specific facts and does not merely rely upon conclusory statements. In the context of a motion to dismiss a securities fraud claim, a court "may consider the full texts of the SEC filings, prospectus, analyst's reports and statements 'integral to the complaint,' even if not attached, without converting the motion into one for summary judgment under Rule 56." *In re Royal Appliance Securities Litigation,* 1995 U.S. App. LEXIS 24626, 1995 WL 490131, [*30] at *2 (6th Cir. Aug. 15, 1995). In addition, the Court may consider documents to which the plaintiffs refer in their complaint, even if the plaintiffs do not attach them as exhibits as long as these documents are central to plaintiffs' claims, *Weiner v. Klais & Co.,* 108 F.3d 86, 89 (6th Cir. 1997), as well as public records and matter of which a court may take judicial notice, *Jackson v. City of Columbus,* 194 F.2d 737, 745 (6th Cir. 1999), without converting the motion to dismiss into a motion for summary judgment.

In 1995, Congress passed the PSLRA which heightened the pleading standard in securities litigation. The PSLRA requires a plaintiff to state with particularity all facts supporting an allegation made on information and belief, and all facts establishing scienter. Section 78u-4(b) states:

### (b) Requirements for securities fraud actions

### (1) Misleading statements and omissions

In any private action arising under this chapter in which the plaintiff alleges that the defendant--

(A) made an untrue statement of a material fact; or

(B) omitted to state a material fact necessary in order to make the statements made, [*31] in the light of circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

### (2) Required state of mind

In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4(b)(1)& (2).

The Sixth Circuit, in *In re Comshare, Inc. Securities Litigation,* 183 F.3d 542 (6th Cir. 1999), held that plaintiffs may meet PSLRA pleading requirements "by alleging facts that give rise to a strong inference of reckless behavior but not by alleging facts that illustrate nothing more than a defendant's motive [*32] and opportunity to commit fraud." *Id.* at 551. The Court in *Comshare* defined recklessness as "highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger may not be known, it must at least be so obvious that any reasonable man would have known of it." *Id.* at 550 (citing *Mansbach v. Prescott,* 598 F.2d 1017, 1025 (6th Cir. 1979)). Recklessness is to be understood as a "mental state apart

from negligence and akin to conscious disregard." *Id.*

The Court in *Comshare,* in explaining the role allegations of motive and opportunity play in the assessment of scienter, stated:

> We cannot agree that under the PSLRA, plaintiffs may establish a "strong inference" of scienter merely by alleging facts demonstrating motive and opportunity where those facts do not simultaneously establish that the defendant acted recklessly or knowingly, or with the requisite state of mind. While facts regarding motive and opportunity may be "relevant to pleading circumstances from which a strong inference of fraudulent scienter may be inferred," In re Baesa, 969 F. Supp. 238, 242, and may, [*33] on occasion, rise to the level of creating a strong inference of reckless or knowing conduct, the bare pleading of motive and opportunity does not, standing alone, constitute the pleading of a strong inference of scienter.

*Id.* at 551 (footnote omitted). In *Helwig v. Vencor, Inc.,* 251 F.3d 540 (6th Cir. 2001) (en banc), the Sixth Circuit clarified its *Comshare* decision regarding the role that motive and opportunity play to showing recklessness:

> While it is true that motive and opportunity are not substitutes for a showing of recklessness, they can be catalysts to fraud and so serve as external markers to the required state of mind. Comshare made this distinction clear by refusing to equate motive and opportunity with scienter but yet recognizing that facts showing each may support a strong inference of recklessness. We reaffirm that plaintiffs cannot simply plead "motive and opportunity" as a mantra for recovery under the Reform Act.

*Id.* at 550. Courts must focus on the facts of the case before them and not simply look to the labels that the parties place on them. *Id.* at 550-51. "Accordingly, facts presenting [*34] motive and opportunity may be of enough weight to state a claim under the PSLRA, whereas pleading conclusory labels of motive and

opportunity will not suffice." *Id.* at 551 (citing *Comshare,* 183 F.3d at 551).

The Court in *Helwig* found this fact-specific approach best reflected the intent of Congress. *Helwig,* 251 F.3d at 551 (citing *Greebel v. FTP Software, Inc.,* 194 F.3d 185, 196 (1st Cir. 1999) ("whatever the characteristic patterns of the facts alleged, those facts must now present a strong inference of scienter")). Thus, in order to determine whether scienter has been pled adequately under the PSLRA, the Court must assess whether the allegations in the complaint, taken as a whole, including those relating to motive and opportunity, give rise to a strong inference of recklessness on the part of the defendants. While recognizing such a fact-specific inquiry does not lend itself to rigid formulas for determining when a plaintiff has sufficiently alleged scienter, the Court did indicate several factors that are usually relevant to this inquiry:

> (1) insider trading at a suspicious time or in an unusual amount; [*35]
>
> (2) divergence between internal reports and external statements on the same subject;
>
> (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information;
>
> (4) evidence of bribery by a top company official;
>
> (5) existence of ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit;
>
> (6) disregard of the most current factual information before making statements;
>
> (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;
>
> (8) the personal interest of certain directors in not informing the disinterested directors of an impending sale of stock;

and

(9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Id.* at 552 (citing *Greebel,* 194 F.3d at 196). The Court emphasized, however, that this list was not exhaustive, and was only meant to "point to fixed constellations of facts that courts have found probative of securities fraud." *Id.* at 552.

In adopting this standard, the Sixth Circuit expressly rejected the views of those [*36] courts with both broader and narrower views of the PSLRA. Thus, the Court in *Comshare,* reiterated by its decision in *Helwig,* rejected the view espoused by a number of courts, including the Second Circuit, that the PSLRA simply requires a plaintiff to either (1) allege facts constituting strong circumstantial evidence of conscious or reckless behavior, or (2) allege facts showing a defendant's motive and opportunity to commit fraud. *Comshare,* 183 F.3d at 549. And, the Court in *Comshare* rejected the view, espoused by the district court in that case, that a plaintiff must allege facts indicating a knowing misrepresentation or conscious intent to defraud before a complaint can pass muster under the PSLRA.*Id.* at 551-52.

Instead, after a careful analysis of the plain language of the PSLRA, the Court in *Comshare* concluded that, while a plaintiff may state a valid claim under the PSLRA premised on recklessness alone (as distinct from knowing misconduct), the facts alleged collectively must give rise to a "strong inference" that the defendants did, indeed, behave recklessly. *Helwig* reaffirms this approach. Thus, the Sixth Circuit employs a [*37] form of "totality of the circumstances" analysis; this Court, accordingly, declines to examine plaintiffs allegations in piecemeal fashion and, will instead, assess them collectively to determine what inferences may be drawn therefrom.

## III. ANALYSIS

To state a claim under§ 10(b) of the Securities and Exchange Act of 1934, and Rule 10b-5, a plaintiff must allege in connection with the purchase or sale of securities (1) a misrepresentation or omission, (2) of a material fact, (3) made with scienter, (4) upon which the plaintiff relied, and (5) which proximately caused the plaintiff's injury. *Comshare,* 183 F.3d at 548. Defendants move for dismissal of the Complaint, focusing on the first

three elements: With regard to misrepresentations and materiality, Defendants argue (1) that many of the alleged misrepresentations were neither made by Defendants nor can be attributed to them; (2) that the Complaint does not sufficiently allege with particularity why or how the alleged misrepresentations were false; (3) that many of the alleged misrepresentations were not material; and (4) that the Defendants' forward looking statements were appropriately qualified and are, [*38] thus, not actionable. With regard to scienter, Defendants argue that the Complaint lacks particularity in its allegations, and, in any case, the facts alleged do not create a strong inference of either an intent to deceive or recklessness. Defendants also argue separately that, with respect to GAAP violations, the Complaint is deficient because those allegations are made with insufficient particularity and do not raise an inference of scienter either alone or in combination with Plaintiffs' other allegations of wrongdoing.

Because the Court finds that the Complaint does not allege facts with particularity which give rise to a strong inference of scienter, the Court dismisses the Complaint without reaching Defendants other arguments. [4]

4    The Court notes, however, that many of Defendants' contentions appear to have merit, either in whole or in part. Plaintiffs, for instance, focus many of their allegations of fraud on forward looking statements of optimism about the future which are not generally actionable under the PSLRA. In addition, while the Complaint charges Defendants with responsibility for all of the statements and predictions made by analysts, many of the statements to which Plaintiffs point are clearly couched as opinions of the analysts which, similarly, are not actionable. Finally, it appears that many of the statements with which Plaintiffs purport to take issue simply are not false. Because the Court resolves Defendants' motion on other grounds, the Court does not undertake here to parse Plaintiffs' allegations and determine which could, in the appropriate circumstances, otherwise support a claim under § 10(b). The Court confirms, though, that it has closely examined Plaintiffs' allegations on an individual and collective basis to determine, to the extent possible, the totality of the circumstances actually presented by Plaintiffs' Complaint.

[*39] Scienter generally refers to a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 47 L. Ed. 2d 668, 96 S. Ct. 1375 (1976). While Defendants contend that the Complaint insufficiently pleads scienter, Plaintiffs argue that their Complaint gives rise to a strong inference of scienter through the combination of (1) its allegations regarding Feuer's and Rutherford's motive and opportunity to defraud, (2) its allegations showing a divergence between internal reports and statements made to the public, and (3) its allegations of GAAP violations. Each is discussed below.

A. *Motive and Opportunity.*

The Complaint alleges that Feuer and Rutherford each had the opportunity and the motive to defraud stockholders. The Plaintiffs argue that these allegations help create a strong inference of scienter.

The Complaint first makes the unsurprising allegation that, as top executives in the company, Feuer and Rutherford enjoyed access to a wide selection of internal reports and information, as well as control over OfficeMax public releases and financial disclosures, providing them an opportunity to defraud the public. In regard [*40] to motive, however, the Complaint makes only a passing reference to the "extreme dissatisfaction" of stockholders because of the substantial decline in stock price, concluding that Feuer "realized that unless the Company was turned around, his position as CEO was in danger." (Compl. P 44.) Plaintiffs argue in their brief that Feuer felt particular pressure because he had launched the major restructuring of the company. [5] They also argue that, as early as March 2, 1999, Feuer must have already known that the major restructuring announced two months earlier would not and could not work; with that knowledge, he nevertheless lied about it, or recklessly disregarded its failure, in order to save his job.

> 5   This is somewhat at odds, again, with the suggestion that the restructuring itself was part of the fraudulent scheme. *See supra* note 2. In other words, Plaintiffs suggest that the pressure on Feuer was both caused by, and a result of, the restructuring.

Plaintiffs cite this Court's opinion in *In re Telxon Corp. Securities Litigation,* 133 F. Supp. 2d 1010 (N.D. Ohio 2000), [*41] for the proposition that particular pressure that an executive may face to demonstrate the wisdom of changes that he has made or to otherwise secure his executive position are relevant to a scienter inquiry. *Id.* at 1028; *see also Helwig,* 251 F.3d at 552. Plaintiffs are quite correct in arguing that these types of allegations are relevant. They are, however, more or less meaningful depending upon the circumstances in which they are made. The defendants in *Telxon* were new executives under pressure to "improve performance after several initial quarters of poor performance under their oversight." The *Telxon* executives were, moreover, "motivated by the promise of substantial additional compensation to make sure their predictions of profitable performance became a reality" and by "the need to stave off ... take over efforts and an ensuing proxy battle." *Telxon,* 133 F. Supp. 2d at 1028. Plaintiffs' Complaint does not allege facts similar, in scope or degree, to *Telxon.* Feuer was no neophyte anxious to prove his mettle, he was the founder of the company. No take over efforts, proxy battles, or particular compensation methods are [*42] alleged which would give rise to some particular danger to the Defendants. *See City of Philadelphia v. Fleming Cos.,* 264 F.3d 1245, 1270 (10th Cir. 2001) (finding alleged motives insufficient to raise strong inference of scienter when no allegations of personal financial benefit from misrepresentations); *Phillips v. LCI Int'l, Inc.,* 190 F.3d 609 (4th Cir. 1999) (finding that "assertions that a corporate officer or director committed fraud in order to retain an executive position ... simply do not, in themselves, adequately plead scienter" (citations omitted)). Merely concluding that stockholders were extremely dissatisfied by a stock falling, even plummeting, does not lend any *particular* weight to allegations of reckless or intentional conduct. The Court notes, as well, the absence of other "fixed constellations of facts that courts have found probative," *Helwig,* 251 F.3d at 552, in this inquiry: No insider trading, at suspicious times or otherwise, is alleged, let alone bribery or other financial self-dealing. *See id.* Indeed, there is not only no apparent financial incentive for Defendants to engage in the deceptive practices [*43] alleged in the Complaint, given their respective shareholdings, which Defendants retained throughout the Class Period and beyond, there appears to have been a disincentive to do so. [6]

> 6   The documents disclosing the scope of share ownership by Feuer and Rutherford, as well as the absence of trading in those shares, were attached to Defendants' motion to dismiss and were the subject of Plaintiffs' motion to strike. Because

those public filings (OfficeMax's reports on Forms 10-K) are integral to the allegations of the Complaint and because the facts Defendants attempt to glean from them are undisputed, the Court finds no prohibition against reference to them. To that limited extent, Plaintiffs' motion to strike is DENIED.

Although Plaintiffs' allegations are most certainly relevant to the Court's totality of the circumstances analysis, the Court finds, in the context of this case, that they are significantly weak allegations, and, thus, they do not substantially assist the Court in drawing the inferences of reckless [*44] or intentional conduct Plaintiffs ask the Court to draw. [7]

> 7   To the extent that Defendants imply in their motion that the absence of allegations of motive is *fatal* to a claim under the PSLRA, the Court expressly rejects that notion. Motive is but one factor, in the totality of circumstances, which the Court must consider. Its presence or absence is more or less meaningful in any given case, depending on all of the other facts and circumstances presented.

B. *Divergence between Internal Reports and External Statements.*

The Complaint alleges that Defendants made repeated optimistic statements about OfficeMax's profitability and the efficiency of its operations when it knew of massive inventory problems from the Salmon study, internal inventory and finance reports, management meetings, and through their active management roles. Citing *Helwig,* Plaintiffs note that this divergence is relevant to scienter. *See id.* at 552.

Although Plaintiffs claim that a multitude of reports and [*45] internal communications must have been inconsistent with the optimistic public statements about OfficeMax, they cite only one report in particular: the Salmon study. According to the Complaint, the Salmon study reviewed OfficeMax's inventory control systems in three stages. At the end of fiscal year 1998, before the study was complete, Salmon concluded that OfficeMax had inadequate management talent and procurement and inventory policies; thus, it would need to curtail its expansion program to regain control over its Core Business Segment. (Compl. P 21.) Plaintiffs claim that Defendants either recklessly or intentionally concealed

these findings from the investing public.

Plaintiffs' argument is undercut in several respects, however. Most notable is the Complaint's concession that OfficeMax, before and during the Class Period, was reconfiguring its entire supply distribution process in order to remedy the procurement and inventory problems that had been identified. (Compl. P 30.) The Complaint also concedes that OfficeMax was addressing its inventory problems during the Class Period by "installing a new, more high powered and sophisticated computerized purchasing and inventory control [*46] system made by SAP - a huge European software maker." (*Id.*) Given the substantial changes being made in order to address the problems identified in the Salmon study, the Court does not find that the Defendants' optimistic statements--about the company in general or the inventory control systems in particular--are inconsistent with the preliminary conclusions of that as-yet-incomplete study. The fact that these changes were "taking much longer than had been anticipated," (*id.*), only points up the fact that hindsight is more accurate than forecasting. OfficeMax's optimism about its new business model and its designs for "improving" inventory control, *see* Complaint at P 50, do not conflict with a study that identified those problems before these changes took place.

Comparison with the facts of *Helwig* is instructive on this point. In that case, a health care organization publicly claimed that "it could not predict whether Medicare reform proposals would be adopted by Congress or if adopted, what effect, if any, such proposals would have on its business." *Helwig,* 251 F.3d at 546. But a month before, company executives gave employees notice that they would [*47] be laid off in sixty days because "there were tough times coming in the industry because of the likely cutbacks in Medicare" and told them they would have been laid off anyway because "the proposed Medicare regulations were going to make it difficult for [the company] to make money and stay profitable."*Id.* Thus, the company was telling its employees that it clearly understood what was coming, while telling the public that it did not. Here, the Complaint does not state facts that demonstrate such "divergence" between the Salmon study and the company's optimistic statements during the Class Period.

What is left after the Salmon study is a number of conclusory allegations about the condition of the

company along with assumptions not only that the Defendants were aware of those characterizations at the time, but also that they understood their materiality and either recklessly or intentionally concealed them. This portion of the Complaint, which constitutes the bulk of the allegations, lacks the particularity required under the PSLRA when alleging scienter. *See* 15 U.S.C. § 78u-4(b)(2). In fact, most of the "true but concealed facts" appear to be bare conclusions [*48] that do not arise from either particular, or even generally identified, reports, meetings, or management responsibilities. For example, what is the basis for the allegation that "Feuer require[d] certain new stores to open knowing that the forecasted sales for those stores would be less than the internally required amount to open a new store--$ 4 million per store--[and] refused to close existing stores that continually operated at a loss"? (Compl. P 59(i).) Not only do the long and repeated lists of alleged "true but concealed facts" appear without an explanation of the facts upon which each allegation is based, but most appear to be allegations of mere bad management, rather than indications of bad faith.

Moreover, many of the "concealed facts" appear either internally inconsistent or chronologically problematic. For example, the Complaint alleges the pre-class period stock price drop (the drop that allegedly placed so much pressure on Feuer, et al.) was caused, in part, by "high executive turnover" due to "Feuer's autocratic management style and ego" and inability to work with senior management." According to the Complaint, these problems were "known throughout the industry. [*49] " (Compl. P 42.) But this alleged problem, if it were known throughout the industry and was already having a negative affect on the stock price when the Class Period began, can hardly be considered a "true but *concealed* fact" as the Complaint elsewhere describes it. (Compl. P 70(x), 80(y).) Similarly, the fact that OfficeMax had a policy of "not having sales" does not seem to be the sort of "concealed" insider-information that would surprise members of the public familiar with the company. (Compl. P 70(n).)

Several allegations are also chronologically inconsistent. For example, when alleging that OfficeMax's optimistic May and June 1999 statements were false or misleading, Plaintiffs describe as a "true but concealed fact" that "in August 1999, OfficeMax rolled out a new program called the 'flat rate discount program' that only applied to new, large, corporate customers."

(Compl. P 70(j).) The Complaint then alleges that this new program irritated existing customers who could not benefit from the discount, driving them to other stores. (*Id.*) It is not clear how the Court is to infer the falsity of optimistic statements made in May or June from the fact that a policy, *not* [*50] *even begun until two months later,* subsequently backfired. [8]

> [8]   The timing of Plaintiffs major allegations is also problematic in a different respect: Plaintiffs attempt to draw a parallel with the facts of *Fidel v. Farley,* 2001 U.S. Dist. LEXIS 9461, No. 1:00-CV-48-M (W.D. Ky. June 27, 2001). In that case, a restructuring of Fruit of the Loom was begun in 1995, while the alleged failure of that restructuring (and defendants' knowledge and concealment of that failure) occurred years later. It appears far different to allege, as the Plaintiffs do here, that as early as March 2, 1999, only two months after the restructuring had begun, Defendants were already in a position to know that the restructuring was failing and would continue to fail. Because the Complaint fails to identify any basis underlying that allegation, the Court finds it particularly difficult to draw the inferences Plaintiff suggests are apparent from this sequence of events.

These particular inconsistencies, in addition to [*51] the repetitive and somewhat confusing organization of the Complaint as a whole, do not assist Plaintiffs. Although inartful pleading does not, by itself, warrant dismissal of a Complaint, it can, and here does, weaken any inferences that might be drawn from it. For all these reasons, the Court finds little, if any, divergence between any identified internal reports and external statements, and thus little, if any, inference of scienter. [9]

> [9]   It is not insignificant that, throughout the Class Period, OfficeMax was openly discussing efforts to improve its inventory control. Contrary to Plaintiffs' implications, these statements, when considered as a whole, can be read as public acknowledgments of continuing problems with its inventory, rather than a guarantee that all such problems had been solved.

C. *GAAP Violations.*

Violations of GAAP, by themselves, are generally not enough, without more, to create an inference of

reckless conduct. *See, e.g., Comshare,* 183 F.3d at 553. They are, however, [*52] part of the totality of circumstances which the Court must assess. As discussed below, the Plaintiffs allege that OfficeMax violated GAAP by failing to record appropriate reserves and by improperly accounting for vendor rebates.

1. *Improper accounting for inventory.* Noting that GAAP requires evaluation of inventory at each quarter-end, the Complaint alleges that OfficeMax failed to do so during the Class Period. It notes, moreover, that GAAP requires that "where the utility of goods is no longer as great as its cost, whether due to physical deterioration, obsolescence, changes in price levels, or other causes, the difference should be recognized as a loss of the current period." (Compl. P 90.) It alleges that, instead, OfficeMax kept its deteriorating excess inventory at its original value until it ultimately took an $ 83 million writedown in September 1999. The Complaint also alleges that the Defendants each must have known of this failure, due to their positions as top managers. It then alleges a host of "practices" or "conditions" that Plaintiffs claim caused the company to accumulate excess, obsolete, or otherwise overvalued inventory.

The Court finds little--beyond speculation--in [*53] these allegations. Plaintiffs merely identify a GAAP provision and apply it to the $ 83 million writedown in September by suggesting that writedowns should have occurred earlier or in stages. Plaintiffs do not, however, explain when these writedowns should have occurred nor offer any basis to assume that periodic writedowns would have had a meaningful impact on the value of OfficeMax stock.

These references to GAAP add little weight to Plaintiffs' scienter allegations. GAAP violations must be plead with particularity. *See Greebel v. FTP Software, Inc.,* 194 F.3d 185, 203-04 (1st Cir. 1999) (noting that "a general allegation that the practices at issue resulted in a false report of company earnings is not a sufficiently particular claim of misrepresentation"). One of the reasons this is true is because GAAP is not "a canonical set of rules that will ensure identical accounting treatment of identical transactions," instead they "tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management." *Thor Power Tool Co. v. Commissioner of Internal Revenue,* 439 U.S. 522, 544, 58 L. Ed. 2d 785, 99 S. Ct. 773 (1979); *Chalverus v. Pegasystems, Inc.,* 59 F. Supp. 2d 226 (D. Mass. 1999).

[*54] Thus, one person's accounting decisions on a given matter, even if open to debate, are not necessarily improper, much less intentionally misleading. Plaintiffs must allege "specific facts that illustrate 'red flags' that should have put Defendant on notice of the revenue recognition errors" before evidence of GAAP errors may be considered meaningful. *Comshare,* 183 F.3d at 553.

In an effort to satisfy this standard, Plaintiffs cite *Helwig,* 251 F.3d at 552, for the proposition that "closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information" is relevant to scienter. (Mot. Opp'n at 23.) They then point out that the September 30, 1999 announcement of an $ 83 million writedown and revised downward forecasts occurred less than two months after OfficeMax's optimistic forecasts in August. While the Court generally agrees with Plaintiffs' proposition of law, its application here does not help create a strong inference of scienter. As discussed earlier, OfficeMax's inventory control system was being entirely restructured, and the Complaint alleges an ongoing Salmon study of those systems. In fact, [*55] the September 30, 1999 press release announced that the policy changes, which resulted in the writedown, themselves resulted from a comprehensive business assessment study undertaken in the Spring of 1999 and finished in September. (Mot. Dismiss, Ex. 17.) Plaintiffs, thus, are not able to negate the inference that "something has changed" which explains the difference between the forecasts in August and those in September. *See Telxon,* 133 F. Supp. 2d, at 1031 n.4.

Finally, while Plaintiffs assert that the revenue recognition methodology used by OfficeMax violated GAAP, there is no allegation that the accounting principle Plaintiffs would have had OfficeMax employ was widely accepted or employed throughout other segments of the industry. Despite the ultimate writedown, moreover, there is no allegation of a restatement of any of the periods during which this revenue recognition methodology was used.

2. *Vendor rebates.*

The Complaint also alleges that OfficeMax recognized vendor rebates as income, in violation of GAAP. It asserts, moreover, that Feuer and Rutherford not only were aware of this practice, but also exacerbated the problem by purposely buying more inventory [*56] during the Class Period than they needed, so that the

failure of their new business model would be hidden.

These allegations are, again, conclusory. It is not clear from the Complaint whether it alleges that the vendor rebate "scheme" began at the beginning of the Class Period or long before, thus, the Court cannot assess whether the problem was a longstanding one or a short term policy that aligns with the Class Period. *See Comshare,* 183 F.3d 553 (noting that even if GAAP violations occurred over long period of time, that fact alone is not sufficient inference of scienter). Nor does the Complaint identify any particular transactions to elucidate its claim. Its only detail is a hypothetical: "If OfficeMax bought merchandise for $ 50 with 15 points of vendor funding, OfficeMax received $ 15 back in rebate, but the company valued the inventory at $ 50." (Compl. P 99.) Although the Complaint purports to calculate the monetary difference created by the alleged improper accounting, its calculations are based on nothing more than approximations of total sales in an average year. Moreover, the allegation identifies no underlying set of facts giving rise to Plaintiffs' belief [*57] that vendor rebates were treated improperly. The Court also finds the additional charge--that Defendants purposely purchased excess inventory solely to reap the short-term gain of vendor rebates, to the detriment of longer term profits--somewhat mystifying. This asserts, apparently, that, in order to hide the company's problems of excess inventory, Feuer and Rutherford bought *more* excess inventory. Plaintiffs do not appear even to acknowledge the peculiarity of this assertion.

Plaintiffs contend that the "enormity" of the alleged GAAP violations mandate the inference that the Defendants knew of them or were reckless in disregarding them. (Mot. Opp'n at 22.) The Court agrees that GAAP violations resulting in substantial misstatements of a company's financial condition may, under appropriate circumstances, create such an inference. *See Hayman v. PricewaterhouseCoopers, LLP,* Case No. 1:01-CV-1078 (N.D. Ohio March 26, 2002) (finding that numerous egregious violations of relatively simple GAAP and GAAS violations, resulting in substantial restatements, contributed to strong inference of scienter). But this inference may only arise if the GAAP violations--"enormous" or otherwise--are [*58] plead with sufficient specificity to make the allegations meaningful. *See id.* (noting specific facts, specific transactions, and specific "red flags" alleged in regard to GAAP and GAAS violations). This the Plaintiffs have

failed to do here. Indeed, the Court finds that Plaintiffs' allegations of GAAP violations do not survive under the particularity standards of the PSLRA, and may not survive even under the more lenient standard of Federal Rule of Civil Procedure 9(b). Because the allegations are vague and conclusory at best, the Court finds that they add little weight to any inference of recklessness or intentional deception.

Taken as a whole, Plaintiffs' allegations of scienter lack strength. Plaintiffs fail to hypothesize any motive for Feuer, the founder of OfficeMax and its largest shareholder, to undercut his companies' long term financial health. In fact, in alleging motive, the Plaintiffs demonstrate only the lack of it--notably absent is any circumstance particular to Feuer or Rutherford which puts them in a position different than any other top executive whose company's stock has recently slumped. Moreover, although Plaintiffs [*59] attempt to show that OfficeMax's internal reports were inconsistent with its optimistic public statements, they identify but one report, and do not demonstrate that report's inconsistency with those public statements. They rely instead on conclusory representations of the company's health, along with bare allegations that Defendants not only "must have" reached those same conclusions but recklessly or purposely concealed them. Finally, what is left of the Complaint is two assertions of GAAP violations that are without any supporting detail; neither identifies any underlying set of facts giving rise to a belief that GAAP was, indeed, violated. On the contrary, the allegations are so conclusory that the Court does not, indeed cannot, draw any particular inference from them. Fraud or reckless behavior is, arguably, one of many reasonable inferences which may be drawn from the facts alleged here. But it is not the strongest inference created by these facts, or even one of several *strong* inferences that may be drawn. Because the Complaint does not give rise to a strong inference of scienter, as it must under the PSLRA, the Court dismisses the Complaint without reaching Defendants' other [*60] arguments.

**IT IS SO ORDERED.**

3/24/02

**s/**

**KATHLEEN McDONALD O'MALLEY**

**UNITED STATES DISTRICT JUDGE**

2002 U.S. Dist. LEXIS 27019, *60

*ORDER*

    For the reasons set forth in the Court's memorandum and order this date, Defendants' Motion to Dismiss is hereby **GRANTED.** This case is **DISMISSED.**

**IT IS SO ORDERED.**

**s/**

**KATHLEEN McDONALD O'MALLEY**

**UNITED STATES DISTRICT JUDGE**

# EXHIBIT 7



**IN RE: TETRA TECHNOLOGIES, INC. SECURITIES LITIGATION**

**CIVIL ACTION NO. 4:08-cv-0965**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION**

**2009 U.S. Dist. LEXIS 126687**

**July 9, 2009, Decided**
**July 9, 2009, Filed**

**SUBSEQUENT HISTORY:** Clarified by In re Tetra Techs. Inc., Sec. Litig., 2009 U.S. Dist. LEXIS 126825 (S.D. Tex., Aug. 10, 2009)

**PRIOR HISTORY:** In re Tetra Techs., Inc. Sec. Litig., 2008 U.S. Dist. LEXIS 112706 (S.D. Tex., June 27, 2008)

**COUNSEL:** [*1] For City of Livonia Employees' Retirement System, Plaintiff: David Avi Rosenfeld, LEAD ATTORNEY, Coughlin Stocia Geller Rudman & Rubbins LLP, Melville, NY; Roger B Greenberg, LEAD ATTORNEY, Schwartz Junell et al, Houston, TX; Samuel H Rudman, LEAD ATTORNEY, Coughlin Stoia Geller Rudman & Robbins LLP, Melville, NY; Beth A Kaswan, ScottScott LLP, New York, NY; John Henry Crouch, IV, Kilgore Kilgore PLLC, Dallas, TX.

For Jon P Leim, Plaintiff: Thomas E Bilek, LEAD ATTORNEY, The Bilek Law Firm LLP, Houston, TX; Beth A Kaswan, ScottScott LLP, New York, NY.

For Fulton County Employees' Retirement System, Plaintiff: David R Scott, LEAD ATTORNEY, Scott & Scott, Colchester, CT; Amanda F Lawrence, PRO HAC VICE, Scott and Scott LLP, Colchester, CT; Beth A Kaswan, Scott+Scott LLP, New York, NY; John Henry Crouch, IV, Kilgore Kilgore PLLC, Dallas, TX; Theodore C Anderson, Kilgore & Kilgore PLLC, Dallas, TX.

For TETRA Technologies Inc., Geoffrey M. Hertel, George McCarroll, Defendants: Paul R Bessette, Royale M Pence, Greenberg Traurig LLP, Austin, TX.

For Jospeh M. Abell, III, Raymond Symens, Defendants: Paul R Bessette, Greenberg Traurig LLP, Austin, TX.

For New Jersey Carpenters Pension Fund, Movant: [*2] Stephen L Hubbard, LEAD ATTORNEY, Hubbard & Biederman LLP, Dallas, TX.

For Michigan Pension Funds, Movant: Roger B Greenberg, LEAD ATTORNEY, Schwartz Junell et al, Houston, TX.

For Ernst & Young LLP, Movant: Mark Daniel Manela, Mayer Brown et al, Houston, TX.

**JUDGES:** KEITH P. ELLISON, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** KEITH P. ELLISON

**OPINION**

**MEMORANDUM & ORDER**

Pending before the Court are Defendants' Motion to Dismiss (Doc. No. 44) and Defendants' Motion for Sanctions. (Doc. No. 61.) Having considered the

Motions, all responses and replies thereto, and the arguments of counsel at a recent motion hearing, the Court has determined that Defendants' Motion to Dismiss must be granted in part and denied in part, and Defendants' Motion for Sanctions must be denied.

## I. INTRODUCTION

This is a Securities Exchange Act class action on behalf of purchasers of TETRA Technologies, Inc. ("TETRA") common stock between November 3, 2006 and October 16, 2007 (the "Class Period"). TETRA is an oil and gas services company with three divisions: fluids; wells abandonment and decommissioning ("W&D"); and production enhancement. The Fluids Division manufactures and markets clear brine fluids ("CBF") that are used in well drilling, completion [*3] and workover operations [1]. The WA&D Division has two operating segments: WA&D Services, which performs well abandonment and decommissioning work, and Maritech Resources, Inc. ("Maritech"), which purchases mature oil and gas wells. The properties purchased by Maritech provide business for WA&D Services. The Production Enhancement Division is not part of this litigation.

> 1   Operations that clean, repair, and maintain a production well to increase or restore production.

Plaintiffs are investment funds that suffered when the price of TETRA stock fell at the end of 2007. [2] Individual Defendants [3] allegedly dumped millions of dollars of stock at inflated prices during the Class Period: Geoffrey M. Hertel received $ 12 million from stock proceeds in May 2007; George McCarroll received over $ 400,000 in stock proceeds during the Class Period; and Raymond Symens received over $ 11 million in stock proceeds during the Class Period.

> 2   Fulton County was appointed lead Plaintiff in late June 2008 because it has the largest financial interest in the relief sought. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II) (Private Securities Litigation Reform Act, "PSLRA").
> 3   The individual Defendants are: Geoffrey M. Hertel [*4] who was the President and CEO during the class period and had formerly been its Executive Vice-President Finance and Administration and COO; George M. McCarroll who was the President of Maritech, a subsidiary of TETRA, and Raymond D. Symens who was a senior VP of TETRA who oversaw the Fluids Division.

In May 2007, TETRA announced the "highest first quarter earnings in company history" and forecast even greater earnings in later quarters. In August 2007, Tetra announced lower than expected earnings for the Fluids Division, WA&D Services, and Maritech. TETRA's CEO Hertel held a conference call in which he explained that Maritech took a write-off related to receivables from disputed insurance proceeds, the Fluids Division recorded lower than expected earnings from onshore operations and high inventory costs, and Maritech experienced a production shortfall because two offshore platforms did not produce as early as was anticipated. TETRA's stock price dropped 25 percent. On October 16, 2007, TETRA withdrew its previously issued 2007 earnings guidance, and announced more possible insurance-related write-downs, and that Maritech would record impairments for non-productive oil and gas properties [*5] purchased in 2005. Its stock dropped 8 percent.

Plaintiffs' claim that Defendants committed fraud because they:

> (1) misrepresented the expected cash flow from a package of properties purchased in 2005 ("2005 properties") by understating Maritech's decommissioning liabilities, improperly allocating acquisition costs for these properties to fields without proved reserves, and failing to either "write off" the properties under the "successful efforts" method of accounting or increase their "depreciation and depletion" expenses at the proper time;

> (2) misrepresented the profitability of Maritech's oil and gas properties by wrongly stating that oil and gas reserves of the 2005 properties had increased when TETRA was about to write the properties off;

> (3) improperly reduced the cost of goods sold and inflated revenues from the Fluids' Division "buyback" program by failing to report customer credits for returned CBFs as sales returns and allowances;

(4) misrepresented the financial performance TETRA's Fluids Division by overstating forecasted sales for onshore operations when demand was flat; and

(5) misrepresented the likelihood of collection of millions of dollars of insurance reimbursements [*6] for hurricane-related repairs performed by WA&D when some of the claims had already been disallowed and Defendants had already incurred costs for weather downtime that exceed those allowed under the applicable insurance policies. Defendants also failed to recognize expense for weather downtime and other reimbursable costs spent working on Maritech properties.

Because of these challenged patterns of alleged conduct, Plaintiffs contend that TETRA and individual Defendants made misleading and false statements about TETRA's expected performance and artificially inflated stock prices during the class period, thereby violating § 10(b) of the Exchange Act of 1934 and Rule 10b-5. They aver that the individual Defendants violated § 20(a) of the Exchange Act as controlling persons. Plaintiffs detail several TETRA filings that contain allegedly false and misleading statements related to the above challenged patterns of alleged conduct. Plaintiffs pray for damages, costs, and fees. This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## II. MOTION TO DISMISS STANDARD

A court may dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). When considering [*7] a Rule 12(b)(6) motion to dismiss, a court must "accept the complaint's well-pleaded facts as true and view them in the light most favorable to the plaintiff." *Johnson v. Johnson*, 385 F.3d 503, 529 (5th Cir. 2004). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief--including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). That is, "a complaint must contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949, 173 L. Ed. 2d 868 (May 18, 2009) (quoting *Twombly*, 550 U.S. at 570). Although the Court generally considers a motion to dismiss for failure to state a claim based on the face of the complaint, the Court may also take notice of matters of public record when considering a 12(b)(6) motion. *See Davis v. Bayless*, 70 F.3d 367, 372 n.3 (5th Cir. 1995); *Cinel v. Connick*, 15 F.3d 1338, 1343 n. 6 (5th Cir. 1994). Defendants [*8] have provided many SEC filings, and the Court may rely on them for what they say, although not for their truth, in deciding the Motion to Dismiss in addition to the complaint and documents incorporated therein. *Tellabs Inc. v. Makor Issues & Rights, Ltd*. (Tellabs I), 551 U.S. 308, 127 S.Ct. 2499, 2509, 168 L. Ed. 2d 179 (2007).

Rule 9(b) states that "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). A plaintiff must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp*., 565 F.3d 200, 207 (5th Cir. 2009) (quoting *Williams v. WMX Techs., Inc*., 112 F.3d 175, 177 (5th Cir. 1997)).

## III. SECURITIES VIOLATIONS

### A. Pleading Standard

To state a claim under § 10(b) of the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act ("PSLRA") of 1995, 15 U.S.C. § 78u-4(b)(1), a plaintiff must allege, in connection with the purchase or sale of securities (1) a material misstatement or omission (2) made with scienter (3) on which [*9] plaintiff relied, (4) economic loss and, (5) "loss causation" (a causal connection between the material misrepresentation and the loss). *Lormand v. US Unwired, Inc*., 565 F.3d 228, 238-39 (5th Cir. 2009); *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 286 (5th Cir. 2006) (quoting *ABC Arbitrage v. Tchuruk*, 291 F.3d 336, 348 (5th Cir. 2002) (internal quotations omitted)).

The PSLRA requires plaintiffs to specify each allegedly misleading statement and the reason why it is misleading; it incorporates, at a minimum, the Fed. R. Civ. P. 9(b) fraud-pleading standard. *ABC Arbitrage v.*

*Tchuruk*, 291 F.3d at 348. "[T]he complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

The Fifth Circuit has defined the PSLRA standard as requiring the plaintiffs to:

> (1) specify each statement alleged to have been misleading, *i.e.*, contended to be fraudulent;

> (2) identify the speaker;

> (3) [*10] state when and where the statement was made;

> (4) plead with particularity the contents of the false representations;

> (5) plead with particularity what the person making the misrepresentation obtained thereby; and

> (6) explain the reason or reasons why the statement is misleading, *i.e.*, why the statement is fraudulent.

> (7) [for statements made on information and belief] state with particularity all facts on which that belief is formed, *i.e.*, set forth a factual basis for such belief.

*Tchuruk*, 291 F.3d at 350, 363 n.4 (citing 15 U.S.C. § 78u-4(b)(2)); *Southland Securities Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 362-63 (5th Cir. 2004); *In re Alamosa Holdings, Inc.*, 382 F.Supp.2d 832, 842 (N.D. Tex. 2005).

The Fifth Circuit has rejected the group pleading doctrine, or the presumption that statements in group-published documents are attributable to those individuals with direct involvement with the everyday business of the company. [4] *See Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 531 n. 1 (5th Cir. 2008) (citing *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d at 363-65 (5th

Cir. 2004)). *See also, In re Alamosa Holdings, Inc.*, 382 F.Supp.2d at 857 [*11] (dismissing allegations made against "defendants" because the allegations do not meet the pleading requirements for allegations of fraud). This rejection requires plaintiffs, in pleading both material misstatements and scienter, to distinguish among defendants and allege the role of each with respect to "each act or omission" in the alleged fraud. *Southland Sec. Corp.*, 365 F.3d at 365. Therefore, corporate statements can be tied to corporate officers if plaintiffs allege that these officers signed the documents in which the statements were made or plaintiffs adequately allege the officers' involvement in creating the documents. *Blackwell*, 440 F.3d at 287 (citing *Southland Sec. Corp.*, 365 F.3d at 364-65). A silent defendant who knows that another's statement is false may be liable as long as the complaint identifies which defendant made the statement and which remained inappropriately silent. *Blackwell*, 440 F.3d at 288. The Circuit, however, attributes to the defendant corporation all the statements in SEC filings, reports, and releases issued in its name by individual defendants pursuant to their positions of authority within the company. *Southland Securities Corp.*, 365 F.3d at 365-66.

> 4  The [*12] Court notes that the group pleading doctrine is still accepted outside the Fifth Circuit. For example, in the Southern District of New York, one corporate document may be considered the product of a group effort and considered the responsibility of top management for 10b-5 purposes. *See, e.g., In re Pfizer Inc. Securities Litigation*, 584 F.Supp.2d 621, 638 (S.D.N.Y. 2008).

As to documentary evidence, the plaintiffs must "specify the internal reports, who prepared them and when, how firm the numbers were or which company officers reviewed them." *Tchuruk* 291 F.3d at 356 (5th Cir. 2002) (citing *In re Scholastic Corp. Litig.*, 252 F.3d 63, 72 (2d Cir.), *cert denied sub nom, Scholastic Corp. v. Truncellito*, 534 U.S. 1071, 122 S. Ct. 678, 151 L. Ed. 2d 590 (2001)). The existence of unspecified confidential corporate reports that reveal corporate information contrary to reported accounts will not defeat a motion to dismiss. *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 432 (5th Cir. 2002); *Tchuruk* 291 F.3d at 355-56. That is, named reports delivered on particular dates are specific enough to support securities act claims, but unidentified "regular reports" delivered to the defendants without any

2009 U.S. Dist. LEXIS 126687, *12

detail about how frequently they [*13] were prepared or by whom, are not. *Tchuruk* 291 F.3d at 359.

## B. Materiality

Materiality is the "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988); *Tchuruk*, 291 F.3d at 359. The disclosure is not measured by the "literal truth" but by the ability of the statements to accurately inform rather than mislead prospective buyers. *Lormand*, 565 F.3d at 248. "The omission of a known risk, its probability of materialization, and its anticipated magnitude, are usually material to any disclosure discussing the prospective result from a future course of action." *Id.* (collecting cases). Materiality is traditionally a question of fact, but if the alleged omissions are "so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality, the court may rule them immaterial as a matter of law." *See Eizenga v. Stewart Enterprises, Inc*., 124 F.Supp.2d 967, 975 (E.D. La. 2000) (quoting *Klein v. General Nutrition Companies, Inc*., 186 F.3d 338, 342 (3d Cir. 1999)).

The Court addresses [*14] most of the parties specific arguments in its analysis of Plaintiffs' allegations below. It pauses however on the parties' differing contentions as to the recently issued opinion in the *Skilling* case since their arguments concern the law to be applied. Likewise, when the parties' arguments relate globally to the ACC, the Court will note them in its recitation of the law to frame the analysis below.

Defendants contend that Plaintiffs have failed to plead materiality because they cite numbers and percentages without examining the total mix of information including TETRA's cautionary disclosures. Defendants contend that, in the context of TETRA's full disclosures, the allegedly omitted information would not have significantly altered the mix of information available. Plaintiffs cite the recent decision on materiality in the *Skilling* case as analogous to the facts at hand. There, Skilling held conference calls in which he claimed, *inter alia*, that all of Enron's businesses were "uniquely strong franchises with sustainable high earnings power" when there was evidence of contrary, verifiable historical facts that some of the businesses were facing a potentially enormous loss, one business

[*15] had an unsupportable cost structure and was losing money, and one company was based on unstable, speculative trading. *U.S. v. Skilling*, 554 F.3d 529, 553-54 (5th Cir. 2009). The Fifth Circuit upheld the jury's determination that those statements were material and not, as the defendant alleged, immaterial puffery. The Court explained that conclusory statements of belief may be so contrary to verifiable historical facts that they falsely misstate the speaker's true reasons and mislead the investors about the stated subject matter. *Skilling*, 554 F.3d at 553. Defendants contend that, unlike the government in *Skilling*, Plaintiffs made no allegations that any individual Defendant knew facts contrary to TETRA's public disclosures at the time they were made. Applying this standard below, the Court will conclude that, for one of the challenged patterns of alleged conduct, Plaintiffs allege that Defendants made several specific material misrepresentations or omissions in press releases, conference calls, interviews, and filings with the SEC that were purportedly contrary to verifiable historical facts.

## C. Scienter

Defendants contend that none of the confidential witnesses ("CW") provide facts [*16] that give rise to a strong inference of scienter. In addition, because Plaintiffs cite no false statement made by McCarroll or Symens, Defendants argue that, because the Fifth Circuit has rejected group pleading, Plaintiffs have failed to plead a securities violation as to Symens or McCarroll as a matter of law. Plaintiffs respond that they have demonstrated conscious misbehavior in at least four ways: (1) information provided by the confidential witnesses, (2) suspiciously timed insider stock sales, (3) statements of Defendants, and (4) the nature and extent of the GAAP violations. The Court will examine the pleading standard and the inferences that may be permissibly drawn from each of these possible sources of scienter, but will reserve the specific arguments as to particular confidential witnesses, post-class statements, presumed knowledge, stock sales and alleged GAAP or SOX violations to the analysis section of the Order.

Scienter is a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12, 96 S. Ct. 1375, 47 L. Ed. 2d 668 (1976). In *Tellabs I*, the Supreme Court outlined the proper approach to evaluate scienter. First, the plaintiff's allegations [*17] must, as in federal

pleadings generally, be taken as true. Second, courts may consider documents incorporated in the complaint by reference and matters subject to judicial notice. Third, a plaintiff must plead scienter such that it raises a "strong inference" (i.e., a powerful or cogent inference) of "fraudulent intent" and is sufficiently pled "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs I*, 127 S.Ct. at 2510; [5] *Lormand*, 565 F.3d at 239. In its analysis, the court must take into account "plausible opposing inferences." *Tellabs I*, 127 S.Ct. at 2502. This strong inference, however, need not be "of the smoking-gun genre or even the most plausible of competing inferences." *Tellabs I*, 127 S.Ct. at 2510. That is, for the scienter element only, the court must alter the 12(b)(6) rule that all reasonable inferences should be drawn in the plaintiff's favor and take into account plausible inferences opposing as well as supporting a strong inference of scienter. *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc*., 537 F.3d 527, 533 (5th Cir. 2008) (citing [*18] *Tellabs I*, 127 S.Ct. at 2510).

5   The Fifth Circuit has taken a holistic view of the 9(b) standard. The complaint in *Shushany v. Allwaste, Inc.* was dismissed for failure to satisfy Fed. R. Civ. P. 9(b)--pre-PSLRA but the reasoning was quoted with approval by the Fifth Circuit last year. The *Shushany* court held that the plaintiffs failed to state a claim for fraud based on accounting irregularities because "the complaint did not identify who in particular was instructing the employees to make the arbitrary accounting adjustments, what particular adjustments were made, how those adjustments were improper in terms of reasonable accounting practices, how those adjustments were incorporated into [the defendant's] financial statements, and if incorporated, whether those adjustments were material in light of Allwaste's overall financial position. Although we need not identify which of these deficiencies, standing alone, might render the complaint insufficient under Rule 9(b), we hold that altogether, they do." *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc*. 537 F.3d 527, 540 (5th Cir. 2008) (quoting *Shushany v. Allwaste*, 992 F.2d 517, 522 (5th Cir.1993)).

The facts must be [*19] evaluated collectively to determine whether a strong inference of scienter has been pled. *Indiana Elec. Workers' Pension Trust Fund IBEW*, 537 F.3d at 533 (citing *Tellabs I*, at 2509-10). Each allegation of a misrepresentation or fraud must individually meet the particularity requirements of the PSLRA. *Barrie v. Intervoice-Brite, Inc*., 397 F.3d 249, 260 (5th Cir. 2005) (citing generally *Greenberg v. Crossroads Sys*., 364 F.3d 657 (5th Cir. 2004)). However, when considering scienter, the complaint must be considered *in toto* to discern whether its allegations create a strong inference. *Cent. Laborers Pension Fund v. Integrated Electrical Services, Inc*., 497 F.3d at 552, 555 (citing *Barrie*, 397 F.3d at 260). For purposes of corporate defendants, if the plaintiff alleges only that the named individual defendants acted with scienter in issuing any of the complained of statement and no other director, officer, or employee did so, the court can simply address the allegations of the individual defendants because liability of the defendant corporation arises derivatively from the individual defendants' state of mind. *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc*., 365 F.3d at 367.

In the [*20] Fifth Circuit, scienter can be established with intent or severe recklessness and may be based on circumstantial evidence. *Fin. Acquisition Partners LP*, 440 F.3d at 287; *Goldstein v. MCI WorldCom*, 340 F.3d 238, 246 (5th Cir. 2003); *Nathenson v. Zonagen Inc*., 267 F.3d 400, 412 (5th Cir. 2001). Severe recklessness is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, or that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware." *Nathenson*, 267 F.3d at 408. *See also Plotkin v. IP Axess, Inc*., 407 F.3d 690, 696 (5th Cir. 2005) (describing reckless indifference as an omission or misrepresentation that is "so obvious that the defendant must have been aware of it").

Motive and opportunity may support a finding of severe recklessness, but the plaintiffs must accompany their legal theory with factual allegations that make their theoretically viable claim plausible. *Nathenson*, 267 F.3d at 412 ("[M]otive and opportunity does not of itself automatically and categorically [*21] mean that the necessary strong inference of scienter is present.") The allegations that directors and officers possess motive and

opportunity to keep a high stock price for their benefit or that a corporation benefits from the high price are universal goals for public companies, and cannot be used to create a strong inference of scienter. *Nathenson*, 267 F.3d at 420 (citing *Melder v. Morris*, 27 F.3d 1097, 1102 (5th Cir. 1994)). Likewise, the desire to keep one's job does not satisfy the scienter requirement. *Blackwell*, 440 F.3d at 290 (citing *Melder*, at 1102).

### 1. Use of Confidential Witnesses

Defendants argue that Plaintiffs' reliance on confidential witness ("CW") statements in their Complaint is improper because Plaintiffs have not described the witnesses with sufficient particularity to support the probability that a witness in that person's position at the Company would possess the information alleged. Without their statements, Defendants aver that Plaintiffs fail to allege any other facts to support their claims or to call into question TETRA's disclosures. Defendants contend that, in general, courts must discount allegations from confidential sources. In their Reply, Defendants [*22] specifically claim that CWs 1-3 and 6-8 do not possess personal knowledge of the facts they assert. They do not specifically address CWs 4 and 5--those related to the reporting of expected insurance payments--but contend that those statements do not establish materiality. Plaintiffs respond that the CWs are in positions to have personal knowledge of the allegations attributed to them and highlight the details provided for each CW.

Confidential sources may be used, but they must be described with "sufficient particularity to support the probability that a person in the position occupied by the source as described would possess the information pleaded to support the allegations of false or misleading statements made on information and belief." *Tchuruk*, 291 F.3d at 353. [6] *See also Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 259 (5th Cir. 2005) (citing *Tchuruk*). Post-*Tellabs I*, the Fifth Circuit has explained that allegations of confidential sources must be discounted, and, at the very least, must comply with the requirement stated above--that they are identified with sufficient particularity to support the probability that the person would possess the information pleaded. *Indiana Elec. Workers' Pension Trust Fund IBEW*, 537 F.3d at 535 (5th Cir. 2008) [*23] (discussing *Higginbotham v. Baxter Intern., Inc.*, 495 F.3d 753 (7th Cir. 2007) (holding that, pursuant to the PSLRA, allegations from confidential

sources must be discounted, but not necessarily ignored, *post-Tellabs I*)). Recently, the Seventh Circuit distinguished *Higginbotham* and credited the testimony of confidential witnesses when:

> The confidential sources listed ... consist of persons who from the description of their jobs were in a position to know at first hand the facts to which they are prepared to testify... The information that the confidential informants are reported to have obtained is set forth in convincing detail, with some of the information, moreover, corroborated by multiple sources... the absence of proper names does not invalidate the drawing of a strong inference from informants' assertions.

*Makor Issues & Rights, Ltd. v. Tellabs Inc.* (Tellabs II), 513 F.3d 702, 712 (7th Cir. 2008) (noting that named sources would be preferable).

> 6  Confidential sources may be used, but, prior to *Tellabs I*, the Fifth Circuit adopted a Second Circuit test to determine whether they are appropriately described:
>
> > (1) if plaintiffs rely on confidential personal sources *and* other facts, their sources [*24] need not be named in the complaint so long as the other facts, *i.e.*, documentary evidence, provide an adequate basis for believing that the defendants' statements or omissions were false or misleading;
> >
> > (2) if the other facts, *i.e.*, documentary evidence, do not provide an adequate basis for believing that the defendants' statements or omissions were false, the complaint need not name the personal sources so long as they are identified through general descriptions in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source as

described would possess the information pleaded to support the allegations of false or misleading statements made on information and belief;

(3) if the other facts, i.e., documentary evidence, do not provide an adequate basis for believing that the defendants' statements or omissions were false and the descriptions of the personal sources are not sufficiently particular to support the probability that a person in the position occupied by the source would possess the information pleaded to support the allegations of false or misleading statements made on information and belief, the complaint must name [*25] the personal sources.

*Tchuruk*, 291 F.3d at 353.

## 2. Presumed Knowledge

In addition, pleadings of scienter may not rely on allegations that the defendants must have known of the misstatements based on their position within the company, even if they have a "hands on" management style. *Indiana Elec. Workers' Pension Trust Fund IBEW*, 537 F.3d at 535, 539-40. Likewise, allegations that the perpetrator of the fraud reported to one of the defendants are insufficient to establish scienter. [7] *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 828 (8th Cir. 2003) (holding that an allegation that someone involved in a fraudulent scheme reported to one of the named defendants was "not specific enough to support a strong inference that [the defendant] knew of or participated in the fraudulent practice while it was occurring"); *Indiana Elec. Workers'*, 537 F.3d at 542 (citing *Kushner); cf. Nathenson*, 267 F.3d at 424-25 (holding that an officer's position may create an inference of scienter when the company is a small, one product company and patent protection of the product is the source of the misstatements).

7   The Fifth Circuit dismissed a complaint against Bernard Ebbers of WorldCom because "the complaint [*26] here present[ed] what could best be described as allegations of

mismanagement of WorldCom's accounts receivable situation, perhaps even gross mismanagement, by several individuals in charge of handling the accounts rather than severe recklessness by Ebbers and Sullivan individually...." *Goldstein v. MCI WorldCom*, 340 F.3d 238, 254 (5th Cir. 2003).

## 3. Timing of Stock Sales

Plaintiffs contend that the individual Defendants sold millions of dollars of stock within several days for the May 7, 2007 announcement of TETRA's 2007Q1 performance. (Am. Consolidated Compl. "ACC" P 154.) Defendants argue that Plaintiffs ignore all of the stock sales other than those in May 2007 to create an artificial inference of scienter. Stock sales may suggest scienter, depending on their timing and amount. When a defendant makes regular stock sales or does not sell stock immediately following an alleged material misstatement, the court will not infer scienter. *Indiana Elec. Workers'*, 537 F.3d at 543-44. Only trading at suspicious times or in suspicious amounts is probative of scienter. *Abrams v. Baker Hughes, Inc.*, 292 F.3d at 434 (citing *In re Silicon Graphics Inc. Securities Litigation*, 183 F.3d 970, 987 (9th Cir. 1999)). [*27] In this context, "suspicious" means "sales that are out of line with prior trading practices or at times calculated to maximize personal profit." *Cent. Laborers Pension Fund v. Integrated Electrical Services, Inc.*, 497 F.3d 546, 552 (5th Cir. 2007) (quoting *Abrams v. Baker Hughes, Inc.*, 292 F.3d at 435). If the defendants sell only a small percentage of their stock during the class period, the sales do not contribute to an inference of scienter. *Cent. Laborers Pension Fund*, 497 F.3d at 553 (selling 4 percent of one's stock insufficient combined with continued ownership of a large amount of stock).

## 4. Post-class Statements

Defendants contend that Plaintiffs' post-class statements may only give rise to an inference of scienter if they are directly and cogently related, quoting *Lormand*, 565 F.3d at 254. Plaintiffs insist that several post-class statements imply that management knew of the problems with the production from reserves in the 2005 packages "from the start." *Rosenzweig v. Azurix Corp.*, 332 F.3d at 867, 868 n. 8. *Azurix* distinguished hindsight assessments from allegations that the management knew, at the time of the relevant occurrence, that the problems were already manifest. [*28] *Azurix*, 332 F.3d at 867-68

(holding that the post-class statements were insufficiently particular to satisfy the 9(b) and PSLRA pleading requirements).

### 5. GAAP and Sarbanes-Oxley violations

Defendants contend that Hertel was not on notice of any glaring irregularities or red flags such that his SOX verifications would support a strong inference of scienter. Allegations that the defendants failed to follow GAAP or published inaccurate accounting figures, without more, are not adequate to satisfy the scienter prong--such allegations must be coupled with allegations that lead to a strong inference of fraudulent intent to mislead investors. *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d at 534, 534 n. 3 (collecting cases); *Fin. Acquisition Partners LP*, 440 F.3d at 290 (citing *Fine v. Am. Solar King Corp.*, 919 F.2d 290, 297 (5th Cir. 1990)). On the other hand, securities fraud may be proved, even where improper accounting is alleged as the basis for misrepresentation, without showing violations of GAAP. *S.E.C. v. Seghers*, 298 Fed.Appx. 319, 331 (5th Cir. 2008) (not designated for publication). Similarly, Sarbanes-Oxley ("SOX") certifications do not, without allegations [*29] that the officer knew of glaring accounting violations or other red flags, establish scienter. *Indiana Elec. Workers' Pension Trust Fund IBEW*, 537 F.3d at 545 (citing *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006) with approval). The Fifth Circuit accepted as a "plausible" interpretation of the PSLRA that a defendants' SOX certification may raise an inference of scienter "if the person signing the certification had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions." *Cent. Laborers Pension Fund*, 497 F.3d at 555.

### D. Loss causation

Defendants contend that, because there were no corrective disclosures that contradict the Company's disclosures or describe the challenged patterns of alleged conduct that Plaintiffs allege, Plaintiffs have not adequately pled loss causation. Plaintiffs respond that the Fifth Circuit does not require a confession of fraudulent misconduct to satisfy the requirement of relatedness between the false statements and the disclosures causing the stock decline. Because the purported disclosures that establish [*30] loss causation relate to all the challenged

patterns of alleged conduct at once, the Court will address Plaintiffs' allegations of loss causation here rather than in the context of the challenged patterns of alleged conduct below.

The Exchange Act requires plaintiffs to plead loss causation, or a causal connection between the material misrepresentation and the loss. *Dura Pharm., Inc. v. Brodo*, 544 U.S. 336, 342, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005); *Catogas v. Cyberonics, Inc.*, 292 Fed. Appx. 311, 314 (5th Cir. Sept. 8, 2008) (not designated for publication). The plaintiffs must allege that the market responded negatively to a corrective disclosure; confirmatory information, information already known to the market, may not constitute a corrective disclosure. *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 663 (5th Cir. 2004). That is, the plaintiffs must allege enough facts to give rise to a reasonable hope or expectation that discovery will reveal a "facially plausible causal relationship between the alleged fraudulent statements or omissions and plaintiff's economic loss, followed by the leaking out of relevant or related truth about the fraud that caused a significant part of the depreciation of the stock and [*31] plaintiff's economic loss." *Lormand*, 565 F.3d at 258 (citing *Dura* and *Twombly*) (holding that statements related to churn and involuntary disconnection problems with its sub-prime credit classes were plausibly related to the alleged misstatements regarding the benefits of programs promoting sales to sub-prime credit classes). The Fifth Circuit does not prevent a plaintiff from alleging loss causation based on the partial or indirect disclosures of the truth, or disclosures by persons other than the defendants. *Lormand*, 565 F.3d at 261-63 (relying on disclosures by corporations involved in the same business, disclosures by the parent corporation, reports of expert stock analysts, and the defendant's discussion of the failures of the business program about which the defendant made material misrepresentations). Moreover, the disclosure need not reveal that previous information was fraudulent, only that it was wrong. *Alaska Electrical Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 2009 WL 1740648, at *7-*8 (5th Cir. 2009) (distinguishing the requirements for alleging loss causation from the requirements for alleging scienter).

Specifically, as to the Fluids Division's buyback program, [*32] Defendants contend that the corrective disclosure that purportedly "corrected and removed the inflation from TETRA's stock price" actually revealed that the high Fluids Division inventory was due to the

Company's decision to accelerate the purchase obligations under a high-price contract with a bromine supplier. Likewise, as to the 2007 forecasts for the Fluids' Division, Defendants contend that none of the disclosures purportedly reveals any foreseeable losses known at the time the forecasts were issued. As to Maritech's accounting for oil and gas properties, the alleged disclosures simply state that the Company recorded impairments in accordance with the successful accounting method. As to the hurricane-related claims, Defendants argue that Plaintiffs identify no statement related to Plaintiffs' allegation that TETRA delayed writing off the insurance receivables.

Plaintiffs respond that the August and October 2007 press releases were related to the challenged pattern of alleged conduct to inflate TETRA's stock price by falsely portraying the Company's prospects in these business areas even though the reasons given for the problems in fall 2007 were not necessarily truthful or complete. [*33] On August 3, 2007, TETRA announced a decrease in per share earnings for 2007Q2 and reduced the 2007 earnings guidance to $ 1.30-1.50/share (from $ 1.80-2.15 per share), but Hertel attributed the decrease to "transitory" reasons. TETRA stock fell 25 percent. (ACC P 129.) Plaintiffs contend that this release revealed a portion of the truth by disclosing flat onshore customer demand, insurance write-offs, and reduced production from the 2005 properties.

Specifically, in these releases, Hertel explained that the Fluids Division was impacted by higher inventory costs because of an existing purchase contract that the company was terminating and that earnings from the onshore fluids service business had not made up the difference because of exceptional rainfall in the Texas and southern Oklahoma markets. (ACC P 127.) Also in the August 3, 2007 press release, Hertel explained that delays in production from two offshore platforms meant that Maritech's production did not reach previously budgeted volumes. (ACC P 127.) In an earnings conference call later that day, Hertel repeated some of these statements and explained that Maritech had taken a write-off for insurance proceeds related to the 2005 [*34] hurricanes because the amount was in dispute with the insurance carrier. (ACC P 128.) On August 9, 2007, Defendants filed TETRA's 2007Q2 Form 10-Q that included the purported "admission" regarding the insurance claims that "the underwriters repeated their position that certain wells did not qualify as covered costs." (ACC P 131.)

Later, on October 16, 2007, when TETRA withdrew its 2007 earnings guidance, Hertel purportedly admitted accounting manipulations related to the insurance reimbursements when he explained "we also have a number of issues related to prior events. An example of this is where historical costs are currently represented as insurance receivables. Almost all of these types of issues have involved charges that impacted reported earnings, but which did not affect cash flow, in the then current period." (ACC P 133.) Hertel also explained that, as of October 2007, TETRA had $ 27.8 million in unreimbursed insurance receivables. (ACC PP 134-35.) TETRA also revealed that it would record impairments "in accordance with the successful efforts accounting method," a statement that Plaintiffs contend reveals what should have happened many quarters previously: all capitalized costs [*35] for non-producing properties would have to be expensed. (ACC P 136.)

Unlike scienter, the standard for loss causation is notice pleading guided by FED. R. CIV. P. 8. *Lormand*, 565 F.3d at 266-67 (rejecting the defendants' arguments that they had a more plausible alternative inference as to the proximate cause of the plaintiffs' economic loss). Consequently, Plaintiffs allege a facially plausible causal relationship between the purported misrepresentations as to the insurance reimbursements and their losses. Prior statements indicated that Defendants believed that most of the insurance receivables would be collected, including Misrepresentations 16-21, discussed below. Plaintiffs connect their losses to TETRA's announcement of the large write off associated with allegedly previously known but undisclosed difficulties with the insurance companies. By consistently omitting the information that the insurance receivables had already been disallowed and then revealing that the company had to write-off millions of dollars of receivables related to those insurance payments, Plaintiffs have plausibly suggested that a significant portion of the stock decline in the fall of 2007 may have been caused [*36] by a revelation of part of the truth about the collectibility of the insurance receivables. The Court need not reach the question of loss causation as to the other challenged patterns of alleged conduct because it finds that Plaintiffs have not adequately alleged facts giving rise to a strong inference of scienter.

**E. Forward Looking Statements**

Defendants note that forward-looking statements accompanied by cautionary language are not actionable because they are protected by the PSLRA "safe harbor" and the "bespeaks caution" doctrine. Defendants contend that the cases upon which Plaintiffs rely to render forward-looking statements actionable are distinguishable because those cases involve particular, detailed facts available to management that demonstrate that forecasts disclosed to investors were based on false information. *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920 (9th Cir. 2003); *Griffin v. GK Intelligent Sys., Inc.*, 87 F.Supp.2d 684 (S.D. Tex. 1999); *Rubinstein v. Collins*, 20 F.3d 160 (5th Cir. 1994). *Rubinstein* involved predictions about data about a new gas well when the defendants knew that test results should have given management [*37] reason to know that the test results were inaccurate. 20 F.3d 160 (5th Cir. 1994). *America West* and *Griffin* purportedly involve statements of current fact rather than forward-looking statements. *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 937 (9th Cir. 2003) (holding that statements about the present effect of a past violation are not forward looking); *Griffin v. GK Intelligent Sys., Inc.*, 87 F.Supp.2d 684, 686 (S.D. Tex. 1999) (holding that statements about an announced agreement that, in fact, did not exist, were not forward looking). In addition, Defendants contend that the cautionary language accompanying TETRA's disclosures was meaningful and substantive. Plaintiff contends that none of the assertions was wholly forward looking. In the alternative, Plaintiffs contend that Defendants knew that the predictions were false, lacked a reasonable basis and were belied by other facts, and the cautionary language was either boilerplate or failed to provide warning of applicable risks.

No person shall be liable under the securities laws for forward looking statements. 15 U.S.C. § 78u-5(c)(1)-(2). In general, under the safe harbor clause, [*38] a "forward-looking" oral or written statement is not actionable if (1) the statement is "identified as ... forward-looking ... and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially ...."; (2) it is "immaterial"; or (3) "the plaintiff fails to [plead] that the forward-looking statement ... was made with actual knowledge ... that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1)(A)-(B). *Lormand*, 565 F.3d at 243. Well-pleaded factual allegations that defendants knew their statements were false are sufficient to bar

application of the safe harbor clause. *Lormand*, 565 F.3d at 244; *Tellabs II*, 513 F.3d at 705 (noting that "indifference to the danger that a statement is false" is insufficient, citing, inter alia, 15 U.S.C. § 78u-5(c)(1)(B)(ii)).

A "forward looking statement" is:

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to [*39] the products or services of the issuer;

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission....

15 U.S.C. § 78u-5(i)(1); *Congregation of Ezra Sholom v. Blockbuster, Inc.*, 504 F.Supp.2d 151, 162 (N.D. Tex. 2007).

"'Meaningful cautionary language' cannot be boilerplate and must include substantive, company-specific warnings based on realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors." *Southland Sec. Corp.*, 365 F.3d at 372. *See, e.g. Lormand*, 565 F.3d at 244 (holding that the following is boilerplate: statements in its documents are "not guarantees of future performance ... and involve known and unknown risks and other factors that could cause actual results to be materially different from any future results expressed or implied by them."). [8] Meaningful cautionary language identifies "important factors that could cause actual results to differ materially from the forward-looking statements." *Harris v. Ivax Corp.*, 182 F.3d 799, 807 (11th Cir. 1999) [*40] (quoting 15 U.S.C. § 78u-5(c)(1)). If "reasonable minds could disagree as to whether the mix of information in the allegedly actionable document is misleading, the statutory safe

harbor provision cannot provide the basis for dismissal as a matter of law." *Lormand*, 565 F.3d at 248 (internal citations omitted).

    8   The Court notes that the language identified by Defendants as "Standard 2006 Cautionary Language" is similar to this rejected language in *Lormand*. TETRA's language is: "This press release includes certain statements that are deemed to be forward-looking statements. These statements are based on certain assumptions and analyses made by the Company in light of its experience and its perception of historical trends, current conditions, expected future developments and other factors it believes are appropriate in the circumstances. Such statements are subject to a number of risks and uncertainties, many of which are beyond the control of the Company. Investors are cautioned that any such statements are not guarantees of future performances and that actual results or developments may differ materially from those projected in the forward-looking statements. Some of the factors that [*41] could affect actual results are described in the section titled 'Certain Business Risks' contained in the Company's ... Form 10-K for ... 2005, as well as other risks identified from time to time in its reports on Form 10-Q and Form 8-K..." (Doc. No. 45, Ex. 8, at Ex. 99.1, p. 4.) As this language explicitly incorporates risk factors identified in other SEC filings, the Court considers below whether these factors may provide meaningful cautionary language.

Oral statements are not actionable if they are accompanied by an "oral statement that additional information concerning factors that could cause actual results to materially differ from those in the forward-looking statement is contained in a readily available [identified] written document or portion thereof." 15 U.S.C. § 78u-5(c)(2). Reasoning by analogy, federal district courts in Texas have held that incorporated language from SEC filings may protect forward-looking statements in other written statements. *See, e.g., Home Solutions of Am. Investor Group v. Fradella*, No. 3:06-cv-1096-N, 2008 U.S. Dist. LEXIS 33425, 2008 WL 1744588, at *6 (N.D. Tex. Mar. 24, 2008); *In re Blockbuster Securities Litigation*, No. 3:03-cv-0398-M, 2004 U.S. Dist. LEXIS 7173, 2004 WL 884308, at *4 (N.D. Tex. Apr. 26, 2004). [*42] The

"bespeaks caution" doctrine, similar to the PSLRA safe harbor provision, survived enactment of the PSLRA and protects optimistic projections accompanied by cautionary language. *In re Securities Litigation BMC Software, Inc.*, 183 F.Supp.2d 860 (S.D. Tex. 2001) (holding that the doctrine can protect alleged misstatements even when the cautionary language is not contained in the same document as the alleged misstatement when the cautionary language is sufficiently related in time and substance to the purported misstatements). *See also Kurtzman v. Compaq Computer Corp.*, No. Civ. A H-99-779 et al., 2002 U.S. Dist. LEXIS 26569, 2002 WL 32442832, at *23 (S.D. Tex. Mar 30, 2002) (citing *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1122 (10th Cir. 1997) for the proposition that cautionary language that does not appear in the same document as the forward-looking statement is less effective).

## IV. Application to TETRA's Challenged Patterns of Alleged Conduct

In the following alleged misstatements [9] Plaintiffs specifically identify the speaker, when and where the statement was made, and why the statements are allegedly misstatements. The facts that purportedly render these statements are false, provided by the confidential witnesses [*43] and by post-class statements made by the individual Defendants, are discussed below. Each set of statements is provided followed by Plaintiffs' explanation as to why they are material misstatements.

    9   Because this is a Motion to Dismiss, the following are referred to throughout the Order as "misstatements" followed by the numbers assigned below.

1. On November 3, 2006, Defendants issued a press release that included statements about WA&D's 2006Q4 revenues and profits and discussed the timing of insurance reimbursements as a possible source of profit, though they noted that $ 2.2 million in pretax earnings were eliminated until they were reviewed by the underwriter. (ACC P 90.)

2. The same press release discussed Maritech's pretax earnings and explained that earnings increases of 803 percent over 2005Q3 levels reflected production increases from acquired properties. TETRA predicted that the same factors that raised earnings over 2006 would bode well for production in 2007. (*Id.*)

3. The same press release describes the 152 percent increase over 2005Q3 pretax earnings from the Fluids Division as a result of the absence of hurricane downtime, price increases, and the rapid increase in domestic [*44] and international onshore markets. In this release, Defendants predict that inventory profits should decline throughout 2006 and 2007, but overall, they predict earnings growth in 2007 and note that the domestic onshore business continues to grow rapidly. (*Id.*)

Plaintiffs allege these statements were materially misleading because the reports about record earnings are not the result of legitimate business operations, but instead were the direct result of Defendants' challenged pattern of alleged conduct to manage earnings in the Fluids and WA&D Divisions (including Maritech) by manipulating TETRA's successful efforts accounting method, failing to recognize expense for weather delays, and inflating Fluids Division revenues and writing up inventory pursuant to TETRA's buyback program. Furthermore, the statement about the onshore business was purportedly misleading because demand for onshore customers was flat. In addition, Plaintiffs contend that Defendants' statements about the timing on insurance reimbursements was false because Defendants already knew that the claims had been returned as "not allowed." (ACC PP 91-94.)

4. On January 3, 2007, Defendants issued a press release announcing [*45] earnings guidelines for 2007 in which Hertel explained that some WA&D profits were deferred until an insurance payment expected in 2007 and that TETRA incurred substantial costs "'waiting on weather' on turn-key platform decommissioning contracts (this work was essentially completed in December)." (ACC P 95.)

5. Also in that press release, Hertel explained that the existing and potential market for WA&D Services in the Gulf of Mexico is larger than previously experienced and WA&D has acquired new equipment and secured a number of contracts. Defendants aver that the dramatically improved profitability guidance for WA&D reflects these among other factors. (ACC P 95.)

6. The January 3, 2007 press release also discusses Maritech's anticipated growth from bringing storm damaged production back onstream and an expected $ 52 million of well abandonment and decommissioning work in 2007. The company predicted that significant exploitation capital expenditures for 2007 would materially impact 2008 and beyond but not substantially affect 2007 production. (ACC P 95.)

7. The same press release repeated expectations that the Fluids Division and associated markets would improve in 2007 from investments [*46] in expanding domestic and international markets and that this growth bodes well for longer-term Fluids Division profits. (ACC P 95.)

Plaintiffs contend that these statements were false and misleading for many of the same reasons discussed above: TETRA knew that its insurer had disallowed the claims so that deferred "profits" for WA&D would not be collectible. In addition, the statements about WA&D were misleading because the majority of the 2005 properties had already been exploited and would soon be abandoned. These statements were also misleading because the hurricane repair work would lead to losses rather than profits because of the lack of reimbursement from the insurance companies. As to Maritech, the statements were allegedly misleading because Maritech's properties had already been exploited and Defendants manipulated the successful efforts accounting method. Finally, the Fluids' Divisions earnings were misleading because 80 percent of Fluids Division profits were attributable to the wrongful accounting of the buy-back program including the inflation of revenues and the write-up of inventory and because the onshore market was flat. (ACC PP 96-99.)

8. On January 3, 2007, Hertel [*47] and another TETRA officer held a conference call and again stated that they could not record insurance proceeds until they have been paid and that anticipated 2007 Maritech volumetric production gains were expected from expenditures made in 2006 and 2005. (ACC P 100.)

These statements are allegedly misleading for the reasons described above.

9. On February 28, 2007, Defendants announced record 2006 earnings of $ 1.37 per share and announced a 31-57 percent increase over its 2006 earnings guidance for 2007. (ACC PP 101.)

10. Discussing the earnings report and 2007 guidance, Hertel explained that "the ability to generate incremental reserves out of older, mature properties is the primary reason that we are projecting improving profits

for Maritech in 2007...." (ACC P 102.)

Plaintiffs aver that these statements were false and misleading because Defendants knew that Maritech had already exploited the most attractive 2005 properties and Defendants were facing a complete write-off of these properties. In addition, Plaintiffs contend that these statements are misleading because of the manipulation of the successful efforts accounting method through which Defendants avoided recognizing costs associated [*48] with decommissioning the wells and avoided recognizing current expense. (ACC P 103.)

11. Also on February 28, 2007, Hertel and McCarroll held an earnings conference with analysts in which Hertel explained that TETRA had completed some Maritech work for which it could not reflect profits because the insurer had not yet paid. In addition, Hertel explained that Maritech had an excellent 2006, increased its proven reserves after producing 16 Bcf equivalents, and the new reserves should allow an increase in total profits in 2007. (ACC P 104.)

Plaintiffs argue that these statements are misleading because Defendants later admitted that Maritech had exploited the most attractive properties first and the "proven" reserves had been depleted already. Plaintiff reiterates that Maritech's 2007 profitability was misleading because of manipulation of the "successful efforts" accounting methods. (ACC P 105.)

13. On February 29, 2007 [10], TETRA filed its 2006 Form 10-K that included TETRA's balance sheet and explained the accounting rules that applied to the 10-K, including that TETRA periodically evaluates its estimates including the collectibility of accounts receivable and the current cost of future [*49] abandonment and decommission obligations and basis its estimates on reasonable historical experience and future expectation. (ACC PP 106-107.)

10   The Complaint uses the date February 29, 2008, but the Court assumes this date is actually 2007 as it reports on 2006 year-end numbers. The 2006 Form 10-K listed its filing date as March 1, 2007. (Doc. No. 52, Ex. 1.)

14. The 2006 Form 10-K also describes the method by which Maritech accounts for its oil and gas properties: Maritech accounts for its interests using the successful efforts methods where costs, including those for unsuccessful development wells "are capitalized and costs related to unsuccessful exploratory wells are expensed as incurred." In addition, capitalized costs are recorded by field and depleted on a unit-of-production basis, based on the estimated remaining proved oil and gas reserves of each field. The properties "are assessed for impairments in value whenever indicators become evident and any impairment is charged to expense." The Form described decommissioning liabilities as estimates based on third-party market values to plug and abandon the wells and to generally decommission the pipelines and platforms and clear [*50] the sites. (ACC P 108.)

15. The 2006 Form 10-K specifies that TETRA reviews its decommissioning liabilities "whenever indicators suggest that either the amount or the timing of the estimated cash flows underlying the liability have changed materially." The 10-K also describes procedures for revenue recognition for turnkey contracts, valuing reserves for bad debts from oil and gas exploration and production companies, and accounting for acquisitions of the TETRA businesses. (ACC P 108.)

Plaintiffs contend that figures associated with the 10-K were misstated in violation of GAAP and the description of the accounting rules included false and misleading statements and omissions with respect to TETRA's actual accounting practices. (ACC P 108.) These challenged patterns of alleged conduct are fleshed out below in ACC P 119, summarized below.

16. The 2006 Form 10-K described accounting for insurance reimbursements and reported both $ 5.2 million of repair costs that the Company did not believe will be reimbursed, as well as a $ 9.2 million gain associated with insurance proceeds in excess of the net carrying value of the destroyed assets. TETRA notes "The Company believes that substantially [*51] all of the repair and well intervention and debris removal costs associated with the hurricane damage, other than the applicable deductibles and the amount charged to earnings discussed above, will be covered under the company's various insurance policies." (ACC P 109.)

17. The 2006 Form 10-K also explains that, in the last half of 2006, the insurance claims adjuster did not have enough information to conclude that the well intervention costs for qualifying wells would qualify as covered costs, but "the Company believes that well intervention costs being questioned by the underwriters will qualify for reimbursement under its insurance

policies and are probable of collection." In addition, the Company indicated its belief that debris removal costs, in excess of the policy limit for removal of debris with the three destroyed platforms, is available under an August 2005 endorsement although TETRA acknowledged that the underwriters questioned whether this endorsement provides additional coverage. (ACC P 110.)

18. In the footnotes to the 2006 Form 10-K, the Company states its belief that "the significant majority of hurricane repair costs, including the well intervention and debris removal [*52] costs associated with the three destroyed Maritech platforms, is covered pursuant to the Company's various insurance policies." The Company reported that $ 57.9 million of hurricane related costs had already been reimbursed during 2006 and $ 12.5 million in the early parts of 2007. (ACC P 111.)

19. These footnotes explain that the net book value of destroyed assets covered by the Company's insurance policies are included in accounts receivable and that these amounts were $ 12.8 million as of December 31, 2005 and $ 64.5 million as of the end of 2006, including non-storm related insurance claims. The company stated its belief that it will be reimbursed related to repair costs for the destroyed assets. (ACC P 111.)

20. The Company also anticipated $ 27.9 million included in accounts receivable related to well intervention costs related to three destroyed Maritech offshore platforms. The Company stated its belief that all of the well intervention costs were probable of collection. (ACC P 111.)

21. Likewise, the Company reiterated its belief that debris removal and other costs qualify for reimbursement under an endorsement obtained in August 2005 even though it noted that the underwriters [*53] questioned whether there is additional coverage provided under this endorsement for the cost of removal of the platforms. (ACC P 111.)

Plaintiffs contend that these statements are misleading with respect to hurricane repair expenses and insurance reimbursements. (ACC P 111.)

22. The 2006 Form 10-K explained that the cash outflow to extinguish Maritech's total decommissioning liability would occur shortly after the end of each property's productive life. It also explained that the timing of the cash outflows is estimated based on future

oil and gas production and the resulting depletion of the company's oil and gas reserves. (ACC P 112.)

Plaintiffs aver that this statement is misleading because it suggests that there will be cash outflow from the 2005 properties for several years. (ACC P 112.)

23. The 2006 Form 10-K explained that determination of impairments on long-lived assets is based on the future estimated cash flows from the Company's proved, probable and possible reserves. (ACC P 113.)

Plaintiffs allege that this statement was misleading with respect to the facts underlying Maritech's oil and gas impairments.

24. The 2006 Form 10-K explained that Fluids' revenues are recognized "only [*54] when collectibility is reasonably assured." (ACC P 114.)

Plaintiffs argue that this statement is misleading with respect to revenue recognition for the Fluids' Division.

25. The 2006 Form 10-K contained statements about costs of product sales and costs of services that includes operating expenses. The Form 10-K also explains that depreciation, depletion, amortization and accretion include depreciation expense for all of the Company's facilities. (ACC P 115.)

Plaintiffs contend that these statements are false and misleading as they apply to Fluids, WA&D expenses incurred on Maritech's properties and Maritech's expense recognition.

26. The 2006 Form 10-K describes TETRA's process for accounting for asset retirement obligations and explains that these asset retirement obligations are the estimated fair value for retiring these assets and are capitalized as part of the asset accounting. The costs are then depreciated on a unit of production basis for oil and gas properties. It then reports that TETRA acquired $ 6.9 million in liabilities and incurred $ 2.8 million in retirement of obligations during 2006. (ACC P 116.)

Plaintiffs contend that this is a misleading account of asset retirement [*55] obligations as applied to Maritech properties.

27. The 2006 Form 10-K describes costs incurred in oil and gas property acquisition including $ 115 million

in capitalized costs for proved properties acquired in 2005, and $ 187 million of proved developed properties being amortized in 2005. TETRA explains that the capitalized costs of properties include the properties' proportionate share of liabilities relating to these properties. It also describes the depreciation, depreciation, and amortization for 2006 as $ 38 million and the impairments of properties as zero for 2006. The 10-K provides the definition for "proved" oil and gas reserves. The 10-K also describes the standardized measure of discounted future net cash flows including $ 752 million for discounted future net cash flows relating to proved oil and gas reserves for 2006, including $ 244 million for production and $ 196 million for development and abandonment. (ACC P 117.)

28. The Form 10-K includes the standard Sarbanes-Oxley certification, signed by Hertel.

Plaintiffs aver that the 2006 Form 10-K balance sheet is false and/or misleading because of the challenged patterns of alleged conduct described previously. For example, [*56] some of the WA&D expenses are improperly treated as insurance receivables, Fluids Division inventories are misstated because sales returns are recorded as inventory rather than sales credits to customers. They contend that, as the flip side of the improperly recorded Fluids inventories, the Fluids Division's income statement included inflated product sales because Fluids failed to report customer credits as sales returns and allowances and COGS were understated for Fluids inventory write-ups. Fluids revenues were recognized even though the Company agreed to provide credit for the buy-back program so revenues were recognized even though collection was not "reasonably assured."

In addition, as to WA&D, the cost of services was understated because WA&D failed to report expenses for weather downtime. In addition, Plaintiffs contend that the amounts for Maritech DD&A were understated because of abuses of the successful efforts method and the false assumption that the cash flows from the 2005 properties would continue for several years. They also contend that the insurance reimbursement statements were misleading because facts relating to the 2006 disallowances were not discussed.

Plaintiffs [*57] reiterate that TETRA had not adjusted the reported balances for Maritech's 2005 property "impairments" even though they knew the

properties were unproductive or largely depleted, decommissioning liabilities were not adjusted up, and Defendants had not expensed the costs of unsuccessful wells as represented in the Critical Accounting Policies and Estimates. Plaintiffs also contend that acquisition cost allocations for the 2005 purchases were made to fields without proven reserves. Impairments were not assessed on the basis of true reserves because the 2005 properties did not have a productive life of more than 3 years. The Maritech properties did not consider the assets' "useful life" because the assets were already exhausted; they were not depreciated in a straight-line basis.

29. On May 7, 2007, TETRA issued a press release and represented that WA&D Services profits were up 712 percent over profits in 2006Q1. It also explained that production volumes for Maritech were lower than forecasted in the 2007 guidance but that Maritech is attempting to accelerate exploitation activities planned for later in the year to offset a near-term production shortfall. (ACC P 120.)

30. In an earnings [*58] conference that day, Hertel explained that TETRA was experiencing unprecedented growth because it was: constructing a new fluids plant to reduce COGS for completion fluids, terminating a supply agreement for some products, experiencing heartening WA&D performance. TETRA noted that a production shortfall for Maritech could be remedied by moving forward several projects. (ACC P 121.)

31. Hertel explained that WA&D revenues should increase and Maritech production was only 3 or 4 months out of sync with the levels that were indicated previously. (ACC P 122.)

Plaintiffs contend that these statements are misleading because Maritech's oil and gas properties were exhausted so there was a permanent volumetric shortfall, WA&D expenses were increasing because TETRA's insurer was not going to reimburse costs on Maritech properties and Fluids' high inventories were falsely stated and the buy-back program concealed. (ACC P 123.)

32. On May 10, 2007, Defendants filed TETRA's 2007Q1 Form 10-Q and reiterated several statements of previous forms including communications from the insurance adjusters, reiterated false and misleading accounting figures, and repeated the false and misleading statement that [*59] TETRA continued to expect cash

flow from the 2005 properties over several years. (ACC PP 124-25.)

Plaintiffs contend that these statements are false for the reasons described above.

## A. Successful Efforts Accounting for Oil and Gas Properties

In 2005, just prior to Hurricanes Katrina and Rita's landfall, Maritech purchased three "packages" of economically unproductive oil and gas wells in the Gulf of Mexico, for $ 23.1 million cash up-front with decommissioning liabilities (the cost to dismantle the oil or gas wells when they were depleted or abandoned, known as asset retirement obligations or "AROs") of $ 94.6 million ("2005 properties"). [11] (ACC PP 2, 33-34.) Defendants purportedly recorded the packages on their books using the "successful efforts" accounting method, which requires the immediate expensing of the cost of non-productive or uneconomic wells. [12] (ACC P 36.) Plaintiffs allege that acquisition costs and the associated abandonment and decommissioning liabilities were allocated to unproductive wells. (*Id.*) In this manner, instead of properly accounting for the wells using the "successful efforts" accounting method, Defendants allegedly delayed the recognition of depreciation, [*60] depletion, and amortization ("DDA") expenses as they worked the wells in 2006. Instead, Defendants allegedly wrote these expenses off as impairments near the end of 2007. Plaintiffs claim that Defendants misrepresented the profitability of the WA&D Division that include Maritech. TETRA reported an "impairment" charge of $ 70 million for the abandonment of properties purchased in 2005 and Maritech reported a $ 71 million total loss in 2007. (ACC P 3.)

11   As this is a Motion to Dismiss, Plaintiffs' alleged facts are taken as true. To the extent that the following are consistent with Plaintiffs' explanation of TETRA's accounting conduct, the Court provides Defendants' explanation of the some of the accounting terms used throughout the Order: Defendants explain that when a well is purchased, the abandonment and decommissioning obligations are recorded as asset retirement obligations ("AROs"). Over time, these AROs are reduced as cash is spent on abandonment work and have no effect on profit or income. In addition, the portion of acquisition costs assigned to the producing fields is amortized

over time and is expensed as "depreciation, depletion or amortization" ("DDA"). Low producing fields [*61] are allocated little or none of the purchase price of the field. Impairment costs are recorded against income when the Company determines that production at a particular field is no longer possible or profitable. (Def. Reply, at 5-6.)

12   Defendants contend that TETRA's accounting policy was actually to account for its properties by field rather than by well so that the decision to write off a given field is based on the whole field rather than individual wells. (Def. Reply at 4.) (citing Doc. No. 445, Ex. 29, at 26-27.)

Defendants contend that Plaintiffs misstate GAAP and TETRA's accounting methods to allege their supposed misstatements. Defendants note that TETRA accounts for its properties by field, so that the decision to write off a field is made based on the field as a whole. Consequently, even if many of the wells in the field are unproductive, the field need not yet be written off. In addition, Defendants contend that Plaintiffs misconstrue purchase price allocation under GAAP. They aver that the acquisition cost of a package of fields is allocated based on the fields' realizable reserves or production so that fields with minimal cash flow are allocated little or none of the purchase [*62] price. In this manner, Plaintiffs' contention that Defendants failed to immediately expense costs associated with low performing fields is allegedly wrong. Likewise, Defendants explain that AROs are recorded when fields are acquired and when they are reduced, they do not result in a charge against income or impact profit (unless the actual ARO costs exceed the recorded liability). Moreover, they contend that SFAS No. 143 requires AROs to be recorded at present value so that the AROs carried on the books will often understate the expected future cost.

Defendants also contend that certain of the purported misstatements related to the successful efforts accounting challenged pattern of alleged conduct are protected by the PSLRA safe harbor. For example, as related to Misstatement 2, in its 2005 10-K, TETRA explains that estimating reserves is complex, and the estimates of oil and gas reserves may be significantly incorrect. Moreover, Maritech may continue to experience significant revisions to its reserve estimates because reserve estimates are:

to some degree subjective, each of the following items may prove to differ materially from that assumed in estimating reserves: the quantities [*63] of oil and gas that are ultimately recovered; the production and operating costs incurred; the amount and timing of future development and abandonment expenditures; and future oil and gas sales prices. Furthermore, different reserve engineers may make different estimates of reserves and cash flow based on the same available data.

(Doc. No. 45, Ex. 3, at 16.) Plaintiffs contend that the statement that Maritech's earnings increased 803 percent, a statement of past fact, is false and therefore cannot be protected by the safe harbor. As to the part of Misstatement 2 in which TETRA avers that 2007 production would do similarly well in the future, Defendants' purported meaningful cautionary language does not warn that revenues and earnings may be significantly revised because the company was improperly allocating acquisition costs to non-producing fields or intentionally understating AROs in order to manage the reporting of expenses (see also Misstatement 5). While the language notes that reserve engineers' estimates may reasonably differ as to reserves, taking all inferences in favor of Plaintiffs, if, as Plaintiffs allege, Defendants knew that the fields would have to be written off well [*64] before they were, the PSLRA safe harbor provides no protection. Misstatements 14, 15, and 26 are related to how TETRA performs its accounting rather than predictions of future results. Likewise, Misstatements 5 and 13 are not protected to the extent that Plaintiffs have adequately alleged that Defendants knew that recorded AROs were too low and depreciation expenses were written off too slowly. The Fifth Circuit has clarified that, in cases where defendants knew that their statements were misleading at the time they were made, the safe harbor provision is inapplicable. *Lormand*, 565 F.3d at 244 (citing 15 U.S.C. § 78u-5(c)(1)(A)-(B)); *Tchuruk*, 291 F.3d at 359.

Even though the analysis of scienter requires courts to find a strong inference of scienter, this weighing is not appropriate when addressing whether Plaintiffs have alleged misstatements. Assuming that the successful efforts accounting method does require the cost of

non-productive wells to be immediately expensed and that, as Plaintiffs allege, costs were allocated to unproductive wells and fields without reserves and then expensed en masse in 2007 in an action called an "impairment," Defendants may have materially misstated [*65] the revenues, profits and assets of WA&D in several of its disclosures by failing to expense these non-productive wells and by under-booking the AROs for these fields not in accordance with SFAS 143. (ACC P 119.) The $ 70 million impairment, purportedly related to the misstatements regarding the accounting of non-productive wells and underbooking AROs, is plausibly material because an investor would have considered that this omission altered the basic mix of information--the impairment equaled Maritech's revenues for the previous year. Plaintiffs allege the connection between the $ 70 million restatement and the allegedly improper accounting practices.

Assuming that Plaintiffs have pled a material misstatement, and leaving aside some problems with Plaintiffs' failure to plead the fraudulent scheme with particularity that are addressed below, the Court now turns to the scienter prong. As to whether Plaintiffs have adequately alleged scienter as opposed to only negligent or innocent misrepresentations, Plaintiffs provide the statements of the CWs, post-class statements, the individual Defendants' stock sales, and purported GAAP and SOX violations.

CW 5 is described as an accounting manager [*66] from April 2006 until June 2007 who reported to Maritech's CFO. (ACC P 71.) CW 5's allegations relate to the challenged patterns of alleged conduct at WA&D including the write-offs of the 2005 properties, the purported successful accounting method flaws, and the insurance reimbursements. Based on the job description provided, it is probable that CW 5 had personal knowledge of the concern expressed by staff at the CFO's weekly meetings regarding the asset retirement obligations for abandoned and decommissioned wells. CW 5 contends that he knew that ARO costs exceeded the liability on the books, but the alleged fact that Maritech's CFO knew that the ARO costs were "large" does not suggest that he knew that they were recklessly or intentionally underbooked or how they were underbooked. Although one could infer that the CFO heard these concerns about AROs, CW 5 does not contend that the CFO shared these concerns. The CFO allegedly participated in meetings with two other high

level TETRA officials, but it is not clear that, if he shared the concerns with the AROs, he repeated them to these TETRA officials. CW 5 also does not allege that any individual Defendants who made alleged misstatements [*67] knew of the alleged problems with the non-productive wells that were allocated part of the purchase price, but not expensed.

CW 4 is described as a senior joint interest billing accountant from December 2005 until September 2007 who handled billing of costs, accounts receivable, and other accounting. (ACC P 62.) She reported to Maritech's controller. (*Id.*) CW 4 alleges that Maritech did not have many properties being drilled and that the successful efforts accounting method meant that non-performing properties were written off immediately. Based on CW 4's position as a billing accountant during most of the Class Period, the Court finds it probable that she was in a position to know this information firsthand. CW 4 does not, however, allege that anyone at the company knew that other properties should have been written off. [13] In addition, she asserts her own belief that Maritech was not keeping up with FAS 143 or that its plug and abandon costs, but she does not explain how that accounting was improper and does not aver that she shared these concerns with others such that her allegations may allow a strong inference of scienter about these supposed problems.

> 13   The end of ACC P 69 appears [*68] to have been cut off.

CW 1 is described as the vice president of operations at Maritech who reported to the president of Maritech, then McCarroll. (ACC P 45.) Defendants contend that Plaintiffs do not plead that CW 1 held a position that allowed him personal knowledge of the accounting decisions and particularities involved in writing off a well. CW 1 describes a property, Sabine 12, that was allegedly not performing well, and claims that "new engineers" had determined that the reserves of other properties were overestimated, specifically East Cameron 305 and others at the Vermillion locations. Plaintiffs concede that CW 1 was only involved with accounting for Maritech and TETRA from the "fringes." (ACC P 53.)

Defendants contend that CW 1's statements about reserves are speculative because CW 1 is not a reserve engineer. *See, e.g., Wieland v. Stone Energy Corp.*, No. 05-2088, 2007 U.S. Dist. LEXIS 76636, 2007 WL

2903178, at *5 (W.D. La. Aug. 17, 2007) (holding that statements from a production manager and reservoir engineers who had knowledge regarding the way proved reserves were calculated, and how and why the reports deviated from SEC requirements, were sufficient to conclude that they would possess the information [*69] they allege). CW 1 does not assert that he is familiar with the reserve process, but instead relies on reports by the new engineers. On one hand, he is described as a vice president who speaks to McCarroll. On the other hand, even if he did have personal knowledge of the information, the purported fraud is not described with particularity--CW 1 does not specifically allege that the reserves were intentionally overestimated or by how much they were overestimated. Plaintiffs also do not plead that McCarroll or other officers knew of the overestimation. Even if CW 1 had responsibilities or job descriptions suggesting that he would understand the accounting problems at a particular well or field, CW 1 explains that reserves were overstated but does not provide the alleged discrepancy between actual and underreported reserves.

Defendants aver that Hertel's post-class statements are not an admission that he previously knew that the properties written off had already been largely exhausted. They also contend that the statement that TETRA exploits the most attractive properties first, suggests only that TETRA accesses the most attractive properties first, not that these same properties were [*70] largely exhausted. Plaintiffs suggest that the post-class statements imply that Hertel knew, at least by February 28, 2007, that his statements that Maritech had actually increased its proven reserves for the 2005 packages and that the new reserves should allow Maritech to increase total profits in 2007, were false and misleading.

In the November 5, 2007 earnings call, Hertel explained:

> Maritech produces profits by actively exploiting properties that it acquires. The last packages ... of properties purchased by Maritech were pre-Rita and Katrina. The inventory of exploitable operations in these older purchases has dwindled during the last 29 months.

(ACC P 138.) Defendants explain that "develop" and "exploit" are synonyms. That is, developing a field is not

the same as "exhausting" its reserves.

In an earnings call in January 14, 2008, Hertel stated that the company attempts to exploit the most attractive properties first and that "the remaining exploitable opportunities after three years are generally quite lean in the economic area." (ACC P140.) Likewise, in that press release, Hertel explained that "by 2007, most exploitation projects, generated out of 2005 acquisitions, had diminishing [*71] return potential. This is one of the primary reasons that Maritech's DD&A grew more rapidly than did its operational pretax profits in 2007." (ACC P 139.) Then, in 2007Q4, TETRA allegedly reported an "impairment" charge for the abandonment of the 2005 package of more than $ 70 million. (ACC P 141.)

Acknowledging a diminishing return potential is not the same as acknowledging that the field is largely exhausted. Acknowledging a diminishing return potential is also not inconsistent with a belief that new reserves would allow Maritech to increase total profits. Likewise, acknowledging that there are fewer operations to develop is not an admission that the fields are largely exhausted. Likewise, in *Barrie v. Intervoice-Brite, Inc.*, even though the plaintiffs pled that the defendant contended that the company was focusing on its sales momentum while, in fact, sales were slowing, this was insufficient to plead a misrepresentation (much less a post-class admission of scienter) because a diminishing sales force is not inconsistent with a focus on sales momentum. 397 F.3d at 260. Consequently, these statements do not appear to allow an inference of scienter as to Hertel or TETRA. In addition, [*72] Hertel's other post-class statements do not add much to the analysis of scienter. Hertel stated that he would like to address the ARO issues to the extent that "we can get things cleaned up" even though he recognized "it's not like the old days.... You can't just set up reserves against something you have an issue with." (ACC P 156.) The phrases describing cleaning up the AROs or addressing issues do not suggest that Hertel knew that officers within his company were committing intentional or severely reckless fraud sufficient to create a strong inference of scienter. Drawing that inference is not equally plausible as Defendants' theory that Hertel was accurately describing the business or even that he was providing hindsight analysis of problems that had occurred.

Lastly, Defendants contend that Hertel's stock sales do not permit a strong inference of scienter. They argue that his sales in May occurred well before the alleged partial disclosure of the "fraud" in August and October 2007 and, therefore, the sales were not suspiciously timed. In addition, Hertel allegedly sold his options before they were set to expire in September and October 2007 and while they were well in the money. [*73] Defendants aver that the May 7, 2007 Form 8-K disclosed several pieces of bad news, including a $ 30 million reduction in Fluids Division's profits and delayed production at two Maritech properties. Moreover, Defendants contend that Hertel owned more stock after the Class Period than he did when the period began. Hertel's stock sales as provided to the SEC suggest that each year, he chose a specific month to exercise his stock sales, although not always the same month. That he conducted a large amount of activity in one month, therefore, appears nonsuspicious. The month he choose, however, does allow some suggestion of scienter. The options Hertel exercised were set to expire in the fall of 2007 not in the summer. The magnitude of his sales in 2007, over $ 12 million, was about $ 3 million more than the year before which was, in turn, more than $ 2 million more than the prior year. This increase does not seem particularly suspicious. Lastly, his stock ownership increased over the Class Period.

Plaintiffs aver that both Hertel and Symens dumped tens of millions of dollars of stock within days of the May 7, 2007 announcement of the 2007Q1 performance, which was the last group of laudatory [*74] comments about TETRA's earnings growth and prospects in general. In addition, Plaintiffs contend that one may infer scienter because Hertel identified June 2007 as the month in which TETRA's fortunes turned--therefore the insiders sold before the market learned of TETRA's reversal. Construing all facts in favor of Plaintiffs, the magnitude of the sales in May 2007, ahead of the purported disclosures in August and October and the turn around in June 2007, provides facts that may be used as motive and opportunity allegations to create a slight inference of scienter.

Even combined with Hertel's stock sales in May 2007, however, the allegations of scienter as to the accounting methods are insufficient to raise a strong inference of scienter as to the challenged patterns of alleged conduct surrounding the successful efforts accounting and recording of reserves and costs at the WA&D Division. Even if there were problems with the

accounting, and it is not clear that the CWs allege that there were, neither the post-class statements nor the CWs allege that any particular Defendant knew of these problems and then fraudulently concealed them. The CWs' allegations, even combined with the post-class [*75] statements and the stock sales do not render Plaintiffs' challenged pattern of alleged conduct as plausible as an innocent inference that Defendants did not knowingly mislead their investors. Defendants' misrepresentations as to this challenged pattern of alleged conduct will not support a § 10b-5 claim.

## B. Write off of the 2005 Maritech Properties

Although closely related to the allegations relating to the successful efforts accounting, Defendants also contend that Plaintiffs have not properly alleged securities violations claims for relief related to the reserves of the 2005 properties and their eventual write off.

Beginning with the 2006Q3 performance and guidance, TETRA issued a press release that explained that "Maritech's performance ... reflects production increases derived from the acquired properties, reworking older wells and new drillings. These same factors should bode well for production into 2007." [14] (ACC P 90.) The January 3, 2007 conference call included statements that Maritech's production would increase because of expenditures made in 2005 and 2006 to exploit properties. (ACC P 100.) On February 28, 2007, Hertel explained that Maritech had an excellent 2006 because it [*76] increased its proven reserves to 93 Bcf after producing 16 Bcf equivalents and the new reserves should allow an increase in total profits in 2007. In addition, discussing the earnings report and 2007 guidance, Hertel explained that "the ability to generate incremental reserves out of older, mature properties is the primary reason that we are projecting improving profits for Maritech in 2007...."

> [14] As the Court discussed above, with respect to the purportedly meaningful cautionary language related to Misstatement 2, the language cautions against uncertainties in reserve estimates, but does not warn against the behavior alleged by Plaintiffs: the purported decision to falsely tout the production capacity of properties that the Company allegedly knows it will have to soon write off.

Defendants contend that they did not make false statements as to Maritech's oil and gas properties: they claim that Plaintiffs essentially allege that reserves could not have "actually increased" when certain fields were about to be written off. Relying on SEC filings, Defendants respond that TETRA reasonably expected 2007 production to exceed 2006 production because storm-damaged parts of the 2005 package of [*77] properties were scheduled to come back onstream. (Doc. No. 45, Ex. 7, at Ex. 99.1, p.3.) Maritech, however, experienced unexpected delays for two properties that were drilled in late 2006. (Doc. No. 45, Ex. 9, at Ex. 99.1, p.3.) Defendants allege that TETRA channeled its development expenditures into existing properties and then, after the Class Period, into new properties Maritech purchased once it determined that it no longer had sufficient capital to develop the remaining undeveloped properties among the 2005 package of properties. Plaintiffs' ACC does not explain why the statement that Maritech continued to produce more reserves from the 2005 properties is inconsistent with the fact that it was about to write them off. [15]

> [15] In their ACC, Plaintiffs provide TETRA's statements about its accounting practices. For example, TETRA explains that "the oil and gas industry is cyclical, and our estimates of the period over which futures cash flows will be generated, as well as the predictability of these cash flows, can have significant impact on the carrying value of these assets and, in periods of prolonged down cycles, may result in impairment charges." (ACC P 108.) Consequently, impairments [*78] appear to address cash flow considerations rather than necessarily reflecting adjustments in reserve estimates.

Plaintiffs contend that these were material misstatements because the properties had already been largely depleted, and Maritech exploited the most attractive properties first. Plaintiffs plead that, by the end of 2006, "Defendants ... fully knew that" TETRA's production and profitability would drop sharply in 2007. (ACC P 38.) Consequently, Defendants, including Hertel, knew that cash flows for the operation of the 2005 properties would not continue for several years, so these statements and the balance statements in the 2006 10-K were false. (ACC P 119(d)). Likewise, Plaintiffs contend that statements made in a May 7, 2007 press release were false: Maritech noted a potential shortfall to production,

but Defendants also explained that "Maritech is now attempting to accelerate forward exploitation activities originally planned for late 2007 or early 2008." (ACC P 120, *see also* ACC P 122.) Plaintiffs contend that Defendants knew, at the time, that there was a permanent volumetric shortfall. (ACC P 123.) Plaintiffs argue that these facts became known to the public, when, on October [*79] 16, 2007, as noted above, TETRA reported an "impairment" charge for the abandonment of the 2005 properties of more than $ 70 million. After the Class Period, Hertel explained that "by 2007, most exploitation projects, generated out of 2005 acquisitions, had diminishing return potential. This is one of the primary reasons that Maritech's DD&A grew more rapidly than did its operational pretax profits in 2007." (ACC P 139.)

Some of the alleged misstatements are similar to those in cases in which the plaintiffs have adequately pled material misrepresentations. As to the profitability and production capacity of the 2005 properties, the Court finds that Plaintiffs have successfully pled a material misrepresentation. It finds this case similar to the facts in *Plotkin v. IP Axess, Inc.*. In *Plotkin*, the defendant company's statements regarding the likely success of agreement with another company that later failed satisfied the material misrepresentation requirement. In that case, the partner company later filed for bankruptcy such that statements about the likely success of the sales contracts supported inferences that the relationship was doomed when the defendant company made the statements. [*80] 407 F.3d 690, 697-98 (5th Cir. 2005). Like the bankruptcy of the partner company in *Plotkin*, TETRA purportedly eventually acknowledged the problems with the fields and wrote off the 2005 acquisitions.

Per *Tellabs I*, the Court must take Plaintiffs' pleadings as true. Plaintiffs plead that Defendants knew by early 2007 that TETRA had largely exhausted the economically exploitable oil and gas properties purchased in 2005, but instead of revealing this information then, continued to tout the productive capacity of these properties, going so far as to explain that their reserves had increased by a particular number. The Court finds that these pleadings satisfy the PSLRA requirement for pleading fraud with particularity. Plaintiffs have alleged several misstatements as to this challenged pattern of alleged conduct.

Defendants contend that Plaintiffs have not sufficiently pled materiality because TETRA had already disclosed that it is difficult to predict costs or profits because of the inherently imprecise nature of oil and gas reserve estimating. Again, however, the $ 70 million impairment, that Plaintiffs allege was related to the misstatements regarding the written off fields, was material [*81] because it was the size of Maritech's revenues for the previous year. Drawing all inferences in favor of Plaintiffs, they do allege a plausible material misstatement related to the 2005 properties.

Defendants also argue that several of the alleged misstatements were forward-looking and protected by the PSLRA's safe harbor. For example, as to Misstatement 6, Defendants contend that cautionary language about future production estimates adequately warned of the potential shortfalls that might affect the process of bringing the new "storm damaged production" online. Plaintiffs' contention is that, like the *U.S. v. Skilling* case, 554 F.3d 529, at the time TETRA made the announcement about bringing storm-damaged properties back online, it already knew that the inventory of exploitable operations from the 2005 properties had dwindled such that these properties would not be able to be profitably drilled and prepared for production.

The incorporated 2005 10-K cautionary statements regarding the inaccuracy of future production estimates warns: "actual future production, cash flows, development expenditures, operating and abandonment expenses and quantities of recoverable natural gas and oil reserves [*82] may vary substantially from those initially estimated by us." (Doc. No. 45, Ex. 3, at 15.) Again, however, while this cautionary language explains possible risks with production estimates, it does not warn about certain dangers that Plaintiffs claim had already begun to materialize. Likewise, the other statements about the anticipated production gains from the 2005 properties and Maritech's cash flow, while forward-looking, are not protected if Defendants knew that the properties were exhausted of possible exploitable or producible reserves at the time those statements were made (Misstatement 8, 9).

The Court must then address whether the CWs' testimony and other allegations of scienter supports a strong inference of scienter on the part of the individual Defendants or TETRA. CW 3's allegations relate to the challenged patterns of alleged conduct at WA&D

including the write-offs of the 2005 properties and the purported successful accounting method flaws. CW 3 is described as lead operator for Maritech from 2005 through January 2008 and in charge of five Maritech platforms. (ACC P 58.) Defendants also argue that the job responsibilities of this CW, including inspections, monitoring well [*83] production, reviewing costs, and overseeing repair work, (ACC P 59) do not suggest that he had involvement with accounting or whether or not fields should be written off. The Court agrees with this argument. While it appears that CW 3 had personal knowledge about the production at these wells, and he concluded that the properties "probably should have been written off sooner than they were," (ACC P 60) the description of this CW is insufficient to allow the court to conclude that he spoke with personal knowledge of when a field should be written off or whether it was profitable for Maritech. His testimony does not appear to be based on personal knowledge such that his statements may be used to establish scienter as to whether the fields were not written off when they should have been. Even if the Court had chosen to credit CW 1 (discussed above in the context of the purported manipulation of successful efforts accounting) and CW 3's testimony, they do not allege that they told Hertel or McCarroll that the fields necessarily should have been written off sooner than they were or provide allegations that would support a strong inference that Hertel or McCarroll knew of these problems [*84] and fraudulently failed to reveal them to investors.

Plaintiffs allege that Hertel's post-class statements support a strong inference of scienter. In November 2007, Hertel stated that "[t]he inventory of exploitable operations in these older properties has dwindled during the last 29 months" and "by 2007, most exploitation projects, generated out of the 2005 acquisitions, had diminishing return potential." Consequently, Plaintiffs allege that these statements make it difficult to credit Hertel's earlier assertions that Maritech production from older properties would drive its growth. Defendants respond that these post-class disclosures only state that, in late 2007, TETRA "canceled plans for the development of some of the previously held, less attractive exploitation properties" in order "to create growth opportunities for 2008 through 2010." (ACC P 139.) As noted above, Defendants argue that these statements do not suggest that the accounting for these properties had ever been inaccurate or that it should have previously taken any impairment charges. Defendants'

competing theory to defeat scienter is that Defendants had no idea that the properties would need to be written off at the [*85] time of the alleged misstatements because Maritech suffered unexpected production shortfalls from weather and rig delays, and subsequent events rendered other more-recently purchased fields more profitable, even though the 2005 properties produced profits throughout 2007.

The Court discussed the inference that may be drawn from Hertel's stock sales above. Defendants contend that McCarroll's stock sales, which occurred near the end of the Class Period, occurred five days before the options expired, and that he sold half of the shares resulting from the exercise of the stock options. In addition, McCarroll's stock ownership increased during the Class Period and, shortly thereafter, he left TETRA to start another company. *In re Enron Corp. Securities, Derivative & ERISA Litigation*, 258 F.Supp.2d at 594 (explaining that readily available, plausible explanations for a sale, such as that the insider is leaving the company, might make a sale nonsuspicious). McCarroll's sales do not seem concentrated after any particular announcement, and he made significant sales after the August 2007 announcements when the stock fell precipitously. Even construing all facts in favor of Plaintiffs, McCarroll's [*86] stock sales do not seem to be suspicious in timing or amount such that they would substantiate strong motive and opportunity allegations to create an inference of scienter.

The Court finds that, considering the discounted value of the CWs, the only plausible inference of scienter from Hertel's stock sales, and the limited value of the post-class statements, given the plausible non-culpable inferences that can be drawn from the word "exploitable" as discussed above, renders Plaintiffs' theory that Hertel or McCarroll knowingly or recklessly touted the production capacity of the 2005 properties while knowing that they were unproductive or largely exhausted less plausible than competing theories. The CWs have not provided testimony that there was necessarily anything wrong with the treatment of the 2005 properties. Even if they had, they do not support an inference that any of the defendants knew about these problems at the time and fraudulently concealed them. When considered together, Plaintiffs' allegations as to the write offs of the 2005 properties do not create a strong inference of scienter.

## C. Fluids Buyback Program

As for the other challenged patterns of alleged conduct, Defendants [*87] *inter alia* contend that the CWs did not possess personal knowledge as to the facts they profess to know, some of the alleged misstatements are protected by the safe harbor provisions of the PSLRA, and the post-class statements, stock sales, and other purported indicia of scienter do not support a claim.

Plaintiffs allege that Defendants altered monthly Fluids division sales estimates to reach arbitrary sales goals by manipulating sales and inventory though a "buyback program." (ACC PP 26-27.) Plaintiffs allege that TETRA's fluids customers typically purchase more CBFs than necessary as a precaution with the understanding that TETRA will repurchase the extra at 40-60 percent of the original sales price. (*Id.* at P 81.) When the CBFs were returned, however, TETRA "revalued" the Fluids division's inventory rather than reduce sales or income to account for the returns. (ACC PP 27, 85.) According to a confidential witness, 80 percent of the Fluids Division's total profits were due to the inventory adjustment. (*Id.* at P 84.) In addition, TETRA allegedly stored the used CBFs it also received from customers rather than reworking and recycling them for reuse. TETRA purportedly falsely attributed [*88] the high fluids inventories to a historically high cost supplier and concealed its inventory write-ups/inflated sales. (*Id.* at PP 28, 88.)

Defendants argue that TETRA properly accounted for the Fluids buyback program as a separate transaction. They further aver that TETRA's treatment of the program was approved by TETRA's independent auditors and that CW 7's statements support Defendants' version of the facts. They complain that his statement that inventory has been "written up" lacks sufficient context. Defendants also argue that the November 2006 spreadsheet produced by CW 6 that purportedly shows a variance or revaluation that reflect improper accounting at the Fluids Division is not necessarily connected to the buyback program, and it is unclear to what the word "revaluation" refers. Finally, Defendants contend that CW 8 was not in a position to know whether re-use of CBFs occurred in the Fluids Division. Defendants explain that TETRA's inventories rose because TETRA switched suppliers in 2006 and accelerated purchases from the old supplier to fulfill its obligations more quickly. (Doc. No. 45, Ex. 8 at Ex. 99.1 p.3; Ex. 19 at Ex. 99.1 p.3; Ex. 7 at Ex. 99.1 p.3.) Defendants contend [*89] that these inventory cost increases were properly disclosed.

Plaintiffs respond that the Fluids Division failed to report customer credits as sales returns and allowances as required by SFAS 48 and that cost of goods sold was understated because of Fluids inventory write-ups. In addition, they contend that Fluids' revenues had been recognized even though their collection was not "reasonably assured," despite the Company's agreement to provide credits pursuant to its buyback program. Specifically, the November 3, 2006 press release announced "third quarter pretax earnings that exceeded third quarter 2005 levels by 152 percent." If the costs of goods were understated because of inventory write-ups, these earnings statements were misrepresentations of the true picture of Fluids Division sales. This statement is not forward-looking, and therefore cannot be protected by the safe harbor.

Defendants also aver that several other of the purported misstatements associated with the Fluids Division are protected by the PSLRA safe harbor. Misstatement 3, as it relates to Fluids Division earnings growth, is a statement of historical fact and not protected. Likewise, Misstatements 24, 25, and 28 are [*90] not forward looking and reflect purported distortions in past numbers because of the allegedly improper reporting of inventory returns. Misstatement 30 relates to the cost of goods for primary completion fluids: Defendants contend that the cost of goods will go down because of a new plant and a new agreement with Chemtura. In addition, TETRA explained that it purchased large inventories in 2005 and 2006 and that it will terminate its previous supply agreements. These statements are purportedly false because they misstate or omit the reasons that Fluids inventories were high--they are not forward-looking statements. In addition, Plaintiffs contend these statements are false because Defendants do not disclose the impact of the buyback program on inventories.

Defendants contend that Plaintiffs do not adequately plead materiality because they only use rough numbers such as "hundreds of storage tanks" of used brine fluids and do not explain how many customers participated in the buyback program to understand its potential impact on TETRA. Notably, Defendants do not address CW 7's allegations that much of Fluids' total profit was attributable to the inventory adjustment. (ACC P 84.) The Court, [*91] however, finds that, even drawing inferences in favor of Plaintiffs, it is not plausible that CW 7 spoke with personal knowledge of the buyback program as to the facts he alleges.

Even assuming Plaintiffs have pled material misstatements, however, Plaintiffs have not alleged a strong inference of scienter. As to allegations of scienter from the confidential witnesses, CW 6 is described as the regional Fluids sales manager. (ACC P 75.) CW 6 provided a report that showed a reduction in the Fluids Division cost of goods sold for "variance/revaluation." (ACC P 76.) This term is not explained, although CW 6 alleges that a person named Hank Reeves disclosed to him that sometime in mid-2006 the fluids inventory was "revalued." (*Id.*) Defendants contend that CW 6's information from Hank Reeves is a "rumor." Moreover, they argue that there is no suggestion that CW 6's job duties included accounting work or that he would have knowledge of the accounting for the Fluids Division buyback programs. CW 6 explains his understanding of the buyback program, but he admits that the actual computation of the credits was a "big secret" that was held by other people, including Hank Reeves, and he had heard [*92] that some component of the buyback program was "borderline illegal." (ACC PP 81-82.) These admissions suggest that CW 6 was not in a position to know whether or not Defendants were improperly accounting for or misrepresenting the buyback credits or intentionally misstating inventories at the Division.

CW 7 is described as a general manager at the Fluids Division from August 2006 until August 2007 who met with senior executives, including the vice-president for the Fluids Division. (ACC P 86.) CW 7's allegations relate to the challenged patterns of alleged conduct at the Fluids divisions including the buyback program and the purportedly artificially inflated forecast numbers discussed below. CW 7 describes the buyback program as overstating revenues and inventories and contends that 80 percent of the Fluids Division's profits were attributable to this program. (ACC PP 84-85.) Beyond the generic term "general manager," Plaintiffs do not provide CW 7's job description, however, or his interaction with accounting or upper management such that he would know how the buyback program was run or who knew about it. Plaintiffs also fail to describe CW 7's education or employment history that would [*93] provide a basis for any statement about a buyback program, or how it should be treated for purposes of financial reporting. CW 7 averred that, rather than account for these returns against actual sales, TETRA would record this credit in inventory. As explained more below in the section describing the Fluids' forecasts challenged pattern of alleged conduct, CW 7 allegedly reported demand

projection figures to Symens, but CW 7 does not allege that he had interactions with Symens regarding the buyback program. Even if the Court had chosen to credit CW 7's statements as based on personal knowledge, CW 7 alleges that much of the Fluids Division's profit was attributable to inventory adjustment, CW 7 does not contend who knew about this program and does not specifically contend that any of the individual Defendants or any officer or manager who prepared the corporate disclosures knew about the allegedly improper massaging of sales at the Fluids' Division. The testimony of CW 7 is therefore insufficient to make a strong inference of scienter as to any of the individual Defendants or as to TETRA, possible.

CW 8 is described as a TETRA contractor who worked as an engineer in the new brine production [*94] facility. He explained that he knew of the "brine buyback program" whereby TETRA would buy "dirty" brine to resell. (ACC PP 87-88.) Defendants contend that a contract engineer would not have knowledge of accounting practices at the firm. The Court finds that the description provided for CW 8 is insufficiently detailed to allow his allegations to raise an inference of scienter as to any of the individual Defendants or TETRA. Plaintiffs do not provide argument on this point. The Court does not find that the details pled concerning CW 8's job duties and position at TETRA suggest that he would have personal knowledge of the way accounting was conducted for the buyback program and he does not provide support for a strong inference of scienter as to misrepresentations concerning this program. Consequently, regardless of whether Plaintiffs have pled material misrepresentations with sufficient particularity, the allegations of the CWs do not support a strong inference of scienter.

As to this challenged pattern of alleged conduct, Plaintiffs do allege that Defendants specifically violated GAAP by failing to reduce customer sales by the return credits. However, as noted above, GAAP violations [*95] do not alone support a strong inference of scienter.

Defendants contend that Symens' Class Period sales were not unusual because he could have made much more money by selling them earlier or later. In addition, Symens made his final Class-Period sale in May 2007, several months before the alleged disclosures. His stock options were also set to expire in March and September. Unlike Hertel, Symens does not appear to typically

concentrate sales, but to make sales periodically, and not very frequently. Symens sold more than half his shares and exercised options that were not about to expire in May 2007. Construing all facts in favor of Plaintiffs, the magnitude of the sales in May 2007, ahead of the purported disclosures in August and October provides facts that may be used as motive and opportunity allegations to create an inference of scienter. Symens, however, was a non-speaking Defendant and Plaintiffs have not connected him to any particular misstatement or to any particular statements in TETRA's SEC filings. Given the Fifth Circuit's rejection of group pleading, that Symens was a non-speaker is determinative of the issue.

When taken together, the lack of sufficient detail to allow [*96] an inference of personal knowledge on the part of the CWs, the non-suspicious timing of the stock sales, even with the purported GAAP violations and SOX certifications, do not support a strong inference of scienter. The Court holds that Plaintiffs have not pled facts that allow for a strong inference of scienter as to any Defendant as to the challenged pattern of alleged conduct related to the buyback program.

**D. Fluids Forecasts**

Defendants contend that Plaintiffs' allegations that the Fluids Division's demand was flat are false because revenues increased from 2005 through 2007. In addition, they contend that CW 6 was not in a position to know about the overall Fluids business to the extent that his statements about forecasting can be credited. Moreover, they aver that the spreadsheet he provides, in which his superiors revise upwards sales projections for his region, only demonstrates that CW 6's superiors expected more of him that he did himself. Moreover, Defendants contend that the forecast data CW 7 allegedly provided to Symens was based on upcoming orders from current customers and did not account for projections from future growth or new customers. Defendants aver that the Fluids [*97] Division's onshore operations suffered unexpected losses in 2007 because of flooding in Texas and Oklahoma during May-July 2007.

Plaintiffs claim that Defendants misrepresented TETRA's Fluids Division financial performance as growing rapidly when the company knew that onshore demand was flat. Assuming that Plaintiffs' allegations that TETRA's upper management revised onshore demand upwards are true, statements that the onshore business was growing rapidly, including those in the

November 3, 2006, press release could be misstatements that misled investors as to the prospects of the onshore Fluids Division business. In the January 3, 2007 TETRA further explained that there were "greater opportunities" for "domestic onshore and international growth."

As with the other challenged patterns of alleged conduct, Defendants claim that the safe harbor protects several of the alleged misstatements. For example, they respond that Misstatement 3, related to the growth in the onshore Fluids Division business, was a forward-looking statement protected by cautionary language. The specific statement that the onshore business continues to grow rapidly includes a comment on historical fact-- that onshore [*98] business had grown rapidly in the past--and a statement of historical fact cannot be protected by the safe harbor. As to the continuing growth, the Court agrees that the cautionary language provided does not warn investors about the reasons that Plaintiffs contend demand turned out to be flat--that Defendants had knowingly, unreasonably inflated forecasted demand. This same analysis applies to Misstatement 7 related to the Fluids Division forecasts.

As to whether TETRA might have acted with scienter as to these statements, in *Southland Securities Corp.*, the Fifth Circuit explained that in determining whether a statement was made by a corporation with scienter "we believe it appropriate to look to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment." 365 F.3d at 366. Likewise, scienter may not rest on the inference that the defendants must have been aware of the alleged fraud [*99] because of their position in the company. *Abrams v. Baker Hughes, Inc*., 292 F.3d at 432. Although courts have found scenarios in which it is possible to infer corporate scienter because of the position of the defendant, that is not the case here. Demand for CBFs onshore is, as Plaintiffs admit, only a part of the Fluids Division revenues and not significant enough to infer that the speaking Defendants would have known about the alleged manipulations of the revenue forecasts such that their statements were made recklessly or with intent to deceive. *See, e.g, Tellabs II*, 513 F.3d at 710 (describing a hypothetical wherein General Motors claimed that it had

sold millions of SUVs when it actually sold none); *Nathenson v. Zonagen, Inc.*, 267 F.3d at 424-25.

Turning to the allegations of scienter from the CWs: CW 6 conceded that he did not know where the 2007 forecast numbers came from but that he believed they were inaccurate from the beginning. (ACC P 79.) Based on the pled facts, CW 6 had personal knowledge of the proper forecasts for his region (which comprised the bulk of "onshore" sales) and the amount by which his supervisors revised them upwards, but Plaintiffs' provided job description [*100] does not indicate that he had personal knowledge of the forecasts for the overall Fluids Division, because sales primarily occurred offshore. (ACC P 75.) CW 6 alleges that he informed several managers that demand was to be flat and they told him to change his forecast so that the numbers "work" within the set budget. The "S&OP 2007 Rev" spreadsheet produced in November 2006 supposedly reflects that his supervisors wanted him to change his forecast upward by $ 4 million for 2007. He does not allege that any of the individual Defendants had knowledge of these purported forecast manipulations. Claims regarding an allegedly fraudulent scheme must fail if the complaint does not adequately identify a particular corporate officer who improperly recorded revenue or performed the challenged acts. *See, e.g.*, *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 259 (5th Cir. 2005).

Plaintiffs also allege that CW 7 provides statements that support a strong inference of scienter: CW 7 avers that he met with Symens every month and provided him and another manager with the projected Fluids demand--that Symens would then "change." (ACC P 86.) Although it is probable that CW 7 had personal knowledge of parts of the forecasting [*101] process, these allegations do not support a strong inference of scienter. It is unclear why Symens changed these numbers. CW 7 contends that demand for fluids was "not there," but he does not provide facts sufficient for the Court to infer that Symens was manipulating the numbers to make fraudulent demand projections such that the Court can draw a strong inference of fraud. Here, even if managers at TETRA and the Fluids Division knew that the Fluids forecasts were massaged, it is unclear that this information was conveyed to the speakers who made the alleged misstatements; or that Short, Pernik or Reeves (unspecified employees in the Fluids Division) were involved in drafting or signing the TETRA releases that contain the alleged misstatements such that TETRA may

have had scienter of the alleged misstatements. [16]

16   In their Response, Plaintiffs aver that CW 6 relayed the information to Fluids' management who reported to Symens. Even if this was the proper chain of command, in the ACC, CW 6 does not specifically allege that the information flowed to Symens.

Evaluating together all sources of scienter as to the misstatements related to the Fluids Division forecasts, including the timing [*102] and size of the individual Defendants' stock sales, the purported GAAP violations and SOX certifications, these allegations do not support a strong inference of scienter as to the Fluids forecasts. Misstatements with respect to this challenged pattern of alleged conduct therefore are insufficient to state a securities violation claim. The Court will not, therefore, address Defendants' arguments about Plaintiffs' failure to allege loss causation as to this challenged pattern of alleged conduct.

### E. Insurance Receivables

Defendants contend that TETRA continually disclosed ongoing negotiations with the insurance companies and that none of the CWs claimed knowledge of a final denial of insurance receivables or even knowledge of the insurance negotiation process. Defendants argue that TETRA never promised its investors that hurricane-related claims would be covered and properly disclosed the negotiation process, including that the insurers questioned whether certain well intervention costs would be covered under the policy. Citing several disclosures, Defendants contend that they continually kept investors informed of developments with the insurance company and eventually sued it in November [*103] 2007 over disputed claims. (Doc. No. 45, Ex. 4, at Ex.99.1, p. 1 (a TETRA press release).) Moreover, Defendants aver that Plaintiffs wrongly emphasize the word "repeated" in the 2007Q2 disclosure about the negotiations to suggest that TETRA had already been denied certain insurance claims. Finally, Defendants take the position that its decision to wait until 2007Q2 to write off the insurance receivables, when it decided to sue its insurer, was a conservative decision, rather than a GAAP violation.

Moreover, they aver that the statements about insurance receivables are protected by the safe harbor provisions. For example, as to statements about WA&D

Services' profits related to the collection of insurance reimbursements for Maritech, TETRA warned that "a significant factor in the fourth quarter will be the inclusion or elimination of WA&D Services profits related to work performed for Maritech which is contingent on the timing of insurance reimbursements." (Nov. 3. 2006 press release, Doc. No. 45, Ex. 8, Ex. 99.1, p. 4.) In addition, TETRA warned its investors that the press-release includes forward-looking statements that are subject to risks and uncertainties. It contends that other [*104] cautionary language from the 2005 10-K was allegedly incorporated by reference by the November 3, 2006 press release. The press release specifically incorporates the 2005 10-K language. This 2005 10-K (filed March 16, 2006) explains:

> [W]e could suffer additional losses in the future related to storm repair efforts.... We maintain insurance protection covering substantially all of the property damaged incurred; and repair costs incurred up to the amount of deductibles were charged to earnings as they were incurred during 2005. However, the amount of covered costs is subject to certain maximum amounts, depending on the policy. If actual repair costs are significantly greater than our estimates, we may exceed these maximum coverage amounts. In that event, it is possible that a portion of future repair expenditures will have to be funded with our capital resources and result in charges to our earnings. In addition, for repair expenditures that are covered by insurance, the collection of insurance claims may be delayed, resulting in the temporary use of our working capital to fund such repairs.

(Doc. No. 45, Ex. 3, at 13.) Notably, this warning explains that the protection covers "substantially [*105] all" of the property damage incurred. The warning, therefore, that "the amount of covered costs is subject to certain maximum amounts," when read in tandem with the statement that substantially all property damage is covered suggests that the company believes actual repair costs will approximate covered costs. Later, however, in a filing made March 1, 2007, TETRA explained:

> If a significant amount of well

intervention costs incurred are not covered pursuant to our insurance policy, or if we incur total well intervention costs in excess of our estimates, our working capital and results of operations could be adversely affected.... In June 2006, the underwriters questioned whether there is additional coverage provided for the cost of the removal of ... platforms in excess of the policy limit under an endorsement we obtained in August 2005 .... While we have yet to incur costs for the removal of the destroyed platforms, these costs, as well as other costs covered under the endorsement, could equal or possibly exceed the policy maximum limit under the endorsement. If all or a portion of these costs are not reimbursed, or if the total debris removal and other costs exceed the policy maximum, our [*106] working capital and results of operations could be adversely affected.

(Doc. No. 52, Ex. 1, at 13.) In that filing, TETRA also explained that "[w]hile the Company believes that all well intervention costs being questioned by the underwriters will qualify for reimbursement under its insurance policies and are probable of collection, it is possible that all or a portion of these costs may not be reimbursed." (*Id*. at 15.) TETRA specifically warned that all or a portion of the costs may not be reimbursed because insurers questioned whether a policy obtained in August 2005 provided additional coverage for the cost of removal. TETRA reiterated its position that it believes that the costs qualify for reimbursement under the endorsement. (*Id*. at 16.)

Nowhere in this cautionary language does the company explain that significant portions of the insurance receivables have already been denied. Taking all inferences in favor of Plaintiffs, this warning does not render the alleged Misstatement 1, as it relates to the insurance receivables' effect on WA&D profits, immaterial. Likewise, the other misstatements related to the payment of insurance receivables are not protected under the PSLRA because [*107] Plaintiffs have adequately alleged that Defendants knew that certain insurance payments had already been denied at or before the time that Defendants contended that "substantially all" of the insurance claims would be covered. The

Misstatements that relate to the insurance receivables, notably 8, 13, 16-21, 25, 27, 29-31 are not protected by the PSLRA safe harbor.

Plaintiffs provide allegations from several confidential witnesses that, in August or September 2006, Maritech reviewed its insurance contracts and discovered that Lloyd's would only pay for the first $ 1 million in weather-delay expenses for the damaged wells even though WA&D had already accrued millions of costs attributable to weather delays for the East Cameron 195 project. (*Id.* at PP 50, 57.) By late 2006 Maritech received unspecified "printouts" that various claims submissions were not allowed. (*Id.* at PP 49-52; 57-58.) In addition, Defendants allegedly admitted their failure to appropriate write off their receivables in the 2007Q2 Form 10-Q in which they stated that "during [2007Q2] ... the underwriters repeated their position that certain wells did not qualify for coverage and that certain well intervention costs for [*108] covered wells do not qualify as covered costs." (*Id.* at P 40.)

Plaintiffs aver that the statements in the press releases and earnings report are misstatements because Defendants expressed a belief that they would be paid on several insurance claims even though the claims had already been denied. Plaintiffs aver that the insurer had already disallowed insurance claims and, therefore, statements of January 3, 2007, in which Hertel explained that WA&D "profits" from insurance receivables were deferred until they were collected was a material omission because this statement implies that claims submitted for reimbursement were covered. Likewise, TETRA's 2006 Form 10-K explained that substantially all of the hurricane damage would be covered, apart from deductibles and a $ 5.2 million charge to earnings already made. Similarly, because of these misstatements as to the insurance receivables, Plaintiffs contend that Defendants misstated WA&D profits and earnings in the May 7, 2007 press release.

Defendants contend that Plaintiffs have not alleged that the purported misstatements related to insurance receivables were material. They note that TETRA disclosed its negotiations with the insurer on [*109] its hurricane repair claim, that the insurer had been slow to pay, and that it was possible that the insurer would not reimburse all TETRA's costs. If the individual Defendants or another corporate officer knew that the insurance receivables had been denied prior to the release

of these statements, that fact would provide a strong inference of scienter.

As to the confidential witnesses, CW 4 reported that, beginning in December 2005, she was told to set up all claims as "receivables" whether or not they had been paid. (ACC P 66.) CW 4 prepared a monthly report of insurance receivables that she delivered to McCarroll and Hertel. (*Id.* at P 68.) She avers that invoices for repair work done by outside companies were personally approved by McCarroll. (*Id.* at P 67.) Defendants contend that CW 4 was not in attendance at the meetings when the participants discussed her spreadsheet, and CW 4 does not contend that the information in the spreadsheets was different than that disclosed to investors. Defendants also aver that Plaintiffs do not provide specific dates when Defendants purportedly acquired knowledge of the denials. (*Id.* at P 50.)

Based, however, on CW 4's position as a billing accountant [*110] during most of the Class Period, the Court finds it probable that she was in a position to know who was attending the meetings and that her report of insurance receivables must have at least been viewed by the participants. Defendants do not specifically argue that CW 4 lacked personal knowledge of the facts she provides but, rather, contend that nothing to which she testifies suggests that she had any knowledge the receivables she booked were not probable of collection from the insurer. As explained above, knowledge of general wrongdoing rather than specific knowledge of particular accounting errors may support an inference of scienter. Her statements as to the insurance payments and Maritech's compliance with accounting regulations may be credited and evaluated as a basis for scienter. Although CW 4 does not specifically allege that McCarroll and Hertel knew that the insurance claims were disallowed, she does provide information that allows the inference that McCarroll and Hertel were intimately involved with the insurance process and provides support for other allegations of scienter provided by other CWs.

CW 1 averred that there were a number of days lost to weather downtime in [*111] the spring of 2006 and Maritech "quickly" learned that the insurance company would only cover the first $ 1 million of weather time even though the witness credibly estimated that the weather downtime at the East Cameron 195 project was $ 10-12 million. Defendants contend that Plaintiffs do not

plead that CW 1 had personal knowledge of the negotiations with the insurers or with the accounting for the insurance claims. Plaintiffs provide details about damages to certain properties, insurance company statements about what work would be paid for, and specific issues at particular fields such as the cost of weather downtime at East Cameron 195, including the dates that they arose sufficient to support a strong inference of scienter. In contrast to the CWs provided in *Cent. Laborers' Pension Fund*, Plaintiffs do provide employment dates for this witness, aver that CW 1 directly reported to Maritech President McCarroll and provide sufficient detail, including property names; dates that suggest that it is probable he has personal knowledge of his testimony and that he is in a position to know first hand the facts he conveys as far as the disallowed "weather downtime." *See* 497 F.3d at 552. [*112] CW 1 testifies that he was involved only with accounting at the fringes, but suggestions that challenged patterns of alleged conduct are fraudulent, such as allowing millions of dollars of weather downtime to accrue when "Maritech quickly learned the insurance company would only cover the first $ 1 million of weather time incurred" (ACC P 50) may support an inference of scienter, although this inference would need to be strengthened with other evidence because it is unclear who at TETRA knew this and when. CW 1's further allegations that "there were going to be problems" with the coverage of the East Cameron 195 work are more specific. He contends that, in December 2006 or January 2007, the adjusters "balked" at paying any additional claims. [17]

> [17]    On the other hand, his allegation that Maritech started to receive computer printouts that claims submissions were "not allowed" is too vague to be credited. <17> The existence of unspecified confidential corporate reports that reveal corporate information contrary to reported accounts will not defeat a motion to dismiss. *See, e.g., Abrams v. Baker Hughes, Inc.,* 292 F.3d at 432; *Tchuruk,* 291 F.3d at 355-56.

CW 2 is described as an operations  [*113] manager at Maritech from November 2002 to November 2006, the beginning of the Class Period. (ACC P 54.) McCarroll purportedly told CW 2 that the TETRA invoices to be submitted to the insurance company, should not include references to weather downtime. Defendants contend that Plaintiffs have provided no information to explain why CW 2 would be involved with the Company's

negotiations with its insurers. CW 2, however, was involved with platform repair, and he avers that he was told by McCarroll that, with respect to Ship Shoal 269 where he was working, TETRA invoices should not include references to weather downtime. (ACC P 58.) These allegations suggests that CW 2 had knowledge of the reporting for weather downtime because he was working in the field at issue and had heard the instruction directly from McCarroll. Defendants respond that neither CW 2 nor Plaintiffs provide any idea of the percentage of accrued well-intervention costs that constituted by weather downtime. In addition, they note that CW 2 does not allege that McCaroll knew that weather downtime was disallowed or that he knew that the costs already incurred at East Cameron 195 exceeded the weather time allowance. Plaintiffs [*114] respond that, based on CW 2's allegations "McCarroll and others at TETRA realized that the insurance policies had been misread and that the costs attributable to 'weather time' were not covered by the insurance claims for millions in costs attributable to weather delays." (ACC P 58.) Plaintiffs Complaint does not appear to go this far in alleging McCarroll's knowledge of the disallowed weather down time. Instead, CW 2 describes the realization of "the Company" that "weather time" was capped at $ 1 million and that after August or September 2006, McCarroll told unspecified people to limit weather costs on all projects. (ACC P 58.) Taking all inferences in favor of the Plaintiff, however, it is a plausible inference that McCarroll, by making the instruction that he did, knew that the weather time insurance claims were disallowed sufficient to support a strong inference of scienter. [18]

> [18]    Defendants contend that allegations that a defendant "attended meetings" is tantamount to the suggestion that the defendant knew something because he was an executive. *See Ind. Elec.,* 537 F.3d at 535. The Court finds the two suggestions distinguishable. The Court realizes that it is relying, in part on [*115] a *Nathenson-type* inference that the head of a Division would have knowledge of disallowed insurance claims that affect millions of dollars of work in his Division. It also acknowledges that the ACC does not explicitly state that McCarroll knew that the insurance claims were disallowed but uses phrases such as "the Company realized" or "the company figured this out." The *Nathenson-inference,* however, combined with McCarroll's instruction to limit weather costs around the same time that

the company made the realization that weather time was not allowed enable the Court find that Plaintiffs have pled a strong inference of scienter as to McCarroll for the purportedly disallowed insurance claims.

In addition, Hertel, in the 2007Q3 earnings call, explained that, as to insurance receivables, he was going to "force that issue." He also told analysis that

> a lot of the issues that you've seen this year and that could hurt us on a go-forward basis would be involved with the insurance situation and there we do have some control over that from the perspective of when we address or bright line some of these issues and we are going to bright line them this quarter and bring them to a head.

(ACC P 156.)  [*116] Plaintiffs contend that Hertel's choice to reveal his decision to bright line the insurance issue was particularly suspicious in the insurance context because he had already sold his stock. Moreover, Plaintiffs aver that, in the 2007 Form 10-Q, signed by Hertel, Hertel explained that "the underwriters repeated their position that certain wells did not qualify for coverage and that certain well intervention costs for covered wells do not qualify as covered costs." (ACC P 40.) Plaintiffs contend that this is Hertel's admission that the underwriters had already disallowed claims. Defendants respond that "repeated" refers to a prior disclosure that the investors had questioned whether certain well costs would be covered under the policy. Although the Court admits some skepticism, it does seem at least as plausible as any innocent inferences that may be drawn that Hertel managed the insurance situation and knew that claims were already denied prior to the time at which TETRA expensed its unreimbursable costs. The scienter analysis does not require the Court to determine the most plausible of competing inferences. *See, e.g., Tellabs I*, 127 S.Ct. at 2510.

Although it is a close call, Plaintiffs  [*117] have pled facts that give rise to a strong inference of scienter with respect to McCarroll and Hertel's treatment of the purportedly disallowed insurance receivables. CW 2 places McCarroll at meetings with Lloyd's, the insurance adjusters; CW 4 describes weekly meetings involving McCarroll and Hertel to discuss insurance receivables

and explains that she prepared reports for these meetings. Based on these allegations, and the inferences the Court may draw from the post-class statements, the Court finds that Plaintiffs have pled sufficient facts so as to make it plausible that McCarroll and Hertel would have been aware that weather downtime already exceeded that allowed for East Cameron 195 and that weather downtime was managed at Ship Shoal 269. Plaintiffs' explanation of disallowance of the insurance receivables is just as compelling as Defendants' argument that TETRA and Maritech were taking a conservative approach pursuant to GAAP. Plaintiffs have pled facts sufficient to satisfy the standard enunciated in *Tellabs I*.

As explained above, the Court finds Plaintiffs' allegations sufficient to plead loss causation, or a connection between the pled fraud and Plaintiffs' injury as the  [*118] truth leaks out. Defendants do not contest that Plaintiffs have suffered economic harm.

## F. Exchange Act 20(a)

Controlling person liability is derivative; it is predicated on the existence of an independent securities violation. *Rubinstein v. Collins*, 20 F.3d 160, 166 n. 15 (5th Cir. 1994). Consequently, Plaintiffs 20(a) claims remain only as to the claims based on misstatements related to the insurance receivables.

## G. Leave to Amend

"We will generally not construe unelaborated, nested requests for amendment as motions to amend." *Cent. Laborers Pension Fund v. Integrated Electrical Services, Inc*., 497 F.3d at 556. If the party requests leave in response to a motion to dismiss, without indication of the grounds on which the amendment is sought, is not a motion pursuant to FED. R. CIV. P. 15(a). 497 F.3d at 556 (affirming an implicit denial of leave to amend because amending would have been futile). In *Cent. Laborers Pension Fund*, the Court construed a request for leave as a proper motion because the plaintiffs explained that they would fix infirmities with the pleadings using two deposition transcripts such that the plaintiffs request was not "devoid of any indication of the grounds for  [*119] amendment." *Id*.

Here, in a footnote to their Response to Defendants' Motion to Dismiss, Plaintiffs ask for leave to amend to remedy any perceived deficiencies as well as incorporate subsequently uncovered facts. [19] In light of the Fifth

Circuit's statements, and without further elaboration of the reasons for amendment, this Court is hesitant to consider this footnote a proper Motion pursuant to FED. R. CIV. P. 15(a). The Court has not dismissed the action in its entirety, and therefore, should Plaintiffs so desire, upon proper Motion, the Court will consider whether leave to amend is warranted in this case.

> 19   During the Motion hearing on Defendants' Motion to Dismiss, Plaintiffs submitted several attachments from recent state court pleadings involving TETRA and its insurer. At the time of the hearing, Defendants did not object to the Court taking judicial notice of the documents but later objected, generally, to Plaintiffs purported attempt to rely on new facts outside those alleged in the Complaint to oppose Defendants' Motion. As the Court did not base any of its holdings on these submitted documents, these objections are **DENIED AS MOOT**.

## V. MOTION FOR SANCTIONS

Defendants filed a Rule 11 [*120] Motion, contending that several of the allegations in the ACC have no evidentiary support or factual basis because Plaintiffs misquoted or misconstrued statements made by confidential witnesses. Defendants provide sworn affidavits from some of the confidential witnesses in which the witnesses aver that some of the information attributed to them in the ACC is not based on their personal knowledge. Plaintiffs respond that they investigated the allegations behind the ACC and based the CW allegations on the reports of their investigator.

Under Rule 11, the court must identify some federal filing in which the attorney violated the rule that claims must be well-grounded in fact and in law, and that filings not be submitted for an improper purpose. Fed. R. Civ. P. 11; *Edwards v. General Motors Corp.*, 153 F.3d 242, 245 (5th Cir. 1998). The court must examine "whether the attorney has abused the judicial process, and, if so, what sanction would be appropriate." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 396, 110 S. Ct. 2447, 110 L. Ed. 2d 359 (1990). The court considers three issues: (1) factual questions regarding the attorney's pre-filing inquiry and factual basis of the filing (2) legal issues of whether the filing is warranted [*121] by existing law or a good faith argument, and (3) discretionary issues regarding an appropriate sanction. *See id.* at 399; *St. Amant v. Bernard*, 859 F.2d 379, 381-82 (5th Cir. 1988).

Reasonableness is measured on an objective basis. *See Jenkins v. Methodist Hosps. of Dallas, Inc.*, 478 F.3d 255, 263 (5th Cir. 2007) (holding that, in certain cases, an isolated factual misrepresentation may serve as the basis for sanctions, including when the misquoted statement could have had a serious impact on a court's summary judgment decision).

Defendants contend that CW 2 based his allegation that "work done by TETRA was costing much more than the insurance company would ever pay Maritech on the claims" on an erroneous assumption that TETRA's insurance policy had a $ 50 million cap. (ACC P 56.) Defendants also claim that CW 2's statements related to the cost of weather downtime at East Cameron 195 were based on rumor. Plaintiffs aver that, based on the state court litigation documents, the proper insurance limit for the insurance policy of which CW 2 speaks, allegedly based on rumor, does have a $ 50 million limit. Defendants note that TETRA holds many policies, and it is unclear of which policy [*122] CW 2 was speaking. Defendants claim that Plaintiffs learned of the $ 50 million policy after they filed the ACC, but they knew that information was not based on the CW's personal knowledge when they filed the ACC. Defendants reiterate their contention that CW 2's statements about the insurance limits, and whether the incurred expenses exceeded those limits, were based on rumor.

Moreover, Plaintiffs purportedly supplied CW 1 the $ 10-12 million estimate of weather downtime at East Cameron that CW 1 confirmed, although he claims he does not know where the number came from. Plaintiffs argue that CW 1's affidavit shows that statement about the $ 10-12 million downtime in for East Cameron 195 was a response to a leading question about an approximation--a proper investigative technique that does not render the statement inadmissible. In his affidavit, Wes Spinic (CW 1) avers: "I [*123] did not estimate that the weather downtime on the East Cameron 195 project alone was approximately $ 10-12 million. Rather the investigators asked me if the weather downtime was approximately $ 10-12 million and I indicated that the approximation was plausible even though I do not know who supplied them that estimate." (Doc. No. 61, Ex. 1 P 6.) The Court does not find the inclusion of this allegation in the ACC improper or sanctionable because Plaintiffs adequately created a foundation for personal knowledge as to that allegation, and Defendants' affidavit does not specifically defeat that foundation.

In addition, Defendants claim that CW 1 never made allegations that Maritech received computer printouts from adjusters that certain claims were disallowed. CW 1 now avers that he did not tell investigators that Maritech received printouts in 2007 indicating that claims submissions were not allowed, whereas, in the ACC, CW 1 alleged that Maritech received the printouts in December 2006. (ACC P 52.) Defendants respond that CW 1 clarified that the printouts occurred in 2007 rather than 2006, an allegation that Plaintiffs aver is contrary to the statements CW 1 provided Plaintiffs' investigators [*124] and the timeline as revealed in state court pleadings. Defendants respond that, because TETRA did not sue Lloyd's until November 2007, it is plausible that the printouts he described were received in late 2007. CW 1's explanation that he had no personal knowledge of the ACC paragraph containing the allegations about printouts is troubling. Based, however, on these discrepancies and conflicting statements, the Court does not find sanctionable behavior or that Plaintiffs failed to reasonably investigate the statements included in the Complaint. The Court notes that it did not rely on statements about the printouts in its Motion to Dismiss.

Lastly, Defendants aver that CW 6's statements that the Fluids Division's buyback program was "borderline illegal" was made in the context of how it was marketed to customers, not in the manner for which it was accounted. In the ACC, the allegations attributed to CW 6 include:

> His understanding of the program, and how it was marketed to customers, was that TETRA would contract with customers to buy-back the fluids after they were used. The customers were told that they would receive a 50% "credit" for the returned fluids.

> According to the witness, the [*125] actual computation of the buyback credits

was a "big secret" and it was closely held by Hank Reeves and Paul Coombs. Reeves once told the witness (in "early" 2007), that the way TETRA did the buyback credit was "borderline illegal."

(ACC PP 81-82.)

The phrase "the way TETRA did the buyback credit" does not seem to particularly refer to either accounting or marketing, and, as Plaintiffs note, falsely described measurements of a business's accounts, in marketing or in financial reporting, may support a securities violation. Defendants respond that there are no allegations in the ACC that the buyback credit was improperly explained to customers or that these statements impacted the financial statements. The Court finds that the provided affidavit, claiming that the previous statements about the borderline illegality of the buyback credit related to the marketing rather than the accounting of the buyback credit, while perhaps inartfully drafted, does not require the Court to strike these statements from the ACC or other take other measures. Moreover, the Court did not rely on this statement in the Motion to Dismiss.

## VI. CONCLUSION

Defendants' Motion to Dismiss (Doc. No. 44) is hereby **GRANTED** [*126] **AS TO ALL PLAINTIFFS' CLAIMS EXCEPT THOSE RELATED TO INSURANCE RECEIVABLES**. Defendants' Motion for Sanctions (Doc. No. 61) is hereby **DENIED**.

**IT IS SO ORDERED**.

**SIGNED** this 9th day of July, 2009.

/s/ Keith P. Ellison

KEITH P. ELLISON

UNITED STATES DISTRICT JUDGE

**EXHIBIT 8**



IN RE TRITON ENERGY LIMITED SECURITIES LITIGATION.

5:98-CV-256

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
TEXAS, TEXARKANA DIVISION

2001 U.S. Dist. LEXIS 5920; Fed. Sec. L. Rep. (CCH) P91,443

March 30, 2001, Decided
March 30, 2001, Filed Entered

**SUBSEQUENT HISTORY:** [*1] As Amended May 11, 2001.

**DISPOSITION:** Defendant's motion to dismiss DENIED.

**COUNSEL:** FOR D H LEE, JR, plaintiff: James N Haltom, George L McWilliams, Richard Andrew Adams, Patton Haltom Roberts, McWilliams & Greer LLP, Texarkana, TX, Nelson James Roach, Charles Cary Patterson, Jeffrey John Angelovich, Bradley Earl Beckworth, Jason Brandt Stephens, Nix Patterson & Roach LLP, Daingerfield, TX, U Seth Ottensoser, Keith M Fleischman, Steven G Schulman, Milberg Weiss Bershad Hynes & Lerach LLP, New York, NY.

For RICHARD STRAUSS, MICHAEL NMN BROWN, consolidated plaintiffs: U Seth Ottensoser, Keith M Fleischman, Steven G Schulman, Milberg Weiss Bershad Hynes & Lerach LLP, New York, NY, Lance Lee, Young & Pickett, Texarkana, TX, Damon Young, John Michael Pickett, Young & Pickett, Texarkana, TX.

BIRDIE CAPITAL CORPORATION, consolidated plaintiff: U Seth Ottensoser, Keith M Fleischman, Steven G Schulman, Milberg Weiss Bershad Hynes & Lerach LLP, New York, NY, Lance Lee, Young & Pickett, Texarkana, TX, Damon Young, Young & Pickett, Texarkana, TX.

For NORTH RIVER TRADING CO., L.L.C., North River Trading Co., LLC (Individually and on behalf of all other similarly situated), RICHARD L ZORN, ELIZABETH [*2] CLOFINE, consolidated plaintiffs: Roger F Claxton, Claxton & Hill, Dallas, TX, U Seth Ottensoser, Keith M Fleischman, Steven G Schulman, Milberg Weiss Bershad Hynes & Lerach LLP, New York, NY.

For KEN BORTNER, consolidated plaintiff: U Seth Ottensoser, Keith M Fleischman, Steven G Schulman, Milberg Weiss Bershad Hynes & Lerach LLP, New York, NY.

For SARAH SCHREIBER, consolidated plaintiff: Mark Stromberg, James D Shields, Shields Britton & Fraser, Dallas, TX, U Seth Ottensoser, Keith M Fleischman, Steven G Schulman, Milberg Weiss Bershad Hynes & Lerach LLP, New York, NY.

For TRITON ENERGY LIMITED, defendant, TRITON ENERGY LIMITED, SECURITIES LITIGATION, consolidated defendant: Nicholas H Patton, Gregory Clay Sandefur, Patton Tidwell Sandefur, Texarkana, TX, Noel M.B. Hensley, Haynes & Boone, Dallas, TX.

For DEGOLYER AND MACNAUGHTON, movant: Craig Alan Haynes, Lauren Carol Felts, Thompson & Knight, Dallas, TX.

2001 U.S. Dist. LEXIS 5920, *2; Fed. Sec. L. Rep. (CCH) P91,443

For THOMAS G FINCK, defendant: Rodney Acker, Ellen B Sessions Jenkens & Gilchrist, Dallas, TX, Rickey Lawrence Faulkner, Brown McCarroll & Oaks Hartline, Longview, TX.

For PETER RUGG, defendant: Nicholas H Patton, Gregory Clay Sandefur, Patton Tidwell [*3] Sandefur, Texarkana, TX, Noel M.B. Hensley, Haynes & Boone, Dallas, TX.

**JUDGES:** DAVID FOLSOM, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** DAVID FOLSOM

**OPINION**

*AMENDED ORDER*

Plaintiffs here are the purchasers of stock in Triton Energy Limited ("Triton"). In their complaint, Plaintiffs allege that they purchased their shares in reliance on statements by company employees, including Triton's chairman, president, and CEO. Thomas G. Finck, and its senior vice president and CFO, Peter Rugg. Plaintiffs contend that these statements were false and were made without regard to their veracity. Triton, Finck, and Rugg (hereinafter "Defendants") move the Court to dismiss Plaintiffs' complaint against them on the grounds that it fails to set out its claims with the degree of detail these kinds of suits require. *See* Doc. Nos. 57 & 82. The Court conducted a hearing in this matter July 12, 2000, and has had the benefit of 200 pages of briefing, not counting hundreds of pages in attachments. Having considered the arguments of counsel and the applicable law, the Court finds that Defendants' motion is without merit

I. BACKGROUND

This lawsuit is not unlike most alleging securities fraud. Plaintiffs constitute [*4] a putative class of persons who purchased shares in Triton between March 30, 1998 and July 17, 1998. On the first day of the class period, Triton announced that it would attempt to sell all or part of the company's assets. The reasoning given for this move, as stated by Finck, was that Triton management believed that the market did not fully appreciate the value of the company's assets. During the course of the several months that followed, Triton and its management issued a number of statements foretelling

that the company in its entirety would be sold and that investors would receive a premium for their shares. As the bidding for Triton assets continued, and as the company and its executives continued to issue glowing reports, the price of Triton stock escalated.

Sometime in June 1998, stockholders hopes that their shares would sell for a premium began to evaporate. Around that time, rumors were circulating that Triton's assets were not as attractive as they appeared on the company's financial statements. In three days, from July 13-15, 1998, the market value of Triton's stock fell from $ 35 1/4 per share to $ 28 7/8, on triple normal volume. Then, on July 17, in a press release [*5] broadcasted over *BusinessWire* news service, Triton announced that it had been unable to find a buyer for the company's assets. Instead, it was declared that Triton sold only one-half of its interest in certain natural gas fields located in the Gulf of Thailand. On the day of Triton's announcement, the company's stock fell from a per-share value of $ 30 1/2 to § 20 5/8, on 12 times normal volume. Plaintiffs contend that Triton lost $ 800 million in market value during the course of the attempted sale. Plaintiffs also contend that Triton's and individual Defendants' misleading statements regarding the attempted sale and the company's assets were deliberately made or were severely reckless and that such statements damaged them.

The instant suit was filed in this Court July 17, 1998, and Plaintiffs' Consolidated Complaint ("Consol. Compl.") was filed November 15, 1999. Thereafter, on June 14, 2000. Defendants renewed their motion to dismiss and filed several supplements thereto. As noted above, the Court conducted a hearing in this matter July 12, 2000.

II. DISCUSSION

The instant motion is brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, which requires [*6] the district court to dismiss when plaintiff has failed "to state a claim upon which relief can be granted." When considering dismissal under Rule 12(b)(6), the district court may look only to the facts stated in the complaint, *see Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996), though the court may also take judicial notice of documents filed with the Securities and Exchange Commission ("SEC"), *see id.* at 1018. The district court must take as true all factual allegations alleged in the complaint, but the court cannot "accept as true conclusory

Case 4:10-md-02185   Document 372-1   Filed in TXSD on 05/23/12   Page 200 of 215

Page 3

2001 U.S. Dist. LEXIS 5920, *6; Fed. Sec. L. Rep. (CCH) P91,443

allegations or unwarranted deductions of fact." *See Tuchman v. DSC Comm.*, 14 F.3d 1061, 1067 (5th Cir. 1994).

Plaintiffs' suit against Triton is brought under Section 10(b) of the Securities and Exchange Act of 1934 (the "Securities Acts"), 15 U.S.C. § 78j(b), and "Rule 10b-5" promulgated thereunder, 17 C.F.R. § 240.10b-5. Plaintiffs' claims against individual Defendants Finck and Rugg are brought under Section 20(a) of the Securities Act, 15 U.S.C. § 78t(a). To establish a claim under any [*7] of these provisions, Plaintiffs must allege "(1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which the Plaintiffs relied (5) that proximately caused the Plaintiffs' injury." *Lovelace*, 78 F.3d at 1018. Further, since suit under these provisions constitutes an allegation of fraud, the district court must apply the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil procedure. *See Williams v. WMX Tech., Inc.*, 112 F.3d 175, 177 (5th Cir. 1997). Under Rule 9(b), "in all averments of fraud . . . the circumstances constituting fraud . . . shall be stated with particularity." This means that Plaintiffs must allege the "'time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby'" *Tuchman*, 14 F.3d at 1068 (quoting *Tel-Phonic Serv., v. TBS Int'l, Inc.*, 975 F.2d 1134 (5th Cir. 1992)).

A. Plaintiffs' Complaint

The gist of Plaintiffs' complaint is as follows. Triton's financial statements contained a number of material misrepresentations regarding the company's [*8] assets. Consol. Compl. PP 10-14. The misrepresentations pertained to Triton's two major assets--namely, Triton's interest in certain offshore natural gas fields in Southeast Asia and the company's Columbia operations--as well as to its exploration and drilling activities elsewhere. *Id.* Triton employees and individual Defendants made a number of public statements touting the company's value but knew or were severely reckless not knowing that such statements relied upon misrepresentations and were therefore unsustainable. *Id.* PP 6-7. Further, Triton distributed to investors reports by independent financial analysts that likewise stated that the company's true worth was greater than its value as then recognized by the market, though Triton and individual Defendants knew that such reports also rested upon misleading financial statements. *Id.* PP 8-9. Plaintiffs purchased shares of

Triton in reliance on the company's and individual Defendants' misrepresentations *id.* P 15, and Plaintiffs were subsequently damaged when the falsity of such representations was revealed, *id.* P 18.

*1. Alleged Accounting Irregularities*

Plaintiffs point to four instances where Triton's [*9] financial statements were materially misleading and in violation of applicable accounting standards. First, Plaintiffs allege that Triton misrepresented the quality of its offshore natural gas reserves in Southeast Asia. Consol. Compl. P 10. The reserves in question were located in the Malaysia-Thailand Joint Development Area (which was in turn located in the Gulf of Thailand), and Triton's interest consisted of a one-half share in eight natural gas fields in a tract known as "Block A-18." *Id.* P 54. Plaintiffs allege that Triton in its 1997 annual report improperly classified Block A-18 as "proved" reserves, thus according the company's interest therein a market value as much as 70% more than that which it would have otherwise received. *Id.* PP 10, 109-10, 118-19. To meet the standards promulgated by the Society of Petroleum Engineers ("SPE") for "proved" reserves, there must be "'facilities to process and transport those reserves to market that are operational at the time of the estimate, or there is a commitment or reasonable expectations to install such facilities in the future.'" *Id.* P 112 (quoting SPE standards). Similarly, "proved" reserves according to the SEC are [*10] those reserves "'which geological and engineering data demonstrate with reasonable certainty to be recoverable in future years from known reservoirs under existing economic and operating condition. . . .'" *Id.* (quoting SEC regulations). Plaintiffs contend that Block A-18 met neither the SPE's nor the SEC's requirements for proved reserves. *Id.* P 113. Specifically, Plaintiffs argue that a definitive contract to sell gas from the Block A-18 reserves was lacking, and there was no reasonable expectation for such a contract in the future since the only two countries near enough to the gas fields--Malaysia and Thailand--were both in the throes of the Asian economic crisis. *Id.* PP 60, 62. The unlikelihood of a forthcoming contract with either country was underscored by the repeated failure of Triton and the governments of Malaysia and Thailand to reach a binding accord, despite two years' of negotiations and several nonbinding "agreements to agree." *Id.* PP 60, 62 & 63.

Additionally, Plaintiffs contend that an undisclosed

contingency on the development of Block A-18 made the prospect of a definitive sales contract even more remote. *Id.* P 11. Plaintiffs allege that the [*11] government of Thailand as a condition for the development of Block A-18 required that the entire tract be developed at once, "utilizing a multi-platform complex." *Id.* PP 11, 121. It is alleged that Triton did not have the capital required to fully develop Block A-18 in one go and that Triton's request that it be permitted to move forward with a limited, staged production was turned aside. *Id.* P 121. Plaintiffs contend that the contingency imposed on the development of Block A-18 further undermines Triton's characterization of the Block A-18 reserves as "proved." *Id.* P 116. As further evidence of Triton's deception, Plaintiffs note that the purchaser of Triton's interest in Block A-18, ARCO, after acquisition classified the reserves as "unproved." *Id.* P 115.

The second misrepresentation Plaintiffs point to is how Triton accounted for a transaction involving its wholly owned subsidiary, Triton Pipeline Columbia, Inc. ("TPC"). *Id.* P 12. By mid 1997, Triton's outstanding debt had approached its debt ceiling ($ 522 million outstanding versus a ceiling of $ 575 - $ 650 million). *Id.* PP 73-74. With its credit nearly tapped out, Triton was in danger of being unable [*12] to fund its capital expenditures for the remainder of the year and service its debt early the following year. *Id.* PP 75, 77-78. Sources of income the company had previously anticipated did not materialize. *Id.* PP 74-75. To generate cash, Plaintiffs contend that Triton turned to TPC. TPC owned a 9.6% interest in Oleoducto Central S.A. ("OCENSA"). *Id.* PP 64, 82 n.5. OCENSA, in turn, owned and operated a 500-mile pipeline used to transport crude oil from the interior of Columbia to the Port of Covenas. *Id.* P 64. To meet its need for cash and at the same time avoid breaching its debt ceiling, Plaintiffs allege that Triton in 1997 borrowed against its interest in the OCENSA pipeline (by using TPC as collateral), though Triton actually disclosed the transaction as a "sale." *Id.* PP 76, 81, 94-97. After the transaction, Triton "retained all of the traditional indications of ownership," including control of the pipeline, a right of use, and a constructive right of first refusal should TPC's purchaser decide to sell. *Id.* PP 84, 88-89. Also, and unbeknownst to investors, Triton was liable for the difference between the price it got for TPC and the price TPC's purchaser [*13] received for the company if TPC was later sold. *Id.* PP 87, 90. The TPC transaction was accounted for as a sale in Triton's 1997 10-K disclosure, filed March 31, 1998,

*id.* P 97, and Triton recognized a gain of $ 50 million from the transaction in its first-quarter 10-Q disclosure, filed May 13 of the same year, *id.* P 82. In actuality, Plaintiffs contend that the TPC transaction saddled Triton with an additional $ 100 million in debt. *Id.* P 168.

Plaintiffs contend that Triton's accounting for the TPC transaction was in violation of Statement 125 of the Financial Accounting Standards Board ("FASB"). *Id.* P 171. FASB Statement 125, entitled "Accounting for Transfers and Servicing of Financial Assets and Extinguishment of Liabilities," provides that whether a transaction constitutes a sale depends in part on whether the putative seller relinquished control over the asset and on whether the seller is subject to post-transaction price risk. *Id.* P 172-73. Plaintiffs contend that neither of these criteria was met. *Id.* PP 84, 88-90.

Third, Plaintiffs contend that Triton failed to take a timely write-down against its Columbian oil fields. *Id.* PP 13 & 98. Triton's [*14] interest in the Columbian fields was the company's only source of revenue for many years, and the fields' continuing productivity was essential to Triton's financial health. *Id.* P 53. Plaintiffs contend that by 1998 crude oil prices had fallen to the point where Triton was required to make a write-down against its Columbian assets of at least $ 45 million in its first-quarter 10-Q disclosure, for the period ending March 31, 1998. *Id.* PP 99 & 123. Triton released its 10-Q in May 1998, but the disclosure did not show the write-down. *Id.* P 123. Triton did not write down its Columbian assets until sometime alter July 1998, *see id.* P 159 (quoting July 17, 1998 Triton press release stating that the company would take a charge against earnings as a result of low oil prices), and Plaintiffs contend that Triton's failure to make a timely write-down materially overstated the value of the company's assets, *id.* PP 100 & 123. Had the write-down been taken when required, Plaintiffs allege that it would have revealed that Triton's assets in Columbia were generating little or no profit and that the situation would not improve unless the price of crude oil increased or production [*15] costs went down. *Id.* PP 100 & 124.

Fourth, Plaintiffs contend that Triton failed to account for its decision to abandon exploration activities in certain foreign countries. *Id.* P 14. Triton had licenses to explore for oil and gas in 29 countries. *Id.* P 125. In 1997, it was determined that the company's exploration activities in two such countries--Guatemala and

Case 4:10-md-02185   Document 372-1   Filed in TXSD on 05/23/12   Page 202 of 215

Page 5

2001 U.S. Dist. LEXIS 5920, *15; Fed. Sec. L. Rep. (CCH) P91,443

China--were unsuccessful, and Triton relinquished its contracts with those nations. *Id.* But rather than recognizing its decision to forgo further operations in Guatemala and China in the accounting period in which the decision was made, Triton waited until the third quarter of 1998 to write-off its investments in those counties. *Id.; see id.* P 159 (quoting July 17, 1998 Triton press release stating that the company would write off the cost of its exploration expenditures). Plaintiffs contend that the company's failure to make a timely write off added to the misconception that Triton's assets were worth more than their actual value. *Id.* P 125.

In addition to the accounting standards described above, Plaintiffs contend that Triton violated several Generally Accepted Accounting Principles ("GAAP"). [*16] *Id.* P 176. Specifically, Plaintiffs point to Concepts Statement No. 1, P 34, which requires that companies "provide information useful to present and potential investors and creditors," *id.* P 176(a); Concepts Statement No. 1, P 40, which provides that financial reporting should include information about the effects of transactions on enterprise resources, *id.* P 176(b); Concepts Statement No. 1, P 42, which notes that information about a company'S financial performance is used by investors to make estimates about future performance, *id.* P 176(d); and Concepts Statement No. 2, PP 58-59, which provides that financial reporting should be both reliable and relevant, *id.* P 176(e).

### 2. Alleged Misstatements

Plaifltiffs contend that individual Defendants Finck and Rugg knew or should have known about the above-described accounting irregularities. Consol. Compl. P 120. Plaintiffs contend that each, by virtue of their positions within company--Finck, chairman and C.E.O., *id.* P 25; Rugg, senior V.P. and C.F.O., *id.*--had access to confidential information and were responsible for approving Triton's financial statements, *id.* P 26. Additionally, Plaintiffs note [*17] that both Finck and Rugg were longtime petroleum lenders at J.P. Morgan before moving to Triton. *Id.* On March 30, 1998, Triton issued a press release declaring that the company was putting its assets up for sale. *Id.* P 103. Knowing of the foregoing accounting irregularities, Plaintiffs point to a number of statements by individual Defendants and Triton employees that were materially misleading end were made with intent to deceive the public regarding the success of the announced sale. Plaintiffs contend that

Defendants knew or were reckless in not knowing that their statements regarding Triton's financial health would be relied upon by analysts and investors alike. *Id.* PP 41-45.

(a). On April 6, 1998, Finck was interviewed by *Petroleum Finance Week*. Several days before, Triton had issued a press release stating the company would attempt to sell some or all of its assets. Consol. Compl. P 103. In the release, Finck declared that "the stock market has not yet fully recognized the value" of the company's assets in the Gulf of Thailand and in Columbia. *Id.* (quoting press release). In the April 6 interview that followed, Finck stated that the sale was designed to "bridge [*18] the gap" between what analysts thought the company was worth and Triton's market value *Id.* P 126 (quoting interview).

(b). On April 13, 1998, Finck was quoted in *Oil Daily. Id.* P 128. Commenting on the prospect of the sale of Triton's Columbian assets, Finck said, "the level of interest seems high." *Id.* (quoting article).

(c). On April 15, 1998, Paine Webber issued a report entitled "Triton Energy--Likely Sale of Company Poses Opportunity for Investors." *Id.* P 131. The report declared that Paine Webber had "heightened confidence that the entire company would be sold this year at a price of $ 45 - $ 50 per share or more. . . ." *Id.* (quoting report). The report went on to say that "there appears to be a vast level of interest for the entire company" and that "we are more convinced than ever that at the end of the day the entire company will be sold." *Id.* The next day, on April 16, Triton investor relations faxed the Paine Webber report to investors. *Id.*

(d). On April 24, 1998, Finck was interviewed by Agence France Presse. *Id.* P 133. In that interview, Finck commented on buyer interest in Triton's Gulf of Thailand assets: "We have [a] tremendous amount [*19] of people wanting to invest in Asia for a project of this size[;] the interest has been intense and gratifying." *Id.* (quoting interview). Finck added that, "To the best of our knowledge, there is no other natural gas project comparable to this one [i.e., Block A-18] anywhere in the world." *Id.* P 134.

(e). On May 11, 1998, *Petroleum Finance Week* reported on a conference call Triton vice president Greg Dunlevy had with reporters. *Id.* P 136. Commenting on efforts to sell Triton's assets, Dunlevy said, "The interest

Case 4:10-md-02185   Document 372-1   Filed in TXSD on 05/23/12   Page 203 of 215

Page 6

2001 U.S. Dist. LEXIS 5920, *19; Fed. Sec. L. Rep. (CCH) P91,443

from the industry is intense in the assets of the company." *Id.* (quoting interview).

(f). On May 12, 1998, Finck was quoted by Renters as saying that Triton was "undervalued" *Id.* P 139 (quoting interview). When asked whether potential purchasers of company assets shared that view, Finck responded, "We believe so." *Id.* Plaintiffs note that Finck's comments to Reuters came on the heels of a May 6 report by J.P. Morgan, Finck's former employer. *Id.* P 138. In that report, the investment bank declared, "we are quite confident that at the end of the current 'strategic review' process, the entire Company will be sold. Our $ 50 per share target [*20] is based on a reasonable 'risked' valuation of Triton's stated total resource base." *Id.* (quoting report).

(g). The same day, May 12, 1998, Triton held its annual shareholder meeting in Dallas. *Id.* P 141. At the meeting, Finck repeated that interest in Triton assets was "strong," *id.*, and he affirmed that the company thought would-be purchasers shared his view of the company's worth, *id.* P 142. After the meeting, Finck told Reuters that interest in company assets "has been strong from all major oil companies throughout the world, the major players in the business." *Id.* P 141 (quoting interview).

(h). In the May 1998 issue of *Oil & Gas Investor*, Finck was quoted as saying, "we believe the stock market has not yet fully recognized the value" of Triton's Columbia and Thailand assets. *Id.* P 147 (quoting article). In that same issue, Robert S. Morris of Paine Webber was quoted as saying, "Triton, in official statements, 'did not rule out' the sale of the company." *Id.*

(i). On July 3, 1998, Credit Suisse First Boston issued a report entitled "'Strategic Alternatives' Process Remains Underway." *Id.* P 149. The report projected that all of Triton's assets [*21] would be sold and at a price of around $ 50 per share." *Id.* The report also addressed rumors that would-be buyers that had examined company assets left disappointed:

> Rumors that Triton is worth less than the current stock price have become frequent and are generally attributed to "sources" who have been through the data room. Our view about these and all subsequent rumors about Triton's real value is that we should expect none of the interested parties to publicly express enthusiasm for

assets they are evaluating for purchase. The fact remains that the process has been altered twice (expansion in number of data rooms and the period open for viewing) due to greater than expected demand from the industry. To our minds this is not surprising given the infrequent nature of companies offering for sale interests in world-class discoveries.

*Id.* P 150 (quoting report). Triton investors relations faxed out the Credit Suisse report the same day it was issued, *id.*, though the period for bidding on company assets had ended June 30, *id.* P 148.

(j). On July 2, 1998, Credit Suisse First Boston issued a second report, styled "process update." *Id.* P 151. In it, [*22] the investment bank stated that the bidding process was "nearing completion" and that "we continue to see a sale of the entire company as the most likely scenario." *Id.* (quoting report). The report went on to state that "we continue to believe a rational range of outcome could yield . . . Triton a value of $ 44 - $ 68 per share." *Id.* This report was faxed to investors by Triton investor relations July 6, about one week after the time to bid for Triton assets bad ended. *Id.* PP 151 & 155.

(k) Also on July 6, Triton investor relations faxed to investors an article from the June 29, 1998 edition of *Oil & Gas Journal. Id.* P 152. The article repeated Triton's claim that interest in Block A-18 from international gas companies was "overwhelming," and Finck was quoted as saying that interest in that asset was "more than you ever imagined." *Id.*

B. Application of Law

Defendants argue, in essence, that Plaintiffs' complaint fails to allege with the required particularity (1) a misstatement or (2) scienter. Defendants do not articulate any cognizable argument with respect to the remainder of the elements in Plaintiffs' securities fraud claim.

*1. Whether Misstatements* [*23] *Alleged with Particularity*

Defendants argue that Plaintiffs have failed to allege misstatements on the part of Triton with respect to the company's financial disclosures. Specifically, Defendants contend that as to each of the four instances where Triton

Case 4:10-md-02185   Document 372-1   Filed in TXSD on 05/23/12   Page 204 of 215

Page 7

2001 U.S. Dist. LEXIS 5920, *23; Fed. Sec. L. Rep. (CCH) P91,443

supposedly misrepresented company assets, Plaintiffs have failed to show a violation of the applicable accounting standards. Whether Defendants violated the applicable accounting standards is a question of fact. *See Ganino v. Citizens Util. Co.*, 228 F.3d 154, 164-65 (2d Cir. 2000); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1421 (3d Cir. 1997) ("*Burlington Coat*").

In one of the cases cited above, *Burlington Coat*, the Third Circuit held that to withstand a motion to dismiss for failure to allege a misstatement, it is enough that plaintiffs alleged a violation of accounting standards and stated that such violation resulted in a material misstatement. 114 F.3d at 1421. In that case, plaintiffs alleged that defendant corporation materially overstated its earnings in violation of the Generally Accepted Accounted Principles ("GAAP") promulgated by FASB. Pointing to [*24] Statement of Financial Accounting Concepts ("SFAC") No. 6, plaintiffs alleged that defendant failed to honor the "matching principle," which requires that expenses incurred to generate revenue be recognized in the same accounting period as the resulting revenue. Plaintiffs alleged that defendant's failure to honor this principle artificially overstated the company's earnings for specific periods. Defendant, in turn, argued that plaintiffs failed to prove the violation of an accounting standard; that the accounting standard defendant was accused of violating was not GAAP; and that in any event its method of accounting was disclosed in defendant's financial statements and therefore was not misleading. The Third Circuit rejected defendant's arguments, concluding, respectively, that whether an accounting principle was violated is a fact-sensitive inquiry not well-suited for resolution in the context of a motion to dismiss, *i.d*; that GAAP includes broad statements of accounting principles (e.g., SFAC No. 6) as well as more specific guidelines, *id.* at 1421 n.10; and that whether disclosure of defendant's accounting practices explained the alleged earnings overstatement [*25] and also avoided any chance of misunderstanding was likewise a question better resolved at a later stage of the litigation, *id.* at 1421.

*Burlington Coat* is on all fours with the case at bar. Here, Plaintiffs have alleged that Triton violated two named standards (the SPE's and the SEC's) pertaining to the classification of gas reserves. Plaintiffs also allege that in accounting for the TPC transaction as a sale, Triton violated FASB Statement 125 since the company retained control over the asset transferred and remained subject to continuing price risk. Further, though more generally, Plaintiffs allege that Triton violated a number of provisions found in the FASB Concepts Statements. No more than that is required to allege a misstatement at this stage of the proceedings. *See Ganino*, 228 F.3d at 165 (reversing dismissal and concluding that whether revenue could be properly regarded as income "is an issue of fact that cannot be decided at this stage of the litigation"); *In re Baker Hughes Sec. Litig.*, 136 F. Supp. 2d 630, 2001 WL 327605, at *11 (S.D. Tex. 2001) ("*Baker Hughes*") (noting that "disputes over the realities [*26] of [a company's] financial health are not properly resolved" on a motion to dismiss); *cf. In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 374 (3d Cir. 1993) ("The complaint wholly fails to allege the established accounting practices that the defendants supposedly departed from and the manner in which they supposedly did so."). Additionally, like the defendants in *Burlington Coat*, Defendants here argue that Triton's financial statements fully disclosed the underlying bases for its accounting decisions, thus negating any misrepresentation. For this Court to sustain Defendants' argument, it would have to find as a matter of law that reasonable minds could not disagree whether Triton's financial statements were misleading. *See Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1308 (C.D. Cal. 1996) ("*Marksman*"). Based on the record before it, the Court cannot so conclude.

Defendants also contend that the complaint fails to allege with particularity misstatements by Triton employees and individual Defendants. To repeat, Plaintiffs contend that individual Defendants and employees of Triton, through their statements and affirmations [*27] described in (a) through (k) above, misled the investing public about the likelihood that all of Triton's assets would be sold at auction and about the possibility that upon sale investors would receive a price for their shares in excess of the then-present market value. *Supra* at 10-14. The statements and affirmations were misleading, Plaintiffs allege, because they were untenable in light of the state of certain company assets. *Supra* at 5-10. These contentions, along with attendant details supplied by Plaintiffs, are sufficient to allege misrepresentations on the part of Defendants. *See Rubinstein v. Collins*, 20 F.3d 160, 167-68 (5th Cir. 1994) (concluding that a misstatement of fact was alleged where defendants made or adopted numerous supposedly unsupportable projections); *Robertson v. Strassner*, 32 F. Supp. 2d 443, 450 (S.D. Tex. 1998) (same).

2001 U.S. Dist. LEXIS 5920, *27; Fed. Sec. L. Rep. (CCH) P91,443

The allegations described in *Rubinstein v. Collins* are in accord with those stated here. In *Rubinstein*, defendants--an oil company and certain of its executives--announced the discovery of a substantial natural gas reserve. Soon after, an analyst report issued estimating the volume of gas [*28] within the reserve. Questioned about the report, an executive said, "I would not be critical of [it]." A second executive described as "realistic" a report that estimated that the company's asset value was in the $ 66 - $ 100 per share range (at the time the stock was trading at $ 15), and an employee from the company's investor relations office described the find as "exceptionally rich" and predicted production would be "unusually high." Another report touting the size and potential value of the discovery was sent to investors. Plaintiffs brought suit when it was later discovered that initial well tests and subsequent development of the reserve did not support analysts' and executives' statements. Reversing the district court's dismissal, the Fifth Circuit rejected any notion that predictive statements are per se not misleading, even where such statements are made alongside cautionary language. 20 F.3d at 167-68. As in *Rubinstein*, in the case at bar Plaintiffs contend that Triton and its officers made a number of statements inconsistent the state of company assets, and like the defendants there, Defendants here are alleged to have adopted analyses regarding company worth that were [*29] also not in accord with Triton's financial affairs.

In contesting any showing of misstatement by Plaintiffs, Defendants rely heavily on *Eisenstadt v. Centel Corp.*, 113 F.3d 738 (7th Cir. 1997). That case is of no help, however. In *Eisenstadt*, defendant executives allegedly overstated the prospects of a company selling its assets at auction. Prior to the beginning of the auction, several would-be buyers rescinded their interest in the target company. Despite this, defendants insisted that the "bidding process continues to go very well" and that there was "widespread interest" in the target company's assets. Ultimately, the auction failed, and plaintiff stockholders brought suit. On appeal from the district court's grant of summary judgment, the Seventh Circuit, Judge Posner writing, concluded that statements like the ones made by defendants would not likely cause an investor to pay more for a stock than he or she otherwise would have. *Id.* at 745. But Judge Posner opined that the situation would be a different one if defendants' statements concealed a forthcoming disaster. *Id.* That is the scenario Plaintiffs describe here--namely, that there [*30] was no

reasonable basis for Defendants' statements that all of Triton's assets would be sold and that investors would receive a premium for their shares.

### 2. Whether Scienter Alleged with Particularity

Defendants argue that Plaintiffs have failed to allege motive--the first prong of the so-called motive-and-opportunity test--or that Defendants' misrepresentation were conscious or constituted severe recklessness. To allege scienter, one or the other--that is, either motive and opportunity or severe recklessness--must be stated with particularity such that a strong inference of intent to defraud may be deduced. *See Tarica v. McDermott Int'l Inc.*, 2000 U.S. Dist. LEXIS 14144, No. 99- CV-3831, 2000 WL 1346895, at *5 (E.D. La. Sept. 19, 2000); *Branca v. Paymentech, Inc.*, 2000 U.S. Dist. LEXIS 1704, No. 3:97- CV-2507-L, 2000 WL 145083, at *5 (N.D. Tex. Feb. 8, 2000); *Robertson*, 32 F. Supp. 2d at 447. The requirement of a strong inference of scienter was cemented by § 101(a) of the Private Securities Litigation Reform Act 1995 ("PSLRA"), which is now codified at 15 U.S.C. § 78n-4(b)(2).

The Court turns to the question whether Plaintiffs have alleged a strong inference [*31] of severe recklessness. Severe recklessness refers

> to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Shushany v. Allwaste, Inc.*, 992 F.2d 517, 521 (5th Cir. 1993) (internal quotations omitted). Severe recklessness does not require that the defendant be aware of the actual falsity of his or her representation. *See Baker Hughes*, 2001 WL 327605, at *16. As described above, Plaintiffs' scienter allegation runs as follows. Plaintiffs contend that a handful of assets accounted for most or all of Triton's market value, *supra* at 4; that Triton committed a series of accounting violations with respect to four such assets, *supra* at 5-9; that the company concealed critical information concerning what was perhaps Triton's most important asset--namely, its interest in certain natural gas

Case 4:10-md-02185   Document 372-1   Filed in TXSD on 05/23/12   Page 206 of 215

Page 9

2001 U.S. Dist. LEXIS 5920, *31; Fed. Sec. L. Rep. (CCH) P91,443

fields located in the Gulf of Thailand, *supra* at 5-7; that [*32] Triton failed to make a timely write-down against its only revenue-producing asset, the company's oil fields in Columbia, effectively disguising the fact that Triton's drilling there was operating at or only slightly above cost, *supra* at 7-8; that individual Defendants knew (or were severely reckless in not knowing) that Triton's small number of assets made the proper representation of each essential to investors, *supra* at 9-10; and that this fact, coupled with individual Defendants' positions and experience with the particular financial disclosures at issue, made individual Defendants' and Triton's representations regarding the sale of company assets severely recklessness or deliberately false. Time and again, courts have held that tautologies approximating this one are sufficient to avoid dismissal on the grounds that plaintiff has failed to allege scienter. *See, e.g., In re MicroStrategy, Inc, Sec, Litig.*, 115 F. Supp. 2d 620, 636-37 (E.D. Va. 2000) ("*MicroStrategy*") (holding that "alleged GAAP violations and the subsequent restatements are of such a great magnitude" that they alone "compel an inference that fraud or recklessness was afoot"); *Carley Capital Group v. Deloitte & Touche*, 27 F. Supp. 2d 1324, 1339-40 (N.D. Ga. 1998) [*33] (concluding that alleged violations of accounting principles "when combined with a drastic overstatement of financial results can give rise to a strong inference of scienter . . . . [and] the totality and magnitude of the . . . accounting violations [may] constitute strong circumstantial evidence of reckless or conscious misbehavior"); *Marksman*, 927 F. Supp. at 1313 (stating that when combined with other circumstances suggesting fraudulent intent. . . . improper accounting may support a strong inference of scienter"). Accordingly, the Court concludes that Plaintiffs have likewise alleged a strong inference of conscious intent or severe recklessness.

Defendants' arguments in support of their contention that Plaintiffs have failed to allege scienter are without merit. First, Defendants argue that GAAP violations standing alone are insufficient to establish scienter. This contention is well founded. *See MicroStrategy*, 115 F. Supp. 2d at 634-35. But this does not mean that

> a misapplication of accounting principles or a restatement of financials can never take on significant inferential weight in the scienter calculus; to the contrary, when [*34] the number, size, timing, nature, frequency, and context of

the misapplication or restatement are taken into account, the balance of the inferences to be drawn from such allegations may shift significantly in favor of scienter (or, conversely, in favor of a nonculpable state of mind).

*Id.* at 635. Thus, in *MicroStrategy*, the court held that a strong inference of scienter was raised where defendant company allegedly overstated its revenues for seven consecutive quarters, which was due to the company's improper recognition of revenues from contracts that had not yet been finalized. This allegation, the court noted, went "well beyond merely alleging that MicroStrategy misapplied accounting principles . . . by alleging in some detail the magnitude of the restated financials and the pervasiveness and repetitiveness of MiciroStrategy's GAAP violations; the simplicity of the accounting principles violated in this case; and the importance of the contracts involved." *Id.* at 636. As detailed above, the *MicroStrategy* plaintiffs' scienter allegations are in accord with Plaintiffs' here.

Defendants also contend that Plaintiffs have failed to allege [*35] that individual Defendants knew (or were reckless in not knowing) of the supposed accounting violations, and that absent such a showing, such knowledge cannot be imputed to them merely on the basis of individual Defendants' "position" within the company or "experience" with the particular financial disclosures at issue. Again, this proposition is likely a correct one, *see In re Criimi Mae, Inc. Sec. Litig.*, 94 F. Supp. 2d 652, 661-62 (D. Md. 2000), but Plaintiffs do not simply argue scienter by virtue of Defendants' positions and experience. Rather, as discussed above, Plaintiffs contend that Defendants' positions and experience are factors that pled with others (e.g., the size of the accounting irregularities and that they pertained to Triton's most important assets) state scienter with the required measure of specificity. To the extent Defendants argue that position-and-experience evidence is incompetent as proof of scienter, the Court has not found any case to that effect and Defendants have brought none to the Court's attention. Indeed, most authorities have found opposite. *See, e.g., Cohen v. Koenig*, 25 F.3d 1168, 1174 (2d Cir. 1994) (reversing [*36] dismissal where "sufficient facts were pleaded to suggest that plaintiffs maybe able to prove that defendants more likely than not knew" of fraud); *MicroStrategy*, 115 F. Supp. 2d at 653 (stating that "the mere fact of access" does not equate

2001 U.S. Dist. LEXIS 5920, *36; Fed. Sec. L. Rep. (CCH) P91,443

with knowledge of the charged fraud but that the greater the defendant's access and involvement "the more support an inference of scienter takes on").

Plaintiffs also argue that they have alleged a strong inference of scienter by stating motive and opportunity to commit fraud on the part Defendants. The Court notes that authorities are conflicting on the question of motive, which is the only prong of the motive-and-opportunity test at issue here. *Compare Wight v. BankAmerica Corp.*, 219 F.3d 79, 92 (2d Cir. 2000) (concluding that alleging financial interest may suffice for motive); *with Coates v. Heartland Wireless Comm., Inc.*, 55 F. Supp. 2d 628, 642-43 (N.D. Tex. 1999) (alleging fraud in furtherance of personal or corporate financial interest insufficient for motive). Moreover, recent authorities at odds on whether a showing of motive and opportunity can raise a strong inference of scienter at [*37] all. *See Baker Hughes*,

2001 WL 327605, at *7-*9 (cataloging cases discussing motive and opportunity decided under the PSRLA). Having concluded that Plaintiffs have alleged a strong inference of severe recklessness, the Court need not delve into this thicket now.

III. CONCLUSION

For each of the foregoing reasons, IT IS ORDERED that Defendants' motion to dismiss, Doc. No. 57, is DENIED.

Signed this *11th* day of May, 2001.

DAVID FOLSOM

UNITED STATES DISTRICT JUDGE

**EXHIBIT 9**



**EDWARD MILLER, Plaintiff-Appellant v. NATIONWIDE LIFE INSURANCE CO., Defendant-Appellee**

**No. 06-31178**

**UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT**

**2008 U.S. App. LEXIS 16922**

**August 6, 2008, Filed**

**NOTICE:** PLEASE REFER TO FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1 GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**SUBSEQUENT HISTORY:** Summary judgment granted, in part, summary judgment denied, in part by Miller v. Nationwide Life Ins. Co., 2010 U.S. Dist. LEXIS 143911 (E.D. La., May 10, 2010)

**PRIOR HISTORY:** [*1]
Appeals from the United States District Court for the Eastern District of Louisiana. USDC No. 2:06-CV-02334.
Miller v. Nationwide Life Ins. Co., 391 F.3d 698, 2004 U.S. App. LEXIS 24200 (5th Cir. La., 2004)

**COUNSEL:** For EDWARD MILLER, Plaintiff - Appellant: James A McPherson, Mary Schillesci McPherson, McPherson & McPherson, Poplarville, MS.

For NATIONWIDE LIFE INSURANCE CO, Defendant - Appellee: George Davidson Fagan, Leake & Andersson, New Orleans, LA; Charles C Platt, WilmerHale, New York, NY.

**JUDGES:** Before WIENER, BARKSDALE, and DENNIS, Circuit Judges.

**OPINION**

**PER CURIAM:** *

> \* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

The issue in this case is whether the district court erred in granting the Rule 12(b)(6) motion of Defendant-Appellee Nationwide Life Insurance Company ("Nationwide") to dismiss Plaintiff-Appellant Edward Miller's ("Miller") breach of contract and Securities Act claims for failure to state a claim and res judicata. We REVERSE and REMAND the case to the district court for further proceedings.

Factual and Procedural Background

In 2001, Miller purchased two variable annuity contracts from Nationwide for roughly $ 1.4 million. Miller chose these particular [*2] annuities because they provided him a great degree of control over the types of securities in which he invested and guaranteed his ability to quickly and economically manage his investments. The annuities, which are comprised of various underlying sub-accounts, allow owners like Miller to quickly and without charge select and change the particular sub-accounts into which their funds are placed. To facilitate such active fund management, Miller's annuity contract, styled "Certificate Agreement," guarantees him

the right to "transfer variable assets among various funds without charge" and "make telephone exchanges where permitted by state law." The Certificate Agreement also explicitly states "your [Miller's] rights under this Certificate Agreement cannot be taken away from you."

Miller exercised his contract rights and actively transferred assets among the sub-accounts underlying his annuities, but, contrary to the contractual language, in 2002, Miller began incurring fees for these transfers. In 2003, Miller filed a class action, separate from the instant suit, against Nationwide (the "2003 Suit"), alleging that Nationwide's imposition of these transfer-fee charges violated securities [*3] laws and represented a breach of contract. *See Miller v. Nationwide Ins. Co.*, No. Civ. A. 03-1236, 2003 U.S. Dist. LEXIS 19332, 2003 WL 22466236 (E.D. La. Oct. 29, 2003). The district court in the 2003 Suit dismissed Miller's securities law claims as prescribed and dismissed the breach of contract claim pursuant to the Securities Litigation Uniform Standards Act ("SLUSA"), 15 U.S.C. § 77p, which mandates dismissal of any class action raising state law misrepresentation claims concerning a covered security. See 2003 U.S. Dist. LEXIS 19332, [WL] at *6. Further, the district court found that Miller's breach of contract claim against Nationwide should also fail because "documents in the public record evidence the fact that Nationwide was not responsible for imposing the fees in question." *Id.* Thus, the district court dismissed all of Miller's claims "with prejudice." *Id.* Miller appealed the judgment, and a separate panel of this court affirmed the district court's dismissal. *See Miller v. Nationwide Ins. Co.*, 391 F.3d 698, 703 (5th Cir. 2004).

Despite the unsuccessful 2003 Suit, Miller carried on his relationship with Nationwide and continued to trade sub-accounts within his annuities; however, Miller encountered further obstacles to his management [*4] of the annuities as Nationwide imposed additional restrictions on his sub-account transfers. For example, in 2004 Nationwide informed Miller that it was limiting the number of telephone and internet transfers he could make to twenty per year. Also, Miller claims that Nationwide failed to provide him with a prospectus, which outlined new transfer fees, dated May 1, 2005, until sometime after June 7, 2005, and Miller alleges that this delay caused him to incur a substantial cost in transfer fees.

In 2006, Miller brought the present suit against Nationwide (the "2006 Suit"), leading to the instant appeal. [1] In the 2006 complaint, Miller alleged: 1) that Nationwide breached the Certificate Agreement by charging a fee for transferring assets among various funds ("transfer fees claim"), 2) that Nationwide breached the Certificate Agreement by limiting his right to make transfers via telephone ("telephone transfer claim"), and 3) that Nationwide violated the Securities Act of 1933 by failing to timely provide Miller with his May 1, 2005 prospectus ("late prospectus claim"). [2]

> 1  Miller's present 2006 Suit is an individual suit, not a class action.
> 2  In his complaint, Miller actually brought four [*5] claims against Nationwide, but Miller stipulated to dismiss one of the claims. Thus, only the three claims listed above are relevant to this appeal.

Before the district court, Nationwide filed a motion to dismiss these claims for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) and as barred by res judicata. During a hearing on the matter, the district court granted Nationwide's motion and dismissed all of Miller's claims in an oral order unaccompanied by written opinion. The district court dismissed Miller's transfer fees claim under Rule 12(b)(6) [3] and dismissed the other two claims, the telephone transfer claim and the late prospectus claim, on res judicata grounds. [4] Miller now appeals the district court's dismissal of all three claims.

> 3  Specifically, the district court stated "I'm going to go ahead and rule on the first cause of action that I do feel, regardless of whether res judicata applies, . . . that the first cause of action should be dismissed under 12(b)(6)."
> 4  The district court stated "this was dismissed with prejudice . . . . I just feel that res judicata applied."

Analysis

This court reviews de novo a district court's disposition of a motion to dismiss [*6] either under Rule 12(b)(6) for failure to state a claim or for res judicata. *See Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 571 (5th Cir. 2005); *Bombardier Aerospace Employee Welfare Benefits Plan v. Ferrer, Poirot & Wansbrough*, 354 F.3d 348, 351 (5th Cir. 2003). Applying this standard, we turn to Miller's claims.

A. The Transfer Fees Claim and Telephone Transfer

Claim

In reviewing the grant of a motion to dismiss under Rule 12(b)(6), we take all the facts alleged in the complaint as true. *See Kennedy v. Chase Manhattan Bank USA, N.A.*, 369 F.3d 833, 839 (5th Cir. 2004). Further, we construe the complaint in the light most favorable to the plaintiff and draw all reasonable inferences in the plaintiff's favor. *See Lovick v. Ritemoney, Ltd.*, 378 F.3d 433, 437 (5th Cir. 2004); *see also Priester v. Lowndes County*, 354 F.3d 414, 418 (5th Cir. 2004) (noting that motions to dismiss are viewed with disfavor and rarely granted). To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007).

Miller's complaint alleges that "Nationwide breached the [*7] contract by charging Miller a fee for transferring variable assets among various funds" despite a contractual guarantee that no transfer fees would be charged. Identifying specific instances of Nationwide allegedly charging transfer fees, Miller claims that "Nationwide reduced the contract balance [of his annuity] by an amount equal to one percent (1%) of the amount transferred out of a subaccount . . . ."

Nationwide argues that Miller's complaint fails to state a claim because documents in the public record show that Nationwide did not charge the fees in question. Specifically, Nationwide contends that the annuities' prospectuses from 2002 and beyond reveal that the underlying mutual funds, not Nationwide, charged the complained-of transaction fee. For example, a 2002 supplemental prospectus states that "some underlying mutual funds may assess (or reserve the right to assess) a short term trading fee . . . any short-term trading fees paid are retained by the underlying mutual funds, not by Nationwide." The District Court accepted these arguments by Nationwide and thereupon dismissed Miller's transfer fees claim for failure to state a claim.

We cannot agree with the district court's [*8] judgment, however, because the complaint, viewed in the light most favorable to the plaintiff, pleads facts that plausibly support a claim. Miller claims that Nationwide charged him transaction fees, and he cites specific instances of Nationwide billing and withdrawing money from his annuity account in payment of such fees, despite contractual guarantees to the contrary. While

Nationwide's argument that the underlying mutual funds, not Nationwide, charged these fees may create a disputed factual issue as to Miller's allegations, resolution of such a factual dispute is improper under a 12(b)(6) inquiry. [5] At the 12(b)(6) stage, we take the complaint as true and view the facts in the light most favorable to the Plaintiff to determine whether a plausible claim has been made. *See Kennedy*, 369 F.3d at 839; *Lovick*, 378 F.3d at 437. Miller alleges specific instances of Nationwide billing his account, and though we may consider documents in the public record in our 12(b)(6) evaluation of Miller's complaint, [6] the public-record prospectuses cited by Nationwide do not conclusively refute Miller's allegations. Thus, we hold that Miller's complaint states a valid claim for relief and that dismissal [*9] of the claim under Rule 12(b)(6) was improper.

5    As further evidence that there is a factual dispute best resolved by the district court on remand, we note that, on February 5, 2008, Miller's counsel submitted a letter to us pursuant to Rule 28(j) of the Federal Rules of Appellate Procedure detailing that the majority of the mutual funds charging a fee to Nationwide's annuity holders have been, and are, "managed by indirect subsidiaries of either Nationwide Mutual Insurance Company or Nationwide Financial Services, Inc."

6    *See, e.g.*, *Papasan v. Allain*, 478 U.S. 265, 269 n.1, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986) ("Although this case comes to us on a motion to dismiss under Federal Rule of Civil Procedure 12(b), we are not precluded in our review of the complaint from taking notice of items in the public record . . . ."); *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 286 (5th Cir. 2006) ("[T]he court may . . . rely on 'public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit . . .'") (internal citation omitted); *Mahone v. Addicks Utility Dist.*, 836 F.2d 921, 924 n.1 (5th Cir. 1988); [*10] *see also* 5B Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 n.1 (3d. ed 2008) (chronicling instances of courts considering matters in the public record in evaluating 12(b)(6) motions).

Alternatively, Nationwide asserts that even if

12(b)(6) dismissal of Miller's claim was improper, the district court's dismissal of the transfer fees claim should be upheld because the claim is barred by res judicata. However, we conclude that it is not barred by res judicata because Miller has never received a final judgment on the merits of his transfer fees claim.

We apply federal res judicata principles because this case falls under federal-question jurisdiction. [7] *See Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 324 n.12, 91 S. Ct. 1434, 28 L. Ed. 2d 788 (1971) ("In federal-question cases, the law applied is federal law. This Court has noted, 'It has been held in non-diversity cases since *Erie R. Co. v. Tompkins*, that the federal courts will apply their own rule of res judicata.'") (internal citations omitted).

> [7]   Miller's claim based on the Securities Act of 1933, 15 U.S.C. § 77a, triggers federal-question jurisdiction, *see* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction [*11] of all civil actions arising under the Constitution, laws, or treaties of the United States"), and federal supplemental jurisdiction extends to Miller's breach of contract claims. *See* 28 U.S.C. § 1367(a) ("[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution").

Under federal law, res judicata bars relitigation of an issue if four conditions are met: 1) the parties in the later action are identical to the parties in the prior action, 2) judgment in the prior action was rendered by a court of competent jurisdiction, 3) the prior action concluded with a final judgment on the merits, and 4) the same claim or cause of action was involved in both suits. *See United States v. Shanbaum*, 10 F.3d 305, 310 (5th Cir. 1994). If these conditions are satisfied, a plaintiff is prohibited "from raising any claim . . . in the later action that was or could have been raised in support of . . . the cause of action asserted [*12] in the prior action." *Id.* at 310 (emphasis original).

Regarding his transfer fees claim, Miller concedes that three of these elements are met: the parties are the same, the 2003 Suit was before a court of competent

jurisdiction, and the same breach of contract claim based on transfer fees was brought in the 2003 Suit. Miller argues, however, that res judicata does not bar his present transfer fees claim because in the 2003 suit he never received a final judgment on the merits of this claim, which was dismissed as precluded under SLUSA. Miller's argument is persuasive because our precedent demonstrates that the SLUSA dismissal of his claim constitutes a jurisdictional dismissal rather than a judgment on the merits.

Federal Rule of Civil Procedure 41(b), provides that "[u]nless the dismissal order states otherwise, a dismissal under this subdivision (b) and any dismissal not under this rule--*except one for lack of jurisdiction*, improper venue, or failure to join a party under Rule 19--operates as an adjudication on the merits." *Id.* (emphasis added). Thus, Rule 41(b) contains an exception providing that claims dismissed for lack of jurisdiction are considered not to have been dismissed [*13] on the merits and therefore not to hold res judicata effect. *See* 18A Charles A. Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 4436 n.1 (2d ed. 2002) ("There is little mystery about the res judicata effects of a judgment that dismisses an action for lack of subject-matter or personal jurisdiction or for improper venue. Civil Rule 41(b) provides that a dismissal for lack of jurisdiction or improper venue does not operate as an adjudication upon the merits."); *see also id.* ("Although a dismissal for lack of jurisdiction does not bar a second action as a matter of claim preclusion, it does preclude relitigation of the issues determined in ruling on the jurisdiction question.").

The Supreme Court has defined Rule 41(b)'s lack-of-jurisdiction exception expansively to include rulings like the SLUSA dismissal of Miller's 2003 transfer fees claim. *See Costello v. United States*, 365 U.S. 265, 285, 81 S. Ct. 534, 5 L. Ed. 2d 551 (1961); 18A Charles A. Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 4435 n.27 (2d ed. 2002). The Court expressly held that the lack-of-jurisdiction exception was not limited to "the fundamental jurisdictional defects which render a judgment [*14] void and subject to collateral attack, such as lack of jurisdiction over the person or subject matter"; instead, the Court broadened the exception to cover "those dismissals which are based upon a plaintiff's failure to comply with a precondition requisite to the Court's going forward to determine the merits of his

substantive claim." *Costello*, 365 U.S. at 285.

Under this standard, the dismissal of Miller's 2003 transfer fees claim constitutes a jurisdictional dismissal because it was based on Miller's "failure to comply with a precondition requisite to the Court's going forward to determine the merits of his substantive claim," *id., viz.*, Miller's attempt to bring a class action claim precluded by 15 U.S.C. § 77p(b). [8] *See Kircher v. Putnam Funds Trust*, 547 U.S. 633, 644, 126 S. Ct. 2145, 165 L. Ed. 2d 92 (2006) ("If the action is precluded [under SLUSA], neither the District Court nor the state court may entertain it, and the proper course is to dismiss"). Accordingly, the panel of this court that considered Miller's 2003 transfer fees claim found that SLUSA mandated dismissal of Miller's breach of contract claim and precluded any evaluation of its merits. Id. In a footnote, the panel specifically stated as much:

> We [*15] express no opinion as to whether Miller . . . had a valid claim for state law breach of contract. We hold only that the statute of limitations ran as to any Securities Act claim and that SLUSA required dismissal of the state contract claim because plaintiff included with his state contract claim allegations of an "untrue statement."

*Id.* at 702 n.3.

8   Because the instant suit is not a class action, it is not similarly precluded by SLUSA. *See* 15 U.S.C. § 77p.

Thus, SLUSA prevented our prior panel from reaching the substance of Miller's claim, [9] so the dismissal was "jurisdictional" for purposes of Rule 41(b) and res judicata. *See Costello*, 365 U.S. at 285; 18A Charles A. Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 4435 n.27 (2d ed. 2002). As such, it does not constitute a final judgment on the merits and cannot bar Miller's present suit.

9   Though the district court in the 2003 Suit commented on Miller's transfer fees claim in dicta, that had no impact on our res judicata analysis. In the 2003 Suit, the district court offered two reasons for dismissing Miller's transfer-fees breach of contract claim. First, the district court found that Nationwide was not [*16] responsible for imposing the fees in question and second the court held that SLUSA's preclusion provision, 15 U.S.C. § 77p(b), mandated that the action be dismissed. *See Miller*, 2003 U.S. Dist. LEXIS 19332, 2003 WL 22466236 at *6. Considering the 2003 Suit on appeal, a panel of this court addressed only whether SLUSA mandated dismissal of Miller's breach of contract claim. See *Miller*, 391 F.3d at 702.

The district court's comment on the merits of the 2003 claim has no res judicata effect in the present suit because once the district court determined that Miller's breach of contract action was precluded under SLUSA, it was forced to dismiss the claim for lack of jurisdiction. *See Kircher*, 547 U.S. at 644 ("If the action is precluded [under SLUSA], neither the District Court nor the state court may entertain it, and the proper course is to dismiss"). Thus, the district court had no authority to reach the merits of the issue. The prior panel opinion in the 2003 Suit implicitly recognized as much, limiting its holding regarding Miller's transfer fees claim to dismissal based on SLUSA preclusion and expressly declining to address the merits of the claim. *See Miller*, 391 F.3d at 702 n.3.

Thus, because the district court [*17] in the 2003 Suit could not pass on the merits of Miller's SLUSA claim, any statement in the district court's opinion regarding the merits of Miller's SLUSA claim was dicta, *see Int'l Truck and Engine Corp. v. Bray*, 372 F.3d 717, 721 (5th Cir. 2004) ("[a] statement is dictum if it could have been deleted without seriously impairing the analytical foundations of the holding and being peripheral, may not have received the full and careful consideration of the court that uttered it.") (internal punctuation omitted), and dicta has no res judicata effect. *See Pegues v. Morehouse Parish School Bd.*, 706 F.2d 735, 738 (5th Cir. 1983) (holding that dicta from a prior panel's consideration of a case could not serve as a basis for res judicata in later consideration of the same case); *cf.* 18A Charles A. Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 4436 (2d ed. 2002) ("[A] determination by an appellate court that the action

must be dismissed for lack of jurisdiction of that court system prevents any use of the trial court findings as issue preclusion . . . .").

Nationwide argues that regardless of the grounds upon which Miller's prior claim was dismissed, the dismissal [*18] of Miller's suit "with prejudice" suffices to trigger a res judicata bar to the claim. Essentially, Nationwide urges that we hold that any "with prejudice" comment associated with a dismissal categorically triggers a res judicata bar. However, our precedent does not demonstrate such an unwavering categorical approach, and we decline to adopt one here. While we have considered a dismissal with prejudice to indicate a final judgment on the merits in most instances, *see, e.g., Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 n.8 (5th Cir. 1993) ("[A] dismissal which is designated 'with prejudice' is 'normally an adjudication on the merits for purposes of res judicata.'"), we have never held that a dismissal with prejudice is *per se* a final judgment on the merits; rather we have found analogous jurisdictional dismissals insufficient to serve as final judgments on the merits for res judicata purposes. *See, e.g., Darlak v. Bobear*, 814 F.2d 1055, 1064 (5th Cir.1987) (holding that a dismissal under the Eleventh Amendment is not "on the merits" for res judicata purposes); *Nilsen v. City of Moss Point, Miss.*, 701 F.2d 556, 562 (5th Cir. 1983) (en banc) (holding, in a res judicata context, [*19] that "[d]ismissals for want of jurisdiction are not decisions on the merits . . . ."). Moreover, our sister circuits have consistently held that "with prejudice" designation does not categorically create a res judicata bar. *See, e.g., Adams v. Cal. Dept. of Health Svc.*, 487 F.3d 684, 692 n.2 (9th Cir. 2007) ("[A]ccording res judicata effect to the dismissal with prejudice of the second suit would be error in this case because [plaintiff] would have been deprived of a full and fair opportunity to litigate her first action."); *American Cyanamid Co. v. Capuano*, 381 F.3d 6, 17 (1st Cir. 2004) (holding that a dismissal with prejudice contained in a consent decree is not a final ruling on the merits); *Ansari v. Bella Automotive Group*, 145 F.3d 1270, 1272 (11th Cir. 1998) (holding that res judicata would not bar a second filing of the same suit in state court when an action was dismissed "with prejudice" for failure to meet an amount-in-controversy requirement); *Kulinski v. Medtronic Bio-Medicus, Inc.*, 112 F.3d 368, 372-373 (8th Cir. 1997) (holding that a "with prejudice" dismissal for lack of subject-matter jurisdiction did not preclude a properly presented second action on the same claim).

[*20] As discussed above, the dismissal of Miller's transaction fees claim was based on a lack of jurisdiction, so regardless of the "with prejudice" designation, [10] the dismissal was not a final judgment on the merits. *Cf. Darlak*, 814 F.2d at 1064; *Nilsen*, 701 F.2d at 561. Thus, the claim is not barred by res judicata.

> 10   We note that this opinion does not endeavor to revisit or re-characterize the 2003 judgment as dismissed "without prejudice," rather we hold that the "with prejudice" comment appended to the dismissal of the 2003 suit has no res judicata effect in this instance.

For the same reasons, we hold that res judicata does not bar Miller's telephone transfer claim. Miller's breach of contracts claims in the 2003 Suit were resolved on jurisdictional grounds rather than with a final judgment on the merits, so the 2003 suit has no res judicata effect on Miller's present breach-of-contract based telephone transfer claim.

Because Miller's transaction fees claim and telephone transfer claim properly state claims under Rule 12(b)(6) [11] and are not barred by res judicata, the district court erred in dismissing them.

> 11   Nationwide contends that Miller's telephone transfer claim should be dismissed [*21] under Rule 12(b)(6), but such an argument is meritless. Miller pled his telephone transfer claim sufficiently to survive a 12(b)(6) challenge by alleging that 1) his contract with Nationwide provides him the right to make telephone exchanges where permitted by state law and 2) after January of 2005, Nationwide breached its contract by limiting telephone exchanges and refusing to accept phone orders.

B. Late Prospectus Claim

The district court also erred in dismissing Miller's late prospectus claim, which asserts that Nationwide violated the Securities Act of 1933, 15 U.S.C. § 77a *et seq.*, by failing to timely provide a prospectus as required by law. Though Miller bases his late prospectus claim on Nationwide's alleged actions in May and June of 2005, the district court held that the 2003 Suit, which concluded in a Fifth Circuit opinion rendered on November 19, 2004, creates a res judicata bar to Miller's claim. However, this holding contravenes the basic res judicata

principle that a matter can be barred only if the parties have had full and fair opportunity to litigate the claim. *See, e.g., Liberto v. D.F. Stauffer Biscuit Co., Inc.*, 441 F.3d 318, 328 n.31 (5th Cir. 2006) ("Judicial [*22] finality-the predicate for res judicata-arises only from a final decision rendered after the parties have been given a reasonable opportunity to litigate a claim before a court of competent jurisdiction.") (citation omitted); *Harper Macleod Solicitors v. Keaty & Keaty*, 260 F.3d 389, 395 (5th Cir. 2001) ("Traditional rules of preclusion as adopted in federal case law-whether under the doctrine of collateral estoppel or res judicata-require that the party to be estopped from re-litigating a claim have had a *full and fair opportunity to litigate the issue*") (emphasis added). Since judgment in the 2003 Suit was rendered before the facts underlying Miller's late prospectus claim arose in 2005, Miller cannot be said to have had "a full and fair opportunity to litigate the issue," *Harper Macleod Solicitors*, 260 F.3d at 395, so res judicata cannot serve to bar his late prospectus claim. [12]

12    Nationwide also contends that Miller's late prospectus claim should be dismissed under Rule 12(b)(6), but again the argument is meritless. Miller pled his late prospectus claim sufficiently to survive a 12(b)(6) challenge by alleging that 1) he transferred assets to purchase certain bonds in June 2005, [*23] 2) at that time, Nationwide had not yet provided him with a prospectus, dated May, 2005, which indicated that Nationwide would charge a fee for the sale of those particular bonds, 3) he sold the bonds and incurred the fee, and 4) he would not have purchased the particular bonds if he were aware of the fee. *See* 15 U.S.C. § 77l.

Conclusion

For the foregoing reasons we REVERSE the district court's dismissal of Miller's claims and REMAND for proceedings consistent with this opinion.