# EXHIBIT B

# DEEP WATER

## The Gulf Oil Disaster and the Future of Offshore Drilling

**Report to the President**

National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling

# Dedication

This report is dedicated to the 11 men who lost their lives on the *Deepwater Horizon* rig on April 20, 2010 and to their families, in hope that this report will help minimize the chance of another such disaster ever happening again.

*Jason Anderson*

*Aaron Dale Burkeen*

*Donald Clark*

*Stephen Curtis*

*Gordon Jones*

*Roy Wyatt Kemp*

*Karl Dale Kleppinger, Jr.*

*Blair Manuel*

*Dewey Revette*

*Shane Roshto*

*Adam Weise*

# Acknowledgements

We wish to acknowledge the many individuals and organizations, government officials and agencies alike that offered their views and insights to the Commission. We would especially like to express our gratitude to the Coast Guard's Incident Specific Preparedness Review (ISPR) for allowing Commission staff to participate in its interviews and discussions, which was invaluable to the preparation of this report. (A copy of the Coast Guard's ISPR report can be found at the Commission's website at www.oilspillcommission.gov). We would also like to thank Chevron for performing the cement tests that proved so critical to our investigation into the Macondo well blowout.

We also thank the Department of Energy, which served as our supporting agency, and all of the Department employees whose assistance was so essential to the success and functioning of the Commission. In particular, we would like to thank Christopher Smith, Deputy Assistant Secretary for Oil and Natural Gas, who acted as the Commission's Designated Federal Officer, as well as Elena Melchert, Petroleum Engineer in the Office of Oil and Gas Resource Conservation, who served as the Committee Manager.

But most importantly, we are deeply grateful to the citizens of the Gulf who shared their personal experiences as Commissioners traveled in the region, providing a critical human dimension to the disaster and to our undertaking, as well as the many people who testified at the Commission's hearings, provided public comments, and submitted statements to our website. Together, these contributions greatly informed our work and led to a better report. Thank you one and all.

# Copyright, Restrictions, and Permissions Notice

Except as noted herein, materials contained in this report are in the public domain. Public domain information may be freely distributed and copied. However, this report contains illustrations, photographs, and other information contributed by or licensed from private individuals, companies, or organizations that may be protected by U.S. and/or foreign copyright laws. Transmission or reproduction of items protected by copyright may require the written permission of the copyright owner.

When using material or images from this report we ask that you credit this report, as well as the source of the material as indicated in this report.] Permission to use materials copyrighted by other individuals, companies or organizations must be obtained directly from those sources.

This report contains links to many Web sites. Once you access another site through a link that we provide, you are subject to the use, copyright and licensing restrictions of that site. Neither the Government nor the National Commission on the BP/Deepwater Horizon Oil Spill and Offshore Drilling (Commission) endorses any of the organizations or views represented by the linked sites unless expressly stated in the report. The Government and the Commission take no responsibility for, and exercise no control over, the content, accuracy or accessibility of the material contained on the linked sites.

Cover Photo: © Steadfast TV

ISBN: 978-0-16-087371-3

# Deep Water

## The Gulf Oil Disaster and the Future of Offshore Drilling

Report to the President

National Commission on the BP Deepwater Horizon
Oil Spill and Offshore Drilling

January 2011


exclusion to account for the possibility that NEPA review would be needed for these activities in certain narrowly defined "extraordinary circumstances." Extraordinary circumstances include those actions that have highly uncertain and potentially significant environmental effects or involve unique or unknown environmental risks.[150]

But because MMS personnel were apparently reluctant to conclude that such extraordinary circumstances were present, the rule in practice in the Gulf of Mexico was the categorical *exclusion*—rather than the *exception* to that exclusion. MMS staff have reported that leasing coordinators and managers discouraged them from reaching conclusions about potential environmental impacts that would increase the burden on lessees, "thus causing unnecessary delays for operators." The Safety Oversight Board also noted that "[s]ome [MMS] environmental staff also reported that environmental assessments for smaller operators may be minimized if the [Regional Office of Field Operations] manager determines that implementing the recommendation may be too costly."[151]

With regard to NEPA specifically, some MMS managers reportedly "changed or minimized the [MMS] scientists' potential environmental impact findings in [NEPA] documents to expedite plan approvals." According to several MMS environmental scientists, "their managers believed the result of NEPA evaluations should always be a 'green light' to proceed." In some cases, there may also have been built-in employee financial incentives that "distort[ed] balanced decision-making" to the extent that "[e]mployee performance plans and monetary awards [were] . . . based on meeting deadlines for leasing or development approvals."[152]

Finally, just as a matter of sheer practicality, MMS personnel plainly lacked the substantial resources that would have been required to engage in meaningful NEPA review in light of the extraordinary expansion of leasing activity in the Gulf. There were literally hundreds of exploration, development, and production plans, as well as individual permit drilling applications to be processed. No President ever sought for MMS the level of resources that would have been required to prepare individual assessments concerning whether each of those activities required an environmental impact statement, let alone such a statement for those that did. Nor did Congress. It should be no surprise under such circumstances that a culture of complacency with regard to NEPA developed within MMS, notwithstanding the best intentions of many MMS environmental scientists.

### The Macondo Well

The gap between the protections promised by environmental statutes and regulations and actual practice is fully illustrated in the review and permitting of the Macondo well itself. MMS engaged in no NEPA review of the well's permitting, and neither MMS nor other federal agencies gave significant attention to the environmental mandates of other federal laws.

**NEPA.** MMS performed no meaningful NEPA review of the potentially significant adverse environmental consequences associated with its permitting for drilling of BP's exploratory Macondo well. MMS categorically excluded from environmental impact review BP's initial and revised exploration plans—even though the exploration plan could have qualified for

an "extraordinary circumstances" exception to such exclusion, in light of the abundant deep-sea life in that geographic area and the biological and geological complexity of that same area.[153] MMS similarly categorically excluded from any NEPA review the multiple applications for drilling permits and modification of drilling permits associated with the Macondo well. The justification for these exclusions was that MMS had already conducted NEPA reviews for both the Five-Year Program and the Lease Sale that applied to the Macondo well. The flaw in that agency logic is that both those prior NEPA reviews were conducted on a broad programmatic basis, covering huge expanses of leased areas of which the Macondo well was a relatively incidental part. Neither, moreover, included a "worst case analysis" because the President's Council on Environmental Quality had eliminated the requirement for such analysis under NEPA for all federal agencies in 1986.[154] As a result, none of those prior programmatic reviews carefully considered site-specific factors relevant to the risks presented by the drilling of the Macondo well.*

Fishery conservation and management. Under the Magnuson-Stevens Fishery Conservation and Management Act, federal agencies must consult with NOAA on all activities (or proposed activities) authorized, funded, or undertaken by the agency that may adversely affect essential fish habitat. For the Gulf of Mexico, accordingly, NOAA prepared a "programmatic" Essential Fish Habitat Consultation for the entire Gulf.[155] To similar effect, MMS complied with the Magnuson-Stevens consultation requirement by preparing Essential Fish Habitat Assessments that looked at offshore oil and gas leasing activities in the Gulf broadly.[156] Neither NOAA nor MMS considered the possible adverse impacts of any one well, such as the Macondo well, in isolation. Nor would it have been practical for them to do so in light of their understandable focus on possible cumulative impacts on fish populations from many offshore leasing activities. What is more telling, however, is that to the extent that the MMS Assessment identified potential threats to essential fish habitat and marine fishery resources from oil spills, both NOAA and MMS ultimately relied exclusively on conservation measures included in oil-spill response plans prepared by the oil and gas industry pursuant to the Oil Pollution Act of 1990 to address those threats.[157] For the Macondo well, both agencies assumed that BP's plan would adequately address those threats and therefore there was no need to seek to do so directly through the Magnuson-Stevens Act. There was, however, little reason to assume that those plans were in fact up to the task.

Oil Pollution Act of 1990 and Oil Spill Response Plans. Under the Oil Pollution Act of 1990, as supplemented by a Presidential Executive Order, MMS is responsible for oil-spill planning and preparedness as well as select response activities for fixed and floating facilities engaged in exploration, development, and production of liquid hydrocarbons and for certain oil pipelines. The agency requires all owners or operators of offshore oil-handling, storage, or transportation facilities to prepare Oil Spill Response Plans. MMS regulations detail the elements of the response plan (an emergency-response action plan, oil-spill response equipment inventory, oil-spill response contractual agreements, a

---

* For instance, bluefin tuna are both commercially vital and biologically significant as predators in the Gulf. But in the relevant Five-Year (2007–2012) Programmatic Environmental Impact Statement on the entire offshore leasing program—covering the *entire* outer continental shelf of the United States—MMS discusses potential impacts of leasing activities on bluefin tuna in one sentence. Subsequent MMS environmental impact statements for lease sales within the Gulf of Mexico contained *no* significant or geographically-focused analysis of the potential impacts on bluefin tuna. And, in finally permitting the drilling of the Macondo well, MMS categorically excluded the action from any NEPA review, and thus conducted no analysis of the potential impacts of drilling on bluefin tuna, based on the rationale that it had already adequately reviewed environmental impacts in its prior reviews.

calculation of the worst-case discharge scenario, plan for dispersant use, in-situ burning plan, and information regarding oil-spill response training and drills).[158] The emergency-response plan is supposed to be the core of the overall plan, and in turn is required to include information regarding the spill-response team; the types and characteristics of oil at the facilities; procedures for early detection of a spill; and procedures to be followed in the case of a spill.[159]

But neither BP, in crafting its Oil Spill Response Plan for the Gulf of Mexico applicable to the Macondo well, nor MMS in approving it, evidenced serious attention to detail.[160] For instance, the BP plan identified three different worst-case scenarios that ranged from 28,033 to 250,000 barrels of oil discharge and used identical language to "analyze" the shoreline impacts under each scenario.[161] To the same effect, half of the "Resource Identification" appendix (five pages) to the BP Oil Spill Response Plan was copied from material on NOAA websites, without any discernible effort to determine the applicability of that information to the Gulf of Mexico. As a result, the BP Oil Spill Response Plan described biological resources nonexistent in the Gulf—including sea lions, sea otters, and walruses.*

Even more troubling, the MMS Gulf of Mexico Regional Office approved the BP plan without additional analysis. There is little in that approval to suggest that BP and MMS gave close scrutiny to the contents of the Oil Spill Response Plan. The Regional Office's routine practice was to review and approve oil-spill response plans within 30 days of their receipt. Absent any legal requirement to do so, the office did not distribute submitted plans to other federal agencies for review or comment, nor did it seek public review or comment.

The inescapable conclusion is striking, and profoundly unsettling. Notwithstanding statutory promises of layers of required environmental scrutiny—by NEPA, the Magnuson-Stevens Act, the Outer Continental Shelf Lands Act, and the Oil Pollution Act—and the potential application of some of the nation's toughest environmental restrictions—the Endangered Species Act and Clean Water Act—*none* of these laws resulted in site-specific review of the drilling operations of the Macondo well. The agency in charge, MMS, lacked the resources and committed agency culture to do so, and none of the other federal agencies with relevant environmental expertise had adequate resources or sufficient statutory authority to make sure the resulting gap in attention to environmental protection concerns was filled.‡

Federal oversight of oil and gas activities in the Gulf of Mexico—almost the only area where substantial amounts of drilling were taking place—took a generally minimalist approach in the years leading up to the Macondo explosion. The national government failed to exercise the full scope of its power, grounded both in its role as owner of the natural resources to be developed and in its role as sovereign and responsible for ensuring the safety of drilling operations. Many aspects of national environmental law

---

* The BP plan does not appear to be an aberration. It was prepared by a contractor who also prepared the Gulf of Mexico plans for Chevron, ConocoPhillips, ExxonMobil, Shell, and other companies operating in the Gulf. The result is four nearly identical plans that repeat the same mistakes found in the BP plan applicable to the Macondo well.

‡ The President's decision in March 2010 to expand offshore oil and gas leasing is a more recent example of the absence of full consideration of environmental protection concerns. According to their testimony before the Commission in August 2010, the White House did not ask either the Chair of the President's Council on Environmental Quality or the Administrator of NOAA to be directly involved in reviewing the plans before the President's decision. See Testimony of The Honorable Nancy Sutley, Chair, Council on Environmental Quality, and The Honorable Jane Lubchenco, Administrator, NOAA, Hearing before the National Commission, August 25, 2010.

were ignored, resulting in less oversight than would have applied in other areas of the country. In addition, MMS lacked the resources and technical expertise, beginning with its leadership, to require rigorous standards of safety in the risky deepwater and had fallen behind other countries in its ability to move beyond a prescription and inspection system to one that would be based on more sophisticated risk analysis.

In short, the safety risks had dramatically increased with the shift to the Gulf's deepwaters, but Presidents, members of Congress, and agency leadership had become preoccupied for decades with the enormous revenues generated by such drilling rather than focused on ensuring its safety. With the benefit of hindsight, the only question had become not whether an accident would happen, but when. On April 20, 2010, that question was answered.