# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

IN RE: BP p.l.c.                        §        MDL NO.: 10-md-2185
SECURITIES LITIGATION                   §
                                        §        Civil Action No. 4:10-md-2185
                                        §
                                        §        HON. KEITH P. ELLISON
                                        §

## MEMORANDUM AND ORDER

Pending before the Court is Defendants' Motion to Dismiss In Part the Second Consolidated Amended Complaint (Doc. No. 360).[1]  Having reviewed the motion, Plaintiffs' response (Doc. No. 373), Defendants' reply brief in support of their motion (Doc. No. 377), and all papers in support thereof, the Court finds that Defendants' Motion to Dismiss In Part the Second Consolidated Amended Complaint (Doc. No. 360) must be **GRANTED IN PART** and **DENIED IN PART**.

## I.       BACKGROUND AND PROCEDURAL HISTORY

This Court is called upon to consider, for a second time in this case, consequences of the loss of life and destruction caused by the April 20, 2010 Macondo well blowout and the resulting oil spill. In particular, the Court must decide whether the tragedy can be translated into financial recovery on behalf of the conglomeration of individuals and pension funds who invested in BP plc, the company at the helm of the Deepwater Horizon drilling effort.  The Court first considered consolidated securities class action claims advanced in two separate complaints, one brought by the New York and Ohio Plaintiffs, acting as lead plaintiffs, and a second brought by

---

[1] All docket references are to Multi-District Litigation No. 10-md-2185.

the Ludlow Plaintiffs, acting as lead plaintiffs of a subclass.[2]   On February 13, 2012, this Court

issued two decisions dismissing the New York and Ohio Plaintiffs' complaint in part ("NY/OH

Order," Doc. No. 324),[3] and dismissing the Ludlow Plaintiffs' complaint in its entirety ("Ludlow

Order," Doc. No. 323; collectively with the NY/OH Order, the "February 13th Orders").   The

decisions gave the Plaintiffs leave to re-plead claims dismissed without prejudice.   At this

juncture, and after a status conference held on February 23, 2012, both sets of lead plaintiffs

agreed to work together to file a single, consolidated amended complaint.

The fruit of this joint effort is the single Second Consolidated Amended Class Action

Complaint for All Purchasers of BP ADS Securities (the "Second Amended Complaint" or

"SAC") now before the Court.   (Doc. No. 339.)   It is this Complaint which Defendants seek to

dismiss in part. (Doc. Nos. 355–357, 360.)[4]

Most broadly, the Second Amended Complaint seeks redress under Section 10(b) of the

Securities and Exchange Act for alleged misrepresentations made in connection with the

Deepwater Horizon drilling project and the safety of BP's operations generally.   Specifically,

Plaintiffs assert violations of section 10(b) of the Securities and Exchange Act of 1934 (the

"Exchange Act"), and Rule 10b-5 of the Securities and Exchange Commission ("SEC") against

---

[2]   These two plaintiff groups represent the seven different federal securities class actions
consolidated in the instant case.   On December 28, 2010, this Court consolidated all pending
federal securities class actions following transfer of the cases by the Judicial Panel on
Multidistrict Litigation.   (Order, Doc. No. 79; Transfer Order, Doc. No. 1.)

[3] The Court subsequently clarified the NY/OH Order on February 27, 2012.   (Doc. No. 327.)

[4] Defendants filed a corrected motion to dismiss on May 3, 2012.   (Doc. No. 360.)   The corrected
motion to dismiss clarifies that all named Defendants are to be considered movants in the motion
now before the court.   (*Id.*)   The Court therefore refers to the corrected motion to dismiss (Doc.
No. 360) as the document under consideration.

all Defendants.[5]  (SAC ¶¶ 419-21.) They also assert violations of section 20(a) of the Exchange Act against the individual defendants Anthony B. "Tony" Hayward, Andrew G. "Andy" Inglis, and Douglas J. Suttles.  (*Id*. ¶¶ 422–25.)  As discussed in greater detail below, the Second Amended Complaint both: (1) alleges new misrepresentations not found in the Plaintiffs' previous complaints, and (2) reformulates and supplements allegations regarding misrepresentations dismissed in the February 13th Orders.  The Second Amended Complaint also significantly reduces the number of individual defendants.

Defendants seek dismissal of all new alleged misrepresentations and all alleged misrepresentations previously dismissed in the February 13th Orders. Defendants contend that this action should proceed based only on the twelve statements held to be actionable in the NY/OH Order.  (Doc. No. 356, at 2.) The alleged misrepresentations sustained in the NY/OH Order concern the following overarching themes: (1) BP's improvements in process safety as measured against the recommendations of an independent commission known as the "Baker Panel" convened in 2005 to review and improve the Company's safety procedures; (2) BP's ability to respond to and contain an oil spill in the Gulf of Mexico; and (3) the spill-rate following the Deepwater Horizon explosion.  (*Id*. at 3.) Using the lettering system instituted by Plaintiffs in the Second Amended Complaint, the alleged misrepresentations not subject to dismissal under Defendants' motion are Statements D, E, F (partial), G (partial), H, K, M, O (partial), Q, T, U, and V.

---

[5] For simplicity's sake, the Court will refer to Plaintiffs' claims arising under section 10(b) and Rule 10b-5 as "section 10(b)" claims.

A.      **The Parties**

Plaintiffs are Thomas P. DiNapoli, Comptroller of the State of New York, as Administrative Head of the New York State and Local Retirement Systems and sole Trustee of the New York State Common Retirement Fund ("New York"); the Ohio Public Employees Retirement System, along with its statutory litigation counsel, the Ohio Attorney General Mike DeWine ("Ohio" and collectively with New York, the "NY/OH Plaintiffs"); and four individual plaintiffs (the "Ludlow Plaintiffs" and collectively with the NY/OH Plaintiffs, "Plaintiffs"). (SAC ¶¶ 35–40.)  The four individual plaintiffs, citizens of California and purchasers of BP American Depositary Shares ("ADSs"), are Robert H. Ludlow, Jr., Peter D. Lichtman, Leslie J. Nakagiri, and Paul Huyck. (*Id.* ¶¶ 37-40.)

The Second Amended Complaint names three corporate defendants—BP plc; BP America, Inc. ("BP America"); and BP Exploration & Production, Inc. ("BP Exploration" and collectively with BP plc and BP America, "BP" or "the Company")—that were also named in Plaintiffs' previous complaints. BP plc is a UK corporation with its principal executive offices located in London, England.  (SAC ¶ 41.)  BP's ADSs are listed on the New York Stock Exchange ("NYSE"), and BP is the largest oil and gas producer in the United States.  (*Id.*)  BP America and BP Exploration, both wholly-owned subsidiaries of BP plc, are Delaware corporations with their principal places of business in Houston, Texas.  (*Id.* ¶¶ 42–43.)

The Second Amended Complaint also names three individual defendants who were directors and officers of BP prior to and during the Deepwater Horizon spill.  They are Hayward, Suttles,[6] and Inglis (collectively, the "Individual Defendants").

---

[6] Suttles was BP's Chief Operating Officer for Exploration and Production from January 2009 until at least January 2011. (SAC ¶ 45.) None of the statements challenged in Defendants' pending motion was made by Suttles.

Hayward served as BP's Chief Executive Officer from May 2007 until October 2010. (SAC ¶ 44.) According to Plaintiffs, his ascension to the chief executive position at BP coincided with the launch of a public relations campaign to resurrect BP's image with respect to safety. Shortly after taking over, Hayward publicly declared his intention to "focus on safety like a laser." (*Id.* ¶ 20.)

In addition to serving as the public face of BP's ongoing safety reform efforts, Hayward was also involved in executive management of those efforts. Beginning in 2006, he headed the Group Operations Risk Committee ("GORC"), which reviewed the Company's safety protocols and responded to safety incidents in Company operations. (SAC ¶ 44.) Hayward was also the executive liaison to the Safety and Ethics & Environment Assurance Committee ("SEEAC"), a committee of directors tasked in part with ensuring that company publications regarding environmental, safety, and ethical matters were accurate. (SAC ¶¶ 44, 90.) Hayward reported to SEEAC on issues within the purview of GORC. (*Id.*)

Inglis was CEO of BP's Exploration & Production ("E&P") business unit, and an executive director of the Company, from February 2007 until October 2010. (SAC ¶ 46.) In his position as CEO of E&P, Inglis attended SEEAC meetings to report on topics specific to E&P. (*Id.*) He also served on the GORC alongside Hayward. (*Id.*) In a deposition taken in connection with a related multi-district litigation ("MDL 2179"),[7] Inglis testified that he was second only to Hayward in terms of authority and responsibility for the safety of BP's worldwide drilling and exploration operations. (*Id.*)

---

[7] All wrongful death, personal injury, and property and other economic damages claims associated with the Deepwater Horizon disaster were aggregated in MDL 2179, assigned to the Eastern District of Louisiana. (Doc. No. 1, at 2 n.3.) Plaintiffs in this matter have had access to the discovery produced in MDL 2179, and this material features prominently in the Second Amended Complaint.

### B.      New Factual Allegations

In a Rule 12(b)(6) motion to dismiss, the Court must accept as true a plaintiff's well-pleaded factual allegations. *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 550 (5th Cir. 2007). The Court does not, however, "accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Id.* (citation omitted) (internal quotation marks omitted).   Nor does the Court accept as true factual allegations that are contradicted by documents on which they are based. *See U.S. ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 377 (5th Cir. 2004) ("[When] an allegation is contradicted by the contents of an exhibit attached to the pleading, then indeed the exhibit and not the allegation controls."). As the Court provided extensive facts and background in the February 13th Orders, the Court will highlight only new factual allegations here.

With one exception, the new and re-stated alleged misrepresentations in the Second Amended Complaint concern BP's Operating Management System ("OMS")—a signature safety measure enacted following a deadly explosion at BP's Texas City refinery in 2005.[8] (SAC ¶¶ 71, 95.) As more fully explained in the Court's February 13th Orders, the Texas City disaster— which killed 15 people and injured approximately 170 others—was one incident among many which had shaken public confidence in BP's ability to manage the risks inherent in its operations. In response to pressure from the U.S. Chemical Safety Board ("CSB"), BP commissioned an independent panel of experts to review its safety culture and procedures and recommend improvements. (*Id.* ¶ 73.) This panel—led by former U.S. Secretary of State James Baker, III and known as the "Baker Panel"—issued a report in January 2007 (the "Baker Report") criticizing BP for emphasizing personal safety (i.e., occupational safety such as slip and falls) over process

---

[8] The one exception is Statement S-1, which concerns BP's abilities to respond to and contain an oil spill. (SAC ¶ 363.)

safety. (*Id.* ¶ 13.) To address this and other shortcomings, the report recommended that BP "establish and implement an integrated and comprehensive system that would systematically identify, reduce and manage process safety risks." (*Id.* ¶ 84.) BP publicly accepted the Baker Panel's advice and announced that it would develop and implement an integrated safety management system—OMS—across all of its business units worldwide. (*Id.* ¶¶ 82, 95.) OMS was intended to optimize BP's process safety protocols and make them uniform and consistent across all of BP's operations. (*Id.* ¶¶ 95, 98.)

A new committee of executives—the GORC—was created in part to serve as the "'overall steward of the OMS implementation project.'"[9] (SAC ¶ 84.) The GORC—including Hayward and Inglis—played a pivotal role in reviewing and approving the structure and scope of OMS. (*Id.* ¶ 102.) The framework approved by GORC specified that OMS would be implemented on BP-owned and operated entities only—a facet of the design that the committee specifically discussed before its approval. (*Id.*) Following approval of the framework, GORC tracked the progress of OMS implementation through quarterly Health Safety Environment & Operations Integrity Reports known as the "Orange Books."[10] (*Id.* ¶¶ 44, 87.)

OMS became the "cornerstone" of BP's safety reform efforts, and the centerpiece of many public speeches, reports, and statements heralding a sea change within BP on the issue of process safety. None of these public statements, however, noted the limitation of OMS to BP-owned and operated assets. Due to this omission, Plaintiffs contend that thirteen public statements regarding the scope and roll-out of OMS were materially misleading to investors and

---

[9]  In addition to overseeing the OMS implementation project, the GORC monitored and responded to safety incidents throughout BP. (SAC ¶ 44.)

[10]  In turn, GORC reported on safety matters within its purview—including OMS implementation—to SEEAC. Some of the reports disseminated to SEEAC via GORC include the "Orange Books" described above. (SAC ¶¶ 51, 93.)

misrepresented BP's ability to manage the risk of catastrophic safety failures in its most dangerous operations. (SAC ¶¶ 101, 106, 407.)

The first alleged misrepresentation was contained within the 2006 Sustainability Report, issued May 9, 2007. That document described OMS as follows:

> The OMS is a comprehensive system that covers all aspects of our operations, including three dimensions of safety—personal safety, process safety and the environment. . . . The new OMS will apply to all operations by the end of 2010 and includes safety, integrity, environmental management and health . . . . Each site will have its own local OMS, based on a consistent group-wide framework.

(SAC ¶ 315 (Statement A).) Plaintiffs contend that this description painted a false picture of OMS because "OMS applied only to rigs that BP fully-owned but not to BP's operations where BP leased rigs from others, as it did with Transocean's *Deepwater Horizon* in the Gulf of Mexico." (*Id.* ¶ 316.) This carve-out of contractor-owned rigs was a significant one. Deepwater exploration and drilling in the Gulf of Mexico was among BP's riskiest endeavors. (*Id.* ¶ 106.) It was also an area where BP relied heavily on contractor-owned assets. In early 2010, for example, six out of the seven wells that BP worked on in the Gulf involved contractor-owned rigs. (*Id.* ¶ 100.)

On July 24, 2007, BP held a conference call with analysts and investors in which Hayward participated. During the call, Hayward stated:

> First, safety. We are ensuring that we have consistent, safe, reliable operations across BP. We are implementing the Baker Panel recommendations. We are also in the early days of establishing a new way of operating in BP—with the progressive rollout of a common group-wide Operating Management System.

(SAC ¶ 317 (Statement B).) As with the preceding statement from the 2006 Sustainability Report, Plaintiffs contend that Hayward's description of OMS was misleading because it failed to explain a key limitation of OMS in the case of contractor-owned assets. (*Id.* ¶ 318.) Hayward

was aware of this limitation through his involvement in GORC, which was the "overall steward" of OMS implementation and had approved the framework of OMS. (*Id.* ¶¶ 44, 84, 102.) His deposition testimony in MDL 2179 confirmed his awareness that contractor safety systems—not BP safety systems—were in place on contracted rigs such as the Deepwater Horizon. (*Id.* ¶ 103.)

On September 25, 2007, Defendant Inglis made the following statement about OMS at the Sanford Bernstein 4th Annual Strategic Decisions Conference:

> One aspect of our focus on safe and reliable operations that I mentioned earlier, is our new standardized Operating Management System (OMS). This will provide a blueprint for safety and all aspects of operations throughout BP, making sure operations are undertaken to a consistently high standard worldwide.

(SAC ¶ 319 (Statement C).) Once again, Plaintiffs contend that this description gave a false impression about the scope of OMS because it failed to clarify that OMS would not be imposed on contractor-owned rigs. (*Id.* ¶ 320.) Inglis, like Hayward, was aware of the intended scope of OMS through his involvement on the GORC committee, which approved the OMS framework. (*Id.* ¶¶ 46, 102.)

Hayward made similar statements about OMS during a February 27, 2008 conference call with investors and analysts and at the Company's 2008 Annual General Meeting on April 17, 2008. At both of these events, Hayward stated:

> [O]ur intense focus on process safety continues. We are making good progress in addressing the recommendations of the Baker Panel and have begun to implement a new Operating Management System across all of BP's operations.

(SAC ¶¶ 325 (Statement F), 327 (Statement G).) Plaintiffs claim that, as before, these statements overstated the reach of OMS, which was not designed or intended to apply to contractor-owned rigs.

In 2009, BP began to report publicly on its progress in implementing OMS across its operations. The 2008 Annual Review, dated February 24, 2009, stated:

> During [2008] we began migrating to the new BP OMS, which has an increased focus on process safety and continuous improvement. The majority of our operations in North America Gas, the Gulf of Mexico, Colombia and the Endicott field in Alaska all completed the migration to the OMS in 2008.

(SAC ¶ 331 (Statement I-1).)  Plaintiffs claim that the representation that the Gulf of Mexico had "completed the migration" to OMS in 2008 was false. (*Id*. ¶ 333(a).)  Plaintiffs also allege that GORC members, in addition to being aware of the limited scope of OMS and the actual pace of implementation, were on notice through a December 2008 "internal BP strategy document" that there were "'major'" process-safety concerns in the Gulf of Mexico region. (*Id*. ¶ 333(c).) Plaintiffs urge that this awareness made it particularly misleading for the 2008 Annual Report to suggest that the Gulf of Mexico was "operating within uniform Company-wide process safety procedures." (*Id*.)

The 2008 Annual Review contained another alleged misrepresentation, this one issued by Defendant Hayward. In the portion of the report designated the "Group chief executive's review," Hayward stated:

> The BP operating management system (OMS) turns the principle of safe and reliable operations into reality by governing how every BP project, site, operation and facility is managed.

(SAC ¶ 332 (Statement I-2).)[11]  Plaintiffs claim that it was misleading of Hayward to state that OMS would "govern" "every BP project, site, operation and facility" when OMS applied only to BP-owned and controlled sites—a key limitation known by Hayward. (*Id*. ¶ 333(b).)

---

[11] Plaintiffs refer to both alleged misrepresentations in the 2008 Annual Review as "Statement I." Because the representations differed in focus, and only one was by an individual executive, the Court will refer to these statements as "Statement I-1" and "Statement I-2."

On March 4, 2009, BP filed its 2008 Annual Report with the SEC on Form 20-F, signed by Hayward in his capacity as chief executive. (SAC ¶ 334.) That document stated:

> We continue to implement our new operating management system (OMS), a framework for operations across BP that is integral to improving safety and operating performance in every site.
>
> When fully implemented, OMS will be the single framework within which we will operate, consolidating BP's requirements relating to process safety, environmental performance, legal compliance in operations, and personal, marine and driving safety.

(*Id*. ¶ 335 (Statement J-1).) Plaintiffs allege that these statements falsely represented the scope of OMS by suggesting that OMS was a "single framework" applied to "every site" when in fact it applied only to rigs fully-owned by BP. (*Id*. ¶ 336(f).) Separately, the Annual Report described the status of OMS implementation, representing that the Gulf of Mexico completed the transition to OMS in 2008:

> All operated businesses plan to transition to OMS by the end of 2010. Eight sites completed the transition to OMS in 2008; two petrochemical plants, Cooper River and Decatur, two refineries, Lingen and Gelsenkirchen and four Exploration and Production sites, North America Gas, the Gulf of Mexico, Colombia and the Endicott field in Alaska.

(*Id*. ¶ 335 (Statement J-2).)[12] Plaintiffs contend that this statement was false, because the transition to OMS was not complete in the Gulf of Mexico by the end of 2008, as specifically confirmed in a report received by Hayward from Inglis in the month before the Form 20-F issued. (*Id*. ¶ 336(b)-(c).)

A month later, on April 16, 2009, BP issued its 2008 Sustainability Review. The document contained a section titled "Group Chief executive's review," in which Hayward made another statement about the scope of OMS:

---

[12] Plaintiffs refer to both alleged misrepresentations in the 2008 Annual Report as "Statement J." Because the representations differed in focus, the Court will refer to these statements as "Statement J-1" and "Statement J-2."

> You can see a similar balanced approach in our new operating
> management system (OMS), which is to be implemented at each BP site.
> It covers everything from compliance and risk management through to
> governance and measuring results.

(SAC ¶ 347 (Statement L).) Plaintiffs allege that Hayward misrepresented that OMS was being implemented "at each BP site" when in reality OMS applied only to rigs fully-owned by BP. (*Id.* ¶ 348.)

On February 26, 2010, BP issued its 2009 Annual Review, the content of which was discussed at the January 26, 2010 meeting of the Board of Directors. (SAC ¶¶ 351, 352(a).) The Annual Review stated:

> Safe, reliable and compliant operations remain the group's first priority. A
> key enabler for this is the BP operating management system (OMS),
> which provides a common framework for all BP operations, designed to
> achieve consistency and continuous improvement in safety and efficiency.
> Alongside mandatory practices to address particular risks, OMS enables
> each site to focus on the most important risks in its own operations and
> sets out procedures on how to manage them in accordance with the group-
> wide framework.

(*Id.* ¶ 351 (Statement N).) Plaintiffs allege that the foregoing statements were false or misleading because: (1) OMS was not fully implemented in the Gulf of Mexico at the time the statement was made, but was in fact in its "infancy," hamstrung by turnover of key personnel in the region; and (2) OMS did not apply to contractor-owned rigs, meaning that major components of OMS—such as Safety and Operations ("S&O") Audits and Major Accident Risk analysis—were not deployed on six out of seven drilling rigs in the Gulf of Mexico. (*Id.* ¶¶ 352(b)-(i).)

On March 5, 2010, BP filed its 2009 Annual Report with the SEC on Form 20-F, signed by Hayward in his capacity as chief executive officer. (SAC ¶ 353.) That document stated:

> Safe, reliable and compliant operations remain the group's first priority. A
> key enabler for this is the BP operating management system (OMS),
> which provides a common framework for all BP operations, designed to
> achieve consistency and continuous improvement in safety and efficiency.

* * *

> BP's operating management system (OMS), which provides a single operating framework for all BP operations, is a key part of continuing to drive a rigorous approach to safe operations.

(*Id*. ¶ 353 (Statement O).) Plaintiffs claim that these representations were false or misleading because OMS applied only to rigs that BP fully owned. (*Id*. ¶ 354(b).)

Defendant Inglis included remarks on OMS in his speech at the Howard Weil Energy Conference in New Orleans, Louisiana, on March 22, 2010, which was later posted by BP on its website. (SAC ¶ 355.) During the presentation, Inglis stated:

> Safety and operational integrity underpins everything we do, and we are now in the final phase of rolling out our operating management system that provides a single, consistent framework for our operations, covering all areas from personal and process safety to environmental performance.

(*Id*. (Statement P).) These remarks occurred in a speech in which Inglis referred to the nearby deepwater Gulf of Mexico operations. (*Id*.) Plaintiffs contend that they were misleading because implementation of OMS in the Gulf was incomplete, and the key elements of OMS would not be applied to the vast majority of the drilling rigs in the Gulf of Mexico because they were contracted rigs. (*Id*. ¶¶ 356(a)-(c).) Inglis knew the risks posed by these contracted rigs, as he noted concern in a June 2009 internal email that contracted rigs were not conforming to BP's "Control of Work" practices. (*Id*. ¶ 356(d).) "Control of Work" was one of the elements of OMS. (*Id*.)

On April 15, 2010, BP issued its 2009 Sustainability Review and its 2009 Sustainability Report. (SAC ¶¶ 359, 363.) Both documents addressed OMS. In the 2009 Sustainability Review, Defendant Hayward reported on the status of the OMS implementation project:

> Having been initially introduced at eight sites in 2008, the OMS rollout extended to 70 sites by the end of 2009, including all our operated

> refineries and petrochemical plants. This means implementation is 80%
> complete.

(*Id*. ¶ 359 (Statement R-1).) The "eight sites" referenced in the above statement are the eight sites

alleged in the 2008 Annual Report to have completed the transition to OMS by the end of 2008.

(*Id*. ¶ 360(c).) Plaintiffs allege that the statement was false or misleading because the Gulf of

Mexico had not completed the transition to OMS in 2008 (*id*. ¶¶ 360(e)-(f)), and because OMS

did not apply to a majority of the deepwater wells in the Gulf (*id*. ¶ 360(d)). Plaintiffs allege that

Hayward was privy to multiple internal sources of information describing the major risks facing

the Gulf of Mexico, which rendered misleading his statements suggesting that the Gulf of

Mexico unit was "operating within uniform company-wide process safety procedures." (*Id*. ¶

360(g).)

The 2009 Sustainability Review also contained the following statement about the scope

of OMS:

> BP's operating management system (OMS) provides a single framework
> for all BP operations to follow, covering all areas from process safety, to
> personal health, to environmental performance.
>
> Providing an integrated and consistent way of working, the OMS helps
> ensure that a rigorous approach to safe operations continues to be taken.
> Its principles and processes are designed to simplify the organization,
> improve productivity, enable consistent execution and focus BP on
> performance.

(SAC ¶ 361 (Statement R-2).)[13] Plaintiffs contend that it was misleading to describe OMS as a

"single framework for all BP operations" given the reality that OMS did not apply to contractor-

owned rigs. (*Id*. ¶ 362(e).)

---

[13] Plaintiffs refer to both alleged misrepresentations in the 2009 Sustainability Review as
"Statement R." Because the representations differed in focus, and only one was issued by an
individual executive, the Court will refer to these statements as "Statement R-1" and "Statement
R-2."

On the same day the 2009 Sustainability Review was issued, BP also issued the 2009 Sustainability Report. (SAC ¶ 363.) This document was evaluated and recommended for publication by SEEAC, at a meeting attended by Hayward and Inglis. (SAC ¶ 365(c); Doc. No. 521-2, at 2.) The Report contained the following statement about BP's ability to respond to an oil spill:

> Preparation: we seek to ensure an infrastructure is in place to deal effectively with spills and their impacts. Our operating facilities have the capacity and resources to respond to spill incidents and we participate in industry and international forums to coordinate contingency planning and emergency response.

(SAC ¶ 363 (Statement S-1).) The Report went on to make the following statement about OMS:

> BP continues to implement its operating management system (OMS), a cornerstone of achieving safe, reliable and responsible operations at every BP operation.

(*Id.* ¶ 364 (Statement S-2).)[14] Plaintiffs allege that both of these statements were false or misleading because: (1) contemporaneous Orange Books, distributed to members of the GORC, revealed deficiencies in BP's process safety and operations, including BP's ability to respond to an oil spill; (2) OMS implementation in the Gulf was behind schedule, incomplete, and hamstrung by key personnel turnover; (3) GORC had been informed of significant safety incidents in the Gulf of Mexico, putting its members on notice of deficient safety processes there; and (4) BP conducted its operations without any legitimate oil spill response plan. (*Id.* ¶¶ 365(d)-(j).)

---

[14] Plaintiffs refer to both alleged misrepresentations in the 2009 Sustainability Report as "Statement S." Because the representations differed in focus, the Court will refer to these statements as "Statement S-1" and "Statement S-2."

## II.     LEGAL STANDARDS

### A.     Rule 12(b)(6)

To survive a motion to dismiss, a complaint must contain sufficient factual allegations, accepted as true, to state a claim for relief that is plausible on its face.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  It follows that, where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but has not shown—that the plaintiff is entitled to relief.  *Id.* at 679; *see also* FED. R. CIV. P. 8(a)(2).  Well-pleaded factual allegations must be taken as true, but the court does not "accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions."  *Cent. Laborers'*, 497 F.3d at 550 (citation omitted) (internal quotation marks omitted).

In considering a Rule 12(b)(6) motion to dismiss, the court must limit itself to the contents of the pleadings, including attachments thereto, with two exceptions.  First, the Fifth Circuit allows the court to consider certain documents attached to the motion to dismiss.  *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000).  Such documents must be referenced in the complaint and central to the plaintiff's claim.  *Id.*; *Scanlan v. Texas A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003).  Second, because this is a securities case, the court may take judicial notice of the contents of public disclosure documents that the law requires be filed with governmental agencies, such as the SEC, and that are actually filed with those agencies.  *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1018 n.1 (5th Cir. 1996).  However, these documents may be considered only for the purpose of determining what statements they contain, not for proving the truth of their contents.  *Id.*

16

As is required for Rule 12(b)(6) analysis, the court must draw all reasonable inferences in favor of the plaintiff.  *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 406 (5th Cir. 2001).  However, for scienter only, in keeping with the requirement of the Private Securities Litigation Reform Act ("PSLRA") that plaintiffs plead facts giving rise to a "strong" inference of scienter, the court must take into account plausible inferences opposing as well as supporting scienter.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.* ("*Tellabs I*"), 551 U.S. 308, 323-24 (2007).  Accordingly, for purposes of a Rule 12(b)(6) motion to dismiss, a strong inference of scienter is one at least as compelling as any opposing inference of non-fraudulent intent.  *Id.* at 324.

### B.      Section 10(b)

Under section 10(b) of the Securities Exchange Act of 1934,

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).  SEC Rule 10b–5, promulgated pursuant to section 10(b), implements section 10(b) by forbidding, among other things, the making of any "untrue statement of a material fact" or the omission of any material fact "necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b–5.  The Supreme Court has implied from the text of section 10(b) that it affords a right of action to purchasers or sellers of securities injured by its violation.  *Tellabs*, 551 U.S. at 318.  To state a private claim under section 10(b), a plaintiff must allege the following: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the

misrepresentation or omission; (5) economic loss; and (6) loss causation, i.e., a causal connection between the misrepresentation or omission and the loss. *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 238-39 (5th Cir. 2009).

### 1.    Material Misrepresentations and Omissions

Because Plaintiffs assert securities fraud claims, they must satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA. *See Lormand*, 565 F.3d at 239; s*ee also Tellabs I*, 551 U.S. at 322 (noting that the PSLRA's twin goals are to "curb frivolous, lawyer-driven litigation, while preserving investors' ability to recover on meritorious claims"). Rule 9(b) requires that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b); *see also Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 866 (5th Cir. 2003) (noting that the PSLRA's particularity requirement incorporates, at a minimum, the pleading standard for fraud under Rule 9(b)). The PSLRA enhances the requirements of Rule 9(b) in two ways. First, plaintiffs must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1). Second, for each act or omission alleged to be false or misleading, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* at § 78u–4(b)(2)(A).

In order to meet these additional requirements of the PSLRA, a plaintiff must, therefore: (1) specify each statement alleged to have been misleading; (2) identify the speaker; (3) state when and where the statement was made; (4) plead with particularity the contents of the false representation; (5) plead with particularity what the person making the misrepresentation obtained thereby; and (6) explain the reason or reasons why the statement is misleading, *i.e.*, why the statement is fraudulent. *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 350 (5th

Cir. 2002).  These allegations constitute the "who, what, when, where, and how" required under Rule 9(b) and the PSLRA.  *Id.*  What constitutes particularity will necessarily differ with the facts of each case.  *Guidry v. Bank of LaPlace*, 954 F.2d 278, 288 (5th Cir. 1992).  A dismissal for failure to plead fraud with particularity as required by Rule 9(b) is a dismissal on the pleadings for failure to state a claim.  *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 361 (5th Cir. 2004).

To be actionable, a misrepresentation of a fact, or an omission of a fact, must be material. The Supreme Court recently reaffirmed that there is no bright-line rule for determining whether information withheld from a company's filings is material as a matter of law.  *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1318–22 (2011).  Unwilling to allow materiality to be reduced to a test of "statistical significance," the Court held instead that assessing materiality involves a "fact-specific inquiry . . . that requires consideration of the source, content, and context" of the allegedly omitted information.  *Id.* at 1321.  The misrepresentation of a fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in making an investment decision.  *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988). For an omission to be material, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.  *Id.* at 231-32; *see also Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1445 (5th Cir. 1993) (explaining that the appropriate inquiry is whether the statement or omitted fact is significant, "such that it alters the 'total mix' of information available about the proposed investment").  Materiality is not judged in the abstract, but in light of the surrounding circumstances. *Rubinstein v. Collins*, 20 F.3d 160, 168 (5th Cir. 1994).

With regard to misstatements, the PSLRA establishes a "safe harbor" protecting

individuals and corporations from liability for certain forward-looking statements that prove false. To qualify for protection, the statement must be "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" or be immaterial.  15 U.S.C. § 78u–5(c)(1)(A)(i)–(ii). Where a material forward-looking statement is not accompanied by cautionary language, a defendant may still claim safe harbor if plaintiff fails to prove that the defendant made the statement with "actual knowledge" as to its falsity.  *Id.* at § 78u–5(c)(1)(B).

### 2.  Scienter

Section 10(b) and Rule 10b–5 do not protect investors against negligence or corporate mismanagement.  *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 539 (5th Cir. 2008).  Under the PSLRA, it is not enough to particularize false statements or fraudulent omissions made by a defendant; rather, for "each act or omission alleged" to be false or misleading, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u–4(b)(2)(A).  To establish a section 10(b) claim, a private plaintiff must prove that the defendant acted with scienter.  *Tellabs I*, 551 U.S. at 319.

In the context of federal securities fraud, scienter is "defined as 'an intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it.'" *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009) (quoting *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 643 (5th Cir. 2005)); *see also Plotkin v. IP Axess Inc.*, 407 F.3d 690, 697 (5th Cir. 2005) ("[A] securities fraud plaintiff must prove that the defendant either consciously misbehaved . . . or was so severely reckless that it demonstrates

20

that the defendant must have been aware of the danger of misleading the investing public.").
Severe recklessness is "'limited to those highly unreasonable omissions or misrepresentations
that involve not merely simple or even inexcusable negligence, but an extreme departure from
the standards of ordinary care, and that present a danger of misleading buyers or sellers which is
either known to the defendant or is so obvious that the defendant must have been aware of it.'"
*Rosenzweig*, 332 F.3d at 866 (quoting *Nathenson*, 267 F.3d at 408).

        For a complaint to adequately plead scienter, "Congress require[s] plaintiffs to plead with
particularity facts that give rise to a 'strong'— i.e., a powerful or cogent—inference." *Tellabs I*,
551 U.S. at 323.  The inference need not be "irrefutable, i.e., of the 'smoking gun' genre, or even
the most plausible of competing inferences."  *Id*. at 324 (citation omitted) (internal quotation
marks omitted).  Nonetheless, the "inference of scienter must be more than merely 'reasonable'
or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations."
*Id*.  In addition, "[t]he strength of an inference cannot be decided in vacuum. . . . To determine
whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter,
a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as
inferences favoring the plaintiff."  *Id*. at 323–24.  "[O]missions and ambiguities count against
inferring scienter, for plaintiffs must 'state with particularity facts giving rise to a strong
inference that the defendant acted with the required state of mind.'"  *Id*. at 326 (quoting 15
U.S.C. § 78u–4(b)(2)(A)).

        *Tellabs I* outlined a three step approach to reviewing scienter allegations in a motion to
dismiss a federal securities fraud case pursuant to the PSLRA.  551 U.S. at 322-23.   First, the
allegations must, as in federal pleadings generally, be taken as true.  *Id*. at 322.  Second, the court
may consider documents incorporated in the complaint by reference and matters subject to

judicial notice.  *Id*.  The facts must be evaluated collectively, not in isolation, to determine whether a strong inference of scienter has been pleaded.  *Id*. at 322-23; *see also Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 260 (5th Cir. 2005) ("While [the Fifth Circuit] will view a complaint *in toto* when considering whether a complaint has adequately pled scienter . . . each allegation of fraud must individually meet the particularity requirements of the PSLRA.") (citation omitted).  Third, a court must take into account plausible inferences opposing as well as supporting a strong inference of scienter.  *Tellabs I*, 551 U.S. at 324. At the conclusion of this process, scienter has been adequately pled if the alleged facts, taken as true, give rise to an inference that the defendant intentionally or recklessly misled the public which is *at least* as compelling as any inference that the defendant acted non-culpably or merely negligently. *Id*.

Although circumstantial evidence can support a strong inference of scienter, allegations of motive and opportunity standing alone will not suffice.  *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 430 (5th Cir. 2002).  Appropriate motive and opportunity allegations may, however, "'meaningfully enhance the strength of the inference of scienter.'"  *Southland*, 365 F.3d at 368 (quoting *Nathenson*, 267 F.3d at 412).  Corporate officers are not liable for acts solely because they are officers, even where their day-to-day involvement in the corporation is pleaded.  *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006).  However, corporate statements can be connected to a particular officer if plaintiffs allege the officer signed the document in which the statement appears or they adequately allege the officer's involvement in creating the document.  *Id*.

The Fifth Circuit has rejected the group pleading approach to scienter.  *Shaw Group*, 537 F.3d at 534.  As a result, the court may not "construe allegations contained in the Complaint against the 'defendants' as a group as properly imputable to any particular individual defendant

unless the connection between the individual defendant and the allegedly fraudulent statement is specifically pleaded." *Southland,* 365 F.3d at 365. Plaintiffs pleading fraud claims against individuals under section 10(b) and Rule 10b–5 must distinguish among defendants and allege the role of each. *Id.* The Court will then look to the "state of mind of the individual corporate official or officials 'who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment.'" *Shaw Group*, 537 F.3d at 533 (quoting *Southland*, 365 F.3d at 366).

### 3.    Section 20(a) claims

Under section 20(a) of the Exchange Act, "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). Section 20(a) is a secondary liability provision, and plaintiffs must therefore establish a primary violation under section 10(b) before liability arises under section 20(a). *ABC Arbitrage*, 291 F.3d at 348 n. 57 (noting that "control person" liability is "derivative, i.e., such liability is predicated on the existence of an independent violation of the securities laws"). Accordingly, if a plaintiff fails to state a claim for a primary securities fraud violation under section 10(b) or Rule 10b-5, they necessarily fail to state a claim for control person liability under section 20(a). *Blackwell*, 440 F.3d at 288.

III.     **ANALYSIS**

A.     **Alleged Misstatements Regarding the Scope of OMS**

The first category of alleged misrepresentation—that BP misled investors when it described OMS as a comprehensive, single framework that would govern safety protocols at each and every BP site and operation—was partially vindicated in the Ludlow Order. The Ludlow Plaintiffs had highlighted two occasions on which this type of misrepresentation was made. These statements are found in the Second Amended Complaint as Statements N and P:

- **Statement N**. BP's 2009 Annual Review, dated February 26, 2010, stated: "A key enabler for [safe, reliable and compliant operations] is the BP operating management system (OMS), which provides a ***common framework*** for ***all BP operations*** . . . . OMS enables ***each site*** to focus on the most important risks in its own operations and sets out procedures on how to manage them in accordance with the ***group-wide framework***." (SAC ¶ 351.)[15]

- **Statement P**. At the Howard Weil Energy Conference on March 22, 2010, Inglis stated: "Safety and operational integrity underpins everything we do, and we are now in the final phase of rolling out our operating management system that provides a ***single, consistent framework*** for our operations, covering all areas from personal and process safety to environmental performance." (SAC ¶ 355.)

The Court was persuaded that these statements were false by the Ludlow Plaintiffs' inclusion of allegations in their complaint that (1) BP's operations in the Gulf of Mexico, most notably its offshore exploration rigs, never received any information related to OMS; (2) the implementation of OMS in the Gulf was hamstrung by cost-cutting measures and employee turnover; and (3) BP's OMS program lagged behind that of its peers. (Ludlow Order at 47-48, 49-50.) The Court was also persuaded that the statements were misleading to investors because they omitted that OMS did not and was not intended to apply to offshore drilling operations for which BP was the operator but not the owner of the rig. (*Id*. at 50-53.) Placing this allegation that

---

[15] Unless otherwise noted, the emphasis given in quoted passages from the Second Amended Complaint is the Court's own and does not necessarily reflect the emphasis given in the Second Amended Complaint.

OMS did not apply to contractor-owned rigs against Defendants' unqualified, expansive, and repeated descriptions of OMS as applying to *all* operations at *each* site, the Court found that the Ludlow Plaintiffs had met their burden to allege with particularity how the misrepresentations were false or misleading and material to investors. (*Id.*) Both misrepresentations were dismissed, however, because the Ludlow Plaintiffs had not adequately established the scienter of the statements' speakers—BP for Statement N (*id.* at 80-81) and Inglis for Statement P (*id.* at 76-77).

Statements N and P have been repled in the Second Amended Complaint, along with eleven other statements concerning the scope of OMS. In the Ludlow Order, the Court focused on Statement N's and Statement P's repeated use of words such as "all," "each," "single," and "consistent" to describe OMS, finding that these words taken at their literal, dictionary meaning reasonably left investors with the impression that OMS would apply to each and every endeavor touched by BP. (Ludlow Order at 51-52.) A review of the eleven other statements from the SAC included in this category reveals that most of them contain similarly expansive—and in many cases, identical—words conveying the same general impression regarding the scope of OMS:

- **Statement A.** BP's 2006 Sustainability Report, dated May 9, 2007, stated: "The OMS is a ***comprehensive system*** that covers ***all aspects of our operations*** . . . . The new OMS will apply to ***all operations*** by the end of 2010 . . . . ***Each site*** will have its own local OMS, based on a ***consistent group-wide framework***." (SAC ¶ 315.)

- **Statement B.** On a July 24, 2007 conference call with analysts and investors, Hayward stated: "We are also in the early days of establishing a new way of operating in BP – with the progressive rollout of a ***common group-wide*** Operating Management System." (*Id.* ¶ 317.)

- **Statement C.** At the Sanford Bernstein 4th Annual Strategic Decisions Conference on September 25, 2007, Inglis stated: "One aspect of our focus on safe and reliable operations . . . is our new standardized [OMS]. This will provide a blueprint for safety and ***all aspects of operations throughout BP***." (*Id.* ¶ 319.)

- **Statements F and G.** At the 2008 Strategy Presentation conducted via teleconference on February 27, 2008, and again at the 2008 Annual General Meeting held April 17, 2008, Hayward stated: "[We] have begun to implement a new Operating Management System *across all of BP's operations*." (*Id*. ¶¶ 325, 327.)

- **Statement I-2.** In the 2008 Annual Review dated February 24, 2009, Hayward stated: "The BP [OMS] turns the principle of safe and reliable operations into reality by governing how *every BP project, site, operation and facility* is managed." (*Id*. ¶ 332.)

- **Statement J-1.** BP's 2008 Annual Report, filed March 4, 2009 and signed by Hayward, stated: "We continue to implement our new [OMS], a *framework* for operations *across BP* that is integral to improving safety and operating performance in *every site*. When fully implemented, OMS will be the *single framework* within which we will operate." (*Id*. ¶ 335.) Elsewhere, the Report stated: "*All operated businesses* plan to transition to OMS by the end of 2010." (*Id*.)

- **Statement L.** In the 2008 Sustainability Review released April 16, 2009, Hayward stated: "You can see a similar balanced approach in our new [OMS], which is to be implemented at *each BP site*." (*Id*. ¶ 347.)

- **Statement O.** BP's 2009 Annual Report filed March 5, 2010 and signed by Hayward, stated: "A key enabler for [safe, reliable and compliant operations] is the BP [OMS], which provides a *common framework* for *all BP operations*, designed to achieve consistency and continuous improvement in safety and efficiency." (*Id*. ¶ 353.) Elsewhere, it stated: "BP's [OMS], which provides a *single operating framework* for *all BP operations*, is a key part of continuing to drive a rigorous approach to safe operations." (*Id*.)

- **Statement R-2.** BP's 2009 Sustainability Review dated April 15, 2010, stated: "BP's [OMS] provides a *single framework* for *all BP operations* to follow." (*Id*. ¶ 361.)

- **Statement S-2.** BP's 2009 Sustainability Report dated April 15, 2010, stated: "BP continues to implement its [OMS], a cornerstone of achieving safe, reliable and responsible operations at *every BP operation*." (*Id*. ¶ 364.)

    1.    **Falsity**

Defendants contend that the misrepresentations in this category should be dismissed because the documents upon which the Second Amended Complaint relies do not actually support the allegation of falsity. Specifically, Defendants claim that these documents show that

OMS did apply to contractor-owned rigs, and that the statements were therefore accurate.[16] (Doc. No. 356, at 6-12.)

According to Defendants, OMS required contractors either to adopt BP's safety standards as set forth in OMS or demonstrate that their own safety standards were commensurate. (Doc. No. 356, at 6-10.) To the extent that specific deficiencies in contractors' systems were identified, bridging documents would be used to bring them in line with OMS. (*Id.* at 9.) Defendants substantiate their argument with (1) passages from the OMS Framework dated November 3, 2008, referencing contractors and joint ventures (Doc. No. 356-8 (Ex. G), at 11, 19, 31-32); (2) passages from a Group Recommended Practice ("GRP") titled "Working with Contractors," discussing how to evaluate prospective contractors and bridge the safety programs of contractors and BP (Doc. No. 356-9 (Ex. H), at 4, 7); (3) passages from the "Drilling and Well Operations Practice" stating that a contractor's safety management system "will incorporate, or be supplemented to address, the requirements of the OMS Framework" (Doc. No. 356-10 (Ex. I), at 10); (4) passages from the Gulf of Mexico Strategic Performance Unit ("SPU") OMS Handbook describing how the SPU ensures that contractors meet BP's personal safety requirements, bridging contractors' safety programs to the safety programs of BP if necessary (Doc. No. 356-7 (Ex. F), at 13); and (5) deposition testimony from Inglis and BP's corporate witness in MDL 2179 describing in practice how OMS applied to contractors (Doc. No. 356-11 (Ex. J.), at 12-13; Doc. No. 356-12 (Ex. K), at 5, 8-10).

---

[16] Plaintiffs urge the Court not to address the substantive dispute regarding falsity because the Court decided the issue in Plaintiffs' favor in the Ludlow Order. (Doc. No. 373, at 4.) Although Plaintiffs are correct that the Court did not intend for the Second Amended Complaint—and any motion practice based on that pleading—to be used by either party as a vehicle to challenge perceived "error" in the February 13th Orders, they too narrowly limit the arguments that Defendants may raise to previously dismissed statements. Statements N and P were dismissed in the Ludlow Order for lack of scienter. Therefore, Defendants could not have sought reconsideration of the Court's finding that the statements were adequately alleged to be false.

Consistent with this position, Defendants argue that the Second Amended Complaint's oft-repeated allegation that OMS did not apply to contractor-owned rigs is unsupported even by those documents on which the allegation is based. In the Complaint, Plaintiffs' allegation is substantiated by the deposition testimony of former Global Head of Safety & Operations John Mogford (SAC ¶ 102); Hayward (*id*. ¶ 103); Group Head of Engineering John Baxter (*id*. ¶ 104); Vice President of Drilling & Completions Pat O'Bryan (*id*.); Wells Team Leader for the Deepwater Horizon John Guide (*id*. ¶ 105); Well Site Leader for the Deepwater Horizon Ronnie Sepulvado (*id*.); and Chief Engineer of Process and Process Safety Cheryl Grounds (*id*.). In an attempt to show how this testimony is taken out of context and inaccurately characterized, Defendants provide additional deposition testimony from Baxter, O'Bryan, Sepulvado, and Mogford which clarifies how OMS worked in the case of contractors. (Doc. No. 356-13 (Ex. L), at 18-19; Doc. No. 356-14 (Ex. M), at 4-5; Doc. No. 356-15 (Ex. N), at 5-6; Doc. No. 356-16 (Ex. O), at 7-8.)

Plaintiffs counter with two arguments. First, Plaintiffs deny that the deposition testimony cited in the Second Amended Complaint was misquoted or taken out of context, stating that Mogford and the other witnesses—who ostensibly knew about the process documents attached to Defendants' motion—nonetheless testified without qualification that OMS was not designed to and did not apply to contractors. (Doc No. 373, at 10-11.) Second, Plaintiffs argue that evidence cited by Defendants to support that BP imposed its own safety standards as a "floor"—and "bridged" contactors' safety programs as necessary—show that these concepts only applied to *personal* safety, not *process* safety. Because process safety issues were the focus of the Baker Panel—and the predominant weakness in BP's safety culture intended to be addressed by OMS—Plaintiffs argue that this evidence is irrelevant to their point that contractor-owned rigs

were not subject to the *process safety* aspects of OMS, the aspects most pressing to savvy investors worried about BP's poor safety history. (*Id.* at 11.)

The Court cannot accept Plaintiffs' second argument, which depends upon a distinction not found in the Second Amended Complaint. Consistently throughout the Complaint, Plaintiffs allege that statements regarding the scope of OMS were false because "OMS applied only to rigs that BP fully-owned but not to BP's operations where BP leased rigs from others." (*E.g.*, SAC ¶¶ 316, 318, 320, 333(b).) At the hearing on Defendants' motion, Plaintiffs' counsel refined this allegation:

> BP knew . . . as early as 2007 that they had no intention of applying the full panoply of OMS process safety and personal safety [to contracted rigs], but only certain items of personal safety.

(Doc. No. 527, at 60:10-13.)[17]   But Plaintiffs cannot avoid dismissal by changing their allegations in response to Defendants' motion. Rule 9(b) and the PSLRA obligated Plaintiffs to plead with particularity how the alleged misstatements were misleading. Plaintiffs alleged that OMS—not certain parts of OMS, but OMS as a whole—did not apply to contractor-owned rigs. The Court must address the sufficiency of this allegation.

At the motion to dismiss stage, the Court must accept as true all well-pleaded allegations in the complaint, and draw all reasonable inferences in the Plaintiffs' favor. *Nathenson*, 267 F.3d at 406. At the same time, the Court is permitted to consider documents referenced in the complaint and central to Plaintiffs' claims. *Scanlan*, 343 F.3d at 536. Where one of these

---

[17] In support of their new argument, Plaintiffs cited a bridging document for the Deepwater Horizon rig dated September 8, 2009. (Doc. No. 527, at 56:15-57:1.) This document contained only six areas of identified deficiencies, all germane to personal safety. (*Id.*; Doc. No. 493-1, at 3.) Because the document was not referenced in the Second Amended Complaint, the Court will not consider it or rely upon it in deciding Defendants' motion to dismiss.

documents contradicts an allegation in the complaint, the document and not the allegation controls. *Riley*, 355 F.3d at 377.

The Court finds it appropriate to consider the OMS Framework and the Gulf of Mexico OMS Handbook (the "OMS Process Documents") in deciding the sufficiency of Plaintiffs' allegation of falsity. (Doc. No. 356-8 (Ex. G); Doc. No. 356-7 (Ex. F).) The availability of these particular documents to the GORC, Hayward, and/or Inglis are central to Plaintiffs' scienter allegations, and thus central to Plaintiffs' claims for relief. (SAC ¶¶ 44, 102, 175-76, 333(c).) If these documents contradict Plaintiffs' allegations, they will control.[18] For the same reasons, the Court also finds it appropriate to consider the deposition testimony of Baxter, O'Bryan, Sepulvado, and Mogford. (Doc. No. 356-13 (Ex. L); Doc. No. 356-14 (Ex. M); Doc. No. 356-15 (Ex. N); Doc. No. 356-16 (Ex. O).) Because the Second Amended Complaint expressly relies on this testimony to substantiate the allegation that OMS did not apply to contractor-owned rigs (SAC ¶¶ 102, 104-05), the Court will review the testimony for purposes of determining whether it has been accurately recounted and fairly characterized by Plaintiffs.[19]

Considering all of these external exhibits, along with the totality of Plaintiffs' allegations, the Court is persuaded that Plaintiffs have articulated a plausible theory for the falsity of *some* of Defendants' statements about the scope of OMS. It is undisputed, and the OMS Process

---

[18] The Court does not find it appropriate to consider the Group Recommended Practice "Working with Contractors" or the "Drilling and Well Operations Practice." (Doc. No. 356-9 (Ex. H); Doc. No. 356-10 (Ex. I).) These documents are not referenced in the SAC or central to Plaintiffs' claims.

[19] The Court does not find it appropriate or necessary to consider the deposition testimony of Inglis or BP's corporate representative in MDL 2179. (Doc. No. 356-11 (Ex. J); Doc. No. 356-12 (Ex. K).) The Second Amended Complaint does not rely upon these witnesses' testimony to support its allegations of falsity. Moreover, given that deposition testimony can be inconsistent— if not deliberately self-serving—the Court finds the contemporaneous OMS Process Documents more suitable evidence of whether or not the challenged statements falsely depicted the scope of OMS.

Documents confirm, that contractor-owned rigs were not entirely exempted or omitted in the OMS architecture.[20] But they were clearly treated differently from BP-owned assets. The OMS Process Documents contemplate that assets and entities not fully owned or operated by BP would be subject to the safety systems of the owning or operating party. (Doc. No. 356-7 (Ex. F) at 13; Doc. No. 356-8 (Ex. G) at 31-32.) While those safety systems would be compared to OMS standards, and rehabilitated if necessary to make them commensurate (Doc. No. 356-7 (Ex. F) at 13; Doc. No. 356-8 (Ex. G) at 31-32), this "gap assessment" or "bridging" process could plausibly be viewed as qualitatively different from, and inferior to, the purportedly "single" framework of OMS which would be deployed in "each" and "every" location where BP operates.

This conclusion is supported by the very deposition testimony cited in the Second Amended Complaint which Defendants claim has been taken out of context and misconstrued. For example, the Second Amended Complaint quotes Baxter (SAC ¶ 104), who testified that OMS did not "apply" to the Deepwater Horizon because BP "does not apply its safety management system to other activities where the contractor has their own safety management system." (Doc. No. 356-13 (Ex. L) at 5, 9.) Elsewhere, Baxter explained that OMS "covers both BP's activities and BP entities where BP is using contractors" and that, where a contractor's activities are governed by its own safety management system, "BP will review the difference between the contractor safety management system and BP's safety management system and . . . then look at any gaps to see whether the contractor safety management system will deliver what BP aims to do with its own safety." (*Id.* at 19.) Drawing all reasonable inferences from the testimony in Plaintiffs' favor, Baxter likely characterized the OMS as not applicable (in design)

---

[20] As previously noted, Plaintiffs acknowledge that at least the personal safety aspects of OMS were imposed on contractor-owned rigs by virtue of the "bridging" process. (Doc. No. 527, at 56:6-10.)

and not applied (in practice) to the Deepwater Horizon precisely because of the distinction between OMS *addressing* the circumstance of a non-BP-owned asset and OMS *substantively governing* the safety management practices deployed on that asset.

The testimony of Patrick O'Bryan, Ronnie Sepulvado, and John Mogford is similarly equivocal.[21] In Defendants' own words, these witnesses testified that "OMS did apply to contractors, although not *in the same way* it applied to BP-operated entities." (Doc. No. 356, at 11 (emphasis original).) But it is exactly this last phrase, qualifying and implicitly limiting the impact of the OMS on non-owned assets, that Plaintiffs contend needed to be disclosed in order to prevent BP's statements from misleading investors. By ignoring the distinction between owned and non-owned entities, Defendants were able to tell investors repeatedly that a "single" robust framework would be applied to all of its operations—a much more impressive statement than one disclosing that BP's operations would be governed by a patchwork of "equivalent" frameworks, all but one created by entities other than BP. For these reasons, the Court concludes

---

[21] The complaint quotes O'Bryan's testimony that the only drilling rig in the Gulf of Mexico that "would fall under the BP OMS is the BP-owned rig the PDQ on Thunderhorse." (SAC ¶ 104.) Elsewhere, O'Bryan testified that, "[T]he contractor's Safety Management System, is bridged to the BP Safety Management System, which is in conformance with OMS, and we operate under the Drilling Contractors Safety Management System." (Doc. No. 356-14 (Ex. M) at 4.)

The complaint quotes Sepulvado's testimony that he was unfamiliar with the Gulf of Mexico Local OMS and its contents. (SAC ¶ 105.) Elsewhere, Sepulvado testified that, on the Deepwater Horizon, Transocean "used their safety program, safety management system" and that BP "had bridging documents" that "joined the BP and the safety management system for Transocean." (Doc. No. 356-15 (Ex. N) at 6.)

The complaint quotes Mogford's testimony that "OMS was designed for BP owned and operated institutions" and that "OMS was not designed to be implemented on contractor sites or vessels." (SAC ¶ 102.) Elsewhere, Mogford testified that BP "does have to verify appropriately the Safety Management systems of drilling contractors and . . . make sure there are effective bridges in place." (Doc. No. 356-16 (Ex. O) at 7-8.)

that Plaintiffs have sufficiently articulated a plausible theory as to the misleading nature of many of Defendants' statements regarding the scope of OMS.

Although Plaintiffs' theory of falsity is plausible, and supported by the documents attached to Defendants' motion, a handful of Defendants' alleged misrepresentations regarding the scope of OMS are so general that they cannot be considered misleading even in light of the foregoing limitation to OMS's scope. For example, Plaintiffs allege that Defendant Inglis misled the public in September 2007 when he said that OMS would "provide a blueprint for safety and all aspects of operations throughout BP." (SAC ¶ 319.) But that is exactly what OMS was designed to do, even in the case of non-owned assets—provide a blueprint or a "floor" under which BP *and its contractors* could not fall.[22] In addition to this statement by Inglis (Statement C), Statements B, F, and G are too general to support Plaintiffs' theory of falsity. (*Id.* ¶ 317 ("We are also in the early days of establishing a new way of operating in BP—with the progressive rollout of a common group-wide Operating Management System."); ¶¶ 325, 327 ("[We] have begun to implement a new Operating Management System across all of BP's operations.").) These four statements are therefore non-actionable for failure to allege with particularity how they were misleading to investors.

### 2.    Safe harbor

Defendants also allege that three of the misrepresentations in this category—Statements A, B, and C—are protected under the safe harbor provision of the PSLRA. Because Statements B and C are not actionable for the reasons identified in Section III(A)(1), the Court will address only whether Statement A is entitled to safe harbor protection.

---

[22] The Court reiterates that it cannot consider Plaintiffs' post-pleading clarification that contractors' safety systems were not bridged to OMS's *process safety* standards.

A forward-looking statement may include both a representation of present fact and a projection of future events. The safe harbor provision does not protect any representation of present fact. *See Makor Issues & Rights, Ltd. v. Tellabs Inc.* ("*Tellabs II*"), 513 F.3d 702, 705 (7th Cir. 2008) ("[A] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present.").

Statement A is a mixed statement of present fact and future events. It projects that OMS will be fully deployed by the end of 2010. (SAC ¶ 315.) The safe harbor provision may protect this portion of the statements which anticipates future OMS roll-out. But it does not protect any representation regarding the scope of OMS which had already been finalized internally.

Plaintiffs' allegations fairly support an inference that the scope of OMS was known by the time of Statement A in May 2007. OMS was created in accordance with a recommendation from the Baker Report, released in January 2007. (SAC ¶¶ 13, 81, 84.) According to Mogford—one of the authors of the OMS Framework—"OMS was designed for BP owned and operated institutions, so the focus was on BP production facilities where BP had people." (*Id.* ¶ 102.) In July 2007, Hayward stated that BP was in the "early days" of establishing and rolling out OMS. (*Id.* ¶ 317.) By the end of that year, OMS had been introduced at 12 representative pilot sites. (*Id.* ¶ 95.)

Because Plaintiffs adequately allege that the design of OMS was in existence at the time of Statement A, and because Plaintiffs claim that representations of the design were materially misleading, Defendants are not entitled to dismissal of Statement A under the safe harbor provision.

### 3. Scienter

Defendants contend that—viewing Plaintiffs' factual allegations as a whole along with the documents on which their claims rest—the inference that any defendant intentionally or recklessly misrepresented the scope of OMS is not as strong as the alternative. According to Defendants, the stronger inference is that the individuals who made or approved the alleged misrepresentations believed them to be fair, accurate, and supported by the overall structure of OMS as they understood it. (*E.g.*, Doc. No. 356, at 20.)

As the Fifth Circuit does not permit group pleading in PSLRA cases, scienter must be shown as to each individual speaker or to the corporation as a whole. Therefore, each individual "speaker" or "author" must be addressed separately.

### a. Hayward

Hayward, in keeping with his position as the figurehead and spokesperson of BP's overall safety reform efforts, spoke frequently on the topic of OMS generally, and on the topic of the scope of OMS specifically. Plaintiffs have identified five occasions on which Hayward personally—in writing, in speeches, or in conference calls—addressed the scope of OMS.[23] (SAC ¶¶ 317, 325, 327, 332, 347.) These range from relatively tepid statements, such as Statement B in a July 2007 conference call that BP was progressively rolling out "a common Group-wide Operating Management System," to more explicit statements such as Statement I-2 in the 2008 Annual Review that OMS "govern[s] how every BP project, site, operation and facility is managed." (*Id.* ¶¶ 317, 332.) In addition to these representations made by Hayward directly, he also signed two Annual Reports in which statements about the scope of OMS are found: Statement J-1, contained in the 2008 Annual Report (*id.* ¶¶ 334-35) and Statement O,

---

[23] Three of these statements were too general to support Plaintiffs' theory of falsity, as set forth in Section III(A)(1) of this opinion.

contained in the 2009 Annual Report (*id*. ¶ 353). Because Hayward signed these reports in his capacity as chief executive officer of BP, they may be attributed to him.[24] *See Blackwell*, 440 F.3d at 287; *Southland*, 365 F.3d at 365. Additionally, Plaintiffs allege that Hayward was connected to an additional four unattributed corporate statements.[25] Adding these to the mix, over a three-year period, Hayward was involved in making at least seven—and perhaps as many as eleven—public representations regarding the scope of OMS.

To determine whether there exists a strong inference that these statements were made with the requisite state of mind, they must be viewed against the backdrop of Hayward's position and role in the Company, and his understanding of OMS. As the Court previously found, Hayward assumed a very active role promoting BP's safety reform efforts. He considered, and publicly declared, process safety improvement at BP to be his priority and his mandate. (NY/OH Order at 99-103.) As a result, he regularly spoke on BP's reform efforts, including OMS.

Additionally, Hayward was the Chair of the GORC, a committee convened specifically to oversee and shepherd the OMS implementation project. (SAC ¶ 84.) This committee reviewed and approved the structure of OMS, as set forth in the OMS Framework (*id*. ¶ 102), which

---

[24] Plaintiffs did not attach a copy of these reports to their Complaint, but the Court takes judicial notice of the contents of these publicly filed documents. *See* BP's 2008 Form 20-F, Ex. 12 (Rule 13a-14(a) Certificates), *available at* http://www.sec.gov/Archives/edgar/data/313807/000115697309000125/u06412exv12.htm; BP's 2009 Form 20-F, Ex. 12 (Rule 13a-14(a) Certificates), *available at* http://www.sec.gov/Archives/edgar/data/313807/000095012310021364/u08439exv12.htm; *see also Lovelace*, 78 F.3d at 1018 n.1 (explaining that, in securities cases, courts may take judicial notice of the contents of public disclosure documents that the law requires to be filed with the SEC).

[25] Three of the statements—A, R-2, and S-2—appeared in documents allegedly reviewed and approved by SEEAC, to which Hayward served as executive liaison. (SAC ¶¶ 316, 361(b)-(c), 365(b)-(c).) The fourth statement—N—appeared in the 2009 Annual Review which the BP Board (including Hayward) reviewed and discussed on January 26, 2010. (*Id*. ¶¶ 351, 352(a).) The adequacy of these connections for purposes of establishing corporate scienter is addressed separately, in Section III(A)(3)(c) of this opinion.

explicitly contemplated that its components would not be implemented on project sites unless those sites were owned and operated by BP (Doc. No. 356-8 (Ex. G) at 31-32). Not only was the OMS Framework explicit in this regard, Mogford testified that the GORC specifically discussed how the implementation of OMS would be limited to project sites owned and operated by BP. (SAC ¶ 102.) Furthermore, a July 2009 document distributed to GORC members, known as a "Pre-Read," showed that Gulf of Mexico joint ventures were excluded from Safety & Operations ("S&O") Audits, which tested rig and rig personnel compliance with OMS. (*Id.* ¶ 165.)

Finally, Plaintiffs identified deposition testimony indicating that Hayward was fully aware of how contractor-owned sites were handled under OMS. Following the Deepwater Horizon disaster, Hayward testified regarding his awareness that BP did not have its own well control procedures in place on the rig because it was owned by a contractor, Transocean. (SAC ¶ 103.) Thus, even beyond his general role as spokesperson and steward of BP's safety reforms and beyond his involvement on the GORC, Plaintiffs have made specific allegations to support their view that Hayward knew that OMS would not be implemented on contractor-owned rigs.

But it is not enough for Plaintiffs to show a strong inference that Hayward was aware of the omitted fact which allegedly made his statements misleading. As the Fifth Circuit has stated:

> [K]nowledge of omitted facts does not itself establish scienter. . . . Rather, the [plaintiffs] must prove that [the defendant] acted with actual "intent to deceive, manipulate, or defraud," . . . or severe recklessness, which is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."

*Shivangi v. Dean Witter Reynolds, Inc.*, 825 F.2d 885, 889 (5th Cir. 1987) (citations omitted). Undoubtedly, Hayward was aware of many details about OMS that he did not disclose to the public. In order to adequately allege Hayward's scienter for *this* particular omission, Plaintiffs'

allegations must support a strong inference that he had "an obvious duty to disclose that information" or that he "*intended* to confuse the market" by omitting it. *In re GeoPharma, Inc. Sec. Litig.*, 411 F.Supp.2d 434, 446 (S.D.N.Y. 2006) (emphasis original).

Defendants argue that, even assuming Hayward understood how OMS worked in the case of contractor-owned assets, this understanding supports the inference that he believed his statements to the public were accurate. (Doc. No. 356, at 2.) Defendants reiterate that OMS did apply to and govern contractor-owned sites by establishing a floor under which contractor's safety management systems were not allowed to fall. (*E.g.*, *id*. at 28-29.) If those systems were judged inadequate, OMS provided that they would be bridged to BP's higher standards. (*Id*.) Thus, even though OMS distinguished in its application between owned and non-owned sites, the end result was intended to be consistent—supporting Hayward's representation that OMS was a "comprehensive" framework applied across "every" BP site. *See Shaw Group*, 537 F.3d at 538 (finding that "the statement ['do something to fix that'] cannot contribute to a strong inference of scienter because it is 'susceptible to many interpretations, including innocent ones'") (quoting *In re Integrated Elec. Servs., Inc.*, No. 4:04-cv-3342, 2006 WL 54021, at *4 (S.D. Tex. Jan. 10, 2006)).

Defendants also emphasize that Hayward's public statements mirrored statements found in the OMS Framework and in internal reports presented to him and to GORC by individuals with more direct involvement in the mechanics of OMS. (Doc. No. 356, at 10.) The March 1, 2007 GORC Pre-Read, for example, featured a report by Mogford in which he stated that OMS "will apply to all operations and will cover all aspects of HSE compliance and risk management." (Doc. No. 356-2 (Ex. A), at 7.) Because internal statements were closely aligned with Hayward's statements to the public, Defendants argue, the strongest inference to be drawn

38

from the circumstances is that Hayward did not speak with the requisite intent to deceive or recklessness regarding the potentially misleading effect of his statements. *See In re Officemax, Inc. Sec. Litig.*, No. 1:00-cv-2432, 2002 WL 33959993, at *17 (N.D. Ohio Mar. 26, 2002) (noting that the court "finds little, if any, divergence between any identified internal reports and external statements, and thus little, if any, inference of scienter").

Defendants have identified serious flaws in Plaintiffs' scienter allegations for this type of misrepresentation. In the absence of any further evidence regarding Hayward's state of mind at the time he spoke to the public about the scope of OMS, these flaws may very well mandate judgment in Hayward's favor. At this stage, however, Plaintiffs are required to present only an inference of scienter *at least* as compelling as any inference that scienter was lacking. *Tellabs I*, 551 U.S. at 324. The Court finds that Plaintiffs have met this requirement. Hayward did not make one or two stray comments about the scope of OMS. He repeatedly emphasized its expansiveness in his most important presentations to investors.

Additionally, over time, Hayward's statements became more detailed and emphatic, and thus more likely to mislead given the reality of how OMS "applied" in the case of contractor-owned project sites. Early statements described OMS as "comprehensive" and "uniform"—a characterization so general and colorless that the Court determined in Section III(A)(1) that such statements cannot be considered false even in light of the fact that specific components and tools developed for the OMS framework would not be deployed on contractor-owned rigs.

But Hayward's later statements were phrased so strongly, it is difficult to square their intensity with the fact that OMS would be—at most—only a comparator for many of BP's operations. In the 2008 Annual Review dated February 24, 2009, Hayward proclaimed that OMS "turns the principle of safe and reliable operations into reality by ***governing how every BP***

*project, site, operation and facility is managed*." (SAC ¶ 332 (Statement I-2).) In the following months, Hayward reiterated this claim by stating that OMS was a "**single framework**" key to improving safety "***in every site***" (*id*. ¶ 335 (Statement J-1)) and would "be implemented ***at each BP site***" (*id*. ¶ 347 (Statement L)). By the following year, even more emphasis was placed on the scope of OMS. The 2009 Annual Report, dated March 5, 2010, billed OMS as the "***single operating framework for all BP operations***." (*Id*. ¶ 353 (Statement O).) The fact that Hayward understood the limitations to OMS's deployment on sites owned by third parties implicitly underlies both Plaintiffs' and Defendants' respective positions. Therefore, the inference that he knew or should have realized that these later statements overstated—indeed, oversold—OMS is *at least* as strong as the alternative that he was oblivious to the inaccurate impression they created.

### b. Inglis

Defendant Inglis made two alleged misrepresentations regarding the scope of OMS, Statement C at the Sanford Bernstein 4th Annual Strategic Decisions Conference in 2007 and Statement P at the Howard Weil Energy Conference in 2010. (SAC ¶¶ 319, 355.) Plaintiffs have also alleged that Inglis was connected to an additional two unattributed corporate statements.[26] Thus, over a nearly three-year period, Inglis was allegedly involved in making at least two—and possibly as many as four—public representations regarding the scope of OMS.

---

[26] One of these statements—N—appeared in an annual review which the BP Board (including Inglis) reviewed and discussed on January 26, 2010. (SAC ¶¶ 351, 352(a).) The other—Statement S-2—appeared in a document allegedly reviewed and approved by SEEAC, at a meeting which Inglis attended. (*Id*. ¶ 365(c).) The adequacy of these connections for purposes of establishing corporate scienter is addressed separately, in Section III(A)(3)(c) of this opinion.

40

Plaintiffs' scienter allegations regarding Inglis are substantially identical to their scienter allegations for Hayward. In Inglis's case, however, the inference that he spoke with the requisite culpable state of mind is not as compelling as the alternative.

As with Hayward, Plaintiffs' allegations fairly suggest that Inglis knew that the components of OMS would be implemented only on assets owned or controlled by BP. This awareness is supported by his membership on GORC (SAC ¶¶ 46, 102); his position as CEO of the Exploration & Production business segment (*id.* ¶ 46); and his authorship of a July 2009 email in which he noted that "conformance with Control of Work (CoW) practices"—a facet of OMS—"on many of [BP's] contractor operated drilling rigs, falls short of BP expectations" (*id.* ¶ 175). But as the Court previously noted, a strong inference that Inglis was aware of this information is not sufficient to establish scienter. *See Shivangi*, 825 F.2d at 889. Plaintiffs' allegations must give rise to a strong inference that Inglis had an obvious duty to disclose the information, or that he intended to confuse the market by omitting it. *See In re GeoPharma*, 411 F.Supp.2d at 446.

Plaintiffs emphasize the similar positions occupied by both Hayward and Inglis, suggesting that they should be held to the same standard, accountable for similar statements. But there is an important distinction between the two men. Both were undeniably high in the corporate hierarchy; as Plaintiffs repeatedly point out, Inglis acknowledged at his deposition that he was second only to Hayward in terms of responsibility and authority for the safety of BP's drilling operations. (SAC ¶ 46.) But only Hayward presented himself as the public face of BP's safety reform efforts. Only Hayward spoke often and at length about the steps BP was taking to improve its process safety record. As noted above, Hayward was responsible for at least seven alleged misrepresentations regarding the scope of OMS. Inglis, however, delivered only two

statements, two and a half years apart, neither of which reached the level of specificity and intensity of Hayward's later statements. Because Plaintiffs' allegations, and the documents on which they rely, do not give rise to a strong inference that Inglis acted with the requisite state of mind, Statements C and P are not actionable.[27]

### c.     BP

The remaining four alleged misrepresentations regarding the scope of OMS are attributed to "BP" as a corporation and were published in various public filings. Statement A was issued as part of the 2006 Sustainability Report. (SAC ¶ 315 ("The OMS is a comprehensive system that covers all aspects of our operations . . . The new OMS will apply to all operations by the end of 2010 . . . Each site will have its own local OMS, based on a consistent group-wide framework.").) Statement N was published in the 2009 Annual Review. (*Id.* ¶ 351 ("[OMS] provides a common framework for all BP operations . . . OMS enables each site to focus on the most important risks in its own operations and sets out procedures on how to manage them in accordance with the group-wide framework.").) Statement R-2 was included in the 2009 Sustainability Review (*id.* ¶ 361  ("[OMS] provides a single framework for all BP operations to follow.")); Statement S-2 in the 2009 Sustainability Report (*id.* ¶ 364 ("[OMS is] a cornerstone of achieving safe, reliable and responsible operations at every BP operation.")).

Plaintiffs advance two arguments in support of scienter for these unattributed statements. Plaintiffs first contend—based on cases such as *Southland*, 365 F.3d at 365—that they may establish scienter by linking the documents at issue to particular individuals with scienter. (Doc. No. 373, at 23-25.) Alternatively, Plaintiffs claim that the unattributed misrepresentations are so egregious that they establish a "strong inference" of scienter on their own, without needing to be

---

[27] As noted in Section III(A)(1), Statement C is also not actionable because it is too general to support Plaintiffs' theory of falsity.

tied to any specific individuals. (*Id.* at 25-27.) This latter argument is based on the standard articulated by the Seventh Circuit in *Tellabs II*, which would permit an inference of scienter when the unattributed statement is so baldly and obviously false that anyone with responsibility for approving the statement must have known it to be untrue or been utterly reckless in his or her lack of knowledge of the truth.[28] *See* 513 F.3d at 710.

The Court easily finds that the alleged misrepresentations regarding the scope of OMS do not rise to such an egregious level of falsity that scienter may be assumed simply from the magnitude of the deception played on the public. Defendants have presented thoughtful, persuasive arguments regarding how these statements were consistent with—and in some cases, mirrored—the contents of internal documents and reports and were therefore either not misleading at all, or at the least not intentionally misleading. Therefore, the Court finds the unattributed corporate statements at issue must be connected to an individual with scienter in order to survive dismissal.

Before turning to the specific statements at issue, the Court feels it necessary to address the competing concerns which underlie the requirement to link unattributed corporate statements to an individual with scienter. As many courts have noted, corporations such as BP regularly transmit information—to regulators, to the market, and to their shareholders—by way of lengthy documents, often without specific authors or signatories. In many cases, it would be impossible for Plaintiffs to associate specific statements with specific individuals. The Fifth Circuit has implicitly recognized this reality, permitting securities fraud plaintiffs to link an unattributed corporate statement to an individual by alleging facts indicating that the individual made or

---

[28] The example given in *Tellabs II* is if General Motors publicly stated that it sold a million SUVs in a year when it really sold zero. *Tellabs II*, 513 F.3d at 710.

43

issued the statement; ordered or approved its making or issuance; or furnished information or language for inclusion therein. *See Southland*, 365 F.3d at 366.

Although the *Southland* standard appears fairly broad, and consequently accommodating of some uncertainty and ambiguity in Plaintiffs' allegations, the Court is mindful of the reality that many allegedly "fraudulent" corporate statements are the product of "a series of acts" taken pursuant to a "hierarchal and differentiated corporate structure," none of which was both (1) done with scienter and (2) imputable to the company. *Tellabs II*, 513 F.3d at 707. Consequently, allowing Plaintiffs too much latitude in showing a connection between a particular statement and a particular individual would greatly increase the chance of BP being held liable for a statement that no responsible executive understood or believed to be misleading or inaccurate. It is with this delicate balance in mind that the Court turns to Plaintiffs' allegations of scienter for Statements A, N, R-2, and S-2.

Plaintiffs have not adequately alleged facts tying Statement A to *any* individual, much less an individual with scienter. The statement appeared in the 2006 Sustainability Report, issued on May 9, 2007. (SAC ¶ 315.) Plaintiffs allege that the statement was "known by Defendants, including Defendant Hayward as chairman of GORC and special liaison to SEEAC, to be false at that time, or [was] made with reckless disregard for the truth." (*Id*. ¶ 316.) Although Hayward is identified by name, Plaintiffs do not allege any facts establishing that he played a role in the 2006 Sustainability Report—for example, by providing input for, drafting, reviewing, or approving the report.

In their response to Defendants' motion to dismiss, Plaintiffs argue that they have established corporate scienter for Statement A by adequately alleging a connection between the 2006 Sustainability Report and SEEAC. (Doc. No. 373, at 24.) They claim that this connection

44

satisfies the scienter requirement, because they have also adequately alleged that each member of SEEAC had the requisite scienter for the allegedly misleading statements found within the report. (*Id*.) Neither of these contentions is correct.

First, Plaintiffs claim that they have connected SEEAC to the 2006 Sustainability Report by alleging that "SEEAC was responsible for reviewing for accuracy and recommending publication of 'material to be placed before shareholders that addresses environmental, safety and ethical performance.'" (Doc. No. 373, at 24). But this general allegation does not specifically link SEEAC to *this* report, as required by *Southland*. *See* 365 F.3d at 365 (noting that "corporate documents that have no stated author or statements within documents not attributed to any individual may be charged to one or more corporate officers provided *specific factual allegations* link the individual to the statement at issue") (emphasis added). Nor does Plaintiffs' allegation that SEEAC reviewed and approved *another* corporate publication discussing environmental, safety and ethical performance—the 2009 Sustainability Report—warrant the "inference that SEEAC also reviewed and approved other BP documents regarding safety that were disseminated to shareholders throughout the class periods." (Doc. No. 373, at 25.)

Second, Plaintiffs' attempt to establish scienter through SEEAC—a committee of board members—simply on the theory that the committee received reports about OMS from Hayward and/or Inglis contradicts well-established law that Plaintiffs cannot rely on group pleading to establish scienter. Plaintiffs' allegations do not reveal who served on SEEAC at the time Statement A was issued, much less what those committee members knew or understood regarding the scope of OMS and its application to assets not owned or controlled by BP.[29] In

---

[29] The only SEEAC member named in the Second Amended Complaint is the committee chair, William Castell. (SAC ¶ 91.) Although the Complaint alleges that Castell was aware that the Gulf of Mexico had not fully transitioned to OMS by the time of the Deepwater Horizon

essence, Plaintiffs' argument is nothing more than a reformulation of the traditional, boilerplate allegation that a corporation's executives *as a group* knew or should have known that corporate statements were inaccurate. "Group pleading" is simply not permitted under the PSLRA, no matter how broadly or narrowly the group is defined.

For these same reasons, Plaintiffs have also failed adequately to allege scienter for Statement R-2, contained in the 2009 Sustainability Review. Plaintiffs first allege that SEEAC "was required to review" the document, based on the committee's mandate to review for accuracy and commend for publication "material to be placed before shareholders that addresses environmental, safety and ethical performance." (SAC ¶ 362(a) (internal quotation marks omitted).) Again, this does not adequately allege that SEEAC actually reviewed *this* document.

Plaintiffs go on to allege that "SEEAC, including Defendant Hayward, specifically discussed and reviewed the content of the '2009 Sustainability Review' and the companion document titled '2009 Sustainability Reporting.'" (SAC ¶ 362(b).) The Court notes a lack of clarity regarding whether SEEAC reviewed both of these documents, or only one. In the Second Amended Complaint, despite the allegation that the committee discussed and reviewed both documents, the specific details provided focus only on the committee's review of the 2009 Sustainability Report—a *different* document from the 2009 Sustainability Review. (*Id*. ¶¶ 362(b)-(c).) This confusion appears to be due to the ambiguity of the underlying SEEAC minutes on which the allegations are based.[30] For purposes of addressing the sufficiency of Plaintiffs'

---

explosion (*id*. ¶ 112), no allegation is made regarding his knowledge or awareness of the scope of OMS.

[30] For example, the March 24, 2010 SEEAC meeting minutes include a section titled "Sustainability Review," in which it is noted that the "2009 BP Sustainability Report" was introduced to the committee. (Doc. No. 521-2, at 2.) Although this portion of the minutes most commonly refers to the committee's consideration of the "report," it also states that Hayward

46

scienter allegations, the Court will accept as true the allegation that SEEAC discussed and reviewed both the 2009 Sustainability Review *and* the 2009 Sustainability Report in early 2010.

Ultimately, however, establishing a connection between SEEAC and the 2009 Sustainability Review is insufficient, because this connection still does not reveal that an *individual* executive with responsibility for the document had the requisite scienter. Although Plaintiffs allege that Hayward attended the SEEAC meetings at issue (SAC ¶¶ 362(b)-(c)), Hayward was not himself a SEEAC member. Therefore, even accepting that SEEAC reviewed and approved the 2009 Sustainability Review, the Court may not presume Hayward's involvement in the process simply through his presence at a meeting for an unknown purpose.[31]

This same deficiency plagues Statement S-2, found in the 2009 Sustainability Report, which was also discussed and/or reviewed by SEEAC at two separate meetings in early 2010. (SAC ¶ 365(b)-(c).) Simply linking this document to SEEAC is not sufficient, for the reasons stated above. Moreover, although Hayward attended both of these meetings, the only detail given regarding his role is that he served as a liaison to SEEAC from the GORC committee (*id*. ¶ 90) and that he reported to SEEAC regarding a change in the focus of the 2009 Sustainability Review (*id*. ¶ 365(c)). It is not clear that Hayward played any role in the committee's discussion of and approval of the content of the 2009 Sustainability Report. Because there is not a strong

---

commented on the changed focus of the "Sustainability Review." (*Id*.) On balance, the Court finds that the minutes fairly suggest that SEEAC addressed both the 2009 Sustainability Review and the 2009 Sustainability Report at this meeting.

[31] The only clear indication of Hayward's role at the meetings is the allegation that he informed SEEAC on March 24, 2010, that the "Sustainability Review had evolved to become a means of encapsulating statements of BP's policies, in addition to being a report on the company's activities." (SAC ¶ 362(c) (internal quotation marks omitted).) Although this allegation suggests Hayward had an oversight role for the document, it does not adequately link him to its content.

inference that Statement S-2 was created, approved, or issued with the required state of mind, it is not actionable.

This leaves only Statement N, contained in the 2009 Annual Review. (SAC ¶ 351.) The Complaint alleges that this particular publication was reviewed and discussed at the January 26, 2010 meeting of the BP Board of Directors. (*Id.* ¶ 352(a).) Hayward was a member of the Board and was present at this meeting, and at two others where a "companion document"—the 2009 Annual Report—was discussed. (*Id.* ¶¶ 44, 352(a).) Defendants appropriately point out that the 2009 Annual Review is a 33-page document, and that Hayward's participation in a board meeting at which the entire document was discussed is a very slender reed on which to place the allegation that Hayward was "involved" in making a particular statement contained within the document. (Doc. No. 356, at 34.) Nonetheless, the Court feels that Plaintiffs have done all they can be expected to do, pre-discovery, to demonstrate a tangible connection between the allegedly misleading statement and an individual with scienter. Because Plaintiffs have adequately alleged Hayward made or issued the statement; ordered or approved its making or issuance; or furnished information or language for inclusion therein, and because Hayward has the requisite scienter for this statement for the reasons stated in Section III(A)(3)(a), Statement N is actionable.

### B.    Alleged Misstatements Regarding the Roll-out of OMS

The second category of alleged misrepresentations challenged in Defendant's motion—that BP misled investors into thinking that OMS had been implemented in the Gulf of Mexico by the end of 2008—was also partially vindicated in the Ludlow Order. The Ludlow Plaintiffs had highlighted two occasions on which this type of misrepresentation was made. These statements are found in the Second Amended Complaint as Statements J-2 and R-1:

- **Statement J-2**. The 2008 Annual Report, filed March 4, 2009 and signed by Hayward, stated: "Eight sites *completed the transition* to OMS in 2008 . . . [including] the *Gulf of Mexico*." (SAC ¶¶ 334-35.)

- **Statement R-1**. In the 2009 Sustainability Review, dated April 15, 2010, Hayward stated: "Having been *initially introduced at eight sites in 2008*, the OMS rollout extended to 70 sites by the end of 2009 . . . This means *implementation is 80% complete*." (*Id*. ¶ 359.)

The Court found that the Ludlow Plaintiffs had adequately alleged the falsity of the misrepresentations. (Ludlow Order at 37-41.) It also found that the statement that OMS had been implemented in the Gulf of Mexico—a very profitable but very risky part of BP's operations— was material to investors.  (*Id*. at 41-44.) Both statements were dismissed, however, because the Ludlow Plaintiffs had not adequately established the scienter of the statements' speakers—BP for Statement J-2 (*id*. at 80-81) and Hayward for Statement R-1 (*id*. at 72-76).

Statements J-2 and R-1 have been repled in the Second Amended Complaint, along with one other statement concerning the implementation of OMS. The new misrepresentation in this category is Statement I-1:

- **Statement I-1**. In the 2008 Annual Review, dated February 24, 2009, BP stated: "The majority of our operations in North America Gas, the *Gulf of Mexico*, Colombia and the Endicott field in Alaska *all completed the migration to the OMS in 2008*." (SAC ¶ 331.)

### 1.     Falsity

At the November 4, 2011 hearing on Defendants' motion to dismiss the Ludlow complaint, counsel for Defendants conceded that Statement J-2 was not true, because not every entity in the Gulf of Mexico business unit had completed the transition to OMS in 2008. (Doc. No. 304, at 58:15-21.) In their pending motion, therefore, Defendants do not contest that Plaintiffs have adequately alleged the falsity of Statement J-2.

Defendants do challenge the sufficiency of Plaintiffs' allegations regarding the falsity of Statements I-2 and R-1. Defendants argue that Statements I-2 and R-1 are consistent with contemporaneous, internal documents tracking the progress of the OMS transition. (Doc. No. 356, at 26-28, 38-40.) The chronology established by the tracking documents was as follows:

- **2008**: OMS was implemented in the Gulf of Mexico at the SPU level in 2008. (Doc. No. 356-7 (Ex. F), at 4.) Eight BP-operated facilities in the Gulf had also transitioned to OMS by the end of 2008. (*Id*.) Other entities in the Gulf, including the drilling rig Thunderhorse, were expected to transition in 2009 or later. (*Id*.)

- **2009:**

  - **First quarter**: Ten of twelve entities in the Gulf of Mexico had transitioned to OMS by the end of the first quarter of 2009. (Doc. No. 356-5 (Ex. D), at 5.)

  - **Fourth quarter 2009:** All thirteen entities in the Gulf of Mexico had transitioned to OMS by the end of 2009. (Doc. No. 356-6 (Ex. E), at 5.)

Plaintiffs respond that these tracking documents—in addition to confirming the falsity of Statement J-2—are contradicted by: (1) deposition testimony of Hayward that the Gulf did not begin transitioning to OMS until Fall 2009, and that the transition was not expected to be completed until the end of 2010 (SAC ¶¶ 109-10); (2) deposition testimony of the Well Team Leader for the Macondo Well, John Guide, that he received no formal training on OMS until 2011 (*id*. ¶ 105); (3) deposition testimony of SEEAC chairman William Castell that he would be surprised if OMS had been fully integrated with legacy systems by the time of the Deepwater Horizon explosion (*id*. ¶ 112); and (4) confidential witness allegations that BP lagged behind its peers when it came to OMS implementation and that OMS was in its infancy at the time of the explosion (*id*. ¶ 114). (Doc. No. 373, at 15-16.) In essence, Plaintiffs argue that their evidence suggests the implementation of OMS in reality was very different from the picture shown in the

tracking documents. They claim that Defendants have done no more than identify a contested issue of fact, which cannot be determined solely on the pleadings. (*Id.* at 16.)

Plaintiffs also allege that the statements at issue were misleading because OMS did not "apply" to assets or project sites unless they were BP-owned or controlled.[32] (Doc. No. 373, at 15.) In the Gulf of Mexico, this exception was large indeed. BP participated in seven wells in the Gulf in 2010; six of the seven—or 85%—were drilled by contracted rigs. (SAC ¶ 100.) Plaintiffs contend that Statements I-1, J-2, and R-1—proclaiming that the Gulf of Mexico fully transitioned to OMS by the end of 2008—were fundamentally misleading without disclosure of the fact that the transition occurred only on BP-owned and controlled assets.

The Court finds that Plaintiffs have sufficiently alleged how the statements regarding OMS implementation were misleading. The burden of Rule 9(b) and the PSLRA at the pleading stage is to plead with particularly how an alleged misrepresentation was false, in order to give the Defendants a fair picture of the allegation of falsity so that they may begin to prepare a defense. *See Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 361-62 (6th Cir. 2001). The Second Amended Complaint accomplishes this goal.

### 2. Scienter

#### a. Hayward

Hayward was the author of Statement R-1, contained in the 2009 Sustainability Review, and signed the 2008 Annual Report in which Statement J-2 appears. These two statements, issued roughly one year apart, made the same basic representation of fact: that the Gulf of Mexico "site" had completed the transition to OMS by the end of 2008. (SAC ¶¶ 334-35, 359.)

---

[32] As previously noted, although the OMS Framework addressed the circumstance of joint ventures and non-owned assets, it clearly contemplated that other safety management systems—not OMS—would be deployed on those assets.

For purposes of scienter, the question that the Court must address is not whether this representation was true or false, but whether Plaintiffs' factual allegations give rise to a strong inference that Hayward—in making Statement R-1 and certifying Statement J-2—understood the representations to be false or misleading, or recklessly disregarded whether the representations were false or misleading.

Plaintiffs argue that their factual allegations strongly suggest that Hayward knew OMS had not been fully implemented in the Gulf of Mexico by the end of 2008. (Doc. No. 373, at 20, 42.) According to the Second Amended Complaint, Hayward received a report from Inglis in February 2009—a month before Statement J-2 was published—confirming that the Gulf of Mexico had not completed the transition to OMS by the conclusion of 2008. (SAC ¶ 113.) Hayward also received, in connection with his membership on GORC, the various Orange Books and other internal reports attached to Defendants' motion which indicate that—at best—the Gulf of Mexico fully transitioned to OMS only in the final quarters of 2009. (SAC ¶¶ 87-89.) Finally, Hayward testified at his deposition following the *Deepwater Horizon* disaster that he had known in April 2010 that OMS was not fully implemented in the Gulf of Mexico. (*Id.* ¶ 109.) He also testified to his recollection that BP did not begin to implement OMS in the Gulf until the fall of 2009 and that he had not expected the transition process to be completed until the end of 2010. (*Id.* ¶ 110.)

Plaintiffs also argue that Hayward's awareness of the limitations on OMS's scope in the case of contractor-owned assets weigh in favor of finding scienter for these statements regarding OMS implementation. (Doc. No. 373, at 42.) Here, Plaintiffs' arguments are identical to those regarding his scienter for his statements addressing the breadth of OMS, noted in Section III(A)(3)(a) above.

Defendants counter that the more compelling inference from the allegations and the documents is that Statement J-2—acknowledged to be untrue even by the internal tracking documents that had been presented to the GORC—was certified by Hayward in error. As counsel explained at the hearing on Defendants' motion, a "site" in BP terminology refers to a strategic performance unit ("SPU") at its highest level. (Doc. No. 527, at 32:19-20, 40:1-3.) By the end of 2008, the Gulf of Mexico "SPU" had transitioned to OMS, but specific assets within the region—including the sole BP-owned drilling rig, Thunderhorse—had not. (Doc. No. 356-7 (Ex. F), at 4.) This fact was reflected in the Gulf of Mexico OMS Handbook dated December 8, 2008, which was presented to GORC. (*Id.*; Doc. No. 356, at 9.) Defendants contend that because this statement was capable of being understood *by Hayward* as accurate, given his entrenchment in BP terminology, it is much more likely that he simply did not realize how misleading it could be to the public. (Doc. No. 527, at 39:24-40:15.) The same argument applies to Statement R-1, which essentially reiterated the claim that eight sites (implicitly including the Gulf of Mexico) had transitioned to OMS by the end of 2008.

Defendants' theory is certainly plausible, but the Court disagrees that it is more compelling than the alternative. As previously noted, Hayward was the public face of BP's safety reform efforts. He frequently spoke on the OMS initiative. He was well aware of the emphasis placed on the expansive scope of OMS in various public statements. In fact, around the time that Statement J-2 issued, Hayward told investors that OMS "turns the principle of safe and reliable operations into reality by governing how every BP project, site, operation and facility is managed." (SAC ¶ 332 (Statement I-2).) Even the Annual Report containing Statement J-2 made promises that OMS would improve safety and operating performance "in every site." (*Id.* ¶ 335.)

The Court finds it telling that *all three* alleged misrepresentations regarding the implementation of OMS were accompanied by alleged misrepresentations regarding the scope of OMS.

Viewed as a whole, Plaintiffs' factual allegations create a cogent and compelling case that Hayward, deliberately or with severe recklessness, engaged in a publicity campaign that vastly exaggerated the reach and efficacy of OMS. Some of his statements concerned the exhaustive scope of OMS; others touted the impressive pace of implementation. Plaintiffs have adequately alleged that all contributed to a misunderstanding of BP's ability to manage risk in its operations. Statements J-2 and R-1 are actionable.

### b.    BP

Plaintiffs have not linked Statement I-1 to any individual executive. Therefore, this alleged misrepresentation must be dismissed unless Plaintiffs' allegations establish that it reaches the egregious level of falsity contemplated in *Tellabs II*, such that intent to deceive or recklessness may be presumed from the face of the statement itself.

Statement I-1 does not surmount this very high hurdle. The statement reads:

> The majority of our operations in North America Gas, the Gulf of Mexico, Colombia and the Endicott field in Alaska all completed the migration to the OMS in 2008.

(SAC ¶ 331.) This statement may be interpreted two different ways. The qualifying phrase "majority of" could apply to all of the locations in the sentence, such that the statement represents that a "majority of the operations in . . . the Gulf of Mexico" completed the transition to OMS in 2008. Alternatively, the qualifying phrase "majority of" could apply only to the first location, North America Gas, in which case the statement represents that "the Gulf of Mexico" completed the transition to OMS in 2008. Although typically on a motion to dismiss the Court would construe this allegation in the light most favorable to Plaintiffs, *Nathenson*, 267 F.3d at

406, the task required under *Tellabs I* and *Tellabs II* is to evaluate whether the statement is so egregiously false *on its face* that it must have been made or approved with the requisite state of mind. This requires a conservative reading of Statement I-1, to determine whether the qualified assertion that the "majority" of operations in the "Gulf of Mexico" had "completed the migration to the OMS in 2008" was so demonstrably false that it must have been issued with knowledge of or reckless disregard for its falsity.

Thus, the question becomes whether it was flagrantly misleading to state that the "majority of operations" in the Gulf of Mexico had completed the transition to OMS by the end of 2008. The Court finds that Plaintiffs have not satisfied the very high standard envisioned in *Tellabs II*. Although Plaintiffs have adequately alleged that Hayward and Inglis understood the limitation to the scope of OMS in the case of contractor-owned rigs, the Court cannot presume that every individual executive at BP had this knowledge. *Cf Nathenson*, 267 F.3d at 424-25 (inference that defendant knew details about patent protection was warranted based on his position within the company because it was "essentially a one product company"). Moreover, while the ratio of BP-owned to non-owned MODUs in the Gulf of Mexico is particularly low— one to six—the Court may not presume that any individual who tracked the implementation of OMS would have known this fact. Finally, drilling rigs were not the only activity located within the Gulf of Mexico business unit. For example, BP had production facilities in that region as well. (Doc. No. 356-7 (Ex. F), at 3.) Plaintiffs' allegations do not specify how many of these other facilities would have been governed by safety management systems of contractors, rather than by OMS. Because these details are all missing from the Second Amended Complaint, the Court cannot determine that Statement I-1 was so false, on its face, that anyone with

responsibility for the statement must have made or approved it with the required intent or recklessness. Statement I-1 is not actionable.

### C.      Loss Causation for the OMS Statements

Finally, Defendants argue that Plaintiffs have not established that any of the alleged misrepresentations regarding OMS caused their harm. This argument addresses the sufficiency of Plaintiffs' allegations pertaining to the element of their claim known as "loss causation."

To adequately plead loss causation, a plaintiff suing for securities fraud must allege:

> a facially 'plausible' causal relationship between the fraudulent statements or omissions and plaintiff's economic loss, including allegations of a material misrepresentation or omission, followed by the leaking out of relevant or related truth about the fraud that caused a significant part of the depreciation of the stock and plaintiff's economic loss; or, as *Twombly* indicates, the complaint must allege enough facts to give rise to a reasonable hope or expectation that discovery will reveal evidence of the foregoing elements of loss causation.

*Lormand*, 565 F.3d at 258 (citations omitted). Defendants argue that Plaintiffs have not met this standard because the ten "corrective disclosures" contained in the SAC do not mention OMS or correct the alleged inaccuracies about OMS contained in prior public statements. (Doc. No. 356, at 46.)

The Court does not agree that Plaintiffs have failed to allege a "corrective disclosure" concerning OMS. Plaintiffs allege that Defendants' repeated statements—exaggerating and overselling the reach and pace of OMS implementation—lulled the market into a false sense that BP was reversing course on process safety and instituting measures that would permit it to manage the risks it faced, including in the Gulf of Mexico. The truth outed, according to Plaintiffs, when reports of the *Deepwater Horizon* disaster first hit the news:

> [T]he truth regarding Defendants' failure to implement process safety controls *emerged on April 20, 2010* [i.e., the day of the *Deepwater Horizon* explosion] and within a week the share price had dropped ten

56

> dollars and it would continue to plummet during the weeks of *subsequent* corrective disclosures.

(SAC ¶ 395 (emphasis added).)

This theory of loss causation is plausible on its face. *Lormand*, 565 F.3d at 258 (loss causation subject to "notice" pleading under Rule 8(a)(2)). It is also supported by the trajectory of BP's stock price. No more is required at the pleading stage. Defendants' arguments to the contrary construe too narrowly the "corrective disclosure" requirement under Fifth Circuit precedent. Even if a "corrective disclosure" must be pled, it need not come directly from the individuals or the corporation alleged to have participated in the fraud. *Id.* at 264 ("[A] plaintiff . . . may plead loss causation based on truth about the alleged fraud disclosed to the market by persons other than the defendants."). Nor does it need to consist of a fact-by-fact recounting of the alleged fraud. *See Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009). It simply has to unwind, slowly or all at once, the inaccurate depiction of the company's affairs as presented in the preceding allegedly fraudulent or misleading statements.

According to Plaintiffs, the explosion aboard the *Deepwater Horizon*, and the resulting uncontrolled oil spill, were the means through which the market learned that Defendants' public relations campaign on process safety had been nothing more than empty rhetoric. *See Flowserve*, 572 F.3d at 231 (noting that corrective disclosure does not have to reveal that a prior public statement was "fraudulent," only that it was "wrong"). The Court finds these allegations of loss causation from the OMS-related statements are sufficient to survive Defendants' motion to dismiss.

### D.    Statement S-1 Regarding BP's Oil Spill Response Capabilities

Finally, Defendants argue that Plaintiffs have not adequately alleged corporate scienter for Statement S-1 ("Our operating facilities have the capacity and resources to respond to spill

incidents.") (SAC ¶ 363.) In the Ludlow Order, the Court found that this statement was adequately pled as false (Ludlow Order at 63-64) and material to investors (*id*. at 65-66), but that the Ludlow Plaintiffs had not established that the statement was so egregiously false as to meet the *Tellabs II* standard for corporate scienter (*id*. at 80-81).

Plaintiffs have tried to rehabilitate this statement by further alleging: (1) that a January 2010 Orange Book sent to GORC (including Hayward and Inglis) revealed deficiencies in BP's emergency response capabilities, and (2) that SEEAC (including Hayward) discussed the filing in which Statement S-1 is found in February 2010. (Doc. No. 373, at 44.) Plaintiffs also supplemented their allegations regarding the lack of a legitimate oil spill response plan ("OSRP"). Plaintiffs argue that the Court may find corporate scienter for Statement S-1 under *Tellabs II*, for the same reasons articulated in the NY/OH Order for finding corporate scienter regarding "similar" statements contained in BP's Exploration Plan ("EP") and OSRP. (*Id*.) Alternatively, Plaintiffs argue that they have established scienter for Statement S-1 under *Southland* by attributing it to an individual—namely SEEAC Chairman Castell, Hayward, and/or Inglis—with scienter. (*Id*.) Defendants contend that the additional allegations are insufficient for corporate scienter under *Tellabs II* and do not meet the *Southland* requirement of linking a specific individual with scienter to the alleged misrepresentation. (Doc. No. 377, at 18-19.)

The Court declines to rely upon the reasons articulated in the NY/OH Order for finding corporate scienter as to statements in BP's EP and OSRP. The alleged misrepresentations in the EP and OSRP: (1) were incredibly detailed regarding *exactly* how much oil BP could recover; (2) were shown following the spill to bear little relation to reality (i.e., were inaccurate to an exorbitant degree); and (3) were accompanied by a host of glaring and shameful errors that paint a very clear picture of how little regard "BP" gave to whether its statements in the filings were

accurate or appropriate. (NY/OH Order at 112-14.) By contrast, the alleged misrepresentation in Statement S-1 is a generically positive statement that BP could respond to oil spills, with no quantifiable details. Although its accuracy has been impugned by subsequent events, it was apparently the lone inaccuracy in the document regarding BP's oil spill response plans/abilities, rather than one of many.

This leaves Statement S-1 to survive on its own scienter allegations. The Court previously found the scienter allegations from the Ludlow complaint to be inadequate under *Tellabs II*. Plaintiffs' supplementations to the Second Amended Complaint do not alter the Court's analysis or conclusion that corporate scienter has not been shown.

Nor have Plaintiffs adequately established a link under *Southland* to an individual executive with the requisite scienter. As discussed in Section III(A)(3)(c), the Second Amended Complaint does not adequately link the 2009 Sustainability Report to any individual executive. Moreover, even if a link had been shown between this document and Hayward, Inglis, or SEEAC Chairman Castell—as claimed by Plaintiffs—the Second Amended Complaint does not adequately allege that any of these individuals had specific knowledge, or any reason to suspect, that BP had no ability whatsoever to respond to an oil spill in deepwater. Because Plaintiffs have failed to allege facts giving rise to a strong inference that Statement S-1 was made with the requisite state of mind, it is not actionable.

### E.    Section 20(a) Control Person Liability

Finally, Defendants contend that the Rule 20(a) claim against Inglis must be dismissed because (1) the statements attributed to him were not false and/or were not made with scienter; (2) Plaintiffs have not alleged that Inglis induced or participated in any alleged misrepresentations made by Hayward, Suttles, or "BP;" and (3) Plaintiffs' allegations regarding

Inglis's high position in the company are insufficient to state a Section 20(a) claim. (Doc. No. 356, at 49.) Plaintiffs counter that they adequately allege that Inglis "'had the power to direct or cause of the direction of' BP's policies." (Doc. No. 373, at 50.) They cite as support Inglis's leadership in the Gulf of Mexico; his attendance at SEEAC meetings and membership on GORC; his role in creating the Orange Books that tracked OMS implementation; and his alleged status as "second only to Defendant Hayward" on the issue of safety in the Exploration & Production unit. (*Id*.)

Section 20(a) of the Exchange Act makes those who control others who violate section 10(b) jointly and severally liable "unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a).  Thus, to prove a violation of section 20(a), a plaintiff must first prove an underlying securities fraud violation and prove that the controlling person had actual power over the controlled person and induced or participated in the alleged violation. *Dennis v. General Imaging, Inc.*, 918 F.2d 496, 509 (5th Cir. 1990).  Section 20(a) claims are subject only to the pleading requirements of Rule 8, not the heightened requirements of Rule 9(b); therefore, to adequately state a claim under section 20(a), Plaintiffs need only provide the defendant fair notice of the claim and the basis of the allegations.  *See, e.g., Trendsetter Investors, LLC v. Hyperdynamics Corp.*, Civ. Act. No. 06-0746, 2007 WL 172627, at *15 (S.D. Tex. Jan. 18, 2007).

Under the control person doctrine, even corporate officers who did not personally make a representation or play a significant role in the preparation of a misrepresentation may still be liable under section 20(a).  *See In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 594–96 (S.D. Tex. 2002).  However, a plaintiff must plead facts indicating that

defendants not directly involved in the making of actionable misrepresentations nonetheless "had the requisite power to directly or indirectly control or influence corporate policy." *G.A. Thompson & Co. Inc. v. Partridge*, 636 F.2d 945, 958 (5th Cir. 1981).

Because the Court has not found any of the statements attributed to Inglis to be actionable, the question under Section 20(a) becomes whether Plaintiffs have adequately alleged Inglis's specific involvement in or control over someone else's actionable misrepresentation. Many of Plaintiffs' allegations establish that Inglis was high in the organization, but not that he *controlled* anyone or anything relevant to any actionable misrepresentation. The allegation that Inglis "had the power to direct or cause the direction of BP's policies" is too general and conclusory to state a claim against him for Section 20(a) liability. Because the Court has dismissed all the alleged misrepresentations attributed to Inglis, and because Plaintiffs had not adequately alleged a Section 20(a) claim against him, Defendant Inglis must again be dismissed from this case.

## IV.   CONCLUSION

It is ordered that Defendants' Motion to Dismiss in Part the Second Consolidated Amended Complaint (Doc. No. 360) is **PARTIALLY GRANTED**. The Court finds that Plaintiffs have not adequately pleaded section 10(b) violations or control person liability pursuant to section 20(a) against Individual Defendant Andrew G. Inglis, and the claims against him are therefore dismissed. The Court further dismisses claims against all Defendants based upon the following alleged misrepresentations, as defined in this memorandum and order: Statement A (SAC ¶ 315); Statement B (*id.* ¶ 317); Statement C (*id.* ¶ 319); Statement F (*id.* ¶

325);[33] Statement G (*id.* ¶ 327);[34] Statement I-1 (*id.* ¶ 331); Statement P (*id.* ¶ 355); Statement R-2 (*id.* ¶ 361); Statement S-1 (*id.* ¶ 363); and Statement S-2 (*id.* ¶ 364).

In all other respects, the Motion is **DENIED**. As described above, the Court finds that Plaintiffs have adequately pleaded section 10(b) violations by Defendants BP plc, BP America, BP Exploration & Production, and/or Anthony Hayward based upon the following alleged misrepresentations, as defined in this memorandum and order: Statement I-2 (*id.* ¶ 332); Statement J-1 (*id.* ¶ 335); Statement J-2 (*id.*); Statement L (*id.* ¶ 347); Statement N (*id.* ¶ 351); Statement O (*id.* ¶ 353); and Statement R-1 (*id.* ¶ 359).[35]

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the 6th day of February, 2013.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

---

[33] Only the claim based upon the portion of Statement F discussed in this memorandum and opinion is dismissed. Defendants did not move to dismiss the portion of Statement F addressing BP's progress on the Baker Panel recommendations, and it is not affected by this order.

[34] Only the claim based upon the portion of Statement G discussed in this memorandum and opinion is dismissed. Defendants did not move to dismiss the portion of Statement G addressing BP's progress on the Baker Panel recommendations, and it is not affected by this order.

[35] Plaintiffs have also adequately pleaded section 10(b) violations by Individual Defendant Douglas Suttles, and control person liability pursuant to section 20(a) with respect to defendants Hayward and Suttles. Defendants do not move to dismiss these claims, and they are not affected by this order.