## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re BP p.l.c. Securities Litigation | No.  4:10-MD-02185 |
| | Honorable Keith P. Ellison |
| | JURY TRIAL DEMANDED |
| | **ORAL ARGUMENT REQUESTED** |

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

OF COUNSEL

Daryl A. Libow (pro hac vice)
Amanda F. Davidoff (pro hac vice)
Elizabeth A. Rose
SULLIVAN & CROMWELL LLP
1701 Pennsylvania Avenue, N.W.
Washington, D.C.  20006-5805
Telephone:  (202) 956-7500

Richard C. Pepperman, II (pro hac vice)
Marc De Leeuw (pro hac vice)
Matthew A. Peller
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Telephone:  (212) 558-4000

Thomas W. Taylor
Texas State Bar No. 19723875
S.D. Tex. Bar No. 3906
ANDREWS KURTH LLP
600 Travis, Suite 4200
Houston, Texas  77002
Telephone:  (713) 220-4200
Facsimile:  (713) 220-4285
ttaylor@andrewskurth.com

*Attorney-in-Charge for Defendants BP p.l.c.,*
*BP America, Inc., BP Exploration and*
*Production, Inc., Anthony B. Hayward and*
*Douglas Suttles*

August 14, 2013

**TABLE OF CONTENTS**

<u>Page</u>

PRELIMINARY STATEMENT ....................................................................1

BACKGROUND ......................................................................................3

ARGUMENT ...........................................................................................9

I.    New York and Ohio Have Failed to Satisfy Rule 23(a)'s Requirements of Typicality and Adequacy of Representation...................................................10

    A.    New York and Ohio Have Failed to Demonstrate That Their Claims Are Typical of Those of the Proposed Class ...............................................11

        1.    New York and Ohio Were Net Sellers by Over 800,000 Shares and Will Be Subject to the Unique Defense That They Did Not Rely on the Alleged Misstatements ...............................................11

        2.    New York and Ohio Have No Incentive to Prove That the Pre-Spill Alleged Misstatements Artificially Inflated the Price of BP ADSs...........................................................................14

        3.    New York and Ohio Lack Standing and Are Atypical of the Proposed Class Because They Profited From the Alleged Fraud ....................................................................................15

    B.    New York and Ohio Have Not Established That They Are Adequate Class Representatives ...........................................................18

II.    The Ludlow Plaintiffs Offer No Support for Certification of the Proposed Subclass................................................................................................20

III.    Plaintiffs Have Not Satisfied Their Burden Under Rule 23(b)(3) With Respect to Their Claims Based on Statements in BPXP's OSRP and IEP.....................23

    A.    The Challenged Statements in the OSRP and IEP Were Not "Publicly Known" Until at Least a Week After the Gulf Oil Spill.....................25

        1.    The OSRP Did Not Become Public Until Several Weeks After the Gulf Oil Spill Began .............................................................27

        2.    Until More Than a Week After the Gulf Oil Spill, Public Access to the IEP Was *De Minimis* .........................................................29

B.      Even If the Challenged Statements Were Publicly Known,
        Plaintiffs Adduced No Evidence That the Market Efficiently
        Processes This Type of Technical Information ......................................32

C.      Plaintiffs' OSRP and IEP Claims Do Not Satisfy the Superiority
        Requirement of Rule 23(b)(3)................................................................35

IV.     Plaintiffs Have Not Shown a Model for Calculating Damages on a Class-
        Wide Basis That Is Consistent With Their Different Theories of Liability....................37

CONCLUSION.............................................................................................41

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alaska Electrical Pension Fund* v. *Flowserve Corp.*,
  572 F.3d 221 (5th Cir. 2009) ..........................................................................9, 10, 26

*Allison* v. *Citgo Petroleum Corp.*,
  151 F.3d 402 (5th Cir. 1998) ...................................................................................10

*Amchem Products, Inc.* v. *Windsor*,
  521 U.S. 591 (1997)..............................................................................................35, 36

*Amgen Inc.* v. *Connecticut Retirement Plans & Trust Funds*,
  133 S. Ct. 1184 (2013)......................................................................................23, 26, 33

*Archdiocese of Milwaukee Supporting Fund, Inc.* v. *Halliburton Co.*,
  2008 WL 4791492 (N.D. Tex. Nov. 4, 2008).........................................................24

*Archdiocese of Milwaukee Supporting Fund, Inc.* v. *Halliburton Co.*,
  647 F.3d 533 (5th Cir. 2011). ..................................................................................24

*Barrie* v. *Intervoice-Brite, Inc.*,
  2009 WL 3424614 (N.D. Tex. Oct. 26, 2009).........................................................24

*Basic Inc.* v. *Levinson*,
  485 U.S. 224 (1988)......................................................................................23, 25, 33

*Bell Atlantic Corp.* v. *AT&T Corp.*,
  339 F.3d 294 (5th Cir. 2003) ..................................................................................10

*Bell* v. *Ascendant Solutions, Inc.*,
  422 F.3d 307 (5th Cir. 2005) ..................................................................................22

*Berger* v. *Compaq Computer Corp.*,
  257 F.3d 475 (5th Cir. 2001) ..............................................................................20, 21

*Bertulli* v. *Independent Association of Continental Pilots*,
  242 F.3d 290 (5th Cir. 2001)...............................................................................15, 24

*Billhofer* v. *Flamel Technologies, S.A.*,
  281 F.R.D. 150 (S.D.N.Y. 2012) .............................................................................32

*Castano* v. *American Tobacco Co.*,
  84 F.3d 734 (5th Cir. 1996) ...............................................................................24, 36

# TABLE OF AUTHORITIES
## (CONTINUED)

Page(s)

*Central Wesleyan College* v. *W.R. Grace & Co.*,
  6 F.3d 177 (4th Cir. 1993) ...................................................................................20

*Comcast Corp.* v. *Behrend*,
  133 S. Ct. 1426 (2013) ................................................................................. *passim*

*Coughlin* v. *Sears Holdings Corp.*,
  2010 WL 4403089 (C.D. Cal. Oct. 26, 2010) ...........................................................17

*David* v. *Signal International, LLC*,
  2012 U.S. Dist. LEXIS 114247 (E.D. La. Jan. 3, 2012) ...........................................9

*East Texas Motor Freight System Inc.* v. *Rodriguez*,
  431 U.S. 395 (1977) ..............................................................................................17

*Erica P. John Fund, Inc.* v. *Halliburton Co.*,
  131 S. Ct. 2179 (2011) ......................................................................23, 25, 26, 33

*Erica P. John Fund, Inc.* v. *Halliburton Co.*,
  718 F.3d 423 (5th Cir. 2013) ................................................................9, 13, 23, 24

*Farrington* v. *Adjutant General of State of Michigan*,
  492 F. Supp. 1362 (W.D. Mich. 1980) ...................................................................17

*Forrand* v. *Federal Express Corp.*,
  2013 WL 1793951 (C.D. Cal. Apr. 25, 2010) .......................................................37

*Gluck* v. *CellStar Corp.*,
  976 F. Supp. 542 (N.D. Tex. 1997) .......................................................................21

*Griffin* v. *GK Intelligent Systems, Inc.*,
  196 F.R.D. 298 (S.D. Tex. 2000) .....................................................................17, 22

*Hanon* v. *Dataproducts Corp.*,
  976 F.2d 497 (9th Cir. 1992) ................................................................................18

*Harris* v. *Vector Marketing Corp.*,
  753 F. Supp. 2d 996 (N.D. Cal. 2010) ..................................................................25

*In re AM International, Inc. Securities Litigation*,
  108 F.R.D. 190 (S.D.N.Y. 1985) ..........................................................................12

*In re Bank of America Corp. Securities, Derivative, and ERISA Litigation*,
  281 F.R.D. 134 (S.D.N.Y. 2012) ..........................................................................24

*In re BP p.l.c. Securities Litigation*,
  2013 WL 487011 (S.D. Tex. Feb. 6, 2013) ........................................................7, 24

**TABLE OF AUTHORITIES**
**(CONTINUED)**

Page(s)

*In re BP p.l.c. Securities Litigation,*
   758 F. Supp. 2d 428 (S.D. Tex. 2010) ............................................................ *passim*

*In re BP p.l.c. Securities Litigation,*
   843 F. Supp. 2d 712 (S.D. Tex. 2012) .......................................................7, 24, 26

*In re BP p.l.c. Securities Litigation,*
   852 F. Supp. 2d 767 (S.D. Tex. 2012) ..................................................................7

*In re Diamond Foods, Inc. Securities Litigation,*
   2013 WL 1891382 (N.D. Cal. May 6, 2013) .......................................................39

*In re Enron Corp. Securities, Derivative & "ERISA" Litigation,*
   529 F. Supp. 2d 644 (S.D. Tex. 2006) .................................................................16

*In re FEMA Trailer Formaldehyde Products Liability Litigation,*
   2008 WL 5423488 (E.D. La. Dec. 29, 2008) ......................................................22

*In re Montano,*
   2013 WL 2244216 (Bankr. D.N.M. May 21, 2013) .............................................37

*In re Organogenesis Securities Litigation,*
   241 F.R.D. 397 (D. Mass. 2007) .........................................................................17

*In re Rail Freight Fuel Surcharge Antitrust Litigation,*
   No. 12-7085, slip op. (D.C. Cir. Aug. 9, 2013) ............................................38, 40

*In re Reliance Acceptance Group, Inc. Securities Litigation,*
   1998 WL 388260 (W.D. Tex. June 29, 1998) .....................................................21

*In re Safeguard Scientifics,*
   216 F.R.D. 577 (E.D. Pa. 2003) ..........................................................................13

*In re Seitel, Inc. Securities Litigation,*
   245 F.R.D. 263 (S.D. Tex. 2007) ........................................................................19

*Jaffe Pension Plan* v. *Household International, Inc.,*
   756 F. Supp. 2d 928 (N.D. Ill. 2010) ..................................................................16

*Katz* v. *Comdisco, Inc.,*
   117 F.R.D. 403 (N.D. Ill. 1987) ..........................................................................18

*Lichoff* v. *CSX Transportation, Inc.,*
   218 F.R.D. 564 (N.D. Ohio 2003) .......................................................................36

*Manaway* v. *Medical Center of Southeast Texas,*
   430 F. App'x 317 (5th Cir. 2011) ........................................................................22

# TABLE OF AUTHORITIES
## (CONTINUED)

Page(s)

*Minpeco, S.A.* v. *Conticommodity Services, Inc.*,
   676 F. Supp. 486 (S.D.N.Y. 1987) ........................................................................16

*Morrison* v. *National Australia Bank Ltd.*,
   130 S. Ct. 2869 (2010) .........................................................................................7

*Mullen* v. *Treasure Chest Casino, L.L.C.*,
   1997 WL 539917 (E.D. La. Aug. 29, 1997) ........................................................22

*Mullen* v. *Treasure Chest Casino, LLC*,
   186 F.3d 620 (5th Cir. 1999) ..............................................................................19

*Muñoz* v. *Orr*,
   200 F.3d 291 (5th Cir. 2000) ..............................................................................18

*Newman* v. *RCN Telecom Services, Inc.*,
   238 F.R.D. 57 (S.D.N.Y. 2006) ...........................................................................14

*Norwood* v. *Raytheon Co.*,
   237 F.R.D. 581 (W.D. Tex. 2006) ........................................................................20

*Oscar Private Equity Investments* v. *Allegiance Telecom, Inc.*,
   487 F.3d 261 (5th Cir. 2007) ..............................................................................33

*Payne* v. *Travenol Laboratories, Inc.*,
   673 F.2d 798 (5th Cir. 1982) ..............................................................................19

*Perrin* v. *Expert Oil & Gas, LLC*,
   2008 WL 339684 (E.D. La. Feb. 6, 2008) ...........................................................36

*Regents of University of California* v. *Credit Suisse First Boston (USA), Inc.*,
   482 F.3d 372 (5th Cir. 2007) ..............................................................................24

*Rivera* v. *Wyeth-Ayerst Laboratories*,
   283 F.3d 315 (5th Cir. 2002) ..............................................................................15

*Rocco* v. *Nam Tai Electronics, Inc.*,
   245 F.R.D. 132 (S.D.N.Y. 2007) .........................................................................13

*Rosen* v. *Fidelity Fixed Income Trust*,
   169 F.R.D. 295 (E.D. Pa. 1995) ..........................................................................19

*Simms* v. *Jones*,
   2013 WL 3449538 (N.D. Tex. July 9, 2013) ........................................................10

*Simon* v. *Eastern Kentucky Welfare Rights Organization*,
   426 U.S. 26 (1976) ..............................................................................................15

**TABLE OF AUTHORITIES**
(CONTINUED)

Page(s)

*South Ferry LP No. 2* v. *Killinger*,
    271 F.R.D. 653 (W.D. Wash. 2011) ..................................................18

*Stirman* v. *Exxon Corp.*,
    280 F.3d 554 (5th Cir. 2002) ..................................................11, 19

*Stoneridge Investment Partners, LLC* v. *Scientific-Atlanta, Inc.*,
    552 U.S. 148 (2008)..................................................26

*Tijerina* v. *Philip Morris Inc.*,
    1996 WL 885617 (N.D. Tex. Oct. 8, 1996) ..................................................19

*Turnbow* v. *Life Partners, Inc.*,
    2013 WL 3479884 (N.D. Tex. July 9, 2013) ..................................................39, 40

*Unger* v. *Amedisys Inc.*,
    401 F.3d 316 (5th Cir. 2005) ..................................................9

*Vaccarino* v. *Midland National Life Insurance Co.*,
    2013 WL 3200500 (C.D. Cal. June 17, 2013) ..................................................38

*Wang* v. *Hearst Corp.*,
    2013 WL 1903787 (S.D.N.Y. May 8, 2013) ..................................................37

*Warren* v. *Reserve Fund, Inc.*,
    728 F.2d 741 (5th Cir. 1984) ..................................................11

*Weintraub* v. *Texasgulf Inc.*,
    564 F. Supp. 1466 (S.D.N.Y. 1983)..................................................12

*West* v. *Prudential Securities, Inc.*,
    282 F.3d 935 (7th Cir. 2002) ..................................................26, 32

*Wolf* v. *Frank*,
    477 F.2d 467 (5th Cir. 1973) ..................................................16

**Statutes and Rules**

Federal Rule of Civil Procedure 23 ..................................................*passim*

Freedom of Information Act, 5 U.S.C. § 552 ..................................................27

**Other Authorities**

Carol R. Goforth, *The Efficient Capital Market Hypothesis—an Inadequate Justification
    for the Fraud-on-the-Market Presumption*, 27 Wake Forest L. Rev. 895 (1992) ..................33

## <u>TABLE OF AUTHORITIES</u>
### (CONTINUED)

**Page(s)**

Donald C. Langevoort, *Basic at Twenty: Rethinking Fraud on the Market*,
2009 Wis. L. Rev. 151 (2009) ................................................................. 33

Jonathan R. Macey & Geoffrey P. Miller, *Good Finance, Bad Economics: An Analysis of
the Fraud-on-the-Market Theory*, 42 Stan. L. Rev. 1059 (1990) ........................................... 33

Defendants BP p.l.c. ("BP"), BP America, Inc., BP Exploration and Production, Inc. ("BPXP"), Anthony B. Hayward and Douglas Suttles submit this memorandum in opposition to the motion of plaintiffs Thomas P. DiNapoli, Comptroller of the State of New York, as Administrative Head of the New York State and Local Retirement Systems and sole Trustee of the New York State Common Retirement Fund ("New York"), and the Ohio Public Employees' Retirement System ("Ohio") and plaintiffs Robert H. Ludlow, Jr., Peter D. Lichtman, Leslie J. Nakagiri and Paul D. Huyck ("Ludlow Plaintiffs") for certification of a class and subclass.

## PRELIMINARY STATEMENT

New York and Ohio ask this Court to certify a class of purchasers of BP American Depositary Shares ("ADS") for a two-and-a-half-year period from November 8, 2007 through May 28, 2010 to pursue claims based on 19 alleged misstatements during that period.  At the same time, the Ludlow Plaintiffs seek certification of a subclass of ADS purchasers for the shorter period of March 4, 2009 to April 20, 2010, the date of the Deepwater Horizon explosion. Neither class should be certified, for multiple reasons.

*First*, New York and Ohio have not met their burden of satisfying Rule 23(a)'s typicality and adequacy of representation requirements.  Each fund sold many more shares of BP ADSs than they purchased before the Deepwater Horizon explosion, which makes them atypical of the proposed class and subject to unique defenses.  Indeed, Ohio did not purchase any shares for more than two years of the proposed class period leading up to the Gulf oil spill and then began aggressively purchasing ADSs *after* the spill.  Although Plaintiffs' expert has not provided any damages model in support of the instant motion, the approach he typically applies in securities class actions shows that New York and Ohio made substantial *profits* from the alleged inflation of BP's share price and that they therefore were net beneficiaries of the alleged fraud.  New York and Ohio also have not addressed the significant conflicts that this Court identified in its prior

decision appointing them lead plaintiffs.  Consistent with this Court's concerns in 2010, the interests of New York and Ohio are antagonistic to absent class members that purchased BP ADSs before the Deepwater Horizon explosion.  Because New York and Ohio are neither typical nor adequate representatives of the proposed class—and the Ludlow Plaintiffs have not sought and are not qualified to represent the larger class—certification of the proposed class covering the period November 8, 2007 through May 28, 2010 is inappropriate.

*Second*, the Ludlow Plaintiffs have failed to offer any support at all for certifying a subclass.  Their appointment as lead plaintiffs for the proposed subclass in 2010 does not excuse them from their burden of showing by a preponderance of the evidence that the requirements of Rule 23 are satisfied.  The total lack of analysis or evidence supporting the proposed subclass leaves the Court without a basis for certifying it under Rule 23.

*Third*, Plaintiffs have failed to demonstrate that the fraud-on-the-market presumption applies to the alleged misstatements in BPXP's Oil Spill Response Plan ("OSRP") and Initial Exploration Plan ("IEP") for the Macondo well.  Plaintiffs thus cannot satisfy Rule 23(b)(3)'s predominance requirement for claims based on those statements.  In arguing that the presumption applies, Plaintiffs rely on their bare allegation that the OSRP and IEP were public in 2009.  Discovery has shown, however, that the OSRP was not seen by any member of the public until sometime in May 2010 *after* the Gulf oil spill and that the IEP was accessed via an obscure website by only a handful of people before the Gulf oil spill.  As a result, Plaintiffs cannot demonstrate that the challenged statements in these documents were known to the market in 2009, a precondition for applying the fraud-on-the-market presumption.  Moreover, when the alleged misstatements from the OSRP and IEP were first publicized more than a week or two after the Deepwater Horizon explosion, they were presented to the market in a highly skeptical

light, and thus could not have *inflated* the price of BP ADSs.  Plaintiffs also cannot show that the market for BP ADSs efficiently processed the highly technical information contained in these lengthy regulatory filings and incorporated that information into the price of BP ADSs.  Because Plaintiffs have not shown that the fraud-on-the-market presumption of class-wide reliance applies to the challenged statements in the OSRP and IEP, the determination of whether any class member relied on those statements would be an individualized question that would overwhelm any common ones.  Plaintiffs therefore should not be permitted to pursue claims based on those statements on a class-wide basis.

*Fourth*, as the Supreme Court recently made clear in *Comcast Corp.* v. *Behrend*, 133 S. Ct. 1426 (2013), Plaintiffs were required to translate their multiple theories of liability based on numerous varied statements over a multi-year time period into a damages model to satisfy their burden under Rule 23(b)(3), but they did not even attempt to do so.  Instead, Plaintiffs merely assert that their expert "will prepare an analysis demonstrating that the decline in the ADS price per share after April 20, 2010 caused loss to the Class."  (Mot. at 20.)  This "trust us" approach does not comport with the *Comcast* decision, because such an unsubstantiated promise does not provide the Court with enough information to evaluate whether Plaintiffs are seeking damages consistent with their theories of liability.  Moreover, in the absence of information about how Plaintiffs will model damages, the Court has no way of determining if or how the model will apply to the entire proposed class and subclass.

## BACKGROUND

### A.    New York and Ohio's Purchases and Sales of BP ADSs

During the putative class period, New York and Ohio sold many more shares of BP ADSs than they purchased, and they went long periods without any purchases of BP ADSs

whatsoever.  These facts have important implications for their ability to serve as representatives of the extremely large class they seek to represent.

Ohio held a substantial number of BP ADSs (528,650 shares) before the beginning of the proposed class period that were purchased under Plaintiffs' theory at a non-inflated price.  (*See* Ex. A (Decl. of Julie G. Reiser, executed July 20, 2010 (Dkt. 23-1) at 49).)  During the first three months of the class period, Ohio made two additional purchases of BP ADSs, but then did not purchase any shares for the next 27 months, until after the spill.[1]  Not only did Ohio abstain from purchasing BP ADSs for the vast majority of the class period—from February 2008 until May 2010—but it actually sold *all* of its BP ADSs during the first eleven months of the class period through seven large transactions totaling 646,850 shares.[2]  As of October 24, 2008, Ohio thus held no BP ADSs, and it continued to own no BP ADSs in the 18 months leading up to the Deepwater Horizon explosion.  Accordingly, Ohio's post-spill purchases, on May 3 and May 25, 2010, weeks after the explosion, are the only basis for its claims against BP.

According to Plaintiffs' theory, Ohio received an inflated price for the more than half a million shares it sold during the class period.  As a result, if Plaintiffs' allegations of fraud are true, Ohio *benefited* from the supposed fraud by selling the 528,650 shares it purchased at non-inflated prices before the proposed class period for an inflated price during the class period.  Overall, Ohio sold approximately 360,000 more shares than it purchased during the entire class period and, due to its pre-spill sales, was a net beneficiary of the alleged securities fraud.

---

[1] Ohio's class-period purchases before the Gulf oil spill occurred on November 13, 2007 (92,800 shares) and February 7, 2008 (25,400 shares).  (*See* Ex. A (Reiser Decl. at 49).)

[2] Ohio's sales occurred on the following dates: December 14, 2007 (91,300 shares); February 1, 2008 (149,100 shares); February 5, 2008 (47,600 shares); March 11, 2008 (225,700 shares); March 12, 2008 (32,200 shares); May 30, 2008 (2,450 shares); and October 24, 2008 (98,500 shares).  (*See* Ex. A (Reiser Decl. at 49).)

As for New York, it sold 949,368 BP ADSs during the pre-spill portion of the class period—451,274 more shares than it purchased—and thus similarly benefited from the alleged fraud by selling at a supposedly inflated price hundreds of thousands of shares it had purchased at non-inflated prices before the class period.[3]  Not only did New York's pre-spill sales of BP ADSs exceed its purchases by hundreds of thousands of shares, but New York also did not purchase any BP ADSs between September 18, 2009 and April 29, 2010.  In total, during the entire class period, New York sold approximately 440,000 more shares of BP ADSs than it purchased and, through its pre-spill sales, was a net beneficiary of the securities fraud alleged in this case.

As set forth in the accompanying Expert Report of Dr. René Stulz, because of the substantial number of BP ADSs that New York and Ohio sold in excess of those they purchased during the class period, their gains from the alleged fraud far outweigh any losses.  (*See* Expert Report of Dr. René Stulz, dated Aug. 14, 2013 ("Stulz Report").)  Employing the methodology for calculating damages typically used by Plaintiffs' own expert, Dr. Stulz estimates that both New York and Ohio profited by millions of dollars as a result of their large pre-spill sales.  (*Id*. at ¶¶ 12-16 & Ex. 1.)

**B.**     **The Court's Appointment of Lead Plaintiffs**

In the fall of 2010, New York and Ohio sought appointment as lead plaintiffs for a class of purchasers of both BP ordinary shares and ADSs spanning nearly five years (June 30, 2005 to June 1, 2010), while the Ludlow Plaintiffs separately sought appointment as lead plaintiffs of a class of ADS purchasers for the much more limited period of March 4, 2009 to April 20, 2010.  Both groups challenged the other's proposed class period and ability to represent the class.  The

---

[3] (*See* Ex. A (Reiser Decl. at 35-38).)

Ludlow Plaintiffs accused New York and Ohio of "intentionally dilut[ing] the strongest claims in the class," criticized their ability to claim losses stemming from ADSs "purchased in May 2010, a month *after* the explosion," and expressed their view that the "only plausible explanation for the New York and Ohio Funds' request to expand the Class period from one to five years is to improve their position for lead plaintiff." (Ludlow Mem. for Appointment as Lead Plaintiffs (Dkt. 41) at 18 n.5, 20, 24.)

New York and Ohio countered that the Ludlow Plaintiffs "failed to provide any showing of just who the members of the group are or whether the group is cohesive" and "abdicated their decision making authority to its counsel in permitting the filing of the lead plaintiff motion, clearly undercutting their ability to act as lead plaintiffs." (New York and Ohio Mem. for Appointment as Lead Plaintiffs (Dkt. 39) at 19-20.) The result, according to New York and Ohio, was that the Ludlow Plaintiffs were "per se inadequate to serve as lead plaintiff." (*Id.*) New York and Ohio also argued that the appointment of the Ludlow Plaintiffs as sub-class or "niche" lead plaintiffs "would impede the efficient prosecution of this litigation and invite chaos." (*Id.* at 18.)

This Court ultimately appointed New York and Ohio as lead plaintiffs and the Ludlow Plaintiffs as subclass lead plaintiffs. *In re BP plc Sec. Litig.*, 758 F. Supp. 2d 428 (S.D. Tex. 2010). In using the longest class period proposed by New York and Ohio—June 30, 2005 through June 1, 2010—for purposes of deciding the lead plaintiff motions, the Court stated that "it is undisputed that New York & Ohio have the 'largest financial interest' within the meaning of the PSLRA." *Id.* at 437. The Court also observed, however, that the claims of New York and Ohio "rest on different legal theories from other class members (including the Ludlow Plaintiffs), and these differences give rise to a substantial risk of conflict with the interests of absent class

members." *Id.* at 439. In particular, the Court noted its concern that "New York & Ohio focus a good deal of attention on fraud allegedly committed after April 20, 2010," and that "[a] substantial portion of New York & Ohio's losses derive from purchases of BP ADR[s] by one of the Ohio funds on May 3 and May 25, 2010, several weeks after the Deepwater Horizon explosion." *Id.* at 438. The Court thus concluded that New York and Ohio had "not made a preliminary showing of typicality and adequacy." *Id.* The Court also found that "a serious potential conflict of interest between the Ludlow Plaintiffs and members of the broader class" prevented the Ludlow Plaintiffs from "represent[ing] those who purchased stock before or after the [sub-Class] Period." *Id.* at 439. The Court's only option, therefore, was to appoint New York and Ohio as lead plaintiffs for the class as a whole—pending further consideration of their typicality and adequacy—and to appoint the Ludlow Plaintiffs as lead plaintiffs for the proposed subclass. *Id.* at 442.

C.      **Subsequent Proceedings**

Plaintiffs filed separate amended complaints in February 2011. The Court later dismissed for failure to state a claim the Ludlow Plaintiffs' complaint in its entirety and dismissed all but twelve statements from New York and Ohio's complaint. *In re BP plc Sec. Litig.*, 843 F. Supp. 2d 712, 799 (S.D. Tex. 2012); *In re BP plc Sec. Litig.*, 852 F. Supp. 2d 767, 820 (S.D. Tex. 2012).[4] Following those decisions, Plaintiffs jointly filed a Second Consolidated Amended Class Action Complaint ("SAC"). The Court later dismissed for failure to state a claim ten out of the 17 new statements at issue in the SAC. *In re BP plc Sec. Litig.*, 2013 WL 487011, at *35 (S.D. Tex. Feb. 6, 2013).

---

[4] The Court also dismissed New York and Ohio's claims on behalf of purchasers of BP ordinary shares under *Morrison* v. *National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010).

The alleged misstatements that survived Defendants' motions to dismiss fall into one of four categories: (1) BP's progress in implementing the Baker Panel recommendations; (2) the scope and implementation of BP's Operating Management System ("OMS") in the Gulf of Mexico; (3) supposed representations in BPXP's OSRP and IEP filed with the Minerals Management Service ("MMS") regarding BP's ability to respond to an oil spill in the Gulf of Mexico; and (4) estimates of the rate of oil flowing from the Macondo well in the weeks after the explosion. The Court's rulings on Defendants' motion to dismiss also shortened the alleged class period to November 8, 2007 through May 28, 2010.

In discovery, BPXP served subpoenas on the Bureau of Ocean Energy Management and the Bureau of Safety and Environmental Enforcement, successor agencies to the MMS. Those subpoenas sought documents and information related to when BPXP's OSRP and IEP filed with the MMS became publicly available. In response, those agencies produced various documents relating to the public's access (or lack thereof) to BPXP's OSRP and IEP during the class period. (*See generally* Decl. of Karen Miller, dated Aug. 6, 2013 ("Miller Decl."); Decl. of Christopher Schoennagel, dated Aug. 7, 2013 ("Schoennagel Decl.").)

On June 14, 2013, Plaintiffs filed a joint motion seeking appointment as class representatives and certification of a class from November 8, 2007 through May 28, 2010, and a subclass from March 4, 2009 through April 20, 2010. Absent from this motion, however, is any discussion of (i) New York and Ohio's atypical trading activity and substantial sales of BP ADSs during the proposed class period, including hundreds of thousands of shares purchased before that period, (ii) the various criticisms each set of plaintiffs raised in 2010 about why the other was ill-suited to represent their proposed class, or (iii) the "serious potential conflicts" that the Court identified in 2010. Additionally, the Ludlow Plaintiffs essentially remain silent throughout

the motion, making no arguments to distinguish themselves from New York and Ohio or to explain why a subclass is necessary or appropriate or why they should be permitted to represent that subclass.

## ARGUMENT

"A potential class of securities fraud plaintiffs, like any other group seeking class certification, must satisfy the requirements of [Federal Rule of Civil Procedure 23] in order to be certified." *Erica P. John Fund, Inc.* v. *Halliburton Co.*, 718 F.3d 423, 428 (5th Cir. 2013). Rule 23 "does not set forth a mere pleading standard," and "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Comcast*, 133 S. Ct. at 1432 (internal quotation marks omitted). As the party seeking class certification, Plaintiffs bear the burden of "establish[ing]" the requirements of Rule 23 "by a preponderance of all admissible evidence." *Alaska Elec. Pension Fund* v. *Flowserve Corp.*, 572 F.3d 221, 228 (5th Cir. 2009) (internal quotation marks omitted); *see also Unger* v. *Amedisys Inc.*, 401 F.3d 316, 320 (5th Cir. 2005) ("party seeking certification bears the burden of establishing that *all* requirements of Rule 23 have been satisfied"). Because of the significance of the class certification decision, "the Supreme Court requires district courts to conduct a rigorous analysis of [the] Rule 23 prerequisites." *Unger*, 401 F.3d at 320; *see also David* v. *Signal Int'l, LLC*, 2012 U.S. Dist. LEXIS 114247, at *57-58 n.30 (E.D. La. Jan. 3, 2012) ("The 'rigorous' Rule 23 analysis required by this circuit's precedent does not comport well with a policy of erring on the side of certifying class actions when there is any uncertainty as to whether Rule 23's standards are met.").

Rule 23(a) sets forth four prerequisites to class certification that plaintiffs must demonstrate by a preponderance of the evidence:  numerosity, commonality, typicality and adequacy of representation. *Unger*, 401 F.3d at 320. Under Rule 23(b)(3), plaintiffs also must

show by a preponderance of all admissible evidence "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."   The predominance requirement is "more demanding than the commonality requirement of Rule 23(a), and as such, mandates caution, particularly where individual stakes are high and disparities among class members great."   *Bell Atl. Corp.* v. *AT&T Corp.*, 339 F.3d 294, 301-02 (5th Cir. 2003) (internal quotation marks omitted).

"Additionally, the Court must consider general prerequisites to certification such as whether the proposed class definitions are appropriate, whether the named representatives are members of the class and whether they have standing."   *Simms* v. *Jones*, 2013 WL 3449538, at *5 (N.D. Tex. July 9, 2013).   In general, a district court "maintains substantial discretion in determining whether to certify a class action" due to the "essentially factual basis of the certification inquiry and . . . the district court's inherent power to manage and control pending litigation."   *Allison* v. *Citgo Petroleum Corp.*, 151 F.3d 402, 408 (5th Cir. 1998).

## I.      New York and Ohio Have Failed to Satisfy Rule 23(a)'s Requirements of Typicality and Adequacy of Representation.

In its Order appointing lead plaintiffs, this Court concluded that New York and Ohio had "not made a preliminary showing of typicality and adequacy" due to its concern "that New York & Ohio's claims differ from those of the class in ways that could make them atypical and inadequate representatives."   *BP plc Sec. Litig.*, 758 F. Supp. 2d at 437, 438.   New York and Ohio have failed to overcome this deficiency and meet the higher standard at class certification of satisfying Rule 23(a)'s requirements "by a preponderance of all admissible evidence."   *Flowserve*, 572 F.3d at 228 (internal quotation marks omitted).   Instead, New York and Ohio offer only conclusory assertions about these essential Rule 23(a) prerequisites.   (*See* Mot. at 6-

10.)  Having failed to satisfy their burden of proof under Rule 23, New York and Ohio's request to certify the class and for appointment as class representatives should be denied.

A.    **New York and Ohio Have Failed to Demonstrate That Their Claims Are Typical of Those of the Proposed Class.**

Under Rule 23(a)(3), New York and Ohio must show that their claims are "typical" of those of the proposed class.  "[T]he critical inquiry is whether the class representative's claims have the same essential characteristics of those of the putative class."  *Stirman* v. *Exxon Corp.*, 280 F.3d 554, 562 (5th Cir. 2002) (internal quotation marks omitted).  New York and Ohio assert that all class members (i) "purchased BP's ADSs during the Class Period," (ii) "contend that those ADSs were artificially inflated" because of Defendants' false and misleading statements, and (iii) "suffered losses when the truth surrounding those misstatements . . . were revealed to the market."  (Mot. at 6.)  Even if these are the "essential characteristics" of the prospective class,[5] New York and Ohio ignore significant distinctions their claims present that subject them to unique defenses.  Because New York and Ohio will be "preoccupied" with unique defenses "applicable only to [themselves]"—and absent class members should not be saddled with representatives subject to such defenses—New York and Ohio fail to satisfy the typicality requirement of Rule 23(a)(3).  *Warren* v. *Reserve Fund, Inc.*, 728 F.2d 741, 747 (5th Cir. 1984).

1.    **New York and Ohio Were Net Sellers by Over 800,000 Shares and Will Be Subject to the Unique Defense That They Did Not Rely on the Alleged Misstatements.**

Despite asserting that an essential characteristic of all class members' claims is that they "purchased BP's ADSs during the Class Period" (Mot. at 6), New York and Ohio actually sold many more shares than they purchased during the proposed class period, making them net

---

[5] If these were in fact the "essential characteristics" of "all" class members' claims, there would be no need for a subclass.

sellers, collectively, by one million shares during the pre-spill period and by 800,000 shares during the entire class period.  They also went months or even years during the class period without a single purchase.  In those lengthy periods when they made no purchases at all, New York and Ohio could not have relied on the integrity of the market price for BP ADSs that supposedly was affected by allegedly false or misleading statements made *after* their last purchases.  Nor could they have relied on a market price supposedly affected by those alleged pre-spill misstatements by purchasing BP ADSs after the Deepwater Horizon spill and the "corrective disclosures" that purportedly revealed the true facts.  Because New York and Ohio were selling shares rather than purchasing them for much of the class period, they are subject to the unique defense that they did not rely on the alleged misstatements, even assuming that the fraud-on-the-market presumption of reliance applies to those statements.  *See In re AM Int'l, Inc. Sec. Litig.*, 108 F.R.D. 190, 195 (S.D.N.Y. 1985) ("a proposed class representative who clearly did not rely upon either the allegedly misleading financials or on the integrity of market price or information is subject to unique defenses, and therefore may not represent the class"); *Weintraub* v. *Texasgulf Inc.*, 564 F. Supp. 1466, 1471 (S.D.N.Y. 1983) (peculiar trading activities of sophisticated speculative trader gave rise to unique defenses).

Ohio's last pre-spill purchase of BP ADSs occurred on February 7, 2008, prior to all but one of the sixteen pre-spill alleged misstatements.  By October 24, 2008, Ohio had sold all of its shares, and did not purchase any BP ADSs again until May 3, 2010, two weeks after the spill. (*See* Ex. A (Reiser Decl. at 49).)  Given its lack of purchases of BP ADSs during this extended time period, Ohio will be unable to show that it purchased shares in reliance on the integrity of the market price of BP ADSs that supposedly was inflated by the fifteen pre-spill alleged misstatements that occurred *after* its last purchase of shares.  Likewise, because New York did

not purchase any BP ADSs from September 18, 2009 until after the Gulf oil spill, New York will be unable to demonstrate its reliance on any of the five challenged statements during that timeframe, even assuming the fraud-on-the-market presumption applies.  (*See* Ex. A (Reiser Decl. at 35-38).)

New York and Ohio's lack of reliance on the pre-spill statements (which make up the large majority of statements at issue in this case) is further evidenced by the fact that New York and Ohio both *increased* their holdings of BP ADS after the Deepwater Horizon explosion and ensuing oil spill, when the market supposedly was learning the truth about BP's prior alleged misstatements concerning the company's progress against the Baker Panel recommendations, implementation and scope of OMS, and ability to respond to a spill (*see*, *e.g.*, SAC ¶ 314). "Although there is no per se rule to this effect," courts often find "that a person that increases his holdings in a security after revelation of an alleged fraud involving that security is subject to a unique defense that precludes him from serving as a class representative." *Rocco* v. *Nam Tai Elecs., Inc.*, 245 F.R.D. 132, 136 (S.D.N.Y. 2007) (internal quotation marks omitted); *see also In re Safeguard Scientifics*, 216 F.R.D. 577, 582 (E.D. Pa. 2003) (lead plaintiff subject to unique defenses in part because he "increased his holdings in Safeguard stock even after public disclosure of the alleged fraud").  In any event, because Plaintiffs allege that the Deepwater Horizon explosion itself began to reveal the truth about the challenged pre-spill statements (*see* SAC ¶¶ 28, 395), New York and Ohio cannot claim that their post-spill purchases were made in reliance on the pre-spill alleged misstatements.  *See Halliburton*, 718 F.3d at 429 ("there would be no reliance by those who purchase the security after the truth had already entered the market and dissipated the effects of the fraud").

### 2.   New York and Ohio Have No Incentive to Prove That the Pre-Spill Alleged Misstatements Artificially Inflated the Price of BP ADSs.

New York and Ohio also assert that an essential characteristic of all class members' claims is proving that the price of BP's ADSs was artificially inflated because of the alleged misstatements.  (Mot. at 6.)  While proving that the pre-spill alleged misstatements artificially inflated the price of BP ADSs will be critical to most class members' claims, the same is not true for New York and Ohio's claims.  To the contrary, the only basis for Ohio's claims is its post-spill purchases, beginning two weeks after the Deepwater Horizon explosion, the event that supposedly revealed the alleged falsity of the pre-spill misstatements.  (SAC ¶ 395.)  Ohio cannot prevail on a claim based on its two pre-spill purchases during the first three months of the class period because Ohio sold those shares at an allegedly inflated price before the explosion.  As a result, Ohio has no economic incentive to prove that the price of BP ADSs was artificially inflated before the Deepwater Horizon explosion as a result of the *pre*-spill alleged misstatements, the large majority of the statements at issue in this case.  Similarly, because New York sold twice as many shares as it purchased during the pre-spill period and purchased twice as many as it sold during the post-spill period, New York's overwhelming incentive is to prove that the *post*-spill alleged misstatements artificially inflated the price of BP ADSs.

Indeed, the evidence shows that both New York and Ohio have an affirmative reason *not* to prove that the price of BP ADSs was artificially inflated before the Deepwater Horizon explosion.  If the price of BP ADSs was inflated because of fraud before the explosion—a period during which both New York and Ohio were substantial net sellers of BP ADSs—then New York and Ohio *profited* from the fraud, which would disqualify them as class representatives.  *See infra* Section I.A.3.  New York and Ohio are clearly "atypical of the class in this regard." *Newman* v. *RCN Telecom Servs., Inc.*, 238 F.R.D. 57, 64 (S.D.N.Y. 2006) (denying class

certification for lack of typicality because lead plaintiff "was not harmed by the misrepresentations/omissions he alleges to have injured the class").

> ### 3. New York and Ohio Lack Standing and Are Atypical of the Proposed Class Because They Profited From the Alleged Fraud.

Although Plaintiffs contend that suffering a loss is an essential characteristic of the class (Mot. at 6), neither New York nor Ohio can show that they incurred any damages as a result of the alleged misstatements.  In the absence of an injury, the Court need not even reach the question of typicality under Rule 23(a)(3) because New York and Ohio would lack standing to assert claims against Defendants and thus could not represent the proposed class.  *See Bertulli* v. *Indep. Ass'n of Cont'l Pilots*, 242 F.3d 290, 294 (5th Cir. 2001) ("[s]tanding is an inherent prerequisite to the class certification inquiry").

Like any plaintiff, class representatives must have standing.  *See Rivera* v. *Wyeth-Ayerst Labs.*, 283 F.3d 315, 319 (5th Cir. 2002).  New York and Ohio thus must "show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class . . . which they purport to represent."  *Simon* v. *E. Kentucky Welfare Rights Org.*, 426 U.S. 26, 40 & n.20 (1976) (internal quotation marks omitted).  Neither New York nor Ohio can demonstrate that it was injured by the alleged fraud because they both reaped substantial profits from their massive sales of BP ADSs that they purchased before the class period at non-inflated prices and then sold during the class period (before the Deepwater Horizon explosion and Gulf oil spill) at allegedly inflated prices.  As net beneficiaries of the alleged fraud and resulting inflation of the price of BP ADSs, New York and Ohio will be unable to "show that they personally have been injured" and have standing to pursue claims.[6]  *Id.*

---

[6] New York and Ohio attempt to minimize their own lack of injuries by proposing a class definition that does not include as a requirement that the class member was injured by the alleged fraud. *(continued)*

In determining the extent, if any, of New York and Ohio's injuries, any losses they supposedly suffered because of the alleged fraud must "be netted against any of their profits attributable to the same fraud." *Jaffe Pension Plan* v. *Household Int'l, Inc.*, 756 F. Supp. 2d 928, 935, 937 (N.D. Ill. 2010) (explaining that netting gains and losses avoids a "windfall" to plaintiffs); *see Wolf* v. *Frank*, 477 F.2d 467, 478-79 (5th Cir. 1973) (considering that "plaintiffs have already made a $20,000 profit on their original purchase of [defendant's] stock" in determining that "plaintiffs are unable to show that they suffered any damages compensable under Rule 10b-5"); *Minpeco, S.A.* v. *Conticommodity Servs., Inc.*, 676 F. Supp. 486, 488-91 & n.13 (S.D.N.Y. 1987) (plaintiff's "damage calculations must account for the profits as well as the losses which it experienced as a result of defendants' manipulative behavior").

As Defendants' expert Dr. René Stulz explains, because their pre-spill sales of BP ADSs at allegedly inflated prices far outnumber their class period purchases, both New York and Ohio likely benefited much more than they claim to have been harmed by the four categories of alleged misstatements at issue in this case.  (*See* Stulz Report ¶¶ 12-13 & Ex. 1.)  Using the event study created by Plaintiffs' expert Chad Coffman (and employing a methodology often used by Mr. Coffman in securities class actions), Dr. Stulz calculated that New York reaped overall profits of $16.4 million (using the FIFO method of calculation) or $12.7 million (using the LIFO method) when the proceeds from New York's allegedly inflated class-period sales are netted

---

(*See* Mot. at 2.)  Even if the Court were to certify a class, the Court should reject this over-inclusive definition and "modify[] the class definition with the addition of a phrase such as 'and were injured thereby'" to ensure that the class does not include other purchasers of BP ADSs who were not injured by the alleged artificial inflation during the class period.  *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 529 F. Supp. 2d 644, 699 (S.D. Tex. 2006).

against its purported losses.  (*See id*.)[7]  Similarly, Ohio reaped a profit of $12.6 million when the proceeds from its allegedly inflated class-period sales are netted against its alleged losses.  (*See id*.)[8]  Having profited from the alleged fraud by millions of dollars, New York and Ohio appear to be without standing to pursue their claims individually or to represent the proposed class.

Even if New York and Ohio somehow have standing to bring claims on their own behalf, they are "not typical of most members of the putative class," as required for class certification, "because [they] realized a net gain on [their] [BP] stock trades."  *Griffin* v. *GK Intelligent Sys., Inc.*, 196 F.R.D. 298, 301 (S.D. Tex. 2000); *see Farrington* v. *Adjutant Gen. of State of Mich.*, 492 F. Supp. 1362, 1367 (W.D. Mich. 1980) (proposed class representative's "lack of injury would also keep him from meeting the extra-constitutional requirement that his claim, as class representative, be typical of the class").  As the Supreme Court "has repeatedly held, a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members."  *E. Texas Motor Freight Sys. Inc.* v. *Rodriguez*, 431 U.S. 395, 403 (1977).  Accordingly, proposed class representatives who "have suffered no injury . . . simply [are] not eligible to represent a class of persons who did allegedly suffer injury."  *Id.* at 403-04; *see Coughlin* v. *Sears Holdings Corp.*, 2010 WL 4403089, at *5 (C.D. Cal. Oct. 26, 2010) ("If Defendants are correct, then [named plaintiff] suffered no injury . . . and her claims would not be typical of proposed class members."); *In re Organogenesis Sec. Litig.*, 241 F.R.D. 397, 403

---

[7] Dr. Stulz explains the difference between these two methods of calculation:  "One method of inventory accounting is Last-In, First-Out ('LIFO').  Under LIFO, those shares purchased most recently are sold first.  Another form of inventory accounting is First-In, First-Out ('FIFO').  Under FIFO, those shares purchased first are sold first."  (Stulz Report at 8 n.6.)

[8] Because Ohio sold all of its BP ADSs as of October 24, 2008, its profit-to-loss calculations are the same under both the LIFO and FIFO methodologies.  (*See* Stulz Report ¶ 14 & Ex. 1.)

(D. Mass. 2007) (if plaintiff "has not suffered a loss, his claim fails, and he is not a typical representative of the class").

In short, if Plaintiffs' claims have merit, New York and Ohio in the aggregate enjoyed millions of dollars of profits as a result of the alleged fraud, rendering them inappropriate class representatives.  *Katz* v. *Comdisco, Inc.*, 117 F.R.D. 403, 407-08 (N.D. Ill. 1987) ("By selling more stock than [he] purchased at a purportedly inflated price, [plaintiff] became a beneficiary of the alleged fraud" and "cannot serve as a representative of the proposed class") (internal quotation marks omitted).  Absent class members should not be saddled at any trial in this case with representatives that are vulnerable to the claim that they lack standing and even profited from the fraud they seek to prove.  *See Hanon* v. *Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) ("a named plaintiff's motion for class certification should not be granted if there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it") (internal quotation marks omitted).[9]

### B.    New York and Ohio Have Not Established That They Are Adequate Class Representatives.

Under Rule 23(a)(4), plaintiffs must demonstrate that they will "fairly and adequately protect the interests of the class."  "It is well established that a class representative cannot have interests adverse to the class."  *Muñoz* v. *Orr*, 200 F.3d 291, 306 (5th Cir. 2000).  Plaintiffs thus are inadequate class representatives if there are "conflicts between the named plaintiffs' interests

---

[9] Doubts as to New York and Ohio's standing militate against appointing them as class representatives because this issue will continue to resurface in this litigation and thus will distract from the claims of the class.  *See S. Ferry LP No. 2* v. *Killinger*, 271 F.R.D. 653, 659 (W.D. Wash. 2011) ("uncertain standing renders [plaintiff] an atypical class representative" because it "presents a unique legal issue that could ultimately severely prejudice the class" and "become a major focus of the litigation"); *Katz*, 117 F.R.D. at 407 (explaining that "lack of standing" is a "unique defense that precludes a plaintiff from representing a class").

and the class members' interests."  *Mullen* v. *Treasure Chest Casino, LLC*, 186 F.3d 620, 626 (5th Cir. 1999).

Plaintiffs assert in conclusory fashion that "no actual or potential conflicts exist" because they "are all united with their respective Class or Sub-Class to establish Defendants' liability and obtain the maximum recovery for the Class."  (Mot. at 10.)  This empty assertion fails to account for conflicts that this Court identified in 2010 between the interests of New York and Ohio and those of the prospective class that render New York and Ohio inadequate representatives.[10]

Because of the timing of their ADS transactions, New York and Ohio "have little or no incentive to pursue [the pre-spill alleged misstatements] with vigor," which "places the interests of the absent class members at risk."  *See Rosen* v. *Fidelity Fixed Income Trust*, 169 F.R.D. 295, 300 (E.D. Pa. 1995).  Thus the timing of New York and Ohio's purchases and sales of BP ADSs creates a "fundamental non-alignment of claims," *id.*, with absent class members who purchased shares before the Deepwater Horizon explosion that far exceeds the "minimal levels of antagonism" that can be tolerated.  *In re Seitel, Inc. Sec. Litig.*, 245 F.R.D. 263, 271 (S.D. Tex. 2007) (internal quotation marks omitted); *see Payne* v. *Travenol Labs., Inc.*, 673 F.2d 798, 811 (5th Cir. 1982) (court may simply "deny representation" rather than "hypothesize about the effect of an actual conflict of interests on the adequacy of plaintiffs' representation").  In fact, because New York and Ohio suffered no damages as a result of the alleged fraud, they "cannot be an adequate class representative for anyone who suffers an actual . . . injury."  *Tijerina* v. *Philip Morris Inc.*, 1996 WL 885617, at *3 (N.D. Tex. Oct. 8, 1996).

---

[10] New York and Ohio's recitation of their prior litigation experience and that of their counsel (Mot. at 7-10) does not ameliorate the conflicts between New York and Ohio and absent class members. *See Stirman*, 280 F.3d at 563 (class representative, not just class counsel, must be found adequate).

In sum, New York and Ohio have not provided the Court with any reason to reconsider its preliminary determination that it could not "with confidence find that New York & Ohio's claims have the 'same essential characteristics' as those of other class members, or that no significant conflicts exist between New York & Ohio and other class members as a result of differences in their claims." *BP plc Sec. Litig.*, 758 F. Supp. 2d at 438. Because New York and Ohio have failed to establish that they are suitable class representatives, their motion to certify a class should be denied.[11]

## II.    The Ludlow Plaintiffs Offer No Support for Certification of the Proposed Subclass.

The Ludlow Plaintiffs ask this Court to appoint them as representatives of a subclass but do not even attempt to justify that request with evidence or analysis. Before certifying a subclass, "the Court must determine whether each proposed subclass meets the requirements of Rule 23." *Norwood* v. *Raytheon Co.*, 237 F.R.D. 581, 585 (W.D. Tex. 2006); *see also Cent. Wesleyan Coll.* v. *W.R. Grace & Co.*, 6 F.3d 177, 189 (4th Cir. 1993) (subclasses "must independently meet all the requirements of subsection 23(a) and at least one of the categories specified in subsection 23(b)") (internal quotation marks and alterations omitted). The Ludlow Plaintiffs thus bear the burden of establishing by a preponderance of all admissible evidence that all of the Rule 23 prerequisites to certification are satisfied for their proposed subclass. *Berger* v. *Compaq Computer Corp.*, 257 F.3d 475, 481 (5th Cir. 2001). Simply because they were appointed lead plaintiffs for the subclass at the outset of the case does not relieve them of their

---

[11] The Ludlow Plaintiffs have never sought to represent the longer class proposed by New York and Ohio, nor could they. Instead, they strenuously argued against a class period starting prior to March 4, 2009 or continuing after April 20, 2010. (*See* Ludlow Mem. for Appointment as Lead Plaintiffs (Dkt. 41) at 18 & n.5, 24 (accusing New York and Ohio of "intentionally dilut[ing] the strongest claims in the class" and criticizing claimed losses based on purchases "a month *after* the explosion").) Additionally, the Court found that the Ludlow Plaintiffs "might not have an interest in vigorously pursuing claims based on conduct outside the [subclass] Period" and are not qualified to represent the broader class. *BP plc Sec. Litig.*, 758 F. Supp. 2d at 439.

burden of coming forward with "[e]vidence regarding the requirements of Rule 23 . . . at the class certification hearing." *Gluck* v. *CellStar Corp.*, 976 F. Supp. 542, 546 (N.D. Tex. 1997); *see also BP plc Sec. Litig.,* 758 F. Supp. 2d at 435 (referring to "searching" inquiry into typicality and adequacy of representation "triggered by a subsequent motion for class certification"); *In re Reliance Acceptance Grp., Inc. Sec. Litig.*, 1998 WL 388260, at *4 (W.D. Tex. June 29, 1998) ("preliminary showing" of typicality and adequacy at earlier stage of case "does not preclude revisiting the issue on consideration of a motion for class certification").

Although defendants are free "to challenge the adequacy or typicality of the proposed class representatives in the context of class certification," plaintiffs must not "invert[] the requirement that the party seeking certification bears the burden of proving all elements of rule 23(a)." *Berger*, 257 F.3d at 482, 484. Yet this is precisely what the Ludlow Plaintiffs attempt to do. Aside from arguing that they "have taken an active role in prosecuting this action" (Mot. at 9) and that their lawyers are "experienced in large complex litigation" (*id.* at 10), the Ludlow Plaintiffs have made no arguments and presented no evidence specific to themselves or the subclass they seek to represent.[12] As a result of their "lack of analysis and briefing on this

---

[12] Contrary to the Ludlow Plaintiffs' assertion that they "have taken an active role in prosecuting this action" (Mot. at 9), their deposition testimony raises serious questions about whether they "possess a sufficient level of knowledge and understanding to be capable of controlling or prosecuting the litigation," as is required. *Berger*, 257 F.3d 475 at 482-83. None of the Ludlow Plaintiffs were able to identify the alleged misstatements, even when presented with the underlying documents. (*See* Ex. B (Lichtman Dep. at 160:7-168:7); Ex. C (Huyck Dep. at 103:25-121:20); Ex. D (Nakagiri Dep. at 125:13-135:22).) Some of the Ludlow Plaintiffs also struggled to articulate any difference between the class and subclass other than that the time periods differed (*see* Ex. B (Lichtman Dep. at 90:3-91:16); Ex. C (Huyck Dep. at 69:10-24)), and they did not know when the subclass starts and ends, let alone why those dates are used (Ex. B (Lichtman Dep. at 90:5-23; 127:10-128:9, 129:7-14); Ex. C (Huyck Dep. at 98:20-102:10)). Moreover, one of the Ludlow Plaintiffs admitted that until midway through his deposition—after he had conferred with his counsel during a break—he "didn't know the meaning of 'class action' thoroughly" or understand that he was representing other absent plaintiffs. (Ex. C (Huyck Dep. at 102:11-103:13; 123:5-129:2).) And despite declaring to the Court in November 2010 that they would hold "regular conferences as a group" (Joint Declaration of Robert Ludlow, Peter Lichtman, Paul Huyck and Leslie Nakagiri, executed November 2-5, 2010 (Dkt. 48-3) ¶ 4)), Huyck, Nakagiri and Lichtman had their first and only *(continued)*

subject," the Ludlow Plaintiffs "have not met [their] burden" of satisfying Rule 23 with respect to the proposed subclass.  *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 2008 WL 5423488, at *5 (E.D. La. Dec. 29, 2008) (refusing to certify subclasses because "it [was] unclear" whether Rule 23 requirements were met).

Having "mailed it in" and failed to carry their burden under Rule 23, the Ludlow Plaintiffs should not be permitted to sandbag Defendants by submitting analysis and evidence in support of the proposed subclass on reply.  *See Mullen* v. *Treasure Chest Casino, L.L.C.*, 1997 WL 539917, at *3 n.4 (E.D. La. Aug. 29, 1997) ("Issues raised for the first time in a reply memorandum deprive a non-moving party of a meaningful opportunity to respond," and therefore, "the basis upon which a movant requests relief must be presented in his memorandum in support of that request"), *aff'd* 186 F.3d 620 (5th Cir. 1999); *Manaway* v. *Med. Ctr. of Se. Tex.*, 430 F. App'x 317, 325 n.4 (5th Cir. 2011) (argument for which plaintiff bears burden of proof "raised for the first time in [plaintiff's] reply brief . . . has been waived"); *cf. Bell* v. *Ascendant Solutions, Inc.*, 422 F.3d 307, 316 (5th Cir. 2005) ("inadequate briefing on an issue critical to class certification for which a party bears the burden of proof is no basis for us to order a repêchage round").  The request of the Ludlow Plaintiffs to certify a subclass and appoint them as representatives thus should be denied.

---

(continued)
joint call in August 2013 (Ludlow was unable to participate).  (*See* Ex. B (Lichtman Dep. at 158:15-159:18); Ex. C (Huyck Dep. at 132:6-133:17); Ex. D (Nakagiri Dep. at 139:21-140:20).)  Given their minimal knowledge of and involvement in the litigation, the Ludlow Plaintiffs appear to be merely "lending their names to a purported class action solely at the suggestion of lead counsel."  *Griffin*, 196 F.R.D. at 302.

### III.    Plaintiffs Have Not Satisfied Their Burden Under Rule 23(b)(3) With Respect to Their Claims Based on Statements in BPXP's OSRP and IEP.

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc.* v. *Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011).[13]  "Whether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance."  *Id*.  As the Supreme Court has recognized, "'requiring proof of individualized reliance from each member of the proposed plaintiff class effectively would' prevent such plaintiffs 'from proceeding with a class action, since individual issues' would 'overwhelm the common ones.'"  *Id*. at 2185 (quoting *Basic Inc.* v. *Levinson*, 485 U.S. 224, 242 (1988)) (alterations omitted).

In *Basic*, the Supreme Court "permitt[ed] plaintiffs to invoke a rebuttable presumption of reliance based on what is known as the 'fraud-on-the-market' theory."  *Id*.  But "securities fraud plaintiffs must prove certain things in order to invoke *Basic*'s rebuttable presumption of reliance. It is common ground, for example, that plaintiffs must demonstrate that the alleged misrepresentations were publicly known . . . , that the stock traded in an efficient market, and that the relevant transaction took place between the time the misrepresentations were made and the time the truth was revealed."  *Id*. (internal quotation marks omitted).[14]  Plaintiffs who "fail to establish publicity, market efficiency, or trade timing . . . lose the class-wide presumption of

---

[13] "The elements of a private securities fraud claim based on violations of § 10(b) and Rule 10b-5 are: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Halliburton*, 131 S. Ct. at 2184 (internal quotation marks omitted).

[14] This remains true after the Supreme Court's decision in *Amgen Inc.* v. *Connecticut Retirement Plans & Trust Funds*, 133 S. Ct. 1184 (2013).  "[T]he fraud-on-the-market elements that should be addressed *at class certification* are limited to those matters which bear on common question predominance and the propriety of class resolution:  trade timing, market efficiency, and publicity."  *Halliburton*, 718 F.3d at 432.

reliance."  *Halliburton*, 718 F.3d at 431.   Without the benefit of the fraud-on-the-market presumption of reliance, individualized questions of reliance predominate and render class certification inappropriate.  *See Regents of Univ. of Cal.* v. *Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372, 394 (5th Cir. 2007) ("no class may be certified in a § 10(b) case without a classwide presumption of reliance"); *Castano* v. *Am. Tobacco Co.*, 84 F.3d 734, 745 (5th Cir. 1996) ("a fraud class action cannot be certified when individual reliance will be an issue.").

It is also well established that a "class should be certified on a claim-by-claim basis." *Bertulli*, 242 F.3d at 295.  Here, the Court and the parties have correctly treated each alleged misstatement (or at least each category of alleged misstatements) as giving rise to a separate claim.[15]  *BP plc Sec. Litig.*, 2013 WL 487011 at *35 ("dismiss[ing] claims against all Defendants based upon [certain specific] misrepresentations," while upholding other claims "based upon [different] alleged misrepresentations").  Accordingly, Plaintiffs and the Court have referred to the various statements contained in BPXP's OSRP and IEP as providing the basis for a separate claim that BPXP misrepresented "BP's ability to respond to an oil spill in the Gulf of Mexico." *BP plc Sec. Litig.*, 843 F. Supp. 2d at 762-64.[16]  The logic for analyzing the statements in BPXP's OSRP and IEP separately from the other categories of alleged misstatements applies

---

[15] Courts commonly conduct separate Rule 23(b)(3) analyses and make separate certification determinations for Rule 10b-5 claims arising from statements on distinct topics.  *See In re Bank of Am. Corp. Sec., Derivative, and ERISA Litig.*, 281 F.R.D. 134, 142, 144 (S.D.N.Y. 2012) (separate predominance analyses for "Section 10(b) claims directed towards the Merrill bonus payments" and for claims "concerning Merrill's losses in the fourth quarter of 2008"); *Barrie* v. *Intervoice-Brite, Inc.*, 2009 WL 3424614, at *9, 13 (N.D. Tex. Oct. 26, 2009) (separate analyses for Section 10(b) "forecast-related claims" and for "merger-related and revenue recognition claims"); *Archdiocese of Milwaukee Supporting Fund, Inc.* v. *Halliburton Co.*, 2008 WL 4791492, at *4-21 (N.D. Tex. Nov. 4, 2008) (separate certification determinations for claims based on alleged misstatements relating to (i) "prospective liabilities from asbestos litigation," (ii) "fraudulent accounting practices," and (iii) "anticipated success of [Company's] merger"), *rev'd on other grounds*, 647 F.3d 533, 534 (5th Cir. 2011).

[16] *See also* SAC, App. A (categorizing OSRP and IEP statements under "Ability to Respond to Spill").

- 24 -

equally in the class certification context.  *See Harris* v. *Vector Mktg. Corp.*, 753 F. Supp. 2d 996, 1019-20 (N.D. Cal. 2010) ("certif[ying] for class action treatment [employees'] claims related to the[ir] initial training," but "den[ying] certification with respect to the[ir] post-training claim").[17]

Anticipating the difficulty they face with respect to their claims based on this category of alleged misstatements, Plaintiffs argued in their motion that the predominance requirement is satisfied because the OSRP and IEP "were publicly available such that, for these statements, the presumption of reliance is applicable."  (Mot. at 18.)  They do not address the applicability of the fraud-on-the-market presumption of reliance to any other category of alleged misstatements.  For the reasons explained below, Plaintiffs have not satisfied their burden of showing that this presumption of reliance applies to statements in BPXP's OSRP and IEP, and thus Plaintiffs' claims challenging those statements cannot be certified under Rule 23(b)(3).

### A. The Challenged Statements in the OSRP and IEP Were Not "Publicly Known" Until at Least a Week After the Gulf Oil Spill.

"Under *Basic*'s fraud-on-the-market doctrine, an investor presumptively relies on a defendant's misrepresentation if that 'information is reflected in [the] market price' of the stock at the time of the relevant transaction."  *Halliburton*, 131 S. Ct. at 2186 (citing *Basic*, 485 U.S. at 247).  "The theme of *Basic* and other fraud-on-the-market decisions is that *public* information reaches professional investors, whose evaluations of that information and trades quickly influence securities prices . . . [whereas non-public information does] not come to the attention of professional investors or money managers, so the price-adjustment mechanism just described

---

[17] The alternative to analyzing the OSRP and IEP statements separately for purposes of the predominance requirement is to view them as part of one claim with the 17 other alleged misstatements (notwithstanding that these statements relate to different subjects).  In that scenario, the inapplicability of the fraud-on-the-market presumption of reliance with respect to the OSRP and IEP statements would preclude certification altogether because determining individual reliance on the challenged statements in either of those two regulatory filings for hundreds of thousands of different class members would overwhelm any common issues pertaining to the other alleged misstatements.

does not operate." *West* v. *Prudential Sec., Inc.*, 282 F.3d 935, 937-38 (7th Cir. 2002).  If information does not reach the market, there is no basis for "assum[ing] that an investor who buys or sells stock at the market price relies upon the statement."  *Stoneridge Inv. Partners, LLC* v. *Scientific-Atlanta, Inc.*, 552 U.S. 148, 159 (2008).  Thus, to invoke the fraud-on-the-market presumption of class-wide reliance, "plaintiffs must demonstrate that the alleged misrepresentations were publicly known (else how would the market take them into account?)." *Halliburton*, 131 S. Ct. at 2185; *see Amgen Inc.* v. *Connecticut Retirement Plans & Trust Funds*, 133 S. Ct. 1184, 1192 (2013) (plaintiffs may "invoke a rebuttable presumption of reliance on material misrepresentations aired to the general public"); *Flowserve*, 572 F.3d at 230 ("only information known to the market is relevant under the fraud-on-the-market theory of class wide reliance").

Although Plaintiffs baldly assert that "there can be little, if any, dispute that all the statements at issue were publicly available and disseminated to investors" (Mot. at 17), they have not and cannot establish that the statements in the IEP and OSRP were public in March and June 2009, respectively, as they allege in their complaint.  (*See* SAC ¶¶ 337, 349.)  Because Rule 23 "does not set forth a mere pleading standard," *Comcast*, 133 S. Ct. at 1432 (internal quotation marks omitted), Plaintiffs cannot simply point out (*see* Mot. at 18) that the Court accepted their allegation that the OSRP and IEP were public "[f]or purposes of pleading reliance" at the motion-to-dismiss stage.  *BP plc Sec. Litig.*, 843 F. Supp. 2d at 764.  At the class-certification stage, Plaintiffs are required to prove publicity "by a preponderance of all admissible evidence." *See Flowserve*, 572 F.3d at 228.  They have failed to do so.

In fact, Plaintiffs' expert failed even to consider whether the challenged statements in the OSRP and IEP were publicly known in 2009, as Plaintiffs contend.  At his deposition, he instead

admitted that whether the OSRP "was made public or not did not bare [sic] in any way on my market efficiency opinion," and that he had not considered "what relevance it may or may not have to the case, or analyzed whether it was public or wasn't public." (Ex. E (Coffman Dep. at 215:7-11).) Similarly, with respect to the IEP, Mr. Coffman acknowledged that he was "not aware of when or where it was filed or whether it was public or not." (*Id.* at 215:17-19.) This failure of proof is critical. As shown below, the OSRP and IEP were not in fact publicly known in 2009; they instead only became known to the public a week or more after the oil spill began, when the filings first were discussed in press articles. Moreover, because these initial post-spill articles cast doubt on the accuracy of statements contained in the OSRP and IEP, the filings could not have inflated the price of BP ADSs when they were first reported to the public.

### 1. The OSRP Did Not Become Public Until Several Weeks After the Gulf Oil Spill Began.

Plaintiffs allege that "[o]n June 30, 2009, BP publicly filed" the OSRP with the MMS (SAC ¶ 349), but they have offered no evidence to support that allegation. In fact, evidence produced during discovery demonstrates that the OSRP was not (and could not have been) seen by any member of the public until sometime after May 6, 2010—that is, more than two weeks after the Deepwater Horizon explosion and more than ten months after Plaintiffs allege the filing became public.

Oil spill response plans are non-public documents that are attainable only by request pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. (*See* Miller Decl. ¶¶ 6, 8.) Prior to the Deepwater Horizon explosion, the MMS had not received any such request for BPXP's OSRP. (*See id.* ¶ 6 & Ex. A.)[18] At some point between May 6 and May 11, 2010—two-

---

[18]   MMS received its first request for the OSRP from Waltzer & Associates on May 3, 2010. Other FOIA requests for the OSRP came from Bloomberg Newsroom on June 1, 2010; NBC Universal

*(continued)*

to-three weeks *after* the Deepwater Horizon explosion—the Department of Interior ("DOI") released the OSRP for the first time by posting a redacted version of it on a DOI website.  (*Id.* ¶ 8 & Ex. B.)

Given the lack of any evidence to support their allegation that the OSRP was "publicly filed" in June 2009, Plaintiffs resort to arguing that the "IEP makes specific reference to the Regional OSRP," and therefore "material facts from the Regional OSRP were indeed 'publicly' misrepresented."  (Mot. at 18-19.)  This makes no sense.  Even assuming the IEP itself was known to the market before the spill (which Plaintiffs have not demonstrated either), that document's mere reference to the OSRP does not publicize "material facts" contained in the OSRP, much less the challenged statements at issue in this case.  Simply put, a reference to the OSRP is not the same as publishing the alleged misstatements contained in the OSRP.[19]

Plaintiffs' assertion that an "April 22, 2010 press release was a clear reference to BP's OSRP" (Mot. at 19) fails for similar reasons.  First of all, Plaintiffs cannot utilize a press release in April 2010 to support a claim that BP made public misstatements to the market in June 2009.  Moreover, there is nothing in the April 22, 2010 press release communicating the specific alleged misstatements in the June 2009 OSRP that this Court held were actionable, and Plaintiffs have never alleged that the press release itself contained an actionable misrepresentation.

Rather, a *Wall Street Journal* article dated May 10, 2010 was the first widely disseminated publication to disclose any of the alleged misstatements in BPXP's OSRP.  (*See*

---

(continued)
(MSNBC) on June 11, 2010; and *The New York Times* on August 6, 2010.  (*See* Miller Decl., Ex. A (BP EFTS Report (summarizing FOIA requests related to BPXP's IEP and OSRP)).)

[19]  Moreover, Plaintiffs allege that the OSRP was "publicly filed" on June 30, 2009 (SAC ¶ 349), three months after they allege that the IEP became "available to the public."  (*Id.* ¶ 337.)  Thus, the version of the OSRP that is referenced in the IEP cannot be the same version that Plaintiffs have challenged in the SAC.

Ex. F (Guy Chazan & Neil King, *The Gulf Oil Spill: BP's Preparedness for Major Crisis Is Questioned*, Wall St. J., May 10, 2010, at A6 (referring to OSRP's worst-case discharge estimate for a hypothetical spill of "250,000 barrels a day").)  In publicizing specific content of the OSRP for the first time, this article casts *doubt* on its accuracy, stating that "BP claimed to have in place sufficient booms, stocks of dispersants and skimmers to deal with a spill far in excess of the volume it is now struggling to contain," which "shows that the company's claimed abilities were out of sync with the realities of the spill."  (*Id.*)  Thus, in publishing certain content of BPXP's OSRP, this article could not have inflated the price of BP's ADSs.

**2.      Until More Than a Week After the Gulf Oil Spill, Public Access to the IEP Was *De Minimis*.**

Plaintiffs also fail to demonstrate when or how the IEP and its contents became known to the market.  They merely assert that "[t]he IEP was public," and note that "Defendants withdrew their argument that Plaintiffs failed to plead reliance on the IEP."  (Mot. at 18.)  At the class certification stage, however, the Court must "probe behind the pleadings."  *Comcast*, 133 S. Ct. at 1432.

Although it was possible for a member of the public to access the IEP on the MMS website before the Deepwater Horizon explosion, the evidence now shows that very few people actually did so.  As detailed in the Affidavit of Jeffrey McGurk, a computer forensics analyst, between February 23, 2009 and April 20, 2010, a mere 22 unique IP addresses (*i.e.*, computer users) accessed the MMS webpage where the IEP could be found.  (Affidavit of Jeffrey McGurk, dated Aug. 13, 2013 ("McGurk Aff."), ¶¶ 7, 11.)  Such *de minimis* access to the IEP is unsurprising, given the difficulty of finding the IEP on the Internet, which required someone to (i) go to the MMS website, (ii) choose the "Gulf of Mexico" tab on the top of the screen, (iii) choose the "Offshore Information" tab that then appeared on the side of the screen, (iv)

- 29 -

choose the "Plans Tracking Info" tab that then appeared on the side of the screen, (v) choose the "Exploration and Development Plans Online Query" link, and (vi) enter appropriate search terms to find BPXP's March 2009 IEP among all the submitted exploration and development plans stored on the database.[20]  Access by 22 computer users hardly demonstrates that the contents of this lengthy regulatory filing, much less the particular alleged misstatements contained therein, were known to the market.  That the IEP was not publicly known until much later than Plaintiffs allege is supported by the fact that, although the IEP could be accessed with some difficulty through the MMS website, beginning on April 30, 2010, MMS received several FOIA requests for or related to BPXP's IEP, including from multiple news agencies.[21]

As Plaintiffs' expert explained, an efficient market is "one in which *widely-available* public information is quickly incorporated into the market price."  (Coffman Report ¶ 14 (emphasis added).)  In contrast, Mr. Coffman testified that "information that an insider or some subset of people have that a general market does not have" constitutes "private information" that "the market . . . often does not reflect."  (Ex. E (Coffman Dep. at 210:14-20).)  Having been viewed by such a small "subset of people," there is no basis to conclude that the IEP contained "widely available public information"—particularly in the absence of any public commentary about the IEP during this time (*see* Stulz Report ¶¶ 27, 37)—and Mr. Coffman readily conceded that he did not consider whether the market for BP ADSs reflected such information accessed by only 22 people before the Gulf oil spill (Ex. E (Coffman Dep. at 209:19, 210:4-6, 215:23-25, 216:1)).

---

[20] (*See* Ex. G (archived MMS webpage).)

[21]  (*See* Miller Decl., Ex. A (BP EFTS Report (summarizing FOIA requests related to BPXP's IEP and OSRP)).)

Plaintiffs' inability to cite a single pre-spill news article or analyst report discussing the IEP (or any BPXP exploration plan, for that matter) strongly suggests that this information was not publicly known until sometime well after the Deepwater Horizon explosion and resulting spill.  (*See* Ex. E (Coffman Dep. at 85:10-12 (analyst coverage "can be an important channel" to convey information to investing public)).)  The earliest the alleged misstatements in BPXP's IEP could be considered "publicly known" was on April 29, 2010, when *The Huffington Post* published an article discussing—and criticizing—specific information contained in the IEP, with a link to the IEP embedded in the article.  (*See* Ex. H (Marcus Baram, *Gulf Oil Spill Exceeds BP's "Worst Case Scenario," Drilling Supporters on Defensive*, The Huffington Post (Apr. 29, 2010, 6:12 AM).)  This article called into question the IEP's statement that BP "has the capacity to respond, to the maximum extent practicable, to a worst-case discharge" and also noted that "the scale of the accident required BP to get assistance from the Coast Guard, other federal agencies and other oil companies such as Shell, which is sending half a dozen vessels to help with the clean-up effort."  (*Id.*)[22]  Similar to the first public coverage of the OSRP, the publication of statements from BPXP's IEP in this highly critical article could not have inflated the price of BP's ADSs.

Because there is no evidence that the challenged statements from BPXP's IEP came "to the attention of professional investors or money managers" or any news outlets until more than a week after the spill began, the "price-adjustment mechanism" underpinning the fraud-on-the-

---

[22] Likewise, the Associated Press released an article on April 30, 2010, questioning specific statements in the IEP, which was reprinted in dozens of online and print sources over the next few days.  (*See*, *e.g.*, Ex. I (Cain Burdeau & Holbrook Mohr, *Document: BP didn't plan for major oil spill in Gulf of Mexico*, AL.COM (April 30, 2010, 9:06 PM) (calling into question IEP's statement that "due to the distance to shore (48 miles) and the response capabilities that would be implemented, no significant adverse impacts are expected" by citing the "giant oil spill seeping into Louisiana's rich fishing grounds and nesting areas")).)

market presumption "does not operate," and there is no empirical or theoretical basis for applying the presumption. *West*, 282 F.3d at 938.  This is consistent with the view of Plaintiffs' expert that "information that an insider or some subset of people have that a general market does not have" is information that "the market can . . . but often does not reflect."  (Ex. E (Coffman Dep. at 210:14-20).)

In sum, the evidence demonstrates that while it was theoretically possible to retrieve the IEP from the MMS website before the spill began, the document and its contents were not actually known to the public until more than a week after the Deepwater Horizon explosion when the media began reporting on the information contained in the IEP and expressing doubt about some of the IEP's statements.  The evidence adduced in discovery thus shows that the IEP was "not 'publicly available' simply because [it was] posted in an obscure location on the internet" beginning in March 2009.  *Billhofer* v. *Flamel Techs., S.A.*, 281 F.R.D. 150, 154, 160 (S.D.N.Y. 2012) (finding that information was not "publicly available" when it was "placed on a subpage of a conference supplement on the website" of prominent medical journal and only "became publicly available when an analyst . . . issued a research report").  Plaintiffs certainly have not satisfied their evidentiary burden of proving otherwise.

**B.     Even If the Challenged Statements Were Publicly Known, Plaintiffs Adduced No Evidence That the Market Efficiently Processes This Type of Technical Information.**

Plaintiffs also have failed to demonstrate that the market for BP's ADSs efficiently processed the technical information contained in the OSRP and IEP—even assuming that such information was publicly known.   As the Supreme Court recently stated, "differences in efficiency can exist within a single market" and "a market may more readily process certain forms of widely disseminated and easily digestible information, such as public merger announcements, than information more difficult to acquire and understand, such as obscure

technical data buried in a filing with the Securities and Exchange Commission."  *Amgen*, 133 S. Ct. at 1197 n.6.[23]   Even prior to the Supreme Court's *Amgen* decision, the Fifth Circuit recognized that "even though the market for the defendant's shares has been demonstrated efficient by the usual indicia, the market [may] actually [be] inefficient with respect to the particular type of information conveyed by the material misrepresentation."  *Oscar Private Equity Inv.* v. *Allegiance Telecom, Inc.*, 487 F.3d 261, 269 (5th Cir. 2007).[24]

The challenged statements in BPXP's OSRP and IEP filed with the MMS are the quintessential example of "obscure technical data buried in a filing" that result in informational inefficiencies because of the market's inability to "acquire and understand" the data.  *Amgen*, 133 S. Ct. at 1197 n.6.  Indeed, Ohio has acknowledged that the OSRP "deals with technical matters that would probably be outside the competence of most security analysts to analyze and

---

[23] The Supreme Court's acknowledgement that the market for a particular security may not be uniformly efficient reflects the growing consensus among academics.  For years, scholars have observed that "in a securities fraud case brought under the fraud-on-the-market theory, courts should not consider the question of whether a security is traded in an efficient market in isolation from the particular disclosure issue being litigated."   Jonathan R. Macey & Geoffrey P. Miller, *Good Finance, Bad Economics: An Analysis of the Fraud-on-the-Market Theory*, 42 Stan. L. Rev. 1059, 1085 (1990).  These commentators have recognized that "even professional investors and analysts sometimes pay insufficient attention to buried facts, and react only, albeit swiftly, when issues are made more salient."  Donald C. Langevoort, *Basic at Twenty: Rethinking Fraud on the Market*, 2009 Wis. L. Rev. 151, 176 (2009).  Because not all information is incorporated efficiently into prices, "[i]t is critical . . . to determine whether particular markets and the prices of particular securities on those markets react efficiently to the particular type of information involved."   Carol R. Goforth, *The Efficient Capital Market Hypothesis—an Inadequate Justification for the Fraud-on-the-Market Presumption*, 27 Wake Forest L. Rev. 895, 929 (1992).

[24] Although this passage from *Oscar* involved the Fifth Circuit's requirement (at that time) that plaintiffs demonstrate loss causation to invoke the *Basic* presumption, the notion that the market for a security may not be efficient with respect to particular types of information remains valid.  *See Halliburton*, 131 S. Ct. at 2187 ("Because we conclude the Court of Appeals erred by requiring EPJ Fund to prove loss causation at the certification stage, we need not, and do not, address any other question about *Basic*, its presumption, or how and when it may be rebutted.").  The *Basic* Court itself acknowledged that not all public information will be processed by the market and incorporated into the market price.  *See* 485 U.S. at 247 n.24 (stating that fraud-on-the-market presumption requires court to believe that "market professionals generally consider *most* publicly announced material statements about companies") (emphasis added).

that it is something that they might rely on someone else's depiction or characterization of." (Ex. J (Davidson Dep. at 162:17-21; *see id.* at 163:10-16 (OSRP was "probably not something that our securities analysts would have read, because they're probably not trying to understand all the engineering details . . . or couldn't understand all the engineering details")).)[25]

Plaintiffs and their expert have not addressed whether the market efficiently processed the technical data in BPXP's OSRP and IEP filed with the MMS.  Plaintiffs' expert instead admitted that he had not drawn any conclusions or done any work to determine whether the market efficiently processed such technical information, despite acknowledging that "you have to understand sort of what's expected, what's actually out there, what question it is you're asking about, what it is [the market] may or may not have relied upon" in order to assess market efficiency.  (Ex. E (Coffman Dep. at 209:15, 213:4-7, 214:5-6).)

As Dr. Stulz points out, Mr. Coffman's event study was limited to the market's reaction to BP's earnings reports filed with the SEC—information that is very different from the technical data included in BPXP's filings with the MMS.  (Stulz Report ¶¶ 26-31.)  Mr. Coffman's event study thus fails to take into account the "ample evidence in finance that investors and prices can react differently to information depending on how, when, and where this information is made available."  (*Id.* ¶ 34.)  In his expert report, Dr. Stulz concludes that "there is no plausible reason to conclude from any evidence of efficiency with respect to earnings announcements that the market for BP's ADS was efficient with respect to information that was in no way comparable to earnings announcements" (*id.* ¶ 33), particularly as to technical information that is not

---

[25] As set forth above, no such public "depiction or characterization" of the IEP or OSRP took place until more than a week or two after the spill began, and the articles that first discussed these filings expressed skepticism of the accuracy of some of the statements contained in them.

"obviously" public (*id*. ¶ 36 ("MMS filings (and their contents) are in no way comparable to the 'obviously' public announcements . . . such as earnings announcements or stock splits")).

Plaintiffs not only have failed to demonstrate market efficiency for the type of information contained in the MMS filings (*id*.), but their expert's event study actually supports the opposite conclusion:  that the market for BP's ADSs was inefficient as to the information in the OSRP and IEP.  (*Id*. ¶ 40.)  As Dr. Stulz explains, "based on Mr. Coffman's own event study, the market did not efficiently respond to the information contained in BPXP's IEP and OSRP." (*Id*.)  Moreover, Dr. Stulz's own empirical study testing market efficiency for securities issued by entities other than BP supports this conclusion by revealing that "the volatility following EP filing releases is not unusually large compared to other days."  (*Id*. ¶¶ 43-48 & Ex. 7.)

In short, Plaintiffs have not carried their burden of showing that the market for BP's ADSs efficiently processed the type of technical information contained in BPXP's OSRP and IEP filed with the MMS.  For this reason as well, no class should be certified to pursue these claims.

### C.   Plaintiffs' OSRP and IEP Claims Do Not Satisfy the Superiority Requirement of Rule 23(b)(3).

Plaintiffs also fail to demonstrate that certifying the OSRP and IEP claims for class treatment is superior to individual adjudication of those claims.   Rule 23(b)(3)'s superiority prong requires courts to take a "close look" and certify a class only if doing so would "achieve economies of time, effort, and expense . . . without sacrificing procedural fairness or bringing about other undesirable results."  *Amchem Prods., Inc.* v. *Windsor*, 521 U.S. 591, 615 (1997)

(internal quotation marks omitted).[26]  For example, while the alleged misstatements in the IEP did not become known to the market until more than a week after oil began spilling into the Gulf, it is possible that a handful of absent class members could have accessed the IEP from its obscure location on the MMS website before the spill.  If claims based on the IEP remain part of the class action, those claims will have to be dismissed on summary judgment because the statements were not known to the market—a ruling that would bind any absent class members who may have accessed the IEP on the MMS website and relied on statements in that document.  *See Lichoff* v. *CSX Transp., Inc.*, 218 F.R.D. 564, 577 (N.D. Ohio 2003).  Such an "undesirable result[]" not only would violate the superiority requirement, *Amchem*, 521 U.S. at 615, but also would be inconsistent with the Court's "foremost concern"—"preserv[ing] the claims of all potential class members."  *BP plc Sec. Litig.*, 758 F. Supp. 2d at 441 (discussing creation of subclass).

Plaintiffs' only argument with regard to superiority is that class certification is preferable to "hundreds of thousands of separate individual actions."  (Mot. at 21.)  But, as no member of the public apparently saw the OSRP, and only a small number of people saw the IEP before the challenged statements in it were publicized over a week after the Gulf oil spill began, that is not a realistic concern.  And, as the claims based on the OSRP and IEP are factually distinct from the other claims alleged here, trying them as part of a class action would not result in greater "judicial efficiency" or "achieve the economies of time, effort and expense."  *Castano*, 84 F.3d at 749 & n.27 (internal quotation marks omitted).  Certification of the OSRP and IEP claims is therefore inappropriate under Rule 23(b)(3).

---

[26] As with the predominance requirement, "[t]he Court must study each claim separately to decide . . . whether the class action is the superior method to resolve the controversy."  *Perrin* v. *Expert Oil & Gas, LLC*, 2008 WL 339684, at *3 (E.D. La. Feb. 6, 2008) (internal quotation marks omitted).

IV.     **Plaintiffs Have Not Shown a Model for Calculating Damages on a Class-Wide Basis That Is Consistent With Their Different Theories of Liability.**

To meet their burden under Rule 23(b)(3), Plaintiffs must proffer a damages model that is consistent with their theories of liability and that demonstrates that damages are capable of measurement on a class-wide basis.  *See Comcast*, 133 S. Ct. at 1433; *see also Forrand* v. *Fed. Express Corp.*, 2013 WL 1793951, at *3 (C.D. Cal. Apr. 25, 2010) ("in order for Rule 23(b)(3)'s predominance requirement to be satisfied, a plaintiff must bring forth a measurement method that can be applied classwide *and* that ties the plaintiff's legal theory to the impact of the defendant's allegedly illegal conduct").   As the Supreme Court explained in *Comcast*, "at the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case," and it must "measure only those damages attributable to that theory."  133 S. Ct. at 1433 (internal quotation marks omitted).[27]   Accordingly, "[t]he first step in a damages study is the translation of the legal theory of the harmful event into an analysis of the economic impact of that event."  *Id*. at 1435; *see also In re Montano*, 2013 WL 2244216, at *7 (Bankr. D.N.M. May 21, 2013) ("If in fact . . . damages could be measured class-wide, Plaintiffs had an obligation to come forward with evidence thereof.  They did not, and *Comcast* does not allow them the luxury of waiting until trial.").[28]

---

[27] *Comcast* applies to class actions generally and is not limited to antitrust cases.  *E.g.*, *Wang* v. *Hearst Corp.*, 2013 WL 1903787, at *9 (S.D.N.Y. May 8, 2013) ("Although Plaintiffs argue that *Comcast* is limited to anti-trust cases, the majority opinion explicitly rejected that very proposition.") (quoting *Comcast*, 133 S. Ct. at 1433 ("This case [] turns on the straightforward application of class-certification principles . . . .")).

[28] New York and Ohio's failure to offer any information as to how they would establish damages for the class may be a result of their desire to obscure the fact that they profited from the alleged fraud.  (*See supra* Section I.A.3.)  If so, this omission merely underscores their own inadequacy as class representatives under Rule 23(a) and the inappropriateness of granting their motion for class certification under Rule 23(b)(3).

Plaintiffs' bare assertion that their expert, Mr. Coffman, "will prepare an analysis demonstrating that the decline in the ADS price per share after April 20, 2010 caused loss to the Class" (Mot. at 20) falls short of satisfying *Comcast*'s requirement that plaintiffs proffer at the class-certification stage a model to translate their legal theories into an analysis of the economic impact of the challenged statements on a class-wide basis. *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, No. 12-7085, slip op. at 18 (D.C. Cir. Aug. 9, 2013) ("It is now clear . . . that Rule 23 not only authorizes a hard look at the soundness of statistical models that purport to show predominance—the rule commands it.")  In his report, Mr. Coffman states that "plaintiffs would seek to quantify harm to class members by performing event study analysis to link declines in stock price to revelation of corrective information."  (Coffman Report ¶ 75.)  But he admits that he did not "perform any work specific to BP" in reaching this opinion (Ex. E (Coffman Dep. at 216:9-15)), and he acknowledges that the "main steps" as well as "the details [of a methodology for calculating damages] can differ substantially from case to case, depending on fact-specific circumstances" (*id*. at 222:1-6).  As Mr. Coffman's own testimony recognizes, merely referencing a methodology is hardly evidence of how such a methodology actually can be implemented on the facts of this case.  *See In re Rail Freight*, No. 12-7085, slip op. at 16 ("It is not enough to submit a questionable model whose unsubstantiated claims cannot be refuted through *a priori* analysis."); *Vaccarino* v. *Midland Nat'l Life Ins. Co.*, 2013 WL 3200500, at *15 (C.D. Cal. June 17, 2013) ("Plaintiffs argue that they need not present a damages theory tailored to this particular case, offering instead the damages theories or expert declarations from various other cases . . . . The Court finds that this showing is insufficient.").  As the Supreme Court explained, if "*any* method of measurement is acceptable so long as it can be applied classwide,

no matter how arbitrary the measurements may be," the predominance requirement would be reduced "to a nullity."  *Comcast*, 133 S. Ct. at 1433.[29]

Because "[n]umerous factors that affect the amount of damages, if any, to any given class member are not accounted for," *Turnbow* v. *Life Partners, Inc.*, 2013 WL 3479884, at *17 (N.D. Tex. July 9, 2013), Plaintiffs have not met their burden under *Comcast*.  As Dr. Stulz explains, neither Plaintiffs nor their expert provides any indication of how corrective company-specific price declines on alleged disclosure days will be apportioned between the alleged fraudulent statements and confounding news, how the portion allegedly related to fraud will be apportioned among the different alleged misstatements, and how the inflation band will be calculated.  (*See* Stulz Report ¶ 55.)  Nor have Plaintiffs addressed whether the separate theories of liability they seek to advance on behalf of the class and subclass (based on four different categories of alleged misstatements spanning a two-and-a-half-year period) can be translated into a single damages model.  Without more information, the Court has no way of determining if Plaintiffs' approach to proving damages is consistent with their legal theories.  *See Turnbow*, 2013 WL 3479884, at *17 (lack of detail left court unable to assess whether "Plaintiffs' proposed damages calculus represents an accurate approximation of any single class member's . . . damages").

---

[29] Plaintiffs rely on a decision from the Northern District of California to support their argument that they have met their burden under *Comcast* by merely stating their intention to use an event study to calculate damages.  (Mot. at 19-20 (citing *In re Diamond Foods, Inc.*, 2013 WL 1891382 (N.D. Cal. May 6, 2013)).)  That reliance is misplaced.  Contrary to Plaintiffs' assertion, that decision did not "reject[] the argument" that under *Comcast* "certification must be denied 'absent affirmative evidence that damages are susceptible of measurement across the entire class.'"  (*Id.* (citing *Diamond Foods*, 2013 WL 1891382, at *11).)  Rather, the court stated that it "need not decide" this issue.  *Diamond Foods*, 2013 WL 1891382, at *11.  The court also accepted plaintiffs' proffered event study because the "defendant [did] not identify any specific complications that would make such a calculation impossible or ill-advised in this case."  *Id.*  Here, by contrast, Defendants have identified numerous reasons why Plaintiffs' failure to provide more information about their approach to modeling damages precludes the Court from determining that Plaintiffs will be able to prove damages for the entire class consistent with their theories of liability.  (*See* Stulz Report ¶¶ 52-64.)

Plaintiffs simply have not demonstrated how they will "clearly measure" the damages "resulting from the particular injury on which Plaintiffs' liability action is premised." *Id*. at *15. Having failed to translate their theories of liability into a damages model, the Court has no way of determining if damages can be measured on a class-wide basis. Plaintiffs' request that the Court trust them to do so later is fundamentally at odds with their obligations under *Comcast*. In short, "[n]o damages model, no predominance, no class certification." *In Re Rail Freight,* No. 12-7085, slip op. at 15.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for class certification should be denied.

Dated:  August 14, 2013

Respectfully submitted,

OF COUNSEL

_/s/ Thomas W. Taylor_

Daryl A. Libow (pro hac vice)
Amanda F. Davidoff (pro hac vice)
Elizabeth A. Rose
SULLIVAN & CROMWELL LLP
1701 Pennsylvania Avenue, N.W.
Washington, D.C.  20006-5805
Telephone:  (202) 956-7500

Richard C. Pepperman, II (pro hac vice)
Marc De Leeuw (pro hac vice)
Matthew A. Peller
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004-2498
Telephone:  (212) 558-4000

_Attorneys for Defendants BP p.l.c.,_
_BP America, Inc., BP Exploration and_
_Production, Inc., Anthony B. Hayward and_
_Douglas Suttles_

Theodore V. Wells, Jr. (pro hac vice)
Roberto Finzi (pro hac vice)
Jaren Janghorbani (pro hac vice)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York  10019-6064
Telephone:  (212) 373-3000

_Attorneys for Defendant Douglas Suttles_

Thomas W. Taylor
Texas State Bar No. 19723875
S.D. Tex. Bar No. 3906
ANDREWS KURTH LLP
600 Travis, Suite 4200
Houston, Texas  77002
Telephone:  (713) 220-4200
Facsimile:  (713) 220-4285
ttaylor@andrewskurth.com

_Attorney-in-Charge for Defendants BP p.l.c.,_
_BP America, Inc., BP Exploration and_
_Production, Inc., Anthony B. Hayward and_
_Douglas Suttles_

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing Memorandum has been served by electronic CM/ECF filing, on this 14th day of August, 2013.

_/s/ Thomas W. Taylor_
Thomas W. Taylor