UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: BP p.l.c. | § | MDL No. 10-md-2185 |
| SECURITIES LITIGATION | § | |
| | § | |
| | § | |
| ALAMEDA COUNTY EMPLOYEES' | § | |
| RETIREMENT ASSOCIATION, et al., | § | Civ. Act. No. 4:12-cv-1256 (cons.) |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | HON. KEITH P. ELLISON |
| | § | |
| BP p.l.c., et al. | § | |
| | § | |
| Defendants. | § | |

<u>MEMORANDUM AND ORDER</u>

Pending before the Court is Defendants' Consolidated Motion to Dismiss Plaintiffs' Complaints. (Doc. No. 46.)[1] Having reviewed the motion, Plaintiffs' response (Doc. No. 55), Defendants' reply (Doc. No. 63), and all papers in support thereof, the Court finds that Defendants' motion (Doc. No. 46) must be **GRANTED IN PART** and **DENIED IN PART**.

I.      **BACKGROUND**

This case is part of a "first tranche" of securities fraud actions filed against various BP companies and executives that are advanced mostly under state law. Plaintiffs seek to hold Defendants responsible for financial harm caused by BP's falling stock prices after the Deepwater Horizon explosion on April 20, 2010 and the resulting 87-day oil spill in deepwater Gulf of Mexico. Plaintiffs contend that Defendants materially misrepresented the worth of BP's stock prior to and immediately following the disaster. They believe Defendants should

---

[1] Unless otherwise indicated, all docket references are to 12-cv-1256.

compensate them for their financial losses following the alleged correction of BP's stock price.

The Court has written at length regarding the events of April 20, 2010. A putative class action grounded in U.S. federal securities law (the "Class Action") is also pending before the Court, and three separate motions to dismiss have been resolved by written order in that action. A more extensive description of the factual allegations regarding BP's checkered safety record and the tragic events leading up to the Deepwater Horizon explosion may be found in two of the Court's prior orders. *See In re BP p.l.c. Securities Litig.* ("*BP I*"), 843 F. Supp. 2d 712, 724-25, 741-42 (S.D. Tex. 2012); *In re BP p.l.c. Securities Litig.* ("*BP II*"), 852 F. Supp. 2d 767, 775-78 (S.D. Tex. 2012).

This action both overlaps substantially with, and deviates from, the Class Action. Most importantly, Plaintiffs in this case seek compensation for losses caused by drops in the price of BP's Ordinary Shares—listed and sold only on the London Stock Exchange ("LSE")—as well as for drops in the price of BP's American Depositary Shares ("ADSs")—listed and sold on the New York Stock Exchange ("NYSE"). In the Class Action, the Court held that U.S. federal securities laws do not provide relief for losses experienced on foreign exchanges. *BP I*, 843 F. Supp. 2d at 796. Consequently, to recover the full range of their losses from both types of financial instruments, Plaintiffs in this case bring both federal and state law claims.

Plaintiffs' First Amended Consolidated Complaint (the "Complaint") is very similar to the Second Consolidated Amended Class Action Complaint (the "Class Action Complaint") in the Class Action. It alleges that a series of public statements—in press releases, regulatory filings, and news reports—were misleading. One important distinction between the Complaint and the Class Action Complaint is that the Complaint includes more specific allegations of Plaintiffs' diligence in researching BP, assessing whether to invest, and then making

investments. Specifically, the Complaint contains allegations about particular investment advisors used by the various plaintiffs; what those investment advisors reviewed; and how at least one of them—███████████████████ representing Alameda County—met with BP officials face-to-face to discuss concerns about ████████████.[2] Statements from seven face-to-face meetings with █████ are included in the Complaint as alleged misrepresentations.

The Complaint also expounds upon Defendants' alleged campaign, post-disaster, to promote and perpetuate the notion that the amount of oil spilling into the Gulf each day was approximately 5,000 barrels, and not 70,000 barrels as reported by other observers of the tragedy. To this end, the Complaint incorporates an additional twelve alleged public misstatements from April and May 2010 which are not found in the Class Action Complaint. Plaintiffs have also included copious detail regarding data and estimates generated within BP that contradicted the post-spill public statements, as well as developments in the criminal and civil enforcement case against BP and its executives and employees in which some liability for misleading the U.S. government and the public has been admitted.

A.    The Parties

The plaintiffs are: Alameda County Employees' Retirement Association ("Alameda County"); Employees' Retirement System of the City of Providence ("Providence"); and State-Boston Retirement System ("State-Boston" and, collectively with Alameda County and Providence, "Plaintiffs"). Plaintiffs are all U.S. public pension funds. Alameda County and State-

---

[2] BP also allegedly met with investment advisors for Providence and State-Boston in the United States, but Plaintiffs concede that this information is not included in the Complaint. (Doc. No. 55 (the "Cons. Opp."), at 25 n.14.) The Court cannot consider matters outside the Complaint at this time.

Boston purchased both Ordinary Shares on the LSE and ADSs on the NYSE. Providence purchased only Ordinary Shares on the LSE. Alameda County and State-Boston's BP holdings date from November 29, 2006; Providence's BP holdings date from October 2, 2009. (Doc. No. 36 (the "Compl."), at ¶¶ 22-24.)

The defendants are: BP p.l.c., BP America, Inc., and BP Exploration & Production, Inc. and seven of BP's present and former officers and directors. BP p.l.c. ("BP" or the "Company") is a U.K. corporation with its principal executive offices located in London, England. (Compl. ¶ 25.) BP America, Inc. ("BP America") and BP Exploration & Production, Inc. ("BP E&P"), both wholly-owned subsidiaries of BP, are Delaware corporations with their principal places of business in Houston, Texas. (*Id.* ¶¶ 26-27.)

The seven individual defendants were directors and officers of one or more of the corporate defendants prior to and during the Deepwater Horizon spill.  They are Anthony B. Hayward, executive director from 2003 to November 2010 and Chief Executive Officer ("CEO") at BP from May 2007 to October 2010; Douglas Suttles, Chief Operating Officer for BP E&P from January 2009 to at least January 2011; Andrew G. Inglis, executive director and Chief Executive of Exploration and Production at BP from 2007 to October 2010; Robert Malone, Chairman and President of BP America from July 2006 to February 2009; David Rainey, BP America's Vice President of Exploration for the Gulf of Mexico; H. Lamar McKay, the Chairman and President of BP America since January 2009; and Robert Dudley, executive director of BP since April 2009 and its Group Chief Executive since October 2010 (collectively, the "Individual Defendants").  (Compl. ¶¶ 29-35.)

### B.    Alleged Public Misrepresentations

As noted above, the alleged public misrepresentations included in the Complaint are

largely the same as the misrepresentations at issue in the Class Action. The statements began in January 2007 and continued through May 2010, after the Deepwater Horizon explosion. The alleged public misrepresentations can be divided into three broad categories: (1) statements regarding BP's safety reform efforts following a fatal explosion at the Company's Texas City refinery in 2005; (2) statements regarding BP's ability to respond to an oil spill in deepwater; and (3) statements regarding the amount of oil spilling from the Macondo well after the Deepwater Horizon collapsed.

### 1.    BP's safety reform efforts

On March 23, 2005, an explosion at BP's Texas City refinery killed 15 people and injured approximately 170 others. (Compl. ¶ 57.) The catastrophe—one in a long string of safety missteps, as catalogued in the Complaint—prompted BP, on recommendation from the U.S. Chemical Safety Board ("CSB"), to commission an independent panel of experts to review its safety culture and procedures and recommend improvements. (*Id*. ¶¶ 61-62.) This panel—led by former U.S. Secretary of State James Baker, III and known as the "Baker Panel"—issued a report in January 2007 (the "Baker Report") criticizing BP for emphasizing personal safety (i.e., occupational safety such as slip and falls) over process safety. (*Id*. ¶ 72.) The Baker Report set out ten recommendations and urged BP to implement them expeditiously:[3]

> RECOMMENDATION # 1 – PROCESS SAFETY LEADERSHIP – The Board of Directors of BP p.l.c., BP's executive management (including its Group Chief Executive), and other members of BP's corporate management must provide effective leadership on and establish appropriate goals for process safety.  Those individuals must demonstrate their commitment to process safety by articulating a clear message on the importance of process safety and matching that message both with the policies they adopt and the actions they take.

---

[3] Although the Baker Report recommendations were directed at BP's U.S. refineries, BP announced that it would "implement the mandates across all lines of its business." (Compl. ¶¶ 75, 88.)

RECOMMENDATION # 2 – INTEGRATED AND COMPREHENSIVE PROCESS SAFETY MANAGEMENT SYSTEM – BP should establish and implement an integrated and comprehensive process safety management system that systematically and continuously identifies, reduces, and manages process safety risks at its U.S. refineries.

RECOMMENDATION # 3 – PROCESS SAFETY KNOWLEDGE AND EXPERTISE – BP should develop and implement a system to ensure that its executive management, its refining line management above the refinery level, and all U.S. refining personnel, including managers, supervisors, workers, and contractors, possess an appropriate level of process safety knowledge and expertise.

RECOMMENDATION # 4 – PROCESS SAFETY CULTURE – BP should involve the relevant stakeholders to develop a positive, trusting, and open process safety culture within each U.S. refinery.

RECOMMENDATION # 5 – CLEARLY DEFINED EXPECTATIONS AND ACCOUNTABILITY FOR PROCESS SAFETY – BP should clearly define expectations and strengthen accountability for process safety performance at all levels in executive management and in the refining managerial and supervisory reporting line.

RECOMMENDATION # 6 – SUPPORT FOR LINE MANAGEMENT – BP should provide more effective and better coordinated process safety support for the U.S. refining line organization.

RECOMMENDATION # 7 – LEADING AND LAGGING PERFORMANCE INDICATORS FOR PROCESS SAFETY – BP should develop, implement, maintain, and periodically update an integrated set of leading and lagging performance indicators for more effectively monitoring the process safety performance of the U.S. refineries by BP's refining line management, executive management (including the Group Chief Executive), and the Board of Directors.

RECOMMENDATION # 8 – PROCESS SAFETY AUDITING – BP should establish and implement an effective system to audit process safety performance at its U.S. refineries.

RECOMMENDATION # 9 – BOARD MONITORING – BP's Board should monitor the implementation of the recommendations of the Panel . . . and the ongoing process safety performance of BP's U.S. refineries.  The Board should, for a period of at least five calendar years, engage an independent monitor to report annually to the Board on BP's progress in implementing the Panel's

recommendations . . . . The Board should also report publicly on the progress of such implementation and on BP's ongoing process safety performance.

RECOMMENDATION # 10 – INDUSTRY LEADER – BP should use the lessons learned from the Texas City tragedy and from the Panel's report to transform the company into a recognized industry leader in process safety management.  The Panel believes that these recommendations . . . can help bring about sustainable improvements in process safety performance at all BP U.S. refineries.

(*Id.* ¶ 74.)

Plaintiffs allege that Defendants embraced the Baker Panel's recommendation to "articulat[e] a clear message on the importance of process safety," but failed to match that message with policies and actions. (Compl. ¶ 76.) Despite this, BP's purported progress on the Baker Report roadmap was a common refrain in public statements after January 2007. The following statements fall into this category of alleged misrepresentation:

- A press release issued January 16, 2007, announcing the release of the Baker Report, stated: "BP *already has taken* a number of actions which align with the recommendations of the [Baker Panel] and will, after a more thorough review, develop plans . . . for applying lessons learned elsewhere." (*Id.* ¶ 331.)

- In a press release issued October 25, 2007, announcing the resolution of law enforcement investigations into Texas City and an oil spill in Prudhoe Bay, Alaska, Malone stated: "In the months and years since these violations occurred, *we have made real progress in the areas of process safety performance and risk management*." (*Id.* ¶ 341.)

- At the Houston Forum on November 8, 2007, Hayward stated: "*We continue to implement the roadmap provided to ourselves and the industry by the excellent work of the Baker Panel.* BP remains absolutely committed to taking these lessons and becoming a world leader in process safety." (*Id.* ¶ 343.)

- In the 2007 Annual Review, dated February 22, 2008, Hayward stated: "When I took over as group chief executive, the immediate task was to restore the integrity and the efficiency of BP's operations. *I set out three priorities: safety, people and performance.*" (*Id.* ¶ 345.)

- At the 2008 Strategy Presentation conducted via teleconference on February 27, 2008, and again at the 2008 Annual General Meeting held April 17, 2008,

Hayward stated: "*[O]ur intense focus on process safety continues. We are making good progress in addressing the recommendations of the Baker Panel*[.]" (*Id*. ¶¶ 347, 349.)

- At the HRH Prince of Wales's 3rd Annual Accounting for Sustainability Forum on December 17, 2008, Hayward stated: "BP had a number of high-profile safety lapses in recent years, notably at our Texas City refinery, where there was a tragic and unacceptable loss of life. . . . *We opened ourselves up to scrutiny . . . [a]nd we have continuously reported progress against a response plan and against an independent external report.*" (*Id*. ¶ 352.)

- BP's 2009 Annual Report filed March 5, 2010 and signed by Hayward, stated: "*Following the tragic incident at the Texas City refinery in 2005 the [Safety, Ethics, and Environment Assurance] committee has observed a number of key developments* . . . . Throughout this time the group chief executive has made safety the number one priority." (*Id*. ¶ 379.)

- During a March 23, 2010 speech at the Peterson Institute for International Economics, Hayward stated: "*That tragic accident [i.e., Texas City] has changed in a profound and fundamental way our approach to safety and operations integrity – providing a safe working environment is a paramount responsibility, and our first and foremost priority.*" (*Id*. ¶ 383.)

According to Plaintiffs, the above statements were false and misleading because BP had not, in fact, instituted the safety reforms advocated by the Baker Panel. (*E.g.,* Compl. ¶ 332.) They claim that BP's abject failure to make any progress on the above recommendations was made tragically clear when a series of process safety failures led to the April 20, 2010 blowout on the Deepwater Horizon. According to Plaintiffs, the events leading up to April 20, 2010 demonstrate that BP—despite public attestations of reform and progress—continued to suffer from a misguided focus on occupational safety over process safety; lacked adequate and consistent process safety procedures; and had engaged in short-sighted, cost-driven decision-making which compromised its ability to maintain safe operations and resulted in an unreasonable risk of catastrophic failures. (*Id*. ¶¶ 11-12, 117-18, 246, 259-60, 262, 264.) Importantly, these same issues were raised in the Baker Report and in other investigations

conducted regarding the Texas City and Prudhoe Bay disasters.[4] (*Id*. ¶¶ 64, 72.)

In addition to the above statements regarding BP's "progress" on the Baker Report roadmap, Plaintiffs allege that Defendants also misrepresented the scope and implementation of BP's Operating Management System ("OMS")—the cornerstone of BP's safety reform efforts. OMS was a response to the second recommendation of the Baker Panel: "BP should establish and implement an integrated and comprehensive process safety management system that systematically and continuously identifies, reduces, and manages process safety risks[.]" (Compl. ¶ 77.) Defendants touted OMS in a variety of public settings, repeatedly updating on its roll-out and reach:

- BP's 2006 Sustainability Report, dated May 9, 2007, stated: "The OMS is a *comprehensive system that covers all aspects of our operations* . . . . *The new OMS will apply to all operations* by the end of 2010 . . . . *Each site will have its own local OMS*, based on a consistent group-wide framework[.]" (*Id*. ¶ 333.)

- On a July 24, 2007 conference call with analysts and investors, Hayward stated: "We are also in the early days of establishing a new way of operating in BP – *with the progressive rollout of a common group-wide Operating Management System*." (*Id*. ¶ 337.)

- At the Sanford Bernstein 4th Annual Strategic Decisions Conference on September 25, 2007, Inglis stated: "One aspect of our focus on safe and reliable operations . . . is our new standardized [OMS]. *This will provide a blueprint for safety and all aspects of operations throughout BP*." (*Id*. ¶ 339.)

- A press release issued October 25, 2007 stated: "BP America is in the midst of a comprehensive effort to improve its safety culture and *to strengthen and standardize process safety and risk management programs* at all BP-operated facilities." (*Id*. ¶ 341.)

- At the 2008 Strategy Presentation conducted via teleconference on February 27, 2008, and again at the 2008 Annual General Meeting held April 17, 2008,

---

[4] In early 2006, between 210,000 and 260,000 gallons of oil leaked from BP's pipelines in Prudhoe Bay, Alaska. It was determined that the leak had been ongoing for weeks before BP discovered it. (Compl. ¶ 65.) BP subsequently pled guilty to a criminal charge in connection with the Prudhoe Bay incident and paid $22 million in fines. (*Id*. ¶ 68.)

Hayward stated: "*[O]ur intense focus on process safety continues. We . . . have begun to implement a new Operating Management System across all of BP's operations.*" (*Id*. ¶¶ 347, 349.)

- In the 2008 Annual Review dated February 24, 2009, Hayward stated: "***The BP [OMS] turns the principle of safe and reliable operations into reality by governing how every BP project, site, operation and facility is managed.***" (*Id*. ¶ 355.)

- BP's 2008 Annual Report, filed March 4, 2009 and signed by Hayward, stated: "We continue to implement our new *[OMS], a framework for operations across BP that is integral to improving safety and operating performance in every site.* When fully implemented, OMS will be the single framework within which we will operate[.]" (*Id*. ¶ 358.) Elsewhere, the Report stated: "All operated businesses plan to transition to OMS by the end of 2010." (*Id*.)

- In the 2008 Sustainability Review released April 16, 2009, Hayward stated: "You can see a similar balanced approach in our new *[OMS], which is to be implemented at each BP site*." (*Id*. ¶ 370.)

- BP's 2009 Annual Review, dated February 26, 2010, stated: "A key enabler for [safe, reliable and compliant operations] is the BP operating management system *(OMS), which provides a common framework for all BP operations* . . . . *OMS enables each site to focus on the most important risks in its own operations and sets out procedures on how to manage them in accordance with the group-wide framework*." (*Id*. ¶ 377.)

- BP's 2009 Annual Report, filed March 5, 2010 and signed by Hayward, stated: "A key enabler for [safe, reliable and compliant operations] is the BP *[OMS], which provides a common framework for all BP operations, designed to achieve consistency and continuous improvement in safety and efficiency*." (*Id*. ¶ 379.) Elsewhere, it stated: "***BP's [OMS], which provides a single operating framework for all BP operations***, is a key part of continuing to drive a rigorous approach to safe operations." (*Id*.) It also stated: "Following the tragic incident at the Texas City refinery in 2005, the SEEAC committee has observed a number of key developments, including . . . *development of a group-wide operating management system (OMS) which is being progressively adopted by all operating sites* . . ." (*Id*.)

- At the Howard Weil Energy Conference on March 22, 2010, Inglis stated: "***Safety and operational integrity underpins everything we do, and we are now in the final phase of rolling out our operating management system that provides a single, consistent framework for our operations, covering all areas from personal and process safety to environmental performance.***" (*Id*. ¶ 381.)

10

- BP's 2009 Sustainability Review dated April 15, 2010, stated: "***BP's [OMS] provides a single framework for all BP operations to follow,*** covering all areas from process safety, to personal health, to environmental performance. Providing an integrated and consistent way of working, the OMS helps ensure that a rigorous approach to safe operations continues to be taken. Its principles and processes are designed to simplify the organization, improve productivity, ***enable consistent execution*** and focus BP on performance." (*Id.* ¶ 387.)

- BP's 2009 Sustainability Report, dated April 15, 2010, stated: "***BP continues to implement its [OMS], a cornerstone of achieving safe, reliable and responsible operations at every BP operation.***" (*Id.* ¶ 390.)

The above statements are alleged to be misleading because they repeatedly emphasized the all-encompassing, consistent nature of OMS, without disclosing that it was not designed to and would not apply to project sites owned by contractors. (Compl. ¶¶ 93-97.) This was a significant carve-out to OMS—six out of seven offshore drilling units in the Gulf of Mexico in early 2010 were owned by contractors, including, notably, the Transocean-owned Deepwater Horizon. (*Id.* ¶ 93.)

Multiple statements regarding the pace of the OMS roll-out in the Gulf of Mexico are also alleged to have been misleading. These include the following:

- In the 2008 Annual Review, dated February 24, 2009, BP stated: "During the year we began migrating to ***the new BP OMS, which has an increased focus on process safety and continuous improvement.*** The majority of our operations in North America Gas, the ***Gulf of Mexico***, Colombia and the Endicott field in Alaska ***all completed the migration to the OMS in 2008***." (Compl. ¶ 354.)

- The 2008 Annual Report, filed March 4, 2009 and signed by Hayward, stated: "***Eight sites completed the transition to OMS in 2008 . . . [including] the Gulf of Mexico***[.]" (*Id.* ¶ 358.)

- In the 2009 Sustainability Review, dated April 15, 2010, Hayward stated: "***Having been initially introduced at eight sites in 2008,*** the OMS rollout extended to 70 sites by the end of 2009 . . . ***This means implementation is 80% complete.***" (*Id.* ¶ 385.)

Plaintiffs claim that the statements were misleading because they touted full implementation of

OMS in the Gulf of Mexico before full implementation had actually been achieved. (*Id*. ¶¶ 100-07.)

Finally, Plaintiffs allege that at least two misrepresentations were made regarding BP's receptiveness to safety concerns raised by its employees and its treatment of safety whistleblowers. Like the representations regarding OMS, the statements about employee feedback and non-retaliation were relevant to one of the recommendations of the Baker Report: Recommendation # 4, which encouraged BP to "involve the relevant stakeholders to develop a positive, trusting, and open process safety culture[.]" (Compl. ¶ 74.) The alleged misstatements in this category include:

- On May 16, 2007, in testimony before a House subcommittee, Malone stated: "I continue to meet with employees to reinforce my expectations of them: *that they must ensure that our operations are safe, that they understand they have both a right and responsibility to shut down any process they feel is unsafe or operationally unsound, and that they are encouraged to raise concerns on any issue.*" (*Id*. ¶ 335.) Malone further stated: "*BP does not tolerate retaliation against workers who raise safety concerns.*" (*Id*.)

- On December 17, 2008, during a speech at the HRH Prince of Wales's 3rd Annual Accounting for Sustainability Forum, Hayward stated that BP's "high profile safety lapses" provided "a huge opportunity to learn and improve the way we operate. *We opened ourselves up to scrutiny – and we listened more to our front-line operations people – who, of course, really know what is going on on the ground.*" (*Id*. ¶ 352.)

Plaintiffs claim that these statements were false because safety concerns raised by BP employees were, at best, ignored. At worst, safety whistleblowers were marginalized, retaliated against, and even terminated. (*Id*. ¶¶ 187-201.)

## 2. BP's oil spill prevention and response capabilities

Defendants are also alleged to have misrepresented BP's ability to prevent and to respond to an oil spill in deepwater, both to the U.S. government and to investors. Most of the alleged

misstatements in this category are found in the Regional Oil Spill Response Plan ("OSRP")—last updated in June 2009 and covering the entire Gulf of Mexico region—and the Initial Exploration Plan ("IEP") for the Macondo well, submitted March 10, 2009. (Compl. ¶¶ 227, 229.) Both documents were filed with the U.S. Department of the Interior's Minerals Management Service ("MMS") and made publicly available. (*Id.* ¶¶ 360, 372.) The alleged misstatements found in the documents include:

- The IEP stated: "***BP Exploration & Production Inc. has the capability to respond, to the maximum extent practicable, to a worst-case discharge,***" which BP estimated at 162,000 barrels of oil per day. (*Id.* ¶¶ 360, 363.)

- The IEP also stated: "***In the event of an unanticipated blowout resulting in an oil spill, it is unlikely to have an impact based on the industry wide standards for using proven equipment and technology for such responses, implementation of BP's Regional Oil Spill Response Plan which address available equipment and personnel, techniques for containment and recovery and removal of the oil spill***." (*Id.* ¶ 360.) It also stated: "An accidental oil spill from the proposed activities could cause impacts to beaches. However, ***due to the distance to shore (48 miles) and the response capabilities that would be implemented, no significant adverse impacts are expected***. Both the historical spill data and the combined trajectory/risk calculations referenced in the publication OCS EIS/EA MMS 2002-052 indicate ***there is little risk of contact or impact to the coastline and associated environmental resources***." (*Id.* ¶ 361.)

- The OSRP estimated the "***TOTAL WORST CASE DISCHARGE***" scenarios in the Gulf of Mexico at between 28,033 barrels and 250,000 barrels of oil per day. (*Id.* ¶ 372.)

- The OSRP also stated that BP and its subcontractors could recover approximately ***491,721 barrels of oil per day*** (or more than 20.6 million gallons) in the event of an oil spill in the Gulf. (*Id.*) It stated that BP and its subcontractors "***maintain the necessary spill containment and recovery equipment to respond effectively to spills***." (*Id.*)

In addition to the alleged misrepresentations in the OSRP and IEP, Plaintiffs include 2 other public statements which addressed BP's spill prevention technologies and promoted BP's ability to deal with any adverse consequences from their deepwater activities:

- On November 19, 2009, Rainey testified before a Senate Committee and gave "[e]xamples of the technologies which have helped to reduce accidental releases," including "*[b]lowout preventer technology which includes redundant systems and controls*" and "*BP's fiber optic network in the U.S. Gulf of Mexico which allows us to monitor well pressures in real time, both at the facility and in our offices in Houston*." (*Id.* ¶ 375.) He also testified: "While our intent is to prevent all accidental discharges, we conduct regular emergency drills with local, state, and federal agencies. *All of our production facilities have contingency plans that identify the procedures, response equipment, and key personnel needed for responding to incidents*." (*Id.*)

- BP's 2009 Sustainability Report, dated April 15, 2010, stated: "*[W]e seek to ensure an infrastructure is in place to deal effectively with spills and their impacts. Our operating facilities have the capacity and resources to respond to spill incidents and we participate in industry and international forums to coordinate contingency planning and emergency response.*" (*Id.* ¶ 389.)

Rainey's testimony regarding "technologies which have helped to reduce accidental releases" is alleged to be false because the blow-out preventers used in the Gulf of Mexico— including on the Deepwater Horizon—did not have safety redundancies such as a second blind shear ram or an acoustical control switch. (Compl. ¶ 376(d)-(e).) Additionally, although Rainey testified that BP could "monitor well pressures in real time," both offshore and in BP's Houston office, in reality no one in BP's Houston office monitored well pressures from the Macondo well—either prior to or on the night that the well blew. (*Id.* ¶ 376(e).)

The falsity of the statements regarding BP's oil spill response capabilities was revealed in April, May, June, and July 2010, when BP proved utterly incapable of counteracting or stopping the oil spill, despite the fact that it was nearly three times *less* serious than the worst case scenario contemplated in the IEP, and four times less serious than that contemplated in the OSRP. Indeed, several Defendants have since admitted that—in contrast to the self-assured statements in the OSRP and IEP—BP did not have the necessary tools and technologies to counteract an oil spill in deepwater. This includes Suttles, who stated that BP did not have a

response plan with "proven equipment and technology" to contain a spill; Hayward, who admitted that BP "did not have the tools you'd want in your tool kit" to stop the leak, and that, after the spill, BP had been "making it up day to day;" Malone, who conceded that BP did not have "individual technologies" for dealing with an oil spill prior to the Deepwater Horizon explosion; and Inglis, who testified that BP had not invested a single dollar in developing methods to contain an oil spill. (Compl. ¶¶ 289, 369(f)-(g), 369(i).)

### 3.   BP's oil spill estimates

Finally, Defendants are alleged to have drastically understated the quantity of oil spilling into the Gulf following the Deepwater Horizon explosion and collapse. According to Plaintiffs, the accuracy of the publicized estimates was important for at least two different reasons. It defined the amount of money BP would owe the U.S. government in fines. (Compl. ¶¶ 211, 436-37.) It also affected how much BP would need to spend in offshore and onshore spill response, as well as the extent of its exposure to liability for private claims and lawsuits. (*Id*. ¶ 437.) Because investors were keenly aware of these metrics, continually evaluating the wisdom of any potential or existing investment in BP, it was particularly important for Defendants to be forthcoming and guileless in their public estimates of the spill rate. (*Id*. ¶ 213.) In the month following the explosion, these estimates were starkly consistent. As indicated below, they ranged from an early number of 1,000 barrels per day to a much-repeated "best guess" of 5,000 barrels per day:

- On April 28, during a Unified Command press briefing, Suttles stated that BP's best estimate was that ***1,000 barrels of oil per day*** were flowing from the well. (*Id*. ¶ 399.)

- On April 29, Suttles conducted an interview on The Early Show and provided the following estimate: "I think that somewhere ***between one and five thousand barrels a day is probably the best estimate*** we have today." (*Id*. ¶ 401(a).)

- Also on April 29, Suttles conducted an interview on Good Morning America and

stated: "I think **between one and 5,000 barrels a day is a reasonable estimate.**" (*Id*. ¶ 401(b).)

- Also on April 29, Suttles conducted an interview with The Today Show and stated: "I actually don't think there's a difference between NOAA's view and our view. I would say **the range is 1,000 to 5,000 barrels a day**." (*Id*. ¶ 401(c).)

- A Form 6-K filed with the SEC on April 29 stated: "Efforts continue to stem the flow of oil from the well, **currently estimated at up to 5,000 barrels a day**." (*Id*. ¶ 404.)

- Another Form 6-K filed with the SEC on April 30 stated: "Efforts to stem the flow of oil from the well, **currently estimated at up to 5,000 barrels a day**, are continuing with six remotely-operated vehicles (ROVs) continuing to attempt to activate the flow out preventer (BOP) on the sea bed." (*Id*. ¶ 405.)

- Also on April 30, the estimate of **5,000 barrels per day** was posted on BP's corporate website. (*Id*. ¶ 406.)

- A Form 6-K filed with the SEC on May 4, 2010 stated: "[C]urrent estimates by the U.S. National Oceanic and Atmospheric Administration (NOAA) suggest **some 5,000 barrels (210,000 U.S. gallons) of oil per day** are escaping from the well." (*Id*. ¶ 414.)

- On May 5, Hayward conducted an interview with the Houston Chronicle and stated: "**A guesstimate is a guesstimate. And the guesstimate remains 5,000 barrels a day.**" (*Id*. ¶ 416.)

- On May 14, Suttles conducted an interview with Good Morning America and stated: "[O]urselves and the people from NOAA and others believe that **something around 5,000, that's actually barrels a day, is the best estimate**." (*Id*. ¶ 420.)

- Also on May 14, Suttles conducted an interview with The Today Show. In response to the question of whether BP had "underplayed" the size of the leak and if the leak could be "more than 5,000 barrels a day," Suttles stated: "I don't think it is wildly different than that number . . . **it could be a bit above or below**." (*Id*. ¶ 421.)

- Also on May 14, BP reasserted the 5,000-barrels-per-day figure on cnn.com and rejected an external estimate of 70,000 barrels per day. Dudley stated that the 70,000-barrels-per-day figure was "**not accurate at all**" and that it "**isn't anywhere I think within the realm of possibility.**" (*Id*. ¶ 422.)

- On May 17, during a Unified Command press briefing, in response to a question

16

of how certain BP was about the 5,000-barrels-per-day figure, Suttles stated: "*[T]hat's our best estimate today.* Clearly people are constantly asking that question." (*Id.* ¶ 425.)

- On May 19, McKay testified before a House committee.[5] In response to the question of whether "5,000 barrels per day" was the "most accurate" figure for the magnitude of the spill, McKay stated: "*That is our best estimate.*" (*Id.* ¶ 418.) Further, in response to the question of whether an external estimate of 70,000 barrels per day could be accurate, McKay stated: "It is theoretically possible. *I don't think anyone believes it is quite that high that has been working on this. I believe the uncertainty range is around that 5,000 number, and it could be higher. But if the number you are talking about is 70,000 barrels a day, I don't know this, but I don't think people that are working with it believe that that is a possibility.*" (*Id.*)

- On May 21, Suttles conducted another interview with Good Morning America. In response to a question of whether BP "deliberately underestimate[d] the size of the spill," Suttles stated: "I should actually point out that the 5,000 barrels a day . . . That was not just BP's estimate. That was the estimate of the Unified Command, including NOAA and the Coast Guard. *And that's the best estimate we have*." (*Id.* ¶ 427.)

- On May 22, Suttles conducted an interview with NPR's "Weekend Edition," in which he stated: "*[T]hose are the techniques we use to give an estimate, and 5,000 barrels a day was the best estimate we could do.*" Suttles also refuted the external estimate of 70,000 barrels per day: "*I've heard those estimates and seen them and I don't believe it's possible that it's anywhere near that number* . . . since I can't meter it, I can't actually say it couldn't be. But *all of our techniques say that that's highly unlikely*." Suttles also stated that the top kill technique— one of BP's failed attempts to stop the spill—would not complicate the situation because "*we don't think the rate's anywhere near that high [of 70,000 barrels per day].*" (Compl. ¶ 430.)

Time has proven the above estimates grossly inadequate. It is currently estimated that between 53,000 and 62,000 barrels of oil gushed from the Macondo well each day that the blowout was not contained. (Compl. ¶ 211.)  In the 87 days that it took BP to close the well, more than 4.9 million barrels of oil escaped into the Gulf of Mexico. (*Id.* ¶¶ 211, 324.) But even

---

[5] Although the Complaint indicates that the House testimony was given on May 10, 2010, Defendants clarify that it was given on May 19, 2010. (Doc. No. 48 ("Cons. MTD"), at 34 n.24.) The Court accepts Defendants' representation.

more importantly than the test of hindsight, Plaintiffs allege that the publicized estimates from April and May 2010 were contradicted by BP's own internal figures, shared only within a "circle of trust." (*Id.* ¶¶ 203-04, 214-15, 219, 409(a), 409(d), 433(a), 433(d)-(i).) They were also contradicted by numerous external estimates of which BP was aware. (*Id.* ¶¶ 207, 409(b)-(c), 433(b)-(c).) These figures did not yield a single identifiable consensus; they generally ranged from *at least* 5,000 to over 100,000 barrels per day. (*Id.* ¶¶ 203-04, 207, 214-15, 219, 409(a)-(d), 433(a)-(i).) But—with one exception—each belied the 5,000-barrel per day "best guess" repeated at least fifteen times in the thirty-two days following the disaster.[6]

## C.    Alleged Private Misrepresentations

In addition to the above public misrepresentations, Alameda County claims that it received and relied upon a number of private misrepresentations directed specifically to its investment manager, ██████ These statements were made during seven face-to-face meetings in which representatives from BP spoke with representatives from ██████

The first meeting occurred on November 29, 2006, before the release of the Baker Report. (Compl. ¶ 439(a).) BP's Investor Relations Director, Fergus MacLeod, represented BP. (*Id.*) ██████ entered the meeting with concerns about ████████████████████████ ████████████████████████████████████████████████████████ ██████████.[7] (*Id.*) BP countered these concerns by discussing the multiple independent

---

[6] The one exception is a BP-prepared estimate, provided to "BP's senior management" on or around April 26, stating that the possible range for the spill was 1,063 barrels per day to 14,266 barrels per day, with a "best" estimate of 5,758 barrels per day. (Compl. ¶¶ 204, 412.)

[7] In July 2005, BP experienced problems with the Thunder Horse PDQ, a newly-deployed production and drilling rig in the Gulf of Mexico which almost capsized due to the incorrect installation of a key internal valve. When the rig was dry-docked for repairs, it was discovered that the underwater pipelines beneath the rig were riddled with cracks. It took three years to

investigations into its safety practices—including the Baker Panel—and its "on-going" safety reform efforts. (*Id*.) BP informed ███████ that the "recent adverse events" were due to residual competing cultures from legacy companies that BP had acquired. (*Id*.) It emphasized that "BP was determined to learn lessons from Texas City;" that safety spending would be increased; and that steps had already been taken to "rectify [BP's] shortcomings." (*Id*.)

███████ met with BP again on February 7, 2007. (Compl. ¶ 439(b).) Hayward, Dudley, MacLeod, then-CEO Lord Edmund John Philip Browne, and BP executive John Manzoni represented BP. (*Id*.) Once again, the conversation focused on BP's safety issues. BP updated ███████ on the multiple independent investigations into Texas City and Prudhoe Bay. (*Id*.) BP stated that its strategy remained improvement of "safety and performance." (*Id*.) It indicated that "local checks and balances in compliance" had been instituted within the U.S. and that "BP assessed risk on an asset by asset basis and took action to reduce risk, so that risk in its business [was] lower . . . in an attempt to create a consistent operations system or a 'BP way.'" (*Id*.)

The third meeting occurred on September 17, 2007. (Compl. ¶ 439(c).) MacLeod represented BP. (*Id*.) BP again updated ███████ on developments regarding the Thunder Horse platform; the Prudhoe Bay pipeline spill; and the Texas City explosion. (*Id*.) BP claimed that it had "learned lessons" from Texas City that it would apply to other refineries. (*Id*.) It also spoke about the causes of the Thunder Horse incident, and steps that had been taken to prevent its recurrence. (*Id*.) Finally, BP claimed that, in the Continental United States, "BP had made a 5-year commitment to tight gas drilling and better crews." (*Id*.)

BP and ███████ met again on March 8, 2008. (Compl. ¶ 439(d).) BP's CFO, Byron Grote; BP's GVP – Russia, James Dupree; and a BP Investor Relations executive, Peter Hall,

---

complete the Thunder Horse repairs. (Compl. ¶ 56.)

represented BP. (*Id.*) ██████████████████████████████████████████████

██████████████████████████████████ (*Id.*) BP stated—as it did on November 29,

2006—that it would increase funding for safety and that "its cost cutting would not impact [its]

ability to conduct safe operations." (*Id.*) Specifically with regard to BP's reorganization efforts,

BP assured ████████ that "personnel reductions" would not "repeat the mistakes of the past."

(*Id.*) It claimed that reductions would be made to "overhead personnel," with operational

personnel being increased rather than reduced. (*Id.*) ████████ and BP also discussed the

Thunder Horse and Atlantis project delays. BP provided some insight into their causes and

discussed measures that had been taken in response—such as "putting contingencies in project

planning that were more realistic" and "set[ting] up a project academy at MIT" for project

engineers to attend. (*Id.*)

     BP's reorganization and cost cutting efforts were also a topic of conversation at the fifth

and sixth meetings. (Compl. ¶¶ 439(e)-(f).) Grote; a BP Investor Relations Manager, Craig

Marshall; and the COO of Fuels Value Chains, Tufan Erginbilgic, represented BP at the meeting

on March 17, 2009. (*Id.* ¶ 439(e).) At that meeting, BP discussed current and projected cost

cutting levels. (*Id.*) Grote; Marshall; and BP's CFO of E&P, Ellis Armstrong represented BP at

the meeting on March 3, 2010. (*Id.* ¶ 439(f).) At that meeting, ██████████████████████

████████████████████████████████████████████████. (*Id.*) BP

responded by promoting the efficiencies gained from its restructuring and cost cutting efforts.

(*Id.*)

     The last meeting occurred on March 18, 2010. (Compl. ¶ 439(g).) BP's Chairman, Carl-

Henric Svanberg, and three members of BP's Board of Directors—De-Anne Julius, William

Castell, and Ian Prosser—represented BP. (*Id.*) BP stated that safety continued to be a high

priority, and that "BP's standardized processes were being rolled out successfully throughout the company." (*Id*.)

Alameda alleges that the above misrepresentations tracked the statements disseminated to the public, reinforcing the false message that BP was improving its process safety procedures as a result of the Texas City explosion and the Baker Report recommendations. (*E.g.,* Compl. ¶¶ 176, 180.) Alameda also claims that BP's representations regarding its restructuring and cost cutting efforts were misleading because they were not accompanied by a disclosure that those efforts "had impacted and would impact [its] ability to deliver on prior safety representations." (*Id*. ¶¶ 439(e)-(f).)

## II.   PLAINTIFFS' CLAIMS

As noted above, only Alameda County and State-Boston purchased ADSs on the NYSE. Consequently, only Alameda County and State-Boston assert violations of section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 of the Securities and Exchange Commission ("SEC") against the corporate Defendants and the "Individual Fraud Defendants."[8,9] (Compl. ¶¶ 522-27.) They also assert violations of section 20(a) of the Exchange Act against the corporate Defendants and the Individual Fraud Defendants. (*Id*. ¶¶ 528-34.)

All Plaintiffs assert common law fraud and common law aiding and abetting fraud claims against the corporate Defendants and the Individual Fraud Defendants. (Compl. ¶¶ 535-46.) Additionally, all Plaintiffs assert common law negligent misrepresentation claims against all Defendants. (*Id*. ¶¶ 547-56.)

---

[8] The Court will refer to Alameda County's and State-Boston's claims arising under section 10(b) and Rule 10b-5 as "section 10(b)" claims.

[9] The "Individual Fraud Defendants" are defined as Hayward, Suttles, Inglis, Rainey, McKay, and Dudley. (Compl. ¶ 523.) Malone is not an Individual Fraud Defendant.

Finally, Plaintiffs bring several state statutory claims. All Plaintiffs bring statutory fraud claims against all Defendants based on the Texas Business & Commerce Code. (Compl. ¶¶ 557-61.) Alameda County also pursues statutory fraud claims against the corporate Defendants and the Individual Fraud Defendants under the California Corporations Code and the California Civil Code. (*Id*. ¶¶ 562-74.) Finally, State-Boston charges all Defendants with deceptive and unfair trade practices under Massachusetts law. (*Id*. ¶¶ 575-86.)

## III.   DEFENDANTS' MOTION

Defendants' Motion to Dismiss raises several possible grounds for dismissing part of Plaintiffs' case.[10] The substance of their arguments will be ordered, not as presented in their briefs, but in the sequence in which they are addressed herein.

- Defendants argue that several alleged misrepresentations are non-actionable under the Exchange Act for one or more of the following reasons: (1) the statements are too general to be actionable as fraud; (2) the statements are non-actionable opinions or statements of future intention; (3) the statements are not adequately pled as false; or (4) the statements are not adequately alleged to have been made with scienter. (Doc. No. 48 ("Cons. MTD"), at 56-64.)

- Defendants argue that English law applies to Plaintiffs' common law and state statutory claims. (*Id*. at 9-18.) They identify three available claims under English law: common law deceit; common law negligent misstatement; and statutory securities fraud under the Financial Services and Markets Act 2000 ("FSMA"). They raise the following arguments for dismissal of these three "state law" claims:

  o Plaintiffs fail to state a claim for deceit because they have not adequately alleged reliance or intent to induce reliance.

  o Plaintiffs fail to state a claim for negligent misrepresentation because they have not adequately alleged reliance or a duty to speak carefully.

---

[10] As noted in the previous section, Alameda County and State-Boston bring claims under the Exchange Act based on their purchases of ADSs on the NYSE. In the Class Action, the Court previously considered—and found viable—Exchange Act claims based on several alleged public misrepresentations in the Complaint. Those statements are not challenged in the Motion to Dismiss currently before the Court.

o   Plaintiffs fail to state a claim for statutory securities fraud because they have not adequately alleged reliance, because the law does not permit recovery for "holder" claims, and because statutory securities fraud cannot be asserted against the Individual Defendants.

(*Id*. at 18-42.) Alternatively, if the Court decides that Plaintiffs' English law claims survive the above challenges, Defendants argue that they should be dismissed under the doctrine of forum non conveniens. (*Id*. at 43-47.)

- Alternatively, if the Court decides that the law of any U.S. jurisdiction applies to Plaintiffs' common law and state statutory claims, Defendants argue that such claims are barred by the dormant commerce clause.[11] (*Id*. at 47-56.)

## IV.   LEGAL STANDARD FOR RULE 12(b)(6)

In considering a Rule 12(b)(6) motion to dismiss, the Court accepts all well-pleaded factual allegations as true and draws all reasonable inferences in favor of Plaintiffs. *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 406 (5th Cir. 2001). The Court does not accept as true, however, "conclusory allegations, unwarranted factual inferences, or legal conclusions." *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 550 (5th Cir. 2007) (citation omitted) (internal quotation marks omitted).

Because a Rule 12(b)(6) motion attacks the legal sufficiency of the claims, the Court must confine its analysis to the contents of the pleadings, including attachments thereto, with only two exceptions.  First, the Fifth Circuit allows the Court to consider certain documents attached to the motion to dismiss.  *See, e.g., Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000).  Such documents must be referenced in the complaint and central to Plaintiffs' claims.  *Id.* (citation omitted); *Scanlan v. Texas A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003).  Second, because this is a securities case, the Court may take judicial notice of the

---

[11] The Court does not reach the merits of Defendants' argument regarding the dormant commerce clause due to its resolution of choice of law.

contents of public disclosure documents that the law requires be filed with governmental agencies, such as the SEC, and that are actually filed with those agencies. *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1018 (5th Cir. 1996). However, these documents may be considered only for the purpose of determining what statements they contain, not for proving the truth of their contents. *Id.*

Regardless of the substantive law that governs Plaintiffs' claims, the Court will apply federal procedural law in this case. *Brown v. Miller*, 519 F.3d 231, 238 (5th Cir. 2008) ("[F]ederal courts use federal procedure even when applying state law[.]"). Accordingly, the Court must decide if Plaintiffs have stated a claim pursuant to the pleading rules contained in Rule 8 and Rule 9 of the Federal Rules.

## A. Rule 8(a) Notice Pleading

The default standard for pleading in federal court is contained in Rule 8(a):

> A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . .

Fed. R. Civ. Pro. 8(a)(2). This standard is commonly referred to as "notice pleading." Under notice pleading requirements, a complaint will survive a motion to dismiss as long as it contains sufficient factual allegations, accepted as true, to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* As noted above, the Court is required to accept only well-pleaded *factual* allegations as true; it does not accept as true "conclusory allegations, unwarranted factual inferences, or legal conclusions." *Cent. Laborers'*, 497 F.3d at 550 (citation omitted) (internal quotation marks omitted).

### B.    Heightened Pleading under Rule 9(b)

Plaintiffs' allegations of fraud must also meet the stricter standards of Rule 9(b), which provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "At a minimum, Rule 9(b) requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Benchmark Elec., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003) (citation omitted) (internal quotation marks omitted). The Fifth Circuit has explained that "Rule 9(b) requires 'the who, what, when, where, and how' [of the alleged fraud] to be laid out." *Id.* (quoting *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 179 (5th Cir. 1997)). Insufficiently particular fraud allegations are properly challenged by a Rule 12(b)(6) motion for dismissal for failure to state a claim. *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 n.8 (5th Cir. 2009); *Carter v. Nationwide Prop. and Cas. Ins. Co.*, 2011 WL 2193385, at *1 (S.D. Tex. June 6, 2011).

Rule 9(b)'s particularity requirement is "supplemental" to the *Iqbal* requirement that a pleading include facts that, taken as true, "state a claim to relief that is plausible on its face." *Grubbs*, 565 F.3d at 185. Thus, Rule 9(b) "requires only simple, concise, and direct allegations of the circumstances constituting fraud, which . . . must make relief plausible, not merely conceivable, when taken as true." *Id.* at 186 (internal quotation marks omitted).

### C.    Additional Pleading Requirements Imposed by PSLRA

Defendants suggest that Alameda County's and State-Boston's Exchange Act claims are further subject to the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"). (Cons. MTD at 58 n.43.) But the PSLRA is clearly limited to private actions brought as class actions. *See* 15 U.S.C. § 78u-4(a)(1) ("The provisions of this subsection shall

apply in each private action arising under this chapter that is brought as a plaintiff class action pursuant to the Federal Rules of Civil Procedure."). This action is not a class action. The PSLRA is therefore inapplicable.

Because the PSLRA has been used to judge the sufficiency of complaints filed in the Class Action, and because the Court will refer extensively to its rulings in that matter, it is important to note how the PSLRA enhances the pleading requirements of Rule 9(b). For each act or omission alleged to be false or misleading, the PSLRA requires Plaintiffs to "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A) (emphasis added). This provision alters how the Court views allegations relevant to scienter at the pleading stage. While the Court in a 12(b)(6) motion is typically required to draw all reasonable inferences from the alleged facts in the Plaintiffs' favor, the PSLRA obligates the Court to consider *all* possible inferences from the facts—both those supporting and those undercutting scienter—in order to evaluate whether a "strong" inference of scienter exists. *See Tellabs, Inc. v. Makor Issue & Rights, Ltd.* ("*Tellabs I*"), 551 U.S. 308, 323-24 (2007).

## V.    ALAMEDA COUNTY'S AND STATE-BOSTON'S FEDERAL CLAIMS

### A.    Legal Standards

#### 1.    Section 10(b)

Under section 10(b) of the Securities Exchange Act of 1934,

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or

26

appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). SEC Rule 10b–5, promulgated pursuant to section 10(b), implements section 10(b) by forbidding, among other things, the making of any "untrue statement of a material fact" or the omission of any material fact "necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b). The Supreme Court has inferred from the text of section 10(b) that it affords a right of action to purchasers or sellers of securities injured by its violation. *Tellabs I*, 551 U.S. at 318. To state a private claim under section 10(b), a plaintiff must allege the following: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation, i.e., a causal connection between the misrepresentation or omission and the loss. *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 238-39 (5th Cir. 2009).

### a.     Material Misrepresentations and Omissions

Because Alameda County and State-Boston assert securities fraud claims, they must satisfy the heightened pleading requirements of Rule 9(b). *See Tuchman v. DSC Communications Corp.*, 141 F.3d 1061, 1067 (5th Cir. 1994). As noted above, Rule 9(b) obligates a plaintiff to: (1) specify each statement alleged to have been misleading; (2) identify the speaker; (3) state when and where the statement was made; (4) plead with particularity the contents of the false representation; (5) plead with particularity what the person making the misrepresentation obtained thereby; and (6) explain the reason or reasons why the statement is misleading, *i.e.*, why the statement is fraudulent. *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002). These allegations constitute the "who, what, when, where, and how" of the alleged

fraud. *Id.*

To be actionable, a misrepresentation of a fact, or an omission of a fact, must be material. The Supreme Court recently reaffirmed that there is no bright-line rule for determining whether information withheld from a company's filings is material as a matter of law. *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1318–22 (2011). Unwilling to allow materiality to be reduced to a test of "statistical significance," the Court held instead that assessing materiality involves a "fact-specific inquiry . . . that requires consideration of the source, content, and context" of the allegedly omitted information. *Id.* at 1321 (citation omitted) (internal quotation marks omitted). The misrepresentation of a fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in making an investment decision. *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988).  For an omission to be material, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available. *Id.* at 231-32; *see also Krim v. BancTexas Grp., Inc.*, 989 F.2d 1435, 1445 (5th Cir. 1993) (explaining that the appropriate inquiry is whether the statement or omitted fact is significant, "such that it alters the 'total mix' of information available about the proposed investment"). Materiality is not judged in the abstract, but in light of the surrounding circumstances. *Rubinstein v. Collins*, 20 F.3d 160, 168 (5th Cir. 1994).

### b.      Scienter

Section 10(b) and Rule 10b–5 do not protect investors against negligence or corporate mismanagement. *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 539 (5th Cir. 2008). To establish a section 10(b) claim, a private plaintiff must prove that the defendant acted with scienter. *Tellabs I*, 551 U.S. at 319.

In the context of federal securities fraud, scienter is "defined as 'an intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it.'" *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009) (quoting *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 643 (5th Cir. 2005)); *see also Plotkin v. IP Axess Inc.*, 407 F.3d 690, 697 (5th Cir. 2005) ("[A] securities fraud plaintiff must prove that the defendant either consciously misbehaved . . . or was so severely reckless that it demonstrates that the defendant must have been aware of the danger of misleading the investing public."). Severe recklessness is "'limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.'" *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 866 (5th Cir. 2003) (quoting *Nathenson*, 267 F.3d at 408).

The Fifth Circuit has rejected the group pleading approach to scienter. *Shaw Grp.*, 537 F.3d at 533-34. As a result, the court may not "construe allegations contained in the Complaint against the 'defendants' as a group as properly imputable to any particular individual defendant unless the connection between the individual defendant and the allegedly fraudulent statement is specifically pleaded." *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.,* 365 F.3d 353, 365 (5th Cir. 2004). A connection is properly pleaded if Plaintiffs allege that a particular individual signed the document in which a statement appears, or if Plaintiffs adequately allege the individual's involvement in creating the document. *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006). The Court can then evaluate the adequacy of Plaintiffs'

scienter allegations by looking to the "state of mind of the individual corporate official or officials 'who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment.'" *Shaw Grp.*, 537 F.3d at 533 (quoting *Southland*, 365 F.3d at 366).

Because of the above pleading rules, scienter usually cannot be established in the absence of a connection between the statement and a particular individual. The Court has recognized, however, a work-around for unattributed corporate statements crafted by the Seventh Circuit in *Makor Issue & Rights, Ltd. v. Tellabs, Inc.* ("*Tellabs II*"), 513 F.3d 702 (7th Cir. 2008). The Seventh Circuit hypothesized that "it is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted  and disseminated the fraud." 513 F.3d at 710. By way of example, the *Tellabs II* court cited a hypothetical announcement by General Motors that it had sold one million SUVs in a given year when it had in fact sold zero. *Id.* Subsequent courts to have considered application of this potential roundabout—including this one—have underscored that it is narrow indeed. *See*, *e.g.*, *In re BP p.l.c. Securities Litig.* ("*BP III*"), 922 F. Supp. 2d 600, 636 (S.D. Tex. 2013) (falsity must be so "egregious" that "intent to deceive or recklessness may be presumed from the face of the statement itself"); *In re Dell Sec. Litig.*, 591 F. Supp. 2d 877, 899 (W.D. Tex. 2008) (falsity must be "so dramatic" that it "would have been approved by corporate officials sufficiently knowledgeable about the company to *know* that the announcement was false") (citation omitted) (internal quotation marks omitted).

## 2. Section 20(a) claims

Under section 20(a) of the Exchange Act, "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation

thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."  15 U.S.C. § 78t(a).  Section 20(a) is a secondary liability provision, and plaintiffs must therefore establish a primary violation under section 10(b) before liability arises under section 20(a). *ABC Arbitrage*, 291 F.3d at 348 n. 57 (noting that "control person" liability is "derivative, i.e., such liability is predicated on the existence of an independent violation of the securities laws").  Accordingly, if a plaintiff fails to state a claim for a primary securities fraud violation under section 10(b) or Rule 10b-5, the plaintiff necessarily fails to state a claim for control person liability under section 20(a). *See, e.g., Blackwell*, 440 F.3d at 288.

### B.    Effect of Rulings in the Class Action

The Court recently ruled on a motion to dismiss the Second Amended Complaint in the Class Action. Pursuant to this ruling, Plaintiffs have elected not to pursue claims based on two alleged misstatements—one made by Hayward during a July 24, 2007 investor call, and another made by Inglis during a September 25, 2007 industry conference. (Doc. No. 55 ("Cons. Opp."), at 8 n.1.) The Court therefore grants Defendants' Motion to Dismiss as to these alleged misstatements.

In addition to these two statements, Plaintiffs also assert claims based on several alleged public misstatements which have been found by the Court to be insufficiently pled—in total or in part—in the Class Action. As Plaintiffs do not indicate that they are abandoning these alleged misstatements, they will be addressed below, with reference to the Court's prior rulings.

### C.     Analysis

Defendants seek dismissal of Alameda County's Exchange Act claims predicated on statements made in the seven face-to-face meetings between BP and ███████ (Cons. MTD at 36-40.) They incorporate by reference arguments for dismissal of Alameda County's and State-Boston's claims predicated on thirteen public statements included in the Second Amended Complaint, as set forth in a motion to partially dismiss that pleading in the Class Action. (*Id*. at 5, 56.) Finally, they seek dismissal of Alameda County's and State-Boston's claims predicated on six public statements not included in the Second Amended Complaint in the Class Action. (*Id*. at 5, 56-64.) Defendants claim that these statements are not actionable for one or more of the following reasons: (1) the statements are too general to be actionable as fraud; (2) the statements are non-actionable opinions or statements of future intention; (3) the statements are not adequately pled as false; or (4) the statements are not adequately alleged to have been made with scienter.

### 1.     Alleged Misrepresentations from the ███████ Meetings

#### a.     Falsity

Defendants claim that none of the alleged statements from the face-to-face meetings between BP and ███████ (investment advisor to Alameda County) can serve as the basis of a 10(b) claim. Defendants' first complaint is that Alameda County's allegations do not satisfy Rule 9(b), because they do not allege: (1) what exact statements were made; (2) by whom; (3) why the statements were false or misleading; and (4) what facts support the assertion that the speakers spoke with scienter. (Cons. MTD at 37.) Defendants further suggest that, even if Alameda County amended to comply with the requirements of Rule 9(b), the statements from the face-to-face meetings would be non-actionable because they are (1) factual information about the

company not alleged to be misleading and (2) general positive statements that do not convey any actionable representation of fact. (*Id*. at 37-39.)

The Court finds that Alameda County has adequately identified the content of statements allegedly made at the various ▬▬▬▬ meetings. It has trouble, however, identifying which specific statements are alleged to be false. The Complaint is of little assistance in this regard. Unlike the public statements, the specific language complained of in the ▬▬▬▬ meetings is not separately identified by use of italics or bolding.

Fortunately, Alameda County's opposition brief sheds some light on the basis of its claims. First, Alameda County maintains that certain statements identified are similar to public statements regarding the Baker Report which have been held actionable in the Class Action. (Cons. Opp. at 28-29.) It also argues that the BP representatives in attendance misled ▬▬▬▬ by omitting key information regarding their safety reform efforts and continued risk exposure. (*Id*. at 25-29.) These alleged omissions include: (1) that BP had not adequately implemented the recommendations of the Baker Panel; (2) that BP had not and would not implement OMS on rigs and operational sites not fully owned by BP; (3) that BP was not prepared to respond adequately to a drilling accident in deepwater; and (4) that BP's cost cutting efforts had jeopardized its ability to deliver on its promises of safety reform. (*Id*. at 28, 30.)

It is undeniable that Alameda County's allegations depict a series of encounters between ▬▬▬▬ and BP in which safety issues occupied center stage. Repeatedly, ▬▬▬▬ focused the conversation on ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. But the Court may not presume the falsity of BP's statements to ▬▬▬▬ solely on the basis that safety featured prominently in each conversation and that BP subsequently suffered another

catastrophic process safety failure on the Deepwater Horizon. Rather, to be actionable, Defendants' alleged misrepresentations regarding safety must be capable of being adjudged either true or false when made.

The line between optimism and misdirection can be quite fine, as the Court has previously emphasized. In the Class Action, the Court found actionable certain public statements regarding BP's progress on recommendations made in the Baker Report. *See BP I*, 843 F. Supp. 2d at 757-59. The Court reached the opposite conclusion, however, when it came to certain public statements that touted BP's "progress" on process safety reform generally, or that declared a corporate commitment to safety. *Id*. at 754-57, 766-67. The Court noted that the Baker Report provided a "clear roadmap" by which the truthfulness of BP's statements about its safety reform efforts could be gauged, while generalized, aspirational statements about the importance of safety and BP's "progress" on safety performance could not reliably be measured as true or false. *Id*. at 756-59, 767. This same razor-edge—dividing material representations from immaterial corporate puffing—will govern whether Alameda County has stated a viable 10(b) claim on the basis of BP's private statements to ▮▮▮▮▮.

Several alleged misrepresentations from the ▮▮▮▮▮ meetings involve tangible, factual statements regarding incidents at Prudhoe Bay, Thunder Horse, and Atlantis and steps taken in response thereto. These include the following statements:

- Statements during the September 17, 2007 meeting that "BP has to make sure nothing goes wrong" with Alaska pipelines which were being replaced and that "mistakes had been made in design [on Thunder Horse] . . . but . . . project management was brought back in-house." (Compl. ¶ 439(c).)

- Statements during the March 3, 2008 meeting that "Thunder Horse and Atlantis project delays had involved unproven technology;" that "BP was too confident and did not recognize the full risks [in those projects]"; that "key lessons were learnt from the Thunder Horse experience [which] are unique to BP and can be

used in future projects;" that, as a result, "BP was putting contingencies in project planning that were more realistic;" and that "BP had set up a project academy at MIT . . . which all project engineers would attend[.]" (*Id.* ¶ 439(d).)

Although most of the above statements are of the type that can be assessed as true or false, Plaintiffs have made no allegations suggesting that they were untrue. Nor are the topics at issue so deeply intertwined with the Baker Report; OMS; BP's oil spill response capabilities; or BP's cost-cutting efforts that—even if true on their face—they were rendered misleading by the "omissions" suggested by Plaintiffs. *See Stichting Pensioenfonds ABP v. Merck & Co., Inc.*, Civil Action No. 05–5060, 2012 WL 3235783, at *4-5 (D.N.J. Aug. 1, 2012) (recognizing that alleged fraudulent omissions must be "related to the subject matter of the [affirmative] statement"). Because Alameda County has not adequately alleged that the above statements were false when made, they cannot form the basis of a viable 10(b) claim.

Just as the Prudhoe Bay, Thunder Horse, and Atlantis incidents were commonly discussed during the face-to-face meetings, ███████ and BP also spoke often and at length about Texas City. The following statements, germane to Texas City, are alleged by Plaintiffs to have been misleading:

- Statements during the November 29, 2006 meeting that "internally, BP had already made efforts to rectify its shortcomings;" that BP "was already beefing up refinery turnaround procedures;" that "things at BP will change as a result of what happened;" that "BP was determined to learn lessons from Texas City;" and that the Texas City disaster occurred, in part, because of a "persistence of different cultures of the companies BP had acquired . . . [as] each major facility still had its own way of doing things[.]" (Compl. ¶ 439(a).)

- Statements during the February 7, 2007 meeting that "risk in [BP's] business is now lower" because "BP assessed risk on an asset by asset basis and took action to reduce risk . . . in an attempt to create a consistent operations system or a 'BP way.'" (*Id.* ¶ 439(b).)

- A statement during the September 17, 2007 meeting that "BP had learned lessons from the Texas City Refinery that could apply to its other refineries[.]" (*Id.* ¶

35

439(c).)

Alameda County argues that these statements resemble the public statements regarding BP's progress on the Baker Panel recommendations which have already been found actionable. (Cons. Opp. at 28-29.) It also argues that BP's statements were misleading because they did not disclose that "BP had not adequately implemented the recommendations of the Baker Panel or OMS" and that "BP did not implement and had no intention of implementing OMS at rigs or other operational sites that were not fully-owned by BP[.]" (*Id.* at 30.)

The statements made during the November 29, 2006 meeting certainly foreshadow Defendants' later public representations regarding progress made on the Baker Panel recommendations. Nonetheless, Alameda County has not adequately alleged that the November 29, 2006 statements were false. The Baker Report was not released until January 2007. Plaintiffs have not alleged that either BP or ▇▇▇▇▇ had any advance notice of its contents or recommendations. Therefore, in November 2006, the BP representatives meeting with ▇▇▇▇▇ could not possibly have rooted their alleged "ongoing" efforts to "rectify their shortcomings" in the Baker Report. Nor can the Baker Report provide a yardstick to judge the truth or falsity of BP's statements.

Although this chronological inconsistency is resolved with the September 17, 2007 meeting, the Court cannot discern how the single Texas City-related statement from this meeting is alleged to be false. The statement indicated that BP had cross-applied lessons learned from Texas City to its other refineries. Nothing in the Complaint impugns the accuracy of this statement, or indicates how an alleged falsehood regarding BP's refineries relates to the fall-out from a later disaster in BP's offshore drilling operations.

The Court agrees, however, that Alameda County has adequately alleged the falsity of the

Texas City-related statement from the February 7, 2007 meeting. Less than three months after BP had informed ▮▮▮▮ that the Texas City incident was partially due to competing safety cultures at different legacy operating sites, BP indicated that risk in its business had been "lower[ed]" due to the "creat[ion of] a consistent operations system"—a "'BP way.'" (Compl. ¶ 439(b).) This statement evoked the Baker Panel recommendation to "establish and implement an integrated and comprehensive process safety management system"—which was purportedly addressed by BP's OMS. (*Id.* ¶¶ 74, 77.) Alameda County has adequately alleged that BP's statement to ▮▮▮▮ was a misleading half-truth, by failing to indicate that the "lower[ed]" risk profile stemming from BP's "consistent operations system" referred only to sites fully-owned and operated by BP—despite BP's professed intention to apply the Baker Panel recommendations across all lines of business worldwide.

Similarly, the Court finds that Alameda County has adequately alleged the falsity of the following statement from the March 18, 2010 meeting:

- "BP's standardized processes were being rolled out successfully throughout the company." (Compl. ¶ 439(g).)

Although not expressly linked to either Texas City or the Baker Panel, it can reasonably be inferred—both in the context of BP and ▮▮▮▮'s prior interactions and in the context of BP's simultaneous public statements—that the "standardized processes" referred to BP's OMS. For the reasons articulated above, as well as in the Court's prior orders, this statement is adequately alleged as misleading due to the failure to disclose that the substance of the OMS architecture did not apply to, and was not intended to be implemented on, contractor-owned sites.

During these sessions with ▮▮▮▮, multiple representations were made regarding BP's efforts to streamline its organization and to cut costs, and how these efforts would not detract

from BP's focus on safety. These include the following:

- Statements during the November 29, 2006 meeting that BP would increase spending on safety issues and that it would be "difficult to focus on costs at the same time as safety and integrity were taking priority." (Compl. ¶ 439(a).)

- Statements during the March 3, 2008 meeting that "personnel reductions as part of BP's reorganization would not repeat the mistakes of the past;" that "reductions were overhead personnel;" that "operational [employees] were being increased rather than reduced;" and that its cost cutting would not impact [its] ability to conduct safe operations[.]" (*Id*. ¶ 439(d).)

- Statements during the March 17, 2009 meeting regarding "current and projected cost cutting levels," which were allegedly misleading because they did not disclose "that the cuts had impacted and would impact BP's ability to deliver on its prior safety representations." (*Id*. ¶ 439(e).)

- A statement during the March 3, 2010 meeting—made in the context of ██████ "concerns regarding ████████"—that BP had "improved efficiency," which was allegedly misleading because it did not "disclos[e] that the restructuring and cost reduction had impacted and would impact BP's ability to deliver on its prior safety representations." (*Id*. ¶ 439(f).)

In a prior order in the Class Action, the Court dismissed 10(b) claims based on public statements that BP would prioritize safety over its efforts to cut costs. The Court reasoned that plaintiffs in the Class Action (the "Class Action Plaintiffs") had failed to demonstrate—beyond conclusory allegations—how BP's reorganization affected its safety budget, safety personnel, and safety capabilities. *See BP I*, 843 F. Supp. 2d at 767-68. The Court found that the Class Action Plaintiffs had failed to connect BP's reorganization to specific safety failures, and therefore had not adequately alleged that the public statements were false. *See id*. The same analysis and conclusion pertain to the ██████ statements above.

Finally, in its opposition brief, Alameda County highlights a number of alleged misrepresentations that address more broadly BP's safety reform efforts. These include:

- A statement during the November 29, 2006 meeting that "things at BP will

change" as a result of Texas City, "with a focus on safety, integrity, and performance in all of BP's divisions[.]" (Compl. ¶ 439(a).)

- Statements during the February 7, 2007 meeting that "BP's strategy . . . [was to] focus . . . on safety and performance" and that "BP had implemented local checks and balances in compliance[.]" (Compl. ¶ 439(b).)

- A statement during the September 17, 2007 meeting that "BP had made a 5-year commitment to tight gas drilling and better crews [in the lower 48 U.S. states]." (*Id*. ¶ 439(c).)

- A statement during the March 18, 2010 meeting that "there was a clear and increasing focus on safety at BP[.]" (*Id*. ¶ 439(g).)

Alameda County has not indicated how any of these statements was misleading. Indeed, all of the statements are of the generalized, aspirational character that the Court has previously found non-actionable as a matter of law. *See BP I*, 843 F. Supp. 2d at 756-57, 766-67. Such statements will not support a 10(b) claim.

### b.   Scienter

Defendants argue that scienter has not been adequately pled for any of the statements made directly to ▇▇▇▇▇▇ They note that most of the statements are unattributed to any specific individual, and that the few attributed statements were made by individuals other than the Individual Defendants, for whom no scienter allegations have been made. (Cons. MTD at 39-40.)

As explained above, only two of the alleged misrepresentations made to ▇▇▇▇▇▇ have been adequately alleged as false. These are:

- The statement during the February 7, 2007 meeting that BP's risk had been "lower[ed]" through an "attempt to create a consistent operations system, or a 'BP way.'" (Compl. ¶ 439(b).) Several individuals represented BP at the meeting, including Hayward and Dudley. However, no individual is identified as having made the alleged misstatement. It is therefore an unattributed corporate statement.

- The statement during the March 18, 2010 meeting that BP's standardized processes were being rolled out successfully throughout the company. (*Id*. ¶ 439(g).) Several individuals represented BP at the meeting, but none is specified

as having made the alleged misstatement. It is therefore an unattributed corporate statement.

Alameda County notes that the Court found the Class Action Plaintiffs had adequately alleged that Hayward, Suttles, BP plc, BP America, and BP E&P possessed scienter for public misrepresentations. (Cons. Opp. at 30.) Because the scienter allegations in the Complaint are substantially identical to the scienter allegations in the Class Action, Alameda County argues, the Court may find scienter for the ███ misstatements as well. (*Id*. at 30-31.)

Alameda County's argument leapfrogs many required steps in the Court's analysis. The Court's prior scienter findings are only germane to the extent that: (1) the individuals involved are the same; (2) the alleged misrepresentations are related; and (3) the timing of the statement is consistent with the allegations supporting scienter. None of the ███ statements is alleged to have been made by Suttles. Nor are any of the ███ statements related in subject matter to Suttles's alleged misrepresentations regarding the magnitude of the oil spill—an unsurprising fact given that the ███ meetings all occurred prior to the Deepwater Horizon disaster. Put simply, the scienter allegations relevant to Suttles have no bearing on any ███ statement.

As for Hayward, he too is not identified as having made any of the alleged misrepresentations to ███. But he is alleged to have been *present* at the February 7, 2007 meeting. Plaintiffs argue that Hayward had a duty to correct any misrepresentations made by others at the meeting. (Cons. Opp. at 31.) The alleged misrepresentation from that meeting involved BP's "consistent operations system"—which the Court interpreted, above, as a reference to OMS. The Court found that the Class Action Plaintiffs had adequately alleged Hayward's scienter for similar OMS-related statements. The Court reasoned that, as alleged, Hayward understood the limitations to the OMS design with regards to contractor-owned sites,

or that he was reckless in not doing so. *See BP III*, 922 F. Supp. 2d at 625-28. Therefore, if Alameda County is correct that Hayward can be liable for securities fraud on the basis of failing to correct misrepresentations made by others, the Court's prior scienter findings as to Hayward would be germane.

Alameda County's theory finds some support in Fifth Circuit law. In *Barrie v. Intervoice-Brite, Inc.*, the Fifth Circuit recognized that a viable securities fraud claim could be grounded in a defendant's alleged failure to correct misrepresentations made by another in his presence. 397 F.3d 249, 263 (5th Cir. 2005). A subsequent case clarified that *Barrie* was only consistent with the Fifth Circuit's general prohibition on "group pleading" if the plaintiff specifies who made the alleged misstatement, and who remained silent despite knowing that the statement was false. *See Blackwell*, 440 F.3d at 288. The Complaint does not contain this level of detail. Because Plaintiffs have not specified Hayward's role in the February 7, 2007 misrepresentation, his alleged scienter is not germane.

Alameda County also argues, in the alternative, that the OMS-related misrepresentations from the ███████ meetings rise to the level of egregious falsity contemplated in *Tellabs II*, obviating any need to attribute the statements to specific individuals with scienter. (Cons. Opp. at 31.) The argument is foreclosed by a prior finding in the Class Action. As the Court noted in that case, Defendants persuasively argued that the alleged misrepresentations regarding the scope of OMS are actually faithful to the OMS design. *See BP III*, 922 F. Supp. 2d at 630. As a result, it is impossible to say that any individual responsible for the statements at issue must have known their misleading nature.

Because the statements from the February 7, 2007 and March 18, 2010 meetings with ███████ were not extraordinarily false on their face, Alameda County needed to attribute or

link them to individuals with the requisite scienter. This, Alameda County has failed to do. The statements do not support viable 10(b) claims.

### 2. Alleged Public Misrepresentations Regarding OMS

Defendants have incorporated arguments for dismissal lodged against several public OMS-related statements also at issue in the Class Action Complaint. Since the filing of the Motion to Dismiss at issue in this case, the Court has ruled on Defendants' arguments in the Class Action. With one exception, noted below, the Court finds that its rulings are applicable in the context of the Complaint at issue here. Specifically, Alameda County and State-Boston have adequately alleged both falsity and scienter for the following public OMS-related statements:

- Hayward's statement in the 2008 Annual Review that OMS "turns the principle of safe and reliable operations into reality by governing how every BP project, site, operation and facility is managed." (Compl. ¶ 355.)

- The statements in the 2008 Annual Report, signed by Hayward, that OMS is a "framework for operations across BP that is integral to improving safety and operating performance in every site" and that the Gulf of Mexico "completed the transition to OMS in 2008." (*Id*. ¶ 358.)

- Hayward's statement in the 2008 Sustainability Review that OMS is "to be implemented at each BP site." (*Id*. ¶ 370.)

- Statements in the 2009 Annual Review, reviewed by the Board of Directors, including Hayward, that OMS "provides a common framework for all BP operations" and "enables each site to focus on the most important risks in its own operations[.]" (*Id*. ¶ 377.)

- Statements in the 2009 Annual Report, signed by Hayward, that OMS "provides a common framework for all BP operations;" is a "single operating framework for all BP operations;" and is "being progressively adopted by all operating sites[.]" (*Id*. ¶ 379.)

- Hayward's statement in the 2009 Sustainability Review which reinforced that OMS had been implemented in the Gulf of Mexico in 2008. (*Id*. ¶ 385.)

In the Class Action, the Court dismissed the 10(b) claim against Inglis based on his

statement at a 2010 industry conference that OMS "provides a single, consistent framework for our operations[.]" (Compl. ¶ 381.) The Court found that the statement was adequately alleged as false, but that the allegations failed to give rise to a *strong* inference of scienter, as required by the PSLRA. *See BP III*, 922 F. Supp. 2d at 624, 628-29. This finding cannot be reflexively applied in this case because, as noted above, the PSLRA does not govern Alameda County's and State-Boston's 10(b) claims. The Court must re-evaluate the allegations to determine whether they support a *plausible* inference of scienter, as required by Rule 8(a) and *Iqbal*.

The Court finds that they do. Alameda County and State-Boston have alleged that Inglis was a member of GORC, a committee convened specifically to oversee and shepherd the OMS implementation project. (Compl. ¶¶ 31, 77.) This committee allegedly reviewed and approved the guidelines governing the structure of OMS. (*Id.* ¶ 95.) GORC also allegedly discussed how the implementation of OMS would be limited to project sites owned and operated by BP. (*Id.*) Inglis was the CEO of the Exploration and Production business segment and, according to Alameda County and State-Boston, the author of a July 2009 email in which he noted that "conformance with Control of Work (CoW) practices"—a facet of OMS—"on many of [BP's] contractor operated drilling rigs, falls short of BP expectations." (*Id.* ¶¶ 31, 169-70.) These allegations fairly suggest that Inglis knew that the components of OMS would be implemented only on assets owned or controlled by BP. The Court previously found that the allegations did not give rise to a *strong* inference that Inglis spoke with intent to mislead regarding the scope of OMS. *See BP III*, 922 F. Supp. 2d at 628-29. However, they do present a *plausible* case that Inglis was not entirely forthcoming during his 2010 presentation at the Howard Weil Energy Conference. The statement is actionable.

The remaining public OMS-related statements, however, are deficient and cannot support

a 10(b) claim. For four of the statements, Alameda County and State-Boston have adequately

pled falsity, but not corporate scienter under the exacting requirements of *Tellabs II*.[12] These are:

- Statements in the 2006 Sustainability Report that OMS "covers all aspects of our operations" and "will apply to all operations by the end of 2010[.]" (Compl. ¶ 333.)

- The statement in the 2008 Annual Review that the Gulf of Mexico "completed the migration to the OMS in 2008." (*Id*. ¶ 354.)

- The statement from the 2009 Sustainability Review that OMS "provides a single framework for all BP operations to follow[.]" (*Id*. ¶ 387.)

- The statement from the 2009 Sustainability Report that OMS is "a cornerstone of achieving safe, reliable and responsible operations at every BP operation." (*Id*. ¶ 390.)

Finally, two OMS-related statements made by Hayward are too general and ephemeral to

support Plaintiffs' theory of falsity. These are:

- Hayward's statement—delivered both at the 2008 Strategy Presentation and the 2008 Annual General Meeting—that BP has "begun to implement a new Operating Management System across all of BP's operations." (Compl. ¶¶ 347, 349.)

### 3.    January 16, 2007 Press Release

A press release issued January 16, 2007 stated that "BP already has taken a number of

actions which align with the recommendations of the [Baker Panel]." (Compl. ¶ 331.) This

statement closely resembles other alleged misrepresentations of progress on the Baker Panel

recommendations, which the Court found adequately alleged as false. *See BP I*, 843 F. Supp. 2d

---

[12] Despite the fact that the PSLRA does not govern the Complaint, the Court need not revisit its scienter findings from the Class Action for unattributed corporate statements. Those findings evaluated whether unattributed corporate statements were so egregiously false that scienter may be inferred despite the failure to connect the statements to specific individuals. *See Makor Issues & Rights, Ltd. v. Tellabs Inc.* ("*Tellabs II*"), 513 F.3d 702, 710 (7th Cir. 2008). Because attribution is required by section 10(b), Rule 10b-5, and Rule 9(b), the Court would reach the same conclusion even without the PSLRA's requirement of a "strong" inference of scienter.

at 757-59. But the Court also found that the statements were not so egregiously false as to circumvent the requirement that they be linked to specific individuals with knowledge of their misleading nature. (Doc. No. 327 at 2, Civ. Act. No. 10-md-2185, *In re: BP p.l.c. Securities Litigation*.) Nothing in Plaintiffs' Complaint compels a different conclusion. Because Plaintiffs have not adequately alleged corporate scienter for the January 16, 2007 press release, it is not actionable under Section 10(b).

### 4.   May 16, 2007 House Testimony

On May 16, 2007, Malone testified before the U.S. House of Representatives Committee on Energy and Commerce, Subcommittee on Oversight and Investigations. (Compl. ¶ 335.) During his testimony, he stated, "[t]oday, I want to assure you that we get it. We have learned lessons of the past." (*Id.*) He also stated: "BP America is committed to safety." (*Id.*) The Court previously found that these statements were too general to be actionable as securities fraud. *See BP I*, 843 F. Supp. 2d at 757. The Court maintains this position.

Malone also testified that he met with employees "to reinforce my expectations of them: that they must ensure that our operations are safe, that they understand they have both a right an responsibility to shut down any process they feel is unsafe or operationally unsound, and that they are encouraged to raise concerns on any issue." (Compl. ¶ 335.) He concluded that: "BP does not tolerate retaliation against workers who raise safety concerns." (*Id.*) The Court previously found that this testimony was adequately alleged as false, in light of persistent, continued retaliation against BP's employees both before and after Malone's statement. *See BP I*, 843 F. Supp. 2d at 764-66. However, the Class Action Plaintiffs had not adequately alleged Malone's knowledge of the retaliation. Although Malone was supposedly informed of retaliation in 2008, his knowledge *after* his May 2007 testimony is irrelevant to the issue of whether he

knowingly misspoke in May 2007. *See id*. at 785. Plaintiffs have provided no new allegations regarding Malone's scienter, and his *post hoc* awareness of retaliation does not present a plausible theory for liability under Rule 8(a). Because Plaintiffs have not adequately alleged Malone's scienter for the May 16, 2007 testimony, it is not actionable under Section 10(b).

### 5.    October 25, 2007 Press Release

A press release issued October 25, 2007 quoted Malone as stating: "In the months and years since [Texas City and Prudhoe Bay] occurred, we have made real progress in the areas of process safety performance and risk management." (Compl. ¶ 341.) In the Class Action, the Court found that this statement was adequately alleged as false, because it grounded promises of "real progress" in the specific recommendations of the Baker Panel. *See BP I*, 843 F. Supp. 2d at 757-59. The Court ultimately found the statement not actionable, however, because the Class Action Plaintiffs had not adequately alleged that Malone knew BP had failed to implement the process safety measures recommended by the Panel. *See id*. at 784-85. The fact that Malone served on BP's executive management team and was involved in the day-to-day running of BP was not sufficient for purposes of establishing scienter. *Id*. at 785. Plaintiffs have provided no new allegations regarding Malone's scienter for the October 25, 2007 statement. Consequently, it remains non-actionable.

The press release also stated: "BP America is in the midst of a comprehensive effort to improve its safety culture and to strengthen and standardize process safety and risk management programs at all BP-operated facilities." (Compl. ¶ 341.) Although OMS is not explicitly mentioned, the reference to "standardiz[ing] process safety and risk management programs" likely invokes the OMS project. Additionally, the representation that programs would be standardized "at all BP-operated facilities" is substantially similar to other OMS-related

statements that have been held actionable in the Class Action. *See BP III*, 922 F. Supp. 2d at 618-24. The Court therefore finds that this statement is adequately alleged as false. The statement is not attributed to any specific individual, however. Defendants have demonstrated that such statements can be fairly interpreted as consistent with the OMS framework. *See id*. at 630. Because the OMS-related statement in the October 25, 2007 press release does not rise to the level of patent, obvious falsity which would support a finding of corporate scienter, it is not actionable in the absence of individualized scienter allegations.

### 6. November 19, 2009 Senate Testimony

On November 19, 2009, Rainey gave testimony before the U.S. Senate Committee on Energy and Natural Resources. Rainey stated that "[r]eleases from oil and gas operations are rare," due in part to "the application of technology" such as "[b]lowout preventer technology which includes redundant systems and control" and "BP's fiber optic network in the US Gulf of Mexico which allows us to monitor well pressures in real time, both at the facility and in our offices in Houston." (Compl. ¶¶ 374-75.) Plaintiffs allege that this portion of Rainey's testimony was false, because: (1) redundancies on the Deepwater Horizon's blowout preventer had been deliberately removed by Transocean, at BP's behest, and (2) no one in Houston monitored the well pressures for the Macondo well, either prior to or during the evening of April 20, 2010, when the well blew. (*Id*. ¶ 376(d)-(e).) The Court finds these details sufficient to allege the falsity of Rainey's testimony regarding BP's spill prevention technology.

Plaintiffs have not adequately alleged that Rainey was aware of these contradictory facts, however—either specifically with regards to the Deepwater Horizon and the Macondo well, or more generally with regards to BP's typical operations in the Gulf of Mexico. Indeed, the only relevant scienter allegations for Rainey involve his position as BP America's Vice President of

Exploration for the Gulf of Mexico and his alleged participation in a 2009 "gap assessment" which "identified significant risks to BP in the Gulf of Mexico." (Compl. ¶ 33.) Plaintiffs do not specify what "significant risks" were identified through the 2009 gap assessment, nor whether the gap assessment took place before or after Rainey's November 2009 testimony. Without more information, Rainey's scienter may not be presumed solely on the basis that he occupied a position of importance in the BP hierarchy. *See In re Franklin Bank Corp. Securities Litig.*, 782 F. Supp. 2d 364, 376 (S.D. Tex. 2011).

A similar fate befalls the portion of Rainey's testimony directed to BP's oil spill response capabilities. Rainey stated: "All of our production facilities have contingency plans that identify the procedures, response equipment, and key personnel needed for responding to [accidental discharge] incidents." (Compl. ¶ 375.) The Class Action Plaintiffs, utilizing similar allegations, adequately alleged the falsity of this statement, but not Rainey's scienter. *See BP I*, 843 F. Supp. 2d at 763-64, 781. Plaintiffs have no new allegations relevant to Rainey's knowledge of BP's oil spill response capabilities.[13] The statement cannot support a 10(b) claim.

### 7.    2009 Sustainability Report

BP's 2009 Sustainability Report, issued on April 15, 2010, claimed that BP's "operating facilities have the capacity and resources to respond to spill incidents[.]" (Compl. ¶ 389.) In the Class Action, the Court held that this statement was adequately alleged as false, but that it did not rise to the level of falsity required to establish corporate scienter in the absence of attribution to a specific individual. *See BP III*, 922 F. Supp. 2d at 638-39. Plaintiffs have no new allegations

---

[13] Plaintiffs have included copious new allegations regarding Rainey's knowledge of the magnitude of the oil spill and his alleged role in defrauding the U.S. government by reverse-engineering "estimates" of the oil spill to match the Company's publicized 5,000-barrel-per-day figure. (Compl. ¶¶ 218-19, 221.) Such allegations are irrelevant to the issue of Rainey's knowledge, pre-spill, that BP lacked adequate spill response capabilities.

relevant to scienter for this statement. It remains non-actionable.

### 8.    May 14, 2010 Article and May 19, 2010 House Testimony

On May 14, 2010, an article appeared on cnn.com which quoted Dudley refuting the estimate of a Purdue University professor that the Macondo well was leaking upwards of 70,000 barrels of oil per day. Dudley stated that the estimate was "not accurate at all" and "[not] anywhere I think within the realm of possibility." (Compl. ¶ 422.)

Five days later, on May 19, McKay appeared before the U.S. House of Representatives Committee on Transportation and Infrastructure. He claimed that the 5,000 barrels-per-day number was BP's "best estimate" of the spill. (Compl. ¶ 418.) He also downplayed the possibility that the professor's much higher estimate might be accurate:

> It is theoretically possible. I don't think anyone believes it is quite that high that has been working on this. I believe the uncertainty range is around that 5,000 number, and it could be higher. But if the number you are talking about is 70,000 barrels a day, I don't know this, but I don't think people that are working with it believe that that is a possibility.

(*Id*.)

Defendants do not dispute that the two statements above are adequately alleged as false. Instead, they claim that Plaintiffs have not adequately alleged scienter for Dudley or McKay, respectively. (Cons. MTD. at 62-64.) They also suggest that McKay's testimony—replete with qualifying words such as "I don't think" and "I don't know"—is a non-actionable statement of opinion and cannot support a claim for securities fraud under the doctrine of "bespeaks caution." (*Id*. at 63-64.)

The Court disagrees. Plaintiffs' allegations present a compelling case that Dudley's and McKay's post-spill misrepresentations were issued with knowledge of multiple conflicting internal estimates, or that they were made recklessly without adequate understanding of the work

being performed by BP's own resources.[14] The allegations are even more substantial than those found to support Suttles's scienter in the Class Action; in contrast to the two internal sources cited in the Class Action Complaint, Plaintiffs have identified at least six conflicting internal sources which pre-date Dudley's and McKay's statements. (Compl. ¶¶ 219, 409(a), 409(d), 433(a), 433(d)-(e).)

The Court also finds the "bespeaks caution" doctrine inapplicable. "Bespeaks caution" limits liability for predictive statements which are coupled with sufficient cautionary language. *Rubinstein*, 20 F.3d at 167. Although McKay's testimony contained qualifications, it was not a prediction of future events; it was a statement of existing facts. Through his statements, McKay represented that BP had studied the oil spill; that BP had determined 5,000 barrels per day was the most accurate estimate; and that BP did not believe the oil spill could be as high as 70,000 barrels per day. Moreover, even if "bespeaks caution" was applicable, the Court does not find that McKay's use of qualifying language, in the circumstances, rendered his testimony immaterial as a matter of law. *See id.* at 167-68 (noting that, under the "bespeaks caution" doctrine, "cautionary language is not necessarily sufficient, in and of itself, to render predictive statements immaterial as a matter of law" because "'materiality is not judged in the abstract, but in light of the surrounding circumstances'") (quoting *Krim*, 989 F.2d at 1448).

Defendants may be attempting to argue that McKay testified as to his opinion and that Plaintiffs were not entitled to rely upon his opinion in deciding whether to invest in or divest BP

---

[14] Defendants claim that Plaintiffs' scienter allegations are insufficient because Dudley and McKay are not specifically alleged to have received any of the conflicting internal or external estimates. (Cons. MTD at 62-64.) But given the importance of the oil spill to the Company, and the fact that Dudley and McKay voluntarily spoke to the public and to Congress as authorities on the disaster, it was at least reckless for them not to have fully apprised themselves of all internal estimates of the spill.

stock. But this argument does not accurately state the law. A section 10(b) claim may be premised on a statement of opinion. *See Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1095-96 (1991); *see also In re Enron Corp. Securities*, 465 F. Supp. 2d 687, 723-24 (S.D. Tex. 2006) ("Although *Virginia Bankshares* dealt with a claim under § 14(a) of the Securities Exchange Act, other courts have applied its rationale to claims under § 10(b) for false or misleading statements.") (citing *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 670 (5th Cir. 2004)). In such circumstances, the stated "opinion" is fraudulent if it was not genuinely held; if the speaker did not have a reasonable basis for his opinion; or if the speaker was aware, but did not disclose, adverse company-specific information which undermines the opinion. *See U.S. v. Causey*, 2005 WL 2647976, at *8 (S.D. Tex. Oct. 17, 2005) (relying upon *In re Wells Fargo Securities Litig.*, 12 F.3d 922, 930 (9th Cir. 1993)). Plaintiffs' allegations support the inference that McKay either did not have a reasonable basis for his opinion, or that he was aware of contradicting internal estimates created by BP which undermined his opinion. McKay's House testimony is actionable.

## VI.    PLAINTIFFS' STATE LAW CLAIMS

### A.    Choice of Law

Plaintiffs assert statutory claims under Texas, California, and Massachusetts law. (Compl. ¶¶ 557-86.) They also assert common law claims, for which four different states' laws are proffered as providing the substantive law. (*Id*. at ¶¶ 535-56.) Defendants, on the other hand, believe the case should be decided under English law. (Cons. MTD. at 2-3.) Therefore, Defendants urge the Court to conduct a choice of law analysis prior to deciding the viability of Plaintiffs' claims. (*Id*. at 10-11.)

Plaintiffs suggest that the Court need not conduct the analysis, at least at this point,

because BP has not demonstrated a conflict in the substantive laws that might be applied to their claims. (Cons. Opp. at 10-11.) They note that the common law across the proposed jurisdictions is largely identical. (*Id*.)

The Court agrees that BP has not demonstrated as strong a conflict in the proposed substantive laws as would ordinarily precipitate a conflict-of-laws analysis, at least with regards to Plaintiffs' common law claims. Specifically, many of the arguments raised by BP under English common law would appear to be identical under the common law of Texas, California, Massachusetts, and Rhode Island. But even in the absence of an irreducible conflict, failure to fix upon one jurisdiction's laws—out of the ten jurisdictions that have been posited by the Plaintiffs in this and other related individual actions—is less than ideal. For the sake of these cases and all other "tag along" lawsuits that may come after, the Court will take this opportunity to address choice of law.

### 1.    Legal standard

Because this case originated in this district, the Court looks to Texas's choice-of-law rules. *In re Enron Corp. Securities, Deriv., & "ERISA" Litig.*, 511 F. Supp. 2d 742, 790 (S.D. Tex. 2005). Texas has adopted the Restatement (Second) of Conflict of Laws's "most significant relationship" test. *Hughes Wood Products, Inc. v. Wagner*, 18 S.W.3d 202, 205 (Tex. 2000).

The starting point for the most significant relationship test is the Restatement's provision regarding fraud and related claims, Section 148. The factors to consider under Section 148 are:

(a)    the place, or places, where the plaintiff acted in reliance upon the defendant's representations,

(b)    the place where the plaintiff received the representations,

(c)    the place where the defendant made the representations,

(d)     the domicil, residence, nationality, place of incorporation and place of business of the parties,

(e)     the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and

(f)     the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

Restatement (Second) Conflict of Laws § 148(2).

Generally, an analysis of the Section 148 factors will yield the jurisdiction with the most significant relationship to fraud-related claims. The result must be tested, however, against the general policy principles embodied in Section 6 of the Restatement:

(a)     the needs of the interstate and international systems,

(b)     the relevant policies of the forum,

(c)     the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d)     the protection of justified expectations,

(e)     the basic policies underlying the particular field of law,

(f)     certainty, predictability and uniformity of result, and

(g)     ease in the determination and application of the law to be applied.

Restatement (Second) Conflict of Laws § 6(2). If Section 6 points to a different jurisdiction than that returned under Section 148, the Section 6 jurisdiction will control. *Id*. § 148 cmt. b.

## 2.     Analysis

Choice-of-law is not a mechanical analysis, in which the various factors can be equally weighted and scored to arrive at a determinative conclusion. Nevertheless, the Court will address

in turn each relevant Section 148 factor.[15] The Court will then examine whether the policy considerations under Section 6 mandate a different conclusion.

### a.   Section 148

The first Section 148 factor is the place or places where Plaintiffs acted in reliance upon Defendants' alleged misrepresentations. Defendants claim that Plaintiffs acted in reliance in England, where they purchased BP's Ordinary Shares on the LSE. (Cons. MTD at 15-16.) Plaintiffs respond that reliance occurred not only in England, but also in the various locations in which they or their investment advisors made decisions respecting BP's Ordinary Shares. (Cons. Opp. at 16-17.) Even accepting Plaintiffs' argument, it is not alleged that any Plaintiff or investment advisor made any decision regarding BP's Ordinary Shares in Texas. Further, it appears that such decisions were made in a multiplicity of jurisdictions, including, at a minimum, California, Massachusetts, Rhode Island, and England. (Compl. ¶¶ 479, 487, 495.) Therefore, this factor points to England over any particular U.S. jurisdiction.

The second Section 148 factor is the place where Plaintiffs received the representations. Defendants de-emphasize this factor to the extent that Plaintiffs received the public representations in their states of residence, or in the states of residence of their investment advisors. (Cons. MTD at 15, 16-17.) They argue that the factor should be ascribed weight only for those representations specifically directed to Plaintiffs or their advisors. (*Id*. at 12, 14-15.) Defendants note that the only private representations directed to Plaintiffs or their advisors were delivered in England. (*Id*. at 14-15.)

The Court agrees that the globally-disseminated public statements, which were

---

[15] The final two § 148 factors—concerning the "tangible thing" which is the subject of the parties' transaction and the place where the plaintiff is to render performance under a contract— are inapplicable to the present dispute and will not be considered.

"received" in any jurisdiction where an investor in BP Ordinary Shares resided, should not be the focus of its analysis. *See* Restatement (Second) Conflict of Laws § 145 cmt. e (acknowledging that, in certain circumstances, "the place of injury will not play an important role in the selection of the state of the applicable law," including when "the place of injury can be said to be fortuitous or when . . . it bears little relation to the [alleged tortious act]"). However, Plaintiffs dispute that they received Defendants' private representations solely in England. They allege that representations were also delivered to their advisors in Atlanta and Boston. (Cons. Opp. at 16.) This may be true, but statements made at BP's meetings with ███████ are the only private representations detailed at any length in the Complaint. And *no* private representation is alleged to have been directed specifically to Plaintiffs or their advisors in Texas. Therefore, the second Section 148 factor also points to England over any particular U.S. jurisdiction.

The third Section 148 factor is the place where Defendants made the representations. Both parties emphasize the importance of this factor, and the Court agrees that it should be weighted very heavily in the overall analysis. *See* Restatement (Second) of Conflict of Laws § 148 cmt. h (noting "[t]his contact is as important as, and occupies a position wholly analogous to, the place of conduct that results in injury to persons and to tangible things"). Defendants contend that most of the alleged misrepresentations were issued in or from England. (Cons. MTD at 13-14.) Plaintiffs disagree. They note that, out of approximately 49 potentially viable misstatements, 30 were made in the U.S., "including Texas." (Cons. Opp. at 13-14.) To be clear, only five of the alleged misstatements were made in Texas.[16] (*Id*. at App. A.) Texas does not

---

[16] The parties do not always agree on how to categorize and count the various statements. For example, Defendants dispute that statements made in BP's SEC filings should be considered statements made in the District of Columbia, and they contend that certain statements should not be counted separately. (Doc. No. 63 ("Cons. Reply"), at 12 n.9-10.) Because the Court does not

even claim the most number of statements of any U.S. jurisdiction; that distinction belongs to either the District of Columbia, with thirteen statements, or to Louisiana, with twelve statements. (*Id*.) By contrast, nineteen alleged misstatements were made in England.[17] (*Id*.) The third Section 148 factor also points to England over any particular U.S. jurisdiction.

The fourth Section 148 factor is the residence and nationality of the various parties. Defendants argue that this factor is "neutral," because the parties reside in many different places. (Cons. MTD at 16-17.) It is true that the three Plaintiffs hail from three different states: California, Rhode Island, and Massachusetts. While this means that the residence and nationality of the Plaintiffs may yield an inconclusive result, it does not follow that the residence and nationality of the Defendants necessarily does so. Particularly in a context such as this, where the vast majority of the alleged misrepresentations were not specifically targeted to Plaintiffs in their home states, it is appropriate to weight the residence and nationality of the Defendants more heavily. *See Greenberg Traurig of New York, P.C. v. Moody*, 161 S.W.3d 56, 72 (Tex. App.—Houston 2005, no pet.) (noting an "important distinction [that] greatly impacts the conflict-of-laws analysis" between fraud-based claims "aimed at defendants . . . with whom [plaintiffs] had no contact and no direct dealings" and fraud-based claims "aimed at [defendants] . . . with whom [plaintiffs] had personal contact and direct dealings").

Plaintiffs emphasize the fact that many Defendants have strong ties to Texas. (Cons. Opp. at 14.) Two of the corporate defendants—BP America and BP E&P—are headquartered in Texas. (Compl. ¶¶ 26-27.) At least one Individual Defendant—McKay—is "based" in Texas.[18]

---

find that these distinctions appreciably change the outcome, it will adopt Plaintiffs' position on how to count and geographically attribute the various statements.

[17] Two statements are of unknown geographic origin. (Cons. Opp. at App. A.)

(*Id*. ¶ 34.) Four others—Suttles, Inglis, Malone, and Rainey—served as officers of BP America or BP E&P, Texas companies.[19] (*Id*. ¶¶ 30-33.) While these ties to Texas are certainly compelling, it cannot be disputed that Defendants also have strong ties to England. BP plc is headquartered and incorporated in England. (*Id*. ¶ 25.) Five Individual Defendants—Hayward, Inglis, Malone, McKay, and Dudley—served as directors or officers of BP, an English company. (*Id*. ¶¶ 29, 31-32, 34-35.) In these circumstances, it is impossible to state that Defendants are more closely allied with either England or Texas. Therefore, the fourth Section 148 factor points both to England and Texas as equally viable alternatives.

Plaintiffs identify another connection between their claims and Texas which is not easily captured under any of the foregoing factors: that many of the alleged misrepresentations directly concerned BP's operations in the U.S., including deepwater Gulf of Mexico. These operations were conducted by BP's Texas-based subsidiaries. (Cons. Opp. at 15-16.) The Court agrees that this is a valid and important consideration. However, the residence of the U.S. operating companies seems less relevant than the fact that the Macondo well itself was located on the Outer Continental Shelf adjacent to Louisiana. Therefore, to the extent that this connection should be considered as an additional "factor," it points to Louisiana rather than Texas.

In summary, none of the Restatement factors militate in favor of Texas <u>over</u> England. However, three factors favor England over any U.S. jurisdiction; one is evenly divided between

---

[18] Plaintiffs suggest that four other Individual Defendants also reside in Texas. (Cons. Opp. at 3, 14.)

[19] Plaintiffs allege that Inglis was the CEO of BP E&P. (Compl. ¶ 31.) The Court notes some ongoing confusion in this and related cases regarding whether Inglis was the CEO of BP E&P—the Texas operating subsidiary—or the Chief Executive of BP plc's Exploration & Production business unit. (Doc. No. 527 at 27-28, Civ. Act. No. 10-md-2185, *In re: BP plc Securities Litigation*.) For present purposes, the Court accepts Plaintiffs' representation that Inglis was the CEO of the Texas operating subsidiary.

England and Texas; and a final consideration points to Louisiana. Section 148 indicates that England, not Texas, has the most significant relationship to Plaintiffs' claims.

      **b.**      **Section 6**

Plaintiffs do not expressly address Section 6 of the Restatement, although they claim that Texas's more robust protections against investor fraud indicates a "superior interest in this case." (Cons. Opp. at 12.) This appears to be an invitation for the Court to find that Texas—regardless of the result under Section 148—possesses a more significant relationship to the case for policy reasons.

Plaintiffs have noted a number of ways in which Texas law provides for greater potential recovery than English law. These include: (1) Texas law permits Plaintiffs to assert common law claims *in addition* to their statutory fraud claims, rather than supplanting some claims with statutory fraud; (2) Texas law recognizes a common law aiding and abetting fraud claim; (3) Texas allows Plaintiffs to assert statutory fraud claims against officers and directors; (4) Texas law does not have a scienter requirement for statutory fraud; (5) Texas law makes punitive damages available for statutory fraud; and (6) Texas, unlike England, does not have a "loser pays" regime. (Cons. Opp. at 11-12 & n.3.)

The Court agrees that Texas has a public policy interest that must be taken into account, particularly under Section 6 of the Restatement. But it disagrees that England lacks such an interest simply because its strictures are less accommodating of Plaintiffs' recovery. England, too, regulates and prohibits fraudulent practices associated with the purchase of securities. It simply defines those practices more narrowly than Texas—presumably because it, on public policy grounds, has struck a different balance between the interests of the opposing sides. *See* Brief for United Kingdom as Amicus Curiae Supporting Respondents, *Morrison v. National*

*Australia Bank Ltd.*, 130 S. Ct. 2869 (2010) (No. 08-1191), 2010 WL 723009 ("U.K. Amicus Curiae Br."), at *1 (Feb. 25, 2010) ("The United Kingdom has made numerous important policy choices regarding securities regulation and litigation practices and procedures. Many of those choices reflect a balancing of interests and policies that differs from the balances that have been struck in the United States."). For example, the decision to require scienter for statutory fraud is as much a policy choice as the converse.

Plaintiffs have not provided—and the Court cannot discern—any strong public policy grounds for displacing England as the jurisdiction with the most significant relationship to Plaintiffs' claims. Plaintiffs' most compelling argument is that the U.S. *in general* has as strong or a stronger connection to the controversy than England, and that, within the U.S., either Texas or Louisiana has the most relevance to the case. But the choice here is between England and a specific state within the U.S., not the U.S. as a whole. *See* Restatement (Second) of Conflict of Laws § 3 cmt. a. At this preliminary stage, the Court can draw no conclusion other than that English law pertains to Plaintiffs' claims.

### B.     Mapping Plaintiffs' State Claims onto English Law

#### 1.     Unavailable Claims

Defendants claim that a decision to apply English law to Plaintiffs' state-law claims carries immediate consequences. According to Defendants, English law does not recognize claims for aiding and abetting common-law fraud, statutory fraud, or statutory unfair and deceptive trade practices, and these claims should be dismissed. (Cons. MTD at 18 n.12.) Plaintiffs do not dispute this characterization of English law. The Court therefore grants Defendants' motion as to these unavailable claims.

Defendants also assert that English law makes some of the alleged misstatements

59

actionable only under statute—specifically, FSMA—while the rest are actionable only under the common law. (Cons. MTD at 10.) According to Defendants' English law expert, this exclusivity rule applies to statements made in Annual Reports. (Doc. No. 48-14 ("Moore Decl."), at ¶ 29.) Plaintiffs' English law expert disagrees with this interpretation of FSMA. (Doc. No. 57 ("Lowe Decl."), at ¶¶ 19-42.) Because the dispute concerns only two statements at issue in the Complaint, both of which have been held actionable under Rule 10(b) and will be subject to discovery under either interpretation of the FSMA, the Court declines to decide the controversy at the motion to dismiss stage.[20]

### 2. Available Claims

Defendants acknowledge three English law claims which map onto Plaintiffs' theories of liability under state law. These include FSMA claims; claims for common law fraud (known as "deceit" in English parlance); and claims for common law negligent misrepresentation (known as "negligent misstatement"). (Cons. MTD at 3, 18.)

The elements of a FSMA claim are: (1) purchase of Defendant's securities; (2) in actual and justifiable reliance on (i) any untrue or misleading statement in a publication to which the law applies or (ii) omission of any matter required to be included in such a publication; (3) scienter regarding the misstatement or omission by a person with responsibility for it; and (4) loss as a result. (Moore Decl. at ¶ 19.) The elements of common law deceit are: (1) Defendant makes a false representation; (2) knowing it to be untrue, or being reckless as to whether it is true; (3) and intends that Plaintiff should act in reliance on it; and (4) Plaintiff does rely on it and suffers loss. (*Id*. at ¶ 40.) The elements of common law negligent misstatement are: (1)

---

[20] The relevant alleged misrepresentations are found in the 2008 and 2009 Annual Reports. (Compl. ¶¶ 357-58, 379.)

Defendant owed Plaintiff a duty to speak carefully; (2) which Defendant breached by failing to exercise due care before speaking; (3) Plaintiff relied on Defendant's careless misstatement; and (4) Plaintiff suffered a loss. (*Id*. at ¶ 78.)

### C.    Effect of Rulings on Alameda County's and State-Boston's Federal Claims

Defendants contend that their arguments for dismissal of Alameda County's and State-Boston's 10(b) claims are equally applicable to Plaintiffs' English law claims. (Cons. MTD at 33 n.23.) With only one exception, noted below, the Court agrees that statements which will not support a 10(b) claim also will not support Plaintiffs' English law claims. This includes statements that are too general to be actionable as fraud, and statements that have not been adequately alleged as false. It also includes statements that are non-actionable expressions of future intention, opinion, or belief. In each of these scenarios, the law governing Alameda County's and State-Boston's 10(b) claims is substantively identical to the law governing Plaintiffs' English law claims.[21]

The only significant deviation between Rule 10(b), on the one hand, and Plaintiffs' English law claims, on the other, appears in the element of scienter. Clearly, negligent misstatement does not contain a requirement that the relevant Defendant knew his statement was false or misleading. Therefore, if a claim has been dismissed for failure to adequately allege scienter, it may nonetheless be actionable as negligent misstatement, so long as the elements of that claim have otherwise been met.[22]

---

[21] Specifically, all of Plaintiffs' English claims require a false representation of fact, and they permit recovery for reliance on statements of future intention, opinion, and belief only when the intention was not genuinely held or the opinion or belief was not genuinely entertained. (Moore Decl. ¶¶ 43-48.)

[22] The statement would not be actionable as deceit, however. English common law deceit, like

61

### D.    Actual Reliance

Defendants' first argument for dismissal is that Plaintiffs have not adequately pled their reliance on any of the alleged misstatements. (Cons. MTD at 19-20, 23-26.) As noted above, "actual reliance" is an element for all three of plaintiffs' claims: FSMA fraud, common law deceit, and common law negligent misstatement. Unlike U.S. federal securities law, English law does not presume reliance based on the theory of "fraud on the market."[23] *See* U.K. Amicus Curiae Br., 2010 WL 723009, at *17; Moore Decl. ¶¶ 35, 71; Lowe Decl. ¶ 89.

Defendants claim that "actual reliance" must be pled with particularity under the heightened pleading standards of Rule 9(b). (Cons. MTD at 19.) They argue that Plaintiffs' allegations of reliance on Defendants' public statements are conclusory, failing to specify which alleged misstatements were relied upon and when. (*Id*. at 23-24.) Defendants also note that, while Alameda County worked with ███████████████████████ who met face-to-face with BP officials, it has failed to identify any actionable misrepresentations from these meetings.[24] Therefore, to the extent Alameda County alleges that it relied upon statements made in the face-to-face meetings, these allegations would not create the required nexus between Defendants' allegedly misleading public statements and Alameda County's decisions to buy,

---

section 10(b) and Rule 10b-5, requires that the responsible defendant must have known the falsity of his statement, or been reckless regarding its truth or falsity.

[23] In addition to arguing that they have adequately pled "actual reliance," Plaintiffs suggest that they can rely on allegations of "indirect reliance." They describe their "indirect reliance" as follows: that the market price of BP's Ordinary Shares was positively affected by Defendants' alleged misrepresentations; that Plaintiffs assumed the market price was not so affected; and that they relied upon the market price in deciding whether to invest. (Cons. Opp. at 40-41.) The Court finds Plaintiffs' "indirect reliance" theory to be nothing more than a relabeling of "fraud on the market," which is not recognized in English law.

[24] The issue of whether any statement identified from the face-to-face meetings with ███████ can support a claim of fraud is addressed separately, in Section V.C.1.

sell, or hold BP securities. (*Id*. at 24-26.) Finally, Defendants suggest that Plaintiffs' allegations of reliance are undercut by allegations regarding the extensive research and modeling performed by their investment advisors in deciding whether to invest in BP. (*Id*. at 26.)

In their response, Plaintiffs dispute the implication that an alleged misrepresentation need be the sole inducer of their action in reliance. They claim that if a misrepresentation had "a material influence" and was a "substantial factor in bringing about [their] action," then they have sufficiently alleged reliance. (Cons. Opp. at 37.) Plaintiffs also dispute that they must plead reliance with particularity under Rule 9(b). (*Id*. at 37-38.) They cite cases in which courts have acknowledged the "inherently conclusory" nature of reliance allegations and declined to dismiss fraud claims on the pleadings. (*Id*. at 38.)

The Court agrees with Plaintiffs that, under English law, Defendants' misrepresentations need not have been the "sole inducement" of Plaintiffs' action in reliance. *Barton v. County Nat West Ltd.* [1999] 1999 WL 477744, at ¶ 55 ("[T]he misrepresentation does not have to be the sole inducement."). The issue of whether the stricter pleading requirements of Rule 9(b) apply to allegations of reliance presents a harder question. Rule 9(b) states that a plaintiff "alleging fraud" must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). The typical articulation of the rule's effect is that it requires a plaintiff to allege specifically the "time, place, and contents of the [alleged] false representations, as well as the identity of the person making the misrepresentations and what [that person] obtained thereby." *Williams*, 112 F.3d at 177 (citation omitted). Specifically, in securities cases, a plaintiff must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Id*. at 177-78. This is often described as the "who, what, when, where, and how" of the alleged fraudulent scheme. *U.S. ex rel. Willard v.*

63

*Humana Health Plan of Tex. Inc.*, 336 F.3d 375, 384 (5th Cir. 2003).

In addition to the above restatements of Rule 9(b), the policy rationales for the rule have been well-explored in Fifth Circuit case law. As numerous courts have recounted, Rule 9(b) protects defendants from "unfounded allegations of wrongdoing which might injury their reputations." *Hernandez v. Ciba-Geigy Corp. USA*, 200 F.R.D. 285, 290 (S.D. Tex. 2001). It discourages the filing of baseless complaints "'as a pretext for discovery of unknown wrongs.'" *Frith v. Guardian Life Ins. Co. of Am.*, 9 F. Supp. 2d 734, 742 (S.D. Tex. 1998) (quoting *Mitchell Energy Corp. v. Martin*, 616 F. Supp. 924, 927 (S.D. Tex. 1985)). And it fully informs defendants of their alleged roles in the fraudulent scheme so that they may prepare their defense. *See U.S. ex rel. Graves v. ITT Educ. Servs., Inc.*, 284 F. Supp. 2d 487, 494 (S.D. Tex. 2003).

The Court notes that none of the above restatements of—or justifications for—Rule 9(b) appears to implicate the element of reliance. The restatements all focus exclusively on the plaintiff's obligation to include specifics regarding the fraudulent scheme and the defendant's role in it—not whether the scheme actually harmed the plaintiff. Similarly, the policy justifications for Rule 9(b) are related to the divulgement of the defendant's alleged bad acts—not whether those acts are responsible for plaintiff's alleged harm. Applying these general principles to the text of Rule 9(b), it would appear that reliance is not a "circumstance[] constituting fraud" that must be alleged with "particularity."

Most courts, however, have concluded differently. The Fifth Circuit, this district, and other district courts within this circuit have either held or strongly suggested that Rule 9(b)'s particularity requirement extends to allegations of actual reliance. *See  Sanchez v. Liggett & Myers, Inc.*, 187 F.3d 486, 491 (5th Cir. 1999); *In re Enron Corp. Securities, Deriv. & ERISA Litig.*, 540 F. Supp. 2d 800, 830 (S.D. Tex. 2007); *Hernandez*, 200 F.R.D. at 291; *Sullivan v.*

*Leor Energy LLC*, Civ. Act. No. H-05-3913, 2006 WL 2792909, at *7 (S.D. Tex. Sept. 27, 2006); *Steiner v. Southmark Corp.*, 734 F. Supp. 269, 275 (N.D. Tex. 1990); *Club Escapade 2000, Inc. v. Ticketmaster, L.L.C.*, No. EP-11-CV-166, 2011 WL 5976918, at *4 (W.D. Tex. Nov. 29, 2011). A number of federal courts outside this circuit are in accord. *See  Evans v. Pearson Enterprises, Inc.*, 434 F.3d 839, 852-53 (6th Cir. 2006); *In re Washington Mut., Inc. Securities, Deriv. & ERISA Litig.*, No. 2:08-md-1919, 2010 WL 2545415, at *5 (W.D. Wash. June 21, 2010); *Gray v. Bayer Corp.*, Civil Action No. 08-4716, 2009 WL 1617930, at *3 (D.N.J. June 9, 2009); *Amzak Corp. v. Reliant Energy, Inc.*, No. 03 C 0877, 2004 WL 1882482, at *6 (N.D. Ill. Aug. 19, 2004); *Baxter v. A.R. Baron & Co., Inc.*, No. 94 Civ 3913, 1995 WL 600720, at *4 (S.D.N.Y. Oct. 12, 1995).[25]

Although the Court would not independently arrive at this conclusion, it will apply the prevailing view that the particularity requirement of Rule 9(b) extends to allegations of reliance. In other words, to surmount the hurdle of Rule 9(b), Plaintiffs must "describe . . . the circumstances of [their] reliance" with particularity. *Sullivan*, 2006 WL 2792909, at *7. In reviewing the adequacy of Plaintiffs' allegations under Rule 9(b), the Court remains cognizant of two important limiting principles. First, "[w]hat constitutes 'particularity' will necessarily differ with the facts of each case." *Guidry v. Bank of LaPlace*, 954 F.2d 278, 288 (5th Cir. 1992). Second, reliance allegations are often inherently conclusory: one either relies, or one does not

---

[25] As Plaintiffs note, some courts have reached the opposite conclusion: that reliance allegations are not subject to heightened pleading under Rule 9(b). *See Timberlake v. Synthes Spine Co., L.P.*, Civil Action No. V-08-4, 2009 WL 926990, at *6 (S.D. Tex. Mar. 31, 2009); *In re Taxable Mun. Bonds Litig.*, Civ. A. MDL No. 863, 1992 WL 165974, at *1 n.11 (E.D. La. July 1, 1992); *Anthony v. Yahoo! Inc.*, 421 F. Supp. 2d, 1257, 1264 (N.D. Cal. 2006); *Indiana Bell Telephone Co. v. Ward*, No. IP 02-170-C H/K, 2002 WL 32067296, at *3 (S.D. Ind. Dec. 6, 2002). This appears to be the minority view, however. Importantly, the Court is not aware of any case in which the Fifth Circuit has reviewed reliance allegations connected to a claim of fraud under the notice pleading requirements of Rule 8(a).

rely. *See In re Compaq Securities Litig.*, 848 F. Supp. 1307, 1312 (S.D. Tex. 1993); *Steiner*, 734

F. Supp. at 275.

Plaintiffs' reliance allegations are found principally in Section XIII of the Complaint. The

following is a brief summary of the reliance allegations:



- Providence alleges that it employed ███████████████ ██████████ to manage its investment decisions during the relevant time period. (Compl. ¶ 479.) ████████ took an "analytical, research-based approach" to investing Providence's assets, which included "read[ing] and rely[ing] upon publicly available information, such as SEC filings, analyst reports, and other public information" regarding various possible investments. (*Id*. ¶ 480.) ████████ "conducted a comprehensive valuation analysis of BP as a potential investment in or about early 2009." (*Id*.) It reviewed, in addition to other materials, BP's SEC filings. (*Id*. ¶ 482.) It also met directly with BP's Head of Investor Relations on or about May 14, 2007. (*Id*. ¶ 481.) Pursuant to this due diligence by ████████, Providence purchased BP Ordinary Shares in October 2009. (*Id*. ¶ 486.)



- State-Boston alleges that it employed ███████████ ████████████████ and ████████████████████████████ to manage its investment decisions during the relevant time period. (*Id*. ¶ 487.) State-Boston makes specific allegations regarding ██████ s actions in advising State-Boston's purchases; these are presented as an "example" of how State-Boston's investment decisions were made. (*Id*. ¶ 488.) According to these allegations, ██████ took an "analytical, research-based approach" to investing State-Boston's assets, which included "read[ing] and rely[ing] upon publicly available information, such as SEC filings, analyst reports, and other public information" regarding various possible investments. (*Id*. ¶ 488.) Throughout the relevant time period, ████ "directly met with BP management to discuss BP on an approximately annual basis." (*Id*. ¶ 489.) It reviewed, in addition to other materials, BP's SEC filings, analyst reports, and analyst calls. (*Id*.) Following the Deepwater Horizon disaster, ████ monitored BP's statements regarding the incident, "specifically those regarding the oil flow rate." (*Id*. ¶ 490.) Pursuant to this due diligence, State-Boston made over 60 purchases of BP Ordinary Shares and/or ADSs, beginning in January 2007 and ending in May 2010. (*Id*. ¶ 493.)

- Alameda County alleges that it used many different investment advisors, including ████████ (*Id*. ¶ 495.) ████████'s actions in advising Alameda County's purchases are presented as an example of how Alameda County's investment decisions were made.[26] (*Id*. ¶ 496.) According to these allegations,

---

[26] The Complaint also contains allegations regarding the actions of another of Alameda County's investment advisors, ████████████████████████████████████ (Compl. ¶¶ 503-

███████ employed an "analytical, research-based approach" to investing Alameda County's assets, which included "read[ing] and rely[ing] upon publicly available information, such as SEC filings, analyst reports, and other public information" regarding various possible investments." (*Id.*) ███████ met with BP management at least six different times during the relevant time period. (*Id.* ¶ 497.) ███████ also monitored BP's SEC filings and, following the Deepwater Horizon disaster, BP's statements regarding the oil flow rate. (*Id.* ¶¶ 498, 500.) Pursuant to this due diligence, Alameda County made over 100 purchases of BP Ordinary Shares and/or ADSs, beginning in November 2007 and ending in May 2010. (*Id.* ¶ 508.)

The Court finds that, at a minimum, Rule 9(b) requires Plaintiffs to specify "with particularity" what actions it took *or forewent* in reliance upon Defendants' alleged misrepresentations. *See In re Enron*, 540 F. Supp. 2d at 830; *Evans*, 434 F.3d at 853. At this time, the only actions identified with any level of detail are Plaintiffs' various purchases of BP's Ordinary Shares within the relevant time period. (Compl. ¶¶ 486, 493, 508.) No other specific act of reliance appears in the Complaint or can be recoverable without more detailed pleading. Specifically, to the extent Plaintiffs claim that they relied upon Defendants' alleged misstatements by deciding not to divest themselves of BP's Ordinary Shares, such reliance is, at present, insufficiently pled under Rule 9(b) and cannot form the basis of any recovery. (*E.g.*, Compl. ¶¶ 494, 509 (alleging that State-Boston and Alameda County experienced "[l]osses related to . . . pre-Relevant Period purchases or acquisitions").)

The Court finds that Plaintiffs' listing of purchases of BP's Ordinary Shares, however, conveys the necessary amount of detail to satisfy Rule 9(b). As a matter of logic, each Plaintiff can only have relied on those alleged misstatements which occurred *prior* to its final listed purchase of BP's Ordinary Shares. The Court therefore dismisses, as to Providence, any claim premised on alleged misstatements made after October 2009: the final purchase date listed for

---

07.) Like ███████, ███████ spoke with BP management during the relevant time period and monitored BP's SEC filings and public statements. (*Id.* ¶¶ 504-05.)

that Plaintiff.[27] (Compl. ¶ 486.)

To the extent that Defendants fault Plaintiffs for not citing specific public statements that motivated each and every purchase of Ordinary Shares, the Court disagrees that Rule 9(b) mandates this level of specificity. Pursuant to Rule 9(b), Plaintiffs have catalogued in detail the statements they contend were materially misleading. Their allegations of falsity and scienter have been tested, both in this case and in the Class Action. The statements now generally fall within five defined categories: (1) that BP misrepresented its progress vis-à-vis the Baker Report recommendations; (2) that BP misrepresented the scope of its OMS program; (3) that BP misrepresented the pace of implementation of its OMS program; (4) that BP misrepresented its ability to respond to an oil spill in deepwater; and (5) that BP misrepresented the rate at which oil was spilling into the Gulf following the Deepwater Horizon disaster. Importantly, the first three of these categories touch upon the state of BP's efforts to reform its safety practices. Given the general coherence of Plaintiffs' allegations regarding Defendants' allegedly fraudulent "scheme," the Court does not believe that identifying which *specific* misrepresentations motivated each purchase would be a productive exercise for either side. *See Steiner*, 734 F. Supp. at 273 (noting that Rule 9(b) does not require "needlessly repetitive pleading"). Of course, by this ruling, the Court does not relieve Plaintiffs of the obligation to prove actual reliance before they may recover any damages. But it concludes that any deficiency in the element of actual reliance is best tested on a full record, not on the pleadings. *See Celanese Corp. v. Coastal Water Auth.*, 475 F. Supp. 2d 623, 638 (S.D. Tex. 2007); *In re Enron Corp. Securities, Deriv., & ERISA Litig.*, No. MDL-1446, 2010 WL 9077875, at *40 (S.D. Tex. Jan. 19, 2010).

---

[27] Alameda County's and State-Boston's final purchases occurred in May 2010, the same month in which the final alleged misstatements were made. (Compl. ¶¶ 493, 508.)

### E.      Negligent Misstatement

As noted above, Defendants cannot be liable to Plaintiffs for negligent misstatement unless they owed Plaintiffs a duty to speak carefully. Defendants claim that Plaintiffs have not adequately alleged that Defendants owed such a duty (Cons. MTD at 40-42), which Plaintiffs deny (Cons. Opp. at 44-45).[28] Before delving into the parties' specific arguments, it is helpful to sketch the broad parameters of negligent misstatement.

English common law does not recognize a general, background obligation to exercise care when speaking. Such an obligation can be imposed by contract, or by virtue of a fiduciary relationship between the parties, but neither applies in the present case. In addition to these categorical situations, a duty to speak carefully can be "voluntarily assumed" in certain limited circumstances. Specifically, if a defendant provides information or renders advice to a plaintiff, knowing that the plaintiff may rely upon it for purposes of deciding whether to engage in a particular transaction, the defendant owes the plaintiff a duty to take care that the information or advice is not false or misleading. *See Caparo Industries PLC v. Dickman* [1990] 2 A.C. 605, at 620-21 (Bridge) (summarizing the general holding of *Hedley Byrne & Co. Ltd. v. Heller & Partners Ltd.* [1964] A.C. 465). In such situations, the duty to speak carefully is said to be borne of the parties' "special relationship" or "proximity," although these terms are useful only in the sense that they provide shorthand for the various factual scenarios that have been acknowledged to give rise to the duty.

---

[28] Defendants also claim that Plaintiffs' negligent misstatement claims against the Individual Defendants must be dismissed because these Individual Defendants were, at all times, speaking in their capacities as representatives of the various corporate Defendants. (Cons. MTD at 40-41.) Defendants have not adequately briefed this issue or provided the English authorities necessary for the Court's consideration. Therefore, the Court will not dismiss the negligent misstatement claims against the Individual Defendants based on their alleged lack of personal liability, although Defendants are free to re-urge the point at a subsequent stage of the case.

The parties need not be in a direct relationship, or even aware of each other, to be in a "special relationship." For example, it is possible for a plaintiff to be an unknown member of a defined group who received the information or advice. *Caparo*, 2 A.C. 605, at 638 (Oliver). Similarly, the information or advice can be transmitted indirectly from the defendant to the plaintiff through an intermediary, so long as the defendant was aware or should have been aware that the transmittal would take place. *Id*.

Despite these allowances, English courts have taken great care to keep the "special relationship" strand of negligent misstatement narrow. The background rule—that people are not obligated to exercise care before speaking—is intended to remain predominant.[29] Accordingly, courts are wary to recognize a "special relationship" when it would create a new, significant, and sweeping exception to the background rule. *See Reeman and Anor v. Department of Transport* [1997] P.N.L.R. 618, at 625, 632-33, 636.

With this background in mind, the Court turns to the parties' contentions. Defendants cite English case law that a duty to speak carefully does not arise from a "special relationship" unless the defendant's statement was: (1) plaintiff-specific (or made to a group, identifiable at the time the statement was made, to which the plaintiff belongs); (2) purpose-specific; and (3)

---

[29] English common law disfavors wider imposition of a duty to speak carefully because of the difficulty of cabining liability:

> Words are more volatile than deeds. They travel fast and far afield. They are used without being expended and take effect in combination with innumerable facts and other words. Yet they are dangerous and can cause vast financial damage. How far they are relied on unchecked . . . must in many cases be a matter of doubt and difficulty. If the mere hearing or reading of words were held to create proximity, there might be no limit to the persons to whom the speaker or writer could be liable.

*Hedley Byrne & Co. Ltd. v. Heller & Partners Ltd.* [1964] A.C. 465, at 534 (Pearce).

transaction-specific. (Cons. MTD at 41.) Defendants argue that the only statements in the Complaint directed at any Plaintiff were the statements made in face-to-face meetings with ███████, which they claim are non-actionable for reasons other than the non-existence of a duty to speak carefully.[30] (*Id.* at 41-42.) They also argue that none of Defendants' alleged misstatements was purpose-specific—i.e., made specifically to be used by Plaintiffs in making investment decisions—or transaction-specific—i.e., directed to specific purchases in shares. (*Id.* at 42.)

Plaintiffs do not dispute Defendants' characterization of the law, but claim that they have adequately alleged that their relationship with Defendants was "sufficiently close" to give rise to negligent misrepresentation liability. (Cons. Opp. at 44.) They base their argument on: (1) Plaintiffs' investment advisors meeting personally with BP representatives, and (2) the fact that most of the Plaintiffs were pre-existing shareholders of BP at the time the misrepresentations were made. (*Id.*)

The Court finds that Alameda County has adequately pled that Defendants involved in the face-to-face meetings with ███████ voluntarily assumed a duty to speak carefully. During these meetings, the relevant Defendants provided information to ███████ They were aware of ███████ identity and role as investment advisor to major institutional investors. Although they may not have been aware of the identities of ███████'s clients, such clients were members of a defined class in existence at the time of meetings. Finally, given ███████'s role as investment advisor, the relevant Defendants were or should have been aware that the information provided would be used to determine whether to invest in or divest BP stock. In summary, these

---

[30] The issue of whether any statement identified from the face-to-face meetings with ███████ can support a claim of fraud is addressed separately, in Section V.C.1.

meetings meet every requirement for a "special relationship" under English common law.

Of course, the duty to speak carefully was assumed only with regard to the meetings themselves, and only with regard to ██████ and its clients. Plaintiffs' attempt to extend this duty to Defendants' public statements and to all shareholders is unavailing. English common law is clear that a defendant should not be held liable for negligently speaking unless he "was, or ought to have been aware that his advice or information would in fact be made available to and be relied on by a particular person or class of persons for the purposes of a particular transaction or type of transaction," such that he could or should have "directed his mind . . . to some particular and specific purpose[.]" *Scott Group Ltd. v. McFarlane* [1978] 1 N.Z.L.R. 553, at 566 (Richmond).[31] During the face-to-face meetings, the relevant Defendants were able to and should have directed their minds to ██████, its clients, and the investment decisions to be made by those entities. But beyond that circumstance, Plaintiffs' allegations do not support that any Defendant, in making or issuing any public statement, did or should have had ██████ or its clients in mind.

Plaintiffs' second argument—that Defendants had a "special relationship" with Plaintiffs as pre-existing shareholders of BP at the time of the allegedly negligent public statements—is also unconvincing. By focusing on the fact that Plaintiffs were pre-existing shareholders, Plaintiffs may be trying to avoid the implication made by Lord Bridge in *Caparo* that prospective shareholders cannot be meaningfully distinguished from other economic actors who deal with the corporation and are likely to make decisions based on the corporation's perceived

---

[31] Although the quoted language is taken from a minority opinion in a New Zealand case, its articulation of what should be the parameters of common law negligent misstatement has been endorsed by English courts over the majority's holding. *See Caparo Industries PLC v. Dickman et al.* [1990] 2 A.C. 605, at 624 (Bridge); *Al-Nakib Investments (Jersey) Ltd. v. Longcraft* [1990] 1 W.L.R. 1390, at 1396-97.

financial viability. *See Caparo*, 2 A.C. 605, at 623. It is doubtful, however, that a meaningful distinction can be drawn between pre-existing and prospective shareholders—as Lord Oliver noted, also in *Caparo*. *Id*. at 650-51; *see also Morgan Crucible Co. PLC v. Hill Samuel & Co. Ltd.* [1991] Ch. 295, CA, at 321 (questioning without resolving whether target company which owed duty of care to identified take-over bidder would also owe duty to any unidentified "white knight" who relied upon the company's defense documents to interpose a higher bid). Moreover, the Court is aware of no English case imposing upon corporations a generalized common law duty to speak carefully, running either to the corporations' shareholders or to the investing public as a whole.[32] If this Court were to recognize such a duty, it would subvert two important limitations on negligent misstatement under English common law.

First, holding broadly that corporations are in a "special relationship" with shareholders would ignore the requirement that a negligent misstatement must be "plaintiff-specific." *See Caparo*, 2 A.C. 605, at 651 (Oliver) (noting that the duty to speak carefully "is not a duty to take care in the abstract but a duty to avoid causing to the particular plaintiff damage of the particular

---

[32] Several cases have recognized that companies owe a duty to speak carefully when issuing prospectuses which invite the subscription of shares in a newly-formed corporation. *See generally Possfund Custodian Trustee Ltd. v. Diamond* [1996] 1 W.L.R. 1351; *Al-Nakib*, 1 W.L.R. 1390; *Peek v. Gurney* [1873] L.R. 6 H.L. 377. In *Al-Nakib*, the duty was limited to the act of reliance explicitly invited by the prospectus, and it did not extend to a similar act of reliance—specifically, purchasing additional shares on the open market. *See* 1 W.L.R. 1390, at 1397-99. *Possfund* parted ways with this analysis, finding that the plaintiffs in that case had adequately alleged that modern prospectuses are issued not only to invite initial subscription of shares, but also to encourage the purchase of shares on the open market. *See* 1 W.L.R. 1351, at 1365-67. Regardless of which case properly reflects the state of the common law on prospectuses, both *Al-Nakib* and *Possfund* fairly stand for the proposition that a company may owe a duty to speak truthfully with regards to specific documents or statements that invite and intend a specific type of reliance, but the invitation must be reasonably explicit and will be narrowly construed. None of the public statements at issue is adequately alleged to fall within this narrow window. Importantly, neither *Al-Nakib* nor *Possfund* supports imposing upon BP a generalized duty to speak carefully in all situations which inures to the benefit of its shareholders.

kind which he has in fact sustained"). English courts have rejected the invitation to dispense with this requirement in the context of corporate communications. *See Morgan Crucible,* Ch. 295 at 316 (implying that duty to speak carefully did not and could not have attached before the take-over company made itself known by advancing its opening bid); *Caparo,* 2 A.C. 605, at 623 (Bridge) (stating that creation of "unlimited duty of care owed by auditors for the accuracy of their accounts to all who may foreseeably rely upon them" is a "legislative step" for Parliament, not the courts); *see also Galoo Ltd. v. Bright Graham Murray* [1994] 2 B.C.L.C. 492, at 513; *Al-Nakib Investments (Jersey) Ltd. v. Longcraft* [1990] 1 W.L.R. 1390, at 1398-99; *but see Possfund Custodian Trustee Ltd. v. Diamond* [1996] 1 W.L.R. 1351, at 1364-65 (suggesting that proximity can be shown between a defendant who makes misstatements in a general-circulation prospectus and "the members of the public" if "reliance by the members of the public for the purpose in question is intended"). The Court also notes that recognizing a "special relationship" between a corporation and its shareholders would affect a "significant extension of the scope of the law of negligence," which English courts have expressly cautioned against. *Reeman*, P.N.L.R. 618, at 636.

Second, it would ignore the requirement that a negligent misstatement must be "purpose-specific." English courts are extremely exacting when they impose this requirement. For example, in the case of *Caparo*, Lord Oliver rejected the proposition that periodic corporate reporting—mandated by statute—is done for the "purpose" of informing investment decisions, although the reporting is no doubt also utilized for that reason. Instead, pursuant to the statutory scheme, the "purpose" for these communications is to inform shareholders of the activities of the company so that they can exercise their shareholder rights at the annual general meeting. *See* 2 A.C. 605, at 629-32. Similarly, in *Al-Nakib Investments (Jersey) Ltd. v. Longcraft*, the Chancery

Court found that the purpose of a prospectus directed to existing shareholders was to invite the subscription of shares pursuant to the prospectus, and not to encourage the purchase of additional shares on the open market. *See* 1 W.L.R. 1390, at 1397; *accord Peek v. Gurney* [1873] L.R. 6 H.L. 377, at 411-13; *but see Possfund*, 1 W.L.R. 1351, at 1636, 1365-67 (acknowledging that modern-day prospectuses may also be issued for the intended purpose of encouraging the purchase of shares on the open market).

Even courts which have found statements issued for the very purpose to which the plaintiff put them are careful to construe that purpose narrowly. In one such case, the plaintiff's position was deemed only "arguable" even though the defendants—directors of a company which was the target of plaintiff's take-over bid—allegedly conscripted and issued defense documents: (1) with plaintiff in mind and (2) with the specific intent of causing plaintiff to increase the amount of its bid. *See Morgan Crucible*, Ch. 295 at 314. Similarly, in another case, the court found that the pursuing company in a take-over situation had stated a claim for negligent misstatement against the target company's auditor only because the auditor was specifically aware, at the time of its audit, that the target company's accounts were the basis for fixing the purchase price under the parties' acquisition agreement. *See Galoo*, 2 B.C.L.C. 492, at 514.

The authorities cited above all indicate that the "purpose-specific" prong is rigidly imposed. Importantly, it cannot be met by mere foreseeability that the statement could be used for another purpose. *See Morgan Crucible*, Ch. 295 at 317; *see also Caparo*, 2 A.C. 605, at 643 (Oliver) ("[I]t is almost always foreseeable that someone, somewhere and in some circumstances, may choose to alter his position upon the faith of the accuracy of a statement or report which comes to his attention . . . . To apply as a test of liability only the foreseeability of

possible damage without some further control would be to create a liability wholly indefinite in area, duration and amount and would open up a limitless vista of uninsurable risk for the professional man."). The Court distills from these cases that influencing the plaintiff's behavior must have been an express and motivating purpose of the defendant's statement. At present, Plaintiffs' allegations do not support the inference that any of Defendants' public statements was issued with the express and motivating purpose of influencing the investment decisions of BP's shareholders.

The requirements of negligent misstatement under English common law, strictly enforced, leave no room for the legal theory espoused by Plaintiffs. Although this outcome may appear harsh, the rationale for disallowing negligent misstatement claims based on general circulation statements is best articulated by Lord Bridge in *Caparo*:

> The salient feature [of cases recognizing a duty to speak carefully] is that the defendant giving advice or information was fully aware of the nature of the transaction which the plaintiff had in contemplation, knew that the advice or information would be communicated to him directly or indirectly and knew that it was very likely that the plaintiff would rely on that advice or information in deciding whether or not to engage in the transaction in contemplation. . . . ***The situation is entirely different where a statement is put into more or less general circulation and may foreseeably be relied on by strangers to the maker of the statement for any one of a variety of different purposes which the maker of the statement has no specific reason to anticipate.*** To hold the maker of the statement to be under a duty of care in respect of the accuracy of the statement to all and sundry for which they may choose to rely on it is not only to subject to him . . . to "liability in an indeterminate amount for an indeterminate time to an indeterminate class" . . . it is also to confer on the world at large a quite unwarranted entitlement to appropriate for their own purposes the benefit of the expert knowledge or professional expertise attributed to the maker of the statement.

2 A.C. 605, at 620-21 (citation omitted) (emphasis added).

Defendants' public statements were not specifically directed to the Plaintiffs or to an

identifiable class to which Plaintiffs belonged. They were not specifically directed to the purpose of informing Plaintiffs' investment decisions. As a result, no special relationship arose pursuant to English common law, and Defendants were under no duty to exercise care when speaking. Plaintiffs' negligent misstatement claims based upon Defendants' public statements fail as a matter of law.

### F.    Intent to Induce Reliance

Defendants also argue that, for purposes of their common law deceit claims, Plaintiffs have not adequately alleged that the makers of the alleged misrepresentations intended to induce Plaintiffs' reliance.[33] They acknowledge that Rule 9(b) permits intent to be alleged generally, but nonetheless raise three separate arguments for why plaintiffs' allegations of intent to induce reliance are insufficient. First, Defendants criticize Plaintiffs' allegations of intent to induce reliance as entirely "conclusory," citing the following allegation from paragraph 536 of the Complaint: "Defendants BP, BP America, BP E&P, and the Individual Fraud Defendants" made the alleged misrepresentations "with the intent and/or foreseeability that Plaintiffs and investors would rely thereon." (Cons. MTD at 29.) Second, anticipating the argument that intent to induce reliance can be inferred from the circumstances in which the statements issued, Defendants note that several alleged misstatements "were not addressed to the investing public, let alone to plaintiffs in particular." (Id. at 29.) Finally, Defendants argue that Plaintiffs have failed to distinguish among the Defendants in their allegations of intent. (Id. at 31-32.)

The first and third of these arguments raise interrelated concerns about the form of

---

[33] Intent to induce reliance is not required for recovery under Section 90A of the FSMA. Although it is not technically an element of negligent misstatement, there is similarity between intent to induce reliance for deceit and the requirement of a "special relationship" giving rise to a duty to speak carefully under negligent misstatement, as explored more fully in the Court's analysis.

Plaintiffs' pleading. Defendants complain that Plaintiffs have not adequately pled the element of intent because the allegation cited above is a conclusion of intent unsupported by factual allegations that relate to specific individuals. Although Defendants claim that the failure to distinguish among the Defendants is due to Plaintiffs' use of "group pleading"—disallowed in the Fifth Circuit under the case of *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*—the Court finds that this argument obscures rather than clarifies the issue to be decided. "Group pleading" is a judicial presumption that permits certain individuals to be linked to unattributed corporate communications simply by virtue of their roles in the corporation. *See Shaw Grp.*, 537 F.3d at 531 n.1. The Fifth Circuit disapproved the use of "group pleading" under the PSLRA on the rationale that it fails to identify a particular individual who: (1) was responsible for the alleged misstatement and (2) had the required knowledge that the alleged misstatement was false or misleading. As the Fifth Circuit explained, it is "appropriate to look to the state of mind of the *individual* corporate official or officials who [are involved in making a statement] rather than generally to the *collective knowledge* of all the corporation's officers and employees acquired in the course of their employment." *Southland*, 365 F.3d at 366 (emphasis added). The Fifth Circuit drew support for its holding from other courts which had noted the mischief created by patching together the mental states of multiple corporate representatives to arrive at a "collective" fraudulent intent which no single individual possessed. *See, e.g., In re Apple Computer, Inc. Sec. Litig.*, 243 F. Supp. 2d 1012, 1023 (N.D. Cal. 2002) ("It is not enough to establish fraud on the part of a corporation that one corporate officer makes a false statement that another knows to be false."); *Gutter v. E.I. Dupont De Nemours*, 124 F. Supp. 2d 1291, 1311 (S.D. Fla. 2000) ("The knowledge necessary to form the requisite fraudulent intent must be possessed by at least one agent and cannot be inferred and imputed to a corporation based on disconnected facts known by

different agents.").

The Court does not dispute that "group pleading" is inadequate in this Circuit. However, it does not follow that generalized allegations of intent to induce reliance—based on objective features of the alleged misstatements themselves—necessarily invite the same sort of mischief as "group pleading" Defendants' participation in a statement and their knowledge of its falsity. Certainly, the Complaint must allege facts that support the existence of intent to induce reliance in the individual or individuals responsible for each alleged misstatement. However, unlike knowledge of falsity, the Court believes that such facts may be alleged on an undifferentiated basis. Depending on the circumstances alleged, it may be reasonable to infer that any individual involved in an alleged misstatement possessed a particular understanding of the audience and effect of the statement, without delineating that understanding by named individuals.

With this framework in mind, the Court turns to Plaintiffs' allegations relevant to intent to induce reliance. The allegations must be tested under the substantive requirements of English common law. Defendants contend that mere foreseeability that inducement could occur is not sufficient (Cons. MTD at 28-29)—a point that Plaintiffs do not appear to contest. Actual foresight that inducement could occur, however, appears to mandate a different conclusion. English courts have expressed the principle to be applied in a number of different ways. Some have found the intent element satisfied when inducement was a "natural consequence" of the allegedly fraudulent statement. *See Andrews v. Mockford* [1896] Q.B. 372, at 378 (intent shown when "natural consequence of the publication [of the false statement] in the newspaper was that the plaintiff should buy shares"); *Richardson v. Silvester* [1873] Q.B. 34, at 36 (intent adequately alleged when "natural consequence would be that a person who was desirous of becoming a tenant would, upon reading the [false] advertisement, incur expense in looking at the farm"); *but*

79

*see Brown Jenkinson & Co. Ltd. v. Percy Dalton (London) Ltd.* [1957] 2 Q.B. 621, at 644 (Evershed, dissenting) ("[I]t is essential for the establishment of a conspiracy to defraud that the defrauding of some third party should not merely be the consequence or the possible or likely consequence of the agreement of the alleged conspirators; but should be its real purpose and aim."). Others have concluded that a defendant who "appreciated" or "must have known" that inducement would occur is deemed to have intended that result. *See Shinhan Bank Ltd. v. Sea Containers Ltd.*, 2000 WL 1274111, at 11 (intent shown when defrauding party "appreciated that (barring some unforeseen intervention) the bank would pay against the false clean receipts"); *see also Cullen v. Thomson* [1862] All E.R. Rep. 640, at 644 (intent adequately alleged when defendants made knowing false representations "under such circumstances as they must have supposed would probably induce a person in the situation of the [plaintiff] to act upon it and to buy shares in the partnership concern").

Following the general rule laid down by these cases, so long as Plaintiffs have alleged facts from which it is fair to infer that the responsible Defendant anticipated that the statement in question would reach the Plaintiffs and be relied upon by them in connection with investment decisions, Plaintiffs will have cleared the bar for stating a claim under Rules 8(a) and 9(b). As suggested by the parties, the Court finds it helpful to categorize and analyze the various alleged misstatements according to the contexts in which they were made.[34]

### 1.    Face-to-face meetings

Several alleged misstatements were made during face-to-face meetings between representatives of BP and the investment firm ████, acting as advisor to Alameda County.

---

[34] For clarity, the Court will address the sufficiency of Plaintiffs' allegations of intent to induce reliance without regard to whether the other elements of deceit have been established.

(Compl. ¶ 439.) Plaintiffs have alleged that ███████ specifically voiced concerns about ███

████████████████████████████████████████████████████████████████████

(*Id*. at ¶ 439(a).) The individuals representing BP in those meetings are alleged to have

responded specifically to ████████'s questions and concerns. (*Id*.) Under these circumstances, it

is reasonable to infer that these individuals were aware of to whom they were speaking and the

line of business in which those people were employed. They must have therefore anticipated that

their statements could reach █████████'s clients and that those clients' investment decisions

could be shaped in part by the information provided. *See Gross v. Lewis Hillman Ltd.* [1969] 1

Ch. 445, at 461 (acknowledging that misrepresentations about a piece of commercial property

made to an "expert dealer" should be actionable by a client of the dealer who buys on the

dealer's recommendation); *Swift v. Winterbotham* [1873] Q.B. 244, at 253 (finding that

misrepresentation about a commercial entity's creditworthiness made by one bank to another is

actionable by the receiving bank's customer because it was "known and contemplated" that the

misrepresentation would be "communicated" to the customer). Given these circumstances,

Alameda County has adequately alleged intent to induce reliance in connection with the

statements made during the face-to-face meetings with ████████ [35]

### 2.   Communications directed to investors

Other alleged misstatements were made in connection with corporate reporting, meetings,

and teleconferences expressly aimed at shareholders and the investing public. Defendants'

English law expert suggests that the anticipated audience for these statements may not be

sufficient to establish intent to induce reliance, analogizing to the *Caparo* case in which Lord

---

[35] To the extent that Providence and State-Boston also assert deceit claims on the basis of these statements, they have not adequately alleged that the BP participants knew their statements would be disseminated beyond ████████ and its clients.

Oliver and Lord Jauncey determined that compliance with corporate reporting requirements is not done for the "purpose" of permitting the public to make informed investment decisions, but to equip shareholders with the necessary information to exercise their rights of ownership. (Moore Decl. ¶¶ 63-66.)

Although attractive on its face, the Court does not believe that the analogy to the law of negligent misstatement withstands scrutiny. The issue encountered in negligent misstatement— addressed in more depth in Section VI.E, above—is whether a defendant has willingly entered into a "special relationship" with the plaintiff such that the law may imply a duty to speak carefully. English common law is very reticent to find such a "special relationship." One limiting requirement is that the statement must have been made for the purpose to which it was used by the plaintiff. Awareness that the statement *could* be used for that purpose is clearly not sufficient. *Caparo*, 2 A.C. 605, at 660 (Jauncey) (noting that "auditors [are] aware that their reports will be seen and relied upon by the members [of a company]" but that this fact "does not answer the fundamental question of the purpose . . . for which the annual accounts of a company are prepared and distributed to its members"). In other words, informing or affecting the plaintiff's actions must have been a motivating impetus for the making of the statement before a special relationship can exist.

The Court does not find this facet of negligent misstatement to be interchangeable with intent to induce reliance under deceit.[36] As noted above, English common law supports that a

---

[36] One English case, *Possfund Custodian Trustee Ltd. v. Diamond*, suggests that intent to induce reliance is a required element of both deceit and negligent misstatement, and that the element is indeed interchangeable between the two claims. *See* 1 WLR 1351, at 1364 (stating that both deceit and negligent misrepresentation require "a material representation intended to influence . . . the mind of the representee"); *see also McInerny v. Lloyds Bank Ltd.* [1974] 1 Lloyds Rep. 246, at 253 ("[I]t seems to me that when one man makes a statement to another with the intention of

defendant is adequately alleged to have intended to induce reliance if he knew that inducement was likely to occur. Such a showing would not be sufficient to ground a "special relationship" for purposes of a negligent misstatement claim. Although the Court has not encountered a case or treatise that directly confronts the issue, this seemingly contradictory outcome can be reconciled by reference to the fact that a deceit claim involves a knowing or severely reckless misrepresentation. When a defendant knowingly states a falsehood, with awareness that the falsehood will reach the plaintiff and may affect his behavior, it is reasonable to infer that the defendant intended the result obtained. Indeed, some English cases have gone so far as to state that the situation gives rise to a "rebuttable presumption" of intent. *See Goose v. Wilson Sandford & Co.*, 2000 WL 191196, at 14-15 ("[I]f a fraudulent misrepresentation is found to have been made it will give rise to a rebuttable presumption of fact that the representor intended the representee to act in reliance on it.") (citations omitted). By contrast, a defendant to a negligent misstatement claim is only alleged to have spoken carelessly. Without more than awareness that the statement could affect the plaintiff's behavior, the defendant should not be deemed to have voluntarily assumed a duty towards him.[37]

---

inducing him to enter into a contract with him . . . on the faith of it, the maker must be regarded as accepting a responsibility for the statement [if negligently made].")." *Possfund* describes the requisite intent as a desire to "influence" the plaintiff's behavior and indicates that the intent must be "expressly communicated" to the plaintiff or capable of being "reasonably inferred" by the plaintiff from the circumstances. 1 WLR 1351, at 1364. The Court finds that *Possfund*'s description of the intent element is appropriate for negligent misstatement—the claim actually at issue in that case—but under-inclusive for deceit.

[37] The Court also notes that the law on negligent misstatement disfavors the implication of a duty when the alleged misstatement was not directed at the specific plaintiff, or to an identifiable and discrete group to which the plaintiff belonged. By contrast, a fraudulent misstatement can be actionable even it was circulated generally with the intent that any member of the public act in reliance thereupon. *See Andrews v. Mockford* [1896] 1 Q.B. 372, at 385 (approving jury determination that defendants disseminated misrepresentations through a prospectus and a

As a result, the Court is persuaded that Defendants' intent to induce reliance has been adequately alleged for the statements directly addressed to BP's shareholders and the investing public. The individuals responsible for these statements were ostensibly aware of the documents in which the statements appeared, or the settings in which the statements were made. They must have therefore anticipated that their statements would reach investors and that investment decisions could be shaped in part by what they said. Therefore, Plaintiffs have adequately alleged intent to induce reliance in connection with the following statements:

- Statements made during conference calls held on July 24, 2007 and February 27, 2008, which were allegedly conducted "with analysts and investors." (Compl. ¶¶ 337, 347.)

- Statements made in BP's periodic corporate reporting, including Annual Reviews, Annual Reports, Sustainability Reviews, and Sustainability Reports. (*Id.* ¶¶ 333, 345, 354, 357-58, 370, 377, 379, 385, 387, 389-90.) The Annual Reports were filed with the SEC. (*Id.* ¶ 357, 379.) The Annual Reviews, Sustainability Reviews, and Sustainability Reports were "made available to the investing public on [BP's] official website." (*Id.* ¶¶ 333, 345, 354, 370, 377, 385.) Defendants argue that the Sustainability Reviews and Sustainability Reports were not directed to shareholders and the investing public because of language in those documents advising readers not to rely upon them for purposes of deciding whether to invest in BP. (Cons. MTD at 30.) Such a "disclaimer" may be sufficient to prevent a "special relationship" from arising under negligent misstatement, but it does not negate intent to induce reliance if such intent actually existed. Plaintiffs have alleged that BP intended the Sustainability Reports and Sustainability Reviews to reach shareholders and the investing public. They were reviewed by the SEEAC

---

publicized telegram "in order to induce members of the public" to buy shares of a company); *Swift v. Winterbotham* [1873] L.R. 8 Q.B. 244, at 253 (a representation can be actionable "even if it is made to the public generally with a view to its being acted on, and the plaintiff as one of the public acts on it and suffers damage thereby"); *Richardson v. Silvester* [1873] L.R. 9 Q.B. 34, at 36 (finding actionable a representation in a newspaper advertisement that was "made and published in order to be read by persons who would be likely to be tenants of farms"); *Barry v. Croskey* (1861) 2 J. & H. 945, at 956 (acknowledging that false representations can be directed to "every member of the community who was likely to purchase shares in [a] company . . . with the intent that every such member . . . should purchase shares at high prices for the benefit of the company"); *but see Peek*, L.R. 6 H.L. 377, at 400 (suggesting that member of the public who purchased shares in reliance on statements made in a prospectus "inviting the public to apply for allotment of shares" cannot recover without "connect[ing] himself with [defendants]").

as "material to be placed before shareholders which addresses environmental, safety and ethical performance." (*Id*. ¶¶ 150-56.) It is reasonable in these circumstances, regardless of the presence of a disclaimer, to infer that the responsible Defendants made the statements with intent to induce Plaintiffs' reliance.

- Statements made at BP's 2008 Annual General Meeting with shareholders, which were made publicly accessible on BP's website and which were subsequently filed with the SEC on Form 6-K as an "Address to Shareholders at The Annual General Meeting of BP plc on April 17, 2008." (*Id*. ¶¶ 349-50.)

### 3.    Press releases

One alleged misstatement was contained within a January 16, 2007 press release announcing the release of the Baker Report. The contents of the release were also filed with the SEC on Form 6-K. (Compl. ¶ 331.) Another alleged misstatement was contained within an October 25, 2007 press release, which was also filed with the SEC on Form 6-K. (*Id*. ¶ 341.) Because the alleged misstatements were publicly disseminated, and filed with the SEC, it is reasonable at this stage to infer that the individuals involved with the press releases contemplated that it would reach investors and could potentially affect investment decisions.

### 4.    Industry conferences

Five alleged misstatements were delivered by Defendants Inglis and Hayward as part of prepared remarks at industry conferences. (Compl. ¶¶ 339, 343, 352, 381, 383.) Three of these speeches—Hayward's remarks at the 2008 HRH Prince of Wales's 3rd Annual Accounting for Sustainability Forum; Inglis's remarks at the 2010 Howard Weil Energy Conference; and Hayward's remarks at the Peterson Institute for International Economics in 2010—were subsequently posted on BP's publicly-accessible website. (*Id*. ¶¶ 352, 381, 383.) Additionally, the Howard Weil Energy Conference was billed as "one of the premier investor conferences in the energy industry." (*Id*. ¶ 382(b).) Although thin, these allegations support the inference that

Defendants Inglis and Hayward delivered their remarks with knowledge that they would reach investors and could affect their investment decisions. Plaintiffs have not sufficiently alleged, however, that Inglis had such knowledge regarding remarks delivered at 2007 Sanford Bernstein 4th Annual Strategic Decisions Conference, or that Hayward had such knowledge regarding remarks delivered at the 2007 Houston Forum. (*Id*. ¶¶ 339, 343.) As a result, Plaintiffs have not adequately alleged intent to induce reliance for these earlier alleged misstatements.

### 5.   Congressional testimony

Plaintiffs also assert deceit claims based on Defendant Malone's testimony to a subcommittee of the U.S. House of Representatives on May 16, 2007 and Defendant Rainey's testimony to a committee of the U.S. Senate on November 19, 2009. (Compl. ¶¶ 335, 374-75.) Plaintiffs' allegations do not indicate any circumstances surrounding the testimony which would support an inference that Malone or Rainey understood or desired that his comments would extend beyond the U.S. Congress to the investment community. Plaintiffs have not adequately alleged intent to induce reliance for these alleged misstatements.

### 6.   MMS filings

Several alleged misstatements were included in the IEP for the Macondo well and the Regional OSRP for the Gulf of Mexico. (Compl. ¶¶ 360-63, 372.) These were regulatory filings required by the U.S. Department of the Interior Minerals Management Services ("MMS") before BP could commence exploration activities on the Offshore Continental Shelf. (*Id*. ¶ 364.) Defendants argue that the documents were not addressed to or intended for the investing public. (Cons. MTD at 30.) The Court agrees. On their face, these documents were addressed to the regulatory agency with which they were filed. Although they complied with specific MMS regulations, there is no suggestion that these regulations were intended to protect investors or to

facilitate informed investment decisions. As a result, Plaintiffs have not adequately alleged that the individuals responsible for the alleged misstatements in the IEP and OSRP knew that those statements would ever be read by or relied upon by investors. On the allegations currently set forth, Plaintiffs' deceit claims premised on those documents fail as a matter of law.

### 7. Post-spill statements

Finally, the alleged post-spill statements made by Defendants Suttles, Hayward, McKay, Dudley, and "BP"—all concerning the amount of oil gushing into the Gulf of Mexico—were made through a variety of media intended to reach as broad an audience as possible.  (Compl. ¶¶ 399, 401, 404-06, 414, 416, 418, 420-22, 425, 427-28, 430.) Specifically:

- Many post-spill statement were made on nationally-broadcast television shows or to nationally-distributed print journalists. (*Id*. ¶¶ 401, 416, 420-22, 427, 430.)

- Three were made during the course of Unified Command press conferences. (*Id*. ¶ 399, 425, 428.)

- Several were filed with the SEC on Form 6-Ks. (*Id*. ¶¶ 404, 405, 414.)

- One appeared on BP's publicly-accessible website. (*Id*. ¶ 406.)

- One was made to a committee of the U.S. House of Representatives during the course of a public hearing. (*Id*. ¶ 418.)

In the thirty-two days following the disaster, three BP representatives (Suttles, Hayward, and McKay) and five unattributed corporate sources repeated the 5,000-barrel-per-day estimate at least fifteen times in at least eight different public outlets.[38]

These allegations fairly support that Suttles, Hayward, McKay, Dudley, and any individual responsible for the unattributed corporate statements made by "BP" were involved in a coordinated and very public campaign to instill and perpetuate the belief that the loss of oil per

---

[38] Although it is alleged that Dudley disputed higher estimates of the oil spill, it is not alleged that he reiterated the 5,000 barrels per day estimate. (Compl. ¶ 422.)

day was approximately 5,000 barrels and <u>not</u> 70,000 barrels as estimated by other observers of

the ongoing tragedy. Plaintiffs acknowledge that these post-spill statements could have been

intended to deceive the U.S. government, to whom penalties would be owed based on the total

volume of oil spilled. (Compl. ¶ 211.) But they also allege that BP's existing and prospective

shareholders were another intended audience of the statements. (*Id.* ¶¶ 212-13.) Given the

circumstances existing at the time; the alleged evidence within BP that the spill rate was much

higher than publicized; and the fact that BP has admitted criminal and civil liability in

connection with some of the above statements, the Court finds that Plaintiffs' allegations fairly

support the inference that the Defendants responsible for the post-spill statements spoke with

intent to affect the investment decisions of BP's existing and prospective shareholders.[39]

## VII.    FORUM NON CONVENIENS

Defendants request—as an alternative to their arguments regarding the infirmities of

Plaintiffs' state-law claims under English law—that the Court dismiss those claims under the

doctrine of forum non conveniens. Under this doctrine, the Court may decline to exercise

jurisdiction "if the moving party establishes that the convenience of the parties and the court and

the interests of justice indicate that the case should be tried in another forum." *Karim v. Finch

Shipping Co., Ltd.*, 265 F.3d 258, 268 (5th Cir. 2001). "[T]he ultimate inquiry is where trial will

best serve the convenience of the parties and the ends of justice." *Koster v. (American)

Lumbermens Mut. Casualty Co.*, 330 U.S. 518, 527 (1947).

---

[39] According to the Complaint, certain post-spill statements undergirded criminal charges and civil claims brought by the U.S. government against BP. BP pled guilty to the criminal charge of felony obstruction of Congress, among other charges, and agreed to pay $4 billion—the highest criminal penalty in U.S. history. (Compl. ¶ 210.) BP also settled the SEC's civil securities fraud case, agreeing to a penalty of $525 million—the third largest in the SEC's history. (*Id.*)

A.    **Legal Standard**

Analysis of a motion to dismiss for forum non conveniens proceeds in two stages. First, the Court must decide whether an available and adequate alternative forum exists. To make this assessment, the Court generally considers the following factors: "(1) amenability of the defendant to service of process and (2) availability of an adequate remedy in the alternative forum." *Karim*, 265 F.3d at 268; *see also Gonzalez v. Chrysler Corp.*, 301 F.3d 377, 379-80 (5th Cir. 2002); *McLennan v. Am. Eurocopter Corp.*, 245 F.3d 403, 424 (5th Cir. 2001).

If the Court concludes that an available and adequate alternative forum exists, it then determines which forum is best suited to the litigation. *Karim*, 265 F.3d at 268. This prong of the analysis begins with a consideration of "relevant factors of private interest, weighing in the balance the relevant deference given the particular plaintiff's initial choice of forum." *In re Air Crash Disaster near New Orleans*, 821 F.2d 1147, 1165 (5th Cir. 1987). The private interest factors to be considered by the Court relate primarily to the convenience of the litigants. They are:

(1)    the relative ease of access to sources of proof;

(2)    the availability of compulsory process to secure the attendance of witnesses;

(3)    the cost of attendance for willing witnesses; and

(4)    all other practical problems that make trial of a case easy, expeditious and inexpensive.

*Syndicate 420 at Lloyd's London v. Early American Ins. Co.*, 796 F.2d 821, 831 (5th Cir. 1986) (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1981)).

If the private interest factors weigh in favor of dismissal, the motion to dismiss for forum non conveniens may be granted. *See Empresa Lineas Maritimas Argentinas, S.A. v. Schichau-*

*Unterweser, A.G.*, 955 F.2d 368, 376 (5th Cir. 1992) (finding "no need to consider the public interest factors" when the "balance of private interest factors favor[ed] dismissal"). Otherwise, the Court must consider in turn the relevant public interest factors. "If these factors weigh in the moving party's favor, the district court may dismiss the case." *Gonzalez*, 301 F.3d at 380 (citing *Baumgart v. Fairchild Aircraft Corp.*, 981 F.2d 824, 837 (5th Cir. 1993)); *see also In re Air Crash*, 821 F.2d at 1165 ("If the district court finds that the private interests do not weigh in favor of the dismissal, it must then consider the public interest factors.").

> The public interest factors relevant to the analysis are:
>
> (1)   the administrative difficulties flowing from court congestion;
>
> (2)   the local interest in having localized controversies decided at home;
>
> (3)   the familiarity of the forum with the law that will govern the case; and
>
> (4)   the avoidance of unnecessary problems of conflict of laws or the application of foreign law.

*Syndicate 420*, 796 F.2d at 831 (citing *Piper Aircraft*, 454 U.S. at 241 n.6). In cases where the private interest factors do not weigh heavily in favor of the alternative forum, a court may still dismiss an action in light of the relevant public interest considerations. *See Piper Aircraft*, 454 U.S. at 256 n. 23 ("[I]f the balance of conveniences suggests that trial in the chosen forum would be unnecessarily burdensome for the defendant or the court, dismissal is proper."); *In re Air Crash*, 821 F.2d at 1165-66 ("[E]ven when the private conveniences of the litigants are nearly in balance, a trial court has discretion to grant forum non conveniens dismissal upon finding that retention of jurisdiction would be unduly burdensome to the community, that there is little or no public interest in the dispute or that foreign law will predominate if jurisdiction is retained.") (quoting *Pain v. United Technologies Corp.*, 637 F.2d 775, 792 (D.C. Cir. 1980)).

When undertaking the required balancing, "no one private or public interest factor should be given conclusive weight[.]" *In re Air Crash*, 821 F.2d at 1163. Ordinarily a favorable presumption is applied to the plaintiff's choice of forum. Thus, "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947); *see also Veba-Chemie A.G. v. M/V Getafix*, 711 F.2d 1243, 1245 (5th Cir. 1983) ("[A] forum non conveniens dismissal must be based on the finding that, when weighed against plaintiff's choice of forum, the relevant public and private interests strongly favor a specific, adequate and available alternative forum.").

### B.    Analysis

Defendants claim that: (1) England is an available and adequate alternative forum for these claims, and (2) the private and public interest factors favor dismissal. (Cons. MTD at 43-47.) Regarding the private interest factors, Defendants claim that most of the alleged misstatements originated from England and that the non-party witnesses such as ███████ are predominantly in England. (*Id*. at 45-46.) Regarding the public interest factors, Defendants note that English courts are more familiar with English law. They also emphasize that the FSMA has not been widely interpreted, which will make it more difficult for the Court to construe and apply that law. (*Id*. at 46-47.)

Plaintiffs contend that England is not an available alternative forum because it cannot adjudicate their entire case—specifically, Alameda County and State-Boston cannot pursue their Exchange Act claims in England. They suggest that an alternative forum is not adequate if it cannot accommodate all of Plaintiffs' claims. (Cons. Opp. at 19.)

As to the private interest factors, Plaintiffs note that many similar claims are pending in this court, and convenience will be served by leaving them in a single forum. (Cons. Opp. at 19-

20.) They caution that dismissing for forum non conveniens creates the risk of inconsistent rulings between this Court and English courts. (*Id*. at 20.) As to the location of witnesses, Plaintiffs believe this factor favors the current forum because four of seven individual defendants are located here; two of three corporate defendants are located here; Defendants are already actively involved in this multi-district ligitation, as well as another located in New Orleans, Louisiana; and ████████ has agreed to participate without need for compulsory process. (*Id*. at 20-21.) Finally, Plaintiffs note that documents have already been produced in this forum with no problems. (*Id*. at 21-22.)

As to the public interest factors, Plaintiffs argue that congestion on the Court and burden on the community will not be alleviated by dismissal, since Alameda County's and State-Boston's Exchange Act claims will have to remain here. (Cons. Opp. at 23.) Plaintiffs also criticize Defendants' reliance on FSMA as a reason for dismissal, because: (1) they dispute that a claims under FSMA is the sole claim that may be brought for the covered statements, and (2) even if the Defendants' interpretation of FSMA is correct, only two statements out of nearly fifty alleged misstatements would be affected. (*Id*. at 23-24.)

In their reply brief, Defendants dispute Plaintiffs' assertion that England is not an available forum. They state that courts have discretion to dismiss only part of a case under forum non conveniens. (Doc. No. 63 ("Cons. Reply"), at 29.) They also clarify that they have agreed Plaintiffs will have access to discovery produced in this multi-district litigation, regardless of the forum in which their English law claims are tried. Therefore, they dispute that forum non conveniens dismissal will be inefficient. They claim the only pertinent question for the Court is which forum should handle dispositive motions and trial. (*Id*. at 30.)

The Court does not find that Defendants have surmounted the high bar for disturbing

Plaintiffs' choice of forum. Even assuming that Defendants are correct that England represents an available forum—despite the fact that Alameda County and State-Boston may not pursue their Exchange Act claims there—the private and public interest factors, viewed *in toto*, do not indicate that this Court is an inconvenient forum for Plaintiffs' English law claims.

First, the relevant private interest factors do not weigh in favor of dismissal. Defendants had these cases aggregated in the instant multi-district litigation based on their similarities and the efficiencies to be gained from coordinated pretrial proceedings. It would be *in*efficient to send these claims to England, when nearly the same issues will be adjudicated here in the Class Action and in individual actions asserting Exchange Act claims. Defendants' offer to coordinate discovery, regardless of where the cases are tried, would not alleviate the inefficiency, although it does prompt the question of what legitimate benefit Defendants hope to gain from proceeding in the English courts.

Nor do the public interest factors return a different result. The one public interest factor favoring dismissal is the need to apply foreign law to some of Plaintiffs' claims. But this factor alone cannot be determinative. *See Piper Aircraft*, 454 U.S. at 260 n.29 (noting that the need to apply foreign law, on its own, "is not sufficient to warrant dismissal when a balancing of all relevant factors shows that the plaintiff's chosen forum is appropriate"); *see also In re Air Crash*, 821 F.2d at 1163 (emphasizing that "no one private or public interest factor should be given conclusive weight" when deciding forum non conveniens). Moreover, the Court is certainly capable of applying English law, which shares so many strong similarities with U.S. law due to a common heritage.[40]

---

[40] The Court acknowledges that it will require the assistance of English law experts to interpret and apply the FSMA. It does not find, however, that this fact justifies dismissal when the FSMA

The other public interest factors weigh in favor of retaining Plaintiffs' English law claims in this forum. Because the Class Action and any individual actions asserting Exchange Act claims will be tried in this Court, dismissal of the English law claims will not appreciably relieve "congestion" on the Court's docket. Most importantly, the nature of the controversy is unquestionably local, and resolving it here will not unduly burden the local community. The oil spill which prompted these claims occurred only 50 miles off the coast of Louisiana, in the Gulf of Mexico. The majority of the misrepresentations alleged by Plaintiffs touch the adequacy of, and the attention paid to, the safety of BP's *U.S.* operations, conducted largely by its *U.S.* subsidiaries based in this very district. Because neither the private interest factors nor the public interest factors weigh heavily in favor of dismissal, the Court declines to upend Plaintiffs' choice of forum.

## VIII.   CONCLUSION

It is ordered that Defendants' Consolidated Motion to Dismiss (Doc. No. 46) is **PARTIALLY GRANTED**. For the reasons articulated in this memorandum and opinion, the Court grants the motion as to the following claims:

- All claims for common law aiding and abetting fraud.

- All claims for statutory fraud under Texas and California law.

- All claims for deceptive trade practices under Massachusetts law.

- As to Providence only, all claims based on public statements made after October 2009.

- All claims based on statements made in the November 29, 2006 meeting with ████████ (Compl. ¶ 439(a).)

- All claims based on statements made in the January 16, 2007 press release (*Id.* ¶

applies to, at most, two alleged misrepresentations, and when the FSMA has already been rendered obsolete by the enactment of a successor law. (Lowe Decl. ¶¶ 7, 15.)

331.)

- All Exchange Act and deceit claims based on statements made in the February 7, 2007 meeting with ▮▮▮▮. (*Id*. ¶ 439(b).)

- All claims based on statements made in the 2006 Sustainability Report, dated May 9, 2007. (*Id*. ¶ 333.)

- All claims based on statements made in the May 16, 2007 House testimony. (*Id*. ¶ 335.)

- All claims based on statements made in the July 24, 2007 investor call. (*Id*. ¶ 337.)

- All claims based on statements made in the September 17, 2007 meeting with ▮▮▮▮. (*Id*. ¶ 439(c).)

- All claims based on statements made in the September 25, 2007 industry conference. (*Id*. ¶ 339.)

- All claims based on statements made in the October 25, 2007 press release. (*Id*. ¶ 341.)

- All deceit and negligent misstatement claims based on statements made in the November 8, 2007 industry conference. (*Id*. ¶ 343.)

- All negligent misstatement claims based on statements made in the 2007 Annual Review, dated February 22, 2008. (*Id*. ¶ 345.)

- All negligent misstatement claims based on statements made in the February 27, 2008 investor presentation. (*Id*. ¶ 347.)

- All claims based on statements made in the March 3, 2008 meeting with ▮▮▮▮. (*Id*. ¶ 439(d).)

- All negligent misstatement claims based on statements made in the 2008 Annual General Meeting, held April 17, 2008. (*Id*. ¶ 349.)

- All negligent misstatement claims based on statements made in the December 17, 2008 industry conference. (*Id*. ¶ 352.)

- All claims based on unattributed statements made in the 2008 Annual Review, dated February 24, 2009. (*Id*. ¶ 354.)

- All negligent misstatement claims based on Hayward's statements in the 2008 Annual Review. (*Id*. ¶ 355.)

- All negligent misstatement claims based on statements made in the 2008 Annual Report, dated March 4, 2009. (*Id*. ¶¶ 357-58.)

- All deceit and negligent misstatement claims based on statements made in the March 10, 2009 Initial Exploration Plan. (*Id*. ¶¶ 360-63.)

- All claims based on statements made in the March 17, 2009 meeting with ▉▉▉. (*Id*. ¶ 439(e).)

- All negligent misstatement claims based on statements made in the 2008 Sustainability Review, dated April 16, 2009. (*Id*. ¶ 370.)

- All deceit and negligent misstatement claims based on statements made in the June 30, 2009 Oil Spill Response Plan. (*Id*. ¶ 372.)

- All claims based on statements made in the November 19, 2009 Senate testimony. (*Id*. ¶¶ 374-75.)

- All negligent misstatement claims based on statements made in the 2009 Annual Review, dated February 26, 2010. (*Id*. ¶ 377.)

- All claims based on statements made in the March 3, 2010 meeting with ▉▉▉. (*Id*. ¶ 439(f).)

- All negligent misstatement claims based on statements made in the 2009 Annual Report, dated March 5, 2010. (*Id*. ¶ 379.)

- All Exchange Act and deceit claims based on statements made in the March 18, 2010 meeting with ▉▉▉. (*Id*. ¶ 439(g).)

- All negligent misstatement claims based on statements made in the March 22, 2010 industry conference. (*Id*. ¶ 381.)

- All negligent misstatement claims based on statements made in the March 23, 2010 industry conference. (*Id*. ¶ 383.)

- All negligent misstatement claims based on Hayward's statements in the 2009 Sustainability Review, dated April 15, 2010. (*Id*. ¶ 385.)

- All claims based on unattributed statements in the 2009 Sustainability Review. (*Id*. ¶ 387.)

- All claims based on statements made in the 2009 Sustainability Report, dated April 15, 2010. (*Id*. ¶¶ 389-90.)

- All negligent misstatement claims based on post-spill statements made between

the dates of April 28, 2010 and May 22, 2010. (*Id.* ¶¶ 399, 401, 404-06, 414, 416, 418, 420-22, 425, 427-28, 430.)

In all other respects, the Motion is **DENIED**.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the 30th day of September, 2013.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE