UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: BP p.l.c. | § | MDL No. 10-md-2185 |
| SECURITIES LITIGATION | § | |
| | § | |
| | § | |
| | § | |
| AVALON HOLDINGS, INC., et al. | § | Civ. Act. No. 4:12-cv-3715 |
| | § | |
| v. | § | |
| | § | |
| BP p.l.c., et al. | § | HON. KEITH P. ELLISON |
| | § | |

<u>MEMORANDUM AND ORDER</u>

Pending before the Court is Defendants' Amended Second Tranche Consolidated Motion to Dismiss. (Doc. Nos. 57, 62.)[1] Having reviewed the original motion (Doc. No. 31), the amended motion, Plaintiffs' response (Doc. Nos. 74, 77), Defendants' reply (Doc. Nos. 83, 84), and all arguments and papers in support thereof, the Court finds that Defendants' amended motion (Doc. Nos. 57, 62) must be **GRANTED IN PART** and **DENIED IN PART**.

I.    OVERVIEW OF MULTIDISTRICT LITIGATION 2185

A.    The securities fraud cases involved in MDL 2185[2]

This action is one of ten actions comprising the "second tranche" of individual investor securities fraud actions filed against BP p.l.c. and related entities and individuals in Multidistrict Litigation No. 2185. With some rare deviations—the significance of which is disputed—the allegations asserted in the second tranche cases track the allegations asserted in the first tranche

_____

[1] Unless otherwise indicated, all docket references are to 12-cv-3715.

[2] In addition to securities fraud claims, MDL 2185 also involves shareholder derivative claims—dismissed in 2011—and ERISA claims.

cases and in the separate class action brought pursuant to the Securities Exchange Act of 1934 (the "Exchange Act"). That is, the second tranche plaintiffs also seek to hold Defendants responsible for financial harm caused by BP's falling stock prices after the Deepwater Horizon explosion on April 20, 2010 and the resulting 87-day oil spill in deepwater Gulf of Mexico.[3] Plaintiffs contend that Defendants materially misrepresented the worth of BP's stock prior to and immediately following the disaster. They believe Defendants should compensate them for their financial losses following the alleged correction of BP's stock price.

The second tranche actions, like the first tranche actions, differ from the parallel Exchange Act class action ("Class Action") in one very significant way. Whereas all of the actions allege that Defendants made misrepresentations which distorted the public's perception of BP's risk profile and downplayed the magnitude of the post-explosion oil spill, only the individual investor actions seek recovery for the diminution in value of BP's Ordinary Shares on the London Stock Exchange ("LSE"). This is because the Court dismissed such claims in the Class Action, finding that the U.S. federal securities laws do not provide relief for losses experienced on foreign exchanges. *In re BP p.l.c. Sec. Litig.* ("*BP I*"), 843 F. Supp. 2d 712, 793-96 (S.D. Tex. 2012). Recovery in the Class Action has thus been limited to losses associated with the drop in value of BP's American Depository Shares ("ADSs"), which are listed and sold on the New York Stock Exchange ("NYSE"). In order to recover their Ordinary Share-related losses, various individual investors—including those involved in the instant action—have filed

---

[3] The Court has written at length regarding the events of April 20, 2010. A more extensive description of the factual allegations regarding BP's checkered safety record and the tragic events leading up to the Deepwater Horizon explosion may be found in two of the Court's prior orders issued in the Class Action. *See In re BP p.l.c. Sec. Litig.* ("*BP I*"), 843 F. Supp. 2d 712, 724-25, 741-42 (S.D. Tex. 2012); *In re BP p.l.c. Sec. Litig.* ("*BP II*"), 852 F. Supp. 2d 767, 775-78 (S.D. Tex. 2012).

independent lawsuits, which have been aggregated with the Class Action and with each other due to their extensive factual and legal similarities.[4]

### B.   Overlap between the first tranche and second tranche cases

All ten actions in the second tranche were filed in or removed to federal court between August 2012 and November 2013. Defendants first moved to dismiss eight of the second tranche cases—including this one—in May 2013. (Doc. No. 31.) At that time, a consolidated motion to dismiss was pending in the first tranche cases. In the interest of efficiency, the Court suspended briefing on the second tranche motion to dismiss until the first tranche motion to dismiss was resolved. (Doc. No. 45 (the "Suspension Order").)

The first tranche orders issued on September 30, 2013, and were amended on December 5, 2013 and April 7, 2014. (Doc. Nos. 672-74, 678-79, 706 [10-md-2185]; Doc. No. 92 [12-cv-1837].) They decided many issues that had been raised in the original second tranche motion to dismiss. Most importantly, the first tranche orders resolved that: (1) English law would govern the individual investors' Ordinary Share-related claims, and (2) England was not a more convenient forum for the individual investors' English law claims. Based on these and other rulings on the first tranche motion to dismiss, the parties involved in the second tranche cases entered into a detailed stipulation, which the Court signed on December 10, 2013 with slight modification. (Doc. No. 59 (the "Conforming Stip.").)

In addition to resolving by implication many of the issues raised in the original second tranche motion to dismiss, the first tranche orders reset the clock on briefing that motion. The parties agreed to fold two newly-filed individual investor actions into the second tranche as

---

[4] Some individual investors also assert Exchange Act claims based on their ADS-related losses, thereby "opting out" of the parallel Class Action. No plaintiff in this action brings an Exchange Act claim.

briefing recommenced, bringing the total number of affected cases from eight to ten. As permitted by the Suspension Order, Defendants then filed an amended consolidated motion to dismiss the second tranche cases. (Doc. Nos. 57, 62.) The motion was fully briefed, and the Court heard argument on July 25, 2014.

## II.     SPECIFICS OF THIS ACTION

### A.     The parties

Plaintiffs in *Avalon Holdings, Inc. et al. v. BP p.l.c. et al*. are 41 institutional investors from around the world. According to Defendants, the "Avalon Plaintiffs" or "Plaintiffs" consist of:

- Six public domestic funds;

- Eight public foreign funds;

- Eight private domestic funds; and

- Nineteen private foreign funds.

(Doc. Nos. 58-2 and 63-2, at 2-6.)

The "Avalon Defendants" or "Defendants" consist of three corporate entities in the BP family of companies—BP p.l.c.; BP America, Inc.; and BP Exploration & Production, Inc.—as well as eight individual defendants. BP p.l.c. ("BP" or the "Company") is a U.K. corporation with its principal executive offices located in London, England. (Doc. Nos. 25, 92 ("Avalon Compl."), at ¶ 71.) BP America, Inc. ("BP America") and BP Exploration & Production, Inc. ("BP E&P"), both wholly-owned subsidiaries of BP, are Delaware corporations with their principal places of business in Houston, Texas. (*Id.* ¶¶ 72-73.)

The individual defendants were directors and officers of one or more of the corporate

4

defendants prior to and during the Deepwater Horizon disaster.[5] They are Anthony B. Hayward, executive director from 2003 to November 2010 and Chief Executive Officer at BP from May 2007 to October 2010; Douglas Suttles, Chief Operating Officer for BP E&P from January 2009 to at least January 2011; H. Lamar McKay, the Chairman and President of BP America since January 2009; Byron E. Grote, Chief Financial Officer at BP from 2002 through 2011 and director since 2000; Robert Dudley, executive director of BP since April 2009 and its Group Chief Executive since October 2010 (i.e., Mr. Hayward's successor); Lord John Browne, BP's CEO from 1998 until May 2007 (i.e., Mr. Hayward's predecessor); Andrew Inglis, CEO of BP E&P and an executive director of the Company from February 2007 until October 2010; and Peter Sutherland, BP's Chairman from 1997 until 2009 (collectively, the "Individual Defendants"). (Avalon Compl. ¶¶ 74-77, 79, 81-83.)

**B.    The claims**

The Avalon Plaintiffs purchased Ordinary Shares on the LSE between June 30, 2005, and June 1, 2010. (Avalon Compl. ¶ 2.) They allege that Defendants concealed material information and made a series of public misrepresentations regarding "BP's implementation of process safety measures and its ability to respond to a 'worst case' oil spill in the Gulf of Mexico region." (*Id*.) They claim "substantial damages" from the correction in BP's stock price following the revelation of the "truth about BP and its lack of commitment to and implementation of safety processes to avoid preventable incidents." (*Id*. ¶ 24.) They assert English common law deceit claims against all Defendants.[6] (*Id*. ¶¶ 479-89; Conforming Stip. at 3.)

---

[5] The Avalon Complaint also names David Rainey and Robert Malone as defendants, but they have been dismissed by stipulation of the parties. (Conforming Stip. at 4, 6.)

[6] The Avalon Complaint also asserts statutory claims under Texas law, but they have been

### C.     Alleged misrepresentations not addressed in prior orders

In the four-plus years that this MDL has been pending, the Court has written at length regarding the fraudulent schemes which Defendants are alleged to have perpetuated both before and after the Deepwater Horizon explosion. *See BP I*, 843 F. Supp. 2d at 727-44, 750-75; *In re BP p.l.c. Sec. Litig.* ("*BP II*"), 852 F. Supp. 2d 767, 778-85, 794-814 (S.D. Tex. 2012); *In re BP p.l.c. Sec. Litig.* ("*BP III*"), 922 F. Supp. 2d 600, 608-13, 618-24, 633-35 (S.D. Tex. 2013); *In re BP p.l.c. Sec. Litig.* ("*BP IV*"), 2013 WL 6388408, at *1-2 (S.D. Tex. Dec. 6, 2013); *Alameda Cnty. Employees' Ret. Ass'n v. BP p.l.c.*, 2013 WL 6383968, at *3-14 (S.D. Tex. Dec. 5, 2013). The Court will not repeat these narratives here.

Fortunately, previous efforts of parties in the Class Action and the first tranche cases have helped to narrow the issues that must be resolved in the instant motion. There are a total of forty-six alleged misrepresentations included in the Avalon Complaint. Eleven of these statements—and portions of four others—were found deficient in one or more of the Class Action and first tranche cases; the Avalon Plaintiffs have stipulated to the dismissal of their claims based on these statements. (Conforming Stip. at 3-7, 13-14 (dismissing claims based on alleged misrepresentations included in paragraphs 226, 229, 231, 233, 235, 237, 241, 243, 251, 252, 259-60, 272, 275-76, 288, 290-91, and 313 of the Avalon Complaint).) Conversely, in one or more of those other cases, the Court found twenty-four statements—and portions of five others—to be adequately alleged, actionable misrepresentations; Defendants do not again advocate for their dismissal. (Avalon Compl. ¶¶ 241, 243, 245, 247, 249, 253, 256, 270, 279, 282, 284, 286, 300, 302-07, 311, 315-17.)

In addition to the misrepresentations previously addressed by the Court, the Avalon

_____

dismissed by stipulation of the parties. (Conforming Stip. at 3.)

Plaintiffs claim that they were misled by six additional public statements. Five statements predate the Deepwater Horizon explosion and concern the state of BP's safety programs and its efforts in the Gulf of Mexico. These are:

- Statements from BP's 2004 Annual Report, filed on June 30, 2005, that "[i]n all regions of the world, BP has processes to ensure compliance with applicable regulations;" that BP employees are "required to comply with the BP health, safety and environment policy;" that partners, suppliers and contractors are "encouraged to adopt them;" and that "[d]eepwater Gulf of Mexico is one of [BP's] new profit centres and [its] largest area of growth in the United States." (Avalon Compl. ¶ 220.)

- Lord Browne's statement, issued in a press release on August 17, 2005, that the March 23, 2005 explosion at BP's Texas City refinery "was the worst tragedy in the recent history of BP, and we will do everything possible to ensure nothing like it happens again." (*Id*. ¶ 221.)

- Lord Browne's statements, issued in a press release on October 24, 2005, that BP would give its "full support and cooperation" to the recently-formed Baker Panel and was "determined to do everything possible to prevent a tragedy like [Texas City] from ever happening again by ensuring that safety practices at our operations are effective and comprehensive." (*Id*. ¶ 222.)

- Statements from the 2005 Annual Review, dated February 6, 2006, that BP has been "implementing a new integrity management standard" and is "applying . . . knowledge [learned from Texas City] widely across BP's operations," as well as statements from Mr. Sutherland's "Chairman's Letter" stating that "the ethics and environment assurance committee . . . enhanced its focus in the area of personal and process safety procedures in the light of the Texas City incident" and that the "governance of [BP] is state-of-the-art." (*Id*. ¶ 224.)

- Statements from the 2006 Annual Report, filed on March 6, 2007, that "BP has committed to implement the [Baker Panel's] recommendations and will consult with the panel on how best . . . to apply the lessons learned elsewhere in its global operations." (*Id*. ¶ 227.)

Plaintiffs also include one post-explosion statement not previously addressed in the Class Action or first tranche cases. On May 18, 2010, Mr. Hayward gave the following allegedly misleading statement to the press: "I think the environmental impact of this disaster is likely to

7

be very, very modest . . . everything we can see at the moment suggests that the overall environmental impact of this will be very, very modest." (Avalon Compl. ¶ 318.)

## III.   DEFENDANTS' MOTION TO DISMISS

Defendants seek dismissal of the deceit claims asserted by foreign and private domestic plaintiffs. They argue that the second tranche actions constitute a "covered class action" brought under "State" law, and that dismissal of the deceit claims is therefore mandated by the Securities Litigation Uniform Standards Act of 1998 ("SLUSA").[7] (Doc. Nos. 58 and 63 ("Mot."), at 10-11.)

Alternatively, Defendants urge the Court to exercise its discretion to dismiss the deceit claims asserted by foreign plaintiffs under the doctrine of forum non conveniens. They acknowledge the Court's decision not to dismiss similar claims asserted by domestic plaintiffs in the first tranche, but argue that the analysis should return a different result for foreign plaintiffs asserting foreign claims against foreign (and American) defendants. (Mot. at 34.)

Defendants also argue that the six alleged public misrepresentations which have never before been addressed by the Court cannot support a deceit claim. According to Defendants, the new alleged misrepresentations are either true statements not adequately alleged to be false by omission; non-actionable expressions of future intent or expectation; or non-actionable statements of opinion or belief. (Mot. at 19-24; Doc. Nos. 58-3 and 63-3, at 1-3.) They also claim that Plaintiffs have inadequately alleged scienter for the new misrepresentations. (Mot. at 19-24,

---

[7] Defendants did not include SLUSA preclusion in their original motion to dismiss, filed prior to the Court's orders in the first tranche. (Doc. No. 31, at 1-2.) Other plaintiffs involved in the second tranche have argued that defendants waived SLUSA preclusion by omitting it from the original motion. (Doc. Nos. 771, 781 [10-md-2185] ("South Yorkshire Opp."), at 11-14.) The Court disagrees. Although it did not contemplate that Defendants would raise new arguments in the amended motion to dismiss, it did not prevent them from doing so. While waiver was not claimed by the Avalon Plaintiffs, the Court addresses it here in the interest of clarity.

31-32; Doc. Nos. 58-3 and 63-3, at 1-3.)

Finally, Defendants note that no misrepresentation remaining in the case is attributable to Mr. Inglis (Mot. at 33 n.24), and that Plaintiffs have failed to adequately allege the scienter of Lord Browne, Mr. Sutherland, and Mr. Grote (*id*. at 31-32). They urge the dismissal of these defendants from the case.

## IV.   LEGAL STANDARD

### A.   Rule 8(a) Notice Pleading

The default standard for pleading in federal court is contained in Rule 8(a):

> A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief[.]

FED. R. CIV. PRO. 8(a)(2). This standard is commonly referred to as "notice pleading." Under notice pleading requirements, a complaint will survive a motion to dismiss as long as it contains sufficient factual allegations, accepted as true, to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In considering a Rule 12(b)(6) motion to dismiss, the Court is required to accept only well-pleaded *factual* allegations as true. *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 406 (5th Cir. 2001). It does not accept as true "conclusory allegations, unwarranted factual inferences, or legal conclusions." *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 550 (5th Cir. 2007) (citation and internal quotation marks omitted).

### B.   Heightened Pleading under Rule 9(b)

Plaintiffs' allegations of fraud must also meet the stricter standards of Rule 9(b), which

provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). "At a minimum, Rule 9(b) requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003) (citation and internal quotation marks omitted). The Fifth Circuit has explained that "Rule 9(b) requires 'the who, what, when, where, and how' [of the alleged fraud] to be laid out." *Id.* (citation and internal quotation marks omitted). Insufficiently particular fraud allegations are properly challenged by a Rule 12(b)(6) motion for dismissal for failure to state a claim. *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 n.8 (5th Cir. 2009); *Carter v. Nationwide Prop. and Cas. Ins. Co.*, 2011 WL 2193385, at *1 (S.D. Tex. June 6, 2011).

Rule 9(b)'s particularity requirement is "supplemental" to the *Iqbal* requirement that a pleading include facts that, taken as true, "state a claim to relief that is plausible on its face." *Grubbs*, 565 F.3d at 185 (citation and internal quotation marks omitted). Thus, Rule 9(b) "requires only simple, concise, and direct allegations of the circumstances constituting fraud, which . . . must make relief plausible, not merely conceivable, when taken as true." *Id.* at 186 (internal quotation marks omitted).

## V.    ANALYSIS

### A.    The action is not subject to dismissal under SLUSA.

Defendants argue that SLUSA bars the non-federal claims asserted by foreign plaintiffs and private domestic plaintiffs in the second tranche.[8] (Mot. at 10-11.) As noted above, the

---

[8] By its terms, SLUSA preserves claims brought by domestic, public pension funds. *See* 15 U.S.C. § 78bb(f)(3)(B)(i) ("[N]othing in this subsection may be construed to preclude a State or

Avalon Plaintiffs assert *only* English law deceit claims. Thus, if Defendants prevail on their SLUSA preclusion argument, all claims asserted by 35 of the Avalon Plaintiffs would be dismissed in their entirety.[9]

SLUSA precludes a securities action if: (1) the action is a "covered class action;" (2) the claims are based on "State" law; (3) the action involves a "covered security;" and (4) the claims allege a misrepresentation or omission of a material fact "in connection with the purchase or sale" of a covered security. *See* 15 U.S.C. § 78bb(f)(1)(A). Plaintiffs do not dispute that the third and fourth requirement are met—i.e., that BP Ordinary Shares sold on the LSE are "covered securities" for purposes of SLUSA, or that Plaintiffs' claims allege a misrepresentation or omission of a material fact in connection with the purchase or sale of BP Ordinary Shares. They take exception, however, to whether the first or second requirement has been met.

### 1.    The individual investor actions constitute a "covered class action."

The parties dispute whether the individual investor actions—which have been filed separately—constitute a "covered class action." A collection of separately filed lawsuits can constitute a "covered class action" under SLUSA if the requirements of 15 U.S.C. § 78bb(f)(5)(B)(ii) are met. This provision is known as the "grouping" provision of SLUSA.

---

political subdivision thereof or a State pension plan from bringing an action involving a covered security on its own behalf, or as a member of a class comprised solely of other States, political subdivisions, or State pension plans that are named plaintiffs, and that have authorized participation, in such action."); *id*. § 78c(a)(16) (defining "State" as "any State of the United States, the District of Columbia, Puerto Rico, the Virgin Islands, or any other possession of the United States").

[9] The six domestic, public pension fund plaintiffs unaffected by Defendants' SLUSA argument are: the Jacksonville Police & Fire Pension Fund; the Municipal Employees' Retirement System of Michigan; the San Mateo County Employees' Retirement Association; the Utah Retirement Systems; the Orange County Employees Retirement System; and the Teachers' Retirement System of the State of Illinois.

Two aspects of the "grouping" provision have been subject to much discussion among the parties in the second tranche. First, there is a numerosity requirement: the actions must seek damages "on behalf of more than 50 persons." 15 U.S.C. § 78bb(f)(5)(B)(ii)(I). Second, there is a functional requirement: the actions must be "proceed[ing] as a single action for any purpose." *Id.* § 78bb(f)(5)(B)(ii)(II).

Some second tranche plaintiffs dispute that the numerosity requirement has been satisfied, despite the fact that a total of sixty-seven institutional investors are named as plaintiffs in the ten second tranche cases. (Doc. Nos. 771, 781 [10-md-2185] ("South Yorkshire Opp."), at 22-24.) The Avalon Plaintiffs have not taken this position, and the Court will not address the complexities of the other plaintiffs' arguments here. In short, the Court agrees—with Defendants and, presumably, with the Avalon Plaintiffs—that the numerosity requirement is satisfied.[10]

The Avalon Plaintiffs reserve their argument for the functional requirement of the grouping provision. In relevant part, the grouping provision states that separately filed cases constitute a "covered class action" if they are "proceed[ing] as a single action for any purpose." 15 U.S.C.§ 78bb(f)(5)(B)(ii)(II). Defendants emphasize that the requirement of "proceed[ing] as a single action for any purpose" is extraordinarily broad. They claim that the second tranche cases—indeed, all the individual investor actions and the federal class action—are "proceeding as a single action" for a number of different purposes. These include:

- The actions are coordinated by virtue of their inclusion in MDL 2185. (Mot. at 13.)

- The complaints are substantially identical. (*Id.*)

---

[10] Even if the second tranche plaintiffs do not number at least fifty-one—due to various exclusions advocated by other plaintiffs—the threshold is certainly met once plaintiffs from the three first tranche cases and fifteen third tranche cases are taken into account.

- The same three law firms represent plaintiffs in all ten second tranche cases, and one of these firms represents plaintiffs in a first tranche case as well. (*Id*.)

- Plaintiffs agreed to a consolidated case management order (the "Leadership/Coordination Order"), which establishes a plaintiffs' steering committee responsible for non-substantive pre-trial decisions. (*Id*. at 13-14.)

- Plaintiffs agreed to a consolidated stipulation which cross-applied the Court's rulings in the first tranche cases to the second tranche cases. (*Id*. at 14.)

- The current motion to dismiss has been briefed on a consolidated basis, and was interrupted pending the Court's ruling in the first tranche. (*Id*. at 14-15.)

- Discovery has been coordinated across nine of the ten actions.[11] (*Id*. at 15.)

Plaintiffs acknowledge that the various securities fraud complaints in this MDL contain similar information—as would any complaint following a high-profile disaster such as the Deepwater Horizon—but dispute that they are "substantially identical" or "copycat" complaints sufficient to run afoul of SLUSA. (Doc. No. 74 ("Avalon Opp."), at 13-14; South Yorkshire Opp. at 25-26.) They note that none of the law firms involved in the second tranche is representing more than 50 plaintiffs or has otherwise shown any signs of attempting to flout SLUSA. (Avalon Opp. at 13-14 & n.18; South Yorkshire Opp. at 26.) They disagree that mere inclusion in an MDL alone can trigger SLUSA.  (Avalon Opp. at 14-15; South Yorkshire Opp. at 25.) Finally, they concede that they have agreed—often at Defendants' request—to minimal coordination across the various individual actions, but they emphasize that the coordination is (1) non-substantive and (2) intended to relieve the burden on the Court. (Avalon Opp. at 15; South

---

[11] *Nova Scotia Health Employees' Pension Plan v. BP p.l.c. et al.* is the most recently filed action in the second tranche. No agreed discovery order has been entered in that case, possibly because Defendants raised the SLUSA preclusion argument before one could be documented.

Yorkshire Opp. at 25-28.) They argue that it would be manifestly unfair to allow Defendants to capitalize on the stipulations and case management procedures that Defendants have solicited. (Avalon Opp. at 16 n.20; South Yorkshire Opp. at 28.) To the extent Plaintiffs' acquiescence has created SLUSA preclusion, they request that the Court nullify the relevant stipulations and return them to their original positions. (South Yorkshire Opp. at 28.) They stress that they have "earnestly pursued their actions independently of the other individual actions" and have "eschewed any coordination." (Avalon Opp. at 15.)

        With some measure of regret, the Court must agree with Defendants that the individual investor actions are "proceeding as a single action" for a number of pre-trial purposes. Case law supports an expansive reading of the statutory language. *See, e.g., In re Refco Inc. Sec. Litig.*, 859 F. Supp. 2d 644, 649 (S.D.N.Y. 2012) ("'For *any* purpose' is about as broad a provision as Congress could draft.") (emphasis original). Numerous courts have found that separate lawsuits are "proceeding as a single action" under subsection 5(B)(ii)(II) if any of the following activities are "coordinated" among them:

- general pretrial case management, *see In re Refco*, 859 F. Supp. 2d at 648-49; *In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 480 (S.D.N.Y. 2012);

- discovery, *see In re Enron Corp. Sec., Deriv., & ERISA Litig.*, 535 F.3d 325, 340 (5th Cir. 2008); *In re Refco*, 859 F. Supp. 2d at 648-49; *Instituto de Prevision Militar v. Lehman Bros., Inc.*, 485 F. Supp. 2d 1340, 1345 (S.D. Fla. 2007);

- motion practice, *see Enron*, 535 F.3d at 340; *In re Fannie Mae 2008*, 891 F. Supp. 2d at 480; *Amorosa v. Ernst & Young LLP*, 682 F. Supp. 2d 351, 376 (S.D.N.Y. 2010); *Stichting Pensioenfonds ABP v. Merck & Co., Inc.*, 2012 WL 3235783, at *16 (D.N.J. Aug. 1, 2012); or

- amended and responsive pleading, *see Enron*, 535 F.3d at 340; *Amorosa*, 682 F. Supp. 2d at 376-77; *Merck*, 2012 WL 3235783, at *16.

One court has described the above as "indicia of coordination" among nominally separate actions. *See Merck*, 2012 WL 3235783, at *15. This language has been invoked by both Defendants and Plaintiffs in their briefing and oral argument.

Importantly, the question of whether there is sufficient "indicia of coordination" appears to be largely independent of whether Plaintiffs' attorneys have chosen to coordinate the actions. For example, in some of the cases cited above, coordination was compelled by the presiding judge, or achieved by the mere existence of an MDL which aggregates lawsuits filed throughout the country. *See, e.g., In re Fannie Mae 2008*, 891 F. Supp. 2d at 480; *Amorosa*, 682 F. Supp. 2d at 375-76; *Instituto*, 485 F. Supp. 2d at 1345; *Merck*, 2012 WL 3235783, at *15-16. The coercive nature of such circumstances has not prevented courts from finding that the requirements of SLUSA's grouping provision are met. *See, e.g., In re Lehman Bros. Sec. and ERISA Litig.*, 2012 WL 6603321, at *2 (S.D.N.Y. Dec. 17, 2012) ("While Congress might have  . . . carv[ed] out of the definition of 'group of lawsuits' cases that become part of such a group only by virtue of a transfer by the Multidistrict Panel, it was not obliged to . . . proceed in that fashion."); *see also In re Enron*, 535 F.3d at 342 (disagreeing with plaintiffs' argument that defendants should not be able to use an MDL to "create a 'covered class action'" because "neither the MDL nor SLUSA is so limited").

Against this backdrop, it is difficult to draw any conclusion other than that the separately filed individual investor actions are coordinated with each other, and may even be coordinated with the federal class action. Much of the coordination has been voluntary, such as the first and second tranche plaintiffs' agreement to stagger the scheduling of their cases with the completion of the Class Action; the agreement establishing a cross-individual-action case management plan; and the agreement stipulating to the effects of the first tranche order on the second tranche cases.

(Doc. No. 60 (agreed scheduling order); Doc. No. 61 ("Leadership/Coordination Order"); Conforming Stipulation.) As noted above, to the extent that Plaintiffs' willingness to coordinate activities has created SLUSA preclusion, they ask the Court to rescind the agreed orders and return the parties to their initial positions. (South Yorkshire Opp. at 28.) But this would not solve the problem, as the Court would invariably end up having to order the coordination that Plaintiffs have previously acceded to. Given the substantial overlap among the factual and legal issues presented by the lawsuits, and the fact that they are all pending in the same court, there is no other possible conclusion than that they are "proceeding as a single action" for various purposes, including—to date—pleading, Rule 12 motion practice, and discovery. The Court agrees with Plaintiffs that this is a manifestly unfair outcome. (South Yorkshire Opp. at 25 (noting that "minimal coordination" among plaintiffs' counsel was undertaken "*to reduce the burden upon this Court*") (emphasis original).) But it is one that appears to be mandated by SLUSA if all other requirements have been met.

### 2.     Foreign law is not "State" law under SLUSA.

Although Plaintiffs cannot avoid the grouping provision of SLUSA, they fare much better on the separate requirement that the "covered class action" must be based on "State" law. *See* 15 U.S.C. § 78bb(f)(1) ("No covered class action *based upon the statutory or common law of any State or subdivision thereof* may be maintained in any State or Federal court . . .") (emphasis added). The Exchange Act defines "State" as "any State of the United States, the District of Columbia, Puerto Rico, the Virgin Islands, or any other possession of the United States." 15 U.S.C. § 78c(a)(16). Plaintiffs argue, based on a straightforward reading of SLUSA and the Exchange Act's definition of "State," that SLUSA does not preclude foreign law claims such as theirs. For support, they cite to a recent Third Circuit opinion which—under the same rationale—

16

found that Swiss law claims were not precluded by SLUSA. *See LaSala v. Bordier et Cie*, 519 F.3d 121, 139 (3d Cir. 2008) ("Given that Congress made the explicit policy choice in the [Exchange] Act of defining 'state' so as not to include foreign countries, and, in SLUSA, chose not to alter that definition while defining other terms . . . we conclude that, when Congress extended SLUSA preemption to claims 'based upon the law of any State,' it meant just that.").

Defendants acknowledge that the Exchange Act's definition of "State" does not incorporate foreign countries, but raise two arguments in an attempt to avoid the relatively straightforward conclusion reached by the Third Circuit in *Bordier*. First, Defendants argue that the unambiguous wording of the statute can be disregarded when the result would be "demonstrably at odds" with the intent of the statute.[12] (Doc. Nos. 83, 84 ("Reply"), at 14.) Defendants note that SLUSA was intended to prevent plaintiffs from avoiding federal securities law and the Private Securities Litigation Reform Act of 1995 ("PSLRA") by pleading claims under the substantive law of another jurisdiction. In other words, Congress passed SLUSA because it intended federal securities law to be the exclusive law for recovery of damages when

---

[12] Defendants argue by analogy to the supplemental jurisdiction statute, which provides that federal district courts "may decline to exercise supplemental jurisdiction over a claim [which] raises a novel or complex issue of State law[.]" 28 U.S.C. § 1367(c)(1). Courts have interpreted the term "State" in this subsection to include foreign jurisdictions, despite statutory language to the contrary. *See, e.g., Mars. Inc. v. Nippon Conlux Kabushiki-Kaisha*, 825 F. Supp. 73, 76 (D. Del. 1993) ("As the principles embodied in [Section 1367(c)(1)] are implicated by complex issues of foreign as well as state law, subsection (c)(1) suggests that the Court should decline to exercise jurisdiction over [the plaintiff's] Japanese patent claim."); *see also In re Urethane Antitrust Litig.*, 683 F. Supp. 2d 1214, 1221 (D. Kan. 2010) (same). These cases are distinguishable. The context of the supplemental jurisdiction statute admits no principled reason for constraining courts' discretion in the case of complex foreign claims. By comparison, in the SLUSA context, it is not unreasonable to presume that Congress intended SLUSA to preclude American-law-based securities fraud claims only—essentially "federalizing" such claims under Section 10(b). Foreign-law-based securities fraud claims, of course, cannot be "federalized" pursuant to the reasoning enunciated by the Supreme Court in *Morrison v. Nat'l Australia Bank Ltd.*, 130 S. Ct. 2869 (2010).

fraudulent conduct is alleged to have harmed purchasers of "covered securities." (*Id.* at 15-16.) They claim that if the Court interprets "State law" *not* to include foreign-law claims, it will create a loophole in the law which Congress could not have intended. (*Id.* at 16; Doc. No. 949 [10-md-2185], at 27.) This argument was attempted by the defendants in the *Bordier* case, and the Third Circuit disagreed that the plain text of SLUSA could be so easily ignored:

> In determining legislative purpose, 'it is not our job to speculate upon congressional motives,' *Reigel v. Medtronic, Inc.*, 552 U.S. 312, 128 S. Ct. 999, 169 L.Ed.2d 892 (2008); our job is to hew as closely as possible to the meaning of the words Congress enacted. 'We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.' *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54, 112 S. Ct. 1146, 117 L.E.2d 391 (1992). Here, the difficulty with divining congressional intent to preempt foreign-law claims is that Congress specifically described the claims preempted as those 'based upon the law of any State.' SLUSA constitutes an amendment of the [Exchange Act], which expressly defines 'state' throughout the Act as 'any State of the United States, the District of Columbia, Puerto Rico, the Virgin Islands, or any other possession of the United States," 15 U.S.C. § 78c(a)(16). Though Congress was at pains to set out separate definitions of various terms used in SLUSA, it left the [Exchange] Act definition of 'state' intact.

519 F.3d at 138.

Although the Congressional intent argument fared poorly in the Third Circuit, it was accepted by a district court judge in the Southern District of New York in two pre-*Bordier* opinions. *See LaSala v. UBS, AG*, 510 F. Supp. 2d 213, 238 (S.D.N.Y. 2007); *LaSala v. TSB Bank, PLC*, 514 F. Supp. 2d 447, 472 (S.D.N.Y. 2007). The *UBS/TSB Bank* court agreed that "Congress's intention of making federal court the 'exclusive venue' for class actions falling within [SLUSA's] purview would be frustrated if actions that would otherwise be preempted if brought under state law were permitted to proceed in state court by virtue of being brought under

foreign law."[13] *UBS*, 510 F. Supp. 2d at 238; *see also TSB Bank*, 514 F. Supp. 2d at 472 (same).

The Court has reviewed the language of SLUSA, and the statutory definition of "State" set forth in the Exchange Act. It has evaluated the reasoning in *UBS*, *TSB Bank*, and *Bordier*. And it concludes that SLUSA simply does not—on its face—preclude foreign law claims. Defendants may indeed be correct that SLUSA *should* preclude foreign law claims. This may indeed be a loophole which threatens the vitality of SLUSA. But the Court does not create this loophole through an "interpretation" of the term "State"—Congress did so by including, in SLUSA, a term expressly defined elsewhere in the Exchange Act *not* to include foreign jurisdictions. The Court has no authority to ignore unequivocal and deliberate statutory language. As drafted by Congress, SLUSA does not preclude Plaintiffs' English law claims.

Defendants have a secondary argument, which would accommodate the Exchange Act's unambiguous definition of "State." Defendants contend that SLUSA preclusion is applied with reference to the claim *pled* by the plaintiff, not the claim that must be pursued following a choice-of-law analysis. (Mot. at 16.) They have provided little authority for this argument. The only cases which directly stand for the proposition are the *UBS* and *TSB Bank* opinions, referenced above. The *UBS/TSB Bank* court was persuaded that SLUSA's "State" law requirement is met so long as the claim "purports" to be brought pursuant to "State" law, even if choice-of-law rules mandate the application of foreign law. *See UBS*, 510 F. Supp. 2d at 237-38; *TSB Bank*, 514 F. Supp. 2d at 471. It based this position, at least in part, on another Southern

---

[13] Although the *UBS/TSB Bank* court did not explicitly reference the Exchange Act's definition of "State" in its analysis, it was presumably aware of the definition—and found Congressional intent to be more compelling. Elsewhere in its orders, the court borrowed heavily from *LaSala v. Bordier et Cie*, 452 F. Supp. 2d 575 (D.N.J. 2006)—the district court opinion later overruled by the Third Circuit—which acknowledged the alleged contradiction between the statutory definition of "State" and SLUSA's expansive scope, but declined to "adjudicate the issue of whether SLUSA preempts foreign law claims," *id*. at 588.

District of New York opinion, *see UBS*, 510 F. Supp. 2d at 238, which described the relevant SLUSA requirement as "the action purports to be based on state law," *Webster v. New York Life Ins. and Annuity Corp.*, 386 F. Supp. 2d 438, 440 (S.D.N.Y. 2005). Cases with similar language are cited by Defendants here. *See Newby v. Enron Corp.*, 2002 WL 31989193, at *2 (S.D. Tex. Feb. 15, 2002); *Daniels v. Morgan Asset Mgmt., Inc.*, 497 Fed. App'x 548, 552 (6th Cir. 2012); *Green v. Ameritrade, Inc.*, 279 F.3d 590, 596 (8th Cir. 2002).

The Court finds the use of the word "purport" in such cases to be commonplace, but ultimately incidental, and declines to elevate it to the prominence found in the *UBS* and *TSB Bank* decisions. In the *Webster*, *Newby*, *Daniels*, and *Green* cases, there was no question that the claims at issue were brought under and would be pursued under "State" law. As a result, there was no reason to draw a distinction between what was pled and what would be pursued. More importantly, the term "purport" does not appear in the statutory language of SLUSA. *See* 15 U.S.C. § 78bb(f)(1) (stating that "[n]o covered class action *based upon the statutory or common law of any State or subdivision thereof* may be maintained in any State or Federal court . . .") (emphasis added). Thus, the oft-repeated use of the word "purport" in cases describing the elements of SLUSA strikes this Court as nothing more significant than judicial gloss.

Additionally, even if a distinction should be drawn between the pleading and what must be pursued under choice-of-law rules, the Court agrees with Plaintiffs that no distinction exists here. Although plaintiffs in nine of the ten second tranche cases—all but the *Nova Scotia* plaintiff—referenced U.S. state law in their original complaints, the Conforming Stipulation noted that "English law applies to all claims in the above-captioned actions," with the exception of certain plaintiffs' Exchange Act claims. (Conforming Stip. at 3.) Plaintiffs claim that this stipulation had the effect of amending their complaints and replacing their U.S. state law claims

with English law claims. (Avalon Opp. at 9; South Yorkshire Opp. at 19 n.17.) Defendants rejoin that the Conforming Stipulation had no such effect, and left the Plaintiffs free to appeal the Court's choice-of-law analysis. (Reply at 13-14.) But the Conforming Stipulation dismissed all statutory U.S. state law claims. (Conforming Stip. at 3 (dismissing all Texas statutory fraud and blue sky claims).) This evinces the Plaintiffs' intent to amend their complaints and to replace their U.S. state law claims with English law claims.

### B.   The common law claims of foreign plaintiffs will not be dismissed in favor of England as a more convenient forum.

In the first tranche cases, Defendants urged dismissal in favor of England as a more suitable and convenient forum for the plaintiffs' English law claims. The Court declined to exercise its discretion to dismiss the first tranche actions.   *See Alameda Cnty.*, 2013 WL 6383968, at *55.

Defendants no longer seek dismissal of all the second tranche cases under the doctrine of forum non conveniens, in light of the Court's ruling in the first tranche cases. However, they argue that the Court should exercise its discretion differently as to foreign plaintiffs. Because none of the plaintiffs in the first tranche cases was a foreign entity, the Court has not yet addressed whether England is a more convenient forum for foreign plaintiffs asserting foreign claims against foreign and American defendants.

### 1.   Legal standard

There are three stages to forum non conveniens analysis. First, the Court must determine whether England is an available and adequate alternative forum for the foreign plaintiffs' claims. *Karim v. Finch Shipping Co., Ltd.*, 265 F.3d 258, 268 (5th Cir. 2001); *Gonzalez v. Chrysler Corp.*, 301 F.3d 377, 379-80 (5th Cir. 2002); *McLennan v. Am. Eurocopter Corp., Inc.*, 245 F.3d

403, 424 (5th Cir. 2001). Second, the Court must decide how much deference to accord the foreign plaintiffs' choice of forum. *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 70-73 (2d Cir. 2001).[14] Third, the Court must decide which forum is best suited to the litigation. *Karim*, 265 F.3d at 268.

The final step requires a weighing of private interest and public interest factors. The private interest factors are: (1) relative ease of access to sources of proof; (2) availability of compulsory process to secure the attendance of unwilling witnesses; (3) cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious, and inexpensive. *Syndicate 420 at Lloyd's London v. Early Am. Ins. Co.*, 796 F.2d 821, 831 (5th Cir. 1986) (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1981)). The public interest factors are: (1) administrative difficulties flowing from court congestion; (2) local interest in having localized controversies decided at home; (3) familiarity of the forum with the law that will govern the case; (4) avoidance of unnecessary problems of conflicts of laws or the application of foreign law; and (5) unfairness of burdening citizens in an unrelated forum with jury duty. *Saqui v. Pride Cent. Am., LLC*, 595 F.3d 206, 214 (5th Cir. 2010).

Evaluating these factors holistically, the Court may exercise its discretion to dismiss the foreign plaintiffs' claims if the private interest factors alone or the private interest and public

---

[14] Typically, the Fifth Circuit does not treat deference as a separate stage in the analysis, although it is implicated in the balancing process that follows in the "third" stage. *See In re Air Crash Disaster near New Orleans, La. on July 9, 1982*, 821 F.2d 1147, 1165 (5th Cir. 1987) (en banc), *vacated on other grounds sub nom. Pan Am. World Airways, Inc. v. Lopez*, 490 U.S. 1032 (1989) (beginning the final prong of the analysis with a consideration of "relevant factors of private interest, weighing in the balance the relevant deference given the particular plaintiff's initial choice of forum"). For reasons to be made clear, the Court finds it particularly useful here—and not inconsistent with Fifth Circuit guidance—to address the question of deference separately, as it is done in the Second Circuit. *See Norex Petro. Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 153 (2d Cir. 2005).

interest factors together weigh in favor of England. How much they need to weigh in favor of England depends upon the answer to the second question: the level of deference that foreign plaintiffs' choice of forum is due. If the foreign plaintiffs are owed the same level of deference as domestic plaintiffs, then the balance of factors must weigh heavily in favor of England. *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947) ("[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed."); *see also Veba-Chemie A.G. v. M/V Getafix*, 711 F.2d 1243, 1245 (5th Cir. 1983) ("[A] forum non conveniens dismissal must be based on the finding that, when weighed against plaintiff's choice of forum, the relevant public and private interests strongly favor a specific, adequate and available alternative forum."). If the foreign plaintiffs are owed less deference, however, the balance of factors need not weigh so heavily in favor of England before the Court may exercise its discretion to dismiss their claims. *See Yavuz v. 61 MM, Ltd.*, 465 F.3d 418, 426 (10th Cir. 2006) (citing *Gschwind v. Cessna Aircraft Co.*, 161 F.3d 602, 606 (10th Cir. 1998)).

## 2.    England is an available and adequate forum.

An alternative forum is available if "the entire case and all parties can come within the jurisdiction of that forum." *Gonzalez*, 301 F.3d at 379 (citation and internal quotation marks omitted). It is adequate if Plaintiffs "will not be deprived of all remedies or treated unfairly, even though they may not enjoy the same benefits as they might receive in an American court." *Id.* at 379-80 (citation and internal quotation marks omitted).

Defendants represent that they are either amenable to process in England or will accept service of process there as a condition to forum non conveniens dismissal. (Mot. at 35.) The Avalon Plaintiffs appear to dispute that England is available and adequate, but articulate no basis for their objection to that forum. (Avalon Opp. at 25 n.31.) The Court has previously held that

England is an available and adequate forum for claims against Defendants, *In re BP Shareholder Derivative Litigation*, 2011 WL 4345209, at *6 (S.D. Tex. Sept. 15, 2011), and does so again today.[15]

### 3. In the circumstances of this MDL, foreign plaintiffs are owed the same deference as domestic plaintiffs.

Defendants argue that their burden on forum non conveniens is "reduced" when the plaintiff is foreign, because a foreign plaintiff's choice of forum is entitled to "substantially less deference." (Mot. at 34-36.) Plaintiffs disagree, emphasizing the numerous points of connection that the foreign plaintiffs' claims have to the forum. (Avalon Opp. at 26-27.)

Ample case law stands for the notion that a foreign plaintiff's choice of forum is typically entitled to less deference than a domestic plaintiff's choice would receive. *See, e.g., Piper Aircraft*, 454 U.S. at 256; *Empresa Lineas Maritimas Argentinas, S.A. v. Schichau-Unterweser, A.G.*, 955 F.2d 368, 373 (5th Cir. 1992); *Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 71 (2d Cir. 2003). This is because the implicit presumption of convenience which arises in the case of a domestic plaintiff simply does not exist in the case of a foreign plaintiff. *Piper Aircraft*, 454 U.S. at 255-56 (approving district court's decision to afford less deference to forum choice of foreign plaintiff because, "[w]hen the plaintiff is foreign," the assumption that the choice is convenient "is much less reasonable"). In other words, in the absence of other information regarding the convenience of the forum, it is fair to presume that a domestic forum is *not* convenient for a foreign plaintiff.

---

[15] In the first tranche, the parties disputed whether England was an available and adequate forum, because certain plaintiffs could not pursue their Exchange Act claims in England. *Alameda County*, 2013 WL 6383968, at *53. The Court did not decide the issue, because the balance of factors did not weigh heavily in favor of England. *Id.* at *54-55. This unresolved issue need not delay the analysis here, as the Avalon Plaintiffs assert only English law claims.

The problem with reflexively relying upon that proposition here is that the Court has access to other information regarding the convenience of the forum which legitimates the foreign plaintiffs' choice and entitles it to deference. Most importantly, this forum is where these types of claims—claims with a distinctly American bent[16]—have been brought and are being litigated against Defendants. The Court is unaware of any other forum where similar claims have been initiated.

The Second Circuit has fashioned a fair and flexible way of thinking about when a plaintiff's choice of forum is due special consideration in the forum non conveniens analysis:

> Based on the Supreme Court's guidance, our understanding of how courts should address the degree of deference to be given to a plaintiff's choice of a U.S. forum is essentially as follows: The more it appears that a domestic or foreign plaintiff's choice of forum has been dictated by reasons that the law recognizes as valid, the greater the deference that will be given to the plaintiff's forum choice. Stated differently, the greater the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice and the more it appears that considerations of convenience favor the conduct of the lawsuit in the United States, the more difficult it will be for the defendant to gain dismissal for *forum non conveniens*.

*Iragorri*, 274 F.3d at 71-72. The Court finds the Second Circuit's "sliding scale" of deference to be particularly useful in the context of this MDL.

In summary, it is clear that a foreign plaintiff's choice of forum must receive *some* deference in the forum non conveniens analysis. *See In re Air Crash Disaster near New Orleans, La. on July 9, 1982*, 821 F.2d 1147, 1164 n.26 (5th Cir. 1987) (en banc), *vacated on other grounds sub nom. Pan Am. World Airways, Inc. v. Lopez*, 490 U.S. 1032 (1989) ("The Court's

---

[16] All of the post-explosion misstatements at issue in this action concerned the situation unfolding in the Gulf of Mexico during the spring and summer of 2010. This connection prompted the Court, in *Alameda County*, to refer to nearly identical claims asserted by first tranche plaintiffs as "unquestionably local." 2013 WL 6383968, at *55.

language that a foreign plaintiff's forum selection deserves less deference is not an invitation to accord a foreign plaintiff's selection of an American forum no deference since dismissal for forum non conveniens is the exception rather than the rule."); *McLellan v. Am. Eurocopter, Inc.*, 26 F. Supp. 2d 947, 951 (S. D. Tex. 1998) ("[A]lthough a foreign plaintiff's choice of forum is entitled to less deference than that of a resident plaintiff, it is not entitled to no deference."). And given the legitimate connection between the English law claims of foreign plaintiffs and this MDL, the Court affords the foreign plaintiffs substantially the same level of deference previously accorded to domestic plaintiffs in the first tranche.

### 4.   The claims of foreign plaintiffs will not be dismissed in favor of England as a more convenient forum.

The substantial deference accorded to the foreign plaintiffs must then be weighed against the private and public interest factors to determine the most convenient forum for trial of the foreign plaintiffs' claims. The Court tangled with these factors in *Alameda County* and determined that "Defendants have [not] surmounted the high bar for disturbing Plaintiffs' choice of forum." 2013 WL 6383968, at *54. Very few factors change in the context of foreign plaintiffs, and those that do are not significant enough to disturb the Court's previous decision.

In *Alameda County*, the Court found that the private interest factors did not weigh in favor of England as a more convenient forum for the trial of certain domestic plaintiffs' claims. As noted above, the private interest factors are: (1) relative ease of access to sources of proof; (2) availability of compulsory process to secure the attendance of unwilling witnesses; (3) cost of attendance for willing witnesses; and (4) all other practical problems that make trial of a case easy, expeditious, and inexpensive. In theory, the Court acknowledges that some of these factors could weigh more heavily in favor of England when it comes to foreign plaintiffs. For example,

evidence related to a foreign plaintiff's individual reliance may exist—in documentary or testimonial form—only outside of the United States. But Defendants have not provided the information necessary to make this determination as to the Avalon Plaintiffs, beyond simply noting that ten plaintiffs reside in the U.K. and an additional seventeen plaintiffs are "foreign."[17] (Mot. at 9; Doc. Nos. 58-2 & 63-2, at 2-6.) Defendants bear the burden of proof on all aspects of forum non conveniens. *See In re Air Crash Disaster*, 821 F.2d 1147 at 1164-65 (noting that defendant's "burden of persuasion runs to all the elements of the forum non conveniens analysis" and that the defendant "'must provide enough information to enable the district court to balance the parties['] interests'") (quoting *Piper Aircraft*, 454 U.S. at 258).

The balance shifts somewhat once the public interest factors are taken into account. The public interest factors are: (1) administrative difficulties flowing from court congestion; (2) local interest in having localized controversies decided at home; (3) familiarity of the forum with the law that will govern the case; (4) avoidance of unnecessary problems of conflicts of laws or the application of foreign law; and (5) unfairness of burdening citizens in an unrelated forum with jury duty. The need to apply foreign law has always militated in favor of dismissal. *See Alameda County*, 2013 WL 6383968, at *55. Because the Court will retain the English law claims of domestic plaintiffs, however, this factor is less weighty in the current calculus. Additionally, the Court faces a very different docket from that which was before it in *Alameda County*. At the time that case was decided, there were twelve individual actions in the MDL 2185. Since then, the number has grown to twenty-eight. Nor can the Court be certain that the influx is over. There are

---

[17] The Court does not find such cursory information to be useful in determining the balance of the private interest factors. As other plaintiffs in the second tranche have convincingly noted, a foreign investor's use of and reliance on American-based investment advisors could mean that reliance-related evidence will be found principally within the U.S., rather than outside it. (South Yorkshire Opp. at 34.)

suggestions that some attorneys continue to solicit new filings in this Court. (Mot. at 37.) And, as the instant lawsuit makes clear, foreign investors represent a sizable number of the plaintiffs seeking individual redress in this MDL. The Court expects that dismissal of foreign plaintiffs' claims will appreciably and immediately relieve congestion on its docket. This factor, combined with the need to apply foreign law, is enough to tip the scale slightly in favor of England. But the private and public interest factors must weigh heavily in favor of England to disrupt the foreign plaintiffs' choice of forum. Because it does not, the Court once again declines to dismiss English law, securities fraud claims asserted in this MDL under the doctrine of forum non conveniens.

### C.     Plaintiffs fail to state a claim based on six new alleged misrepresentations.

Defendants' motion challenges only six of the alleged misrepresentations included in the Alameda Complaint. None of the statements has previously been addressed by the Court.

#### 1.     Lord Browne's 2005 statements

Two statements from 2005—attributed to then-CEO Lord Browne—reference the March 2005 explosion at BP's Texas City refinery and express the Company's intention to learn from its mistakes and improve its safety programs to prevent future disasters. (Alameda Compl. ¶¶ 221, 222.) Both parties acknowledge that these statements—indicative of BP's *future* plans—are actionable as deceit under English law only if, at the time they were made, the speaker did not honestly possess the intent expressed.[18] (Mot. at 21; Avalon Opp. at 18.) They disagree, however, on whether Plaintiffs have adequately alleged that Lord Browne's statements were insincerely made.

To support the falsity of Lord Browne's statements, as well as his scienter, Plaintiffs

---

[18] "It is clearly established that a representation of present intention, whether the intention be that of the representor or or of a third party, is a sufficient representation of an existing fact to form the foundation of an action for deceit." Clerk & Lindsell on Torts, § 18-11 (20th ed. 2010).

focus almost entirely on what they claim is an unbroken string of safety disasters preceding and closely following those statements. (Avalon Opp. at 18-20.) They insinuate that, given his position in the Company and his knowledge of its inadequate safety culture, Lord Browne could not have "honestly believe[d] that BP would take the necessary steps to improve." (*Id.* at 18.) Defendants dispute that Lord Browne's awareness of past safety mishaps can be construed as evidence that he knew BP would not improve its safety programs in the future. (Reply at 16-17.) And they caution that allegations of safety failures following Lord Browne's statements—i.e., allegations that BP's safety programs were not improved or that BP did not learn from its mistakes—are "'little or no evidence of the original non-existence of the intention.'" (Mot. at 22 (quoting Clerk & Lindsell on Torts, § 18-12 (20th ed. 2010).)

The Court finds Plaintiffs' allegations of falsity and scienter too conclusory to satisfy the requirements of Rule 8(a) and 9(b). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The Court does not find it reasonable to infer, on the basis of BP's allegedly dismal track record, that Lord Browne *must* have known that BP would fail to take the necessary steps to improve its safety culture. After all, Lord Browne's public declaration that safety reforms would be pursued presupposes a poor safety record. And Defendants correctly note that BP's subsequent safety failures are "little or no evidence" that reforms were not sincerely intended (or genuinely attempted).

### 2.    The remaining pre-explosion statements

The other new statements from the pre-explosion time period are found in the 2004 Annual Report, the 2005 Annual Review, and the 2006 Annual Report. (Avalon Compl. ¶¶ 220, 224, 227.) Specifically, the alleged misrepresentations in these documents are as follows:

- "In all regions of the world, BP has processes to ensure compliance with applicable regulations;" BP employees are "required to comply with the BP health, safety and environment policy;" BP's partners, suppliers and contractors are "encouraged to adopt them;" and "Deepwater Gulf of Mexico is one of [BP's] new profit centres and [its] largest area of growth in the United States." (Avalon Compl. ¶ 220.)

- BP has been "implementing a new integrity management standard;" BP is "applying . . . knowledge [learned from Texas City] widely across BP's operations," "the ethics and environment assurance committee . . . enhanced its focus in the area of personal and process safety procedures in the light of the Texas City incident;" and "governance of [BP] is state-of-the-art." (*Id*. ¶ 224.)

- "BP has committed to implement the [Baker Panel's] recommendations and will consult with the panel on how best . . . to apply the lessons learned elsewhere in its global operations." (*Id*. ¶ 227.)

The above statements are not identical, but they each paint a "rosy" picture of BP's regulatory compliance, corporate governance, and ongoing attempts to improve its safety record. (Avalon Opp. at 21.) Plaintiffs argue that the statements are false by omission, because they "failed to disclose that BP was expanding its deepwater drilling operations . . . 'without implementing adequate operational protocols.'" (Avalon Opp. at 20.) They also claim that the statements are false because, at the time, BP was plagued by a "checkbook mentality" which prevented meaningful process safety reforms from taking place. (*Id*. at 21.)

The Court has encountered, and rejected, very similar arguments of falsity in the Class Action. *See BP I*, 843 F. Supp. 2d at 754-57, 766-68. The problem with such arguments is that they lack a palpable, distinct connection to the statements at issue. In other words, it is insufficient to simply cite BP's safety history—checkered as it might be—and argue that every contemporaneous safety-positive statement was a deliberate fraud perpetuated on the public. There must be some measure by which a fact-finder may determine a specific representation to be demonstrably true, or demonstrably false. *See id*. at 757 ("Even the very specific facts

30

Plaintiffs allege to show the falsity of the statements cannot confirm or deny whether 'progress' was being made; general 'progress' is simply too illusory a metric from the start."); *see also Alameda Cnty.*, 2013 WL 6383968, at *21 ("[T]he Baker Report provide[s] a 'clear roadmap' by which the truthfulness of BP's statements about its safety reform efforts [can] be gauged, while generalized, aspirational statements about the importance of safety and BP's 'progress' on safety performance [cannot] reliably be measured as true or false."). The Court cannot conceive how the quoted statements from the 2004 Annual Report, the 2005 Annual Review, and the 2006 Annual Report would be adjudged either true or false. Neither the allegations in the Complaint, nor Plaintiffs' arguments in response to Defendants' Motion, allay the Court's concerns.

### 3.    Mr. Hayward's May 18, 2010 statement

The Avalon Complaint includes a single new misrepresentation from the post-explosion time period. On May 18, 2010, Mr. Hayward stated to the press:

> I think the environmental impact of this disaster is likely to be very, very modest. It is impossible to say and we will mount, as part of the aftermath, a very detailed environmental assessment as we go forward. . . . By everything we can see at the moment suggests that the overall environmental impact of this will be very, very modest.

(Avalon Compl. ¶ 318.) Defendants contend that this statement is a non-actionable statement of opinion. They posit that no reasonable investor could have justifiably relied on Mr. Hayward's remarks given his use of limiting phrases. (Mot. at 20-21.) The Court does not base its decision on this argument, and notes that a leading treatise on English law specifically provides that:

> [A] representor 'may qualify what might otherwise have been an outright statement of fact by saying that it is only a statement of belief, that it may not be accurate, that he has not verified its accuracy or completeness, or that it is not to be relied on.' But this will not, it is suggested, exonerate the representor if he actually knows the suggestion to be untrue, since the expression of an opinion of itself comports a belief that it is correct.

31

Clerk & Lindsell, § 18-14 (quoting *Raiffeisen Zentralbank Österreich AG v. Royal Bank of Scotland plc* [2010] EWHC 1392 (Comm.)) (citations omitted).

The Court is more persuaded by another of Defendants' arguments as to why Mr. Hayward's May 18th statement is not actionable as deceit. Defendants acknowledge that a statement of opinion can be false when made if it was not honestly believed, but note the absence of any allegation that Mr. Hayward did not honestly believe the impact would be "modest."[19] (Mot. at 21.) They also argue that there is no "measurable benchmark" against which the subjective term "modest" can be gauged, in order to discern if Mr. Hayward's use of that word was insincere. (Reply at 19.)

In response, Plaintiffs characterize Mr. Hayward's statement as "similar" to another post-explosion statement by Mr. Hayward which the Court has already found viable. (Avalon Opp. at 22.) The Court cannot agree with the characterization. The other post-explosion misrepresentation contained a numerical estimate of the spill rate which allegedly conflicted with BP's internal estimates. By comparison, Mr. Hayward's stated belief that the "environmental impact" of the spill would be "modest" is unmoored from any defined, verifiable metric, making

---

[19] Under English common law, a statement regarding a future event:

> implicitly represent[s] that the maker of the prediction had an honest belief in it. The existence (or otherwise) [of] a belief is a present fact at the moment that the prediction is uttered. If, therefore, the maker of the prediction does not have an honest belief in the prediction at the time when he makes it, he will have made a false representation of fact.

*Foodco UK LLP v. Henry Boot Devs.*, [2010] EWHC 358, at ¶ 198. Additionally, a forward-looking statement is actionable as deceit if, at the time the statement is made, the speaker does not have an honest belief that there exist "reasonable grounds" for the statement. *See Barings Plc (In Liquidation) v. Coopers & Lybrand (No. 5)*, [2002] EWHC 461, at ¶¶ 44-52 (Ch.); *Bankers Trust Int'l plc v. PT Dharmala Sakti Sejahtera*, [1996] C.L.C. 518, 530 (Comm); *Bank Leumi Le Israel B.M. v. British National Insurance Co.*, [1988] 1 Lloyd's Rep. 71, 75.

it much more difficult to prove as either true or false. Indeed, in the Avalon Complaint, Plaintiffs do not even allege that the May 18th statement was "materially false and misleading" because Mr. Hayward disbelieved that the environmental impact of the spill would be "modest." (Avalon Compl. ¶ 319.)

Instead, Plaintiffs suggest that the statement is actionable because Mr. Hayward possessed information not available to Plaintiffs—the internal spill rate estimates—which allegedly contradicted his stated opinion that the impact of the spill would be "modest." (Avalon Compl. ¶¶ 309, 319; Avalon Opp. at 22-23.) With this argument, Plaintiffs seek refuge in the axiom that when "'facts are not equally known to both sides, then a statement of opinion by the one who knows the facts best involves very often a statement of a material fact, for he impliedly states that he knows facts which justify his opinion.'" *Brown v. Raphael*, [1958] Ch. 636, 642 (quoting *Smith v. Land and House Property Corp.*, (1884) 28 Ch.D. 7, 15). But the environmental impact of the spill was dependent on a number of factors in addition to the spill rate, including the number of days that the spill continued; how much oil was captured or otherwise dispersed before reaching wildlife or land; and other variables. While the spill rate is certainly relevant to the stated opinion, it cannot be considered determinative. In other words, Mr. Hayward may well have honestly believed that the impact of the disaster would be "modest" *based on the internal spill rate estimates which he allegedly withheld from the public*. Because Plaintiffs rely exclusively on these internal spill rate estimates to demonstrate the falsity of Mr. Hayward's stated opinion, they have failed to allege "factual content" which would allow the Court "to draw the reasonable inference" that Mr. Hayward "is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

###### D. Plaintiffs have not alleged valid deceit claims against Mr. Grote, Lord Browne, Mr. Inglis, or Mr. Sutherland, and these defendants are dismissed.

Taking into account the rulings announced above, the alleged misstatements remaining in this case are attributed to the following individuals: Mr. Hayward, Mr. Suttles, Mr. McKay, and Mr. Dudley. (Avalon Compl. ¶¶ 241, 243, 247, 249, 253, 270, 284, 286, 300, 302, 306-07, 315-17.) There being no remaining misstatements attributed to Mr. Grote, Lord Browne, Mr. Inglis, or Mr. Sutherland, these defendants are dismissed.[20]

## VI.   CONCLUSION

It is ordered that Defendants' Amended Second Tranche Consolidated Motion to Dismiss (Doc. Nos. 57, 62) is **PARTIALLY GRANTED**. For the reasons articulated in this memorandum and opinion, the Court **GRANTS** the motion as to the following claims:

- All claims based on the portions of Mr. Hayward's December 17, 2008 speech at the HRH Prince of Wales's 3rd Annual Accounting for Sustainability Forum specified on page 13 of the parties' original draft of the Conforming Stipulation.[21] (Doc. No. 55, at 13.)

---

[20] Plaintiffs suggest that Mr. Grote can be held liable for his certification of the 2009 Annual Report, because he allegedly knew about the process safety-related accidents that plagued BP, as well as the safety and environmental violations issued to BP by the U.K. Health and Safety Executive between 2006 and 2010. (Avalon Opp. at 23-24.) But the alleged misstatements in the 2009 Annual Report concern the scope and design of OMS. (Avalon Compl. ¶ 282.) Even if Plaintiffs had adequately alleged Mr. Grote's generalized knowledge of BP's poor safety record, such allegations have no bearing on whether he knew or should have known that the OMS-related statements in the 2009 Annual Report were misleading.

[21] Parties in this action stipulated to partial dismissal of Mr. Hayward's remarks on the basis of the Court's prior holdings in the Class Action. Because the Court believed that dismissal might not be compelled by those rulings, it struck the relevant line entry before signing and entering the Conforming Stipulation. Defendants filed a supplement, continuing to urge dismissal. The Court agrees that certain portions of those remarks—specifically, those identified and argued by Defendants in their supplement—cannot survive, pursuant to reasoning announced in the Class Action. (Doc. 64, at 3-4.) Plaintiffs have given the Court no indication that they intend to pursue claims based on any other portions of Mr. Hayward's remarks. The Court therefore gives effect to the parties' original stipulation.

- All claims based on statements made in the 2004 Annual Report, dated June 30, 2005. (Avalon Compl. ¶ 220.)

- All claims based on statements made in the August 17, 2005 press release. (*Id.* ¶ 221.)

- All claims based on statements made in the October 24, 2005 press release. (*Id.* ¶ 222.)

- All claims based on statements made in the 2005 Annual Review, dated February 6, 2006. (*Id.* ¶ 224.)

- All claims based on statements made in the 2006 Annual Report, dated March 6, 2007. (*Id.* ¶ 227.)

- All claims based on Mr. Hayward's statements to the press on May 18, 2010. (*Id.* ¶ 318.)

There being no claims remaining against Mr. Grote, Lord Browne, Mr. Inglis, or Mr. Sutherland, these defendants are **DISMISSED.**

In all other respects, the Motion is **DENIED**.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the thirtieth day of September, 2014.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE