# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| IN RE BP P.L.C. SECURITIES LITIGATION | MDL 2185 |
| | CIVIL ACTION NO.: 4:10-md-2185 |
| | HON. KEITH P. ELLISON |
| ILLINOIS STATE BOARD OF INVESTMENT, | |
| Plaintiff, | CIVIL ACTION NO.:  4:14-cv-01075 |
| v. | |
| BP, PLC; BP AMERICA, INC.; BP EXPLORATION & PRODUCTION, INC.; ANTHONY B. HAYWARD; DOUGLAS SUTTLES; H. LAMAR MCKAY; ROBERT DUDLEY; and ANDREW G. INGLIS, | AMENDED COMPLAINT |
| | JURY TRIAL DEMANDED |
| Defendants. | |

## TABLE OF CONTENTS

I.      INTRODUCTION.................................................................................................. 2

II.     JURISDICTION AND VENUE ........................................................................ 10

III.    THE PARTIES .................................................................................................. 11

        A.   Plaintiff.................................................................................................. 11

        B.   Defendants ............................................................................................ 11

IV.     CONFIDENTIAL WITNESSES ...................................................................... 14

V.      BACKGROUND ............................................................................................... 15

        A.   BP's Prior Safety Debacles Demonstrate That Its Process Safety Was
             Flawed ................................................................................................... 15

        B.   The Texas City Refinery Explosion and The Prudhoe Bay Oil Spill – Different
             Places, Same Results ........................................................................... 17

        C.   The Findings of the Baker Report are Made Publicly Available and BP Portrays
             Itself As a Company that Puts Safety First ...................................... 20

        D.   On the Heels of the Baker Report, BP Vowed to Execute OMS and
             Established GORC to Monitor Process Safety ................................... 23

        E.   SEEAC was Also Created to Directly Monitor BP's Safety Performance,
             Including the Implementation of OMS ............................................... 28

        F.   BP Touts OMS as a Company-Wide Mandate, But BP had No Intention of
             Fully Applying OMS Process Safety and Personal Safety to Rigs BP did not
             Own, Instead Applying Only Certain Elements of Personal Safety .............. 31

        G.   BP Looks to Conceal Safety Concerns and Retaliates Against
             Whistleblowers in the Gulf of Mexico ................................................ 41

        H.   BP Retaliates Against Safety Whistleblowers Working in Alaska ................ 44

VI.     THE *DEEPWATER HORIZON* EXPLOSION AND ITS AFTERMATH
        REVEALS THAT BP CONTINUED TO FLOUT PROCESS SAFETY ............ 47

i

A.   BP's Systemic Failures were the Catalyst for the *Deepwater Horizon* Tragedy ................................................................................................ 47

B.   BP Was Completely Unprepared to Control the Oil Spill ................. 56

VII.   DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE RELEVANT PERIOD ......................................... 66

VIII.   SCIENTER ALLEGATIONS AGAINST DEFENDANTS ............................... 104

A.   Defendants Knew, or Recklessly Disregarded, That BP's Process Safety Procedures Did Not Adequately Address the Known Risks in Deepwater Drilling, Risks that Materialized at the Macondo Well ................................. 104

B.   The Orange Book Reports Disclosed Process Safety Related Information to GORC and SEEAC Members and Board Members ....................................... 106

C.   SEEAC, the Board, and BP Senior Executives Reviewed and Discussed the Content of BP's Safety Related Publications ......................................... 109

D.   The Defendants Consciously Limited the Applicability and Scope of the S&O Audit Function so as to Exclude BP's Gulf of Mexico Deepwater Wells ..... 112

E.   Defendants Failed to Disclose and Address Process Safety and Operational Risk Issues ........................................................................................... 114

F.   Defendants Were Aware of or Recklessly Disregarded Heightened Process Safety Risks and Deficiencies With Third-Party Rigs, Particularly Those Owned by Transocean .................................................................................. 115

G.   Defendants Ignored Concerns About the Integrity of Safety Processes in Alaska ............................................................................................... 117

H.   "Afraid-a-Spill" Email Raises Complaints About Alyeska's Operations .... 119

I.   BP Looks to Conceal Safety Concerns and Retaliates Against Safety Whistleblowers Working in the Gulf of Mexico ...................................... 120

J.   BP Also Retaliates Against Safety Whistleblowers Working in Alaska ...... 121

K.   Aftermath of BP's 2007 Criminal Plea ................................................. 123

L.   The Defendants Falsely Assured Investors That BP Was Implementing OMS Across All Operations and the Baker Report's Recommendations .............. 125

M.   Defendants knew that BP Was Cutting Corners and Ignoring Safety Risks on the *Deepwater Horizon* Rig to Speed the Sealing of the Macondo Well.. 128

N.   Defendants Knew that BP's Operations Did Not Conform to Industry Standard.......................................................................................... 132

O.   Defendants Were Aware That Faulty Cementing Jobs and Other Stability Issues Were Known as the Most Frequent Causes of Well Control Problems............. 133

P.   Defendants Knew or Recklessly Disregarded that BOPs Were Known to Fail, Yet Did Not Adjust Their Process Safety Procedures Accordingly ................... 135

Q.   Defendants Were Aware That BP Received No Less Than One Hundred Safety Warnings for its Safety Protocol Lapses in its North Sea Deepwater Drilling Operations ....................................................................................... 139

R.   Defendants Knowingly or Recklessly Disregarded That BP's 2007-2009 Budget Reductions and Staff Reorganizations Were Negatively Affecting Its Operational Process Safety Programs ............................................... 141

S.   Defendants' Estimates of the Gulf Oil Spill are Flatly Contradicted by Contemporaneous Internal Company Documents ................................ 144

T.   BP Exploration & Production Inc. Has Pleaded Guilty to Felony Manslaughter, Environmental Crimes and Obstruction of Congress ......................... 150

U.   BP Has Agreed to Pay $525 Million to Settle the SEC's Charges That the Company Misled Investors Regarding the Oil Spill Flow-Rate ........................ 152

V.   Defendants Were Motivated to Conceal the Amount of Oil Spewing Into the Gulf to Reduce Fines and Penalties by Billions of Dollars........................... 153

IX.   CAUSATION/ECONOMIC LOSS FOR ENGLISH LAW CLAIMS ..................... 154

X.   RELIANCE ................................................................................... 164

XI.   THE CLAIMS ARE TIMELY FILED ................................................. 167

XII.   COUNTS....................................................................................... 167

PRAYER FOR RELIEF........................................................................ 171

JURY TRIAL DEMANDED................................................................... 172

iii

Plaintiff, Illinois State Board of Investment ("ISBI"), by and through undersigned counsel, hereby alleges as follows:

1.     Plaintiff's allegations are based upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.   Plaintiff's information and belief are based upon the investigation of their counsel including, without limitation:

(a)     a review and analysis of public filings, reports, and other documents and information pertaining to or disseminated by BP, plc ("BP")  including, but not limited to, filings with the U.S. Securities and Exchange Commission ("SEC"), press releases, news articles, and reports by securities analysts;

(b)     Defendants' filings and statements to government regulators including, among others, the U.S. Department of Interior's Minerals Management Service ("MMS");

(c)     a review and analysis of other publicly available information concerning BP, including governmental records, documents obtained through other civil actions against BP, independent reports, and other testimony, documents, and reports obtained in connection with hearings held by the U.S. House of Representatives, the U.S. Senate, and the Joint Investigation of the U.S. Coast Guard and Bureau of Ocean Energy Management, Regulation and Enforcement ("Joint Investigation");

(d)     the Report of the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling ("Presidential Commission Report");

(e)     the Second Consolidated Amended Class Action Complaint for All Purchasers of BP ADS Securities (the "Class Action Complaint") and other filings, pleadings, and orders filed in the United States District Court for the Southern District of Texas in the action styled as *In re BP p.l.c. Securities Litigation*, Docket No. 10-md-02185 (the "Securities Class Action");

(f)     documents and testimony produced in connection with the oil spill litigation, In re Oil Spill by the Oil Rig *"Deepwater Horizon"* in the Gulf of Mexico on April 20, 2010, MDL 2179 (E.D. La.);

1

(g)     the Complaint and other filings, pleadings, and orders filed in the United
        States District Court for the Eastern District of Louisiana in the action
        styled *SEC. v. BP p.l.c.*, Docket No. 2:12-cv-02774-CJB-SS; and

(h)     the Criminal Information and other documents filed in the United States
        District Court for the Eastern District of Louisiana in the action styled
        *United States v. BP Exploration & Production, Inc.*, Docket No. 2:12-cr-
        00292-SSV-DEK.

## I.     **INTRODUCTION**

2.     Plaintiff brings this action in connection with its transactions in BP ordinary
shares between February 22, 2008 and June 25, 2010, inclusive (the "Relevant Period").  This
action alleges that BP, a number of its subsidiaries, and certain executive officers and directors
concealed material information and made false and misleading statements concerning BP's
implementation of process safety measures and its ability to respond to a "worst case" oil spill in
the Gulf of Mexico region.

3.     On April 20, 2010, a massive explosion rocked the *Deepwater Horizon*, a deep
sea oil rig in the Gulf of Mexico owned by Transocean Ltd. ("Transocean"), but leased, operated,
and controlled by BP, killing eleven crew members and injuring several others.   When the
explosion occurred, the crew was preparing to place the Macondo oil well into "temporary
abandonment" – a process that was already 45 days behind schedule and $58 million over budget
– until another production rig could get there and begin pumping oil or gas for production.

4.     The *Deepwater Horizon* burned for almost two days before finally sinking on the
morning of April 22, 2010.  As the oil rig went under, it further damaged the pipe that had
connected the rig to the wellbore (the "riser").  The crew tried to activate the *Deepwater
Horizon*'s blowout preventer ("BOP"), a device used to seal a well in an emergency situation
such as this, which failed.  The disaster was exacerbated by the lack of a back-up BOP, which a

2004 study by federal regulators identified as an important safety feature that should be present for the type of deepwater drilling BP conducted in the Gulf of Mexico.  As a result, millions of barrels of oil began spewing into the water, creating an environmental hazard of unprecedented proportions.

      5.      Despite public representations that BP already had a plan in place to contain a "worst case" oil spill, Defendants adopted a hit-or-miss approach – applying various tactics that were being haphazardly developed – as the spill continued practically unabated.  This scattershot approach and BP's failure to control the spill within a reasonable period of time was made worse by the misleading statements of BP's senior officers, including defendants Anthony B. Hayward ("Hayward"), BP's Chief Executive Officer at the time, and Douglas Suttles ("Suttles"), who was in charge of BP's spill response team.  These senior officers obfuscated the impact of the disaster by providing the market with materially false and misleading oil spill figures that were belied by contemporaneous internal BP reports that revealed substantially larger amounts of oil were rushing into the Gulf of Mexico than BP's senior officers had claimed.

      6.      In fact, more than two months after the *Deepwater Horizon* explosion, BP continued to evade the truth.  For example, on June 17, 2010, defendant Hayward testified before Congress' Subcommittee on Oversight and Investigations concerning BP's responsibility with respect to the *Deepwater Horizon* disaster and the resulting oil spill.  During his testimony to Congress, Hayward dodged giving substantive answers to direct questions, leading Congressman Henry Waxman to proclaim that "BP's corporate complacency is astonishing … BP cut corner after corner to save a million dollars here and a few hours or days there.  And now the whole Gulf Coast is paying the price."

      7.      Finally, on July 16, 2010, after some 87 days had passed since the *Deepwater*

*Horizon* explosion, BP finally stemmed the flow of oil from the Macondo well, but only after exacting a heavy environmental toll with an estimated 5 million barrels of oil discharged into the Gulf of Mexico – surpassing Exxon Valdez as the worst environmental disaster in U.S. history.

8.     At least nine governmental investigations were commenced to investigate the disaster, including the Presidential Commission appointed by President Barack Obama.  The Presidential Commission, after interviewing hundreds of witnesses, reviewing hundreds of thousands of pages of documents and consulting with industry experts, issued the "Presidential Commission Report" in January 2011. The first conclusion of the Presidential Commission Report was sobering: "[t]he explosive loss of the Macondo well could have been prevented." Indeed, the Presidential Commission specifically found that: "the blowout was not the product of a series of aberrational decisions made by rogue industry or government officials that could not have been anticipated or expected to occur again.  Rather, the root causes are systemic" to BP.

9.     Indeed, the Presidential Commission detailed numerous safety tests and procedures that the *Deepwater Horizon* crew failed to perform or just simply ignored.  The Presidential Commission Report concluded that "[t]he immediate causes of the Macondo well blowout can be traced to a series of identifiable mistakes made by BP, Halliburton, and Transocean that reveal such systematic failures in risk management that they place in doubt the safety culture of the entire industry."

10.    Indeed, BP had suffered from a string of catastrophic industrial incidents leading into and during the Relevant Period, including incidents related to its off-shore drilling operations.  Notorious among them were an explosion at BP's Texas City, Texas, refinery in 2005 that killed 15 workers and injured more than 170, and the discovery of a 212,000 gallon oil leak in a section of poorly maintained corroded pipe in its Prudhoe Bay, Alaska, transit pipelines

in March 2006.

11.     Yet, on the heels of the Texas City Refinery disaster (on June 30, 2005), the Company pledged in its Annual Report with the SEC on Form 20-F, that BP had implemented protocols to ensure regulatory and safety compliance by all employees.  In fact, to confirm its newfound commitment to process safety BP issued a press release on August 17, 2005 announcing that it was "appoint[ing] an independent panel to review the safety management systems and corporate safety culture" of BP's subsidiary responsible for its U.S. refining operations.   Then-CEO Lord John Browne ("Browne") was quoted as saying "the Texas City explosion was the worst tragedy in the recent history of BP, and we will do everything possible to ensure nothing like it happens again.   Today's recommendation from the [Chemical Safety Board ("CSB")] is a welcome development and we take it seriously."

12.     At the time, the Texas City refinery disaster seemed to mark a turning point in the Company's view on process safety.  Indeed, on October 24, 2005, BP issued a press release announcing that its own independent panel would be led by former U.S. Secretary of State James Baker, III (the "Baker Panel").   The Baker Panel's investigation culminated in a report spanning more than 350 pages (the "Baker Report") and finding, in the words of the Presidential Commission, that "BP management had not distinguished between occupational safety (*e.g.*, concern over slips, sprains, and other workplace accidents) and process safety (*e.g.*, hazard analysis, design for safety, material verification, equipment maintenance, and process-change reporting).   The [Baker P]anel further concluded that BP was not investing leadership and other resources in managing the highest risks."  More specifically, the Baker Panel asserted that: "from the top of the company, starting with the Board and going down … BP has not

5

provided effective process safety leadership and has not adequately established process safety as a core value."

13.    The Baker Panel singled out organizational problems as the root cause of BP's continued failure to learn from, and respond to, major incidents, finding "a lack of operating discipline, toleration of serious deviations from safe operating practices, and apparent complacency toward serious process-safety risks."

14.    On January 16, 2007, Defendants publicly released the Baker Report, which contained 10 recommendations to "help bring about sustainable improvements in process safety performance."  Then-BP Chief Executive Officer Browne embraced the Baker Report recommendations, acknowledging that "BP gets it.  And I get it too."  Indeed, Browne emphasized that "BP's workforce is ready, willing and able to participate in a sustained Group-wide effort to move BP towards excellence in process safety.  BP's safety lapses have been chronic."

15.    Throughout the Relevant Period, Defendants would again and again return to this pledge and the recommendations advanced in the Baker Report to assure investors that BP had learned its lesson and that its operations were now safe and reliable.  Defendant Hayward, the other Individual Defendants, and BP itself repeatedly reaffirmed in public filings with the SEC and press releases the Company's commitment to process safety and, in particular, the virtues of such efforts in one of its greatest profit centers – the Gulf of Mexico.  For instance, in its 2007 Annual Review, released on February 22, 2008, the Company maintained, among other things, that "[w]e have consistently communicated that safe and reliable operations are our highest priority" and that "we are addressing performance by reducing organizational complexity, improving operational consistency and changing individual behaviours."  Indeed, less than two

months before the *Deepwater Horizon* explosion, in its 2009 Annual Report, filed on March 5, 2010, BP confirmed that "[s]afe, reliable and compliant operations remain the group's first priority. A key enabler for this is BP's operating management system (OMS), which provides a common framework for all BP operations, designed to achieve consistency and continuous improvement in safety and efficiency."

16.     Beginning in 2006, Hayward became chair of the Group Operations Risk Committee ("GORC"), an executive committee tasked with monitoring and examining BP's safety protocols, including the Operating Management System ("OMS"), and addressing safety incidents in BP's operations. Hayward also served as executive liaison to the Safety, Ethics and Environment Assurance Committee ("SEEAC"). SEEAC was charged with examining the processes adopted by executive management to identify and mitigate significant non-financial risks, and obtaining assurance that these processes are appropriate in design and effective in implementation, as well as reviewing BP's internal risk control systems for non-financial risk. SEEAC was responsible for ensuring that the Baker Panel's recommendations, as well as BP's other safety policies and practices, were implemented and followed. Members of both GORC and SEEAC received the quarterly Health and Safety Environment & Operations Integrity Reports, referred to at BP as the "Orange Book." These reports, among other things, monitored the process of implementing OMS and provided various safety metrics. As a result, through the Orange Book, Defendants knew or should have known that: (i) there were at least two high-potential incidents involving Transocean, one of which was in the Gulf of Mexico; (ii) that S&O Audits excluded joint venture operations in the Gulf of Mexico, such as the *Deepwater Horizon*; and (iii) that the implementation of OMS in the Gulf of Mexico was not completed in 2008 and was still not complete when the *Deepwater Horizon* exploded.

7

17.     Following the Texas City disaster and various other safety incidents, BP was forced to act and vowed to implement OMS across the entire Company.  BP claimed that it intended OMS to apply to all BP operations, including the Exploration & Production unit in the Gulf of Mexico.  Indeed, BP falsely stated that it had done this when the implementation of OMS in the Gulf of Mexico was still not complete at the time of the *Deepwater Horizon* disaster in April of 2010.  The members of GORC, including defendant Hayward, were kept apprised of the progress of the OMS implementation during the Relevant Period through reports detailing where OMS had been incorporated.  BP also failed to disclose that the process safety component of OMS did not apply to BP operations on rigs that were not fully-owned by BP – such as the Transocean-owned *Deepwater Horizon*, as well as rigs at five of the other wells located in the Gulf of Mexico.  Thus, BP's implementation of the process safety aspect of OMS excluded the majority of the Company's operations in the Gulf of Mexico.

18.     A January 24, 2011 *Fortune* magazine article entitled "BP: An Accident Waiting to Happen," revealed a previously unreleased internal BP strategy document dated December 2008 that specifically warned BP executives of serious process safety "gaps" in the Gulf of Mexico:

> It's become apparent that process-safety major hazards and risks are not fully understood by engineering or line operating personnel.   Insufficient awareness is leading to missed signals that precede incidents and response after incidents, both of which increases the potential for and severity of process-safety related incidents.

The document concluded that BP's employees needed "major hazard awareness" training.

19.     The *Fortune* article featured Nancy Leveson ("Leveson"), an industrial safety expert at the Massachusetts Institute of Technology, who served on a panel that investigated

8

BP's safety practices after its Texas City refinery explosion and subsequently taught safety classes to BP executives in a course entitled BP "Operations Academy."  More recently, Leveson served as an advisor to the Presidential Commission.  In the article, Leveson was quoted as criticizing BP's approach to safety, explaining that BP "just did safety wrong."  She determined that BP was "producing a lot of standards but many were not very good and many were irrelevant."  She was so troubled by BP's approach to safety that, in January 2010 – just months before the *Deepwater Horizon* tragedy – she prophetically warned colleagues that BP was "an accident waiting to happen."

20.     Not surprisingly, the string of safety deficiencies above existed not only with refineries and pipelines, but also with offshore drilling operations, which would prove catastrophic on April 20, 2010.  The Presidential Commission Report concluded that, despite receiving warnings from the prior disasters about the need for clear operational protocols and safety measures, BP had no adequate process safety procedures in place with regard to well testing in deep sea drilling.  Similarly, it lacked established protocols for securing a well before placing it into temporary abandonment.  To compound the deficient safety procedures and protocols, BP also failed to suitably outfit rigs with properly designed and tested equipment to meet the extreme risks posed by deepwater drilling operations.

21.     After the *Deepwater Horizon* explosion, the truth about BP and its lack of commitment to and implementation of safety processes to avoid preventable incidents began to emerge.  Among other things, investors learned that BP: was not the safe and secure company it portrayed itself to be after the Texas City refinery and Prudhoe Bay, Alaska disasters; had not implemented the process safety overhaul it represented it would in response to the Baker Report; knew or recklessly disregarded that the amount of the spill was vastly greater than it had publicly

admitted; knew or recklessly disregarded that its statements regarding the size of the oil spill were false and materially misleading when made; could not contain the oil spill; and could not expeditiously stop the flow of oil from the well (which did not stop for 87 days after the explosion).  As a result, when the truth was revealed, BP's stock price plunged in value, causing Plaintiff to suffer substantial damages.

## II.   **JURISDICTION AND VENUE**

22.    The claims herein arise under the common and statutory law of England.

23.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332.  Plaintiff and Defendants are citizens of different states or are aliens and the amount in controversy between the Plaintiff and the Defendants exceeds $75,000, exclusive of interest and costs.  This is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

24.    Alternatively, this Court has jurisdiction pursuant to the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1349(b)(1).  Plaintiff alleges that Defendants made false and misleading statements "in connection" with BP's "operation" conducted on the Outer Continental Shelf related to "exploration of subsurface minerals."

25.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).  Many of the acts and transactions that give rise to the violations of law alleged herein, including the dissemination to the public of materially untrue and misleading press releases and filings with the SEC, occurred in substantial part in this District.  Furthermore, BP's U.S. operations are headquartered in this District and two Defendants maintain their principal places of business in Houston.  Moreover, by Order dated August 10, 2010, the Judicial Panel on Multidistrict Litigation transferred several related actions to this jurisdiction for coordination and pretrial proceedings.

10

26.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of a national securities exchange and market.

## III.   THE PARTIES

### A.     Plaintiff

27.     Plaintiff, ISBI, domiciled outside of Texas and Delaware, purchased BP ordinary shares outside the United States at artificially inflated prices during the Relevant Period in reliance on Defendants' false and misleading statements and was damaged by Defendants' misconduct.

### B.     Defendants

28.     Defendant BP is a United Kingdom corporation with its principal executive offices located at 1 St James' Square, London SW1Y 4PD, United Kingdom.  BP has substantial contacts with the United States, including that BP: (a) is the largest oil and gas producer in the U.S.; (b) has 40% of its assets and workers in North America; (c) lists ordinary shares on the NYSE in connection with its ADS program; (d) has roughly 40% of its ordinary shares owned by individuals and institutions within the U.S.; and (e) files annual reports and other documents with the SEC.

29.     Defendant BP America, Inc. ("BP America"), a wholly-owned subsidiary of BP, is a Delaware corporation with its principal place of business in Houston, Texas.  BP America produces oil and natural gas products in the United States.  Throughout the Relevant Period, Defendants touted BP America's commitment to process safety and risk management and its ability to monitor the *Deepwater Horizon*'s operations, yet BP America failed to aptly respond to

11

emergency warnings from the *Deepwater Horizon*.

30.     Defendant BP Exploration & Production, Inc. ("BP Exploration"), a wholly-owned subsidiary of BP, is a Delaware corporation with its principal place of business in Houston, Texas.

31.     Defendant Hayward served as the Company's CEO from May 2007 until October 2010 and served as an executive director of the Company from 2003 to November 2010. Hayward joined BP in 1982 as a rig geologist offshore of Aberdeen, Scotland, and later as a field geologist in various locations throughout the world.   In 1992, he moved to Colombia as exploration manager, and he became president of the BP group in Venezuela in 1995.   Hayward served in various other executive positions beginning in 1997, and from 2002 to 2007, he served as the CEO of BP's exploration and production division, which oversees exploration and drilling in the Gulf of Mexico, among other places.   Hayward was a member of BP's executive management, which is responsible for the day-to-day running of BP.   During the Relevant Period, Hayward signed BP Annual Reports that are alleged herein to have been knowingly or recklessly false and misleading when made.   Hayward also made false and misleading statements from Houston and operated from Houston following the *Deepwater Horizon* disaster.   On July 27, 2010, BP announced that Hayward would step down as the Company's CEO effective October 1, 2010, but he remained on the BP board until November 20, 2010.

32.     Defendant Suttles served as BP's Chief Operating Officer for Exploration and Production from January 2009 until at least January 2011.   Suttles has more than 25 years' experience in the oil industry, and he spent at least 22 years in various engineering and leadership positions with BP, including roles as Vice President for Northern North Sea Operations and President of BP's Trinidadian oil business.   In January 2007, he was named

President of BP Exploration (Alaska), Inc. As noted in the *Telegraph*, "Suttles was the face of operational briefings during the [Gulf] spill and led the technical response to stopping the oil leak." During the Relevant Period, Suttles made knowingly or recklessly false and misleading statements as alleged herein. On January 12, 2011, Suttles abruptly announced that he would be retiring from BP.

33.     Defendant H. Lamar McKay ("McKay") has served as Chairman and President of BP America since January 2009. He has more than 30 years' experience in the oil industry, and has worked with BP in various roles since 1998, including the Head of Strategy and Planning for Worldwide Exploration and Production, the Business Unit Leader for the Central North Sea in Aberdeen, Scotland, and the Chief of Staff for Worldwide Exploration and Production. In May 2007, McKay assumed the role of Senior Group Vice President of BP and Executive Vice President of BP America, and in 2008, he became Executive Vice President of BP plc Special Projects, focusing on Russia. McKay is a member of BP's executive management, which is responsible for the day-to-day running of BP. During the Relevant Period, McKay knowingly or recklessly made false and misleading statements as alleged herein.

34.     Defendant Robert Dudley ("Dudley") has served as BP's Group Chief Executive since October 2010, succeeding defendant Hayward, and as an executive director since April 2009. Dudley has worked in the oil industry since 1979 and for BP since 1999, where he has served in numerous roles. He is a member of BP's executive management, which is responsible for the day-to-day running of BP. During the Relevant Period, Dudley knowingly or recklessly made false and misleading statements as alleged herein.

35.     Defendant Andrew Inglis ("Inglis") served as the CEO of BP Exploration and Production and as an executive director of BP from February 2007 until October 2010. During

13

the Relevant Period, Inglis made several public statements attesting to BP's commitment to improving personal and process safety practices in all of its operations. Inglis made these false and misleading statements knowingly or recklessly, as alleged herein. Inglis attended meetings of SEEAC to report on issues germane to BP Exploration. Inglis was also a member of GORC and in this capacity he provided reports on BP Exploration to Hayward and received the Orange Book reports, which monitored the progress of the implementation of the OMS across BP's operations.

36.     Defendants Hayward, Suttles, McKay, Dudley, and Inglis are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of BP's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each individual defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each of the Individual Defendants knew, were reckless in not knowing, that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made regarding BP's operations and safety practices and procedures were then materially false and misleading when made.

37.     BP, BP America, BP Exploration, and the Individual Defendants are collectively referred to herein as the "Defendants."

## IV.     CONFIDENTIAL WITNESSES

38.     According to the Securities Class Action Complaint, No. 4:10-md-02185

14

(S.D. Tex.), Confidential Witness #1 ("CW1") provided information on process safety and risk assessment management.  Through 2005, CW1 acted as a safety systems and risk assessment consultant for, among other things, deepwater platforms and offshore drilling including, but not limited to, the Gulf of Mexico.  Following that consultation, and through the present, CW1 has been apprised of information related to BP's process safety and risk assessment and management of its Gulf of Mexico operations.

39.     According to the Securities Class Complaint, Confidential Witness #2 ("CW2") is a former BP senior manager and an expert in the offshore oil and gas drilling and completions.  CW2 possessed information related directly to BP's Gulf of Mexico deepwater exploration including, but not limited to, process safety implementation. Before separating from BP in 2009, CW2 reported directly to senior BP executives and indirectly to defendant Inglis.

40.     As alleged in the Securities Class Complaint, Confidential Witness #3 ("CW3") is an oil industry operational safety expert and former consultant to the BP Board.  CW3 presented information and analyses directly to former CEO Browne and Defendant Hayward on issues including, but not limited to, implementation of process safety and risk management practices.

V.     **BACKGROUND**

A.     **BP's Prior Safety Debacles Demonstrate That Its Process Safety Was Flawed**

41.     The *Deepwater Horizon* disaster is just the latest example in a string of tragic events resulting from BP's continued failure to operate its facilities in line with industry standards and its own internal safety protocols.  In fact, well before the beginning of the Relevant

15

Period, BP was intimately familiar with the risks associated with the petroleum industry, and deepwater drilling in particular, and had the dubious distinction of being at ground zero for several other catastrophic events.

42.     In 2002, the *Ocean King*, a drilling rig that BP was operating in the Gulf of Mexico, suffered two separate drilling blowouts within a three-month span.  In response to these incidents, MMS issued a special Safety Alert to all drilling companies operating in the Gulf of Mexico regarding the serious risk of a blowout in the event of a failed cementing job.  The Safety Alert made particular note of MMS' findings concerning BP's role in the *Ocean King* incidents, warning others about "erroneous chain of decisions, inadequate training of personnel or knowledge of the diverter system, and inadequate planning."

43.     In May 2003, the Transocean *Discoverer Enterprise*, an offshore oil rig which BP was contractually responsible for its operations, experienced a near blowout under circumstances eerily similar to those surrounding the *Deepwater Horizon* explosion.  The *Transocean Enterprise* drifted off its drill site just as a well was being completed, breaking the riser pipe linking the rig to the ocean floor.  BP was fortunate this time that the backup "deadman" switch on the rig's BOP worked, sealing the BOP's rams and preventing the damaged riser from leaking oil or gas into the Gulf of Mexico.  Later, an inspection revealed that sections of broken riser pipe were leaning up against the BOP, close to its control lines, and that the BOP itself was partially damaged, revealing that the purportedly "fail safe" BOP was easily susceptible to becoming inoperative by the falling riser pipe, as it did on the *Deepwater Horizon*.

44.     Just over a year later, in August 2004, BP suffered a blowout off the coast of Egypt, when the *GSF Adriatic IV*, a gas drilling rig operated by Global Santa Fe, exploded while completing a well for a joint consortium that included BP.  The blowout occurred after a final

16

cementing job failed, reminiscent of the *Deepwater Horizon* incident.

45.     In 2005, the BOP on the *Deepwater Horizon* underwent an independent five-year audit that revealed problems with gauges and leaks.  This was an indication that the device was not being properly maintained.  The audit, however, was incomplete because the *Deepwater Horizon*'s BOP was in use at the time of the audit and many of its components were never properly tested.  For instance, a key test to determine whether the unit's blind shear rams could cut through actual drilling pipe was never performed.

**B.      The Texas City Refinery Explosion and The Prudhoe Bay Oil Spill – Different Places, Same Results**

46.     On March 23, 2005, an explosion occurred at BP's Texas City refinery killing 15 workers and injuring approximately 170 people.  The Texas City refinery explosion led to a string of regulatory investigations by, among others, the U.S. Environmental Protection Agency's ("EPA") criminal investigative division, U.S. Occupational Safety and Health Association ("OSHA"), EPA civil inspectors, the CSB, and the Texas Environmental Quality Commission ("TEQC"), that resulted in BP pleading guilty to one felony count and paying $50 million in criminal fees for the unlawful release of air pollutants during the explosion.  Similarly, OSHA levied a record $87.4 million civil penalty against BP for process safety management violations at its Texas City facility.  In its final report, the CSB charged that the "Texas City disaster was caused by organizational and safety deficiencies at all levels of the BP Corporation."

47.     The investigations following the Texas City refinery explosion demonstrated that BP was warned about deteriorating safety conditions at the facility months before the explosion, but completely disregarded them.  In fact, the CSB noted that "[w]arning signs of a possible

disaster were present for several years, but company officials did not intervene effectively to prevent it." Some of the CSB's key organizational findings included, among other things: (1) cost-cutting, failure to invest, and production pressures from executive managers impaired process safety; (2) BP's Board of Directors failed to provide effective oversight of the Company's safety culture and major accident prevention programs; (3) Texas City lacked a reporting and learning culture where employees were not encouraged to report safety issues and some feared retaliation for doing so; (4) safety campaigns, goals, and rewards focused on improving personal safety metrics and conduct rather than process safety and management safety systems; (5) several studies, reports, and audits revealed deep-rooted safety issues, but BP's response at all levels was "too little, too late"; and (6) Texas City did not effectively assess changes involving people, policies, or the organization that could affect process safety. Likewise, on October 29, 2006, a report on *60 Minutes* revealed "evidence that Texas City's own plant manager, Don Parus, was dismayed by unsafe conditions at the refinery and even tried to get the attention of his bosses in London. [Parus] showed them a report revealing that most workers at the refinery felt the plant was unsafe: one worker wrote 'the equipment is in dangerous condition and this is not taken seriously.' Another wrote 'this place is set up for a catastrophic failure.'"

48. Similarly, on May 12, 2005, BP released an interim report on the Texas City explosion that acknowledged the disaster was preventable with proper measures:

> Supervisory staff did not verify that the correct procedure was being used or followed, and were absent from the unit during shift relief, and key stages of the startup. There was a lack of clarity around who was supervising the startup. Although the startup procedure was not up-to-date, if the procedure had been followed, or if one of several possible interventions had been made earlier, this incident would not have happened.

18

49.     BP's interim report provided a number of corrective measures to prevent future accidents.  The final report was released on December 9, 2005.

50.     As the investigations in Texas City persisted, in early 2006, an oil spill spewing more than 210,000 gallons occurred on BP's Prudhoe Bay pipelines on Alaska's North Slope. Although the leak was first discovered on March 2, 2006, the pipeline had actually been leaking for weeks.  Within weeks, federal and state authorities began civil and criminal investigations into the Prudhoe Bay spill.  These investigations ultimately addressed not only the initial March 2006 leak, but a subsequent leak in another part of the pipeline that was discovered in August 2006 and other weaknesses in the pipeline.

51.     An EPA criminal investigation at Prudhoe Bay concluded that widespread corrosion in the pipelines had led to the March and August 2006 leaks and that BP could have prevented the leaks by maintaining and inspecting its pipelines.  In 2007, BP pleaded guilty to a criminal charge in connection with the March 2006 spill, admitting that BP's "criminal negligence" caused the corrosion – and thus the spill itself.  BP was sentenced to three years of probation and fined $22 million.

52.     Congress' Energy & Commerce Committee (the "E&C Committee") probed the Prudhoe Bay incident, concluding that severe budget cuts, at a time when BP was reaping huge profits, put pressure on managers to cut corners.  According to Representative Bart Stupak, "BP field managers were being asked to choose between saving money and critical maintenance." Likewise, Representative John Dingell recognized that "[c]ost cutting … drove many key management decisions" on pipeline upkeep.  For instance, the E&C Committee pointed to an October 2001 internal BP email that requested the termination of a pipe corrosion inhibitor because of budgetary pressures: "We are under huge budgetary pressure for the last quarter of

19

the year and therefore we have to take some rather disagreeable measures." Later that year, BP managers were instructed to shift $800,000 from anticorrosion programs and to "do this quietly."

53.     Although the Texas City and Prudhoe Bay disasters were hundreds of miles from each other and approximately a year apart, they are not unrelated to one another. This was underscored by Carolyn Merritt, Chairman of the CSB, in her May 2007 testimony before Congress, in which she articulated that "[v]irtually all of the seven root causes identified for the Prudhoe Bay incidents have strong echoes in Texas City," and identified "common findings" that included "flawed communication of lessons learned, excessive decentralization of safety functions and high management turnover. BP focused on personal safety statistics but allowed catastrophic process safety risks to grow." According to Chairman Merritt, both incidents smacked of "a checkbook mentality" that prevented actions that might have sidestepped problems.

**C.      The Findings of the Baker Report are Made Publicly Available and BP Portrays Itself As a Company that Puts Safety First**

54.     On the heels of the Texas City refinery disaster, in mid-2005, the CSB recommended that BP appoint an independent commission to investigate the Company's internal safety culture and uncover the causes of the incident as well as to investigate other general concerns with BP's safety environment. As a result, in October 2005, BP announced the formation of the "U.S. Refineries Independent Safety Review Panel," chaired by Baker. The Baker Panel began conducting investigations in October 2005 and issued its final report on January 16, 2007. In its report, the Baker Panel strongly suggested that BP immediately implement the following ten recommendations:

**RECOMMENDATION # 1 – PROCESS SAFETY LEADERSHIP**

The Board of Directors of BP p.l.c., BP's executive management (including its Group Chief Executive), and other members of BP's corporate management must provide effective leadership on and establish appropriate goals for process safety. Those individuals must demonstrate their commitment to process safety by articulating a clear message on the importance of process safety and matching that message both with the policies they adopt and the actions they take.

## RECOMMENDATION #2 – INTEGRATED AND COMPREHENSIVE PROCESS SAFETY MANAGEMENT SYSTEM

BP should establish and implement an integrated and comprehensive process safety management system that systematically and continuously identifies, reduces, and manages process safety risks at its U.S. refineries.

## RECOMMENDATION #3 – PROCESS SAFETY KNOWLEDGE AND EXPERTISE

BP should develop and implement a system to ensure that its executive management, its refining line management above the refinery level, and all U.S. refining personnel, including managers, supervisors, workers, and contractors, possess an appropriate level of process safety knowledge and expertise.

## RECOMMENDATION #4 – PROCESS SAFETY CULTURE

BP should involve the relevant stakeholders to develop a positive, trusting, and open process safety culture within each U.S. refinery.

## RECOMMENDATION #5 – CLEARLY DEFINED EXPECTATIONS AND ACCOUNTABILITY FOR PROCESS SAFETY

BP should clearly define expectations and strengthen accountability for process safety performance at all levels in executive management and in the refining managerial and supervisory reporting line.

## RECOMMENDATION #6 – SUPPORT FOR LINE MANAGEMENT

BP should provide more effective and better coordinated process safety support for the U.S. refining line organization.

## RECOMMENDATION #7 – LEADING AND LAGGING PERFORMANCE INDICATORS FOR PROCESS SAFETY

BP should develop, implement, maintain, and periodically update an integrated set of leading and lagging performance indicators for more effectively monitoring the process safety performance of the U.S. refineries

21

by BP's refining line management, executive management (including the Group Chief Executive), and Board of Directors. In addition, BP should work with the U.S. Chemical Safety and Hazard Investigation Board and with industry, labor organizations, other governmental agencies, and other organizations to develop a consensus set of leading and lagging indicators for process safety performance for use in the refining and chemical processing industries.

### RECOMMENDATION #8 – PROCESS SAFETY AUDITING

BP should establish and implement an effective system to audit process safety performance at its U.S. refineries.

### RECOMMENDATION #9 – BOARD MONITORING

BP's Board should monitor the implementation of the recommendations of the Panel ... and the ongoing process safety performance of BP's U.S. refineries. The Board should, for a period of at least five calendar years, engage an independent monitor to report annually to the Board on BP's progress in implementing the Panel's recommendations .... The Board should also report publicly on the progress of such implementation and on BP's ongoing process safety performance.

### RECOMMENDATION #10 – INDUSTRY LEADER

BP should use the lessons learned from the Texas City tragedy and from the Panel's report to transform the company into a recognized industry leader in process safety management. The Panel believes that these recommendations ... can help bring about sustainable improvements in process safety performance at all BP U.S. refineries.

55.     The Baker Report further noted that "[b]ased on its review, the Panel believes that BP has not provided effective process safety leadership and has not adequately established process safety as a core value across all its five U.S. refineries." In addition, as noted by the Presidential Commission, "[the Baker Panel] found that BP management had not distinguished between occupational safety (*e.g.*, concern over slips, sprains, and other workplace accidents) and process safety (*e.g.*, hazard analysis, design for safety, material verification, equipment maintenance, and process-change reporting). The [P]anel further

concluded that BP was not investing leadership and other resources in managing the highest risks." Moreover, the Baker Report recognized that "from the top of the company, starting with the Board and going down … BP has not provided effective process safety leadership and has not adequately established process safety as a core value."

56.    Upon the release of the Baker Report, BP assured investors that it would implement the mandates across all lines of its business.  The rationale behind BP's public pronouncements about its steadfast commitment to implement the recommendations of the Baker Report was self-serving and transparent – to assuage investor and regulatory trepidation about BP's lax risk management and safety protocols that led to Texas City and Prudhoe Bay.  The reality was that not only did BP not "get it," but Defendants knowingly or recklessly repeatedly failed to implement the process safety programs and procedures necessary to avoid the recurrence of similarly preventable deep sea drilling incidents. The occurrence of the worst industrial incident in history, along with the Presidential Commission's finding that BP has not met "its professed commitment to safety" belied BP's public representations concerning this "commitment" to safety.

### D.    On the Heels of the Baker Report, BP Vowed to Execute OMS and Established GORC to Monitor Process Safety

57.    By the end of 2006, BP formed GORC to create the impression that the Company was improving process safety management and reducing risk.  This committee was purportedly tasked with monitoring and implementing OMS across BP.  Mirroring the second recommendation of the Baker Report, BP peddled OMS as an integrated and comprehensive system for identifying, reducing, and managing process safety risks.  GORC, which met monthly, was to review and monitor the Company's progress in managing

23

operational risks and keep defendant Hayward apprised of the Company's progress in these areas.

58.     Defendant Hayward, as BP's CEO and GORC Chairman, was tasked with overseeing the development and implementation of OMS.  In fact, Hayward confirmed in his deposition testimony that this role, and his attendance at GORC meetings, provided him with unique understanding into process safety:

> Q:     And you are very familiar with process safety because of your position as Chair of the Group Operating Risk Committee, aren't you?
>
> A:     I am.
>
> Q:     And one of the responsibilities you had . . . as Chair of [GORC] . . . tell me whether I read this correctly, quote, "Oversight of development and implementation of BP's Operating Management System . . ."
>
> A:     That's correct.

Hayward Dep. at 149:10-13; 163:14-21.

59.     According to Hayward, GORC "reviewed on a pretty well monthly basis the safety performance of BP," akin to a business review, and was comprised of "[Hayward], the Head of. . .Exploration & Production, the Head of Refining and Marketing, [and] the Head of our Alternative Energy business."  Hayward Dep. at 840:3-16.  While not members, the Head of Safety & Operations and the Head of Engineering – the individual charged with implementing OMS across BP – also attended GORC meetings.  Id.  According to defendant Hayward, GORC met approximately once a month to "review the safety performance, to review the progress we were making with respect to implementation of OMS, to review the audits [ ] the Safety Audit Group had conducted to assess safety performance broadly and in detail, and to make interventions as necessary."  Hayward Dep. at 843:12-18.

24

60.     Likewise, defendant Inglis testified that he was familiar with both the function and implementation of OMS due to his participation in GORC:

> The group operations – Group Operations Risk Committee was set up by – by Tony Hayward to monitor our safety and integrity performance. It was there to act as a vehicle for continuing to improve our performance. That was through OMS. So part of it was to actually look at how OMS was being implemented. It connected into the OMS audit function, so that reported in to GORC.

Inglis Dep. at 279:21-280:4.

61.     Defendants Hayward, Inglis and all other members of GORC were provided regular updates on the status and progress of the OMS implementation through the Orange Book. As described by defendant Inglis, the Orange Book was intended to provide GORC members with key performance and progress indicators relating to OMS:

> Q.     What was the purpose of the Orange Book?
>
> A.     The Orange Book actually started in the upstream [relating to Exploration & Production]. It was sort of under my leadership, and then it got introduced as something that would apply across the whole of the – of the group, but, in essence, it was to provide a – a performance monitoring in – performance monitoring information around safety and operational integrity. So it had in it key performance indicators, indicators of progress on various initiatives, whether they be the six-point plan, the implementation of OMS. So it was a – a compendium of all the information that you could use to assess progress on our safety and operation integrity agenda.

Inglis Dep. at 286:24-287:15.

62.     Defendant Inglis further stated that: "There was then a very rigorous process for [OMS'] implementation, as I've described to you. I monitored the implementation of [OMS] through the – the Orange [B]ook and the three stages of [g]ap assessment, prioritization, and MOC [Management of Change]." Inglis Dep. at 379:11-16.

63.     Defendant Hayward also acknowledged that the Orange Book was used to

monitor the OMS implementation, stating: "if you refer to the thing called the Orange Book, it's very clear which areas are complete, which areas are in – in transition." Hayward Dep. at 791:7-11.

64.







**E.    SEEAC was Also Created to Directly Monitor BP's Safety Performance, Including the Implementation of OMS**

65.    Memorialized in a document entitled "Background Note: Independent Expert's Report, Board Level Response to the Recommendations of the BP U.S. Refineries Independent Safety Review Panel," David Pearl, April 10, 2008 (the "April 10, 2008 Background Note"), in 2006, BP's Board re-designated its Ethics and Environment Assurance Committee as SEEAC to "emphasize its monitoring role in safety matters." To bolster the appearance to management and staff of the Board's focus on, and the Chief Executive's commitment to, safety, executive management's attendance at meetings of SEEAC would be led by the Chief Executive. *Id.*

66.    According to BP's 2008 Annual Report on SEC Form 20-F, SEEAC was responsible for, among other things:

- Monitoring and obtaining assurance on behalf of the board that the management or mitigation of significant BP risks of a non-financial nature is appropriately addressed by the group chief executive.

- Reviewing material to be placed before shareholders that addresses environmental, safety and ethical performance and make [sic] recommendations to the board about their adoption and publication.

67.    The Company's Annual Reports noted that SEEAC "receives information on

28

agenda items from both internal and external sources, including internal audit, the safety and operations function, the group compliance and ethics function, and Ernst & Young," and "[t]he wider board is kept informed of the activities of the committee, and any issues that have arisen, through the regular update given by the audit committee chair after each meeting."

68. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

69.     As William Castell, a member of BP's Board since 2006 and Chairman of SEEAC since April 2008, testified, just like GORC, SEEAC members also received the Orange Book on a quarterly basis, and it contained detailed data concerning BP's safety performance:

Q.     Now, the Reports you get, that's the Orange Book; is that right?

A.     We receive an Orange Book on a quarterly basis, sir.

Q.     Yes. And tell us what that is.  What is the Orange Book?

A.     The Orange Book is a compilation of Operations and Risk data which is – which is received by the Group Operations Risk Committee, which is the mechanisms of formal reporting to the GORC Committee as to the level of safety achieved, the lead and lag factors, the major incidents reported. These are all consolidated.  So on a quarterly basis, there is a consolidated document that refers to the last quarter's performance.

29

*     *     *

Q.   Is it metrics?

A.   It's metrics, and it's – well, it goes beyond metrics, sir.  There are
Reports that highlight where there have been major incidents.  There
are verbal Reports from Upstream and Downstream, and there are
Reports on Audit, so not always metrics.  There are also, you know,
comments on audits, audit closeouts, et cetera.

*     *     *

Q.   I'm trying to understand at what level the seriousness of an incident
would come to your Committee, the SEEAC Committee.  How – how
bad does it have to be before your Committee finds out about it?

*     *     *

A.   I think you've seen from the data, sir, that we have the data that comes
to us.  When you say, "How bad does it have to be," the – the data in
the Orange Book goes down to lost days of work.  So if they lost days
at work, we can see it.

Castell Dep. at 377:23-378:12, 378:15-22, 380:22-381:1, 381:4-8.

70.   SEEAC also regularly provided updates to the Board regarding, among other

things, OMS and the implementation of recommendations from the Baker Report.   For

instance, during regular Board meetings, SEEAC advised:



- It received a report from GORC and discussed the available data on safety
and environmental performance in Q1 2008.  Minutes of a Meeting of the
Board of Directors of BP p.l.c., May 2008.



30

**F.      BP Touts OMS as a Company-Wide Mandate, But BP had No Intention of Fully Applying OMS Process Safety and Personal Safety to Rigs BP did not Own, Instead Applying Only Certain Elements of Personal Safety**

71.      Following the Texas City disaster and various other safety incidents, BP was forced to act and vowed to implement OMS across the entire Company.  BP claimed that it intended OMS to apply to all BP operations, including the Exploration & Production unit in the Gulf of Mexico.  Ellis Armstrong Dep. at 57:1-13.  BP and Hayward often boasted that OMS provided a blueprint for company-wide safe and effective operating procedures, not just for its refineries.  However, this was not the case, as the process safety aspect of OMS excluded the majority of the Company's riskiest operations in the Gulf of Mexico, including the *Deepwater Horizon*.  Thus, BP falsely assured Plaintiff and investors that the Company's operations, including those on the Gulf of Mexico, were operating safely.

72.      For example, BP's 2006 Sustainability Report, which was released to the public on May 9, 2007, represented that the "OMS is a comprehensive system that covers *all aspects* of our operations . . . ," and that "[t]he new OMS will apply to *all operations.*"

73.      In the "Group chief executive's introduction" of BP's 2007 Sustainability Report, defendant Hayward stated that BP was "still learning lessons from" Texas City and had "agreed to implement all [the Baker Panel's] recommendations and we are now working to do so."  Describing BP's efforts to achieve those goals, Hayward stated, "[w]e are also now introducing our new operating management system (OMS), designed to bring greater consistency to our operations . . . .  My executive team continues to monitor closely our safety performance."  The report further stated that GORC met 14 times in 2007.

74.      In the "Group Chief Executive's Review" section of BP's 2008 Annual Review, released on February 24, 2009, Hayward noted that "[t]he BP operating

31

management system (OMS) turns the principle of safe and reliable operations into reality by governing how *every BP project, site, operation, and facility is managed*." On March 4, 2009, BP released its 2008 Annual Report, which was filed on Form 20-F and signed by Hayward. This report claimed that the OMS was a "*framework for operations across BP that is integral to improving safety and operating performance in every site.*"

75.     In its 2008 Form 20-F, BP also stated that "[e]ight sites completed the transition to OMS in 2008," including the Gulf of Mexico.

76.     These statements were false, however, as BP conceded at the oral argument on its motion to dismiss in the Class Action that the process safety component of OMS, in fact, was not applicable to contracted rigs, particularly those located in the Gulf of Mexico including the *Deepwater Horizon*. *See* MTD Hr'g Tr. (Dkt. 304) at 58:15-20 ("The statement here that the Gulf of Mexico completed the transition to OMS in 2008 . . . . This is the one statement, Your Honor, that the plaintiffs have alleged that I admit to the Court is not accurate."). Despite BP's disclosure of specific data detailing the number of sites that had already implemented OMS and demonstrating that the implementation process was on track elsewhere, the implementation of OMS in the Gulf of Mexico was not even complete in 2008 and still was not complete at the time of the *Deepwater Horizon* disaster in April of 2010.

77.     The members of GORC, including defendant Hayward, were kept apprised of the progress of the OMS implementation during the Relevant Period through reports detailing where OMS had been incorporated. In fact, Hayward testified, "I believe I was aware that [OMS] had not been fully implemented [in April of 2010]. It was in the process of being implemented as it was in other parts of BP." Hayward Dep. at 662:25-663:20.

Hayward also conceded that BP did not even begin to implement OMS in the Gulf of Mexico until 2009, stating, "my recollection is that we began the process of cutover to OMS in the Fall of 2009." Hayward Dep. at 789:11-14.

78.      This was confirmed by SEEAC Chairman Castell, who testified: "I believe that OMS started its integration in the Gulf in 2009.  I would be personally surprised – and I don't know, But I'd be surprised if it had been fully integrated with all the legacy systems [April 2010]." Castell Dep. at 71:11-14.

79.



80.      Not surprisingly, according to CW2 in the Securities Class Action Complaint, BP's OMS lagged far behind its peers (e.g., Chevron and Exxon) in 2009, and by 2010, the program was still in its pilot phase and yet to be fully implemented in the Gulf of Mexico. CW2 confirmed that, by 2009 and 2010, BP still had not implemented a robust operations

management system to ensure offshore processes could be managed effectively for both exploration and risk.  Indeed, according to CW1, there was a Company failure to implement an OMS protocol that would have ensured that the individual decision makers at the rig level understood how cost-savings and corner-cutting could affect the process safety of the *Deepwater Horizon*.

81.    Indeed, in the fourth quarter of 2009 and in January 2010, BP, as part of a global cost-cutting restructuring, reorganized the drilling operations unit for the Gulf of Mexico.  According to CW2, the global reorganization was attributable to decisions made by defendants Inglis and Suttles.  The result of this massive restructuring was the termination or forced transfer of those employees chiefly responsible for BP's Gulf of Mexico Operations including, but not limited to, those operations involving safety processes and the implementation of BP's OMS in the Gulf of Mexico.  Thus, the individuals tasked with implementing OMS in the Gulf of Mexico were either transferred or terminated in Q4 2009 and Q1 2010.

82.    Instead of replacing these experienced personnel with equally or better trained professionals, as described below, the individuals brought in to implement BP's OMS and manage BP's Gulf of Mexico operations lacked the knowledge, experience, and expertise of those they were replacing.  In fact, in September 2009, a non-public BP rig audit of the *Deepwater Horizon* found that safety goals were neither commonly known nor properly communicated to employees, and not all relevant rig personnel were knowledgeable about drilling and well operations practices.

83.    Some of these hazardous replacements included:

- Ian Little, the Gulf of Mexico wells manager for BP, was replaced by David

34

Sims, who, according to CW2, lacked Little's knowledge and expertise. Despite this, Sims was required to make decisions regarding not only management of the well, but also the response to the *Deepwater Horizon*'s explosion.

- Harry Thierens, before becoming Vice President of Drilling and Completions, London in December 2009, served from 2006 to 2009 as the well director for the Gulf of Mexico. He managed the engineering and operations group in the Gulf of Mexico. Thierens was replaced by David Rich, who, according to CW2, lacked the expertise of Thierens.

- Kevin Lacy, vice president of Drilling and Completions for BP until December 15, 2009 when he left the Company, and who worked in exploration and production for 30 years, was replaced by Patrick O'Bryan. According to CW1 and CW2, O'Bryan lacked Lacy's experience and expertise.

84.    According to CW2, the restructuring of BP's Gulf of Mexico operations was undertaken despite concerns raised by CW2 and other senior BP employees to top-level management with direct reporting responsibilities to BP's board of directors. These concerns related specifically to BP's ability to operate safely in the Gulf of Mexico.

85.    Despite all of its public protestations, BP never intended for OMS to apply across all of its operations. Even more stunning, the process safety component of OMS did not apply to BP operations on rigs that were not fully-owned by BP including the *Deepwater Horizon* – a critical fact that BP admitted at the oral argument on its motion to dismiss the Class Action. *See* MTD Hr'g Tr. (Dkt. No. 304) at 66:6-68:20. Unbeknownst to the public, some of BP's riskiest well sites were drilled by contracted rigs and were thus exempt from OMS procedures related to process safety. Such contracted rigs included the Transocean-owned *Deepwater Horizon*, as well as rigs at five of the other wells located in the Gulf of Mexico. Thus, BP's implementation of the process safety aspect of OMS excluded the majority of the Company's operations in the Gulf of Mexico.

86.     O'Bryan, who replaced 30-year veteran Lacy as Vice President of Drilling & Completions, testified that the only rig in the Gulf of Mexico covered by the limited implementation of OMS was the *Thunderhorse*. Pat O'Bryan Dep. at 413:6-9. John Baxter, Group Head of Engineering for BP and GORC member, likewise confirmed that OMS did not apply to the *Deepwater Horizon*, rendering the procedures instituted in response to the Baker Panel's recommendations useless to the rig because the *Deepwater Horizon* was not fully-owned by BP.   John Baxter Dep. at 175:11-12; 175:14-15; 186:24-187:8; 191:20-192:23; 210:3-10.

87.     Defendant Hayward confirmed this, testifying:

Q.     And again, the effective well control system, is that something that is both part [Transocean]'s and part BP's?

A.     Yes, very largely Transocean, because it is a Transocean Drilling Team that implement the well control procedures.   There's no one from BP involved in implementing well control procedures.   So what we have to do is determine that the well control procedures that Transocean has and that are documented as their well control procedures are appropriate, and, of course, that they're . . . followed.

Q.     Okay.   But if there are well control procedures and process procedures in place in the Gulf of Mexico, BP procedures, those are applicable as well as the [Transocean] procedures?

A.     Well, I don't want to be pedantic, but BP doesn't have well control procedures to manage a well that is beginning to flow, because we're not actually drilling any of the wells that our contractors are.   So what we want to verify is that those procedures are in place, and they're deemed to be appropriate, and people have been trained such that they know them, and when a situation occurs, that they implement and follow them to control the well.

Hayward Dep. at 668:7-669:5.

88.     Baxter also confirmed that certain aspects of OMS did not apply to the *Deepwater Horizon*.   As a result of this limited scope, several safety and risk management

36

procedures implemented as a direct consequence of the Baker Report were simply not applied to a majority of BP's drilling fleet in the Gulf of Mexico, chiefly among them, the *Deepwater Horizon*.  Baxter Dep. at 175:14-15.  For example, BP chose not to apply its Integrity Management, Major Accident Risk ("MAR") assessment, Safety & Operations Audits, or Control of Work to the majority of its drilling fleet, including the *Deepwater Horizon*, because OMS was restricted only to rigs that were fully owned by BP.  *Id.* at 175:11-12; 186:24-187:8; 191:20-192:23; 210:3-10.  O'Bryan also confirmed this, testifying that "[t]he only drilling rig that we had in our fleet that would fall under the BP OMS is the BP-owned rig the PDQ on Thunderhorse."  O'Bryan Dep. at 413:6-9.

89.    Members of GORC were also well aware of the restricted applicability of OMS.  John Mogford, former Global Head of Safety & Operations for BP and former member of GORC, confirmed that members of the committee, including defendants Hayward and Inglis, would have known the limitations of OMS because the "OMS document, it was approved and the scope was approved . . . at the GORC."  Mogford Dep. at 150:13-19.  As Mogford stated, GORC discussed "that the scope was the [OMS] applied to BP owned and operated and controlled sites."  *Id.* at 461:23-25.

90.    This was further substantiated by the accounts of numerous employees involved in BP's Gulf of Mexico drilling and completions operations that revealed that these operations did not receive information on OMS.  BP Well Team Leader John Guide testified that he had no formalized training on OMS until January 2011 – approximately eight months after the Deepwater Horizon catastrophe.   Guide Dep. at 433:5-8.   Ronald Sepulvado, a BP well site leader, was equally unaware of OMS, testifying that he had only "heard" of process safety and that he was completely unfamiliar with 13 policies that were

seemingly part of the Gulf of Mexico Local OMS.  Sepulvado Dep. at 357:16-20; 391:6-394:10.  Additionally, Cheryl Grounds, Chief Engineer of Process and Process Safety, stated that "[m]y understanding is it was frequently stated in the company is [*sic*] that drilling managed their own work.  And we had a lot of work to do in process safety elsewhere, so that was prioritized.  So I focused on producing assets and major capital projects[.]" Grounds Dep. at 88:18-24.  Thus, while BP was touting that it was focusing in on safety and implementing OMS across the Company, those involved with some of BP's most treacherous operations had barely even heard of OMS, let alone were actually implementing OMS in those operations.

91.     Moreover, a *Fortune* Magazine article titled "BP: 'An Accident Waiting to Happen,'" which was published on January 24, 2011, revealed that BP executives were previously warned about process safety "gaps" in the Gulf of Mexico.  The internal document, which was dated December 2008, and had not previously been released, stated:

> It's become apparent that process-safety major hazards and risks are not fully understood by engineering or line operating personnel.  Insufficient awareness is leading to missed signals that precede incidents and response after incidents, both of which increases the potential for and severity of process-safety related incidents.

This internal document also called for stronger "major hazard awareness."

92.     OMS contemplated that assets and entities that were not completely owned or operated by BP, such as the *Deepwater Horizon* rig, would be subject to the safety systems of the party that owned or operated the asset.  After a "gap assessment," where OMS and the contractor's safety standards are compared, those safety standards are reformed if necessary.  This process was confirmed by Inglis:

Q.     Who – if a bridging contract says that the contractor's rig – the contractor's

safety management system will apply, but that BP will compare it to OMS and fill any gaps as necessary, you understand that?

A.    Yeah, I don't think it's fill any gaps as necessary.  What you want to do –

Q.    Supplement?

A.    No, what you want to do is make sure there's conformance with it.

Q.    And if there isn't conformance with it, what do you do?

A.    You would find a way of ensuring that, you know, one system applies, which would be in general the approach would be that the contractor's safety management system applies and then you would look to make sure that it's bridged to the BP process and if there are areas where there needs to be a – a supplementary approach applied, you identify those.

Q.    Okay.  How does one go about – how does BP go about identifying the supplementary approach when it finds that there are areas that need additional safety management procedures on a contractor's rig?

A.    Well, it would go through the process.  It would take the contractor's SMS, compare it to the requirements for – OMS, and it would look to create that bridging document.

                              *       *       *

Q.    Okay.

A.    Having a conformance document in place would be part of that overall [Local] OMS, is my understanding.

                              *       *       *

Q.    Compliance with OMS?

A.    Not compliance with OMS because it's actually to be a bridging document required, that would be part of it.

Inglis Dep. at 641:7-646:5.

    93.    Indeed, a September 8, 2009 bridging document was in force for the

39

*Deepwater Horizon* that purportedly sought to synchronize safety controls between BP and Transocean.  However, unbeknownst to the public, the bridging document was substantively lean and concentrated only on six personal safety issues: oil protection, respiratory protection, boat operations, general safe work practices, incident reporting, and dive operations.  According to the CSB, who released its preliminary findings on the *Deepwater Horizon* explosion at a public hearing on July 24, 2012, this bridging document did not address major accident hazards like the potential for well loss control.

94.     In the end, the restricted applicability of OMS and the limited scope of OMS' implementation as of April 2010 came at a significant cost.  As defendant Hayward admitted, if OMS had been employed in the Gulf of Mexico – and on the *Deepwater Horizon* – the disaster could have potentially been avoided:

Q:     If OMS had been implemented in the Gulf of Mexico before April 20, 2010, is there not the potential for having avoided this terrible catastrophe?

*          *          *

A:     There is a possible potential –

*          *          *

A:     Undoubtedly.

Hayward Dep. at 793:25-794:8.

95.     This came as no surprise to Hayward, as he readily admitted that deep water drilling operations in the Gulf of Mexico presented some of the highest risks facing the Company:

Q.     Well, what did you know, though, was the that DEEPWATER blowout was the highest risk across the entire corporation and that it was the highest risk for your Exploration and Production Unit, wasn't it?

40

A.      It was certainly one of the highest risks for the corporation.  It was the highest risk in the Gulf of Mexico and one of the highest risks for the Ex – for the Exploration and Production Unit.

Hayward Dep. at 196:10-18.

### G.      BP Looks to Conceal Safety Concerns and Retaliates Against Whistleblowers in the Gulf of Mexico

96.      According to the CSB's findings, BP created an environment that discouraged employees from raising concerns about the safety and integrity of BP's operations that continued to run rampant during the Relevant Period.

97.      In August 2008, Kenneth Abbott ("Abbott"), a BP engineer working on design and blueprint management issues relating to the operations of BP's *Atlantis* rig (a major BP rig involved in drilling deepwater exploration and production wells in the Gulf of Mexico), began to raise concerns with BP managers about the Company's practices and policies for managing and updating designs and blueprints for its infrastructure and equipment on the *Atlantis*.  Abbott's concerns were corroborated by a fellow employee, BP manager Barry Duff ("Duff"), who wrote to BP managers stating that a lack of properly-reviewed and approved designs could result in "catastrophic operating errors" and that "currently there are hundreds if not thousands of Subsea documents that have never been finalized," a situation which Duff referred to as "fundamentally wrong."

98.      Abbott continued to raise the above concerns from November 2008 through January 2009 – when he was fired in retaliation for his whistle-blowing.  This led Abbott to file a federal lawsuit in which he alleged that his employment was terminated by BP because he alerted senior managers about the *Atlantis* operating without proper plans.

99.      According to Abbott's lawsuit, "hundreds if not thousands of documents"

41

relating to *Atlantis'* construction and operation were not approved by regulators, as required. Abbott further alleged that "BP managers recognized the gravity of this problem" because "using the incomplete, unapproved drawings, 'could lead to catastrophic Operator errors due to their assuming that the drawing is correct. Turning over incomplete drawings to the Operator for their use is a fundamental violation of basic Document Control, the IM Standard[,] and Process Safety Regulations."

100.    Shortly after Abbott was terminated, he raised his concerns with BP's Ombudsman. Among the documents Abbott forwarded to the Ombudsman, which was later forwarded to senior BP managers during the Ombudsman's investigation into Abbott's allegations, was a declaration by Mike Sawyer, a safety engineer in Houston, who independently reviewed Abbott's allegations, internal BP emails, and applicable regulations.

101.    Mike Sawyer's affidavit affirmed that a "large portion of [the *Atlantis*'] subsea safety critical drawings, documents, specifications, and certificates were not in final, "as-built status," and warned that "[t]he lack of 'as-built' design documents is a violation of Federal requirements under the Department of Interior MMS Safety and Environmental Management Systems as specified in 30 CFR Part 250 [including] 30 CFR 250.903 and 905." The Sawyer affidavit specifically warned that:

- Time is of the essence in avoiding an Outer Continental Shelf (OCS) environmental disaster, Atlantis production should be shut in until resolution of its design shortcomings is complete and a thorough inspection confirms that critical breaches have been satisfactorily resolved. . . . *It is inconceivable that BP could justify the risk of commissioning Atlantis production without completed design documentation reflecting the latest approved design version . . . .*

- The absence of a complete set of final, up-to-date, 'as-built' engineering documents, including appropriate engineering approval, introduces substantial risk of large scale *damage to the deepwater Gulf of Mexico ("GOM") environment and harm to workers*, primarily because analyses and inspections based on *unverified design*

42

*documents cannot accurately assess risk or suitability for service*. . . .

- The wide spread pattern of unapproved design, testing, and inspection documentation on the Atlantis subsea project creates a risk of a catastrophic incident threatening the GOM deepwater environment and the *safety* of platform workers.  *The extent of documentation discrepancies creates a substantial risk that a catastrophic event could occur at any time.*  (Emphasis added).

102.   In April 2010, BP's Ombudsman wrote to Abbott, affirming that his allegations had been substantiated.  Abbott received a letter from BP's Deputy Ombudsman, Billie Garde ("Garde"), on April 13, 2010, which stated:

> Your concerns about the [Atlantis] project not following the terms of its own Project Execution Plan were substantiated. . . . [BP] did not do a comprehensive documentation audit regarding the documentation issues on Atlantis. . . .  *The concerns that you expressed about the status of the drawings upgrade project were . . . of concern to others who raised the concern before you worked there, while you worked there, and after you left*.

103.   Abbott's concerns about BP's failure to maintain complete and current materials for infrastructure and equipment that he raised in 2008 were prescient and would come to have an effect on BP's ability to at least mitigate, if not thwart, the *Deepwater Horizon* incident.  This was corroborated by the Presidential Commission Report which found that a contributory factor to the *Deepwater Horizon* explosion and the problems in attempting to trigger the BOP related to BP's practice of not updating designs and plans from their original schematics.

104.   The Presidential Commission also substantiated BP employees' fears of raising safety concerns, noting that a survey conducted in March 2010 indicated that crew members working on the *Deepwater Horizon* feared retaliation.  The survey, which included workers on the *Deepwater Horizon* and three other rigs, was conducted between March 12 and March 16, 2010 – about one month before the *Deepwater Horizon* explosion.   The Presidential

Commission recognized that "[s]ome 46 percent of crew members surveyed felt that some of the workforce feared reprisals for reporting unsafe situations, and 15 percent felt that there were not always enough people available to carry out work safely."

105.    Following the *Deepwater Horizon* tragedy, on June 17, 2010, Abbott's plight was acknowledged by Congress and he was invited to testify before Congress about the circumstances that led him to initially report his concerns to senior BP management. Abbott's testimony was a sweeping indictment of BP's failure to adhere to safety protocols and regulations:

> From my experience working in the industry for over 30 years, I have never seen these kinds of problems with other companies. Of course, everyone and every company will make mistakes occasionally. I have never seen another company with the kind of widespread disregard for proper engineering and safety procedures that I saw at BP and that we hear from the news reports about BP *Horizon*, or BP Texas City, or the BP's Alaska pipeline spills. BP's own investigation of itself, by former Secretary of State James Baker, reported that BP has a culture which simply does not follow safety regulations. From what I saw, that culture has not changed.

**H.    BP Retaliates Against Safety Whistleblowers Working in Alaska**

106.    The BP Ombudsman conducted a robust investigation of Acuren, the company responsible for pipeline inspection and monitoring of BP's pipelines in Alaska, where BP contractor Marty Anderson ("Anderson") had worked until 2008. Anderson had begun to raise serious criticisms with his supervisors and BP intermediaries about BP's pipeline corrosion and inspection system in Alaska and Acuren's staffing for that program. According to 2009 communications involving the BP Ombudsman's office, in 2007 Anderson began to cite "a significant quality control breakdown" in Acuren's and BP's testing procedures, "inadequate record keeping," and "unqualified inspectors in the field performing inspections." BP's Ombudsman's office stated that "[t]he concerns were serious, and although people try to

44

downplay the significance of the issues, they reveal a complete breakdown." According to the BP Ombudsman's office, the audit confirmed Anderson's claims.

107.    The matters Anderson raised were serious enough for the BP Ombudsman's office to alert BP and BP North America officials, including Rick Cape, BP's Vice President for Compliance and Ethics, to them, *specifically recommending to him that Anderson's concerns be reported to the BP Board of Directors*, among others.  In addition, the Ombudsman himself, Judge Sporkin, communicated Anderson's concerns in 2008 with then-President of BP North America Bob Malone.  Garde wrote to Jack Lynch, BP's General Counsel, about it in September 2009, and Anderson himself met with Lynch on August 3, 2009.  Yet, BP did not adequately address the continuing concerns that had been raised.  An internal email dated July 15, 2010, from Christine Anastos, a BP Ombudsman Inspector, to other Ombudsman staff, stated that "many of the issues identified by Marty [Anderson] years ago appear to be persisting [into mid-2010]," and "it is clear that, over time, root causes have not been identified and/or addressed . . ."

108.    A 2008 BP Ombudsman "Workforce Briefing," which included an assessment of Acuren's "Work Environment," reported that a survey of Acuren employees by the Ombudsman's office found significant problems with workers' perceptions of potential retaliation for reporting safety or environmental concerns.  A "key insight" in the presentation stated that "[a]ctions and events in the past 18 months [*i.e.*, during the period in which BP vowed to improve safety practices in Alaska in the wake of the 2006 spills] have had a decidedly chilling impact on worker attitudes."  The section noted:  "[p]roduction [as opposed to safety] is viewed by very many workers as the primary focus."  The presentation also indicated that the "actual or perceived presence of HIRD [Harassment, Intimidation, Retaliation, Discrimination] is high in the Acuren organization. . . ."  In fact, one in three employees believed "recent

45

resignations" were due to HIRD, and 38% of employees – and 80% of the employees who worked on natural gas lines – indicated as the reason for not reporting safety concerns: "nothing seems to happen to reported items."

109.    The Ombudsman also noted that about 10% of Acuren employees reported that, in the previous 18 months, they had been asked to perform a job that was not in compliance with regulations or safety practices.  Shockingly, this number was even higher for workers who monitor BP natural gas pipelines:  almost half of Acuren's workers in that field indicated that they had been asked to perform "non-compliant work."

110.    The 2008 presentation also included selected quotes from employees, including the following:

- "I've raised issues, now I'm labeled a troublemaker."

- "You get treated better when your supervisor doesn't hear from you."

- "[A] co-worker falsified production numbers and I brought it to my supervisor's attention with the result that I was ostracized, moved to a different shift, moved to the ghetto and told I should produce more in line with the guy who falsified the records."

- "Supervisors talk safety but when concerns are brought up they are viewed as irritating and just given lip service."

- "I have stopped jobs for safety reasons and they just hand it to the next guy till they find someone who will do it."

- "I was pressured to change my evaluation of some pipe which I deemed to be defective."

- "BP doesn't listen, they put too much emphasis on rules to look good but have no common sense when it comes to safety."

- "BP's support of safety comes off as lip service and seems to only be in place to lower their insurance rates.  While superficially, BP delivers lip service about safety, their continually increasing demands accompanied by consistently decreasing resources create a 'results oriented' atmosphere where the ends justify the means."

- "BP creates the adverse and dysfunctional world we work in here.  Many problems that

46

occur are because they drive people too hard to perform with limited resources. . . ."

111.   Further, BP Ombudsman records from 2010 include numerous other examples of serious issues raised by Acuren employees.  For instance, according to a June 7, 2010 article by *ProPublica*, on December 9, 2009, a "Concerned Individual" at Acuren raised process safety concerns about other personnel "pencil whipping" test results (*i.e.*, manipulating devices to produce desired readings) and "falsified inspections."  The "concerned individual," Stuart Sneed, worked on BP's Alaska pipeline.  According to Sneed: "They [BP] say it's your duty to come forward . . . but then when you do come forward, they screw you.  They'll destroy your life. . . . No one up there [in Alaska] is going to say anything if there is something they see is unsafe.  They are not going to say a word."

## VI.   THE *DEEPWATER HORIZON* EXPLOSION AND ITS AFTERMATH REVEALS THAT BP CONTINUED TO FLOUT PROCESS SAFETY

### A.   BP's Systemic Failures were the Catalyst for the *Deepwater Horizon* Tragedy

112.   The tragedy of the Macondo well explosion was avoidable, and BP's conduct evidenced a systematic departure from recognized industry safety practices.  In fact, the Presidential Commission found that "the cumulative risk that resulted from these decisions and actions was both unreasonably large and avoidable[.]"

113.   On March 29, 2008, BP paid approximately $34 million to acquire the exclusive drilling rights from the MMS for the Mississippi Canyon Block 252, a nine-square-mile plot in the Gulf of Mexico where the Macondo well is situated.  The Macondo well was located approximately 48 miles off Louisiana's shoreline.  It was believed that the well could hold as much as fifty million barrels of producible oil.  According to the President's Commission, "[a]lthough the Mississippi Canyon area has many productive oil fields, BP

47

knew little about the specific geology of Block 252: Macondo would be its first well on the new lease.  BP planned to drill the well to 20,200 feet, both to learn more about the geology of the area and because it thought – based on available geological data – that it might find an oil and gas reservoir that would warrant installing production equipment at the well."

114.    However, before it could commence drilling operations, BP was required, pursuant to the Oil Pollution Act of 1990, as supplemented by a Presidential Executive Order, to prepare and file oil spill response plans with MMS demonstrating the Company's specific strategy and ability to respond to an oil spill if one occurred while drilling in the Gulf of Mexico.  This required, among other things: (1) an emergency response action plan; (2) disclosure of the equipment available to combat an oil spill; (3) any oil spill response contractual agreements with third parties; (4) calculations of the worst-case discharge scenarios; (5) a plan for dispersant use in case of a spill; (6) an in-situ oil burning plan; and (7) information regarding oil spill response training and drills.  *See* 30 C.F.R. § 254.21.

115.    Accordingly, BP filed its "Regional Oil Spill Response Plan – Gulf of Mexico" with the MMS on December 1, 2000 ("BP Regional OSRP").  BP's Regional OSRP covers a massive area, including all of the United States' interests in the Gulf of Mexico.  BP has approximately 600 leases and operates roughly 70 oil wells in the Gulf of Mexico, all of which were covered by BP's Regional OSRP.

116.    The latest version of BP's Regional OSRP, which was filed on June 30, 2009, estimated the "TOTAL WORST CASE DISCHARGE" scenario for the Gulf of Mexico at a range between a release of 28,033 barrels of oil per day ("bopd") to 250,000 bopd.

117.  BP's Regional OSRP explicitly stated that the Company and its subcontractors could recover approximately 491,721 bopd in the event of an oil spill in the

48

Gulf of Mexico:

> Offshore response strategies may include attempting to skim utilizing MSRC & NRC's Oil Spill Response Vessels (OSRVs), Oil Spill Response Barges (OSRBs), ID Boats, and Quick Strike OSRVs, which have a combined derated recovery rate of 491,721 barrels/day. Temporary storage associated with the identified skimming and temporary storage equipment equals 299,066 barrels.

118.   Additionally, BP submitted the Macondo IEP for the Mississippi Canyon Block 252 to the MMS on March 10, 2009. (BP's Regional OSRP and the Macondo IEP are collectively referred to herein as "BP's Oil Spill Response Plan").

119.   In the Macondo IEP, BP claimed that there would be no issues in responding to a worst case scenario while drilling the Macondo well:

> Since BP Exploration & Production Inc. has the capability to respond to the appropriate worst-case scenario included in its regional OSRP . . . and since the worst-case scenario determined for our Exploration Plan does not replace the appropriate worst-case scenario in our regional OSRP, I hereby certify that BP Exploration & Production Inc. has the capability to respond, to the maximum extent practicable, to a worst-case discharge, or a substantial threat of such a discharge, resulting from the activities proposed in our Exploration Plan.

*     *     *

> [D]ue to the distance to shore (48 miles) and the response capabilities that would be implemented, no significant adverse impacts are expected.

120.   With the filings to the MMS satisfied, the Transocean rig *Marianas* began drilling the Macondo well in October 2009 and drilled for approximately 34 days, but had to stop drilling and move off-site to evade Hurricane Ida. Despite this, the *Marianas* sustained enough damage that a replacement rig was needed to resume operations.

121.   The *Deepwater Horizon* replaced the *Marianas* and arrived at the Macondo well site on January 31, 2010. After initial preparations were completed on February 10, 2010, the *Deepwater Horizon* continued drilling operations shortly thereafter. Its first undertaking was to

lower its BOP into the wellhead left by the *Marianas*: once in place, everything needed in the well, such as drilling pipe, bits, casing, and drilling mud, would pass through the BOP.

122.    When drilling a deepwater well like Macondo that extends 13,000 feet below the ocean floor, controlling the well pressure is undoubtedly a priority.   If the proper safety procedures are not followed, uncontrolled well pressure can cause an explosion.

123.    Once the initial drilling of the well was complete, the *Deepwater Horizon*'s crew was to, according to standard practice, plug the well and "temporarily abandon" it until BP's engineers in Houston could formulate a plan to extract the oil.

124.    The *Deepwater Horizon* was a giant off-shore drilling rig with the capabilities needed to drill a well like Macondo.  However, BP, like most operators, would use a smaller and less costly rig to "complete" the well, *i.e.*, connect to the well to pump oil and gas from the site. To place the well into temporary abandonment and make room for the new rig, the *Deepwater Horizon* had to remove its own BOP and riser from the wellhead.  According to the Presidential Commission Report, there were "[f]our key features of the temporarily abandoned well worth noting":

> First is the single 300-foot-long cement plug inside the wellbore.   MMS regulations required BP install a cement plug as a backup for the cement job at the bottom of the well.  Second is the location of the cement plug: BP planned to put it 3,300 feet below the ocean floor, or "mudline" (which was deeper than MMS regulations allowed without dispensation, and deeper than usual).   Third is the presence of seawater in the well below the sea floor: BP planned to replace 3,000 feet of mud in the wellbore above the cement plug with much lighter seawater (seawater weighs roughly 8.6 ppg, while the mud in the wellbore weighed roughly 14.5 ppg).   Fourth is the lockdown sleeve – a mechanical device that locks the long casing string to the wellhead to prevent it from lifting out of place during subsequent production operations.

Throughout this process, the well is monitored and a series of tests are performed to insure that the well is secure, *i.e.*, that no hydrocarbons are leaking into the well.   According to the

50

Presidential Commission, neither the BP Well Site leaders, nor any of the rig's crew, had seen the temporary abandonment plan for the Macondo well prior to 10:43 a.m. on the day the abandonment procedure began.   Indeed, the temporary abandonment plan had undergone numerous changes leading up to April 20, 2010, but, according to the Presidential Commission, "[i]t does not appear that the changes to the temporary abandonment procedures went through any sort of formal review at all."

125.    While preventable, the *Deepwater Horizon* disaster resulted from the same cost-saving, corner-cutting approach to safety that laid claim to, among others, the Texas City refinery and Prudhoe, Alaska incidents.

126.    As the investigations began to unfold, a May 27, 2010 article in *The Wall Street Journal* revealed that the investigations pointed to a series of missteps by BP "over the course of the project that rendered this well more vulnerable to the blowout[.]"   *The Wall Street Journal* obtained documents belonging to BP and Transocean that revealed "BP … cut short a procedure involving drilling fluid that is designed to detect gas in the well and remove it before it becomes a problem … BP also skipped a quality test of the cement around the pipe – another buffer against gas – despite what BP now says were signs of problems with the cement job and despite a warning from cement contractor Halliburton Co."

127.    In addition, according to the Presidential Commission, BP's original design called for the use of 16 or more centralizers placed along the "long string" – a single continuous wall of steel between the wellhead and the seafloor to keep the casing in the center of the wellbore. However, on April 1, 2010, team member Brian Morel learned that BP's supplier had only six in stock.   Despite computer simulations run on BP proprietary software (called OptiCem) suggesting the need for more than six centralizers, BP Well Team Leader John Guide, based in

51

BP's Houston office, opposed the use of additional centralizers because the installation would delay the team by approximately ten hours, costing BP additional money. *The Wall Street Journal* identified an April 18, 2010 report from Halliburton to BP that "warned that if BP didn't use more centering devices, the well would likely have 'a SEVERE gas flow problem' [but] BP decided to install fewer of the devices than Halliburton recommended – six instead of 21." BP ordered additional centralizers, but when they arrived on the *Deepwater Horizon*, it was determined that they were the wrong type and not used. The Company's approach was based more on convenience than science or engineering, deciding to use six centralizers simply because that was the number currently available on the rig.

128.    Moreover, according to Company documents, BP cut short a common industry practice, called "bottoms up," that circulates drilling mud through the well, bringing the mud at the bottom all the way up to the drilling rig. This process, which should have taken about 12 hours to complete based on the drilling depth, allows workers to check the mud for gas influxes, remove gas pockets and remove any contaminants from the cement. According to *The Wall Street Journal* article, however, the mud circulation was done for a paltry 30 minutes.

129.    *The Wall Street Journal* also revealed that "[o]ne of the final tasks was to cement in place the steel pipe that ran into the oil reservoir. The cement would fill the space between the outside of the pipe and the rock, preventing any gas from flowing up the sides."

130.    The Presidential Commission determined that the crew finished pumping the primary cement job at 12:40 a.m. on April 20, 2010. A Halliburton crew member sent an email to a Halliburton engineer, stating "[w]e have completed the job and it went well." A team of outside technicians was on hand to conduct a suite of tests on the well including, but not limited to, the "cement bond logs," which was designed to evaluate and test the sufficiency of the

cement job by analyzing the casing's response to acoustic signals.   However, BP decided to forego the acoustical test and sent the team of technicians home later that morning.   This decision diverged sharply from industry practice and the recommended safe practices of the American Petroleum Institute.

131.   *The Wall Street Journal* reported that some time after 5:00 p.m. on April 20, 2010, the workers conducted a "negative pressure test" to evaluate whether hydrocarbons were flowing into the well.   This critical test was overseen by BP well-site leader Robert Kaluza, whose experience was admittedly primarily in land drilling and who "told investigators that he was on the rig to 'learn about deep water'" drilling.   The negative pressure test "initially strayed from the procedure spelled out in BP's permit . . . .   When the first test results indicated something might be leaking, workers repeated the test, this time following the permitted procedure.   The second time, pressure rose sharply, with witnesses saying that the well 'continued to flow and spurted.'"   In fact, the BP crew performed the test a third time and, as before, the pressure within the drill pipe spiked.   Finally, a fourth negative-pressure test yielded results that BP considered successful and so the crew continued with temporary abandonment. Despite this, *The Wall Street Journal* noted that "[w]ell control experts say it's clear gas was leaking into the well, most likely through the seal at the top but possibly through the bottom or even through a collapsed pipe."

132.   In order to perform the negative-pressure tests, the crew had already removed approximately 3,300 feet of drilling mud below the seafloor and replaced it with lighter seawater. According to *The Wall Street Journal*, Transocean workers "disagreed with a decision by BP's top manager about how to remove drilling mud and replace it with lighter seawater[,]" leaving less weight to hold down any gas.   BP's opinion prevailed, but the Company subsequently

53

"admitted a possible 'fundamental mistake' in concluding that it was safe to proceed with mud removal."

133.    The Presidential Commission Report noted that once the crewmembers "began displacing the riser with seawater at 8:02 p.m., they confronted the challenge of dealing with all of the returning mud."  The driller continuously rerouted the mud from one pit to another to deal with the heavy inflow while the crew also sent mud from other locations to the "active pit system."  The Presidential Commission concluded that it was "not clear whether the driller, assistant drillers, or mudlogger could adequately monitor active pit volume (or flow-in versus flow-out) during that time given all of the activity."

134.    The situation remained uneventful until approximately 9:01 p.m., when drill pipe pressure began to creep slowly upward despite the fact that the pump rate remained constant. The Presidential Commission recognized that "[w]hile the magnitude of the increase may have appeared only as a subtle trend [on the display], the change of direction from decreasing to increasing was not . . . .  One possible reason might have been that hydrocarbons were flowing into the well and pushing heavy drilling mud up past the drill pipe."  The crew, however, did not respond to the pressure differential until about thirty minutes later when the driller ordered a crew member to bleed pressure from the drilling pipe.

135.    Around approximately 9:45 p.m., drilling mud began spewing onto the rig floor and, a few minutes later, the crew began its initial attempt to activate the BOP.  This effort was ineffective, as gas was already above the BOP and shooting up the riser.

136.    According to the Presidential Commission Report, the first explosion occurred at 9:49 p.m., claiming its first victims on the drilling floor.

137.    After the first explosion, workers on the bridge acted to deploy the Emergency

Disconnect System ("EDS"), which would have closed the blind shear ram, severed the drill pipe, sealed the well, and disconnected the rig from the BOP. However, the EDS failed and none of its remedial measures were activated.

138.    Despite the ineffectual EDS, the BOP's automatic "deadman switch" should have triggered the blind shear ram, but that failed too. Later inspections revealed that the device had myriad problems due to lack of inspection and poor maintenance, including low battery charges in the critical components responsible for deploying the blind shear ram and defective relays that supply the power to close the blind shear ram.

139.    In September 2010, BP's Accident Investigation Report on the *Deepwater Horizon* revealed that a BP rig audit team conducted an audit of the *Deepwater Horizon*, uncovering "[o]verdue maintenance in excess of 30 days was considered excessive, totaling 390 jobs and 3,545 man hours. Many of the overdue routines were high priority." According to BP's Accident Investigation Report, the audit "identified 31 findings that were related to the well control system maintenance. Of these, six findings related to BOP maintenance; all findings were outstanding as of December 2009." Moreover, according to an August 4, 2010 article in *The New York Times*, in March 2010, the month before the explosion, Transocean commissioned the risk management company Lloyd's Register to investigate certain operations in the Gulf of Mexico, including the *Deepwater Horizon*. According to *The New York Times*, the investigators concluded that many crew members and front-line supervisors were hastily promoted without adequate on-the-job experience to appreciate the hazards, noting "[f]ront-line crews are potentially working with a mind-set that they believe they are fully aware of all the hazards when it is highly likely they are not." Moreover, the analysis referred to at least 36 pieces of poorly maintained equipment that could "lead to loss of life, serious injury or environmental damage as

a result of inadequate use and/or failure of equipment."

**B.**   **BP Was Completely Unprepared to Control the Oil Spill**

140.   After the *Deepwater Horizon* explosion, it became readily apparent that BP's Regional OSRP was materially false and misleading when filed.  In fact, corroboration of this began to leak out when, on May 10, 2010, defendant Suttles admitted that BP failed to have an oil spill response plan with "proven equipment and technology" in place that could contain the oil spill.  Correspondingly, in a November 9, 2010 interview with the BBC, defendant Hayward ultimately confirmed that the Company had failed to draw up sufficient emergency response plans, conceding that "we were making it up day to day."  Indeed, the Presidential Commission found that despite BP's claims that it could recover nearly 500,000 bopd, "the oil-spill removal organizations were quickly outmatched."

141.   In its OSRP for the Gulf, filed with MMS on December 1, 2000, and subsequently revised on June 30, 2009, BP confidently declared that it had the capability to recover nearly 500,000 barrels of spilled oil per day in the Gulf region, rendering the worst case scenario for the Macondo well – a release of 162,000 barrels of oil per day – a relative certainty to contain.  BP's claim, however, would be quickly debunked after the *Deepwater Horizon* explosion.  In fact, the Presidential Commission found that despite BP's claims that it could recover nearly 500,000 bopd, "the oil-spill removal organizations were quickly outmatched."

142.   The Presidential Commission aptly leveled criticism at BP's Regional OSRP, as it fell woefully short of a "serious attention to detail."  As an example, it noted that the BP plan identified three different worst-case scenarios – *i.e.*, less than ten miles from the shoreline, more than ten miles from the shoreline, and from a exploratory well from offshore drilling – that ranged from 28,033 to 250,000 barrels of oil discharge and "used identical language to 'analyze'

the shoreline impacts under each scenario[,]" despite a range of volatile factors.  In addition, half

of the "Resource Identification" appendix (five pages) to the BP Regional OSRP was copied

from the material on the National Oceanic and Atmospheric Administration's ("NOAA")

website, without any discernible effort to determine the applicability of that information to the

Gulf of Mexico – nonsensically resulting in descriptions of "biological resources nonexistent in

the Gulf – including sea lions, sea otters, and walruses."

143.    The Presidential Commission also noted several other errors in BP's OSRP such

as:

- Naming Dr. Peter L. Lutz ("Lutz") from the University of Miami's School of Marine Sciences as wildlife expert, despite the fact that he "had died several years before BP submitted its plan."  Not only had Lutz been deceased since 2005, but he left the University of Miami almost twenty years prior to chair the marine biology department at a different university;

- Including incorrect contact information for the Marine Spill Response Corporation ("MSRC") which, according to the Presidential Commission, was "BP's main oil-spill removal organization in the Gulf."  Tellingly, "a link in [BP's Regional OSRP] that purported to go to the Marine Spill Response Corporation website actually led to a Japanese entertainment site[;]"

- Listing the incorrect names and phone numbers of several Texas A&M University marine specialists; and

- Listing outdated contact information for certain mammal stranding network offices in Louisiana and Florida, some of which were actually closed.

144.    As detailed above, without a legitimate OSRP primed for action, BP had to resort

to a scattershot approach in the midst of an environmental cataclysm to stanch the flow of oil in

the Gulf – clearly incongruous to what it had represented.

145.    Within hours after the *Deepwater Horizon* explosion, on April 21, 2010, BP

commenced efforts to use remotely operated vehicles ("ROVs") to seal off the well.  First, BP

used ROVs to conduct a "hot stab," in which hydraulic pressure is applied to a control panel for

the blind shear ram. BP's attempts to engage the blind shear ram, however, were ineffective and, by May 5, 2010, BP learned that the hot stab procedure had no probability of success because the control panel was actually attached to a non-operative test ram. Second, BP directed the ROVs to cut electrical wires in the blind hope that the BOP's "deadman switch" would be triggered and deploy the ram by activating the well's autoshear system, an emergency mechanism that automatically seals the well when the riser disconnects from the BOP. All of BP's attempts to seal the well with ROVs failed miserably.

146.    With the failed attempts to use ROVs to seal the well behind them, on April 22, 2010, BP began spraying massive amounts of the dispersant "Corexit" on the oil that had reached the surface of the Gulf of Mexico. As an unprecedented volume of dispersants were sprayed on the surface, BP brought up the concept of applying dispersant directly to the well. However, no federal agency has ever allowed the use of dispersants in the deepwater environment and the EPA ultimately rejected BP's use of dispersants altogether.

147.    Knowing that dispersants would be unable to significantly lessen the environmental catastrophe, BP's next effort – which was noticeably absent from BP's Regional OSRP – was to place a large containment dome or "cofferdam" over the larger of the two leaks, with a pipe at the top channeling oil and gas to a ship on the surface of the Gulf of Mexico, the *Discoverer Enterprise*. BP had several cofferdams already, but those had been designed, and had only been utilized, in shallow water scenarios and had never been tested in a similar deepwater environment. Thus, BP was forced to quickly attempt to modify one of its existing cofferdams for these new and unintended purposes. The makeshift cofferdam was modified on or about May 4, 2010, and, within days, on May 6, 2010, BP began to lower the 98-ton dome to the sea floor late in the evening.

148.    BP was grasping at straws, as it was aware that the likelihood that the improvised cofferdam would contain the spill was remote.  In fact, the Presidential Commission Report noted:

> BP's Suttles publicly cautioned that previous successful uses had been in much shallower water.  BP recognized that chief among potential problems was the risk that methane gas escaping from the well would come into contact with cold sea water and form slushy hydrates, essentially clogging the cofferdam with hydrocarbon ice.  Notwithstanding the uncertainty, BP, in a presentation to the leadership of the Department of Interior, described the probability of the containment dome's success as "Medium/High."   Others in the oil and gas industry were not so optimistic: many experts believed the cofferdam effort was very likely to fail because of the hydrates.

149.    Sure enough, the effort failed.  As many experts predicted, when crews started to maneuver the cofferdam into position on May 7, 2010, hydrates formed before BP could place the dome over the leak, clogging the opening through which oil was to be funneled.  While BP had a plan to deal with hydrates once the cofferdam was in place, it had no similar strategy to deal with hydrate formation during installation.  This error in planning almost led to another catastrophe.  As noted by the Presidential Commission:

> Because hydrocarbons are lighter than water, the containment dome became buoyant as it filled with oil and gas while BP tried to lower it.  BP engineers told [the Company's Vice President overseeing the project Richard] Lynch that they had "lost the cofferdam" as the dome, full of flammable material, floated up toward the ships on the ocean surface.  Averting a potential disaster, the engineers were able to regain control of the dome and move it to safety on the sea floor.  In the wake of the cofferdam's failure, one high-level government official recalled Andy Inglis, BP's Chief Executive Officer of Exploration and Production, saying with disgust, "If we had tried to make a hydrate collection contraption, we couldn't have done a better job."

150.    In his book on the *Deepwater Horizon* incident published in late 2010, entitled "Disaster on the Horizon," former drilling engineer Bob Cavnar ("Cavnar") described the initial containment dome effort as the "silliest contraption" that BP built in the aftermath of the

incident, and that the steps to construct and lower it down to the leaking BOP "never made much sense ... they were more for show – to look like they were doing something while they were trying to come up with a real plan." Cavnar stated in an interview that the cofferdam was "destined to fail" due to the "scientific certainty" that gas hydrates would immediately form in the device and clog it, and describes in his book the results of its deployment as "almost instantaneous failure."

151.   Following the failed cofferdam effort, BP attempted to plug the surging oil by embarking on so-called "top kill" and "junk shot" efforts – industry techniques that have been historically met with mixed results – and which were ominously missing from BP's Regional OSRP.

152.   A top kill involves pumping heavy mud into the top of the well through the BOP's choke and kill lines, at rates and pressures high enough to force escaping oil back down the well and into the reservoir.  A junk shot complements a top kill and involves pumping material (including pieces of tire rubber and golf balls) into the bottom of a BOP through the choke and kill lines.  The material is supposed to get caught on obstructions within the BOP and impede the flow of oil and gas making it easier to execute a top kill.  However, as acknowledged by the Presidential Commission, neither technique "had [] ever been used in deepwater."  For example, in 1979, after a semi-submersible oil rig exploded releasing millions of gallons of oil into the Gulf of Mexico, the top kill and junk shot methods had taken nearly 290 days to control the oil spill that occurred in shallow waters.

153.   BP proceeded with its top kill and junk shot plan on May 26, 2010, but, as with its previous efforts, communicated mixed messages about the potential likelihood of success to both the government and the public.  BP's ineffectual effort to piece together a coherent and

straightforward message about its efforts to contain the oil spill did not escape the notice of the

Presidential Commission:

> As with the cofferdam, BP struggled with public communications surrounding the top kill. At the time, both industry and government officials were highly uncertain about the operation's probability of success. One MMS employee estimated that probability as less than 50 percent, while a BP contractor said that he only gave the top kill a "tiny" chance to succeed. But BP's Hayward told reporters, "We rate the probability of success between 60 and 70 percent." After the top kill failed, that prediction may have lessened public confidence in BP's management of the effort to contain the well.

154.    During three separate attempts over the next three days, BP pumped mud at rates

exceeding 100,000 barrels per day and fired numerous shots of "junk" into the BOP. After the

third unsuccessful attempt, BP acknowledged that the plan was a failure, citing the risk of a

possible collapse of the three sets of weak points, or "rupture disks," in the well's 16-inch casing.

155.    The Presidential Commission, however, was not completely convinced by BP's

explanation, noting that the "[c]ollapse of the rupture disks was only one of BP's possible

explanations for the unsuccessful top kill. But the company presented it to the government

as the most likely scenario." Moreover, the Presidential Commission recognized that the

"government science teams did not fully accept BP's analysis of what happened to the mud"

and, in contrast, "government officials have suggested that the top kill likely failed because the

rate at which oil was flowing from the well was many times greater than the then-current

5,000 barrels-per day estimate. Because BP did not pump mud into the well at a rate high

enough to counter the actual flow, oil and gas from the well pushed mud back up the BOP and

out of the riser."

156.    Following the failed top kill and junk shot strategy, on May 29, 2010, BP

announced that it would attempt to cut off the portion of the riser still attached to the top of the

BOP and install a collection device, known as a "top hat," which would then be connected *via* a new riser to the *Discoverer Enterprise* vessel. Not surprisingly, BP's Regional OSRP was devoid of any reference to the top hat technique as a potential remedy in the event of an oil spill.

157. According to the Presidential Commission Report, BP began installing the top hat on June 1, 2010, and had it in place by June 3, 2010. By June 8, 2010, the *Discoverer Enterprise* was collecting about 15,000 bopd.

158. In conjunction with the top hat method, BP developed a system to bring oil and gas to the surface through the choke line on the BOP by outfitting a vessel called the *Q4000* with collection equipment, including an oil and gas burner imported from France. Similar to BP's other post-spill cleanup efforts, using a vessel, such as the *Q4000*, was also noticeably absent from BP's Regional OSRP.

159. After some, albeit limited, success, BP was, in the words of the Presidential Commission, once again "overly optimistic about the percentage of the oil it could remove or collect." The Presidential Commission noted:

> On June 1, Suttles said that he expected the top hat, when connected to the *Discoverer Enterprise*, to be able to collect the "vast majority" of the oil. Within days, it became apparent that the top hat and *Discoverer Enterprise* were inadequate. On June 6, Hayward told the BBC that, with the *Q4000* in place, "we would very much hope to be containing the vast majority of the oil." But when the *Q4000* came online in mid-June, the two vessels' joint capacity of 25,000 barrels per day was still insufficient.

160. Following the failure to contain most of the oil using the top hat, the U.S. Coast Guard continued questioning BP's response to the spill. The Presidential Commission recognized that:

> BP's Lynch said that the speed at which the company brought capacity online was limited solely by the availability of dynamically positioned production vessels. One senior Coast Guard official challenged BP's definition of

availability: he suggested that BP did not consider options such as procuring ships on charter with other companies until the government pushed it to do so. Obtaining another production vessel might have enabled BP to collect oil through the BOP's kill line at a rate comparable to that of the *Q4000*.

161.    Following the limited success of the top hat procedure, BP began presenting its final well-control plans to government experts.    According to the Presidential Commission Report:

> The [U.S. government] science advisors would question BP's assumptions, forcing it to evaluate worst-case scenarios and explain how it was mitigating risk.  The government saw its pushback as essential because BP would not, on its own, consider the full range of possibilities.  According to one senior government official, before the increased supervision, BP "hoped for the best, planned for the best, expected the best."  [Paul] Tooms, BP's Vice President of Engineering, believed that the government science advisors unnecessarily slowed the containment effort, arguing that scientists consider risk differently than engineers and that BP had expertise in managing risk.  BP, however, was not in the best position to tout that expertise: its well had just blown out.

162.    On June 10, 2010, the Associated Press published an article entitled "BP Spill Response Plans Severely Flawed," which detailed the "glaring errors and omissions in BP's oil spill response plans."  The article, in relevant part, provided:

> [BP's] 582-page regional spill plan for the Gulf, and its 52-page, [exploration plan] ... vastly understate the dangers posed by an uncontrolled leak and vastly overstate the company's preparedness to deal with one, according to an Associated Press analysis.
>
> *        *        *
>
> In the spill scenarios detailed in the documents, fish, marine mammals and birds escape serious harm; beaches remain pristine; water quality is only a temporary problem.  And those are the projections for a leak about 10 times worse than what has been calculated for the ongoing disaster.
>
> *        *        *
>
> The plans contain wildly false assumptions about oil spills.  BP's proposed method to calculate spill volume judging by the darkness of the oil sheen is way off.  The internationally accepted formula would produce estimates 100 times

63

higher.

*    *    *

In early May, at least 80 Louisiana state prisoners were trained to clean birds by listening to a presentation and watching a video.  It was a work force never envisioned in the plans, which contain no detailed references to how birds would be cleansed of oil.

*    *    *

There are other examples of how BP's plans have fallen short:

Beaches where oil washed up within weeks of a spill were supposed to be safe from contamination because BP promised it could marshal more than enough boats to scoop up all the oil before any deepwater spill could reach shore – a claim that in retrospect seems absurd.

"The vessels in question maintain the necessary spill containment and recovery equipment to respond effectively," one of the documents says.

BP asserts that the combined response could skim, suck up or otherwise remove 20 million gallons of oil each day from the water.  But that is about how much has leaked in the past six weeks and the slick now covers about 3,300 square miles, according to Hans Graber, director of the University of Miami's satellite sensing facility.  Only a small fraction of the spill has been successfully skimmed.  Plus, an undetermined portion has sunk to the bottom of the Gulf or is suspended somewhere in between.

The plan uses computer modeling to project a 21 percent chance of oil reaching the Louisiana coast within a month of a spill.  In reality, an oily sheen reached the Mississippi River delta just nine days after the April 20 explosion.  Heavy globs soon followed.  Other locales where oil washed up within weeks of the explosion were characterized in BP's regional plan as safely out of the way of any oil danger.

BP's site plan regarding birds, sea turtles or endangered marine mammals ("no adverse impacts") also have proved far too optimistic.

While the exact toll on the Gulf's wildlife may never be known, the effects clearly have been devastating.

More than 400 oiled birds have been treated, while dozens have been found dead and covered in crude, mainly in Louisiana but also in Mississippi, Alabama and Florida. More than 200 lifeless turtles, several dolphins and countless fish also

64

have washed ashore.

The response plans anticipate nothing on this scale.  There weren't supposed to be any coastline problems because the site was far offshore.

"Due to the distance to shore (48 miles) and the response capabilities that would be implemented, no significant adverse impacts are expected," the site plan says.

*     *     *

Perhaps the starkest example of BP's planning failures: The company has insisted that the size of the leak doesn't matter because it has been reacting to a worst-case scenario all along.

Yet each step of the way, as the estimated size of the daily leak has grown from 42,000 gallons to 210,000 gallons to perhaps 1.8 million gallons, BP has been forced to scramble to create potential solutions on the fly, to add more boats, more boom, more skimmers, more workers. And containment domes, top kills, top hats.

While a disaster as devastating as a major oil spill will create unforeseen problems, BP's plans do not anticipate even the most obvious issues, and use mountains of words to dismiss problems that have proven overwhelming.

163.    On July 9, 2010, the U.S. Coast Guard authorized BP to install a "capping stack," a smaller version of a BOP that was designed to sit atop the BOP and stop the flow of oil, but required BP to wait for additional tests before sealing it.

164.    The capping stack was finally installed on July 12, 2010. On the following day, experts conducted a "well integrity test" to determine if the well had been compromised and to see whether oil could flow into the rock formation.   According to the Presidential Commission, "[t]he test was to last from 6 to 48 hours, and BP had to monitor pressure, sonar, acoustic, and visual data continuously, as recommended by the [U.S. government's] Well Integrity Team."

165.    On July 15, 2010, after a 24-hour delay to repair a leak, BP shut the capping stack and began the well integrity test.  For the first time in 87 days – and after approximately five

million barrels of oil had already seeped into the Gulf of Mexico – the well had finally stopped surging.

166.    Just days later, on July 19, 2010, BP sought authorization to kill the well through a procedure called a "static kill" which involved pumping heavy drilling mud into the well in a process similar to the top kill.  However, because the oil and gas were already static, the pumping rates required for the static kill to succeed were far lower than the top kill.  There was also a concern about the amount of pressure a static kill would put on the well.  Despite these issues, on August 2, 2010, the U.S. government approved the procedure.  By late morning on the following day, the static kill appeared to have worked.  On August 8, 2010, retired Coast Guard Admiral Thad Allen reported that the cement had been pressure-tested and was holding.

167.    In mid-September 2010, the first relief well – which BP had begun to drill in early May – finally intercepted the Macondo well, allowing BP to pump in cement and permanently seal the reservoir.  As a result, on September 19, 2010, the U.S. government finally announced that "the Macondo well is effectively dead."  According to the Presidential Commission Report, the U.S. government's first public estimate of the oil discharged during the spill was roughly 4.9 million barrels.

## VII.    DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE RELEVANT PERIOD

168.    Before the start of the Relevant Period, BP experienced a series of high-profile safety lapses, including the 2005 Texas City refinery explosion, that resulted in the loss of life, damage to the environment, harm to BP's reputation, and significant costs to BP in the form of criminal pleas and fines, civil settlements, and remediation expenses. Responding to these concerns, BP sought to assure its investors that it was a Company committed to safety as its

66

"number one priority" Through the implementation of the Baker Panel recommendations, in particular, its process safety system, OMS.

169.   On February 22, 2008, BP released its 2007 Annual Review, which emphasized that the Company remained committed to process safety.   The 2007 Annual Review contained the "Group chief executive's review," signed by defendant Hayward. In his Executive Review, defendant Hayward assured investors that, under his leadership, safety was BP's top priority.   For example, he stated, in part, as follows: "[w]hen I took over as group chief executive, the immediate task was to restore the integrity and the efficiency of BP's operations. I set out three priorities: safety, people and performance."   Defendant Hayward further explained that BP's new OMS brings "greater consistency to [BP's] operations" regardless of where those operations were occurring.

170.   The foregoing statements in the 2007 Annual Review, which caused BP securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by defendant Hayward to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)   Hayward misrepresented the true risks associated with deepwater drilling in that he failed to disclose the multiple safety failures and near-failures that BP had experienced in its deepwater drilling operations, rendering his statements materially false and misleading;

(b)   Hayward falsely represented that BP's OMS was "bringing greater consistency to [BP's] operations" when, in fact, BP set differing safety practices country-by-country in order to save time and money; and

(c)   Hayward misrepresented BP's professed commitment to safety, as he failed to disclose that BP was implementing safety budget cuts and staff reductions that impacted

the Company's ability to safely drill in the Gulf of Mexico.

171.    On February 27, 2008, BP conducted its 2008 Strategy Presentation during a conference call with investors and analysts.  There, defendant Hayward asserted that safety was BP's top priority and claimed that the Company was able to deliver strong performance while maintaining safe operations:

> [Hayward:] 2007 saw further improvement in our overall safety performance. Over the last eight years, our safety performance, measured by Recordable Injury Frequency Rate, the standard measure of safety in our industry, has improved three-fold. As you can see on this chart, our performance is amongst the best in our industry.
>
> Notwithstanding this track record, ***our intense focus on process safety continues. We are making good progress in addressing the recommendations of the Baker Panel and have begun to implement a new Operating Management System across all of BP's operations.*** Integrity-related incidents have fallen significantly over the last three years, and oil spills of more than one barrel continue a strong downward trend.
>
> Safe and reliable operations remain our number one priority.

172.    The foregoing statements, which caused BP securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by Defendants to be false at that time, or were made with reckless disregard for the truth, because Hayward misrepresented BP's absolute commitment to process safety when, in fact, BP was not so committed and was instead expanding its deepwater drilling operations without implementing adequate operational protocols and safety measures, including the process safety aspect of OMS, necessary to reduce the risk of catastrophic failure, thereby increasing the Company's exposure to risk.  Hayward also misrepresented the true risks associated with deepwater drilling in that he failed to disclose the multiple safety failures and near-failures that BP had experienced in its deepwater drilling operations, rendering his statements

materially false and misleading.  Moreover, the fact that the *Deepwater Horizon* disaster was so similar to the previous disasters at the Texas City Refinery and Prudhoe Bay shows that BP was not making "real progress in the areas of safety performance and risk management."  In addition to the foregoing misrepresentations, Hayward falsely stated that BP was implementing OMS "across all of BP's operations" when, in actuality, the process safety component of OMS only applied to rigs that BP fully owned, and not to BP operations on leased rigs.  Hayward, through his positions within SEEAC and GORC, had access to information, such as that disclosed in the Orange Book reports, that directly contradicted these statements and was not publicly disclosed.

173.    On March 4, 2008, BP filed its 2007 Annual Report with the SEC on Form 20-F, which was signed by Hayward.  In this report, BP stated:

> ***Throughout 2007, BP continued to progress the process safety enhancement programme initiated in response to the March 2005 incident at the Texas City refinery.***  We worked to implement the recommendations of the BP US Refineries Independent Safety Review Panel (the panel), which issued its report on the incident in January 2007 (see www.bp.com/bakerpanelreport).  ***We have made material progress throughout the group across all of the panel's 10 recommendations.***

174.    The foregoing statements, which caused BP securities to trade at artificially inflated prices, were materially false and misleading and were made knowingly, or with reckless disregard for its truth, for the reasons alleged above in ¶ 170; 172.

175.    On April 17, 2008, defendants Hayward and BP Chairman Sutherland delivered speeches at the Company's 2008 Annual General Meeting. BP posted transcripts of the speeches on its publicly-accessible website. In his speech, Hayward again asserted that safety was of the utmost importance at BP and distinguished BP from other oil companies based on its deepwater operations. In particular, Hayward stated, in part, as follows:

When I took over as chief executive last May, I said that we would focus on three

basic priorities: safety, people, and performance. Everyone at BP understands those priorities. And while I am in this role they will remain the priorities.

Safety is our number one priority and in 2007 our overall safety record continued to improve. Over the last eight years our safety performance according to the standard industry measure has improved threefold and is now among the best in our industry.

***Our intense focus on process safety continues. We are making good progress in addressing the recommendations of the Baker Panel and have begun to implement a new Operating Management System across all of BP's operations.*** This is aimed at ensuring that our operations across the world look and feel the same everywhere - and perform to the same high standard.

*    *    *

International oil companies have always operated on the frontiers of the industry. And that is where BP is happiest, doing the tough stuff that others cannot or choose not to do. From our roots in those Edwardian days when the company was formed, prospecting for oil among the dunes of Persia - it is the same frontier spirit that is evident today as we develop the deepwaters of Angola, the Gulf of Mexico and Egypt[.] ...

Today, we continue to push technological frontiers, exploiting tight gas, increasing reserves through enhanced oil recovery techniques, developing advanced seismic imaging techniques and pioneering research into the next generation of biofuels - which will be based on more efficient molecules and will not be derived from food crops ....

So - the frontier is where our role is. It is by pushing the energy frontier, by moving into new markets and new geographies and by applying our know-how and new technology, that BP has for almost one hundred years generated its returns.

176. The foregoing statements, which caused BP securities to trade at artificially inflated prices, were each materially false and misleading when made, and were known by Defendants to be false at that time, or were made with reckless disregard for the truth, because Hayward misrepresented BP's absolute commitment to process safety when, in fact, BP was not so committed and was instead expanding its deepwater drilling operations without

implementing adequate operational protocols and safety measures, including the process safety aspect of OMS, necessary to reduce the risk of catastrophic failure, thereby increasing the Company's exposure to risk.  Hayward also misrepresented the true risks associated with deepwater drilling in that he failed to disclose the multiple safety failures and near-failures that BP had experienced in its deepwater drilling operations, rendering his statements materially false and misleading.  Moreover, the fact that the *Deepwater Horizon* disaster was so similar to the previous disasters at the Texas City Refinery and Prudhoe Bay shows that BP was not making "real progress in the areas of safety performance and risk management."  In addition, Hayward misrepresented that BP was implementing OMS "across all of BP's operations" when, in actuality, the process safety component of OMS applied only to rigs that BP fully owned, and not to BP operations on leased rigs, such as Transocean's *Deepwater Horizon*; and Hayward, through his positions within SEEAC and GORC, had access to information, such as that disclosed in the Orange Book reports, that directly contradicted these statements and was not publicly disclosed.

177.    On December 17, 2008, defendant Hayward gave a speech at the HRH Prince Of Wales' 3rd Annual Accounting for Sustainability Forum.  BP posted a transcript of the speech on its publicly-accessible website.  Hayward claimed that BP was continuing to improve its process safety practices.  More specifically, defendant Hayward stated, in part, as follows:

> BP had a number of high-profile safety lapses in recent years, notably at our Texas City refinery, where there was tragic and unacceptable loss of life.
>
> *These lapses exposed shortcomings — but they also gave us a huge opportunity to learn and improve the way we operate.  We opened ourselves up to scrutiny — and we listened more to our front-line operations people — who, of course, really know what is going on the ground.  And we have*

71

*continuously reported progress against a response plan and against an independent external report.*

*One of the many consequences for us has been to develop and to embed a new Operating Management System right across BP – and we operate in 100 countries – so that is no mean feat.*

The critical aspect of this system is that it actually translates words into action. It starts out as a set of requirements which are the platform for safe, reliable, responsible operating activities. And then we continuously improve what we do, every day, every month, every year – in pursuit of sustainable operating excellence. Importantly, it is developed, implemented and sustained locally in our operating businesses – and makes our leaders locally fully-accountable for what they do.

178. The foregoing statements created the false impression of consistent progress in safety processes, a potent OMS, and thus, safe, reliable and responsible deep sea drilling operations, which caused BP securities to trade at artificially inflated prices, were each materially false and misleading when made or included material omissions, and were known by Defendants to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)     An internal BP strategy document issued in December 2008 warned BP executives of "major" process-safety concerns in the Gulf of Mexico that permitted the accumulation of risks prior to and in response to incidents, which, therefore, increased the likelihood and severity of "process-safety related incidents";

(b)     Hayward misrepresented that BP did not tolerate any retaliation against workers who raised safety concerns when, in fact, BP engaged in a pattern of systematic retaliation against workers who reported safety violations;

(c)     Hayward misrepresented BP's professed commitment to safety in that he failed to disclose that BP was implementing safety budget cuts and staff reductions which impacted BP's

ability to safely drill in the Gulf of Mexico, rendering his statements materially false and misleading;

(d)    Hayward misrepresented that BP was implementing OMS "right across BP" when, in actuality, the process safety component of OMS only applied to rigs that BP fully owned, and not to BP operations on leased rigs, such as Transocean's *Deepwater Horizon*; and

(e)    Hayward, through his positions within SEEAC and GORC, had access to information, such as that disclosed in the Orange Book reports, which directly contradicted these statements and was not publicly disclosed.

179.    BP issued its 2008 Annual Review on February 24, 2009. In the "Group chief executive's review" section of the Annual Review, Hayward echoed the Company's purported commitment to safety, stating:

Q:    At the start of the year what priorities did you set out for BP?

A:    Safety, people and performance, and these remain our priorities. Our number one priority was to do everything possible to achieve safe, compliant and reliable operations.

Good policies and processes are essential but, ultimately, safety is about how people think and act. That's critical at the front line but it is also true for the entire group. Safety must inform every decision and every action. ***The BP operating management system (OMS) turns the principle of safe and reliable operations into reality by governing how every BP project, site, operation and facility is managed.***

\*        \*        \*

Q:    How did Exploration and Production perform?

A:    It was an excellent year, with major projects such as Thunder Horse in the Gulf of Mexico and Deepwater Gunashli in Azerbaijan coming onstream. That, together with safe and reliable performance from our existing operations, contributed to underlying production growth – in contrast to the falling output of our major competitors – and more than compensated for the effects of Hurricanes Ike and Gustav and other operational issues.

73

180.   The foregoing statements, which caused BP securities to trade at artificially inflated prices, were materially false and misleading and were made knowingly, or with reckless disregard for their truth, for the following reasons, among others:   as alleged above, BP misrepresented that BP's Gulf of Mexico operations had transitioned to OMS when, in actuality, OMS had not been implemented in the Gulf as of April 2010; Hayward misled investors by stating that OMS "govern[ed] how every BP project, site, operation and facility is managed" when, in truth, the process safety component of OMS only applied to rigs that BP fully owned and not to BP operations on leased rigs, such as Transocean's *Deepwater Horizon*, and Hayward, through his positions within SEEAC and GORC, had access to information, such as that disclosed in the Orange Book reports, that directly contradicted these statements and was not publicly disclosed.

181.   On March 4, 2009, BP filed its 2008 Annual Report with the SEC on Form 20-F, which was signed by Hayward.   In this Report, BP made numerous false statements regarding the implementation of OMS and the safety and quality of its Gulf of Mexico operations.   BP represented, in part, that eight sites, including the Gulf of Mexico, had "completed the transition to OMS in 2008."

182.   The Report further stated:

We continue to implement our new operating management system *(OMS), a framework for operations across BP that is integral to improving safety and operating performance in every site.*

When fully implemented, OMS will be the single framework within which we will operate, consolidating BP's requirements relating to process safety, environmental performance, legal compliance in operations, and personal, marine and driving safety. . . .

The OMS establishes a set of requirements, and provides sites with a systematic

74

way to improve operating performance on a continuous basis.  BP businesses implementing OMS must work to integrate group requirements within their local system to meet legal obligations, address local stakeholder needs, reduce risk and improve efficiency and reliability.  A number of mandatory operating and engineering technical requirements have been defined within the OMS, to address process safety and related risks.

All operated businesses plan to transition to OMS by the end of 2010.  *Eight sites completed the transition to OMS in 2008*; two petrochemicals plants, Cooper River and Decatur, two refineries, Lingen and Gelsenkirchen and four Exploration and Production sites, North America Gas, *the Gulf of Mexico*, Colombia and the Endicott field in Alaska. . . .

For the sites already involved, implementing OMS has involved detailed planning, including gap assessments supported by external facilitators.  A core aspect of OMS implementation is that each site produces its own 'local OMS', which takes account of relevant risks at the site and details the site's approach to managing those risks.  As part of its transition to OMS, a site issues its local OMS handbook, and this summarizes its approach to risk management.  Each site also develops a plan to close gaps that is reviewed annually.  The transition to OMS, at local and group level, has been handled in a formal and systematic way, to ensure the change is managed safely and comprehensively.

*     *     *

Executive management has taken a range of actions to demonstrate their leadership and commitment to safety.  The group chief executive has consistently emphasized that safety, people, and performance are our top priority, a belief made clear in his 2007 announcement of a forward agenda for simplification and cultural change in BP.  Safety performance has been scrutinized by the Group Operations Risk Committee (the GORC), chaired by the group chief executive and tasked with assuring the group chief executive that group operational risks are identified and managed appropriately. . . .(Empahsis added).

183.   The foregoing statements, which caused BP securities to trade at artificially inflated prices, were materially false and misleading and were made knowingly, or with reckless disregard for their truth, for the following reasons, among others:  as alleged above, Hayward, who signed the certification for the foregoing statement, had access to information, such as that disclosed in the Orange Book reports, through his positions with SEEAC and GORC, which directly contradicted these statements; Hayward admitted to knowing that OMS was not fully

75

implemented in the Gulf of Mexico in 2008, that the implementation process would not begin until Fall 2009, and that by April 2010, the Gulf of Mexico had yet to transition to OMS; and Hayward knew that OMS was intended to address process safety and prevent major accidents, and admitted that OMS could have potentially avoided the *Deepwater Horizon* tragedy if it had been properly implemented in the Gulf of Mexico.

184.   Defendants also misled investors because the Company's Form 20-F, which Hayward signed, stated that OMS was a "common" system applying a "single operating framework" to "all BP operations" and that the OMS would be "adopted by operating sites" when, in truth, the process safety component of OMS only applied to rigs that BP fully owned and not to BP operations on leased rigs, such as Transocean's *Deepwater Horizon*.  Defendants further misled investors by failing to disclose that:  BP had not implemented adequate safety measures in the Gulf of Mexico; BP did not have a legitimate OSRP; BP had downplayed the risks facing its Gulf of Mexico operations while emphasizing the potential profitability of the region; and BP failed to put in place adequate internal safety and risk controls.

185.   On March 10, 2009, BP's IEP, which discusses BP's purported safety protocol for the Mississippi Canyon Block 252, was "deemed submitted" by the MMS.  The document was initially received by the MMS on February 23, 2009 and was available to the public and BP's investors no later than March 10, 2009.  The document falsely stated, in part, that:

> *I hereby certify that BP Exploration & Production Inc. has the capability to respond, to the maximum extent practicable, to a worst-case discharge,* or a substantial threat of such a discharge, resulting from the activities proposed in our Exploration Plan.

*       *       *

An accidental oil spill that might occur as a result of the proposed operation in Mississippi Canyon Block 252 has the potential to cause some detrimental effects

76

to fisheries.  However, it is unlikely that an accidental surface or subsurface oil spill would occur from the proposed activities.  If such a spill were to occur in open waters of the OCS proximate to mobile adult finfish or shellfish, the effects would likely be sublethal and the extent of damage would be reduced to the capability of adult fish and shellfish to avoid a spill, to metabolize hydrocarbons, and to excrete both metabolites and parent compounds.  No adverse activities to fisheries are anticipated as a result of the proposed activities.

*     *     *

*In the event of an unanticipated blowout resulting in an oil spill, it is unlikely to have an impact based on the industry wide standards for using proven equipment and technology for such responses, implementation of BP's Regional Oil Spill Response Plan which address available equipment and personnel, techniques for containment and recovery and removal of the oil spill.*

186.    In addition, the IEP stated that:

An accidental oil spill from the proposed activities could cause impacts to beaches.  However, *due to the distance to shore (48 miles) and the response capabilities that would be implemented, no significant adverse impacts are expected.*  Both the historical spill data and the combined trajectory/risk calculations referenced in the publication OCS EIS/EA MMS 2002-052 indicate *there is little risk of contact or impact to the coastline and associated environmental resources.*

187.    The IEP also contained identical statements to the statement in the immediately preceding paragraph, except that they pertained to wetlands, coastal wildlife, refuges, and wilderness areas.

188.    Section 7.1 of the IEP also falsely estimated a worst-case discharge scenario of 162,000 BOPD, an amount it falsely asserted BP could handle.

189.    Additionally, before BP could begin operations at the Macondo site, federal regulations required BP to submit its IEP demonstrating that it had planned and prepared to conduct its proposed activities in a manner that was safe, conformed to applicable regulations and sound conservation practices, and would not cause undue or serious harm or damage to

77

human or marine health, or the coastal environment.  30 C.F.R. §§ 250.201, 250.202.  BP did not

have such a plan or a means of conducting their proposed activities.

190.    Further, federal regulations required that the IEP be accompanied by "oil and

hazardous substance spills information" and "environmental impact analysis information."  30

C.F.R. §§ 250.2 12, 250.219, 250.227.

191.    Among the information required to accompany the IEP was a "blowout scenario,"

described as follows:

> A scenario for the potential blowout of the proposed well in your EP that you
> expect will have the highest volume of liquid hydrocarbons.  Include the
> estimated flow rate, total volume, and maximum duration of the potential
> blowout.  Also, discuss the potential for the well to bridge over, the likelihood for
> surface intervention to stop the blowout, the availability of a rig to drill a relief
> well, and rig package constraints.  Estimate the time it would take to drill a relief
> well.  30 C.F.R. § 250.213(g).

192.    The oil and hazardous spills information accompanying the IEP was also required

to include an oil spill response plan providing the calculated volume of BP's worst-case

discharge scenario, *see* 30 C.F.R. § 254.26(a), and a comparison of the appropriate worst-case

discharge scenario in its approved regional oil spill response plan with the worst-case discharge

scenario that could result from its proposed exploration activities; and a description of the worst-

case discharge scenario that could result from its proposed exploration activities, *see* 30 C.F.R.

§§ 254.26(b), (c), (d), and (e); 30 C.F.R. § 250.2 19.

193.    Federal regulations required BP to conduct all of its lease and unit activities

according to its approved IEP, or suffer civil penalties or the forfeiture or cancellation of its

lease.  *See* 30 C.F.R. § 250.280.

194.   The misrepresentations above, which caused BP Shares to trade at artificially inflated prices, were each materially false or misleading when made, and were known by BP to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

(a)   As explained by a group of eight United States Senators in a May 17, 2010 letter to United States Attorney General Eric H. Holder, Jr., there was no "proven equipment and technology" to respond to the spill.   The Senators wrote that "[m]uch of the response and implementation of spill control technologies appears to be taking place on an ad hoc basis." Indeed, BP acknowledged on May 10, 2010 that "[a]ll of the techniques being attempted or evaluated to contain the flow of oil on the seabed involve significant uncertainties because they have not been tested in these conditions before";

(b)   BP falsely represented that the IEP was based on an analysis of the Mississippi Canyon Block 252 site when, in fact, the IEP was boilerplate language copied from one or more exploration plans that MMS had previously approved for other distinct drilling sites;

(c)   BP misrepresented that it was prepared to stop a blowout at Mississippi Canyon Block 252 or contain the resulting oil spill when, in fact, BP was wholly unprepared;

(d)   In connection with the IEP, BP sought a permit from the MMS to drill to a total depth of 19,650 feet at the Macondo well.   Following the sinking of the *Deepwater Horizon,* a BP crewman admitted that this depth had been misrepresented to the MMS, and that BP had in fact drilled in excess of 22,000 feet, in violation of its permit;

(e)   BP misrepresented that an oil spill would not adversely impact beaches, wetlands, and other environmentally sensitive areas;

(f)      BP concealed from the investing public and Plaintiffs its failure to have sufficient

internal safety and risk management processes to satisfy the above referenced regulation.  In fact,

Suttles acknowledged on May 10, 2010, that BP did not actually have a response plan with

"proven equipment and technology" in place that could contain the *Deepwater Horizon* spill.

Later, Hayward admitted that "BP's contingency plans were inadequate," and that the company

had been 'making it up day to day."  Hayward further admitted that it was "an entirely fair

criticism" to blame BP for the disorganized and poor cleanup effort because "*[w]hat's

undoubtedly true is that we did not have the tools you'd want in your tool kit*" to stop the leak

from the Macondo well in the Gulf of Mexico in the aftermath of the explosion;

(g)      On May 12, 2010, McKay admitted in testimony to the House Subcommittee on

Oversight and Investigations, Committee on Energy and Commerce, that BP did not have the

capability and technology to respond to the *Deepwater Horizon* oil spill:

> Mr. McKay:  We are using the best technology at scale. This is the largest effort
> that has ever been put together. So we believe we are using the best technology
> and if we have any other ideas.
>
> Mrs. Capps:  But you never had any until it happened.
>
> Mr. McKay:  Well, we have been drilling with the Coast Guard for years.
>
> Mrs. Capps:  Did you develop technologies for dealing with this?
>
> Mr. McKay:  Not individual technologies for this, no.
>
> Mrs. Capps:  I rest my case.

(h)      The Presidential Commission concluded, "there was nothing to suggest that BP's

engineering team conducted a formal, disciplined analysis of the combined impact of [] risk

factors on the prospects of a successful cement job"; and

(i)     In deposition testimony, Inglis confirmed that BP never invested a dollar in developing methods to contain an oil spill.  Inglis Dep. 162:9-162:21.

195.   On June 30, 2009, BP publicly filed its revised oil spill response plan for the Gulf of Mexico – titled "Regional Oil Spill Response Plan – Gulf of Mexico" or BP's Regional OSRP for the GOM.

196.   According to BP's Regional OSRP for the GOM, the *"TOTAL WORST CASE DISCHARGE" scenarios in the Gulf of Mexico ranged from a release of 28,033 to 250,000 BOPD.*  More specifically, BP's Regional OSRP for the GOM stated:  (i) an oil spill occurring less than ten miles from the shoreline could create a worst case discharge of 28,033 BOPD; (ii) an oil spill occurring more than ten miles from the shoreline could create a worst case discharge of 177,400 BOPD; and (iii) an oil spill caused by a mobile drilling rig that is drilling an exploratory well could create a worst case discharge of 250,000 BOPD.  BP's Regional OSRP for the GOM explicitly states that BP and its subcontractors *could recover approximately 491,721 BOPD* (or more than 20.6 million gallons) in the event of an oil spill in the Gulf of Mexico.  BP further claimed and provided certified statements to the MMS that BP and its subcontractors "*maintain the necessary spill containment and recovery equipment to respond effectively to spills.*"

197.   These misrepresentations, which caused BP Shares to trade at artificially inflated prices, that BP and its subcontractors "maintain the necessary spill containment and recovery equipment to respond effectively to spills" and that nearly 500,000 BOPD could be recovered were each materially false or misleading when made, and were known by BP to be false at that time, or were made with reckless disregard for the truth, for the following reasons, among others:

81

(a)     BP's Oil Spill Response Plan contained numerous errors, gross deficiencies and was wholly inadequate to respond to a deepwater oil spill; and

(b)     Hayward confirmed that BP had failed to draw up sufficient emergency response plans, admitting that during the spill "*we were making it up day to day.*"  In addition, Suttles admitted that BP failed to have an oil spill response plan with "proven equipment and technology" in place that could contain the oil spill.

198.     BP issued its 2008 Sustainability Review on April 16, 2009.  In the "Group chief executive's review" section, Hayward stated:

> You can see a similar balanced approach in our new *operating management system (OMS), which is to be implemented at each BP site.*  It covers everything from compliance and risk management through to governance and measuring results.

199.     The foregoing statements, which caused BP securities to trade at artificially inflated prices, were materially false and misleading and were made knowingly, or with reckless disregard for their truth, for the following reasons, among others:  as alleged above, defendant Hayward misrepresented that OMS would be adopted "at each BP site" when, in actuality, the process safety component of OMS only applied to rigs that BP fully owned, and not to BP operations on leased rigs, such as Transocean's *Deepwater Horizon*; Hayward, through his positions within SEEAC and GORC, had access to information, such as that disclosed in the Orange Book reports, that directly contradicted these statements and was not publicly disclosed.

200.     BP issued its 2009 Annual Review on February 26, 2010.  In the section entitled "Safety, reliability, compliance and continuous improvement," BP stated:

> Safe, reliable and compliant operations remain the group's first priority.  A key enabler for this is the BP operating management system *(OMS), which provides a common framework for all BP operations*, designed to achieve consistency and continuous improvement in safety and efficiency.  Alongside mandatory practices

to address particular risks, ***OMS enables each site to focus on the most important risks in its own operations and sets out procedures on how to manage them in accordance with the group-wide framework.*** (emphasis added)

201.   The foregoing statement, which caused BP securities to trade at artificially inflated prices, was materially false and misleading and was made knowingly, or with reckless disregard for its truth, for the following reasons, among others: Defendants misrepresented that OMS provided "a common framework for all BP operations" and that OMS enable "each site" to manage risks "in accordance with the group-wide framework" when, in actuality, the process safety component of OMS only applied to rigs that BP fully owned and operated, and not to BP operations on leased rigs, such as Transocean's *Deepwater Horizon*; defendants Hayward and Inglis, and other GORC members were tasked with monitoring and implementing OMS but, nonetheless, made the decision to limit the applicability of the S&O audit function in the Gulf of Mexico; and, Hayward admitted to knowing that OMS was not implemented in the Gulf of Mexico in 2008 and other BP personnel confirmed as much.

202.   In addition, because the 2009 Annual Review was "material to be placed before shareholders which addresses environmental, safety and ethical performance," SEEAC was required to review the 2009 Annual Review and make recommendations to the Board concerning its adoption and publication.   For instance, on February 24, 2010, the Annual Report was discussed at a SEEAC meeting, particularly its Safety and Environment section.   During this meeting, concerns over external perceptions of the Company's reporting of sustainability issues were discussed and SEEAC reviewed the topics that were material to the public's perception.

203.   On March 5, 2010, BP filed its 2009 Annual Report with the SEC on Form 20-F, which was signed by defendant Hayward and Grote.   BP's Form 20-F falsely stated, in part, that:

83

Safe, reliable and compliant operations remain the group's first priority. A key enabler for this is the ***BP operating management system (OMS), which provides a common framework for all BP operations, designed to achieve consistency and continuous improvement in safety and efficiency.***

\*      \*      \*

Our OMS covers all areas from process safety to personal health, to environmental performance.

\*      \*      \*

This performance follows several years of intense focus on training and procedures across BP. ***BP's operating management system (OMS), which provides a single operating framework for all BP operations***, is a key part of continuing to drive a rigorous approach to safe operations. 2009 marked an important year in the continuing implementation of OMS.

\*      \*      \*

Following the tragic incident at the Texas City refinery in 2005 the [Safety, Ethics, and Environment Assurance] committee has observed a number of key developments, including: the establishment of a safety & operations (S&O) function with the highest calibre of staff; development of a group-wide operating management system (OMS) which is being progressively adopted by all operating sites; the establishment of training programmes in conjunction with MIT that are teaching project management and operational excellence; the dissemination of standard engineering practices throughout the group; and the formation of a highly experienced S&O audit team formed to assess the safety and efficiency of operations and recommend improvements. Throughout this time the group chief executive has made safety the number one priority. (emphasis added)

204.   The foregoing statements, which caused BP securities to trade at artificially inflated prices, were materially false and misleading because Defendants knew or recklessly disregarded the fact that BP was expanding its deepwater drilling operations without implementing the recommendations by the Baker Panel to improve process safety or instituting sufficient operational protocols and safety standards necessary to reduce the risk of catastrophic failure, thereby increasing the Company's exposure to risk. For example, BP failed to institute

procedures to reduce the risk of accidents occurring at its rigs, including the *Deepwater Horizon*, despite being aware of the specific dangers tied to executing cement jobs in the course of deepwater drilling.   Moreover, the fact that the *Deepwater Horizon* disaster was strikingly similar to prior disasters at Texas City and Prudhoe Bay demonstrates that BP was not making progress in implementing the recommendations of the Baker Panel.   As the Presidential Commission found, BP lacked "consistent and reliable risk management processes." Additionally: BP misrepresented that OMS provided "a common framework for all BP operations" and that OMS provided "a single framework for all BP operations" when, in actuality, the process safety component of OMS only applied to rigs that BP fully owned, and not to BP operations on leased rigs, such as Transocean's *Deepwater Horizon*; defendants Hayward (who signed the Form 20-F), Inglis, and other GORC members were tasked with monitoring and implementing OMS but, nonetheless, made the decision to limit the applicability of the S&O audit function in the Gulf of Mexico; and, Hayward, through his positions within SEEAC and GORC, had access to information, such as that disclosed in the Orange Book reports, that directly contradicted these statements and was not publicly disclosed.

205.   On March 22, 2010, defendant Inglis delivered a speech at the Howard Weil Energy Conference in New Orleans, Louisiana.   BP posted a transcript of this speech on its publicly accessible website.   During the speech, Inglis discussed BP's deepwater operations in the Gulf of Mexico, falsely stating, in part:

> We are currently planning to make final investment decisions for 24 new major projects in the next two years.  Each project has been high-graded through our project selection and progression process.  They are concentrated in the Gulf of Mexico, the North Sea, Azerbaijan and Angola – high margin production areas that improve the portfolio and enable profitable growth.

\*        \*        \*

85

*Safety and operational integrity underpins everything we do, and we are now in the final phase of rolling out our operating management system that provides a single, consistent framework for our operations, covering all areas from personal and process safety to environmental performance.* And I am pleased to say that in 2009 we saw continuing improvement in all aspects.

206.   The foregoing misrepresentation, which caused BP securities to trade at artificially inflated process, was materially false and misleading when made, and was known by defendant Inglis to be false at that time, or was made with reckless disregard for the truth, for the following reasons, among others:

(a)   Defendant Inglis was a member of GORC, and in that capacity, was charged with oversight and implementation of OMS with respect to explorations and production activities in BP's Gulf of Mexico deepwater operations.   Further, because Inglis received the quarterly Orange Book reports, which contained detailed reports regarding the scope and implementation of OMS across BP's business, and which should that the implementation of OMS in the Gulf of Mexico was incomplete;

(b)   At the time defendant Inglis made this statements, OMS applied to only one drilling rig – the BP-owned *Thunderhorse* – out of seven drilling rigs in the Gulf of Mexico.  As Chief Executive of Exploration and Production, defendant Inglis knew, or was reckless in not knowing, that more than half of the deepwater wells drilled in the Gulf of Mexico were drilled by contracted rigs, such as the *Deepwater Horizon*, to which OMS did not apply.;

(c)   Defendant Inglis, as well as other GORC members, decided not to apply key elements of OMS, including Safety and Operations Audits and Major Accident Risk analysis, to Gulf of Mexico joint ventures and Gulf of Mexico exploration, including the *Deepwater Horizon*;

(d)     Defendant Inglis testified that "[o]ne of the purposes of OMS would be to prevent loss of primary containment." Inglis Dep. at 242:23-243:9. And on July 13, 2009, defendant Inglis sent an email to the Upstream Senior Leadership expressing concern over contractor-operated rigs, such as the *Deepwater Horizon*, not conforming to BP's Control of Work practices;

(e)     BP had only begun implementing its OMS in a pilot stage in the Gulf of Mexico when BP – partly due to a reorganization structured by Inglis, terminated and/or displaced key employees responsible for rolling out OMS. According to CW2, BP was not, in fact, in the "final phase of rolling out" OMS in the Gulf of Mexico at the time Inglis made the above statement. In fact, key employees in the Gulf of Mexico, including Wells Team Leaders and Well Site Leaders, had no knowledge of OMS requirements;

(f)     Key employees in the Gulf (including David Sims, David Rich, and Patrick O'Bryan) lacked the knowledge, experience, and expertise of those BP employees they were sent to replace (including Ian Little, Harry Thierens, and Kevin Lacy), and BP's roll out of OMS in the Gulf was disorganized and incomplete;

(g)     According to CW1, there was a company failure to implement an appropriate OMS protocol that would have ensured that the individual decision makers at the rig level understood how cost-saving and corner-cutting could negatively impact process safety on the *Deepwater Horizon*; and

(h)     According to CW2, by 2009 and 2010, BP's OMS lagged far behind the safety programs of BP's industry peers. Indeed, OMS was still in its pilot phase, had yet to be fully implemented in the Gulf of Mexico, and was not implemented on the *Deepwater Horizon*.

207.   On March 23, 2010, defendant Hayward delivered a speech at the Peterson

87

Institute for International Economics in Washington, D.C., in which he discussed BP's changes to its safety program following the Texas City, Texas refinery explosion. BP posted a transcript of the speech on its publicly-accessible website. During the presentation, Hayward falsely stated, in part, that:

> Five years ago on this day, fifteen people died and many more were injured, when an explosion tore through our Texas City refinery.
>
> That tragic accident has changed in a profound and fundamental way our approach to safety and operations integrity - providing a safe working environment is a paramount responsibility, and our first and foremost priority.

208.   The foregoing statements, which caused BP securities to trade at artificially inflated prices, were materially false and misleading because Defendants knew or recklessly disregarded the fact that BP was expanding its deepwater drilling operations without implementing the recommendations by the Baker Panel to improve process safety or instituting sufficient operational protocols and safety standards, including the process safety aspect of OMS, necessary to reduce the risk of catastrophic failure, thereby increasing the Company's exposure to risk. For example, BP failed to institute procedures to reduce the risk of accidents occurring at its rig and contracted rigs, including the *Deepwater Horizon*, despite being aware of the specific dangers tied to executing cement jobs in the course of deepwater drilling. Moreover, the fact that the *Deepwater Horizon* disaster was strikingly similar to prior disasters at Texas City and Prudhoe Bay demonstrates that BP was not making progress in implementing the recommendations of the Baker Panel. As the Presidential Commission found, BP lacked "consistent and reliable risk management processes."

209.   BP issued its 2009 Sustainability Review on April 15, 2010. The "Chief Executive's Review" section contained a Q&A exchange with Hayward:

- Group Chief Executive's Review:

Q:   What progress has BP made on safety during 2009?

A:   Safety is fundamental to our success as a company and 2009 was important because of the progress we made in implementing our operating management system (OMS). The OMS contains rigorous and tested processes for reducing risks and driving continuous improvement. I see it as the foundation for a safe, responsible and high-performing BP. *Having been initially introduced at eight sites in 2008*, the OMS rollout extended to 70 sites by the end of 2009, including all our operated refineries and petrochemicals plants. *This means implementation is 80% complete.* (emphasis added)

210.   The foregoing statements, which caused BP securities to trade at artificially inflated prices, were materially false and misleading and were made knowingly, or with reckless disregard for their truth, for the following reasons, among others: as alleged above, defendant Hayward, through his positions within SEEAC and GORC, had access to information, such as that disclosed in the Orange Book reports, that directly contradicted these statements and not publicly disclosed; Hayward admitted to knowing that OMS was not fully implemented in the Gulf of Mexico in 2008, that the implementation process would not even begin until Fall 2009, and that by April 2010, the Gulf of Mexico had yet to transition to OMS – information confirmed by other BP personnel; Hayward knew that OMS was intended to address process safety and prevent major accidents, such as a blowout, and admitted that OMS could have potentially avoided the *Deepwater Horizon* tragedy if it had been implemented in the Gulf of Mexico; and BP falsely represented that the Company intended to implement and was implementing the recommendations of the Baker Panel and other measures to improve process safety company-wide.

211.   In addition, because the 2009 Sustainability Report was "material to be placed before shareholders which addresses environmental, safety and ethical performance," SEEAC

89

was required to review it and make recommendations to the Board concerning its adoption and publication. *See also* 2008 Form 20-F at 69.  SEEAC, including defendant Hayward, specifically discussed and reviewed the content of the "2009 Sustainability Review" and the companion document titled "2009 Sustainability Reporting."  For instance, on February 24, 2010, SEEAC discussed the 2009 Sustainability Report and, just one month later, on March 24, 2010, the 2009 Sustainability Report was presented at a SEEAC meeting, after which defendant Hayward acknowledged that the "Sustainability Review had evolved to become a means of encapsulating statements of BP's policies, in addition to being a report on the company's activities."  And, as discussed further below, defendant Hayward routinely participated in Board-level discussions regarding the form and content of BP's annual Sustainability Reviews and Sustainability Reports.  A statement in the 2009 Sustainability Review by Ernst & Young, BP's independent assurance provider, emphasized the degree to which senior management took an active role in creating these documents:  "BP's Sustainability Report 2009 (the Report), which includes this Sustainability Review and www.bp.com/sustainability, has been prepared *by the management of BP p.l.c., who are responsible for the collection and presentation of information within it."*

212.  Moreover, the 2009 rig audit of the *Deepwater Horizon* confirmed that not all relevant personnel on the rig were knowledgeable about drilling and well operation practices, including containing a blowout, and safety goals were neither commonly known nor properly communicated.  And, as the Presidential Commission concluded, "there was nothing to suggest that BP's engineering team conducted a formal, disciplined analysis of the combined impact of [ ] risk factors on the prospects of a successful cement job."

213.  According to CW2, by 2009 and 2010, BP's OMS lagged far behind the safety programs of its industry peers, was still in the pilot phase, and had not yet been fully

implemented in the Gulf of Mexico (and was certainly not implemented on the *Deepwater Horizon*). Moreover, employees in key positions in Gulf of Mexico operations lacked any knowledge of OMS requirements. In short, BP's Gulf of Mexico operations had failed to implement BP's OMS in any robust manner, and the knowledgeable individuals that should have been tasked with its implementation had been terminated or moved outside of Gulf of Mexico operations.

214. Further, BP's executive officers knew that the Company's Gulf of Mexico operations had caused oil spills in 2008 and two of its rigs (the *Deepwater Horizon* and the *Atlantis*) had reported operational safety problems. This information would have been reported to GORC and, accordingly, Defendants were on notice of the inadequacy of their safety processes in the Gulf of Mexico.

215. BP conducted its operations in the Gulf of Mexico without any legitimate OSRP, understated its exposure from drilling operations in the Gulf of Mexico, and lacked adequate internal and safety controls. According to BP's own internal reporting, decisions regarding the Macondo well "appear to have been made by the BP Macondo well team in an ad hoc fashion. . . . This appears to have been a key causal factor to the blowout."

216. As discussed above, on the evening of April 20, 2010, after the markets closed, the Macondo well suffered a significant – yet preventable – blowout, leading to a fatal explosion aboard the *Deepwater Horizon*, killing 11 crew members and injuring many others. After attempts to stop the blowout failed, the surviving crew members abandoned ship as the rig became engulfed in flames. Consequently, oil and gas spewed from the Macondo well onto the rig and into the Gulf of Mexico. Due to Defendants' ongoing misrepresentations and omissions regarding the true state of BP's safety measures and operational protocol, including those called

91

for by the Baker Panel and the progress made on its implementation of OMS, the truth regarding Defendants' failure to implement process safety controls was partially disclosed on April 20, 2010 and within a week of the *Deepwater Horizon* explosion, BP's ordinary share price dropped more than 10% in value and would continue to plummet during the weeks of additional corrective disclosures.  As a result, Plaintiff suffered significant losses following the *Deepwater Horizon* explosion.

217.   Thereafter, on April 28, 2010, after the markets closed, Coast Guard leader Rear Admiral Landry announced during a joint press conference with BP that NOAA had increased its estimate of the oil flow rate from 1,000 to 5,000 bopd.

218.   During the joint press conference, defendant Suttles again reiterated that BP's best estimate was that 1,000 barrels of oil per day were flowing from the Macondo well.  In addition, Suttles stated, in part, as follows:

> Late this afternoon, while monitoring the blowout preventer area, which we have done continuously since the event began, we discovered a new point of leak.  This leak is just beyond the top of the blowout preventer in the pipe work called the riser.  Given the location, we do not believe this changes the amount currently estimated to be released.

219.   The following day, April 29, 2010, Department of Homeland Security chief Janet Napolitano announced that "today I will be designating that this is a spill of national significance."

220.   On the same day, April 29, 2010, defendant Suttles conducted several media interviews to discuss the oil flow rate from the Macondo well.  For example, during an interview with *The Early Show*, Suttles stated, in part, as follows: "I think that somewhere between one and five thousand barrels a day is probably the best estimate we have today." Suttles made nearly identical false statements that same day during interviews with *The*

*Today Show* and *Good Morning America*.

221.    Further, on April 29, 2010, BP filed a Form 6-K with the SEC addressing the *Deepwater Horizon* explosion, which included quotes by defendant Hayward. In it, BP stated in part, that "[e]fforts continue to stem the flow of oil from the well, ***currently estimated at up to 5,000 barrels a day***," (emphasis added).

222.    On April 30, 2010, BP filed a Form 6-K with the SEC addressing its response effort, which contained quotes from defendant Hayward. In it, BP stated in part that "[e]fforts to stem the flow of oil from the well, ***currently estimated at up to 5,000 barrels a day***, are continuing with six remotely-operated vehicles (ROVs) continuing to attempt to activate the blow out preventer (BOP) on the sea bed," (emphasis added).

223.    On April 30, 2010, BP published on its corporate website the same 5,000 barrels per day oil flow estimate included in its Form 6-K filed with the SEC that day.

224.    Defendant Suttles continued to make false and misleading statements concerning the amount of oil escaping from the Macondo well throughout the month of May. For instance, during a May 14, 2010 interview on *Good Morning America*, Suttles claimed that, "ourselves and people from NOAA and others believe that something around 5,000, that's actually barrels a day, is the best estimate." On the same day, Suttles told *The Today Show* that "I don't think it's wildly different than that [5,000 bopd] number, but it could be – we've said since the beginning it could be a bit above or below." Then, at a Unified Command press briefing on May 17, 2010, Suttles reiterated that the 5,000-bopd estimate was "our best estimate today." Suttles used nearly identical language in an interview with *Good Morning America* on May 21, 2010, and at a Unified Command press conference that same day. Finally, on May 22, 2010, during an interview with National

Public Radio's *Weekend Edition*, Suttles balked at the estimate, suggested by independent scientists, of a flow rate of 70,000 bopd:

> I've heard those [70,000 bopd] estimates and seen them and I don't believe it's possible that it's anywhere near that number . . . since I can't meter it, I can't actually say it couldn't be.  But all of our techniques would say that that's highly unlikely.

When, during the same interview, it was suggested that the well might be leaking at a rate of 30,000 bopd, Suttles said that "we don't think the rate's anywhere near that high."

225.    Similarly, on May 5, 2010, defendant Hayward conducted an interview with journalists from the *Houston Chronicle* at BP's offices in Houston.  In reference to the oil flow rate at the Macondo well, Hayward stated, "[a] guesstimate is a guesstimate.  And the guesstimate remains 5,000 barrels a day."

226.    The foregoing statements, which caused BP securities to trade at artificially inflated prices, were materially false and misleading because Defendants knew or recklessly disregarded that the Company's "best estimate" of the amount of oil spewing from the well on a daily basis was more likely 5,758 bopd, with a high of 14,266 bopd.  BP senior management, including defendant Suttles, received this "best estimate" range by way of two internal reports dated April 26, 2010 and April 27, 2010, i.e., before Suttles told the market that the oil flow was 1,000 bopd on April 28, 2010, and between 1,000 and 5,000 bopd on April 29, 2010.  Moreover:

(a)    On or before April 24, 2010, BP was aware of an estimate that showed that, immediately following the *Deepwater Horizon* explosion, oil was flowing through the still-attached riser at a rate of 100,000 bopd;

(b)    By April 25, 2010, BP engineers were aware of an external analysis of the

oil on the water concluding that the flow rate could be as high as 10,000 bopd;

      (c)    On April 27, 2010, a BP engine*er estimated the f*low rate to be approximately 5,000 to 22,000 bopd on the basis of, among other things, temperature readings along the riser pipe;

      (d)    By April 28, 2010, David Rainey, then BP America's Vice President of Gulf of Mexico Exploration, had prepared his own estimates showing a flow rate ranging up to over 14,000 bopd;

      (e)    By April 28, 2010, BP had learned that oil was also leaking from the "kink," the place where the riser ripe had bent before it came to rest on the ocean floor.  This represented a totally separate leak point from the primary leak point, and the flow from this "kink" would necessarily add to the total being calculated and reported.

    227.    In addition, BP admitted in its November 15, 2012 Consent with the SEC that by April 28, 2010, the Company had several other internal pieces of data, estimates, or calculations and one external calculation that showed potential flow rates significantly higher than 5,000 bopd.  These were:

      (a)    On April 30, 2010, an analysis performed by a BP engineer yielded a range of possible flow rates *from 5,000 bopd to 40,000 bopd*;

      (b)    In early May 2010, a video analysis by a BP engineer resulted in an estimate of *20,000 bopd*, attributable to just the riser pipe;

      (c)    On May 9, 2010, modeling done by a BP contractor led to a range of possible flow rates *from 37,000 bopd to 87,000 bopd*;

      (d)    On May 10, 2010, a video analysis done by a BP contractor led to the conclusion that, with regard to oil leaking from the riser pipe alone, it could not be "ruled out"

that the flow rate was "in the order of *40,000 bopd*";

      (e)    On or about May 10, 2010, and May 11, 2010, reservoir modeling done by a BP engineer yielded a range of potential flow rate estimates *from 14,000 bopd to 96,000 bopd*. This senior engineer shared his work internally with senior BP executives during the second week of May 2010.  As described below, this engineer expressed his concerns in an email to a senior executive and a junior executive in BP's Exploration & Production business regarding the Company's public statements reaffirming the 5,000 bopd figure and refuting a professor's 70,000 bopd estimate.  In the email, the engineer stated that the flow rate could be anything up to 100,000 bopd;

      (f)    From May 14 to May 15, 2010, a critique was authored by a BP engineer of a Purdue University professor's analysis estimating a flow rate of 70,000 bopd.  The critique identified what the BP engineer stated were potential errors made by that professor that, when corrected for, yielded a revised estimate of 15,000 bopd, just attributable to the riser pipe, from which the BP engineer stated that a further reduction appropriately could be made;

      (g)    On May 16, 2010, a reservoir-depletion/pressure-drop analysis done by a BP engineer yielded a flow rate calculation of 86,600 bopd, based on the then-estimated pressure;

      (h)    From May 19 to May 20, 2010, a collection of a portion of the oil from the riser pipe with the Riser Insertion Tube Tool ("RITT") showed average collection rates of approximately 5,000 bopd for a 12-hour period, capturing only a portion of the oil leaking from the riser, therefore indicating that the total amount of oil leaking was in excess of 5,000 bopd;

      (i)    On May 22, 2010, an external surface expression analysis showed a range of estimated flow rates from 6,154 bopd to 11,609 bopd;

(j)     On May 23, 2010, an analysis created by a BP engineer of the flow rate attributable only to the flow coming from the "kink" in the riser pipe showed an estimate of 11,600 bopd; and

(k)     On May 24, 2010, the RITT collected approximately 6,100 barrels of oil during the 24-hour period from midnight to midnight, despite the fact that it was not collecting all of the oil flowing out from the well, thus indicating that the total amount of oil leaking was in excess of 5,000 bopd.

228.   In light of the fact that BP possessed data, estimates, and calculations that were significantly higher than 5,000 bopd, BP and defendant Suttles knowingly made materially false and misleading statements by publicly stating that the flow rate had been estimated at "up to 5,000 [bopd]." Moreover, failing to disclose even the existence of the date, estimates, and calculations evincing a higher flow rate also amounted to a material omission regarding the flow rate.

229.   On May 4, 2010, BP filed a Form 6-K with the SEC, which contained quotes from defendant Hayward, and in which BP stated in part that "[c]urrent estimates by NOAA suggest *some 5,000 barrels (210,000 U.S. gallons) of oil per day* are escaping from the well," (emphasis added).

230.   The foregoing misrepresentation, which caused BP securities to trade at artificially inflated prices, was materially false or misleading when made, and was known by Defendants to be false at that time, or was made with reckless disregard for the truth. Defendants omitted from this Form 6-K the material fact that, by that date, its own engineers and scientists had generated or received numerous pieces of data, estimates, and calculations regarding the oil flow rate estimates that far exceeded the 5,000 bopd figure, as set forth in

¶¶ 226-27, herein.  For the same reasons, Defendants should have – but did not – disclose that, based on the internal data, estimates, and calculations, it was not accurate to continue to assert that 5,000 bopd was the best estimate of the amount of oil flowing from the Gulf of Mexico, and it was misleading to use NOAA's 5,000 bopd as the "best estimate" as the basis of any public disclosure when BP itself had its own, higher range of flow rate estimates.

231.    On May 6, 2010, defendant Dudley delivered a speech at the Chief Executives' Club in Boston, Massachusetts.  BP posted a transcript of the speech on its publicly-accessible website.  In the speech, Dudley discussed the *Deepwater Horizon* rig and its safety mechanisms.  More specifically, Dudley falsely stated, in part, that:

> At the time of the explosion, the *Deepwater Horizon* drilling rig had been working for BP for almost nine years .... The rig had handled some of the industry's greatest technical challenges, and her safety record had been excellent and had recently won awards.

*       *       *

> A Blowout Preventer is used on every oil and gas well drilled in the world today - onshore and offshore.
> These mechanisms are regularly inspected and tested. If they don't pass the test, drilling operations are made safe and the system is replaced or repaired and retested.
>
> BOPs are designed to be fail-safe. This Blowout Preventer was not. It failed to close, or to close completely.

232.    The foregoing statements, which caused BP securities to trade at artificially inflated prices, were materially false and misleading because Dudley falsely represented that the *Deepwater Horizon*'s safety record had been excellent when, in fact, there were problems with the rig as far back as 2005.  In fact, four to six weeks before the explosion, a leak developed in the *Deepwater Horizon*'s BOP that was reported to both BP and the

98

owner of the rig; instead of effectuating repairs, the faulty part responsible for the leak was switched off. Moreover, four weeks prior to the explosion, chunks of the BOP's rubberized annular preventer had surfaced after a pressure-related incident, further indicating that there were operational problems with the BOP, yet nothing was done. Instead, on March 6, 2010, BP sought and obtained a postponement of MMS' inspection of the BOP. This was directly contrary to Dudley's representation that the BOPs were "replaced or repaired and retested" when proven faulty. Moreover, Dudley failed to disclose that BP contracted to remove a second blind shear ram, putting the BOP at a higher risk for malfunction and increasing the "risk profile" of the BOP.

233. On May 14, 2010, on CNN.com, BP publicly reasserted the 5,000 bopd estimate and expressly rejected Professor Wereley's estimate that the flow rate was up to 70,000 bopd. Specifically, defendant Dudley, who at the time was BP's Managing Director and one of the top BP officials coordinating the Company's oil spill response, called the 70,000 bopd figure "not accurate at all." Defendant Dudley further disparaged Wereley's estimate, saying that it "isn't anywhere I think within the realm of possibility." Just two weeks later – on May 30, 2010 – however, defendant Dudley essentially disavowed his own assessment altogether as having been false.

234. On May 18, 2010, defendant Hayward reiterated to the press in statements made in Houston that "I think the environmental impact of this disaster is likely to be very, very modest. It is impossible to say and we will mount, as part of the aftermath, a very detailed environmental assessment as we go forward. . . . By everything we can see at the moment suggests that the overall environmental impact of this will be very, very modest."

235. On May 19, 2010, defendant McKay appeared before the Congressional

99

Committee on Transportation and Infrastructure and said the following in response to a question about whether "5,000 barrels per day [was] the most accurate" figure for the amount of oil leaking into the Gulf:

> **[McKay]:** That is our best estimate. Obviously, it's continually being looked at. As you may know, we've gotten this riser insertion tube to work, and we're getting increased volumes at the surface where we can actually measure. And then, I believe there is a new small task force that has been put together under the direction of Unified Command to get all the experts together in a room and try to understand, with the latest available data, is there a more accurate estimate? But we do recognize there is a range of uncertainty around the current estimate."

236.    The following exchange followed later during the same hearing:

> **[Rep. Laura A. Richardson]:** … Why is there a disagreement between the total amount of oil that is leaking? BP has said 5,000, other experts are saying otherwise. Why do you think there is a disagreement, and do you stand by your point that it is only 5,000?

> **Mr. McKay.** I think there are a range of estimates and it is impossible to measure. That is the reality. What we have been doing with government officials, government experts, industry experts, is trying to come up with the best estimate, and that has been done essentially by understanding what is happening at the surface and trying to understand volume there, adding to it what we believe the oil properties, how it would disperse in a water column as it moves to the surface. And those two added together is the estimated volume. It has been clear from day one there is a large uncertainty range around that.

> **Ms. Richardson.** Is it possible it could possibly be the larger number that has been reported?

> **Mr. McKay.** It is theoretically possible. I don't think anyone believes it is quite that high that has been working on this. I believe the uncertainty range is around that 5,000 number, and it could be higher. But if the number you are talking about is 70,000 barrels a day, I don't know this, but I don't think people that are working with it believe that that is a possibility.

237.    The foregoing statements, which caused BP securities to trade at artificially inflated prices, were materially false and misleading because Defendants knew or recklessly

disregarded that the Company's "best estimate" of the amount of oil spewing from the well on a daily basis was more likely 5,758 bopd, with a high of 14,266 bopd.  BP senior management, including defendant Suttles, received this "best estimate" range by way of two internal reports sated April 26, 2010 and April 27, 2010, *i.e.*, before defendants McKay and Hayward explained that BP's best estimate was a flow rate of approximately 5,000 bopd and that the overall environmental impact of the *Deepwater Horizon* disaster would be modest.  In actuality, the amount of oil spilling into the Gulf of Mexico was approximately 60,000 bopd – which is significantly closer to the 70,000 bopd McKay dismissed as something people working on the spill response would not believe.  In addition, the foregoing statements were materially false and misleading for the reasons stated in ¶¶ 226-27, above.

238.    In a hearing before the U.S. House of Representatives on May 26, 2010, Representative Edward Markey was outraged about Suttles' misrepresentations and stated, in part, as follows:

> Yesterday, BP provided me with an internal document dated April 27, 2010, and cited as BP Confidential that shows a low estimate, a best guess, and a high estimate of the amount of oil that was leaking.  According to this BP document, the company's low estimate of the leak on April 27 [2010] was 1,063 barrels per day. Its best guess was 5,758 barrels per day. Its high estimate was 14,266 barrels per day.

*        *        *

> BP has also turned over another document dated April 26[, 2010] which includes a 5,000 barrel per day figure as well.  So when BP was citing the 1,000-barrel per day figure to the American people on April 28[th], their own internal documents from the day before show that their best guess was a leak of 5,768 barrels per day and their high estimate was more than 14,000 barrels that were spilling into the Gulf every day.

239.    Likewise, in a May 27, 2010 news conference, President Obama remarked that BP had failed to be fully forthcoming in describing the rate of the oil leak:

101

I think it is a legitimate concern to question whether BP's interests in being fully forthcoming about the extent of the damage is aligned with the public interest.  I mean, their interests may be to minimize the damage, and to the extent that they have better information than anybody else, to not be fully forthcoming.  So my attitude is we have to verify whatever it is they say about the damage.

This is an area, by the way, where I do think our efforts fell short.  And I'm not contradicting my prior point that people were working as hard as they could and doing the best that they could on this front.  But I do believe that when the initial estimates came that there were -- it was 5,000 barrels spilling into the ocean per day, that was based on satellite imagery and satellite data that would give a rough calculation.  At that point, BP already had a camera down there, but wasn't fully forthcoming in terms of what did those pictures look like.

240.    Also, in his book on the *Deepwater Horizon* incident, former drilling engineer Bob Cavnar explained that "[n]o one in the industry ever believed the flow were less than 20,000 barrels a day."  In an interview, Cavnar said that the characteristics of the Macondo well, particularly that it was drilled into "High Pressure High Temperature" pay sands and the specific fact that the well's pressure had blown out the *Deepwater Horizon*'s riser dictated a higher flow rate.  "If pressure directly from the pay sands blows out a major deepwater rig, by definition it's going to result in a very significant flow of oil," he said.

241.    The official flow rate estimates released by the Flow Rate Technical Group ("FRTG"), a group of scientists and engineers from federal agencies and universities charged with estimating the oil flow from the *Deepwater Horizon* disaster, confirmed the severe inadequacy of the flow rates provided by BP and the Individual Defendants.  Following its creation in May 2010, the FRTG produced four public reports, the first of which estimated the flow rate at 11,000 to 25,000 bopd.  Each subsequent estimate eclipsed its predecessor and, on August 2, 2010, the FRTG publicly released its final report, which estimated that the Macondo well had leaked oil at a rate of 52,700 to 62,200 bopd during the course of the leak, resulting in the release of roughly 4.9 million barrels of oil.

102

242.    On Saturday, May 29, 2010, BP revealed that the top kill procedure it had begun a few days earlier had failed.  The failure of top kill indicated that BP would be unable to stop the oil spill and would have to rely on efforts to try to contain the spill while it completed the relief wells. The failed attempt to kill the well by using the top kill and junk shot efforts shocked investors. As noted by *ABC News* on Saturday, May 29, 2010, "[w]e begin tonight with breaking news from the Gulf.  After so much talk that Top Kill was the best bet to plug the oil spill in the Gulf, BP announced just a short time ago that the effort has failed. . . .  That live picture so many Americans have been keeping track of [*i.e.*, the oil spewing from the Macondo well], us included, confirms that the oil is still gushing into the Gulf.  This is another crushing blow when it comes on what is now day 40 of this crisis."  Similarly, on that same day, *Agence France Presse* reported, in part, that "[t]he announcement [that the top kill and junk shot plans failed] is a stunning setback for efforts to halt what has become the worst oil spill in US history [...]."  Moreover, *The Business Insider* made clear that the failure of the top kill would lead to BP's securities being "slaughtered in London trading on Monday."

243.    On that same day, *The New York Times* published an article entitled "Documents Show Early Worries About Safety of Rig."  The article provided new evidence that:

> Internal documents from BP show that there were serious problems and safety concerns with the *Deepwater Horizon* rig far earlier than those the company described to Congress last week.

\*          \*          \*

> The documents show that in March, after several weeks of problems on the rig, BP was struggling with a loss of "well control."  And as far back as 11 months ago, it was concerned about the well casing and the blowout preventer.

244.    On Tuesday, June 1, 2010, minutes before the close of the U.S. stock market, U.S. Attorney General Eric Holder announced that the Department of Justice had opened formal

103

criminal and civil probes into BP in response to the oil spill and its false assurances that it could

stop the flow of oil.  On this news, BP ordinary shares declined approximately 13%, from £4.94

per share, to close at £4.30 per share on June 1, 2010.

## VIII.  SCIENTER ALLEGATIONS AGAINST DEFENDANTS

### A.  Defendants Knew, or Recklessly Disregarded, That BP's Process Safety Procedures Did Not Adequately Address the Known Risks in Deepwater Drilling, Risks that Materialized at the Macondo Well

245.    Throughout the Relevant Period, Defendants were aware, or recklessly

disregarded, that their statements to investors regarding BP's commitment to safety were not

true and that their statements touting the importance of deepwater drilling in the Gulf of

Mexico omitted material information regarding BP's highly risky and unsafe practices in its

deep sea operations.

246.    In a June 19, 2010 article, *The New York Times* reported that in mid-2006, in

the wake of Prudhoe Bay and Texas City, then-CEO defendant John Browne asserted that

"[w]e have to get the priorities right. . . .  And Job 1 is to get to these things that have

happened, get them fixed and get them sorted out.  We don't just sort them out on the

surface, we get them fixed deeply."  Defendant Hayward picked up this mantle after he

succeeded Browne in May 2007 by boldly vowing to focus "like a laser" on safety.  To this

end, Hayward and BP consistently assured investors that the Company was committed to

strengthen process safety within BP's operations, including the key operations in the Gulf of

Mexico.

247.    Regrettably, BP's assurances were nothing more than bluster belied by the

refinery violations BP accumulated between 2005 and 2010 and the Company's continued

choice of savings over safety.  For example, in May 2010, immediately after the *Deepwater*

*Horizon* disaster, it was revealed by the Center for Public Integrity that between June 2007 and February 2010, BP received a total of 862 citations for OSHA violations relating to its refineries in Texas City and Toledo, Ohio, of which 760 were classified as "egregious willful" and 69 were classified as "willful." The willful violations accounted for over 97% of all willful violations found by OSHA in all U.S. refineries during the same period – BP's main competitors' combined citations were 22. Center for Public Integrity, *OSHA Says BP Has "Systemic Safety Problem,"* May 16, 2010. Likewise, the UK's Health and Safety Executive imposed substantial fines and citations on BP – issuing no fewer than 100 letters or notices to the Company between 2006 and 2010 – for safety or environmental violations related to exploration or production rigs, pipeline or storage systems, or other facilities.

248.    In 2006, BP commenced its OMS, touting it as a "single framework" of standards across its operations, which would result in "continuous improvement" of safety practices. In April 2008, defendant Hayward acknowledged that OMS was directed at "ensuring that our operations across the world look and feel the same everywhere – and perform to the same high standard."

249.    Despite BP's proclamations of a standardized safety strategy, as revealed in testimony in 2010 and the Presidential Commission Report, BP's OMS did not provide a "single" or "common" framework for BP's safety operations around the world. Rather, it allowed BP to use differing safety practices country-by-country and to satisfy minimal safety standards set by local regulations.

250.    Defendants' willingness to exploit less restrictive local rules was clearly on display in BP's Gulf of Mexico operations. With respect to offshore drilling operations, applicable rules for drilling protocols are more rigorous in certain jurisdictions, such as

105

Norway, Canada, and the UK, than in the Gulf of Mexico. For example, rules exist in other jurisdictions that require that two barriers must always be maintained on top of hydrocarbons during well completion, that wells in temporary abandonment never be left "underbalanced," and that BOPs always be equipped with two blind shear rams and emergency acoustical switches. BP followed such higher standards for wells drilled in jurisdictions that required these heightened safety measures, but took advantage of a lower level of regulation in the Gulf of Mexico.

251. In this way, BP's OMS operates in marked contrast to Shell's safety program. Shell's "Safety Case" methodology dictates that Shell personnel not merely follow regulations, but specifically make out a satisfactory "case" for the safety of a particular operation and the mitigation of risk. Shell's Safety Case further requires that the company perform the same mandatory drilling practices around the world, whether required by regulation or not. In direct contrast to Shell's program, BP's OMS failed to set consistent safety standards across BP's operations despite representations by Defendants to investors that BP adopted consistent practices throughout its global operations.

### B. The Orange Book Reports Disclosed Process Safety Related Information to GORC and SEEAC Members and Board Members

252. As discussed above (at ¶¶ 57-64, 69), BP's Orange Book reports provided information about safety and risk information to GORC and SEEAC members and members of the Board of Directors. The reports were provided to both GORC and SEEAC on a quarterly basis. Armstrong Dep. at 86:4-11. During the Relevant Period, defendant Hayward was a member of both GORC and SEEAC, and defendant Inglis was a member of GORC and attended meetings of SEEAC to report on issues pertaining to BP Exploration.

106

253.    According to defendant Hayward, GORC met approximately once a month to "review safety performance, to review the progress we were making with respect to the implementation of OMS, to review the audits [ ] the Safety Audit Group had conducted to assess safety performance broadly and in detail, and to make interventions as necessary." Hayward Dep. at 843:12-18.

254.    Likewise, defendant Inglis testified that he was familiar with both the function and implementation of OMS due to his participation in GORC:

> The group operations – Group Operations Risk Committee was set up by – by Tony Hayward to monitor our safety and integrity performance.  It was there to act as a vehicle for continuing to improve our performance.  That was through OMS.  So part of it was to actually look at how OMS was being implemented.  It connected into the OMS audit function, so that reported in to GORC.

Inglis Dep. at 279:21-280:4.

255.    In fact, at the time of the *Deepwater Horizon* incident, defendant Inglis viewed himself as occupying the highest position of authority over BP Exploration's drilling and exploration operations worldwide, except for maybe Hayward:

> Q.    Do you feel any responsibility, sir, at all for what happened on April 20th of 2010?
>
> A.    As the CEO of the exploration and production company, I am responsible for the safe and reliable operations across all of the E&P operations globally.
>
> *        *        *
>
> Q.    And that, of course, would include [the] Gulf of Mexico, correct?
>
> A.    Again, as I said, I was responsible for the – the safety and reliability of – of our operations globally.  So that would include the Gulf of Mexico operations.
>
> *        *        *

107

> Q.    All right.  And in terms of safety for drilling and exploration operations in the Gulf of Mexico and worldwide insofar as safety is concerned, other than perhaps Dr. Hayward, you would have been the highest in line of authority; is that true?
>
> A.    In terms of the – the responsibility for their safe and reliable operations, yes.

Inglis Dep. at 75:24-76:5, 79:18-24, 80:13-22.

256.    Thus, defendants Hayward, Inglis and all other members of GORC were provided regular updates on the status and progress of the OMS implementation through, among other things, the Orange Book.  As described by defendant Inglis, the Orange Book was intended to "provide a – a performance monitoring in – performance monitoring information around safety and operational integrity.  So it had in it key performance indicators, indicators of progress on various initiatives, whether they be the six-point plan, the implementation of OMS.  So it was a – a compendium of all the information that you could use to assess progress on our safety and operation integrity agenda."  Inglis Dep. at 286:24-287:15.  As a result, Defendants Hayward, Inglis and all other members of GORC and SEEAC were provided regular updates on the status and progress of the OMS implementation through the Orange Book.  Thus, through the Orange Book, Defendants knew or should have known that: (i) there were at least two high-potential incidents involving Transocean, one of which was in the Gulf of Mexico; (ii) that S&O Audits excluded joint venture operations in the Gulf of Mexico, including the *Deepwater Horizon*; and (iii) that the implementation of OMS in the Gulf of Mexico was not completed in 2008 and was still not complete when the *Deepwater Horizon* exploded.

**C.**   **SEEAC, the Board, and BP Senior Executives Reviewed and Discussed the Content of BP's Safety Related Publications**

257.   As discussed above, SEEAC was tasked with "[r]eviewing material to be placed before shareholders that addresses environmental, safety and ethical performance" and making "recommendations to the board about their adoption and publication." The recommendations made by SEEAC were reviewed, discussed and approved by the Board of Directors, which included defendant Hayward. Thus, the Board and defendant Hayward were aware of or should have been aware of the false information contained in recommendations it approved for public dissemination and agreed that critical safety-related documents would be made available on the Company's website. Defendant Hayward attended and participated in meetings of both BP's Board and SEEAC.

258.   For instance, the January 9, 2008 meeting minutes of the SEEAC disclosed that the SEEAC discussed the publication of the Independent Expert's findings. Defendant Hayward attended this meeting, and defendant Hayward took an active role, discussing whether a summary should be included in the 2007 Sustainability Report with additional information available online. Dr. Bickerton, BP's Director of Communications who was in attendance, described the approach being taken towards the 2007 Sustainability Report, noting that it would be an e-report available online with a 12-page printed summary containing key information for general use.

259.   Approximately two months later, on March 13, 2008, during a SEEAC meeting, defendant Hayward confirmed that the Company intended to publish a summary of the Independent Expert's report in the 2007 Sustainability Report. Dr. Bickerton described the structure of that year's report and confirmed that its publication would be web-based.

According to the March 13, 2008 SEEAC meeting minutes, SEEAC members provided Dr. Bickerton with specific comments on the draft of the Independent Expert's report for inclusion in the final version.

260.    Also during the March 13, 2008 SEEAC meeting, Ernst & Young's assurance work was discussed.  One Committee member described the nature and purpose of Ernst & Young's assurance work on the Sustainability Report and stated that, as of that time, Ernst & Young believed the report addressed key issues faced by the Company and key topics of interest to stakeholders.

261.    On May 7, 2008, during a SEEAC meeting, defendant Hayward commented that executive management felt that the Independent Expert's report was fair and balanced, and it was confirmed that a synopsis of the Independent Expert's report would be published in the 2007 Sustainability Report.  SEEAC further discussed the Sustainability Report and confirmed the "value of the report in communicating to external audiences."

262.    Similarly, during a January 7, 2009 meeting of SEEAC, Dr. Bickerton described the change of structure proposed for BP's 2008 Sustainability Report and the development of materials for inclusion in the report.   The structure of the 2008 Sustainability Report centered on five groupings of material issues that could impact BP's ability to deliver its strategy, including "diverse and affordable energy, cleaner energy, *safe and reliable energy*, people (human energy) and development (local energy)."  (Emphasis added).   According to the meeting minutes, the Committee continued to discuss the proposed structure and content of the 2008 Sustainability Report "and its relevance to the company's commitment to people, safety and performance."  As with the 2007 Report, a summary of the 2008 Sustainability Report would be published with the full report available

110

online.  Similarly, as in previous SEEAC meetings, defendant Hayward took an active role in the discussion of the Sustainability Report, nothing that "the aim was for the company to be within the leading pack for sustainability reporting, by addressing matters being publicly discussed by the CSR community, whilst not creating expectations the company could not deliver."

263.  On March 12, 2009, during a SEEAC meeting, it was confirmed that a summary of the Independent Expert's annual report would be included in the 2008 Sustainability Report.  As usual, defendant Hayward participated in the SEEAC meeting. During this meeting, BP's sustainability review was introduced and it was decided that, in addition to being printed, it would appear on BP's website.  It was also noted during the meeting that Ernst & Young's work for 2008 had relied more on BP's own assurance program and less on its own local reviews.

264.  On February 24, 2010, SEEAC, along with defendant Hayward, discussed the 2009 Sustainability Report.  Dr. Bickerton reviewed the approach taken for the 2009 Sustainability Report and outlined its proposed content.  During this meeting, Dr. Bickerton also raised external perceptions of BP's reporting of sustainability issues and reviewed the topics that were material in the public's perception.  As before, a summary of the 2009 Sustainability Report would be published with the full report online.

265.  In the following month, during a March 24, 2010 SEEAC meeting, Dr. Bickerton introduced the 2009 Sustainability Report.  Defendants Hayward and McKay all attended this meeting.  As in previous years, defendant Hayward actively participated in the discussion of the Sustainability Report, acknowledging that the "Sustainability Review had evolved to become a means of encapsulating statements of BP's policies, in addition to

111

being a report on the company's activities."

266.   Thus, in connection with their unique duties as members of GORC, both Hayward and Inglis conferred with SEEAC to approve false and/or misleading safety-related publications made available to shareholders either in print or on the Company's website, including the 2007, 2008 and 2009 Sustainability Reviews and Reports.  In fact, SEEAC received reports from Hayward, who served as Special Liaison to the committee, concerning matters overseen by GORC, such as the status of the OMS implementation. Hayward attended each of the SEEAC meetings in 2008, 2009, and 2010 leading up to the Macondo disaster.   Likewise, Inglis reported to SEEAC on matters pertaining to BP Exploration.

**D.**   **The Defendants Consciously Limited the Applicability and Scope of the S&O Audit Function so as to Exclude BP's Gulf of Mexico Deepwater Wells**

267.   The Safety & Operations ("S&O") segment was a component of OMS that allowed BP's Board to monitor process safety through reporting mechanisms, progress updates, and other metrics.

268.   BP's Response to the Baker Panel's recommendations, which explained BP's actions to improve its process safety management, included a detailed description of the S&O audit function:

> A group level S&O audit function independent of the line organization has been put in place that provides audit and action item verification. Operating on a 3 year cycle, it undertakes a risk-based assessment of BP's highest-risk sites.  The speed with which the S&O audit function has been developed and the rigor of the team's approach reinforces BP's commitment to safe and reliable operations:  a team of 60 auditors (as of February 2008) has been recruited, and 28 audits were complete by 4Q 2007.

112

**S&O audit intent – support risk reduction in the group by:**

- Supplying management and SEEAC with a systematic and structured operations-focused audit program at those sites assessed to carry the highest risks;

- Providing audited facilities with an independent review of their HSE and operating programs carried out by a high-caliber team of operations and compliance experts from outside the site; and

- Using a risk-based approach to verify the status of audit findings and corrective actions and providing reports on the status of closure activities to appropriate management levels.

269.    As noted in the meeting minutes for the SEEAC meeting held on March 12, 2009, the SEEAC, along with defendant Hayward, discussed the experience of the S&O Audit team and reviewed the scope of the function's activity.  O'Brien explained the S&O audit and reporting process in some detail, noting "that the function had ranked the 400 entities requiring review and selected the top 100 to be audited by S&O over a 3 year period.  The remaining entities would be audited by the business segments."  Further, as the minutes of the meeting reflects, "Mr. O'Brien noted that where audits identify deficiencies, plans for remediation seek to address systems improvement rather than just fixing specific gaps.  He confirmed that audit findings feed into the Orange Book and are reported to GORC.  Delays in closure are flagged and any rejected audit findings are reviewed with management."  During the meeting, defendant Hayward further emphasized, as reflected in the minutes, the importance of the S&O audit function:

> Dr. Hayward referred to the rigorous and disciplined approach taken by the S&O audit function and considered it was establishing a new standard for the industry. He noted the deep expertise that had been recruited into the function and confirmed Executive management's full support for the audit process.

270.    In short, the S&O audits tested the compliance of rigs and rig personnel with

113

safety standards and risk management policies, such as those established by OMS.

271.    Despite the intended scope and essential function of the S&O audits, the GORC members, including defendant Hayward, opted to limit the applicability of the audits so as to exclude some of the riskiest aspects of BP's operations which were never publically disclosed.  This is substantiated by a July 2009 "Pre-Read" distributed to GORC members which revealed that joint ventures in the Gulf of Mexico, such as the *Deepwater Horizon*, were excluded from S&O Audits.

272.    Indeed, defendant Hayward knowingly excluded these areas of BP's operations, which included the majority of BP's deepwater wells in the Gulf of Mexico, from the S&O audit function.  Importantly, if the S&O audit function had applied to these areas, both SEEAC and GORC would have received data indicating the numerous process safety failures on the *Deepwater Horizon*.  The decision to exclude these areas from the audit program squarely contradicted the Company's professed commitment to the implementation of a company-wide framework to improve process safety.

E.    **Defendants Failed to Disclose and Address Process Safety and Operational Risk Issues**

273.    GORC members, including defendants Inglis and Hayward, received numerous documents detailing numerous process safety risks and deficiencies, such as the Orange Book and "Pre-Reads," but failed to publicly disclose and adequately address these issues.

274.    Defendants were also aware of and failed to publicly disclose the process safety risks specific to the Gulf of Mexico.  A *Fortune* Magazine article titled "BP: 'An Accident Waiting to Happen,'" which was published on January 24, 2011, revealed that BP

114

executives were previously warned about process safety "gaps" in the Gulf of Mexico. The internal document, which was dated December 2008, and had not previously been released, stated:

> It's become apparent that process-safety major hazards and risks are not fully understood by engineering or line operating personnel. Insufficient awareness is leading to missed signals that precede incidents and response after incidents, both of which increases the potential for and severity of process-safety related incidents.

This internal document also called for stronger "major hazard awareness." The decision not to disclose the process safety risks specific to the Gulf of Mexico squarely contradicted the Company's professed commitment to the implementation of a company-wide framework to improve process safety and to be transparent with the investment community.

**F.**     **Defendants Were Aware of or Recklessly Disregarded Heightened Process Safety Risks and Deficiencies With Third-Party Rigs, Particularly Those Owned by Transocean**

275.     Defendants were aware of, or recklessly disregarded, substantial process safety deficiencies and issues with rigs that were owned or operated by third parties, especially those rigs owned and operated by Transocean, but failed to disclosed them to the public.

276.     BP experienced a high-potential incident ("HiPo") in the Gulf of Mexico on July 21, 2007, during which Transocean rig operators dragged the BOP along the ocean floor, almost severing underground pipelines. There was also a HiPo in Alaska involving Transocean. These incidents were confirmed by Inglis:

> Q.     Okay. This is an e-mail dated 2009 to Mr. Sims, Mr. Guide, a number of other people, and what I wanted to ask you about, they're talking – it says, I'm looking forward to our call this week where we intend to focus the conversation around the recent Control of Work review and key learnings from two of our most recent HIPO incidents in the U.S.

And then down below, it looks like it's referring to one incident that occurred in the Gulf of Mexico and another incident that occurred in Alaska. Do you see that?

A.      Yes, I do.

Inglis Dep. at 701:17-702:6.

277.    According to February 15, 2008 GORC meeting minutes, which identified Defendants Hayward's attendance, GORC discussed "two new incidents involving Transocean." These incidents resulted in a joint safety improvement plan that would address rig-safety culture and standardization across the two companies when implemented. According to entries for each incident in the Orange Book, they were Control of Work related Major Incident Announcements/High Potential Incidents.

278.    



279.    Inglis testified that BP's senior management was aware of Control of Work concerns:

Q.      And the second bullet point says, "On many of our sites: Hazard identification/awareness is inadequate."

It says, among other things, "The majority of our bridging documents linking BP and Drilling Contractor safety systems are outdated and/or poorly understood.

"Low value realized from HSE advisers by both BP and key

116

Contractors due to poorly defined roles."

"Site supervisors have poor awareness of major accident risks."
Do you see that?

A. I do.

Inglis Dep. at 702:21-703:10.

### G. Defendants Ignored Concerns About the Integrity of Safety Processes in Alaska

280. On April 11-12, 2009, Marc Kovac ("Kovac"), a BP mechanic, welder, and union representative, sent two emails to BP's Ombudsman's office – headed by the Honorable Stanley Sporkin, a retired federal judge, copying several BP Exploration Alaska ("BP Alaska") offices, regarding, among other things, serious concerns about the integrity of pipelines in Alaska and general problems with inspections of oil wells in the western part of BP's Prudhoe Bay facilities. His April 11th email noted that "it's getting back to a very dangerous situation, too much overtime and too much responsibility and area to cover for each man. Anything can happen when [well] pads are not monitored. Anything can happen when workers work over 12 hours a day, every day. Things are not getting better." On April 12, 2009, Kovac sent another email identifying a number of specific examples of overextended staff, concluding that the situation "sets up for another major mishap. Who will they blame this time? This situation is not acceptable."

281. Then, in June and August 2009, BP employees and representative members of the United Steelworkers met with BP's management in Alaska about numerous safety and pipeline integrity issues and complaints about BP's culture that impeded employees from raising safety issues. Minutes released from the United Steelworkers demonstrated that union representatives raised detailed concerns to BP management about understaffing and

117

excessive overtime (including being required to work 16-18 hour shifts) and noted that these issues caused an "increased . . . risk for accidents."

282.    These concerns were highlighted in October 2009 by Phil Dziubinski ("Dziubinski"), BP Alaska senior officer for HSSE. Dziubinski explained that shifts in excess of 16 hours impeded workers' ability to make sound decisions, and he described this impaired decision-making ability as akin to "intoxication." He noted these conditions were persistent in BP's operations before and throughout the Relevant Period. Further, he believed that the failure to remediate such dangerous work conditions would require BP to affirmatively acknowledge to HSE Committees, the Board, the Ombudsman, and Congress that this situation put "production ahead of safety." In late 2009, Dziubinski was asked to resign from his post in what he believes was retaliation for voicing his concerns.

283.    In the June and August 2009 meetings, union representatives also voiced concerns about the delayed replacement or repair of equipment and old, corroded pipelines, including gas leak detectors. (Faulty gas leak detection devices were among the problems that led to the ignition of flammable gases during the blowout and subsequent explosion on the *Deepwater Horizon*.) "We have several lines ready to leak," the representatives are noted as saying. The minutes also show union representatives urging BP not to simply "patch" pipelines: "These lines should be replaced."

284.    These were precisely the types of safety issues Defendants informed Plaintiff BP would address after the Baker Report was released and the types of safety issues that Defendants represented to Plaintiff was – purportedly – already being addressed and remedied throughout the Relevant Period.

**H.    "Afraid-a-Spill" Email Raises Complaints About Alyeska's Operations**

285.    In late 2009, another confidential employee "concern" was sent to the BP Ombudsman from an anonymous employee of BP-operated Alyeska, the BP-led consortium that operates the Trans-Alaska Pipeline in Alaska.  The email, which was signed, "Afraid-a-spill," raised myriad complaints about Alyeska's operations, including serious safety and pipeline integrity concerns.

286.    Unidentified executives, the email stated, "told employees not to speak up or go against" Alyeska CEO Kevin Hostetler ("Hostetler").  The email stated that, as a result of Hostetler's behavior, the work environment at Alyeska had degraded over several years to the point where: "*People are afraid to speak up on safety or integrity issues for fear of retaliation.*"  According to a subsequent investigation into the allegations by BP-retained lawyers with the law firm Morgan Lewis & Bockius, the subject of the email was communicated to BP senior leadership in early 2010, and Judge Sporkin, the Ombudsman, discussed it with BP leadership.  This discussion led to the law firm being hired to carry out a further investigation, the results of which still are not public.

287.    Concerns about the risks of spills in BP's Alaska operations, and the inadequacy of BP's pipeline integrity and inspection programs, were not only being voiced internally or to the BP Ombudsman, but also from government officials.  BP and its subsidiaries received enforcement letters from the U.S. Department of Transportation's "Pipeline and Hazardous Materials Safety Administration" ("PHMSA"), which communicated regulatory violations, enforcement actions, orders to comply, and warnings relating to pipelines.  Between 2008 and 2010, BP-related companies operating in the United States received 40 separate enforcement letters from PHMSA, a far higher number

than those sent in the same period to peer companies Exxon Mobil, Conoco Philips, Chevron, or Shell. (During the same period, for example, Shell received only six PHMSA letters.) One PHMSA letter was sent to BP on April 20, 2010, the very day the *Deepwater Horizon* blast occurred. In that letter, PHMSA explained that it had found serious shortcomings with BP's pipeline inspection and anti-corrosion systems in Alaska, which increased the likelihood of a major spill.

288.    These were precisely the types of safety issues Defendants informed Plaintiff BP would address after release of the Baker Report and the types of safety issues that Defendants represented to Plaintiff was – purportedly – already being addressed and remedied throughout the Relevant Period.

I.    **BP Looks to Conceal Safety Concerns and Retaliates Against Safety Whistleblowers Working in the Gulf of Mexico**

289.    As discussed above (at ¶ 96), according to the CSB's findings, BP created an environment that discouraged employees from raising concerns about the safety and integrity of BP's operations that continued to run rampant during the Relevant Period.

290.    This was substantiated by Abbott, a BP engineer working on design and blueprint management issues relating to the operations of BP's *Atlantis* rig, who, in August 2008, began to raise concerns with BP managers about the Company's practices and policies for managing and updating designs and blueprints for its infrastructure and equipment on the *Atlantis*. Abbott's account was largely substantiated by Barry Duff, a BP manager. However, Abbott was fired in retaliation for his whistle-blowing January 2009.

291.    The Presidential Commission also substantiated BP employees' fears of raising safety concerns, noting that a survey conducted in March 2010 indicated that crew members

120

working on the *Deepwater Horizon* feared retaliation. The survey, which included workers on the *Deepwater Horizon* and three other rigs, was conducted between March 12 and March 16, 2010 – about one month before the *Deepwater Horizon* explosion. The Presidential Commission recognized that "[s]ome 46 percent of crew members surveyed felt that some of the workforce feared reprisals for reporting unsafe situations, and 15 percent felt that there were not always enough people available to carry out work safely."

292. Following the *Deepwater Horizon* tragedy, on June 17, 2010, Abbott's plight was acknowledged by Congress and he was invited to testify before Congress about the circumstances that led him to initially report his concerns to senior BP management. Abbott's testimony was a sweeping indictment of BP's failure to adhere to safety protocols and regulations:

> From my experience working in the industry for over 30 years, I have never seen these kinds of problems with other companies. Of course, everyone and every company will make mistakes occasionally. I have never seen another company with the kind of widespread disregard for proper engineering and safety procedures that I saw at BP and that we hear from the news reports about BP *Horizon*, or BP Texas City, or the BP's Alaska pipeline spills. BP's own investigation of itself, by former Secretary of State James Baker, reported that BP has a culture which simply does not follow safety regulations. From what I saw, that culture has not changed.

### J.    BP Also Retaliates Against Safety Whistleblowers Working in Alaska

293. As discussed above (at ¶¶ 106-111), according to 2009 communications involving the BP Ombudsman's office, in 2007 contractor Anderson began to cite "a significant quality control breakdown" in Acuren's and BP's testing procedures, "inadequate record keeping," and "unqualified inspectors in the field performing inspections." The BP Ombudsman conducted a robust investigation and found that "[t]he concerns were serious, and although people try to downplay the significance of the issues, they reveal a complete breakdown."

121

According to the BP Ombudsman's office, the audit confirmed Anderson's claims. Although the BP Ombudsman's office alerted BP and BP North America officials about these issues, BP did not adequately address the continuing concerns that had been raised.

294.   A 2008 BP Ombudsman "Workforce Briefing," which included an assessment of Acuren's "Work Environment," reported that a survey of Acuren employees by the Ombudsman's office found significant problems with workers' perceptions of potential retaliation for reporting safety or environmental concerns. A "key insight" in the presentation stated that "[a]ctions and events in the past 18 months [i.e., during the period in which BP vowed to improve safety practices in Alaska in the wake of the 2006 spills] have had a decidedly chilling impact on worker attitudes." The section noted: "[p]roduction [as opposed to safety] is viewed by very many workers as the primary focus." The presentation also indicated that the "actual or perceived presence of HIRD [Harassment, Intimidation, Retaliation, Discrimination] is high in the Acuren organization. . . ." In fact, one in three employees believed "recent resignations" were due to HIRD, and 38% of employees – and 80% of the employees who worked on natural gas lines – indicated as the reason for not reporting safety concerns: "nothing seems to happen to reported items."

295.   Further, BP Ombudsman records from 2010 include numerous other examples of serious issues raised by Acuren employees. For instance, according to a June 7, 2010 article by *ProPublica*, on December 9, 2009, a "Concerned Individual" at Acuren raised process safety concerns about other personnel "pencil whipping" test results (*i.e.*, manipulating devices to produce desired readings) and "falsified inspections." The "concerned individual," Stuart Sneed, worked on BP's Alaska pipeline. According to Sneed: "They [BP] say it's your duty to come forward . . . but then when you do come forward, they screw you. They'll destroy your life. . . .

No one up there [in Alaska] is going to say anything if there is something they see is unsafe. They are not going to say a word."

**K.    Aftermath of BP's 2007 Criminal Plea**

296.    During the Relevant Period, defendants Hayward and Inglis knew, or recklessly disregarded, that the recommendations of the Baker Panel were not being adequately implemented throughout the Company, especially in terms of improving its process safety practices.   In particular, as set forth below, between 2008 and 2010, the Environmental Protection Agency ("EPA") warned BP's General Counsel, among other senior BP executives, that EPA investigators found BP to be operating unsafely.

297.    As described above, BP pleaded guilty to a violation of the U.S. Federal Water Pollution Control Act in connection with the Alaska pipeline oil spill, admitting that its "criminal negligence" had caused the corrosion and thus the spill.   BP was sentenced to three years of probation and fined $22 million.   In late 2008, BP attempted to obtain an early release from probation in Alaska, arguing to its federal probation officer, Mary Frances Barnes ("Barnes"), that the Company had made "significant progress" in relevant areas of maintenance and inspection.   Unbeknownst to Plaintiff and investors, however, Barnes found continuing safety issues and incidents with BP operations and denied BP's request.   In September 2010, as a result of continuing complaints that she received about safety and pipeline integrity issues in 2008 through 2010, Barnes requested that the court revoke BP's probation and that additional fines and penalties be levied against the Company.

298.    Also unbeknownst to Plaintiff and investors during the Relevant Period, BP was potentially facing serious disciplinary action by the EPA's Suspension and Debarment Division ("SDD"), in connection with past and ongoing misconduct in Alaska, Texas, and

other states. The SDD has the authority to prevent BP from being a party to any U.S. government or state contract or grant funded with federal funds, which would materially affect BP's revenues.

299. Beginning in early 2008 and through early 2010, Jeanne Pascal ("Pascal"), the EPA SDD Debarment Counsel for Region 10 (West Coast and Alaska) who handled EPA debarment oversight activities on the BP Group in the greater United States, communicated repeatedly by telephone and email with senior BP officials, including senior BP executive and defendant Doug Suttles, BP General Counsel Jack Lynch ("Lynch"), and BP's outside counsel at Vinson & Elkins, Carol Dinkins, among other persons. The BP Ombudsman, Judge Sporkin, also raised Pascal's concerns with the President of BP America, defendant McKay. In her communications, Pascal noted that her office had received information from BP employees and from EPA inspectors in Alaska and Texas demonstrating that BP was *in a state of continuing non-compliance* with numerous applicable laws and civil settlement agreements; that BP was continuing to run many of its operations unsafely; and that BP was continuing to retaliate against workers and contractors who raised safety and environmental issues. Thus, on several occasions during the Relevant Period, Pascal stated that, because of the Company's continuing misconduct, the EPA was entitled to file a debarment complaint, to strip BP and its subsidiaries of the right to bid for U.S. government contracts and to bid for U.S. government oil and gas concessions.

300. These were precisely the types of safety issues BP told Plaintiff it was addressing after the release of the Baker Report.

124

**L.**     **The Defendants Falsely Assured Investors That BP Was Implementing OMS Across All Operations and the Baker Report's Recommendations**

301.    Throughout the Relevant Period, defendants Hayward and Inglis were aware or recklessly disregarded that their statements regarding BP's implementation of process safety improvements, including OMS, were untrue and that they omitted material information concerning BP's failure to make adequate progress toward satisfying the recommendations set forth in the Baker Report and to implement OMS across all of BP's operations, including rigs it did not own.   Indeed, Hayward's self-proclaimed personal involvement in the Company's prioritization of safety since the beginning of his tenure as CEO establishes that he knew, or was reckless in not knowing, that BP was failing to implement the recommendations in the Baker Report.

302.    Hayward's succession as BP's CEO in May 2007 was touted as an opportunity for BP to make significant progress toward improving process safety within the Company's operations.   In fact, after the Baker Report was released in January 2007, BP held a press conference on January 16, 2007, to discuss the Baker Report's recommendations.   During the press conference, defendant Browne assured investors that:

> If I had to say one thing which I hope you will all hear today it is this 'BP gets it.'   And I get it too.   This happened on my watch and, as Chief Executive, I have a responsibility to learn from what has occurred.   I recognise the need for improvement and that my successor, ***Tony Hayward, and I need to take a lead in putting that right by championing process safety as a foundation of BP's operations.***
>
> *          *          *
>
> The list of what we have done since the accident ***shows how seriously we take process safety.*** (Emphasis added.)

303.    As BP's new CEO, defendant Hayward vowed to focus "like a laser" on

125

safety. Hayward and the other Defendants repeatedly assured investors, through BP's statements and public filings with the SEC, that BP was committed to improving process safety within the Company's operations, including the critically important oil operations in the Gulf of Mexico. Indeed, Hayward later told investors that when he took over as CEO, "the immediate task was to restore the integrity and the efficiency of BP's operations" and that he "set out three priorities: safety, people and performance." As discussed above, Hayward's involvement in that regard included chairing GORC and serving as executive liaison to SEEAC.

304.   Separately, Hayward implemented a safety course for BP executives known as the BP "Operations Academy." The Operations Academy, which Hayward himself attended, consisted of three two-week sessions at Massachusetts Institute of Technology, in which BP executives focused on process safety. As explained in the *Fortune* article entitled "BP: 'An Accident Waiting to Happen,'" the course taught universal process safety lessons, including that: "Critical procedures should be formalized and carried out with rigor; it's essential to maintain multiple safeguards against an accident; it is dangerous to change operating plans on the fly; anomalies need to be clearly resolved; small incidents are warning signs that conditions are ripe for a disaster."

305.   Another component of Hayward's plans for improving process safety was the implementation of BP's OMS, which was touted as having "an increased focus on process safety and continuous improvement." Indeed, in a speech delivered at the Company's 2008 Annual General Meeting, Hayward stated that the OMS was "aimed at ensuring that our operations across the world look and feel the same everywhere – and perform to the same high standard."

126

306.   Hayward's plans to improve process safety also included the reorganization of the Company to achieve "increased efficiencies."  According to Grote, BP's Chief Financial Officer, Hayward's reorganization efforts were "designed to simplify the organization and improve productivity and accountability, freeing up operating units to enable them to focus on safe, reliable, and profitable operations."

307.   Focused on improving process safety as defendant Hayward claimed he was doing, he knew that drilling the Gulf of Mexico was inherently risky and that a deepwater blowout was one of the largest risks confronting BP's Gulf operations.  As he stated during his deposition, "[a deepwater blowout] was certainly one of the highest risks for the corporation.  It was the highest risk in the Gulf of Mexico and one of the highest risks for the Ex – for the Exploration and Production Unit."  Hayward Dep. at 196:10-18.

308.   However, in the aftermath of the Macondo spill, defendant Hayward effectively admitted that the implementation of process safety improvements during the Relevant Period had failed.  As discussed above, Hayward stated during his deposition that if OMS had been implemented in the Gulf of Mexico, the *Deepwater Horizon* tragedy could have potentially been avoided.  (¶ 94).  On May 3, 2010, he acknowledged on NPR's *Morning Edition* that BP was fully responsible for the spill and stated that "It is indeed BP's responsibility to deal with this, and we are dealing with it . . . .  We will absolutely be paying for the cleanup operation.  There is no doubt about that.  It's our responsibility – we accept it fully."

309.   Similarly, in a June 2, 2010 article entitled "BP 'not prepared' for deep-water spill," the *Financial Times* reported that Hayward "accepted it was 'an entirely fair criticism' to say the company had not been fully prepared for a deep-water oil leak" and

127

acknowledged that it "is undoubtedly true [] that we did not have the tools you would want in your tool-kit."

310.    Then, in a November 9, 2010 interview with *BBC*, Hayward confessed that BP had failed to develop adequate emergency response plans for oil spills and admitted that the Company was "***making it up day to day***."

**M.   Defendants knew that BP Was Cutting Corners and Ignoring Safety Risks on the *Deepwater Horizon* Rig to Speed the Sealing of the Macondo Well**

311.    BP's exploration operations at the Macondo well included the *Deepwater Horizon* drilling platform leased from Transocean and Halliburton personnel conducting subcontracting tasks.  Despite this, the supervision of the entire exploration operation was BP's responsibility, as certified in its IEP.

312.    Although the exploration drilling phase of the Macondo well was successfully completed in early 2010, it was shockingly over-budget.  For example, this initial phase was supposed to last only three weeks, but took six weeks, resulting in additional costs of over $25 million to BP.  Moreover, the temporary abandonment of the Macondo well was 45 days late and $58 million over budget.  These costly delays led BP down one path – to cut corners on safety to hasten the sealing of the well and the eventual oil extraction.  This rashness only heightened the safety risks already inherent in the drilling operations at this particular site, including the likelihood of a BOP failure.

313.    As early as 2001, and on a continuous basis throughout the Relevant Period, Defendants knew that various components of BOPs in use (both on their own rigs and Transocean-owned rigs) had high probabilities of failure, especially in deepwater and ultra-deepwater settings, where drill piping is thicker and more difficult to cut and where hydrostatic

pressures affect hydraulic systems that control the BOP rams.

314.   In July 2001, the analyst group SINTEF, the largest independent research organization in Scandinavia, provided the MMS with a report recommending that all deepwater and ultra-deepwater drilling rigs in operation in the Gulf of Mexico be equipped with not one, but two separate blind shear rams, because of the significant risk that one might fail.  The SINTEF report, while not publicly released, was shared with BP and other industry operators.

315.   BP exacerbated the risk of BOP failure by permitting rigs operating in the Gulf of Mexico to be equipped with just one single blind shear ram.  Notably, in late 2004, before the start of the Relevant Period, BP contracted with Transocean to replace one of the rams on the *Deepwater Horizon*'s BOP with a test ram in order to speed up testing procedures.  Yet, the installation of this test ram lowered the unit's reliability even further.  Indeed, an agreement between BP and Transocean executed in October 2004 noted BP's awareness that the removal of the second ram would "reduce the built-in redundancy" of the BOP and raise the rig's "risk profile."  The existence of this agreement was not made public until June 20, 2010.

316.   The inherent risk and lack of redundancy for the *Deepwater Horizon*'s BOP should have been all the more apparent to BP when it was informed, prior to the explosion, that chunks of the BOP's annular preventer had broken off, causing a leak in the hydraulic system controlling device – pointing to severe operational problems with the BOP.  In fact, Remotely Operated Vehicle technician Tyrone Benton testified before the Joint Investigation Team of the Bureau of Ocean Energy Management, Regulation and Enforcement ("BOEMRE") (formerly MMS) and the United States Coast Guard ("Joint Investigation Team") on July 23, 2010, that he discovered a leak in the *Deepwater Horizon*'s BOP sometime between "February 24 and March 13[, 2010]."  On June 21, 2010, *The Guardian* reported that Benton advised representatives of

129

BP and Transocean of this critical issue, but no repairs were made: "Benton says that he spotted a leak on the rig's Blowout Preventer. . . .   He told the BBC's Panorama programme that both BP and Transocean, who owned the rig, were informed of the leak, and the faulty part – a control pod – was switched off rather than being repaired."  In fact, a July 20, 2010 *Los Angeles Times* article corroborated Benton's statement, reporting that testimony revealed that "as early as February [2010], a routine monthly maintenance report showed fluids leaking from the blowout preventer.  A subsequent report in March [2010] showed the problem had not been fixed."

317.   Likewise, Ronald Sepulvado, one of BP's two top officials aboard the *Deepwater Horizon*, testified before the Joint Investigation Team that "[o]ne of the [BOP] functions was leaking hydraulic fluid – the fluid used in the system to operate it."  Sepulvado stated that he "reported it to John Guide [in Houston], who was the [BP] team leader at the time.  I don't know if he reported it to MMS or not."  Although he acknowledged that federal guidelines require drilling to be suspended if the BOP is not fully functional, Sepulvado was falsely assured that "everything was O.K., since I reported it to the team leader and he should've reported it to MMS."  BP, however, not only failed to report this information to the MMS as required, but continued to keep drilling.

318.   The Joint Investigation Team also concluded that the *Deepwater Horizon* was not in compliance with another federal regulation requiring independent inspection of a rig's BOP every three to five years.  During the hearing, Jason Matthews, an official with the U.S. Interior Department, recited the results of an audit of the *Deepwater Horizon* conducted April 4-14, 2010, revealing that the BOP "was well past its ... inspection dates of every three to five years." According to *The Times-Picayune*, investigators stated that they had no record of an inspection after the year 2000 – approximately ten years before the explosion.  Despite his senior leadership

on the rig, Sepulvado testified that he was not familiar with the inspection requirement.

319.    In addition, during the process to seal the well, BP officials on the *Deepwater Horizon* made critical decisions that were clearly designed to hasten the process and save money despite the risk of a major disaster.  In fact, the Presidential Commission found that there was no "comprehensive and systematic risk-analysis, peer-review, or management of change process" for any of the following key decisions, amongst others:

- Failing to wait for the correct amount of centralizers;

- Failing to wait for the foam stability test results and/or redesigning slurry;

- Failing to run a cement evaluation log;

- Failing to use the correct spacer to avoid disposal issues;

- Failing to displace the mud from the riser before setting the surface cement plug;

- Failing to properly place the cement plug at the appropriate level and instead placing it 3,000 feet below the mud line;

- Failing to install additional physical barriers during the temporary abandonment procedure;

- Failing to perform further well integrity diagnostics in light of the troubling and unexplained negative pressure test failures; and

- Failing to use the correct mud pits and conducting other simultaneous operations during mud displacement.

The Presidential Commission then concluded that "[t]he evidence now available does not show that the BP team members (or other companies' personnel) responsible for these decisions conducted any sort of formal analysis to assess the relative riskiness of available alternatives."

320.    As noted above, in the aftermath of the Macondo spill, defendant Hayward effectively admitted that the successful implementation of process safety improvements during the Relevant Period had failed and that the Company had not been fully prepared for a deep-

water oil leak."

N.     **Defendants Knew that BP's Operations Did Not Conform to Industry Standard**

321.    BP's sealing of the Macondo well was a clear breach of the established standard of care. As noted in the preliminary findings of the "Deepwater Horizon Study Group" issued on July 15, 2010 by the Center for Catastrophic Risk Management at the University of California, Berkeley:

> To date compelling indicators have been surfaced to suggest that: 1) BP's drilling and well completion operations did not meet industry standards, 2) operations were "Faster" and "Cheaper," but not "Better" – the operation records point to excessive economic and schedule pressures resulting in compromises in the Quality and Reliability of the Macondo deep water oil and gas development system, and, thus ignoring risks and potential consequences, 3) the involved parties did not anticipate a blowout and, accordingly, did not develop effective, collaborative and constructive interactions to ensure that the resources needed in case of a blowout would be available.

322.    These findings were substantiated by others in the industry. For example, on June 15, 2010, Rex Tillerson, the CEO of ExxonMobil, testified before the Congressional Subcommittee on Energy and Environment of the House Committee on Energy and Commerce. Tillerson commented that the BP incident "represents a dramatic departure from the industry norm in deep water drilling." Tillerson emphasized that his company "would not have drilled the well the way [BP] did" (noting, in particular, the well design, cement mixture and testing procedures) and asserted that ExxonMobil's focus on "safe operations and risk management" would have prevented the oil spill. He added that the Macondo well had "a lot of indications or problems … going on for some period of time leading up to the final loss of control." Senior executives of other companies in the field leveled similar criticisms. For instance, John Watson (Chairman of Chevron) acknowledged "[i]t certainly appears that not all the standards that we

132

recommend or that we would employ were in place."  Likewise, Marvin Odum (President of Shell) stated that "[i]t's not a well that we would have drilled in that mechanical setup."

323.    The Presidential Commission also reached the identical conclusion – BP had no "comprehensive and systemic risk-analysis, peer-review, or management of change process" for a series of key decisions and the evidence did not show that "BP team members … responsible for these decisions conducted any sort of formal analysis to assess the relative riskiness of available alternatives."  In connection with BP's Regional OSRP, the Presidential Commission described it as outright "embarrassing," as it "described biological resources nonexistent in the Gulf – including sea lions, sea otters, and walruses."

## O.    Defendants Were Aware That Faulty Cementing Jobs and Other Stability Issues Were Known as the Most Frequent Causes of Well Control Problems

324.    As early as 2003, Defendants knew or recklessly disregarded risks associated with oil spills in offshore drilling related to the failure of cementing at various stages of well development, from the cementing around well casings and annuluses to the cementing of plugs, or shoes, to block pressure during the process of "temporary well abandonment."

325.    Defendants also knew, but failed to disclose, that as early as 2003, MMS had determined that failed cement jobs were associated with 33 blowout or well kick incidents in the Gulf of Mexico since 1973, some of which involved "well loss" and "rig and platform destruction by fire."  Indeed, an October 22, 2003 alert from MMS noted that "*[a]nnual flow related to cementing surface casing has been identified as one of the most frequent causes of loss of control incidents in the Gulf of Mexico*." (Emphasis added.)

326.    Defendant Browne knew of these developments and the others alleged herein, which arose during his tenure as CEO.  These developments concerned BP's extensive record of

133

repeated safety violations and incidents, all of which cost the company billions of dollars from fines, lawsuits, and lost productivity costs.  Tragically, in the case of the Texas City refinery explosion, BP's reckless disregard for safety also cost the lives of 15 workers in addition to the roughly 200 more who were injured.

327.     Importantly, BP had experienced cementing failures and it and the other Defendants knew of similar failures on other companies' rigs prior to and during the Relevant Period.  Additionally, BP experienced, but Defendants did not disclose, BP's own problems with a faulty cement job on one of its deepwater wells in the Caspian Sea, off the coast of Azerbaijan, in September 2008.  On or around September 17, 2008, BP experienced a gas leak at one of its central production platforms in the Azeri-Chirag-Guneshi ("ACG") field in the Caspian Sea – which is the largest of BP's deepwater drilling operations in Azerbaijan.  Shortly thereafter, another rig in the field, called *B-i 7*, suffered a blowout, causing gas, water, and mud to shoot onto the rig floor, raising the possibility of an explosion.  *B-i 7* was evacuated and its well was sealed, resulting in the shut down of most of the entire field's operations, and cutting daily production by over 600,000 barrels per day.  In later communications, BP told U.S. officials that they suspected that numerous wells had a "bad cement job."

328.     BP and other Defendants did not disclose this incident when it occurred.  In fact, BP's Form 20-F for 2008 merely mentioned a "subsurface gas release" on September 17, 2008, and notably omitted any reference to the blowout on *B-i 7*, the fact that gas alarms went off on the field's central production platform, and the possibility that cementing job on the well was faulty, as well.  As noted by *The Wall Street Journal* on December 17, 2010:  "BP had been 'exceptionally circumspect in disseminating information' about the [ACG gas] leak, both to the public and [to] its partner."  And, according to the same article, several of BP's partners "were

134

upset with BP for allegedly withholding information from them about the incident."

**P.      Defendants Knew or Recklessly Disregarded that BOPs Were Known to Fail, Yet Did Not Adjust Their Process Safety Procedures Accordingly**

329.    As early as 2000, and on a continuous basis throughout the Relevant Period, Defendants were aware of or recklessly disregarded the substantial and known risks associated with relying on a single blind shear ram in a BOP, which the *Deepwater Horizon* was outfitted with, to prevent an uncontrolled oil or gas release.  Indeed, even though Defendants were well aware that blind shear rams were highly untrustworthy and failed nearly 50% of the time, they continued to tout the Company's process safety procedures which misled investors into believing that BP's operations complied with safety regulations and the Company's own internal guidelines.

330.    A BOP is a large, five-story device typically set on the ocean floor at the so-called "mud line," beneath the riser connecting the rig to the sea floor and on top of the cement surface casing that seals around the "annulus," which runs down farther into the earth toward the "pay sands" in which oil and gas are found.

331.    More specifically, Defendants knew or recklessly disregarded that, in the event the BOP needed to be activated, the following should occur:

- Closure of the "variable rams," which would seal the area around the drill pipe in the well (or, with "annular rams" or "blind rams," if no pipe lay in the well), thereby sealing oil and gas in the annulus below the BOP; and then attempting to pump drilling mud into the annulus to outweigh and balance the pressure of rising oil and gas; or

- In a worse scenario, and if the method described above did not work, activate the BOP's "blind shear rams," which are intended to cut through the drill pipe in the well and then

135

seal the oil down in the annulus below the BOP; or

- In an emergency setting, set the BOP to activate all of its rams – variable, annular, and blind shear – and disconnect from the riser, preventing further gas or oil from rising to the rig above.

332.    As set forth below, as early as 2000, and continuing throughout the Relevant Period, Defendants knew, or were reckless in not knowing, that various components of BOPs in use (both on their own rigs and Transocean-owned rigs) had high probabilities of failure, especially in deepwater and ultra-deepwater settings, where drill piping is thicker and more difficult to cut, and where hydrostatic pressures affect the hydraulic systems that control the BOP rams.

333.    For example, in July 2001, SINTEF, the largest independent research organization in Scandinavia, provided the MMS with a report recommending that all deepwater and ultra-deepwater drilling rigs in operation in the Gulf of Mexico be equipped with not one, but *two* separate blind shear rams, because of the significant risk that one might fail.  The SINTEF report, while not publicly released, was shared with BP and other industry operators.

334.    In both December 2002 and September 2004, MMS provided to BP and other industry operators several reports written by West Engineering Services revealing serious deficiencies with blind shear rams.  In particular, the reports mentioned:

- The incapacity of shears to cut through many newer types of drill pipe, which tend to be thicker than older pipes;

- The certainty with which the shears that close on the thick joints that connect the sections of pipe together (rather than simply closing on the pipe itself) fail; and

- The significantly lower capabilities of shears to cut pipe at extreme depths, for instance,

136

in excess of 5,000 feet, because of the effect of hydrostatic pressure on BOPs' hydraulic systems.

335.   The SINTEF and MMS studies noted above, although not known to the general public and Plaintiff, were shared with and made available to industry members, including senior BP managers and directors involved in drilling operations, and were discussed at industry conferences that occurred during the Relevant Period including conferences held by the Society of Petroleum Engineers ("SPE") and the International Association of Drilling Contractors ("IADC") in New Orleans, February 2-4, 2010, and in Amsterdam in 2009.  Notably, Senior BP drilling managers routinely attended SPE and IADC conferences.

336.   In April 2000, an independent expert report by EQE International, a risk and insurance consulting group, conducted an extensive analysis of the BOP to be installed on the *Deepwater Horizon*.  The report, which was not publicly disclosed until June 20, 2010, identified a serious flaw in the BOP's design:  despite extensive "redundancies" (*i.e.*, back-up systems) in the BOP's layout, a particular component in the unit's hydraulic system – a single "shuttle valve" – had no backup.  Accordingly, EQE noted the potential for a "single point failure" of the shuttle valve and explained that if the shuttle valve failed, the remaining redundancies built into the BOP would be rendered irrelevant.

337.   In both 2008 and early 2010, BP specifically requested, as a member of the joint industry group focused on deepwater drilling issues, that West Engineering carry out research projects on BOP reliability and testing, and integrate past studies analyzing BOPs and their device failures.  Significantly, West Engineering was the same company that carried out the research for MMS on BOP reliability.

338.   A July 2009 report by the consultant group Det Norske Veritas also put BP on

137

notice that BOPs were unreliable.   The report, which was commissioned by BP's partner, Transocean, analyzed past BOP performance (including in the Gulf of Mexico) as part of a risk assessment for deepwater drilling in the Beaufort Sea, north of Alaska.   The report found that, in practice, blind shear rams on offshore BOPs had a failure rate of 45%.   Det Norske Veritas was subsequently contracted by the U.S. government to perform an extensive investigation into the *Deepwater Horizon*'s BOP in the wake of the April 2010 blowout and explosion.

339.   Defendant Hayward acknowledged in his deposition that he was aware that problems had been identified with BOPs and that those problems were generally known throughout the industry.   Hayward Dep. at 774:9-780:20.   Nevertheless, the existence of this report and its findings were not disclosed to the investing public or Plaintiff until June 20, 2010.

340.   BP exacerbated the risk of BOP failure by permitting rigs operating the Gulf of Mexico to be equipped with just one single blind shear ram.   Moreover, BP contracted with Transocean in 2004 to replace one of the variable bore rams on the *Deepwater Horizon*'s BOP with a test ram in order to speed up subsea testing procedures – a decision that lowered the unit's reliability even further.   Indeed, in an agreement between BP and Transocean executed in October 2004, Transocean noted BP's awareness that the removal of the variable bore ram would "reduce the built-in redundancy" of the BOP and raise the rig's "risk profile."   The existence of this agreement was not made public until June 20, 2010.

341.   Despite all the knowledge and information about difficulties with BOPs, Defendants either knew, or recklessly disregarded, that BP failed to establish uniform process safety features for rig operators to follow during offshore drilling to address BOPs safety issues. Thus, Defendants continued to tout the Company's process safety procedures, which misled investors into believing that BP's operations complied with safety regulations and the

138

Company's own internal guidelines.

**Q.** **Defendants Were Aware That BP Received No Less Than One Hundred Safety Warnings for its Safety Protocol Lapses in its North Sea Deepwater Drilling Operations**

342.    Defendants knew of the significant risks in BP's deepwater drilling operations during the Relevant Period, yet knew or recklessly disregarded, and failed to publicly disclose, that BP's process safety protocols failed to properly and sufficiently address these known risks.

343.    Unknown to the investing public and Plaintiff, the UK HSE levied extensive citations and fines on BP, sending no fewer than 100 letters or notices to BP between 2006 and 2010, and citing the Company for safety or environmental violations related to exploration or production rigs, pipeline or storage systems, or other facilities.   Tellingly, many of the communications concerned offshore deepwater rigs operated by BP in the North Sea around Scotland, including the *Schiehallion, Unity, Bruce, Hutton, Magnus, Clair,* and *Miller* vessels. Some of these rigs and the ships that serviced them were decades old, and, in many cases the safety issues identified, concerned a failure to properly maintain and inspect equipment.

344.    According to UK HSE records, the *Schiehallion*, an aging floating production storage and offloading ("FPSO") ship in the far North Sea, experienced an engine room fire in 2005 and, in 2006, suffered a "mooring chain failure."   These problems resulted in special UK HSE inspections and meetings with BP officials, and notifications concerning various violations of safety and environmental regulations during the Relevant Period.

345.    In correspondence in 2006, UK HSE strongly urged BP to dry-dock the *Schiehallion* for repairs.  BP refused, arguing that it would instead prioritize efforts to improve the ship's condition through a focus on maintenance.  UK HSE, in a letter to BP on February 2, 2007, strongly criticized BP's decision, noting several areas of maintenance backlog and

139

numerous cases in which past UK HSE notices were not addressed, and listing various

continuing operations that were not in compliance with "relevant statutory provisions" ("RSPs"):

> Finally, it is HSE's view that *the overall magnitude of the various categories of maintenance backlog [on the Schiehallion] is such that BP does not have significant control of the situation*. . . . [T]he situation means that there are concerns for BP's continued ability to comply with the fundamental duties under Sections 2 and 3 of the HASWA [Health and Safety at Work Act].   At the meeting of 29th January, we discussed with BP the issues associated with drydocking, shutting down production and prioritizing integrity management (i.e., the latter being BP's current approach) as a means of addressing the overall maintenance backlog.  *We listened to BP's opinions on the issues associated with the various options, but remain unconvinced that BP's proposed course of actions to remain on station, with an increased focus on integrity, is compatible with achieving compliance with the RSPs given the historic susceptibility of the FPSE Schiehallion to events or conditions that exacerbate ongoing maintenance backlogs* (e.g., 2005 Compressor Fire, 2006 Mooring Chain Failure). (Emphasis added.)

346.   The February 2, 2007 UK HSE letter continued:

> [UK HSE maintains] the view that *major accidents result when a series of failings with several critical risk control systems materialize concurrently. . . . The number and relatedness of backlogs on the Schiehallion is such that it appears as though there is a significant risk of such a series of failings arising*. (Emphasis added.)

347.   The letter concluded with criticisms of BP's poor safety culture and warned of the

Company's susceptibility to major incidents, echoing the MMS's findings about BP in 2002:

"BP's decisions on the *Schiehallion* have not in any way been informed by a systematic

assessment [by independent safety inspectors] of the adequacy of the management system to

achieve compliance with those RSPs . . . that are intended to avoid the failings that might align to

cause major accidents."

348.   According to a 2009 UK HSE letter, BP again suffered a "significant

Hydrocarbon Release" (*i.e.*, an oil spill or gas release) on the *Schiehallion* rig on August 4, 2008.

The UK HSE attributed the release to a "failure to comply" with BP's own process safety

procedures.

349.   Several other UK HSE letters were sent to BP between 2007 and 2010, as well. These letters outlined safety and maintenance problems on other rigs that created a danger of hydrocarbon release:

- A March 5, 2009 UK HSE letter discussed inspections of BP's *Harding* rig, criticizing BP's failure to inspect several "high risk" systems for corrosion, as requested in previous notices.  The inspector wrote:  "This lack of progress is unsatisfactory.  It is important that the condition of these systems is ascertained in a timely manner, in order to reduce the risk of loss of containment incidents"; and

- Additional letters to BP Exploration Operating Company Ltd. on March 25, 2008, March 5, 2009, and July 7, 2009, relating to the *Bruce*, *Magnus*, *Unity*, and *ETAP* platforms chastised BP for its failure to conduct maintenance programs that were compatible with the intended lifespan of its rigs.  The clear implication of these letters was that BP was recklessly running its own equipment into ruin.

**R.**   **Defendants Knowingly or Recklessly Disregarded That BP's 2007-2009 Budget Reductions and Staff Reorganizations Were Negatively Affecting Its Operational Process Safety Programs**

350.   Contrary to public statements and assurances to Plaintiff and its shareholders, BP's cost-cutting affected the Company's protocols and processes for ensuring worker and process safety and preventing environmental incidents.

351.   In October 2007, defendant Hayward announced plans to reorganize BP to accomplish "increased efficiencies."  Grote, BP's CFO, told analysts in an October 2007 conference call that the changes were "designed to simplify the organization and improve productivity and accountability, bringing up operating units to enable them to focus on safe,

141

reliable, and profitable operations."  However, Defendants failed to disclose that the so-called "reorganization" – which resulted in numerous layoffs and cuts to safety budgets – would materially affect the Company's ability to drill safely in the Gulf of Mexico.

352.    Cutbacks and layoffs climaxed in 2009.  For example, the Class Action Complaint asserts that the manager of report writing in the Office of Compliance and Ethics ("OCE") at BP America during 2008 and 2009 (referenced as Confidential Witness No. 1 ("CW1")) stated that in July 2009, BP merged its U.S.-based Group Compliance and Ethics ("GRCE") Office in Houston, which oversaw BP operations in the Americas, with its Global Compliance and Ethics ("GLCE") Office in London.  According to CW1, the merger resulted in "huge staff reductions" with GRCE suffering a 33% cut and GLCE cut by 44%.  (As a result of the merger, CW1 was offered a severance package and resigned.)  Even with these deep cuts, Defendants continued to falsely profess throughout the Relevant Period that the Company's focus on process safety would not be hampered.

353.    The cuts and reshuffling in BP's Compliance and Ethics staff was reflected also in cuts in Health, Safety, Security, and Environment ("HSSE") staff that led to resignations and terminations of HSSE managers who complained or raised issues about the cuts.  Among those terminated was Curtis Jackson, a senior HSSE manager for Gulf of Mexico operations, responsible for HSSE issues related to deepwater drilling, in January 2010.  Additionally, Phil Dziubinski, BP Exploration Alaska's senior officer for HSSE, who raised safety concerns stemming from extensive overtime in Alaska, was terminated in late 2009, ostensibly as part of HSSE downsizing.

354.    The effects of BP de-prioritizing safety in 2009 and re-shuffling and merging staff had direct repercussions on BP's drilling operations.  For instance, in late 2009, just before the

*Deepwater Horizon* was dispatched to drill the Macondo well, BP's senior Vice President for Drilling Operations for the Gulf of Mexico, Kevin Lacy, resigned from the Company because of disagreements with BP over its lack of commitment to process safety.  Lacy, an experienced drilling engineer who had implemented a rigorous drilling safety program while at Chevron, had been recruited to join BP in 2007 to improve and standardize its drilling policies and protocols. Before leaving, Lacy communicated his concerns to executives with the Company, including to Barbara Yilmaz, BP's Vice President for Global Drilling and Completions, and to defendant Inglis, the head of BP's Exploration and Production unit.

355.  Lacy's departure from the Gulf of Mexico drilling unit in December 2009 coincided with other additional and extensive reorganizing of personnel in the BP Gulf of Mexico drilling unit.  Several experienced senior engineers were transferred out of the Gulf of Mexico in or around December 2009, such that by the time of the *Deepwater Horizon* incident, four out of five of BP's senior drilling officials for the Gulf of Mexico had only been in their posts for a few months.  Indeed, BP's Wells Manager for the Gulf of Mexico, David Rich, was promoted only weeks before the incident and was primarily experienced in well completion operations, not exploratory drilling like that being undertaken by the *Deepwater Horizon* on the Macondo well.  Additionally, neither Rich nor his immediate subordinate, David Sims, the Drilling and Completions Operations Manager for the Gulf of Mexico, had experience with well control operations.

356.  Concerns about staffing turnovers were raised as a process safety issue in the Baker Report three and a half years earlier.  The staffing turnovers in the Gulf of Mexico directly impacted drilling operations on the *Deepwater Horizon*'s operations at the Macondo well. Indeed, as *The Wall Street Journal* reported on January 29, 2011, John Guide, who directed

143

*Deepwater Horizon*'s operations from Houston, told Sims just days before the *Deepwater Horizon* incident that it was "chaos" on the rig and that "[t]he operation is not going to succeed if we continue in this manner." Sims merely told Guide to tell the rig workers "to hang in there ... until the [Macondo] well is over." At that point, Sims left BP's Houston office to attend a dance practice.

357.    Thus, contrary to Defendants' public pronouncements, which were relied upon by Plaintiff, BP's cost-cutting, which included budget cuts and staff reductions, affected the Company's protocols and processes for ensuring worker and process safety and preventing environmental incidents and, at the same time, mislead investors into believing that BP's operations complied with safety regulations and the Company's own internal guidelines

### S.    Defendants' Estimates of the Gulf Oil Spill are Flatly Contradicted by Contemporaneous Internal Company Documents

358.    Throughout the Relevant Period, defendants Hayward, Suttles, and McKay were aware or recklessly disregarded that their statements concerning estimates of the amount of oil spilling into the Gulf following the *Deepwater Horizon* explosion were not true and that their statements omitted material information regarding the true scope of the oil surging into the Gulf of Mexico which were relied upon by Plaintiff.

359.    For example, an internal BP document (dated April 26, 2010) revealed that 5,000 barrels per day were leaking into the Gulf. The document (released by Representative Ed Markey and linked to *The New York Times* article titled "Ruptured BP Well Tops Valdez as Worst U.S. Spill") flatly contradicted the 1,000 barrels a day BP initially claimed:

> Assuming that 50% of the plume volume is oil and a rise velocity of 15 cm/sec, the oil released from this source would be roughly 5000 bbl/day. (approximately 200,000 gal/day) other sources would contribute additional oil. This answer will be refined as additional information becomes available. (marginalia omitted).

144

360. Another internal BP document (dated April 27, 2010) that was provided to BP's senior management, linked to the same *The New York Times* article, revealed that the Company's low estimate of the oil spill was 1,063 bopd, its best estimate was 5,758 bopd and its high estimate was 14,266 bopd.

361. As BP's COO for Exploration and Production and BP's officer in charge of co-managing the spill response with the U.S. Coast Guard, defendant Suttles knew the Company's estimated spill rate from the Macondo well, or was reckless in not knowing it. Nevertheless, on April 28, 2010, as was reported by the *Huffington Post*, defendant Suttles reiterated earlier estimates that 1,000 barrels of oil from the Macondo well were spilling into the Gulf of Mexico each day. Notably, on the same day, BP learned that the well's riser pipe had developed a new leakage point at the "kink" where the pipe had bent before it came to rest on the sea floor. And, when the NOAA representative within the Unified Command reported to senior members of the Command that NOAA's initial 1,000 bopd estimate was probably incorrect, defendant Suttles, after contacting a BP employee or agent, reported that BP's internal flow rate estimate was between 1,000 and 5,000 bopd, with 2,500 bopd being the most likely rate. Then, on April 29, 2010, defendant Suttles stated in an interview on CBS's *The Early Show* that "I think that somewhere between 1,000 and 5,000 barrels a day is probably the best estimate we have today" of the spill rate of the Macondo well.

362. Likewise, defendant Hayward, as BP's CEO, knew the Company's April 26, 2010 and April 27, 2010 internal estimates of the Macondo well spill rate, or would have been reckless in not knowing about BP's internal reports. Despite this, defendant Hayward ignored the Company's internal estimates and, in a May 5, 2010 *Houston Chronicle* interview, referred to the

145

Macondo well spill rate by stating that "[a] guesstimate is a guesstimate. And the guesstimate remains 5,000 barrels a day."

363.   On April 26, 2010, a NOAA senior scientist authored a memorandum – which was distributed to Unified Command – which estimated the flow rate to be 5,000 bopd. BP relied on this figure publicly. At the same time, Rainey – who had no prior experience calculating oil spill flow rates – took it upon himself to create a BP flow rate estimate, and he prepared several spreadsheets indicating a "best guess" of 5,000 to 6,000 bopd. Rainey's calculations were, incredibly, based on guidance he received by consulting the online encyclopedia "Wikipedia" and, later, more established sources. Ultimately, however, Rainey's methodology was riddled with mathematical and procedural flaws, and the calculations were manipulated to consistently yield a "best guess" flow rate that approximated the April 26 NOAA estimate of 5,000 bopd. Even using this flawed methodology, however, Rainey's calculations indicated that the flow could reach a rate of approximately 14,000 bopd.

364.   Additionally, as reported by the *Times-Picayune* on May 19, 2010, "[a]n engineering professor who has been monitoring the *Deepwater Horizon* disaster said … that 'there is scientifically no chance' that BP's estimate of a discharge of about 5,000 barrels of oil per day into the Gulf of Mexico is anything close to the actual number. Steve Wereley, associate professor of mechanical engineering at Purdue University, told the House Energy and Environmental Subcommittee that his own review indicates that a 1.2-inch hole is producing about 25,000 barrels of oil a day by itself, and overall the daily spill could amount to something 'short of 70,000 barrels to as high as 115,000 barrels.'"

365.   In response to Wereley's estimates, "BP America Chief Executive Lamar McKay, denied that his company is trying to obscure the size of the leak. 'This leak is not measurable

through technology we know,' he said. He also told the House Transportation and Infrastructure Committee that anyone working on the spill would have a hard time believing the size is anything close to the 70,000 barrels per day projected last week by Wereley."

366.    However, approximately 60,000 barrels of oil per day were leaking into the Gulf of Mexico after the *Deepwater Horizon* sank. Together with the internal BP estimates provided to the Defendants and Wereley's estimates (based on public information equally accessible to BP), Defendants knew, or were reckless in not knowing, that their statements minimizing the Macondo well spill rate were materially misleading. Indeed, Defendants ignored, among other things, contemporaneous reports provided to them belying their public statements. These included at least eleven items of data, estimates, and calculations showing flow rates significantly higher than 5,000 bopd, including:

- An April 30, 2010 analysis by a BP engineer showing a range of possible flow rates from 5,000 to 40,000 bopd;

- A video analysis, created in early May 2010 by a BP engineer, that resulted in a 20,000 bopd estimate for oil leaking from the riser pipe alone;

- A May 9, 2010 model, created by a BP contractor, that led to a possible range of 37,000 to 87,000 bopd;

- A May 10, 2010 video analysis, performed by a BP contractor, leading to the conclusion that, with respect to oil leaking from the riser alone, it could not be "ruled out" that the flow rate was "in the order of 40,000 bopd";

- A reservoir model, created by a BP engineer on or about May 10 and 11, 2010, yielding a range of potential flow rate estimates between 14,000 and 96,000 bopd;

- A critique of Wereley's estimates, authored by a BP engineer between May 14 and 15, 2010, explaining that Wereley potentially made errors that, when corrected for, yielded a revised estimate of 15,000 bopd flowing from the riser alone, from which the BP engineer deduced that a further reduction would be appropriate;

147

- A May 16, 2010 reservoir-depletion/pressure-drop analysis performed by a BP engineer, yielding a flow rate calculation of 86,000 bopd, based on then-estimated pressure;

- Data obtained from May 19 to 20, 2010, showing that oil collected from the riser pipe by the Riser Insertion Tube Tool ("RITT") was obtained at a rate of 5,000 bopd over a 12-hour period, indicating an overall flow rate greater than 5,000 bopd;

- A May 22, 2010 external surface expression analysis showing a range of estimated flow rates between 6,154 and 11,609 bopd;

- A May 23, 2010 analysis, conducted by a BP engineer, demonstrating that the oil flow emanating from the "kink" in the riser pipe alone was an estimated 11,600 bopd; and

- Data obtained during the 24-hour period on May 24, 2010, showing that the RITT collected 6,100 barrels of oil, which was less than all of the oil escaping from the well.

367.   It is clear that Defendants were aware of some, if not all, of this evidence, but never disclosed it to the public.  Indeed, according to the civil complaint filed by the SEC and the criminal complaint filed by the DOJ, Mike Mason, a vice president in BP's exploration and production technology division engineer who worked on the May 10-11, 2010 model discussed in the immediately preceding paragraph, emailed two BP executives, including defendant Inglis, to express concern over BP's continued reliance on the 5,000-bopd figure:

I just read an article in CNN (May 14, 2010 1:00 p.m.) stating that a researcher at Purdue believes that the Macondo well is leaking up to 70,000 bopd and that BP stands by a 5,000 bopd figure.  With the data and knowledge we currently have available we cannot definitively state the oil rate from this well.  We should be very cautious standing behind a 5,000 bopd figure as our modeling shows that this well could be making anything up to ~100,000 bopd depending on a number of unknown variables, such as:  flow path either through the annulus behind the production casing or through the production casing float shoe, the height of reservoir exposed, if drill pipe is suspended in the [blow out preventer] and sealed by [variable bore] rams, reservoir skin damage, choking effects and etcetera.  We can make the case for 5,000 bopd only based on certain assumptions and in the absence of other information, such as a well test.

148

368.    According to a *Huffington Post* article titled "BP Oil Spill Emails Reveal High-Level Discord Over Flow Estimates," Jack Lynch, BP's general counsel in the United States, forwarded Mason's email to defendant Suttles on May 16, 2010.

369.    The revelation of BP's internal flow rate estimates led Representative Markey to observe that "[n]ow we know what we always knew – this spill is much larger than BP claimed.... What's clear is that BP has had an interest in lowballing the size of their accident, since every barrel spilled increases how much they could be fined by the government."

370.    As explained in the SEC civil complaint, by April 28, 2010, Defendants possessed at least five pieces of evidence indicating potential flow rates substantially higher than the 5,000 barrels advertised by BP.  Four of these clues were generated internally, including:  a model of possible oil flow paths, created by a BP engineer on or about April 22, 2010, that indicated flow rates of between 64,000 and 146,000 barrels of oil per day; an estimate generated on or before April 24, 2010, showing that, in the immediate wake of the explosion aboard the *Deepwater Horizon*, oil was flowing through the still-attached riser at a rate of approximatel*y 100,000 barrels* of oil per day; an estimate, generated by a BP engineer on or about April 27, 2010, indicating that, given a number of factors, including the temperature along the riser pipe, oil was escaping at a rate of 5,000 to 22,000 barrels per day; and a series of calculations, prepared by David Rainey, evincing a flow rate of anywhere from 1,000 to over 14,000 barrels of oil per day.  In addition, BP engineers were made aware of an external calculation, made on or before April 25, 2010, concluding that the flow rate could be as high as 10,000 barrels of oil per day.

371.    The facts alleged herein have been previously found to support an inference of scienter as to defendants Hayward and Suttles. *See BP 1*, 843 F. Supp. 2d at 782-84, 786-88.  In addition, the facts alleged herein were the basis upon which BP pleaded guilty to, *inter alia*,

felony obstruction of Congress and agreed to pay $4 billion – the highest criminal penalty in U.S. history.  They were also the basis upon which Rainey has been criminally indicted, and upon which BP admitted its liability and settled the SEC's civil securities fraud case for the third largest penalty in the SEC's history:  $525 million.  Simply put, the facts alleged herein overwhelmingly indicate that BP and the Individual Defendants, with scienter, perpetrated a massive fraud on the investing public, including Plaintiff.

**T.**     **BP Exploration & Production Inc. Has Pleaded Guilty to Felony Manslaughter, Environmental Crimes and Obstruction of Congress**

372.   On November 15, 2012, BP Exploration agreed to plead guilty to eleven counts for violations of 18 U.S.C. § 1115 (Misconduct or Neglect of Ship Officers), one count for a violation of 18 U.S.C. § 1505 (Obstruction of Congress), one count for a violation of 33 U.S.C. §§ 1319(c)(1)(A) and 1321(b)(3) (Clean Water Act), and one count for a violation of 16 U.S.C. §§ 703 and 707(a) (Migratory Bird Treaty Act), and to pay a record $4 billion in criminal fines and penalties for the Company's conduct leading to the *Deepwater Horizon* accident that killed 11 people.  Among other things, the Information and Guilty Plea charging BP details that the Company, through David Rainey, obstructed a Congressional inquiry into the amount of oil spilling into the Gulf following the accident.  Further, as part of its guilty plea agreement, BP Exploration admitted the following facts:

> On or about May 24, 2010, in the Eastern District of Louisiana and elsewhere, BP did corruptly, that is, with an improper purpose, endeavor to influence, obstruct, and impede the due and proper exercise of the power of inquiry under which an inquiry and investigation was being had by a Committee of the United States House of Representatives into the amount of oil flowing from the Macondo Well ("flow rate") through the following omissions and false and misleading statements in its May 24, 2010 response ("Markey Response") to the Committee on Energy and Commerce:

> 1.     BP, through a former vice president, withheld information and documents

relating to multiple flow-rate estimates prepared by BP engineers that showed flow rates far higher than 5,000 BOPD, including as high as 96,000 BOPD.

2.      BP, through a former vice president, withheld information and documents relating to internal flow-rate estimates he prepared using the Bonn Agreement analysis that showed flow rates far higher than 5,000 BOPD, and that went as high as 92,000 BOPD.

3.      BP, through a former vice president, falsely represented that the flow-rate estimates included in the Response were the product of the generally-accepted ASTM methodology.  At the time that this false representation was made, BP's former vice president knew that those estimates were the product of a methodology he devised after, among other things, a review of a Wikipedia entry about oil spill estimation.

4.      BP, through a former vice president, falsely represented that the flow-rate estimates included in the Markey Response had played "an important part" in Unified Command's decision on April 28, 2010, to raise its own flow-rate estimate to 5,000 BOPD.  At the time this false representation was made, BP's former vice president knew that those flow-rate estimates had not played "an important part" in Unified Command's decision to raise its flow-rate estimate and had not even been distributed outside of BP prior to that decision.

5.      BP falsely suggested, in its May 24, 2010 letter, that the Unified Command's flow rate estimate of 5,000 barrels of oil per day ("BOPD") was the "most scientifically informed judgment" and that subsequent flow rate estimates had "yielded consistent results."  In fact, as set forth above, BP had multiple internal documents with flow rate estimates that were significantly greater than 5,000 BOPD that it did not share with the Unified Command.

6.      On or about June 25, 2010, in a BP letter to Congressman Markey, BP's former vice president inserted language that falsely stated that BP's worst case discharge estimate was raised from 60,000 BOPD to 100,000 BOPD after subsequent "pressure data was obtained from the BOP stack."  At the time this false representation was made, BP's former vice president knew that the 100,000 BOPD figure was not first derived after subsequent pressure data had been obtained, but instead, he had been aware of a 100,000 BOPD worst case discharge since as early as on or about April 21, 2010.

373.      BP further admitted that its "former vice president's [Rainey] knowledge and actions are attributable to BP.".

374.      In the wake of BP's guilty plea, Assistant Attorney General Lanny A. Breuer of

151

the Justice Department's Criminal Division was frank: "*The explosion of the rig was a disaster that resulted from BP's culture of privileging profit over prudence.*"  Breuer continued:

> As the oil spill continued, BP made a tragic situation worse:  it began misleading Congress and the American people about how much oil was pouring out of the Macondo well.  As BP now admits, in responding to Congress, the company lied and withheld documents, in order to make it seem as though less damage was being done to the environment than was actually occurring.  Acknowledging those lies, BP has agreed to plead guilty to felony obstruction of Congress.

U.   **BP Has Agreed to Pay $525 Million to Settle the SEC's Charges That the Company Misled Investors Regarding the Oil Spill Flow-Rate**

375.   On November 15, 2012, the SEC announced that BP agreed to pay a $525 million penalty – the third largest in SEC history – into a fair fund for the benefit of investors damaged by the Company's misrepresentations in connection with the oil spill flow rate following the *Deepwater Horizon* blowout.

376.   The SEC's Complaint alleged that BP made false or misleading statements in Forms 6-K filed with the SEC on April 29, April 30, and May 4, 2010, that the estimated flow rate was up to 5,000 barrels per day.  In addition, the SEC Complaint alleged that defendant Suttles (referred to as Executive B therein) made materially false and misleading statements between April 29 and May 22, 2010, on ABC's *Good Morning America*, NBC's *Today Show*, CBS's *The Early Show*, NPR's *Weekend Edition*, and at Unified Command press briefings reiterating BP's 5,000 barrels per day estimate.  According to the SEC Complaint, contrary to these representations, David Rainey (referred to as Executive A therein) and BP engineers and contractors prepared numerous analyses and estimates during this time period estimating the oil spill flow rate to be as high as 146,000 barrels per day, with many other estimates coming in well above the 5,000 barrel per day number reiterated publicly by Defendants.

377.   At the announcement of the settlement, SEC officials were unambiguously harsh

in their criticism of BP's conduct in misleading investors.  For instance:

> (a) Robert Khuzami, Director of the SEC's Division of Enforcement, said

in an SEC press release:

> The oil spill was catastrophic for the environment, but by hiding its severity BP also harmed another constituency – its own shareholders and the investing public who are entitled to transparency, accuracy, and completeness of company information, particularly in times of crisis.   Good corporate citizenship and responsible crisis management means that a company can't hide critical information simply because it fears the backlash.

> (b) Daniel M. Hawke, Director of the SEC's Philadelphia Regional Office

and Chief of the Enforcement Division's Market Abuse Unit, said in the same press release,

"Without accurate critical flow rate data known only to BP, the company denied its shareholders

and investors the opportunity to fairly assess BP's potential liabilities and true financial

condition."

> (c) At a news conference, Mr. Khuzami further reprimanded BP's

executives, the Defendants in the instant action, for standing behind an oil flow estimate of 5,000

barrels per day "despite an ever-growing body of evidence that this estimate was unreasonably

low," until "eventually, outside groups realized that the flow rate estimate was 10 times what BP

had fraudulently communicated to investors."  He summarized the SEC's case against BP:

> [T]he eyes of the world were on BP in the spring and summer of 2010.  The company had an opportunity to provide fulsome, accurate disclosure about the facts needed by the public to make informed investment decisions.  And, instead, BP chose to mislead the public.   That is not what we expect from public companies and their management.  In fact, it is exactly in times of crisis that the need for accurate information is most acute.

### V.  Defendants Were Motivated to Conceal the Amount of Oil Spewing Into the Gulf to Reduce Fines and Penalties by Billions of Dollars

378.  Defendants were motivated to lie about the amount of oil gushing into the Gulf

following the Macondo well explosion to reduce the amount of civil fines and penalties owed as a result of BP's gross negligence. Civil fines under the U.S. Clean Water Act are based on the number of barrels spilled. According to *The Wall Street Journal*, the final government estimate of the amount of oil spilled translates to $5.4 billion to $21 billion in fines, depending on whether investigators find that the Company was grossly negligent.

## IX.    CAUSATION/ECONOMIC LOSS FOR ENGLISH LAW CLAIMS

379.    Defendants' fraudulent inducement of Plaintiff's purchases of BP ordinary shares during the Relevant Period, through their false and misleading statements as alleged herein, caused Plaintiff to suffer economic losses. As set forth below, the price of BP ordinary shares purchased by or on behalf of Plaintiff significantly declined below their original purchase price(s) on the disclosure dates set forth below in ¶ 380, during which time Plaintiff held such shares. In addition, as a result of Defendants' ongoing and continuing misrepresentations up through May 22, 2010, Plaintiff continued to retain BP ordinary shares and suffered further losses, having been induced to do so by such ongoing and continuing misrepresentations.

380.    Immediately prior to the *Deepwater Horizon* disaster, BP's common shares traded at approximately 655.4 pence per share on the LSE. In connection with, and as a consequence of, the disclosures—which gradually revealed the relevant truth about BP's process safety operations and the severity and scope of the oil spill – the price of BP ordinary shares on the LSE declined.

381.    Due to Defendants' ongoing misrepresentations and omissions regarding the true state of BP's safety measures and operational protocol, including those called for by the Baker Panel and the progress made on its implementation of OMS, the truth regarding Defendants' failure to implement process safety controls was partially disclosed on April 20, 2010 and within

154

a week of the Deepwater Horizon explosion, BP's ordinary share price dropped more than 10%
in value and would continue to plummet during the weeks of additional corrective disclosures.

382.     On April 26, 2010, government officials announced that attempts to stop the spill
had failed and that oil was flowing into the Gulf of Mexico.  On this news the price of  BP's
ordinary shares fell from 639.7 pence per share on April 23, 2010, to close at 626.8 pence per
share on April 26, 2010, a decline of 12.9 pence per share; and BP's ADSs declined $1.97 per
ADS, from $59.88 per ADS on Friday, April 23, 2010 to close at $57.91 per ADS on Monday,
April 26, 2010.

383.     After the market closed on April 28, 2010, NOAA held a press conference during
which it increased its estimate of the amount of oil spewing into the Gulf of Mexico from 1,000
to 5,000 barrels per day – five-times greater than that previously estimated by BP.  On April 29,
2010, Homeland Security Secretary Janet Napolitano declared the spill a crisis of "national
significance."  This news caused the price of BP securities to fall again.  Specifically, BP
ordinary shares fell from 625.0 pence per share on April 28, 2010, to 584.2 pence per share on
April 29, 2010, a decline of 40.8 pence per share; and BP's ADSs fell from a closing price of
$57.34 per ADS on April 28, 2010 to close at $52.56 per ADS on April 29, 2010, a decline of
$4.78 per ADS or more than 8%.

384.     In the days and weeks that followed, additional news and information emerged on
a seemingly continuous basis further revealing BP's wanton disregard for conducting its
operations in a safe manner and the lack of any legitimate spill response plan by BP.  These
revelations caused BP's ordinary shares to plummet further.

385.     The Company's ordinary shares were not traded on May 3, 2010, due to a
holiday, but closed at 575.5 pence per share on April 30, 2010, and opened at 546 pence per

155

share on May 4, 2010, representing a decline of 5.1%; and BP's ADSs fell from $52.15 to $50.19, a decline of 3.8%.

386.   On May 3, 2010, BP claimed responsibility for the cleanup efforts related to the spill, Hayward stated: "This is not our accident, but it's our responsibility." On May 6, 2010, BP commenced its attempt to contain the spill with a large dome-like structure, to be placed over the Macondo well. On May 8, 2010, BP disclosed that the containment dome efforts had failed. At this time, tar had begun to wash up on the Alabama coast. On May 10, 2010, BP released a statement updating the public on the Gulf of Mexico oil spill response and revealed that oil spill costs to date had reached $350 million.

387.   BP's ordinary shares fell from 553.9 pence per share on Friday, May 7, 2010, to close at 549.2 pence per on Monday, May 10, 2010; and BP's ADSs fell from $49.06 per ADS on Friday, May 7, 2010 to close at $48.75 on Monday, May 10, 2010, a decline of $0.31 per ADS. This decline is directly related to the market absorbing information revealing risks concealed by Defendants throughout the Relevant Period, specifically that the Company conducted its operations in the Gulf without a legitimate spill response plan and that the Company's statements about reforming BP's safety profile were false.

388.   On May 12, 2010, *Bloomberg* published an article entitled "BP Tells Congress Gulf Well Failed Tests Before Blas." The article stated, in relevant part:

**Tests Before Blast." The article stated, in relevant part:**

A Gulf of Mexico oil well failed a pressure test hours before a drilling rig exploded last month, an executive for well owner BP Plc told the U.S. House Energy Committee that's investigating the incident.

Such pressure tests are aimed at ensuring the integrity of cement poured into the well to keep out natural gas, said Committee Chairman Henry Waxman, a California Democrat, citing a report to the panel from James Dupree, BP senior

156

vice president for the Gulf.   The tests before the April 20 blast showed "discrepancies" in pressure levels, Waxman said.

\*      \*      \*

*"BP, one of the largest oil companies, assured Congress and the public that it could operate safely in deep water and that a major oil spill was next to impossible," Waxman said. "We now know those assurances were wrong."*

\*      \*      \*

**'Serious Questions'**

"BP promised to make safety its number one priority," Stupak said.  "This hearing will raise serious questions about whether BP and its partners fulfilled this commitment.  The safety of its entire operations rested on the performance of a leaking and apparently defective blowout preventer."

389.    On May 12, 2010, BP's ordinary shares closed at 541.6 pence per share, down 3.9 pence per share from the previous day's closing price and 113.8 pence per share (-17.4%) from April 20, 2010; and BP's ADSs to closed at $48.50 per ADS, a decline of $0.24 per ADS from the previous day's closing price.

390.    On May 13, 2010, *The Wall Street Journal* published an article entitled "Red Flags Were Ignored Aboard Doomed Rig."  This article stated, in relevant part:

Managers at oil giant BP PLC decided to forge ahead in finishing work on the doomed *Deepwater Horizon* rig despite some tests suggesting that highly combustible gas had seeped into the well, according to testimony released by congressional investigators and documents seen by *The Wall Street Journal.*

391.    On May 13, 2010, as a result of these continuing revelations about BP's operations, BP's ADSs closed at $48.10 per ADS, $0.40 per share below the previous day's closing price.  This decline is directly related to the market learning of BP's process safety deficiencies.

392.    On May 14, 2010, *The Wall Street Journal* published an article entitled "BP Wasn't Prepared for Leak, CEO Says."  This article stated, in relevant part:

157

BP has been particularly vulnerable to criticism because among the large oil companies it is by far the biggest player in deepwater oil exploration. *Some in the industry have said a company with such a strong focus on deepwater drilling should have had much better contingency plans for dealing with an underwater oil leak at this depth.*

*Mr. Hayward, speaking to a small group of journalists Wednesday night in Houston, admitted the oil giant had not had the technology available to stop the leak. He also said in hindsight it was "probably true" that BP should have done more to prepare for such an emergency of this kind.*

"It's clear that we will find things we can do differently, capability that we could have available to deploy instantly, rather than be creating it as we go," he said. (emphasis added).

393.    On this news, BP's ordinary shares dropped 17.40 pence per share from the closing price on May 13, 2010, to close at 530.20 pence per share on May 14, 2010; and BP's ADSs dropped $1.23 per ADS from the previous day's closing price to close at $46.87 per share.

394.    On May 24, 2010, BP announced that the costs for addressing the Gulf oil spill had more than doubled, from $350 million to $760 million. Additionally, BP announced that it was recovering less oil than it expected. Finally, pressure on BP continued to grow because the U.S. government threatened to take over the oil spill response effort because of BP's lack of progress. On this news, BP's ordinary shares fell from 506.7 pence per share on Friday, May 21, 2010, to close at 493 pence per share on Monday, May, 24, 2010; and BP's ADSs fell from $43.86 per ADS on Friday, May 21, 2010 to close at $41.86 per ADS on Monday, May 24, 2010, a decline of $2.00 per ADS.

395.    On May 26, 2010, BP began its "top kill" efforts, the goal being to put heavy kill mud into the well so that it reduced the pressure in and then the flow from the well.

396.    On May 27, 2010, the Flow Rate Technical Group, a group comprised of engineers and scientists from various federal agencies and universities that was tasked with creating its own estimate of the oil spill rate from *Deepwater Horizon*, issued a public report

estimating the oil spill flow rate to be between 11,000 and 25,000 barrels per day. In response to this news, BP's ordinary shares fell in after-market trading from a closing price of 520.80 pence per share on May 27, 2010 to open at 517.00 pence per share on May 28, 2010, and continued to fall throughout the day on May 28, 2010, to close at 494.80 pence per share, for a total loss of 26 pence per share or 4.99%; and BP's ADSs fell $1.74 per ADS in after-hours trading, from a closing price of $45.38 on May 27, 2010, to open at $43.64 per ADS on May 28, 2010 and continued to fall throughout the day on May 28, 2010, closing at $42.95 per ADS, for a total loss of $2.43 per ADS or 5.35%.

397.    On May 29, 2010 (a Saturday), BP revealed that its "top kill" efforts had failed. The failure of the "top kill" indicated that BP would be unable to stop the oil spill and would have to rely on efforts to try to contain the spill while it completed the relief wells. The failed attempt to kill the well by using the "top kill" and "junk shot" efforts shocked investors. As noted by ABC News on Saturday, May 29, 2010: "We begin tonight with breaking news from the Gulf. After so much talk that Top Kill was the best bet to plug the oil spill in the Gulf, BP announced just a short time ago that the effort has failed. That live picture so many Americans have been keeping track of [i.e., the oil spewing from the Macondo well], us included, confirms that the oil is still gushing into the Gulf. This is another crushing blow when it comes on what is now day 40 of this crisis." Similarly, on that same day, the *Agence France Presse* reported, in part, that: "The announcement [that the top kill and junk short plans failed] is a stunning setback for efforts to halt what has become the worst oil spill in US history. . ." Moreover, *The Business Insider* made clear that the failure of the top kill would lead to BP's securities being "slaughtered in London trading on Monday."

398.    Also on May 29, 2010, *The New York Times* published an article entitled

"Documents Show Early Worries About Safety of Rig." This article stated, in relevant part:

> Internal documents from BP show that there were serious problems and safety concerns with the *Deepwater Horizon* rig far earlier than those the company described to Congress last week.

*     *     *

> The documents show that in March, after several weeks of problems on the rig, BP was struggling with a loss of "well control." And as far back as 11 months ago, it was concerned about the well casing and the blowout preventer.

399.    On May 30, 2010, Dudley conducted a series of interviews with U.S. media outlets in which he admitted that BP's original oil flow estimates – which he himself had personally reiterated just two weeks prior – were vastly understated. On these disclosures, BP's ordinary shares fell from 494.8 pence per share on Friday May 28, 2010, to close at 430.0 pence per share on Tuesday, June 1, 2010, a decline of over 60.0 pence per share or approximately 12%; and BP's ADSs fell from $42.95 per ADS on Friday, May 28, 2010, to close at $36.52 per ADS on Tuesday, June 1, 2010, a decline of $6.43 per ADS or approximately 15%. BP's ordinary shares suffered a similar decline.

400.    On June 1, 2010 (the first trading day since the failure of the "top kill" effort), United States Attorney General, Eric Holder, reported that the DOJ opened formal criminal and civil probes of BP. News of the Attorney General's action and BP's inability to cap the well with its "top kill" procedure sent its ADSs tumbling nearly 15%, to close on June 1, 2010 at $36.52 per ADS, on heavy trading volume.

401.    The Company's ordinary shares did not trade on May 31, 2010. BP's ordinary share price fell 64.8 pence from its closing price on May 28, 2010, to close at 430.00 pence per share on June 1, 2010, representing a total decline of more than 225 pence per share or 34% between April 20, 2010 and June 1, 2010; and BP's ADSs fell nearly 15%, to close on June 1,

160

2010 at $36.52 per ADS, on heavy trading volume. This decline is directly related to the market absorbing information revealing risks concealed by Defendants throughout the Relevant Period, specifically that the Company conducted its operations in the Gulf without a legitimate spill response plan and that the Company's statements about reforming BP's safety profile were false.

402.    Speaking to the *Financial Times* in Houston on June 2, 2010, Hayward admitted that it was "an entirely fair criticism" to blame BP for the disorganized and poor cleanup effort because "[w]hat is undoubtedly true is that we did not have the tools you would want in your tool-kit" to stop the leak from the Macondo well in the Gulf of Mexico in the aftermath of the explosion.

403.    On June 9, 2010, fears that the Company would suspend dividends caused a further decline in BP Securities. On this news, BP's ordinary shares fell from 408.9 pence per share on June 8, 2010, to close at 391.5 pence per share on June 9, 2010, a decline of 17.4 pence per share or almost 4%; and BP's ADSs fell from $34.68 per ADS on June 8, 2010, to close at $29.20 per ADS on June 9, 2010, a decline of $5.48 per ADS or almost 16%.

404.    Speculation regarding the possibility that BP would suspend dividend payments continued on June 9, 2010. An *Associated Press* article published on the afternoon of June 9, 2010, entitled "Dividend worries weigh on BP shares" explained, "[c]utting the dividend would have a big impact in Britain, as BP accounts for around 12-13 percent of payments from companies in the blue-chip FTSE 100 index . . . ."

405.    On June 14, 2010, BP's Board of Directors officially met to discuss suspending the Company's dividend payments in light of the Company's agreement to set up a $20 billion claim fund for damages caused by the *Deepwater Horizon* catastrophe. On that date, *The New York Times* reported, in part, as follows:

161

To make sure that all claims are paid, the Obama administration has stepped up the pressure on the company, demanding that it set aside money to pay for future liabilities before paying dividends to shareholders, which now amount to about $10.5 billion annually.  Senate Democrats are asking BP to set up a $20 billion cleanup fund.

BP, which has spent about $1.5 billion on the cleanup so far, has said it expects to be able to pay all spill costs from its regular operating funds.

But in response to the federal government's requests, BP's board met Monday to consider its options.  A spokesman said the company did not expect to announce decisions about its dividend until after its chairman and its chief executive spoke with Mr. Obama on Wednesday at a meeting the president had called.

A person with direct knowledge of the discussions said the board was considering three options: suspending payment of the dividend for two quarters, paying the dividend in bonus shares rather than cash, or placing an amount equal to the dividend payment in escrow while continuing to pay for the cleanup separately.

406.    According to another news source: "Shares in BP plunged again Monday [June 14, 2010] as the company's board discussed U.S. demands that it suspend dividend payments until it pays for the cleanup of the Gulf of Mexico oil spill."  On this news, BP's ordinary shares fell from 391.9 pence per share on Friday, June 11, 2010, to close at 355.5 pence per share on Monday, June 14, 2010, a decline of 36.4 pence per share or almost 9%; and BP's ADSs fell from $33.97 per ADS on Friday, June 11, 2010, to close at $30.67 per ADS on Monday, June 14, 2010, a decline of $3.30 per ADS or almost 10%.

407.    The next day, on June 15, 2010, the FRTG released its latest public report, revising its oil flow rate estimates upward again, to between 35,000 barrels per day and 60,000 barrels per day.  The FRTG maintained this estimate until August 2, 2010, when it issued its final report, estimating the oil flow rate at between 52,700 barrels per day and 62,200 barrels per day during the course of the leak, meaning a total of 4.9 million barrels of oil was spilled overall.  On this news, BP's ordinary shares fell from 355.45 pence per share on June 14, 2010, to close at

162

342.00 pence per share on June 15, 2010, a decline of 13.45 pence per share or almost 3.8%.

408.     On June 21, 2010, at 2 a.m. EST, BP issued a press release updating the spill response and estimated the cost of the response to date to be approximately $2 billion.  The $2 billion estimate is about $33 million per day, compared with an estimate on June 14 of $1.6 billion or about $30 million per day.  Also, on June 21, BBC interviewed a *Deepwater Horizon* worker, Tyrone Benton ("Benton"), who claimed to have spotted a leak in safety equipment weeks before the explosion.  Benton claimed the leak in the blowout preventer was not fixed at the time, but instead the faulty device was shut down and a second one used.  Benton said: "We saw a leak on the pod, so by seeing the leak we informed the company men. . . . They have a control room where they could turn off that pod and turn on the other one, so that they don't have to stop production."  He said to repair the control pod would have meant temporarily stopping drilling work on the rig at a time when it was costing BP $500,000 per day to operate the *Deepwater Horizon*.

409.     On this news, BP ordinary shares fell 7.95 pence or 2.2% on June 21, 2010 and BP's ADSs fell $1.43 or 4.5%.  On June 22, 2010, BP's ordinary shares fell 15.30 pence or 4% and BP's ADSs fell an additional 65 cents or 2%.

410.     On June 25, 2010, at 2 a.m. EST, BP issued a press release updating the spill response and estimated the cost of the response to date to be approximately $2.35 billion.  There was also concern that tropical storm Alex may disrupt the clean-up response.

411.     On this news, BP's ordinary shares fell 20.65 pence or 6% on June 25, 2010; and BP's ADS fell $1.72 or nearly 6%.

412.     Governmental investigations following the oil spill have primarily blamed BP for the initial explosion and the ensuing oil spill.  For example, the Interior Department Report

(dated September 14, 2011) states:

> The loss of life at the Macondo site on April 20, 2010, and the subsequent pollution of the Gulf of Mexico through the summer of 2010 were the result of *poor risk management*, last-minute changes to plans, failure to observe and respond to critical indicators, inadequate well control response, and insufficient emergency bridge response training by companies and individuals responsible for drilling at the Macondo well and for the operation of the *Deepwater Horizon*.
>
> BP, as the designated operator under BOEMRE regulations, *was ultimately responsible* for conducting operations at Macondo in a way that ensured the safety and protection of personnel, equipment, natural resources, and the environment.

413.    The cost of the spill has been highly material.  To date, BP has set aside $37.2 billion to pay spill-related expenses.

414.    These stock price declines and Plaintiff's resulting losses are a consequence of Defendants' inducement of Plaintiff's purchases of BP securities through the false and misleading statements alleged herein.  Accordingly, in remedy of Defendants' deceit and FSMA violations, Plaintiff is entitled to recover the difference between Plaintiff's purchase price(s) and the value of its BP securities at the point at which it ceased to be reasonable to retain them.

415.    Plaintiff is also entitled to recover lost profits on foregone opportunities flowing from Defendants' wrongful conduct as alleged herein, necessary to put Plaintiff as nearly as possible in the position Plaintiff would have been if Defendants' such wrongful conduct had not occurred.

## X.    RELIANCE

416.    Plaintiff and/or its investment managers or brokers acting on Plaintiff's behalf, actually, reasonably and/or justifiably relied upon some or all of Defendants' misleading statements and omissions in purchasing, selling and holding BP shares during the Relevant Period by, among other things: (i) reading BP's SEC filings, press releases, and other public

164

statements by BP executives, including materials published in print or transmitted only on BP's website; (ii) reading analyst reports regarding BP which were based, in part, on information provided by Defendants; (iii) reading newspaper accounts and hearing other media accounts regarding BP; and/or (iv) relying on the assumption that the price of BP shares reflected accurate and truthful information issued by or on behalf of the Company and had not been impacted by false or misleading information. Moreover, Plaintiffs and/or its investment managers did not, and in exercising reasonable diligence could not, have known of Defendants' false and misleading statements and omissions in Section VII, described above, when transacting in BP securities.

417.   ████████████████████████████████████████████
███████████████████████████████████████████████████████████

████████████████████████   As such, it was the regular practice of Plaintiff and/or its investment managers to read and rely upon publicly available information concerning potential investments, including annual reports, Forms 20-F and other SEC filings, conference calls with analyst and investors, industry conferences, press conferences, Congressional hearings, nationally broadcast television shows, press releases, and/or other company statements and public information when making investment decisions.

418.   ████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
█████████████████████████████████████

419.   Plaintiff and/or its investment managers read and reasonably and justifiably relied

upon some or all of the material misrepresentations and omissions of fact alleged herein and, on that basis, purchased BP ordinary shares during the Relevant Period.

420.    The materially false and misleading statements relied upon by Plaintiff and/or its investment managers, were made by Defendants both before and after the April 20, 2010 explosion aboard the *Deepwater Horizon*, which caused the deceit to continue to operate after the ensuing oil spill and induced Plaintiff and/or its investment advisers to continue to hold BP ordinary shares in reasonable reliance on such continued misrepresentations.

421.    Plaintiff and/or its investment managers also relied upon the market price for BP's ordinary shares in making investment decisions with respect to BP's ordinary shares during the Relevant Period, and the assumption that BP's stock price reflected truthful and accurate information disseminated by or on behalf of the Company that had not been impacted by false or misleading information.

422.    ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

423.    Plaintiff and/or its investment managers did not, and in the exercise of reasonable diligence could not, have known of Defendants' false and misleading statements and omissions set forth herein, when transacting in BP ordinary shares during the Relevant Period.

424.    Had Plaintiffs and/or its investment managers known the truth about BP's deficient drilling safety practices, failure to implement the Baker Report recommendations, inability to respond to the oil spill like the one caused by the *Deepwater Horizon* explosion, and the full magnitude of the spill, they would not have purchased BP ordinary shares during the

166

Relevant Period, at least not at the prices paid.  Based on this, Plaintiff was induced to purchase BP ordinary shares due to the false and misleading statements alleged herein.

425.   As a publicly-traded company Defendants knew, understood and had reason to expect that: (1) their misstatements would artificially inflate the price of BP securities; (2) investors would rely on the price of BP securities as reflecting accurate information known to the Company and its principals; and (3) their misstatements and omissions would induce Plaintiff and/or its agents to purchase BP ordinary shares, as well as to continue to hold such securities even after the April 20, 2010 *Deepwater Horizon* explosion.

## XI.   THE CLAIMS ARE TIMELY FILED

426.   These claims are filed within the applicable statute of limitations and/or are otherwise tolled as a result of the filing of the Class Action Complaint filed in Texas federal court.

## XII.   COUNTS

### COUNT I

### Common Law Deceit Against All Defendants

427.   Plaintiff repeats and realleges each of the allegations above as if fully set forth herein.

428.   This Count is asserted against all Defendants based on common law principles of deceit and conspiracy to commit deceit under English law.

429.   As alleged herein, each Defendant made material misrepresentations and omitted to disclose material facts about BP's implementation of the Baker Panel's safety recommendations, BP's capability to safely drill in the Gulf of Mexico, and its ability to adequately contain and respond to an oil spill if one occurred while drilling in the Gulf of

167

Mexico.

430.   Defendants also conspired with each other for the purpose of misleading Plaintiff and the investing public regarding BP's commitment to safety, its ability to contain and respond to an oil spill if one occurred while drilling in the Gulf of Mexico, and the scope of the oil spill after the *Deepwater Horizon* explosion and each committed overt acts, including the making of false and misleading statements, in furtherance of such conspiracy.

431.   The Defendants' misrepresentations and omissions were made intentionally, or at a minimum with severe recklessness, to induce reliance on those misrepresentations and omissions by Plaintiff and the investing public when making their investment decisions.

432.   Defendants' misrepresentations and omissions constitute deceit under English law.

433.   Because, among other reasons, BP is a public company which is required by law to make certain filings and statements regarding its operational and financial health for purposes of public transparency, Defendants knew, understood and had reason to expect that their statements would be distributed to or available to Plaintiff and the investing public, and that investors, such as Plaintiff and/or its investment managers, would rely and had a right to rely on such statements. Defendants were required to present BP's operations and oil spill response in a fair and accurate manner in, among other documents, filings with the U.S. and U.K, regulators, press releases, and other public statements. Moreover, because BP and BP exploration were involved in drilling for oil in the Gulf of Mexico, Defendants knew, understood and had reason to expect that statements regarding BP's operations and oil spill response would be available to Plaintiff and the investing public, and that investors, such as Plaintiff and/or its investment managers, would rely and had a right to rely on such statements. In addition, Defendants were

168

required to file Forms 20-F, Forms 6-K and other reports with the SEC pursuant to the Exchange Act, 15 U.S.C. § 78 *et seq.*, and to publish similar annual, semi-annual and interim reports under the United Kingdom Listing Authority's Disclosure and Transparency Rules ("DTR"), which were enacted to protect investors such as Plaintiff from misrepresentations by public companies. Thus, Defendants had reason to expect that Plaintiff and other members of the investing public would be influenced by and rely upon the statements in Bp's public reports, as the class of persons intended by Congress to be protected by the Exchange Act, and the class of persons intended to be protected under the DTR and other European Directives, including the Transparency Obligations Directive.

434.   Defendants made (as attributed to them above), on behalf of BP or BP Exploration, or caused BP to make, false and misleading misrepresentations alleged herein with the intent that they be acted upon by others, including investors and prospective investors in BP securities, such as Plaintiff and/or its investment managers.  At the time Defendants made the foregoing materially false and misleading statements and omissions, each of the Defendants intended to induce investors like Plaintiff and/or its investment managers to rely on such statements because Defendants anticipated that their statements would reach investors such as Plaintiff and/or its investment managers and that these investors' investment decisions, including the decision to purchase, sell or hold BP ordinary shares, could be shaped by the statements of Defendants.

435.   Plaintiff and/or its investment managers reasonably relied on Defendants' misrepresentations when deciding to purchase BP ordinary shares and when otherwise making investment decisions with respect to those securities during the Relevant Period, and did not know of the falsity of any of the misrepresentations and omissions at the time the investment

decisions were made.  Plaintiff's reliance was justified since it was unaware of the true facts. Had Plaintiff known of the true facts, it would not have acted as it did in holding and purchasing BP ordinary shares.  Defendants false and misleading statements and omissions induced Plaintiff and/or its investment managers to purchase BP ordinary shares during the Relevant period and were a substantial factor in causing Plaintiff and/or its investment managers to retain BP ordinary shares after the April 20, 2010 *Deepwater Horizon* explosion and ensuing oil spill.  Had Plaintiff and/or its investment managers known the true state of BP's affairs, as misrepresented or omitted by Defendants' false and misleading statements and omissions, they would not have purchased and retained such securities during the Relevant Period.

436.    As a direct and proximate cause of the fraud and deceit by Defendants, Plaintiff suffered damages in connection with its investments in BP securities during the Relevant Period. The Defendants' deceit was committed intentionally and/or involved conscious acts that willfully and wantonly disregarded the rights of others, including Plaintiff.  As a result, BP is liable to Plaintiff for putative damages.

## COUNT II

### Against BP for Violation of the Financial Services and Markets Act of 2000

437.    Plaintiff repeats and realleges each of the allegations above as if fully set forth herein.

438.    This Count is brought pursuant to Section 90A of the Financial Services and Markets Act of 2000 ("FSMA"), as amended by the Companies Act of 2006, against BP, seeking damages in relation to Plaintiff's purchases of BP ordinary shares during the Relevant Period.

439.    Defendants made misrepresentations in reports and statements published in response to provisions implementing Articles 4, 5 and 6 of Directive 2004/109/EC of the

170

Transparency Obligations Directive of December 31, 2004 and in its preliminary statements pertaining thereto.

440.    These reports and statements were created by Defendants in discharging managerial responsibilities on behalf of the Company.

441.    The misrepresentations and omissions by Defendants were made intentionally, or at a minimum with severe recklessness, to induce reliance thereon by Plaintiff and the investing public when making their investment decisions.

442.    Plaintiff reasonably relied on Defendants' misrepresentations when deciding to purchase BP ordinary shares and when otherwise making investment decisions with respect to those shares, and did not know of the falsity of any of the misrepresentations or omissions at the time the investment decisions were made.  Plaintiff's reliance was justified because it was unaware of the true facts.  If Plaintiff had known of the true facts, it would not have acted as it did in holding and purchasing BP ordinary shares.

443.    Accordingly, BP is liable to Plaintiff for compensation as provided by Section 90A of the FSMA, as amended.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a) Awarding compensatory damages and equitable relief in favor of Plaintiff against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(b) Awarding consequential damages flowing from Defendants' wrongful conduct as alleged herein, including but not limited to lost profits on foregone opportunities and expenses forseeably incurred in remedying the wrongful conduct;

(c) Awarding exemplary damages in favor of Plaintiff against all Defendants;

(d) Awarding Plaintiff pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs; and

(e) Awarding such other relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: August 31, 2015

**KENDALL LAW GROUP LLP**

By: /s/ *Joe Kendall*
Joe Kendall
Texas Bar No. 11260700
Jamie McKey
Texas Bar No. 24045262
3232 McKinney Avenue
Suite 700
Dallas, TX 75204
Tel.: 214.744.3000
Fax: 214.744.3015
jkendall@kendalllawgroup.com
jmckey@kendalllawgroup.com

*Local Counsel*

**SPECTOR ROSEMAN KODROFF & WILLIS, P.C.**
Mark S. Willis
1101 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C. 20004
Tel.: 202.756.3601
Fax: 202.756.3602
mwillis@srkw-law.com

Robert M. Roseman
Andrew D. Abramowitz
Daniel J. Mirarchi
Joshua B. Kaplan
1818 Market Street
Suite 2500

172

Philadelphia, PA 19103
Tel.: 215.496.0300
Fax: 215.496.6611
rroseman@srkw-law.com
aabramowitz@srkw-law.com
dmirarchi@srkw-law.com
jkaplan@srkw-law.com

*Counsel for Plaintiff*

173