United States District Court
Southern District of Texas
**ENTERED**
January 04, 2016
David J. Bradley, Clerk

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| *In re: BP p.l.c. Securities Litigation* | **MDL No. 4:10-md-2185** |
| **This document relates to:** | |
| *PEAK 6 Capital Management LLC v. BP p.l.c.* | No. 4:15-cv-0865 |
| *BPLR, LLC v. BP p.l.c.* | No. 4:15-cv-1059 |
| *BP Litigation Recovery I, LLC v. BP p.l.c.* | No. 4:15-cv-1061 |
| | **Honorable Keith P. Ellison**<br>**JURY TRIAL DEMANDED** |

## MEMORANDUM AND ORDER

Before the Court is Defendants' Motion to Dismiss Plaintiffs' Complaints (the "Motion").

## I. BACKGROUND

Five years after the Deepwater Horizon oil spill, Plaintiffs Peak6 Capital Management LLC et al., BP Litigation Recovery I, L.L.C., and BPLR, L.L.C. (together, the "Plaintiffs") each filed a complaint (the "Complaints").[1] They comprise the fourth "tranche" of individual actions in MDL No. 2185. The Complaints allege that Defendants BP plc, BP America, BP Exploration & Production Inc., Douglas Suttles, and Anthony Hayward (the "Defendants") violated Sections 10(b) and 20(a) of the Securities Exchange Act.[2]

The factual background of the spill warrants minimal attention here—it bears little relevance to Defendants' defenses and has already been recounted by this Court on multiple

---

[1] The only material difference between the complaints appears to be the time period at issue: PEAK6 purchased shares between April 26, 2010 and May 29, 2010, while the other two plaintiffs purchased them between April 29 and May 28 of that year.

[2] Plaintiffs also allege that several other BP representatives made misrepresentations during the relevant period, but have not included them as defendants.

1

occasions.  The most noteworthy factual wrinkle pertains to the identity of the Plaintiffs: BP Litigation Recovery and BPLR (the "Assignee Plaintiffs") are not actual purchasers of BP securities.  Instead, they are limited liability companies into which eight purchasers (the "Purchasers") of BP American Depositary Shares ("BP ADS") expressly contributed "all of their respective rights . . . in all claims and causes of action related to [their BP ADS shares]."[3]  In other words, the Assignee Plaintiffs are special purpose entities created by actual purchasers of BP ADS to serve as litigation vehicles for their Exchange Act claims in this action.  There is no suggestion that the Assignee Plaintiffs have, or ever will have, any function in any other litigation or non-litigation context.  Nor is there any suggestion that the Purchasers would be in any degree disadvantaged if they were to litigate their claims without the Assignee Plaintiffs.

Each Assignee Plaintiff is manager-managed and owned by two classes of members.  The manager of each company holds a Class A membership interest and is "empowered to retain counsel and take the actions necessary and appropriate to prosecute the claims, including coordinating discovery requested from the Class B Members [*i.e.*, the Purchasers] in connection with the prosecution of the Claims.'"[4]  The Purchasers each hold Class B membership interests and are entitled to all "Net Profits" distributed by the companies.  Profits, to the extent that any arise from this litigation, will be allocated "pro rata based on the relative purchases of each Class B Member in the American Depository [sic] Shares of BP plc."[5]  The manager, as a Class A member, does not hold an equity stake in the companies and is not entitled to any distributions.[6]

---

[3] (*See* Pls. Exhibits A and B ("Op. Agmt") § 3.04.)  BPLR has six Class B members, and BP Litigation Recovery I has two Class B members.

[4] (Opp'n at 8 (quoting Op. Agmt. § 3.04)).

[5] (Op. Agmt. § 3.03; *see also* Op. Agmt., Schedule A.)

[6] (*See* Op. Agmt., Schedule A.)

## II. <u>LEGAL STANDARD</u>

Defendants have moved to dismiss the Complaints under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  Rule 12(b)(1) governs challenges to a court's subject matter jurisdiction. "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case."[7]  In ruling on a Rule 12(b)(1) motion, "the court is permitted to look at evidence in the record beyond simply those facts alleged in the complaint and its proper attachments."[8]  "The plaintiff bears the burden of demonstrating that subject matter jurisdiction exists."[9]

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), the complaint must contain sufficient factual allegations to state a claim to relief that is plausible on its face.[10]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[11]  In considering a Rule 12(b)(6) motion to dismiss, the Court accepts all well-pleaded factual allegations as true and draws all reasonable inferences in favor of plaintiffs.[12]

---

[7] *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir.1998).

[8] *Ambraco, Inc. v. Bossclip B.V.*, 570 F.3d 233, 238 (5th Cir. 2009); *see also Clark v. Tarrant County*, 798 F.2d 736, 741 (5th Cir.1986) ("Courts may dismiss for lack of subject matter jurisdiction on any one of three bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.")

[9] *Walsh v. Aries Freight Sys.*, L.P., 2007 WL 3001650, at *1 (S.D. Tex. Oct. 12, 2007) (citing *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir.1981)).

[10] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[11] *Id.*

[12] *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 406 (5th Cir. 2001).

## III. <u>STANDING OF ASSIGNEE PLAINTIFFS</u>

Defendants aver that the Purchasers' assignments to the Assignee Plaintiffs (the "Assignments") are inherently problematic.  As a result, say Defendants, the Assignments should be rendered inoperable as a matter of law under *Smith v. Ayers*.  While the Court agrees with Defendants' conclusion—the Assignments are indeed problematic and cannot stand—Defendants' reliance on *Blue Chip* and *Smith* is misplaced.  Those cases turned on evidentiary concerns that differ in kind from the issues implicated by the Purchasers' assignments to the Assignee Plaintiffs.

The problem here is not one of evidentiary adequacy, but of procedural inequity.  As Defendants correctly argue, the Purchasers have gained several procedural advantages as a result of the Assignments.  Of still greater concern is the prospect that the Assignments were made for the purpose of manufacturing these procedural advantages—the Purchasers struggle to articulate any "ordinary business purposes" that can otherwise justify the assignment—and that future claimants could follow this template.[13]   The Court therefore holds that the Assignments must be disregarded for all purposes relevant to this litigation, and dismisses the Assignee Plaintiffs' Complaints for lack of standing.

### A. Evidentiary Concerns under *Blue Chip Stamps* and *Smith*

"Assignees of a claim, including assignees for collection, have long been permitted to bring suit."[14]  But this general rule of assignability is not without exception.  Some assignments have given rise to policy concerns that have led courts to invalidate the assignments and deny standing to the assignee.  For example, it was on these grounds that the Fifth Circuit invalidated

---

[13] *Cf. Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 292 (2008) (upholding an assignment that was made for "ordinary business purposes" despite the fact that the assignment produced certain procedural challenges for the Court and the defendants).

[14] *Id.* at 275.

an assignment of Exchange Act claims in *Smith v. Ayers*,[15] and Defendants urge this Court to do the same.

*Smith* instructs that *Blue Chip Stamps v. Manor Drug Stores*[16] is the "guidepost case determining standing rules for 10b–5 actions."[17]   In *Blue Chip*, the Supreme Court narrowed Rule 10b-5 standing based principally on two policy considerations: (1) the danger that an expansion of the potential class of plaintiffs would result in "vexatious" litigation or "strike suits"; and (2) "the evidentiary problems inherent in allowing non-purchasers/sellers to bring a Rule 10b–5 action."[18]   The Fifth Circuit keyed its analysis of the *Smith* assignments on these two policy considerations, dismissing the assignee-plaintiff's claims because the "action [bore] all the hallmarks of a strike or nuisance suit, the very actions which *Blue Chip Stamps* seeks to reduce," and because the plaintiff would have to "necessarily rely heavily on his own 'self-serving testimony'" to prosecute the claim.[19]

Defendants' motion to dismiss focuses on the latter of the *Blue Chip* policy considerations, arguing that the Assignee Plaintiffs' suit "would raise the exact evidentiary concerns set forth in *Blue Chip Stamps*."[20]   In 10b-5 claims, the purchaser's reliance on a misrepresentation is a key element.   Yet here, argue Defendants, the Assignee Plaintiffs did not purchase BP ADS, and the actual purchasers—whose reliance ultimately must be proven—are

---

[15] *Smith v. Ayers*, 977 F.2d 946, 949-51 (5th Cir. 1992).

[16] 421 U.S. 723 (1975).

[17] *Smith*, 977 F.2d  at 949.  *Smith* is the only circuit court case that directly addresses the standing of an assignee in the context of 10b-5.  (Although the Third Circuit addressed this issue, it did so in *dicta*.  *See Lowry v. Baltimore & Ohio R.R. Co.*, 707 F.2d 721 (3d Cir. 1983) (*en banc*).)

[18] *Smith*, 977 F.2d at 950 (citing *Blue Chip Stamps*, 421 U.S. at 740-43).

[19] *Id.* (quoting *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1105 (1991)).

[20] (Defs.' Br. at 11.)

not parties to this lawsuit.  Thus, the plaintiffs' claims turn on the involvement of a non-party.  According to Defendants, this makes the Assignee Plaintiffs "'the type of remote purchasers whose 10b-5 actions are discouraged by *Blue Chip Stamps*,'"[21] and their complaints should be dismissed accordingly.

The Assignee Plaintiffs respond that Defendants' comparisons to the evidentiary concerns in *Blue Chip* (and, by extension, *Smith*) are inapposite.  The evidentiary problem that concerned the Court in *Blue Chip* was that a non-purchaser/seller who alleges securities fraud— for example, a plaintiff who alleges that he would have bought 1,000 shares of stock but for the company's misrepresentation—can offer nothing in support of that claim other than his own self-serving testimony as to what he would have done had he known the truth.  This is a far cry from Defendants' argument, say the Assignee Plaintiffs, which is merely that the case will require the involvement of non-parties.

Plaintiffs are correct.  The concerns raised by Defendants are qualitatively different from the evidentiary concerns articulated in *Blue Chip* and *Smith*.  At issue in *Blue Chip* was whether "would-be investors" (*i.e.*, plaintiffs who claim that a misrepresentation caused them to refrain from purchasing the company's stock) have standing to assert a 10b-5 claim.[22]  Based in large part on specified evidentiary concerns, the Supreme Court denied standing to this class of potential plaintiffs, and limited 10b-5 standing to actual sellers and buyers of securities.  The Court succinctly summarized its *Blue Chip* rationale in a subsequent decision:

> [A]ctual sellers and buyers who sue for compensation must identify a specific number of shares bought or sold in order to calculate and limit any ensuing recovery.  Recognizing liability to merely would-be investors, however, would [expose] the courts to litigation unconstrained by any such anchor in

---

[21] (Defs.' Br. at 3 (quoting *Smith*, 977 F.2d at 950).)

[22] *Blue Chip Stamps*, 421 U.S. at 734-35; *see also Virginia Bankshares*, 501 U.S. at 1092.

demonstrable fact, resting instead on a plaintiff's "subjective hypothesis" about the number of shares he would have sold or purchased."[23]

In other words, the Court was reluctant to allow claims that would turn almost entirely on a plaintiff's account of his own subjective decision-making process. Such claims would raise substantial evidentiary concerns, turning "on hazy issues inviting self-serving testimony," and leaving the litigation "with little chance of reasonable resolution by pre-trial process."[24]

The courts in *Smith* and *Dobyns v. Trauter*,[25] using *Blue Chip* as a "guidepost,"[26] expressed similar evidentiary concerns. In *Smith*, for example, the court noted that the assignee-

---

[23] *Virginia Bankshares*, 501 U.S. at 1092.

[24] *Id.* at 1105.

[25] 552 F. Supp. 2d 1150, 1156 (W.D. Wash. 2008). Defendants cited heavily to this case in their briefing.

[26] Both *Smith* and *Dobyns* indicate that the assignments at issue raised the same types of evidentiary concerns that troubled the Supreme Court in *Blue Chip Stamps*, but this Court must admit to some difficulty in understanding those similarities and applying them here. *See Dobyns*, 552 F. Supp. 2d at 1156 ("The court finds that the evidentiary problems associated with this case are of the type that the Supreme Court sought to avoid in Blue Chip."); *Smith*, 977 F.2d at 950 (noting *Blue Chip's* concerns regarding "self-serving testimony," and citing the same evidentiary concerns with respect to the assignments at issue). In *Smith*, the assignee-plaintiff was a former officer of the company with first-hand knowledge of the alleged misrepresentations. *See Smith v. Ayres*, 845 F.2d 1360, 1362 (5th Cir. 1988). The Fifth Circuit was concerned that, because the assignee-plaintiff's factual account was "unequivocally denied" by the company's two majority shareholders, his claims faced "potentially insuperable evidentiary obstacles." *Smith*, 977 F.2d at 950. In other words, the court's "evidentiary concern" was the reliability of the assignee-plaintiff's first-hand account of actual events. *See also Dobyns*, 552 F. Supp. 2d at 1156 (expressing similar evidentiary reservations).

In *Blue Chip*, however, the Court's concern turned not on the reliability of the assignee's account of what *actually happened*, but rather on a non-purchaser's account of what he *hypothetically would have done*. This seems like a material distinction, but neither *Smith* nor its progeny address it. *See, e.g.*, *Dobyns v. Trauter*, 552 F. Supp. 2d at 1156 (indicating that the assignments at issue in *Dobyns* implicate the same "type [of evidentiary concerns] that the Supreme Court sought to avoid in *Blue Chip*"). As a result, this Court has struggled to understand whether *Smith* based its standing limitation only on the evidentiary concerns described in *Blue Chip*, or whether it intended to expand standing limitations beyond those outlined by the Supreme Court.

plaintiff, a former officer of the company, would face "potentially insuperable evidentiary obstacles in proving the merits of his case."[27]   The two majority shareholders of the company "unequivocally denied [the assignee-plaintiff's] allegations," meaning that the assignee-plaintiff would have had to "rely heavily on his own 'self-serving testimony'" and "the action [would] bear[] 'little chance of reasonable resolution by pre-trial process.'"[28]   Similarly, in *Dobyns*, the court held that the assignee-plaintiff was likely to offer "self-serving testimony" regarding "the general operation of the corporation and shareholder communication."[29]

But the assignments at issue here do not implicate the type of evidentiary concerns raised in *Blue Chip*, *Smith*, or *Dobyns*.   To the contrary, the Assignments are far more similar to those in *Farey-Jones v. Buckingham*, a case in which the assignee-plaintiff was allowed to bring a 10b-5 claim.[30]   Unlike in *Smith* and *Dobyns*, the assignment in *Farey-Jones* involved "a strong connection" between the assignor and assignee; the assignor was a limited partnership that expressly assigned its 10b-5 claim to the partnership's only remaining partner.[31]   The court noted that, even if the limited partnership (the assignor) had brought the securities claim, the lone partner (the assignee) would have been the person to testify on the partnership's behalf.[32]   In

---

The Court can ultimately take comfort here, however, because the case at bar is factually distinguishable from *Smith* and *Dobyns* as well as *Blue Chip Stamps*, meaning that any precedential ambiguity is moot.

[27] *Smith*, 977 F.2d at 950.

[28] *Id.*

[29] *Dobyns*, 552 F. Supp. 2d at 1156.

[30] 132 F. Supp. 2d 92 (E.D.N.Y. 2001)

[31] *See Farey-Jones*, 132 F. Supp. 2d at 101-02; *Dobyns*, 552 F. Supp. 2d at 1156 (noting the "strong connection" present in *Farey-Jones*).

[32] *Farey-Jones*, 132 F. Supp. 2d at 101-02.

other words, the same person would have testified regardless of whether the assignor or assignee brought the claim.[33]

Here, a similarly "strong connection" exists between the purchasers and Assignee Plaintiffs—one that obviates the risk of self-serving testimony that concerned the *Blue Chip* and *Smith* courts. Each of the Assignee Plaintiffs is a limited liability company that was formed in April of 2015, roughly *five years* after the conduct at issue. As a result, it is unclear how the Assignee Plaintiffs could offer any self-serving testimony relevant to the alleged misrepresentations or the Purchasers' reliance thereon. Indeed, given their lack of proximity to the alleged conduct, unlike in *Smith* and *Dobyns*,[34] it seems unlikely that the Assignee Plaintiffs could offer any relevant testimony at all. And even if one of the Assignee Plaintiffs was deposed through Rule 30(b)(6), the company's Class B Members—each of whom is a purchaser of the BP ADS at issue here—would presumably be the individuals designated to testify on behalf of the companies. Thus, as in *Farey-Jones*, the assignor-Purchasers would testify regardless of who brought this lawsuit. The Court therefore holds that the prohibitive evidentiary concerns expressed in *Blue Chip* and *Smith* are not present here,[35] and those cases do not provide this Court with a basis for dismissing the Assignee Plaintiffs' claims.

---

[33] *Farey-Jones*, 132 F. Supp. 2d at 101-02 ("Finally, the evidentiary problems described in *Blue Chip* will not occur in the instant case, because Jones was the person who spoke to Buckingham; the misrepresentations that Buckingham allegedly made were made to Jones; and Jones allegedly relied upon those misrepresentations when he agreed to sell Acorn's stock in SCAI. Indeed, had Acorn brought this action, Jones would have been the person testifying on behalf of the limited partnership.")

[34] *Smith v. Ayres*, 845 F.2d 1360, 1362 (5th Cir. 1988) (assignee-plaintiff was a corporate officer with relevant knowledge of the alleged misrepresentation); *Dobyns* 552 F. Supp. 2d at 1156 (same).

[35] As an additional point of distinction, the Court also notes that, unlike in *Smith* and *Dobyns*, there is no indication that the Assignee Plaintiffs have filed a "strike suit" or "nuisance suit."

**B. Procedural Problems Arising from the Assignments**

Although the Assignments do not give rise to the type of prohibitive evidentiary concerns raised in *Blue Chip* and *Smith*, the Assignments nevertheless raise several problematic procedural issues.  Defendants argue that the Purchasers' non-party status—which the Purchasers manufactured by assigning their claims to newly-formed shell companies—will have a prejudicial effect both on Defendants' ability to litigate the case and the Court's ability to adjudicate it.[36]  For example:

- Discovery will be more cumbersome.  Because the Purchasers are not parties to this action, Defendants' rights to seek discovery from the Purchasers may be limited to the discovery rights available against non-parties.

- If the need arises, sanctioning the Assignee Plaintiffs would be difficult as they might simply dissolve.

- The Assignee Plaintiffs' operating agreement provides that the manager "may at any time admit one or more new Members who have Claims."[37]  It is unclear how such new members should be treated under the Federal Rules of Civil Procedure.

The Assignee Plaintiffs respond by citing the Supreme Court's decision in *Sprint Communications v. APCC Services*.  In *Sprint*, payphone operators assigned approximately 1,400 "dial-around" claims to billing and collection companies called "aggregators," and the aggregators then brought suit on the payphone operators' behalves.[38]  The defendants moved to dismiss under 12(b)(1) based in part on the "various practical problems that could arise because the aggregators, rather than the payphone operators, [were] suing."[39]  The Supreme Court

---

[36] (Reply at 4-5; Mot. Hr'g at 17:21-18-5.)

[37] (Op. Agmt. 5.01.)

[38] *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 271-72 (2008).

[39] *Id.* at 291 ("[T]he payphone operators may not comply with discovery requests served on them, that the payphone operators may not honor judgments reached in this case, and that

rejected the defendants' argument, reasoning that Courts have "long permitted assignee lawsuits notwithstanding [these problems]," and district courts have certain tools at their disposal to address such problems as they arise.[40]

The Assignee Plaintiffs' point is well taken; clearly, despite the practical inconveniences that result, there is a long-standing rule allowing the assignment of legal claims. But it is equally clear that this general rule is not without exception.[41] Even *Sprint* acknowledges as much, noting that "additional prudential questions might perhaps arise" if an assignment was "made in bad faith" or made for purposes other than "ordinary business purposes."[42] In other words, sham assignments raise a host of potentially problematic issues and are not necessarily protected by the general rule of assignability.

*Sprint's* caveat is well-founded. With unfettered discretion to assign their claims, claimants could easily use assignments as a tool to manufacture the types of tactical advantages that Defendants attribute to the Assignee Plaintiffs here. A number of the burdens imposed by the Federal Rules of Evidence and Civil Procedure apply only to parties to litigation. A wily claimant, however, could skirt these obligations by assigning his claim to a litigation vehicle. With the litigation vehicle serving as the nominal plaintiff, the real claimant would potentially be beyond the reach of court sanctions,[43] conventional discovery protocols,[44] certain evidentiary

---

petitioners may not be able to bring, in this litigation, counterclaims against the payphone operators.").

[40] *Id.* at 291-92.

[41] *See, e.g.*, *Smith*, 977 F.2d 946 (invalidating an assignment of Exchange Act claims based on policy considerations); 13F Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc. Juris.* § 3639 (3d ed.) (noting that courts have ignored sham assignments for purposes of determining diversity jurisdiction).

[42] *See Sprint v. APCC Serv.*, 554 U.S. 269, 292 (2008).

[43] As Defendants argue here, the Assignee Plaintiffs are litigation vehicles rather than going concerns, meaning that they have neither business to protect nor assets on which a sanction could

rules,[45] and other obligations that are incumbent upon parties to litigation.[46]   This type of chicanery would be detrimental to the legal process, and the Court sees no reason to permit the type of assignments that could facilitate it.[47]

  While this proposition is relatively straightforward—allowing claimants to skirt important rules of evidence and procedure is, of course, less than ideal—determining whether an assignment was made for ordinary business purposes is more complicated.   Indeed, not all assignments made in anticipation of litigation are improper.   The payphone operators in *Sprint* assigned their claims to the aggregators under those circumstances, yet the Court took no issue with the payphone operators' assignments.   To the contrary, it concluded that the assignments

---

be levied.  If sanctioned, they could simply dissolve out of existence.  Perhaps courts could use veil piercing theories to enforce sanctions against the assignor, but at the very least, the assignors would have succeeded in substantially increasing the difficulty of the process.

 [44] As Defendants note here, they would likely need to serve subpoenas to request discovery from the Purchasers, which is a far more burdensome process than serving discovery requests on a party.  Additionally, Defendants would be unable to serve requests for admission or interrogatories on the Purchasers.  *University of Tex. v. Vratil*, 96 F.3d 1337, 1340 (10th Cir. 1996) ("Under [FRCP] 33(a), interrogatories may only be directed to a party to an action."). Finally, the Purchasers might not be obligated to make initial disclosures under Rule 26(a), as that rule applies only to actual parties.  *See* Fed. R. Civ. Pro. 26(a)(1)(A) ("a *party* must . . . provide to other parties . . .") (emphasis added).

 [45] *See* Fed. R. Ev. 801(d)(2) (outlining scenario's in which an opposing *party's* statement is not considered hearsay).

 [46] As Defendants argued at the hearing, the most vexing issues created by the Assignments may be those that are not yet apparent.

 [47] At the hearing, the Assignee Plaintiffs attempted to describe work-arounds to some of the procedural problems that Defendants have raised.  For example, the Court asked the Assignee Plaintiffs if the Defendants would need to resort to third-party subpoenas to obtain discovery from the non-party Purchasers.  The Assignee Plaintiffs responded, "I would say not, Your Honor, because under Rule 26 the [Assignee Plaintiffs] would have an obligation to produce any materials that are in their possession, custody or control. [The Purchasers' contractual agreement with the Assignee Plaintiffs] to cooperate makes those documents in the control of the LLC plaintiffs." (Mot. Hr'g at 25:7-11.)  But this arrangement likely creates more questions than it answers (*e.g.*, the third-party enforceability of the contractual arrangement; the possibility of an amendment of the contract).  And regardless of whether these procedural Band-Aids are effective, they represent an additional layer of unnecessary complications for the litigation.

12

were not made in bad faith, but rather for "ordinary business purposes."[48]   Several of the circumstances driving the assignment in *Sprint*, however, stand in stark contrast to those at issue here.

First, the payphone operators in *Sprint* had a strong business case for assigning their claims to the aggregators: "because litigation is expensive, because the evidentiary demands of a single suit are often great, and because the resulting monetary recovery is often small," the payphone operators needed to assign their claims to aggregators who could then leverage economies of scale.[49]   There is even some suggestion in *Sprint* that pursuing dial-around claims was otherwise cost prohibitive for many payphone operators.[50]   The existence of this strong business-related justification for the assignments suggests that they were made for "ordinary business purposes," not as a sham.[51]

---

[48] *Sprint*, 554 U.S. at 292.

[49] *Id.* at 272-73.

[50] *See id.* at 271-72; *see also* Brief for Respondents at 2-5, *Sprint Communications Company L.P. v. APCC Services, Inc.* 554 U.S. 269 (2008) (No. 07-552), 2008 WL 685065 (asserting that "aggregators are also necessary in practice because PSPs are typically small businesses lacking the technical ability or financial resources to pursue claims independently").   Indeed, the practice of assigning claims to aggregators seems to have been widespread throughout the industry.   *See Sprint*, 554 U.S. at 271-72 (describing the general practice of payphone operators assigning claims to aggregators).   The expediency of the practice was even recognized in regulations promulgated by the Federal Communications Commission.   7 F.C.C.R. 3251, 3259 (¶ 49) ("PPOs and/or OSPs are also free to retain the services of one or more clearinghouses to assist them with billing and collection and/or payment.")

[51] *See, e.g.*, *Farey-Jones*, 132 F. Supp. 2d at 102 (leaving open the possibility that the assignment could be invalidated under 28 U.S.C. 1359 because it was not in furtherance of a "valid business purpose."); *Southgate Master Fund, L.L.C. ex rel. Montgomery Capital Advisors, LLC v. United States*, 659 F.3d 466, 489 (5th Cir. 2011) (to establish that a partnership was not formed as a sham for the purpose of tax avoidance, the formation must "exhibit objective economic reality, a subjectively genuine business purpose, and some motivation other than tax avoidance."); *Mother Bertha Music, Inc. v. Trio Music Co., Inc.*, 717 F. Supp. 157 (S.D.N.Y. 1989) (an assignment from a Californian to a newly-formed California corporation of a claim

Here, as Defendants correctly argue,[52] the claimants have struggled to articulate a business-related justification for assigning their claims to newly-formed shell companies. As an initial matter, unlike in *Sprint*, the Purchasers admit that they made the Assignments for the sake of expediency, not out of necessity. And the expediencies proffered here seem marginal, at best. BPLR explains that the Purchasers, each of whom is a Huff entity or an individual that invested in a Huff entity, "wanted to put all of their claims together with a single manager, which is itself a Huff entity, . . . so that they are spared [from] having to deal with the day-to-day problems [of litigation]."[53] For example, the managers of the Assignee Plaintiffs are "charged with interacting with [counsel], facilitating discovery, et cetera, et cetera."[54]

This business case is unpersuasive. The day-to-day burden of litigation is relatively minimal for plaintiffs, particularly in the context of securities litigation. More importantly, the Court struggles to understand how the Assignments alleviate the purported burden. For example, while "facilitating discovery" is certainly a legitimate goal, interjecting a middleman (the Assignee Plaintiffs) into the discovery process would do little to effect it. The burden of locating relevant documents will still fall on the Purchasers, as the relevant documents are in their possession.[55]

---

that previously belonged to a defunct New York corporation was not collusive because there were valid reasons for the assignment (a general reorganization of the company's business affairs)).

[52] (Reply at 3-4.)

[53] (Mot. Hr'g at 26:1-6)

[54] (*See* Mot. Hr'g at 27:2-9; *see also* Opp'n at 8 (quoting Op. Agr. § 3.04) (the Assignee Plaintiffs, through their managers, are "empowered to retain counsel and take the actions necessary and appropriate to prosecute the claims, including coordinating discovery requested from the Class B Members [i.e., the purchasers] in connection with the prosecution of the Claims.'").))

[55] Plaintiffs' argument is even more puzzling in the context of BPLR's claim. How does suing through BPLR, which is managed by a "Huff entity," somehow alleviate the burden on the

If anything, the Assignments have made this litigation substantially more complicated, creating more work for all involved.  There is little (if any) precedent for a claimant bringing suit through a newly-formed shell company.[56]  The Purchasers' election to do so here has, predictably, provided Defendants with fertile grounds on which to move for dismissal.  If the Purchasers thought it expeditious to hire a litigation manager, they could have contracted one through a services agreement and avoided Defendants' 12(b)(1) motion altogether.  The Court cannot conceive of any legitimate, material benefit unique to suing through a litigation vehicle, nor have the Assignee Plaintiffs provided one.[57]

Second, the claims in *Sprint* were assigned to independently-owned and -operated entities in arm's length transactions.[58]  Here, the opposite is true: the Purchasers assigned their claims to entities that they own, operate,[59] and formed for the sole purpose of this litigation.  Such assignments between affiliates have long been viewed with suspicion,[60] and this consideration

---

Purchasers, who themselves are Huff entities or affiliates?  *See* Mot. Hr'g at 25:23-26:6.  Either way, Huff resources are used.

[56] The parties have not provided the Court with any such precedent, and the Court is not aware of any.

[57] *See* (Mot. Hr'g at 27:10-16 ("Was it necessary that we do it this way? No, I'm not here before the Court saying that we absolutely had to do it this way, but I am here before the Court saying there is nothing that prohibited us from doing this. This is how the client wanted to do it in order to pursue their litigation strategy.").)

[58] *See Sprint*, 554 U.S. 269 271-72.

[59] While the Assignee Plaintiffs are technically manager-managed, the managers are apparently affiliates of the Purchasers.

[60] 13F Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc. Juris.* § 3639 (3d ed.) ("In the context of transactions between parent companies and their subsidiaries, . . . the cases make it clear that assignments that create diversity of citizenship may be given heightened scrutiny by the court and must be justified by legitimate business purposes" and citing cases). *See also Funderburk Enterprises, LLC v. Cavern Disposal, Inc.*, 2009 WL 3101064, at *5 (W.D. Tex. Sept. 22, 2009) (examining whether an assignment had been made as a sham to create diversity, and noting that "various courts have held that transfers between affiliated corporations

weighs in favor of concluding that the Assignments were not made for ordinary business purposes.

Finally, although *Sprint* does not directly address the issue, the factual context of the case indicates that the aggregators were adequately-capitalized going concerns. Here, the assignee-plaintiffs are litigation vehicles with no material assets. As discussed above, this could be problematic if the Court tries to impose sanctions on the Assignee Plaintiffs, and is another point of contrast with *Sprint* that counsels in favor of departing from the Supreme Court's holding.

Several factors indicate that the Purchasers' assignments were not made for "ordinary business purposes." As the Supreme Court noted, such assignments raise "additional prudential questions," and here, those questions must be answered in Defendants' favor. Allowing the Purchasers (and claimants generally) to bring claims through newly-formed, affiliated shell companies allows them to avoid several of the carefully crafted rules of federal procedure and evidence. While this may not have been the subjective intent of the Purchasers here,[61] the objective characteristics of their litigation structuring are inescapable. The Court therefore holds the Assignments inoperable for the purposes of this litigation, and dismisses the Assignee Plaintiffs' Complaints for lack of standing.

## IV. __10B-5 CLAIMS AGAINST BP E&P__

Plaintiffs claim that BP Exploration & Production Inc. ("BP E&P") made numerous misrepresentations through four of its corporate representatives—Suttles, Hayward, Dudley, and McKay (the "Corporate Executives")—in violation of Section 10(b) and Rule 10b-5. Defendants move to dismiss this claim on the grounds that Plaintiffs have failed to plead that any of these

---

'are presumptively ineffective to create diversity jurisdiction.') (quoting *Dweck v. Japan CBM Corp.*, 877 F.2d 790, 792 (9th Cir.1989)).

[61] (*See* Mot. Hr'g at 27:10-16.)

individuals were employed by BP E&P, and, therefore, as a matter of law, none of their alleged misrepresentations can be imputed to BP E&P.

The parties agree that misrepresentations made by employees may be imputed to the employer.[62]  Thus, the first inquiry for the Court is whether the Corporate Executives were employees of BP E&P.  Plaintiffs concede that Hayward, Dudley, and McKay were not employees of BP E&P,[63] but Plaintiffs argue that they have adequately alleged that Suttles was an executive officer of the company: "In October 2007, Suttles was named Chief Operating Officer for BP's Exploration and Production business."[64]  Defendants respond that this allegation is inadequate.  It merely provides that Suttles was the COO of "BP's Exploration and Production *business*," not the separate corporate entity called BP Exploration & Production Inc.

The Court agrees with Defendants; Plaintiffs' allegation is deficient.  In their Complaints, Plaintiffs specifically define "BP E&P" to mean "BP Exploration & Production Inc.," yet refer to Suttles as the COO of "BP's Exploration and Production *business*."  This inconsistency creates ambiguity that renders Plaintiffs' allegation inadequate.

Given that Plaintiffs have failed to allege that any employees of BP E&P made any actionable misrepresentations, the question becomes whether the alleged misrepresentations of the Corporate Executives may be imputed to BP E&P.  Plaintiffs argue that, "because the Corporate [Executives] were executive officers of BP [or one of its affiliates] whose actions were

---

[62] (*See* Defs.' Br. at 12-13 ("In the absence of any allegations that BP E&P or one of its employees made any alleged misstatement, BP E&P cannot be liable under Section 10(b).") (citing *Janus*, 131 S. Ct. at 2302; *Southland*, 365 F.3d at 363 (plaintiffs must allege "facts demonstrating an individual defendant's participation in the particular communication containing the misstatement or omission")).

[63] (*See* Opp'n at 21.)  Hayward, Dudley, and McKay are alleged to have held senior management positions only at BP.

[64] (Compl. at ¶ 30.)

intended to benefit BP [or one of its affiliates], their misrepresentations are deemed to have been made by the corporate entities responsible for the conduct to which their misstatements relate, *i.e.*, BP plc, BP America, and BP E&P."[65]  Defendants respond that Plaintiffs have cited to no case law that supports this proposition.  To the contrary, say Defendants, case law essentially rejects Plaintiffs' position.

Defendants are again correct. Plaintiffs cite only to this Court's decision in *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712 (S.D. Tex. 2012).  But there, quoting the Fifth Circuit's decision in *Southland*, the Court held only that the misrepresentations "'appear from the face of the Complaint to have been made [by the Individual Defendants] pursuant to their positions of authority *within the company*.'"[66]  Neither *BP* nor *Southland* makes any reference to imputing a non-employee's statements to a corporate defendant.  Just the opposite, both cases affirmatively indicate that only statements made by persons from "within the company" are imputable. Indeed, in *Southland*, the court expressly noted that all of the individual defendants were executive officers of the only corporate defendant in the case.[67]

## V. SECTION 20(a) CLAIMS AGAINST BP E&P AND SUTTLES

Plaintiffs additionally bring claims against each of BP E&P and Suttles under Section 20(a) of the Exchange Act.  To state a claim under Section 20(a), a plaintiff must first allege facts showing: (i) "an underlying securities fraud violation [by the controlled person]"; (ii) that the "controlling person had actual power over the controlled person"; and (iii) that the

---

[65] (Opp'n at 21.)

[66] *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d at 788 (quoting *Southland*, 365 F.3d at 365).

[67] *Southland*, 365 F.3d at 365.

"controlling person . . . induced or participated in the alleged violation."[68]   Defendants' motion to dismiss focuses on the first two elements.[69]

### A. Section 20(a) Claim against BP E&P

Defendants argue that Plaintiffs' Section 20(a) claim against BP E&P should be dismissed because Plaintiffs have failed to adequately allege that BP E&P "had actual power over [Suttles]."   Plaintiffs respond by arguing that they alleged Suttles was the COO of BP E&P.   Thus, because Suttles was an employee of BP E&P, he was under the company's control.[70]

Plaintiffs' entire argument is premised on the notion that Suttles was alleged to be the COO of BP E&P.   But that premise is incorrect.   As discussed in Section IV above, Plaintiffs alleged only that Suttles was the COO of the "Exploration and Production business," not the COO of BP E&P.   Consequently, Plaintiffs' only theory of BP E&P's "actual power over" Suttles is flawed, and their Section 20(a) claim cannot stand.

### B. Section 20(a) Claim against Suttles

Plaintiffs similarly bring a Section 20(a) claim against Suttles, alleging that Suttles controlled BP E&P, and is therefore liable as a "control person" for the Company's violations of Section 10(b).[71]   Defendants argue that Plaintiffs have failed to adequately plead two elements of their Section 20(a) claims: (i) that BP E&P committed an "underlying securities fraud violation," and (ii) that Suttles had actual power over BP E&P.

---

[68] *BP*, 843 F. Supp. 2d at 791 (citing *Dennis v. General Imaging, Inc.*, 918 F.2d 496, 509 (5th Cir.1990)).

[69] *Id.*

[70] (*See* Opp'n at 25 (arguing only that "BP E&P had control over its executive officer, Suttles."))

[71] This is essentially the mirror image of their 20(a) claim against BP E&P.

As to the first element, Defendants are correct.  Section 20(a) is a secondary liability provision, and plaintiffs must therefore establish a primary violation under section 10(b) before liability arises under section 20(a).[72]  As discussed in Section III above, Plaintiffs have failed to state an underlying claim against BP E&P.  Consequently, their Section 20(a) claim is not viable.

## VI. CONCLUSION

After considering the parties' filings, all responses and replies thereto, the oral arguments of the parties, and the applicable law, the Court holds that Defendants' motion to dismiss should be **GRANTED** in its entirety.  As a result:

(1) The Assignee Plaintiffs' complaints are **DISMISSED** without prejudice.
(2) All claims against BP E&P are **DISMISSED** without prejudice.
(3) All Section 20(a) claims against Defendant Douglas Suttles are **DISMISSED** without prejudice.

The Court grants Plaintiffs 15 days to replead.

**IT IS SO ORDERED**.

Signed this 4th day of January 2016.

_____
Hon. Keith P. Ellison
United States District Judge

---

[72] *BP*, 843 F. Supp. 2d at 750 (citing *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 348 (5th Cir. 2002)).