United States District Court
Southern District of Texas

**ENTERED**

June 02, 2016

David J. Bradley, Clerk

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| *In re: BP p.l.c. Securities Litigation* | MDL NO.  4:10-MD-2185 |
| **This document relates to:** | |
| *In re: BP p.l.c. Securities Litigation (federal securities class action)* | MDL NO.  4:10-MD-2185 |
| | **JURY TRIAL DEMANDED** |
| | **Honorable Keith P. Ellison** |

## MEMORANDUM AND ORDER

The Deepwater Horizon, an off-shore drilling rig leased by BP, exploded around 10:00 p.m. on Tuesday, April 20th, 2010, resulting in the deaths of eleven workers and a catastrophic oil spill.[1]  In the days and weeks following the explosion, scientists at BP, several independent contractors, and the National Oceanic and Atmospheric Association ("NOAA")[2] employed methodologies to estimate the rate at which oil was leaking into the Gulf of Mexico.  Plaintiffs argue that BP publicly misrepresented the range of its internal flow-rate estimates on four different occasions, causing the market to conclude that the oil spill would be relatively small, when in fact BP's internal estimates suggested that the flow rate (and, by extension, the ultimate size of the spill) was far more severe than BP publicly represented.  Plaintiffs bring their claims under Sections 10(b) and 20(a) of the Securities Exchange Act.

---

[1] (Doc. Nos. 927, 928 ("Third Consolidated Amended Class Action Complaint" or "TAC"), at ¶ 263; Doc. No. 996 ("Answer"), at ¶ 263.)

[2] The NOAA is an agency of the U.S. federal government.  *About our agency*, NOAA, http://www.noaa.gov/about-our-agency.  Its stated mission is "[t]o understand and predict changes in climate, weather, oceans, and coasts, to share that knowledge and information with others, and to conserve and manage coastal and marine ecosystems and resources."  *Id*.

Defendants have moved for summary judgment, seeking to dismiss Plaintiffs' case in its entirety.[3]  Plaintiffs have filed a motion for partial summary judgment, seeking judgment as a matter of law with respect to the elements of falsity and scienter.  For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion for summary judgment, and **DENIES** Plaintiffs' motion for summary judgment in its entirety.

I.       **FACTUAL BACKGROUND**[4]

    A.       **Overview of Flow Rate Estimation Methodologies**

BP employed three different types of techniques to measure the flow rate of the leak: (1) hydraulic modeling; (2) surface expression estimation; and (3) velocimetry.

        **(1) Hydraulic Modeling**

For the purposes of this case, "hydraulic modeling" refers to "the use of mathematical . . . techniques to simulate the behavior of fluids in systems and to make projections about those systems."[5]  Simplistically, "a user of a hydraulic model can typically specify two of three basic hydraulic variables in order to solve for the remaining, third variable. Those three basic hydraulic variables are (i) inlet pressure, (ii) outlet pressure, and (iii) flow rate through the system."[6]  In this case, the "system" to be modeled was the reservoir through the wellbore and blow-out preventer ("BOP") to the subsurface.

There are many software programs which perform hydraulic modeling, including:

---

        [3] Also pending are Defendants' motions to exclude the testimony of Chad Coffman and Gregg Perkin.  The Court will take up those motions in a separate memorandum and order at a later date.

        [4] The facts contained herein are undisputed, unless otherwise noted.

        [5] (Def. Ex. 25 ("Ballard Rep."), at 3.)

        [6] (Ballard Rep. at 4.)

Prosper, GAP, PIPESIM, OLGA-ABC, and OLGA-WellKill.[7]   The quality of the estimates produced by these programs, however, depends on how accurately the physical properties of the modeled system are defined.[8]  Here, while some physical properties of the system were known as a result of the drilling process,[9] others were not.[10]  The sinking of the rig and wrenching of the riser altered the well's geometry,[11]  and it was unclear exactly what breaches had occurred and what restrictions were present to impede flow.[12] As a result, it was impossible to define the system with absolute certainty.

Despite these unknowns, multiple individuals employed by BP (or contracted to BP) utilized hydraulic modeling in the post-explosion time period. In fact, of the three types of work product concerning flow rate produced in this time period, hydraulic modeling was the most extensively deployed and appears to have been the work product that BP and its contractors relied upon for substantive source control decisions.[13]

### (2) Surface Estimates

Surface estimation involves estimating the volume of oil contained within a slick based upon surface area and assumed thickness. This technique is also called "mass balance" or

---

[7] (Def. Ex. 26 ("Perkin Rep."), at 20.)

[8] (Ballard Rep. at 4-7.)

[9] As operator, BP had access to proprietary data relating to the reservoir, fluid properties, and the infrastructure of the well. (Pl. Ex. 6, at 52; Pl. Ex. 36, at 83; Pl. Ex. 42, at 144-47; Def. Ex. 15, at 14-15; Perkin Rep. at 20.)

[10] In addition to the unknown flow path and restrictions, system unknowns included the amount of exposed reservoir; the "skin factor;" and the well's Productivity Index ("PI"). (Pl. Ex. 42, at 153, 376; Perkin Rep. at 20.)

[11] (*See* Perkin Rep. at 20.)

[12] (Ballard Rep. at 8-9; Perkin Rep. at 20; Pl. Ex. 36, at 84-85.)

[13] (*See* Pl. Ex. 18 (Barnett Dep.) at 63:15 – 64:5.)

"surface expression."  Roughly, field observers conduct aerial overflights of the slick in order to map its size and variations in its coloring.[14] Once the slick and its color gradations are mapped, the total surface area of each color variant is multiplied by an assumed thickness (in microns) for that variant.[15] Combining the volumes of each color variant together provides an estimate of the total volume of oil contained within the slick.[16]

There are multiple surface estimation methodologies, including ASTM, the Bonn Agreement, and Metcalf & Eddy.[17] The primary differences among these methodologies are (1) the number and description of color gradations within the slick and (2) the thicknesses assigned to the respective color gradations.[18]

Surface estimation is typically used to determine the amount of oil contained within a slick: *i.e.*, what is sitting on the water.[19] But it can also be used to calculate the rate at which oil is being released on an ongoing basis.[20] In order to accomplish an ongoing rate calculation, the volume of oil contained within the slick is combined with the volume of oil assumed to be lost through dispersion and evaporation.[21] This total amount is then divided by the number of days that oil has been released to arrive at a daily flow rate.

---

[14] (Def. Ex. 24 ("Potter Rep.") at 3; *see also* Pl. Ex. 46 (applying this methodology).)

[15] (Potter Rep. 3; *see also* Pl. Ex. 46.)

[16] (Potter Rep. 3; *see also* Pl. Ex. 46.)

[17] (Potter Rep. 3.)

[18] (*See* Potter Rep. 3-5.)

[19] (Pl. Ex. 42, at 60.)

[20] Plaintiffs have submitted "expert" testimony from Gregg Perkin to the effect that surface estimation techniques were inapplicable to, and scientifically unreliable in, the case of a deepwater blowout. (Perkin Rep. at 53-55.) Defendants argue, convincingly, that Perkin is not qualified to offer this testimony.

[21] (Def. Ex. 24 ("Potter Rep."), at 2-3.)

### (3) Particle Image Velocimetry

Particle Image Velocimetry—or simply velocimetry—involves visual observation of the underwater plume. The plume's velocity can be estimated by visually tracking a particle within the plume over time.[22] Combined with the size of the hole and an assumption of the gas-to-oil ratio, velocimetry returned a rough estimate of the flow of oil from the well.

### B.     April 20 to April 23: The Explosion and its Aftermath

After the Deepwater Horizon exploded on the night of Tuesday, April 20th,[23] the rig burned for approximately 36 hours before sinking at 10:20 a.m. on Thursday, April 22nd.[24] When the rig sank, it wrenched and twisted the pipe attaching the rig to the wellhead (the "riser").[25] The riser came to rest on the seafloor. Initially, no ongoing releases of hydrocarbons were detected from the riser or the blowout preventer ("BOP"). Remote-operated vehicles ("ROVs") first detected two leak points in the riser around 6 p.m. on Friday, April 23rd.[26]  A third leak was detected on Wednesday, April 28th.[27]

In the meantime, an organization known as the Unified Area Command ("UAC" or "Unified Command") was established to organize and manage any spill response.[28]  The UAC included representatives from the federal government and affected state governments— particularly, the U.S. Coast Guard; the NOAA; and the Department of the Interior's Minerals

---

[22] (Pl. Ex. 39, at 251.)

[23] (TAC at ¶ 263; Answer at ¶ 263.)

[24] (Def. Ex. 64.)

[25] (Def. Ex. 64.)

[26] (Def. Ex. 64.)

[27] (Pl. Ex. 3, at 2, 5.)

[28] (TAC at ¶ 45.)

Management Service ("MMS")—and from the private sector—particularly, BP.[29]  Defendant Doug Suttles[30] served as BP's representative on the UAC.[31]  The head of the UAC was the Federal On-Scene Coordinator ("FOSC").[32]  In the time period at issue, the FOSC was Rear Admiral Mary Landry of the U.S. Coast Guard.[33]

Up to this point, BP's flow rate estimates were limited—the leak was not even discovered until the evening of April 23rd.  According to BP, their surface expression work resulted in estimates in the hundreds of barrels, and engineers at BP had begun employing hydraulic modeling to determine ranges of possible flow rates on the assumption that the well was leaking.[34]

### C.    April 24th: Suttles's First Alleged Misrepresentation

On April 24, 2010, Suttles participated in a UAC press conference. He prepared two pages of remarks.[35] These scripted remarks—along with a typed summary of the press conference prepared by BP's Daren Beaudo[36]—are the only evidence of what Suttles said at the press conference; according to the Associated Press, responding to a non-party subpoena, no

---

[29] (Pl. Ex. 85, at 17-19.)

[30] At that time, Suttles was Chief Operating Officer of BP's Exploration and Production business segment. (TAC at ¶ 45; Answer at ¶ 45.) When questioned at his May 19, 2011 deposition in MDL 2179, he could not identify the exact BP corporate entity which employed him. (Pl. Ex. 14, at 548-51.)

[31] (Pl. Ex. 1, at 29-31.)

[32] (Pl. Ex. 85, at 18; Def. Ex. 10, at 64.)

[33] (Pl. Ex. 85, at 14.)

[34] (*See* Doc. No. 1128 ("Pl. Opp.") at Appendix A.)

[35] (Pl. Ex. 2.)

[36] (Def. Ex. 110.)

transcript or audio or video recording exists of the April 24th press conference.[37] Suttles, when shown the prepared remarks at his deposition, testified that they "look[] like my prepared remarks for the [April 24, 2010] press conference," but he could not remember if he delivered the remarks verbatim.[38]

In the prepared remarks, Suttles spoke in the collective "we." He claims that he was speaking on behalf of the Unified Command,[39] but his remarks can also be read—more fairly, in the Court's estimation—to refer to the BP Group rather than the combined UAC.[40]  Speaking in this manner, he acknowledged the detection of leaks from the damaged riser:

> [W]e have located the Transocean Deepwater Horizon drilling rig. It lies on the seabed approximately 1300 feet northwest of the well site in 5,000 feet of water. The rig is intact and secure. We have also located the drilling riser, which connected the drilling rig to the blowout preventer.
>
> In addition, we have detected ongoing releases of oil from the well, emanating from the end of the riser and a section of drill pipe, at a rate of approximately 1,000 barrels per day at the seabed.[41]

### D.    April 25 to April 27th

BP continued its surface expression estimates, and the estimates began to increase during this period of time. David Rainey, Suttles's deputy incident commander, was tasked with

---

[37] (Doc. No. 1082 ("MSJ"), at 14 n.8.)

[38] (Pl. Ex. 1 (Suttles Dep.) at 91:9-92:8, 107:2-15.)

[39] (Pl. Ex. 1 (Suttles Dep.) at 108:2-5.)

[40] (*E.g.,* Pl. Ex. 2, at 2 ("Working with Transocean – the owner and operator of the drilling rig – the MMS, and the Coast Guard, we are committed to finding the cause of this incident."); *id*. at 3 ("Our current efforts – in cooperation with Transocean, the MMS, and the Coast Guard – are focused on developing and implementing the most effective way to stop the flow of oil.").) At the very least, this issue is a dispute of fact appropriately resolved at trial.

[41] (Pl. Ex. 2, at 2-3.)

"playing point" on flow rate,[42] and he began researching and experimenting with surface estimation methodologies on April 26th. Employing a variation of the ASTM method, on April 27th, Rainey produced estimates of 1,063 (low), 5,758 (best), and 14,266 bpd (high).[43] Employing the Bonn method, Rainey produced estimates of 2,784 (low), 17,328 (best), and 92,028 bpd (high).[44] There is evidence that he shared these figures with Suttles.[45]

BP employees and contractors also began hydraulic modeling work. While they acknowledged that there were too many unknowns to produce an estimate of the actual flow rate, they used the models to create ranges of potential flow rates based on varying assumptions/inputs.[46] The lower end of the assumptions were generally producing estimates in the range of 5,800 to 25,000 bpd, with more extreme assumptions producing estimates that ranged much higher.[47]

### E.   April 28th: Suttles's Second Alleged Misrepresentation

The UAC held another press conference on April 28, 2010. Admiral Landry spoke first. She told the press that BP had located an "additional breach in the riser."[48] She then stated: "[W]hile BP believes and we believed and established a thousand barrel per day estimate of what is leaking from the well, NOAA experts believe the outlook . . . can be as much as 5,000

---

[42] (Pl. Ex. 1, at 58:1-11.)

[43] (Pl. Ex. 19; Def. Ex. 39.) Defendants state that, "[t]he next day, Rainey's methodology estimated flow rates . . . with a best guess of 5,092." (Doc. No. 1123 ("Def. Opp.") at 10-11.) But there is no indication that Rainey presented these estimates to Suttles before he (Suttles) made his statement on the 29th. To the contrary, based on the evidence that Defendants have cited, it looks like Rainey himself did not receive the estimates until the afternoon of April 29th. (*See* Def. Ex. 40.)

[44] (Pl. Ex. 19; Def. Ex. 39.)

[45] (Pl. Ex. 48 (Rainey Dep.) at 149:12-150:4.)

[46] (*See* Pl. Opp. at Appendix A (citing Estimates F to M).)

[47] (*See, e.g.*, Pl. Ex 22; Def. Ex. 58; Pl. Ex. 20; Def. Ex. 59)

[48] (Pl. Ex. 3, at 2:3-5.)

barrels."[49]  Suttles then spoke and confirmed that a new leak point had been discovered late that afternoon (April 28th).  He then stated: "This leak is just beyond the top of the blowout preventer in the pipework called the riser. Given the location, we do not believe this changes the amount currently estimated to be released."[50] He did not expressly state what that estimate was. Specifically, he neither reiterated the 1,000 barrels per day estimate from April 24th, nor did he reinforce the 5,000 barrel per day number suggested by Admiral Landry.

Reporters picked up on this ambiguity. One asked: "Admiral, you said that the oil in NOAA's estimation is increasing by a factor of five, yet BP says it's not increasing at all. Which one is it?" Admiral Landry responded by emphasizing that the number was just an estimate. She stated that UAC—working with NOAA, BP, and MMS—initially agreed that that estimate was 1,000 barrels per day.[51]  "[H]owever, NOAA is telling me that now they prefer we use 5,000 barrels a day as an estimate for what has actually leaked from this well and will continue to leak until we – until BP secures the course."[52]

Another reporter immediately asked Suttles for his comment, while a third suggested that Admiral Landry hadn't answered the question: "You [i.e., Suttles] say it's a thousand and that doesn't change, and you [i.e., Admiral Landry] say it's 5,000, so…"[53]  Suttles then stated:

> No, actually I don't think the Admiral and I have actually said different things. I think what the Admiral stated is that when we had the initial data, it's highly uncertain, as I described there's no way to put a meter on this flow rate; so the only thing we can do is make very basic estimates at the subsurface, monitor it, and actually then start to see what we see on the surface. And that's what we're

---

[49] (Pl. Ex. 3, at 2.)

[50] (Pl. Ex. 3, at 3.)

[51] (Pl. Ex. 3, at 3.)

[52] (*Id.*)

[53] (Pl. Ex. 3, at 4.)

doing, but that range is actually quite wide [in terms of what] the outcome could be.

What I can tell you for certain is what we're observing at the seabed is the same as what we were observing when we first reported the two locations. The only difference is this new leak point, but I do not disagree with the Admiral's estimate that it could be 5,000 barrels a day. It's clearly within the range of uncertainty. And actually the only thing we know for certain is what we see on the surface. And of course that's what we're trying to pick up.

So I actually don't think we're saying something different. It's all about the uncertainty and inability to precisely measure this.[54]

### F.     April 29th: Suttles's Third Alleged Misrepresentation

Suttles appeared on television's The Early Show the following morning around 7:00 a.m. EST.[55]  The show began its coverage by stating that "Coast Guard officials" had disclosed a third point of leak and had updated their estimate of the oil flow from 1,000 barrels per day to 5,000 barrels per day.[56] The Early Show reporter, Maggie Rodriguez, immediately questioned Suttles about the discrepancy between the Coast Guard's revised estimate and his insistence that the third point of leak did not change the amount of oil coming out of the riser: "This morning, we're learning that the leak from this week is five times worse than originally estimated. Yet, we just heard you say in our report that you don't believe this will change the amount that's estimated to be released in to the ocean. I'm not an expert. But how is it possible that four thousand additional [barrels] leaking a day does not change the equation?"[57] Suttles gave the following lengthy response:

---

[54] (Pl. Ex. 3, at 5.)

[55] (Pl. Ex. 4, at 1.)

[56] (Pl. Ex. 4, at 3.)

[57] (Pl. Ex. 4, at 4.)

I should probably explain that on the – the difference between one and five thousand barrels a day and – and what we tried to explain is that, what we're seeing through the remote-operated vehicle cameras on the sea floor hasn't actually changed. So, physically those images are the same. And that of course is horribly difficult to estimate what the flow is. But what we can see is the amount of oil on top of the water. And based on the fact of what we're seeing on the surface, that's actually we can almost measure. We can take those aerial views. We think the range has increased of what the estimate has been. So, I think that somewhere between one and five thousand barrels a day is probably the best estimate we have today.[58]

### G.    April 30 to May 5th

It appears that there were relatively few developments during this period of time.  Surface expression estimates had largely stopped due to inclement weather and other logistical difficulties.  A few hydraulic modeling estimates were created, and they were largely in line with the estimates that had been produced in the prior days.

### H.    May 5th: Hayward's Alleged Misstatement

Anthony Hayward spoke with a Houston Chronicle reporter at BP's Houston offices on or shortly before May 5, 2010. One day earlier, an unnamed BP executive—David Rainey—had told U.S. lawmakers in a closed-door briefing that the damaged well could be spewing up to 60,000 barrels per day, 12 times the official 5,000 per day estimate. Dr. Hayward called this higher estimate "deeply theoretical" based on "an absolute worst-case scenario" of a totally unobstructed well.[59] He acknowledged that the exact flow rate was unknown, and that "a guesstimate is a guesstimate." He then stated: "[T]he guesstimate remains 5,000 barrels a day."[60]

---

[58] (Pl. Ex. 4, at 4).  Suttles sat for all three major morning television shows on April 29th. In his interviews with The Today Show and Good Morning America, he made similar statements which suggested that the "best" or "reasonable" or "range" of estimates was between 1,000-5,000 barrels per day. (Def. Ex. 77.)

[59] (Pl. Ex. 5, at 2.)

[60] (Pl. Ex. 5, at 3.)

## II.   APPLICABLE LEGAL STANDARDS

### A.   Standard for Resolving Motions for Summary Judgment

Summary judgment is authorized if the movant establishes that there is no genuine dispute about any material fact, and that it is entitled to judgment as a matter of law.[61]   Rule 56(c) requires "the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[62]   The party moving for summary judgment bears the initial burden of identifying the evidence that it believes demonstrates the absence of a genuine issue of material fact.[63]   If the party moving for summary judgment meets this initial burden, Rule 56(c) requires the non-movant to go beyond the pleadings and show that specific facts exist over which there is a genuine issue for trial.[64]   The party opposing summary judgment must identify specific evidence in the record and articulate the precise manner in which that evidence supports his or her claim.[65]   Factual controversies are to be resolved in favor of the non-movant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts."[66]   The court should not, in the absence of proof, assume that the non-movant could or would prove the necessary facts.[67]

---

[61] Fed. R. Civ. P. 56(c).

[62] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[63] *Id.* at 323.

[64] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

[65] *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994).

[66] *Little*, 37 F.3d at 1075.

[67] *Id.*

### B.    Elements of Plaintiffs' Claims

Plaintiffs assert claims under §§ 10(b) and 20(a) of the Securities Exchange Act.  Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe."[68]  The SEC's implementing rule, Rule 10b-5, provides that it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."[69]  To prevail on a claim under § 10(b) of the Exchange Act, a plaintiff must prove the following elements:

(1)    a material misrepresentation or omission by the defendant (*i.e.*, falsity);

(2)    scienter;

(3)    a connection between the misrepresentation or omission and the purchase or sale of a security;

(4)    reliance upon the misrepresentation or omission;

(5)    economic loss; and

(6)    loss causation.[70]

To state a claim under § 20(a) of the Exchange Act, "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled

---

[68] 15 U.S.C. § 78j(b).

[69] 17 C.F.R, § 240.10b-5.

[70] *See Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1317 (2011).

person's fraud."[71]  If a plaintiff has not adequately alleged a primary violation, *i.e.*, a viable claim under another provision of the Exchange Act, then the § 20(a) claims must be dismissed.

## III.   FALSITY AND SCIENTER

Plaintiffs contend that Suttles misrepresented the range of BP's internal flow rate estimates in his public statements on April 24th, April 28th, and April 29th, and that Hayward did the same in his comments to the Houston Chronicle on May 5th.[72]  Broadly, Plaintiffs allege that the two executives represented that BP's best flow rate estimates ranged from 1,000 bpd to 5,000 bpd, when in fact many of BP's internal estimates indicated that the flow rate could be as great as 100,000 bpd.  And not only do Plaintiffs believe that they have presented sufficient evidence to defeat Defendants' motion for summary judgment, Plaintiffs aver that the evidence is sufficient to warrant judgment in *their* favor as a matter of law on the issues of falsity and scienter.

Defendants generally respond in two ways.  First, they say, Plaintiffs have failed to present evidence that BP produced any internal flow rate estimates that rendered the representations false or misleading as of the time the statements were made.  Instead, Plaintiffs point only to "worst case discharge"[73] estimates and other hydraulic modeling calculations that were not intended to calculate the actual flow rate.  Second, even if Plaintiffs have presented evidence of contradictory flow rate estimates, Defendants' substantial evidence of Suttles's and Hayward's good faith negates any inference of scienter.

---

[71] *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014).

[72] (Doc. No. 1085 ("MPSJ") at 2.)

[73] A worst case discharge calculation is "based upon the counterfactual assumption of unrestricted flow at the mudline."  (Ballard Rep. at 10-11.)

The Court holds that neither party is entitled to judgment as a matter of law with respect to Suttles's alleged misrepresentations on April 24th, April 28th, or April 29th.  The Court need not reach the issues of falsity or scienter with respect to Hayward's alleged misrepresentation because, for the reasons discussed in Section IV, *infra*, Plaintiffs have failed to establish loss causation for any of the stock drops that followed Hayward's statement.

### A.    Falsity and Scienter Post-*Omnicare*

The parties' first two rounds of summary judgment briefing featured lengthy debates regarding the appropriate legal standard for evaluating the falsity of Suttles's alleged misrepresentations.  Defendants argued that Suttles's statements were expressions of opinions, and statements of opinion are actionable only if the speaker did not in fact hold that opinion.[74]  Plaintiffs, on the other hand, contended that Suttles's representations were statements of fact because the "truth or falsity of modeled flow rates is objectively determinable."[75]  Statements of fact are subject to a less demanding legal standard.[76]

Fortunately, the Supreme Court addressed a remarkably similar issue in *Omnicare v. Laborers Dist. Council Const. Industry Pension Fund*,[77] and both parties were able to use their reply briefing to apply *Omnicare* to the case at bar.  The Court first turns to whether, in light of *Omnicare*, Suttles's representations should be deemed statements of facts or opinions.  Because the representations were statements of opinion, the Court then discusses the legal standard that governs the elements of falsity and scienter post-*Omnicare*.

---

[74] (Def. Opp. at 28.)

[75] (Pl. Opp. at 22.)

[76] *In re Lehman Bros. Sec. & Erisa Litig.*, 131 F. Supp. 3d 241, 251 (S.D.N.Y. 2015)

[77] 135 S. Ct. 1318 (2015).

### (1)       Statements of Opinion versus Statements of Fact

*Omnicare* begins with a discussion of the standard for determining whether a statement is one of fact or opinion—an issue that vexed the parties in this case considerably.  A fact is "a thing done or existing" or "[a]n actual happening."[78]   An opinion, on the other hand, is "a belief[,] a view, [or a] sentiment which the mind forms of persons or things."[79] But "most important," the Court continues, is that "a statement of fact . . . expresses certainty about a thing, whereas a statement of opinion . . . does not."[80]

Defendants argue that each of Suttles's statements were expressions of opinion.  With respect to Suttles's statements on April 28th and 29th, their arguments are particularly compelling.   Estimates and projections are classic examples of opinions,[81] especially when cloaked in the context of language such as "I believe (or I think)."[82]   Moreover, on the 28th and 29th, not only was Suttles expressly relaying estimates of flow rate, he made clear that he was expressing his opinion as to which of those estimates was "best," adding yet another layer of subjectivity and judgment.[83]   And his statement on April 24th, while unadorned with such express language of uncertainty or personal judgment, would similarly have been understood by

---

[78] *Omnicare*, 135 S. Ct. at 1325.

[79] *Id.*

[80] *Id.*

[81] *Bykowicz v. Pulte Home Corp.*, 950 F.2d 1046, 1052 (5th Cir. 1992) ("An estimate is defined as "an opinion or judgment of the nature, character, or quality of a person or thing[;] ... a rough or approximate calculation.") (citing Websters New Collegiate Dictionary 426 (9th ed. 1989)).

[82] *Omnicare*, 135 S. Ct. at 1326 (holding that this language can "transform[] [a] factual statement into one of opinion").

[83] *Guidance Endodontics, LLC v. Dentsply Int'l, Inc.*, 2011 WL 1336473, at *2 (D.N.M. Mar. 31, 2011) (A determination as to which estimate or piece of information is "best" is a matter of judgment or opinion); *Omnicare*, 135 S. Ct. at 1329 ("opinions sometimes rest on a weighing of competing facts").

reasonable investors as a statement of BP's "best" estimate—Plaintiffs themselves concede as much.[84]

Plaintiffs contend Suttles's representations are nevertheless statements of fact because "the truth or falsity of [his statements] can be measured objectively against the flow rate information [that was] actually available to Defendants."[85]   But that characteristic is not the exclusive province of factual statements.   Take, for example, the statement that "the 2008 Texas Longhorn football team was better than the 2008 Oklahoma Sooner football team."   This statement can be evaluated against objective evidence—as a matter of fact,[86] the Longhorns beat the Sooners 45-35 at the Cotton Bowl on October 11, 2008—but few would dispute that the statement is a paradigmatic example of an opinion, however well founded.[87]

Plaintiffs also claim that this Court has already held a very similar statement made by Lamar McKay to be one of fact, and argue that the Court should follow suit here.[88]   But this argument is based on a flawed premise; the Court did not necessarily hold that McKay's statement was one of fact.   Instead, the Court expressed uncertainty as to how Defendants were

---

[84] (Pl. Opp. at 23 (Suttles's April 24th statement merely "purported to describe BP's then-current supposedly-***best*** information available").)  Suttles's statement could potentially be construed as representing that, as a matter of fact, BP had measured the flow rate at 1,000 bpd— his statement was declarative and definitive in nature, and made no reference to other estimates. But the more reasonable interpretation, as Plaintiffs seem to concede, is that BP had multiple estimates and ostensibly chose the best one.  The declarative and definitive nature of his statement is relevant to whether his opinion was misleading, however.

[85] (Pl. Opp. at 23.)

[86] *See Omnicare*, 135 S. Ct. at 1325 (a fact is "a thing done" or "an actual happening").

[87] It seems that Plaintiffs are under the impression that Suttles's representations were statements of fact because so many underlying facts cut against it.  (*See* Pl. Opp. at 23-24.)  But the lack of supporting facts is relevant only to whether his statement (be it of fact or opinion) was false or misleading, not to whether the statement itself was one of fact or opinion.

[88] (Doc. No. 1147 ("Pl. Reply") at 6 (citing *In re BP P.L.C. Sec. Litig.*, 2013 WL 6383968, at *31 (S.D. Tex. Dec. 5, 2013)).)

attempting to characterize McKay's statement, and concluded that the statement was actionable regardless of whether it was one of fact or opinion.[89]

### (2)   Misleading Statements of Opinion under *Omnicare*

With Suttles's representations properly identified as statements of opinion, the question becomes what a plaintiff must prove to satisfy the falsity element of securities fraud claims. *Omnicare* addresses this question at length, outlining two potential avenues for plaintiffs to establish the falsity of an opinion.[90]

The first avenue is rooted in the provision of Rule 10b-5 that prohibits "untrue statements of a material fact."[91]  Although opinion statements are at the edge of this provision's reach, they are not wholly immune from liability: "every . . . statement [of opinion] explicitly affirms one fact: that the speaker holds the stated belief."[92]  Thus, a speaker may be liable for a statement of opinion if the plaintiff can prove that "the speaker did not hold the belief she professed."[93]  This proposition is relatively uncontroversial and was already widely accepted by federal courts, including the Fifth Circuit.[94]

---

[89] *See id.* (noting that "Defendants may be attempting to argue that McKay testified as to his opinion" and analyzing his statement accordingly).

[90] *Omnicare*, 135 S. Ct. at 1327-1323.  *See also In re Lehman Bros. Sec. & Erisa Litig.*, 131 F. Supp. 3d 241, 251-55 (S.D.N.Y. 2015) (providing an outstanding discussion of the standard for falsity post-*Omnicare*).  Technically speaking, Omnicare only addresses opinion statements in the context of Section 11 of the Securities Act, not Section 10(b) of the Securities Exchange Act.  As discussed in detail in Section III.A.3, *infra*, however, this distinction results in no practical differences.  For the sake of convenience, the Court will refer to *Omnicare* as addressing claims brought under Section 10(b) of the Securities Exchange Act.

[91] *See Omnicare*, 135 S. Ct. at 1327; 17 C.F.R. § 240.10b–5(b).

[92] *Omnicare*, 135 S. Ct. at 1327.

[93] *Id.*

[94] *See, e.g.*, *Greenberg v. Crossroads Systems Inc.*, 364 F.3d 657, 670 (5th Cir. 2004).

But *Omnicare* takes liability for opinions a step further by turning to the omissions provision of Rule 10b-5: "It shall be unlawful for any person . . . to **omit** . . . a material fact necessary . . . to make the statements made . . . not misleading."[95]   In the context of opinions, reasonable investors "understand [such statements] to convey facts about . . . the speaker's basis for holding that view."[96]   Thus, although a speaker's opinion may be sincerely held, the statement may nonetheless be actionable under 10b-5's omissions provision if: (i) the speaker "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion," and (ii) "those facts conflict with what a reasonable investor would take from the statement itself."[97]

The Supreme Court emphasized, however, that meeting this standard is "no small task for an investor."[98]   An investor must do more than make conclusory allegations that the issuer "failed to reveal its basis" for the opinion.[99]   After all, Rule 10b-5's omissions clause "is not a general disclosure requirement; it affords a cause of action only when an issuer's failure to include a material fact has rendered a published statement misleading."[100]   Nor may the plaintiff merely "recit[e] . . . the statutory language" or offer bare "conclusory allegation[s]" that the issuer "lacked reasonable grounds for the belief it stated."[101] Rather, the plaintiff "must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry

---

[95] 17 C.F.R. § 240.10b–5(b).

[96] *Omnicare*, 135 S. Ct. at 1328.

[97] *Id*. at 1329.

[98] *Id.* at 1332.

[99] *Id.*

[100] *Id.*

[101] *Id*. at 1333.

the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes

the opinion statement at issue misleading to a reasonable person reading the statement fairly and

in context."[102]

### (3)   Applicability of *Omnicare* to Falsity and Scienter Analysis under Section 10(b)

Although *Omnicare* was decided in the context of Section 11 of the Securities Act, courts

have overwhelmingly applied its holdings in the context of alleged omissions under Section

10(b) of the Securities Exchange Act[103]—the Court is aware of only one district court that held to

the contrary.[104] Even Defendants generally seem to concede that *Omnicare* governs falsity

analysis for claims brought under Section 10(b).[105]

But Defendants' concessions end there.  According to Defendants, "*Omnicare* did not

address at all the scienter element of a Section 10(b) claim because the Supreme Court analyzed

Section 11, a strict liability statute."[106]  As a result, say Defendants, Plaintiffs must present

---

[102] *Id.* at 1332.

[103] *See, e.g., In re Velti PLC Sec. Litig.*, 2015 WL 5736589, at *38 (N.D. Cal. Oct. 1, 2015) (citing cases); *see also In re Lehman Bros. Sec. & Erisa Litig.*, 2015 WL 5514692, at *5 n.48 (S.D.N.Y. Sept. 18, 2015) ("*Omnicare* was a Section 11 case. Nonetheless, its reasoning applies with equal force to other provisions of the federal securities laws, including, as relevant to this case, Section 10(b)..., which uses very similar language."); *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 2015 WL 5311196, at *1 n.3 (S.D.N.Y. Sept. 11, 2015) (same); *In re Amarin Corp. PLC.*, 2015 WL 3954190, at *7 n.14 (D.N.J. June 29, 2015) (assuming without deciding that Omnicare applies in the Section 10(b) context); *In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*, 2015 WL 2250472, at *20 (D.N.J. May 13, 2015) (noting that Omnicare "illuminates this Court's Section 10(b) scienter analysis" of defendant's allegedly misleading statements of opinion).

[104] *See Firefighters Pension & Relief Fund of the City of New Orleans v. Bulmahn*, 2015 WL 7454598, at *25 (E.D. La. Nov. 23, 2015).

[105] (*See* Doc. No. 1146 ("Def. Reply") at 19.)

[106] (Def. Reply at 22.)

evidence that Suttles subjectively disbelieved the flow-rate estimates to avoid summary judgment on scienter.[107]

The Court disagrees.  Since the Supreme Court's decision in March of 2015, no fewer than six courts have invoked *Omnicare* in their 10b-5 scienter analysis.[108]  Indeed, the Southern District of New York—whose precedent in matters of security litigation is particularly persuasive—has done so on at least two occasions.[109]  Once again, the Court sees no reason to depart from the emerging majority position of these district courts.  To the contrary, there is substantial reason to follow their lead.

"[T]he required state of mind for scienter is an intent to deceive, manipulate, or defraud or severe recklessness."[110]  Severe recklessness is "limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of *misleading* buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."[111]  The close relationship of this language to the definition of falsity is unmistakable.  Any inquiry into the falsity of an opinion (which, as *Omnicare* confirms, looks to whether an omission renders a statement "misleading to an ordinary

---

[107] (*See* Def. Reply at 22-23.)

[108] *In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig.*, 2015 WL 2250472, at *1 (D.N.J. May 13, 2015); *In re Velti PLC Sec. Litig.*, 2015 WL 5736589, at *38 (N.D. Cal. Oct. 1, 2015); *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 2016 WL 634079, at *9 (S.D.N.Y. Feb. 17, 2016); *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1159 (10th Cir.), *cert. dismissed*, 136 S. Ct. 499 (2015); *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 733 (S.D.N.Y. 2015); *In re EveryWare Glob., Inc. Sec. Litig.*, 2016 WL 1242689, at *15 (S.D. Ohio Mar. 30, 2016).

[109] *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 2016 WL 634079, at *9 (S.D.N.Y. Feb. 17, 2016); *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 733 (S.D.N.Y. 2015).

[110] *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 684 (5th Cir. 2014).

[111] *Id*. (emphasis added).

investor")[112] goes hand in hand with analysis of scienter (which looks to whether a speaker intended for his statement to be "misleading [to] buyers or sellers").[113]   In other words, falsity is the *foundation* of scienter, not a wholly unrelated structure.[114]   And to the extent that the surface area of that foundation is expanded, so too is the area upon which a plaintiff's theory of scienter can be constructed.   Accordingly, to establish scienter at the summary judgment stage post-*Omnicare*, a court looks to whether the record contains evidence upon which a reasonable jury could conclude that the defendant "omit[ed] material facts about [his] inquiry into or knowledge concerning a statement of opinion" with the "intent to deceive, manipulate, or defraud or severe recklessness."[115]

### B.    Suttles's April 24th Statement

Plaintiffs have provided evidence that, at a press conference on April 24th, Suttles stated: "[W]e have detected ongoing releases of oil from the well, emanating from the end of the riser and a section of drill pipe, at a rate of approximately 1,000 barrels per day at the seabed."[116]   The Court concludes that Plaintiffs have provided sufficient evidence of falsity and scienter to defeat

---

[112] *Omnicare*, 135 S. Ct. at 1327-28.

[113] *Spitzberg*, 758 F.3d at 684.

[114] *See In re Velti PLC Sec. Litig.*, No. 13-CV-03889-WHO, 2015 WL 5736589, at *33 (N.D. Cal. Oct. 1, 2015) (quoting *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005)) ("The Ninth Circuit has observed that 'falsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts, and the two requirements may be combined into a unitary inquiry under the PSLRA.'")

[115] *See Omnicare*, 135 S. Ct. at 1329; *see also Merck*, 2015 WL 2250472, at *1 (concluding that defendants were not entitled to summary judgment on scienter where "The record contains evidence upon which a reasonable jury could conclude that Defendants not only lacked support for this assertion of belief but, additionally, knew that it did not "fairly align" with other information in their possession.")

[116] (Pl. Ex. 2, at 2-3.)

Defendants' motion for summary judgment, but insufficient evidence to warrant summary judgment in Plaintiffs' favor.

Plaintiffs have identified two types of "omit[ed] material facts about [Suttles] knowledge concerning [his April 24th] statement of opinion."[117]  First, Plaintiffs have provided evidence of the fact that Suttles knew the flow rate "could be *considerably* different" from the stated 1,000 bpd estimate[118] or, put differently, that there was a "wide" range of potential flow rates.[119]  Indeed, Suttles acknowledged to the SEC that he knew the flow rate was somewhere between zero and the pre-drill theoretical limit of 160,000 bpd, "[b]ut exactly where it is in [that range], no one had ever dealt with this problem before."[120]  And the evidence suggests that Suttles's understanding of this fact was not limited to the abstract.  Plaintiffs have presented evidence that, on the morning of April 24th, the Houston source control team provided Suttles with an estimate of "a few thousand" barrels per day.[121]  Even Charlie Henry, whom Defendants tout as the "government's foremost person on oil spills,"[122] evidently told Suttles that the range of potential flow rates "could be a thousand, could be 10,000."[123]

Second, Plaintiffs argue, not only was there a wide range of potential flow rates, Suttles omitted the fact that there was little basis for picking one particular number within that wide

---

[117] *Omnicare*, 135 S. Ct. at 1329.

[118] (MPSJ at 21 (citing Pl. Ex. 1 (Suttles Dep.) at 83:19-84:1).)

[119] (Def. Ex. 75 at 9:14-16).)

[120] (Pl. Ex. 42 (Suttles SEC Tr.) at 263:12-19.)

[121] (Pl. Ex. 16; Pl. Ex. 1 (Suttles Dep.) at 123:22-125:8 (admitting that the handwritten notes were his, and that he took them during the call with the Houston source control team).)  This same evidence—Suttles handwritten notes—also make reference to "70,000 bopd @ surface." *Id.*

[122] (MSJ at 10.)

[123] (Pl. Ex. 43 (Henry Dep.) at 182:2-11; s*ee also* Pl. Ex. 14 (Suttles Dep.) at 403:13-404:14 (Henry "said something like I only work in orders of magnitude and – and something like 1,000").)

range over another.[124]  For example, Suttles himself acknowledged that the flow rate was "highly uncertain"[125] and that there was a "high degree of uncertainty in any estimate."[126]   Indeed, to the extent that the 1,000 bpd number was based on any of BP's actual estimates,[127] it was based only on "surface expression" estimation.  In other words, the only estimates on which Suttles was relying were the results of field observers conducting aerial overflights, mapping out different sheens and shades of the black oil in the area of the spill, using those sheens and shades to make assumptions about the thickness (in microns) of oil in that particular spot, accounting for the amount of oil that had evaporated, and then calculating the flow rate based on how that data changed over time.[128]

Defendants cite to numerous excerpts from deposition testimony indicating that surface expression was the best available means for evaluating flow rate,[129] and that may well be true. But even if it was the *best* method available (relatively speaking), it was certainly not a *good* method (absolutely speaking).  As Henry noted in his April 26th estimation, "Estimating oil volume by the visual appearance of the slick is a highly unreliable process.  At best, one can

---

[124] (MPSJ at 20-22.)

[125] (Pl. Ex. 1 (Suttles Dep.) at 83:19-84:1.)

[126] (Pl. Ex. 1 (Suttles Dep.) at 90:11-14.)

[127] As Henry testified, there was no scientific basis for the 1,000 bpd figure in particular.  (Pl. Ex. 43 (Henry Dep.) at 212:8-18, 222:8-12; 225:19-24; *see also* Pl. Reply at 14 n.3 (explaining the lack of basis for the 1,000 bpd figure and citing evidence).)  Moreover, Plaintiffs have presented an email from an NOAA employee to, among others, Charlie Henry, summarizing the discussion among Landry, Suttles, and Henry that led to the 1,000 bpd estimate.  (Pl. Ex. 44.) According to the email, BP told Landry that the flow rate "is about 250 bbl per day," and Landry then asked Henry if he agreed.  (Pl. Ex. 44.)  Henry responded that "it was more likely between 1,000 – 10,000 bbl per day."  (Pl. Ex. 44.)  From there, the three made a "'handshake' agreement" to place the flow rate at 1,000 bpd, and "it was off to the press brief."  (Pl. Ex. 44.)

[128] *See* Section I.A.2., *supra*.

[129] (*See* Def. Opp. at 7-8.)

calculate an answer to only an order of magnitude."[130]  According to David Rainey, the NOAA's

Bill Lehr "expressed strong concern about the methodology in general," saying that "it's just

hugely uncertain.  You're not going to get the right answer."[131]  Lehr himself testified that the

surface expression method is "highly unreliable" and will provide only a "very, very rough

estimate" of the volume of oil on the surface, "and usually on the low side."[132]

These omitted facts do not "fairly align[]" with what a reasonable investor would have

taken from Suttles's statement:[133] "[W]e have **detected** ongoing releases of oil from the well . . .

at a rate of approximately 1,000 barrels per day at the seabed."[134]  As the Supreme Court noted in

*Omnicare*, "a reasonable investor generally considers the specificity of an opinion statement in

making inferences about its basis."[135]  And here, Suttles not only spoke with specificity (*e.g.*,

"1,000 bpd" rather than providing a range of possible flow rates), but portrayed some degree of

precision and certainty in the estimate ("we have detected" rather than, for example, "we

---

[130] (Pl. Ex. 46.)  This lends further credence to Henry's testimony that, when asked on April 24th, he estimated that the flow rate was between 1,000 bpd and 10,000 bpd.

[131] (Pl. Ex. 48 (Rainey Dep.) 151:3-152:19.) Plaintiffs have presented evidence that Suttles was aware of how the methodology worked.  (*See* Pl. Ex. 42 (Suttles Dep.) at 107:3-21, 109:8-12 ("I was familiar that people estimated a volume based on aerial assessment of a slick.")  Thus, even if Lehr's concerns were never relayed from Rainey to Suttles—and given that Rainey and Suttles discussed the methodology shortly thereafter, one would assume Rainey did so—the uncertainty and margin for error of surface expression methodology would have been apparent to Suttles.

[132] (Pl. Ex. 47 (Lehr Dep.) 246:16-247:8.)

[133] *See Omnicare*, 135 S. Ct. at 1329 (To establish falsity under *Omnicare*, plaintiffs must prove that the omitted facts "conflict with what a reasonable investor would take from the statement itself."  A reasonable investor expects that a speaker's "[statement of] opinion . . . fairly aligns with the information in [his] possession at the time").

[134] (Pl. Ex. 2, at 2-3.)

[135] *Omnicare*, 135 S. Ct. at 1329 n.8 ("Compare two new statements from our ever-voluble CEO. In the first, she says: "I believe we have 1.3 million TVs in our warehouse." In the second, she says: "I believe we have enough supply on hand to meet demand." All else equal, a reasonable person would think that a more detailed investigation lay behind the former statement.)

estimate" or "we think").  His statement was declarative and practically unequivocal.  Yet this specificity and certainty is belied by the omitted facts that the 1,000 bpd estimate was based on a "highly unreliable" methodology that resulted in a "high degree of uncertainty," that the "wide" range of potential flow rates actually spanned an order of magnitude, and the fact that Suttles had received contradictory estimates from both the Houston source control team ("several thousand" bpd) and the NOAA's foremost expert (1,000 to 10,000 bpd).

Defendants correctly note that the benign or misleading nature of an opinion "always depends on context."[136]  Indeed, a speaker can "avoid exposure for omissions . . . [by] mak[ing] clear the real tentativeness of its belief."[137]  But here, if anything, the context of Suttles's statement reinforces the conclusions drawn from the statement itself.  The "surrounding text" included no "hedges" or "disclaimers" of any kind that would alert investors to the extraordinarily tentative nature of BP's estimate.[138]  While the presence of hedges and disclaimers are certainly capable of preventing a statement from being misleading, the absence of hedges and disclaimers can have the opposite effect.

Plaintiffs' evidence is also sufficient to create a genuine dispute of material fact as to scienter.  Specifically, as discussed at length in the preceding paragraphs, Plaintiffs have provided evidence indicating that: (1) Suttles knew that there was a "wide" range of potential

---

[136] *Omnicare*, 135 S. Ct. at 1330.

[137] *Id.* at 1332.

[138] Defendants have provided an email summary of the press conference drafted by a BP press officer, David Beaudo, that indicates Suttles may have hedged BP's estimate as "rough and preliminary."  (Def. Ex. 110.)  At the summary judgment stage, however, the Court cannot weigh competing evidence.  Instead, facts and evidence must be considered in the light most favorable to the non-moving party.  *Breaux v. Halliburton Energy Servs.*, 562 F.3d 358, 364 (5th Cir. 2009).  As a result, based on the considerable evidence that Plaintiffs have provided, the Court assumes for the purposes of summary judgment that Suttles's April 24th statement directly tracked his prepared remarks.  (*See* Pl. Reply at 14 n.30 (citing evidence).)

flow rates; (2) Suttles knew that the 1,000 bpd estimate was highly uncertain and based on an inaccurate and imprecise methodology; and (3) that Suttles knew that the flow rate estimates were market sensitive.[139]   As Suttles testified, "[I]n my judgment, at the time, [I] recognized that this was highly uncertain, an incredibl[y] unusual set of circumstances . . . , and that . . . *people had to recognize* it was just an estimate and the actual number could be considerably different."[140]   Yet, speaking from prepared remarks, he provided investors with a specific estimate and stated it with some degree of certainty.  A reasonable jury could conclude from this evidence that Suttles either knew (or was severely reckless with respect to the probability) that omitting these facts would mislead investors as to BP's flow rate estimates.

The Court would be remiss, however, if it failed to emphasize the limited nature of its holding.   For example, the Court is *not* holding that, as a general rule, speakers must expressly disclose the full range of every estimate—such a holding would certainly be foreclosed by *Omnicare*.[141]   Nor is the Court holding that, as a general rule, *Omnicare* requires speakers to disclose the certainty of a given estimate or the methodology that produced it.  To the contrary, the Court's holding is driven by the unique factual contours of the case—specifically, the unusual asymmetry of information between BP and its investors—which demand a bespoke pattern rather than a blanket approach.

---

[139] *See* Pl. Ex. 45 at BP-HZN-2179MDL04909585-86.  At the very least, it was severely reckless.  The flow rate was one of two factors contributing to the total amount of oil that would be spilled into the Gulf as a result of the leak, and the amount of oil in the Gulf was one of the largest factors in cleanup costs.

[140] (Pl. Ex. 1 (Suttles Dep.) at 83:19-84:1.)

[141] *Omnicare*, 135 S. Ct. at 1329 ("Reasonable investors understand that opinions sometimes rest on a weighing of competing facts. . . . A reasonable investor does not expect that every fact known to an issuer supports its opinion statement.")

Most securities fraud cases involve types of estimates or projections with which investors are familiar.  For example, suppose the CEO of Company X represents that the company has been valued at $1 billion.  A week later, a third party values the company at $950 million, and several shareholders sue the CEO for securities fraud.  In this scenario, it would be fruitless for the investor to allege that the company failed to disclose the uncertainty of the valuation, or that the $1 billion figure was really just one number within a range of potential valuations.  Courts have repeatedly acknowledged that investors understand statements within "the customs and practices of the relevant industry."[142]  In the financial industry, for example, investors not only understand that reasonable estimates can vary within and among established valuation models, they understand the *degree* to which those reasonable estimates can vary.[143]

Here, however, the market was unable to evaluate Suttles's statements through the lens of well-known "customs and practices" in the oil industry—the leak was unprecedented.  Indeed, when discussing the difficulty of estimating the flow rate, Suttles admitted that "no one had ever dealt with this problem before."[144]  In other words, reasonable investors had no frame of reference for the flow rate estimate that BP provided.  Omissions that might not have been misleading under conventional circumstances (*e.g.*, the Company X hypothetical) were particularly misleading given the market's relative lack of familiarity with the deepwater oil leaks.  Here, as of April 24th, a reasonable investor would not necessarily have known that BP's flow rate estimates spanned an order of magnitude, nor that BP was using a "highly unreliable"

---

[142] *Omnicare*, 135 S. Ct. at 1330; *see also In re Lehman Bros. Sec. & Erisa Litig.*, 131 F. Supp. 3d 241, 254 (S.D.N.Y. 2015).

[143] *See In re Lehman Bros. Sec. & Erisa Litig.*, 131 F. Supp. 3d 241, 253 (S.D.N.Y. 2015).

[144] (Pl. Ex. 42 (Suttles SEC Tr.) at 263:12-19; *see also* Pl. Ex. 1 (Suttles. Dep.) at 83:19-84:1 ("But as I said earlier, I think that, in my judgment, at the time, recognized that this was highly uncertain, an incredible unusual set of circumstances").)

surface expression methodology to produce them.  And Plaintiffs have provided evidence that Suttles knew the market was dealing with an unprecedented situation, yet omitted critical facts that were "necessary . . . to make [his] statement[] . . . not misleading."[145]

**(C)      Suttles's April 28th and April 29th Statements**

Because Suttles's statements on the 28th and 29th were substantively similar and were each made within the span of about eight hours, they will be addressed together.  Plaintiffs contend that Suttles's statements were misleading for two reasons.  First, the statements were misleading because Suttles omitted facts that were within his knowledge that did not "fairly align[]" with what a reasonable investor would have taken from his statements.[146]  Second, a reasonable investor would have expected Suttles's statements "to rest on some meaningful . . . inquiry,"[147] yet Suttles's statements instead rested on a superficial inquiry that neglected key data produced by hydraulic modeling efforts.  The Court agrees, and addresses Plaintiffs' arguments in turn.

**(1)      Alignment of Omitted Facts with Suttles's Opinion**

The context in which Suttles's statements were presented is critical to determining how a reasonable investor would have taken them.[148]  Before Suttles spoke on April 28th, Admiral Landry stated, "[W]hile **BP believes** and **we believed** and **established** a thousand barrel per day estimate of what is leaking from the well, NOAA experts believe the outlook . . . can be **as much as** 5,000 barrels."[149]  In other words, the statement from Landry would indicate to a reasonable

---

[145] 17 C.F.R, § 240.10b-5.

[146] *Omnicare*, 135 S. Ct. at 1329.

[147] *Id.* at 1328.

[148] *See id.* at 1330.

[149] (Pl. Ex. 3, at 2.)

investor that: (1) BP "believes" (present tense) that the flow rate is 1,000 bpd; (2) while the NOAA "believed" (past tense) that the flow rate was 1,000 bpd, NOAA experts now "believe" (present tense) that the flow rate could be higher than previously thought; and (3) the NOAA—but not BP—now estimates that the flow rate could be "as much as" (*i.e.* an upper bound of) 5,000 bpd.

Rather than concur with the NOAA's revised estimate, however, Suttles arguably doubled down on the 1,000 bpd figure following Landry's comments, saying that BP does "not believe [the new leak] changes the amount currently estimated to be released."[150]  The evidence suggests that reporters at the press conference similarly interpreted Suttles's statement.[151]  It was only after reporters pressed Suttles on the issue that he described the "highly uncertain" and "very basic" nature of the estimates,[152] ultimately concluding, "I do not disagree with the Admiral's estimate that it could be 5,000 barrels a day."[153] That estimate is "clearly within the range of uncertainty."[154]

While a reasonable investor likely would not have concluded that Suttles endorsed the 5,000 bpd estimate as the upper bound of *all* of BP's estimates, at the very least, a reasonable investor would have taken Suttles's statements, in the context of Landry's comments and the reporters' questions, to mean that BP's best flow rate estimates ranged from 1,000 bpd and 5,000

---

[150] (Pl. Ex. 3, at 3.)

[151] (*See* Pl. Ex. 3, at 3.)

[152] (Pl. Ex. 3, at 4.)

[153] (Pl. Ex. 3, at 4.)  Worth noting, however, is that the Admiral actually said that the flow rate could be "as much as 5,000 bpd," so it is somewhat unclear as to what, precisely, Suttles was agreeing.  (Pl. Ex. 3, at 2.)

[154] (Pl. Ex. 3, at 4.)

bpd.[155]   Indeed, that is precisely what Suttles expressly represented hours later in the early morning of April 29th: "I think that somewhere between one and five thousand barrels a day is probably the best estimate we have today."[156]

Plaintiffs' have identified information that was within Suttles's knowledge, the omission of which made his opinion misleading to a reasonable investor.[157]   As Defendants acknowledge,[158] Plaintiffs' evidence indicates that Suttles was in possession of two sets of BP-produced flow rate estimates as of April 28th and 29th: a range of estimates produced by David Rainey's application of the Bonn methodology, and a range of estimates that Rainey produced by using his hybrid ASTM methodology.[159]   The Bonn method produced a "low" estimate of 2,783 bpd, a "best guess" of 17,328 bpd, and a "high" estimate of 92,028 bpd.[160]   For several reasons, some of which are more compelling than others, Suttles and Rainey chose to disregard the Bonn estimates.[161]   Thus, Rainey's ASTM estimates—which produced a "low" estimate of 1,063, a "best guess" of 5,758, and a "high" estimate of 14,266 bpd—were the only timely set of BP-produced flow rate estimates upon which Suttles's representation could have been based.[162]

---

[155] Arguably, a reasonable investor would have inferred that Suttles was emphasizing the lower end of the range.  (Pl. Ex. 3 at 3-4 (BP does "not believe [the new leak] changes the amount currently estimated to be released," and "The new location is upstream of that, it's before that; so that's the reason we don't believe the total flow is different.")

[156] (Pl. Ex. 4, at 3.)

[157] *See Omnicare*, 135 S. Ct. at 1332.

[158] (*See* Def. Opp. at 14.)

[159] (*See* Pl. Ex. 48 (Rainey Dep.) 139:23-141:2, 147:24-150:4.)

[160] (Pl. Ex. 19.)

[161] (Pl. Ex. 149:18-152:2; *but see* Doc. No. 1333 ("Hr'g Tr.") 153:12-154:7 (explaining that Rainey's and Suttles's basis for disregarding the Bonn method was questionable).)

[162] (Pl. Ex. 19.)

But even the few facts upon which Suttles was purportedly relying did not fairly align with his April 28th and 29th statements.[163]  By omitting these facts, Suttles's representation was misleading in several ways.  First, to the extent that 1,000 bpd fell within the range of BP's "best estimate[s],"[164] so too would 14,266 bpd—each of those estimates was produced using Rainey's hybrid ASTM surface expression method.  Defendants argue that there is "no evidence that the assumptions used to calculate the higher numbers were more accurate or realistic,"[165] but this misses the point.  Plaintiffs need not present evidence that the "high" estimate was *more* compelling than the low estimate.  Omitting the "high" estimate would be misleading to investors as long as the "high" and "low" estimates were *equally* compelling.  As *Omnicare* holds, investors expect that assertions rest on something more than "mere intuition."[166]  Because Plaintiffs have presented evidence that the "high" and "low" figures were produced under the ASTM methodology (*i.e.*, the figures can be compared apples-to-apples), at the very least, Plaintiffs have created a dispute of material fact as to the weight of the two estimates.[167]  If those two estimates are proven to be of equal weight and Suttles merely cherry-picked the more

---

[163] And this is to say nothing of Suttles's severe recklessness in failing to apprise himself of additional, readily-available flow rate estimates, which is discussed in the following sub-section.

[164] (Pl. Ex. 4, at 3 (indicating Suttles stated, "I think that somewhere between one and five thousand barrels a day is probably the best estimate we have today.").)

[165] (Def. Opp. at 21.)

[166] *Omnicare*, 135 S. Ct. at 1328.

[167] Defendants argue that the high end of Rainey's hybrid ASTM methodology was actually based on more conservative assumptions (*i.e.*, that it erred on the high side as compared to the true ASTM methodology).  (Def. Reply at 17 n.8.)  But this is still not necessarily a reason for Suttles to discard it in favor of the low end of Rainey's findings.  If anything, it could be viewed as evidence that Rainey thought the high end of the ASTM methodology would have produced too low of a figure, and that his hybrid better represented the range of potential flow rates.

favorable of the two, then the omission of the higher estimate would be misleading to a reasonable investor.  Moreover, it would suggest that Suttles acted with "intent to deceive."[168]

Second, by suggesting that 1,000 bpd was still within the range of "best estimates," Suttles understated the potential flow rate.  Suttles himself has since admitted that, by April 29th, BP's "best estimate had moved from one to five."[169]  Indeed, the only expressly-designated "best" estimates that Suttles had seen were 5,758 bpd (ASTM) and 17,328 bpd (Bonn).[170]  Third, even the upper bound of Suttles's "best estimate" range understated by 15% the "best" estimate on which Suttles was purportedly relying.[171]  In short, the Court struggles to find any way in which the "information . . . in [Suttles's] possession" at the time "fairly align[ed] with" his opinion.[172]  And not only does Plaintiffs' evidence suggest that Suttles's statements were misleading, it is certainly sufficient to suggest that Suttles *knew* that his representations would be misleading (or was at least severely reckless in this regard).

Defendants seek safe harbor in the context of Suttles's statements, which they contend "ma[de] clear the real tentativeness of [his] belief," absolving him of any liability.[173]  This argument is unavailing.  No amount of caveats or hedges gives a speaker license to cherry-pick favorable data based on little more than a whim, and Plaintiffs have provided evidence that Suttles did so here.  His statements were ostensibly based on one set of flow rate estimates, yet

---

[168] *See Spitzberg*, 758 F.3d at 684.

[169] (Pl. Ex. 42 (Suttles SEC Tr.) at 239:25-240:10, 259:12-263:3; *see also* Pl. Ex. 1 (Suttles Dep.) at 275:22-24 ("I believe what we were trying to convey is our best estimate had moved to five.").

[170] (Pl. Ex. 19.)

[171] (*See* Pl. Ex. 19 (providing a "best guess" of 5,758 bpd).)

[172] *See Omnicare*, 135 S. Ct. at 1329.

[173] (Def. Reply at 4.)

he disregarded the high-end of the range (for reasons unknown), and then represented that the low end of the range was one of BP's best estimates.

This is markedly different from the type of scenario in which the "tentativeness" safe-harbor outlined in *Omnicare* would apply. For example, by way of comparison, suppose that Suttles had said, "BP's flow rate estimates are very tentative and wide ranging, but I think our best estimate is 5,700 bpd." In this scenario, *Omnicare* would likely afford him protection. Omitting the high end of the ASTM range would not be misleading because, in this hypothetical situation, he similarly omitted the lower end, lending a degree of balance and symmetry to the representation—in other words, the tentativeness of the statement cuts both ways. Here, that sense of symmetry and balance is lacking entirely.

### (2)   Meaningful Inquiry

Plaintiffs additionally argue that Suttles failed to conduct a meaningful inquiry into flow rate estimates, as would have been expected by a reasonable investor.[174] Specifically, say Plaintiffs, BP's engineers and contractors had produced thirteen sets of internal flow rate estimates as of the times Suttles spoke on April 28th and 29th, yet Suttles apprised himself of only two.[175] In fact, Suttles completely neglected all of BP's internal hydraulic modeling estimates. Defendants respond that these purported "estimates" have only a "superficial connection to [Suttles's] public statement," and he was therefore under no obligation to seek them out.[176] Defendants' conclusion predominantly rests on two arguments.

---

[174] *Id.* at 1329 n.6 (holding that, under the omissions provision, a speaker's subjective belief in the truth of his opinion will not insulate him from liability "in the absence of the expected inquiry").

[175] (*See* MPSJ at 7-8.)

[176] (Def. Opp. at 44.)

First, Defendants argue that BP's hydraulic models were "worst case discharge" calculations based on counterfactual assumptions, rendering them of little use in estimating the actual flow rate. To some extent, Defendants are correct. For example, one of the calculations was based on the assumption that there were "open hole" flowing conditions.[177] Three other calculations were similarly intended to calculate only a worst case scenario, and the Court agrees that these types of calculations were of little relevance to Suttles's public statements.[178]

Second, Defendants argue that BP's hydraulic models were irrelevant because such models "require accurate data for several input variables," and without all of those variables, "it is impossible to use hydraulic modeling to reliably solve for flow rate."[179] For example, Defendants impugn the hydraulic modeling estimates produced on April 27th and April 28th because one of the inputs was the diameter of the orifice through which the oil was leaking, which was unknown at the time. Instead, the models were run using a range of potential orifice diameters, and they produced a range of potential flow rate estimates as a result. Thus, say Defendants, these estimates were "*not* estimates of the *actual* flow rate, but rather estimates of what the flow rate *might* be given certain assumptions . . . ."[180]

But uncertainty does not render information completely irrelevant. Every estimate or projection is based on variable assumptions—otherwise, the "estimate" would not be an estimate at all, but rather an empirical statement of fact. Indeed, the very nature of estimation involves

---

[177] (*See* Pl. Ex. 11 (indicating that Estimate C was based on counterfactual assumption that there were "open hole" flowing conditions).)

[178] (*See* Def. Opp. (explaining that Estimates A, B, and E are worst case discharge estimates).)

[179] (Def. Opp. at 15 (citing Def. Ex. 25 (Ballard Report) at 4). While four of the hydraulic models produced worst case discharge, Plaintiffs have provided evidence that the remaining models attempted to calculate the actual flow rate based on a range of reasonable factual assumptions about unknown variables. (*See* Pl. Reply at 10 n.4.)

[180] (Def. Opp. at 43-44 (emphasis in original).)

looking at multiple data points produced from a range of assumptions and drawing a reasonable range of conclusions accordingly.  Ole Ryegg, a BP contractor who developed the OLGA modeling system that BP used to model the Macondo well flow, made a similar observation in the context of hydraulic modeling: "hydraulic modeling matches known downhole well data to a description of the flowpath, identifying possible interpretations and eliminating those that cannot exist. . . . In producing fields [of data], good data may be available and kill operations can be planned with confidence."[181]

BP's engineers must have had *some* idea as to which orifice diameters were more likely than others.  As Suttles told the Coast Guard following the spill, "it doesn't take a very large opening to get a relatively large flow rate."[182]  So at the very least, Suttles knew that the low end of the hydraulic modeling estimates would have yielded useful information.  And on April 27th and 28th, BP engineers produced at least four different sets of calculations based on different orifice sizes.[183]  For example, on April 28th, Trevor Hill stated that, even if the diameter of the orifice was as small as .25 inches, the flow rate would be 2,523—more than two times the low end of BP's range of purported "best estimates."[184]  And according to Tim Locket's calculations on April 27th, an orifice size of one inch would have resulted in a flow rate of 22,000 bpd.[185]

---

[181] (Pl. Ex. 143.)

[182] (Pl. Ex. 14 at 429:12-432:6.)

[183] (*See* MPSJ at 8 (citing Estimates I, J, K, L).)

[184] (Pl. Ex. 23.)  Defendants also argue that many of the hydraulic model estimates actually support Suttles's flow rate statements.  (Def. Reply at 30.)  This is inaccurate.  For example, Defendants state that Trevor Hill estimated a flow rate of 5,800 on April 27th.  But Plaintiffs neglect to mention that this was the *low* end of the range of estimates, which also included potential flow rates of 12,900 and 22,600.  (Pl. Ex. 20.)  Defendants similarly misconstrue the nature of several other hydraulic modeling estimates.

[185] (Pl. Ex. 22.)

Moreover, the Court struggles to comprehend how Defendants can castigate BP's hydraulic modeling efforts on the heels of touting the surface expression methodology on which Suttles exclusively relied.  Defendants' aspersions on hydraulic modeling—that it relies on unknown variables and cannot "reliably solve for flow rate"[186]—seem to apply with equal (or perhaps even greater) force to BP's surface expression methodologies, which are similarly based on widely variable assumptions.  For example, there are at least three surface expression methodologies, each of which attributes different thicknesses to different shades of oil.[187]  In other words, the correlation between shades of oil and the thickness of the slick was an unknown variable—one that was widely divergent across competing methodologies.[188]  The Court sees little difference between field observers making assumptions about the thickness of the oil, on the one hand, and BP's expert engineers making assumptions about orifice size, on the other. (And all of this is to say nothing of the potential for human error and variance among the field observers who are conducting aerial overflights for the surface estimates.[189])  If it is true that, as Defendants argue, the surface expression estimates were an adequate basis for Suttles's flow rate representations, it seems only logical that the hydraulic modeling work would have been similarly informative.

Further to the point, not only is there evidence that the hydraulic modeling estimates would have been of *relative* value to Suttles, Plaintiffs have also presented evidence that the

---

[186] (Def. Opp. at 15; *see also* Ballard Rep. at 8 ("The Macondo system was too undefined to generate a *reliable* flow estimate using hydraulic modeling") (emphasis added).)

[187] (Potter Rep. at 3-6.)

[188] (*See* Potter Rep. at 3-6.)

[189] As Defendants themselves admit, "you and I could be in the same airplane looking at the same thing, and I *guarantee you we'd see something different*."  (Def. Opp. at 32 (citing Def. Ex. 7 (Perkin Dep.) at 184:1-7); *see also* Hr'g Tr. 100:6 ("There is no standardization to how people describe these colors.").)

estimates were of *actual* value to BP's response efforts—both BP's engineers and contractors were relying on hydraulic modeling estimates in their source control efforts—even Defendants concede as much in their briefing.[190]   If those estimates were reliable enough to inform the source control team's decision making, then they were at least arguably reliable enough to inform Suttles's public statements regarding BP's "best estimate" of the actual flow rate.[191]

Plaintiffs' argument that Suttles was at least severely reckless in failing to apprise himself of BP's hydraulic modeling estimates is made all the more compelling by evidence that Suttles knew that BP's engineers were producing the models.  For example, Plaintiffs have provided evidence suggesting that Suttles: (1) was generally aware that BP had the engineering expertise to potentially model the flow rate;[192] (2) Suttles knew that the Houston source control team was performing flow rate estimates;[193] (3) Suttles knew that the estimates on which he was relying

---

[190] (*See* Def. Reply at 24 (noting that "Both parties' experts agree that . . . BP and its contractors used hydraulic modeling to understand the possible impact of source control operations" and citing evidence); Def. Opp. at 15 (citing Ballard Rep. at 1); *see also* Pl. Ex. 18 (Barnett Dep.) at 63:15 – 64:5.)  Even if, as Defendants' say, "the flow rates used for . . . this work were necessarily and intentionally biased to the high side," (Def. Opp. 15), that is no reason to disregard the data entirely.  As Bill Lehr stated, surface expression modeling produces estimates that are "usually on the ***low*** side," (Pl. Ex. 47 (Lehr Dep.) 246:16-247:8,) yet Suttles relied on it exclusively.

[191] Defendants argue that Plaintiffs have failed to prove that the hydraulic modeling estimates would have been material to a reasonable investor.  (Def. Reply 20.)  Specifically, they point to testimony from Plaintiffs' loss causation expert, Chad Coffman, stating that these estimates would have been "'informative' to the market only 'if the methodology underlying those estimates got you closer to an assumption as to what was actually going on under the sea at that moment.'  (Def. Reply 20 (quoting Def. Ex. 13 (Coffman Dep.) at 121:3-23)).  But for the reasons outlined in the preceding paragraphs, Plaintiffs have presented evidence from which a jury could conclude that the hydraulic modeling estimates *would* have gotten the market closer to what was "going on under the sea."  Defendants' argument fails as a result.

[192] (MPSJ Ex. 14 at 434:15-435:21 (noting that BP had "experts in flow assurance," which involves expertise regarding how oil "flow[s] through pipes in deepwater."); Pl. Ex. 42 (Suttles SEC Tr.) at 151:22-152:4 (Suttles explained that he "knew that you could make this [flow rate] calculation in various ways").)

[193] (Pl. Ex. 16 (Suttles's handwritten note from call with Houston source control team that

were far from perfect;[194] and (4) while on a conference call on April 27th, Suttles heard that BP's engineers were calculating ranges of flow rates based on varying orifice sizes and pressure curves.[195]  Yet despite knowing of these readily available estimates—and despite knowing that the *one* surface expression estimate on which he was exclusively relying was highly unreliable—Suttles elected to forego reviewing this flow rate information before speaking publicly *about the flow rate*.[196]

This evidence is sufficient for Plaintiffs to avoid summary judgment.  Suttles knew that he was going to speak about BP's flow rate estimates at the April 28th press conference and on the April 29th morning shows.  A reasonable jury could conclude that it was at least severely reckless for Suttles to essentially rely on one "highly unreliable" flow rate estimate instead of inquiring as to BP's numerous other calculations, particularly given that his statement was diverging from the flow rate estimates produced by the NOAA.[197]

---

contains a reference to a flow rate estimate).)

[194] *See* Section III.B., *supra*.

[195] (*See* Pl. Ex. 150 (conference call notes referencing "ACTION" items for "Doug," indicating that Doug Suttles was in fact on the conference call during which hydraulic modeling efforts were discussed).)

[196] (Pl. Ex. 14 at 4:35:15-23.)  For these reasons, Defendants' assertion that this holding would "require [corporate executives] to search for and disclose *all* information throughout the company (regardless of relevance) before they speak on a subject" is misguided.  (*See* Def. Reply at 26.)  Here, Suttles *knew* that the information on which he was relying was far from reliable or conclusive, *knew* (at least generally) about the hydraulic modeling estimates of flow rate, and *knew* that he was about to speak *about flow rate*.  This is a far cry from situations where, for example, a plaintiff sues a CEO for failing to investigate accounting regularities about which he had no notice.

[197] Defendants counter that Suttles was relying not only on the ASTM estimates, but also on the fact that those estimates were corroborated by the NOAA's estimates.  But the notion that the NOAA's estimates corroborated Suttles's ASTM estimates overstates the facts (or is at least a disputed fact).  The NOAA repeatedly emphasized that their estimates were accurate only to an order of magnitude and that surface expression methodology was highly unreliable.  Indeed, the NOAA's estimates were arguably a red flag that should have led Suttles to rely on more than surface expression methodology, especially given BP's unique ability to model the conditions of

### D.    Hayward's May 5th Statement

The Court need not reach the issues of falsity and scienter with respect to Hayward's statement to the Houston Chronicle.  Plaintiffs have failed to provide evidence that Hayward's May 5th statement proximately caused any of their losses (*i.e.*, Plaintiffs have not satisfied the loss causation element of their Section 10(b) claim).[198]  As a result, Hayward is entitled to judgment as a matter of law regardless of whether he intentionally made a false or misleading statement.

### E.    Defendants' Evidence of Suttles Good Faith

Defendants additionally argue that any possible evidence of scienter is negated by substantial evidence indicating that Suttles was acting in good faith.  The Court disagrees.  At most, Defendants have demonstrated that Suttles's intentions are a disputed point of fact that should be resolved at trial.

Defendants first contend that it was the UAC who announced the 1,000 and 5,000 bpd estimates, and Suttles's merely acquiesced to those estimates in good faith reliance on government experts (*e.g.*, Charlie Henry of the NOAA).  The evidence, however, suggests that a reasonable jury could conclude otherwise.  As an initial matter, a reasonable investor would have understood Suttles to be speaking on behalf of BP, not merely repeating the UAC's estimate.[199]

---

[198] As the Court discusses at length in Section IV, *infra*, Plaintiffs have provided evidence of loss causation only as to the stock drops on April 29th and May 3rd, meaning that they could not have been caused by Hayward's statement on May 5th.

[199] (Pl. Ex. 2, at 2-3.)  During his prepared remarks, Suttles spoke in the collective "we." His remarks can most fairly be read to refer to the BP Group rather than the combined UAC. (*E.g., id.* at 2 ("Working with Transocean – the owner and operator of the drilling rig – the MMS, and the Coast Guard, we are committed to finding the cause of this incident."); *id.* at 3 ("Our current efforts – in cooperation with Transocean, the MMS, and the Coast Guard – are focused on developing and implementing the most effective way to stop the flow of oil.").).  Additionally, at

More importantly, Suttles's estimates and comments actually diverged from the NOAA's estimates, so the suggestion that he was just a supporting character in the UAC's play rings hollow.[200]

Defendants additionally argue that Suttles operated with a high level of transparency throughout the post-spill timeframe.  But Admiral Landry, who worked extensively with Suttles, provided testimony that calls Defendants' position into question.  For example, Landry indicated that "Suttles attempted to downplay the flow rate," particularly on April 28th after the third leak point was detected in the piping.[201]  According to Landry, Suttles advocated for increasing the flow rate estimate to only 2,500 bpd rather than the 5,000 bpd figure produced by the NOAA.[202]  Not only did this 2,500 bpd figure cut against the few BP-produced estimates with which Suttles was familiar—estimates which were not shared with the UAC—it cut against the NOAA-produced estimates upon which Suttles is claiming to have relied in good faith.[203]

Additionally, David Hayes, Deputy Secretary for the U.S. Department of the Interior, expressly suggested that BP's communications were less than forthcoming.  After receiving an

---

the April 28th press conference, Landry drew a distinction between BP's estimates and the NOAA/UAC's estimates: While "BP believes and we believed and established a thousand barrel per day estimate . . ., NOAA experts believe the outlook . . . can be as much as 5,000 barrels." As a result, it is reasonable to assume that Suttles was speaking on behalf of BP, not the UAC. At the very least, this is a fact issue for the jury.

[200] See Sections III.B and III.C, *supra*. In short, the NOAA's representative told Suttles that the flow rate "could be a thousand, could be 10,000,"  (Pl. Ex. 43 (Henry Dep.) at 182:2-11), yet Suttles represented only the low end of that range publicly on April 24th.  On April 29th, the NOAA's best estimate had moved to 5,000 bpd, yet, once again, Suttles represented that BP's best estimate was lower: somewhere between 1,000 to 5,000 bpd.  If anything, this is evidence that Suttles was acting in *bad* faith by consistently providing estimates at the low end of the NOAA's range.

[201] (Pl. Ex. 85 (Landry Dep.) 82:8-84:12.)

[202] (Pl. Ex. 85 (Landry Dep.) 66:18-68:13, 96:1-96:18.)

[203] (Pl. Ex. 85 (Landry Dep.) 82:8-11.)

41

update from BP, Hayes emailed Suttles: "[There is] very little granularity on the key points that we are focusing on.  Frankly, it looks like outside communication folks and lawyers have intervened since the template was circulated yesterday."[204]

## IV.   LOSS CAUSATION

Plaintiffs argue that they have identified six days on which "corrective" information— that is, negative information that revealed the truth about Defendants' fraudulent representations—entered the market, causing the value of BP ADS to drop, and thereby proximately causing injury to Plaintiffs.  The corrective disclosures include:

- **April 29** – News that BP increased its estimate of the flow rate from 1,000 bpd to 5,000 bpd.
- **May 3** – News that the size of the oil slick had tripled in size over the weekend.
- **May 10** – News that BP failed to stop the oil spill via a "coffer dam" or "containment dome."
- **June 1** – News that BP failed to stop the oil spill using "Top Kill."
- **June 9** – News that members of Congress sent a letter to BP advising that BP should suspend its dividend.
- **June 14** – News that BP's Board of Directors was meeting to discuss alternatives to its Q2 dividend payment because of "anticipated costs and repercussions from the oil spill."

Defendants argue that Plaintiffs have failed to provide evidence of loss causation for any of these alleged "corrective event days."  Accordingly, say Defendants, summary judgment is appropriate.  The Court agrees that Defendants are entitled to judgment as a matter of law with respect to the stock drops on May 10, June 1, June 9, and June 14, but holds that Plaintiffs have met their burden of identifying specific evidence from which a reasonable jury could conclude that Defendants' misrepresentations were the proximate causes of the stock drops on April 29 and May 3.

---

[204] (Pl. Ex. 86 (BP-HZN-2179MDL01446171).  *See also* Pl. Ex. 85 (Landry Dep.) 69:10-71:8 (Suttles pushed back against Landry's attempts to be more transparent with the press).)

## A.     Loss Causation, Generally

"Loss causation requires proof of a causal connection between a misstatement and a subsequent decline in a stock's price."[205]  Merely establishing that the stock's purchase price was artificially inflated is insufficient.[206]  Instead, "the plaintiff must prove that when the 'relevant truth' about the fraud began to leak out or otherwise make its way into the marketplace it caused the price of the stock to depreciate," directly devaluing the stockholder's shares, and "thereby proximately caus[ing] the plaintiff's economic loss."[207]

There are two components to establishing loss causation.[208] First, the decline in stock price must follow "a disclosure of negative truthful information that was related to the allegedly false, non-confirmatory positive statement made earlier."[209]  For negative information to be "related to" a prior misstatement, it need not "specifically reveal[ ] the fraud" by correcting the prior misstatement "fact-for-fact."[210] Instead, the "disclosed information must reflect part of the 'relevant truth'—the truth obscured by the fraudulent statements."[211] Second, it must be "more

---

[205] *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 229 (5th Cir.2009); *see also Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005) (describing loss causation as a "causal connection between the material misrepresentation and the loss").

[206] *Dura*, 544 U.S. at 342.

[207] *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 255 (5th Cir. 2009) (citing *Dura*, 544 U.S. at 344); *In re BP p.l.c. Sec. Litig.*, 2014 WL 2112823, at *6 n.4 (S.D. Tex. May 20, 2014).

[208] *Id.* at *7.

[209] *Flowserve Corp.*, 572 F.3d at 229.

[210] *Id.*

[211] *Id.* at 230.

probable than not that . . . this negative statement, and not other unrelated negative statements . . . caused a significant amount of the decline."[212]

## B. Scope of the "Relevant Truth" and Corrective Disclosures

The parties' loss causation arguments are many and span dozens of pages, but most of their arguments arise out of a fundamental disagreement regarding the scope of the "relevant truth." Plaintiffs define the concept broadly, contending that the "relevant truth" is any "truth that was obscured by the fraud, [including] instances where . . . a broader relevant truth follows from a misrepresentation because of the message that the statement conveys."[213] And here, Plaintiffs argue, by fraudulently misrepresenting BP's flow rate estimates, BP implicitly misrepresented (or "obscured") the true magnitude of the oil spill.[214]

Defendants construe the relevant truth more narrowly. According to Defendants, the "relevant truth" is the fact that BP underrepresented its flow rate estimates. Disclosures are therefore corrective only if the market understands the disclosure as corrective of the flow rate.

The Court agrees with Defendants. The general thrust of Plaintiffs' argument is intuitively appealing, but a closer inspection reveals that their conception of the "relevant truth" would lead to outcomes that cannot be harmonized with the principles outlined by the Supreme Court in *Dura Pharmaceuticals*.[215]

---

[212] *Id.* at 228 (quoting *Greenberg v. Crossroad Sys.*, 364 F.3d 657, 666 (5th Cir. 2004)).

[213] (Doc. No. 1341 ("Pl. Supp.") at 2.)

[214] (Pl. Supp. at 4.) For example, as one analyst put it, "[W]e do not see [the oil spill] materially impacting BP's outlook. The leak is relatively small (1[,000] bopd]); it would take a year of continuous leaking to reach Exxon Valdez-type proportions." (Pl. Ex. 94, *Macondo spill overshadows solid 1Q10 results*, Bank of America Merrill Lynch April 28, 2010, at 1.)

[215] *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005).

### (1)   Plaintiffs' Conception of the "Relevant Truth" and Corrective Disclosures

Plaintiffs' conception of the relevant truth is based on the uncontroversial arithmetical proposition that *Magnitude of the Spill = Duration of the Leak \* Flow Rate of the Leak*.[216]   In other words, Plaintiffs' theory is premised on the proposition that the potential magnitude of the spill is a direct function of the flow rate; to misrepresent the latter necessarily obscures the truth about the former.   And here, say Plaintiffs, because Suttles was providing the market with each of the two requisite variables for calculating the magnitude of the spill (duration and flow rate), not only was he obscuring the truth about the magnitude of the spill, in effect, he was implicitly misrepresenting it.[217]   Thus, the "relevant truth"—that is, the truth obscured by Defendants'

---

[216] (Pl. Supp. at 7.)  The "magnitude of the spill" is the amount of oil (measured in barrels) that is spilled into the Gulf of Mexico as a result of the leak from the Macondo well.

[217] (Pl. Supp. at 4.)  For example, on April 25th, Suttles publicly stated that it could take BP up to three months to stem the flow of oil from the leak, and he reiterated this timeline throughout the class period.  By extension, Plaintiffs argue, when Suttles later stated that the flow rate was estimated to be 5,000 bpd, he was implicitly representing that BP's estimation of the ultimate size of the spill was 90,000 barrels of oil (1,000 bpd \* 90 days = 90,000 barrels of oil).  (*See* Hr'g Tr. at 49:11-50:2, 58:13-25, 140:8-140:20.)

There was much debate between the parties as to what, precisely, Suttles stated about the duration of the leak.  Plaintiffs have vociferously contended that Suttles represented it would take BP 90 days to stop the leak, but this position is flatly contradicted by the very evidence that Plaintiffs cite in support.  The evidence actually indicates that Suttles consistently provided the market with a *range* of duration estimates throughout the class period:  BP would first try to seal the leak with a remote-operated vehicle ("ROV"), which would take a matter of about twenty-four hours;  if the ROV failed, then BP would attempt to build a containment dome around the well, which would take roughly two to four weeks;  in the meantime, BP would build relief wells that would take about three months to complete.  Thus, the 90 day timeline to which Plaintiffs refer was merely the outer bound of the potential duration, not BP's hard and fast estimate.  (*See, e.g.*, Pl. Ex. 90, Chevreux, April 27, 2010, *Clean Q1-10 net income 18% above consensus* (noting that BP was "trying to seal the leak with an ROV"; if the ROV fails, BP will build containment domes which will take "two to four weeks"; and BP will build a relief will, which could take "months"); Pl. Ex. 96, Bank of America Merrill Lynch, *Macondo Spill reaction looks overdone*, April 30, 2010 (same); Pl. Ex. 105, JPM Casenove Analyst Report, *Macondo update – first attempt with containment system fails*, May 10, 2010 (same)).

fraud—is not only that BP expressly underrepresented its estimates of the flow rate, but also that, by doing so, BP implicitly underrepresented the potential magnitude of the spill.[218]

This definition would substantially enhance Plaintiffs' ability to recover damages for drops in the value of BP ADS.  As explained in Section IV.C., Fifth Circuit law provides that plaintiffs may recover damages for any decline in stock price that follows a corrective disclosure (*i.e.*, a disclosure that reveals the relevant truth).[219]  Thus, as the scope of the relevant truth expands, so too does the universe of disclosures that can qualify as "corrective."  For example, under Defendants' definition of the relevant truth, Plaintiffs could establish loss causation only for stock drops that follow disclosures related to BP's fraudulent flow rate estimates.  Under Plaintiffs' definition, however, Plaintiffs could recover damages for stock drops that follow any disclosure that reveals the true magnitude of the spill.  In other words, disclosures would be corrective not only if they relate to BP's fraudulent flow rate estimates, but also if they relate to BP's *non*-fraudulent estimates of the duration of the spill.[220]

Consider, for example, how Plaintiffs' loss causation framework applies to the June 1 disclosure that the "Top Kill" containment method had failed.  According to Plaintiffs, the failure of Top Kill revealed "that the duration . . . of the spill would continue," causing the market price of BP ADS to decline by $5.93.[221]  Although this disclosure said nothing of flow rate—it speaks only to BP's estimates of the *duration* of the spill, which Plaintiffs concede was accurately represented throughout the class period—the disclosure nonetheless indicated to the market that

---

[218] (Pl. Supp. at 4.)

[219] (*See* Section IV.C., *supra*.)

[220] Plaintiffs concede that BP accurately represented its estimates of the duration of the leak.

[221] (Pl.' Opp. 72-73.)

the magnitude of the spill would be more severe than initially anticipated, and is therefore corrective.[222]

According to Plaintiffs, this loss causation framework "present[s] a classic 'but for' methodology that 'seeks to address the question of what a stock's price would be absent the alleged fraud.'"[223]  If BP had accurately represented its flow rate estimates initially, the market would have understood that the potential magnitude of the spill was substantial, and the value of BP ADS would have declined accordingly.  The failure of Top Kill, although unrelated to flow rate,[224] demonstrates how the market responds to news that the spill is of a greater magnitude than BP's flow rate estimates initially implied.  Thus, Plaintiffs aver that they can use "BP's failure to stop the oil flow as a proxy for measuring what the 'true value' of what BP's stock would have been had Defendants' not misrepresented the severity of the spill from the outset."[225]

Defendants contend that "Plaintiffs' formulation of the relevant truth . . . [has] no support in the case law," and they appear to be correct—Plaintiffs have not provided any case law that

---

[222] (Ps. Opp. 72-73.)  It must be remembered that the bedrock of Plaintiffs' argument is the notion that *Magnitude of the Spill = Duration of the Leak * Flow Rate of the Leak*.  An increase in the duration of the spill leads to an increase in the magnitude of the spill in the same way that an increased flow rate would lead to an increase in the magnitude of the spill.  Because the relevant truth is that BP underrepresented the magnitude of the spill, any disclosure that reveals the true magnitude of the spill is corrective.  Under Plaintiffs' theory, whether that disclosure relates to duration or flow rate matters not.  (*See* Hr'g Tr. at 50:22-51:19.)

[223] (Pl. Opp. 73-74 (quoting *In re Novatel Wireless Secs. Litig.*, 2013 U.S. Dist. LEXIS 164725, at *10 (S.D. Cal. Nov. 19, 2013).)

[224] The relationship, or lack thereof, between flow rate and the failure of Top Kill is discussed in Section IV.C., *infra*.

[225] (Pl. Opp. 73; *see also* Pl. Opp. 68-69 and 77 (applying this "proxy" theory to the disclosures on May 10, June 9, and June 14); Doc. No. 1124 (Pl. Opp. to Def. Mot. to Exclude) at 29 ("Mr. Coffman has clearly testified that through his analysis he is calculating artificial inflation that Defendants' misrepresentations impounded into the stock. Artificial inflation is measured through the use of proxies in the form of later price declines that occurred after some portion of the truth came to light and provides an appropriate class-wide damages methodology.").)

sets a precedent for their broad conception of the "relevant truth," nor is the Court otherwise aware of any.[226]   But, while true that Plaintiffs have provided no case law endorsing their approach, Defendants have cited no case law that expressly forecloses it.[227]   As a result, the Court must evaluate the merits of Plaintiffs' definition of the relevant truth in the more general context of the loss causation principles outlined in *Dura*.

### (2)    The Proper Scope of the Relevant Truth and Corrective Disclosures

The Supreme Court's edict in *Dura* was clear: "the [securities laws] make actions available, not to provide investors with broad insurance against market losses, but to protect them against those economic losses that *misrepresentations actually cause*."[228]   Here, Suttles fraudulently misrepresented BP's flow rate estimates.   Yet Plaintiffs' definition of "the relevant truth" would allow them to use the market's reaction to BP's non-fraudulent ***duration*** estimates as a proxy for the economic loss that was caused by Suttles's ***flow rate*** misrepresentations.   This approach—at least, as applied here—is incongruous with *Dura*'s limiting principle.   Plaintiffs

---

[226] Following the motion hearing, the Court ordered the parties to provide supplemental briefing on the proper scope of the "relevant truth."  The Court instructed, "To the extent that Plaintiffs think the 'relevant truth' should be defined more broadly than 'the fact that Defendants made false statements regarding BP's flow rate estimates,' Plaintiffs should . . . identify any supporting precedent."  (Doc. No. 1340 ("Order") at 5.)  In their supplemental briefing, Plaintiffs identified three cases in support of their position.  (Pl. Supp. at 3-5 (citing *Lormand*, 565 F.3d at 249; *Spitzberg*, 758 F.3d at 680-81, 688; *Flowserve*, 572 F.3d at 231).)  As Defendants correctly note, none of these cases addresses the type of theory that Plaintiffs are advocating here.  (*See* Doc. No. 1345 ("Def. Supp.") at 14-18 (explaining that the relevant truth in each case involved the direct subject matter of the misrepresentation, making them inapplicable to Plaintiffs theory).)

[227] There seems to be a dearth of case law discussing the proper scope of the "relevant truth." Instead, case law tends to focus on what constitutes a corrective disclosure.  For further discussion of the distinction between a corrective disclosure and the relevant truth, *see* Order at 2-4.

[228] *Dura*, 544 U.S. 336 at 345 (emphasis added); *see also id.* at 345-46 (investors must "prov[e] that the defendants' misrepresentations caused the loss for which plaintiff seeks to recover").

have presented no evidence from which a reasonable jury could find that the market's reaction to duration information is an adequate proxy for determining the "economic losses . . . actually cause[d]" by Suttles's misrepresentations of BP's flow rate estimates.[229]

Although ultimately unavailing, Plaintiffs' position is not entirely without force.  It is indisputable that a fraudulent flow rate estimate would "obscure[]" the truth about the potential magnitude of the spill—even Defendants concede that *Estimated Flow Rate * Estimated Duration of the Leak = Estimated Magnitude of the Spill.*[230]  And Plaintiffs have provided reams of evidence indicating that the market was indeed internalizing BP's flow rate estimates with an eye towards the ultimate size of the spill.[231]  It seems relatively simple to conclude that the market would react the same way to an increased flow rate estimate as it would to an increased duration estimate—either way, the projected size of the spill is going to increase.

But the attraction of Plaintiffs' argument is limited to its veneer of simplicity.  When a revised flow rate estimate (or any piece of news) is disclosed, the market does not internalize the news in a vacuum.  Instead, that one shard of information is examined within a pre-existing mosaic of interrelated data points and strategic considerations.  In other words, just because two

---

[229] Plaintiffs might argue that the "misrepresentation" relevant here is Suttles's implicit misrepresentation of the magnitude of the spill (*e.g.*, 1,000 bpd * 90 days = 90,000 barrels), not just his direct misrepresentation of flow rate.  But even assuming this contention has adequate factual support, (*see* n. 217, *supra*), the distinction is of no consequence in the context of *Dura*.  Suttles implicitly misrepresented the magnitude of the spill only to the extent that he misrepresented the flow rate.  His liability should be similarly limited.

[230] It is little more than tautology to say that, if *Estimated Flow Rate * Estimated Duration of the Leak = Projection of Total Barrels of Oil Spilled into the Gulf*, then a fraudulent flow rate would necessarily misstate the projected amount of oil spilled into the Gulf.

[231] (*See, e.g.*, Ex. 94, "*Macondo spill overshadows solid 1Q10 results*," Bank of America Merrill Lynch April 28, 2010, at 1 ("The leak is relatively small (1[,000 bopd]; it would take a year of continuous leaking to reach Exxon Valdez-type of proportions."))

variables have the same effect on a given output (*e.g.*, magnitude of the spill) does not mean they have the same effect on a company's stock price.  Consider the following hypothetical.

A technology company manufactures and sells two products: blank CD disks and flash drives.  The company represents that its revenue projection for Q1 is $5 million for CD sales, and $10 million for flash drive sales.  The representation for flash drives is accurate, but the representation for CDs is fraudulent.  In fact, the company projects only $1 million in revenue for CD sales.  Under Plaintiffs' theory, by over-representing projected CD revenue by $4 million, the company has implicitly misrepresented its projection of total revenue by $4 million, and *that* is the "relevant truth."[232]

A few weeks later, information leaks that the revenue projection for CD sales has been revised from $5 million to $4 million, and the company's stock price drops.  The following week, information leaks that the public has proven reluctant to adopt the new flash drive technology, and that the revenue projection for flash drives has been revised downward from $10 million to $7 million.  Once again, the company's stock price falls as a result.

Under Plaintiffs' theory of loss causation, both of these disclosures "reveal the relevant truth," and shareholders are entitled to recover damages for *each* of the ensuing stock drops.  After all, revenue is revenue.  A downward revision of $4 million for CD revenue, on the one hand, should have a substantively identical effect on stock price as a downward revision of $3 million in flash drive revenue and $1 million in CD revenue, on the other hand.  Either way, the market is responding to an aggregate downward revision of $4 million of total revenue.  Thus, according to Plaintiffs, shareholders could use the stock drop that resulted from the ***flash drive***

---

[232] (*See* Pl. Supp. at 4.)

disclosures as a proxy for what would have happened if the company had accurately disclosed revenue projections for *CDs*.[233]

But this theory relies on a false equivalence.  While true that each input (CD revenue and flash drive revenue) has the same effect on a given output (total revenue), their effects on the company's stock price are markedly distinct.  The market moves based not just on what the projected decrease in a product's revenue means for total revenue, but on what the decrease signifies about the company's business more generally.  For example, CDs are virtually obsolete. News that the company's CD sales are worse than the company publicly projected may be relatively insignificant to the market.  Indeed, the market may have already suspected that Plaintiffs' projection was overly optimistic, meaning that the artificial inflation in the stock price (*i.e.*, the inflation that resulted from the fraudulent statement) was relatively small.[234]  As a

---

[233] Or, to paraphrase Plaintiffs, the "stock price declines" resulting from the company's non-fraudulent conduct (failure to sell more flash drives) can be used "as a proxy for measuring what the 'true value' of what [the company's] stock would have been had [the company] not misrepresented [the total revenue] from the outset."  (*Cf.* Pl. Opp. 73 (arguing that Plaintiffs can use "BP's failure to stop the oil flow as a proxy for measuring what the 'true value' of what BP's stock would have been had Defendants' not misrepresented the severity of the spill from the outset").)

[234] For example, suppose that, instead of overstating its revenue projection for CDs by $4 million, the company overstated the projection by almost $400 million.  In this scenario, would the artificial inflation in the stock price be 100 times greater than in the original hypothetical? Of course not.  Just because a company makes a projection does not mean that the market necessarily assumes the projection is infallible.  Indeed, the market is not comprised of rubes or automatons.  Analysts independently evaluate representations using established financial metrics and in light of extensive industry-specific knowledge, and they price companies' stocks accordingly.  This is particularly true in the context of projections, which give rise to a wide range of potential opinions.  So, returning to our hypothetical, no reasonable investor—knowing what they know about the relevant markets and company's earnings history—would price the company's stock based on the company's overly rosy $400 million revenue projection.  Instead, the stock would trade based on a far more realistic assumption.  As a result, using the market's response to unrelated decreases in revenue projections for flash drives (up to $400 million) would drastically overstate the loss that was actually caused by the company's overstated CD

result, so too would be the decline in stock price that follows a disclosure that corrects the fraudulent projections of CD revenue.

On the other hand, perhaps the company's future viability depends entirely on its new flash drive technology, and the market was very bullish on the technology's prospects.[235]  When the market responds to news that flash drive revenue has been revised downward by $3 million, the stock drops precipitously not only because projected total revenue decreased by 20%, but because the viability of the flash-drive product—and, as a result, the viability of the company itself—has been called into question.

Here, similarly, Plaintiffs seem to contend that, because estimates of duration and flow rate have the same effect on a given output (estimated magnitude of the spill), the two types of information have an interchangeable effect on the market price of BP ADS.  But even assuming that this approach is theoretically plausible under some hypothetical set of facts, those facts are not present here; Plaintiffs have not provided evidence that the market effects of duration estimates provide a proxy for estimating the losses "actually cause[d]" by Suttles's fraudulent flow rate estimates.  Based on this conclusion alone, summary judgment is appropriate.

If anything, the evidence cuts *against* Plaintiffs' theory.  Specifically, the evidence suggests that: (i) the market reacted differently to disclosures of duration and flow rate estimates; and (ii) the artificial inflation attributable to the flow rate misrepresentations had fully dissipated by even the May 10th duration disclosure.

---

revenue, which the market never fully believed in the first place.

[235] The Court acknowledges that flash drives are no longer a burgeoning new technology for storing data, but the concept is far easier to understand than cloud computing.  For the purposes of this hypothetical, assume that flash drives are still the cutting edge storage solutions that they were in the early 2000s.

Much like in the footnoted hypothetical above,[236] it appears that the market treated BP's flow rate estimates somewhat skeptically.  After Suttles's revised estimate on April 29th, the market generally met news about flow rate with a shrug of its shoulders.  For example, on May 3rd, news broke that "the oil slick over the water's surface appeared to triple in size over the past two days, which could indicate an increase in the rate that oil is spewing from the well."[237] Reuters specifically noted growing fears that "the amount of oil gushing from one of its wells . . . may be *far* greater" than previously represented by BP.[238]  Yet BP's ADS price fell by only 4%.[239]

After May 3rd, the market's indifference to flow rate estimates was even more noticeable:

- On May 13 and 14, the media reported that a Purdue University professor had estimated the flow rate at 70,000 bpd.[240]

- On May 15, The Wall Street Journal reported that the 5,000 bpd estimate was facing "growing skepticism," and noting that the NOAA was "working on a worst case scenario assuming some 50,000 barrels a day of oil are pouring into the water."[241]

- On May 27th, the FRTG announced its preliminary flow-rate estimate of 12,000 to 19,000 bpd.  Additionally, analysts at Societe Generale remarked that BP's formal estimate of 5,000 bpd had been "challenged," and "independent experts [were] insist[ing] that BP [had] underestimate[d] the flow rate," which "might be anywhere between 20,000 and 95,000 b/d."[242]

---

[236] *See* n. 234, *supra.*

[237] (Pl. Ex. 99, "*Gulf Oil Spill Swiftly Balloons, Could Move East,*" Associated Press, May 1, 2010, 11:26 p.m.)

[238] (*See* Pl. Ex. 89 ("Coffman Rep.") at ¶155 and ¶114 (citing *BP shares fall again as oil leak fears escalate*, Reuters, May 3, 2010) (emphasis added).)

[239] (*See* Coffman Rep. ¶114.)

[240] (Def. Ex. 30 ("James Report") ¶ 147 n.170.)

[241] (Def. Ex. 92 at 2.)

[242] (Pl. Ex. 112 (citing independent estimates from John Amos, SkyTruth, Florida State

Despite the disclosure of these third-party estimates—which included flow rate estimates that were one to two orders of magnitude greater than BP's then-current estimate of 5,000 bpd—the price of BP's ADS did not decline by a statistically significant amount.  Thus, it appears that BP's flow rate estimates resulted in relatively little artificial inflation to begin with, and the inflation quickly dissipated as the market increasingly lost confidence in BP's flow rate estimates.  Indeed, by as early as mid-May, it appears the market had *no* confidence in BP's estimates.

Both BP's initial representations and subsequent disclosures about the duration of the leak, however, were far more concrete.  There was apparently general agreement within the market as to the methods that BP was employing, when they were employing them, and the fact that, if all else failed, BP would be able to drill a relief well within 90 days that would stop the leak.[243]  The effect of information regarding flow rate presumably had—and Plaintiffs have provided no evidence suggesting that it did *not* have—a different effect on the stock price than new information regarding duration.

In summary, notwithstanding the fact that flow rate and duration estimates each affect the projections for the total size of the spill, the magnitude of their effects on stock price differ.  It would be folly to use the price drop caused by revised duration estimates as a proxy for the effect of Suttles's flow rate misrepresentations (*i.e.*, for determining the "economic losses that [Suttles's] misrepresentations actually cause[d]").  Thus, Plaintiffs cannot create a genuine

---

University, the University of California, and two estimates Purdue University).)

[243] (*See, e.g.*, Pl. Ex. 90, Chevreux, April 27, 2010, *Clean Q1-10 net income 18% above consensus* (noting that BP was "trying to seal the leak with an ROV"; if the ROV fails, BP will build containment domes which will take "two to four weeks"; and BP will build a relief will, which could take "months"); Pl. Ex. 96, Bank of America Merrill Lynch, *Macondo Spill reaction looks overdone*, April 30, 2010 (same); Pl. Ex. 105, JPM Casenove Analyst Report, *Macondo update – first attempt with containment system fails*, May 10, 2010 (same)).

dispute of material fact as to the injury caused by Suttles's fraudulent *flow rate* misrepresentations by pointing to evidence that the market reacted negatively to news about BP's non-fraudulent *duration* estimates.   Doing so would diverge from *Dura*'s insistence that a Plaintiff recover only for "economic losses that the misrepresentations actually caused."[244] Because Plaintiffs' definition of the "relevant truth" would necessarily lead to a result that conflicts with *Dura*, the Court must reject it.   Instead, the "relevant truth" in this case is the fact that Defendants underrepresented BP's flow rate estimates.

### C.   Corrective Events

With the relevant truth defined, the question becomes whether Plaintiffs have identified any corrective disclosures—that is, disclosures of negative information that revealed the relevant truth, thereby causing the price of BP ADS to decline.[245]   As the Fifth Circuit has repeatedly cautioned, however, "a corrective disclosure [need not] squarely and directly contradict earlier misrepresentations."[246]   Instead, "indirect" disclosures of fraud may suffice, provided that "the plaintiff . . . 'provide[s] proof that the market recognized a relationship between the event disclosed and the fraud.'"[247]

---

[244] *Dura*, 544 U.S. at 345.

[245] *See Flowserve Corp.*, 572 F.3d at 229.

[246] *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 688 (5th Cir. 2014)

[247] *In re DVI, Inc. Sec. Litig.*, 2010 WL 3522090, at *6 (E.D. Pa. Sept. 3, 2010) (citing *McKowen Lowe & Co. v. Jasmine, Ltd.*, 2005 WL 1541062, at *8 (D.N.J. June 30, 2005); *see also In re Ikon*, 131 F.Supp.2d at 690, *aff'd*, 231 F. App'x 216 (3d Cir.2007); *In re Retek Inc.*, 621 F.Supp.2d at 699 (adopting *McKowen* approach)); *In re Williams Securities Litigation*, 496 F.Supp.2d 1195, 1266 (N.D. Okla. 2007), *aff'd* 558 F.3d 1130 (10th Cir. 2009).

### (1)    Stock Price Declines on May 10, June 1, June 9, and June 14

Plaintiffs have provided no evidence that the market understood the disclosures of negative information on these days to be corrective of BP's fraudulent flow rate estimates. Plaintiffs have failed to satisfy the first component of loss causation, and Defendants are entitled to judgment as a matter of law on the issue of loss causation for the price drops of BP ADS on May 10, June 1, June 9, and June 14.

### (i) Stock Price Declines on June 9 and June 14 (Dividend Cut)

Coffman attributes the stock-price declines on June 9 to news that Congressional representatives criticized BP for planning to pay its quarterly dividend,[248] and attributes the declines on June 14 to news that BP's Board of Directors met to discuss alternatives to paying the dividend.[249]  Plaintiffs argue that this news of a potential dividend-cut "further revealed the severity and financial impact of the spill," and conclude that this showing is sufficient to establish loss causation.[250]  The Court disagrees.

While true that disclosures may be indirectly corrective, Plaintiffs still must provide evidence that the market understood the link between the indirect disclosure and the earlier misrepresentation.[251]  But here, there is no indication that the market understood BP's dividend cut to relate in any way to the flow rate of the leak.  To the contrary, Plaintiffs' own evidence indicates that the market viewed the dividend cut as a response to increasing political pressure.[252]

---

[248] (Coffman Rep. ¶ 162.)

[249] (Coffman Rep. ¶ 164.)

[250] (Pl. Opp. at 75; *see also* Coffman Rep. ¶¶ 163, 165.)

[251] *In re DVI*, 2010 WL 3522090, at *6.

[252] (*See* Coffman Report ¶ 162; Pl. Ex. 127 ("We believe suspending the quarterly dividend could reduce the current political pressure and public anger in the US at BP . . . ."); Pl. Ex. 123

Plaintiffs alternatively argue that, even if the dividend-related disclosures are not corrective, they can cite to an additional disclosure that speaks directly to flow rate: on June 9th, the USGS released an updated flow rate estimate of 20,000 and 40,000 barrels per day.[253] Defendants correctly object to this argument on two grounds.  As an initial matter, the USGS estimate "is entirely new and not supported by Coffman's expert report," and "neither Plaintiffs' complaints nor their expert ever identified higher flow-rate estimates announced on June 9 as the cause of BP's stock-price declines that day."[254]  Moreover, the evidence of this updated flow-rate estimate is an analyst report dated June 11,[255] and the USGS press release upon which the report was based is dated June 10.[256]  Thus, the estimate could not possibly have caused BP's stock price to decline on June 9.

Finally, Plaintiffs also seem to advance the theory that Defendants have misconstrued the legal standard for loss causation:

> "Fifth Circuit law does not require that Plaintiffs show that the dividend cut revealed the truth about the flow rate; instead, through their expert's analysis, Plaintiffs need only demonstrate that had BP truthfully revealed the higher flow rates, analysts would have accurately calculated the spill costs to BP in late April . . . and been better equipped to determine that the dividend could be at risk."[257]

Plaintiffs' provide no authority or explanation to support their argument.  If anything,

---

("Present and future dividends look secure even if political pressure could force a short terms suspension of payments.").)

[253] (Pl. Opp. at 74-75.)

[254] (Def. Reply at 41.)

[255] (Pl. Opp. at 75 n.227 (citing Pl. Ex. 122).)

[256] (*See* Def. Reply Ex. 7.)

[257] (Pl. Opp. at 78 n.243).

case law expressly contradicts their interpretation.[258]  As the Court understands it, Plaintiffs' are

arguing that, but for Suttles's misrepresentations, the market would have been able to accurately

price the risk of a dividend cut into the value of BP ADS.[259]  But even assuming this is true, it

shows only that BP's misrepresentation caused an artificial inflation in the price of BP stock.  As

the Supreme Court has made clear, the fact that a misrepresentation artificially inflates the stock

price is insufficient evidence of loss causation.[260]  Instead, the loss causation inquiry focuses on

whether a release of corrective information causes a *decrease* in the previously-inflated stock

price (*i.e.*, whether the shareholder suffers an actual loss),[261] and Plaintiffs have provided no such

---

[258] *Compare* (Pl. Opp. 78, n.243. ("Fifth Circuit law does not require that Plaintiffs show that the dividend cut revealed the truth about a flow rate")) *with Flowserve*, 572 F.3d at 229 (the "disclosed information must reflect part of the 'relevant truth'—the truth obscured by the fraudulent statements.").

[259] (*See* Pl. Opp. 78, n. 243 ("had BP truthfully revealed the higher flow rates, analysts would have accurately calculated the spill costs . . . and been better equipped to determine that the dividend could be at risk"); (Pl. Opp. 76 ("Had the full truth been told, my opinion is that the market would have had much better information with which to evaluate whether or not the dividend was going to be cut") (quoting Pl. Ex. 131 (Coffman Dep.) at 197:20-198:1).)

Also worth noting is that, as Defendants correctly argue, this raises materialization-of-the-risk issues.  These issues are discussed in Section V.B., *infra*.

[260] *BP Sec. Litig.*, 2014 WL 2112823, at *6 n. 4 (S.D. Tex. May 20, 2014) *aff'd sub nom. Ludlow v. BP, P.L.C.*, 800 F.3d 674 (5th Cir. 2015).

[261] *Flowserve*, 572 F.3d 221, 229 (5th Cir. 2009) ("Loss causation requires proof of a causal connection between a misstatement and a subsequent *decline in a stock's price*.")(emphasis added); *Amedisys*, 769 F.3d at 320 ("To establish proximate causation, the plaintiff must allege that when the 'relevant truth' about the fraud began to leak out or otherwise make its way into the marketplace, *it caused the price of the stock to depreciate* and, thereby, proximately caused the plaintiff's economic harm."); *Dura*, at 342 ("an inflated purchase price will not itself constitute or proximately cause the relevant economic loss").  To the extent that Plaintiffs are exclusively drawing from common law conceptions of proximate cause, those comparisons are inapposite. *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 183 (2d Cir. 2007) ("The concept of loss causation elucidated in *Dura* is closely related to the common law doctrine of proximate cause. *Dura* culls from the common law the black letter law that a fraud plaintiff must show that he acted on the basis of the fraud and suffered pecuniary loss as a result of so acting. Without doubt, these principles govern defendant's fraud claim, but *Dura's* conclusion

evidence here.

**(ii)     Stock Price Decline on June 1 (Top Kill Failure)**

Coffman attributes the stock price decline on June 1 to news that the "Top Kill" containment method was unsuccessful.[262]   Specifically, Plaintiffs argue, "The market learned something on [this] day[].   The market learned that there would be more oil flowing from the well."[263] But this argument is deficient as a matter of law for the same reason that the June 9th/14th disclosures are legally deficient: Plaintiffs have provided no evidence that the market interpreted the failure of Top Kill to mean that the flow rate was greater than BP initially represented.[264]

At most, Plaintiffs have shown that, following the failure of Top Kill, analysts increased their estimates of the magnitude and financial consequences of the spill.[265]   But this proves nothing with respect to the flow rate.   The success or failure of Top Kill pertained to the *duration* of the flow, not the *rate* at which oil is flowing.   In other words, while true that the failure of Top Kill caused analysts to increase the projected magnitude of the spill, it is not necessarily true that

---

that overpayment alone cannot prove loss causation, as the district court incorrectly believed, is based on the tailored application of these principles set out by the Supreme Court in the securities context. Such application does not govern here."); *see also* Thomas Lee Hazen, 4 *Law Sec. Reg.* § 12:93.

[262] (Coffman Rep. at ¶ 159.)

[263] (Hr'g Tr. at 47:21-24.)

[264] *See In re DVI*, 2010 WL 3522090, at *6.

[265] *See, e.g.*, Pl. Ex. 131, Coffman June 3, 2014 Dep. Tr. ("Q. So to flip that, corrective event days are days when there is a statistically significant stock price decline and the disclosures on that day you believe are tied to disclosures of additional information about the severity or financial consequences of the spill, correct?  A. I think that's fair.  . . .  I think the -- we've talked at length how the containment dome and top kill are ultimately related to spill severity but don't specifically mention the flow rate. And then the dividends are more of the financial consequence aspect of this.")

they attributed the increased magnitude to an increase in flow rate.[266]   And Plaintiffs provide no evidence that the market otherwise saw a link between Top Kill and BP's flow rate estimates. They say only that, had the market known the true flow rate, it would have been better able to assess the risk that Top Kill would fail.[267]   Even assuming this argument is true, it is insufficient to create a genuine dispute of material fact with respect to loss causation.

### (iii)   Stock Price Decline on May 10 (Containment Dome)

Coffman attributes the stock price decline on May 10th to news that the "Containment Dome" containment method was unsuccessful.   Once again, Plaintiffs are relying on the same theory that they unsuccessfully asserted in support of the June 9th and 14th disclosures, as well as the June 1st disclosure.[268]   There is nothing unique about Plaintiffs' evidence regarding the failure of the containment dome (or the market's reaction to the failure) that would change the analysis here.[269]   Plaintiffs have provided no evidence that the market interpreted the failure of

---

[266] Plaintiffs seem to implicitly concede as much.   (*See* Hr'g Tr. 47:25-48 (admitting that "if the view is it needs to be a one-for-one correction and we're talking about flow rate, that is a tougher case," and instead resorting to the argument that "the related truth is a broader concept," which the Court rejected in Section IV.B., *supra*).)

[267] (*See* Pl. Opp. at 73.)

[268] (*See* Pl. Opp. at 68 (citing Pl. Ex. 131 (Coffman Dep.) ("What I am trying do is model essentially had the market been told the truth, they would have had a much better picture of the financial consequences that BP was ultimately going to face as a result of this spill, and one of those consequences was revealed when top kill and containment dome failed.")); *see also* Hr'g Tr. at 65:20-66:5.)

[269] The only difference of note is that Plaintiffs seem to articulate a different loss causation standard in this sub-section.   Here, they say that "the relevant inquiry is whether the failure of containment efforts made it more probable than not that the earlier statements in question were, in fact, false."   (Pl. Opp. at 70 (citing *Amedisys*, 769 F.3d at 321).)   This is incorrect.   As Defendants argue, this is the *pleading* standard for loss causation.   The *Amedisys* quote that Plaintiffs cite occurs in the context of a discussion on "the controlling standard for pleading proximate causation in a private securities fraud-on-the-market case."   *Amedisys*, 769 F.3d at 321 (citing *Spitzberg*, 758 F.3d at 687–88 (concurring with *Lormand* on the applicable standard for

Top Kill to mean that the flow rate was actually higher than BP initially represented.[270]

### (2)    Stock Price Declines on April 29th and May 3rd

Plaintiffs have satisfied the first component of loss causation for April 29th and May 3rd by identifying disclosures of negative information that were corrective of BP's misrepresented flow rate estimates.[271]  To satisfy the second component of loss causation, however, Plaintiffs must identify specific evidence showing that it is "more probable than not that it was [the fraud-related] negative statement, and not other unrelated negative statements, that caused a significant amount of the decline [in stock price]."[272]

Defendants argue that Plaintiffs have failed to do so.  In addition to the fraud-related negative statements that Plaintiffs have properly identified as corrective events, Defendants contend that several "unrelated negative statements" (or "confounding information") were released on April 29th and May 3rd, and those unrelated statements contributed to the BP ADS price drop.  Summary judgment is warranted, say Defendants, because Plaintiffs have failed to

---

pleading corrective disclosure)).  *See also Lormand*, 565 F.3d at 256 n.19.

[270] At the hearing, Plaintiffs stated that there is no difference between (i) news that the containment dome had failed and (ii) the news released on May 3rd that the size of the oil slick had expanded.  (Hr'g Tr. 68:2-13.)  This is incorrect.  On May 3rd, information was released that the oil slick had expanded by a certain amount over a certain period of time, and Plaintiffs have provided evidence that analysts inferred that this "could indicate an increase in the rate that oil is spewing from the well."  (Pl. Ex. 99; *see also* Hr'g Tr. at 79:8-13.)  As Defendants correctly argue, Plaintiffs have failed to provide any evidence that the market understood a similar link between the failure of the containment dome and the flow rate of the leak.  (Hr'g Tr. at 79:14-80:7.)

[271] (*See* Pl. Ex. 3 and Pl. Ex. 4 (The NOAA, via the UAC, disclosed that the flow rate could be "as much as 5,000 barrels per day," and BP stated that its best estimate was a flow rate of 1,000 to 5,000 bpd, correcting the previous estimate of 1,000 bpd); Pl. Ex. 99 (May 3rd news article disclosing that the size of the oil slick had tripled in size over a two day period, and noting that it "could indicate an increase in the rate that oil is spewing from the well").)  Defendants conceded as much at the hearing.  (Hr'g T. at 12:11-13:3.)

[272] *Greenberg v. Crossroads Sys.*, Inc., 364 F.3d 657, 666 (5th Cir. 2004).

disentangle the effects of this confounding information from the effects of the fraud-related statements.  In other words, Plaintiffs have provided no evidence showing that it was the corrective disclosures—and not the confounding information—that caused a "significant amount of the decline" in BP ADS.[273]

Plaintiffs refute Defendants' arguments in two ways.  First, they reject Defendants' premise that confounding information was present on any of the post-spill corrective event days.  According to Plaintiffs, "Coffman considered all news on [each corrective event] day and found that no such confounding information exists.[274]  Second, Plaintiffs argue that, even if confounding information existed, Coffman offered an "alternative analysis" at his deposition that adequately disentangled the effects of the confounding information.[275]

### (i)   Presence of Confounding Information

Plaintiffs' arguments that there was no confounding information on April 29th or May 3rd are unpersuasive.  Indeed, the March 17, 2014 report of Plaintiffs' own expert, Chad Coffman, essentially concedes that the market responded to negative information that was completely unrelated to BP's fraudulent flow rate statements.

Coffman opined on both the pre-spill claims and post-spill claims in his expert report.  Because Plaintiffs' damages theory for the pre-spill claims was substantially broader than their damages theory for the post-spill claims,[276] Coffman identified more corrective events for the

---

[273] *See Flowserve*, 572 F.3d at 229.

[274] (*See, e.g.*, Pl. Opp. at 67 (Citing Ex. 89, Coffman Report ¶ 155 and ¶ 112).)

[275] (Pl. Opp. at 67; *see also* Def. Ex. 82.)

[276] Plaintiffs theorized that any foreseeable consequence of the spill revealed BP's undisclosed process-safety risks to the pre-spill class.  For the post-spill class, Defendants have identified as corrective any foreseeable consequences from BP's misrepresentation of the flow rate.

pre-spill claims than for the post-spill claims.  For example, Coffman identified three corrective disclosures on May 3rd in the pre-spill section of his report: (i) news that the oil slick in the Gulf had tripled in size; (ii) Admiral Allen's statement that it's impossible to know the actual flow rate; and (iii) news that the Senate increased the liability cap for spill-related economic damages.[277]   Coffman further concluded that these three pieces of negative information combined to cause an aggregate price drop of $2.19.[278]   Yet Coffman claims the *same $2.19 price drop* in the post-spill section of his report, despite the fact that the liability cap news was in no way corrective of BP's alleged post-spill misrepresentations regarding the flow rate.[279]   This is a textbook example of confounding information.

### (ii) Disaggregating the Confounding Information

The presence of confounding information is not an insurmountable problem *per se*, but it does mean that Plaintiffs need to present evidence that the fraud-related information—and not the confounding information—was responsible for "a significant amount of the decline" in the stock price.[280]   As Defendants correctly note, the Fifth Circuit requires Plaintiffs to "offer some empirically-based showing that the corrective disclosure was more than just present at the

---

[277] (Coffman Rep. ¶ 109-13.)

[278] (Coffman Report ¶ 114.)

[279] (*Compare* Coffman Report ¶ 114 (claiming $2.19 price drop for disclosures corrective of pre-spill misrepresentations) *with* Pl. Opp. at 65 (claiming $2.19 price drop for disclosures corrective of post-spill misrepresentations).)  Tellingly, when Coffman describes the corrective events of May 3rd in the post-spill section of his report, he expressly references only the oil slick news and Admiral Allen's statement as corrective events.  (*See* Pl. Ex. 89, Coffman Report at Exhibit C (identifying only Admiral Allen's statement and oil slick news as corrective) and ¶ 154 ("In summary, satellite surveillance indicated the Spill was larger than expected and that BP could not give an exact estimate of the rate of the Spill.").)

[280] *Greenberg v. Crossroads Sys.*, Inc., 364 F.3d 657, 666 (5th Cir. 2004)

scene."[281]  And here, say Defendants, Coffman made no attempt to disaggregate the confounding information when he prepared his initial report.  Coffman himself admitted as much at his deposition.[282]

Instead, Plaintiffs note that Coffman provided an "alternative analysis . . . in rebuttal to Defendants experts" that would allow a jury to remove the effects of confounding information.[283] In the "Alternative Analysis," Coffman notes that the fraud-related (*i.e.*, properly corrective) information was released during pre-trading hours on April 29th and May 3rd.[284]  The confounding information identified by Defendants, on the other hand, was not released until the afternoon of April 29th and May 3rd[285]—well after the market had largely absorbed the fraud-related information.[286]  Thus, there is a substantial period of time on each day during which the stock price was untainted by confounding information.  Coffman's "Alternative Analysis" runs a regression analysis on this untainted period of time, calculating the price drop of BP ADS that occurred *before* the confounding information came into the marketplace.[287]

Defendants seem to concede that the Alternative Analysis is sufficient to show loss causation, but they briefly argue that the analysis should be excluded as an untimely supplement,

---

[281] (Def. Brief at 69 (quoting *Oscar Private Equity Investments v. Allegiance Telecom, Inc.*, 487 F.3d 261, 271 (5th Cir. 2007), *abrogated on other grounds by Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804 (2011)); *see also Operating Engineers Const. Indus. & Miscellaneous Pension Fund (LOCAL 66)*, 579 F.3d 401, 409 (5th Cir. 2009).

[282] (Def. Ex. 13 Coffman Dep. 274:19-275:2, 276:4-18.)

[283] (*See* Pl. Opp. at 67; Def. Ex. 82 (the Alternative Analysis).)

[284] (*See* Def. Ex. 82.)

[285] Specifically, the first piece of confounding information on April 29th was released at 12:06 PM.  The first piece of confounding information on May 3rd was released at 2:28 PM.

[286] (*See* Def. Ex. 82.)

[287] (*See* Def. Ex. 82.)

citing several cases.[288]  Suttles's expert report was due on March 17, 2014, yet Suttles provided

his Alternative Analysis on June 3, 2014 during his deposition.

The Court declines to exclude the Alternative Analysis.  As Plaintiffs correctly respond,

Coffman proffered his supplementation well within the period for expert discovery, and any

resulting judicial economy concerns and prejudice to Defendants are limited.[289]  This stands in

contrast to the cases cited by Defendants.[290]  Moreover, it appears that at least one of

Defendants' experts, Ray Perryman, was able to review the Alternative Analysis prior to his

deposition, and Perryman indicated at his deposition that Coffman's "suggested modification . . .

---

[288] (Def. Mem. Supp. at 77; Hr'g Tr. at 80:9-20.)

[289] Neither party addressed this issue at any length.  Defendants' argument consisted of one sentence and a citation to four cases, some of which addressed rebuttal opinions, *see, e.g., Cooper Tire & Rubber Co. v. Farese*, 2008 WL 5104745 (N.D. Miss. Nov. 26, 2008), and some of which addressed supplemental disclosures, *see, e.g., Buxton v. Lil' Drug Store Products*, Inc., 2007 WL 2254492, at *6 (S.D. Miss. Aug. 1, 2007) *aff'd*, 294 F. App'x 92 (5th Cir. 2008).  As a result, the precise legal grounds on which Defendants are seeking to exclude the Alternative Analysis is somewhat unclear.  Based on their comments at the hearing, it appears that Defendants contend that the Alternative Analysis is an untimely supplemental disclosure (as opposed to an untimely rebuttal report).  (Hr'g Tr. at 80:9-20.)  Accordingly, the disclosure should not be stricken if Coffman's failure to make a timely disclosure was harmless.  *Hoffman v. L & M Arts*, 2013 WL 81578, at *1 (N.D. Tex. Jan. 8, 2013).  *See also Miller v. Pfizer*, Inc., 356 F.3d 1326, 1332 (10th Cir. 2004) ("We agree with the Millers that an expert's initial Rule 26 report cannot always anticipate every possible challenge to the report. Accordingly, on occasion it may be appropriate to permit the party using the expert to submit supplements to the report in response to assertions by opposing experts that there are gaps in the expert's chain of reasoning. A court's failure to permit such supplementation could even constitute an abuse of discretion in some circumstances.")

[290] *See, e.g., In re Pfizer Inc. Sec. Litig.*, 2014 WL 3291230, at *1-2 (S.D.N.Y. July 8, 2014) (Rejecting supplemental analysis on judicial economy grounds because it "came long after the close of expert discovery, Dr. Fischel's delivery of two supplemental reports, and depositions and motion practice in which Dr. Fischel had been given opportunities to proffer the relevant analyses. Indeed, in his deposition, Dr. Fischel disclaimed having made any analysis with respect to the impact of the excluded Pharmacia statements."); *Buxton*, 2007 WL 2254492, at *6 ("Here, plaintiff offered Dr. Ramsey's Supplemental Affidavit almost eight months after the deadline for her expert reports and seven months after service of defendants' expert reports, not to mention on the eve of defendants' final summary judgment briefing.").

is quite reasonable."[291]   Indeed, the analysis contained in Coffman's supplement seems to be in line with the temporal methodology employed by Dr. Christopher James, another expert whom Defendants engaged to opine on loss causation and damages.

## V.   DAMAGES

Defendants argue that Plaintiffs have failed to present a satisfactory theory of damages for two reasons: (1) Plaintiffs' damages model does not properly calculate the but-for price of BP ADS; and (2) Plaintiffs are applying a materialization-of-the-risk theory, yet are incorrectly claiming as damages 100% of the stock price movement on the date of correction.

### A.   Legal Standard

"Traditionally, economic loss in Section 10(b) cases has been determined by use of the 'out-of-pocket' measure for damages.  Under that measure, . . . damages consist of the difference between the price paid and the 'value' of the stock when bought."[292]  "Recovering out-of-pocket damages . . . requires elimination of that portion of the price decline that is the result of forces unrelated to the wrong . . . so as to limit recovery to actual damages on account of the act complaint of."[293]   Plaintiffs are therefore required "to provide a method to discern by just and reasonable inference the amount of plaintiff's loss solely caused by the defendant's fraud."[294]  Consequential damages are not permitted.[295]

---

[291] (Pl. Ex. 132 (Perryman Dep.) 115:23-116:1.)

[292] *Acticon AG v. China N.E. Petroleum Holdings Ltd.*, 692 F.3d 34, 38 (2d Cir. 2012) (internal quotes omitted).

[293] *Miller v. Asensio & Co.*, 364 F.3d 223, 232 (4th Cir. 2004).

[294] *Id.* at 232.

[295] *BP Sec. Litig.*, 2014 WL 2112823, at *12.

### B.    Calculation of But-For Price

Defendants argue that Plaintiffs failed to properly calculate a but-for price for two distinct reasons.  First, say Defendants, calculating a but-for price requires articulating a but-for world, and Coffman has failed to do so.[296] For example, at his deposition, Coffman could not identify what, if anything, Suttles and Hayward should have said in order to not mislead investors about the flow rate.[297]  Instead, Coffman merely speculated that, if Suttles had properly disclosed BP's calculations of potential spill rates, the price of BP ADS would have dropped by the full amount of the subsequent declines.

This argument is unavailing.  As Plaintiffs correctly respond, Coffman defined the but-for world as one in which BP accurately disclosed the fact that the range of flow rate estimates reached into "the multiple tens of thousands."[298]  He then modeled the artificial inflation caused by BP's understated flow rate estimates by measuring the dissipation in BP's ADS price as corrective information made its way into the market.

Defendants understandably take issue with the notion that Suttles should have disclosed flow rates in the "multiple tens of thousands," but their arguments on this point are of little consequence.  The corrective disclosures that Plaintiffs have identified were relatively modest, and therefore would likely fit within *any* reasonable conception of the but-for world.   For example, the April 29th disclosure modeled the market's reaction to news that the flow rate was likely somewhere between only 1,000 to 5,000 bpd.  Thus, regardless of how the but-for world is defined—which is a fact issue either way—Plaintiffs have provided an adequate damages model.

---

[296] (MSJ at 84.)

[297] (MSJ at 84 (citing Def. Ex. 13 (Coffman Dep.) at 200:24-201:24).)

[298] (Pl. Ex. 131 (Coffman Dep.) at 93:23-24.)

Defendants' second attack on Coffman's claimed but-for price is similar to the argument that they repeatedly made in the loss causation section: Coffman failed to disaggregate the effects of non-fraud related events on BP's ADS price, and his model therefore seeks damages for price declines that were "the result of forces unrelated to the wrong."[299]  For example, the effects of the Senate's liability cap announcement are included in the $17.10 figure, but that announcement is completely unrelated to Suttles's alleged misrepresentation of BP's flow rate estimates.  As discussed at some length above, however, Coffman eliminated the effects of the confounding information on April 29th and May 3rd in his Alternative Analysis.  As a result, with respect to those two dates, Plaintiffs have provided "a method to discern by just and reasonable inference the amount of plaintiff's loss solely caused by the defendant's fraud."[300]

### B.     Materialization of the Risk

Plaintiffs theorize that they are entitled to damages for the stock drops that resulted from news that Top Kill failed (May 10), that the containment dome failed (June 1), and that BP might cut its dividend (June 9 and June 14).  As discussed at length in Section IV, *supra*, the Court holds that Defendants have failed to establish loss causation as to the price declines on these dates. But Defendants argue that summary judgment is warranted as to these dates for an additional reason: even assuming that the news on these days was "related to" the misrepresented flow rate (*i.e.*, that Plaintiffs established loss causation), Plaintiffs' damages model is flawed.  As this Court explained at class certification, "when the corrective event is the materialization of an understated risk, the stock price movement on the date of correction (*i.e.*, on the date that the risk materialized) will not equate to inflation on the date of purchase unless the probability of the risk

---

[299] *See Miller*, 364 F.3d at 232.

[300] *See id.* at 232.

materializing was 100 percent."[301]   Here, argue Defendants, Plaintiffs are applying a materialization-of-the-risk theory, yet are incorrectly claiming as damages 100% of the stock price movement on the date of correction.  The Court agrees.  Indeed, the Court warned Plaintiffs of this very problem in its class certification memorandum and order.[302]

Take, for example, Coffman's damages theory for the BP ADS price decline on May 10. Coffman premised his loss causation and damages models on the understanding that "Defendants knew or recklessly disregarded that the containment dome and other containment methods were *highly unlikely* to succeed in containing the Spill given that . . . BP's internal modeling of the spill rate was far higher than had been publicly disclosed, and those containment efforts viability were dependent on the spill rate."[303]   In other words, if BP had properly disclosed its flow rate estimates, at most, investors would have known that it was *highly likely* that the containment dome would fail, and that BP's ADS price would decline as a result.  Put differently, while it may have been "highly likely" that the containment dome would fail, even Coffman admits that the chances of failure were less than 100%.  Plaintiffs are consequently not permitted to claim 100% of the stock decline as damages upon the materialization of that understated risk.  Their

---

[301] *BP Sec. Litig.*, 2014 WL 2112823, at *10.

[302] *BP Sec. Litig.*, 2014 WL 2112823, at *10 n.17.

[303] (Coffman Rep. at ¶ 157.  *See also* Pl. Opp. 78 n. 243 ("Plaintiffs need only demonstrate that had BP truthfully revealed the higher flow rates, analysts would have accurately calculated the spill costs to BP in late April and early May and been better equipped to determine that the *dividend could be at risk*.).  *Compare* Coffman Rep. at ¶ 16 (expressly employing a materialization-of-the-risk methodology that purported to show that "[pre-spill] investors suffered a loss stemming from a foreseeable consequence of the risk Defendants misrepresented.") *with* Coffman Rep. at ¶ 218 (purporting to *not* employ a materialization-of-the-risk methodology, yet opining that the post-spill investors "can recover losses that are suffered as the truth comes to light through the foreseeable consequences of that misrepresentation.").

damages claims on May 10, June 1, June 9, and June 14 all suffer from this flaw, and are rejected accordingly.

VI.     **CONCLUSION**

For the reasons set forth above, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion for summary judgment.  Specifically, the Court holds that Plaintiffs have established that there is a genuine dispute of material fact with respect to: the falsity and scienter of Suttles's statements on April 24th, April 28th, and April 29th; loss causation for the decline in value of BP ADS on April 29th and May 3rd; and damages for the decline in value of BP ADS on April 29th and May 3rd.

Defendants are entitled to judgment has a matter of law, however, to the extent that Plaintiffs' claims rely on the decline in value of BP ADS on May 10, June 1, June 9, or June 14. As a result, Defendant Hayward is entitled to judgment as a matter of law as to Plaintiffs' Section 10(b) claim because Plaintiffs have failed to provide sufficient evidence that his alleged misrepresentation proximately caused Plaintiffs' loss.

The Court also **DENIES** Plaintiffs' motion for summary judgment in its entirety. Although Plaintiffs have provided sufficient evidence to create triable issues of fact, their evidence is insufficient to warrant judgment as a matter of law in their favor.

**IT IS SO ORDERED**.

**SIGNED** on this the 31st day of May, 2016.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE