United States District Court
Southern District of Texas
**ENTERED**
March 08, 2017
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| IN RE: BP P.L.C. SECURITIES LITIGATION | MDL No. 4:10-MD-2185 |
| This document relates to: IN RE: BP ERISA LITIGATION | Civil Action No. 4:10-cv-4214 Honorable Keith P. Ellison |

### MEMORANDUM AND ORDER

Before the Court is ERISA Plaintiffs' Motion for Leave to File an Amended Complaint. (Dkt. 232 (the "Motion").) Defendants oppose the Motion, arguing that Plaintiffs' proposed amended complaint fails to state a claim, and that leave to amend should therefore be denied as futile. (Dkt. 235.) The Court agrees. Plaintiffs' Motion must be denied.

### I. BACKGROUND[1]

This is far from the first time that Defendants have challenged Plaintiffs' pleadings in the course of this nearly seven-year-old litigation. In March of 2012, the Court granted Defendants' motion to dismiss Plaintiffs' First Consolidated ERISA Complaint, holding that Plaintiffs had failed to adequately rebut the so-called "*Moench* presumption of prudence."[2] Later that year, Plaintiffs filed a motion for leave to amend, but the Court denied the motion because the

---

[1] The Court has previously provided a detailed factual background of Plaintiffs' ERISA action and will refrain from repeating itself here. (*See, e.g.*, Dkt. 116 at 1-14.)

[2] The *Moench* presumption provided that company stock is a presumptively prudent investment for certain employee benefit plans. *Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 254 (5th Cir. 2008) (adopting the presumption of prudence articulated in *Moench v. Robertson*, 62 F.3d 553, 571 (3d Cir. 1995)). To overcome the presumption, a plaintiff had to allege "persuasive and analytically rigorous facts demonstrating that reasonable fiduciaries would have considered themselves bound to divest." *Id.* at 256.

1

proposed amendments would have been futile in light of the *Moench* presumption. Plaintiffs timely appealed to the Fifth Circuit.

It turned out, however, that these motion-to-dismiss proceedings were largely for naught. While this case was pending appeal, the Supreme Court scuttled the *Moench* presumption and created a new framework for evaluating claims against certain ERISA fiduciaries. *See Fifth Third Bancorp v. Dudenhoeffer,* 134 S. Ct. 2459, 2466-67 (2014). Accordingly, the Fifth Circuit vacated this Court's order denying leave to amend and remanded the matter for reconsideration in light of *Dudenhoeffer*. (Dkt. 147.) On remand, this Court granted Plaintiffs' motion for leave to amend their complaint, but did so with some concern—*Dudenhoeffer* proved challenging to apply. (*See* Dkt. 170 at 23-30.) Given the uncertainty surrounding the governing legal standard, at Defendants' request, the Court certified the issue for interlocutory appeal to the Fifth Circuit. (Dkt. 178.) In certifying the matter, the Court noted that "if Defendants are correct in their interpretation of *Dudenhoeffer*"—and the Fifth Circuit has since confirmed that they were— "then none of Plaintiffs' prudence claims would survive a motion to dismiss." (*Id.* at 4.)

In the meantime, this Court declined to stay proceedings pending the interlocutory appeal, and Plaintiffs filed an amended complaint. The amended complaint asserted two general theories of liability (the "Prudence Claims" and "Monitoring Claims," respectively): (i) that the "Insider Defendants"[3] and "Corporate Defendants" breached their duties of prudence and loyalty by permitting BP's 401(k) Plan (the "Plan") participants to invest in the BP Stock Fund at an artificially inflated price; and (ii) that numerous defendants breached their duties to adequately monitor the fiduciaries whom they appointed. (Dkt. 173 at 89, 93.) Defendants moved for

---

[3] The term "Insider Defendants" refers to the Defendants who are alleged to have had insider information regarding the artificially inflated value of BP's stock. These Defendants included BPNAI, Anthony Hayward, Lamar McKay, Neil Shaw, and James Dupree. (TAC ¶ 338.)

2

partial dismissal, which the Court granted. (Dkt. 212.) The Court's order dismissed the Prudence Claims against the Corporate Defendants and the Insider Defendants, with the exceptions of Insider Defendants McKay, Shaw and Dupree, and further dismissed the Monitoring Claims in their entirety. (*Id*. at 30; *see also* Dkt. 223 at 2 n.5.) This ruling left Plaintiffs' complaint on unstable ground. Only the Prudence Claims against McKay, Shaw, and Dupree remained, and those claims were the subject of Defendants' pending interlocutory appeal.

Following several rounds of briefing,[4] the Fifth Circuit held that this Court erred in granting Plaintiffs' motion for leave to amend the Prudence Claims; the proposed amended complaint failed to plead sufficient factual allegations to state a claim, and leave therefore should have been denied as futile. The Fifth Circuit accordingly reversed the judgment of this Court and remanded the matter for further proceedings. *Whitley v. BP, P.L.C.*, 838 F.3d 523, 529 (5th Cir. 2016). As a result of this ruling, Plaintiffs were left without a single viable claim.

Plaintiffs now move for leave to file another amended complaint, attaching a proposed amended complaint that purportedly cures the deficiencies identified by the Fifth Circuit.[5] (Dkt. 232, Ex. A (the proposed "TAC").) Plaintiffs have substantially bolstered the TAC with specific factual allegations, expressly weighed the "harm" and "good" of each proposed alternative, and even taken the unconventional approach of appending two expert reports to the proposed pleadings to show the bases for their factual allegations. Defendants maintain that the TAC fails to state a claim and that leave to amend should once again be denied as futile.

---

[4] The issue was the subject of numerous briefs filed by the parties, as well as the Secretary of Labor and the Securities Exchange Commission, both of which filed briefs as *amicus curiae*.

[5] Plaintiffs expressly disclaim any attempt to rehabilitate the claims that this Court dismissed in its October 2015 order. (Mot. at 3 n.5.) The Motion focuses solely on sufficiently bolstering the Prudence Claims against McKay, Shaw, and Dupree.

## II.     LEGAL STANDARD

Plaintiffs move for leave to amend their complaint under Rule 15(a)(2) of the Federal Rules of Civil Procedure. "Rule 15(a) declares that leave to amend 'shall be freely given when justice so requires'; this mandate is to be heeded." *Foman v. Davis,* 371 U.S. 178, 182 (1962). Accordingly, district courts in the Fifth Circuit "must entertain a presumption in favor of granting parties leave to amend." *Mayeaux v. Louisiana Health Service and Indem. Co.,* 376 F.3d 420, 425 (5th Cir. 2004). Leave to amend may be denied, however, in the case of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, [or] futility of amendment." *Wimm v. Jack Eckerd Corp.,* 3 F.3d 137, 139 (5th Cir. 1993).

Futility is shown by amendments which "advance[e] a claim or defense that is legally insufficient on its face, or . . . fail[ ] to include allegations to cure defects in the original pleading." 6 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Fed. Prac. and Proc. § 1487 (3d ed.). In other words, Plaintiffs will be denied leave to amend only if "the amended complaint would fail to state a claim upon which relief could be granted." *Stripling v. Jordan Prod. Co., LLC,* 234 F.3d 863, 873 (5th Cir. 2000); *see also Landavazo v. Toro Co.,* 301 Fed. Appx. 333, 337 (5th Cir. 2008) (affirming denial of leave to amend after determining that "[a] review of the amended complaint leaves the reader speculating as to what conduct, even if taken as true, occurred that would give rise to a right to relief").

A complaint fails to state a claim if it does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). The plausibility standard is not akin to a "probability requirement," but asks for more than a sheer possibility that

4

a defendant has acted unlawfully. *Id.* A pleading need not contain detailed factual allegations, but must set forth more than "labels and conclusions [or] a formulaic recitation of the elements of a cause of action." *Twombly,* 550 U.S. at 555 (citation omitted).

Ultimately, the Court must decide whether Plaintiffs' proposed amended pleading states at least one valid claim when viewed in the light most favorable to Plaintiffs. In making this determination, the Court will accept the complaint's well-pleaded facts as true, but will not imbue legal conclusions with the same assumption of truth. *Iqbal,* 556 U.S. at 678 (citation omitted). Nor will the Court " 'strain to find inferences favorable to the plaintiffs' " or "accept 'conclusory allegations [or] unwarranted deductions.' " *R2 Investments LDC v. Phillips,* 401 F.3d 638, 642 (5th Cir. 2005) (quoting *Southland Secs. Corp. v. INSpire Ins. Solutions, Inc.,* 365 F.3d 353, 361 (5th Cir. 2004)). The Court will confine its analysis to the contents of the TAC; documents provided by the parties will be disregarded, unless they are referenced in the TAC and are central to Plaintiffs' claims. *See Collins v. Morgan Stanley Dean Witter,* 224 F.3d 496, 498–99 (5th Cir. 2000).

### III. <u>ANALYSIS</u>

The only issue raised in the briefing is whether the TAC satisfies the standard for pleading an ERISA stock drop claim against Defendants McKay, Dupree, or Shaw. The Supreme Court first elucidated the relevant standard two years ago in *Fifth Third Bancorp v. Dudenhoeffer*: "To state a claim for breach of the duty of prudence on the basis of inside information, a plaintiff must plausibly allege an alternative action that the defendant could have taken that would have been consistent with the securities laws and that a prudent fiduciary in the

same circumstances would not have viewed as more likely to harm the fund than to help it."[6] 134 S. Ct. 2459, 2472 (2014). But lower courts found the latter half of the standard challenging to apply. *See, e.g.*, *In re BP p.l.c. Sec. Litig.*, 2015 WL 1781727, at *17 (S.D. Tex. Mar. 4, 2015), *rev'd and remanded sub nom. Whitley v. BP, P.L.C.*, 838 F.3d 523 (5th Cir. 2016); *see also Harris v. Amgen, Inc.*, 788 F.3d 916, 925 (9th Cir. 2015), *cert. granted, judgment rev'd*, 136 S. Ct. 758 (2016). If rigidly construed, *Dudenhoeffer* would place a burden on plaintiffs that is not often seen at the pleading stage. *See In re BP p.l.c. Sec. Litig.*, 2015 WL 1781727, at *17 ("The weighing of harm versus good is inherently fact-specific and subject to expert analysis," and this is especially true in the securities context.).

The Supreme Court soon returned to the issue in *Amgen, Inc. v. Harris* to provide additional guidance, 136 S. Ct. 758 (2016), and the Fifth Circuit subsequently provided guidance of its own on Defendant's appeal of this Court's ruling. *Whitley v. BP, P.L.C.*, 838 F.3d 523 (5th Cir. 2016). In short, the courts confirmed that *Dudenhoeffer* imposes precisely this type of "significant burden" at the pleading stage. *Whitley*, 838 F.3d at 529. Plaintiffs must allege "an alternative course of action so *clearly* beneficial that a prudent fiduciary *could not conclude* that [the action] would be more likely to harm the fund than to help it" and "offer facts that would support such an allegation." *Id.* (second emphasis in original). In other words, a plaintiff must do more than show that the proposed alternative could have resulted in a net benefit to the fund; he must "plausibly allege that *no* prudent fiduciary could have" reached the opposite conclusion (*i.e.*, that the proposed alternative would cause more harm than good). *See id.* ("the district court recognized that if defendants have correctly read *Dudenhoeffer* to require 'plaintiffs to plausibly

---

[6] Of note, the Supreme Court formulated the standard in a slightly different way elsewhere in its opinion: "lower courts . . . should . . . consider whether the complaint has plausibly alleged that a prudent fiduciary . . . *could not* have concluded . . . ." *Dudenhoeffer*, 134 S. Ct. at 2473 (emphasis added).

6

allege that *no* prudent fiduciary could have concluded that the proposed alternative action would do more harm than good'—*and Amgen has since confirmed that is the standard*—then the plaintiff's claim should be dismissed.") (second emphasis added). The Court is not aware of any post-*Amgen* case in which a plaintiff met this significant burden.[7]

Here, Plaintiffs propose five alternative actions in an attempt to satisfy the *Dudenhoeffer* standard:

(i) Prior to the spill (and as early as May 15, 2008), publicly disclose in an SEC Form 8-K filing that BP had not fully implemented its OMS safety program;

(ii) Prior to the spill (and as early as May 15, 2008), urge BP to make such a disclosure;

(iii) After the spill, freeze the stock fund pending an investigation into the prudence of investing in the Fund and simultaneously disclose this action to the public;

---

[7] This comes as no surprise. As the Court noted in its consideration of Plaintiffs' previous motion for leave to amend:

> [If] Defendants' construction of *Dudenhoeffer* [is adopted], the standard is virtually insurmountable for all future plaintiffs—'plausible sheep' included. Defendants' counsel conceded as much at oral argument, postulating that one of the only situations in which a EIAP fiduciary 'could not have' concluded that public disclosure of insider information would do more harm than good is when the company is so new that the employee benefit plans have not accumulated large amounts of pre-existing stock."

*In re BP p.l.c. Sec. Litig.*, 2015 WL 1781727, at *17. On appeal, the Fifth Circuit held that *Amgen* "confirmed" that "Defendants [had] correctly read *Dudenhoeffer*." *See Whitely*, 838 F.3d at 529.

Plaintiffs cite to three cases in which a court allowed an ERISA stock drop claim to proceed past the Rule 12(b)(6) stage. Two of the cases pre-date *Amgen* and are of relatively little precedential effect. *See Murray v. Invacare Corp.*, 125 F. Supp. 3d 660, 669 (N.D. Ohio, Aug. 28, 2015) (relying heavily on the 9th Circuit's holding in *Harris v. Amgen*, 770 F.3d 865, 878–79 (9th Cir. 2014), which was later reversed by the Supreme Court in *Amgen Inc. v. Harris*, 136 S. Ct. 758, 760 (Jan. 25, 2016)); *see also Ramirez v. J.C. Penney Corp. Inc.*, 2015 WL 5766498, at *4–5 (E.D. Tex. Sept. 29, 2015) (pre-dating *Amgen*). The third case involved a class certification issue and, at most, seems relevant only to the "consistent with securities laws" prong of the *Dudenhoeffer* standard. *See In re Suntrust Banks, Inc. ERISA Litig.*, 2016 WL 4377131, at *4 (N.D. Ga. Aug. 17, 2016).

7

    (iv)    Direct that all contributions to the Fund be held in cash (*i.e.*, increase the "cash buffer" provided for in the Plan) and simultaneously disclose this action to the public; and

    (v)    Report the fraud to the DOL and/or the SEC pursuant to their respective whistleblower statutes, after which a public disclosure would be made concerning the safety lapses and potential impact on profits.

(TAC at ¶¶ 285-336.) Defendants seem to concede that each proposed alternative satisfies *Dudenhoeffer's* first criterion; to avoid running afoul of insider trading laws, each of the proposals contemplates public disclosure of either the action being taken or the insider information itself.

But therein lies the rub. It is undisputed that such a public disclosure of negative information would likely have led to at least *some* negative effect on the price of BP ADS. Thus, the question is whether "plaintiffs [have] plausibly allege[d] that no prudent fiduciary could have concluded" that this negative effect would do more harm than any alleged benefit would do good. *Whitley*, 838 F.3d at 523.

    A.    **Proposed Alternatives 1 and 2: Pre-Spill Disclosure**

The parties' briefing primarily focuses on the first two proposed alternatives, each of which contemplates Defendants or other BP officials making the following disclosure in May of 2008 in an SEC Form 8-K:

> It has come to the attention of the fiduciaries of the BP Stock Fund that the Company has not implemented its OMS safety program on drilling rigs in the Gulf of Mexico which the Company does not fully own. Implementation of OMS reduces the risk of a catastrophic event including technical integrity failure and loss of containment of hydrocarbons and other hazardous material at operating sites in the Gulf. Failure to manage these risks could result in injury or loss of life, environmental damage, and/or loss of production. If that risk occurs, our business, financial condition, and results of operations could suffer and the trading price of our securities could decline, in which case you could lose all or part of your investment. Accordingly, four business days ago the fiduciaries froze new purchases and sales of the BP Stock Fund for BP's 401(k) Plan. Now that this information has been disclosed, the fiduciaries will begin to trade in BP ADSs again for the benefit of the Plan.

(*See* TAC at ¶ 285.) To quantify the hypothetical effect of making this disclosure, Plaintiffs' financial markets expert, Cynthia Jones, measured the effect of ostensibly similar disclosures that BP actually made between March of 2005 and October of 2007. (Dkt. 232, Ex. B ("Jones Dec.") ¶¶ 13-27.) Based on this analysis, Jones concludes that "[t]he hypothetical disclosure would likely have resulted in a correction to the stock price" and estimates that "the correction . . . would have been in the 3 to 5% range." (Jones Dec. ¶¶ 6, 28; *see also* TAC at ¶ 287-88 (citing Jones Dec.).) Plaintiffs allege that a prudent fiduciary would have conducted a similar evaluation and reached the same conclusion. (*See* TAC ¶ 288.)

Jones's work—or, more specifically, the allegations based thereon—forms the centerpiece of Plaintiffs' renewed efforts to state a claim under *Dudenhoeffer*. Plaintiffs theorize that no prudent fiduciary could have concluded that "the possibility of a 3 to 5% decline from an early disclosure" would be more harmful than "a late disclosure and/or catastrophic event," such as the Deepwater Horizon explosion and spill, "that would nearly eliminate [their] investments." (TAC ¶ 295; *see also* TAC ¶ 291.) Indeed, note Plaintiffs, the price of BP ADS declined by nearly 50% when the undisclosed safety risk materialized in April of 2010—a percentage far in excess of the 3-5% decline that allegedly would have resulted from early disclosure. (TAC ¶ 294.) Framed in these terms, Plaintiffs' allegations seem unassailable. But this framing is a half-bubble off plumb, both undervaluing the negative effects of early disclosure and overstating its benefit.

*Dudenhoeffer* expressly instructs courts to consider whether "publicly disclosing negative information would do more harm than good to the fund by causing a drop in the stock price *and a concomitant drop* in the value of the stock already held by the fund." 134 S. Ct. at 2473 (emphasis added). Here, that "concomitant drop" would have been precipitous. As Plaintiffs

themselves acknowledge, the Plan held approximately $2.2 billion in BP ADS in mid-2008, meaning that a prudent fiduciary "would have concluded the impact on the Fund's holdings in the event of a 5% decline would have been a decline of approximately $110 million in value." (TAC at ¶ 288.) In other words, in weighing the potential "harm" and "good" that would result from Plaintiffs' proposal of early disclosure, a prudent fiduciary would have considered the harmful prospect of a stock drop that was imminent, substantial, and likely to occur.

Moreover, Jones's conclusion arguably underestimates the extent of the stock drop. Plaintiffs' first alternative envisions Defendants making the disclosure as fiduciaries of the BP Stock Fund. (TAC ¶ 285 (proposing a disclosure that begins, "It has come to the attention of the fiduciaries of the BP Stock Fund . . . .").) Such an unusual disclosure by ERISA fiduciaries could "spook" the market, causing a more significant drop in price than if the securities disclosure were made through BP's customary corporate representatives. *See Dudenhoeffer*, 134 S. Ct. at 2473 (recognizing that the market can respond negatively if it infers that "insider fiduciaries view[] the employer's stock as a bad investment"). Defendants argue—and the Court agrees—that a prudent fiduciary could have taken this potential outcome into account. Jones's estimate did not.

Plaintiffs argue, however, that while early disclosure may have proven harmful to the BP Stock Fund's holdings, purchases of BP ADS following the disclosure would have been made at a lower price. Assuming a 5% decline, Plaintiffs calculate that this would have resulted in post-disclosure purchasers saving $35 million during the relevant time period.

This logic is problematic for two reasons. First, Plaintiffs fail to account for the other edge of their sword: while purchasers would benefit from a post-disclosure decline in price, sellers, on the other hand, would be harmed. Plaintiffs make no allegation that there was any

10

reason for a prudent fiduciary to believe that the Plan would be a net purchaser of BP ADS. (See Dkt. 239 ("Reply") at 9 (acknowledging that "the quantity of future Plan sales or purchases was unknowable").) To the contrary, Defendants note that the Plan proved to be a net seller during the relevant time period. (Dkt. 235 ("Opp.") at 15 (citing Jones Dec. at 5).) Second, the BP Stock Fund was so heavily capitalized that it would have taken an almost inconceivable volume of post-disclosure purchases to offset the effect of any "concomitant drop" in value of the $2.2 billion of BP ADS already held by the Fund.

Plaintiffs contend that these harms of early disclosure are nonetheless outweighed by an important benefit: had the truth of BP's limited safety response been properly disclosed, BP would have fully implemented OMS on its rigs in the Gulf of Mexico, and the Deepwater Horizon spill (and attendant price decline) would have been avoided. (Mot. at 8.) The value of BP ADS declined by 50% in April of 2010, and the value of the Plan's holdings decreased by $1.5 billion. (TAC at ¶ 294.) Accordingly, allege Plaintiffs, no prudent fiduciary could have concluded that early disclosure—which would have resulted only in a 3-5% decline in value— would do more harm than good. (*See* TAC ¶ 291, 295.)

But Plaintiffs' argument relies on an unsupported premise: that a prudent fiduciary would have known that making an early disclosure would avert a massive oil spill and decline in stock price. The oil spill was inevitable only in hindsight, and ERISA subjects fiduciaries to no such standard—the "fiduciary duty of care requires prudence, not prescience." *Rinehart v. Lehman Bros. Holdings Inc.*, 817 F.3d 56, 64 (2d Cir. 2016), cert. denied, No. 16-562, 2017 WL 670226 (U.S. Feb. 21, 2017). Instead, a prudent fiduciary would have weighed the likely harm of a 3-5% decline in value against the *chance* that a Deepwater Horizon-type disaster would arise absent BP implementing OMS; the *chance* that early disclosure would lead BP to install OMS on

11

remaining rigs in the Gulf; and the *chance* that OMS would then successfully avert or mitigate such a disaster. (*See* TAC ¶¶ 296-97; Reply at 2.) Nowhere do Plaintiffs plead facts from which this Court can conclude that these odds were at all significant. To the contrary, as of May 2008, an environmental disaster of this magnitude was unprecedented.

At bottom, Plaintiffs theorize that a prudent fiduciary could not have concluded that a likely $66-110 million loss in value would harm the BP Stock Fund more than the possibility of BP installing OMS would help it. The Court disagrees and therefore finds Plaintiffs' first two proposed alternatives insufficient to state a claim.

### B. Proposed Alternatives 3, 4, and 5

The allegation that Defendants should have frozen the BP Stock Fund fares no better. First, Plaintiffs misstate the relevant legal standard, alleging only that a prudent fiduciary "could easily conclude that freezing the Fund would not have done more harm than good." (TAC ¶ 327.) And, more important, the TAC's deficiencies are not limited to matters of form. Even assuming, as Plaintiffs allege, that a prudent fiduciary would have known that KEMET Corporation and The Home Depot, Inc. froze their funds in 2009 with no ill effects, there is nothing to suggest that a prudent fiduciary would have found those situations at all comparable to the crisis facing BP after the Deepwater Horizon explosion. To the contrary, in the midst of such great uncertainty in the market following the explosion, a prudent fiduciary easily could have concluded that freezing the fund would send a negative signal to the market and cause more harm than good.

Plaintiffs' fourth and fifth proposed alternatives—increasing the size of the BP Stock Fund's cash buffer and notifying the DOL and the SEC of BP's process safety issues (*see* TAC ¶¶ 328-336)—add nothing to their more harm than good argument. Plaintiffs' support of the

fourth alternative is expressly "based on a similar analysis as set forth in Alternative One," which the Court has already found inadequate. (TAC ¶ 331.) And as Defendants correctly argue in opposition to Plaintiffs' fifth alternative, reporting the fraud to the SEC would simply shift the question rather than answer it. Plaintiffs seem to concede that this alternative would still require public disclosure, (*see* TAC ¶ 336), but fail to adequately allege how a public disclosure in these circumstances would lead to better results than those produced by the first alternative.

## IV.    CONCLUSION

After considering the parties' filings, all responses and replies thereto, and the applicable law, the Court holds that Plaintiffs' Motion for Leave to File Amended Complaint should be, and hereby is, **DENIED**. All claims having been dismissed, the Court will enter final judgment in all ERISA defendants' favor in a separate document. The parties should submit an agreed form of final judgment within seven days.

**IT IS SO ORDERED**.

Signed this 8th day of March 2017.

*[signature]*

Hon. Keith P. Ellison
United States District Judge