# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| | ) | MDL 2185 |
| | ) | Case No. 4:10-md-02185 |
| | ) | |
| | ) | **This Document Relates to Only The** |
| | ) | **Following Individual Actions** |
| | ) | |
| | ) | No. 4:12-cv-1256 (cons.) |
| | ) | No. 4:12-cv-1272 |
| | ) | No. 4:12-cv-2362 (cons.) |
| | ) | No. 4:12-cv-3621 |
| | ) | No. 4:12-cv-3714 |
| | ) | No. 4:12-cv-3715 |
| *In re BP plc Securities Litigation* | ) | No. 4:13-cv-0069 |
| | ) | No. 4:13-cv-0129 |
| | ) | No. 4:13-cv-0517 |
| | ) | No. 4:13-cv-0887 |
| | ) | No. 4:13-cv-1044 |
| | ) | No. 4:13-cv-1393 |
| | ) | No. 4:13-cv-3397 |
| | ) | No. 4:14-cv-0457 |
| | ) | No. 4:14-cv-0980 |
| | ) | No. 4:14-cv-1065 |
| | ) | No. 4:14-cv-1085 |
| | ) | No. 4:14-cv-1068 |
| | ) | No. 4:14-cv-1072 |
| | ) | No. 4:14-cv-1073 |
| | ) | No. 4:14-cv-1075 |
| | ) | No. 4:14-cv-1087 |
| | ) | No. 4:14-cv-1279 |
| | ) | No. 4:14-cv-1280 |
| | ) | No. 4:14-cv-1281 |
| | ) | No. 4:14-cv-1418 |
| | ) | |
| | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF
## INDIVIDUAL ACTION PLAINTIFFS'
## <u>MOTION TO COMPEL DISCOVERY RESPONSES</u>

## TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................................................1

II.     BACKGROUND .................................................................................................................3

        A.      Plaintiffs' Discovery Requests in 2016.................................................................3

        B.      Plaintiffs' Motion to Compel in 2016 ...................................................................4

        C.      The March 21, 2017 Letter Agreement..................................................................5

        D.      Plaintiffs Produced Substantial Discovery During Summer 2018.........................5

        E.      Full Fact Discovery Is Now Underway With Looming Deadlines..........................5

        F.      At Defendants' Insistence, Plaintiffs Searched Through "Millions" Of
                Documents Previously Produced In MDL 2179 And MDL 2185 ..........................6

        G.      Defendants Are Resisting Their Discovery Obligations Now ................................7

                1.      Interrogatory Responses / Identification Of Custodians ............................7

                2.      Documents Regarding "*Any* Direct Communications" With
                        Plaintiffs And Their Outside Investment Managers .................................10

                3.      Documents Regarding "*All* Alleged Misstatements" In Plaintiffs'
                        Complaints ................................................................................................15

III.    ARGUMENT .....................................................................................................................19

        A.      The Applicable Legal Standards Favor Discovery ..............................................19

        B.      The March 2017 Letter Agreement Is Binding And Must Be Enforced...............19

        C.      Defendants Have Not Quantified Or Otherwise Articulated *Any* Burden ............20

        D.      Prior MDL 2179 / 2185 Productions Do Not Alleviate Defendants'
                Obligations ...........................................................................................................21

        E.      Defendants Must Fully Disclose And Search Pertinent Custodians.....................22

        F.      Defendants Should Be Ordered To Run Plaintiffs' Appendix A & B
                Searches ................................................................................................................23

IV.     CONCLUSION..................................................................................................................25

## **TABLE OF AUTHORITIES**

**Page(s)**

<u>**Cases**</u>

*Am. Airlines v. Travelport Ltd.*, No. 4:11-cv-244-Y,
  2012 WL 12884821 (N.D. Tex. May 29, 2012) .........................................................22, 24, 25

*Auto Club Family Ins. Co. v. Ahner*, No. 05-5723,
  2007 WL 2480322 (E.D. La. Aug. 29, 2007) .........................................................................24

*Dollar v. Long Mfg. N.C., Inc.*,
  561 F.2d 613 (5th Cir. 1977) ...................................................................................................19

*Export Worldwide, Ltd. v. Knight*,
  241 F.R.D. 259 (W.D. Tex. 2006) ...........................................................................................19

*Fannie Mae v. Hurst*,
  613 F. App'x 314 (5th Cir. 2015) ............................................................................................19

*Halleen v. Belk, Inc.*, No. 4:16-cv-55,
  2018 WL 3735579 (E.D. Tex. Aug. 6, 2018) ..........................................................................25

*Hickman v. Taylor*,
  329 U.S. 495 (1947).................................................................................................................19

*Kipp v. Laubach*, No. 3:17-CV-67-S,
  2019 WL 3219801 (N.D. Tex. July 17, 2019) ............................................................19, 20, 21

*Kleppinger v. Tex. Dep't of Transp.*, No. L-10-124,
  2012 WL 12893654 (S.D. Tex. Aug. 23, 2012),
  *aff'd*, 2013 WL 12137773 (S.D. Tex. Jan. 24, 2013) .............................................................24

*Lee v. Cent. Gulf Towing, L.L.C.*, No. Civ. A-04-1497,
  2004 WL 2988478 (E.D. La. Dec. 9, 2004)............................................................................20

*Lopez v. Don Herring Ltd.*,
  327 F.R.D. 567 (N.D. Tex. 2018) ...........................................................................................19

*McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*,
  894 F.2d 1482 (5th Cir. 1990) ................................................................................................19

*Merrill v. Waffle House, Inc.*,
  227 F.R.D. 475 (N.D. Tex. 2005) ......................................................................................19, 20

*Ntakirutimana v. Cmty. Health Sys., Inc.*, No. L-09-114,
  2012 WL 12894293 (S.D. Tex. July 16, 2012).......................................................................22

ii

*Pan Am. Life Ins. Co. v. La. Acquisitions Corp.*, No. 13-5027,
   2015 WL 4168435 (E.D. La. July 9, 2015) ..........................................................................23

*SEC v. Brady*,
   238 F.R.D. 429 (N.D. Tex. 2006) ..............................................................................19, 20, 21

*Shaw Grp. Inc. v. Zurich Am. Ins. Co.*, No. 12-257-JJB-RLB,
   2014 WL 4373210 (M.D. La. Sept. 3, 2014) ......................................................................23

*Valenzuela v. Willette*, No. 5:14-cv-62,
   2014 WL 12620827 (S.D. Tex. Nov. 28, 2014) ...................................................................20

*Widevine Techs., Inc. v. Verimatrix, Inc.*, No. 2-07-cv-321,
   2009 WL 4884397 (E.D. Tex. Dec. 10, 2009).................................................................19, 20

## **Statutes**

Civil L.R. 7.1 ...................................................................................................................................1

## **Rules**

Fed. R. Civ. P. 26(b)(1)..................................................................................................................19

Fed. R. Civ. P. 26(b)(2)(B) ............................................................................................................24

Fed. R. Civ. P. 29(b) ...........................................................................................................1, 19, 20

Fed. R. Civ. P. 37 .....................................................................................................................1, 19

Fed. R. Civ. P. 37(e) ......................................................................................................................21

Pursuant to Fed. R. Civ. P. 29(b) and 37 and Civil L.R. 7.1, the Individual Action Plaintiffs Steering Committee ("Steering Committee"), on behalf of all Individual Action Plaintiffs in the above-captioned actions,[1] hereby respectfully submits this Memorandum of Law in support of its Motion for an Order compelling Defendants to comply with the parties' March 21, 2017 Letter Agreement and to: (1) provide complete responses to Plaintiffs' Interrogatories 1, 3, 9, and 11; (2) identify all custodians from the parallel ADS-only class case for use in discovery in Plaintiffs' lawsuits; (3) otherwise use Plaintiffs' "Appendix C" custodians list, as adjusted by any other custodians identified by items (1) and (2); (4) run Plaintiffs' "Appendix B" searches as written on these custodians to produce all documents regarding <u>all</u> direct communications between BP and Plaintiffs or their outside investment managers, whether or not alleged in any complaint; and (5) run Plaintiffs' "Appendix A" searches as written on these custodians to produce all non-duplicative documents regarding <u>all</u> misstatements alleged in Plaintiffs' complaints, whether dismissed or upheld as actionable, and whether or not alleged in the parallel ADS-only class case.

Prior to filing this Motion, Plaintiffs engaged in a lengthy meet-and-confer process over 16 total months (12 months in 2016-2017 and four months in 2019), filed a motion to compel in 2016 on the same issues, and withdrew it without prejudice in exchange for the discovery obligations imposed on Defendants by the March 21, 2017 Letter Agreement. Defendants have refused Plaintiffs' repeated requests for this necessary discovery, by disregarding that Agreement and reviving their 2016 obstructionist arguments. Due to the impending document production cutoff under the Court's Revised Scheduling/Docket Control Order (MDL 2185 Dkt. No. 1758), currently August 19, 2019, Plaintiffs seek the Court's intervention and the relief sought herein.

## I.    INTRODUCTION

As authorized by the Steering Committee, Plaintiffs first served interrogatories and

---

[1]     Excluded are the Individual Action Plaintiffs who led the parallel ADS-only class action: the DiNapoli Plaintiff (Case No. 4:14-cv-1083), Massachusetts Pension Reserves Plaintiff (Case No. 4:14-cv-1084), and Ohio Plaintiffs (Case No. 4:12-cv-1837). While they have been kept informed and are bound by the agreements and Court Orders described herein, they have otherwise minimized collaboration and have for the most part not shared class action work product.

document requests in March 2016.  Acting through the Steering Committee and the Individual Action Plaintiffs' Liaison Counsel ("Liaison"), they then engaged in a year-long meet-and-confer process with Defendants, before and after filing a motion to compel (MDL Dkt. No. 1383) in August 2016.  Those time- and resource-consuming efforts resulted in the parties' March 2017 Letter Agreement, which, in exchange for Plaintiffs' withdrawing their motion and ceasing pursuit of other discovery-related arguments, imposed discovery obligations on Defendants now at issue.

Throughout, Defendants insisted that Plaintiffs must first review the huge, unorganized mountain of *millions* of documents previously identified and produced – without any input or involvement by Plaintiffs – for different reasons, in response to different requests, by different litigants or regulators, pursuing different claims or investigations, in MDLs 2179 and 2185. Before filing this Motion, Plaintiffs did so.  This ongoing process, now in its late stages, so far has consumed nearly a year, cost over $350,000.00, and required over 9,000 attorney review hours.

After processing and loading these documents into databases, absent any guidance from Defendants as to which might actually be responsive, Plaintiffs employed search terms, analytics, de-duplication and threading software, and, lastly, attorney review to try to identify which *might* be responsive.  Plaintiffs' counsel held weekly conference calls to discuss the broad array of irrelevant documents and techniques to more efficiently remove them.  The results underwhelmed. Plaintiffs identified roughly 18,500 potentially responsive documents via a search term hit and initial coding review – a paltry *1.14%* success rate compared against the total documents processed – with another 25,000 or so related "family" members (documents substantively irrelevant but linked to the responsive documents, like a transmittal email to its attachment).  Secondary review is ongoing on these documents and a percentage of those initially coded nonresponsive.  To say Plaintiffs did their homework before filing this Motion is an understatement.

In this context, during the current period of full discovery, Plaintiffs sought the discovery responses and documents they are owed under the March 2017 Letter Agreement.  In early April 2019, Plaintiffs served a list of custodians, with a legend as to their relevance, as well as targeted search terms, never before employed, designed to identify responsive documents that must be

produced under the Agreement.   Thereafter, Plaintiffs engaged in a further time-consuming dialogue with Defendants, memorialized in writing.   These efforts have not been productive.

Defendants have not complied with the March 2017 Letter Agreement and have revived their arguments that prompted Plaintiffs' 2016 motion to compel.   They have not provided required full interrogatory responses.   They have withheld, without explanation, names of custodians searched in the parallel ADS class action.   They rejected Plaintiffs' more fulsome custodians list, without meaningful explanation.   They refuse to test Plaintiffs' search terms or to engage in a dialogue based on data such as hit counts – the process Plaintiffs' and Defendants' counsel are jointly employing on subpoenaed third-party investment managers.   They refuse to run searches for documents regarding most misstatements at issue or regarding direct communications with Plaintiffs and their managers not specifically alleged in a complaint.   Without articulating any actual burden, they have revised or deleted search terms after claiming that an unclear number of unidentified responsive documents purportedly exists somewhere in the MDL 2179 / 2185 productions to such an extent that no additional searches are warranted.   They have rejected use of threading and de-duplication software – the techniques Plaintiffs employed to get through the millions of documents in the MDL 2179 / 2185 productions – without ever trying them.

To date, Defendants have not produced a single document, *ever*, in response to Plaintiffs' 2016 requests and have not committed to doing so on any timeframe.   The parties face an extended document production deadline in mid-August 2019, which Defendants appear unable to meet. Plaintiffs had no choice other than to file this Motion and seek the Court's intervention.

## II.    BACKGROUND

### A.    Plaintiffs' Discovery Requests in 2016

The Tranche 1 and most Tranche 2 Plaintiffs first served discovery Interrogatories and Document Requests on March 24, 2016 (*see* Exhs. A (transmittal letter), B (Interrogatories), and C (Document Requests)), followed by the rest of the Tranche 2 and most Tranche 3 Plaintiffs on

August 4, 2016 (*see* Exhs. D (transmittal letter), E (Interrogatories), and F (Document Requests)).[2] These requests are now deemed to have been served by all Plaintiffs. *See* Tuccillo Decl. ¶11.

Many Interrogatories sought to identify document custodians early on to inform Plaintiffs' discovery efforts. Interrogatories 1, 3, and 9 sought to identify BP employees or third parties who participated in meetings, calls, presentations, and similar direct communications with Plaintiffs or their outside investment managers, whether or not alleged in a complaint. *See* Exh. B at 11-17, 18-24; Exh. E at 10-13, 14-22. Interrogatory 11 sought to identify BP employees who participated in preparing, writing, editing, or creating talking points, scripts, speeches, prepared remarks, agendas, attendance lists, Powerpoints, slides, handouts, brochures, marketing, summaries, notes, or similar materials in conjunction with such communications. *Id.* Exh. B at 24; Exh. E at 23.

Plaintiffs also sought documents, such as all documents regarding any meetings, conference calls, presentations, emails, or other direct communications between themselves or their outside investment managers and BP (Requests 1-2 and 5) or any talking points, scripts, speeches, prepared remarks, agendas, attendance lists, Powerpoints, slides, handouts, brochures, marketing, summaries, notes, or other similar materials related to such communications (Requests 6-7). *See* Exh. C at 11-12; Exh. F at 10-11. Request 11 sought all documents, including drafts, regarding all alleged misstatements, whether privately made or public-record and whether upheld or dismissed (*e.g.*, for lack of scienter evidence). *Id.* Exh. C at 12; Exh. F at 11-12.

### B.     Plaintiffs' Motion to Compel in 2016

After a lengthy meet-and-confer process, Plaintiffs filed a motion to compel on August 8, 2016. *See* MDL 2185 Dkt. No. 1383. Defendants, *inter alia*, had refused to: (i) provide responses or produce documents regarding *all* meetings and direct communications with Plaintiffs and their investment managers, as versus only those alleged in a complaint (*see* MDL 2185 Dkt. No. 1383-1 at 2-3, 6, 8, 11-12); (ii) produce documents regarding misstatements also alleged in the parallel

---

[2]     Herein "Tuccillo Decl." refers to the accompanying Declaration of Matthew L. Tuccillo, and "Exh." refers to the Exhibits thereto. The First and Second requests differed primarily due to naming different Plaintiffs and different outside investment managers.

ADS class action, on grounds that the earlier MDL 2179 / 2185 productions purportedly contained any responsive documents – which they refused to identify by Bates number or otherwise (*id.* at 3, 7-8, 9, 15-17); (iii) produce documents regarding previously dismissed misstatements, despite the Court's often ruling that falsity was sufficiently alleged and dismissal was due to a correctable scienter issue (*e.g.*, where the specific speaker of a corporate misstatement was not alleged) (*id.*); and (iv) use the full "Relevant Time Period" in Plaintiffs' complaints and their discovery requests, as versus some artificially shortened period of Defendants' design (*id.* at 2, 6-7, 9, 12-15).

### C.    The March 21, 2017 Letter Agreement

Thereafter, the meet-and-confer process continued, ultimately consuming a *full year* in total, before the parties executed the March 21, 2017 Letter Agreement.  *See* Exh. G.  In exchange for Plaintiffs' withdrawing – without prejudice – their motion to compel, Defendants agreed to specific, enumerated discovery obligations, discussed below.  This Agreement was part of a twin package resolving the parties' discovery disputes, the other part being a similar December 28, 2017 Letter Agreement (MDL 2185 Dkt. No. 1720-3) that addressed Defendants' requests.

### D.    Plaintiffs Produced Substantial Discovery During Summer 2018

Per the Court's Scheduling/Docket Control Order (MDL 2185 Dkt. No. 1630) and the parties' December 28, 2017 Letter Agreement, ***all ~100 Plaintiffs*** provided *substantial* documents and information during summer 2018.  Plaintiffs identified their outside investment managers, described the damages they seek, and produced BP trading and dividend records, investment guidelines and policies, buy/sell/hold recommendations for BP securities, written analyses of BP or BP investments, and communications with managers.  To do so, for over ***half a year***, Plaintiffs searched centralized document servers, electronic storage systems, and email accounts of the top individuals with trading authority, individuals with top-level responsibility for overseeing outside investment managers, and individuals serving as primary points of contact with managers.

### E.    Full Fact Discovery Is Now Underway With Looming Deadlines

Plaintiffs' considerable efforts permitted the parties to select 16 Representative Plaintiffs

in August 2018.  Full fact discovery, involving Defendants, the 16 Representative Plaintiffs, and their outside investment managers, is now underway.  After a joint written submission and telephonic hearing to resolve disputes on January 15, 2019, the Court entered its Order Concerning Depositions (MDL 2185 Dkt. No. 1727) to set certain ground rules and parameters for discovery.

A revised Scheduling/Docket Control Order (MDL 2185 Dkt. No. 1758) extended the document production cutoff to August 19, 2019 and the cutoff for all fact discovery to November 18, 2019.  These deadlines are currently operative and fast-approaching.  In advance thereof, Plaintiffs or their outside investment managers have produced or committed to produce **tens of thousands** of additional documents to Defendants in a second wave of 2019 productions.

### F.   At Defendants' Insistence, Plaintiffs Searched Through "Millions" Of Documents Previously Produced In MDL 2179 And MDL 2185

Defendants identified and produced "millions" of documents – without any input or involvement by Plaintiffs – for different reasons, in response to different requests, by different litigants or governmental bodies, pursuing different claims or investigations, in MDLs 2179 and 2185.  Defendants have insisted that somewhere within are documents responsive to Plaintiffs' requests and that it is Plaintiffs' job to try and find them, without Defendants' guidance as to which documents (if any) are responsive to which requests.  Plaintiffs tried, devoting nearly a year and spending over $350,000.00 to date.  *See* Tuccillo Decl. ¶13.  After processing and loading the documents into databases, Plaintiffs employed search terms, analytics, de-duplication, and threading software.  *Id.*  These cost-effective techniques helped eliminate duplicative documents and reduced the number of documents needing attorney review.  *Id.*  Thereafter, over 9,000 hours of attorney review (and counting) have been spent, on both first-line and secondary review.  *Id.*

Via search terms and initial coding review, Plaintiffs encountered and reviewed *hundreds of thousands* of utterly irrelevant documents and identified just 18,500 potentially responsive documents that were linked to ~25,000 related, substantively irrelevant "family" members (*e.g.*, a transmittal email to its substantive attachment).  *Id.* ¶¶13-14.  Frustrated by these numbers, Plaintiffs held weekly calls to discuss how to most efficiently remove from review the deluge of

nonresponsive documents, ranging from personnel documents and résumés to wildlife impact reports to seafood safety reports to cleanup vessels lists to dispersant studies to weather reports. *Id.* (listing irrelevant documents in detail). These numbers underscored the "needle in a haystack" problem that *Defendants* created. Secondary review is ongoing to gauge the value of documents coded responsive and to verify coding on a percentage of those coded nonresponsive. *Id.* ¶13.

### G.   Defendants Are Resisting Their Discovery Obligations Now

With this costly, time-consuming review substantially complete, on April 5, 2019, Plaintiffs sent Defendants a letter ("4/5/2019 Letter") seeking the discovery owed under the March 21, 2017 Letter Agreement (*see* Exh. H) and attaching three Appendices A-C outlining Plaintiffs' proposed search terms and custodians. *See* Exhs. I-K.

### 1.   Interrogatory Responses / Identification Of Custodians

As regards interrogatory responses and the identification of custodians, the March 21, 2017 Letter Agreement (Exh. G at 1) stated:

> Defendants ***will provide*** initial written responses to [ ] Plaintiffs' Interrogatories 1, 3, 9, and 11. The Interrogatory 11 response will respond to such Interrogatory to the extent it related to Interrogatories 1-4 and 9-10. Defendants ***will supplement*** those responses in a timely fashion as additional information becomes available. Defendants ***will <u>start</u>*** by identifying potential document custodians within 60 days.[3]

Defendants provided an initial list of 32 custodians via letter dated May 23, 2017. *See* Exh. L. Thereafter, for over ***two years***, Defendants did not supplement the custodian list and did not provide the required responses to Interrogatories 1, 3, 9, and 11.

Plaintiffs' 4/5/2019 Letter requested the overdue interrogatory responses and supplemented custodians list. *See* Exh. H at 1-2. It appended Plaintiffs' Appendix C listing 78 BP custodians, many omitted without explanation from Defendants' initial list, with a legend explaining up to four undisputedly valid reasons why each was listed: (1) named Defendant; (2) identified in Defendants' May 23, 2017 letter; (3) served as a custodian in the parallel ADS-only class action; and/or (4) witness alleged in Plaintiffs' complaints. *See* Exh. K.

---

[3]      Herein, all emphasis in quoted text is added unless otherwise noted.

The ensuing dialogue has not been productive.  Defendants did not engage for **10 weeks**.
They failed to respond on these points in their April 9, 2019 email, April 11, 2019 email, April 11,
2019 letter, or April 26, 2019 email.  *See* Exhs. M, N, O.  So, **six weeks** after the 4/5/2019 Letter,
Plaintiffs' May 17, 2019 letter repeated their requests, asked for an explanation why custodians in
the ADS-only class case were not listed as custodians for Plaintiffs' actions, and asked for
confirmation that Defendants' silence on Plaintiffs' Appendix C equated to agreement.  *See* Exh.
R.  The same day, Defendants responded, without elaboration, "[W]e do not agree to your
custodian list at this time."  *See* Exh. S.  Nearly **three weeks** later, Plaintiffs' June 6, 2019 letter
again asked for a commitment to provide interrogatory responses and a substantive response to
Plaintiffs' Appendix C, absent which Plaintiffs would move to compel.  *See* Exh. T.

Under threat of motion, Defendants' June 13, 2019 letter finally, deficiently responded.
*See* Exh. U.  They generally protested Plaintiffs' Appendix C as "overbroad" and "unmoored from
the claims," but did not dispute the legend indicating why each proposed custodian was listed.  *See*
Exh. U at 4.  They attached a competing appendix ("Defendant App. B") counter-proposing to run
only isolated Plaintiff searches (discussed in greater detail in §II.G.2.-3. below) on just 26 of
Plaintiffs' custodians.  *See* Exh. W.  They offered no metrics or data-driven rationale.  They wholly
ignored the other 52 custodians on Plaintiffs' Appendix C.  Incredibly, they included another
appendix ("Defendant App. A") disclosing that they had used at least **106 unnamed custodians** for
the ADS-only class action (Plaintiffs' Appendix C listed only 44 such custodians).  *See* Exh. V.
They refused to provide responses to Interrogatories 1, 3, 9, and 11 – then 26.5 months overdue –
until after performing contested document searches (*see* Exh. U at 4), a circular argument that
refused to name custodians until after running searches on a *de facto* deficient custodian set.

Plaintiffs' June 20, 2019 letter asked for a prompt markup of Appendix C indicating which,
if any, custodians were proposed for topical limits and an explanation of the substantive reasons.
*See* Exh. X at 4, 5.  It asked Defendants to either run Plaintiffs' searches (discussed below) on their
full Appendix C or to confirm that the June 13, 2019 letter was a "final position" so Plaintiffs could

- 8 -

move to compel.  *Id.* at 4, 5, 7-8.  Defendants protested the timing, and Plaintiffs' counsel reiterated both an upcoming scheduled absence and an intention to move soon.  *See* Exh. Y.

Defendants' June 24, 2019 letter reiterated their June 13, 2019 positions on custodians.  *See* Exh. Z.  It did not provide the requested markup of Appendix C, nor did it refute the legend explaining why each custodian was listed.  *Id.*  Instead, ignoring the scope, purposes, and unique terms of Plaintiffs' searches (discussed below), it stated, generally, that Defendants' alternative list consisted of individuals "who were actually present when an alleged misstatement was made" and that documents were already gathered from the 100+ unnamed custodians in the ADS-only class action (using different searches not designed by Plaintiffs).  *Id.* at 3.  Otherwise, it promised supplemental responses to Plaintiffs' Interrogatories No. 1, 3, 9 and 11 in two weeks.

Plaintiffs' June 28, 2019 letter, **12 weeks** after the 4/5/2019 Letter, stated that Defendants' failure to provide a markup of Appendix C with substantive explanations as to proposed topical limits meant the issue was ripe for a motion.  *See* Exh. AA at 1-2.  It again sought an explanation why custodians from the ADS-only class case were not disclosed to Plaintiffs and asked for a full list of all such custodians.  *Id.* at 2.  It reserved all rights to revise Appendix C after receipt of this information and the purportedly forthcoming responses to Interrogatories 1, 3, 9, and 11.  *Id.*

Defendants' July 1, 2019 letter, sent during a known two-week absence by Liaison Counsel (*see* Tuccillo Decl. ¶¶31, 34), suggested more talk instead of providing the requested information. *See* Exh. BB.  Defendants' July 17, 2019 email (*see* Exh. CC), sent days after Liaison Counsel's return, transmitted Supplemental Responses and Objections to Plaintiffs' Interrogatories 1, 3, and 9 (*see* Exh. DD) ("Supplemental Responses"), which ***ignored*** Interrogatory 11 and gave ***identical*** answers to Interrogatories 1, 3, and 9.  *Id.*  Incredibly, **14 weeks** after the 4/5/2019 Letter and **28 months** after the March 21, 2017 Letter Agreement, Defendants identified just **_seven_** new custodians beyond those in their May 23, 2017 letter.  *Id.*  They did not provide other requested information, like a substantive explanation why ADS-only class action custodians were omitted.

Plaintiffs' July 22, 2019 email (*see* Exh. EE) asked when to expect an Interrogatory 11 response and transmitted a revised Appendix C (Exh. FF), adding the seven newly-disclosed

custodians (tagged with new code "E").  Defendants' July 23, 2019 email provided no substantive response, and while paying lip service to more "discussion," expressly "reiterate[d] our previously stated objections, including that any custodial searches be limited to individuals who were present at meetings where an alleged misstatement was made."  *See* Exh. GG.

> ### 2.  Documents Regarding "*Any* Direct Communications" With Plaintiffs And Their Outside Investment Managers

Regarding direct communications with Plaintiffs and their outside investment managers, the March 21, 2017 Letter Agreement (Exh. G at 2) stated:

> Defendants **will work with** [ ] Plaintiffs to develop and utilize reasonable search terms to identify responsive documents evidencing ***any direct communications*** (emails, letters, teleconferences, meetings, etc.) between BP and [ ] Plaintiffs and/or their outside investment managers who managed their relevant BP investments.

This provision encompassed "***any***" direct communications between BP and Plaintiffs and/or their outside investment managers, <u>not</u> just *meetings* as versus other forms of communication and <u>not</u> only those that were alleged in a Plaintiffs' complaint.  The March 21, 2017 Letter Agreement also stated, with regard to this requirement (and others), "The relevant time period to be employed for ***all*** the foregoing will be the ***broadest*** 'Relevant Time Period' pled in any of [ ] Plaintiffs' operative complaints."  *Id*.  The broadest such period is November 22, 2006 through June 25, 2010, per the operative *Universities* action complaint.  *See* MDL 2185 Dkt. No. 1247, ¶1.

Plaintiffs intentionally negotiated this language.  Given their burden under English law to establish claim elements including their reliance (often via investment managers) and Defendants' intent to induce reliance and intent to deceive, it is ***imperative*** that Plaintiffs get discovery into ***all*** direct communications with BP – <u>not</u> only those alleged in a complaint and <u>not</u> only those giving rise to an alleged misstatement.  Thus, Plaintiffs' 2016 motion sought to compel Defendants to produce documents regarding *all* meetings and direct communications, not only those alleged in a complaint (*see* §II.B., *supra* (citing MDL 2185 Dkt. No. 1383-1 at 2-3, 6, 8, 11-12)) and to use the full "Relevant Time Period" as defined in Plaintiffs' complaints and discovery requests.  *Id.* (citing

MDL 2185 Dkt. No. 1383-1 at 2, 6-7, 9, 12-15).   As stated in the March 21, 2017 Letter Agreement, Plaintiffs' withdrew that 2016 motion, without prejudice, in exchange for Defendants' agreement to the above-quoted provisions and its other obligations.  *See* Exh. G at 1.

Defendants have actively, continuously, and unambiguously violated these provisions of the March 21, 2017 Letter Agreement.   In doing so, Defendants have revived the same obstructionist positions that led Plaintiffs to file their earlier 2016 motion to compel.

Plaintiffs' 4/5/2019 Letter transmitted their "Appendix B: Search Terms for Plaintiffs + Outside Managers" and Appendix C listing custodians.  *See* Exh. H at 3.  To that point, Defendants had not worked with Plaintiffs to develop and utilize search terms as required by the March 21, 2017 Letter Agreement, despite working with dozens of subpoenaed investment managers on search terms.   The Appendix B searches used a simple formula, pairing well-understood terms used to describe direct communications [4] with the key words from the names of Plaintiffs and their managers.  *See* Exh. J.  As per the March 21, 2017 Letter Agreement, Appendix B used the "Search Term Period" (*id.*), defined in the 4/5/2019 Letter as the broadest "Relevant Time Period" alleged in a complaint, *i.e.*, November 22, 2006 - June 25, 2010, as pled in the *Universities* complaint.  *See* Exh. H at 2-3.  Plaintiffs' Appendix C listed 78 custodians, with a legend describing the reason(s) each was listed.   *See* §II.G.1., *supra*; Exh. K.   Thirty-six were either named Defendants or witnesses specifically alleged in Plaintiffs' complaints.  *See* Exh. K.  The rest were identified as custodians by Defendants and/or were as custodians in the parallel ADS-only class action.

***Three weeks*** later, Defendants ***conceded*** that ***hit counts*** should guide discussions over revisions.   Their April 26, 2019 email provided "initial comments" on Appendix B that "remain subject to modification based on *hit count*, technical scoping and other related concerns."  *See* Exh. O.  They proposed one-word deletions in line edits to seven of 25 Appendix B searches, without

---

[4]      With "*" as a root expander, Appendix B searches used the words teleconference*, "meet*, conference*, call*, interview*, presentation*, note*, question*, email*, message*, concern*, "one on one," "one to one," or "1-to-1," which were alleged in Plaintiffs' complaints to describe forms of direct communications. Appendix B otherwise used words associated with such direct communications, like questions or concerns that prompted them or notes taken during them.

explanation.  *See* Exh. Q.  Significantly, Defendants did ***not*** propose ***any*** revisions to the "Search Date Range" of ***any*** of the 25 Appendix B searches, each of which used the full "Search Term Period."  *Id.*  They did not oppose or comment on the Appendix C custodians list.  *See* Exh. O.

On May 17, 2019, Plaintiffs asked Defendants for the basis of their seven one-word revisions to the Appendix B searches and asked them to confirm that their silence on Appendix C signified agreement to it.  *See* Exh. R.  The same day, Defendants sent a one-line email stating, "[W]e do not agree to your custodian list at this time."  *See* Exh. S. Another ***three weeks*** elapsed.

On June 6, 2019, Plaintiffs again asked for the basis of the seven Appendix B revisions and for a substantive explanation as to any disagreement on Appendix C.  *See* Exh. T.

On June 13, 2019, ***<u>nine weeks</u>*** after Plaintiffs' 4/5/2019 letter, Defendants ***for the first time*** proposed ***far more extensive*** modifications to the Appendix B searches and Appendix C custodians list.  *See* Exh. U.  They abandoned their seven, one-word revisions to Appendix B and instead provided a competing appendix (*see* Exh. W) ("Defendants' App. B"), which proposed running just ***five*** of Plaintiffs' 25 searches on only limited custodians, each subject to a severe ***two-month*** time period restriction in direct violation of the March 21, 2017 Letter Agreement's above-quoted provisions.[5]  They did not provide search term hit counts or fact-based data to support these proposals, nor did they explain why it took 2.5 months to generate them.  Instead, they said they would search a "centralized electronic repository maintained by BP Investor Relations" for "documents relating to all ***alleged*** meetings between [ ] Plaintiffs or their investment managers and BP" – a restriction that directly violates the March 21, 2017 Letter Agreement.  They otherwise generally pointed to their prior productions in MDLs 2179 and 2185.[6]

---

[5]     Specifically, Defendants' App. B proposed to run only the following Appendix B searches, all subject to a two-month time restriction:  Search #18 (1 custodian), Search #19 (2 custodians), Search #23 (4 custodians), Search #24 (13 custodians), Search #25 (10 custodians).

[6]     Having already searched BP's prior MDL 2179 and MDL 2185 productions, Plaintiffs knew that they contained no documents responsive to their Appendix B searches, which is not surprising given the different purposes for which those productions were made.

Plaintiffs' June 20, 2019 letter explained that the March 21, 2017 Letter Agreement's above-quoted provisions required Defendants to produce documents evidencing "*any*" direct communications with Plaintiffs and their managers, not just those alleged in a complaint, and sought confirmation that Defendants would comply.  *See* Exh. X at 2, 7.  It stated that, 10 weeks after Plaintiffs' 4/5/2019 Letter and just two months before the document production cutoff, Plaintiffs' Appendix B searches should be run as written, using their text and Search Term Period, and asked for confirmation.  *Id.* at 2-3, 7-8.  After explaining deficiencies in Defendants' counter-proposals, with express references to Plaintiffs' complaints (*id.* at 6-7),[7] it sought confirmation that Plaintiffs' searches would be run on the Appendix C custodians.  *Id.* at 7-8.  Last, it responded that a "centralized repository" search was a necessary but not sufficient step, stated that all locations or repositories that might house responsive documents must also be searched using Plaintiffs' appendices, and asked for confirmation.  *Id.* at 1, 7.  The letter stated Plaintiffs' intent, absent the requested confirmations, to proceed with a motion to compel (*id.* at 8), a point reiterated during an email exchange on June 21, 2019.  *See* Exh. Y.

Defendants' June 24, 2019 letter said "centralized repository" searching had begun, but did not confirm Plaintiffs' Appendix B searches were used.  *See* Exh. Z at 1.  It proposed many restrictions, without *any* hit count or fact-based reason, in direct violation of the March 21, 2017 Letter Agreement.  It pressed for an *even more restrictive* scope limitation to cover only a "meeting or other type of direct communication (including e-mail, etc.) *wherein an alleged misstatement was made*."  *Id.* at 3.  Under this new approach, it was insufficient if a direct communication was

---

[7]     Plaintiffs' letter used the example of Giles Mackey, BP's Manager of Extra Financials and Investor Relations, among the most active communicators with BP investors at relevant times, for whom Defendants proposed a time restriction that did not encompass direct communications he had with Plaintiff USS that were *alleged* in USS's complaint.  *Id.* at 6-7 (citing MDL 2185 Dkt. No. 1247, ¶¶500-501).  It listed eight custodians from Plaintiffs' Appendix C who were alleged to have met with Plaintiffs or their investment managers but who Defendants excluded.  *Id.* at 7.  It directed Defendants to the Pomerantz firm's complaints for examples of the broad array of alleged direct communications (emails, calls, meetings, etc.) at issue.  *Id.* at 6 n.2.  *See also* Exh. B (Plaintiffs' First Interrogatories) ¶9(a)-(xx) at 18-24 (listing 50 such direct communications); Exh. E (Plaintiffs' Second Interrogatories ¶9(a)-(dddd) (listing 82 such direct communications).

alleged so as to establish intent to induce reliance and reliance – as so many were alleged in Plaintiffs' complaints (*see, e.g.*, n.7 *supra* (citing Exh. B ¶9(a)-(xx) and Exh. E ¶9(a)-(dddd) (listing 132 total emails, calls, meetings, and other direct communications))) – it had to be alleged specifically as a *misstatement*. It sought to restrict Plaintiffs' Appendix C to "27 custodians who were actually present *when an alleged misstatement* was made." *Id.* It also sought to impose an arbitrary time restriction of one month before and after each communication of that limited subset. *Id.* Last, it revived their seven one-word revisions to the Appendix B searches. *Id.*

Plaintiffs' June 28, 2019 letter sought confirmation that Defendants were searching not only a "centralized electronic file repository," but also other locations with potentially responsive documents, and that they were using Plaintiffs' search terms. *See* Exh. AA at 1. It sought an estimated date for production. *Id.* It reiterated the elements of Plaintiffs' English law claims (*e.g.*, reliance, intent to induce reliance), reminded Defendants of their obligation under the March 21, 2017 Letter Agreement to "work with [ ] Plaintiffs to develop and utilize search terms," and reiterated the Agreement's mandate that "documents evidencing *any* direct communications" with Plaintiffs or their managers be produced. *Id.* at 2-3. It stated that dialogue was hampered by Defendants' refusal to test Plaintiffs' searches and provide hit counts and a data-based rationale for restrictions – the same process the parties were using with subpoenaed managers. *Id.* It asked for *explanations* for temporal or topical limits, and said that absent of any, Plaintiffs would move to compel that their Appendix B searches must be run on their Appendix C custodians. *Id.* at 3.

No explanation was ever given. Defendants' July 1, 2019 letter – just six weeks before the document production cutoff – offered no substantive response or new content. *See* Exh. BB. It merely suggested more discussion. *Id.* After Defendants identified seven new custodians on July 17, 2019 (*see* Exhs. CC-DD), Plaintiffs updated their Appendix C on July 22, 2019. *See* Exhs. EE-FF. On July 23, 2019, Defendants reiterated their previously-stated objections, including that searches be limited to "meetings where an alleged misstatement was made." *See* Exh. GG.

### 3. Documents Regarding "*All* Alleged Misstatements" In Plaintiffs' Complaints

The March 21, 2017 Letter Agreement (Exh. G at 1-2), while articulating a "focus" for the parties' efforts, expressly required production of documents regarding *all* alleged misstatements, whether or not they had also been pursued in the parallel ADS class action or previously had been dismissed (*e.g.*, due to unclear scienter) in Plaintiffs' lawsuits.  It stated, in relevant part:

> Defendants **will work with** [ ] Plaintiffs to develop and utilize reasonable search terms to identify non-duplicative, non-privileged and responsive documents concerning **all alleged misstatements** in [ ] Plaintiffs' complaints, with the focus being the identification of documents related to newly-alleged misstatements not previously at issue during Defendants' prior discovery efforts in the parallel ADS-only class case and in MDL 2179.  Such terms would be applied across the relevant time period, without limited date restrictions.  Where possible and mutually agreeable, the parties may employ reasonable date parameters, to a given search, *e.g.*, limiting a search solely focused on a post-spill-only concept such as oil flow rate solely within a time period that post-dates the oil spill.  Such limitations, if any, will be discussed later.

It added, "The relevant time period to be employed for **all** the foregoing will be the **broadest** 'Relevant Time Period' pled in any of [ ] Plaintiffs' operative complaints" (*id.*), which as discussed above is November 22, 2006 through June 25, 2010.  *See* MDL 2185 Dkt. No. 1247, ¶1.

Plaintiffs negotiated these provisions, after having no involvement in negotiating the prior searches used and productions done in MDLs 2179 and 2185, and given their pursuit of English law claims, with different elements (*e.g.*, intent to induce reliance, reliance, and intent to deceive), over a different time period.  Plaintiffs' 2016 motion had sought to compel Defendants to produce documents regarding *all* alleged misstatements, whether or not alleged in the ADS-only class action or previously dismissed (*e.g.*, due to unclear scienter) (*see* §II.B., *supra* (citing MDL 2185 Dkt. No. 1383-1 at 3, 7-8, 9, 15-17)), from the entire "Relevant Time Period" (*id.* at 2, 6-7, 9, 12-15).  As stated in the March 21, 2017 Letter Agreement, Plaintiffs' withdrew that 2016 motion, without prejudice, in exchange for Defendants' agreement to these provisions.  *See* Exh. G at 1. Defendants have violated them, reviving their arguments that prompted Plaintiffs' 2016 motion.

Instead of working with Plaintiffs to develop and utilize search terms concerning the alleged misstatements, Defendants pressed Plaintiffs to first review the "millions" of documents in the MDL 2179 / 2185 productions.  After doing so at significant cost (*see* §II.F., *supra*), and after considering the meager results, the search terms used by others to generate the MDL 2179 / 2185 productions, and the search terms that Plaintiffs tested and used during their later database review of those earlier productions, Plaintiffs' 4/5/2019 Letter transmitted their "Appendix A: Search Terms for Misstatements" and their Appendix C custodians list.  *See* Exh. H at 2-3.  Appendix A lists 39 highly-targeted search terms focused on the alleged misstatements.  *See* Exh. I.  Though the March 21, 2017 Letter Agreement sets the entire Relevant Time Period as the default, most Appendix A searches (29 of 39) are limited to a narrow, customized date range of six to eight weeks around a specific misstatement.  *Id.*  As discussed above (§II.G.1.), Appendix C listed custodians with a legend explaining the reason(s) for each.  *See* Exh. K.

On April 26, 2019, Defendants ***conceded*** that hit counts should drive any analysis of search terms, by conveying "initial comments" on the Appendix A searches that "remain subject to modification based on *hit count*, technical scoping and other related concerns."  *See* Exh. O. Defendants relayed ***no revisions*** to the wording or time period of nine Appendix A searches (Searches #1, 4-7, 9-11, 14).  *See* Exh. P.  Without stating hit counts or other substantive reasons, they relayed wording revisions, ***but no time period comments***, for 10 more searches (Searches #3, 8, 13, 15-18, 24-26) and proposed total deletion of the other 20 searches (Searches #2, 12, 19-23, 27-39).  *Id.*  They did not oppose or comment on the Appendix C custodians list.  *See* Exh. O.

On May 17, 2019, Plaintiffs conveyed that, given their efforts to that point, they would not indulge a protracted standoff and asked for the reasons for any search term line edits or deletions, including pre- and post-revision hit counts and any other credible burden-based rationale.  *See* Exh. R.  Plaintiffs also sought confirmation that Appendix C was unopposed (*id.*), prompting Defendants' one-line email stating their disagreement, without explanation.  *See* Exh. S.

On June 6, 2019, ***two full months*** after Plaintiffs sent their 4/5/2019 Letter, Plaintiffs again sought the requested substantive reasons for any revisions or deletions to their Appendix A

searches, including pre- and post-revision hit counts, and for any disagreements with their Appendix C custodian list.  *See* Exh. T.  Plaintiffs stated, "[I]f you are refusing to engage or otherwise commit to a response, we will also consider the issue ripe for a motion to compel."  *Id.*

Defendants' June 13, 2019 letter proposed *more extensive* revisions to Appendices A and C.  *See* Exh. U.  It used the MDL 2179 / 2185 productions and the March 21, 2017 Agreement's reference to a "focus" (not a *limitation*) on newly-alleged misstatements as excuses to not even test Plaintiffs' search terms, despite their facially different wording, thereby precluding fact-based dialogue informed by hit counts.  *Id.* at 1-3.  They refused to run 19 searches about the post-spill period (Searches #32-38),[8] the Baker Panel (Searches #29-31), overlapping misstatements from the ADS class case (Searches #2, 12, 19, 20, 22, 27, 28), and BP's exploration and spill response plans (Searches #21, 23).  *Id.*  They otherwise ***did not substantively address*** the other 20 searches (Searches #1, 3-11, 13-18, 24-26, 39).  *Id.*  Instead, they appended a competing "Defendants' App. B," which, without hit counts or fact-based explanation, proposed to run Plaintiffs' Appendix A Searches #1, 3-7, 9, 11, 13, 15-18, 24-25, 32-34, 37-38 on just ***one*** Appendix C custodian each and Searches #8, 10, 14, 26 on only ***two*** Appendix C custodians each.  *See* Exh. W.

Plaintiffs' June 20, 2019 letter refuted Defendants' arguments regarding the sufficiency of the MDL 2179 / 2185 productions.  *See* Exh. X at 1-2.  It highlighted the differences (text, time period, custodian) between Plaintiffs' Appendix A searches and the ADS class searches, explained that de-duplication and threading software could eliminate duplicate search hits, and stated that Defendants had not shown any actual burden.  *Id.* at 3, 4-5.  It again sought a markup of Plaintiffs' Appendix C with substantive reasons for revisions.  *Id.* at 4.  It rejected Defendants' new, more restrictive search proposals as insufficient, but said that any uncontested searches should be run without further delay.  *Id.*  It sought confirmation that Defendants would run the Appendix A searches as written on the Appendix C custodians or that their June 13, 2019 letter was a "final

---

[8]     Defendants also pointed to their review of Defendant Hayward's post-spill emails from April 20 – May 28, 2010 (a date range spanning only ***half*** the post-spill period at issue in Plaintiffs' complaints, which run through June 24, 2010).

position." *Id.* at 4-5.  Absent such confirmations, it stated Plaintiffs' intent to move to compel (*id.* at 8), a point reiterated during an email thread on June 21, 2019.  *See* Exh. Y.

Defendants' June 24, 2019 letter reiterated their positions on the Appendix A searches.  *See* Exh. Z at 1-3.  In a footnote, they for the first time claimed that "BP would need to ***re-collect*** custodial documents" and "***upload***[ ] collected documents to a review platform" (*id.* at 2 n.1) – which, if referring to prior-collected documents, ignored the far more obvious path of simply reviving prior databases from a near-line or archival posture.  The footnote claimed that, despite de-duplication and threading software, "BP would still have to review the much larger set of documents that likely were identified by prior search terms but determined to be non-responsive after review" – a point that assumes Defendants failed to previously code non-responsive documents as such and/or failed to preserve that coding for use during Plaintiffs' discovery.

Plaintiffs' June 28, 2019 letter stated that Defendants' refusal to test Plaintiffs' search terms and provide hit counts was hampering dialogue.  *See* Exh. AA at 2.  It challenged the validity of Defendants' footnoted points, given that they would be expected to maintain prior databases in revivable format, so that sorting out non-responsive documents would be simple and de-duplication and threading software would work as Plaintiffs stated.  *Id.* at 2-3.  It said that if Defendants, in actuality, had dismantled their databases completely, during active litigation, they must bear the self-created burden to reconstitute them and would face penalties for spoliation if they could not do so.  *Id.* at 3.  Otherwise, it said that Defendants must run Plaintiffs' Appendix A searches, which were new and untested, and that Plaintiffs would move to compel.  *Id.* at 3, 4.

Defendants' July 1, 2019 letter and July 17, 2019 email provided no new information (*see* Exh. BB, CC), and their July 23, 2019 email "reiterate[d] our previously stated objections, including that any custodial searches be limited to individuals who were present at meetings where an alleged misstatement was made."  *See* Exh. GG.

## III.   ARGUMENT

### A.   The Applicable Legal Standards Favor Discovery

"[D]iscovery rules are to be accorded a broad and liberal treatment." *Fannie Mae v. Hurst*, 613 F. App'x 314, 316 (5th Cir. 2015) (quoting *Hickman v. Taylor*, 329 U.S. 495, 507 (1947)); *see also Dollar v. Long Mfg. N.C., Inc.*, 561 F.2d 613, 616 (5th Cir. 1977) ("discovery '. . . together with pretrial procedures make a trial less a game of blind man's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent"); Fed. R. Civ. P. 26(b)(1) (non-privileged materials and information discoverable if "relevant to any party's claim or defense" and "proportional to the needs of the case").

"The party requesting discovery may move the court to compel disclosure of any materials requested, provided that they are relevant and otherwise discoverable." *Widevine Techs., Inc. v. Verimatrix, Inc.*, No. 2-07-cv-321, 2009 WL 4884397, at *1 (E.D. Tex. Dec. 10, 2009) (citing Fed. R. Civ. P. 37).  The resisting party must then "articulate specifically how each discovery request is not relevant or is overly broad, burdensome, or oppressive." *Id.* (quoting *Export Worldwide, Ltd. v. Knight*, 241 F.R.D. 259, 263 (W.D. Tex. 2006)); *see also Lopez v. Don Herring Ltd.*, 327 F.R.D. 567, 580 (N.D. Tex. 2018) ("party resisting discovery must show specifically how each discovery request is not relevant or otherwise objectionable") (citing *McLeod, Alexander, Powel & Apffel, P.C. v. Quarles,* 894 F.2d 1482, 1485 (5th Cir. 1990) (party resisting discovery "must have a valid objection to each [request] in order to escape the production requirement")).  To do so, it "must submit affidavits or offer evidence revealing the nature of the burden." *Kipp v. Laubach*, No. 3:17-CV-67-S, 2019 WL 3219801, at *1 (N.D. Tex. July 17, 2019) (citing *Merrill v. Waffle House, Inc.*, 227 F.R.D. 475, 477 (N.D. Tex. 2005)); *see also SEC v. Brady*, 238 F.R.D. 429, 437 (N.D. Tex. 2006) ("party asserting undue burden typically must present an affidavit or other evidentiary proof of the time or expense involved in responding to the discovery request").

### B.   The March 2017 Letter Agreement Is Binding And Must Be Enforced

Courts will enforce agreements between parties to litigation regarding discovery, both as a Fed. R. Civ. P. 29(b) stipulation and under basic contract law.  *See Widevine*, 2009 WL 4884397 at

*2; *Valenzuela v. Willette*, No. 5:14-cv-62, 2014 WL 12620827, at *2 (S.D. Tex. Nov. 28, 2014). Rule 29(b) "allows parties to stipulate to 'procedures governing or limiting discovery.'" *Widevine*, 2009 WL 4884397, at *2 (quoting Fed. R. Civ. P. 29(b)). "The self-evident purpose of this rule is to encourage agreed-upon, lawyer-managed discovery and to eliminate the cost, effort and expense involved in court intervention in discovery through motion practice." *Id.* (quoting *Lee v. Cent. Gulf Towing, L.L.C.*, No. Civ. A-04-1497, 2004 WL 2988478, at *2 (E.D. La. Dec. 9, 2004)).

The March 21, 2017 Letter Agreement (Exh. G), part of a two-agreement negotiated resolution to all discovery disputes pursuant to which Plaintiffs have already produced substantial materials, is binding upon Defendants and is enforceable by the Court via this Motion. *See, e.g.*, *Widevine*, 2009 WL 4884397, at *2 (where parties reached agreement on scope of discovery, and one of them has acted in reliance on it, by producing materials with the intent that the agreement is mutually binding, the court will enforce its terms); *Lee*, 2004 WL 2988478 at *2 (enforcing agreement by counsel regarding order of discovery, as "[t]he orderly and efficient conduct of discovery depends to a large extent on the cooperation of counsel, who must be able to rely upon the agreements they make"); *Valenzuela*, 2014 WL 12620827, at *3-*4 (enforcing discovery letter agreement based on its express terms). Defendants cannot credibly argue otherwise.

## C.    Defendants Have Not Quantified Or Otherwise Articulated *Any* Burden

Plaintiffs have detailed their costly efforts (*see* §II.F., *supra*) to confirm that the additional discovery required by the March 21, 2017 Letter Agreement is needed. By contrast, Defendants have not quantified or otherwise articulated *any* burden to providing the discovery sought herein, let alone an undue or oppressive one, despite Plaintiffs' repeated requests for search hits and data-driven metrics to inform dialogue on the Appendix A and B search terms and for an Appendix C markup with substantive explanations for any proposed custodian limits. They have fallen far short of the required showing to resist this necessary and bargained-for discovery. *See, e.g.*, *Kipp*, 2019 WL 3219801, at *1 (affidavits or evidence must reveal the nature of the burden) (citing *Merrill*, 227 F.R.D. at 477); *Brady*, 238 F.R.D. at 438 (same).

- 20 -

Defendants' only attempt to do so was *12 weeks* after Plaintiffs' 4/5/2019 Letter, in a footnote that failed to recite hit counts or metrics to address Plaintiffs' uncontested assertion that de-duplication and threading software will cost-effectively reduce duplicative efforts.  Instead, it cited only Defendants' self-created "burden" of "re-collecting custodial documents," "uploading collected documents to a review platform," and "review[ing] the much larger set of documents that likely were identified by prior search terms but determined to be non-responsive after review." *See* §II.G.3. (quoting Exh. Z at 2 n.1).  As stated in Plaintiffs' June 2, 2019 letter, Defendants are in active litigation with clear preservation and discovery obligations arising from Plaintiffs' 2016 discovery requests and the March 21, 2017 Letter Agreement, in which context they should have preserved, in near-line or other archival posture, their prior databases and document coding.  *Id.*; Exh. AA at 2.  If they failed to do so, Defendants bear their self-created "burden" and any related reconstitution costs and face penalties for any spoliation of the Electronically Stored Information (ESI) necessary to respond to Plaintiffs' requests.  *Id.* at 3, 4; *see also* Fed. R. Civ. P. 37(e).

### D.     Prior MDL 2179 / 2185 Productions Do Not Alleviate Defendants' Obligations

The "millions" of documents produced in MDLs 2179 / 2185 resulted from efforts that *did not involve Plaintiffs* – in response to different requests, by different parties, using different search terms, in different cases, raising different claims.  By pointing to those productions, but not providing any list or guidance as to which specifically are responsive to Plaintiffs' requests or discoverable under the March 21, 2017 Letter Agreement, Defendants forced Plaintiffs to try and 'prove a negative' as far as the productions' insufficiency.  As a result, over a year, Plaintiffs spent $350,000.00; employed de-duplication, threading, and analytics; designed and used search terms; and devoted 9,000+ attorney review hours to identify just 18,500 substantively relevant documents from those productions – a responsiveness rate of just *1.14%*. *See* §II.F., *supra*.

This work led Plaintiffs to design new, never-before-run Appendix A and B search terms. *See* §II.G.2.-3., *supra*; Exhs. I and J.  For Defendants to oppose them, to the point of refusing to test-run them (even on new custodians), they must, at least, identify the specific documents from

prior productions that are purportedly responsive to Plaintiffs' requests. *See, e.g.*, *Ntakirutimana v. Cmty. Health Sys., Inc.*, No. L-09-114, 2012 WL 12894293, at *5 (S.D. Tex. July 16, 2012) (stating "it is difficult for the Court to resolve this he-said-she-said standoff without knowing exactly what information has been produced up until now" and ordering Defendants, who had already "reviewed this [prior] production for its relevance to this case" to file an advisory report with the Court in 10 days listing, *inter alia*, "the bates number for each [prior-production] item produced to Plaintiffs"); *Am. Airlines, Inc. v. Travelport, Ltd.*, No. 4:11-CV-244-Y, 2012 WL 12884821, at *2 (N.D. Tex. May 29, 2012) (ordering new searches to be run and supplemental production to be made, despite earlier production of documents from same custodians, where, *inter alia*, later case involved a different time frame and different claims, the new searches were not identical, and party opposing discovery failed to show how much additional expense or burden the new searches would cause).

### E.   Defendants Must Fully Disclose And Search Pertinent Custodians

As discussed in §II.G.1. *supra*, under the March 21, 2017 Letter Agreement, Defendants must answer Plaintiffs' Interrogatories 1, 3, 9, and 11, designed to identify document custodians. *See* Exh. G at 1.  After serving an initial list of 32 in May 2017, Defendants failed to update it or to respond to these Interrogatories for 2 years.  Plaintiffs' April 5, 2019 letter served a 78-custodian Appendix C, updated in July 2019, with a legend stating five uncontested reasons why each was listed (*see* Exhs. K and FF).  Plaintiffs thereafter pressed for the required Interrogatory responses, asked why Defendants failed to disclose 100+ custodians from the ADS class case, and pushed for Plaintiffs' Appendix A and B searches to be run on the Appendix C custodians.

Defendants have obstructed. *See* §II.G.1.  They have not answered Interrogatory 11, refuse to provide a markup of Appendix C with substantive explanations for proposed topical custodian limits, and refuse to explain why ADS class case custodians were not disclosed for Plaintiffs' discovery.  Their competing "Defendants' App. B" (Exh. W), served June 13, 2019, proposed to run only limited searches on just 26 custodians.  A month later, their Supplemental Responses

(Exh. DD) to Interrogatories 1, 3, and 9 (but not 11) listed 40 custodians – 18 of whom were *excluded from their own searches*.  The March 21, 2017 Letter Agreement requires searches for documents concerning "*all* alleged misstatements" in Plaintiffs' complaints and for "*any* direct communications" between Plaintiffs or their managers and BP.  Yet, Defendants insist they will only search for documents regarding either misstatements not at issue in the ADS class case or face-to-face meetings where an alleged misstatement occurred, and only on custodians "who were actually present when an alleged misstatement was made" (Exh. Z).

None of these maneuvers, which violate the March 21, 2017 Letter Agreement, was backed by search hits or any other data-driven, metrics-based consideration that would evidence an actual burden.  Defendants' actions are wholly insufficient to resist searching the records of a proposed document custodian, particularly ones never searched before.  *See, e.g.*, *Pan Am. Life Ins. Co. v. La. Acquisitions Corp.*, No. 13-5027, 2015 WL 4168435, at *4 (E.D. La. July 9, 2015) (denying motion to compel searching of a custodian's records only where the custodian's name was used as a search term and Defendants averred before the court, under penalty of contempt and sanctions, that they had already produced documents related to that custodian).  At this point, Plaintiffs respectfully submit that Defendants should be ordered to use Plaintiffs' revised Appendix C, as it might be augmented after Defendants – within 10 days – respond to Interrogatory 11 and disclose all custodians used in the parallel ADS-only class action.

F. **Defendants Should Be Ordered To Run Plaintiffs' Appendix A & B Searches**

In a search term dispute, the party resisting use of proposed search terms must report objective metrics like hit counts, time needed to review and process documents, and estimated monetary costs of doing so.  *See, e.g.*, *Shaw Grp. Inc. v. Zurich Am. Ins. Co.*, No. 12-257-JJB-RLB, 2014 WL 4373210, at *5-*6 (M.D. La. Sept. 3, 2014) (crediting argument by party opposing search terms, where it represented that those terms – which used generic words such as "settle," "claim," or "defense" to be run on custodians such as attorneys and risk managers – would generate 103,202 emails with 20,000 attachments that would take 10-12 weeks to review

and 2 weeks for redactions and a privilege log, with costs between $550,000 - $650,000).  A party must articulate a greater burden than the fact that searches will likely require review of thousands of emails.  *See, e.g.*, *Kleppinger v. Tex. Dep't of Transp.*, No. L-10-124, 2012 WL 12893654, at *4 (S.D. Tex. Aug. 23, 2012) ("Although the ordered searches will likely require Defendant [ ] to review thousands of emails, any risk of overproduction does not outweigh the benefit of finding potentially relevant emails that cannot be obtained otherwise"), *aff'd*, 2013 WL 12137773 (S.D. Tex. Jan. 24, 2013).

Defendants have presented *no fact-based rationale*, despite conceding that "hit counts" should drive assessment of search terms.  *See* §§II.G.2.-3., *supra*.  Other than pointing to the vast, unorganized MDL 2179 / 2185 productions, an invalid basis to oppose Plaintiffs' search terms (*see* §III.D., *supra*), in a letter footnote *three months* after receiving Plaintiffs' Appendices A and B, Defendants only alluded to potential costs caused by their own failure to maintain prior databases in near-line or archival posture and/or to preserve prior document coding.  *See* §II.G.3. (citing Exh. Z at 2 n.1).  This speculation, highlighting only Defendants' potential failure to preserve evidence, falls far short of the showing required to oppose e-discovery.  "A party resisting the production of relevant electronically stored information must submit evidentiary proof 'that the information is not reasonably accessible because of undue burden or cost.'"  *Am. Airlines,* 2012 WL 12884821, at *2 (quoting Fed. R. Civ. P. 26(b)(2)(B)).  *See also Auto Club Family Ins. Co. v. Ahner*, No. 05-5723, 2007 WL 2480322, at *3 (E.D. La. Aug. 29, 2007) (denying motion to quash and ordering nonparty to produce requested ESI within 10 days where it failed to "make an evidentiary showing that the data sought is not reasonably accessible because of undue burden or cost," as "[t]he statement of a lawyer in a memorandum that the electronic information is not readily accessible or that it would be unduly burdensome to comply with the request is not evidence").

The *American Airlines* decision is instructive.  There, like here, a party (Travelport) resisted discovery by "claim[ing] that it has already produced relevant documents from most of the employees American has identified" as part of earlier litigation and investigations.  *See* 2012 WL 12884821, at *2.  The court rejected this argument, because, like here, that party "has not …

satisfactorily demonstrated that a search of these employees would produce purely duplicative documentation." *Id.* The court noted, like here, that the prior investigation involved different time frames and claims, and that the party seeking discovery (American) had not contributed to the prior search terms. *Id.* It observed that, like here, "Travelport has never asserted that the search parameters used [previously], including the search terms and time period searched, are identical to the search parameters set by the parties here, which means that a search of the requested employees could yield additional documents not found as part of the [earlier effort]." *Id.* The court also found that, like here, "Travelport has also failed to show how much additional expense or burden these searches would produce because it has only provided the cost it has incurred thus far, not the potential cost of any additional production." *Id.* at \*3. On these facts, the court **ordered the new searches to be undertaken**: "Travelport must perform the requested searches so that American can have the opportunity to obtain any relevant information that has not already been discovered." *Id.*

Defendants have not satisfied their burden to oppose Plaintiffs' searches, have violated the March 21, 2017 Letter Agreement, and have revived their obstructionist arguments that had prompted Plaintiffs' 2016 motion to compel. At this point, Plaintiffs respectfully urge the Court to order Defendants to run Plaintiffs' Appendix A and B searches, as written, on Plaintiffs Appendix C custodians list, as it might be further revised per §III.E., *supra*. Given the 16 total months Plaintiffs have spent negotiating these issues (*see* p. 1 and §1, *supra*), and the upcoming document production cutoff, any counter-argument by Defendants claiming ongoing willingness to discuss search terms or that the issue is not yet ripe should be rejected. *See, e.g.*, *Halleen v. Belk, Inc.*, No. 4:16-cv-55, 2018 WL 3735579, at \*3 (E.D. Tex. Aug. 6, 2018) (in light of ongoing discovery disputes and inability to cooperate, rejecting Defendant's contention that "parties are still working on agreed search terms and have yet to reach an impasse" and ordering Defendants to provide complete interrogatory answers and Plaintiffs' requested ESI).

## IV.    CONCLUSION

For all these reasons, Plaintiffs respectfully request that the Court grant their Motion.

Dated: July 31, 2019           Respectfully Submitted,

**POMERANTZ LLP**
<u>/s/ Matthew L. Tuccillo</u>
Jeremy A. Lieberman
Matthew L. Tuccillo
Jessica N. Dell
Jennifer Banner Sobers
600 Third Avenue, 20th Floor
New York, NY 10016
(212) 661-1100
(212) 661-8665 (Fax)

***Individual Action Plaintiffs Steering Committee &***
***Individual Action Plaintiffs' Liaison Counsel***

**KESSLER TOPAZ MELTZER & CHECK, LLP**
Geoffrey C. Jarvis
Matthew Mustokoff
Darren J. Check
Gregory M. Castaldo
Michelle M. Newcomer
Margaret Mazzeo
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706
(610) 667-7056 (fax)

**KIRBY MCINERNEY LLP**
Daniel Hume
Ira M. Press
Meghan Summers
Angela Farren
825 Third Ave
New York, NY 10022
Tel: 212.371.6600
Fax: 212.751.2540

**SPECTOR ROSEMAN & KODROFF, P.C.**
Robert M. Roseman
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Tel.: (215) 496.0300
Fax: (215) 496.6611

***Individual Action Plaintiffs' Steering Committee***

- 26 -

## **CERTIFICATE OF CONFERENCE**

I hereby certify that Plaintiffs' counsel made a good-faith effort to confer about the disposition of this motion by extensively writing, emailing, and speaking telephonically with Defense counsel over the course of 16 total months, including four months in 2019, as described more fully in §II.B., *supra*, and in Tuccillo Decl. ¶¶4-40 and Exhs. A-GG thereto.  Despite these time-consuming efforts and the impending document production cutoff, the parties were unable to reach agreement on the matters discussed herein.

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 31, 2019, a copy of the foregoing was served by me via ECF notification on the counsel of record for all Defendants, with an email copy also sent to Mr. Marc De Leeuw and Mr. Matthew Peller at Sullivan & Cromwell LLP.

*/s/ Matthew L. Tuccillo*
Matthew L. Tuccillo, Esq.